**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**IN RE:**

**MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY LITIGATION (NO. II)**

**17-MD-2767 (PAE)**
**17-MC-2767 (PAE)**

***This Document Relates To All Actions***

---

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF LEMUEL A. MOYÉ, M.D., Ph.D

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 1

ARGUMENT ........ 3

I. Dr. Moyé's General Causation Opinion is Not Rooted in a Reliable Methodology. ........ 3

A. Dr. Moyé Failed His Own Standards for Causation. ........ 4

B. Dr. Moyé Cannot Support His General Causation Opinion with His Scattershot of Unreliable Evidence. ........ 5

1. The Available Epidemiological Study Data Cannot Reliably Establish Causation. ........ 5

a) The Etminan Cohort Study ........ 6

b) The Valenzuela Study ........ 7

c) Epidemiological Studies on Oral Contraceptives and IIH ........ 10

2. Dr. Moyé's Anecdotal Adverse Event Reports Cannot Provide a Reliable Basis to Support a Causation Opinion. ........ 11

a) Mirena Adverse Event Reports ........ 11

b) Norplant Adverse Event Reports ........ 12

3. Dr. Moyé's Biological Gradient Opinion Is Unfounded. ........ 14

4. Dr. Moyé's Mechanism Theory Should Be Excluded. ........ 15

a) Dr. Moyé Is Unqualified to Render a Mechanism Opinion. ........ 15

b) Dr. Moyé's Mechanism Theory Is Unreliable. ........ 16

C. Dr. Moyé Failed to Conduct a Reliable Bradford Hill Analysis. ........ 17

D. Dr. Moyé's Testimony Fails to Meet Any of the Reliability Factors. ........ 20

CONCLUSION ........ 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*,
524 F. Supp. 2d 1166 (N.D. Cal. 2007) ....................6

*Hollander v. Sandoz Pharm. Corp.*,
289 F.3d 1193 (10th Cir. 2002) ....................19

*Mancuso v. Consol. Edison Co. of N.Y.*,
967 F. Supp. 1437 (S.D.N.Y. 1997)....................16

*In re Mirena IUD Prods. Liab. Litig.*,
169 F. Supp. 3d 396 (S.D.N.Y. 2016), *aff'd*,
2017 WL 4785947 (2nd Cir. Oct. 24, 2017)....................10, 16

*Norris v. Baxter Healthcare Corp.*,
397 F.3d 878 (10th Cir. 2005) ....................7

*In re Rezulin Prods. Liab. Litig.*,
369 F. Supp. 2d 398 (S.D.N.Y. 2005)....................20

*Soldo v. Sandoz Pharm. Corp.*,
244 F. Supp. 2d 434 (W.D. Pa. 2003)....................14

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
858 F.3d 787 (3d Cir. 2017)....................18

*In re Zoloft (Sertraline Hydrocloride) Prods. Liab. Litig.*,
2015 WL 7776911 (E.D. Pa. Dec. 2, 2015), *aff'd*,
858 F.3d 787 (3d Cir. 2017) ....................10

## Other Authorities

Fed. R. Evid. 702 ....................16

## PRELIMINARY STATEMENT

Dr. Lemuel A. Moyé concedes that none of the evidence he relies upon for his causation opinion independently demonstrates that Mirena can cause idiopathic intracranial hypertension ("IIH" or "pseudotumor cerebri" or "PTC"). He nevertheless concludes that causation exists by applying an unscientific and unreliable methodology: he rejects all studies that undermine his causation opinion as being unreliable but readily embraces the results from a deeply flawed study that is subject to the same limitations and that he concedes "doesn't show" causation; he cherry-picks evidence from a subset of anecdotal adverse event reports that are incapable of showing causation; he insists that the LNG in Mirena can cause IIH even though he declines to reach the same conclusion for other contraceptives that release higher doses of LNG; and he speculates about an untested mechanism by which Mirena *could* cause IIH that is undermined by other plaintiff experts and that he lacks the data to support.

Dr. Moyé's methodology is infected with internal contradictions and *ipse dixit*. For the reasons set forth in Bayer's General Brief and below, his testimony should be excluded.

## BACKGROUND

Dr. Moyé is a professor of biostatistics who had no Mirena experience and limited IIH experience before being hired as an expert in this litigation. *See* Ex. 8, Moyé Deposition Tr. ("Dep.") 85:2-21 (testifying that he has no experience with Mirena or Norplant and has never conducted research on LNG outside of the litigation); 86:17-88:19 (explaining that he was last part of a team making an IIH diagnosis "in the '80s" and that he has never utilized the modified Dandy criteria for IIH diagnosis because he has not cared for an IIH patient since the modern criteria were established in 1985). Dr. Moyé never entered a residency or fellowship program after attending medical school, and thus he is not a gynecologist, obstetrician, neurologist, or ophthalmologist. *Id.* at 84:1-21; 86:3-16. In fact, he has not had a regular medical practice since

March 1992. *Id.* at 84:15-17. Instead, Dr. Moyé regularly serves as a plaintiff causation expert. *Id.* at 275:4-276:6 (agreeing that he testified for plaintiffs in numerous product liability litigations); 277:15-18 ("Q. Is it the case that in every personal injury case where you've [] prepared a report, the report has alleged causation on behalf of plaintiffs? A. Yes, sir.").

