UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

IN RE:

MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY LITIGATION (NO. II)

17-MD-2767 (PAE)
17-MC-2767 (PAE)

*This Document Relates To All Actions*

---------------------------------------------------------------x

**OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTIONS TO EXCLUDE THE TESTIMONY OF THE PLAINTIFF EXPERTS**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 2

A. Overview of IIH and Its Risk Factors ..... 2

B. Mirena ..... 2

C. Publications Addressing Mirena and IIH ..... 3

D. The Plaintiff Experts ..... 5

LEGAL STANDARD ..... 7

ARGUMENT ..... 8

I. The Plaintiff Experts' Opinions Fail the *Daubert* Reliability Factors. ..... 8

II. The Plaintiff Experts' Opinions Do Not Provide a Reliable Basis for Causation. ..... 11

A. The Available Epidemiology Does Not Reliably Support Causation. ..... 13

1. The Etminan Cohort Study ..... 14

2. The Valenzuela Case Control Study ..... 15

B. Anecdotal Case Reports Are Not Reliable Evidence of Causation. ..... 18

1. Mirena Adverse Event Reports ..... 19

2. Norplant Adverse Event Reports ..... 21

C. The Plaintiff Experts' Selective Consideration of Other Contraceptive Data Shows That Their Opinions Do Not Reliably Support Causation. ..... 22

D. The Plaintiff Experts' Various Mechanism Theories Are Speculative and Unproven and Do Not Reliably Support Causation. ..... 24

CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*In re Accutane Prods. Liab.*,
2009 WL 2496444 (M.D. Fla. Aug. 11, 2009) ....................15, 18

*In re Accutane Prods. Liab.*,
511 F. Supp. 2d 1288 (M.D. Fla. 2007) ....................6

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
137 F. Supp. 2d 147 (E.D.N.Y. 2001) ....................10

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ....................8

*Awad v. Merck & Co.*,
99 F. Supp. 2d 301 (S.D.N.Y. 1999) ....................10

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*,
524 F. Supp. 2d 1166 (N.D. Cal. 2007) ....................15

*In re Breast Implant Litig.*,
11 F. Supp. 2d 1217 (D. Colo. 1998) ....................13

*Brumbaugh v. Sandoz Pharm. Corp.*,
77 F. Supp. 2d 1153 (D. Mont. 1999) ....................22

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) .................... *passim*

*Dunn v. Sandoz Pharm. Corp.*,
275 F. Supp. 2d 672 (M.D.N.C. 2003) ....................13, 22, 25

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ....................8

*Golod v. La Roche*,
964 F. Supp. 841 (S.D.N.Y. 1997) ....................25

*Henderson v. Kennedy*,
253 F.3d 12 (D.C. Cir. 2001) ....................13

*Hollander v. Sandoz Pharm. Corp.*,
289 F.3d 1193 (10th Cir. 2002) ....................6, 12

*Konrick v. Exxon Mobil Corp.*,
2016 WL 439361 (E.D. La. Feb. 4, 2016) ....................15, 16

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................................................................................................7

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
209 F. Supp. 3d 612, 644 (S.D.N.Y. 2016)............................................................11

*Magistrini v. One Hour Martinizing Dry Cleaning*,
180 F. Supp. 2d 584 (D.N.J. 2002) ........................................................................13

*McClain v. Metabolife Int'l, Inc.*,
401 F.3d 1233 (11th Cir. 2005) ..............................................................................19

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
593 F. Supp. 2d 549 (S.D.N.Y. 2008)......................................................................11

*In re Mirena IUD Prods. Liab. Litig.*,
__ F. App'x ___, 2017 WL 4785947 (2d Cir. Oct. 24, 2017) ....................................8

*In re Mirena IUD Prods. Liab. Litig.*,
169 F. Supp. 3d 396, 451 (S.D.N.Y. 2016)...................................................... *passim*

*Colon ex rel. Molina v. BIC USA, Inc.*,
199 F. Supp. 2d 53 (S.D.N.Y. 2001)..........................................................................9

*Pozefsky v. Baxter Healthcare Corp.*,
2001 WL 967608 (N.D.N.Y. Aug. 16, 2001) ..........................................................13

*In re Rezulin Prods. Liab. Litig.*,
369 F. Supp. 2d 398 (S.D.N.Y. 2005)............................................................ *passim*

*Siharath v. Sandoz Pharm. Corp.*,
131 F. Supp. 2d 1347 (N.D. Ga. 2001) ..................................................................13

*Soldo v. Sandoz Pharm. Corp.*,
244 F. Supp. 2d 434 (W.D. Pa. 2003)......................................................................13

*Wills v. Amerada Hess Corp.*,
379 F.3d 32 (2d Cir. 2004)....................................................................................7, 8

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
858 F.3d 787 (3d Cir. 2017)....................................................................................12

*In re Zoloft (Sertralinehydrochloride) Prods. Liab. Litig.*,
176 F. Supp. 3d 483, 498–99 (E.D. Pa. 2016) ........................................................12

**Other Authorities**

Fed. R. Evid. 702 ....................................................................................................................7, 8

## PRELIMINARY STATEMENT

The plaintiff experts seek to opine that Mirena can cause idiopathic intracranial hypertension ("IIH"), also known as pseudotumor cerebri ("PTC"). No medical organization, regulatory agency, or article in the peer-reviewed scientific literature draws this conclusion, and the plaintiff experts themselves have not offered this opinion outside of this litigation.

To find causation where no other scientist will, the plaintiff experts centrally rely on the unquestionably inaccurate results of a single, never-replicated epidemiological study — the Valenzuela study. In doing so, the plaintiff experts go well beyond the conclusions of the Valenzuela study authors, who acknowledge that their study "***does not indicate*** that an LNG-IUS [Mirena] can cause PTC." At the same time, the plaintiff experts ignore science that contradicts the opinions they offer: for example, they ignore a study generated by a now-discarded plaintiff expert, and they also ignore the admitted fact that contraceptives with much higher doses of the hormone in Mirena have no link to IIH.

Instead, the plaintiff experts rely on a smattering of case report data that the science, the law, and the experts themselves recognize cannot demonstrate causation. They also speculate about biological theories by which Mirena might cause IIH, even though the experts admit that these theories amount to little more than guesswork. Demonstrating the distance between their opinions and sound science, the plaintiff experts regularly contradict each other, and in deposition testimony repeatedly backed away from claims made in their expert reports.

At bottom, the plaintiff experts' causation opinions are unreliable because they cobble together evidence that on its own is plainly insufficient and ignore contrary data that under their own methodology should be relevant. Such a methodology is unreliable and fails every *Daubert* factor. Their opinions in support of general causation should be excluded.

## BACKGROUND

### A. Overview of IIH and Its Risk Factors

IIH is a disease marked by increased cerebrospinal fluid ("CSF") pressure in the skull. Scientists agree that the cause and mechanism of this elevated CSF pressure are unknown.[1] Its most common symptoms are headaches and vision problems, and it is typically treated with weight loss and diuretics. Diagnosing IIH requires measuring CSF pressure with a lumbar puncture — which itself can relieve the symptoms — and imaging to rule out other causes of increased pressure. Ex. 4, Fraunfelder Dep. 152:6-12; Ex. 2, Darney Dep. 166:8-13.

IIH overwhelmingly affects women of childbearing age, especially those who are overweight or who have recently gained weight. Overweight women are approximately 6.5 times more likely to develop IIH than women of ideal weight, while women who are obese are at least 20 times more likely to develop IIH. Ex. 22, Daniels 2007, at 637 fig. 1. As our population has become more obese, the incidence of IIH has markedly risen. Ex. 39, Kilgore 2017.

