**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **IN RE:** | : | |
| | : | **17-MD-2767 (PAE)** |
| **MIRENA IUS LEVONORGESTREL-RELATED** | : | **17-MC-2767 (PAE)** |
| **PRODUCTS LIABILITY LITIGATION (NO. II)** | : | |
| | : | |
| ***This Document Relates To All Actions*** | : | |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF GERI D. HEWITT, M.D.

# TABLE OF CONTENTS

**Pages**

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

LEGAL STANDARD .......... 3

ARGUMENT .......... 3

A. Dr. Hewitt's testimony as to the mechanism by which PTC/IH occurs in the human body should be excluded because she lacks the requisite knowledge, experience, and expertise to reliably give an opinion on the issue .......... 4

B. Dr. Hewitt should be precluded from testifying that there is a lack of association between Mirena use and PTC/IH because she has failed to review critical data in reaching her opinion .......... 6

C. Dr. Hewitt's opinions as to the non-contraceptive benefits of Mirena are irrelevant, misleading, and likely to confuse the jury .......... 11

D. Dr. Hewitt's opinions as to the pharmacological effects of Mirena should be excluded because she is not a pharmacologist and she gives no support for her claims .......... 13

E. Dr. Hewitt's opinions as to the adequacy of the Mirena label should be excluded because she is not a regulatory expert and her conclusions regarding the label are not supported by a reliable methodology .......... 15

F. Dr. Hewitt's opinion that PTC/IH is not an androgenic side effect should be excluded because it is unsupported conjecture .......... 17

CONCLUSION .......... 19

# TABLE OF AUTHORITIES

**Cases** **Pages**

*Amorgianos v. Amtrak*, 303 F.3d 256 (2d Cir. 2002) ....................4

*Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179 (2d Cir. 2001)....................14

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) .................... *passim*

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ....................18

*In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164 (S.D.N.Y. 2009)....................7

*In re M/V MSC Flaminia*,
2014 U.S. Dist. LEXIS 119146, at *165 (S.D.N.Y. July 28, 2017)....................14

*In re Rezulin Prods. Liabl. Litig.*, 369 F. Supp. 2d 398 (S.D.N.Y. 2005) ....................6

*Katt v. City of N.Y.*, 151 F. Supp. 2d 313 (S.D.N.Y. 2001) ....................13

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ....................7

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.* 525 F. Supp. 2d. 558 (S.D.N.Y. 2007)......3, 11

*Lust by & Through Lust v. Merrell Dow. Pharm*., 89 F.3d 594 (9th Cir. 1996)) ....................6

*Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450 (S.D.N.Y. 2001) ....................18

*Santoro v. Donnelly*, 340 F. Supp. 2d 464 (S.D.N.Y. 2004) ....................18

*THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218 (S.D.N.Y. 2010)....................3

**Rules**

Fed. R. Evid. 403 ....................10

Fed. R. Evid. 702 .................... *passim*

**Statutes and Regulations**

21 C.F.R. § 201.57 (2018....................15

**Other**

*Questions and Answers on FDA's Adverse Event Reporting System (FAERS)*,
U.S. Food & Drug Administration (Feb. 21, 2018) ....................9

Pursuant to Federal Rule of Evidence 702, Plaintiffs hereby submit this Memorandum of Law in Support of their Motion to Exclude the Opinions and Testimony of Geri D. Hewitt, M.D. In support of their motion, Plaintiffs respectfully show the Court as follows:

## INTRODUCTION

This case involves the Mirena levonorgestrel-releasing intrauterine system ("IUS" or "IUD" or "LNG-IUS") and its association with the development of pseudotumor cerebri/intracranial hypertension ("PTC/IH" or "IIH"), a condition of increased intracranial pressure characterized by debilitating migraines and vision loss. The Mirena IUD releases levonorgestrel ("LNG"), a potent synthetic progestin, from a matchstick-sized cylinder. Norplant, developed by Bayer prior to Mirena, consisted of six LNG-releasing cylinders implanted in the arm (now Norplant-2/Jadelle, comprised of two cylinders). Leiras OY (now Bayer OY) manufactured Norplant, and Norplant-2/Jadelle is currently manufactured and marketed by Bayer OY. Both Norplant products contain warnings for benign intracranial hypertension. A PTC/IH warning was added to the Norplant label as early as 1993—eight years before Mirena was marketed in the United States. Mirena's label contains no such warning.

