**In the Matter Of:**

IN RE: MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY

# VIDEOTAPED DEPOSITION OF GERI D. HEWITT, M.D.

*February 09, 2018*

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

\- - -

IN RE: :
MIRENA IUS LEVONORGESTREL- : 17-MD-2767 (PAE)
RELATED PRODUCTS LIABILITY : 17-MC-2767 (PAE)
LITIGATION (NO. II) :

\- - -

VIDEOTAPED DEPOSITION OF GERI D. HEWITT, M.D.

\- - -

Friday, February 9, 2018
at 8:48 a.m.

\- - -

Taken at: Thompson Hine, LLP
41 West Broad Street, Suite 1700
Columbus, Ohio 43215

\- - -

REPORTED BY: CAROL A. KIRK, RPR/RMR/CSR

VIDEOTAPED DEPOSITION OF GERI D. HEWITT, M.D.

APPEARANCES

- - -

On behalf of the Plaintiffs:

MARTIN D. CRUMP, ESQUIRE
ANDERSON R. BROWN, ESQUIRE
DAVIS & CRUMP
2601 14th Street
Gulfport, Mississippi 39501
228-863-6000
martincrump@daviscrump.com
anderson.brown@daviscrump.com

and

LESLIE LaMACCHIA, ESQUIRE
PULASKI LAW FIRM
2925 Richmond Avenue, Suite 1725
Houston, Texas 77092
832-690-4013
llamacchia@pulaskilawfirm.com

On behalf of the Defendants:

KATHLEEN E. PALEY, ESQUIRE
ANNIE X. WANG, ESQUIRE
COVINGTON & BURLING, LLP
850 Tenth Street, NW
Washington, DC 20001
202-662-5641
kpaley@cov.com
awang@cov.com

ALSO PRESENT:

Melinda Sindiong, Videographer

- - -

VIDEOTAPED DEPOSITION OF GERI D. HEWITT, M.D.

INDEX TO EXHIBITS


| WITNESS | PAGE |
| --- | --- |
| GERI D. HEWITT, M.D. | |
| CROSS-EXAMINATION BY MR. CRUMP: | 6 |
| REDIRECT EXAMINATION BY MS. PALEY: | 233 |
| RECROSS-EXAMINATION BY MR. CRUMP: | 242 |

VIDEOTAPED DEPOSITION OF GERI D. HEWITT, M.D.

INDEX TO EXHIBITS


| HEWITT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Video Deposition of Geri Hewitt, M.D. | 6 |
| Exhibit 2 | Document titled, "Hewitt Supplemental Materials List" | 9 |
| Exhibit 3 | Letter to Mr. Baum from Dr. Hewitt, dated April 11, 2014, with invoices attached | 26 |
| Exhibit 4 | Article titled, "The Environment and Disease: Association or Causation?" | 36 |
| Exhibit 5 | Expert Report of Geri D. Hewitt, M.D. | 36 |
| Exhibit 6 | Highlights of prescribing information for Mirena | 159 |
| Exhibit 7 | Prescribing information for Norplant System | 168 |
| Exhibit 8 | Highlights of prescribing information for Jadelle | 170 |
| Exhibit 9 | Proposed Prescribing information for ParaGard T380 Intraoperative Copper Contraceptive | 172 |
| Exhibit 10 | Compilation of studies | 205 |
| Exhibit 11 | Article titled, "An Estimation of the Risk of Pseudotumor Cerebri Among Users of the Levonorgestrel Intrauterine Device" | 222 |
| Exhibit 13 | Article titled, "Epidemiology of idiopathic intracranial hypertension: A prospective and case-control study" | 236 |

\- - -

P R O C E E D I N G S

\- - -

THE VIDEOGRAPHER: This is disk number 1 to the videotaped deposition of Dr. Geri Hewitt, M.D., taken in the matter of Mirena IUS Levonorgestrel -- I'm sorry. I should have practiced this one -- Rebate Production -- or Products Limited Liability.

This deposition is being held at 41 South High Street, Columbus, Ohio, and today is February 9, 2018. My name is Melinda Sindiong. I'm the videographer. The court reporter is Carol Kirk.

Will counsel please introduce yourselves for the record, and then the court reporter will swear in the witness and we can proceed.

MS. PALEY: Kathleen Paley for the defense.

MS. WANG: Annie Wang for the defense.

MR. CRUMP: Martin Crump for the Plaintiffs.

MR. BROWN: Anderson Brown for the Plaintiffs.

MS. LaMACCHIA: Leslie LaMacchia for the Plaintiffs.

\- - -

GERI D. HEWITT, M.D.

being by me first duly sworn, as hereinafter certified, deposes and says as follows:

directly to medical school. So I would have been in medical school between '86 and '90.

