UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

IN RE: MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY LITIGATION (NO. II)

17 MD 2767 (PAE)

------------------------------x

New York, N.Y.
October 24, 2017
2:30 p.m.

Before:

HON. PAUL A. ENGELMAYER
District Judge

HON. JAMES L. COTT
Magistrate Judge

APPEARANCES

JONES WARD PLC
Attorneys for Plaintiffs
BY: LAWRENCE L. JONES II
CHRISTINA T. NATALE

PULASKI LAW FIRM
Attorneys for Plaintiffs
BY: LESLIE LAMACCHIA

DAVIS & CRUMP
Attorneys for Plaintiffs
BY: MARTIN D. CRUMP

KENNERLY LOUTEY LLC
Attorneys for Plaintiffs
BY: MAX KENNERLY

APPEARANCES

GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP
Attorneys for Defendants
BY: SHAYNA S. COOK

COVINGTON & BURLING LLP
Attorneys for Defendants
BY: PAUL W. SCHMIDT

SHOOK HARDY & BACON LLP
Attorneys for Defendants
BY: JAMES SHEPHERD

(Case called).

JUDGE ENGELMAYER: Good afternoon.

This is the third status conference in this MDL. The Court had originally scheduled this conference for last Wednesday, October 18th. On October 12th, six days before that conference was to be held, the Court issued an order stating that it was unaware of any open issues requiring its resolution. The Court's order directed counsel to notify it if there was any business to cover and, if not, whether the conference should be adjourned with a new one rescheduled in about a month.

Only then did counsel notify the Court that a number of discovery disputes had arisen requiring the Court's resolution. Counsel's letter of October 16, 2017, which is docketed at docket 96, which set out counsel's proposed agenda for this conference, provided a topic outline of these disputes. It was evident that some disputes were complex and some had multiple parts.

Counsel's letter further disclosed to the Court that as to the four categories of discovery disputes, counsel intended at some unspecified date to submit joint letters on these disputes. Counsel evidently envisioned submitting these letters on the eve of the October 18th conference, apparently either the following day, October 17th, the day before the conference, or maybe even on the date of the conference itself.

All of this was obviously an utterly unrealistic timetable. The Court was therefore obliged, two days before the October 18th conference was to occur, to issue an order adjourning the conference until today. I expect that the rescheduling of the conference may have inconvenienced some of you, much as it required the Court to rearrange its schedule.

Counsel, I am not interested in deconstructing who is responsible for the decision to deny the Court meaningful advance notice of these disputes. What is important is that Judge Cott and I need to ask you to do better. We prepare for these conferences. You have seen that. Our objective is to be able to rule from the bench at these conferences on pending discovery disputes. That requires forethought and preparation.

It is not acceptable to present complex discovery disputes to the Court at the eleventh hour. The Court should not have to prompt counsel to give advanced notice of such disputes. This is an MDL. It has very substantial stakes and it presents very complex questions.

In the future, Judge Cott and I need you to be ready for prime time. In the future, if you intend to raise a discovery dispute at a scheduled conference, please submit your joint memoranda a week beforehand. That will permit us to dig into the disputes and, if necessary, commission additional submissions on them.

That is the end of the homily. We are moving forward.

Here is how we propose to proceed today.

There are four categories of discovery disputes. Judge Cott and I intend to resolve them all together. As to some, we have questions to put to counsel. We will then retire to discuss and confirm our resolution of the disputes that we are not as yet certain about. We would then retake the bench and put our rulings on the record.

After that, we can take up the few other issues which really appear to be more informational that are listed in your October 16th letter. I am going to take the lead with just a few questions as to a few of the disputes, and then I'm going to turn the floor over to Judge Cott.

The first dispute I want to briefly take up involves metadata. This is the dispute that is reflected in the parties' letter that is docketed at docket 101. The critical date as to general causation discovery is December 8th. In a few sentences can somebody explained to me, because it has gone on unexplained, what is the relevance of the metadata to mean general causation?

MR. JONES: Your Honor, Larry Jones for the plaintiffs. The relevance of the metadata to the general causation question is it is a review issue. It is intended to sort the documents in a way that allows a meaningful review of the documents.

Having answered your question, I will also tell you

that Mr. Shepherd and I conferenced again before this hearing, and he has provided us with a date certain for the fix to that issue. So there is no issue. However, your Honor, I'll be glad to answer any questions.

JUDGE ENGELMAYER: That's fine. What is the date on which the metadata that has been sought will now be produced by agreement?

MR. JONES: It is my understanding that Mr. Shepherd is going to try to do it on Friday. He has represented, and I believe him, that the tech folks have been able to create the solution and they are in the quality control testing phase to make sure that when they give it to us, we can simply load it up.

JUDGE ENGELMAYER: Your understanding, and I'll check this with the defense in a moment, is that all the outstanding metadata that is the subject of the dispute at docket 101 will be provided Friday, October 27th?

MR. JONES: Yes, your Honor.

JUDGE ENGELMAYER: Am I correct that the parties have mooted that dispute, beginning with you, Mr. Jones?

MR. JONES: Yes, your Honor.

JUDGE ENGELMAYER: Defense?

MR. SHEPHERD: Your Honor, quickly, there are a number of metadata issues. OCR text, which is actually the text of the document, we provided to plaintiffs' counsel for I think

23,900 of the 24,000 documents they requested last Friday. The remaining issues, we will provide an overlay of those. The intention is to have it to them on Friday of this week.

JUDGE ENGELMAYER: I have prepared a ruling on the metadata point with a few questions to be followed up on. It sounds like you are in the process of mooting it, which I am delighted to have happened, but I want to make sure that we don't leave here and then have a meta issue on the metadata.

Are you making a confident promise that all of the issues that are embraced in docket 101 relating to the metadata will be resolved by your producing the identified material by the close of business Friday? I'm trying to pin you down because otherwise I'm going to get a letter.

MR. SHEPHERD: Yes, your Honor, with this caveat. There is a request for metadata for a number of documents. Some of those documents don't have metadata. For those for which we have metadata, we will provide it. For those which we don't, we will say we don't.

JUDGE ENGELMAYER: You can't get blood from a stone. If you have metadata and it is within the scope of plaintiffs' request, you will produce that by the close of business Friday?

MR. SHEPHERD: Yes, your Honor.

JUDGE ENGELMAYER: That's fine. I'm happy to treat the dispute as mooted on those terms. I'm glad to hear it. Thank you for continuing to work together. I will therefore

not pursue the issue that was on my mind of what this has to do with general causation. You solved the problem. I'm not getting into the middle of it.

Going back, I take it there has been no progress solving the dispute at docket 100 relating to redactions. Is that correct?

MR. SHEPHERD: There is not, your Honor.

MR. KENNERLY: That's correct, your Honor.

JUDGE ENGELMAYER: Then I will resolve that after the break. I don't have any questions for you on that.

The next topic I want to take up involves 30(b)(6) depositions. I want to focus my questions first on the clinical development topic. That is specifically the last articulation of the plaintiffs' 30(b)(6) notice on clinical development as reflected at Exhibit 6.

As you know, the only depositions that are being taken in this case until the resolution of the Daubert motion are depositions that relate to general causation, at least in part to general causation. The question I have for plaintiffs is the topics that are covered in Exhibit C, which involve clinical testing, free clinical testing, factors considered by defendants about the use of levonorgestrel, product safety activities, location of storage of documents, things of that nature, what does that have to do with general causation given the material you are already by agreement getting? Can

somebody explain to me why it is that the topics on Exhibit C, relevant as they may be to other issues in the case, are relevant to the scientific issue of general causation?

Ms. Lamacchia.

MS. LAMACCHIA: Leslie Lamacchia for the plaintiffs, yes, your Honor. I want to give a little bit of history regarding the relevancy of the preclinical development of Mirena. It does focus on whether or not Mirena is capable of causing PTC, so it is relevant to the general causation issue.

Plaintiffs do not have an issue of reasonably tailoring the deposition notice to --

JUDGE ENGELMAYER: I'm sorry. Forget the reason for detailing. My question to you is why this is relevant to general causation. There are profound issues of tailoring throughout a number of 30(b)(6) notices. But I'm dealing with the gating issue of what this has to do with general causation.

You are already getting adverse event reports. You are getting investigations. The topics here -- participant consent forms, potential product safety issues -- what independent of the data you are already getting that bears on the investigations done by Bayer has to do with scientific general causation? I'm struggling with that.

MS. LAMACCHIA: It has everything to do with the development of Mirena. It is the reason why we are actually here today. It's the preclinical trials, it's the product

safety assessments, it's the adverse events, it's the initial investigator brochures.

JUDGE ENGELMAYER: You are blurring things together. Adverse events are ready being produced. They are already the subject of an agreed topic in the PV section. The problem here is all these notices are so broad that they have enormously overlapping footprints.

I am trying to isolate the portion of your clinical development rule 30(b)(6) that is not also covered by the agreed parts of the PV topics and trying to understand why that, once it's accepted that the defense is going to be producing a 30(b)(6) witness on the topics they have agreed to under PV, why that which is left within clinical development is relevant to general causation. I'm just having difficulty with it. It's not explained at all in your letter.

MS. LAMACCHIA: Any issue that arose during the development of Mirena is what we should be entitled to be able to ask that person with the most knowledge of such. There is the preclinical testing. There are safety issues. We should be able to ask Bayer's representative regarding these things.

JUDGE ENGELMAYER: Let me ask the defense this question. On the PV topic you are putting forward a 30(b)(6) witness, as you have agreed, that deals with investigations and the deals with adverse events. The formulation is a little more narrow than the plaintiffs' counterformulation, but the

bottom line is such a person is already testifying.

MR. SCHMIDT: Yes, your Honor.

JUDGE ENGELMAYER: Can you submit to me that that person as part of their portfolio would be bringing to bear adverse events and safety issues that came to light in the context of preclinical and clinical testing?

MR. SCHMIDT: The problem we have is we are not writing on a blank slate. We have produced the pre-clinical data we have in the IND. We have produced the studies that we have. We are aware of them raising no issues that have arisen in that context. From our perspective, having produced preclinical data, having looked at preclinical data, them having looked at preclinical data, there is no showing that there is anything in that dataset that bears on IIH.

JUDGE ENGELMAYER: Be that as it may, counsel. If you indulge the premise that the plaintiffs ought to be able to have, at least at a macro level, an account of the data or lack thereof that was exposed at the preclinical phase that might bear on general causation, even if the answer turns out, as you posit, to be a null set, is that something that would be covered by one of your two PV deponents?

MR. SCHMIDT: Not as presently contemplated, your Honor.

JUDGE ENGELMAYER: Can it be? If you have already produced the underlying data, it is not a particularly big ask

to ask that the 30(b)(6) witness who is talking about, let's say, investigations or some other person be able to give an overview of the preclinical and clinical data as bears on general causation issues. Why is that not practicable?

MR. SCHMIDT: Because it is a different type of dataset. Pre-clinical is test tube and animal data as opposed to the human data that is the focus of the pharmacovigilance witness. It is a different dataset. It is inherently more burdensome to go back through it because it dates back to the 1980s, before the medicine was approved. I don't know if we would educate our existing PV witness if we were ordered to produce a witness on this topic or if we would produce someone already familiar.

JUDGE ENGELMAYER: Let's deal with the formulation. Suppose I were inclined to find some topic within the scope of the 30(b)(6) that can narrate Bayer's perspective on the data obtained during pre-clinical and clinical testing that sheds light on or is relevant to general causation, whichever way it points. Why is that not a suitable topic even if it is not one that is within the scope of those you have agreed to?

MR. SCHMIDT: I would probably distinguish those two topics. I think clinical has more potential bearing if there were clinical data that bore on the question of IIH. That would be more relevant, less burdensome, more in line with what we are already producing witnesses on. Pre-clinical data is a

very different type of data and is particularly different data on a disease like this. You can't check whether dogs are getting conditions like headaches. I don't know if there is an animal analogue of IIH or PTC.

