# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:

MIRENA IUS LEVONOGESTEREL-RELATED
PRODUCTS LIABILITY 17-MD-2767(PAE)
LITIGATION (NO.II) 17-MC-2767(PAE)

---------------------------------------/
This Document Relates to All Actions.
---------------------------------------/

* CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER *
VIDEOTAPED DEPOSITION OF PHILIP DARNEY, M.D.
San Francisco, California
Tuesday, January 30, 2018

Reported by:
LORRIE L. MARCHANT
California State CSR No. 10523
Washington State CSR No. 3318
RMR, CRR, CCRR, CRC

Job No. 173602

Tuesday, January 30, 2018
9:12 a.m.

Videotaped deposition of PHILIP DARNEY, M.D., held at the offices of Lieff Cabraser Heimann & Bernstein, LLP, 275 Battery Street, 29th Floor, San Francisco California, before Lorrie L. Marchant, a California Certified Shorthand Reporter, Registered Merit Reporter, Certified Realtime Reporter, California Certified Realtime Reporter and Certified Realtime Captioner.



A P P E A R A N C E S

FOR THE PLAINTIFFS:

JONES WARD PLC
BY: CHRISTINA NATALE, ESQ.
The Pointe
1205 E. Washington Street, Suite 111
Louisville, Kentucky 40206
Phone: (502) 882-6000
Fax: (502) 587-2007
e-mail: christina@jonesward.com

and

DAVIS & CRUMP, P.C.
BY: TREVOR B. ROCKSTAD, ESQ.
TAYLOR S. HARDENSTEIN, ESQ.
2601 Fourteenth Street
Gulfport, Mississippi 39501
Phone: (228) 863-6000
Fax: (228) 864-0907
e-mail: trevor.rockstad@daviscrump.com
taylor.hardenstein@daviscrump.com

and

ARIAS SANGUINETTI STAHLE TORRIJOS
BY: ELISE R. SANGUINETTI, ESQ.
JAMIE G. GOLDSTEIN, ESQ.
555 12th Street, Suite 1230
Oakland, California 94607
Phone: (510) 629-4877
Fax: (855) 481-1020
e-mail: elise@asstlawyers.com
jamie@asstlawyers.com

(Continued)



A P P E A R A N C E S

FOR THE DEFENDANT:

GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM, LLP
BY: SHAYNA S. COOK, ESQ.
LAURA SEXTON, ESQ.
564 West Randolph Street, Suite 400
Chicago, Illinois 60661
Phone: (312) 681-6000
Fax: (312) 881-5247
e-mail: scook@goldmanismail.com
lsexton@goldmanismail.com

and

SHOOK, HARDY & BACON, LLP
BY: MICHELLE M. FUJIMOTO, ESQ.
5 Park Plaza, Suite 1600
Irvine, California 92614
Phone: (949) 475-1500
Fax: (949) 475-1508
e-mail: mfujimoto@shb.com

ALSO PRESENT:

Joseph Margous, Videographer

---oOo---



I N D E X

INDEX OF EXAMINATION


| EXAMINATION BY | PAGE |
|---|---|
| MS. COOK | 9 |
| MR. ROCKSTAD | 307 |
| MS. COOK | 310 |


---oOo---

INDEX OF EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Videotaped Deposition of Philip Darney | 15 |
| Exhibit 2 | Invoice to Christina T. Natale from Philip D. Darney, dated 11/12/2017 | 16 |
| Exhibit 3 | General Causation Expert Report of Philip Darney, MD, MSc | 18 |
| Exhibit 4 | "Additional Documents Reviewed" | 30 |
| Exhibit 5 | "Recent Developments in Hormonal Contraception" | 57 |
| Exhibit 6 | Copies of excerpted pages 238 - 279 from the book entitled "A Clinical Guide for Contraception, Fifth Edition" | 83 |
| Exhibit 7 | Copies of excerpted pages 18 - 152 from the book entitled "A Clinical Guide for Contraception, Fifth Edition" | 99 |
| Exhibit 8 | "Obesity and contraceptive use among women 20-44 years of age in United States: results from the 2011-15 National Survey of Family Growth (NSFG)," dated November 2017 | 107 |

INDEX OF EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 9 | "Two-year continuation of intrauterine devices and contraceptive implants in a mixed-payer setting: a retrospective review" | 114 |
| Exhibit 10 | "Contraceptive Use Among Nonpregnant and Postpartum Women at Risk for Unintended Pregnancy, and Female High School Students, in the Context of Zika Preparedness - United States, 2011-2013 and 2015" | 121 |
| Exhibit 11 | Copies of excerpted pages 184 - 216 from the book entitled "A Clinical Guide for Contraception, Fifth Edition" | 131 |
| Exhibit 12 | Copies of excerpted pages 430 - 438 from the book entitled "A Clinical Guide for Contraception, Fifth Edition" | 140 |
| Exhibit 13 | "An Estimation of the Risk of Pseudotumor Cerebri among User of the Levonorgestrel Intrauterine Device" | 168 |
| Exhibit 14 | "Contraceptive use in Nordic countries" | 178 |
| Exhibit 15 | "Response Document, BfArM requested dated 20th July 2017, Risk of pseudotumor cerebri/idiopathic intracranial hypertension," MIR_IIH_EU00606946 - MIR_IIH_EU00607040 | 196 |
| Exhibit 16 | "Risk of intracranial hypertension with intrauterine levonorgestrel" | 206 |




INDEX OF EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 17 | Affidavit of Dr. Mahyar Etminan | 215 |
| Exhibit 18 | "Abstracts of the 2010 Meeting of the International Neuro-Ophthalmology Society, Lyon, France" | 217 |
| Exhibit 19 | "Letter to the Editor, Minocycline-induced intracranial hypertension in a patient with a levonorgestrel intrauterine device," MIR_IIH_EU01083403 - MIR_IIH_EU01083405, and "Hipertensión intracraneal inducida por minociclina en mujer portadora de dispositivo intrauterino de levonorgestrel" | 221 |
| Exhibit 20 | "Idiopathic intracranial hypertension, polycystic-ovary syndrome, and thrombophilia" | 248 |
| Exhibit 21 | "Hyperandrogenism is Associated with Earlier Age of Onset of Idiopathic Intracranial Hypertension in Women" | 252 |
| Exhibit 22 | "Endocrine Abstracts, November 2017, Volume 50, Society for Endocrinology BES 2017" | 256 |
| Exhibit 23 | "Androgenic side effects of Mirena," MIR_JSEU_01362341 - MIR_JSEU_01362346 | 263 |
| Exhibit 24 | "Levonorgestrel effects on serum androgens, sec hormone-binding globulin levels, hair shaft diameter, and sexual function" | 267 |
| Exhibit 25 | "Pharmacokinetics of single-dose levonorgestrel in adolescents" | 276 |




INDEX OF EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 26 | "Integrated pharmacokinetic analysis of leveonorgestrel-containing contraceptives with various routes of administration," MIR_IIH_EU01205373 - MIR_IIH_EU01205406 | 279 |
| Exhibit 27 | Copy of PowerPoint slides | 305 |

---oOo---

Certificate of Witness 313
Certificate of Deposition Reporter 314
Errata 315


---oOo---



SAN FRANCISCO, CALIFORNIA
TUESDAY, JANUARY 30, 2018
9:12 A.M.

THE VIDEOGRAPHER: We are now on the record. My name is Joseph Margous. I'm the videographer representing Golkow Technologies. The court reporter is Lorrie Marchant.

And the read-on has been waived. Please begin. Administer the oath, please.

PHILIP DARNEY, M.D.,
FIRST DULY SWORN/AFFIRMED, TESTIFIED AS FOLLOWS:

EXAMINATION BY MS. COOK

BY MS. COOK:
Q. Good morning, Dr. Darney.
A. Good morning.
Q. I'm Shayna Cook, and I represent Bayer in the Mirena litigation.
And we just met for the first time this morning before the deposition; right?
A. Yes.
Q. Have you ever met any of the attorneys that represent Bayer in this litigation, to your recollection?
A. No.
Q. And you are here today as an expert witness

for the plaintiffs.
Do you understand that?
A. Yes.
Q. What do you see your role in this litigation being?
MS. NATALE: Object to form.
THE WITNESS: I see my role as having expert technology about synthetic progestins, in general, and levonorgestrel, in particular, with regard to the potency of that compound, the variability of its absorption, the sensitivity of women to androgens, in general, and levonorgestrel, in particular, and the implications of those factors in the genesis of intracranial hypertension or pseudotumor cerebri.
BY MS. COOK:
Q. You just mentioned intracranial hypertension or pseudotumor cerebri. And just for the record, let's just make sure that we understand each other.
Pseudotumor cerebri is also known in the literature as it idiopathic intracranial hypertension.
You've seen that; right?
MS. NATALE: Object to form.



You can answer.
THE WITNESS: Yes.
BY MS. COOK:
Q. So if I say "IIH," will you understand that I'm talking about IIH and PTC both?
MS. NATALE: Just a quick -- we'll just preserve -- I will not use it all day. We'll just object to the use of "IIH." That's the only time I'll say it.
MS. COOK: Okay.
MS. NATALE: Thank you.
THE WITNESS: Yes.
BY MS. COOK:
Q. Thank you.
When did you become involved in this litigation?
A. I don't recall the precise date, but I think I would have first heard about this litigation a little less than a year ago.
Q. So we're here in late January 2018.
Would it be sometime in the late summertime of 2017 that you heard about the litigation?
A. Possibly.
Q. Who contacted you about the litigation first?



A. As I recall, Mr. Langevin.
Q. Do you know his first name?
A. I think it's David.
Q. Is Mr. Langevin an attorney? Do you know?
A. He is an attorney, as far as I know.
Q. Have you dealt with him before this litigation?
A. No.
Q. So did the call come sort of out of the blue?
A. Yes.
Q. And why did you decide to get involved in this litigation?
A. Because, as I mentioned earlier, levonorgestrel is a compound I've researched throughout most of my career.
Q. Did you agree to serve as an expert for the plaintiffs in this litigation the first time that you were contacted?
A. No.
Q. When did you agree to serve as an expert?
A. After I had reviewed materials and thought about the issue.
Q. What materials did you review before deciding to be an expert for the plaintiffs?



A. Well, I refreshed my own memory about pseudotumor cerebri and its relationship to androgens, and particularly to levonorgestrel. That had been an issue during clinical trials for the contraceptive levonorgestrel-based subdermal contraceptive, Norplant, and what's now called Jadelle, that I had investigated and written about over several -- many years. So I refreshed my memory about that relationship.
Q. So were you finished with your answer?
A. No.
Q. Okay. Go ahead. Please finish.
A. And then as I recall, I asked if there was -- what additional information that I might not be aware of that was available and asked for materials that Bayer had about reports of pseudotumor cerebri related not to Norplant or Jadelle, but to Mirena.
Q. When you say you refreshed your memory about the relationship between Norplant and Jadelle and IIH from clinical trials, what was it that you reviewed to refresh your memory?
MS. NATALE: Just object to the form. I don't know that that's what the testimony was.
MS. COOK: So you can object to form and

not go further, please.
MS. NATALE: Sure. Object to form. Misstates the testimony.
MS. COOK: Okay.
THE WITNESS: I looked at the literature about that issue, literature search. Case reports. I had -- this is something we had discussed -- "we," Norplant investigators -- in the past.
BY MS. COOK:
Q. The information that you reviewed to refresh your memory about Norplant and Jadelle, was that only published information, or did you also review internal information from the company Wyeth or whomever that you had available to you?
MS. NATALE: Object to form.
THE WITNESS: No. That was published information.
BY MS. COOK:
Q. And you mentioned case reports. Was it the published case reports for Norplant that you reviewed?
A. Yes.
Q. Okay. And then you also mentioned that you had done a literature search before.
Did you do that before agreeing to be an



expert in this litigation?
A. Yes.
Q. What did you search for?
A. For keywords like "levonorgestrel," "idiopathic hypertension," "pseudotumor cerebri," "contraception."
Q. Did you search for "Mirena" and "PTC" or "IIH"?
A. Yes. Well, that would -- some of that would have come up with levonorgestrel.
Q. Do you remember when it was that you actually agreed to serve as an expert for the plaintiffs in this litigation?
A. I don't recall precisely. I believe it was after a meeting that we had.
Q. Okay. Well, Dr. Darney --
A. I'm thinking it was middle of last year or so.
MS. COOK: Let me see if I can mark some exhibits to help refresh your memory.
(Marked for identification purposes, Exhibit 1.)
BY MS. COOK:
Q. Exhibit 1 that you're receiving the deposition notice from your deposition today.



Have you seen this?
A. Yes.
MS. COOK: And it requests a number of documents, and we received them this morning from counsel, and we'll mark them later as exhibits. For the time being, I'm going to mark one which is --
(Marked for identification purposes, Exhibit 2.)
BY MS. COOK:
Q. -- appears to be an invoice.
Do you recognize this, Dr. Darney, Exhibit 2?
A. Yes.
Q. What is it?
A. It's an invoice for time I'd spent on this issue, the time period we were earlier discussing, that I sent in November. And it shows that I was slightly wrong about when I was first contacted.
Shall I repeat the dates that are here?
Q. There's no need to just read them into the record, but let me follow up on what you just said.
Does looking at Exhibit 2 refresh your memory that you were first contacted about this litigation on June 26th, 2017?
A. Yes. It's possible that I had a talk about



it shortly prior to that. But that's -- that's about right.
Q. The phone conversations listed here, is "DL" Mr. Langevin that you referred to earlier?
A. Yes.
Q. "CN" is Christina Natale, another attorney for the plaintiffs?
A. Yes. Who's sitting here.
Q. You had billed, as of November 12, 2017, a total of 12.2 hours at $400 an hour; is that correct?
A. That's correct.
Q. Is there any other time that you spent on the litigation between being hired and November 12, 2017, that's not reflected here?
A. Well, I don't suppose that every moment that I spent thinking about it is reflected here, but those more or less accurate.
Q. Certainly if you spent half an hour or an hour reviewing materials, you would have billed for that; right?
MS. NATALE: Object to form.
THE WITNESS: Not certainly. That is, I'm not all that good at keeping track of how I spend my time, so this would have been based on calendar

records of when we talked and how I prepared for the conversations. So it's not certain, but it's more or less accurate.
BY MS. COOK:
Q. Do you know how much time you've spent on the litigation since November 12th, 2017?
A. I haven't created an invoice or added that up, but I would say several days.
Q. How did you spend -- or how did you prepare for your deposition today?
A. Well, I suppose the major way I prepared for the deposition today was to, during -- during December, write my report. I spent quite a bit of time on that. Specifically for the deposition, we met yesterday.
Q. How long did you meet yesterday?
A. About six and a half hours.
Q. Was anyone there other than the attorneys for plaintiffs who are here today?
A. No.
(Marked for identification purposes, Exhibit 3.)
BY MS. COOK:
Q. Hand you your report that you just mentioned.



Dr. Darney, is Exhibit 3 your expert report for this litigation along with its appendices?
A. Yes.
Q. This one right here that she just handed you.
A. Yes.
Q. And you brought with you a copy as well; right?
A. Yes.
Q. Did you have any markings on that?
A. No.
Q. Okay. So just so we're all looking at the same thing, if you don't mind just looking at Exhibit 3 when we refer to it, that's -- that will keep us straight.
Is Exhibit 3 -- now you -- withdrawn.
The date that this is signed, if you look at page 25, is December 27th.
Is that when you signed and completed this report?
A. Yes.
Q. Does this report contain all of the opinions that you intend to offer in this litigation as of today?
A. Yes.



Q. And then at the end of the report, before the appendices, start there is a list -- you can put Exhibit 1 aside if you want.
A. Okay.
Q. So if you just flip -- not the end of the total report, but the -- right after page 25, before your CV starts. Here. Let me help you. It's before your CV.
MS. NATALE: Right after the signature page, Dr. Darney.
THE WITNESS: Okay. Thank you.
MS. NATALE: It's a little hard without a staple to keep it all in order.
BY MS. COOK:
Q. At the end of the report, there's a list of sources consulted and/or relied on.
Do you see that, Doctor?
A. Yes. Yes.
Q. Is this the complete list of materials you consulted before completing your expert report?
MS. NATALE: Object to form.
THE WITNESS: Yes. It doesn't mean that there may not have been information or materials I considered when I was thinking about it that don't appear here, but these -- these are the sources



relevant to the report itself.
BY MS. COOK:
Q. Sitting here today, can you think of any specific additional materials that you reviewed before completing your expert report that aren't on the list?
A. Yes. For example, I notice that my own textbook about contraception is in here. So I know that early on I read what I had written about levonorgestrel in the textbook.
Q. Which textbook are you referring to?
A. It's Speroff and Darney. Yes. That's it.
Q. "A Clinical Guide for Contraception, Fifth Edition"?
A. Yes.
Q. So you looked at that before completing your expert report?
A. Yes.
Q. Anything else that you can think of that you reviewed before completing your expert report that's not on the list?
A. I looked at another textbook that Robert Hatcher and I had written together. And anything of that relevance that I would have -- relevant that I looked at would be in my CV.

Q. Okay. So --
A. So I could identify it specifically, if there were other items, by looking at my CV.
Q. Other than your own publications, are there any materials that you consulted before completing your expert report in this litigation that you can think of today?
A. No. Other -- other than things that I would have been an author or coauthor of. I can't think of anything else.
Q. The articles --
A. And those wouldn't -- excuse me.
Those wouldn't appear as sources consulted because I didn't -- I didn't use them specifically in writing the report.
Q. The articles that are -- or the scientific literature that is listed in your sources consulted list, how did you get those articles?
A. Sometimes by recalling what I had read in the past that was relevant to the report, remembering a particular paper, particularly of colleagues, like Frank Stanczyk or Francisco Alvarez or Biran Affandi had written it.
And you'll remember, earlier I said that we -- we, Norplant levonorgestrel investigators --


had -- had discussed this issue in the past. So it wasn't something that was -- I was completely unfamiliar with. So I would have wanted to see what Irv Sivin and other examples had written.
So some of the sources would be from colleagues. I would have been aware of those sources and would have reread them. Others are from literature searches that I mentioned earlier.
Q. Any other way you got these articles?
A. Well, I -- I didn't have materials specific to Bayer. So I asked for those materials from the attorneys.
Q. And you're talking about the internal Bayer documents that you cite?
A. Yes. Right.
Q. But just sticking to the scientific literature, other than your literature search and remembering colleagues and looking for their materials, was there any other way that you came about the scientific literature listed on your sources consulted or relied on list?
A. No.
Q. And then the -- you mentioned the Bayer documents.
What type of materials did you request from


the Bayer documents?
A. Materials that would be adverse event reports involving pseudotumor cerebri, for example. Information about subjects and clinical trials of Mirena in which I participated in the past, I would be aware of those -- of those -- of the existence of those trials. Information of that kind.
Q. Did you have access to a database of Bayer documents to do your own searches?
MS. NATALE: Just object to form. Vague.
THE WITNESS: No. No.
BY MS. COOK:
Q. You also have listed a number of drug labels on your sources list. And they are Jadelle, Kyleena, Mirena, Norplant, and Skyla.
Did you also look at the Liletta label?
A. I certainly looked at the Liletta label. For example, in part, because I'm doing a -- two levonorgestrel trials right now, one for Bayer and one for Medicines360, Liletta. I don't recall that I specifically -- I've looked at it, but I don't recall that I specifically looked at it for this in this situation.
Q. Did you look at any drug labels for any other LNG-containing contraceptive other than IUDs


or implants?
A. Of course I've looked at labels in the past for all of those, levonorgestrel-containing oral contraceptives, for Jadelle and Norplant. In fact, helped write the drafts of those labels. So I'm aware of them. I don't recall that I looked specifically at them for -- for this report.
Q. You helped write the drafts of which labels?
A. Of the Norplant and Jadelle labels.
During the course of research, during the course of work with the Population Council, and subsequently with Wyeth.
Q. Did your work on Jadelle, did any of that have to do with serving as a consultant for Bayer or Berlex or --
A. No. Most of my -- my work with Jadelle and Norplant would have been with the Population Council and then with Wyeth. And subsequently, also -- and this is related to Mirena -- with the little Finnish company, Leiras Oy, that actually made -- made both products, both Norplant, Jadelle, and Mirena.
So, for example, I visited colleagues in -- in Finland. That company was bought by Schering. Then Schering established a U.S. subsidiary, Berlex.

And then when I was no longer closely involved -- after we had done our first Mirena trial, Bayer bought Schering.
Q. So I think we got a little off topic, but my question was about Jadelle and whether you had ever done any work with any Bayer-related company, whether Leiras or Schering or Bayer, about the Jadelle label.
And I think you said "no" to that; is that correct?
MS. NATALE: Object to form.
You can answer.
THE WITNESS: I said -- I said, "No," and qualified it by saying that I would have had contact with Leiras --
BY MS. COOK:
Q. Okay.
A. -- and with Berlex, who -- who never marketed implantable contraceptives in the United States. They did market Mirena. So as I -- the only discussions of labeling would have been with Pop Council and Wyeth.
Q. Okay. Thank you.
A. That's the answer.
Q. Yes.


And then your work with Leiras in Finland related to Mirena, you mentioned you were one of the investigators on preapproval at least in the U.S. --
A. Pre-U.S. approval, yes.
Q. Of Mirena; correct?
A. That's right. Yes.
Q. And was the context for your visit to Finland, was working on the Mirena clinical trial?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. Now, there are two deposition transcripts from Bayer employees on here.
Did you review those?
A. Yes.
Q. Did you review the exhibits?
A. No. The exhibits that went with those?
Q. Yes.
A. Those -- those transcripts and the exhibits, I would have read some of it and glanced at some of it. I don't recall specific -- how much detail.
Q. How did you pick just those depositions to look at?
MS. NATALE: Object to form.


THE WITNESS: I relied on the judgment of the attorneys what was most relevant. And I -- they were quite -- they were lengthy depositions. I don't have -- some of it didn't seem relevant.
BY MS. COOK:
Q. Are you relying on any documents or any communications directly from Bayer or any of its predecessors to you in this litigation?
A. No.
Q. Are you relying on any conversations that you've had with anyone, any of your colleagues or anyone else, in this litigation?
MS. NATALE: Object to form.
THE WITNESS: No.
BY MS. COOK:
Q. You mentioned Dr. Frank Stanczyk.
A. Yes.
Q. One of your colleagues.
A. Yes.
Q. Have you spoken to him about this issue?
MS. NATALE: Object to form.
THE WITNESS: I've spoken to Frank a lot about -- and collaborated in studies about levonorgestrel, but not about this issue.
///


BY MS. COOK:
Q. Not about the opinions that you express in your report; is that correct?
A. That's correct.
MS. NATALE: Object to form and just scope.
THE WITNESS: And it's possible that Frank and I or other colleagues would have discussed, in the distant past, with regard to Norplant, pseudotumor cerebri, but I'm not relying on those discussions in this report.
BY MS. COOK:
Q. Did you review any expert reports from any other experts in Mirena IIH litigation before finalizing your own expert report?
A. I read part of Dr. Johanson's --
MS. NATALE: Just -- sorry.
BY MS. COOK:
Q. And did you read part of Dr. Johanson's report before finalizing your expert report on December 27th?
A. Yes.
Q. And why did you read Dr. Johanson's report?
A. Well, I was interested in biologic plausibility, as I recall. I'm not an expert on cerebrospinal fluid.

Page 30

Q. Are you relying on Dr. Johanson for any of your opinions in this case?
A. No.
MS. COOK: I'm going to hand you what we got this morning, called "Additional Documents Reviewed."
(Marked for identification purposes, Exhibit 4.)
BY MS. COOK:
Q. Do you recognize Exhibit 4, Dr. Darney?
A. Yes.
Q. Are these additional documents that you reviewed before or after completing your expert report?
A. Stanczyk's I looked at before. Dorflinger I looked at after.
Q. What about -- and then Dr. Johanson's report is listed there.
A. And I don't recall when I first looked at that.
Q. Did you see any of the other plaintiff's expert reports in this litigation before today?
A. No.
Q. The Dorflinger article that you reviewed after your expert report was finalized, why did you

Page 31

look at that?
A. Well, I know -- I know Laneta, and I was just interested to see what she had to say about this issue. Contraception is a journal I read all the time, but I hadn't recalled that particular article. Curiosity.
Q. Have you read any transcripts from any of the expert depositions in this litigation?
MS. NATALE: Object to form.
THE WITNESS: You mean the recording like we're making now?
BY MS. COOK:
Q. Yes.
A. Well, I suppose the ones I've looked at were -- are transcripts of depositions.
Q. So those are the Bayer employees.
But the people like you, who have been paid to give your opinions by the plaintiff lawyers, did you look at any of their deposition transcripts?
MS. NATALE: Object to form.
You can answer.
THE WITNESS: No.
BY MS. COOK:
Q. Okay. Do you agree -- oh, withdrawn.
Have you looked at any of the expert

Page 32

reports from Bayer's expert witnesses in this litigation?
A. You mean people who aren't Bayer employees?
Q. Right. The people who are retained by Bayer, academics like yourself, who are expert witnesses for Bayer.
A. You mean paid by Bayer to give an opinion?
Q. Right.
A. No.
Q. Do you know who they are, any of them?
MS. NATALE: Object to form.
THE WITNESS: You mean do I -- do I recognize them as -- as colleagues or ...
BY MS. COOK:
Q. Do you know what their names are? Bayer's experts.
A. I know that one is Dana Gossett.
Q. Do you know Dana Gossett?
A. Yes. Because we're -- she recently moved from Northwestern to UCSF, so I met her.
Q. And do you respect Dana Gossett as one of your colleagues?
MS. NATALE: Object to form.
THE WITNESS: Well, I don't disrespect any colleague. But Dana Gossett wasn't one of the

Page 33

people I would have thought of as among the people I mentioned who are levonorgestrel investigators and who have written about it.
For example, I -- probably in my textbook, I refer to, at the time, every paper ever written about this issue, and I wouldn't find Dr. Gossett's name there.
BY MS. COOK:
Q. And she's a couple decades junior to you; right?
A. I don't know how old she is.
Q. Okay. Have you ever spoken to her about this issue, any of the issues --
A. No. No.
Q. -- at -- okay.
Do you agree it's important to consider the evidence on both sides of an issue like this before reaching an opinion?
A. Do you mean it's -- do you mean evidence or other opinions or -- how are you classifying "evidence"?
Q. Sure.
I mean, certainly you would want to review all of the peer-reviewed literature about Mirena and IIH before reaching your opinions in this

litigation; correct?
A. Well, not necessarily all of it. It mean, it depends where it's published and who wrote it. That's what I -- that was my caveat in saying would you review everything.
But I've read enough to have opinions about who's a -- who's a respected researcher and who's competent and who isn't. So I don't read everything.
Q. So when you say it depends on where it's published, what journals would you be looking for for authoritative literature about this issue?
MS. NATALE: Object to form.
THE WITNESS: I mentioned that I would rely on a journal like Contraception. And of course we all rely on the big three: Lancet, JAMA, New England Journal. Obstetrics and Gynecology, the American Journal of Obstetrics and Gynecology, and so on down the -- down the list of reliable sources.
It doesn't mean that there's not good work published in many other journals, but those are just examples of journals that I would typically look at. Not just for this issue, but for -- for any issue related to my field.
///



BY MS. COOK:
Q. If you turn to page 5 of your expert report --
MS. NATALE: I think you flipped it backwards.
THE WITNESS: Okay. Sorry.
MS. NATALE: Do you mind if I just pull the rest aside for now?
MS. COOK: Sure.
MS. NATALE: Okay.
THE WITNESS: Got it.
BY MS. COOK:
Q. Page 5, you say:
"In this report I will state opinions on the following topics."
And then you give four opinions.
A. Yes. Or four topics.
Q. Is that a summary of your opinions in this litigation?
A. Yes.
Q. You don't offer opinions in your report about whether Bayer complied with FDA regulations; correct?
A. No.
Q. When I say "correct," am I correct that you



don't offer those opinions?
A. No, I don't offer that opinion.
Q. Okay. Do you offer opinions about the adequacy of the Mirena label?
A. As I recall, I mentioned that -- not the label specifically, but that I have to go to the -- I think it's toward the end of the report with regard to susceptible individuals, Item 4.
So under that topic, the likelihood that informing physicians could be useful, I believe I comment on that.
MS. NATALE: I'm just going to quickly interpose an objection based on the scope of this phase of litigation as per the Court's order. That's it.
BY MS. COOK:
Q. Okay. So to the extent that you later offer opinions about the Mirena label, we'll get an opportunity to ask you about those.
MS. COOK: Is that fair, Christina? Is that your objection?
MS. NATALE: We will stipulate that on the record.
MS. COOK: Okay.
MS. NATALE: I don't think that was his



purpose here. I'm not testifying.
MS. COOK: Okay. Okay.
BY MS. COOK:
Q. So just so we're clear, you're not here today as an expert in the FDA regulations, are you?
A. No.
Q. And are you intending to offer any opinions about Bayer's conduct with regard to Mirena?
A. No.
Q. Are you offering any opinions about Bayer's pharmacovigilance efforts?
A. I have opinions about pharmacovigilance in general, and I've been involved in pharmacovigilance efforts as a consultant, for example, to Organon, now Merck. So I have opinions about that way of collecting data, and it might come up that I give opinions about that in relation to this, so I wouldn't want to rule out that possibility.
Q. Okay. So you know that -- I think you've done this often enough to know that your expert report is where your opinions in the litigation are supposed to be expressed. And these aren't hard questions that I'm asking you. I just have to make sure that you're not holding in your pocket some opinion that you already have and think that you

Page 38

have in your report. So that's where we are.
Do you understand that's the purpose of the report?
MS. NATALE: I'll just object to the characterization. And I think that the question stands and the record and what it is.
THE WITNESS: Yes, I understand that.
BY MS. COOK:
Q. Okay. So can you agree with me that -- at least that you've expressed in your report you don't have any opinions that you're offering about Bayer's pharmacovigilance efforts with respect to Mirena; correct?
A. Yes.
Q. And you -- do you intend to offer any opinions as stated in your report about Bayer's communications of the risks of Mirena to doctors or patients?
A. Well, I mentioned in our earlier discussion that I believe this report says something about the utility of physicians having knowledge of all associations.
Q. Okay. And we'll get back to that.
Are you offering any opinions about Bayer's promotional activities related to Mirena?

