# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

\- - -

IN RE: MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY LITIGATION (NO. II) : 17-MD-2767 (PAE) : 17-MC-2767 (PAE)

THIS DOCUMENT RELATES TO ALL ACTIONS.

\- CONFIDENTIAL -

SUBJECT TO PROTECTIVE ORDER

\- - -

January 23, 2018

\- - -

Videotaped deposition of FREDERICK W. FRAUNFELDER, M.D., MBA, taken pursuant to notice, was held at the law offices of Lieff Cabaser, LLP, 250 Hudson Street, New York, New York, beginning at 9:05 a.m., on the above date, before Michelle L. Gray, a Registered Professional Reporter, Certified Realtime Reporter, Certified Shorthand Reporter and Notary Public.

\- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph| 917.591.5672
deps@golkow.com

APPEARANCES:

JONES WARD, PLC
BY: CHRISTINA T. NATALE, ESQUIRE
LAWRENCE L. JONES, II, ESQUIRE
1205 E. Washington Street, Suite 111
Louisville, Kentucky 40206
(502) 882-6000
christina@jonesward.com
larry@jonesward.com
Representing the Plaintiffs

COVINGTON & BURLING, LLP
BY: PAUL W. SCHMIDT, ESQUIRE
620 Eighth Avenue
New York, New York 10018
(202) 841-1000
pschmidt@cov.com
- and -
COVINGTON & BURLING, LLP
BY: ANNIE X. WANG, ESQUIRE
850 10th Street, NW
Washington, DC 20001
(202) 662-6000
awang@cov.com
Representing the Defendant, Bayer

ALSO PRESENT:

VIDEO TECHNICIAN:
Henry Marte



- - -
INDEX
- - -

Testimony of:

FREDERICK W. FRAUNFELDER, M.D., MBA

By Mr. Schmidt 12, 621, 654

By Ms. Natale 597, 651

- - -
EXHIBITS
- - -



| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Fraunfelder-1 | Expert Report Of Dr. Fraudfelder 12/23/17 | 12 |
| Fraunfelder-2 | Medication Induced Intracranial Hypertension In Dermatology (Friedman) | 20 |
| Fraunfelder-3 | The Use of the WHO-UMC System For Standardized Case Causality Assessment | 25 |





- - -
EXHIBITS (Cont'd.)
- - -



| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Fraunfelder-4 | Chart of Product, Daily Levonorgestrel Dose and LNG Dosing Regime | 58 |
| Fraunfelder-5 | Notice of Videotaped Deposition | 68 |
| Fraunfelder-6 | Rule 26 Disclosure of Prior Testimony | 69 |
| Fraunfelder-7 | Additional Documents Reviewed Expert Reports | 70 |
| Fraunfelder-8 | Two Invoices | 72 |
| Fraunfelder-9 | Expert Report Of Dr. Fraunfelder 1/21/16 | 76 |
| Fraunfelder-10 | Obesity and Contraceptive Use Among Women 20-44 Years of Age in the United States: Results From the 2011-15 National Survey Of Family Growth (Mosher) | 89 |





- - -
EXHIBITS (Cont'd.)
- - -



| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Fraunfelder-11 | Handwritten List Titled Risk Factors | 135 |
| Fraunfelder-12 | Handwritten List Titled Treatments for IIH | 153 |
| Fraunfelder-13 | An Estimation Of the Risk of Pseudotumor Cerebri Among Users of the Levonorgestrel Intrauterine Device (Valenzuela) | 165 |
| Fraunfelder-14 | Contraceptive Use Among Nonpregnant and Postpartum Women at Risk for Unintended Pregnancy, and Female High School Students in the Context of Zika Preparedness, United States 2011-2013 and 2015 | 208 |

- - -
E X H I B I T S (Cont'd.)
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Fraunfelder-15 | Two-Year Continuation of Intrauterine Devices And Contraceptive Implants in a Mixed-Payer Setting: A Retrospective Review (Sanders) | 212 |
| Fraunfelder-16 | BfArM Request 7/20/17 MIR_IIH_EU00606946-40 | 215 |
| Fraunfelder-17 | Contraceptive Use in the Nordic Countries (Lindh) | 223 |
| Fraunfelder-18 | Reference Manual on Scientific Evidence (Third Edition) | 251 |
| Fraunfelder-19 | Risk of Hypertension with Intrauterine Levonorgestrel (Etminan) | 258 |
| Fraunfelder-20 | Affidavit of Mahyar Etminan | 274 |
| Fraunfelder-21 | FDA FAERS FOIA Case Report Information | 366 |



- - -
E X H I B I T S (Cont'd.)
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Fraunfelder-22 | CIOMS Reports MIR_IIH_EU01156273-74 MIR_IIH_EU01156364-65 MIR_IIH_EU01156298-300 | 376 |
| Fraunfelder-23 | Suspect Adverse Reaction Report MIR_IIH_EU01156271-72 MIR_IIH_EU01157497-98 MIR_IIH_EU01156358-59 MIR_IIH_EU01156374-75 | 425 |
| Fraunfelder-24 | Underreporting Of Adverse Drug Reactions (Hazell) | 465 |
| Fraunfelder-25 | Abstracts of the 2010 Meeting of the International Neuroophthalmology Society, Lyon France | 479 |
| Fraunfelder-26 | Letters to the Editor Minocycline-Induced Intracranial Hypertension in a Patient with Levonorgestrel Intrauterine Device MIR_IIH_EU01083403-05 And Spanish Version | 483 |



- - -
E X H I B I T S (Cont'd.)
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Fraunfelder-27 | Excerpts of Drug-Induced Ocular Side Effects (Fraunfelder) | 517 |
| Fraunfelder-28 | NEJM, Levonorgestrel Implants and Intracranial Hypertension Excerpt | 541 |
| Fraunfelder-29 | Excerpt, Sunku Poster Presentation | 544 |
| Fraunfelder-30 | Serious Adverse Events in Norplant Users Reported To the FDA's MedWatch Spontaneous Reporting System (Wysowski) | 549 |
| Fraunfelder-31 | Pseudotumor Cerebri Associated With the Norplant Contraceptive Device (Tang) | 556 |



- - -
E X H I B I T S (Cont'd.)
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Fraunfelder-32 | Copy of the Deposition Transcript of Rosa A. Tang, MD 5/10/16 (Houston v Bayer) | 561 |

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
PAGE LINE
None.

Request for Production of Documents
PAGE LINE
None.

Stipulations
PAGE LINE
None.

Questions Marked
PAGE LINE
None.



- - -

THE VIDEOGRAPHER: We are now on the record. My name is Henry Marte. I'm a videographer for Golkow Litigation Services.

Today's date is January 23rd, 2018.

And the time is 9:05 a.m.

MR. SCHMIDT: Good morning, Doctor. I'm Paul Schmidt. I introduced myself to you just before we --

THE VIDEOGRAPHER: One second.

This is in the matter of Mirena products liability litigation.

The deponent today is Dr. Frederick W. Fraunfelder.

The court reporter is Michelle Gray and will now administer the oath to the witness, and then counsel you may begin.



- - -

... FREDERICK W. FRAUNFELDER, M.D., MBA, having been first duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. SCHMIDT:

Q. Doctor, I got a little ahead of myself. My name is Paul Schmidt, and I represent Bayer in this case. I think you met my partner Mike Imbroscio a couple of years ago. I'm going to follow-up on some of the questions that he asked on behalf of Bayer.

I've gone ahead and marked Exhibit 1 as Exhibit 1 a copy of your report in this matter.

(Document marked for identification as Exhibit Fraunfelder-1.)

BY MR. SCHMIDT:

Q. Is that in fact what Exhibit 1 is?



A. Yeah.

Q. Is Exhibit 1 a full and complete set of your opinions in this case?

MS. NATALE: Objection to form.

You can answer.

THE WITNESS: Yes.

BY MR. SCHMIDT:

Q. Okay. Do you have any opinions that you intend to offer that are not contained in Exhibit 1?

A. No.

Q. Would I be correct in understanding that you've -- you've done the work necessary to be able to testify to the opinions offered in Exhibit 1, and if you had to testify before a court or before a jury today, you'd be ready to go?

MS. NATALE: Objection to form.

THE WITNESS: Yes.

BY MR. SCHMIDT:

Q. Are there any opinions or -- strike that.
Is there any work that you plan to do that you have not yet done in order to testify that you know of?
A. Not that I know of.
Q. Okay. Do you -- let's talk about your expertise. Do you consider yourself to be an expert in the causes of IIH?
MS. NATALE: Objection form.
THE WITNESS: I consider myself to be an expert in drug safety and pharmacovigilance. So insofar as IIH is caused by a drug, then I think I'm an expert in that area.
BY MR. SCHMIDT:
Q. Okay. Let me ask you an example of that. If you look at Exhibit 1, at Page 27 of your report.
In the first full sentence you say, "Specifically the literature has focused on the well established



relationship of LNG, PTC in contrast to largely disproven associations to oral contraceptives and pregnancies."
Did I read that correctly?
A. Yeah, you read that correctly.
Q. Is that a correct statement that an association between oral contraceptives -- I'm going to use the term IIH, which is, for the record, idiopathic intracranial hypertension.
Is that okay?
MS. NATALE: Just objection to the use of IIH.
BY MR. SCHMIDT:
Q. Okay. Is that okay, Doctor, if I use the term IIH?
A. I will understand that, yes.
Q. Okay. And that's the same thing as PTC or pseudotumor cerebri?
A. Yes. It's synonymous. People use a lot of different terms. It's not the officially recognized term by the latest nomenclature. But I



understand it.
MS. NATALE: I'm sorry, Michelle. It was -- I was objecting to the term IIH, idiopathic. Thank you.
BY MR. SCHMIDT:
Q. And let me come back to the language of your report. Would you say it's accurate based on your study that an association between oral contraceptives and IIH has been largely disproven?
MS. NATALE: Just objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. And is the same thing true for an association between pregnancy and IIH, that has been largely disproven?
MS. NATALE: Same.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. In the case of oral contraceptives, for example, are you aware that there have been multiple



studies establishing that oral contraceptives do not increase the risk of IIH?
MS. NATALE: Objection to form.
THE WITNESS: I am peripherally aware. I haven't studied that for this deposition.
BY MR. SCHMIDT:
Q. But you -- do you know that independently from your work on -- I think you referred to your expertise in drug safety. Do you understand that independently from your work in drug safety, there are multiple studies, some of which you cite in your report or some sources that you cite in your report, that show there to be no increased risk of IIH in oral contraceptive users?
A. I'm aware of that.
Q. Would you carve any oral contraceptives out of those statements that you've just been making, are there some oral contraceptives that you would

Page 18

identify that are linked to IIH?
MS. NATALE: Objection to form.
THE WITNESS: I don't know. I'd have to study all the oral contraceptives. I'm not able to pull off in my fund of knowledge off the top of my head all the oral contraceptives and whether they are associated to IIH. I'm not able to answer that right now.
BY MR. SCHMIDT:
Q. Are there any that you can point me to that are associated with IIH, that you would carve out of this statement that you've made in your report?
A. Not that I can carve out for certainty right now.
Q. Now, just so we have it for the record, you cite a Friedman article from 2005 in support of the proposition that there is no link between oral contraceptives and IIH. Am I correct in

Page 19

that?
MS. NATALE: Objection to form.
THE WITNESS: You know, I wasn't writing in my paper -- my report, that I'm not linking oral contraceptives to IIH. That wasn't the whole point of the report. So I'm not sure where your headed with that.
BY MR. SCHMIDT:
Q. Where I'm headed is you state that there is a largely disproven association to oral contraceptives.
Do you see where I just read?
MS. NATALE: Objection to form. And just incomplete.
THE WITNESS: Yeah.
BY MR. SCHMIDT:
Q. And the citation for that is a 2005 article by Friedman; is that correct?
A. Yes.

Page 20

Q. I'd like to show you that article. Have you reviewed that article?
A. I've read that article, yeah.
(Document marked for identification as Exhibit Fraunfelder-2.)
BY MR. SCHMIDT:
Q. We'll mark that as Exhibit 2.
Is this in fact the article that you cite in Footnote 77 of your report in support of the proposition that there is a largely disproven association between IIH and oral contraceptives, what we've marked as Exhibit 2?
A. So that's what I've cited, yes.
Q. If you look, I believe the source of your citation, and you give a rather large pin citation, but I think it comes down to Page 35 of the article where there's a discussion of hormone therapy.

Page 21

Do you see that?
A. Yes, sir.
Q. And it states in the second sentence that, "There are a few reports of PTC occurring with oral contraceptive use, but the association has never been born out in case-control studies of PTC." And then it cites a few sources of its own.
Do you see that?
A. Yes.
MS. NATALE: Objection to form and incomplete.
BY MR. SCHMIDT:
Q. Do you understand that to be an accurate statement?
MS. NATALE: Same objection.
THE WITNESS: I agree with that statement.
BY MR. SCHMIDT:
Q. And there are no oral contraceptives that you can point me to now that you would carve out of that statement, are there?

MS. NATALE: Same --
BY MR. SCHMIDT:
Q. Specific ones?
MS. NATALE: Same objection, and asked and answered.
THE WITNESS: Yeah. Asked and answered.
BY MR. SCHMIDT:
Q. That's not an objection that you can make. Let me ask it a third time under Ms. Natale's counting, the first time under my counting so I can get an answer.
Am I correct that there are no oral contraceptives you can point me to that you would carve out of a statement that we just read in the Friedman article that you relied on?
MS. NATALE: Same objection.
THE WITNESS: Right, I haven't.
MS. NATALE: Compound.
THE WITNESS: In my fund of knowledge right now, I haven't



read about that. I'm not carving any out.
BY MR. SCHMIDT:
Q. Okay. Thank you.
Does Mirena cause IIH?
MS. NATALE: Objection to form.
THE WITNESS: I believe it's more likely than not Mirena causes IIH.
BY MR. SCHMIDT:
Q. And in reaching that conclusion, did you perform a Bradford Hill analysis?
MS. NATALE: Objection to form.
THE WITNESS: I performed analysis that is analogous to Bradford Hill.
BY MR. SCHMIDT:
Q. Did you perform a formal Bradford Hill analysis looking at the specific Bradford Hill criteria?
A. No.



Q. Have you ever published Bradford Hill analysis?
A. No.
Q. Have you ever conducted one in another context?
A. The World Health Organization's criteria for classifying an adverse drug reaction is derived from the Bradford Hill. So when my answer's that I perform one that's analogous to it, it's essentially a Bradford Hill analysis.
But I guess if you're asking me do I formally apply the eight or nine criteria that Bradford Hill lay out, then no.
Q. You just made reference to the World Health Organization criteria. I'd like to be sure I understand what you're referencing.
At one point in your report you make reference to some world health criteria where you can, as I understand it, look at individual cases and make a



judgment as to -- actually, let me make sure I get the categories right.
Why don't I actually go ahead and mark this as an exhibit so we are on the same page. I don't want to be looking at something that you don't have in front of you.
(Document marked for identification as Exhibit Fraunfelder-3.)
BY MR. SCHMIDT:
Q. I've marked as Exhibit 3 a document from the World Health Organization titled "The Use of the WHO UMC System For Standardized Case Causality Assessment."
And if you look at the second page of this document it has what it refers to as different causality categories ranging from certain to probable/likely to possible to unlikely.
Is this the causality -- are these the causality categories that you were referencing in your prior answer

regarding the approach that you applied in this case?
A. Yes, sir.
Q. And these are what you view as analogous to Bradford Hill?
A. Yes. I think it's very comparable.
Q. So would it be accurate to say that the causality approach described in Exhibit 3 is the approach that you've applied in this case?
A. Yes.
Q. And if I look at the title of this document, it states that it is a system for standardized case causality assessment. Did I read that correctly?
A. Point out to me where you are reading?
Q. Just from the very top, from the title.
A. "The use of WHO UMC system for standardized case causality assessment." I'm sorry. Yes.
Q. If you look at the first



sentence, it talks about case reports and then that discussion of case reports and pharmacovigilance runs through this document. Do you see that?
A. Yes.
Q. Is it your understanding that this causality system is intended for individual case reports in the pharmacovigilance context?
MS. NATALE: Objection to form.
THE WITNESS: It's intended for individual case reports or a collection of case reports.
BY MR. SCHMIDT:
Q. Have you seen this WHO system applied to epidemiological data, for example?
A. Can you give me an example of what you mean by that? I'm not sure I understand.
Q. Sure. You cite the Valenzuela study in your report, correct?
A. Yes.



Q. That's -- we can agree that's an epidemiological study, correct?
A. Yes.
Q. Have you seen this criteria that is discussed in Exhibit 3 applied to a study like Valenzuela or to a body of studies like Valenzuela?
MS. NATALE: Objection to form.
THE WITNESS: I'm thinking back on that. There's -- as there's thousands of epidemiological studies, and I can't say for certain if I know if this has been applied to any of them. So I apologize for not knowing.
But in general this is applied to case reports and case series.
BY MR. SCHMIDT:
Q. Okay. Let me -- let me take a step back. As I look at your report, Exhibit 1, and you -- you helpfully



summarize it on the first page, and I appreciate that. You talk about different types of data that you've reviewed; is that correct?
A. Yes.
Q. And some of the data is adverse event data. And you cite a range of that data from reports the company has received, reports other entities like the WHO have received, reports that have been published in the medical literature, different forms of case reports; is that correct?
A. Yes.
Q. A second sign -- line of evidence that you discuss is the Valenzuela study; is that correct?
A. Yes.
Q. And another line of evidence that you discuss is data that you have seen, principally case reports, on Norplant; is that correct?
A. Yes.
Q. And another line of evidence

that you discuss is what I'll refer to as biological data that would support a potential mechanism by which Mirena might cause IIH; is that correct?
MS. NATALE: Objection to form.
THE WITNESS: Yeah, plausible biological mechanism. Yes.
BY MR. SCHMIDT:
Q. I'll write that down so I get the verbiage right because you see I struggled with that. Plausible biological mechanisms?
A. Yes.
Q. Okay. And beyond those sources, adverse event data -- and that's broad in terms of covering reports the company has received -- published reports, reports from other sources, Valenzuela, Norplant, and -- actually let me stop there.
You also -- and I'm going to ask you how you rely on it. But you also



cite the Etminan article, correct?
A. The Etminan article is something that I cited.
Q. Okay. Is that something that you rely on in giving your opinions?
MS. NATALE: Objection to form.
THE WITNESS: I don't rely on that solely. Certainly not. I think -- I think some of it was, valuable which we can talk about.
BY MR. SCHMIDT:
Q. Okay. And we will. Other than those sources -- and I didn't mean that as an ominous statement.
MS. NATALE: We'll get there.
BY MR. SCHMIDT:
Q. Just didn't want you to think that we wouldn't have a chance to talk about it.
Other than those sources, Etminan, Valenzuela, Norplant information, adverse event data from all



the sources we talked about, plausible biological mechanism, and data potentially supporting that. Is there any other evidence that you rely on? I didn't see any. But I want to make sure that I have your list correct.
MS. NATALE: Objection to form.
THE WITNESS: There's quite a few literature reports that you didn't mention.
BY MR. SCHMIDT:
Q. I was including those in --
A. Okay. Just, like, the medical literature I relied on which includes a number of case reports and case series.
Q. Okay. So let me ask the question again. As I understand your lines of evidence, it's adverse event data, which includes both reports to the company and to agencies as well as published literature reports; it's the publications Valenzuela and Etminan; it's



Norplant data, which also includes publications of reports; and it's data supporting biological plausible mechanism.
Is there anything else that you've relied upon that I have not touched on?
A. I rely on -- I rely on those things, yes. And I also rely on my clinical and research experience as an expert in pharmacovigilance.
Q. Okay. Anything else?
A. I think that's a good summary of it.
Q. Okay. So let's go back to Exhibit 3.
Is it -- did I understand correctly your testimony that Exhibit 3, this causality assessment system, as it's referred to -- I'm looking right here.
A. Gotcha.
Q. -- is intended primarily for case report data --
MS. NATALE: Objection.

BY MR. SCHMIDT:
Q. -- and case series?
MS. NATALE: Objection. Objection to form.
THE WITNESS: I think it's most applicable to case reports and case series, yes.
BY MR. SCHMIDT:
Q. Have you ever seen it applied to biological mechanism data?
A. That doesn't --
Q. Let me ask the question differently. Is it fair to say that it doesn't fit --
MS. NATALE: Objection.
THE WITNESS: Plausible mechanism doesn't --
BY MR. SCHMIDT:
Q. -- for biological mechanism data?
MS. NATALE: Objection to form.
THE WITNESS: So, you know, those are difficult questions for



me to answer, just because I don't have in my brain the millions of literature reports on ADRs, adverse drug reactions. So I -- you know, I don't know if it's been applied to biological data.
BY MR. SCHMIDT:
Q. Okay. As far as you know, can you point me to an instance?
A. As far as I know, I can't point you to an instance.
Q. And can you point me to an instance where this methodology reflected in Exhibit 3 that you said that you applied has been applied to case report data on Mirena in a publication that has led someone to conclude that Mirena causes IIH?
MS. NATALE: Objection to form and misstates testimony.
THE WITNESS: So this method of looking at case reports and case series in the literature that I cite has been used to qualify



what's been written about it.
Has it said that it -- do the reports that I cite say that Mirena definitely causes IIH? The literature is reticent to do that because that's not the way scientists write --
BY MR. SCHMIDT:
Q. Okay.
A. -- peer review papers. It wouldn't be something that we do when we write papers.
Q. Let me take a step back.
Have you seen any scientific publication that comes to the conclusion in your opinion that Mirena causes IIH, the same opinion that you expressed to me a few minutes ago?
MS. NATALE: Objection to form and misstates testimony.
THE WITNESS: In my opinion, the body of literature that I cite, taken as a whole, make it more likely than not that Mirena



causes IIH.
BY MR. SCHMIDT:
Q. I'm asking a little bit of a different question, which is have you seen a specific article or publication or study where the authors conclude -- reached the same conclusion that you have reached, that Mirena can cause -- is capable of causing IIH?
MS. NATALE: Objection to form.
THE WITNESS: The -- you know, the best way to answer that is that, you know the authors wouldn't have written about it if they didn't think there was an association.
BY MR. SCHMIDT:
Q. I don't want you to speculate on what the authors think or don't think. I just want to know, is there an article that you can point me to where that causation conclusion is reached in the article?

A. Where they say it's more likely than not?
Q. Yes, or something to that effect.
A. It's just not the way scientists talk or write. So they -- that's not a -- it's not the kind of question that you ask medical people to write.
Q. Is the answer to my question you've not seen such an article?
A. The -- they don't speak like lawyers, doctors don't -- or scientists. So they aren't going to say more likely than not. They aren't going to say it certainly causes, because there's -- there are potential compounding variables and to call something certain would be not the way a medical person writes.
Q. So have you seen that?
A. It's not -- it's not something that we would write.
Q. Okay. My question is simply, have you seen it?



A. It's not something that we would write.
Q. You've got to answer my question or we have to go to the judge.
Have you seen it? I understand your explanation --
A. Yeah.
Q. -- for why maybe you haven't seen it. But have you seen it?
A. The reason that we haven't seen that sort of phrase in the medical literature is because we don't write that way. So we haven't seen it --
Q. Okay.
A. -- that kind of language, no.
Q. Have you seen doctors, in any publication, say that there is a causal association or that they have concluded that Mirena use increases the risk of IIH?
A. Yes.
Q. Which ones?
A. A number of the ones that I



cite.
Q. Which ones, please.
A. Well, let's go through all my literature citations. And we'll go through them one by one because I don't remember the names of the -- of the authors unless I look at them on the paper. So that might take us some time. But there's a causal -- there's a causal implication on a lot of them.
Q. Okay. Can you name me anywhere where there's a causal -- as you say a causal implication?
A. Well, the Valenzuela article.
Q. Okay.
A. And are we talking about Mirena or levonorgestrel in general?
Q. Just Mirena specifically.
A. Etminan 1 indicates there is a causal relationship. And there's others. You know, there's others. We have to dig through. But there are case reports and case series.



Q. Can you --
A. Even from overseas there's some, so...
Q. So can you identify for me now?
A. I'd have to look at the authors names. I can't just pull that out of my -- out of my head.
Q. Well, I'm going to show you articles. Let me just ask you if you see articles or if some occur to you as we're going through the day, let me know, please, because I want to make sure I cover them with you.
A. Okay.
Q. Have you seen -- looking at Exhibit 3, the second page has the causality criterias -- I'm sorry.
Page 2 of Exhibit 3 has causality categories, and I mentioned before they range from certain to probable/likely, to possible, to unlikely.
Do you see those categories?

Page 42

A. Yes, sir.
Q. Have you seen any scientists anywhere in the literature who have concluded that there are reports of IIH following Mirena use that are either certain, according to these criteria, or probable?
MS. NATALE: Objection to form.
THE WITNESS: I haven't seen that in the literature.
BY MR. SCHMIDT:
Q. Okay. And I think in your own publication, you categorize it as possible with respect to LNG generally, correct?
A. Yes, sir.
Q. Have you seen anyone else categorize it even as possible in the literature beyond you using these criteria?
A. I would say that I would come to the conclusion from the papers that I've cited that they would -- they

Page 43

would classify it as possible certainly.
Q. Have you seen papers where they make that classification, using these criteria?
A. Using these criteria is something that not everybody does. And in the papers that I cite, it's not something the authors utilize. One thing to understand is that there aren't a lot of people that do pharmacovigilance and drug safety, and not everybody writes papers the way I write them. And not everybody who writes about drug safety uses WHO criteria to do it.
I think it is the right way to do it, and I think I have a lot of evidence to back me up in that it's the right way to do it. But in the papers that I looked at, I think the authors definitely think it's possible.
Q. Okay. So to come back to my question -- and that's helpful to get that explanation. To come back to my question, is it the case that you have

Page 44

not seen other publications outside of your publication where these WHO criteria are applied to Mirena case reports regarding IIH and the conclusion reached is possible; is that correct?
A. Well, I haven't published on Mirena.
Q. Have you seen any other authors who have published on Mirena and concluded using these criteria that there are IIH reports that are rated as possible relative to Mirena?
A. So I'm going to -- I'm going to answer that with a qualifier. And that is, I believe, from reading the authors that it's logical to assume that they assume it's possible. But they don't use this specific criteria, because this criteria is used relatively rarely because they aren't pharmacovigilance experts. They may be epidemiological experts or they may be writing a single case report. That sort of thing.
Q. Let me just ask you a

Page 45

question. You've said a couple times now, you've -- I think you used the word "assumed" in your last answer with regard to other authors.
Have you had any contact with any authors on any publications regarding Mirena or LNG?
A. No, sir.
Q. And just so we have it for the record. I think you used the term LNG first. I'll use it as well. We both agree that's a shorthand for levonorgestrel?
A. Yes.
Q. And am I correct that when you give your opinion that Mirena is capable of causing IIH, the part of Mirena that you believe is responsible for the cause is the LNG in Mirena?
A. Yes.
Q. If there were no LNG in Mirena, it would not cause IIH in your view?
A. It's the only active

Page 46

ingredient in Mirena.
Q. So what I said is correct?
A. Yes.
Q. Okay. Before we put Number 3 aside, do you mind looking at the first page of Number 3.
It's got a table, Table 1. And it says, "Advances and limitations of standardized case causality assessment." And on the left-hand side it says, "What causality assessment can do," and on the right-hand side it says, "What causality assessment cannot do."
Do you see that?
A. Yes.
Q. And that's referring to this methodology reflected in Exhibit 3, right?
A. Yes.
Q. And, for example, some of the things it says that causality assessment can do is, "Decrease disagreement between assessors."
Do you see that?

Page 47

A. Yes.
Q. Do you agree with that?
A. Yes.
Q. It says it can help mark individual case reports.
Do you agree with that?
A. Yes.
Q. And then on the right-hand side -- and that's an incomplete list. On the right-hand side it also has a list of what causality assessment cannot do.
Do you see that?
A. Yes.
Q. And it states, "Causality assessment cannot:
"Give accurate quantitative measurement of relationship likelihood."
Do you agree with that?
A. Yes.
Q. It says the causality assessment cannot distinguish valid from invalid cases.
Do you agree with that?
A. Yes. I mean we can de facto

Page 48

say I agree with this table, if you would like to do that.
Q. Let me -- let me shortcut it that way. And I appreciate that. Do you agree with all of these limitations --
A. Yes.
Q. -- in Table 1 as to what causality assessments cannot do?
A. Yes.
Q. Including prove the connection between drug and event?
A. Yes.
Q. Let's go back to your causation opinion. Is -- you give rates in your report -- and if you'd like, I can refer them to you -- as to how common IIH is in different population groups, correct?
A. I give rates as to how common. Yes. I'm citing other people's work, but yes.
Q. Okay. And I think, just so you have it, I'm not going to ask you about it yet, but it's on Page 5 of your

Page 49

report. You talk about how common it is in women of reproductive age and how common it is in obese women, correct?
A. Yes.
Q. Here's my question.
Is there any calculation you have done that lets you -- strike that.
The rates that you give are in -- thank you -- in persons per hundred thousand, correct?
A. Yes.
Q. For example, you talk about it being somewhere just north of three per hundred thousand for women of reproductive age and somewhere between 11.9 and 21.4 for obese women, correct, per 100,000?
A. I just want to point out, you're making me a little uncomfortable saying that I say. I'm citing other people's work.
Q. Fair enough.
A. So these are what these authors are saying in 100,000. Yes.

Page 50

Q. Have you done any research on the incidence of IIH in any population groups?
A. No.
Q. And where I was going is, have you done any calculations that would let you say for women taking Mirena, these are the number of additional cases per hundred thousand that you would see?
MS. NATALE: Objection to form.
THE WITNESS: Ask that again.
BY MR. SCHMIDT:
Q. Sure. Have you done any calculations that would let you say when women take Mirena, these are the additional number of cases per hundred thousand that you would expect to see?
A. No.
Q. Do you know whether it's single digits or tens or hundreds of thousands of additional women who you believe would have IIH per hundred

Page 51

thousand from taking Mirena?
MS. NATALE: Objection to form.
THE WITNESS: No.
BY MR. SCHMIDT:
Q. Have you calculated the odds ratio that you believe applies to women taking Mirena and developing IIH versus women of a comparable group not taking Mirena?
A. No.
Q. So you don't know if it's 10 percent increased risk, a doubling, a fivefold?
MS. NATALE: Objection to form.
THE WITNESS: No.
BY MR. SCHMIDT:
Q. Would you agree with me that the vast majority of -- of Mirena patients never develop IIH?
A. Yes. No, I'm sorry. I don't want to editorialize it with "vast." I would say that there is a

Page 52

majority of women who take Mirena who not get IIH.
Q. If I were to try -- majority to me is 50 percent. If I were to try numbers, whether it's over 75, over 90, would you be able to calibrate where it is?
A. No, I would not be able to.
Q. And would you agree with me that the vast majority of IIH patients have never used Mirena?
MS. NATALE: Objection to form.
THE WITNESS: Objection to "vast." I'll just say majority, yeah.
BY MR. SCHMIDT:
Q. Okay. You would agree with me that the majority of IIH patients have never used Mirena?
A. Yes. I agree with that. Yeah.
Q. Do you know -- do you have any quantification of beyond that, of how

Page 53

many IIH patients in the United States use Mirena?
MS. NATALE: Objection to form.
THE WITNESS: Do I know how many people in the U.S. use Mirena?
BY MR. SCHMIDT:
Q. Yeah, let me -- let me re-ask the question. You just told me that the majority, more than 50 percent of people who have IIH have not used Mirena. Beyond that, do you have any quantification of the numbers, the percentage of people who have IIH who have never used Mirena?
MS. NATALE: Same objection.
THE WITNESS: No.
BY MR. SCHMIDT:
Q. Is -- you're familiar with the demographics of IIH patients, the symptoms of IIH, the treatment modalities and outcomes of IIH; is that correct?
A. Yes.

Q. Is there anything that you can point me to that is different about the IIH that develops -- you believe develops from Mirena than IIH that does not develop from Mirena?
MS. NATALE: Objection to form.
THE WITNESS: I think the IIH that develops from Mirena occurs in a temporal relationship to receiving Mirena, which sets it apart from a regular IIH.
BY MR. SCHMIDT:
Q. Is there anything about the symptoms of IIH associated with Mirena that are different than regular IIH symptoms?
MS. NATALE: Same objection.
THE WITNESS: Not that I'm aware of.
BY MR. SCHMIDT:
Q. Is there anything about the demographics of patients who develop IIH using Mirena than the demographics of



patients who develop IIH having never used Mirena?
MS. NATALE: Same objection.
THE WITNESS: So I think the demographics are similar.
BY MR. SCHMIDT:
Q. So, for example, if I were to ask you -- and I'm going to spend some time asking you questions about potential risk factors for IIH like obesity, like recent weight gain, like being overweight, like being a woman of childbearing age.
Taking those demographics as examples, is there anything that you can point me to in terms of those demographics, age, gender, weight gain, overall weight, that is different about Mirena IIH patients versus non-Mirena IIH patients?
A. Well, some of the Mirena IIH patients are not overweight.
Q. And some non-Mirena IIH patients are not overweight, correct?



A. Correct.
Q. Okay. So is there any difference between those two groups that you know of, Mirena patients who have IIH and non-Mirena patients who have IIH, that you would point me to that is different in terms of their distribution of weights, weight gain, gender, age?
A. I think the demographics are similar.
Q. No differences that you can point me to on those criteria, correct?
MS. NATALE: Objection to form.
THE WITNESS: Yeah, I can't point to any differences.
BY MR. SCHMIDT:
Q. Is there any difference between Mirena IIH patients and non-Mirena IIH patients in terms of the treatments that they receive or the outcomes that they have?
MS. NATALE: Objection to form.



THE WITNESS: The only difference that I can think of would be that if you stop Mirena the IIH would go away in some of our case reports.
BY MR. SCHMIDT:
Q. Okay. And I'll come to that. Other than your dechallenge data, which we'll spend some time talking about, are there any differences between the groups that you know of in terms of treatments or outcomes?
A. So I should say that there may very well be differences. They could -- maybe Mirena people get more ear ringing or they get more dizziness or they get more six nerve palsy. I just haven't studied it. And there could be differences. Just by me saying I'm not aware of it doesn't make it true. It just means I'm not aware of it.
Q. And that's my only question. Are you aware after any differences in treatment, or symptoms or outcomes?

Page 58

MS. NATALE: Objection to form. Asked and answered.
THE WITNESS: I'm not -- I'm not aware of the difference in the demographics.
BY MR. SCHMIDT:
Q. Do you believe that -- your opinion is that Mirena is capable of causing IIH in some patients, correct?
A. Yes.
Q. Do you believe that's a matter of public health concern?
A. Yes.
(Document marked for identification as Exhibit Fraunfelder-4.)
BY MR. SCHMIDT:
Q. I'm going to show you a document that I've marked as Exhibit 4. And what I will represent to you is that this is -- this purports to be -- and you see it on the cover, on the heading rather. This purports to be a list of different products that contain

Page 59

levonorgestrel LNG, along with their dose and their dosing regime.
MS. NATALE: I'll object to foundation and go from there.
BY MR. SCHMIDT:
Q. Do you see this list, sir?
A. Yes, sir.
Q. Do you have an opinion -- and take as much time as you want to read these -- this list. I'll just flag for you before I do.
If you look close to the bottom, the second one from the bottom is Mirena, correct?
A. Yes.
Q. And right above that is Norplant. Do you see that?
A. Yes.
Q. And a few above that is Jadelle. Do you see that?
A. Yes.
Q. Other than those products, because I'll ask you about those ones specifically, Norplant, Mirena,

Page 60

Jadelle -- well, strike that.
Let me ask you right out. Do you have an opinion that Norplant is capable of causing IIH in some patients?
A. Yes.
Q. And you understand Jadelle to be a follow on product to Norplant, correct?
A. Norplant 2.
Q. Okay. Do you believe that Jadelle is capable of causing IIH in some patients?
A. Jadelle is -- remind me about Jadelle. It's the IUS in Europe? Is that right? Jadelle. Oh, it's the arm implant. It's the Norplant 2, right? Jadelle is. So did you ask me the same question twice?
Q. No. I asked you if you understood it to be the follow-on to Norplant, you said yes. And then I asked you do you believe that Jadelle is capable of causing IIH in some patients?
A. Well, yes.

Page 61

Q. Okay. Other than those three products that we've talked about, Jadelle, Norplant, and Mirena, are there any products on this list, front or back page, that you would point me to, that you believe are capable of causing IIH in some patients?
MS. NATALE: Objection to form.
THE WITNESS: Well, I believe any of them that have levonorgestrel in them do. And I think Skyla is one of them, right?
BY MR. SCHMIDT:
Q. I'll represent to you every single thing on this list has levonorgestrel in varying degrees. That's why -- that's why I'm showing you this list.
A. So --
Q. Do you believe all of these products are capable of causing IIH?
A. I'm not -- I think the ones that are IUSes and arm implants are

capable of causing IIH.
The oral ones, I don't know.
Q. And why the distinction?
A. Well, the distinction is that I think that the biological mechanism between the arm implants and the IUS is -- leads to a higher rate of getting IIH from those types of levonorgestrel. When you take it orally, I don't -- I don't recall case reports of it occurring when you take it orally.
But I could be wrong. I haven't studied all those drugs. I would have to look them up.
Q. Okay. So let me just give you an example. If you look at Mirena. Do you see that it has the amount of levonorgestrel that is released?
A. Yes.
Q. And if you -- if you turn the page, there's a product on the back page called Skyla. Do you see that?
A. Yes.
Q. And Skyla has a lower amount



of levonorgestrel than Mirena, correct?
A. Yes.
Q. But it is also an intrauterine device, correct?
A. Yes.
Q. Do you have an opinion that Skyla, even with the lower doses, is capable of causing IIH?
MS. NATALE: Objection to form.
THE WITNESS: So --
BY MR. SCHMIDT:
Q. Or is that --
A. You know, my opinion is on Mirena. However, if you're asking me my opinion as a -- as an experienced clinician and pharmacovigilance expert, I would be very suspicious of Skyla causing IIH. I haven't studied Skyla though. I haven't looked it up or read about it or, you know, pulled up spontaneous reports of Skyla.
Q. I guess what I'm trying to get at is, if you -- I thought this is



where you were going. But I might have misunderstood.
You do have an opinion on Mirena, right?
A. Yes.
Q. It's based on the LNG, right?
A. Yes.
Q. Would you need to separately evaluate whether the level of LNG in Skyla is sufficient to cause IIH or do you believe that the fact that it has LNG in it tells you that it's capable of causing IIH?
MS. NATALE: Objection to form.
THE WITNESS: It's two things. One is that it is LNG. And the other is that it's an intrauterine device. And those two things would make me feel like it's possible that Skyla causes IIH.
BY MR. SCHMIDT:



Q. Okay. Do you have a certain opinion as we sit here right now on Skyla and IIH?
MS. NATALE: Objection to form. Asked and answered.
THE WITNESS: Not certain.
BY MR. SCHMIDT:
Q. You have a certain opinion as we sit here now on Mirena and IIH?
A. I'm not certain.
Q. If we look at these other products, just to take an example. If you look at the fourth box down on the front page.
I'm going to pick a different one so I don't pronounce it incorrectly. You see in the box there's a product called Levora in the fourth box down?
A. Yes, I see Levora.
Q. Do you see that the dosing -- you're going to have to help me, is that micrograms?
A. Yes.

Page 66

Q. And do you see that the dosing is 150 micrograms oral?
A. Yes.
Q. And just as a matter of math and I understand there's a different release mechanism, that's -- took me a second, 7.5 times higher than the gross number, the gross release rate for Mirena; is that correct?
MS. NATALE: Objection to form.
THE WITNESS: Well, I mean --
BY MR. SCHMIDT:
Q. Just as a matter of math?
A. I see where you're going with this. I'd like to cut to the chase.
Q. Is my math correct?
A. That dose is seven times higher than the -- I don't know if it's seven. What -- so Mirena is 20 micrograms. Seven times two is 140. It's more than seven times higher.
Q. I said 7.5. And I was

Page 67

really happy getting the .5?
A. Well, .5 is wrong too.
Q. Okay. We'll say more than seven times.
A. More than seven times.
Q. I'll take my pride back. Do you have an opinion that Levora causes IIH?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Or is that something that you'd need to study further?
A. Well, it's -- I mean, I answered that, right? I mean, I don't know about the oral ones. I don't know case reports of oral levonorgestrel causing IIH.
Q. Okay. Let me -- just as a housekeeping matter, let's go through some of the material that I received at the beginning of the deposition. What I'll probably do is I'll give you your deposition notice. Did you ever get a

Page 68

deposition notice in this case?
A. Deposition notice. You have to remind me what that is.
Q. The thing that I care about, it's a document saying all the official --
A. That I have to produce some stuff?
Q. Yeah, yeah.
A. Yes.
Q. Did you look at that list?
A. Yes.
Q. Okay. And I'll go ahead and mark the deposition notice as Exhibit 5.
(Document marked for identification as Exhibit Fraunfelder-5.)
BY MR. SCHMIDT:
Q. And ask you, if you look at the fourth page titled Exhibit A -- no need to review it exhaustively, but do you understand that to be the list that you -- list that you looked at?
A. Yes.

Page 69

Q. I'm going to mark some documents that I was given.
(Document marked for identification as Exhibit Fraunfelder-6.)
BY MR. SCHMIDT:
Q. Exhibit 6 is an update of your recent testimony. Do you see that?
A. Yes, sir.
Q. What was the subject matter of that testimony?
A. That was hepatitis B vaccine causing uveitis, at type of eye inflammation.
Q. Were you testifying for the defense or the plaintiff?
A. Plaintiff.
Q. The allegation was that hepatitis, I got the number wrong -- hepatitis B vaccine caused some type of eye problem?
A. Yes.
Q. Do you know the outcome of that litigation?

A. No.
Q. Do you know the plaintiff firm or lawyer that you worked with?
A. Yes.
Q. Who was that?
A. Joseph Pepper. And that's all I know. Joseph Pepper.
Q. Do you remember who conducted your examination for the defense in that case? It's going to hurt my feelings immensely.
A. Well, it's the government. You know, there's a -- there's a -- it was a special master, and the government had a -- had a defense lawyer. And I don't know who it was.
(Document marked for identification as Exhibit Fraunfelder-7.)
BY MR. SCHMIDT:
Q. Exhibit 7 is another document that we were given before the deposition that just lists a couple of documents reviewed.



Do you see that?
A. Yes.
Q. And it includes two plaintiff expert reports and three defense expert reports. Do you see that?
A. Yes.
Q. Do you know who for example Lemuel Moye is? M-O-Y-E, is Dr. Moye's last name.
MS. NATALE: Lemuel.
BY MR. SCHMIDT:
Q. I'm sorry, Lemuel.
A. You would have to remind me, I don't remember.
Q. Do you know a Dr. Salpietro?
A. I don't recall that name. I'm sorry.
Q. And just -- I don't mean to throw names at you.
There are some plaintiff experts in this litigation who do not appear on your list of materials that you have reviewed.
Do you know why it is that



you reviewed certain plaintiff expert reports and not others?
MS. NATALE: Objection to form.
THE WITNESS: No, I don't know why.
BY MR. SCHMIDT:
Q. And I can do the same exercise for the defense. I'm sure the lawyers across the table would readily testify as to the number of defense expert reports.
Three is a fraction of them. Do you know why you reviewed those three and not others?
MS. NATALE: Objection to form.
THE WITNESS: No.
BY MR. SCHMIDT:
Q. Anything sitting here right now that jumped out at you from those reports that you did review?
A. No.
(Document marked for



identification as Exhibit Fraunfelder-8.)
BY MR. SCHMIDT:
Q. I'm going to pass you Exhibit 8 which is the last set of materials I was given at the start of your deposition. And it's two invoices that I am going to mark together. And, actually, just for the same of the report I'm going to ask you to put that paperclip on them when you're done with that. One I understand to be your invoice. And one I understand to be the invoice of someone named Bree Jensvold-Vetsch?
A. Yes.
Q. As I understand it -- I don't mean to be overfamiliar. I'm going to refer to her by her first name so I don't butcher her last name. As I understand it, Bree is someone who helps you run searches of adverse event data?
A. Yes.
Q. Did she assist you in

running the searches that are reflected in your report of your registry?
A. Yes.
Q. Were there any searches other than that that you ran of adverse event data in connection with your opinions in this case?
A. No.
Q. And she spent, as I understand it, 6.5 hours on those searches?
A. Yes.
Q. And then the invoice that I have from you, the first page of Exhibit 8 is an invoice for $16,000, a little more than $16,000, to a fine gentleman named Mr. Larry Jones dated April 13, 2016; is that correct?
MS. NATALE: Paul, really quickly, there's a less retainer received at the bottom. And I just am not sure whether that's -- it looks like to be in addition so.



MR. SCHMIDT: Okay.
BY MR. SCHMIDT:
Q. With that caveat --
A. Yes.
Q. -- do you understand this to be your invoice?
A. Yes.
Q. -- through --
A. I understand this to be my invoice.
Q. -- through April of 2016?
A. Yes.
Q. And as I understand it this reflects work that you did -- let me strike that.
We now have something called a multi-district litigation, which I'm not sure if you're familiar with the term. It's a combination of cases in front of a single Judge. Are you aware of that?
A. I am now.
Q. Okay. Before we had the multi-district litigation, we had



multiple cases pending around the country. And it was in that regard that you prepared an initial report and were deposed by my colleague Mr. Imbroscio.
Do you remember that?
A. Yes.
Q. And that initial report -- why don't we go ahead and mark it, just so you've got an anchor for what I'm talking about.
(Document marked for identification as Exhibit Fraunfelder-9.)
BY MR. SCHMIDT:
Q. That initial report which I've marked as Exhibit 9 was dated January 21, 2016, correct?
A. Yes.
Q. And that's the one that you were deposed about by Mr. Imbroscio?
A. Yes.
Q. So if I look at your invoice, and I think you testified to this in your prior deposition, if I were



to delineate between the time that you spent preparing your report and then time that you spent getting ready for your deposition, the time that you spent preparing for your -- preparing your report, the one that we've marked as Exhibit 9, that was less than ten hours; is that correct?
MS. NATALE: Objection to form.
THE WITNESS: So just tell me how you came to the ten hours and I will more than likely than not agree with you. I don't know where you're getting that.
BY MR. SCHMIDT:
Q. If I look at the April 1st, 2016 entry, that's the first entry that I see that references your deposition. Do you see that?
A. April 1st, 2016. Deposition got it.
Q. Yeah. And as I understand it, everything before that relates to

Page 78

your report, an hour review of reports, another hour, two hours, 2:30, 2:45. 3:15, 3:45, four, four plus four is eight. Eight hours and 15 minutes is my count spent preparing your report; is that correct?
A. It's not ten hours.
Q. Okay. I said less than ten hours.
A. All right. Yes, that is correct.
MS. NATALE: I'll just -- I'll just object to the use of "report." I just don't want it to get confusing. You're talking about the 2016 report.
MR. SCHMIDT: I am, Exhibit 9.
BY MR. SCHMIDT:
Q. That leads to my next question.
After spending the eight or so hours preparing Exhibit 9 and after getting deposed, you prepared a more

Page 79

recent report which is what we have marked as Exhibit 1; is that correct?
A. I'm sorry. Say that again.
Q. Sure. You spent a little more than eight hours preparing Exhibit 9 back in 2016, correct?
A. Yes.
Q. After preparing your first report, Exhibit 9 and after being deposed about it, you subsequently spent time preparing a new report which we've marked as Exhibit 1; is that correct?
A. Yes.
Q. And the new report, as I read it, takes -- actually contains some of the same language as Exhibit 9, but adds additional discussion; is that fair?
A. Yes.
Q. And there's some additional data, I think, cited in Exhibit 1 that was not in Exhibit 9, correct?
A. Correct.
Q. My question to you is, I don't have an invoice for your time spent

Page 80

preparing Exhibit 1 beyond those eight hours, eight-plus hours that we talked about. Can you give me your best estimate of how much time, just in terms of the preparation of Exhibit 1, you spent?
A. I don't know. I have a secretary that keeps track of it for me.
And I would estimate it's a similar to this invoice, is my estimation. That it will probably be less than ten hours prior to this deposition.
MR. SCHMIDT: Okay. I will put a request on the record to --
BY MR. SCHMIDT:
Q. At some point you are going to give an invoice to --
A. I need to remember to do that.
Q. I would encourage you to do that the minute that you walk out of here.
MR. JONES: You're costing

Page 81

me money here. I felt like shushing you when you started to count.
THE WITNESS: I don't know the number. Doris -- I don't know why I'm saying Doris.
My executive assistant keeps track of my hours. And she knows the numbers, and I don't.
BY MR. SCHMIDT:
Q. Okay. Whether you do prepare an invoice or not, I'll put a request on the record that you ask your executive assistant for the number of hours spent preparing your report.
A. Okay.
MR. JONES: But you don't have to bill me.
MS. NATALE: And just to --
THE WITNESS: I should.
MS. NATALE: And just to get it on the record. I'm sure that the time that you're asking for will include both preparing the

report and preparing for today's deposition, or are you asking --
MR. SCHMIDT: Yes, for everything. But I'd like to know how much was specifically for the report. And I appreciate that you very helpfully did in Exhibit 8.
BY MR. SCHMIDT:
Q. Is there anything you know of that is -- if you go back to the deposition notice, Exhibit 5, is there anything you recall in terms of documentation discussed in Exhibit 5 that I've not put in front of you other than materials cited in your reliance list and in your report?
A. So you know, you asked for my speaking engagements, medical grand rounds, and all those things are represented in my CV, which you should have because I keep track of all of my speaking engagements.
Q. Okay. Are there any -- let me just ask that. Are there any -- are



there any talks that you've given or publications that you've given that specifically touch on Mirena and IIH beyond your -- I'm going to get your title wrong, your ocular side effects book?
A. No, I haven't written about Mirena and IIH. And I haven't spoken about Mirena and IIH outside of drug-induced ocular side effects. Drug-induced ocular side effects is being prepared as an Eighth Edition as we speak.
Q. Where does that stand in the preparation process?
A. Elsevier agreed to publish it. And we are writing the -- rewriting the chapters as we speak right now. We have a year to produce it.
Q. Have you rewritten the chapter that addresses LNG?
A. No.
Q. And when you say "we," is that you and your father and your



co-author?
A. Yes, sir.
Q. When you publish with Elsevier, do you pay any kind of fee for them to publish it?
A. No.
Q. Do they pay you any kind of upfront fee?
MS. NATALE: Objection to form.
THE WITNESS: There's no upfront fee. It's book sales only.
BY MR. SCHMIDT:
Q. Just royalties on the book sales?
A. Yes.
Q. Now, I'm not going to go through everything Mr. Imbroscio went through with you, which we'll both be gratified by. But I do need to update some questions that he asked you just to make sure nothing has changed since he deposed you in 2016.



A. Okay.
Q. And I hope that I can do this very quickly.
Is it the case that you have never inserted a Mirena?
A. That's the case.
Q. Is it the case that you have never prescribed any contraceptive?
A. Well, I would have prescribed contraceptives when I was an intern and an emergency room doctor. So I would have -- I would have prescribed it. But I've never prescribed Mirena.
Q. Okay. When would the last time have been that you would have prescribed contraceptives?
A. So '95 to '97 would have been my years that I did primary care.
Q. Since that time, have you ever counseled a patient on contraceptives?
A. No.
Q. In your work on this case, have you studied any other potential

Page 86

risks of Mirena beyond IIH?
MS. NATALE: Objection to form.
THE WITNESS: In our spontaneous reports, there's a lot of other side effects that are reported that I've studied and read, but I haven't written about them or put them into a case series or spoken about them.
BY MR. SCHMIDT:
Q. Okay. Have you studied the benefits of Mirena?
A. Well, I've read the Mirena package insert. And so that -- insofar as the package insert talks about Mirena can prevent unwanted pregnancies, then yes, I've read about that benefit.
Q. For example, do you know whether Mirena carries benefits relative to oral contraceptives?
MS. NATALE: Objection to form.
THE WITNESS: You know, I'm

Page 87

not an expert in that area. And so I would prefer not to answer that.
BY MR. SCHMIDT:
Q. You are not an expert in which area?
A. On the --
MS. NATALE: I'll just -- sorry. I will just object to the extent that this phase of litigation, is focusing on general causation, to the extent that it's beyond the scope of the Court's order.
THE WITNESS: I'm not an expert on the benefits that Mirena embrues outside of birth control.
BY MR. SCHMIDT:
Q. Are you aware of the birth control benefits of Mirena?
MS. NATALE: Same objection.
THE WITNESS: No, I'm not an expert on birth control.
BY MR. SCHMIDT:

Page 88

Q. Have you undertaken any study of the prescribing patterns for Mirena in terms of what kind of patient demographics that results in, in the Mirena population?
A. I have not done any studies on Mirena.
Q. Are you aware that -- of -- of data indicating -- strike that.
Have you heard the term "preferential prescribing" before?
A. No.
Q. If I may use that term to describe -- well, let me not use that term then.
Are you aware of data indicating that Mirena is more likely to be exposed -- to be prescribed to women who are overweight?
MS. NATALE: Objection to form and foundation.
BY MR. SCHMIDT:
Q. Are you aware of any such data?

Page 89

MS. NATALE: Same objection.
THE WITNESS: Can I repeat the question myself?
BY MR. SCHMIDT:
Q. Sure.
A. So Mirena -- do I know if Mirena is prescribed to women who are overweight?
Q. More so than average for contraception.
MS. NATALE: Same objection.
THE WITNESS: I'm not aware -- I'm not aware that it's prescribed to overweight women more so than women who are not overweight.
BY MR. SCHMIDT:
Q. Let me show you a study on that, which I'll mark as Exhibit 10.
MS. NATALE: I'll just object to the non-question.
(Document marked for identification as Exhibit Fraunfelder-10.)

BY MR. SCHMIDT:
Q. This is a study lead author, William Mosher, it's an article in press, being published by I believe the same entity that you said published your book in a journal called Contraception.
You see it's dated 2017?
A. Yes.
Q. Have you seen this publication before? I did not see it on your -- on your list of materials reviewed.
MS. NATALE: And I'll just object to the extent that it's, as you mentioned, in press.
THE WITNESS: I don't recall it.
BY MR. SCHMIDT:
Q. Okay. And I'll note, just in fairness, it's pretty recent. It was accepted November 24th, 2017.
If you look at Page 2 of this document, under methods, they make reference to reviewing CDC data, data



from the centers for disease control. Do you see that?
A. Yes.
Q. And they say that is the preeminent data source for national estimates of pregnancy rates and contraceptive use. Did I read that correctly?
A. It is the preeminent data source for national estimates of pregnancy rates and contraceptive use. Yes.
Q. Do you take any issue with that statement, that CDC data is the preeminent data source for national estimates of pregnancy rates in contraceptive use?
MS. NATALE: Objection to form.
THE WITNESS: Insofar as I'm not an expert in this area, I don't object to it.
BY MR. SCHMIDT:
Q. Okay. If we look at, if we



look at Page 4 of this article under discussions and conclusions.
It states that, "Obese women were less likely to report current use of hormonal methods, more likely to use sterilization, and when parous, more likely to use IUDs than non-obese women."
MS. NATALE: Objection.
BY MR. SCHMIDT:
Q. Did I read that correctly?
MS. NATALE: Objection to --
THE WITNESS: Yes.
MS. NATALE: -- form and foundation.
BY MR. SCHMIDT:
Q. Do you take issue with the statements these authors make that obese women are more likely when parous to use IUDs than non-obese women?
MS. NATALE: Objection to form.
THE WITNESS: So again, I'm not an expert in this area. So I don't take any objection to it.



BY MR. SCHMIDT:
Q. Okay. And just for example if you look at Table 3 on the next page?
A. Yes.
Q. They have across the top different categories of contraception, sterilization, IUDs, systemic hormonal contraception.
Do you see that?
A. Mm-hmm.
Q. And then they have different odds ratios for different patient characteristics?
A. Yes.
Q. And one of them is BMI. Do you see that, the first one in fact is BMI.
Do you see that?
A. This first column here is BMI?
Q. Yes. On the left.
A. Yes.
Q. And if you look, it has three BMI categories starting with 25 to

29, 30 to 34.9, 35 and up.
Do you see that?
A. Yes.
Q. And if you look at the odds ratios, the odds ratios -- the adjusted odds ratio for IUDs increases as the BMI category increases.
Do you see that?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. Are you aware of any contrary data of any data showing that there is no greater usage of IUDs among overweight and obese women?
MS. NATALE: Objection to form.
THE WITNESS: Yeah I'm not an expert in this area. I'm not -- I don't read that literature, so I don't know.
BY MR. SCHMIDT:
Q. So for example, if I assert



the proposition that this article supports that, relatively speaking, overweight women and obese women are more likely to be prescribed IUDs than they are oral contraceptives, are you aware of any data that contradicts that proposition?
MS. NATALE: Objection to form.
MR. JONES: Paul, can I -- I'm sorry.
MS. NATALE: That's fine.
MR. JONES: Paul, can I tip in. I'm not sure, are you -- I think everyone, including the record, needs clarification. Are you talking about hormonal IUDs, nonhormonal IUDs, or the whole thing?
MR. SCHMIDT: I'll just stand on my question. I think it's improper to have two people objecting.
MR. JONES: Well, I was just



trying to make a clear record here.
MS. NATALE: So I will just, for a clear record, object to form. Compound. Incomplete hypothetical. Continue. Vague.
BY MR. SCHMIDT:
Q. I bet you have no idea what my question is. We'll have to read it back.
A. You're right. I lost track of where we are at.
Q. Subject to the objections, let me read my question back.
If I assert the proposition that overweight and obese women are more likely to be prescribed IUDs than oral contraceptives, are you aware of any data that contradicts that proposition?
MS. NATALE: Same objection.
THE WITNESS: I don't know.
BY MR. SCHMIDT:
Q. If I assert the specific proposition that overweight and obese



women are more likely to be prescribed Mirena than they are oral contraceptives relative to women of average weight, do you know of any contrary data?
MS. NATALE: Same objections.
THE WITNESS: I'm not aware of that.
BY MR. SCHMIDT:
Q. And when we look at an article like this and it talks generally about IUDs, do you have any demographic data that tells you how much of IUD use is Mirena versus other forms of IUDs?
MS. NATALE: Same objection.
THE WITNESS: Do I, Dr. Fraunfelder, have that data? No.
BY MR. SCHMIDT:
Q. If I tell you that the majority of IUD use is Mirena, are you aware of any contrary data?
MS. NATALE: Same objections.

THE WITNESS: I don't know the subject, so I'm not sure why you keep asking me about it.
BY MR. SCHMIDT:
Q. In terms of -- you mentioned looking at the Mirena prescribing information. Do you recall that? What's sometimes called the label?
A. Yes, yes.
Q. Have you done any -- any surveys or focus groups of doctors to see how they understand the Mirena label?
A. No.
Q. Have you talked to Mirena's prescribers to in any way to assess their understanding of Mirena or IIH?
A. No.
Q. Have you done any comprehension testing with doctors or consumers about how they understand information about Mirena?
A. No.
Q. And I think I asked this, I apologize. I have asked this.



When was the last time that you diagnosed someone with IIH?
MS. NATALE: I'm sorry. Just to -- for a clear record, are you saying that you already asked that or you were not asking the question that you already asked and that's a new question?
MR. SCHMIDT: Just ignore my self-talk.
BY MR. SCHMIDT:
Q. When was the last time that you prescribed someone -- strike that.
When was the last time that you diagnosed someone with IIH?
A. Well, it would have been this year.
Q. And I think in your deposition with Mr. Imbroscio, you said that you've probably diagnosed somewhere more than ten and fewer than 50 cases of IIH in your career. Would your answer now be different?
A. I think that's still an



accurate answer.
Q. When you diagnose people with IIH, do you provide care for them, for their IIH?
A. Yes, yes.
Q. And would that be about the same number of patients for whom you've provided care for their IIH, somewhere between 10 and 50?
A. Yes. I provide care as part of a healthcare team. I'm not a neuroophthalmologist where I would refer my patient to them for care for their IIH. And I would refer them to a neurologist and a radiologist, and it would be a healthcare team. It wouldn't just be Dr. Fraunfelder. But in the instances where a patient comes and sees me, and I diagnose IIH, I involve more than just myself.
Q. And what is the referral to the neuroophthalmologist for? What is it that they do versus what you do?
A. So --



MS. NATALE: Sorry, I will also just -- I'm not -- it's not really clear if he said neurologist or neuroophthalmologist. But to the extent -- it might be --
MR. SCHMIDT: It's in the transcript. Neuroophthalmologist.
THE WITNESS: So both. I would refer to a neurologist and a neuroophthalmologist. And a neuroophthalmologist specializes in optic nerve disease, and the primary manifestation of IIH is papilledema, which I think you know what that is. And that optic nerve swelling from the high intracranial pressure is something that a neuroophthalmologist diagnoses and treats much more commonly than a person that would see me as a -- as a general ophthalmologist or a cornea specialist.

Page 102

BY MR. SCHMIDT:
Q. Let me try the question this way. Do you perform lumbar punctures of IIH patients?
A. I don't currently, but I've done a number of lumbar punctures in my life.
Q. When would the last one have been ballpark?
A. Probably '97.
Q. So would you refer to -- is it neuroophthalmologists --
A. Yes.
Q. -- who do lumbar punctures?
A. The neurologist would probably do the lumbar puncture. Neuroophthalmologist would do an optic nerve sheath fenestration, which I think you know what that is as well.
Q. Okay. Do you do the optic nerve sheath fenestration?
A. I've assisted.
Q. When is the last time?
A. In the last five years,

Page 103

maybe twice with my neuroophthalmologist, yeah.
Q. And do you prescribe -- there are medications that can be prescribed for IIH, correct?
A. Yes.
Q. Do you prescribe those medications?
A. I prescribe Diamox quite often, yeah.
Q. When was the last time that you prescribed Diamox?
A. Couple weeks ago, probably.
Q. In your patients who you have diagnosed or been part of the team caring for who have IIH, have any of those patients, to your knowledge, used Mirena?
A. No.
Q. Do you ask your patients -- strike that.
IIH is a disease of -- that's diagnosed by exclusion, correct?
A. Yes.

Page 104

Q. And that means that you see certain symptoms that could be symptoms of IIH, that could be symptoms of something else, you rule out the other conditions, and you're left with IIH?
A. Yes.
Q. There are a series of criteria called modified Dandy criteria. Are you familiar with those?
A. I need you to refresh me on those.
Q. Okay. Are you aware of a set of criteria that are used called the modified Dandy criteria to determine if someone has IIH?
MS. NATALE: Objection to form.
THE WITNESS: I don't use the name "modified Dandy criteria."
BY MR. SCHMIDT:
Q. Are there specific criteria that you use diagnostic criteria to determine whether someone has IIH?

Page 105

A. Well, yes.
Q. Like, for example, is there a measurement -- is a lumbar puncture necessary, in your view, to determine whether someone has IIH?
A. I think a lumbar puncture is very helpful.
Q. Do you need it? Can you diagnose IIH without a lumbar puncture in your view?
A. I'm going to -- I'm going to defer on this question as I'm not an expert in neuroophthalmology or neurology. And so I don't want to pretend like I am an expert on a lumbar puncture being necessary for a diagnosis of IIH. I'd just like to say I think it's helpful.
Q. Okay. Fair enough. Do you know, when a lumbar puncture is done, what level is diagnostic for IIH?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:

Page 106

Q. What measurement?
A. Well, millimeters of mercury, above 20, above 25, in that range.
Q. That's consistent with IIH?
A. Well, that's consistent with high intracranial pressure.
Q. Okay. And that's why I said consistent with IIH --
A. Yeah, yeah.
Q. -- instead of it tells you for sure if it's IIH.
A. Right.
Q. When you suspect that -- let me ask you this.
When you see patients and you have a suspicion that they might have IIH, is a part of your regular practice before making a final diagnosis to refer them for a lumbar puncture?
A. I would refer them to a neurologist.
Q. Specifically for a lumbar puncture or just generally?

Page 107

MS. NATALE: Objection to form.
THE WITNESS: Just generally.
BY MR. SCHMIDT:
Q. Okay. Will you make an IIH diagnosis without referring to -- let me try to be more precise. I'll withdraw that.
Will you make a conclusive judgment that someone has IIH without making a referral to a neurologist and hearing back from the neurologist as to their testing results?
MS. NATALE: Objection to form.
THE WITNESS: In my practice, that's not something that I do because I'm not -- I'm not a neurologist. So I refer to the experts in that area.
BY MR. SCHMIDT:
Q. And you look to neurologists to help you make that diagnosis as to

Page 108

whether someone has IIH?
A. Yes.
Q. Okay. When you -- when you were involved in the care of a patient who has IIH, are there questions that you or that you know your colleagues ask to assess whether the patient has been exposed to any potential environmental agents that could cause or worsen the IIH?
MS. NATALE: Objection to form.
THE WITNESS: So am I aware of them asking that?
BY MR. SCHMIDT:
Q. Yes. Or do you ask that?
A. Well, in my -- in my role as a drug safety -- drug safety researcher, I frequently do ask people about drugs that they take that would be associated with IIH. That would be something that I would ask.
Q. Okay. For example I think in your report you talk about retinoids

Page 109

and tetracyclines. Are those products that you ask patients who you think might have IIH or who you know who have IIH whether they've taken?
A. I would ask them about that if I -- I mean, you know it's hard to say what you do every single time. Medicine is an art. And you treat every patient differently. And maybe the patient's really sick and needs to be admitted them to the hospital, and their headache's terrible, and you don't ask them about tetracycline and retinoids.
So I don't know what I do every time. But I would, if I was at my best and I had time, ask about other drugs.
Q. Okay. Do you ask them specifically about Mirena usage if you're at your best and you have the time?
A. Yeah, if I'm at my best and I have the time, Mirena would be something that I would ask.
Q. And how long have you done

Page 110

that for with respect to Mirena?
MS. NATALE: Objection to form.
THE WITNESS: Well, I was involved in the Norplant -- Norplant data back in 1995, and so I've always felt like levonorgestrel caused IIH. And so I will always have asked about levonorgestrel-containing agent and IIH --
BY MR. SCHMIDT:
Q. So let me --
A. -- when I'm -- when I'm thinking about it.
Q. Okay. Fair enough. And let me see if I have the question right. Is it accurate that since 1995, you have asked generally about whether patients who you provide some level of care for who have IIH have been exposed to an LNG-containing product?
A. I would have asked about that on rare occasions because I see IIH

Page 111

relatively rarely.
Q. And do you recall any patient identifying exposure to an LNG-containing product in response to those questions?
A. No, I don't recall that.
Q. When -- when was the last time that you did any direct work with the FDA?
A. Five years ago. No, maybe two or three years ago actually. Because -- you're going to ask me what was it.
Q. Yes.
A. And I'm going to forget. You know what, I do remember what it was. It was -- I was a consultant for Eli Lilly. And Eli Lilly makes Cialis. And there was a number of case reports of optic neuritis associated with Cialis, an erectile dysfunction drug. And so they asked me to come consult on developing a clinical trial for all of the companies that make ED drugs. And that's what I

Page 112

did at the FDA for a couple days.
Q. Have you ever been asked by the FDA to serve on an advisory committee?
A. I've been asked by the FDA to do a lot of things. I don't know -- I don't remember the phrase "advisory committee" though.
Q. Do you know what an FDA advisory committee is?
MS. NATALE: Objection to form.
THE WITNESS: I believe it's a committee that is formed by, you know -- to look at a design for drug companies to do clinical trials.
BY MR. SCHMIDT:
Q. Have you done such committee for work the FDA?
A. When I worked at the FDA, which I did as a fellowship, I was on the other side of the table. And I was part of the regulatory environment where we

Page 113

would review the clinical trials and the clinical trial designs and the investigational new drug applications. And that's what I did. I didn't really -- I didn't really work on the drug company side.
Q. Okay. When was the last time that you worked on the FDA side?
A. That would have been during my fellowships after my residency. Oh that might have been 2004, 2005 possibly. I'd have to look at my CV if you want me to. Do you want me to?
Q. I think you've given it in terms that we can figure it out based on what you said.
When was the last time that you worked with the WHO? Is that the same answer?
MS. NATALE: Objection to form.
THE WITNESS: No. I have worked with the WHO every week.
BY MR. SCHMIDT:

Q. When was the last time that you worked for the WHO?
A. I've never been paid by the WHO. I'm a volunteer consultant for the WHO.
Q. Are you to this date?
A. Yes.
Q. When was the last time that you -- strike that.
Have you -- have you disclosed to the WHO any of your litigation work?
A. No.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Have you talked with anyone at the WHO about Mirena or about IIH?
A. No.
Q. Have you done any work in connection with the FDA or WHO regarding Mirena or IIH?
A. No.
Q. Have you disclosed your



litigation work, you're at the University of Missouri now?
A. Yes.
Q. Have you disclosed your litigation work to the University of Missouri in any way?
MS. NATALE: Objection to form.
THE WITNESS: Disclosed? People know because we did a deposition in my office. So insofar as they know I do litigation work, yes. But I didn't tell them it was about Mirena. It was confidential when we were in the conference room.
But my executive assistant would have known it was Mirena.
BY MR. SCHMIDT:
Q. Do you have a -- do you know if you have a disclosure process when you do outside expert testimony work at the University of Missouri?
MS. NATALE: Objection to



form.
THE WITNESS: We are permitted to do outside consulting and testimony and expert work unlimited. And the University of Missouri doesn't make any claim to the monies earned and don't restrict us from using university property. There is no restriction in that area.
BY MR. SCHMIDT:
Q. Is there a disclosure requirement to your --
A. No.
Q. -- department?
A. There's no disclosure requirement.
Q. Have you designed an epidemiological study?
A. No.
Q. Have you published an epidemiological study in a peer-reviewed journal?
A. No. I'm not an



epidemiologist. I don't claim to be an expert in epidemiology.
Q. Okay. In your report -- and if you want to look at the language. I want to just read you the language without putting it in front of you.
On Page 3, you state that, right before your list of abbreviations, you refer to your expertise and you say, "My expertise qualifies me to opine on various issues." And among those issues is drug prescribing.
Do you see that?
A. Yes.
Q. My question to you is -- is, do you consider yourself an expert on drug prescribing for any -- any type of medication, or are there specific areas where your expertise extends or is limited?
A. You know, the word expertise is qualitative. I'm certainly a much more expert at drug prescribing than the average person who goes to medical school

because I deal with drugs and drug safety and that sort of thing.

So I would put myself forward as an expert in drug prescribing. But you know, I'd have to read about it before I do. I'm not irresponsible.

Q. Fair enough.

If you read about it, would you hold yourself out, for example, as an expert on drug prescribing for cancer drugs?

A. Well, I'm an ocular oncologist. So yes.

Q. Would you -- have you heard of a drug called warfarin?

A. Yes.

Q. And I take it, being a doctor, you're familiar that warfarin is a tricky drug to prescribe, in terms of you've got to monitor blood levels and watch for food-drug interaction. Would you consider yourself an expert on drug prescribing for warfarin?

A. That wouldn't be a drug that



I would prescribe comfortably because, as an ophthalmologist, I don't want to check their blood clotting levels. I'd defer that to primary care doctors and oncologists and --

Q. Would you consider yourself an expert on drug prescribing for psychiatric medications?

A. No. I'm not a psychiatrist.

Q. Would you consider yourself an expert for drug prescribing for any form of contraception?

MS. NATALE: Objection to form.

THE WITNESS: No, I'm not an expert on drug prescribing for contraceptives.

BY MR. SCHMIDT:

Q. Let's go back to your numbers about -- and I'm going to ask you a similar question to what I asked you before, but just a little bit differently. Look at Page 5 of your report. Exhibit 1, with me, if you



would. You have these numbers of these incidence rates for IIH in different populations. Do you see that?

A. Yes.

Q. You give an incidence rate for obese women and an incidence rate for American women of reproductive age. Do you see that?

A. So again, I'm citing other authors. But I write about other authors' incidence rates.

Q. And I take it by citing these authors, you are not taking any issue with their -- with their numbers, right?

MS. NATALE: Objection to form.

THE WITNESS: Correct.

BY MR. SCHMIDT:

Q. Would you be able to tell me -- strike that.

I'm going to -- I'm going to refer to a concept called background rate. Is that -- is that a concept that



you've heard referred to in the drug safety context, that there's a background rate of a disease in a given population that you need to take account of when you're looking at the impact of a medicine in that population?

MS. NATALE: Objection to form.

THE WITNESS: I understand what you mean when you say background rate.

BY MR. SCHMIDT:

Q. And what I'm getting at, so that we are on the same page, is when you look at a condition that might be linked to a medication, whether it's IIH or something else, it's possible that that condition would occur at a certain level in the population being treated with that medicine, even if they never used the medicine, correct?

MS. NATALE: Objection to form.

THE WITNESS: Correct.

BY MR. SCHMIDT:
Q. And some of that could be because of the disease state that the medication is treating, although that's not the case with Mirena and IIH, unless you consider women of childbearing age. Some of that could be due to other factors, like independent risk factors in the population?
A. Yes.
Q. And so if I were to try to calculate the background rate for women who take Mirena in terms of their background rate of IIH, do you have an opinion as to what that background rate would be?
MS. NATALE: Objection to form.
THE WITNESS: So the background rate of IIH in women who take Mirena?
BY MR. SCHMIDT:
Q. Yes. Have you calculated that?



A. I haven't calculated that.
Q. So for example, one rate that you provide here is a rate for American women of reproductive age. Do you see that?
A. In the general population -- yes.
Q. And do you have an opinion as to whether women in America who use Mirena are all or mostly all of reproductive age?
A. Mostly all.
Q. And so would you expect at a minimum, the background rate in the Mirena population to be at least 3.3 to 3.5 --
MS. NATALE: Objection.
BY MR. SCHMIDT:
Q. -- background rate for IIH --
MS. NATALE: Objection.
BY MR. SCHMIDT:
Q. -- per hundred thousand?
MS. NATALE: Objection to



form. Sorry, Paul.
THE WITNESS: So you know, you can't generate incidence data for IIH and Mirena. So I don't know how to answer your question about background rate of IIH and Mirena. You can't generate incidence data from -- for such a rare -- for such a rare side effect.
BY MR. SCHMIDT:
Q. Let me try it this way. You have here incidence data for different populations. American women of reproductive age, and then a higher incidence rate for obese women. Do you see that?
A. Yes.
Q. Do you know if you looked at the demographics of the Mirena population what you would expect their background rate for IIH to be even if they never used Mirena?
MS. NATALE: Objection --



BY MR. SCHMIDT:
Q. Do you know what that would be?
MS. NATALE: -- to form.
THE WITNESS: So the answer is that if you compare Mirena and IIH to just IIH, you want to control the confounding variables as much as you can. You want the two populations to look similar.
And so the question is not really fair unless you phrase it that way, which is to say that if women with a similar BMI, I would say the background rate would be similar between the Mirena IIH group and the IIH group with no Mirena.
BY MR. SCHMIDT:
Q. Let me see if I understand you. And this is intended, because I think you are answering a different question than I'm asking. This is intended to be a simple yes/no.

Have you calculated which of these two rates or any other rates that would be the rate of IIH in the type of patients who get prescribed Mirena if they never used Mirena?
MS. NATALE: Objection to form.
THE WITNESS: So I've calculated no rates of any type in regards to Mirena.
BY MR. SCHMIDT:
Q. So for example, if I look at these rates, the lowest rate I see on Page 5 is 3.3 per hundred thousand, correct?
A. Correct.
Q. And the highest rate I see is 21.4 per hundred thousand, correct?
A. I don't see the 21.4. Where is that?
Q. One line --
A. Oh, there it is, yes.
Q. Do you know what you would -- based on the patient



demographics of women who use Mirena, do you know where along that spectrum from 3.3 to 21.4 you would expect potential Mirena patients to be in terms of their IIH incidence if they never use Mirena?
MS. NATALE: Same objection.
THE WITNESS: That last part where you said they never used Mirena. I just lost you.
BY MR. SCHMIDT:
Q. I'm trying to get the background rate. That's what I'm going at. Do you know the background rate, where it lies between 3.3 and 21.4 for Mirena patients of IIH?
MS. NATALE: Objection to form.
THE WITNESS: Mirena patients that get IIH, where are they in that rate? I don't know.
BY MR. SCHMIDT:
Q. I'm asking a terrible question.
A. I don't know.



Q. Let me try one more time and make sure. Your answer might be the same. But let me ask my question precisely.
Do you know what the background rate of IIH is in patients who are prescribed Mirena, whether it's down at the 3.3 per hundred thousand level or 21.4 per hundred thousand level or somewhere else? Do you know?
A. I don't know. I don't know. I really don't know what you're talking about truthfully. I'm sorry.
Q. Well, you could look at Mirena patients and determine how many of them are women of childbearing age for example, right?
A. Yeah.
Q. You can look at them and determine how many are obese, right?
A. Yeah.
Q. You can look at them and determine how many have recent weight gain, right?



A. Mm-hmm.
Q. You can make judgments based on that data and what we know about incidence rates in those types of populations. You could make judgments as to what the likelihood of those women developing IIH would be if they never used Mirena, correct?
MS. NATALE: Objection.
BY MR. SCHMIDT:
Q. Just based on their patient characteristics and how that fits into incidence rates, correct?
MS. NATALE: Objection to form.
THE WITNESS: Okay.
BY MR. SCHMIDT:
Q. Have you done that?
A. No.
Q. Okay. In your last deposition, you were asked about a lot of the symptoms of IIH. I'm not going to go back through them.
But I want to ask just a

Page 130

couple of general questions about them.
Let's start with papilledema, do you know how often it is the case, just roughly speaking, where you see papilledema and it is due to something other than IIH?
A. So I will qualify this answer by saying I'm not an expert in neuroophthalmology, and I'm not an expert in IIH or the mechanism of IIH. But being that it's a diagnosis of exclusion, you have to exclude other diseases. And I can't say with any certainty what percent is IIH and what percent isn't.
Q. Okay. Do you know -- I'll ask it much more simply. Do you know if you see papilledema if it's more likely than not that it's IIH or something else?
A. I'm not an expert in that area. So I don't -- I don't think that way, talk that way, write that way as a doctor.
Q. Would your answer be the same if I asked you about intracranial

Page 131

pressure. Do you know how -- let me ask the question directly. Do you know how often that you observe intracranial pressure and it proves to be pseudotumor cerebri?
MS. NATALE: Objection to form and intracranial pressure.
THE WITNESS: You know, I mean, doctors write down a differential diagnosis of what they think things could be. And we don't say is it more likely than not meningitis or pseudotumor cerebri or subarachnoid hemorrhage. We write down what it could be. We do diagnostic studies. And then we determine it.
We don't think like lawyers.
MS. NATALE: Paul, do you -- sorry. Do you mine increased intracranial pressure?
MR. SCHMIDT: I do, so I'll re-ask the question.

Page 132

THE WITNESS: Don't re-ask the question.
MS. NATALE: I'm sorry.
THE WITNESS: It was such a good answer.
MS. NATALE: I think it was.
BY MR. SCHMIDT:
Q. If you see a patient who has increased intracranial pressure, do you know that it's more likely than not that they have pseudotumor cerebri as opposed to some other condition?
A. I don't know what it is yet. I have to investigate it.
Q. Okay. So let me try it a little differently. Is it fair to say that just because you see increased intracranial pressure, you cannot assume that it's pseudotumor cerebri? Is that fair to say?
A. That's fair to say.
Q. I thought I saw counsel opposite looking at the clock.
MS. NATALE: I was just

Page 133

trying to figure out where we were at. It's not an issue to me but just the tape.
MR. SCHMIDT: I'll keep going.
THE WITNESS: Let's keep rolling.
MS. NATALE: Whenever he tells us we're out of tape, that's what I was looking for.
BY MR. SCHMIDT:
Q. Would you agree with me that the cause of IIH is generally unknown in the medical community?
MS. NATALE: Objection to form.
THE WITNESS: The cause of IIH can be, you know, investigated and found out. So I don't know if that's what neurologists think when they diagnose high intracranial pressure.
BY MR. SCHMIDT:
Q. Are there recognized risk

Page 134

factors for IIH?
A. Yes.
Q. What are those -- I'm going to write them down and then I'm going to ask you if I write them down correctly. So please help me as much as you can.
A. I assume you don't know what they are.
Q. What are the recognized risk factors for IIH in your view?
A. Well, obesity, women of childbearing age. That's it. I mean, that's the main -- those are the main things.
Q. Is recent weight gain --
A. Yes.
Q. -- a risk factor?
A. Yes, that's a risk factor.
Q. And you said that obesity is a risk factor. Is being overweight but not being obese a risk factor for IIH?
MS. NATALE: Objection to form.
THE WITNESS: Yes. Yes I

Page 135

believe so.
(Document marked for identification as Exhibit Fraunfelder-11.)
BY MR. SCHMIDT:
Q. I've marked the list that I made as Exhibit 11. Is that a correct -- is Exhibit 11 a correct list of risk factors for IIH?
MS. NATALE: Objection to form and the exhibit itself.
THE WITNESS: You're making me afraid I'm missing other risk factors. So let me just leaf through.
BY MR. SCHMIDT:
Q. I'm going to ask you about some medications in a minute. So I'm not purporting to have this be an exhaustive list.
A. Yeah.
Q. My question is simply, are the items --
A. Well --

Page 136

Q. -- on Exhibit 11 --
A. Well --
Q. -- risk factors for IIH?
MS. NATALE: Same objection.
THE WITNESS: So medications is a risk factor. I want to add that one.
BY MR. SCHMIDT:
Q. Okay. I will certainly come to that.
A. Let's write that one on there.
Q. Well, let me ask you, before I do, are the items listed on Exhibit 11 risk factors for IIH?
A. Yes.
Q. And by risk factors, could you tell me what you mean?
MS. NATALE: Just objection to form. And it's your question.
MR. SCHMIDT: Don't coach the witness by throwing the witness a pen.
MS. NATALE: He said he

Page 137

wanted to write it down.
MR. SCHMIDT: I'm going to ask --
MS. NATALE: He said on the record, "I'd like to add that to the list."
MR. SCHMIDT: That's fine. It's still coaching to be throwing a pen at the witness.
MS. NATALE: He doesn't have one.
BY MR. SCHMIDT:
Q. Doctor --
A. Yes.
Q. -- I'm going to present you with my pen.
A. Do you want me to write it down?
Q. Write down any other risk factors that you believe exist for IIH.
A. All right. I'm going to take my time on this one since you're --
Q. I might be able to help you. On Page 8 of your report, right at the

top. The first full paragraph you list --
A. My pages aren't -- one, two, three --
MS. NATALE: They're numbered.
BY MR. SCHMIDT:
Q. They are numbered at the bottom, aren't they?
MS. NATALE: Oh. Not in the --
THE WITNESS: Mine is not numbered.
MS. NATALE: -- copy you gave --
BY MR. SCHMIDT:
Q. You're looking at the wrong version of the report maybe.
MS. NATALE: Oh, is that the -- you want Exhibit 1. That's Exhibit 9.
BY MR. SCHMIDT:
Q. Yeah. What I suggest, Doctor --



MS. NATALE: You can --
BY MR. SCHMIDT:
Q. And I'll ask you to give it to Ms. Wang. I'm going to take away all your exhibits because I'm basically done with these. You can get them anytime you'd like, but I'm done with them until I decide I'm not. I'm unpredictable like that?
A. Okay. Page 8. I'm there.
Q. Do you see that you list various drugs associated with PTC?
A. Yes, I see that.
Q. So I'm pointing you to that in the event that it helps you fill out your list.
A. Yeah, so I'm just going to put medications as a general.
Q. Okay. Now, when you list risk factors on Exhibit 11, what do you mean by risk factor? What is a risk factor if you were to define that for the judge?
MS. NATALE: Same objection



and also --
THE WITNESS: It's a characteristic a subject would have that would make them at risk of developing a disease.
BY MR. SCHMIDT:
Q. For example, are you aware that there are multiple studies showing that being overweight or being obese increases your risk of developing IIH by several magnitudes of order?
A. Yes, I'm aware of that.
Q. Are you aware of the same thing for recent weight gain?
A. Yeah, I'm aware of that.
Q. And in that regard -- I think this is probably a truism that every American knows. But are you aware of the fact that the American population has become heavier over -- heavier over the last several decades?
MS. NATALE: Objection to form.
THE WITNESS: Yeah, I've



read about obesity epidemic, yes.
BY MR. SCHMIDT:
Q. That was the term that I was going to use.
A. Yeah.
Q. It's actually called an epidemic, right?
A. Yes.
Q. Would you expect rates of IIH to increase as the population gets heavier?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. And you referred to something earlier called a confounder. Do you remember referencing confounders?
A. Yes.
Q. What's a confounder?
A. So if you have a drug, adverse drug reaction relationship and you say that the drug causes the side effect, a confounder could be another

Page 142

disease, a different drug, a different biological mechanism, inherent autoimmune disease that could have also caused the disease. So those are confounding variables, and it might not be the one variable you're looking at.

Q. And when you're trying to assess causation, whether it's in case reports or studies, is it important to do your best to control for potential confounders?

MS. NATALE: Objection to form.

THE WITNESS: Yes. When you're trying to design a research study, if you can control the confounding variables, that makes the study more powerful.

BY MR. SCHMIDT:

Q. And if you cannot, does that raise questions or can that raise questions about the study?

A. Yes.

Q. Would you identify the items

Page 143

that you have helped me list on Exhibit 11 as potential confounders in terms of studying causes of IIH?

MS. NATALE: Objection to form.

THE WITNESS: So, yes. Yes. These can be, if you're not controlling these variables in both groups and you are not comparing the same weight or the same age or the same recent weight gain, and taking into account other medications that could cause IIH, then those can confound your study.

BY MR. SCHMIDT:

Q. And just in simplistic terms, would I be correct in saying that one of the concerns with confounders is that if you don't control for confounders, you could attribute causation to the thing that you're trying to study, when in fact it's due to the confounder?

Page 144

MS. NATALE: Objection to form.

THE WITNESS: Yes.

BY MR. SCHMIDT:

Q. I'd like to ask you about the medications on your list, but before I do, let me just ask you a couple of things that I don't think you did calculations on. But let me be sure that I understand this.

We talked about the obesity epidemic. Do you remember that?

A. Yes.

Q. Have you done any analysis of whether there has been linkage between increasing IIH rates in the population that has corresponded to Mirena usage in the population?

MS. NATALE: Objection to form.

BY MR. SCHMIDT:

Q. Have you done any such analysis?

A. No.

Page 145

Q. Have you done any analysis as to whether Mirena causes weight gain?

A. I haven't personally done any analysis on that, no.

Q. And you are not offering any opinions on that?

A. I'm not an expert in that area.

Q. Let's look at the medications then. And -- and before looking at the specific ones listed on Page 8. I want to point you to Page 5 of your report, please.

A. Okay.

Q. On Page 5 right at the top, you state, "Certain conditions and medications are so strongly associated with the disease, PTC, that the medical community considers them to cause the condition. These can be called risk factors."

Do you see that?

A. Yes.

Q. Is that a -- your view of

what a risk factor is, a condition or medication so strongly associated with the disease that the medical community considers them to cause the condition?
A. Yeah, I think that could be a way of describing it, yes.
Q. And is that true for the risk factors that you list on Exhibit 11, that they are so strongly associated with the disease that the medical community considers them to cause the condition?
A. That they could cause the condition.
Q. Could cause the condition. Fair enough.
Let's drill down then on what you mean in that regard with respect to medications. Let me give you back the pen.
A. Okay.
Q. Hopefully making Ms. Natale's day.
And ask you of the types of medications that you list on Page 8,



which ones of those, if you wouldn't mind writing under your heading, medication, are so strongly associated with the disease that the medical community considers them to cause the condition, just of the ones listed in that paragraph on Page 8.
A. (Witness complies.)
Do you want me to write the medicines here or any ones that I can think of?
Q. Just the ones listed there. And then I'll ask you if there's any others. May I -- may I get that back just so I can read into the record what I understand you to have written.
Am I correct that as these risk factors that are so strongly --
THE VIDEOGRAPHER: Put your microphone on.
BY MR. SCHMIDT:
Q. -- so strongly associated with the disease that the medical community considers them to cause the



condition, you've listed corticosteroids, tetracyclines, and retinoids, correct?
A. Yes.
Q. Are there any others?
A. Yes.
Q. What are the others?
A. There's a lot.
Q. Okay.
A. I have to find the list in my little thing in here.
Q. Let me just ask you a question. I'm not going to make you dig through it. What is that binder that you have in front of you?
A. This binder is my expert report. It is the WHO spontaneous reports. It is --
MS. NATALE: The appendices to the report.
THE WITNESS: It's every single literature -- every single paper that I've cited in my expert report. It is the Bayer clinical trials reports, and it's the



Norplant data, the package insert for Mirena.
MS. NATALE: I'll help you out. It's all the references in the report.
THE WITNESS: It's the gel label -- yeah, I said all the references in the report.
BY MR. SCHMIDT:
Q. Have you -- have you made any notations or highlighted on those documents?
A. No. I haven't touched them.
Q. Okay. Have you seen that binder before this morning? Let me ask the question little differently. Have you seen that binder in that literal specific form before this morning?
A. I saw it last night.
Q. Okay. And that's why you haven't annotated it in any way?
A. Yes.
MS. NATALE: Objection.
BY MR. SCHMIDT:

Page 150

Q. I'll ask to take a look at it at a break. Normally we would go ahead and mark something like that. But I don't know that we need to. But I will ask to look at it at a break.
MS. NATALE: He was going to list other medications. Is that where we were?
MR. SCHMIDT: Yeah, but I don't want to force him to go through in great detail, the binder.
Let's move on from Exhibit 11.
MS. NATALE: Okay. I'll just reserve the objection to his desire to search for additional items.
BY MR. SCHMIDT:
Q. And just so we have it for the record, I think what counsel is referring to is Exhibit 11 is a list of risk factors you believe exist for IIH, but it's not your complete list, correct?

Page 151

A. Correct.
Q. Okay. Fair enough.
MR. SCHMIDT: Can I get another piece of paper.
BY MR. SCHMIDT:
Q. Are you familiar with treatments for IIH?
A. Yes.
Q. Are you aware that in some cases with no treatment at all -- and I'm going to make a list of these, so I want to know if I'm right.
Are you aware that in some cases with no treatment at all, there is spontaneous resolution of IIH symptoms?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. May I write that on the page?
A. Yes, you may.
Q. If I could spell spontaneous.

Page 152

Are you aware that there is data indicating that the simple act of performing a lumbar puncture -- and I think you refer to this in your report. But let me be sure that I have it.
Is there data indicating that the simple act of performing a lumbar puncture can constitute a treatment for IIH?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. Is there data indicating that weight loss can be a treatment --
A. Yes.
Q. -- for IIH?
And you mentioned a medication earlier called Diamox. Is there data indicating that Diamox can treat IIH?
A. Yes.
Q. So again, I'm not purporting to be exhaustive. And I'll give you the

Page 153

chance to list additional treatments in a moment.
I didn't put my little sticker on it. Sorry.
(Document marked for identification as Exhibit Fraunfelder-12.)
BY MR. SCHMIDT:
Q. Is what I've marked as Exhibit 12 a list of some treatments --
A. Yes.
Q. -- for IIH?
A. Yes.
Q. Would you like to list other treatments? Sorry.
MS. NATALE: Now he's got too many pens.
THE WITNESS: So, well, the optic nerve sheath fenestration is a treatment that ophthalmologists do.
BY MR. SCHMIDT:
Q. May I ask you to list that. I'm not going to list every arcane one.

If there are other major ones, I ask you to list those.
A. I will write diuretics, which is what Diamox is.
Q. Okay.
A. There may be more. That's just all that I remember.
Q. Okay.
A. Oh, I know. There's one more. Withdraw of Mirena. Let me write that one down.
Q. Is that -- have you seen --
A. I'll write "withdraw of drugs that cause IIH or that are risk factors of IIH." Withdraw of drug -- offending drug.
Q. Okay.
A. All right.
Q. Have you seen textbooks, medical textbooks on IIH that talk about, for example, retinoids or tetracyclines and how withdraw of those can improve IIH symptoms?
A. Jeez, I'm sure I have. I



bet we can find it. I just -- you know, I haven't recently reviewed a textbook for this case.
Q. And where I wanted to go next is Mirena. I have not seen any textbooks that talk about Mirena withdraw as a way to treat IIH. Have you seen such textbooks --
MS. NATALE: Objection.
BY MR. SCHMIDT:
Q. -- that you can point me to?
MS. NATALE: Object to the form.
THE WITNESS: Textbooks -- I bet you we could find something that implies that.
BY MR. SCHMIDT:
Q. Have you seen any that say that?
A. I haven't seen them saying if you withdraw Mirena, your IIH will go away in a textbook. And I haven't looked for it either.
Q. Have you seen any



publications in your work on Mirena and IIH that had advocate withdraw of Mirena with patients who have IIH?
MS. NATALE: Objection to form.
THE WITNESS: I haven't searched the literature for that. I think if we searched the literature, we would find literature that says if you withdraw levonorgestrel or other IIH-causing drugs that that is a treatment -- that is a treatment for IIH, is to withdraw the offending drug. And levonorgestrel would be listed in that -- in that list.
BY MR. SCHMIDT:
Q. Have you -- is there anything specific that you can point me to that says that?
A. I bet you I could if you gave me some time.
Q. Can you do it right now



without taking that time to go back through the materials?
A. I'm kind of guessing it might be in that dermatology paper, listing all the drugs that cause IIH.
Q. In the Friedman paper?
A. No, I don't think she's a dermatologist. She is a neurologist. There is a dermatology paper that I referenced that talks about drugs in dermatology that cause IIH. And there's another -- there's another paper in there about drugs that cause IIH. Levonorgestrel is probably listed in it. But I'm not positive. But I would have to do a literature search to look for it.
But dating back to 1995, levonorgestrel is listed as an agent that causes IIH. And it says in those papers, if you want to look for them, if you withdraw the drug, it decreases -- it's the treatment for it if it's the thing that is causing it.
Q. We'll come back to that

then.
You've referred to a concept called positive dechallenge.
A. Yes.
Q. And that's the idea that if you withdraw an environmental agent and the symptoms improve, that can be an indicia of potential causation; is that right?
A. I'm sorry. Ask me again.
Q. Positive -- let me be much more simpler. A positive dechallenge is when you have a disease or symptomology, and you withdraw an agent and the disease or symptoms get better, correct?
A. We use it in regards to drugs, not anything else really. And if you take the drug away and the side effect goes away, that's considered a positive dechallenge.
Q. A negative dechallenge is when you take the drug away and the side effect does not go away, correct?
MS. NATALE: Objection to



form.
THE WITNESS: Correct.
BY MR. SCHMIDT:
Q. Is your -- is dechallenge confounded when you withdraw the drug but you also administer what's recognized to be effective treatment for the disease?
MS. NATALE: Objection to form.
THE WITNESS: If the treatment also causes IIH, that could be a confounding variable.
BY MR. SCHMIDT:
Q. I'm actually asking the opposite.
If -- as I understood what you said, a dechallenge is where you withdraw the drug and the symptoms go away, correct?
A. Yes.
Q. Can you consider it to be a dechallenge if you withdraw the drug, but you also administer treatment that is recognized to be effective for the



symptoms and the symptoms go away?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Can you say that's a dechallenge?
A. I think that would be -- yeah, that's hard. I mean, that's a confounding variable, and that would have to be looked at by a person like me to determine if we think that's a real case report or not.
MS. NATALE: Sorry. I just want to make sure my objection was preserved for the record.
BY MR. SCHMIDT:
Q. For example, if -- if you look at Exhibit 12 and the different treatments you've listed on Exhibit 12, why don't you put to the side -- may I see Exhibit 12?
A. Yes.
Q. Why don't you put to the side Number 7, which is withdraw of



Mirena, because that's what I'm going to ask you about.
A. Okay.
Q. If you -- if you withdraw Mirena, but in addition to withdrawing Mirena give some or all of those treatments that you list on Exhibit 12 and the symptoms get better, can you automatically call that a positive dechallenge for Mirena?
MS. NATALE: I'm just going to object to the form of the question. And are you --
MR. SCHMIDT: I'm going to ask you to make the objection without a question.
MS. NATALE: Sure. I'm just preserving.
MR. SCHMIDT: It's preserved.
MS. NATALE: Well, it's not really. So are you saying withdraw Mirena from the list or withdraw Mirena as a physical act?

Page 162

I don't --
MR. SCHMIDT: I think the question is clear.
BY MR. SCHMIDT:
Q. But I'll ask it again, Dr. Fraunfelder.
If you withdraw Mirena from a patient who has IIH symptoms but you also administer one of the other forms of treatment on Exhibit 12 that you have listed and the symptoms get better, can you automatically consider that to be a positive dechallenge with Mirena?
A. I don't think you can automatically consider it a positive dechallenge. I think what you're getting at is if the lumbar puncture makes the intracranial pressure go down, and you're calling that a dechallenge, is it fair to do that? And in those instances, that's a hard -- that's a hard call to make. I can't automatically say that's a positive dechallenge.
Q. And is the reason that you

Page 163

can't automatically make that judgment because it's difficult and maybe impossible to tease out the impact of withdrawing Mirena on the symptoms versus the impact of providing another form of effective treatment?
A. Yes. I think it's what makes adverse drug side effects a difficult subject and the reason we're here today.
Q. All right. You gave testimony at your last deposition about something called the hierarchy of evidence. Do you remember that?
MS. NATALE: Objection to form.
THE WITNESS: Yes, I remember that vaguely. That was two years ago, but yeah.
BY MR. SCHMIDT:
Q. And I'm not going to ask you about the testimony. I'm trying to streamline. Do you agree with the hierarchy of evidence --

Page 164

A. Yes.
Q. -- that certain types of evidence that's more probative on causation --
A. Yes.
Q. -- than other types of evidence?
A. Yes.
Q. At the top are randomized clinical studies?
A. Randomized controlled clinical trials would be the top.
Q. And then observational epidemiological studies?
A. Yeah. And at the bottom is case reports, yes.
Q. And animal data?
A. Yeah.
Q. Which epidemiological studies have evaluated Mirena and IIH?
A. The Valenzuela article was an epidemiological study.
I believe Etminan is -- yeah Etminan is an epidemiological study.

Page 165

Q. I'm not aware of any others beyond those two. Are you?
A. Not off the top of my head.
Q. Let's look at Valenzuela. And again, I'm good asking about it if you want to take a break.
MS. NATALE: Why don't we -- why don't we take a break. Go off the record.
THE WITNESS: Okay. All right.
THE VIDEOGRAPHER: Stand by, please. The time is 11:00 a.m. We are going off the record.
(Short break.)
THE VIDEOGRAPHER: The time is 11:11 a.m. We are back on the record.
(Document marked for identification as Exhibit Fraunfelder-13.)
BY MR. SCHMIDT:
Q. Doctor, is Exhibit 13 a copy of the Valenzuela study that you cite?

Page 166

Doctor?
A. I'm sorry. They wanted you on the microphone. I apologize.
Q. This one is not a super important question.
Is Exhibit 13 a copy of the Valenzuela study that you cite, Doctor?
A. Yes.
Q. And am I correct that before appearing in its published form, this appeared in, I believe, two different abstract forms, one where the lead author was Raia and one where it was Valenzuela?
A. Yes.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Are you aware of any data contained in the abstract that didn't make its way into this article that you rely on?
A. The demographic data is a little more spelled out in the article. And the methods are more spelled out. It

Page 167

doesn't mean the article has --
Q. I'm asking the opposite. Are you aware of anything in the abstracts that is not in the article?
A. No.
Q. Are you familiar with the journal in which this article is published?
A. Yes.
Q. Would you agree with -- this is an epidemiological study, correct?
A. Yes.
Q. Would you agree with the proposition that every study has limitations?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. What would you identify as the limitations of the Valenzuela study, Exhibit 13?
MS. NATALE: Objection to form.

Page 168

THE WITNESS: The limitations, a limitation is that it's not a randomized controlled clinical trial.
BY MR. SCHMIDT:
Q. And as you're -- as you're looking, Doctor, let me just insert another question, and I'll come back to that question. Before me asking that question, have you undertaken to create in your mind a list of the potential limitations of the Valenzuela study?
A. I have thought about it critically, which would include thinking about limitations for it.
Q. Bless you.
May I ask you to list the other limitations beyond it not being a randomized controlled trial?
A. So I'm drawing from the article and one of the things the article talks about is there's no reliable animal model to study this relationship.
Q. Do you agree with that

Page 169

statement?
A. Yes.
Q. What other limitations?
MS. NATALE: Same objection.
THE WITNESS: There is no prospective trial of LNG-IUS in a population of women at risk for PTC, because it would be too costly to do that, according to the authors. And that tends to be true for drug companies. They don't study drugs that have rare side effects after it's marketed because it would be very expensive to do so.
BY MR. SCHMIDT:
Q. Well, do you have an opinion that a prospective clinical trial would be feasible regarding Mirena and IIH given the background rate of IIH?
MS. NATALE: Objection to form.
THE WITNESS: It would be very difficult to do. It's a rare

Page 170

side effect.
BY MR. SCHMIDT:
Q. What other limitations?
MS. NATALE: Same objection.
THE WITNESS: A larger observational case crossover study that examined potential confounders could be conducted to more reliably estimate the risk of PTC among LNG-IUS users.
BY MR. SCHMIDT:
Q. Did this study control for confounders?
MS. NATALE: Objection to form.
THE WITNESS: So -- so it made an attempt at trying to compare women of childbearing age.
And childbearing age is a risk factor. So they tried to -- tried to control for that by comparing two similar groups.
BY MR. SCHMIDT:
Q. Any other confounders that

Page 171

you believe they controlled for or attempted to control for?
A. Only women for whom we could obtain a birth control history during the three months preceding the onset of symptoms.
Basically identified all women in the same age group with at least one clinical encounter. That's for the Denmark study.
And -- so it looks like we -- we have a list of -- on Page 4, there's a table.
Q. Table 2?
A. Yeah. And it looks at mean age, mean body mass index, recent weight gain.
Q. And just so we have it. That's for the Denmark portion in Table 1. It's the same data for the Utah portion, correct?
A. Yes.
Q. And you understand that that's not data that they controlled for,

Page 172

they were just measuring the average for those different criteria?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. For example, they list BMI. They did not control for BMI, correct?
MS. NATALE: Same objection.
THE WITNESS: Correct.
BY MR. SCHMIDT:
Q. They did not control for recent weight gain or age, correct?
MS. NATALE: Same objection.
THE WITNESS: So the -- it appears that they tried to get similar age because it's women in childbearing age. So insofar as the range of age is similar in the groups.
BY MR. SCHMIDT:
Q. Are you familiar with the concept in epidemiological studies called age matching?

Page 173

A. Yes.
Q. And that's the idea that you try to ensure a certain correspondence in age between the study group and the control group, correct?
A. Yes.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. There's no age matching in this study, correct?
A. Yeah. Just a range.
Q. Okay. And so for example, that means that within that range, it could be the case that one group is more skewed in the high end of the range or the low end of the range, correct?
A. I suppose that could be possible.
Q. Okay. Any other limitations of this study?
MS. NATALE: Objection to form.
THE WITNESS: So again, it's

not the highest level of evidence because it is a retrospective review.

And it doesn't have a -- a large number of pseudotumor cerebri subjects, again because it's rare and -- and studying this you wouldn't see a large number in any research paper that looks at rare side effects.

BY MR. SCHMIDT:

Q. Why is that a limitation?

A. Well, the more -- the more subjects you're able to study, the more you can generate power from your study. And the study becomes less powerful if it's got a smaller number.

But again, in rare side effects, you can't -- you can't get really large numbers because the -- the adverse event is -- is uncommon.

Q. Would you agree that having larger numbers gives you greater confidence in the results and having



fewer numbers gives you less confidence in the results?

MS. NATALE: Object -- objection to form.

THE WITNESS: So yeah, as a scientist when you read papers, if -- if the N value is -- is low, it does put it lower on the evidence scale, which I had already said earlier.

BY MR. SCHMIDT:

Q. Okay. Let's look at the results of the study, and I'll come back to some of these limitations in a minute.

If you look at Page 3 of the study on the upper right-hand side, it reports an unadjusted odds ratio from the Utah portion of the study of 7.70.

Do you see that?

A. Yes.

Q. If you look at the next page, it reports an unadjusted odds ratio of 3.91, the bottom left-hand column --

A. Yes.



Q. -- for the Denmark portion of the study, correct?

A. Yes.

Q. The Utah odds ratio is close to twice the size of the Denmark odds ratio, correct?

A. Yes.

Q. Which of those is applicable to the United States population?

MS. NATALE: Objection to form.

BY MR. SCHMIDT:

Q. If -- if either?

MS. NATALE: Same objection.

THE WITNESS: So the -- the Utah study was done in the U.S., and that is applicable to the U.S. population. And the Denmark study was done in Denmark which doesn't rule out as being applicable to the U.S. population.

BY MR. SCHMIDT:

Q. Let me ask the question this way. Do you know what the odds ratio



would be if you did a nationwide U.S. study of Mirena and IIH?

MS. NATALE: Objection to form.

BY MR. SCHMIDT:

Q. Whether it would be 7.7 or 3.91 or something else, do you know?

A. I don't know.

Q. And do you know -- do you have any data to indicate that Mirena has a different propensity to cause IIH among Danish women than among women in Utah?

MS. NATALE: Objection to form.

THE WITNESS: I don't know if that's a true statement.

BY MR. SCHMIDT:

Q. Do you have any explanation for the difference in the results between the two populations?

A. No.

Q. Now, if you look at those two numbers that are reported, they are both described as unadjusted odds ratios.

Page 178

Do you see that?
A. Yes.
Q. This paper reports no adjusted odds ratios, correct?
A. This paper reports no adjusted odds ratios, so that's the question.
Q. Yes. It's almost a statement because I know it to be true, but I'll ask it as a question.
A. Okay.
MS. NATALE: And I will object to your editorialization.
MR. SCHMIDT: Since I've editorialized, let me just ask the question.
BY MR. SCHMIDT:
Q. I don't see any adjusted odds ratios in this paper. Do you?
A. Okay. No.
Q. Do you understand that, generally speaking, the reason that authors will report adjusted odds ratios is because the adjustment takes into

Page 179

account or tries to take into account potential confounders?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. So there's been no adjustment in this study for potential confounders that we know of, correct?
A. I'm still of the opinion that it looked at similar age ranges, which to me means they are adjusting for an age confounder. It's not looking at, you know, pediatric age group for instance.
Q. Did -- did they formally perform any adjustments for any potential confounders?
A. So it's unadjusted odds ratios. But it looked at similar age groups.
Q. Okay. Do you have an understanding -- I know you are not an epidemiologist. But do you have an

Page 180

understanding that in epidemiology, you are not supposed to rely on unadjusted odds ratios, you are supposed to perform appropriate adjustments for potential confounders, do you have that understanding?
MS. NATALE: Objection to form. And compound.
THE WITNESS: No, I don't. I don't think about it that way.
BY MR. SCHMIDT:
Q. Okay. Do you have an understanding as to whether you can give less weight to a study that only reports unadjusted odds ratios than to one that performs --
A. Yes, I can think about it that way.
Q. Do you agree with that statement --
MS. NATALE: Sorry. Just allow him to finish talking before you --
THE WITNESS: I'm sorry.

Page 181

MR. SCHMIDT: That's okay.
BY MR. SCHMIDT:
Q. Do you agree with the statement that a study that only reports unadjusted data can be given less weight than one that -- where they've performed adjustments for potential confounders, do you agree with that statement?
A. The way I would phrase it is that a study that purports unadjusted odds ratios didn't control for the confounding variables.
Q. Does that make it less reliable than a study that does adjust?
MS. NATALE: Objection to form.
THE WITNESS: It makes it, I think, it lower on the evidence scale because of that, yes.
BY MR. SCHMIDT:
Q. Okay. And, in fact, if you look at Page 5 of the study, they state in the left-hand column, halfway down, "when interpreting the findings presented

here," right before the next paragraph begins. They state, "When interpreting the findings presented here, it is also important to consider that the risk analysis does not account for potential confounders."
Did I read that correctly?
A. Yes.
Q. And is this that concept we've been talking about for the past few minutes?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. Do you agree with this statement that "when interpreting the findings presented here, it is also important to consider that the risk analysis does not account for potential confounders"?
A. Yes, I think that's important.
Q. Have you -- have you


performed any analysis, any empirical analysis that attempts to take account of how potential confounders like those listed in Exhibit 11, how potential confounders might impact the results of the study and how controlling for potential confounders might impact the results of the study?
MS. NATALE: Objection to form and compound.
THE WITNESS: So have I?
BY MR. SCHMIDT:
Q. Yes.
A. I have not.
Q. Have you seen any such analyses?
A. I think so. I'd have to look through my little -- I think so.
Q. Where -- where do you think you've seen them?
A. I'd have to leaf through my references.
Q. Okay.
A. Yeah, I'd have to look


through.
Q. Where people have specifically purported to quantify the impact that adjusting for confounders like those listed on Exhibit 11 would have on the Valenzuela results?
MS. NATALE: Objection to form.
THE WITNESS: So Valenzuela specifically?
BY MR. SCHMIDT:
Q. Yes. Have you seen -- let me re-ask the question.
Have you seen any, or have you performed any analysis of how adjusting for risk factors, potential confounders like those listed in Exhibit 11, would affect the specific Valenzuela results?
A. I haven't performed any.
Q. Have you seen anywhere other people have purported to attempt to calculate the impact of controlling for confounding on the Valenzuela results?


A. No.
Q. So for example, let's just pick one of those potential confounders. Obesity. Do you know, can you say one way or another whether, if they had found a way to control for obesity in their study, whether it would increase their odds ratio or reduce their odds ratio?
MS. NATALE: Objection to form.
THE WITNESS: So what's the question again?
BY MR. SCHMIDT:
Q. Sure.
Have you done any calculations that allow you to say that had the Valenzuela authors controlled for obesity, just taking that as an example, whether that would have increased or reduced their odds ratios reported?
A. I haven't done any calculations.
Q. Can you testify that the odds ratios would still be statistically

significant had they controlled for the range of confounders listed on Exhibit 11?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Do you know?
MS. NATALE: Incomplete.
THE WITNESS: I don't know.
BY MR. SCHMIDT:
Q. Do you know what ascertainment bias is?
A. Not off the top of my head.
Q. Do you know what selection bias is?
A. I am vaguely familiar with selection bias.
Q. What do you understand it to be in the epidemiological context?
A. You select a population that you want to study. And you are biased in how you select them, based upon your situation or your environment or whatever.



Q. Was there selection bias or potential selection bias in the Valenzuela study?
A. Well, the -- are you saying because they did it in Denmark they're having selection bias? Is that the -- the implication?
Q. I'm just -- no, I'm just asking generally. Was there selection bias that you saw?
A. Oh, I'm -- I -- I'm not -- not prepared to -- to talk about selection bias in this.
Q. Do you know what responder bias is?
A. Yes.
Q. What is responder bias?
A. So a person who is asked about a -- let's say, for instance, a drug side effect may not associate, for instance, the IUD they have in as a drug. That would be a responder bias because they might not remember that they had that and that's an actual drug.



Q. Have you analyzed whether there was responder bias in the Valenzuela study?
A. I have not.
Q. And did I understand your prior answer to be you have not analyzed whether there's selection bias?
A. I haven't analyzed it.
Q. In the Utah analysis, let's -- let's dig into the two analyses they conducted.
In the Utah analysis on Page 2 they describe that they identify a group of -- of cases, those were people with the IIH diagnosis, correct?
A. Yes.
Q. And for their cases, they attempted to conduct a telephone interview of those patients, correct?
A. Yes.
Q. They did not -- well, let me come back to that.
They report how successful they were in conducting those telephone



interviews, also on Page 2 on the right-hand side under results.
A. Yes.
Q. Do you see that?
A. Yes.
Q. And so they identified from their IIH cases 176 patients who met their inclusion criteria.
Do you see that?
A. Yes.
Q. And they sent them all letters and then they tried to interview them on the telephone about whether they had used Mirena or not, correct?
A. Correct.
Q. And they were only able to interview 59 of the 176 patients; is that correct?
A. Yes.
Q. They had roughly a third response rate, correct?
A. Yes.
Q. Does that give -- is that responder bias?

MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Does that create concerns about -- let me re-ask the question.
Does that create concerns about responder bias, that response rate?
A. I'm going to answer it in two parts. One is yes, it's responder bias. And two, it's extraordinary that they did phone interviews.
Q. Okay.
A. That is not normal for epidemiological studies to actually talk to people on the phone, which makes the paper stronger in my opinion.
Q. Okay. Verifying data with telephone interviews makes the paper stronger in your view?
A. I think that adds to the -- I think it adds to the paper's strength, is talking to people in person, yes.
Q. What is the concern if you don't talk to people in person?



A. I'm not concerned if they don't talk to them in person. I just think it adds to the strength of the paper that they talk to them in person.
Q. Why?
A. Because typically, in epidemiological studies you -- you don't call the -- the subject. And to be able to talk to them on the phone is extraordinary.
Q. Why -- why does that add value?
MS. NATALE: Just objection to form.
THE WITNESS: It adds value because you get details on the telephone verbally that you don't get by simply a case report or a spontaneous report that says their age and that they had Mirena. They might say for instance, you know, it says on your paper that I -- I had the IUD, but actually I got the -- a headache immediately



after I -- I had the IUD. And it says on the thing that I got IIH a month later. But actually, you know, I might have gotten it the day after.
So I mean, that sort of -- that sort of editorializing is invaluable when you are looking at case reports.
BY MR. SCHMIDT:
Q. If you look at this paragraph that we are looking at, they talk about as a result of their interviews, they were able to confirm women who had an LNG-IUS in place. That's Mirena, right?
A. Yes.
Q. And they were able to identify other women who were using other forms of contraception and women who were not using contraceptives at all.
Do you see that?
A. So -- says of the 59 women completed the interview, 9 were using



another contraceptive and 42 were not using any contraceptives within 90 days of the onset of symptoms.
Q. Correct. That's what I was --
A. Yes, I see that.
Q. Do you know of any data they gathered through their telephone interviews other than data on contraceptive use?
A. I don't know what they gathered on the telephone, no.
Q. Is it valuable -- I think you said it makes the study stronger, the telephone interviews.
Knowing that they did gather data on contraceptive use by the telephone interviews, is that -- does that make the study stronger?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Does that specific form of data --

Page 194

A. Yes. Any data makes it stronger. So yes, that -- that makes it stronger.
Q. Would you expect that there is at least a possibility that by doing the telephone interviews for example, they identify some people who they might not have identified who used Mirena, some people they might not have identified who used other contraceptives?
A. Yes.
Q. And are you familiar with something called recall bias?
A. Yes.
Q. What is recall bias?
A. Why do you keep asking me to tell you what they are?
All right. Recall bias is you can't remember what -- what happened, and so you give the wrong answer.
Q. Is there a concern about recall bias in telephone interviews?
A. Yes.
Q. Do you know any of the steps

Page 195

these authors took to rule out recall bias?
A. I'm not aware of the steps they took.
Q. When you interview -- when you only get to interview and get data on a third of the total patients meeting your inclusion criteria, and you don't get data on the other two-thirds, does that give you concerns that the people who are actually responding and getting on the telephone with you might be -- might be skewed in terms of being representative of the full population?
MS. NATALE: Objection to form.
THE WITNESS: No. I think it's extraordinary they talked to people on the telephone. I think it's a great thing.
BY MR. SCHMIDT:
Q. So do you know whether a third response rate is a high or a low response rate relative to standards for

Page 196

conducting this type of study?
A. I'm not aware of response rates on calling people on studies like this.
Q. Do you know if they gave any information in their letters that would indicate to the subjects what they were calling about?
A. I don't know.
Q. For example, would it give you concern if in the letters they said we are interested in studying the relationship between Mirena and IIH, will you have a telephone call about us, with us, about whether you used Mirena?
MS. NATALE: Objection to form and incomplete.
BY MR. SCHMIDT:
Q. Would you be concerned about that potentially biasing the results?
MS. NATALE: Same objection.
THE WITNESS: So I'm not concerned about it. I think it's a good thing to do for research.

Page 197

I -- I understand that there could be an insertion of selection bias in that. But that is not -- that doesn't overweigh the utility and the usefulness of doing a telephone interview.
BY MR. SCHMIDT:
Q. Do you know that the results would have been the same had all 176 patients responded?
A. I don't know what the results would have been.
Q. Do you know that the results would have been the same had they not done the telephone interviews and just gone off the data for the 176 patients?
A. I don't know.
Q. Now, they did the telephone interviews for the people who had IIH. They did not do telephone interviews for the people who did not have IIH, correct?
A. Correct.
MS. NATALE: Objection to form.

Page 198

BY MR. SCHMIDT:
Q. And does that give you any concerns that they used one method to evaluate the number of people who were exposed to Mirena who had IIH, and a different method to count the number of people who were not -- who did not have IIH but who were exposed to Mirena, does that give you concern?
A. I'm not concerned. I think that's logical.
Q. You don't consider that to be a potential design limitation of the study, that they did telephone interviews for the IIH group but not for the non-IH group?
A. I love it that they did a telephone interview. Any telephone interview is good.
Q. Would you prefer that they do telephone interviews for both arms of their study?
A. Yes.
Q. Because you would agree with

Page 199

me that you cannot rule out the proposition that had they done telephone interviews of the non-IH patients, they would have received a higher level of reports of Mirena usage than they saw just from the medical records, correct?
A. I don't know.
Q. Well, do you -- do you know that when they did the medical records, the way that they determined from the medical records if people had Mirena was if they had a medical record in the University of Utah electric -- electronic billing database that reflected insertion of Mirena within that database, within that healthcare system?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. So if someone had their Mirena inserted before the relevant period of time that they were looking at, but still had it in place during the

Page 200

study period, they would have missed that patient, right?
A. Yeah. That sounds logical.
Q. And if someone would have had their Mirena inserted somewhere else other than the University of Utah system, but was nevertheless picked up by the University of Utah system because they received some other form of healthcare from the University of Utah system, they would not be counted as a Mirena patient even though they were using Mirena, correct?
A. Yes.
Q. And that could happen because while they were getting care within the University of Utah healthcare system, they had a Mirena inserted but they did it through a group like Planned Parenthood, correct?
A. Theoretically.
Q. And it could happen because in, let's say 2010, they get it inserted in another state and then later that year

Page 201

they move to Utah and get picked up by the University of Utah healthcare system but not counted as a Mirena patient, correct?
A. Yes. Theoretically you're -- you're describing something that could have happened.
Q. And if they would have done the telephone interviews, presumably they would pick up those cases, correct?
A. The -- the telephone interviews of who?
Q. Good question.
If they would have done telephone interviews of their non-IH patients, they would have picked up people who had Mirena but did not have it inserted in the University of Utah healthcare system, correct?
MS. NATALE: Objection to form.
THE WITNESS: I don't know.
MS. NATALE: Incomplete.
THE WITNESS: I don't know

what they would have picked it up.
BY MR. SCHMIDT:
Q. Do you rule out -- have -- have you seen reference -- you talked about something called the BfArM response that Bayer provided. B-F-A-R-M.
You talk about that in your report. You've reviewed that document, correct?
A. Is that the -- the case report from the clinical trials, is that what that is?
Q. No. That's the response -- if you look in your report at Page 23, you reference the BfArM document at the top.
Do you see that?
A. Additionally a response document?
Q. Yes.
A. Yes.
Q. Do you recall reviewing that document?
A. Yes.


Q. It was a detailed review by Bayer of their Mirena and IIH data?
MS. NATALE: Objection -- and editorializing.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. And do you recall seeing in that document concerns that the company raised about whether the methodology employed by the Valenzuela researchers accurately counted the number of Mirena patients in their control group, do you recall seeing that in the BfArM response?
A. Say that again.
Q. Do you recall seeing in the BfArM response that Bayer raised concerns along the lines you and I have been talking about, that the Valenzuela authors did not -- that they undercounted the -- the rate of Mirena use in the controls.
Do you recall that?
A. I don't recall it. And I'm happy to go to that and look at it


together if you'd like. But I can't remember every detail of that BfArM response.
Q. Well, let -- let's try it this way. If we look at -- let's look at Page 5 of this article. The right-hand column. The second full paragraph talks about limitations of our study.
Do you see that?
A. Yes.
Q. And in the second sentence they say, "It was not possible for the University of Utah group to capture the number of LNG insertions performed outside of the university system, so we may have underestimated the number of women with an LNG-IUS."
Did I read that correctly?
A. Yes.
Q. And that's this concept we've been talking about for the past couple minutes, right?
A. Yes.
Q. Do you agree that that is a


limitation of this study?
A. Yes.
Q. And to put numbers on it -- strike that.
Do you know how many patients in that category there are, whether it's single digits, dozens, hundreds, thousands, that they missed because they had Mirena inserted outside the University of Utah healthcare system?
MS. NATALE: Objection to form.
THE WITNESS: No.
BY MR. SCHMIDT:
Q. And you've not, either with respect to the Utah dataset or -- I'm going to ask you similar questions about the Denmark dataset in a minute. You've not performed any calculations to try to determine what you believe is an appropriate -- is a correct rate of usage of Mirena in the control group either in Utah or Denmark, have you?
MS. NATALE: Objection to

form.
THE WITNESS: No.
BY MR. SCHMIDT:
Q. If you look at Page 3 of the study. I'm going to ask you to help me with a little bit of math. I can give you my phone if you want a calculator or --
A. Nah --
Q. Or Ms. Natale can give you hers --
MS. NATALE: He's got his right here.
MR. SCHMIDT: Okay. Perfect.
BY MR. SCHMIDT:
Q. Then I'm going to ask you to do some math, but it will be simple math.
On the left-hand side they -- they talk about the -- in the first full paragraph, the control dataset from the University of Utah billing database. Do you see that?
And they say they identified



220,000 women without PTC. And they identified 4,408 of those women who had an LNG-IUS in the relevant time period.
Do you see that?
A. Yes.
Q. And so just in terms of percentage usage of Mirena in that time period, can you tell me what percent that is, 4,408 divided by 222,904? Just so we are operating on the same numbers. I get about 2 percent, but --
A. Well, I bet you know the answer there, my friend.
Q. I have to get you to agree with me.
A. 4,408 divided by 220,904 equals -- yes, 2 percent. Rounding up.
Q. Okay. So let's take it as 2 percent just for ease of -- of conversation.
Have you seen independent data sources on national Mirena usage rates or Utah specific Mirena usage rates that -- that tells you whether the



2 percent rate that they found is correct or not?
MS. NATALE: Objection to form.
THE WITNESS: No.
BY MR. SCHMIDT:
Q. Have you seen any data on either national or Utah Mirena usage rates independent of what they found when they looked in this one dataset?
MS. NATALE: Same objection.
THE WITNESS: So rates of Mirena usage in Utah?
BY MR. SCHMIDT:
Q. Or nationally, in the United States.
A. No.
Q. Do you know if -- if Mirena usage in Utah is higher or lower than the national average?
A. I don't know.
(Document marked for identification as Exhibit Fraunfelder-14.)



BY MR. SCHMIDT:
Q. Let me give you a study that I've marked as Exhibit 14. The lead author is Boulet. The publication is Morbidity and Mortality Weekly Report.
And let me ask you if you've seen this before. Let me show you.
MS. NATALE: Is there a date on this? Oh, I see.
MR. SCHMIDT: Yeah, it's August 2016.
BY MR. SCHMIDT:
Q. I don't believe it appears on your reliance list.
A. I haven't seen this.
Q. If you look at the author affiliations, you'll see that they are affiliated with the Centers For Disease Control, and that appears in the footer at the bottom.
Do you see that?
A. U.S. Department of Health & Human Services, CD -- CDC. Got it.
Q. And look with me if you

Page 210

would on the left-hand side of the first column, about halfway down, there's a sentence that begins with the words, "to estimate." Right here.
A. Okay. Got it.
Q. They state, "To estimate the prevalence of contraceptive use among nonpregnant and postpartum women at risk for unintended pregnancy, and sexually active female high school students living in the 41 states where mosquito-born transmission might be possible, CDC used 2011 to 2013 and 2015 survey data from four state-based surveillance systems."
Did I read that correctly?
A. Yes.
Q. Look with me if you would at Table 1 of this study, please.
A. Got it.
Q. Table 1 of this study lists use of contraception among women aged 18 to 44 at risk for unintended pregnancy by selected states. Do you see that?
A. Yes.

Page 211

Q. And if you look at the -- the state with the lowest rate on this list, do you see that there's a listing for LARC?
A. Yes.
Q. Highly effective reversible LARC which stands for long-acting reversible contraception. Do you see that?
A. Yes.
Q. Do you understand that Mirena is a type of LARC?
A. Yes.
Q. They report, "The lowest reported rate of LARC usage among the states listed here is Arizona at 5.5 percent."
Do you see that?
A. Yes.
Q. And the highest rate is Utah, at 18.9 percent, do you see that?
A. Yes.
Q. Do you -- do you have any reason to question the accuracy of that

Page 212

data?
MS. NATALE: Objection to form.
THE WITNESS: Any reason to question the accuracy of that data. I don't. First time I've seen this so I don't.
BY MR. SCHMIDT:
Q. Do you know of any contrary data that suggests a different rate of LARC usage in Utah than the rate reported in this study?
A. I am not aware of anything else, no.
(Document marked for identification as Exhibit Fraunfelder-15.)
BY MR. SCHMIDT:
Q. I'm going to show you another study, this one published in the American Journal of Obstetrics & Gynecology which I've marked as Exhibit 15. The lead author is Jessica Sanders.

Page 213

And it's a two-year continuation of intrauterine devices and contraceptive implants in a mixed payor setting, a retrospective review. Have you seen this study before today?
A. No.
Q. If you look in the abstract, under study design, it states, "This retrospective chart review assessed University of Utah healthcare system patients who had an intrauterine device or contraceptive implant inserted between January 1st, 2004, and December 31, 2012."
Did I read that correctly?
A. Yes.
Q. So do you understand this to be reporting data from at least some Utah patients in terms of their use of an IUD or implant?
A. Yes.
Q. And under results they report data on 8,603 device insertions were obtained, and then they give the --

Page 214

the distribution.
Do you see that?
A. Yes.
Q. And the distribution for Mirena is 70 -- a little over 75 percent, correct?
A. Yes.
Q. Do you have any reason to question the accuracy of that data?
A. No.
Q. Are you aware of any contrary data among Utah patients indicating that Mirena patients have -- constitute a lower percentage of device insertions than 75 percent?
A. You know, again, with the qualifier, this is the first time that I've seen this, and I'm not -- I'm not, you know, familiar with this paper.
Q. Okay. Do you recall seeing data analyses in the BfArM response document from Bayer that I was talking about a moment ago where they calculated the impact of using different levels of

Page 215

Mirena usage in the control group and what impact that had on the ultimate study results?
MS. NATALE: Objection.
BY MR. SCHMIDT:
Q. Do you recall seeing that?
MS. NATALE: Objection to form.
THE WITNESS: I'd like to look at it together if you want me to opine on it.
BY MR. SCHMIDT:
Q. Let's do that.
(Document marked for identification as Exhibit Fraunfelder-16.)
BY MR. SCHMIDT:
Q. I've marked that document as Exhibit 16. Do you understand that to be a copy of the BfArM response that you cite in your report?
A. Yes.
Q. If you look at Page 21 of the document, there is a discussion of

Page 216

the Valenzuela study. Do you see that?
A. Yes.
Q. And if you look on Page 22, there is a heading that says exposure assessment. And in the second sentence under that heading it raises this concern we've been talking about, whether the control groups in this study were properly counted. They say, "Underestimation of exposure in the control cohort and risk of recall bias in the cases leads to differential misclassification of exposure and affects sizes away from the null."
Did I read that correctly?
A. "Underestimation of exposure in the control cohort and risk of recall bias in the cases leads to differential misclassification of exposure and affects sizes away from the null."
That's what that says.
Q. Right. And do you understand that to be raising -- this section to be raising some of the same

Page 217

concerns that we've been talking about, the concern that the control groups in the Valenzuela study might not have included all Mirena cases, might have undercounted the control group rate of Mirena?
MS. NATALE: Objection to form.
THE WITNESS: I understand that's your point.
BY MR. SCHMIDT:
Q. And that's the point being discussed in this document, right?
A. Yes.
Q. On the next page they conduct a statistical analysis. Do you see that?
MS. NATALE: Objection to form.
THE WITNESS: Direct me to which part on that page?
BY MR. SCHMIDT:
Q. Down at the bottom of Page 23.

A. Statistical analysis, got it.

Q. Yes. And if you turn the page, there is a bullet point that appears on Page 24. Do you see that?

A. Bullet. I see it.

Q. And in the second paragraph below that it has a discussion for the Denmark study and then right below that it has a discussion for the Utah study. Do you see that?

A. Yes.

Q. And if you look in both of those discussions, we talked about how the rate in the control group in Valenzuela in Utah was 2 percent, correct?

A. Mm-hmm.

Q. And let's just figure out what that rate is in Denmark. And here it's much easier. If we look at Page 3 of Valenzuela, Exhibit 13.

On the right-hand side down at the bottom of Page 3 for Denmark, they



calculate a Mirena usage rate in their control group of 3.5 percent. Do you see that?

A. Yes.

Q. In the BfArM document that we've marked as Exhibit 16, the company says, "We don't think that's the right rate. And if you use a rate of 10 percent in Denmark instead of 3.5 percent, you no longer have a statistically significant increase."

Do you see that?

MS. NATALE: Objection to form and editorializing.

THE WITNESS: Yes, I see that.

BY MR. SCHMIDT:

Q. They do the same thing for Utah. Where they say if you use a rate of 10 percent for Utah rather than 2 percent, you no longer see a statistically significant rate, correct?

A. I see that.

Q. And I will represent to you



that when they came up with the Utah rates they were using the same data that we just looked at, those two studies.

MS. NATALE: Objection to form.

BY MR. SCHMIDT:

Q. Do you -- do you have an opinion as to whether the correct rate of Mirena usage in Utah is closer to -- in people who don't have IIH, is closer to 2 percent or 10 percent?

MS. NATALE: Objection to form.

BY MR. SCHMIDT:

Q. Do you have an opinion on that?

A. I'd have to study it. I don't have an opinion at this point in time.

Q. Do you have an opinion as to whether the correct rate of Mirena usage among women who don't have IIH in Denmark was closer to 3.5 percent or closer to 10 percent?



A. I don't have an opinion at this time.

Q. Do you take any issue with -- with the math performed in this BfArM document, that if you assume a higher rate of Mirena usage in the control group, the statistically significant effect reported goes away?

MS. NATALE: Objection to form.

THE WITNESS: Well, I -- I would object to the arbitrariness of just saying 10 percent.

BY MR. SCHMIDT:

Q. My -- my question is different.

Do you -- do you take any issue -- let me just ask you.

Have you done your own analysis to test -- strike that.

Have you evaluated on your own how they came up with those 10 percent numbers used in this document, Exhibit 16?

A. I understand. I haven't done any of my own evaluation of it.

Q. Have you done your own analysis that lets you say whether 10 percent is right or wrong?

MS. NATALE: Objection to form.

THE WITNESS: I haven't done my own analysis.

BY MR. SCHMIDT:

Q. Have you checked -- have you done your own analysis -- strike that.

Do you take issue with the proposition that if you use a higher rate of exposure in the control group as is reflected in the BfArM response document, that the reported statistically significant effect in Valenzuela goes away?

MS. NATALE: Objection to form.

BY MR. SCHMIDT:

Q. Do you take issue with that as a mathematical proposition?



A. I understand the math on the -- on the BfArM document. I just -- I just don't understand, you know, the 10 percent.

Q. Fair enough.

Do you take issue with the math that if you assumed 10 percent usage in the control group, the statistically significant effect goes away?

MS. NATALE: Objection to form.

BY MR. SCHMIDT:

Q. Do you take issue with that?

A. Your math looks fine.

Q. Okay. And -- and just in -- in fairness, let me show you the -- the complete dataset.

MR. SCHMIDT: Can I get this?

BY MR. SCHMIDT:

Q. Or let me show you more data.

(Document marked for identification as Exhibit



Fraunfelder-17.)

BY MR. SCHMIDT:

Q. I'm going to mark as Exhibit 17 a study called Contraceptive Use in the Nordic Countries. The lead author is Ingela Lindh, 2016. I'm not going to attempt the pronounce the Scandinavian journal title.

Have you seen this study before?

A. No.

Q. If you look at Page 23 of the study, do you see that they have a figure that reports contraceptive use among women aged 15 to 49 in the Nordic countries between 2010 and 2003?

MS. NATALE: Objection.

THE WITNESS: The tables?

BY MR. SCHMIDT:

Q. 2013.

A. Are you looking at the tables, is that what you are looking at?

Q. Yes. Yeah.

A. Okay, yes.



Q. And one of those countries is Denmark, correct?

A. Yes.

MS. NATALE: What -- which table are you on? I'm sorry, Paul.

MR. SCHMIDT: It's Figure 1 on Page 23.

BY MR. SCHMIDT:

Q. And if you look at the -- the top bar is something called CU-IUD, do you see that?

A. Yes.

Q. And the next one, the slightly darker one is LNG-IUS, correct?

A. Yes.

Q. And Mirena is an LNG-IUS, correct?

A. Yes.

Q. And you can see it varies a little bit by year. But every year is in excess of a 3.5 percent usage rate for LNG-IUS. Do you see that?

MS. NATALE: Objection to

Page 226

form.
THE WITNESS: An excess of what percent?
BY MR. SCHMIDT:
Q. 3.5.
A. So the percentages on the left?
Q. Yes.
A. And so there's no decimals on those. That's 20 percent, 25 percent, 30 percent, 35 percent. So where are you seeing 33.5 percent? I don't understand.
Q. Well, let's --
A. Do you mean the -- the range --
Q. Yeah. Exactly. Those ranges are all bigger than 3.5 percent, right?
MS. NATALE: Objection to form.
THE WITNESS: Okay.
BY MR. SCHMIDT:
Q. Do you take any issue with -- with these numbers reported in

Page 227

this article?
A. I've never seen this article before. So I don't --
Q. Do you know if any --
A. -- know how I could take issue.
Q. Fair enough.
Do you know of any contrary data on Mirena usage in Denmark to what's reported in this article?
MS. NATALE: Objection to form.
THE WITNESS: Contrary data from the Valenzuela article, I don't know what you mean.
BY MR. SCHMIDT:
Q. Do you know of any data showing that the Mirena usage rates are -- in Denmark, are lower than reported in the Lindh article?
A. So they are not lower.
Q. Or do you know of any data indicating that they are lower than the rates reported in the Lindh article?

Page 228

THE WITNESS: I think I have to go to the boys' room.
BY MR. SCHMIDT:
Q. Okay. Can we get -- can we get the answer and then we'll break?
A. No, I mean I don't care -- I mean, I'm not scared about the answer. I'm just not able to concentrate. I --
MS. NATALE: Let's try to -- usually you will have to give an answer to the pending question.
THE WITNESS: So power through it?
MS. NATALE: Before we take a break.
THE WITNESS: I promise not to talk to anybody.
MS. NATALE: Do your best to give us --
THE WITNESS: Okay. Ask -- ask me the question again and maybe tell me the rates you're talking about in each one so I can give you a simple yes or no.

Page 229

BY MR. SCHMIDT:
Q. Thank you, I appreciate that.
Exhibit 23, Page 20 -- I'm sorry.
Exhibit 17, Page 23 reports Mirena usage rates in Denmark for a number of years.
A. Yes.
Q. My question to you is: Are you aware of any data you have seen that reports lower Mirena usage rates in Denmark than what's reported in this -- in this article?
A. No.
MR. SCHMIDT: Let's break.
THE VIDEOGRAPHER: The time is 12:03 p.m. Going off the record.
(Short break.)
THE VIDEOGRAPHER: The time is 12:09 p.m. Back on the record.
BY MR. SCHMIDT:
Q. Doctor, let's look at Page 4

of the Valenzuela study, please.
A. Okay.
Q. If you look at the right-hand column, the paragraph beginning, "Our investigation"?
A. Yes.
Q. About halfway down that, after the comma, there's language that says, "It is possible that this observation occurred."
Do you see where I'm reading?
A. Yes.
Q. "It is possible that this observation occurred because use of an LNG-IUS is also associated with other established risk factors that are known to be associated with PTC, e.g., obesity and recent weight gain."
Did I read that correctly?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:


Q. Do you understand that to be a reference to this concept of confounders that we've been discussing?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. Do you agree with the Valenzuela authors that it's possible that the observation they saw occurred because use of an LNG-IUS is also associated with established risk factors that are known to be associated with PTC?
A. Yes.
Q. They go on to say, "The analysis was also limited by the lack of temporal data to confirm that exposure to LNG-IUS occurred prior to PTC symptom onset for diagnosis."
Did I read that correctly?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:


Q. What is it -- what is it you understand them to be saying in that sentence?
MS. NATALE: Objection to form.
THE WITNESS: They are saying that the study could be limited by the time to onset of the IIH and that's why they say the lack of temporal data is static. They don't know the time to onset, and they can't say for sure it's IIH related to Mirena.
BY MR. SCHMIDT:
Q. Are they, in fact, saying they don't even know with at least some of their data whether Mirena usage occurred before or after IIH?
MS. NATALE: Objection to form.
THE WITNESS: Yeah, I think they are saying that they don't have the temporal data.
BY MR. SCHMIDT:


Q. Okay. Do you know if they had any temporal data that would let them determine whether Mirena usage occurred before or after symptoms?
A. Any temporal data is -- is -- you know, I -- I mean I believe it's inferred that it's -- so they don't -- they don't have the actual, it occurred 90 days after. So they don't have that, no.
Q. Let me ask you. Would -- would you want in a well-designed study, looking at Mirena and IIH, would you want the study authors to confirm that the IIH cases that they are looking at regarding Mirena, the Mirena usage preceded the IIH?
MS. NATALE: Objection to form.
THE WITNESS: Well, they -- I mean they got a birth control history during the three months preceding, you know, the onset of IIH.

BY MR. SCHMIDT:
Q. Different question. My question is just a general question.
In -- would you want in a well-designed study, evaluating Mirena and IIH, the authors to confirm that Mirena usage actually preceded IIH development?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. As opposed to coming after?
A. Yes, if I'm going to -- if I'm going to say a drug and a drug side effect are related, I would want to know that they had received the drug prior to getting the side effect.
Q. Okay. And when you read this language saying the analysis was limited by the lack of temporal data to confirm that exposure to LNG-IUS occurred prior to PTC symptom onset or diagnosis, do you know if they had any data for any of their Mirena PTC cases indicating that



Mirena exposure occurred prior to PTC symptom onset or diagnosis, do you know?
A. I mean, what they had was birth control history three months preceding the onset of symptoms, which reads to me that they -- they had some birth control data which would have included Mirena.
Q. Let me ask the question the other way then. When they say that their analysis was limited by the lack of temporal data to confirm that exposure to LNG-IUS occurred prior to PTC symptom or onset -- onset or diagnosis, do you know what data they are lacking?
A. I'm assuming, from reading that, that they are lacking some of the temporal data.
Q. And do you know how much of the temporal data they are lacking?
A. I don't know.
Q. Okay. If it's zero -- if it's 1 percent or a hundred percent?
MS. NATALE: Objection to



form.
THE WITNESS: I don't know.
BY MR. SCHMIDT:
Q. Let's look at the abstract, please.
A. The Raia abstract?
Q. I'm sorry. The abstract for the Valenzuela publication.
A. Oh, got you. Yes.
Q. On the front page?
A. Yes.
Q. Exhibit 13. They conclude their abstract by saying, "Our investigation suggests that women with an LNG-IUS may have an increased risk of developing PTC, but does not suggest an LNG-IUS can cause PTC."
Did I read that correctly?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. Do you agree with that statement with regard to the Valenzuela



study?
MS. NATALE: Objection to form.
THE WITNESS: I agree that that's how they feel.
BY MR. SCHMIDT:
Q. Not my question. Do you agree that that's an appropriate statement in light of the data?
MS. NATALE: Objection to form.
THE WITNESS: In light of the data I wouldn't have written it like that. So I probably would have been a little more forceful in my opinion. So I don't agree with that entirely, no.
BY MR. SCHMIDT:
Q. If you look at Page 4 of the article.
A. Yes.
Q. Let's look under the discussion.
In the first paragraph under

the discussion, they've got a sentence that begins with the word "otherwise."
Do you see that?
A. Yes.
Q. And they say, "The signs and symptoms of the subjects with PTC and with an LNG-IUS were not significantly different from those documented in the subjects with PTC and without an LNG-IUS."
Did I read that correctly?
A. Yes.
Q. And do you agree with that statement?
MS. NATALE: Objection to form.
THE WITNESS: I just think it's odd that you asked me if I agree with what they feel. But, I mean, I believe that that's an accurate statement based upon their research study.
BY MR. SCHMIDT:
Q. Okay. And they go on to



say, "This result indicates that if an LNG-IUS is somehow associated with the development of PTC, it does not cause a form of PTC that can be distinguished from IIH based on clinical symptoms" -- I'm sorry -- "clinical signs, clinical symptoms or lumbar puncture opening pressure."
Did I read that correctly?
A. Yes.
Q. In your experience, is that a true statement that if an LNG-IUS is associated with development of PTC, it does not cause a form of PTC that can be distinguished from IIH based on clinical signs, clinical symptoms or lumbar puncture opening pressure.
Is that consistent with your experience?
MS. NATALE: Objection to form.
THE WITNESS: So you know that I don't have experience recently in being a person that



does lumbar punctures and -- and that as an expert on Mirena insertion. So, insofar as what these authors said, that sounds logical to me that the two populations are similar.
BY MR. SCHMIDT:
Q. Okay. Let me read the next sentence. "Our investigation suggests that women with an LNG-IUS may have an increased risk of developing PTC."
Did I read that correctly?
A. Yes.
Q. "Our investigation does not indicate that an LNG-IUS can cause PTC."
Did I read that correctly?
A. Yes.
Q. Would you disagree with that statement?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. That their investigation does not indicate that an LNG-IUS can



cause PTC, do you agree or disagree with that?
MS. NATALE: Same objection. Form.
THE WITNESS: Can I answer with that it's somewhere in between?
BY MR. SCHMIDT:
Q. Sure.
A. Is that a -- is that an okay answer? I don't want to say that I completely disagree with it. Because that's how they feel in their research paper.
But I also think that they could have, based on the evidence they have in the research paper, they could have been a little more forthright with what the evidence shows.
Q. So --
A. Which is to say that there is a much stronger association than saying it does not indicate that LNG can cause PTC. I wouldn't have written that

sentence.
Q. Do you believe that's an untrue statement, that the Valenzuela study does not indicate that an LNG-IUS can cause PTC?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Or would you just frame it differently?
MS. NATALE: Objection to form and --
THE WITNESS: I would just frame it differently.
BY MR. SCHMIDT:
Q. Okay. You wouldn't say it's true or untrue?
MS. NATALE: Same objection.
THE WITNESS: I would just frame it differently. I -- I can't speak for the authors. They wrote the paper. That's their words. And they are not my words.
BY MR. SCHMIDT:



Q. But you can speak for what you believe to be true, right?
A. Yeah, I'd speak for what I believe to be true, which I believe the evidence indicates that there is a much stronger association than saying it does not indicate that an LNG-IUS can cause PTC.
Q. Okay. So do you believe that to be a true or untrue statement or can't say?
MS. NATALE: Objection to form. Asked and answered.
THE WITNESS: I can't say.
BY MR. SCHMIDT:
Q. Okay. Now, look with me if you would at the last page of the article.
A. Okay.
Q. Before you do, do you mind looking back at the first page?
A. Okay.
Q. I think you commented favorably in your report on the



qualification of these authors. Is that correct?
Do you -- do you believe these authors to be well qualified in their fields?
A. Well, yes. I think that they are qualified authors, yes. That's a respectable university and a good academic eye center, so...
Q. And this includes people with back -- the authors include people with backgrounds in ophthalmology, neurology, and obstetrics and gynecology, correct?
A. Yes.
Q. If you go back to Page 6, these ophthalmologists, OB/GYNs, and neurologists state, "We do not recommend the removal of LNG-IUS from women with PTC."
Do you see that?
A. Yes.
Q. Do you agree, disagree, or not have a view on that statement?



MS. NATALE: Objection to form.
THE WITNESS: Is -- if somebody has intracranial hypertension that I think is due to Mirena, I would recommend they remove it. And these authors are making a recommendation not to take it out globally, you know, just because of their research paper. And so that's all they are saying.
I think if you ask the authors would they take it out if they thought it was due to Mirena, they would say yes.
BY MR. SCHMIDT:
Q. Well, I suppose anyone would take it out if they thought it was due to Mirena. They say they can't reach a causation opinion.
Let me -- let me try the question this way.
MS. NATALE: Objection,

editorializing.
BY MR. SCHMIDT:
Q. As a global -- as a global statement, we do not recommend the removal of LNG-IUS from women with PTC. Do you agree with that as a global statement?
MS. NATALE: Objection to form, and asked and answered.
THE WITNESS: I don't think that we should take Mirena out of -- of women for birth control just everywhere.
BY MR. SCHMIDT:
Q. Simply because they have --
A. For no reason.
Q. Simply because they have IIH or PTC?
MS. NATALE: Objection to form, and misstates the testimony.
THE WITNESS: If they have PTC, that's a discussion that you've got to have with your OB and your primary care doctor. But



it's something to definitely consider.
BY MR. SCHMIDT:
Q. Okay. When they say, "We don't recommend the removal of Mirena from women with PTC," is that something you agree with, disagree with or don't have a view on?
MS. NATALE: Objection to form. Asked and answered.
THE WITNESS: I wouldn't write it that way. That wouldn't be how I would write it.
BY MR. SCHMIDT:
Q. Do you disagree with that?
MS. NATALE: Same objection.
THE WITNESS: I disagree with the way they wrote it.
BY MR. SCHMIDT:
Q. Okay. Do you -- do you have the view that based on their data, Mirena should be removed from women who are diagnosed with PTC?
MS. NATALE: Objection to



form.
THE WITNESS: I think that's a big statement. I don't think you'd just start taking it out.
You have to diagnose what the PTC is from.
BY MR. SCHMIDT:
Q. Okay. Next sentence says, "Likewise, if a woman with PTC or at risk for PTC needs contraception, an LNG-IUS should still be considered as an effective form of contraception."
Did I read that correctly?
A. Yes.
Q. Do you agree, disagree or not have a view on that statement?
A. If you have PTC I'm not going to recommend Mirena.
Q. So do you disagree with that statement?
MS. NATALE: Objection to form.
THE WITNESS: Yeah. I don't -- I disagree with that



statement.
BY MR. SCHMIDT:
Q. Would you ever recommend removal of a Mirena from a woman without first consulting with her OB/GYN?
MS. NATALE: Objection to form.
THE WITNESS: I wouldn't.
BY MR. SCHMIDT:
Q. You would not recommend removal without first consulting with an OB/GYN?
A. I would not recommend it without first consulting with your -- I mean family doctors do OB as well. But your -- with your obstetrics doctor.
Q. So let me just rephrase that, because I think I used too many negatives in my question.
A. Yeah.
Q. If you were to recommend removal of Mirena from a patient with IIH, would you first consult with their OB/GYN?

A. Yes.
Q. Is -- is there another -- we -- we talked about the statistically significant odds ratios, unadjusted odds ratios in the Valenzuela study, correct?
A. Yes.
Q. Is there another study out there that has replicated those findings?
A. Not to my knowledge.
Q. Do you agree with me, and I'm going to read you language, just in fairness, that comes from the Reference Manual on Scientific Evidence. Is that a publication you are familiar with?
MS. NATALE: Objection to form.
THE WITNESS: Not right now, no.
BY MR. SCHMIDT:
Q. Okay. Do you agree with the proposition that rarely if ever does a single study persuasively demonstrate a cause-effect relationship?
MS. NATALE: Objection to



form.
THE WITNESS: Occasionally a single study is very strong evidence, so it can go both ways.
BY MR. SCHMIDT:
Q. So you would disagree with that statement, rarely --
MS. NATALE: Objection.
THE WITNESS: No, I don't disagree with it. I'm just saying it's true, and it can also be true the opposite.
BY MR. SCHMIDT:
Q. Let me get the publication.
MS. NATALE: Objection to form. And misstates the testimony.
(Document marked for identification as Exhibit Fraunfelder-18.)
BY MR. SCHMIDT:
Q. I'm going to mark as Exhibit 18 the document I'm reading from.
A. Sure.



Q. I just think it's more fair to you to have it than me just reading it.
A. Absolutely. Yeah.
Q. Which is different than how some lawyers operate.
Do you see it says on the cover Reference Manual --
MR. SCHMIDT: I'll strike my joke from the record.
MS. NATALE: Thank you.
BY MR. SCHMIDT:
Q. Do you see on the -- on the cover it says Reference Manual on Scientific Evidence?
A. Yes.
Q. And these are excerpts, it's a huge book.
If you look at Page 604?
A. Yes.
Q. There is the question, "Have" -- "have the results been replicated?"
Do you see that?



A. Yes.
Q. And if you look at the next page, you can see that this appears in a chapter called Reference Guide on Medical Testimony?
A. Yes.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. And it has at the top there, that language I referenced, "Rarely if ever does a single study persuasively demonstrate a cause-effect relationship."
Do you see that?
A. Yes.
Q. From your perspective is that a true or a false statement?
MS. NATALE: Same objection to form.
THE WITNESS: I think it can be a true statement.
BY MR. SCHMIDT:
Q. The next sentence says, "It is important that a study be replicated

Page 254

in different populations and by different investigators before a causal relationship is accepted by epidemiologists and other scientists."

Do you agree with that statement or disagree?

A. I think it can be important.

Q. Do you agree with it?

MS. NATALE: Objection to form.

THE WITNESS: I agree it can be important.

BY MR. SCHMIDT:

Q. Okay. And -- and Valenzuela as we just discussed has not been replicated in different populations and by different investigators, correct?

MS. NATALE: Objection to form.

THE WITNESS: Not to my knowledge.

BY MR. SCHMIDT:

Q. One more in here.

If you look ahead, there's

Page 255

some pages missing because we've excerpted it. But Page 777 has a heading called Replication.

A. Okay.

Q. Do you see that?

A. Yes.

Q. It says, "A good general rule of thumb in science is never to rely on any experimental finding until it has been independently replicated."

Did I read that correctly?

MS. NATALE: Objection to form.

THE WITNESS: Yes.

BY MR. SCHMIDT:

Q. Do you agree with that as a good general rule of thumb in science?

A. It's -- this is odd, just like getting handed a random thing with papers out of the middle of a thing. I don't really know anything about this.

I don't like words "never" or "any." And I don't know about this publication or -- I'm not familiar with

Page 256

it, so...

I'm not an expert on this, and I don't know if you want to keep going down that road, but --

Q. Well, I'm almost done. But what about the principle? And I only gave this to you so you'd know where I was reading from.

A. Yeah.

Q. But I really want to just you about the principle. Do you agree with the principle that it's a good rule of thumb in science to never rely on any experimental finding that -- until it has been independently replicated, do you agree or disagree with that?

MS. NATALE: Objection to form.

THE WITNESS: I think it's better to have a research finding replicated than to have it not be replicated.

BY MR. SCHMIDT:

Q. But you wouldn't go so far

Page 257

as to say you should never rely on it if it's not replicated?

MS. NATALE: Same objection.

THE WITNESS: I don't like the word "never." I mean, jeez.

BY MR. SCHMIDT:

Q. Would you disagree with that?

A. I wouldn't say I disagree with it, no.

Q. Okay. Let's talk about Etminan.

MS. NATALE: Do you -- just -- up to you. Do you want to break for lunch before we move on?

MR. SCHMIDT: We can do that. Do you want to do that?

MS. NATALE: I think that might be the best way to do it.

MR. SCHMIDT: Okay.

THE WITNESS: Yeah.

MR. SCHMIDT: Sure. Of course. We're doing a totally new subject, so...

THE VIDEOGRAPHER: Remove your microphone. The time is 12:27 p.m.
Off the record.
- - -
(Lunch break.)
- - -
A F T E R N O O N  S E S S I O N
- - -
THE VIDEOGRAPHER: We are back on the record. The time is 1:04 p.m.
(Document marked for identification as Exhibit Fraunfelder-19.)
BY MR. SCHMIDT:
Q. Doctor, thanks for bearing with us. I have marked as Exhibit 19 what we've referred to as the Etminan study. This is what you cite in your report, right?
MS. NATALE: Objection to form.
THE WITNESS: Yes.



BY MR. SCHMIDT:
Q. And do you know Dr. Etminan?
A. No.
Q. Do you know that at the time he wrote this article, he was being paid by your lawyer's law firm to be an expert witness in Mirena litigation?
A. No.
MS. NATALE: Objection to form and characterization. Objection to use of Mirena litigation.
BY MR. SCHMIDT:
Q. Do you know that he has admitted under oath that he failed to disclose the conflict of interest he had in terms of getting paid by plaintiffs' lawyers while he was publishing this article?
A. No.
MS. NATALE: Same objections.
BY MR. SCHMIDT:
Q. Do you evaluate conflicts of



interest when you read articles?
A. Yeah.
Q. Would you want to know if someone who wrote an article on Mirena and IIH was being hired as an expert witness in litigation involving Mirena and IIH whether it was by either side?
MS. NATALE: Objection to form, and same objections to litigation involving Mirena, and IIH.
THE WITNESS: Yes. I think conflicts of interest are important to disclose.
BY MR. SCHMIDT:
Q. Did you know before I told you -- do you see where he says conflict of interest statement, he declares no conflict of interest?
A. I -- I will look at that right now. And I see that.
Q. Did you know before I told you just now that that is a false statement in this publication?



MS. NATALE: Objection to form.
THE WITNESS: I did not know that.
BY MR. SCHMIDT:
Q. Dr. Etminan performs two -- do you know if there are any other false statements in this article?
MS. NATALE: Objection to form. And characterization.
THE WITNESS: I don't know.
BY MR. SCHMIDT:
Q. Dr. Etminan in this article performs two analyses, correct?
A. Yes.
Q. One is an observational study comparing Mirena to oral contraceptives, correct?
A. Yes.
Q. And one is a disproportionality analysis regarding Mirena case report data, correct?
A. Yes.
Q. And could you just explain

Page 262

to the -- could you just -- strike that.
Could you just explain what a -- what you understand, generally speaking, a disproportionality analysis to be?
A. Give me just a second here. So a disproportionality analysis is a tool that Etminan used in his study to detect a signal of a relationship between IIH and Mirena.
Basically he estimated the comparative risk of disease across different drug exposures.
Q. Okay. And do you have a specific understanding that disproportionality analyses like Dr. Etminan performed essentially involved comparing whether the rate of adverse event reporting -- whether the percentage of Mirena adverse event reports that are IIH are higher or lower or the same as the percent of IIH reports for all total reports for other drugs?
MS. NATALE: Objection to

Page 263

form.
THE WITNESS: What was that first part of that question?
BY MR. SCHMIDT:
Q. Sure. I think I probably made it more complicated than I needed to.
A disproportionality analyses is comparing two reporting rates, correct?
A. Yes.
Q. One reporting rate is the percentage of Mirena reports that are IIH roughly, correct?
A. Yes.
Q. And the other reporting rate that it's being compared to is the percentage of all adverse event reports for all drugs that are IIH, correct?
A. Okay.
Q. And you get this disproportionality if one is higher or lower, right?
A. Yes.

Page 264

Q. And that gives you a signal that there might be an issue there?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. Do you agree with the proposition that disproportionality analyses cannot establish causation?
MS. NATALE: Objection to form.
THE WITNESS: So all by itself alone, I think that, you know, medical, scientific readers would not rely on just that alone to say there is a certain relationship.
BY MR. SCHMIDT:
Q. And there are different -- do -- do you understand that there are different statistical techniques to conduct disproportionality analyses? One is referred to as PRR or it's referred to as an IC statistic. Are you familiar

Page 265

with those?
MS. NATALE: Objection to form.
THE WITNESS: I'm peripherally familiar with those, yes.
BY MR. SCHMIDT:
Q. Have you ever conducted a disproportionality analysis?
A. No.
Q. Other than the disproportionality analysis in the Etminan study, are you aware of any others that have been conducted regarding Mirena and IIH?
MS. NATALE: Objection to form.
THE WITNESS: Not to my knowledge.
BY MR. SCHMIDT:
Q. Now, as I understand it, you relied on his disproportionality analysis in his published study when you did your last report back in 2016; is that

Page 266

correct?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. Do you still rely on his analysis as contained in his study?
MS. NATALE: Same objection.
THE WITNESS: I think --
BY MR. SCHMIDT:
Q. Disproportionality analysis?
A. I think -- I think some of his -- I think some of his data is useful in his first report. I don't think it's foolproof and without criticism. And I don't rely on it alone to form my opinion. But it is part of the body of knowledge that we have about pseudotumor cerebri and I do not discard at all out of hand.
Q. Okay. Is your -- let me try it this way. Is your causation opinion informed -- supported -- strike that.
In reaching your causation

Page 267

opinion, do you rely in part on the disproportionality findings in Etminan's article?
MS. NATALE: Objection to form.
THE WITNESS: You could throw out the Etminan article and I would still have the same opinion.
BY MR. SCHMIDT:
Q. My question is simply: Do you rely on it?
A. I use it as part of the body of evidence. So insofar as does that mean I rely on it? I rely on a very small part of it.
Q. Which small part of it?
A. The entire thing represents a small part.
Q. Okay. I thought you were talking about part of the article. You're saying it's a small part of your broader evidence.
A. Yes. Yes.

Page 268

Q. Do you -- do you view that disproportionality analysis contained in Etminan as supportive of your opinion that Mirena causes IIH?
MS. NATALE: Objection to form.
THE WITNESS: Well, I think that his conclusions on his papers, to sit here, I think that I rely on that a very small amount to form my opinion that -- that Mirena causes IIH.
BY MR. SCHMIDT:
Q. Do you view that disproportionality as supportive of that opinion?
A. The disproportionality conclusions are we found a higher than expected number of reports of ICH with Mirena in the FAERS database.
Q. Mm-hmm.
A. So that's valid to me.
And that I also found a similar risk of ICH with Mirena compared

Page 269

with the oral contraceptive EE-norgestimate. And I think that's supportive of my opinion.
High risk of ICH with EE-norephedrone and all other oral contraceptives should be further investigated.
I don't -- that last sentence, I don't rely on.
Q. Okay. Do you --
A. The first two conclusions in that conclusion I think have some validity.
Q. Okay. You reference in your report a letter to the editor that Etminan wrote. Have you read that letter to the editor?
A. Yes.
Q. Do you view that letter to the editor as functionally retracting his IIH -- his disproportionality analysis?
MS. NATALE: Objection to form.
THE WITNESS: So the -- he

had two letters to the editor.
BY MR. SCHMIDT:
Q. Let me rephrase my question.
A. Yeah.
Q. Because that's a fair point.
I'm -- I'm talking about the second letter to the editor.
Do you -- do you view the second letter to the editor as functionally retracting his disproportionality analysis?
MS. NATALE: I'm sorry, Paul. Just, are you referring to the 2017 or are you --
MR. SCHMIDT: The second one in time.
MS. NATALE: Okay. Okay.
THE WITNESS: So the second one, it appears that he retracts many of his conclusions from his original paper.
BY MR. SCHMIDT:
Q. Including the ones you just read, right?



A. Verbatim, I don't think he, you know, he retracted them verbatim the ones that I just read.
Q. Does his letter to the editor keep you from relying on his disproportionality analysis?
MS. NATALE: Objection to form.
THE WITNESS: It doesn't help.
BY MR. SCHMIDT:
Q. Well, I agree with that.
Does -- does it keep you from relying on his disproportionality analysis?
A. It -- it hurts his disproportionality analysis.
Q. Do you still see some value in his disproportionality analysis notwithstanding?
A. Yes.
Q. Have you seen his affidavit that he swore out in connection with Mirena litigation?
MS. NATALE: Objection to



form.
THE WITNESS: No.
MS. NATALE: And same objection to Mirena litigation.
BY MR. SCHMIDT:
Q. Did you know that my colleague deposed Dr. Mirena in -- Dr. Mirena.
Did you know that my colleague, Dr. Kenneth Baum, deposed Dr. Etminan in Mirena litigation?
A. No.
MS. NATALE: Same objection, and to Mirena litigation and to any representation of Dr. Etminan's purported work in, quote, Mirena litigation.
BY MR. SCHMIDT:
Q. Do you know that shortly after, within days of Dr. Baum deposing Dr. Etminan, he withdrew as plaintiffs' expert witness and refused to give further testimony for plaintiffs in the Mirena litigation?



MS. NATALE: Same objection.
THE WITNESS: No.
MS. NATALE: And objection to the use of plaintiffs, especially within this litigation.
BY MR. SCHMIDT:
Q. Is -- is that at all relevant to you if the author of this paper was an expert witness for the plaintiffs, for some plaintiffs anywhere alleging IIH from Mirena, and within pretty short order after being challenged on his opinions in his deposition, he said I can't -- I can't do this anymore. I can't be a plaintiffs' expert anymore?
MS. NATALE: Same objection. Objection to editorializing, and again I will object to the use of plaintiffs particularly given the scope of this litigation and the Court's orders.
THE WITNESS: So does it bother me -- how does it bother me about -- what am I bothered by?

Page 274

BY MR. SCHMIDT:
Q. Just the fact that he gave his opinions, got deposed on them and said I can't do this anymore, I withdraw my testimony?
A. I don't know --
MS. NATALE: Same objection and the litigation.
THE WITNESS: I just don't know. I don't know anything about what he went through and I don't know what he was feeling. Maybe he had a bad social life. I don't know what it is.
BY MR. SCHMIDT:
Q. Let me -- let me show you the affidavit that I referenced.
(Document marked for identification as Exhibit Fraunfelder-20.)
BY MR. SCHMIDT:
Q. I've marked it as Exhibit 20. And I'll ask you if you've seen this before.

Page 275

MS. NATALE: I will object to this --
THE WITNESS: I have not seen this before.
MS. NATALE: I will object to this exhibit as a whole and on the bases that I've already provided.
BY MR. SCHMIDT:
Q. Do you see it's titled Affidavit of Dr. Mahyar Etminan?
A. Yes.
Q. And do you see his signature or a signature that looks like his signature on the back page?
MS. NATALE: Same objection.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. And it's dated December 17, 2016, do you see that?
A. Yes. Yes.
Q. Okay. And let's just look at some portions of this affidavit. Do you see he identifies himself as the

Page 276

author of the article we are discussing that's marked as Exhibit 19 in the second paragraph of his affidavit?
A. Yes.
MS. NATALE: I just -- I don't know if you'd like me to make a standing objection to the use of this document --
MR. SCHMIDT: Sure. Glad you did it.
MS. NATALE: -- and all of those that I preserved.
Awesome.
BY MR. SCHMIDT:
Q. Okay. If you look at the third paragraph he describes the two analyses he conducted in Exhibit 19. Do you see that?
A. Yes.
Q. And then he starts giving detail in particular about the disproportionality analysis. And that's what I'd like to direct your attention to. In Paragraph 5 he says, "I relied on

Page 277

an analyst to extract the data from the FAERS database."
Do you see that?
A. Mm-hmm-hmm.
Q. The next paragraph he says, "To the best of my knowledge the analyst did not limit the groups compared in the FAERS DPA to reproductive age females."
Do you see that?
A. Yes.
Q. He goes on to say, "Because the background incidence of intracranial hypertension is higher in reproductive age females and in other demographic groups, failing to limit the comparator group to reproductive age females can artificially inflate the ROR for Mirena because almost all Mirena users are reproductive age females."
Did I read that correctly?
A. Yes.
Q. And I think you've already said something similar. But do you agree with that?

Page 278

MS. NATALE: Objection to form.
THE WITNESS: "Because the background incidence of intracranial hypertension is higher in reproductive age females than in other reproductive groups, failing to limit" -- so I agree with that first statement.
BY MR. SCHMIDT:
Q. Okay.
A. That that's a risk factor for IIH.
Then he goes on to say, "failing to limit" -- is that -- do you want me to keep reading?
Q. Sure.
A. So failing to limit the comparator group to reproductive age females can artificially inflate the ROR for Mirena.
So I'm not so sure about that.
Q. Okay. Do you remember

Page 279

talking about confounding earlier?
A. Yes.
Q. If you were to do a study comparing Mirena patients in one group to a control group that included people of both genders and people of all ages, would that potentially bias your results because it would be confounded?
MS. NATALE: Objection to form.
THE WITNESS: Yeah. There's a -- yes, you want to try and control confounders as best you can.
BY MR. SCHMIDT:
Q. And that's what he -- that's what he's saying here, you should control for the confounder of women of childbearing age, correct?
MS. NATALE: Same objection.
THE WITNESS: Correct.
BY MR. SCHMIDT:
Q. And you agree with that, if you can?

Page 280

A. So I just agree with the first sentence before the comma. And I don't know what he's saying after that. "Failing to limit the comparator group to reproductive age females can artificially inflate."
I mean that's speculation. He didn't have any evidence of that. That's just his opinion.
Q. Really?
A. Yeah, that's his opinion.
Q. Does -- does IIH get reported in old men at the rate it gets reported at the women of childbearing age?
MS. NATALE: Objection to form.
THE WITNESS: Well, I mean, he's -- he's talking about women here. Not men.
I mean he's -- basically, he's -- I mean, what he does is he eliminates all women that he doesn't have age data for. So

Page 281

he's -- in his -- in his letter to the editor. And so he is eliminating all kinds of childbearing age women in that arbitrary elimination. But...
MR. SCHMIDT: Move to -- move to strike as nonresponsive.
BY MR. SCHMIDT:
Q. My question was simply, does IIH get reported in old men at the rate it gets reported for women of childbearing age?
A. No.
MS. NATALE: I'll preserve my objection to your motion to strike.
BY MR. SCHMIDT:
Q. Does it -- look at the next sentence. "A proper analysis would be limited to women of reproductive age." Do you agree with that?
MS. NATALE: Objection to form. Asked and answered.
THE WITNESS: Therefore a

Page 282

proper analysis would be limited to women of reproductive age.
You know --
BY MR. SCHMIDT:
Q. Do you agree with that?
MS. NATALE: Same objection.
THE WITNESS: I mean, you know, a sentence all by itself it's -- you know, it's not out of context basically.
BY MR. SCHMIDT:
Q. Read the context and tell me whether you agree with the sentence.
A. I think a proper analysis would be to, you know, have confounding variables controlled in both groups that you're comparing. So if he's comparing all women in one group, and he's got to compare all women in the control group. If he's comparing women of just reproductive age in one group, he's got to compare women of reproductive age in the other group. So --
Q. Okay.

Page 283

A. The sentence all by itself to say improper is just kind of vague.
Q. We know that all women, or almost all women who use Mirena are of reproductive age, right?
A. Yes.
Q. And there's no men in that group, right?
A. Come on. There's transgender men. And there's men -- yeah. Transgender men.
MS. NATALE: I --
BY MR. SCHMIDT:
Q. Do you know if transgender individuals who become women use Mirena?
A. I don't see how they could.
Q. Okay. So let's -- let's stick to the real world.
In the real world, if you're doing a study of rates of IIH in Mirena, whether it's a disproportionality analysis or an observational study, should you compare the Mirena patients to other women of reproductive age?

Page 284

A. That would be a good thing to do.
Q. Okay. And he did not do that, that's what he's saying here, right, in his published study?
MS. NATALE: Objection to form.
THE WITNESS: What he's saying is that --
BY MR. SCHMIDT:
Q. The first sentence in Paragraph 6.
A. He should of -- that -- he -- he's saying that -- he's saying that he should have just looked at reproductive age women.
Q. And in the first sentence of that paragraph, he says he did not do that to the best of his knowledge, correct?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:

Page 285

Q. Okay. Let's go to Number 7. He raises a separate flaw with his study in Number 7. He says, "I do not know if my analyst used unique cases or instead used unique reports."
Do you see that?
A. Yes.
Q. And do you understand that distinction he is drawing? And you can read the rest of the paragraph, because it gives his context between unique cases and unique reports?
MS. NATALE: Objection to form.
THE WITNESS: I don't understand that, no.
BY MR. SCHMIDT:
Q. Are you aware that sometimes with adverse event data a single case will generate multiple reports?
A. A single case report. Single spontaneous report in the FDA will generate multiple reports?
Q. Mm-hmm. A single -- let me

Page 286

phrase it a little differently. There are case -- there are instances where a single individual reporting single adverse event will generate distinct case reports in your database, are you aware of that?

A. So you are referring to duplicate reports? Is that what you mean, like they could report it to the FDA, they could report it to Bayer, they could report it to WHO, is that what you mean?

Q. Yeah, or they might report it, and their doctor might report it and their lawyer might report it.

A. Yes.

MS. NATALE: Objection to form.

THE WITNESS: I'm aware of duplicate reporting.

BY MR. SCHMIDT:

Q. Is it important to try to control for duplicate reporting if you're analyzing adverse event report data?

Page 287

A. Yes.

Q. Do you understand Dr. Etminan to be saying he agrees with you, specifically in the last sentence of Paragraph 7?

A. Yes.

Q. And do you understand him to also be saying he doesn't know if he did that in his published study?

A. I haven't seen the phraseology of unique cases. And so I don't know what he means when he says that. But if you're inferring that he's meaning he's controlling for duplicate reports, then I would agree you should control for duplicate reports.

Q. And do you agree that he did not control, or he could not affirm that he controlled for duplicate reports in his study?

A. I don't know.

Q. By the way, you -- you have conducted -- you -- you have produced I think it's Appendix B to your report,

Page 288

some data from your registry?

MS. NATALE: Just objection to form.

BY MR. SCHMIDT:

Q. Some case reports from your registry?

A. Some spontaneous reports?

Q. Yes.

A. Yes.

Q. Did you go through those and duplicate those for duplicate reports?

A. Yes, we go through those and do our best. But we make errors and sometimes we miss. But in the scheme of duplicate reporting, it's -- it's a very small fraction of the reports. It's rare to even get one report, let alone the same report three times. So duplicate reporting is an issue, but it's not a gigantic issue. It's a very small issue.

Q. Have you -- have you quantified the issue in the context of Mirena and IIH?

MS. NATALE: Objection to form.

Page 289

THE WITNESS: I haven't quantified it, no.

BY MR. SCHMIDT:

Q. Do you know if there is duplication between the reports that you have from your registry and reports that are otherwise available from Bayer's adverse event reporting base?

MS. NATALE: Objection to form.

THE WITNESS: So in my database, I would more likely than not have the Bayer cases, because Bayer would have been required to report that to the FDA. And so I'm not taking the Bayer cases and including that in my adjudication of it. I am only looking at it once.

Now I could make errors. It is true that we make errors sometimes and we do duplicate sometimes.

BY MR. SCHMIDT:
Q. Well, for example, you talk in your report at Page 23 about data from your registry.
A. Yes.
Q. And you refer to 422 cases you found, in the first sentence. Do you see that?
A. Yes, sir.
Q. Now, I'm correct, aren't I, that many of those cases do not involve Mirena?
MS. NATALE: Objection to form.
THE WITNESS: About I'd say two-thirds do involve Mirena.
BY MR. SCHMIDT:
Q. And one-third do not?
A. That's just a rough estimate.
Q. And you looked for increased intracranial pressure disorders, do you see that?
A. Yes.



Q. What are the specific search terms that are encompassed with increased intracranial pressure disorders?
A. That's the search term. That's it. There is no other search term.
Q. Okay. You agree with me that that would pick up conditions that are not IIH, correct?
A. Yeah. Yes.
Q. Have you done an adjudication of those 422 reports to see how many are IIH and how many are not?
I didn't see it reflected in your report.
MS. NATALE: I'm sorry. Earlier you said Appendix B. So I'm just asking if you're referring to Appendix A, Appendix B.
MR. SCHMIDT: I'm referring to the number in his report on Page 23.
THE WITNESS: Right. So



increased intracranial pressure can be synonymous with IIH and usually would be assumed to be so. So the -- the search term is what it is. My adjudication of it is that that term is what happened in the cases with Mirena.
MR. SCHMIDT: Move to strike as nonresponsive.
BY MR. SCHMIDT:
Q. My specific question is, of those 422 cases that were kicked out with the search term "increased intracranial pressure," have you performed an adjudication of those cases to confirm that in your opinion they are all IIH?
A. I'm going to look at my search terms real quickly because it's right here at the beginning.
Increased intracranial pressure disorders.
So some of those might not be -- might not be just pseudotumor cerebri.



Q. Right. And that's my question.
A. Where I -- yes.
Q. Have you done an adjudication to see which ones are and which ones are not among those 422?
A. You wouldn't -- yes, I have. And -- and my -- my answer is you're not able to differentiate the two.
Q. Okay. So for the 422, you can't tell me to a reasonable degree of medical certainty that they are all IIH, that they are all not IIH or that they are somewhere in between?
MS. NATALE: Objection to form.
THE WITNESS: Yeah, all I can say is it's increased intracranial pressure. That's all I can say.
BY MR. SCHMIDT:
Q. And would the same be true for the number of dechallenges you report?

Confidential - Subject to Protective Order



A. Yes.
Q. And going back to my point about the -- the Bayer database versus your registry. Have you looked at these 422 cases and attempted to remove from that number ones that also appear in the Bayer database?
A. Yes.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Okay. My understanding is if we -- is that true for the dechallenge cases?
A. Yes.
Q. When we look at the dechallenge cases that you cite, we see a number that we think also appear in the Bayer database.
A. Okay.
Q. Is it -- is it your testimony that you did all of those?
MS. NATALE: Objection to form.



THE WITNESS: My testimony is that we try to control for that every time. And like I said earlier, sometimes we miss one or two.
BY MR. SCHMIDT:
Q. Okay. How did -- we counted more than half of your dechallenge cases that appeared in the Bayer database. Would that surprise you --
MS. NATALE: Object -- objection to form.
BY MR. SCHMIDT:
Q. -- if that were the case, given what you described as your efforts?
A. There -- it's okay for us to have these case reports all by themselves in our database. It's not like Bayer -- I can have the Bayer case reports. I can totally have them.
Q. I totally -- I'm not challenging that proposition.
A. Yeah. Yeah.
Q. I'm not saying they are



proprietary or anything.
A. Yeah, I mean, are you saying it's the same case over and over again in the rechallenge -- I mean in the dechallenge group?
Q. I'm saying that your -- the data that you pulled from the Bayer dataset repeats in your registry dataset.
A. Well, that's okay.
Q. Okay. But is that --
A. I mean that's part of the deal. We're going to have the Bayer data.
Q. Totally understood.
A. Yeah.
Q. But that's my question. You didn't attempt to remove cases that were in the Bayer database from your set of --
A. No.
Q. -- 422 cases, correct?
MS. NATALE: Objection to form.
THE WITNESS: Why would I?
BY MR. SCHMIDT:



Q. You didn't do that, correct?
A. I didn't remove the Bayer cases. We are going to have everything that's been reported to the FDA --
Q. Right.
A. -- and if Bayer reported to the FDA, we're going to have it.
Q. And let me ask the question the other way around. Did you go through your registry data to find Mirena cases -- to find any Mirena cases that you were able to confirm were not contained in the Bayer database?
MS. NATALE: Objection to form.
THE WITNESS: I'm sorry, I didn't hear it.
BY MR. SCHMIDT:
Q. That's okay. Did you go through your data -- let me start the question again.
Did you go through the set of cases you pulled from the registry to see if there were any Mirena cases in

Page 298

there that were not contained in Bayer's database?
A. Yes. That's something that Bree Jensvold that we talked about does for me.
Q. And how many --
A. And it's my experience that we very rarely have duplicate cases. So in the dechallenge data, we hope not to have any cases reported twice. There could be one from Bayer in -- in Europe. There could be one from Bayer here in the U.S.
Q. I think we're -- we're saying slightly different things.
I'm focused on whether there's cases that appear in the Bayer database that also appear in your registry set. Not if the same case appears multiple times in the Bayer database or multiple times in your registry. Do you follow me?
MS. NATALE: Objection, asked and answered.

Page 299

THE WITNESS: I understand.
BY MR. SCHMIDT:
Q. Okay. So let me be sure we are on the same page because maybe we are, maybe we are not.
But do you know if there are any cases that appear in your registry set involving Mirena and IIH that do not appear in Bayer's database?
MS. NATALE: Objection to form.
THE WITNESS: I haven't compared the two.
However -- can I answer more?
MS. NATALE: Yes.
THE WITNESS: The -- it's -- it's possible. It's possible if it wasn't part of the -- the years that we searched. So we searched, you know, from -- well, we searched 217.
So September 25, 2017, we conducted the search. So if the

Page 300

Bayer database has stuff that occurred before that, I wouldn't have that.
And if the Bayer database got stuff after that I wouldn't have it. You know, actually I would have it if it was before. But I wouldn't have it if it was after. So...
BY MR. SCHMIDT:
Q. And I'm asking the other way around. Do you know if there's anything involving Mirena and IIH that's in your registry that's not in the Bayer database?
A. I haven't compared the two.
Q. Okay. There's not a report you could point me to that's in your registry that's not in the Bayer database; is that fair?
MS. NATALE: Objection to form.
THE WITNESS: I think that's fair. Although I -- I can't say

Page 301

that that's a true statement. I just would have to compare the two.
BY MR. SCHMIDT:
Q. Okay.
A. You -- you should know though that we get all the Bayer data when we search for it.
Q. That's --
A. So it should be in there depending on when I searched for it.
Q. That's what I'm asking.
A. Yeah.
Q. Let's look back at the affidavit.
A. Okay.
Q. Dr. Etminan's affidavit?
A. All right.
Q. Which I believe is Exhibit 20. His sworn statement disavowing all of his prior publications.
MS. NATALE: Objection to form, and same as every objection that was made in the past.

MR. SCHMIDT: I was just saying that for fun also, that comment.
MS. NATALE: I know.
MR. SCHMIDT: Even though I think the record speaks for itself.
MS. NATALE: I will object to your further comment on your previous comment that you allegedly withdraw.
BY MR. SCHMIDT:
Q. Let's look at Paragraph 8, please.
A. I'm there.
Q. He states, "I have no basis to say that the results in the FAERS DPA would have been statistically significant or that the point estimate would have been greater than two had the control group been properly limited to reproductive age females and had the analysis properly used unique cases rather than unique reports."



Did I read that correctly?
A. Yes.
Q. Do you have any basis to say that had he properly limited his analysis to reproductive age females and only counted cases instead of -- and excluded ones where there were multiple reports, that he still would have received a statistically significant effect?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Do you have any basis to say that?
A. What I would say is that the people that he excluded would have been reproductive age as well. Who is going to take Mirena that's not of reproductive age? So, I mean I don't know what the guy is getting at, excluding all the cases. It seems -- it seems odd.
Q. Do you -- come back to my question, please.
Do you have any basis to say



that had he properly limited his analysis to reproductive age females, and only counted cases, de-duplicating multiple reports, that he still would have a statistically significant effect?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Do you know that that would have been the case?
A. I don't know.
Q. Okay. And when he excludes women of reproductive age -- I'm sorry. Strike that.
You've referred a couple times now to him excluding women for whom no age data was given, correct?
A. Correct.
Q. And you know he excluded some women in the Mirena group for whom no age data was given, correct?
A. Yes.
Q. Do you know how many he excluded?



MS. NATALE: Objection to form.
THE WITNESS: Well, that number is there in his -- shall we look at it?
BY MR. SCHMIDT:
Q. Sure.
A. I think that number is there. Let's -- what -- what tab is he on here? Let's find him. Let's find Etminan.
I'm going to find it. You guys just wait.
So I'm going to have to read it. I'm so sorry. I -- I think you know the answer. But I'm just going to take my time and find it. Okay.
First, a smaller number of benign intracranial hypertension cases in age-restricted analysis, a drop in cases from 40 to 17. This demonstrates possible use of Mirena in older women...
So let's see in the table. Age-restricted analysis, BIH Mirena, 40.

Page 306

All other drugs, 566 for BIH.
Age-restricted analysis, 17. All other drugs, 242.
So you saw that, right?
Q. Yep. So how many did he exclude?
A. So he -- he excluded -- he went from 566 minus 242, right?
Q. So how many did he exclude in your view from the Mirena group?
A. So basically 23.
Q. Did he exclude the same proportion from the non-Mirena group where age information was not provided?
MS. NATALE: Objection to form.
THE WITNESS: So proportion meaning that 17 divided by 40. Is that what we're saying -- like a percentage or something?
BY MR. SCHMIDT:
Q. Mm-hmm. Little -- he's excluded a little more than half from the Mirena group. Did he also exclude a

Page 307

little more than half from the other drug group?
MS. NATALE: Objection to form.
THE WITNESS: It looks kind of half-ish.
BY MR. SCHMIDT:
Q. Do you have any basis to testify that had he gone through and identified the -- I'll strike that.
He says, "Indeed" -- let's look back at his affidavit.
"Indeed, rerunning DPA analyses of the FAERS data using Open Vigil 2.1 software and properly limiting it to unique cases of women of reproductive age results in no elevated ROR for Mirena suggested that intracranial hypertension and Mirena use are 'likely not related.'"
Did I read that correctly?
A. Yes.
Q. Do you have any reason to disagree with his -- the factual

Page 308

proposition he states, that if you use Open Vigil and properly limit it to unique cases of women of reproductive age that you get no elevated ROR for Mirena?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Any reason to disagree with that as a factual matter?
A. Yes.
Q. And what is your basis to disagree with that as a factual matter?
A. I disagree with it because I think his -- his paper stood on his own, as flawed as it is, but when he originally wrote it. And he should not have eliminated the women that he didn't know their age. Because you could have assumed, a logical person would have assumed, they were women of reproductive age. So he unnecessarily got rid of IIH cases. He didn't need to get rid of them.
Q. And of the 200 and -- the

Page 309

more than 300 women he eliminated from the other drug group because they didn't have IIH, how many of those would you assume were women of reproductive age, do you know?
MS. NATALE: Objection to form.
THE WITNESS: All other drugs.
BY MR. SCHMIDT:
Q. Yeah.
A. All -- all other drugs being -- I have to remember what the all other drugs are. They are the -- I'm not going to ask you because you are not going to help me. So I'm just going to read it.
Q. I don't know. It's -- it's -- I think it's what it's -- I think it's what it says, which is all other drugs.
A. Right. So, I mean --
Q. Contained in the FAERS database.

Page 310

A. I don't know if -- I don't know if those women are -- I don't know what he's talking about with all other drugs.
Q. You see that he eliminated 300 women from the all other drug group because he didn't have age, correct?
MS. NATALE: Objection to form, and to women.
THE WITNESS: It looks like 3 million -- oh, I see what you're saying. Yeah. Right.
566 to 242, is that what you're saying?
BY MR. SCHMIDT:
Q. Right.
MS. NATALE: Same objection.
THE WITNESS: That's --
BY MR. SCHMIDT:
Q. And so you -- you picked up on something that's important. When he went from looking at women who report cases for other drugs, he started off with 3 million cases before his age

Page 311

restriction and went down to under 400,000 cases after his age restriction, right?
MS. NATALE: Same objection, and to women.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. So in terms of total cases, he reduced the total case pool from 3 million to 400,000, correct?
A. Yes.
Q. And then when he looked at the IIH cases specifically, the number went from 566, dropped by more than 300 cases to 242, correct?
A. Yes.
MS. NATALE: I'll just object to the extent, I know that Dr. Fraunfelder has in front of him, but you have not entered the 2017 piece into the record.
BY MR. SCHMIDT:
Q. And do you know of any women among those 300 who were excluded from

Page 312

the other drug category who had IIH who were not of reproductive age?
A. I don't know.
Q. If we come back to the sworn affidavit from Dr. Etminan, Exhibit 20, Paragraph 8. I was asking you a slightly different question than -- than you answered.
He reports in that language we were looking at having run an analysis. Do you see that?
A. Yes.
Q. After rerunning the analysis?
A. Yeah.
Q. He says when he ran his analysis and limited it to unique cases in women of reproductive age, he no longer got a statistically significant ROR. Do you see that?
A. Yes.
Q. Have you done that math to say he's wrong in his math?
A. No.

Page 313

Q. Do you have any reason to question his math?
A. No. Not his math.
Q. Do you have any reason to question that the results of his math generate a result that the database refers to as, quote, likely not related?
MS. NATALE: Objection to form.
THE WITNESS: I don't object to his math. I just think that he's copping out.
BY MR. SCHMIDT:
Q. Okay. You've never talked to him about his motives or anything?
A. No, I have never talked to him.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. You don't know if he hasn't corrected his -- his published report through this affidavit because he is, in fact, a champion of truth and a champion

of justice?
A. No, I don't.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Do you know that when you perform these kind of disproportionality analyses in the -- have you ever performed a disproportionality --
A. No.
Q. -- in the Open Vigil database?
A. No.
Q. Do you know that when you perform them, it gives you both a number and a category rating?
MS. NATALE: Objection to form.
THE WITNESS: I've looked at those sorts of things before. But I never performed them.
BY MR. SCHMIDT:
Q. Are you aware that one of the category ratings is -- is what he



quotes here, likely not related?
MS. NATALE: Same objection.
THE WITNESS: I didn't know that.
BY MR. SCHMIDT:
Q. Let me ask you this question.
If -- if you did a disproportionality analysis that in your view was properly conducted and it failed to find any disproportionality in the rates of IIH reports among Mirena users versus all other drugs, would that be evidence against causation?
MS. NATALE: Objection to form. Compound. Calls for speculation. Incomplete hypothetical.
THE WITNESS: It would be a piece of evidence that you would take as a whole.
All by itself it wouldn't tell me that it's not true, that the relationship is not true if it



was all by itself.
BY MR. SCHMIDT:
Q. All by itself, would it be evidence against causation?
MS. NATALE: Same objection.
THE WITNESS: All by itself it would argue against causation.
BY MR. SCHMIDT:
Q. Look with me at Paragraph 14.
A. 14.
Q. Yeah. In the sworn Etminan affidavit. Do you recall talking about there being two letters to the editor?
A. I remember that.
Q. He references in Paragraph 14 the first letter to the editor he wrote. His author replied. Do you see that?
A. Yes.
Q. He states -- and -- and I think that's the one that you've been referring to, correct?
MS. NATALE: Objection to



form.
THE WITNESS: No, I haven't been referring to that one, no.
BY MR. SCHMIDT:
Q. I'm sorry, you are right. You have not been. I'm sorry. And I -- I misspoke.
He says in his first letter to the editor, "I reported that I had used the program Open Vigil 2.1 to calculate using the FAERS database an ROR of 3.4."
Do you see that?
A. Yes.
Q. In Paragraph 15 he says, "That statement was in error." Do you see that?
A. Yes.
Q. Does it give you pause relying on the results of an author who admits that his statements about his work are wrong?
MS. NATALE: Objection to form.

Page 318

THE WITNESS: Right, I don't rely on his results all by themselves.
BY MR. SCHMIDT:
Q. Does it give you pause giving any reliance on his results when he admits that he has published wrong results?
MS. NATALE: Same objection.
THE WITNESS: Yeah, it doesn't argue well in his favor.
BY MR. SCHMIDT:
Q. But do you still rely on his results notwithstanding his admission that he makes mistakes in his work?
MS. NATALE: Same objection.
THE WITNESS: I -- I don't rely on his results as they stand alone.
BY MR. SCHMIDT:
Q. Do you rely on them in any way?
A. I think that his first paper has some validity.

Page 319

Q. Okay. He goes on to say, explain how he made the error. He said, "As I was not very familiar working with Open Vigil 2.1, when calculating the ROR of 3.4, I failed to limit the groups to reproductive age women which introduced a bias against the Mirena group."
Do you -- do you see that?
MS. NATALE: Objection to form.
THE WITNESS: I see that.
BY MR. SCHMIDT:
Q. Do you agree that if he failed to limit the comparison group to women of reproductive age, that introduces a bias against Mirena?
MS. NATALE: Same objection.
BY MR. SCHMIDT:
Q. That's the confounder we talked about, right?
A. "I failed to limit the group to reproductive age women."
I stand by my argument that the women would have been reproductive

Page 320

age. He -- he eliminated a bunch of reproductive age women.
Q. I'm asking a different question.
His original analysis did not limit to reproductive age women, right?
A. Right.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Your point is it de facto did for the Mirena group but it certainly did not for the comparison group, right?
A. It de facto did for the Mirena group.
Q. But not for the comparison group, right?
A. I don't know about that.
Q. Well, you would have had all kinds of old dudes and young kids and older women, right, in the -- included in the dataset, right?
A. I don't know.

Page 321

Q. You don't know --
A. I don't know what -- I don't know what he would have had in that group.
Q. Well, if it's a database, if it's the FAERS database of all adverse events, that includes a lot of adverse events from older men who take medications, right?
A. Well, I'd like to look at his methods. I'm not sure that he's -- he's -- let's look at the group, the -- the methods on what he did.
Q. All right. Exhibit 19.
MS. NATALE: I don't believe that is what Dr. Fraunfelder is looking at.
THE WITNESS: I'm on the wrong one.
BY MR. SCHMIDT:
Q. Let's look at Exhibit 19 please.
A. Yeah.
Q. His original study. Do you

see that?
A. Yes.
Q. The one where he fails to disclose his conflict of interest, correct?
MS. NATALE: Objection to form.
THE WITNESS: Correct.
BY MR. SCHMIDT:
Q. And look at the methods on the second page where he describes he used two different methodologies. Do you see that?
A. Yes.
Q. And the first one he describes is the disproportionality analysis we've been talking about, right?
A. Yeah, I could just read it if you want me to.
Q. Do you mind answering my question?
A. So the first one is the FAERS database.
Q. That's disproportionality.



What we've been discussing, right?
A. Okay.
Q. And he purports, at least on its face, to capture all data from FAERS, right?
A. "First we used the FAERS database to quantify reporting odds ratios which quantifies the odds of reported cases of ICH against Mirena and IUL used in the United States."
You don't have to write this down, I'm sorry.
THE COURT REPORTER: I do actually.
THE WITNESS: I won't -- I won't read out loud.
So --
BY MR. SCHMIDT:
Q. I'm not sure there is a question. So let me just -- until I get a question in.
A. Okay.
Q. Do you understand that when he's comparing patients with Mirena who



are all or almost all women of childbearing age to other drugs, that's other drugs for all ages and both genders?
A. Correct. However, I would argue with you that his search terms are benign intracranial hypertension, idiopathic intracranial hypertension, cerebral edema, et cetera. And as you know, the risk factors for that are women of childbearing age.
So if he excludes, you know, age data, even in the all other drugs category, it's going to be predominately women. Mostly women.
Q. But he didn't exclude age data in his original report, correct?
MS. NATALE: Objection to form.
THE WITNESS: In -- in his original report he didn't exclude age data.
BY MR. SCHMIDT:
Q. Okay. That's my question.



Now, let's go back to my discussion of his error in his analysis in his sworn affidavit in Paragraph 15.
Do you see where he says, "I was not very familiar working with Open Vigil 2.1," and because of that he failed to limit the groups to reproductive age women.
Do you see that?
A. I see that.
Q. Does it give you -- and then he also identifies another error. "I also inadvertently searched unique reports rather than unique cases. As a result some Mirena cases were included more than once."
Do you see that?
MS. NATALE: Objection to form.
THE WITNESS: I see that.
BY MR. SCHMIDT:
Q. Does it give you pause relying on an expert's disproportionality analysis who admits under oath that he's

so unfamiliar working with the database he's purporting to study that he makes basic errors like double counting cases and not excluding old men from his analysis?

MS. NATALE: Objection to form.

BY MR. SCHMIDT:

Q. Does that give you pause?

A. I -- I just think the -- the magnitude of that error is what matters. And I don't know if it just completely -- I don't think it completely disqualifies his first paper.

Q. Have you done an analysis to assess the magnitude of his errors?

MS. NATALE: Objection to form.

THE WITNESS: I have not.

BY MR. SCHMIDT:

Q. Can you tell me that for example, if you just de-duplicate his cases -- let me phrase the question differently.



I'm going to state a proposition and you tell me if you know it to be true or false or you don't know.

If he duplicates his cases, he sees no difference in his disproportionality analysis for Mirena versus other drugs, is that true, false or you don't know?

MS. NATALE: Objection to form.

THE WITNESS: Duplication is not good. But, remember, duplication rarely happens. It's not -- I mean it's not going to be a huge error. It's not going to like completely skew his ROR.

MR. SCHMIDT: Move to strike as nonresponsive.

BY MR. SCHMIDT:

Q. Just, all I'm asking you is to answer my question which is, do you know if what I'm saying is true or false or you don't know.

If you remove his duplicated



cases, his statistically significant effect size goes away, true, false or you don't know?

A. I don't know on his stuff. I don't know what he was doing.

Q. Okay. Do you see at the bottom where he talks about in Paragraph 17 what I referred to you, that he gave sworn testimony on April 15, 2016, in his capacity as a paid expert witness for lawyers suing Bayer, do you see that?

A. Yes.

MS. NATALE: Objection to form.

BY MR. SCHMIDT:

Q. "I subsequently withdrew as an expert in those cases."

Do you see that?

A. Yes.

MS. NATALE: Objection to form.

BY MR. SCHMIDT:

Q. And then do you see above



that where he admits in Paragraph 12 that he had a conflict of interest that he did not disclose?

MS. NATALE: Objection to form.

THE WITNESS: Yeah, I see that.

BY MR. SCHMIDT:

Q. Does any of this, the failure to disclose his conflict of interest, the admitted errors in his analysis, his admitted not being not very familiar with the database he's purporting to use, the fact that he withdrew the first time he was challenged on his opinions by Dr. Kenneth Baum, does any of that cause you to discard reliance on his disproportionality analysis?

MS. NATALE: Objection to form and also to use of Dr. Kenneth Baum in the context.

THE WITNESS: I wouldn't use the phrase "discard." I -- I don't rely on his evidence in his

papers as much as -- all alone, you know. And I've said in my expert report that he made some errors. And, therefore, his evidence is lower on the scale of evidence.
BY MR. SCHMIDT:
Q. Okay. But is it something you consider, that's my question.
A. I -- I do consider it, especially his first paper. I've said it a few times. I think he has some valid data there.
Q. And none of these challenges I've raised, his withdrawing as an expert, his failure to disclose his conflict of interest, his admitted errors, his admitted being not very familiar with the database he's using, none of those cause you to change your view that you relied to some extent on his disproportionality analysis, correct?
MS. NATALE: Objection to form.



THE WITNESS: Well, the view I stated wasn't like overwhelmingly enthusiastic. It just doesn't change my view, no. The view I stated I stick with.
BY MR. SCHMIDT:
Q. Well, since you used the term "overwhelmingly enthusiastic," are you pretty tepid on his data?
MS. NATALE: Objection to form.
THE WITNESS: I am -- I put his paper low on the evidence scale as far as the data I used to form my opinion.
BY MR. SCHMIDT:
Q. Okay. Now, let's look at his second analysis. Do you want a copy of that so you can take it home, the affidavit?
A. No. No, thank you.
MS. NATALE: All right.
BY MR. SCHMIDT:
Q. Let's look at the second



analysis that he performed.
MS. NATALE: Just quickly.
MR. SCHMIDT: Strike that. Would you like to --
MS. NATALE: Sorry. Just a few times you've referred to like second analyses or second letters to the editor. I just feel like there's not a very clear record to which documents you're referring to.
Now, are you referring to the second letter to the editor, or the second analysis being the 2016 letter to the editor?
MR. SCHMIDT: I'll ask the question again.
BY MR. SCHMIDT:
Q. Would you like to see Dr. Etminan's sworn testimony in Mirena cases where -- the testimony he gave promptly before withdrawing as an expert?
MS. NATALE: Objection to form and to, again, Mirena cases.



THE WITNESS: I don't care to see it, no.
BY MR. SCHMIDT:
Q. Okay. Is it your view that no matter what errors he confessed to in his deposition, it wouldn't affect your reliance on his report -- or reliance you attach to it?
MS. NATALE: Objection to form and also to use of report.
THE WITNESS: Ask the question again, please.
BY MR. SCHMIDT:
Q. Sure.
Is it the case that regardless of what, if any, errors Dr. Etminan confessed to in his deposition, those would not affect your reliance on his disproportionality analysis insofar as you do rely on it?
MS. NATALE: Same objection.
THE WITNESS: I don't -- I don't think that's true.
BY MR. SCHMIDT:

Page 334

Q. You might see something in there that would change your reliance on it?
MS. NATALE: Same objection. And asked and answered numerous times.
THE WITNESS: I see something in where? Like I've already seen --
BY MR. SCHMIDT:
Q. His depositions.
A. -- I've already seen what -- oh, in his deposition.
Q. Yeah.
A. I haven't looked at the deposition. So I -- it's theoretical, isn't it? I don't know what to say about that.
Q. Okay. Well --
A. The only reason I don't want to read it is because I don't want to read it.
Q. Fair enough.
Do you -- do you rule out --

Page 335

let me -- let me try it this way and then I'll move on.
Do you rule out the possibility that something in Dr. Etminan's deposition, the deposition that he gave and then promptly withdrew from the litigation after giving, do you rule out that there's anything in the deposition that would cause you to change the low level of reliance you place on his disproportionality analysis?
MS. NATALE: Same objections to form and to litigation.
THE WITNESS: I don't know the answer to that.
BY MR. SCHMIDT:
Q. Okay. Fair enough.
Let's go back to his study published at Page 19. And he talks about a second analysis in his study that was a retrospective cohort study comparing Mirena to two other oral contraceptives.
MS. NATALE: Did you say -- do you mean Exhibit 19?

Page 336

MR. SCHMIDT: Yes, I did.
MS. NATALE: You said Page 19. I think that's the confusion.
BY MR. SCHMIDT:
Q. All right. Yeah. Let's start over.
Look with me at Exhibit 19, the Etminan study. Do you have that in front of you?
A. Yes. Yes.
Q. Look with me at the second page, under methods. The second -- I asked you about the first analysis, the disproportionality analysis.
Now I'm going to ask about the second one where he says, "We supplemented the first analysis with a retrospective cohort study that compared the risk of intracranial hypertension between IUL and two other combination oral contraceptives."
Do you see that?
A. Yes.

Page 337

Q. Okay. Do you see those two oral contraceptives listed there?
A. Yes.
Q. One is referred to as EE, and one is referred to as EE norgestimate. Do you see that?
A. Yes.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Do you know if either of those contain levonorgestrel?
A. I don't think so.
Q. Do you have an opinion that either of those cause IIH?
MS. NATALE: Objection to form.
THE WITNESS: I don't know that oral contraceptives cause IIH.
BY MR. SCHMIDT:
Q. So you have no basis to say that these two oral contraceptives cause IIH, correct?

Page 338

A. I have no basis to say that those two cause IIH.
Q. Let's look at the results of his comparison. Come with me to Table 2 if you would, on the next page.
A. Okay.
Q. Do you see where he reports odds ratios for Mirena versus these two oral contraceptives?
A. Yes.
Q. And he reports point estimates, accrued point estimate, point estimate with weak confounding and strong confounding and then confidence intervals.
A. Yes.
Q. And can you tell from the confidence intervals whether there are any statistically significant differences between Mirena and these two other oral contraceptives?
MS. NATALE: Objection to form.
THE WITNESS: Well, it looks

Page 339

like Mirena causes ICH papilledema and combined outcomes more often than the other two drugs do.
BY MR. SCHMIDT:
Q. I think that's the results of the disproportionality analysis. I'm looking at Table 2, below.
A. Oh. All right. Table 2, so, those are two oral.
Q. Right.
A. And what do you want me to say about that? It just says what it says.
Q. Well, let me -- let me take a step back. Do you understand Table 2 to report odds ratios for Mirena versus those two oral contraceptives?
A. Yes.
Q. And is Mirena statistically significantly different from any of those oral contraceptives in terms of its IIH risk?
A. How do you determine that it's statistically significant from that

Page 340

table?
Q. Do you know how to do that?
A. You get P-values and you get a -- non-odds ratio above one indicates it happens more often. So I mean, but what's your criteria for statistical significance?
Q. P-value of .05, I think the same one you're talking about.
A. But that -- are there --
MS. NATALE: Objection to form.
THE WITNESS: Are there P-values here?
BY MR. SCHMIDT:
Q. Well, let me ask you this question. Can you tell from looking at Table 2, the data reflected in Table 2, whether the odds ratios reported for Mirena versus these two oral contraceptives are statistically significant?
A. Are those things in parentheses P-values?

Page 341

Q. Do you know what the things in parentheses are?
A. Good Lord. I'm going to sit there and read it instead of asking you.
So accrued OR 9-10 percent confidence intervals. So those are confidence intervals and not P-values.
Q. Okay. So to come back to my question. Can you -- you see that there are reported odds ratios, both accrued and adjusted for Mirena versus these two oral contraceptives.
A. Yes.
Q. Can you tell from looking at this table whether those odds ratios are statistically significant or not?
A. The odds ratios do not look strong.
Q. Can you tell whether they're statistically significant?
A. I'd like to read what he determines statistically significant in his results.
Q. Well, can you tell from

Page 342

looking at that table?
MS. NATALE: Objection to form.
THE WITNESS: So there -- there doesn't appear to be a statistical difference between the risk of ICH for EE-norgestimate compared with Mirena users. So no statistical significance on that first one. A trend towards lower risk of ICH was observed between EE-norephedrone use compared with use of Mirena.
BY MR. SCHMIDT:
Q. And was that trend statistically significant?
A. And it didn't -- didn't reach statistical significance.
You could have just said that. Would have saved us like 10 minutes.
Q. Do you -- do you rely on -- on study results that are not statistically significant?

Page 343

MS. NATALE: Objection to form.
THE WITNESS: Sometimes you can't reach statistical significance, because it's a rare event. So I take it all in context.
BY MR. SCHMIDT:
Q. Have you done any power calculations on -- on this study, the power of this study, to --
A. No, I have not.
Q. -- evaluate certain effect sizes?
A. No.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. So can you tell me if this study is powered or not to find, say, a 10 percent or 50 percent or 100 percent increase in the risk of IIH?
A. I cannot.
Q. Okay. For example, your --

Page 344

we talked earlier this morning about the odds ratio seen in the Valenzuela study. Do you remember that?
A. Mm-hmm. Yes.
Q. Do you know if this study is powered to find odds ratios of that size?
A. I don't know.
Q. Let's go back to his affidavit please. I just want to round that out. Which is Exhibit --
MS. NATALE: 20.
BY MR. SCHMIDT:
Q. -- 20.
MR. SCHMIDT: Thank you.
BY MR. SCHMIDT:
Q. If you look at the second page of this sworn -- Dr. Etminan's sworn affidavit. He states in Paragraph 11, "Based on the" -- "based on the above, as the lead author of this article, I acknowledge that neither of the analyses in the article provide evidence that Mirena use increases the risk for intracranial hypertension, therefore,

Page 345

there is no basis to say, based on these analyses, that the risk of intracranial hypertension with Mirena use outweighs the risk of unplanned pregnancies."
Did I read that correctly?
A. Yes.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Let's put aside the second sentence. Let me focus on the first sentence where he says, "I acknowledge that neither of the analyses in the article provide evidence that Mirena use increases the risk for intracranial hypertension."
Do you agree with that statement or disagree with that statement or not have a view on it?
A. I acknowledge that neither of the analyses -- I'm so sorry.
Q. Of course. Take your time.
A. In the article --
MS. NATALE: He's

apologizing to our court reporter.
THE WITNESS: -- provide evidence that Mirena use increases the risk for intracranial hypertension.
And so I think that his first article and his first letter to the editor do provide some evidence that Mirena possibly is associated with intracranial hypertension and so I don't agree with that sentence.
BY MR. SCHMIDT:
Q. And do you rely on his first letter to the editor?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. I hadn't focused on that until now.
A. Yeah.
Q. Do you also rely on the analysis in his first letter to the editor?



MR. SCHMIDT: Can we mark that as an exhibit, just so you have it in front of you?
THE WITNESS: Yeah, his first letter to the editor was a response to a criticism of his article by Friedman and I think that that has some validity. I think you keep saying that I rely on it.
Like I said earlier, I could throw it out and I wouldn't change my opinion. But I use it as a piece of the evidence of -- of Mirena causing IIH.
BY MR. SCHMIDT:
Q. Do you use his first letter to the editor as a piece of the evidence of Mirena causing IIH, even though in Paragraph 14, in Paragraph 15, he acknowledges that he made false -- a false statement in the -- in the letter to the editor?
MS. NATALE: Objection to



form and characterization. Misstates the document.
THE WITNESS: I -- I rely on it to a very small degree. But it is still data and all data is valuable. And that's all I had to say about that.
BY MR. SCHMIDT:
Q. Even data that the author of the data admits is erroneous?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. As he does in the first sentence of Paragraph 15 of his sworn affidavit?
A. Yeah. I mean it's -- it definitely lessens the value of the data. There is no question. It lessens the value of the data. But I don't know what was going on here.
Q. Okay.
A. So I can't speak to his state of mind when he was retracting



everything that he did, you know, for years of research. I can't -- I don't know what he was going through.
Q. Okay. But do -- is that your understanding of what he has done, he's retracted everything he did with respect to Mirena and IIH, what you just said?
MS. NATALE: Objection -- objection to form.
THE WITNESS: No, I don't think -- I think that was a misstatement. I don't think that he retracted everything he did. I think that he admitted errors in his -- his first research paper and in his first letter to the editor. And he acknowledges those errors and he writes an affidavit about it.
BY MR. SCHMIDT:
Q. And I'm almost done with this. Do you continue to use his first letter to the editor and his original

Page 350

publication, and I'm looking at your testimony, as a piece of the evidence of Mirena causing IIH?
A. Yes.
MS. NATALE: Same objection.
BY MR. SCHMIDT:
Q. Have you done any analysis of your own of his findings or his data to try to correct the errors he acknowledges making?
A. No.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. If you look with me at your report, Exhibit 1. Page 14.
A. Yes.
Q. About midway down the page, you state -- at the end of the second full paragraph. You state, "Regrettably." Do you see where I'm looking at the end of the second full paragraph?
A. Second full -- second full

Page 351

paragraph. One, two?
Q. Just right there.
A. That's three? Three.
MS. NATALE: The full.
THE WITNESS: Oh, full. I gotcha.
Okay, yes.
BY MR. SCHMIDT:
Q. Do you see where he says, "Regrettably Dr. Etminan's letter to the editor and ultimately his series of analyses is of little utility in assessing the relationship between LNG-IUS and PTC."
Is that a correct statement?
A. Yes.
Q. Do you agree?
A. Yes.
Q. And when you refer to his series of analyses, are you referring to his original article too?
A. Yes.
Q. Do you know of any errors, and we -- we've been focused on the

Page 352

errors in his disproportionality analysis. I want to ask about his observational study analysis comparing Mirena to oral contraceptives. Do you know of any errors in that analysis?
MS. NATALE: Objection to form.
THE WITNESS: Well, he -- you know, he admits that they are not statistically significant.
BY MR. SCHMIDT:
Q. But that's a finding, not an error, right?
A. Right.
MS. NATALE: Sorry. Is the original question still pending?
MR. SCHMIDT: He's looking.
THE WITNESS: So he writes, "Given that ICH is a rare disease, it is unlikely that adjusting for variables" -- is this the right guy? Yeah.
"That adjusting for variables that are only risk

Page 353

factors and not confounders may have changed the results of our study. We did not have information on all risk factors for ICH."
So is that what you want?
BY MR. SCHMIDT:
Q. No. Do you know if you made any simple math errors or counting errors, the kind he did with his disproportionality analysis?
A. Oh. I don't know that.
Q. With regard to his epidemiological analysis?
A. No.
MS. NATALE: Objection to form. And I don't believe that's what the question was.
BY MR. SCHMIDT:
Q. Last question and then I'm going to move onto another line of evidence. We've spent some time looking at Exhibit 20, the Etminan affidavit.
A. Yes.

Q. And let me just ask you as an expert witness in this case.
When you're shown a publication like the Etminan study that's Exhibit 19, and you come to learn that an affidavit like what we've marked as Exhibit 20 exists discussing specific issues with the study and specific aspects of the data in the study, do you want to know about the affidavit or do -- do you just ignore it?
MS. NATALE: Objection to form and also to characterization.
THE WITNESS: I think the affidavit is contributory.
BY MR. SCHMIDT:
Q. Is it important for you in evaluating Exhibit 19 to know about Exhibit 20?
MS. NATALE: Objection to form.
THE WITNESS: It's contributory.
BY MR. SCHMIDT:



Q. Is it part of the evidence you'd want to consider?
MS. NATALE: Objection to form, and I will restate our objection to the document as a --
THE WITNESS: Can I say it's contributory again?
MS. NATALE: -- document as a whole.
BY MR. SCHMIDT:
Q. I'm trying to understand what contributory means. What does contributory mean?
A. I mean it's part of the whole picture. And it counts.
Q. Okay. And you want to know that whole picture?
MS. NATALE: Same objection.
THE WITNESS: Yes, I think it counts.
BY MR. SCHMIDT:
Q. Okay.
MS. NATALE: If we're moving on to another line of questioning,



I'd ask that we take a break.
MR. SCHMIDT: Of course.
MS. NATALE: Okay.
MR. SCHMIDT: Of course.
THE VIDEOGRAPHER: Stand by please. The time is -- you may remove your microphones. The time is 2:10 p.m. We are going off the record.
(Short break.)
THE VIDEOGRAPHER: The time is 2:19 p.m. We are back on the record.
BY MR. SCHMIDT:
Q. Doctor, let's talk about case reports.
A. Okay.
Q. You say in your report at Exhibit 1 on the very first page under Item 2, that the number of reports along with the review of individual reports supports a causal relationship.
Do you see that?
A. Yes.



Q. I want to focus on that first clause you say with respect to the number of reports.
Do you see that?
A. Yes.
Q. And in your report you quantify the number of case reports, correct?
A. Yes.
Q. What is the size of the population from which they come?
MS. NATALE: Objection to form.
THE WITNESS: So the -- the case reports in regards to just Mirena and ICH?
BY MR. SCHMIDT:
Q. Mm-hmm.
A. So the population -- the denominator would be the number of women in the U.S. who have Mirena.
Q. Do you understand that you also looked at international case reports?

MS. NATALE: Objection to form.
THE WITNESS: True, yes. You're right.
BY MR. SCHMIDT:
Q. What's the worldwide population of Mirena users?
MS. NATALE: Objection to form.
THE WITNESS: I don't know.
BY MR. SCHMIDT:
Q. What's the U.S. population of Mirena users?
A. I don't know.
Q. Do you know if it's hundreds of thousands, millions, tens of millions, hundreds of millions?
MS. NATALE: Objection to form.
THE WITNESS: I think it would range in the millions.
BY MR. SCHMIDT:
Q. Have you done any analysis of -- when you talk about the number of



case reports that support causation, have you done any analysis of how that number compares to the population from which they come?
A. No.
Q. Would you agree with me that it -- it's -- it's a radically different level of evidence if, say, among a population of Mirena users you get one case report versus a hundred case reports?
MS. NATALE: Objection to form.
THE WITNESS: It's a radically different number if you go from one case report to a hundred case reports.
BY MR. SCHMIDT:
Q. Yeah.
A. It's a bigger number. I don't know if I'd use the word "radical."
Q. Okay. Let me come back to something.
How long is Mirena used for?



MS. NATALE: Objection to form.
THE WITNESS: I believe it's marketed as being effective for five years.
BY MR. SCHMIDT:
Q. And have you seen data that lets you know how many women use it for, say, the full five years or more than a year?
A. Women use -- it's effective for ten years I've read. So I mean, it -- it secretes levonorgestrel quite a long time after the five years.
Q. Do you know for example, if you have a hundred women who start using Mirena on day one, how many will still be using it after year one?
A. I don't know that answer.
Q. Would you assume that it would be something more than zero?
A. You mean if a hundred start out, there's not going to be a hundred at the end of a year or two probably. It's



going to be lower than a hundred.
Q. Do you know how much lower?
MS. NATALE: Objection to form.
THE WITNESS: No.
MS. NATALE: Calls for speculation.
BY MR. SCHMIDT:
Q. Would you expect it -- would you expect it to be more than zero?
A. I would expect it to be more than -- I don't think all 100 quit. So yeah, I think it's going to be more than zero.
Q. But you have not seen specific data --
A. No.
Q. -- on usage rates after a year?
A. No.
Q. But you would assume, given it's a five-year usage product, that there would be people who use it for longer than a year?

Page 362

MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. Let's go back to Exhibit 13, the Valenzuela study.
A. Okay.
Q. I forgot to ask you a question about the Denmark arm of that study.
MS. NATALE: Give us one second.
BY MR. SCHMIDT:
Q. While you find it I'll just reorient us.
Do you remember talking about how they estimated usage of Mirena in the control arm at being 3.5 percent? It's on Page 3 of the study.
A. Okay.
Q. And do you remember me asking you about higher reported rates of Mirena use in the Lindh study, Exhibit 17?

Page 363

MS. NATALE: Objection to form.
THE WITNESS: I remember that. Yes.
BY MR. SCHMIDT:
Q. Do you know how they generated that 3.5 percent rate?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. In the Valenzuela study?
A. I can make an assumption. But I don't know.
Q. Okay. I don't want you to assume, so let me see if I can help you.
Look at Page 3 please, where they report the 3.5 percent rate.
A. Yes.
Q. All right. They state, a few lines above, they cite the number of LNG-IUSs that were sold in one year in 2014. Do you see that?
A. Yes.
Q. And they say -- they give an

Page 364

approximate number of Danish women in the age group, do you see that, 1.34 million?
A. Yes.
Q. And they essentially divide the number of Mirena sold in one year by the number of Danish women to get 3.5 percent, correct?
A. Understood.
Q. And, in fact, they give that fraction, 47,000 over 1.3 million, right?
A. Yes.
Q. Now, you would expect that the number of women who are using Mirena at any one point in time is greater than the number of Mirena sold in one year, correct?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Because it's a multiyear use product, right?
A. The number of women using Mirena is higher than the amount that's sold. So it's going to be --

Page 365

Q. In one year.
A. So that -- that would -- that would make sense to me.
Q. Okay. Do you know how much higher their numbers would be above 3.5 percent had they counted the number of women actually using Mirena at one point in time as opposed to the amount sold in one year?
MS. NATALE: Objection to form.
THE WITNESS: No.
BY MR. SCHMIDT:
Q. Can you rule out that it would have been 10 or 15 percent as opposed to 3.5 percent, have you done any work that lets you do that?
A. I haven't done any calculations.
Q. And have you ruled out that if they actually counted the amount of women using Mirena at one point in time instead of just the amount sold in a single year, that that would eliminate

Page 366

their purported statistically significant effect in that group?

MS. NATALE: Objection to form.

THE WITNESS: I don't know.

BY MR. SCHMIDT:

Q. Let's go back to case report data.

Do you agree that there are limits that can be -- to the conclusions that can be drawn from case reports?

A. Yes.

Q. And I'll just give you an example. You cite a ParaGard MedWatch report in your report. And I'm just going to show it to you because it's -- I stand correct. You do not cite it. But it is on your reliance list.

MS. NATALE: I will object to that actually. But --

(Document marked for identification as Exhibit Fraunfelder-21.)

BY MR. SCHMIDT:

Page 367

Q. I've marked it as Exhibit 21. Have you seen this document before, sir?

A. So this is one of the 422?

Q. This is something different. This is a ParaGard report, which you can see on -- on the second page of the document which --

MS. NATALE: Paul, I'll direct you to page --

BY MR. SCHMIDT:

Q. -- at the bottom is -- is Page 1 of 3.

MS. NATALE: I'll direct you to Page 7, Footnote 7 of the report.

BY MR. SCHMIDT:

Q. Okay. And maybe you did cite it. That's kind of immaterial for my purposes. But I appreciate that.

MS. NATALE: Okay. Just the representation on the record.

MR. SCHMIDT: No, I appreciate that. I wasn't trying

Page 368

to misstate. So I appreciate that.

MS. NATALE: Annie, you're fired.

MR. SCHMIDT: Absolutely not. Smartest person in this room, for the record.

MS. NATALE: I'm sure. Just messing with you.

THE WITNESS: Okay. Were you going to ask me a question?

BY MR. SCHMIDT:

Q. Yeah. All I want to ask you is, do you see that there is -- this is an FDA document on the cover?

A. Yes.

Q. And there is template language regarding submission of a safety report?

A. Yes.

Q. And it says, "Submission of a safety report does not constitute an admission that medical personnel, user facility, importer, distributor,

Page 369

manufacturer or product caused or contributed to the event."

Do you see that?

A. Yes.

Q. Do you agree with that statement about case reports?

A. Yes.

Q. It goes on to say, "The information in these reports has not been scientifically or otherwise verified as to a cause-and-effect relationship and cannot be used to estimate the incidence of these events."

Do you agree with that statement about case reports?

A. Yes.

Q. Now, there are reasons why there are limitations to case reports, correct?

A. Yes.

Q. One reason is you don't have a comparison group, correct?

MS. NATALE: Objection to form.

Page 370

THE WITNESS: Okay.
BY MR. SCHMIDT:
Q. Is -- is that a limitation of case reports?
A. Yes.
Q. And that means you can't tell if the cases you're seeing are background rate cases or cases specifically attributable to the medicine, right?
MS. NATALE: Same objection.
THE WITNESS: I'm aware of limitations of case reports. You don't have to go through each one.
BY MR. SCHMIDT:
Q. I need to for the record unfortunately.
A. Okay.
Q. Is what -- is what I said correct, that because you don't have a comparison group with case reports, you can't determine whether an individual case is one that would have arisen without drug exposure or whether it's

Page 371

specifically due to the drug?
MS. NATALE: Objection to form.
THE WITNESS: Okay.
BY MR. SCHMIDT:
Q. Do you agree with that?
A. Yes.
Q. Do you agree that a limitation of case reports is you can't control for confounders?
A. Yes.
Q. Do you agree that a limitation with case reports is you don't have often a lot of information that you need, like information about confounders, information about treatment?
MS. NATALE: Objection to form.
THE WITNESS: Repeat the question, please.
BY MR. SCHMIDT:
Q. Sure.
Is it a limitation of case reports that they are often missing

Page 372

critical information about confounders and treatments?
A. Case reports don't necessarily eliminate confounders. I mean they -- they have confounding information in them.
What you're trying to ask me is, you know, are you controlling for confounders in case reports. No, you don't control for confounders in case reports.
Q. Is it the case that for all case reports, you get the full information you would want on confounders and treatments to evaluate the case or are they all --
A. No, you do not -- you do not get the full information in a case report.
Q. All right. Let's -- let's -- I'm going to try to do this as fast as humanly possible. Please try to bear with me, but you've talked a about a lot of individual case report data in

Page 373

your report. And I'm going to show it to you. And right now we are going to either go on a death march or be very, very efficient in going through this. I hope the former.
A. Go on.
MS. NATALE: The death march? You prefer the former?
MR. SCHMIDT: No, I prefer the latter. I'm sorry. Thank you for that correction.
BY MR. SCHMIDT:
Q. You begin discussing case report on Mirena and IIH on Page 17 of your report where you discuss three clinical trial cases. Do you see that?
A. Clinical trial cases, yes.
Q. And then on Page 21 to 23 you discuss dechallenge data, correct?
A. Yes.
Q. On Page 23 through 24, you discuss data from your registry that we've already talked about, correct?
A. Correct.

Page 374

Q. And then on Pages 24 through 26, you discuss case reports from the medical literature, right?
A. Yes.
Q. All of that is case report data, right?
A. Yes.
Q. We'll go through this as fast as we humanly can for the humanitarian interest of everyone in this room.
A. Okay.
MR. SCHMIDT: I need an exhibit there, please. I need them all as one.
BY MR. SCHMIDT:
Q. So I'm going to show you first as one exhibit, the three clinical trial cases that you discuss on Pages 17 through 20. And let me just ask you.
You indicate that these are three reports of IIH, correct?
MS. NATALE: Objection to form.

Page 375

THE WITNESS: I'm going to remind myself about these. So do you want to go through each one individually?
BY MR. SCHMIDT:
Q. Yeah, but look with me if you would at Page 17.
A. Yes.
Q. You say in the second paragraph on that page, you talk about more than 120 -- 120 reports of PTC and/or papilledema within their database from 2000 to the date of retrieval.
Do you see that?
A. Yes.
Q. And you say, "Three of these were detected during the course of Bayer's own clinical trials," and then as I understand it you discuss those three cases, correct?
A. Yes. Correct.
Q. Are those all IIH cases, do you know?
MS. NATALE: Objection --

Page 376

objection to form and misstates the testimony.
THE WITNESS: I would have to look at them individually before I clump them altogether.
BY MR. SCHMIDT:
Q. So --
A. So it looks like we call them -- the first one we call pseudotumor cerebri. PTC is what it's --
Q. Do you know if they are all Mirena cases?
A. I'd have to look at them each individually. The first one is levonorgestrel intrauterine systems. So it's either Mirena or a levonorgestrel containing IUS.
Q. Okay. Let's look at them --
(Document marked for identification as Exhibit Fraunfelder-22.)
THE WITNESS: I can't clump them altogether. I have to do them one at a time.

Page 377

BY MR. SCHMIDT:
Q. Let's look at them individually.
I've marked as Exhibit 22, the CIOMS forms for these three cases. And just for ease of reference, look with me at Page 17 of your report.
A. Yes.
Q. You see that you discuss a case 02518-USE. Do you see that?
A. It's report number A00551. Oh, number 231004?
Q. Yeah. Where the --
A. Got it.
Q. -- where the case number is 01/02518-USE.
A. Yes. Yes.
Q. If you look at the first page of Exhibit 22, do you see that number in Box 24-B under the manufacturer control number, lower left corner?
A. 01/02518-USE. Yes, those match.
Q. And if you go to the next

case report in this exhibit. Is it, in fact, looking in the same place, the case that you cite on Page 18 of your report, the second clinical trial case?
A. Case 20081597?
Q. Yes.
A. Yes.
Q. Is it the same?
A. Is -- this is the -- so same what am -- the same as what? Am I comparing something here?
Q. Yes. Is the report you cite on Page 18, the second clinical trial report, the same report that starts on Page 3 --
A. Yes.
Q. -- of Exhibit 22?
A. Yes.
MS. NATALE: Just objection to form and use of report.
BY MR. SCHMIDT:
Q. And then if you go to the final report in this three-report series that I've marked as Exhibit 22, is that



the third report you cite on Page 19, the third clinical trial report?
A. 094244. 094244. Yes.
Q. Okay. So let's dig into these now. And Let's start with the first one, the one that ends 2518.
Do you see that?
A. Yes.
Q. And let's -- do you see that these have a narrative attached to them that you have summarized in your report?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. Okay. As I read this, does -- is -- is IIH in your experience a disease that takes time to develop?
A. Yes.
Q. Like for example, are you familiar with that concept with diseases, some diseases take time to develop?
MS. NATALE: Objection to form.



THE WITNESS: I'm probably more familiar than you are.
BY MR. SCHMIDT:
Q. Okay. I'm not trying to have a competition, Doctor. I'm just asking if you're familiar with that concept.
A. Yeah, I don't know what your point is.
Q. Like cancer takes some time to develop, correct?
A. Sure.
Q. Is IIH a disease that takes some time to develop?
MS. NATALE: Objection to form.
THE WITNESS: I -- I think it -- pressure builds up and I think it can go fast or it could go slow.
BY MR. SCHMIDT:
Q. Okay. Let's look at the -- the narrative in Exhibit 22 for Report 2518.



Do you see that narrative, talking about a 23-year-old Hispanic female?
MS. NATALE: Are you ask -- asking about on Exhibit 23?
MR. SCHMIDT: On Exhibit 22.
THE WITNESS: Yes, I see it. The back page of it.
MS. NATALE: 23?
MR. SCHMIDT: Have I been referring to it as the wrong number? Can I see your exhibit?
MS. NATALE: Oh, you might be right. I might be --
MR. SCHMIDT: Yeah, 22.
MS. NATALE: So do you -- oh, paragraph is 21. Sorry.
BY MR. SCHMIDT:
Q. This refers to a patient who had Mirena inserted on January 8th and started to experience double vision on January 9, one day after Mirena insertion.
Do you see that?

A. Yes.
Q. Are you aware of any other instances where a causal agent causes IIH in a single day?
MS. NATALE: Objection to form.
THE WITNESS: I think that's possible.
BY MR. SCHMIDT:
Q. Are you familiar with the concept of dose threshold?
MS. NATALE: Objection to form.
THE WITNESS: I think I know what you mean by that.
BY MR. SCHMIDT:
Q. Is there a dose threshold for LNG in IIH, do you know?
MS. NATALE: Objection to form.
THE WITNESS: I don't know that we know that.
BY MR. SCHMIDT:
Q. Is it -- is it your



testimony, do you know how -- have you studied the mechanics of --
A. Have you?
Q. Let's break this down. Does -- Mirena is -- is placed in the uterus, correct?
A. Yes.
Q. And in the uterus it releases IIH, correct -- I'm sorry, that would make our case easy for you.
A. Yeah, I was going to say.
Q. In the uterus it releases LNG, correct?
A. Yes.
Q. And then some level of that LNG can leave the uterus and circulate in the bloodstream, correct?
A. Yes.
Q. And I take it it's your view that once it circulates in the bloodstream, that's what can start the process by which it causes IIH?
A. Possibly.
Q. Let me ask this question.



If Mirena and the LNG released by Mirena remained only in the uterus, do you have an opinion that that can cause L -- that can cause IIH?
A. I -- I think, you know, the mechanism is unknown. And to my view -- and I'm not being put forward as an expert on the mechanism of it.
To my view it -- it gets into the bloodstream at a certain level, and when you are talking about dose threshold, people probably have a dose threshold where they develop IIH.
Q. And we're not -- we're not disputing that some level of -- of LNG from Mirena enters the bloodstream. But my question is, if it did not enter the bloodstream, do you believe it could still cause IIH if it had exclusively local effects in the uterus?
MS. NATALE: Objection to form.
THE WITNESS: Well, I think that's -- I think that's silly.



Of course it's going to reach the bloodstream if it's in the uterus. It's a mucosal membrane that's going to be absorbed. It's going to reach the bloodstream. So that is a -- not a realistic situation.
BY MR. SCHMIDT:
Q. Does it need to reach the bloodstream in your view to have -- to cause IIH?
MS. NATALE: Objection to form.
THE WITNESS: I don't know the mechanism for it. But I believe it's because it reaches the bloodstream.
BY MR. SCHMIDT:
Q. Okay. And do you know -- we talked about that process and I think I laid out two steps. Step one being the -- the time between the -- when the Mirena is placed and when it starts to release LNG, and step two is when -- the time between when the LNG is in the -- in

the uterus versus when it enters the bloodstream.
Do you know how long step one takes?
A. No.
Q. Do you know how long step two takes?
A. No.
Q. Do you know if it can take more than a day, those two steps combined?
MS. NATALE: Objection to form.
THE WITNESS: I don't know that answer.
BY MR. SCHMIDT:
Q. Do you know if it ever happens in a day, those two steps combined?
MS. NATALE: Objection to form.
THE WITNESS: I don't know.
BY MR. SCHMIDT:
Q. Sticking with this report,



if we go to the second paragraph, it has an initial report and then there's supplements at different points in time. Do you see that?
A. Yes.
Q. Let's go to the May 1st supplement.
They indicate that an ophtha -- can you help me with that word?
A. I'm at -- I'm at investigator, so I don't know where you're at -- oh, an -- an ophthalmoscopic exam?
Q. Yes. Is -- that's an eye exam, right?
A. Yeah.
Q. Fancy doctor term for an eye exam.
A. Yeah.
Q. They say, "An eye exam revealed no abnormalities and no treatment intervention was given."
Do you see that?
A. Yes.



Q. Can you tell from that whether the patient has IIH or not?
A. I can't tell from that.
Q. In the next paragraph, the July supplement, toward the end of the paragraph you make note of this in your report, that "the ophthalmologist consult recommended a repeat MRI, and if normal, to proceed with a lumbar puncture to rule out pseudotumor cerebri."
Do you see that?
A. Yes.
Q. And there's no indication in this that the patient ever received the lumbar puncture, correct?
MS. NATALE: Objection to form.
THE WITNESS: Correct.
BY MR. SCHMIDT:
Q. So can you tell me to a reasonable degree of certainty that this patient had IIH?
MS. NATALE: Objection to form.



THE WITNESS: I'm going by the opinion of the -- of the report. The report.
BY MR. SCHMIDT:
Q. Where is that, sir?
A. So it says double vision and then chronic papilledema. So that could or could not be IIH. It could possibly be.
Q. Right. Can you tell me to a reasonable degree -- I recognize this is a possibility. It's a possibility.
A. Yeah.
Q. It's not to, correct?
A. I'm just saying it's possible.
Q. It's possible either way, right?
MS. NATALE: Objection to form.
THE WITNESS: Well, I mean I think it's more likely IIH because if you have papilledema and double vision, those are symptoms that go

Page 390

along with it.
Also, this is a weight increase. You know, a person that reports a recent weight increase. Because it says it here.
BY MR. SCHMIDT:
Q. What is the relevance of that?
MS. NATALE: Objection to form.
THE WITNESS: Well, that -- that puts them at a risk factor of, you know, getting IIH.
BY MR. SCHMIDT:
Q. Okay. Can you rule out that this is not an IIH case?
MS. NATALE: Objection to form --
THE WITNESS: Can I rule out. It's like a double negative.
MS. NATALE: -- and double negative.
THE WITNESS: I've got to think about that one.

Page 391

BY MR. SCHMIDT:
Q. Can you tell me --
A. So if that means is it an IIH case? I don't -- I don't --
Q. Let -- let me state a proposition. Can you tell me true, false or I can't tell from this data?
A. All right.
Q. This is not an IIH data, true, false or I can't tell from this data?
A. I think it more likely than not is an IIH case because of the -- the physical findings.
Q. Can you diagnose IIH without a lumbar puncture?
MS. NATALE: Objection to form. Asked and answered.
THE WITNESS: Yeah, you asked me that earlier. And I said that I am not a neurologist.
BY MR. SCHMIDT:
Q. So you don't know?
A. I think it helps.

Page 392

Q. Okay. Have you ever diagnosed IIH without a lumbar puncture being performed?
MS. NATALE: Objection to form.
THE WITNESS: I don't diagnose IIH by myself.
BY MR. SCHMIDT:
Q. Okay.
A. I refer it.
Q. Do you know of anyone to whom you have referred a case of potential IIH who has, in fact, diagnosed IIH without a lumbar puncture being performed?
A. You know, IIH being a diagnosis of exclusion and you exclude all other possibilities, if -- even if you haven't done a lumbar puncture, I suppose you can call something still IIH. But you probably would want a lumbar puncture.
Q. Okay. And, in fact, that's what the doctor said in this case said,

Page 393

let's do a lumbar puncture to rule out a pseudotumor cerebri, right?
A. Yeah. He wanted to know if the pressure was high.
Q. That's appropriate diagnostic course, correct?
A. Yes.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. And that lumbar puncture as best we know was never done, correct?
A. As far as we know.
Q. So can you testify to a reasonable degree of medical certainty that this is, in fact, a case of IIH?
MS. NATALE: Objection to form. Asked and answered.
THE WITNESS: I think it's more likely than not IIH.
BY MR. SCHMIDT:
Q. To a reasonable degree of medical certainty can you diagnose this as a case of IIH?

Confidential - Subject to Protective Order



MS. NATALE: Objection to form. Asked and answered.
THE WITNESS: You know, to a reasonable degree of medical certainty I think it's more likely than not IIH.
BY MR. SCHMIDT:
Q. Are you comfortable making that medical diagnosis based on these records?
MS. NATALE: Same objection.
THE WITNESS: Well, I'm not making a diagnosis from New York City on this person that has the data on this paper. I'm just saying from what I read, you know, a common -- you know, a layman would -- and a medical person, and a researcher would all say this is more likely than not IIH. Because of the papilledema that's been documented.
BY MR. SCHMIDT:
Q. Okay. And you can't tell me



how often it's the case that a patient who has papilledema like this actually gets an IIH diagnosis, can you?
A. I can't. But I will say that papilledema is associated with high intracranial pressure.
Q. It's also associated with a lot of other things, correct?
A. Yes.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. This patient recovered, correct?
A. Where does it say that?
Q. In the next supplement, from August.
MS. NATALE: Just objection to form.
THE WITNESS: You just have to point that to me before I agree with you. But I probably will agree with you.
Where does it say that?



BY MR. SCHMIDT:
Q. On -- on the back, in the narrative under the August supplement. It says --
A. "Patient has recovered from double vision."
Q. And the patient recovered even though Mirena was not removed, correct?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. That's contained in the November supplement?
MS. NATALE: Same objection.
THE WITNESS: Mirena was not removed --
MS. NATALE: Objecting to the characterization.
THE WITNESS: I'm reading. "Mirena was not removed as the patient refused to return after reporting this diplopia and constantly refused to have Mirena



removed."
MS. NATALE: Same objection to the characterization.
THE WITNESS: Okay.
BY MR. SCHMIDT:
Q. Do you see that?
A. Yes.
Q. So the patient recovered without Mirena being removed, correct?
A. That's what it says.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. And the reporter of this case, who was a healthcare professional, concluded that the event was unlikely related to Mirena.
Do you see that?
A. Yes.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Do you disagree with that conclusion from the reporter, from the

medical professional who put hands on and treated this patient?
A. "The event is unlikely related to the study medication."
I -- I can't argue with them. They were there.
Q. Okay. So your first clinical trial report is one where there was no lumbar puncture and no definitive IIH diagnosis, correct?
MS. NATALE: Objection to form.
THE WITNESS: Correct.
BY MR. SCHMIDT:
Q. The symptoms resolved without the Mirena being removed, correct?
MS. NATALE: Same objection.
THE WITNESS: Correct.
BY MR. SCHMIDT:
Q. And the reporter concluded that it was not related, likely not related?
A. Correct.



Q. Unlikely related?
A. Yes.
MS. NATALE: Objection.
BY MR. SCHMIDT:
Q. And this is also one where the patient had a risk factor before developing the IIH of weight gain, correct?
A. Yes.
Q. Let's go to the next one in the series, the one ending 815971-GPV.
A. I have it.
Q. If you look at the narrative. We know that this patient had the risk factor of being obese, correct? And I'm referring to the April 24, 2008 update.
MS. NATALE: Objection to form.
THE WITNESS: So you're reading the back?
BY MR. SCHMIDT:
Q. Yes, sir.
A. April what?



Q. April 24, 2008.
A. Okay. Yes.
Q. Do you see --
A. Patient had a weight of 88 kilograms. BMI of 31.
Q. And that's obese, correct?
A. Correct.
Q. So that's an independent risk factor for IIH, correct?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. If we look at -- up above, this is a patient, and I'm looking in the one, two -- the third paragraph, if you disregard the headings on this page where it says, "Patient first had Mirena."
Do you see that?
A. Yes.
Q. And if you kind of count the months, this is a patient who had used Mirena for approximately six years before having their symptoms, correct?



MS. NATALE: Objection to form.
THE WITNESS: It looks like five years, but yeah.
BY MR. SCHMIDT:
Q. Was one 5-year course and then they were about a year into their second course, correct?
A. I see. Okay. Yes.
Q. And is it your opinion that it can take six years to develop IIH from Mirena?
MS. NATALE: Objection to form.
THE WITNESS: I don't know how long it takes.
BY MR. SCHMIDT:
Q. Okay. Either -- either way, correct?
A. I think it can happen fast. It can happen slow.
Q. Let me ask you this.
If -- is there any period of time, from the second after Mirena is

Page 402

installed to, you think of the reproductive life a person has, 25 years or so, to 25 years later, is there any period of time that could lapse between Mirena placement and development of IIH that would cause you to say this is not related to Mirena?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Between that first second Mirena is installed and 25 years later if it's used continually across the reproductive life?
MS. NATALE: Same objection to form.
THE WITNESS: That's a difficult question. You do want there to be a temporal relationship. So if the Mirena is removed and a year passes and they get IIH, that would make me feel like it's less likely related to Mirena.

Page 403

BY MR. SCHMIDT:
Q. What about -- what about if the Mirena is not removed. Is it -- let me start at the beginning.
If you saw -- we just looked at a report that was the day after Mirena insertion, remember?
A. Yes.
Q. If you saw a report an hour after Mirena insertion, would you rule that out as Mirena related?
A. Well, that's -- that's a little more difficult. I don't -- I think an hour would be pretty quick.
Q. Too quick?
A. In my mind it sounds too quick. Although I don't know how long it takes.
Q. Okay. What about if someone used Mirena continuously for 25 years and only then reported IIH, would that be too long a period for you to attribute it to the Mirena?
MS. NATALE: Objection to

Page 404

form.
THE WITNESS: If they still have the Mirena in --
BY MR. SCHMIDT:
Q. Yes.
A. -- I think it's not something I would rule out.
We have -- I think the -- the judge should know this, is that we have a number of cases in the medical literature of drugs building up over time in the body and in the system. And it's stored in the body. And it can be released and you reach a critical level of dose that causes the side effects. So somebody with 25 years of Mirena, I -- I would think that would still probably be related to Mirena if they got PTC.
MS. NATALE: Just to preserve the objection to -- in addition to the use of continuously.
BY MR. SCHMIDT:
Q. Let me ask you this

Page 405

question. Do you know if there is data -- we talked about LNG levels in the blood from Mirena use, do you remember that?
A. Yes.
Q. Do you know if there is data quantifying blood levels of LNG in Mirena patients?
A. Yes.
Q. And have you studied that data?
A. I read it.
Q. Do you know if -- let's say a patient, as this patient did, uses Mirena for the full five-year course of Mirena, do you know whether those blood levels change over the course of use?
A. Well, sure, they do.
Q. How do they change?
MS. NATALE: Objection to form.
THE WITNESS: They go down.
BY MR. SCHMIDT:
Q. Have you studied the

specific amount by which they go down?
A. I can pull up the reference but I read it.
Q. Okay.
A. It's one of the papers that I cite. The pharmacokinetics is one of the papers I cite.
Q. Look with me if you would two paragraphs down. Do you see where it says, "It was reported that the patient has recovered, the dose of Mirena was not changed."
Do you see that?
A. Yes.
Q. So this is another patient who recovered without removing the Mirena, correct?
A. Yes.
Q. And then below that it states that the original reporter's clinical assessment was that for IIH, there's no relationship to first and second Mirena, correct?
MS. NATALE: Objection to



form.
THE WITNESS: Yes, I see that.
BY MR. SCHMIDT:
Q. Do you disagree with that conclusion from the doctor who treated and laid hands on this patient?
A. I can't disagree with it.
Q. Or her.
A. Pardon me?
Q. Or her.
A. Or her, yeah. Yeah. I said it, not -- I meant him or her.
Q. I thought you said him. I'm sorry, I apologize, I misheard.
A. Yeah. Yeah.
Q. Let's look at the third report in this sequence. The third clinical trial case that you cite. This is a case -- the number ending 94244 that you cite on Page 20 of your report, correct?
A. Starts on 19. Yeah.
Q. Yeah. Let's look at this



one quickly. First of all, if we stay on the first page of the report, do you see where it says suspect drug information?
A. Yes.
Q. And the drug reference is levonorgestrel, and then it's got 12 next to it, LCS-12?
A. Yes. Yes.
Q. Is that Mirena?
A. I don't think so.
Q. If we look at the back?
And I think you say this in your report. But if you look about halfway down the page there's a sentence that says, "The subject's concomitant condition included pseudotumor cerebri since 2009."
Do you see that?
A. Yes.
Q. This is a preexisting case of IIH, correct?
A. Correct.
Q. Before they used Mirena, correct?



A. Yes.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Down towards the bottom, it states, "Under company causality comment," do you see that?
A. Yes.
Q. And the last sentence of that first paragraph it says, "During the study" -- this is a Mirena study, correct?
A. Yes.
Q. Or I'm sorry, I misspoke. This is a study of an LNG product, right?
A. Study. You mean this case report is an LNG product, yes.
Q. Yeah, it comes from a study involving an LNG product, correct?
A. Yes.
Q. It says, "During the study involving the LNG product no worsening of the pseudotumor occurred," correct?
MS. NATALE: Objection to

form.
BY MR. SCHMIDT:
Q. Do you see that?
A. I'm trying to find it.
Q. It's the last sentence under company causality comment.
A. "During the study, no worsening of the pseudotumor cerebri occurred." Yes.
Q. Okay. Do you have any contrary data that tells you that this patient's exposure to LNG worsened her preexisting PTC, pseudotumor cerebri?
MS. NATALE: Objection to form.
THE WITNESS: No.
BY MR. SCHMIDT:
Q. And then it -- a little further up under September 2012, September 18, 2012, it indicates that the subject recovered without having the LNG product removed, correct?
A. September 18. I see September 10th. 10th of September.



Q. Directly below that. Two lines down.
A. The outcome of --
Q. You -- you might be looking -- September 10th appears a couple places. If I could just point you. I'm looking right there.
A. Okay. Got it.
Q. Do you see where it says, "On September 18, 2012, that the LNG-containing product was not removed but the subject nevertheless recovered"?
MS. NATALE: Objection to form.
THE WITNESS: It says on September 10th she had worsening of pseudotumor cerebri.
Do you see that?
BY MR. SCHMIDT:
Q. Yeah. Can you come back to my question?
A. Okay.
Q. On September 18th, it says that the drug -- the LNG drug was not



removed and the subject recovered?
A. Yes.
Q. And then above that it says, "Investigator did not relate the event to study drug or protocol required procedures."
Do you see that? Maybe four or five lines above?
A. Okay. "Investigator did not relate the event to study drug or protocol required procedures." Yes.
Q. Do you have any basis to disagree with the investigator on that point?
MS. NATALE: Objection to form.
THE WITNESS: No.
BY MR. SCHMIDT:
Q. Okay. So just to sum up. And then we're going to be much quicker in moving through the rest of these clinical -- these cases.
Just to sum up on these three clinical trial cases we've been



discussing. The first one, we can't be sure it was IIH, correct?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. There was no definitive diagnosis and no lumbar puncture, correct?
A. I'm not -- my memory's -- I'm going to forget. I thought we just went through them. We have to do it again?
Q. Yeah. I'm just trying to sum it up.
A. I've got to go back to it again. So let's -- let's do it again. I thought we just did it.
Q. The first one, there is no definitive IIH diagnosis and no lumbar puncture, correct?
A. Correct.
Q. The second one, the patient was obese and they recovered without removal of the Mirena, correct?

Page 414

A. The person was obese, recovered without removal, yes.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. And the third one did not use Mirena, correct?
A. It wasn't Mirena. It was a levonorgestrel product.
Q. Every one of these patients was a woman of childbearing age, right?
A. I have to look at the ages.
MS. NATALE: Objection to form.
THE WITNESS: I thought we were done with this.
23 years is childbearing. 37 is childbearing. 17 is childbearing.
BY MR. SCHMIDT:
Q. Okay. And can you rule out from the data provided -- we looked at one of the three was obese, correct?
A. Yes.

Page 415

Q. We looked at another of the three had recent weight gain, correct?
A. Yes.
Q. For the third, we know she was 65 kilograms, but we don't know if she had recent weight gain or was obese, correct?
A. Yes.
Q. She could be, right?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. We just don't know?
A. I don't know.
Q. Okay. And in all three cases, the reporter said it was not related, correct?
A. So in the first one, the 17-year-old from Austria, investigator did not relate the study drug -- did not relate the event to study drug or protocol required procedures, which to me does not mean -- he says -- he's not saying it's not related to the drug. He

Page 416

just didn't relate the information. That --
Q. Let me ask you this way. Did any of the investigators make the conclusion that the symptoms they were seeing were linked to LNG or Mirena?
A. So I'm not comfortable clumping them altogether. I'll take each one individually if you want to do that.
Q. Sure. Let's do it. First one, second page.
A. Yes.
Q. Event unlikely related to study medication. Did I read that correct?
A. Where are you at? Am I on the wrong one?
Q. Yes, you are. I'm looking at the one --
MS. NATALE: First one has the exhibit sticker on it.
THE WITNESS: All right. Exhibit 22. I got it.
BY MR. SCHMIDT:

Page 417

Q. Yeah. Look at the second page. Do you see reporter's comment, "The event is unlikely related to study medication"?
A. Yes, I see that.
Q. Look at the next one, the one ending 71.
A. I shouldn't give it to you. I should just keep it.
MS. NATALE: Trying to keep them in order.
THE WITNESS: All right. I'm looking at the back page.
BY MR. SCHMIDT:
Q. Yeah. For benign intracranial hypertension, no relationship to first and second Mirena, correct?
A. Where is that?
Q. Right there.
A. So for benign intracranial hypertension, no relation to first and second Mirena. Yes.
Q. And the third one, the

Page 418

Austrian one, investigator did not relate the event to study drug.
A. Investigator did not relate the event to study drug or protocol required procedures. That's what he said.
Q. So none of the investigators, none of the doctors in these three clinical trial cases linked the condition they saw to an LNG-containing product, correct?
A. Well, like I said on this one here from Austria, the one from Austria which is number 094244, the investigator did not relate the event to study drug or protocol required procedures.
Did not relate the event to study drug or protocol required procedures. So that speaks for itself.
Q. Okay. All three of them, they don't relate it to the drug, correct?
A. I'm just going to clump

Page 419

them. I'm doing one at a time. So that's what that one says.
I don't know if you want to keep going over it. But I'll just do one at a time.
Q. Okay. You can't agree with me that all three failed to link the LNG-containing product to the symptoms seen?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Can you agree with me on that?
A. I've gotten confused by thinking one of them just didn't -- didn't report the information or didn't follow the protocol. That's what I'm confused by.
Q. Okay. Well, let's stand on the record on that.
A. Okay.
Q. Let's talk about dechallenge which is the next section of your report

Page 420

after discussing these clinical trial cases.
A. Yes.
Q. And your report uses a term, if you want to look at it, it's on Page 21, in the second paragraph under dechallenge data called unambiguous dechallenge. Your report uses that term?
Do you see that?
MS. NATALE: Objection to form. And characterization. Misstates the testimony.
BY MR. SCHMIDT:
Q. Page 21, Exhibit 1, second paragraph under the heading Dechallenge Data uses the term, "unambiguous dechallenge."
Do you see that term?
MS. NATALE: Same objection.
THE WITNESS: No.
BY MR. SCHMIDT:
Q. It's in the first sentence of the second paragraph. First --
A. "First a number of cases

Page 421

identify unambiguous dechallenge."
Yes, I see that.
Q. What do you mean by unambiguous dechallenge?
MS. NATALE: Same objection. Incomplete. Misstates the testimony.
THE WITNESS: I mean that when the drug was stopped, the IIH went away or the side effect went away.
BY MR. SCHMIDT:
Q. Is it in your view -- let's look back, if we could, to number Exhibit 11, the different treatments we talked about for IIH?
A. Yes.
Q. Is it a case of unambiguous dechallenge if, in addition to the Mirena being removed, one or more of those -- actually I put the wrong one in front of you, it's Exhibit 12 -- is the treatments -- so let me re-ask my question.

Page 422

A. Okay.
Q. Is it a case of unambiguous dechallenge if, in addition to Mirena removal, a patient is receiving one or more of the treatments listed in Exhibit 12?
MS. NATALE: Objection to form and compound.
THE WITNESS: I think that could be a confounder to the -- to calling it unambiguous.
BY MR. SCHMIDT:
Q. Would you call it unambiguous if the patient was, in fact, receiving some combination of those treatments in Exhibit 12 --
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. -- in addition to having their Mirena removed?
MS. NATALE: Objection to form.
THE WITNESS: Well, I did.

Page 423

So apparently so.
BY MR. SCHMIDT:
Q. Is that appropriate in your view?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Let me just ask the question cleaner.
A. Yeah.
Q. Is it a case, as you sit here right now, in your opinion right now --
A. Yeah.
Q. -- is it a case of unambiguous dechallenge if, in addition to having their Mirena removed, the patient received some combination of the other treatments listed on Exhibit 12?
MS. NATALE: Objection to form and compound.
THE WITNESS: I prefer that I'd say positive dechallenge. That's what I prefer that I did.

Page 424

BY MR. SCHMIDT:
Q. So can you answer my question? Would -- would you call it an unambiguous dechallenge if there is other treatment other than removal of Mirena or does --
A. I'd have to look -- I'd just have to look at it individually and -- but I usually like to just say positive dechallenge or negative dechallenge. And unambiguous is unnecessarily editorializing by myself. So I would say positive dechallenge.
Q. Okay. Is it a confounded positive dechallenge if there is treatment administered as well?
MS. NATALE: Objection to form.
THE WITNESS: Yeah. That's a confounding variable. Yes.
BY MR. SCHMIDT:
Q. And would you want to be able to assess the degree of confounding to be able to evaluate such a dechallenge

Page 425

case?
MS. NATALE: Objection to form.
THE WITNESS: That would be very difficult to do. But, yes. I would want to assess it, and look at it, read it, and think about it.
(Document marked for identification as Exhibit Fraunfelder-23.)
BY MR. SCHMIDT:
Q. So let's -- let's mark -- you've got different categories of dechallenge cases on Pages 21 through 22 of your report. And the first category are the ones that in your report you refer to as unambiguous dechallenges. And there are four of those. And that's what I'm marking as Exhibit 23.
A. Okay.
Q. Let me just ask you for the record to confirm that the four reports that I have marked as Exhibit 23 are, in

Page 426

fact, the four you cite in that first grouping on Page 21 as unambiguous dechallenge reports?

A. So, one -- I'm going to be easily confused by all of this. There's a whole lot of reports. I mean the first four that have a number are the -- what are represented here? Is that what's happening?

Q. Mm-hmm. Yeah. Well, let -- let me see if I can help you out. On Page 21 of your report you say, "First a number of cases identify unambiguous dechallenge."

Do you see that?

A. Yes.

Q. And then you give some case numbers. Do you see that?

A. Yes.

Q. And you discuss those cases, correct?

A. Yes.

Q. And then a little further down, you say, "Additionally, a number of

Page 427

reports identify either positive dechallenge or outcome resolved along with some information about treatment."

Do you see that?

A. Yes.

Q. So I'm focused on that first grouping before you get to that additionally part, the unambiguous dechallenge. And as I count it, you list four cases by case number there; is that correct?

A. These four here?

Q. No, you're -- I think you are too far down. I'm up above.

A. Okay. Yes.

Q. Case 01-2016?

A. Yes.

Q. Case 2002-308?

A. Yes.

Q. Case 2012-65106?

A. Yes.

Q. Case 2013-80487. Do you see that?

A. Yes.

Page 428

Q. Are those cases that you identify in your report as unambiguous dechallenge cases what we've marked as Exhibit 4?

MS. NATALE: Objection to form.

BY MR. SCHMIDT:

Q. I'm sorry, Exhibit 23.

MS. NATALE: And can you just pass that exhibit pile?

MR. SCHMIDT: Yes, I'm sorry.

MS. NATALE: That's okay.

THE WITNESS: I'd have to look at them individually to see if I think they are unambiguous dechallenge.

BY MR. SCHMIDT:

Q. Have you done that?

A. Yes, but I don't want -- I'd have to do it again because I don't have a photographic memory.

Q. And I'm not asking you to. My question is simply, are these -- is

Page 429

the document I've given you as Exhibit 23, the CIOMS forms for the cases you cite, those four cases you cite in your report?

A. Yes.

Q. And it -- here is what I will ask you to do. In the interest of time, I'm going to ask you a question about each one of them. And ask you just to flip through them and tell me if I'm -- if I'm correct --

A. Okay.

Q. -- in my question.

Let's start with the easy one. The last report in this series, 80487.

A. I've got to go to the last page. Hang on.

Q. Yeah, very last page.

A. Okay.

Q. There's a reference to the patient having a BMI of 36.33. Do you see that?

A. Yes.

Page 430

Q. That's categorized as obese, correct?
A. Yes.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Would you -- do you agree with me that if you look through all these reports, these four reports, one of the patients is obese and for the other three patients we can't tell from the data provided?
MS. NATALE: Objection to form.
THE WITNESS: Okay. Well, the last patient is mentioned as obese. The first patient weighs 94 kilograms and is 34. We don't know their BMI.
The next one after that is 57.96 kilograms. And the one after that we don't know the weight.
BY MR. SCHMIDT:

Page 431

Q. So -- and I'm going to give you -- you don't have to use this, it's totally up to you.
I'm going to give you a piece of paper. Because in the interest of time I'm going to try to state some general propositions from my review of these case reports and ask you if -- if you agree. So if you want to make notes on it as you go through them, please do.
MS. NATALE: Objection.
BY MR. SCHMIDT:
Q. But my first question is, do you agree with me that one of these four cases, the patient is obese and we don't know for the other three?
MS. NATALE: Same objection.
BY MR. SCHMIDT:
Q. Based on that review you just conducted?
A. I mean, you know, I reviewed it for ten seconds. I'd have to -- I'd have to read them all.
Q. Okay.

Page 432

A. I'd have to read them all to agree with your supposition so which...
Q. Well, let me -- let me ask you to do that. And here is what I'm going to ask you about.
I'm going to ask you about what information we have about their treatment, about their weight, about the timing of their Mirena removal relative to when their symptoms stopped, and about the reporter's view on causality. Those four things. Treatment, weight, and timing of removal relative to symptom cessation, and reporter causality. That's what I'm going to ask you about.
A. Okay.
Q. And let me give you a minute to look through them and then I'll ask you my questions so we can move on to the next set. Trying to be efficient.
MS. NATALE: I'm just -- while we're on the record. I'm just -- I think where I got messed up but I'm just making sure. Did

Page 433

you never enter the 2016 Etminan letter to the editor?
MR. SCHMIDT: Correct.
MS. NATALE: I think that's what I had as 22.
MR. SCHMIDT: Yeah. We talked about doing it but didn't do it.
MS. NATALE: Okay.
MR. SCHMIDT: I'm sorry for that.
MS. NATALE: No, it's okay. Just making sure.
MR. SCHMIDT: We can go back and redo it if you want.
MS. NATALE: That's fine.
(Whereupon, a discussion was held off the record.)
MS. NATALE: I'll object -- I will object to the extent these are not the case reports cited in the -- in Dr. Fraunfelder's report and that there might be any incomplete information.

Page 434

MR. SCHMIDT: I'll object to the speaking objection. And I think he's already testified that they are the same case numbers.
MS. NATALE: Right, case numbers. I'm just saying --
MR. SCHMIDT: It's our understanding it's the same information. And what you're asking me to do as far as data, multi-10,000-page spreadsheet which is non-markable as an exhibit.
MS. NATALE: Not -- that's not what I'm asking you to do. But I will preserve my objection.
BY MR. SCHMIDT:
Q. So tell me when you've had a chance to conduct your review, Doctor.
A. It might be faster just to do them like verbally while I'm doing it.
Q. Okay.
A. Want me to? So like on the first one. The first case is 2016.

Page 435

2016? 01216?
Q. Mm-hmm.
A. I got the weight of 94 kilograms, timing was --
Q. Is that -- is that obese or not?
MS. NATALE: Objection to form.
THE WITNESS: It depends on how tall they are. But it sounds heavy.
BY MR. SCHMIDT:
Q. Okay.
A. Timing is about a little more than five months after having Mirena. The patient recovered --
Q. Let me just pause on that one. Do you know what the specific timing was between symptom resolution and Mirena removal?
A. I think I'm going to get to that. Yeah, but I mean --
Q. That's what I'm focused on.
A. Oh, okay. Because they got

Page 436

the symptoms six -- five months after starting it. And so the patient recovered six months after the reaction onset. So, six months.
Q. And when did they have their Mirena removed?
MS. NATALE: Objection to form.
THE WITNESS: Mirena was removed on the 8th of June. They had it put in in December. Right?
BY MR. SCHMIDT:
Q. So what's the relationship between how quickly the Mirena was removed and when the symptoms resolved?
A. So it was removed in June, right, it was removed in June and -- and they presented in May with -- with papilledema. Is that what I'm reading there?
Q. You tell me.
A. "On 22nd of May" -- "on 22nd of May, patient presented with bilateral papilledema under intracranial

Page 437

hypertension."
I don't understand on 22 May, '01. What's the '01 after it?
2001. I see. All right.
So on 22nd of May, 2001, and Mirena was removed in June, so a month. From May to June.
Q. I'm asking a different question. I'm asking about symptom resolution.
When did the symptoms resolve, do you know?
MS. NATALE: Objection to form.
That's the answer.
THE WITNESS: So the patient recovered six months after reaction onset which puts us in June. Mirena was removed in June. So that month.
BY MR. SCHMIDT:
Q. Do you know if it was -- if the Mirena was removed before or after the symptom onset?

Page 438

MS. NATALE: Objection to form.
THE WITNESS: I don't know what part of June.
BY MR. SCHMIDT:
Q. And do you know --
A. Got through that one.
Q. No. Almost.
Do you know anything about whether there was alternate treatment provided?
A. So in this -- I don't read anything about a lumbar puncture or anything. Patient had an MRI which was negative.
Q. Does that mean that there was no alternative treatment provided or do we just not know?
A. We don't know.
Q. Okay. So let's just sum this one up. Report 2016, if I understand your views, potentially obese patient, correct?
A. Yes.

Page 439

Q. We don't know whether the Mirena removal preceded symptom cessation or came after, correct?
MS. NATALE: Objection to form.
THE WITNESS: We don't know, but it's logical to assume that it occurred right after they took it out.
BY MR. SCHMIDT:
Q. And we don't know what alternate treatment, if any, was provided, correct?
A. Right. We don't know.
Q. Okay. Let's go to the next one, and I'll ask you the same question for the next one, which is, for the record, the one ending in 308.
A. You know, did reaction abate after stopping the drop? You know, on that case we were just looking at, the reporter said the reaction abated after stopping the drug, so, there you go.
Q. Do you know if they had

Page 440

specific data to confirm that the Mirena was actually removed before the symptoms stopped as opposed to just after?
MS. NATALE: Objection to form.
THE WITNESS: Well, when the treating doctor said that it occurred -- it abated after -- after removing the Mirena, after stopping the drug, then I'm going to trust the treating doctor that wrote that down, and like I trusted him on the previous case reports we looked at.
BY MR. SCHMIDT:
Q. Do you know if that box that you're referring to, Box 20, was checked as checked based on specific statements from the doctor as opposed to a judgment that the coder of this report is trying to make?
MS. NATALE: Objection to form.
THE WITNESS: No, this is

Page 441

something that, when we do these, by and large, it's -- it's checked by the doctor or by the healthcare professional or by the layman or by the drug company person that's reporting it. But it's -- it's not checked by a clerk who knows nothing about it.
BY MR. SCHMIDT:
Q. It's checked by someone in drug safety, correct?
MS. NATALE: Objection to form.
THE WITNESS: It's -- it's checked because the reporting individual said it stopped when -- when they, you know, withdrew the drug. So I'm just -- I -- I assume that is from the spontaneous reporting professional or nonprofessional.
BY MR. SCHMIDT:
Q. Do you know that to be true?
A. I know it to be the standard

of practice in spontaneous reports.
Q. Okay. Do you know how Bayer -- have you read any of the deposition testimony or looked at the coding manuals for how Bayer processes spontaneous reports?
A. No.
Q. Let's look at the next report. The one ending 308.
A. Three --
Q. Yeah.
A. Hold on, hold on. Yes, got it, 308.
Q. And my questions to you are going to be, number two, can you tell if this patient is obese or has recent weight gain? Number two, other than the box we've talked about being checked, can you give me the details on withdraw date versus symptom cessation date, and number three, is there full information regarding other treatments provided?
A. So weight was 57.96 kilograms which might be normal,



could be.
Q. Do you know?
MS. NATALE: Objection to form.
THE WITNESS: I don't know.
So it was inserted first week of May. Removed first week of June. So they had it for a month. Had IIH in the first week of June. The box was checked that they -- reaction went away after stopping the drug.
So that makes sense to assume that it was taken out the first week of June. And that's when the side effect went away.
Looking for treatment. And I can't see any treatment for this individual.
BY MR. SCHMIDT:
Q. Okay. Let me see if I can streamline this.
The first case I think you said is potentially obese. The second



case you can't tell.
Can you tell for the third case in Exhibit 23?
A. No.
Q. And the fourth case we know is obese, correct?
A. Yes.
Q. So one that we know is obese, one potentially, one we -- and two we don't know, correct?
A. Correct.
Q. For any of these cases, do they provide you with confidence that you know the full range of other treatments that the patient was receiving for their IIH?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. For any one of them?
A. I just don't know that. I'd have to read each one. I don't see any treatment for the second one I'm looking at.



Q. So keep going. You didn't for the first. So let's look at the third and fourth.
Do you see any information that gives you comfort that you know the full range of treatment they received?
A. I don't see any treatment for this one.
Q. That's the third one?
A. Third one, yeah.
And the fourth one, it's a pretty good summary of what happened. You know, about taking out the Mirena.
Q. Is there a summary of the treatment provided?
A. It was recommended that she lose weight.
Q. Do you know if that happened?
A. She didn't -- she didn't apparently lose weight. But when they are that complete about describing what happened, they would have probably mentioned if they did a lumbar puncture

Page 446

or an optic nerve sheath fenestration.
You make assumptions when you read these things. And if someone is going to be that detailed, they probably would have talked about a treatment.
Q. I don't want you to make assumptions because I think that's unscientific. So I just want to ask you a question --
MS. NATALE: Objection to form.
THE WITNESS: No, no.
BY MR. SCHMIDT:
Q. Can you -- from a medical perspective, can you rule out that the fourth patient received Diamox for example?
A. So first I just want to challenge you on that unscientific thing.
Q. Okay. Let me just ask the question.
A. Okay.
Q. Do you rule out that the fourth patient you just mentioned used

Page 447

Diamox to a reasonable degree of medical certainty?
MS. NATALE: Objection to form.
THE WITNESS: Do I rule out they used Diamox.
BY MR. SCHMIDT:
Q. Mm-hmm.
A. So I don't see anything about Diamox in here.
Again, when you have a complete description of what this person went through, they probably would have mentioned Diamox. This is a person that was pretty complete about the way they reported it, which is not like a lot of reports we get.
Q. So is -- what is the answer to my question, to a reasonable degree of medical certainty, did you -- do you rule out that that last patient received Diamox treatment?
A. I don't know if they got Diamox.

Page 448

Q. You just don't know, right?
A. I don't know.
Q. Okay. And I take it that's true for all four of those reports, now having gone through them, you can't say one way or the other whether they received some combination of the treatments reflected on Exhibit 12, correct?
MS. NATALE: Objection to form.
THE WITNESS: I don't -- I don't know if they got Diamox.
BY MR. SCHMIDT:
Q. You don't know if they got other forms of treatment too, correct?
A. That I don't know.
MS. NATALE: Same objection.
BY MR. SCHMIDT:
Q. Okay. Let's go back to your report. And I'm going to try to streamline the rest of this, because there's a bunch of these other ones. And we both want to get out of here.

Page 449

If you look at the next section of your report, talking about dechallenge data on Page 21. You say, "Additionally, a number of reports identify either positive dechallenge or outcome resolved or resolving along with some information about treatment."
Do you see that?
A. Yes.
Q. And you list eight reports under that grouping. Do you see that?
A. Yep.
Q. The next page you say, "The reporters identify for another set of cases that the patient was recovering while receiving treatments," and you list three reports under that, correct?
A. Yes.
Q. I can show you all those reports. You can go through them. But am I correct that in all of those reports, there is some reference to confounding treatment?
MS. NATALE: Objection to

form.
BY MR. SCHMIDT:
Q. Am I understanding your summary correctly?
A. Yeah, some of them have confounding -- not all of them.
Q. Well, isn't that why you grouped them this way, they all do?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. The first group is some information about treatment, the second group is recovering while receiving treatment, correct?
A. So you're saying that when I say along with some information about treatment, you're saying I said it had confounding information, is that what you're saying?
Q. Mm-hmm.
A. So insofar as receiving treatment as a confounding variable, then yes.



Q. Okay. They are all getting some level of treatment, right?
A. Yes.
Q. And I take it your answer, if I showed you all those reports, would be the same, you can't be sure if -- if the case reports contain all the treatments they are receiving, correct?
MS. NATALE: Objection to form.
THE WITNESS: Correct.
BY MR. SCHMIDT:
Q. That's true for any case report, right?
A. Some case reports are very complete. So not true for all case reports.
Q. Are you confident with any case reports you receive, that you've received all medically relevant information regarding that patient?
A. The word "all" is a -- is a bit extreme. I mean I've --
Q. That's why I'm asking it



that way.
A. I probably wouldn't say all, no.
Q. Okay. Let's look at your last category. You say, "The following cases include either conflicting data between the reporter and the company or conflicting data within the report."
Did I read that correctly?
A. Yes.
Q. And am I right that for that -- for that category, there's something that suggests that it might be a dechallenge, but something that conflicts with that?
A. Yes.
Q. So you can't be sure if it's a dechallenge or not, correct?
MS. NATALE: Objection to form.
THE WITNESS: That's true. If there is conflicting data there, I can't be positive.
BY MR. SCHMIDT:



Q. We talked earlier about negative dechallenge. Did you do any analysis of negative dechallenge?
MS. NATALE: Objection to form.
THE WITNESS: So, yes, I do have some data on negative dechallenge. Yeah.
BY MR. SCHMIDT:
Q. How many times is it the case that Mirena is removed in the case reports you've seen and there is no improvement in symptoms?
I didn't see that in your report which is why I asked you if you had done that.
A. Right. Right.
MS. NATALE: I'd ask at the next convenient time that we take a break.
MR. SCHMIDT: Yeah, I'm almost done with this section. I hope.
BY MR. SCHMIDT:

Q. I hope, Doctor.
A. Yeah, so on Page 23 of my expert report, on the second paragraph, last sentence. I talk about positive dechallenge in the dechallenge category. And then I wrote, "There is 17 cases noted of no" -- "no dechallenge."
And so that means negative dechallenge to me.
Q. And I'm sorry, I -- I got lost. Where -- oh, I see where you are reading.
A. Yeah.
Q. Actually, let's look at the paragraph above that where you finish discussing the Bayer data.
You say Bayer is now -- do you see in the last sentence before data from the registry, do you see that?
A. Yes. Yes, I see that.
Q. All right. You say, "In the majority of cases where information is available about the patient's course after removal, the patient either



recovered or improved."
And you've got, as I count it, 37 cases where the patient recovered or improved and 31 cases where the patient did not recover. Do you see that?
A. Yes.
Q. Do you view that as a meaningful difference, 37 versus 31?
A. It could be meaningful. It could be.
Q. Have you done any statistical analysis of that difference?
A. No.
Q. Have you done any statistical analysis of the difference below the 35 cases versus the 17 that we just talked about?
A. No.
Q. Have you done any analysis of the number of instances where Mirena was not removed and the patient nevertheless improved?
MS. NATALE: Objection to



form.
THE WITNESS: I know that that happens. And I have not done a statistical analysis of it.
BY MR. SCHMIDT:
Q. For example, if you looked at the cases of positive dechallenge and counted them up as you have in your report, do you know whether that number is exceeded by the number of cases where Mirena is not removed and the patient nevertheless improves? Have you done that count?
A. So that would be -- so say that again? So they --
Q. Sure.
A. -- they got better -- they had pseudotumor cerebri, and they got better even though the Mirena stayed in?
Q. Right. Do you know if that number of cases is greater or lesser than the number of potential positive dechallenges?
A. I don't know that number.



Q. Did you see any rechallenge cases?
A. No.
Q. Positive rechallenge cases?
A. No.
MR. SCHMIDT: Let's take a break.
MS. NATALE: Great. Thank you.
THE VIDEOGRAPHER: The time is 3:27 p.m. Off the record.
(Short break.)
THE VIDEOGRAPHER: We are back on the record. The time is 3:36 p.m.
BY MR. SCHMIDT:
Q. Doctor, you talk about a report -- a phenomena with case reports called underreporting, correct?
A. Yes.
Q. You cite an article by Hazell and Shakir?
A. Yes.
Q. And the idea of

underreporting is that companies typically don't get 100 percent of the cases reported that occur in the real world because it's a voluntary reporting system?
A. Correct.
Q. Would you agree with me that reporting rates vary by drug, vary by condition, vary by point in time, and are influenced by factors like publicity?
A. It might be. I haven't studied that.
Q. Are you aware that there is literature studying the effect of litigation publicity on reporting rates?
MS. NATALE: Objection to form.
THE WITNESS: No.
BY MR. SCHMIDT:
Q. Do -- would you take issue with the proposition -- do you know what stimulated reporting is in the case report context?
A. I haven't heard that term.



Q. Would you take issue with the fact that lawyer advertising for lawsuits can increase reporting rates?
A. I didn't know that.
Q. Do you know that when a company receives a lawsuit that they treat it as a case report?
MS. NATALE: Objection to form.
THE WITNESS: When a legal firm gets sued over a drug, it gets treated as a case report?
BY MR. SCHMIDT:
Q. Yes.
A. In what context?
Q. Well, for example, the number of case reports that you cite, particularly the ones from Bayer, those include some litigation cases. Did you know that?
A. I didn't know that, no.
Q. Did you know that if a lawyer files a complaint alleging that Mirena caused her client to develop IIH,



that the company puts that case into its adverse event drug system and treats it as a case report and reports it to the FDA if it meets the reporting criteria?
MS. NATALE: Objection to form.
THE WITNESS: I wouldn't be surprised if a drug company that gets sued puts it into their adverse drug reporting database. But as you know, it's just so variable. Lots of stuff gets lost.
BY MR. SCHMIDT:
Q. Did you know, in fact, that companies are obligated to handle lawsuits they get as individual case reports for pharmacovigilance purposes?
MS. NATALE: Objection to form.
THE WITNESS: I didn't know lawsuits were obligating drug companies to report them, no.
BY MR. SCHMIDT:



Q. Did you know -- have you -- recognizing that there is a potential increase in reporting rates when there is litigation over a drug, have you studied the litigation -- advertising campaign that occurred regarding Mirena and IIH?
MS. NATALE: Objection to form.
THE WITNESS: Well, first I didn't recognize it that there's increased reporting when it's advertised.
And second, I haven't studied the -- the Mirena advertising.
BY MR. SCHMIDT:
Q. Have you studied the volume of case reports you've reviewed to try to tease out which ones are litigation reports and which ones are not?
A. I didn't try and tease out litigation reports, no.
Q. And do you know if -- of the percentage of total reports as of the

Page 462

last time you looked that are litigation reports versus non-litigation reports?
MS. NATALE: Objection to form.
THE WITNESS: I didn't know that, no.
BY MR. SCHMIDT:
Q. Do you know if it's more than 50 percent litigation reports?
MS. NATALE: Same objection.
THE WITNESS: I don't know.
BY MR. SCHMIDT:
Q. In addition to the concept of underreporting, are you familiar with the concept called overreporting?
A. I suppose that's -- I suppose that's got to exist.
Q. For example, would you consider it overreporting if a company receives a reporting of potential IIH and they are not able to get any more information on the case, but unbeknownst to them the patient goes to a different doctor and IIH is ruled out.

Page 463

MS. NATALE: Objection to form. Incomplete hypothetical.
BY MR. SCHMIDT:
Q. Could that be overreporting?
MS. NATALE: Calls for speculation.
THE WITNESS: Yeah, that sounds like a pretty rare thing. But it could be overreporting.
BY MR. SCHMIDT:
Q. Have you done any analysis to try to account for overreporting in your --
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. -- in your review of case reports?
A. Overreporting is not an issue in spontaneous reporting. It would be an exceedingly rare thing.
Q. Have you done any analysis to try to rule out overreporting in your cases?

Page 464

A. The only analysis we would have done would be looking for duplicate reports, which would be I guess what I would call overreporting, but I don't --
Q. But --
A. -- I don't think patients go and report things to multiple venues just to get it in the spontaneous reporting database.
You must know, and the judge should know that probably 2 percent of spontaneous reports, 2 percent of adverse drug reactions are reported to spontaneous reporting databases like the FDA and like mine, and like the WHO, it's -- and 6 percent in some others. So it's just -- underreporting is like a mammoth and overreporting is like an ant.
Q. Do you know the rate of underreporting, have you attempted to calculate it for Mirena and IIH specifically?
MS. NATALE: Objection to form.

Page 465

THE WITNESS: No, I didn't calculate anything regarding Mirena.
(Document marked for identification as Exhibit Fraunfelder-24.)
BY MR. SCHMIDT:
Q. Let's mark -- I wasn't going to mark it. But given that answer, I'll mark the Hazell and Shakir study that you cite in your report.
Is this, in fact, a study that you reviewed?
A. Yes. Is it in my -- is it in my little binder too?
Q. I don't know if it's in your binder, but if you look at Page 8 of your --
A. Is it in my binder?
Q. -- Page 9 of your report?
A. Page 9. Yes.
Q. You make a statement almost identical to what you made just now. Only about 6 percent of ADRs are ever

reported, in the U.S. is found to be at least as 2 percent.
Do you see that?
A. Yes.
Q. And one of the sources that you cite for that proposition is Hazell and Shakir, correct?
A. It looks like I -- Classen and Pestonik.
Q. Yeah. You cite Hazell and Shakir and Classen, correct?
A. Yes.
Q. And Classen is a study from 1991, correct?
A. Yes.
Q. That's a study before the modern MedWatch system even existed, correct?
A. I don't know when MedWatch was invented.
Q. Okay. I will assert as a proposition that that study comes from before when the modern MedWatch system was put in place.



MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Do you know if that's true or false?
A. I don't know if that's true or false. But that also doesn't mean that it wasn't an accurate -- an accurate statistic.
Q. Do you know that the modern MedWatch system has increased reporting rates?
MS. NATALE: Objection to form.
THE WITNESS: I didn't know that that -- I don't know if that's true.
BY MR. SCHMIDT:
Q. Okay. Do you -- do you believe it to be untrue or you just don't know?
A. I just don't know.
Q. Let's look at Classen. I'm sorry, let's look at Hazell, which is



what I've marked as Exhibit 24, correct?
A. Yes.
Q. And if we look at Hazell, is IIH a serious condition, a serious adverse event?
MS. NATALE: Objection to form.
THE WITNESS: It's relative. But I would say it's serious.
BY MR. SCHMIDT:
Q. Okay. Let's look at Page 2 of this document.
A. Page 386?
Q. Yes, please. And in the abstract at the top, the second full sentence starts with the words "the median underreporting rate."
Do you see that?
A. Yes.
Q. And just read that to yourself and then I'm going to ask you a question about that.
A. Okay. I read that.
Q. So this sentence is talking



about the median underreporting rate for serious or severe adverse reactions, correct?
A. Yes.
Q. And they say for severe adverse reactions the median underreporting rate is 85 percent, correct?
MS. NATALE: Objection to form.
THE WITNESS: 95 percent. Oh, 85 -- it says -- there's one that says 95 and one that says 85.
BY MR. SCHMIDT:
Q. Right. I'm focusing on the one that says 85. Do you see where it says 85?
A. Yes, I see that. Yeah.
Q. That means 15 percent of adverse events, serious adverse events get reported, correct, according to that data?
A. According to that.
MS. NATALE: Objection to

form.
BY MR. SCHMIDT:
Q. Okay. Do you have -- do you know of any contrary data?
A. Well, the sentence right above it.
Q. Okay. Do you know which one is right?
A. No.
Q. For example, if we look at the tables that they present. Let's look at Table 2 on Page 389.
And this has different studies with -- from different countries. Do you see that?
A. Yes.
Q. And so for example, they list Classen at the bottom as the only U.S. study, right?
A. Yes.
Q. And that is where you get your 2 percent or less number, correct?
A. Yes.
Q. And then if you go to the



next page, they also list some more modern studies from the U.S., Kimmel and Prevots.
Do you see that?
MS. NATALE: Objection to form.
THE WITNESS: Kimmel, I see. And why do you say it's more modern? Where is the year on Kimmel?
BY MR. SCHMIDT:
Q. It's in the back, in the references.
A. What year was Kimmel?
Q. Kimmel is --
A. Prevots.
Q. Kimmel is from 1998 and Prevots is from 1994.
A. So relatively more modern but not grossly.
Q. And they also list a source called La Grenade. Do you see that, from the U.S.? And that's from 2001.
A. Yes.



Q. And it's a little confusing, because they I think report the inverse number to what we've been using.
So what is the actual, according to these three U.S. studies, what are the reported rates in these three U.S. studies?
A. Excluding Classen?
Q. Yeah, the ones in Table 3.
A. So La Grenade has, you know, a hundred percent underreporting.
Q. So zero reporting rate?
A. Yeah.
Q. Okay. What is it, according to Kimmel?
A. Kimmel's, it looks like it's 19 percent.
Q. Okay. And what about Prevots?
A. And Prevots was 94 -- well, yeah, 94 percent.
Q. So on that spectrum. It's a pretty broad spectrum, from zero to 19 to 94. Do you know where Mirena and IIH



falls, have you done any quantification of that?
MS. NATALE: Objection to form.
THE WITNESS: I haven't done any quantification of that. But you've got to recognize the Prevots article that looks at vaccine-associated paralytic poliomyelitis would occur in kids and would be a paralyzing disease in children which would raise the threshold of reporting to the point of no one is going to ever ignore that, but not recognize it.
And you get -- also you have to recognize that if somebody has Mirena-associated IIH, that could go unrecognized for quite a while. Maybe never recognized.
And so the underreporting, I believe, in general is going to be in the range of 2 to 6 percent. And this vaccine-associated

Page 474

paralytic poliomyelitis is a
definite zebra outlier.
BY MR. SCHMIDT:
Q. What is the reporting rate
if you run television ads or newspaper
ads saying if you have IIH or pseudotumor
cerebri and took Mirena you may be
entitled to a recovery, call now?
MS. NATALE: Objection to
form.
THE WITNESS: I don't know.
BY MR. SCHMIDT:
Q. Let's continue going through
your case reports. If you go back to
your case report section. We've now
talked about the clinical trial cases.
We've talked about the dechallenge data.
We've talked about the data from the
registry.
Let's talk about the medical
literature, starting on Page 24?
A. Okay.
Q. You cite two articles from
the medical literature, Martinez and Ros

Page 475

Forteza, correct?
A. So Martinez I see. And Ros
Forteza I see. Yes.
Q. And those are the only two
medical reports you've seen in the
literature regarding IIH and Mirena,
correct?
MS. NATALE: Objection to
form.
THE WITNESS: Those are the
ones I cite here.
BY MR. SCHMIDT:
Q. Are you aware of any others?
I'm not. So if you are --
A. I -- I haven't -- I'm not.
I haven't searched recently.
Q. By the way, did you -- did
you conduct a medical literature search
to find these or were they identified for
you?
MS. NATALE: Objection to
form.
THE WITNESS: Medical
literature search.

Page 476

BY MR. SCHMIDT:
Q. Okay. What about for the
cases, did you go through all the cases
to identify the clinical trial cases and
the dechallenge cases or were those
provided to you?
MS. NATALE: Objection to
form.
THE WITNESS: I do it --
it's an answer. I do it and Bree
Jensvold does it. So Bree
Jensvold who is my -- essentially
my assistant in the registry will
summarize the data for me and
identify the dechallenge cases and
the demographics.
And we have ability to put
it in an Excel spreadsheet and
summarize it.
BY MR. SCHMIDT:
Q. Do you have -- did you
receive case reports in an Excel
spreadsheet from -- from Bree?
A. I would have. But I just

Page 477

can't remember. This would have been a
long time ago.
But that's how I would have
summarized it in this so I probably did.
MR. SCHMIDT: We have not
received it. So we'll put in a
request for it.
MS. NATALE: Sure.
BY MR. SCHMIDT:
Q. One question I meant to ask
you about the clinical trial cases.
Do you remember talking
about how two of them were from Mirena
clinical trials, one was from a clinical
trial involving another product?
Do you -- do you know --
actually you've got to say yes, I'm
sorry.
A. Yes.
Q. Do you know in total how
many patients have been -- how many
Mirena patients have been studied in
clinical trials?
MS. NATALE: Objection to

Page 478

form.
THE WITNESS: I don't know how many.
BY MR. SCHMIDT:
Q. Do you know if it's hundreds, thousands, tens of thousands, hundreds of thousands?
MS. NATALE: Same objection.
THE WITNESS: Just from my experience with clinical trials, it wouldn't be hundreds of thousands. And it's probably in the range of hundreds to low thousands. That would be the range.
BY MR. SCHMIDT:
Q. Have you quantified that or are you just going off?
A. I'm just off going my experience in clinical trials.
MS. NATALE: Same objection.
BY MR. SCHMIDT:
Q. Okay. Do you know how many patients were in the clinical trials for

Page 479

the other product that was referenced?
A. No.
(Document marked for identification as Exhibit Fraunfelder-25.)
BY MR. SCHMIDT:
Q. Exhibit 25 is a copy of the Martinez abstract. Tell me if I've correctly identified that.
A. Yes.
Q. Specifically it appears on Page Number 255 of this document. Atypical pseudotumor cerebri.
A. Got it.
Q. Now, first of all, does this identify that the patient specifically used Mirena as opposed to another LNG-IUD?
MS. NATALE: Objection to form.
THE WITNESS: No, it doesn't specifically reference Mirena.
BY MR. SCHMIDT:
Q. Okay. If you look in the

Page 480

results section.
A. Mm-hmm.
Q. Do you see where it says that there were no headaches and no papilledema?
A. Yes.
Q. Was there any confirmation that this patient actually had IIH?
MS. NATALE: Objection to form.
THE WITNESS: They all had an elevated pressure in the cerebral spinal fluid. And -- yeah. And had -- you know, symptoms of IIH, like a visual field constriction.
And the author concludes they had pseudotumor cerebri.
BY MR. SCHMIDT:
Q. Do you know if -- if we look at your set of risk factors, if this patient had no other risk factors such as recent weight gain, can you rule that out?

Page 481

MS. NATALE: Objection to form.
THE WITNESS: So she was a non-obese patient.
BY MR. SCHMIDT:
Q. Do you know if she had recent weight gain?
A. It doesn't state she had recent weight gain.
Q. Okay. Can you rule out recent weight gain?
A. I mean, wouldn't they say it if she did have recent weight gain?
Q. Yeah.
A. It's -- it's a descriptive case report which isn't really lacking. That would be a significant thing to write. So why would we assume she had recent weight gain?
Q. Do you know one way or the other, that's my question.
MS. NATALE: Objection to form.
THE WITNESS: I don't know

if she had recent weight gain.
BY MR. SCHMIDT:
Q. Okay. If you look at the results, she complains of progressive restriction of visual field since four years ago, getting worse to the point of generating limitations in her daily life. Do you see that?
A. Yes.
Q. Okay. Those would be symptoms of IIH, correct?
A. Could be.
Q. Then on the next page it says, "During her treatment she referred that she was using an LNG intrauterine device for endometriosis."
Do you see that?
A. Yes.
Q. Do you know whether, from this report, whether the Mirena was -- or the LNG -- do you know from this report whether the LNG device was inserted before or after her symptoms began?
MS. NATALE: Objection to



form.
THE WITNESS: I don't know when it was inserted.
BY MR. SCHMIDT:
Q. And do you know if there was any relationship between removing the device and her symptoms getting better?
A. No.
Q. Let's look at the other one. You cite to the Ros Forteza one.
(Document marked for identification as Exhibit Fraunfelder-26.)
BY MR. SCHMIDT:
Q. Are you aware that the Ros Forteza case report was a letter to the editor that was actually published in, I believe it's Spanish?
A. Yes.
Q. I'm going to give you both the translation that I have and the Spanish copy.
A. All right.
MS. NATALE: Why don't you



make it really interesting and just hand him the Spanish.
MR. SCHMIDT: Do you speak Spanish?
THE WITNESS: Un poco.
BY MR. SCHMIDT:
Q. I don't. So I'm not going to -- other than one -- there's a reason I'm giving it to you for one point.
A. All right.
Q. This is the Ros Forteza letter to the editor that you cite in your report, correct?
A. Correct.
Q. Now, this patient we do know she was obese, correct?
A. Yes.
Q. And we also know that she had another risk factor immediately before her use of -- before her development of IIH which was minocycline use, correct?
A. Yes.
Q. And, in fact, the authors



attribute her IIH to minocycline, correct?
MS. NATALE: Objection.
BY MR. SCHMIDT:
Q. They call it minocycline-induced intracranial hypertension, correct?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. And there's no such similar statement regarding IIH -- regarding Mirena, is there?
MS. NATALE: Same objection.
THE WITNESS: Right. It's not identifying Mirena.
BY MR. SCHMIDT:
Q. Do you take any issue with the fact that the authors refer to this as a case of minocycline-induced intracranial hypertension?
MS. NATALE: Objection to form.

THE WITNESS: I don't take any issue except to say they are implying that it's made worse with the IUD -- with the levonorgestrel.
BY MR. SCHMIDT:
Q. Okay. The authors on the second page discuss the possible association. And I'm looking at the one, two, three, four -- let me do it from the bottom. One, two -- third paragraph from the bottom, fourth paragraph from the bottom that begins "with regard."
Do you see that?
A. Yes.
Q. They say, "With regard to the possible association between L-IUD and IIH."
Do you see that?
A. Yes.
Q. They discuss 56 cases that have been recorded, and then they discuss what the authors of the publication containing those 56 cases stated.



Do you see that?
A. Yes.
Q. And this is the reason I gave you the translated version, the untranslated version, because in the translated version it doesn't have the source. Do you see that?
A. It doesn't have the source, you mean like it doesn't have a reference?
Q. Yeah, it has Footnote 6 but it doesn't tell you what Footnote 6 is, correct?
MS. NATALE: Do you mean 9?
BY MR. SCHMIDT:
Q. You've got to go to the original to look at what --
MS. NATALE: Do you mean 9?
MR. SCHMIDT: I do mean 9, yeah.
BY MR. SCHMIDT:
Q. To look at what Footnote 9 is.
Correct?



A. I don't even -- it's hard for me to find it on the Spanish one.
Q. Go to the last page. Bibliografia.
A. Okay.
Q. Footnote 9 that they cite, that contains these 56 cases --
A. Yes.
Q. -- and where they make an author attribution, is the Alder publication, right?
A. Yes.
Q. And I think your dad is an author on that, right?
A. Yes.
Q. That's a Norplant publication, not a Mirena publication, correct?
A. Correct.
Q. They go on to say that there have been other cases of IIH associated with L-IUDs. And they cite the FDA. They cite Martinez, which we discussed. And then they give further information on



the FDA and they support that with Footnote 10.
Do you see that?
A. Yes.
Q. And Footnote 10 is the Etminan study we've been discussing with the retracting affidavit, correct?
MS. NATALE: Objection to form.
THE WITNESS: Correct.
MS. NATALE: And characterization.
BY MR. SCHMIDT:
Q. If an -- if an author retracts a study by way of an affidavit, is that something you'd want to know about?
MS. NATALE: Same objection.
THE WITNESS: Yeah, I think that's contributory.
BY MR. SCHMIDT:
Q. Okay. Is that an understatement?
A. I remembered that one.

Q. Is that an understatement,
Doctor?
MS. NATALE: Same objection
to form.
BY MR. SCHMIDT:
Q. Is that important to know if
the author retracts a study by way of an
affidavit?
MS. NATALE: Objection to
form. Asked and answered and
previous objections reserved.
THE WITNESS: Do I keep
answering?
MS. NATALE: You may answer.
THE WITNESS: It's
contributory.
BY MR. SCHMIDT:
Q. Is it important?
A. It counts.
MS. NATALE: Same objection.
BY MR. SCHMIDT:
Q. You want to know?
MS. NATALE: Same objection.
THE WITNESS: It counts.



BY MR. SCHMIDT:
Q. Do you want to know it?
MS. NATALE: Same objection.
THE WITNESS: Want to know
it?
BY MR. SCHMIDT:
Q. Yeah.
A. Be a hard thing for me to
say want. But it's contributory.
Q. Is it something you include
in your analysis?
A. I take it into account.
Q. Okay. Now, we have gone
through various -- let's --
MR. SCHMIDT: Can I get
those two exhibits. Did you steal
back my exhibits?
MS. NATALE: 11 and 12?
MR. SCHMIDT: Yeah.
MS. NATALE: They are in the
pile.
BY MR. SCHMIDT:
Q. Do you remember making that
list of risk factors --



MS. NATALE: Objection.
BY MR. SCHMIDT:
Q. -- that we marked as
Exhibit 11?
MS. NATALE: Objection to
making.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. We've now looked at a number
of case reports, the clinical trial case
reports that we marked as Exhibit 22, the
dechallenge reports that we marked some
of them as Exhibit 23 and discussed
others of them, and these two reports
that appear in publications, correct,
along with your registry reports,
correct?
A. Yes.
Q. Is it accurate that, to the
best of your knowledge, in none of those
reports can you rule out the full range
of alternate risk factors reflected in
Exhibit 11?
MS. NATALE: Objection to



form.
THE WITNESS: None of --
none of my stuff that I reviewed
can I rule those things out is
your question?
BY MR. SCHMIDT:
Q. Yeah. That's the nature of
case reports.
MS. NATALE: Objection to
form. Compound.
THE WITNESS: So, yeah,
that's a difficult -- that's a --
it's hard for me to make sweeping
statements like that.
I feel like when I look at
my -- my data, that there's a
number of people that weren't
obese or overweight.
BY MR. SCHMIDT:
Q. That's why I asked.
A. And there's -- there's
transgender people that have gotten
pseudotumor cerebri when their hormonal
changes occurred. There's people that

didn't have recent weight gain. There's -- you know, just -- I'm not going to make a sweeping statement like that.
Q. Okay. That's what I was focused on, the full range. There's certainly case reports where you can say this person was or wasn't obese, correct?
A. Yeah.
Q. Certainly case reports where you could say -- well, do you know of any individual case report where you could point me to -- strike that.
We've now spent the last couple hours going over case reports, right?
A. Yes.
Q. It probably feels like three days, right?
A. Mm-hmm, maybe.
Q. From that review of case reports over the past few hours, or from your total review of case reports, can you tell me with certainty that you have



seen a case report that you are comfortable in that case report, every single one of these alternate risk factors, is not present?
MS. NATALE: Objection.
BY MR. SCHMIDT:
Q. That we've listed in Exhibit 11?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Can you tell me that?
A. I can't -- I can't answer that because I don't speak that way with all or nothing-type sweeping statements. It's not the way -- it's not the way I look at this. It's not the way I study drug side effects. So I'm not going to say none of them have any confounding variables or all of them have confounding variables. I'm not going to answer that kind of question because it's not an absolute.
Q. I'm not asking -- I'm not



asking you that. I'm just asking simple factual questions.
If you look at the list of risk factors on Exhibit 11.
A. Yeah.
Q. Do you recall seeing any case report, either today or in your prior work that you can point me to where you know that that case report contains none of those risk factors in the case?
Just a factual question.
A. I just don't -- I don't operate under that kind of certainty. So I think you just have to ask me each one individually. I'm not going to clump them altogether. It's not --
Q. I'm not asking if you'd see in any one -- I can't -- all right. Let me ask you this.
You've cited some 400 case reports in your report, right?
A. We -- we cited 422 spontaneous reports. They weren't really case reports.



Q. Right. If I put all 400 of those, will you give me the multiple days of deposition time I need to have you go through those on the record? Will you come back for multiple days?
A. Well, I don't -- I don't want to.
Q. So let me try my question, and -- and I don't think your lawyer would agree to you coming back.
MS. NATALE: I would not.
BY MR. SCHMIDT:
Q. Let me try the question --
A. Yeah.
Q. -- just really simply.
As you sit here, can you point me to a single case, any single case you know where you can say none of these risk factors reflected on Exhibit 11 are present?
A. I think it's possible those kinds of cases exist in my 422. But I don't know for sure.
Q. Okay. Look with me if you

Page 498

would at Page 9 of your report, sir, Exhibit 1.

A. Okay.

Q. And at the bottom in the paragraph that starts on nine and carries over to 10, you reference using the WHO and the registry to evaluate signals.

Do you see that?

A. Yes.

Q. And you state that, "This program calculates an information component, a figure that measures the statistical dependency between a drug and an adverse event calculated based on the frequency of reporting."

Do you see that?

A. Yes.

Q. You summarize that information component as an IC.

Do you see that?

A. Yes.

Q. Is that a form of disproportionality analysis to your knowledge?

Page 499

MS. NATALE: Objection to form.

THE WITNESS: I think it probably is. But I got -- I should explain to you that I don't understand the statistical analysis of the information component number. This is -- there's a statistician employed by the WHO by the name of Andrew Bates. And he's an expert on the information component numbers.

And the short way of describing what it is, is that it looks at the number of reports based on the expected number of reports, based on drug sales and that sort of thing.

But it's not -- it's not real science. And it's not something that I rely on exclusively. I sometimes get reports from the WHO as a consultant to them, and they'll

Page 500

say, look, this relationship has an high IC number. That means we want you to look at it and adjudicate it.

But the IC number all, in and of itself, isn't valuable as a scientific thing that I would report in a research paper. It's just kind of a tool that spontaneous reporting experts use, if that makes sense.

BY MR. SCHMIDT:

Q. It does. Would you say the same thing for a reporting odds ratio for adverse event data?

A. I've really got to tell you, I'm not -- and I said this earlier, that I'm not an epidemiologist. And so I don't -- I don't understand the formulas that go into IC numbers and odds ratios and those sorts of things. I can interpret them based upon my training as -- went to medical school and we have to take epidemiology and we have to take

Page 501

biostatistics.

But me calculating it in research papers is not something that I do.

Q. Okay. You said a moment ago, the IC number, all in and of itself isn't valuable as a scientific thing that I would report in a research that spontaneous reporting experts use.

I think we missed a line.

Would you say the same thing about a reporting odds ratio for case report data that in and of itself, it isn't valuable as a scientific thing that you would report in a research paper?

MS. NATALE: Objection to form.

THE WITNESS: Well, we're talking about me.

BY MR. SCHMIDT:

Q. Yes.

A. We are talking about Dr. Fraunfelder --

Q. Yes.

A. -- and the papers that he writes. And I don't write statistical papers and epidemiological papers. I write papers that look at case series of drug side effects that are usually very rare. And usually my conclusion is that it's probable or possible or uncertain or unlikely, and in some instances certain. But I don't put odds ratios and information component numbers in my research papers.

Q. Okay. Let me try it this way, again, drawing on your prior testimony.

Would you agree with me that a reporting odds ratio for case report data in and of itself isn't valuable as a scientific thing that you personally would report in a research paper. Would you agree with that?

MS. NATALE: Objection to form.

THE WITNESS: I don't personally write those kinds of



papers.

BY MR. SCHMIDT:

Q. Do you not personally view it in and of itself as valuable as a scientific thing when it comes to your publications?

A. I don't think you can put odds ratios on a case report. It has to be an epidemiological study.

Q. Including reporting odds ratios for case report data?

MS. NATALE: Objection to form.

THE WITNESS: Well, I mean if you can -- if you look at, say, 400 case reports, you could put things together, you could create a denominator of -- we're being theoretical here. I don't know why you're going down this road.

But you can say we sold this many Mirena devices in the U.S. And so that's our denominator.

And then based on the



reporting rate and this IC number you can generate a numerator and you can generate incidence data.

But that's not something that I do. That's something that, you know, statisticians do and epidemiologists do.

BY MR. SCHMIDT:

Q. Let me ask you this question. Outside of your work in this litigation and any aspect of your other work, do you make use of reporting odds ratios for case report data?

MS. NATALE: Objection to form.

THE WITNESS: I think that when I've read odds report -- odds ratio reports in the epidemiological studies that I looked at, which was Etminan and Valenzuela, that that was valuable to me. I didn't write it. But that's something that I read and I took it at face value and it was



useful.

BY MR. SCHMIDT:

Q. And I'm trying to focus not on epidemiological studies but case report data. In your report you refer to something called IC, an IC metric that can be used for case report data, correct?

A. Yes.

Q. Are you familiar with something called a reporting odds ratio, an ROR, that can be used for case report data?

A. Well, yes, we talked about those earlier today.

Q. And so my question is, are ICs and RORs for case report data something that you use in your work outside of this litigation?

MS. NATALE: Objection to form.

THE WITNESS: Others may use statistical methods, you know not me, others may use. That's what I

said in my report. I'm not talking about what I do. I'm talking about what others do.
BY MR. SCHMIDT:
Q. Understood what's what I'm trying to get at. That's what I'm trying to understand. Is it accurate to say outside of litigation, you do not use, when it comes to case reports, measures like IC or ROR?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Is that accurate?
A. Well, no. I -- outside of litigation -- so in my research life, the WHO will send me IC numbers. They'll send me drug side effect relationships with IC numbers by each one of them.
Q. And --
A. And I can use it in litigation or not a litigation. It doesn't really relate to litigation. It's something that they provide me.



Q. You say, "The IC allows you WHO and the registry to generate hypotheses about association between drugs and ADR." Is that a correct statement?
A. Yes.
Q. Did you obtain an IC value here for the data that you retrieved from the registry regarding IIH?
A. No. However, I could. I just haven't.
Q. Do you have any idea what it is?
A. I don't know.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. You rely on Norplant and Jadelle data, correct?
A. I looked at some Norplant data. And Jadelle was in some of the spontaneous reports.
Q. Okay. And let's just talk about that. At Page 17 of your report.



At the top, you say, "Similar to Norplant and Jadelle Mirena releases approximately 20 micrograms of LNG per day. Do you see that?
A. Yes.
Q. From a hormone cylinder. Do you see that?
A. Yes.
Q. Do you -- have you specifically compared the release rates of LNG from Mirena versus Norplant or Jadelle?
MS. NATALE: Objection to form.
THE WITNESS: So I have read about the way that levonorgestrel is released from the implants versus the way it's released from intrauterine delivery. I have read about that.
BY MR. SCHMIDT:
Q. And so what's the different level of release between Mirena on the one hand and Norplant and Jadelle on the



other hand?
MS. NATALE: Objection to form.
THE WITNESS: I think the key take-home point is that when you are placing it intrauterine, that you can get a very, very high blood level that's not predictable. And you can get a very potent effect from it when it's placed in the uterus.
BY MR. SCHMIDT:
Q. Is there a dose effect, in your opinion, between LNG and IIH?
MS. NATALE: Objection to form. Asked and answered.
THE WITNESS: I think it's more likely than not there's a dose effect.
BY MR. SCHMIDT:
Q. So can you tell me what the different release rate, if any, is between Mirena on the one hand and Norplant and Jadelle on the other hand?

Page 510

MS. NATALE: Same objection.
THE WITNESS: The release rate is variable. And so from what I read, when you do an intrauterine device, that the release rate is variable.
BY MR. SCHMIDT:
Q. Do you know what it is on average in Mirena patients versus Norplant and Jadelle patients?
MS. NATALE: Objection to form.
THE WITNESS: I don't know what the averages are. But I will say that based on the literature that I've cited on pharmacokinetics that it's much more potent when it's intrauterine. Much more potent.
BY MR. SCHMIDT:
Q. Your testimony is that LNG from Mirena is more potent than LNG from Norplant and Jadelle?
MS. NATALE: Objection to

Page 511

form.
THE WITNESS: It has a more potent effect.
BY MR. SCHMIDT:
Q. When you say more potent, do you mean more ends up in the blood?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. What do you mean?
A. Probably. Probably that. First off I want to say that, you know, we don't know exactly the mechanism of how it causes pseudotumor cerebri. But there are biological mechanisms that we hypothesize. And the intrauterine implantation of levonorgestrel ends up being -- ends up being a problem, because it becomes unpredictable and in some people it's a really -- really strong.
Q. What's the highest level of LNG in the blood from someone who is taking Mirena that you've seen?
MS. NATALE: Objection to

Page 512

form.
THE WITNESS: We just have to go to the paper to read about that. That's not my area.
BY MR. SCHMIDT:
Q. Can you tell me what the level of variability is? Is it --
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. -- a twofold level, tenfold level, a hundredfold level?
A. I can't tell you the levels, no.
Q. Is it your testimony that on average Norplant and Jadelle release less LNG in the blood than Mirena does?
MS. NATALE: Objection to form.
THE WITNESS: Say that again.
BY MR. SCHMIDT:
Q. Is it your testimony that -- you know, I'll pass. I think you've

Page 513

already -- you've already addressed this.
Have you -- if I told you that when Norplant is inserted, it has an initial release of LNG in the blood that is several times higher than the initial release of LNG from Mirena, do you know if that's true or not?
MS. NATALE: Objection to form.
THE WITNESS: Yeah, I think the dose is much higher in Norplant than it is with Mirena. So you get 20 micrograms with Mirena and it's like 80 micrograms or something with Norplant.
BY MR. SCHMIDT:
Q. Does that result in higher levels of LNG in the blood with Norplant or with Mirena on average?
MS. NATALE: Objection to form.
THE WITNESS: I don't know about the blood levels. But I do know that I read about -- that

intrauterine delivery of it causes
a very potent effect.
BY MR. SCHMIDT:
Q. So if I tell you the levels of LNG in the blood from Norplant and Mirena -- Norplant and Jadelle are always higher on average than they are with Mirena. Do you have any reason to disagree with that or agree with that?
MS. NATALE: Objection to form.
THE WITNESS: So Norplant and Jadelle have a higher blood level than --
BY MR. SCHMIDT:
Q. On average?
A. -- than Mirena.
Q. Yeah.
A. I don't -- I just don't know the blood levels of those -- those modes of administration.
Q. Have you compared the blood levels with -- of LNG with Mirena to the blood levels from combined oral



contraceptives that contain LNG?
A. I would suggest that you ask the pharmacokineticists and the pharmacologists and those sorts of people that are claiming to be experts in that area. I told you a couple times all throughout the day that I'm not pharmacokinetics expert. And I didn't -- I can bring the paper up and cite what they wrote. Would you like to do that?
Q. Well, let me just ask you and maybe we can move onto another topic. Is it fair to say that you are not an expert on blood levels from -- of LNG from Mirena?
A. Yeah, I'm not an expert on blood levels.
Q. And you're not an expert on pharmacokinetic effect of Mirena?
A. No.
Q. And the same would be true for Norplant and Jadelle?
A. Correct.
Q. Let's take a look -- can we



get the book, please. Do you remember my colleague Mr. Imbroscio showing you a copy of your book "Drug-induced Ocular Side Effects" --
A. I don't remember.
Q. -- in your prior deposition?
A. What's that? Did I show him a copy of my book?
Q. Do you remember him showing you a copy of your book during your prior deposition?
A. No.
Q. He made a point of saying how he had bought the book to respect your --
A. I doubt it was respect.
Q. -- your interest. I will tell you that I went to a library and when no one was looking, photocopied it.
MS. NATALE: I have yet to see a full book. We'll send you a bill.
MR. SCHMIDT: I'm obviously joking.



(Document marked for identification as Exhibit Fraunfelder-27.)
BY MR. SCHMIDT:
Q. Let me show you an excerpt from your book that I've marked --
MS. NATALE: You know he only gets paid off the royalties. Better help him out.
THE WITNESS: No one cares.
BY MR. SCHMIDT:
Q. Does this -- does this appear to be an excerpt of your book, "Drug-induced Ocular Side Effects," the current edition, seventh edition?
A. Yes.
Q. If you turn to the third page of this document on Page 201, there's a reference to levonorgestrel.
A. Yes.
Q. Do you see that?
A. Yes.
Q. And this is the book that I think you told me earlier that you were

Page 518

in the process of updating but you have not gotten to update this section yet?
A. Correct.
Q. Do you have a timetable for updating this section?
A. A year or two.
Q. In terms of overall updating the book, do you have a sense of how far are you in terms of updating the book? Are you halfway? Are you three quarters?
A. Just started.
Q. Just started.
You have a listing of ocular side effects, do you see that?
A. Yes.
Q. And under ocular side effects you have probable side effects, correct?
A. Yes.
Q. And IIH does not appear there, correct?
A. Correct.
Q. Instead papilledema secondary to intracranial hypertension

Page 519

appears as a possible side effect, correct?
A. Yes.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. And your definition of possible is the WHO definition of possible, that there's a temporal -- there has been a temporal association observed but you can't rule out other causes, correct?
A. There's plausible biological mechanisms, but yes.
Q. Is that an accurate statement in your view for levonorgestrel and IIH, that in your view they are plausible biological mechanisms, there has been a temporal relationship observed in some cases, but you can't rule out alternate causes?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:

Page 520

Q. Is that an accurate statement?
A. So I think it's -- I think it's probable now.
Q. So is this rating accurate as you sit here today?
MS. NATALE: Objection to form.
THE WITNESS: I'm -- I'm going to rewrite it and put it under probable.
BY MR. SCHMIDT:
Q. Do you believe it's accurate as you sit here today now, that it is possible, under your definition of possible, that papilledema secondary to intracranial hypertension is linked to levonorgestrel?
MS. NATALE: Objection to form.
THE WITNESS: Yeah. Possible is encompassed by probable. So possible still is true too. It's still true.

Page 521

BY MR. SCHMIDT:
Q. With all the qualifications that exist on possible, correct?
A. Yes.
Q. Let's look at clinical significance. You discuss case report data including the Alder study we referenced a little while ago?
A. Yes.
Q. And at the end of that discussion of case report data you say, "Of course, the problem with this type of data is that intracranial hypertension occurs in this age group of persons without obesity at a rate of approximately 3.3 per 100,000 per year. Do you see that?
A. Yes.
Q. Therefore, a report of 57 cases with much of the data being incomplete is suspect for causality.
Do you see that?
A. Yes.
Q. Is that a correct statement?

Page 522

A. So the rate of 3.3 per 100,000, I want to go back to that reference, if you don't mind.
Q. It's the same one I believe you cite in your report?
A. And I say the same thing?
Q. You say 3.3 per 100,000 generally in women of childbearing age?
A. Right, without obesity.
Q. And then you cite a different rate for with obesity?
A. Okay.
Q. So my question is, just as you sit here today, is this statement -- you see this is a reference to case report data, correct?
A. Yes.
Q. And you say, "Of course the problem with this type of data is that there's a background rate of intracranial hypertension," correct?
A. Yes.
Q. You say, "Therefore, a report of 57 cases with much of the data

Page 523

being incomplete is suspect for causality." Is that still a correct statement regarding case report data today?
MS. NATALE: Objection to form.
THE WITNESS: Yes, I think it's -- it has the confounding variables we talked about.
BY MR. SCHMIDT:
Q. Right. And you identify two here. One is that the disease occurs at a background rate independent of LNG exposure, correct?
A. Yes.
Q. And the other is that much of case report data is incomplete, and we spent hours about that?
A. Yes, we talked about that.
Q. And because of those reasons and other reasons, just looking at case report data, case report data by itself is suspect for causality, correct?
MS. NATALE: Objection to

Page 524

form.
BY MR. SCHMIDT:
Q. That's your wording?
MS. NATALE: And misstates the --
THE WITNESS: Yeah, I mean, case report data has -- is lower than a randomized prospective clinical trial. So it's lower on the evidence scale, which we have talked about a lot today.
BY MR. SCHMIDT:
Q. Then you -- if you look in the next paragraph. You talk about removing implants that have levonorgestrel. Do you see that?
A. Just show me where that is, what line.
Q. Do you see the Brittain citation?
A. Yes.
Q. In the sentence before that you say, "While not a proven association one should probably remove the implants

Page 525

if optic nerve findings occur."
Do you see that?
A. Yes. "Also they suggest that patients who develop papilledema or intracranial hypertension have the implants removed."
Q. Right. Now, here you are talking specifically about Norplant, correct?
MS. NATALE: Objection to form.
THE WITNESS: They stated, what reference is that? Brittain.
BY MR. SCHMIDT:
Q. Let's take a step back.
A. That's 1995. And so that would have been Norplant.
Q. Right. Norplant is an implant, correct?
A. Yes.
Q. And it's implanted in the arm, correct?
A. Yeah.

Q. And it's got to release enough levonorgestrel in the body that it has an effect in the uterus, correct?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. A contraceptive effect in the uterus, correct?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:
Q. Mirena is not an implant, correct?
A. That's an intrauterine device.
Q. Right. That's not an implant. It's not implanted in the body in the way that Norplant is, correct?
A. Different mechanisms of drug administration.
Q. Have you seen Mirena referred to as an implant or do you understand implants to refer to only



products like Norplant and Jadelle?
A. I don't think about them that way. I think if somebody said Mirena implant I would understand what they are saying.
Q. Okay. When you -- the data that you talk about here is all Norplant data, correct?
A. I take that to mean Norplant.
Q. Okay. I do too. The data that you discuss here is all Norplant data correct? There's no Mirena data cited here, no IUD data cited here, correct?
A. When we're citing papers we are talking about Norplant because that's all it was written about. But we're talking about levonorgestrel, is what we're talking about.
Q. And what you say in this sentence we were looking at, the one that begins, "While not a proven association."
Do you see that? Halfway



through the second paragraph.
MS. NATALE: Right before Brittain.
BY MR. SCHMIDT:
Q. Actually, before we get there, let's -- if we look at the first page of this document, the second page, this publications from 2015, correct?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Look at the second page.
A. 2015.
Q. And was it true in your view as of 2015 that there was not a proven association between Norplant and IIH as you state in this document?
MS. NATALE: Objection to form.
THE WITNESS: My opinion is that there was a possible association between Norplant and IIH. That's my opinion.
BY MR. SCHMIDT:



Q. When you say that it was not a proven association, do you see that language I'm looking at?
A. I do.
Q. Was that an accurate statement that the association between Norplant and IIH as of 2015 was not a proven association?
MS. NATALE: Objection to form. Asked and answered.
THE WITNESS: So not a proven association could be synonymous with possible. So I stick -- stick to what I wrote there.
BY MR. SCHMIDT:
Q. That's an accurate statement as of 2015, right?
A. Yeah. One thing to recognize is this would have been written three, four years prior to publication. So you know, this is -- this is pretty old data.
Q. Let's say 2012. Was that an

accurate statement as of 2012, that there was not a proven association between Norplant and IIH?
A. I agree with my -- what I wrote there. It's possible.
Q. And you're not aware of any data on Norplant since 2012, are you?
A. It got withdrawn from the market.
Q. Right.
A. Because it caused IIH.
Q. Is that your understanding of why it got withdrawn?
A. I think that's a big reason.
Q. Okay. Have you studied why it got withdrawn?
A. Have you?
Q. Yes. Have you?
A. You tell me.
Q. I will tell you I don't believe it was because of IIH. Do you disagree with that?
A. I think IIH is a contributory factor to it being removed,



absolutely.
Q. And how do you know that?
A. I don't know it. That's what I think.
Q. Okay. Let's focus on the things that you know.
Given that there's no new data on Norplant, do you still agree here today that there is not a proven association between Norplant and IIH as you wrote in your 2015 book?
A. Norplant contains levonorgestrel. So when I rewrite this chapter, I'm going to write probable. So that's what I think now. You're asking my opinion right now. I think probable.
Q. Even though there's no new Norplant data, will you take out the statement in here that there's not a proven association between Norplant and IIH?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:



Q. Or will you keep that statement in here?
MS. NATALE: Same objection.
THE WITNESS: I haven't decided what I'm going to do about that statement. But I probably will remove "while not a proven" because I think that weakens the public safety of this drug causing IIH.
I'm going to help the public. And I'm going to make it probable. And I'm going to make them know that I think it should be removed when you get IIH.
BY MR. SCHMIDT:
Q. Now, you have two co-authors on this book, right?
A. Yes.
Q. Wiley Chambers?
A. Yes.
Q. And your dad, also Dr. Fraunfelder?
A. Yes.



Q. And are both of them are going to be authors on the eighth edition?
A. Yes.
Q. And are you able to change it to probable without them agreeing to it?
A. No.
MS. NATALE: Objection to form.
THE WITNESS: No.
BY MR. SCHMIDT:
Q. Are you able to remove your 2015 statement that there is not a proven association between levonorgestrel and IIH without their agreeing to it?
MS. NATALE: Same objection.
THE WITNESS: We will all agree together.
BY MR. SCHMIDT:
Q. And have you talked to them to get their agreement yet?
A. Not yet.
Q. So as you sit here today, do

Page 534

you know whether in fact once you go through that process of talking to your dad and talking to your co-author -- other co-author, that you will upgrade it to probable and remove the statement about it being not a proven association?
A. It's a scientific consensus in my circles that regard it as probable. And the deputy director of the FDA, Wiley Chambers, who approves all ophthalmologic drug is going to agree with that. And my father, who wrote the Norplant article back in 1995, has always thought that it caused IIH. So we're going to call it probable is my guess.
Q. I don't want --
A. You can wait and buy the book.
Q. I don't want you to speculate as to what your father or your co-author is going to say. Let me just break down what you just said. Is Dr. Chambers an FDA official?
A. Oh, yeah.

Page 535

Q. Do you understand that the FDA has the statutory, not just power, but obligation, to change drug warnings if they see a risk?
MS. NATALE: Objection to form.
THE WITNESS: Well, certainly, that's what the FDA is for.
BY MR. SCHMIDT:
Q. Right.
A. And I believe you should have a drug warning on this drug which you should have done when you -- when you created it.
Q. Has anyone at the FDA, including Dr. Chambers, ever suggested from their research, including working on your book with you, that there should be an IIH warning for Mirena?
MS. NATALE: Objection to form.
THE WITNESS: We don't personally talk about IIH.

Page 536

There's thousands of drugs. We don't talk about Mirena individually. In fact, Mirena is only on my radar because of this lawsuit, which is a relatively recent thing for me.
BY MR. SCHMIDT:
Q. Come back to my question. In your work in connection with this lawsuit, once Mirena was put on your radar by Ms. Natale and her colleagues --
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. -- have you come across any data that tells you that the FDA has ever raised or proposed that there be a warning for IIH with Mirena?
MS. NATALE: Same objection.
BY MR. SCHMIDT:
Q. Were you aware of any such information?
A. They will have this lawsuit, I imagine. I haven't seen it yet. But

Page 537

sometimes lawsuits are what bring it to people's attention.
Q. Another way you can bring it to your attention is write to the FDA, right? You as a doctor could write to the FDA right and say, "I think there should be a warning. I actually believe what I'm saying. I think there should be a warning."
You could do that, right?
MS. NATALE: Objection to form. Characterization.
THE WITNESS: I could write to my senator too I mean, I can write to anybody I want.
BY MR. SCHMIDT:
Q. Did you know there's a specific mechanism to write to the FDA called a citizen's petition and request a label change based on actual data?
MS. NATALE: Objection to form.
THE WITNESS: No, I have not done a citizen's petition.

BY MR. SCHMIDT:
Q. Do you know that such a mechanism exists including because my colleague Mr. Imbroscio asked you about it a couple years ago?
A. It doesn't surprise me.
Q. And despite you believing that this is a public health issue, have you made any efforts outside of this litigation to publish, talk to the medical community, talk to the FDA about Mirena and IIH?
A. You're giving me an idea. Remember this is a relatively recent thing for me. So maybe I should. I'll take your advice.
Q. You said the same thing back in 2016. Have you done it since then?
MS. NATALE: Objection to form.
THE WITNESS: I have not.
BY MR. SCHMIDT:
Q. Will you tell us if you do it?



A. Am I required to tell you?
Q. I'm asking you to, as a courtesy. Will you tell us if you do it?
MS. NATALE: I'm sure we'll let you know.
THE WITNESS: You know, really, I intend to see what happens with the lawsuit and then we'll see what happens.
I mean, it's not like this is part of my -- you know, I do surgery and I take care of patients and I have a full practice. And I don't sit and think about Mirena all day long. But now that you're challenging me, I'm going to start thinking about it more.
BY MR. SCHMIDT:
Q. Am I correct that while this lawsuit is pending you don't intend to publish or reach out to the FDA on Mirena and IIH?
A. No, I don't intend to write



any papers or call the FDA. And Wiley Chambers is prevented from influencing anything in regards to labeling as an author of our book, and he receives zero royalties from the book. So he does it as a labor of love, but not as a vested profit-making type thing for him.
MR. SCHMIDT: Move to strike everything after the word "FDA."
MS. NATALE: I will preserve a counter to your motion to strike.
BY MR. SCHMIDT:
Q. Let's look at your -- you just purported to represent your father's views on Norplant. You're not here to testify on his behalf, are you?
A. No.
Q. And you're not here to testify that he's given you secret information about his views on Norplant that are not contained in his publications, are you?
A. He has no secret information



in regards to this.
Q. Or secret views?
A. No secret views.
Q. Let's look at -- let's look at the Alder report that your father is an author on. You've never published on Norplant, correct?
A. Correct.
Q. Have you prescribed Norplant since 1997?
A. No. But I have inserted Norplant in a woman's arm.
Q. Since 1997?
A. I did it then.
Q. Okay. Since then, have you?
A. No.
(Document marked for identification as Exhibit Fraunfelder-28.)
BY MR. SCHMIDT:
Q. Look with me if you would --
MR. SCHMIDT: Can you tell me the exhibit of that document, please.

Page 542

MS. NATALE: 28.
THE WITNESS: Exhibit 28.
BY MR. SCHMIDT:
Q. Look with me if you would at Exhibit 28. This is the letter to the editor that your father was a co-author on where Alder was the lead author.
A. Yes.
Q. This is the one you cite in both your report and your book that we've marked as Exhibit 27, correct?
A. Yes.
Q. And he discusses some cases that he has seen as well as general reporting rates in the general population, correct?
A. Yes. He looks at 56 cases from the registry, and then he has two-case reports from his practice.
Q. At the bottom of the page, he states, "The cause of intracranial hypertension is not known."
Do you see that?
A. Yes.

Page 543

Q. Do you agree with that as an accurate statement?
MS. NATALE: Objection to form.
THE WITNESS: I've said that twice today, that we don't know the mechanism for ICH.
BY MR. SCHMIDT:
Q. So you agree with that?
A. Yes.
Q. If you look at the next page, right before his conclusion, he talks about in the -- I'm going to focus on the second-to-last sentence. Do you see where he says, "Levonorgestrel may have contributed to the onset of intracranial hypertension or it may have had nothing to do with it."
Do you see that?
A. Levonorgestrel may have contributed to the onset of ICH or it may have had nothing to do with it.
I see that.
Q. Do you disagree with that

Page 544

statement as your father applies it to his data?
A. I agree with his statement based on the 1995 environment that he wrote it in.
Q. And are you aware of him making any contrary statements to that regarding levonorgestrel and IIH in any kind of publication?
A. We haven't talked about it since this.
Q. Let me show you the other Norplant sources you cite. You cite one called Sunku.
(Document marked for identification as Exhibit Fraunfelder-29.)
BY MR. SCHMIDT:
Q. If you want to look at where you cite it, it's on Page 26 of your report.
A. Yes.
Q. Sunku is another -- Sunku is a poster presentation, correct, which

Page 545

I've marked as Exhibit 29.
A. I see it.
Q. And they report two patients with Norplant, correct?
A. Yes.
Q. And each of these patients received treatment for their IIH, correct?
A. Yep.
Q. And they refer to there only being a possible association of levonorgestrel implants and BIH.
Do you see that?
A. Yes.
Q. And they say, "Further observation may allow a determination as to whether this association is etiological or coincidental."
Do you see that?
A. I see that.
Q. Do you disagree with that conclusion based on their two cases that there's a possible association?
A. I agree with their

Page 546

conclusion. And one of the things that I've just noticed throughout the day that you do is that you try to diminish the case reports of every single one that you look at.

And what these represent, the authors wouldn't write about it if they didn't think it was something important.

When they say possible, they're trying to be polite. They're trying -- they are trying to say, "I don't want to alarm the medical community and say it's certain, but you sure as heck better pay attention to it."

So by you saying it's possible means nothing, possible actually means a lot.

It means that the -- are you going to strike my --

Q. Yes.

A. Okay. Then I'll stop talking. But I have more to say.

MR. SCHMIDT: Move to strike

Page 547

everything after "conclusion."

MS. NATALE: He can continue to move to strike, but you may continue to answer the question as you see fit.

BY MR. SCHMIDT:

Q. Dr. Fraunfelder, do you understand the difference between association and causation?

A. Yes.

Q. And what is the difference between association and causation?

A. Well, association doesn't prove causation.

Do you understand the difference between association and causation?

Q. Do you understand association -- I'm not trying to antagonize you.

A. I mean, it's an obvious answer. I don't know why you're asking me simple things. I mean...

Q. Because we need it for the

Page 548

record, and because you seem to be conflating the two in your testimony. And so I want to be sure we understand.

MS. NATALE: Objection to form. And strike the editorialization.

MR. SCHMIDT: I'll withdraw it. I don't mean to engage in the witness's argumentation.

BY MR. SCHMIDT:

Q. My question is simply, is it accurate that when you see an association, it maybe be causal and it might not be?

A. Yes.

Q. And is it accurate sometimes associations are not causal because things are associated because of some other risk factor that exists for the two associated things?

A. Okay.

Q. Is that possible?

A. Yes.

Q. For example, you might see

Page 549

one possibility with Mirena and IIH is they are associated because both are also associated with obesity. That's a possibility, correct?

A. Yes.

Q. Where the obesity is explaining both the Mirena usage and the IIH but the Mirena usage is not causing the IIH, correct?

MS. NATALE: Objection to form.

THE WITNESS: I understand your point.

(Document marked for identification as Exhibit Fraunfelder-30.)

BY MR. SCHMIDT:

Q. Let me show you the next Norplant source you cite. This is Wysowski, Exhibit 30.

MR. SCHMIDT: I'm sorry. I just wrote 30 on yours, Christina.

MS. NATALE: That's fine.

BY MR. SCHMIDT:

Page 550

Q. Are you familiar with this publication?
A. Yes. I'm familiar with this.
Q. This is an evaluation of 39 Norplant case reports, correct?
A. Yes.
Q. And if you look on the third page, am I correct that in every case where they had weight data, patients were overweight or obese?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Let me help you out. Do you see where they talk about pseudotumor cerebri on the third page?
A. Yes.
Q. And four, five sentences in, they say, "16 of the 39 women were reported to be obese and two were overweight." And then for the remaining 21 patients, they didn't have weight, height, and body habitus data, correct?

Page 551

A. Correct.
Q. Is it accurate that in this article, the Wysowski article, Exhibit 30, every patient for whom they had weight data was confounded in terms of weight?
MS. NATALE: Objection to form.
THE WITNESS: It reads that way except for the ones where it's not reported. I just don't know.
BY MR. SCHMIDT:
Q. And if you look on the next page, they reach the conclusion that they can't tell whether these reports are due to Norplant or weight or something else?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Correct?
A. Just show me where and I'll --
Q. On the left-hand column, second full paragraph that begins, "No

Page 552

pseudotumor cerebri."
A. Yes, I see that.
Q. End of that paragraph, last -- the second-to-last sentence says, "As a consequence it is not possible to determine whether Norplant, obesity or weight gain or both factors are related to the occurrence of pseudotumor cerebri."
Do you see that?
A. Yes.
Q. Do you agree with that statement as to that data, as you understand their data?
MS. NATALE: Objection to form.
THE WITNESS: I agree with their -- I agree with what they wrote there.
BY MR. SCHMIDT:
Q. They go to say, "Epidemiologic research, case-control, or cohort studies would be required to determine if a causal association between

Page 553

Norplant and either pseudotumor cerebri or stroke exists."
Do you see that?
A. Yes.
Q. Do you agree with that statement?
A. I think that would be helpful to do more studies.
Q. Do you agree that it's required --
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. -- when you've got conflicted -- confounded case reports that you need to do epidemiologic research, that it is required to determine if a causal association exists?
MS. NATALE: Same objection.
THE WITNESS: You know -- so you know, when you look at case reports and case series and as a lawyer you pull out words like required and try to say it's

Confidential - Subject to Protective Order

Page 554

invalid because of that. It's
just not the way scientists read
scientific papers.
Epidemiologic research would
be helpful, but it's not required
to do it.
Required is just what a
lawyer would pull out of it, but
not a doctor.
BY MR. SCHMIDT:
Q. Do you see when these doctors used the word "required" in their medical publication?
MS. NATALE: Objection to form.
THE WITNESS: Yeah, they use
the word "required" in their
medical publication. But if they
had been faced by a lawyer saying
don't say it, they probably would
have changed the word. If they're
going to pull it out and hinge the
paper's quality on the one word.
That's what you've been

Page 555

doing all day long on the case
reports, is pulling out little
tiny hairs. And the doctors don't
write about it unless they think
it's a real association.
BY MR. SCHMIDT:
Q. Doctor, we are close to the finish of our time. I'm going to be going to the judge if you're going to argue with me --
A. Okay.
Q. -- about my questions. I'm trying to ask you my questions as best I can. I'm going to ask you to answer them as best I can so that we can finish without me having to go to the judge. Is that fair?
A. That's fair.
Q. Okay. My question is simply, do you agree with their use of the word "required," that epidemiological research would be required to determine if a causal association exists? Do you agree with that?

Page 556

MS. NATALE: Objection to form.
THE WITNESS: I would say it would be helpful.
BY MR. SCHMIDT:
Q. You would not say it would be required?
A. I wouldn't say required. I'd say it would be helpful.
Q. Thank you, Doctor.
Let's look at the last Norplant source you cite in your report, which is -- I'm not sure what this is. I think it's a poster presentation by Tang. Do you know who Dr. Tang is?
A. I don't know Dr. Tang.
(Document marked for identification as Exhibit Fraunfelder-31.)
BY MR. SCHMIDT:
Q. It's titled pseudotumor cerebri associated with Norplant contraceptive device.
A. I see that.

Page 557

Q. Okay. Do you know who -- I just asked you that. Do you know that Dr. Tang, like Dr. Etminan, was a retained plaintiffs' expert in this litigation?
MS. NATALE: Object to the form. Use of "plaintiffs." Use of "this litigation."
THE WITNESS: No.
BY MR. SCHMIDT:
Q. Do you know that she also withdrew from this litigation rather than give further testimony?
A. No.
MS. NATALE: I will absolutely object to the characterization and any ongoing questioning regarding this line of questioning.
BY MR. SCHMIDT:
Q. Do you know that she gave testimony in Mirena cases where she refused to testify that there was a causal link between Mirena and IIH?

MS. NATALE: Same objection, characterization, misstates testimony, foundation. And I would preserve any other objections to form.
THE WITNESS: No.
BY MR. SCHMIDT:
Q. Would you want to know Dr. Tang's views on Mirena and LNG generally or Mirena and IIH specific -- and -- let me ask my question again.
Before relying on Dr. Tang's work, such as it is, would you want to know her views on either IIH and LNG generally or IIH and Mirena specifically?
MS. NATALE: Same objection and I'll move to strike the entire line of questioning.
THE WITNESS: Dr. Tang wrote an abstract in a well respected -- and it was accepted -- investigative ophthalmology and visual sciences. It was a poster presentation of this organization



called ARVO. Ophthalmologists respect that meeting. She got it accepted. It was peer reviewed. I would care about her opinion.
BY MR. SCHMIDT:
Q. You'd want to know what she had to say, right?
MS. NATALE: Objection to form.
THE WITNESS: If it's contributory.
BY MR. SCHMIDT:
Q. And for example, there's very little information here, correct?
A. It's an abstract. So abstracts are by definition little.
Q. She says she had 100 patients with the Norplant device. We have no idea how many of them had IIH, correct?
A. So 100 patients with a Norplant device were examined. The duration of the Norplant was recorded. There were no demographic restrictions.



Neuroophthalmic exams were undertaken.
So I don't see that kind of data.
Q. We have no idea how many had positive dechallenge, correct?
A. Well, no.
Q. We have no idea how many had negative dechallenge, correct?
A. I -- I don't know. I'm losing patience with you. I'm not here to defend this abstract or answer questions that are obvious. I don't see -- it's a short, you know, few sentences. I don't see dechallenge, rechallenge. I mean, it's an abstract.
Q. She provides no data on potentially confounding treatments or potentially confounding risk factors, correct?
A. Not that I see.
Q. Do you look to Dr. Tang's publication that we just marked as an authoritative source?
MS. NATALE: Objection to



form.
THE WITNESS: Dr. Tang's abstract is contributory.
(Document marked for identification as Exhibit Fraunfelder-32.)
BY MR. SCHMIDT:
Q. Let me show you Dr. Tang's deposition --
MS. NATALE: I will --
BY MR. SCHMIDT:
Q. -- from Mirena litigation. Exhibit 32.
MS. NATALE: I will to object on numerous grounds. And I'd appreciate if you allow me to itemize at least several of them.
I will object to your use of Mirena litigation. I will object to the use of deposition. I will object to the extent that Dr. Tang provided some general causation testimony in numerous depositions on case-specific plaintiffs prior

to the creation of the MDL
litigation.
And I will preserve my motion to strike any questions related to this line of evidence and we will be meeting and conferring before we take this issue to the court within the next several days.
BY MR. SCHMIDT:
Q. Doctor, do you see on the first page of this exhibit it says videotaped deposition of Rosa Tang from May of 2016?
A. Yes.
Q. If you look on the next page of this document, Page 2.
A. Yes.
Q. Four pages on a page. But look at Page 2 where it says appearances.
Do you see that?
A. Appearances?
Q. Right up here in the corner.
A. Yes.



Q. Do you recognize -- I'm not trying to call anyone out. But do you recognize one of the lawyers who you're working with in this litigation?
A. Yes.
MS. NATALE: Objection to form. Incomplete. Foundation.
BY MR. SCHMIDT:
Q. Look with me if you would at Page 234 of this deposition.
MS. NATALE: Objection to the extent that you intend to ask any questions about any of this document, particularly without context.
BY MR. SCHMIDT:
Q. Do you see page 234, upper left corner?
A. Got it.
Q. Look at line four. Dr. Tang is asked the question: "Well, earlier what you told me causation means is when you have enough information to say that A causes B."



Do you see that?
A. Yes.
Q. "And that's not a conclusion that you reach with respect to Mirena and IIH, correct?"
Do you see that?
A. Yes.
Q. And Dr. Tang's answer is. "Right. That's why I said association."
And to make it clear she goes on to say --
MS. NATALE: Objection. Just object before you move on.
MR. SCHMIDT: You can't object in the middle of my question.
MS. NATALE: You finished a line -- you finished the line, and you've moving onto another part before you asked him a question.
BY MR. SCHMIDT:
Q. "Question: And you're distinguishing association from causation, correct?



"Answer: Yes.
"In other words, there's not enough information to say that a patient who develops IIH who uses Mirena has IIH because it was caused by Mirena correct?
"Answer: I don't think that you can generalize that."
Did I read that correctly?
MS. NATALE: Objection to form.
THE WITNESS: You read that correctly.
BY MR. SCHMIDT:
Q. Now, this first question and answer, "Causation means is when you have enough information to say that A causes B, and that's not a conclusion that you reached with respect to Mirena and IIH, correct?"
"Answer: Right."
Do you see that?
A. Yes.
MS. NATALE: Objection to form.

BY MR. SCHMIDT:
Q. "That's why I said association."
Do you see that?
A. Yes.
Q. And she asks, "And you're distinguishing association from causation, correct?" And Dr. Tang says: "Yes."
MS. NATALE: Same objection.
THE WITNESS: I'm not being a smartass. But we're reading it twice right? You're reading it again. I heard you the first time.
BY MR. SCHMIDT:
Q. I just want -- do you agree with Dr. Tang that the appropriate way to describe the relationship between Mirena and IIH as an association and not as a causation?
MS. NATALE: Objection to form and again characterization, incomplete testimony, foundation.



THE WITNESS: So what's the question?
BY MR. SCHMIDT:
Q. Do you agree with -- do you agree with Dr. Tang that the appropriate way to describe the relationship between Mirena and IIH is as an association and not as causation?
MS. NATALE: Same objections.
THE WITNESS: I don't have an opinion on Dr. Tang's deposition.
BY MR. SCHMIDT:
Q. But do you agree, putting aside her deposition -- do you agree, if someone asserts the proposition that we see here, that the appropriate way to describe the relationship between Mirena and IIH is as an association but not as causation? Would you agree with that statement?
A. No.
MS. NATALE: Objection to



form. Same objections.
BY MR. SCHMIDT:
Q. Before relying on Dr. Tang's views, and her data, would you want to understand what she has to say in her deposition about that data?
MS. NATALE: Objection to form.
THE WITNESS: I suppose it would be contributory. I don't know anything about Dr. Tang.
BY MR. SCHMIDT:
Q. Okay.
A. And it's the first time I've seen that. Is that part of -- is that part of the exhibits now?
Q. Let me ask about your mechanism opinions, and we're going to take a break and see if I can streamline the rest of what I had. First, do you have any mechanism opinions --
MS. NATALE: Objection to form.
BY MR. SCHMIDT:



Q. -- on Mirena and IIH?
A. I believe there is a plausible biological mechanism.
Q. I've got to ask you about it.
You state, let's look at Page 6 of your report.
You state on Page 6 of your report, in the third sentence, "The greatly increased risk of this rare disease among obese women of childbearing age suggests an underlying mechanism related to sex hormones."
Do you see that?
A. Yes.
Q. Which sex hormones are implicated in the development of IIH?
A. I believe in this instance it's progestin.
Q. Are all progestins linked to IIH in your view?
MS. NATALE: Objection to form.
THE WITNESS: I think

Page 570

levonorgestrel is linked to IIH.
BY MR. SCHMIDT:
Q. What about other progestins?
A. I don't know about other progestins.
Q. Do you know about other sex hormones other than progestins, whether they are linked to IIH?
MS. NATALE: Same objection.
THE WITNESS: Well, you know, growth hormone, corticosteroids, you know, we think those hormones are probably related to it.
BY MR. SCHMIDT:
Q. What about estrogen?
A. Estrogen, I don't know. I just think that levonorgestrel is from the evidence that I looked at.
Q. For example, looking at this sentence that, "The greatly increased risk of this rare disease among obese women of childbearing age suggests an underlying mechanism related to sex

Page 571

hormones," it would be the case that women of childbearing age have higher levels of progesterone, correct?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Than other groups?
A. You know I'm an ophthalmologist, right?
Q. I have to examine you based on what you put in your report.
A. I just believe there is a plausible biological mechanism. I do not want to opine on the hormone levels of childbearing women. That's not something that I'm going to be an expert on.
Q. Do you know whether IIH rates in women in of childbearing age, higher IIH rates in women of childbearing age, are attributable to progesterone or estrogen or other sex hormones or something else?
A. I suspect they are due to higher levels of progesterones -- or

Page 572

progestins.
Q. Why progestins as opposed to estrogens?
A. Again, I'm not a hormone childbearing age expert. I'm not going to go down that road with you.
Q. Do you know if it's due to estrogens or progestins or something else?
A. I'm not going to go down that road with you.
Q. Well, you've got to answer my question.
A. Then I'll say I don't know.
Q. Okay. Now, you mentioned it's even higher among obese women, correct?
A. What is?
Q. Rates of IIH?
A. I mentioned it. We've mentioned it all day long. In all the literature, you've mentioned it.
Q. Fair enough. Do you know if progestin levels are higher or lower on

Page 573

average in obese women than they are in non-obese women?
A. I don't know women's hormones levels.
Q. You mentioned that a link between pregnancy and IIH has been refuted, right? We looked at that earlier today, right?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. I can show you what I'm talking about.
A. Yeah, go ahead.
Q. Look with me if you would at page -- I believe it was Page 26, but let me confirm. 27. You referred to the largely -- at the top of Page 27, the largely disproven association between PTC and pregnancy.
Do you see that?
A. So where?
Q. Just right there. Pregnancy in that sentence.

A. So we are talking about oral contraceptives? Right.
Q. So we are talking generally about pregnancy. You said -- well, let me ask you this question. Does -- are there higher rates of IIH among pregnant women?
A. Well, no.
Q. Do you know if progestin levels are higher or lower during pregnancy?
A. I'm not going to talk about women's hormone levels.
MS. NATALE: Objection to form. Asked and answered.
THE WITNESS: I don't know why you keep asking me that.
BY MR. SCHMIDT:
Q. Because you did talk about it in your report, so I need to understand what you know.
MS. NATALE: Same objection.
THE WITNESS: I talked about that I believe there is a



plausible biological mechanism. I didn't say that I know women's hormone levels when they're childbearing age, when they're pregnant, when they're pre-pubescent. I don't know those answers.
BY MR. SCHMIDT:
Q. Fair enough. Do you know as a factual matter whether progestin levels are higher or lower during pregnancy?
MS. NATALE: Same objection. And objection to use of "progestin."
THE WITNESS: I have a -- I'm not going to answer that question anymore. I don't know. I'm not answering your questions about hormones.
BY MR. SCHMIDT:
Q. Is your answer you don't know or is your answer you're refusing, because if it's you're refusing we're going to move for the judge to strike



your testimony. If it's you don't know, then I'll take that answer.
A. I don't know.
MS. NATALE: Same objection. Preserve any cross-objection to your motion to your strike or whatever.
BY MR. SCHMIDT:
Q. You referred a couple times to a mechanism by which Mirena might cause IIH. I want to ask you about that. I think you covered that in your report at the top of Page 7. Am I correct about that?
A. I see page -- top of Page 7. I see that.
Q. Is that what you reference in terms of a mechanism?
A. That can be a potential mechanism.
Q. Are you aware of any others other than what's discussed in those first two sentences on Page 7?
A. There could be other



mechanisms. This is the only one that I reference.
Q. Is it the only one that you know about?
A. That I could write about, yes, in this paragraph, or speak intellectually about, yes.
Q. Let's focus on this one. "So you say steroid hormone activity in the region of the brain where CSF is produced, the choroid plexus, may be one important modulator of CSF production."
Picking up on that language. Can you articulate to me what the proposed mechanism is by which Mirena causes IIH?
MS. NATALE: Objection to form.
THE WITNESS: So Mirena is a progestin, a steroid hormone and the theory is that it causes increased secretion of CSF from the arachnoid villi leading to high intracranial pressure.

Page 578

That's the -- that's one of
the biological mechanisms.
BY MR. SCHMIDT:
Q. That progestin causes increased CSF release from the arachnoid villi?
A. Let's say levonorgestrel. Let's not say progestin. Say levonorgestrel.
Q. Okay. So let me re-ask. One mechanistic theory is that LNG causes -- it acts on the arachnoid villi; is that correct?
A. It acts on the centers of the brain that produce cerebral spinal fluid. And cerebral spinal fluid is, to my knowledge, secreted by the arachnoid villi, which is part of the choroid plexus.
Q. Okay. Let me see if I have it then. One theory of how Mirena causes IIH is that LNG acts on a part of the brain in the choroid plexus that makes CSF. And it causes that part of the

Page 579

brain to produce more CSF?
A. Yes.
Q. Are you aware of any data that LNG is capable of crossing the blood-brain barrier?
A. I don't know that.
Q. Are you aware of any data indicating that Mirena -- I'm sorry, that LNG has any effect on any part of the choroid plexus?
A. Well, my reference -- references do talk a little bit about that there's a possible mechanism of increased production of CSF.
Q. Okay. And what's -- what's the basis for them saying that LNG specifically might impact the choroid plexus?
A. I can't speak for them.
Q. Were these references that you found or were though provided to you?
MS. NATALE: Objection to form.
THE WITNESS: These are all

Page 580

my references.
BY MR. SCHMIDT:
Q. Okay. Is there any data you have seen indicating that LNG does in fact impact the choroid plexus in any way as opposed to just a theory that it could?
MS. NATALE: Same objection.
THE WITNESS: There's a paper in here that we might have to dig up on that if we are going to keep talking about mechanism, which is -- apparently you want to do.
BY MR. SCHMIDT:
Q. Okay. Unless you want to disclaim that part of your opinion, I'd ask you to do that.
MS. NATALE: I don't mean to interrupt the testimony if you're on a line of questioning, but I'd like to pause at some point, find out how long we are on the record, and take a quick break.

Page 581

BY MR. SCHMIDT:
Q. Let me ask you this question while you're looking.
There are receptors in the brain -- do you know what a mineral corticoid receptor is?
MS. NATALE: Objection to form.
THE WITNESS: You know, I've heard it.
BY MR. SCHMIDT:
Q. Do you know if there are mineral corticoid receptors in the brain?
MS. NATALE: Same objection.
THE WITNESS: I don't know where the mineral corticoid receptors are.
BY MR. SCHMIDT:
Q. Do you know if there's any hypothesized link between mineral corticoid receptors and IIH?
MS. NATALE: Same objection.
THE WITNESS: I don't know.
BY MR. SCHMIDT:

Q. You are aware that hormone --
A. I think it's one of my electronic files that I reviewed. So it's not in here.
Q. Okay. You are aware that hormones can act on receptors and be what's called an agonist or an antagonist?
A. Yes.
Q. An agonist increases activity at the receptor and an antagonist diminishes activity?
A. Okay.
Q. Correct?
A. If that's what you think.
Q. I'm asking you if that's correct?
A. It sounds correct.
Q. Do you know whether for receptors in the choroid plexus, Mirena is an agonist or antagonist?
A. I don't know.
Q. Do you know whether for the



mineral corticoid recepters Mirena is an agonist or an antagonist?
A. I suspect it's an agonist, but I don't know for sure.
Q. You haven't seen any studies that answer that question?
A. I may have. I may have read those studies. I would have to go look them up. And I will come back to you with my detailed mechanistic opinion, because that's what you want. So let's go into the paper that I reference, because I believe the papers that I read and I read about a mechanism. And you want to hear about it. So let's do that.
MS. NATALE: I'll take a -- I will request that we take a short break. We don't even need to leave the room. We will go off the record for a moment.
MR. SCHMIDT: As long as it's not to take the witness --
MS. NATALE: I just said we won't even leave the room. We're



going to take a break.
MR. SCHMIDT: Why don't we take a break.
THE VIDEOGRAPHER: Stand by. The time is 5:04 p.m. We are going off the record.
(Short break.)
THE VIDEOGRAPHER: So the time is 5:15 p.m. Back on the record.
MR. SCHMIDT: I think both sides intend to enforce the seven-hour limit for these depositions absent special circumstances. So by my count, I've got about 15 minutes left in that seven hours. I'm going to go then and pass even though I have more to ask.
BY MR. SCHMIDT:
Q. Doctor, looking at Page 7 of your report, just where we were. You make reference to a product spironolactone.



Do you see that?
A. Page 7.
Q. Right at the top, second sentence.
A. "The role is strengthened by the therapeutic use of spironolactone." Yes.
Q. Are you aware of any study data showing that spironolactone is an effective treatment for IIH?
MS. NATALE: Objection to form.
THE WITNESS: I mean, in pediatric cases of pseudotumor cerebri, I wrote it right there. Do you see that?
BY MR. SCHMIDT:
Q. Yes. Do you believe that data supports the proposition that spironolactone is an effective treatment generally for IIH?
MS. NATALE: Same objection.
THE WITNESS: It's not one of the treatments that I cited

Page 586

earlier.
BY MR. SCHMIDT:
Q. Okay. And are you aware -- have you reviewed the full body of clinical data on that product?
A. No.
Q. Have you ever prescribed a medication to a patient that included an IIH warning in the label?
A. I don't remember.
Q. Do you recall ever warning a patient about IIH notwithstanding what the label said as a potential risk?
A. So I have to try and understand your question. Have I prescribed a medicine that I know is associated or causes IIH to a patient? Have I done that and not told them? Is that what you're asking?
Q. No, the opposite. Have you prescribed a medication that you believe is associated with IIH where you have provided an IIH warning to a patient?
A. I can't remember off the top

Page 587

of my head having done that.
Q. Have you -- do you have any data on -- from OB/GYNs as to which portions of the label for the products they prescribe, they share with their patients?
A. I'm giving you a blank look. One more time.
Q. Sure. I'm trying to ask one simple broad question. Have you done any review of the warning practices that OB/GYNs adhere to in prescribing contraception?
MS. NATALE: Objection to form and the scope.
THE WITNESS: I'm not an OB/GYN, and I don't study OB/GYNs.
BY MR. SCHMIDT:
Q. And you don't know how they warn their patients about different risks of contraceptions?
A. As a treating physician like I am, and having done an OB rotation in med school and having delivered babies, I

Page 588

would assume, it would be logical to assume that they warn patients of adverse events that they are familiar with.
Q. For example, apart from your assumption, do you know whether OB/GYNs, when they prescribe contraceptives that do have an IIH warning, pass that warning along to their patients or how frequently they do?
MS. NATALE: Same objection. And I will just object again to the extent that you request extra time. These questions are nongermane to this phase of the litigation as per court order.
MR. SCHMIDT: Are you going to reproduce him on labeling opinions?
MS. NATALE: If he intends to give any.
MR. SCHMIDT: Okay. Then I'll withdraw the question and move on.
MS. NATALE: Just because

Page 589

that's something that we discussed. I apologize for any argumentation back.
MR. SCHMIDT: No, I'll withdraw that and I'll move on.
BY MR. SCHMIDT:
Q. Look with me if you would at the BfArM report which we marked as Exhibit 16.
A. Okay.
Q. Look with me, if you would at Page 44 of the report.
A. Okay.
Q. This is where Bayer is summarizing their case report data. And in the third paragraph, they say that they found 319 reports for this analysis.
Do you see that?
A. Yes.
Q. And under reporting source, they say that more than 60 percent of the cases were submitted to the company in the context of litigation. Do you see that? In the U.S.

Do you see that?
A. So -- okay. Gotcha. Yes, I see more than 60 percent of the cases were submitted to the company in the context of litigation in the U.S.
Q. Have you done any analysis of that data to indicate that you would disagree with that math?
A. I haven't done any analysis of that.
Q. If you look at Page 45, the next page.
A. Yes.
Q. At the end of the first full paragraph, they say, excluding cases submitted in the context of litigation -- well, actually, they give two reporting rates. First, in the sentence before, they say the reporting frequency is low at .22 cases per hundred thousand women years.
Do you see that?
A. Yes.
Q. Have you done any math that



causes you to disagree with that reporting frequency calculation?
A. I haven't done any math. I'm just trying to understand what -- just reading that.
Q. In the next sentence they exclude the litigation cases. And the reporting frequency comes down to .08 per hundred thousand.
Do you see that?
MS. NATALE: Objection to form.
THE WITNESS: I see that.
BY MR. SCHMIDT:
Q. Have you done any math that tells you that calculation, the .08 calculation is wrong?
MS. NATALE: Same objection.
THE WITNESS: So, I don't have any problem with the math. I just don't necessarily believe the assumption, which is I believe there's probably massive underreporting. And to say that



there's a reporting rate of .22 or .08 would be -- how can you do that?
BY MR. SCHMIDT:
Q. Have you performed any reporting frequency calculations?
A. No.
Q. Look with me at Page 46. That's a heading on Page 46 titled "BMI/weight." Do you see that?
A. Yes.
Q. And they say, in the very last sentence, "In more than 90 percent of cases in which information on BMI or body habitus were available, the patients were either overweight or obese or the patients reported recent weight gain before diagnosis of IIH."
Do you see that?
A. I see that.
Q. Do you take any issue with that math?
A. The only issue I have to say is that just because they are overweight,



doesn't mean that levonorgestrel didn't cause the IIH.
Q. Do you take any issue with their math?
A. I didn't do any calculations, so I don't see how I could.
Q. Okay. And that was going to be my next question. You've not independently tried to calculate, where weight information is available, how many people are overweight, obese or had recent weight gain?
A. No.
Q. There was one other question that I was going to ask about this document.
You, in your report, Page 17, Footnote 39 -- do you see that? You make reference to a 2017 signal assessment.
Do you see that?
A. Yes.
Q. And you say, "The details of these more recent cases do not appear" --

Page 594

"do not yet appear to have been provided by Bayer."
Do you see that?
A. Yes.
Q. Are you aware that when a company gets case reports through litigation, it's limited in its ability to gather further information about those cases because of the litigation?
MS. NATALE: Objection to form.
THE WITNESS: I'm not aware of that, no.
BY MR. SCHMIDT:
Q. Would you like to see that data?
A. That data could be useful.
MS. NATALE: I will object to the --
BY MR. SCHMIDT:
Q. If that data is uniquely in the hands of the lawyers that have retained you, would you want to get it from them?

Page 595

MS. NATALE: Objection to form and characterization.
THE WITNESS: I don't know.
MR. SCHMIDT: I'll put in a request for that. Strike that. I'll stand on the question.
MS. NATALE: The fact discovery processes are available to you as per Federal Rules of Civil Procedure.
BY MR. SCHMIDT:
Q. Doctor, can you point me to any scientific association that has concluded that Mirena causes IIH?
MS. NATALE: Objection to form.
THE WITNESS: The word causes, I cannot point you to something that says that Mirena certainly causes IIH, no.
BY MR. SCHMIDT:
Q. Can you point me to any regulatory agency that has concluded that Mirena causes IIH?

Page 596

A. No.
Q. Anywhere in the world?
A. No.
Q. Can you point me to any regulatory agency anywhere in the world that has even concluded that there's sufficient evidence of an association between Mirena and IIH to justify an IIH warning for Mirena?
MS. NATALE: Same objection.
THE WITNESS: So I haven't reviewed the regulatory bulletins or that sort of thing. So I can't point that to you right now.
MR. SCHMIDT: I suspect I've used my 15 minutes. Why don't we stop there.
MS. NATALE: Let's take a short break off the record. Thank you.
THE VIDEOGRAPHER: Stand by please. The time is 5:24 p.m. We are off the record.
(Short break.)

Page 597

THE VIDEOGRAPHER: The time is 5:37 p.m. We are back on the record.
\- - -
EXAMINATION
\- - -
BY MS. NATALE:
Q. All right. Dr. Fraunfelder, I'm going to ask you some questions about the various exhibits that you've looked at -- you've been presented today and also about your report generally. Okay?
A. Okay.
Q. On Page 3 of your report, which was Exhibit 1, you were directed to a sentence right before, abbreviations used, where you wrote, "My expertise qualifies me to opine on issues of drug safety, drug monitoring, ophthalmologic medical conditions, drug prescribing and ophthalmologic medical practice."
Did I read that correctly?
A. Yes.
Q. Do you agree with that

statement?
A. Yes.
Q. Okay. Do you -- are you qualified to opine on those issues as they relate to the Mirena intracranial hypertension relationship?
A. Yes.
Q. You were asked some questions about your methodology and use of the WHO-UMC system for standardized case causality assessment; is that correct?
A. Yes.
Q. Is that your methodology that you applied in reaching your conclusions?
A. It's not the only methodology I used.
Q. What other methodology did you use?
A. Well, I looked at individual case reports. I looked at spontaneous reports. I looked at the available literature. I looked at the



epidemiological papers. I looked at the plausible biological mechanism for sex hormones causing pseudotumor cerebri.
Q. And is that all contained within these Opinions 1 through 8 of your report on Pages 1 to 2?
A. Yes.
Q. Okay. You were asked if you -- I'm going to paraphrase here. You were asked something like has anyone else ever applied the WHO-UMC standard for case causality to a biologically plausible mechanism. Does that ring a bell?
A. Kind of.
Q. Did you apply the WHO-UMC system to a biologically plausible mechanism in this case?
A. No, I used the WHO-UMC system to look at spontaneous reports and to classify them based -- into certain, probable, possible, unlikely, or unclassifiable. I don't use it to classify biological mechanisms.



Q. Okay. You were asked some questions about whether there is a proven causation -- strike that.
You were asked whether there is a proven causal association between Mirena and IIH or if there is a certain causal association between Mirena and IIH.
Does that sound --
A. Yes, I remember that.
MR. SCHMIDT: Object to characterization.
BY MS. NATALE:
Q. Okay. How would you classify or quantify the relationship between Mirena and IIH?
A. I would say within a reasonable degree of medical probability it is more likely than not that Mirena causes increased intracranial hypertension.
Q. And --
A. Pseudotumor cerebri. Increased intracranial pressure. IIH.



There's a lot of names for it.
Q. Sure. And the WHO, this Exhibit 3, which is the WHO-UMC document. Under what causality assessment cannot do, you were asked if in that -- within that table it states give accurate quantitative measurement of relationship likelihood; is that correct?
A. Right.
Q. Okay. Are there methods to give quantitative measurements of relationship likelihood?
MR. SCHMIDT: Objection.
THE WITNESS: Epidemiological studies can do quantitative data.
BY MS. NATALE:
Q. You mentioned that epidemiological evidence is also apart of the analysis that you --
A. Yes.
Q. Just let me finish the question.
A. Sorry.

Page 602

Q. -- that you've performed in this case?
A. Yes.
Q. Okay. You can put Exhibit 3 away. Exhibit 2 was the Friedman 2005 piece. Do you remember that piece?
A. Exhibit 2?
Q. Yeah.
A. Yes.
Q. And you were asked about, on your report, on Page 27, about your citation to this source, correct?
A. 27?
Q. Page 27 of your report. I'm sorry. Exhibit 1.
A. Oh, page of my report. All right. So yes.
Q. And the sentence from your report on Page 27 that you were brought to is, "Specifically the literature has focused on the well established relationship of LNG to PTC in contrast to largely disproven associations to oral contraceptives in pregnancy."

Page 603

Did I read that correctly?
A. Yes.
Q. Okay. And there's actually two -- two references there. But the one that you were provided today is Number 77, which is the Exhibit 2, correct?
A. Correct.
Q. Yes? Okay.
A. Yes that's Friedman.
Q. So on Page 35 of Exhibit 2 where you were brought, do you remember discussing the section of Exhibit 2?
A. Yes.
Q. Do you see Dr. Friedman writes on this -- under hormone therapy, several lines up from the bottom, in contrast to oral contraceptives there is a well established relationship between PTC and levonorgestrel releasing implants. Did I read that correctly?
A. Yes.
Q. Is that consistent with the opinions provided in your report?
A. Yes.

Page 604

Q. You can put that aside.
Exhibit 4 was a listing, purported listing of some levonorgestrel-containing products; is that correct?
A. Yes.
Q. Do you have any information about whether these products are levonorgestrel only or if they are combined products?
A. I don't know.
Q. Okay. You can put that aside. Exhibit 10 was the Mosher piece. Do you recall looking at this piece?
A. Yes.
Q. You were asked some questions about data in this article regarding potential preferential prescribing of Mirena to overweight or obese women; is that correct?
A. Correct.
Q. If you turn to the chart on Page 5 where you were looking earlier.
A. Yes.

Page 605

Q. Are you aware of whether IUD includes both hormonal and nonhormonal IUDs?
A. I don't know.
Q. Okay. You were pointed to adjusted odds ratios for BMI for the IUD correct?
A. Correct.
Q. Okay. Do you see under -- directly underneath the chart, "Statistically significant ORs are shown in bold"?
A. Yes, I see that.
Q. Okay. Is the OR for IUD -- adjusted OR for IUD use between BMI 25 to 29.9 statistically significant?
A. No.
Q. Are the adjusted odds ratios for BMI of 30 to 34.9 for the IUDs statistically significant?
A. No.
Q. You can put that aside. Exhibit 14, was the -- I'm going to say this wrong -- Boulet piece from Morbidity

Page 606

and Mortality Weekly Report, correct?
A. Correct.
Q. Okay. And you were asked some questions about this article also in the context of potential -- preferential prescribing of Mirena, correct?
A. Correct.
Q. And particularly about the data from Utah; is that correct?
A. Correct.
Q. Okay. Not -- you can put this down for just a minute. In the context of the Valenzuela study, were you asked if -- and I'm going to paraphrase here -- if differences in methodology between two groups within a study effect the validity or reliability of that data?
MR. SCHMIDT: Objection characterization. Vague.
THE WITNESS: I remember that.
BY MS. NATALE:
Q. Do you see there is kind of like a key at the bottom of this chart?

Page 607

A. Yes.
Q. Okay. And do you see the last one is like two paragraph symbols?
A. Yes.
Q. Do you see the last two sentences state, "For Connecticut, Kentucky, Massachusetts, Mississippi, Ohio, Texas, and Utah, text responses for 'other' contraception were evaluated and reclassified into appropriate categories when possible. The text field was not available for other states."
Did I read that correctly?
A. Yes.
Q. Does it appear that the Utah group may have had more information than other states included in this analysis?
A. Yes.
Q. You can put that aside. Exhibit 15 was a 2017 piece by Dr. Jessica Sanders, correct?
A. Yes.
Q. And is she one of the authors on the Valenzuela study?

Page 608

A. Yes.
Q. Okay. Does it appear that Dr. Sanders utilized this data in the Valenzuela study?
A. No.
Q. Do you have any understanding of why she didn't?
A. No.
Q. Okay. You can put that aside.
You were asked some questions about replicability. Do you recall that?
A. Like duplicate reports?
Q. No. So you were asked about replicability, meaning the replication of results from one study --
A. Yes.
Q. -- between other studies?
Do you recall that?
A. Yes. Repeat research results.
Q. Okay. Do you understand the Valenzuela study to have included two

Page 609

separate cohorts?
A. Yes.
Q. One in Denmark and one in Utah?
MR. SCHMIDT: Objection to --
THE WITNESS: Yes.
MR. SCHMIDT: Just let we have a running objection to leading your own witness.
MS. NATALE: Sure. Sure.
BY MS. NATALE:
Q. Okay. So you were shown Exhibit 18, which is various excerpts from the reference manual in scientific evidence; is that correct?
A. Yes.
MR. SCHMIDT: Objection. Leading.
BY MS. NATALE:
Q. Okay. On Page 777, were you asked --
A. What exhibit is that?
Q. I'm sorry. Exhibit 18.

Page 610

A. Okay.
Q. On Page 777 were you asked whether it is a good general rule of thumb in science to never rely on any experimental finding until it has been independently replicated?
A. Yes.
Q. What -- could you read the last little paragraph of that section out loud, please?
A. "This may be particularly true" --
Q. No, sorry. Of the full -- of the Section A, replication, the last paragraph, that a --
A. "That a finding has been replicated does not mean it is correct. Different laboratories can make the same mistakes. Neither does failure of replication mean the result is wrong. Nonetheless the existence of independent replication is an important support for a finding."
Q. So does this stand for the

Page 611

proposition that replication is required for a finding of causation?
MR. SCHMIDT: Objection. Foundation.
THE WITNESS: Replication is not required.
BY MS. NATALE:
Q. You were asked some questions about the -- what you refer to in your report as dechallenge cases; is that correct?
A. Yes.
Q. Okay. And Exhibit 23 was the reports from the kind of first set of four cases listed in your report; is that correct?
A. Yes.
Q. Okay. I believe in the beginning, you were asked some questions about the reporters -- strike that. Strike that.
Okay. You mentioned -- do you see -- strike that.
The second case within that

Page 612

set was the ESP-2002-00308. Do you see that?
A. Yes.
Q. Is there any information in this case report regarding dechallenge?
A. It says symptoms disappeared after Mirena removal.
Q. Okay. Is there anything else in this report that is, I guess, relevant to your assessment of dechallenge?
A. It was a spontaneous report from a physician. And the next page is some data.
Q. Was a positive dechallenge reported in this case report?
A. Well, yes. The reaction abated after stopping the drug. The answer is yes.
Q. Okay. And on the second page under -- do you see second paragraph up from the bottom, "Additional case details were retrieved" -- "have been retrieved"?

Page 613

A. The part that talks about the reporting gynecologists?
Q. No.
A. Oh, I see the decisional case. Yeah, I see that.
Q. Does this -- does this state a positive dechallenge was reported?
A. Positive dechallenge was reported, yes.
Q. And then the next case report, which was 2012-065106?
A. Yes.
Q. Is there any information in that report regarding dechallenge? I'll help you out. On Page 2, do you see, just up from the bottom, there is a line, "No assessment of seriousness." What's the line right above that. What does that say?
A. "A couple of months after insertion" --
Q. Nope.
A. "The Mirena was removed, and both the headache and the hypertension

resolved."

Q. Does that give you any information about dechallenge?

A. It's a positive dechallenge.

Q. Okay. And I'll direct you just back to the first page under case description.

A. Yes.

Q. Do you see it says, "The report refers to a female friend of the reporter who was prescribed Mirena and developed debilitating headache and was diagnosed with benign intracranial hypertension a couple of months after insertion."

Did I read that correctly?

A. Yes.

Q. Does that give you any information about temporality?

A. Yes, it makes me think there is a temporal relationship between Mirena and IIH.

Q. In this case report?

A. Yes.



Q. The final report that was part of Exhibit 23 was Case 2013-080487.

A. Yes.

Q. And does this case contain any information regarding dechallenge? I believe you were discussing earlier -- strike that.

A. I mean on the next page it says the, "Outcome of the event, intracranial hypertension recovered."

Q. Okay. You were asked some questions about -- do you remember there was Exhibit 12, which was some forms of treatment of --

A. Yes.

Q. -- PTC or IIH?

Okay. And you were asked to describe whether there was any treatment, correct?

A. Yes.

Q. And so I believe you -- strike that.

Do you see about --

A. Yeah, the measure was to



remove the hormone coil, Mirena, and lose weight.

Q. Okay. And is there any opinion by the -- listed that the physicians thought about causation? Does this report state, "The physicians thought that the hormone coil in combination with overweight was the reason for the illness"?

A. Yes.

Q. Okay. And then does it state, the measure was to remove the hormone coil, Mirena, and lose weight. Consumer had not succeeded in losing weight though. But since she had the hormone coil removed on 15 April, 2011, consumer was free of the symptoms of the illness."

Did I read that correctly?

A. That's correct.

Q. Okay. Does that have any bearing on your opinion of causality of this case report?

A. I would classify that as a



positive dechallenge.

Q. And you were asked some questions about Exhibit 31 which was an abstract by Dr. Tang and testimony of Exhibit 32 from a prior Mirena case that is not --

MS. NATALE: Huh?

MR. SCHMIDT: I'm talking to Annie.

BY MS. NATALE:

Q. That is not -- is it your understanding that there is a case, Houston v. Bayer, in the Mirena MDL currently in Mirena MDL 2767?

A. Yes. Is that what this is here?

Q. I will retract that question.

MR. SCHMIDT: Asked and answered. I don't think you can retract it.

MS. NATALE: Okay. Well, it's retracted. You can preserve your objection to that.

BY MS. NATALE:
Q. I will represent to you that there is no current case Shenika J. Houston versus Bayer in Mirena MDL 2767. Okay.
Given that proposition -- strike that.
A. I've never seen this till today.
Q. Have you ever -- have you ever seen this document before?
A. No.
Q. Have you reviewed -- are you aware if Dr. Tang has given testimony in more than just this single time -- instance?
A. No, I'm not aware of Dr. Tang's testimony.
Q. Do you have any reason to disagree that she did testify more than once in this -- in Mirena actions?
MR. SCHMIDT: Objection. Foundation, given his last answer.
MS. NATALE: Sure. Fine. I



will withdraw my question and the record will speak for itself.
BY MS. NATALE:
Q. Do you have any understanding of Dr. Tang's testimony on this date or any other given date other than the representations made to you today by Mr. Schmidt?
A. No.
MR. SCHMIDT: Okay. All right. Doctor, you're going to want to keep every exhibit that she shows you in front of you because we are going to walk through every one of them again.
THE WITNESS: I thought you had your seven hours. That's off the record.
MR. SCHMIDT: It just got real.
MS. NATALE: All right. I will object to the extent that you think anything has been reopened. But we'll take it up when we get



there.
MR. SCHMIDT: We're about to get there, I hope.
MS. NATALE: I have no further questions. I'd just like to again preserve for the record my -- plaintiff's objection to numerous exhibits and lines of questioning today. I believe some -- no offense to you, Paul, but some egregious representations, utilization of improper documents without any foundation, and to use of the terms "plaintiffs" and "this litigation" to refer to experts that were not disclosed on December 28, 2017 by the plaintiffs in MDL 2767.
And any other objections that have been made today, I will also obviously preserve.
With that said, I will pass the witness back to you.



MR. SCHMIDT: Before questioning, I'll just say that I politely disagree with what you just said. I more strongly disagree with the accusation of egregious misrepresentations.

\- - -
EXAMINATION
\- - -

BY MR. SCHMIDT:
Q. Doctor, just to follow up on those questions that you were asked.
On Page 3 of your report you were asked about the sentence where you describe your expertise and your view of your qualifications.
A. Yes.
Q. You recognize the federal court judge in this case could disagree with your view as to what you are qualified to address?
A. Yes.
MS. NATALE: Objection to form.

BY MR. SCHMIDT:
Q. And in terms of your expertise regarding drug prescribing, have you ever written a label?
MS. NATALE: Just objection to form.
THE WITNESS: So, I was on the editorial board of the PDR for ophthalmology a few years back. I guess I didn't write a label, but I'm familiar with label writing.
MS. NATALE: Sorry. I just want to restate the object to this line of questioning regarding labeling and regulatory opinions.
MR. SCHMIDT: And I'm just asking this because you went back and covered it.
BY MR. SCHMIDT:
Q. The PDR simply just --
MS. NATALE: It's not --
BY MR. SCHMIDT:
Q. -- reprints labels, correct? It doesn't change labels or write its own



labels, correct?
MS. NATALE: I'll just argue that this is --
THE WITNESS: Yeah.
MS. NATALE: I will object this is beyond the scope of what you believe.
BY MR. SCHMIDT:
Q. Is there ever a time when you've actually written a label?
A. I've never written a label, no.
Q. Is there ever a time that you've been in a position where you've approved a label?
MS. NATALE: Same objection.
BY MR. SCHMIDT:
Q. Acting for a regulatory agency?
A. I don't remember. When I was at the FDA we did a lot of things. I know we negotiated with the pharmaceutical industry on what was going on in the label, and it was a back and



forth.
Q. As a volunteer who was unpaid, did you have any responsibility individually for approving labels?
A. No.
Q. And have you reviewed the full regulatory history in the United States or any other country regarding Mirena and IIH?
A. No.
Q. You were asked some questions about your methodology. Do you remember that?
A. In regards to how I --
Q. Use of the WHO for parts of your methodology, right?
A. Yes.
Q. And you said you used it for the case reports but not for other things, correct?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
BY MR. SCHMIDT:



Q. And for the case reports, I don't see it in your report. Is there anywhere in your report that you purport to classify different Mirena IIH cases according to the WHO criteria of possible, probable?
MS. NATALE: Objection to form.
THE WITNESS: Not yet.
BY MR. SCHMIDT:
Q. Have you done that?
A. Not yet. Not Mirena. Levonorgestrel, we have in the form of Norplant.
Q. Okay. But not for Mirena?
A. Right.
Q. Did you -- I asked you about using the Bradford Hill methodology earlier, right?
A. Yes.
Q. And you said you used something analogous, but you didn't use Bradford Hill. Do you remember that?
A. Yes.

Q. Is there any name that is recognized in the scientific literature for the methodology you used --
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. -- to conclude causation?
A. Yeah. There's a paper in a journal called Drug Safety by Ralph Edwards that sets out the WHO criteria for classifying adverse drug events.
Q. And I'm asking a little broader question. I understand that you used the WHO methodology -- I think you said you didn't use the WHO methodology, right, because you haven't actually rated the cases, correct?
A. For Mirena I haven't, no.
Q. Is -- looking at your broader methodology, is there any methodological approach, term, you would use to describe your broader methodology?
A. I look for a pattern. I think that would be my philosophy on



classifying adverse drug reactions. I would look for a pattern.
Q. You gave an opinion that Mirena more likely than not causes IIH, correct?
A. Yes.
Q. Have you seen that view published anywhere?
MS. NATALE: Objection to form.
THE WITNESS: No.
BY MR. SCHMIDT:
Q. Have you published that view anywhere?
A. No.
Q. Has anyone used a method like the one you used to conclude causation between Mirena and IIH that you can point me to?
A. I can't point you to that for Mirena just yet, no.
Q. And you talked about how you looked at the epidemiological studies, correct?



A. Yes.
Q. And you would agree with me that only one study, one epidemiological study, the Valenzuela study is purported to find an increased risk at a statistically significant level of IIH with Mirena, correct?
A. The Valenzuela study found that, and the Etminan study found -- found a higher rate of IIH in its first report and in its first letter to the editor in response to Friedman.
Q. You're talking about the disproportionality analysis, correct?
A. Yes.
Q. I'm focusing on epidemiology. That was not an observational study, correct?
A. Okay.
Q. If we focus on observational studies, epidemiological studies, the only study to find a statistically significant elevated risk was Valenzuela, correct?



A. I agree with that.
Q. And if you want to look at Exhibit 13, you probably remember this.
MS. NATALE: I'll just object to the extent that we did not review that document on direct examination. It's beyond the scope of the examination.
BY MR. SCHMIDT:
Q. Do you see at the end of the abstract, they state, "Our investigation suggests that women with an LNG-IUS may have an increased risk of developing PTC but does not suggest an LNG-IUS can cause PTC"?
Did I read that correctly?
MS. NATALE: Objection to form.
THE WITNESS: You read that correctly.
BY MR. SCHMIDT:
Q. And you disagree with that?
A. So I agree that's what the authors are saying. It's not my paper.

Page 630

But I, I think it's more likely than not that IIH is caused by Mirena. That's my opinion.

Q. Do you disagree with them that their paper does not suggest an LNG-IUS can cause PTC?

A. Haven't we -- I'm not trying to be a smart aleck. But haven't we spent like two hours on this. Why are you doing the exact same thing again?

Q. Ms. Natale opened it. Do you disagree with that statement?

MS. NATALE: I don't -- I will object to that representation.

THE WITNESS: All right. So we can go round and round about it. But I believe that IIH -- and this is a piece of the evidence, so I take this in addition to everything else that we've looked at, which there is a lot, and I believe that IIH is caused by Mirena.

Page 631

And so if they say that it does not suggest there is a -- it can cause it, then I would disagree with that. But not just because of their paper, but because of the body of evidence would disagree with just that one statement.

BY MR. SCHMIDT:

Q. You were shown Exhibit 2 by Ms. -- by the plaintiffs lawyer.

Do you have that handy?

A. Yes.

MS. NATALE: Objection to form.

BY MR. SCHMIDT:

Q. You were shown a statement on Page 35 about a relationship between PTC and levonorgestrel-releasing implants. Do you remember that?

A. Yes.

Q. And you understand that the data being cited, there's only Norplant data, there's no Mirena-specific data

Page 632

cited there. Do you understand that?

MS. NATALE: Objection to form.

THE WITNESS: What year is this?

BY MR. SCHMIDT:

Q. 2005 -- '6. If you look at the citations, it's 87 and 89. If you look at the back of the article those are two Norplant studies we evaluated.

A. Yes. Norplant.

Q. Not Mirena, correct?

A. Not Mirena.

Q. Look at Exhibit 10. You were asked a couple questions about this Mosher study from 2017.

Do you remember being asked if their IUD data included data on IUDs that have a hormonal effect? Do you remember being asked that question?

A. I remember.

Q. You weren't sure of the answer?

A. I don't know the answer.

Page 633

Q. Let me help you. Look at Page 2, please.

MS. NATALE: Objection to form.

THE WITNESS: Yes.

BY MR. SCHMIDT:

Q. Look at the right-hand column where it says, "Measurement of contraceptive use."

A. Yes.

Q. And do you see about halfway down that middle paragraph, about five lines down from the citation, the 13 and 16, there is a sentence that begins, "While the levonorgestrel."

Do you see that? And if not, I can point it to you?

A. I see 13 and 16.

MS. NATALE: I will just object to your representation that this might help clarify your question.

BY MR. SCHMIDT:

Q. Do you see where it says,

Page 634

"While the levonorgestrel IUD does rely on hormonal effect, we included it in the IUD group for this analysis."
Do you see that?
A. Yes.
Q. Does that suggest to you that they did include LNG-containing IUDs in their IUD group?
MS. NATALE: Same objection, and objection to the characterization of my question. I think the record will stand for itself that the question was actually the opposite.
THE WITNESS: So the levonorgestrel is included in the IUD group in this analysis.
BY MR. SCHMIDT:
Q. Does that answer the question as to whether the IUD group included Mirena?
MS. NATALE: Same objection.
THE WITNESS: I don't remember the original question

Page 635

that I got from Ms. Natale, but basically this just says that levonorgestrel was included in the IUD group for this analysis.
MS. NATALE: I'll preserve for the record that the question was whether the hormonal IUD was --
MR. SCHMIDT: Let's not have a speaking objection, please.
MS. NATALE: That's fine. I believe that you've mischaracterized the question and the answer provided.
MR. SCHMIDT: The record will be what I heard -- what I heard. I don't think it's a case-changing point.
BY MR. SCHMIDT:
Q. Let's look at Page 5 where the table is.
A. Okay.
Q. Is it your understanding that when this lists data for IUDs, that

Page 636

includes Mirena?
A. From that statement it probably does.
Q. And you were asked some questions about whether the first two adjusted odds ratios for the first two BMI groups were statistically significant. Do you remember that?
A. Yes.
Q. You weren't asked whether the third one was statistically significant, were you?
A. No.
Q. That's the one for the highest BMI group, correct?
A. Yes.
Q. And so let me ask you. Is the highest BMI group at a statistically higher rate with Mirena patients than with oral contraceptive patients?
MS. NATALE: Objection to form.
THE WITNESS: Yes.
MS. NATALE: And

Page 637

characterization. Misstates the document.
BY MR. SCHMIDT:
Q. Of those three BMI groups, the 25 to 29, 30 to 35, 35 and up, which one would you expect to have the highest background rate of IIH?
MS. NATALE: Objection to form. Foundation. Calls for speculation.
THE WITNESS: Do I speculate?
BY MR. SCHMIDT:
Q. Based on the data that you've seen. If you don't know based on the data that you've seen, let me know.
A. I would speculate that the -- that the higher BMI would have more IIH.
Q. That's because the data tells us that as BMI increases, IIH rates increase, correct?
MS. NATALE: Objection to form.

Page 638

THE WITNESS: Based on this, it looks that way.
BY MR. SCHMIDT:
Q. And what this tells us is that you are more likely to get Mirena if you have a high -- the highest BMI correct?
MS. NATALE: Objection to form.
THE WITNESS: I don't know.
BY MR. SCHMIDT:
Q. You don't know what that statistically significant finding that you were not shown on the plaintiffs' lawyers examination means?
MS. NATALE: Objection to form.
THE WITNESS: I don't know what you're asking.
BY MR. SCHMIDT:
Q. Does this article support the proposition that patients at the highest BMI level are more likely to be prescribed Mirena than patients who have

Page 639

an average BMI?
MS. NATALE: Objection to form. Characterization. Foundation. And to the extent that this document has nothing to do with IIH or IIH risk factors.
THE WITNESS: So I just read that the 35 kilograms per metered square and up have a higher odds ratio. That's what I read.
BY MR. SCHMIDT:
Q. And higher odds ratio, do you see at the beginning of BMI, the reference category, the comparison for that odds ratio is people with a BMI of less than 25.
Do you see that?
A. Show me that.
Q. Just right here, sir.
A. Okay. I see that.
Q. So this is comparing in the statistically significant finding people who have the highest BMI classification with people who have a BMI that puts them

Page 640

in the normal range, less than 25, correct?
A. Okay.
Q. And so what this tells us is according to this data, patients who have the highest BMI are statistically significant more likely to use Mirena than patients who have a BMI below 25, correct?
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. According to this data?
MS. NATALE: Object to form.
THE WITNESS: I don't know.
BY MR. SCHMIDT:
Q. You don't know how to read this data?
A. I don't know how to read that data.
Q. Come with me if you would to Exhibit 14. You were asked a question about Table 1 in Exhibit 14.
A. Table 1. Got it.

Page 641

Q. And specifically the sentence at the bottom with the double paragraph sign for Connecticut, et cetera. "Text responses for other contraceptions were evaluated and reclassified into appropriate categories when possible."
Do you see that?
A. Yes.
Q. Does that lead you to question that data at all?
MS. NATALE: Objection to form. Vague, "et cetera."
BY MR. SCHMIDT:
Q. The fact that they got additional data where they could and acted on it?
MS. NATALE: Objection to form.
THE WITNESS: Text responses for other -- I don't know -- ask your question again. I don't know what the question is.
BY MR. SCHMIDT:

Q. Do you know how the plaintiff lawyer showed you that sentence that I just pointed you to?
A. Yes.
Q. Does that sentence cause you to question the accuracy of the Utah data in this table at all?
MS. NATALE: Objection to form.
THE WITNESS: No.
BY MR. SCHMIDT:
Q. Come with me if you would to Exhibit 23. This is the four rechallenge reports.
MS. NATALE: Dechallenge.
MR. SCHMIDT: Dechallenge. I'm sorry. Thank you.
BY MR. SCHMIDT:
Q. Do you have that in front of you?
A. Yes.
Q. It looks like you only got part of it. You got it all? Sorry, sorry. You were not asked questions



about the first one. So let me move onto the next one, the one ending in 308. Do you have that there?
A. Yes.
Q. On the second page, maybe five or six lines down, it says, "Causality as reported by the gynecologist, none."
Do you see that?
A. Yes.
Q. Do you take issue with the causality report from the gynecologist?
MS. NATALE: Objection to form.
THE WITNESS: I don't take issue with it.
BY MR. SCHMIDT:
Q. Okay. Do you have any, if you look in the next paragraph, it states that the gynecologist at the end does not have any information -- does not have information about any possible new drugs prescribed for treatment.
Do you see that?



A. Yes.
Q. So are you able to rule out the fact that this patient was receiving treatments that account for her improvement in IIH?
A. I can't rule it out.
MS. NATALE: Objection to form.
BY MR. SCHMIDT:
Q. Look at the next one, 65106.
A. Yes.
Q. Now, this is not a -- actually I'm mixing my reports up.
This is the one that on the cover, it talks about headaches beginning a couple months after insertion.
Do you see that? On the cover, up in the top box?
A. Yes.
Q. If you look at the next page, it says in the third paragraph that the patient had the IUD inserted five years before the time of reporting.
MS. NATALE: Objection to



form.
BY MR. SCHMIDT:
Q. Do you see that?
A. Yes.
Q. And it then repeats a couple months after insertion, she went to the hospital.
Is it clear to you what the timing of the Mirena insertion versus the headaches versus the removal was in this case?
A. It was not entirely clear.
MS. NATALE: Objection to form and just to "reporting." Characterization.
BY MR. SCHMIDT:
Q. If you look, is it accurate to say this is a doctor who had a friend who told them about a case and the doctor then reported it?
A. This spontaneous report was received from a physician in Australia via company sales representative.
Q. The report refers to the

female friend of the reporter.
Do you see that?
A. Yes.
Q. And so for example, the doctor was missing a lot of information about this report, right?
MS. NATALE: Objection to form.
THE WITNESS: The -- so I don't -- I don't know -- I'm supposed to tell you what the doctor missed? I just have -- what's on the reports is what I have.
BY MR. SCHMIDT:
Q. Well, the doctor said -- look in the second paragraph on the second page. Doctor said patient had no relevant medication or medical history.
Do you see that?
A. Yes.
Q. And from that, can you tell whether the patient received any medical treatment for her IIH?



MS. NATALE: Objection to form.
THE WITNESS: I can't tell from that.
BY MR. SCHMIDT:
Q. Okay. Is it standard of care to provide medical treatment for IIH when patients report with it? Do you know?
MS. NATALE: Objection to form.
THE WITNESS: You can -- you can lose vision and have neurological deficits if it's severe, so you are going to want to treat it.
BY MR. SCHMIDT:
Q. And what's the customary form of treatment?
A. There's a lot of forms of treatment.
Q. Is Diamox standard of care?
A. Could be.
Q. I'm missing one of my



reports here. Let's look at the last one, the 180487.
Do you see that?
A. Yes.
Q. And this one was not reported by a doctor, correct?
A. This report came from a 30-year-old female consumer.
Q. Right. So it's not from a doctor, correct?
MS. NATALE: Objection to form.
THE WITNESS: It doesn't appear to be from a doctor.
BY MR. SCHMIDT:
Q. And this is the patient we talked about earlier who was obese, right?
A. Let's see. The weight is unknown that I see on the front here.
Q. Look at the top of the second page.
A. So, yes. BMI of 36.
Q. And it says, "No information



was given on the consumer's medical history, drug history. It was not reported whether consumer received any concomitant medication."
Do you see that?
A. Yes.
Q. Do we know in this case whether the patient had other treatment that might account for her symptoms improving?
A. No.
Q. And is there any data in here beyond this patient saying I think I have IIH that it was actually medically confirmed?
A. I just have that report. I don't -- medically confirmed is -- it wasn't reported by a doctor.
Q. Is there any indication that the patient even saw a doctor and had a medically confirmed case of IIH with, for example, a lumbar puncture or something else?
MS. NATALE: Objection to

form.
THE WITNESS: I don't -- I don't know what happened in her case.
BY MR. SCHMIDT:
Q. Let's look at Exhibit 32.
MS. NATALE: I will object to, again, the extent that any questioning goes beyond the scope of the direct examination and again preserve any objections to this document as a whole.
BY MR. SCHMIDT:
Q. You were asked questions about representations I made about Dr. Tang's testimony, correct?
A. Representations about Dr. Tang's testimony. You showed me a couple of paragraphs in there.
Q. I showed you her actual testimony, right?
MS. NATALE: Same objection. I will preserve and to the mischaracterization.



THE WITNESS: You showed me her deposition and two paragraphs, yes.
MR. SCHMIDT: I'll stop there.
MS. NATALE: I just have two additional questions based on your redirect.
\- - -
EXAMINATION
\- - -
BY MS. NATALE:
Q. If you go back to Exhibit 23 quickly and the Report Number 2013- sorry. It was called 65106. It's the one that -- give me one second.
MS. NATALE: I'm not sure the order anymore, Paul, but it's the one -- 065106.
BY MS. NATALE:
Q. The third in Exhibit 23.
A. I'm looking. I've become lost.
Q. Is that 23?



A. Yes.
Q. Okay. So the report that ends in 065106. Can you find that?
A. What number is that one in there?
Q. The third one?
A. Third one, I got it.
Q. Okay. So you were -- you testified that this, based on this case report, that the patient was diagnosed with benign intracranial hypertension a couple months after insertion of that -- strike that.
Did you testify that based on this case report, the benign intracranial hypertension was diagnosed a couple months after insertion?
A. Yes. It says here that she developed a debilitating headache and was diagnosed with benign intracranial hypertension a couple months after insertion.
Q. Okay. And you were asked by Mr. Schmidt, this is the one -- strike



that.
You were asked by Mr. Schmidt, if you look at the next page it says in the third paragraph that the patient had the IUD inserted five years before the time of reporting. Did I -- do you recall that?
MR. SCHMIDT: Object to characterization.
MS. NATALE: I will represent --
THE WITNESS: Yes.
MS. NATALE: I'm reading the transcript right now. And I will represent that Mr. Schmidt asked if you look at the next page it says in the third paragraph that the patient had the IUD inserted five years before the time of reporting. Okay. I'm representing that to you.
THE WITNESS: Yes.
BY MS. NATALE:
Q. Does that indicate that the

event occurred five years after time of insertion?

A. No.

Q. Okay. It states that the event happened about five years by time of reporting; is that correct?

A. Yes.

MS. NATALE: Okay. I have no further questions.

\- - -

EXAMINATION

\- - -

BY MR. SCHMIDT:

Q. Stick with that one, Doctor. This is the report where the patient tells her friend who happens to be a doctor about her case five years ago and the doctor then reports it, correct?

MS. NATALE: Objection to form.

THE WITNESS: Yes.

BY MR. SCHMIDT:

Q. And I take it as a truism that when someone recites the facts of



their case five years later, and then a doctor recites it, you've got, again, a telephone where mistakes can be made, correct?

MS. NATALE: Objection to form.

THE WITNESS: Five years is a long time.

BY MR. SCHMIDT:

Q. And we can't place any weight on the fact that there's no reported medical treatments for the IIH in here. That doesn't mean that they didn't occur in the patient, just didn't report it or didn't remember it, correct?

MS. NATALE: Objection to form.

THE WITNESS: Yes, that -- I've answered that.

MR. SCHMIDT: Thank you.

MS. NATALE: No further questions.

MR. SCHMIDT: Thanks, Doctor.



THE VIDEOGRAPHER: Stand by, please. This marks the event of today's deposition. The time is 6:21 p.m. Off the record.

(Excused.)

(Deposition concluded at approximately 6:21 p.m.)



CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, FREDERICK W. FRAUNFELDER, M.D., MBA, have the opportunity to read and sign the deposition transcript.

________________________________
MICHELLE L. GRAY,
A Registered Professional
Reporter, Certified Shorthand
Reporter, Certified Realtime
Reporter and Notary Public
Dated: January 26, 2018

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.



\- - - - - -
E R R A T A
\- - - - - -

PAGE LINE CHANGE

____ ____ ____________________________
REASON: ____________________________
____ ____ ____________________________
REASON: ____________________________
____ ____ ____________________________
REASON: ____________________________
____ ____ ____________________________
REASON: ____________________________
____ ____ ____________________________
REASON: ____________________________
____ ____ ____________________________
REASON: ____________________________
____ ____ ____________________________
REASON: ____________________________
____ ____ ____________________________
REASON: ____________________________
____ ____ ____________________________
REASON: ____________________________
____ ____ ____________________________
REASON: ____________________________



ACKNOWLEDGMENT OF DEPONENT

I,_____________________, do hereby certify that I have read the foregoing pages, 1 - 661, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

______________________________________
FREDERICK W. FRAUNFELDER, M.D., MBA
DATE

Subscribed and sworn
to before me this
_____ day of ______________, 20____.
My commission expires:______________

___________________________________
Notary Public



LAWYER'S NOTES

PAGE LINE

____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________
____ ____ ____________________________