# Exhibit 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE:
MIRENA IUS
LEVONORGESTREL-RELATED
PRODUCTS LIABILITY 17-MD-2767(PAE)
LITIGATION (NO.II) 17-MC-2767(PAE)

This Document Relates to
All Actions

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Friday, February 2, 2018

VIDEO DEPOSITION OF LEMUEL MOYE, M.D., PH.D. held at the offices of the Pulaski Law Firm, 2925 Richmond Avenue, Houston, Texas, commencing at 8:33 a.m., on the above date, before Rene White Moarefi, Texas Certified Shorthand Reporter, Certified Realtime Reporter, Certified LiveNote Reporter, Louisiana Certified Court Reporter, and Notary Public in and for the State of Texas.

— — —

GOLKOW LITIGATION SERVICES
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

A P P E A R A N C E S

KENNERLY LOUTEY, LLC
BY: MAX KENNERLY, ESQ.
Msk@thlawyer.com
601 Walnut Street, Suite 1150 West
Philadelphia, Pennsylvania 19106
215.261.7070
Counsel for Plaintiffs

PULASKI LAW FIRM
BY: LESLIE LaMACCHIA, ESQ.
Llamacchia@pulaskilawfirm.com
2925 Richmond Avenue, Suite 1725
Houston, Texas 77098
713.664.4555
Counsel for Plaintiffs

THE SNAPKA LAW FIRM
BY: KATHRYN SNAPKA, ESQ.
Ksnapka@snapkalaw.com
606 N. Carancahua, Suite 1511
Corpus Christi, Texas 78403
361.888.7676
Counsel for Plaintiffs

COVINGTON & BURLING, LLP
BY: PAUL W. SCHMIDT, ESQ.
Pschmidt@cov.com
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405

ANNIE X. WANG, ESQ.
Awang@cov.com
850 Tenth Street, N.W.
Washington, D.C. 20001-4956
202.662.6000
Counsel for Defendants

Also Present:
MR. DOUG OVERSTREET - VIDEOGRAPHER



I N D E X


PAGE

LEMUEL MOYE, M.D., Ph.D.

EXAMINATION
BY MR. SCHMIDT........................ 7
BY MR. KENNERLY....................... 281

CERTIFICATE.............................. 307
LAWYER'S NOTES............................ 308

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Expert Report of Lemuel A. Moye, M.D., Ph.D.; no Bates, 48 pages | 8 |
| Exhibit 2 | Handwritten list of causes of PTC; no Bates, 1 page | 13 |
| Exhibit 3 | BfArM Response Document Bates stamped MIR_IIH_EU00606946 to MIR–IIH–EU00607040 | 24 |
| Exhibit 4 | Handwritten list of risk factors for PTC; no Bates, 1 page | 29 |
| Exhibit 5 | Article titled "Profiles of Obesity, Weight Gain, and Quality of Life in idiopathic Intracranial Hypertension"; no Bates, 8 pages | 34 |
| Exhibit 6 | Article titled "Idiopathic Intracranial Hypertension"; no Bates, 10 pages | 47 |
| Exhibit 7 | List of products; no Bates, 2 pages | 53 |





| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8 | Article titled "Obesity and contraceptive use among women 20-44 Years of Age in the United States: Results from the 2011-15 National Survey of Family Growth (NSFG)"; no Bates, 7 pages | 58 |
| Exhibit 9 | ACOG Practice Bulletin; no Bates, 20 pages | 64 |
| Exhibit 10 | Article titled "Two-year continuation of intrauterine devices and contraceptive implants in a mixed-payer setting: A retrospective review"; no Bates, 8 pages | 70 |
| Exhibit 11 | Article titled "Does body mass index or weight perception affect contraceptive use?"; no Bates, 6 pages | 71 |
| Exhibit 12 | Article titled "Levonorgestrel Intrauterine Device Use in Overweight and Obese Women"; no Bates, 6 pages | 71 |
| Exhibit 13 | Handwritten list of lines of evidence; no Bates, 1 page | 77 |
| Exhibit 14 | Article titled "An Estimation of the Risk of Pseudotumor Cerebri Among Users of the Levonorgestrel Intrauterine Device"; no Bates, 6 pages | 78 |
| Exhibit 15 | Article titled "An Update on Idiopathic Intracranial Hypertension"; no Bates, 21 pages. | 95 |
| Exhibit 16 | Curriculum Vitae; no Bates, 31 pages | 105 |
| Exhibit 17 | Notice of Videotaped Deposition of Lemuel A. Moye, M.D., Ph.D.; no Bates, 6 pages | 104 |





| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 18 | Additional Documents Reviewed; no Bates, 2 pages | 106 |
| Exhibit 19 | Additional Published Literature Reviewed; no Bates, 3 pages | 106 |
| Exhibit 20 | IUA-IIH-MDL Report - Month to Date, 9-1-2017 through 9-30-2017; no Bates, 5 pages | 110 |
| Exhibit 21 | Reference Manual on Scientific Evidence; no Bates, 17 pages | 113 |
| Exhibit 22 | Excerpts from "Statistical Reasoning in Medicine, The Intuitive P-Value Primer"; no Bates, 17 pages | 116 |
| Exhibit 23 | Article titled "The Environment and Disease: Association of Causation?"; no Bates, 6 pages | 128 |
| Exhibit 24 | Article titled "The use of the WHO-UMC system for standardized case causality assessment"; no Bates, 3 pages | 132 |
| Exhibit 25 | Handwritten list of limitations of Valenzuela; no Bates, 1 page | 141 |
| Exhibit 26 | Article titled "Contraceptive Use Among Nonpregnant and Postpartum Women at Risk for Unintended Pregnancy, and Female High School Students, in the Context of Zika Preparedness - United States, 2011-2013 and 2015; no Bates, 9 pages | 192 |
| Exhibit 27 | Article titled "Contraceptive use in the Nordic countries"; no Bates, 10 pages | 197 |

Exhibit 28 Article titled "Changes in Use of Long-Acting Reversible Contraceptive Methods Among U.S. Women, 2009-2012"; no Bates, 17 pages 198

Exhibit 29 Suspect Adverse Reaction Report - New Zealand; no Bates, 31 pages 231

Exhibit 30 Suspect Adverse Reaction Report - Switzerland; no Bates, 12 pages 239

Exhibit 31 Article titled "Idiopathic intracranial hypertension: A unifying neuroendocrine hypothesis through the adrenal-brain axis"; no Bates, 5 pages 251

Exhibit 32 Expert Report of Conrad Johanson, Ph.D.; no Bates, 52 pages 259

Exhibit 33 Article titled "Molecular mechanisms of steroid receptor-mediated actions by synthetic progestins used in HRT and contraception"; no Bates, 17 pages 263

Exhibit 34 Article titled "Serious Adverse Events in Norplant Users Reported to the Food and Drug Administration's MedWatch Spontaneous Reporting System"; no Bates, 5 pages 270




THE VIDEOGRAPHER: Okay. We're now on the record. My name is Doug Overstreet. I'm the videographer for Golkow Technologies.
Today is February 2nd, 2018. It's 8:33 a.m. This -- this video deposition is being held in Houston, Texas, in the matter of Mirena Products Liability Litigation for the US District Court, Southern District of New York.
The deponent is Lemuel Moye. The court reporter is Rene Moarefi. She'll now swear in the witness.
(Witness sworn.)
MR. SCHMIDT: Then I'll kick us off. My understanding is that this deposition is subject to the provisions of the protective order in this case. I'll just put that on the record, along with my understanding that everyone in the room is bound by that protective order and ask if anyone is not bound by the protective order, let me know so we can proceed accordingly. Hearing nothing.
LEMUEL MOYE, M.D., Ph.D.
having been duly sworn, testified as follows:
EXAMINATION
BY MR. SCHMIDT:
Q. Dr. Moye, it's good to meet you. I introduced



myself before we started. My name is Paul Schmidt. I represent Bayer in this case. And let me start off by marking a copy of your report as an exhibit.
MR. SCHMIDT: And if it's okay, I'll steal all these.
(Exhibit 1 marked.)
Q. (BY MR. SCHMIDT) I've put in front of you Exhibit 1, your report in this litigation. I want you to have it so that --
A. Sure.
Q. -- you can refer to it if you need it. I'm going to obviously ask you a lot of questions about it throughout the course of the day. Sometimes specific, sometimes general.
Let me just start off by asking: Are you in a position where you're ready to give your final opinions in this case?
MR. KENNERLY: Object to the form.
You can answer.
A. I would say this. I'm always learning, so to the degree to which I have understood this material, it is represented in this report and I'm prepared to respond to questions based on that.
Q. (BY MR. SCHMIDT) Let me try it this way, then. Are you prepared to answer questions based on all the



material in your report?
A. I am.
Q. Okay. Is there anything in your always learning -- further learning that you have learned about that is not reflected in your report that you would like to testify about?
MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) Or that you plan to testify about?
A. I certainly don't plan to testify about anything in this report. However, based on the questions that you ask, we may go outside the bounds of the report.
Q. Okay. And just so I -- I hope you understand that we will object to you going outside the bounds of the report, but I understand what you're saying.
So I have it, as we sit here right now, there are no opinions that you intend to offer that are not contained in the report at this time; is that correct?
A. That is correct.
Q. Okay. And there are no changes that you've made to your report since the time you prepared it, correct?
A. That's correct.
Q. Let's start off with -- with the meat of -- of your report, and I want to just get a terminology point behind me. I think you address this in your report.

There are different ways of referring to the disease at issue in this case. My own preference, which I see that you've written in your report on that, is to use the term "idiopathic intracranial hypertension." That's very destructive for the court reporters, because I say IIH and sometimes they miss a letter from it.
A. Uh-huh.
Q. So I'm going to use the term for -- for sake of ease pseudotumor cerebri or PTC, because I think that's cleaner for them with the fast talking questioner on the transcript. But you know when I use the term "pseudotumor cerebri" or "PTC" what I'm referring to, correct?
A. That's correct.
Q. Okay. And do you consider yourself to be an expert in the causes of PTC?
A. Yes.
MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) And is that true just as to Mirena or more broadly?
A. I think more broadly.
Q. So let me start off by doing this, then. You talk in your report -- and I'll -- again, I don't want to be asking you about details in your report without you having the chance to look at it. If you look at page 24 of your report and Paragraph 93, you will see that there's


language where you talk about intracranial hypertension as a disease with multiple causes, one of those causes is Mirena. Do you see where I'm referencing?
A. Yes, sir.
Q. Can I pass you a piece of paper and ask you to write down for me the other causes of PTC?
A. Sure. I mean, they're right in my affidavit.
Q. Okay.
MR. KENNERLY: Object to the form.
A. (Witness complies.)
Q. (BY MR. SCHMIDT) And, sir, while you're doing that, you're referring to a specific part of your report. I'm desperately trying to see which part that is.
A. I actually wrote it down on here.
Q. Okay.
A. It's Paragraph 101.
Q. Thank you.
A. Right. Writing it is easy. Reading it is another matter.
Q. That's the problem with doctors. Thank you.
So, Doctor, just so I have it, as -- as I read what you've written Under Causes of PTC, it says from Paragraph 101, "SLE, chronic kidney disease, hormonal therapy, vitamin A toxicity, antibiotics, minocycline, Bechet's disease," B-e-c-h-e-t's, "arteriovenous


malformations, extracranial venous hypertension secondary to cardiac septal defect, uremia, and iron deficiency anemia"; is that correct?
A. Yes, sir.
Q. All of those you believe are causes of PTC?
A. I would say all of those are believed to be causes of PTC.
Q. Okay. And do you base that on having surveyed the literature on each of those topics, or do you base that on review articles?
A. On review articles.
Q. Okay. Have you conducted a survey of literature on these different agents as causes of PTC?
A. I have not conducted an evaluation -- a literature evaluation for each and every one of those, correct.
Q. In any of the sources where you have seen these identified as causes of PTC, have you seen Mirena identified as a cause of PTC?
MR. KENNERLY: Object to the form.
A. I don't remember.
Q. (BY MR. SCHMIDT) Can you point me to any sources you have seen that specifically identify Mirena as a cause of PTC --
MR. KENNERLY: Object to the form.


Q. (BY MR. SCHMIDT) -- whether -- these sources or anywhere else?
A. No.
Q. Are you aware of any published -- I'm sorry -- strike that.
Are you aware of any regulatory agencies like the US Food & Drug Administration or regulatory agencies in other countries that have determined that Mirena is a cause of PTC?
MR. KENNERLY: Object to the form.
A. I don't know one way or the other. I haven't looked.
(Exhibit 2 marked.)
Q. (BY MR. SCHMIDT) Okay. Now, I've gone ahead and -- I don't know if I said this for the record -- marked your list of causes of PTC as Exhibit 2. And I want to ask you about something that's not listed on here. I did not see in your report. And, in fact, I think you say the opposite. I can point you to the language. Obesity listed as a cause of PTC. Am I correct in that?
A. Yes, sir.
Q. Okay. And, in fact, I think if you look at Paragraph 103, about two-thirds of the way down the paragraph, you make the opposite statement, that obesity is not a cause of IH. Do you see that?

Page 14

A. I do.
MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) Is it correct in your view that obesity is not a cause of PTC?
A. That's correct.
Q. And what makes you say that? What makes you rule it out?
A. Well, three things: No. 1, I don't see -- I don't see any strong epidemiologic study, any observational study that would suggest that obesity is a cause of PTC. No. 2, there is no known mechanism for obesity being a cause of PTC. And the third is that there is -- there is no ecologic evidence that obesity is a cause of PTC.
Q. And what do you mean by "ecologic evidence"?
A. I mean, for example, that we -- I believe we all understand, and I will represent, that we have an obesity epidemic in this country. And that for several decades, obesity has been on the rise.
Now, we certainly understand that obesity causes diabetes. We understand the mechanism, No. 1, and we say that as obesity increases generally across the nation. So has diabetes mellitus, talking about type 2 diabetes. We don't see anything like that generally for PTC in obesity.

Page 15

Q. Okay. Let me try to break down those three points you raised, epi study, mechanism, ecologic evidence. Sticking with the ecologic evidence, has -- have PTC rates increased as you note with increases in the weight of the US population?
A. I have found no evidence of that.
Q. Do you know when Mirena was approved in the United States?
A. I don't know the exact year, no.
Q. Do you know if it's the last 10 years, 20 years, 30 years?
A. I think it's older than ten years.
Q. But not beyond that?
A. I don't know.
Q. Okay. Have you conducted any review of whether PTC rates have increased with increasing usage of Mirena?
MR. KENNERLY: Object to the form.
A. Say the question again, please.
Q. (BY MR. SCHMIDT) Sure. Have you conducted any review of whether PTC rates in the US or in any other country have increased in connection with increasing use of Mirena?
MR. KENNERLY: Object to the form.
A. I'm not sure I know how to answer that. I will say that I've seen case control studies looking at Mirena

Page 16

and -- and PTC. But they -- they are not longitudinal studies.
Q. (BY MR. SCHMIDT) Okay. That's what I'm asking about.
A. Uh-huh.
Q. You a moment ago talked about how diabetes rates have increased as obesity has increased. Do you remember that?
A. Yes, sir.
Q. Has -- have PTC rates increased as Mirena use has increased?
A. I see no evidence of that.
Q. Okay. And am I correct from your diabetes example that it is a relevant factor in causation if as a risk factor increases, rates of the disease increase in the population?
A. Ask me that again, please.
Q. Sure. Am I correct in understanding from your testimony that it is a relevant factor in assessing causation if it's the case that as the risk factor exposure increases in the population, the disease increases in the population?
A. It's -- it is a -- it is a -- a helpful contributory observation, yes.
Q. Okay. Now, the other two points you mentioned

Page 17

were an epidemiological study and a mechanism. Have you studied the mechanistic literature on obesity and PTC?
A. I believe I have.
Q. Do you know if obesity is linked to aldosterone levels in the body?
MR. KENNERLY: Object to the form.
A. I would answer it this way: There's a relationship between obesity and aldosterone levels. However, the directionality seems to be more aldosterone driving obesity than the -- driving weight gain than the reverse.
Q. (BY MR. SCHMIDT) Is that established or hypothetical what you just told me?
A. It's established.
Q. Okay. Is -- are aldosterone levels linked to PTC, in your view?
A. Yes, they are.
Q. How is that?
A. They are because -- well, aldosterone activity is linked to PTC in my view, that's correct.
Q. And -- and how is that?
MR. KENNERLY: Object to the form.
A. You're asking me what the mechanism is?
Q. (BY MR. SCHMIDT) Yes.
A. Sure, okay. Well, it has to do with the

Page 18

activation of mineralocorticoid receptors in the -- the luminal section of the cuboidal cells and the choroid plexus.
Q. Okay. May I see if I have your view, and I think you set forth a little bit of that in your report. Is it your view that aldosterone has the potential to influence the mineralocorticoid receptor and that in turn can lead to elevated levels of -- of CSF or cerebrospinal fluid?
MR. KENNERLY: Object to the form.
A. Through moment of sodium in water, yes.
Q. (BY MR. SCHMIDT) Okay. And that in turn is the hallmark symptom of PTC, correct?
A. Increased CST pressure, yes, sir.
Q. Okay. Is it known whether aldosterone is an agonist or an antagonist to -- I'm going to refer to it as MR receptors, short for mineralocorticoid receptors, if that's okay. Is that okay?
A. Yes, sir.
Q. Okay. So let me reask my question having muddied it up with all that verbiage. Is it -- is it known whether -- whether aldosterone is a agonist or an antagonist at the MR --
MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) -- site?
A. Aldosterone is an agonist.

Page 19

Q. Okay. And just so we have this for the record, an agonist is something that increases activity, an antagonist is something that reduces activity, correct?
A. Yes, sir.
Q. And so am I correct --
(Comments off the record.)
Q. (BY MR. SCHMIDT) Is it known whether -- I'm sorry -- strike that.
Am I correct in understanding your view to be that aldosterone has agonist activity at the MR and that in turn promotes increased levels of CSF?
A. Yes, sir.
Q. If aldosterone were an antagonist at the MR, what would be the effect of that in terms of CSF?
MR. KENNERLY: Object to the form.
A. It's a little difficult to ask that, because the MR receptors are kind of made for aldosterone, so we're reversing physiology here.
Q. (BY MR. SCHMIDT) Okay. Let me try the question differently.
A. Okay.
Q. What would an antagonist do at the MR site?
A. Typically, an antagonist blocks the -- well, pharmaceutical antagonist -- block the action of aldosterone.

Page 20

Q. What would an antagonist -- if something were an antagonist as to the MR site, what would it do to the MR site, block activity at the MR site?
A. It would block activity at the MR site, that's correct, yes.
Q. And would that have the effect of reducing CSF levels?
MR. KENNERLY: Object to the form.
A. It would have the -- it would have the effect of reducing the flow of salt and water, yes. And if we're talking about CSF, then, yes, because most of the MR receptors are on the luminal side, then, yes.
Q. (BY MR. SCHMIDT) And is it -- is it -- am I correct that it's your view -- let me just see if I have this right, and I'm probably going to get it wrong, so please follow me closely on this one.
Am I correct that it is your view that aldosterone increases obesity levels rather than obesity levels increasing aldosterone?
A. It is my view that aldosterone promotes weight gain. And I appreciate obesity can be a more complex disease process than simply weight gain, but aldosterone promotes weight gain.
Q. Does weight gain independently promote aldosterone levels?

Page 21

MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) And to kind of simplify it, if I sit in a room and eat all day, as I would be -- want to do if I were not employed, are my aldosterone -- would you expect my aldosterone levels to increase?
A. I would say I would not expect it based on eating. I would expect it based on sodium and water intake, but not on eating.
Q. So if I increase my sodium and water intake as part of overeating --
A. Yes.
Q. -- that would increase my aldosterone levels?
A. Well, what it would do would be to -- since aldosterone is -- its job is to promote sodium and water absorption, a saltwater load would decrease aldosterone activity and therefore increase natriuresis -- sorry, n-a-t-u-r-e-s-i-s, I think -- increase sodium excretion and water and urine.
Q. Let me -- let me see if I have your answer. If I just simply increased my intake of food and in the process increased my intake of sodium and water, would that increase or decrease my overall aldosterone levels?
A. It would be based on sodium and water. It would decrease aldosterone levels.
Q. It would decrease. Okay.

Now, on the epi point that you mentioned, are you aware of any epidemiological studies that evaluate whether there is a elevated risk of -- or a statistically significant risk of PTC with weight gain?
MR. KENNERLY: Object to the form.
A. I have read several studies that examine the relationship between obesity and PTC, yes.
Q. (BY MR. SCHMIDT) And would it be a correct statement from your point of view to say that there are multiple studies that show a statistically significant elevated risk of PTC with obesity?
MR. KENNERLY: Object to the form.
A. I would say this, that there are studies that demonstrate that women with PTC tend to be heavier than normal. I would certainly say that that is true.
Q. (BY MR. SCHMIDT) Okay. At a statistically significant level?
A. I'd have to look at the exact literature to be sure.
Q. Is that something that you have done?
A. I've looked at -- I've looked at some, yes.
Q. Okay. Have you purported to do a -- the kind of comprehensive survey you'd want to do of the literature on obesity and PTC to be able to give an opinion on causation between obesity and PTC?



MR. KENNERLY: Object to the form.
A. I believe I have, yes.
Q. (BY MR. SCHMIDT) Okay. Let's look at one of those studies. Do you know -- while I'm pulling this up, do you have in your head what the odds ratio is for either being overweight or obese and having PTC? Do you know the magnitude of it?
MR. KENNERLY: Object to the form.
A. I wouldn't do it from memory, no.
Q. (BY MR. SCHMIDT) Okay. You don't know if it's a doubling of the risk, a tenfold of the risk or --
A. Well, I would say it certainly is not a tenfold of the risk, but I don't know what it is.
Q. Let me actually -- before I do this, you -- you do recognize that there are case reports of obesity in PTC, correct?
A. Yes, sir.
Q. And many of the Mirena case reports that you have looked at could also be viewed as case reports of either recent weight gain and PTC or obesity and PTC, correct?
MR. KENNERLY: Object to the form.
A. Absent any other knowledge about the problem, I could -- I would say a naive point of view would suggest that, but, in general, I would say it does not.
Q. (BY MR. SCHMIDT) Okay. In your review -- let me



try the question this way, then.
Would you ever treat -- you make reference in your report to a report that Bayer prepared for the German regulatory authorities. Do you recall that?
A. Yes, sir.
Q. And I take it that's something you studied in some detail?
A. Yes, sir.
Q. I'm going to mark that as Exhibit 3, please.
(Exhibit 3 marked.)
Q. (BY MR. SCHMIDT) And I'm not going to spend a lot of time with this, but is Exhibit 3 the German regulatory report we just talked about?
A. It is.
Q. If you look at page 46, you will recall from the report that there's a good bit of discussion about case reports. Do you remember that?
A. Yes, sir.
Q. Specifically, the case reports that Bayer received regarding PTC and Mirena, correct?
A. Yes, sir.
Q. Look with me, if you would, at page 46. Do you see that there's a discussion on page 46 about the BMI weight data from those case reports?
A. At the bottom of the page, yes.



Q. Yes, sir. And if you look at the last sentence, it says, "In more than 90 percent of cases, 90 of 99 cases, in which information on BMI or body habitus were available, the patients were overweight or obese or the patients reported recent weight gain before diagnosis of IH."
Did I read that correctly?
A. I would like your forbearance. I just need a moment to read the entire paragraph.
Q. Sure. And my question about that after you've read it is simply did I read that sentence correctly?
A. Okay.
Yes, you read it correctly.
Q. And my question to you is, I guess, two points. One is in a number of case reports, there's no data on weight gain or weight overall; is that correct?
A. That's correct.
Q. And that's not unusual with case reports, they're often lacking information you might want to have, correct?
A. That's true.
Q. But the statistic that's given here in over 90 percent of cases where there was that data, there was either data indicating that the patient was overweight, obese, or had recent weight gain before their diagnosis of PTC.

Page 26

As a factual matter, have you done any analysis that causes you to take issue with that statistical point, that where the data's available in over 90 percent of cases, the patient had recent weight gain, was overweight, or was obese?

MR. KENNERLY: Object to the form.

A. So let me try to answer you this way. Are you asking me specifically have I done an analysis? The only analysis I've done has been to read BfArM and some of the articles in BfArM. I -- so is there another part to your question?

Q. (BY MR. SCHMIDT) Yeah. Do you take any issue with that -- with that factual proposition that where the data's available in over 90 percent of the cases that Bayer has received, the patient is either overweight, obese, or had recent weight gain?

MR. KENNERLY: Object to the form.

A. I would say this. I think that this statement really is nonresponsive to the issue of obesity and -- and PTC.

Q. (BY MR. SCHMIDT) Can you answer my question now?

A. Sure.

Q. Do you take issue with it as factually correct in terms of just a factual proposition that when you look at the case reports where there's data available in over

Page 27

90 percent of the cases, there's data indicating recent weight gain, obesity, or overweightness. Is that true or false? Do you know?

A. I have -- I have no reason to question the statistic that's provided here. I just don't think it's helpful.

Q. Okay. Understood. And would -- I'm just going to state a proposition and ask you if it's true or false. Every one of those 90 plus percent of cases where the patient is overweight, obese, or had recent weight gain is a case report regarding obesity, recent weight gain, or being overweight.

MR. KENNERLY: Object to the form.

Q. (BY MR. SCHMIDT) Do you agree or disagree with that?

A. I would disagree. It depends on what other information is available in the case report.

Q. Okay. Do you -- do you know generally how much of the -- of the PTC population is overweight just as a matter of prevalence?

A. I know the prevalence in the US population. I don't know the prevalence in the -- in the PTC population.

Q. So if I were to ask you how many PTC patients in the US or worldwide are overweight, could you answer that?

A. I could not.

Page 28

Q. Okay. Do you know how many PTC patients in the US or worldwide have had recent weight gain?

A. I do not.

Q. Do you understand that recent -- let me take a step back.

At one point in your report, you do say that being obese or overweight -- and I'm referring to Paragraph 102 of your report -- actually, to be precise, you say, "Obesity and recent weight gain have -- both have been identified as risk factors for IH."

Do you see that?

A. Yes, I do. Actually -- actually, if -- if we read this sentence, it is not clear what Bayer means by "increased weight," but I do say obesity and recent weight gain have been both identified as risk factors, that's correct, yes.

Q. I'm going to ask you to do the same exercise as we did with Exhibit 2. Can you identify for me on the sheet of paper I just passed to you what you believe are risk factors for PTC?

MR. KENNERLY: Object to the form.

A. You are separating this from the previous list I gave you?

Q. (BY MR. SCHMIDT) Yes.

A. Okay. The previous list I gave you was known

Page 29

causes.

Q. Yes.

A. Right?

Q. That's Exhibit 2.

A. Right.

Q. And so now I'm asking you to identify risk factors. And just by way of --

A. Sure.

Q. -- introduction, I might be misunderstanding your report, but I understand you to be distinguishing between risk factors and known causes?

A. That's correct.

Q. Okay.

A. Right, right.

(Exhibit 4 marked.)

Q. (BY MR. SCHMIDT) So let me ask you to identify on what I'll mark as Exhibit 4 --

A. Okay.

Q. -- the risk factors for PTC. Let me go ahead and mark that as Exhibit 4. And let me just ask you to read into the record what you've written down.

A. Sure, it's easier.

Q. Risk factors for PTC.

A. So I've written one obesity, the second hypoaldosteronism, and the third hyperandrogenemia.

Q. Hyperaldosteronism is increased levels of aldosterone; is that correct?
A. Yes, sir.
Q. And what -- what is the third?
A. Hyperandrogenemia.
Q. What is that?
A. Which essentially means elevated levels of androgen.
Q. Okay.
A. Testosterone derivatives.
Q. Okay. On the hyperandrogenism point, people have -- there are testosterone replacement products, right?
A. Yes, sir.
Q. Are those linked at all to PTC?
MR. KENNERLY: Object to the form.
A. I don't know one way or the other. I haven't looked at that.
Q. (BY MR. SCHMIDT) Males have higher levels of testosterone than women; is that correct?
A. Yes, sir.
Q. PTC is much more rare --
A. Post -- post pubertal, yes.
Q. Post puberty?
A. Right.



Q. PTC is much more rare among adult males than it is among adult females, correct?
A. That's correct.
Q. Would you identify recent weight gain as a risk factor for PTC?
MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) And I'm -- I'm looking at the language in your report.
A. I know. I'm trying to think if that's in -- part of hyperaldosteronism, but let's not complicate that. Let's just say recent weight gain.
Q. Is being --
A. That's recent. Sorry.
Q. Is being a woman a risk factor for PTC?
MR. KENNERLY: Object to the form.
A. I don't know that I'd call it a risk factor for PTC. I'd almost call it a characteristic of PTC, but I wouldn't call it a risk factor.
Q. (BY MR. SCHMIDT) You can get PTC as a male, correct?
A. Right, but it's just so rare.
Q. It's so rare that it's almost a characteristic of PTC that it comes with women?
A. Yes.
Q. Okay. What about being of childbearing age? Is



that a risk factor for PTC, or would you call that a characteristic of PTC?
A. No, I think that's fair. I think being of childbearing age is a risk factor. A woman obviously -- obviously what we're talking about.
Q. Let me ask you --
A. Yeah, sure.
Q. -- to add that to the list.
A. Okay.
Q. And since you've declined use of my cheap 25 cent pen, I'll take it back.
A. It didn't help me any.
Q. Not the first time someone's told me that.
What -- what in your mind -- we now have Exhibit 2, a list of known causes of PTC, and Exhibit 4, a list of risk factors for PTC, correct?
A. Yes.
MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) What's the difference between a known cause of PTC and a risk factor?
A. Sure. A known cause of PTC excites the production of PTC. In isolated circumstances, PTC is not there, the known cause appears and PTC can be produced. Pretty clear. Okay. A risk factor relationship is not so clear. The risk factor -- risk factor is itself affected



by true causal agents. So the risk factor and the presence of risk factor results with and the presence of PTC appears.
Q. So let me see if I have this. Would it -- would it be correct that for the items you have on Exhibit 4, your list of risk factors, you do not list them as known causes, because you believe that with -- with those instances, there's something else that is causing the risk factor and causing the PTC, they just happen to travel together?
A. Yes, sir.
Q. Association as opposed to causation?
A. Yes, sir.
Just a moment. Let me -- I'm a safety monitor and so --
Q. Okay.
A. -- when I --
Q. If you're going to do that, I'm going to just walk behind you. We don't --
A. Okay.
Q. -- need to go off the record.
A. Okay. I'm done.
Q. Doctor, let me go ahead and mark an article on obesity and weight gain. Before -- before I do, is -- and I don't mean this -- well, let me just ask it. I don't

Page 34

mean to ask a stupid question. But do you have an understanding that obesity is often measured by a metric called BMI?
MR. KENNERLY: Objection.
Q. (BY MR. SCHMIDT) Body mass index?
A. I do, yes.
Q. And there are different cut points -- conventional cut points what's regarded as normal weight, overweight, obesity?
A. Yes, sir.
Q. Where I'm going is: Is simply being overweight but being short of obese a risk factor for PTC?
A. Sorry. Say it again, please.
Q. Sure. Is -- is simply being overweight but not reaching the threshold for being obese, is that a risk factor for PTC?
A. By my definition, yes.
Q. Okay. I'm going to ask you to add overweight to --
A. Sure.
Q. -- your list of risk factors.
A. (Witness complies.)
(Exhibit 5 marked.)
Q. (BY MR. SCHMIDT) I've marked as Exhibit 5 an article by Daniels from 2007 Profiles of Obesity, et

Page 35

cetera, is the title.
MR. KENNERLY: Is this 5?
MR. SCHMIDT: Yes.
Q. (BY MR. SCHMIDT) Do you know if you've seen this article before, sir?
A. I have.
Q. Okay. Let's take a look at this article. The third page of the article, 637 of the journal --
A. Yes, sir.
Q. -- has Figure 1 and Figure 2. And Figure 1 reports the association between body mass index and PTC. Do you see that?
A. Yes, sir.
Q. Am I correct in understanding that according to their data, the odds ratio for being overweight, BMI 25 to 29, is 6.5 relative to being a BMI of less than 25 BMI?
A. I just need a moment to look at the methods. I'm sorry. Is your -- is your question, is that what they say?
Q. Yes.
A. It is what they say, yes.
Q. Okay. So according to this data, there is a 6.5 fold increased risk of PTC associated with having a BMI in the overweight range of 25 to 29; is that correct?
A. That's the data that they show, yes. That's the

Page 36

result that they show.
Q. And that odds ratio increases as you move into different ranges of obesity, correct?
A. That is true, yes.
Q. For the first what they call Category 1 or Class I obesity, the BMI of 30 to 35, the odds ratio is 19.5, correct?
A. Yes.
Q. That's a 19.5 fold increase in risk, correct?
A. Yes.
Q. And just -- that's in the category of tobacco and lung cancer in terms of the size of the odds ratio, correct?
A. That is true. I mean, the cohort on which it's based is very different in size, but that is the -- yes, it's a large odds ratio, there's no question about that.
Q. And do you -- do you -- have you seen literature that causes you to take issue with the specific odds ratios that we have just looked at for both being overweight and being obese?
MR. KENNERLY: Object to the form.
A. I would say my understanding of what they have here is a relationship between size, BMI, and IH in the -- in the -- in the cases in this case control study. And the number of cases in this case control study is -- and I

Page 37

think I saw that. And I'm sorry, I'm not seeing it right now. Oh, it's 34. They had 34 patients and the 34 cases.
So my understanding, that they looked at the 34 cases and have produced Figure 1. That's my understanding of what we're looking at here in Figure 1.
Now, the problem with Figure 1 is that it does not produce -- it doesn't show error bars. This is a common problem in observational studies, they don't show error bars. And so while it does look like a phenomenal trend including the error bars, which is just quite a different picture, I believe.
Q. (BY MR. SCHMIDT) They do include confidence intervals, correct?
A. That -- that is true. That is true. But they don't have the error bars on the -- on the actual figure.
Q. And they do report statistical significance for every increment of increased weight gain, correct, relative to the BMI of less than 25?
A. And that's a critical point, because it's always compared to the ones who are the lowest. So I wouldn't say it's everyone, it's just when they compare to the lowest --
Q. Okay.
A. -- they get these -- small cohort, they get these large odds ratios, but we don't have the error bars here.

