# Exhibit 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: MIRENA IUS )
LEVONORGESTREL-RELATED ) 17-MD-2767 (PAE)
PRODUCTS LIABILITY ) 17-MC-2767 (PAE)
LITIGATION (NO.II) )
_________________________)
THIS DOCUMENT Relates )
TO ALL ACTIONS. )

\- - -

FRIDAY, JANUARY 19, 2018

\- - -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Videotaped deposition of Laura Plunkett, Ph.D., DABT, held at the offices of Pulaski Law Firm, 2925 Richmond Avenue, Suite 1725, Houston, Texas, commencing at 9:03 a.m., on the above date, before Carrie A. Campbell, Registered Diplomate Reporter, Certified Realtime Reporter, California, Texas and Illinois Certified Shorthand Reporter, Missouri and Kansas Certified Court Reporter.

\- - -

GOLKOW LITIGATION SERVICES
877.370.DEPS
deps@golkow.com

INDEX


| | PAGE |
|---|---|
| APPEARANCES | 7 |
| EXAMINATIONS | |
| BY MS. COOK | 9 |
| BY MS. NATALE | 380 |
| BY MS. COOK | 435 |


EXHIBITS


| No. | Description | Page |
|---|---|---|
| 1 | Expert Report of Laura M. Plunkett, Ph.D., DABT, December 27, 2017 | 12 |
| 2 | Expert Report of Laura M. Plunkett, Ph.D., DABT, December 27, 2017 | 13 |
| 3 | "Idiopathic intracranial hypertension," Alex K. Ball, Carl E. Clarke | 29 |
| 4 | "Additional Documents Reviewed" | 64 |
| 5 | "Integrated pharmacokinetic analysis of levonorgestrel-containing contraceptives with various routes of administration," MIR_IIH_EU1205373 - MIR_IIH_EU1205406 | 78 |
| 6 | "Pharmacokinetics of two low-dose levonorgestrel-releasing intrauterine systems and effects on ovulation rate and cervical function: Pooled analyses of phase II and III studies," Apter | 82 |
| 7 | "Idiopathic Intracranial Hypertension and Obesity," Andrews | 113 |





| No. | Description | Page |
|---|---|---|
| 8 | "Risk of intracranial hypertension with intrauterine levonorgestrel," Etminan | 140 |
| 9 | "Revised disproportionality analysis of Mirena and benign intracranial hypertension," Etminan | 145 |
| 10 | Affidavit of Dr. Mahyar Etminan | 147 |
| 11 | "An Estimation of the Risk of Pseudotumor Cerebri among Users of the Levonorgestrel Intrauterine Device," Valenzuela | 153 |
| 12 | Poster Presentation: Headache and Pain, P218. "Benign Intracranial Hypertension Associated with Levonorgestrel Implants," Sunku | 177 |
| 13 | "Serious Adverse Events in Norplant Users Reported to the Food and Drug Administration's MedWatch Spontaneous Reporting System," Wysowski | 178 |
| 14 | The New England Journal of Medicine, Letter to the Editor, "Levonorgestrel Implants and Intracranial Hypertension," Alder | 181 |
| 15 | 3100 - 87 "Pseudotumor Cerebri Associated with the Norplant Contraceptive Device," Tang | 184 |
| 16 | Excerpt from the oral deposition of Laura Plunkett, Ph.D., February 19, 2013, Esterbrook vs. Hoffmann-La Roche | 194 |
| 17 | Table 1. Classification of adult underweight, overweight and obesity according to BMI | 202 |
| 18 | Schering Group - Global Medical Safety Surveillance, cases concerning Mirena and MedDRA HLGT Vision disorders received until 15.08.2005 | 207 |





| No. | Description | Page |
|---|---|---|
| 19 | Suspect Adverse Reaction Report, MIR_PIEU_00157045 - MIR_PIEU_00157048 | 209 |
| 20 | Bayer HealthCare Amended Clinical Study Report, MIR_INDNDA_00473411 - MIR_INDNDA_00473424; MIR_INDNDA_00473757 - MIR_INDNDA_00473761; MIR_INDNDA_00473902- MIR_INDNDA_00473904 | 211 |
| 21 | Response Document, BfArM request dated 20th July 2017, Risk of pseudotumor cerebri/idiopathic intracranial hypertension, MIR_IIH_EU00606946 - MIR_IIH_EU00607040 | 219 |
| 22 | Mirena label, FDA approved 08 June 2017 | 236 |
| 23 | "Evolving evidence in adult idiopathic intracranial hypertension: Pathophysiology and management," Mollan | 256 |
| 24 | "Idiopathic intracranial hypertension, polycystic-ovary syndrome, and thrombophilia," Glueck | 269 |
| 25 | "Hyperandrogenism is Associated with Earlier Age of Onset of Idiopathic Intracranial Hypertension in Women," Klein | 285 |
| 26 | P320 "Androgen excess is highly prevalent in women with idiopathic intracranial hypertension and is biochemically distinct from polycystic ovary syndromes," O'Reilly | 289 |
| 27 | 014 "The Andro-Metabolic Signature of IIH Compared with PCOS and Simple Obesity," Hornby | 294 |





| No. | Description | Page |
|---|---|---|
| 28 | "Women with idiopathic intracranial hypertension have a distinct andro-metabolic signature compared to polycystic ovary syndrome and simple obesity," Kempegowda | 297 |
| 29 | P325 "Evaluating the role of testosterone in cerebrospinal fluid secretion," Westgate | 300 |
| 30 | "Medication-Related Pseudotumor Cerebri Syndrome," Thon | 302 |
| 31 | Notice of Videotaped Deposition of Laura Plunkett | 323 |
| 32 | "Strategies for Reducing Adverse Drug Reactions, Science versus Regulatory Considerations," Plunkett, October 26, 2006 | 330 |
| 33 | "Strategies for Reducing Adverse Drug Reactions, Science versus Regulatory Considerations," Plunkett, May 1, 2009 | 330 |
| 34 | Schering Clinical Study Report, No. A10982, 14.4 Pharmacokinetic data MIR_BSR_00011296 - MIR_BSR_00011300 | 333 |
| 35 | Integrative Biostrategies, LLC invoices | 335 |
| 36 | Highlighted versions of articles brought by Dr. Plunkett to the deposition | 358 |
| 37 | Thumb drive of documents of Dr. Plunkett | 378 |
| 40 | Hofmann Exhibit 5, MIR_IIH_EU01015398 - MIR_IIH_EU01015449 | 399 |
| 41 | "Diagnostic criteria for idiopathic intracranial hypertension," Friedman and Jacobson | 404 |

42 E-mail(s), MIR_PIEU_00913710 - MIR_PIEU_00913711 426
43 Schering Clinical Study Report, No. A10982, Listing 16.2.5.2: Individual serum LNG concentrations by time point during 12-month insertion of LNG IUS <Amendment 1>, MIR_BSR_IIH_00002034 - MIR_BSR_IIH_00002048 428
(Exhibits attached to the deposition.)
CERTIFICATE.................................450
ACKNOWLEDGMENT OF DEPONENT..................452
ERRATA......................................453
LAWYER'S NOTES..............................454



A P P E A R A N C E S :

JONES WARD PLC
BY: CHRISTINA NATALE, ESQUIRE
christina@jonesward.com
312 South Fourth Street
Louisville, Kentucky 40202
(502) 882-6000

PULASKI LAW FIRM
BY: LESLIE LAMACCHIA, ESQUIRE
llamacchia@pulaskilawfirm.com
2925 Richmond Avenue, Suite 1725
Houston, Texas 77098
(713) 664-4555

DAVIS & CRUMP, P.C.
BY: TREVOR B. ROCKSTAD, ESQUIRE
trevor.rockstad@daviscrump.com
2601 Fourteenth Street
Gulfport, Mississippi 39501
(228) 863-6000
Counsel for Plaintiffs

GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM
BY: SHAYNA S. COOK, ESQUIRE
scook@goldmanismail.com
LAURA SEXTON, ESQUIRE
lsexton@goldmanismail.com
564 West Randolph Street, Suite 400
Chicago, Illinois 60661
(312) 681-6000
Counsel for Defendants

V I D E O G R A P H E R :
STEVE SMITH,
Golkow Litigation Services

– – –



VIDEOGRAPHER: We are now on the record. My name is Steve Smith. I'm a videographer for Golkow Technologies.
Today's date is January 19, 2018, and the time is 9:03 a.m.
This video deposition is being held in Houston, Texas, in the matter of Mirena Products Liability Litigation MDL. The deponent is Laura Plunkett.
Counsel, please identify yourselves.
MS. NATALE: Christina Natale for the plaintiffs and Dr. Plunkett.
MS. LAMACCHIA: Leslie LaMacchia for the plaintiffs.
MR. ROCKSTAD: Trevor Rockstad for the plaintiffs.
MS. COOK: Shayna Cook for defendants.
MS. SEXTON: Laura Sexton for defendants.
VIDEOGRAPHER: The court reporter is Carrie Campbell and will



now swear in the witness.

LAURA PLUNKETT, Ph.D., DABT, of lawful age, having been first duly sworn to tell the truth, the whole truth and nothing but the truth, deposes and says on behalf of the Defendants, as follows:

DIRECT EXAMINATION
QUESTIONS BY MS. COOK:
Q. Good morning, Dr. Plunkett.
A. Good morning.
Q. Is there any reason that you cannot testify truthfully and accurately today?
A. No.
Q. Did you bring any documents with you to your deposition?
A. I provided documents to counsel, yes, to bring to the deposition.
MS. COOK: Okay. Counsel, can you provide us with a copy of those?
MS. NATALE: Sure. Some of them are responsive to the NOD, so I didn't know if you're going to go

Page 10

through Exhibit A or if you want us to just --
MS. COOK: Yeah, for now I'll just take the documents.
MS. NATALE: These are responsive to request number --
MS. LAMACCHIA: This one is 13. These are responsive to 13.
MS. NATALE: Nope, that would just be demonstratives.
MS. LAMACCHIA: Christina, these are responsive to 13 -- to 12.
MS. NATALE: Okay. These are responsive to Request Number 12.
MS. COOK: Okay.
MS. NATALE: This is responsive to Request Number 15.
MS. COOK: Okay.
MS. NATALE: These are responsive to request 7.
MS. COOK: Okay.
MS. NATALE: And then this is just materials that Dr. Plunkett reviewed and provided with us yesterday. Also for number 9.

Page 11

MS. COOK: Which one is responsive to number 9?
MS. NATALE: The flash drive.
MS. COOK: Okay. All right. Well, we will mark these later after we've had a chance to look at them.
QUESTIONS BY MS. COOK:
Q. Did you bring anything else with you?
A. I just brought in front of me a copy of my report, although you have that, so just --
Q. Yes?
A. -- to refer to in case you asked some questions where I need to do that.
Q. Did you mark anything on there?
A. I have only on pages 6 and 7 to make it easier for me because I usually get asked questions. When I have bullets, these are the paragraphs that refer to those bullet so that if you ask me "what's your basis," I can say, go to this paragraph --
Q. Okay.
A. -- without taking all that extra time to flip through the report.

Page 12

(Plunkett Exhibit 1 marked for identification.)
QUESTIONS BY MS. COOK:
Q. Okay. Well, I'm going to hand you Exhibit 1. And Exhibit 1 is a copy of your expert report and appendices, correct?
A. Yes.
Q. Okay. And can I take a look at the report that you brought with you?
A. Sure.
And also, the thing that's on there, there was one typo in the report that I corrected, and let me see if I can tell you which page it's on. You might see it. It may be page 18, I think, possibly. Let me look.
MS. NATALE: Shayna, really quickly --
THE WITNESS: Yes, page 18. It should be 3,000 to 6,000, not 300 to 600.
QUESTIONS BY MS. COOK:
Q. And just so the record's clear, you're referring to on page 18 the sentence that says, "A 150-microgram LNG oral dose in

Page 13

humans results in peak blood levels of from 3 to 6 nanograms per milliliters," and instead of 300 to 600 picograms per milliliter, that should actually be 3,000 to 6,000?
A. That's correct.
Q. Okay. I will give this back to you, but I'm just going to mark it as Exhibit 2 so that it's part of the record.
A. Sure.
(Plunkett Exhibit 2 marked for identification.)
MS. NATALE: Two quick things, Shayna. This is also responsive to number 9, and just -- we were not provided any information about the videographer today, so we were not provided the option for realtime. I don't know if that's something we can deal with on a break, but --
MS. COOK: Okay.
MS. NATALE: -- we'd just like to note that on the record.
QUESTIONS BY MS. COOK:
Q. Okay. I'm going to give you back your copy of Exhibit 2, but what you did

here is you put paragraph numbers by the summary of opinions so that you could reference where you discussed those opinions?
A. Yes. Because typically that's -- I get asked those questions so, yes, make it easier and faster for us.
Q. Okay. Well, I appreciate that.
And the date on the report, if you look at -- I think it's on the front. It's December 27, 2017, correct?
A. That's correct.
Q. And does this report contain all the opinions you intend to offer in this litigation as of today?
A. With the -- yes, with the clarifying statement that I don't know how the questions will be asked if I go to trial. So sometimes how I've stated here may be stated a bit differently, but certainly the substance or all of the general opinions and the areas I will cover are within this report, yes.
Q. So if you turn to page 6, it's where you have the summary of your opinions in paragraph 15?



A. Yes.
Q. And is that -- paragraph 15, is that a summary of the opinions, sort of an overall summary?
A. Of the major areas, yes. Obviously there's -- if you go to -- that's why I put the paragraph numbers. So if you go to the first bullet, there is actual citations and more text around that, but I consider these to be -- bullets to be useful for me as I'm here today, or for you if you read my report, to understand -- summarize the areas that I'm covering in my report and then where my basic opinions lie.
And then, of course, within each of those bullets there's additional text and things that we can talk about.
Q. You are not offering any opinions in your report about the adequacy of the Mirena label, correct?
MS. NATALE: Objection. Form. And we'll also point you to the objections to the notice of deposition.
THE WITNESS: I have not formed



any opinions at this point in time.
QUESTIONS BY MS. COOK:
Q. And you do not offer any opinions in your report about whether Bayer complied with FDA regulations, correct?
MS. NATALE: Same objection.
THE WITNESS: And the answer was the same: I haven't formed those opinions at this point in time.
QUESTIONS BY MS. COOK:
Q. And you have no opinions in your report about the appropriateness of Bayer's conduct with respect to Mirena, correct?
MS. NATALE: Same objection.
THE WITNESS: And the answer would be the same: I haven't formed those opinions at this point in time. My opinions are -- at this point in time are directed towards pharmacology, toxicology of the product, pharmacokinetics, and then issues that relate to general causation as it relates to biologic plausibility, delivery of the drug and



some of the chemical analogy issues.
QUESTIONS BY MS. COOK:
Q. Okay. And we will get to those opinions. I'm just making sure that we're clear on the areas that you're not covering, if that's all right with you.
Okay? Okay?
A. That's fine.
MS. NATALE: Same objection.
QUESTIONS BY MS. COOK:
Q. And in your report, you do not include any opinions about the adequacy of Bayer's signal assessments, correct?
MS. NATALE: Same objection.
THE WITNESS: That's correct. At this point in time, I have not formed those opinions. I'm not saying that I won't be asked to do that later, but at this point in time, this is what I have done so far.
QUESTIONS BY MS. COOK:
Q. Okay. And you also don't include any opinions in your report about Bayer's communications with doctors or promotional activities, correct?

Page 18

MS. NATALE: Same objection. And I will just note the Court's order on the scope of this phase of litigation.
THE WITNESS: I have not at this point in time formed those opinions. It's the same issue. I may be asked to do that later, but at this point in time it's my understanding that the issues that were being discussed in the case had to do with causation, not with regulatory matters.
QUESTIONS BY MS. COOK:
Q. And you have not provided any opinions about the efficacy of Mirena or the benefits of Mirena, correct?
MS. NATALE: Same objection.
THE WITNESS: No, I do have opinions based -- about efficacy here. I talk about what it's used for, what it's labeled for, why you would use the drug.
So that's kind of a broad question. Maybe you mean something

Page 19

different than what I'm stating in my report.
QUESTIONS BY MS. COOK:
Q. You do not provide any opinions about the overall risk/benefit profile of Mirena, correct?
MS. NATALE: Same objection.
THE WITNESS: That's true. At this point in time, I have not formed that opinion.
QUESTIONS BY MS. COOK:
Q. You also do not provide any opinions about a safer alternative design to Mirena, correct?
MS. NATALE: Same objection.
THE WITNESS: At this point in time, I have not done that, that is true.
QUESTIONS BY MS. COOK:
Q. With respect to the benefits of Mirena, it's true that you include the indication, or a reference to the indication, but you do not provide opinions about how effective it is at preventing pregnancy or with respect to any other condition, correct?

Page 20

MS. NATALE: Same objection.
THE WITNESS: With the exception of I do point to the labeling. But that is true, I don't have -- for example, I don't go through the clinical studies that formed the basis of approval and provide a critique of those, no, I don't do that in my report at this point in time.
QUESTIONS BY MS. COOK:
Q. And you've also provided no opinions about whether Mirena is prescribed more often to overweight or obese women than other birth control options, correct?
MS. NATALE: Same objection and foundation.
THE WITNESS: I have not formed an opinion on the -- like that, and it would be more than that. To me, if you're going to talk about that, you need to talk about generally how it's used and prescribed, not just maybe even one population but the variety of different types of uses in the

Page 21

populations where it's prescribed.
QUESTIONS BY MS. COOK:
Q. And you don't do that, correct?
A. I haven't done that at this point in time, that is true.
Q. And you also don't provide any opinion that Mirena causes weight gain, correct?
A. I have not formed that opinion at this point in time, no.
Q. And you give opinions in here about LNG-containing IUSes and LNG-containing implants, correct?
A. Yes. I talk about both of those, yes.
Q. And you do not give any opinions about LNG-containing pills, whether it be combined oral contraceptives or progestin-only pills or emergency contraceptives, correct?
MS. NATALE: Objection. Form.
THE WITNESS: No, I do discuss the oral forms in here. I compare and contrast the pharmacokinetics, for example, on the blood levels. I also,

I think I mention, play -- the Plan B pill even specifically here.
But certainly the majority of the work that I've done -- when you read this report, hopefully you'll understand -- that to me, the closest comparison product would be the subdermal implants based on the way that the drug is released over time, long term in the body versus a daily oral dose with one single bolus.
QUESTIONS BY MS. COOK:
Q. Well, let me ask you this: You don't provide an opinion in your report about whether or not combined oral contraceptives increase the risk of IIH, correct?
MS. NATALE: Objection. Form.
THE WITNESS: I don't have that specific statement, that is true.
QUESTIONS BY MS. COOK:
Q. And you also don't provide an opinion that -- about whether a levonorgestrel-only containing contraceptive pill increases the risk of IIH, correct?
MS. NATALE: Same objection.



THE WITNESS: I need to look. I'm not sure whether -- I mention the Plan B pill, but let me see if I talk about it.
Do you want me to look? It's possible that would be in my causation section when I talk about the data that's available discussing -- because there was a case report of PTC, pseudotumor cerebri, with a Plan B pill user.
QUESTIONS BY MS. COOK:
Q. Well, let me -- if you don't remember it, that's fine, and we can look later, but that's what I'm trying to understand now as we're looking at the summary of your opinions.
A. So I can't recall if I cite that document, but certainly that was part of the -- part of the information I've reviewed and relied upon under causation.
I looked across the case reports, the epidemiological literature that's available for the association between use of levonorgestrel products, so LNG



products generally, of all types, and pseudotumor cerebri.
My focus was on the data related to the subdermal implants and the intrauterine implants, but certainly I have -- and I thought I mentioned the case report with the Plan B product.
Q. So are you giving an opinion that combined oral contraceptives increase the risk of IIH?
MS. NATALE: Objection. Form. Beyond the scope.
MS. COOK: I thought you just said that you're not.
THE WITNESS: So I haven't formed -- that's different. Plan B is not a combined oral contraceptive.
QUESTIONS BY MS. COOK:
Q. Right. But let's stick with combined oral contraceptives for now.
A. Right. So I have not formed the opinion at this time about the combined products --
Q. And let's just --
A. -- but --



MS. NATALE: She was not done with her response.
MS. COOK: I just want to stick to the combined oral contraceptive for now, so if you were going to move on to something else, I'll come back to that.
MS. NATALE: I would prefer if you allowed the witness to finish her response before you change the question.
THE WITNESS: What I was going to say was, but the question I heard related to oral products. So the Plan B is an oral product.
If you're going to limit it further, I have answered the question: At this point in time, I have not formed the opinion on the combined products.
QUESTIONS BY MS. COOK:
Q. Did you research as part of your work in this litigation whether combined oral contraceptives increase the risk of IIH?
MS. NATALE: Objection. Form.

Page 26

THE WITNESS: Say that again, I'm sorry? What was the first part of your question again?
QUESTIONS BY MS. COOK:
Q. Did you research as part of your work in this litigation whether combined oral contraceptives increase the risk of IIH?
A. I certainly included those within the documents that I reviewed. So in other words, I did a general search for levonorgestrel, LNG, and pseudotumor cerebri. So there were papers that come up that discuss combined products as well as individual -- individual component products like Mirena or Norplant, for example, or Plan B.
And that was what my focus was on. Because if there's a -- there's a -- there would be some different things that you would need to consider if you're talking about the combined oral product versus looking at the products that are delivering a single agent. There's interactions between the estrogens and the progestins that you would have to describe and consider, and I'm

Page 27

not administering -- you're not being administered exogenous estrogen when you're talking Mirena.
Q. So the -- everything that you just said about the combined oral contraceptives and the different interactions to consider, you don't talk about that in your report, correct?
MS. NATALE: Objection. Form.
THE WITNESS: No, because, again, my focus is on looking at the cause -- either the cause and effect relationship between Mirena and PTC and looking at what data is available that is informative of that relationship, and then the pharmacokinetics of Mirena which, again, is a single -- is a single component product, not a combined product.
MS. NATALE: While there is no question pending, I'd like to ask that we take a quick break off the record to figure out if we can get realtime on this side.

Page 28

MS. COOK: You can borrow this one for now, but I don't want to disrupt...
QUESTIONS BY MS. COOK:
Q. So just so I get a clean answer on this.
Are you, sitting here today, aware of any evidence that combined oral contraceptives, including those containing levonorgestrel, increase the risk of PTC?
MS. NATALE: Objection. Form.
THE WITNESS: I'd have to go back and look at my documents. There certainly is a discussion of combined orals in some the documents I reviewed, but that was not the focus of my analysis.
QUESTIONS BY MS. COOK:
Q. And by the way, when I say "PTC," that's the phrase you use, but it's also known as IIH. So when I say "PTC" or "IIH," can we just have an agreement that I'm talking about the same thing?
MS. NATALE: Objection. Form and to the use of IIH.

Page 29

THE WITNESS: So I think you need to be specific when you're talking about drug-induced -- a drug-induced condition, which is why I use PTC, which is consistent with the literature.
But I agree with you, and I discuss this in my report, there are other terms that are used in the literature. I don't believe, though, the drug-induced -- if you call it truly drug-induced, it's no longer idiopathic.
QUESTIONS BY MS. COOK:
Q. IIH is a term used in the literature, correct?
A. Yes, it is.
(Plunkett Exhibit 3 marked for identification.)
QUESTIONS BY MS. COOK:
Q. Hand you Exhibit 3.
And this is a document that you relied on, correct?
MS. NATALE: Objection. Form.
THE WITNESS: Yes, this is in

my reference -- group of references,
yes.
QUESTIONS BY MS. COOK:
Q. And you reviewed this?
A. Yes.
Q. And if you look at page 434 under the section Medication, a little more than halfway down it says, "The oral contraceptive pill has been historically connected with the disorder, but more recent research has shown no significant increase in the proportion of women taking the pill and those with idiopathic intracranial hypertension compared with the general population."
Do you see that?
A. Yes, I do.
Q. And do you have any basis to disagree with that statement?
A. I haven't formed an opinion on that statement one way or the other.
MS. NATALE: Objection. Sorry.
QUESTIONS BY MS. COOK:
Q. Let's look at -- well, first of all, let's talk about emergency contraceptive



or the Plan B pill that contains levonorgestrel.
Have you formed an opinion about whether you think that causes PTC, IIH?
MS. NATALE: Objection. Form.
THE WITNESS: Are you asking for an independent opinion about just that product?
QUESTIONS BY MS. COOK:
Q. Yes.
A. No, I have not.
Q. Okay. And then with respect to Norplant, you said that -- I believe you said that your focus here was looking at the cause and effect relationship between Mirena and PTC, correct?
A. One of the focuses. I lay it out for you in my report. I first consider the pharmacokinetics of delivering of the dose, and then I also, within the general causation context, look to the relationship between LNG exposure and PTC, yes.
Q. And then with respect to Norplant, are you intending to provide an opinion that Norplant causes IIH?



MS. NATALE: Objection. Form.
THE WITNESS: So I rely on literature that has described the relationship between Norplant and IIH, or PTC or IIH or essentially the condition that I call pseudotumor cerebri, but I have not formed a complete causation opinion just on that.
For example, I haven't looked at the -- all of the literature and the adverse event reporting or any files, discovery, clinical trials specific to Plan B, which is what I would do if I was going to do what I did here for Mirena where I focused on more than just, for example, the epidemiological literature.
QUESTIONS BY MS. COOK:
Q. You just said Plan B.
Did you mean Norplant there?
A. Oh, I'm sorry, yes, Norplant, yes.
Q. Okay. That answer you just gave, that's about Norplant, right?



A. Right. It's the same idea.
In other words, I have looked at the labeling and some of the FDA documents on Norplant mainly as it relates to pharmacokinetics and chemical analogy for Mirena. And then there certainly is a literature body on Norplant and PTC which describes that the -- it has indeed been listed as a drug known to be associated with PTC.
Many of the review papers list it under a table like we just saw in this document, Exhibit 3, on page --
Q. Yeah, the table on Exhibit 3, by the way, doesn't include Norplant or levonorgestrel, correct?
MS. NATALE: Objection. Form.
THE WITNESS: Yes, it has levonorgestrel here under Endocrine.
If you're looking at the table --
QUESTIONS BY MS. COOK:
Q. Panel 2?
A. Yes, panel 2.
Q. So just so I understand, you

Page 34

said, "I haven't performed a complete causation opinion on Norplant and PTC."
Is that sort of the bottom line with respect to Norplant?
MS. NATALE: Objection. Form.
THE WITNESS: I haven't focused on that. That's exactly right. If I was going to do a Norplant causation analysis, I would lay it out much like I have laid out the analysis for Mirena, and I haven't done that separately for Norplant.
QUESTIONS BY MS. COOK:
Q. And you said there are published articles about Norplant?
A. Yes.
Q. And those are all case reports, right?
MS. NATALE: Objection. Form.
THE WITNESS: Well, there are some other review articles, like this one that talks about PTC that actually lists Norplant as one of the devices that's been associated with PTC as well, which are correct. There are

Page 35

also case reports on Norplant.
QUESTIONS BY MS. COOK:
Q. There's no controlled study that concludes that Norplant increases the risk of PTC, correct?
A. So you'll need to define what you mean by "controlled study."
Q. Is there anything but a published case report or a review article referring to a published case report that discusses an increased risk or even a patient having IIH or PTC who is using Norplant?
MS. NATALE: Objection. Form.
THE WITNESS: Well, if you're talking about a patient, that would be a case report. But if you're talking about a clinical study, for example, or are you talking about a prospective epidemiological study, that is true, those are not available.
QUESTIONS BY MS. COOK:
Q. Are you aware of any published literature that concludes that Norplant causes IIH?
MS. NATALE: Objection. Form.

Page 36

THE WITNESS: Are you asking me is that specific sentence put into one of the publications?
I don't know that I could point to that. I can only point to the review papers that list it as a drug-induced cause of PTC where they describe drugs that have been linked to the disease.
But I don't -- none of them are a specific causation analysis just for Norplant.
QUESTIONS BY MS. COOK:
Q. In the review articles you're referring to, they talk about an association, not causation, correct?
MS. NATALE: Objection. Form.
THE WITNESS: I believe that the words in the tables are "drug-induced PTC." They may say medications associated. There's different -- there's different tables and different papers, but it depends on the paper you're talking about.

Page 37

QUESTIONS BY MS. COOK:
Q. Let's look at your summary of opinions on page 6 to 7.
A. Okay.
Q. Now, you give opinions about the variability of the levels of LNG in Mirena patients, correct?
A. Yes, I do.
Q. And is the -- are your opinions about variability offered to support your opinion that LNG blood levels in Mirena users overlap with LNG blood levels in patients using LNG implants like Norplant?
MS. NATALE: Objection. Form.
THE WITNESS: If you're asking me is that part of the information that I rely upon when I talk about that, yes, that's true, but I also describe the pharmacokinetics and the level of variability generally, too, not just in the context of the issue of overlap.
QUESTIONS BY MS. COOK:
Q. Okay. So the variability of LNG, other than to show -- well, I'll

Page 38

withdraw that question.
Is it your opinion that the higher level of free levonorgestrel in the blood the higher of risk of IIH?
MS. NATALE: Objection. Form.
THE WITNESS: I don't -- we can't state that because we don't have the data. Nobody has done that specific kind of analysis.
We can say -- what we can say, however, is that in situations where you have increased levels of free LNG, you would expect, based on general principles, to have an increased risk of experiencing adverse events. That we can say based upon what the general literature and pharmacology and toxicology tells us.
QUESTIONS BY MS. COOK:
Q. And when you say "an increased risk of experiencing adverse events," you're not saying that increased levels of free LNG have been shown to correspond to increased risk of IIH specifically, are you?
MS. NATALE: Objection. Form.

Page 39

THE WITNESS: If by that you're asking me can I point to a study where they measured it? No, that's not been done.
Unfortunately, there's -- that would be a difficult study to do, for example. You'd have to be measuring the levels of free LNG immediately before someone experienced the event, and those kinds of studies are not available.
What is available is data showing that the experience reports we see with Mirena and then the experience reports we see with Norplant are occurring with a drug where we know that there is significant not only intrauterine exposure but also systemic exposure. And we know that systemic exposure of the drug biologically is what you would expect to lead to the toxicity.
QUESTIONS BY MS. COOK:
Q. And when you say that there are experience reports with Mirena and experience

Page 40

reports with Norplant, are you referring to adverse event reports where a woman uses either a Mirena or a Norplant and also experiences IIH?
A. That's part of the data, and then there's also the data where we've looked at the -- what we do know about blood levels in individuals showing that there is such a large amount of variability in the total levels, also variability in the levels of the binding globulin SHBG, and that those things are both important indicators of what's going to happen to free levels.
Q. You agree with me that there's no study showing that variability of LNG or SHBG is linked to IIH, correct?
MS. NATALE: Objection. Form. Asked and answered.
THE WITNESS: Again, if you're asking me is there a study, an epidemiological study, where, in addition to looking at the risk of PTC in women that have been either exposed or not exposed to Mirena and measuring blood levels of LNG, that doesn't

Page 41

exist, and I'm not surprised.
Again, it would be very difficult to do that kind of study unless you did a very, very large prospective clinical trial, and it would be kind of unethical to treat people with the understanding that you're expecting to get that kind of toxicity.
QUESTIONS BY MS. COOK:
Q. And you said an epidemiology study, but I'm referring to any study at all.
Is there any evidence of what the LNG level or SHBG level was of any patient who used Mirena or Norplant and had IIH?
MS. NATALE: Objection. Form.
THE WITNESS: I can't tell you that there isn't a measurement reported in some of the case reports. I'd have to go back and look.
But what's also important to understand is that there is no information from the company that allows us to understand what a

threshold would be for free blood
levels that would be related to an
increased risk of toxicity even.
What's available in the clinical data
from the company on this product is
very limited as well.
So, yes, I have a limitation
based upon what's been done.
QUESTIONS BY MS. COOK:
Q. Okay. So what you just said is
that there's no information about what
threshold for free LNG in the blood levels
would -- related to an increase risk of
toxicity. You're referring to IIH there --
MS. NATALE: Objection. Form.
Mischaracterization.
QUESTIONS BY MS. COOK:
Q. -- when you say toxicity?
A. Well, I would say any kind of
toxicity. Let's just start with basics. We
don't have those kinds of relationships
established from the clinical studies that
have been done on the product by the company,
who is the one who would be doing those
studies, so...



Q. Well, we're here -- I just want
to get an answer to my question about whether
there's information that you're relying on.
You understand that's what I'm
asking you?
MS. NATALE: Same objection.
Asked and answered.
THE WITNESS: Certainly I
understand you're trying to understand
the basis for my opinions, and I'm
trying to give you that.
But the way you asked the
question, I'm trying to answer it
based upon how I'm interpreting how
you're asking it.
I apologize, I'm not trying to
be obtuse. I don't know what the
right word is.
QUESTIONS BY MS. COOK:
Q. You agree with me that there is
no evidence that a certain LNG level or SHBG
level increases a risk of IIH, correct?
MS. NATALE: Same objection.
Asked and answered.
THE WITNESS: I did answer



that. I said there is no study that
gives that. I'm not surprised that
there isn't. And then I tried to
explain what the situation is, but I
did answer that already for you.
QUESTIONS BY MS. COOK:
Q. And then -- so sitting here
today, you can't tell me what free LNG level
would be associated with an increased risk of
IIH, right?
MS. NATALE: Same objection.
Asked and answered.
THE WITNESS: No one has done
that study, that's correct. And it's
not unusual that such data would not
exist either. That isn't how those --
those kind of studies tend to be
epidemiological investigations that
are not going to be collecting that
kind of -- that kind of data.
QUESTIONS BY MS. COOK:
Q. And for any given patient who
reported IIH with Mirena, you do not have
information about what level of LNG or SHBG
they had in their blood, correct?



MS. NATALE: Same objection.
Asked and answered.
THE WITNESS: So that one I
said I'd have to go look at each of
the case reports. I can't confirm
that none of them report that, and I'd
have to go look.
QUESTIONS BY MS. COOK:
Q. You use --
A. But even if they did, the
problem would be -- it might be -- the
problem would be that what is likely reported
is going to be post-event, and what we would
need to know something about is what is
occurring before the event occurred as well.
And I would find it -- based on
my experience, I would find it hard to
believe you'd have all that data.
Q. Certainly in your report you
did not include any reference to LNG levels
of any adverse event report related to Mirena
and IIH, correct?
MS. NATALE: Same objection.
Asked and answered, and to the form,
and to the use of IIH.

Page 46

QUESTIONS BY MS. COOK:
Q. I mean, you said you'd have to go look it up, but you haven't done it yet is all I'm asking.
MS. NATALE: Same objection.
THE WITNESS: I did not form an opinion about a specific level with PTC and Mirena use, if that's what you're asking me now.
But what I was trying to convey to you is we can look. I just can't recall whether that information was in the case reports that were there.
QUESTIONS BY MS. COOK:
Q. And all I'm asking is whether you looked for it yourself in putting your report together. That's all I'm trying to figure out.
Have you looked yet to see if there's any information on LNG blood levels and any adverse event report of IIH with a Mirena user?
MS. NATALE: Same objection.
THE WITNESS: So I did look at -- if you're -- any adverse event.

Page 47

So I did look at the literature that was available looking at dose response for Mirena, for efficacy as well as safety, and that's what I was reporting to you. There's limited data available, and none of it is looking at free levels. It's looking -- well, I shouldn't say none of it. Most of it is not looking at free levels.
For example, the clinical studies are -- there's pharmacokinetic studies and then there are -- some of those studies report adverse events. So, yes, there are adverse events reported where you could go and try to identify ranges.
But that was not the focus of my investigation, to do a separate dose response curve for a variety of different adverse events across the data that was available.
QUESTIONS BY MS. COOK:
Q. And I'm only talking about IIH.
Did you look to see if you had

Page 48

any LNG level for any IIH report with Mirena?
MS. NATALE: Same objection. Form. IIH. And asked and answered.
MS. COOK: And with respect to the IIH objection, I mean, I think we're understanding each other. If I say IIH, I'm just referring to what you're talking about in your report. You use the word "PTC."
QUESTIONS BY MS. COOK:
Q. Can you -- if I say IIH accidentally, you'll understand I mean PTC, right?
MS. NATALE: Same objection.
THE WITNESS: Well, certainly I'm talking about PTC. And I have a reason for using that term, and I think I conveyed that to you.
So, yes, I mean, I'm -- I'm talking about my report, so if you want, I will certainly stand behind how I describe it in my report. That's probably the best way to answer that for you.

Page 49

QUESTIONS BY MS. COOK:
Q. And I'll try to use PTC since you like that better, but if I accidentally say IIH, you still know what I'm talking about, right? You haven't been confused yet?
MS. NATALE: Same objection.
THE WITNESS: I have not been confused yet. Doesn't mean I won't be confused later.
QUESTIONS BY MS. COOK:
Q. Okay. So let's talk about the adverse events --
MS. NATALE: Are you withdrawing the question?
MS. COOK: I'm asking a new question.
MS. NATALE: Okay.
MS. COOK: And I think she'll figure that out. She's done this 150 times.
MS. NATALE: I'm asking if you were withdrawing the question that was asked.
MS. COOK: Christina, please limit your objections to form. Your

Page 50

witness doesn't need your help.
MS. NATALE: I don't think she needs any help. I'm asking you if you're withdrawing the question that you asked.
MS. COOK: I'm asking a new question.
MS. NATALE: Okay.
QUESTIONS BY MS. COOK:
Q. Dr. Plunkett, you talk about a number of adverse event reports of IIH with Mirena, and my only question is: Yes or no, did you look at adverse event reports to see if there was any LNG level specifically for an IIH patient?
MS. NATALE: Same objections.
QUESTIONS BY MS. COOK:
Q. PTC?
A. I did not do a focused analysis on that, no. What I was telling you, it's possible it's there, but I did not try to identify what those would be because in my experience that would be a fruitless exercise because it's going to be taken after the fact.

Page 51

Q. So you, in your summary of your opinions, again on page 7 in the middle bullet point, the end sentence there says, "Therefore, toxic effects observed in patients exposed to Norplant would be expected to occur in patients taking other LNG drug products, including Mirena."
Does that -- when you say "toxic effects" there, are you referring to PTC?
MS. NATALE: Objection. Form.
THE WITNESS: One of the things, yes, absolutely. I'm referring generally to toxic effects here in this sentence, but certainly later on in my report I talk about that as it relates to PTC then specifically. Because I use the Norplant data as part of my chemical analogy.
QUESTIONS BY MS. COOK:
Q. Okay. And I think you told me earlier that you didn't do an independent analysis or come to an independent conclusion that Norplant causes IIH, correct?

