# Exhibit 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: MIRENA IUS )
LEVONORGESTREL-RELATED ) 17-MD-2767 (PAE)
PRODUCTS LIABILITY ) 17-MC-2767 (PAE)
LITIGATION (NO.II) )
______________________________)
THIS DOCUMENT APPLIES )
TO ALL ACTIONS. )

FRIDAY, JANUARY 26, 2018

\- - -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Videotaped deposition of Vincenzo Salpietro, MD, held at the offices of Covington & Burling, LLP, 265 Strand, London, commencing at 9:31 a.m., on the above date, before Carrie A. Campbell, Registered Diplomate Reporter, Certified Realtime Reporter, California, Texas and Illinois Certified Shorthand Reporter, Missouri and Kansas Certified Court Reporter.

\- - -

GOLKOW LITIGATION SERVICES
877.370.DEPS
deps@golkow.com

INDEX

PAGE
APPEARANCES.................................. 6
EXAMINATIONS
BY MR. IMBROSCIO........................... 8
BY MR. KENNERLY............................ 387
BY MR. IMBROSCIO........................... 417

EXHIBITS

| No. | Description | Page |
| --- | --- | --- |
| 1 | Notice of Videotaped Deposition of Vincenzo Salpietro, M.D. | 8 |
| 2 | Plaintiffs' Objections and Responses to Defendants' Notice of Videotaped Deposition of Vincenzo Salpietro, M.D. and Supplemental Disclosure of Expert Materials Considered (See Response to Exhibit A, #5) | 8 |
| 3 | In re: Mirena IUS Levonorgestrel-Related Products Liability Litigation (No. II), Expert Report of Vincenzo Salpietro, MD | 8 |
| 4 | Curriculum Vitae of Dr. Vincenzo Salpietro | 8 |
| 5 | Materials Reviewed and Relied Upon | 8 |
| 6 | Compensation, Expert Witness Testimonial History, Qualifications and Ten-Year Publication History | 8 |
| 7 | "The History of Pseudotumor Cerebri Syndrome among "Courses" and "Recourses," Ruggieri | 25 |
| 8 | Expert report of John E. Maggio, Ph.D. | 57 |
| 9 | Esquire Bank wire transfers | 106 |
| 10 | "An Estimation of the Risk of Pseudotumor Cerebri among Users of the Levonorgestrel Intrauterine Device," Valenzuela | 157 |
| 11 | "Effects of estrogens and progestogens on the renin-aldosterone system and blood pressure," Oelkers | 194 |
| 12 | "Conception and pharmacodynamic profile of drospirenone," Elger | 197 |
| 13 | "Pharmacology of estrogens and progestogens: Influence of different routes of administration," Kuhl | 199 |
| 14 | "Difference of In Vivo and In Vitro Antimineralocorticoid Potency of Progesterone," Quinkler | 202 |
| 15 | "The Mineralocorticoid Activity of Progesterone Derivatives Depends on the Nature of the C18 Substituent," Souque | 227 |
| 16 | "Molecular mechanisms of steroid receptor-mediated actions by synthetic progestins used in HRT and contraception," Africander | 254 |
| 17 | Description of non-clinical studies for integration into the Investigator's Brochure, MIR_AC_00035404 - MIR_AC_00035426 | 282 |
| 18 | "One Year Oral Toxicity Study of Levonorgestrel in Female Cynomolgus Monkeys," Hite | 287 |
| 19 | "One Year Oral Toxicity Study of Levonorgestrel in Female Rats," Hite | 287 |
| 20 | "Three-Month Oral Toxicity Study of Levonorgestrel, LOC-31, and Norgestrel in Female Rats," Usui | 287 |
| 21 | "Weight variation in users of depot-medroxyprogesterone acetate, the levonorgestrel-releasing intrauterine system and a copper intrauterine device for up to ten years of use," Modesto | 318 |
| 22 | "Progestin-only contraceptives: Effects on weight (Review)," Lopez | 323 |
| 23 | "Body weight and composition in users of levonorgestrel-releasing intrauterine system," Dal'Ava | 326 |
| 24 | "Impact of obesity on the pharmacokinetics of levonorgestrel-based emergency contraception: Single and double dosing," Edelman | 369 |
| 25 | "Pharmacokinetics of levonorgestrel and ulipristal acetate emergency contraception in women with normal and obese body mass index," Praditpan | 375 |
| 26 | "Integrated pharmacokinetic analysis of levonorgestrel-containing contraceptives with various routes of administration," Hofmann, MIR_IIH_EU01205373 - MIR_IIH_EU01205406 | 382 |
| 27 | E-mail from Vincenzo Salpietro to Christina Natale and Larry Jones in re; Draft Report & considerations | 427 |

(Exhibits attached to the deposition.)



CERTIFICATE.................................428
ACKNOWLEDGMENT OF DEPONENT..................430
ERRATA......................................431
LAWYER'S NOTES..............................432

A P P E A R A N C E S :

KENNERLY LOUTEY
BY: MAX KENNERLY, ESQUIRE
msk@thlawyer.com
KIM LOUTEY, ESQUIRE
601 Walnut Street, Suite 1150W
Philadelphia, Pennsylvania 19106
(215) 261-7070

JONES WARD PLC
BY: LAWRENCE L. JONES II, ESQUIRE
larry@jonesward.com
1205 E Washington Street, Suite 111
Louisville, Kentucky 40202
(502) 882-6000
Counsel for Plaintiffs

COVINGTON & BURLING LLP
BY: MICHAEL X. IMBROSCIO, ESQUIRE
mimbroscio@cov.com
ALEJANDRO L. SARRIA, ESQUIRE
asarria@cov.com
850 Tenth Street, NW
Washington, D.C. 20001-4956
(202) 662-5694

SHOOK, HARDY & BACON
BY: MICHELLE MANGRUM, ESQUIRE
mmangrum@shb.com
1155 F Street NW, Suite 200
Washington, D.C. 20004
(202) 783-8400
Counsel for Defendants

ALSO PRESENT:
Luciana Green, Interpreter

V I D E O G R A P H E R :
DAN LAWLOR,
Golkow Litigation Services
– – –



VIDEOGRAPHER: We are now on the record.

My name is Dan Lawlor. I'm a videographer representing Golkow Litigation Services.

Today's date is January 26, 2018, and the time is 9:31 a.m.

This video deposition is being held in London, United Kingdom, in the matter of Mirena Products Liability Litigation MDL.

The deponent is Vincenzo Salpietro, MD.

Counsel, please identify yourselves for the record starting with the plaintiff.

MR. KENNERLY: Max Kennerly for the plaintiffs.

MS. LOUTEY: Kim Loutey for the plaintiffs.

MR. JONES: Larry Jones for the plaintiffs.

MR. IMBROSCIO: Michael Imbroscio of Covington & Burling for Bayer.



MS. MANGRUM: Michelle Mangrum, Shook, Hardy & Bacon, for Bayer.

MR. SARRIA: Alejandro Sarria, Covington & Burling, for Bayer.

VIDEOGRAPHER: The court reporter is Carrie Campbell and will now swear in the interpreter and the witness.

VINCENZO SALPIETRO, MD,
of lawful age, having been first duly sworn to tell the truth, the whole truth and nothing but the truth, deposes and says on behalf of the Defendant, as follows:

(Salpietro Exhibits 1, 2, 3, 4, 5 and 6 marked for identification.)

DIRECT EXAMINATION
QUESTIONS BY MR. IMBROSCIO:
Q. Good morning, Dr. Salpietro.
My name's Mike Imbroscio. I'm going to ask you some questions today.
Let me just begin by asking you: You've never served as an expert



witness before, correct?
A. Never.
Q. Okay. You've never obviously given sworn testimony before; is that true?
A. Never.
Q. Okay. Well, I'm going to ask you questions, and you have to answer my questions. I would ask that if you would wait until I finish my question before you begin to answer, and then I'll wait until you finish until I ask my next question; that will be easier for the court reporter.
Okay?
A. Okay.
Q. I have premarked a number of exhibits that you should have seen, but I'm going to premark as Exhibit 1 the notice to the deposition; Exhibit 2, plaintiff's objections to the notice; Exhibit 3 is a copy of your report; Exhibit 4 is a copy of your CV; Exhibit 5 is the list you provided to us of materials relied -- reviewed and relied upon; and Exhibit 6 is your disclosure concerning compensation and testimony history.

Let me just provide those to you so you have them.
MR. IMBROSCIO: We have copies of those, Max --
MR. KENNERLY: Yeah, I'm okay. I've got them.
MR. IMBROSCIO: Okay.
QUESTIONS BY MR. IMBROSCIO:
Q. All right. So I'd like to just begin by asking you some questions about how it came to be that you became an expert in this case.
When were you first approached to become an expert in this case?
A. It was before the summer 2017. I was contacted by Christina Natale.
Q. Uh-huh.
A. She --
MR. KENNERLY: Hold on.
THE WITNESS: I was contacted earlier than that.
QUESTIONS BY MR. IMBROSCIO:
Q. Okay.
A. Something like 2015, around 2015.



Q. Okay.
A. And I was not really -- I mean --
MR. KENNERLY: Let me --
QUESTIONS BY MR. IMBROSCIO:
Q. Just don't tell me anything that Christina said to you or that you said to her, but I would like to know -- you were first contacted in 2015, you think, around that time?
A. Around that time, I received just an e-mail.
Q. Okay.
A. It was not from Christina. It was from someone else. I don't remember.
Q. Okay.
A. And I didn't --
MR. KENNERLY: Let me instruct the witness of the -- we would assert a privilege to the substance of the communications back and forth.
And without stating the question for Mr. Imbroscio, he's asking about timing of contact.



QUESTIONS BY MR. IMBROSCIO:
Q. Yeah.
So 2015, correct?
A. I received an e-mail, and I was very busy with my career -- with my work at the time so I didn't continue -- I mean, I didn't give any attention to that.
Q. All right. So let me stop you there for a moment, sir.
Without disclosing, did you not respond to the e-mail or did you respond and say "I'm not interested"?
A. I think I have not -- I don't remember. It was more than two years ago.
I was -- it was very busy time of my career because I was completing my pediatric residency, I was looking for academic jobs around Europe. So I was not -- I mean, I was very, very focused on my career.
So then before the summer 2017, I received this e-mail from Christina. I was interested to understand better what was all this about because basically she contacted me in regard to some publication -- publications



I published in 2012, 2013, 2014.
If you see my papers on IIH are all about that time, so in the last two, three years my research change a little bit in a sense because I was appointed at UCL in the Institute of Neurology.
I am now working there in the department of molecular neuroscience, and so I started to do more lab research, more animal models, more collaborative genetic and molecular neuroscience research.
And when I initially came in this country, in the UK, I was hoping to do more research related to IIH because this was one of the first subject I -- I mean, I was focused about, and basically -- so this was something that made me curious and interested, this litigation and all this. So I was happy to provide my opinions because I thought at the time that --
MR. KENNERLY: I'm going to instruct --
MR. IMBROSCIO: No, you can't interrupt him. Respectfully, he can continue his answer, and then when

he's finished --
QUESTIONS BY MR. IMBROSCIO:
Q. Again, please do not say anything that you've said to the lawyers or the lawyers have said back to you, but otherwise -- that's going to be a standing rule. I'm not going ask you about that?
But please continue. You were about to explain why it was you thought this would be an interesting project.
A. Because that was fitting my model, and I believed immediately that was -- that was kind of a causal relationship, and I was interested to provide my opinions in that context.
Q. Okay. So let me just make sure I understand.
In 2015, you were wrapping up your pediatric neurology residency --
A. Yeah.
Q. -- or training?
A. I was in a very busy time of my career, and I -- I mean, yeah.
Q. Why don't you tell me: When did you complete your medical -- tell me



about your medical school history. That's not clear from your CV.
A. Yeah. So I had my medical degree in Italy. I wrote that in my CV, I think, in University of Messina.
When I started my pediatric residency --
Q. When did you get your medical degree? Sorry to interrupt.
A. 2019 -- 2009.
Q. Okay.
A. 2009. And then --
Q. And by the way, is -- your dad, he's a professor at the University of Messina, too?
A. My dad?
Q. Your father; is that right?
A. Yeah. My dad, yeah.
Q. Yeah.
A. Then when I started my residency, basically I spent long time either in other universities or abroad. For example, if you see my CV, many publications have been done in collaboration with University of Catania, which is a close-by



city.
So I spent --
Q. Dr. Ruggieri is at University of Catania?
A. Yeah.
So I spent long time collaborating with him and other people in Catania. Then I spent long time collaborating with people in Paria, which is a small university close to Milan in the north of Italy.
And then I spent long time working and collaborating with people in London at the Imperial College of Chelsea and Westminster Hospital.
So basically my training started as a general pediatric training, and then I switched to pediatric neurology, gaining experiencing in terms of clinical and academic experiences in different in universities: Catania, Paria and then London. So that was my residency part.
And while I was a resident of pediatrics and a fellow of pediatric neurology -- because I had a fellowship of



pediatric neurology at Chelsea and Westminster Hospital in London between 2013, 2014. And I was also a fellow at Imperial College in the same time between 2013 and 2014.
So at that time I started to develop a strong interest in genetics as well and in molecular neuroscience lab-based research. And that was the reason why I decided to stay longer in the UK, to have more opportunities to pursue my interest in this field. And that's why I'm here working now in the department of molecular neuroscience with different professors: Professor Henry Houlden, who is a neurogenetician; Professor James Rothman, who is a biochemist and a recipient of the Nobel Prize for medicine in 2013. I have a couple of publications with him. And also several other researchers who helped me to continue my research and to apply my ideas on research in the field of rare neurological disorders.
So this is what I -- I'm an expert about, to understand the molecular causes of rare neurological disorders.

Q. All right. Let me ask you: In your current position at Imperial College here in London --
A. No. No. No. My current position -- sorry if I interrupt you -- is at UCL, University College London.
Q. Okay.
A. In the Institute of Neurology.
Q. At UCL --
A. Yeah.
Q. -- do you continue to see patients clinically?
A. My research is particular. So basically I am part of a project which is funded by the Wellcome Trust -- it's a big organization in the UK -- and this project is about understanding the molecular cause of some neurological disorders like epilepsy or migraine. Some of these neurological disorders are episodic, which means patients have symptoms that sometimes disappear and then appear again.
And this grant, which employed me because I am paid by this grant, is focused on this type of disorders. So our



aim is to sequence by exome sequencing, genome sequencing. These are techniques which are useful to sequence the DNA of patients.
So we sequence the DNA of a large amount of patients, and my work is to collect the samples to phenotype these patients, these families, when it's possible and to analyze the genetic data which are generated by these sequencing.
So for this reason, sometimes I see patients here, but more often our collection is done abroad because we go with my -- with the head of the laboratory of neurogenetics, with Professor Henry Houlden. We have been in different countries. We have been in Pakistan. We have been in Morocco. We have been in Jordan in December, in Pakistan in November. We have been in Morocco. We have been in Sicily as well.
The reason why we do these trips is because we have collaborators there. And when we go there, these collaborators which are part of our project -- so they have edicts approved to be collaborating with us,



basically we see patients and families. And in these countries marriages are often consanguineous, so there is a strong genetic component underlying these children, these patients, these families, presenting with neurological disorders.
These neurologic disorders may be migraine, may be severe headaches. We have also seen some pseudotumor cerebri cases. We have seen children with epilepsy, with movement disorders. I mean, with any kind of rare neurological disorder.
So my answer to your question is, yes, I saw many patients during the last years for my research, but is more oriented in the research. I don't do much private or things like that.
Q. So you're not seeing patients clinically. You see them, perhaps, in collection of information and samples for your lab's research; is that fair?
A. Yeah, my clinical activity is strictly related with my research. I don't see something which is -- I mean, in the last years, at least. I mean, I don't know in the



future, but in the last years, I focus my clinical activity on my research.
Q. Got it.
And how about when you were at Imperial College or Catania or Paria, were you seeing patients clinically?
A. Everything. In that time I saw everything.
Q. Okay. And one of the rare neurological disorders that you're looking at currently is one -- are one of the disorders, excuse me, pseudotumor cerebri or idiopathic intracranial hypertension?
A. Yeah.
Q. And let me just stop there on the terminology.
You would agree that this condition is known by several terms, correct?
A. Yes.
Q. It's known as pseudotumor cerebri. It's known as benign intracranial hypertension. It's known as idiopathic intracranial hypertension, correct?
A. That's correct.
Q. And idiopathic, that is just a

fancy scientific word for cause unknown, correct?
A. Idiopathic is cause unknown.
In regards to benign, I wouldn't say many people use this because, as you know, it may cause vision loss, and that's why benign is not appropriate. I mean, just -- I don't think anyone use it anymore.
Q. Okay. That's fine.
But those are three words that have -- nomenclature that's been used across the years for the same condition, correct?
A. It's correct.
Q. In fact, this varying nomenclature is, in fact, an indication that the cause and origin of this disease is difficult to understand; is that fair?
MR. KENNERLY: Object to the form.
THE WITNESS: I wrote in my report that is uncompletely {sic} understood. That's what I wrote. And it is uncompletely understood.
I also wrote this of unclear



pathophysiology, so, I mean --
QUESTIONS BY MR. IMBROSCIO:
Q. Let me ask this: Would you agree that the variation in nomenclature reflects the unclear etiology of the syndrome?
MR. KENNERLY: Object to the form.
QUESTIONS BY MR. IMBROSCIO:
Q. You can answer.
Yes or no: Would you agree to that?
A. About your question, I agree that the term "idiopathic" in medicine is used for diseases of unclear -- unclear pathophysiology.
Q. Okay. I'm going to move to strike as nonresponsive. Let me ask it again.
Would you agree that the variation in nomenclature reflects the unclear etiology of this syndrome?
MR. KENNERLY: Object to form, and note that we object to your motion to strike. It was responsive.



QUESTIONS BY MR. IMBROSCIO:
Q. You can answer.
Would you agree with that sentence?
A. I don't -- I've not understood the question.
So you are -- you are asking me if the variation in the nomenclature reflects the unclear pathophysiology?
Q. Yes.
A. I don't -- I don't know because, I mean, many conditions in medicine are coded in different ways, so...
Q. So you're saying you can't agree or disagree with that?
MR. KENNERLY: Object to the form.
QUESTIONS BY MR. IMBROSCIO:
Q. Just trying to understand your testimony.
A. I would say that idiopathic reflects the unclear pathophysiology. I agree with that. But the variation in nomenclature, we may call the same disease in different ways even if the pathophysiology is



clear in medicine. In the context.
(Salpietro Exhibit 7 marked for identification.)
QUESTIONS BY MR. IMBROSCIO:
Q. Let me show you what's been marked as Exhibit 7, Doctor.
This is an article that you wrote with Dr. Ruggieri, who we mentioned earlier --
A. Yeah.
Q. -- and Dr. Conrad Johanson.
A. Yeah.
Q. You see that?
Do you remember writing this article?
A. Say again?
Q. Do you remember being a part of this article?
A. Yeah. It was something like three years ago, yes.
Q. Yeah. So let's look at the -- about midway through the first paragraph, Introduction, where you're talking about pseudotumor cerebri syndrome.
A. Yeah.

Page 26

Q. Do you see there's a sentence there that says -- well, let me just read it so the jury has it.
"The disease now most frequently referred to as pseudotumor cerebri syndrome, according to the most recent diagnostic criteria, has been known by various names since its first clinical descriptions: pseudotumor cerebri, benign intracranial hypertension and idiopathic intracranial hypertension. These terms were introduced respectively by" -- these three researchers, and I won't try to pronounce them.
A. Yeah.
Q. And then the article writes, "The variation in nomenclature reflects the unclear etiology of this syndrome."
Do you agree with what you wrote in 2015 about this disease?
A. I think you should put this sentence in the context because the context is a historical context of the last 60 years, where 60 years ago people had no idea about this, 40 years ago had no idea. I'm not

Page 27

saying that we now have a full, complete idea, but in the context of the history, this disease was not understood, and people called it benign intracranial hypertension.
Then they understood, look, this disease may cause severe vision loss. It's not that benign. And then they change to idiopathic intracranial hypertension.
And in more recent years, many researchers, including me, prefer to define it as pseudotumor cerebri because it's something that may reflect better the disease definition.
So in this context, the variation in the nomenclature across the decades reflects the unclear etiology of the syndrome. So in the context of the history of the condition, I agree with that.
Q. So as of 2000 --
A. I don't know if you understood me -- I mean, I can tell in Italian and then she translates, but it's in the context of the history.
Q. When you wrote this sentence in 2015, was it a true statement?

Page 28

MR. KENNERLY: Object to the form. He just explained that.
THE WITNESS: When I wrote this -- can you repeat?
QUESTIONS BY MR. IMBROSCIO:
Q. When you wrote this sentence in 2015, was it a true statement?
MR. KENNERLY: Object to the form. He just explained it.
MR. IMBROSCIO: I'm going to ask you to be very cautious, sir.
Please, you can answer your question.
THE WITNESS: As I told you, I -- the sense of this sentence should put in the context of the history. So Nonne, Foley, Buchheit, these people are introduced at this times many, many, many years ago.
And, of course, compared to 50 years ago we know more about this condition, and hopefully in 50 years from now they -- the doctors will know even more and it will be less unclear. This is the hope.

Page 29

QUESTIONS BY MR. IMBROSCIO:
Q. It's certainly not altogether clear today; would you agree with that?
A. I --
Q. The cause and origin of this disease?
MR. KENNERLY: Object to the form.
THE WITNESS: As I told you, in my report I wrote that. I included the sentence: is a disease of uncomplete understood pathophysiology; is of unclear pathophysiology.
QUESTIONS BY MR. IMBROSCIO:
Q. Okay. Let me ask you this: Your coauthor on that article is Conrad Johanson, correct?
A. It's correct.
Q. And have you written many articles with Dr. Johanson?
A. I don't think so. I think it was a few articles. So this article, in another article is my coauthor in Journal of Pediatric Neurology. And then I wrote another article in this special volume on

lithium causing pseudotumor cerebri, and then I think it's --
Q. I'm sorry on what causing?
A. Lithium.
Q. Lithium.
A. Yeah. So I think these three papers we have as coauthors if I'm not wrong.
Q. Is he a colleague who you are in regular contact with?
A. He was a colleague with who I was in contact during the preparation of this volume, but after that I was not in contact with him.
Q. And he's in the UK, correct, Dr. Johanson? Where is he?
A. I think he's in America.
Q. Oh, he's at Brown. He's at Brown University, right?
A. Yeah.
Q. Sorry about that.
When was the last time you talked to Dr. Johanson on any subject, on anything?
A. I think that we spoke when -- in -- we spoke about the litigation by phone.



We discuss it about the reports in a way because he was telling me that his -- his main -- his main experience is cerebrospinal fluid physiology, call it plexus cerebrospinal fluid physiology, CSF, physiology.
And basically he was telling me that it was focusing his -- his contribution in the context of this litigation on that. Yeah, that's what we discussed.
Q. When did you have this conversation with him or these conversations?
A. In -- before Christmastime.
Q. Okay.
A. Because I think we had to submit our expert reports around Christmastime. So it was immediately before, something like that.
Q. Okay. And I noticed your report -- I think if we look at Exhibit 3, am I correct that your report was signed on December 28?
A. Yeah.
Q. 2017?
A. Yes.



Q. Is that when you completed your report?
A. Maybe I completed the days immediately before and I just made the very last changes, the very last, you know, minor revisions in that time, yeah.
Q. Okay. You make reference to referencing Dr. Johanson's report. You reference that a few times in your report?
A. Yeah.
Q. When did you receive a copy of Dr. Johanson's report?
A. I think that was maybe around early December --
Q. Okay.
A. -- or late November.
Q. Okay.
A. I'm not sure. Maybe it was -- it's more likely maybe late November.
Q. Okay. And did you share a copy of your report with him?
A. I don't remember. I think -- so, yeah. Yeah. Actually, yeah. So he has -- he has seen my report, yes. Yes.
Q. But my question is: Did you



send him a copy of your report?
A. I -- Christina. I sent to Christina a draft and --
Q. Okay. So she could send it to Dr. Johanson?
A. She was -- she was in a way coordinating us because for me it was my first expert report. And also in this regard I was -- I mean, I was not sure how to format it, how to prepare it, because I'm used to write scientific papers, but I have no experience with reports.
So she provided me a copy of a report from Dr. Maggio, which was related to this litigation, and in that way I had a feeling of the structure of a report. Because I never saw or read or prepared any report before.
Q. And I'll get to that respectfully, Doctor, in a moment about your receipt of Dr. Maggio's report.
My question is a little bit different, and that is, is it -- did you share a copy of your draft report with Dr. Johanson either directly to him or

through --
A. Yeah.
Q. -- some intermediary?
A. Yes.
MR. KENNERLY: Objection.
QUESTIONS BY MR. IMBROSCIO:
Q. And when did that occur?
MR. KENNERLY: Objection.
You can answer.
QUESTIONS BY MR. IMBROSCIO:
Q. Would that be in the same early December, late November time period?
A. Yeah, I think so.
Q. Okay.
A. I think so. I think -- yes, because also Dr. Johanson wanted to compare his ideas with my ideas because we -- we focus on different angles. So that was something he wanted and as well as I wanted, because his experience with cerebrospinal fluid physiology is, I mean, is outstanding. He has done great work during his life. He's a senior professor, and I personally was inspired by his papers.
So I think he did outstanding



research. He collaborated with NASA on IIH in astronauts. He is one of the best person I know in cerebrospinal fluid physiology in the world, so I really wanted to ask his opinion and to see his report.
And on the other hand, he wanted to understand something about my model, something more, and to understand how that applied to this litigation in particular, but in general to the pathophysiology of the disease because we are interested in that part of this litigation. I mean --
Q. And you mentioned you had a telephone conversation with him?
A. Yeah. Yeah.
Q. And that would have been roughly the same time period, late November, early December?
A. We had phone conversations --
Q. Okay.
A. -- with him.
Q. How many did you have?
A. I would say a few. I think we had maybe, I don't know, three or four.



Q. Over the course of how long of a period?
A. Maybe in a couple months' time.
Q. Okay. Did he call you or did you call him?
A. I called him.
Q. Okay.
A. All times I called him.
Q. Okay. And just the two of you on the phone?
A. Me and him.
Q. Okay. And when you received a copy of his report, his draft report, did you find it enlightening?
A. Say again?
Q. Did you find it interesting? Informative is a better word.
A. As I told you, I think that Dr. Johanson is a great scientist in the context of cerebrospinal fluid physiology. So I think he -- he knows, I mean, a lot about the mechanisms which regulate cerebrospinal fluid circulation, balance, dynamics.
So in that sense I found the



report very inspiring, as I always found very inspiring Dr. Johanson's research activity. That why -- that's why I collaborated with him in 2015 and 2014 because I thought it was a good opportunity for me to have his contributions, his intellectual contribution, to my model.
Q. And did having his intellectual contributions, having reviewed his report, did that help inform the completion of your report in this litigation?
A. Do you think -- do you mean -- so your question is if I think that his the point of view is complimentary with mine? That's what you're asking?
Q. It's a little different, sir. It's really -- you know, you had a chance to review his report in late November or early December, correct?
A. Yeah, approximately.
Q. And having -- fair enough.
And having read his report, did that help you complete the contents of your report that you finished a little bit later?
A. I think that it is -- his point

of view, his research, is, as I previously mentioned, is from a different angle compared to my research. So in that respect, it didn't help me to finish my report, but he gave me his angle, point of view, on cerebrospinal fluid physiology, which is something interesting, and he also discuss some other aspects that I have not focused in my report.

Q. And we'll get into that in a little bit, but his theory is a little different than your theory; is that fair?

A. I think this is fair because he has focused on different aspects. I mean, my work has always been focused, not for this litigation but from my early papers, on the model -- on the model of the mineralocorticoid receptor pathway.

And I have not focused my work or my papers or my actual expert report, for example, on the androgenic mechanism, and I saw that he focused parts of his report about that.

Q. And I note there is a portion in your report now about the androgenic



mechanism.

A. Yes.

Q. Did you add that --

A. Yes, it's very short.

Q. Yeah.

And did you add that after having communicated with Dr. Johanson --

A. No.

Q. -- and reviewed his draft report?

A. No. I -- this was part of the initial draft, and as you can see, I have not focused on that. I have not focused on that. And I referenced Johanson because when I saw his report, I noticed he focused on that and --

Q. Well, that's what I wanted to ask you because -- and we'll get to that.

But in your report, in your androgenic section, the only thing you cite is Dr. Johanson's report.

A. Because I saw his report, and I saw that he focused on this mechanism --

Q. Sure.

A. -- quite extensively.



Q. But my -- I'm sorry, go ahead.

A. So in the same way, I saw that he referenced me when it was coming to the mineralocorticoid mechanism.

Q. But my question is: How did you write those paragraphs about what was in his report until you saw his report?

A. I just included the information that androgens may have a role in IIH, and I mentioned PCOS. And I didn't go into the detail because that was not the focus of my report. That was not the focus of my research as well and of my early papers.

Q. But my question is a little bit different, sir. My question is: You have a paragraph or some sentences about the androgenic aspects, correct?

A. It's correct.

Q. And it's a small part of your report to be fair, correct?

A. Yeah, it's very -- maybe it's three lines.

Q. Yeah.

And then after those three lines, you cite the Johanson report, correct?



A. Because in the sense -- in the meantime, I had the chance to go through his report, and I saw that he focused part -- large parts of his report on this mechanism, so I reference it.

Q. Okay. So is it your sworn testimony here today that you wrote those three sentences before you saw Dr. Johanson's report?

A. I wrote these lines because this is part of IIH, and I discussed many of the theories of the risk factors linked to IIH. I discussed vitamin A. I discussed many, many of the other things. And in this context I included some informations about this androgenic mechanism, which is not the focus of my report and which was not the focus of my research when I published my IIH papers.

And on the other hand, after I drafted this report, including several different mechanisms which were linked to IIH - abnormal reabsorption, androgenic effects of -- androgenic mechanisms and vitamin A and all these things - after I

drafted this report, I saw the report from Dr. Johanson where he focused a lot on these mechanism. Then -- that's why I reference it in...
Q. All right. I'm not sure I fully understand, but let me ask the question more pointedly.
Is it your sworn testimony that the sentences that you wrote in your report about the androgenic aspects were written before you read Dr. Johanson's report, draft report, in late November or early December?
Maybe I can -- actually, why don't you answer that question first.
MR. KENNERLY: Object to the form.
You can answer.
THE WITNESS: Say again?
MR. IMBROSCIO: Yeah, so he's going to object from time to time. He's allowed to for the record. You still have to answer my question, but let me just reask it so it's clear.
QUESTIONS BY MR. IMBROSCIO:
Q. Is it your sworn testimony that



the sentences that you wrote in your report about the androgenic aspects were written before you read Dr. Johanson's report, his draft report, in late November and early December, and you then only later added --
A. Can you show me this androgenic sentence?
Q. Yeah. Yes, one second.
Yeah. So take a look at page 31 of your report, which is Exhibit 3.
A. So I wrote this small section of the androgenic mechanism in different steps. I remember that I discussed -- so you have -- of course, you know that English is not my mother language, so when I draft a paper or a report or anything in English, basically the drafts, the initial drafts, are very rough. And then I go through and I improve the fluency, and I connect each other the different sections of what I write.
And in this case, I mean, I don't -- because it's -- it's 40 pages, the report, so I don't remember these few lines, when I wrote these few lines exactly, but I remember that this was done in -- in the



initial draft.
When I discuss all the risk factors associated with pseudotumor cerebri, I included the polycystic ovary syndrome, and this was part of the initial draft of my report.
Q. Okay.
A. But I have not focused this report on the androgen mechanism.
And when I saw report -- the report from Dr. Johanson, I -- I under -- even myself, I understood more about this -- this mechanism, which I've never been focused on, and I reference this in my report.
So during the process of drafting my report is possible that I added few words about this section after I saw Dr. Johanson report.
Q. Okay. And let me just come back to the conversations you've had.
Did you set up these conversations via -- did you schedule these conversations with him via e-mail, or how did you come --
A. Mostly phone calls.



Q. But --
A. Yeah.
Q. Well, mostly phone.
Did you ever e-mail him and say, "Hey, can I call you at three o'clock US time"?
A. I don't remember when I called him in November how it was, if he told me -- no, I remember that when I -- so sometimes when I had phone call with him, he told me when it was -- when he was available, things like that. But it's possible that I asked him by e-mail or by message, but I don't remember because we are talking about a couple of months ago.
Q. Okay. And so you would communicate through Dr. Johanson by phone, correct?
MR. KENNERLY: Object to form.
THE WITNESS: We communicated by phone.
QUESTIONS BY MR. IMBROSCIO:
Q. Yeah. And you also communicated by e-mail, perhaps, occasionally?

Page 46

A. We --
Q. You have his e-mail?
A. We discussed -- it's impossible to discuss science or mechanisms by e-mail. I mean, you would need to write a three-pages e-mail to discuss something that you may talk about by phone in one minute.
Q. I'm not asking about the substance yet. I'm just asking you what were the forms of your communications with Dr. Johanson.
Telephone calls, right?
A. Mostly telephone calls, yes.
Q. You communicated by e-mail?
A. We communicated mostly by phone calls.
Q. Okay. I understand mostly -- my question is: Did you communicate -- did he send you an e-mail ever or did you send him an e-mail ever?
A. Yeah, we had e-mail exchanges, but, for example, when we -- when I wanted to contact him at the beginning, I met him --
THE WITNESS: Do you have a tissue for my --

Page 47

MR. IMBROSCIO: Yeah, there's a box of tissues there.
THE WITNESS: I wrote him an e-mail and I ask him, "Can I call you now?" And I -- thank you very much.
And, yes.
QUESTIONS BY MR. IMBROSCIO:
Q. And then you mentioned earlier that you would sometimes message him.
When you say "message him," did you mean like a text message to his cell phone?
A. I have his -- he gave me a couple of numbers, but I mostly used his home phone number, yeah.
So sometimes I called him without telling him I'm calling, so his wife answered me and I probably bothered. So it -- since that time, it is likely that sometimes I asked him via e-mail can I call you, something like that, and he say -- he answered me, yes. So...
Q. So just to summarize -- actually, did you -- have you ever text messaged him or he text messaged you for any

Page 48

reason?
A. I don't remember. Honestly, I don't -- it's possible that he text messaged me when we were preparing the special issue, 2014. I mean, I know him since quite a few years.
Q. Understood.
A. So as I told you, I like to discuss research subjects with him, but not because of this litigation. Just because of his experience in the field I was starting -- I started to collaborate with him in 2014, so while it's possible that in the last three or four years I messaged him, I don't remember.
Q. Is part of --
A. But --
Q. Please, I'm sorry.
A. -- I tell you, in the last couple of months, most of our communications were through phone calls. Because when it comes to discuss very complicated pathophysiological mechanisms, in my opinion there is no other way than a phone chat; otherwise, you can -- you cannot really do that in an e-mail.

