# Exhibit 80

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| KATRINA DAWN COPLEY, | ) | |
| PLAINTIFF, | ) | |
| vs. | ) | Civil Action No. 3:14-cv-00406 |
| BAYER HEALTHCARE PHARMACEUTICALS INC., BAYER PHARMA AG AND BAYER OY, | ) | |
| DEFENDANTS. | ) | |

CONFIDENTIAL

DEPOSITION OF FREDERICK W. FRAUNFELDER, M.D.

TAKEN ON BEHALF OF THE DEFENDANTS

APRIL 12, 2016

REPORTED BY ANITA R. CATHCART, CCR

SEE INDEX PAGE 2

# INDEX


| | PAGE NO. |
|---|---|
| INDEX | 2 |
| INDEX OF EXHIBITS | 3 |
| DEPOSITION INFORMATION | 4 |
| APPEARANCES | 5 |
| EXAMINATIONS | |
| DIRECT EXAMINATION BY MR. IMBROSCIO | 7 |
| CROSS EXAMINATION BY MR. JONES | 227 |
| REDIRECT EXAMINATION BY MR. IMBROSCIO | 246 |
| RECROSS EXAMINATION BY MR. JONES | 250 |
| NOTARIAL CERTIFICATE | 251 |
| SIGNATURE PAGE | 253 |
| CORRECTION SHEET | 254 |
| SIGNATURE LETTER | 255 |

| EXHIBITS | MARKED | IDENTIFIED |
|---|---|---|
| DEFENDANT'S EXHIBIT 1 Deposition Notice | 6 | 23 |
| DEFENDANT'S EXHIBIT 2 Dr. Fraunfelder's Report | 6 | 23 |
| DEFENDANT'S EXHIBIT 3 Printouts From the WHO | 6 | 61 |
| DEFENDANT'S EXHIBIT 4 Fraunfelder A(1) Table From Dr. Fraunfelder's Software | 6 | 61 |
| DEFENDANT'S EXHIBIT 5 Fraunfelder B, Norplant Label | 6 | 61 |
| DEFENDANT'S EXHIBIT 6 Fraunfelder C, PARAGARD Adverse Event Form | 6 | 62 |
| DEFENDANT'S EXHIBIT 7 Dr. Fraunfelder's Reliance List | 6 | 51 |
| DEFENDANT'S EXHIBIT 8 Uppsala Monitoring Centre VigiLyze Search | 43 | 43 |
| DEFENDANT'S EXHIBIT 9 Search Table | 43 | 43 |
| DEFENDANT'S EXHIBIT 10 Bayer Document Association Between Mirena and IIH | 70 | 71 |
| DEFENDANT'S EXHIBIT 11 Excerpts From ARVO 2015 Annual Meeting Abstracts | 73 | 73 |
| DEFENDANT'S EXHIBIT 12 Etminan Article | 74 | 74 |
| DEFENDANT'S EXHIBIT 13 Document from Dr. Fraunfelder's File | 76 | 76 |
| DEFENDANT'S EXHIBIT 14 Page 201 of Dr. Fraunfelder's book Drug-Induced Occular Side Effects | 160 | 160 |
| DEFENDANT'S EXHIBIT 15 Martinez Case report | 193 | 193 |
| DEFENDANT'S EXHIBIT 16 Dr. Fraunfelder's CV | 227 | 227 |

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

KATRINA DAWN COPLEY, )
)
)
PLAINTIFF, )
)
)
vs. ) Civil Action No.
) 3:14-cv-00406
)
BAYER HEALTHCARE )
PHARMACEUTICALS INC., )
BAYER PHARMA AG AND BAYER )
OY, )
)
)
DEFENDANTS. )

CONFIDENTIAL

DEPOSITION OF FREDERICK W. FRAUNFELDER, M.D., produced, sworn, and examined on April 12, 2016, between the hours of eight o'clock in the forenoon and six o'clock in the afternoon of that day at the medical offices of Mason Eye Institute, 1 Hospital Drive, Columbia, Missouri, before Anita R. Cathcart, a Certified Court Reporter and Notary Public in and for the County of St. Charles, State of Missouri in a cause now pending before the United States District Court for the Middle District of Tennessee, Nashville Division between KATRINA DAWN COPLEY, PLAINTIFF, versus BAYER HEALTHCARE PHARMACEUTICALS INC., BAYER PHARMA AG AND BAYER OY, DEFENDANTS, taken on behalf of the Defendants.