Dr. Moyé admitted that he developed his causation opinion for this litigation. Ex. 8, Moyé Dep. 89:1-3 ("Q. Do you have an opinion that Mirena caused PTC before becoming involved in this litigation? A. No, sir."). He had not reviewed the relevant literature or conducted research on Mirena and IIH before being retained as an expert in this litigation. *Id.* at 89:18-21 ("Q. Before becoming involved in this litigation, did you have an opinion that any of the risk factors on Exhibit 4 were risk factors for PTC? A. No."); 139:16-25 (conceding that he had never seen the Valenzuela study before this litigation and that he does not subscribe to any neurological or ophthalmological journals); 262:16-23 (conceding that he had never done research on his mechanism theory before this litigation).

Despite being willing to offer a litigation causation opinion, Dr. Moyé conceded that a relationship between Mirena and IIH has not been established. In distinguishing between forms of IIH that he asserts have known causes (which he calls "secondary intracranial hypertension") and forms where the cause is "not yet established" (which he calls "primary intracranial hypertension"), he confirmed that in his view Mirena falls in the "not yet established" category:

> Q. Would -- would Mirena-caused PTC be primary intracranial hypertension or secondary intracranial hypertension?
>
> A. . . . [I]f the relationship is in the process of being discovered and is ***not yet established***, then I think you could say it's a cause of primary intracranial hypertension. Once it -- once it's established -- like hypervitaminosis A is established, then it becomes secondary.
>
> Q. Okay. Which one is Mirena, primary or secondary?
>
> A. ***Well, right now we're arguing over it, so I'd say it's primary.***

Ex. 8, Dep. 94:9-21 (emphases added). Dr. Moyé also conceded that no one, other than experts engaged by Plaintiffs' lawyers, has concluded that Mirena can cause IIH. *Id.* at 12:22-13:3 ("Q. Can you point me to any sources you have seen that specifically identify Mirena as a cause of PTC . . .? A. No."); 13:6-12 (unaware of any regulatory agency that has determined that Mirena is a cause of PTC). Nevertheless, Dr. Moyé has never published or tested his causation opinion. *Id.* at 83:23-25 ("Q. Have you, outside of the litigation, given your views in any way that Mirena causes PTC? A. I have not."); 85:9-10, 85:18-21, 88:20-22 (conceding he has never published on Mirena or PTC and has never "conducted research on LNG in any form").

## ARGUMENT

Dr. Moyé's general causation opinion should be excluded in its entirety. The bases for his opinions -- individually and collectively -- fail to support causation and his opinions lack the reliability required by *Daubert*. Dr. Moyé's proposed mechanism theory should also be rejected because he lacks qualifications to give such an opinion.

### I. Dr. Moyé's General Causation Opinion is Not Rooted in a Reliable Methodology.

Dr. Moyé relies on four data points to support his causation opinion: the Valenzuela study, a fraction of the total set of individual adverse event reports, "biological gradient," and a mechanism theory. Ex. 8, Moyé Dep. 77:6-13; Ex. 84, Dep. Ex. 13 (listing four "Lines of Evidence"). His testimony establishes that this dataset does not meet basic scientific standards for determining causation and demonstrates that he cannot reliably conclude causation from forms of evidence that he acknowledges cannot individually demonstrate a causal link between Mirena and IIH. *See* Ex. 8, Dep. 215:4-6, 215:23-216:7 (conceding that the single epidemiologic study he relies upon "doesn't show" causation and he cannot "conclude causation with just the results of [the study] standing alone"); 235:14-22, 272:14-25 (conceding that Mirena adverse event reports cannot show causation); 238:11-18, 239:4-9 (same for biological gradient); 76:6-8,

260:17-261:5, 261:23-262:2 (same as to mechanism theory of how Mirena "might cause" IIH). The evidence fails to satisfy the Bradford Hill criteria and fails the *Daubert* factors for reliability.

**A. Dr. Moyé Failed His Own Standards for Causation.**

Dr. Moyé conceded that the evidence does not meet his own standards for causation. He fully agreed with the basic scientific proposition that case reports can merely raise the *question* of whether causation exists, but that epidemiological studies are required to answer that question. *See, e.g.*, Ex. 86, Reference Manual 218 ("Anecdotal evidence usually amounts to reports that events of one kind are followed by events of another kind. Typically, the reports are not even sufficient to show association, because there is no comparison group."). He readily acknowledged that "[e]pidemiologic research, case controlle[d or] cohort studies would be required to determine if a causal association . . . exists." Ex. 8, Dep. 272:7-13. In his words:

> Q. When you've got case reports, particularly ones with confounding, to be able to make a causal association to determine if a causal association exists, you need some kind of observational data?
>
> A. Right. So you need the case report to raise the question. That raises the question. Without the case report, there's no question. You have the case report. It raises the question. It doesn't provide the answer. And you move on to an observational study or a -- I mean, a case control study or a cohort study or another study.
>
> Q. To help you answer the question?
>
> A. Yes, sir.

*Id.* at 272:14-25; *see also* 272:14-18 (agreeing that "to be able to make a causal association to determine if a causal association exists, you need some kind of observational data").

Dr. Moyé also conceded that replication is a "basic principle of science" and "rarely, if ever, does a single observational study persuasively demonstrate a cause-effect relationship." Ex. 8, Moyé Dep. 122:21-123:7, 125:4-16. Again, that is an unremarkable scientific proposition. *See* Ex. 86, Reference Manual 604 ("It is important that a study be replicated in different

populations and by different investigators before a causal relationship is accepted by epidemiologists and other scientists.").