### B. Mirena

Mirena is an FDA-approved intrauterine device ("IUD") marketed by Bayer that provides contraception for up to five years by slowly releasing levonorgestrel ("LNG") into the uterus. The plaintiff experts do not dispute that Mirena is one of the "most effective," "safest," and "most cost-effective" contraceptive methods available. Ex. 2, Darney Dep. 60:17-21, 67:24-68:2. More than 45.5 million Mirenas had been inserted as of May 2017, amounting to close to 142 million woman-years of use since its first introduction in 1990. Ex. 71, BfArM Response

---

[1] Sources cited by the plaintiff experts agree. *E.g.*, Ex. 36, Hornby 2017 (IIH's "pathogenesis is currently unknown"); Ex. 44, McGeeney 2014 ("PTCS is an uncommon disorder of increased intracranial pressure of unknown etiology. The signs and symptoms have been well described but the pathogenesis remains a mystery."); Ex. 46, Mollan 2016 ("The underlying pathogenesis of IIH is uncertain"); Ex. 58, Samanci 2017 (IIH is "a syndrome of unknown mechanism"); Ex. 56, Salpietro 2014 ("IIH is a disorder of unclear pathophysiology").

44-45. As of October 2017, only 315 possible IIH cases among Mirena users had been reported (along with four reports of possible IIH among users of another LNG IUD, Skyla), more than 60% of which (197) were lawsuits filed after December 2013. *Id.* at 17, 45-46.

Mirena is a particularly important contraceptive option for overweight and obese women because it is effective regardless of body weight and, unlike estrogen-containing contraceptives, it does not increase the risk of blood clots. *See* Ex. 26, Edelman 2018, at 1; *see also* Ex. 77, CDC 2016; Ex. 43, Marnach 2013; Ex. 2, Darney Dep. Ex. 7 at 112; Ex. 2, Darney Dep. 99:24-100:16. As a result, women who use Mirena tend to be heavier than users of other contraceptives, with one recent study finding that 63% of Mirena users were overweight or obese, compared to 48% of the general population of reproductive-age women. Ex. 54, Saito-Tom 2015, at 369; *see also* Ex. 47, Mosher 2017, at 4; Ex. 49, Peipert 2011, at 1110; Ex. 18, Bhuva 2017, at 61; Ex. 60, Scott-Ram 2012, at 123; Ex. 14, Wheeler Dep. 90:16-18 ("hormonal IUDs are preferentially prescribed to obese women").

This differential use of Mirena by overweight and obese women is critical to assessing the alleged link between Mirena and IIH because, as the plaintiff experts acknowledge, the most well-established risk factors for IIH are female gender, reproductive age, excess weight, and recent weight gain. *See, e.g.*, Ex. 11, Salpietro Rpt. 13; Ex. 4, Fraunfelder Dep. 133:24-135:1; Ex. 8, Moyé Dep. Ex. 4; Ex. 4, Fraunfelder Dep. Ex. 11; Ex. 2, Darney Dep. 162:7-20, 165:1-7. The disproportionate prevalence of these risk factors in the Mirena population makes controlling for these risk factors essential in any evaluation of whether Mirena use can cause or increase the risk for IIH. *See, e.g.*, Ex. 2, Darney Dep. 165:9-13.

**C. Publications Addressing Mirena and IIH**

To date, only two studies have addressed Mirena and IIH, and neither concludes that a causal link exists. In 2015, Dr. Mahyar Etminan published the first study addressing a potential

link between Mirena and intracranial hypertension. Although he failed to disclose it in his initial publication, Dr. Etminan developed and wrote that article while serving as a plaintiffs' expert in pre-MDL lawsuits. Dr. Etminan's 2015 article contained two analyses: an epidemiological cohort study comparing Mirena patients to oral contraceptive patients and a disproportionality analysis of adverse event reports. Ex. 27.

As designed and conducted, Dr. Etminan's epidemiological study found no difference in intracranial hypertension rates between users of Mirena and oral contraceptives. *Id.* at 112 tbl. 2. Because every epidemiologic study of oral contraceptive users has found no increased risk of IIH, *infra* at 23 n.19, his epidemiological results point to no increased risk of IIH from Mirena use. Dr. Etminan's 2015 disproportionality analysis, by contrast, showed that intracranial hypertension represented a higher proportion of all adverse events for Mirena than for all other drugs in the FDA's adverse event reporting database. This analysis, however, contained several rudimentary flaws, including that Dr. Etminan failed to adjust his comparisons for age and gender (thus comparing Mirena patients — reproductive-age females — who have a higher background rate of IIH to populations like older men who almost never get IIH).[2] When Bayer documented these errors at the first day of Dr. Etminan's deposition, he withdrew as an expert and ultimately avoided further deposition testimony by submitting an affidavit confirming that a corrected disproportionality analysis "suggests that intracranial hypertension and Mirena use are '***likely not related***.'" Ex. 29, Etminan Aff. ¶ 8 (emphasis added). Thus, in the words of his affidavit, "***neither of the analyses in the article provide evidence that Mirena use increases the***

---

[2] Even a well-designed disproportionality analysis of adverse event reports can at best only provide a signal of a possible association; it is not evidence of a causal relationship. Ex. 78, FDA 2005 Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment at 8-10.

***risk for intracranial hypertension***." *Id.* ¶ 11 (emphasis added). He also published a letter to the editor with a corrected disproportionality analysis finding no signal of a possible association between Mirena use and IIH. Ex. 30, Etminan 2017; *see also* Ex. 28, Etminan 2016 (first correction admitting to undisclosed conflict and re-doing disproportionality analysis).

In 2017, Reuben Valenzuela published a study evaluating IIH risk with Mirena in two groups of patients: one in Utah and one in Denmark. In both groups, the authors reported an elevated *unadjusted* (meaning not controlled for potential confounders) odds ratio for IIH in Mirena patients. Ex. 64, Valenzuela 2017 at 5 ("When interpreting the findings presented here, it is also important to consider that the risk analysis does not account for potential confounders."). These shortcomings prompted the authors in the final, peer-reviewed publication to disclaim a causative role for Mirena:

> Our investigation does *not* indicate that an LNG-IUS [Mirena] can cause PTC, and the number of women with an LNG-IUS was too small to determine if an LNG-IUS is an *independent* risk factor for PTC. Although use of an LNG-IUS seems to be associated with an increased risk of PTC, it is possible that this observation occurred because use of an LNG-IUS is also associated with other established risk factors that are known to be associated with PTC (e.g., obesity and recent weight gain).

*Id.* at 4 (emphasis in original). The Valenzuela study also suffers from crucial methodological flaws: first, the authors failed to control for known confounders such as age, body mass index (BMI), recent weight gain, and tetracycline antibiotic use; second, the authors ascertained Mirena usage differently between their IIH (case) groups and their non-IIH (control) groups, making Mirena use appear comparatively more common among IIH patients. Plaintiff's experts acknowledge these flaws, as set forth below.

**D. The Plaintiff Experts**

The seven plaintiff experts seek to link Mirena and IIH despite this lack of evidence and

the scientific consensus to the contrary. Several place topmost reliance on the Valenzuela study despite the study's methodological flaws and its express conclusion disclaiming causation. Some point to the Etminan study without grappling with its epidemiological findings or the lead author's subsequent revision of the disproportionality analysis results. All of them rely heavily on anecdotal case reports, which as a matter of science and law cannot prove causation. *See, e.g.*, *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 451 (S.D.N.Y. 2016), *aff'd*, 2017 WL 4785947 (2nd Cir. Oct. 24, 2017). And all of them speculate about possible biological mechanisms, even though "biological possibility is not proof of causation." *See, e.g.*, *In re Accutane Prods. Liab.*, 511 F. Supp. 2d 1288, 1296 (M.D. Fla. 2007).