Defendants Bayer HealthCare Pharmaceuticals, Inc., Bayer Pharma AG, and Bayer OY ("Bayer") have identified Geri D. Hewitt, M.D. ("Dr. Hewitt") to give expert opinions in this litigation. In the General Expert Report of Geri D. Hewitt, M.D. ("Hewitt Rpt." attached as Exhibit A), Dr. Hewitt offers opinions about a variety of different topics, many of which are wholly irrelevant to general causation and outside the scope of her purported areas of expertise and qualifications. Much of her report serves no purpose but to confuse and mislead the jury. Finally, her opinions are not supported by a reliable methodology. The following is a brief overview of the topics and opinions discussed in Dr. Hewitt's General Expert Report.

Dr. Hewitt begins by discussing her background and qualifications. She is currently a professor at Ohio State University College of Medicine in the Department of Obstetrics and Gynecology and the Department of Pediatrics. Hewitt Rpt. pg. 1. Dr. Hewitt divides her professional time evenly between acting as the Section Chief of Obstetrics and Gynecology at Nationwide Children's Hospital and as a member of the General Obstetrics and Gynecology Division at Ohio State Medical Center. *Id*. Dr. Hewitt's report continues with a discussion of general gynecology and the female reproductive system. Hewitt Rpt. pg. 3. Starting on page five, she discusses the inherent risks of pregnancy, the risks of unintended pregnancy, and the various contraceptive options available. Hewitt Rpt. pgs. 5-10. On page ten, Dr. Hewitt begins opining about contraceptive efficacy and safety in obese women, the safety profile of Mirena, and the non-contraceptive benefits of Mirena. Hewitt Rpt. pgs. 10-16. Dr. Hewitt also purports to offer opinions about the cause of intracranial hypertension and what she believes to be limitations of a peer-reviewed, published study finding an association between Mirena and PTC/IH. Hewitt Rpt. pgs. 16-24. Dr. Hewitt concludes her report by describing opinions as to the pharmacological effects of Mirena and the adequacy of the Mirena label. Hewitt Rpt. pgs. 24-27.

Much of Dr. Hewitt's General Report is irrelevant to general causation. The section starting on page three entitled "Gynecology & the Female Reproductive System" through the section on page eight entitled "Short-Acting Hormonal Contraception" has nothing to do with whether Mirena more likely than not can cause PTC/IH. Within these pages, Dr. Hewitt included sections of irrelevant material entitled: "Inherent Risk With Pregnancies," "Risks of Unintended Pregnancy," "Sterilization," "Barrier Methods," and "Short-Acting Hormonal Contraception." Hewitt Rpt. pgs. 3-8. The discussion of wholly irrelevant gynecological topics is likely to confuse and mislead the jury. Further, Dr. Hewitt's General Report contains opinions that are entirely outside

her expertise and qualifications as an obstetrician/gynecologist. Finally, Dr. Hewitt's opinions are not supported by reliable methodology, and should be excluded. Plaintiffs seek to preclude Dr. Hewitt's opinions as to the following subject areas: A) the cause of PTC/IH; B) the association between Mirena and PTC/IH; C) the non-contraceptive benefits of Mirena; D) the pharmacological effects of Mirena; E) the adequacy of the Mirena label; and F) the androgenicity of PTC/IH.

## LEGAL STANDARD

In the interest of brevity, Plaintiffs will not set forth a detailed discussion of the legal standard in this Memorandum. Plaintiffs respectfully refer the Court to the legal standard set forth in detail in Memorandum in Support of Plaintiffs' Omnibus Motion to Exclude Defendants' General Causation Expert Witnesses and hereby incorporate that Omnibus Motion into this Memorandum. In short, it is well established that the admissibility of expert testimony is governed by the Federal Rules of Evidence, including but not limited to Rules 702, 403 and 104. The trial judge acts as a gatekeeper for the admission of testimony on issues requiring scientific, technical and other specialized knowledge. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.* 525 F. Supp. 2d. 558, 580 (S.D.N.Y. 2007). The proffering party has a burden to establish the admissibility of its experts by a preponderance of the evidence. *THOIP v. Walt Disney Co.,* 690 F. Supp. 2d 218, 229 (S.D.N.Y. 2010).

## ARGUMENT

Plaintiffs move to exclude Dr. Hewitt's opinions regarding several topics. Dr. Hewitt is an obstetrician/gynecologist ("OB/GYN") by education, training, and experience. *See* Curriculum Vitae of Geri D. Hewitt, M.D. (attached as Exhibit B) ("Hewitt CV"). Plaintiffs do not challenge Dr. Hewitt's qualification as an OB/GYN. However, her qualification as an OB/GYN does not man-

date carte blanche admission of her opinions in this case. Dr. Hewitt's general expert report contains pages of opinions that are off-topic, baseless, and outside the area of her expertise. Any minimal probative value of this expert's opinions on these topics is substantially outweighed by the likelihood that the opinions will mislead the jury, confuse the issues, and waste time. Further, Dr. Hewitt has disregarded important evidence in forming her opinions, and as such, her opinions are not supported by reliable methodology.