Q. Okay. And then where did you do your residency training?

A. I did my residency at Georgetown.

Q. Do you hold any specialties?

MS. PALEY: Objection.

A. Other than OB-GYN?

Q. Yes.

A. OB-GYN.

Q. Okay. Any others?

A. No.

Q. Your work history after medical school, can you take me through that?

A. Sure. My work history after medical school, I went and did my residency at Georgetown University. And then I came back to Ohio State where I'd been a faculty member of the department of OB-GYN at Ohio State since I completed my training.

Q. Okay. And when did you begin with Ohio State?

A. 1994.

Q. And you've been consistently with the university since '94 until now.

A. I have.

Q. Your -- tell me about your position with the

supplement, as you sit here today, relative to your report?

A. No.

Q. Are all the materials that you utilized in preparation of your report listed in Appendix B?

MS. PALEY: Objection.

Go ahead.

A. Yes.

Q. Dr. Hewitt, did you review any of the data from the Empirica database?

A. Empirica database. I don't think I know what the Empirica database is. If I did, it was under a certain -- I don't know that I recognize what word, Empirica database, means.

Q. Okay. Are you aware that Bayer has a database that has a special program for calculating adverse event report signals?

A. I don't know that I've known that or not.

Q. Okay. If that existed, would you have wanted to see it before preparing your report?

MS. PALEY: Objection.

A. So the way that I think about databases are -- and I think I have -- I think the reason I feel this way is my experience of, like, understanding how VARS works, like vaccine adverse reporting systems. So my

perception is -- as a practicing clinician, is that patients, their advocates, physicians, anybody can report events to these adverse event reporting systems.

And in my mind, as a busy practicing clinician, I see a lot -- I interpret that as a lot of noise that gets sent to these adverse event reporting systems. So, like, take, for instance, the HPV vaccine. Patients poured information into the vaccine event reporting system. Patients told me these things; you know, "My cousin got the vaccine. She was paralyzed." You know, all this sorts of stuff.

As a busy practicing clinician, I interpret that as all those sort of reports, isolated case, quote, unquote, signals, I interpret that as a lot of noise. And what I want to know is once all of that information has been collected inside of an adverse event reporting system, I want someone to go through it and to analyze it and to assess it and give me the end result, like in the vaccine adverse reporting system, all that information that poured in -- and the CDC went through it and analyzed it and came up with a report that said, "There is no evidence. The only recommendation we have for a busy practicing physician is that teenage girls can faint after a vaccine, and they need to be monitored thereafter."

IN RE: MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF GERI D. HEWITT, M.D. on 02/09/2018

MR. CRUMP: Let me finish my question.

MS. PALEY: Oh, sorry.

BY MR. CRUMP:

Q. So you would not want to see the isolated reports, but if Bayer had a special program for the calculating of adverse event reporting signals, would you have wanted to have seen that before preparing your report and giving your opinions in this litigation?

MS. PALEY: Objection.

A. Well, I don't know what "calculating" means. I think if there was -- you know, just -- I don't know what -- you use the word "calculating." So I don't know what "calculating" means. So, again, I don't need to see isolated individual limited things. I would be looking more at comprehensive analysis or assessment.

Q. Wouldn't you want to err on the side of inclusion of data that you were utilizing to form your opinions?

MS. PALEY: Objection.

A. Again, I don't see that as being omitting. I know the nature of what patients report to adverse event reporting systems. So no. I mean, that's just not -- that would not have been tremendous value to me. The raw patient report of an experience would not have been more meaningful to me.

IN RE: MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF GERI D. HEWITT, M.D. on 02/09/2018

Q. Okay. But if the program calculated adverse event reporting signals, would you have wanted to have seen that before you put your opinions in your report in this case?

A. I guess I don't know the -- when you use the word calculating adverse event reporting systems --

Q. Signals.

A. Signals. Calculating is a verb that to me is a math number that could be as simple as counting them and keeping track of how many. So, no, that's -- I mean, I don't know -- calculating, that verb, no.

Q. Are you familiar with the use of signal assessments in pharmaceuticals?

A. I'm familiar with the fact that pharmaceutical devices and drugs that come to market and new vaccines that come to market, that they collect adverse events that are reported to them, yes.

Q. And do they assess those during the course of the life of the drug?

MS. PALEY: Objection.

A. My understanding is that there's an ongoing collection of adverse events, as well as an ongoing analysis of adverse events in terms of safety monitoring devices, drugs, vaccines that are on the market.

Q. So if Bayer had a special program for

MS. PALEY: Objection.

A. So I think -- are you talking -- so the question that you ask, in which section would you expect to see the most serious medical conditions?