JUDGE ENGELMAYER: So pre-clinical data you are representing to the Court does not involve humans?

MR. SCHMIDT: Pre-clinical does not involve humans. Pre-clinical refers to animal data, not data that is before approval.

JUDGE ENGELMAYER: Pre-clinical data is pre-approval but it is when you have reached the point of testing on people?

MR. SCHMIDT: It can be either pre- or post-approval but yes, it includes both animals and humans.

JUDGE ENGELMAYER: Maybe if the reformulation to be pre-approval data based on human testing.

MR. SCHMIDT: Yes.

JUDGE ENGELMAYER: Where I'm going is there is a drop in this ocean here that appears to be germane. I'm trying to work with you to formulate the definition of the 30(b)(6) topic here that gives plaintiff a one-stop shop not for every detail but for the Bayer macro perspective on the clinical data as it sheds light on these conditions. What is the right way to formulate that?

MR. SCHMIDT: I think your Honor is asking us to write an order against us, but I think it is where your Honor is

going. It's human clinical trial data, whether it is pre- or post-approval. Carving out the pre-clinical data, the animal data, we would need to look at whether that is one of our two existing PV witnesses or someone new but that would be much more targeted and I think responsive to your Honor's question.

JUDGE ENGELMAYER: Is there any other safety dimension of the pre-approval work that would bear on IIH potentially in any direction, favorably or not, than the human clinical trial data?

MR. SCHMIDT: From our perspective, the plaintiffs have alleged that pharmacovigilance data, which is not clinical trial data, is relevant. We would take issue with that. But that is being covered by the existing notices. Outside of those areas, I'm not sure what that would be.

MS. NATALE: Your Honor, would you mind if I address the issue of the relevance of the pre-clinical and clinical testing?

JUDGE ENGELMAYER: Animal data?

MS. NATALE: Yes.

JUDGE ENGELMAYER: Go ahead. Have you gotten that data?

MS. NATALE: We have the some of the data. We have the original NDA, like the actual documents.

JUDGE ENGELMAYER: Do you have any reason to think that, putting aside 30(b)(6), you either haven't gotten or

won't get the full scope of the pre-clinical animal data that you are seeking?

MS. NATALE: The issue is less about us getting the data. I know one of the other issues is the request for admissions served by the plaintiffs. We have no admissions in these cases. We have Daubert briefs that took place prior to consolidation in every single argument. To exclude the plaintiffs' experts on general causation includes basically disagreement on even basic scientific facts.

For instance, Mr. Schmidt keeps saying there is nothing in the animal testing about IIH. Part of plaintiffs' theory pre-MDL was that there are mineralocorticoid receptors in the human choroid plexus of the brain. One of Bayer's arguments to exclude plaintiffs' experts pre-MDL was that there is no evidence that there are mineralocorticoid receptors in the human choroid plexus.

So what we are looking for is we would like either admissions --

JUDGE ENGELMAYER: If I may. I'm speaking to you about the 30(b)(6).

MS. NATALE: Absolutely.

JUDGE ENGELMAYER: Assuming that you have the underlying material from the pre-clinical testing, your expert can harvest that. Why do we need a 30(b)(6) on that point? I understand it's a theory you want to develop, but it sounds

like you have the raw materials.

MS. NATALE: There are denials and disagreements over these issues. We are looking for a 30(b)(6) deposition so that we can get the testimony of the corporation on these issues so that we can avoid unnecessary disputes at the briefing stage. Thank you.

JUDGE ENGELMAYER: Thank you.

Let me turn to the PK issue. This is, candidly, the one that I have found far and away the most confusing. The most recent iteration of plaintiffs' 30(b)(6) on PK issues is contained in Exhibit H. Without completely disclosing my own lack of scientific sophistication, it is safe to say that each of the propositions here is a more technical question than some of the others that are presented in the other 30(b)(6) notices.

For example, number 2 asks the relative binding affinities, RBA, and specificity of LNG to sex hormone bonding globulin and albumin. Putting aside plaintiffs' seeking information about these matters, why do you need a 30(b)(6) as to that? Why do you assume that is free-standing information that is existent within Bayer, and why does it have to do with general causation?

MS. NATALE: Your Honor, the first issue, to address your question regarding any of those, quote, subtopics, is not necessarily that they are free-standing information. Say the notice was just topics A and B without any of the, quote,

subtopics. A is the pharmacokinetic profile of LNG and/or Mirena and B is the resulting pharmacodynamic profile, the resulting pharmacological activity.

Numbers 1 through 9 are not necessarily free-standing. They are the topics that the plaintiffs wish to explore under the topic of the pharmacokinetic profile of LNG. The reason is very similar to what I just explained to you about clinical and pre-clinical development except we are talking about the basic capacity of this drug to cause disease.

We understand that defendants have their opinion that Mirena does not cause PTC. These are the basic pharmacological processes by which the woman leaves the IUD, which is in the endometrium, and it circulates throughout the body and it finds its way to target organs, such as the brain, where it causes systemic side effects. It causes acne, it causes hair loss, etc.

We are at a point where we are going to get to Daubert and we are going to get to these expert depositions, and once again defendants will say there is no evidence that Mirena causes systemic side effects at all. We would love to get a response to those requests for admissions, etc.

We have used these documents in the past, and they are still moving to exclude our experts by saying that's against the scientific evidence. We are looking to depose a corporate representative of the company to explain their knowledge at the

time of the pharmacological profile of this drug.

JUDGE ENGELMAYER: How does this relate to the expert testimony? Wouldn't it be the case that with or without this, the parties' experts would presumably be taking up issues that include the ones in Exhibit H?

MS. NATALE: Absolutely they will. We would like the opportunity to depose a corporate witness.

JUDGE ENGELMAYER: That's the question. If they are going to have an expert or experts who deal with this point, why do you need a corporate witness to supply these scientific database conclusions? Why isn't that the stuff of which the upcoming expert testimony will be?

MS. NATALE: Absolutely, your Honor. We will be here in April for a Daubert hearing, and the defendants will argue to you that our experts did not employ scientifically reasonable or proper methodology in order to reach their conclusions.

Each one of these items on here are premises of our necessary general causation opinions. You are going to hear that those are scientifically unreliable, unsound methodologies. We would like the opportunity to depose the corporation and get some answers on these. Maybe they will deny it.

JUDGE ENGELMAYER: Let's go to number 2, which is the example I gave you. Is that the sort of information, A2, that

will get expressed in a number or an adjective? What is the sort of answer one would expect to get in response to A2, which is the relatively binding affinity?

MS. NATALE: What that means is there are natural or endogenous pathophysiologic hormones and hormone receptors in our bodies. There are androgen receptors which bind to testosterone. There are mineralocorticoid receptors which bind to the natural, which is aldosterone, and that is responsible for salt and water balance throughout the body.

LNG is a synthetic hormone. It is derived from a 19-nortestosterone and it is developed to mimic mainly the activity of progesterone, which is the pregnancy-maintaining and disrupting hormone in the body. Because LNG is a synthetic hormone, it actually binds to numerous receptors in the human body, including the AR, the androgen receptor, mineralocorticoid receptor, progesterone receptor, and glucocorticoid receptor.

Aldosterone is the natural hormone that binds the mineralocorticoid receptor. That is a large basis, as the defendants are aware, of the theory that plaintiffs put forth for general causation pre-MDL. The relative binding affinity would be the percentage of the binding between aldosterone and the MR, what percentage of LNG binds to that same M receptor.

JUDGE ENGELMAYER: It gets expressed ultimately as a percentage?

MS. NATALE: There is a percentage.

JUDGE ENGELMAYER: Why do you need a 30(b)(6) to capture that percentage? Is that the sort of data point that is going to be existing in a Bayer document or something that a fact witness can opine on? In the end, whether Bayer says it is a 30(b)(6) or whether it is fact establishable by non-30(b)(6) evidence, you've got your data point and you build on it or not in the course of the expert work. Why do you need Bayer to say our official position is 26.7 percent?

MS. NATALE: There are three levels to that. The directer answer is that pre-MDL, once again, Bayer's experts denied that there is any binding affinity at all to the MR. They deny that once it binds it can be an --

JUDGE ENGELMAYER: That's fine. Maybe you will call those witness or they will call the same people. It doesn't address the issue of why you need Bayer to, as a corporation, whatever happened in somebody else's litigation, commit to that.

You have a burden here. It is to prove up the viability of general causation evidence. But you also have an enormous dataset here in the form of the very substantial document discovery and what I expect will be non-30(b)(6) testimony. If you can get from Bayer through those means testimony to that effect, even if you've got Bayer people disagreeing, you have got at least a data point that you can

build on. I am trying for the 30(b)(6) mechanism to get them to pin down on all these data points.

MS. NATALE: Your Honor, I absolutely respectfully completely understand that there is scientific literature out there, there are studies that say that the relative binding affinity is 70. If you will accept that as valid scientific evidence when we come to Daubert that our experts are relying upon, great, we can move past that phase.

If the entire dispute here is whether Mirena is capable of causing IIH or PTC, then we have the burden of explaining that our experts have relied upon scientifically valid methodologies. We are going to have our experts say this is what the science says, and then their experts are going to come in and say that's wrong, that's not what the science says.

Doesn't it make sense to go back to the company that is developing the drug and answer one way or another whether they have seen in their clinical studies and their post-marketing experience --

JUDGE ENGELMAYER: In the documents you have reviewed, and obviously you have had all the pre-MDL cases, do the answers to any of the questions in Exhibit H appear?

MS. NATALE: They do, your Honor. The issue is that they are not necessarily direct. You will hear about the relevance redactions, or you may not because I think you said that you were moving past it. One of the issues in there is

discuss the sex human binding globulin, the SHBG issue.

There are indirect mentions of this. There is no, okay, these individuals may be more susceptible to side effects because they have less SHBG in their blood, for instance. There is nothing that says that in the documents. There is science that explains that that should be correct. There are documents that discuss we would expect less side effects in these individuals because it is the free fraction of the hormone that matters.

You are going to hear about the free hormone hypothesis. What that says basically that LNG binds very highly and specifically to SHBG, and the amount that is bound is biologically inactive, it's incapable of causing hormonal activity in the body, only the free amount that is not bound to SHBG or albumin is capable of causing --

JUDGE ENGELMAYER: I think you indicated that the answers to these questions already are existing in documents. Why can't you get a fact witness or somebody else to authenticate the document or make that statement -- it may be that Bayer until this date doesn't have a position on some of these issues -- and, unlike a classic 30(b)(6), explain your database where there is an objective reality to it? It is not obvious to me that Bayer needs to get forced to take a position on these matters.

MS. NATALE: Again, there are no indirect answers to

these questions. There are no direct answers to these questions in the database. There are facts that add up to these issues. We are literally just trying to solidify our scientific basis prior to Daubert and prior to their moving to exclude our experts.

JUDGE ENGELMAYER: Can an expert retained by the plaintiff also reach a conclusion as to number 2, the relative binding affinity issue?

MS. NATALE: Absolutely, your Honor, and they are going to.

JUDGE ENGELMAYER: The Bayer expert can as well?

MS. NATALE: Absolutely. You will hear both of them before you in April.

JUDGE ENGELMAYER: Thank you.

Bayer, let me ask you this question. You globally say no to Exhibit H but then say that what you would like the plaintiffs to do is narrow it down somewhat. What you don't do is give me an alternative. You basically say no or just a little bit please.

What is the most defensible part of Exhibit H? If we are looking for a compromise position in which you are committing to positions that Bayer is prepared to commit to and doesn't have to come to a conclusion it hasn't had to come to before, which of the questions in Exhibit H are fair game?