Page 39

A. I believe the report specifically mentions promotional activities related to Mirena, so in that way I've offered an opinion.
Q. And what's the opinion there?
A. That, as I recall -- I have to read that section again, that -- that Mirena was promoted by virtue of having a low dose of levonorgestrel and of not having estrogen. Those are examples of -- of my comments about promotion.
So it's not something that I ignore in the report. That's the point that I'm making.
Q. Are you here to appear as an expert on Bayer's promotional activities with respect to Mirena?
A. No.
Q. And will you agree with me that you haven't offered any opinions about a safer alternative design of Mirena?
MS. NATALE: Object to form.
THE WITNESS: Well, I have offered opinions about that in -- in light of Mirena's development of lower dose delivery systems; that is, that Bayer was apparently motivated to do two things: Lower the dose that's delivered by the system and consider the use of less androgenic progestin.

Page 40

So in that way my report does offer those observations, perhaps not opinions.
BY MS. COOK:
Q. Okay. And what I'm trying to do is understand your opinions, because there's a summary of four opinions, and it doesn't include that.
You understand that; right?
MS. NATALE: Object to form.
THE WITNESS: Well, I see those -- those opinions we've been discussing, those in particular, as subsumed under Item 3.
BY MS. COOK:
Q. Okay. So are you offering an opinion about Bayer's motivations for creating new innovations like Skyla and Kyleena?
MS. NATALE: Object to form.
BY MS. COOK:
Q. Is that part of your opinions in this litigation?
A. Yes.
Q. What -- what do you think makes you an expert in Bayer's motivations?
MS. NATALE: Object to form and characterization.
THE WITNESS: As a contraceptive developer, I'm aware of what generally motivates us with regard to safety and efficacy in developing new contraceptives. So I would have some opinion about what's likely to motivate anyone in this -- in this field.

Page 41

BY MS. COOK:
Q. Dr. Darney, are you aware of any evidence that Skyla and Kyleena have a lower risk of IIH than Mirena?
MS. NATALE: Object to form.
THE WITNESS: No.
BY MS. COOK:
Q. You also mentioned the new progestin, the less androgenic progestin, that I think you cite a patent application about.
A. Yes.
Q. Do you have any evidence that that product had a lower risk of IIH than Mirena?
MS. NATALE: Object to form.
THE WITNESS: No, I don't have evidence of that. It was never marketed.
BY MS. COOK:
Q. Now, the only levonorgestrel-containing products that -- as far as I could tell, that you give opinions about in your report are implants and

Page 42

IUDs; is that accurate?
A. I believe the report mentions oral contraceptives, so there's some mention of oral contraceptives. And the report applies to delivery systems in general. For example, there are transdermal and vaginal systems that use levonorgestrel.
Q. And that's exactly what -- what I'm trying to understand.
Are you offering any opinions about the risk of IIH with combined oral contraceptives?
A. I believe the report mentioned oral contraceptives, so I don't want to exclude the possibility that I would -- that they would come up in a discussion of this issue.
You're aware that they have, in the past, been viewed as having a risk of being associated with pseudotumor cerebri.
Q. And today, as we sit here, with additional studies that have been done, the current consensus is that combined oral contraceptives do not increase the risk of IIH; is that accurate?
A. Yes.
MS. NATALE: Object to form.
///

Page 43

BY MS. COOK:
Q. So to the extent I was asking are you planning to offer an opinion that combined oral contraceptives cause IIH, what's your answer to that?
MS. NATALE: Object to form.
THE WITNESS: My opinion is that they do not.
BY MS. COOK:
Q. Okay. And your opinion that combined oral contraceptives do not cause IIH, does that include levonorgestrel-containing combined oral contraceptives?
A. Yes.
Q. Are you planning to opine that levonorgestrel-only contraceptive pills cause IIH?
MS. NATALE: Object to form.
THE WITNESS: Well, I'm aware and I believe I cite a case report. But for reasons we wouldn't want to go into now, I believe that it's unlikely they would be an important cause of pseudotumor cerebri.
BY MS. COOK:
Q. You reference a case report related to levonorgestrel-containing emergency contraceptive;

Page 44

correct?
A. And I should mention that I've done considerable work with levonorgestrel-containing pills as so-called emergency contraceptives. They have been used as daily contraceptives as well.
So it's something I'm interested in and would have -- and, therefore, would have mentioned it in the report. But I don't think -- so I don't want to exclude the possibility that it could come up for discussion.
Q. Is it your opinion that levonorgestrel-containing pills -- levonorgestrel only, so emergency contraceptive or other pills, cause IIH?
MS. NATALE: Object to form. Asked and answered.
THE WITNESS: I wouldn't discard that possibility. I'm not aware of data that support the contention.
BY MS. COOK:
Q. As we sit here today, there's no reliable data supporting an opinion that levonorgestrel-only contraceptive pills cause IIH; correct?
A. Not that I'm aware of.
Q. You have your CV, which is Appendix A to

Page 45

your report, handy?
MS. NATALE: Right here, Dr. Darney.
At the break -- I'm sorry, Shayna. At the break I would like to just staple just the report together so that we can keep it in line.
THE WITNESS: Yes, I have that.
BY MS. COOK:
Q. Is this the most current and accurate version of your CV?
A. Yes.
Q. Currently, you are an emeritus distinguished professor at UCSF? That's your current title?
A. Yes.
Q. And it also says that you are the -- well, somewhere it says that you are the founding director of the Bixby Center for Global Reproductive Health.
A. Yes.
Q. What is the Bixby Center?
A. It's a research and training group at the University of California, San Francisco, School of Medicine focused on contraception, development and evaluation, the relationship of contraceptives to reproductive infectious diseases and their prevention, to abortion services, training and

Page 46

technology, to teen pregnancy prevention, and to safe childbirth, safe motherhood.

Those are the areas of emphasis of the member scholars and the trainees.

Q. One of the areas of Bixby Center's focus that you mentioned in your answer was contraception; right?

A. Yes.

Q. The Bixby Center has done a lot of work in promoting the use of long-acting reversible contraceptives, or LARCs for short, including Mirena; correct?

A. Yes. Yes.

Q. And the Bixby Center has also had as one of its missions to not only promote the use of LARCs, including Mirena, but also increase their usage across the country; correct?

A. Yes.

Q. And are you still involved with Planned Parenthood currently?

A. Well, the Bixby Center uses Planned Parenthood clinics around the country to conduct as sites for research. So in that way we're involved with Planned Parenthood.

We also use Planned Parenthood as training

Page 47

sites for young physicians all around the country. So in that way we're involved with Planned Parenthood. I'm not on the Planned Parenthood board or actively involved in Planned Parenthood administration.

Q. You're aware that Planned Parenthood has long promoted the increased use of LARCs, including Mirena as well; correct?

A. Yes.

Q. The professional organizations that you list on page 4 of your CVs -- CV includes ACOG and other memberships.

Are you still a member of all of those organizations?

A. Yes.

Q. And ACOG also has long promoted the increased usage of LARCs, including Mirena; correct?

A. Yes.

Q. You mentioned that you were involved in a clinical trial involving Liletta; correct?

A. Yes.

Q. And that's something that you are doing for the company that promotes Liletta, Medicines360; correct?

A. Yes.

Page 48

Q. The purpose of that clinical trial is to see if Liletta is efficacious at preventing pregnancy for five years; correct?

MS. NATALE: Object to form.

THE WITNESS: Yes. And for longer than that.

BY MS. COOK:

Q. It's currently approved for three years; right?

A. Yes.

Q. You would agree with me that Liletta has the same risk-benefit profile as Mirena; correct?

MS. NATALE: Object to form.

THE WITNESS: Yes.

BY MS. COOK:

Q. Liletta also has the same pharmacokinetic profile as Mirena; correct?

A. Yes.

Q. You currently use Liletta with your patients even outside of the clinical trial; right?

A. Yes.

Q. Liletta is a competitor of Mirena, too; right?

A. Yes.

Q. You are also an investigator in a Mirena

Page 49

clinical trial that you mentioned earlier; right?

A. Yes.

Q. The purpose of that trial is to see whether Mirena is efficacious at preventing pregnancy beyond five years; right?

A. Yes.

Q. And it -- is it a randomized clinical trial?

A. No.

Q. Okay. So is it patients who choose to use Mirena already by themselves, or how does it work in terms of selecting which patients use Mirena?

A. It's enrolling women who have already used Mirena for five years and continuing to follow them for additional years. So when they enroll in the study, they're nearing five years of use, and we follow them up for an additional year, two years, three years, we hope ten years if we enroll enough subjects and are able to follow them long enough.

Q. The subjects in the Mirena clinical trial that you're following, are those your patients?

A. Some would have been. Others would have been patients elsewhere. Kaiser, Planned Parenthood would enroll in our trial.

Q. Are you still using Mirena with patients

Page 50

outside of the clinical trial?
A. Yes.
Q. Do you still train residents to use Mirena with their patients?
A. Yes.
Q. Do you currently still teach?
A. Yes.
Q. Do you teach about Mirena to your patients?
MS. NATALE: Object to form.
BY MS. COOK:
Q. If that makes sense.
A. Yes.
Q. Okay. Now, you mentioned two clinical trials you've been involved in that are sponsored by pharmaceutical manufacturers, but you've been involved in other clinical trials in your career; correct? Right?
A. Yes.
Q. And many clinical trials are sponsored by pharmaceutical manufacturers; right?
A. Yes.
Q. Just because a company sponsors a trial does not render the results of that clinical trial unreliable, does it?
A. No.

Page 51

Q. Other than your clinical trial work, are you currently consulting for any pharmaceutical companies?
A. Yes.
Q. Which ones?
A. For Merck.
Q. Is your Merck consulting work related to Nexplanon?
A. It's -- it's related to development of contraceptives in general.
Q. And I don't want to get into the details because I'm sure they're confidential; right? Probably.
A. Yes.
Q. Are there any other companies that you're currently consulting for?
A. Medicines360.
Q. In general, what is the nature of that consulting?
A. A conduct of a current clinical trial and what additional trials or products could be developed. What additional products and subsequent trials could be developed.
Q. So we're -- I'm sorry. I did not mean to interrupt you.

Page 52

So it relates to Liletta and other potential future products; right?
A. Yes.
Q. Any other companies that you're currently consulting for?
A. No.
Q. You have done an extensive amount of work for decades studying LARCs; correct?
A. Yes.
Q. You've spent a lot of your time training other doctors and clinicians about LARCs, including Mirena; correct?
A. Yes.
Q. You've long advocated using LARCs, including Mirena, as an effective contraceptive method; right?
A. Yes.
Q. You've also conducted studies and published many papers and even book chapters about the need to expand the use of LARCs, including Mirena; right?
A. Yes.
Q. Would you say that one of the greatest accomplishments of your career is increasing the use of LARCs, including LNG IUDs like Mirena and Liletta?

Page 53

MS. NATALE: Object to form.
THE WITNESS: I certainly see it as an important contribution, yes.
BY MS. COOK:
Q. That's one of the things that you're most known for, isn't it? Increasing the use of LARCs through training and through your publications; right?
A. Through research and publications that are descriptions of results of research, yes.
Q. With respect to Mirena specifically, you've trained many doctors on how to use Mirena over the years; correct?
A. Yes.
Q. And you've worked hard to try to expand the usage of Mirena in clinics and practices throughout the country; right?
MS. NATALE: Object to form. Asked and answered several times.
THE WITNESS: Yes.
BY MS. COOK:
Q. When did you start using Mirena yourself?
MS. NATALE: Object to form.
MS. COOK: What's the objection, Christina?
MS. NATALE: Just that sentence itself.

"When did you start using Mirena yourself?" I think that you can understand, it's just unclear. Ambiguous.

MS. COOK: Okay. Let me rephrase the question in case it --

BY MS. COOK:

Q. Doctor, I know you've been deposed before, but if I ask you any question you don't understand, please just ask me. I'll rephrase it.

Do we have that understanding?

MS. NATALE: I don't think I said he didn't understand it.

THE WITNESS: Yes.

MS. NATALE: But you can continue.

MS. FUJIMOTO: Well, can I just state for the record, I think we know that coaching is not allowed in depositions. Let me just state this for the record, Christina.

MS. NATALE: Sure.

MS. FUJIMOTO: You may not realize it, so I don't mean this to be offensive.

MS. NATALE: You are being -- well, it sounds like you are going to be offensive, but you may continue.

MS. COOK: The laughter, the chuckling, the



constant smiling, the nodding your head and shaking your head in response to questions can be construed as implicit coaching --

MS. NATALE: Sure.

MS. FUJIMOTO: -- and disruptive. So I'm stating that for the record.

MS. NATALE: So two -- I will state two things for the record as well.

First of all, I'm not on camera. I'm sitting next to him --

MS. FUJIMOTO: You should be.

MS. NATALE: You have a protocol that we've discussed in the past. I am sitting next to the witness. I have not coached him a single time.

The question was -- first of all, I can -- I have a right to object to the questioning.

MS. FUJIMOTO: Sure.

MS. NATALE: I've done nothing improper today, and I would respect that if you showed the same respect and not speaking something into the record that has -- if you feel that I'm coaching the witness, move the Court.

Thank you. We can move on.

MS. COOK: So I want to move on, but I do -- like, to the extent that there isn't something



that's reflected on the record, like the body movements, I do appreciate that putting that on.

MS. NATALE: Sure.

MS. COOK: So we'll just move on.

MS. NATALE: Again, if you want to accuse me of improper conduct, you can bring it to the Court. Thank you.

BY MS. COOK:

Q. Dr. Darney, my question was do you remember the first time that you used Mirena with one of your patients?

A. Yes. Because I've looked at my CV and see that I began a trial in 2000 called "Safety and Acceptability of Levonorgestrel Intrauterine Contraceptive System," for Berlex, which was Schering's U.S. affiliate.

Q. The trial you just referred to from 2000, was that before the approval of Mirena in the United States, to your recollection?

A. Yes.

Q. And you have written many publications discussing the benefits and other risk information about Mirena since 2000; correct?

A. Yes.

Q. And I don't want to make you go through and



count on your CV how many, but do you have any idea how many publications about Mirena you've written? Off the top of your head. I really don't want to have you count them up.

A. Well, those directly about levonorgestrel intrauterine contraception would probably be four or five.

(Marked for identification purposes, Exhibit 5.)

BY MS. COOK:

Q. I'm going to hand you as Exhibit 5, one of the publications that you were the senior author on.

Do you recognize Exhibit 5?

MS. COOK: Oh, did I give you one, Christina?

MS. NATALE: No.

MS. COOK: Sorry.

THE WITNESS: Yes.

BY MS. COOK:

Q. This was published in 2002, so about a year or so after Mirena became available in the United States; right?

A. Yes.

Q. And if you turn to page 60, this is -- pardon, 260, this is the section on intrauterine

contraceptive devices.
A. Yes.
Q. And by the way, the title here is "Recent Developments in Hormonal Contraception"; right?
A. That's right.
Q. And is the purpose of a review article like this to inform your colleagues about, basically, what it says, the recent developments in hormonal contraception that's available to them?
A. Yes.
Q. Now, page 260, the section on IUDs, talks about -- it starts out by referring to the distinct advantages of the intrauterine delivery of contraceptive progestins compared to traditional IUDs; right?
A. Yes.
Q. And this is -- when you talk about progestins, the only progestin-containing IUD that was available in 2002 was Mirena; right?
A. That's correct.
Q. If you turn to page 261, the left-hand side, do you see how it says:
"By contrast the LNG-releasing intrauterine system relies on local hormonal effects to thin the endometrial



lining and thicken the cervical mucus"?
A. Yes.
Q. That's a reference to Mirena; right?
A. Yes.
Q. That's an accurate statement; right?
A. Yes.
Q. So to say that Mirena relies on local hormonal effects, that's accurate; right?
A. Yes.
Q. Going on in that paragraph, it says:
"Combining the advantages of hormonal and intrauterine contraception, it is the most efficacy form of reversible contraception currently available, even more effective than female sterilization."
And that's a reference to Mirena; correct?
A. Yes.
Q. That was a --
A. I could add that subsequently, our clinical trials demonstrated that the most effective contraceptive was the desogestrel implant. So this is a little out of date, but I don't think -- we can take a look here. I don't think that Implanon is -- is mentioned here.



Q. Well --
A. Which turns out to be more effective than Mirena.
Q. Well, page 263 does mention Implanon, right, on the left-hand column, near the top?
A. Yes.
Q. But at that time it wasn't available. It says it's expected to be available in the United States by 2003; right?
A. Yes. And it says in one study, no pregnancy occurred. And I think that's my paper.
Q. Well, certainly at the time, when you published this, Mirena was the most effective form of reversible contraception currently available; correct?
A. That was on the market in the U.S., yes.
Q. And it's true even today, that it's one of the most effective forms of reversible contraception currently available, even more effective than female sterilization; correct?
A. Yes.
Q. And by "it," I mean, Mirena; right?
A. Yes.
Q. And you have mentioned the implant, so Implanon and Nexplanon. But other than those two,



Mirena is -- and Liletta are the most effective forms of reversible contraception in the United States; correct?
A. Yes.
Q. And then it goes on -- back to 261. That same paragraph, it talks about the release rate of Mirena, and says:
"It achieves serum concentrations of LNG that are about half of Norplant."
Do you see that?
A. Yes.
Q. That's an accurate statement; correct?
A. Yes. On average, it means.
Q. And that's what you reported at least to your colleagues; right?
A. Yes.
Q. And you go on -- we're not going to go through everything here, but starting at the bottom of that same column, you talk about the numerous noncontraceptive health benefits of the LNG IUD Mirena; right?
MS. NATALE: Object to form.
BY MS. COOK:
Q. And it says --
A. Particularly with regard to menses.

Page 62

Q. You say:
"Unlike the copper IUD, LNG IUD users have markedly less menstrual flow and cramps."
And that's a reference to Mirena; right?
A. Yes.
Q. And that's an accurate statement; right?
A. Yes.
Q. You go on to say that it can be a boon for women with anemia, and that Mirena is an effective treatment for menorrhagia and dysmenorrhea; correct?
A. Yes.
Q. And then in the next column, you talk about how, as a progestin-only method with local action and relatively limited systemic effects, the LNG IUD is appropriate for women in whom estrogen-containing methods are contraindicated or less effective, such as COCs for women treated for epilepsy or women with cardiovascular or thrombogenic risk.
Do you see that?
A. Yes.
Q. What type of women would be included in the list of people -- women for whom progestin-only methods are preferred?
MS. NATALE: Object to form.

Page 63

THE WITNESS: Well, as we've just discussed the principal advantage of the progestin-only long-acting methods -- that is, LARCs -- is high efficacy.
So for women who want a very effective method and who, for example, would not want to have an abortion to terminate an unintended pregnancy, these methods are often the first choice.
BY MS. COOK:
Q. Are there particular women or a list of types of women who would be at risk of the cardiovascular or thrombogenic risk with COCs?
A. Yes. Women of a family history particular of -- of deep vein thrombosis or an early MI or a stroke and who may have a genetic predisposition to thrombosis. Factor V Leiden is -- is the most common example.
And progestins make epileptic attacks less frequent, so women with epilepsy are mentioned there specifically.
Q. Your article goes on to say:
"Because the principal action of the LNG is local, with limited systemic absorption, the IUD causes few hormone" -- "hormonal adverse events."

Page 64

Is that a true statement?
A. Yes. And that's followed by the adverse events due to the progestin that do occur.
Q. And the adverse events due to the progestin that do occur that you list in this article are headache, mastalgia, nausea, acne, hirsutism, depression, and mood changes; correct?
A. Yes.
Q. What is mastalgia?
A. Breast pain.
Q. This article doesn't say anything about a risk of pseudotumor cerebri or IIH with Mirena; correct?
A. No.
Q. Am I correct?
A. Yes.
Q. And then at the end of this column here, it says:
"The LNG IUD is a totally reversible, extremely effective contraceptive that offers significant noncontraceptive benefits, including reduced menstrual blood loss and decreased dysmenorrhea. Its reduction of menstrual effects make it a better choice for nulliparous women

Page 65

than copper IUDs."
Do you see that?
A. Yes.
Q. And that's an accurate statement; right?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. And the reduction of menstrual effects make it a better choice for nulliparous women than copper IUDs, but it also is a better option for other women with menstrual disorders or -- or just lifestyle reasons than copper IUDs; right?
MS. NATALE: Object to form.
THE WITNESS: Well, I don't mean here to -- we don't mean here to imply that -- that Mirena is always a better choice than a copper IUD. For some women, copper would be better, and for some women, Mirena.
BY MS. COOK:
Q. It's good to have both options available; right?
A. Yes.
Q. And what I was reacting to was the fact that it says it's a better choice for nulliparous women than copper IUDs, but, in fact, it's a better

choice for many women; right?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. When Mirena became available in the United States, is it accurate to say that you were enthusiastic about having an extremely effective contraceptive option available to your patients?
A. Yes.
Q. Did you believe that Mirena was an important innovation in women's healthcare?
A. Yes.
Q. And do you still believe that today?
A. Yes.
Q. In the 17 years or so since Mirena came on the U.S. market, you've continue to write and speak about the benefits and safety of Mirena; correct?
A. Yes.
Q. You've also written about the noncontraceptive benefits of Mirena; correct?
A. Yes.
Q. You've also studied the use of Mirena in women who had no children or nulliparous women; correct?
A. Yes.



Q. Is that the population, you found in your research that Mirena was safe and extremely efficacious in the nulliparous population; correct?
A. Yes.
Q. And have you recommended for years that Mirena be offered to nulliparous women based on your own study findings and experience?
A. Yes. I felt that physicians had become primarily -- because of ill-founded concerns about infection, had become much too conservative in offering intrauterine contraception to nulliparous women and younger women.
Q. You have trained medical students that Mirena is a safe and effective option for women; correct?
MS. NATALE: Object to form. Asked and answered.
THE WITNESS: Yes.
BY MS. COOK:
Q. Would you agree that the safety and efficacy of Mirena is well-established in the medical community?
A. Yes.
Q. Even today, LNG-containing IUDs, including Mirena, are among the safest and most cost effective



contraceptive methods; correct?
A. Yes.
MS. NATALE: Object to form.
BY MS. COOK:
Q. And have you spoken publicly about the use of Mirena by various of your own family members?
A. Yes.
Q. Did you personally recommend Mirena to your family members?
A. Yes.
Q. Did you ever advise any of your family members to remove Mirena other than because of the amount of time that had passed or because of their own lifestyle choices?
A. Yes.
Q. And what was the reason?
A. Development of acne.
Q. When was that?
A. Several years ago. I don't recall precisely.
Q. Is it true that you have personally known about the potential development of acne by Mirena patients for a long time now?
A. Yes.
Q. And the acne -- well, the family member who



removed the Mirena because of acne, is that something you're planning on testifying about in this litigation?
A. No.
Q. Then I won't get into the details.
Have you also written that Mirena is highly effective and safer than oral contraceptive pills because it doesn't contain estrogen that can provoke a deep vein thrombosis?
A. Yes. Particularly for the women we earlier discussed.
Q. There are women who use combined oral contraceptives who develop DVTs who don't have traditional risk factors; right?
A. Yes. But the risk is dramatically higher for women who have these genetic abnormalities.
Q. The risk of DVTs with combined oral contraceptive, that's been well-established for decades; correct?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. There have been many studies involve DVTs with -- let's call them COCs for ease; right?
A. Yes.

Page 70

Q. And the studies that have established that there's a risk of DVTs with COCs, many of them have been well conducted and the results have been replicated; right?
A. This is a complex issue that provides DVT and COCs. A good example of the failure of clinical trials to detect relatively unusual events, like deep vein thrombosis in pill users or pseudotumor cerebri in levonorgestrel users; that is, that the event is rare enough that you wouldn't expect to see it in a typical trial that results -- Phase III trial that results in approval of a method, which usually involves about 2,000 subjects.
And whether the -- and then the details of whether or not the women who are most likely to develop the DVT, for example, have particular characteristics, like Factor V Leiden, or other disorders of clot dissolution take even longer to define. So this is an area that is complex and slow to develop.
Q. The --
A. So what I'm saying is some of the studies were better than others.
Q. Of course.
A. And they have become increasingly detailed

Page 71

over time.
Q. And at this point, sitting here today, the risk of DVTs with COCs has been well-established by multiple epidemiology studies; correct?
A. Yes.
Q. And those studies have been replicated; correct?
A. Yes.
Q. And there's no debate in the medical community that there is a risk of DVTs with COCs; correct?
MS. NATALE: Object to form.
THE WITNESS: The debate remaining is how much of it is dose related, which progestins are -- increase the risk. So there's still lots of room for debate.
But in a general way, whether combined oral contraceptives at relatively high doses are associated with a DVT is, I agree, well-established. But there's still lots of discussion about that issue, and it's been going on, as you observed, for 40 years.
BY MS. COOK:
Q. No contraceptive is 100 percent safe; correct?

Page 72

A. Right. No drug is 100 percent safe.
Q. It's important for clinicians to consider the comparative risk profile when they're looking at contraceptive options; correct?
A. Yes.
Q. You have published on the costs of unplanned pregnancy, both in terms of cost to the mother and child, but also to the public health; correct?
A. Yes.
Q. And you've published on the cost savings of effective contraception like Mirena; correct?
A. Yes.
Q. Do you currently -- well, withdrawn.
Can you describe your current clinical practice in terms of how many patients you see, how often, what type of patients?
A. Yes. I work in the family planning clinic at San Francisco General Hospital a few times a month and see patients who are terminating pregnancies or wanting to avoid pregnancy, that is, seeking contraception and/or. And that's the extent of my current practice.
Q. How many -- you said a few --
A. In addition, I see patients who are

Page 73

participating in clinical trials, and we've discussed those trials. And the current trials -- trial I'm conducting currently are listed in my CV.
Q. How -- you said you see the patients at the clinic at San Francisco General a few times a month.
Is it three days a month, or can you quantify about how often you do that?
A. Sometimes it's once a week. Sometimes it's twice a month. It depends on the scheduling.
Q. In your clinical practice at the family planning clinic at San Francisco General, is Mirena one of the contraceptive options that you use with your patients?
A. Yes.
Q. What other contraception options do you use with your patients in your current clinical practice?
A. We offer all of the contraceptives, oral -- combined oral contraceptives, implants, copper IUDs, Mirena, sterilization for women who want that.
Q. Do you offer other LNG IUDs other than Mirena in your current clinical practice?
A. Yes. Both Liletta and Mirena. We offer both.
Q. What about Skyla and Kyleena, do you use

those with your patients currently?
A. Yes. It depends also what's on the formulary at the hospital.
Q. Do you know what's on the formulary currently?
A. I'm not sure that Kyleena is. Skyla and Mirena and Liletta and several oral contraceptives, and Nexplanon, certainly are.
Q. How does your current use of Mirena compare to Liletta or Skyla? I'm leaving out Kyleena because it might not be on the formulary.
A. You mean what proportions of women receive --
Q. Or how do you decide which patients to use them in?
MS. NATALE: Object to form.
THE WITNESS: Patients are given information about each of the IUDs, including copper T 380A, and make a decision about that. And my impression is the decision is often based on duration of action despite the fact that we're happy to remove an intrauterine device whenever somebody is dissatisfied with the side effects or wants to become pregnant.
For someone who is -- has a history, for



example, of severe acne and has been -- found that the acne was better when she was taking oral contraceptive pills, in situations like that, then we might provide special counseling. But most -- most women can use most methods safely and successfully.
What I'm saying is that patient choice is an important component, but there are patients who -- for whom we give special advice.
BY MS. COOK:
Q. Do you still treat patients at the Bixby Center?
MS. NATALE: Object to form.
THE WITNESS: No. The Bixby Center is not a clinic. It's a research and training organization.
BY MS. COOK:
Q. Okay. And the Bixby Center trains residents, for example; right?
A. Yes.
Q. Does the Bixby Center still train residents today about the use of Mirena?
A. Yes.
MS. NATALE: Object to form. Asked and answered.



BY MS. COOK:
Q. Do you know if the Bixby Center still today recommends Mirena for use with most patients?
MS. NATALE: Object to form.
THE WITNESS: We have a program called "Beyond the Pill" that's a national program, and training providers and educating patients about all kinds of contraception and Mirena is certainly included.
BY MS. COOK:
Q. The "Beyond the Pill" program actually recommends the use of long-acting reversible contraceptives including Mirena and implants; right?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. Are there certain patients --
A. It's example, I should say, of our collaboration -- close collaboration with Planned Parenthood.
Q. Are there certain patients for whom you do not recommend Mirena today?
A. Yes.
Q. Who are they?
A. Well, I mentioned patients who have



histories or concerns about androgenic effects and acne, hirsutism, acanthosis nigricans, skin-coloring issues. Darkening of the skin when they were pregnant, for example. Headaches. So women who have had symptoms that suggest androgen sensitivity would be an example.
Q. Okay. So --
A. Another example would be women who -- for whom it's really important to have regular menses. And on the whole, about 20 percent of Mirena users would not have periods at all. So if women express that kind of concern, they might not be a good candidate.
And all of this information would be included in the counseling that's provided through the "Beyond the Pill" effort and in our own family planning clinic at San Francisco General Hospital.
Q. The patients who you mentioned that you don't recommend Mirena to because of their history -- history or concerns about androgenic effects, I wrote down acne, hirsutism, skin color issues, and headaches.
Were there any other androgen side effects that you --
A. Well, we would be likely to mention the

Page 78

things that are in the package insert, and we've mentioned that list already. Androgenic side effects.
Q. Breast pain, mood changes, nausea, or depression, those were the other ones you mentioned in your 2002 article; is that what you're referring to?
A. Yes. Those are -- probably summarize what's in the package insert.
Q. Are there any other androgenic side effects that patients -- that you would not recommend Mirena to patients who have a history of those or concerns about them?
MS. NATALE: Object to form.
THE WITNESS: Not in a general way.
BY MS. COOK:
Q. Now, with those --
A. This is information that we give to all patients.
Q. Would you recommend Liletta or any other LNG IUDs to those patients with a history or concerns about androgenic side effects?
A. No.
Q. Which COCs do you currently prescribe?
A. In the case of oral contraceptives, it

Page 79

depends largely what is on the hospital formulary, which is an issue of cost. In the past I've prescribed every -- almost every oral contraceptive.
Currently, I think that we are using desogestrel-based oral contraceptives and -- as well as norethindrone-based oral contraceptives. But if a woman requests a particular oral contraceptive, we try to make that available, depending on the insurance she has.
Q. Are you currently using any LNG-containing COCs with your patients?
A. We're still using emergency contraceptives. Making -- and I think it's true of most practitioners -- a gradual switch to ulipristal acetate from levonorgestrel. But we're still providing levonorgestrel emergency contraceptive. Levonorgestrel daily pills, no, we're not using those.
Q. The desogestrel pills that you currently prescribe, that progestin did not become available until sometime in the '90s?
A. I bet that's right. When it was first introduced in the United States.
Q. Back in the 1980s and the early 1990s, LNG-containing COCs were one of the only COC options

Page 80

out there; right?
A. Initially norethindrone, norethindrone acetate, levonorgestrel accounted for most of the oral contraceptives, certainly in the '60s, '70s.
Q. Do you know whether LNG-containing oral contraceptives were widely used back in the 1980s?
A. Yes. They were widely used all around the world.
Q. LNG-containing COCs have been long used as a comparator in clinical studies, for example, because of established efficacy and safety; correct?
A. Yes. And because they've been used for a long time. So there's a -- it's had enough users to use them as a comparison or control group in trials.
Q. Would you agree that the safety and efficacy of LNG-containing contraceptives is well-established?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. I believe in your report you say that you moved away from LNG-containing COCs because of androgenic side effects.
A. Yes.
Q. When did you do that?