Page 38

Q. Let me go back to something I asked you at the beginning when I asked you about do you have in your head the odds ratios for being overweight and being obese and having PTC.
Do you have data that would -- would lead you to provide different numbers than what is reported in this article in terms of the odds ratios for the increased level of risk for being overweight at different increments and having PTC?
MR. KENNERLY: Object to the form.
A. I don't have -- I don't have data, other data.
Q. (BY MR. SCHMIDT) Okay. If we look at Figure 2 --
A. Yes.
Q. -- that is focused on weight gain over the -- over the previous 12 months. Do you see that?
A. Yes, I do.
Q. And they -- they use increments of 5 percent. Do you see that?
A. Yes.
Q. Relative to increments of less than 1 percent. Do you see that?
A. Yes.
Q. And is it true that with every increment above 5 percent, that they go up -- they report a larger odds

Page 39

ratio relative to no weight change?
A. That's what they say, yes.
Q. And do you take any issue with that data?
A. I do.
MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) And what -- what issue --
A. I'm sorry.
Q. -- do you take with that data?
A. I'm going too fast. Your question to me was?
Q. Do you take any issue with that data?
A. I do, yes.
Q. What is that?
A. Not -- again, it's a small sample size. I mean, the same issues I had before plus one more. And the same issues I had before, just to be clear, are it's a small sample size, and, in fact, we don't have error bars here. So this looks like it's phenomenal, but, in fact, with the error bars, I don't think it would be.
Also, they're comparing, as they did before to the OR, to the healthiest group let's say. The other issue here is now this is weight gain. It's not BMI. Now, recent weight gain might very well be due to a endocrinologic phenomenon, so we have that confounder here.
Q. Do you have any data that Mirena increases

Page 40

weight, that it promotes weight gain?
MR. KENNERLY: Object to the form.
A. No, I don't have any data. It's -- of course, hormone -- hormone therapy does have effects on fluid -- sodium and water flow. So I would not be surprised that -- that there would be a relationship, but I haven't seen that in patients who are on Mirena.
Q. (BY MR. SCHMIDT) And that's not an opinion you're offering here?
A. That's correct.
Q. If we go back to this data in Figure 2, I want to pick up on a couple of critiques you've made. You said that -- that -- I think you said it was a small sample. And at one point, you gave the number 34 cases in support of your point that it's a small sample. Let me just look at some of -- of -- of the data that they have here.
A. Sure.
Q. And let's actually look at Figure 1.
A. Okay.
Q. Am I correct that in Figure 1, if we look at the comparison between overweight patients defined as BMI 25 to 29 versus nonoverweight patients defined as BMI less than 25 --
A. Yes.
Q. -- we have 30 patients in the less than 25 group

Page 41

and 18 patients in the 25 to 29 group?
A. I'm not sure I understand that. If they only have 34 IIH patients, those are the -- and those are the only patients they have with IIH, I mean, forgive me if I'm missing something here, but I don't see how there could be more than 34 patients represented in Figure 1.
Q. Okay. Well, do you know -- have I correctly described the data as it appears in Figure 1?
A. How did you describe it?
Q. Sorry. At least according to Figure 1, they report 30 patients with a BMI of less than 20?
A. I'm sorry. Where are you seeing that? In the text or --
Q. Right below where it says -- on the sample, BMI less than 25 and equals.
A. Oh -- oh, I see -- oh, I see. You're looking at the legend?
Q. Yes. I'm sorry.
A. I see. Okay. I understand. Thank you.
Q. Do you see they report 30 patients with a BMI of less than 25?
A. Right.
Q. And they report 18 patients with a BMI of 25 to 29?
A. They do report that, but something seems amiss.

Q. Do you consider those to be small sample sizes?
A. I -- I actually consider these to be wrong.
Q. Okay. Do you -- put that to the side. Do you consider those to be small or large sample sizes?
A. Those are relatively small sample sizes, yes.
Q. Does that lead you to question these results --
A. Well, it leads me --
Q. -- if that's accurate?
A. It -- it leads me to just a couple of things. No. 1, of course, with small results, we have confidence intervals. That is very helpful of a kind -- of a kind that's very helpful. Nevertheless, the sample is small.
But what I'm saying 30 and 18 is small, 300 and 180 would be better, but I recognize that they were not going to see that. Is there another point to your question?
Q. Sure. Let's look at the recent weight gain.
A. Okay.
Q. Under recent weight gain, the N for the number of patients who are less than 5 percent is 46. Do you see that? Under Figure 2.
A. Oh, oh, we are misrepresenting these figures.
Q. Okay.
A. I understand what's going on now. This is not a figure that shows the risk of IIH for level of obesity,



right? This is a figure that shows the relative -- look at the third line. Bars represent ORs in favor of IIH versus control status for each BMI category. Okay. Now the numbers make sense.
Q. Okay.
A. Now the numbers make sense. However, we have an entirely new issue here, because controls in this study are controls with neuro-ophthalmic disease. I actually practiced that. I still got it wrong. Neuro-ophthalmic disease.
Q. Okay.
A. And patients with neuro-ophthalmic disease can suffer weight loss. They can have low weight.
Q. Okay.
A. So that really is quite a confounder here. I'm glad that we saw that, because now the numbers make sense. Okay.
Q. So if we look -- go back to my question --
A. Yes.
Q. -- on Figure 2.
A. Right.
Q. The N is 46 --
A. Yes.
Q. -- for the patients who have low weight gain, correct?



A. Yes.
Q. For the patients who have 5 to 10 percent, the N is 12, correct?
A. That's correct.
Q. Do you consider that to be a small sample size?
A. The -- I mean, the answer must be yes. Yes.
Q. Does that leave you to question the results just in terms of the sample size?
A. Not in terms of the sample size itself, because, again, we do have a confidence interval here, but as you -- as I've pointed out to you, the design of this using neuro-ophthalmic patients as controls confuses the interpretation of these trends.
Q. Okay. Let me -- let me go back to a question I asked you, then, because I want to make sure we're on the same page. This study reports an odds ratio, for example, for obese patients of 19.5 relative to patients with a BMI of less than 25, correct? Do you see that?
A. I would say it's for patients with BMI between 30 and 35.
Q. Okay.
A. Okay.
Q. Fair enough.
Because it gets even higher as you go higher --



A. Yes.
Q. -- right?
A. Yes, right, right. Okay.
Q. Fair enough.
For obese patients with a BMI of 30 to 35, it reports an elevated risk of 19.5 times versus patients who have a BMI of less than 25, correct?
A. That's true.
Q. Are you aware of any contrary data that shows there to be a lower elevated risk of PTC with a BMI of 30 to 35?
MR. KENNERLY: Object to the form.
A. I would say I have no contrary data, but I can't say I believe this data.
Q. (BY MR. SCHMIDT) Okay. Do you believe that there is not an elevated risk of PTC with a BMI of 30 to 35? And there's a lot of negatives built into that, so --
A. Yeah.
Q. -- let me ask it more --
A. Okay. Sure. Right.
Q. Do you agree with me that there is an elevated risk of PTC with both being overweight and being obese?
MR. KENNERLY: Object to the form.
A. I think obesity is a risk factor for PTC, so I think my answer to your question is yes.

Page 46

Q. (BY MR. SCHMIDT) Okay. And in terms -- this study reports odds ratios of 6.5 for overweight, 19.5 for the first category of obesity?
A. Yes.
Q. Would you supply different -- different measures as to how much of a risk factor being overweight and being obese is than those supplied in this article?
MR. KENNERLY: Object to the form.
A. I have no idea how to answer that.
Q. (BY MR. SCHMIDT) Okay. Well -- well, do you have different odds ratios?
A. Oh. I do not, no.
Q. Okay. And same question for what's reported in terms of weight gain.
A. I would say for -- for weight gain, my answer is the same, and also my answer is the same about the ability to interpret this with these neuro-ophthalmic patients as controlled.
Q. Okay.
A. Can we take a break for a few minutes?
Q. Of course.
THE VIDEOGRAPHER: We're off the record at 9:24, end of Tape 1.
(Short recess.)
THE VIDEOGRAPHER: Okay. We're on the

Page 47

record at 9:32, beginning of Media 2.
Q. (BY MR. SCHMIDT) Doctor, I'm going to pass you another article that I'm going to mark as Exhibit 6.
(Exhibit 6 marked.)
Q. (BY MR. SCHMIDT) And ask you if you've seen this article before. And you know what, I didn't put the sticker on it, I apologize. It happens when I try to do this on my own. Always a mistake. Thank you.
A. This one does not look familiar. Can I look at it for a moment?
Q. Of course.
A. Okay.
Q. Okay. I'm going to simply direct you, if I may. This is an article by Alex Ball and others. I guess my question was: Do you know if you've seen this before?
A. I have not.
Q. Okay. If you look on the right-hand column on the first page, there's a heading that says Epidemiology. And if you look at the second paragraph under that heading, it states, "Published frequencies of obesity in patients with the disorder PTC are 71 percent, 88 percent, 91 percent, and 94 percent according to different citations."
Do you see that?
A. Yes.

Page 48

Q. Do you take any issue with that data that the levels of obesity in patients with PTC are somewhere in the range of 70 plus percent?
MR. KENNERLY: Object to the form.
A. I -- I'm -- I believe that women with PTC are more likely to be obese. Now, I can't say anything about the particular numbers because they're references and we have to go there and study those.
Q. (BY MR. SCHMIDT) Okay. And you don't have numbers of your own other than above 50 percent?
A. I do not.
Q. I want to round out one question on the last article we were looking at, Exhibit 5, the Daniels article. You -- you made a comment about it where you said there was confounding because they included neuro-ophthalmic patients; is that correct?
A. Yes.
Q. And can you explain that to me?
MR. KENNERLY: Object to the form.
A. Sure. Neuro-ophthalmic patients controls are likely to be different because the -- their history suggests they might have a very different -- different weight. We're really talking about weight here.
For example, patients who -- with neuro-ophthalmic disease can have weight loss and

Page 49

experience weight loss. And if you're trying to compare -- looking at the relationship between obesity and the relation between obesity -- how obesity modifies the odds ratio, then the clearest way to do that would be to try to ensure that, in fact, weights across the two groups are the same. But the weights in neuro-ophthalmic patients might not be.
Q. (BY MR. SCHMIDT) And you understand that PTC is a neuro-ophthalmic disease?
A. It is, that's true.
Q. What is different about PTC versus other neuro-ophthalmic diseases --
A. Well --
Q. -- in terms of --
A. -- patients who have other neuro-ophthalmic diseases may have diseases that produce weight loss.
Q. Which are those?
A. I actually spent some time looking at this. Melanoma -- cancer, particularly. But melanoma has eyeground changes that would be neuro-ophthalmic disease. Another one is lymphoma.
Q. And do you refer to that as a potential confounder in the -- in the study?
A. Yes, I do.
Q. The -- the Daniels study?

Page 50

A. Yes.
Q. Have you done any analyses to try to measure the size of the confounding that might exist in Daniels?
A. No, I have not.
Q. But that confounder concern causes you to question the results reported?
A. Yes.
Q. You talked about -- and -- and you can look back at Exhibit 2, if you want, hormonal therapy being a known cause of -- of PTC?
A. Yes.
Q. What do you mean by "hormonal therapy"?
A. I think I'm talking there specifically about growth hormone.
Q. Okay. Do you know what the hormone in growth hormone therapy is?
A. I think it's ACTH.
Q. Do you have an opinion about any other forms of hormonal therapy being known causes of PTC other than growth hormones?
A. Outside the -- the topic of litigation, I would say -- and outside the bounds of -- well, put it this way. My report talks about how hormones can produce PTC. I mean, it focuses on that. Talk about aldosterone -- ant -- aldosterone -- and also LNG.

Page 51

Q. Let me ask this question, because I think that's where I was going. Do oral contraceptives, which I don't see listed on Exhibit 2, are they known causes of PTC?
A. That's not something I've really spent a lot of time with here.
Q. So if I were to say to you are there any oral contraceptives you would point me to that are known to cause PTC, would your answer be I don't have any -- I haven't studied that?
A. I haven't studied that.
Q. Are you aware that there are multiple studies evaluating oral contraceptives and concluding that they are not linked to PTC?
A. I haven't looked at that, so I don't know.
Q. Do you know if -- if, in fact, there are any epidemiological studies evaluating whether oral contraceptives are linked to PTC?
MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) And I'm just asking the question: Do you know if they exist, such studies?
A. I would presume they exist, but I have not identified them and have not read them.
Q. And so you don't know whether the uniform body of oral contraceptive research indicates, A, that there is no elevated PTC risk with oral contraceptives or, B,

Page 52

something else?
MR. KENNERLY: Object to the form.
A. Just ask me again, please.
Q. (BY MR. SCHMIDT) Sure.
A. Okay.
Q. Sometimes I try to be simple and it ends up being more complicated.
If I were to say to you the uniform body of oral contraceptive literature indicates that there is no statistically significant elevated risk between oral contraceptives and PTC, do you know if that's true or not?
MR. KENNERLY: Object to the form.
A. I need to look at my report for just a second.
Q. (BY MR. SCHMIDT) Sure.
A. No, I wouldn't know one way or the other.
Q. Let's -- let's come to what -- where I think you are going, which is you do spend time in your report evaluating LNG, correct?
A. Yes, sir.
Q. Which is short for levonorgestrel?
A. Yes.
Q. And as I understand your opinions, you believe that Mirena causes IH, correct, or PTC?
A. I do, yes.
Q. And the reason or the -- the active agent in

Page 53

Mirena that causes PTC is LNG, correct?
A. Yes, sir.
Q. If Mirena did not have LNG, it would not cause PTC?
A. I would presume so. I don't know anybody who's actually looked at that, but, yes, I would presume that was the case.
Q. Does -- do you know what ParaGard is?
A. I do, yes.
Q. Does ParaGard cause PTC?
A. It does not, to my knowledge.
Q. And am I correct that -- I'm sorry. I gave you the wrong one.
(Exhibit 7 marked.)
Q. (BY MR. SCHMIDT) Am I correct that ParaGard is an IUD that does not have LNG?
A. Yes.
Q. I've marked as Exhibit 7 a list of products that I understand have LNG in them. You see on the left --
MR. KENNERLY: What's the source of this? Is this yours or --
MR. SCHMIDT: Let me finish, please.
Q. (BY MR. SCHMIDT) You see on the left-hand side -- this is something that one of our experts has prepared. Do you see on the left-hand side that there is

Page 54

a list of products; in the middle, there's their daily LNG dose; and on the right-hand side, there's the dosing regime. Do you see that?
MR. KENNERLY: Object to the form.
A. I do see it.
Q. (BY MR. SCHMIDT) Let me ask you first off: Have you undertaken -- have you undertaken any kind of -- of survey of -- like that reflected in Exhibit 7 of products that contain LNG to look at the levels and the range of products?
A. I have not.
Q. One of the products here, just so we're on the same page, is Mirena, which, of course, you have looked at. Another one is Norplant. Do you see that?
A. I see Norplant, yes. And I see Mirena, yes.
Q. If I look at your report, Exhibit 1, where you reference Norplant data -- Paragraph 153, please.
A. Yes.
Q. Actually, before we get there, in Exhibit 2, you talk about known causes of PTC. Do you believe that Mirena is now a known cause of PTC?
MR. KENNERLY: Object to the form.
A. I believe Mirena causes PTC. I have not seen any literature that suggests that or -- so I believe it does. Whether it's a known cause, I have to ask known by who.

Page 55

Q. (BY MR. SCHMIDT) Let's -- let's look at -- let's look at 153 --
A. Yes.
Q. -- of your report. And 153 of your report, you talk about Norplant case reports, correct?
A. Yes.
Q. And are you aware that there has been no epidemiological study on Norplant and PTC?
A. I just need --
MR. KENNERLY: Object to the form.
A. Just need to finish reading the paragraph.
Q. (BY MR. SCHMIDT) Sure.
A. Okay. I'm sorry. Ask your question now.
Q. Are you aware of any epidemiological studies that have evaluated -- or the relationship between Norplant and PTC?
A. No.
Q. There are none, correct?
A. Right.
Q. There are only case reports, correct?
A. Yes.
Q. And you talk about these case reports in Paragraph 153, correct?
A. Yes.
Q. And after talking about them, you say -- you

Page 56

say -- you refer to them raising the suspicion of a causal association with Norplant. Do you see that about two-thirds of the way through that paragraph, the language "raised the suspicion of a causal association with Norplant"?
A. Yes.
Q. And if you go to the end of that paragraph, you talk about they suggest an increased risk with Norplant use --
A. Yes.
Q. -- do you see that?
And my question to you is: When I read that language, that there is a suspicion of a causal association and a suggestion of an increased risk --
A. Yes.
Q. -- I read that as something short of you opining that Norplant causes PTC. Am I correct in that?
A. That's correct.
Q. So are you offering an opinion that Norplant causes PTC that we know?
A. No.
Q. In your mind, is it an open question whether Norplant causes PTC?
A. Yes.
Q. And so if we go back to Exhibit 7, put Norplant

Page 57

to the side, put Mirena to the side, do you have an opinion that any of the other products on this list cause PTC?
MR. KENNERLY: Object to the form.
A. I do not have an opinion.
Q. (BY MR. SCHMIDT) Let's stick with your report, please.
A. Okay.
Q. Look at Paragraph 103, if you would, sir. Coming back to this idea of obesity, if you look at the bottom of page 27 --
A. Yes.
Q. -- you state, "I am not aware of any actual data showing that Mirena users are more frequently obese than women of reproductive age in general."
Did I read that correctly?
A. Yes.
Q. Is that a true statement?
A. And the rest of the sentence says, "Nor the extent to which those users are more frequently obese."
Yes, I think it is.
Q. Have you become aware of any data since the time you prepared your report that speaks to the question of whether women who use Mirena are more frequently obese than women of reproductive age in general?

Page 58

A. Well, we've talked about some literature here, but I have some concerns about literature here, so . . .
Q. The literature we focused on is not specific to Mirena, correct?
A. Right, that's right.
Q. So have you become aware of any Mirena literature that speaks to whether women who use Mirena are more likely to be obese than women of reproductive age in general?
A. No.
MR. KENNERLY: Object to form.
Q. (BY MR. SCHMIDT) I'm going to show you an article that is -- to be fair to you is in press. It was on the -- on the Web in December, but -- but it is -- oh, I'm sorry. I don't -- that's really rude. I don't mean to be rude. I want to make sure I'm not giving you my copy. I apologize.
A. Okay. Thank you.
(Exhibit 8 marked.)
Q. (BY MR. SCHMIDT) I've marked it as Exhibit 8.
A. Yes.
Q. Lead author is Mosher. And you see at the top, it's an article in press. Have you seen this article before?
A. Actually, I have.

Page 59

Q. When -- when did you first learn about this article?
A. I saw this article about a week ago.
Q. So this is not something you had access to before your report?
A. That's correct.
Q. Is this an article that contains actual data regarding whether Mirena users are more frequently obese than women of reproductive age in general?
A. Let me refamiliarize myself, if I can.
Q. Please.
MR. KENNERLY: Object to the form.
A. No, it speaks -- excuse me. It speaks about IUDs. I don't know that it's -- focuses only on -- it doesn't focus only on Mirena use, though. Perhaps that was not your question.
Q. (BY MR. SCHMIDT) That was my question.
A. Okay. I don't see that it focuses only on Mirena use.
Q. Okay. Look with me, if you would, at Table 3.
A. Table 3.
Q. Yes.
A. Yes.
Q. Do you see that Table 3 reports results for IUDs and different BMI categories?

Page 60

A. I do. I just need to make sure I understand what it is we are trying to measure here. So we have patients with IUDs.
Q. And --
A. And the -- and we have BMI reference. So -- okay. So what is the odds ratio that's being measured here? Let me just look back. Oh, odds of IUD use.
Q. Right.
A. I see. All right. So we're looking at the odds of IUD use. So -- okay -- all right. Go ahead, please. I don't mean to ramble on the record. Okay.
Q. Let me -- let me see if I can shortcut it. If we go to page 4 of the article.
A. Yes.
Q. The first sentence under the discussion, do you see that?
A. Yes.
Q. States that "Obese women were less likely to report current use of hormonal methods"?
A. Yes.
Q. Then if I skip ahead, "And when parous, more likely to use IUDs than nonobese women."
Do you see that? It's -- it's in the same sentence.
A. Right.

Page 61

Q. I didn't skip that far ahead.
A. I do see that.
Q. Okay. And -- and do you understand that to be an accurate reporting of -- of the data that they state that they have found?
MR. KENNERLY: Object to the form.
A. Let me think. I don't think so. I don't think so. For a couple of reasons. You know, I'm very confused. I remember looking at this article. I'm very confused about this statement on page 5, second column, "Compared with normal weight women, those in the highest BMI category had decreased odds ratio of IUD use."
Q. (BY MR. SCHMIDT) Yeah, I think that's an error.
A. Well, yeah, but it begs me -- I agree with you. I don't know which is an error, though.
Q. Okay.
A. And I actually went to look for errata on this, and I couldn't find any errata on this.
Q. Well, let me -- let me see if I can help you. If we just look at Table 3, do you understand that just looking at the adjusted odds ratios, the likelihood of using an IUD increases with each weight category above the category of less than 25?
A. Okay. So let me --
Q. Is that correct?

Page 62

A. I'm not sure. And not to make too big a deal out of this, I at this point don't know if the statement is right or the data are right.
Q. Okay. Well, let's -- let's look --
A. But -- but go ahead.
Q. Yeah, let's look at the data.
A. Okay.
Q. Do you understand that the data that they report on page 5 show that the adjusted odds ratio increases as BMI increases?
A. Yes, I do. However, they are always comparing to the lowest group, right?
Q. And when --
A. If one were to compare, for example, people who are not obese to people who were obese or even the 30 to 35 to the greater than 35, you get a different result.
Q. Okay. And, for example, when they compare people who are less than BMI Category 25 to people who are Class II or Class III obesity, which is 35 and above, they see people in the Class II or III obesity group are statistically significantly more likely to use an IUD than people in BMI below 25, correct?
A. You're talking about the adjusted odds ratio?
Q. Yes.
A. Your statement is correct. However, I do have to

Page 63

add my two caveats about the question about the validity, I mean, the -- the accuracy of this data, and also the comparison is not the most helpful one.
Q. Have you seen any contrary data indicating that women who are obese are no more likely to use Mirena than other products?
A. Say it again, please.
Q. Sure. Have you seen any data that indicates that women who are obese are no more likely to use Mirena than women of -- of -- than nonobese women?
A. I --
MR. KENNERLY: Object to form.
A. I have not.
Q. (BY MR. SCHMIDT) Are you aware that there are -- are recommendations in the medical literature that women who are obese use IUDs because of efficacy questions with other forms of contraception used by obese women?
A. I have not studied that.
Q. Okay. For example, let me just show you an example of that.
(Comments off the record.)
Q. (BY MR. SCHMIDT) In the interest of time, I'm not going to mark another article. Are you aware of -- of statements in the medical literature that indicate that IUDs are more suitable for women who have a higher BMI

Page 64

because of health concerns that non-IUD forms of contraception carry for those women?
MR. KENNERLY: Object to the form.
A. I don't know any such guideline.
Q. (BY MR. SCHMIDT) Are you aware that different medical groups will issue prescribing guidelines for patients for doctors?
A. I am, yes.
Q. And are you aware -- have you done any study as to how those prescribing guidelines impact actual prescribing practices?
A. No, I have not.
Q. Are you aware of a group called ACOG?
A. Sorry?
Q. A-C-O-G. It's an acronym.
A. I don't know -- I don't know the acronym.
Q. Okay. Have you ever studied the prescribing guidelines of the -- or the practice bulletins of the American College of Obstetricians and Gynecologists?
A. No, sir.
(Exhibit 9 marked.)
Q. (BY MR. SCHMIDT) I take it from that answer that Exhibit 9 is not a document you have seen before; is that correct?
A. No, I have not.

Page 65

Q. Okay. Now, I will tell you that this is a document that years after it was issued -- you see it was issued in 2006, it was withdrawn, and it has not been reissued, just so you have the full context of this document. But it was in place for several years.
And with that in mind, I'll direct you to page 1462, please. And do you see that there's a heading that says, Which Hormonal Contraceptives are Appropriate for Obese Women?
A. The bottom of the first column?
Q. Yes, sir.
A. Yes, I do.
Q. Okay. Do you see the first sentence of that -- I'm sorry -- the second sentence of that says that "Obesity may impair efficacy of combination oral and transdermal contraceptives."
Do you see that?
A. I do.
Q. And then if you look at -- and that's this efficacy point we talked about, right?
A. Yes, sir.
Q. And then in the second paragraph under this heading, it talks about safety issues. For example, "Use of combination oral contraceptives and obesity represent independent risk factors for venous thromboembolism."

Page 66

Do you see that?
A. I do.
Q. They ultimately state at the end of that paragraph, "Because obese women experience an elevated risk for dysfunctional uterine bleeding and endometrial neoplasia, use of the LNG intrauterine system may represent a particularly sound choice for obese women."
Do you see that?
A. I do.
Q. Do you have any reason to take issue with those statements?
A. Yes.
MR. KENNERLY: Object to the form.
A. Sorry.
MR. KENNERLY: Go ahead.
A. Yes.
Q. (BY MR. SCHMIDT) Okay. Do you have -- let me break it down, then.
Do you have any reason to take issue with the proposition that Mirena works better -- has better efficacy for obese women than oral contraceptives?
MR. KENNERLY: Object to the form.
A. If -- if you focus on the narrow question of efficacy, I do not.
Q. (BY MR. SCHMIDT) And in terms of the health

Page 67

concerns that are identified in the second paragraph, I'm not going to read them all into the record, but you see there are several?
A. Yes.
Q. Do you have any reason to take issue with the proposition that Mirena has -- presents less of a health concern on those issues for obese women than oral contraceptives?
A. I would --
MR. KENNERLY: Object to the form.
A. -- just say no, with the understanding that this is not the universe of health concerns.
Q. (BY MR. SCHMIDT) Okay. Do you have any issue -- are you familiar with the concept of preferential prescribing?
A. No, I am not.
Q. Okay. And I don't know if it's a medical term or if it's one that we lawyers use. I'm using it to -- well, strike that.
Are you familiar with the idea that some products are prescribed at different rates based on specific patient characteristics?
A. Certainly, you prescribe in accordance with the patient's characteristics and needs, and those are individual.

Page 68

Q. Okay. And that's what I'm trying to get at with --
A. Okay.
Q. -- with my term "preferential prescribing."
Are -- are you aware of whether just as a matter of medical practice Mirena is preferentially prescribed for some of the reasons identified in Exhibit 9 and perhaps because of guidelines like Exhibit 9 to women who are obese?
A. I don't know.
Q. Do you -- are you aware when we were talking about exhibit -- I believe it was 8, the Mosher article -- I'm sorry. It's 7 -- no, it's 8. You made --
A. Yes.
Q. You made the point in connection with Exhibit 8 that it focused on IUDs generally and not Mirena specifically. Do you recall that?
A. Yes.
Q. Have you done any analysis of either worldwide or in the US how much IUD utilization is specific to Mirena?
MR. KENNERLY: Object to the form.
A. I have not.
Q. (BY MR. SCHMIDT) Do you take issue with the fact that the majority of -- of IUD usage is Mirena usage?
MR. KENNERLY: Object to the form.

Page 69

A. I don't know one way or the other.
Q. (BY MR. SCHMIDT) I'm going to come to this later. But you will recall that when individual scientists at Bayer looked at the Valenzuela article, they raised questions about whether the two control groups in that article were accurately counting the population use of Mirena. Do you remember that?
A. I remember that, yes.
Q. And they attempted to perform calculations to estimate what they thought the population rate of Mirena use was, correct?
A. Yes.
Q. And those calculations involved a couple of steps, at least in Utah. One step was saying how much IUD usage is there in Utah, and the second step was how much of IUD usage is Mirena. Do you remember that?
A. I need to look -- there are two cohort studies. I need to look to see what the steps were for each of the cohorts.
Q. Well, my question is -- and we'll come to that. I'll spend some time asking you about that.
My question is simply this: You took issue with the data that the company used to estimate IUD usage. There was a study -- I don't know if you remember -- called Bhuva that they used to estimate IUD usage?

A. Yes.
Q. They used a separate study that I'm going to mark as Exhibit 10 to estimate not IUD usage, but the percentage of IUD usage that is Mirena. And I did not see you take issue with that.
MR. SCHMIDT: Where are the exhibit stickers?
(Exhibit 10 marked.)
MR. KENNERLY: Object to the form.
MR. SCHMIDT: Oh, I'm sorry. I did that again. I marked the wrong exhibit. I'm sorry.
Q. (BY MR. SCHMIDT) Exhibit 10 is an article by Sanders and other authors looking at intrauterine usage. And if you look in the -- under the study design, it's from the University of Utah health care system. Do you see that?
A. Okay. I see that, yes.
Q. Do you take any issue with the data reported in here? I did not see it in your report, but I wanted to ask you.
MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) And I don't want to make you a sponsor for the full article, so if I could point you to specific data.
A. Yes.



Q. But I want to ask you that. If you stick with the abstract on the first page under results, it reports data on different device insertions, and it reports that 75 percent of the usage was for Mirena. Do you see that?
A. Yes.
Q. Do you take any issue with the proposition that somewhere north of 70 percent of IUD usage is for Mirena?
A. I just need a moment.
No.
Q. Okay. And you recognize that this is by one of the authors of the Valenzuela studies --
A. Yes.
Q. -- that you rely?
A. I'm sorry. Yes.
Q. I'm going to pass you two articles and mark them as Exhibits 11 and 12.
(Exhibits 11 and 12 marked.)
Q. (BY MR. SCHMIDT) Exhibit 11 is an article by the late author Bhuva, and Exhibit 12 is an article by the late author Saito-Tom.
And my question to you simply is: Have you seen these before?
A. No.
Q. Okay. You can put those to the side.
If you look at your report, page 27,



Paragraph 102 --
A. Yes.
Q. -- you give different incidence rates -- I'm sorry -- yeah, incidence rates of PTC among different patient groups. Do you see that?
A. Yes.
Q. Again, you give an incidence rate for -- for women specifically and obese women of childbearing age. Do you see that?
A. Yes.
Q. Do you take any issue with -- with the data that you're reporting there in terms of those being generally accurate incidence rates?
A. No.
Q. Let's focus, for example, on one of these rates. You say that the rate of PTC in obese women 15 to 44 years of age is 22.041. Do you see that?
A. Yes.
Q. If -- if -- have you done any analysis -- strike that.
Are you familiar with the concept of -- of a background rate in a population?
A. Yes.
Q. And I'll ask you to give me a definition if this one is not right. But would it be fair to say that the



background rate of a disease in a population is the expected rate you would see if that patient group were not exposed to another risk factor like a drug that might cause the risk to be elevated?
A. In -- in general, yes.
Q. Okay. What -- have you done any calculation that tells you the background rate of -- given the patient characteristics of the Mirena population, what the background rate of PTC is among that population?
A. No.
Q. For example, we know that all Mirena patients are women, correct?
A. Correct.
Q. So the floor for the background rate according to your data would be 3.277, correct?
MR. KENNERLY: Object to the form.
A. I actually would need to look at the source for this. What concerns me about this is that I don't have a time period, and incidence rates usually have time periods associated with them.
Q. (BY MR. SCHMIDT) Okay. Well, do you have any other data on what the incidence rate for women is in terms of PTC?
A. No.
Q. Okay. So using the rate that you report in

Page 74

your -- well, strike that.
You -- you understand -- well, strike that.
Are all Mirena patients women of childbearing age?
MR. KENNERLY: Object to the form.
A. I would expect that they would be. Certainly, I'm -- I can't think of an example, just sitting here, why you'd have an IUD in a woman who is not at risk of being pregnant.
Q. (BY MR. SCHMIDT) And you don't know the percentage of Mirena patients who are obese?
A. No.
Q. Would you be able to tell me what the background rate of PTC would be in the Mirena population but for their use of Mirena?
MR. KENNERLY: Object to the form.
A. Well, it would be the incidence rates for women who are not -- with PTC who are not using Mirena.
Q. (BY MR. SCHMIDT) Right. Do you know what that rate is?
A. No.
Q. Do you know if it's higher or lower than 3.277?
A. I don't know.
Q. Do you know if it's higher or lower than 22.041 per 100,000?