Page 52

A. I have not done a causation analysis specific to Norplant, that is true.
Q. So when you say here that "toxic effects observed in patients exposed to Norplant would be expected to occur in Mirena patients," is that sort of saying if Norplant causes IIH, then Mirena would also?
MS. NATALE: Objection. Form.
THE WITNESS: I would put it a different way. I wouldn't say it quite that way.
Do you want me to tell you how I would say it?
QUESTIONS BY MS. COOK:
Q. Yes.
A. So I would say instead, that based upon the fact that these drugs have -- it's the same drug -- have a common mechanism of action, because of that, LNG coming subdermally versus LNG intrauterine, when it gets into the bloodstream it's going to end up causing the same types of biological effects due to its presence in the blood.
And so as a result of that, it's a general principle of pharmacology and

Page 53

toxicology that you would expect the similar compounds to have a similar adverse event profile as well as a similar benefit profile.
Q. Now, you don't give an opinion about how biologically high levonorgestrel levels would increase the amount of cerebrospinal fluid or prevent it from draining or anything like that, correct?
MS. NATALE: Objection. Form.
THE WITNESS: Are you asking me do I describe cerebrospinal fluid kinetics that could be responsible?
No, it's my understanding that there is other experts in the litigation who are handling mechanisms related to PTC.
QUESTIONS BY MS. COOK:
Q. Are you relying on any other experts in the litigation?
MS. NATALE: Objection.
THE WITNESS: No.
MS. NATALE: Form.
THE WITNESS: I have my own independent opinions, and I have not -- the only -- the only other

people in the litigation I have relied upon are some statements from the company themselves about their understanding of the data.

QUESTIONS BY MS. COOK:

Q. So you opine that the androgenic effects of levonorgestrel are a biologically plausible mechanism by which LNG drug products, including Mirena, can cause PTC in humans?

A. Yes, I have that in one of my bullets.

Q. And is your opinion that PTC is an androgenic side effect of Mirena like acne or increased body hair?

MS. NATALE: Objection. Form.

THE WITNESS: Well, it's different than acne or increased body hair, but certainly androgens are causing those events as well. The androgenic activity is the biologically plausible mechanism for why you get those effects as well.

QUESTIONS BY MS. COOK:

Q. And you did not -- excuse me.



You do not offer any opinion about how biologically increased androgen would cause an increased intracranial pressure due to elevated cerebrospinal fluid levels, correct?

MS. NATALE: Objection. Form.

THE WITNESS: So what you're asking me is if I laid out more details? No. Again, it's my understanding that there is a mechanism expert that will be describing this in the litigation.

QUESTIONS BY MS. COOK:

Q. Can you point to the levels of androgen that were recorded in any Mirena user who reported having IIH?

MS. NATALE: Objection.

THE WITNESS: No, unfortunately that data is not reported that I can recall.

QUESTIONS BY MS. COOK:

Q. Have you conducted any testing to support your opinions?

MS. NATALE: Objection. Form.

THE WITNESS: What do you mean



by "testing"? In an animal or a human?

QUESTIONS BY MS. COOK:

Q. Yes.

A. No, I've not administered Mirena to an animal or a human or, even more generally, levonorgestrel -- levonorgestrel. LNG. That's -- otherwise it's a mouthful.

Q. Have you published any of the opinions in your report or put them through peer review?

A. As they relate only to Mirena, no, but certainly there's things in my report that talk about basic principles that are in some of my publications. So basic principles of pharm and tox, I certainly talk about that in some of my papers.

Q. The opinions about LNG, Mirena and IIH, that hasn't been subjected to peer review or published, correct?

A. No, I have not published those opinions.

Q. And have you presented or shared your opinions about LNG and Mirena and IIH or PTC with anyone other than the lawyers



for the plaintiffs here?

MS. NATALE: Objection. Form.

THE WITNESS: I personally, no. I assume that -- although I do know that my report has made it -- the way to defense experts because I -- last night I received a couple of defense reports that, indeed, if you search it, my name shows up.

But I have not provided it to any other scientists at this point in time.

QUESTIONS BY MS. COOK:

Q. Your appendix -- sorry. Withdrawn.

Your CV is attached to your report as Appendix A, right?

A. I think it's A, yes.

Q. Is that the current and accurate copy of your CV?

A. Yes, with the exception of -- I will say there is one thing that I'm doing, that I added this month. I forgot about it.

Under Abstracts, I'm making a presentation at the Society for Toxicology

Page 58

meeting in March, and I am -- my abstract was accepted, so it -- that is an addition that will go on there. I probably won't add it until March, but it will be added there.
Q. What is the abstract?
A. I'm doing a talk on marijuana safety and describing the issues between federal and state regulation of cannabis products and some of the human health and public safety issues that arise.
Q. Appendix B is the list of materials reviewed?
A. Yes, it is.
Q. Correct?
And is this a complete list of the materials you reviewed in completing your expert report?
MS. NATALE: Objection.
THE WITNESS: In completing this report, yes, although I know that you've been provided with some things I've received since I filed my report about a month ago.
QUESTIONS BY MS. COOK:
Q. And -- but those were not

Page 59

materials that you reviewed in coming to the opinions in your report, correct?
A. That is true.
Q. Okay. And we'll take a look and go through those later.
Did you do a literature search on your own?
A. Yes. Always do.
Q. Did you do that before you signed up to be an expert for the plaintiffs?
A. Yes. Well, before I agree to work on the case --
MS. NATALE: Objection. Form.
THE WITNESS: -- I always get a call first -- most of the times I get a call: Would you be interested in helping us?
And then I usually spend anywhere from two to six to seven hours on my own looking at the literature to see if the issue that is related here has to do with scientific literature.
Sometimes I'm just asked a question about labeling and I'll only

Page 60

have to look at the labeling in order to form an opinion based upon my already having an understanding of the science behind it.
But, yes, most of the time I do a literature search, which I did.
QUESTIONS BY MS. COOK:
Q. What did you search for?
A. I looked for --
MS. NATALE: Objection.
THE WITNESS: I'm sorry.
MS. NATALE: That's okay.
THE WITNESS: I looked for literature related to the relationship between LNG exposure and pseudotumor cerebri, but I also separately looked at literature on the pharmacokinetics of levonorgestrel by different routes of administration.
So I had two areas that I was asked to assist in: basic pharmacokinetics and then separately on the issue of general cause as it relates to my area of expertise.

Page 61

QUESTIONS BY MS. COOK:
Q. Are all of the articles in the list of materials reviewed the articles that you found in your literature search?
MS. NATALE: Objection.
THE WITNESS: Most of them. There may be a few that were provided to me as exhibits to depositions, things like that, but most of them -- all the ones that are pretty much cited in my report that are scientific literature, those -- I would say 99 percent -- are things I found.
QUESTIONS BY MS. COOK:
Q. There are some Bayer documents on your list of materials reviewed?
A. Yes, there are.
Q. Did you have access to a database and perform your own searches to --
MS. NATALE: Objection.
QUESTIONS BY MS. COOK:
Q. -- obtain these?
MS. NATALE: Objection. Form.
THE WITNESS: No, I directed the attorneys to provide me with

Page 62

materials that I asked for based on the fact that I knew they had a very large discovery database.
QUESTIONS BY MS. COOK:
Q. What materials did you ask for?
MS. NATALE: Same objection. Form. Attorney-client privilege.
MS. COOK: I don't think that this is privileged because it actually has do with you providing information for her to review, which is not under the rule.
MS. NATALE: Sure. I'm just preserving my objection.
THE WITNESS: So I asked them for -- well, I first asked them did they have any deposition testimony from the company related to the issues I was concerned with. So they provided with me deposition testimony of two individuals in the company, Dr. Hofmann and Dr. Zurth, who dealt with pharmacokinetics of the products, so that's one thing.
And then to their depositions

Page 63

there were exhibits that were internal documents, so I asked for -- I looked at those. Those were provided.
And then I asked for -- if there was any other data in the files that wasn't publicly available that might have dealt with either clinical studies that looked at PTC, which there weren't; clinical studies that might have been -- provided additional information on pharmacokinetics, and I was provided with a few of those documents. There were some in there, for example, the Japanese -- the clinical study report for the Japanese pharmacokinetic study.
And I'm thinking what else I might have asked for.
Those are the things I recall off the top of my head.
If I -- if later if I'm asked to do additional work, obviously when -- if I develop regulatory opinions, I make a broader ask from the database because there's often

Page 64

many documents that deal with those issues.
QUESTIONS BY MS. COOK:
Q. Did you review any expert reports from plaintiff experts before coming to your opinions?
A. Before coming to my opinions? No. I have some that I have received after the fact. Other than I did see an affidavit from Dr. Jusko before I prepared my report.
Q. Did you rely on that?
A. No.
(Plunkett Exhibit 4 marked for identification.)
QUESTIONS BY MS. COOK:
Q. I'm going to hand you Exhibit 4, which is a list that I got today. It says "Additional Documents Reviewed."
Is this a list of documents that you reviewed after completing your expert report?
A. Yes. Although I believe the affidavit I also had beforehand. I may be wrong, but I thought I had that beforehand.
Q. And as of today, you've looked

Page 65

at two of the reports that were served last night: Jusko and Langer?
A. Well, I've been provided them. I shouldn't say I have looked in detail, but I have -- I looked at sections that mention my name.
Q. And then we got another stack of documents.
Is that additional materials that you reviewed on top of this?
A. No, those -- those -- I think you had a request in the notice of deposition for highlighted documents, and so what I provided you with is documents that I cite in my report or were part of my reliance list that I might have made some highlights in.
Q. Okay. Before being hired in this litigation, have you ever done any work related to IUDs?
MS. NATALE: Objection.
THE WITNESS: At Environ, yes, we did do some regulatory work only, though not litigation work.
QUESTIONS BY MS. COOK:
Q. Have you done any research or

testing related to IUDs?
MS. NATALE: Objection. Form.
THE WITNESS: So if by that you mean in a laboratory --
QUESTIONS BY MS. COOK:
Q. Yes.
A. -- or like the bench? No, I have not done that.
Q. And -- well, let me ask you more generally.
Have you done any scientific research, however you define it, related to IUDs before being hired here?
A. Yes, in the past. Over the years that I have been involved as a pharmacologist, yes.
Q. Well, let me ask you a more specific question.
Have you done any scientific research on LNG IUDs before being hired in the litigation?
A. As it relates to the use of different -- the use of the different products, yes, in the regulatory context but not in a litigation context.



Q. And what is your prior -- can you tell me about your prior research on LNG IUDs?
A. So I have looked at some of the issues related to Norplant before in the past. So specifically at Environ, often projects that we dealt with we were asked to look at the literature generally. And so there's a project that I can think of that we looked at IUDs, and Norplant was -- Norplant was not an IUD, but Norplant was a contraceptive that was available at the time.
So I certainly reviewed the literature on -- some of the literature on what Norplant was and what it did at the time, which is, in other words, contraceptive methods generally.
Q. Okay. So when was that?
A. It would have been in the mid-1990s, I guess.
Q. So --
A. Before I left Environ in '97.
Q. What I asked was about LNG IUDs, not Norplant, right?
A. So I apologize, I thought you



were asking about LNG products generally.
Q. Yeah.
A. So --
Q. So have you done any scientific research related to LNG IUDs before being hired in this litigation?
A. No, I don't recall that being an LNG IUD.
Q. Have you -- have you ever published or written an article on Mirena or any other LNG IUD?
A. No.
Q. Before being hired in this litigation, have you ever read any published articles about Mirena?
MS. NATALE: Objection. Form.
THE WITNESS: Maybe not Mirena specifically, but about LNG IUDs, yes, just in general. Having -- having a daughter who is thinking about using different types of birth control, I certainly, at the time that she was looking at different options with her OB/GYN, I looked at some of the literature for her.



QUESTIONS BY MS. COOK:
Q. When was that?
A. Let's see. Back in probably 2004, 2005 time frame.
Q. Do you remember what you read?
A. I don't remember specifics other than having looked at the different options and what they delivered and what they did.
Q. Are you relying on any of that research in your opinions in this case?
A. The research, no, but certainly that knowledge and experience is something I came to this with. I mean, I have an understanding generally of what LNG is. I had that before I was contacted by the attorneys, but certainly not in any way did I -- can I say that it was a paper that I reviewed that I know I cited in this report, no.
Q. Okay. So what was your conclusion when you looked at the literature back in 2004, 2005 about LNG IUDs?
MS. NATALE: Objection. Form.
THE WITNESS: It was strictly

in the relationship to my daughter and what she should use, but she ended up instead opting for an oral, low-dose contraceptive.
QUESTIONS BY MS. COOK:
Q. Are you relying on your research and advice you provided to your daughter back in the mid-2000s in this case?
MS. NATALE: Objection. Form.
THE WITNESS: As far as specific opinions formed here, no.
QUESTIONS BY MS. COOK:
Q. Okay.
A. But it is something that is -- it's something that's within my experience and knowledge from having looked at the literature, but it's not something that I'm relying upon and I'm citing here. I didn't cite that in my reliance list, for example.
Q. Have you ever lectured about Mirena or any other LNG IUD or provided any talks about it?
A. Not that I'm aware of, no.
Q. Have you ever given any lectures about LNG?


A. Not a lecture specific to LNG. In -- when we taught medical students, I assisted with lectures that dealt with reproductive hormones, but I did not -- I don't recall a specific mention of LNG, no. That would have been before LNG probably even came on the radar for most people as far as approved products.
Q. Okay. So before being hired in this litigation, did you have any experience with LNG other than looking into various birth control options to advise your daughter back in the mid-2000s?
MS. NATALE: Objection.
THE WITNESS: And just understanding the basic pharmacology of the drugs that are out there that are used, no, that would be it.
Again, as a pharmacologist, I tend to try to keep up with things that appear that are either new classes or new types of products, and that's strictly what I would have done with relationship to LNG IUDs.


QUESTIONS BY MS. COOK:
Q. You're aware that LNG has been used for decades in a variety of contraceptives, correct?
MS. NATALE: Objection. Form.
THE WITNESS: Yes. It's been on the market for decades, yes.
QUESTIONS BY MS. COOK:
Q. Is it your understanding or do you know whether millions of women have used LNG-containing contraceptives safely?
MS. NATALE: Objection. Form.
THE WITNESS: I have no specific knowledge of a number, but I have seen that number described in the literature, yes.
QUESTIONS BY MS. COOK:
Q. In your report -- I'm going to switch topics. I don't know if you want a break or if you're doing okay.
Dr. Plunkett?
A. I'm okay unless he needs to change a tape. Why don't we just go until he needs a change of tape.
Q. Just let me know, okay?


A. Okay, sure.
VIDEOGRAPHER: About 30 minutes.
MS. NATALE: Okay.
QUESTIONS BY MS. COOK:
Q. So if you look at page 13 of your report...
A. Yes.
Q. ...you talk at the very top about -- you say, "Additionally, due to its significant androgenic properties, LNG administration results in reductions in the level of SHBG circulating in the blood," right?
A. Yes, that's -- well, that's not the whole sentence, but that's part of it, yes.
Q. Okay. You continue on. You say, "While in contrast, estrogens are known to increase blood SHBG levels."
A. That's correct, and then I cite to two articles.
Q. And those two articles you cite to, those aren't Mirena articles, right?
MS. NATALE: Objection. Form.

THE WITNESS: They're not specifically to Mirena, that is true. They're talking about -- I think the Fotherby article is talking about LNG as well as other hormones.

The Kuhl article -- I have to look at the title. No, again, it's a review paper so it's -- I believe that one actually does talk about LNG specifically but it's, again, a review of the general area of hormones that are used.

QUESTIONS BY MS. COOK:

Q. So the reason that you talk about the reduction of SHBG by LNG and the increase in SHBG by estrogens is to support what you say in the next sentence, which is basically you need to look at the free levels of LNG to really get a sense of the active amount of LNG in the blood, right?

MS. NATALE: Objection. Form.

THE WITNESS: That's not the only reason I have that sentence in there.

Essentially this paragraph is a



background paragraph, so I'm just laying out what is known or not known about LNG, and it's binding to different receptors here.

So SHBG is a carrier protein. And it's important to the pharmacokinetics of the compound, but it's also important to overall the profile of the compound from a pharmacology standpoint.

So that's what I'm doing here. I'm just laying out generally what it is, and I indeed do then later in the paragraph start talking about what is -- one of the important things about it, and that is that free LNG is what produces biological effects. And if you have a carrier protein, that's a component that is not immediately available, even though the drug moves on and off of the protein as well.

QUESTIONS BY MS. COOK:

Q. So one of the points of talking about the SHBG levels -- and I think you just said this -- is, as you say later in the



paragraph, you want to look at the impact of SHBG levels on the levels of free or unbound LNG, right?

MS. NATALE: Objection to form.

THE WITNESS: I point out that it can be important to looking at that issue, yes, because it's influencing -- that binding is influencing what is available as a free -- a free LNG molecule or not.

QUESTIONS BY MS. COOK:

Q. And then you say -- in this paragraph you say that approximately 98 percent of blood LNG is bound, right?

A. Yeah.

Q. So that leaves somewhere between 1 and 2 percent unbound, right?

A. That's correct.

Q. And you talk in your report about the free levonorgestrel index, or the FLI, but there's also other ways, at least now in the modern days, of measuring free LNG, correct?

MS. NATALE: Objection. Form.

THE WITNESS: Well, the FLI is



not a measurement; it's an estimation.

QUESTIONS BY MS. COOK:

Q. Yeah.

A. So -- but, yes, today there are analytical methods. Is that what you're asking me? Yes, there are analytical methods that now have the sensitivity to be able to measure it.

Q. In other words, FLI is not the only way to come up with an estimate of free LNG in the blood, correct, in 2017, 2018?

A. Well, it depends on whether you want to estimate or measure. It's a common estimation method, but if you're talking about measurement, it's not a measurement. A measurement is actually taking a blood sample and using analytical tools that allow you to look at protein bound versus nonprotein bound hormone.

Q. Did you look to see -- did you look at studies that measure SHBG levels in Mirena users?

MS. NATALE: Objection. Form.

THE WITNESS: Some of the studies that I cite did indeed report

that, yes, I believe. I don't know about Mirena users, but LNG users. I thought some of them may have been Mirena users.
QUESTIONS BY MS. COOK:
Q. Would you agree that in Mirena users SHBG goes down initially, but then it levels out and remains stable after the first month?
MS. NATALE: Objection. Form.
THE WITNESS: Depends on what you mean by stable. I would agree that the most significant drop is within the first month, which makes sense because that's when you have the highest blood levels typically of the drug as well.
(Plunkett Exhibit 5 marked for identification.)
QUESTIONS BY MS. COOK:
Q. I'm going to hand you Exhibit 5, which is the Hofmann manuscript that's on your list.
You recognize this, right?
A. Yes, I believe that is what was



an exhibit to her deposition. I don't think -- I was not able to find it published yet.
Q. But you cite this in your report for various things, right?
A. Yes, because she talks about it in her testimony.
Q. Okay. If you turn to page 32, which is the next to last page...
MS. NATALE: Are these highlights on the original?
MS. COOK: Yes. This is as produced in color.
QUESTIONS BY MS. COOK:
Q. Page 32 includes descriptive statistics of SHBG serum concentrations.
Do you see that?
A. Yes.
Q. And the LNG IUS 20, that is Mirena, right?
A. That would be indicative of Mirena, yes.
Q. Well, this is actually from Mirena. This is about Mirena, right?
MS. NATALE: Objection.



Foundation.
THE WITNESS: Well, it's about more than Mirena. It's also talking about two other -- two other lower dose formulations as well. But I would agree that, yes, Mirena is -- is I think even mentioned in another part of this document, yes.
QUESTIONS BY MS. COOK:
Q. Mirena is the LNG IUS 20 mentioned here. If you turn back to page 4, it clarifies that.
A. Yes, it is later on, but it just doesn't list it that way here.
Q. Okay. So here you see that it says at the bottom of the table SHBG baseline concentration was 51.5?
A. As estimated in the meta-analysis, yes.
Q. And then with respect to Mirena it has gone down, and by day 25 it's at 43.7.
Do you see that?
A. If you're talking about the first column, yes, I see 43.7 as the geometric mean value, yes.



Q. And then at the lowest point there is two and three months, it's 42.9, right?
A. Yeah, that's what's reported in this table.
Q. And it doesn't -- it goes slightly up after that, but basically it remains stable out through five years as recorded in this table, correct?
A. I agree that the numbers -- the numbers that go out past this to five years, yes, they're all within a range of 42.9. I think the highest value was 45.4, towards the end of the lifespan of the product.
Q. Do you have any evidence that with Mirena it's inaccurate to say that the SHBG levels go down over the first month or two and then don't go down anymore?
MS. NATALE: Objection. Form.
THE WITNESS: Well, I don't think I formed that opinion, but I need to look. I think this may be from a simulation, not from actual measured data, so that makes it a little different. So I need to look

Page 82

at this table if they're talking about
the Reinecke, the Reinecke.
QUESTIONS BY MS. COOK:
Q. Well, my question is: Do you have any basis to disagree that the pattern of SHBG is -- with Mirena is as reflected here in table S2?
MS. NATALE: Objection. Form.
THE WITNESS: I think -- I think what I would answer for that is we don't know because there are very few people that have measured these levels. And I think this may be a simulation and not an actual measurement, so I need to look at -- I need to look at that again from this paper because some of this is simulations and some of it is measurements.
(Plunkett Exhibit 6 marked for identification.)
QUESTIONS BY MS. COOK:
Q. I'll hand you Exhibit 6. And this is a publication by Apter.
This one is not on your list,

Page 83

correct?
MS. NATALE: Objection. Form.
THE WITNESS: I have seen this paper.
MS. COOK: Christina, what's the objection?
MS. NATALE: I'm almost -- I believe that this is cited on the list. I could be wrong.
MS. COOK: That's, A, not a proper objection to form, but if it's -- if she cites it --
MS. NATALE: It is an objection to the characterization.
MS. COOK: Okay.
QUESTIONS BY MS. COOK:
Q. Do you rely on this article?
I see that Apter 2014 is on your list.
A. I mean, it's one of the -- it's one of the -- the body of literature that I have reviewed and relied upon, yes. I don't know that I cite this one in my report in a specific statement, if that's what you're asking me. I'd have to look at my paper.

Page 84

Q. Well, no, that wasn't my question. My question was just whether you relied on it.
So this is a report from a couple studies. One of them includes Mirena, correct?
A. Yes. If they're pooling data across studies, then, yes, that's true.
Q. If you look at Figure 1, this is a graph of mean LNG serum concentrations on the top and then serum SHBG on the bottom, and it has LNG IUS 20, which is Mirena.
Do you see this?
A. Yes. I see Figure 1, yes.
Q. Okay. And what Figure 1 shows is that the SHBG goes down initially with Mirena, but then it stabilizes or goes slightly up as the days go on, correct?
MS. NATALE: Objection. Form.
THE WITNESS: So what I would -- I wouldn't state it quite that way.
What I would say is that -- because they're not showing the variability around the mean. But

Page 85

certainly the mean levels as plotted, that is what the graph is doing. It's down lower than it starts.
It starts up here. If you look at the line here at -- just under 60 nanomoles per liter at day zero, drops significantly within the first 90 days, stays low out past one year, out into the -- halfway into the second year, and then is also continuing to increase as the mean goes on out much later in the time, the lifespan of the product, yes.
QUESTIONS BY MS. COOK:
Q. If you turn to page 6 of the article, the right-hand column, first full paragraph says, "Changes in SHBG during treatment with an IUS can be expected to lead to changes in total LNG concentration over time indicating nonlinear PK of LNG with respect to time; however, the effect was small, SHBG decline of approximately 15 percent."
MS. NATALE: Objection.

QUESTIONS BY MS. COOK:
Q. Do you have any basis to disagree with that statement?
MS. NATALE: Objection. Form.
THE WITNESS: I have not formed an opinion that I agree or disagree with that; however, I'd say that's not inconsistent with what I've stated in my report as far as the issue that the concentrations drop over time.
QUESTIONS BY MS. COOK:
Q. And then the next sentence says, "Therefore, only small changes in the PK of LNG are expected to occur over time during LNG IUS use, which are not expected to be of any clinical relevance."
Do you disagree with that statement?
A. I think I do disagree with that statement based on what I have said in my report, because I point to generally the literature which talks about the issue of variability being a significant issue for these products generally.
But if you're talking about --



if you're talking about the issue of just SHBG being the only contributor, no, it's not. There's other contributors to why there's a significant variability other than these changes in SHBG.
Q. And certainly you're not aware of any literature that says that changes of SHBG are -- lead to an increased risk of IIH, correct?
MS. NATALE: Objection.
QUESTIONS BY MS. COOK:
Q. Or PTC?
MS. NATALE: Objection. Form.
THE WITNESS: That specific statement I'd have to go look. I didn't look for that specific statement because that would be almost irrelevant. It's not -- the most important thing is to look at the relationship between the product and the event.
We know that there's going to be more than one issue that's going to contribute to exposure. For example, it's not just SHBG levels. There's



other things that affect the exposure.
And then based upon -- I think if you read my report, looking at the issue of what are the mechanisms as far as other ways that LNG affects other receptor systems is also a contributing factor to the risk profile.
So on exposure, I think it's even more than SHBG that's possible, and then I also think that it's not just an SHBG event.
QUESTIONS BY MS. COOK:
Q. Okay. But with respect to my question, which was can you point me to any article that says that changes in SHBG increases the risk of IIH, the answer is no, correct?
MS. NATALE: Objection. Form.
THE WITNESS: I said I'd have to look. I have not done an analysis to look at that specific sentence, and then I tried to tell you why I didn't.
QUESTIONS BY MS. COOK:
Q. Right.



Turn back to Figure 1, please.
Graph A shows that the levonorgestrel serum level in Mirena and in the other LNG IUDs drops initially and then continues to decline over time, right?
A. The mean levels are declining over time, but if you look at the variability within individual patients, there's a range of levels. But certainly as the drug is being depleted of its reservoir, at some point in time those blood levels are going to disappear.
Q. In talking about the mean serum levels, you agree that they decline significantly from day one over the first year, correct?
MS. NATALE: Objection.
THE WITNESS: If you're asking me statistically significantly, I don't think this graph proves that.
If you're asking me if the means appear different, they do. And again, we know that there's an initial higher release as the drug comes into equilibrium within the tissue with the

release rate.
So there's -- as with all drugs that are delivered this way through a reservoir, there's an initial time point where you're loading the tissues, and that's what's going on, and then you're going to continue to release. Then there's a -- there's homeostatic mechanisms that are helping to control what that exposure may be.
QUESTIONS BY MS. COOK:
Q. Can you look back at Exhibit 5?
A. The paper by Dr. --
Q. Yeah.
A. Yes, I've got that.
Q. And can you turn to page 13, please?
A. (Witness complies.)
Q. You see where it says, "After a substantial initial decrease, 28 percent during the first year of the in vivo release for the implant, the release rate stabilized, and did serum concentrations until the end of the five-year use period"?



MS. NATALE: Where are you --
MS. COOK: Near the top of page 13.
THE WITNESS: So you're talking about the release rate now, not the blood level. That's what you're pointing me to is about the issue of looking at the decrease of the rate of release from the reservoir. Yes, I see that.
QUESTIONS BY MS. COOK:
Q. And do you have any basis to disagree with that?
A. I haven't done an analysis to say I agree or disagree with that on release rate.
Q. Okay. And if you turn to Table 2, which is page 22.
A. I'm there.
Q. These are estimates of total and unbound LNG serum concentrations at different time points, correct?
A. Yes.
Q. And do you see that with LNG 20, which is Mirena, that the serum



concentration goes down over time, and in the first year it goes from 196 -- and this is in picograms per milliliter?
A. Yes, I see that. You're talking about day 25 measurement?
Q. Yeah, day 25.
A. I see that.
Q. And then to one year it's down to 177.
Do you see that?
A. As a geometric mean, yes, I see that.
Q. And do you have any basis to disagree with that decrease in serum concentrations over the first year?
A. I have no basis to disagree with those actual numbers, no. I mean, I'm aware of these data.
Q. Okay. And then the unbound, the estimate of the unbound levonorgestrel, is in parentheses there, and that's also decreasing, correct?
MS. NATALE: Objection. Form.
THE WITNESS: Yes. Well, if you're asking me is the number at



25 days different than the number at one year, yes, it is. The number at 25 days is higher.
QUESTIONS BY MS. COOK:
Q. And the numbers of -- or the unbound levonorgestrel numbers here, that is consistent with your expectation of unbound levonorgestrel based on the percentage of unbound in the blood, right?
MS. NATALE: Objection. Form.
THE WITNESS: Are you asking me about -- you're asking me does that number indicate from 1 to 2 percent? Is that what you're asking me?
QUESTIONS BY MS. COOK:
Q. Yes.
A. Yes, those numbers fall generally within that range.
Q. And do you have any basis to disagree that these unbound levonorgestrel numbers here for Mirena are inaccurate?
A. No. I haven't formed that opinion, no.
Q. And back to what we were looking at -- well, actually what you pointed

Page 94

me to at the beginning of the deposition in
your report on page 18?
A. Yes.
Q. You pointed me to the sentence
that talks about the LNG oral contraceptives
where the peak blood levels are between 3,000
and 6,000 picograms per milliliter, correct?
MS. NATALE: Objection.
THE WITNESS: As corrected,
yes, that is true.
QUESTIONS BY MS. COOK:
Q. And that is a levonorgestrel-
containing oral contraceptive -- combined
oral contraceptive, right?
A. Yes, I believe that's true from
that paper.
Q. And so if you assume that only
1 percent of that is unbound, then the
unbound LNG number there would be 30 to 120?
MS. NATALE: Objection.
QUESTIONS BY MS. COOK:
Q. Or I guess 30 to 60 if it's
just 1 percent, picograms per milliliter?
A. If you were to take and apply
the 98.2 percent, yes, that would be within

Page 95

that range, yes.
But again, this is a different
product because it's -- as you just
indicated, I believe, this is a combination
product, so there's -- this is, again, an
apples to oranges comparison now because now
you've got the effect of estrogen and
progestins on levels of binding protein, so
it's a little bit more complex.
This calculation -- well, not
calculation. This paper introduces
additional complexities, which is again why
I've tried to focus on the single products,
the single hormone products, when you're
making a comparison, such as the Norplant
product.
Q. Did you look to see what the
free levonorgestrel level is in any combined
oral contraceptive?
MS. NATALE: Objection. Form.
THE WITNESS: Did I try to
determine a specific number? No.
I mean, it ought to be -- if it
was -- if you're talking about just
the progestin component of it and what

Page 96

it may be free or not, I haven't
looked for a specific number, no.
QUESTIONS BY MS. COOK:
Q. Would you have any basis to
disagree that even a free levonorgestrel
level with a combined oral contraceptive
would be much higher than free levonorgestrel
level in Mirena?
MS. NATALE: Objection.
THE WITNESS: So I don't think
I can answer that based on just the
98.2 percent number because of the
additional complexity of adding in the
effect of the estrogen component on
SHBG levels as well.
So I'd have to go and look and
see if anybody has tried to correct
for that. And again, I didn't focus
on the combined products because with
pharmacokinetics, we know that the
estrogen products affect a component
in the blood, the levels of SHBG,
which are going to then, in turn, have
an effect on the pharmacokinetics of
the progestin product.

Page 97

QUESTIONS BY MS. COOK:
Q. And if you estimated free
levonorgestrel the way that you do, using the
FLI, you would be taking into account the
SHBG level because that's part of the
calculation, right?
A. If you were going to do a
calculation, yes, you would -- that's part of
the equation, yes.
Q. Okay. So if you looked at a
free levonorgestrel level for a combined oral
contraceptive, that should have taken into
account the estrogen, right?
MS. NATALE: Objection. Form.
THE WITNESS: No, it doesn't
take into account -- well, I guess
what I'm saying to you is the
situation is more complex than having
just three pools to deal with, because
now we've got to look at how those
pools are affected by the estrogen.
So I don't disagree.
Could we estimate it with FLI?
Yes, we could. But I will not opine
for you is that I would expect it to

look exactly, as far as the relationship, as you see with a single hormone product.
The more appropriate comparison would be to look at the products that are a single hormone, not a combined hormone, if you're going to talk about effects on SHBG and even try to compare FLI measurements. You should be looking at that -- because you know the estrogen is part of the equation as well.
QUESTIONS BY MS. COOK:
Q. The estrogen increases the SHBG, which is a component of FLI calculations, correct?
A. Yes.
Q. Okay. So just to be clear, you decided not to look at the free levonorgestrel levels in combined oral contraceptives as part of your work here; is that what you're saying?
MS. NATALE: Objection.
THE WITNESS: No, not quite. It's not that I decided not to do it;



I looked for the most appropriate comparison.
Certainly I have -- I have papers that look at that, but if you want to talk about comparisons, I limited my comparison to a situation where we have less variables to worry about.
So if I have a product that is administering a single component, one hormone, that's going to be a better comparison product than it would be if I'm having a product that's administering multiple hormones that affect some of the same end points in opposite directions.
So, no, the estrogen takes it up; levonorgestrel takes it down. So if you're going to be looking at that, it may -- it's just a complexity you don't need to introduce. So it's more appropriate -- I mean, as a pharmacokineticist, that's what I would do. I would look for the product that is going to give me a



situation that is going to allow me to have the most appropriate comparison.
So that would be another single -- single hormone progestin product.
QUESTIONS BY MS. COOK:
Q. My question: Did you look at any free levonorgestrel levels in combined oral contraceptives, period?
Have you done that today?
A. I don't describe them in my report, but they're certainly within papers that I have relied upon. That's what I'm saying, there is data there for some of those products, but that's not the appropriate comparison to make.
Q. You're not relying on that data here?
A. I rely on that data for other parts of my report, but certainly as far as if you want to talk about calculating -- or not calculating, but estimating at FLI, then I would look at a single hormone product, not a combined.
Q. Let's make it easy.



Your report doesn't have any opinions in it about what the free levonorgestrel level is in any combined oral contraceptive. You talk about total serum levels but not free levels, correct?
A. That is true, again, because that's the most appropriate -- appropriate method in my view.
Q. Page 13 of your report?
A. Of my report? Okay.
Q. At the very bottom you talk about factors that affect the levels of SHBG and can impact free levels of LNG, and you say that that includes obesity.
A. Yes.
Q. Do you agree that the serum LNG levels are lower in obese patients?
MS. NATALE: Objection. Form.
THE WITNESS: Are you talking about total, total LNG levels in obese patients?
QUESTIONS BY MS. COOK:
Q. That's my first question.
A. So I think it depends on the product you're giving and what your

comparison is.
So are you asking me if I have two different people, one who is obese and one who is not, and everything else is equal, in other words, they're matched for all other factors, and I give them the exact same product in the exact same way and measure them on the exact same days, would I expect there to be a difference? Is that what you're asking me?
It's possible there would be, yes, because of the issue of the effects on SHBG, yes.
Would it be a biologically significant difference? May or may not be depending upon other aspects.
Q. Are you aware that the -- both the serum levonorgestrel and the free levonorgestrel levels are significantly lower in obese patients using LNG than in normal weight patients using LNG?
MS. NATALE: Objection. Form.
THE WITNESS: So I have seen data that would support that statement, yes.



Is that what you're asking me?
QUESTIONS BY MS. COOK:
Q. Yes.
A. There is such data, yes. But what I'm stating for you is I don't know that every patient is obese. I think you'd have to make sure that you talk about -- about apples to apples when you're talking about it.
But certainly, yes, I've seen that in the literature and I've seen that described. Absolutely, it's a risk factor.
Q. And you have no basis to disagree, right?
MS. NATALE: Objection. Form.
THE WITNESS: A basis to disagree on what?
QUESTIONS BY MS. COOK:
Q. You have no basis to disagree that the serum levonorgestrel and free levonorgestrel levels are significantly lower in obese women using LNG contraceptives than normal weight women?
MS. NATALE: Objection.
THE WITNESS: So I don't think



that I would -- could make that -- I would say I -- I can't say that I would -- I can say that I disagree that -- I would disagree with the point on the free levels, and I do think that that is something that there is some question about based upon what we know about the interactions of SHBG.
However, however, I would agree that there's data that shows that, if that's what you're asking me.
QUESTIONS BY MS. COOK:
Q. There's data that shows that the free levonorgestrel levels are lower in obese women, correct?
A. There's some of those, yes.
MS. COOK: Okay. The videographer is asking to take a technical break, so let's take that.
VIDEOGRAPHER: We're off the record at 10:30 a.m. This is the close of Tape Number 1.
(Off the record at 10:30 a.m.)
VIDEOGRAPHER: We're on the



record at 10:40 a.m. This is the beginning of Tape Number 2.
QUESTIONS BY MS. COOK:
Q. Dr. Plunkett, are you aware of any article that states that free levonorgestrel levels are not lower in obese women than normal weight women?
MS. NATALE: Objection. Form.
THE WITNESS: Well, I'd have to go look. I'm sure there are some papers that have measured them and shown that there's variability so that some may be within that range of nonobese women, but as far as -- I'd have to go -- I didn't attempt to cite a paper that stated that specifically, so I can't answer that without looking at my literature.
QUESTIONS BY MS. COOK:
Q. Well, you don't include any opinions in your report on whether free levonorgestrel levels are lower in obese women or not lower, so do you intend to offer an opinion about that?
MS. NATALE: Objection. Form.

Page 106

THE WITNESS: So I'm not a case-specific expert, so I didn't intend to delve into a lot of other risk factors that a case-specific expert would do; however, I do have literature I have reviewed and I have seen the discussion in the literature, and that's why I had that paragraph where I tell you that there are other risk factors for -- or other factors that affect SHBG.
So in my literature -- that's all I'm just saying. I know I have literature that talks about this issue, and I do know that there's significant variability. And based upon the numbers that I have seen, I would not be surprised if there are data showing that there is significant overlap between those two populations as well. That's all I'm saying.
QUESTIONS BY MS. COOK:
Q. But you can't cite to me any of that data, right?
A. I have not done an analysis to

Page 107

pull it out, but it's possible it's there, so...
Q. And you know I'm just here today to try to find out the opinions that you actually have, not ones that you could have if you wanted, right?
A. Well, sometimes -- no, sometimes I get asked questions at depositions where there's something that I actually am aware of that I didn't focus on and I can answer it.
I'm just saying to you for this one, my focus was not on trying to determine what the quantitative differences were between the obese population of women versus the nonobese.
But what I am aware of with the significant variability, I would expect there to be overlap between those two things as well.
Q. Okay. So let's switch topics, talk about IIH, or PTC as you call it.
Have you ever studied PTC before being hired in this litigation?
A. If -- what do you mean by

Page 108

study? Do you mean in a laboratory or read things about it in the literature, or what are you referring to?
Q. Any of that.
A. So I've not studied it in the laboratory. There's no animal model that I know of that would allow me to do that.
And I have read literature on pseudotumor cerebri before in the context of drugs, but it's never been a focus of my work.
Q. When you say you have read literature on pseudotumor cerebri before being hired in this litigation, what literature did you read?
A. I read some of the basic literature on drug-induced pseudotumor cerebri. In other words, it has come up before as a question to me in my work as far as is it something that has been linked to drug exposure, but not to any particular drug or any particular analysis that I've drafted a report, or it's not been a litigation case I've worked on, for example.
Q. What drug did you look to see

Page 109

if PTC has been associated with?
MS. NATALE: Objection. Form.
THE WITNESS: I said no specific drug. In other words, I have been asked before to look at issues generally related to -- in the context of drug-induced injuries, what types are out there. So I am certainly aware of the fact that there is literature that links PTC with drugs. In other words, there's drugs that have been linked to it.
There's a couple papers where we talk about that as a relationship, but I've not done a focused analysis of it, and I've not written any articles or written an expert report where PTC was the end point of concern, for example, for my opinions -- opinions that I've expressed.
QUESTIONS BY MS. COOK:
Q. When, before being hired in this litigation, did you look into literature on PTC?

A. Gosh. I don't recall the specific context other than it is -- I had in my files at home a couple of review articles on PTC, so that's all I -- and so that's all I can tell you. I actually went and looked -- did a literature search in this case, and there were a couple of things that were in my files.