Page 49

Q. Did you have questions about issues in his draft report that you asked -- that you discussed with him?
A. Yes.
Q. Tell me about those.
MR. KENNERLY: Object to the form.
You can answer.
THE WITNESS: So when we were speaking by phone, I asked him some informations about -- I mean, if he has read any papers recently which he suggested me on the sodium potassium channels in the choroid plexus, technical questions; if he had some literature source he recommend me to be careful about; questions like this, you know. I respect him and that's why I asked.
QUESTIONS BY MR. IMBROSCIO:
Q. Did he have any questions about your draft reports that he reviewed?
A. Basically he -- he asked -- he asked me something about the binding of the synthetic progestins to mineralocorticoid

receptor.
Q. Uh-huh.
A. He asked me which paper I thought was more convincing in that context, and he asked me as well about my opinion about the transactivation effect of progestin on mineralocorticoid receptor. And we discussed about other ideas.
Q. Well, let me go in order then.
You said he asked you about some of the binding of the synthetic progestins and what article or support provided that.
What did you tell him?
A. Yeah, he asked me, are there papers you suggest me to read, and so basically I discussed with him about the binding. I say that -- so basically we -- we started from the -- to discuss from the expression, so -- we start to discuss from the expression.
So basically there are papers which show abundant expression in terms of RNA and -- as well as protein some Wistar rat experiments in rat choroid plexus. And



basically we were discussing about human choroid plexus. So we were discussing some papers which show similar expression levels of the gene which encode the receptor for the mineralocorticoid which in the choroid plexus continuum.
And I referenced the brain atlas, which is a website that we use when we want to check the expression of the genes in specific tissues. And then we discussed about different aspects of our reports. We exchanged thoughts and -- on -- on most of the aspects of our reports, we exchanged some kind of thoughts and...
Q. You talked about he asked you about the transactivation effect?
A. Yes.
Q. Tell me about that.
A. Yes. So basically he asked me about that. So as you know, it's -- there are some people who, including probably your experts, who are not convinced about the agonistic effects of progesterone and synthetic progestins on mineralocorticoid receptors, and there are some people who say



there are agonistic effects. So the literature is a little bit controversial.
Q. Controversial?
A. Controversial, yeah.
And -- in my opinion. So that's what we were discussing with Johanson.
He asked me, "Vincenzo, what is your opinion about this? What do you think?"
I said, "This is my opinion, is not 100 percent certain, but it's likely, probably is more likely than not, that we have an agonistic effect."
And he asked me, "Why? Why you think so?"
I said, "Because there are some kind of evidences we can extrapolate from the literature." And this evidences are, for example, some in vitro studies that I cited in my report show a low agonistic effect, a couple of in vitro studies.
Some animal studies showed a binding to the promoter region of the mineralocorticoid receptor gene NRC2 of progesterone and the induction of transcription, so -- which is a



transactivation effect because basically this steroid bind the -- the steroid responsive elements in the DNA and upregulate the expression of the gene. So there is the in vitro evidence about that. At least two papers talk about that.
Q. What are those two papers?
A. There is a paper from -- so there are two papers which have a similar finding, so they have a similar result. If I'm not wrong, one of the two papers showed a low agonistic activity, which was approximately 20 percent --
Q. Which page are you on?
A. Page 9.
Q. All right.
A. So the papers were -- one, it was from Souque, and the other one was from Quinkler. And --
Q. I'm sorry, what word did you say?
A. Souque. Souque and Quinkler showed similar -- similar effects of low agonistic activity. The difference was 27 percent in one paper and approximately

20 percent in the other one.
And they also showed that the metabolites of progesterone had different activity on the mineralocorticoid receptor. Some of them had larger agonistic activity than some others. And this was the in vitro data I discussed with Johanson.
And then I discussed the animal, the animal data, which was the paper from Castren. The paper from Castren and from Marissal-Arvy, so basically --
Q. What page are you on, sir?
A. Page 30.
So the paper on -- the paper from Castren and from Marissal-Arvy did show it, did show some transactivation effects on the receptors due to the binding of progesterone. So basically this occurs within the animal data, the animals data, the in vitro data, and then as I am a clinician, the clinical -- the clinical data as well, the clinical evidence. Because there are some studies, including some of the studies I reviewed from Bayer, which describe in a number of patients weight gain and edema. So



if you have edema and weight gain, these science are suggestive of the activation of the mineralocorticoid receptors.
So basically there is the in vitro data, there is the animal data and there is the clinical data. The combination of this data suggests to me that is more likely than not that the effect is agonistic on the mineralocorticoid receptor.
Of course, as I mentioned earlier, this is controversial. For example, in a paper from Africander, there was the question mark: Is agonistic? Is antagonistic? There was a question mark. And, I mean, I have not seen a paper which show an antagonistic effect if I have to --
Q. That showed an antagonistic effect?
A. I have not seen a paper which documents an antagonistic effect, but probably is possible. I mean, I don't exclude that this paper -- such a paper exists. And, I mean, I'm not perfect and I may have missed it.
But in the report of your



expert, Jusko, it was that defense report, and he referenced the papers which showed an antagonistic antimineralocorticoid effect.
I looked at the references, but they were another subject. It was not about that. Because I was curious to read such papers. And when I checked the references of this two papers he cited as papers which were proving an antagonistic effect of progesterone on mineralocorticoid receptor, I know these two references probably was, I don't know, a typo or something because they were papers from previous Jusko publications which were another subject, so...
Q. Do you remember which references you looked at to --
A. Yeah.
Q. What were they?
A. He referenced -- there is an evidence of antimineralocorticoid effect. He referenced a couple of papers.
I checked the reference numbers, and I found other kind of references which were not focused on this.
Q. Okay. We'll come back to that.



Let me just ask you a few questions.
You mentioned earlier that you were shown a copy of Dr. Maggio's report to help give you a sense of the format and the content, correct?
A. Yes.
Q. Did you ever have a conversation with Dr. Maggio?
A. No, never.
Q. Okay. And you saw in his report, which I can mark but I don't necessarily need to, he discusses your hypothesis in his report extensively, correct?
MR. KENNERLY: Object to the form.
You can answer.
THE WITNESS: He discussed in two sections of his report, actually; at the end of his report and toward the report in another -- in a couple of sections.
(Salpietro Exhibit 8 marked for identification.)

QUESTIONS BY MR. IMBROSCIO:
Q. Let's go ahead and mark it.
Doctor, I've just marked, just so you can have it handy, Exhibit 8, which is Dr. Maggio's report in this litigation.
You understand Dr. Maggio has since passed away?
A. Yeah.
Q. Okay. And is this the report -- looking at it, is this the report that you were provided as a model for drafting your report?
A. Yes.
Q. And if you turn to page 41, for instance --
A. Yeah.
Q. -- he has a nice graph, a couple graphs or charts, I should say, or figures, of Salpietro, et al., MR hypothesis of IIH?
A. 41, 42 and 43.
Q. Yep.
A. Yeah.
Q. And he -- first of all, that's an accurate depiction of your hypothesis,



those two charts, correct?
MR. KENNERLY: Object to the form.
THE WITNESS: I included this figure in my report as well.
QUESTIONS BY MR. IMBROSCIO:
Q. Yeah, I noticed there are -- how about the previous -- turn to the previous page for a minute.
Is that a figure that you've ever included in any publication?
A. I think not in a -- not to -- in a -- so basically these were my first publications. So basically we had kind of a small -- when I was resident in my early years, we have kind of a small department, journal, things like that, and we also were -- we also were used to do presentations about clinical cases. So probably this was one of the very early figure, but I always use this one in my -- in my publications. So this is more accurate.
Q. Okay. You've used a version of this chart and figure in multiple publications, have you not?



A. Referencing --
MR. KENNERLY: Object to the form.
QUESTIONS BY MR. IMBROSCIO:
Q. Fair enough. That's a fair objection.
You've used different versions of your MR hypothesis model in various publications, correct?
A. I referenced the previous paper and I said I will -- I used, referencing the previous paper, the same figure because otherwise it's very difficult to show the mechanism without the figure. And you cannot change every -- the figure, you know, it's...
Q. Let me ask you to just take a look at your report, which is page 25, and just leave that open. That's Dr. Maggio's report, so leave that open.
Take a look at your report. And I'm just curious why in your report, which is marked as Exhibit 3, you've altered the figure that Dr. Maggio used from one of your earlier publications.
MR. KENNERLY: Object --



QUESTIONS BY MR. IMBROSCIO:
Q. In particular, why, the top, including the acetazolamide section at the top, has been removed?
MR. KENNERLY: Object to the form.
You can answer.
THE WITNESS: Because I -- I took this from the publication. I reference it here, International Journal of Endocrinology. And probably when I included this figure in that publication, probably this was the version. I mean, this was the version.
QUESTIONS BY MR. IMBROSCIO:
Q. Okay. So it's fair to say --
A. And probably took this from another publication which was a slightly different version.
Q. So you've had -- it's fair to say that you've published slightly different versions of this model, this graph of this model, in different publications, correct?
A. Is not exactly like this

Page 62

because in this paper, International Journal of Endocrinology, this was a review, and it was not about pseudotumor cerebri. It was about all the different adrenal disorders which cause neurological complications, especially in children. That was the focus of that review in the International Journal of Endocrinology.

So I cited the MR mechanism. I cited the MR mechanism, but the review was not focused on the MR mechanism or on pseudotumor cerebri. It was a very large overview of all the neurological complications associated with adrenal disorders.

So probably when I -- when I did that, I didn't go -- I decided to not go too much into the details because the review was not about pseudotumor cerebri but was a general overview of all the neurological complications.

So the title of the review was, if I'm not wrong, "Adrenal Disorders and the Pediatric Brain: Pathophysiological Considerations and Clinical Implications."

Page 63

And adrenal disorders means ex -- aldosteronism but means many other things like Cushing syndrome, pheochromocytoma, so it was a very general review.

So I dedicated just to a small section -- a section of the review to pseudotumor cerebri as a possible complication of hyperaldosteronism.

And there was no need to go too much into the details of the mechanism because the review was different.

Q. But the model was very similar in the figure except that --
A. Yeah.
Q. -- it's got the acetazolamide at the top.
My question is: Why did you have the acetazolamide portion of it in the publication that's reflected in Dr. Maggio's --
A. Because --
MR. KENNERLY: Object to the form.
You can answer.

Page 64

THE WITNESS: Because Dr. Maggio took this figure from the paper, which was focused on the hypothesis of IIH. It was a paper -- one of the first publications I made. The paper was "Idiopathic intracranial hypertension: a unifying neuroendocrine hypothesis through the adrenal-brain axis."

So this paper was focused on IIH and then was -- that was the reason why I included more details, more -- I really focused the entire paper on this -- on this mechanism why the International Journal of Endocrinology paper was a large review of all the neurological complications associated with adrenal disorders.

So the pseudotumor cerebri was just a small section of it, and I didn't go too much into the details. I mean, that's the reason why the figure is less informative.

QUESTIONS BY MR. IMBROSCIO:
Q. Okay. Well, let's look at the

Page 65

figure in Dr. Maggio's report. And right below it there's a sentence, and let me just read it for you. It says, "The authors' hypothesize that MR activation in epithelial cells of the choroid plexus, open paren, this is where CSF is produced, close paren, is a key mechanism in IIH caused by at least hyperaldosteronism, obesity, hypervitaminosis A and recombinant growth hormone."

First, is that an accurate -- was Dr. Maggio accurate when he described your hypothesis of the MR model?
MR. KENNERLY: Objection.
You can answer.
THE WITNESS: I think he was -- he was accurate because -- I mean, I think he did a good job, honestly, because he really looked through the literature.

And he started with my hypothesis, with the paper of the hypothesis, and then he switched to other papers which have been published following my papers. Because after my papers were published, other groups

Page 66

focused their research on mineralocorticoid receptor model for pseudotumor cerebri. And one of this group was from University of Pennsylvania. It's a group that I collaborated with. I have a paper with them which was published in Ophthalmology in 2016.
They also published a model which is similar to mine, after my papers, and they referenced my model. This was a manuscript published in Pediatric Research. I'm not sure if it was published 2015 or 2016.
And Dr. Maggio followed the evolution of this model because he observed this started with Salpietro, who proposed this mechanism, and then this mechanism has been factored, developed, by other researchers from the field who proposed additional risk factors, mostly metabolic risk factors.
So I really -- yeah, so this is what he wrote.

Page 67

QUESTIONS BY MR. IMBROSCIO:
Q. Okay.
A. Can I read? It's page 47. "It is biologically plausible that exposure is .2, page 47, that exposure to LNG, levonorgestrel, could cause or significantly contribute" -- and then he cite, "The mineralocorticoid receptor basic mechanism, developed mainly by Salpietro and Sheldon, is discussed in Section J of my report."
So he referenced both mine -- my model and the model proposed by Sheldon.
Q. Okay. Let's go --
A. And then I remember that he discussed Sheldon model somewhere. Anyway, so that's what he did. So basically he applied our model to the litigation.
Q. Okay. Let's go back to page 43, which is the section you just referenced.
A. Yes.
Q. And let me read a couple sentences, and you tell me, Doctor, if you agree or disagree with what Dr. Maggio wrote.
Can you do that?

Page 68

A. Yes.
Q. Okay. I'm going to ask you the -- the sentence that begins "whether" on page 43 in the middle of Dr. Maggio's report --
Do you see where it says "whether"?
A. Yes.
Q. He writes, "Whether or not LNG is an agonist at certain mineralocorticoid receptors is a basic research question which may not be answered soon."
Do you agree with his assessment?
MR. KENNERLY: Objection.
QUESTIONS BY MR. IMBROSCIO:
Q. You can answer.
A. I agree.
Q. Up above --
A. To be sure -- to be sure about the answer, it's a basic science question which will take resources and time.
Q. Okay.
A. So what I suggested before, it was based on the available literature and it

Page 69

was more likely than not. But to be sure about it, it takes -- it will take years and resources. It's a basic science question, I agree.
Q. That hasn't yet been answered, correct?
MR. KENNERLY: Objection.
You can answer.
THE WITNESS: There is no proof in terms of total evidence from science, which is from 95 to 100 percent. I mean, is a basic science question.
QUESTIONS BY MR. IMBROSCIO:
Q. Okay. I got it.
MR. KENNERLY: Wait. Wait. Let him finish.
QUESTIONS BY MR. IMBROSCIO:
Q. I'm sorry, I thought you were finished.
Go ahead.
A. And is -- can I do a small -- I mean, is -- so what I mentioned before, basing on in vitro data, animal data and clinical data, all this available literature,

Page 70

publications and resources, suggest me is more likely than not.
Q. I got it.
A. Let me -- let me --
Q. I'm sorry. Please.
A. Let me finish.
Q. Yeah.
A. Let me finish.
And I wrote in my report what type of experiments will be needed to address this question and to prove -- I mean, I very briefly summarized this, but this is likely to involve the generation of animal models and some molecular biology experiments. I mean, it's -- it's something very complicated to prove and to be fully sure.
Q. And that hasn't happened yet, correct?
A. And this did not happen in any sense.
Q. Okay. Let me ask you to go up a sentence above, which is in the drospirenone paragraph. It's a long sentence, but I -- the second sentence, but -- and I'm going to not read the sources,

Page 71

but let me see if I can do it this way.
"LNG has significant affinity," then there's some rates, "at the MR" -- but then I want to you focus on the next part of it -- "comma, but whether LNG is an agonist, i.e., with mineralocorticoid activity, or an antagonist, with antimineralocorticoid activity, is less clear."
Do you agree with Dr. Maggio that whether LNG is an agonist or an antagonist is less clear?
MR. KENNERLY: Objection.
You can answer.
THE WITNESS: I said earlier that this is a controversial -- is a controversial point of the literature, and I said that basing on what is my opinion is that is an antagonist basing on in vitro, animal and clinical data.
But this is my opinion and is more likely than not. Is not 100 percent evidence. Is 51 percent.
QUESTIONS BY MR. IMBROSCIO:
Q. Okay. Sorry, I thought you

Page 72

were finished, sir.
And we'll dig into detail on those points in a moment. I'm just trying to hit the overview now.
As I understand it, something can be an agonist at a site, correct? That means it's creating activity in layman's terms, correct?
A. (Witness nods head.)
Q. You have to answer yes.
A. Yes.
Q. One thing I should have mentioned earlier is she has to hear audible answers. The nodding doesn't work because of the transcript, so just -- you have to say yes or no and not uh-huh or nod your head.
Understood?
A. Yeah. Yes.
Q. So let me start again.
Something can be an agonist at a site that stimulates activity, correct?
A. Yes.
Q. Something can bind and be an antagonist?
A. Yes.

Page 73

Q. Which inhibits activity?
A. Exactly.
Q. Or something can bind to a site and have no activity?
A. Exactly.
Q. Okay. And -- okay. Let me stop there for now.
Let me ask you just a -- I know you've not done this legal work before. In your report, there are a number of places -- I counted about 30 -- where you wrote in your report the phrase "more likely than not."
You're familiar with that, right?
A. Yes.
Q. And I read everything you wrote in the scientific literature, and I didn't see you use that phrase a single time.
And my question is: Why did you use that phrase so many times in your report when you were expressing certain opinions?
MR. KENNERLY: And I would instruct him not to answer that. If you'd like me to elaborate why on the

Page 74

record, I will.
MR. IMBROSCIO: You are going to take a big risk in that one, I have to tell you.
MR. KENNERLY: You can -- excuse me. I'm not saying a word.
MR. IMBROSCIO: Yeah.
MR. KENNERLY: If you want me to make a record why I'm --
MR. IMBROSCIO: You're instructing him not to answer.
MR. KENNERLY: Correct.
MR. IMBROSCIO: That's a dramatic --
MR. KENNERLY: I would suggest you look at your question. If you want to talk about this, we can take a break because there is something very vital in your question. I don't want to talk about it in front of the witness.
It's not that this whole subject matter is gone; there is a problem with your question.
We can take a break.

Page 75

MR. IMBROSCIO: No, we're not going to take a break.
MR. KENNERLY: We have been going more than an hour.
I'm not saying this whole subject is off, but I have instructed that one very specific question. And if you want to talk about it, I am happy to.
MR. IMBROSCIO: Let me -- let me do it this way.
QUESTIONS BY MR. IMBROSCIO:
Q. Did you understand -- without giving me the reason why, did you understand that there was a necessity to include language like that in your report?
MR. KENNERLY: Objection.
You can answer.
THE WITNESS: Okay. I tell you something. I am a clinician, scientist. If you look in my recent papers, I published -- I think I mention this in my curriculum. I published a new gene which caused myasthenia in children. And in

Page 76

this --
QUESTIONS BY MR. IMBROSCIO:
Q. Which is terrific. That's wonderful.
A. In this gene, we have the mouse model which has mutation which is almost identical to the mutation we found in the children. So we have a gene -- we had a gene which we know that the biological mechanism of this gene is to release the acetylcholine, the neurotransmitter acetylcholine, in the neuromuscular junction.
Q. You're going to have to slow down for her, because no way she got that.
A. Sorry, I apologize.
We found this gene in these children. The name of this gene is VAMP1, which is necessary to release acetylcholine in the neuromuscular junction. And we found perfect situation, the mutations in the patients the same mutation in the mouse model are almost the same mutation; the same neurophysiological features in the patients and in the mouse model. And from a scientific evidence point of view is

Page 77

something very strong because you have all the pieces. You have the clinical, the genetics, the functional data, the mouse model with the same mutation.
And this is science. I mean, this is research which is supported by proofs. Also, the number of patients is limited.
So when it comes to this subject, we have a different situation. We lack -- we lack some final proofs. And I am honest as a scientist to tell you that.
I'm not coming here and say, look, this is -- so this is true, what I wrote is true, and it's like this, 100 percent. I'm not saying this. I cannot say that because I've been trained as a scientist, and I know that we need several further proofs and evidences to confirm and to prove this model.
The only thing I am saying here, this is a biologically plausible model. I provide you an example, and I hope this will help you to understand why I used so many times this "more likely than not."

Page 78

Let's say that we sequence the DNA of a large number of individuals, I mean hundreds of individuals, thousands of individuals, with pseudotumor cerebri, and we analyze this data. And if we find variance, rare mutations or rare variance or even interesting polymorphisms in genes which encode for the mineralocorticoid receptor or for that specific subunit of the sodium potassium channels which is highly expressed in the choroid plexus -- should be a reason why it's unexpressed -- and we find interesting variance. And then we translate this variance into an animal model, probably with the same mutation, and then we perform some in vitro studies, and then we can say this is fully proven.

I mean, unfortunately, we are not in that situation.

Q. Okay.

A. And I am -- I recognize that. I recognize that many times in my report, but this doesn't mean that I don't believe in my mechanism. And this doesn't mean that I am producing this model now of -- because of the

Page 79

litigation. Because I published this in 2012, 2013, and the litigation started in 2015. I --

Q. I'm sorry, go ahead.

A. There is no relationship between these. And --

Q. Let me be clear. I'm not suggesting -- I don't mean to interrupt, but I -- I'm not suggesting that you've made this up for the litigation, so please don't take that from my questions.

A. No, no, no. I'm just telling you that the interest which moved me to develop this model was because I followed up some children with pseudotumor cerebri. And specifically I cannot forget one of these -- one of them who had almost permanent visual loss.

So since that time, I wanted to understand more about this condition, and I did my research. And the resources I had at that time, the resources I had available were limited --

Q. Yeah.

A. -- were literature revision

Page 80

{sic} try to extrapolate findings from previous studies like animal model studies, in vitro studies, and translate that findings into the clinical scenario, into the clinical situation.

So that was a translational research. So there is some support which comes from research done by other researchers, by other people, the recent translation effort.

But there is not the last step, which is the proper scientific confirmation of a model which is biologically plausible, which is in my opinion more likely than not, but which is not proven.

Q. Okay.

A. If I will have the chance -- probably after this litigation because I don't want to have any conflict of interest. So when I would finish with this, I hope I will have the chance to continue with my research.

I collected samples from pseudotumor cerebri patients. I have some interesting findings in their DNA, and I hope

Page 81

I will have the chance to continue and to come to a conclusion which is not "more likely than not" but which is 95 to 100 percent sure.

But at this time, in this circumstance, I had to provide my opinion on the base of what is available in the literature and what I think is more likely than not, and that's the reason why I use this sentence so many times.

Q. Okay. Let me -- we're going to take a break in a moment. Let me make sure I understand what you just said.

So what you just described is essentially the scientific process. There's a hypothesis, and then you test it to confirm it or disprove it, correct?

MR. KENNERLY: Object to form.

QUESTIONS BY MR. IMBROSCIO:

Q. I mean, in simple terms, that's what you've described a moment ago?

A. Translational research means that you may do the experiment and then you translate from the bench to the bedside. So you go from the animal model, from the in

Confidential - Subject to Protective Order



vitro study to the patient, trying to understand the mechanism, or you use the work done by other people. This is still translational research.

So we know that the pressure of cerebrospinal fluid is impaired in this condition. We know that the pressure of cerebrospinal fluid is influenced by not so many factors, by the proteins and the electrolytes that are present in the cerebrospinal fluid because we are talking about idiopathic intracranial hypertension, so there are no tumors, there are no obstructions. There is nothing which could explain the increase of the cerebrospinal fluid pressure.

And starting from this circumstance, you go through the literature and you investigate the factors which influence the cerebrospinal fluid pressure, and you translate the mineralocorticoid receptor and sodium potassium channels pathway into the clinical scenario of patients with pseudotumor cerebri by linking the endocrine metabolic risk factors to this



context.

So it is something that you need to extrapolate data from animal models, from in vitro research studies, and link this data to the patients, to the hormonal changes of the patients, to the risk factors associated with the condition.

So what it -- what is the result of this translational effort is a model -- is a biological model which can be proven by further experiments. I don't know if --

Q. Are you finished?
A. Yes.
Q. I don't want to interrupt you. Okay.

Do you remember my -- my question was a little bit different. You said earlier that you view yourself very much as a scientist, which I fully appreciate, correct?
A. My research now has changed because --
Q. Okay. I'm sorry, I'm going to just -- and I'm sorry. Because we have a



limited amount of time, and I may need to ask for more.

But if you try to listen to my questions and answer them. I don't want to cut you off, but I want to try to get the answers to my questions. So let me --
MR. KENNERLY: I object to the characterization. Just ask a question.
QUESTIONS BY MR. IMBROSCIO:
Q. Okay. Here's my question --
MR. KENNERLY: You asked it; he answered it.
MR. IMBROSCIO: To be fair, he didn't. That's fine.
MR. KENNERLY: He did.
QUESTIONS BY MR. IMBROSCIO:
Q. You consider yourself a scientist, correct?
A. My papers talk about me, especially in the last two years, I published animal models of drosophila melanogaster, the fruit fly, which is associated with a neurological disease, neuropathy, leukodystrophy. I published this animal



model of VAMP1 which is associated with myasthenia.

So these kind of publications are not just clinical papers but is a mixture of clinical and science because there is animal model, there is lab work; it's not just clinical. That's why I say to you my training at this step is as a clinician scientist, yes, and I consider myself like that.
Q. Okay. As part of being a clinical scientist, clinician scientist, you understand what the scientific process is, the scientific method, correct?
A. Yeah.
Q. You learned that in your training, correct?
A. Yes, but it's different from field to field.

In which field do you mean the scientific process?
Q. In general, am I correct that the scientific process entails coming up with a hypothesis and then developing evidence which either disproves or proves it?

Is that in layman's terms what we know as the scientific method or the scientific process?
MR. KENNERLY: Objection.
You can answer.
THE WITNESS: This is the scientific process, but also you can go from the basic science to the clinical, and in that case it's translational research, which is also very important.
QUESTIONS BY MR. IMBROSCIO:
Q. Well, translational research as you've described it is nothing more than the proving -- different ways of proving or disproving the hypothesis that forms the basis of the question, correct?
MR. KENNERLY: Objection to form.
You can answer.
THE WITNESS: Translational research in my view is applying knowledge from previous experiments and from previous animal -- I mean, in this context and from previous animal



data to the context, for example, of a specific disease or a group of patients, and I think this is very important.
QUESTIONS BY MR. IMBROSCIO:
Q. Okay. Do I understand your testimony earlier, that is, that your hypothesis, you believe, is right, correct?
A. I believe is biologically plausible, and I believe that there is slightly higher chance, in my opinion, is right than is not right. I may be wrong, maybe, 49 percent. I may be right 51 percent, in my opinion.
But if someone in some time disprove my model, this is something that I cannot exclude, absolutely.
Q. Okay. And so when you used the phrase "more likely than not," as I think heard you say, your view is that's to emphasize your belief in your model that it is currently correct?
MR. KENNERLY: Object to the characterization.



QUESTIONS BY MR. IMBROSCIO:
Q. Is that a fair summary of what you said?
A. I believe that this model is -- more likely than not is correct. It may be that there are some things -- I mean, pseudotumor cerebri pathophysiology is extremely complex, and there are several heterogeneous factors which may cause it.
I mean, I'm sure you noticed from my report and also from my previous papers that I mostly focused on the endocrine metabolic risk factors. So in this context is possible that some of this mechanisms are correct and some of this mechanism can be also not confirmed by fact or research.
I don't know, but the current situation, I believe, is biologically plausible, which means that is something that it may be correct. And it's my intention in the following years after this litigation, we finish, to continue to work on it.
Q. Okay.
A. And I will apply for funds and I will apply for grants with the hope of



characterize the variance I'm actually working on from patients with pseudotumor cerebri I collected and sequence the DNA longer.
So this happened in the middle of a process which, I mean -- which will take time to have more knowledge in this field. But there is something I can tell you, and this is not more likely than not. This is set in, 100 percent. I mean, it's true that my model may have limitations. Who will say no, I mean, especially outside the endocrine metabolic field of pseudotumor cerebri. But I really tried with all my honesty to provide an answer linking different pieces of the puzzle from animal to in vitro studies to patients. I tried my best. I may be wrong, maybe, but I believe in this mechanism, and this is the reason why I worked on it in 2012, 2013, 2014.
I can tell you something. There is no one in the world who knows the exact cause of pseudotumor cerebri. There is no one who has the answer. I am someone who has tried to provide some answers with a

Page 90

translational research effort.
And unfortunately, most of the research on this condition is not trying to provide answers because most of the research in this condition is done by ophthalmologists, who are much better than me in the diagnosis, for example, in the fundoscopic examination, in the treatment, I can recognize that, but are not people experienced in the lab, in animal models, in molecular neuroscience. And it's not their interest to understand this condition causes. And in most of the papers they never really advanced any model or proposed any model. And unfortunately, this is the cause of this condition to be not completely understood.
And I am sure about this: that anyone, anyone in the world, knows the exact cause or have a real clue on the mechanism.
At the same time, I believe my model can explain many things can be plausible. This has been recognized, has being cited by other researchers, has been followed by papers which in the same field worked in further developing the model and

Page 91

proposing other additional ideas. And in this context I think that is something that is possible to work on in the future and to do more research.
MR. IMBROSCIO: Okay. Let's take a break. Let's go off the record for a moment.
VIDEOGRAPHER: Okay. We are going off the record. The time is 11:15.
(Off the record at 11:15 a.m.)
MR. IMBROSCIO: Let's go back on.
MR. KENNERLY: Just a couple little transcript notes. And I know it's a realtime so I'm not expecting perfection. It's just this is the stuff that often changes.
Page 5, line 23 in realtime where he says, "Before summer of 2015," he has to mean before summer of 2017, because then he refers to Christina, who wasn't even in a lawyer in 2015.
MR. IMBROSCIO: I got to come

Page 92

back to that. That's a substantive change. He said '17. It should stay there.
MR. KENNERLY: No, he said -- he said -- the transcript said '15.
MR. IMBROSCIO: That's what he said.
MR. KENNERLY: I mean, I heard it as 2017.
MS. MANGRUM: He said --
MR. IMBROSCIO: He got a call in '15. He's not sure --
MR. KENNERLY: Yes, he got a call in '15. I agree with that. He got a call in '15.
It's when he comes back to that next part and he's talking about once he actually starts getting involved --
MR. IMBROSCIO: Listen, the record -- the video will say what it says. Just sync it to the video.
MR. KENNERLY: That's why I'm not saying it in front of him. At least that's how I heard it.
MR. IMBROSCIO: Okay.

Page 93

MR. KENNERLY: Page 21, line 4, you had your question about altogether clear today. I objected to it but I didn't see it on the realtime.
And the video says what it says, if you don't think I actually objected to it. I just didn't see it on the realtime.
MR. IMBROSCIO: She'll sync it up.
MR. KENNERLY: Yeah. Then -- I think that was it, actually.
MR. IMBROSCIO: All right. You want to make your --
MR. KENNERLY: And then I did want to note --
MR. IMBROSCIO: You want to make your record for why you instructed him not to answer before we go to the judge?
MR. KENNERLY: Yes.
Now, your question for this first-time witness had two huge problems with it: One of them, you intentionally conflated the difference

Page 94

between published science literature and an expert report. You outright told him that the standard was somehow supposed to be the same and the language was supposed to be the same, and that is a grossly inappropriate comparison.

The second one was the critical one that you found your way around. That question itself, I don't think any witness could possibly answer without giving privileged information. Asking it exactly in the specific form that you did requires the witness then spit out privileged information from what the lawyer instructed them was the subject matter and what the nature, importance is.

Now, that said, I didn't want get into too much in front of the witness, but I told you my instruction was just that question exactly as framed I thought sought privileged material.

You then continued down this

Page 95

line, without any sort of instruction or anything, and got at least what seems to me a complete and total description as to how and why he's using this language. So I consider that moot.

MR. IMBROSCIO: My question is if you represent to me that you guys told him he's got to include that for legal reasons, I won't ask any more questions. That's fine. But is that what you're saying?

MR. KENNERLY: Well, no, no, no, because you're characterizing it differently there. No, here's -- the way --

MR. IMBROSCIO: That's what I'm asking. If you guys told him he's got to include that for legal reasons, that's fine.

MR. KENNERLY: No, no, because the way you're framing that right there is incorrect. You're suggesting that like the lawyers are telling him to put "more likely than not" at

Page 96

random points in his reports.

MR. IMBROSCIO: Yeah.

MR. KENNERLY: If you're -- well, exactly. We didn't instruct him to randomly put "more likely than not."

If you're asking me to represent in the record -- and I will represent this -- of we did tell Dr. Salpietro that in legal proceedings the standard incorporates a more likely than not evaluation of many of these scientific principles.

Now, going into which part or that part of the report, that would be privileged. You know, I'm not going to testify about this line or that line about it. But, yes, as a general matter we did, in fact, tell him this is different from scientific literature, which does not use a more likely than not standard, never would and has no reason to.

We did, in fact, tell him, as is the case of -- in the law we use a

Page 97

more likely than not standard, and that is what he used to reach his opinions, just like experts from Time Memorial, just like it says in the reference manual on scientific evidence.

MR. IMBROSCIO: Okay. Let me just -- it's 6:21 on the East Coast, and we don't have time to do it now, but I'm going to need more time with this witness.

I asked him a question, is he a scientist, and we went on for about three minutes about fruit flies.

MR. KENNERLY: I'm not gonna --

MR. IMBROSCIO: You're going to have to have a discussion with your doctor.

MR. KENNERLY: No. No, I am absolutely not going to have a discussion with my doctor. And what I would refer you to is Dr. Schöndorf's deposition, because I had far longer answers from your designee where she would go on at length at completely

Page 98

irrelevant topics. She would repeat the entire question multiple times in the phrasing of it.

Dr. Salpietro, even though this is not his native language, has been answering directly and fully in the English language. There's been nothing wrong with his answers. And in fact, both of you -- Mr. Imbroscio, you keep visualizing at him and interrupting him. Ms. Mangrum, you stop shaking your head at him. You keep constantly doing this in his answers. You shake his head when -- your head at him one way or the other.

MS. MANGRUM: I don't shake my head. I don't know if --

MR. KENNERLY: Both of you keep trying to suggest to him that he needs to stop his answer while he's continuing to testify to what is his first testimony of any sort.

You two are not amateurs.

MS. MANGRUM: I never have shaken my head at him once.

Page 99

MR. KENNERLY: Yes, you did.

MS. MANGRUM: Well, you need to get a camera if you've got a complaint.

MR. KENNERLY: Then we will get a camera on you for the next time --

MS. MANGRUM: Okay.

MR. KENNERLY: -- because this is inappropriate.

Mr. Imbroscio, you have been interrupting him. I will not instruct him anything. Everything he has done here has been proper.

And if you ask him a question like "do you agree" and give him a big scientific principle, guess what, you're going to get ten pages of testimony. That is how this works. You are not going to get your cute little snippet by interrupting him. You're not going to ask him some broad scientific ultimate conclusion and then hope he only gives one line.

He is a scientist. He is a thorough one. He did a thorough job

Page 100

here. You're going to get a lot of substance to it. And that's not my problem. That's the problem with your case.

MR. IMBROSCIO: Are you finished?

MR. KENNERLY: Yes, I am.

Are you finished?

As far as I can tell, you don't have anything else you need to go down with this. The privilege issue is resolved. You got a complete answer on all of it. There's nothing else to do here. I am not going to instruct him anything about his answers.

MR. IMBROSCIO: All I'm going to say is that we've probably had enough whataboutism in our country these days. I'm just telling you that the witness' answers are not -- they are not responsive and going on for a long time, and we are going to reserve our right to go back to the Court and seek more time if we're not able to go through our examination. That's all

Page 101

I'm saying.

You can reserve whatever rights you want to reserve. Just telling you right now, I want to give you that warning early on that we're going to do that.

MR. KENNERLY: And I would suggest you to look at your questions. Because when you ask him open-ended, narrative questions about large scientific principles, he is going to elaborate on them.

Every time you've asked him a narrow question, he's given you a one-word answer.

MR. IMBROSCIO: That's not true.

MR. KENNERLY: You asked him about agonist and antagonist, he gave you one word: Exactly.

MR. IMBROSCIO: "Do you consider yourself a scientist," and I got three or four minutes about fruit flies. So I'm gonna say --

MR. KENNERLY: That starts in

context.
MR. IMBROSCIO: -- that I would disagree -- I would disagree with your description in any event. I've made it clear what my intention is given the way this deposition is going.
I frankly have been trying to estimate when his long answers are done. I have apologized when I've interrupted him when he hasn't completed it. I've let him finish every answer.
I don't take kindly to the accusation that you lodged a moment ago about my conduct. I don't think it's accurate. I don't think it's professional.
I will continue to try to speed this along. If I sense a pause in his long answers that he is done -- you will notice that if he continues to talk, I will immediately apologize and let him finish, but that's going to have consequences is all I'm saying.
MR. KENNERLY: Okay.



MR. IMBROSCIO: Thank you.
MR. KENNERLY: And I would put just briefly, to consider your questions. And while we're at it, in these first two hours you've asked him about phone calls with Dr. Johanson and Dr. Maggio's report. And, I mean, there's a little bit on the substance here, but if you're not going to get to the substance and if you're going to go to the Court about do you consider yourself a scientist, you might want to do something else.
MR. IMBROSCIO: You can write your brief -- you can write your brief on the record. Let's just proceed with the deposition.
MR. KENNERLY: Please.
MR. IMBROSCIO: We've already wasted enough time.
MR. KENNERLY: That's why we're here. We're done.
(Off the record at 11:25 a.m.)
VIDEOGRAPHER: We are going on the record. This is the beginning of



Media 2. The time is 11:42.
QUESTIONS BY MR. IMBROSCIO:
Q. Dr. Salpietro, let me just clear up a few things. There was some confusion. We were chatting about you mentioned that you were contacted at some point by Ms. Natale.
As I understand it, that was in 2017, the more recent contact, correct?
A. (Witness nods head.)
Q. You need to say yes.
A. Yes. Yes, sorry.
Q. Again, you can't just nod your head. Sorry.
And then you mentioned you had contact in 2015?
A. Around --
Q. Around that time?
A. I cannot swear because I was not working in London at that time as a clinical research associate in UCL.
I think it was at the end of my pediatric residency program. Maybe it was --
Q. In?
A. -- 2015.