A P P E A R A N C E S

ATTORNEY FOR PLAINTIFF:
JONES WARD
Lawrence L. Jones, II, Esq.
Christina Natale, Esq. (Co-counsel)
312 S. Fourth Street
6th Floor
Louisville, Kentucky 40202
502-882-6000

ATTORNEY FOR DEFENDANTS:
COVINGTON & BURLING LLP
Michael X. Imbroscio, Esq.
Elizabeth A. Spavins, Esq. (Co-counsel)
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
202-662-5694

WITNESS:
FREDERICK W. FRAUNFELDER, M.D.

COURT REPORTER FOR THE DEPOSITION:
Anita R. Cathcart, CCR
Jim Ross, Videographer

undergraduate student at Baylor I had written about adverse drug reactions and so I have large experience in this area. And probably sixth is that I'm the world's expert on spontaneous reports on pharmacovigilance in ophthalmology. Probably people would agree with that. And so my opinion on that is based on all of those things.

Q. Okay. Let me make sure I can just -- Just so I understand it, first item was Spontaneous Adverse Event Reports. Is it fair to say that your -- your sixth item which was, I think you said your -- your experience, those are -- those are essentially related; is that fair to say?

A. All six of them?

Q. No, no, no. I mean, the first item was based on your review of the spontaneous reports, correct?

A. Yes.

Q. And then your Item 6 was you relied on your -- your experience in reviewing Adverse Event Reports and those two are basically the same, right? It's your experience in reviewing the Adverse Event Reports?

A. Well, I mean, there's -- What I mean is I reviewed the Adverse Event Reports on Mirena and PTC.

Q. Yeah.

* * *

A. In this report --

Q. Be happy to look at your opinion. Yes. 105 cases sound -- sound familiar?

A. Yes.

Q. Okay. And we're going to talk about how you got to that in a moment but my question is: Is it your testimony that this is now a supplement, you're purporting this a supplement to the spontaneous report aspect of your basis of your opinion?

A. Yes.

Q. Okay. Do you recall what searches Brea did, what the keywords for the search she did last night for you?

A. I can make an educated guess if you want me to?

Q. Yeah, sure, I mean.

A. So she would have searched pseudotumor cerebri, intracranial hypertension, she would have associated with Levonorgestrel and maybe also the tradenames like Mirena, Norplant, Skyla. Hydrocephalus she might have also included in that search. I'm not positive.

Q. Let -- let -- let me ask you about -- about the -- It's an issue on terminology. You say in your report that papilledema is, I think, the hallmark

symptom of IIH, fair?
A. Fair.
Q. But I think you also say that papilledema can be caused by other conditions that are not IIH, fair?
A. Yeah.
Q. I believe -- I believe you gave three -- And I'm just kind of trying to summarize your report. I think you said brain tumor?
A. Yeah.
Q. Meningitis, infection?
A. Yes.
Q. And I think thrombosis?
A. Yeah, blood clot. Uh-huh.
Q. And so if a patient had papilledema and then has one of those conditions, is that effectively exclusionary? In other words, if you have those you don't have IIH, by definition?
A. That's a good question and --
Q. That's why I get paid the big money, to ask good questions.
A. Yeah, that's right. I suppose it's -- You know, it would be exceedingly rare for you to have both at the same time, although you can have measles and a broken leg but it's -- it would be rare to have them.

Q. So in other words, if someone's got papilledema and they did an MRI and they see a brain tumor, it's probably fair they don't have a pseudotumor --

A. Right.

Q. -- cerebri? They've got the tumor cerebri, so to speak.

A. The vast majority of the time, correct.

Q. Okay. Got it. The same with thrombosis, the thrombosis itself can cause the pressure that --

A. Yes. Yes.

Q. Okay. Got it. Let me just try to herd some more cats here. Let me -- I'm going to show you what's been marked as Exhibit 7 which is -- One second. Okay. That's fine.

Let me show you what's been marked Exhibit 7 which is what you've given to us which is the, what we lawyers call reliance list for -- associated with -- with your report. Take a look and see if it looks familiar.

MR. IMBROSCIO: And guys, I have copies of all of these, if you want them. I suspect you have them all as well but if you would like a copy I'm happy to provide one to you.

MR. JONES: Thank you.

* * *

Mr. Jones or one of his colleagues?