In acknowledging these basic scientific norms, Dr. Moyé effectively conceded his causation opinion is inconsistent with those norms. He admits that epidemiology is required, and that replication is essential, but he relies upon only a single, deeply flawed epidemiological study by Dr. Valenzuela and his co-authors. Not only has the Valenzuela study never been replicated, Ex. 8, Dep. 218:7-9, its reported results run counter to another epidemiological study, *id.* at 280:4-13 (conceding that at face value, the results of the other study "would not be supportive of causation"), and the Valenzuela authors explicitly stated that the available evidence *does not establish causation*, *id.* at 215:23-216:1. Simply put, Dr. Moyé did not adhere to the scientific standards he himself has acknowledged are required to provide a causation opinion.

### B. Dr. Moyé Cannot Support His General Causation Opinion with His Scattershot of Unreliable Evidence.

Dr. Moyé cannot reliably string together his various data points to provide a reliable basis to support a general causation opinion.

#### 1. The Available Epidemiological Study Data Cannot Reliably Establish Causation.

Two epidemiological studies have examined the relationship between Mirena and IIH: (1) the Etminan cohort study comparing intracranial hypertension rates in Mirena users with oral contraceptive users and (2) the Valenzuela study comparing IIH rates between Mirena users and non-users in Utah and Denmark. The Etminan study found no difference between intracranial hypertension rates in Mirena and oral contraceptive users, *see* Ex. 27, Etminan 2015, at 112, Table 2, and because every oral contraceptive study has shown that oral contraceptives do not increase the risk of IIH, *see* General Brief at 23, n.18, Dr. Etminan's study results point to no increased IIH risk from Mirena use. In contrast, the Valenzuela study purported to find an

elevated odds ratio for IIH and Mirena use (which, as explained below, was unadjusted for known confounders).

Dr. Moyé testified that both studies were flawed. But while he used that argument to reject the Etminan study results as unreliable, he nevertheless relied extensively on the Valenzuela study. Dr. Moyé's divergent treatment of the two epidemiological studies and his repeated concessions of the flawed nature of the Valenzuela study demonstrate the unreliability of his methodology.

**a) The Etminan Cohort Study**

Dr. Moyé fails to even mention the Etminan publication in his report; instead, he treats the study as if it did not exist. *See* Ex. 7, Moyé Expert Report ("Rpt."); Ex. 8, Dep. 136:13-15 ("Q. You do not cite the Etminan study in any way in your report, correct? A. That's correct, I don't.").[1] Failing to address contrary data -- particularly when it comprises half of the available studies -- is a hallmark of unreliability. *See* Ex. 86, Reference Manual 23 ("[A]n expert . . . must take into account those studies that reach conclusions contrary to the position the expert seeks to advocate."); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) ("[R]ejecting or ignoring" unfavorable evidence "does not reflect scientific knowledge, is not derived by the scientific method, and is not good science.").

[1] As set forth in Bayer's General Brief, Dr. Etminan's article included two distinct analyses -- his epidemiological cohort study and a "disproportionality analysis of adverse event reports. Dr. Moyé also declined to rely on the Dr. Etminan's disproportionality analysis because Dr. Etminan, who formerly served as an expert for Mirena IIH plaintiffs, "functionally retracted" his analysis after being shown a fundamental error in his analysis during his deposition. Ex. 8, Moyé Dep. 137:22-138:14 ("Q. And reading that subsequent letter to the editor, do you read that as a functional retraction of his earlier published disproportionality analysis? A. That's a good use of a term. Yes, I would say so. . . .Q. But you don't consider it to be a valid analysis? A. That's correct.").

When asked about the Etminan cohort study during his deposition, Dr. Moyé stated that he had "reliability concerns" because he thought a letter to the editor about the flaws in the article "was incisive and insightful." Ex. 8, Moyé Dep. 137:9-13; 279:22. But not only was Dr. Moyé unable to point to a single issue with the cohort analysis in the Etminan article, *see id.* at 281:2-5 ("A. Okay. Can you tell me now what you found to be unreliable about the observational portion of Etminan? A. I would have to look at the study again."), it became clear that he had very little understanding of the basic premise of the study. *See id.* at 279:23-281:1 (initially conceding that, if the Etminan cohort study were methodologically reliable, it would not support causation, but when reminded *again* that the study compared Mirena to two oral contraceptives, Dr. Moyé could no longer give an answer). Dr. Moyé's outright rejection of the Etminan cohort study -- despite not being able to articulate any flaws in the study -- starkly contrasts his willingness to embrace the Valenzuela data, even though his repeated concessions regarding the study's flaws rendered him unable to vouch for the accuracy of its findings. Expert gatekeeping exists to preclude exactly this type of unscientific advocacy. *See, e.g.*, *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 886 (10th Cir. 2005) (excluding testimony where experts "ignored or discounted without explanation the contrary epidemiological studies").

**b) The Valenzuela Study**

As described in Bayer's General Brief, the Valenzuela study is subject to significant limitations that render it too flawed to support causation. *See* General Brief at 15-18. Dr. Moyé conceded that most of these limitations could have inflated the odds ratios reported in the study:

***Undercounting Mirena use in controls:*** Dr. Moyé conceded that it was a "valid concern" that the authors undercounted Mirena usage in the Utah and Denmark control groups, Ex. 8, Moyé Dep. 169:2-170:2, and that he could not "rule out any level of undercounting of Mirena usage among the Utah controls" or the Denmark controls. *Id.* at 175:3-5; *see also*

203:12-205:10. He conceded that this undercounting would artificially overestimate the odds ratio for IIH and Mirena use. *Id.* at 188:22-189:11; 208:16-25.