They all seek to cobble together a causation opinion from these individually unreliable pieces of evidence. The law does not permit them to do so. *See, e.g.*, *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1216 n.21 (10th Cir. 2002) ("To suggest that those individual categories of evidence deemed unreliable by the district court may be added to form a reliable theory would be to abandon 'the level of intellectual rigor' of the expert in the field.").

- Dr. Philip Darney, an OB/GYN who has enthusiastically endorsed the use of Mirena throughout his career but here offers his self-described "hypothesis" that LNG can cause IIH, Ex. 2, Darney Dep. 52:14-53:20, 160:18-161:21;
- Dr. Frederick W. Fraunfelder, an ophthalmologist who admits that he lacks the expertise claimed in his report about how Mirena might cause IIH and relies extensively on adverse event reports, Ex. 4, Fraunfelder Dep. 130:7-14, 384:7-8, 515:6-8;
- Dr. Conrad Johanson, a neuroscientist who never hypothesized his proposed mechanism for LNG causing IIH until this litigation, Ex. 6, Johanson Dep. 17:5-18:6, 66:10-68:24;
- Dr. Vincenzo Salpietro, a pediatric neurologist who proposes a different but equally untested hypothetical mechanism for LNG causing IIH, one he admits "is not proven," Ex. 12, Salpietro Dep. at 241:15–19;
- Dr. Lemuel Moyé, an epidemiologist with notable litigation experience on behalf of plaintiffs, Ex. 8, Moyé Dep. 275:4-277:18;

- Dr. Laura Plunkett, a pharmacologist and toxicologist who has been testifying exclusively on the plaintiff side in product liability cases since 2003 and has testified at least 65 times in the last five years alone, Ex. 9, Plunkett Rpt. App'x A, C; and
- Dr. James Wheeler, an OB/GYN who frequently testifies on behalf of plaintiffs in medical malpractice cases, Ex. 14, Wheeler Dep. 46:9-47:11.

None of these experts have published their opinions about Mirena or otherwise subjected their opinions to peer review. To the contrary, their views seem to emanate more from Plaintiffs' counsel than from an independent scientific process. Ex. 2, Darney Dep. 286:6-288:5 (Plaintiffs' lawyers selected and calculated data); Ex. 12, Salpietro Dep. 160:2-19 ("I asked [Plaintiffs' counsel] to help me to understand and analyze this epidemiology data. And in this context, she may have suggested me how to interpret some specific data."). They seek to cloak their opinions with a veneer of propriety by invoking the Bradford Hill criteria — a set of subjective factors to assess whether an observed statistical association might be causal — as if the mere utterance of these factors would otherwise cleanse their outcome-driven methodology.

## LEGAL STANDARD

Under Rule 702, the proponent of expert testimony must show by a preponderance of the evidence that (i) the expert is qualified, (ii) the testimony is reliable, and (iii) the testimony is relevant and will assist the jury. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–95 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–52 (1999). "In *Daubert*, the Supreme Court made clear that the district court has a 'gatekeeping' function under Rule 702, and is charged with . . . ensuring . . . the reliability and relevance of the proffered testimony." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004) (internal quotation marks omitted).

To be reliable, expert testimony must be "based on sufficient facts or data," and it must be "the product of reliable principles and methods" that have been "reliably applied" to the "facts

of the case." Fed. R. Evid. 702. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). Accordingly, the court "should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* at 267; *see also id.* at 269 (district court's "extremely thorough review of the scientific literature on which plaintiffs' experts relied" was "commendable" because it "assures that an expert, when formulating an opinion for use in the courtroom, will employ the same level of intellectual rigor as would be expected in the scientific community.").

## <u>ARGUMENT</u>

### I. The Plaintiff Experts' Opinions Fail the *Daubert* Reliability Factors.

*Daubert* sets out four key criteria for determining the reliability of expert testimony: (1) whether a theory or technique has been or can be tested; (2) whether it has been subjected to peer review and publication; (3) its known or potential rate of error; and (4) whether it has gained general acceptance in the relevant scientific community. *Wills*, 379 F.3d at 48 (citing *Daubert*, 509 U.S. at 593-94); *see also In re Mirena IUD Prods. Liab. Litig.*, __ F. App'x ___, 2017 WL 4785947, at *2 (2d Cir. Oct. 24, 2017) (similar). "Courts have considered other factors as well, including whether an expert's opinion was developed for litigation[.]" *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 420 (S.D.N.Y. 2005); *see also Mirena*, 2017 WL 4785947, at *3 (the

experts "developed their theories for the purposes of this litigation"). Reflecting the unreliability of their methodology, the plaintiff experts fail every *Daubert* reliability factor.

***The Plaintiff Experts' Theories Have Not Been Tested.*** "In analyzing the reliability of an expert's testimony, the 'key question' is 'whether it can be (and has been) tested.'" *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 75 (S.D.N.Y. 2001) (*quoting Daubert*, 509 U.S. at 593). Here, none of the plaintiff experts have done any testing of their theories, including whether LNG actually increases CSF production, as their mechanism theories hypothesize.[3] Dr. Johanson's testimony is illustrative: he says that "a week's research could answer some pivotal questions," but he did no such research. Ex. 6, Johanson Dep. 15:1-2; 17:5-18:6.

***The Plaintiff Experts' Theories Have No Known Error Rate.*** Because the plaintiff experts' theories have not been tested, by definition they have no "known or potential rate of error." *Mirena*, 169 F. Supp. 3d at 429; *see also Rezulin*, 369 F. Supp. 2d at 423 (rejecting expert testimony when theory "never has been tested and necessarily has no error rate").

***The Plaintiff Experts Have Not Subjected Their Theories To Peer Review and Have Developed Them Solely for Litigation.*** While not dispositive, "submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." *Daubert*, 509 U.S. at 593. None of the plaintiff experts have sought to publish the views they offer in this litigation.[4] *Mirena*, 169 F.

[3] Johanson Dep. 19:6-13; Ex. 2, Darney Dep. 238:11-20 (no testing, experimentation, or studies); Ex. 10, Plunkett Dep. 55:22-56:8 (no "testing to support [her] opinions"); Ex. 12, Salpietro Dep. 145:25-146:6 (no "laboratory work studying Mirena" or LNG).

[4] Ex. 12, Salpietro Dep. 146:7-9 (has never published about Mirena or LNG); Ex. 6, Johanson Dep. 109:8-110:7 (has never published, submitted for peer review, or presented in any public forum about whether Mirena or LNG can cause IIH); Ex. 10, Plunkett Dep. 56:9-22 (has not published or subjected to peer review any of her opinions about LNG, Mirena, and IIH); Ex. 8, Moyé Dep. 83:23-25 ("Q. Have you, outside of the litigation, given your views in any way that Mirena causes PTC? A. I have not."); Ex. 2, Darney Dep. 235:11-236:4 (has not subjected

Supp. 3d at 429 (excluding expert testimony because, among other reasons, it "has not been subjected to peer review and publication," has not "been scrutinized by the scientific community," and has been "shared . . . only with lawyers, not with other medical researchers or experts") (citation and internal quotation remarks omitted). Indeed, none of the plaintiff experts have offered their general causation opinions outside of this litigation.[5] *Awad v. Merck & Co.*, 99 F. Supp. 2d 301, 304 (S.D.N.Y. 1999) ("[A] significant consideration is whether research was conducted independently or for the sole purpose of litigation."); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 137 F. Supp. 2d 147, 190 (E.D.N.Y. 2001); *Rezulin*, 369 F. Supp. 2d at 424.