**A. Dr. Hewitt's testimony as to the mechanism by which PTC/IH occurs in the human body should be excluded because she lacks the requisite knowledge, experience, and expertise to reliably give an opinion on the issue.**

In order for expert testimony to be admissible, the expert's opinions must be relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). In deciding whether an expert's analysis is reliable, "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion on those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002). An expert who is relying solely or primarily on experience must explain how that experience leads to her conclusion, why her experience is a sufficient basis for her opinion, and how her experience is reliably applied to the facts. Fed. R. Evid. 702 advisory committee's note (2000 Amendments).

It is undisputed that Dr. Hewitt's only specialty is obstetrics and gynecology. February 9, 2018, Deposition Transcript of Geri Hewitt (transcript excerpts attached as Exhibit C)[1] ("Hewitt Transcript") at 41: 6 – 12. Dr. Hewitt is not an ophthalmologist, neurologist, neuro-ophthalmologist, or neuro-scientist. As a medical doctor specializing in OB/GYN, Dr. Hewitt is qualified to

[1] For the Court's convenience, Plaintiffs provide relevant excerpts from the February 9, 2018, deposition of Dr. Hewitt. Additionally, in the event the Court wishes to review additional portions of the transcript, the entire transcript is attached hereto as Exhibit D.

opine on many physiological processes in the human body. However, it is inappropriate for Dr. Hewitt to give opinions on the mechanism by which PTC/IH occurs in the human body. PTC/IH is a complex neuro-ophthalmological condition, and Dr. Hewitt has little to no experience with the disease. In roughly 28 years of practice, she has never diagnosed a patient with PTC/IH. Specifically, Dr. Hewitt's deposition transcript reads:

> Q. Okay. Have you ever diagnosed anyone with PTC?
> A. I have not diagnosed any patient with pseudotumor cerebri, no.
> Q. IIH?
> A. Nor have I ever diagnosed a patient with IIH.
> Q. Do you know what the Dandy criteria are?
> A. I know them broadly, that neurologists use them in the diagnosis, but I'm not -- I can't rattle them off the top of my head, no.
> Q. Do you know if severe headaches are one of the things listed in the Dandy criteria?
> A. Again, I cannot outline the Dandy criteria in my head, no.
> Q. Okay. So that's a no, right?
> A. That's a no.
>
> Have you ever utilized a PTC diagnosis as a differential diagnosis?
> MS. PALEY: Objection.
> A. That would be highly unlikely for me to use PTC as a differential diagnosis, because my understanding of PTC is that's a diagnosis that you come to after -- with symptoms and physical findings and even head imaging, that that's a diagnosis at the end of the road.
> It would much more likely if I was worried about that, that I would be using the symptom of headache in referring to a neurologist with headache, but pseudotumor cerebri would not be on a differential diagnosis list that I would be generating -- I would be -- as a gynecologist.
> I would be more broadly concerned if someone had a persistent headache and commonly would refer patients to a neurologist that have a headache, but I

can't say that that would be on a differential diagnosis necessarily that I would be generating.

Q. Okay. Same question but with IH.
A. Same answer.

Hewitt Transcript at 184: 13 – 186: 2. Additionally, Dr. Hewitt has never published any literature on PTC/IH, nor has she studied PTC/IH except within the context of this litigation. *See* Exhibit B, Hewitt Curriculum Vitae.

Dr. Hewitt recently formulated her ideas and opinions regarding the mechanism by which PTC/IH occurs in the human body only after having been retained by Bayer. Dr. Hewitt does not research or evaluate the causes of PTC/IH in her clinical practice, nor does she diagnose patients with the disease. She never had any experience with PTC/IH prior to this litigation. Additionally, Dr. Hewitt provides no reliable support for her opinions regarding PTC/IH. It would be improper to allow her to give opinions on this subject to the jury because she has no experience on the mechanism by which PTC/IH occurs, and she has not provided a reliable basis for her opinions. Allowing a witness who is not fully knowledgeable about this condition to give opinions about its etiology risks confusing and misleading the jury, and her opinions regarding the causes of PTC/IH should be excluded.