Q. Associated with the product, yes.

A. Okay. Associated with use of the product. I think that those could be in either three of those sections. I don't know that as a practicing physician, I would think that they needed to be in one section over the other, whether it's warning, precautions, or adverse event.

THE VIDEOGRAPHER: Excuse me. Please don't play with your mic wire.

Q. Do you have an understanding of how the FDA decides what goes into a label?

A. I'm not an expert in FDA labeling. I think I have a very rudimentary understanding based on practicing as a physician what goes into a product label, as well as from my very limited exposure from being on the advisory board.

Q. Okay. Would you agree with me that at least for the warning section, it's evidence believed -- to believe that there is a causal relationship between an exposure and an outcome or known risk?

MS. PALEY: Objection.

IN RE: MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF GERI D. HEWITT, M.D. on 02/09/2018

Q. Have you ever had a patient develop focal migraines with asymmetrical vision loss after an insertion of a Mirena?
A. Not that I'm aware of, no.
Q. Have you ever removed a Mirena for that reason?
A. Not that I'm aware of, no.
Q. Okay. The next one, "exceptionally severe headache." Have you had patients complain about exceptionally severe headaches after the insertion of the Mirena device?
A. Not that I recall, no.
Q. Okay. Have you ever diagnosed anyone with PTC?
A. I have not diagnosed any patient with pseudotumor cerebri, no.
Q. IIH?
A. Nor have I ever diagnosed a patient with IIH.
Q. Do you know what the Dandy criteria are?
A. I know them broadly, that neurologists use them in the diagnosis, but I'm not -- I can't rattle them off the top of my head, no.
Q. Do you know if severe headaches are one of the things listed in the Dandy criteria?
A. Again, I cannot outline the Dandy criteria in

my head. no

IN RE: MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF GERI D. HEWITT, M.D. on 02/09/2018

Q. Okay. So that's a no, right?

A. That's a no.

Q. Okay. Have you ever referred -- well, let me ask it in this manner. I'll withdraw that.

Have you ever utilized a PTC diagnosis as a differential diagnosis?

MS. PALEY: Objection.

A. That would be highly unlikely for me to use PTC as a differential diagnosis, because my understanding of PTC is that's a diagnosis that you come to after -- with symptoms and physical findings and even head imaging, that that's a diagnosis at the end of the road.

It would much more likely if I was worried about that, that I would be using the symptom of headache in referring to a neurologist with headache, but pseudotumor cerebri would not be on a differential diagnosis list that I would be generating -- I would be -- as a gynecologist.

I would be more broadly concerned if someone had a persistent headache and commonly would refer patients to a neurologist that have a headache, but I can't say that that would be on a differential diagnosis necessarily that I would be generating.

IN RE: MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF GERI D. HEWITT, M.D. on 02/09/2018

Q. Okay. Same question but with IIH.
A. Same answer.
Q. Have you ever referred one of your patients to a neurologist with a suspicion of PTC?
A. I have referred lots of patients to neurologists with headaches and constellation of symptoms that I can't explain for evaluation. I do not think I've ever sent a patient to the neurologist with the note saying "I'm suspicious of pseudotumor cerebri." It's more persistent headache or needs evaluation for this constellation of symptoms, but I have never expressed a suspicion of pseudotumor cerebri, nor have I expressed a suspicion of IIH.
Q. Okay. Have any of your patients been diagnosed with PTC?
A. I have seen one patient over the course of my career with the diagnosis of pseudotumor cerebri that would have that diagnosis when she was sent to me, but I've had no patients that had a new diagnosis of pseudotumor cerebri.
Q. Do you warn your patients that you're consulting regarding the insertion of a Mirena about migraine headaches?
A. No, I do not.
Q. Exceptionally severe headache?

study.

Q. For a rare disease like IH?

IN RE: MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF GERI D. HEWITT, M.D. on 02/09/2018

MS. PALEY: Objection.

A. Yeah, I don't know that that's absolutely necessary.

Q. Okay. In Exhibit 10, which of the studies had reliable data about whether the cases and controls used oral contraceptives containing LNG?

MS. PALEY: Objection.

A. So I would have to again look at this specifically looking for that information.

So I'm first looking at the D-i-g-r-e article. So these patients were pregnant, so I'm assuming that they were not taking birth control pills, but I don't know that they actually say that.

They say what they reviewed for, but I don't see anything saying whether or not they were, like, taking birth control pills prior to their pregnancy or anything like that. But I would assume if they were pregnant as a part of inclusion in the study, that they were not taking birth control pills while they were pregnant.

Q. Okay.

A. So that's that one.

Ireland. So in Ireland, it does say that they

took a reproductive history, including contraceptive use.