MR. SCHMIDT: I think the answer to that question,

your Honor, is we have made the compromise we think is appropriate, and it is we are producing two individual witnesses.

JUDGE ENGELMAYER: You are doing that on PV.

MR. SCHMIDT: No, on pharmacokinetics. We are producing two witnesses: Dr. Zurth, who they have requested; Dr. Hofmann, who we have said we think this is the person most involved in relevant pharmacokinetic questions.

JUDGE ENGELMAYER: One moment. PV. We are talking about PP now. My understanding is that you have committed to eight topics within PV.

MR. SCHMIDT: That's correct.

JUDGE ENGELMAYER: Put that aside. I'm struggling to find in your letter some separate point where within the scope of the PK topics, that's Exhibit H, you have identified people and topics as an alternative. Where in the letter does it say that?

MR. SCHMIDT: The closest reference we have is if your Honor looks at the relief requested, the second sentence: "Defendants will also produce in their individual capacity the witness it had communicated to plaintiffs would be a likely 30(b)(6) witness on this point." That is Dr. Hofmann. We discussed her documents early in the litigation and voluntarily produced them.

JUDGE ENGELMAYER: You want that person as an

individual?

MR. SCHMIDT: Yes.

JUDGE ENGELMAYER: But if she gives an answer that Bayer determines is unhelpful, Bayer could repudiate that itself.

MR. SCHMIDT: Yes, subject to them saying your own employee says this, your own person who is put in this position of responsibility says this.

JUDGE ENGELMAYER: Why can't that employee bind Bayer an those issues? Why does Bayer get a mulligan?

MR. SCHMIDT: I don't think it is a mulligan. I think it goes to the question your Honor was asking. Our concern with these 30(b)(6) documents particularly in this area, the latter half of their 30(b)(6) topics have nothing to do with safety. They have to do with efficacy. That's topic B in their notice. Then topics C through F have to do with other products that we understand --

JUDGE ENGELMAYER: Other products are going to be out. I can guarantee you that. The issue is this product. What they are trying to get is data about this product. The case is not about which product is better or safer. The issue is whether this product causes a particular condition. To the extent that PK questions clear the 30(b)(6) bar, they will be focused on this product, not on comparators.

That said, if we limit it to this product, why can't

Dr. Hofmann answer the questions within Exhibit H as to this product?

MR. SCHMIDT: I think it is where your Honor was going with your question to plaintiffs' counsel that there shouldn't be an obligation to us to adopt a hard-and-fast position and produce expert testimony through a fact witness on these topics. If your Honor looks at topics, for example, A1, A4, and A5, those aren't about Mirena. Those are about Mirena compared to seemingly every other LNG-using product. Even the ones that appear on their face to be limited to Mirena, they are still essentially asking us to make --

JUDGE ENGELMAYER: I just said that I'm not in the comparison game here. The issue here is purely an issue of what the data is as to Mirena. Assume that we are not going to be having 30(b)(6)s on comparison shopping but just on the qualities of Mirena, why can't Hofmann bind Bayer on those points? If you are willing to come forward with Hofmann on those points as somebody who is apparently a trusted employee, you would have the time to prep. Why can't Hofmann bind Mirena on the statistical data that is being sought limited to Mirena within Exhibit H?

MR. SCHMIDT: It is essentially turning her into an expert witness on points that may not have been developed, that the company may not have a position on, that may be tentative in terms of the state of the science.

JUDGE ENGELMAYER: It is not so much turning her into an expert witness. You apparently are willing to put her forward not as any old Joe or Joanne but as somebody who knows something about the area. She is apparently able to answer a serum level question or something like that. You are not saying to me that she is unqualified to speak to the point. You are just hesitant to have her bind Bayer on that point, right?

MR. SCHMIDT: On points where she might not have an opinion herself, where she certainly knows about pharmaco-kinetics data regarding --

JUDGE ENGELMAYER: As you know, the 30(b)(6) person doesn't have to have an opinion themselves. The 30(b)(6) witness has to be capable of expressing the corporate view. Even if she needed to do, as a good 30(b)(6) does, some recon within the company, in the end if H is thinned down to data just about Mirena, whether it's Dr. Hofmann or if you choose somebody else, why can't those data points be expressed by a 30(b)(6)?

MR. SCHMIDT: I don't read these topics as being addressed strictly to data points. These aren't topics saying tell us where these documents are located, tell us who is responsible for which areas of duties within your company.

JUDGE ENGELMAYER: Let's look at A1. Let's suppose we edited A1 to get rid of the comparison. The simple question

was serum levels of LNG during use of Mirena. While it may properly be answered as a range, I don't know, it certainly sounds like a data point.

MR. SCHMIDT: That is more data-driven. We could have fights after the fact about whether the witness was properly prepared, but that is more data-based.

JUDGE ENGELMAYER: Number 3, the effect of LNG on levels of SHBG during use of Mirena, I take it that is a factual matter limited to Mirena.

MR. SCHMIDT: Yes.

JUDGE ENGELMAYER: Number 3 again, up through the comparison clause, the free levonorgestrel index during use of Mirena. Again, these are factual matters. Are these things unknown to the company?

MR. SCHMIDT: There is obviously knowledge on those questions in the company. I don't know what questions they would ask about them. I assume they would verge into opinions. But there is a level of fact knowledge on those questions that the company has.

JUDGE ENGELMAYER: If these were merely factual points in the knowledge of the company, in the interests of adding and shedding light, moving us along in the general causation inquiry, if H were thinned down to data points about Mirena without comparisons, why can't a company witness commit to those data points? It actually is a useful input if

potentially germane to the general causation. It at least pins Bayer as the knowledgeable manufacturer down as to some statical points that may turn out to have relevance and don't appear to be outside of its natural knowledge base.

MR. SCHMIDT: There is still a burden point which we would object to, which is that it does force a single witness to ensure that they have done a full review.

JUDGE ENGELMAYER: Why does it force a single witness to do that? Just as you are proposing two witnesses for PV if this gets too burdensome, you can break this up among different people.

MR. SCHMIDT: It forces a set number of witnesses to learn the dataset and be able to give final company positions on the dataset. We would still have that burden objection. It becomes less burdensome, to be sure, if you carve out some of the opinions.

JUDGE ENGELMAYER: Let me try it this way. Suppose that C, D, E, and F are all gone. They deal with other products. Suppose all the comparative parts are gone that are within A and B and we are left simply with the more factual questions that are within H. Explain to me what the burden is there. That just doesn't sound that big.

MR. SCHMIDT: Just so I have your Honor's point, P would be gone as well?

JUDGE ENGELMAYER: The notion would be that R through

F would be gone. Those are dealing with other products. I'm not receptive to that. That's not what this MDL is about. B would be simply edited to focus on Mirena. The B questions can be lightly edited to get to a locked-in focus just on Mirena. There are indeed references to LNG and/or Mirena. One could presumably narrow it down to Mirena. Assuming we get it down to the product that is at issue in the case, what is the problem?

MR. SCHMIDT: B has a distinct issue which I want to be clear about. B seems to focus on efficacy, the activities by which Mirena prevents pregnancy, inhibition of ovulation during use of Mirena. That is not what this stage of the litigation is about. This stage of the litigation is does Mirena cause IIH, not how does it work in terms of the benefits of the product, but what is its potential harm. I think B is objectionable on those grounds.

If we just focused on A, I think our position would be that they get the point that they want by a pared-down version of A1, serum levels of LNG during the use of Mirena. As we get into some of these other, thornier questions, they start approaching expert opinions.

JUDGE ENGELMAYER: Thank you.

MS. NATALE: Your Honor, might I address that?

JUDGE ENGELMAYER: No. We have plenty of other issues to take up. We have a number of issues here before me.

MS. NATALE: Yes, your Honor.

JUDGE ENGELMAYER: I think I have heard enough to put me in a position to rule.

May I ask counsel, has there been a 30(b)(6) witness earlier in this litigation on any of the points covered by clinical development or PK?

MS. NATALE: There have never been PK witness before. There has never been custodial files or any sort of production.

JUDGE ENGELMAYER: So this is new ground.

MR. SCHMIDT: We agree with that, your Honor.

JUDGE ENGELMAYER: So no 30(b)(6) has been covered.

Bayer, these topics are likely to come up on both sides' expert opinions, right? If Bayer has committed on some of these data points, that may simplify the experts' work and the Court's ability to assess the experts. If I'm talking about questions that are within Bayer's realistic knowledge base and Bayer has committed to them, limited to Mirena, doesn't that, at the margin anyway, assist all of our work with respect to the experts by enabling an assessment of the general causation issue premised on certain factual inputs rather than nesting in a bunch of underlying factual disputes?

MR. SCHMIDT: That's right, your Honor. To a certain extent that is true. Of course, it is true there are certain data that if we can reach agreement on, that streamlines the dispute. Our concern is you could have five scientists look at

a set of PK data and come to different conclusions about the nuances of what it represents, given which data is good data and which is less reliable data.

JUDGE ENGELMAYER: If in the end Bayer is unable to commit as between two positions and Bayer's position is that the serum level range is between X and Y, that there is a range, false precision doesn't help anybody. Just because there is a 30(b)(6) topic doesn't require the company to strive for a level of precision that is unrealistic for it to have.

On the other hand, it doesn't seem to me terribly fruitful if the company is able to within some parameter answer the question. If it appears to be a data point that is going to assist us here, why can't Bayer, limited to this product, make those commitments?

MR. SCHMIDT: I think we probably could. It is just a question of where you draw that line between what the simple facts are and where it becomes a matter of scientific opinion.

JUDGE ENGELMAYER: I am entertaining the idea of limiting it to A and ending it within A, to get rid of the other product, but otherwise authorizing a 30(b)(6) witness or witnesses to answer the factual questions about Mirena that are in A. That's the current thought here. It seems to me those are data points that have the potential to assist me in the end and assist the experts on general causation.

With that, I'm going to turn to Judge Cott, who has

probably the heaviest lift here, which is the other discovery issues.

JUDGE COTT: Good afternoon, folks. I don't know if I do. Is this still an open issue in all respects? I'm talking about the docket number 99 letter, the written discovery dispute issues. Is that also still an open issue today?

MR. KENNERLY: Yes, your Honor, all of it.

JUDGE COTT: With that in mind, let state where I think you are. Then you can tell me if it is something else.

I understand that the plaintiffs have asked the Court to instruct the defendants to answer 6 RFAs, 6 interrogatories, and 5 requests for production, as well as to respond to the remaining written discovery with specific objections and answers, and the defendants' position is that the Court should limit the plaintiffs to just the 6 RFAs and 6 interrogatories, I gather with no responses to the requests for production. Am I framing the current state of dispute accurately or is it something else?

MR. KENNERLY: Yes, your Honor, that is how we under- stand it. We hope these can give guidance for the other ones with objections and answers.

JUDGE COTT: If the Court directs the defendants to answer the designated items you have made, where does that leave all the other ones?

MR. KENNERLY: We would then receive answers from the

defendants either with some sort of specified objections to them or some degree of true response or answer. Our hope is if the defendants were given guidance on this in order to respond to these and be instructed that written discovery was proper, the defendants would then at least respond to the other discovery. If they object to it, that's fine, we can meet and confer and figure out what to do with it. Or they will answer it consistent with this Court's ruling on how written discovery should proceed.

JUDGE COTT: Let me say as a threshold matter it is my understanding, having reviewed the July 27th transcript, that the parties and the Court are in agreement that discovery unrelated to general causation would proceed except as to depositions. Is that not right?

MR. KENNERLY: Our understanding was unrelated to general causation would proceed.

JUDGE COTT: With an end date of the end of January I believe was what was agreed to. Correct?