Page 81

A. At the time that less androgenic progestins became available. Norgestimate, desogestrel are the prime examples in the United States.
Q. Are the androgenic side effects that you are referring to there the ones that we discussed earlier, the acne, hirsutism, breast pain, skin color issues, et cetera?
A. Yes. And hepatic effects as well, lipoprotein changes.
Q. With the patients in whom you recommend Mirena currently or just in your clinical practice since it's been available, do you do any tests or screening measures before recommending Mirena?
A. You don't mean medical history, which we've already discussed? You mean actually doing a laboratory determination of something?
Q. Yes.
A. No.
Q. So you take --
A. We routinely -- we don't wait for the results, but we routinely do a determination of gonorrhea and chlamydia, and we have written about how waiting for the results is not necessary. But we don't do any -- any blood tests.
And we've recommended in the past that you

not do determinations of serum lipoproteins to see whether or not the person would likely be very sensitive to levonorgestrel and might develop an adverse lipid profile. I've certainly not recommended.

The other recommendation that we recommended against testing is to do one of the tests for abnormality of clotting. We should rely on family history.

Q. When you talk about the family history of clotting, you're referencing before deciding on a contraceptive option generally, not Mirena specifically; right?

A. Yes. Yes. As an example of a test you don't need to do.

Q. Do you do an eye exam on patients before recommending Mirena?

A. No.

Q. Are there -- well, withdrawn.

Tell me when you need a break. I know we've been going for a while.

MS. COOK: Christina, do you need a break?

MS. NATALE: Can we just take a quick biological break? Thank you.

MS. COOK: Let's take a quick break.



THE VIDEOGRAPHER: This marks the end of Disk No. 1. We're off the record at 11:01 a.m.

(Recess taken, from 11:01 to 11:20.)

(Marked for identification purposes, Exhibit 6.)

THE VIDEOGRAPHER: We are back on the record. This marks the beginning of Disk No. 2. We -- the time is 11:20 a.m.

BY MS. COOK:

Q. Dr. Darney, we had talked about your moving away from LNG-containing COCs when other less androgenic progestins became available.

Do you recall those questions?

A. Yes.

Q. When was it that the other less androgenic progestins became available? Do you recall?

A. In the '80s.

Q. In the 1980s?

A. M-hm.

Q. Which ones are those?

A. Well, I would have to look to see when norgestimate was first marketed. Probably late '80s. Desogestrel was around the same time. And I, prior to that, used levonorgestrel or norethindrone, norethindrone acetate pills.



I could tell by looking at when -- my CV, when clinical trials were conducted, because they would have been marketed shortly after.

Q. Well, I looked to see when desogestrel was approved in the U.S., and that was in 1992.

Does that ring a bell?

A. Yeah. I would say late '80s, early '90s.

Q. That's when you started using other nonlevonorgestrel COCs?

A. Yes.

Q. Okay.

A. And I don't mean that I completely abandoned levonorgestrel pills, because formulary and cost in the state family planning program and at our hospital were important considerations. And as I recall, when Wyeth marketed levonorgestrel pills, they had a real cost advantage.

Q. So you continued using levonorgestrel-containing COCs in the 1990s and 2000s; you just had other options available to you as well; is that accurate?

A. Yes. And I would have -- I would have -- other things being equal preferentially, used less androgenic progestin.

Q. Okay. I would like to look at your book at



this point, which you have in front of you, "A Clinical Guide for Contraception." And I marked as Exhibit 6 the Chapter 7 on intrauterine contraception which starts on page 238. So if you could just turn there.

Well, actually, first, let me ask you. The purpose of this book that you published is to educate clinicians on various contraceptive options available; is that accurate?

A. Yes.

Q. And if you -- you can look back to the publication page if you want, but there's a copyright from 2005 and then another one from 2011.

Do you see that?

A. Yes. This was about the fifth edition, I think. Yes, it is.

Q. So the fifth edition was published in 2011? That's the latest copyright there at least.

A. Yes.

Q. And that updated information that was available up to 2011?

A. Yes.

Q. Okay. Now, if you can turn back to the intrauterine contraceptive chapter. I wanted to ask you a few questions about it. And starting with

Page 86

page 257.
A. I have 257 here.
Q. 257 is the section on IUD insertion, and then there's a subsection for patient selection there.
A. Yes.
Q. And the section on patient selection discusses considerations in selecting appropriate candidates for different IUDs; right?
A. Yes.
Q. If you turn the page to page 258, at the top -- the top paragraph there, midway down it says:
"Most women are good candidates for the IUD."
Correct?
A. Yes.
Q. And that was a true statement back in -- as recently as 2011; correct?
A. Yes.
Q. Do you agree with that statement today, even including Mirena?
A. Yes.
Q. And it goes on to talk about various types of women who might not be appropriate for IUDs, including women with abnormal uterine anatomy or

Page 87

immunosuppressed patients.
Do you see that?
A. Yes.
Q. And then on the next page, it has a summary. It says:
"Summary. IUD use and medical conditions."
Do you see that?
A. Yes.
Q. And it has a list of conditions to consider when deciding whether to use IUDs; right?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. And this list of medical conditions does not talk about any androgenic conditions; right?
A. No.
Q. Am I right?
A. Yes. It doesn't mention specifically androgenic conditions.
Q. Then there's a list of key points in patient --
A. This is an -- about IUDs in general. All IUDs.
Q. Including Mirena; right?

Page 88

A. Yes.
Q. Okay. And then there's a list of key points in patient counseling.
Do you see that?
A. Yes.
Q. And that's relating to patient counseling on IUDs; right?
A. Yes.
Q. And there's nothing in the key points in patient counseling about androgenic side effects; correct?
A. That's correct.
Q. Okay. Now, there is an additional -- there's additional information about side effects. If you turn to page 252 and 253 of that same chapter on IUDs, do you see the section on side effects?
A. Yes, I do.
Q. And on the left side, there's a discussion of menstrual bleeding. And -- and midway through that -- that second paragraph, it says:
"Women with prolonged heavy menstrual bleeding or significant dysmenorrhea may not be able to tolerate copper IUDs, but may benefit from a progestin IUD."
And that would be a reference to Mirena;

Page 89

correct?
A. That's right.
Q. And then on the right-hand side, at the top of the page 253, it says:
"Sufficient progestin reaches the systemic circulation from the levonorgestrel-containing IUS so that androgenic side effects, such as acne and hirsutism, can occur. However, in one study no change could be detected in the circulating levels of sex hormone binding globulin and, therefore, marked clinical effects are unlikely."
Do you see that sentence?
A. Yes.
Q. And that was a true statement when you wrote it; right?
A. Yes. And I'm taking time to look at the reference here because I cite other references that show that change does occur in sex hormone binding globulin, and that is that it's depressed. So this is a 1999 citation from Finnish colleagues.
Q. The statement that I read about -- well, the statement that I read is what you published in your book including as late as 2011; correct?

A. Yes.
Q. And then it goes on to say:
"Occasionally, a patient will experience facial androgenic skin changes or breast tenderness."
Correct?
A. Yes. And we talked about those previously.
Q. Yes. It says:
"There are no significant metabolic effects."
And that's true; correct?
MS. NATALE: Object to form.
THE WITNESS: A distinction we would need to make here is that these are, in general, and -- in studies done in healthy women.
BY MS. COOK:
Q. And this is what you wrote in your book for the clinicians; right?
A. Yes.
Q. And certainly it would be important to include clinically relevant information for your fellow clinicians who are looking to your book; right?
A. I don't mean to suggest that -- though, that -- although there are a lot of references here,



that this is an exhaustive references -- list of references; that is, I didn't -- couldn't include everything that had been written at the time.
Q. What you included was what you believed to be the most clinically relevant for your fellow clinicians; right?
MS. NATALE: Object to form.
THE WITNESS: Yes. And we also based our references on journals that would be most likely to be available to people. Of course, written in English, published in the standard journals that we earlier recited.
BY MS. COOK:
Q. And putting aside what you cited as references, I'm actually just focusing on what you said in the text. And to the extent that there was something inaccurate, you have five editions to correct any inaccuracies; right, Doctor?
MS. NATALE: Object to form.
THE WITNESS: Yes. We tried to -- to add new information whenever it became available. But my point was that we -- we didn't cover absolutely everything.
BY MS. COOK:
Q. Yes. And the information you covered was



what you made a reasoned judgment would be the most clinically relevant; right?
A. Yes.
Q. And then if you go to about halfway through the page there, it says:
"Long-term use of the IUD is associated with impressive safety and lack of side effects."
Do you see that?
A. Yes.
Q. And that's a true statement; right?
A. Yes. But a statement -- just as an example of how knowledge evolves and how you can't be exhaustive is the statement about the incidences of breast cancer in users of the system was equivalent.
So we're citing a Finnish study that at the time was current. But you're probably aware of study just published in the New England Journal that showed an increase risk of breast cancer in users of Mirena and other progestin-only contraceptives.
So this is not relevant to our discussion here, but it provides a good example of how knowledge evolves. And if we wrote an additional edition, which Leon and I don't plan to do, we would include that paper in the New England Journal



because it's an important journal.
The point is that every possible reference is not included here and that knowledge is evolving all the time.
Q. Do you -- well, withdrawn.
Have you changed your use of Mirena and Liletta since the new study on breast cancer came out?
A. No.
Q. Have you warned your patients about the risk of breast cancer since that study came out?
A. We have, in our clinic, begun to mention that in this way: "You may have heard that," so that patients have that concern, they feel welcome to talk to us about it.
Q. So you say you may have heard that there was a study --
A. "You may have heard that a study showed that some contraceptives are associated with breast cancer."
"Yes, I heard that. And I'm really worried about that, and I would like to know more."
Then we would tell them more.
Q. And what would you tell them?
A. We'd tell them that the risk is small, and

Page 94

that we don't think that should have a -- unless you're really concerned about your own risk for breast cancer, that shouldn't be a primary issue in your decision about which contraceptive to use. By far more important is what you can use successfully, and the reason for using breast cancer -- reason for using contraception, excuse me, is not to avoid breast cancer; it's to avoid unintended pregnancy. But risk is small. It really doesn't change our practices in this clinic, but in case you've heard about it, we wanted to bring it up.

So the short answer is, yes, we have changed our practice in response to that paper because it was in the New England Journal. It was on the front page of the New York Times and The Chronicle. So we don't want patients to think we're hiding anything.

Q. You agree that there's nothing in this chapter, either in the discussion of side effects or anywhere else, about a risk of IIH or PTC with LNG IUDs; correct?

A. I agree.

Q. And has the patient's population -- let me ask you this.

You mentioned earlier the -- the

Page 95

information that your -- I guess you said it was the Bixby Center's "Beyond the Pill" project puts out for patients or healthcare providers.

Do you recall mentioning those resources?

A. I do.

Q. And we've looked at the resources, and there are a very impressive amount of them available; right?

A. Yes.

Q. And you would agree with me that none of the Bixby Center or "Beyond the Pill" resources that are available for clinicians or patients talks about a risk of IIH; correct?

A. That's correct.

Q. Now, has the patient population to whom you recommend Mirena changed over the years at all? Since you first started using it in 2000.

MS. NATALE: Object to form.

THE WITNESS: We've become more enthusiastic about offering it to younger, never-pregnant women. We've certainly become more enthusiastic about using it -- the date was 2000; right?

BY MS. COOK:

Q. (Nonverbal response.)

Page 96

A. -- about using it immediately post pregnancy termination, including post abortion and postpartum.

We've gradually become -- by "we," I mean, my colleagues right at San Francisco General Hospital. I'm not speaking for all physicians, and myself, about counseling women with regard to androgenic side effects; that is, concerns about hirsutism, acne, the other androgenic side effects that we mentioned.

We've more recently begun to offer Liletta and Skyla as alternatives. I think those are the changes I can think of now.

Q. You mentioned several populations that you have, since 2000, expanded the use of Mirena to.

Have there been any populations that you have cut back using Mirena with since 2000?

MS. NATALE: Object to form.

BY MS. COOK:

Q. As opposed to -- well, let me withdraw that question.

Are there any populations of women to whom you have stopped offering Mirena or another LNG IUD since 2000?

A. No.

Page 97

Q. And you mentioned that you have, over the years, started counseling patients more about androgenic side effects. And you're not intending to include that -- to include IIH or PTC within that, sir, are you?

MS. NATALE: Object to form.

THE WITNESS: No.

BY MS. COOK:

Q. And -- and even today you don't include IIH and PTC in your counseling to patients about Mirena; is that accurate?

MS. NATALE: Object to form.

THE WITNESS: Yes. In a general way, that's accurate.

BY MS. COOK:

Q. You say "in a general way, that's accurate."

Is there -- can you tell me if --

A. Well, for someone who we might have reason to believe, because -- take an extreme example, she has polycystic ovarian syndrome or looks like she might, our counseling would be different about androgenic side effects. I mean, that's a special case.

So in a general way, that pseudotumor

cerebri would not be mentioned. But for special patients, it would be.

Q. Let me see if I understand you.

In general, you do not counsel your patients about a potential risk of PTC or IIH with Mirena; correct?

A. Correct.

Q. And you said that there may be certain patients who you believe -- and you mentioned PCOS patients. And is it that you believe that they already have PTC or IIH?

MS. NATALE: Object to form.

BY MS. COOK:

Q. Is that why they're a specific case?

A. No. But they would be -- they demonstrate androgenic sensitivity, perhaps insulin resistance; would be more likely to develop it than the general -- certainly than the general population. And we would caution them that they should consider a different kind of contraception.

Q. Now, you have recommended Mirena for use in obese patients; correct?

A. Yes.

MS. NATALE: Object to form.

///



BY MS. COOK:

Q. And in your book -- and we can look at it --

A. But I'm not -- I'm not -- PCOS patients are often obese. And under obesity, I'm not including PCOS patients.

Q. Okay. Well, if you want to look at your book about this topic, you recommended the LNG-IUS for obese women as opposed to combined oral contraceptives.

Do you recall that that's in there, or do you want me to direct to the page?

A. Direct me to it.

Q. Okay. It's page 112.

A. It's because I want to look at it --

MS. COOK: And I'll -- let me just mark this chapter.

(Marked for identification purposes, Exhibit 7.)

THE WITNESS: There's some evidence that failure is greater of oral contraceptives in overweight women.

BY MS. COOK:

Q. So let's look at page 112, and you're talking about special considerations associated with



obesity there; correct?

A. Yes.

Q. And one of them is that obesity is an independent risk factor for venous thrombosis; right?

A. Yes.

Q. And you say:

"Progestin-only methods should receive serious consideration by use for obese women, especially the levonorgestrel intrauterine system."

Do you see that?

A. Yes.

Q. And at the time Mirena was the only LNG-IUS available; right?

A. That's correct.

Q. And then you also go on to talk about the modest evidence that hormonal contraceptive failure is increased in overweight women; right?

A. Yes.

Q. And do you continue to recommend the use of Mirena and other LNG-IUSs in obese patients today?

MS. NATALE: Object to form.

THE WITNESS: Yes. But not in those who are androgen sensitive.



BY MS. COOK:

Q. And you mentioned PCOS was one category of women who you believe are androgen sensitive.

Is there any other category of patients other than PCOS who you would put in the category of women who you might counsel about IIH or PTC?

A. Women who had real problems in the past with androgen excess. I mentioned there could be a range of dermatologic manifestations. Hirsutism, acanthosis nigricans, severe acne, all those would be signs of -- those can occur, but not always in PCOS women.

So insulin resistance; that is, late onset diabetes would be examples of women who have -- may have abnormal androgen metabolism and be sensitive to additional androgen.

Q. Do you recommend that women who have had androgenic side effects, like acne and the other ones that you mentioned before, not use an LNG-IUS?

A. We'd want to discuss it with them. This may make your -- for example, make your acne worse.

Q. So the concern that you express -- well, withdrawn.

The discussion that you have with patients who have had a history of androgenic side effects,

like acne, is not that they may specifically get IIH or PTC, it's that they may have androgenic side effects like they've had before, acne, and that it may be worse with an LNG-IUS; is that accurate?
MS. NATALE: Object to the form.
THE WITNESS: Yes.
BY MS. COOK:
Q. Certainly you're not saying that any patient who has had acne or another androgenic side effect, like hirsutism, is going to get PTC or IIH with Mirena?
A. Not going to get it, but the risk may be increased.
Q. And do you recommend that --
A. An example would be discussing birth control pills and DVT. That it's a rare event. You may have heard about it, and you deserve to know that the risk is slightly increased. And here are reasons you are at an increased risk or not at an increased risk. For example, you have no family history of deep vein thrombosis. So we think it's -- you could safely be exposed to this additional low dose of estrogen and don't need to worry about that slightly increased risk.
Q. Other than the patients who have PCOS and



have had androgenic effects, the ones that you mentioned earlier, including acne, are there any other patients to whom you inform about any risk of PTC or IIH with Mirena?
A. No. In a general way, it doesn't come up. Just to patients who have -- for whom we have some reason to believe that abnormal androgen metabolism could be an issue.
Q. Do you recommend that they not use an LNG-IUS if they've had prior androgenic effects, like acne?
MS. NATALE: Object to form. Asked and answered.
THE WITNESS: It depends on their degree of concern and how severe it was and how much it upset their lives.
BY MS. COOK:
Q. You don't formally screen patients for a PTC or IIH; correct?
A. No.
Q. Correct?
A. That's right.
Q. Okay. Are you -- well, have you ever written it down anywhere, in any of your books or in the Bixby -- Bixby Center's resources or anything



else, that patients who have had androgenic side effects or have PCOS should be counseled about PTC or IIH with Mirena?
MS. NATALE: Object to form.
THE WITNESS: No.
BY MS. COOK:
Q. When you counsel patients about PTC or IIH, these specific androgenic patients, is it about Mirena and every other LNG-IUS, including Liletta and Skyla?
A. It's about androgenic progestin-only methods in general.
Q. So you don't distinguish between Mirena and any other LNG-IUS in that counseling?
MS. NATALE: Object to form.
THE WITNESS: No.
BY MS. COOK:
Q. And do you -- when you say "progestin-only methods in general," do you counsel about the risk of PTC/IIH with progestin-only implants on the market that don't contain LNG?
A. No. The only implant that's available now is Nexplanon, 3-ketodesogestrel, so -- and it's a much less androgenic progestin.
Q. Are you aware of any organization, like



ACOG or Planned Parenthood, that recommends counseling of the risk of PTC or IIH with Mirena with any patients?
A. No.
Q. We talked about your recommendation in your book for using Mirena with obese patients. We looked at that a minute ago; right?
A. Yes.
MS. NATALE: Object to form.
BY MS. COOK:
Q. And have you changed that recommendation with regard to obese patients up until today?
MS. NATALE: Same objection.
THE WITNESS: No. But I mentioned that were we -- and we don't intend to -- to write another edition of this book, that we would seek more recent references and may or may not revise the book.
BY MS. COOK:
Q. But not with regard to the recommendation that Mirena is a good option for obese patients; right? That was a different issue regarding androgenic side effects in PCOS; right?
A. Yes. The key issue here is DVT and obesity.

Page 106

Q. Okay. And I'm --
A. Estrogen's effect on DVT. That's the issue here.
Q. And I'm changing subjects now, just to talk about obesity, just to be clear.
Now, you have recommended Mirena for use in obese patients, and you know that ACOG and other organizations have as well; right?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. And is it your understanding that clinicians have preferentially prescribed Mirena to obese women?
A. No. I'm not aware of data that show that Mirena is prescribed. I saw a paper by my colleague, Ann Burke and Bill Mosher, that looked at IUDs in general and lumped copper with levonorgestrel and showed a trend, but as I recall, it wasn't significant. Those are the data that I'm aware of.
It doesn't mean there aren't additional data. But I don't know that I would think that a -- if you saw a preferential prescribing for progestin-only contraceptives for obese women, it

Page 107

would be for injectables and for implants rather than IUDs.
(Marked for identification purposes, Exhibit 8.)
BY MS. COOK:
Q. All right. Well, let's look at the paper. Exhibit 8, is this the --
A. Yeah, that's the one.
Q. -- paper you're referencing?
A. Yes.
Q. And this one comes from Contraception, which is a journal that you read and find reliable; right?
A. Yes. That's how I ...
Q. And focusing first on just the results of the abstract for purposes of expediency here, it says that odds of IUD use are significantly higher among woman with BMI of over 35 kilograms, which is well into the obesity range; right?
MS. NATALE: Object to form.
THE WITNESS: Yes. But --
BY MS. COOK:
Q. Is that what it says?
A. But let's look at the -- I recall saying that, and then I turned to the data. And as I

Page 108

recall, for women in that range, the data weren't actually statistically significant.
Q. Okay.
A. The reason that I think that practitioners don't routinely insert IUDs for obese women is because it's simply difficult and awkward to do for both the patient and the clinician. So the issue here is that if you were concerned about obese women having an androgenic method, you -- in IUD systemic ...
Q. Okay. So I -- if you'll just focus on the question that I asked you.
The first question I asked you is whether I read correctly the sentence in the abstract and the results that said that the odds of IUD use were significantly higher among women with BMI of greater than 35 kilograms per square meter.
Do you see that?
A. Yes.
Q. And that it has the odds ratio of 1.64 and the confidence intervals, and it's statistically significant; right?
MS. NATALE: Object to form.
THE WITNESS: But as I recall, when you adjusted that in the table -- go through this

Page 109

complicated table again.
BY MS. COOK:
Q. Table 2?
A. I was looking at Table 3.
That the IUDs -- and include typically it would be a little more than a third would be copper IUDs, and I think there would be a preponderance of obese women receiving those --
Q. Well --
A. -- that the result was not statistically significant.
Q. Well, if you can just let me show you what I'm talking about.
Table 2, which is current contraceptive use among women ages 20 to 44 at risk of unintended pregnancy according to BMI and parity.
A. Yes.
Q. And if you look at the BMI under the IUD column, the -- as you go through the BMI ranges from under 25 to 25 to 30 to above 30, the percentage of IUD use goes up; right? Do you see that?
A. Well, yes. But this -- this is IUD and systemic hormonal methods together, right?
Q. No. The column for IUD is what I'm looking at. Systemic methods --

A. Methods, yes.
Q. -- is a different column. And if you look below the table, it says that systemic methods includes the combined pill, patch, and ring --
A. Yep, I see.
Q. -- et cetera. And that percentage goes down as BMI goes up; correct?
A. M-hm.
Q. Yes?
A. Yes.
Q. And then going down into the text of the paper in the IUD section, again, it states that odds of IUD use were significantly greater in women with BMI of 35 or more; right?
MS. NATALE: Object to form.
BY MS. COOK:
Q. Do you see that, Doctor?
A. Well, this is weighted percentage in Table 2. What we want to look at is odds ratios; right?
Q. And the odds ratio is in Section 310, where it says --
A. Yes.
Q. -- the adjusted odds ratio is 1.65.
That's the same one we looked at in the



abstract; right? Right?
A. Well, I have to take a moment because it's been a while since I looked at this table. But I recall seeing that when they adjusted the odds ratio, the unadjusted odds ratio wasn't significant for IUD. And it was not significant for women who were overweight, but it was just significant for women -- I see your point.
Just barely significant, 1.2 to 2.2, barely significant for women who were morbidly obese.
Q. The --
A. And I -- I would assert that that's significant. You can't determine whether levonorgestrel IUDs would be -- would account for that because copper IUDs are included.
So I thought -- my point is in the, I think they were too -- a little too -- and they don't claim that's -- that that's Mirena. They simply say it's IUDs.
Q. Well, let me ask --
A. And I assert that a copper IUD is more likely to be used in an obese woman than a shorter acting IUD with an androgenic progestin. So that's where we disagree.
Q. This -- well, first of all, you don't cite



this paper in your report; right?
A. No. I just happen to know about it.
Q. Okay. And this statement that you said, about copper IUD being more likely to be used in an obese woman, have you seen any data supporting that?
A. No. Because just the problem that Mosher and Lantos and Burke have here is the distinction -- and they probably use billing data -- isn't made between copper and levonorgestrel.
Q. They're using the National Survey of Family Growth, which is -- which is a source that you rely on in multiple publications; isn't that right, Doctor?
MS. NATALE: Object to form.
THE WITNESS: Yes. And when women are asked in that -- in that survey, it's whether you have an IUD or not, not what kind. Or it could be that -- no. As I recall, women are not asked what type of IUD they have. Just what kind of contraception are you using, IUD, pill, condoms. And the data are based on that kind of limited information.
BY MS. COOK:
Q. Have you seen data that indicates that 75 percent of IUD use is LNG-IUSs and 25 is copper?



A. I've seen marketing data that show that, yes.
Q. Have you seen published data by your colleagues showing that Mirena use is the vast majority -- or not Mirena use, but LNG-IUS use is the vast majority of IUD use?
A. I don't recall a specific paper, but I know that a majority of IUD use is Mirena. But if that were the case, and, say, a third of these IUDs were copper, then I'll bet that the significance here would be lost because it's just marginally significant.
Q. That's not something that you've looked at yourself, right, Doctor?
A. No.
Q. Okay. I'm correct, you haven't looked at it? Just to make the record clear.
A. Looked at what? Be specific again.
Q. Well, you haven't looked at the issue of what percentage of IUD use by obese women is copper versus LNG IUDs? That's just something you haven't studied; is that accurate?
A. That's correct. I haven't.
MS. COOK: Okay. Now, I'm going to mark another exhibit for you on this same issue.

Page 114

(Marked for identification purposes, Exhibit 9.)
BY MS. COOK:
Q. This is Exhibit 9. And this is an article where the lead author is Jessica Sanders, who you reference in your report; correct?
A. Yes.
Q. And you don't reference this article in your report, but have you seen it before, from AJOG?
A. Yes, I have. I recall seeing this. I don't specifically remember its -- its content. And it was ...
Q. This is looking at the -- it's a retrospective chart review of University of Utah patients who had an intrauterine device or contraceptive implant between 2004 and 2012.
Do you see that in the abstract?
A. Yes.
Q. And the results here say that the distribution among the types of those LARCs that were used at University of Utah, there was -- 75 percent was LNG IUDs, which at this period of time before 2012 would have been Mirena; correct?
A. Yes.
Q. And then copper was 13 percent, and then

Page 115

the arm implant was the rest.
Do you see those percentages?
A. Yes.
Q. And you don't have -- you haven't, at least in your report, expressed any opinion about those data; right?
A. No, I didn't include this publication. I had seen it, because I know the authors. And, in fact, I believe I coauthored a paper with Richard Lynen in a study done with Bayer about the cost effectiveness of various methods of contraception.
Q. Okay. So at least as it relates to what percentages of each of these LARCs was used in the Utah database, you don't have any reason to quibble with it today, correct? Not looking at the rest of the result of the study.
MS. NATALE: Object to form.
THE WITNESS: I have not read this recently. In order to quibble, I would have to read it thoroughly.
BY MS. COOK:
Q. Are you -- going back to this question of obesity -- you can put that aside for now. I don't want it to distract you. I'm done with that. Thank

Page 116

you, Doctor.
Going back to the discussion we were having about obese patients. Do you agree that Mirena has been shown to be safe and effective in obese patients?
A. Yes.
Q. Do you agree that Mirena has been shown to be safe and effective in overweight patients?
A. Yes.
Q. Are you aware that the CDC and the WHO both recommend IUDs as good options for obese patients?
A. Yes.
Q. And have you seen the recommendation from the American College, ACOG, that Mirena and other IUDs are good options for obese patients?
A. Yes.
Q. With your patients yourself, have you -- have you recommended Mirena for your own overweight and obese patients?
MS. NATALE: Object to form. Asked and answered.
THE WITNESS: Yes. With the exceptions I described previously.
BY MS. COOK:
Q. There was exceptions of PCOS patients and

Page 117

androgenic patients where you didn't -- my understanding is you didn't say that you didn't ever recommend them to use Mirena, but you have begun to give them additional information about androgenic side effects; is that accurate?
MS. NATALE: Objection. Form.
THE WITNESS: Yes. Counsel them about the fact that androgenic side effects could be worsened.
BY MS. COOK:
Q. Have you found Mirena to be a good option for your own overweight and obese patients?
MS. NATALE: Object to form.
THE WITNESS: My preference is actually for -- other things being equal, for implant contraception for obese patients.
BY MS. COOK:
Q. Why is that?
A. Because the trials in which I was one of the study centers, initial trials of Implanon, which was approved first in the United States, unlike Mirena, which was in -- used in Europe prior to its introduction in the United States, included obese women.
So we have evidence of efficacy, and we have good evidence that serum concentrations of

desogestrel are high enough in obese women to maintain efficacy.
In some clinical trials -- and I don't recall whether that was the case in our Mirena trials -- frankly, obese women with BMI of 35 were excluded. That wasn't the case in the Implanon trials.
Q. And you're not going to testify about any of the exclusions of obese women from the Mirena trials because, as you said, you don't remember whether they were included or not; right?
MS. NATALE: Object to form.
THE WITNESS: No, I don't intend to testify about -- about that particular trial.
BY MS. COOK:
Q. Your Liletta trial includes obese patients; right?
A. I don't recall specifically the -- the exclusion criteria.
Q. Well --
A. To answer precisely, I would have to look at the exclusion criteria again.
Q. Whether or not you prefer implants in your obese patients, you offer Mirena as an alternative; correct?