Page 75

A. I -- I don't know.
Q. Okay. Let me -- let me do one more, and I promise this will be my last piece of paper that I do, and this one I'm going to write.
I want to be sure I have the lines of evidence that you rely on in your report regarding Mirena and PTC. And so as I understand one line of evidence, it is case reports? Is that correct, that you rely on case report information?
MR. KENNERLY: Object to the form.
A. I would say simply this, that case reports are contributory to the argument.
Q. (BY MR. SCHMIDT) Is that something you rely on in opining that Mirena causes PTC?
A. It's something that adds to the argument, yes.
Q. And some of the case report you -- data you rely on is general case report data, some of it is dechallenge data, some of it is case report data involving Norplant, correct?
A. Yes.
Q. A second line of evidence I understand you rely on is the Valenzuela publication; is that correct?
A. Yes, sir.
Q. And a third line of evidence that I understand you rely on is -- I want to make sure I get the term

Page 76

right -- is I -- what I think you refer to in your report at page 145 as causal mechanism?
A. Yes.
Q. And I'll come back to that, but that involves some of the topics that we have been talking about. That's the -- the mechanism by which if Mirena causes PTC, it might cause PTC, correct?
A. Yes.
Q. So other than those three lines of evidence, case report data in the various forms we discussed it, Valenzuela and causal mechanism, are there any other lines of evidence that you rely on in giving your opinion that Mirena causes PTC?
MR. KENNERLY: Object to the form.
A. I have a section on page -- actually, Paragraph 133, page 37. It talks about biologic gradient. This supports my argument as well.
Q. (BY MR. SCHMIDT) Okay. I'll write that down as No. 4. And -- and that's -- that's the concept of dose response, correct?
A. Yes, sir.
Q. Okay. So I'll write down biologic gradient --
A. Right.
Q. -- dose response.
Anything else?

Page 77

MR. KENNERLY: Object to the form.
A. I think principally that's it.
Q. (BY MR. SCHMIDT) I'm going to mark as Exhibit 13 what I've written down and put it in front of you.
(Exhibit 13 marked.)
Q. (BY MR. SCHMIDT) Am I correct that the forms of evidence, the lines of evidence that you rely on in giving your opinion in this case are case report data of the various forms we have talked about, the Valenzuela study, data or theories about a causal mechanism and biologic gradient or dose response?
A. It's a distillation of -- of my -- my application of Bradford Hill here.
Q. Okay. And I'm going to come to your application of Bradford Hill. Let me actually go back to what I was asking you about background rate.
Have you done any calculation that tells you in a given population how many extra cases of PTC are caused by Mirena in a given year or in a given time frame?
A. I can't answer for a given time frame, because it wasn't based on relative risks which are time. The closest that I've come to that would have been the attributable risk exposed that I computed from Valenzuela.
Q. So, for example, if we look at the -- the incidence rates that you reported in your report that we

were talking about a moment ago, do you know how many extra cases per 100,000 happened due to Mirena that would not happen otherwise?
MR. KENNERLY: Object to the form.
A. That's -- I think that's attributable risk, which is the difference in the rates, but, no.
Q. (BY MR. SCHMIDT) Okay. Do you know if it's 1 per 100,000, 1,000 per 100,000, somewhere in between?
A. I don't know.
Q. Have you calculated the odds ratio for development of PTC with Mirena use, what you believe the correct odds ratio is?
MR. KENNERLY: Object to the form.
A. The odds ratios I rely on are the ones from Valenzuela.
Q. (BY MR. SCHMIDT) Do you know which one of those -- those are two separate odds ratios, correct?
A. Yes.
MR. SCHMIDT: Could we go ahead and mark Valenzuela so I'm not asking questions in the ether.
(Exhibit 14 marked.)
Q. (BY MR. SCHMIDT) I've marked the Valenzuela study as Exhibit 14.
MR. SCHMIDT: And I'll just say you don't need to take this down.



(Comments off the record.)
Q. (BY MR. SCHMIDT) Exhibit 14, sir, is the Valenzuela study that you --
A. Yes.
Q. -- rely on, correct?
A. Yes.
Q. I probably just have one or two questions on this study. Let's look at the odds ratios they report. They report data from two analyses, correct?
A. Yes, sir.
Q. One in Utah, one in Denmark?
A. Yes.
Q. The odds ratio from the Utah analysis -- and I'm looking at the upper right-hand column on page 3 -- is 7.70, correct?
A. Yes.
Q. And the odds ratio for the Denmark analysis, looking at the bottom of page 4 on the left column, is 3.91?
A. Yes.
Q. Which of those is the right odds ratio for the general population?
A. Well, actually, I think it's impossible to say. I think you can say that in these two different disparate communities, you've got these elevated odds ratios. I



can't say which one is more generalizable to the planet at large.
Q. And -- and maybe you've just answered this. But if I were to ask you from this data can you tell me what the odds ratios is in the general US population, could you tell me?
A. No, I could not.
Q. Could you tell me what the odds ratio is in a population of Utah IUD users who did not receive care at the University of Utah health care system?
MR. KENNERLY: Object to the form.
A. The -- the result -- it's a question of generalizability. If the question --
Q. (BY MR. SCHMIDT) Yes.
A. If it's reasonable to generalize this University of Utah study to -- to the state of Utah, then, yes, you do know. If it's not so reasonable to do that, then you really don't know.
Q. And that's my question. Is it reasonable to generalize to the state of Utah from the University of Utah results, in your view?
A. Well, in my view, there is some ability to generalize. However, if you look at the specific definition for generalizability, there has to be the opportunity for women of childbearing age to be part of



the University of Utah study, and I don't think that was the case. I mean, that is true for every study, and so we have to be very careful about generalizing.
Q. And where I'm going with this -- and you probably see this is not a subtle point -- is when I look at the odds ratios, the Utah odds ratio is close to double than what the Denmark odds ratio is, correct?
A. Yes.
Q. And I view that as -- as some level of divergence between the two. If I were to ask you where on the spectrum between 7.7 and 3.91 the odds ratio would be for the US population or if it's lower than 3.91 or if it's higher than 7.70, do you know?
MR. KENNERLY: Object to the form.
A. I don't know.
Q. (BY MR. SCHMIDT) And so would it be correct that -- that you -- strike that.
You're familiar with meta-analytic technique?
A. I am, yes.
Q. Would you perform a meta-analysis of those two data sets in the Valenzuela study to get a combined odds ratio?
A. You are not talking to an advocate of meta-analysis.

Page 82

Q. Okay.
A. So the answer is no, I would not.
Q. Okay. And why is that?
A. Because meta-analysis typically carries out mathematics where mathematics are inappropriately applied. It's the rare studies that are designed specifically to be combined. It is to say have the same definition of exposure, same definition of endpoint -- of endpoints, same duration of follow-up.
Those are perfectly attuned for meta-analysis. And sometimes those studies are designed to be combined, but that's not the case for the overwhelming population of study -- overwhelming collection of studies.
Q. Am I correct that you would hold yourself out as an expert in epidemiology?
A. Yes, sir.
Q. Am I correct that you would not meta-analyze the results from Denmark and Utah to get a single odds ratio because you don't believe that single odds -- odds ratio -- that meta-analyzed odds ratio would be an accurate representation of the true odds ratio in the general population?
A. Correct. And specifically because the studies weren't designed to be -- to be combined.

Page 83

Q. I'm going to just say two propositions, and please tell me if you think they are true or false or you don't know. The vast majority of Mirena patients never develop PTC?
MR. KENNERLY: Object to the form.
A. That's true.
Q. (BY MR. SCHMIDT) The vast number of PTC patients have never used Mirena?
MR. KENNERLY: Object to the form.
A. It depends on the time frame at which you look. Certainly, there was PTC well before Mirena, right, so I would say yes.
Q. (BY MR. SCHMIDT) Is there anything about the PTC that you see with Mirena patients in terms of the symptoms or the severity or the patient characteristics that differentiates it from non-Mirena PTC?
A. I have not done that analysis. That would really be a clinical analysis. I haven't done anything like that.
Q. Do you believe the fact that, in your opinion, Mirena causes PTC as a matter of public health concern?
A. Yes, I do.
Q. Have you, outside of the litigation, given your views in any way that Mirena causes PTC?
A. I have not.

Page 84

Q. Let me do what I hope is a speed round about your experience. As I understand it, obviously, you're a medically-trained doctor. You completed a medical internship. Am I correct that you never did a residency program?
A. That's correct.
Q. Am I correct that you never completed a fellowship?
A. That is correct.
Q. And I understand that you have at different points in time done what I understand to be volunteer work with -- with patients like during Hurricane Katrina; is that correct?
A. Yes, that's true.
Q. Is it true that you have not had a regular medical practice since March 1992?
A. That is correct.
Q. You're not a gynecologist?
A. Correct.
Q. You're not an obstetrician?
A. Correct.
Q. Have you ever prescribed a contraceptive?
A. Yes.
Q. When was the last time?
A. Oh, when I was in practice through -- up through

Page 85

'92.
Q. Have you ever prescribed a contraceptive containing LNG?
A. I don't recall.
Q. Have you ever prescribed Mirena?
A. No.
Q. Or Norplant?
A. No.
Q. Have you -- have you published on Mirena?
A. No.
Q. Outside of this litigation, do you have any form of experience with Mirena?
A. No, sir.
Q. Is the same true for Norplant?
A. The same is true for Norplant.
Q. Have you ever published on LNG?
A. No.
Q. Have you conducted research on LNG in any form?
A. Outside the litigation?
Q. Outside of the litigation.
A. No.
Q. Do you hold yourself out as a pharmacokinetics expert?
A. No.
Q. Do you hold yourself out as a pharmacodynamics

Page 86

expert?
A. No.
Q. Do you -- do you understand -- do you have an understanding of -- of which medical discipline typically diagnoses and treats PTC?
MR. KENNERLY: Object to the form.
A. I believe I do, yes.
Q. (BY MR. SCHMIDT) And what is that?
A. I believe it's neurology.
Q. You're not a neurologist, correct?
A. No, sir.
Q. I take it you have never diagnosed PTC or cared for a patient with PTC?
A. Excuse me. Ophthalmology, I -- perhaps as well.
Q. Okay. And you're not an ophthalmologist?
A. No.
Q. Have you ever diagnosed or cared for a patient with PTC?
A. Yes.
Q. And when was the last time?
A. Oh, goodness, it was long time ago, in the '80s.
Q. Okay. Did you make the diagnosis?
A. A team made the diagnosis.
Q. You were part of a team that made a diagnosis?
A. Yes, sir.

Page 87

Q. Did you care for that patient's PTC?
A. Yes.
Q. And how did you care for that patient's PTC?
A. Actually, we supported the care until we did a lumbar puncture, and a lumbar puncture relieved the patient's symptoms.
Q. And there's a lot in there that I wanted to ask you about. Have you ever given a lumbar puncture?
A. Yes.
Q. Is one -- when was the last time you did that?
A. 1978, '79.
Q. Is a lumbar puncture required to diagnose PTC?
A. Yes.
Q. And you refer -- and if you want to reference that. I'm not going to ask you about it. It's Paragraph 96.
You refer to something called the modified Dandy criteria in your report?
A. Yes, sir, I do.
Q. Do you understand those to be the criteria for diagnosing PTC?
A. Paragraph 96? Yes. Yes, sir.
Q. Yes, they are the criteria for diagnosing PTC?
A. Yes.
Q. Had you applied the Dandy criteria individually

Page 88

before this litigation, the modified Dandy criteria?
A. As a -- well, I would say no. I mean, the patients I saw -- or the patient I saw that I recall was before 1985.
Q. Okay. But you do understand it's -- it's a basic fact about PTC that the Dandy -- criteria guide diagnosis of PTC?
A. Yes.
Q. A modified Dandy criteria.
Have you ever reviewed optic nerve imagery to try to detect papilledema?
A. Again, a long time ago, but, yes.
Q. In the '70s?
A. Yes.
Q. Would it be fair to say that over the last several decades, you would refer out the diagnosis and treatment of PTC to other -- other disciplines of medicine?
A. Yes.
Q. And I may have asked this. Have you ever published on PTC?
A. No, sir.
Q. Have you ever researched the causes of PTC before becoming involved in this litigation?
A. Sure. But, again, a long time ago, in the '70s.

Page 89

Q. Do you have an opinion that Mirena caused PTC before becoming involved in this litigation?
A. No, sir.
Q. If we look back at Exhibit 2, do you have an opinion that any of the items on Exhibit 2 were known causes of PTC before becoming involved in this litigation?
MR. KENNERLY: Object to the form.
A. So 2. Okay. Ask me again, please.
Q. (BY MR. SCHMIDT) Sure. Did you have an opinion before becoming involved in this litigation that any of the items on Exhibit 2 were known causes of PTC?
A. Yes, sir.
Q. Did you have an opinion before becoming involved in this litigation -- I'm sorry to do this to you. Strike that.
Can you put Exhibit 4 in front of you?
A. Okay.
Q. Before becoming involved in this litigation, did you have an opinion that any of the risk factors on Exhibit 4 were risk factors for PTC?
A. No.
Q. Let's look at Paragraph 95 of your report.
A. Can we take a break for a few minutes?
Q. Of course.
A. Thanks.

THE VIDEOGRAPHER: Off the record at 10:28, end of Media 2.
(Short recess.)
THE VIDEOGRAPHER: We're on the record at 10:41, beginning of Media 3.
Q. (BY MR. SCHMIDT) Doctor, I'm going to turn to a -- a new topic. Before I do, let's just go back quickly to something we talked about before the break on Valenzuela, which is Exhibit 14.
A. Yes.
Q. Is the reported odds ratio -- you used a term called "generalizable," correct?
A. Yes.
Q. And generalizable is a epidemiologic concept about -- what it sounds like, whether data is generalizable for a larger population?
A. Yes.
Q. Is the Denmark odds ratio generalizable to the US population?
MR. KENNERLY: Object to the form.
A. I'm sorry. Excuse me. Perhaps. Just because -- and I'm not suggesting that you're saying this, but just because it's from another continent doesn't mean it's prima facie not generalizable.
Q. (BY MR. SCHMIDT) Okay. Okay. Do you have a



view as to whether or not it's generalizable to the US population?
A. I think it's applicable. I --
Q. Using your term "generalizable."
A. The odds ratio that they saw in --
Q. Denmark.
A. -- Denmark was --
Q. 3.91.
A. Right. Right. Whether three point --
Q. 3.91.
A. Whether 3.91 -- I don't think 3.91 is generalizable.
Q. Okay.
A. I think the concept that there is elevated risk for IH of people with -- for women whose Mirena is generalizable.
Q. I've got you. Let me focus, then, on how you frame that. Is the odds ratio of 7.70 generalizable to the US population?
A. A little closer, I think, but the important message to me is that the risk is greater.
Q. Okay. So if you come back to my -- my question --
A. Uh-huh.
Q. -- you said it's closer to being generalizable.



Is 7.7 generalizable to the US population?
A. A 7.7 number, I would say no. And specifically what I mean is that I think it would be a mistake to take somebody in North Dakota or somebody in Miami and suggest that the ratio is 7.7 -- the odds ratio is 7.7. I do think it speaks -- the concept that Mirena has a significantly increased risk of IH is generalizable.
Q. And last question on this point. Do you think that odds ratio of 7.7 is generalizable to women using Mirena in Utah who were not seen in the University of Utah health care system?
A. Again, the 7.7 by itself, no, but the concept of increased risk is.
Q. Let's look at Paragraph 95 of your report.
A. Yes.
Q. You've got a heading Intracranial Hypertension, IH. Do you see that?
A. I do.
Q. Is that the -- is that the same thing as PTC?
A. Yes, sir.
Q. Are there cases of -- of intracranial hypertension that are not PTC?
A. Yes, there are, yes.
Q. You -- do you know, in fact, that many things unrelated to PTC can cause intracranial hypertension?



A. Yes, sir.
Q. Do you know how often idio -- intracranial hypertension is PTC? Like, if you looked at the percent -- of the total intracranial hypertension cases, do you know how many of them are PTC?
A. No, I don't.
Q. You say a little further down, you've got a paragraph entitled Nomenclature?
A. Yes.
Q. And you make reference to the term "PTC," and you say, "It's a term of historical interest but has little intrinsic value."
Do you see that?
A. Yes.
Q. Is it -- is it a disfavored term in the medical community?
A. I think it's a -- it's a term that has disappeared.
Q. Okay. Is it incorrect to refer to the disease using the term "PTC"?
A. It's not incorrect, it's just inaccurate.
Q. PTC is an inaccurate term?
A. It's -- it's -- yes, it's inaccurate.
Q. Is the term "idiopathic intracranial hypertension" inaccurate?

Page 94

A. I believe it is, yes.
Q. You -- you provide the term "primary intracranial hypertension." Do you see that?
A. Yes, sir.
Q. And you say, "That's a better descriptor of cases where no secondary etiology has yet been identified."
Do you see that?
A. Yes, sir.
Q. Would -- would Mirena-caused PTC be primary intracranial hypertension or secondary intracranial hypertension?
A. Well, again, that's nomenclature. I would -- if it -- if it is in the process of being -- if the relationship is in the process of being discovered and is not yet established, then I think you could say it's a cause of primary intracranial hypertension. Once it -- once it's established -- like hypervitaminosis A is established, then it becomes secondary.
Q. Okay. Which one is Mirena, primary or secondary?
A. Well, right now we're arguing over it, so I'd say it's primary.
Q. And you cite -- you cite a couple of -- of articles to support your expert opinion that the term "primary intracranial hypertension" is a better descriptor of cases. Do you see that?

Page 95

A. Yes.
Q. Look with me, if you would, at those sources, 13 and 14, one on page 45 is Thurtell, one is Shawn Aylward. Do you see that?
A. Yes.
Q. Those are the two sources you cite for your statement and text on page 26 that in your expert opinion, the term "primary intracranial hypertension" is a better descriptor of cases?
A. Yes.
(Exhibit 15 marked.)
Q. (BY MR. SCHMIDT) Let's look at the Thurtell article. Is what I've marked as Exhibit 15 a copy of the Thurtell article.
Is this a copy of the article that you cite in your report?
A. Yes, it is.
Q. Okay. If you look at the second page of the article, What's in a Name?
A. Yes.
Q. He has a similar nomenclature discussion to the -- the one you and I have been talking about?
A. Yes.
Q. Do you see that?
A. I do.

Page 96

Q. If you look at the -- the latter half of that paragraph --
A. Yes.
Q. -- these authors talk about the terms "primary" and "secondary intracranial hypertension." Do you see that?
A. Yes.
Q. And after talking about this, they say, "At this point the preferred term 'idiopathic intracranial hypertension' emphasizes our general lack of understanding of the pathophysiology of this disorder."
Did I read that correctly?
A. I do -- I mean, yes, you did, uh-huh.
Q. Do you agree with that statement?
A. No --
Q. Okay.
A. -- I don't.
Q. And is it accurate that you disagree with that statement both in terms of use of idiopathic intracranial hypertension as a preferred term and in terms of there being a general lack of understanding of the pathophysiology of the disorder?
A. I was referring -- at this point, I was referring to the -- the italicized word "idiopathic."
Q. Okay. Do you agree with the statement that there

Page 97

is a general lack of understanding of the pathophysiology of PTC?
A. At this point, I would say no.
Q. No, you do not agree with that?
A. Okay. Let me rephrase.
Q. Sorry. It might be the way I phrased it.
A. It's okay. Let's start again.
Q. Okay. Is it true in your view that there is a general lack of understanding of the pathophysiology of PTC?
A. I would disagree with that.
Q. You -- you talk in Paragraph 99 of your report about symptoms of PTC?
A. Yes, sir.
Q. Do you know how -- strike that.
One of the hallmark symptoms is papilledema, correct?
A. Yes, sir.
Q. Do you know how often when you see papilledema it is PTC?
A. I do not, no.
Q. Do you know if it's a majority or not of cases?
A. I do not know.
Q. And if I were to go through some of these other symptoms like tinnitus, headaches, other symptoms of PTC,

Page 98

would you be able to tell me whether the majority of appearances of those symptoms are PTC?
A. Well, I would suggest that perhaps pulsatile -- pulsatile tinnitus may be very specific for PTC, but the others are nonspecific.
Q. And by "not specific," you see them all the time with other conditions that are not PTC?
A. Yes, sir.
Q. For pulsatile tinnitus, do you know if the majority of pulsatile tinnitus cases turn out to be PTC?
A. I don't know.
Q. And you talked earlier about lumbar punctures, and I think you've -- you've said this, but I want to make sure I have this. Is it the case that lumbar punctures sometimes resolve the symptoms of PTC?
A. It is, yes.
Q. Is it the case that PTC symptoms sometimes spontaneously resolve?
A. I'd be hard-pressed to say no, that -- but I would be very surprised if profound symptoms of PTC go away on their own.
Q. Okay. Do you know how often it's the case that PTC goes away with a lumbar puncture alone, the symptoms at least?
A. I would think it would be fairly common.

Page 99

However, it's possible, if not likely, that they would recur.
Q. Okay. For example, do you know if in the majority of cases, a lumbar puncture eliminates the symptoms of PTC?
A. Again, I would say they would eliminate the symptoms of PTC for a time period.
Q. And have you seen any data that tells you when in the majority of cases a lumbar puncture eliminates the symptoms of PT -- PTC, it later recurs?
A. Sorry. Say again.
Q. Sure.
MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) Let me break it down.
A. Okay.
Q. I think you just agreed with me, but I want to make sure. Is it -- is it the case that in the majority of instances, a lumbar puncture alleviates the symptoms of PTC?
A. And my -- my answer is, yes, but for a short period of time, for a specific duration of time.
Q. And that was where I was going next. In how many instances where the symptoms of PTC are alleviated by a lumbar puncture do the symptoms later recur; do you know?
A. I would say the majority of times.

Page 100

Q. Okay. And do you base that on data? Have you seen data to that effect?
A. Well, it says -- I think -- I think it's really just based on my understanding of the causes of PTC, what exactly lumbar punctures do, and the mechanism by which PTC occurs.
Q. Would you agree with me that when -- strike that.
You cite a number of case reports in your report, correct?
A. Yes, sir.
Q. And I have seen in some of those case reports and I've seen it more broadly in case reports statements that past a certain point in time no further data was available.
A. Yes, sir.
Q. Is it the case that in -- would you agree with me that in many case reports, we can't tell if the symptoms of PTC later recurred or not?
A. Case reports are commonly censored, so I would say you can't tell.
Q. Okay. Can weight loss alleviate the symptoms of PTC?
MR. KENNERLY: Object to the form.
A. My best answer is perhaps.
Q. (BY MR. SCHMIDT) I said I wasn't going to do

Page 101

this, but I -- I forgot that I had this. There's an article we marked as Exhibit 5, the Daniels article. Do you mind looking back at that?
A. Okay.
Q. If you look at page 640 of this article, the second full paragraph on the left, it states that "There is evidence from retrospective studies that even a small degree of weight loss in IH may lead to improved outcomes with respect to resolution of papilledema."
Did I read that correctly? And then it gives specific data.
A. I am not with you. The second paragraph?
Q. On the left, please.
A. On the left?
Q. Yeah. Sorry.
A. Okay.
Q. Do you see that language that I --
A. I do --
Q. -- read?
A. -- yes. Right.
Q. Have you surveyed the data on -- on how weight loss improves symptoms of PTC?
A. Have I surveyed the data in -- at large? No. But I have some mechanistic data that would help understand how that might happen.

Page 102

Q. Do you take issue with the proposition that weight loss can alleviate the symptoms of IH?
A. I do, yes.
Q. You take issue with that --
A. I do take issue with that, yes. And just to be clear, it's not just weight loss, but it's salt and water loss.
Q. Well, weight loss can be a -- a proxy for salt and water loss, correct?
A. That's true. And that's what I wanted to be clear about. There are people who can -- who will lose. If we all go on a diuretic, for example, we will all drop our sodium content and drop our water and lose weight, but that's not affecting adipose tissue.
Some people talk about weight loss -- and, actually, most people talk about weight loss as adipose tissue. I think if people lose adipose tissue, they're not likely to change their symptoms of IH. But if they drop their salt and water load, they will.
Q. And you base that not on studies showing that, but on your -- on your mechanistic theory; is that correct?
A. Well, on what I've read about mechanism, yes.
Q. Is -- is the -- the means by which Mirena might cause PTC a theory or is it established?

Page 103

A. I think it --
MR. KENNERLY: Object to the form.
A. I -- I -- the best answer I can give you is that it is in the process of becoming established.
Q. (BY MR. SCHMIDT) But not yet established?
A. Not yet established.
Q. Have you seen data indicating how often weight loss improves the symptoms of PTC?
MR. KENNERLY: Object to the form.
A. Yes, I have.
Q. (BY MR. SCHMIDT) Do you know what that data shows?
A. It show that -- it show that weight loss -- again, this is primarily sodium and water loss -- improved the symptoms of PTC.
Q. Do you know if that's true in a majority of cases -- a majority of patients who have PTC and lose weight have improvement in their symptoms?
A. That, I don't know.
Q. You talk about the concept of -- of dechallenge --
A. Yes.
Q. -- in your report?
A. Yes.
Q. And dechallenge is well-recognized phenomena, the

Page 104

idea being when you remove an agent and the symptoms improve, that's a dechallenge?
A. Yes, sir.
Q. Is it a confounded dechallenge if you remove the agent, but also provide treatment?
A. Yes, it is.
Q. And does that limit your ability to reach causal determinations based on a dechallenge if the dechallenge is confounded by treatment?
A. Well, it limits the utility of that particular piece of information, yes.
Q. We didn't do this at the beginning, so let me do it now. Did you receive a copy of the deposition notice in this case?
A. I did, yes.
Q. Did you provide any documents in response to the schedule?
MR. SCHMIDT: I need exhibit stickers.
MR. KENNERLY: Yeah, I think we have some.
(Exhibit 17 marked.)
(Comments off the record.)
MR. SCHMIDT: Did we give you a copy? No.
Q. (BY MR. SCHMIDT) I've marked as Exhibit 17 the deposition notice. And all I care about in this document is Exhibit A. Do you see that?

Page 105

A. Oh, I see, yes, I do.
MR. SCHMIDT: And I'll just note for the record that I skipped an exhibit, so my next exhibit will be 16. But the deposition notice is Exhibit 17.
MR. KENNERLY: Ah, okay. Yeah, we do have some documents in response to that.
MR. SCHMIDT: Okay. May I get those?
MS. LAMACCHIA: Yes.
Q. (BY MR. SCHMIDT) And while I'm doing that, Dr. Moye, do you mind just perusing through Exhibit A. And I'm going to ask you a question about that at the end.
A. Okay.
MS. LAMACCHIA: This is in response to No. 1?
(Exhibit 16 marked.)
Q. (BY MR. SCHMIDT) Let me -- if I can do this piecemeal. I'm going to mark as Exhibit 16 what I was --
A. All right.
Q. -- just handed, which is your CV. Is Exhibit 16 a current copy of your CV along with publications and things of that nature?
A. It is, sir.
Q. Okay.
MS. LAMACCHIA: Are you ready for the next?
MR. SCHMIDT: Yeah, please. Thank you.

Page 106

MS. LAMACCHIA: This is all in response to No. 5.
MR. SCHMIDT: Do you have an extra copy of this?
MS. LAMACCHIA: Oh, yes. Sorry. I only handed you one.
MR. SCHMIDT: Thank you.
(Exhibit 18 marked.)
Q. (BY MR. SCHMIDT) I marked as Exhibit 18 a document entitled Additional Documents Reviewed. Do you see that?
A. I do.
Q. Now, you have -- you have listed at the back of your report various references you cite, correct?
A. Yes, sir.
MR. SCHMIDT: And can I get the other reliance list document?
(Exhibit 19 marked.)
Q. (BY MR. SCHMIDT) When we received your original report, we were given what I've marked as Exhibit 19, which is titled Additional Published Literature Reviewed. Do you see that?
A. Yes, sir.
Q. And we now have Exhibit 18, which is Additional Documents Reviewed; is that correct?

Page 107

A. Yes, sir.
MS. LAMACCHIA: And I think stapled to the back of that, Paul, is -- is what you just marked as Exhibit 19, okay? So it just needs --
MR. SCHMIDT: Got it.
MR. KENNERLY: -- to be torn off, then we can tear it off.
Q. (BY MR. SCHMIDT) Yeah, let's do that. Let's tear off the last three pages of Exhibit 18, please.
A. So all but the first page?
Q. All but the first two, I think.
A. First two. Okay.
Q. So I just want to be sure I have it. And I'll take those three pages so they don't get mucked up in the record.
A. Sure.
Q. As I understand it, Doctor, at the time you prepared your report, you cited various documents and publications in the footnotes to your report, correct?
A. Yes.
Q. And there was an additional universe of materials you reviewed, which is Exhibit 19, correct?
A. Yes, sir.
Q. And that was the limits of what you reviewed at the time you had prepared your report, correct?

Page 108

A. Yes, sir.
Q. And, then, is Exhibit 18 materials you have reviewed since preparing your report?
A. Yes, sir.
Q. Okay. And just to -- to drill down on some of these materials, are these materials that you -- for example, you've got the Mosher publication that we discussed?
A. Yes, sir.
Q. Are these materials that you found in your own research or that were provided to you by counsel?
A. Most of these I found by my -- in my own research.
Q. And, obviously, you didn't find the expert reports or the deposition in your research, those were given to you by counsel?
A. Yes, sir.
Q. There would be no other way for you to get them. But was there literature that was provided to you by counsel that you did not find in your own research?
A. Yes, there was.
Q. Was the Mosher article one of those?
A. Yes.
Q. Was the Peipert article listed on the first page of this document one of those?

Page 109

A. Yes.
Q. Was the Sanders article listed in exhibit -- on the second page of Exhibit 19 -- 18 one of those articles?
A. No.
Q. You have -- you were given a set of expert reports for the plaintiffs and for the defendants. Do you see that?
A. Yes, sir.
Q. Do you have an understanding as to whether or not that is a complete set of all of the plaintiff expert reports in this litigation and all of the defense expert reports in this litigation?
A. I do not.
Q. Do you know why -- I will represent to you that it's not.
A. Uh-huh.
Q. Do you know why you were given some and not others?
A. No, sir.
Q. Do you rely on any portions of either the defense experts or the plaintiff experts in giving your opinions?
A. No, sir.
Q. Is there anything you have seen in the materials contained on Exhibit 19 that change your opinions or cause you to have new opinions?

Page 110

A. No, sir.
MS. LAMACCHIA: This is the literature that is cited on his additional documents reviewed.
MR. SCHMIDT: Thank you. I don't think we'll mark that.
MS. LAMACCHIA: Okay.
MR. SCHMIDT: Is there anything else from the good doctor?
MS. LAMACCHIA: Yes. In response to No. 10, these are the invoices.
MR. SCHMIDT: So as I -- as I track it, we have responses to 1, 5, and 10 --
MS. LAMACCHIA: Correct.
MR. SCHMIDT: -- of the deposition notice?
(Exhibit 20 marked.)
Q. (BY MR. SCHMIDT) Doctor, I've marked as Exhibit 20 what your counsel just provided to me, which I understand to be invoices for your work in this litigation. Is that what Exhibit 20 is?
A. Yes, it is.
Q. Okay. And so would it be accurate that your work started in September 2017?
A. Yes, sir.
Q. And it -- your bills proceed up through deposition preparation, I guess, just a couple of days

Page 111

ago? Correct?
A. Yes, sir.
Q. Have you totaled either the number of hours or the -- the total bills?
A. I have not, no.
Q. She's trying to do that.
A. She had the calculator out. I'm afraid she's not texting somebody.
Q. Is there anything else that is referenced in Exhibit A that you provided to your counsel that we have not yet talked about?
A. No, sir.
Q. Do you have a retention agreement?
A. Excuse me. Excuse me. Not yet talked about?
Q. In terms of these exhibits we've just marked, the reliance list --
A. Oh.
Q. -- the invoices, the CV.
A. No.
Q. Do you have a retention letter?
A. No.
Q. And my -- my total of -- of your -- I'm making a misrepresentation. My -- my smarter colleague's total of your invoices as reflected in Exhibit 20 is just a little north of $100,000 for your work in this matter. Does that

Page 112

seem about right?
A. Yes, sir.
Q. You're familiar with the concept called the hierarchy of evidence?
A. I am, yes.
Q. Is the idea that certain types of evidence are more probative to determining causation than others?
MR. KENNERLY: Object to the form.
A. Yes, sir.
Q. (BY MR. SCHMIDT) And at the top are randomized controlled clinical trials?
A. That's not true anymore. Sad to say. Meta-analyses -- excuse me. Systematic reviews are considered at the top now. Now, what that actually is, I'm not really sure, but the new ones have (inaudible).
Q. Okay.
THE REPORTER: The new ones have what?
THE WITNESS: The new ones have systematic review. I do have to concede that.
Q. (BY MR. SCHMIDT) Actually, let me give you a document, because that reflects that. I think I glossed over that, and I don't -- I don't mean to do that. And it will guide our discussion.
Are you familiar with something called the "Reference Manual on Scientific Evidence"?