Q. What were they?

A. Which articles? Let me pull my reference list out and see if I can tell you which ones they were or if I cite them, actually.

Q. Well, without reading through your list, you can't state them off the top of your head, I guess is my only question. I don't want to take the time to go through it.

MS. NATALE: Objection. Form.

THE WITNESS: No, I'd have to -- I'm sorry.

MS. NATALE: It's okay. And if you'd like to look through it, you may.

THE WITNESS: Without looking, I can't answer that.



QUESTIONS BY MS. COOK:

Q. Okay. You have never diagnosed a patient with IIH, correct?

A. No, because I'm not a doctor, so I don't diagnose and treat patients.

Q. So you're not planning to give an opinion about whether any given individual actually had PTC, correct?

A. No. That's -- to me that would be either a differential diagnosis or a case-specific opinion or because I'm a medical doctor and I do that in my practice. And I'm not a medical doctor, and I don't do differential diagnosis, so, no, I don't plan on doing that.

Q. Have you ever published anything on PTC?

A. No, I have not.

Q. Have you ever met or spoken to anyone who has PTC?

A. I don't know. I don't recall -- I don't believe I have, but I can't answer that.

Q. And obviously you have never treated a patient with PTC, correct?



A. That's correct, and I do not treat patients. I'm not a medical doctor.

Q. So you wouldn't be able to look at a particular patient's medical records and determine if a particular treatment was effective or not, right?

MS. NATALE: Objection. Form.

THE WITNESS: Well, I don't do that because I'm not a -- I'm not a medical doctor. That is not something I do in my work.

QUESTIONS BY MS. COOK:

Q. Do you know any doctors who treat PTC?

A. I am sure that some of the neurologists that I have crossed paths with in the past probably do, but I've never had any conversations with them or had any discussions with anybody about it.

Q. Do you agree that PTC is a disease of unknown etiology?

MS. NATALE: Objection. Form.

THE WITNESS: So what do you mean by "unknown etiology"?



QUESTIONS BY MS. COOK:

Q. All right. You certainly have seen that phrase in the literature, correct?

A. With regards to PTC, you'll need to point me to what you're pointing to.

The reason I say that is there is description in the literature of drugs that have been linked to specific cases of PTC.

(Plunkett Exhibit 7 marked for identification.)

QUESTIONS BY MS. COOK:

Q. All right. Well, I handed you Exhibit 7 which is the Andrews publication that you rely on, right?

A. It's one on my list, yes.

Q. And this one in the very beginning says, "Idiopathic intracranial hypertension, IIH, also known as primary pseudotumor cerebri syndrome, PTCS, is a condition of unknown etiology which affects primarily overweight, reproductive-aged women and causes increased intracranial pressure."

Anything in that sentence that you disagree with that?

Page 114

A. I haven't formed an opinion that I agree or disagree with any particular sentence in this paper, so, no, I have not.
Q. Well, what about the statement that "IIH, also known as PTCS, is a condition of unknown etiology"?
A. Well, I don't disagree with -- I never disagree with any particular authors' statements. That's very atypical for me. But I would tell you that there certainly are papers that describe individual cases where the doctors in that case report have linked what I call the etiology, or the cause of, in that patient of PTC as being a specific drug.
But generally, PTC, we don't understand the detailed molecular mechanisms that lead to it in every individual, that is true.
Q. And certainly I could -- well, actually, let's look back at Exhibit 3, which is the Ball publication that you also rely on.
And in the intro paragraph here it says, "That first described more than 100 years ago, the cause of the disorder

Page 115

remains unknown. Despite a multitude of proposed links, the etiology has never been established," right?
Do you see that?
A. I'm looking for that last part of your sentence. I see the first part about despite --
Q. It's in the abstract.
A. Oh, I was looking in the introduction, I'm sorry. In the abstract.
Q. Yeah.
"Despite a multitude of proposed links, the etiology has never been established."
Do you see that?
A. Yes, I see that.
Q. And this is the paper that you pointed to that has the panel of medication reportedly associated with intracranial hypertension, right?
A. Yes.
Q. Would you agree that the consensus in the medical literature is that PTC is a disease of unknown etiology?
MS. NATALE: Objection. Form.

Page 116

THE WITNESS: I haven't formed that opinion.
QUESTIONS BY MS. COOK:
Q. Okay. And you agree that obesity and excess weight and recent weight gain are well-established, significant risk factors for PTC, right?
A. I certainly agree they are commonly described risk factors, yes.
Q. Did you research the degree to which the risk of PTC increases with BMI?
A. Did I do an independent analysis just of that risk factor?
Q. Yes.
A. No, I did not. I certainly, though, am aware, and I have some papers that talk about that in my reliance list.
Q. And the Andrews paper that we marked talks about that, right?
A. Yes, and this is one of the papers that I -- that I would say talks about it, yes.
Q. And the Table 2 here has a list of epidemiologic studies on IIH and obesity.
Do you see that?

Page 117

A. Yeah, there are.
Q. And the incidence of IIH in those papers is significantly higher than the general population, right, as reported in this table?
A. Yes. As they report it, they're showing significant differences, yes.
Q. Do you know whether you reviewed all these studies listed here?
A. No. I'm sure I did not because, again, I didn't try to do an independent analysis of just obesity.
Q. And you also are aware that women of childbearing age are at an increased risk of PTC, right?
MS. NATALE: Objection. Form.
THE WITNESS: Women -- premenopausal women, yes, that is true. If that's what you mean by women of -- I often see it described that way, premenopausal.
QUESTIONS BY MS. COOK:
Q. Page 28 of your report.
The very top, it's a continuation from the previous page. The

sentence is, "In the current case, the available scientific studies address this issue, for example, when they are describing confounding factors in the epidemiological investigations such as obesity, female gender, et cetera."

Do you see that?

A. Yes.

Q. Would you agree that obesity, female gender and age are potential confounders, or confounding factors, to consider when assessing the risk of PTC with Mirena?

MS. NATALE: Objection. Form.

THE WITNESS: Certainly within the epidemiological literature, I would agree those are ones that are typically considered.

QUESTIONS BY MS. COOK:

Q. Given that women of childbearing age are at increased risk of PTC compared to the general population, would you agree that the population of people at increased risk of PTC overlaps with the population that uses Mirena?



MS. NATALE: Objection. Form.

THE WITNESS: If what you're asking me is whether or not some of the characteristics or factors that have been described as confounding are the same within the population that are also exposed to Mirena, that is true, because Mirena is used here by women.

QUESTIONS BY MS. COOK:

Q. So would you agree that you would expect at least some women using Mirena to have PTC just by coincidence?

MS. NATALE: Objection. Form.

THE WITNESS: It's possible. That's why you need to do -- that's why you need in these studies to look at, as the investigators describe, characteristics. So, yes, you need to look at that as well.

QUESTIONS BY MS. COOK:

Q. And when you say "characteristics" you mean...

A. You need to define your population. So if you're -- Mirena users are



women, so obviously when you're looking at the -- your epidemiological investigation, you're comparing the women -- background to women with users and nonusers. So that is something that is being controlled for within the population.

But it's certainly something that you would -- so, for example, if you're going to look at exposed and nonexposed, and unexposed included women and men and your exposed were only women, that would be an inappropriate comparison because obviously you wouldn't want your background rate to be a population that's not being studied in your exposed -- in your exposed group.

Q. Would you also agree that you would want not only to look at women who are exposed and unexposed but also women of reproductive age who are unexposed and exposed?

A. Well, Mirena is used -- has been used in postmenopausal situations as well. So certainly if what you're interested in is the use of the Mirena as a contraceptive device, yes, you would be



looking at women of childbearing age.

And that is -- from my understanding of reading the literature, that's the overwhelming majority of the people that use Mirena, are using it for contraception.

Q. Well, regardless of use of Mirena, knowing that women of childbearing age or premenopausal age are at the greatest risk of IIH, you would want to look at Mirena users and nonusers in the same age group, right?

A. I don't disagree with that -- I disagree with that statement.

You're saying they are at the greatest risk? I don't think that that's been proven, that they are at the greatest risk. It is a risk factor, so --

Q. Greater risk.

A. Oh, I thought you said greatest.

Q. I did that say, but let me rephrase the question.

Given that women of childbearing age are at an increased risk of

Page 122

IIH compared to women of all ages, you would want to compare a population of Mirena users and non-Mirena users who are both within the childbearing age group, correct?
A. I would say that that would be an appropriate comparison. It isn't that you couldn't do it otherwise, but you certainly wouldn't consider that as a confounding factor, yes.
Q. And similarly you would want to control the BMI in the exposed group and the nonexposed group, correct?
A. Depends. Depends upon what your population -- whether or not you had that information in your population to be able to control for that.
Q. And if you're not able to, it would be a confounder, right?
A. Yes, and that's what I'm saying. There are -- there is literature that describes populations, generally epidemiology, where they don't have everything that they need to have.
And so, again, that's part of the consideration you take when you're doing

Page 123

your weight of the evidence for the epidemiological literature.
Q. So taking it out of the epidemiological study discussion and looking just at a single adverse event report, just because there's a report of a woman who uses Mirena and has IIH, that does not mean that Mirena caused her IIH, correct?
MS. NATALE: Objection. Form.
THE WITNESS: Depends upon what differential diagnosis is done by the doctor to investigate each of those things.
Certainly in -- generally, case reports, it's difficult to use a case report by itself as the only evidence for causation.
However, in case reports the doctor can make a decision on the most likely cause. And that's what they typically do, even though they understand that there are other risk factors.
And that's because the drugs -- it's important to understand that that

Page 124

risk being added by the drug is being added already on to a susceptible population, so that's another kind of issue that you need to consider.
You have independent risk factors, and if those independent risk factors are -- more than one is present within an individual, that's one way to understand why not everybody who takes Mirena or everybody who is exposed to Mirena experiences PTC.
QUESTIONS BY MS. COOK:
Q. In the differential diagnosis you would be looking for in an adverse event report, that's not something that you would do, correct?
A. I don't do differential diagnosis, no. I do evaluate case reports as part of weight of the evidence, and I look for whether or not in that case report the individual reporter or the author of the paper has discussed confounding and other alternative factors that are well-known. That weighs in on the quality of the data as

Page 125

you use it within the weight of the evidence.
Q. So you would look to what the investigator reported about their differential diagnosis, right --
MS. NATALE: Objection. Form.
QUESTIONS BY MS. COOK:
Q. -- when looking at an adverse event report?
A. That's part of it, yes, and then what is missing as well as what's there.
Q. And you didn't do that here, though. You don't have any discussion about specific individual adverse event reports with Mirena and what their investigators concluded there, right?
MS. NATALE: Objection. Form.
THE WITNESS: So I have not done a review of the adverse event reporting system of the company, and I have not done a review of the adverse reporting system within FDA other than having reviewed and considered the article by Wysowski and Green, I think, which was a Norplant paper.
So I certainly do do that.

Again, when I do a causation analysis and I consider case reports, within those reports I do look at what is described by the doctor. And I have -- I certainly will form opinions that this one is poorly reported and carries less weight within my -- within my evaluation.
QUESTIONS BY MS. COOK:
Q. But I'm just looking at what you did here, and what you did here, you don't talk about specific adverse event reports or case reports with Mirena and IIH and what the doctor reported in those, right?
MS. NATALE: Objection. Form.
THE WITNESS: Let me look at my paragraph to say that I don't. Hold on.
I'm looking under -- I'm going to look at page 26 and 27 under Strength Association.
No, these are -- these are not individual case reports, that is true.
But there are some individual case reports that I describe later in



here, but certainly under this paragraph I did not.
QUESTIONS BY MS. COOK:
Q. The individual case reports -- well, the only ones I saw that you actually talk about specific reports is on page 28 when you refer to three reports of PTC in the clinical trials.
A. Yes, that's true.
Q. And I didn't see any other reference to any other specific adverse event report.
Is that accurate?
A. Hold on.
Q. With Mirena and IIH or PTC.
A. I think that is probably true, but hold on. Let me just check the title of the article.
Q. Which article are you looking for?
A. That is true.
Alder. That is true.
Q. Alder is Norplant?
A. Yes, that's true.
So my answer to the question



is, yes, that is true. I'm sorry.
Q. Okay. And I understand you haven't diagnosed a patient with IIH and you're not a doctor, but you are aware that there are specific diagnostic criteria that must be met to confirm that a patient has PTC, correct?
MS. NATALE: Objection. Form.
THE WITNESS: Yes, I'm aware that doctors use a set of diagnostic criteria, yes.
QUESTIONS BY MS. COOK:
Q. And not every patient who has one of the symptoms of IIH or PTC is actually diagnosed with it, right?
MS. NATALE: Objection. Form.
THE WITNESS: Well, I haven't done an evaluation of that, but I assume that's correct because that would be consistent with my experience.
QUESTIONS BY MS. COOK:
Q. And you don't intend to opine that any individual patient met the diagnostic criteria for PTC, right?



MS. NATALE: Objection. Form.
THE WITNESS: Are you asking about any individual patient that -- in the litigation? I'm not case-specific, so that's true I will not be doing that.
QUESTIONS BY MS. COOK:
Q. Any individual patient at all, in an adverse event report or anything else --
MS. NATALE: Same objection.
QUESTIONS BY MS. COOK:
Q. -- you're not going to opine that they met the diagnostic criteria for PTC or not, correct?
A. I would agree. For example, under these case reports I'm talking about on page 28, I have not compared what was there to the diagnostic criteria, that is true.
Q. And you're referring now to the clinical trial cases?
A. Yes.
Q. And you haven't given any opinions in your report about the relationship between other drugs like

antibiotics or lithium or other drugs that have been associated with PTC, whether those cause PTC, right, other than LNG?

MS. NATALE: Objection. Form.

THE WITNESS: So I have not done independent evaluations of those, that is true.

QUESTIONS BY MS. COOK:

Q. So page 28, are you still there?

A. Yeah.

Q. You talk about temporality, and you say, "The question asked for each study is confirming that exposure preceded the measured response."

Does that mean confirming that the exposure to Mirena preceded IIH or PTC?

A. That's what I'm -- that's what I would be talking about here, yeah, because I'm talking about a causation analysis for that as an end point, yes.

But certainly in some of these -- some of the papers -- well, for example, I say here that there were adverse events consistent with signs and symptoms



such as papilledema, right?

So in that one, in that case report that I'm looking at, I'm talking about whether or not the temporality related to those signs and symptoms.

Q. But you're not saying that that person did or did not actually have PTC, right?

MS. NATALE: Objection. Form.

THE WITNESS: I haven't diagnosed the patients, no, I have not done that.

QUESTIONS BY MS. COOK:

Q. Okay. Would you agree that if a patient is -- develops symptoms of PTC or is diagnosed with PTC before ever using Mirena, that Mirena is not responsible for that PTC?

MS. NATALE: Objection. Form.

THE WITNESS: I wouldn't -- no, I wouldn't make that conclusion -- draw that conclusion because PTC can resolve in a patient. And so it's possible that an additional bout or diagnosis of PTC could be related to



exposure to Mirena even in someone who have might experienced maybe with a different drug or under a different situation earlier.

So I wouldn't rule it out. I haven't talked about that in my report, though.

QUESTIONS BY MS. COOK:

Q. Do you have any support for that?

MS. NATALE: Objection. Form.

THE WITNESS: For the fact that people could be -- could experience it in -- could experience and then see it with Mirena later?

QUESTIONS BY MS. COOK:

Q. Yes.

A. My support for that would be my basic understanding of the biology of the drug and how it works. I mean, certainly -- and understanding the disease. So PTC can indeed withdraw -- especially drug-induced. It can resolve once it's removed. It may not, but it can resolve. And so if it resolves, there's no longer any signs or



symptoms of it. And then someone is exposed later, there could be a recurrence of the signs and symptoms of PTC. That's just a basic biology of how drugs can work.

Q. And when I say do you have any support, is there an article that you can point to me right now?

A. I'd have to look. I don't know whether any of the articles I have reviewed describe that.

Q. And you say that the -- your understanding is that the signs and symptoms of PTC can resolve and recur later, and for that reason you wouldn't be able to know if PTC has actually been resolved for good because of taking away Mirena, for example, right?

MS. NATALE: Objection. Form.

QUESTIONS BY MS. COOK:

Q. You'd have to look and see what happened later?

A. If you're asking me -- I think what you're asking me is whether or not once the drug is removed, that you're not 100 percent sure that all symptoms have

Page 134

resolved. I think that's a question for the physician to answer for each patient based on their monitoring of the condition.
But certainly there are reports in the literature that talk about PTC and the disease generally that talk about resolution after removal of certain agents, yes. Or certain conditions.
Q. So whether that's actually a true resolution of PTC, that's something you defer to the physician for that patient?
A. Well, for that patient, absolutely, yes. You would have to have -- the physician is going to have to make a diagnosis at each point in time.
Q. Are you aware of any test or marker that identifies what caused PTC in any given patient?
MS. NATALE: Objection. Form.
THE WITNESS: No. If you're asking for a biological signature, no, I'm not aware of that.
QUESTIONS BY MS. COOK:
Q. Have you researched the effectiveness of different treatments for PTC

Page 135

like lumbar punctures or Diamox?
A. No, again, that's beyond the scope of what I was asked to do in this case.
Q. So if a patient's symptoms resolved while on a specific treatment, you're not giving an opinion about whether that resolved because of the treatment or because of something else, right?
MS. NATALE: Objection. Form.
THE WITNESS: I have not formed opinions in that area.
QUESTIONS BY MS. COOK:
Q. On page 27 of your report, at the top you say, "A review of the relevant published scientific literature shows that exposure to LNG from LNG intrauterine drug products has been associated with an increased risk of intracranial hypertension."
A. Yes, i.e., PTC in women, yes.
Q. And then you reference Etminan 2015?
A. Yes.
Q. Rai 2015?
A. Yes.
Q. And Valenzuela 2017?

Page 136

A. Yes.
Q. Now, you realize that Rai is an unpublished abstract from Valenzuela, right?
MS. NATALE: Objection. Form.
THE WITNESS: So it's not a full-length paper, that is true. It is an abstract, that is true. But it was found -- I believe I found it on the Internet, so...
QUESTIONS BY MS. COOK:
Q. Are you aware that that is the same study, or one of the studies, that's actually published in Valenzuela 2017?
MS. NATALE: Objection.
THE WITNESS: Yes, that I'm aware of. If you're asking me is that data then that shows up in the full -- the full publication later is Valenzuela, yes.
QUESTIONS BY MS. COOK:
Q. Okay. So when you say three publications here, it's really two: Etminan and Valenzuela, right?
MS. NATALE: Objection. Form.

Page 137

QUESTIONS BY MS. COOK:
Q. Or two studies?
A. There's two studies that -- well, there's two populations that are being studied here, two different people reporting an analysis, however. And the Rai paper is an abstract of the population that then ends up being reported in a full publication by Valenzuela, if that's what you're asking me.
Q. Now, you say that the literature has shown that LNG intrauterine drug products have been associated with an increased risk. You agree that neither the Etminan publication nor the Valenzuela/Rai study concluded that Mirena caused IIH?
MS. NATALE: Objection. Form.
THE WITNESS: If what you're asking me is do they make a final statement about causation, that's true, they don't. Because, again, most epidemiologists use an individual study specifically as evidence of association, and a causation analysis involves more than that.

Page 138

QUESTIONS BY MS. COOK:
Q. You yourself don't base your causation opinions on one epi study, right?
MS. NATALE: Objection. Form.
THE WITNESS: In this case I have not, and I can only think of one other instance I've ever worked in where it's only been one study that's been available.
QUESTIONS BY MS. COOK:
Q. So you mention the Etminan study here, and the only thing that you report there is the 1.85 number. That's from Etminan, right?
A. Yes, I'm giving the range of the risk ratios or the odds ratios, relative risks, that are reported in the literature, yes.
Q. And 7.7, that one's from Valenzuela?
A. Yes.
Q. Are you relying on the 1.85 odds ratio from Etminan to support your causation opinion?
MS. NATALE: Objection. Form

Page 139

and characterization.
THE WITNESS: So not by itself but certainly as my weight of the evidence, yes. That's why in here I don't just focus on one paper. I'm telling you what evidence I weighed as part of my weight of the evidence.
QUESTIONS BY MS. COOK:
Q. Is it your opinion that the 1.85 reporting odds ratio in the Etminan article is reliable evidence of a causal link between Mirena and PTC?
MS. NATALE: Same objection.
THE WITNESS: So it's a reliable piece of evidence to be used within the weight of the evidence for causation, yes.
QUESTIONS BY MS. COOK:
Q. So that is a reporting odds ratio from an analysis that Etminan did from the FDA adverse event reporting database, right?
A. So I need to pull it out again. I think that's true, but I need -- it's been a while since I've looked at it.

Page 140

Q. All right. Let me mark it for you.
(Plunkett Exhibit 8 marked for identification.)
QUESTIONS BY MS. COOK:
Q. Exhibit 8 is the Etminan 2015 publication that you rely on, correct?
A. Yes, it is.
Q. And the number that you cite in your report is the -- if you look at Table 1 is probably the easiest. It's the Bayesian-reported odds ratio looking at a disproportionality analysis in the FDA FAERS database, correct?
A. Yeah, that's true. There's also -- that's what I thought I remembered. He also has data in here from a cohort study as well, from a different database.
Q. And are you relying on the cohort study from Etminan?
MS. NATALE: Objection. Form.
THE WITNESS: I'm relying on the paper, so if I relied on this paper which would include the information that is -- all of the

Page 141

information contained within this paper.
Certainly that number that you pulled out that I listed comes from that table, that is true.
QUESTIONS BY MS. COOK:
Q. Okay.
A. Which is the FAERS -- which would be the FAERS data.
Q. And if you look at the results on page 111, bottom right-hand corner, do you see the sentence, "There was no statistically significant difference between the risk of ICH for EE norgestimate" --
Which is a birth control pill containing a non-LNG progestin, right?
MS. NATALE: Objection. Form.
THE WITNESS: Yes, it has progestin but it's not LNG, that's true.
QUESTIONS BY MS. COOK:
Q. -- "compared with Mirena users and a trend toward a lower risk of ICH between another birth control pill, norethindrone use, compared with users of

Mirena."
Do you see that?
A. Yes.
Q. So in other words, what Etminan found in his cohort study was that the risk of intracranial hypertension with Mirena was no different than two different birth control pills, right?
A. Well, he says there was a trend towards lower risk but you're right, he didn't report statistically significant findings, and he explains it later about the size of the study. And I believe that's a limitation of that study as far as the number of events.
Q. The trend toward the lower risk was with Mirena. Mirena had the lower risk, right?
A. There was a difference --
MS. NATALE: Objection. Form. Characterization.
THE WITNESS: No, I think it was -- well, it's not what this sentence says, but let me look at his data.



No. His sentence says there was a trend to a lower risk when you're comparing the use of the ethindrone used compared with Mirena.
And if we look at the data --
QUESTIONS BY MS. COOK:
Q. You can look at the results --
A. -- he doesn't see a statistically significant difference, that is true.
Q. If you look at the results in the abstract, EE norgestimate compared with Mirena was 1.29, which means that the birth control pill was increased, right, not Mirena?
MS. NATALE: Objection. Form. Characterization.
THE WITNESS: Well, for the norgestimate that's true, but not for the norethindrone that's true, yes.
QUESTIONS BY MS. COOK:
Q. What Dr. Etminan concluded was that there was no difference between the birth control -- well, look at the conclusion.



"We also found" -- in the abstract. "We also found a similar risk of ICH with Mirena compared with the oral contraceptive EE norgestimate. The higher risk of ICH with EE norethindrone, another oral contraceptive, should be further investigated."
A. Yes, I see that.
Q. Certainly the cohort study in Etminan does not indicate a higher -- an increased risk with Mirena, correct?
A. The data does not support that by itself, but, again, I didn't use only one number from the study. I used the study as a whole.
Q. And the number that you used is the number from the disproportionality analysis in the FDA FAERS database, correct?
A. No, I use all of these numbers as a whole. I report in the sentence absolutely the 1.85 is coming from that, as you described.
Q. And then in your expert report you note that Dr. Etminan reported that an age adjustment reduced the risk such that the



results were no longer statistically significant, right?
A. Yes.
Q. So in other words, after restricting to childbearing age, there was no difference with Mirena and other drugs in the FDA database, right?
MS. NATALE: Objection. Form.
THE WITNESS: I don't know if he called it childbearing age, but I agree when he accounted for use of the product by older women -- some of -- women in the older range versus the younger range, that is true.
QUESTIONS BY MS. COOK:
Q. Do you want to see it?
A. Well, I just don't recall him using just restricted by childbearing years. That's what I don't recall. But there was an age range.
(Plunkett Exhibit 9 marked for identification.)
QUESTIONS BY MS. COOK:
Q. Show you Exhibit 9 which is a letter to the editor from Etminan that you

reference in your report, right?
A. Yes, this is in my report.
Q. And the bottom right column says, "Based on the age-restricted analysis, a signal is not detected with Mirena with respect to BIH," which is benign intracranial hypertension, "when childbearing age is accounted for," correct?
A. That's what is stated in that sentence, yes.
Q. And do you disagree with that representation of the finding of the Etminan results there?
A. Again, I haven't formed an opinion one way or the other on that statement, but I have stated what I believe the study does show, which is in my report.
Q. Are you aware that Dr. Etminan signed an affidavit after publishing his article?
MS. NATALE: Objection. Form. Foundation.
THE WITNESS: No, I'm not -- I have not seen that.



QUESTIONS BY MS. COOK:
Q. Did you know that he was an expert witness hired by the plaintiffs in this litigation?
MS. NATALE: Objection to the form and also to the use of "in this litigation" and also to the use of "plaintiffs."
THE WITNESS: I am not aware that he is working in the litigation at this time.
QUESTIONS BY MS. COOK:
Q. Do you know if he ever was?
MS. NATALE: Same objection.
THE WITNESS: I have not seen the report, and I have not seen this either before.
(Plunkett Exhibit 10 marked for identification.)
QUESTIONS BY MS. COOK:
Q. So Exhibit 10 is an affidavit of Dr. Etminan, and I know you haven't seen it before, but if you look at the last page, it's signed and sworn in December of 2016.
Do you see that?



A. Yes.
Q. And so --
A. Could I read it real quick if you're going to ask me questions about it? Because I've not seen this before.
Q. Go ahead.
A. Just take a second.
Okay. Go ahead.
Q. So paragraph 11 of the affidavit Dr. Etminan states, "Based on the above, as a lead author of this article, I acknowledge that neither of the analyses in the article provide evidence that Mirena use increases the risk for intracranial hypertension."
Do you disagree with that statement?
MS. NATALE: Objection. Form.
THE WITNESS: Well, that's his opinion, so I can't agree with -- disagree with his opinion.
I do believe that there is data within this that is informative to weight of the evidence.



QUESTIONS BY MS. COOK:
Q. And that is the 1.85 reporting odds ratio that you cite in your report?
A. Well, the entire article. I certainly -- I certainly -- in that sentence, I'm giving you the range that's been reported, but certainly there's more in that article than just one number.
Q. Well, I'm focusing on what you said in your report, and that's all you said in your report, right?
MS. NATALE: Objection. Form.
THE WITNESS: No, I say more than that. I talk about his letter to the editor, so I do talk about more than that.
But I agree when I -- in that sentence, if you're going to limit it to that one sentence, I say that there are literature showing that exposure to LNG from these intrauterine products has been associated with an increased risk, and that's true, based upon consideration of all three studies.

Page 150

And then I give the increased
risk range reported, 1.85 to 7.7, and
then I talk about the letter to the
editor as well.
QUESTIONS BY MS. COOK:
Q. Okay. So just so I get a straight answer, you disagree with Dr. Etminan that neither of the analyses in the article provide evidence that Mirena use increases the risk for intracranial hypertension?
MS. NATALE: Objection. Form.
THE WITNESS: I don't think that's exactly what I said. I disagree that there is no evidence that informs on the weight of the evidence. That's what I believe the paper can be used to do. It informs on the weight of the evidence.
It certainly, however, by itself cannot be used to be the sole piece of evidence to prove causation, absolutely. You can't do that, and you would not do that.

Page 151

QUESTIONS BY MS. COOK:
Q. Paragraph 16, Dr. Etminan writes, "When that analysis is properly limited to reproductive-aged females in unique cases, the resulting reporting odds ratio for Mirena is 0.91. This result is not statistically significant. The point estimate is below 1, and it does not support the claim that Mirena use increases the risk for IIH."
Do you see that?
A. Yes, I do.
Q. Do you agree with that statement?
A. I would agree that the .91 is not statistically significant, and certainly it by itself doesn't prove an increased risk. But again, it can be used -- you can use this data, all of this data, even the corrected number, as part of your weight of the evidence.
Q. And did you see in paragraph 12 that when Dr. Etminan submitted the article that you rely on, the 2015 publication, that he was being paid by lawyers suing Bayer in

Page 152

cases alleging that Mirena caused users to develop IIH?
MS. NATALE: Objection. Form.
THE WITNESS: I do see that, yes.
QUESTIONS BY MS. COOK:
Q. And he did not disclose that relationship?
MS. NATALE: Objection. Form.
THE WITNESS: Well, I don't know. I wasn't there, but he states that he did not.
QUESTIONS BY MS. COOK:
Q. So now having seen the Etminan affidavit, you're still relying on Etminan 2015 as support for your causation opinion, correct?
MS. NATALE: Objection. Form. It mischaracterizes.
THE WITNESS: I am relying on that paper as part of the weight of the evidence. Certainly it by itself is not sufficient to prove causation.
QUESTIONS BY MS. COOK:
Q. Let's talk about the Valenzuela

Page 153

publication where you quote the 7.7 odds ratio on page 27, correct?
A. Yes.
Q. Now that is an unadjusted odds ratio, right?
A. I'll have to pull it out.
Q. Here, I'll mark it for you.
(Plunkett Exhibit 11 marked for identification.)
QUESTIONS BY MS. COOK:
Q. Is Exhibit 11 the Valenzuela article that you rely on?
A. Yes.
Q. And you were going to tell me whether you think that the 7.7 reporting odds ratio, which I'll give you a hint is on page 194 in the right-hand column, is unadjusted or not.
Do you see where it says "The unadjusted odds ratio indicated that exposure to LNG IUS was associated with an increased odds of PTC diagnosis of 7.7"?
A. Yes, I do see that. And that's true, that's the highest end of the range that I found within these papers.

Page 154

So I found different ranges of relative -- or of risk reported, and that's what the 7.7 is. And there's other numbers in here in between that, some of which are adjusted.
Q. So the fact that the 7.7 is an unadjusted odds ratio, that means it hasn't taken into account factors that may influence the risk like obesity, right?
MS. NATALE: Objection. Form.
THE WITNESS: Well, that's typically what it's defined as, yes. It's an analysis that has not -- is looking -- looking at the raw data themselves. And then you go back, most epidemiologists go back, and look at what I called confounders in my report, and those are things that you may adjust for if you have data to be able to do that.
QUESTIONS BY MS. COOK:
Q. And you haven't formed an opinion about whether it's scientifically appropriate to conclude that there is a cause and effect relationship between an exposure

Page 155

and a disease based on a crude or unadjusted odds ratio, right?
MS. NATALE: Objection. Form.
THE WITNESS: I have before stated the opinion that you would not rely on one number like that by itself for cause and effect. You absolutely need to do a weight of the evidence.
And there's more than epidemiology that goes into it, which I've also tried to point out to you in my report.
QUESTIONS BY MS. COOK:
Q. And if you look on page 196 of the Valenzuela publication, in the middle of the page, left-hand column --
A. I'm sorry, 196?
Q. 196.
Left-hand column, middle of the page, do you see where it says, "When interpreting the findings presented here, it is also important to consider that the risk analysis does not account for potential confounders"?
A. Yes, I see that.

Page 156

Q. And you agree with that?
MS. NATALE: Objection. Form.
THE WITNESS: Certainly it's something you use when you're interpreting or using this paper within the weight of the evidence, yes.
QUESTIONS BY MS. COOK:
Q. And you cannot say what the odds ratio would be if it were adjusted to account for obesity or other potential confounders, correct?
MS. NATALE: Objection. Form.
THE WITNESS: So I haven't done that analysis, but I am aware that that has been done based on my review of another expert's report in this litigation. I believe Dr. Moye has addressed that issue, but I have not done that analysis, no.
QUESTIONS BY MS. COOK:
Q. And you're not relying on Dr. Moye, right?
A. No. I'm just pointing that I'm aware it's been done, but I'm not relying on

Page 157

his opinion, no.
Q. Okay. I said you're not relying on him. You said no. I think we understand each other.
The answer is, no, you're not relying on him, correct?
MS. NATALE: Objection. Form.
THE WITNESS: I'm not -- I did not rely on -- I did not see his report till after I had formed my opinions, so I absolutely am not relying on his report in order to form my opinions.
However, I was answering the question for you to tell you that I am aware that that had been done. I have not done that analysis, though.
QUESTIONS BY MS. COOK:
Q. In the right-hand column of page 196, the paragraph that starts, "Limitations of our study."
A. Yes, I see that.
Q. It says, "It was not possible for the University of Utah group to capture the number of LNG IUS insertions performed

outside of the university system, so we may have underestimated the number of women with LNG IUS."
Do you see that?
A. Yes.
Q. Now, if there was an underestimate of the number of women with LNG IUS insertions, you agree that that would impact the study results, right?
MS. NATALE: Objection. Form.
THE WITNESS: It may not. Depends upon whether or not that -- whether that population that were outside had a similar -- similar result. So you don't know. You'd have to go look at that in order to answer that.
QUESTIONS BY MS. COOK:
Q. If all you changed was the number of women in the control group exposed to Mirena, that would make a difference, right?
MS. NATALE: Objection. Form.
THE WITNESS: It depends -- no, I think it depends upon how many



people you're talking about. It's possible. Absolutely, it's possible. I'm just saying you don't know unless you actually gather -- gather the data, because it could be that group also has events of exposed people that experience the event as well.
So this is unknown data, and you'd need to -- you need to look at it in order to see which way it takes the numbers.
QUESTIONS BY MS. COOK:
Q. You have not provided any opinions about whether -- what the reliable estimate of Mirena users in Utah is, correct?
A. No, I have not done that analysis.
Q. And similarly with Denmark, you have not provided any opinions about what would be a reliable estimate of Mirena users in the control group there either, correct?
MS. NATALE: Objection. Form.
THE WITNESS: Well, they actually have a number for their control group that they considered,



but are you asking me in the entire Danish population? No, I don't think I have done that analysis. I mean, they certainly have a number in their group that they look at.
QUESTIONS BY MS. COOK:
Q. The period 2008 to 2014, you haven't given an opinion about what percentage of the Danish women within the age group of 18 to 55 were using LNG IUS, correct?
MS. NATALE: Objection. Form.
THE WITNESS: Outside of what they report, no, I have not done an analysis.
QUESTIONS BY MS. COOK:
Q. Page 195.
A. Sorry.
Q. The right-hand side, middle paragraph, the last sentence says, "The analysis was also limited by the lack of temporal data to confirm that exposure to LNG IUS occurred prior to PTC symptom onset or diagnosis."
You see that?



A. Yes, I see that.
Q. And would you agree that the study was not able to confirm whether or not a patient was diagnosed with PTC before or after being exposed to Mirena?
MS. NATALE: Objection. Form.
THE WITNESS: I would point you to their materials and methods where they actually do attempt to control for that by looking at women who had a history of birth control for a time of three months preceding the onset.
However, I would agree that there can be -- that is a limitation of any of these retrospective analyses, that there could be things that are missed and there could be things that may have -- for example, just because somebody took it for three months before, someone may not have been diagnosed yet and they might have had things that occur.
But that's any epidemiological investigation, which is why it's important to look at more than just a

Page 162

single number. You got to put all of this, the way the study is designed, into a weight of the evidence considering more than just the epidemiology.
QUESTIONS BY MS. COOK:
Q. You're not going to disagree that this is a limitation of the study as stated by the authors on page 195, correct?
MS. NATALE: Objection. Form. Asked and answered.
THE WITNESS: No, but what I'm pointing to -- to the fact is it's not that there was no attempt to control for temporality. And they did, indeed, attempt to do that by putting in a inclusion criteria that looked at the issue of when was the birth control prescription obtained.
QUESTIONS BY MS. COOK:
Q. Page 196, left-hand column starts, "There are two possible explanations for the association demonstrated in our study."
A. Yes.

Page 163

Q. And one possible explanation is that LNG does cause increased intracranial pressure, and another explanation is that LNG does not cause an increase in intracranial pressure.
Did you consider the possibility of the other explanation here, that LNG does not cause increased intracranial pressure?
MS. NATALE: Objection. Form.
THE WITNESS: So certainly when I started my analysis, I looked -- I was looking for evidence that may teach one way or the other. I had not formed an opinion one way or the other. So I did look at both possibilities when I looked at the data in the literature.
I did not -- I didn't perform this study, so obviously I couldn't have done -- I didn't do the study in a different way, but certainly I'm aware.
And what's good about the study is he -- is -- epidemiological

Page 164

literature that discusses the limitations and the confounding is really important. So you need to look at what does the investigator do; does he consider where the strengths and weaknesses of the study may be?
And that's what's important to look for when you're relying upon an epidemiological piece of literature, whether or not the individuals conducting the study are aware of the effects that such limitations or strengths and weaknesses of a retrospective study can have, and that is one common one.
QUESTIONS BY MS. COOK:
Q. Do you agree with the Valenzuela authors that there are two possible explanations for the association demonstrated in their study, one of which being that LNG does not cause increased intracranial pressure?
MS. NATALE: Objection. Form.
THE WITNESS: I agree that that's the alternative -- there's two

Page 165

hypotheses. It's either the two things are related or the two things are not. So that is absolutely an outcome. The study can show one or it can show the other.
QUESTIONS BY MS. COOK:
Q. The abstract, the last sentence in the abstract says, "Our investigation suggests that women with an LNG IUS may have an increased risk of developing PTC but does not suggest an LNG IUS can cause PTC."
Do you agree that the Valenzuela study does not suggest that an LNG IUS can cause PTC?
MS. NATALE: Objection. Form.
THE WITNESS: So that's not how I would state it. What I would say instead, it is true that this one study does not prove cause and effect, but this study does have evidence as part of -- or part of a -- that can be used as part of the weight of the evidence that's informative on that relationship.
So I believe what he's saying

is what I typically see in epidemiological papers is this study alone can't prove cause and effect. And absolutely, one study alone isn't going to be able to do that.
QUESTIONS BY MS. COOK:
Q. 195 of the study, bottom right-hand corner says, "Previous reports on another LNG contraceptive implant, Norplant, suggested an association with PTC. As in the present report, these previous reports did not imply a causative role for LNG in the pathogenesis of PTC."
Do you agree with the Valenzuela authors that the reports of Norplant and PTC did not imply a causative role for LNG in the pathogenesis of PTC?
MS. NATALE: Objection. Form.
THE WITNESS: So I would answer the same way I just did. What I would state is -- and I believe he -- I don't disagree that -- again, you can't use -- even on Norplant you're not going to use any individual epidemiological study to prove



causation, but what you do is you look at the body of the evidence.
So I would state it a different way, that certainly these studies can form part of the weight of the evidence when you perform a causation analysis, but each study on their own, and particularly the ones on Norplant, if I'm doing Mirena, aren't going to be the end -- the absolute end answer, but they can form part of the weight of the evidence.
QUESTIONS BY MS. COOK:
Q. Would you agree that there's no published literature that reaches the conclusion that Mirena can cause PTC?
MS. NATALE: Objection. Form.
THE WITNESS: I would agree that I don't recall seeing that specific statement in the literature because I don't think anybody has published a weight of the evidence causation analysis as sometimes will occur. I haven't seen that.