Q. No. Where were you? I'm sorry, just so I understand the context.
A. Okay. So I was contacted between 2014 and 2015. I don't remember the month.
Q. That's fine.
The reason I asked you where is just that helped place you in time somewhere.
But it was 2014, 2015?
A. Yeah.
Q. Do you recall, was it a lawyer who contacted you or was it another scientist?
A. It was a lawyer.
Q. Okay. And was it a woman or a man?
A. A woman.
Q. Okay. And -- but you don't think it was Ms. Natale?
A. No.
Q. That would be surprising --
A. No.
Q. -- because I don't think she was a lawyer then.
A. It was not Ms. Natale.

Q. Okay. Do you remember where the -- other than in the United States, was it -- do you remember where the lawyer was from?
A. I think from the same --
Q. Was her name Lauren?
A. Lauren.
Q. Lauren?
A. It's possible.
Q. Okay.
A. It's possible.
(Salpietro Exhibit 9 marked for identification.)
QUESTIONS BY MR. IMBROSCIO:
Q. Okay. Secondly, I've marked as Exhibit 9 some records from MR. JONES' --
MR. KENNERLY: Do you want me to proffer what they are for --
QUESTIONS BY MR. IMBROSCIO:
Q. Yeah. No, yeah, Exhibit 9 is some records provided to me by MR. JONES that I think reflect payments that you've received to you; is that correct?
A. In my Italian bank account I received these transfers.



Q. Okay. Great.
And did you ever send MR. JONES or Christina or anyone at his law firm a bill?
A. They -- they don't -- they never asked me, or if they did, I -- I mean, probably they mentioned it and I -- I never released any bill.
Q. Okay. Did you ever --
A. I can do that. I'm happy to do that.
Q. Did you ever send them an e-mail saying "this is the number of hours I worked on" or --
A. Yeah. Yeah, that's what I did.
Q. Okay.
A. I did.
Q. Okay. And so you sent them an e-mail that accounted for some of your hours, at least?
A. Yeah, they initially paid me 10,000 just as an initial payment, and then I started to work on this. And when it came to the payment, I included the whole amount of hours I spent on the litigation, including



literature revision {sic}, draft of the report, phone calls with Johanson or with Christina or with anyone from the law firm, and all the time spent also meeting them.
So I included the whole amount of hours I dedicated myself to the litigation. And, I mean, being English not my mother language, it takes for me even time to write report and -- I mean, the overall amount of hours was consistent because everything started before summer until -- until now.
Q. Okay. Let me just see if I understand it.
You were paid $10,000 on May 25th, according to Exhibit 9?
A. Yeah.
Q. And then 35,000 on November 14, 2017, correct?
A. Yeah.
Q. And then finally another 30 on January 5, 2018, correct?
A. Yes, exactly.
Q. So for a grand total of 75,000?
A. Yes.



Q. Which you list in your disclosure, which is Exhibit 6, that you've agreed to cap your billing at 75,000?
A. Yes, because at some point I understood that I work -- that I spent many hours on this. And, I mean, it was ridiculous to ask the equivalent of $650 per hour related to the amount of hours I spent because, I mean, it was -- I felt it was too much. So I decided to be paid just $250 per hour and -- yes.
Q. Okay. And then you mentioned that you had some -- you communicated via e-mail what your hours were, correct?
A. Yes.
Q. And when you did that, was it -- did you break down, you know, X number of hours for literature review and X number of hours for meeting with lawyers?
A. Yes, something like that.
Q. Okay.
A. Literature revision {sic}, report drafting and phone calls and meetings, yes.
MR. IMBROSCIO: Okay. I know

Page 110

MR. JONES is not in the room, Max, but I'm gonna ask that we have those communications. I think we're entitled to those, to be frank.
MR. KENNERLY: I don't want to coach in front of the witness. Let's talk about this off the record.
MR. IMBROSCIO: Yeah, I just want to make my record clear that I would like to have those. You know, I think --
MR. KENNERLY: Understood. Let's talk about it a little bit. I see your point.
MR. IMBROSCIO: Okay.
QUESTIONS BY MR. IMBROSCIO:
Q. Now, your last payment was in January, so earlier this month?
A. Yes. Because the payment of November was when I completed the initial -- I mean, the draft, which I keep working on during November and December. And when it was completely finished, it was in the final form, in the present form, then they transferred the remaining 30,000 in early

Page 111

January.
Q. Okay. And do you intend or have you communicated with them whether you will send an additional bill for your time preparing for today's testimony and/or actually testifying today?
A. I very briefly discussed it. We had not reached, I mean, final agreement about it. I'm not sure, honestly, what --
Q. Tell me this: About how much time have you spent since the beginning of this month doing work on this case, which would include meeting with the lawyers and reading your report? Anything else that you've done that you would potentially bill for?
A. Today is 25 -- 26th --
Q. 26th.
A. -- so probably -- I don't know. The biggest effort for me was the report because even when I write, I'm a bit perfectionist, and it takes time for me to write. This month, I don't think I spent a big amount of time, honestly.
Q. All right. Let me ask you

Page 112

this: You certainly -- well, I assume you met with the lawyers to get ready for testifying today, correct?
A. Yeah, we met. We went through my report.
Q. Okay. And again, I want to be careful you don't -- please don't tell me what you said to them or what they said to you, that's -- but I am allowed to ask how much time you spent and when you spent.
So did ---
A. I asked them to meet me because this is the first time I do something like this, and I have completely -- I had completely no idea how to be prepared for this. So I asked them, I would be grateful if you can provide me some suggestions how this works.
And we met yesterday and we spent a few hours, including lunch, which we discussed something else. So, I mean, discussing exclusively this deposition, maybe we spent, I don't know, maybe something between two and three hours or maybe four hours.

Page 113

Q. Okay. What time did you meet with them yesterday?
What time did you start?
A. Nearly 11.
Q. Okay. And you had lunch, and then what time did you end?
A. Nearly 4.
Q. Okay. And any other in-person meetings with the lawyers this month?
A. No.
Q. Any phone calls this month?
A. Yes.
Q. Okay. How many phone calls?
A. I don't know. I think a couple of phone calls.
Q. What was the duration of the phone calls?
A. Maybe -- I don't know, not long.
Q. An hour? Three hours?
A. No. No. Less than one hour.
Q. Okay. So the phone calls this month in total were less than one hour each?
A. Yes.
Q. And so how many calls do you

Page 114

think overall?
A. I think maybe one or two.
Q. Okay. So this month, so I have it --
A. But I'm not sure. I'm not sure, honestly, if it was this month or late December that we had phone call.
I mean, we had e-mails exchange because they discussed with me the defense reports and things like that. So for sure I spent some time through the e-mails, and also I saw the defense reports they shared with me. I'm not sure about the phone calls.
Q. How much time did you spend reviewing the defense reports?
A. I would say I spent probably -- probably -- I would say an afternoon but with many breaks, like maybe three hours or four hours maximum.
Q. And did you review all of the reports or just certain ones?
A. I focused on the ones which are more relevant to my expertise -- or I mean my report, which is more focused on the mechanism.

Page 115

So I ignored, honestly, the epidemiology reports because this is not to what I am expert about, not what is my report focused on. So probably I read with more attention the report from Jusko and I read with more attention the report from -- I don't remember the names.
Q. So with -- you read with more attention.
So the Jusko report I understand, and we'll talk with you about that.
You said the epidemiologist's report you -- you sort of ignored the epidemiology?
A. It's not to my --
Q. It's not your area. Let me ask you about that.
When you did your report, did you do a literature search, a comprehensive literature search, on levonorgestrel, LNG?
A. I did.
MR. KENNERLY: Object to form.
You can answer.
THE WITNESS: I did, but when I

Page 116

talk about epidemiology, I talk about statistics and correlate the disease with the -- I mean, it's -- it's something which is beyond my -- the reason why I've been involved.
The reason why I've been involved is more focused on the pathophysiology and explaining what I think it would be the plausible biological mechanism, and it's not epidemiology or something like that.
So that sections of the reports from your experts, I read -- I read them through very quickly, and I mostly focused on the sections which were discussing the pathophysiology, the mechanism.
And I found especially two defense reports focusing on these subjects: One was from Jusko, as I mentioned it, and the other one was from someone else. I don't remember the name.
QUESTIONS BY MR. IMBROSCIO:
Q. Okay.

Page 117

A. I don't remember.
Q. Well, let me ask you -- you said earlier you don't view yourself as an expert in epidemiology.
A. No.
Q. You've got a section in your report that describes some epidemiology and also runs through a number of case reports.
Do you know what part I'm talking about?
A. Yes.
Q. All right. Let's turn to that, just so we have it. Can do that right now.
I think it probably begins, if I can point you in the right direction, page 27.
And so what I wanted to really ask you to begin with, which is you went through a number of case reports involving LNG or related products on pages 27 and 28.
Is that -- does that describe what you've done there?
A. Yes.
Q. And my question to you is: How did you select these literature case reports

to put into your report?
Did you find them -- for instance, did you find them via a literature search or were they provided to you by the lawyers, or just curious how you -- how you got them?
MR. KENNERLY: Object to form.
You can answer.
THE WITNESS: It was a combination of factors. I initially searched through PubMed, the medical literature website. Then I found some case reports and some case series on my own in PubMed, and I included this in my initial draft.
And then by discussing with Christina Natale, she mentioned me a few case reports which I have missed at the time, so I included these references as well.
And then by reviewing some other documents related to this litigation, such the report from Dr. Maggio, I found maybe another one or two case reports.



So by combining all these references, I included all the ones that I -- that I found and that I thought to be -- to be relevant.
QUESTIONS BY MR. IMBROSCIO:
Q. Okay. Are you finished? I'm sorry.
A. Yeah, I'm finished.
Q. Okay. I'm curious. Obviously your expertise is in the pathophysiology of these issues.
A. Yes.
Q. Why did you decide to include the various case reports?
A. Because -- I tell you why. Because I -- I'm probably -- I mean, I'm not an epidemiologist, but I'm an expert of rare neurological disorders. So in my life, even if my career started not so long ago, I saw very rare neurological disorders in my clinical and in my research activity; for example, families with mutations in a certain gene that there are maybe just two or three families in the world and disorders which are extremely rare, genetic -- neurogenetic



disorders which are extremely rare.
I'm not saying that IIH is that rare, but it's still a very rare neurological disorder. It's 1 in 100,000. In some specific sex and age groups the prevalence rise, in the females of certain ages, but still it's a very rare neurological disorder.
So what I wanted to emphasize, including these case reports, is that when you have something so rare, which has been -- which is described in association with a certain drug, in my opinion -- but I may be wrong -- even if it's just one case report, it is still significant because that made you think about, oh, this is something that can be associated because it's something extremely rare what we are talking about. And I started discussing this case report by introducing the cause and association between recombinant GH and pseudotumor cerebri.
I can tell you that as a pediatrician this is something that we've worried about when we suggest to patients, to pediatric patients, to families, to initiate a treatment with recombinant GH because we



know this could be a risk factor for pseudotumor cerebri. Still, it's a very rare complication, pseudotumor cerebri, in patients who undertake GH treatment, but still this is a recognized complication -- as a rare neurological complication of GH treatment, even if the case reports are few. And the same is with vitamin A intoxication, with tetracycline.
And what I would like to emphasize, that in any of these medication-related pseudotumor cerebri there is a recognized causal mechanism.
For example, with the GH there are many hypotheses. None of these hypotheses have been proven. Some of them think the causal mechanism can be linked with IGF, some other think aldosterone may play a role, but still the occurrence of pseudotumor cerebri in children treated with GH, regardless the understanding of the causal mechanism, is recognized as a complication.
And this is the reason why I decided to include all these case reports. Because even if I'm not an epidemiologist, we

Page 122

are talking about a very rare neurological disorder, and I think that these case reports from a clinical point of view are important to emphasize a possible association.
Q. Okay.
A. Similarly to what happened with growth hormone and with vitamin A.
Q. You mentioned in your last answer that the -- from recombinant growth hormone there are many hypotheses.
A. Yes.
Q. None of them have been proven, correct?
A. None of them, yeah.
Q. Would you agree that your own hypothesis about the MR model, that's not yet been proven either, right?
A. I agree. I told you that today morning many times.
Q. Okay. Okay. Now, would you agree -- let me see if we can agree on some basic --
A. Yeah.
Q. Case reports like you've described here can be informative; would you

Page 123

agree with that?
A. Can be informative.
Q. Would you also agree that they can generate a hypothesis?
A. They can generate a hypothesis.
Q. Would you also agree that case reports can answer the question that gets raised by the hypothesis?
A. In some cases.
Wait. What do you mean "can answer the question"?
Q. I mean an individual case report may just be a coincidence of the fact that the person was taking the drug and had the event; would you agree with that?
A. If is an isolated case report.
Q. Yeah.
A. Yeah.
Q. And would you agree that a case report can't prove that a drug caused the event?
A. A single case report --
Q. Yeah.
A. -- or a combination of several case reports?

Page 124

Q. We'll start with what about a single case report?
A. A single case report, I mean, unless there is a biological mechanism behind which already linked the specific drug to the specific complication is very weak to suggest a hypothesis. But a combination of case reports, in my opinion, can suggest you a causal association when it comes to very rare neurological disorders.
Because IIH is very rare, a very rare neurological disorder, as I mentioned previously, the occurrence of several case reports in the literature ring a bell in my mind as -- I mean, with all the rare neurological disorders.
And as I mentioned it, the same is with recombinant GH, with vitamin A, all started from case reports in that case, and these are now well-recognized risk factors for IIH, or at least accepted, and are accepted despite -- in spite there is no proved causal mechanism. Because the occurrence of this neurological -- very rare neurological disorder, in coincidence with

Page 125

the use of these drugs and some biological explanations behind that, in some cases in the past have been enough to propose these as possible risk factors.
And this is the reason why I accepted to be part of this, because I think that the same can be applied to LNG.
Q. And we'll get to that in a moment.
You mentioned earlier that IIH is a rare disease but that -- I think you said the prevalence is higher in females, correct?
A. Yeah, the prevalence is higher in females.
Q. And in fact, the highest incidence of IIH is for obese women of childbearing age, true?
A. It's true.
Q. It is between 20 and 30 times higher than someone who is not an obese woman of childbearing age?
A. Yes.
MR. KENNERLY: Object to the form.

You can answer.
THE WITNESS: Yes.
QUESTIONS BY MR. IMBROSCIO:
Q. And so in looking at a case report, it would be useful to know whether the person or persons described in that literature, if they have IIH, whether they were overweight or not, correct?
A. It's useful. It is useful.
Q. So if you look at your report, you spent some time talking about the Wysowski and Green case reports. Begins on the bottom of 28 and it runs over to 29.
Tell me when you're with me.
A. Page 28.
Q. I think it begins with "In a 1995 study." There's not a paragraph break so it's a little tricky to find it.
A. Yeah, in 1990 -- yeah.
Q. And then I think that discussion of that literature report runs over into page 29, all the way to the bottom. Or I guess to the middle of the page.
A. Yeah.
Q. And do you know -- I mean, one



question is: How many of the women in -- and to be clear, this involved Norplant, which is an arm implant version of LNG, correct?
A. Yeah.
Q. And do you recall how many women of the 39 reports were obese or overweight?
A. I -- I don't remember, and I think I've not included this.
Q. Well, let's read what you say at the top.
You write, "Less" --
A. Okay.
Q. Just one second.
A. Less than half.
Q. Less than half. Okay.
Let me just stop for a second.
MR. IMBROSCIO: Madam translator, we appreciate your assistance here today, but your assistance will be limited -- has to be limited to if there are questions about the translation.
I understand you just pointed him to the sentence I was directing



him to, which I appreciate, but you really can't do that.
INTERPRETER: Okay.
MR. IMBROSCIO: I appreciate your help, but we just can't do that.
Thank you.
QUESTIONS BY MR. IMBROSCIO:
Q. Dr. Salpietro, looking at that sentence --
A. Yeah.
Q. -- you write, "Less than half were reported as overweight, obese," correct?
A. Yes.
Q. Is it relevant to you that less than half were reported as overweight and obese?
A. Well, it's quite -- I mean -- I mean, in this context is not -- I mean, it's nearly 50 percent, so it's a big percentage, honestly, yes.
Q. What about the other women, were they not overweight?
A. Some of them described within this case reports are overweight, but I would like to ask you a question. I mean, the



percentage of IIH in the obese population is very small. I mean, it's a very rare neurological disorder.
While obesity is epidemic, I mean, is a very important problem for society nowadays and just a very small proportion of overweight individuals get IIH.
So as I discussed in my report, obesity, overweight, are, of course, important factors, but IIH is not, in my opinion, black or white. It's multifactorial.
And the reason -- the fact that some of these individuals are overweight or obese is not -- I mean, I think -- I think is wrong to put this in correlation with IIH in a -- like in a clearcut correlation. Because, still, is very small the proportion of overweight individuals who develop this very rare neurological disorder.
So obesity, overweight, are extremely well-recognized risk factors, and they always, of course -- everyone agree on this in the world, but they are not enough in my opinion. Sometimes they are just a risk

factor, part of a bigger context where the assumption of drugs and specific circumstances, the lifestyle, the diet, all these have a role.

And I mentioned in my report that it's possible that obesity or overweight may be contributing factor in women who take LNG because it can be -- I mean, it has been observed in some studies how obesity, for example, impact the metabolism of free LNG.

So it seems, according to some studies that I cited through my report, that overweight status or obesity by reducing the concentration of SHBG cause an increase of free LNG, which is the biologically active LNG.

I mean, this is something that I extrapolated from clinical studies that I cited through my report. I have no direct proof of this inverse correlation between SHBG and free LNG, but I think this possible mechanism can be useful to understand how complex and multifactorial the nature of IIH is and how diverse different factors, including obesity and the use of specific



drugs, interact in increasing the risk.

So there is a threshold of IIH that is achieved by the combination of several factors. And this is not something that I am proposing for LNG. This is something that is known for other drugs associated with IIH.

For example, for recombinant GH, individuals who have children who have recombinant GH, because of their short stature are more prone to develop IIH versus children who have total GH deficiency. Because in that situation there is some endogenous GH plus the GH -- recombinant GH that is administered to these patients, and the combination of both meet the threshold for the risk of developing IIH more frequently than another group of patients with total GH deficiency.

By saying this, and I'm completing my answer, is that it is not just a drug. Is the drug in a context which is multifactorial that in my opinion can be associated and can be capable of causing IIH.

Q. Are you done?



A. Yes.

Q. All right. I think you just gave an answer for about four minutes.

Do you remember what my question was?

My question was: What about the other women in the Wysowski study, were they overweight.

And do you know the answer to that question?

A. Yes.

MR. KENNERLY: The question before that --

MR. IMBROSCIO: No, that was the question he just answered.

MR. KENNERLY: The context is the relevance of overweight.

MR. IMBROSCIO: Max, enough. All right?

QUESTIONS BY MR. IMBROSCIO:

Q. What's the answer to my question, sir?

A. Some of them were overweight.

Q. How many of them?

A. I don't remember. We can go



through, if you want.

Q. Well, would it be relevant -- so you say in your report 16 out of 39 were listed as obese or overweight, right?

A. In that paper, yes.

Q. Yeah. And so my question is in that paper --

A. Yes.

Q. -- what about the other 21 women, do you know whether they were overweight, they were not overweight, or anything?

A. Some of them were overweight.

Q. How do you know?

A. When I read the reports.

Q. What did it say when you read it?

A. I cannot remember all the case reports that I've read.

Q. I'm talking about this one, though. I'm talking about Wysowski. 39 patients.

A. Oh, these 39 patients.

Q. Yes.

Focusing on that article, my

Page 134

question is: You say less than half, 16 out of 39, were reported as overweight.
A. Yes.
Q. So the other -- the more than half were not overweight; is that your testimony?
MR. KENNERLY: Object to form.
THE WITNESS: I'm sorry, sir, I don't remember this paper.
QUESTIONS BY MR. IMBROSCIO:
Q. Would it be relevant that every patient in that study where there was weight known, they were all overweight?
Would that be relevant to your assessment of that paper?
A. For this paper, yes.
Q. Yes.
A. Yes.
Q. Because while, as you said earlier, the vast majority of overweight women don't get IIH --
A. Yes.
Q. -- correct?
The vast majority of people who do get IIH are, in fact, obese women of

Page 135

childbearing age, correct?
A. Is correct.
Q. So if it is an obese woman of childbearing age, there is a -- they have a much greater likelihood of getting the disease than other people?
A. Yes.
Q. Okay.
A. But my --
Q. You've answered my question. I appreciate it.
A. Yes, but my -- the point of view -- sorry if I talked too long -- is just because I wanted to give you -- to provide you the full context of my answer of my ideas.
What I told you in few words before is that -- what is the difference between the woman of childbearing age, overweight, who get IIH and the other woman of childbearing age, obese, who does not get IIH, which is the vast majority of the group of overweight women of childbearing age.
The difference is that in some specific -- in a specific small proportion of

Page 136

these women there are, in my opinion, additional risk factors which is not just LNG. I mean, I am not saying that. It may be anything. It can be genetics. It can be the diet. It can be the lifestyle. It can be the amount of salt they take. I mean, it can be many things, including, probably for some cases, also, specific drugs, and among these drugs, LNG.
That's what I wanted to say to you before.
Q. And you would agree that the vast majority of women who use Mirena, even the vast majority of obese or overweight women who use Mirena, do not get IIH, correct?
A. I don't have the feeling of the number of the women who take Mirena, but I -- in your country. I'm sure -- I mean, is a very big number, so in that case I agree with you.
Q. Okay. Now, you -- maybe I can shorten it this way.
You cite a number of case reports in your report, correct?

Page 137

A. Yes.
Q. Are you relying on those case reports to prove your mechanism theory?
A. No.
Q. Okay. You also cite some -- an epidemiological study by Valenzuela at the bottom of 29 and you carry over to 30, correct?
A. Yes.
Q. And you write at the top of page 30, "It is the job of epidemiologists to discuss the details of statistical significance and the like with regard to LNG IUD patients and IIH," correct?
A. Yes.
Q. Is that another way of saying you don't plan to come to court and offer an epidemiological opinion?
A. It is not my expertise. I have been not trained like an epidemiologist. I have no experience of epidemiology.
Q. And you're not -- therefore, you're not going to come and give an opinion about the epidemiology?
A. No.

Page 138

Q. And let me ask you: You chose that one study. You said you did a literature search.
A. Yes.
Q. Did you come across any other epidemiology of LNG and IIH?
MR. KENNERLY: Object to the form.
You can answer.
THE WITNESS: What do you mean?
QUESTIONS BY MR. IMBROSCIO:
Q. So you said you did a PubMed literature search, correct?
A. Yes.
Q. When did you do your literature search? In 2017?
A. Yes, of course.
Q. Did you notice any other epidemiological -- let me take a step back.
You would agree that large-scale epidemiological studies provide a greater level of proof than isolated case reports as a scientific matter?
A. Yes. Yes. But --
Q. I'm sorry.

Page 139

A. No. No. Sorry, sorry, sorry. It's my fault. Sorry.
Q. And you would agree that if there's an epidemiological study looking at that issue, that could very much be informative of your opinion, true? Looking at that issue, meaning LNG and IIH?
A. Yes.
Q. Okay. Do you recall any other studies that you found looking at epidemiology when you did your literature search besides the Valenzuela study?
A. I have not understood the last few words you said.
Q. That's okay. Let me try it again.
When you did your literature search -- well, strike that. I'll start again even.
Did you find the Valenzuela study through your literature search or is that something the lawyers gave to you?
A. I -- I -- as I told you before, I combined the references I found myself on PubMed --

Page 140

Q. No, I don't mean to interrupt you, but you explained that. I understand that.
For this particular one, do you know which one -- and you may not know. For this one, was it something you found or something the lawyers gave you or you don't remember?
A. I don't remember -- there were 30 papers -- which one was given me by --
Q. I accept that. I accept that. That's fine. I accept that.
And I apologize. I have a limited amount of time today. I want to try to avoid coming back to do this, to get finished, so I want to -- please accept my apology. I don't mean to be rude, but I want to try to move forward.
I know this is your first time, too, and I want to let you finish your answers, but I also -- I've got to get through some material. So thank you for that.
Do you recall coming across a study by Dr. Etminan?

Page 141

A. I heard about his study.
Q. What did you hear about it?
A. I heard about this doctor who prepared this study which was beyond my expertise because it was mostly based on statistics and -- so basically it -- it's a different field, because in my field we do, as you say, the hypothesis and then we try to prove with experiments.
We may be successful or we may be wrong, and I recognize before that I may be wrong. But in this case, it was wrong in terms of the statistical analysis. That's what I heard. And I have not included this reference in my report because of this reason.
Q. So the reason that you didn't include the Etminan report in your paper where you did include the Valenzuela report is because someone told you that the statistics were wrong?
A. No. No, because I saw that the paper was not valid from a statistic point of view.
Q. You came to that conclusion

yourself?
A. No, I saw a letter to the editor of this journal from one of your expert who recognized that the statistical analysis was not correct. And I, of course -- I mean, statistics is not like pathophysiology model. Pathophysiology model may be wrong, but I am still honest in proposing it.
But if you propose a statistical analysis and you are wrong, I mean, it's more likely than not that you were not honest since the beginning.
Q. Did you analyze -- did you do any analysis as to whether the statistical analysis of the Valenzuela article was wrong?
A. It's not my field. It is not my field, statistics.
Q. So the reason --
A. I work with very rare neurological disorders, and it's not my field to understand the epidemiological statistics.
Q. So the reason that you did not include the Etminan study was because you saw in a letter to the editor that the article



was not valid or --
MR. KENNERLY: Object to the form.
QUESTIONS BY MR. IMBROSCIO:
Q. -- or that there were problems with the statistical analysis?
A. Yeah, I saw that there was a problem with the statistical analysis, and in this field it means the article is not valid.
Q. Okay. And yet you have not made any independent determination of whether the statistics are valid or not in the Valenzuela study, correct?
A. Is not my experience or my expertise to do the statistical analysis.
Q. Okay. You also cite in the very next paragraph a Bayer document, and let me ask you this: From your reliance list, which is just a list of things that you were provided or that you reviewed, which is Exhibit 5, which you should have in front of you -- I think it's right there, or there's a copy of it right there -- there's a bunch and bunch and bunch of articles on there, correct? Publications?



A. Yes.
Q. And as I understand earlier, some of those publications you found and some the lawyers gave you, correct?
A. Some I found; some have been suggested to me by Johanson; some have been found through the revision {sic} of the Maggio report; some have been sent me from the lawyers. It's a combination of things.
Q. Understood. I get that. Okay. I appreciate that.
But then there's also a number of documents that begin MIR_AC. Those are -- those are doc -- and other MIR documents. Those are documents of Bayer studies and the like.
My question to you is: Did you request those or are those documents that the lawyers gave to you that they thought may be helpful?
A. Probably the second.
Q. Okay. And did you review all of those documents?
A. I have seen a couple of these documents. In one of these there was a table



with the observation of the side effects of Mirena, including edema and weight gain, and another one was, I think, the response of your company to the German authorities, BfArM, and I reviewed that as well.
So, yes, I read through some of these documents.
Q. And those are documents that the lawyers gave you that you looked at?
A. I think probably the lawyers, yeah.
Q. Okay. And let me ask you this: When was the first time you heard of the product Mirena?
Was that around the time that the person called you in 2015?
A. Yes.
Q. Okay. And you've not endeavored to do any studying of Mirena, correct?
MR. KENNERLY: Object to the form.
THE WITNESS: What do you mean?
QUESTIONS BY MR. IMBROSCIO:
Q. You haven't done any laboratory

work studying Mirena?
A. Never.
Q. You haven't done any laboratory work studying LNG, which is the synthetic hormone that's in Mirena?
A. Never.
Q. Okay. You haven't published about Mirena or LNG, correct?
A. Never published.
The reason why they contacted me is because in my model I included progesterone as part of the mineralocorticoid receptor pathway, and Mirena is a synthetic progestin, is the only link between me and them --
Q. Fair enough.
A. -- between me and this litigation.
Q. In your model, progesterone -- for your model to include progesterone, that assumes that progesterone is an agonist at the MR receptor, correct?
A. I told you today morning that in my opinion, since 2012, not in the context of this litigation, I think there is a low



agonistic effect which is supported by in vitro study, animal studies and clinical observations which is not proven but is my opinion.
Q. Under --
A. Which may be, as I told you, correct, may be wrong, but for me is likely.
Q. Understood.
And we'll spend some time on that, but my question is even a threshold question, which is: As a logical matter, for progesterone to be -- to work in your model, it has to be an agonist. If it's an antagonist or it has no effect, then it wouldn't fit in your model, correct?
A. Not really.
Q. Okay.
A. Not really. Sorry.
Q. I gave it a shot.
A. Not really. Sorry.
Q. Not really I'm correct or not really I'm not correct?
A. No, you are not correct for one reason.
Q. Okay.



A. I mean, I think is more likely than not to be an agonist. But if it is an antagonist, it wouldn't be ruled out by the model. Because, as I observed it in this model and as I wrote in the report, there are either agonistic -- and the opposite effects are even included with IIH.
I give you an example. I give you an example. Vitamin A either intoxication or reduced level of vitamin A have been linked with IIH.
Q. In case reports?
A. In case reports of a rare neurological disorder, which is always something that ring a bell in my mind because this is my mindset about rare neurological disorders.
As well as cortisol, is much more common in cortisol deficiency in withdrawal sterile treatment IIH. But even in cortisol, sometimes administration has been observed. It's very rarely observed.
So, I mean, even Addison disease, which is the dramatic reduction of cortisol, aldosterone in the body, has been



described with IIH. And also even hyperaldosteronism has been described, which is the opposite.
So opposite situations have been described with IIH. So in my model, I try to say that is about the fluctuations of the cerebrospinal fluid pressure that can be caused either by excess or reduction of specific substances and hormones, either endogenous and exogenous.
So I think is more likely than not that that the effect is agonist of the mineralocorticoid receptor, but it will be -- I would be less confident if, for example, tomorrow someone prove that is an antagonist. I would be less confident, but still I couldn't exclude 100 percent that this is linked to IIH according to the model.
Q. For instance, spironolactone in your model is an antagonist, and it inhibits activity of the MR, correct?
A. Yeah, this is --
Q. Which is why you suggested that spironolactone might be a treatment for IIH, correct?

Page 150

A. In the case of an excess of aldosterone.
Q. And in your model, as you've published, you list progesterone as a weak agonist, correct?
A. In my model I suggested it is more likely than not that there is an agonistic effect of progesterone.
Q. And you've never published anywhere that even if it's an antagonist, progesterone could, in fact, still be implicated?
A. I don't think I ever proposed this.
Q. Now, let me go back to the materials, the studies that you were given.
You've made no effort to review the entirety of the Mirena clinical studies, correct?
In other words, you were given some documents that included clinical studies of Mirena, correct?
A. Yeah, I've been -- I received some documents.
Q. And did you review each and

Page 151

every one of those documents?
A. I reviewed the sections which were more relevant to my involvement in this litigation, which was more a pathophysiology aspect of Mirena causing IIH.
So I reviewed mostly, for example, some documents related to the animal models, so the animals under Mirena treatment, and what were the effects of Mirena administration in these animals in the midterm, in the long term.
So this was the part I was mostly interested in, and the effects of Mirena in -- I mean, the association of Mirena to some specific clinical complications like weight gain or edema.
Q. And there's a chart you use from one of the studies for that reason, correct, that list some clinical effects --
MR. KENNERLY: Object to the form.
QUESTIONS BY MR. IMBROSCIO:
Q. -- you cite in your report?
A. A table.
Q. A table. Yes.

Page 152

A. I included the one table.
Q. And my question is, did you make an effort to look at all of the clinical studies for Mirena to see what the overall picture, clinical picture, of the drug was?
A. I --
MR. KENNERLY: Object to the form.
You can answer.
THE WITNESS: Honestly, I mean, I -- my review was not -- I mean, I did not spend my entire days by reviewing all these.
What was -- what catch my attention was that in this study where -- that I included the table where weight gain and edema had been observed in the study, the follow-up of these women was done by doctors, while in some other studies were self-reported by the women, the other complications.
So I put more attention in this study that I cited in my report because the follow-up was done by --

Page 153

by professionals, by doctors, instead of self-reporting.
QUESTIONS BY MR. IMBROSCIO:
Q. So the table that you mentioned --
A. Yeah.
Q. -- is that something that you saw when you reviewed the documents or is that --
A. Yes.
Q. -- something that --
A. Yes, it's in page 11.
Q. Yeah, I see the page 11.
So is that table something that you independently saw when you were looking at the documents or is that something that the lawyers pointed out to you that might be relevant to your opinion?
A. I think it was something that I picked up from the -- all amount of documents, but I'm not sure. I'm not sure if someone emphasize the table or this specific study.
Q. Okay.
A. I don't remember.

Q. And you didn't ask any of the lawyers to look at the other clinical studies that you may not have been provided with?
MR. KENNERLY: Object to the form.
THE WITNESS: As I told you, I was more interested in this particular study because the follow-up was done by -- by doctors, while the other one the follow-up was done by -- I mean, the follow-up was based on self-reported side effects.
QUESTIONS BY MR. IMBROSCIO:
Q. What about other -- how about the other clinical studies you haven't reviewed, do you know how the follow-up was done in those ones?
MR. KENNERLY: Object to the form.
THE WITNESS: I honestly -- probably I -- I mean, I'm not saying that -- probably I should have spent more time because in the whole amount of data I reviewed, I tried to be more focused on the pathophysiology. This



is the reason of my involvement.
So, for example, if Mirena cause androgenic effects and all the androgenic effects which are related to the drug, I mean, I have not focused on this aspect. And if I reviewed some documents and clinical data from Bayer which were discussing these aspects, probably I was -- I went through this part more faster.
QUESTIONS BY MR. IMBROSCIO:
Q. Do you know one way or the other whether you got all of the clinical studies on Mirena?
A. No, I --
MR. KENNERLY: Object to the form.
You can answer.
THE WITNESS: If I saw all the clinical studies?
QUESTIONS BY MR. IMBROSCIO:
Q. Yeah.
You don't know?
A. I'm sure that I have not seen all the clinical studies on Mirena.



Q. Are you going to testify that pseudotumor cerebri syndrome is more common in Mirena patients than in women of similar populations who aren't using Mirena?
A. I cannot say is more common if I don't have the picture. I cannot say that.
Q. Okay.
A. The only thing I can discuss about is my model and how this is applied to this context, and the evidence is from the previous studies.
But the interest I have here is to understand the cause; is not to say this is more common, this is less common. I am interested in providing my opinions in regard to the causation.
Q. And on that causation point, you cited the Valenzuela article.
You understand that the authors of the Valenzuela article wrote that their study did not conclude that this constituted proof of causation?
MR. KENNERLY: Object to the form.
THE WITNESS: The others, if



I'm not wrong, said this is not a proof of causation, but they say something like is more frequent. That's what they concluded.
I can check it.
Do you remember the page?
QUESTIONS BY MR. IMBROSCIO:
Q. Yeah, take a look at 20 -- 29 over to 30.
A. 29, Valenzuela, "may have an increased risk."
Q. Yeah, I saw that, but you know the authors also wrote that it did not constitute evidence that LNG caused IIH?
A. Yeah.
MR. KENNERLY: Object to the characterization.
THE WITNESS: But this "may have an increased risk," I -- yeah.
(Salpietro Exhibit 10 marked for identification.)
QUESTIONS BY MR. IMBROSCIO:
Q. One second just because there was an objection. Let me just get the article so it's clear.

A. Yeah, I extrapolated the sentence from the...
Q. There's no question pending. Just one second.
A. Yes.
Q. So let me just read the last sentence, and maybe we can come to an agreement as to what they say.
In the abstract of Exhibit 10, which is the Valenzuela study, the last sentence says, "Our investigation suggests that women with an LNG IUS may have an increased risk of developing PTC but does not suggest an LNG -- that an LNG IUS can cause PTC."
Do you agree with that --
A. Yes.
Q. -- statement?
A. Yes.
Q. You cite -- at the bottom of page 29 of your report, you cite a document reflecting Bayer's comments about the Valenzuela study.
And you write, "Bayer" -- the last sentence there at the bottom.