A. I'm going to preempt this line of questioning by saying all of my answers are going to be pretty inexact so this first answer is I don't recall who contacted me from their Jones Ward office.

Q. Okay. Someone from his office did?

A. Yes.

Q. Okay. And I'm going to give you a standing instruction which is I don't want you to tell me the substance of your conversations that you had with any of the lawyers, just so that's clear.

A. Okay.

Q. But I do want to ask some questions about timing, just to get some -- some parameters. Your report was dated in January, so three or four months ago, of 2016. Were you contacted by someone from the Jones Ward office, prior to that obviously?

A. Yes.

Q. What's your best estimate of how long before you issued your report that you had been in contact with the office?

A. I'm making an educated guess.

Q. Uh-huh.

A. But I think I was in Oregon.

Q. Okay. So that --

A. I'm looking for clues on this one --
Q. That would put --
A. -- but I think I was in Oregon.
Q. That would put it back in 2-- at least back as far as 2014?
A. Yeah.
Q. Okay.
A. It could be.
Q. And you prepared your report or you submitted a report in January of '16?
A. Uh-huh.
Q. Approximately how much time did you spend working on the report, whether reviewing something the lawyers wrote or drafting something yourself or some combination?
A. I don't recall.
Q. Let me ask you this: How much -- This may be the easier way. You may know this, given your MBA background. How many hours have you charged the Jones Ward firm for your work on the IIH litigation?
A. I don't think I've submitted them any bills.
Q. Okay. Do you -- Who keeps track -- How do you keep track of your time for --
A. The secretaries.
Q. Someone here or someone in Oregon or?

* * *

nothing special other than doctors have a -- they have the expertise to prescribe medicines?

A. Yes.

Q. Okay. You're not suggesting that you can offer an opinion about what is a better medicine for a given patient than any other doctor because you're an expert in drug prescribing?

A. I think my opinions on drug prescribing is probably better than a lot of doctors and maybe worse than some.

Q. Okay. But -- Understood. You don't purport to bring any special expertise other than your general experience in what medicines might be good for a given patient?

A. That's a hard question, Michael. I would say my expertise is based upon my experience. That's an accurate statement. My experience in drugs though would -- would eclipse most human beings or doctors' experience within drugs, so whether that makes me more of an expert or not. I would say it does.

Q. But, for instance, obviously with respect to medicines that are used to treat ophthalmology -- ophthalmologic conditions, you would have special expertise I would assume?

A. Yes.

* * *

which was Monday night?
A. Yeah.
Q. So roughly ten hours leading up to the deposition, fair?
A. Fair.
Q. And then do you think you spent overall more than 40 hours?
A. No.
Q. Okay. How about more than 30 hours?
A. No.
Q. More than 20 hours?
A. I don't think so.
Q. Okay. So basically the ten hours that you're -- I'm saving you money here. I'm getting him down. So you spent roughly ten hours in the immediate up -- lead-up of this deposition, seven on Saturday and two roughly last night?
A. Yeah.
Q. And then prior to that time in the preceding year and a half, including drafting your report, roughly another ten hours, fair?
A. It could be -- could be pretty close.
Q. Okay. That's all --
A. Thanks for helping me with that.
Q. Yeah. That's all I'm looking for.

* * *

A. I think it's the body of reports, not just one.

Q. Okay. So it's the number of reports that you have identified?

A. I wouldn't say the total number because some reports may not be valuable at all.

Q. Okay. Would it surprise you to know that the output of some of these reports are not in fact cases involving Mirena?

A. No, it wouldn't surprise me.

Q. Does it surprise you that some of these reports are cases that actually are not pseudotumor cerebri or IIH?

A. That would not surprise me.

Q. Is it -- Would it be the normal practice to go through the report and effectively adjudicate them, put them into separate piles, to find out which are the cases that bear relevance and which are the ones that do not bear relevance?