Other published data document the "valid concern" that the actual Mirena usage in Utah and Denmark are in fact much higher than the 2% usage in Utah and 3.5% usage in Denmark estimated by the Valenzuela authors. *See* Ex. 19, Boulet (18.9% LARC usage in Utah); Ex. 59, Sanders (75% of LARC usage in Utah is Mirena); Ex. 42, Lindh (8-12% LNG-IUS usage in Denmark); Ex. 20, Cibula (9% LNG-IUS usage in Scandinavian countries as of 2006). Notably, when Bayer used a more realistic estimate of Mirena usage in controls, the statistically significant findings in both study arms disappeared. Ex. 8, Moyé Dep. 157:3-25.

Applying standards that he refused to apply to Valenzuela, Dr. Moyé rejected all studies that showed higher Mirena usage rates than seen in Valenzuela. For example, he rejected the Boulet study's finding on Utah Mirena usage solely because it relied on self-reported data "and might be subject to recall or social desirability bias," *id.* at 195:19-196:4, yet he relies on Valenzuela even though he conceded that the self-report criticism would also "apply to the case arm of the Utah portion of the Valenzuela study," *id.* at 196:5-17. He similarly rejected the Lindh study on Danish usage for reasons that could also apply to the Valenzuela findings. *Id.* at 209:16-211:17 (criticizing Lindh for looking at "what percentage of contraceptive users are using Mirena as opposed to looking at what percentage of all women of childbearing age" and conceding that he "can't be certain" as to whether the criticism also applied to Valenzuela); 213:2-16 (criticizing Lindh for including women with repeat Mirena prescriptions and conceding that "[i]t's possible [Valenzuela] included repeat prescriptions").

***Absence of adjustment for confounders:*** In Dr. Moyé's words, controlling for confounding factors "is a necessary procedure in observational studies" to eliminate the

possibility that the study result was driven by something other than Mirena. Ex. 8, Moyé Dep. 158:15-22. Dr. Moyé conceded that the Valenzuela study failed to control for known confounders such as age, obesity, and antibiotic use, and he did nothing to rule out any form of confounding or bias. *Id.* at 180:2-6 (Q. "Are there any analyses you have done with [] the Valenzuela data to rule out any form of potential bias or confounding? A. No, sir."). The lack of adjustment for confounders could have had a large effect on the results. Indeed, Dr. Moyé conceded that he would "expect [the risk] to decrease had Valenzuela controlled for weight and age." *Id.* at 220:21-25; *see also id.* at 147:14-19; 151:3-17; 161:14-20.

***Author Conclusions of No Causation:*** Intimately aware of some of the limitations of their study, the Valenzuela authors conclude that their "investigation does *not* indicate that an LNG-IUS can cause PTC." Ex. 64, Valenzuela at 195. Dr. Moyé largely agreed with the study's conclusion, conceding that ***he could not "conclude causation with just the results of Valenzuela standing alone***." Ex. 8, Moyé Dep. 215:4-6 (emphasis added); *see also* 215:23-216:7 ("I think an appropriate statement would be to say that ***it's possible that LNG-IUS causes PTC but this study doesn't show it***."); 216:10-217:8 (agreeing with the Valenzuela authors' assessment that "[t]here are two possible explanations" for the study results -- "One explanation is that LNG does cause increased intracranial pressure . . . Another explanation is that LNG does not cause increased intracranial pressure, but that PTC is more likely to occur in the same population of women who are more likely to have an LNG-IUS recommended to them by their physician").

Despite conceding that the study did not establish causation, and despite acknowledging numerous shortcomings in the study, Dr. Moyé nevertheless relied principally on it without addressing the uncontested deficiencies or explaining how the study is reliable. This failure

cannot be squared with an expert's obligation to "carefully examine . . . any possible sources of bias or confounding which may make the study a weak indicator of causation." *In re Zoloft (Sertraline Hydrocloride) Prods. Liab. Litig.*, 2015 WL 7776911, at *2 (E.D. Pa. Dec. 2, 2015).

Ultimately, the Valenzuela authors' conclusions -- and Dr. Moyé's own concessions -- show that Dr. Moyé's reliance upon the study is misplaced. His willingness to go beyond the conclusions of the study's authors and proffer a causation opinion in this litigation is unreliable. *See, e.g.*, *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 431 (S.D.N.Y. 2016) (excluding expert who drew "impermissibly speculative conclusions" from studies that "'exceed[ed] the limitations the authors themselves place[d] on the[se] stud[ies]'" (quoting *In re Accutane Prods. Liab.*, 2009 WL 2496444, at *2 (M.D. Fla. Aug. 11, 2009)), *aff'd*, 2017 WL 4785947 (2nd Cir. Oct. 24, 2017) .

#### c) Epidemiological Studies on Oral Contraceptives and IIH

Every study examining the relationship between oral contraceptives and IIH has found no link. *See* General Brief at 23, n.18. Yet Dr. Moyé did not review any of those studies, even though oral contraceptives -- many of which contain much high amounts of LNG than Mirena -- serve as an obvious analogy to consider in evaluating the relationship between IIH and Mirena:

> Q. Are you aware that there are multiple studies evaluating oral contraceptives and concluding that they are not linked to PTC?
>
> A. I haven't looked at that, so I don't know.