***The Plaintiff Experts' Theories Are Not Generally Accepted.*** All of the plaintiff experts admit that their opinion that Mirena can cause IIH is not generally accepted in the scientific community.[6] Their testimony therefore fails this *Daubert* factor as well. *Mirena*, 169 F. Supp.

---

views to peer review, "[i]f you mean the kind of peer review that comes with publishing in a journal"); Ex. 4, Fraunfelder Dep. 83:7-8 ("I haven't written about Mirena and IIH."); Ex. 14, Wheeler Dep. 41:9-42:1 (has never published on Mirena, LNG, IUDs, or IIH).

[5] *See, e.g.*, Ex. 6, Johanson Dep. 97:11-18 ("Q. . . . So you formed the opinion that Mirena causes PTC or IIH specifically in the context of your work as an expert witness in this litigation, correct? A. That's correct."); *id.* at 349:11-15 (has never presented his Mirena/PTC opinion outside of this litigation); Ex. 4, Fraunfelder Dep. 538:7-539:9 (has made no "efforts outside of this litigation to publish, talk to the medical community, [or] talk to the FDA about Mirena and IIH" because he "intend[s] to see what happens with the lawsuit and then we'll see what happens"); Ex. 8, Moyé Dep. 89:1-3 ("Q. Do you have an opinion that Mirena caused PTC before becoming involved in this litigation? A. No, sir."); Ex. 10, Plunkett Dep. 56:23-57:3 (has not shared or presented her opinions to anyone other than Plaintiffs' lawyers in this litigation); Ex. 14, Wheeler Dep. 40:7-22 (only work on Mirena, LNG, IUDs, or IIH is in this litigation); Ex. 2, Darney Dep. 235:11-236:4 ("Q. And you have not written these opinions that you express on page 5 anywhere other than your expert report; correct? THE WITNESS: No, I have not.") (objection omitted).

[6] Ex. 2, Darney Dep. 201:15-20 ("No, it's not generally accepted that it causes it."); *id.* at 203:20-23 ("I would agree, there's no consensus"); Ex. 14, Wheeler Dep. 281:17-19 ("Q. There's no consensus of opinion that Mirena causes IH, true? A. True."); *id.* at 100:13-19 (unaware of "anyone other than paid experts for the plaintiffs who has concluded that Mirena causes intracranial hypertension"); Ex. 8, Moyé Dep. 12:22-13:3 ("Q. Can you point me to any sources you have seen that specifically identify Mirena as a cause of PTC . . .? A. No."); Ex. 12, Salpietro Dep. 176:13 to 177:2 ("Q. Would you agree that it is not generally accepted at this time

3d at 449 (excluding general causation opinion because "[e]ven if there are some members of the medical and scientific community who agree" with the expert's theory, "Plaintiffs have not established general acceptance"). Indeed, their hypothesis has "no acceptance outside this litigation, let alone widespread acceptance." *Rezulin*, 369 F. Supp. 2d at 423.

The plaintiff experts' admissions illustrate that their combined patchwork cannot satisfy any of the *Daubert* reliability factors. *See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 644 (S.D.N.Y. 2016) ("This methodology does not come close to withstanding scrutiny under *Daubert* — it does not satisfy a single one of the *Daubert* factors.").

## II. The Plaintiff Experts' Opinions Do Not Provide a Reliable Basis for Causation.

When an expert's opinion fails all of the *Daubert* reliability factors, the court should "carefully scrutinize[]" the expert's methodology. *Mirena*, 169 F. Supp. 3d at 430, 449; *see also In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 593 F. Supp. 2d 549, 564 (S.D.N.Y. 2008) ("[W]hen an expert is offering testimony that is presented as a *scientific* conclusion and the expert's method fails to satisfy *any* of the factors identified in *Daubert*, a court should pause and take a ***hard look*** before allowing a jury to consider it.") (emphasis added). The plaintiff experts cannot withstand any such scrutiny. In cobbling together scraps of unreliable evidence in hopes that it adds up to causation, they ignore contrary evidence or fail to explain how it impacts their opinions; they rely on sources where the authors themselves find no causation; they rely on case reports, which they admit cannot prove causation; and they speculate about hypothetical biological mechanisms that have no scientific support as applied to LNG.

---

in the medical community that Mirena can cause pseudotumor cerebri? A. . . . [I]t's not recognized, Mirena."); Ex. 4, Fraunfelder Dep. 627:3-11 (has not seen the opinion that Mirena more likely than not causes IIH published anywhere); Ex. 6, Johanson Dep. 111:8-10 (unaware of any peer-reviewed publication concluding that Mirena causes IIH); Ex. 10, Plunkett Dep. 168:24-169:18 (unaware of anyone other than "paid experts for the plaintiffs in this litigation" who believes that Mirena causes IIH).

Courts consistently reject such flawed methodologies, even when faced with fuller datasets than the plaintiff experts invoke here, for good reason: it is the epitome of an unreliable methodology to string together isolated data that, examined individually, could never support a reliable causation opinion. *See, e.g.*, *Hollander*, 289 F.3d at 1216 n.21 (cannot add together "individual categories of evidence deemed unreliable by the district court . . . to form a reliable theory"); *In re Zoloft (Sertralinehydrochloride) Prods. Liab. Litig.*, 176 F. Supp. 3d 483, 498–99 (E.D. Pa. 2016) ("Without admissible expert testimony based on the epidemiological evidence, Plaintiffs instead have cobbled together evidence of biological plausibility. . . and anecdotal evidence. Taken together, Plaintiffs' potentially admissible evidence supports no more than an association . . . . Causation must be based upon more than a possibility.").

Plaintiffs hope to sanitize such a profoundly unscientific approach by having their experts assert that they are applying the Bradford Hill criteria, a set of general factors used to evaluate whether an established statistical association might be causal. Ex. 8, Moyé Dep. 77:6-13 ("It's a distillation of — of my — my application of Bradford Hill here."); Ex. 4, Fraunfelder Dep. 23:12-19 ("I performed analysis that is analogous to Bradford Hill."); Ex. 10, Plunkett Dep. 385:20-24 ("So in my report I describe that I use the Bradford Hill criteria. Essentially that's a set of — to me a set of questions that organize information that you then analyze using weight of the evidence."); Ex. 14, Wheeler Dep. 123:20-124:3 (asserting application of Bradford Hill criteria in his report). Courts are justifiably skeptical of experts who seek to clothe their opinions in the pretense of science when the subjective assessment of multiple factors can so easily disguise speculative guesswork. *See In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 796-800 (3d Cir. 2017) (affirming exclusion of "conclusion-driven" analysis, noting district court's gatekeeping responsibility to ensure "that the Bradford Hill/weight of the

evidence criteria 'is truly a methodology, rather than a mere conclusion-oriented selection process'"); *Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 514 (W.D. Pa. 2003) (excluding experts whose "efforts to apply the Bradford-Hill principles" were "not scientifically reliable"); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 604 (D.N.J. 2002) (excluding Bradford Hill-based causation opinion where the expert "did not adequately explain his methods for assessing the[ir] internal validity"), *aff'd*, 68 F. App'x 356 (3d Cir. 2003); *Dunn v. Sandoz Pharm. Corp.*, 275 F. Supp. 2d 672, 679 (M.D.N.C. 2003) (excluding expert whose "application of the Bradford Hill criteria does not satisfy the reliability prong of *Daubert*").

In short, the plaintiff experts cannot aggregate flawed and limited data to conclude causation: "[I]n law as in mathematics zero plus zero equals zero." *Henderson v. Kennedy*, 253 F.3d 12, 19 (D.C. Cir. 2001).