**B. Dr. Hewitt should be precluded from testifying that there is a lack of association between Mirena use and PTC/IH because she has failed to review critical data in reaching her opinion.**

Any theory that fails to explain information that would tend to cast doubt on that theory is inherently suspect. *In re Rezulin Prods. Liabl. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005). If the scientific literature contains evidence that tends to refute the expert's theory and the expert does not account for that evidence, the expert's opinion is unreliable. *Id.* Courts have excluded expert testimony "where the expert selectively chose his support from the scientific landscape."

*Id.* (quoting *Lust by & Through Lust v. Merrell Dow. Pharm.*, 89 F.3d 594, 596 (9th Cir. 1996)). The ultimate object of the court's gate-keeping role is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 174 (S.D.N.Y. 2009) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

At the end of her general expert report, Dr. Hewitt states, "In conclusion, having reviewed all of the available evidence, I see no evidence that Mirena can or does cause IIH, and no information that would warrant a change in my prescribing practice." Hewitt Rpt. pg. 27. However, Dr. Hewitt did not in fact review all of the available evidence, including Bayer's own evidence regarding PTC/IH occurrence in Mirena users. Bayer maintains a database known as Empirica that stores adverse event data and does various calculations on this data to determine if an association exists between an event and a drug. The Empirica data show a statistically significant association between Mirena users and PTC/IH.

Interestingly, Bayer failed to even provide the Empirica data to their experts. In her deposition, Dr. Hewitt testified that she had not been given, or even heard of, Bayer's Empirica data. The transcript reads:

> Q. Dr. Hewitt, did you review any of the data
> from the Empirica database?
> A. Empirica database. I don't think I know what
> the Empirica database is. If I did, it was under a
> certain -- I don't know that I recognize what word,
> Empirica database, means.
> Q. Okay. Are you aware that Bayer has a database
> that has a special program for calculating adverse event
> report signals?
> A. I don't know that I've known that or not.

Then later:

Q. So you would not want to see the isolated reports, but if Bayer had a special program for the calculating of adverse event reporting signals, would you have wanted to have seen that before preparing your report and giving your opinions in this litigation?
MS. PALEY: Objection.
A. Well, I don't know what "calculating" means. I think if there was -- you know, just -- I don't know what -- you use the word "calculating." So I don't know what "calculating" means. So, again, I don't need to see isolated individual limited things. I would be looking more at comprehensive analysis or assessment.
Q. Wouldn't you want to err on the side of inclusion of data that you were utilizing to form your opinions?
MS. PALEY: Objection.
A. Again, I don't see that as being omitting. I know the nature of what patients report to adverse event reporting systems. So no. I mean, that's just not -- that would not have been tremendous value to me. The raw patient report of an experience would not have been more meaningful to me.

Q. Okay. But if the program calculated adverse event reporting signals, would you have wanted to have seen that before you put your opinions in your report in this case?
A. I guess I don't know the -- when you use the word calculating adverse event reporting systems --
Q. Signals.
A. Signals. Calculating is a verb that to me is a math number that could be as simple as counting them and keeping track of how many. So, no, that's -- I mean, I don't know -- calculating, that verb, no.
Q. Are you familiar with the use of signal assessments in pharmaceuticals?
A. I'm familiar with the fact that pharmaceutical devices and drugs that come to market and new vaccines that come to market, that they collect adverse events that are reported to them, yes.
Q. And do they assess those during the course of the life of the drug?
MS. PALEY: Objection.
A. My understanding is that there's an ongoing collection of adverse events, as well as an ongoing

analysis of adverse events in terms of safety monitoring
devices, drugs, vaccines that are on the market.
Q. So if Bayer had a special program for
analyzing adverse event reporting signals, would you
have wanted to have seen that prior to putting your
opinions in your report?
MS. PALEY: Objection; asked and answered.
A. Not -- not necessarily. I would say no.

Hewitt Transcript at 126: 9 – 18; 129: 4 – 131: 5. The Empirica data contain material information that any reasonable healthcare provider would want to consider before forming an opinion regarding an association, or a causal relationship, between Mirena and PTC/IH. Even after Plaintiffs' counsel told Dr. Hewitt about Bayer's database, she took the position that this evidence was unimportant.

She even went so far as to describe adverse event reports as "a lot of noise." Hewitt Transcript 127: 4 – 14. This is a shocking statement considering adverse event reports are one of the tools used by the Food and Drug Administration ("FDA") to evaluate product safety and warning label adequacy. *See Questions and Answers on FDA's Adverse Event Reporting System (FAERS)*, U.S. Food & Drug Administration (Feb. 21, 2018), https://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Surveillance/AdverseDrugEffects/. It is difficult to explain why Dr. Hewitt chooses to ignore reports from the clinical field, other than the fact that Mirena adverse event reports do not support her predetermined conclusions. Whatever her motives may be, choosing to ignore large swaths of data is not indicative of sound methodology and should preclude her from offering an opinion regarding this area.