IN RE: MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF GERI D. HEWITT, M.D. on 02/09/2018

Q. Contraceptive use including LNG?

MS. PALEY: Objection.

A. Well, I mean, I think if they took a contraceptive history or during contraceptive use, that if he they identified the contraceptive they were using, you could infer whether or not they were taking LNG.

Q. Can you show me where they're talking about LNG in this study?

A. Well, I can show you where they said they took the reproductive history including contraceptive use.

Q. Yes, but contraceptive use doesn't necessarily have to include LNG, correct?

A. That's correct. But if you're taking a contraceptive history including contraceptive use, I'm assuming that you would say that part of taking a history around contraceptive use would be noting the type of contraception that's used.

That would be -- as a medical person reading this, a history related to contraceptive use would include the type of contraception, and if they told you the type of contraception, you could infer whether or not that had LNG in it --

Q. Okay.

A. -- as I read that as a physician.

Q. Can you show me in the study where LNG is mentioned?

IN RE: MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF GERI D. HEWITT, M.D. on 02/09/2018

MS. PALEY: Objection.

A. I don't know. But I see a lot of references to oral contraceptives. I don't see any specific references to the particular type of -- the particular type of oral contraceptive.

Q. All right. How about Giuseffi?

A. So in this I see a detailed medication history is noted. So as I'm reading that as a physician, as an M.D., if they're noting a detailed medication history, in my mind, that would include medications, all medications, including contraceptives.

So in my mind, when I read that part of their data collection was a detailed medication history, I would assume, like in the other study, that that included medications that may fall into the category of contraceptives, and that if the patient identified her medication, you would know whether or not that medication contained levonorgestrel.

Q. Okay. Is the LNG referenced in this study?

A. As I'm looking through here, I do not see levonorgestrel specifically mentioned. I do see oral contraceptives broadly are mentioned.

Q. And, again, that doesn't necessarily mean oral contraceptives containing LNG, correct?

IN RE: MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF GERI D. HEWITT, M.D. on 02/09/2018

A. That's correct. So I do not see -- as I'm reading through this again, I do not see specifically oral -- I do not see specifically levonorgestrel mentioned, but I do see where they took a -- what they describe as a detailed medication history.

Q. Okay. The next one, Doctor.

A. So the next one is Durcan. So, again, here it says it is a history of medication that specifically requested information on birth control pills. So I'm assuming in doing that -- and this is published in 1988. I'm assuming in doing that, that they did know what patients were taking birth control pills and what type of birth control pills they were taking.

Q. Okay. And is LNG mentioned in the article?

A. LNG specifically I do not think is mentioned in the article.

Q. And just because they say birth control pills doesn't necessarily mean that the oral contraceptives had LNG as an active ingredient?

A. They do not specifically mention which progestins were used in the birth control pills that were prescribed.

Q. The last one, the impossible R name?

A. The R name. In this article, again, they mentioned oral contraceptive pills, and they mention

IN RE: MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY
VIDEOTAPED DEPOSITION OF GERI D. HEWITT, M.D. on 02/09/2018

oral contraceptive pills broadly and do not speak about which particular oral contraceptive pill, which particular progestin was contained in the oral contraceptive pill, but I do note that patients were taking oral contraceptive pills.

Q. Okay. Which of these studies had controls that fairly represented the population?

MS. PALEY: Objection.

A. So are you talking about the population in their communities, or are you talking about population as compared to the case arm?

Q. I am talking about controls that are fairly represented in the population. Well, how did they acquire in each of these studies the controls that they utilized? And let's start with Digre.

MS. PALEY: Objection.

A. Okay. So in this first chart, in this first study, identification of controls, they found women that were delivering, they said, at or about the same time as each one of the subjects, and they matched the subjects for age, gravity, and parity.

So they -- this was the one with pregnant women. So they went to the same labor and delivery

Q. Do you have a degree in pharmacology?
A. I do not have a degree in pharmacology.
Q. Do you have a degree in ophthalmology?
A. They do not give degrees in ophthalmology. They do board certification in ophthalmology. I'm not a board certified ophthalmologist.
MR. CRUMP: Okay. I have no further questions.
MS. PALEY: Okay. Give me just a moment.
MR. CRUMP: Sure.
MS. PALEY: I have a very brief direct.
MR. CRUMP: Yes, ma'am.

\- - -

REDIRECT EXAMINATION

BY MS. PALEY:
Q. Dr. Hewitt, you were asked a little while ago whether you've read any study that proved there was no causal relationship between Mirena and IIH.
Do you remember being asked that question?
A. Yes.
Q. Do studies typically prove no causation in science?
A. So typically studies are not set up to prove no causation, to prove a negative.
Q. Do you -- can you get your copy of the