MR. KENNERLY: That's correct, your Honor. That's where we ran into the issue of committing to the Court an agreement about how this affected depositions. We understood it would proceed, but we didn't want to front-load all the requests for production of documents there as well. And we got a response from defendants that they would not proceed with written discovery at all, which frustrated the ability to

further deal with this issue.

JUDGE COTT: Maybe the best and most efficient way to proceed is to start off with your exemplars, about which I have some views but I am certainly happy to briefly discuss them with everybody. Let's start off with the RFAs that are identified, which is RFA numbers 1, 18 through 21, and 23. Who from the defendants' side is addressing this?

MS. COOK: I am, your Honor.

JUDGE COTT: All right, Ms. Cook. What is the problem that the defendants have in either admitting or denying or DKIing any of these six? They seem pretty straightforward as they are phrased. You can either admit them, deny them, or something else, but I don't understand why there would be an objection to these as they are stated. Is there?

MS. COOK: We would be willing to respond to those six as stated.

JUDGE COTT: That being the case, you will do that by Friday? How quickly can you do that?

MS. COOK: I think we would need more time than that.

JUDGE ENGELMAYER: You can do it by 5 o'clock today, I bet. This is not that complicated, is it?

MS. COOK: It would require us to speak to our phar-macokinetic witnesses.

JUDGE COTT: How much time do you need to respond to the RFAs that are here?

MS. COOK: We could do it within I would say two weeks. That would be before any of the pharmacokinetic depositions.

JUDGE COTT: They have to be done in advance of the relevant depositions, right? That's in advance of them, two weeks from today?

MS. COOK: Yes, your Honor.

JUDGE COTT: That's November 7th, if I'm not mistaken. Why don't at a minimum we say that that is true.

Let's stay on RFAs for the moment. There are 200 of them. What about the other 194 given that they are going to respond to these 6 between now and November 7th? What do we do about the other 194?

MR. KENNERLY: Your Honor, a substantial chunk of them are very similar to this. They are requests for admission on specific scientific principles. I would say that about half of them relate in some form or another to regulatory issues or labeling.

JUDGE COTT: They relate to regulatory issues or?

MR. KENNERLY: Or labeling. The issue there is not that we are trapping them in some sort of liability issue. It is because at pharmaceutical companies and under the regulations, labeling and causation are intertwined. The standard by which they assess causation is in fact the labeling standard.

These requests relating to regulatory actions in the past or to labeling of other matters or the corporation's involvement with something like Norplant and Wyeth will help streamline the understanding of the science going forward so that we are not quibbling about issues that really aren't genuinely in dispute.

JUDGE COTT: I will concede I didn't read every single RFA carefully. I looked at them to understand what subjects were covered. Some of them relate to products other than Mirena, do they not?

MR. KENNERLY: They do, your Honor.

JUDGE COTT: Given what the Court has ruled in that regard previously, why should any RFA related to a product other than Mirena be answered?

MR. KENNERLY: Our problem with the other products is the defendants themselves have done all of this intertwining of them together. When they discuss these products, they don't streamline out Mirena. It's not like it's a different drug. Mirena is a piece of plastic that carries the LNG with it.

These issues, every time the defendants themselves do a signal investigation, they combine multiple LNG products together. Every time they report to the FDA with the PSUR, they combine all of their LNG implants together. If your Honor's position is discussion of any other product is out of bounds, then --

JUDGE COTT: That is consistent with how the Court has been ruling in various other contexts. Why would we make an exception here?

MR. KENNERLY: Until today, as we understood the past ruling, there would be no pre-standing search for other product. That is not what we are requesting for any of them, not with the 30(b)(6) or written discovery. What we are asking for are the times the defendants themselves are putting these products together and discussing them in conjunction.

The problem with deposing, say, a pharmacokinetic expert on Mirena is that 90 percent of the defendants' documents talk about these things simultaneously. They talk about them in a comparative fashion. For example, in our redactions letter we have an example of Dr. Zurth. It's a question about LNG and SHBG, and it starts out in our version with a redaction by the defendants on another product. Right after that, he starts discussing Mirena because that is the same chemical in it as whatever was redacted. Then there is another redacted section, then it goes back to Mirena.

The truth is this is how it works at the pharmaceutical company. We are not trying to find a free-standing issue on these or generate litigation on these. But defendants own documents blur these together. The signal investigations that we are going to depose there pharmacovigilance people on include in them IIH cases from Skyla. They include references

to Jadelle. It is the same thing we see in the FDA files.

So when we are asking about this, it's not that we want a fishing expedition. It's because the defendants themselves are talking about them in conjunction because it is the same chemical in all of them.

JUDGE COTT: I'm a little confused about what your proposal was. You provided these 6 RFAs, which the defendants have now said in court they are going to respond to. What was the purpose of pulling out these 6 relative to the other 194?

MR. KENNERLY: Because the place we were stuck in written discovery is the defendants said they were not going to respond to any of it on any subject whatsoever. So we had these as an exemplar to move forward. We have the principle of they will respond to the discovery that we have served to it limited to whatever the Court has ordered.

Our view of it is helping us with the guidance on written discovery as required and in particular these core scientific facts have to be answered. That's why I raised the regulatory labeling, because those requests for admission are separate from the parts where we are requesting pure science. I didn't want to sandbag the Court with something that is separate from that.

JUDGE COTT: Sandbagging the Court, generally not a good plan.

MR. KENNERLY: Exactly, your Honor.

JUDGE COTT: Sandbagging your adversary, also not a good plan.

MR. KENNERLY: Same thing, your Honor. They are not all exactly like these.

JUDGE COTT: I'm not sure how that helps us.

Let me ask Ms. Cook. What is your position with respect to the other 194 RFAs? I thought of the three categories, this was the easiest, in a way. What are we going to do with the other 194?

MS. COOK: Our position, your Honor, is that responding to 194 RFAs, 50 of which relate to Jadelle, I have no idea how many of them relate to Norplant --

JUDGE COTT: When you say relate Jadelle, Mr. Kennerly is going to tell me some version of it is intertwined with Mirena, it is not stand-alone Jadelle type inquiry. Isn't that right, Mr. Kennerly?

I took you all at your word when Judge Engelmayer said let's divide this up and you're going to do docket number 99. In it it says you don't have to read all 200 of them, so I didn't literally read all 200 of they meant. I kind of skimmed them to get the lay of the land. Maybe I should have read them and said, okay, this one yes, this one no, this one yes, which is what I was afraid of. Give me some guidance here.

MR. KENNERLY: The guidance that I asked from the Court is first the most basic one, your Honor ordering a

response to those pure scientific facts.

JUDGE COTT: They are agreeing to it. I'm not even ordering to it. They are stipulating.

MR. KENNERLY: They are agreeing. What I asked is your Honor to say they need to respond to pure scientific fact.

JUDGE COTT: If you are going to fight about which ones are scientific fact generated and which are not, I don't see how that advances the inquiry. Can you identify some subset of the 194 that you think are in that category?

MR. KENNERLY: With reasonable time, yes, we could, your Honor.

JUDGE COTT: You're the ones who created the 200 of them. There is a burdensome argument here. That is a lot of RFAs, especially if they are in multiple categories, which they appear on the surface to be. To the extent you are willing to streamline them or say we are going to withdraw them and we are going to re-serve RFAs, we are going to serve 75 of them, these are the ones we care about the most and we think are consistent with the 6 the judge either directed or you agreed to, something along those lines would make more sense to me.

MR. KENNERLY: Your Honor, we can do that. We can remove the labeling-related ones, lean it towards the scientific direction with a couple of elements of regulatory history to it. That's where we wanted the guidance from your Honor.

JUDGE COTT: Let's keep our eye on the ball here. What is most relevant here is what you need for purposes of your depositions which you need in advance of the Daubert hearing, right?

MR. KENNERLY: Exactly, your Honor.

JUDGE COTT: You're in a far better position than the Court is to go through the 200 and pick your top 75, whatever the number is going to be, which you think are most relevant.

MR. KENNERLY: We can do exactly that, your Honor. We will be able to withdraw a fair amount of them based on what we have addressed here.

JUDGE COTT: Ms. Cook, if there are 75, you have less of a burdensome argument. If you want to interpose objections or otherwise, what you have to do is respond to them, not just say we are not going to do that. You can admit, deny, deny knowledge or information, or otherwise interpose objections consistent with rule 36. Okay? What is the problem with that?

MS. COOK: Your Honor, 75 in the six weeks remaining in general causation discovery still seems quite burdensome.

JUDGE COTT: A lot of it is going to involve the same kind of preparation you are doing for your depositions, it seems to me.

MS. COOK: Your Honor, if we are talking about pure scientific facts about Mirena, that may possibly be true. What I'm hearing is that there is a reargument about the relevance

of the other products that the Court has already excluded from discovery. The other thing I'm hearing is that there will be ones relating to regulatory history, which we do not believe has anything to do with the general causation questions at issue in this phase of the litigation. Those will not be the witnesses who are being prepared or presented for deposition.

JUDGE COTT: Why doesn't that mean if any of the 75 fall into that category, that's your objection?

MS. COOK: Absolutely, your Honor. If the guidance from the Court is that any of them that are not related to Mirena only and are only related to general causation is a valid basis for objection, then we will object on that basis.

JUDGE COTT: I'm not going to rule yet. I'm going to during the break talk to Judge Engelmayer about this. To pin this down, Mr. Kennerly, can you identify in any of the RFAs one that falls into what you referred to earlier as kind of this intertwining category? I see a potential for some dispute there, where Ms. Cook is going to say in black and white that is not Mirena, that is Jadelle-related, we are not answering, and you're going to say, no, it's intertwined in some way. Can you give me an example of that? I think that is the hardest type issue.

MR. KENNERLY: Your Honor, based on the remarks here, we can probably or we will withdraw the bulk of them discussing our product if we can identify some of these that are right on

that intertwining. The intertwining is probably more an issue for depositions. We will go back through the requests.

JUDGE COTT: Let's talk briefly then about the interrogatories. I'm going to look at the exemplars you provided. Numbers 4 and 5 strike me under the local rules of this court as what would be characterized as contention interrogatories. Also embedded in them is the phrase "described in detail." Both of those preliminarily give me concern that an interrogatory is not the most useful means of obtaining the information you are seeking in those two interrogatories. Can you speak to that as a threshold matter.

MR. KENNERLY: Yes, your Honor. Part of this is because, not having agreement or order on the 30(b)(6)s when we are preparing these, we need to cover the waterfront in what we seek. If there is going to be a 30(b)(6) prepared witness who is going to discuss these very issues, then an interrogatory becomes less relevant and less useful.

However, our concern, both for the 30(b)(6)s and with the written discovery, is if there is no one to speak to these issues, then we are left fishing in the dark through the files to find what is most relevant and most probative and to discuss with our experts --

JUDGE COTT: From a sequencing standpoint, what I would suggest is these be withdrawn, you take your 30(b)(6)s. If there aren't answers in the record related to those

subjects, you can then interpose what would more properly be considered contention interrogatories post-30(b)(6) depositions rather than currently, where I think in some respects they are premature and not phrased in a method that gives me confidence that they are the most efficient way to obtain the information.

MR. KENNERLY: If we are permitted to do that under the scheduling, we absolutely will do that. Our concern is we are doing these depositions in the later part of November, and at the earliest we would have interrogatories served contemporaneously or right after the deposition. We wouldn't want an objection that the answer is due outside the December 8th deadline so we are not going to respond to it. If that is authorized, we would certain move to that process of 30(b)(6)s and follow up with contention interrogatories.

JUDGE COTT: We will talk further about that. Let me ask Ms. Cook: With respect to 7, 10, 17, and 21, those, at least as a threshold, strike me as proper interrogatories. What is the problem in responding to them? When I say responding to them, it could be whatever response may be appropriate. But in and of themselves, I don't see an inherent problem with them.