A. Yes.
Q. And you've used Mirena in patients who are overweight and obese in the past; correct?
MS. NATALE: Object to form. Asked and answered several times.
THE WITNESS: Certainly in overweight patients. You know, I can't recall specifically whether --
BY MS. COOK:
Q. In the overweight --
A. -- the extent to which I have personally used Mirena in obese patients. I mentioned already the -- my own exclusion criteria.
Q. In the overweight patients in whom you have used Mirena, have you had a good experience in terms of Mirena being safe and effective in those patients?
A. Yes.
Q. If you turn to page 6 of your expert report -- it's just the report -- the middle paragraph there talks about the historical use of the IUD in the U.S.; right?
A. Yes.
Q. And it says:
"Since 1995, the use of the IUD in



the U.S. has steadily climbed to about 10 percent of contraceptors, reflecting the popularity of the LNG-releasing system in America."
Right?
A. Yes.
Q. And, again, you don't say what percentage of the 10 percent is copper versus Mirena, but I think you testified earlier that Mirena is the majority of the IUDs for sure; right?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. And we looked at the University of Utah data.
Are you aware that the CDC also keeps data on LARC usage by state?
A. Yes.
Q. And have you looked to the BRFSS data about LARC use by state?
A. Not recently.
Q. Is that --
A. Nor do I know whether the CDC, like the National Survey of Family Growth, lumps both kind of IUDs together. I don't recall whether they can



distinguish the type of IUD.
Q. Well, and I am just talking about IUDs generally. In fact, I'm talking about LARCs generally.
MS. COOK: So let me just mark an exhibit real quick.
(Marked for identification purposes, Exhibit 10.)
BY MS. COOK:
Q. Exhibit 10 is a publication by the CDC in the Morbidity and Mortality Weekly Report about contraceptive use among nonpregnant and postpartum women at risk for unintended pregnancy.
Have you seen this before?
A. No, I don't recall seeing this specifically. I don't -- I know the MWR, but I don't regularly read it any longer.
Q. Okay.
A. But I recognize -- several of the authors are my friends and colleagues.
Q. So if you just -- I don't want to spend too much time on this, but I mainly wanted to see if you had seen it before and if you were familiar with the BRFSS, which is the survey that's referred to in the bottom right-hand paragraph of the first page.

A. Yes. I know of its existence.
Q. And then Table 1 has a table of usage of contraception in various states, including Utah, and it includes LARCs, which, if you look below the table, that is both intrauterine devices and implants.
Do you see this, Doctor?
A. Yes.
Q. And do you have any -- any basis to doubt the accuracy of this BRFSS survey data reported here?
MS. NATALE: Object to form.
THE WITNESS: No.
BY MS. COOK:
Q. All right. You can put that aside, Doctor.
A. The issue would be the one that I raised previously, that -- and that you pointed out, is that implants, copper IUDs, and levonorgestrel IUDs were all lumped together here. So we don't know what component is levonorgestrel.
Q. So, for example, if you look at Utah, the LARC usage is 18.9 percent. But as you say, you don't know exactly what percentage is Mirena because it includes intrauterine devices and implants, so you would have to look somewhere else for data



breaking that down; right?
A. Yes.
Q. Okay. So if you can put that aside.
We've talked a lot about your -- your publications about Mirena and your research about Mirena over the years; right?
A. Yes.
Q. Would you agree that today the overall risk-benefit profile of Mirena is positive?
MS. NATALE: Object to form.
BY MS. COOK:
Q. Doctor?
A. Yes.
Q. Would you agree that today the overall benefits of Mirena outweigh the overall risks for most patients?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. Would you agree that the consensus in the medical community is that the overall benefits of Mirena outweigh the potential risks?
MS. NATALE: Object to form.
THE WITNESS: Yes. And I would say that's true for all kinds of contraception.



BY MS. COOK:
Q. You would agree that Mirena -- well, withdrawn.
A. And that's principally because it's a lot riskier to be pregnant than it is to use any kind of contraceptive. So the more effective a contraceptive is, the greater the benefit relative to risk.
Q. And the risk of being pregnant are even higher in women who are overweight and especially obese; right?
A. Yes.
Q. The -- the risk of having some sort of irregular bleeding or menorrhagia or dysmenorrhea are higher in obese women too, correct, than normal weight women?
A. Particularly perimenopausal obese women.
Q. Do you believe that Mirena should be on the market and available to women in the U.S. today?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. In your own patient population, has the potential risk of IIH ever outweighed the benefit of Mirena in a single patient you've treated?



MS. NATALE: Object to form.
THE WITNESS: I think not, because of the counseling I and our clinic provide about androgenic effects.
BY MS. COOK:
Q. Has there ever been a patient for whom Mirena would have been a good option if not for a potential risk of PTC or IIH that you believe is present?
MS. NATALE: Object to form.
THE WITNESS: You mean a particular patient of mine?
BY MS. COOK:
Q. Yes.
A. I don't recall such a patient, no. Well, I should correct that by saying I have had patients who I believed, as we discussed previously, were at high risk of androgenic abnormalities to whom I didn't provide Mirena.
And I suppose, through conjecture, you can say, well, that patient might have developed IIH, pseudotumor cerebri, had I provided Mirena, but that didn't happen.
I certainly have not had a patient who developed that condition, nor have I had a

Page 126

participant in a clinical trial. Clinical trials, admittedly, include people who are healthy, and you'd be unlikely to enroll someone in a clinical trial who had PCOS. She wouldn't be ovulating regularly, for example, and so she wouldn't be eligible for the trial, because fertility is compromised.

Nor were you enroll someone in a trial who had really bad acne in a trial with levonorgestrel product. You would be too concerned they would discontinue.

So clinical trial subjects in that way are not representative. We're mentioned already that sometimes obese women are excluded from clinical trials. Less frequently more recently.

So I would not -- the point is I would not have expected to see anybody with pseudotumor cerebri because it's a rare condition. And the people I see are, in general, healthy and at low risk.

Q. The people that you see generally in your practice are healthy and at low risk?

A. Yes. And the people who participate in clinical trials are healthy and at low risk.

Q. Now, my question was whether there had ever

Page 127

been a patient for whom Mirena would have been a good option if not for the potential risk of PTC or IIH. And I want to put aside any other risk of androgenic side effect, like acne.

Is there any patient for whom a PTC or IIH risk has typically tipped the risk-benefit balance for Mirena?

MS. NATALE: Object to form. Asked and answered. Incomplete hypothetical. Calls for speculation.

THE WITNESS: Only in the context of androgen sensitivity.

BY MS. COOK:

Q. And how many patients have fallen into that category?

A. Do you mean how often -- I mentioned the patients I see are generally in good health. So if you want me to make an estimate, 1 in 30.

Q. When is it that you started telling your patients about the potential risk of PTC or IIH with Mirena, the specific patients who have androgenic side effect potential?

MS. NATALE: Object to form.

THE WITNESS: I believe I said that that's not part of our routine counseling.

Page 128

BY MS. COOK:

Q. Right. So let me ask --

A. It's a rare condition, and we wouldn't bring it up.

Q. Okay. So typically you don't bring up PTC or IIH with Mirena in most of your patients?

A. Or with contraceptive counseling, right. If somebody chooses Mirena, and as a healthy person, we don't say, Well you've made a choice. You could have this problem.

Q. Okay. Thank you for that clarification.

So the only time you would ever potentially bring up PTC or IIH with Mirena and all the other LNG IUDs is if someone had a history of PCOS or androgenic side effects, you would tell them that this is a potential risk with LNG IUDs; is that accurate?

A. Yes.

MS. NATALE: Object to form.

BY MS. COOK:

Q. When did you start doing that?

MS. NATALE: Object to form.

THE WITNESS: As we discussed earlier, my attention was first drawn to this issue toward the -- after the approval of Norplant and Jadelle

Page 129

and case reports of the occurrence with that delivery system for levonorgestrel --

BY MS. COOK:

Q. That was --

A. -- with regard to the -- after Norplant was marketed in the early '90s, 1992.

With regard to the same concern with Mirena, it would have been when I began to see patients who really couldn't tolerate Mirena because of androgenic side effects. That is who wanted to discontinue, because acne became worse or they developed skin changes or hair loss or hirsutism, androgenic reactions.

BY MS. COOK:

Q. And when was that with Mirena?

A. Mirena was introduced -- did we say in 2002 in the United States?

Q. 2001?

A. After several years of its use.

Q. Okay. So that was when you started warning people about androgenic side effects.

A. Yes.

Q. But when did you start specifically mentioning PTC or IIH with those patients who were specifically at risk for androgenic side effects?

Page 130

MS. NATALE: Object to form. Misstates testimony.
THE WITNESS: I don't recall specifically when -- when the first case reports came out.
BY MS. COOK:
Q. The first case reports with Mirena or with Norplant?
A. With Mirena.
Q. Are you talking about case reports of PTC or IIH with Mirena?
A. Yes.
Q. Okay. You mentioned Norplant and the case reports with Norplant; right?
A. Yes.
Q. And those were from the 1990s; right?
A. I believe so. I don't remember specifically.
Q. The only publications discussing any risk of PTC or IIH with Norplant were case reports or case series; right?
A. Yes.
Q. And --
A. And I heard about the issue before I saw the case reports from -- as I mentioned earlier in our discussion, from colleagues.

Page 131

Q. And what colleagues were those?
A. Irv Sivin is an example.
Q. Dr. Sivin at the Population Council?
A. Yes.
Q. Anyone else?
A. I don't recall discussing it with -- the issue with -- specifically with others. I met with Dan Mishell -- Sam Pasquale and Dan Mishell, because the three of us were the clinical centers for the Norplant trials.
MS. COOK: Okay. Well, let's look at what you said about Norplant in your book.
I'm marking as Exhibit 11 the chapter on Norplant.
BY MS. COOK:
Q. But you have the book in front you still right, sir?
(Marked for identification purposes, Exhibit 11.)
THE WITNESS: Yes. Thank you.
BY MS. COOK:
Q. So Exhibit 11 is the Chapter 5 on implant contraception from your book that was updated in 2011, which was long after Norplant was taken off the market in the U.S; right?

Page 132

A. Yes.
Q. Now, if you look at the first page of Chapter 5 --
A. So if you -- if you look --
Q. Can I --
A. Excuse me. I just wanted to say that if -- this, of course, because Norplant was off the market, and this is a practical handbook for clinicians, focuses on the desogestrel implant may say something about Norplant.
More specifically -- and I haven't done that. You could look at earlier editions prior to the marketing of the desogestrel implant, which would have focused on Norplant, I offer that explanation for why there's not much said about Norplant here.
Q. Well, there's a decent amount said. And -- I mean, if you look at the second page of the chapter, which is page 184, it talks about the implant systems, which includes Norplant and Jadelle here; right?
A. Yes.
Q. And that's because it was still used in other places in the world, and you expected that your book would be read by people in other places; right?

Page 133

A. Yes.
MS. NATALE: Object to form.
THE WITNESS: And Jadelle was approved, still is, in the United States.
BY MS. COOK:
Q. Okay. So in the -- on the first page here of this chapter, you say there are three major implant systems --
MS. NATALE: Sorry. I just -- he's just not on the same page. I'm sorry. I just want to -- if you're going to read it to him.
BY MS. COOK:
Q. The first page of the chapter.
A. Okay.
Q. You talk about the three major implant systems, and you go on to say that:
"Unfortunately, Norplant was withdrawn from the U.S. market in a business decision dictated by profit and liability, despite the fact that it provided an excellent option for contraception."
So you personally believed that Norplant was an excellent option for contraception even after

it was withdrawn in the United States; right?
A. Yes.
Q. And you -- the withdrawal of Norplant from the U.S. market, to the extent you know why it was withdrawn from your work for the company, would you agree that it was not withdrawn for anything having to do with PTC or IIH?
A. Yes.
Q. And going ahead to page 184 -- or, sorry, page 185 and 86 talks about absolute and relative contraindications for implants.
A. Yeah. Well, for Implanon specifically.
Q. So this is -- this section is for Implanon specifically?
A. Right.
Q. Okay.
A. And in most -- in most of the rest of this, as I said, we ignored Norplant because it was no longer available.
Q. Well, turn to page 194, please.
A. Got it.
Q. Page 194, right there in the middle paragraph, where it says -- you say:
"There are no significant metabolic differences comparing Implanon and Norplant."
A. Yes.
Q. That's accurate; right?
A. Well, it looks -- it's accurate with regard to the specific metabolic effects that are mentioned, lipoprotein, carbohydrate, thyroid and adrenaline, liver function, or clotting.
Q. If you go to page 195 --
A. It doesn't say that -- for example, that -- it mentions in the last sentence:
"Because of the lower androgenic characteristic of etonogestrel, Implanon does not cause a decrease in the levels of SHBG."
So that's what -- I think that's the sentence that's relevant to our discussion; that is, levonorgestrel is more androgenic than 3-ketodesogestrel. Etonogestrel. Same compound.
Q. Please turn to page 195, the next page. The side effects section.
A. Yes.
Q. This is discussing side effects with Norplant and other implants; right?
A. Well, this specifics side effects levonorgestrel implant users report these acne related -- these androgen-related side effects, including acne, and so on and so forth.
Q. Yes. You mentioned those androgenic side effects with levonorgestrel implants; correct?
A. Yes.
Q. And then in the third paragraph of the side effects section, you write that stroke and then thrombotic thrombocytopenic purpura, thrombocytopenia, and pseudotumor cerebri have been reported with Norplant.
Do you see that?
A. Yes.
Q. And that is a reference to case reports that reported PTC with Norplant back in the '90s?
A. Well, let's see what reference 94 is.
Q. 94 is the Wysowski article that you reference in this.
A. Yes. That would have been from the FDA's reporting system. Yep.
Q. And you reference that in this litigation in your report too, right?
A. Yes.
Q. Okay. So you say that PTC has been reported with Norplant, and then you go on to write:
"However, it is by no means established that the incidence of these problems is increased, and there is little reason to suspect a cause-and-effect relationship."
Do you see that?
A. Yes.
Q. And that was a true statement; correct?
A. Well, it was true at the time.
Q. Well, there's been no additional information that became available since 2011, or even 2005, about the risk of PTC with Norplant, has there?
A. I'm not aware of additional information that could shed more light whether there's -- could change little to some.
Q. So you -- just so I understand what you just said, you're not aware --
A. Of additional information.
Q. -- of additional -- just let me finish my sentence so we don't drive our court reporter crazy.
Do I understand you correctly to be saying that there's no additional information available today that was not available at the time of any of the publication of any edition of your book that would allow you to change this statement "there's

Page 138

little reason to suspect a cause-and-effect relationship between Norplant and PTC" to state there is some reason to suspect?
Is that an accurate statement of what you're saying?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. And today, in your expert report, are you opining that there is a cause-and-effect relationship between Norplant and PTC?
MS. NATALE: Object to form.
THE WITNESS: No. The expert report doesn't directly concern Norplant --
BY MS. COOK:
Q. Okay. So would you agree with me that --
A. -- which was never as widely used as Mirena.
Q. I apologize for interrupting you, Doctor. I really didn't mean to do that.
A. No problem.
Q. Would you agree with me that as of today, the evidence does not support a cause-and-effect relationship between Norplant and PTC or IIH?
A. Yes.

Page 139

Q. And your book -- and I don't want to go through all your publications, but your book and your various publications about Norplant, none of them say that there is a cause-and-effect relationship between Norplant and PTC or IIH; correct?
A. That's correct.
Q. The case reports that you reference in your expert report, the Wysowski case report and the other ones that you reference, those case reports don't support a cause-and-effect relationship between Norplant and IIH; correct?
A. Well, the case reports don't explore that possibility either in a physiologic or epidemiologic way. Though they can't confirm it or refute it.
Q. Case reports generally can't confirm or refute causation, is that what you're saying?
A. Yes.
Q. That is a good transition to talk to you about a different chapter in your book.
MS. NATALE: Shayna, I'm sorry, it doesn't matter if you want to move on to another line of questioning. I just wanted to let you know that it looks like lunch might be coming pretty soon if you're at a place that you wanted to switch gears.

Page 140

That's all.
MS. COOK: Well, let's see if we can get through this section, one more chapter of the book, which is the last chapter, Doctor.
THE WITNESS: Okay.
MS. COOK: And I'll mark this one just so we have a record of it.
(Marked for identification purposes, Exhibit 12.)
THE WITNESS: Interpreting epidemiologic reports?
BY MS. COOK:
Q. Yes. Doctor, Exhibit 12 is the final chapter of your book, which is a chapter that -- if you just look at the first paragraph:
"The purpose of this chapter is to help clinicians determine whether data derived from epidemiologic studies are clinically relevant and useful."
Right?
A. Yes.
Q. And it says that this is a guide to help clinicians make appropriate determinations regarding epidemiologic data and ultimately apply it properly in their clinical practice; right?

Page 141

A. Yes.
Q. And one of the things that you talk about is the hierarchy of epidemiologic studies which really is the hierarchy of scientific evidence, because it starts with randomized controlled trials; correct?
MS. NATALE: Object to the form.
THE WITNESS: Correct.
BY MS. COOK:
Q. And -- and that's the top of the hierarchy, is randomized controlled trials; right?
A. Yes.
Q. And you mentioned earlier that randomized controlled trials are not feasible for very rare side effects, and that's the case with PTC and Mirena; right?
A. That's right. And we mentioned other situations with regard to contraception in which that was the case. Deep vein thrombosis, for example.
Q. It would not be feasible or possible to do a randomized controlled trial with Mirena to see if there was a risk of PTC or IIH; correct? Correct, Doctor?
A. Well, it might be possible, but it would

be -- it would be complex and expensive.
Q. It would be complex and expensive. And you, as a clinical trial investigator, would, frankly, prefer that clinical trial funding go to other questions that aren't as rare, of side effects, is that an accurate statement?
MS. NATALE: Object to form.
THE WITNESS: Yes. That have a greater public health impact and affect more people.
BY MS. COOK:
Q. And when you say "a greater health" -- "public health impact and affect more people," you're referring to affecting more people than any potential risk of PTC with --
A. Like unintended pregnancy, for example.
MS. NATALE: Object to form.
THE WITNESS: It affects a lot of people.
BY MS. COOK:
Q. Okay. So below randomized controlled trials are observational studies. And you talk about cohort studies, case control studies, and cross-sectional studies.
Do you see that?
A. Yes.
Q. And the focusing specifically on the case



control studies, the advantages that you have here are that they're quick and inexpensive, but the disadvantages are that they are subject to biases and errors.
A. Yes.
Q. Is that accurate, Doctor?
A. Yes. Which, to a greater or lesser extent, can be controlled for.
Q. One of the issues that you talk about with respect to observational studies are confounders.
Do you see that on page 431?
A. Yes.
Q. And with respect to an issue -- well, withdrawn.
Failure to control for confounders can impact the reliability of case control studies; correct?
A. Yes.
Q. The other thing that you mention here are biases, which you define as "errors due to study design." And you talk through a number of potential biases; right?
A. Yes.
Q. And would you agree with me that if there are biases present in an epidemiology study, that



can impact the reliability of the results?
A. Yes.
Q. The final category that you refer to are case series and case reports which are at the bottom of the hierarchy of evidence; right?
A. Yes.
Q. And you -- I believe you testified earlier that case reports do not establish cause-and-effect relationships; right?
A. Yes.
Q. Would you agree that case reports are hypothesis-generating only?
MS. NATALE: Object to form.
THE WITNESS: That is their -- their principal use, to generate a hypothesis for epidemiologic, usually, investigation, particularly if they look at rare conditions.
BY MS. COOK:
Q. In order to reach a causation conclusion or conclude that there's a cause-and-effect relationship between a drug and an event, you would need something more than case reports to confirm that there's a causal relationship; right?
A. Generally speaking, yes.
Q. Now, review articles are not listed here in



the hierarchy of evidence, and is that because they're not actually evidence, per se, but they're a review of other evidence that is available? Is that accurate?
A. That's right. Here we're talking about -- about specific epidemiologic reports. We do mention meta-analysis, which is a kind of review article, in -- at least in terms of collecting -- using studies that have been previously conducted.
Q. Well, a meta-analysis actually takes data and does something with it, whereas there are review articles that simply report --
A. Simply describe --
Q. Yes.
A. -- what's been previously done, yes.
Q. And there's a difference between that; right?
A. Yes.
Q. And with respect to the confounding issue, would you agree that if you don't adequately control for known confounders, then a study can lead to false association?
A. Yes.
Q. And if you don't -- if a study has one or more biases, that can also lead to false

associations?
A. That's possible, yes.
Q. And I see that lunch is being brought in, but I promise I'll finish this section in just a couple of minutes, and we can -- we can break.
If you turn to page 433, the "Important Points" section --
A. I have it here.
Q. And this is the points that you want to highlight for clinicians when they're reviewing epidemiology studies to see whether there's a true association; right?
A. Yes.
Q. And the -- the first paragraph states:
"Epidemiologic studies do not prove causation; they identify associations between diseases and certain factors."
And that's a true statement; right, Doctor?
A. Yes.
Q. What's the difference between association and causation?
A. Association refers usually to correlation and the correlation coefficients that show that there's a strong or weaker association. For example, little risk in the range of one to two,


you'll recall the weight -- our previous discussion about body weight determining -- association with intrauterine device use was less than two. So a weak association.
So those -- you wouldn't, from that study, assume that the IUDs cause obesity, but you asserted that they were associated with obesity. That's the point we're making here.
Q. Okay. So causation means that --
A. Causation would require biologic plausibility and a strong association that would get you closer to causation.
And you pointed out previously, ultimately a randomized clinical trial, which is often not -- usually not possible with rare events, such as pseudotumor -- pseudotumor cerebri, and even with something more common, like with deep vein thrombosis, unlikely to be exposed to a clinical trial.
Q. Okay. So you mention criteria that the conclusion that an epidemiologic finding is clinically real. One of them is the strength of the association.
So that's just referring to the relative risk; right?


A. Yes.
Q. The second one is consistency, uniformity, and agreement among studies. And you would agree --
A. Yes. And that's where -- that's where reviews can be helpful. Someone who knows about the topic, collects them all, and looks for comments on consistency and uniformity.
Q. But ultimately, if a review is just collecting case reports and not epidemiologic studies, just because it's a risk, collecting them doesn't transform it into a higher level of evidence, does it?
A. Not necessarily.
Q. The consistency, uniformity, and agreement prong, you would agree that you look for replication of epidemiologic findings in order to see if they're clinically real; right?
A. Yes.
Q. And here you said you looked for agreement among many studies. So just having one study alone would not be strong evidence that there's a causative relationship between a drug and an effect; right?
MS. NATALE: Object to form.
THE WITNESS: The more -- that's what we


mean by consistency and agreement among many studies. The more studies, the better.
Of course, the rarer the event, the more difficult it is to have many studies.
BY MS. COOK:
Q. You reference a dose-response relationship, meaning that if there were a true association, you would see a higher risk with a higher dose, as you say here; right?
MS. NATALE: Object to form.
THE WITNESS: Yes. That usually supports an argument along with biological plausibility.
BY MS. COOK:
Q. And the biologically -- biological plausibility that you state in your book, it says:
"Known mechanisms by which the exposure could cause or influence the disease."
Right?
A. Yes.
Q. And when you say "known mechanisms," you mean mechanisms that have actually been studied and established, not hypothetical mechanisms; correct?
MS. NATALE: Object to form.
THE WITNESS: Correct.

BY MS. COOK:
Q. And then, finally, you look for an appropriate temporal relationship. So in other words, you would look to see that there's actually drug exposure at the time that the disease is developed; correct?
A. Yes.
MS. COOK: Okay. I'm at a stopping point if you would like to break for lunch.
THE VIDEOGRAPHER: This marks the end of Disk No. 2. We're off the record at 12:53 p.m.
(Recess taken, from 12:53 to 1:49.)
THE VIDEOGRAPHER: We are back on the record. This marks the beginning of Disk No. 3 in the deposition of Philip D. Darney, M.D. The time is 1:49 p.m.
BY MS. COOK:
Q. Good afternoon, Dr. Darney.
A. Good afternoon.
Q. We have talked a lot about your extensive experience as an OB/GYN.
Would you say that's your main area of expertise, is OB/GYN?
MS. NATALE: Object to form.
THE WITNESS: I was trained, prior to being



an obstetrician/gynecologist, as a demographer epidemiologist at the Centers for Disease Control and at London School of Hygiene. So I actually worked as an epidemiologist and demographer for several years prior to completing my residency in obstetrics and gynecology. And I applied that skill to the evaluation of contraceptives.
My clinical practice has been as an obstetrician until about five years ago, obstetrician/gynecologist, and more recently limited to gynecology. My main academic interest, as we've discussed, has been in contraceptive development and evaluation.
(Discussion off the record.)
(Cup of water spilled.)
MS. NATALE: Let's go off the record.
MS. COOK: Yeah, let's go off record.
THE VIDEOGRAPHER: We are off the record. The time is 1:51.
(Recess taken, from 1:51 to 1:53.)
THE VIDEOGRAPHER: We are back on the record at 1:53 p.m.
BY MS. COOK:
Q. Doctor, I had asked if your main area of expertise is OB/GYN, and I believe that you



clarified for me that you also have background in epidemiology, and that recently your practice has been limited to gynecology.
Is that accurate?
MS. NATALE: Objective to form. Objection to form.
THE WITNESS: Yes. And that my research interest has been in contraceptive development and evaluation as a -- during my training as an obstetrician/gynecologist, I worked with my mentor, Ken Ryan, who was one of the world's leading reproductive endocrinologists.
BY MS. COOK:
Q. Have you ever studied IIH or PTC? And, again, when I say "IIH," I'm including PTC.
Have you ever studied it?
MS. NATALE: Object to form.
THE WITNESS: Only insofar as it has been implicated with the use of levonorgestrel. I haven't studied it as an independent condition from the point of view of an ophthalmologist or neurologist.
BY MS. COOK:
Q. Have you ever done any research on IIH in terms of studies, conducted any studies?



MS. NATALE: Object to form.
THE WITNESS: No, I have not -- you'll see from my CV that I have not published anything about pseudotumor cerebri.
BY MS. COOK:
Q. You've published more than 300 articles. And do any of them have to do with PTC or IIH?
A. No.
Q. Have you ever lectured or presented on IIH?
A. I may have mentioned it in a lecture as a possible androgenic adverse event associated with levonorgestrel, but I have not lectured on it as -- as a subject in isolation, only in passing. That's what I mean to say.
Q. So when you say you may have mentioned IIH in a lecture as a possible androgenic adverse event associated with levonorgestrel, sitting here today, can you remember for certain if you've ever mentioned IIH in any of your lectures?
A. Not specifically, no.
Q. Before being hired in this litigation, was your experience with IIH limited to reviewing the available literature related to IIH and LNG?
A. I had mentioned earlier that I had discussions -- you asked me for the names of people

with whom I had talked about the relationship. So in addition to seeing case reports, I had discussions.
Q. And the discussions that you had, we did mention that earlier, those were with people at the Population Council, like Dr. Sivin, right, and other investigators in the Norplant trials?
A. Yes.
Q. And those discussions were about any -- the potential risk of IIH with Norplant; correct?
A. Yes.
Q. We've already discussed your views on Norplant, so I won't go back there.
But have you had -- other than the discussions that you have had with people about whether there is a potential risk of IIH with Norplant and having reviewed Norplant-related literature, had you had any experience with IIH before being retained in this litigation?
A. You mean experience in addition to what we've already talked about, like making the diagnosis or -- I haven't published about it. I have not had a patient who had it. That I know of.
Q. Okay. That was going to be my next question.