Page 113

A. Not -- not by that name, no.
(Exhibit 21 marked.)
Q. (BY MR. SCHMIDT) Okay. It's -- it's not necessarily a reason you would be. It's a judicial publication working with scientists. I'm going to pass you excerpts from it, which I've marked as Exhibit 21.
And you see on the cover it says, "Reference Manual on Scientific Defense." And you see it's a joint publication from the Federal Judicial Center of the National Research Council of the National Academies?
A. Yes.
Q. The language I'm going to ask you about appears on numbered page 723 of these excerpts?
A. I'm sorry, which?
Q. 723?
A. Is that a page number or?
Q. Yeah, if you look at the bottom, they're numbered. It's just that they're excerpts.
A. Oh, this is not the complete document?
Q. It would be quite large if it were.
A. Okay.
Q. And largely irrelevant but for some of the pieces I'm showing you. The other --
A. Okay.
Q. -- sections I'm not going to cover with you.

Page 114

If you look at 723, there's a heading that's -- uses this term we've been talking about, Hierarchy of medical evidence. Do you see that?
A. Yes.
Q. And it says in the third sentence, "When ordered from strongest to weakest, systematic review of randomized trials (meta-analysis) is at the top." That's the idea you were just telling me about, right?
A. Yes, sir.
Q. "Followed by single randomized trials, systematic reviews of observational studies, single observational studies, physiological studies, and unsystematic clinical observations."
Did I read that correctly?
A. Yes, sir.
Q. Do you agree with that hierarchy of medical evidence?
A. No.
Q. Which parts of it do you disagree with?
A. The systematic review at the top.
Q. And fair enough. If you take out the meta-analysis points in this --
A. Okay.
Q. -- listing, it has randomized trials above observational or epidemiological trials above

Page 115

physiological studies and unsystematic clinical --
A. Yes.
Q. -- observations. Do you agree with that ordering?
A. I do. But it is an epidemiologist's distinction to say that clinical trials are also epidemiology studies as well.
Q. That's why I used the term observational, because I have heard that distinction made. The Valenzuela study is an observational study, correct?
A. That's right, yes.
Q. And when -- when this refers to unsystematic clinical observations, do you understand unsystematic observations to include case reports?
A. I do, yes.
Q. Do you agree with the proposition that randomized trials are generally superior to observational studies?
MR. KENNERLY: Object to the form.
A. Ceteris paribus. Everything being equal, I would say yes. I mean, there are some terrible randomized controlled trials, but if it's a well-designed well-executed study, I'd say yes.
(Comments off the record.)
Q. (BY MR. SCHMIDT) Do you agree with the proposition that all other things being equal,

Page 116

observational studies are superior to individual case reports?
A. Yes.
Q. Why is it that observational studies are lower in the hierarchy of evidence than randomized clinical trials?
A. Because the investigator doesn't control the exposure and therefore the exposure cannot be randomly allocated and random allocation essentially divorces or disassociates characteristics of the patients from the exposure.
Q. And so if -- if I can see if I understand what you just said, you can control better for bias and confounders in a randomized clinical trial than you can in an observational study. Is that accurate?
A. I would say some I would -- if we put in the adjective "some," then yes I'd agree.
Q. And let me show you a publication of yours, and I want to be sure I have it right. You've written a book called "Statistical Reasoning in Medicine," correct?
A. Yes.
Q. I'll mark excerpts of your book as Exhibit 22.
(Exhibit 22 marked.)
Q. (BY MR. SCHMIDT) Sorry I keep doing that, Doctor. Do you recognize this as excerpts from your book, "Statistical Reasoning in Medicine"?

Page 117

A. Yes, I do.
Q. Look with me if you would at page 109 of these excerpts. You have a section called --
A. Yes.
Q. -- Design Considerations. Do you see that?
A. I do.
Q. And you make reference to something that you talk about in the third paragraph called "cost effective retrospective studies." Do you see that?
A. Yes.
Q. And those are the kind of observational studies we're talking about?
A. Yes.
Q. Like Valenzuela?
A. Yes.
Q. Do you agree with me -- am I correct in understanding from your report that a randomized clinical trial regarding Mirena and PTC is not feasible in this setting?
MR. KENNERLY: Object to the form.
A. I would say yes for two reasons.
Q. (BY MR. SCHMIDT) Okay.
A. Okay. So the first reason is one simply cannot design the clinical trial and write an informed consent to bring patients into a research effort where the idea is to

Page 118

see if the drug is doing harm. Okay. The second is that the rate of PTC is so low that one would have to randomize I think hundreds of thousands of people in order to have enough cases to be able to statistic -- to statistically distinguish the difference in the event rates from patients randomized to Mirena versus patients randomized to something else.
Q. So am I correct that there are both feasibility and ethical reasons why you can't conduct a clinical trial -- randomized clinical trial on Mirena and PTC?
A. That's right.
Q. So looking back at Exhibit 22, your -- your book, you talk about a price one must sometimes pay for these kind of observational studies we're talking about, right?
A. Yes.
Q. And the price you pay is the potential of bias; is that correct?
A. Yes, sir, it is.
Q. And that's a greater -- bias is a greater concern with observational studies than it is with randomized clinical trials; is that correct?
A. That is true.
Q. Is --
A. I'm sorry. Some types of bias are. There are other biases that are concerned in clinical trials.

Page 119

Q. Are confounders a form of bias or potential bias, or should I put those in a different bucket?
A. In a randomized trial, no, because confounders are typically randomized according to each group, so it's not a bias, but it's a potential bias in a observational study.
Q. So would it be accurate to say that confounders are a potential bias in observational studies but not randomized clinical trials?
A. That's true, yes.
Q. And are both confounders specifically and bias generally of greater concern in case reports than they are in observational studies?
A. Well, certainly it is an issue in case reports to be sure. But case reports don't -- are not analytic. They don't give you a quantitative measure of effect. So the question is what's being biased.
Q. Okay. That's a very fair way to state it. You go on to write in your book, "Researchers must balance the relatively weaker causality arguments developed from the cost effective retrospective studies against the stronger causality assessment from the prohibitively expensive prospective randomized clinical trials."
Did I read that correctly?
A. Yes, sir.

Page 120

Q. Is that a true statement?
A. It is.
Q. Now, I'm going to try to -- for the sake of my own brain make this as simple as possible and ask you to help me with this. If it's too simple, then tell me if I'm oversimplifying.
Bias is a concern when you conduct an -- or can be a concern when you conduct an observational study, correct?
A. Yes, sir.
Q. And as I understand your report, you can have different forms of bias. One form of bias can skew the results towards the null, correct?
A. Yes, sir.
Q. And that means that -- strike that.
Biasing towards the null means that you have a bias in your study that causes you to miss an effect or lessen an effect that is there?
A. Underestimate the odds ratio, yes, sir.
Q. Bias can also skew results away from the null, correct?
A. Yes, sir.
Q. And that means that you could have potential bias in your study that causes you to see an effect that is not actually there, correct?

Page 121

A. Yes, sir, overestimates the odds ratio, yes.
Q. And for both of those reasons, you try to control for bias in observational studies when you can?
A. Yes, sir.
Q. And sometimes you control for bias by having a more rigorous design of the study; is that correct?
A. Yes, sir.
Q. And sometimes you control for bias by adjusting the results of the study based on things like patient characteristics or match -- or adjust, yeah, patient characteristics?
A. I would say the latter is dealing with the issue of confounders.
Q. Okay.
A. Right? Bias is more of a systematic --
Q. Okay.
A. -- problem with the study, and it's difficult to quantitatively adjust out of that.
Q. Got it. Let me -- let me ask you some special confounders questions. Confounders I take it just like other bias can skew the results towards the null or away from the null?
A. That is true. And just to be clear, we're talking about the distribution of confounders inequitably --

Page 122

Q. Yes.
A. -- between the -- between the cases and the controls.
Q. Right. The idea being that confounders are distributed inequitably between the cases, the group you're --
A. Right.
Q. -- studying, and the controls, the group you're comparing them to. If there is such an inequitable distribution of a true confounder, it can bias your results toward the null or away from the null?
A. Yes, sir.
Q. Let's go back to your report. You state in Paragraph 71 on page 19 of your report.
A. Paragraph.
Q. 71?
A. 71. Okay.
Q. You're talking about a Bradford Hill criteria called consistency. Do you see that?
A. Yes, sir.
Q. And you say, "Consistency requires that the findings of one study be replicated in other studies." Do you see that?
A. Yes, sir.
Q. Why is that important?

Page 123

A. It's important because the research community needs to have some assurance that the findings are not a peculiarity of the population that was studied, the way the exposure was measured and just did not appear just because of an eccentricity in the research design.
Q. And that's a basic principle of science, right?
A. Yes, sir.
Q. And what does it mean to replicate the findings of one study in other studies?
A. It's -- it means that a investigator using different patients, using different mechanism of identifying cases and control and obviously using different patients are produced as a result that is similar to the result of the initial study.
Q. If you look at your exhibit -- do you have the reference manual in front of you still, Doctor?
A. I think I do, yes.
Q. What exhibit number is that?
A. That's 21.
Q. Thank you.
If you look at page 604 of 21.
A. 604. Okay.
Q. There's a heading that says, "Have the Results Been Replicated"?
A. Yes.

Page 124

Q. I'll just ask you -- two short paragraphs. Can you read that to yourself?
A. Yes. (Witness reading.)
Yes.
Q. Do you understand this to be referring to this concept of replication we've been talking about?
A. Consistency?
Q. Yes, consistency.
A. Yes.
Q. Okay. First sentence says, "Rarely, if ever, does a single study persuasively demonstrate a cause-effect relationship."
Did I read that correctly?
A. Yes, sir.
Q. Do you agree with that statement?
A. I would say a single observational study. I mean, clinical trials, you can't -- commonly can't afford to do more than one study, and a well-designed clinical trial will answer a question with clear definition, and there's no need to replicate it.
Q. And that's a very fair point. And I think it's something that is a limitation about not having the full book in front of you here. I believe that this section -- but let me confirm it online.
Oh, no. Okay. I thought this was focused

Page 125

specifically on epidemiology, this statement. So let me make it specific --
A. Okay. Sure.
Q. -- to observational studies. Do you agree with me that rarely, if ever, does a single observational study persuasively demonstrate a cause-effect relationship?
A. I do.
Q. Do you agree with me that it is important that an observational study be replicated in different populations and by different investigators before a causal relationship is accepted --
MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) -- by epidemiologists and other scientists?
MR. KENNERLY: Sorry. Object to the form.
A. In general, yes, I agree with that.
Q. (BY MR. SCHMIDT) Okay. And then it refers in the third sentence, after the one I read, that "Consistency in findings is an important factor in making a judgment about causation."
I take it you agree with that?
A. Yes, sir.
Q. It states, "Inconsistent results do not necessarily rule out a causal nexus, but inconsistencies signal a need to explore whether different results can be

reconciled with causality"?
A. Yes, sir.
Q. Do you -- as you understand it, consistency, are the two results from Valenzuela inconsistent in terms of the different odds ratios involved?
A. I thought you asked me as I understood inconsistency. Is that what you meant to say?
Q. Sure. Let me reask the question.
A. Okay.
Q. We've been talking about consistency and inconsistency --
A. Right.
Q. -- correct?
A. Right.
Q. Are the two -- do you view the two results -- the two odds ratios reported in Valenzuela as inconsistent as we have been using those terms?
A. No, sir.
Q. You -- you say in Paragraph 60 of your report -- and just while you're looking at that, I take it the converse of what you just said is you view the two odds ratios in Valenzuela as consistent, correct?
A. Yes, sir.
Q. Let's look at page 60.
A. Oh, page -- no -- Paragraph 60 or page --



Q. Paragraph 60.
A. Thank you. Okay.
Q. "The mere presence of an association does not imply causation."
Is that accurate?
A. Yes, sir.
Q. And that's true even if there's a statistically significant association, correct?
A. Yes, sir.
Q. When you use the term "association," does that -- does that require there be a statistically significant finding?
A. Not --
MR. KENNERLY: Object to the form.
A. Not necessarily.
Q. (BY MR. SCHMIDT) You talk about using the Bradford Hill criteria. Do the Bradford Hill criteria require as a precursor to applying the different factors a statistically significant finding?
A. No, sir. And Bradford Hill right now is turning in his grave at the suggestion.
Q. Well, you don't speak for Bradford Hill, do you?
Let's -- let's look at what Bradford Hill has said. I take it this is a publication you have seen many, many times what I'm marking as Exhibit 23?



(Exhibit 23 marked.)
Q. (BY MR. SCHMIDT) Have you seen this publication?
A. Yes.
Q. This is the original -- I guess it was a speech that Dr. Bradford Hill gave regarding his criteria, the ones that you apply in your report?
A. Yes, sir.
(Ms. Snapka joins the proceedings.)
Q. (BY MR. SCHMIDT) Let me just focus here on the first page right before he talks about strength. Before talking about the different criteria you apply, he states, "Our observations reveal an association between two variables perfectly clear-cut and beyond what we would care to attribute to the play of chance."
Did I read that correctly?
A. Yes, sir.
Q. And he then says, "What aspects of that association should we especially consider before deciding that the most likely interpretation of it is causation?"
A. Yes, sir.
Q. And then he lists the different factors you apply?
A. Yes, sir.
Q. When he states that "The observations reveal an association between two variables perfectly clear-cut and



beyond what we would care to attribute to the play of chance," do you understand that to be a reference to a statistically significant finding?
A. No, sir.
Q. What do you understand him to mean by saying "beyond what we would care to attribute to the play of chance"?
A. I mean by hid the observation by Dr. Hill and other epidemiologists and investigators that the results are unlikely to be the play of chance, but that is not the requisite for stat -- for stat significance.
Q. Let's talk about -- we've talked about randomized trials. We've talked about observational studies. Let's talk about case reports.
Is it a limitation of case reports that you don't have a comparison group so it's difficult to determine whether the case reports are arising by more than what you would expect in terms of the background rate?
A. That's correct.
Q. Is it a limitation of case reports that there's no way to control for confounders --
A. That's correct.
Q. -- in a case report?
A. I'm sorry. That's correct.

Confidential - Subject to Protective Order



Q. And so you can't tell in giving cases whether it was a -- a confounder that caused the case, something else, or the agent you're studying like Mirena, correct?
A. That's correct.
Q. Is it a limitation of case reports that they often have incomplete information?
A. Yes.
Q. And in the context of PTC, are they often incomplete in terms of factors like the known causes you listed on Exhibit 2 of -- of -- of this deposition and the risk factors you listed in Exhibit 4, those are often missing?
A. That's correct, yes.
Q. You can't tell, for example, whether patients were exposed to other known causes of PTC in many, many case reports, correct?
A. That's correct.
If we're going to shift, I'm going to ask for a brief break.
Q. Yeah, let me ask one more question while we still have the reference manual --
A. Okay.
Q. -- in front of us.
If you look at 218 of this.
A. Page 218?



Q. Yes, please.
A. Okay.
Q. The first full paragraph states, "Anecdotal evidence usually amounts to reports that events of one kind are followed by events of another kind."
Did I read the correctly?
A. Yes, sir.
Q. And that's case reports that's talking about, right? Well, let me rephrase it.
A. I'm not sure, actually.
Q. Yeah, that's maybe not a fair question.
Are case reports reports that events of one kind are followed by events of another kind?
A. I think I understand what we're talking about here. We're talking about in a case report, there is a finding -- there's an exposure which is followed in the case report by an event?
Q. Right.
A. Yes, that's true.
Q. Is it the case -- and I'm going to add the word case reports in here, so I'm not purporting to represent this is the exact verbiage. Is it the case that typically case reports are not even sufficient to show association because there is no comparison group?
A. That's correct, yes.



Q. Why don't we take our break.
A. Okay.
THE VIDEOGRAPHER: Off the record at 11:30, end of Media 3.
(Short recess.)
THE VIDEOGRAPHER: We're on the record at 11:41, beginning of Media 4.
(Exhibit 24 marked.)
Q. (BY MR. SCHMIDT) Doctor, I'm passing you what I've marked as Exhibit 24, a WHO publication. You reference in your report WHO criteria. If you want to take a look at it --
A. Yes.
Q. -- it's Paragraph 32.
Do you understand these to be the criteria that you reference?
A. Yes.
Q. And these are criteria for performing something called a causality assessment on individual case reports, correct?
A. Yes, sir.
Q. If we look at the cover of this document, it -- it has a Table 1 that is titled Advances in Limitations of Standardized Case Causalities. Do you see that?
A. Yes.



Q. And on the right-hand side, it says, "What causality assessment cannot do."
Do you see that?
A. Yes, sir.
Q. One of the things is prove the connection between drug and event. Do you see that? The third item.
A. Prove the connection between drug and event. I do see that. This isn't true in all circumstances, but I do see this, yes.
Q. Do you -- do you generally agree with these statements contained in this document about what causality assessment cannot do?
A. Yes.
Q. Do you believe that you can use causality assessment in the context of Mirena and PTC to prove the connection between drug and event?
A. I would say this: I certainly can't use the -- the case -- the individual cases to demonstrate by themselves causality. But I can use them to contribute to the (inaudible).
THE REPORTER: Contribute to the what?
THE WITNESS: I'm sorry. Contribute to the causal argument. Sorry.
Q. (BY MR. SCHMIDT) In your review -- okay. Thank you.

Page 134

If you just had case reports, would you conclude causation for Mirena and PTC?
A. In and of themselves, no, sir.
Q. Are you familiar with something called disproportionality analyses?
A. Yes, sir.
Q. You have not done one of those here?
A. I have not.
Q. Are you relying on any here?
A. No, sir.
Q. Does the presence of disproportionality in case reports contribute to causation or can it?
A. Well, disproportionality analysis, as I understand it, is the analysis over case series, if you would, a collection of cases. We're talking here, I thought, about individual case reports.
Q. Right. If you perform a disproportionality over a series of cases and see disproportionality, does that contribute to causation?
A. There is some contribution, yes, but in and of itself, it does not stand for the premise that it's a causal relationship.
Q. If you conduct a disproportionate --
A. I beg -- I'm sorry. I'm going to need a -- I'm sorry. I should have brought this with me. I didn't. I

Page 135

need a piece of bread or a cracker. Is anything like that available? And I actually should have brought one and I didn't this morning.
MS. LAMACCHIA: I don't, but we'll find something.
THE WITNESS: Okay.
(Comments off the record.)
THE VIDEOGRAPHER: Off the record at 11:45.
(Short recess.)
THE VIDEOGRAPHER: We're on the record at 11:45.
Q. (BY MR. SCHMIDT) I was just asking you about disproportionality. If -- if -- and if you'd like, Doctor, we can just strike your last answer starting with "I beg." I don't have a preference one way or another just in terms of that was the request you just made.
MR. KENNERLY: Yeah, let's start over again.
Q. (BY MR. SCHMIDT) Let me ask you the converse of the question you just answered. If you conduct a disproportionality analysis of a series of case reports and find no disproportionality, does that argue against causation?
MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) Or is that evidence against causation?

Page 136

A. It is -- it is a small caliber evidence against causation.
Q. Let's talk about Valenzuela. How many studies have evaluated Mirena and PTC? How many observational studies?
A. One I rely on is Valenzuela. There's another one that I don't -- I do not rely on -- and I'm probably going to say it wrong -- is Etminan.
Q. Etminan.
A. Etminan.
Q. Well, let me ask you about this since you said that. As I understand it, we don't need to go back and look at the exhibits. You do not cite the Etminan study in any way in your report, correct?
A. That's correct, I don't.
Q. You do include on your reliance list the publication and two letters to the editor that Dr. Etminan wrote following his publication, correct?
A. Yes, sir.
Q. So you have reviewed those materials?
A. Yes, sir.
Q. Have you reviewed any other materials regarding the Etminan publication?
A. No, I have not.
Q. And why is it -- am I correct that as a whole

Page 137

with -- strike that.
Do you recall that there are two analyses in the Etminan publication, one an observational study, one a disproportionality analysis?
A. Yes, sir.
Q. Am I correct that you rely on neither of those?
A. That is correct.
Q. And why is that?
A. I don't find them reliable. I think that the review done by -- the critique done by the letter -- it may have been Dr. Friedman -- was incisive and insightful, and I think it removed any real value -- any contributory value of the -- of the Etminan analyses to my perspective.
Q. Is that true as to both the disproportionality analysis and the observational component of the Etminan publication?
A. Yes, sir.
Q. You read Dr. Etminan's second letter to the editor where he acknowledges shortcomings in his disproportionality analysis, correct?
A. Yes, sir.
Q. And reading that subsequent letter to the editor, do you read that as a functional retraction of his earlier published disproportionality analysis?
A. That's a good use of a term. Yes, I would say

Page 138

so.
Q. In your view, is it appropriate to rely on his disproportionality analysis that functional retraction having occurred?
A. I -- I don't rely on it, no.
Q. Would it be methodologically appropriate in your view to rely on it?
A. I can only speak for myself. I don't rely on it for the reasons that I've discussed.
Q. If it contained valid data, would you rely on it?
A. If it contained a valid analysis, I would certainly consider it, yes.
Q. But you don't consider it to be a valid analysis?
A. That's correct.
Q. Is it relevant to you in analyzing the Etminan publications that Dr. Etminan was, quote, paid by lawyers suing Bayer in cases alleging that Mirena caused users to develop idiopathic intracranial hypertension?
MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) Is that relevant to you in assessing it?
A. No.
Q. Okay. Is it relevant to you if he reperformed his disproportionality analysis, and after reperforming it stated that it does not provide evidence that Mirena use

Page 139

increases the risk for intracranial hypertension?
MR. KENNERLY: Object to the form.
A. No.
Q. (BY MR. SCHMIDT) Let's go back to Valenzuela. Are there any observational studies other than Valenzuela which you do rely on and Etminan which you don't regarding Mirena and PTC?
A. No.
Q. And Valenzuela, of course, is a single study, correct?
A. Valenzuela is a single publication that has two case reports in it -- I'm sorry -- that has two case control studies in it.
Q. Performed by the same authors?
A. Correct, yes.
Q. Had you seen this study before this litigation?
A. I had not, no.
Q. Do you subscribe to the journal in which this was published?
A. What journal is it published in?
Q. "Neuro-Ophthalmology."
A. No, sir.
Q. Do you -- do you prescribe to any neurological or ophthalmological journals?
A. No, sir.

Page 140

Q. Have you had contact with any of these authors?
A. I'm just looking for the article. No, sir, I have not.
Q. Have you had contact with any authors on the topic of Mirena or PTC?
A. Any authors?
Q. Yes.
A. Of the --
MR. KENNERLY: Object to the form.
A. -- study?
Q. (BY MR. SCHMIDT) Of any -- any studies on Mirena and PTC where you've talked with them about Mirena and PTC.
A. No.
Q. Have you conferred with anyone about Mirena and PTC other than the lawyers?
A. No.
Q. I trust you would agree with me that every study has limitations?
A. Yes, sir.
Q. Could you tell me the limitations of the Valenzuela study?
MR. KENNERLY: Object to the form.
A. Principally, the relatively low response rate. This is -- this is the Utah study. Relatively low

Page 141

response rate. And also -- No. 1. No. 2, the fact that the exposure is ascertained differently across cases and controls. And, No. 3, the absence of any quantitative adjustment for age or obesity.
Q. (BY MR. SCHMIDT) All right. So I'm going to mark this as an exhibit, but let me first show it to you. I've tried to write down what you've said are the limitations of Valenzuela. And the first one that I wrote down is the relatively low response rate in the Utah portion of the study. The second one is that the exposure was ascertained differently across cases and controls, and the third was the absence of a quantitative adjustment for age or obesity.
Are those your opinions as to the limitations in the Valenzuela study?
A. Your writing is much neater than mine. Yes, they are.
(Exhibit 25 marked.)
Q. (BY MR. SCHMIDT) All right. Let me mark that as Exhibit 25.
Any other limitations?
A. No, sir.
Q. Let's -- let's talk about some of those. And I want to talk first about what I understand to be Point 3. Point 3 is the concern about confounders, correct?

A. Yes, sir.
Q. In your report, you -- you talk generally about confounders, and I'll refer you specifically to Paragraph 87 of your report.
A. 87?
Q. Yes, sir. On page 23.
A. Okay. Analytic studies?
Q. Yes.
A. Okay.
Q. And the last sentence I'm referring to: "Statistical adjustments for confounders of disease or exposure are entirely appropriate in these nonrandomized studies."
Did I read that correctly?
A. Yes, sir.
Q. Have -- you have published a number of observational studies, correct?
A. Yes, sir.
Q. Have you published an observational study in a peer-reviewed article where you have no control for confounders?
A. I don't know -- I haven't published very many. I actually would have to look to see. I don't -- I think the one I recall publishing we did adjust for confounders.
Q. One -- one way to control for confounder is to



match patients, correct?
A. That's true, yes.
Q. There's no matching in Valenzuela, correct?
A. That's correct.
Q. And another way to control for confounders is to adjust after the fact the data based on confounders, correct?
A. A statistical adjustment.
Q. Yes.
A. Yes, sir.
Q. And there's no adjustments in Valenzuela, correct?
A. That's true, yes.
Q. And as I understand this language in your report, you believe that it's a good thing to perform statistical adjustments for appropriate confounders?
A. It has to be conducted, of course, with some expertise and with a correct and justifiable selection of confounders, but, yes.
Q. And why is that?
A. Because without the -- you ask -- sorry. Let me --
Q. Why is adjusting a good thing for confounders?
A. Adjusting is a good thing because it can help to remove the differential effect of confounders in cases and



controls to obtain an odds ratio that is relatively free of the influence of the confounder.
Q. So look with me, if you would, at Exhibit 2 and Exhibit 4 that we prepared.
A. 2 and 4. Okay.
Q. Would you agree with me that all of those are potential confounders?
A. Well, I think we have to put "potential" in quotes. I don't think Behcet's disease is a potential confounder. It's very rare.
Q. Well, let me ask the question this way: Confounders are something that if they are imbalanced between the study arm and the control arm can bias the results, correct?
A. The cases and the controls.
Q. The cases and the controls. So let me reask it.
A. Uh-huh.
Q. Confounders are something that if they are imbalanced between the cases and the controls can bias the study results, correct?
A. Yes, sir.
Q. Are all of those factors listed on Exhibit 2 and Exhibit 4 potential confounders in the sense that if they were imbalanced between the cases and controls could influence the results?



A. Yes.
MR. KENNERLY: Object to the form.
A. Yes, sir.
Q. (BY MR. SCHMIDT) Now, the important caveat, I take it, when I ask you -- and your point about Behcet's disease is that there may not be a reason to think they're imbalanced?
A. Well, there -- there may be no cases --
Q. Right.
A. -- but there may be no -- for example, AV malformations, uremia, low vitamin A toxicity. There just may not be any in the study at all, either group.
Q. And so that -- that leads to my next question, which is: I take it in -- in a perfect world you would control for every potential confounder, but you're particularly concerned about confounders where there's reason to be concerned there might be imbalance between -- between the cases and the controls; is that fair?
MR. KENNERLY: Object to the form.
A. I would say no.
Q. (BY MR. SCHMIDT) Okay.
A. Only -- only because the more confounders that one attempts to control for the more statistical instability you put in the result that comes out --
Q. Fair point.

A. -- in the final result.
Q. Let me -- let me simplify my question, then. Is it particularly important to try to control for confounders where there's reason to believe they might be imbalanced between the cases and the controls?
A. Yes, sir.
Q. And from your list in Exhibit 2 and Exhibit 4, what would those confounders be that might cause particular concern about them being imbalanced between your cases and your controls that you'd want to control for if you could?
A. Maybe iron deficiency anemia if you could, obesity/overweight, and maybe age.
Q. Okay. And why -- why obesity/overweight?
A. Well, because there may be -- we don't know this is true. But there may be a difference in the distribution of weight -- let's just say weight -- across the two groups. And one would want to identify, isolate, and remove the influence of weight on the impact of exposure on -- the impact of being a case of control on the prevalence of -- on the -- the percentage of patients who are exposed.
Q. And so earlier we talked about whether Mirena users were more likely to be overweight than non-Mirena users --



A. Uh-huh.
Q. -- correct?
A. Yes, sir.
Q. If it were the case that Mirena users were more overweight than non-Mirena users, would that be a potential bias away from the null?
MR. KENNERLY: Object to the form.
A. Applying this to Valenzuela now?
Q. (BY MR. SCHMIDT) Yes.
A. Okay. And let me just make sure I understand the question. Are we --
Q. Let me be more precise.
A. Okay.
Q. If the Mirena patients in the Valenzuela study were more likely to be overweight than the non-Mirena patients in the Valenzuela study, would that bias the results away from the null?
MR. KENNERLY: Object to the form.
A. Yes, it would.
Q. (BY MR. SCHMIDT) If the Mirena patients in the Valenzuela study were a different age group focusing on that second potential confounder you identified, then the non-Mirena patients in the Valenzuela study, could that bias away from the null?
MR. KENNERLY: Object to form.



A. That's a little different. Based on the precise way you defined your question, it could be a bias one way or the other.
Q. (BY MR. SCHMIDT) Okay. It's a potential bias, you don't know which way it would run?
A. Yes, sir.
Q. How would it -- what would -- what would the facts need -- what would -- strike that.
What would the difference in age need to be to bias towards the null?
A. Well, it depends on whether the distribution of age and whether -- and the distribution -- excuse me -- the relationship between age and exposure to Mirena. But I can't tell you what the exact magnitude of the age difference would need to be.
Q. Okay. If you look at the methods in the Valenzuela study on page 2.
A. Yes, page 2.
Q. For both the Utah study and the Denmark study --
A. Yes, sir.
Q. -- they report that patients were -- the inclusion criteria was patients between 18 and 55?
A. Yes, sir.
Q. Do you know if you go to the high end of that range versus the low end of that range whether PTC is more



common at one or the other?
A. I think at the high end of that range, PTC would be less common.
Q. And does this study tell us whether patients were the same or different -- strike that.
Does this study tell us whether Mirena patients had the same average BMI or a different average BMI for non-Mirena patients?
A. Look at Table 1. Look at the -- this is Valenzuela, yes. Look at Table 1. The question was about -- was about BMI.
Q. Actually, I asked the question wrong.
A. Okay.
Q. Does this study tell us whether the -- the cases had the same BMI as the non -- as the controls?
A. It does not.
Q. Does it tell us whether the cases had the same age as the controls?
A. It does not.
Q. If the controls had a higher average age than the cases, would that bias away from the null?
A. If the -- only if -- let me make sure I understand. If the controls had a higher average age.
Q. And I think I mucked this up a little bit by asking the question wrong. Do you -- do you know -- would

Page 150

you expect that if -- we don't know the average age of the controls, correct?
A. That's correct.
Q. Would you expect that if the average age of the controls was above 45, say, that there would just naturally be a lower percentage of Mirena use than if the average age of the controls was, say, 30?
MR. KENNERLY: Object to the form.
A. I think that's fair, yes.
Q. (BY MR. SCHMIDT) And we don't know if the average age of the controls was above or below 45, correct?
A. That's correct.
Q. If the average age of the controls was above 45, would that bias away from the null by undercounting Mirena use in that group?
A. What are we assuming about the cases?
Q. That they're above the age of 45.
A. They're all -- they're all above the age of --
Q. But the average age is above the age of 45.
A. I'm sorry. So we're assuming that both cases and control --
Q. No.
A. Then I -- then I missed the point. I apologize.
Q. Yeah, let me -- let me go back and reask it.

Page 151

A. Okay.
Q. And not at all.
If -- and that's a fair -- that's a fair qualifier. If the average age of the cases were above 45 --
A. Okay.
Q. -- and the average age of the controls were much lower, like 30 --
A. Okay.
Q. -- would that bias away from the null?
MR. KENNERLY: Object to the form.
A. That would tend to lead to more exposure among the controls, and absent that, that would -- well, that -- that circumstance would bias toward the null, I believe, because it was going to increase the number of exposures among the controls if I understand the scenario you're providing here.
Q. (BY MR. SCHMIDT) When you talk about number of exposures, you're talking about exposure to Mirena, correct?
A. Correct. Yes.
Q. Because this is a case control, not a cohort study, correct?
A. Yes, sir.
Q. And so if the control population was older on

Page 152

average --
A. Okay. Right.
Q. -- than the -- than the case population, that would bias away from the null, correct?
A. Right, right.
Q. Valenzuela reported only on adjusted numbers, correct?
A. That's correct.
Q. No adjusted numbers?
A. We're talking about odds ratio here.
Q. Yes.
A. He reported only on adjusted odds ratios.
Q. And I think I asked this, but let me ask it again. Can you point me to a peer-reviewed pub -- I did not ask this. I asked something similar.
A. Uh-huh.
Q. Can you point me to a peer-reviewed publication of yours where you have relied on -- on unadjusted odds ratios in the absence of adjustment --
MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) -- or controls?
A. I actually don't know how to answer that. Are you asking have I ever published a study with unadjusted -- only unadjusted odds ratios? I'm not --
Q. I think that's what I asked earlier.