QUESTIONS BY MS. COOK:
Q. Do you agree that no regulatory authority in the world has stated a conclusion that Mirena causes PTC?
MS. NATALE: Objection. Form.
THE WITNESS: So I can't answer that for all regulatory authorities in the world, but I haven't seen that statement from FDA, if that's what you're asking me.
QUESTIONS BY MS. COOK:
Q. Are you aware of any scientific or medical organization that has stated a conclusion that Mirena causes PTC?
MS. NATALE: Objection. Form.
THE WITNESS: It's the same answer: I haven't looked throughout all the potential places. I can't recall one, but I also didn't -- I didn't attempt to look across all bodies to determine whether or not they had formed a final causation opinion on PTC and Mirena.
QUESTIONS BY MS. COOK:
Q. Do you agree that it is not



generally accepted in the medical community that Mirena causes PTC?
MS. NATALE: Objection. Form.
THE WITNESS: I haven't done the analysis. Can't answer that.
I can tell you that certainly I'm aware of the fact that there are other experts in this litigation who believe it does.
QUESTIONS BY MS. COOK:
Q. Are you aware of anyone other than paid experts for the plaintiffs in this litigation who has concluded that Mirena causes PTC?
MS. NATALE: Objection. Form.
THE WITNESS: I haven't done that analysis. I'd have to -- have to ask people, and I haven't done that.
QUESTIONS BY MS. COOK:
Q. You're aware that the vast majority of Mirena users who report PTC are obese or overweight or have recent weight gain --
MS. NATALE: Objection. Form.

Page 170

QUESTIONS BY MS. COOK:
Q. -- to the extent there is information available about them?
MS. NATALE: Same objection.
THE WITNESS: I'm not case-specific so I certainly haven't looked at those issues. I can't answer that.
QUESTIONS BY MS. COOK:
Q. Did you look at the mean body mass index of the Mirena users in the Valenzuela study who were reported to have PTC?
A. I'm sure it's there, but I didn't -- I'll have to look back to see.
Q. Did you look to --
MS. NATALE: Objection. And I will just ask that --
MS. COOK: No, I -- my question was did you look, and her answer was no.
MS. NATALE: Sure.
Were you done with your answer? Because she was still --
THE WITNESS: So I think my

Page 171

answer was, I don't recall; I'd have to look. That's my answer.
It is in there. I know it's in there, but I'd have to go back and look.
So do you want me to do that or not?
QUESTIONS BY MS. COOK:
Q. If you think you've looked before, let's look again.
Table 1 has the mean body index for the LNG IUS users who were diagnosed with PTC. It's 35.
Do you see that?
A. Yes. That's what I'm saying. I know that there's tabular data because it was something that he considered in his -- in his tables. I remember him collecting -- looking at that data from the records.
Q. That's obese, right?
A. Yes. Well, yes, by most definitions clinically that would be obese.
MS. NATALE: Objection. Form.
QUESTIONS BY MS. COOK:
Q. Anything over a BMI of 30 is

Page 172

considered obese, correct?
MS. NATALE: Objection. Form.
QUESTIONS BY MS. COOK:
Q. Do you know?
A. So I am aware of the fact that over 29 is considered obese, and I know -- but I know that there is a range of values reported here, so some of the women may not have been, obviously, if it's 35 plus or minus nine.
Q. But you don't know one way or the other, right?
A. Well, no, I know statistically when you have 35 plus or minus nine that the women -- there's women in the population that are below the obesity level. But you're correct, the average mean body mass index of that population was in the obese range.
Q. So can you answer for me whether the vast majority of Mirena users reporting PTC are obese and overweight or have recent weight gain --
MS. NATALE: Objection.
QUESTIONS BY MS. COOK:
Q. -- or is that just something

Page 173

you did not look at?
MS. NATALE: Objection. Form.
THE WITNESS: I did not -- I did not form the opinion that the vast majority, but I would point to the tables because the tables do report the values that were looked at.
QUESTIONS BY MS. COOK:
Q. Did you look to see whether the -- or what percentage of the spontaneous adverse event reports received by Bayer of PTC were obese or overweight or had recent weight gain?
MS. NATALE: Objection. Form and compound.
THE WITNESS: It's possible that was in some of the documents I reviewed, but I don't recall it.
QUESTIONS BY MS. COOK:
Q. Are you aware of any evidence that obese Mirena users develop IIH more frequently than obese women not using Mirena?
MS. NATALE: Objection. Form.
THE WITNESS: I haven't performed that analysis, so I can't

Page 174

answer that.
QUESTIONS BY MS. COOK:
Q. Do you know what the LNG or SHBG levels of any of the Mirena users reported in the Valenzuela study was?
MS. NATALE: Objection. Form.
THE WITNESS: I don't believe he had that data to review, based on what I see in the paper.
QUESTIONS BY MS. COOK:
Q. Let's talk about Norplant for a minute.
Now, you cite -- in your report on page 27, you cite a number of Norplant articles. They're the Sunku '93, Wysowski '95, Alder '95 and Tang '95.
A. Well, I'd actually point you to my discussion on page 34 under Analogy because that's where I have a more complete discussion of the Norplant literature.
Q. Do you cite anything other than the four papers I said?
A. I have Wysowski and Green in the back, and then I have -- and then I also address in this paragraph the review articles

Page 175

that are actually listing Norplant as one of the drugs that has been associated with the condition as well.
Q. And the review articles, those are referencing back to those same case reports, right?
MS. NATALE: Objection. Form.
THE WITNESS: Well, it depends on the year of the article, but, yes, some of them are going to be pointing to those, yes.
QUESTIONS BY MS. COOK:
Q. Are you aware of any published scientific literature related to PTC and Norplant that actually talks about patients or anything other than a review article that aren't listed here: Sunku, Alder, Wysowski, and then earlier you list Tang.
MS. NATALE: Objection. Form.
THE WITNESS: I don't think I understand your question. Are you asking me is there any other literature on Norplant out there that I haven't cited, or are you asking me specifically about have I -- have I

Page 176

provided you with the list of articles that I considered?
QUESTIONS BY MS. COOK:
Q. What I'm asking is the literature that actually reports on Norplant and IIH instead of just providing it in a list like the review articles, that's the Sunku, Alder, Wysowski and then the Tang article you also cite, right?
A. Yes.
Q. And those are all either case reports or case series, right?
A. Yes.
Q. And do any of those authors reach the conclusion that Norplant causes PTC?
MS. NATALE: Objection. Form.
THE WITNESS: As a general proposition, I would doubt they do because of what the papers are. I believe in at least one of those case reports that the physician came to the conclusion that the cause of the PTC was the exposure to Mirena.

Page 177

QUESTIONS BY MS. COOK:
Q. Do you know which one?
A. I'd have to pull them all out. Do you want me -- I may have them if you want me to do it.
Q. Well, let's just see if we can go through them quickly. Start with Sunku.
(Plunkett Exhibit 12 marked for identification.)
QUESTIONS BY MS. COOK:
Q. Exhibit 12.
This is what you cite, correct?
A. Yes, this is -- this is the publication, yes.
Q. And this is an abstract, correct?
A. Yes.
Q. Reporting on two patients, right?
A. Yes.
Q. And the end of this says, "Further observations may allow a determination as to whether this association is etiological or coincidental," right?
A. Yes, that's what is stated.

Page 178

Q. So it doesn't reach a conclusion about whether Norplant can cause PTC in that abstract, correct?
A. I would agree that they haven't made that statement, that is true, but they are certainly describing cases that they believe that the PTC, or in this case they're calling it benign intracranial hypertension, was indeed associated with the exposure to Mirena.
But, yes, I agree they have not made a final cause statement.
Q. Yeah, that was the question I -- that's the question we're talking about here is causation, not association.
And that's not reported here, correct?
MS. NATALE: Objection. Form.
THE WITNESS: I would agree that they have not used the word "cause." But causation -- causation in a general sense is more than just one case report. If you're talking about causation in a general sense.
(Plunkett Exhibit 13 marked for

Page 179

identification.)
QUESTIONS BY MS. COOK:
Q. And you wouldn't reach a causation opinion on one case report either, right?
MS. NATALE: Objection. Form.
THE WITNESS: No, I have not done that, that's true.
QUESTIONS BY MS. COOK:
Q. Exhibit 13 is Wysowski's that you rely on, right?
A. Yes.
Q. And page 541, left-hand column, middle, says -- at the end of that middle paragraph says, "Epidemio" -- sorry. "As a consequence, it is not possible to determine whether Norplant obesity or weight gain or both factors are related to the occurrence of PTC. Epidemiologic research, case control or cohort studies would be required to determine if causal association between Norplant and either PTC or stroke exists."
Do you see that?
A. Yes.
Q. So these authors don't conclude

Page 180

from this evidence that Norplant causes PTC, correct?
A. Right, which they can't do because of the -- what they're doing here. This is not a case report. This is a different -- this is a review of an adverse event reporting system, so this is not a doctor going in and seeing the patient. This is different.
Q. And so when you say "they can't do that because of what they're doing here," what they're doing here is looking at adverse event reports -- or adverse events from the FDA's reporting system, correct?
A. Yes. And then they're pointing to what they believe the data shows. And they're saying here in this paper, if you look at their -- I think if you look at their abstract, the FDA received reports -- if you want, I can read it into the record, but essentially one of those reports that they're -- that they were concerned about was pseudotumor cerebri.
So, again, this was not a study that was designed to determine whether

Page 181

there's a cause and effect relationship. This was a study that was looking at adverse event reports for these particular devices and what was commonly being seen. And they actually report on more than pseudotumor cerebri.
Q. Where they say, "Epidemiologic research, case control or cohort studies would be required to determine if a causal association between Norplant and PTC exists," none of that epidemiologic research has been published since this paper, correct?
A. On Norplant?
Q. Yes.
A. I believe that is true, yes. I did look for other epidemiological literature on Norplant, and if I had found it, I would have cited it.
Q. The Alder 1995 report, let's see if that has a causation conclusion.
(Plunkett Exhibit 14 marked for identification.)
QUESTIONS BY MS. COOK:
Q. Exhibit 14.
And this is a letter to the

editor, correct?
A. Yes.
Q. And if you look on the second page, it talks about -- in the last paragraph of the letter it talks about -- it says, "Such factors may confound this possible association, and it remains unclear whether the drug causes intracranial hypertension."
Do you see that?
A. Yes. And again, that would be appropriate. You would not use -- he would not -- or this author should not use these studies to say that it shows there's a general cause and effect relationship. Absolutely. You need more than the case studies.
Q. You need more than the case studies to conclude general cause and effect, right?
A. Yes, which is what you do.
Again, I think the question -- I thought the question we were addressing was different than that, but that's fine. I...
Q. And then he goes on to say, "Levonorgestrel may have contributed to the



onset of intracranial hypertension or it may have had nothing to do with it."
A. So where are you now?
Q. That same paragraph, two sentences later.
A. Yes, I see that.
Q. And you don't disagree with that, do you?
A. I haven't -- again, I never -- I never agree or disagree with one particular sentence, typically. I might say I might state it differently, but it is what it is.
Q. And then you also cite -- not here, but otherwise in your report you talk about the Tang paper?
A. Tang may not -- Tang may be the Plan B article, or is it not? I apologize. I can't recall what Tang is. Or it might be Mirena. I'd have to pull it out.
Q. Sitting here today, do you know whether you're relying on the Tang paper for your opinion about Norplant?
A. I'm relying on -- it's not in my Norplant section. It's up front with my IUD section or my Norplant -- I mean, with my



LNG device section, so my guess is -- and I can look at the title and tell you, but my guess is it's -- no, it is Norplant. I apologize. It is.
(Plunkett Exhibit 15 marked for identification.)
QUESTIONS BY MS. COOK:
Q. I'll show you this one, Exhibit 15.
This is an abstract or a poster, right?
A. Yes.
Q. Bottom left?
A. Yes, it is.
Q. And the conclusion says, "Norplant can be associated with pseudotumor cerebri."
Right?
A. Yes.
Q. It does not say anything about causation, correct?
A. Well, that's correct. And that's, again, appropriate for a case report. It shows associations, not general cause.
Q. Do you know that Dr. Tang



testified in certain IIH cases in this litigation as an expert?
MS. NATALE: Objection to form. Same objection to the use of "plaintiffs" and same objection to use of "this case."
THE WITNESS: I'm not aware of him being an expert in the litigation as I -- that I'm working on. In other words, I haven't seen a report from him or seen him listed.
QUESTIONS BY MS. COOK:
Q. Do you know that Dr. Tang testified that she did not conclude that Norplant causes PTC or IIH?
MS. NATALE: Same objection.
THE WITNESS: I'm not aware of -- and I said "his." I apologize, I didn't realize it was a her. So, no, I'm not aware of that.
QUESTIONS BY MS. COOK:
Q. Are you aware of any medical literature that states that Norplant causes PTC?
MS. NATALE: Objection. Asked

Page 186

and answered.
THE WITNESS: Yeah, I told you that I'm -- I have not looked for that specific sentence, but I'm not aware of it either. So I'd have to go and look to tell you that no one says that.
QUESTIONS BY MS. COOK:
Q. Can you identify any scientific or medical organization that has concluded that Norplant causes PTC?
MS. NATALE: Same objection.
THE WITNESS: I know I answered that question for you already. I said no, and I haven't looked. But, no, I'm not aware of it.
QUESTIONS BY MS. COOK:
Q. I actually asked you the questions about Mirena.
A. Oh, I'm sorry.
Q. That's all right.
A. I thought we were doing Norplant and Mirena earlier. I apologize.
Q. That's okay.
MS. NATALE: I will object to

Page 187

that characterization.
QUESTIONS BY MS. COOK:
Q. Are you aware of any evidence that obese Norplant users have an increased risk of IIH compared to obese women not using Norplant?
MS. NATALE: Objection. Form.
THE WITNESS: I don't know. I'd have to look at the articles that I reviewed to tell you whether any of them provide that data. I don't recall.
QUESTIONS BY MS. COOK:
Q. And are you aware of any publications about a PTC risk with Jadelle?
MS. NATALE: Objection. Form.
THE WITNESS: Jadelle, J-a-d-e-l-l {sic}?
I don't think I've seen an article specific to that, but certainly it is an LNG product, so...
QUESTIONS BY MS. COOK:
Q. Do you know what Jadelle is?
A. Yes, it's another form of an implantable LNG product, Norplant and

Page 188

Jadelle.
Q. Are you giving an opinion that Jadelle causes PTC?
MS. NATALE: Objection. Form.
THE WITNESS: It's the same answer as I had for Norplant: I haven't formed that opinion at this point in time. But it certainly does -- any data on Jadelle would be relevant to assessing risks associated with Mirena.
QUESTIONS BY MS. COOK:
Q. Have you looked at data on Jadelle?
A. I've provided you the data that I have looked at. So there's no specifics other than I have looked at the labeling for all these products, and so on the pharmacokinetics section of my report I did do the consideration of all of those pieces of evidence.
Q. Other than the label, can you think right now of anything that you have seen related to the risk of PTC with Jadelle?
MS. NATALE: Objection. Form.

Page 189

THE WITNESS: I'd have to go back and look at all my articles to tell you whether any of them describe it. I don't recall that, though.
QUESTIONS BY MS. COOK:
Q. Are you -- excuse me. Are you relying on individual adverse event reports of Mirena users reporting PTC to support your causation opinion in this litigation?
A. Only in -- only in -- I believe there's a section where I talk about those, and I don't believe that's within the -- no, it is, yes.
So I talk about it in the individual reports within the temporality section. So I do rely on some of those adverse event reports there.
Q. You're referring to page --
A. 28. I think we were there earlier. I said there were at least three reports of PTC, two with Mirena and one with Jaydess. And I'm talking about looking at the clinical trial data for Mirena.
Q. Okay. So other than the clinical trial cases that you cite there on

page 28, are you relying on any individual adverse event reports of Mirena users reporting PTC in supporting your causation opinion?

MS. NATALE: Objection. Form.

THE WITNESS: Well, I'm only relying on what I've cited in my report, so certainly if I haven't cited that, I don't recall that fitting the description of my other evidence.

But if it -- again, I just point you to what I have cited for you in my report.

QUESTIONS BY MS. COOK:

Q. Would you agree that the vast majority of people who have PTC are not using Mirena as far as you know?

MS. NATALE: Objection. Form.

THE WITNESS: Well, I haven't done a specific analysis to quantify it, but I would absolutely assume that there's many people using Mirena that -- did you ask Mirena users that don't develop PTC or vice versa, PTC



that don't use Mirena?

QUESTIONS BY MS. COOK:

Q. Vice versa.

A. Okay. So I haven't done an analysis for either one of those, but I would assume that the number would be larger than the Mirena users. And same thing, I would assume that many have used it that haven't developed it.

Q. You don't give any opinions about what you believe the percentage of Mirena users who have PTC is, correct?

MS. NATALE: Objection. Form.

THE WITNESS: Are you asking me for an incidence rate?

QUESTIONS BY MS. COOK:

Q. Yeah.

You don't do that, right?

A. I haven't done that, no.

Q. Okay. And you also don't have an opinion about what the actual reporting rate of PTC is with Mirena, right?

MS. NATALE: Objection. Form.

THE WITNESS: If you're asking me based on an analysis of the adverse



event reporting systems from the company, no, I have not done that, although I do see it described in some documents. And I'd have to go back and look at my documents that have talked about that.

I think there's a justification document that may have been done by the company that may describe that.

QUESTIONS BY MS. COOK:

Q. You cite documents that -- from the company that give a reporting rate for Mirena and PTC, but you don't yourself give an opinion about what the correct reporting rate is, correct?

MS. NATALE: Objection. Form.

THE WITNESS: I have not done an analysis to determine that that's incorrect or correct, that is true. Because I was -- that was not the focus of what I was doing in the work that I did to prepare for this report -- to prepare this report.

QUESTIONS BY MS. COOK:

Q. You mention underreporting as a



general concept in your report, but you do not give an opinion about what the specific underreporting rate is with Mirena and PTC, correct?

MS. NATALE: Objection. Form.

THE WITNESS: I don't think I state that, but I would tell you that there's no reason to believe that it would be any different than the reporting rate that's assumed to exist for prescription drugs generally.

So I would expect it to be -- the reporting rate to be somewhere in the -- in 1 to 10 percent of the actual adverse event reports. That has always fit for almost any drug when I've actually tried to actually assess that.

QUESTIONS BY MS. COOK:

Q. Now, you have -- you agree that there's a concept of stimulated reporting in the context of litigation about a product and an event, right?

MS. NATALE: Objection. Form.

THE WITNESS: So I've seen it

Page 194

discussed in the literature, yes. I'm not convinced it's always an operative factor in every situation, but, yes, it is discussed.
QUESTIONS BY MS. COOK:
Q. Well, you also testified about that, right?
MS. NATALE: Objection. Form.
THE WITNESS: You will have to remind me. I don't recall using that specific wording for it, "stimulated reporting rate," but I may have talked about reporting rates being affected by things, yes.
(Plunkett Exhibit 16 marked for identification.)
QUESTIONS BY MS. COOK:
Q. Well, I would refresh your memory by showing you Exhibit 16, which is an excerpt from a deposition in 2013.
MS. NATALE: I will just object to the extent that the full transcript is not here.
QUESTIONS BY MS. COOK:
Q. So if you turn to page 228 --

Page 195

MS. NATALE: And just objection to the use of the document generally.
THE WITNESS: So let me -- if you're going to ask me a question about something on 228, so can I read the question before first so I know --
QUESTIONS BY MS. COOK:
Q. Yeah.
A. -- context?
Q. Yeah.
A. Okay.
MS. NATALE: What page are you on, Shayna?
MS. COOK: 227 and 228.
QUESTIONS BY MS. COOK:
Q. Do you see the question about underreporting?
A. Yes, and I -- hold on. I'm almost finished.
Yes, I see that. I mean, I see that section that you're referring to.
Q. Okay. So what you're talking about here is stimulated reporting, right?
MS. NATALE: Objection. Form.
THE WITNESS: I said it

Page 196

stimulates additional reporting, yes, and I had forgotten about -- I don't recall this testimony, but absolutely I did say this.
QUESTIONS BY MS. COOK:
Q. And when an event and a drug are the subject of a litigation or the subject of articles in the newspaper, that may stimulate additional reporting, and you say it's actually probably closer to the 10 percent number than it might be of the 1 percent number because of the stimulated reporting, right?
A. Yes. I said if you're looking at issues of comparing reporting rates, looking at underreporting before or after something becomes -- becomes known, that's exactly right, by doctors or by patients. You would likely get additional reports once it becomes known.
Q. And here, do you know how long the litigation has been going on in terms of cases against Bayer related to PTC and Mirena?
MS. NATALE: Objection. Form.

Page 197

THE WITNESS: No, I do not. I only know since I've become involved.
QUESTIONS BY MS. COOK:
Q. Do you know what percentage of the adverse events that Bayer has received that -- were actually lawsuits filed that then became adverse event reports?
MS. NATALE: Objection. Form.
THE WITNESS: I am not aware of that, no.
QUESTIONS BY MS. COOK:
Q. So can you say sitting here today that the vast majority of Mirena users don't have PTC? Do you know whether that's true or not?
MS. NATALE: Objection. Form and asked and answered.
THE WITNESS: The answer I gave to you, I said I haven't done that analysis, but I think I told you I would expect it to be that there's many more that have taken than have reported it, yes, that's true.
QUESTIONS BY MS. COOK:
Q. You don't give an opinion that

just because there's any adverse event reports of PTC with Mirena users at all, that that would prove causation, do you?
A. Say that again.
MS. NATALE: Objection. Form.
QUESTIONS BY MS. COOK:
Q. You don't give an opinion that just because you see any adverse events reports at all of PTC with Mirena, that that necessarily means that Mirena causes PTC, correct?
MS. NATALE: Objection. Form.
THE WITNESS: No, I would never rely just on that. Again, it's part of the evidence you use.
And certainly case reports are widely used in causation analysis as a piece of the puzzle, but certainly you wouldn't use that by itself. Although they're -- case reports can be used for other purposes, case reports alone are used to remove drugs from the market at times and also to add warnings to the labeling, because causation is a different standard



there.
But I'm not here to talk about that. So -- but I just wanted to point out that there is -- it's not the case reports are unreliable and unuseful for certain situations, and in fact it's typically used in weight of the evidence.
MS. COOK: All right. Let's take a break. We're out of video.
VIDEOGRAPHER: We are off the record at 12:08 p.m. This is the close of Tape Number 2.
(Off the record at 12:08 p.m.)
VIDEOGRAPHER: We are on record at 12:13 p.m. This is the beginning of Tape Number 3.
MS. NATALE: I'd just like to quickly note for the record it's not clear here, but whether or not this transcript that you've entered as Exhibit 16 is subject to any sort of protective or confidentiality order in the original litigation from which it comes.



MS. COOK: Not that I'm aware of.
MS. NATALE: Okay. We will take that up later.
QUESTIONS BY MS. COOK:
Q. All right. So can you go back to Exhibit 11, please, Valenzuela article?
A. Yes, I'm there.
Q. Table 1, we were looking at the mean body mass index. And you had pointed out earlier that while the mean body mass index was 35, which is obviously well into the range of obesity, that the standard deviation was nine.
A. I don't think I said standard deviation. I thought I said variability, but, yes.
Q. Even if you looked at the standard deviation, that would mean that the range of the BMI would be between 26 and 44?
MS. NATALE: Objection. Form.
THE WITNESS: If what you're asking me, the plus or minus 35 range is from 26 to 44, yes, that is true.



QUESTIONS BY MS. COOK:
Q. And that would -- 26 to 44 would be patients who are either overweight or obese, correct?
MS. NATALE: Objection. Form.
THE WITNESS: If by overweight you're using 25 as the lower end, yes, that is true.
QUESTIONS BY MS. COOK:
Q. Well, that is what is typically used, right?
MS. NATALE: Objection. Form.
THE WITNESS: Well, yes, but there are some -- there are some discussions about whether or not in the overweight range, that if you look at height as well as weight, that that can skew this BMI. But I do agree with that.
For example, my husband is 6'4" and he weighs 210, and he's considered overweight, and there's no fat on his body. So I'm just saying that there are issues like that.
But I don't disagree. It is --

Page 202

by standard characteristics, 25 to 29 is considered in the overweight range for women.
(Plunkett Exhibit 17 marked for identification.)
QUESTIONS BY MS. COOK:
Q. Exhibit 17 is just a table of classifications of adults - underweight, overweight and obesity - from the WHO.
And you don't have any reason to fuss with the characterizations here which include anything above or equaling 25 as overweight or obese, correct?
MS. NATALE: I will just object to the -- it says adapted from WHO 2004. There's no -- I don't know --
MS. COOK: Object to the form, Christina.
MS. NATALE: I'm asking you where you got this document from.
MS. COOK: I asked a question of your witness, and she will answer it.
MS. NATALE: Okay. I again will preserve the objection that

Page 203

there's no source on this document.
QUESTIONS BY MS. COOK:
Q. Doctor, do you remember the question?
A. Why don't you repeat it so I answer the correct question?
Q. Do you have any reason to doubt that the standard classification of overweight is anything above or equal to 25, and then it moves into classes of preobese and obese, correct?
A. Yes, I agree that is what's listed on this table, yes.
Q. And you don't have any reason to dispute that as being the generally accepted classification of overweight and obesity in the medical community, correct?
MS. NATALE: Objection. Form.
THE WITNESS: Well, I haven't formed that opinion, but what I would state is I agree I've seen this actually from WHO before. So I don't disagree that this is something that I have seen before.

Page 204

QUESTIONS BY MS. COOK:
Q. So looking at the classification of overweight and obese, will you agree with me that all of the patients who reported PTC and were using LNG in the Valenzuela study were overweight or obese?
A. By this -- if you want to compare to this table, I would agree that's how they would fit, with using the 20 -- the 26 to 44 as the range as reported.
Q. And you don't have any other table that you're relying on that says that above 25 is not overweight, right?
MS. NATALE: Objection. Form.
THE WITNESS: I cannot point you to that, no. I'm just -- I'm referring you to the -- to my experience in looking at what has been stated about BMI tables recently.
QUESTIONS BY MS. COOK:
Q. Back to page 28 of your report.
A. Can I put this one away?
Q. Yeah.
A. Okay.
Q. Page 28 of your report where

Page 205

you talk about the cases, the reports of PTC in the clinical trials for Mirena.
A. Yes.
Q. Now, one of the reports was a Jaydess patient, which is Skyla, not Mirena, correct?
A. That's correct.
Q. And with these three cases, you don't intend to give an opinion about whether each of these patients met the diagnostic criteria for IIH or PTC; you'd leave that to the doctors, right?
MS. NATALE: Objection. Form. Asked and answered.
THE WITNESS: I have not formed that specific opinion as far as diagnosing, but I believe on these documents it's listed as PTC as the actual event. It's listed on the document that I'm referring to.
QUESTIONS BY MS. COOK:
Q. You don't know the LNG or SHBG level of any of these patients, correct?
MS. NATALE: Objection. Asked and answered.

Page 206

THE WITNESS: I don't know that I can point you to where it is, but that's possible that we could find that if we dig into the clinical trial.
QUESTIONS BY MS. COOK:
Q. It's not something you looked at and put in your report, right?
A. No, I did not.
Q. Are you aware that the patient who was using Skyla, not Mirena, actually had PTC before even entering the trial and receiving her Skyla?
MS. NATALE: Objection. Form.
THE WITNESS: I'd have to pull it back out to look at it. I can't answer that without looking at the report.
QUESTIONS BY MS. COOK:
Q. Do you know that one of the patients' PTC symptoms -- well, did you look at the details of these reports?
A. I looked at the documents that I am referring to, yes, which I believe gave some description of them. And I would point

Page 207

out that -- I would -- being that these were clinical trials, there should have been exclusions for people that were sick, so I'd have to look at this again to answer that question fully, though.
(Plunkett Exhibit 18 marked for identification.)
QUESTIONS BY MS. COOK:
Q. Well, I've shown you Exhibit 18.
Do you recognize this as relating to one of the clinical trial cases that you rely on?
A. In this form as you presented to me, it does not look familiar, but that doesn't mean this isn't what I have seen.
So if you want me to review it, I can tell you if the details look familiar.
Q. Let me just ask you a question about it and see if this triggers your memory at all.
So this is a Mirena study patient who, if you look in that first paragraph of the case narrative, talks about how she has double vision?

Page 208

A. That she started to experience double vision, yes, on the 9th of January. I see that.
Q. And you're not going to opine that having double vision alone means that you have PTC, right?
MS. NATALE: Objection.
THE WITNESS: I haven't formed that opinion, no. It is certainly a symptom that is described within the medical literature, however.
QUESTIONS BY MS. COOK:
Q. And at the bottom of that first page of the case narrative it talks about an ophthalmologist consult that was recommended -- or that recommended a repeat MRI and, if normal, to proceed with an LP, a lumbar puncture, to rule out PTC?
A. So I'm looking. Are you in the third paragraph or the second paragraph or --
Q. The very last sentence on this page.
A. Oh, I see.
Okay. Yes, I see that.
Q. And then on the next page it

Page 209

talks about as of November 2002, that PTC was not ruled out, but do you know whether this patient was ever actually diagnosed with PTC?
MS. NATALE: Objection. Form.
THE WITNESS: No, I can't answer that based on this document.
QUESTIONS BY MS. COOK:
Q. Do you know if this is one of the clinical trial cases you're relying on?
A. This document in this form does not look familiar to me. That doesn't mean it isn't one of them. I'd have to go and pull my documents to answer that.
I believe I have read about this patient before, though. This looks familiar to something I've seen in maybe a PSUR document or the justification document that I was referring to earlier. I don't know.
(Plunkett Exhibit 19 marked for identification.)
QUESTIONS BY MS. COOK:
Q. All right. Let me hand you Exhibit 19, which is an adverse reaction report from a clinical trial.

Page 210

And do you know if this is one of the clinical trial cases you're relying on?
A. I don't know that I've seen it in this form, but this sounds like one of the patients that I might have seen a more abbreviated form described in a document.
Q. Okay. The second page, I'll refer you to the paragraph that says, "The progression of the events and their outcome in the patient" --
A. Can you point me to where you are?
Q. Right here.
Under the Progression of the Events and Its Outcome.
A. Okay. I'm there, I'm sorry.
Q. It says that on January 8th the patient developed severe headache and was hospitalized, and a CT, angiography, spinal puncture and neurological exam were all normal, and the intracranial benign hypertension was diagnosed.
Do you know -- well, let me ask you this: You're not giving an opinion about

Page 211

whether or not a diagnosis of IIH or intracranial benign hypertension after a normal spinal puncture is appropriate or not, right?
MS. NATALE: Objection. Form.
THE WITNESS: So I have not formed that opinion. I think the -- a physician would be able to tell you that.
QUESTIONS BY MS. COOK:
Q. Okay. And then the -- I'm not going to show you the last clinical trial report because it's a Skyla report, although I think you said you don't recall whether she had IIH before.
A. I said I would have to pull them out to answer that question, so...
(Plunkett Exhibit 20 marked for identification.)
QUESTIONS BY MS. COOK:
Q. All right. I hand you Exhibit 20.
And this is from the amended clinical study report?
A. Yes.

Page 212

Q. This is just a few pages of it, including the relevant clinical -- or the relevant patient that we're talking about here, which is in the last two pages. So if you just flip to the last two pages where it describes this one event.
MS. NATALE: Objection to "relevant" and/or "amended."
QUESTIONS BY MS. COOK:
Q. Do you see where I'm referring to, page 146 of 156?
A. Yes.
Q. Okay. The event here is PTC, and this is a patient who was in the LCS 12 arm, which is Skyla, right?
A. Yes.
Q. And do you see where it says her medical history included dysmenorrhea and PTC since September 3, 2009?
A. Yes, I see that.
Q. And then a few paragraphs down it says, "The LCS 12 was inserted on 1 March 2012."
A. Yes, I see that.
Q. Which is at least two, two and

Page 213

a half years after she had been diagnosed with PTC, according to this, right?
A. Yes, but what's important about this case is that if you just read the description, it shows that even with being treated that it was -- that she had an episode that required her to be hospitalized due to the event.
So this is an example of the drug exacerbating a condition, maybe not necessarily being the initial cause.
Q. If you look at page 147, it has the investigator's assessment?
A. 147.
Q. Do you see that?
A. Yes, I see that.
Q. And it says, "The investigator considered the event as not related to study drug and not related to study conduct."
A. Yes, I see that.
Q. And do you disagree with that?
MS. NATALE: Objection. Form.
THE WITNESS: I haven't formed the opinion that I agree or disagree with that, no.

Page 214

QUESTIONS BY MS. COOK:
Q. Page 29 --
MS. NATALE: Are you back to her report?
QUESTIONS BY MS. COOK:
Q. -- of your expert report.
You see where it says, "There are several data sources that provide information on Mirena dose response that are relevant to the cause and effect assessment of Mirena and PTC"?
A. Yes.
Q. And at the bottom of that page you say, "Another source of dose response data relevant to the cause and effects assessment is the adverse event reporting data for Mirena versus lower-dose devices also marketed by Bayer"?
MS. NATALE: Objection.
THE WITNESS: Yes.
QUESTIONS BY MS. COOK:
Q. And then you go on to talk about the signal investigation in 2017.
A. Yes.
Q. And what you talk about there

Page 215

is that Bayer calculated the reporting frequency to be 0.22 per 1,000 for Mirena and 0.22 per 1,000 for Jaydess, right?
A. Per 100,000.
Q. Sorry, 100,000.
A. Yes, with that correction that they're per 100,000, that's true.
Q. And that is the same reporting rate, right?
A. Based on that, yes.
Q. Now, you don't give an opinion about what you think the reporting rate is with Skyla either, correct? Right?
A. No, I have not attempted to calculate a reporting rate for those -- for either of those drugs.
Q. You also don't give an opinion about what you think the appropriate estimate of women years of exposure is for Mirena or for Skyla, correct?
MS. NATALE: Objection. Form.
THE WITNESS: That's correct, because, again, that's not something that was part of the analysis that I was doing.

Page 216

QUESTIONS BY MS. COOK:
Q. Okay. And what you refer to here, this is the 2017 signal investigation, right?
A. Yes.
Q. And based on what you said in your report about the reporting rate being the same, you agree that at least as reported in the signal investigation the reporting rates of Mirena and Skyla don't provide any evidence of a dose-response relationship, correct?
A. Right. And then I tell you why I believe that that would be difficult to do; in other words, why I'm not surprised that you were not -- that's the next paragraph.
Q. You're not surprised that there's no evidence of a dose-response relationship, but you certainly haven't seen any evidence, whether in the adverse event data or in the literature or anything else, that would indicate that Mirena has a higher risk of IIH or PTC than Skyla, right?
MS. NATALE: Objection. Form.
THE WITNESS: So I don't point you -- if what you're asking me -- and I'm not really sure what you're asking me. Maybe you need to rephrase that because I'm a little confused.
Are you asking me whether or not looking at what -- what I do know, which is I don't have a lot of data, but the data that I do have doesn't allow me to determine what the dose-response relationship is, that is true. And I explain why I'm not surprised.
No study the company has done has been looking at dose-response relationships for these type of adverse effects as the goal of the study. That's something that you could do, but that's not something that has been done. These are individual trials looking at adverse events in the clinical populations, without that goal being to try to determine what the dose response would be for any particular adverse event.

Page 217

Page 218

QUESTIONS BY MS. COOK:
Q. There's not been any published study or any adverse event data or anything else available that does support a finding of increased risk of PTC with Mirena compared to Skyla, correct?
MS. NATALE: Objection. Form.
THE WITNESS: Not based on the data I have, because no one has done -- in order to answer that question, you would probably need to get an epidemiological investigation together that would allow you to look at enough people in those two populations of exposed in order to try to differentiate whether or not the risk was higher or not. And I haven't seen anybody do that epidemiology.
QUESTIONS BY MS. COOK:
Q. Similarly, you haven't seen any evidence, whether in a published study or in adverse event data, that the risk of PTC with Mirena is increased compared to Kyleena, right?
A. No, I have not seen -- the same

Page 219

answer. Again, these are studies that could be done as part of postmarketing by a company, phase IV commitment studies, but I haven't seen such a study done, no.
(Plunkett Exhibit 21 marked for identification.)
QUESTIONS BY MS. COOK:
Q. Exhibit 21 that I've handed you is the Bayer response to the BfArM request from July 2017 that you cite in your expert report, correct?
A. Yes, I believe this is the document.
Q. And is it your understanding that this includes, among other things, the latest analysis of the adverse event data that Bayer has?
A. Well, I can't tell you if it's the latest. It's possible there's been something done since, but as of October 2017, this would have been what they had done, yes.
Q. And this is the latest you've seen, right?
A. Yes, I haven't seen another document since this that has a similar

Page 220

analysis.
Q. Okay. So if you look at page 45 of 95?
A. Yes, I'm there.
Q. This has the reporting frequency that was calculated by Bayer, correct? At the top of the -- top paragraph?
A. The number of reports per year, yes.
Is that what you're looking at? Are you looking -- I'm looking at the figure. You're not looking there?
Q. I'm looking at the first full paragraph on this page which says that the reporting frequency is low at 0.22 cases per 100,000 women years.
That's what you cite in your report, right?
A. Yes, that's correct. That is the number we read.
Q. And then it goes on to say that excluding cases submitted in the context of litigation, which is 118 cases for Mirena, the reporting frequency is 0.08 per 100,000 women years, right?

Page 221

A. Yes, I see that.
Q. And so the reporting rate that you included in your report includes the litigation cases, right?
A. Yes, and I have a reason why if you would like me to explain.
Q. What's your reason why?
A. The reason why is because even though they may have -- as we talked earlier, stimulated, the word that you used from my previous deposition -- some reporting, you're still underreporting.
So the fact that the .22 versus the .08, the .08 doesn't mean that those are not cases; it just means that the publicity has allowed for a higher level of reporting, which is still an underreport.
Q. As far as you know is the October 2017 data about adverse event reports the most inclusive set of adverse event report data that's available?
MS. NATALE: Objection. Form.
QUESTIONS BY MS. COOK:
Q. Or at least that you reviewed?
MS. NATALE: Same objection.