"Bayer still found an elevated odds ratio, 1.41 for Utah and 1.29 for Rigshospitalet."
Do you see that?
A. Yes.
Q. Why'd you put that in your report?
MR. KENNERLY: Object to the form.
MR. IMBROSCIO: I'll withdraw the question then.
QUESTIONS BY MR. IMBROSCIO:
Q. Do you know whether those numbers were statistically significant, those point estimates?
MR. KENNERLY: Object to the form.
THE WITNESS: Yes, so basically I -- as I wrote in my report and as I told you today, I am not an epidemiologist. I consider myself a molecular neuroscientist, clinician scientist, a researcher.
I'm very interested in understanding the cause of IIH and all



these things, but I'm not an epidemiologist, so I am no background to understand the statistics or the epidemiology.
I have never done research in epidemiology or in statistics but always in very rare neurological disorders. So when I -- sorry, if I -- let me finish.
So when I read these papers, I asked Christina some help, some support, to help me to understand and analyze this epidemiology data. And in this context, she may have suggested me how to interpret some specific data. And I decided to keep this data in the report to provide a large picture of my -- of IIH and of the association with Mirena.
But it's not an analysis that -- I mean, is -- I cannot really say that -- I mean, my report is not focused on this.
QUESTIONS BY MR. IMBROSCIO:
Q. And although you're not an



epidemiologist, I take it you do understand the basic scientific principle of statistical significance?
MR. KENNERLY: Object to the form.
QUESTIONS BY MR. IMBROSCIO:
Q. True?
A. I understand, but as I told you, I work with extremely rare neurological disorders, even much more rare than IIH. So there is no statistics for that because -- for example, if I do something now is going to be published in a nice journal, Movement Disorders, a new gene I found just in one patient -- because there are some genes and some neurological disorders which you may find just one patient or one family in the world.
Q. Okay.
A. So this is something that probably -- I mean, it's very few doctors work with very rare neurological disorders, and we don't need the statistics. If you have five patients or ten patients or 100 patients in the world with that specific

Page 162

genetic disease, you don't need the statistics. And this is the reason why I never trained in statistics.

Q. You would agree that if a finding is not statistically significant, the scientific community generally does not accept that finding as being scientifically relevant?

MR. KENNERLY: Object to the form.

QUESTIONS BY MR. IMBROSCIO:

Q. You agree with that?

A. If you're talking about, I mean, statistics which have an impact on the population, of course I agree with that.

Q. Okay.

A. But that -- I mean, can you find that paper for me where I did statistics on pseudotumor cerebri? I only focused on the model and on the pathophysiology.

Q. That's actually why I'm asking these questions, because I understand your background and training, and so I was puzzled by the length to which you went putting in the epidemiology and putting in these numbers

Page 163

in particular.

Do you know that --

A. That's what I told you. In the analysis of these papers, because I am not an epidemiology {sic}, I exchanged thoughts with Christina, and she -- she helped me to analyze, to interpret this data.

And I decided I was not sure if -- to keep this informations in my final report or just to eliminate everything and just talk about the pathophysiology, which is my main focus. I decided to keep this informations just to provide a big picture.

And, I mean, I'm not a pharmacologist either, but I discussed in some sections of my report some pharmacology aspects of Mirena just because I wanted to provide a big picture. It was an effort for me because I had to challenge myself in fields which are not my direct fields.

Q. Well, let me ask you that since you brought it up.

There are some pharmacology opinions in your report. Do you plan to come to court and offer opinions about the

Page 164

pharmacology of Mirena or LNG?

MR. KENNERLY: Object to the form.

You can answer.

THE WITNESS: As I told you, my -- I am planning, if that will be -- if that will happen, to discuss about the mechanism and the possible causation according to my model, which was published in 2012, 2013, 2014. And I don't think I should go in -- I should talk about things which are beyond my field.

Of course, there are some informations from pharmacology which may be important. For example, the correlation between -- the inverse correlation between the free LNG and the SHBG. I think this is a plausible biological mechanism and is pharmacology but is relevant to the mechanism.

So I may mention this. In a general consideration, I may mention these. And I know that your experts

Page 165

are not agree with this -- with this consideration. But even in the report from your expert Jusko, there is the formula to calculate the free LNG.

And the formula to calculate the free LNG is an inverse correlation with the SHBG. So that means if you have less SHBG, you have an increase in free LNG.

Is true, as your expert Jusko recognized, that we have also albumin which bind LNG. That means the formula is not correct 100 percent but still suggests as -- that there is an inverse correlation between free LNG and SHBG.

So in the context of my model, if you have more unbound LNG, this could be something relevant. So this is the only pharmacology information I may mention eventually in my model.

QUESTIONS BY MR. IMBROSCIO:

Q. And what would matter is the level of unbound LNG in your model, correct?

MR. KENNERLY: Object to the

form.
QUESTIONS BY MR. IMBROSCIO:
Q. In other words, it's the total amount of unbound that might have implications for your model, correct?
MR. KENNERLY: Object to the form.
THE WITNESS: In this model if there is more unbound is likely -- is more likely than not that there is more biological effect.
QUESTIONS BY MR. IMBROSCIO:
Q. Okay. So my question is: Do you know whether there's more unbound LNG for a woman using Mirena versus a woman using a combined oral contraceptive?
A. I think it's not -- again, is not the focus of my report, but I think in the combined oral contraceptive there are some different -- there is a different situation because the estrogen -- while the synthetic progestin like LNG decrease itself the levels of SHBG, the estrogens, the ethinylestradiol increase the SHBG. So there is no the same.



But I mean, I'm not a pharmacologist and this is not the focus of my report, so I may be wrong.
Q. Yeah.
Here's my question: Do you know whether there's more absolute free LNG in a woman using Mirena versus a comparable woman using a COC?
MR. KENNERLY: Objection. Asked and answered.
QUESTIONS BY MR. IMBROSCIO:
Q. Do you know; yes or no?
A. I know, as I told you, that in -- in terms of the level of total LNG, I am sure that is -- is not -- I mean, the SHBG is increased, if I'm not wrong, in the women taking combined oral estro-progestins.
That means if it's increased, you should have less. But, again, this is not the focus of my report.
Q. Do you have -- I didn't ask about SHBG. I'm just asking you total amount of unbound LNG.
Do you know whether a woman taking Mirena has more or less free LNG than



a woman taking a combined oral contraceptive?
MR. KENNERLY: Objection.
QUESTIONS BY MR. IMBROSCIO:
Q. Do you know?
A. If the SHBG is inversely correlated with the unbound free LNG, and if the SHBG is increased in women using the combination of estrogens and progestins during an oral contraceptive treatment, then it should be less, but, again --
Q. What should be less, just so I understand?
A. The free.
Q. In which patient?
A. In the oral.
But, again, I may be wrong because I'm not a pharmacologist. I'm not a gynecologist. And I never prescribed an oral contraceptive in my entire life because I'm a pediatrician.
So I am telling you, I'm challenging myself doing also some pharmacology and some epidemiology. But please consider my testimony focused on the mechanism, because this is what I spent my



time in 2012, 2013, 2014, and this is also what I'm doing now in my work in London.
Q. I know --
A. No, just --
Q. Okay.
A. I mean, my aim is to understand the cause of rare neurological disorders. Sometimes I just propose models. Sometimes when I have the chance and I have the funds, I go ahead and identify genes and I do animal models and I do proper science.
In this context is a model which I proposed. And my inclusion {sic} in this litigation is about a model, not about the pharmacology, the gynecology, the epidemiology.
Q. Are you aware of whether there's been any testing of whether the amount of total free LNG is higher or lower in Mirena versus a combined oral contraceptive?
Are you aware that that's been tested?
A. I'm sure there are some studies about this and, again, I --

Confidential - Subject to Protective Order



Q. You haven't reviewed them, though?

A. I have not included this in my report, so I have not reviewed these.

I saw some papers -- well, I mean, I have not included this information, is not relevant with my model and with the aim of my inclusion.

I included this SHBG, LNG, free LNG mechanism, and I included on page 34 --

Q. Yep.

A. -- a study which showed that the unbound fraction is higher -- of LNG is higher in obese.

So the only reason why I included this is not because I have a direct proof of this or because it's my fear. But just because the free LNG, if it's increased, it may have stronger biological activity on the mineralocorticoid receptor, and within the context of my model, it could be an important information.

Q. In your footnote there on page 34, you said, "This is the fraction of the unbound LNG, not the serum



concentration." And you highlighted both the word "fraction" and the word "concentration," correct?

MR. KENNERLY: Objection. Italicized.

QUESTIONS BY MR. IMBROSCIO:

Q. Okay. In the generic sense highlighted.

You've italicized those to give highlight to those words, correct?

A. Yes.

Q. Okay. The point you're making there is that the relative fraction may be higher with decreased SHBG, but you weren't commenting on what the total serum concentration might be.

Is that a fair description of what you're trying to say there?

MR. KENNERLY: Object to the form.

You can answer.

THE WITNESS: Yes, I'm not talking about the total concentration, which is lower -- sorry. I was not --



QUESTIONS BY MR. IMBROSCIO:

Q. You said yes, and then you began talking. You used the word "yes."

A. Sorry, I'm confused now. Can you repeat --

Q. Just give your answer. Just make sure you sync it up. You can go.

A. So by saying that I am not a pharmacologist and I never used these drugs and I'm not a gynecologist, I included this information, I excerpted this information, from the literature because there are some studies like the one I cited and other I cited that suggest, or also show, that in the presence of obesity, the fraction of unbound LNG is increased compared to normal-weighted individuals.

And I include this information because it may be relevant. If you have increased fraction of unbound LNG, it may be more active biologically.

Q. And if you have just a greater absolute amount of free, does it follow in your hypothesis that there would be a greater chance that the LNG -- the free LNG could be



having biological activity?

A. Yes, it could have biological activity.

Q. So if, for instance, combined oral contraceptives had higher levels of absolute LNG concentration, then the oral contraceptives, under your hypothesis, would be more likely than the Mirena to have a connection to IIH; does that follow?

MR. KENNERLY: Object to the form.

THE WITNESS: As I told you before, is not my expertise. By what I saw and the papers and the studies I reviewed, in oral contraceptives with estrogens there is an increase. So estrogen cause an increase of SHBG.

So this is different with Mirena because in Mirena you have a reduction of SHBG. Because of Mirena, it cause a reduction. And further reduction is caused by overweight and obesity.

QUESTIONS BY MR. IMBROSCIO:

Q. I'm actually -- didn't ask

about SHBG. I'm asking you to assume that the total free concentration is higher in oral contraceptives. Just assume that, that -- I'm going to give you an example. The free concentration in the oral contraceptive is 50 -- I'll make up a number -- and the total free for the Mirena is 10.
Under that hypothetical, in your model the combined oral contraceptive would be more likely than the Mirena to have activity concerning potential IIH, true?
MR. KENNERLY: Object to the form.
THE WITNESS: Could be more -- more active biologically, yeah.
QUESTIONS BY MR. IMBROSCIO:
Q. And do you know -- you mention oral contraceptives in your report, and I think you say that that connection with oral contraceptives has been disproved, correct?
A. Did I wrote that?
Q. Well, let's see -- that may not be your exact word.
What page is that on?



One second. We'll take a lunch break shortly.
While we're looking for that, let me ask you some easy questions.
Are you aware of any published article that reached the conclusion that Mirena can cause PTC?
MR. KENNERLY: Object to the form.
THE WITNESS: Any published article. You mean epidemiology or --
QUESTIONS BY MR. IMBROSCIO:
Q. Anything. That Mirena can -- that Mirena can cause PTC.
A. No, there is not an article which describe that Mirena cause PTC.
Q. Have you seen any statement from any regulator, whether it's the FDA or EMA or anyone else in the world, that says that Mirena causes PTC?
A. I don't think so.
Q. Have you -- can you name me any scientific or medical organization that has concluded that Mirena causes pseudotumor cerebri?



A. No.
Q. Have you ever analyzed whether it's generally accepted in the medical community that Mirena causes pseudotumor cerebri?
A. No.
Q. In fact, would you agree that it's not generally accepted that Mirena --
A. No, but --
Q. Let me finish. I get to finish my question now.
A. Yeah.
Q. Would you agree that it is not generally accepted at this time in the medical community that Mirena can cause pseudotumor cerebri?
MR. KENNERLY: Object to the form.
You can answer.
THE WITNESS: I can answer?
MR. KENNERLY: Yes.
QUESTIONS BY MR. IMBROSCIO:
Q. Yes.
A. Is not recognized as it is, for example, GH treatment. GH treatment is



recognized. I mean, it's not recognized Mirena.
Q. Okay. Let me ask you just one more thing to wrap up with this section.
You, on page 30 -- back to page 30 of your report -- you make a reference to an additional Bayer document about review of -- Bayer's review of case reports.
A. Yes.
Q. Do you see that?
Is that another document that you decided to include after your discussions with Ms. Natale that it may help fill out the picture?
MR. KENNERLY: Object to the form.
You can answer.
THE WITNESS: Let me finish to read and I will answer you.
Yes, this was one document, the BfArM document, that I decided to include to provide a larger picture of my model after discussing it with...

Page 178

QUESTIONS BY MR. IMBROSCIO:
Q. You understand that with Mirena, during the first year is when the highest levels of LNG are released and then it dissipates over the five-year period?
Do you know that?
MR. KENNERLY: Object.
MR. IMBROSCIO: If you disagree with that, you can object and take it up later.
MR. KENNERLY: All right. I will object.
You can answer.
THE WITNESS: I -- yeah, this is what has been observed.
QUESTIONS BY MR. IMBROSCIO:
Q. And you say in your -- this paragraph here on page 30 that the majority of PTC cases came within the first two years after Mirena implantation, which is the time period with the highest LNG levels and the largest changes in LNG levels.
Do you see that sentence that you wrote?
A. Yes.

Page 179

Q. Do you know how much occurred in the first year versus the second?
A. I think it was more in the second.
Q. Which there would be more LNG released in the first year than the second year, correct?
A. Yeah.
Q. Yet you wrote it that -- why did you write it that way?
A. I think the more cases were in the second.
Q. Yeah.
A. Yes.
Q. But then you lumped the first two years together, just curious why you wrote it that way.
A. Because I think that the temporal association is important, regardless this litigation, is important in pseudotumor cerebri.
For example, if you have weight gain, is -- in the temporal -- in the temporal context when you have weight gain, you may have -- you may be at an increased

Page 180

risk of developing IIH.
So, I mean, it's not about Mirena. It's about all the risk factors associated with IIH, and there is a temporal correlation.
MR. IMBROSCIO: Okay. Let's take a lunch break.
VIDEOGRAPHER: Okay. Going off the record. This ends Media 2. The time is 1:08.
(Off the record at 1:08 p.m.)
MR. KENNERLY: The first is actually just a tiny spelling thing.
134:21, 22, aldosterone. I kind of have to --
MR. IMBROSCIO: Aldosterone, a-l.
MR. KENNERLY: I know. I'm trying to spell it out for her. A-l-d-o-s-t-e-r-o-n-e. Because it's in there as like all the testosterone.
MR. IMBROSCIO: Okay.
MR. KENNERLY: It's not a spelling issue; it's a substantive one.

Page 181

MR. IMBROSCIO: What I like about Carrie is she is amazing at making sure the transcript is good at the end and syncing with the videotape, which I have full cause --
MR. KENNERLY: I haven't corrected everything on her realtime, but it was substantively different there.
Now, the other is billing. As he mentioned there and we talked a little bit, he was talking about e-mails that laid out the timing of what he did.
We didn't know about those before. We looked before -- we did make a mistake there, so I'm saying it on the record.
We're going to provide a redacted copy of this, but I don't want you to be surprised by it and be able to think what you want to do with it.
November 7th, there was an e-mail where he delineates phone

conferences or meetings, 11 hours; literature sources revision -- and I said that correctly; he might have meant review -- 46 hours; drafting of the report, 93 hours; total, 150 hours. And --

MR. JONES: Can I say on the record?

MR. KENNERLY: Yes.

MR. JONES: I mean, we haven't talked, but I do -- you know, I -- I just want to state to you guys, I didn't remember seeing any invoices, and that's not an invoice. And I checked with him this morning and said, you didn't ever send me any invoices, right?

MR. IMBROSCIO: I'm not going to fuss that.

MR. KENNERLY: That's why I wanted to give you --

MR. JONES: I'm --

MR. IMBROSCIO: I hear you.

MR. KENNERLY: Yeah, that -- he was right with his memory there --



MR. JONES: So I searched, and I'm very sorry.

MR. KENNERLY: -- we can discuss it --

MR. IMBROSCIO: We can discuss something I'm a little more concerned about, which is, in the objection to the notice, you said that there were no communications between this fellow and Johanson. And, you know, we heard about a lot of phone calls and e-mails back and forth with drafts.

Frankly, if the e-mails are going back and forth without the lawyers involved, then I think that becomes fully discoverable, and so I'm going to ask that those be produced.

MR. KENNERLY: Just to put it on the record here, if you ask about it.

Now, one, your notice is not asking him to produce phone calls, obviously, so that wouldn't qualify underneath it.

Second, they are researchers



constantly in contact with each other, and so whatever they're talking about that's unrelated to the litigation is their own business. Frankly, if they're talking about us, it's their own business.

The third part of it is, as he testified, he wasn't sending drafts back and forth.

MR. IMBROSCIO: Well, he said they e-mailed drafts back and forth.

MR. KENNERLY: He did not say that. You should go back to your transcript.

I know you had a couple of questions where you inferred it, but his actual testimony about it was not that direct communication.

What he said was --

MR. IMBROSCIO: Even if they went through Christina --

MR. KENNERLY: So -- hold on.

He said he was discussing the drafts with Christina, and it was put back and forth.



And you will definitely agree I gave you a lot of leeway down this road, but you do not have total leeway into all draft report issues just because they happen to cite each other on some topics.

So I gave you ample road down this, and it sounds like what you want to get into is what they're e-mailing about for research, which is stuff that we don't have.

MR. IMBROSCIO: Nothing that --

MR. KENNERLY: We don't have e-mails from them about them back and forth.

MR. IMBROSCIO: To be clear, I could care less about the research. What I want, though, and I think what I'm entitled to and what we're going to ask for under the federal rules, is the draft that Dr. Salpietro saw of Dr. Johanson's report and incorporated into his analysis and, conversely, the draft that Dr. Johanson got of Dr. Salpietro's report.

Page 186

I want those two drafts that they got of each others' and --
MR. KENNERLY: Go ahead. I don't mean to interrupt you.
MR. IMBROSCIO: Are you willing to provide those or not?
MR. KENNERLY: No. Those would be privileged, and I think you and I disagree on what facts under which something like that would come out.
But under our understanding of the testimony and under our understanding of what occurred, it is privileged. Those remain draft reports.
MR. IMBROSCIO: Okay. That's fine. We'll take it up with the Court.
MR. KENNERLY: Okay.
MR. JONES: But, again, guys, I'm sorry, man.
MR. IMBROSCIO: Don't sweat it.
MS. MANGRUM: That's not a big deal.
MR. JONES: I feel like such a

Page 187

heel.
(Off the record at 1:13 p.m.)
VIDEOGRAPHER: We're going on the record, beginning of Media 3. The time is 2:11.
QUESTIONS BY MR. IMBROSCIO:
Q. Dr. Salpietro, I want to talk with you about progesterone.
Progesterone is the -- is a natural hormone in the body, correct?
A. Yes.
Q. And would you agree that the overwhelming volume of the medical literature indicates that progesterone has an antagonist effect at the mineralocorticoid receptor?
A. We discussed this today many times and, you know, we discussed there are -- there is a controversial point in the literature and in recent reviews. There is a question mark about the activity on the receptor, and it is something that is not -- that has not been answered.
Q. You would agree -- you testified earlier about you had discussions with Dr. Johanson, correct?

Page 188

A. Yes.
Q. And you reviewed a copy of his report, correct?
A. I --
Q. I didn't say draft. I don't want to fuss with what you saw, but you did look at a copy of his report?
A. Yes.
Q. Okay. And that's --
MR. IMBROSCIO: Again, I don't want to ask him about drafts.
QUESTIONS BY MR. IMBROSCIO:
Q. You looked at what became his report, yes?
A. Yes.
Q. Let me show you what's been -- I just want to show you a copy of it.
Well, let me just try it this way. Do you recall where Dr. Johanson wrote, "Progesterone binds its cognitive receptor and significantly is also a mineralocorticoid receptor antagonist"?
Do you recall where he wrote that?
A. He wrote that.

Page 189

Q. And do you agree or disagree with that statement?
A. Okay. I -- I think that progesterone is not proven to be an antagonist and is not proven to be an agonist.
Q. Okay.
A. In my opinion, I told you today that is more likely than not an agonist based on in vitro studies, animal studies and the clinical complications of certain -- in the patients who were taking synthetic progestins, but is not proven to be an agonist as well as it is not proven to be an antagonist. And -- yes, this is my answer.
Q. And I want to distinguish at least for the moment between progesterone and synthetic progestins.
A. Yes. Yes.
Q. Do you understand the difference there?
A. Yes. Yes.
Q. Okay. Focus on progesterone for the moment.
A. Yes.

Page 190

Q. Dr. Johanson says progesterone is an antagonist, correct?
A. Yes.
Q. And he cites Dr. Oelkers from 1996 which says that endogenous progesterone is a mineralocorticoid receptor antagonist.
A. Yes.
Q. You agree with that?
And there are many other pieces of literature that describe progesterone as a mineralocorticoid receptor antagonist, correct?
A. I have not identified a paper which proved that, and I have not identified by reviewing the expert report of your expert -- by reviewing the expert report of Dr. Jusko.
I mention I do have here -- I checked the references included in his report where he said that this is an antagonist, but the references were linked to other type of papers not discussing about this. I know that is a controversial subject in the literature, and some others proposed progesterone can be an antagonist, as well as

Page 191

some papers and some studies suggested, proposed or showed is an agonist.
So this is, in my opinion, a controversial subject.
Q. Okay. Well, to be clear, these papers that describe progesterone as a potent antagonist, are you saying they're wrong or they're not proven?
A. No, I'm not saying that. I am saying that I -- in my opinion, I find more convincing for me, in my opinion, more likely than not, the papers which show that progesterone as a low agonistic activity on the mineralocorticoid receptor.
And this always has been my thought. I always thought about it since several years. I have this -- I have this opinion, which is not an opinion fully proven; is an opinion that I included in my report as more likely than not.
Q. And we can run through all these articles, but these aren't articles that just propose a hypothesis. These are articles that test the activity of progesterone, correct?

Page 192

A. Yes.
Q. And they show in their testing in these articles that progesterone is an antagonist, correct?
A. No, is not correct. Sorry if I --
Q. That's okay.
A. I mean, I mentioned a few studies. There are a couple of studies which showed that progesterone has a low agonistic activity in vitro. One was from Quinkler, and the other was from Souque.
Q. Yeah. We'll get to those.
A. Yeah.
And then there are some papers like the one from Castren which showed that progesterone in use in that regulation of the mineralocorticoid receptor in neuron cells. And another paper on an animal model, on mice or on rats, I don't remember, which show transactivation effect of progesterone on the mineralocorticoid receptor gene, which is NRC2.
So in these papers, I mean, what I did, I extrapolated this informations.

Page 193

If you have some evidences in vitro as well as some evidences in animals that progesterone may upregulate the expression of mineralocorticoid receptor, as well as some clinical complications that you observed in subjects who have taken LNG and synthetic progestins like -- such as edema and weight gain.
So if you have the in vitro data, the animal data and the clinical data that suggests an activation of the mineralocorticoid receptors mediated by progesterone, I think all these pieces of information from the literature and from the clinical experience suggest to me, in my opinion, but I may be wrong, that is more likely than not to be an agonist on the receptor. But this is not proven --
Q. Okay.
A. -- as well as it is not proven that it is an antagonist.
And this remains a controversial subject. Indeed, in the authoritative review from Africander, there is a question mark about the effect of

progesterone on mineralocorticoid receptor.
Q. All right. Well, let's run through some of these quickly. Let me see.
Do you have Oelkers, '96?
(Salpietro Exhibit 11 marked for identification.)
QUESTIONS BY MR. IMBROSCIO:
Q. I'm showing you what's being marked as Exhibit 11. This is the Oelkers report from 1996, correct?
A. Yes.
Q. Did you review this report?
A. Yeah, I'm familiar with this --
Q. Okay.
A. -- with this -- yeah, I saw this paper.
Q. Okay. And you understand that Oelkers 1996 is the very cite that your fellow expert, Dr. Johanson, has cited for the proposition that progesterone is an MR antagonist, correct?
A. Can you repeat the question? I didn't understand.
Q. This is the same article that Dr. Johanson --



A. Oh, okay. So it is an article that has been cited by Dr. Johanson. Okay. I got it.
Q. Okay.
A. Yeah.
Q. And it says right there in the abstract, "Endogenous progesterone is a mineralocorticoid receptor antagonist."
That's what it says, right?
A. Yeah.
Q. Okay. And is your view Dr. Oelkers is just wrong here?
MR. KENNERLY: Object to the form.
THE WITNESS: I cite that is controversial, and there are many papers which review this field that state is not set whether progesterone act as an agonist or an antagonist on the mineralocorticoid receptor.
Also, this information is included in many reviews.
QUESTIONS BY MR. IMBROSCIO:
Q. All right. Well, let's look at the next article.



A. I'm not saying that is not true or that this doctor is wrong. I'm saying that this is not proven either if is an antagonist or if is an agonist.
And there are pieces of evidence that may be an antagonist, maybe, and pieces of evidences that can be an agonist. It's controversial.
Q. And to be clear --
MR. IMBROSCIO: Can I have Elger?
QUESTIONS BY MR. IMBROSCIO:
Q. -- these are articles where scientists like yourself have studied the question of whether progesterone is an agonist or an antagonist, correct?
A. Yes.
Q. And at least in the Oelkers article, Dr. Oelkers came to the conclusion in 1996 that it's an antagonist, correct?
A. Yes.
Q. And Dr. Johanson, in his report issued just a few weeks ago, concluded it's an antagonist, correct?
A. He said -- he said that is an



antagonist in his report.
Q. Okay. And --
MR. IMBROSCIO: Let's mark the next exhibit.
(Salpietro Exhibit 12 marked for identification.)
QUESTIONS BY MR. IMBROSCIO:
Q. Okay. This is an article by Dr. Elger and colleagues from 2003, correct?
A. Correct.
Q. It's an article that you reviewed and listed on your list of items you reviewed, correct?
A. Yes.
Q. And Dr. -- the very first sentence, actually the second sentence, he writes, "Beyond functions in cycle of pregnancy, progesterone binds with high affinity to the mineralocorticoid receptor, MR, acting as an antagonist."
That's what he wrote, correct?
You have to yes or no.
A. Yes, sorry. Apologize.
Q. And again, you don't -- you don't think Dr. Elger was wrong --

MR. KENNERLY: Objection.
QUESTIONS BY MR. IMBROSCIO:
Q. -- you just disagree with him?
MR. KENNERLY: Object to the form.
You can answer.
THE WITNESS: I say that this is controversial. Some researchers state is an antagonist; some researchers state is an agonist.
But by reviewing the papers and the evidences, I made the conclusion that in my opinion is more likely than not to be an agonist because of the in vitro studies, the animal studies and the clinical observations, which overall suggest an agonistic effect on the mineralocorticoid receptor mediated by progesterone or also probably by synthetic progestins.
But this is not proven. I have not proven -- proofs of this, and they have no, in my opinion, convincing proofs as well. And this is why, as a result, this is a controversial



subject.
(Salpietro Exhibit 13 marked for identification.)
QUESTIONS BY MR. IMBROSCIO:
Q. How about Dr. Kuhl? You know who Dr. Kuhl is, don't you?
You cite his article from 2005 in your -- in your report. That's from -- let me show you. Let's go to 13.
This is an article from Dr. Kuhl. You cited, I believe -- let me make sure you cited it. Make sure that's right.
Yeah, I believe it's on your list from 2005, Dr. Kuhl.
And I'd like to direct your attention to page 34. It's a long article, but I'm just going to ask you about one thing under Progesterone.
A. Yes.
Q. If you go to the right-hand column --
A. Yeah.
Q. -- talking about progesterone, it says, "In the endometrium and cervix, it,



progesterone, exerts strong progestogenic and anti-estrogenic activities. It has a pronounced anti-mineralocorticoid effect which causes a compensatory rise in the aldosterone levels."
And just let me ask you: When it says it has "a pronounced anti-mineralocorticoid effect," that means it's an antagonist, correct?
A. Yes. Yes.
Q. That's what that language means?
A. Yes.
But can I ask you, what is the reference? He is saying that, but he is not including a reference.
I mean, I would be curious to see a paper that show an anti-mineralocorticoid effect for sure.
I cited you two papers which show an agonist mineralocorticoid effect in vitro, two papers in neural cultures are animal models. So these papers show some evidence of agonistic effect.
I'm not saying -- I'm not



saying that they are right and these other papers you are showing me are wrong, but, I mean, a statement without reference is not...
Q. Let me ask you this: We talked earlier this morning about spironolactone.
Do you remember that?
A. Yes.
Q. And you testified, I think, that spironolactone is an anti-MR -- an antagonist, correct?
A. Yeah, is a drug used for this purpose, as DRSP. DRSP is also an antagonist.
Q. And you understand that spironolactone, that's a progestin derivative, correct?
A. As DRSP is a progestin derivative as well.
Q. Okay. Well, let's -- I want to look at -- let's look at Quinkler.
A. But is -- I mean, these progestin derivatives are very different, each other. For example, DRSP is also anti-androgenic, which is not Mirena. I mean, they are very different in their

Page 202

activity.
It's not just because they are part of the same family, they are the same drugs. They are completely different.
(Salpietro Exhibit 14 marked for identification.)
QUESTIONS BY MR. IMBROSCIO:
Q. Doctor, I'm showing you Exhibit 14. This is one of the two articles you mentioned that showed what you described to be an agonist effect for progesterone, correct?
A. Yeah, yes.
Q. Let me just read the abstract for a second to make sure I understand what you're saying.
Abstract here says, third sentence, "Progesterone binds with higher affinity to the MR than aldosterone but shows only low transactivation activity."
And it says -- goes on to say, "This results in a very strong anti-mineralocorticoid potency of progesterone in vitro."
Did I read that correctly?

Page 203

A. Yeah.
Q. The authors there are saying progesterone has an anti-MR effect, correct?
A. But if you look in the papers from Souque --
Q. Well, hold on. Let's stick with this one first.
A. Okay. Okay.
Q. So here it looks like it actually says "anti," correct?
A. Okay. Yeah.
Q. All right. Let's look at Souque.
A. Can I show you in this article that you read the sentence in the abstract? In page 467, in the conclusion they say, "We showed that progesterone has a low agonistic mineralocorticoid activity with approximately 20 {sic} percent of the maximum aldosterone-induced response," which is exactly what I told you today, 25 versus 21, because I was talking about the transactivation.
And also when it talk about transactivation studies, it say that

Page 204

progesterone show weak agonistic properties and edema had a mineralocorticoid receptor.
So what all these studies suggest to me, I mean, even if I'm not a pharmacologist and this is slightly beyond my skills and my background, what this study, as well as the study from Souque, as well as the study from Castren, as well as the other study from Marissal-Arvy -- so all this study published in the last 20 years from Castren, Marissal-Arvy, Souque and Quinkler suggests to me that there is a presence of progesterone and a presence of a binding between progesterone and certain cellular-responsive elements and then the activation of the promoter region of the mineralocorticoid receptor gene.
This article suggests me in in vitro analyses and the cellular and animal studies that progesterone is more likely than not capable of causing an increase in the expression of the gene, which called for the mineralocorticoid receptor.
Q. Okay.
A. However -- let me finish.

Page 205

However --
Q. I thought you were finished. I apologize. Please continue.
A. Sorry. Sorry. Because, I mean, I want to be -- I'm here to be honest to the fullest.
I'm not saying that I am sure about an agonistic effect. I'm not saying that this is proven by science and that all the community in -- scientific communities agreed on this. I'm not saying that.
I'm saying these studies suggest to me is more likely to be an agonist. But still it can be disproven, my consideration, by future experiments and future studies.
And I'm not saying that the colleagues and the researchers who wrote this is an antagonist are wrong. This is a controversial subject, and I don't think that anyone will be able to prove his opinion to the scientific standard.
Q. Okay. Let me --
MR. KENNERLY: Hold on. Hold on. Before you answer, was 15 Souque?

Did you mark it or no?
MR. IMBROSCIO: I haven't marked it yet because he hasn't stopped talking to give her a chance to mark it. Let me start -- I'll mark it in a second, but let me get through 14.
QUESTIONS BY MR. IMBROSCIO:
Q. Again, in context, Doctor, let's go back to that conclusion, it's what you just read, of Quink -- the one you have open right in front of you -- of Quinkler.
You got Quinkler?
A. Yeah.
Q. Yeah, open Quinkler again.
You read in the conclusions the sentence about the low agonist MT activity.
Do you see that?
A. Yeah.
Q. Let's just keep reading, okay? This -- the sentence you wrote. Then it next says, "This is in accordance to previous reports" -- cites three sources there, one of which is Souque, I will tell you. And then it goes on to say, "These authors concluded,



due to these properties, progesterone is a potent anti-MC in vitro."
So what these authors are concluding, based on their studies, that -- that their studies showed actually that progestin was a potent antagonist.
They go on to write, "This explains the nature-ready potency of progestin described over 40 years ago."
So I understand the word "agonist" is there in that conclusion, but their conclusion is their study proved, shows, that progestin is a potent antagonist, right? That's what they say?
MR. KENNERLY: Object to the form.
THE WITNESS: I am not a pharmacologist, but they are referring to the natriuretic effect of progesterone in vitro in the binding with the mineralocorticoid receptor.
I think this is, as I told you, a -- as I previously mentioned, this is a complicated and controversial issue.



Also, the difference between the in vivo and the in vitro activity of progesterone is something that you cannot really measure, I mean, by an experiment. This is a complicated -- it's a complicated subject.
And even if I'm not a pharmacologist, I -- my opinion is that regardless the natriuretic effect of progesterone that has been proposed by these and other researchers, it seems to me that is capable of increasing the expression of the gene.
So I focused -- the information I included in my report is about the low agonistic activity in terms of increasing the expression of the gene in base of the transactivation. And I am saying you that of course it's something I'm not completely sure. It's controversial. And if I will be in front of a proof that this is not correct, I will be happy to admit it.
But if it was a natriuretic -- a potent -- a powerful natriuretic



hormone, I mean, we would say different.
And now I come to the clinical world, which is my world. Now we would say that the clinical situations would be completely different.
QUESTIONS BY MR. IMBROSCIO:
Q. Okay.
A. I mean, we would have patients who lose weight. We would have patients with low blood pressure, with hypotension. And to the best of my knowledge, I never -- I have never seen low blood pressure or weight loss in users of synthetic progestins.
Q. Okay. We're talking about progesterone here still, right?
A. Yeah.
Q. All right. So let's go back to my question, Doctor.
These authors, after noting the sentence about a low agonist, they came to the conclusion that, therefore, progestin is a potent anti-MC in vitro, correct? That's what they came to?
MR. KENNERLY: Object to the

Page 210

form.
QUESTIONS BY MR. IMBROSCIO:
Q. That's in the conclusions we just read.
A. Yeah. Yes.
Q. Okay. Now, is it your point that you -- you've interpreted their sentence about the low agonist MC activity to suggest that progesterone is actually not an antagonist but an agonist? That's your interpretation of what they wrote?
MR. KENNERLY: Object to the form.
THE WITNESS: Why, in the reviews of the field, this is controversial and this is -- has a question mark, because there is some kind of discrepancy between the different status, and there is some kind of discrepancies between the in vitro and the in vivo experiments.
And I am not a pharmacologist, so you are -- you are right, this is what they've wrote. But again, as well as I'm not an epidemiologist, I

Page 211

am not a pharmacologist. I extrapolate some data from this study, the study from Castren on neuron cell lines, the study on the animal models done by other researchers like Marissal-Arvy.
And all these studies suggest to me not an immediate consequence of the progesterone in terms of a natriuretic effect but suggested to me that this likely, is more likely than not, that progesterone, by interacting with the certain steroid-responsive elements, seem to probably increase the expression of the gene, which then calls for the mineralocorticoid receptor is something different compared to the immediate pharmacological in vivo activities. It's something that is related to the mechanism by which progesterone enacts the expression of the gene.
And this is what this paper suggests to me.