A. Yes.

Q. In fact the adjudication process is a crucial part of filtering through raw adverse event information, correct?

A. Yes, the kind of thing that I do.

Q. Yeah, that -- I figured you would. Had you

-- Have you done any adjudication of the reports that are reflected in this exhibit, up to this point?
A. I think I have.
Q. Okay.
A. I don't recall what I've done though. It would have been the many months ago.
Q. Is there any output that you can share with me of which reports you've thought were relevant and which ones you thought were not relevant?
A. In general, as an overall opinion, I think the ones that are relevant are the ones that have more demographic information. So the ones that have age, gender, dosage, duration, dechallenge, those are things that I value and when I adjudicate it -- You know, and I -- I adjudicate it probably before I write a research paper on it.
Q. But --
A. And I -- And I -- Or before I -- You know, when I'm being asked by a law firm to form an opinion and so I would have done that but I -- I have been busy the last few days and I haven't done it recently.
Q. Adjudicating large numbers of Adverse Event Reports can at times be an onerous process?
A. Yeah, it is a process that requires looking at hundreds of pages of documents and I would agree

* * *

Q. All right. Dr. Fraunfelder, my very capable and smart associate says I need to ask a couple of questions that I missed earlier, to be more precise. Do you agree that being overweight, in other words having a body mass index between 25 to 29, is a risk factor for IIH?

A. Yes.

Q. And do you believe that obesity, generally defined to be a BMI above 30, to also be a risk factor for IIH?

A. Yes.

Q. And as a general principle the greater level of body mass index or obesity the greater the risk?

MR. JONES: Objection to form.

A. Yeah, I just don't know that answer. You've asked me that before. I don't --

BY MR. IMBROSCIO:

Q. Okay.

A. I don't know if that association exists or not.

Q. Okay. Let me ask you about Dr. Etminan's paper and then we'll wrap up. You have not spoken with Dr. Etminan, right?

A. No, sir.

Q. Dr. Etminan does two different analyses,

correct? Do you remember?
A. No, I don't remember. Let's read it. Okay.
Q. Okay. Dr. Etminan does two different analyses, correct?
A. Yes.
Q. He does analyses of Adverse Event Reports derived from FAERS, true?
A. Uh-huh. Yes.
Q. And he does a reporting odds ratio of that data, correct?
A. Yes.
Q. And as you say in your report, "A reporting odds ratio like a PRR or an IC are ways to detect signals looking at large amounts of reports," correct?
A. It's a strategy and IC stands for Information Component. It's a -- It's a quantitative number that the WHO uses.
Q. Okay. They are all ways to sort through and look for signals in large amounts of data, correct?
A. Yes.
Q. And these kinds of techniques can be used for signal generation, true?
A. So those techniques are used to try and -- I -- I think probably the correct way to think about it is that they are looking at signals and trying to

* * *

NOTARIAL CERTIFICATE

STATE OF MISSOURI )
) SS
COUNTY OF ST. LOUIS )

I, ANITA R. CATHCART, a Certified Court Reporter and Notary Public before the County of St. Charles, State of Missouri, do hereby certify that pursuant to notice came before me at the Medical Offices of Mason Eye Institute, 1 Hospital Drive, Columbia, Missouri,

FREDERICK W. FRAUNFELDER, M.D.,

who was by me first duly sworn to testify to the truth and nothing but the truth of all knowledge touching and concerning the matters in controversy aforesaid in this cause; that the witness was thereupon carefully examined under oath and said examination was reduced to writing by me; that the witness chose to read his transcript and check the testimony thereof for accuracy, with agreement of all counsel; that this deposition is a true and correct record of the testimony given by the witness, and that this deposition is now returned to the Court.

I further certify that I am neither attorney nor counsel for nor related by any of the parties to the action in which this deposition is taken; further,

that I am not a relative or Plaintiff of any attorney or counsel employed by the parties hereto or interested in this action.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of April, A.D., 2016.

My commission expires March 18, 2020.

__________________________________________

I, FREDERICK W. FRAUNFELDER, M.D., do hereby state that I have read the foregoing questions and answers appearing in this transcript of my Deposition; that this is a true and accurate report of said answers given in response to the questions appearing herein.

IT IS FURTHER STIPULATED AND AGREED, between Counsel, that this Deposition may be signed before any Notary.

________________________________________

FREDERICK W. FRAUNFELDER, M.D.

(REPORTED BY: ANITA R. CATHCART)

C E R T I F I C A T E

STATE OF MISSOURI )
) SS
____________ OF ____________ )

Before me personally appeared FREDERICK W. FRAUNFELDER, M.D., known to me to be the person described in and who executed the foregoing instrument and acknowledged to and before me that she executed the said instrument in the capacity and for the purpose therein expressed.

WITNESS my hand and official seal this __________ day of _____________________, 2016.

_________________________________
NOTARY PUBLIC
State of Missouri

My Commission Expires: __________________________