Ex. 8, Moyé Dep. 51:1-14; *see also id.* at 51:15-52:15. No reliable methodology would tolerate ignoring what would be potentially the most important evidence -- a large body of epidemiological evidence looking at products with much higher doses of the implicated drug. Dr. Moyé's failure to even consider this key data demonstrates the subjective, outcome-driven nature of his work in this litigation.

### 2. Dr. Moyé's Anecdotal Adverse Event Reports Cannot Provide a Reliable Basis to Support a Causation Opinion.

Dr. Moyé purports to rely on a limited number of Mirena and Norplant adverse event reports to support his causation opinion. *See* Ex. 7, Rpt. 34-37, 41-43. However, it is well established that adverse event reports are subject to numerous limitations and cannot establish causation. *See* General Brief at 18. Dr. Moyé freely acknowledged this principle, agreeing that there was "no question" that he could not attribute causation to Mirena based on adverse event reports because he could not rule out all confounders from the reports. Dep. 235:14-22. Dr. Moyé's reliance on Mirena and Norplant adverse event reports was thus inherently unreliable.

#### a) Mirena Adverse Event Reports

Dr. Moyé's methodology with respect to adverse event reports consisted entirely of cherry-picking favorable evidence. Of the 315 IIH adverse event reports discussed in Bayer's 2017 signal assessment examining adverse event reports, Dep. 229:17-19, Dr. Moyé reviewed only roughly 10% of them. *Id.* at 231:2-6 (testifying that he reviewed 36 reports).[2] From that subset, Dr. Moyé identified what he believed were five "positive dechallenge" cases, where the patient's IIH was reported to have improved at some point after Mirena was removed. Ex. 7, Rpt. ⁋ 150.[3] However, when presented with the reports, Dr. Moyé conceded that his five

[2] There were 315 possible cases of IIH (most of them lawsuits) reported out of ~142 million woman-years of Mirena use. *See* Ex. 71, BfArM Response 44-45. The reporting rate (0.22 cases per 100,000 woman-years; 0.08 cases per 100,000 woman-years excluding litigation cases), *id.*, continues to be far below the annual incidence of IIH in women of childbearing age. *See* Ex. 39, Kilgore at 15 (6.8 cases per 100,000 women of childbearing age per year; 22 cases per 100,000 obese women of childbearing age per year in the United States).

[3] While Dr. Moyé deems these reports to be "representative examples," Ex. 7, Rpt. ⁋ 150, he conceded that they cannot be representative of all the cases because he only reviewed a small subset of adverse event reports. Ex. 8, Dep. 241:8-16 ("Q. You've not purported to review all the re -- all the dechallenge or potential dechallenge cases, correct? A. Correct. Q. So you can't say they're representative in that sense, correct? A. Well -- correct. What I mean by 'representative,' I simply mean to say that these are examples of cases where there was dechallenge. The phenomenon of dechallenge was observed.").

selected dechallenge cases are potentially confounded by concomitant treatments and alternative causes, and the patients' improvements cannot be attributed to the Mirena removal as opposed to treatment. *See* Ex. 8, Moyé Dep. 242:1-15 (agreeing that it's "impossible to rule out treatment leading to the improvement in symptoms that's reported in those cases."). Thus, these adverse event reports fail to provide any evidence of a relationship between Mirena and IIH.

While selectively relying on certain purported "positive dechallenge" cases, Dr. Moyé admitted to ignoring other adverse event reports that pointed against causation. For example, Dr. Moyé failed to account for "negative dechallenge" cases (where symptoms did not improve after Mirena removal) or instances where IIH resolved while Mirena was still in place. Ex. 8, Dep. 240:19-21 ("Q. Okay. And to be sure I have this from your answer, you've done no analysis of negative dechallenge? A. Right."); 240:22-25 ("Q. Have you done any analysis of how often someone develops symptoms of IH or PTC, the Mirena is not removed, and the symptoms still go away? A. I have not.). He likewise failed to consider the absence of "positive rechallenge" reports -- instances where the purported IIH recurs when the Mirena is reinserted. Dep. 242:16-17 ("Q. Okay. There are no rechallenge cases, correct? A. Correct, that -- that I know about.").

Dr. Moyé did not attempt to conduct any statistical or quantitative analysis of these reports. Dep. 226:5-21. Nor did he consider the Mirena IIH reporting rates, even though they are well below the expected background rates for women of childbearing age. *Id.* at 226:14-228:15; *supra* n.2. Instead, his expert "analysis" consisted of a selective compilation of adverse reports and his ensuing *ipse dixit* conclusion that they support a causal connection.

**b) Norplant Adverse Event Reports**

While Dr. Moyé cites to adverse event reports for Norplant (an LNG-containing contraceptive implanted in the arm) as support for his causation opinion in his report, Ex. 7, Rpt. ⁋ 153, he actually reversed his position during his deposition. Dr. Moyé's report discusses a

single publication evaluating 39 adverse event reports of IIH in Norplant users. But during his deposition, Dr. Moyé conceded that the adverse event reports were subject to confounders and that the article actually highlights the absence of reliable causation evidence. *See* Ex. 8, Dep. 271:8-272:13 (agreeing with Wysowski authors that "it is not possible to determine whether Norplant, obesity, or weight gain, or both factors are related to the occurrence of pseudotumor cerebri"); *see* also Ex. 67, Wysowski 1995, at 541 (concluding that, without further study, it was "***not possible***" to "***determine if a causal association . . . exists.***") (emphases added).