### A. The Available Epidemiology Does Not Reliably Support Causation.

In complex medical cases, epidemiological evidence can provide a reliable foundation for a general causation opinion. *See, e.g.*, *In re Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1224 (D. Colo. 1998) ("epidemiological studies are necessary to determine the cause and effect between" substance and disease that occur in background); *Pozefsky v. Baxter Healthcare Corp.*, 2001 WL 967608, at *3 (N.D.N.Y. Aug. 16, 2001) ("In the mass torts context, epidemiology is the best evidence of causation."); *Siharath v. Sandoz Pharm. Corp.*, 131 F. Supp. 2d 1347, 1356 (N.D. Ga. 2001) ("[E]pidemiological studies provide 'the primary generally accepted methodology for demonstrating a causal relation between a chemical compound and a set of symptoms or disease.'" (citation omitted)); Ex. 8, Moyé Dep. 272:14-25 (when case reports raise a question, "you move on to an observational study or a — I mean, a case control study or a cohort study or another study" to answer the question). Only two epidemiological studies have analyzed Mirena and IIH — Etminan and Valenzuela. Neither provides a reliable basis for a causation opinion.

### 1. The Etminan Cohort Study

Dr. Etminan's about-face has confounded the current plaintiff experts. Four of their seven experts do not mention Etminan at all in their expert reports (Drs. Moyé, Johanson, Salpietro, and Darney).[7] Dr. Wheeler brushes aside Etminan, claiming he is "unable to assess" it. Ex. 14, Wheeler Dep. 185:8-187:12. The other two (Drs. Plunkett and Fraunfelder) double down on Dr. Etminan's 2015 disproportionality analysis, without accounting for the fact that it has been functionally retracted.[8] Perhaps what is more remarkable is that Plaintiffs' counsel has elicited from their own epidemiologist, Dr. Moyé, how unreliable it would be to continue to rely on Etminan: "Q. Now, as a matter of epidemiology, would it be appropriate to rely on any part of a paper that was functionally retracted? A. I don't believe so." Ex. 8, Moyé Dep. 284:3-6.

In an equally unscientific manner, the plaintiff experts fail to confront Dr. Etminan's cohort study. Although Dr. Plunkett did not mention the Etminan epidemiological analysis in her report, she claimed reliance on it at her deposition, *see* Ex. 10, Plunkett Dep. 140:19-141:5, only to admit shortly thereafter that the data in that analysis do not support her causation opinion. *Id.* at 144:9-15 ("Q. Certainly the cohort study in Etminan does not indicate a higher — an increased risk with Mirena, correct? A. The data does not support that by itself . . . ."); *id.* at

---

7 Dr. Moyé claimed that he had "reliability concerns" with Etminan's epidemiological analysis, but he could not articulate those concerns. Ex. 8, Moyé Dep. at 137:6-13 281:2-5 ("A. Okay. Can you tell me now what you found to be unreliable about the observational portion of Etminan? A. I would have to look at the study again."). Dr. Darney reviewed the Etminan article only *after* he prepared his report, Ex. 2, Darney Dep. 207:2-17, and ultimately conceded that Etminan does not support his causation opinion, *id.* at 217:10-13.

8 *See, e.g.*, Ex. 10, Plunkett Dep. 139:9-17 (claiming that Etminan's calculated reporting odds ratio of 1.85 is a "reliable piece of the evidence"); *id.* at 144:23-145:3, 151:2-21 (acknowledging that corrected reporting odds ratio of 0.91 is "not statistically significant" but advocating it can still be "part of [the] weight of the evidence"); *id.* at 444:6-445:13 (testifying that Etminan 2015 is "still a piece of evidence that I have weighed and relied upon, yes, and I think it is supportive of my overall opinions."); Ex. 4, Fraunfelder Dep. 348:19-20, 349:23-350:4 (Etminan's retraction "lessens the value of the data," but Dr. Fraunfelder still relies on analysis "as a piece of the evidence of Mirena causing IIH.").

148:9-150:24, 446:10-447:12 (resorting to vague claims about "the weight of the evidence" and the "paper as a whole"). Similarly, Dr. Fraunfelder acknowledged that the Etminan epidemiological analysis "didn't reach statistical significance" and he was unable to point to any mathematical errors in the Etminan epidemiological analysis, Ex. 4, Fraunfelder Dep. 342:15-18, 353:8-15, but he nonetheless continued to assert that Dr. Etminan's "first article and his first letter to the editor do provide some evidence that Mirena possibly is associated with intracranial hypertension." *Id.* at 346:6-11. Such a haphazard approach, largely ignoring how Dr. Etminan's cohort study undermines their opinions and twisting any fact to support their pre-ordained position, constitutes the antithesis of the scientific method. *Rezulin*, 369 F. Supp. 2d at 425 ("[I]f the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable."); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) ("[R]ejecting or ignoring" unfavorable evidence "does not reflect scientific knowledge, is not derived by the scientific method, and is not 'good science.'").

**2. The Valenzuela Case Control Study**

Many of the plaintiff experts rely on the Valenzuela study, even though the Valenzuela authors disclaimed a causative role for Mirena. Ex. 64, Valenzuela 2017 at 4 ("Our investigation does *not* indicate that an LNG-IUS [Mirena] can cause PTC"). The plaintiff experts' willingness to stretch far beyond the authors' self-imposed limitations of their study is a tell-tale sign of an unreliable, litigation-driven opinion. *Konrick v. Exxon Mobil Corp.*, 2016 WL 439361, at *6 (E.D. La. Feb. 4, 2016), *aff'd*, 670 F. App'x 222 (5th Cir. 2016) ("[W]hen a study's authors expressly disclaim the causal relationship that the expert relies upon the study to prove, the study likely does not provide a reliable basis for the expert's opinion."); *In re Accutane Prods. Liab.*, 2009 WL 2496444, at *2 (M.D. Fla. Aug. 11, 2009) ("[W]hen an expert relies on the studies of

others, he must not exceed the limitations the authors themselves place on the study."), *aff'd*, 378 F. App'x 929 (11th Cir. 2010).

Even setting aside the fact that the study's authors disclaim any finding of causation, the elevated unadjusted odds ratio in Valenzuela still could not reliably support a general causation opinion. To begin with, the study has never been replicated. *See, e.g.*, Ex. 4, Fraunfelder Dep. 254:14-21; Ex. 14, Wheeler Dep. at 194:11-20. Replication is an essential aspect of confirming a potential relationship: "It is important that a study be replicated in different populations and by different investigators before a causal relationship is accepted by epidemiologists and other scientists." Ex. 86, Reference Manual 604; *Konrick*, 2016 WL 439361, at *13 (same); *see also, e.g.*, Ex. 8, Moyé Dep. 123:1-5; Ex. 4, Fraunfelder Dep. 253:10-254:12; Ex. 2, Darney Dep. 148:14-18. Moreover, the Valenzuela study suffers from several crucial methodological flaws — for which the plaintiff experts made no attempt to account. Two are especially important:

<u>First</u>, the authors failed to control for known confounders such as age, BMI, weight gain, and tetracycline antibiotic use. Ex. 4, Fraunfelder Dep. 172:7-10, 181:3-182:23; Ex. 14, Wheeler Dep. 193:14-194:7; Ex. 2, Darney Dep. 184:2-9. These confounders could bias the study results to make it appear that Mirena was associated with IIH when in fact the confounders were driving the results. *See, e.g.*, Reference Manual 591 (a "major reason for error in epidemiologic studies is confounding," and a classic example of confounding "is when a confounder is both a risk factor for the disease and a factor associated with the exposure of interest"). Plaintiff's expert Dr. Darney confirms that a study "would have to control for BMI, female gender, and age, in order to conclude that Mirena is associated with IIH[.]" Ex. 2, Darney Dep. 165:9-13.