In hopes of bolstering her opinion that there is no association, Dr. Hewitt attempts to use an epidemiological analysis to undermine the 2017 Valenzuela study (Valenzuela attached as Exhibit E). Hewitt Rpt. pgs. 20 – 23. She criticizes Valenzuela for failing to control for weight gain

and PTC/IH risk factors. Hewitt Rpt. pg. 22. Yet, in support of her opinion on the association between hormonal contraception and PTC/IH, she cites to several studies that failed to control for use of LNG—the active ingredient in Mirena and the hormone at issue in this litigation. On page 17 of her report, she states, "published case-control studies have consistently found no association between hormonal contraception and IIH, despite the fact that LNG-containing oral contraceptives provide significantly higher doses of LNG than Mirena." She then cites several studies, including Durcan 1988, Ireland 1990, Giuseffi 1991, Radhakrishnan 1993, and Ball 2006 (attached collectively as Exhibit F). None of these studies mention controlling for use of LNG. *See* Exhibit F and Hewitt Transcript at 210: 6 – 214: 7. It is illogical for her to criticize one study for failure to control when she cites five studies that did the same thing.

Dr. Hewitt also disregards the fact that Norplant and Jadelle, predecessor products that contained the exact same hormone as Mirena, carried PTC/IH warnings. While this alone is not proof of a causal relationship, or even an association, it certainly should be considered in reviewing the totality of the available evidence. Dr. Hewitt's complete disregard for this evidence further undermines the reliability of Dr. Hewitt's methodology.

Finally, in addition to completely disregarding Bayer's adverse event data, published literature, and the labeling of equivalent products, Dr. Hewitt failed to consider FDA adverse event data and adverse event data from the regulatory agencies of other countries. This is likely because she believes that there is no value to adverse event data, but this is merely her subjective belief. This data is clearly important, or its reporting would not be required by the FDA. While it may not be sufficient by itself to support an association, it should absolutely be considered as a part of a sound and reliable methodology when *ruling out* an association.

Dr. Hewitt's disregard for the Empirica data and adverse event reports is indicative of the amount of intellectual rigor she used in reaching her conclusions. She criticizes Valenzuela's peer-reviewed study for failing to control for weight gain and PTC/IH risk factors, but cites numerous studies that failed to control for LNG use in support of her opinions. Finally, she ignores the fact that Mirena's predecessor products carried PTC/IH warnings. The law does not allow an expert to cherry-pick her way to a conclusion. Failure to consider significant data when ruling out an association is not a reliable basis for the opinion that there is not an association. Therefore, Dr. Hewitt's opinion that there is not an association between Mirena use and PTC/IH should thus be excluded.

**C. Dr. Hewitt's opinions as to the non-contraceptive benefits of Mirena are irrelevant, misleading, and likely to confuse the jury.**

In order for Dr. Hewitt's testimony to be admissible, her opinions must be relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Under Fed. R. Evid. 702, expert testimony must help the trier of fact understand the evidence or determine a fact in issue. The requirement that expert testimony assist the trier of fact goes primarily to relevance by demanding a valid scientific connection to the pertinent inquiry. *Daubert*, 509 U.S. at 591. Even if the elements of relevance and reliability are met, the expert testimony may still be deemed inadmissible under Fed. R. Evid. 403. Expert evidence can be both powerful and misleading because of the difficulty in evaluating it. *Daubert*, 509 U.S. at 595. Because of this risk, the trial judge, in weighing possible prejudice against probative force, exercises more control over experts than over lay witnesses. *Id.* Particularly, trial courts have authority to exclude expert testimony under Rule 403 if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Louis Vuitton Malletier*, 525 F. Supp. 2d. at 580.