MS. COOK: Number 17 looks to me more like a document request for every communication between anyone at the company and any authors of an article where I do not see how those communications would relate to the general causation question.

JUDGE COTT: Remember, we agreed that document discovery interrogatories outside general causation are proceeding. Right? That's what order number 9 said following the July 27th conference. We didn't say there was going to be no document discovery related to nongeneral causation, in my review of it anyway.

MS. COOK: My understanding, your Honor, of the order was that the document production that was ordered at the conference would continue, it just had a different deadline, which is at the end of January.

JUDGE COTT: Right, exactly.

MS. COOK: To the extent that this is a brand new document request, that would be our objection: that we understood the Court already defined the scope of our document production obligations. That was defined by a number of custodial files, supplemental custodial files, new custodial files, and databases. That is what we are intending to produce for those witnesses. Whereas, this looks to me like it is more asking for a search whether anyone at the company has had any communications ever with any of those people on any topic.

JUDGE COTT: I agree it is broadly written. But as a topic generally, is there an objection to the topic just because it isn't entirely general causation-related?

MS. COOK: To the extent that it was an appropriate interrogatory and not a request for production or a contention

interrogatory, which it is not, then we would ask for the Court to allow us to answer it outside of the general causation time line and within the discovery for nongeneral causation time line.

JUDGE COTT: I feel like in the first instance the parties should be able to work out what I will call staging with respect to your answers. Obviously, we want you to front-load any interrogatories or document requests that are general causation-related. If they aren't, then you can do that post December 8th, between December 8th and January 31st I would think. Is that not your view, Judge Engelmayer?

JUDGE ENGELMAYER: That is exactly my understanding.

JUDGE COTT: I feel like I'm simply repeating what my understanding or take-away was from the July conference. If you want to say to plaintiffs' counsel we're going to answer number 17 as narrowed but we are not going to do it until after December 8th, that's fine, but that is not where we are right now. That's why we are talking about this.

If it is a nongeneral causation-related interrogatory that you are otherwise going to answer, your answer can be we will answer that between December 8th and January 31st. But if it is a general causation-related interrogatory and they need the responses in advance of depositions, then you need to work out a time line for that to happen so that it is a level playing field or as level as it can be.

MS. COOK: I understand. That is consistent with my understanding of the ruling as well. Our issues with that interrogatory are just that it is so broad and also seemingly is a very broad document request directed outside of the scope of discovery as defined by the Court.

With respect to the remaining interrogatories, the issue with those is just that they are extremely broad in the way that they are phrased. Each and every person who has participated in any way in gathering, processing, evaluating and our analyzing information for purposes related to evaluating the potential causal association between levonorgestrel, which brings in all the products, and PCT/IIH, just the breadth of that is our concern with it.

JUDGE COTT: Mr. Kennerly.

MR. KENNERLY: On this very particular one, there is a reason for that request, which is that Dr. Schoendorf, who conducted the pharmacovigilance assessment, was specifically asked at her pre-MDL deposition who else worked on these signal investigations. She made references to teams of people being involved. When all was said and done, she would remember one, Alex Asiimwe, an epidemiologist. We have to have a request like this to be able to identify who was doing what.

JUDGE COTT: In your meet-and-confer with Ms. Cook, did you say the reason for number 7 is precisely what you are now telling the Court?

MR. KENNERLY: At our meet-and-confers we were told that they would not respond to any written discovery what- soever, however they would contemplate extremely narrowed requests relevant to general causation. We gave the example of those requests for admission and never heard a response back. So we have tried to do meet-and-confers and been told that we have a response to nothing.

JUDGE COTT: Number 7 is extremely broad as written: each and every person who has participated in any way. You couldn't add more words to make it broader than it is. On the other hand, if you have a particular reason for number 7, as you have just articulated, and you want to know, I don't understand why number 7 isn't some reference to that deposition you mentioned and the answer that was given and some interrogatory or document request that would provide you or expand, rather than asking for the sun, moon, and stars, which is inevitably one that will generate an objection.

MR. KENNERLY: Your Honor, I agree with you.

JUDGE COTT: If I can say this. Philosophically, I think interrogatories are wildly overrated as a discovery tool. They really are. Let's be honest. Lawyers just reflexively use them and think they are going to give you much more than they almost ever can. So I don't know that we should really belabor this as much as we are.

Frankly, I think you need to meet and confer further

about number 7 anyway to narrow it consistent with what you have just articulated before the Court. Then you will get a resolution. That's probably true for a lot of these. It sounds like you sort of have a hand in your face so to speak, the proverbial hand in your face, felt like you had no choice but to come here, so here we are.

I'm not sure we are being derelict in our duties if we say now go back with this conversation and have a real meet-and-confer and get this resolved. If you don't, you can come back again. Until then, I'm not sure our parsing through the "each and every" and "in any way" kind of interrogatories is a useful undertaking.

MR. KENNERLY: I agree, your Honor. That's why we gave you the exemplars. We got the hand in the face and also the note on the 30(b)(6)s. I think your Honor had a great idea that the contention interrogatories can await if we have done a properly designated 30(b)(6) with an actual witness from Bayer. If we have a 30(b)(6) pharmacovigilance witness who says here is everyone who was involved in it, this interrogatory goes away and is not necessary. But we got the hand to every one of the tools we tried to use in discovery.

JUDGE COTT: What about the others, 10, 17, and 21? Problems with any of them other than the each and every person part or each and every communication part?

MS. COOK: Yes. 10 has the same problem as 7 in the

sense that it is extremely broad: each and every person participated in any way.

JUDGE COTT: If you had a further meet-and-confer and Mr. Kennerly or one of his colleagues said the reason for number 10 is because of whatever it is, some answer in a deposition or something else, that will by definition generate a conversation which will inevitably lead to some narrowing. He can tell you what he is looking for. You can say we have it, don't have it, or we have legitimate objections or whatever it may be.

MS. COOK: Yes, we would invite that opportunity.

JUDGE COTT: What about 17? We talked about that. What about 21?

MS. COOK: 21, we could meet and confer about that one as well.

JUDGE COTT: All right. I assume there are 25 interrogatories, another whatever, 19 or 20, and they are similar in the sense that we are not going to go through them all. It seems to me the likely result here is a further meet-and-confer with the guidance that we have discussed. We'll talk a little more about that.

What about the requests for production? Are we going to find ourselves in the same place? I will say preliminarily that requests for production that ask for any and all documents are inherently overbroad and would be objectionable on that

basis alone. Let's get past that.

I'll take number 6 as an example because it is short: produce any and all documents relating to hormonal levels, serum levels, plasma levels, and systemic levels in the body of Mirena users. If you served that on me, I would say that is so overbroad I can't imagine it being any broader. What are you really looking for, Mr. Kennerly with respect to that one?

MR. KENNERLY: I agree with your Honor. We don't like using that language either.

JUDGE COTT: Could it be any broader? I don't think so. Which means you are just going to get an objection. If the purpose of this is just to have lawyerly exercises, that's fine, but I don't think you have time for that. It's better to pick up the phone and say this is what we need, do you have it, will you produce it, will you not produce it.

MR. KENNERLY: The problem, your Honor, is what adjective we put in there other than saying "any or all." If we write "the important ones," "the substantive ones," "the major ones," we will get objection to it. What we are looking for is the defendants know where they have documents about hormone levels, serum levels, plasma levels, and systemic levels of Mirena.

JUDGE COTT: Where do they have them?

MR. KENNERLY: In a combination of whatever master file they have for the labeling.

JUDGE COTT: Why isn't that in the request? Now you are starting to narrow it as you are describing it to me.

MR. KENNERLY: The problem with this is the way that Bayer specifically works, they try to not put documents in those repositories. We have emails in which two people will discuss safety and a vice president comes in and says do not discuss safety issues by email. We have no idea where that discuss goes after that.

JUDGE COTT: There will be documents then. You can learn this by deposition, not documents. Once again, overrated written discovery in advance of depositions.

MR. KENNERLY: Here's the thing, your Honor. Something like serum levels, it is similar to 30(b)(6). We have a joint pile of production from custodial files asking someone at Bayer what are your documents relevant to serum levels and not getting it all. It's not a matter every single email. But asking the people at the corporation what do you know of the systemic effects of Mirena, somebody knows an answer of where to point with that.

We keep getting a shell game for every one we look for. We thought was Dr. Kurth, and we were told that his file has been moved to Dr. Hofmann, and we are supposed to have Dr. Hofmann as an individual witness instead of a 30(b)(6). Everything looks like this. It all looks like a 3-card game of Monte. What we need is an answer. They know where they have

serum levels. They know where they have systemic effects.

JUDGE COTT: But asking for any and all documents related to serum levels is not something a court is ever going to order the other side to respond to. It's just too broad.

MR. KENNERLY: We can narrow it down with something like documents in which you have either discussed this or analyzed it, but then we get objections in similar format. What we want is them to ask somebody in the corporation what do you have on serum levels in Mirena. We know that that they have them. They end up on the label in one way or another. They end up in scattered emails.

As far as we know, buried somewhere in the joint production of files someone actually sat down and analyzed this and prepared a memo on this. But to this day nobody will actually tell us what they know about it. We just have this generalized production.

If we have a better way to word it for the critical stuff, that is going to get a similar objection. But thus far, until we get to a 30(b)(6), assuming we even have one on it -- we haven't noticed it -- but assuming we are authorized to do it and it doesn't get an objection, is asking someone what analyses have you done of the serum levels of Mirena.

They said the FDA has got something on the label, and what we have seen scattered around in clinical trials is very different from that. It is that core initial question, having

them look for something and identifying something. "Any and all" is a bad sort of wording, but there is no superior way.

JUDGE COTT: All of the requests for production that you have identified as exemplars, all are written interrogatories and they are all very broad. Not to speak for her, but I'm sure Ms. Cook will tell me they are so overbroad as to be ones they can't respond to and won't respond to and will impose objections of overbreadth and burdensomeness as phrased, etc.

Is that not right, Ms. Cook, on some level?

MS. COOK: That is absolutely correct. I can go further about our position about the burden here. We believe that these requests are incredibly burdensome, especially in light of the all production that we have already committed to do and were ordered to do.

All of the documents that Mr. Kennerly just mentioned are being produced under what we are already committed to produce. The master file for labeling, I don't know what that word means, but I assume that it has to do with the regulatory file for Mirena. We have already supplemented that, 26,000 pages worth. So we have already produced that.

He also mentioned something about the serum level data and pharmacokinetic issues that are requested in number 6. They requested both the files of Dr. Zurth and Dr. Hofmann. We are producing both of those custodial files along with both

witnesses for deposition at their request.

One of these relates to the signal investigations and signal assessments. Not only have we agreed to produce Dr. Schoendorf's custodial file, but we are also producing the other person who was involved in the signal assessments, and they are taking the depositions of I think five people who were involved in them in some very minor way.

We committed at the first conference, and I believe it is in the order, to supplement Dr. Schoendorf's files specifically related to that signal evaluation that they raised already. All of these requests go above and beyond what we have already been ordered to produce, which is a huge amount of documents. We understood that to be the scope of what we were going to produce.

These are not targeted requests identifying something that they are missing. In fact, everything I see and everything I'm hearing today is precisely within what we are producing. The burden to us is very large to look outside of all of the sources that have already been identified and to somehow find whether there are any other documents in any other custodial files in the entire company. I'm not hearing anything on the other side in terms of the need that the plaintiffs have for these documents that they are not already getting.

JUDGE COTT: Given that the defendants have a duty to

supplement, Mr. Kennerly, why isn't the right result here that you take your depositions, 30(b)(6) and otherwise, you get the production that is already in process, and if there are documents that are identified at the depositions that haven't been produced or otherwise revealed, then the duty to supplement exists plus you can request further at that point?