You have never had a patient who has had IIH or PTC; is that your testimony?
A. Not that I'm aware of.
Q. You don't treat IIH in your practice; correct?
A. No.
Q. Correct?
A. That's correct. Yes.
Q. Have you ever diagnosed a patient with IIH?
A. No.
Q. If you had a patient that you suspected had IIH, you would defer them to another specialist; is that accurate?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. Have you ever spoken to a person with IIH?
A. Not that I'm aware of.
Q. Have you spoken to any of the plaintiffs in this litigation?
A. No.
Q. Do you have any colleagues or friends who are doctors who treat IIH?
A. I -- I imagine, although I haven't discussed it specifically with my colleagues in



ophthalmology, that they do.
Q. Have you discussed with any ophthalmology or neuro-ophthalmology specialist the issue of IIH and LNG?
A. You'd probably include neurologists in that list, and I don't recall that I have.
Q. Do you hold yourself out to your colleagues as an expert in IIH?
A. No.
Q. Do you hold yourself out to your patients as an expert in IIH?
A. No.
Q. Would you defer to neuro-ophthalmologists about issues related to the etiology or diagnosis or treatment of IIH?
MS. NATALE: Object to form.
THE WITNESS: Not necessarily, because, as you know from reading my report, I believe that pseudotumor cerebri is, for some patients, particularly women, related to androgen metabolism. And I think one reason that knowledge about this condition and its risk factors and etiology has been slow to develop is that there has not been good communication among the three groups of clinicians who could work together to resolve the issue; that



is neurologist, ophthalmologist, neuro-ophthalmologist in particular, and obstetrician/gynecologists.
That's why I don't think that selected reporting among -- just to give a concrete example -- Mirena or Norplant users would be an issue. I think it would be other way around, that a typical gynecologist would not be alert enough to this condition. Perhaps even if a patient said, "I have a headache," it's not -- it's not something the typical gynecologist would think of, pseudotumor cerebri, as a cause of that headache.
Or visual changes. The gynecologist, as you suggested, would say, "Well, you need to see a ophthalmologist. Go see this person."
But the two wouldn't communicate, wouldn't have said, "Well, you should know that the patient I am sending you, who has had visual changes, has been using levonorgestrel." That -- that wouldn't happen. We haven't communicated very well.
BY MS. COOK:
Q. And even as of today, when you're serving as an expert in this litigation, you have not taken efforts to improve communications with the neuro-ophthalmologists or ophthalmologists that you

Page 158

work with about the risk of IIH; correct?
MS. NATALE: Object to form.
THE WITNESS: That's not quite true, because we and several centers that we've organized around the country -- University of Utah is one of them -- for family planning training and family planning research, have organized complex contraceptive clinics.
So we've worked with our colleagues in neurology to care for patients together. So I think we're making some progress in that way.
BY MS. COOK:
Q. Just to be clear, Doctor, are you saying that in the family planning training efforts that you've been part of, that PTC or IIH has been mentioned with respect to LNG-containing contraceptives?
A. No, not necessarily. I am saying that we have emphasized and encouraged our family planning investigators -- we have 30 programs around the country at major medical schools -- to organize collaborative clinics for complex contraceptive issues.
And it may be that I hope that issues like pseudotumor cerebri, where there'd be an

Page 159

interaction -- possibility for interaction of neurologists -- excuse me -- and gynecologists, family planning specialists, are more prevalent than they used to be.
Q. Okay. But as of today, just to be clear, the issue of PTC has not been discussed in these family planning clinics that you're referring to. You're just saying it might be in the future.
Is that what you're saying?
A. I don't know if it has been or -- or hasn't been. I would assume because of the Valenzuela work at the University of Utah, it has been, for example.
Q. But you don't know; correct?
A. No.
Q. And in terms of communications with your own colleagues here at UCSF, I think that you said that you have not yet reached out to any of your colleagues over in the neurology or ophthalmology departments to talk about whether there's a PTC risk with Mirena; correct?
A. No, I haven't.
Q. Okay. Now, would you agree that the published medical literature out there on IIH states that it's a disease of unknown etiology?
MS. NATALE: Was there a question?

Page 160

MS. COOK: Yeah.
BY MS. COOK:
Q. Did you hear my question?
A. Yes.
Q. I said would you agree that the published medical literature on IIH states that it's a disease of unknown etiology?
A. Often summaries of it, of the topic, do. But I think there is more and more detailed exploration of its relationship to androgen metabolism, as we previously discussed.
Q. Well, you would agree that as of today, IIH is still a disease of unknown etiology?
MS. NATALE: Object to form.
THE WITNESS: I agree that we need to know more about it, yes.
BY MS. COOK:
Q. Okay. And you talk about there's more and more exploration of a relationship between PTC and androgen metabolism, but as of today, that's still a hypothetical mechanism that is yet to be proven; right?
MS. NATALE: Object to form.
THE WITNESS: As we discussed earlier, there are varying degrees of proof --

Page 161

BY MS. COOK:
Q. Well, it's still --
A. -- in Chapter 14.
Q. I apologize. I didn't mean to interrupt you.
A. So I think we're moving along, as we are in most areas of medicine, to a clearer understanding.
Q. We're moving towards a clearer understanding, but as we here today, January 2018, the idea that there's a connection between PTC and androgen mechanism is still a hypothesis; correct?
MS. NATALE: Object to form.
THE WITNESS: It's a hypothesis for which there's accumulating epidemiologic evidence and biological plausibility; that is, the process is dynamic. Like the process of counseling, for example. Not something -- as -- as physicians learn more, then their counseling approaches change over time, as we discussed earlier. So I don't say the same things about -- to patients about contraceptives now as I did in 2000.
BY MS. COOK:
Q. And we'll come back to that. The evidence that's out there with respect to the androgen mechanism that you cite in your report, we'll come

back to that in a bit. But right now I'm just talking about IIH generally.
Would you -- and, again, PTC/IIH, I'm using the same term, and I think we discussed that earlier.
A. Yes.
Q. Okay. Would you agree that obesity, excess weight, and recent weight gain are all well-established significant risk factors for IIH?
MS. NATALE: Object to form.
THE WITNESS: Yes. They're associated with -- with it.
BY MS. COOK:
Q. Would you agree that women of childbearing age are at risk -- at increased risk of IIH as well?
MS. NATALE: Object to form.
THE WITNESS: Yes. Much more at risk than men as a relationship to -- and in my view, all of those risk factors support the -- the -- what you call the androgen hypothesis.
BY MS. COOK:
Q. You would agree that overweight or obese women of childbearing age are the typical IIH patients; right?
MS. NATALE: Object to form.



THE WITNESS: Yes.
BY MS. COOK:
Q. Now, would you agree that the population at greatest risk of IIH overlaps with the population that uses Mirena?
A. Well, they are certainly childbearing-age women that use Mirena.
Q. And there are also many overweight or obese women or women with recent weight gain who use Mirena too; correct?
MS. NATALE: Object to form.
THE WITNESS: I'm not aware of any evidence about recent weight gain. And you and I have discussed and disputed the evidence about Mirena users being obese as compared to users of other long-acting contraceptives.
BY MS. COOK:
Q. Well, I guess that's -- that's really not my point, Doctor. I'm not actually talking about more Mirena users who are obese and overweight and have recent weight gain than people who use other contraceptives right now.
So we understand each other, I'm asking you are there people who use Mirena who are overweight or obese or have recently gained weight who are



women of childbearing age? You agree that those people are out there; right?
MS. NATALE: Object to form.
THE WITNESS: Oh, yes. And they are using other contraceptives, and many of them aren't contracepting at all.
BY MS. COOK:
Q. And some of them are using Mirena too; right?
A. No doubt.
Q. So just because a woman has IIH and also uses Mirena, that does not mean that Mirena actually caused her IIH; correct?
A. Not necessarily.
Q. You would expect some women using Mirena to have IIH just by coincidence, given that the populations overlap; correct?
MS. NATALE: Object to form.
THE WITNESS: Well, since it's a very unusual condition, you wouldn't expect many.
BY MS. COOK:
Q. IIH is an unusual condition, but you know that Mirena has been used by millions and millions of women around the world; right?
A. Yes.



Q. Given that excess weight, female gender, and childbearing age increase the risk of IIH, you would agree that those are potential confounders in any study seeking to assess the risk of IIH with Mirena; correct?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. And you would have to control for BMI, female gender, and age, in order to conclude that Mirena is associated with IIH; correct?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. Are you aware that there's specific diagnostic criteria that must be met to confirm IIH?
A. Yes.
Q. You may not be aware of the specific criteria in a way that you could name them off, but certainly not every patient who has a headache or papilledema has IIH; correct?
A. That's correct.
Q. Are you aware of any test or marker that identifies what has caused IIH in any given patient?
A. No.

Page 166

Q. Have you reviewed data on the efficacy of various treatments for IIH?
A. Yes.
Q. Are you aware that --
A. Well, I haven't reviewed clinical trials of Diamox, for example. I am aware that many patients with it respond to Diamox. Weight loss, so on.
Q. Are you aware that lumbar punctures can relieve the pressure from IIH and, therefore, the symptoms?
MS. NATALE: Objection to form.
THE WITNESS: Yes. That sometimes -- particularly for headache, that provides relief.
BY MS. COOK:
Q. You mentioned weight loss and Diamox, and both of those have been shown to improve IIH symptoms as well; correct?
A. Yes.
Q. Are you aware that IIH symptoms can wax and wane?
A. Yes.
Q. So given that lumbar punctures and weight loss and Diamox can improve symptoms of IIH, would you agree that you need to look to see whether a patient has received those treatments before

Page 167

concluding that any resolution of IIH is due to stopping a suspect drug?
MS. NATALE: Object to form.
THE WITNESS: I agree that it would be -- in making the determinations and in view of the issues we discussed in our review of Chapter 14, that the more information you have, the better.
BY MS. COOK:
Q. Well, in other words, if you're looking to see if there's an actual dechallenge from removing a drug with a woman who has IIH, you would want to see if it was confounded by another treatment that's been proven to be successful at treating IIH; correct?
A. Yes. That would be ideal.
Q. Now, if you'll turn to page --
A. Those treatments are helpful in some patients and not helpful in others. So in such situations, it's not uncommon to see more than one intervention. What I'm saying is that it's not -- Diamox doesn't make everybody better.
Q. And in those situations, if there's more than one intervention, you would not be able to tell what intervention it was that was making the difference for that patient, right?

Page 168

MS. NATALE: Object to form.
THE WITNESS: You could have help by the temporal relationship, as we discussed earlier. So there would be -- the more information you have the better. That's right.
But that's rarely the situation in epidemiologic studies. You have to work with what you have.
BY MS. COOK:
Q. Or even if you're looking at one specific patient, if the patient had a suspect drug withdrawn at the same time that they received a lumbar puncture and went on Diamox, and then their symptoms improved, you would have no way of knowing what was responsible for the improvement of the symptoms; correct?
A. Correct.
Q. If you look at page 23 of your report, I want to talk to you about the Valenzuela publication.
A. 23?
Q. 23.
A. I have it here.
(Marked for identification purposes, Exhibit 13.)

Page 169

BY MS. COOK:
Q. And you are writing some notes over there, Doctor.
What is it that you're writing down?
A. I'm just writing some -- what occurs to me is my observations remembering the Valenzuela paper.
Q. And what did you write down?
A. I wrote down "Utah has high use."
Remember we observed the use of long-acting contraception in that paper we looked at earlier, about -- that Utah had a particularly ...
Q. You're talking about the Boulet paper that talked about the CDC data?
A. Yes.
Q. And you remember that there was about 18 percent of LARC use?
A. That's what I'm referring to, yes.
Q. And you also remember we looked at the Sanders paper that looked at the Utah system and found that 75 percent of LARC use was Mirena.
Do you remember that?
MS. NATALE: Object to form.
BY MS. COOK:
Q. We can look back at it. But do you remember us looking at that?

Page 170

A. Yeah.
Q. Okay. So since you raised this "high use in Utah" issue, can you look at page 194 of the publication which you have over there.
A. Valenzuela?
Q. Yes. Page 194, just above Table 1 is where they talk about how they identified the exposure and the controls.
And just so we are clear here, what -- what the -- what the authors did in this study was they compared Mirena use in IIH cases to Mirena use in the controls.
Is that -- is that basically what happened here?
A. Yes.
Q. Okay. So the way that they calculated their control group exposure is that they looked at the University of Utah electronic billing database, and they identified -- out of the women who did not have PTC, they said 4408 of them underwent LNG-IUS insertion in this five-year period.
Do you see that?
A. Yes.
Q. So in other words, they looked at the billing database for the University of Utah system

Page 171

to see who had LNG-IUS insertions; right?
A. Yes.
Q. And I have a calculator on my phone, but you would look at the percentage of Mirena use in the exposure group by dividing 4408 divided by 220,904; right?
A. Yes.
Q. And we can calculate it, or I can just tell you that's about 2 percent.
Does that sound about right?
A. That's what they say here.
MS. NATALE: Object to form.
BY MS. COOK:
Q. Okay. So --
A. .2 percent.
Q. Well, that's the prevalence of PTC.
So if you're looking at the control group, so the people without PTC -- do you want to use my calculator?
A. No.
Q. If you're looking for the percentage of people using Mirena in the control group, you would divide 4408 divided by 220,904; right?
MS. NATALE: Object to form.
THE WITNESS: Yes.

Page 172

BY MS. COOK:
Q. And that's about 2 percent; right?
A. Yep.
Q. And so first of all, the identification of Mirena users by looking just at the University of Utah electronic billing database, you'll agree with me that that would not include women who had their Mirena placed outside of the university system, for example, in Planned Parenthood; correct?
A. Right. It wouldn't include those. I don't think that the University of Utah would be a relatively high user of Mirena --
Q. But --
A. -- because, as I mentioned, they're a family planning research center. They train every resident in inserting Mirena and other long-acting contraceptives. So their use of -- their denominator would -- would not be falsely low.
Q. Well, the denominator is everyone who came to the University of Utah within a certain time period and within a certain age range; right? That's the 220,904.
A. Yes.
Q. And what you're saying is that you think a lot of people get -- that the University of Utah

Page 173

does use Mirena with a lot of patients; right?
A. Yes.
Q. But --
A. Compared to some other places.
Q. But we can agree that the University of Utah billing database would not include women who had their Mirena inserted at Planned Parenthood or from any other external practice group, private practice group, not at the University of Utah; correct?
A. Yes.
Q. So if people -- if the 220,000 women who came in for whatever treatment they came into the hospital -- hospital for had their Mirena inserted somewhere else, they wouldn't be captured in the numerator, right, because they hadn't been billed for Mirena by the university?
A. Right.
Q. And from what we looked at previously, 2 percent is a low percentage of Mirena users for the State of Utah based on other data that's available; correct?
MS. NATALE: Object to form.
THE WITNESS: Yes.
///

BY MS. COOK:
Q. And it's also lower than your own report's statement of national IUD use; correct?
A. Yes.
Q. Now, if the exposure -- if the Mirena exposure percentage or number is inaccurate here, you agree that that would impact the overall odds ratio; right?
A. Yes.
Q. And is that an analysis that you've done yourself?
A. No.
Q. Would you have any basis to disagree that if you do the same -- use the same data, but estimate 8 percent or 10 percent Mirena use in Utah, that the result is actually not statistically significant?
MS. NATALE: Object to form.
THE WITNESS: I haven't done the calculation, so I don't know.
BY MS. COOK:
Q. Okay. Well, let's look at another issue in this paper. Well, let me -- while we're on this topic --
A. But I do note that they found similar risks



in the two populations. In other words, not just Utah, they also studied a Danish population --
Q. Yeah. Well, let's --
A. -- and found similar risks in similar people.
Q. Yeah, let's look at that, then.
So this is the same page 194, under the section of the article where they talk about the Danish group and how they estimated exposure there. And what they did there is for the patients who had IIH, they actually reviewed their medical records to see if they're using Mirena. But they didn't do the same thing, to see how many of the controls use Mirena; right?
A. I'll have to take a closer look at that.
Q. Okay. Well, let's -- I'll direct you to it. The paragraph on page 194, the last full paragraph on the page on the right, where it says during the period from 2008 to 2014, they identified 154,000 women who visited this hospital once and didn't have IIH or PTC.
And then the way that they tried to estimate how many of those were using Mirena is they looked at the 2014 sales data for Mirena.
Do you see that?



A. M-hm.
Q. Yes?
A. Yes.
Q. And then they basically used the statistic of how many Danish women were in an age group and then came up with a percentage of 3.5 percent of Danish women who used Mirena.
Do you see this?
A. Yeah, m-hm.
Q. Now, with your own patients, you -- if you only looked at how many Mirenas were inserted at the University of -- let's call it the -- what's the hospital, San Francisco General?
A. Yes.
Q. If you just looked at one year, you would not be getting an accurate picture of who was using Mirena during that year if you just look at one year of sales data; right?
MS. NATALE: Object to form.
THE WITNESS: Well, I think that that use is fairly stable, so that 2014 would be a reflection of other years.
BY MS. COOK:
Q. Well, it's --
A. You mean it's cumulative?



Q. Well, my question is if you're looking at 2014 and trying to ascertain how many patients use Mirena in 2014, you would have patients who did not actually buy the Mirena in 2014 but had it inserted in 2013 or 2012; correct?
A. My assertion is that the use of Mirena in Denmark is fairly stable. So you could pick any year, and the proportion of users would apply to adjacent years.
Q. Right. But if you're trying to ascertain how -- what percentage of women are using Mirena in any given year, you can't just look at women who had the Mirena placed in the year, because people use Mirena for more than one year; is that accurate?
A. Yes. That's what I meant by "cumulative effect."
Q. And how -- how long, on average, do you believe that people use Mirena?
A. There -- there are data about that, and I think it's about two years.
Q. Is that something that you would have to look at the data to be able to confirm?
A. Yeah, it would be.
Q. Have you looked at published literature to see if there's data available about what percentage

Page 178

of women in Denmark used LNG IUDs?
A. I actually have, but I don't recall what the proportion is.
(Marked for identification purposes, Exhibit 14.)
THE WITNESS: I saw data for all of Scandinavian one time.
BY MS. COOK:
Q. Okay. I'm going to hand you --
A. It's very high in Finland and a little lower in Denmark.
Q. Okay. I've handed you Exhibit 14, which is an article on contraceptive use in the Nordic countries.
Is this the one that you're thinking of?
A. Yes, I think it is.
Q. And if you turn to Figure 1, which is on page 23, this looks at contraceptive use among women age 15 to 49 in Nordic countries from 2010 to 2013.
And if you look at the top left table, that's Denmark, and there's actually -- the dark pink is LNG-IUS.
Do you see that?
A. Yes.
Q. And what are the percentages, as far as you

Page 179

can tell, from the years 2010 to 2013 in Denmark?
A. It's about 10, 11 percent.
Q. And you don't have any basis to disagree with this data; correct?
A. No.
Q. Am I correct?
A. Yes.
Q. And so the 10 or 11 percent of Mirena use in the Lindh study, that's quite higher than the 3.5 percent estimate that the Valenzuela publication used; correct?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. And if the number is more like 10 percent instead of 3.5 percent, you would agree that that could have a significant impact on the odds ratio reported here; right?
MS. NATALE: Same objection.
THE WITNESS: I haven't calculated it, but it would, yes.
BY MS. COOK:
Q. Certainly a change to the exposure in the control group would impact the results; right?
A. Yes.

Page 180

Q. Now, do you know if the Valenzuela publication used age matching?
A. They did in the sense that -- for the two groups, they looked at mean age, which wasn't significantly different.
Q. You're talking about the --
A. Table 1, for example, the first quote presenting characteristic is mean age.
Q. Well, that's the mean age of women with PTC; correct?
A. Yes.
Q. And that was about 30 -- that was -- the mean age was 30 in the LNG group and 32 in the control group; correct?
A. That's right.
Q. But the age range that they looked at was between 18 and 55; correct?
A. Correct.
Q. And they did not actually age match, did they?
A. No.
Q. And are you aware that older people go to hospitals more frequently --
MS. NATALE: Object to form.
///

Page 181

BY MS. COOK:
Q. -- according to CDC and other data?
A. I'm aware that, generally speaking, older people, except for women having babies, go more frequently.
Q. The control group made up of women who went to the University of Utah hospital during the relevant time frame would likely have skewed toward the higher end of the range of age; correct?
MS. NATALE: Object to form.
BY MS. COOK:
Q. Based on what you know.
A. I don't know. I would have to -- Utah has a very young population. High fertility rate.
Q. Well, do you know --
A. Big obstetrical service, which means women are more likely to come for other conditions. So I don't know if that's true.
Q. Do you know how old, on average, the Mirena user group would be?
A. No. But I would -- I -- we know on average, overall, in the aggregate, the age of Mirena users. Older than people who use oral contraceptive pills. So do you want me to make an estimate of what I think it would be?

Q. No, that's all right. If it's not something you've looked at for purposes of the litigation or not something you know offhand, I don't -- you don't need to guess.

Okay. So the bottom line is if the controls who did not use Mirena were at a lower risk of IIH than Mirena users, that could artificially inflate the odds ratio; correct?

MS. NATALE: Object to form.

THE WITNESS: You mean if they were an older group of people?

BY MS. COOK:

Q. Yes.

A. It could. But we don't know that that's the case.

Q. Now, we don't have any information on the level of LNG or any androgen levels in any of the Mirena patients in the Valenzuela study who had PTC; correct?

A. No, we don't.

Q. And on page 5 of the study or -- I guess it's 196, the study authors discuss a number of limitations. On the right-hand side, it says:

"Limitation of our study include."

A. Yes. Yeah.



Q. And one of the things that they say is that it's not possible to capture the number of insertions performed outside the university system, so they may have underestimated the number of women with an LNG-IUS.

And you agree with that, especially based on the data you've looked at today; right, Doctor?

MS. NATALE: Object to form.

THE WITNESS: Yes. But I disagree with some of their other caveats about their data. For example, polycystic ovarian syndrome women are usually given oral contraceptives, not the other way around. People with headaches are not less likely to receive oral contraceptives.

So I think that the -- some of the biases in their own work that they assert are -- are patently wrong. For example, combined oral contraceptives are a treatment for polycystic ovarian syndrome, not the other way around. We've discussed how you wouldn't give a levonorgestrel-containing method to somebody with PCOS.

So my point is I -- it goes both ways in terms of the -- the biases they assert here.

///



BY MS. COOK:

Q. Well, one of the things that they say is that they did not account for potential confounders, like, for example, they did not account for obesity or recent weight gain; correct?

A. Yes.

Q. And you agree that that was a limitation of the study; right?

A. Yes.

Q. And in your own book, we looked at what you said in your book about confounders. And one of the things you look at or you encouraged doctors to look at when they're considering how to weigh a published study is that case control studies that are confounded, that that can impact the reliability of the results; correct?

MS. NATALE: Object to form.

THE WITNESS: That's correct.

But if you look at their Table 1 and those who had pseudotumor cerebri with and without levonorgestrel intrauterine system, as they call it, there was no significant difference in mean body mass.

BY MS. COOK:

Q. So in the cases that had PTC, all of them



were overweight or obese; right?

MS. NATALE: Object to form.

THE WITNESS: Yes.

BY MS. COOK:

Q. But what the confounders matter for is when you're looking at the control groups and whether those are matched in terms of the risk for IIH; correct?

A. Yes.

Q. And that's where the confounding makes a difference; correct, Doctor?

A. Yes.

Q. And because of the various confounders in other issues, the Valenzuela authors actually conclude that their investigation does not suggested an LNG-IUS can cause PTC.

Did you see that in --

A. Yes, I see that.

Q. And you agree with that, don't you, Doctor?

MS. NATALE: Object to form.

THE WITNESS: Well, as I said, I think they've been a little harsh on themselves with regard to these possibly androgenic -- possibly and clearly androgenic conditions -- headache, possibly. Polycystic ovarian syndrome, clearly -- who are

less, not more likely, to receive levonorgestrel system.
So on the one hand, they have biases. On the other, I think they misjudge the degree to which their results are biased.
BY MS. COOK:
Q. Well, I know that you disagree with the statements they make about PCOS and about oral contraceptives, but those are only two of the statements that they mention. And you have agreed that they did not control for potential confounders, which is a limitation of the study; correct?
A. Yes. This study does have some limitations.
Q. And you also agreed with me that they likely underestimated the use of Mirena in the control group in both studies according to the published data; correct?
MS. NATALE: Object to form. Misstates testimony.
THE WITNESS: That's a possibility. We don't know that.
BY MS. COOK:
Q. Well, you haven't looked at it yourself; right?



A. No.
Q. Correct?
A. Correct.
Q. So just so I can get a clean answer to my question, when I asked you whether you agreed with the authors' statement that their investigation does not suggest an LNG-IUS can cause PTC, do you agree with that --
MS. NATALE: Object to form.
BY MS. COOK:
Q. -- based on the limitations you do agree with?
MS. NATALE: Asked and answered.
THE WITNESS: I think it suggests a relationship. It does not prove one.
BY MS. COOK:
Q. Okay. And -- and just to be clear, the relationship I'm talking about is a cause-and-effect relationship.
Do you believe that the Valenzuela article suggests a cause-and-effect relationship?
MS. NATALE: Object to form.
THE WITNESS: I agree that it suggests one.
BY MS. COOK:
Q. And that's a different finding than the



study authors themselves; right?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. And when the study authors say, on page 196, there are two possible explanations for the association demonstrated in their study, and one of the two possible explanations is that LNG does not cause increased intracranial pressure, do you agree with that?
MS. NATALE: Object to form.
THE WITNESS: Which --
BY MS. COOK:
Q. Page 196 --
A. I'm on that page.
Q. Left-hand column, it says:
"There are two possible explanations for the association demonstrated in our study."
A. Yep.
Q. And one of them --
A. Let me reread that. I haven't read it in a while.
One explanation is that LNG does cause it. Another explanation is it does not cause it. Yes.



Q. So you agree that one explanation of the study results is that LNG does not cause increased intracranial pressure, but that PTC is more likely to occur in the same population of women who have Mirena; right?
MS. NATALE: Object to form.
THE WITNESS: Yes. But I've mentioned my reservations about some of their -- some of their reservations about their own data.
BY MS. COOK:
Q. On the right-hand column of 196, the study authors say:
"Our findings are preliminary and caution should be exercised in applying this information to clinical practice."
Do you agree with that?
A. Yes.
MS. NATALE: Object to form.
THE WITNESS: I see that.
BY MS. COOK:
Q. And do you agree with that?
A. I don't know what they mean by "caution."
Q. Okay.
A. They should certainly be cautious about providing levonorgestrel to women who already have

polycystic ovarian syndrome. I don't know if that's what they -- if that's what they're referring to, if that's included in their -- in their reservations.
Q. Let's --
A. So the statement isn't clear enough about what -- where they think caution should be applied or not applied.
Q. Okay. Let's --
A. Usually, taking care of patients, a cautious approach is the better one.
Q. If you look at the remainder of the paragraph, it says:
"We do not recommend removal of LNG-IUS from women with PTC as the benefit of effective contraception for these women likely outweighs the risk."
Do you disagree with that statement?
A. I disagree with that statement.
Q. Do you disagree with the statement that the benefit of effective contraception likely outweighs the risk of PTC?
A. No. Because we've discussed that there are many other contraceptive options, and the risk is principally unintended pregnancy. So I -- I disagree with that statement.



Q. You yourself have not encountered that situation, though; right, Doctor?
A. Where I would want to remove a levonorgestrel intrauterine system from somebody who had pseudotumor cerebri?
Q. Correct.
A. No, I haven't.
Q. Okay. And then it says:
"Likewise, if a woman with PTC or at risk for PTC needs contraception, an LNG-IUS should still be considered as an effective form of contraception."
Do you disagree with that?
A. Yes.
Q. And let's break that down.
You disagree that a woman with PTC should be given an LNG-IUS, I presume?
A. I do disagree with that.
Q. But people who are at risk for PTC include women of childbearing age who are overweight, obese, and/or have recent weight gain, which we already discussed; correct?
A. And in that situation, you would want to know more about susceptibility to excess androgen. So it would -- there it would depend on the woman.



Q. You certainly consider LNG-IUS in women who are obese, overweight, or of contraceptive age; correct?
A. Yes.
Q. Okay. Now, have you communicated with any of the authors about this paper?
A. No.
Q. Have you communicated your views about this paper to anyone other than the lawyers in this litigation?
A. I'm trying to remember whether or not this came up in one of our journal clubs or works in progress, and I don't recall that I have.
Q. Okay. So notwithstanding the authors' conclusions in Valenzuela, are you giving the opinion that Valenzuela is evidence that Mirena causes IIH?
MS. NATALE: Object to form.
THE WITNESS: I'm giving the opinion that it is supportive evidence.
BY MS. COOK:
Q. Supportive evidence that Mirena causes IIH?
A. That Mirena is -- the use of Mirena is associated with pseudotumor cerebri.
Q. And I know we talked before about the



difference between association and causation --
A. Yes.
Q. -- and you described the difference.
Is it -- am I accurate that you're not reaching the conclusion that the Valenzuela publication is supportive evidence that Mirena causes PTC?
MS. NATALE: Object to form.
THE WITNESS: It is supportive, but not conclusive; that is, you would want to look at the other factors we talked about in our discussion of Chapter 14.
BY MS. COOK:
Q. Okay. And when --
A. Biologic plausibility and so on.
Q. I apologize for interrupting you.
When you say it's supportive and not conclusive, you understand that what I'm trying to understand is that you said that it's supportive evidence that Mirena is associated with PTC, and I'm trying to see if you agree that it's not supportive evidence that Mirena causes PTC.
MS. NATALE: Object to form.
THE WITNESS: By itself it's not evidence that Mirena causes PTC and that's why it's not the

only reference that's cited in my report. I think you have to look at the evidence in its entirety.

BY MS. COOK:

Q. Have the results of the Valenzuela publication been replicated?

MS. NATALE: Object to form.

THE WITNESS: No, there's no other -- there's no other study quite like it that I'm aware of.

BY MS. COOK:

Q. Are you aware of any published literature that concludes that Mirena can cause IIH?

A. I'm not aware of any single publication that is conclusive in the way you're suggesting.

Q. Are you aware of any regulatory authority in the world that has concluded that Mirena can cause IIH?

A. Well, I'm aware of regulatory authorities that are concerned about the issue and have asked -- and I've examined some of those reports -- have asked that Bayer follow up on, quote, signals --

Q. You're talking --

A. -- to report the results of dechallenge and so on and so forth.

So there's certainly concern among



regulatory authorities about -- about the issue.

Q. Are you referring to the German regulatory authority BfArM?

A. Yes.

Q. Are you aware of any other regulatory agency in the world who has expressed any -- what you call "concern" about Mirena and IIH?

MS. NATALE: Object to form.

THE WITNESS: I'm recalling that the Belgian authorities also asked for an examination. It would take a pretty big country to ...

BY MS. COOK:

Q. You think the Belgian authority has asked for an examination about IIH?

A. I thought that I recalled that Bayer -- I think that I recall that Bayer reported the Belgian authority.

Q. Well, let's stick to this topic for a minute, because in your report you actually talk about a draft response to a Belgian health authority. I'm trying to find where that is -- on page 13 of your report. But that is talking about androgenic side effects, not PTC.

A. That's what I'm thinking of.

Q. Is that what you're remembering?



A. Yes.

Q. And that wasn't about PTC at all; right, sir? It was about androgenic side effects?

A. Androgenic effects in general. Yes, that's correct.

Q. Okay. So the only regulatory authority you're aware of that's raised IIH with the company is the German one, BfArM; right?