Page 153

A. Okay.
Q. Have you ever published a study that -- that relies on -- on adjusted data in any form for the publication?
MR. KENNERLY: Object to the form.
A. Yes. Actually, many times, yes.
Q. (BY MR. SCHMIDT) Okay. Let me come back to your publication, which is Exhibit 22.
A. Okay.
Q. And look with me, if you would, at page 111 drawing inferences in epidemiology.
A. 111. Okay.
Q. You state at the end of these first two paragraphs, "Epidemiologists build inferential arguments by following these guidelines," and then you list various guidelines.
Do you see that?
A. Yes, right.
Q. And by inferences, you -- inferential arguments, you mean causal inferences, correct, or you include causal inferences, correct?
A. Yes, yes.
Q. One of the guidelines you identify that epidemiologists use to build causal inferential arguments is to rely on adjusted analyses. Do you see that?

Page 154

A. Yes.
Q. And is it -- is that accurate, that where they're available, you rely on adjusted analyses?
A. Yes, sir.
Q. And if there were adjusted analyses here, you would rely on them in place of the unadjusted?
A. I believe so, yes.
Q. And you've done no calculation or seen any calculation that lets you say what the adjusted analyses would be if they adjusted for factors you've identified like age and obesity?
A. Well, that's actually a good question. So to answer your question directly, no, but I have a lot of experience and have worked with many epidemiologists who have been in this circumstance, and their advice has been -- and I haven't consulted them with -- in regard to this case.
But just over my experience and my career, I've -- I've had many conversations with them, and their advice has been very influential for me. And that advice essentially is if you're looking at an odds ratio of 1.9, 1.5, something that low, quote/unquote in the grass, if you will, then it really is of no value, because an adjustment is really going to change that.
But the higher the odds -- the higher the

Page 155

unadjusted odds ratio, the less likely the adjustment is going to make the analysis -- is going to decrease the confidence interval -- the lower bound of the confidence interval so it's less than 1.
Q. Okay. And I understood you just to be referring to the concept that the larger the odds ratio that is unadjusted, the less likely it is that an adjustment would take away statistical significance; is that accurate?
A. Yes.
MR. KENNERLY: Object to the form.
A. That's not how an epidemiologist would say it, but, yes, that's true.
Q. (BY MR. SCHMIDT) But that's what it means, to take the lower end of the confidence interval below 1, correct?
A. Yes.
Q. The -- the odds ratio for Utah is 7.7, correct?
A. I believe we said that, yes.
Q. And I believe that was based on eight cases -- on 59 total cases, 8 of which were Mirena PTC cases, correct?
A. Yes, sir.
Q. Have you performed any calculations of -- given the sample size, how much of a -- strike that.
And that was based on a control group where the estimated exposure to Mirena in the control group was,

Page 156

I believe, 2 percent, correct?
A. I'm looking at page 3, first column, second paragraph, "4,408 of these women underwent Mirena insertion." And that's in the control group. Is that where we are?
Q. Yes.
A. Okay.
Q. Yeah. And -- and when I do the math, on 4,408 divided by 220,904, I get 1.99 rounded up to 2 percent.
A. Okay. Fine.
Q. So they were comparing, just in very simplistic terms, 8 out of 59 Mirena patients in the case group versus 2 percent Mirena patients in the control group, correct?
A. Yes, sir.
Q. Have you done any calculations -- you know that Bayer has disputed that 2 percent estimate in the control group, right?
A. Yes, sir.
Q. Have you done any calculation --
A. I'm sorry. Yes, sir. Okay.
Q. Have you done any calculations to see how much higher the rate in the control group could be without losing statistical significance?
MR. KENNERLY: Object to the form.

Page 157

A. To answer your question, no, I would not. I would find that computation to be disturbing.
Q. (BY MR. SCHMIDT) Okay. You saw that Bayer calculated that if you used a 10 percent -- well, strike that. Let me back up.
The control rate in the Denmark group was 3.5 percent, correct?
A. I believe that's right, yes.
Q. You saw that Bayer did calculations where if this they used a 10 percent Mirena usage in the control group in Utah or the control group in Denmark, statistical significance went away?
A. I did see that, yes.
Q. And I understand you take issue with the use of 10 percent, correct?
A. No, I take issue with the practice.
Q. Okay.
A. With the practice of doing that, that's what I take issue with.
Q. Do you have any dispute with the math, that if the control group exposure rate was 10 percent in either Utah or Denmark, statistical significance vanishes?
A. I can't argue with the arithmetic, but I think the -- the process is -- is severely flawed and very nonstandard.

Q. Do you know what the point between 2 percent and -- and 10 percent in Utah is where you lose statistical significance?
A. I don't know that either, no.
Q. Do you know the point in Denmark between 3.5 percent and 10 percent where you lose statistical significance?
A. I don't know, and I would say that that is -- is irrelevant.
Q. Going back to your publication.
A. Yes.
Q. And your -- your discussion of relying on adjusted analyses.
A. Yes, sir.
Q. You described regression analysis -- or you make reference to regression analysis. Is that a means of adjusting?
A. Yes, sir.
Q. You say, "Regression analysis is a necessary procedure in observational studies," and then you explain where, correct?
A. Yes, I do.
Q. And do you -- you stand behind that language?
A. Yes. I mean, I -- I obviously -- if you -- if you -- clearly, if you can do it, it's necessary. If you



can't do it, then you can't do it. But if you can do it, yes, it's necessary.
Q. And the reason you identify it as necessary is because observational studies have no random allocation of the risk factor of interest?
A. Yes, sir.
Q. And that means there are differences between the group with the risk factor and the group without?
A. Right. And so another -- another small caveat is that you really need to identify a difference in the confounded distribution between the cases and controls. If you have that information, you identify it, then I think doing the -- the adjusted analysis is wholly appropriate.
Q. Okay. Have you -- have you done studies in either of the two databases these authors -- I guess three databases these authors used?
MR. KENNERLY: Object to the form.
A. Have I personally done studies?
Q. (BY MR. SCHMIDT) Yeah.
A. No, sir.
Q. Do you know factually whether they had the data available to them to adjust for the confounders you've identified are the potential confounders of age and obesity?



A. I don't know.
(Comments off the record.)
Q. (BY MR. SCHMIDT) These authors say the same thing you say. They say, "A potential limitation of their study is the lack of control for confounders," correct?
A. Yes, sir.
Q. If you look at page 4 of their study.
A. Page 4, yes.
Q. On the right-hand side about halfway down in the second paragraph, there's a sentence that begins "Although use of an LNG"?
A. Yes.
Q. It says, "Although use of an LNG-IUS seems to be associated with an increased risk of PTC, it is possible that this observation occurred because of an LNG-IUS -- because use of an LNG-IUS is also associated with other established risk factors that are known to be associated with PTC," and then it lists obesity and recent weight gain as examples.
Do you see that?
A. Yes, sir.
Q. And that's exactly what you're talking about, right?
A. Yes, sir.
Q. And you agree that's a limitation of the study?



A. Yes, I do.
Q. On page 5, on the right-hand column, they talk about antibiotic administration to women who get an IUD. Do you see the paragraph I'm referring --
A. I see -- it looks like the third full paragraph, second column.
Q. Yes, sir.
A. Okay.
Q. Do you agree with them that the failure to control for antibiotic use is a potential confounder?
MR. KENNERLY: Object to the form.
A. Yes, potential is a broad word, so I would say yes.
Q. (BY MR. SCHMIDT) And if they are correct that there's a possibility that women with IUDs are more likely to be given antibiotics than women without, that would bias away from the null?
A. Yes, sir. And -- and that's an assumption. But, yes, if that -- we accept that assumption, then that's true.
Q. These limitations of the study that we just looked at, you -- you agree with me that they are appropriately noted limitations by these authors?
A. Yes, sir.
Q. And you have not performed any calculations to

try to adjust for the effect of these confounders, have you?
A. No, sir.
Q. Is it -- is it the case that -- that studies typically match by age or no?
A. It -- it -- that's no longer a requirement. There was a time when statistical analyses were not quite so sophisticated, that you really did need to stratify -- call stratify by age or match by age. You don't see it quite so much. However, there are larger clinical -- larger case controlled studies that do age and gender match.
Q. Okay.
A. They try to match them within -- within five years of age and match on gender.
Q. And why do they do that?
A. Well, they do that because they want to help to ensure the distribution of gender, and the distribution of age is the same in the exposure -- in the -- in the case and in the controls.
Q. Because of the general recognition that age can be a confounder?
A. Yes, sir, uh-huh.
Q. And you said that not all studies do that now. And I think you made some reference to statistical -- more


sophisticated statistical analyses. Why is it that some studies don't match?
A. Because they -- because they have a confidence in the ability to statistically adjust for the difference in the distribution. Their propensity analyses are very popular now, and they identify a difference in distribution of a wide number of confounders and adjust the final analysis for this different multi-dimensional distribution.
Q. So would it be accurate to say that a standard for observational studies is that you match for basic demographic factors like age and gender or use statistical analyses after the fact to adjust for potential confounders?
A. When they are available, yes.
Q. When they're available. And neither was done here, correct?
A. That's correct. I don't know if they are available, but neither was done.
Q. Let me dig into some of your other -- I think we've -- we've touched on Point 3 in Exhibit 25 --
A. Okay.
Q. -- here, your limitations --
A. Uh-huh.
Q. -- on the study. Let me dig into Points 1 and 2.


A. Okay.
Q. So let's start first with -- with Utah, if that's okay. In the Utah analysis, they conducted telephone interviews of the cases, correct?
A. Yes, sir.
Q. They did not conduct telephone interviews of the controls?
A. That's correct.
Q. And they did not conduct telephone interviews of either the cases or controls in Denmark, correct?
A. That's correct.
Q. Is that what you meant when you referred to the fact that the exposure was ascertained differently across cases and controls?
A. Yes, sir.
Q. And what -- what form of bias does -- does that create a concern about?
A. It -- either bias. Either bias. The fact that -- I mean, the -- the standard is to identify exposure the same way in the cases and in the controls, and the degree to which one does not do that is the degree to which one opens the study up to bias. However, the direction of the bias is uncertain.
Q. Is there a technical term for the form of that bias?


A. Nondifferential -- no, no. Oh -- oh, you mean for -- for the bias I'm talking about?
Q. Yes.
A. Perhaps exposure ascertainment bias.
Q. Okay. And you said the standard is to identify the exposure using the same way in the cases and the controls. Why is that the standard?
A. It's the standard because you want to assure yourself that the -- the difference between the exposed -- the difference between the cases and controls is truly related to the level of exposure and not related to the exposure ascertainment.
Q. The -- the Valenzuela authors did not follow that standard with respect to their Utah analysis, correct?
A. They did not.
Q. And so does that mean you cannot be assured that the difference they saw between the cases and controls is truly related to the level of exposure and not related to the exposure ascertainment?
MR. KENNERLY: Object to the form.
A. Can you ask me that again, please?
Q. (BY MR. SCHMIDT) Sure. I was trying to use your words.
Does the fact that the Valenzuela authors with respect to their Utah analysis did not follow the

Page 166

standard of using the same method of exposure -- of identifying exposure in their cases and controls means that you do not have assurance that the difference they saw between cases and controls is truly related to the level of exposure and not related to the means of ascertainment?
A. I would --
MR. KENNERLY: Object to the form.
A. I would say this. I mean theoretically, yes, that is true. Practically what the implications are, it's very difficult to know.
Q. (BY MR. SCHMIDT) Okay. And -- and am I understanding your point correctly that there is a possibility of bias, but we just don't know how it cuts?
A. That's correct, yes.
Q. Would -- would you -- let me dig into that a little bit more. In the -- in the cases in Utah on the telephone interviews, they asked people if they had used Mirena. Is that your understanding?
A. Yes.
Q. Would you expect there to be a meaningful level of undercounting of Mirena usage if you -- you call people up on the telephone and say to them, in the last several years, have you used Mirena?
A. Our memories aren't perfect. I -- having said

Page 167

that, I don't know whether it would be undercounting or overcounting, but it would just be -- it would be -- it would be background noise.
Q. I suspect every woman in this room might disagree with that proposition. But there is reason to believe that by not interviewing women in the Utah control group, that they undercounted, correct?
A. By?
Q. That they undercounted Mirena usage.
A. I need to think about that for just a second. In the control group in Mirena, they actually did a database query.
Q. Right.
A. Right. And you're asking whether if they did not do that?
Q. If they telephoned people.
A. And they -- and they simply telephoned people. Well, certainly, you wouldn't have this concern about differential exposure ascertainment. And so having said that, now what is your question?
Q. Well, let me -- let me get a little more granular.
A. Uh-huh.
Q. The database they used was University of Utah patients, correct?

Page 168

A. Yes.
Q. And specifically whether the Mirena placement occurred within the University of Utah system?
A. Yes.
Q. You -- you understand, I take it, that women might be part of the University of Utah system but have their Mirena placed somewhere else?
A. That's possible, yes.
Q. One reason for that might be they had their -- you understand that Mirena is intended to be a five-year product, correct?
A. Yes.
Q. So one possibility is they had their Mirena placed out of state and then moved to Utah and were counted as a non-Mirena patient because they received a service from the University of Utah, correct?
A. Yes.
Q. Another possibility was they spent their whole lives in Utah, but for costs or other reasons had their Mirena placed at a -- say, a Planned Parenthood facility and, therefore, they were not counted as a Mirena patient in the University of Utah data set?
A. Again, this is all speculation, but, yes.
Q. Do you -- the authors talk about this as a potential limitation of their study, correct?

Page 169

MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) And -- and just so you have the language I'm talking about, on page 5 on the right-hand column, second full paragraph, they talk about that it was not --
A. Yes.
Q. -- possible for the University of Utah group -- that's the control group -- to capture the number of insertions performed outside of the university system, so we may have underestimated the number of women with an LNG-IUS?
A. Yes, they say that.
Q. Okay. That's them raising the concern that maybe we undercounted Mirena in that control group?
A. Yes.
Q. At least as to Utah?
A. Yes, sir.
Q. And that's a valid concern, correct?
A. Yes. However, I will say it's not the only valid concern, because we're in the world of speculation, and speculation obviously cuts both ways.
Q. Have you studied -- have you seen any data that lets you rule out the fact that there are significant numbers of women who end up in the University of Utah system at a time when they are using Mirena but that it

Page 170

was placed outside of the system?
A. Not that I recall, no.
Q. If it were the case -- and you may disagree that this is a common sense point, but I will assert it as what I believe to be a common sense point. If -- if it were the case that you are unlikely to undercount Mirena use by calling women up and saying, have you used Mirena in the past several years, but you are highly likely to undercount Mirena if you just look at whether patients in the University of Utah system also had Mirena placed --
A. Right.
Q. -- through the University of Utah system, would that lead to a -- if that were the case, whether you agree with that or not, would that lead to a bias away from the null?
MR. KENNERLY: Object to the form.
A. I'd have to review again carefully. So in the case --
Q. (BY MR. SCHMIDT) Let me break it out.
A. Okay. Sure. Right.
Q. Do you agree with what -- what I'm asserting as a common sense proposition that women are unlikely to forget that they went to a gynecologist, went through a procedure where they had Mirena placed, went back for checkups to check on the strings for the Mirena, during that full time

Page 171

did not need to worry about other forms of contraception, that if you interview women who have used -- who have gone through those steps and used Mirena in the past several years, they're unlikely to forget it during a telephone interview?
MR. KENNERLY: Object to the form.
A. I understand what you're saying. I'm not sure.
Q. (BY MR. SCHMIDT) Okay.
A. But I understand what you're saying.
Q. Do you agree with me that you are likely to miss at least some Mirena cases given the nature of the product and --
A. Conflated two things. I'm sorry. Did you mean --
Q. I'm turning to a different topic now.
A. Did you mean Mirena cases or Mirena exposures?
Q. Fair point.
A. Okay.
Q. I'm glad you made that clarification.
A. Okay.
Q. Let me reask my question.
Do you agree with me that you are likely to miss at least some -- and there's a question about is it trivial, is it a lot. But you are likely to at least miss some Mirena exposures in your control group if your

Page 172

control group depends on only looking at women who have their Mirena placed in the University of Utah system?
A. I -- I think that's plausible. I -- I think other things are also plausible. But staying within the confines of your question and I think that that's possible, yes.
Q. If both parts of what I said are true --
A. Uh-huh.
Q. -- that you are unlikely to miss Mirena exposure in your control group by virtue of the telephone interviews, but you are likely to have some level of missed exposure in the control group by virtue of just looking at the medical records from one system, would that bias away from the null?
MR. KENNERLY: Object to the form.
A. At this point, we are kind of jigging madly on the head of a pin. Right? There are a lot of assumptions here. So within the confines of the assumption, that's how the math would work.
But my -- my sense of how the universe works says that other things are happening besides the conditions of your assumption. For example, there might very likely be missed cases in the control group, and if we include missed cases and what the effect of that is, then that's a complication.

Page 173

Q. (BY MR. SCHMIDT) Okay. So let me see if I understand that. Your testimony is, I take it, in either control group, Utah or Denmark, there might be missed cases?
A. In either control group?
Q. Yes. Missed cases of PTC.
A. Correct, PTC, that's correct.
Q. And do you know which way that biases the results?
A. Well, if we -- if you -- if there are a number of them and if they use Mirena and they are un -- and they are mistakenly characterized as control patients than cases, then, yes, it underestimates the odds ratio.
Q. Could go the other way, too, right?
A. If they used Mirena, I don't think so.
Q. You don't think you could be missing PTC cases where people did not use Mirena?
A. I'm talking about and -- I'm talking -- well, again, that's another assumption, right? So it -- it --
Q. Right.
A. -- depends on what set of assumptions that we work with.
Q. Okay.
A. Yes, that's true, but in the circumstance I set up, that's -- the reverse would happen.

Page 174

Q. Okay. Let me ask it this way: I think you and I have agreed that if the differential ascertainment in the Utah group led to a more accurate count of Mirena use in the cases than it did in the controls, that would bias away from the null?
A. Maybe a small bias, depending on how much.
Q. All right.
A. Because not every bias away from the null is a huge bias, but, yes, uh-huh.
Q. And -- and the question you have is: Are those assumptions, in fact, correct that there is a differential assessment of Mirena use between the cases and the controls?
A. My assumption -- my -- the difficulty I have is that it's not the entire universe of assumptions that have to be considered.
Q. Well, that's fair. I understand your point in that.
A. Do you know -- let me just try it this way.
Do you know if there is any undercounting of Mirena use in the cases?
MR. KENNERLY: Object to the form.
A. Say it again, please.
Q. (BY MR. SCHMIDT) Focusing on the Utah portion of the Valenzuela analysis, do you know if there's any

Page 175

undercounting of Mirena usage among the cases?
A. I don't know that for a fact, no, I don't.
Q. And are you able to rule out any level of undercounting of Mirena usage among the Utah controls?
A. I can't rule that out, no.
Are we ready to take a break?
Q. Sure, if you want to take a break.
THE VIDEOGRAPHER: Off the record, 12:33, end of Media 4.
(Lunch recess.)
THE VIDEOGRAPHER: Okay. We're on the record at 12:58, beginning of Media 5.
Q. (BY MR. SCHMIDT) Okay. Doctor, when we were -- before we went off the record, we were talking about, I think, that there is a potential ascertainment bias in the Utah portion of the Valenzuela study because they used one method to measure Mirena in the cases and another in the controls, correct?
A. That's right.
Q. You, I think, have identified a second issue with the way they measured Mirena in the cases, which is the relatively low response rate that they got?
A. Yes, sir.
Q. And by that, you mean that only -- they identified their total pool of potential cases, they sent

Page 176

letters to conduct telephone interviews of the people, and they only heard back from roughly a third of them, correct?
A. Yes.
Q. And why does that give rise to a concern about bias?
A. Well -- well, it's not a concern about bias. It's a concern about the -- just the limitation of Valenzuela. Again, that may be an epidemiologist's distinction.
Q. Okay. Let me ask the question that way. Why is the low response rate in the case arm of the Utah portion of the study a concern?
A. Okay. It -- it actually makes it more difficult to reliably ascertain what the exposures are. And the larger the response rate, the greater -- the greater the accuracy of the -- of the estimate of exposure.
I will say this is not a problem only in Valenzuela, it's a problem with every -- almost every research effort involving human beings in the United States in the 21st Century. It's well-documented. It's really quite predictable. They are a victim of this as are other clinical trials as well as case control and observational studies, but it is an observation that we have to factor in.

Page 177

Q. Is -- is there a recognized range or number in terms of a response rate that removes concerns about this form of limitation?
A. Well, there -- there used to be. I mean, obviously, 100 percent is what -- is what the goal is.
Q. Uh-huh.
A. But -- but the range of practical percentages has been falling over time. So this is well within -- sad to say, but it's well within what the anticipated range of response would be.
Q. To a telephone survey?
A. Yes.
Q. And when you say they've been falling, you're talking about things like polling?
A. Well, polling -- the polling, volunteering for research efforts, dropout rates. The commitment of the population to health care research has declined in a number of measurable ways.
Q. That's why we thought President Trump would not be our president, right?
Sticking with this, would you -- would you characterize the -- the one-third response rate as high, low, average? Is -- would you characterize it in any way?
A. I would characterize it as both expected and low.
Q. And does it give rise to concerns of responder

Page 178

bias having a lower response rate?
A. I don't know what you mean by "responder bias."
Q. Are you -- maybe I just made up that term. Are you familiar with the term called "responder bias," the idea that the people who take the time to respond are not representative of the larger population?
A. Oh. Yes, that's not a -- that's -- that's not so much an internal bias in the study, but it does hurt the generalizability to the population at large.
Q. And in terms of this point we've been talking about about biasing away or toward the null, you would have a concern about the low response rate biasing away from the null if somehow you were getting people who used Mirena were more likely to respond to the letter than people who were not using --
A. Right.
Q. -- Mirena --
A. That's right.
Q. -- correct?
A. Yes.
Q. Do you know anything about the -- the contents of the letter that went out?
A. I do not, no.
Q. Do you know, for example, if Mirena was identified as the -- the drug of interest?

Page 179

A. I don't know.
Q. Do you know if the letter was sent out at a time when television advertisements were being run by lawyers linking Mirena to PTC?
MR. KENNERLY: Object to the form.
A. I don't know.
Q. (BY MR. SCHMIDT) Would that give a -- if -- if the letter identified Mirena as the subject drug and it went out when Mirena was being linked to PTC by television advertisements, would that give you a concern about response bias when you get only a third responding?
A. I -- I don't know. I understand the point that you're making, but it seems to me that university professors go out of their way to distinguish themselves from litigation. So I just don't know how that dynamic would actually play out.
Q. Okay. Can you rule out that there's some form of response bias in that one-third group that responded?
A. No.
Q. Do you know if the one-third that responded is representative of the two-thirds who did not?
A. I cannot know that.
Q. All right. I've asked you different forms of -- of this question, and let me just ask it once and be done with it -- --

Page 180

A. Uh-huh.
Q. -- because I think I know the answer. Are there any analyses you have done with -- with the Valenzuela data to rule out any form of potential bias or confounding?
A. No, sir.
Q. You're familiar with a concept called recall bias, correct?
A. Yes, I am.
Q. That -- and as I understand it, recall bias is a concern when you use some form of -- of interview and rely on self-reported data as opposed to using documented data, correct?
A. No.
Q. Okay. Let me try the question differently --
A. Okay.
Q. -- because I probably mangled it.
Any time you do a telephone interview, there's a concern with recall bias, correct?
A. No.
Q. Okay. When -- when is there not a -- when is --
A. Recall bias.
Q. -- recall bias --
THE REPORTER: Hold on. I'm sorry.
THE WITNESS: I'm sorry. My fault.

Page 181

THE REPORTER: Repeat your question.
Q. (BY MR. SCHMIDT) When is recall bias a concern in telephone interviews?
A. Recall bias to an epidemiologist is the phenomenon that however one determines exposure, be it telephone or -- or interview, however one determines it, the responses of the -- those -- the cases -- cases are likely to be more accurate and more complete than the responses of the controls. That's recall bias.
Q. Then let me ask my question differently. Is -- is there a concern that when data is gathered by telephone interviews, it's sometimes not accurately reported because of people's recollection not being perfect?
A. Oh, yes, for sure, yes.
Q. And does that concern take on greater prominence when you use telephone interviews for one arm of the study as was done in Utah and database searches for the other arm?
MR. KENNERLY: Object to the form.
A. Sorry. I don't know, because as we talked earlier, it's always best to ascertain the same way. So there is the advantage of doing the database ascertainment; there's no recall bias there. But as we pointed out, there are other issues. The codes may be inaccurate. The -- the -- excuse me. There may be

Page 182

experiences away from -- away from the Utah database, away from the Utah medical system.
So it's very difficult to ascertain what's happening here. I think the best thing to say, that the possibility of recall bias here is zero, but there is this issue of differential ascertainment.
Q. (BY MR. SCHMIDT) One way -- one error in your data that calling people up and asking them if they've used Mirena could introduce as people might forget that they used Mirena. And you raised that possibility earlier, correct?
A. That's true, yes.
Q. And I think raised questions about whether people would forget.
A second type of error that could be introduced in terms of calling people up and asking if they used Mirena is they might be wrong about when they used Mirena, correct?
A. That's correct.
Q. And that is a concern that these authors raise about their data, correct?
A. Yes.
Q. And they don't just raise it as to the Utah arm, they raise it generally, correct?
A. Yes.

Page 183

Q. Specifically on -- if you look at page 4 of the study.
A. Yep.
Q. Right-hand column under discussion after that language we were looking at where they talk about confounders, they state, "The analysis was also limited" --
A. I'm sorry. I'm not with you yet. Second paragraph or third paragraph?
Q. It's the last second sentence of the second full paragraph on the right.
A. Okay. I see it now.
Q. They say, "The analysis was also limited by the lack of temporal date to confirm that exposure to LNG-IUS occurred prior to PTC symptom onset or diagnosis."
Do you see that?
A. Yes.
Q. And so they're raising this concern that we've -- we've talked about more broadly that they were missing data on -- that -- that allowed them to confirm that Mirena exposure actually occurred before PTC symptoms and diagnosis, correct?
A. Yes, sir.
Q. And do you -- do you know one way or another when -- when they make that statement -- that statement

Page 184

applies to their cases, correct?
A. Yes.
Q. Not to their controls, right?
A. Yes. Yes.
Q. Do you know when they make that statement as to their cases whether that statement is true for every single one of their cases or only a subset?
A. I don't know.
Q. And if that -- if there is a bias in the data on that basis, would you be able to say whether it biases away from the null or toward the null?
A. We have to be careful about using biased. This makes more sense to me if we talk about there's an effect.
Q. Okay. Let me ask it in that term, then. If -- if there is some effect of some skewing of the fact that they cannot confirm that exposure to Mirena occurred prior to PTC, do you know whether that skewing would be away from or toward the null or we just don't know?
A. Well, in a case control study, it wouldn't matter. From a -- from a causal evaluation, certainly, it does matter. I mean, just -- let's take -- let's take Valenzuela out of this and let's say that there is a study that's done where exposure always occurs after the -- after the case. Well, that's -- clearly is a temporality issue. That's a -- that's a protopathic bias. But it

Page 185

doesn't affect the odds ratio.
Q. Well, if they -- as I understand what they're saying here, they're raising the possibility that some of the cases that they included as cases where there was Mirena and then PTC developed, there might actually have been preexisting PTC, correct?
A. Yes, right.
Q. And if that were true, then their odds ratios would not be accurate if you corrected for that?
A. But you're suggesting, I think, that you would then remove those cases where you had this -- where you had this protopathy.
Q. Protopathy means the disease precedes the exposure?
A. Yes. And if -- if that's -- that's your assumption --
Q. Yes.
A. -- then that is true.
Q. Right.
A. But, of course, I mean, again, we're here -- here we are talking about a collection of assumptions whose reasonableness, I suppose, one might debate, but it also presumes that there aren't cases that haven't been determined that, in fact -- that are being missed here --
Q. Right.

A. -- right? So . . .
Q. And I take it that's why your answer to my question, would this limitation that they raise bias away or toward the null, is your answer we just don't know?
A. That's correct.
Q. Okay. So let's go back to the Utah group.
A. Okay.
Q. The Utah group in their cases, they looked at women who when they talked to those women on the telephone, those women said they had a Mirena in place between 2008 and 2013, correct?
A. Yes, sir.
Q. And so those include women who had their Mirena installed -- placed between 2008 and 2013, correct?
A. Yes.
Q. It also includes women who had their Mirena placed before 2008, correct?
A. Had women -- had placed before 2008?
Q. Yes.
A. Let me just look at this and see. So the inclusion criteria included women with PTC diagnosis in the age range 18 to 55 and between 2008 and 2013. So if you were not in that age range -- I'm sorry -- in that cohort, then you were not considered a case here. That's how I read this.



Q. But what they did when they -- when they called people up on the phone --
A. Okay.
Q. -- for the case group was they asked them, "Did you use Mirena during that time period," correct?
A. Yes.
Q. As opposed to, "Did you have it placed during that time period?"
A. Yes. I -- I believe so. But, again, I don't know exactly what the interview -- what the interviewer said. Telephone interview confirmed --
(Witness reading.)
So let's just see here what they did. So they first sent an introductory letter and then to these individuals who met this inclusion criteria --
Q. Uh-huh.
A. -- and then they conducted a telephone interview to confirm clinical and birth control history.
Now, can you ask your question again about this.
Q. Sure. Do you know from this study whether when they interviewed people on the telephone, they were asking them, "Did you have Mirena in place between 2008" --
A. I see.
Q. -- "and 2013" or were they asking, "Did you have



it actually put into place between 2008 and 2013?"
A. I can't tell --
MR. KENNERLY: Object to the form.
You can answer.
A. Sorry. I can't tell from this.
Q. (BY MR. SCHMIDT) If it were the former, if they were only asking, "Did you have Mirena in place; did you use it between 2008 and 2013," that might pick up people who had placement going all the way back to 2003, correct?
A. That's possible, yes, right.
Q. And you can't rule out that possibility?
A. I cannot, no. One way or the other I can't.
Q. We know that did not happen with our control group for Utah, correct?
A. That's correct.
Q. Because the control group for Utah was only University of Utah --
A. Right.
Q. -- patients who had it placed between 2008 and 2013?
A. Right.
Q. If they had -- if they had -- if they were comparing patients in the control group who only had it placed between 2008 and 2013 to patients in the -- in the case group who could have had it placed anywhere between



2003 and 2013, would that give concern about differential ascertainment?
A. Well, that would -- I mean, it -- it certainly would. I mean -- again, with this assumption, yes, it would.
Q. Okay. Do you -- do you know one way or the other whether that could bias the results towards or away from the null, or do you just not know?
A. That kind of bias would be away from the null, I believe, because you have a greater -- if that occurred it would be a bias away from the null.
Q. Okay. I think I've covered a lot of what I wanted to ask you about the control group, but let me just look at my notes.
Have you -- we talked earlier about the concern that Bayer raised that in Utah they undercounted the usage of Mirena in the control group, correct?
A. Right.
Q. And Bayer tried to conduct an estimation and they came up with an estimation of 10 percent usage --
MR. KENNERLY: Objection.
Q. (BY MR. SCHMIDT) -- in Utah, correct?
A. Yes, they did.
Q. And -- and you studied how they performed that analysis, correct?

A. Yes.
Q. They took -- and let me see if I can direct you to where in your report you talk about it. And if you can help me, that would be wonderful.
I believe you talk about it in Paragraph 127 of your report. That says to Utah --
A. Okay.
Q. -- actually. I gave you the wrong one, because I'm focused right now on Denmark.
A. So it would be?
Q. 113 is for Denmark.
A. Sorry. 113 is for Utah.
Q. Utah. I'm sorry.
A. Utah. Right. Okay.
Q. Okay. So with that reference, you understand that what the company did to try to get what they viewed as a more accurate rate of Mirena usage in the control group in Utah was they took data from a study authored by Boulet and -- that reported rates of just generally IUD use in Utah, and then they multiplied that by a study we've already looked at by Sanders, which you cite in Note 24, which contains data on the percentage of IUD use in Utah that is Mirena. That's how they came up with 10 percent, right?
A. I understand that, yeah.