Page 222

THE WITNESS: If you're going to limit it to this point in time, I have not seen another at this point in time. But this -- let me look. I believe that this is a review of just their files. Let me check.
QUESTIONS BY MS. COOK:
Q. If you see page 44, that could answer the question you're looking for.
A. Well, I was just going to where I was looking for what they have listed as what they did review, so...
Here's their methodology.
Q. Page 44, the reporting source I think is what you're looking for.
Do you see that 14 cases were based on reconciliation with the FDA FAERS database and that 11 cases were identified from scientific publications, including Valenzuela?
A. Yes, but -- yes, so they are -- but they're -- I thought I remembered, and this is what I'm thinking. What this is telling me is that they looked at the FAERS as of 2015, but they haven't looked at FAERS

Page 223

from 2015 to 2017, I don't believe.
So but yes. But certainly they have attempted to look at possible sources; I don't disagree with that.
Q. This is the most up-to-date signal investigation analysis of the FAERS data that you looked at yourself, of the Bayer data plus the FAERS data, right?
A. That I have seen, that is true.
Q. Okay. So you -- if you look at -- let's look at page 48.
MS. NATALE: Did you say 48?
MS. COOK: Yeah, 48 of 95.
THE WITNESS: Yes.
QUESTIONS BY MS. COOK:
Q. Do you see the figure of time from insertion to IIH event?
A. Yes.
Q. And have you analyzed in this graph how many events or what percentage of events took place -- or, sorry, reported a diagnosis during the first year of use of Mirena?
A. No. In my report I talk about what was reported in the first two years, not

Page 224

the first year.
Q. Well, did you look at this data to see what was reported within the first two years?
A. I've seen this graph, yes, if that's what you're asking me.
I'm just saying in my report I don't describe it based on only one year. I talk about -- about the reporting that was done within the first two years.
Q. Did you look at one year?
A. I looked at this graph. I've reviewed this.
Q. Okay.
A. So I've seen it. I don't -- I'm -- but I'm not disagreeing that I don't think I provide a sentence in my report that talks about what it was at one year.
Q. Okay. So can we look and see here in front of us from this graph -- and I have a calculator if we need it -- try to figure out what percentage of the reports for which the time from insertion to IIH event is known, what percentage happened within the first year and first two years?

Page 225

A. I can tell you the number or -- the number reported is 104 there.
Q. And you're getting that by adding 19 plus --
A. 19, 42 and 43.
Q. Okay. So 104?
A. That's what I get, I believe, if my math is correct.
Q. And then if you add the ones that were reported between one and two years, what do you get up to?
A. That would be 156.
Q. Okay. So then 92 were reported after two years, right?
A. Right.
Q. So you would have to add 156 and 92?
A. Yes.
Q. Can you do that off the top of your head?
A. 148. No? 138?
MS. LAMACCHIA: It's 156 plus 92.
THE WITNESS: Yeah, well, 156 plus 92, you add 90. So 156 plus 90

is 140 -- 2, I'm sorry, 200. I
apologize. I wasn't carrying my 1.
Yeah, so 248.
QUESTIONS BY MS. COOK:
Q. Okay. So do you know what percentage of 248 104 is?
A. What percentage 104 is of 248?
MS. NATALE: Objection. Form.
THE WITNESS: It's in the range of 40-some percent.
QUESTIONS BY MS. COOK:
Q. Like 42?
A. Now, that, I'd have to do the math. That, I can't do in my head.
But if I was estimating it, I'd say in the range -- it's less than 50 but it's more than 40.
Q. Okay. Well, I have to use a calculator to do it, so I came up with 42, rounded off.
And then if you look -- do you know what percentage of 248 156 is?
MS. NATALE: Objection. Form.
THE WITNESS: So that's going to be probably in the range around



40 percent as well. It's less than half.
QUESTIONS BY MS. COOK:
Q. Do you want to do it on my calculator?
A. Yeah, those numbers I can't do in my head.
Q. Okay. So what we're trying to figure out is what percentage of the total events that were reported have a time to -- from insertion to event reported were within the first two years.
And so it's 156 were within the first two years, right?
A. Yes, that's true.
Q. So you do 156 divided by 248, right?
A. 62. 63 percent.
Q. Okay. So 63 percent within the first two years.
And then do you want to do the first year? So it's 104 divided by 48?
A. How do you clear?
MS. NATALE: Sorry, did you just do that, Shayna?



MS. COOK: Yeah, but she can do it.
THE WITNESS: 104 divided by 248. 42 percent.
QUESTIONS BY MS. COOK:
Q. Okay. So 42 percent were reported within the first year, right?
A. Yes, and 63 percent in the first two years.
Q. Okay. So if you look at page 29 of your report.
Page 29, do you see near the bottom when you refer to the 2015 signal investigation, and you say that Bayer found approximately 75 to 80 percent of the adverse events were reported in the first two years?
A. Right, which is a different one. This is 2017 --
Q. Right.
A. -- which is where my numbers come from. I thought that was a different document. But, yes, I see that.
Q. And you're relying there on the 2015 signal investigation?
A. Right. In other words, the



signif -- either one you look at, a significant number of the events are being seen within the first two years.
Q. Well, if you look at the 2017, which is the most up to date that we have available, it's 63 percent within the first two years, right?
A. Yes.
Q. And that means there's 37 percent that are after two years, right?
MS. NATALE: Objection.
THE WITNESS: Well, actually, I think that we have these unknowns. That's one of the questions.
I don't think we can say 37 percent are always more than two. We have these unknowns.
I think all we can talk about is what we do know. We know that they were getting this many in two years in 2015 and this many in two years in 2017.
QUESTIONS BY MS. COOK:
Q. Yes.
So it's all -- all of these

questions are about the ones where the adverse event reports actually reported the time to diagnosis, correct?
A. That's correct.
Q. Okay. So there's no reason -- in other words, my only question is, there's no reason why we wouldn't focus on the most up-to-date data from October 2017 instead of 2015, correct?
MS. NATALE: Objection. Form.
THE WITNESS: Are you asking me could we certainly -- we could include it and it's consistent with my statement, but certainly -- yes, we should -- so to be complete, we can cite it now, and you've done it on my deposition, and I would say that the data from 2017 is consistent.
The issue is you're finding the majority of the adverse events that being -- here being related to the -- now, this is specific to -- I assume they're using the same criteria, but essentially the majority are being reported within the first two years.



63 percent is still the majority.
QUESTIONS BY MS. COOK:
Q. And if you look at the first year, it's less than half, so it's not a majority, right?
MS. NATALE: Objection. Form.
THE WITNESS: Yes. And if you look at the variability in the blood levels, it's the two-year time point that has the highest level of variability, which I think is important if you read my report.
QUESTIONS BY MS. COOK:
Q. But while it might have the highest level of variability based on one report, it certainly is not the highest level of serum LNG or free LNG, correct, in two years?
MS. NATALE: Just objection. Form. And use of "report."
THE WITNESS: So I disagree with that when you're talking about the population as a whole. I think I did agree with you that the mean level you calculated from that one study



that was reported was lower at two years than one, but the variability is what I think explains, and I hope that's clear in my report, why we see certain people that have this problem and others who don't.
In other words, you have -- certainly if we had the data and somebody did the study, we could probably come up with a better understanding of what the threshold is, but nobody has done that.
Instead what we have is a temporal relationship that's related to variability.
QUESTIONS BY MS. COOK:
Q. But my question was about the serum levels and the free LNG levels.
And you agree that those by one year have gone down substantially and continue to go down, correct?
MS. NATALE: Objection. Form.
THE WITNESS: I don't think I agreed with you that they were substantial. I agreed they were



lower.
And the issue is even at five years you have significant levels of the drug that are still being released and found in the blood.
So, no, I disagree with that. I wouldn't state it that way. I've tried in my report to state it the way I think is appropriate based on the data we have, which is that is there is a relationship seen when you look at these two pieces of data: the variability in the blood levels and the -- and the experience that's being reported.
MS. COOK: All right. Let's break for lunch.
VIDEOGRAPHER: We are off the record at 12:49 p.m. This is the close of Tape Number 3.
(Off the record at 12:49 p.m.)
VIDEOGRAPHER: We are on the record at 1:26 p.m. This is the beginning of Tape Number 4.

Page 234

QUESTIONS BY MS. COOK:
Q. Dr. Plunkett, are you looking at Exhibit 5, the Hofmann manuscript?
A. Yes, I have it in front of me.
Q. Okay. If you go to Table 2, this is the table that provides summary statistics of total and unbound LNG serum concentration at different time points, right?
A. Yes.
Q. And we looked at this before, and we looked at the LNG IUS 20 data, which is Mirena, right?
A. Yes.
Q. And we looked at the -- both the serum concentration numbers and also the unbound concentrations, right?
MS. NATALE: Objection. Form.
QUESTIONS BY MS. COOK:
Q. Do you recall that?
A. We looked at more than one table, so, yeah, I guess that...
Q. Okay. So this also reports the geometric coefficient of variation, right?
A. Yes.

Page 235

Q. And it -- the percentage of -- the coefficient of variation ranges from 34.7 to 36.6 at five years --
MS. NATALE: Objection. Form.
QUESTIONS BY MS. COOK:
Q. -- right?
A. Let me look. I'm sorry. 34.7 to 36.6, is that what you said?
Q. Yes.
A. Yes, I agree. That's the mean, yes. That's the average coefficient of variation, yeah.
Q. And the coefficient of variation when you talk about the variability of LNG levels in Mirena, you're referring to that coefficient of variation, right?
MS. NATALE: Objection. Form.
THE WITNESS: I may not be referring to these specific numbers. In fact, I think I point first in my report to what comes from the label.
But, yes, this certainly is -- when I'm talking about coefficient of variation, I may be talking about it around the arithmetic mean or around

Page 236

the geometric mean. It depends on how the data is presented.
I think the label presents arithmetic mean, not geometric mean. That makes a difference on what the numbers may be.
QUESTIONS BY MS. COOK:
Q. Do you want to look at the label?
A. I'm going to look at what I had in my report, so let me start there. I thought I listed that.
(Plunkett Exhibit 22 marked for identification.)
QUESTIONS BY MS. COOK:
Q. Let me just mark for you the current Mirena label, just so you have that. Exhibit 22.
A. So I'm actually referring to the coefficient of variation values that are actually in -- cited by the FDA reviewer. And I'm at paragraph 35, page 21 of my report.
Q. And this is when you say that the highest coefficient of variation that was

Page 237

listed by the FDA reviewer was 54 percent?
A. That's correct, based on the data at that point in time, yes.
Q. And then in the footnote you say the percentage of CV values range from 23 percent to 54 percent, right?
A. That's correct.
Q. And certainly the percentages in Table 2 of the Hofmann manuscript that range from, you know, 34 to 36 percent are within the range discussed by the FDA reviewer, right?
A. Yes.
Q. Now, the Hofmann manuscript also refers to COCs.
Do you see at the bottom there, LNG COCs?
A. The combined oral contraceptive data? Yes.
Q. Yes.
And that has -- reports serum -- total serum levels of LNG for COCs, and then in the parentheses, that is the estimated free LNG levels, right?
A. Well, they don't -- they're not

Page 238

reporting quite what you say, depending on which column you're referring to. These are C max, C average and C min.
Are you referring to the C average levels when you say "total"?
Q. Well, which one would you refer to?
A. Well, if you're going to compare means to means, you should probably look at the C average levels.
Q. Okay.
A. But --
Q. So the C average levels, the serum levels, total serum level of levonorgestrel for the COC is 644 on day one and 1676 on day 21, right?
A. Yes.
Q. And then the free LNG in the parentheses is 8.58 in day one and 17.7 in day 21, right?
A. Yes.
Q. And even taking into account the coefficient of variation, even the highest level of coefficient of variation that you state in your expert report, you

Page 239

still would not see an overlap in the total serum level or the free LNG level between Mirena and the COCs, correct?
MS. NATALE: Objection. Form.
THE WITNESS: So state that again for me. I don't know that I can do apples to apples; that's why I'm concerned. But go ahead.
QUESTIONS BY MS. COOK:
Q. I'm just looking at serum LNG levels. Let's just start with that.
Even looking at serum LNG levels and taking into account the coefficient of variation, the variability that you talk about in your expert report, the serum levels for Mirena at any point in time would not overlap with the serum levels for COCs, correct?
MS. NATALE: Objection. Form.
THE WITNESS: I don't know that I can answer that based on the data that's here because I don't have the -- I have the coefficient of variation, but I don't have the standard deviation. I'd have to

Page 240

back-calculate it.
Maybe you can tell me what the -- I don't quite understand -- I understand what you're saying look at, but I think it's still kind of apples to apples, but that's fine.
I address this issue in my report with data that is more relevant, but based on looking at a single -- this is a combined oral contraceptive versus a single, so...
QUESTIONS BY MS. COOK:
Q. You don't talk about a comparison between the serum levels of combined oral contraceptives containing levonorgestrel and Mirena in your report, do you?
MS. NATALE: Objection. Form.
QUESTIONS BY MS. COOK:
Q. That's not what you're saying?
A. No, because as I -- we discussed this this morning. To me that's -- is not the appropriate comparison to be making. You should be looking at the issue related to the single formulations because we

Page 241

know that the estrogens and the progestins that are in the compound have effects on each others' pharmacokinetics. And so to me that's a complicating factor that makes it difficult to do a direct comparison.
To me it's more appropriate to look at the drug comparison -- when we're talking safety and expectations, to look at compounds that are more alike. So that's why I'm taking the Norplant comparisons with the Mirena or the Skyla or the Kyleena comparisons.
Q. And I know you want to focus on Norplant, but I'm asking you about COCs.
MS. NATALE: Objection to form.
THE WITNESS: Well, then -- or you could take -- if you want to take oral, we could take the progestin-only pills, because with the oral progestin-only pill, again, you're not giving that other hormone to interfere.
QUESTIONS BY MS. COOK:
Q. And you agree that the progestin-only pill has a higher both serum

Page 242

level and unbound level than Mirena, right?
MS. NATALE: Objection. Form.
THE WITNESS: The absolute number is, but these numbers would overlap based on the 214 with the 2.43, applying a coefficient of variation around the 196 and 3.05, which is a 25-day versus 21-day.
Well, let's take 327 and 4.2 to get 21, 25. Those are closer together.
QUESTIONS BY MS. COOK:
Q. You're comparing 327 at day 21 for the progestin-only pill to 196 in levonorgestrel?
A. Right. And applying -- if you're applying a coefficient of variation of 54 percent, which is what you were asking me to do on the other number, that should get me to numbers that overlap.
Q. And you're talking about the very first month of use of Mirena?
A. You're talking about that. I'm talking about in my -- in my paper, I talk about data that's beyond even the first month

Page 243

of use. I talk more about what happens with the compounds once you get to -- into the time point when the release rates are more evened, and I'm also talking about comparing it with the subcutaneous implants, not with the progestin-only.
But at least the progestin-only comparison is single-drug-to-single-drug comparison.
Q. And you're not giving an opinion that a progestin-only pill containing levonorgestrel increases the risk of IIH in your report, correct?
MS. NATALE: Objection. Form.
THE WITNESS: I have not formed that opinion. I told you I had not done that independent analysis for that pill, that's correct.
QUESTIONS BY MS. COOK:
Q. Okay. Now, I know you're not giving opinions about combined oral contraceptives, but I just want to ask you a couple of questions about them.
Okay?
A. That's fine. If I have an

Page 244

opinion, I will let you know.
Q. Are you aware any evidence that the serum level with COCs overlaps with the serum level for Mirena?
MS. NATALE: Objection. Form.
THE WITNESS: I'd have to look. I don't know. I haven't looked for that.
QUESTIONS BY MS. COOK:
Q. And you also haven't looked to see if there's any evidence that the unbound amount of levonorgestrel is any different -- or withdrawn.
Are you aware of any evidence that the unbound portion of levonorgestrel in Mirena is overlapping with the unbound portion of levonorgestrel in a combined oral contraceptive?
MS. NATALE: Objection. Form.
THE WITNESS: It's the same answer. I haven't done that analysis. I've tried to tell you what I think's appropriate, and that's what I've done in my report.

Page 245

QUESTIONS BY MS. COOK:
Q. Table 1 of your report, do you see it?
A. Yes.
Q. You reference four Mirena studies here, right?
A. Well, yes, four studies that talk about Mirena, yes.
Q. And you don't claim to be including all Mirena studies here, right?
A. No.
Q. Correct? Am I correct that you're not claiming to be including all --
A. I'm not claiming to -- I'm sorry, it's a double negative. I'm not claiming that these are all the studies, no.
Is that what you're asking me?
Q. Yes.
A. Yes. I am not making that claim. How about that?
Q. Thank you.
Mirena study A10982, that's the highest mean blood LNG level that you cite in your table, right?
A. Yes, that's the Japanese study.

Page 246

Q. Did you look to see how the BMI of the patients in that study compared to the rest of the Mirena data that's available?
A. I didn't do a direct comparison, but I do know that when I have read that study that there's a discussion -- well, there's some documents that I have reviewed around that study to discuss the fact that being an Asian population, they were smaller, and I would expect that based on my experience with clinical data that's been collected in Asian populations like in Japan versus a population in western Europe or in the US.
Q. Being smaller or having lower BMI would mean that they have higher LNG serum levels than an average-weight user, correct?
MS. NATALE: Objection. Form.
THE WITNESS: Well, that, I don't think you can state with certainty that they all would, but certainly that I would expect -- I would expect that based on the fact that they have a smaller size and are

Page 247

getting the same dose that you ought to see some differences in the blood levels.
QUESTIONS BY MS. COOK:
Q. And on page 21, you point to one patient who --
A. I'm sorry, page?
Q. 21.
Paragraph 36, you're talking about this study.
A. Yes.
Q. And you say -- and first of all you say, "In a set of 350 patients."
Is it true that there was only PK data available for 11 of those?
MS. NATALE: Objection. Form.
QUESTIONS BY MS. COOK:
Q. Do you know?
A. That's true, yeah, it was a small subset, absolutely. They didn't collect a lot of PK data. Unfortunately, in most of the trials there's a very limited number of patients where the data has been collected.
Q. Okay. So in your table, the

Page 248

332 mean blood LNG from that study, that's based on 11 patients, right?
MS. NATALE: Objection. Form.
THE WITNESS: The number -- the range that I report there in the number, yes, that's right, it's 11 different patients they had a data collection protocol for, which, again, is very standard in clinical studies. It's very expensive to perform pharmacokinetic studies.
QUESTIONS BY MS. COOK:
Q. So back to paragraph 36 that we were looking at that talks about that study.
You refer to a patient who had an LNG blood level as high as 725 picograms per milliliter?
A. Yes.
Q. Did you look to see what that patient's BMI was?
A. No, but I don't know whether it's in the table that I had or not. I can pull out the table and tell you if it's reported.
No, I did not attempt to

Page 249

correlate BMI with the blood levels because that's not the point I'm trying to make.
Q. And you didn't attempt to correlate whether they had PTC with the blood levels either, right?
A. Well, these patients didn't have PTC, these patients.
Are you talking about something else?
Q. That's what I'm talking about. The one with 725, that one didn't have PTC, correct?
MS. NATALE: Objection. Form.
THE WITNESS: Well, based on the trial report I have, I didn't see a report of PTC in this trial, but it was not as long a term a study as maybe that you would get. I don't know.
QUESTIONS BY MS. COOK:
Q. Would you agree that the patient with 725 picograms per milliliter was an extreme outlier --
MS. NATALE: Objection. Form.

Page 250

QUESTIONS BY MS. COOK:
Q. -- even in that study?
MS. NATALE: Objection. Form.
THE WITNESS: I don't know that I would use that term. I mean, if you want to define what you mean by extreme outlier, which is a subjective term, maybe we can -- are you asking me did I do an outlier test on the data? That's not been done to prove that it is truly an outlier.
QUESTIONS BY MS. COOK:
Q. Well, you would agree that 725 picogram per milliliter is not a typical LNG serum level for a Mirena user, correct?
MS. NATALE: Objection. Form.
THE WITNESS: I can't -- we don't know because most Mirena users don't have their blood levels measured, so I can't tell you that. That's a question that the data doesn't allow us to answer.
QUESTIONS BY MS. COOK:
Q. Based on the data you've seen, 725 picograms per milliliter is not a typical

Page 251

LNG serum level for a Mirena user, correct?
MS. NATALE: Objection. Form.
THE WITNESS: It is one of the higher levels that I've seen reported, if that's what you're trying to get at. Yes, I would agree.
But again, unfortunately, there hasn't been data collected across large populations to say how representative that is or isn't of other populations.
QUESTIONS BY MS. COOK:
Q. Did you -- you don't give an opinion about the average amount of time a patient uses Mirena before having it removed, correct?
A. No, I haven't addressed that issue.
Q. Okay. Page 31 of your report.
A. Okay. I'm there.
Q. You talk about your biologically plausible mechanism by which you believe Mirena could cause PTC?
A. Yes, I believe that the biologically plausible mechanism that

Page 252

identifies is the issue related to androgens, yes.
Q. So the bottom paragraph there says, "Although the exact pathophysiologic mechanism responsible for inducing PTC in humans is not known, there are several plausible mechanisms that have been discussed in the scientific literature."
Do you see that sentence?
A. Yes.
Q. So even though different plausible mechanisms have been discussed in the scientific literature, would you agree that the -- there's no consensus in the medical community about the mechanism by which women develop PTC?
MS. NATALE: Objection. Form.
THE WITNESS: I don't think I would agree with that, no.
I think if you look at the literature that attempts to address that question, that the issue related to androgenicity is one of the mechanisms that has been discussed over and over again based on the data

Page 253

that's been collected in women with PCOS, also the issue of obesity, what that does to androgen levels.
There's even some case reports where they talk about transgender patients and Mirena and androgen signature. There's a couple of new abstracts that I talk about that talk about looking at an androgen signature for PTC.
So I think it is one of the more commonly described mechanisms, but no one knows exactly what it is. So I don't disagree with that. I stand by that point, yes. We don't know exactly what it is, but this is a commonly discussed one. There's others as well.
QUESTIONS BY MS. COOK:
Q. And even the publications that you just referenced in your answer there, even they don't conclude that the androgenicity mechanism that you propose here is, in fact, what is happening to cause IIH in -- or PTC in those patients, do they?

Page 254

MS. NATALE: Objection. Form.
THE WITNESS: I don't believe that they do, no, and that makes sense because, again, we're talking about a biologically plausible mechanism, which means we're looking at what does the data indicate can be happening.
Again, everybody in the literature is going to tell you, if you look across the literature, that the exact mechanism is still not known. However, there are mechanisms that appear to be -- appear to be based on sound scientific data that many authors report as being biologically plausible.
That's the only issue I'm trying to say. Again, in one individual you don't know the exact mechanism.
QUESTIONS BY MS. COOK:
Q. One of the things that you say in this paragraph on page 31 is that the pathogenesis of PTC is complex and likely multi-factorial, although endocrine systems

Page 255

appear to play key roles.
Now, endocrine system, that involves a whole bunch of different hormones, not just androgens, right?
A. Yes, because many of these hormones interact with each other. We know that androgens, estrogens, glucocorticoids, all of those -- those hormones, and even thyroid hormone, have feedback loops interact with each other. So it's a complex system.
Q. And there are pieces of literature that believe that it's the estrogen that's interacting with the endocrine system and leading to PTC.
Have you seen those?
MS. NATALE: Objection. Form.
THE WITNESS: I have seen some of those, but, again, the -- much of the discussion in the last five years has focused more on the issue related to androgens than it has on estrogens. But certainly the balance between androgens and estrogens are important because we know estrogen affects androgen levels and vice versa.

Page 256

So it's not to say that you have no role for estrogens, but certainly I think that the data that's been collected on the risk factors has led towards some basis within an androgen mechanism.
QUESTIONS BY MS. COOK:
Q. The article that you cite in support of your statement that endocrine systems play a key role is the Mollan article, right?
A. Yes. In this sentence, yes.
(Plunkett Exhibit 23 marked for identification.)
QUESTIONS BY MS. COOK:
Q. I'm marking that as 23.
Do you recognize Exhibit 23 as the Mollan article that you cite?
A. Yes.
Q. And the abstract here says -- about halfway down it says, "The pathophysiology of IIH is incompletely characterized. Suggested, under pending mechanism, include the role of cerebrospinal fluid regulation as well as metabolic and

Page 257

endocrinological perspectives," right?
A. Yes.
Q. So this is -- as of 2016 when this is published, the endocrine-related pathophysiology of IIH, or mechanism of IIH, was still one of the various suggestions out there, right?
MS. NATALE: Objection. Form.
THE WITNESS: Yeah. It is one of the biologically plausible mechanisms that is discussed.
QUESTIONS BY MS. COOK:
Q. And if you turn to page 984, to the section on the role of obesity, the second paragraph there says, "Despite the association between IIH and an obese phenotype, the pathological mechanisms tying the two together are unclear."
And would you agree with that statement?
A. I would say today that's still true, yes. We don't know the exact pathological mechanism, that's true.
Q. And so there's no definitive statement in this article that the endocrine

system plays a key role in PTC --
MS. NATALE: Objection. Form.
QUESTIONS BY MS. COOK:
Q. -- is there?
A. So there's a conclusion on page 990 that says, "IIH is a multi-system disorder encompassing neuroscience, ophthalmology and endocrinology, and cross-specialty collaboration will be integral to advance our understanding."
So the endocrine is described there. And I think if you read this paper, you'll see that there is a lot of discussion of the interaction of endocrine systems with an underlying pathogenesis.
And then if you look over on Table 2 where they talk about conditions that may cause intracranial hypertension, you'll see mention of hormonal agents under pharmacological agents, and you'll also see systemic conditions that deal with hormonal imbalances or hormonal systems.
So I think the paper is entirely consistent with the fact that a biologically plausible mechanism would



involve some aspect of the endocrine systems. Whether or not that is acting independent of other systems totally, that's something that still has to be worked out.
Q. So in the conclusion sentence that you read, it says that cross-specialty collaboration -- that includes endocrinology, plus neuroscience and ophthalmology -- will be integral to advance our understanding of IIH.
And the implication there is that we do not currently, as of 2016 when this is published, understand how the endocrine system or anything else has to do with the mechanism of IIH, correct?
MS. NATALE: Objection. Form.
THE WITNESS: No, I disagree with that. I think what they're saying is, as I admitted in my paragraph, is we don't know the exact mechanisms.
But certainly, again, if you read this paper as a whole and go through what is described, certainly the endocrine system is a key piece of



the puzzle that these authors are laying out.
QUESTIONS BY MS. COOK:
Q. Okay. So turning to Table 2, which was the other place you pointed me to, Table 2 says, "Conditions that may cause intracranial hypertension."
And you pointed out that on the right-hand side it has systemic conditions and it mentions the endocrine system, right?
A. It mentions endocrine and a variety of different diseases that are associated with the endocrine system, yes.
Q. And the variety of things that it lists under endocrine is obesity, weight gain, polycystic ovarian syndrome, Cushing's disease, Addison's disease, hypoparathyroidism, correct?
A. Yes.
Q. And it doesn't say anything there about androgens, right?
MS. NATALE: Objection. Form.
THE WITNESS: Well, you have to understand that in the majority of those an androgen dysfunction is



involved. So obesity involves dysfunction of the androgen systems, effects on that. Weight gain can leads to changes in the androgen system. PCOS is a hyperandrogen system experience. Cushing's is cortisol, and cortisol and androgens are related. So -- Addison's disease is a thyroid disease.
So all of these hormones interact with each other, so I disagree that -- with your statement.
QUESTIONS BY MS. COOK:
Q. Do you know if obesity is also associated with an increase in any other hormone other than androgen?
MS. NATALE: Objection. Form.
THE WITNESS: Yes, absolutely, but the androgen component of it is what's been described within the published literature that relates to PTC.
QUESTIONS BY MS. COOK:
Q. You're not aware of any published literature that talks about the

estrogen component of obesity with PTC?
MS. NATALE: Objection. Form.
THE WITNESS: Certainly it talks about estrogen, but, again, based upon the literature I have reviewed, it comes back again and again to the issue of androgens as well.
QUESTIONS BY MS. COOK:
Q. The hormonal agents listed there in Table 2 does not include LNG, correct?
MS. NATALE: Objection. Form.
THE WITNESS: No, it does not mention LNG.
QUESTIONS BY MS. COOK:
Q. The pharmacological agents listed there, the antibiotics, the hormonal agents and the other agents that are listed there, did you -- when you looked at the adverse event report data, to the extent that you looked at it for Mirena, did you look to see if any of the users were also taking any of or using one of these other agents?
MS. NATALE: Objection. Form.



THE WITNESS: I certainly did not do a complete analysis of that, but I know that some of these drugs would typically be used, yes.
QUESTIONS BY MS. COOK:
Q. So -- well, let me ask you this: Are you claiming that the Mollan article states that the mechanism of PTC via the endocrine system and the increase in androgen is a proven mechanism?
MS. NATALE: Objection. Form.
THE WITNESS: That's not what I've stated. My sentence says, "The pathogenesis of PTC is complex and likely multi-factorial, although endocrine systems appear to play key roles."
And that's my citation on Mollan, and I think that's entirely consistent with what we have just described.
QUESTIONS BY MS. COOK:
Q. So then you go on to -- you talk about the recent paper where the role of androgens and PTC was described.



And we'll look at that in the other -- in the other citations that you have here, but would you agree with me that the proposition that PTC is an androgenic side effect is not proven today?
MS. NATALE: Objection. Form.
THE WITNESS: So what do you mean by proven? Do you mean is it the only mechanism that absolutely is known to operate?
That's not been proven, that is true.
Are you asking me by proven, do you mean that there is data that has -- where individuals have linked androgenicity with a likely mechanism? I think that you can find in the literature.
QUESTIONS BY MS. COOK:
Q. The prospect that androgens play a role in the pathogenesis of PTC is still a hypothesis today; do you agree?
MS. NATALE: Objection. Form.
THE WITNESS: I would say that it is a biologically plausible



mechanism that has been put forth in the literature, and so, yes, in that way it could be a hypothesis to be tested.
But certainly there are data that support that as being the -- a biologically plausible mechanism that can be operating within the realm of pathogenesis of PTC.
QUESTIONS BY MS. COOK:
Q. The literature that you cite in your report that references androgens and PTC, none of those articles actually concludes that the androgenic activity is what actually caused the PTC in any given patient, correct?
MS. NATALE: Objection. Form.
THE WITNESS: So are you asking me whether or not the case reports, which would be the ones where they would be talking about this, are linking that? Is that what you're asking me?
Because there are these more recent papers that have talked about

Page 266

the androgen signature. They're
actually very specifically trying to
understand what is going on.
But if you're asking about the
case reports that we went through
already, I would agree I don't think
any of them are linking it that way.
QUESTIONS BY MS. COOK:
Q. What I'm saying is you can't --
you can't show me a paper -- any paper that
concludes that androgens or androgenic
activity causes PTC, correct?
MS. NATALE: Objection. Form.
THE WITNESS: So if you're
asking me is it going to have that
statement in the paper, no. But
certainly there are papers that I've
just tried -- that I've described in
my report where the authors are
linking that mechanism to an
underlying etiology or pathogenesis
for PTC generally.
QUESTIONS BY MS. COOK:
Q. And the articles that you're
referencing, and we'll look at them, they

Page 267

aren't talking about progestins, the
androgenic activity of progestins, correct?
MS. NATALE: Objection. Form.
THE WITNESS: I have to pull
them out to see if they mention
progestins.
They're specifically discussing
androgens, and we know that progestins
are androgenic and have potent
activity as receptors, but to answer
that question, I'd have to pull each
of these out to see if they actually
mention that.
QUESTIONS BY MS. COOK:
Q. And we will look at them.
I'm trying to see if you can
shortcut any of that by telling me if you
remember seeing any paper that says that the
androgen activity of LNG caused PTC.
MS. NATALE: Objection. Form.
QUESTIONS BY MS. COOK:
Q. And my understanding, if you
want to look at your report, because that's
what you're doing, is you're citing these
articles on page 31 and 32, right?

Page 268

A. This is where I was looking to
start with, yes. And I'll have to pull them
out. I mean, most of the papers that I'm
talking about are focusing -- when you're
talking about biologically plausible
mechanism, are looking at one piece of the
puzzle.
So I don't -- I mean, I
can't -- I don't know, to answer without
pulling them out to look at them. I can't
tell by -- with that.
Q. Okay. Well, let's pull them
out and look at them.
Do you have one that you want
to start with? Do you want to start with the
Glueck one?
A. Well, if you -- if we're going
to go through them just -- let's go through
them one by one and -- it's up to you. We
don't have to go through all of them, but if
you want to go through them we should --
let's just go to the Klein, then Glueck and
then Hall and -- if you want to go by
chronology, we can start with Glueck.
Q. Let's start with Glueck because

Page 269

I have it in my hand.
(Plunkett Exhibit 24 marked for
identification.)
QUESTIONS BY MS. COOK:
Q. Exhibit 24, is this the Glueck
article that you rely on?
A. Yes, this is the one I cite.
Q. And this is a paper that talks
about polycystic ovarian syndrome and IIH,
correct?
A. Yes.
Q. And this is not about LNG,
correct?
A. No, it's not discussing LNG
specifically.
Q. And if you look at the
discussion section on page 76, right-hand
column, it talks about the correlation of
obesity in both PCOS and IIH, correct?
A. So I'm looking on the
right-hand column, and where are you?
Q. Towards the top, about seven
lines down from the top.
A. Are you saying -- you started
with the sentence starting with "obesity is"?

Q. Yeah. "Obesity is a clinical characteristic of both PCOS and IIH."
And do you have any reason to dispute that?
A. Well, I think that there are people with PTC that are not obese, but certainly I agree that there is a population with PTC that are obese, yes.
Q. And what this says is that the increased prevalence of PCOS in women with IIH may reflect PCOS-driven morbid obesity which, in turn, facilitates the development of IIH.
Right?
A. I see that, yes.
Q. In other words, what that means is that it may be the obesity in the women with PCOS that's leading to the IIH, right?
MS. NATALE: Objection. Form.
THE WITNESS: I would agree that that is part of the -- part of the equation, and both obesity and PCOS are known to be conditions which are hyperandrogen activity conditions as well.



QUESTIONS BY MS. COOK:
Q. Do you see at the bottom of the paragraph there that it talks about the high levels of endogenous estrogens that are common in PCOS and in severe obesity and how they may play a role in the development of IIH?
MS. NATALE: Objection. Form.
THE WITNESS: How far down have you gone? I'm looking.
QUESTIONS BY MS. COOK:
Q. The end of that same paragraph.
A. About the thrombophilia, yes, I see that.
Q. So the conclusion of this study at the -- on page 77?
Are you on page 77, in the conclusion?
It says, "On the basis of our findings in this study, we make the following speculations: PCOS characterized by obesity, extreme obesity and hyperfibrinolysis is associated with and may facilitate development of IIH."
And you would agree that at



least according to these authors the characterization that PCOS may facilitate development of IIH is speculation?
MS. NATALE: Objection. Form.
THE WITNESS: Say that again?
QUESTIONS BY MS. COOK:
Q. You don't disagree with the authors' use of the word "speculations" in their conclusions, right?
MS. NATALE: Objection. Form.
THE WITNESS: I don't agree or disagree. They can choose the word they would like. I mean, this is a -- this is -- a hypothesis is another word you could use. It is -- they're saying that there is a biologic plausibility for it in their view. Those are all other ways to describe it.
QUESTIONS BY MS. COOK:
Q. And then they go on to describe a mechanism that involves exogenous estrogens and may reduce CSF reabsorption.
Do you see that?
MS. NATALE: Objection. Form.



THE WITNESS: Well, they actually -- they actually talk about the fact that you need to have first the acquired thrombophilia hyperfibrinolysis that can be exacerbated by exogenous estrogens, pregnancy and PCOS that can lead to reduced CSF resorption.
QUESTIONS BY MS. COOK:
Q. Do you agree that the Glueck publication does not conclude that a mechanism by which an increase in androgenic activity causes PTC has been proven?
MS. NATALE: Objection. Form.
THE WITNESS: Certainly they don't state that, but what they do state -- what they do state is what I've said: PTC has been linked to PCOS. That's how I cite the paper.
QUESTIONS BY MS. COOK:
Q. Okay. So you're not saying that this supports an androgenic theory?
MS. NATALE: Objection. Form.
THE WITNESS: No, that's different.

Page 274

MS. NATALE: Mischaracterization.
THE WITNESS: That's different. I'm telling you how I cite it, and if you read the paragraph, I then talk to you after this about what is important about PCOS.
QUESTIONS BY MS. COOK:
Q. Well, the article, the Glueck article, does not conclude that a high level of circulating androgens in PCOS patients was what led them to develop PTC, does it?
MS. NATALE: Objection. Form.
THE WITNESS: If you're asking me do they contain that specific statement? No, they do not.
QUESTIONS BY MS. COOK:
Q. Do they say that it's the androgen that's leading the PCOS patients to develop IIH and PTC?
MS. NATALE: Objection. Form.
THE WITNESS: Well, they do talk in here, if you go to the abstract, about this disease being linked to patients taking estrogen, progestin contraceptives and hormone

Page 275

replacement therapy. They do talk about the link of that in some of these individuals for what the individuals' characteristics were.
But I agree, I haven't stated and I'm not saying that this paper by itself makes the link of PTC, PCOS and hyperandrogenicity, but it does provide a piece of the puzzle along the way.
And that's all I'm using the study for. It's part of the information that produces this weight of the evidence, in my view, for androgenicity. It's why it makes sense that we -- I'm talking about it here, because I'm going to talk about PCOS.
Well, I have information to realize that PCOS is a condition that is linked with PTC, and what is it about PCOS that we know? And that's where I go with the rest of this paragraph here when I talk about this paper.

Page 276

QUESTIONS BY MS. COOK:
Q. You're not claiming that any of the patients that took the estrogen progestin contraceptives or the hormone replacement therapy were on LNG, are you?
MS. NATALE: Objection. Form.
THE WITNESS: I don't know that they report that, so let me look.
I don't think they tell me, so I can't answer that.
QUESTIONS BY MS. COOK:
Q. Okay. The next one you referenced was Klein. Right?
A. I point you also -- you were asking for evidence in the paper, so go to Table 1 where they actually look at the fact that some of these women have certain levels of circulating testosterone in their blood.
And they actually talk about hyperandrogenism in these individuals as well. So that's another piece to link this then with androgens.
Q. So the --
A. So I was incomplete in my previous answer.

Page 277

Q. There were eight women in the study who had higher than normal free testosterone levels; is that what you're looking at?
A. So I'm looking at -- I'm looking at biochemical hyperandrogenism here, greater than 1 high androgen level, and looking at the population across women who were anovulatory, but they also break it down -- they're breaking it down by different characteristics of PCOS patients.
Severity of disease means no ovulations versus more frequent. And so you're seeing that there is -- there's -- in the majority of the patients in this -- in this population, they're seeing a number of -- a number of patients that -- with these different abnormalities in their menstrual cycles that are showing a biochemical hyperandrogenism.
Q. Now, are you aware of any literature that has concluded that it is the androgenic characteristics of PCOS that leads those patients to develop PTC?
MS. NATALE: Objection. Form.

Page 278

Asked and answered.
THE WITNESS: Well, I already answered that. I said I don't think you'll find that statement in here. But again, this is --
MS. COOK: I said any literature.
MS. NATALE: She's still answering.
THE WITNESS: Oh, I'm sorry. Any literature at all?
QUESTIONS BY MS. COOK:
Q. Yes.
A. I'll have to look at the rest of my papers to see if that's in there. I don't recall that, but we can go through them.
Q. So Table 1 in the Glueck paper that you just pointed me to that has these different measurements in the PCOS patients who had PTC, you pointed to the one that says biochemical hyperandrogenism?
A. Yes, and then also below that --
Q. And can I --

Page 279

A. -- you also have the data on clinical hyperandrogenism as well.
Q. Okay. Let me finish my question, please.
MS. NATALE: Please also allow her to finish her answers.
MS. COOK: I wasn't finished with my question, and she can wait for me to ask her a question.
MS. NATALE: It can go in both directions.
QUESTIONS BY MS. COOK:
Q. The measurement of biochemical hyperandrogenism, have you ever seen a measurement for what that is in any Mirena patient?
MS. NATALE: Objection. Form. Compound.
MS. COOK: There's no form objection. What is it? What's the objection?
MS. NATALE: What's the question again?
MS. COOK: You're literally objecting to every question, and if

Page 280

the Court sees this, I don't think he's going to like it.
MS. NATALE: I'm not objecting to every single question.
MS. COOK: Please object when you have a legal basis.
MS. NATALE: I have the right to object to objectionable questions. You don't need to -- the tone is not appreciated. I have not been objecting in bad faith.
Your question states: The measurement of biochemical hyperandrogenism, have you ever seen a measurement for what that is in any Mirena patient?
MS. COOK: What's the basis?
MS. NATALE: Foundation. Compound. I could continue.
MS. COOK: What's the compound?
MS. NATALE: You're talking about biochemical hyperandrogenism in any woman with any -- in any Mirena patient.