Page 212

QUESTIONS BY MR. IMBROSCIO:
Q. Right.
A. But again, I am not a pharmacologist and this is not proven. This is an information that I believe is relevant.
Q. So is it your testimony that you don't fully have the expertise to interpret exactly what these authors are saying when they conclude that progestin is a potent anti-MC in vitro based on their study?
A. No, I conclude that nobody has the expertise, otherwise wouldn't be controversial subject. Is a controversial subject and is not -- there is no proof of it.
And in my report, I focused on the evidences of regulation of the expression of the gene in presence of progesterone.
Q. Well, let's go to Souque then.
And you just disagree with at least that conclusion of the authors about progestin being an anti-MR, in your own opinion?
A. I think that they show it is a low agonist in terms of the transactivation,

Page 213

as I told you, but they also report an anti-mineralocorticoid activity in regard to the natriuretic activity of progesterone.
Q. So do you agree or disagree with that conclusion, or have no opinion?
A. It's controversial. It's controversial. I --
Q. You said that, but do you agree with it, disagree with it or have no opinion? Which one is it?
A. I think is controversial. Sorry for this. I mean --
Q. So you -- is that like you -- so you, therefore, take no position on this?
A. I have not --
Q. I'm sorry to interrupt, but let me just get my --
I'm allowed to ask you what your opinion is. That's the whole point here. And so you can have an opinion that you agree with it --
A. Yeah.
Q. -- their conclusion, an opinion that you disagree with it, or you have no opinion on it. Whatever -- it's fine,

Page 214

whatever it is, but what is your view?
MR. KENNERLY: Object to the form.
THE WITNESS: Okay. My opinion -- my opinion is that the papers, the studies that I reviewed, made me more confident about how probable agonistic effect based on the gene expression or on the capacity of progesterone to increase gene expression.
But this is the point of view of someone who is interested in the genetics of neurological disorders and on the mechanisms of neurological disorders. Is not the opinion of a pharmacologist, of someone who spent long time in studying, in doing in the field of pharmacology.
But even if you take the best pharmacologist in the world, he cannot prove is an antagonist, as well as he cannot prove is an agonist, basing on the evidences that are currently available, in my opinion.

Page 215

And to prove this, to support this conclusion, in many reviews I saw and I went through during the draft of my report is considered by big players of the field of pharmacology and -- it is considered a controversial action, and this is what I think about this subject.
I don't exclude I may be wrong. I am saying my opinion, more likely than not, there is a low agonistic activity in regard not to the pharmacological properties but in regard to the capacity of -- in using the expression of the gene.
Of course, this is different when it comes to synthetic progestins.
QUESTIONS BY MR. IMBROSCIO:
Q. Okay. Are you done?
A. I am done -- let me finish.
Because when it comes to synthetic progestins, as you say, there are some synthetic progestins which have this capacity -- that has been proven to antagonize the mineralocorticoid receptor.

Page 216

And an example of this is, as you mentioned it, DRSP.
Q. Okay.
A. Sorry if I took long, but I just want make you -- I mean, provide you my total view on this, which is...
Q. Okay. No, you've provided your total view several times. Let's come back to my question now.
A. Yeah.
Q. My question really only focused on this article and these authors and their conclusion at the end that we've talked about --
A. Yeah.
Q. -- that progestin is a potent anti-MC in vitro.
Those authors, this article, that question: Do you agree, do you disagree or have no opinion?
MR. KENNERLY: I instruct him not to answer that because you've had this answered several times. You're going to badger him over the language --

Page 217

MR. IMBROSCIO: We're going to call the judge. That's fine. You can step out.
MR. KENNERLY: Okay.
MR. IMBROSCIO: Well, I'm sorry. Make your record why you're going to instruct him not to answer.
MR. KENNERLY: Because you have asked this exact same question several times.
You started out this line of questioning by trying to compel him to say wrong, right.
He gave you a very nuanced view of scientific opinion on this. He explained at length his scientific view here. He told you the controversy in the science. He told you it's not a settled issue.
You didn't like this answer, so you kept badgering him with the same question over and over again. Your last question misrepresents the study on top of it. You don't get to badger the witness until they give the answer

you like.
And frankly, it wasn't on the camera here, but you were making faces at him, you put your head in your hand --
MR. IMBROSCIO: Yes, because he talked -- stop for a second.
MR. KENNERLY: No.
You crossed his arms at him.
I am sorry the complicated science is upsetting you. This is a honest, nuanced answer from a knowledgeable scientist. You need to understand this better, and you need to stop badgering the witness for a answer you don't like. He's answered this question repeatedly.
MR. IMBROSCIO: There's nothing about badgering at all in the questions.
Let's -- we're going to call the judge.
THE WITNESS: It's okay. I mean --
MR. KENNERLY: No. No. Hold


on. It's not okay to me.
Because, first, I'm asking you procedurally, why are you calling the judge? I want you to lay out why you are calling the judge.
MR. IMBROSCIO: Okay. I asked the question whether he had a view about these authors' conclusions in this article. He was free to say he had a view, he agreed with it, disagreed with it or he had no view, any of those three. I'm entitled to an answer to that question.
Instead, he went on and repeated for what may be the sixth or seventh time his broad theory in the case. I've heard that.
That answer, I believe, was about four or five, maybe even six minutes of what he talked. That's not a viable way to elicit this testimony. He can't just filibuster.
And that was a very clear question, a very direct question he didn't answer twice, and I'm entitled


to an answer.
MR. KENNERLY: Mr. Imbroscio, he has answered it several times, and I don't know why you can't understand the record here.
He did not give a broad theory about the case. He answered this extremely specifically.
So here, do you want me to stipulate it for you? Because apparently you can't read the transcript or listen to the witness' answers. I'll stipulate it to you.
Assuming -- because you've put this predicate in your question. Assuming that the conclusion of this study is that progesterone is a potent anti-mineralocorticoid -- let's say antagonist, I guess, to fill the rest of the line out.
Assuming that is the conclusion of the study, Dr. Salpietro's answer is that he does not agree with that particular conclusion, and his own view is that it is a mineralocorticoid


agonist. It is a controversial subject, though, that has not been proven.
And I'm not putting words in his mouth. Every single word there he has told you several times.
MR. IMBROSCIO: Maybe I should have asked the witness to leave.
Let me -- let's do this. Let me just try.
QUESTIONS BY MR. IMBROSCIO:
Q. Dr. Salpietro, do you disagree with the conclusion of these authors that progesterone is a potent anti-mineralocorticoid antagonist?
MR. KENNERLY: Object to the form.
You can answer.
MR. IMBROSCIO: Yeah, let me start again.
QUESTIONS BY MR. IMBROSCIO:
Q. Dr. Salpietro, do you disagree with the conclusions of these authors that progesterone is an antagonist at the MR?
MR. KENNERLY: Object to the

form.
You can answer.
THE WITNESS: Okay. I am not used to this legal language. I don't know how to explain you my view. Sorry if I repeated myself many times, but I'm trying with you to be honest and as well to be humble.
And I'm saying you, I hope this is the last time I tell you this. This is extremely complicated. There is no proof in either once sense or another one.
I focused my analysis on the effects of progesterone and its variants on gene expression. And according to some studies, there is an upregulation of the expression of the gene. There is an increase in the expression of the gene, which means that progesterone is capable of increasing the expression of the RNA, the expression of the mineralocorticoid receptor gene.
Told that, there are many



differences in terms of in vitro and in vivo studies. They show different things.
And also, if you look at the metabolites of progesterone, the different metabolites seem to have a different effect on the mineralocorticoid receptor, is something extremely complicated.
And if you look into the synthetic progestins, there are some which have been shown and have been proven to be antagonist at the mineralocorticoid receptor, like DRSP and other that you mention.
But in -- by reviewing all this data and this literature, I can conclude by saying that is not proven that is an antagonist and is not proven that is an agonist is a controversial subject.
And in my opinion, is more likely than not that a low agonistic activity in terms of inducing the expression of the gene mediated by



progesterone exists.
Once I said you that, I may be wrong. And I would be very happy if you will show me an evidence, an absolute evidence, of antagonist, I would be happy to change my position.
And as well, I can tell you that this is not so important related to the model. Because as I anticipated to you, in the model we may have different, opposite, effects which may cause a fluctuation in the cerebrospinal fluid.
And I wrote this information in my report. I included this information. I said that there are opposite situations which may cause the same clinical result.
So still, I think my opinion is that more likely than not is an agonist, and this is supported by some literature.
I don't know if you have the study by Castren or by Marissal-Arvy there, but we may go through these



studies which prove it.
QUESTIONS BY MR. IMBROSCIO:
Q. Well, you've given me four. We've talked about one of them. We've talked about Quinkler.
A. Yeah.
Q. And I asked if the conclusion as to progesterone being an antagonist at the MR.
A. Yes, but with a transactivation effect which show low agonistic mineralocorticoid activity.
So you have to -- I mean --
Q. And tell the jury what transactivation effect means.
A. So basically is an activation of the expression of the gene, which is very important in terms of regulating the expression of the gene and in terms of basically increasing the amount of RNA and protein as a result of the binding of the specific hormone to the steroid-responsive element.
But, I mean, I am here, and my report is focused on a pathophysiological

Page 226

model which include maybe a few lines about this. And I don't know why you are insisting so much.
I'm saying you, some in vitro studies show an increase in the expression of the gene as well as studies on animals and on neuronal cell cultures. Clinical observations made by Bayer showed that in a proportion of these women, of these patients, there is edema and there is weight gain. All these pieces of evidence brought together in a large puzzle which include each piece suggest to me is more likely to be an agonist of the mineralocorticoid receptor rather than an antagonist.
So if you focus on a single sentence of a single study, you lose the big picture I tried to offer in my report bringing all these pieces together.
Q. So I'll be very clear what I'm trying to do. I'm trying to go through the pieces that you offered --
A. Okay.
Q. -- and test whether they are adequate support or not. I'm just going to

Page 227

be very frank with you.
A. Okay.
Q. What I'm doing is I've gone through now a bunch of articles that have concluded that progesterone is an antagonist.
Now, I've gone through the Quinkler article where the --
A. But you showed me just one review without reference before about the anti-mineralocorticoid activity.
Q. I think I showed you four articles --
A. Okay.
Q. -- and I showed you Dr. Johanson's report.
And let's look at --
MR. IMBROSCIO: Carrie, let's mark the next one.
(Salpietro Exhibit 15 marked for identification.)
MR. KENNERLY: Go off the record for a second.
QUESTIONS BY MR. IMBROSCIO:
Q. Doctor, I've handed you what's been marked as Exhibit 15. This is the

Page 228

Souque article you've referred to earlier.
A. Let me check if it's the same.
Q. Okay. You may want to look at page 9. I haven't asked you any questions about it yet. I just want to make sure we're lining up to the same argument, same document. Souque, Endocrinology, 1995.
A. Yeah.
Q. Okay.
A. But it's not the same. I mean --
Q. I'm looking at page 9 of your report. You said it has been demonstrated by Souque that progesterone has a low agnostic MC activity with approximately 24 percent, goes on for a while, and cites Souque and Endocrinology 136, page 5651.
Is what we have here, right, as Exhibit 15?
A. This is not the paper I -- sorry, a minute.
MR. IMBROSCIO: Tell you what, take a moment and look at it. We need to go off the record for the court reporter.

Page 229

VIDEOGRAPHER: Going off the record at 3:00 p.m.
(Off the record at 3:00 p.m.)
VIDEOGRAPHER: We're going back on the record the beginning of Media 4. The time is 3:18.
QUESTIONS BY MR. IMBROSCIO:
Q. Doctor, when we broke before the difficulty with the transcript, we were just about ready to talk about the Souque article.
You have that in front of you as Exhibit 15?
A. Yes.
Q. And I believe that you refer to this article on page 9 of your report talking about the 24 percent of the maximum aldosterone-induced response.
A. Yeah.
Q. Do you see that?
A. Yes.
Q. And I believe -- I think we pointed this out even off the record -- I think you cite page 5654. There's a reference there as shown in Figure 4A.

Do you see where we are?
A. Yeah.
Q. And that is, in fact, what you were citing in your paper, correct?
A. I believe so.
Q. Okay. And what I'd like to do is go through the rest of this article and just make sure I understand your interpretation of it.
Let's go back to the first page of the article, which is page 5651. And it says that progesterone -- I'm in the last paragraph on the right-hand column of the text. Begins with "Progesterone, P."
Do you see that?
A. Yes.
Q. And in fact, they use the capital P for progesterone throughout this article.
You understand that, correct?
A. Yes.
Q. Okay. And the authors write, "Progesterone, P, binds to the MR with a high affinity and acts as an antagonist derivative." And it cites source 12, 19, 20



and 21.
Do you see that?
A. 12...
No, I cannot see. Sorry.
Q. Okay. I'm just -- I'm reading the first sentence --
A. Yeah.
Q. -- "Progesterone," right?
A. Yeah. Yeah.
Q. "Progesterone, P, binds to MR with high affinity and acts as an antagonist derivative," with references 12 and 19 through 21.
Do you see where I'm reading?
A. Yeah.
Q. Did I read that correctly?
A. Yes.
Q. Do you agree or disagree with the statement by Dr. Souque that progesterone binds to the MR with high affinity and acts as an antagonist derivative?
A. I think that you should put this sentence, like all these sentences from the papers you are showing me, into context, because basically is all about the context.



That's why this is a controversial subject. Because even in the abstract, if you read the conclusion, they say that the presence of an oxo group does not change the agonist feature of progesterone but confers to the ligand agonistic activity throughout the human mineralocorticoid receptor.
So I think that -- I mean, I think that we are -- we are -- I mean, we are confounding different things here.
I -- is the job of a pharmacologist going through all these papers and extrapolate conclusion, but what I can tell you is that there is no proven conclusion.
And this is a controversial subject, indeed. These studies include sentences where the authors state progesterone and its derivatives may have an agonistic activity on the human mineralocorticoid receptor, may induce the expression of the gene, but in some specific experiments it does show also an anti-mineralocorticoid activity.
So it's impossible to make a



conclusion on the sense -- on the meaning of these articles by exclusively extrapolating one sentence.
Q. Okay.
A. And I have been honest with you. I mean, I told you that possibly when I extrapolated some meanings and some sentences, this not completely offer overview of all the in vivo and in vitro activities of progesterone on the mineralocorticoid receptors.
And this is the very important thing that we should discuss, because there is a reason why this activity is controversial. It is because there are some experiments which suggest an agonistic effect in terms of transactivation and increasing the expression of the genes. There are some other experiments which suggest an anti-mineralocorticoid effect.
And according to the sentences that you will pick up from these articles, you may find sentences which support your antagonistic view as well as you can find sentences which support my agonistic views.

Page 234

And what gives me more confidence about a probable agonistic effect, which I might be wrong, is the clinical evidence of weight gain and edema in some patients. Even if you ask to a first-year medical school student what's the meaning of edema and what is edema in terms of -- is the result of what, is the result of retention of fluids, is the result of an activation of the mineralocorticoid receptor.

And if this is observed in a proportion of women according to Bayer clinical studies, to that specific Bayer clinical study I included in my report, this was a side effect observed in a number of women between 1 and 10 and 1 and 100. So it's quite frequent observation.

I mean, if in that table the observation was weight loss and excess of hypotension and hyperkalemia, high levels of potassium and hypotension and the loss of weight, if that was the meaning of observation, today I would say you -- I believe is more likely than not that progesterone and synthetic progestins have an

Page 235

anti-mineralocorticoid receptor. Because if you have loss of weight, if you have high levels of potassium, if you have a low blood pressure, from a clinical perspective, all these things suggest an anti-mineralocorticoid effect.

So what I did in my report, I suggested is probable an agonistic effect. I cited some papers which contained controversial subjects, I agree with you. I agree these sentences are against each other. But these sentences do not exclude what I tried to represent in my report, and as well as the animal studies by Castren and by the other researcher which I don't remember, the surname is very difficult, as well as the clinical observations included in these studies by Mirena. All these things made me convinced -- well, made me confident that is probable an agonistic effect on the mineralocorticoid receptor.

And my point of view is not related to this litigation, but this is something I thought since 2012 about this. I may be wrong. Yes, I may be wrong, but give

Page 236

me the freedom to have an opinion on this and accept that is controversial, because it is controversial.

Q. You finished?
A. Yeah, because --
Q. Thank you.
A. -- I just want to make this clear because otherwise --
Q. I understand.
A. -- you will ask me another ten times.
Q. All right. No, I understand that this is your view. You've extrapolated from some articles and some clinical data to come to that view, correct?
A. That suggest me that. So it's 51 percent; it's not 95. It's 51 percent of confidence that it may be an agonist.
Q. And let me just maybe take a step back, and maybe we can come to some agreement here. I'm going to ask you some questions that maybe are hopefully short.
The MR hypothesis that you've published well before this litigation --
A. Yeah, before.

Page 237

Q. -- you've had that view well before, correct?
A. Yeah, you can see that.
Q. I can see it. I get it.
And it's a view that you've expressed in several papers, correct?
A. Well, it's a model, and --
Q. A model, I'm sorry, a model.
It's a model you've expressed in several papers?
A. From different angles.
Q. Okay.
A. Because first I expressed the model itself, and then I tried to relate it to the clinical. Then I made that small letter. Then I focused more on the weight gain.
I mean, it's not the same, exactly the same. I tried to -- to understand the -- the pathophysiology from different angles.
Q. And is it fair to say that your model is also controversial?
A. Yes. Yes, it is.
Q. Yeah.

Page 238

Is it fair to say that you've not yet been able to come forward with evidence that shows that your model for IIH is correct versus the many other models that exist?

MR. KENNERLY: Object to the form.

QUESTIONS BY MR. IMBROSCIO:

Q. Is that correct?

A. I have not proofs, is correct.

Q. Okay. Now --

A. But can I ask you something?

Q. I haven't stopped you yet today. Feel free to --

A. Have you seen any model of IIH related to the endocrine metabolic risk factors in addition to mine?

Q. You know, the good thing about being a lawyer is we get to ask the questions and not the other way around.

A. Yeah, I can tell you something. There is no other model --

Q. Okay.

A. -- which is focused on the endocrine metabolic risk factors of IIH. Is

Page 239

my model has been developed by Claire Sheldon in another paper in Pediatric Research, so she had to do something on the top of what I proposed. But there are no alternative models which contradict my model.

Q. Do you agree with Dr. Johanson that progesterone decreases cerebrospinal fluid formation?

MR. KENNERLY: Object to the form.

You can answer.

THE WITNESS: I think that Dr. Johanson is a very good scientist, especially in the field of physiology. So he made a challenge with this litigation as well as I did.

I had to do pharmacology, endocrinology, gynecology and epidemiology. I had to challenge myself with these fields that are not part of my daily research, which is on genetics and on neuroscience.

But I decided to take these challenges. And I may be wrong, but I decided to take these challenges to

Page 240

provide a big picture, including informations from different fields implicated in this mechanism, as well as Dr. Johanson did.

Dr. Johanson is a physiologist. He was a professor of cerebrospinal fluid physiology at Brown University. I think he was. I think he's retired now, but I'm not sure.

I mean, but his field is physiology. So he challenged himself to understand more about endocrinology, which is not his field, as I challenged myself to understand more about epidemiology, which is not my field.

So when you go in a field which is not your field, you may be wrong.

QUESTIONS BY MR. IMBROSCIO:

Q. Yeah. Tricky territory, right?

A. Is a tricky territory.

And I say you that if you will show me I was wrong in something, I will tell you I was wrong, and I will say I was wrong.

Q. Let me ask you this --

Page 241

A. I'm not stop or something like that. I'm telling you I did a challenge going into different territories, but I made the best of myself to provide a picture which I thought, and I think, it was inclusive of the most important informations.

Q. So we've talked about your theory of how -- the MR theory of how MR -- how IIH might develop.

Is it fair to say there are a lot of other theories out there as to how IIH can develop?

A. Yes, is fair, but not in the endocrine metabolic field of IIH.

Q. Is it also fair to say that whether in that field or other fields, there's really not been any theory proven?

A. Is right, and even my theory is not proven.

Q. Okay. Let's just look at Souque for a second.

A. Yes.

Q. And you can keep on the abstract.

As I understand what these

Page 242

scientists did is they took progesterone, and then they introduced an oxo function at C18. In fact, the title of the article says, "The mineralocorticoid activity of progesterone derivatives depends on the nature of the C18 substituent."
A. Yeah.
Q. What's the C18 substituent?
A. The C -- is part of the chemical structure of progesterone.
Q. And what they did is they took progesterone and they -- I'm going to use a very scientific term here -- they fiddled with it at that location to make it different.
A. Yeah.
Q. Okay. And when they made it different, it conferred agonist mineralocorticoid properties, correct?
I'm just reading the top of the abstract in the right-hand column.
A. Yeah.
Q. And so in other words, it was when they fiddled with it that it developed its agonist properties, not in its native

Page 243

state?
A. Yeah.
Q. Okay. And in fact, let's go to where you cite it, which is page 5654, right-hand column.
There's that first sentence where you draw from your report that says progesterone, as well as the other ones, have low mineralocorticoid activity inducing blah-blah-blah. I can't say that.
Let me start again.
This is a sentence that you pointed to about the agonist activity, correct?
A. Yes.
Q. And this is the agonist activity of the fiddled-with progesterone, correct?
A. Yes.
Q. And then they go on to say, "The antagonist potencies of the progesterone derivatives were measured" after some things.
And then the sentence that begins at the bottom, it says, "P" --
That's progesterone, right?

Page 244

A. (Witness nods head.)
Q. And it carries over. These other three -- these other three items' dose dependently inhibited the A, aldosterone, receptor-mediated response.
Correct?
A. Yes.
Q. That's what they write.
So in other words, in the very next sentence it's saying that the progesterone had an anti-MR effect?
MR. KENNERLY: Object to the form.
THE WITNESS: With some -- some showed a low mineralocorticoid agonistic activity.
QUESTIONS BY MR. IMBROSCIO:
Q. And then the next sentence --
A. Yeah.
Q. The next paragraph, first sentence --
A. Yeah.
Q. -- says, "Thus 18VP, 18EP-like progesterone behaved as antagonists."
A. Yeah.

Page 245

Q. A antagonists?
A. Yes.
So without me teaching you -- because I'm not in the position of teaching any of -- anything which is related to pharmacology, because my pharmacology background was the pharmacology I studied in the medical school, the little bit of pharmacology I do in my daily work in terms of researcher and doctor.
But I am not in the position of explaining all the aspects of a study like this, but what I'm in the position of suggesting to you, at least -- and I hope you will accept the suggestion -- is that what these authors are showing us is that slight changes in the chemical structure of a substituent may change the activity of an -- do you agree with that -- of a synthetic -- sorry, I'm starting to talk like you.
Sorry.
Q. No, I -- I understand --
A. What I'm trying to tell you is that basically synthetic progestins are completely different each other. There are

some like DRSP which is anti-mineralocorticoid and anti-androgenic. Some, like Mirena, which is androgenic as you recognize it, but you are not recognizing is mineralocorticoid agonist.

Okay. But what I'm telling you, that small changes in the chemical structures may change completely the outcome of that drug. And from my point of view as a person who does research in genetics, small changes in the sequence of the DNA -- let me finish -- may completely change the outcome.

I tell you something. We don't know if a polymorphism of the gene that called for the mineralocorticoid receptor or for the subunit of the sodium potassium channel a polymorphism may change in specific individuals the response to the drug. We have no idea.

But there are many examples in medicine where you have a small -- a small polymorphism, a small change in a nucleotide in the sequence of your DNA, and that will completely change the response to a drug, exactly as it happens with the small change



in the substituent. And this is pharmacogenetics.

So assuming that this happens in people who use Mirena, you would explain why just a small, very, very small, proportion of these women develop IIH as a complication, so we should investigate the genetics of these women. We should see with these women.

That's why I'm here. I'm here to try to understand the cause and to provide my opinion. I am not here to tell you I'm saying that you -- this is wrong; this is right. I'm here to learn as well.

I don't know much about the experiments needed to get such conclusion, but what I can tell you, this is -- this is showing us that small changes in the chemical structure may completely change the outcome of a drug or a hormone, as well as a small change in their DNA may completely change the outcome.

So if we want to be scientific, we have to be honest and we have to go until the end and prove what we -- what we aim to



prove.

Q. Okay.

A. The effect or not the effect of these small changes.

Q. Let me see if I understand what you said. I'm going to try to summarize it quickly.

A. Sorry, my English.

Q. No, your English is perfect. Let me see if I can simplify and understand what you said.

You said that small changes can have big effects on how a substance interacts with the body.

A. Yes.

Q. Okay. In this experiment, they had progesterone and they tweaked it, they changed it a bit, from instead of having an antagonist activity, it seemed to have a low agonist activity.

That's what this experiment showed?

MR. KENNERLY: Object to the form.

THE WITNESS: This experiment



showed that a substituent can have greater influence in the outcome of a hormone.

QUESTIONS BY MR. IMBROSCIO:

Q. Okay.

A. And as well as I suggested that a variant in the sequence of the DNA which encode proteins that are involved in the metabolism of synthetic progestins. Because we know that the metabolism is different from a person to another, and as well as in the context we may have a different response.

So what we are -- we can say here, we can suggest, but we cannot prove anything. We can suggest and we can exchange doubts. This doesn't prove that it's an antagonist to me.

Q. So in other words, the change in the progesterone in this experiment resulted for these researchers in a low agonist activity, but it was the change that led to the agonist observation versus the normal antagonist operation of progesterone?

MR. KENNERLY: Object to the description.

Page 250

QUESTIONS BY MR. IMBROSCIO:
Q. You can either agree or disagree if I've said it correctly.
A. I agree --
Q. Okay.
A. -- and this is the reason why it's controversial.
Q. Okay. Let me come back to the DNA point then.
Do I understand you correctly that you said changes in the human DNA for someone using a product can have -- can have changes in how a drug affects them?
A. Yeah, this is proven in many different drugs and many different medical conditions.
Q. But to be clear, you're not suggesting that you have determined --
A. No.
Q. -- which women, what DNA feature --
A. No. No. But this is my --
Q. That's just a hypothesis or a theory?
A. This is my job. So, I mean, if

Page 251

you ask me, Dr. Salpietro, how do you look yourself in five years time? I hope to provide an answer to this question.
So what I'm telling you here is my opinions, which is just partially based on demonstrated experiments.
Q. Okay. Now, I want to switch now -- we've been talking about progesterone, which is the natural human hormone, to LNG, levonorgestrel --
A. Yeah.
Q. -- which is the -- as you understand, that's the active product in Mirena, correct?
A. Yes.
Q. Okay. It's also the active product in a whole range of contraceptives. You know that, right?
A. Yes.
Q. It's in some combined oral contraceptives, COCs, right?
A. Yes. Yes.
Q. And it's in -- there are certain progestin-only pills, pills that are just progestin?

Page 252

A. Yes.
Q. Including just LNG, correct?
A. Yes.
Q. And then it's in -- levo is in certain implants, contraceptive implants, like Norplant used to be?
A. Yes.
Q. And it's in the Mirena and similar products, correct?
A. Yes.
Q. So we're talking about LNG now.
And if I say LNG, you understand we're talking about levo?
A. Yes.
Q. Okay. The product that's in Mirena.
All right. I believe we talked about earlier that a product like LNG, it can have an antagonist effect at the MR, an agonist effect or no effect?
A. Yes.
Q. Okay. Now, I think you said earlier you're not aware of any study that shows for LNG an agonist effect at the MR, correct?

Page 253

A. An agonist effect?
Q. For LNG.
A. No, it's correct.
Q. Okay.
A. I don't have such evidence.
Q. Okay. And then --
A. But not even for progesterone I have this evidence. Is my opinion that is more likely than not an agonist effect, but I don't have an evidence for that.
Q. No, you've been very clear as to your opinion. I get that.
A. Yeah.
Q. You mentioned earlier -- let me get your testimony, make sure I get it right.
You said -- in talking about the controversial aspect of this, you said, "In the review from Africander, there was a question mark about the effect of progesterone on mineralocorticoid receptors."
Do you remember saying that?
A. I believe I saw that with a question mark --
Q. Yeah.
A. -- about the antagonist and

agonistic effect. I'm not sure if it was Africander or someone else, but I reviewed a very nice review manuscript which was questioning whether it was agonistic or antagonistic.
(Salpietro Exhibit 16 marked for identification.)
QUESTIONS BY MR. IMBROSCIO:
Q. Well, let's take a look and see if this is it.
Okay. Doctor, I'm handing you Exhibit 16, which is, I believe, a copy of Africander. And there's a table in the upper left-hand corner, Table 2 of the fifth page, fourth page.
A. Yes, it's not this review, because in the review I remember it was emphasized this question whether it was agonistic or antagonistic. And it was a question mark.
Q. Okay.
A. So probably was another review.
Q. Okay. So it might not have been -- this is -- to be clear, this is one of the articles that you have on your list of


things you reviewed, correct?
A. Yes.
Q. Okay. Let's look at Table 2. And let's begin -- the very first item is PROG. That's progestin, correct? Progesterone, excuse me.
A. Yeah.
Q. And the question is: Is it an anti-mineralocorticoid, in other words, is it an antagonist at the MR site.
That's what that column means, right?
A. Yes.
Q. And under Progesterone it says "plus"?
A. Yeah. Yes. Yes.
Q. That means it's a --
A. An anti-mineralocorticoid.
Q. It's an -- this is -- the authors are saying it's an antagonist?
A. Yes.
Q. Okay. And then you go down three items and it's got LNG?
A. Yes, literature not consistent.
Q. Yes, literature -- so whether


it's an anti- or has no effect?
A. Yes.
Q. Okay.
A. So that is what -- I mean, it's controversial.
Q. Okay. Yeah, I get it.
A. So is not consistent. And the researchers will state this is an antagonist. They are not wrong. They may be right. And only research -- future research will address this question.
So in this current situation, nobody can be sure about this. Indeed, this review is not conclusive.
The literature is not consistent. That means that this person, Africander, reviewed all the papers, probably has seen more papers than the ones I saw, because this is his field and is not directly my field. And by reviewing all these papers, he concluded that levonorgestrel anti-mineralocorticoid effect is not consistent in the literature.
So it means it may be anti-mineralocorticoid or it may be not. It


is controversial.
Q. And while it may be controversial whether it's been demonstrated to be an antagonist or not, the literature is inconsistent in that point; there's no literature that would show the opposite, that it's an agonist, correct?
A. I --
Q. At least that you're aware of?
A. I mentioned you some papers. Some papers are controversial themselves, like the ones that we just reviewed from Souque and from Quinkler.
Q. Respectfully, with LNG, though. Focus on LNG, not progesterone.
A. Okay, okay, okay.
Q. On LNG --
A. No, there is no literature I am aware of which show an agonistic effect of LNG.
Q. Okay. Let me come back because -- see if I understand your theory.
You've got this model that in your view might predict one way that IIH, PTC, develops, correct?

Page 258

A. In some endocrine metabolic risk -- to some endocrine metabolic risk factors.
Q. Okay. And that theory, correct me if I am wrong, depends on triggering the MR which regulates the potassium sodium flow at some point in your body?
MR. KENNERLY: Object to the form.
You can answer.
THE WITNESS: Yeah, because these receptors, these genes, these proteins, have been proven to regulate sodium and potassium excretion and reabsorption.
QUESTIONS BY MR. IMBROSCIO:
Q. And so --
A. Not -- I mean, they have been proven in many sites they affect in the cerebrospinal fluid secretion less well-studied compared to, for example, the kidney and the other sites.
Q. Let me see if I understood what you said there.
A. Yes.

Page 259

Q. It's well-accepted that the MR regulates the potassium sodium flow?
A. Yeah.
Q. What's less clear, I think you said, is whether and to what degree that affects the cerebrospinal fluid, correct?
A. Is less studied.
Q. Less studied?
A. Yes.
Q. For your model to -- or for a given substance to be implicated in your model, at least as I read your report, it would have to be an agonist at the MR to disrupt that flow in a way that would lead to pseudotumor cerebri?
MR. KENNERLY: Object to the form.
THE WITNESS: Yes, because -- let me just -- because this is important concept, so I just want 30 seconds to -- so it's about the concentration of these electrolytes which regulates the pressure itself of the cerebrospinal fluid.
So everything which may act at

Page 260

a mineralocorticoid receptor or at a sodium potassium channel level may influence the concentration of sodium and, by consequence, the pressure of the cerebrospinal fluid in absence of any structural abnormalities, so by definition, IIH.
So you have nothing else which would explain this -- this sudden and physically unexplained increase in the cerebrospinal fluid, so you have to look on a molecular level what is happening here.
And we know that the concentration of these electrolytes is extremely important in regulating the pressure of the fluids in the body, of the blood, for example. So I applied this model on the cerebrospinal fluid.
And basically most of the factors which are capable of influencing the activity of this mineralocorticoid receptor of these sodium potassium channels are endocrine or metabolic factors. I

Page 261

mean, the ones that I mostly focused my activity, my research on.
So then I gathered all these risk factors and I proposed this as a probable model. There are many limitations in this model which are --
QUESTIONS BY MR. IMBROSCIO:
Q. There are or there are not?
A. There are.
Q. Okay.
A. There are. Which I recognize.
So my effort in the following years will be trying to identify evidences which will further support this, as I did with many other mechanisms and neurological diseases which I proved on a genetic base.
I would love to prove this. This would be much more complicated, will require much more efforts because it's likely multi-factorial rather than monogenic, but my goal is -- I mean, I'm here by coincidence in this litigation. This is not my work, and it is not my job.
Q. Understood.
A. I discussed with the lawyers

today that I would like -- I would like --
Q. I just wanted to caution you, make sure Max is awake.
MR. KENNERLY: I'm awake, and I hear it, and I know where he's going.
THE WITNESS: I asked Larry's permission and he say me I can -- I can say that.
And I want that she write -- she write this in the -- so I asked the hours I spent after the litigation, including the hours yesterday and the hours today, the fees that I will expect for this time, I asked Larry to not transfer me anything and to transfer this money from this day, so for deposition, et cetera, to the Intracranial Research Foundation in the US. Because I really care about research.
And what I did in the previous years is not related any way with money or with the purpose of this litigation.
So I'm here just to offer my



point of view, which may be wrong.
QUESTIONS BY MR. IMBROSCIO:
Q. Understood.
A. But I want to be respected by the -- because of the effort at least I put to provide some fresh ideas in a field which is extremely neglected by medical research, where most of people who do research on this produce really low science, low profile research.
I'm not saying that I produced high profile but, I mean, if you review the papers on IIH, you won't find really an effort by anyone to understand this condition. And as a result, we have no idea, really, of a proven mechanism and of a proven cause of this -- of this disorder.
And as you know, for example, one of the treatment option is to do the lumbar puncture to have the relief of the increased cerebrospinal fluid pressure. I mean, when you do something like that, this means that you have no clues about the pathophysiology of the disease.
What you are offering to the



patient is a symptomatic treatment, is an immediate relief from his or her symptoms. Because to really treat a condition in medicine, you need to have clear ideas about the pathophysiology. Only when you know the mechanism underlying the condition you will be able to propose an etiologically targeted treatment.
I did that from my small point of view with spironolactone in the context of aldosterone-triggered IIH is not enough. We should do more. But we don't know the pathophysiology of the mechanism in a fully proven way, so we will not be -- we will not be able to treat the -- if you don't know the cause, you cannot really treat; you can just offer symptomatic relief.
So sorry for this discussion. Just I wanted to emphasize you that my involvement in this litigation is more as a -- someone who is called to provide opinions which are based on his research efforts, his translational research efforts and his honesty.
Q. Basically what you're saying is



medical science hasn't figured it out yet?
MR. KENNERLY: Object to the form.
THE WITNESS: Yes.
And I took the advantage in a sense of this litigation to review more material and to try to understand better and to -- I mean, to focus a little bit more on some aspect. Because when I first did publish these papers, I was a medical resident. I was at the beginning of my research activity. These were among my first papers.
In the last two or three years my research profile evolved because I've been exposed to lab research. I started to collaborate with very good scientists who taught me a lot of things and who helped me a lot to develop my research -- my research and my scientific profile.
So this is important for me that you understand this.