Given that only confounded, anecdotal reports have linked Norplant with IIH, Dr. Moyé conceded that he could not conclude a causal relationship between the two:

> Q. So are you offering an opinion that Norplant causes PTC that we know?
>
> A. No.
>
> ***Q. In your mind, is it an open question whether Norplant causes PTC?***
>
> ***A. Yes.***

Ex. 8, Moyé Dep. 56:19-24.

Dr. Moyé's refusal to opine that Norplant can cause IIH is fatal to his opinion in this litigation. If there is "an open question" on IIH causation with Norplant -- which releases three to four times more LNG each day than does Mirena, Ex. 69, 1997 Norplant Label (85 mcg after the first year and 30 mcg at five years); Ex. 68, 2017 Mirena Label (20 mcg after the first year and 10 mcg at five years) -- then Dr. Moyé cannot logically opine that Mirena can cause IIH.

Dr. Moyé's treatment of adverse event reports thus reflects yet another instance of his inconsistent methodology. Whereas he rejects anecdotal reports of IIH as unreliable for establishing causation with Norplant, he nevertheless relies on IIH reports to support his opinion that Mirena can cause IIH. Dr. Moyé's unscientific double standard cannot survive meaningful

review. *See Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 561 (W.D. Pa. 2003) (excluding plaintiff's experts for failing to apply their own scientific standards "[b]ecause consistency is a hallmark of the scientific method [and] plaintiff's experts must be required to satisfy their own standards of reliability").

**3. Dr. Moyé's Biological Gradient Opinion Is Unfounded.**

Dr. Moyé opined that a "biological gradient" -- a dose response where IIH rates increase with increased Mirena exposure -- provides evidence that Mirena causes IIH. However, he admitted that he conducted no dose response analysis to support his opinion. Dr. Moyé never analyzed whether LNG release rates or serum blood levels track with IIH adverse event reports. Dep. 238:11-18 ("Q. Have you done any kind of quantification of how those [serum levels] track against the case report data? A. No, I have not."); 239:4-9 ("Q. Have you done any analysis to show that PTC rates with Mirena increase or are highest around two years as opposed to five years or one year? A. I haven't tried to correlate directly [] quantitatively correlate this with the post implantation incidence rate of PTC."). Nor did he cite any other dose response data.

Dr. Moyé's report argued that there must be a dose response because 62.9% of IIH adverse event reports are from the first two years of Mirena use, a time period when Mirena releases relatively higher levels of LNG. Ex. 7, Rpt. ¶¶ 141-42. But Dr. Moyé conceded that there could be a "reporting bias where people are more likely to report PTC closer in time to beginning use of Mirena than later in time." Ex. 8, Dep. 236:21-237:7. More fundamentally, Dr. Moyé has not reconciled how Mirena could in his opinion show a dose-response relationship with IIH and yet at the same time (1) agree that Norplant (with its higher dose of LNG) has no such connection and (2) not even to bother to consider LNG-containing oral contraceptives, which deliver massively more LNG than either Mirena or Norplant. If he had conducted this rudimentary evaluation, it would have fatally undermined his "biological gradient" opinion

because every epidemiological study has shown no connection between oral contraceptives and IIH. *See* General Brief at 23, n.18.

**4. Dr. Moyé's Mechanism Theory Should Be Excluded.**

As set forth in Bayer's General Brief, Plaintiffs' experts have proposed rival mechanism theories for how LNG might cause IIH: an androgen receptor theory and a mineralocorticoid receptor (MR) theory. General Brief at 24. Dr. Moyé, who is not an expert in pharmacokinetics or pharmacodynamics, comes down on the side of the MR theory. Ex. 8, Dep. 249:12-18 ("Q. As I understand what you have written in your report you rely on the MR theory; is that correct? A. Correct. Q. Not the androgen receptor theory? A. That's correct."). Dr. Moyé's mechanism opinion should be excluded because he lacks qualifications to give it and it is unreliable.

**a) Dr. Moyé Is Unqualified to Render a Mechanism Opinion.**

Dr. Moyé purportedly developed his mechanism opinion based on a literature review he conducted since being retained as an expert. He provides a single reference to 40 articles lumped together as support for his conclusory statement that "[t]here are ample biomedical sources that support this mechanism." Ex. 7, Rpt. ⁋ 146 (noting that evidence for his conclusion "is cited at references [26] through [66]"). But Dr. Moyé conceded that he holds no expertise in the disciplines relevant to his mechanism theory, including pharmacokinetics and pharmacodynamics. Ex. 8, Dep. 85:22-86:2 ("Q. Do you hold yourself out as a pharmacokinetics expert? A. No. Q. Do you hold yourself out as a pharmacodynamics expert? A. No."). Nor had he ever conducted research on LNG or any aspect of his mechanism theory before being retained in this litigation. *Id.* at 85:18-21 ("Q. Have you conducted research on LNG in any form? . . . A. No."); 262:16-18 ("Q. Had you done research on hormonal impact on MR receptors before this litigation? A. I have not, no.").

Simply claiming to have reviewed some literature does not render Dr. Moyé qualified to provide a mechanism opinion, particularly when one of Plaintiffs' own mechanism experts has stated that "there is not a credible and comprehensive hypothesis aimed to uncover the pathogenesis and pathophysiology of IIH." Ex. 55, Salpietro 2012 at 572; *see Mancuso v. Consol. Edison Co. of N.Y.*, 967 F. Supp. 1437, 1443 (S.D.N.Y. 1997) ("We cannot help but conclude that [the plaintiffs' expert] was not in fact an expert . . . when he was hired by plaintiffs, but that he subsequently attempted, with dubious success, to qualify himself as such by a selective review of the relevant literature."). Because Dr. Moyé is unqualified to render mechanism opinions, this Court should bar him from doing so. *See, e.g.*, *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d at 448; Fed. R. Evid. 702 (expert testimony must come from someone who is "qualified as an expert by knowledge, skill, experience, training or education.").