<u>Second</u>, as they allude to in their article, the Valenzuela authors ascertained Mirena usage *differently* between their IIH (case) groups and their non-IIH (control) groups, leading them to

undercount Mirena use in the control groups in an obvious way that had the effect of making Mirena use appear comparatively more common among IIH patients (*i.e.*, artificially inflating the odds ratios). *See* Ex. 64, Valenzuela at 5.[9] This is no mere hypothetical concern. The plaintiff experts acknowledge that higher rates of Mirena usage in the control groups could impact the calculated odds ratios, even while admitting that they never did this corrected analysis for their expert reports. *See, e.g.*, Darney Dep. 173:19-174:12, 178:17-179:25; Ex. 14, Wheeler Dep. 194:4-6, 194:21- 197:12, 198:19-199:6; Ex. 10, Plunkett Dep. 157:23-160:4 ("No, I have not done that analysis."). In fact, when data more accurately approximating Mirena usage is substituted for the artificially low rates used in the study (2% in Utah and 3.5% in Denmark), the increased odds ratio vanishes. *See* Ex. 71, BfArM Response 22-24; Ex. 8, Moyé Dep. 157:9-25; Ex. 19, Boulet at 782 tbl. 1 (18.9% LARC usage in Utah); Ex. 59, Sanders at 590.e3 (75% of LARC usage is Mirena); Ex. 42, Lindh at 23 (8-12% LNG-IUS usage in Denmark); Ex. 20, Cibula tbl. 2 (9% LNG-IUS usage in Scandinavian countries as of 2006).

---

[9] Specifically, in the Denmark arm of the study, the authors counted women with IIH (cases) as Mirena "users" if their medical records indicated that they had a Mirena in place at the time their IIH occurred, regardless of whether their Mirena was placed that year or some earlier year. Among women without IIH (controls), the authors estimated Mirena "use" by dividing the number of Mirenas sold in Denmark in a single calendar year (2014) by the female reproductive-age population in the entire country. As Mirena is used on average for more than one year, this differentially miscategorized women in the controls as non-users, resulting in much higher Mirena rates in the case group than in the control group. In the Utah group, the authors used telephone interviews to determine whether patients with IIH (cases) had used Mirena when their symptoms began, regardless of where (University of Utah versus elsewhere) or when (during the study period versus prior to 2008) their IUD was inserted. But for the control group they relied on billing records documenting only those patients whose Mirena was inserted at the University of Utah during the study period, thereby missing patients who received Mirena at sources like Planned Parenthood, community OB/GYN practices, or out-of-state, or who had their IUD inserted before 2008 but were still using it. In both instances, this differential counting makes Mirena usage appear much more common in IIH cases than in non-IIH controls, resulting in the statistically significant, unadjusted differences between these two groups.

The plaintiff experts admitted that these flaws exist.[10] But they simply disregarded them so they could embrace Valenzuela's unadjusted odds ratios to argue for causation.[11] In doing so, the plaintiff experts expose the advocacy-driven nature of their opinions: "when an expert relies on the studies of others, he must not exceed the limitations the authors themselves place on the study." *Accutane*, 2009 WL 2496444, at *2; *Mirena*, 169 F. Supp. 3d at 452 (same).

**B. Anecdotal Case Reports Are Not Reliable Evidence of Causation.**

The plaintiff experts also premise their opinions on reports of individual cases of IIH in users of Mirena or Norplant, a different contraceptive that is implanted in the arm and contains far more LNG than Mirena.[12] Setting aside the fact that a fair reading of these limited case reports hardly supports Plaintiffs' theory, the case law and scientific sources overwhelmingly recognize that anecdotal reports of individual cases cannot constitute reliable evidence of causation. The fundamental "difficulty with case reports . . . is distinguishing between

---

[10] *See* Ex. 8, Moyé Dep. 180:2-6 (cannot rule out confounders in the Valenzuela data); *id.* at 169:2-170:2, 175:3-5 (cannot rule out undercounting Mirena use in controls); *id.* at 179:17-22 (conceding that the low response rate in the Utah case group was subject to responder bias); Ex. 10, Plunkett Dep. 157:23-160:15 (limitations in exposure estimates could have impacted the Valenzuela results); *id.* at 154:6-20 (Utah unadjusted odds ratio of 7.7 has not accounted for confounders like obesity); Ex. 2, Darney Dep. 184:2-9 (agreeing that Valenzuela was limited by failure to account for potential confounders like obesity or recent weight gain); Ex. 4, Fraunfelder Dep. 175:5-10 (admitting that study has small number of cases, which "does put it lower on the evidence scale"); *id.* at 190:6-10, 194:21-195:4 (conceding potential bias in study).

[11] *See, e.g.*, Ex. 7, Moyé Rpt. 17, 31 (relying on unadjusted odds ratio reported in the Utah study arm of Valenzuela); Ex. 9, Plunkett Rpt. 27 (relying on unadjusted odds ratio in the Utah arm); Ex. 1, Darney Rpt. 24 (relying on unadjusted odds ratios in the Utah and Denmark arms); Ex. 13, Wheeler Rpt. 35-36 (asserting that Valenzuela "found a statistically significant increased risk of IH in a large case-control observational study of two different groups").

[12] *See, e.g.*, Ex. 1, Darney Rpt. 24 (relying on two case reports involving Mirena and IIH); Ex. 3, Fraunfelder Rpt. 1 (citing "adverse event reporting" and "a review of individual reports"); Ex. 7, Moyé Rpt. 29 (citing "case reports"); Ex. 9, Plunkett Rpt. 28 (citing adverse event reports); Ex. 13, Wheeler Rpt. 20, 39 (citing "individual case information" and a list of 115 adverse event reports analyzed in analysis); Ex. 11, Salpietro Rpt. 27-30 (citing case reports); Ex. 5, Johanson Rpt. 24-25 (citing adverse event reports from Norplant and Mirena users).

association and causation. Simply because a patient exposed to a particular substance exhibited a set of symptoms does not mean that it was the substance that caused the symptoms." *Rezulin*, 369 F. Supp. 2d at 406; *see also* Ex. 86, Reference Manual 218 ("Anecdotal evidence usually amounts to reports that events of one kind are followed by events of another kind. Typically, the reports are not even sufficient to show association, because there is no comparison group."). As Judge Seibel recognized in the previous Mirena MDL, "[c]ase reports are generally disfavored by courts as evidence of causation because they merely describe reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group; they do not isolate and exclude potentially alternative causes; and they do not investigate or explain the mechanism of causation." *Mirena*, 169 F. Supp. 3d at 451 (citation, quotation marks, and alterations omitted). In short, "case reports raise questions; they do not answer them." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1254 (11th Cir. 2005).

The plaintiff experts cannot disagree with these basic scientific principles: they admit that adverse event reports can only raise a hypothesis that must be tested by epidemiological investigation.[13] But they nevertheless rely on case reports to prop up their causation opinions. This have-it-both-ways approach hardly comports with good science.