Dr. Hewitt's opinions about the non-contraceptive benefits of Mirena are not relevant to the task of determining general causation. Dr. Hewitt touts Mirena as an effective treatment for

adenomyosis, endometrial hyperplasia, and uterine protection. Hewitt Rpt. pg. 13. She goes on to advocate for Mirena as a treatment for menstrual bleeding and pelvic pain associated with endometriosis. *Id.* Specifically, she states: "Heavy menstrual bleeding (with or without a bleeding abnormality) can be managed very successfully with Mirena. Studies have found Mirena to be superior to typical medical therapy for the treatment of menorrhagia (Gupta 2013)." *Id*. These claims may or may not be true, but they are extraneous to this litigation. Opinions about adenomyosis, endometrial hyperplasia, menstrual bleeding, and pelvic pain may be relevant to a case in which an individual plaintiff was prescribed Mirena for the treatment of such injuries. However, it is improper for Dr. Hewitt to offer these opinions in a case to which the plaintiff was not experiencing such injuries. These opinions are even less relevant for determining general causation. They do nothing to assist the trier of fact because the benefits of Mirena are not at issue in this litigation. If these opinions have any probative value at all, it is substantially outweighed by the danger of unfair prejudice and misleading the jury.

Dr. Hewitt continues her report by endorsing Mirena as a sensational product that can help prevent endometrial cancer. Hewitt Rpt. pgs. 15-16 (explaining that obese women are at an increased risk of anovulation and endometrial hyperplasia and cancer). These alleged benefits have not been reliably established, and are not endorsed by the FDA. In fact, an endometrial protection indication for Mirena has been reviewed by the FDA, and denied. *See generally* Ex. G, MIR_PSEU_00303474. Where, as here, the purported relevance of an expert's opinion is the impact of an alleged benefit on a physician's prescribing decision, a determination by the FDA *that this specific benefit does not outweigh the risks* is surely relevant to the assessment of reliability. *See id*. at 77 ("Recent studies suggest that progestin exposure increases breast cancer risk in menopausal women. Therefore, there is need for a product that provides endometrial protection with

little systemic effect. You have an opportunity to produce a product that provides endometrial protection with little systemic exposure to progestin. The systemic concentrations of levonorgestrel produced by Mirena, based on data you have provided, however, appear to offer little or no advantage over an oral progestin."). Once again, Dr. Hewitt is offering opinions on more irrelevant information. As counsel for Bayer argued at the October 24, 2017, Case Management Conference in this matter, this stage of the litigation is about whether Mirena can cause PTC/IH; it is not about the benefits of the product. *See* 10/14/17 CMC Transcript at 30: 12 – 15) (attached as Exhibit H).

Dr. Hewitt's opinions about using Mirena for the treatment of adenomyosis, endometrial hyperplasia, uterine protection, and menstrual bleeding will do nothing but inundate the jury with irrelevant information that is likely to confuse and mislead. The lone purpose for which Bayer offers these opinions is to apprise the jury of benefits of Mirena that have nothing to do with the issues in this lawsuit. Dr. Hewitt's beliefs regarding the non-contraceptive benefits of Mirena will not assist the trier of fact, and there is no basis in law or fact that warrants presenting these opinions to the jury. The testimony should not be submitted to the jury, and her opinions in this area should be excluded.

**D. Dr. Hewitt's opinions as to the pharmacological effects of Mirena should be excluded because she is not a pharmacologist and she gives no support for her claims.**

Fed. R. Evid. 702 makes clear that the trial court must ensure that the witness is properly qualified as an expert to testify on matters that are scientific, technical, or specialized in nature. *Katt v. City of N.Y.*, 151 F. Supp. 2d 313, 352 (S.D.N.Y. 2001). This entails a preliminary assessment of whether the methodology underlying the testimony is scientifically valid and whether that methodology can properly be applied to the facts in issue. *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001). This Court does not admit opinions premised on speculation

or that amount to *ipse dixit*, that is, assertions that something is true because the expert says so. *In re M/V MSC Flaminia*, 2014 U.S. Dist. LEXIS 119146, at *165 (S.D.N.Y. July 28, 2017). Further, the Federal Rules of Evidence require that experts confine their testimony to subjects on which they are qualified to give opinions. *Id.*

On page 24 of her report, Dr. Hewitt attempts to rebut Plaintiffs' assertion that Mirena users experience a higher proportion of free LNG as compared to combined oral contraceptive users. Without any citation, Dr. Hewitt claims "for purposes of pharmacologic effects, it is the total amount of free LNG circulating in the serum that matters, not the proportion." Hewitt Rpt. pg. 24. She continues:

> Because the total serum level of LNG is so much higher in combined oral contraceptive users, even if the proportion of free LNG is slightly lower, their overall amount of free LNG is still higher compared to Mirena users (Mirena label; Seasonique label; Alesse label). Furthermore, the proportion of free LNG has no bearing on clinical decision making about contraceptive choice, because the proportion is very low and similar across LNG- containing products.