I think we are suffering a little bit from what often happens in complex litigation, which is lawyers don't want to take any depositions until they have every single piece of paper in hand, thinking that if they don't, somehow it is going to be inadequate or incomplete deposition when as a practical matter you will never have every piece of paper you need in advance of a deposition.

It sounds like, given what we already know, that the massive production has been to date plus the additional production that was discussed in July, I'm not convinced that there is going to be more necessary to be made. Why don't you keep your response short because I think I have spent plenty of time on this subject. Unless Judge Engelmayer has some follow-up, we are going to need to take our break soon.

MR. KENNERLY: Very briefly, I agree with your Honor about not having every document for a deposition. Request number 3 is a perfect example, signal investigation. The defendants have asserted this at various points, that you have everything relating to the signal investigation. We don't know

that. We don't know where it would be.

JUDGE COTT: You have to take a deposition to really satisfy yourself is the point.

MR. KENNERLY: But the one request is someone there has actually gone and looked and asked the people involved where is the medical literature you relied upon, where is the scientific data you relied upon, give me that, I will send it to the plaintiffs, and it is going to be marked here with this Bates number. As it is now, we are fishing out of the custodial files what we hope is everything related to this but was really just produced by a mass search.

JUDGE COTT: You served document request number 3. Ms. Cook responds and said some version of we already gave you this or what we have given you we think is sufficient. You come to us, there is no possible way for us to know one way or the other. We say take a deposition related to these signal documents.

If something comes out at that deposition where the witness identifies documents that you don't have in hand, you say to Ms. Cook we want to supplement our request, you have a duty to supplement, we want those within two weeks. She will either give them to you, in which case there is no issue, or she doesn't, in which case you come back to us.

The problem is you are backloading all the depositions so we are going to bump up against the deadline. But that is

not our problem.

MR. KENNERLY: Our missing part is actually very early in your example, which I agree with. The missing part early on is where they respond with we gave it to you, it's in blank, and they identify either a production, Bates range, something like that. For all of these requests, they should have already given us. They should not be separate documents.

Someone at the company and their attorney looking through it saying okay it is in that Bates range, it is in that file, something to help us identify that (1) they have looked at and pointed to where it is in the documents, even generally, and (2) someone at the company has looked and said okay, yes, they do have everything relating to the signal investigation, thumbs up, those Bates numbers, go.

JUDGE COTT: Last question. Ms. Cook, to your point, where does Mr. Kennerly find what has been produced or, when it is produced, how will he know that that is the equivalent of your responding to requests number 3 and 4? How will he know that other than here is a whole pile of documents, figure it out? Which is some variation of what effectively he is saying.

MS. COOK: Your Honor, that is why we are producing all of these metadata and fully text-searchable fields. You could easily search for, and this is exactly what we had to do too, search for "signal investigation," search for "signal assessment" and "Mirena." That's how you will find the

documents that are related to the signal investigation.

To follow up on that point, we have agreed in our letter to produce a witness, a pharmacovigilance witness, 30(b)(6) witness, on the signal investigations of Mirena and IIH. So they will be getting that witness.

JUDGE COTT: Do you want to follow up in any way? I'm done.

JUDGE ENGELMAYER: We are going to take a ten-minute break. It may last a little long, but at least ten minutes. Come back in ten minutes. Then I expect we will be able to rule on the open issues.

(Recess)

JUDGE ENGELMAYER: Judge Cott and I are going to resolve as best we can the outstanding issues. After that, we will take up very briefly what appear to be the limited other topics of the agenda that you jointly sent us.

The first issue I'm going to address involves Bayer's redactions. This controversy is reflected in the parties' letter at docket 100. Pursuant to the Court's order at the late July conference, Bayer has not been redacting text associated with five non-Mirena levonorgestrel-containing products to the extent this text appears in documents yielded by the agreed-upon search terms in this case. These products are Norplant, Jadelle, Skyla, Kyleena, and new progesterone IUS.

However, there has been redacted text from its production to the extent that the material in question relates to other Bayer products containing levonorgestrel-containing products. Although, as the Court understands it, Bayer redacts such references only where that text does not relate to Mirena or IIH/PTC. In other words, if there is a text involving another levonorgestrel product but this text relates to either Mirena or IIH-PTC, then Bayer is not redacting it.

The issue is whether these redactions are proper, as Bayer contends, or improper, as plaintiffs argue. The Court rules on this issue with Bayer. Such redactions are proper. To be sure, the Court's July 27 ruling did not literally resolve this issue. The parties did not present the question of what to do about references in responsive documents to other non-Mirena products than the five I listed where those references appear outside the context of a reference to Mirena or IIH/PTC.

However, presented now with the issue, the Court is persuaded that there is no need for plaintiffs to receive access to information about these other products where the references to them are not in a context that implicates either the product or the medical conditions at issue in this case.

The Court's ruling on discovery disputes 12 and 13 on July 27th is relevant here. The Court declined to authorize in discovery in this case a free-standing review of documents

related to other Bayer products. This case involves Mirena only, and I want to remind you of that. The case involves Mirena only. It follows reasonably that where references to other products occur in responsive documents that do not indicate relevance to this case, plaintiffs have no valid claim of entitlement to such material.

As to the five other products contained in levonorgestrel, Norplant and the other four, the redaction practices are different by agreement. Bayer agreed categorically not to redact references to these in responsive documents, and the Court has enforced that agreement.

But Bayer's agreement to that condition should not be leveraged to exact a broader requirement that references to other products outside of the context indicating reference to the product or the medical conditions at issue here. These materials should not be disclosed to plaintiffs merely because they appear in a document than is in other respects responsive.

Bottom line. The Court resolves the dispute at docket 100 in Bayer's favor. For avoidance of doubt, however, Bayer, the Court expects that references to these other products will not be redacted where these references appear in connection with text that refers to either Mirena or IIH/PTC. I understood Bayer to concede that, but I'm just underscoring the point that that is a premise on which the Court is acting.

I am going to skip over the controversy of the

metadata. Hopefully the parties have resolved it.

The next issue, and a substantial one, involves rule 30(b)(6) notices which plaintiffs have served. This dispute is reflected in the parties letter at docket 98. These reflect live issues relating to three separate 30(b)(6) notices that cover together more than 45 topics.

As an aside, I would note that plaintiffs report that they have separately withdrawn additional notices for rule 30(b)(6) depositions on regulatory and labeling topics and on medical affairs and communications topics. These were evidently withdrawn as premature at this stage of the case insofar as only subjects relevant to general causation are currently ripe now for depositions.

Of the three rule 30(b)(6) notices that are presently in dispute, one is for testimony on pharmacovigilance topics, otherwise known as PV topics; a second is for testimony on pharmacokinetics topics, otherwise known as PK topics; and a third notice is for testimony on clinical development, which I will call CD. Defendants essentially contend that these notices are unreasonable, too sweeping, and plaintiffs defend them.

There are really two issues implicated by this web of disputes. The first is whether the topics of 30(b)(6) testimony at issue relate to general causation. That is because, as the July 27th transcript reflects, by the parties'

agreement, as approved by the Court, the only depositions that will be taken prior to the Court's rendering a decision after next April's Daubert hearing on general causation are those relating to general causation.

It follows that there is no occasion to resolve disputes relating to rule 30(b)(6) deposition topics that don't implicate issues of general causation. Disputes relating to 30(b)(6) testimony on other subjects, such as the labeling issue that has apparently been tabled, those can be resolved later, assuming the case moves forward after the Daubert ruling.

The second set of issues involves whether the topics, even if relevant to general causation, comply with rule 30(b)(6). You are all familiar with the text and purposes of the rule. In the interests of time, I will skip that. But the ground rules as to the 30(b)(6) are familiar.

The testimony provided by the corporate representative binds the corporation. A party is not to be prevented from questioning a 30(b)(6) witness merely because the information has been provided in other forms. In other words, merely because the testimony can be supplied by an individual doesn't preclude use of a 30(b)(6) tool.

At the same time, the notice is subject to the familiar rule 26 limitations. The information sought must not be unduly burdensome or duplicative. And these need to be

productive questions, not means of obtaining information that effectively is already known.

Overbreadth is also a very significant issue in the context of rule 30(b)(6), as there is a lot of preparation that goes into the 30(b)(6) process. Failure to pin down the precise questions that are at issue runs the obvious risk of having an unproductive rule 30(b)(6) deposition and then a follow-on spate of litigation and letter-writing.

The burden of proof lies with the party opposing discovery to show good cause to deny the discovery sought.

Having set out broadly these principles and applied them, the Court finds that among the many topics for rule 30(b)(6) depositions proposed by plaintiffs, there are proper topics for rule 30(b)(6) testimony that relate to general cause case, but there are many, many topics that are not either relevant for general causation or proper. In other words, some don't relate to general causation and some that do are very substantially overbroad or otherwise problematic so as to make meaningful preparation impossible or impractical or to make the rule 30(b)(6) notice improper. I'm going to take the categories in turn.

I'll turn first for the notice as to the PV deposition. As to that deposition, the Court will authorize a rule 30(b)(6) deposition on the eight topics which defendants propose in Exhibit 8, their letter of October 2nd.

Specifically, these are the four topics on which plaintiffs propose to have Charles Walsh testify and the four topics on which defendants propose to have Juliane Schoendorf testify. I am going to read them into the record because these cover a fair amount of terrain, and the fact that the defendants have agreed to produce a witness on them should not be taken to obscure the extent of the concession.

As to Mr. Walsh:

1. The organizational structure and duties of Bayer's U.S. pharmacovigilance department and its employees who had Mirena-related responsibilities;

2. Bayer's procedures relating to the receipt, processing, assessment, and follow-up and reporting of adverse events reported with Mirena;

3. The identity of any databases Bayer has used to process reports of adverse events reported with Mirena; and

4. Generally Bayer's procedures for reporting adverse events reported with Mirena to the FDA.

As to Ms. Schoendorf:

1. The global pharmacovigilance department's, GPD, process for reviewing and assessing of adverse event reports related to Mirena and IIH/PTC, including GPD's process determining relatedness in the Argus deposition;

2. GPD's signal investigations related to Mirena and IIH-PTC;

3. Preparation of PSURs and PBRERs related to Mirena;

4. Any GPD guidance manuals or operating procedures related to Mirena and IIH-PTC

These topics are not inconsiderable and they appear relevant or potentially relevant to general causation. They are appropriately tailored and not unduly burdensome. They cover the relevant points. Indeed, they broadly appear to capture, albeit at more of a macro level, the significant majority of the subjects covered by plaintiffs' most recent notice of a PV deposition, which is Exhibit E, and they do so in a way that ensures that plaintiffs receive meaningful factual information as to the critical PV issues relevant to general causation. At the same time, they are not oppressive, they are not overbroad, they do not require unreasonable preparation on the part of Bayer to ready a client representative for the deposition.

The Court has considered plaintiffs' original deposition notice on PV topics, which is Exhibit A, and plaintiffs' slightly revised version of that notice, which is Exhibit E, that latter version issued after defendants committed to the eight topics I have just read aloud on Exhibit D.

Regrettably, Plaintiffs' Exhibit E is not usefully responsive to defendants concessions on Exhibit D of the eight PV topics on which they acknowledge that the rule 30(b)(6)

testimony is timely improper. Exhibit E does not attempt to isolate areas of agreement versus disagreement with defendants' positions as to proper topics. Indeed, on the Court's review, it does not appear that plaintiffs seriously revisited their 30(b)(6) demands in response to the meet-and-confer process. The changes were made only at the margin.

Because Exhibit E is substantially a rehash of the original subpoena and does not reflect the areas of testimony to which Bayer has assented, the Court was therefore obliged on its own to compare and contrast the two exhibits, D and E, to smoke out where the parties agree and where they disagree. Having gone through that exercise and having reviewed the topics proposed by plaintiffs, the Court declines to authorize any additional 30(b)(6) testimony as to any PV topics beyond the eight as to which defendants agree.