MS. NATALE: Object to form.

THE WITNESS: Yes, that's the only one I'm aware of.

BY MS. COOK:

Q. And you cite that -- well, you look -- you cite the company's response to BfArM in your report.

And let me ask you this: Do you have any insight into why BfArM asked Bayer to provide an analysis beyond what's written in Bayer's response to BfArM?

A. No.

Q. When you say that the --

A. I assume it was -- as I'm recalling, it was their concern about reports of an association and signal, quote-unquote, cases.

(Marked for identification purposes, Exhibit 15.)



BY MS. COOK:

Q. I'm going to hand you that response marked as an exhibit.

This is -- Exhibit 15 is the response to BfArM that you reviewed; correct?

A. Yes.

Q. And if you look at page 8 of 95 -- the page numbers are at the top -- it has verbatim what BfArM's request was.

Do you see that?

A. Yes.

Q. And what BfArM asked for was a signal analysis based on the recent publication by Valenzuela.

Do you see that?

A. Yes. M-hm.

Q. Do you have any evidence whatsoever that BfArM was concerned about the risk of -- of PTC or IIH with Mirena?

MS. NATALE: Object to form.

THE WITNESS: My interpretation of this request is that they are concerned about the association.

BY MS. COOK:

Q. BfArM asks Bayer to provide information

Page 198

about whether there's an association between Mirena and IIH, but nowhere in here do they say they're concerned, do they, sir?
MS. NATALE: Object to form.
THE WITNESS: I suppose we're -- that the request was evidence of concern, in my view.
BY MS. COOK:
Q. Do you -- have you ever consulted with the German regulatory authority BfArM?
A. No.
Q. Do you have any insight into how frequently BfArM asks pharmaceutical companies to analyze various issues raised by published articles?
MS. NATALE: Object to form.
THE WITNESS: No.
BY MS. COOK:
Q. Do you know how frequently these requests lead to label changes or not?
A. No, I don't.
Q. Have you ever seen --
A. My experience is limited to the FDA in the United States.
Q. The FDA has not asked Bayer for an analysis of IIH; correct?
MS. NATALE: Object to form.

Page 199

THE WITNESS: No.
BY MS. COOK:
Q. And I don't know if you reviewed this as part of your materials reviewed, but do you know that Bayer has provided data on all of the IIH reports that it's received with Mirena for years?
MS. NATALE: Object to form.
THE WITNESS: I know that the FDA wants to see serious adverse events reports.
BY MS. COOK:
Q. Well, have -- I guess my question is a little different.
Have you looked to see what Bayer has provided to the FDA over the years in terms of information about IIH reports with Mirena?
A. No.
Q. And with respect to the BfArM request, can we agree that the sheer fact that the BfArM asked for information from Bayer regarding Mirena and IIH is not evidence of causation?
MS. NATALE: Object to form.
THE WITNESS: We can agree that it's not evidence of causation.
BY MS. COOK:
Q. Okay. So back to what we were talking

Page 200

about before -- you can put that aside, Doctor.
Are you aware of any scientific or medical organization that has concluded that Mirena causes IIH?
A. No.
Q. Do you believe that it's generally accepted in the medical community that Mirena causes IIH?
A. By "medical community," do you mean practicing physicians generally, or do you mean experts in contraception, physicians who study contraceptives and are well informed about them? Because I think in the latter group, there is concern. In the former group, not much information about it.
Q. Okay. Let's talk about the experts in contraception, that medical community.
Do you believe that it is generally accepted in the community of experts in contraception that Mirena causes IIH?
MS. NATALE: Object to form.
THE WITNESS: I believe there's concern about the association and curiosity about the issue and, therefore, reluctance to expose patients who are at risk to additional androgen or androgenic progestin.

Page 201

BY MS. COOK:
Q. What is your basis for saying that there's a generalized concern among the experts in contraception that Mirena causes IIH?
A. The -- the discussions that I've mentioned already going back to Norplant. The case reports.
Q. So the only --
A. And the concern about the androgenic implications of widely varying corrections of levonorgestrel with various delivery systems.
Q. Okay. So the only discussions that you've mentioned to me today was with colleagues about Norplant and IIH, not Mirena; correct?
A. Yes.
Q. And what I'm saying is is it generally accepted in the community of experts in contraception that Mirena causes IIH? That's my question.
A. No, it's not generally accepted that it causes it. There's concern about the association.
Q. Have you spoken to any expert in contraception about the concern about an association between Mirena specifically and IIH?
A. Yes, I've talked to colleagues about it.
Q. Who did you talk to?

Page 202

A. My colleagues who have done lots of research with levonorgestrel.
Q. When did you --
A. I mentioned two of them. Dan Mishell. Sam Pasquale.
Q. When did you talk to them?
A. As we were working on developing -- doing our clinical trials for Mirena and outlining possible risk factors for androgen-sensitive women.
Q. This was back in 2000?
A. Yes.
Q. Okay. So you were talking to certain colleagues about a potential concern about an association between Mirena and IIH as far back as 2000?
A. Because we had been concerned about association -- case reports of an association with Norplant, where delivering levonorgestrel through a different system, should we have the same concerns about androgenic side effects.
Q. But even though you had potential concerns about IIH with -- being associated with Mirena as far back as 2000, none of your publications mention that concern; correct?
A. Right.

Page 203

MS. NATALE: Object to form.
BY MS. COOK:
Q. And this is -- this potential concern about IIH and Mirena is not something that you've mentioned to any of the governments that you say in your report that you've consulted with; correct?
MS. NATALE: Object to form.
THE WITNESS: No.
BY MS. COOK:
Q. Correct?
A. That's correct.
Q. And you haven't mentioned any potential association between IIH and Mirena to any of the -- withdrawn.
You haven't mentioned any potential association between IIH and Mirena in any of the materials that the Bixby Center or the UCSF clinic that you work for provides to patients; correct?
A. That's correct.
Q. So as of today, you would agree it's not a consensus in the OB/GYN or contraceptive community that Mirena causes IIH; correct?
A. I would agree, there's no consensus.
Q. Are you aware of any evidence that obese Mirena users or overweight Mirena users develop IIH

Page 204

more frequently than obese or overweight women not using Mirena?
MS. NATALE: Object to form. Compound.
THE WITNESS: That obese users of Mirena ...
BY MS. COOK:
Q. Do you need me to reframe the question?
A. No, I understand what you mean.
No, I'm not aware of any data that show that's the case.
Q. Other than the Valenzuela publication, are you relying on any other published literature about Mirena to support your opinion that Mirena causes IIH?
MS. NATALE: Object to form.
THE WITNESS: Yes, I'm relying on many of the articles we've already discussed contained in -- that are referenced in my report.
BY MS. COOK:
Q. Okay. So I'm being specific about published literature about Mirena and IIH.
Are you relying on any other published literature about Mirena specifically and IIH?
A. There are other case reports which I cite. The most extensive examination is Valenzuela.

Page 205

Q. Well, let's talk about the case reports for a minute. And these are cited on page 24 of your report.
Do you have that handy?
A. Yes.
Q. And that's the Martinez and the Ros Forteza case reports; right?
A. Yes.
Q. And you talk about those in the context of talking about Bayer's response to BfArM.
A. Yes.
Q. Were you aware of those case reports before looking at the response to BfArM?
A. I don't recall if I was or not.
Q. Well, one of them was published in Spanish; right?
A. Yes.
Q. And the other one was either an abstract or a letter to the editor, but certainly not something you would have come across in your own review of literature; right?
MS. NATALE: Object to form.
BY MS. COOK:
Q. An abstract.
A. I don't recall.

Q. Okay. Well, let's make it easy.
Are you relying on either Martinez or Ros Forteza as evidence of causation?
MS. NATALE: Object to form.
THE WITNESS: As I've said, I think the literature in its entirety is what I'm relying on, not on a particular case report.
BY MS. COOK:
Q. I think you said earlier that case reports cannot establish causation; correct?
A. That's right.
Q. And that applies to the Ros Forteza and Martinez case reports too; right?
A. Right.
Q. Have you heard of the Etminan article?
A. Excuse me?
Q. Have you heard of the Etminan article?
A. Not that I recall.
Q. Well, let me show it to you.
(Marked for identification purposes, Exhibit 16.)
THE WITNESS: Yes, I have. You're pronouncing the name in a different way.
BY MS. COOK:
Q. Do you recognize Exhibit 16?



A. Yes.
Q. Did you review the Etminan article before completing your expert report?
MS. NATALE: Shayna, I -- we can let him lead if you don't. I'm not trying to coach him. Earlier, there were some confusion about when things were reviewed. So I just want to instruct him to respond to the best of his recollection. It's not my intent to --
THE WITNESS: I think I reviewed it afterward.
BY MS. COOK:
Q. Well, it's not on your materials reviewed list in your report.
So would that indicate that you didn't review it before you completed your report?
A. I assume so.
Q. Now, this article has to do with IIH and Mirena; correct?
A. That's right.
Q. Did this come up in your -- in your literature search?
A. I don't recall if it did or not. And I saw it -- or I saw it later.
Q. Now, let's look at the abstract first,



because it lays out the two different studies that are included here. One of them is looking at the adverse event database, and the other one is a retrospective cohort study comparing Mirena to two oral contraceptives that don't include LNG; correct?
A. Yes.
Q. And the results were that there was no increased risk of intracranial hypertension with Mirena compared to the two non-LNG birth control pills; correct?
A. That's right.
Q. And, in fact, the risk of intracranial hypertension was lower with Mirena compared to one of the oral contraceptives, although it wasn't statistically significant; right?
A. Yes.
Q. And you said before that you believe there is no increased risk of intracranial hypertension or IIH with birth control pills; correct?
A. Right.
Q. So the fact that there was no difference between Mirena and the birth control pills, you agree that that's evidence that Mirena does not increase the risk of IIH; correct?
MS. NATALE: Object to form.



THE WITNESS: No, I would have to -- I've read this once. I would have to look at it more -- I would have to look at it again more closely.
BY MS. COOK:
Q. Well --
A. But I didn't -- didn't agree with the way he analyzed the data, as I recall.
Q. Well, certainly you don't give any opinions about this in your report; correct?
A. That's right.
Q. And without going into the article and the methodology of the epi study, you would at least agree with me that if an epidemiology study that compared Mirena to two oral contraceptives that you believe do not cause IIH found no difference, that that would be relevant to the issues in this case; right?
MS. NATALE: Object to form. And preserving all -- just ...
BY MS. COOK:
Q. Did you hear my question?
A. Yes. And I'm still trying to find why I -- when I did see the article, I didn't agree with its conclusion. I thought it was badly ...
Q. Well, and you understand that's not what

I'm asking you right now; right? Let me just ask you what -- what I'm asking you, which is actually at this point a hypothetical, since you don't give any opinion about the study.
So can you -- can we just --
A. Yes.
Q. My question is if the study showed no difference between Mirena and two oral contraceptives, you agree that that information is relevant to the opinions you give in this case; right?
MS. NATALE: Shayna, I believe he stated that he was trying to read it, so --
THE WITNESS: It depends how -- I would have to refresh my memory about how the study was done. Might or might not.
BY MS. COOK:
Q. But what I'm asking you is actually a hypothetical. So put aside the study.
If I said to you assume that there's a study that finds no difference in risk between Mirena and two oral contraceptives --
A. Assume that there's a valid study finding no risk?
Q. Yes.



A. With -- and the question was would that affect my opinion?
Q. No. It would be relevant to your opinions in this case; correct?
MS. NATALE: I'll object to form.
THE WITNESS: Yes.
(Ms. Fujimoto leaves room.)
BY MS. COOK:
Q. And a study or a valid study finding that there was no difference between Mirena and oral contraceptives would be supportive of a finding of no increased risk of IIH with Mirena; correct?
A. Now I'm getting to --
MS. NATALE: Object to form.
THE WITNESS: I objected to the study because the comparator is invalid.
BY MS. COOK:
Q. What's the comparator --
A. In select oral contraceptives containing the very drugs that are given to treat people -- norgestimate, for example, to treat people who have abnormalities of androgen.
So you've identified people who have PCOS, who have bad acne, hirsutism, and you would treat them specifically with oral contraceptives.



So it's an improper comparator. That's one of the reasons that the study was invalid. I mean, here's ethinylestradiol and norgestimate, treatments for PCOS and other androgenic abnormalities.
Norgestimate is approved to treat acne. That's what it's used for. So he picked exactly the wrong -- that's all coming back to me -- picked exactly the wrong comparison group.
Q. Now, this looked at the health claims database IMS LifeLink; correct?
A. Yes.
Q. And you have no information about what percentage of people using norgestimate or norethindrone in that database were using it for PCOS or acne or anything else; correct?
A. Well, you can bet a high proportion of them, since it's approved by the FDA to treat acne, were using it for that reason.
Q. Do you have any data that you can point me to today, sir, that says what percentage of users of norgestimate and norethindrone in the entire United States are using it because they have PCOS?
MS. NATALE: Object to form.
THE WITNESS: No. I assume it's a lot more than the general prevalence of 8 percent of PCOS in



the general -- in the population, because those women are selected to use these drug as a treatment for PCOS. And for acne, it's an FDA-approved drug to treat acne. Acne is the first line of treatment. So I assume it's relatively high.
BY MS. COOK:
Q. You're not saying that every patient who has acne and takes birth control for acne is at high risk of IIH, are you, sir?
MS. NATALE: Object to form.
THE WITNESS: No. But they're -- it's a marker of abnormal androgen metabolism.
BY MS. COOK:
Q. The incidence of acne is far, far, far above the incidence of IIH in the population of childbearing-age women; correct?
A. Yes. That's right.
Q. Okay. So even though you didn't actually include this on your review list or provide any opinions about it in your report, you're now saying that you are rejecting the findings of the epi study portion of this; correct?
MS. NATALE: Object to form.
BY MS. COOK:
Q. Because of assumptions about PCOS

Page 214

prevalence in the -- in the COC populations?
A. Because it's a -- it's the wrong control group.
Q. Now, you're not aware of any study that compares Mirena to any other oral contraceptive in any journal anywhere with respect to the risk of IIH; correct?
A. No, I'm not. Correct.
Q. Okay. Now, you're also not relying on the FAERS database finding here with respect to that portion of the study; right?
A. I would have to look at that in more detail.
Q. Well, you certainly don't list it in your report, so you're not relying on it; right?
A. Right.
MS. NATALE: I'll just --
BY MS. COOK:
Q. Now, do you know that Dr. Etminan, at the time that he published that study, had been hired by lawyers in litigation involving Mirena and IIH?
MS. NATALE: Shayna, I will object to the form. And I will note for the record that we had a meet and confer last week in which you --
MS. COOK: Your objection's preserved.

Page 215

MS. NATALE: I'm going to say what we -- what we discussed in our meet and confer, which you said that the reason that you were introducing the exhibits that you are currently discussing, the line of questioning you are currently discussing --
MS. COOK: Christina, save it.
MS. NATALE: -- is for -- is for experts who are relying on the Etminan -- on Dr. Etminan's article, which Dr. Darney has just stated he is not. Thank you. That was --
MS. COOK: He also just expressed opinions about it.
MS. NATALE: Because you asked him to.
MS. COOK: I'm going to mark an exhibit.
MS. NATALE: Thank you.
(Marked for identification purposes, Exhibit 17.)
BY MS. COOK:
Q. Dr. Darney, have you seen Exhibit 17 before?
A. No.
Q. And do you see that this is an affidavit of Dr. Etminan, who is an author on the study we just looked at?
A. Yes.

Page 216

Q. And it's signed in December 2016.
Do you see that?
A. Yes.
Q. If you look at paragraph 11 of this affidavit, it says:
"Based on the above, as the lead author of this article, I acknowledge that neither of the analyses in the article provide evidence that Mirena use increases the risk for intracranial hypertension."
Would you agree with that based on your review of the article?
MS. NATALE: Object to form and just to the extent that he's not reviewed this document.
THE WITNESS: Well, I don't -- I mentioned that I'm looking just now at the study, that I don't agree with the composition of the control group. So I can't say whether it -- whether it provides evidence or not.
BY MS. COOK:
Q. Well, you certainly agree that the cohort study -- even though you disagree with the control group, the control group that was used, there was no evidence that Mirena use increases the risk of

Page 217

intracranial hypertension; correct?
MS. NATALE: Object to form.
THE WITNESS: Well, certainly -- you certainly wouldn't expect to see it with that control group.
BY MS. COOK:
Q. And there was no difference in the study; correct?
A. There was no difference, no.
Q. Well, certainly you're not saying that the Etminan article supports your opinions in this case; correct?
A. No, it doesn't support my opinion.
Q. Okay. Okay. All right. Let's go to the case reports that you mentioned.
MS. NATALE: Are we putting that aside?
MS. COOK: Yep.
MS. NATALE: Okay.
(Marked for identification purposes, Exhibit 18.)
BY MS. COOK:
Q. Exhibit 18, Doctor, is the Martinez abstract that you rely on; correct?
A. Yes.
Q. And I believe that while you said that, by

itself, case reports cannot establish causation, that this is part of the overall literature in its entirety that you rely on; correct?
A. Yes.
Q. And this is an abstract from a meeting that you did not attend; correct?
A. That's right. I didn't attend.
Q. And is this publication something that you typically review?
A. No.
Q. So in this short abstract, we -- well, first of all, do you know if this was peer reviewed?
A. I would think that an abstract of a meeting is not peer reviewed.
Q. And an abstract of a case report, in your hierarchy of evidence that you talked about in your book, is in the lowest level; correct?
A. That's correct.
Q. And this patient here, if you just look at the bottom of the first page of the abstract, says that the lumbar puncture had 20 centimeters of water, opening pressure, but with dynamic measure, the opening pressure increased up to 70 centimeters.
Now, you're not going to opine that that patient was properly diagnosed with IIH based on



those opening pressures, are you?
MS. NATALE: Object to form.
THE WITNESS: No.
BY MS. COOK:
Q. And you defer that question to someone who treats IIH; correct?
A. Yes.
Q. And while it says that this patient was nonobese, there's no information about the patient's BMI, so we don't know if she's overweight or if she recently gained weight; correct?
A. That's right.
Q. And there's also no information in here about whether she had her Mirena inserted after she began having IIH symptoms; correct?
A. During the treatment, she said she was using -- that's correct. We don't know how long she'd been using it.
Q. And she also was being treated for her IIH with Diamox before her Mirena was removed, and there's no information about what happened when her Mirena was removed; correct?
A. That's right.
Q. Okay. So from this information -- from this -- what's available in this Martinez case



report, there's really no information to even conclude that there is IIH at all or that it's temporally associated with Mirena; correct?
A. Well, I think there's some evidence. The treating physician says she was using Mirena. And a treating physician who I assume is a neuro-ophthalmologist thought she had IIH.
Q. Well, certainly as your role in this litigation, you don't have any information from this abstract -- or I believe you said you're not going to give an opinion about whether she was appropriately diagnosed with IIH, and you don't have information about when she started using Mirena, so you cannot say whether she had a temporal association between Mirena and IIH; correct?
MS. NATALE: Object to form.
THE WITNESS: Well, I think she was using Mirena and developed pseudotumor cerebri, as the ophthalmologist calls it.
BY MS. COOK:
Q. You have no information in that report about whether she had --
A. No, I have no other information than what's in the report.
Q. You have no information about whether she



had symptoms of IIH before she start using Mirena; correct?
A. No.
Q. Correct?
A. That's correct. Yes.
Q. Okay. And to conclude that there's a temporal association, you would want that information; correct?
MS. NATALE: Object to form.
THE WITNESS: It would be better to have it.
(Marked for identification purposes, Exhibit 19.)
BY MS. COOK:
Q. Well, will you agree with me that if someone had IIH symptoms before they began using Mirena, that would weigh against a temporal association; correct?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. All right. I'm going to show you the Ros Forteza.
MS. NATALE: In Spanish, I hope.
MS. COOK: I'm going to ask him if he can

Page 222

read it in Spanish.
BY MS. COOK:
Q. Now, Doctor, I showed you an -- the published version of the Ros Forteza case report and then the translation that was produced by Bayer.
Did you actually read the published Spanish version, or did you read the translation?
A. I read the Spanish version.
Q. You read fluent Spanish?
A. A little bit. And I asked my Spanish-reading daughter to read it to me.
Q. Did you read this case report before you got retained in this litigation?
A. No.
Q. Now, this is a letter to the editor providing a single case report; correct?
A. Yes.
Q. So that is at the bottom of the hierarchy of evidence that you've described; correct?
A. Yes.
Q. And you mention in your report that there's a confounding due to minocycline; correct?
A. Yes.
Q. And you agree that minocycline is a potential confounder for when you try to ascertain

Page 223

whether this letter to the editor contains information that would support an association between Mirena and IIH; correct?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. And you also would agree that from a temporal standpoint, given that this patient used Mirena for two years with no symptoms and then developed IIH symptoms seven days after minocycline use, it's not possible to say that Mirena played a causal role in her IIH as opposed to the minocycline?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. And did you also see that the minocycline was withdrawn, and the patient began treatment and started improving before her Mirena was withdrawn?
A. Yes.
Q. And that would also -- that information would also caution against a finding that Mirena was responsible for her IIH; correct?
A. Yes. It wouldn't negate the possibility, nor would the fact that she had it for two years,

Page 224

because data show wide variations in serum concentrations of levonorgestrel, even in women -- even when you'd expected serum concentrations to decline over time, two years, for example.
In some patients the serum concentrations can actually increase or during a particular cycle be -- particular period of use, I should say, for women who aren't cycling -- unexpectedly high. So I don't think that necessarily negates an association.
Q. You certainly have no information whatsoever about the patient's levonorgestrel levels at any point in time in the Ros Forteza case report; correct?
A. Not about this particular subject, no.
Q. And given the minocycline confounding that we discussed, there's no way to point to Mirena instead of minocycline in terms of a causal effect on the patient's IIH; correct?
A. It could be either.
Q. Let's talk about adverse event reports for a minute.
You talked about those before with respect to the BfArM response, but it's unclear to me, are you actually relying on individual adverse event reports that the company received with respect to

Page 225

Mirena and IIH in your causation opinions in this case?
A. No.
Q. Okay. And you would agree with me that adverse events or adverse event reports cannot establish causation; right?
A. Well, I think that adverse event reports need to be taken seriously, as the FDA and the German authority take them, because they provide one kind of assessment of the safety of any drug. That's why they're collected.
Q. They -- adverse event reports certainly, as you said, are part of a regulatory agency's review of products, and they're part of a pharmaceutical company's review of product safety, but we can agree that they don't establish causation; correct?
A. They don't establish causation, but they help to development hypotheses about possible causation.
Q. And in your report -- I don't know if you have your report in front of you. Yeah, you do.
Page 24. Are you still on that page?
A. Yes.
Q. The top of the page you reference the fact that there are 315 Mirena cases of IIH; correct?

Page 226

A. Yes.
Q. And that's out of -- I mean, we can look at the BfArM response, but that's out of an estimated 45 million insertions; correct?
A. Worldwide, you mean?
Q. Yes.
A. Yes. Worldwide, that's --
Q. Well, the --
A. -- that's the number of Mirena that have been sold worldwide.
Q. The 315 cases is also a worldwide number; right?
A. Yeah. Bayer has -- has collected from all over, from all the countries in which it does business.
Q. And I think we're on the same page here, but certainly you're not relying on the fact that there were 315 reports of IIH with Mirena as evidence in and of itself that Mirena causes IIH; correct?
A. No.
Q. Am I correct?
A. That's correct.
Q. Okay. Would you agree with me that based on the data you have seen, in Valenzuela and

Page 227

otherwise, that the vast majority of Mirena users do not get IIH?
A. I would agree that they don't.
Q. And would you also agree with me that the vast majority of patients with IIH are not using Mirena, as far as you know at least?
A. Well, I think there's much less information about that. I assume that's the case.
Q. And the 315 Mirena cases that were reported, you don't have any information about whether any of these women had high LNG levels or high androgen levels; correct?
A. In -- if I'm recalling, in some of these reports, the minority, levonorgestrel values were available.
Q. In the adverse event reports?
A. But in a great majority not.
Q. Are you referring to the actual spontaneous adverse event reports, you believe there were levonorgestrel levels available?
Well, certainly that's not something you're relying on in your report. Is that accurate?
A. No.
Q. Correct?
A. No, I'm not relying on that.

Page 228

Q. Okay.
A. That's not the -- that's not the basis of my -- we'll call them pharmacokinetic arguments.
Q. Okay. We'll get to those in a minute. I'm just trying to make sure I cover all the bases. Okay.
Page 24, you also say that the majority of PTC reports with time-to-onset information occurred in the first two years of use. Now, you're referring there to the adverse event reports; correct?
A. Yes.
Q. And did you actually do a calculation of what percentage were reported in the first two years?
A. No.
Q. Do you know -- well, how do you know that it was a majority?
A. I'm recalling that that was reported somewhere else.
Q. Do you know where?
A. No, I don't recall.
Q. And then --
A. I don't recall where I saw that.
Q. You also say that the majority of cases in

Page 229

which the LNG-IUS was removed experienced recovery or improvement.
Did you calculate that information?
A. No.
Q. Would you disagree with me that 46 percent of the patients for whom information was available about removal did not recover, according to the BfArM response that you reviewed?
A. Yes.
Q. You would disagree?
A. No, I would agree.
Q. Okay. And you haven't provided any examples in your report where you say that there was an unconfounded dechallenge, for example, Mirena removed but not any other recovery; correct?
A. Not specifically, no.
Q. And you're not planning to give any opinion that any specific patient's recovery was more likely than not due to Mirena removal instead of some other treatment; correct?
A. No, not a specific example.
Q. You don't provide any -- well, you don't discuss in your report anything about the Mirena clinical trials, correct, other than the PK data?
A. No.

Page 230

Q. Okay. So, for example, you're not relying on any reports of IIH or anything related to that in the Mirena clinical trials in support of your opinion; correct?
A. Yes. That's correct.
Q. Okay. How are you doing? Do you need a break, or are you doing okay?
A. I could use a toilet break.
MS. COOK: Okay. Let's take a quick break.
THE VIDEOGRAPHER: This marks the end of Disk No. 3. We're off the record at 3:39 p.m.
(Recess taken, from 3:38 to 3:56.)
THE VIDEOGRAPHER: We are back on the record. This marks the beginning of Disk No. 4 in the deposition of Philip D. Darney, M.D. The time is 3:57 p.m.
BY MS. COOK:
Q. Dr. Darney, we were talking about the Martinez case report before the break, and I forget to ask you, did you review that one, the abstract from the neuro-ophthalmology conference, before you were hired in this litigation?
A. No.
Q. We also were talking about COCs that contain norgestimate and norethindrone.

Page 231

Do you remember that conversation?
A. Yes.
Q. Are you aware of any evidence that users of combined oral contraceptives with norgestimate or norethindrone have IIH more frequently than the background population?
A. No.
Q. Let's look at the summary of your opinions on page 5 of your report.
Do you see that?
A. Yes.
Q. Okay. So the first one is that LNG is a potent androgenic progestin.
And that's something that you have believed for a long time; right?
A. Yes.
Q. And your opinion is that PTC or IIH is an androgenic side effect, just like acne or increased body hair or any other androgenic side effect; correct?
MS. NATALE: Object to form.
THE WITNESS: My belief is that pseudotumor cerebri is related to hormonal variations. There's lots of evidence for that. For example, it occurs predominantly in women who are having menstrual

Page 232

cycles; that is, during the fertile years. It's related to androgen metabolism.
An example would be that it's more common in women who have polycystic ovarian syndrome. Abnormalities of androgen metabolism. Another example is that it's -- the condition is related to body weight, with obese women having lower levels of sex hormone binding globulin and producing estrogen erratically, so that androgen metabolism is disturbed.
It's more common in women who are obese, partly because it's related to the androgen effects on insulin resistance.
So there are a number of factors that suggest that the condition is related to androgen metabolism in women. I don't mean to say that it's the kind of direct effect that acne has.
Another line of evidence which I cite is that transgender people who are treated with androgens have been reported to develop pseudotumor cerebri in conjunction with that treatment.
So as I discussed earlier, it's the entirety of the evidence that suggests this relationship and, of course, levonorgestrel is the most potently androgenic of the progestins used in

Page 233

contraceptives.
BY MS. COOK:
Q. So you do not offer an opinion about how biologically increased androgens would cause an increased intracranial pressure due to elevated cerebrospinal fluid levels; correct?
A. No.
Q. Correct?
A. That's correct.
Q. And you talk -- back to the opinions in your report, you talk about the variability of levels of LNG in the blood; correct?
A. Yes.
Q. And you give an opinion that in susceptible individuals, relatively high unbound LNG concentrations can cause IIH.
That's your opinion; correct?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. And is it your opinion that the higher level of unbound or free LNG, the higher the level of risk of IIH?
MS. NATALE: Object to form.
THE WITNESS: Yes.

Page 234

BY MS. COOK:
Q. You don't give an opinion about how high the LNG -- free LNG level must be for a person to be at risk of IIH; correct?
A. No. And I think that that -- that probably can't be established because of Topic 3; that is, the great individual variation in sensitivity to androgens. So what might be a real high level in one person -- and we know there's tremendous variability, particularly in women using contraceptives in general, but particularly when there's intrauterine delivery of any steroid, levonorgestrel, as an example, of course, tremendous intra and interindividual variability.
And what might be really high for one woman, high enough to cause an androgenic reaction, cause acne, for example -- I've seen that in my own patients, as well as in clinical trials -- wouldn't cause a problem in another woman.
And we know that's true from the work of Roger Lobo, for example, in examining susceptibility to acne and sebaceous gland changes. And studying androgen concentrations in relation to that, what we see is that really high androgens in one woman don't cause acne, don't change sebaceous glands, while in

Page 235

another woman they do. So that interindividual variability is important.
Q. There is no publication that discusses the variability of LNG with Mirena and how it impacts the risk of IIH; correct?
A. That's correct. There's not.
Q. And there's also no publication that discusses the androgen levels with Mirena and how that impacts the risk of IIH; correct?
A. Correct.
Q. And you have not written these opinions that you express on page 5 anywhere other than your expert report; correct?
MS. NATALE: Object to form.
THE WITNESS: No, I have not. And these opinions have evolved, as I described earlier, over years of learning more and more about androgenicity and synthetic progestins in general and the condition we're discussing specifically.
BY MS. COOK:
Q. But as we sit here today, you have not subjected the opinions you're giving in this opinion to peer review; correct?
MS. NATALE: Object to form.
THE WITNESS: If you mean the kind of peer

Page 236

review that comes with publishing in a journal, no, I've certainly subjected the opinions to -- to the comments of colleagues. What do you think of this idea?
BY MS. COOK:
Q. But not with respect to Mirena. I think we made that clear. You've only discussed IIH risk with respect to Norplant with your colleagues; right?
A. No. With regard to androgenic effects generally, with levonorgestrel contraceptives, because we've been studying levonorgestrel in delivery systems for 40 years, so, of course, side effects come up.
Q. Well, let's focus on the opinion that you give, that relatively high unbound LNG concentrations with Mirena, I presume, can cause or be a substantial contributing factor in causing IIH/PTC.
That's not something you've discussed with your colleagues; correct?
A. Yes, I have. I mentioned that with Irv Sivin and Dan Mishell, for example, we would have discussed this possibility when the cases were first reported.