Q. Okay.
A. Please don't think I'm endorsing that, because I have problems with what they did, especially the population with Boulet.
Q. Yeah.
A. But that's what they did.
Q. Yeah. And that's -- that's what I want to ask you about. As I understand it -- and I was getting at this before, but I hadn't put this in front of you, so I want to give you the chance to answer it again with this in front of you.
As I understand it, you take issue with their use of the Boulet -- Boulet article to estimate IUD usage in Utah, correct?
A. Yes, sir.
Q. I don't see any criticism you take -- you make of their usage of Sanders to say what percentage of IUD usage in Utah is Mirena?
A. I need to look at Sanders, if I could, for a moment.
Q. Okay. We looked at it earlier, so let me focus on Boulet.
A. Okay.
Q. And let me go ahead and mark Boulet.
You understand, and I think it's reflected



in your -- in your report, that Boulet was by authors -- by CDC authors?
A. Yes, sir.
Q. These were CDC authors protecting the public health in battling the Zika virus by trying to understand what contraceptive usage was in different states?
A. Yes, sir.
Q. And I apologize. Can you tell me the exhibit number on that, Doctor?
A. It's 26.
(Exhibit 26 marked.)
Q. (BY MR. SCHMIDT) Exhibit 26 is a copy of that Boulet study. This was a telephone survey study; is that correct?
A. Yes, sir.
Q. Just like the Utah case arm was?
A. Well, that aspect of it is the same, yes.
Q. Okay. And they came up with a -- a LARC usage rate in Utah of 18.9 percent if you look at Table 1. Do you see that?
MR. KENNERLY: Object to the form.
(Comments off the record.)
A. Yes. Now, I'm not -- I'm not there with you yet. I'm sorry. I don't want to hold this up too much. I thought there was a concern about using this analysis for



state data, but I can't seem to find the comment here.
Q. (BY MR. SCHMIDT) Okay.
A. I'm sorry. Go ahead. What -- what was your question?
Q. Do you see that in Table 1 the CDC authors report LARC usage in Utah of 18.9 percent?
MR. KENNERLY: Object to the form.
A. I do see that, yes.
Q. (BY MR. SCHMIDT) And if you look, they report other states. The lowest rate they report from any state is 5.5 percent in Arizona, correct?
A. I don't see 5.5 yet.
Q. It's because you're going bottom up and it's at the top.
A. I see. Okay. Yes, thank you. Right.
Q. Have you seen any data on Utah specifically or the nation more generally that suggests LARC usage lower than reported here in Utah?
MR. KENNERLY: Object to the form.
A. Except, of course, for Valenzuela.
Q. (BY MR. SCHMIDT) Other than Valenzuela?
A. Right. No.
Q. You raise a question -- 113 of your report, you talk about this Boulet study. Do you see that?
A. I do, yes.

Page 194

Q. And you identify a numbered 1 concern about use of Boulet. "The CDC survey was not attempting to gather exposure data"?
A. Right.
Q. There's no number 2, correct?
A. Sorry?
Q. There's only one concern you identify there, right?
A. Oh, oh. Oh, I see. There's only one I -- there's only one concern identified here. I just need just a moment.
Just concerned about the applicability of the Utah survey percent to the University of Utah study. I think they're trying -- first of all, obviously, 18 plus percent is different than the percent they got at the University of Utah, clearly. But the -- I'm not so sure that we can attribute that to just bad variability of University of Utah data.
They might be looking at very different populations, because certainly there is a different driving question to answer for each of these two. Both worthy questions, but different questions.
Q. Let me see if I understood what you just said. Do you -- do you -- as an estimate of overall LARC usage in Utah, do you question the 18.9 percent? Do you have

Page 195

data that tells you that's wrong?
A. Well, the data from Valenzuela suggested it's wrong, but that's all I have.
Q. Okay.
A. That's all I have.
Q. Are you also raising a question, though, that the general Utah population that, according to the CDC, resulted in this 18.9 percent LARC rate is a different population than the University of Utah population, that the two are not generalizable to each other?
A. That -- that they're not comparable, yes, right. And so, therefore, both rates are correct for the population from which the sample was obtained.
Q. But they're just not generalizable to each other as --
A. Right.
Q. -- as populations?
A. That's right.
Q. And you -- you say something in your report in terms of the -- the single criticism or concern you offer in your report. You quote language from the CDC authors themselves that I -- I take it you're asserting supports that concern you raised; is that correct?
A. Yes, sir.
Q. And their quotation is "Information on

Page 196

contraceptive use was self reported and might be subject to recall or social desirability bias."
Did I read that correctly?
A. That's what they said, yes.
Q. Would that same statement apply to the case arm of the Utah portion of the Valenzuela study?
A. Certainly, it was self-reported. And I don't know about social desirability. I'm not sure I know what that really means, actually.
Q. Okay.
A. But -- but -- however, self-report means that individuals maybe remember incorrectly.
Q. So that same statement, at least the parts of it you understand, would apply to the Utah arm of the Valenzuela study?
A. Right. Right. They also should not use the word "bias" here.
Q. Have you seen -- outside of Valenzuela, which reports 2 percent Mirena usage among the controls in the University of Utah system and 3.5 percent for the controls in the Denmark hospital system --
A. Yes.
Q. -- have you seen any estimates of Mirena usage in any population that are that low?
MR. KENNERLY: Object to the form.

Page 197

A. I don't have much of a denominator here, so I'm not going to be able to answer that question very helpfully. So I'm going to say no, but I haven't done a broad survey to give any confidence in the fact that I haven't seen any.
Q. (BY MR. SCHMIDT) Apart from the -- I've shown you data from -- from Utah that at least purports to show a higher usage rating, correct?
A. That's true. And we've also discussed the comparability of the populations, but, yes.
Q. And now I'll show you data from the Denmark group --
A. Okay.
Q. -- for the same proposition. And this is data that you discuss in your report --
A. Yes.
Q. -- from an author called Lindh.
(Exhibit 27 marked.)
Q. (BY MR. SCHMIDT) Exhibit 27. Do you recall reading this article?
A. I do. Thank you.
Q. And do you agree with me that if you look at table -- I'm sorry -- Figure 1 on page 23 of this article, it purports to show Mirena usage rates in Denmark across --

THE REPORTER: Across what?
Q. (BY MR. SCHMIDT) -- different years?
A. Across, right, exactly, yes.
Q. And every one of those Mirena usage rates in Denmark is higher than 3.5 percent reported by the Valenzuela authors, correct?
A. That is correct, yes.
Q. Let me show you one more --
A. Okay.
Q. -- publication.
A. My report does reflect some concerns about -- there's no question these are the numbers they report, but my report also does reflect some concerns I have about those.
Q. Okay.
A. Can I -- can I -- is this mine?
Q. Yes. Yes. I'm sorry.
A. That's all right.
(Exhibit 28 marked.)
Q. (BY MR. SCHMIDT) I'm going to come to those concerns --
A. Okay.
Q. -- but I want to show you one more article --
A. Okay.
Q. -- what I've marked as Exhibit 28, an article by



Cavanaugh. And my understanding is this is not something that you listed as a document you reviewed, but please tell me if I'm correct on that.
A. You're right.
Q. You have not seen Cavanaugh before today?
A. I have not.
Q. If you look on results, that's all I'm going to ask you about, it states, "The prevalence of LARC use among contracepting US females increased from 8.5 percent in 2009 to 11.6 percent in 2012."
Do you see that?
A. I do.
Q. Do you take any issue with that data being accurate?
A. Let me just have a moment.
(Witness reviewing document.)
So this to me appears to be a statement about IU -- LARC, not Mirena --
Q. Correct.
A. -- not Mirena, but LARC, okay?
Q. I've now shown you three articles that contain, I guess, four, if you count the Sanders article, that indicates 75 percent of the LARC usage is Mirena, four articles that indicate higher rates of Mirena usage than reported in either control arm of Valenzuela.



Have you seen any -- maybe I just asked you this, but let me ask you again. Have you seen any data that is consistent with the control rate numbers in Valenzuela --
MR. KENNERLY: Object --
Q. (BY MR. SCHMIDT) -- 2 percent or the 3.5 percent?
A. Okay. The answer to your question --
MR. KENNERLY: Object to the form.
THE WITNESS: Sorry.
A. No, I've not. But as we have talked about, the applicability of -- not the last one, of course. The applicability of the -- well, actually, of Cavanaugh and of Boulet to Utah and the application -- the applicability of Lindh to Denmark is something we disagree with --
Q. (BY MR. SCHMIDT) Okay.
A. -- over.
Q. Now, Let's talk about the Denmark, okay?
A. Sure.
Q. I know you were waiting to get to Denmark. The whole room has been waiting to get to Denmark.
In the Denmark group, looking at page 2 of the Valenzuela article --
A. Page 2. Okay.
Q. -- they were looking at patients who were diagnosed between 2008 and 2014, correct?



A. Yes.
Q. And they included those patients if they could get a birth control history during the three months preceding the onset of symptoms, correct?
A. Yes.
Q. Do you know whether that -- that included or excluded patients who reported no birth control use?
A. We're talking about identification of cases now, correct?
Q. Yes.
A. Okay.
Q. Yes. Thank you for that clarification. Yes.
A. Okay. And your question to me now is what?
Q. Is do you know whether if they -- in the Denmark analysis of the cases if they found a patient who had a PTC diagnosis between 2008 and 2014 and they looked at the records and saw no evidence of birth control because the patient was not using birth control if they were included or not.
MR. KENNERLY: Object to the form.
A. Well, they say only women for whom contain a birth control history.
Q. (BY MR. SCHMIDT) Right.
A. Which I think presumes that the birth control history says, "I was not using birth control."

Q. Okay. And -- and that's what I --
A. Right, I think that they would be included if I'm reading this correctly.
Q. Okay. Do you -- you know that such annotations appear in medical records? If it's customary in medical records or insurance databases like what they're looking -- let's strike that.
Do you know if they did medical record review of their cases from Denmark?
A. I would be willing to presume they did. I don't know how else you would do it without looking at medical records.
Q. Well, you could look at insurance records or -- or medical coding in a medical --
A. Right.
Q. -- database --
A. Right.
Q. -- correct?
A. Right. But this is -- they have what sounds like an internal PTC database --
Q. Right.
A. -- but I also would presume that they're looking actually at medical records here.
Q. Why would you presume that?
A. Because medical records are going to provide all



the information. When they talk about recurrent cases being excluded, it's my belief they did. I can't prove it.
Q. Okay. Do you know if they'd limited themselves to patients who had Mirena inserted in the three months prior to their symptoms or if they were just looking at patients who had a Mirena in place?
A. They don't say anything about Mirena in this section for only women who obtained a birth control history, but certainly they identified women with Mirena. That's what the analysis ultimately is about.
Q. I guess my question is similar to something I asked you about Utah. In -- in the Denmark -- and I think I know the answer, but tell me if you agree with me. In the Denmark case arm of their study, they counted patients who had Mirena in place between 2008 and 2013, correct?
A. Between 2008 and 2014.
Q. 2014. I'm sorry. And that means that Mirena could have actually been placed any time between 2003 and 2014, correct?
A. Actually, it's possible. It doesn't say. That's possible.
Q. But we know that that's not how they assessed their controls, correct?
A. That's right, controls were assessed differently.



Q. For the controls, they just looked at people who had Mirena placed in a single year, correct?
MR. KENNERLY: Object to the form.
A. I -- I believe that's true. And we're looking at 2014.
Q. (BY MR. SCHMIDT) Right.
A. Right.
Q. So for the -- the cases, they're potentially picking up people who had Mirena placed between 2003 and 2014, correct?
A. Potentially, yes.
Q. For sure picking up people who had Mirena placed between 2008 and 2014, correct --
A. Yes.
Q. -- in the cases?
A. Yes.
Q. And in the controls, they're only looking at people who have Mirena placed in 2014, correct?
MR. KENNERLY: Object to the form.
A. Actually, that's not how they did the computation. If you look at the bottom of page 3, the last three sentences of that third full paragraph.
Q. (BY MR. SCHMIDT) Yes.
A. "With 3.5 percent of patient -- women having Mirena an estimated 5,467 women underwent Mirena insertion



between 2008 and 2014."
So, I mean, they do provide a range here.
Q. But the 3.5 percent that is their control estimate is based on the number of people who have it inserted in one year, correct?
A. That's correct, yes, right.
Q. And then the range of women that they are looking at in their case estimate are people who've had it inserted in potentially an 11-year period, correct?
A. That's right. Now, they did extend this -- well, from two -- since -- I mean, this is a computation where they're not following individual women. This is an aggregate computation. And they've done it for 2014 -- actually, maybe it's more complicated than that.
During the period 2008 to 2014, they -- so they identified something close to the enumerator over 2008, 2014, and then got a usage rate from 2014, apply it to 2008, 2014. However, that's different than -- that's a smaller range than the range for the cases, that is true.
Q. Okay. The -- the -- the way they tried to assess Mirena exposure in the cases is more akin to a prevalence measure, correct?
A. Yes, right.
Q. The way they tried to assess Mirena usage among the controls is more akin to an incidence measure,

correct?
A. I would disagree with you, because they are -- they are assuming, I believe, that the rate in 2014 is applicable to the rate as early as 2008. So they're trying to work their way toward. They start with an incidence.
Q. Right.
A. Right. But -- excuse me. It's not really incidence, right? I mean it's usage, right?
Q. Right.
A. It's usage. So they start with a one-year usage, and they want to expand that percent. They want to compute the usage over four years. They identify women over four years, and they use that rate that came from the one year.
Q. Right.
A. So I would -- okay. Fair enough. They're working their way back to something like a prevalence rate, yes.
Q. Right. But they're doing it for a different time span than was done for the cases, correct?
A. It's -- it's possible. We don't know, but it's possible that there were individuals who in the cases whose exposure was tracked earlier than 2008, that's possible.



Q. And going back to the point I raised about Mirena being a five-year product, do you know the average usage period for Mirena?
A. I do not.
MR. KENNERLY: Object to the form.
A. Sorry. I do not.
Q. (BY MR. SCHMIDT) Do you have an expectation one way or the other whether it's greater than a year?
MR. KENNERLY: Object to the form.
A. It's recommended for five years. I'd be surprised if it was only used for one year, but on average, on average.
Q. (BY MR. SCHMIDT) And -- so you would expect that in the -- in the cases if they are looking at people who have Mirena in place between 2008 and 2014, that they're picking up some people who actually had it inserted before, correct?
A. Yes.
Q. You would not get that at all in the -- in their control measurement, correct? Because they're doing no kind of math to account for insertions before 2008, correct?
A. Well, yeah.
MR. KENNERLY: Object to the form.
A. I mean, they did do math to account for



assertions before 2014, but they didn't do any math to account -- account for insertions before 2008.
Q. (BY MR. SCHMIDT) Right.
A. And I guess just sitting here, I'm not sure what the insertion rate was for women prior to 2008. So this may not be about much of anything. It just depends on what that rate is.
Q. You haven't studied that?
A. I have not.
Q. If there was some meaningful level of insertions in their case group that occurred before 2008 and they missed a comparable amount of insertions in their case -- let me ask my question again.
A. Right. Right.
Q. I apologize.
If there was some level of insertions that occurred before 2008 and were counted in their case group and we know they counted no insertions from before 2008 in their control group, would that bias away from the null or toward the null?
A. It would bias away from the null, because you've got kind of an artifactual increase in exposure in the case group, but, again, this is based on assumptions that -- whose truth or whose -- whose accuracy, whose applicability is subject to question.



Q. Okay. Now, I asked you this as to Utah. I want to make sure I ask this as to Denmark. The math that the Bayer scientists performed showed that if you assume a 10 percent usage rate of Mirena in the control group, the reported statistically significant effect from Denmark goes away. Do you question the accuracy of that math?
A. I can't question the arithmetic. It's just the applicability of the arithmetic to this setting.
Q. And to be sure I asked, you have not attempted to determine the percentage usage rate in the control group for which statistical significance goes away, whether it's 3.6 percent or 9.9 percent or somewhere in between, correct?
A. I think -- no, I think the -- the exercise is inappropriate.
Q. Now, I want to give you the moment you've been waiting for, which is in Paragraph 128, 127, and 129. You raise some -- some concerns about the usage of the Lindh data to try to adjust the control rates in the Valenzuela study?
A. Right.
Q. Let's look at 129.
A. Okay.
Q. You raise at the bottom half of that paragraph --
A. Yes.

Page 210

Q. -- three primary reasons that you cannot rely on the Lindh figures?
A. Yes.
Q. The first is that the Lindh paper did not attempt to determine the unconditional probability leading to the absolute number of women using LNG-IUS?
A. Yes.
Q. But, rather, the conditional probability given that a woman is on contraceptives?
A. Yes, sir.
Q. Put that in my language, that would be that you're saying Lindh looked at just what percentage of contraceptive users are using Mirena as opposed to looking at what percentage of all women of childbearing age --
A. Right.
Q. -- are using Mirena?
A. Overestimating the -- the correction factor, yes.
Q. Do you know -- in fact, we touched on this a little bit -- that in the Denmark portion of the Valenzuela study, that they did not limit their analysis to women using contraceptives by the way they applied their criteria of requiring the birth control history in the prior three months? Do you know?
A. Are we talking about cases now, right?
Q. Yes.

Page 211

A. Talking about cases now?
Q. Yes.
A. Ask the question again.
Q. Sure. Do you know with certainty one way or the other whether this critique would also apply to the case arm of the Denmark study because they limited themselves through their requirement of a birth control history of the prior three months only to women who were using some form of birth control?
A. See, I -- so we did talk about this a little bit earlier. I think that this information is -- is available in the medical records, and I -- and I'm willing to assert that, in my view, they, in fact, did include women who had no birth control experience as well.
Q. You can't be certain of that one way or the other, though, correct?
A. I cannot. That's true. That's my impression.
Q. Let's look at Lindh, which was Exhibit 27.
A. Okay. Yes.
Q. And isn't it the case that they give both unconditional and conditional data in Figure 2?
A. Figure 2. Figure 2.
Q. I'm sorry. Figure 1. I apologize.
A. Figure 1. Okay. So let's take a particular year, say, 2012 in Denmark.

Page 212

Q. Uh-huh.
A. So we're looking at LNG-IUS.
Q. Uh-huh.
A. And it looks like they provide both. Just one second now. Yes, they did. I don't -- I don't know what number they actually used to compute their correction factor, though.
Q. Okay.
A. Maybe I should have said this differently in Paragraph 129, but I just don't know which number they used. I'm assuming they should have used the unconditional probability.
Q. Okay. In your second point regarding Lindh, you say, "They didn't provide specific figures that I could use for an alternative computation"?
A. Right.
Q. And is that just the idea that if you look at these bars in Figure 2, you can't tell the precise percentage?
A. I should have said numbers, not figures --
Q. Okay.
A. -- because figures is here. But -- but that's correct, yes.
Q. We can tell that all of these numbers are above 3.5 percent, well above 3.5 percent?

Page 213

A. That's true.
Q. And your third criticism is that the Lindh paper included women with repeat prescriptions, correct?
A. Yes, sir.
Q. Is -- is it not true that both the Utah case arm and the Denmark case arm included women with repeat prescriptions?
A. Yes, but they were not used as multiplicative factors, so here we get into the issue of the differential ascertainment of exposure.
Q. Did the Denmark case -- I'm sorry.
Did the Denmark control group include women with repeat prescriptions?
A. I'd have to check.
It's possible it included repeat prescriptions. It's possible.
Q. Okay.
A. Based on the description they give on page 3.
Q. On Paragraph 125.
A. 125.
(Comments off the record.)
Q. (BY MR. SCHMIDT) On Paragraph 125 of your report, you say that the -- at the end that "The method used in the Denmark control arm to estimate exposure is similar to Bayer's own method for calculating global and

Page 214

national exposure by way of sales data."
Do you see this?
A. Yes.
Q. Are you aware from the documents you've reviewed that any time Bayer attempts to estimate usage of Mirena, that they adjust for the fact that it is a multiyear product?
MR. KENNERLY: Object to the form.
A. That would be reasonable, yes, uh-huh.
Q. (BY MR. SCHMIDT) Okay. Why don't we take a break.
THE VIDEOGRAPHER: Off the record, 1:51, end of Media 5.
(Short recess.)
THE VIDEOGRAPHER: We're on the record at 2:00 p.m., beginning of Tape 6.
Q. (BY MR. SCHMIDT) Look with me, if you would, at the abstract of the Valenzuela publication. At the end of the abstract, they state that "The results suggest that women with Mirena may have an increased risk of developing PTC, but does not suggest that Mirena can cause PTC."
Did I read that -- or did I paraphrase that correctly?
A. Yes.
Q. And do you agree with that as an appropriate

Page 215

conclusion based on their data?
MR. KENNERLY: Object to the form.
A. No, I disagree with it.
Q. (BY MR. SCHMIDT) Would you conclude causation with just the results of Valenzuela standing alone?
A. No, sir, I would not. I don't -- what I disagree with is his last statement, "but does not suggest that Mirena can cause PTC." I mean, it's -- it's the can cause. It certainly can cause PTC. This doesn't demonstrate it causes PTC. But this -- this to me is kind of an inappropriate statement --
Q. Okay.
A. -- and it doesn't contradict my belief that you can't rely on one case control study by itself.
Q. Okay. Look with me, if you would, at page 4. Under discussion in the right-hand column.
A. Yes, sir.
Q. "Our investigation does not indicate that an LNG-IUS can cause PTC."
Do you see that?
A. Where are you? Second paragraph? Third paragraph?
Q. Second paragraph beginning of the second sentence where they state, "Our investigation does not indicate that an LNG-IUS can cause PTC."

Page 216

A. I see that.
Q. Do you think that's an appropriate statement based on their data?
A. I don't -- I don't think so. I think that -- I think an appropriate statement would be to say that it's possible that LNG-IUS causes PTC, but this study doesn't show it.
Q. And on the next page -- --
A. Uh-huh.
Q. -- in the first full paragraph, they say, "There are two possible explanations for the association demonstrated in our study."
Do you see that?
A. Yep.
Q. One is that it causes, right?
A. Yes.
Q. "Another explanation is that LNG does not cause increased intracranial pressure but that PTC is more likely to occur in the same population of women who are more like to have an LNG-IUS recommended to them by their physician."
Did I read that correctly?
A. Yes.
Q. Do you agree that that's a possible explanation of their data?

Page 217

A. Well, it's hard to disagree. They say either we show it caused it or it didn't.
Q. Do you agree --
A. That's the universe of possibilities.
Q. Okay. Do you -- do you agree that those are both appropriate, valid possibilities based on their data?
A. I would say that's an appropriate description of the sample space.
Q. On the last page of their article, they state, "We do not recommend the removal of Mirena from a woman with PTC." And they go on to say that "If a woman has PTC or is at risk of PTC, Mirena should still be considered."
Do you see that?
A. Yes, I do.
Q. Do you disagree with those clinical statements?
A. You asked me if I disagree with these clinical statements?
Q. Yeah. Let me break it down.
A. Okay.
Q. Do you -- do you disagree with the Valenzuela authors that Mirena removal should not be recommended for PTC patients?
A. I would disagree with that based on this, yes.
Q. Do you --
A. And this is in women with -- not women in

Page 218

general, but women with PTC?
Q. Right.
A. I would disagree with that.
Q. Do you disagree with their statement that if a woman has PTC, Mirena should still be considered?
A. I would disagree with that, too.
Q. Has -- has the -- has the Valenzuela study ever been replicated by any other publication?
A. So far, no.
Q. You -- you calculate something called attributable risk that you referred to earlier?
A. Yes, sir.
Q. Is it appropriate to use unadjusted odds ratios for determining attributable risk?
A. It's appropriate to use -- if you believe in causality, and that's an underpinning of this computation, you have to believe there's causality, then I think you use any odds ratio that you've got. Now, you prefer to use an adjusted odds ratio, but you use what you have.
Q. If an odds ratio is confounded and you do an attributable risk calculation, does that mean you're really calculating the risk attributable to both the confounder and the product?
A. If -- if it's demonstrated that there's true confounding, yes.

Page 219

Q. So, for example, if there is confounding -- true confounding in the Valenzuela studies, would your attributable risk calculation apply -- be the actual risk of PTC from Mirena as well as from the confounding factors?
MR. KENNERLY: Object to the form.
A. Actually -- actually, no. If the odds ratio included multiple causes, then that would certainly be the case, because the ARE would reflect the -- the combined influence of dual -- dual causes. But if we're looking at just simply confounders, then I would say no. The odds ratio would change, but it would still be the odds ratio for the cause.
Q. (BY MR. SCHMIDT) Would you expect your attributable risk number to change for Valenzuela or numbers, plural, to change for Valenzuela if the odds ratio -- ratios had been adjusted for age and obesity?
A. I think the odds ratios would change for age and obesity. And I think the ARE would change, yes.
Q. So is the attributable risk that you calculated for Valenzuela the attributable risk for Mirena plus the impact of whatever impact there is of the confounders of age and obesity?
A. So -- so to be clear, mathematically, there would be a change in the -- in the ARE. The number would be

Page 220

different. And, in fact, the number would -- we would expect the number to be lower. However, the implication of the number would remain the same.
Q. Okay. Let's -- does -- attributable risk, does that type of calculation depend on -- I'll strike that.
A. Okay. Can I -- can I just clarify something? We are talking about attributable risk exposed, which is the computation I did.
Q. Yes.
A. Because I wanted to be clear. Attributable risk is a different computation I did not do. So I just want to be clear that we're talking about the ARE that I've -- that I've done.
Q. Yeah, I am talking about the calculation that you performed in Paragraphs 118 and 119 of your report and --
A. Yes.
Q. -- Paragraph 130 of your report.
A. Yes, those are attributable risk exposed. So our conversation was about attributable risk exposed. That's the only clarification I wanted to make.
Q. And you -- you would expect those numbers to decrease had Valenzuela controlled for weight and age?
A. Yes, sir.
Q. And do you know by how much they would decrease?
A. I don't know precisely how much they'd decrease.

Page 221

I don't think they go down to -- well, I don't know precisely how much, but they would not be reduced to the null.
Q. Okay. Let's look at Paragraph 119, please. You state --
A. 119?
Q. Yes, sir.
A. Okay.
Q. "In a person who is exposed to Mirena and thereafter develops IH, there's a 87 percent chance that the IH was produced by the Mirena."
Did I --
A. Yes.
Q. -- read that correctly?
A. Yes.
Q. Does that apply to all Americans?
A. If I can clarify this for just a second. This is also under the presumption that Mirena causes IH.
Q. Okay.
A. I mean, one could do this for obesity, but it would mean nothing, at least for me, because I don't believe obesity causes IH.
Q. Yes.
A. Having said that, ask your question, please.
Q. Sure. Your statement that in a person who's

Page 222

exposed to Mirena and thereafter develops IH, there's an 87 percent chance that the IH was produced by the Mirena --
A. Yes, sir.
Q. Who is that true for?
A. That's true for whomever the -- this would be Utah? Whomever the results of the Utah evaluation -- to whomever the results in the Utah -- Utah generalized.
Q. Would that include all Americans?
A. I -- I think we talked about this earlier. They would be -- the OR doesn't generalize. So whatever OR one would use for -- for the entire United States, you could do this, but this OR doesn't generalize to the United States simply because all US residents didn't have an opportunity to be part of the study.
Q. Okay. For example, you give a different number for Denmark, a lower number, correct?
A. That's true, yes.
Q. And that's not generalizable to the US either?
A. That number itself, no, it is not. I mean, I believe an elevated number is, but that number is not.
Q. Okay. Now, you alluded to this before. You could do odds -- you could do attributable risk exposed calculations for any risk factor for which you have an odds ratio, correct?

Page 223

A. It's just a computation, yes.
Q. And your view is you shouldn't be doing it unless it's established that it's causal; is that correct?
A. That's the only way that computation has any power.
Q. Okay. And you don't believe that obesity is an established cause, correct?
A. Correct.
Q. But if we were to perform -- do you have the Valenzuela study in front of you?
A. I do.
Q. We know that the average body mass index for patients in the Utah case arm of the Valenzuela study was 35, correct?
A. I think I'm with -- BMI -- Table 1?
Q. Yes.
A. We were here before. Yes. Yes.
Q. And so the average case in the Utah study was -- was overweight, correct? Was obese actually under the definition?
A. Yes, right, this is -- this is a table for just the cases, so, yes, that's right.
Q. And we don't know if that was true for the controls in Utah?
A. No, we don't.

Page 224

Q. And if we were to take a study like Daniels, which is Exhibit 5, just as an example.
A. Here it is.
Q. Look at the data in Figure 1 on page 637.
A. Figure 1, page 637, yes.
Q. If we focused on the BMI group of 30 to 35, do you see that?
A. Yes, sir.
Q. Their odds ratio is 19.5?
A. Yes, sir.
Q. By my math, if you do 19.5 minus 1 over 19.5, that's how you would do an attributable risk calculation, correct?
A. That's true. You wouldn't do it here, but that is -- that's the math.
Q. And when I do that math, I get about a 95 percent attributable risk estimate. Does that sound right? I can give you a calculator.
A. No, no, that's -- that's -- that's the arithmetic, but, of course, it doesn't have the energy behind it because of the study on which it's based.
Q. All right. If we look at the Denmark arm.
A. This is Valenzuela?
Q. Yes.
A. Yes.

Page 225

Q. For Denmark, we don't know the precise mean body mass index, but we know it's somewhere between 36 and 37, correct?
A. This is Table 2? It's correct.
Q. If we were to --
A. Are we going back to Daniels?
Q. Yes. If we were to perform the attributable risk estimate math for the highest BMI group greater than 35 in Daniels --
A. Yes.
Q. -- it would be 26 minus 1 divided by 26, correct?
A. Yes.
Q. And when I do the math, I get about 96 percent. Does that sound right --
A. That's the --
Q. -- as the attributable --
THE REPORTER: What? I'm sorry.
Q. (BY MR. KENNERLY) -- as the attributable risk estimate for that group?
A. That is the correct -- that's the correct arithmetic. I wouldn't call that an attributable risk exposed, though. It doesn't -- it doesn't have the same impact.
Q. And that's because you believe that weight is not causal?

Page 226

A. Well, that's part of it, but it's also because we have -- from Daniels, we have these controls who have neuro-ophthalmic disease. I mean, there's a whole series of issues with it.
Q. Okay. Have you -- have you done any analysis -- any empirical analysis based on case reports? I asked you about disproportionality before, but is there any form of empirical analysis you've done on the case reports that you looked at?
MR. KENNERLY: Object to the form.
A. Do you mean quantitative analysis?
Q. (BY MR. SCHMIDT) Yes.
A. No, sir.
Q. Okay. Do you -- do you know the -- the number of cases that have arisen?
A. The total number of cases?
Q. Yes.
A. No, sir.
Q. Do you know the population size from which they come?
A. I do not.
Q. If you were to look back at that BfArM report --
A. Okay.
Q. -- the German regulatory report that is --
A. Sure.

Page 227

Q. -- Exhibit 3, it will be the thickest thing in your file --
A. Yeah.
Q. -- right?
A. Sad to say my CV is the thickest thing. That's a -- that's a shame.
Q. Here's the --
A. Okay. Thank you.
Q. If you look at page 44 and 45.
A. 44 and 45.
Q. Just focus on 45 for me, please.
A. 45?
Q. Yeah.
A. Okay.
Q. Do you see that there -- in the first full paragraph, there's a calculation of a reported frequency for Mirena case reports?
A. Beginning with 315?
Q. Yes.
A. Okay.
Q. They give a reporting frequency of .22 cases per 100,000 looking at all their cases, and then if they exclude lawsuits, the rate is .08 per 100,000?
A. Yes.
Q. Do you take any issue with that math?

Page 228

MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) Not with the import of it, but with the actual correctness of the math?
A. I assume we're taking 315 and subtracting 118, right, and then -- and what's the denominator? Actually, I have to say I don't know how they did this.
Q. Okay.
A. I think I understand there's a straightforward way to do it. I don't know how they did it. There's no denominator in this paragraph.
Q. You -- you haven't checked the math yourself?
A. I have not, no.
Q. Okay. Or done your own math on a calculation like this?
A. No, sir.
Q. That reference to litigation cases and how they inflate the reporting frequency, when you were looking at case reports, did you undertake a consideration of whether they were or were not litigation cases?
MR. KENNERLY: Object to the form.
A. No, because I wasn't trying to do a -- excuse me -- an -- an incidence or prevalence rate. I was just trying to look at what were the circumstances.
Q. (BY MR. SCHMIDT) If you were trying to do an incidence or prevalence rate, would you take account of

Page 229

the fact that some of the cases -- a large number of the cases are litigation cases?
A. I don't think so, because that would, I think, would be counterbalanced by the fact that many cases actually are not even reported.
Q. Look with me, if you would, at your report.
A. Okay.
Q. In Paragraph 132.
A. Yes.
Q. You identify 13 representative cases. Do you see that?
A. Yes, sir.
Q. What -- what made you identify these 13 cases?
A. Actually, there were so many cases, these were -- that made my simple point. These were the first 13 I came across.
Q. Did you review the full 315 cases that are discussed in the BfArM report?
A. No, did not.
Q. Did you review more than these 13 cases?
A. Maybe --
Q. Let me be fair. Let me be fair. Sorry. Let me reask.
A few pages later -- and I'm going to ask you about these -- you identify some dechallenge cases.