Page 281

QUESTIONS BY MS. COOK:
Q. Dr. Plunkett, do you know the answer to the question?
MS. NATALE: Thank you. Continue.
THE WITNESS: Could you repeat the question so I make sure I'm answering the right question?
QUESTIONS BY MS. COOK:
Q. Yes.
Do you have any idea what any Mirena patient's measurement biochemical hyperandrogenism is?
A. If what are you asking me is have I seen tabulated data where Mirena patients have been classified based on a level of hyperandrogenism -- is that what you're asking me?
I don't recall that, but that doesn't mean that I can't find -- that there won't be data in the clinical studies where they've looked at levels of, for example, testosterone.
And I do know -- what I do know, though, is there are patients in the

Page 282

studies who are showing signs of hyperandrogenism, which would include acne and hair growth.
So in those patients, those are symptoms or signs and clinical signs that are indicative of those effects with the drug.
Q. This was a very specific question, and I'm going to ask you to just focus on my questions because I don't want to have to ask the Court for more time. I'm asking you about the specific readings in this chart.
The reading that you pointed me to for clinical or biochemical hyperandrogenism or both, have you seen, as of today, a number for that reading in any Mirena patient?
MS. NATALE: I will object. Asked and answered. And I will also preserve an objection to any request for additional time.
MS. COOK: It's a different measurement. Listen to the question.
MS. NATALE: Sure.

Page 283

QUESTIONS BY MS. COOK:
Q. Can you answer?
A. So if you were -- I'm going to repeat because I want to make sure I'm answering the right question.
If you're asking me can I go to the clinical datas or patient data from anybody that I have seen on Mirena -- is that not what you're asking me?
Q. My question is: Have you looked before today to see what the clinical or biochemical hyperandrogenism or both reading is in any Mirena patient?
A. If you're asking me have I looked for a number like this in a table, I can't answer that. I haven't looked. I haven't focused on looking for it, but I can't tell you that there isn't such data available because I do know that there's clinical symptoms data.
Q. Have you looked at the free testosterone levels in any Mirena patient?
MS. NATALE: Objection. Form.
THE WITNESS: I haven't done a focused analysis, no, but that doesn't

Page 284

mean that the data isn't among the data that I have reviewed. I'd have to go back and look.
QUESTIONS BY MS. COOK:
Q. I'm just asking if you recall doing that as of right now.
You understand that's the question, right?
A. Yes. And that's why I always start out by telling you I haven't done that focused review as we sit here today. And then I'm saying, however, I believe that there is data responsive to that based on what I've reviewed.
Q. Can you tell me what the free testosterone data in Mirena patients looks like compared to a normal level?
A. I can only tell you based upon the symptoms data that free testosterone data should be elevated.
But to answer that question, I'd have to go back and look at the data for those patients in the clinical trials that I'm thinking of. And I don't know. I'd have to go look because that was not -- I was not

Page 285

trying to identify that specific data in my analysis.
(Plunkett Exhibit 25 marked for identification.)
QUESTIONS BY MS. COOK:
Q. Exhibit 25 is the Klein article that you rely on, correct?
A. Yes.
Q. And you say on page 31 of your report that in a recent paper the role of androgens and PTC was described, and you point to Klein, right?
A. Yes.
Q. Now, this study looked at patients who already had IIH and then measured the different hormone levels in them, right?
A. Yes. They were looking at identifying what types of endocrine dysfunction there might have been in the patients that have been diagnosed with PTC, yes.
Q. And this does not reference any use of LNG or Mirena or any LNG product in any IIH patient, correct?

Page 286

A. I'll have to look because I did not cite that in my paragraphs. If you want me to look, I will. I'll have to look to answer that.
Q. You'd have to read through the paper to see if there's any evidence that any of these people were using LNG?
A. Yes, because that's not the way I have cited this paper in my report.
Q. Certainly sitting here today, you don't remember having anyone in this study that had anything to do with LNG, right?
A. I don't recall that, no. But, again, if you want -- all I'm telling you is I don't recall it. I'd have to look because I don't -- I did not certainly use -- I did not cite this paper per my -- per my report for that premise. So as a result, in order to answer, I'd have to look.
Q. Page 975 of the article says that -- in the discussion, a few lines down it says, "The key finding in this study is that circulating androgens, including androstenedione, testosterone and its

Page 287

bioactive fraction bioavailable testosterone, androgens originating in either the ovaries or the adrenal cortex were clearly linked to an early age of onset of IIH."
Right?
A. Yes.
Q. It doesn't say that the androgen levels were linked in this study to an increased risk of IIH overall, right?
MS. NATALE: Objection. Form.
THE WITNESS: So if you read the rest of this paragraph, they conclude with saying, "Raising the possibility of causal involvements of hormones such as androgens in the pathogenesis of IIH."
QUESTIONS BY MS. COOK:
Q. And they report that as a possibility but not as a proven fact, right?
A. They use the language, "Raising the possibility of causal involvements."
Q. And they don't say that their study showed that there was causal involvement of androgens in the pathogenesis of IIH, correct?

Page 288

A. I'll look and see if I see that. I don't recall that. But, you know, pointing to what I remember, which was the discussion there, again, as consistent with how I'm citing it.
Q. Well, earlier in the same paragraph it says, "One might speculate then that in women susceptible to the evolution of IIH, increased circulating androgens might function as a precipitating factor allowing earlier expression of the disease," right?
A. Yes.
Q. That certainly is stated as a hypothesis, not a finding, right?
MS. NATALE: Objection. Form.
THE WITNESS: In that sentence, that's correct.
QUESTIONS BY MS. COOK:
Q. And if you look at the last paragraph, the conclusion paragraph in the paper on page 976, it says -- it repeats the key finding that we just looked at and it says, "Short of conclusive evidence for a role of androgens in the expression of IIH, these findings nevertheless comprise

Page 289

sufficient circumstantial justification for future reassessment of the role of androgens in IIH in female patients."
Right?
A. That's what is stated, correct.
Q. So this article does not say that it's providing conclusive evidence for a role of androgens in the expression of IIH, correct?
A. That's correct. What it provides is evidence of a biologically plausible mechanism.
Q. And it says that there should be future reassessment of the role of androgens in IIH in female patients, correct?
A. That's what is stated, yes.
Q. Now, in terms of turning to the next page of your report, you mention a recent abstract where an androgen signature was identified in patients with PTC, and you reference the O'Reilly abstract, right?
A. Yes.
Q. So let's look at that one.
(Plunkett Exhibit 26 marked for identification.)

Page 290

QUESTIONS BY MS. COOK:
Q. That's Exhibit 26, right? Exhibit 26 is the O'Reilly abstract that you cite?
A. You've marked it as 26, yes. Is that what you're asking me?
Or, yes, it is the O'Reilly abstract I cite, if that's what you're asking me.
Q. Yes.
And this is an abstract from a November 2017 meeting, right?
A. Yes.
Q. And what this studied is it looked at women with IIH and then women with PCOS and women with obesity, right?
A. Yes.
Q. And it doesn't look at any woman that's using LNG, correct?
A. He doesn't tell me that, no.
Q. And it says that we show that women with IIH have a distinct androgen excess phenotype compared to PCOS in simple obesity with active -- higher active serum androgens.

Page 291

And then what's that next word?
A. 5alpha-reductase activity. That's an enzyme involved in androgen synthesis.
Q. And increased CSF androgens?
A. Yes.
Q. So with respect to the 5 -- what did you say? 5alpha?
A. 5alpha-reductase activity.
Q. Do you have any idea what the measurement of 5alpha-reductase activity is in any Mirena patient?
A. If I looked for data on that; is that what you're asking me?
I don't recall it, no. That doesn't mean it's not there.
Q. And have you looked at any data about the level of CSF androgens in Mirena users?
A. I don't recall that having been collected, no. That would be a fairly invasive test, so I'd be surprised that that was done.
Q. The last sentence there says, "Further studies are needed to understand the

Page 292

mechanistic role of androgen excess in the pathogenesis of IIH."
Do you agree with that statement?
MS. NATALE: Objection. Form.
THE WITNESS: I certainly agree that we have not delineated all possible aspects of the role, yes, that is true. So again, it's biologically plausible and more work should be done.
QUESTIONS BY MS. COOK:
Q. And the O'Reilly abstract does not conclude that androgen excess is playing a causal role in the pathogenesis of IIH, correct?
A. No, and that's not what I -- that's not how I cite it. I cite it as, again, evidence for a biologically plausible mechanism.
Q. Do you agree that the -- that further studies would be required in order to understand the mechanistic role of androgen excess in the pathogenesis of IIH?
A. Well, certainly if you want to

Page 293

understand the exact molecular mechanisms, absolutely, but unfortunately there's no animal model or cellular model that is going to likely allow you to do that.
But certainly, yes, more study is going to be needed, absolutely, if you want to get into the details such as gene expression profiling or genetic signatures that might be linked to it, or even maybe doing a study where you look at levels of androgen CSF if you're already doing a lumbar puncture, for example, on patients.
Q. Certainly as of November 2017, there was no proven mechanistic role of androgen excess in the pathogenesis of IIH, correct?
A. No, but it was biologically plausible based on the evidence that I'm citing.
Q. And again you said no, and my question was am I correct.
I think you're agreeing with me, right?
MS. NATALE: Objection.
THE WITNESS: Yes, and I have

agreed with you all along.
QUESTIONS BY MS. COOK:
Q. Okay.
A. I said we don't know the exact molecular mechanism; however...
Q. I just was trying to correct for the double negative. You understand.
MS. NATALE: There was a double negative? It was an answer and then...
QUESTIONS BY MS. COOK:
Q. The next article or piece of literature that you cite for the androgen signature for PTC is the Hornby abstract?
A. Yes.
Q. And this is by the same group as O'Reilly, right?
A. Yes.
Q. And do we need to look at that one, or do you agree that that doesn't conclude that there is an androgen signature for PTC?
A. If you want that sentence, we can pull it out and I can look.
(Plunkett Exhibit 27 marked for



identification.)
QUESTIONS BY MS. COOK:
Q. Is Exhibit 27 the Hornby 26 abstract that you refer to?
A. Yes.
Q. And the first sentence is that -- says that IIH is a disorder of raised intracranial pressure of unknown cause, right?
A. Yes, that's what is stated.
Q. And again, this is the same group that we just looked at. O'Reilly's a coauthor here, right?
A. Yes, but they do make the sentence that you just asked me about. The answer to your original question would be, yes, they do state that there is -- that they demonstrated a unique androgen signature.
Q. They say that "these results demonstrate a unique androgen metabolic signature in IIH characterized by increased testosterone but normal androstenedione, potentially driven by increased AKR1C3 activity," right?
A. Yes.



Q. And then it goes on to say, "Further evaluation of AKR1C3 in IIH would be of interest," right?
A. Yes.
Q. So they're not saying that increased AKR1C3 activity is causing IIH, correct?
A. No, but they're saying that there's a unique signature that involves the androgen metabolism, which is how I've cited the paper, again, making androgens a biologically plausible mechanism operating in PTC.
Q. Does this -- well, I guess this is a four-paragraph abstract.
Does this conclude that increased androgen activity causes PTC?
A. No, they don't make that statement, but, again, this is a piece of evidence about the issue of biologic plausibility, which is part of the weight of the evidence for causation.
Q. The AKR1C3 activity that they reference here, do you have any idea what that measurement is in any Mirena patient?



A. No, and because it's a genetic signature, I would be surprised if anybody has monitored it at this point in time.
But I think -- when I read this, I'm thinking that an interesting study design would be to do some genetic screening, and you might actually find a susceptibility factor with a mutant enzyme.
Q. And then the last one that you cite there, the Kempegowda one, I don't think we need to look at that. It's basically the same people reporting on the same study, unless you want to look at it.
A. Well, it's a different -- it's a different publication, but, yes. I mean, that one, just like these other two, I think show you that there is an identification of papers that are describing the biologically plausible mechanism of an androgen signature as underlying the pathogenesis of PTC in some patients.
(Plunkett Exhibit 28 marked for identification.)
QUESTIONS BY MS. COOK:
Q. I'll mark that one then,

Page 298

Kempegowda, as 28.
And this is a poster presentation from 2016, right?
A. Yes.
Q. And this, again, is -- the objective here is to assess androgen metabolism in women with IIH in comparison to women with PCOS and healthy, obese females, right?
A. Yes.
Q. This doesn't include any LNG users, correct, as far as you know?
A. They don't tell me that, so I don't know.
Q. And the conclusion, they talk about increased testosterone but not androstenedione, and then they say that those readings -- or certain readings fall following therapeutic weight loss, right?
A. Yes.
Q. And weight loss, of course, has been shown independently to be an effective treatment for PTC, correct?
MS. NATALE: Objection. Form.

Page 299

QUESTIONS BY MS. COOK:
Q. You've seen that?
A. I have seen literature on that, if you're asking me generally, yes.
Q. Yes.
And then the final bullet says, "IIH may be characterized by increased AKR1C3 activity," right?
A. Yes, that's true. And again, that's consistent with the other paper.
Q. And again it says, "As evidenced by increased serum testosterone relative to androstenedione and whether" -- what the levels of those two hormones in LNG users, that's not something that you've looked at, correct?
A. I don't think that anybody has provided that data, no. I don't recall the enzyme activity data.
Q. Okay. And I'm saying not just the enzyme, but you haven't looked at the testosterone levels either, right, in LNG users?
A. I thought I already answered that for you. I told you I haven't done a

Page 300

focused analysis, but I do believe that there would be some data like that that we could pull out.
Q. All right. So the final one that you cite there is Westgate 2017?
A. Yes.
(Plunkett Exhibit 29 marked for identification.)
QUESTIONS BY MS. COOK:
Q. And I'll give you Exhibit 29, which is the Westgate abstract from November 2017, right?
A. Yes. Here it is, yes.
Q. And you say that in this abstract the authors suggested that testosterone may have a pathogenic role in PTC, right?
A. Yes.
Q. Now, looking at the abstract, the last sentence there says, "We speculate that testosterone may have a pathogenic role in IIH through a modulation of CSF formation and increasing ICP."
Do you see that?
A. Well, it's not quite what they

Page 301

say. They say, "We hypothesize that obesity and androgen excess may be pathogenic in IIH through dysregulation of CSF secretion and, hence, ICP."
Q. So I'm looking at the last sentence.
A. I'm looking at the last sentence here.
MS. NATALE: I guess it flips to the next page.
THE WITNESS: I'm sorry. I apologize.
QUESTIONS BY MS. COOK:
Q. That's all right.
A. I'm really not trying to be difficult, but that's what I was -- it's funny, that sentence is almost exactly what you read; it's just a little different.
Q. Yes.
Well, either way, the conclusion is a hypothesis or a speculation that testosterone may have a pathogenic role in IIH, not a conclusive finding that testosterone does have a pathogenic role in IIH, right?

A. That is correct. This again is a piece of the evidence that there is a biologically plausible mechanism.
Q. I can't remember if it's in this section or somewhere else, you cite the Thon, T-h-o-n -- how do you say that?
A. Thon and Gittinger?
Q. Yeah.
A. Yeah, that's actually in a different section. That is, I believe, back in the...
Q. Well, in any event, it's one of the articles that you rely on here, right?
A. Its analogy, I believe, yes.
Under -- on page 34 I talk about it. I say, "In a more recent review of the topic of drug-induced PTC."
(Plunkett Exhibit 30 marked for identification.)
QUESTIONS BY MS. COOK:
Q. Okay. So I've marked this as Exhibit 30.
And in the -- this review article, the abstract describes what their methodology was, which was searching the



literature for case reports and series, right?
A. Yes.
Q. That associate medications with PTC?
A. Yes, it's what -- that's what they're doing.
Q. And then in the left-hand column near the bottom, you see where it says, "The best described" -- and it's talking about a list of causes of secondary PTC.
It says, "The best described are estrogens, tetracyclines, corticosteroids and vitamin A."
A. Yes, you've read it correctly.
Q. And do you agree that those are the best described?
MS. NATALE: Objection.
THE WITNESS: Those are commonly described.
QUESTIONS BY MS. COOK:
Q. So you don't agree with the word "best"?
A. I would use the word "commonly



described." It's not that I don't agree with it. I would use the word "commonly described."
Q. And then it goes on to say, "Most cases reported have an uncertain relationship between the specific medication and the pathogenesis of elevated intracranial pressure, which correlates with our lack of knowledge of the etiology of this syndrome."
Do you see that?
A. Yes, I do.
Q. And do you agree with that statement?
A. Well, I think I've already agreed to something similar to it. Before I told you we don't know the exact molecular mechanism of the pathogenesis, so I -- that's what I would agree with. And I think that's what he's saying -- or she's saying, actually, she and he.
Q. The section on reproductive hormones is on page 140. And on the right-hand column it talks about the Glueck article we looked at in PCOS, but then it talks about cases of papilledema that were



possibly associated with testosterone supplementation in the setting of sexual reassignment.
And I think you mentioned that earlier, right?
A. Yes, I think that was the transgender -- paper about a transgender patient.
Q. So it says that the first case was confounded by presence of a Chiari 1 malformation.
And do you know that that's a -- how that would impact an analysis of a PTC case?
A. Well, it's a malformation in the area of the brain that deals with CSF secretion, so, yes, that could impact the flow of CSF in the brain, yes.
Q. Okay. So then the second case, it says that the patient had an elevated testosterone level and a normal BMI and that the symptoms resolved with a combination of acetazolamide and a normalization of testosterone levels, right?
A. Yes.

Q. And then it goes on to say,
"The mechanism by which raised testosterone causes intracranial hypertension is not known, but one hypothesis is that elevated estrogen from peripheral aromatization of testosterone stimulates CSF production."
Do you see that?
A. Yes.
Q. And you agree that that's one of the hypotheses out there about why -- how testosterone might have anything to do with PTC, right?
A. I've heard that described, yes.
Q. And then it says that it's plausible that elevated free testosterone may increase CSF production by directly stimulating the choroid plexus, and then says that that theory has been supported by a mouse model, right?
A. Yes. And that's an important -- that's an important piece of evidence that's showing that if you can have a -- when you have a compound like LNG that interacts with androgen receptors, that you can get an effect from the drug just like you



would for the natural hormone.
Q. But this doesn't say anything about LNG, correct?
A. Well, it doesn't have to, because we know that LNG has activity at the androgen receptor.
Q. To answer my question, this is talking about free testosterone, not LNG, correct?
A. Yes, but again, you have to -- as a pharmacologist, that's how I interpret this data. That's what's important about that, putting those pieces together, not just one individual sentence picked out.
Q. Well, there's no mouse study or anything else showing that LNG is interacting with an androgen receptor in the choroid plexus and increasing CSF production, correct?
A. I've not seen that study, no, but, again, as a pharmacologist, this sentence has meaning.
Q. Certainly even in the Thon article that you cite and rely on, any mechanism by which increased testosterone



could lead to PTC is not established as of 2017, correct?
A. Can you define what you mean by "any increase"?
Did you say any increase in testosterone?
Q. No, I didn't.
A. Okay. I'm sorry, then please repeat your question. If you just want to read it off the record there --
Q. My question is: Even in the Thon article that you cite and rely on, any mechanism by which increased testosterone could lead to PTC is not established as of 2017?
A. Are you asking me is that established as the ultimate causal mechanism? No. But again, this is additional evidence that provides support for the biologically plausible mechanism, and it's consistent with the data that's been collected.
Q. And in that article, another biologically plausible mechanism that's stated is related to estrogen, correct? Elevated estrogen?



A. Well, estrogen is involved with testosterone, so it's the idea that you're having a -- you're having an increase in testosterone activity. But I would agree that elevated estrogen could also be involved.
I haven't ruled estrogen out because I'm telling you throughout this process that just like LNG has effects as an androgen, that it's the balance of the hormones in any one individual that could be important.
But certainly independent from estrogens, there's a body of literature that is focused on testosterone-type actions or androgen actions of compounds such as LNG.
Q. And we just looked at the literature that you cite in your report, correct?
A. Except for the -- we just -- only didn't go through the Harrison's, which I cite as a textbook teaching that PCOS is a hyperandrogenic situation.
Q. Right.
And that doesn't talk about

Page 310

PTC, though?
A. Well, it's part of the puzzle, so it's part of the weight of the evidence. But to agree, it does not mention PTC and androgens in that chapter.
Q. Okay. Now, now that we've looked at all of it, you would agree with me that the prospect that androgens play a role in the pathogenesis of PTC is still a hypothesis today?
MS. NATALE: Objection. Form.
THE WITNESS: I would state that it is a hypothesis that has been tested and biologically plausible based on the information that's been collected, but certainly we still don't know the exact molecular mechanism.
QUESTIONS BY MS. COOK:
Q. And none of the articles or abstracts that you cite concluded that androgenic activity increases the risk of PTC, correct?
MS. NATALE: Objection. Form.
THE WITNESS: If you're asking

Page 311

me is that specific sentence in those articles, I don't think we found that, but I do think we came close to that when we talked about the signature, the androgen signature papers. I mean, an androgen signature has to do with that specific issue when you see the -- when they talk about underlying etiology.
QUESTIONS BY MS. COOK:
Q. Is it your claim that the abstracts we just looked at, that any of them actually concluded that the IIH patients discussed in them, their IIH was caused by androgen?
A. Well, I answered that. I said I don't think you'll find that sentence. But I said you come close to that when you look at those papers because they're actually identifying what they call a signature, which is a step beyond just an observation of the fact that we know that PCOS is linked to hyperandrogen activity. So we've taken it a step further.
Q. The articles that you cite for

Page 312

your androgen theory do not mention LNG or Mirena in them, correct?
A. That's true. I think we went through that, although I told you some of those it's possible that the patients were on it; they just don't report it. So I don't see it stated.
MS. NATALE: And objection, sorry, to the previous question.
QUESTIONS BY MS. COOK:
Q. Any claim that the papers that you cite for your androgen theory include Mirena patients would be just speculation on your part, right?
MS. NATALE: Objection. Form.
THE WITNESS: Well, I haven't speculated that. That's true. I mean, I've told you what I -- I think I've gone through and tried to tell you what I believe these papers do, and they build a body of evidence for a biologically plausible mechanism consistent with what Mirena does.
QUESTIONS BY MS. COOK:
Q. There's no publication that

Page 313

says that androgenic activity from levonorgestrel or Mirena increases the risk of PTC, correct?
A. Are you asking me the ones we just went through? The ones we just went through, no, those are not -- those are papers that are doing a -- that kind of analysis.
Q. Can you point me to any paper that discusses LNG or Mirena and says that the androgenic activity from them increases the risk of IIH?
A. I don't recall one, no. I don't think that the -- you would look in the epidemiological literature for that, and I don't recall that, no.
Q. And there's no paper that is published that -- or an abstract that's not published -- that states that androgenic activity with Mirena use is a plausible mechanism for underlying PTC?
MS. NATALE: Objection. Form.
THE WITNESS: Now, that -- that we went over with the papers that talk about an androgen signature. So when

Page 314

they're making a comment about an androgen signature linked to PTC, I think that is what you're asking me.
QUESTIONS BY MS. COOK:
Q. I'm talking about Mirena.
A. I understand. But Mirena -- Mirena has androgenic activity, and so I'm saying I believe that that's -- in answer to your question, I would point you to those papers. That's where that link would come.
But I don't disagree that nobody has a study that has exactly as you're asking. I've already answered that for you. I told you I don't think I can find that for you. But I'm trying to explain to you what is out there, and I do believe it builds a biologically plausible mechanism.
Q. Okay. Let me just ask my question again then because I don't think you understood it.
There's no paper out there that states that the androgenic activity with Mirena is a plausible mechanism for PTC?
MS. NATALE: Object to the form, and asked and answered several

Page 315

times.
THE WITNESS: I think I did answer that for you. I said you're not going to find that statement; however -- then I pointed you to what I think is there. I think that what we see there is consistent with that.
QUESTIONS BY MS. COOK:
Q. And what you're pointing me to are the articles we just looked at about androgen that don't have anything to do with Mirena, correct?
A. They do --
Q. They don't involve Mirena --
A. No, that's not true.
Q. -- users?
A. I disagree with you. They didn't identify the person as having taken Mirena, but absolutely it's a basic -- your own labeling talks about the fact that Mirena has androgenic activity. You have -- you have reports in your patients of androgenic side effects.
So the fact that that material is not relevant is just wrong. It's

Page 316

absolutely relevant.
I apologize. I don't mean you personally, your own label. The label for Mirena is what I'm pointing to.
Q. So what I asked you is the articles you're relying on about androgen that you're pointing me to in your answers here, they do not involve Mirena patients as far as anyone knows, correct?
A. Yes.
MS. NATALE: Objection. Form.
THE WITNESS: I already answered that for you.
QUESTIONS BY MS. COOK:
Q. Okay. Now, testosterone is fundamentally an androgen, correct?
A. Yeah, it's the -- it's the naturally occurring endogenous androgen. It circulates in all of us.
Q. And levonorgestrel is fundamentally a progestin, not an androgen, correct?
MS. NATALE: Objection. Form.
THE WITNESS: It's a synthetic compound that is a progestin with a

Page 317

high level of androgenic activity.
QUESTIONS BY MS. COOK:
Q. But fundamentally, you'll agree with me, LNG is a progestin?
MS. NATALE: Objection. Form.
THE WITNESS: It is a progestin-like compound, but by structure it differs only by one functional group from testosterone. I have that in my -- in my report.
QUESTIONS BY MS. COOK:
Q. None of the articles you cite for your androgen theory shows an increased incidence of IIH that the authors conclude is related to increased androgens, correct?
A. That's true, because they're not epidemiological investigations, which is where you would go to look for that kind of data.
MS. COOK: Okay. We need to take a break for the video.
VIDEOGRAPHER: We are off the record at 3:12 p.m. This is the close of Tape Number 4.
(Off the record at 3:12 p.m.)

VIDEOGRAPHER: We are on the record at 3:21 p.m. This is the beginning of Tape Number 5.
QUESTIONS BY MS. COOK:
Q. Dr. Plunkett, your report, page 32, where you talk about -- we're still in the biologically plausible mechanism section.
Right?
A. Yes, I am.
Q. So that middle paragraph there, you have a statement at the end that says, "Moreover, the fact that women are administered Mirena for prolonged periods of time, years, is another basic principle governing pharmacology and toxicology that also would lead scientists to expect androgenic consequences with Mirena exposure."
A. Yes.
Q. And I think you said earlier you don't know the average usage time for Mirena, correct?
A. Have I done -- I haven't done an analysis of it. It's meant to be -- to be



used for up to five years. And certainly a lot of the clinical data was collected out to at least two years.
Q. Now, you saw from the adverse event reports that were submitted to the company that less than half of them were in the first year, the ones where the information is available, and then I think it was 63 percent that you calculated were in the first two years, right?
A. Yeah.
Q. And so there are adverse events reported -- you know, 37 percent of them are reported after two years, right?
A. Well, yes, except that -- except that we had that problem with the unknown part of it, whether or not the data is really relevant. But, yes, the -- what we call the unaccounted for, after two years, is 37 percent.
Q. And when you say "whether the data are really relevant," you're relying on that data in your report, right?
MS. NATALE: Objection. Form.
THE WITNESS: So, I'm sorry.



QUESTIONS BY MS. COOK:
Q. You're relying on the data, the adverse event report data, and when, after starting using Mirena, people reported IIH, right?
MS. NATALE: Objection. Mischaracterizes.
THE WITNESS: So we're relying on the 2015 signal investigation, and then we went over the 2017 signal investigation reports, if that's what you're asking me about, and I describe the 2015 report numbers in my report.
QUESTIONS BY MS. COOK:
Q. Right.
A. And then on the other issue, I talk about the -- relating that to the -- the variability issue, looking at what was reported in serum as far as the pharmacokinetics of LNG and how in this particular product the most significant variability is seen out at the two-year end point.
Q. Looking back at 32, though, when you talk about the basic principle



governing pharmacology and toxicology related to duration of exposure, the source that you cite there is not a Mirena-specific or LNG-specific source, right?
A. No, although the source covers general principles of pharmacology, which apply to Mirena based on my knowledge of Mirena.
Q. And so your opinion is that you would expect more androgenic consequences with Mirena exposure if people use it longer?
MS. NATALE: Objection. Form.
THE WITNESS: No, not necessarily.
What I'm saying here is that when I'm looking at androgenic consequence, I'm expecting that to take a little more time to evolve.
So, for example, I wouldn't expect an androgenic consequence of Mirena after just one day of use to be PTC, but certainly I would expect andro -- because I would expect androgen consequences to evolve after androgen levels have been changed for

Page 322

a period of time.
You understand what I'm saying?
I don't believe -- it's not like blood pressure. You can give a drug, and within the time the drug reaches its peak you could see an increase in blood pressure, and you could relate blood pressure to that drug.
So when we talk about these hormonal changes that can lead to adverse events, typically they take a little longer than just the initial exposure to the drug.
QUESTIONS BY MS. COOK:
Q. And do you have any idea whether the androgenic side effects with Mirena that include acne and hirsutism that you reference in your report, do you know whether those are more often reported early after Mirena use is started or later?
A. Well, in the information I have seen, they're reported at a variety of different times after use of Mirena. They are reported early, and they're also reported

Page 323

a little later as well.
But "early" is relative. So not within the first day, no, but certainly they are things that you can see within the first few months of use.
Q. Do you know whether the majority of androgenic side effects like acne, for example, are reported within the first few months of Mirena use?
MS. NATALE: Objection. Form.
THE WITNESS: I haven't formed the opinion that it's the majority, but certainly you can see it.
QUESTIONS BY MS. COOK:
Q. You haven't seen literature that talks about that point?
A. I haven't attempted to define what the majority would be just for those side effects.
Q. Okay.
A. So it's possible I have it; I just haven't attempted to form that opinion.
(Plunkett Exhibit 31 marked for identification.)

Page 324

QUESTIONS BY MS. COOK:
Q. Okay. I'm going to mark your deposition notice Exhibit 31.
Have you seen this before today?
A. Yes.
Q. I want to ask you some questions about the things you brought with you today.
Turning to page 4, Exhibit A, Request Number 2 is the list of lectures, presentations, et cetera.
Would those all be on your CV?
A. Yes.
Q. And then number 3, it asks about lists of articles and publications, et cetera, that you've authored or co-authored.
The first category there is long-acting reversible contraceptives.
Have you offered any papers on those?
A. No.
MS. NATALE: Just restate my objections served.

Page 325

QUESTIONS BY MS. COOK:
Q. The second one is levonorgestrel-containing contraceptives. Have you published any papers on those?
A. No.
Q. And then Mirena, we've already been through that, and IUDs.
IIH and PTC, you have -- have you published any papers on those?
A. No.
Q. Number 4, have you published any papers about the risks associated with exposure to LNG or other progestins?
A. Not to LNG or progestins as in a drug. I have published papers that are related to chemicals that have hormonal-like activity and affect reproductive function, but not that it -- so it may be acting through a progestin mechanism, but not -- not a therapeutic progestin.
You understand what I'm saying?
There's chemicals that have hormonal effects through progesterone or estrogen or androgen.
Q. Okay. But the papers you

Page 326

published were not on levonorgestrel or other progestins?
A. That's correct.
Q. And have you published any papers on androgenic symptoms or effects of levonorgestrel?
A. Again, androgenic symptoms, yes, because I talk about that in my toxicity triggers papers, but not on LNG specifically because it was not -- isn't specifically one of the chemicals that we were looking at.
Q. You haven't published on androgenic symptoms of levonorgestrel specifically, correct?
A. No, but it says "or," and I have published on androgenic symptoms, just not "or" the effects of LNG. So I haven't done LNG-specific publication.
Q. Okay. Have you published any papers on the free levonorgestrel index?
A. No.
Q. And then number 5, I think we've gone through that.
Have you done any -- well, let me just ask: Have you done any lectures or

Page 327

presentations on long-acting, reversible contraceptives, levonorgestrel contraceptives, Mirena, IUDs, PTC, any of the things listed in number 5?
MS. NATALE: Sorry, again, just restating the objections served.
THE WITNESS: So a couple of my abstracts, again, that dealt with reproductive function deal with androgenic effects also deal with risks associated with exposure to compounds that alter hormonal function, but certainly not LNG or the therapeutic drugs that I discuss in my report.
QUESTIONS BY MS. COOK:
Q. And are those abstracts listed in your CV?
A. Yes. Look for the abstracts that deal with toxicity triggers or for reproductive -- reproductive function. And I think that there's also an abstract on copper toxicity where I talked about reproductive function.
Q. Where would I be looking for

Page 328

this? What year was this, or years?
MS. NATALE: Do you have your Exhibit 1?
THE WITNESS: Let me get my Exhibit 1 out and see if I can point you to them.
QUESTIONS BY MS. COOK:
Q. So I see number 5 has to do with copper, copper reference dose for soil remediation.
Is that one of the ones you're referring to?
A. No. I'm referring to 3, because the high throughput screening assays we were looking at were assays for looking at receptor binding to androgen and estrogen receptors. Those were a couple of those.
The number 6.
And then the other copper -- the other copper may be a talk instead of an abstract. Let me look and see.
The copper one I'm thinking about may be the one you were pointing to, which was number -- what did you say, number --

Page 329

Q. 5.
A. -- 5, because the project that you were talking about here that I did had to do with identifying different toxicity end points for copper when we're trying to develop a reference dose. And so some of that data was reproductive toxicity data, so looking at effects of copper on hormonal levels, things like that.
Q. And again, those aren't about LNG, right?
A. No, they're not.
Q. Okay.
A. And then I have publication on the toxicity triggers as well.
Q. So did you bring any documents related to the abstracts you just pointed me to?
A. No, I don't have copies of those easily obtainable.
Q. Did you bring the abstract that's listed in number 6 on the...
A. No, I didn't bring -- I only brought you things that you specifically asked for from my nonpublications. I mean,

nonpeer-reviewed publications.
Q. So number 7 asks for certain slides and handouts on specific presentations and --
A. I brought you -- I brought you what I said. I did not have two of them.
Q. You brought two slide sets, right?
A. Yes.
(Plunkett Exhibit 32 marked for identification.)
QUESTIONS BY MS. COOK:
Q. And I'll mark as 32 the October 2006 presentation and ask you to identify that.
A. Yes, that's one of the two. That's the one that's listed on page 5 under number 7, second bullet.
Q. And that was for the AAPS visiting scientist program?
A. Yes.
Q. What is AAPS?
A. American Association of Pharmaceutical Sciences -- Scientists.
(Plunkett Exhibit 33 marked for



identification.)
QUESTIONS BY MS. COOK:
Q. And then I'll mark as 33 the other slides that you brought.
And can you tell us what 33 is?
A. Yes, so that's a copy of the first bullet under number 7.
Q. Which is another AAPS program, right?
A. Yes, that's correct.
Q. Okay. And then the list of all the expert reports that you've read, I know that we marked materials reviewed, additional materials reviewed, after your report, which is --
MS. NATALE: It is number 4.
QUESTIONS BY MS. COOK:
Q. -- number 4.
A. That is correct.
Q. Are those the only expert reports you've reviewed as of today?
A. Yes, other than the -- well, yeah, expert reports, that's correct. And the depositions, I think I listed those in my original list, the ones I had reviewed.



Q. Have you had any communications with any third parties other than counsel for the plaintiffs about this litigation?
A. No.
Q. Have you spoken to any of the other experts for the plaintiffs in this litigation about the litigation?
A. No.
Q. Have you had any communications with any of the authors of the Valenzuela 2017 publication?
A. No.
Q. And then number 12 asks for all work product or notes or anything else that you created in connection with the litigation other than draft reports.
And you brought a number of highlighted articles with you, but did you have anything else responsive to that request?
A. There was one sheet there that had a calculation on it from the Japanese data I brought you, one single sheet, a table from one of the cited exhibits.
MS. NATALE: It's a five-page



document.
THE WITNESS: Yeah, that one.
So that's the only other one, I think the second page, where the -- is possibly where the notes are.
And there's a sticky there for -- that I used in that table as well. That's the molecular weight of LNG that I used in my calculations to do the conversion in Table 1 of my report.
(Plunkett Exhibit 34 marked for identification.)
QUESTIONS BY MS. COOK:
Q. All right. So I'll mark this as 34.
And this is a couple of pages from the clinical study report for Study Number 10982, right?
A. Yes.
Q. And I'll hand it to you. It's my only copy, so I'm trying to figure out what it is.
It's about -- the section here is about the serum LNG concentrations?

Page 334

A. Right. It's a source -- I wanted you to have the source of the data when I actually did the calculation. So that is the data I cite in that Table 1. I tell you that I use that study report, and that's where I came -- because they don't report in that table the mean, so I had to calculate it.
Q. That's where you came up with the number for your table, right?
A. Yes, exactly.
Q. Did you read this whole clinical study report for the study?
A. Yes, I have it. I have the study report. I don't think I read every word, but I have read the study report.
Q. And then do you have any graphics prepared that you're planning on using at trial?
MS. NATALE: Just restating the objections served.
THE WITNESS: Not at this point, although I expect if I go to trial, I typically do do some graphics, and I certainly would

Page 335

provide those to you if that becomes necessary to do.
QUESTIONS BY MS. COOK:
Q. Do you have any consulting contracts or retention letters related to your involvement in the litigation?
MS. NATALE: Restating the objections served.
THE WITNESS: No, I do not.
(Plunkett Exhibit 35 marked for identification.)
QUESTIONS BY MS. COOK:
Q. I'm going to hand you Exhibit 35. And what is Exhibit 35?
A. It is copies of the invoices to date for this -- my work on this case, so the review of documents and preparation of my report.
It does not include billing for this month, January. I will generate a bill at the end of the month for the time this month to get ready for the deposition and to be here today.
Q. Do you have an estimate of how much time you've spent in January?