QUESTIONS BY MR. IMBROSCIO:
Q. Okay. I understand.
A. Yes.
Q. Let me just try to wrap this up and then we'll take a break, so I understand where you're coming from.
When you got involved in the case, you did a literature search and you also brought with you your extensive experience in dealing with IIH, correct?
A. Yes.
Q. Your publications.
And that was -- the first time you heard of Mirena or LNG was when you were contacted back in '15, and that raised an interesting question for you, correct?
A. Yes. Yes. By Lauren.
Q. Yes, Lauren. Okay.
And then you looked for literature, and there's no literature that says LNG is an agonist at this stage, correct?
A. Is correct.
Q. Okay. And then -- so then you extrapolated and looked at, among other



things, some of the clinical results from Bayer's studies, correct?
A. Yes.
MR. KENNERLY: Object to the form.
QUESTIONS BY MR. IMBROSCIO:
Q. Okay. And one of the things that -- one of the symptoms that undergirds -- you won't know what that word means.
One of the symptoms that underlies your opinion is weight gain, correct?
A. And edema.
Q. Those two, weight gain and edema.
And edema is bloating, essentially?
A. Yes.
Q. Candidly.
And bloating can be fluid retention, but other things might be reported as bloating, too. It's a general term?
MR. KENNERLY: Object to the form.



THE WITNESS: Well, I have not seen these patients, so I cannot be certain about it. But these patients have been seen by a doctor, because in the study the follow-up was done by doctors.
QUESTIONS BY MR. IMBROSCIO:
Q. And have you -- you haven't looked at the overall set of the clinical trials on Mirena, correct?
A. That's correct.
MR. IMBROSCIO: Okay. Bear with me a second. Why don't we just take a little break now, and then I'll see what I have and try to get organized and do the rest efficiently.
VIDEOGRAPHER: Going off record. This ends Media 4. The time is 4:02.
(Off the record at 4:02 p.m.)
VIDEOGRAPHER: We're going back on the record. The beginning of Media 5. The time is 4:23.
QUESTIONS BY MR. IMBROSCIO:
Q. Doctor, I'm trying to just



clean up some things and move quickly.
We talked earlier today about androgens and the portion of your report that touches upon androgens. I think it was page 31, if you want to go to that.
A. Yes.
Q. Remember we talked about that?
A. Yes.
Q. Okay. As I understand it, neither the androgen receptor nor testosterone or any other androgen is in your model, correct?
A. Yes. Correct.
Q. And you've never written an article where you've attributed pseudotumor cerebri to high testosterone?
A. No, I don't think so. I don't remember any article I wrote about this association.
Q. Okay. If you look at page 23 of Dr. Johanson's report, which is in front of you...
Let's see if we can do it without marking it. Let me just try this for a second.

Page 270

Dr. Johanson --
MR. KENNERLY: And I don't care about the marking it, but for language, I'd like it in front of him.
MR. IMBROSCIO: Okay.
QUESTIONS BY MR. IMBROSCIO:
Q. Well, let me ask you this: Do you know what PCOS is?
A. Yes.
Q. What is PCOS?
A. It's polycystic ovarian syndrome.
Q. Do you agree with Dr. Johanson that greater than 50 percent of PCOS patients have pseudotumor cerebri?
MR. KENNERLY: Object to the form.
THE WITNESS: I think maybe it's higher than what I remember. I think it's less than that. Less than 50 -- you said 50 percent?
QUESTIONS BY MR. IMBROSCIO:
Q. 5-0.
A. I think is less than 50 percent.

Page 271

Q. Okay.
A. I mean, in my work I don't see many patients with PCOS because it's something that mostly gynecologists deal with this, but I don't think it's 50 percent. I think it's less.
Q. Okay. But PCOS, those -- some of those women have high testosterone, correct?
A. Yes.
Q. Testosterone, that's an androgen, correct?
A. Yes.
Q. And LNG, that's a progestin?
A. Yes.
Q. Okay. Women suffering from PCOS, they don't have high levels of LNG, correct?
A. Yes.
Q. Yes, I'm correct?
A. You are correct.
Q. Okay. They have high levels of testosterone, correct?
A. You are correct.
Q. And as you write on page 31 of

Page 272

your report, which is in front of you, is it fair to say you describe this androgen theory as a possible role in causing or triggering pseudotumor cerebri?
A. Is not something I focused my research about. I never -- as you noticed, I never included this mechanism in my model, and I never really discussed this in my papers, and I never did much research about it. And even for my report, I just very briefly mentioned this, just because it's not what I've been focused on. But I believe it may be -- it may be plausible.
Q. It's possible; is that what you said?
A. It may be plausible. I think it's controversial. I think it's controversial because from what I -- from what I've read from the papers that I reviewed, I mean, it may be -- it may be complicated. I mean, it may be -- it may be complicated.
Q. And you say "plausible" here; you say "possible" in your report.
It's controversial?

Page 273

A. It's -- I mean, it's not the focus of my research, and it's not something that I consider myself an expert about. And --
Q. Do you know whether use of Mirena increases testosterone in women?
A. Yes, I know that, and this is recognized by you as well.
Q. That the use of Mirena increases testosterone levels in women? That's -- maybe you misheard me.
A. Once again?
Q. Yeah, I want to be fair. Make sure you heard me.
Does the use of Mirena with LNG in it, does it increase testosterone levels in women who use the product?
A. I am not sure about this.
Q. Okay.
A. I'm not sure about this. I have not focused my research on this, and I have included -- I have included this information in my report.
But to answer to your question, I should read many papers. I should

Page 274

understand if there is an agonistic effect of LNG documented on androgen receptor or if there is a competition between the binding of LNG to SHBG, which interferes with the binding of testosterone to SHBG.
There may be several mechanisms involved in the androgenicity of Mirena, but I am not in the position of offer you a proper opinion because I should read much more about this --
Q. Okay.
A. -- to really have an opinion in this context.
Q. So you're not going to come to court in a few months and offer an opinion, a proper opinion, about the potential role of androgens?
A. No, I will not come.
Q. Makes that easy.
I want to come back to what we were talking about before the break, and that's your reliance on weight gain as an indicator of potential MR activity.
Okay?
A. One of the many pieces of the

Page 275

puzzle.
Q. Yes.
And we've gone over lots of pieces of the puzzle, but I want to focus --
A. I am more convinced by edema. I mean, if I should choose between edema and weight gain as clinical signs of increased mineralocorticoid activity, I would more put my money on edema because you may false weight gain. You may eat more. There are many situations where people may gain weight.
I mean, edema, you cannot really provocate {sic} edema or bloating. Is more -- is more a clinical sign of activation of the mineralocorticoid receptor.
Weight gain may be due to your diet habits or other things.
Q. So lots of things can cause weight gain?
A. Yes.
Q. Okay. And so in your report --
A. And also -- sorry if I interrupt you.
Also, a woman who get -- who gain weight during Mirena or during whatever

Page 276

drug is -- she is taking, which she relates to the weight gain, I mean, is likely to interrupt the drug because it's something that she doesn't like if there is, in her opinion, a causal association.
So it's something that you cannot really follow up, so...
Q. Well, that's why I wanted to -- I wanted to follow up with you on the weight gain because, to be very frank with you, you cite some material about weight gain.
And I'm going to run through that --
A. Yes.
Q. -- to understand that -- because you have relied on it. It's one of the pieces of the puzzle, and so I'm going to ask questions about it.
A. Okay.
Q. But do I understand you correctly that at least as you sit here today, it's not the weight gain that convinces you; it's the edema?
MR. KENNERLY: Object to the form.

Page 277

THE WITNESS: Can you repeat your question?
QUESTIONS BY MR. IMBROSCIO:
Q. Yeah.
So my real question is, I'm trying to understand the grounds for your opinion, and you've described them extensively.
But when it comes to weight gain, am I correct that -- when it comes to clinical evidence, you rely on evidence of weight gain and edema --
A. Yes.
Q. -- correct?
And you principally rely on the edema and less so on the weight gain?
MR. KENNERLY: Object to the form.
You can answer.
THE WITNESS: Yes, because women cannot influence edema but can influence weight or lose of the weight according to their diet habits.
QUESTIONS BY MR. IMBROSCIO:
Q. That's all. Just bear with me

a second. I need to find one thing in your report. Bear with me one second.
A. But in the meantime, I complete the sentence. Sorry for this.
Q. Yes.
A. Weight gain is something that I explained more thoroughly in my report compared than edema because weight gain is a recognized mechanism for IIH.
Q. Well, that's what I wanted to get at.
A. Yes.
Q. So weight gain -- we discussed this earlier. Both weight gain and absolute levels of weight, so obesity and overweightness, those are well-recognized risk factors for IIH, correct?
A. Is correct.
Q. And so as I understand your theory, if you are seeing weight gain with Mirena, that could be -- that could have a connection to IIH?
A. I would correlate weight gain to IIH even without Mirena. I mean --
Q. Understood. Understood.



A. Yes.
Q. And my point is is that the reason that you have pointed to weight gain, what you believe to be weight gain with use of Mirena, is because that could be part of the equation.
If Mirena is causing weight gain, then weight gain causes IIH; therefore --
A. Yes.
Q. -- Mirena might cause IIH?
A. Yes. Yes.
But if you read my report, I cited --
Q. Which I did, trust me.
A. I -- sorry. Of course you did.
But if you read the sentence of my report, I said this is also controversial. Because in some studies there is no evidence of weight gain, and I cited that studies. I've been completely honest. Some studies showed a weight gain, some clinical studies I'm talking you, and some did not. And I included the citations of the study which did not show weight gain.



Q. Why don't you tell me what those were.
MR. KENNERLY: Object to the form.
You can answer.
THE WITNESS: So, okay. So I wrote that I -- I discussed a meta-analysis which included --
QUESTIONS BY MR. IMBROSCIO:
Q. Which page are you on, just to help me?
A. 36.
Q. All right.
A. So I cited a meta-analysis which included some clinical studies which suggested either a gain in weight or an increase in the fat tissue in women taking LNG IUD, but -- and I cited a few clinical studies. And I also included that some other studies -- page 36 -- have shown no significant correlation between LNG and weight gain.
So I included all the studies, the ones which showed some correlations and the one which not.



Q. Okay.
A. But in my opinion, as someone who has proved with these papers to do translational research from humans to mice, from mice to humans, as my recent papers, I trust a lot the papers which were cited from a Bayer report.
There are three papers on animal models under Mirena which gained weight. One was on rats, one was on monkeys, and I am not sure if the third one was on mice.
Q. Have you read those papers?
A. I've read -- I have not found all the three papers. I found two of them, and I was interested by the correlation with the decrease of weight after the discontinuation of LNG in these animal models.
So I included this concept of the weight gain basing my opinion on a possible, probable effect of Mirena on weight, based on these animal studies as well as some clinical studies. But I recognize that this is controversial when it comes to

the clinical studies because some clinical studies did not showed a gain of weight in these women. And I included this citation.
Q. Okay. Let me -- let me break that down.
So what I heard you say is there was some evidence in animal studies of weight gain that you cited, and we'll go through that in a moment, and then there were some studies going both ways in humans on weight gain, correct?
A. Yes.
Q. Okay. So let's try to break it down. I want to focus only on the animals now.
Let's look at page 10 of your report.
A. Yes.
Q. And it's the second from the bottom paragraph I think we're talking about, right?
A. Yes.
(Salpietro Exhibit 17 marked for identification.)



QUESTIONS BY MR. IMBROSCIO:
Q. Okay. I've handed you Exhibit 17, which is the document that you cite in your report with the Bates numbers that end 35404.
Do you see that?
A. Yes.
Q. And this is, in fact, the document you relied on, right?
A. Yes.
Q. Okay. And I apologize for the small print. That's just the way the document was created.
A. No problem.
Q. Your eyes may be better than mine. I had my blown up.
But let me ask you to turn to page 10 of 23.
A. Yes.
Q. I think I'm going to lead you to where you're cited.
There is a -- which one is it? Is it this? Yeah.
A. Yes.
Q. So it says, "Prolonged



administration of LNG alone resulted in increased body weight in rats, dogs and monkeys."
A. Yes.
Q. The rats and monkeys -- "in rats and monkeys, the increase in body weight was reversible following termination of treatment"?
A. Yes.
Q. And that's what you relied on, correct?
A. That's what I told you -- that was I previously mentioned you.
Q. No, understood. Yeah, no, I'm just trying to get through, make sure we're on the same page.
And then you cite 27, 28, 29, and it's Hite -- and you cite Hite from 1991, you cite Usui from 1991, and you cite Hite again, a different -- I think it's a different Hite from 1991.
A. So, sorry, which page are you?
Q. I'm still on page 10 of your report.
A. Sorry.



Q. That's okay. Why don't you take a look at that.
A. Yes.
Q. I'm just going to put those in front of you.
And before I do, do you recall when you first read these articles?
Was it before you did your report or afterwards?
A. I don't remember. I've read so many papers while I was doing my report. I don't remember.
I think I -- I've -- I think I have read not all of them because I think I read the rats paper.
Q. And I think there -- so there were two rats papers. You think you read both of those?
A. I think I have read one of them.
Q. Okay.
A. Yes.
Q. And do you know which rat study you did not read?
You couldn't find?

Page 286

A. I'm not sure.
Q. Let me just ask you an honest question, which is: Why would you cite something in your report that you hadn't found and hadn't yet read?
A. Because I read some evidence and then I relied on -- for the other reference, I relied on the Bayer report which brought -- I mean --
Q. I get it.
A. -- I have not added anything that was not present in the Bayer report.
Q. I get it. So in other --
A. I trust -- I trust this is true.
Q. Yeah. So in other words, you saw this in the document that you were provided --
A. Yes.
Q. -- from Bayer?
A. Yes.
Q. You then looked at the cites that they had, and then you added the cites into your report?
A. I went through one paper on the

Page 287

rats --
Q. Okay.
A. -- under levonorgestrel, and I saw the presentation of weight gain and I saw how the discontinuation was associated with a slight decrease of the weight gain. And for the other references, I trusted the Bayer document.
Q. Okay.
A. Because I think that to include this information, a lot of research has been done.
(Salpietro Exhibits 18, 19 and 20 marked for identification.)
QUESTIONS BY MR. IMBROSCIO:
Q. Let me have this marked.
All right. Doctor, I've put before you Exhibits 18, 19 and 20, which I will represent to you I believe are the three articles that you cited in your report on page 10 concerning weight gain in animals with the administration of LNG.
A. Yes.
Q. Okay. Now, the first one, the -- let's focus on Hite on monkeys.

Page 288

You're not -- do you know whether you read this or -- before you did your report or whether you just relied on Bayer's citation of it?
A. I read the rats one, and the other ones no --
Q. Okay.
A. -- because, honestly, I didn't -- I haven't found -- I also wrote on research guide, which is the website of researchers to share papers, I wrote to the researchers who wrote this paper asking a copy because I haven't found anywhere.
Q. Got it.
A. That's the reason why I haven't -- I mean, it's nowhere. It's -- I mean, it's impossible to find.
One of these, the rats, have been found by the lawyers who shared with me the document, but the other ones, I mean, I have not found them.
Q. When did the lawyers share that one with you?
A. I don't remember if it was recently or -- I mean, they provided me many

Page 289

documents and many sources. I cannot remember exactly this specific article, when I -- when I receive it.
Q. And let's look at the monkey one for a moment. That's Exhibit 18, by Hite.
A. Yes.
Q. I want to ask you to focus on -- let me -- do you remember when you read this, recently or perhaps recently --
A. Yes.
Q. -- that there were different doses of LNG given to these monkeys?
A. Yes.
Q. There was a high dose of 25 milligrams a kilogram?
A. Yes.
Q. And then there was a very low dose of .00025 milligrams per kilogram?
A. Yes.
Q. Okay. And I want to be clear. Actually the high dose was -- was it 25 or 2.5? It was 2.5 milligrams a kilogram for the high dose.
A. Yes.

Page 290

Q. Do you see that?
And do you have any estimation when the use of Mirena -- how much LNG is in the body on a milligram per kilogram basis?
A. Much less.
Q. Yeah?
A. Yes.
Q. And the reason I ask you is if you look at the last line of the article, it says -- on Exhibit 18, the authors write, "A dose of .00025 milligrams a kilogram a day of levo" --
A. Yes.
Q. -- "did not produce any observable gross microscopic change and, therefore, is considered the no-effect dose."
A. Yes.
Q. And can you briefly describe what a no-effect dose is?
A. Can you repeat the last three words? I have not catched the last three words.
Can you describe that?
Q. Do you know what a no-effect dose is --

Page 291

A. The effect dose?
Q. -- in medicine?
A no-effect dose, which is the last three words they use.
A. Yes.
Q. What is a no-effect dose, briefly?
A. A dose which does not cause any biological effect, consequence.
Q. Do you know in milligrams per kilogram for a 70-pound woman --
MS. MANGRUM: Kilogram.
MR. IMBROSCIO: Strike again.
New sentence.
QUESTIONS BY MR. IMBROSCIO:
Q. Do you know what the dose in milligrams per kilogram are of Mirena for a woman who is 75 kilograms?
A. I have never prescribed Mirena in my life.
Q. If I were to tell you that that milligram per kilogram dose is almost exactly .00025 milligrams a kilogram --
A. Yes.
Q. -- how would that influence

Page 292

your opinion?
A. I think there is something to consider. Again, I am not a pharmacologist. I am not an expert on drug metabolism. But by reviewing these documents related to the litigation, I saw that in Bayer studies there is important difference in the pharmacokinetics of LNG between humans and animals.
And if you go in my report, at the end of page 6 I included this concept, extrapolating this information from Bayer documents. At the end of page 6: "Studies in animal models have aimed to dissect the pharmacokinetics of the synthetic progestin LNG. In terms of bioavailability, different studies have suggested a much higher bioavailability of LNG when administered to humans compared to animals." And I included three citations.
And then I summarized in general the studies agreed that the faster clearance of LNG in animals versus humans represented the main cause for this species' peculiar pharmacokinetics.

Page 293

Q. Do you know whether --
A. So I'm not a pharmacologist, and I may be wrong, but even if the dose which was capable of causing weight gain in animals was hugely greater compared to the normal standard dose that is used in women for contraceptive purpose, even -- I mean, if -- I may be wrong because I'm not a pharmacologist, but we should consider that in animals the metabolism is much, much faster according to these studies. So even if you have higher doses, this means that you have to consider some proportions.
So this is my opinion that may be wrong because --
Q. Do you have a -- and I'm sorry.
Do you have any knowledge sitting here today of the different clearance and elimination rates of LNG in monkeys that were tested here versus humans?
A. No.
Q. And you would agree that the model that is typically closest to humans is the primate model, the monkey?
A. Yes. And it's more likely than

not that I am wrong in this.
Q. Okay. Got it. Okay.
A. So I'm saying that is not something which -- I mean, it's just a consideration. I mean, is not my field, is not my expertise, but if this is much higher dose, I agree with that. But, I mean, should be proportionate to the metabolism, which is different in animals.
I mean, I'm not saying that this is, I mean, wrong, but is just a consideration.
Q. So let's take a look at the next article on rats, also by Hite. That's Exhibit 19.
A. Yes.
Q. It's the second article you cite. And maybe we can do this a little more quickly.
In that study, the rats were given anywhere from 25 milligrams a kilogram down to .0005 milligrams a kilogram.
Is that accurate?
A. Yes.
Q. And apart from the



25-milligram-a-kilogram dose, all the other doses showed no increase in weight for these rats; is that a true statement?
A. Sorry, I lost you.
Q. So let's go to page 297. Maybe we can follow along.
A. So you are talking about the --
Q. Exhibit 19, the Hite study on rats.
A. And the page, 9 --
Q. 297 at the bottom.
A. Yes.
Q. And I'm going to -- I'll just point you to the left-hand column, the paragraph that begins, "Body weights."
A. Yes.
Q. And it says, "The body weights for the rats in the-25-milligram-to-kilogram-a-day group were increased" -- gives some description.
And then the last sentence says as follows: "The body weights for all remaining levo-treated groups of rats were comparable to those of controlled."
Do you see that?



A. Okay, yes.
Q. So what this is saying is the rats -- they got 25 milligrams a kilogram --
A. Gained weight.
Q. By 10 percent?
A. Okay.
Q. And all the others had no difference, correct?
A. Is correct.
Q. Okay. And setting aside the clearance rate, would it -- would you have any reason to disagree that a rate of 25 -- a dose of 25 milligrams a kilogram per day --
A. Yes.
Q. -- is about 85,000 times higher dose than a woman gets with Mirena?
A. I trust you. I -- I mean, I have not done these calculations, but I trust you.
Q. Okay.
A. I am not a, as I mentioned, a pharmacologist. The only consideration I would do here is to -- and this is not my job; is something that pharmacologists do -- to correlate this dosage to the metabolism of



the different species, to adjust these outcomes according to the different species-specific metabolism.
Q. And you have made no attempt to do that as part of your expert work here?
A. I cannot do that because is beyond my expertise.
Q. So you've relied on the animal data, but you don't have the expertise to connect it with how that might implicate humans?
MR. KENNERLY: Object to the characterization.
THE WITNESS: I have not the expertise to correlate the dosage to the metabolism according to the species-specific peculiarities, which I mentioned in my report.
QUESTIONS BY MR. IMBROSCIO:
Q. So you've -- when it comes to animals, at least, you've relied on the statement in the Bayer document that there is an increase with animals, and that's it. You haven't gone to investigate whether it might be relevant to your human opinion here?

Page 298

MR. KENNERLY: Object to the form.

THE WITNESS: I always take in serious consideration any data which come from animal models when there's concern -- this is related to an evaluation of a rare neurological disorder or to something which may cause a rare neurological disorder because I think the animal models still teach us a lot.

QUESTIONS BY MR. IMBROSCIO:

Q. Animal models can be important, right?

A. Can be important.

Q. And -- but the dose can also be a really important factor when you interpret animal models, correct?

A. When you interpret animal models. And in this specific situation, I have not the expertise to correlate this dosage to the metabolism and the clearance values according to the different species.

But the occurrence of weight gain in these animal models, even if the

Page 299

dosage was very, very high, ring me a bell that in some specific circumstances some of these women -- not all of them but a proportion of these women -- may have a predisposition to gain weight during a treatment with LNG.

And this observation, this opinion, which is not something I am sure about, is an opinion that I believe is more likely than not, is supported by these animal studies as well as by the reported occurrence of weight gain in the context of LNG IUD treatment in some women. Which is not, again, something that has been proven because is controversial in terms that I stated within my report by referencing both the clinical studies which showed weight gain or an increase in fat tissue in a proportion of these women, as well as by referencing studies, clinical studies, which did not show any significant correlation between weight gain and the treatment with LNG IUD.

So, again, this is something controversial which I cannot be sure about, but I made a consideration, an opinion, which

Page 300

is partially supported by literature and is more likely than not.

Q. Is it fair to say -- I'm actually now going to ask you about your broader piecing-it-together puzzle.

Is it fair to say that you were asked for your views as to whether LNG in Mirena might be causing pseudotumor cerebri?

That's your -- that was your task here, correct?

MR. KENNERLY: Object to the form.

You can answer.

THE WITNESS: I tell you in this case, no, because this weight gain section of my report I included was not to support the conclusion that Mirena was associated with IIH. I mean, I've not included this section to support my opinions.

I've included this section because I think that weight gain is a very important risk factor for IIH. And I published a small paper in Journal of Pediatrics a few years ago,

Page 301

accepted on this weight gaining pseudotumor cerebri.

I think weight gain is very important. I mean, it's not that -- it's not my opinion; it's the opinion of many researchers. And a lot of published papers focused on weight gain and IIH and is very well-recognized causal risk factor. Even your -- your reports from your experts, they emphasize the role of weight gain. And even the document from Bayer to the German authorities admitted that weight gain is a recognized risk factor.

I mean, I knew that recognized risk factor of IIH is weight gain since many years, since when I started to focus my research on IIH and on weight gain.

Then, because of this reason, when I read that some animal studies showed weight gain in the rats and monkeys taking high dosages of LNG, and when I saw that some clinical

studies reviewed by the large meta-analysis identified some degrees of weight gain in some women taking LNG IUD, and when I saw that some women who had LNG IUD were upset with weight gain in some bioclinical studies, I put all these pieces together and I say it, it is more likely than not that weight gain may be an additional risk factor of IIH in these women basing on the notion I had before that weight gain is a recognized risk factor.

But, again, these are my considerations, and I admit they are controversial because they may be convincing from some point of view.

But I wouldn't be honest if I tell you that this is absolutely straightforward. There are some things which as well do not fit completely.

As you mentioned, the very, very high dosages of LNG in these animals cannot be compared with the



ones administered to these women. And there's some clinical studies did not show a significant correlation. So there are some controversial aspects.

But still, in my research in the future, I will be really interested to understand if some of these patients may be predisposed to gain weight by -- during -- during LNG administration.

QUESTIONS BY MR. IMBROSCIO:
Q. And that's a question you yet don't know the answer to?
A. I don't know the answer.
Q. Let me come back to what you said. I want to make sure I understand it.
You say -- you included the weight gain section in your report, but not to support the conclusion that Mirena was associated with IIH?
A. I mean, it's not something that I included to -- because your question was different. The question you made me was different.
You asked me: Have you -- have



you been asked to -- you asked me something different.
Q. Well, I asked you a general question. I'll tell you what I asked you.
Your task in this litigation was to offer an opinion as to whether LNG might be causing or contributing to pseudotumor cerebri, right?
MR. KENNERLY: Object to the form.
THE WITNESS: Yes.
QUESTIONS BY MR. IMBROSCIO:
Q. Is that what you understood your task to be?
A. Yes, but to provide an opinion basing on my previous model.
Q. Yeah.
A. So in my previous model, I included weight gain. As I mentioned, there was this small contribution to Journal of Pediatrics about weight gain. And by studying IIH, of course I knew that weight gain was an important risk factor.
So when I was reviewing all the documents related to the litigation and I saw



that weight gain was described in animal models under LNG, even if the doses -- the dosages are -- were very, very high, when I saw that in the Bayer clinical studies some women had weight gain, as was in the table I included in my report, when I saw that in a large meta-analysis there were some clinical studies which showed some degrees of weight gain, I -- I had the feeling -- I had the feeling I should include this small section on weight gain because it is complementary to my model.
But, again, is something that is controversial, and I -- I could -- I mean, I would be interested to understand this better. Because on the base of what is available now, I cannot come to the conclusion Mirena cause weight gain that cause IIH. I cannot say that.
Q. Okay. And so you don't plan to come in and offer that as the basis of your opinion?
MR. KENNERLY: Object to the form.
THE WITNESS: Say again?

QUESTIONS BY MR. IMBROSCIO:
Q. And so, therefore, you don't plan to come to court and say that Mirena causes weight gain and, therefore, that weight gain causes IIH?
A. I cannot come to the court and say Mirena cause the weight gain that cause IIH because this is not scientific.
Q. Okay.
A. I mean, what I wrote in my report is that in a proportion of these women, it may be a gain of the weight is more likely than not. And this gain in the weight of some of these women may predispose or contribute to IIH.
I mean, is something -- is -- 51 percent is not -- I cannot say caused this and caused that. I can never say that.
Q. Is your view that an overweight or obese woman would be more susceptible to getting IIH?
A. Absolutely, yes.
Q. And is it your view that in a susceptible woman that Mirena will -- or it can cause that woman to develop IIH?



A. Mirena?
Q. Mirena.
A. By which mechanism?
Q. Well, that's my question to you. I'm trying to -- setting aside the mechanism for a moment, is it your view that Mirena can cause an otherwise overweight woman to develop pseudotumor cerebri?
A. I say that according to my model is more likely than not that is capable of causing, through the activation of the receptor as I was -- as I published this model in 2012. And as additional risk factors, I included obesity and weight gain.
But, I mean, this is my opinion and is not something that I'm sure about and is not something that has been proved fully, completely, by the current research. Is something plausible that I suggest as an opinion according to my model and according to my previous work.
Q. So you were interested in whether LNG in Mirena might cause IIH?
A. I'm very interested about understand if there is a proven correlation



about this, if we can do an experiment or a number of experiments which may definitively prove or disprove.
But until that time, what I can offer to this litigation is -- what I offered was my opinion about a plausible biological mechanism --
Q. Okay.
A. -- of causal association between this drug and the development of this rare neurological disorder.
I would be really interested. The real -- as I mentioned before, the real aim I have for IIH, of course, is not to -- I mean, I've not -- I mean, I'm interested to understand what has happened here, of course, I'm interested to understand. But I'm interested in general to understand because of IIH, regardless this drug, even in other risk factors, in other reported associations.
Q. Because -- that's because it's still a mystery as to what exactly is causing IIH, correct?
MR. KENNERLY: Object to the form.



THE WITNESS: What moved me at the beginning was the curiosity to understand this mechanism. And when I moved to the UK to do my research, I was really interested in some lab research, some science which can -- which would put me in the situation finally to prove my model and -- I mean, but as you know, research is about money. So the money I got was for another project more focused on genetics and synaptic conditions.
So, I mean, in the last couple of years I focused on some other rare neurological disorders, but in the same time I continued to collect samples from IIH patients around the world. And I sequenced some of the samples, and I am in the process of analyzing some of these results, some of this data.
So my aim, my plan, after I will be disconnected by this litigation -- because otherwise I don't want to have any conflicts of

Page 310

interest. But once I will be completely disconnected, my plan is to continue to do my research on these preliminary findings I have and to apply for grants and funding to understand more about the pathophysiology, which is the focus -- which was the focus and still is the focus of my research for this condition.

And all this data, in a way, inspired me because it allowed me to go through documents and papers and to get new ideas. So this is the sense, really, for me of me being here.

QUESTIONS BY MR. IMBROSCIO:

Q. Let me try it this way. And I think you said this earlier, but let me try it.

Is it true that the pathophysiology and etiology of pseudotumor cerebri remains uncertain today?

A. It is true.

Q. And you have proposed a potential model that might possibly explain

Page 311

how IIH may be happening, at least in some people?

MR. KENNERLY: Object to the form.

THE WITNESS: It is true.

QUESTIONS BY MR. IMBROSCIO:

Q. Okay. And you are -- you had in the past worked and at some point in the future will work to try to either prove or disprove your model?

A. I hope I will get resources to continue this research.

Q. Because at this stage, it's neither been proven or disproven?

A. It can be disproven. It can be disproven, and I can even disprove myself. So I can disprove myself and find something new, something different. I cannot exclude that could happen.

Q. Okay. But at least sitting here today, you've not been able to prove it and it hasn't yet been disproven, true?

A. Yes.

Q. Okay.

A. Exactly.

Page 312

Q. Let me just go to -- quickly to Exhibit 20. This will be real quick one. This was the third animal study.

A. Yes.

Q. Something tells me this is the one that you could not find --

A. Yes.

Q. -- because it is written in Japanese.

But what I wanted to just confirm, make sure you understood -- make sure you agreed that -- if you look at the Figure 2 that's on page 392.

A. Yes.

Q. If you notice, that just tracks the weight gain?

A. Yes.

Q. In the different groups?

A. Yes.

Q. And the skinny dotted line is the untreated control?

A. Yes.

Q. And it looks like the untreated control is the one that actually had, certainly in the recovery period, the most

Page 313

weight gain?

A. Yes.

But honestly, it's difficult for me to -- because, I mean, if I cannot read -- if I cannot understand the paper because it's in Japanese, I cannot state -- I mean, I trust you, but I cannot tell just from one figure. Maybe you know Japanese. I don't know.

Q. Well, here's the thing is this is an article that you cited and relied upon and said to the world "this is something that influences my opinion."

And so, you know, I appreciate the situation you're in, that you can't read the Japanese language, and so I'm just --

A. I mean, I cannot justify, looking the figure, understand this finding.

Q. Okay.

A. Sorry.

Q. That's fine. We can move on. That makes it easy.

Let me talk about human weight gain. And you've been very straightforward in that there's -- in your view you've seen

Page 314

some studies that show weight gain and some studies that don't show weight gain in humans --
A. Yes.
Q. -- correct?
A. In -- in LNG users.
Q. In LNG users?
A. Yeah.
Q. In humans.
If you could, point me to the studies in your report that show weight gain in Mirena users.
MR. KENNERLY: Object to the form.
You can answer.
THE WITNESS: So I mentioned a study on another -- so initially I mentioned a study on another synthetic progestin, NPA --
QUESTIONS BY MR. IMBROSCIO:
Q. Which page?
A. Page 35.
-- which showed some degrees of weight gain in the NPA users compared to the nonhormonal copper IUD.

Page 315

And then I switched on the studies included in the meta-analysis which were focused on LNG users. So specifically the users of LNG.
And I found that in a few of these studies there were some interesting observations.
Q. Which studies?
A. Which I included.
So, for example, in one of these study there was an increase in the percentage of the fat mass, on the fat tissues.
Q. Which study is that?
A. That was from Napolitano.
But the difference in the weight was not significant.
Q. Okay. So in other words, Napolitano said there was some difference in fat content but that the weight -- there was actually no difference between the LNG user and the control?
A. Not significant differences, yes.
Q. Okay.

Page 316

A. And then --
Q. And so just so I'm clear, this study is not evidence that use of Mirena increases weight, correct?
A. Not about the increase of the weight but about the increase of the fat tissue.
Q. Okay. I understand. I understand your point there.
A. Which is interesting because in all the mechanisms which -- in many of the mechanism which have been proposed to explain the pathophysiology of pseudotumor cerebri in obese individuals, in many of these mechanism, for example, there is a scientist from the UK which -- who proposed new inflammatory -- new inflammatory perspective in IIH pathophysiology. And she proposed that the release of leptin may be involved in IIH pathophysiology. Leptin is released by adipocytes, so by the cells which are a constituent of the fat tissue.
So if you have more fat tissue, you may have -- if you have a high percentage of fat tissue, you may have a higher release

Page 317

of leptin. So that's why I included this observation.
It may -- doesn't mean anything. It may be just something that doesn't mean anything, or it may be something interesting.
If the leptin hypothesis of IIH developed by Alex Sinclair will be proven one day, then is something interesting.
Q. Are you going to go court and testify that LNG causes increase in fat tissue, which, in turn, causes IIH?
A. No. Because I don't have -- I mean, no, because it's not something that -- I mean, is not a finding that -- I mean, if it was replicated in many studies, then if it was something proven, fully, completely proven, and --
Q. Then you would testify in court about it?
A. If it was fully proven, yes. But, I mean, in this case --
Q. It's not?
A. -- it's one piece of the -- of a larger puzzle. And I included this

informations to provide my view --
Q. Now -- I'm sorry.
A. -- including -- I mean, with the aim, as I -- I say to you before, with the aim of be helpful, not just to the plaintiffs but even to everyone to understand better which may be the mechanism, if there is a causal association.
Q. So we've talked about --
A. That will be proven in the future.
(Salpietro Exhibit 21 marked for identification.)
QUESTIONS BY MR. IMBROSCIO:
Q. We've talked about Napolitano, and that one, no weight gain but change in fat tissue.
Let's talk about Modesto. You also cite Modesto on page 35, correct?
A. Modesto was not LNG. It is NPA, isn't it?
Q. Well, I'm asking you. You now have it in front of you --
A. No, because you say at page 35, and I have discussed page -- the -- sorry,



yes, I'm on it.
Q. Okay. So what you wrote is, for example, in one of these studies they found a significantly greater, with a very low P value, mean weight increases with the use of NPA-based contraceptives versus the nonhormonal copper IUD for weight at certain points in time.
That's what you wrote, correct?
A. Yes.
Q. But we don't -- Mirena is not an NPA-based contraceptive?
A. No, it's not an NPA.
Q. It's an LNG-based --
A. Yes.
Q. And this study actually looked at LNG IUS systems, right?
A. Yes.
Q. It looked exactly at Mirena, correct?
A. I don't know if it looked exactly at Mirena.
Q. Let's just read the title of Modesto.
A. Yes.