**b) Dr. Moyé's Mechanism Theory Is Unreliable.**

Dr. Moyé's theory is that the distinct hormone aldosterone increases MR activity, which leads to increased CSF formation and pressure in the skull. Ex. 8, Dep. 250:23-251:3. He then layers on a second theory -- that LNG can act like aldosterone, *id.* at 258:4-9, by acting as an MR agonist (*i.e.*, a substance that increases MR activity). *Id.* at 259:1-7; *see also* Ex. 7, Rpt. ⁋ 145. This opinion is unsupported and even contradicted by Plaintiffs' actual mechanism experts.

***Unknown link between aldosterone and CSF formation:*** Plaintiffs' expert Dr. Vincenzo Salpietro, whose work Dr. Moyé relies upon, published that it is unknown whether aldosterone-increased MR activity leads to increased CSF formation. *See* Ex. 55, Salpietro 2012 at 570 ("Whether CSF formation is increased in aldosteronism accounting either for increased intracranial pressure and for headache showing symptoms of aldosteronism and IIH remains unknown ."). Dr. Moyé simply disagreed with Dr. Salpietro, Ex. 8, Dep. 252:19-22 ("I don't agree with that, no"), but he offered no literature to support his disagreement.

***LNG does not act like aldosterone:*** Studies have shown that LNG binds to human MR at only 17% of the rate of aldosterone. Ex. 15, Africander at 638, Table 1. Indeed, both Dr. Salpietro and Dr. Moyé agree that LNG and aldosterone have different chemical structures and that small differences in structure have large effects. Ex. 8, Moyé Dep. 264:4-19; Ex. 12, Salpietro Dep. 246:6-12 ("But what I'm telling you, that small changes in the chemical structures may change completely the outcome of that drug.").

***Unknown if LNG is an MR agonist:*** Dr. Moyé concedes that "for his theory to hold, LNG would have to be an agonist at the MR site," Ex. 8, Moyé Dep. 258:1-7, yet he cites literature undermining his theory that LNG increases MR activity. *See* Ex. 15, Africander at 639, Table 2 (showing that "literature [is] not consistent" as to whether LNG *decreases* MR activity).[4] Faced with this literature, Dr. Moyé conceded that studies are "not consistent" as to whether LNG is an MR agonist or antagonist. Ex. 8, Moyé Dep. 261:23-262:2.

The inconsistencies and uncertainties surrounding every necessary step of Dr. Moyé's mechanism theory demonstrate its unreliability. In fact, Dr. Salpietro even conceded that there is no credible mechanism theory for the development of PTC: "Thus far, however, there is not a credible and comprehensive hypothesis aimed to uncover the pathogenesis and pathophysiology of IIH despite the different mechanisms proposed." Ex. 55, Salpietro 2012 at 572. Dr. Moyé's unsupported speculation to the contrary, based solely on his *ipse dixit*, should be excluded.

**C. Dr. Moyé Failed to Conduct a Reliable Bradford Hill Analysis.**

[4] In fact, Dr. Moyé conceded that another of Plaintiffs' proffered mechanism experts, Conrad Johanson, opined that a related hormone is an MR *antagonist*. *See* Ex. 8, Moyé Dep. 259:25-261:2.

Dr. Moyé purports to have conducted a Bradford Hill analysis to arrive at his general causation opinion. Ex. 7, Rpt. 29.[5] As an initial matter, the Bradford Hill criteria should only be applied when there is a "perfectly clear cut" association "beyond what we would care to attribute to the play of chance." Ex. 35, Hill at 295. Here, the available evidence does not meet this threshold hurdle, and the Bradford Hill criteria cannot be appropriately applied. In any event, Dr. Moyé failed to apply the Bradford Hill criteria in a scientifically reliable manner. When properly applied, every factor points away from causation, and the Court should justifiably be skeptical of an expert so flexibly willing to reach a predetermined litigation result. *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 796-800 (3d Cir. 2017) (affirming exclusion of "conclusion-driven" analysis, emphasizing district court's gatekeeping responsibility to ensure "that the Bradford Hill/weight of the evidence criteria 'is truly a methodology, rather than a mere conclusion-oriented selection process'").

As discussed above, Dr. Moyé cannot demonstrate strength of association, given his concessions regarding the methodological flaws in Valenzuela and his failure to even consider the Etminan cohort study. Dep. 136:13-15; 215:4-6; 215:23-216:7. He has also conceded that consistency has not been established, given that replication must be done in different populations by different authors and Valenzuela's results have never been replicated. *Id.* at 218:7-9.

The adverse event report data undermines many of the remaining factors. There is no specificity between Mirena and IIH -- the condition has numerous known risk factors, *see* General Brief at 2, and Dr. Moyé conceded that he could not rule out confounders from any adverse event report, Dep. 242:1-15. While Dr. Moyé attempts to establish temporality through

[5] The Bradford Hill criteria are: (1) strength of association, (2) consistency, (3) specificity, (4) temporality, (5) biological gradient, (6) plausibility, (7) coherence, (8) experiment, and (9) analogy. *See* Ex. 35, Hill at 295-300.

adverse event reports, Ex. 7, Rpt. ⁋ 132, he did not actually analyze temporality in any way, including by looking at the full adverse event report dataset, or by considering the cases that do not show temporality, such as "negative dechallenge" or cases where the IIH improves while the patient is still using Mirena. Dr. Moyé's failure to conduct any analysis to show a dose response leaves him unable to satisfy the biological gradient criteria.