### 1. Mirena Adverse Event Reports

How the plaintiff experts handle the Mirena case report data exemplifies their unscientific approach. They admitted that they cannot rule out alternate causes and confounders for any

[13] *See, e.g.*, Ex. 8, Moyé Dep. 131:22-25 ("case reports are not even sufficient to show association because there is no comparison group"); Darney Dep. 206:9-11 ("case reports cannot establish causation"); *id.* at 144:7-24 (the "principal use" of case reports is "to generate a hypothesis for epidemiologic . . . investigation"); Ex. 10, Plunkett Dep. 184:20-24 (case report "shows associations, not general cause"); Ex. 14, Wheeler Dep. 206:13-20 ("adverse event data cannot be used to establish causation" and "the proper use of adverse event report data is . . . hypothesis generating").

given adverse event report, especially given that all Mirena users are women, nearly all of childbearing age, and the vast majority of IIH reports were in Mirena users who were overweight or had recently gained weight:

- Dr. Fraunfelder pointed to more than 400 adverse event reports, but ultimately admitted that he cannot identify a single one that was not confounded in some way, speculating only that "it's possible those kinds of cases exist . . . [b]ut I don't know for sure." Ex. 4, Fraunfelder Dep. 497:16-23;

- Dr. Plunkett relied on three adverse event reports[14] from clinical trials, two of which had doubtful or no diagnosis of IIH, and the third had IIH before ever using Skyla (a different LNG IUD); in all three cases, their doctors reported that the patients' symptoms were probably not related to Mirena, and Dr. Plunkett, who is not a medical doctor, agreed she could not second-guess the doctors' assessments or even confirm that the patients had IIH. Ex. 10, Plunkett Dep. 128:23-129:22; 131:6-12; 205:8-20, 207:6-209:6, 210:18-211:9.

Indeed, although several experts tried to elevate the importance of purported cases of "dechallenge" — in other words, a patient's symptoms improved or resolved when the Mirena was removed —they concede that these dechallenge cases are equally confounded by alternate treatments that could alone explain the patients' improvement:

- Dr. Moyé quickly abandoned his reliance on dechallenge cases: "it's impossible to rule out treatment leading to the improvement in symptoms that's reported in those cases[.]" Ex. 8, Moyé Dep. 242:1-15;

- Dr. Wheeler similarly admitted that he did not know "whether the women had any medical intervention that would alternatively explain their improved symptoms." Ex. 14, Wheeler Dep. 258:7-13;

- Dr. Fraunfelder claimed to identify four cases of "unambiguous dechallenge," Ex. 3, Fraunfelder Rpt. 21-22, only to backpedal under questioning, admitting that "I don't know" whether the patients also received other treatments. Ex. 4, Fraunfelder Dep. 425:13-20, 448:3-17; *id*. at 451:4-11 ( "can't be sure if . . . the case reports contain all the treatments they are receiving");

- Dr. Plunkett claimed she found "valuable examples of dechallenge," Ex. 9, Plunkett Rpt. 34, citing only a Bayer analysis that expressly concluded the opposite: ***"[n]o unambiguous case***

---

14 Ex. 73, MIR_JSEU_01057383, at -384-85; Ex. 75, MIR_INDNDA_00473902, at -902-903; Ex. 74, MIR_PIEU_00157045, at -046

***of positive dechallenge could be identified."*** Ex. 70, MIR_INDNDA_481006 at -742 (emphasis added).[15] But Dr. Plunkett didn't bother to actually look at the specific cases, *see* Ex. 10, Plunkett Dep. 366:23-367:25, nor could she opine about why any particular patient's symptoms may have resolved. *Id.* at 135:4-11.

In sum, the individual reports on which the plaintiff experts rely show the inherent unreliability of drawing causation conclusions from isolated, individual cases. The adverse event reports with Mirena show only that women who otherwise have an increased risk of IIH because of their age, gender, and weight report IIH while using Mirena. The plaintiff experts admit that they are unable to "isolate and exclude potentially alternative causes," and as a result they cannot develop a reliable "comparison to the rate at which [IIH] occur[s] in the general population or in a defined control group[.]" *Mirena*, 169 F. Supp. 3d at 451.[16]

### 2. Norplant Adverse Event Reports

The plaintiff experts' reliance on Norplant case reports is even less reliable: Norplant is implanted in the arm, acts throughout the body, and contains far more LNG than Mirena: 216 mg versus 52 mg. Ex. 69, Norplant Label, at -55897; Ex. 68, Mirena Label 2. Norplant produces higher average blood concentrations of LNG than Mirena: 1600 pg/mL ± 1100 pg/mL vs. 342 ± 147 pg/mL after a few weeks, and 327 ± 119 pg/mL vs. 180 ± 66 pg/mL after one year. Ex. 69, Norplant Label, at -55898; Ex. 68, Mirena Label 18. Courts are rightly skeptical when

---

15 In 2015 Bayer conducted an investigation of the alleged link between Mirena and IIH in response to the Etminan article and concluded that the available data "do not indicate that Mirena use would be associated with an increased risk for developing IIH." Bayer submitted the findings of that investigation to regulators. Ex. 70, MIR_INDNDA_481006.

16 The plaintiff experts' reliance on adverse event data is especially unreliable where, as here, the majority of the adverse event reports are lawsuits filed by Plaintiffs that Bayer is required to report to the FDA as adverse events. *See, e.g.*, Ex. 14, Wheeler Dep. 219:10-15 (agreeing that lawsuit-generated adverse event reports would confound any analysis of adverse event data). Of the 319 cases in Bayer's pharmacovigilance database in October 2017 that potentially referred to a diagnosis of IIH in Mirena or Skyla users, 197 (61.8%) had been submitted in the context of litigation. Ex. 71, BfArM Response 44.

prospective experts make such leaps. *See Brumbaugh v. Sandoz Pharm. Corp.*, 77 F. Supp. 2d 1153, 1157 (D. Mont. 1999) ("Testimony extending general conclusions about similar drugs does not meet *Daubert*'s requirement of reliability."); *Dunn v. Sandoz Pharm. Corp.*, 275 F. Supp. 2d 672, 681 (M.D.N.C. 2003) ("Dr. Kulig's assertion that because bromocriptine is an ergot alkaloid and *may* behave like other ergot alkaloids and cause vasoconstriction simply does not support the proposition that Parlodel causes stroke in postpartum women.").

More fundamentally, the Norplant reports suffer from the same problem as the Mirena case reports: it is impossible to demonstrate that Norplant caused the patients' IIH. Ex. 14, Wheeler Dep. 165:20-166:4. Indeed, the plaintiff experts agree with the Norplant case report authors' own conclusion that the case reports do not establish causation.[17]

### C. The Plaintiff Experts' Selective Consideration of Other Contraceptive Data Shows That Their Opinions Do Not Reliably Support Causation.

The plaintiff experts' selective reliance on Norplant case reports highlights an additional way in which their methodology is unreliable. Multiple plaintiff experts give dose-response opinions, meaning that one would expect that products with higher (or much higher) levels of LNG would show a higher risk. In fact, every epidemiologic study looking for an association between oral contraceptives (which contain much more LNG than does Mirena) and IIH has

---

[17] *See* Ex. 63, Sunku 1993, at 299 ("possible" association between Norplant and IIH could merely be "coincidental"); Ex. 16, Alder 1995, at 1721 (Norplant "may have contributed to the onset" of IIH, "or it may have had nothing to do with it"); Ex. 67, Wysowski 1995, at 541 (further study "would be required to determine if a causal association . . . exists"); Ex. 8, Moyé Dep. 271:18-272:13; Ex. 14, Wheeler Dep. 164:17-21; Ex. 2, Darney Dep. 138:22-25 (agreeing that "evidence does not support a cause-and-effect relationship between Norplant and PTC or IIH"); Ex. 10, Plunkett Dep. 182:17-23 (case studies cannot establish causation); *see also* Ex. 64, Valenzuela 2017, at 4 ("these previous [Norplant] reports did not imply a causative role for LNG in the pathogenesis of PTC").

shown no association.[18] Crucially, none of the plaintiff experts accounted for these findings. That these experts have focused solely on the LNG-containing product Norplant (at the apparent direction of the lawyers) without taking into account (or even investigating) whether other LNG-containing products have even been associated with IIH betrays their unscientific methodology.