*Id.* at 24-25. The subject of pharmacology surely falls into the "scientific, technical, or specialized nature" category of Rule 702. Accordingly, the proffered expert witness must be qualified to give an opinion on the subject.

It is undisputed that Dr. Hewitt is not a pharmacologist. Hewitt Transcript at 41: 6 – 12; 233: 1 – 2. Dr. Hewitt likely received some pharmacology training during medical school, but that does not mean she has the knowledge and experience to give an expert opinion on the subject. Pharmacology is a highly specialized branch of medicine, and Dr. Hewitt's medical degree does not automatically render her opinions on pharmacology, or anything else, admissible. Opining as an expert on this subject is outside the witness's expertise as an OB/GYN, and any such opinions should be excluded.

Even if the pharmacological effects of Mirena could be considered within Dr. Hewitt's expertise as an OB/GYN, her testimony about total versus proportion of free LNG in the serum is not based on sufficient facts or data. She offers no support for her assertion that the proportion of free LNG in the serum does not matter for purposes of pharmacological effects. It is unclear what methodology, if any, she used in reaching this conclusion. Her pharmacological opinions amount to nothing but pure speculation that will likely mislead the jury. Accordingly, there is no basis for admitting these opinions.

**E. Dr. Hewitt's opinions as to the adequacy of the Mirena label should be excluded because she is not a regulatory expert and her conclusions regarding the label are not supported by a reliable methodology.**

A codified standard governs the contents and format of labeling for human prescription drug products. *See* 21 C.F.R. § 201.57 (2018). The warnings and precautions section of a label should be changed "to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established." 21 C.F.R. § 201.57(c)(6)(i) (2018). Additionally, the law requires a drug's label to contain adverse reactions "for which there is some basis to believe that there is a causal relationship between the drug and the occurrence of the adverse event." 21 C.F.R. § 201.57(c)(7) (2018).

Although she is not qualified to offer such opinions, Dr. Hewitt begins discussing the adequacy of warning labels on page 26 of her report. She tries to rebut Plaintiffs' expert Dr. Fraunfaulder's testimony that a prescribing doctor would more likely than not warn about the relationship between Mirena and PTC/IH if a warning label existed. Hewitt Rpt. pg. 26. Dr. Hewitt says:

> Given the fact that there is no reliable evidence in the literature of a causal relationship between Mirena IUD use and IIH, the current labeling is accurate and reflective of best medical evidence. From a practical clinical perspective, the presence or absence of an IIH warning in the Mirena label would have no bearing on my use of

> Mirena. Moreover, adding a clinically irrelevant and scientifically inaccurate IIH warning to the Mirena label would not be appropriate, because it would deter women from using one of the safest and most efficacious contraceptives in favor of less effective contraceptives with additional clinically-relevant risks.

*Id.* at 27.

The witness cannot say with authority that the current label is accurate and adding a PTC/IH warning would be inappropriate because Dr. Hewitt does not possess a specialized knowledge of the regulatory procedures, governmental statutes, and FDA standards involved in pharmaceutical labeling. When asked whether she had an understanding of how the FDA decides what goes into a label, Dr. Hewitt responded, "I'm not an expert in FDA labeling. I think I have a very rudimentary understanding based on practicing as a physician what goes into a product label, as well as from my very limited exposure from being on the advisory board." Hewitt Transcript 158: 14 – 20. Dr. Hewitt's opinions on the adequacy of the Mirena label are based on nothing more than her personal beliefs as an OB/GYN and should therefore be excluded.

Her opinions regarding the accuracy or inaccuracy of adding a PTC/IH warning to the label should also be excluded because the methodology by which she comes to her conclusion is flawed. She premises her conclusion by stating: "Given the fact that there is no reliable evidence in the literature between Mirena use and IIH . . . ." That is untrue. As previously discussed, there are important data that Dr. Hewitt chose not to consider in formulating her opinions. Bayer's Empirica data show an association between use of Mirena and PTC/IH, but Dr. Hewitt has not even given passing consideration to that evidence. She has completely disregarded the published, peer-reviewed literature demonstrating an association between Mirena and PTC/IH. She has given no weight to the fact that the labels for Norplant and Jadelle, both of which contained the same active ingredient as Mirena, warned of PTC/IH. She also considers adverse event reports to be "a lot of noise." Hewitt Transcript 127: 4 – 14. To ignore adverse event reports is to ignore one of the

factors the FDA considers in approving a product label. Dr. Hewitt's disregard for these data evidences the flawed methodology by which she reaches her conclusions: she only gives weight to favorable information that supports her opinions.