With respect, many of the topics on Exhibit E as proposed by plaintiffs are quite overbroad and in some instances egregiously so. To choose a few illustrative examples, plaintiffs asked for corporate representative testimony on "all routine pharmacovigilance activities," on all "standard operating procedures, operating manuals, standards, processes, guidelines, or procedures governing all routine pharmacovigilance activities," on "all computerized information systems," and on "all computerized information systems used for purposes of communicating with employees in conducting all

routine pharmacovigilance activities."

The Court is constrained to admonish plaintiffs' counsel to the extent there is occasion later to formulate rule 30(b)(6) topics at later phases of the case, that is to say on topics other than general causation, to be much more disci-plined and more heedful of the case law that disfavors such capacious topic designations.

On Exhibit E plaintiffs also ask for, paraphrasing here, rule 30(b)(6) testimony on what amounts to all adverse event reports and all investigations relating to intracranial hypertension. Obviously, the topics of adverse event reports and investigations are clearly centrally relevant to general causation. Some 30(b)(6) testimony on these points is clearly in order. However, the Court's judgment is that the topics the defendant has identified for such testimony on these topics, that is to say rule 30(b)(6) testimony on adverse events and investigations relating to Mirena and IIH/PTC, are properly formulated.

That said, speaking here to Bayer, the Court does expect Bayer's rule 30(b)(6) witness or witnesses on these topics to be sufficiently familiar with these subjects so as to give meaningful guidance and a meaningful overview in a deposition.

The Court expects that this witness or witnesses will be able at a macro level to describe these matters, including

to describe generally the adverse event reports that Bayer received or generated, the investigations it conducted, and the conclusions that Bayer drew from the information it obtained from these sources.

However, it is not reasonable or realistic to expect a rule 30(b)(6) witness to comment omnisciently on each of the many adverse event reports or each aspect of each investigation.

To be sure, these factual matters are proper subjects to document discovery. They are also proper subjects for fact witnesses depositions of employees with familiarity with, let's say, a particular investigation or adverse event report. The Court expects that Bayer will not resist testimony, if in reasonable scale, as to such matters by percipient witnesses during the general causation phase.

And, as reflected in the Court's earlier round of discovery rules, it is important that plaintiffs obtain access to records of adverse event reports and investigations by Bayer. Such data has obvious and meaningful potential to inform the inquiry into general causation.

However, it is unduly burdensome to expect Bayer to prepare a 30(b)(6) witness to testify so as to bind the company on all such matters at the level of detail that plaintiffs appear to envision. Plaintiffs' demand for rule 30(b)(6) testimony on each such report is akin to demanding that the

witness master an entire two-semester curriculum. It's too much.

The Court accordingly directs that there be 30(b)(6) testimony on the eight PV subjects reflected on Defendants' Exhibit A. The Court sustains Bayer's objections to the other rule 30(b)(6) testimony as to PV subjects.

Turning to PK and CD. The PK deposition notice was originally set forth on Exhibit B, and the CD deposition notice was originally set forth on Exhibit C. Plaintiffs' correspondence after the issuance of these notices, which are largely treated together in the parties' submission, has been somewhat elusive as to whether plaintiffs continue to insist on such testimony, in particular now that the court has clarified what I thought was clear before, which is that the only deposition discovery that must be taken after December 8th is deposition discovery actually or potentially relevant to general causation.

The parties' correspondence could be read to suggest that provided it was clear to plaintiffs who were reserving the right to seek such testimony after the resolution of Daubert motions, plaintiffs were forgoing their requests for testimony in both of these areas, PK and CD.

However, plaintiffs' most recent letter on this point does not retreat in that matter. Plaintiffs appear to continue to pursue such testimony at this phase on the grounds presum-

ably that the PK and CD topics are potentially relevant to general causation. In particular, plaintiffs on October 15th issued a somewhat modified notice for PK testimony, which is at Exhibit H. On the other hand, there doesn't appear to have been a modified notice at any point for testimony on CD topics.

So, I understand Exhibit H to reflect plaintiffs' most recent bid as to the PK topics on which it is seeking 30(b)(6) testimony and Exhibit C to reflect plaintiffs' most recent articulation of the topics on which it is seeking CD testimony.

For avoidance of doubt, the ruling I'm about to make, which significantly limits the available such testimony, now relates only to the general causation phase. To the extent the ruling is not permitting rule 30(b)(6) testimony in these areas, the ruling is without prejudice to plaintiffs' right to pursue 30(b)(6) topics in these areas as may be relevant to subjects other than general causation after resolution of the Daubert hearing. And it is of course also without prejudice to defendants' right to object to 30(b)(6) notices on future such topics. In other words, I'm ruling now only as relevant to general causation, and neither party has waived any rights as to the post-Daubert phase on these matters.

With respect to CD, I will with one exception sustain defendants' objection to the rule 30(b)(6) notice. The one exception, as prefigured by our colloquy now, involves human clinical trial data pre- and post-approval. I will permit

limited rule 30(b)(6) testimony on that point.

It is for the parties, not the Court, to draft that formulation, but I think you understand what the substance of the ruling here is. Based on the colloquy, I am persuaded that such data has the potential to be relevant to IIH and the general causation issue that will be before the Court.

To be sure, it may be that the data tends to disprove causation of IIH, as Bayer suggests, or perhaps it proves the other way, as plaintiffs posit. But either way, it appears to have at least some potential in this space and therefore seems to be a fruitful, proper area of general causation testimony. I am not going to, though, permit animal clinical trial data. We are getting far afield. I don't know whether pigs get headaches, but it is not going to be relevant at the Daubert hearing.

By way of explaining why the rest is out as to CD, the CD topics in plaintiffs' notice otherwise essentially involve the development of Mirena, and in particular aspects with no real potential to shed light on general causation if IIH. Plaintiffs seek testimony on factors that Bayer considered in developing Mirena and using levonorgestrel in it and utilizing standard procedures relating to same.

The CD topics also cover, among other things, the design of clinical trials, the use of patient consent forms, the writings that Bayer used to govern such trials, and the

compensation paid for investigators or institutions that participated in Mirena clinical trials or studies.

It may be that some or even all of these topics prove relevant to other issues in the case. To the extent, for example, that Bayer's state of mind or knowledge in developing Mirena proves relevant to a cause of action, for example, a claim sounding in negligence, a number of these topics have obvious potential relevance. But the sole issue that is the subject of proper deposition testimony at this stage is general causation, and the issue there is whether there is reliable evidence that Mirena can cause the conditions alleged by plaintiffs.

Bayer's state of mind does not speak to that issue, nor does the quality or integrity of Bayer's product testing, the safety protocols that Bayer put in place, the consent mechanisms that Bayer used for participants in trials, even humans, or the compensation arrangements it had with participants or investigators. To be sure, the adverse event reports obtained by Bayer have the potential to speak to that issue. But those reports are already covered by the eight topics within the PV subpoena that I have upheld as a proper subject of testimony.

That concludes the Court's assessment of the CD topics.

Turning next to PK, again we have a split decision.

The Court will exclude topics C through F. Those relate to other products. That's another litigation, it's not this. Items C through H are out on that ground.

As to item B, I am persuaded by the defense that the pharmacodynamic profile of LNG or Mirena as defined here principally involves issues of efficacy, not issues relevant to general causation. Once again, there may be relevance later on in the case, but not to general causation.

I will, however, allow a portion of 1A to be the subject of rule 30(b)(6) testimony. The topic sentence of 1A is the pharmacokinetic profile of levonorgestrel and/or Mirena, and then it goes on to say including the following. A number of the subsets, the nine of them that follow, relate to other products. Those are out.

I am not inviting rule 30(b)(6) testimony comparing to other products. If another product doesn't cause IIH, the fact that Mirena has more levonorgestrel doesn't mean that Mirena does too. This is ultimately not a comparative exercise; it is an objective inquiry into what Mirena does or doesn't do. It is important for us to keep our eyes on the prize. So I want to exclude those other products.

However, it does seem to me, based on colloquy I had helpfully with plaintiffs' counsel and with Bayer, that there is a productive value in pinning Bayer down on the strictly factual points that are contained within 1A. Therefore, I will

authorize a rule 30(b)(6) testimony limited to establishing Bayer's position on the factual points relating to Mirena that are embedded within 1A.

For avoidance of doubt, if Bayer's opposition on a particular point is incapable of being pinpointed to a precise decimal point, so be it. I am not requiring Bayer to feign a level of admissions or knowledge that it does not have. But I expect Bayer to responsibly answer the questions as best as it can.

I am persuaded that the answer to these questions is, as ultimately I think Mr. Schmidt gave up, within Bayer's knowledge. It is useful for this process, this telescoped process of litigating general causation, to pin down what we can with respect to these data points. That may, in turn, narrow to some degree the general causation litigation.

There ends the ruling. My judgment as to all these areas is that the rulings respect the assembled case law on rule 30(b)(6) and do not impose an undue burden on Bayer to the extent I am requiring answers to 30(b)(6) topics.

Judge Cott.

JUDGE COTT: As to the issues raised in docket number 99 that we spent some time discussing, with respect to the requests for admissions, by agreement the six exemplars will be responded to by the defense. What the Court will otherwise direct is that plaintiffs will be permitted to re-serve 50

additional requests for admission consistent with the colloquy that we had earlier, which I hope provided sufficient guidance as far as scope, content, topic, and the like.

As Judge Engelmayer has adverted to in other contexts, any RFA as an example related solely to products other than Mirena would be out of bounds as one but not the only example from our colloquy. I would direct counsel to review the colloquy because I think that provides, we hope, sufficient guidance as to what the proper scope is.

Obviously, the defense can reserve and make any objections that they believe are appropriate, whether based on what was discussed here today or otherwise. But you are obligated to respond to the 50 additional RFAs that will be served in due course.

With respect to the interrogatories, the Court's conclusion is that at this juncture the interrogatories are not the best mode of obtaining the information that it appears is being sought consistent with the local rules of this court and therefore will not direct Bayer to respond to any of the interrogatories that were previously served, with the caveat or addendum that plaintiffs can serve up to 20 contention interrogatories and may do so as late as December 1st, presumably after the bulk of 30(b)(6) and other depositions have been taken. Then Bayer will have until December 22nd or three weeks from whenever they may have been served to respond

to those contention interrogatories.

I would counsel Mr. Kennerly and his colleagues that if you do proceed with contention interrogatories, to use a phrase, watch your language and avoid what will naturally be the language of overbreadth, as I'll put it, that we have discussed today, the any "and alls," the "every detail," the "every person," and try and be as telescoped as possible.

What you are really, I think, going to be seeking to the extent you don't obtain it in the depositions is something that truly falls within the definition of what a contention interrogatory is: what is Bayer's contention about fact X or whatever it may be. That is what I think the Court envisions will be the case with respect to interrogatories.

Similarly with the request for production. Given what has already been produced and what is being produced and in our review of the document requests as stated, we do not believe it would be appropriate at this juncture for Bayer to respond to those that have been served. That would again be without prejudice to the defendants' post-deposition service of any documents that either are identified at depositions or otherwise would not be duplicative of anything that has otherwise been produced.

For avoidance of doubt, which is a phrase I have learned from Judge Engelmayer during this case, we had some discussion about certain document requests, and I think perhaps

even interrogatories that had some intertwining, if you will, between Mirena and some other product. If it is truly the case that it is not some document request or interrogatory that is isolated to another product but that a legitimate argument can be made that the response of the document would advance the inquiry with respect to general causation or as otherwise germane to the facts of this case, then it would be within bounds; otherwise, it would not be. I think that is the best guidance the Court can give on that point at this moment, but obviously we will see how that all plays out.