Page 237

Q. And I thought we established that those discussions were about Norplant; right?
A. About delivery -- about delivery of levonorgestrel in general.
Q. Okay. But my question specific to Mirena and your Mirena opinions that you're giving in the litigation about -- that the high unbound LNG concentrations in Mirena can cause PTC, because that's what you're here for today; correct?
A. Yes.
Q. And that's something you haven't discussed with colleagues or subjected to peer review; correct?
MS. NATALE: Object to form.
THE WITNESS: I haven't subjected it to peer review in the sense of publishing it. I've, in the past, talked with colleagues about it. I mentioned that previously.
BY MS. COOK:
Q. Right. But I -- but that's with respect to Norplant; right?
A. With respect to plastic delivery systems in general.
Q. Okay. Well, I won't go back there. I think the record is clear. But I thought we

clarified you were talking about Norplant because that was back before Mirena was even -- before you even used Mirena; right?
MS. NATALE: Objection and --
BY MS. COOK:
Q. In the '90s?
MS. NATALE: Sorry. I agree that the record stands. So asked and answered.
THE WITNESS: Yes.
BY MS. COOK:
Q. Okay. Have you performed any testing or studies to verify whether the opinions that you offer about Mirena causing the PTC are borne out by testing?
A. You mean direct experimentation?
Q. Yes.
A. No, no direct experiments.
Q. Or epi studies or clinical trials or anything else?
A. No.
Q. Okay. So page 21 of your report, I want to talk about the androgen side of your opinions for a minute.
This is when you -- the bottom paragraph there says:



"Although PTC was first identified approximately 120 years ago, its relationship to steroid hormones with androgenic effects has more recently become clearer."
Now, when is it that you say it has become clearer?
A. Over the past several years.
Q. Now, I think you referenced earlier that the androgenic theory of PTC is still a hypothesis for which evidence is accumulating. Is that an accurate summary of what you said earlier?
A. Yes.
Q. And are you aware of any published article that concludes that IIH is, in fact, caused by androgenic effects of levonorgestrel?
A. No.
Q. Are you aware of any published article that concludes that IIH is, in fact, caused by androgenic effects of any hormone?
A. I've just recited the evidence that I think supports the perception that androgens are complicit in causing PTC.
Q. And I promise we'll get to what you rely on, but these are questions about whether or not



you've seen anything that concludes what I'm asking you.
Do you understand the distinction?
A. You mean a particular study or paper that gives definitive evidence?
Q. Well, let me just ask the question again and make sure you understand it.
Are you aware of any published article that concludes that IIH is, in fact, caused by androgenic effects of any hormone?
A. No.
Q. Would you agree that as of today, it's not generally accepted in the medical community that IIH is related to androgen?
A. I have no way of knowing whether it is or isn't. My perception is that among people who are interested in this issue, and that would be neuro-ophthalmologists who see the condition on the one hand, and contraceptive researchers who use levonorgestrel on the other hand, there's increasing acceptance of the idea that there's a relationship.
Q. Okay. So you --
A. For all of the reasons I just mentioned.
Q. So you believe there's increasing acceptance of the idea that there's a relationship



between IIH and androgens, but you can't say, sitting here today on January 30th, 2018, that that theory is generally accepted in the medical community; is that fair?
A. Yeah. I don't know whether it is or isn't. I can only speak for myself and colleagues.
Q. Are you aware of any medical organization that has signed on to the androgen theory for PTC?
A. No.
MS. NATALE: Object to form.
BY MS. COOK:
Q. And even though there have been different -- well, you've seen the literature and you see that different possible mechanisms have been discussed for PTC even with PCOS, androgens and estrogen; correct?
A. I don't think I understand the question.
Q. Okay. Well, you've seen --
A. Associated with PCOS. PCOS is principally a disorder of androgen metabolism. And it's telling that women who have PCOS are much more likely to develop PTC than women who don't have it.
Q. Well, you cite the Glueck article, and we can look at that if you want.
But do you recall that that article talks

Page 242

about the fact that PCOS patients have high levels of estrogen and that that could be one possible mechanism by which they get IIH?
A. Yes. Yes.
Q. Okay. So there's multiple different possible mechanisms that are being discussed in the literature as accounting for the PTC even in women who have high androgen levels, like PCOS patients; correct?
A. Yes. But the discussion all revolves around hormonal fluctuations, free androgens.
Q. Well, while we're talking about hormonal -- hormonal issues, period, there are multiple hormones that play in women who have PCOS, including estrogen levels; correct?
MS. NATALE: Object to form. Asked and answered.
THE WITNESS: Yes.
BY MS. COOK:
Q. And with obese women, they also have higher levels of estrogen than other patients; correct?
A. Some do and some don't.
Q. And you mentioned the --
A. It depends on where the fat is and -- you know.

Page 243

Q. Okay. But certainly in the literature where obese patients are discussed and hormonal mechanisms are contemplated, estrogen as a mechanism is one that's discussed in the literature?
A. It's a peripheral conversion to estrogen in obese women, particularly around the time of the menopause, and hence an increased risk of endometrial cancer. But it's a different function of the -- of the central fat related to abnormalities and androgen metabolism.
Q. Well, certainly the mechanism by which women develop PTC is unknown as of today; right?
A. Yes. It's not -- not yet clear, but we're getting closer to an understanding.
Q. And the articles that you cite -- and we can look at them one by one if you want, those refer to the androgen theory of PTC either as a suggestion or a speculation or a hypothesis; right, Doctor?
A. Yes.
Q. And you agree that the prospect that androgens play a role in PTC is still a hypothesis today; right?
MS. NATALE: Object to form. Asked and answered.
///

Page 244

BY MS. COOK:
Q. I think you answered that before, but please just go ahead and humor me.
MS. NATALE: I was just preserving the objection.
THE WITNESS: Yes.
BY MS. COOK:
Q. Now, you don't cite any article that actually discussions levonorgestrel or Mirena and the androgenic activity from those leading to IIH; correct?
A. Well, I cite several articles that attest to the androgenic potency of levonorgestrel.
Q. And those articles don't talk about IIH; correct?
A. No.
Q. Correct?
A. They don't talk about that condition in particular. They talk about other conditions dependent on androgen metabolism.
Q. And the articles about transgender patients, those are case reports; right?
A. Yes.
Q. And those don't talk about levonorgestrel, they talk about testosterone; right?

Page 245

A. Right.
Q. And --
A. And I present information that shows the avidity with which levonorgestrel binds to testosterone receptors, that it's more like DHT than any of the other synthetic progestins.
Q. Now, you do not give any opinions in your report about the level of testosterone or any other androgens in Mirena users; correct?
MS. NATALE: Object to form.
THE WITNESS: I'm trying to think of any of the studies I cited, like Frank Stanczyk looked at levonorgestrel concentrations in relation to DHEAS or DHT. Some do. I don't know if I cited them or not.
BY MS. COOK:
Q. Did you --
A. But I'm saying there is information about the effect of levonorgestrel on other androgens.
Q. In Mirena users?
A. I don't recall specifically if it was Mirena or Norplant users.
Q. That information would be relevant to your opinions; correct?
A. Yes.

Q. Now, you agree that levonorgestrel is fundamentally a progestin, not an androgen; right?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. Testosterone, on the other hand, is fundamentally an androgen; right?
A. Yes. But levonorgestrel and several of the other synthetic progestins are 19-nortestosterone derivates that have progestogenic properties. And the effort over the years has been to -- beginning with 19-nortestosterone, to enhance progestogenic character and diminish the androgenic character. Levonorgestrel remains with the most androgenic character of the synthetic progestins.
Q. You would agree with me that men have higher androgen levels than women; correct?
A. Yes.
Q. And the percentage of IIH patients who are men is incredibly small; right?
A. Yes.
Q. Now, the -- the Glueck 2005 article, we can look at it if you want, but you agree with me that that doesn't conclude that high levels of androgens in PCOS -- PCOS patients is what caused them to



develop IIH; right?
A. It doesn't conclude that, but it suggests it, in my view.
Q. Well, let me ask you this: While PCOS patients develop IIH at a higher level than the background group or the background rate, you're not aware of any study that has actually concluded that PCOS, not obesity and the other risk factors of the patients, are what caused the patient's IIH, are you?
A. Well, I believe that -- that the principal mechanism by which obese patients develop PTC is through abnormalities of androgen metabolism, and that some of those women are undiagnosed PCOS.
Some estimates of abnormalities of androgen metabolism -- although overall about 8 percent of women have PCSO, estimates of abnormalities is a spectrum. Estimates of abnormalities of androgen metabolism reach as high as 20 percent of women if you actually looked for those abnormalities.
Q. Are you aware of any study that concludes that obese patients develop PTC through abnormalities of the androgen metabolism? Are you aware of any study that has reached that conclusion?
A. Not of a study that -- that definitively



demonstrates that association.
Q. Do you even know if the androgen mechanism theory is generally accepted in the community of doctors that research and treat PTC?
MS. NATALE: Object to form. Asked and answered.
THE WITNESS: I don't know if it is or isn't. I mentioned earlier that there's a real division between those who provide contraceptives, the gynecologists, and those who would diagnose and treat PTC, the neuro-ophthalmologists.
BY MS. COOK:
Q. I'm going to hand you the Glueck article that we've been talking about and ask you a quick question.
(Marked for identification purposes, Exhibit 20.)
BY MS. COOK:
Q. And this is the article that you cite and discuss on page 21 of your report; right?
A. Yes.
Q. Now, this article itself -- well, if you turn to page 76, the discussion section --
A. Yes.
Q. -- on the right-hand column, about eight



lines down, it says:
"Obesity is a clinical characteristic of both PCOS and IIH. The increased prevalence of PCOS in women with IIH may reflect PCOS-driven morbid obesity which, in turn, facilities the development of IIH."
Do you see that?
A. That's just what I said.
Q. But that doesn't say anything about androgens; correct?
A. Well, it implies that because PCOS is an abnormality of androgen metabolism.
Q. But my answer is correct, that it doesn't say that; correct?
A. It doesn't say that specifically, but that's the implication, maybe the understanding of the author.
Q. Okay. So page 77, the concluding paragraph of this paper --
A. Concluding paragraph?
Q. Yeah. It says:
"On the basis of our findings in this study, we make the following speculations: PCOS characterized by

"obesity, extreme obesity, and hypofibrinolysis is associated with and may facilitate development of IIH."
Do you see that?
A. Yes.
Q. And it refers to that finding as a speculation.
Would you agree with that characterization?
A. Yes.
Q. And then the -- the final sentence of this paragraph talks about thrombophilia and hypofibrinolysis; right?
A. Yes.
Q. And you would agree that Mirena doesn't cause thrombophilia or hypofibrinolysis; right?
A. Yes, I agree with that. On the other hand, abnormalities of sex steroid metabolism are associated with changes in clotting parameters. So we're not -- we're not talking about a -- about a simple mechanism in which levonorgestrel would cause thrombophilia.
Q. What the authors talk about in this paragraph is about familial and acquired thrombophilia/hypofibrinolysis often exacerbated by exogenous estrogens and talks about that as the


mechanism by which PCOS can be associated with IIH; correct?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. And that's not referencing androgens; correct?
A. Well, the association with PCOS refers to androgens and the effects of androgens on sex hormone binding globulin, which binds both estrogen and androgen. I think it's a complex picture.
Q. Well, certainly this study does not conclude that the high level of circulating androgens in PCOS patients is what caused them to develop IIH; correct?
A. Well, to my reading, it suggests an implication for something that's not yet well understood.
Q. Well, it certainly doesn't say that; right?
A. It does not say that androgens cause -- and you wouldn't expect that the explanation would be that simple -- cause pseudotumor cerebri, no.
Q. Okay. So then on the next page of your report, page 22, you refer to a 2013 study. And you don't have a citation there, but I deduce that it


was probably the Klein study.
Do you remember that one?
A. Yes. I would have to take a minute to look at it.
MS. COOK: Well, let me give it to you.
(Marked for identification purposes, Exhibit 21.)
BY MS. COOK:
Q. Do you recognize Exhibit 21 as the Klein study that you reference in your report?
A. Yes.
Q. And this study looked at patients who already had IIH and then measured different hormone levels in them.
A. That's right.
Q. And if you look at page 975, the discussion -- well, actually let's just look at the concluding paragraph on page 976. It says:
"In conclusion, the key finding of this study is that increased levels of circulating androgens, including testosterone, BT and androstenedione, are linked to younger age of presentation of IIH."
Do you see that?


A. Yes.
Q. And it says:
"Short of conclusive evidence for role of androgens in the expression of IIH, these findings, nevertheless, comprise sufficient circumstantial justification for future reassessment of the role of the androgens in IIH in female patients."
Right?
A. Yes. I agree.
Q. So you would agree that this study does not provide conclusive evidence for a role of androgens in the expression of IIH; correct?
A. It certainly supports the -- the hypothesis.
Q. Well, this study only showed that patients with higher circulating androgen levels were younger when they presented with IIH, not that they were at an increased risk compared to a general population; correct?
A. And I think that implies that there is a -- an element of period of exposure; that is, if you have these abnormalities and have high levels of androgens, high -- early distortion of androgens

Page 254

metabolism, that you'll develop the condition sooner. That was my reading.
Q. So that's your reading of the conclusion. But my question was actually about the conclusion of the study.
And the conclusion of the study was that there's higher levels of circulating androgens in the younger presentation of IIH because it didn't even look at patients who didn't have IIH already; correct?
A. That's right. Yes.
Q. And has this study been replicated in your -- in your review or to your knowledge?
A. No. Not to my knowledge.
Q. And then back to your report, page 22, you say that other investigators more recently noted that the androgen profile in women with PTC is distinct from that in women with either PCOS or simple obesity; right?
A. Yes. M-hm.
Q. And that's referring to recent posters or abstracts that compared androgen levels in patients with IIH to patients who were obese or patients who had PCOS; correct?
A. Yes.

Page 255

(Ms. Sanguinetti leaves.)
BY MS. COOK:
Q. And those abstracts did not actually conclude that the androgens that they measured were causing IIH, did they?
A. No. Those studies couldn't prove a causal relationship, but they certainly implicated androgens.
Q. And the androgens that they studied, the testosterone and androstenedione, those are androgens that you don't know -- well, you haven't looked at Mirena patients to see what their levels of those androgens were; correct?
A. I haven't cited studies of that, and I would have to look at the literature to see whether androstenedione and testosterone have -- measurements have been made in women using Mirena. I believe they have been made in women using Norplant.
Q. That data would be relevant to your opinions; right?
A. Might or might not be. I haven't seen the data, so I don't know.
Q. The Klein article and the abstracts and studies that looked at the androgen profile in women

Page 256

with PTC, none of those looked at patients using LNG or Mirena; correct?
A. No, they did not.
Q. And then you talk about the -- how further biological plausibility of the association of PTC and LNG comes from Westgate's observation that women with increased secretion of CSF also have high androgen levels.
The Westgate article -- well, abstract, that also did not involve levonorgestrel or Mirena; correct?
A. No, it did not.
Q. And that was looking at rats; right?
(Ms. Goldstein enters room.)
THE WITNESS: Well, Westgate was looking at women.
MS. COOK: All right.
(Marked for identification purposes, Exhibit 22.)
MS. COOK: Let's look at it.
What number?
THE REPORTER: 22.
BY MS. COOK:
Q. Is Exhibit 22 the Westgate abstract that you cite in your report?

Page 257

MS. NATALE: Sorry. Just to help out, because it's a different version than I think what -- the online. It starts down here (indicating) and goes up to the next page.
BY MS. COOK:
Q. Is this the one?
A. Yes.
Q. Okay. So if you look at the top of the second page of the abstract -- well, let me just ask you this: This is an usual published abstract from a Society for Endocrinology meeting in November 2017; right?
A. Yes.
Q. So -- and you don't know whether this has been peer reviewed, I assume; right?
A. I don't know.
Q. Okay. So anyway, going back to my question about whether this involved looking at an assay involving rats -- is that right?
A. Yes. He developed a -- developed a particular assay using -- using rat choroid plexus, that's correct.
Q. Okay. And so at the end of this abstract, it says:
"We speculate that testosterone may

have a pathogenic role in IIH through modulation of CSF formation and increasing ICP."
Do you see that?
A. Yes.
Q. So this does not conclude that testosterone is what causes IIH; correct?
A. No. It -- it speculates that it has a role in it and supports the general -- generally developing idea that androgens are implicated in pseudotumor cerebri.
Q. It's a generally developing idea. But certainly as of November 2017, it's still speculative; correct?
MS. NATALE: Object to form.
THE WITNESS: Well, Westgate and his colleagues here are looking at the results of their particular study and not assembling all the -- putting the evidence in its entirety.
So this study -- that's correct. This study leads us in that direction. It's not conclusive.
BY MS. COOK:
Q. Okay. Where does this abstract fall in your hierarchy of evidence?



A. This is direct biologic -- demonstration of biotic plausibility. So in that hierarchy, this is one brick in the biologic plausibility structure, and that's how science develops.
Q. Okay. And it's one brick, but when it's an unpublished abstract that concludes with a speculation, that's a --
A. Well, this is 2017, and he wouldn't have had time yet, November, to publish in a journal. So we'll have to see whether it's published in a journal and is peer reviewed and whether others -- that's the scientific process -- others look at it and develop additional ways to test this, add other bricks.
Q. But as far as we know, sitting here today, this brick is speculative, according to the authors, two months ago; right?
MS. NATALE: Object to form. Asked and answered.
THE WITNESS: Yes.
BY MS. COOK:
Q. Okay. So then in your report, back to page 22, you talk about Westgate, and then you talk about the case reports for women who had gender reassignment; right?



A. Yes.
Q. Okay. So those are case reports which, again, is the lowest level of your hierarchy of evidence; right?
A. Yes.
Q. And these are women who were going through the transition to become men, so they were taking high levels of circulating testosterone; right?
A. Yes.
Q. And we can look at the articles if -- or at the case reports if you want, but if you recall them offhand, would you agree with me that none of them actually concludes that testosterone caused IIH in that patient?
A. No. They report an association.
Q. And --
A. A temporal association.
Q. Okay. So you would agree that, based on those case reports, that testosterone and IIH, a relationship between them is still only possible as of today?
MS. NATALE: Object to form.
THE WITNESS: These case reports provide further evidence that there is a connection between androgen -- androgen metabolism and development of



pseudotumor cerebri.
BY MS. COOK:
Q. And even though --
A. By themselves, they are not conclusive, right.
Q. Okay. So by themselves, you agree that they could not establish foundation; right?
MS. NATALE: Object to form.
BY MS. COOK:
Q. And we're talking about the transgender case reports still; right?
A. Yes.
Q. But you say that they are --
A. Simply further evidence.
Q. They provide further evidence?
A. Yes.
Q. Because they are case reports of people taking testosterone who also develop IIH?
A. Yes. Who didn't have it before, received androgens, and developed pseudotumor cerebri.
Q. And there --
A. With no other explanation.
Q. Well, we can look at them one by one, but did you look to see whether they already had risk factors for IIH?

Page 262

A. I don't recall specifically.
Q. Now, in your studies of Mirena or Norplant, have you studied circulating androgen levels?
A. In our studies, my own studies, we've only looked at circulating levonorgestrel levels in sex hormone binding globulin.
Q. If you look at page 13 of your expert report, please, sir, do you see at the bottom of page 13, you reference a draft response to a request from the Belgian Health Authority regarding known androgenic effects of Mirena?
A. Yes.
Q. Now, did you look just at the draft and not the final?
A. I believe I just saw the draft.
Q. Did you ask for the final?
A. No.
Q. Do you typically rely on draft internal company documents in making your clinical decisions in your practice?
MS. NATALE: Object to form.
THE WITNESS: No.
BY MS. COOK:
Q. Okay. So I'm going to hand you what you relied on, at least as far as I could tell from what

Page 263

you quoted there.
(Marked for identification purposes, Exhibit 23.)
BY MS. COOK:
Q. Exhibit 23. Do you recognize Exhibit 23 as the draft response to the Belgian Health Authority that you relied on?
A. Yes.
Q. And, again, this is about androgenic side effects, but not -- it doesn't have anything to do with PTC or it doesn't say anything about it; correct?
A. That's right.
Q. And what you quote in your expert report, if you look at page 343 --
MS. NATALE: The Bates number at the bottom.
MS. COOK: Yeah.
THE WITNESS: Got it.
BY MS. COOK:
Q. What you quote in your expert report is the paragraph that begins:
"In comparison to other progestins, LNG is known to have a high binding affinity to androgen receptors causing

Page 264

androgenic side effects. Thus, LNG among other progestins is known to display certain androgenic side effects. Apart from direct androgen receptor interaction, binding to SHBG, and displacement of testosterone is supposed to lead to an increase in free, metabolically active testosterone."
That's what you quote in your report; right?
A. Yes.
Q. And that is actually redlined in this draft; right? The "supposed to" part is actually in redline; right?
A. Yes.
Q. And I suppose you don't know what the final says because you didn't see it; right?
A. That's right.
Q. And do you believe that this draft redlined internal document is a reliable source of information?
MS. NATALE: Object to form.
THE WITNESS: Yes. Because this is simply a quote from Reference 3 here, and it's something -- it's information that's well established. We all

Page 265

know that this is true. It's just Bayer quoting it.
BY MS. COOK:
Q. The reference there is to a Kovalevsky article. Kovalevsky 2010. That's the next sentence. It says:
"Nevertheless, Kovalevsky found."
Do you see that?
A. M-hm.
MS. NATALE: Object to form and mischaracterizes the document.
BY MS. COOK:
Q. Yes?
Are you familiar with the Kovalevsky article?
A. Yes, I've seen that article. I would have to take another look at it to make sure this comports with it.
Q. You did not quote the portion of this draft response that actually talks about the published articles; correct?
MS. NATALE: Object to form. Same objection.
BY MS. COOK:
Q. In your expert --
A. I don't understand the question.

Page 266

Q. In your expert report, you don't quote the actual references to --
A. Kovalevsky. I quote this Bayer report, yes.
Q. Okay. And this goes on to say:
"Nevertheless, Kovalevsky found no effect on markers of androgen bioactivity, like hair shaft diameters, SHBG, and even other serum androgens decreased after implantation of LNG subcutaneous implant. No change was found in free testosterone."
Do you see that?
A. Yes.
Q. And there's a number of typos in there, but is that your recollection of what Kovalevsky found?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. And so I can show you the Kovalevsky article if you want to see it, but you would agree that the measurements of testosterone and free testosterone in the Kovalevsky article are relevant to your opinions in this case; right?
MS. NATALE: Object to form.

Page 267

THE WITNESS: Well, I would want to reread the Kovalevsky article to make the determination.
BY MS. COOK:
Q. That's not -- that's not something that you looked at for purposes of your expert report; right? That's not on your list, at least.
A. I don't recall when I would have -- when I would have read that.
(Marked for identification purposes, Exhibit 24.)
MS. COOK: Okay. I'm going to mark it for you. I don't know why I don't have a copy of this.
MS. NATALE: Do you want to -- do you want to take a break off the record and make a copy?
MS. COOK: No. I'll hand you my copy.
(Discussion off the record.)
BY MS. COOK:
Q. Okay. This is Exhibit 24.
MS. NATALE: 24.
THE WITNESS: Yes. Now I'm recalling it, because my colleagues David and Susan and Frank Stanczyk --
BY MS. COOK:
Q. Are authors?
A. Yeah.

Page 268

Q. Okay. So if you look at -- well, I guess let's just establish this is looking at women using Norplant; right?
A. Yes.
Q. And if you look at the page 2001, where it talks about -- or where there's a table of serum levels in women using Norplant.
Do you see that?
A. Yes.
Q. And do you see that if you look at the baseline and then a change within three months, total testosterone and free testosterone both go down in the Norplant patients?
A. Yes. Now I'm recalling this study in the --
Q. And DHT, which is the free circulating endogenous androgen, that also goes down; right?
A. Yes.
MS. NATALE: Dr. Darney, were you -- I'm sorry. Were you finished with your response?
THE WITNESS: Well, I'm remembering this study, and it was a study that was originally designed to look at the effects of doxycycline on bleeding with Norplant. And -- so that's why one group is doxycycline and the other is -- is a

Page 269

placebo. So my concern was that that's not the right control group.
BY MS. COOK:
Q. Okay. Well --
A. But --
Q. -- this is a study of women using Norplant, some treated with doxycycline and some treated with placebo; correct?
A. Right.
Q. Okay. So --
A. So what you needed was comparing it to people not using Norplant, not people using Norplant and doxycycline. But they just happen to have this -- this particular data set and decided to analyze it. And that may be why --
Q. Well, if you want to --
A. But that's an aside. That's just my critique of the study, now that I -- now that I recall it.
Q. Well, Table 3 is looking at Norplant users and whether -- what -- how their testosterone levels and other androgen levels change from baseline to three months; right? After using -- three months after using Norplant; correct?
A. Yes.

Page 270

Q. And you're not saying that there's any confounding effect on what happened with the androgen levels from baseline to three months here, because at baseline they were not using anything; right?
MS. NATALE: Object to form.
THE WITNESS: Well, the important issue here is that SHBG fell dramatically. And it's not total testosterone you're interested in. It's free testosterone.
BY MS. COOK:
Q. And the free testosterone went down in the Norplant users from baseline to three months; correct?
A. Declined insignificantly.
Q. But it --
A. It didn't go up.
Q. It did not go up, and neither did any of the measures of androgen -- the other measures of androgen; correct?
MS. NATALE: Object to form.
BY MS. COOK:
Q. Correct?
MS. NATALE: Same objection.
THE WITNESS: Right. They didn't go up.

Page 271

BY MS. COOK:
Q. Okay. So this evidence doesn't -- this paper does not support an opinion that androgen levels go up after levonorgestrel implant use; correct?
A. It doesn't support it or refute it.
Q. The --
A. Free testosterone levels.
And the issue here would be that the levonorgestrel itself binds two androgen receptors. So free T didn't change, but you added levonorgestrel, which would increase the androgenic effect.
And there's no disputing that Norplant, levonorgestrel, increases the occurrence of acne, hirsutism, or hair loss. So I'm recalling now that I didn't find this a convincing -- convincing paper.
Q. On the right-hand side of 2001, in the discussion, second paragraph, it says:
"Large decreases were observed in serum androgen levels. Total T, DHT, A and DHEAS all declined after three months of Norplant insertion."
Correct?
A. That's what it says, yes.

Page 272

Q. And it says:
"These data are similar to those previously reported."
Right?
A. Yes.
Q. Now, you don't have any data stated in your report that shows that any serum androgen level increases after Mirena use; correct?
MS. NATALE: Object to form.
THE WITNESS: No.
BY MS. COOK:
Q. Am I correct?
A. That's correct.
Q. Okay. Let's turn to your opinions on levonorgestrel levels in Mirena users. If you turn to the chapter on implants from your book.
MS. NATALE: Shayna, do you remember which exhibit that is?
MS. COOK: I'm trying to figure it out.
MS. NATALE: Okay. Thanks. Which exhibit is it? 11.
MS. COOK: Thanks.
MS. NATALE: We've been trying to keep a list.
MS. COOK: Looks like that.

Page 273

THE WITNESS: Which page?
MS. NATALE: It starts on page -- 183 is the first page of the chapter.
BY MS. COOK:
Q. Okay. I wanted to point you to 187.
A. Got it.
Q. And this is -- do you see this figure that you have here?
A. Yes.
Q. And that is a figure of levonorgestrel concentration, serum concentration, over time; correct?
A. Correct.
Q. And the bottom axis doesn't say anything, but that's got to be some time.
Do you know if that's months or days or what?
A. Well, it's -- you can see by the OC cycling, it's a cartoon meant to represent months.
Q. Okay. And you know that because the up and down V for the OC, would that be one month?
A. Yes.
Q. Okay. And if you look at this, the levonorgestrel serum levels in OCs are far above levonorgestrel serum levels of Mirena; correct?