Specifically in 150, there are another four cases?
A. Yes, sir.
Q. So let me be more fair in my question. Between these 17 cases, the 13 in Paragraph 132 and the four in 150, did you identify any other cases?
A. I think --
Q. Did you review any other cases?
A. I -- actually -- actually, it's five as it turns out, right?
Q. I might have miscounted. Let me reask.
A. Okay.
Q. You are correct, sir. I'm sorry. I'm just trying to be fair, and I inadvertently miscalculated.
A. Okay.
Q. We have 13 --
A. 13.
Q. -- 13 cases discussed in 132, correct?
A. Yes, sir.
Q. And five cases discussed in 150, correct?
A. Yes.
Q. Did you review any cases other than those two groups?
MR. KENNERLY: Object to the form.
A. I -- I reviewed a few more cases than this, but I just didn't want the report to be overburdened with



listings of case reports, but, yes.
Q. (BY MR. SCHMIDT) By "a few more," do you mean like a small handful?
A. I'd say maybe twice as many.
Q. So you might have reviewed --
A. 36.
Q. Okay. Were those cases that were selected for you by counsel, or did you go through some data set to find them?
A. I went through a data set.
Q. Of what you understood to be all the cases?
A. Yes, sir.
Q. Let's look at these cases you discuss as representative cases in Paragraph 132.
A. One thirty?
Q. Two.
A. Two. Okay.
Q. You say at the beginning of this paragraph that "The diagnosis spans from several weeks to four years after Mirena insertion," correct?
A. Yes.
(Exhibit 29 marked.)
Q. (BY MR. SCHMIDT) I'm going to pass you -- this is Exhibit 29 that I understand to be the cases that you cite. Does that appear to be the cases that you cite?



A. I don't know. This is --
Q. And I think I gave you two copies, so I'll just --
A. Sure.
Q. -- take back the other one.
A. There you go.
I don't see the identifying number anywhere.
Q. Okay.
A. Probably not looking -- oh, hold on. 0001605?
Q. Yeah. Look at the first page --
A. Right.
Q. -- under manufacturer information, there's a manufacturer control number down at the bottom. Maybe three lines up sort of --
A. Okay. I see it. Right, right.
Q. Okay.
A. Sorry.
Q. If you flip through, do you see that this corresponds to the cases you cite in Paragraph 132 of your report, Exhibit 29 does?
A. Yes.
Q. And let's look, for example, at case -- at the case that begins on page 19. We added numbers to these just to make the examination easier. Do you see --
A. Oh, I see. So page 19 of the exhibit?



Q. Yeah.
A. Of Exhibit 29?
Q. Correct.
A. Okay.
Q. And that's a case report that ends with the numbers 971 and the letters GPV, correct?
A. Yes, that's right.
Q. That's the one you cite in Subparagraph H of --
A. Okay.
Q. -- your report?
This is, in fact, a patient who -- if you look at the second page of this document, page 20 of the exhibit.
A. Page 20. Yes.
Q. This is a patient who had Mirena in place for five years from 2002 to 2007, correct?
A. Yes.
Q. And then they had a new one put in place in 2007 on the same day their old one was removed, correct?
A. Yes.
Q. And it was ten months after they started that second one that they developed PTC --
A. Yes.
Q. -- correct?
So this is a patient who, in fact, had five

Page 234

years and ten months of usage before developing PTC, correct?
A. Fair, yes.
Q. Is there any outer limit in your view for temporality?
MR. KENNERLY: Object to the form.
A. I -- I need to understand what the conditions are for that.
Q. (BY MR. SCHMIDT) Sure. Let me ask the question a little differently. Is -- is -- this is an example of a patient who used Mirena for six years before developing PTC, correct?
A. Yes.
Q. Is there any outer limit in terms of the length of time for which a patient can use Mirena with no symptoms before they develop PTC where you would rule out the Mirena as a cause?
A. I understand. Are we taking out the following scenario: The woman has Mirena installed for five -- implanted for five years, has it removed. Five years later, without having it, she gets PTC. I don't think you can make a link there. Let's take that out, because she's not been recently exposed.
Q. Okay.
A. Take that out. And now we're talking about a

Page 235

woman who has had a sequential exposure month after month, does not get PTC, continues to be exposed and has PTC, can we remove Mirena as a cause? I don't think so.
Q. Okay. It's hypothetically possible for a woman to use 25 -- Mirena for 25 years before developing PTC, correct?
A. It's hypothetical, yes, that's true.
Q. And would you attribute PTC to Mirena in that instance?
A. It depends on what else we have with the case. For example, if we go -- wherever my Exhibit 2 is. If we remove everything from Exhibit 2 and that's all that we have, then it's possible, yes.
Q. Okay. In order to attribute causation in a case report to Mirena, would you want to remove all the items in Exhibit 2 from the case?
A. In -- ideally, yes, ideally, but . . .
Q. Would you agree with me that looking at these case reports that we've marked as Exhibit 29, you can't do that for any of these cases because that information just isn't there?
A. No question to that.
Q. What about on the front end? Is there a minimum exposure period to Mirena before you can develop PTC?
A. I don't know. I don't know. If -- if -- if

Page 236

for -- if -- if for some women Mirena is like a poison, then, of course, the more they're exposed to it, the greater the risk. But is there some minimal exposure for them that's safe, I don't know.
Q. Okay. You state in Paragraph 39 -- I'm sorry -- page 39 of your report, Paragraph 141, you make a point about 62.9 percent of cases occurring in the first two years of use?
A. Hold on. I don't think I'm with you. What paragraph is this?
Q. Paragraph 141, page 39.
A. I'm sorry. 141. Okay.
Okay. Ask your question again, please.
Q. Just simply you make note of the fact that 62.9 percent of cases are reported within the first two years of Mirena use?
A. Yes, sir.
Q. And you're drawing on Bayer's data and their -- and their German regulatory authority report?
A. Yes, sir.
Q. Do you know if there's any kind of reporting bias where people are more likely to report PTC closer in time to beginning use of Mirena than later in time?
MR. KENNERLY: Object to the form.
A. I -- I don't know incidence by -- I know about

Page 237

the concept of the bias --
Q. (BY MR. SCHMIDT) Yeah.
A. -- but I don't know if that's in place here.
Q. Okay. So let me see if I have this accurately. Is it fair to say that's a potential bias, but you don't know if it exists here?
A. Yes.
Q. Have you done any kind of analysis -- strike that.
Are you aware that the amount of LNG released from a Mirena changes over time?
A. I am.
Q. Are you aware that the serum blood levels associated with Mirena use change over the usage periods?
A. I am.
Q. Have you done any analysis of either the release rate or the serum blood levels in terms of how that corresponds to a two-year period?
MR. KENNERLY: Object to the form.
A. Only as far as what I have in Paragraph 133 through -- it looks like through 139 -- actually, through 138.
Q. (BY MR. SCHMIDT) Okay. So let's look at that. The only -- you've got data in 139 on ovarian cysts. Do you see that?

Page 238

A. I do.
Q. And you've got data in 138 on suppression of ovulation?
A. Yes.
Q. Is there any relation between either suppression of ovulation or ovarian cysts and PTC that you know of?
A. No.
Q. Okay. In 137, you have data on just pure serum levels, correct?
A. Yes.
Q. And you talk about the serum levels being 150 to 200 at -- in the first few weeks and then you talk about what the concentrations are at 12, 24, and 60 months. Do you see that?
A. Yes.
Q. Have you done any kind of quantification of how those rates track against the case report data?
A. No, I have not.
Q. Have you done any kind of quantification of whether there's any data that suggests -- for example, the highest number I see here is 192; is that correct?
MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) In terms of serum concentration levels.
A. It's the highest mean concentration, yes.

Page 239

Q. Okay. The highest mean concentration you have is 192 at 24 months; is that correct?
A. Yes, sir.
Q. Have you done any analysis to show that PTC rates with Mirena increase or are highest around two years as opposed to five years or one year?
A. I haven't tried to correlate directly quantitative -- quantitatively correlate this with the post implantation incidence rate of PTC.
(Exhibit 30 marked.)
Q. (BY MR. SCHMIDT) Okay. Let's go to those five dechallenge cases --
A. Okay.
Q. -- that you list in, I believe, 150. I've marked those as Exhibit 30. Tell me --
A. Thank you.
Q. -- if I have that right, please.
A. Excuse me. I'm getting confused here. Should I be keeping this or -- okay. Thank you.
Q. Are these, in fact, the dechallenge cases that you cite at Paragraph 150 of your report?
A. They appear to be.
Q. Did you -- in Paragraph 150, you were talking about something called positive dechallenge; is that correct?

Page 240

A. Yes.
Q. It's the idea that you stop the -- the exposure and the condition goes away?
A. Yes.
Q. There's also something called negative dechallenge, which is you stop the exposure and the condition does not go way, correct?
A. Sure, correct.
Q. And would you want to consider both forms of data?
A. For this analysis, since I'm not trying to quantitate anything, no.
Q. Okay.
A. Because I simply want to -- excuse me. I simply want to demonstrate here what's possible.
Q. Okay.
A. I can't compute what's probable, but I want to just provide for what's possible.
Q. Okay. And to be sure I have this from your answer, you've done no analysis of negative dechallenge?
A. Right.
Q. Have you done any analysis of how often someone develops symptoms of IH or PTC, the Mirena is not removed, and the symptoms still go away?
A. I have not.

Page 241

Q. Do you know if that's the majority of cases or the minority?
A. I don't know.
Q. With respect to these five cases, you -- when you say that these are -- you say in your report that these are representative examples, correct?
A. Yes.
Q. You've not purported to review all the re -- all the dechallenge or potential dechallenge cases, correct?
A. Correct.
Q. So you can't say they're representative in that sense, correct?
A. Well -- correct. What I mean by "representative," I simply mean to say that these are examples of cases where there was dechallenge. The phenomenon of dechallenge was observed.
Q. Okay. Can you tell me in any of these five cases that the symptoms improved with no other treatment other than Mirena removal?
A. I'm not trying to spend too much time on this.
Q. Since you have my question, let me ask you to look at that. I'll rephrase my question before --
A. Sure.
Q. -- when you're -- when you're done.
A. No, I can't.

Q. And -- and so just to be sure I have it, I'm just going to state a proposition and ask you to tell me if it's true or false. With respect to the dechallenge cases you identify in your report, which are marked as Exhibit 30, it's impossible to rule out treatment leading to the improvement in symptoms that's reported in those cases, correct?
MR. KENNERLY: Object to the form, leading.
A. If by "treatment" you mean some other concomitant intervention?
Q. (BY MR. SCHMIDT) Yes.
A. Then, no, I can't.
Q. Okay. You can't rule out the effect of some other concomitant treatment?
A. I cannot.
Q. Okay. There are no rechallenge cases, correct?
A. Correct, that -- that I know about.
Q. Okay. And you -- you make a statement in your report about, in your opinion, it being unethical?
A. Yes.
Q. To have a rechallenge?
A. Yes.
Q. Do you know whether that has, in fact, occurred in any of the case reports that a patient was put in a rechallenge situation?



A. So by "rechallenge," I assume we're talking about patient initially had the Mirena implanted, developed PTC, had the Mirena removed, PTC resolved, and the patient went on for another implantation with Mirena?
Q. Yes.
A. I know of no such cases.
Q. Do you know that -- and when you say you know of no such case, do you know that it doesn't exist or you just don't know one way --
A. I don't -- I don't know one way or the other.
Q. I'm going to jump around a little bit in the -- in an effort to streamline. Page 18, Paragraph 67.
A. Okay.
Q. You drop some more Latin on us in this paragraph.
A. Uh-oh.
Q. And you're talking about temporal relationship in your last sentence.
A. Yes.
Q. And I'll just read the English. You talk about an example of the bias that results from relying on the causality of -- of temporal relationship alone, which is the bias that follows, therefore, it is caused by?
A. Yes.
Q. Can you tell me what you mean by that?
A. Sure. I mean simply because a expose -- a -- a



disease, a condition, follows an exposure. It doesn't mean the disease was caused by the exposure.
Q. Okay. And I believe somewhere in here you talk about that can be particularly challenging in -- in certain settings. And you give the example of -- of a disease like cancer where it's challenging even to determine when the disease starts?
A. Yes.
Q. Is that a challenge with PTC?
MR. KENNERLY: Object to the form.
A. That is possible, yes. It would -- I mean, it would be the rare unfortunate individual who had a Mirena insertion and suddenly her -- her CSV pressure jumps to 200 in three hours. That would be rare.
Q. (BY MR. SCHMIDT) Okay.
A. So there is some -- there is some lag period over which the disease PTC develops.
Q. Okay. And are you aware that there's also often a lag period with certain diseases between when symptoms first manifest and when a patient ultimately gets diagnosed with the ultimate disease?
A. I think most diseases are that way.
Q. Do you know for PTC whether the average lag time between exposure -- sufficient exposure or causal agent and ultimate diagnosis is?



A. Actually, I don't know -- oh, from exposure to diagnosis, you could certainly measure. But how much of that is actually lag time? I don't know, because the true lag time is when the disease actually presents itself in the organ system and when the symptoms develop. That's the unknown.
Q. Okay.
A. We know when exposure is, but how long that period is, we don't know.
Q. Do you know if it's months or weeks or years?
A. I -- I don't know. I don't think it's days. I don't think it's -- I have no idea of knowing whether it would be weeks or months.
Q. Okay. And do you know what the average period of time between when someone first experiences -- strike that.
Are you familiar with -- with the concept that a lot of PTC patients experience initial symptoms like, say, headaches and only months or even years later get diagnosed with PTC?
A. I can see where that would be the case, yes.
Q. Do you know what the average period of time between first symptoms and diagnosis is with PTC, whether it's weeks, months, years?
A. I don't know how we could know that, because so

Page 246

many cases occur with women who don't seek care, so I don't know how we would really know that.
Q. Is it possible to rule out the proposition that the average period of time between first symptom manifestation and PTC diagnosis is a year, for example, just to pick a number?
A. No. I mean, if someone actually carried out an evaluation for a number of cases and they knew when the patient was diagnosed, that's not lag period, but that's just diagnosed -- that's just -- excuse me -- symptom to diagnosis time.
Q. Right.
A. Right.
Q. And do we know what that average time is?
A. No, I don't know what that average time is.
Q. For example, could you rule out that period between symptom to diagnosis time being on average one year?
A. I couldn't rule it out. I don't know one way or the other.
Q. Okay. Do you know if -- if LNG levels vary by weight?
MR. KENNERLY: Object to the form.
A. I would anticipate they do, but I don't know.
Q. (BY MR. SCHMIDT) Which way would you expect them

Page 247

to vary?
A. Don't know. I mean, they're different forces. I mean, LNG -- we're talking about plasma -- I mean, serum LNG, though, blood levels.
Q. Let me ask more precisely. Do you know if there are differences between the serum levels of obese and nonobese women who use Mirena --
A. I don't --
Q. -- for LNG?
A. I'm sorry. I don't know.
Q. Let's look at Paragraph 69 of your report.
A. Yeah.
Q. You talk about the biological mechanism for LNG and PTC, correct?
A. Yes.
Q. And you say, "The mechanism should be elaborated sufficiently and buttressed with supporting data that permits one to understand how the disease could be produced by the exposure and permits an assessment of coherence."
Do you see that?
A. Yes.
Q. Has the mechanism for LNG and PTC been elaborated sufficiently and buttressed with supporting data?
A. Yes.

Page 248

Q. In your opinion?
A. Yes, sir.
Q. Look with me, if you would. Let's turn to that question, Paragraph 146 of your report.
A. Sure.
Q. So I understand that this is your articulation of -- of the causal mechanism, the biological mechanism?
A. 145?
Q. Yes, sir.
A. Yeah.
Q. And you cite about 40 sources in support of that proposition?
A. Yes, sir.
Q. Did you find all those yourself?
A. Yes, sir.
Q. Did you review them all?
A. Yes.
Q. One theory that Dr. Johanson, who I think was on your list of reports you had reviewed, offers is an androgen receptor theory. Are you familiar with that theory?
A. I am --
MR. KENNERLY: Object to the form.
A. Sorry. I am familiar with it.
Q. (BY MR. SCHMIDT) Okay. Another theory that

Page 249

Dr. Salpietro offered is the MR theory that we've already touched on, correct?
A. Yes, sir.
Q. Do you understand those to be two distinct theories?
MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) As to how Mirena might cause IH?
A. Well, they are distinct in that there are two different culprit steroid molecules, but they are very similar in the notion of mimicry of receptor.
Q. As I understand what you have written in your report, you rely on the MR theory; is that --
A. Correct.
Q. -- correct?
A. Yes.
Q. Not the androgen receptor theory?
A. That -- that is correct.
Q. So let's focus on the MR theory. And I think we -- we talked about this earlier, but one part of the theory is that you rely on the proposition that aldosterone affects the MR and that leads to PTC?
MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) Correct?
A. In general, yes, right.

Page 250

Q. And then the next step in the theory is that LNG is capable of operating like aldosterone in that regard?
A. Yes.
Q. Okay. And as I -- I had a question to ask you and I think you've answered it, but I want to make sure. It strikes me that one way that aldosterone could lead to PTC is by increasing CSF levels. Another way it could do that is by preventing elimination of CSF in an appropriate fashion. I think your view, as you said it earlier this morning, is that you believe it increases CSF levels?
MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) Is that correct?
A. Yes, sir.
Q. Okay. Increases CSF production?
A. Well, it increases the flow of sodium and water into the -- into the ventricle.
Q. Okay.
A. So it increases the volume of fluid in the ventricle.
Q. And that leaves --
A. If that -- if we call it increased CSF production, then I accept the definition.
Q. Okay. And you believe that is a demonstrated proposition, it's not hypothetical that aldosterone increases CSF and leads to PTC?

Page 251

A. I --
MR. KENNERLY: Object to the form.
A. I believe that aldosterone is incontrovertible.
Q. (BY MR. SCHMIDT) Okay. Incontrovertible.
Let's look at one of the -- let's look at a few publications. You cite both a study by Dr. Salpietro in your report, and then you say you looked at his expert report; is that correct?
A. I didn't rely --
MR. KENNERLY: Object to the form.
A. I'm sorry. I didn't rely on his expert report. I found his article and relied on his article.
Q. (BY MR. SCHMIDT) Do you understand him to be an expert in this area?
A. Yes, sir.
Q. Let's mark the article you cite as Exhibit 31.
A. Yes, sir.
(Exhibit 31 marked.)
Q. (BY MR. SCHMIDT) Is this, in fact, the article you rely on from 2012 by Dr. Salpietro?
A. Yes.
Q. Let's look at page 2, No. 570.
A. Page 2 --
Q. Yeah.
A. -- number --

Page 252

Q. Let's call it 570.
A. Okay. All right.
Q. Under aldosterone, do you see that?
A. Yes.
Q. An aldosteronism is when you have too much aldosterone, right?
A. Hyperaldosterone is when you have too much aldosterone, yes.
Q. Okay. He says in the second to last sentence under that heading, "Whether CSF formation is increased in aldosteronism accounting either for increased intracranial pressure and for headache showing symptoms of aldosteronism and IH remains unknown."
Did I read that correctly?
A. Yes, uh-huh.
Q. Not well, but correctly.
A. Yes, right.
Q. Talking about my reading.
Do you agree with the proposition that whether increased levels of aldosterone leads to increased CSF formation remains unknown?
A. Actually, I don't agree with that, no.
Q. Okay.
A. This is an article from two thousand -- when is this?

Page 253

Q. 2012.
A. 2012. No.
Q. Let's look at page -- do you see where he says -- do you see where he has a heading Renin/Aldosterone Axis and Obesity, 570?
A. I do, yes.
Q. Second sentence under that, he says, "Obesity is frequently associated with increased plasma aldosterone levels."
A. Yes.
Q. Do you understand that to be a true statement?
A. Yes.
Q. "Increased mineralocorticoid activity may be the common link between obesity, hypertension, dyslipidemia, and insulin resistance."
Do you understand that to be a correct statement?
A. Well, I understand that -- let's just parse this. Increased mineralocorticoid activity may be the common link between obesity. Hypertension, I agree with that.
Q. Okay. Let's limit it to that, because I'm not asking about other conditions.
A. Gotcha. Okay.
Q. And let me try to reframe the question --
A. Sure.

Q. -- in terms I understand. Do you agree that the common link between obesity and PTC might be increased mineralocorticoid activity?

A. I would phrase it this way: I would say that increased mineralocorticoid activity increases weight gain and produces PTC. Now -- now, I do want to be clear about something. Someone with normal aldosterone levels that go up a little bit doesn't get PTC. I want to be clear about that. People who have profound primary aldosteronism, profound elevations, they can get PTC.

Q. Okay.

A. And, of course, they will have huge weight gains and sodium load.

Q. So let me see if I can break this down. Whether it's causal or not or which way the causality goes, would you agree that there's link between obesity and aldosterone levels?

A. I would say there's a link between weight gain and aldosterone levels. Obesity is a more -- more complex than weight gain. I mean, it's the type of weight you lose. It's dyslipidemia. There's a lot of things going on. Insulin resistance. That's -- I don't believe aldosteronism causes any of that. That's -- that's the obesity disease, but the weight gain part I think aldosterone plays a major role in.



Q. Would you agree that there is a link between weight gain and increased mineralocorticoid activity leading to PTC whether that's due to the weight gain or aldosterone increases that go along with that?

A. Oh, try me again.

Q. Sure. Is there a linkage between weight gain and increased mineralocorticoid activity that leads to PTC?

A. Yes, elevated -- profoundly elevated aldosteronism increases the flow -- increases extra -- extra vascular volume of sodium and water, increased weight gain, and also increased flow of sodium and water into the CSF and PTC.

Q. Okay.

A. Can produce that. Doesn't do it all the time, thank heavens, but can do it.

Q. Right. So -- so can I see if I have this?

A. Sure.

Q. Is it accurate to say that in some cases, weight gain or obesity leads to increased sodium and water which in turn leads to increased mineralocorticoid activity in PTC?

A. I would reverse. I would say aldosteronism, increased reabsorption of sodium and water, increased weight gain, and PTC.

Q. Okay.



A. Okay. Again, extreme. These are -- these are extreme cases.

Q. And what causes aldosteronism?

A. Typically, the kind of aldosteronism we're talking about is an adrenal tumor.

Q. Okay. Is there any linkage between adrenal tumors and PTC?

A. Yes.

Q. Do adrenal tumors lead to PTC?

A. They can, yes, but not all the time. But, like, let's be clear. So there are -- there are adrenal tumors that lead to excess adrenaline being produced and there are -- there's a pheochromocytoma and -- sorry. I'll spell that for you later. And there are adrenal tumors that lead to increased aldosteronism, and those are called -- that's called primary aldosteronism. They produce tremendous quantities of aldosterone, lead to tremendous reabsorption of sodium and water, tremendous outflow of sodium and water into the CSF and PTC.

Q. Can increased consumption of food lead to aldosteronism?

A. Typically not. You and I would have to eat -- we'd have to increase -- if -- if we had, say, a Morton's can of salt, the old Morton's can of salt, we split it between us, put some water, gulp it down, you and I would



get aldosteronism.

Q. You've just described my diet.

A. But, typically, eating -- eating salt-free foods and not drinking a lot of water would not produce aldosteronism.

Q. Look with me, if you would, at 572 of this Salpietro article.

A. I'm sorry. Which page?

Q. 572.

A. Okay.

Q. On the right-hand column, second full paragraph, he writes, "Thus far, however, there is not a credible and comprehensive hypothesis aimed to uncover the pathogenesis and pathophysiology of IH despite the different mechanisms proposed."

Did I read that correctly?

A. I'm not sure I'm with you.

Q. Second full paragraph.

A. Oh, second full, of course. Okay. So -- and thus far -- let me just read this to myself.

I see this, yes.

Q. Do you agree with that sentence?

A. No, I don't.

Q. Now, I talked about the theory that aldosterone lead to -- impacts the MR, and that leads to PTC. We've

talked about that?
A. Again, right in extreme cases, yes, the Morton salt hypothesis.
Q. Okay. For your theory about Mirena to hold under this theory of biological plausibility --
A. Yes.
Q. -- LNG would have to act in a similar way to aldosterone, correct?
A. Yes.
Q. And is there any study showing that LNG impacts the mineral -- strike that.
Is there any study showing that in the human body, LNG reaches the MR receptors in the brain and impacts them?
A. Well, the human body's a -- that's a different question, and I don't know how you study a living human being and actually do this work. It's animal models that this is derived from.
Q. Okay. Is there any human data indicating that LNG can impact MR sites of the brain?
A. Is there any human data? To my --
Q. Yes, sir.
A. -- to my knowledge, no. It's tough -- I don't know how you do this to a living human being.
Q. Is there any -- okay.


All right. Now, as I understand it, for this theory to hold, LNG would have to be an agonist at the MR site, correct?
A. Correct. Yes.
Q. It would not work if it were an antagonist at the MR site, correct?
A. Correct. Yes.
Q. And things can be received at a receptor like an MR and be neither an agonist nor an antagonist, correct, they can have no effect?
A. Well, there's an antagonist and there's an antagonist. If there is an inner molecule that attaches to the MR, then that's acting like a pseudoantagonist because it keeps the agonist from applying itself to the MR and it stops the agonal activity.
So I would say that there could be a active antagonist that actually combines with the MR and causes trans-replication of DNA and so on, but, typically, we're talking about antagonism being passive, holding to the MR and not doing anything.
Q. Okay. Can antagonism be actually reducing activity at the MR?
A. It's possible, yes.
(Exhibit 32 marked.)
Q. (BY MR. SCHMIDT) Okay. Look with me, if you


would, at Exhibit 32, which is the expert report of Dr. Johanson in this case, which, I believe, is one you reviewed after preparing your report in this case --
A. Yes.
Q. -- is that correct?
A. Yes, sir.
Q. And look with me, if you would, at page 18.
MR. KENNERLY: Is this 32 or 33?
MR. SCHMIDT: 32.
A. Page 18.
Q. (BY MR. SCHMIDT) Yes, sir. And look at the bottom of the page, the last full paragraph.
A. Okay.
Q. The fifth sentence begins "Progesterone binds." Do you see that?
A. Yes.
Q. "Progesterone binds its cognate receptor and significantly is also a mineralocorticoid receptor antagonist."
Do you see that?
A. I do see that, yes.
Q. Do you agree or disagree with that?
A. Well, I don't disagree with Reference 121. I would say that there are -- there have been many studies that have examined this. Some studies report that this is


antagonistic activity. And I'm talking now about progesterone, but levonorgestrel.
Q. Yes.
A. Some studies provide -- show that there is no antimineralocorticoid activity.
Q. So am I understanding your answer correctly, would it be accurate to say that the studies are conflicted as to whether LNG is an agonist or an antagonist with respect to MRs?
A. I would say this. I would say that they're -- in some animals, it does seem to have -- in some organisms, it does seem to have some antagonist activity. In some organisms, it does have agonist activity.
Q. So the studies are conflicted depending on organism?
A. Well, I wouldn't -- responses to the LNG in the -- in the cuboidal cells are variable. And that's wholly consistent with what we're talking about today, because we know, fortunately, that not all women get PTC from LNG and, therefore, you would expect that in some women the LNG really doesn't have much of a forceful impact on the MR, and in other sensitive women, it does.
Q. I guess my question is: Are the studies consistent in recognizing that LNG is either agonist or an antagonist with respect to the MR site?

Page 262

A. My answer is to you they are not consistent, and it is that inconsistency that we would expect.
Q. Is there a recognized animal model for hormonal impact on MR sites in humans?
A. The --
MR. KENNERLY: Object to the form.
A. The model I know about is the rat model.
Q. (BY MR. SCHMIDT) Do you know if that's a recognized -- animal model recognized superior to other animals?
A. I would say since most all the research is done in the rat model, then that would be the accepted one.
Q. Okay.
A. It's not -- it's not a large animal model like a pig or a chimp.
Q. Had you done research on hormonal impact on MR receptors before this litigation?
A. I have not, no.
Q. And I take it you've never published on hormonal impact -- strike that.
Have you ever done any form of work on MR antagonism or agonism before this litigation?
A. Studied it, but never done any research on it.
Q. Let me mark another article that you cite.
A. Yes.

Page 263

(Exhibit 33 marked.)
Q. (BY MR. SCHMIDT) Exhibit 33. This is by the lead author Africander?
A. Yes.
Q. Do you recall reading this?
A. I do.
Q. Look with me, if you would, at page 639 of this article, Table 2?
A. 639, Table 2, yes.
Q. They report the results of different progestins --
A. Yes.
Q. -- in animal models. Do you see that?
A. I sure do.
Q. One of them being LNG?
A. Yes.
Q. And in terms of whether it has an antimineralocorticoid effect, their results are is that the literature is not consistent?
A. That is correct, yes.
Q. Do you agree with that as an accurate statement that the literature is not consistent as to whether LNG has a mineralocorticoid effect?
A. Yes, I -- I mean, I -- I agree with that. And I think that's wholly consistent with the hypothesis.

Page 264

Q. Now, you make a point in your report about the chemical structure of LNG versus aldosterone, correct?
A. Yes.
Q. And you agree with me that even small differences in chemical structure can change the effect of a -- a molecule in the body?
A. Small differences can have no effect, small differences can have phenomenal effects, that is true.
Q. You would never recommend aldosterone for contraception, would you?
A. I would not, no.
Q. But you recognize LNG is effective for contraception?
A. Yes.
Q. And you recognize that they have different chemical structures and different chemical formulas, correct?
A. I recognize that they have differences and important similarities, yes.
Q. Okay. Look with me, if you would, at Table 1 in this article on page 638.
A. Okay.
Q. It has the relative binding affinities of different progestins. Do you see that?
A. I sure do.

Page 265

Q. Including LNG?
A. Yes.
Q. And it has the binding efficiency for MR. Do you see that?
A. I do.
Q. And the binding efficiency for MR according to one source is 75. Do you see that?
A. I do.
Q. But that's where the determination was not defined, right?
A. I'm not sure what you mean by "determination not defined."
Q. I'm just reading.
A. Let's see. If we're looking at Footnote B?
Q. Yes, sir.
A. Yes, right. Okay.
Q. Do you know what that 75 is based on? Is it based on rat models or something else?
A. I believe it's based on rat models.
Q. Okay. Do you know that?
A. I believe it. I mean, all the literature I've read I believe has been in rat models.
Q. And then another source they cite, it's 17 --
A. Yes.
Q. -- correct?

Page 266

A. Yes.
Q. That would be a low level of binding affinity, correct?
A. That's right.
Q. And that is based on -- on human data in a test tube, correct?
A. That's based on in vitro data, yes, right.
Q. From humans, right?
A. Right, that's right.
Q. Okay. That's one way you can study -- we were talking earlier about studying the effect in the human MR receptors, right?
A. Right.
Q. One way would be by test tube data?
A. Yes.
Q. And according to this test tube data, it has a low binding affinity with the MR sites?
A. In this one article, yes, that's right.
Q. Are you aware of any contrary human test tube data showing a higher binding affinity?
A. I'm aware of other articles. I don't know if it uses in vitro binding assays.
Q. So to my question, are you -- could you point me to specific human data you've seen that shows a higher binding affinity than the 17 we looked at in this article?