Page 336

A. Probably an additional -- to get ready, probably additional maybe six to eight hours of time at the most. That would be to mainly gather the materials for the notice of deposition, review my report, go through some of the papers that -- we reviewed some of the papers.
Luckily for me this was fresh in my memory because the report was back in December. So it was a little easier, didn't take as long to get ready.
Q. Have you spoken to any of the plaintiffs in the litigation?
A. Not that I'm aware of, no.
Q. Have you spoken to any of the plaintiffs' health care providers in the litigation?
A. The same answer: I am not aware of anybody that I've spoken to that is a health care provider in this litigation.
I only know one person that's involved in this litigation, and it's not a health care provider, I don't believe.
Q. Who is it?
A. I know Dr. Moye, but I haven't

Page 337

spoken to him about his work in this case. I just -- he and I have known each other for years.
Q. And you've been in multiple litigations together, right?
A. Maybe twice I can think of we've been in litigations. He often does different things than I do, but at least twice I can remember that we've been in the same litigation that I'm aware of. That doesn't mean that he wasn't listed and I'm not aware of it.
Q. Who retained you for this litigation?
A. I got a phone call from Leslie of the Pulaski Law Firm. That's why the initial invoices have been sent to her.
Q. Leslie LaMacchia?
A. Yes.
Q. Have you worked with her before?
A. Yes.
Q. In what litigation?
A. When she worked with a different firm in the Risperdal litigation

Page 338

for state Attorney Generals.
Q. When was that?
A. Oh, gosh. It's been -- I don't remember the case you and I actually worked on together. I don't know how long you -- when you left, but I've been working on -- I worked on state AG cases for five or six years.
So it was with the firm -- she was with Bailey -- at the time Bailey Perrin & Bailey, and now it's Bailey Peavy and Bailey. And they may have changed their name again, but...
Q. Have you worked with any of the other plaintiff lawyers involved in this litigation to your knowledge?
A. No, I haven't had the pleasure, that I recall.
Q. When you were first contacted about the Mirena litigation?
A. I don't know the exact date. It was sometime I believe in early summer or late spring of 2017.
Q. The first time that you billed was from September 2017?

Page 339

A. That's correct.
Q. And did you do any work on the case between the first contact in early summer and late spring -- or late spring 2017 and September 2017?
A. Yes. As I customarily do, when I was contacted I -- before I agree to work on the case specifically, I will do some additional -- research on my own. So I spent -- I don't know exactly the time. Usually it's two to four to five hours looking at the scientific literature at the issues that were described to me over the phone that they were interested in me potentially helping with; mainly pharmacokinetics and biologic plausibility issues, mechanism issues, related to a weight of the evidence assessment.
Q. And you didn't bill for that time?
A. Not for the first couple of hours, no, because I had to determine whether or not I would be able to work with them on the case. And once I decide I can work with them, then I will start to bill.

Page 340

And then I didn't actually do any work until September because I was very busy this summer on other things. And I didn't have a deadline that was imminent.
Q. Okay. So you -- do you remember what exactly you looked at before you agreed to serve as an expert?
MS. NATALE: Objection. Asked and answered.
THE WITNESS: I don't know exactly which documents, other than I know I did look at the labeling for Mirena.
I looked at also the labeling for the other lower-dose products, Kyleena, Skyla. I looked at the FDA review document, summary review for Mirena. And I did a quick literature search to look at what type of information was out there on the relationship between LNG specifically and PTC, pseudotumor cerebri.
So I do believe I identified maybe the Etminan paper initially and some of the case reports, the older

Page 341

case reports, and then also the Norplant -- the Norplant case reports came up because I did LNG, not specifically Mirena.
QUESTIONS BY MS. COOK:
Q. And the older case reports you're referring to, those are Norplant, right?
A. Yes, the ones from the '90s that I cite in my report.
And then I probably also pulled -- I know I pulled a couple of review articles on the pharmacokinetics of progestins and compared that to what was in the FDA review document for Mirena.
Q. Now, you're charging $300 as an hourly rate, right?
A. Yes.
Q. Is that for testimony as well?
A. Yes.
Q. Is that less than you've charged in the past for testimony?
A. Yes. As of June, I changed my billing rates to be equal. It's just easier for me and accounting purposes to charge the

Page 342

same rate. So I used to charge $300 for work and $400 for testimony, and now it's 300 regardless.
Q. Okay. So looking at the time that you spent, is the time that you spent, at least once you decided to be an expert for the plaintiffs, is that reflected in the invoices?
A. Yes, that's correct.
Q. And there are entries for review of documents and then there's a conference call.
I'm assuming that's with an attorney or multiple attorneys, right?
A. Yes. It would have probably -- it would be with either Ms. LaMacchia or with a combination of Ms. LaMacchia and Ms. Natale.
Q. And then a meeting with attorneys in October.
Do you remember who that was with?
A. With Ms. LaMacchia and Ms. Natale.
Q. Have you met with anyone else

Page 343

who represents the plaintiffs, other than Trevor who is here today?
A. And I did not meet him until this deposition time. But actually yesterday we had a short meeting, and I met with him for about two hours yesterday.
But, no, I spoke on the phone -- on the phone call there may have been other attorneys on the phone, but -- well, in fact, I can't think of Larry's last name. Mr. Ward?
MS. NATALE: Jones.
THE WITNESS: Jones.
Mr. Jones, I believe he was on the phone possibly with me at one time.
QUESTIONS BY MS. COOK:
Q. So you said that you met with the attorneys for a couple of hours yesterday?
A. Yes.
Q. How long?
A. I think it was a little over two hours. We went through the deposition notice --
Q. You don't have to tell me --

Page 344

MS. NATALE: I was just about to --
THE WITNESS: I'm sorry. Sorry.
QUESTIONS BY MS. COOK:
Q. And was that with the three attorneys who are here today?
A. That's correct.
Q. Did you do anything else to prepare for your deposition?
A. Other than what I've already described for you, which is gather the material, review the report and review a few of the papers.
Oh, I reviewed -- I reviewed this month the -- some of the other materials, obviously, too. Yesterday I didn't review those, but I did this month.
The expert reports of some of the others experts, I have been through those since my report. I already gave you those: Dr. Moye, Dr. Darney, Dr. Fraunfelder. I forget who else. You have a list of them.
Q. And that would be -- that's all within the six to eight hours that you spent

Page 345

in January?
A. Yes, right, exactly. I just -- you know, I quickly read through to get an idea of what their opinions are.
Q. When you reviewed the materials in this litigation, did you make sure that you were considering evidence on both sides?
A. Yes, absolutely. When I do my literature search, I make it broad and general. And I pull article -- more articles than I may cite, and some of those other articles would be potentially articles that describe other -- other opinions. For example, there's some other mechanisms described in the literature.
Q. Do you agree that it's important to consider evidence on both sides of an issue rather than just evidence supporting one side?
A. Absolutely.
Q. In your report, do you acknowledge whether there are pieces of medical literature that go against the opinions that you're offering in the litigation?

Page 346

MS. NATALE: Objection. Form.
THE WITNESS: When appropriate, I try to do that. So, for example, that's one of the reasons why I describe both the Etminan article and the Valenzuela article and then the reassessment, the letter to the editor that comes with the Etminan article.
I describe -- I've tried to list all the case reports I could find.
And on the mechanism, I made a decision what I think is biologically plausible based upon the majority or the weight of the evidence. So certainly there are other papers that discuss other potential mechanisms, but it's not that -- it's not that I'm saying they're not possible. I'm saying that I believe the weight of the evidence leans towards the androgen activity, which is why I spend the time in my report describing that.
And pharmacokinetics, I tried

Page 347

to be as complete as I could. I don't think there's a lot of controversy on pharmacokinetics. So a lot of it is factual information over what levels are, what variability levels are, what half-life is, what is -- how it binds. Those, I believe, are topics that there's not as -- not the same kind of questions you might raise when you talk about what does epidemiology say.
QUESTIONS BY MS. COOK:
Q. Well, certainly the opinion that -- in terms of the overall conclusion, though, that LNG increases the risk of IIH, you agree that that is a matter of dispute in the medical community, correct?
MS. NATALE: Objection. Form.
THE WITNESS: I don't know that it's a dispute. I would agree that people have different opinions, for example, in this litigation, but I certainly see a lot of -- I see a lot of discussion in the medical literature of the information we do have, for example, cases of PTC in

Page 348

association with use of Mirena.
I don't know what you mean by -- maybe you need to describe what it is you're talking about and I can respond a little better.
QUESTIONS BY MS. COOK:
Q. What I'm just trying to understand is whether you believe that your conclusion that LNG in Mirena increases the risk and can cause or contribute to PTC is something that's undisputed in the medical community.
A. I would say that nothing is going to be undisputed, if that's what you're asking me. I would say to you that I haven't seen -- you did ask me a question earlier that would be sort of an answer to that question: It doesn't exist. I haven't seen anybody that has published a weight of the evidence assessment in the same way I've done it that has come to a different conclusion. So that's typically what you might point to.
I mean, I do a different analysis than many scientists who provide you with the summary of one study or one piece of

Page 349

data. I take all that data and synthesize it, and that isn't something that all the time shows up in the published medical literature.
Q. Well, you say that no one has published a weight of the evidence assessment in the same way you've done yours that comes to a different conclusion.
Nobody has published one that comes to the same conclusion as you either, correct?
A. I haven't seen one published, that's correct.
Q. Okay. Are you still the president of Integrative Biostrategies?
A. Yes.
Q. Is your husband still the only other employee of the company?
A. As a full-time employee, yes. I have some subcontractors that I use.
Q. Are they employees?
A. No, not a full-time employee, but I pay them a wage.
Q. You are the only person who generates revenue for Integrative

Biostrategies, correct?
A. No, my husband has some of his own clients and does generate, but I'm the principal generator of money, yes.
Q. When did your husband start generating income for the company?
A. Well, he works -- he does work that I bill out for my clients. So he does database design and literature searching and literature retrieval, and he also has some of his own clients that he works for apart from the cases that I do, or the projects that I do, where he does some of those same types of things, information retrieval.
Q. And my question is: Did that just start or has it always been the case?
A. He's always had some of his own work. Again, he also bills his overhead for part of the work that he does. He does all my accounting and bookkeeping and information retrieval for my projects, and I don't bill separately for that except for the cost of retrieval of articles, so...
Q. Has your husband done any work on this case?



A. Retrieving of articles, yes. That's all he's done in this case.
Q. Do you know what he did or what he looked for?
A. Well, I do the searching, and I send him a list of articles to retrieve and he does that for me. Sometimes he has to -- they're hard to retrieve and -- you can't get them through a library source. So he's very good at finding obscure places to dig out information.
Q. Did you bill out for his time?
A. No, I bill out by the article. So the clients are charged per the retrieval cost for the article, and that's -- part of his time is built into that.
Q. So I'm seeing your -- where you've testified that in 2016 approximately 55 percent of your income was from litigation consulting.
Do you know if that's still accurate or has that --
A. That's probably consistent. I've testified many times. It's about half of my income; sometimes a little more,



sometimes a little less.
Q. And I think you said that you thought 2017 was going to be higher than that.
Did it end up being more than 55 percent litigation?
A. I don't know yet. I haven't done my billings and taxes for the full year.
Q. Do you have any idea how much money you made from litigation in 2017?
MS. NATALE: Just an objection.
THE WITNESS: As I sit here today, I can't tell you, no.
I can tell you in a couple of months. We usually do our taxes in March.
I have a bookkeeper for the company, and I haven't gotten that from him.
QUESTIONS BY MS. COOK:
Q. So you provided a prior testimony list for the last five years, and that's Appendix C, right?
A. Yeah, should be Appendix C.
Q. Is there anything that needs to



be added to this?
A. There was one additional deposition that happened last week in a personal injury case involving Abilify, an antipsychotic medicine. It's set in state court in Louisiana.
Q. Do you have any idea what the name of the case is?
A. Well, the company is Otsuka, and the -- I can get that for you. I don't recall the name of the plaintiff. I'll have to get it for you.
I'm not a case-specific expert there either. I'm talking about labeling of Abilify, what was labeled, and also the issue of looking at sort of the mechanism of injury.
Q. Since 2001, is it still true that you've only testified for plaintiffs when you testify in product liability cases?
A. Only in -- no. No, I don't think I've said only plaintiffs. Most of my -- all my plaintiffs -- all of my product liability work, if that's what you're asking --

Page 354

Q. Yes.
A. -- since 2003 --
Q. Okay.
A. -- has been for plaintiffs' attorneys, yes, that is true.
Q. Okay. So since 2003, you've only testified on behalf of plaintiffs when you testify in product liability cases?
A. And that's drug -- and I'm talking about drug and medical device and dietary supplements, yes, and cosmetics.
Q. Do you know of any major pharmaceutical companies that you haven't testified against in that time period?
MS. NATALE: Objection.
THE WITNESS: I haven't tried to make a list. I'm sure -- I mean, I'm sure there are some that I haven't. It's been a lot of repeats.
QUESTIONS BY MS. COOK:
Q. So since 2003 in the product liability cases that you've testified in, have you ever testified that you weren't aware of a plausible mechanism?
A. Well, I don't always do

Page 355

mechanism, so that -- I would say that there are times that's not what I do at all.
I do two different types of things, and some litigation I only do one and some litigation the other. Sometimes it's regulatory only, sometimes it's pharmacology, toxicology and regulatory, and sometimes it's pharmacology -- sometimes it's pharmacology, toxicology/mechanism.
Q. Have you ever, since 2003, in a product liability case testified that there is no plausible mechanism?
MS. NATALE: Objection.
THE WITNESS: On a case where I was asked to address mechanism?
QUESTIONS BY MS. COOK:
Q. In any case.
A. Well, I mean, I don't always do mechanism, so obviously if I haven't done mechanism in the case, then that doesn't make sense.
But in the cases where I was hired to look at issues related to mechanism, I wouldn't have taken those cases if I didn't believe that the injury was caused by the

Page 356

drug or device and that I had an understanding of what was biologically plausible.
Does that answer your question?
I mean, I don't know how -- I mean, otherwise it doesn't make sense to me, but...
Q. Have you ever testified in a product liability case since 2003 that you did not believe that a pharmaceutical or a medical device or dietary supplement increased the risk of the side effect at issue?
A. Not in cases I've agreed to do. I've turned down cases that I have not agreed to do that have involved those issues, where I didn't believe I could support the cause and effect association. Or even in some cases I've turned down, I didn't believe I could opine about the labeling.
Q. But you never testified that there was no increased risk of the side effect at issue since 2003, right?
A. That's correct. And I've not been hired by defense to do that kind of

Page 357

work, which is where those kinds of opinions would come up.
Q. And have you ever -- I know you've been asked this a lot.
Have you ever bothered to add up the total amount that you've made from your litigation work since you started doing this?
MS. NATALE: Objection to that characterization.
THE WITNESS: I have never added it up, but I've agreed to people when they've thrown numbers out there. I said it's probably plausible that over the -- let's see, how many years since I started doing work? 28 years. I started doing litigation back with Environ.
It's several million dollars, absolutely, over that time period. But it's not as high as -- some people throwing out numbers like 5 million. No, it's absolutely not been that high.

QUESTIONS BY MS. COOK:
Q. So you'll agree to several million dollars from your litigation work over the number of years, but that's as specific as you can get, right?
A. Yes, that's where I -- that's what I have assessed.
MS. COOK: All right. Let's take a break, please.
VIDEOGRAPHER: We are off the record at 4 p.m. This is the close of Tape Number 5.
(Off the record at 4:00 p.m.)
VIDEOGRAPHER: We are on the record at 4:18 p.m. This is the beginning of Tape Number 6.
(Plunkett Exhibit 36 marked for identification.)
QUESTIONS BY MS. COOK:
Q. Dr. Plunkett, I'm going to mark as Exhibit 36 the highlighted versions of articles that you brought with you today, and I'll just ask you to confirm that that is the stack of articles with your highlights.
A. Yes, that is. They were in



alphabetical order.
Q. Oh.
A. It's okay. But they are. That's them.
Q. Okay. So we'll try to just keep those together if you just put them to the side or --
A. I'll just put them here.
Q. Okay. Perfect.
Okay. Can you please turn to Exhibit 21, the BfArM response document?
A. This one here?
Q. Yes.
Okay. Now, we talked about the -- page 48, the graph of time from insertion to event.
A. Yes, we did.
Q. And we did the calculation of various percentages that were -- that reported that the time from insertion to the IIH event was one year, two years or more than two years.
Do you recall those calculations?
A. I don't believe we actually



calculated more than two years because I made a comment that we have this unknown issue, but we said that there's a number left that's been 37 percent of -- that is either part of the unknowns or greater than two years.
Q. Well, that's what I wanted to clarify, because if you see the graph, there's the -- there's the various numbers and then there's 71 that are unknown, right?
A. Yes.
Q. Okay. And what we calculated was not including those 71.
A. That's correct.
Q. Okay.
A. The other two numbers we did, yes. The 40-something percent, 42 percent and the 63 percent, yes.
Q. Right.
That was all of the ones that did report the time from insertion to IIH event, correct?
A. Right.
Q. Okay. So saying that 63 percent of the patients that did report a time from insertion to IIH event were



reported within the first two years means that 37 percent of the patients that did report time to event were after two years, right? They were between 2 and 11 years as reflected in this chart?
A. Well, see, that's what I don't know. It's possible -- the point I was making is some of those 71 could be in the first two years, but we don't know.
So that other part is things over two years or something -- something less. That's what I read from that.
Maybe a more correct -- you know, at least to me, that's a more correct way to read that. If you say it's unknown, then I think you either don't know whether it's within two months, two to six, six to one, one to two or greater than two. You just don't know what that is. Probably you don't have a report of that time.
Q. Right.
And we're putting the unknown, the 71 unknown, aside because they could be at any point in time. We just don't know, correct?

A. Right. But I can't put them -- assign a percentage because they could make up some of that -- you understand what I'm saying? That other part we haven't calculated.
We have a calculated -- we have a number of events. We have so many that have occurred here on this graph by one year, we have so many that have occurred by two years, and then we have anything else. And I'm saying that anything else could be things that were reported within a time frame or are they unknowns.
And that's what I'm -- I don't have the data. That's what I'm saying to you.
Q. Well, that's not even what the graph says. It says that there's 92 that did report the time, and it was greater than two years up to 11 years, right?
A. That's correct.
Q. Okay. And if you do the math, 92 out of 248, the 248 being the people that we do have that information about, that's where you get the 37 percent, right?



A. Well, then I need to do the math to check to make sure. That may be right, but I'm worried about unknowns for some reason.
So maybe we could clarify it by saying of the ones where we know the duration in this graph -- are you saying ignore the 71? Is that what you're telling me to do?
Q. That's what we've been doing in all the calculations, right?
A. But you're telling me do that now, too, with the --
Q. Yes.
A. Okay. That's fine. If you want to do that, that's fine.
I'm just saying it's possible that these 71 could fill in any of these places.
Q. And that's true for any of the time frames, correct?
A. That's correct.
Q. Okay.
A. That's all I'm trying to point out.
Q. And all I'm trying to point out



is if you do the math -- I mean, we know that 63 percent were within the first two years, and so the rest of that percentage, which is 37 percent, would be beyond two years, right?
A. Of the ones we know the timing, yes.
MS. NATALE: Objection. Form.
QUESTIONS BY MS. COOK:
Q. Yes.
A. That's true.
Q. Okay. And that was all I was trying to establish.
A. Okay. That's fine.
Q. Now, in your expert report -- all right. Page 34.
A. Under Analogy?
Q. Actually, at the very top.
A. So this is the part of the section on experiment?
Q. Yeah.
A. Okay. That's fine.
Q. The sentence that says, "Additionally, the 2015 signal assessment data also provides some valuable examples of dechallenge."



Do you see that?
A. Yes.
Q. And you don't reference any specific cases that you believe are a dechallenge, right?
A. No, but I think they're listed in those cases.
You need me to point them out to you? I'd have to pull out the document.
Q. So you're talking about cases that were coded as having a dechallenge in the database?
A. Cases that were coded as having a resolution of the condition following the removal of Mirena.
Q. And you -- I know -- I believe that you've agreed to this earlier. You haven't gone through any of the specific reports to see if there's any other treatment that was given that would explain the resolution of the condition. That's not something you've done, correct?
MS. NATALE: Objection. Form. Misstates testimony.
THE WITNESS: I'll need to see

the document to answer that fully, but I believe that in that document there are actually discussion of dechallenge/resolution of symptoms in cases linked to Mirena, but -- I believe that may even be discussed in the signal assessment, but I need to pull it out to answer that fully.
QUESTIONS BY MS. COOK:
Q. Well, it's certainly not something that you specifically address in your report in terms of which cases the removal of Mirena you believe are responsible for the resolution as opposed to any other treatment the patient received, right?
MS. NATALE: Objection. Form.
THE WITNESS: What I will agree to is I have not cited for you which specific cases those were, that is true. I cite you to the document only.
QUESTIONS BY MS. COOK:
Q. I believe that you said earlier that you would not look at a specific patient's history and be the person to



conclude that one treatment for IIH, whether it's a medication or lumbar punctures or whatever else, was responsible for the resolution of the condition as opposed to something else, right?
MS. NATALE: Objection. Form. Mischaracterizes.
THE WITNESS: I certainly would not diagnose or look at the records and make a summary of that, but, again, in the reports I'm thinking of, if I'm correct, these are reports where that's actually mentioned as part of the analysis. So that there were reports that showed examples of dechallenge.
So I'm not -- I have not gone into each of the medical -- each of the case reports that's described in the signal assessment and tried to reanalyze them, though, if that's what you're asking me. No, I have not done that. I've relied on what the document describes itself.
Does that answer your question?



QUESTIONS BY MS. COOK:
Q. Yes.
Now, if there is -- I believe you said you're not giving any specific causation opinions, meaning that any given Mirena patient's IIH was because of their Mirena as opposed to some other condition, right?
A. That's correct, I will not be reviewing patient records or looking at patient information sheets and doing that, that's correct.
Q. And so you wouldn't be, for example, looking at the records of an obese patient who takes -- who uses Mirena and concluding that her Mirena, as opposed to her obesity, was the reason for her developing PTC, right?
MS. NATALE: Objection to form and incomplete hypothetical.
THE WITNESS: I have not been asked to do any -- what you're describing for me I would characterize as a case-specific opinion and, no, I'm not -- I have not been asked and I



typically do not do that.
QUESTIONS BY MS. COOK:
Q. And you wouldn't do that type of an opinion with Norplant either?
MS. NATALE: Same objection.
THE WITNESS: I have never worked on a case where I've been asked to do that for Norplant in a litigation context, and I certainly, again, typically would not be doing a case-specific assessment.
QUESTIONS BY MS. COOK:
Q. Do you know whether -- well, withdrawn.
Are you aware that obesity is associated with increased androgen levels?
MS. NATALE: Objection.
THE WITNESS: Oh, absolutely. I think I talked about that in my biologic plausibility section. I talked about that as well.
QUESTIONS BY MS. COOK:
Q. And obesity is associated with increased androgen levels in patients who do not even use LNG, correct?

A. It can happen, yeah.
Q. And that's been reported in the literature, right?
A. Yes.
Q. And the literature that you just referenced that talks about obesity and increased androgen levels, that's not talking about in the context of LNG, right?
MS. NATALE: Objection. Form.
THE WITNESS: Are you asking -- I don't know -- are you asking me if in the literature I'm referring to are patients -- are descriptions of obese people that are also on LNG that have increased testosterone level, is that what you're asking me? There's discussion of some of that in some of the articles that I've reviewed, but my discussion of that literature that we went over in some detail has to do with the fact that we know that obesity and PCOS are conditions related to increased androgenicity, increased androgen activity, and those are consistent with an androgen



hypothesis since we know that those are also risk factors for PTC.
And then the important thing to understand is then when you add to that, a drug that has androgen activity, you're making that situation worse.
MS. COOK: Let's take quick break for the court reporter.
VIDEOGRAPHER: We're going off the record at 4:31 p.m.
(Off the record at 4:31 p.m.)
VIDEOGRAPHER: We are on the record at 4:37 p.m.
QUESTIONS BY MS. COOK:
Q. Dr. Plunkett, I can't -- I don't have it in front of me, but I think you just said something like when you add a drug to -- well, what I understood is that you said when a patient is already obese and at an increased risk of IIH and then you add a drug that increases androgenicity, then that compounds the risk for PTC; is that basically what you were saying?
A. That -- it could do that,



exactly, and it has to do with the issue of looking at the androgen as a plausible mechanism.
Q. Okay. And my question is: Have you seen a paper in the literature that talks about how Mirena increases the risk in obese patients of PTC above and beyond the risk of PTC that obese patients already have?
MS. NATALE: Objection. Form.
THE WITNESS: I don't think it's reported in the Valenzuela study, but you could do that, I believe, based upon the data that's there, but I haven't done that.
So, in other words, remember he didn't correct for obesity, but you could look at that paper in conjunction with the literature that is out there on obesity and compare the relative risks.
So if the -- in other words, there's -- potentially a type of meta-analysis you might be able to do. I have not done that though, no.



QUESTIONS BY MS. COOK:
Q. So what you're talking about is the -- comparing the 7.7 odds ratio that's reported in Valenzuela to some other study that reports a relative risk of obesity?
A. Yes, if you had some population -- if you had something to allow you to look at the populations and compare them. If nothing else, you can take the -- the papers that look at obesity as a risk factor and look at the relative risk increase and compare that to the risk increase that you're getting with the study with the Mirena users without the correction for obesity.
Q. That's not an analysis you've done, correct?
A. No, I said I have not done that, but I'm just saying that's where I would look for that kind of data to occur. I have not seen that exact data that you're asking for, though, at this point in time, other than case reports where some people that were using Mirena were obese.
Q. And there's no paper that does what you're describing, correct?

Page 374

MS. NATALE: Objection. Form.
THE WITNESS: As I sit here today, I have not seen one. That doesn't mean it's not out there or I missed it. I haven't seen one, and I haven't cited to one.
QUESTIONS BY MS. COOK:
Q. And I know -- I think you said earlier that you didn't look at the degree to which obese patient -- obesity increases the risk of PTC to see what the relative risk was that was reported in those epi studies, right?
MS. NATALE: Objection.
THE WITNESS: So what I think I said was I didn't do an analysis of that literature, but certainly there is information in the literature about relative risks that are reported, and some of those are studies that are within my reliance list.
QUESTIONS BY MS. COOK:
Q. Do you know if it's above or below 7.7?
A. Well, I would have to look. I

Page 375

don't think it was as high as 7.7, no. That's a really high relative risk ratio. I will tell you that's -- it's on par with some of the ones that I have seen for drugs which are really potent at producing a certain event.
Q. Okay. So you don't think that the -- that -- well, let me ask you this: Do you have any idea what the incidence in the population is for IIH compared to -- for obesity compared to the background rate for the general population?
MS. NATALE: Objection. Form.
THE WITNESS: Of what? Background rate of what?
QUESTIONS BY MS. COOK:
Q. PTC.
A. PTC. I thought we read that into the record, didn't we? You brought a paper out earlier. You want me to look and see? I thought we had a paper where we looked at that. Maybe I'm wrong, but -- do you recall?
Q. Well, we looked at a paper that referenced a bunch of epi studies, that's the

Page 376

Andrews paper.
A. Which exhibit?
Q. Exhibit 7.
A. Okay. So let me look at that.
Q. But I believe that you said that you hadn't read the epi studies there or you weren't aware of having done so.
A. I said I hadn't done an analysis, but if you're wanting numbers, there's numbers here. Is that what you're asking me? I thought that's what you were asking me. Compared, because these are numbers looking at PTC and obesity, and we have numbers for PTC and Mirena use unadjusted for obesity.
Q. In the Andrews article?
A. Well, the Andrews article talks about general population and then they have incidence in the overweight, obese population, yes.
Q. And --
A. And not in all of the studies that are here, but in some of them.
Q. Okay. So in the general population, let's just take the top study, do

Page 377

you know which study that is?
A. I'm looking at Table 2. Is that where you are?
Q. Right.
A. Okay. So Table 2, I'm looking at a study that just says -- I haven't looked at these. Iowa USA.
Q. That's the Dirkin study.
A. I don't know. Again, I haven't analyzed these data. I'm just telling you there's a table here that had the data you were asking.
Q. Okay. So the general population incidence of PTC here, 0.9 per 100,000 and 3.5 per a hundred thousand of reproductive-aged women, right?
A. Yes.
And then the second line is the same study, different state.
Q. And that doesn't break it down between general population and reproductive-aged women, right?
A. No, it just says general population.
Q. Okay. So let's stick with the

Page 378

top one, the overweight women is 13 per hundred thousand and obese women is 19.3 per hundred thousand, right?
A. Yes.
Q. And that is -- do you have any reason to quibble with those numbers?
A. I haven't done an analysis. I'm just trying to point you to where the data might be if you wanted to answer that question. I have not formed an opinion one way or the other what the appropriate number would be.
MS. COOK: Okay. All right. I think that's it for me for now. Pass the witness. Thank you, Dr. Plunkett.
THE WITNESS: Thank you.
MS. NATALE: We will take a break off the record.
VIDEOGRAPHER: We are off the record at 4:45 p.m.
(Off the record at 4:45 p.m.)
VIDEOGRAPHER: We are on the record at 5:14 p.m.
(Plunkett Exhibit 37 marked for identification.)

Page 379

QUESTIONS BY MS. COOK:
Q. Dr. Plunkett, real quick before your lawyer asks questions of you.
Exhibit 37 is a thumb drive you brought with you today, right?
A. Yes.
Q. And can you just describe briefly what is included on that thumb drive?
A. So this has a copy of what is cited in Appendix B to my report, which is Exhibit 1.
Q. Okay.
A. And then in addition to that it has any documents that I received and reviewed after I filed my report on December 27th.
So I believe there's four or five expert reports from plaintiffs' experts. There's a label for Liletta, and there may be one or two other documents that I reviewed, but that's what is on there.
MS. COOK: Okay. Thanks. Go ahead.
CROSS-EXAMINATION

Page 380

QUESTIONS BY MS. NATALE:
Q. Dr. Plunkett, earlier today exhibit -- there was an Exhibit 1 which was your full report and appendices, correct?
A. Yes.
Q. And a few of the items on your Appendix C, which was the prior litigation, and then Appendix A, which was your CV, were discussed; is that correct?
A. That's correct.
Q. So we're looking at Exhibit 1, Appendix A, which was your curriculum vitae, correct?
A. Yes.
Q. And is this document up to date?
A. Yes.
Q. Okay. And could you just talk a little bit about your educational background?
A. Sure.
So I have a bachelor's degree, which I received in 1980 in zoology, and then I entered graduate school and I received my doctorate in pharmacology from the University

Page 381

of Georgia College of Pharmacy in 1984.
And then what I consider additional educational/training was I did a two-year fellowship at the program called the Pharmacology Research Associate Training Program through the National Institute of General Medical Sciences up in Bethesda, Maryland, and that's a competitive fellowship. And I was there for two years doing additional training, basically research in a lab.
And then after that I got what I call my first real job in academics.
Q. What does DABT stand for?
A. That's Diplomate of the American Board of Toxicology. So it's a certification program in general toxicology. People that practice in the area of toxicology will often obtain it. I got mine in 1993. So it's -- you have to submit your credentials, show that you work in the area, that you have experience and training and then you have to sit for an exam. And you recertify every five years, and I just recently recertified.

Page 382

Q. And it looks like on page 1 of your curriculum vitae, from 1989 until 1997 you worked with Environ Corporation?
A. That's correct.
Q. Okay. Is that a pharmaceutical company?
A. No. No. It's a consulting company, although a good number of our clients were pharmaceutical companies. So it's a consulting firm that actually after last year no longer exists. But I was in the DC office, Arlington, Virginia.
When my family relocated from Little Rock where I was at the medical school on faculty, I took a job at Environ. I was hired as a pharmacologist and -- with expertise in pharmacokinetics, and I worked on a number of projects. I would say over half my work was probably on products that were regulated by the FDA.
Our clients were food and drug attorneys in the DC area, and they represented almost all of the major pharmaceutical companies at the time. Many of them have changed names. But most of the

Page 383

ones that exist today in some other name or in some combination of names we worked for at the time.
And I did regulatory consulting, but I also did litigation support there as well. I worked as an expert supporting other more senior members of the staff that had been working in that area for a number of years, former FDA employees; one of the founders of the company, Dr. Rodricks, for example.
And then I also did environmental-type work as well. So I worked with food and drug products as well as pesticides, chemicals, a variety of different things, and essentially answered questions for our clients related to risk posed by human exposure to products or chemicals or compounds.
Q. So in that capacity, did you ever serve as a consulting or testifying expert for a pharmaceutical company?
A. Yes. One of the project -- first litigation projects I did was on behalf of -- at the time was Glaxo Wellcome, and I

Page 384

testified as an expert in pharmacology for them.
Q. You can put that aside. Thank you.
At various times today you have answered questions by discussing the weight of the evidence.
What does that mean?
A. So to me the weight of the evidence is a methodology or a tool that scientists use in order to evaluate scientific information, and it can be done in a variety of context. I use weight of the evidence in my regulatory work. When I'm putting together a dossier on a compound to describe information for a -- for regulators such as the FDA, I put together parts of a safety assessment, for example.
I use it in litigation as well when I'm doing causation analysis, for example. It's essentially gathering all the information you can that are relevant to a question you're trying to answer.
So in a case like this where, for example, I was doing -- I was answering

Page 385

two basic questions: One was related to what do we know about the pharmacokinetics of levonorgestrel, LNG; and also specifically Mirena as well.
So I gathered, you know, all of the information I could find publicly available as well as what was referred to in the labeling or referred to within the FDA submission. And I looked at what that information said based on weighing that information across the quality of the data. You evaluate different studies based on whether or not they're peer-reviewed or not, whether or not the information is -- has statistical analysis attached to it, things like that.
The other context in the question I was asked to address is use of weight of the evidence in doing a causation analysis. So in my report I describe that I use the Bradford Hill criteria. Essentially that's a set of -- to me a set of questions that organize information that you then analyze using weight of the evidence.
So essentially it's all of the

relative information I could find that related to the question of does it make sense that Mirena and LNG can cause pseudotumor cerebri, PTC, in humans that have been exposed to it through a drug product. And so that's how I use the weight of the evidence methodology.

Again, I think that's a standard method that scientists use.

Q. Okay. If you turn to -- also part of Exhibit 1 is your report in this case, and on page 4 you have a subsection 3 titled Methodology, correct?

A. Yes.

Q. Okay. Under paragraph 10 you talk about a tool -- method known as human health risk assessment.

What does that mean?

A. So risk assessment is a tool that I use also as part of my evaluations and most questions I'm asked. In other words, it is looking at whether or not there is a risk or a safety concern raised by exposure.

So in this case when you're putting together, for example, information on



a label for a product, you will look at the risks and benefits, and assessing risk is part of what you do. What does the experience tell you?

Also, when I do a weight of the evidence assessment sometimes in causation, part of that implies applying principles of risk assessment even though I'm not doing a risk assessment necessarily as part of that methodology.

The principles of risk assessment include dose response evaluation, which is part of weight of the evidence as I do in causation. It involves exposure assessment. So when we talk about temporality under Bradford Hill, that's exposure assessment as well.

So I list it there as another method that I use as a pharmacologist in different projects I work on.

Q. And then paragraph 11 you describe the weight of the evidence assessment that you were talking about just a bit ago. You state, "In the current case I examined the Mirena product labeling."



Is that correct? Do you examine that?

A. Yes, that's correct.

Q. "Internal company documents related to the pharmacokinetics of Mirena"?

A. Yes, and also the pharmacology and toxicology as well.

Q. Okay. "Scientific literature related to the benefits and risks of levonorgestrel products"?

A. That's correct.

Q. Okay. And then "as well as FDA regulations that govern the development and marketing of human prescription drug products."

Is that correct as well?

A. That's correct.

Q. You state at the end of paragraph 10, "Risk assessment is a standard tool used by pharmacologists and toxicologists when they are trying to understand the benefits and risks associated with a drug"; is that correct?

A. That's correct.

MS. COOK: Object to form.



QUESTIONS BY MS. NATALE:

Q. Did I read that correctly?

A. You read that correctly, yes.

Q. Is it correct that is a standard tool used in the field?

A. Yes, it is.

MS. COOK: Object to form.

THE WITNESS: I'm sorry, I'll be a little slower.

Yes, it is.

QUESTIONS BY MS. NATALE:

Q. Okay. And how would you define it as a standard tool?

A. It is a standard tool means that it's something that you apply. So there's specific types of risk assessments that are done by -- in the drug arena, just like there's specific types of risk assessment done in the pesticide arena.

But regardless of which arena you're in, the risk assessment uses some of the same methods, which I talked about, what are you exposed to; how much are you exposed to; looking at what -- what the risk profile or the hazard profile for the compound is as

Page 390

you go through your assessment. So those are all standard things.
The difference in the drug world is when you do a risk assessment you are -- you are also making -- if you're doing an approval decision, you're making a assessment of how -- whether or not the risks outweigh the benefits. So that's a very specific use of risk assessment within the drug approval arena.
But when I'm doing a safety assessment for a product such as Mirena, I'm using still those same basic principles of dose response and exposure, for example, to look at what does the information say.
Q. Is that a commonly accepted methodology in pharmacology and toxicology?
A. Yes. And there's, again, just -- just as there's -- I cite in paragraph 12 -- sorry, paragraph 11, to -- sorry, it's paragraph 12 -- to some of the regulatory bodies that apply weight of the evidence, and the same thing would go with risk assessment. You can find descriptions of the general process of risk assessment

Page 391

within different regulatory bodies as well.
Q. Okay. You can put that aside. Thank you.
Earlier I believe you were asked some questions about whether there's any literature that has ever identified levonorgestrel or progestins as a secondary cause of PTC.
Do you recall that?
A. Generally, yes.
Q. Okay. And I believe it was in the context of a chart in Exhibit 3 from Ball that said medication reportedly associated with intracranial hypertension.
Does that ring a bell?
A. Yes. We did describe this, yes.
Q. Okay.
A. Yeah, and we were looking at this panel over here, panel 2.
(Plunkett Exhibit 38 marked for identification.)
QUESTIONS BY MS. NATALE:
Q. Dr. Plunkett, I'm going to mark Exhibit 38 for the record, and this is a 2017

Page 392

piece by Dr. Sheldon.
Have you seen this piece before?
A. It's possible. I'm not sure. It's possible, though.
Q. Okay. Are you familiar with Dr. Sheldon from any of the other materials that you reviewed?
A. The name is familiar. That's what -- I don't recall whether or not this is the specific paper that I've seen, but, yes, the name is familiar.
MS. COOK: I'll just state an objection for the record. This is not on her materials reviewed list or the supplemental list, so I'd object to any questioning based on this paper at the end of the deposition.
QUESTIONS BY MS. NATALE:
Q. If you turn to -- you reviewed on the supplemental reviewed list Dr. Fraunfelder's report, correct?
A. Yes.
MS. COOK: Object to form. Leading.

Page 393

QUESTIONS BY MS. NATALE:
Q. Okay. Do you recall seeing a citation to Sheldon or a chart included in Dr. Fraunfelder's report?
A. There was a chart in his report, absolutely.
Q. Okay. If you turn to -- there's no page numbers on here, but right before references, okay, one page before that it says "summary," and then there's a Table 1, classification of pseudotumor cerebri syndrome, correct?
A. Yes.
Q. And it refers to a Friedman, et al., 2013?
A. Yes.
Q. Okay. Do you see that there's a secondary pseudotumor cerebri and then it says, parentheses, "most common causes"?
A. That's correct.
Q. Okay. Are any forms of progestin or levonorgestrel listed on this chart?
MS. COOK: Object to form.
THE WITNESS: Progestin is

listed, and again, this would be consistent with some of my other papers I cite in my report that describe drug-induced PTC and talk about the most common drugs. And they will often list progestins or Norplant or even in some cases levonorgestrel itself, such as the Ball paper.
QUESTIONS BY MS. NATALE:
Q. Is this chart consistent with opinions you've provided today regarding the differentiation of idiopathic intracranial hypertension versus medication-induced or secondary pseudotumor cerebri?
A. Yes, this is relevant to that discussion. It's the idea that there is a classification of this disease that where a drug induction -- or induction of a disease by drug has been identified -- by drugs have been identified.
Q. Turn back to Exhibit 3, which was Ball and Clarke. You were directed to page 434, a statement, "The oral contraceptive pill has been historically connected with the disorder, but more recent



research has shown no significant increase in the proportion of women taking the pill and those with idiopathic intracranial hypertension compared with the general population."
Did I read that correctly?
A. Are you in the medication section?
Q. Sorry, yes, I am.
A. Yes, I thought that's what you -- where you were. So, yes, I see that. Yes, that's correct.
Q. Okay.
A. And it has a citation.
(Plunkett Exhibit 39 marked for identification.)
QUESTIONS BY MS. NATALE:
Q. Okay. I'm going to mark Exhibit 39 for the record. And I will represent there's some highlighting that I made in here just for -- to direct you. It's electronic so it's on your copy as well.
But have you seen this article before?
A. Yes.