Q. "Weight variation in users of" --
A. Yes. Yes.
Q. -- "depo" --
A. Yes. Yes.
Q. So, yes, it did look expressly at Mirena?
A. Yes.
Q. And the comparison between Mirena with LNG and the copper without the hormone, that would be the relevant thing to look at, right?
A. Yes.
Q. Okay. Let's turn to page --
A. But is not significant difference.
Q. Turn to 60, yeah.
A. Yes.
Q. Table 3, this study shows that there was no significant difference in weight gain.
A. Yes. Yes. Yes.
Indeed, I have included this information in my report. I discussed some studies did not show any difference



between -- in terms of weight gain, in the correlation between weight gain and LNG.
Q. I understand.
I guess my point is, I was surprised, Doctor -- you strike me as a really honest guy -- that you would put in the NPA and suggest that there was maybe some weight connection when, in fact, that very study looked at -- looked at the Mirena. And to your credit, you put it in the next page.
But I guess I'm trying to understand why you would put that in if this very study disproved the point.
MR. KENNERLY: Object to the form.
THE WITNESS: My fault that I have not included this, because I included the studies.
So I started with this NPA finding, which was probably the most significant finding from this meta-analysis. And then I included the findings which had some interest in terms of this -- the possible -- the probable association between LNG

Page 322

and weight gain.
And then I included a sentence where I discussed other clinical studies did not found any significant association between weight gain and LNG. And I forgot to include this reference from Modesto.
So my -- my fault.
QUESTIONS BY MR. IMBROSCIO:
Q. Okay. I get it. I'll move on.
For the Cochrane database --
A. No, wait. Wait. I included this.
Q. Yeah, you did -- no. I said, to your credit, you included it in the next page.
A. So I included this reference.
Q. Yes.
But here you were talking about the NPAs?
A. Yes.
Q. Okay. But even when you look at -- let me have Cochrane, the Lopez.
But even when you look at Lopez, which was the Cochrane database

Page 323

review, which is the first thing you cite...
A. Yes.
(Salpietro Exhibit 22 marked for identification.)
QUESTIONS BY MR. IMBROSCIO:
Q. That's Exhibit 22, Doctor.
And let me just go straight to the point. There's a plain language summary of their results. I've given you the big table of contents, but -- which is on page 2 and then carries over to page 3.
A. Yes.
Q. Do you see that?
A. Yes.
Q. At the top of page -- and it talks in terms of POCs. Those are progestin-only contraceptives, right?
A. Yes.
Q. Mirena is a progestin-only contraceptive, right?
Read for me what the top of page 3 says.
A. "Little evidence of weight gain using progestins-only contraceptives."
Q. So in other words, the result

Page 324

of this large study concluded that they did not have evidence of weight gain?
A. Yes, is controversial.
Q. Okay.
A. Is -- I mentioned this previously, is controversial subject. But in some studies there was -- there was some -- some studies suggested --
Q. Well, that's what I'm trying to get to. So far, none of the studies have suggested it. Let's keep going through your studies that you've cited.
MR. KENNERLY: Object to the form.
THE WITNESS: Say again?
QUESTIONS BY MR. IMBROSCIO:
Q. We've looked at --
MR. KENNERLY: He'd like to explain to you his views.
QUESTIONS BY MR. IMBROSCIO:
Q. We talked to Napolitano. No weight gain there, right?
A. Napolitano increase in fat tissues.
Q. But no change in weight, right?

Page 325

A. But as I mentioned previously, fat tissue --
Q. No, you made that very clear. I just want to --
A. So it's still --
Q. It's relevant to you because of the fat tissue?
A. Yes.
Q. But not because the weight was different, correct?
A. Not because the weight was different.
Q. Okay. Modesto, no change in weight, correct?
A. Not --
Q. Between copper --
MR. KENNERLY: Wait.
MR. IMBROSCIO: I'm sorry. I didn't mean -- I'll withdraw the question.
QUESTIONS BY MR. IMBROSCIO:
Q. Modesto, no change in weight between LNG and copper, right?
A. Not significant with LNG. Significant with NPA, yes.

Q. Yes.
In fact -- yeah.
And now with Lopez, which was the Cochrane review, they again found --
A. Little evidence.
Q. -- little evidence of any weight gain?
A. Yes, little evidence, okay.
Q. And next you cite Dal'Ava, which is at the bottom of 35.
A. Yes.
Q. And let's mark that.
(Salpietro Exhibit 23 marked for identification.)
QUESTIONS BY MR. IMBROSCIO:
Q. Doctor, I'm showing you what's been marked as Exhibit 23. This is an article by Natalia Dal'Ava, who is at the University of Campinas in Brazil.
Do you see that?
A. Yes.
Q. And let me just focus on the abstract. This was, again, a body weight and composition in users of levo-releasing intrauterine system.



That's Mirena, correct?
A. Yes.
Q. And compared copper IUD without a hormone with Mirena, correct?
A. Yes.
Q. And the conclusion that they came to was there was no significant difference in body weight change between the two groups, Mirena and copper, at -- of users at 12 months, correct?
A. So the conclusion they stated: "Although an increase in mean fat mass among the LNG users at 12 months was observed, it should be noted that an increase of body weight was also observed in both groups after one year of insertion of the device. However, a study with a larger number of women and long-term evaluation is necessary to evaluate these body changes."
Q. And so in other words, the Mirena people gained some weight, correct?
A. Yes.
Q. And the copper users gained some weight, correct?
A. Yes.



Q. Copper doesn't have LNG in it, correct?
A. Yes.
Q. And so the study concluded that there was no difference in weight gain between the women taking the hormonal contraceptive and using the copper IUD, correct?
A. They show it, as I wrote in my report, an increase in the gain -- in weight gain which was not significant. So --
Q. Yeah, not statistically significant.
A. At 12 month different percent change in body fat mass compared with the normal copper IUD group, reported means 2.5 versus minus 1.3.
Q. Got it.
A. Yes.
Q. No significant difference.
A. No significant. Indeed, I included the P value which was just P 0.027. Yes.
So, I mean, it seems that the main feature, I mean, is controversial, but I



included this section in my report because weight gain is an important, recognized and, I would say, very well-accepted risk factor of IIH. And I did previously some research on the association between weight gain and IIH.
Q. You don't need to convince me of that one. I will accept that one.
A. No, no, no, I don't want -- I just want to summarize -- sorry if I sometimes talk too long.
In 30 seconds. Why I included this section? Because this is an important risk factor.
The animal studies cited by Bayer document some increase in the weight even if the dosages are very high. Some studies, like the clinical study from Bayer, observed an increase in the weight gain in a percentage between 1 in 10 to 1 in 100 documented by the doctors. And some studies suggested that there is an increase in fat tissue.
Is that significant? I don't know. I don't know really. I think it's

Page 330

very controversial, and I think also these other studies which show no correlation are important to be considered.

My final opinion is that in some women who take these contraceptives, these progestins or this contraceptive, it may be a predisposition to weight gain in a small proportion of these women.

Again, we don't know if the diet style or the lifestyle has an impact on this, and we have not the whole picture because some of these women as well as -- as soon as they gain even 1 or 2 kilograms, they don't take any more the progestins because they don't want to gain any fat or weight, in their mind, because they associate the weight gain with the drug.

So it's not, I mean, a clearcut situation. But it's more likely than not that in some specific circumstances these manufactured hormones in some -- in a proportion of these women, in a small proportion of these women, may cause either an increase of the weight or an increase of the fat tissue.

Page 331

How this is related to IIH? Still, I don't know. I would like to understand why just a small proportion of these women developed this weight gain or increase of fat tissue because I think this will be key to understand eventually if there is the proof of a causal association with the drug.

Q. Well, some of these studies we've looked at have shown that women who are using this contraceptive, this contraception, are gaining weight whether they're on the Mirena or on the copper IUD, correct?

A. Yes.

Q. Okay.

A. I mean, is correct.

Q. And so if the women are getting -- are gaining weight at the same rate for using the Mirena versus the copper, and assuming they are otherwise equal, then if one of the women developed IIH, it would be due to the weight gain and not necessarily the hormone that one or the other was taking?

Withdraw that. That was a horrible question.

Page 332

See, I can mess up, too.

I guess what I'm trying to get across -- well, let me ask you about the next study.

You also cite this survey of women in south -- in Latin America by Silva-Filho, S-i-l-v-a, F-i-h-l-o {sic}.

Let me try to do this really quickly.

A. I don't believe much in this because is a self-report --

Q. Okay.

A. -- and is not monitored by -- I mean --

Q. Well, it's just a perception of what their views -- they're not even taking the medicine. This is just a survey of --

A. I included this reference, but as I mentioned previously, I would rely much more, of course, on the weight gain documented by doctors in routine follow-up --

Q. Okay.

A. -- like the one that was documented by that bioclinical study with the follow-up by the doctors.

Page 333

Q. Got it.

A. Not this.

Q. And so you -- but you would agree that women taking Mirena, some of them can experience weight gain just because of life?

A. Yes.

Q. They just had a baby, perhaps?

A. Yes. Yes. Yes.

Q. They're getting older, perhaps?

A. And I told that before. I said, to support my opinion about the mineralocorticoid activation, which was more likely than not in Mirena users, if I would have to choose between -- as a clinic -- on the clinical side -- so we discussed about the in vitro study, we discussed about the animal studies which showed increase of the gene expression following progestin, we discussed about all that.

And on the mineral side we have these two clinical observations: the weight gain and the edema. And approximately 20 minutes ago, half an hour ago, I told you I would put -- I would bet much more on the

Page 334

edema as a sign of mineralocorticoid activation rather than on the weight gain. Because the weight gain, it can be secondary, as you say, to many factors, including the diet, the lifestyle, the physical activity and many other things.
Q. Got it.
A. Whereas the edema, the bloating, is very difficult to induce bloating and edema on yourself. I mean, if your kidney is working properly, I mean, it's very difficult unless you have some kind of hormonal imbalances or kidney issues. Then in that case --
Q. But on edema, there are lots of reasons that women can develop edema. Not everyone who develops edema develops IIH, correct?
A. Is correct.
Q. It actually can be a very common affliction, correct?
A. Yes. But if you ask to a medical student in the first year, second year of medical school, edema is the result of, in many cases, of the retention of fluid,

Page 335

of the activation of the mineralocorticoid receptor. It may be caused by many other things; if you have heart failure, if you have kidney issues. You may have many secondary causes of edema.
Q. A lot of older people have edema?
A. You may have many other secondary causes, but still, in an active person who has not heart problems or kidney problems, if you have edema following medication is something that is an important observation, much more important than weight.
And, of course, you can -- you can modify your weight, as you said, with your lifestyle and diet and physical activity, habits, but you cannot make yourself prone to edema if you're an active person.
Q. While you can't eat yourself into edema like you can eat yourself into weight gain --
A. Yes.
Q. -- there are other medical conditions that can lead to edema apart

Page 336

from --
A. Yes.
Q. -- perhaps the hormonal contraceptive, correct?
A. Yes. What I mentioned before, heart failure, kidney, many other things.
Q. Like congestive heart failure, those patients tend to have edema?
A. Yes, that's what I said before.
Q. So you don't know -- for the patients that experienced edema using Mirena, you don't know sitting here today whether that edema was caused by the levo in the Mirena or for some other reason, correct?
A. Yes, of course. But, I mean, it's more likely that -- I mean, I don't think they had -- many of them had congestive heart failure or kidney problems, but of course some of them may have these problems.
Q. And did you understand the reports that you relied on regarding edema to suggest that the physicians objectively assessed the women as having edema?
Is that your understanding?
A. That's what I understood.

Page 337

Q. Okay. For example, edema assessment in the way that doctors are looking for congestive heart failure would assess edema?
A. Can you repeat the question?
Q. Well, let me ask you this: Did you see any edema reported in any other clinical study, apart from the one that you cite, which is A46796?
That's the study you cite, right?
A. Yes.
Q. Any other studies where you saw edema besides that one?
A. I don't remember, I'm sorry.
Q. Okay. Do you recall looking -- let me put it this way: You based your opinion on what you found in A46796, true?
MR. KENNERLY: Object to the form.
QUESTIONS BY MR. IMBROSCIO:
Q. Among other things you've talked about.
But as far as cases of edema, you base your opinion on the cases that you

Page 338

saw in clinical trial A4796 {sic}?
A. Mostly on that, because I'm not remembering now papers which describe edema. Maybe there was one paper --
Q. Well, that's what I was going to ask you. Let me ask the question.
Have you seen any published study that says that use of Mirena causes edema?
A. No.
Q. Okay. And do you know whether that study had an inactive comparator so that you can compare whether it was the natural occurrence of edema in the population versus something that was caused by the use of the Mirena?
Do you know?
A. Can you repeat your question?
Q. Yeah.
The study A4976 -- sorry. A46796, do you recall whether that study had an active -- or had an inactive comparator, a control group?
A. No.
Q. Okay. You don't recall or

Page 339

there wasn't one?
A. I don't think there was one.
Q. Okay. And so in other words, without an active control group or, you know, a control group, you wouldn't know whether the Mirena -- excuse me, strike that.
Without a control group, you could not say that the edema seen in the Mirena patients was any different than what would have been the background rate for edema, correct?
A. I think that -- I mean, I -- I don't know, but I think that congestive heart failure and other medical causes of edema are likely to be more rare compared to obesity or -- you know, so it's something that make -- ring me a bell and, of course, is a piece in a larger puzzle.
Q. Yeah.
A. I mean --
Q. So you put all these pieces together --
A. Yes.
Q. -- and you deduced that the LNG in Mirena, in your view, more probably than

Page 340

not can cause or contribute to IIH, correct?
A. I said that in my view, in a proportion of these women is probable that the manufactured hormone cause or is capable of causing or of contributing to either a gain in weight or a gain in fat tissue, and this may have a role in the developing of IIH.
Q. It may; it may not, right?
A. It may not have a role, and I may be wrong.
If there is an evidence which show this opinion is wrong, I may change my mind. And I reserve the right to change my mind, of course.
Q. Just like my wife.
A. What I'm trying to tell you, that I made really an effort trying to understand all these risk factors. And I believe that if in a proportion of women there is a risk of an increase in weight gain or an increase of fat tissue, this is something important. Because these women may represent, for example, the key to understand if there is a causal association.

Page 341

So why just these women developed an increase of fat tissue and not all the other ones, which are the vast majority, I guess, who did not. Because probably these women were predisposed, so maybe these women need to be further investigated.
Q. That's a key scientific question for you?
A. It's a key scientific question.
Q. One you don't know the answer to yet?
A. I don't know -- I would love to address this question, but as with previous questions I mentioned, this is a matter of time, studies, money to invest in this research, and is not likely a question that will be fully proven or disproven in a matter of -- it may require many years since now, but I think is an important question.
Q. Let me ask you just about one more, and then we'll take a break, which is, you cite the Dickerson study on page 36, which was another report -- women self-report of weight gain.

Page 342

A. Sorry, I don't find any reference.
Q. Dickerson, in a US study, some women also reported weight gain as a side effect.
MR. KENNERLY: What page is this?
MR. IMBROSCIO: Page 36.
QUESTIONS BY MR. IMBROSCIO:
Q. Do you see that?
A. Yes, but I don't -- I mean --
Q. You don't put much weight in that one, right?
A. No.
MR. IMBROSCIO: Okay. Let's take a break.
VIDEOGRAPHER: We're going off the record --
MR. IMBROSCIO: I'm sorry, one more.
THE WITNESS: The studies -- let me finish with a sentence.
The study that ringed me that -- sorry, I had a bell ring me, I mean, I would like to understand if

Page 343

this increase of the -- for example, yes, the weight gain mechanism is well-recognized in IIH. So let's say if this will be proven, that in a proportion of women LNG cause weight gain, I mean, that is something that needs to be understood and further investigated.
But as well as -- I am interested in understand the increase of fat tissue because, according to some models not published by me, by myself, but by other researchers, if you have an increase of fat tissue -- not if you have an increase -- in fat tissue, you release -- from fat tissue you release some adipokines, some leptin, some substance, endogenous substance, which may be linked to IIH.
So the question is the increase of fat tissue cause an increase of the concentration of these substances in the body of these women, which, in turn, cause an increased risk of IIH? This is a question that I would like

Page 344

to answer.
QUESTIONS BY MR. IMBROSCIO:
Q. Okay. I got it.
I think we've now gone through all of the studies, human -- showing human weight gain that you've cited in your report.
A. Yes.
Q. Are there any others that you didn't cite in your report that you would rely on?
A. Probably. So -- sorry.
You said the question was if I missed some references?
Q. Well, it's -- it's human nature. Let me try it this way.
Apart from the articles about weight gain in humans that you've cited in your report, are there any others you plan to come to court and talk about, other than the ones that we've gone through?
MR. KENNERLY: Object to the form.
THE WITNESS: No. No, I don't plan --

Page 345

QUESTIONS BY MR. IMBROSCIO:
Q. Okay. And then on edema, really quickly, and then we'll take a break.
On that study A46796, would it change your opinion if the edema you rely on was reported but then not objectively assessed? Would that impact your view of --
A. Yes.
Q. Because --
A. If it was not a doctor.
Q. Yes.
A. If it was a self-report, yeah.
Q. Okay. And then do you recall in looking at the study whether there was any description of pitting?
You know what pitting is with edema?
A. Yeah.
Q. Was there any description of pitting that you remember?
A. I don't remember.
MR. IMBROSCIO: Okay. Let's go off.
VIDEOGRAPHER: We're going off the record. This ends Media 5. The

time is 5:50.
(Off the record at 5:50 p.m.)
VIDEOGRAPHER: We're going back on the record. Beginning of Media 6. The time is 6:12.
QUESTIONS BY MR. IMBROSCIO:
Q. Doctor, we're going to wrap up with hopefully what will be a speed round to cover some remaining topics so we can get you done and don't have to bring you back.
Let me -- I'm going to bounce around a bit.
There's a portion in your report where you talk about pharmacoceutrics {sic} associated to pseudotumor cerebri syndrome.
A. Yes.
Q. You know what I'm talking about, right?
MR. KENNERLY: Object to "bringing him back" characterization.
You can go on with your questions.
QUESTIONS BY MR. IMBROSCIO:
Q. And you mention that there are



several pharmaceuticals that have been associated with pseudotumor cerebri, correct?
A. Yes, I confirmed that. And, unfortunately, for none of these drugs there is a proven causal mechanism, but is a proven association --
Q. Okay.
A. -- in some of these drugs.
Q. And --
A. It's an accepted association.
Q. And would you agree that at least as it's been reported that there is a dose relationship between the medicine and the pseudotumor cerebri?
A. I think this is not complete as a statement because, as I mentioned previously, there is in my opinion the cumulative effect, at least in some of these drugs, of the endogenous and the exogenous manufactured hormone.
For example, if you have a child with a GH deficiency because of a central problem, so it does not produce GH, is going to -- the thyroid cells do not work, and if you have a child who produce less GH



than normal but still produce some endogenous GH, the second child is more predisposed to IIH when it's treated with recombinant GH.
So it's not a matter just of the dosage of the manufactured hormone, but also there are some endogenous conditions which need to be considered in the whole picture, in my opinion. This is my opinion.
Q. Fair.
But you don't have any reason to think that the normal principles of dose relationship would not apply when it comes to medicines that are associated with pseudotumor cerebri?
A. I have not understood the question.
Q. Okay. You know generally the concept of dose relationship?
A. Yes. Yes. So the exposure to the drug is associated with the development of the complication, and the discharge from the drug is associated with the relief of the -- I mean with the -- the discontinuation of the treatment is associated with the reduction of the symptoms or the



disappearance of the symptoms.
Q. Is it your view, or do you have any view, on whether -- in your opinion, whether LNG and its potential impact on pseudotumor cerebri that's dose related, that the higher the dose of LNG, the greater of risk of --
A. In some case reports I reviewed, I noticed that there was a temporal association, but, I mean, still, I mean, I have not followed up these patients. I cannot really -- I cannot really be sure, but some reports suggested dose and a temporal association.
Q. You couldn't testify more likely than not that there is a dose relationship between the use of LNG and pseudotumor cerebri?
A. No, I wouldn't testify that because my involvement in this litigation is relevant to the model I proposed in 2012, 2013, and 2014. And all the additional informations I included in my report were the result of a personal effort I made to provide, first of all, to myself and then to

Page 350

the readers of my report a more comprehensive analysis of this problem, including some epidemiology and some pharmacology informations which are not part of my -- which were not part of my model and which are not -- I mean, which are beyond my research experience.

And I -- I think that is the job of an epidemiologist to discuss questions like dose and temporal relationships with specific drugs.

My involvement is more focused on the model and on the pathophysiological mechanism, so I wouldn't testify that.

Q. Okay. In other words, you view your role in this litigation to talk about, come in and sponsor your model?

A. Yeah, to provide my opinions how this possible causal association, this probable causal association, may fit into my previously proposed model of IIH pathophysiology, which is not proven.

Q. Got it.

You talk in your report about -- I think on page 32 -- about the

Page 351

predilection of pseudotumor cerebri for the female gender.

Do you see that?

A. Yes.

Q. And you write, "It would suggest" --

A. Which page? Sorry.

Q. I'm sorry, page 32, first full paragraph.

A. Yes.

Q. About a third of the way down.

You write, "The predilection of pseudotumor cerebri syndrome for the female gender would suggest that female hormones may play a role in the pathogenesis."

Do you see that?

A. Yes.

Q. And I just want to make sure I understand.

Your words would suggest that it may play a role. Does that indicate that -- that the role of female hormones, that's still a theory?

MR. KENNERLY: Object to the form.

Page 352

THE WITNESS: What do you mean by -- with your question?

QUESTIONS BY MR. IMBROSCIO:

Q. Well, I read words that you've written like the word "suggest" and that "may play a role."

Is that your way of saying that it's not been proven?

MR. KENNERLY: Object to the form.

THE WITNESS: There is no proven mechanism which link the female hormones to pseudotumor cerebri, but the biggest, the strongest evidence about pseudotumor cerebri is that is more -- is predominantly a condition which affects females of childbearing age. So this is the strongest evidence in medicine we have about pseudotumor cerebri.

QUESTIONS BY MR. IMBROSCIO:

Q. So in other words, because pseudotumor cerebri most commonly strikes women, including obese women, of childbearing age --

Page 353

A. Yes.

Q. -- you've made the logical deduction that female hormones must be playing a role?

MR. KENNERLY: Object to the form.

THE WITNESS: Well, it's -- yeah, it's a -- something that is more likely than not, of course.

QUESTIONS BY MR. IMBROSCIO:

Q. And that's a deduction --

MR. KENNERLY: Can he just answer? Whoa. Whoa.

MR. IMBROSCIO: Do not raise your voice, sir. I thought he was done.

MR. KENNERLY: Do not assert he is done. Ask him if he is done.

QUESTIONS BY MR. IMBROSCIO:

Q. Were you finished, sir?

A. Sorry if sometimes I talk long. Just to provide my -- a comprehensive point of view.

MR. KENNERLY: Don't shake your head either.

MR. IMBROSCIO: I'm shaking my head at you.
MR. KENNERLY: Don't shake your head at either of us. You're shaking your head at his answer.
QUESTIONS BY MR. IMBROSCIO:
Q. Please continue, Doctor.
A. I said that the research suggested that there are some evidences which are not controversial. So I spoke about many controversial things today, and I recognized each time when a subject was controversial. I also considered controversial my own model.
So when it comes to the female gender, that childbearing age, the risk associated with obesity and overweight, all these things are not controversial. Weight gain is not controversial risk factor.
And the most interesting thing to me about pseudotumor cerebri, one of the most interesting observations that has been proven, I would say, from the available literature data is that when the condition affects children before puberty, this female preference, this association with overweight,



do not exist really anymore.
And as a pediatrician, my opinion -- and I think this is very, very more likely than not. I mean, I am very confident that this group of patients, the children, children of prepubertal age, not overweight, they may teach us a lot about the pathophysiology of this condition.
In this group of patients, there are less confounding factors. There is not the role of weight; there's not the role of hormones, so they are more likely to be -- they are -- it is more likely to be a strong genetic component in this group of IIH individuals.
And as a pediatrician, I am particularly interested in understanding the role of the genetics in this group -- age group with this specific conditions. Indeed, the samples I collected in London were mostly from this type of patients.
When it comes to post-pubertal females, obese, there are so many confounding factors. There is the role of overweight, the role of hormones, the role of gender.



And it is unlikely, my opinion, that this group of individuals are of multi-factorial pathophysiology age with many different parts involved and is very difficult to really analyze this group in terms of the pathophysiology. But still there are some recognized and generally accepted risk factors that need to be considered.
Q. And I would agree with you that the noncontroversial things that you've described. I would agree, they're not controversial.
My point was -- my question was a little bit different, which is was it your logical deduction from those noncontroversial observations that suggest female hormones that may be playing a role?
A. They may play a role.
Q. Okay. You deduced that from the observations that are noncontroversial?
MR. KENNERLY: Object to the form.
QUESTIONS BY MR. IMBROSCIO:
Q. Women, weight, the difference in pediatric patients, those all suggest to



you that female hormones may be playing a role?
A. Yeah.
Q. And that is your logical deduction from those factors, correct?
A. Yes.
Q. And --
A. And it's an opinion which is more likely than not. There is no proof.
Q. Okay. More likely than not, in your view, based on your testimony here?
A. Yes.
Q. Okay. A couple of quick questions.
Are there any studies you're aware of testing whether LNG is found in the cerebrospinal fluid?
A. No.
Q. Are you aware of any direct evidence that would suggest that LNG is found in the cerebrospinal fluid?
A. That is found or that is present?
Q. Present, yeah.
A. That is present.

Q. Yeah.
A. Well --
Q. Any evidence that LNG is present in the --
A. Directly of LNG, no, but of progesterone, yes. And there are some correlations with plasma levels.
Q. I get that. That's why I focused on LNG.
A. No.
Q. Just like it was tested for progesterone, someone could do a test to measure whether LNG is found in the cerebrospinal fluid, true?
A. Yes.
Q. Okay. But that hasn't been done as far as you're aware of?
A. That has not been done as far as I am aware.
Q. And you haven't done that?
A. I wish. I wish.
Q. Something you may do down the road?
A. There are so many things I would like to do.



Q. Oh, I have no doubt about that, Doctor.
You say in your report that the free fraction of LNG in a Mirena patient is 2 to 3 percent.
You say that I think on page 33.
A. Yes, is approximately 2 or 3 percent.
Q. Would you quibble with me if I said there were a number of other studies that found it to be 1 and 2 percent?
A. Yeah, it's possible.
Q. It's in that --
A. It's probable.
Q. -- range?
Okay. And to be clear, you said this earlier, you're not a pharmacologist by training, correct?
A. I'm not a pharmacologist.
Q. And you're not a pharmacokineticist?
A. I'm not a pharmacokineticist.
Q. Okay. You also say there on page 33 that the presence of LNG can decrease



SHBG?
A. This has been --
Q. Well-established?
A. -- established.
Q. Yeah, I'm not going to quibble with you on that.
You cite two studies. You cite Kuhnz, which says 50 percent, and then Jia, which says 30 percent.
Do you see that?
A. Yes.
Q. And make sure you know this. Kuhnz, that was an oral, higher dose LNG, and Jia, that was the LNG IUS.
Do you recall that?
A. Yes.
Q. And so at least for the Mirena, the rate was 30 percent in that particular study?
A. Okay. Yes, I included this information. With a Mirena inserted during normal menstrual cycle, I found a 30 percent decline.
Q. And you didn't look at the Apter study; that wasn't on your list.



You don't recall a study by Dr. Apter that showed 15 percent?
A. I don't -- I'm not sure if I included this.
Q. Okay. That's fine.
A. If I did not, I mean, I probably -- I have not seen.
Q. I did not see it on your sheet. That's fine.
And you agree that levels of sex hormone binding globulin, SHBG, they're lower in obese women, correct?
A. Yes.
Q. I think you have this in your report, but would you agree that obese women as compared to normal weight women using the same Mirena have lower plasma concentrations of LNG versus --
A. Yes.
Q. Okay.
A. I included these, I think.
Q. You did, yeah.
So heavier women, decreased concentrations, correct?
A. Yes.

Page 362

Q. Okay. And then do you know one way or the other whether heavier women have greater or less free LNG compared to normal weight women?
Do you know?
A. Can you repeat the question? Sorry.
Q. Yeah.
Do you know whether heavier women, obese and overweight women, have higher or lower free LNG compared to normal weight women?
MR. KENNERLY: Object to the form.
You can answer.
THE WITNESS: According to some of the studies I reviewed, they have a higher fraction of unbound LNG.
QUESTIONS BY MR. IMBROSCIO:
Q. Yeah. Okay. Listen very carefully because I didn't ask you about the fraction --
A. Yes.
Q. -- of unbound, whether it's 3 percent, 4 percent, 5 percent.

Page 363

My question is total LNG levels.
A. Free. Oh, total.
Q. Total free. Total free.
A. Okay. Okay.
Q. Do you know whether heavier women have a higher total free or a lower total free?
A. Lower.
Q. Okay. So heavier women have a lower total amount of free LNG?
A. Free or total LNG? Sorry, I got confused.
Q. So there's the fraction of the free components?
A. Yeah.
Q. Then there's the total amount of the free components?
A. Okay.
Q. My question is focused on the total amount of the free components.
A. Okay.
Q. Do you know whether heavier women using Mirena have a higher or lower total amount of free LNG?

Page 364

MR. KENNERLY: Object to the form.
THE WITNESS: Okay. I -- I am not a pharmacologist. I don't do that. And from the papers I reviewed, I focused my attention on some of these papers which showed that SHBG is reduced, as you said before, in obese women, and as a result of less SHBG, there is more unbound free manufactured hormone.
And I suggested in my opinion this is likely -- this is probable associated with higher biological activity. But, again, I included this piece of data in the context of my efforts on the pharmacology behind this litigation, which is not my skill, my specific task.
My specific task is to -- was and is to provide opinions in regard to my model, which was published in 2012, 2013, and how can LNG fit this model.
And all the other data,

Page 365

epidemiology, pharmacology, was a personal effort to provide a better and a bigger picture.
If there is something wrong in this data, which is possible, I would be very happy to change and to reserve the right to change my opinion, because this is based on a literature revision {sic} of someone who is not a pharmacologist but still, in my opinion, is important that the free amount of LNG is inversely correlated to SHBG. Because if SHBG is reduced, this may be more likely than not associated with a higher biological activity of the manufactured hormone.
QUESTIONS BY MR. IMBROSCIO:
Q. Okay. And I want to be very straight with you, just to tell you where I'm going, just so you know.
A. Yes.
Q. It's our view, and I think I can show you some documents to do it, but I'm just going to tell you that -- I think you said earlier that heavier women have less

serum concentration of LNG.
And you agree with that, correct, using Mirena?
A. Using Mirena.
Q. Yeah.
So in other words -- I'm just going to give you an example. Let's say that the 60-kilogram woman using the Mirena has an LNG level of 100 --
A. Yes.
Q. -- just making up a number, and the 110-milligram -- kilogram woman has a level of 50.
A. Okay.
Q. Just take that as a given.
A. Yes.
Q. The free fraction for the heavier woman -- and let's use 2 percent as the number on average of free.
You with me so far?
A. Yeah. I'm with you.
Q. And so the heavier woman may have greater -- a greater percentage. They may go up to 4 percent?
A. Okay.



Q. You with me?
Whereas the normal weight woman stays at 2 percent.
A. Okay.
Q. If the total amount is only half, then the total free in both would be the same, correct?
A. Yes.
Q. Okay.
A. I mean would be similar.
Q. Yeah, would be similar.
A. The same is impossible. Would be similar.
Q. And so --
A. But can I interrupt you?
Q. Sure, of course you can.
A. I mean, this explanation, I mean, sounds to me straightforward, but I would ask you the concentration of SHBG before to say that. Because, I mean, we don't know how much is reduced. If it's 30 percent reduced or if it's 15 percent, the result would change completely because 30 percent is double than 15. And there are some studies which show is 30 percent, some



which show is 15 percent.
But if the reduction of SHBG is marked, I think that despite the reduction of the total LNG level, still the free -- the free fraction would be higher in the obese women. I think it depends on the situation.
Q. Have you seen it tested, what the free amounts are for heavier women using Mirena versus normal weight women?
Have you seen that tested anywhere?
MR. KENNERLY: Object to the form.
You can answer.
THE WITNESS: The test, I think I saw something in the documents I reviewed, but I'm not sure. If you show me, I can tell you for sure if I...
QUESTIONS BY MR. IMBROSCIO:
Q. I guess let me try it this way.
A. Yes.
Q. Let me try it a different way.
You would agree that it is the total free amount of LNG that matters for



your consideration versus the percentage that any given woman has of the LNG, true?
A. Can you repeat the question?
Q. Yeah.
A. Sorry, I lost the point.
Q. So every woman has -- using Mirena will have an amount of free LNG --
A. Okay.
Q. -- true?
And my question is: Is it the amount of free that matters, or does it matter what the relative comparison of free versus bound is?
What matters?
A. I think the free is the one that is involved in the pathophysiology, if there is a causal association.
Q. If there's a relationship, it's the free that matters?
A. Yes.
Q. Okay. All right.
A. Because the bound hormone cannot bind any receptors, cannot even have an effect.
(Salpietro Exhibit 24 marked

Page 370

for identification.)
QUESTIONS BY MR. IMBROSCIO:
Q. And I'm going to show you what's been marked as Exhibit 24, which has been previously marked as Hofmann 22.
And this is an article by Edelman from 2016 which I will represent to you you have reviewed and cited on your list of materials.
Look familiar?
A. Yes.
Q. Let me ask you to turn your attention to exhibit -- or excuse me, page 5.
A. Yeah.
Q. There's a pharmacokinetic section.
Do you see that?
A. Yes.
Q. And it says, "Levels of free LNG were approximately 1 percent of the total levels. Although there was no significant difference in the free Cmax between obese and normal women, the absolute proportion of the free drug was somewhat higher in the obese group."

Page 371

That's what we talked about, right?
A. Yes.
Q. So in other words, while the fraction was -- the proportion was different, was higher --
A. Yes.
Q. -- the absolute amounts there was no difference, true?
A. So is -- what you -- what you suggested to me before?
Q. Yeah.
A. Okay. Okay.
Q. And this --
A. Yeah. I mean --
Q. -- makes that point.
A. -- I'm not saying -- it may be correct and I may be wrong, but what I tried to provide you as my opinion is that any calculation cannot be regarded as the values of SHBG, in my opinion, because I think it is accepted that SHBG inversely correlated with free LNG.
This is accepted, do you agree? I mean --

Page 372

Q. Yeah, I would agree that SHBG can affect the serum concentration.
My point is --
A. Not -- the free fraction.
Q. The free fraction, yes.
A. In an inversely correlated manner.
Q. Agreed.
But you do agree with me that it's the total amount of free that matters, not what the relative fraction may be?
A. Yes.
Q. Okay.
A. But I would like to understand if the reduction is 30 percent or 15 percent because this is controversial. Some studies say is 30 percent, some other say 15 percent.
I think if the reduction is 30 percent, I mean, the free fraction is much higher versus a reduction of 15 percent of SHBG. So I think that -- I am not a pharmacologist, but I think that any calculation should be focused on the percentage of degrees of SHBG. And the percentage of the degrees of SHBG is

Page 373

something very complicated.
I mean, I -- it's my fault as well that I tried to simplify a very complicated concept in a few lines because these concepts are extremely complicated.
You may have a reduction of SHBG by the LNG itself, which was already established as a mechanism. Further you may have a further reduction by the weight status. So we need to understand if there is a direct correlation of -- between the degree of obesity and the reduction of SHBG. And we have also to better assess the role of albumin because we don't know in which proportion albumin may interfere with this inverse correlation.
So it's something extremely complicated that I'm not entitled on the basis of my background and experiences to analyze and to resolve. And it's not something that excite me in terms of science because my aims are to understand the mechanism and to understand if there are genes involved and to understand this kind of things.

The pharmacology, the epidemiology is not my job. I tried to provide an overview on these concepts and to implicate this possible opinions, this probable opinions, to implicate them in my model.

But still, I'm very happy to understand more and to -- if you have some documents you want me to read, I don't exclude I may reserve the right of polish my opinion or -- in front of an evidence. But I will say that in -- my opinion is that it is still a controversial aspect. Because of this valuable confounding factors I mentioned, this is still a controversial aspect which will be difficult even for an experienced pharmacologist to resolve and address properly, in my opinion.