The analogy criterion strongly supports the lack of a causal relationship. First, Dr. Moyé actually renounced his reliance on Norplant, conceding that there is "an open question" as to whether Norplant can cause IIH. Ex. 8, Dep. 56:22-24. Second, oral contraceptives provide a useful analogy -- one that Dr. Moyé completely ignored. Indeed, combination oral contraceptives and LNG-only oral contraceptives release much higher doses of systemic LNG than Mirena, yet they have been demonstrated, in every controlled study published on the topic, to have no link to IIH. *See* General Brief at 23, n.18. Third, "elevated testosterone levels, a hormone with a similar structure to levonorgestrel" fails to support causation because, as Dr. Moyé conceded, this analogy is nonsensical, given that post-pubertal men have "much higher" testosterone levels than women, and "PTC goes the exact opposite way, it's far, far higher in women than in men." Ex. 8, Moyé Dep. 269:21-270:6; Ex. 7, Rpt. ⁋ 152. Finally, Dr. Moyé's mechanism theory is unfounded and contradicted by Plaintiffs' mechanism experts. Dr. Moyé's causation opinion thus lacks any coherence.

In short, Dr. Moyé has no basis to conclude causation by aggregating inherently flawed data that do not show causation. *See, e.g.*, *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1216 n.21 (10th Cir. 2002) ("To suggest that those individual categories of evidence deemed unreliable by the district court may be added to form a reliable theory would be to abandon 'the level of intellectual rigor' of the expert in the field."). His opinions should be excluded.

**D. Dr. Moyé's Testimony Fails to Meet Any of the Reliability Factors.**

*Daubert* provides four factors for evaluating whether proposed testimony is scientifically valid. *See* General Brief at 8. Dr. Moyé's testimony fails to meet any of them.

Dr. Moyé's opinion that Mirena causes IIH has never been tested or subjected to peer-review. *See* Ex. 8, Dep. 83:23-25 ("Q. Have you, outside of the litigation, given your views in any way that Mirena causes PTC? A. I have not."); 85:9-10, 85:18-21, 88:20-22 (conceding that he has never published on Mirena or PTC or "conducted research on LNG in any form"); 262:16-23 (conceding that he had never done research on his mechanism theory before this litigation). Instead, he admittedly developed his causation opinion for this litigation, *id.* at 89:1-3, which weighs against reliability. *See In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 424 (S.D.N.Y. 2005) ("whether an expert's opinion was developed for litigation" weighs against reliability). Because his conclusion has never been published or tested, the error rate is unknown.

Moreover, Dr. Moyé admitted that there is no general acceptance of his views, acknowledging that causation is "not yet established." Ex. 8, Dep. 94:9-21. Indeed, he testified that no scientist outside of this litigation, no regulatory agency, and no scientific association has ever concluded that Mirena can cause IIH. *Id.* at 12:22-13:3 ("Q. Can you point me to any sources you have seen that specifically identify Mirena as a cause of PTC . . . ? A. No."); 13:6-12 (unaware of any regulatory agency that has determined that Mirena can cause PTC).

Every *Daubert* factor weighs heavily against the admission of Dr. Moyé's unfounded and anti-scientific testimony.

**CONCLUSION**

For the foregoing reasons, Bayer respectfully requests that the Court exclude the general causation testimony of Dr. Lemuel A. Moyé in its entirety.

Dated: March 2, 2018

Respectfully submitted,

*s/ Paul W. Schmidt*

Paul W. Schmidt
Michael X. Imbroscio
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-5272
Facsimile: (202) 778-5272
pschmidt@cov.com
mimbroscio@cov.com

Shayna S. Cook
Goldman Ismail Tomaselli Brennan & Baum LLP
564 West Randolph Street, Suite 400
Chicago, Illinois 60661
Telephone: (312) 681-6000
Facsimile: (312) 881-5191
scook@goldmanismail.com

James Shepherd
Shook Hardy & Bacon LLP
600 Travis Street, Suite 3400
Houston, TX 77002
Telephone: (713) 227-8008
Facsimile: (713) 227-9508
eshepherd@shb.com

*Attorneys for Defendants Bayer HealthCare Pharmaceuticals Inc., Bayer Pharma AG, and Bayer OY*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of March, 2018, a copy of the foregoing has been served on the interested parties in this action via ECF:

Martin D. Crump
Davis & Crump PC
2601 Fourteenth Street
Gulfport, Mississippi 39501
martincrump@daviscrump.com
*Co-Lead Counsel for Plaintiffs*

Lawrence L. Jones II
Jones Ward PLC
The Pointe
1205 East Washington Street, Suite 111
Louisville, Kentucky 40206
larry@jonesward.com
*Co-Lead Counsel for Plaintiffs*

Maxwell S. Kennerly
Kennerly Loutey, LLC
PO Box 30049
Elkins Park, Pennsylvania 19027
msk@thlawyer.com
*Liaison Counsel for Plaintiffs*

*/s/ Paul W. Schmidt*
Paul W. Schmidt
*Attorney for Defendants*