Some of the plaintiff experts fully agreed that science has largely disproven any connection between IIH and oral contraceptives, without reconciling that scientific finding with their opinions in this litigation. Ex. 4, Fraunfelder Dep. 16:7-14 (agreeing that "an association between oral contraceptives and IIH has been largely disproven"); Ex. 2, Darney Dep. 43:2-14 ("My opinion is that [oral contraceptives] do not [cause IIH]"). Others simply made no investigation of the issue.[19] Their failure to square their causation opinions with this contrary data highlights the unreliability of their opinions. *See Mirena*, 169 F. Supp. 3d at 449 ("[I]f the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable.") (quoting *Rezulin*, 369 F. Supp. 2d at 425).

---

[18] *See, e.g.*, Ex. 23, Digre 1983, at 727; Ex. 25, Durcan 1988, at 876-77; Ex. 37, Ireland 1990, at 315; Ex. 33, Giuseffi 1991, at 239; Ex. 51, Radhakrishnan 1993, at 24; Ex. 17, Ball 2006, at 440. Between 1979 and 1988, when data were collected for the Durcan, Ireland, and Giuseffi studies, the predominant progestins in combined oral contraceptives on the US market were norgestrel/levonorgestrel and norethindrone. Ex. 31, Gerstman 1991, Figure 4. Plaintiffs' pharmacologist admits that LNG-containing oral contraceptives result in systemic LNG levels 15-20 times higher than those observed with Mirena. Ex. 9, Plunkett Rpt. 18; Ex. 10, Plunkett Dep. 12:19-13:4 ("It should be 3,000 to 6,000, not 300 to 600.").

[19] Ex. 8, Moyé Dep. 51:11-14 ("Q. Are you aware that there are multiple studies evaluating oral contraceptives and concluding that they are not linked to PTC? A. I haven't looked at that, so I don't know."); Ex. 10, Plunkett Dep. 22:13-19, 30:6-21 (agreeing that she does not "provide an opinion in [her] report about whether or not combined oral contraceptives increase the risk of IIH" and has no basis to disagree that "more recent research has shown no significant increase in the proportion of women taking the pill and those with [IIH]"); Ex. 12, Salpietro Dep. 166:13-25 (comparing Mirena to COCs "is not the focus of my report"); Ex. 14, Wheeler Dep. 158:4-159:11 ("I have not analyzed them in my report").

### D. The Plaintiff Experts' Various Mechanism Theories Are Speculative and Unproven and Do Not Reliably Support Causation.

The final piece of the plaintiff expert patchwork is their speculation about potential biological mechanisms by which Mirena might somehow cause IIH. The fact that they offer rival theories — their "androgen theory" and their "mineralocorticoid receptor (MR) theory" — validates what Dr. Salpietro described as the scientific community's "prehistoric" understanding of the mechanism of IIH. Ex. 12, Salpietro Dep. 409:5-410:17. Their inability even to agree on a single proposed mechanism speaks to the speculative nature of their biologic guesswork.

The specific deficiencies in these theories are spelled out in the individual *Daubert* briefs challenging their corresponding sponsors, but a few broad points warrant mention here. First, none of the experts — even those sponsoring mechanism theories — seriously dispute that science does not yet know what causes IIH. Ex. 2, Darney Dep. 243:11-14 ("Q. Well, certainly the mechanism by which women develop PTC is unknown as of today; right? A. Yes. It's not — not yet clear, but we're getting closer to an understanding."); Ex. 12, Salpietro Dep. 89:21-23 ("There is no one in the world who knows the exact cause of pseudotumor cerebri."); Ex. 4, Fraunfelder Dep. 384:5-6 ("the mechanism is unknown").

Second, each of the sponsors acknowledge that the mechanism theories are unproven, untested hypotheses. Ex. 6, Johanson Dep. 214:6-10 (androgen theory "properly characterized as a plausible hypothesis at this point"); Ex. 10, Plunkett Dep. 264:20-265:9 (androgen theory is a "hypothesis to be tested"); Ex. 2, Darney Dep. 239:9-13 ("the androgenic theory of PTC is still a hypothesis for which evidence is accumulating"); Ex. 12, Salpietro Dep. 80:11-15; 122:15-19 (MR theory "is not proven" and is at most "biologically plausible"). Indeed, the plaintiff experts admit that ***no study*** has connected the androgenic effects of LNG (e.g., acne) to IIH or

demonstrated that LNG activates the MR receptor.[20]

In this state of scientific uncertainty, Plaintiffs cannot bootstrap their general causation case by layering on such speculation. "While hypothesis is essential in the scientific community because it leads to advances in science, speculation in the courtroom cannot aid the fact finder in making a determination of whether liability exists." *Dunn*, 275 F. Supp. 2d at 684; *see also Mirena*, 169 F. Supp. 3d at 450 ("the law cannot wait for . . . confirmation" of the experts' theories (citation omitted)). Such speculation cannot pass *Daubert* scrutiny: "[T]he courtroom is not the place for scientific guesswork, even of the most inspired sort. Law lags science; it does not lead it." *Golod v. La Roche*, 964 F. Supp. 841, 861 (S.D.N.Y. 1997) (citation omitted).

## CONCLUSION

For the foregoing reasons, and for the additional reasons set forth in Bayer's individual *Daubert* motions for each of the plaintiff experts, Bayer respectfully requests that the Court exclude the plaintiff experts' opinions in their entirety.

---

[20] Ex. 14, Wheeler Dep. 143:5-14 ("Q. Can you identify any peer-reviewed medical literature discussing the androgen theory of IIH using — measuring LNG? A. No. . . . Q. Can you identify any peer-reviewed literature discussing the androgen theory of IIH having any experimental data on LNG at all? A. No, too early. Hasn't been done."); Ex. 2, Darney Dep. 239:14-17 ("Q: And are you aware of any published article that concludes that IIH is, in fact, caused by androgenic effects of levonorgestrel? A. No."); Ex. 10, Plunkett Dep. 266:9-22 ("Q. What I'm saying is you can't — you can't show me a paper — any paper that concludes that androgens or androgenic activity causes PTC, correct? . . . THE WITNESS: So if you're asking me is it going to have that statement in the paper, no."); *id.* at 311:25-312:7 ("Q. The articles that you cite for your androgen theory do not mention LNG or Mirena in them, correct? A. That's true."); Ex. 6, Johanson Dep. 119:3-9 (cannot identify a single study of Mirena or LNG finding that it increases CSF production or CSF pressure by any mechanism); *id.* at 113:11-15 ("Q. … Are you aware of any peer-reviewed publication that has concluded that androgens are established to cause PTC, IIH? A. No."); Ex. 12, Salpietro Dep. 252:22-253:5 (confirming that he is "not aware of any study that shows for LNG an agonist effect at the MR . . . I have no such evidence.").

Dated: March 2, 2018

Respectfully submitted,

*s/ Paul W. Schmidt*

Paul W. Schmidt
Michael X. Imbroscio
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-5272
Facsimile: (202) 778-5272
pschmidt@cov.com
mimbroscio@cov.com

Shayna S. Cook
Goldman Ismail Tomaselli Brennan & Baum LLP
564 West Randolph Street, Suite 400
Chicago, Illinois 60661
Telephone: (312) 681-6000
Facsimile: (312) 881-5191
scook@goldmanismail.com

James Shepherd
Shook Hardy & Bacon LLP
600 Travis Street, Suite 3400
Houston, TX 77002
Telephone: (713) 227-8008
Facsimile: (713) 227-9508
eshepherd@shb.com

*Attorneys for Defendants Bayer HealthCare Pharmaceuticals Inc., Bayer Pharma AG, and Bayer OY*