Finally, Dr. Hewitt's labeling opinions will confuse and mislead the jury. In any trial of a Mirena PTC/IH case, various physicians will testify, including the physician that prescribed a Mirena device to the specific plaintiff. Dr. Hewitt intends to testify that "the presence or absence of an IIH warning would have no bearing on my use of Mirena." This testimony will confuse and mislead the jury, who will need to carefully consider the prescribing physicians' testimony regarding this precise question. Further, there is no probative value to this testimony, outside of unnecessary bolstering of the Mirena device and its labeling by Bayer's paid expert.

Dr. Hewitt's opinions regarding the Mirena warning label are outside of her expertise and unsupported. The methodology used in reaching these opinions is once again questionable at best. Further, these opinions will do nothing but mislead the jury and waste time. Therefore, Dr. Hewitt's opinions in this area should be excluded.

### F. Dr. Hewitt's opinion that PTC/IH is not an androgenic side effect should be excluded because it is unsupported conjecture.

The trial court's function as a gatekeeper requires more than simply "taking the expert's word for it." Fed. R. Evid. 702 advisory committee's note (2000 Amendments) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)). The expert's qualifications, conclusions, and assurances of reliability are not enough; rather, Rule 702 requires that expert testimony be based on sufficient underlying facts or data. *Id.* An expert basing his opinion solely on experience "must do more than aver conclusorily that his experience led to his opinion." *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 530 (S.D.N.Y. 2001). Experts may rely on existing data, but "nothing in either *Daubert*, or the Federal Rules of Evidence requires a district

court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Santoro v. Donnelly*, 340 F. Supp. 2d 464, 475 (S.D.N.Y. 2004) (quoting *GE v. Joiner* 522 U.S. 136 (1997)).

On page 25 of her report, Dr. Hewitt once again offers an opinion without support. She attempts to attack the proposition that LNG may cause PTC/IH through androgen receptors in the human body. She begins by giving the opinion that PTC/IH is not an androgenic side effect. Hewitt Rpt. pg. 25. Her purported basis for this opinion is that: "As a clinician who has prescribed hormonal contraceptives and counseled patients on potentially androgenic side effects for more than two decades, and as an active member in many leading national OB/GYN organizations, I have never heard of or considered IIH to be an androgenic side effect." Hewitt Rpt. pg. 25. She then moves to her next point without giving any further basis for this opinion. One can only conclude that Dr. Hewitt expects the reader to take her opinion as truth simply because she says it is so.

The law is quite clear that expert testimony must be based on sufficient facts or data. As discussed above, Dr. Hewitt did not begin studying PTC/IH until she was retained for this litigation. She has never diagnosed anyone with the disease, nor has she published any literature on it. Further, she offers no support for her assertions regarding the potential patho-physiological mechanisms for PTC/IH. As such, she should not be permitted to testify about the potential mechanisms by which Mirena may cause PTC.

## **CONCLUSION**

Bayer, as the proponents of Dr. Hewitt's expert testimony, bears the burden of establishing that her testimony satisfies the applicable evidentiary standards. Bayer fails to meet that burden. Dr. Hewitt lacks the training, education, and experience to give a reliable opinion about the cause of PTC/IH. Dr. Hewitt has failed to consider significant evidence in reaching her opinion about

the association between Mirena and PTC/IH, fatally undermining the reliability of her methodology and ultimately her opinions. Additionally, Dr. Hewitt's testimony regarding Mirena's non-contraceptive benefits is totally irrelevant to the present action. Further, Dr. Hewitt gives no support for her opinions regarding the pharmacological effects of Mirena, and her assertions about the Mirena label are mere speculations that are outside her expertise as an OB/GYN. Finally, her ideas about the androgenicity of PTC/IH are unsupported and outside of her expertise. For the foregoing reasons, and those stated in Plaintiffs' Omnibus Motion, Plaintiffs respectfully move the Court to exclude Dr. Hewitt's testimony on these subjects.

Dated: March 2, 2018

Respectfully submitted,

*/s/ Martin D. Crump*
Martin D. Crump
Davis & Crump PC
2601 14th Street
(228)863-6000
martincrump@daviscrump.com
*Co-Lead Counsel for Plaintiffs*

Lawrence L. Jones II
Jones Ward, PLC
*Co-Lead Counsel for Plaintiffs*

Maxwell S. Kennerly
Kennerly Loutey, LLC
*Liaison Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was filed via the ECF/CM system with the Clerk of the Court, which will have sent notice to all attorneys of record in this matter on March 2, 2018.

/s/ *Martin D. Crump*
Martin D. Crump