That concludes our rulings with respect to the requests for admissions, the interrogatories, and the document requests.

JUDGE ENGELMAYER: Counsel, I want to make sure that before we adjourn, and I've got a date as well for our next conference, we take up any issues on your October 16th letter. Most of the topics in that letter involved the discovery disputes, but it appears that there were a couple of other topics you intended to take up.

The first one reads, "Scope of initial general causation phase of discovery." I think I have resolved that by the order that issued that attempted to clarify that. Does anyone have any need further to take that up?

We then have defendants' production of discovery materials. Putting aside the disputes, the letter reads,

"Progress and schedule of document production." Is there anything that is productive to report? I don't know what you had in mind when you included that.

MR. SHEPHERD: I can report, your Honor, to this point since the MDL was formed we produced an additional 1.25 million pages of documents from the custodial files of 21 different individuals. We have also updated, as we said we would, the IND NDA. We have produced the source documents for the adverse event reports that Judge Cott ordered. We have produced Bayer study reports and any contact between the company and the FDA. We continue to produce documents on a biweekly basis. As the Court ordered, we will meet on December 8th.

JUDGE ENGELMAYER: Putting aside anything that flows out of today's rulings, how much more discovery is there, putting aside depositions, to be produced by Bayer?

MR. SHEPHERD: That's a difficult question. I have been trying to get the answer to that question for a long time. Kroll, which is Bayer's vendor, is in the process of processing the last batch of documents that have been collected pursuant to the Court's rulings.

As soon as they finish that processing, which will take about one more week, I should be able to give an estimate to the plaintiffs as to the date of completion. I would say that we are far along, more than halfway along for sure, but I cannot be any more specific than that.

JUDGE ENGELMAYER: What is the approximate scale of the remaining document production?

MR. SHEPHERD: It should be less than what has been produced to date.

JUDGE ENGELMAYER: Less than a million pages. That's a big stamp.

MR. SHEPHERD: With the caveat that there are documents being produced now. I'm not sure how many of them are going to duplicate out. I'm not sure how many of them are going to be produced.

JUDGE ENGELMAYER: Are you front-loading documents as best you can that have causation relevance?

MR. SHEPHERD: We are. We have also modified our procedure to make sure we get documents out as soon as possible for the witnesses being deposed. We want to make sure that if Chuck Walsh is going to be deposed, that we close out that file before his deposition. We are making every effort to do that.

THE WITNESS: Without getting into gory details, the new areas, the areas in which there has been or will be production post-MDL, broadly, what are the key areas generating most of the hits, most of the documents?

MR. SHEPHERD: I'm not sure.

JUDGE ENGELMAYER: I'm asking what's new. Can you give me a generalization as to what the newly produced materials turn out to consist of?

MR. SHEPHERD: The majority of the documents are going to be the custodial files of the 10 witnesses that the plaintiffs selected along with Dr. Hofmann. So their custodial files as they are hitting on the key words that were done in the MDL production and in the new key words set here. That is the vast majority of what is being produced. We have copied off all the other files. But the majority of those other files, people had already left the company, so there is not in touch of anything to top off.

JUDGE ENGELMAYER: It is largely custodian-based, 10 or 12 people's documents?

MR. SHEPHERD: Yes.

JUDGE ENGELMAYER: I take it over time that tends to churn up a lot of emails and the like.

MR. SHEPHERD: It does.

JUDGE ENGELMAYER: Anything else from plaintiffs on that subject, the production of written discovery?

The next topic, skipping over discovery disputes, is status of deposition scheduling. Putting aside what we covered today, does anyone want to report on that? Where are we on that?

MS. COOK: Your Honor, the plaintiffs gave us a list of 10 individual witnesses they wanted to depose on October 6th. We have provided dates for them. By October 13th. We had some pushback on some of them, which we have moved,

provided new dates for. We are still waiting for confirmation on some others. I spoke to Ms. Natale before we started today, and I think all the dates can be confirmed.

We were waiting for guidance from the Court on the clinical development 30(b)(6), especially since it was so broad, to figure out what we would do with that. Now that we have the Court's ruling --

JUDGE ENGELMAYER: As to PV, you have the two witnesses in question, you know who they are. Because I have adopted your reformulation of that 30(b)(6), you know who the two people are. There are obviously small subsets or subsets of the clinical development and the PK. Without binding you, do you have a notion as to who the person or people will be that deal with the portions I have permitted to go forward?

MS. COOK: On the PK issue, yes, we do, and we have already told the plaintiffs who that is and agreed on a date for that one. With respect to the clinical development, we are still trying to figure out who would be the best witness on that topic. I know it seems narrower than what was requested, but the clinical trials have gone on for a long time. We will figure that out and get a date to the plaintiffs in the next couple of days.

JUDGE ENGELMAYER: That I think covers, except for the schedule for our next conference, the topics other than discovery disputes listed on your letter. Is there any other

way we can be helpful, anything you want to bring to our attention, anything unexpected that you are experiencing as we are going through this intense process?

MS. NATALE: Your Honor, Ms. Cook just discussed a list of 10 individuals that were proposed. As you saw in the letters, we significantly narrowed the number of 30(b)(6) requests. There are a few individuals that we have small individual issues on.

The defendants want to produce Dr. Schoendorf for one day and one day only. She is testifying presumptively in German with a translator. We had discussed adding on I think it is in the deposition protocol like 60 percent or something like that. The issue with Dr. Schoendorf is that I believe the defendants don't feel that plaintiffs have the right to that much discovery from Dr. Schoendorf. We would like your guidance.

JUDGE ENGELMAYER: If she were testifying in English, putting aside the German factor now, how much time do you think realistically it would take to accomplish the deposition on the topics as formulated by Bayer?

MS. NATALE: The actual issue with Dr. Schoendorf is that we have requested her deposition as a 30(b)(6). They have designated her as a 30(b)(6) for global pharmacovigilance and also her testimony on in her individual capacity on this specific issue. I think we envisioned something close to a day

and a half. I don't want to tie us to that.

JUDGE ENGELMAYER: A day and a half would span both the individual and the 30(b)(6)?

MS. NATALE: We were envisioning two days.

JUDGE ENGELMAYER: That includes --

MS. NATALE: The 30(b)(6) and the individual.

JUDGE ENGELMAYER: And it includes the compensation for the translation?

MS. NATALE: Correct.

JUDGE ENGELMAYER: Ms. Cook?

MS. COOK: Your Honor, we have actually told plaintiffs that she has agreed to testify in English.

JUDGE ENGELMAYER: Is she good at it? Does she speak it?

MS. COOK: Obviously, we would not offer a witness who is in a position to bind the company who couldn't speak English.

JUDGE ENGELMAYER: I appreciate that.

MS. COOK: The deposition protocol calls for having a translator stand by in case there is some question about something. We would not offer her if we did not think --

JUDGE ENGELMAYER: You think she is going to be able to move at the speed of a native speaker of English?

MS. COOK: Absolutely, your Honor. I will point out that Mr. Jones actually deposed her for a day and a half in

November 2015 on everything except what's happened since then and the 30(b)(6) topics.

JUDGE ENGELMAYER: On the other hand, while I don't doubt that that is so, we are in an MDL and I have, I think rightly, done a reset here. It is to the advantage of plaintiffs that they get to start with her there. It may also be that she can validly claim to have her memory refreshed in between.

In addition to plaintiffs being allowed to start from square one in the deposition, given that she is going to be testifying in English, plaintiff, does it not make sense to limit the overall scale to a day and a half rather than two? Your bid was a day and a half to two. If we lop off half a day, a day and a half for those topics does not sound unreasonable.

MS. NATALE: We can live with that, your Honor.

JUDGE ENGELMAYER: Sounds like she is an important witness. Ms. Cook?

MS. COOK: Your Honor, our position is that she should be completed in a day. We have offered her in English so that that could happen.

JUDGE ENGELMAYER: If you all proceed with Teutonic efficiency, you can get it done in a day, but I'll authorize a day and a half. This seems to me very important, and I would rather err on the side of inclusiveness.

MS. NATALE: Some small individual issues. A subset of pharmacovigilance would be epidemiology/signal investigation witnesses. There is a little bit of disagreement about what was requested, but we believe we requested one day to be split between Dr. Manlich and Mr. Alex Asiimwe. Right now they are offering two days for Dr. Manlich. We are simply requesting one day for Dr. Manlich and one day for Asiimwe.

JUDGE ENGELMAYER: This has not been briefed. I have no idea how to resolve this. Rather than flipping a coin here, you should meet and confer. With all other disputes in the case, we have a big problem if you can't sort that one out. Anything else?

MS. NATALE: I guess the real question is, is there any sort of limitation in number that you intend to hold plaintiffs to or as long as it is reasonable?

THE COURT: The issue has not been briefed before me. I understand the representation to be made that we have 10 depositions plus 30(b)(6)s. That sounded like what was being said.

MS. NATALE: Thank you.

JUDGE ENGELMAYER: That's what you are doing, right?

MS. NATALE: I think it is somewhere around there. There has been some disagreement about --

JUDGE ENGELMAYER: Is there a well-founded disagreement between you that has resulted in a meet-and-confer as to

the cap here? You're at 10 plus 30(b)(6)s, but it is a big case. You are at or above the ordinary presumptive amount but not far enough over that it shocks the conscience.

MS. NATALE: I think it is probably something like 10 plus 30(b)(6)s. With some of the Court's guidance today --

JUDGE ENGELMAYER: My guidance is that that does not shock the conscience.

MS. NATALE: Thank you, your Honor.

JUDGE ENGELMAYER: And that you ought to be able to sort that out. Anything further from the plaintiffs before I set a next date? Defense?

MS. COOK: No, your Honor.

JUDGE ENGELMAYER: I would propose that we set our next conference down for December 1st at 2:00 p.m. That is a week before the close of general causation. The Court is on trial for the week or two before in a criminal case. It seemed to me productive to check in with you then. In the event a controversy arises, either Judge Cott or I would schedule an ad hoc conference.

MR. KENNERLY: I think currently that is the day for Dr. Schoendorf.

JUDGE ENGELMAYER: Are you all going to be there for her?

MR. KENNERLY: No. And Dr. Zurth the day after. I'm just saying, your Honor, certainly there is counsel available

to be here, but you are going to chop a fair number out from plaintiffs' and defendants' side, that's all. Competent people will be here, your Honor.

JUDGE ENGELMAYER: It seems to me one of the beauties of having a deep team on both sides is that you can multitask. A week before seemed to make sense, and it doesn't therefore interfere with the criminal trial I have.

MR. SCHMIDT: We agree with that, your Honor.

JUDGE ENGELMAYER: So plan on December 1st at 2 p.m. Back to the homily at the beginning. If there is no business to attend to, let us know and we will cancel the conference. If there are discovery disputes that need to be resolved, let us know the week before.

If something else comes up that you can't sort out amongst yourselves -- hopefully, Judge Cott and I have given you the tools about how we think about resolving some of these disputes -- let us know pronto, and we will schedule an ad hoc conference. What we don't want to do is retard the process of the case by not scheduling a conference in time.

MR. SCHMIDT: Your Honor, we take your words to heart and apologize for putting the Court in that situation.

JUDGE ENGELMAYER: Apology not necessary but appreciated. I know I speak for Judge Cott in saying we are both deeply appreciative of the excellence of counsel on both sides and also mindful of the sheer dump truck level of work

that you all have to do. Perfection is a hard standard to achieve in the course of that.

Just be mindful that we are part of the solution here. We are trying to resolve disputes in a timely way but in a way that we can get to, not in a think-fast way but where we have time to reflect. The letters you submit and the backup material you submit helps us assess the issues here and come to a conference with targeted questions that really deal with the ambiguities that we have identified after review, not what we are learning on the spot.

Thank you. We stand adjourned.

(Adjourned)