Page 274

A. Yes.
Q. And the implants are above Mirena, too; correct?
A. Yes.
Q. And this is the --
A. I know about it because I drew it. It's meant to be a cartoon representation, not a precise quantitation.
Q. Well, this is the cartoon representation that you drew for clinicians to help them understand the varying levels of hormone, levonorgestrel, with various types of contraceptives; right?
A. That's correct.
Q. And you show them the differences in total serum levels, not free LNG levels; right?
A. Yep.
Q. And you would agree that LNG-containing COCs have higher serum levels of LNG than Mirena, even when you account for variability of Mirena and the cycling of the pills; right?
A. Yes.
Q. And would you also agree that LNG COCs have higher free LNG serum levels than Mirena, even accounting for variability?
A. Well, there are probably data about that,

Page 275

but I bet not because -- remember, we were providing estrogen with the oral contraceptive, and the estrogen raises sex hormone binding globulin and binds estrogen and preferentially androgen and levonorgestrel. And so the free levels may -- could actually be lower. But I -- I don't have the data about that.
Q. That's not something you looked at; correct? The free levonorgestrel levels in --
A. I may -- I may have looked at that in the past.
Q. For purposes of your report --
A. For purposes of this cartoon, no. And not for purposes of the report.
Q. Okay. So for purposes of your expert report in this litigation, you did not look for data on the free LNG levels in combined oral contraceptives that contain LNG; correct?
MS. NATALE: Object to form.
THE WITNESS: No, I did not.
BY MS. COOK:
Q. Okay. Now, you talk in your report about LNG binding to SHBG and albumin; correct?
A. Yes.
Q. Have you previously written that LNG is

Page 276

bound to albumin approximately 30 to 55 percent and SHBG approximately 40 to 60 percent?
MS. NATALE: Object to form.
THE WITNESS: I don't recall.
BY MS. COOK:
Q. Well, would you agree with that statement?
A. I think it -- I think the binding to SHGB is -- I would have thought greater than that. More on the order of 80/20 or something.
(Marked for identification purposes, Exhibit 25.)
THE WITNESS: And the avidity of the binding is an important issue. When it binds, does it stay bound.
BY MS. COOK:
Q. Okay. So this is a 2006 publication in Contraception, of which you're an author; correct?
A. Yes.
Q. Okay. And this looks at the pharmacokinetics of single-dose levonorgestrel in adolescents; right?
A. Yes. This is oral single dose.
Q. Emergency contraception; right?
A. Right.
Q. Okay. So page 108, right-hand column, the

Page 277

bottom paragraph, do you see that it says:
"Levonorgestrel is bound to albumin approximately 30 to 55 percent and SHBG approximately 40 to 60 percent, with considerably greater affinity to SHBG"?
A. Yes.
Q. And that's a true statement; right?
A. Well, let's look at the reference because that's not what we studied.
Where in the -- is that in the --
Q. 16 and 17 are at the back of the paper. One of them is the Kuhnz 1992 article, and the other one is Juchem 1990.
A. Yes. M-hm.
Q. Okay. So you're not going to dispute the article or the statement in the article you published; right?
MS. NATALE: Object to form.
THE WITNESS: Well, remember, this is oral levonorgestrel, not parenterally administered. So I would bet that the binding characteristics are different for Norplant or Mirena than they are for a big dose of oral levonorgestrel. You wouldn't expect the same binding.
And what I'm referring to here is binding

of oral, because that's -- that's the topic.
BY MS. COOK:
Q. Well, you certainly would agree that looking at a free levonorgestrel index that tries to calculate free levonorgestrel by only looking at SHBG and not albumin would not provide a complete picture; correct?
A. The binding to albumin is agreed by most experts to be trivial. So I think you get a pretty accurate estimate by -- and colleagues like Frank Alvarez, who have done a lot of work with levonorgestrel and its effects, agree with me, that the free levonorgestrel index that depends just on sex hormone -- sex hormone binding globulin, particularly for parenteral administration -- that is, sustained release rather than big dose -- falls off, half-life is short, is -- is a good index.
Q. Certainly, there --
A. So I don't agree with -- no, I don't agree with you.
Q. Certainly there are other ways of estimating free levonorgestrel today; correct?
A. There are other ways.
Q. Okay. I'm going to hand up a paper that you rely on in your report.



(Marked for identification purposes, Exhibit 26.)
THE WITNESS: And I think the importance of this paper, although I didn't cite it in the report, is that it shows the high variability, if you look at Figure 1, all exposed to the same dose, very different metabolism, and really high variability in the serum concentration.
BY MS. COOK:
Q. And this is high variability in the serum concentrations of levonorgestrel in adolescents taking single-dose emergency contraception; correct?
A. Yep.
Q. All right. I handed you Exhibit 26. That's the Hoffmann manuscript that you reference in your report.
Do you recognize this?
A. Yes. Yep.
Q. Okay. And you relied on this; right?
A. Yes.
Q. Page -- well, page 32 at the very back, Table S2. This provides statistics of SHBG serum concentrations over time with various products, including Mirena; correct?
A. Yes.



Q. And you see that the geometric mean SHBG level for Mirena goes down between Day 25 and three months, but then it starts to go up a little bit and stabilizes; correct?
MS. NATALE: Object to form.
THE WITNESS: Yes. What was remarkable to me, and I comment on that, is the -- in all of the doses, the huge coefficient of the variation.
BY MS. COOK:
Q. But even with the coefficient of variation, you would agree with me that the SHBG stabilizes over time; correct?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. If you turn to Table 2, which is on page 22 of the manuscript, that's what you cite in your report, and --
A. Total and unbound levonorgestrel serum concentrations at various times after insertion.
Q. And the -- the unbound levels of LNG serum concentrations that are in Table 2 for Mirena, do you have any reason to dispute the accuracy of those data?
MS. NATALE: Object to form.



THE WITNESS: No reason to dispute the data, and I don't think they would have been -- but I don't think that the index used to calculate them is a lot better than the simple free index relying on SHBG that most others have used.
And what -- what was remarkable to me and why I cited this -- this work was the, again, huge coefficient of variation.
BY MS. COOK:
Q. Even with the coefficient of variation, the Norplant free levonorgestrel levels are still lower than the ones with COCs; correct?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. And you said that you don't think that this way of calculating free levonorgestrel is a lot better than the FLI, but you're certainly not saying there's anything wrong with this way of calculating free levonorgestrel; correct?
MS. NATALE: Object to form.
MS. SEXTON: Did you mean the Mirena?
MS. NATALE: I think she meant Jadelle, actually, but I reserve the objection because there's no methods here.

Page 282

THE WITNESS: No.
MS. COOK: Okay. So he said, "No."
BY MS. COOK:
Q. And you're responding to my question? There's nothing wrong with the way that these authors calculated the free LNG information here; correct?
MS. NATALE: Object to form.
BY MS. COOK:
Q. Just to make sure the record is clear; is that right?
A. That's right.
Q. Now, what I meant to ask you is that the free levonorgestrel levels with Mirena, even taking into account the coefficient of variation that you referenced, are still lower than the levels -- or the free LNG levels with the LNG-containing COCs; correct?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. Okay.
A. But the variation is much greater.
Q. The variation is --
A. We're looking at the mean, but it's the

Page 283

variation that's important in individual patients.
Q. The variation is greater. But even considering the variation, Mirena users had a lower level of free LNG than COCs users; correct?
MS. NATALE: Object to form.
THE WITNESS: They have a lower mean, but individual -- because of a high coefficient of variation, individual users may have a much -- may have a higher value than someone taking an oral contraceptive --
BY MS. COOK:
Q. If you look --
A. -- because the variation is so much higher. And the reason for that is the delivery system.
Q. The percentage of variation that is listed here for Mirena is -- of the coefficient of variation is 21 percent, roughly -- between 21 and 22; correct?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. And if you increase the free LNG levels by 22 percent at any time point, they are still not as high as the free LNG levels with COCs; correct?
MS. NATALE: Same objection.

Page 284

THE WITNESS: In general. That doesn't mean for an individual they wouldn't be.
BY MS. COOK:
Q. You can't point me to a single Mirena patient who has higher free LNG level than a COC patient; correct?
A. Well, no. We don't have the individual results.
Q. Can you turn back to your book chapter on implants.
A. Yes.
Q. And this is Exhibit 11 again. It's page 188 is where I wanted to ask you about.
A. Yes.
Q. And on the left-hand side, you say:
"Body weight affects the circulating levels of levonorgestrel. The greater the weight of the user, the lower the LNG concentrations at any time during Norplant or Jadelle use."
Correct?
A. Yes.
Q. And that's true with Mirena; too, right?
A. Yes.
Q. LNG levels are lower in overweight and

Page 285

obese Mirena users than normal weight Mirena users; correct?
A. Yes.
Q. And are you aware of any article that says that free LNG levels are higher in overweight and obese women than in normal weight women using Mirena?
A. I'm trying to think of others. I haven't studied using free levonorgestrel index and made that assessment and published it. So I'm not saying that it hadn't been done.
I would expect that because obesity generally lowers SHBG levels, less levonorgestrel would be bound, and that you might find higher free levels in obese women than in slender women, even though their total levels were lower, because of the dilutional effect.
So what I'm saying is I'm not aware, but we could review the literature and see. I bet that Vivian and Frank have studied it.
Q. Sitting here today, and after preparing your expert report and reaching your opinions in this case, you are not aware of any article that says that free levonorgestrel levels are higher in obese women using levonorgestrel than in normal

Page 286

weight women; correct?
MS. NATALE: Object to form.
THE WITNESS: Right at this moment, I can't recall whether I've seen that or not.
BY MS. COOK:
Q. Appendix C of your report has certain data from a clinical trial.
A. Yes.
Q. And how did you decide to look at these patients?
A. Well, I received from the Bayer documents a huge number, I recall about 3,000 clinical trial subjects, in which these data were sporadically recorded, these kinds of data: BMI, serum concentration, duration of use, adverse events.
And asked that representative cases that had the most data -- that is, the most information about serum concentrations and weight -- be selected and that they be selected with attention to having both obese and nonobese subjects to get an overview of the -- of the data.
Q. Who did you ask to select these patients for you?
A. I asked Christina to make a table that would give me a way of -- give me a summary of the

Page 287

data rather than -- with the most information, the subjects that had the most information, and were representative of -- included some obese subjects, heavier subjects, and to -- and had enough SHBG information that a free index could be calculated using the method of Alvarez and others.
Q. So did you rely on the plaintiff lawyer, Christina Natale, to select representative patients for you?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. And you didn't look at the data for all of the patients in this clinical trial to see if they were, in fact, representative; correct?
MS. NATALE: Object to form. Misstates the testimony.
THE WITNESS: Well, I -- I looked through those pages, saw that there were a lot of missing data, as you would expect in a clinical trial like this, and saw there was a wide range in weight, and asked to have -- have it presented in a more interpretable form, and this is it.
BY MS. COOK:
Q. So did you look -- well, first of all, who

Page 288

calculated the FLI for these patients?
A. Christina did.
Q. Did you calculate the FLI of any patient yourself?
A. No.
Q. Did you calculate the FLI for any patients not to the charts that you received from Christina Natale --
A. But that's --
Q. Just please let me ask my question.
A. Ask it again.
Q. Did you calculate the FLI for any patients not on the charts that you received from Christina Natale in Exhibit C?
A. You mean any of the subjects that don't appear here?
Q. Yes.
A. Well, I don't recall. It's possible when we were looking at this big assemblage of data and testing the FLI calculation, that we may have done that for a few subjects. But I don't recall specifically. And those subjects may be here.
Q. Did you look to see if there were other reports of androgenic side effects, like acne, et cetera, that aren't included on this chart?

Page 289

A. In a general way. I didn't examine in detail each of the -- of those few thousand subjects, but I looked to see what appeared in terms of adverse event listings. These are typical adverse event listings, so they're representative. Typical adverse events in a trial like this.
Q. Now, you found that the same androgenic reactions were reported in women with varying BMIs, LNG serum levels, SHBG levels, and FLI; correct?
A. Yes.
Q. And in other words, there was no evidence from this clinical trial that higher FLI or serum level of LNG corresponded to more androgenic side effects; correct?
MS. NATALE: Object to form.
THE WITNESS: Yes. Supporting my impression from other clinical trials in which we've looked at adverse events and not found a close correlation between levonorgestrel concentrations and the adverse events because, as we discussed earlier, of the wide interindividual variation in sensitivity to the androgens.
BY MS. COOK:
Q. One of the side effects that you looked here -- at here were ovarian cysts; correct?

A. Yes.
Q. And ovarian cysts are related to progestin levels; correct?
A. Ovarian cysts are related to the degree to which the contraceptive, whatever it is, in this case a progestin, suppresses follicular development, you know, through negative feedback on the hypothalamus and pituitary, and allows FSH to be elaborated, causing follicular growth, but suppresses luteinizing hormone, so the egg is never released and the cyst grows.
So it's an issue of partial suppression of -- the simplest way to think of is partial suppression of ovulation.
Q. In any event --
A. So it's a common event with progestin-only contraceptives.
Q. Ovarian cysts are not an androgenic side effect; correct?
A. Well, they are insofar as the progestin used here is -- has androgenic capacity.
Q. I'm not sure what you mean by that.
But would you agree with me that ovarian cysts are not like acne in the sense that they are not androgenic side effects. They're based on



progestin and its impact as the way that you -- your lengthy explanation is impact on FSH; correct?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. Okay. Now, you looked at this list of adverse events that was compiled for you by the plaintiff's counsel, but did you actually look at the two published articles that report the actual study findings from these -- this trial?
A. I bet that I have, in the past, looked at those articles because I'm -- I may even cite them in this book. So not specifically in relation to these data, but I bet that I've read those articles in the past. I can't recall specifically.
Q. Well, if they're not on your list of materials reviewed with respect to this expert report, that's not something that you looked at in compiling your report; right?
MS. NATALE: Object to form.
THE WITNESS: No. But it doesn't mean I wouldn't have been aware of the results of the trial.
Want to see if they're in here?
///



BY MS. COOK:
Q. Well, that book was last updated in 2011, and these publications are from 2012 and 2014.
A. So it wouldn't be in there, no.
Q. Okay.
A. That doesn't mean I haven't seen them. No, but I didn't rely on them for this report.
Q. Now, you have -- is it correct to say that in your experience using levonorgestrel, you've had hundreds of patients with hair loss or acne or other androgenic side effects; correct?
A. Yes.
Q. And you've not had any patients with PTC; correct?
A. Not that I'm aware of.
Q. And I would guess that you don't know the level of your patients who had androgenic side effects, you don't know what their free LNG level was or their free testosterone level; correct?
A. Yes. For some subjects, because of my longstanding interest in levonorgestrel we measured SHBG and could calculate the FLI and looked at that in relation to, particularly, bleeding, which is one of the major -- irregular bleeding is one of the major reasons for discontinuing progestin-only



contraceptives, and androgenic side effects, and found surprisingly little relationship.
And that attests -- and that's why I commented on that in my report. That attests to the high degree of variability in response to -- of individuals to androgenic progestins; that is, one person with a certain free level or certainly total levonorgestrel with low level may develop acne, while another won't.
Q. Have you seen any published paper that concludes that the variability of responses to levonorgestrel has any relationship to PTC or IIH?
A. Whether or not develop -- developing androgenic -- other androgenic responses would predict developing pseudotumor cerebri, that's the question?
Q. No.
You've been talking about the variability of individuals' responses to levonorgestrel and how you've seen, in your experience, that different people have different reactions to different levels of levonorgestrel as it relates to androgenic side effects like acne; right?
A. Yes.
Q. Now, my question for you is is there any

published paper that talks about the variability of levonorgestrel and its impact on PTC?
A. No.
Q. Is there --
A. I'm not aware if there is one.
Q. Is there any article that concludes that higher free levonorgestrel levels increases the risk of IIH?
A. I'm not aware of any.
Q. Now, on page 21 of your report, you state that:
"In susceptible individuals, relatively high unbound LNG concentrations can cause or be a substantial contributing factor in causing PTC."
That statement there or that opinion there hasn't been expressed in any published paper that you're aware of; correct?
A. If the question is in women who develop PTC, have -- has anyone been able to measure levonorgestrel and sex hormone binding globulin and look at the degree of association, a kind of progression analysis and correlation coefficient, which would be the -- the ideal way to do that, the



answer is, no.
Q. Well, and you haven't done that either, right, sir?
A. No.
Q. When you say "no," I'm correct; right? Sorry. My question may have been confusing.
A. Yes, it would be a -- a long-term study. We only have 300 reports in all of Bayer's experience, for example.
Q. So when you say "susceptible individuals," there's no way to identify those individuals; correct?
MS. NATALE: Object to form.
THE WITNESS: I think that we've discussed already that there -- that there probably are ways to identify the individuals. And an example would be someone who has PCOS or has really had problems with developing acne when exposed to some androgenic substances in the past.
Someone who has -- you have reason to think has a really low sex hormone binding globulin, PCOS, would be an example.
So I think there probably are ways that you can screen women, as we do now. We talked earlier about counseling women about which contraceptive to



use if they have exhibited androgen sensitivity.
BY MS. COOK:
Q. So when you say "susceptible individual," you're talking about patients who either have PCOS or have demonstrated that they are -- have had androgenic side effects in the past; correct?
A. Yes.
Q. And for those patients, what exactly do you tell them about --
A. Or certainly somebody who's had pseudotumor cerebri in the past.
Q. Okay. So the patients who have had PCOS or PTC or have had problems with androgenic side effects in the past, what exactly do you tell them about Mirena and PTC/IIH?
MS. NATALE: Object to form. Asked and answered.
THE WITNESS: "You may be somebody who shouldn't be exposed to an androgenic progestin, and we have other methods of contraception that are very effective and might actually benefit you."
BY MS. COOK:
Q. Do you say anything about PTC/IIH specifically to them?
MS. NATALE: Object to form.



BY MS. COOK:
Q. Or do you just talk about androgenic -- well, being exposed to an androgenic progestin, period?
A. Exposure to androgenic progestins in general. Of course, if someone had said, "I've had PTC in the past," I would point out that "You may be at higher risk of getting it again if you're exposed to androgens, and you shouldn't use them."
Q. And that's hypothetical, because that has not happened yet, correct, in your experience?
A. Right. It hasn't.
Q. Okay. So to other patients who you think shouldn't be exposed to androgenic progestins, you don't specifically name PTC/IIH; you just say that if you think they're susceptible to androgenic side effects, they should consider a different progestin; correct?
MS. NATALE: Object to form.
THE WITNESS: I name the androgenic side effects that are listed on the package insert.
BY MS. COOK:
Q. But you don't mention PTC/IIH; correct?
A. No, it's not listed.
Q. Okay.

Page 298

A. It doesn't mean that it shouldn't be or that I wouldn't mention it in the future.
Q. At San Francisco General, where you treat patients in your family planning clinic, there is no information available to patients seeking information about contraceptive options that says that Mirena increases the risk of PTC or IIH; correct?
MS. NATALE: Object to form. Asked and answered.
THE WITNESS: That's correct.
BY MS. COOK:
Q. And for your patients who have Mirena, how do you follow them after you insert it?
A. You don't mean patients in clinical trials, who are scheduled to return and --
Q. Just your general patients. Right.
A. We would tell them to -- it's duration of action, and to come back if they have side effects, like the ones we've discussed. Irregular bleeding. They develop acne or changes in skin coloration. And, otherwise, we would see them about every year if they don't develop what they perceive as an adverse event.
Q. When patients come in for checkups, do you

Page 299

test their --
A. In some patients, I should go on to say, that we actually -- we found, and others who've published on this, that the more contact you have with a patient, the more successful she'll be in using her method.
So we have a program which we actually call patients up and say, "How are you doing? Do you have any questions that need answering about the method that you're using?" Particularly women who have received IUDs in our clinic.
Q. Do you do any testing of LNG serum levels or androgen levels when you follow up with your patients who are using Mirena?
A. No. Only for women who are in the clinical trial and it's in the protocol to follow blood levels.
Q. Do you --
A. For example, that's occurring in -- in the extension studies of Mirena, looking at blood levels to make sure they stay high enough, consistent with contraceptive efficacy.
Q. Do you recommend removing the Mirena when a patient has an androgenic side effect, like acne or hirsutism?

Page 300

MS. NATALE: Object to form.
THE WITNESS: Yes. Depends on how severe the reaction is.
BY MS. COOK:
Q. And that was my question.
Any time a patient has an androgenic side effect, do you automatically recommend removing it, or do you only recommend removing it if the side effect is extreme enough that the patient wants it removed?
MS. NATALE: Object to form.
THE WITNESS: Well, that really depends on the individual, how much is this bothering you, rather than -- than my perception of how much it should bother her. Highly -- that's individualized.
BY MS. COOK:
Q. So sitting here today, do you believe that a causal link between Mirena and IIH has been established?
A. Well, that depends on what you mean by "established." I believe we have increasing evidence over time of a relationship. The precise mechanism of causality is being established. For example, we discussed a paper using -- described using a rat choroid plexus model.

Page 301

Q. Well, we looked at the various pieces of data that you cite in your report, the Valenzuela report. We talked about that for a long time. Looked at the Etminan article that you don't cite. We looked at the case reports that don't establish causation, and then we looked at the various pieces of evidence about the androgen theory.
And at the end of the day, having looked at all this information, would you agree that a causal relationship between Mirena and IIH has still not been established today?
MS. NATALE: Object to form.
THE WITNESS: I believe that, taken together, the evidence supports an association.
BY MS. COOK:
Q. And I understand that. But as we've discussed, there is difference between association and causation.
And would you agree with me that, taken together, as we sit here today, keeping in mind that things evolve, the evidence does not establish causation?
MS. NATALE: Object to form.
THE WITNESS: I think in terms of dealing with -- with patients, the evidence is strong enough

to require caution.
BY MS. COOK:
Q. And that's a different question, isn't it, Doctor, than what I asked; right?
A. I don't know. We discussed that -- how I would disagree with Valenzuela's assertion that you wouldn't remove Mirena from someone who had pseudotumor cerebri.
I think the evidence is perhaps not just from his work, although that's part of the support for the argument, but from all of the evidence, that someone who is at risk of the condition shouldn't be exposed to additional exogenous androgen.
Q. And we can put aside that issue, because I -- I think that's a different issue than what I'm asking, which is, you know, looking at what your own textbook says about the difference between causation and association, you would agree with me that as of this moment, in January 2018, the evidence is not sufficient to support a causation -- causal link between Mirena and IIH? Would you agree with that?
MS. NATALE: Object to form.
THE WITNESS: No. I think the evidence supports causal link. But what -- I think what you're asking for is a clear mechanism of action. I



don't think we're there yet.
BY MS. COOK:
Q. Okay. We're not there yet in terms of a clear mechanism of action by which Mirena might cause IIH. You definitely agree with that right?
A. Yes. More work -- work remains to be done.
Q. Okay. But my question, then -- and you were right to -- to point out the wording, and I think I should have worded it more accurately.
Because what I'm really trying to understand is if you agree that, taken together, while the evidence, in your view, supports an association, causation has not yet been established between Mirena and IIH?
A. The mechanism --
MS. NATALE: Object to form.
THE WITNESS: -- of action hasn't been established. I think, as you -- as you well know, that it's related to androgen metabolism, and that we're getting closer to understanding that. But it's a process.
MS. NATALE: And just interposing an objection to the question.
BY MS. COOK:
Q. You said that you think the mechanism is



related to androgen metabolism, but that's not been established; right? I think that's what you just said.
A. I believe evidence is accumulating.
Q. Okay. But, I mean, if you look at what your own textbook says is required to establish causation, replicated studies, et cetera, including a mechanism -- a known mechanism of biological plausibility, you agree that there's not sufficient evidence to establish causation at this time between Mirena and IIH; correct?
MS. NATALE: Object to form.
THE WITNESS: Well, I believe we have biologic plausibility, and we have some epidemiologic association. We don't have a clear mechanism of action.
MS. NATALE: Where -- sorry. I didn't mean to cut you off.
THE WITNESS: Koch's Postulate kind of proof.
BY MS. COOK:
Q. Okay. I'm not -- I'm not sure you've actually answered my question yet, Doctor.
But, I guess, is the bottom line that you believe evidence supports an association here, but



that the evidence is evolving? Does that sort of sum it up?
MS. NATALE: Object to form.
THE WITNESS: Yes.
BY MS. COOK:
Q. And I'm not sure that you specifically answered my question, that causation has not -- well, you certainly would agree with me that a causal link between Mirena and IIH has not been proven, right?
A. Well, the mechanism hasn't been proven. As I said, I believe it's related, the mechanisms, more and more evidence, epidemiologic and biologic, that it's closely related to sex hormone metabolism. The precise mechanism has not been established.
MS. COOK: All right. So I have reached the limit of my seven hours with you.
Christina, if you don't mind, I would like to just mark for the record the PowerPoint that he brought with him.
MS. NATALE: Sure.
(Marked for identification purposes, Exhibit 27.)
MS. COOK: And what is this exhibit?
THE REPORTER: 27.

Page 306

MS. COOK: And that's -- do you know what request that's responsive to?
MS. NATALE: Yeah. It's maybe No. 5. It's the one that there were -- here, I've got it right here. I know this. It should be No. 5, I think.
And the PowerPoint that was requested -- it's No. 4. All paper, slide, handouts, et cetera. The -- one, two, three, four, five, six -- the sixth bullet down, it's not the exact PowerPoint. That one said 2009, Beijing, noncontraceptive uses of LNG -- of intrauterine LNG. And Dr. Darney told us that those PowerPoints evolve over time, and that he had a version of it from 2010 conference in Beijing that discussed the same subject matter.
MS. COOK: Okay. Got it.
MS. NATALE: So let's take a break. Off the record.
MS. COOK: Okay.
THE VIDEOGRAPHER: We're off the record at 5:49 p.m.
(Recess taken, from 5:49 to 6:33.)
THE VIDEOGRAPHER: We are back on the record. This marks the beginning of Disk No. 5 in the deposition of Philip D. Darney, M.D. The time is 6:34 p.m.

Page 307

EXAMINATION BY MR. ROCKSTAD
BY MR. ROCKSTAD:
Q. Dr. Darney, I'm Trevor Rockstad. I represent the plaintiffs in this case.
It's late. We've had a long day, so I don't want to keep you too long, but I just have a few questions to clarify a couple of things.
A. Okay.
Q. So if you would, pull your Exhibit 3. It's your report. We're going to take a look at Appendix C. Let me know when you've got that out.
Do you have it? If you would look at the -- I believe it's the first page of that appendix.
Are you there?
A. Yes.
Q. Okay. At the top there, right under title of the appendix, there's some data sets listed with some MIR numbers.
Do you see those?
A. Yes.
Q. Are those a wider set of data from which this Appendix C was compiled?
A. Yes.
Q. And did you review all the data from those

Page 308

data sets?
A. Yes.
Q. And does that data, the full data, support the contention for which you cite this Appendix C?
MS. COOK: Object to foundation. Form.
BY MR. ROCKSTAD:
Q. You can answer.
A. Yes, those data do support what's shown in Appendix C.
Q. And what is that contention, Dr. Darney?
A. The high degree of variability in levonorgestrel concentrations, both free and total, among subjects participating in these trials, representative subjects, and the general lack of relationship of androgenic progestogenic side effects, those accepted the result from levonorgestrel among those subjects in the trials.
Q. And you mentioned side effects. There's a number of side effects listed in this Appendix C.
Why did you choose those specific side effects to -- to discuss here?
A. Well, those -- those are the side effects that -- about which there's agreement that they are caused by exposure to the drug.
Q. Doctor, does anything you've heard here

Page 309

today cause you to rethink any of the opinions stated in your expert report?
A. No.
Q. Let's look at those opinions just briefly.
If you would, look at page 24 of the actual report.
A. Got it.
Q. Do you stand by all these opinions down here listed at the bottom, one through four?
A. Yes, I do.
Q. Do you hold these opinions to a reasonable degree of medical and scientific probability?
A. Yes.
Q. Okay. I want you to look specifically at No. 4. It reads:
"In susceptible individuals, relatively high unbound LNG concentrations can cause or be a substantial contributing factor in causing pseudotumor cerebri."
Do you see that? Did I read that correctly?
A. Yes.
Q. Has anything you've heard today caused you to rethink that opinion?

A. No.
Q. Do you stand by that opinion?
A. Yes.
Q. And do you hold that opinion to a reasonable degree of medical and scientific probability?
A. Yes.
MR. ROCKSTAD: I don't have any further questions. Shayna.

FURTHER EXAMINATION BY MS. COOK

BY MS. COOK:
Q. Dr. Darney, before we started back up again, we took a break for about 45 minutes or so.
Is that accurate?
A. I didn't time the break.
Q. Okay. Well, we have it timed on the record, so you don't have to worry about keeping track of the time.
During that break that we took, did you meet with the plaintiff attorneys during that time?
A. Yes.
Q. None of the patients in Appendix C or in the larger study report that you reviewed had IIH or PTC; correct?
A. No.



Q. Correct?
A. No, they didn't. They did not.
Q. Okay. And you said that --
A. Or that did not appear in the list of the side effects they had.
Q. Okay. And you said that you had looked at the larger set of data from the clinical study reports, but I believe you previously testified you didn't look at the -- you did not look at the free levonorgestrel of all the patients in the study; right?
A. No. That was -- needed to be calculated.
Q. And you did not calculate the free levonorgestrel level for all patients in the study; right?
A. No. It was calculated for a representative group, not for each one.
MS. COOK: Okay. No further questions.
MR. ROCKSTAD: Nothing from the plaintiffs.
Thank you, Dr. Darney.
THE WITNESS: Thank you.
MS. COOK: Thank you, Doctor.
///
///
///



THE VIDEOGRAPHER: This marks the end of Disk No. 5 and today's testimony of Philip D. Darney M.D. We are off the record at 6:41 p.m.
(Deposition concluded at 6:41 p.m.)
---oOo---



CERTIFICATE OF WITNESS

I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, additions or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained therein.

EXECUTED this _____ day of __________________, 20____ at _____________________, _________________.

_______________________________________

PHILIP DARNEY, M.D.

DEPOSITION OFFICER'S CERTIFICATE

I, LORRIE L. MARCHANT, Certified Shorthand Reporter, Certificate No. 10523, for the State of California, hereby certify that PHILIP DARNEY, M.D. was by me duly sworn/affirmed to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place herein named; that the deposition is a true record of the witness's testimony as reported to the best of my ability by me, a duly certified shorthand reporter and a disinterested person, and was thereafter transcribed under my direction into typewriting by computer; that request [ ] was [ X ] was not made to read and correct said deposition.

I further certify that I am not interested in the outcome of said action, nor connected with, nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of February, 2018.

__________________________________
LORRIE L. MARCHANT RMR, CRR, CCRR, CRC
Certified Shorthand Reporter #10523



NAME OF CASE: Mirena IUS Levonorgestrel-Related Products Liability Litigation
DATE OF DEPOSITION: 1/30/2018
NAME OF WITNESS: Philip Darney, M.D.
Reason Codes:
1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

Page ______ Line ______ Reason ______
From ____________________ to ____________________

__________________________
PHILIP DARNEY, M.D.