Page 267

A. Than the -- oh, for humans?
Q. Yes.
A. No.
Q. You cite one source -- in Paragraph 153, you talk about Norplant data. Actually, before we get there, could you look at -- I think we were able to clear this up with Mr. Kennerly, but look with me, if you would, at Paragraph 153 of your report.
A. 153?
Q. Yes, sir.
A. 153. 153.
Q. I'm sorry. 152. I misspoke.
A. Okay. 152. Yes.
Q. You state, "There are several examples reviewed in Appendix A that demonstrate how Mirena plausibly produces IH."
Do you see that?
A. I do see that. That shouldn't be there.
Q. Yeah, I think the Appendix A is a -- is a typo.
A. Right.
Q. I'm not going to you ask about it.
But when you say there's several examples that demonstrate how Mirena plausibly produces IH, are you talking about case reports that you discuss earlier in your report? And -- and I'm basing that on the -- I'm not

Page 268

trying to bind you to this -- the discussions you had with Mr. Kennerly, but then also in the next sentence, you reference case reports.
A. Yes, I'm not sure this is the universe of them, though. That's what I'm thinking about. Oh, it is the -- what appears in the next sentence and also the occurrence of PTC in hyperaldosteronism.
Q. Okay. You talk about testosterone having similar -- a similar structure to LNG?
A. Yes.
Q. Is that correct?
A. Yes.
Q. You would agree with me, I take it, just along the lines we discussed earlier, testosterone is inversely associated with PTC?
A. I'm not sure what you mean by "inversely associated."
Q. Well, it's probably because it's not a scientifically accurate term.
You would agree with me that testosterone is inversely correlated with PTC in the human population?
A. I -- the reason I would tend to disagree, that there are clear examples where individuals have received testosterone and developed PTC.
Q. Okay. You would not say testosterone treatment

Page 269

is linked to PTC, would you, like testosterone replacement therapy?
A. Well, I would say this, that there are circumstances where individuals are treated with testosterone. Now, it's not the low T syndrome, it's actually a gender conversion, so the testosterone doses are greater and PTC results.
Q. In gender conversion, there are a number of hormones involved, right?
A. There are a number of hormones involved, to be sure, but when they stop the testosterone or they change the formulation, the PTC disappeared.
Q. Are there any -- is there any data you know of that says testosterone replacement products are linked to PTC?
A. Well, testosterone replacement products are principally used in men --
Q. Right.
A. -- right? I don't think there's any data that suggests that that's related to PTC.
Q. And I guess what I was saying is if you looked at the population, testosterone levels are much higher than men -- in men than they are in women, correct?
A. That is true, yes.
Q. And --

Page 270

A. Again, post puberty, right.
Q. Post puberty?
A. Uh-huh.
Q. And PTC goes the exact opposite way, it's far, far higher in women than in men?
A. That's true, right, right.
Q. And in -- in 153, you talk about Norplant, and I think we've covered what I wanted to cover with Norplant with one exception. You site a publication by Wysowski talking about Norplant --
A. Yes, sir.
Q. -- is that correct?
A. Yes, sir.
Q. That is a discussion -- this, I think, we did cover, but I'm going to show you the article. That's a discussion talking about case reports, right?
A. It is, that's right.
Q. I'll mark this as Exhibit 34.
A. Okay.
(Exhibit 34 marked.)
Q. (BY MR. SCHMIDT) This is the Wysowski publication you cite?
A. It is.
Q. Look with me, if you would -- I think you've covered this but, I just want to relate it back to this

Page 271

article. Look with me, if you would, at page 541 of this article.
A. 541. Okay.
Q. Yes, sir. In the left column, there's a sentence -- there's a paragraph, the second full one, that begins "No pseudotumor cerebri." Do you see that?
A. Yes.
Q. About halfway down, they say, "A large proportion of reports that provided body weight information for women who developed PTC after Norplant insertion indicated that patients were obese or had experienced weight gains."
Did I read that correctly?
A. Yes.
Q. And that's a correct description of their data as you understand it, correct?
A. Right. We have a temporality issue here, of course, but, yes, that is true.
Q. "As a consequence it is not possible to determine whether Norplant, obesity, or weight gain, or both factors are related to the occurrence of pseudotumor cerebri."
Did I read that correctly?
A. Right, based on their case report, their case series review.
Q. Do you agree with that statement?
A. Well, I can only rely on what they say about

Page 272

their own evaluation. It was not possible for them to do it.
Q. Do you agree with the proposition that it's not possible to conclude from that type of data whether it's Norplant, obesity, or weight gain or something else?
A. I think that's fair.
Q. Okay. They then say, "Epidemiologic research, case controller cohort studies would be required to determine if a causal association between Norplant and either pseudotumor cerebri or stroke exists."
Do you agree that that's an accurate statement?
A. Yes.
Q. When you've got case reports, particularly ones with confounding, to be able to make a causal association to determine if a causal association exists, you need some kind of observational data?
A. Right. So you need the case report to raise the question. That raises the question. Without the case report, there's no question. You have the case report. It raises the question. It doesn't provide the answer. And you move on to an observational study or a -- I mean, a case control study or a cohort study or another study.
Q. To help you answer the question?
A. Yes, sir.

Page 273

Q. And I hope this goes without saying, but I'm good at saying things that go without saying. That observational study that you're looking for, does it have to be a valid and well-designed observational study?
A. It has to be -- well, I'll put it this way. It has to be the best available. Now, of course, ideally, ideally, you would want a well-designed, well-executed case control study where you have the appropriate confounders either balanced, stratified, or adjusted for. But on planet earth, we -- we take the best studies that we can find and we draw the best conclusions we can find -- we can draw for the public good.
Q. You -- you looked at -- at case report data for Norplant patients, correct?
A. A little bit, not much, but, yes.
Q. And that's because Norplant contains LNG like Mirena?
A. Yes.
Q. We looked earlier at a long list of products that contain LNG. Do you recall that?
A. I do, yes.
Q. Besides me showing you that -- that chart, is that -- is it -- is it your understanding that there are, in fact, a wide range of products that do contain LNG?
A. Yes.

Page 274

Q. Have you -- have you looked at the case report data or the epidemiologic data for any LNG-containing product other than Mirena and Norplant?
A. I have not.
Q. And why is it that you looked only at Norplant data and not at data for other LNG-containing products?
A. Well, two reasons: First reason is that I was engaged to render an opinion about Mirena and, secondly, time is finite.
Q. Okay. But -- but why -- why look at Norplant at all, then, among all the LNG products?
A. Because I came across an article. I came across the -- I say her name wrong -- Wysowski article about Norplant at the same time I'd found an article by another -- Ireland, I think, and studied them both, read them both.
Q. Let me just do a speed round of work you've done in other litigation.
MR. KENNERLY: Do you want to take a break before it?
MR. SCHMIDT: I might be done when I'm done with this. So I was going to propose I ask you five more minutes and then take a break and make sure I don't have any other questions. I might have one or two follow-up, which in my verbiage translates to five or ten minutes.

Page 275

But I'm -- I'm close to being done.
THE WITNESS: You doing okay?
(Comments off the record.)
Q. (BY MR. SCHMIDT) Am I correct that you've testified for plaintiffs in Tylenol litigation?
A. Yes --
Q. Involving the condition TEN?
A. Yeah, I'm trying to think. Certainly Motrin. Certainly Motrin. I don't remember -- I've not been involved in a Tylenol case, and I don't think I've given a Tylenol deposition, but I was involved in Motrin and TEN.
Q. That was involving a Johnson & Johnson product?
A. Yes. Yes.
Q. You've testified for plaintiffs in the Actos litigation involving Takeda?
A. Yes, sir.
Q. You've testified for plaintiffs in regard to the Depakote litigation involving Abbott -- AbbVie?
A. Yes, sir.
Q. You've testified against Roche in the Accutane litigation involving Accutane?
A. I gave one deposition, but that is correct, yes.
Q. You've testified for plaintiffs in the Plavix litigation against BMS?
A. Yes.

Page 276

Q. You've testified for plaintiffs in the Vioxx litigation against Merck?
A. Yes.
Q. You testified for plaintiffs in the Fen-Phen litigation against Wyeth American Home Products?
A. Yes, sir.
Q. Have you ever testified in favor of a pharmaceutical company in a personal injury case?
A. In a personal injury case. I think I'm getting ready to.
Q. Okay. And who is --
A. It's -- it's Guardian Pharmacy in Dallas.
Q. What's the product?
A. It's a -- it's -- it's a -- it's a compound part that's put in the eye after patients have cataracts.
Q. Okay. And --
A. And they're being sued.
Q. And are you testifying in that case that the product is not capable of causing injury, the relevant injury?
A. Yes. Put it this way, I believe I am. I plan to.
Q. Okay.
A. Let's see how it works out.
Q. Okay. Have you prepared a report in that case?

Page 277

A. No.
Q. Okay. Is it -- is it true that in every instance where you've prepared a report in a pharmaceutical product liability case, it's been on behalf of the plaintiffs alleging causation?
A. Almost. Almost. I was involved in a patent case last year that was pharmacy companies against pharmacy companies.
Q. That's the Cialis case?
A. Yes.
Q. Okay. That's why I was focusing on -- on personal injury --
A. Right.
Q. -- cases.
Is it the case that in every personal injury case where you've -- where you've prepared a report, the report has alleged causation on behalf of plaintiffs?
A. Yes, sir.
Q. Do you have a sense of, like, your -- of your lifetime earnings from personal injury product liability work?
A. The best I could do would be to say that over -- I've been doing this for -- this is 2018, so 20 years, 20 years. It's over a million dollars.
Q. Okay. I have a transcript from 2009

suggesting -- I think it's actually the Accutane deposition suggesting it might be over 2 million by that point in time?
A. Boy, that seems high. I don't know.
Q. Okay.
A. Don't know. Must have been the pimple preparation.
Q. Okay. And it's obviously only increased since then, correct?
A. That's correct.
Q. Okay. Why don't we stop there. I'm going to look through my notes and see what else I have with the hope that it's nothing or not much.
THE VIDEOGRAPHER: Off the record at 3:14, end of Media 6.
(Short recess.)
THE VIDEOGRAPHER: Okay. We're on the record at 3:24, beginning Media 7.
Q. (BY MR. SCHMIDT) Sir, I'm just going to ask you questions on one last piece of -- of information. We talked earlier about the Etminan publication. Do you recall that?
A. The Etminan publication. Yes.
Q. And there was a disproportionality aspect to that?


A. Yes.
Q. I'm not going to ask you about that.
There was an observational aspect of that where rates of PTC in Mirena users were compared to rates of PTC among two oral contraceptives. Do you remember that?
A. Yes.
Q. And do you recall that that showed no statistical difference between those groups?
A. I don't remember that.
Q. Okay.
A. I don't.
Q. Am I correct that -- that you're not relying on the epidemiological -- the observational portion of Etminan because you don't think it's -- it's reliable?
MR. KENNERLY: Object to the form.
A. I'm not relying on any part of the Etminan analysis.
Q. (BY MR. SCHMIDT) Is that because of reliability concerns or because you don't like the data or you don't agree with the data or what?
A. Reliability concerns.
Q. Okay. And as to the observational portion of Etminan, if -- if that data were reliable, that according to Etminan there was no statistically significant


difference between Mirena and two oral contraceptives when it came to PTC, would that argue for or against causation?
MR. KENNERLY: Object to the form.
A. We're assuming that Etminan was a reliable study?
Q. (BY MR. SCHMIDT) Yes.
A. State-of-the-art case controlled study, well managed, and they found no difference? Well, then, I'd have to factor that into my opinion.
Q. Do you know whether that would be supportive of causation or noncausation?
A. It would not --
MR. KENNERLY: Object to the form.
A. It would not be supportive of causation.
Q. (BY MR. SCHMIDT) Why is that?
A. Well, if they found no -- we assume that they got an odds ratio of 1, then that doesn't speak to strength of association.
Q. Okay. Even if they're comparing it to oral contraceptives?
A. Well, now, see that's a little bit different. I thought we -- let's see now. We're talking about cases and controls, and controls are oral contraceptives?
Q. Yes.
A. And cases are?
Q. Mirena.


A. I have to think about this.
Q. Okay. Can you tell me now what you found to be unreliable about the observational portion of Etminan?
MR. KENNERLY: Object to the form.
A. I would have to look at the study again.
Q. (BY MR. SCHMIDT) Okay. That's all I have, sir. I thank you for answering my questions. I'll reserve the right to ask follow-up to anything Mr. Kennerly asks.
A. Thank you.
EXAMINATION
BY MR. KENNERLY:
Q. Good afternoon, Dr. Moye.
A. Good afternoon.
Q. I know we've covered everything about eight or nine times, but we're going to go for one more round on everything.
MR. SCHMIDT: Object to the preamble.
Q. (BY MR. KENNERLY) And I'll -- I will represent to you that in this litigation, Bayer has identified three experts with regard to epidemiology: Dr. Langer, Dr. Barnhart, and Dr. Lee. Did you receive their reports?
A. Yes, sir, I did.
Q. And did you review those reports?
A. Yes, I did.
Q. Did you see any of those three experts,

Page 282

Dr. Langer, Dr. Barnhart or Dr. Lee, attempt to adjust the results of the Valenzuela paper on the basis of obesity?
MR. SCHMIDT: Objection, scope.
A. No, sir.
Q. (BY MR. KENNERLY) And did you see Dr. Langer, Dr. Barnhart, or Dr. Lee attempt to adjust the result of Valenzuela on the result -- on the basis of recent weight gain?
MR. SCHMIDT: Same objection.
A. No, sir.
MR. SCHMIDT: Can I just have running objection to these questions on scope?
MR. KENNERLY: No.
MR. SCHMIDT: Okay. Objection, scope.
Q. (BY MR. KENNERLY) Do you have Exhibit 4 in front of you? I don't have a copy of that, but it's one of the things that you -- that you wrote out by hand.
A. That must be risk factors.
MR. SCHMIDT: It was.
Q. (BY MR. KENNERLY) Yes.
A. Yes.
Q. Now, if you remember Exhibit 4, at least as I understood what was going on, there was a series of questions and you were being asked to write about potential risk factors for PTC. Is that generally

Page 283

correct?
A. Yes, sir.
Q. Now, when you reviewed the expert reports of Dr. Langer, Dr. Barnhart, and Dr. Lee, did you see any of those experts attempt to adjust the Valenzuela results for any of those risk factors?
MR. SCHMIDT: Objection, scope.
A. No, sir.
Q. (BY MR. KENNERLY) And I believe is -- Exhibit 3 is the potential causes of -- 2 -- Exhibit 2.
A. 2 is my handwritten causes.
Q. Handwritten potential other causes of PTC?
A. Other than Mirena? Yes.
MR. SCHMIDT: Objection --
Q. Yes.
MR. SCHMIDT: Objection, characterization.
Q. (BY MR. KENNERLY) Now, when you reviewed the reports of Dr. Langer, Dr. Barnhart, and Dr. Lee, did you see any of them perform an analysis on whether any of those caused PTC?
A. No, sir.
MR. SCHMIDT: Objection, scope.
Q. (BY MR. KENNERLY) You were recently asked some questions about the work of Dr. Etminan. Do you recall questions earlier about if it had been functionally

Page 284

retracted?
A. I do, yes, this morning.
Q. Now, as a matter of epidemiology, would it be appropriate to rely on any part of a paper that was functionally retracted?
A. I don't believe so.
Q. Now, if you could, Exhibit 5, it's the Daniels paper.
A. Yes.
Q. Now, what I'd like to turn your attention to in the Daniels paper is that Figure 1 that you were asked about.
A. Yes.
Q. Now, Figure 1 has this breakdown in the chart by BMI. And for each of those later three BMI groups, there's what appears to be a confidence interval on the odds risk. Do you see that?
A. I do.
Q. And for BMI of 25 to 29, that confidence interval goes from 1.4 to 30.9; and from BMI 30 to 35, the confidence interval goes from 3.5 to 109.9?
A. Yes.
Q. And on the last group of BMI over 35, the confidence interval seems to go from 4.9 to 135.9. Do you see that?

Page 285

A. Yes, sir.
Q. Now, is that a wide confidence interval or a narrow confidence interval?
A. Well, they're all fairly wide confidence intervals.
Q. Now, in general, what does a wide confidence interval mean for epidemiology?
A. In general, again, everything else being equal, the wider the confidence interval, the less confidence you have in the position of the -- the estimate. In this case, the odds ratio.
Q. Now, on these, at least as I see it, the -- for all three of those BMI categories, the confidence interval overlaps as in BMI 25 to 29 includes in its confidence interval a number of the same values that would be in BMI 30-35 and BMIs over 35. Do you see that?
A. Yes.
MR. SCHMIDT: Object to characterization.
Q. (BY MR. KENNERLY) How as a epidemiologist do you interpret that those confidence intervals overlap?
A. Suggests to me that these rates -- the -- the odds ratios -- the three odds ratios for the 25 to 29, No. 1; 30 to 55 -- 30 to 35, No. 2; and greater than 35, No. 3, the odds ratios essentially -- the data are consistent with the odds ratios overlapping essentially

Page 286

the odds ratios being the same.
Q. Now, for Figure 2, it's a -- it's conceptually a similar analysis, but involves weight gain -- percent weight gain and intracranial hypertension. Do you see Figure 2?
A. I do.
Q. Do those odds ratios, are those also wide confidence intervals or narrow confidence intervals?
A. Certainly, the 11 to 15 percent and the greater than 15 percent -- and the greater than 15 percent are wide confidence intervals.
Q. Now, in those -- at least it -- it looks to me, those three groups also have overlapping confidence intervals. Do you see that?
A. They do overlap, yes.
Q. And how do you interpret that as a matter of epidemiology?
A. Again, the odd -- this data is consistent with the odds ratios being the same.
Q. Now, moving to Exhibit 26. That was the Boulet paper. That one.
A. At the very bottom. The very bottom. Okay.
Q. If you could turn to Table 1.
A. Yes.
Q. This is the same table that you were asked about

Page 287

in your direct questioning?
A. Yes, sir.
Q. Now, it says at the top, "Use of contraception at last sexual intercourse among women aged 18 to 44 years at risk for unintended pregnancy," and then it goes on by selected states.
Did I read that correctly?
A. Yes.
Q. Now, there's a little cross there after unintended -- at risk for unintended pregnancy. Do you see that?
A. Yes.
Q. And how does it define women at risk for unintended pregnancy?
A. If they were not -- I assume these are all ands. If they were not currently pregnant, and were sexually active, and the last time they had sex, had not had a hysterectomy, and did not have a same sex partner, and did not want a pregnancy.
Q. Now, we were -- you were talking before about generalizability of, you know, one study to another. Now, this study here, the Boulet study Table 1, that's not a study of LARC usage among all women aged 18 to 44, is it?
A. It is not.
Q. So it's a study of women aged 18 to 44 at risk

Page 288

for an unintended pregnancy, correct?
A. With that restriction, yes.
MR. SCHMIDT: Objection, leading.
Q. (BY MR. KENNERLY) Okay. So would this automatically be generalizable to all women in Utah aged 18 to 44?
A. No, this also would not be generalizable.
Q. And why wouldn't it be generalizable?
A. Because many women do not meet this criteria who live in Utah, and, therefore, these results would not apply to those women who never had an opportunity to be part of the sample.
Q. Now, women who are currently pregnant, would they be indicated for Mirena?
A. I don't think so.
Q. What about a woman who's not sexually active?
A. No.
Q. And what about a woman with a same sex partner?
A. I don't think so.
Q. And what about a woman who wanted to get pregnant?
A. No.
Q. So is it a fair inference that the women excluded from this would actually be less likely than most of the population to use the Mirena?

Page 289

A. Yes.
MR. SCHMIDT: Objection, speculation.
Q. (BY MR. KENNERLY) And if you could, Exhibit 27.
A. Yes.
Q. That would be the Lindh study.
A. Yes.
Q. If you could, turn to the bottom of page 20. It's the sentence that doesn't even finish on there. The very last sentence starts "Contraceptive use"?
A. Yes.
Q. And it says, "Contraceptive use of COC" -- I believe meaning combined oral contraceptives?
A. Yes.
Q. -- "progestin only pills, patch vaginal rings" -- and I'm just going to call it MPA.
A. Okay.
Q. -- "was expressed as defined daily doses per 100 women in relevant age groups."
Do you see that?
A. Yes.
MR. SCHMIDT: Can you point me to where you're looking?
MR. KENNERLY: Bottom, page 20.
MR. SCHMIDT: Thank you.
MR. KENNERLY: Starts "Contraceptive use,

COC."
MR. SCHMIDT: Got it. Thank you.
Q. (BY MR. KENNERLY) Now, that sentence right there where they say, "expressed as defined daily doses per 100 women in relevant age groups," are the authors here making an assumption about what their data means, or is that just, you know, the empirical truth from what they read?
MR. SCHMIDT: Objection, foundation.
A. It just sound likes this is aggregate data. "Defined daily does per 100 women in relevant age groups." That's very vague.
Q. (BY MR. KENNERLY) Now, the next sentence, they say, "Total rates were calculated as total use per 100 women aged 15 to 49 years."
Did you see that?
A. Yes.
Q. So does that indicate to you that the authors of the Lindh study have made some sort of computation to reach their numbers?
A. It suggests to me that like many of the computations we talked about in this component of the deposition are based on assumptions. There is no health care system that generates with precision the estimates these authors would like, and so they are doing their best to compute on their own, and that computation is based on



assumptions.
Q. Now, in this paper, do they anywhere elaborate on what those assumptions and computations are?
A. To my knowledge, no.
Q. Now, in the next sentence there where it says -- towards the top of 21, it says, "We set the mean duration of use of copper IUD and the LNG-IUS to be four years."
Do you see that?
A. Yes.
Q. Do they give any sort of basis as to why they set that as the mean duration?
A. No, they don't say they computed the duration. They just say they set it.
Q. So that's an assumption they just put in there to reach the rest of their study?
MR. SCHMIDT: Objection, foundation.
A. It's -- it's a -- in this -- in this string of computations they do, the -- the computations are connected by assumptions, and this is one of the assumptions that they made.
Q. (BY MR. KENNERLY) Now, on that same part page 21 just going down towards the middle, there's a paragraph that begins "In these pure descriptive assessments." Do you see that?
A. Yes.



Q. So it says -- and it's all just one sentence. "In this -- in these pure descriptive assessments, no confidence limits were calculated for their country's specific rates due to both large sample sizes making even small differences highly significant and to the complete national data from each country making such calculations redundant."
Do you see that?
A. Yes.
Q. Now, beginning -- how do you interpret the phrase "these pure descriptive assessments"?
MR. SCHMIDT: Objection, foundation.
A. These were not quantitative. They were not necessarily quantitative.
Q. (BY MR. KENNERLY) Okay. And they also mentioned that same sentence "Large sample sizes making even small differences highly significant."
What does that mean to you as an epidemiologist?
A. Well, it just means that --
MR. SCHMIDT: Objection, foundation.
A. Sorry. Large sample sizes large ends will produce small P values regardless of the effects size.
Q. (BY MR. KENNERLY) So is it fair to say that even minor changes in this -- the results perhaps due to



different assumptions could have had a large impact on the effects?
A. Well, based on the assumptions that they make here, I mean, that's -- that's fair. They assumed a mean duration of use was not four years, but was two years or was five years, it would lead to a very different set of -- very different set of concluding data.
Q. Okay. And Exhibit 31, this was the Salpietro paper.
A. Yes.
Q. And if you could go back to page 570, the section on aldosteronism.
A. Yes.
Q. Now, you were asked about a part towards the end about CSF formation. I'm asking you to go up a little bit higher. If you could see the sentence that starts "The biological action of aldosterone."
A. Same paragraph?
Q. Same paragraph. A little bit higher. And it starts about the seventh line down.
A. Oh, okay. I have it.
Q. So as I read it, it says, "The biological action of aldosterone on the epithelial cells of the choroid plexus are similar to the classical mechanisms involved in the epithelial cells of the kidney with enhancement to the

Page 294

number and activity of the sodium potassium ATPase pumps and the apical membranes."
Do you see that sentence?
A. Yes.
Q. Now, do you agree with that?
A. Yes.
Q. Is that a subject of controversy in medical literature that you've seen?
A. No.
MR. SCHMIDT: Objection, foundation.
A. Sorry. No.
Q. (BY MR. KENNERLY) Now, in the next sentence, it says, "Cerebrospinal fluid production by the choroid plexus is governed by the systemic volume control which is tightly regulated by the action of aldosterone acting on its specific receptors."
Do you see that?
A. Yes.
Q. Now, do you agree with that?
A. Yes.
Q. Is that, to your knowledge, a controversial subject in the literature?
A. It is not.
MR. SCHMIDT: Objection, foundation.
A. It is not.

Page 295

Q. (BY MR. KENNERLY) And, finally, the sentence after that says, "In this respect, aldosterone alters the compensation of CSF, which in turn contributes to the regulation of blood (CSF levels) pressure."
Do you see that?
A. Yes.
Q. Do you agree with that?
A. Yes.
Q. And, to your knowledge, is that controversial in the literature?
A. No.
MR. SCHMIDT: Objection, foundation.
Q. (BY MR. KENNERLY) Last subject says -- you got asked a couple of times about other work you've done consulting or testifying. Have you ever consulted for a pharmaceutical company?
A. Oh, goodness, many times.
Q. How many times? Are you able to estimate?
A. Maybe 20 times.
Q. And have you ever testified in any forum on behalf of a pharmaceutical company?
A. Yes.
Q. And how many times have you done that?
A. I testified once on behalf of the -- a pharmaceutical company at the FDA.

Page 296

Q. And when was that?
A. Well, there's a question. 1990, I think.
Q. And that was on behalf of a pharmaceutical company to the FDA?
A. Actually, I testified twice. Once in 1990; another time maybe the early 1990s, the early to mid 1990s.
Q. Okay. No further questions.
FURTHER EXAMINATION
BY MR. SCHMIDT:
Q. Those times you testified for a Pharma company before the FDA, what was -- what were the two companies or what were the two products?
A. Oh, okay. I think I can do this. One was ER Squibb, and the product was Captopril, Capoten. And the other was -- the other was -- it was about terfenadine or Seldane. And I just can't remember the name of the company because the name of the companies morphed over time.
Q. Were you testifying on safety issues?
A. Yes.
Q. What were the safety issues?
A. Well, I'm sorry. The first one was an efficacy issue, an end point issue. That was Captopril. Terfenadine -- the terfenadine issue was on a safety

Page 297

issue, and it was on a -- the relationship between terfenadine and erythromycin on a -- how about we just say a cardiac arrhythmia. I cannot not give the specific name because --
Q. And were you testifying that there was no such issue?
A. We were testifying on developing a study to determine whether there was an issue or not.
Q. Let me just follow up on a -- on a few of the points you were asked about. You were asked a series of questions about Drs. Langer, Barnhart, and Lindh. Do you recall those?
A. Yes.
Q. Do you rely on their work in any way in giving your opinions?
A. No.
Q. You were asked about the Daniels study, Exhibit 5. Do you recall that?
A. Yes.
Q. Do you -- do you -- let's put that study to the side in terms of its specific design and results. Do you take issue with the factual proposition that higher weight levels are associated with statistically significantly higher levels of PTC?
MR. KENNERLY: Object to the form.

Page 298

Q. (BY MR. SCHMIDT) Do you take issue with that?
A. I would say this. I think it's a reasonable premise, but I do have issue with the methodology used by the studies that demonstrate it.
Q. Have you ever seen a study that suggests there is not a statistically elevated rate of PTC as you increase weight levels?
A. No.
Q. And as you understand it, is that increased risk of PTC associated with increased weight, is it akin to a dose effect in terms of the greater the increased weight, the greater the increased risk?
A. I would say this, that it is -- it masquerades as a dose effect, but it truly is a confounder effect.
Q. Okay. Let me try to ask it a little differently. Is it true that there is a linear relationship or somewhat linear relationship between increasing weight and increasing rates of PTC?
A. Yes.
Q. You talked about how there were wide confidence intervals in the Daniels study. Do you remember that?
A. Yes.
Q. You might want to put it in front of you. But my question is: Is there a recognized measure, in your view, for a range that becomes wide, for example?

Page 299

A. There's no -- there's no set standard range --
Q. Okay.
A. -- that differentiates wide from less than wide.
Q. Is it a subjective determination?
A. Yes, subjective and experiential, yes.
Q. For example, if it's a fourfold range, is that a wide range, in your view?
A. Well, it depends on whether we're talking -- it depends on the magnitude of the estimate. If the estimate is -- if the -- if it's between 1 and 4, then you would think that perhaps that's not quite so wide. Of course, if it's -- and obviously the wider it gets, the less confidence you have.
Q. The range that's reported in Valenzuela for the Utah findings is 3.7 to 16. Would you agree with me that that is a wide confidence interval?
A. It's not as wide as we've been talking about, but I would say it is moderately wide.
Q. Okay. And that leads you to question those results?
A. What it does, as this just says, that we can't have such confidence in the exact odds ratio that's provided. However, the chances are that it's greater than 1.
Q. Okay.

Page 300

A. Chances are is not the best way to put it. But we believe it's greater than 1.
Q. Subject to the criticisms we talked about in terms of confounding in potential bias?
A. Agreed.
Q. And is the odds ratio for the Denmark result wide 1.89 to 8.06?
A. Again, I would say moderately wide.
Q. With the same answer as to what that means about the results?
A. Correct.
Q. And I might have misunderstood your answer. Is it any -- is it your testimony that any time confidence intervals overlap, that means there is not statistically significant differences between the point estimates?
A. That's a little -- that's a little more nuanced. You actually have to do the computation, but it does suggest that the odds ratios are -- that the odds ratios are closer together than the odds ratios themselves suggest.
Q. But it is possible to have overlapping confidence intervals but statistically significant differences in point estimates?
MR. KENNERLY: Object to the form.
A. The confidence interval is based on a standard

Page 301

deviation.
Q. (BY MR. SCHMIDT) Let me -- let me actually ask it in a concrete setting --
A. Okay.
Q. -- it might help. If you go back to Exhibit 5.
A. 5.
MR. KENNERLY: Daniels.
Q. (BY MR. SCHMIDT) Daniels. And while you're looking for it --
A. Yeah, I got it.
Q. -- you commented on the fact that the confidence intervals in Figure 1 and Figure 2 overlap?
A. Well, suggesting that for the three bars on the right of each figure, yes.
Q. Do you know if you performed statistical analyses whether or not between the -- between the odds ratios where the confidence intervals overlap, do you know if you performed statistical significance analyses of those odds ratios whether they would or would not be statistically significantly different?
MR. KENNERLY: Object to the form.
A. Sitting here right now, I guess I'd say I don't know. You have to back-solve to get the standard deviation. The ends are kind of small. I would guess that they would. They would not be statistically

significant between -- for example, between two adjacent ones, but between the noncontiguous ones, they might be.
Q. (BY MR. SCHMIDT) Okay. Let's talk about Boulet --
A. Yes.
Q. -- which was Exhibit 26.
A. Yes.
Q. And you raised some concerns about -- about generalizability with respect to the data in Table 1, correct?
A. Okay. I have it. I have it.
Q. You raised questions about the generalized ability of the data reported in Table 1 of Boulet, correct?
A. Yes.
Q. And the basis that was articulated in the examination was that it was limited to women who were considered at risk for unintended pregnancy and then defined what that was, correct?
A. Yes.
Q. Do you know what percentage of the population that is?
A. I don't think I would guess.
Q. Okay. You don't know?
A. I don't know.



Q. Okay. Do you know if there were any women who fell outside that category of being at risk for unintended pregnancy or are included among the 50 or 60 cases in the Utah arm of the Valenzuela study?
A. I -- I don't know with assurance, no.
Q. And when you, broadly speaking, raised concerns about the generalizability of this data to broader population sets, do you recall that?
A. Right, I do.
Q. I take it you could raise the same concerns about the generalizability about either arm of the Valenzuela study to general population sets?
A. We have the same type of concern, yes. And that's -- that's one reason we have confidence intervals.
Q. You specifically focused on -- well, strike that.
One group that was not included in the data set in Table 1 in the Boulet study was women who have a same sex partner, correct?
A. Women who did not have a same sex partner. Okay. That's what it says here, women did not have a same sex partner.
Q. That was the inclusion criteria?
A. Right.
Q. So if women had a same sex partner, they were not included --



A. Correct.
Q. -- correct?
A. Correct.
Q. And another criteria is that -- another exclusion criteria is women who are not sexually active, correct?
A. Correct.
Q. Do you know if there were any nonsexually active or women who had same sex partners included in the -- I think it was 59 Utah cases in Valenzuela?
A. Valenzuela says nothing about that.
Q. And do you know whether women in either of those two categories, women who have same sex partners or women who are not sexually active, use Mirena?
A. Ask me that again, please.
Q. Yeah, I understood from your answers that you would not expect women who are not sexually active to use Mirena; is that correct?
A. Right.
Q. And I understood from your answer that you would not expect women who have same sex partners to use Mirena; is that correct?
A. Right.
Q. And that's because your understanding is Mirena's intended only for contraception purposes --
A. Right.



Q. -- correct?
A. Right.
Q. You talked about the Lindh article?
A. Yes.
Q. Exhibit 27?
A. Yes.
Q. And you talked about various assumptions that were made --
A. Yes.
Q. -- in the Lindh article?
A. Yes.
Q. Do you -- do you have any data that tells you the assumptions they made were false, were inaccurate?
A. I -- they -- they are arbitrary. I don't -- I have no data to support them or to refute them.
Q. And there were, of course, assumptions made in the various arms of the Valenzuela study, correct?
A. Right, I thought -- right, they were clear about what those were, but, yes, there were.
Q. Do you have any greater reason to believe in the validity of the assumptions made in the Valenzuela study than in the Lindh study?
MR. KENNERLY: Object to the form.
Q. (BY MR. SCHMIDT) Do you have any empirical basis to say that?

A. I don't have empirical basis, no.
Q. Okay. That's all I have, Doctor. Thank you.
MR. KENNERLY: That's it.
MR. SCHMIDT: Okay. We're off the record.
THE VIDEOGRAPHER: We're off the record at 3:56, end of deposition, end of Tape 7.
(Proceedings adjourned at 3:57 p.m.)



CERTIFICATE

I, RENE WHITE MOAREFI, Certified Shorthand Reporter and Notary Public in and for the State of Texas, hereby certify to the following:

That the witness, LEMUEL MOYE, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That pursuant to FRCP No. 30(e)(2) that the signature of the deponent was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 7th day of February, 2018.

________________________________
RENE WHITE MOAREFI, CRR, RPR
Texas Certified Shorthand Reporter
NCRA Certified Realtime Reporter
Notary Public in and for the
State of Texas
My commission expires: 10-28-18



LAWYER'S NOTES

PAGE LINE