Q. Is it listed in your reference list?
A. I believe this was -- this is on my flash drive, so it would have been Exhibit B.
Q. Of the flash drive, which is Exhibit 37?
A. I mean, I think it was part of Exhibit B, or Appendix B to my report.
Q. Appendix B to your report?
A. I'm sorry, Appendix B, not exhibit.
Q. Okay. And is the -- the title of this is "Medication-Induced Intracranial Hypertension in Dermatology," correct?
A. Yes.
Q. Okay. And then on the contents it says "Six hormone therapy" on page 35, correct?
A. That's correct.
Q. Okay. If you turn to page 35 under that title Hormone Therapy, the article -- the second sentence says, "There are few reports of PTC occurring with oral contraceptive use, but the association has



never been borne out in case-control studies of PTC."
Did I read that correctly?
A. You did.
Q. Okay. And there are references 1 and 12 -- I thought that might have been Ball. Okay.
And then -- okay. The next sentence says, "Given the large number of women using oral contraceptives, a direct relationship is unlikely. It is possible that hormone-related weight gain or fluid retention may be contributory in the reported patients."
Did I read that correctly?
A. You read that correctly, yes.
Q. Okay. And you skip a sentence, it says, "In contrast to oral contraceptives, there is a well-established relationship between PTC and levonorgestrel-releasing implants."
Did I read that correctly?
A. Yes, you did.
Q. Is that consistent with the opinions that you have given in your report?

Page 398

A. Yes, it is.
Q. Is that consistent with the opinions you've given today?
A. Yes, I believe it is.
Q. You can put Ball away and all the others.
Tell me when you're ready.
A. Go ahead.
Q. If we -- you were asked some questions about Exhibit 5, which was the Hofmann manuscript, correct?
A. Yes.
Q. Okay. On page 12 -- strike that.
You were directed to Table 2 numerous times which discussed some summary statistics of estimated total and free LNG concentrations with some various LNG products, correct?
A. That's correct.
Q. Okay. If you turn to page 12, under number 4, Discussion.
A. Yes.
Q. Do you see the second paragraph starts, "Development characteristics and

Page 399

validity of the pop PK model are reported in detail elsewhere, parentheses, Reinecke, et al., manuscript in preparation."
A. Yes, that I see.
Q. Do you recall you reviewed the -- strike that.
On your reliance list, which was part of your original report, Exhibit 1, did you cite to Dr. Hofmann's deposition testimony and exhibits?
A. Yes, and I reviewed this exhibit. There was an exhibit for this paper as well. I was interested in looking at that because I wanted to understand how they had designed the model, and that's what they describe.
(Plunkett Exhibit 40 marked for identification.)
QUESTIONS BY MS. NATALE:
Q. Okay. I'm going to mark Exhibit 40, and it is Exhibit 5 from the Hofmann deposition.
And does this appear to be the Reinecke manuscript in preparation?
A. Yes, it is.

Page 400

Q. Okay. If you turn to the page ending in -- do you see the Bates numbers at the end?
A. Yes.
Q. Okay. Bates ending in 15429.
A. Okay. I'm there.
Q. And it says, "Table 1, overview of clinical studies of LNG-containing contraceptives using the integrated population PK analysis"?
A. That's correct.
Q. Okay. Do you see -- you were asked earlier some questions that LNG IUS 20 corresponds to Mirena, correct?
A. That's correct.
Q. And there appear to be two studies included; is that also correct?
A. Yes.
Q. Okay. How many individuals were included in the first study?
A. 239 in the study that's 308901, and then 94 in 89532.
Q. Okay. Do you see the third kind of -- or I guess fourth column says, "Number of LNG/SHBG/residual content

Page 401

measurements"?
A. Yes.
Q. Okay. How many SHBG content measurements were taken from the first study?
A. The first study it's 500 -- I'm sorry, yeah, 510.
Q. I think I messed that up, too. Did I say SHBG residual content -- how many SHBG measurements?
A. That's what I thought you meant.
Yes, 510 of the sex hormone binding globulin measurements were taken.
Q. From 239 subjects?
A. That's correct. That's correct.
Q. And from the second study, how many SHBG measurements were taken?
A. Unfortunately, none were taken there.
Q. Okay. You can put that aside.
You were asked -- Exhibit 7 was the Andrews paper.
Do you recall that?
A. Yes.

Q. Okay. And you were asked several questions about this paper, but namely you were asked initially about the question: Does this paper state that PTC or IIH is a condition of unknown etiology.
Is that accurate?
A. Yes. We were talking about that, yes.
Q. Okay. And you turn to page 219, do these authors specifically discuss PTCS etiology?
A. Yes, they do. They have a section on it starting on the left-hand column.
Q. Okay. About halfway down that column do you see a section starting "Secondary PTCS"?
A. Yes.
Q. Okay. So the first sentence says, "While the etiology of IIH remains unknown" --
And you were asked some questions about, correct?
A. Yes.
Q. Okay. The sentence that I



directed to you starts, "Secondary PTCS can be caused by many medical conditions and medication side effects of which an exhaustive list is detailed in the literature."
Did I read that correctly?
A. Yes, you did.
Q. Is that consistent with your explanation of how you see the difference between IIH and medication-induced or secondary PTC?
A. Yes, that's what I was trying to point out when I was describing why I preferred the term -- not to use the term "idiopathic."
Q. And is there -- are there citations to support that sentence in this paper?
A. Yes, there are two, and I believe they're articles that are -- at least one or -- one of them, I believe, maybe both of them, are on my list.
Q. Okay. So number 18 is Friedman and Jacobson 2002, correct?
A. Yes, that one is.



Q. And that one is cited in your report, correct?
A. Yes, exactly.
(Plunkett Exhibit 41 marked for identification.)
QUESTIONS BY MS. NATALE:
Q. Okay. I'm going to mark for the record Exhibit 41. It is not stapled so just be careful.
Is this the 2002 Friedman piece cited in your report?
A. Yes.
Q. Okay. If you turn to Table 3 of this -- sorry, on page 1494 --
A. Yes.
Q. -- do you see --
Do you see at Table 3, "Conditions that may produce intracranial hypertension and masquerade as idiopathic intracranial hypertension"?
A. Yes, I do.
Q. Okay. Do you see anything related to levonorgestrel or progestins in this chart?
A. Yes, there's actually a



specific listing for Norplant LNG implant system under Medications.
Q. Okay. Is there a citation for where the conditions that may produce the intracranial hypertension that masquerade as IIH, where that table comes from?
A. Yes, there is in the -- there is in the body. Right here, 28. And you can go to the back to find that, and that's a paper by Wall.
Q. Okay. And then number 3, which is Digre, correct, or Digre?
MS. COOK: Object to form.
QUESTIONS BY MS. NATALE:
Q. On page 1494 of this, do you see in the second column, italics, "no other cause of IIH identified"?
A. Yes. And down there under the -- there's citations to 28, 3, 29 and 30.
Is that what you're looking at?
Q. Oh, sure, yeah.
A. I assume that's where you're going.
Q. Where were you looking?
A. So I was looking at this whole

column because I saw Table 3 here with 28 first.
Q. Oh, I see. Okay.
A. Yeah.
And then you go down further and they're talking about this particular information, and they cite to other papers as well.
Q. Okay. Next to the title for Table 3, do you see a reference?
A. Yes. That has number 3 next to it there, yes.
Q. And that's the Digre article?
A. Yes, that is the Digre article.
Q. Okay.
A. Or Digre. I don't know how you pronounce it. Digre.
Q. Are you familiar with the article?
A. That looks familiar, too. Let me look on my list to see if it's there, but...
MS. COOK: It's not.
MS. NATALE: I assume you'll have an objection.



QUESTIONS BY MS. NATALE:
Q. We're going to mark Exhibit 42.
And does this appear to be that citation in the Friedman article that is listed in your reference list?
A. Yes, this is --
MS. COOK: Well, hang on just a second.
MS. NATALE: Sure.
MS. COOK: I'm going to object to marking Exhibit 42 that is not on her list of materials reviewed at the end of a deposition where she's already provided her list and a supplemental list, and that's what I questioned her on.
So you can answer the question.
MS. NATALE: I don't think there was a question yet, but maybe. We'll see.
Oh, no, I just marked it.
QUESTIONS BY MS. NATALE:
Q. If you turn to --
MS. COOK: Just to make -- well, while we have a pause, I'm just



going to make my objection clear.
The objection that I have is a Rule 26 violation, so a failure to state the bases for her opinions in the report and at the deposition as required.
So you can continue, if you want.
MS. NATALE: Preserve our -- that's fine. We're going to withdraw the exhibit, but I don't think that I agree with your characterization.
THE WITNESS: You want to unmark it?
MS. NATALE: I'm going to unmark it. We're going to withdraw it. That's fine.
QUESTIONS BY MS. NATALE:
Q. So you were asked some questions earlier about a set of exhibits, 8 through 10, which related to Dr. Etminan, correct?
A. 8? Yes, that's correct. Well, no, 10 is --
Q. Sorry.



A. Wait a minute.
Q. Oh, and then --
A. Yes, you're right. You're right. 8, 9, 10.
Q. And just to clarify, I think I said, but if I didn't, documents related to Dr. Etminan.
A. That's correct.
Q. Okay. And that's because Exhibit 10 is not a published article; is that correct?
A. That's correct. The other two are publications that I have cited or they're in my list.
Q. Okay. And when you were discussing the Etminan publications you mentioned, as you wrote in your report, that the -- Dr. Etminan had purportedly revised his disproportionality analysis in 2017; is that correct?
A. That's correct.
Q. Okay. And the affidavit that you were shown at Exhibit 10, do you recall, again, when that was sworn?
A. It was a date after that.

Page 410

December -- December 2016.
Q. Okay. And then this revised disproportionality analysis at Exhibit 9, when was that accepted, the manuscript accepted?
A. April of 2017.
So the manuscript -- this letter to the editor comes after the affidavit, which came after the original paper.
Q. Okay. So you were asked some questions about the affidavit at Exhibit 10, correct?
A. Yes.
Q. And does Dr. Etminan in this affidavit appear to describe apparently what he felt were numerous limitations of his original analysis?
MS. COOK: Object to form.
THE WITNESS: So you're asking about the affidavit?
QUESTIONS BY MS. NATALE:
Q. Sure.
A. Yes, there are things that he describes in here about things that either he

Page 411

felt he did not -- he had questioning about the method he had used, things like that, some things that he would redo differently.
Q. Okay. What are some of those limitations that are discussed?
A. So he talks about limiting the group to reproductive-aged females. He talks about -- talking about the use of unique cases. He wasn't sure what his analyst did. He talks about -- he says he has no basis to say that the FAERS data would have been statistically significant or the point estimate would have been greater than 2 had the control group been properly limited.
You want me to keep going? I mean, he has different -- I had not seen these before -- until today --
Q. Sure.
A. -- so I'm just reading.
There's about ten different bullets up here, things that he states. And he says then -- he also says that based on these comments he's making as the lead author, he says that the analysis provided do not provide evidence that Mirena use

Page 412

increases the risk of what he calls intracranial hypertension.
Q. As you were just discussing, this affidavit was sworn several months prior to the public -- the letter to the editor, Exhibit 9; is that correct?
A. About four months it looks like, yeah.
Q. And this revised proportionality analysis, does it appear to address each of the issues identified in this affidavit of Dr. Etminan?
A. Not everything is addressed in the affidavit. He does, indeed, talk about revising it to look at the issue of reproductive-aged females. That's the main issue that he's addressing here.
Q. You were asked about whether you were relying on any of the Etminan analyses; is that correct?
A. Yes, I did. I was asked that question, yes.
Q. And did you explain that it was part of your weight of the evidence analysis?
A. Yes.

Page 413

MS. COOK: Object to the form. Leading.
THE WITNESS: Yes. Certainly I think I was very clear that I felt that the original paper, and I also mentioned the letter to the editor that has a revision to part of the analysis, that I felt that those were pieces of information that I had obviously described and reviewed and relied upon. So it was part of my weight of the evidence in the causality section of my report.
QUESTIONS BY MS. NATALE:
Q. And back to your report which was Exhibit 1.
On page -- I think it's under Strength of Association, maybe.
A. Yeah, should be under Strength of Association. Yes.
Q. Okay.
A. It's on page 27.
Q. On page 27.
I believe -- for what -- for what precisely is Etminan cited on here?

Page 414

A. So I'm citing it as a basis for numbers that appear in the literature. So in other words, when I look at the studies that are available, I see increased risk reported that ranges from 1.85 to 7.7.

Then I point out that when he reanalyzed or age-adjusted his assessment, that he no longer found statistically findings. So his 1.85 range of numbers were no longer statistically significant, so that's what I cite.

And then I state that all of these studies are part of my weight of the evidence, looking at the relationship between LNG exposure with the Mirena and PTC.

Q. You can put the Exhibits 9 through 11 away.

You were asked some questions at Exhibit 16, which was some prior testimony you gave that we've preserved some objections to. But you did, in fact, give this testimony, correct?

A. Yes. It appears -- I mean, it looks -- I don't recall giving it as I sit here, but certainly this -- I agree this is

Page 415

my -- I remember this case generally, and I certainly agree that we read into the record accurately what I said.

Q. Okay. You, I believe, directed to page 228 of the transcript where you stated generally that when things become, say, the subject of litigation or the subject of articles or newspapers, the degree of underreporting is probably closer to the 10 percent of the range than to the 1 percent; is that accurate?

A. Yes, that's what was discussed in the published literature that talks about underreporting.

Q. Okay. If you could pull out Exhibit 21, which was the BfArM response document, and turn to page 45. I just wanted to ask you a few questions about that.

A. Yes.

Q. Do you see -- I think you talked earlier about the -- or you were asked some questions about the 14 cases that came from the FAERS database?

A. That was a different document, but, yes, I believe we did. Or maybe it's on

Page 416

the front of this other --

Q. I think it was on this page 45.

Do you see on the chart there's these dots for -- that say FAERS?

A. F-A-R-E-S?

Q. Oh, I'm sorry --

A. Yes.

Q. -- F-A-E-R-S.

A. Yes.

Q. Annual number of reports and this Figure 3-1?

A. Yes, that's on the bar graph for 2015?

Q. Sure.

A. Yes, I see that. And we did talk about the 2015 signal investigation as well.

MS. COOK: We actually were looking at page 44 when we talked about that, but it doesn't matter. Whatever.

MS. NATALE: Okay.

QUESTIONS BY MS. NATALE:

Q. So actually, let's turn to page 44 under Reporting Source.

Page 417

A. Yes.

Q. Do you see that?

A. Uh-huh.

Q. Okay. So it says, "14 cases were created based on reconciliation with the FDA Adverse Event Reporting System during the signal investigation activities described in the 2015 signal investigation."

Did I read that correctly?

A. Yes, you did.

Q. Okay. Is there any indication that any reconciliation has been done with the FAERS system since 2015?

A. No, I think that's what I pointed out. I didn't see that based upon what was described in their methods.

Q. Okay. Do you know -- you discussed a little bit the 2015 signal investigation that you reviewed.

Do you recall how many cases were reported at that time?

A. No, I'd have to pull my report back out. I'm sorry.

Q. That's okay. I don't know if it's in there, but...

Page 418

A. Let me see.
Q. Okay.
A. No, I didn't state the number --
Q. Okay.
A. -- but the documents have it if you want to pull those out.
Q. If you look at this chart on page 45, going up to 2015, is it -- does it look to be somewhere around 100 to 115?
A. So you're talking about all reports or the --
Q. Up through 2015.
A. Up through 2015?
All reports including the cases where -- so all these bars is what you're talking about?
Q. Yeah.
A. It's probably a little over 100. Yes, 115 probably. Yeah, I'd say that's about right.
Q. Okay. And 14 of those reports were not included in the evaluation until an attempt to reconcile with the FAERS database, correct?

Page 419

MS. COOK: Object to form. Leading.
THE WITNESS: Certainly 14 of them were not captured until they went to the FAERS database, that is true.
QUESTIONS BY MS. NATALE:
Q. Okay. Back on page 45, do you see the first full paragraph starts with "315 spontaneous cases"?
A. Yes.
Q. Okay. About two and a half lines after you see, "The reporting frequency is low at .22 cases per 100,000 women years," and you describe that in your report, correct?
A. Yes.
Q. Okay. And then it says, "Excluding cases submitted in the context of litigation, the reporting frequency is .08 per 100,000 women years."
Did I read that correctly?
A. Yes, you did.
Q. Okay. What degree of underreporting does that appear to reflect?
MS. COOK: Object to form.

Page 420

Object to the solicitation of new opinions on direct.
Go ahead.
THE WITNESS: Taking the .08 versus the .22, that's about a 30 percent increase in the number of reports, if that's what you're referring to. It's a significant increase in the number of reports.
QUESTIONS BY MS. NATALE:
Q. Sure.
And you -- again, when you were -- when you were asked questions about Exhibit 16, you testified that in the context of litigation the degree of underreporting is likely to be substantial; is that correct?
A. Yeah.
MS. COOK: Object to form.
THE WITNESS: Yes, that's correct.
QUESTIONS BY MS. NATALE:
Q. Perfect. You can put both of those aside.
Okay. You were asked some questions about -- earlier -- you don't have

Page 421

to take it out, but earlier when you were describing -- you were asked some questions about coefficient of variation and levels of variability of both levonorgestrel and sex hormone binding globulin levels; is that correct?
A. Yes, we were -- I think we spent some time in the paper, Exhibit 21, looking at those numbers.
Q. Okay. And you were asked if LNG serum levels decrease after a certain point in time, correct?
A. Right. We went through that table. There's a table in there, and it shows that when you looked at day 25, at different points in time that -- I was asked a question whether those mean values were lower or higher over time.
Q. Okay. And I believe you stated that -- strike that.
Let's take a look at Exhibit 22, which was the 2017 Mirena label.
And if you could turn to Section 12.2 -- or 12.3, Pharmacokinetics.
A. Yes.

Page 422

Q. The second paragraph states, "A stable serum concentration without peaks and troughs of LNG of 150 to 200 picograms per milliliter occurs after the first few weeks following insertion of Mirena."
Did I read that correctly?
A. You did.
Q. Is that consistent with the figures, the numbers, cited in your chart, in your report?
A. Yes. That is also similar to some of those numbers that were in Exhibit 21.
Q. Okay. And then it states, "LNG concentrations after a long-term use of 12, 24 and 60 months were 180, plus or minus 66; 192, plus or minus 140; and 159, plus or minus 59."
Did I read that accurately?
A. Yes, you did.
Q. How does that -- strike that.
Is that consistent with opinions you've given in your report?
A. Yes, this is -- I have a paragraph or two on -- in my section talking

Page 423

about variability, and this is the point I was making. Because if you look at the data, you find that at -- looking at the 12, 24 and 60-month levels, 180, 192, 159, also looking at the standard deviations of 66 -- plus or minus 66 with 180, plus or minus 140 with the 192, and then look at those levels in comparison to what the levels in the first few weeks are, which are typically higher, you see -- again, that variability is showing you how variable those levels can be even out to two years.
And they found in this study that two years had the highest level of variability. And those numbers of 192, plus or minus 140, are numbers that are going to be significantly more than even the levels of 150 to 200 that are occurring in first few weeks which are considered to be some of the highest levels.
Q. Okay. You can put that aside.
You were asked some questions about the citations in your report regarding the androgen mechanism, correct?
A. Yes.

Page 424

Q. Okay. And one of the citations was -- strike that.
You were asked if any of the articles that you cited discussed any patients using levonorgestrel.
Does that generally sound accurate?
A. Yes, I was -- on a number of papers I was asked that question, is there any information in there about patients on LNG.
Q. Okay. If you pull out Exhibit 24, which is the -- how do you say it, the Glueck article?
A. Glueck. It's German.
Yes, I've got it.
Q. Okay. If you could turn to page 77, do you see the second to the last paragraph on the left-hand column, it states, "It is not known whether subjects with thrombophilia are at a higher risk of IIH if they take medications associated with the development of IIH, e.g., minocycline, synthetic vitamin A, implanted levonorgestrel."

Page 425

Did I read that correctly?
A. Yes, you did.
Q. Is that consistent with the opinions you provided in your report?
A. Yes, I believe so.
Q. Is that consistent with the opinions you provided today?
A. Yes, I think so.
Q. Going back to your report really quickly, Exhibit 1, you were asked some questions about the data in your table on page 22.
A. Yes.
Q. Okay. And you were asked about on study A10982 how many subjects were included in the -- in determining that mean.
Does that -- does that sound accurate?
A. Yes. We started out by looking at paragraph 36, and then went over to the table, which is in paragraph 37, when we talked about 11 patients.
Q. Okay. And you said on page 21, you were asked about -- you said, for example, in a set of 350 patients, and that

Page 426

was referring to that study, correct?
A. Yes.
Q. Okay. Did you -- strike that.
(Plunkett Exhibit 42 marked for identification.)
QUESTIONS BY MS. NATALE:
Q. I'm going to mark, for the record, Exhibit 42 now that we withdrew the other.
And was this document included in the exhibits to Dr. Zurth's deposition?
A. Yes, I believe -- yes. Yes, this is -- this document is one.
Q. Okay. And it's included on that flash drive at Exhibit 37?
A. Yes, that's correct.
Q. Okay. Do you see here -- in the first kind of e-mail at the top of this first page, do you see a second bullet point that starts with "the LNG serum concentrations"?
A. Yes. And they're talking about the Zwoe publication here to give context, but, yes.
Q. And do you see about halfway

Page 427

through that bullet, "Nevertheless, individual results from our own studies are up to 500 picograms per milliliter at three months. In addition, data from about 350 Japanese women showed a mean value of 360 picograms per milliliter after one month treatment and individual values up to 1,000 picograms per milliliter"?
A. Yes.
Q. Okay. And is that consistent with your understanding that 350 patients had PK measures in that study?
A. Yes, there were 11 patients that had detailed pharmacokinetics, but that's what I -- that's why I was pretty sure when I had put that number in that there was a reason I used 350 specifically, but certainly, yes, there were 11 that had more detailed pharmacokinetics.
MS. COOK: And just for the record, this document is not on the materials reviewed list. There's a list of deposition transcripts. It does not say exhibits, other than for the Hofmann deposition. It does not

Page 428

say she reviewed those exhibits. So I'm just going to state the objection for the record.
QUESTIONS BY MS. NATALE:
Q. Was this an exhibit to the Dr. Hofmann deposition?
A. It was certainly an exhibit that I have seen. I have seen this on my file. So if it was Hofmann or whether it was Zurth, I've read both, and I thought I had provided exhibits to both.
(Plunkett Exhibit 43 marked for identification.)
QUESTIONS BY MS. NATALE:
Q. Okay. I'm going to mark Exhibit 43, and give me one second, actually.
And is this document included in the flash drive at Exhibit 37?
A. Yes, this is the -- part of the clinical study report. I think I -- I had five -- four or five pages from it that I have highlighted and written on that we marked as an exhibit earlier, but this is part of the larger study report.
Q. And does this appear to be

Page 429

individual serum LNG concentrations taken from that study A10982?
A. Yes.
MS. COOK: Objection. Leading.
QUESTIONS BY MS. NATALE:
Q. What is the title of this listing?
A. So this is part of the clinical study report from A10982 which is the first listing, the study that I listed in my Table 1 from my report.
Q. And what is the title of this listing 16.2.5.2?
A. "Individual serum LNG concentrations by time point during 12-month insertion of LNG IUS, Amendment 1."
Q. And how many subjects appear to be included in this?
A. This is the 300-and-some-odd subjects.
Q. Okay. Does it appear to be about 350?
A. Yes. This is --
MS. COOK: Object to form.
THE WITNESS: Yes, this is --

if we add it up, that should be what
this is from my review of this -- of
this document.
QUESTIONS BY MS. NATALE:
Q. Okay. Do you see on the final page which ends in Bates 2048?
A. Yes.
Q. Do you see the third column says, "Post-insertion, one month"?
A. Yes.
Q. Okay. And then down at the bottom do you see -- does it look to include a total number of subjects?
A. Yeah, the population in the PK -- the PK, they're having -- that's what they're talking about, here's the number of subjects, the 350, had samples at this period of time, at one month, 366, 354, and there were 45 that discontinued of the 433 that started at insertion.
Q. Is this documentation consistent with the opinions provided in your report?
A. Yes. I talk about this specific study, yes.



Q. Is this document consistent with the opinions you've provided today?
A. Yes, it is.
Q. Okay. You were asked about a subject from this study with the reported value of 725, I think?
A. Yes, that's correct. Well, I think I listed it on my paragraph, yes.
Q. Okay. And you were asked if you would characterize that as an extreme outlier, correct?
A. She asked me if I agreed with that, I believe, and I said, no, I wouldn't call that an extreme outlier, and I asked if she would define that, yes.
Q. Is this document consistent with your disagreement with the characterization of an extreme outlier?
A. Yes, because there are some values in here that are even higher than that. I believe there are some that are close to a thousand.
Q. You can put that aside.
Okay. Exhibit 26 was the O'Reilly abstract.



Do you recall reviewing this?
A. Yes.
Q. Okay. And I believe at some point you were asked questions about whether obesity increases androgens; is that correct?
A. Yes. We talked about that generally, yes. Or at least I did. I know I talked about that being an issue.
Q. Okay. And as you testified earlier, did these authors find a distinct androgen signature in PTC or IIH compared to PCOS and simple obesity?
A. Yes, and that's what I kept trying to point to is that's what's important about these -- this body of work here, this new or these newer abstracts, is it's actually providing to me important data that shows that there's a very specific type of imbalance in the hormones that are indicative of PTC that are different than the type of imbalance you may see in people -- in people with simple obesity.
So this would be a way to try to define the different roles that androgens may play based on different risk factors.



Q. Okay. You can put that one aside.
And I think this might be the last one. Exhibit 30, if you could pull that out one.
You were asked about -- you were asked some questions about the section on reproductive hormones starting at page 140, correct?
A. Yes. Yes, we did.
Q. Okay. And I believe you were asked about these authors state -- the last paragraph of that section in the right-hand column says, "The mechanism by which."
Do you see that?
A. Yes.
Q. Okay. And you were asked about the one hypothesis regarding elevated estrogen, correct?
A. Yes.
Q. Okay. That sentence -- that part of the sentence states, "But one hypothesis is that elevated estrogen from peripheral aromatization of testosterone stimulates CSF production."

Page 434

Did I read that correctly?
A. That's correct.
Q. Okay. What is aromatization of testosterone?
A. That's the formation of estrogen from -- this was the part I was talking about where these hormones are all interrelated. You can have -- administer exogenous estrogen and you can also -- you can also find levels of estrogen that are derived from other hormones. And so that's the issue of you could have estrogen involved, but testosterone is still in the link.
Q. Okay. And so both of the mechanisms described by these authors include testosterone; is that accurate?
A. Yes, I believe they do, that's why I believe that there's a good body of evidence that supports the biologic plausibility of increased androgen activity, specifically. Not just for the fact that you've increased testosterone levels, but you've increased exposure in the system to an androgenic compound that acts like

Page 435

testosterone and it is a very potent compound interacting with testosterone receptors in the body.
MS. NATALE: We'll just take a quick five minutes.
MS. COOK: Are we going off the record?
MS. LAMACCHIA: We can stay on the record. It's going to be 30 seconds unless you want to go off the record.
MS. COOK: No, I thought she said she wanted five minutes.
MS. NATALE: Okay. We're going to stay on the record.
Okay. We will pass the witness.
REDIRECT EXAMINATION
QUESTIONS BY MS. COOK:
Q. Dr. Plunkett, I have a couple of follow-up questions.
A. Sure.
Q. Let's start with Exhibit 26 that you were just looking at.
A. Okay. Yes, I'm there.

Page 436

Q. And you said that you believed that this abstract shows that there's a very specific type of imbalance in hormones that are indicative of PTC that are different than what you see in people with obesity who don't have PTC, right?
A. That's correct.
Q. And the specific hormone that -- the hormone imbalance that's discussed here, that's a hormone imbalance in obese patients with IIH, right?
MS. NATALE: Objection. Form.
THE WITNESS: Yes.
QUESTIONS BY MS. COOK:
Q. So these are obese patients with IIH who, as far as we know, are not using any kind of levonorgestrel product who have these -- this specific androgen excess phenotype, right?
A. Say that again, actually.
Q. The patients who have the specific androgen excess phenotype that's talked about in this abstract, these are obese patients with IIH, correct?
Do you know?

Page 437

A. Yes. No, that's correct. Yeah, if what you're -- I think what you're asking me is -- we have -- we have a population of patients with PTC, IIH in this paper, and they have been matched for both BMI and age to patients that either have obesity or patients with PCOS. So, yes, that's correct, there would be patients with obesity as well because they're matched for that.
Q. And we don't have any evidence anywhere of whether or not they had the same patients who now have IIH and are being tested in this abstract what the phenotype measurement would have been before they developed IIH, correct?
MS. NATALE: Objection. Form.
THE WITNESS: No, that's right. Because they're measuring these people -- they're measuring these people that already have PTC or IIH -- IIH, that is true.
QUESTIONS BY MS. COOK:
Q. Okay. So we don't know if they've always had that since they were born,

Page 438

right?
MS. NATALE: Objection.
THE WITNESS: Based on this measurement, we can't tell that. But, again, if you read what these authors are talking about, they're identifying it as, in their view, a signature for the disease.
QUESTIONS BY MS. COOK:
Q. And they say that further studies are needed to understand the mechanistic role of androgen excess in the pathogenesis of IIH; that's their actual conclusion, right?
A. Yes, they do indicate further study and, again, that's consistent with my opinions about it being a biologically plausible mechanism.
Q. You were asked some questions about your underreporting testimony and about the rates of adverse events that were reported to the company, correct?
Do you remember those questions?
A. Just a few minutes ago?

Page 439

Q. Yes.
A. Yes.
Q. And you were asked to compare the reporting rate when you include all of the litigation cases, that was 0.22 per 100,000 women years, right?
A. Yes.
Q. With the rate of adverse events or the, I guess, reporting rate of adverse events, not including the litigation cases, which was 0.08 per 100,000 women years, right?
A. Right. Yes.
Q. And you -- I believe you testified earlier you're not giving any opinion in this case about what degree of underreporting has occurred with respect to PTC and Mirena, no specific opinion, right?
MS. NATALE: Objection. Form.
THE WITNESS: I haven't formed an opinion what the ultimate number would be, that is true. And I think what we were trying to show when I was answering the question is there's certainly data within the company's

Page 440

own documents that shows something about what some of the underreporting was based upon what happens once you have the stimulated, which I thought you were tieing it back to the issue of looking at stimulated reporting that we were talking about. So how reporting has changed with publicity.
QUESTIONS BY MS. COOK:
Q. And the 0.22 per 100,000 years, women years, that is a rate that reflects stimulated reporting from litigation, correct?
MS. NATALE: Objection.
THE WITNESS: It is certainly consistent with that based on the graph. I can't tell you if that's an ultimate number, but certainly in that graph that would be that, yes, and included those -- those reports, yes.
QUESTIONS BY MS. COOK:
Q. And to give the opinion that the -- the reports that came in that were lawsuits filed, that that actually reflects how much underreporting there was before the

Page 441

litigation, that assumes that all of those patients had PTC due to Mirena, right?
MS. NATALE: Objection. Form.
THE WITNESS: It's a different question, because the issue on underreporting isn't necessarily that they're all confirmed cases of reports; it's the idea of how many reports do you get.
So the issue still -- the issue is still valid that regardless of whether or not you've done a causality assessment, those reports are for that event, and that's what the underreporting is talking about. The literature on underreporting doesn't talk about having done causality assessments on each of those reports.
QUESTIONS BY MS. COOK:
Q. Well, I'm not even talking about a causality assessment. You can't say that for the adverse event reports that are included in the 0.22 per 100,000 women years, you're not going to give an opinion that all of those women even had PTC at all, right?

Page 442

MS. NATALE: Objection. Form.
THE WITNESS: Well, I certainly haven't reviewed them, so if that's what you're asking me.
But I still -- regardless of whether they do or not, that issue of underreporting still exists, even for the baseline -- the baseline number with or without litigation, those are still underreported because we know we don't even capture that based upon the stimulation reporting.
QUESTIONS BY MS. COOK:
Q. Do you know that the litigation reports in the 0.22 per 100,000 women years includes lawsuits that were voluntarily dismissed?
MS. NATALE: Objection. Form.
THE WITNESS: I don't. I have no -- no knowledge of what reports those really were, as far as how they related to litigation, no.
QUESTIONS BY MS. COOK:
Q. You were asked about the Etminan publication and the letter to the

Page 443

editor and the affidavit, right?
A. Yes.
Q. And you confirmed that you still believe that the Etminan 2015 publication supports your overall opinion about Mirena and PTC, right?
MS. NATALE: Objection. Form. Misstates --
THE WITNESS: I believe what I said was that it is part of my overall weight of the evidence, yes, that is true. That certainly is a piece of data that I reviewed and relied upon in forming my opinions, yes.
QUESTIONS BY MS. COOK:
Q. Okay. But when you say it's "part of the overall weight of the evidence," do you mean that you think it's on the side of the evidence supporting a causation opinion for Mirena and PTC?
MS. NATALE: Objection. Form. Mischaracterizes the testimony.
THE WITNESS: It certainly provides -- it certainly provides evidence relevant to the question of

Page 444

does Mirena cause PTC, yes. It's still a report looking at the relationship, excuse me, between Mirena use and PTC.
QUESTIONS BY MS. COOK:
Q. I'm not questioning the relevance. My question is: Do you believe that it actually supports a causation opinion here?
MS. NATALE: Objection. Form. And use of "supports."
THE WITNESS: I believe that it indeed provides a piece of evidence that supports my opinion, yes. I don't know how else to state it.
In other words, my opinion is not based on just that study or just one study, but on all of these studies that I've described in the report. Certainly I understand the limitations of this assay, and I've described that -- or his assay, his study, and I list those for you.
But regardless of what he did or didn't do, the affidavit makes no

Page 445

sense to me because the affidavit and the letter to the editor aren't even consistent with each other. It's still a piece of evidence that I have weighed and relied upon, yes, and I think it is supportive of my overall opinions.
QUESTIONS BY MS. COOK:
Q. And when you say "it," are you referring to the Etminan 2015 publication?
MS. NATALE: Objection. Form.
THE WITNESS: Yes, that's correct.
QUESTIONS BY MS. COOK:
Q. Okay. And what is it in the 2015 publication that you say supports your causation opinion?
MS. NATALE: Objection. Asked and answered.
THE WITNESS: It's the paper as a whole. It's the fact that there is reports of PTC in Mirena users; it's looking at the number of -- number of patients that were reporting that with or without obesity. Those are all

information that is relevant to the
assessment of do we see this seen at
different times and different
conditions.
Certainly the strength of the
evidence, the number, is not as robust
as the number from the Valenzuela
paper, that is true.
QUESTIONS BY MS. COOK:
Q. Exhibit 8 is the article.
A. Yes, that's what I'm talking
about.
Q. No, I know, but can you just
show me in the article what you're talking
about that you think supports your causation
opinion?
MS. NATALE: Same objection.
Asked and answered numerous times.
THE WITNESS: The paper as a
whole is being relied upon in this.
This is a -- this is a study that
looks at the relationship between a
report of -- a relationship between
exposure to Mirena and reports of PTC
or the occurrence of PTC.



Just as you would rely on case
reports or other pieces of information
on occurrence, this study, at least,
provides that, even if there is not a
statistically significant odds ratio.
You still have information in here
about what they saw that's important
and relevant to my assessment.
So his letter to the editor
doesn't negate and wipe the study out
as far as its use in a weight of the
evidence.
QUESTIONS BY MS. COOK:
Q. So his statement that neither
analysis in the article provide evidence that
Mirena use increases the risk for
intracranial hypertension, that does not
impact your opinion about the article at all
in this litigation?
MS. NATALE: Objection. Form
and foundation.
THE WITNESS: It certainly is
part -- well, is that from the
affidavit or the paper you're reading?



QUESTIONS BY MS. COOK:
Q. From the affidavit.
A. So I did not consider the
affidavit, and certainly it does not impact
my opinion because I'm not aware of how that
even goes with -- he has different -- he
doesn't have that statement within his letter
to the editor. So in looking at that, not
knowing the situation, no, it does not --
it's a piece of information that I don't have
any background for or context to. I relied
on what was in the peer-reviewed literature.
Q. And the statement in the letter
to the editor that a signal is not detected
with Mirena when childbearing age is
accounted for, that did not impact your
inclusion of this article --
MS. NATALE: Objection.
QUESTIONS BY MS. COOK:
Q. -- in your opinion as support
for your causation opinion?
MS. NATALE: Objection. Form.
Asked and answered.
THE WITNESS: Well, I certainly
even included that in my discussion on



my weight of the evidence, so it is
part of what I weighed, absolutely.
But it doesn't change -- regardless --
I can take this paper, these two
papers away, and it doesn't change my
opinion.
My opinion would still be based
upon a weight of the evidence that
exists with or without these papers,
but I do believe these papers provide
information that's relevant and I did
weigh it as part of my assessment.
MS. COOK: No further
questions.
MS. NATALE: No further
questions.
VIDEOGRAPHER: We're off the
record at 6:21 p.m. This is the close
of Tape Number 6.
(Deposition concluded at 6:21 p.m.)
_ _ _ _ _ _ _

CERTIFICATE

I, CARRIE A. CAMPBELL, Registered Diplomate Reporter, Certified Realtime Reporter and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination, Laura Plunkett, Ph.D., DABT was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

CARRIE A. CAMPBELL,
NCRA Registered Diplomate Reporter
Certified Realtime Reporter
California Certified Shorthand Reporter #13921
Missouri Certified Court Reporter #859
Illinois Certified Shorthand Reporter #084-004229
Texas Certified Shorthand Reporter #9328
Kansas Certified Court Reporter #1715
Notary Public

Dated: January 24, 2018



INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it. You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.



ACKNOWLEDGMENT OF DEPONENT

I,_______________________, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_______________________________________
Laura Plunkett, Ph.D., DABT DATE

Subscribed and sworn to before me this
_______ day of ______________, 20 _____.
My commission expires: _______________

Notary Public



-------
ERRATA
-------

PAGE LINE CHANGE

| PAGE | LINE | CHANGE |
| --- | --- | --- |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |
| ____ | ____ | ____________________________ |

-------
LAWYER'S NOTES
-------

PAGE LINE