Q. Do you know whether a woman who weighs 250 pounds will have a higher amount of free LNG using Mirena than a woman who weighs 100 pounds?
A. Again --
Q. If you don't know, you can say you don't know.



A. I don't know. I don't know.
Q. Okay. Let me show you the next exhibit.
(Salpietro Exhibit 25 marked for identification.)
QUESTIONS BY MR. IMBROSCIO:
Q. Doctor, I'm showing you what I've marked as Exhibit 25. It's an article by Dr. Praditpan, and I will tell you it does not appear on your list of materials that you reviewed.
It's entitled, "Pharmacokinetics of levonorgestrel and ulipristal acetate emergency contraception in women with normal and obese body mass index."
Do you see that?
A. Yes.
Q. Okay. It was published just this year, in 2017. I guess just last year in 2017.
Do you see that?
A. Yes.
Q. And let me sort of cut to the chase here.
If you take a look at Table 2, which is the LNG PK parameters in normal?



QUESTIONS BY MR. IMBROSCIO:
Q. And obese women?
Do you see that?
A. Yes.
Q. And do you see -- well, there's a calculated free LNG number, the bottom part of that chart.
Do you see that?
A. Yes.
Q. And if you see for the normal weight women compared to the obese women, the normal weight women actually have more free LNG than the obese women?
A. Yes.
Q. And the differences are statistically significant down to a P value of .01. True?
A. Yes.
Q. Okay. You mention in your report, I think on page 6, about the free levo index, free levonorgestrel index?
A. But can I bring your attention --
Q. Yes.



A. -- on page 34?
Q. Yes, okay. I'm happy to --
A. So basically, I mean, again, this is a controversial subject. And in this other study, it has been shown that obesity directly correlated with the unbound fraction of LNG, and that unbound fraction of LNG inversely correlated with SHBG.

I mean, I'm not saying that this is wrong, this is right, but I don't see this SHBG correlation in this study, which, as I mentioned you previously, I think is very important. Because if the degree of SHBG reduction is very marked, and this is very marked especially in individuals -- this is an important concept I think in individuals who have a long-term treatment with LNG, because LNG itself is capable of reducing SHBG, as also you said.

So if you have something which is an emergency contraception, you don't have the time -- enough time for the LNG to reduce the SHBG even. You have just basically here the influence of the SHBG levels mediated by the weight, which is good, but you -- with

the long-term contraception with LNG, like with Mirena, you have the accumulation of the effect of weight plus the effect of the LNG itself.
So this is speculation, honestly, but I would suggest you to consider also this aspect in the -- in the whole picture. I mean, there are so many variables that is not really possible to simplify with a single study or a single concept, in my opinion.
Q. I guess sitting here today, you don't know one way or the other whether the obese woman using Mirena has higher or lower total free levonorgestrel, true?
Not the fraction --
A. Total, no. Less, yes.
Q. Total free.
Total -- they have total -- that they have less total serum concentration --
A. Yes.
Q. -- of LNG, correct?
A. Yes.
Q. And then they may have a



slightly higher fraction --
A. Yes.
Q. -- of free, correct?
A. Yes.
But you mean the lower total will compensate the higher free fraction.
Q. Yes.
A. This is what --
Q. Yeah, it's --
A. And I never -- I mean, this is an interesting point of view.
Q. And you're not suggesting that that's inaccurate, right? You're not suggesting that?
A. I suggest this is interesting.
Q. Okay.
A. But we need to understand how much is the degrees of SHBG. Because if the degrees is 30 percent, still I think the obese women will have more high fraction than nonobese. If the obese is 15 percent, just 15 percent is probable that they are very similar.
And then we have to consider also the period of treatment because this is



an emergency contraceptive, so there is not enough time for the LNG to decrease the SHBG, in my opinion.
Q. Understood. That makes sense.
But you -- well, do you know whether -- sorry.
A. Yes.
Q. Thank you.
Do you know whether SHBG was measured in studies of Mirena?
A. I am not aware about some specific studies. So, I mean, I'm sure that -- yeah, I mean, this is -- there are some studies which measured the SHBG, and it has been found that is reduced by Mirena. And this is accepted in the -- you accept as well this notion that Mirena can reduce the SHBG. The matter is can reduce 15 percent or 30 percent. We don't know that.
Q. And then the matter is, does that reduction because of the SHBG levels compensate for the general reduced level of serum concentrations in obese women, true?
A. Yes.
Q. Okay. Because it's the obese



women, even with Mirena, that tend to get IIH, true?
A. Yes.
MR. IMBROSCIO: Okay. Bear with me one second. I have one more thing I need to do. I'm sure we're coming close on time, but I will represent that despite the lengthy answers, I think I can complete my examination, but I have one more thing to do.
I don't know where we are on time.
MR. KENNERLY: Object to the characterization.
MR. IMBROSCIO: Are we on time? I have 12 minutes? Oh, I still have time. I thought I was out of time and you were ready to say you were -- I was out of time.
MR. KENNERLY: I think we lose the translator at 7, which we've been proceeding okay, so --
MR. IMBROSCIO: I think we'll be fine.

(Salpietro Exhibit 26 marked
for identification.)
QUESTIONS BY MR. IMBROSCIO:
Q. Okay. All right. Doctor, I'm handing you what's been marked as Exhibit 26.
Doctor, this is a manuscript that has been prepared and looking at various PK aspects of levo-containing contraceptives.
A. Yes.
Q. Do you see that?
And what I really want to get at, we talked earlier about combined oral contraceptives?
A. Yes, and I say to you that that increase SHBG level.
Q. Yes.
A. This is exactly what is here.
Q. Yeah.
So let's take a look at Table 2. This is a summary of total -- I'm sorry, I'll wait until you get there. It's on the page that ends 394.
A. Table 8?
Q. It's Table 2. Table deux.
A. Okay. So because it's -- yeah.



Q. All right. Looking at Table 2, it's a summary of total, and then the parenthetical, unbound LNG serum concentrations.
Do you see that?
A. Yes.
Q. So, for instance -- and I will tell you that LNG IUS 20, which is the third item down there, that's Mirena. That's just an --
A. Yeah.
Q. -- internal name for Mirena.
A. Okay.
Q. And then below that there's an implant, then there's POP.
Do you see that, POP?
A. Yes.
Q. That's progestin-only pill. You know that, right?
A. Yes.
Q. And COC, that's combined oral contraceptive.
Do you see that?
A. Yes.
Q. And this is measuring the level



of levo, both total and free?
A. Okay.
Q. And the free has -- in the parentheticals. So, for instance, if you look at -- let's just take one year, for example, under Mirena. The total amount was 177 units.
A. 177.
Q. Nanograms a liter, right?
A. Sorry, I cannot find this.
Q. So look under one year --
A. Yeah, sorry, 177, yeah.
Q. Do you see that?
A. Yes.
Q. And then the free amount was 2.76.
Do you see that?
A. 2 point --
Q. Which is just a parenthetical below it.
A. 2 point -- sorry, I cannot see it.
Q. I think it should be right below --
A. Yeah. Yes. Sorry. Sorry.



Q. Are you with me now?
A. So this is the free concentration, the free amount.
Q. Yes.
A. Okay.
Q. And so 177 is the total amount.
A. Okay.
Q. 2.76, that's the free amount, correct?
A. Yeah.
Q. Let's just look down, just to get to the punch line, under the COCs, combined oral contraceptives. And those COCs include levo, they measured the levo. And we can look at any of these. It's a pill, so it comes up with a Cmax, C average, but let's just look at the C average.
A. Yes.
Q. At day 21 --
A. Sorry. Why this is in day and that is in months? In months?
Q. They're all in nanograms a liter.
A. Okay.
Q. And so because it's a pill that

you take, you know, your levels go up and down every day, true? That's just the nature of a pill?
A. Okay.
Q. Okay. And it gives you -- for the COCs, it gives you the total serum LNG on day 21. On average, it's 1676 nanograms a liter.
Do you see that?
A. 1600 --
Q. And 76.
A. Yes.
Q. Day 21.
A. Yes.
Q. And the Cmax, which is the first column on the left, which is the -- at the height of the amount of drug in the body, it's actually 3537.
A. Yes.
Q. Do you see that?
And then the free fraction is below that. So the total amount of free in the women taking the COCs on average for day 21 was 17.7, true?
A. 17.7, yes.



Q. And so 17.7 nanograms a liter --
A. Yes.
Q. -- is seven or eight times greater than the free amount of LNG that was available in women using Mirena?
A. Yes.
MR. IMBROSCIO: Doctor, with a few minutes to spare, those are all the questions I have for you today.
MR. KENNERLY: Should we take a break?
MR. IMBROSCIO: Yeah.
VIDEOGRAPHER: We're going off the record. End of Media 6. The time is 6:57.
(Off the record at 6:57 p.m.)
VIDEOGRAPHER: We're going back on the record. This is the beginning of Media 7. The time is 7:11.
CROSS-EXAMINATION
QUESTIONS BY MR. KENNERLY:
Q. Dr. Salpietro, during a lot of your testimony today you mentioned about being truthful and honest, and I think even



the defense lawyer said that you were truthful and honest.
Is that because in your testimony here you applied the exact same methods you would use as a doctor, a researcher and a scientist?
MR. IMBROSCIO: Object to the form.
THE WITNESS: I -- yes, I -- I mean, I've been honest about everything, including the limitations and the caveats of the possible, probable mechanisms I proposed and of the observations which do not always cover the whole picture and the underlying complexity of these risk factors and mechanism.
And I hope I did my best in providing this testimony as well as I hope the defendants understood my effort in going through territories like pharmacology, epidemiology and gynecology, which are not my usual territories. And I hope that they understood how challenging it was, I



mean, for me to provide something I was confident about within these fields.
And I -- for this reason I reserve the right to reconsider any opinion which can be proven to be -- to be not right, not correct.
And, yes, this is my statement about my opinions and about my testimony.
QUESTIONS BY MR. KENNERLY:
Q. Now, since the final -- since your report was finalized, you've been provided reports from other plaintiffs' experts, correct?
A. What do you mean?
Q. The reports from other experts that the plaintiffs have --
A. From the other side or from --
Q. From us.
A. Yes. Yes, I -- yes.
Q. And you've been provided many reports from defendant Bayer, correct?
A. Yes. From Bayer experts, yes.
Q. And how many reports was that?

Dozen? Something like that?
A. Well, many.
MR. IMBROSCIO: Let me just object to the form.
THE WITNESS: Many. I received I think three reports from neuroophthalmologist from the defendants, then one from an epidemiologist and another one, if I'm not wrong, from a pharmacologist. And this is the ones that I remember now.
Then I received an expert report from gynecology from the plaintiff side and another one from Johanson, a physiologist, and I think another one, but I don't remember if it was from a pharmacologist or an epidemiologist.
So in total, I think around ten reports from both sides.
QUESTIONS BY MR. KENNERLY:
Q. And you've now been questioned for seven hours by lawyers for the defendants, correct?
A. Yes.



Q. And they gave you a bunch of papers and documents, correct?
A. And also a lot of interesting ideas which I did not consider while I was drafting my report, and different point of views which I will be happy to understand better in the future.
Q. Now, having seen all of this additional information since your final reports, do you still believe in the opinions that were in your report?
MR. IMBROSCIO: Object to the form.
THE WITNESS: I believe in the model I proposed in 2012, and I proposed the model because, of course, I believed in it; otherwise, I wouldn't have submitted any papers with any mechanisms if I was not confident about it.
I am aware as well as -- I mean, I'm aware as well as many possible limitations which are linked to the considerations that model, and, of course, a lot of work will be



needed to be done. As well as because in the last couple of years my research experience evolved, so I understood how much important is to prove models and hypothesis with functional work, with lab work.
I had not the chance to do this during my training when I started to submit this initial papers, but the methodology I used to reach that conclusion was probably less mature than the methodology I use now, but still it was valid, and I still believe is a plausible biological mechanism which may explain in some cases IIH.
And if LNG is causally associated with IIH, assuming it is and assuming this will be proven in the future, I believe is more likely than not this causal association will be within my model at least in part because I don't believe in -- I mean, because I believe this could be biologically plausible. But I believe



this will be -- will need to be confirmed and proved.
QUESTIONS BY MR. KENNERLY:
Q. So sitting here today, it's still your opinion that it is more likely than not that LNG is capable of causing or contributing to pseudotumor cerebri?
MR. IMBROSCIO: Object to the form.
THE WITNESS: I think that if LNG cause pseudotumor cerebri, if this will be proven by further future research, is more likely than not that this happens throughout my model because I believe my model, despite the limitations, is biologically plausible in the sense that LNG may fit this model. So I still believe it's biologically plausible.
On the other hand, I understood that the documents that have been shown to me, of course, make more -- less simplified some of the statements, some of the opinions, I expressed in my reports in regard to

Page 394

the pharmacology, the epidemiology. During the efforts I made to cover all these different fields, which were interlinked to my model, probably I simplified some opinions.
But still, I believe these opinions are valid and I think that will have to understand more. For example, the evidences that the defendants showed me about the high free LNG in the oral con -- I mean, I had not a chance to see that document during the draft of my report. I mean, if I -- if I think about it, probably I oversimplified that specific -- that specific opinion. But still, I think that the defendants probably oversimplified some of their opinions in regard to the impact of SHBG reduction and how this inversely correlate with LNG.
So I think that from my report, the most important -- the most relevant part to me is the model and not all the other opinions which I had

Page 395

to include to provide a more comprehensive overview. But still, I think that these opinions are important to better understand the model for the people who will read my report.
QUESTIONS BY MR. KENNERLY:
Q. Now, let me ask you about some of the words you used there, that you've used at other points in testifying. One of them is the word "model."
Now, is that a reference to mechanism?
MR. IMBROSCIO: Object to the form of the question. Leading.
THE WITNESS: Model is, yeah, is a -- to the mechanism -- the mechanism of mineralocorticoid receptor and the sodium potassium channel pathway being likely, probably implicated in cerebrospinal fluid regulation.
QUESTIONS BY MR. KENNERLY:
Q. So is it your opinion -- well, let me back up.

Page 396

In talking about pseudotumor cerebri, do you believe there's multiple potential pathways to --
A. Yes.
Q. -- causing pseudotumor cerebri?
A. Yes, I believe so.
Q. Now, is your model or mechanism one of those pathways?
A. Is one of those pathways and is probably the only one which focused on -- exclusively on the endocrine metabolic risk factors associated with the syndrome.
Q. Now --
A. One of the few, I would say. Because there has been some research from Pittsburgh, there has been some research from Manchester. I don't want say it's the only one; it's one of the few. But my research was focused almost exclusively on this.
Q. So if we looked at the whole world full of pseudotumor cerebri patients, some of them are -- or what's your opinion about are they all getting it through one mechanism?
A. Absolutely not, yes. There are

Page 397

many mechanisms and many opinions and, unfortunately, none of these -- none of them have been proven.
Q. Now, let me stop you on the word "proven."
A. Yes.
Q. Now, how does the word "proven" relate to your opinion if something is more likely than not?
A. What do you mean?
Q. Well, you've mentioned the word "proven" at times.
A. Yes.
Q. And in your opinion you've said things are more likely than not.
So, you know, if something's proven, is that more than if it's just more likely than not?
MR. IMBROSCIO: I'm going to object to the form of the question. It's leading. Foundation.
THE WITNESS: Yes, proven is something much more solid than more likely than not. Proven includes a degree of -- a strong degree of

confidence.
And the animal model studies, which are not adjusted, translated, into the clinical scenario as I did, which is something can be useful, can be important, is a good insight but is not a scientific experiment which show a causal association, absolutely not.
QUESTIONS BY MR. KENNERLY:
Q. So something that's proven in the way you've been using it here is something that really can't be disputed by the experts in the field?
MR. IMBROSCIO: Object to the form.
THE WITNESS: Disputed? What do you mean?
QUESTIONS BY MR. KENNERLY:
Q. Well, as in, you know, is it proven?
When you use the word "proven," do you mean something that, you know, all of the experts in a field agree on?
A. I mean, proven I mean is proven that mineralocorticoid receptor is involved



in the reabsorption of sodium and in the excretion of potassium. So nobody can come here and say, no, I believe this is not true, this is not proven. I mean, this is proven. And this is proven because you cannot contradict that assumption.
And, I mean, I am not offering this today. I'm offering to both sides, the plaintiffs, the defendants, my interest, my true interest, in understanding this condition and my willingness to work on this and try to understand this, regardless the litigation on LNG but in general.
Q. Now, going back to -- we were talking about the many mechanisms to pseudotumor cerebri.
In your opinion, is it more likely than not that one of those mechanisms to pseudotumor cerebri is the mineralocorticoid mechanism you've described in your report and your testimony?
A. Yes.
Q. Now, in your opinion is it more likely than not that levonorgestrel can activate or gauge that same mineralocorticoid



mechanism?
MR. IMBROSCIO: Object to the form.
THE WITNESS: Yes. As I said previously, I believe in my model. I mean, otherwise, in 2012, in 2013, I wouldn't submit these papers.
I believe there is -- there are limitations. I believe -- I am aware that tomorrow it can come out something in the literature which will disprove it, but, I mean, until that won't happen, I will be confident that what I proposed and the effort, the translational research effort, I made lead to something which was biologically plausible, which was -- which is 51 percent of chances to be true.
And I made that in 2012, 2013, not for money or for this litigation. I made because when I've read this, when I followed up these patients, I was so upset about the lack of any ideas about this condition in the



literature. It was very frustrating to me going through these papers which was we're debating how we should call it, how we should treat it, how we should -- but no one really asked why this happens.
And because I was so upset, I made some research with the available resources I had at that time, which are -- which were extremely limited compared to the available resources I have now.
And in that process of trying to propose an answer and to provide some models and some ideas, I was aware that what I was doing, it was kind of something to stimulate the debate, to stimulate the scientific community. I was hoping that someone by reading my papers, for example, start a -- kind of experiments or an animal model or a -- basic science projects. I was hoping that. And that was all about my -- I mean, my -- my work at the time.

Page 402

And, of course, I believe -- I still believe it's biologically plausible, but now with the awareness I have now on how much difficult is the process of proving something with basic science, I know that it is much more difficult to prove -- I mean, I know that it will take time and resources. Yes, that's what I know.

QUESTIONS BY MR. KENNERLY:

Q. Now --

MR. IMBROSCIO: Let me just interrupt. Sorry.

Carrie, every once in a while I'm getting a no line on the realtime. It's blank.

MR. KENNERLY: I got that the whole time.

MR. IMBROSCIO: Okay.

QUESTIONS BY MR. KENNERLY:

Q. So you also mentioned sometimes in your testimony the word "controversial," to talk about some subject as controversial.

A. Yes.

Q. Does that just mean something's

Page 403

not proven or disproven?

MR. IMBROSCIO: Object to the form of the question.

THE WITNESS: Yes, controversial means that there are a lot of different factors which are present in each of these opinion I made as well as in the opinions that have been made by the expert from the defense side.

I mean, I am not bringing here any truth, any absolute truth, but my opinions based on my -- on the idea I developed by reviewing the literature and by analyzing these informations, as well as I think that many, many of the ideas and opinions provided by the experts -- I have not read through all the reports from the defendants' experts from page 1 to last page, but many of the things I read were similarly to the opinions I provided here, were just opinions which were sometimes oversimplifying very complicated mechanisms and very

Page 404

intricated pathways and risk factors.

So this is what I mean when I say "controversial," something that is characterized by debate where there is no winner. It's just a debate of people who honestly started, invest their time trying to understand these mechanism, these problems, and may be wrong or may be right.

QUESTIONS BY MR. KENNERLY:

Q. Now, you were mentioning the defense expert reports.

Do you recall seeing any of those reports reference to -- or a claim that you had argued LNG causes cerebrospinal fluid overproduction?

MR. IMBROSCIO: Object to the form.

THE WITNESS: Yes, I -- for example, some of the neuroophthalmologists from the defendants oversimplified my opinions in my report and said, ah, CSF overproduction proposed by the plaintiff's expert, et cetera, et

Page 405

cetera.

I mean, I don't think -- I don't think I ever included the word "CSF overproduction" as my model because I rather focused on the increase of the pressure, not on the overproduction of the fluid, of the cerebrospinal fluid, in my report.

I said that CSF overproduction or reduced CSF absorption are all hypotheses that have been made in the context of pseudotumor cerebri, but I proposed that the central pathophysiological mechanism is characterized by the increase of cerebrospinal fluid pressure.

I give you an example. If you have mutations in genes which are called, for example, for the androgen gene receptor or for other receptors or for other genes' proteins which are involved within the regulation of the pressure of the blood, the regulation of blood pressure, you have an increase in the blood pressure, but

Page 406

you're not an overproduction of blood.
I mean, is the same with cerebrospinal fluid. You don't have an overproduction. You have an increase of the pressure, and increase of the pressure in some circumstances is associated with an expansion of the volume but is not the main pathophysiological feature. Is secondary to the increase of the pressure, which is secondary to the increase of certain substances which are part of the cerebrospinal fluid in the context of the mineralocorticoid receptor model.
These are the electrolytes, which is generally accepted that regulate the osmotic pressure of the fluids throughout the body. So in the blood, in all the fluids, this has been proved, as well as it has been undirectly {sic} suggested with the cerebrospinal fluid. And this is part of my model.
And -- I was saying something

Page 407

else. I lost the track.
And basically, yes, that's what I was saying.
QUESTIONS BY MR. KENNERLY:
Q. So --
A. Is about the increase of the pressure, not the overproduction of the fluid.
Q. So those defense experts talking about overproduction are not even discussing your actual mechanism, are they?
MR. IMBROSCIO: Object. Hold on. Object to the form. Leading. Argumentative. Inappropriate.
You can answer, sir.
THE WITNESS: I said in my report -- let me have the chance to read this.
Okay. I found. Page 17. Literature -- okay. Page 17: "Research evidences that many cases of pseudotumor cerebri are more likely than not related to the primary event of raised cerebrospinal fluid pressure, thus, considering all the

Page 408

possible changes in cerebral hemodynamics, resistance to CSF absorption and perturbations in CSF flux as secondary consequential events."
So it's not the overproduction. So if you have an essential high blood pressure because your father and your grandfather has high blood pressure because of a polymorphism in a certain gene which control the blood pressure, you don't have an overproduction of blood; you have an increase of the blood pressure, which is always -- or I will say not always, but in most cases is part of a multi-factorial etiology.
So you have that polymorphism, then maybe you have a diet with high salt, then maybe you are slightly overweight, and the combination of all these factors together with that specific genetic predisposition may make some individuals prone to an increase of blood pressure but not an

Page 409

overproduction of blood.
And sorry if I did not explain this properly. Maybe asked in my previous papers.
But to provide you an example how much we are still in the prehistoric age in regard to the research of pseudotumor cerebri is that now we know all these mechanism about high blood pressure. Indeed, we have many drugs which are capable of reducing blood pressure by acting to specific receptors and pathway which have been very well-recognized.
On the other hand, we have no molecular clues in regard to pseudotumor cerebri pathophysiology. So we don't know the genes involved, the pathways involved, and as a consequence we are not able to offer to these patients etiologically targeted treatments but just symptomatic reliefs. Like I mentioned previously, you do a lumbar puncture and then you offer a relief because

you drain some fluid and then you lower the cerebrospinal fluid pressure.

For high blood pressure, this was common couple of hundred years ago because when you had high blood pressure 300 years ago, you have no drug for high blood pressure. What you did -- what the people did at the time, they just took some blood out. They took some blood off to lower the blood pressure.

And this what we are doing in 2013 with patients with pseudotumor cerebri. So we are totally in the prehistoric area of research in this condition.

I can never change alone. This will require hundreds, thousands of researchers actively involved in pseudotumor cerebri especially focused on the pathophysiology, in my opinion.

So I hope -- I really hope this litigation will offer the chance to make some steps ahead in the context



of this disease.

QUESTIONS BY MR. KENNERLY:

Q. Now, there was a lot of discussion in your testimony about combined oral contraceptives, and the discussion was always about how they have LNG in them.

What are these drugs combined with?

MR. IMBROSCIO: Object to the form.

You can go.

THE WITNESS: They are combined with estrogens as -- I mean, with -- I mean, I have not focused my report on oral contraceptives. I rather focused on progestins only, IUD-releasing LNG.

And honestly, I admit that the data that the defendants showed me about the higher fraction of free LNG in users of combined oral contraceptives, I mean, impressed me because I had not a chance during my report to review that data.

And honestly, it seems that the levels, the levels of the free



LNG, are much higher in that group of patients. However, I think that still there are some pieces of the puzzles which are missed even in that -- in that opinion because there was no mention of the SHBG levels.

And until we don't know exactly how much is the degrees of the SHBG level, then there will still be controversial results in the literature. Some papers show a 15 percent reduction; some papers show a 30 percent reduction.

We don't have paper, to the best of my knowledge, which directly prove a correlation between the degree of obesity with the reduction of SHBG and the duration of obesity with the reduction of SHBG.

So there are so many pieces which are missed that I don't think anyone can state something which is fully proven and fully certain in this context, but I recognize that probably some of my views were oversimplified



in this context.

QUESTIONS BY MR. KENNERLY:

Q. Now, you were also asked in talking to these studies about weight gain or fat mass, those types of things.

In terms of this mineralocorticoid mechanism, which is the more important factor: fat mass or just the number of the body weight?

MR. IMBROSCIO: Object to the form of the question.

THE WITNESS: What do you mean by fat mass or -- what was the second --

QUESTIONS BY MR. KENNERLY:

Q. Or body weight.

A. Body weight.

I mean, the best person to answer to this question is our researcher, which her name is Alex Sinclair, which was the one that really focused on this inflammatory perspective of obesity-related IIH. She reported, if I'm not wrong, the role of leptin.

I mean, if that model will be

Page 414

proven one day, that model correlate leptin with obesity and then with IIH risk, and, I mean, if you have an increase in the percentage of fat tissue, you have an increase in leptin. So that could be something that need to be considered if it will be proven.

Otherwise, still we are in the middle of a highly controversial subject and -- I mean, if it's more weight gain, I mean, or if it's more fat tissue, I don't know.

I observed that some papers, some basic -- also basic science studies suggest that adipocytes, which are the cells that constitute the fat tissue, are able, are capable, of release some aldosterone-like factors which may also be linked to an increased IIH risk as well.

But I admit that all these opinions are not really -- any of them is really conclusive or is really fully supported by scientific, proven evidence.

Q. Now, do you remember you were talking -- you were being asked about a

Page 415

study, and there was a question from Mr. Imbroscio about progesterone that was, quote, fiddled with, close quote.

Do you remember discussing that?

A. Yes.

Q. Now, is LNG a progestin that's been fiddled with?

MR. IMBROSCIO: Object to the form.

THE WITNESS: If LNG fit this model, this is -- is this the question?

QUESTIONS BY MR. KENNERLY:

Q. Well, that same sense of fiddled with when you were discussing that before in response to Mr. Imbroscio. Is LNG a synthetic progestin that has also been fiddled with in the same sense of that testimony before?

MR. IMBROSCIO: Object to the form of the question.

THE WITNESS: I don't understand the question, sorry.

Page 416

QUESTIONS BY MR. KENNERLY:

Q. Okay. Did you understand what Mr. Imbroscio was talking about with the "fiddled with"?

A. Fiddle? What do you mean, fiddle?

Q. He used that term before. I just wanted to understand --

A. Fiddled.

Q. Fiddled.

A. Yeah.

MR. IMBROSCIO: I wish Luciana were here, but means change, tweaked, adjusted.

MS. MANGRUM: The C18 portion we were discussing.

MR. KENNERLY: Here, I'll withdraw it. We don't have the translator anymore. Don't worry. It's withdrawn.

MR. IMBROSCIO: He's mercifully withdrawn it.

MR. KENNERLY: No further questions.

MR. IMBROSCIO: Okay. I just

Page 417

have a -- I realize, Max, if you give me some leave, I forgot to --

MR. KENNERLY: Oh, yes, you can -- yes.

MR. IMBROSCIO: Even though it's not responsive to what you said.

MR. KENNERLY: No. Yes, I understand.

MR. IMBROSCIO: I appreciate the courtesy.

REDIRECT EXAMINATION

QUESTIONS BY MR. IMBROSCIO:

Q. Dr. Salpietro, I'm going to -- you know what, I'm gonna --

MR. KENNERLY: Do we need to switch around?

MR. IMBROSCIO: Just really quickly. Really quickly.

QUESTIONS BY MR. IMBROSCIO:

Q. Doctor, thank you so much.

I just -- during the course of the deposition, your counsel has provided a copy of the e-mail that you referenced when we were talking earlier with the financial information.

Page 418

A. Yes.
Q. And it looks like you sent that on November 7, 2017.
I only have one copy of it, but I'll mark it as an exhibit. If you need to see it, let me know.
But what it is, it's a note from you to MR. JONES and Ms. Natale.
A. Yeah.
Q. There are some portions redacted, which I assume are privileged information, which I accept, but you note a couple things.
One is that you write, quote, "Being my, quote, salary, an average of $300 an hour as originally agreed, a total of 150 hours makes $45,000. Given that you already sent me 10, the difference would be 35,000. I hope I will receive this amount soon."
Do you remember -- I'll show this to you.
Do you remember writing that?
A. Yes.
Q. Okay. And here's what I don't

Page 419

understand. If you look at exhibit -- I think it's 3 over there. It's the -- it's the compensation disclosure.
A. Yes. Is a -- is a total of --
MR. IMBROSCIO: It's that one right there.
MR. KENNERLY: 3 is the wrong one.
MR. IMBROSCIO: What number is that?
MR. KENNERLY: 6.
THE WITNESS: Yes, is a total of 75,000, and basically this is what happened.
QUESTIONS BY MR. IMBROSCIO:
Q. Here's what I don't understand, though. You say there in the front, in the top, that your rate is $600 an hour?
A. Yes. Yes.
Q. You then said today, I think I heard you say, $650 an hour.
A. Yes.
Q. But it looks like here your rate from the beginning was agreed to be $300 an hour?

Page 420

A. Yes.
Q. And so as I read Exhibit 4 -- excuse me, Exhibit 6 --
A. Yes.
Q. -- it was almost as if you had agreed to cap your rate at some number.
A. Yes.
Q. When did that agreement to cap your rate occur? Or excuse me, strike that.
When did you agree not to charge $600 an hour?
A. Well, I didn't want to -- at $600.
As I mentioned previously, I am a slow writer, and because English is not my mother language, I used to take long time to go through things. So I spent longer time compared to other experts, also because some other experts have been involved, like Dr. Johanson, in the later stage compared to me.
So when it comes to the calculation, I thought it was too much, that amount for me. So I said I'm happy with 75,000. And as well now, as I previously

Page 421

said, all the money that have been agreed because of this preparation to deposition yesterday, this deposition today, I don't want any of that dollars, and I asked the plaintiffs to transfer this money to the Intracranial Hypertension Research Foundation in America.
This won't be much. Probably will be 15,000 or 10,000, I don't know. But still it would be something, I think -- I don't -- I'm not here for this.
Of course, this had an impact on my research and on my work in the last months because I had to read many papers, I had to spend long hours working in the weekends and in the night hours on this report, so I think some compensation is fair. But I'm happy with this amount.
And since now on because my involvement -- my involvement with this litigation is completed, I won't have any more -- any other amount.
Q. Well, let me ask you about the last comment you made about your involvement being completed.

Page 422

Do you have any intention to come to the United States in a month or two and testify before the federal judge who is going to be hearing evidence on this case?

MR. KENNERLY: Well, I should interject there. You're instructing him that he's supposed to come there. He's scheduled. That is not part of any order. There's no subpoena for him. That -- the whole premise of that, of what you're telling him --

MR. IMBROSCIO: I don't mean to suggest he's got an obligation. My question is, does he plan to come to the US to testify in front of the US judge, to offer his opinions when he holds a hearing that's been scheduled for sometime in the next couple months.

MR. KENNERLY: I mean, I can stipulate for you we don't plan his live testimony there.

QUESTIONS BY MR. IMBROSCIO:

Q. Okay. And then to take what you have said, from your point of view, is

Page 423

your -- with the conclusion of this deposition, is your involvement with this litigation completed?

A. I think that my involvement with this litigation -- I mean, you have to understand that this is the first time I do something like this, so I am uncertain about how this work and all about these steps.

What I've been asked for was to provide my opinion, and I was very happy to do that.

And when the defendants asked me, are you willing to prove your opinion, not just by a written report but as well as talking with the defendants and testify about your report, I was also happy to do that. And this is, I think, the purpose of my involvement in this process.

In the case -- in the case it would be -- they will ask me to be involved in the step of the US judge, et cetera. I mean, the only thing I can really offer is my model. I mean, I cannot talk about anything else than my model because I'm not a pharmacologist; I am not an epidemiologist.

Page 424

I think I emphasized the caveats and the limitations of my background and of my opinions with you, and I tried to be as more honest as I -- I mean, I've been really honest in admitting my -- I mean, my opinions may be simplified in some terms, in some respects, so I would never testify about the pharmacology underlying Mirena or the -- or the epidemiology or the gynecology side of this litigation.

What I would be eventually willing to provide is the model I worked on in 2012, 2013, and this is the only thing I can provide as an opinion.

Q. And so --

A. Of course, I -- sorry, if I -- I'm not finished. Of course, I --

Q. I apologize.

A. I included -- I have included all this pharmacology and epidemiology and gynecology because I wanted to do a proper job. I wanted the people that will read my report, including you -- I mean, found an interlinked overview of the -- my model and how this is probably implicated with many

Page 425

other pieces of this -- of this story.

But it's something that I did challenging myself and going in a different territory, so I cannot testify about that. I can eventually, and I don't know if that will be possible because of my very intense research activity and my very intense schedules in the following months. But eventually, the only thing I could offer is my view on the model and my opinions on the model.

Q. And I apologize. That was a long answer. I think I followed most of it, but I'm not sure I heard an answer to the particular question that I was asking, which is: After you give your deposition, would you be willing or do you have any intention to come to the United States and testify in front of a jury, if the case gets to that point, about a particular plaintiff who claims that Mirena has caused her IIH?

MR. KENNERLY: Well --

MR. IMBROSCIO: If you know.

MR. KENNERLY: I mean, I have to object to that because we're just

Page 426

not there. I mean, there's no schedule for anything. It's just like the Daubert hearing.

I mean, if you're asking him if he's coming to a trial that doesn't exist, like -- I mean, it's --

THE WITNESS: I don't know what will happen, honestly, Mr. Imbroscio. I don't know if there will be this step happening at some point. I don't know if the plaintiffs will ask me to be involved within that step. I mean, I don't know.

QUESTIONS BY MR. IMBROSCIO:

Q. Okay.

A. But let's say that this step will happen, and let's say that the plaintiff will ask me to provide my opinions in that context.

Eventually, if I will decide to provide my opinion and context in front of the judge, in front of the jury, I can provide the opinion and my view on my model, and I can tell them how I get there with all the caveats and all the limitations which are

Page 427

present in my model that I recognize, but I cannot absolutely testify about pharmacology or epidemiology or gynecology. I mean, I would never -- I would never do that.

MR. IMBROSCIO: Okay. Thank you, Doctor. Those are all the questions I have.

MR. KENNERLY: All right.

THE WITNESS: You're welcome. Thank you.

VIDEOGRAPHER: This concludes today's deposition. We're going off the record. The time is 7:56.

(Salpietro Exhibit 27 marked for identification.)

(Deposition concluded at 7:56 p.m.)

– – – – – – –

Page 428

CERTIFICATE

I, CARRIE A. CAMPBELL, Registered Diplomate Reporter, Certified Realtime Reporter and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination, Vincenzo Salpietro, MD was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

CARRIE A. CAMPBELL,
NCRA Registered Diplomate Reporter
Certified Realtime Reporter
California Certified Shorthand Reporter #13921
Missouri Certified Court Reporter #859
Illinois Certified Shorthand Reporter #084-004229
Texas Certified Shorthand Reporter #9328
Kansas Certified Court Reporter #1715
Notary Public
Dated: January 30, 2018

Page 429

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it. You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

ACKNOWLEDGMENT OF DEPONENT

I,_____________________, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_______________________________________

Vincenzo Salpietro, MD DATE

Subscribed and sworn to before me this

________ day of _______________, 20 _____.

My commission expires: _______________

Notary Public



-------

ERRATA

-------

PAGE LINE CHANGE



-------

LAWYER'S NOTES

-------

PAGE LINE