**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**IN RE:**

**MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY LITIGATION (NO. II)**

***This Document Relates To All Actions***

**17-MD-2767 (PAE)**
**17-MC-2767 (PAE)**

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF DEAN M. CESTARI, M.D.**

# TABLE OF CONTENTS


**I. INTRODUCTION AND FACTUAL BACKGROUND .................................................. 1**

**II. LEGAL STANDARD ........................................................................................... 2**

**III. ARGUMENT ..................................................................................................... 3**

**A. Cestari's General Causation Opinions Should Be Excluded Because They Are Not Based On Any Reliable Principles Or Methods........................ 3**

**B. Cestari's Opinions Should Be Excluded Because His Principles And Methods Are Not Reliably Applied To The Facts............................................ 5**

1. Cestari Fails To Reliably Compare Data Supporting Other Substances Associated With PTC To The Data Supporting An Association Between LNG and PTC .......................................................................................... 6

2. Cestari Misrepresents The Relevance and Significance Of Studies Of PTC In Oral Contraceptive Users ................................................... 8

3. Cestari Fails To Support Or Quantify Alleged Demographic Differences Between Mirena Users And Users Of Other Substances Associated With PTC ......................................................................................... 10

4. Cestari's Opinions Regarding Mechanism of PTC Are Based In *Ipse Dixit* Rather Than Scientific Support........................................................ 11

5. Cestari's Testimony With Regards To Dechallenge and Rechallenge Is Unreliable As Applied To The Facts Of The Case ....................................... 12

**C. Cestari's Testimony Should Be Limited To His Expertise ............................ 15**

1. Cestari Lacks Expertise To Evaluate The Epidemiological Significance Of Case Reports And Studies .............................................................. 15

2. Cestari Lacks Expertise To Evaluate Study Design ...................................... 15

3. Cestari Lacks Expertise In Endocrinology, Pharmacology, Or Any Other Field Relevant To Disease Mechanism........................................................ 16

4. Cestari Is Unqualified To Make Clinical Claims About Mirena..................... 17

**D. Cestari's Opinions About Oral Contraceptives Are Also Confusing And Misleading, And Should Be Excluded Under Rule 403.......................... 18**

**E. Although Cestari Is Essentially A Rebuttal Expert, His Opinions Do Not Directly Address Plaintiffs' Experts' Opinions, And Are Therefore Unhelpful To The Trier Of Fact ........................................................... 19**

**IV. CONCLUSION ................................................................................................. 19**

# TABLE OF AUTHORITIES

**CASES**


*Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256 (Fed. 2nd Cir., 2002) 3, 5, 6

*Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.*, 222 F.Supp.2d 423 (S.D.N.Y., 2002) 4, 11

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) 2, 4, 5

*Diaz v. Johnson Matthey, Inc.*, 893 F.Supp. 358, 372-73 (D.N.J.1995) 3

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, (1997) 2

*Groobert v. President and Directors of Georgetown College*, 219 F. Supp. 2d 1, (D.D.C. 2002) 2

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir.1994) 3

*Jarvis v. Ford Motor Co.*, 92 Civ. 2900, 1999 U.S. Dist. LEXIS 10041 (S.D.N.Y. Jul. 6, 1999) 4

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) 2, 5, 18

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 2016 U.S. Dist. LEXIS 124109 (S.D.N.Y., 2016) 3, 15

*Mancuso v. Consolidated Edison Co. of New York*, 967 F.Supp. 1437 (S.D.N.Y., 1997) 3, 15

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) 3


**RULES**


Federal Rule of Civil Procedure 403 19

Federal Rule of Civil Procedure 702 passim

Plaintiffs move to exclude the opinions and testimony of Dean M. Cestari, M.D. ("Cestari") who has disclosed expert opinions on the Levonorgestrel ("LNG")-releasing Mirena® Intrauterine System ("Mirena") and its causative relationship with the medical condition pseudotumor cerebri ("PTC"), also known as idiopathic intracranial hypertension ("IIH"). Ex. A, Expert Report of Dean M. Cestari, M.D. ("Cestari Rpt."). In support of this Memorandum, Plaintiffs incorporate Plaintiffs' Omnibus Motion to Exclude the General Causation Testimony of Defendants' General Causation Expert Witnesses ("Plaintiffs' Omnibus Motion").

## I. INTRODUCTION AND FACTUAL BACKGROUND

On January 18, 2018, Defendants disclosed the reports of their retained experts, including that of Dean M. Cestari, M.D. Cestari is a neuro-ophthalmologist at Massachusetts Eye and Ear Infirmary, where he works as a treating clinician and surgeon. Cestari Rpt. at 1. The primary thrust of his opinions is that after a review of the medical literature documenting the association of LNG and Mirena to PTC, he finds the evidence of a causative relationship lacking. Cestari Rpt. at 22-23. In his report and deposition, Cestari takes issue with the methodologies and analyses of several publications relied upon by Plaintiffs' experts. Cestari Rpt. at 21-22; Ex. B, Videotaped Deposition of Dean. M. Cestari, M.D. ("Cestari Dep."). Although he is an experienced neuro-ophthalmologist, Cestari has no formal education, specialized training, or certifications in the fields of clinical study design, endocrinology, epidemiology, or obstetrics and gynecology beyond general medical school courses. Ex. C, Curriculum Vitae of Dean. M. Cestari, at 1-36; Cestari Dep. at 77:11-79:16, 148:16-151:13. In his report and testimony, Cestari opines on all of the above fields of medicine, touching on everything from the epidemiological value of adverse event reports, to flaws in the methodology of medical research, to the effectiveness of Defendants' contraceptive product. Cestari Rpt. at 11-19; Cestari Dep. at 124:17-23, 221:13-230:12.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 702 ("Rule 702") permits expert testimony if the subject of the testimony is relevant, the witness is qualified to express the opinions, and the proposed evidence upon which the witness bases the testimony is reliable or trustworthy. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-50 (1999). Courts are gatekeepers of expert evidence "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. at 152.

Expert testimony must also be trustworthy for it to be reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993). Four nonexclusive factors control the reliability of expert testimony: "(1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline." *Id*. at 593-94.

Likewise, the court should not admit opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 157 (1997), or that is based on his own methodology rather than a respected methodology. *Groobert v. President and Directors of Georgetown College*, 219 F. Supp. 2d 1, (D.D.C. 2002). "To warrant admissibility, however, it is critical that an expert's analysis be reliable at every step… [T]he *Daubert* requirement that the expert testify to scientific knowledge — conclusions supported by good grounds for each step in the analysis — means that any step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible." *Amorgianos v. National*

*R.R. Passenger Corp.*, 303 F.3d 256, 267 (Fed. 2nd Cir., 2002) (quoting *In re Paoli R.R. Yard PCB Litig*., 35 F.3d 717, 745 (3d Cir.1994)).

A doctor is not an expert in a medical field outside of his specialty without qualifications beyond his "medical education and his years practicing [in his field.]" *Mancuso v. Consolidated Edison Co. of New York*, 967 F.Supp. 1437, at 1442 (S.D.N.Y., 1997) ( quoting *Diaz v. Johnson Matthey, Inc.*, 893 F.Supp. 358, 372-73 (D.N.J.1995)). To offer opinion evidence, an expert must know the field he is discussing, not merely be qualified in any field: "It is well established that even if "a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 2016 U.S. Dist. LEXIS 124109 *36 (S.D.N.Y., 2016) (citing *Nimely v. City of New York*, 414 F.3d 381, 399 (2d Cir. 2005)).

## III. ARGUMENT

### A. Cestari's General Causation Opinions Should Be Excluded Because They Are Not Based On Any Reliable Principles Or Methods

For Cestari's opinions to be admissible under Rule 702, his opinions must be based on reliable principles or methods. While his report contains discussion of the literature tying LNG to the development of PTC, Cestari did not articulate any established or independent method to guide his analysis or develop his opinions. The closest his report comes to explaining his literature analysis method is a section called 'Levels of Scientific Evidence,' which consists of a thesis statement about certain pieces of evidence being more significant than others and six sentences outlining 'levels' or categories of evidence. Cestari Rpt. at 10. Cestari does not refer to any propagating authority for the 'Levels of Scientific Evidence' or explain how they are to be applied in a uniform manner. Lacking any other explanation of how Cestari reached the opinions in his report, it must be assumed that these 'Levels of Scientific Evidence' are the principles or method

he used to analyze the literature underpinning Plaintiffs' experts' opinions. However, throughout his entire discussion of the medical literature and the rest of his report, Cestari never again refers to these 'Levels of Scientific Evidence.' Cestari Rpt. at 11-18. In his entire deposition regarding his opinions on LNG and PTC, and how those opinions were formed, Cestari never at any point referred to the 'Levels of Scientific Evidence' to justify how he came to his opinions or put them into context.[1]

Without a unifying method to structure his analysis of the medical literature or establishing a benchmark which would prove or disprove Plaintiffs' experts' theory, Cestari's report proceeds to aimlessly pick at the body of medical literature indicating a causal relationship between LNG and PTC. *Id.* Cestari's review consists of merely reading the documents and pointing out what he perceives to be methodological flaws before summarily declaring that there is no reliable evidence that Mirena can cause PTC. Cestari Rpt. at 22-23. At times, Cestari seems to be demanding a history of peer-reviewed literature conclusively demonstrating that a causal relationship between LNG and PTC exists before Plaintiffs' experts can opine that such a relationship exists. This is not required for Plaintiffs' experts' testimony to be admissible: "[T]he mere fact that an expert's findings have not been peer-reviewed or published is not a sufficient reason to exclude it." *Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.*, 222 F.Supp.2d 423, 489 (S.D.N.Y., 2002) (citing *Jarvis v. Ford Motor Co.*, 92 Civ. 2900, 1999 U.S. Dist. LEXIS 10041, at *19 (S.D.N.Y. Jul. 6, 1999), aff'd in part, vacated in part, 283 F.3d 33 (2d Cir.2002)).

Cestari's review of the medical literature is not a reliable method or set of principles under Rule 702 and it cannot satisfy any of the *Daubert* reliability factors: 1) His qualitative literature

[1] The 'Levels of Scientific Evidence' were asked about once by Plaintiffs' Counsel, but Cestari never affirmatively tied them to his opinions. Cestari Dep. at 221:5-12.

analysis is wholly subjective and therefore cannot be tested; 2) The method of analysis does not appear to have been the subject of peer review or publication; 3) The potential rate of bias is enormous as there was no established procedure; and 4) Because this method of review appears to be self-designed, there is no acceptance of this type of literature review in the fields of epidemiology or clinical study design. Cestari's opinions are based on an unreliable qualitative analysis devoid of established principals or a guiding method, and therefore his report and testimony should be excluded under *Daubert* and *Kumho Tire Co.*

### B. Cestari's Opinions Should Be Excluded Because His Principles And Methods Are Not Reliably Applied To The Facts

An expert's testimony must be reliable in his application of principles and methods to the facts of the case at each step of his analysis in order to comply with Rule 702 under *Amorgianos,* 303 F.3d 256. To the extent Cestari's literature review represents a legitimate examination of the medical literature, it is not applied to the facts in a reliable, unbiased manner:

> Question: Is it fair to say that with a typical drug associations [*sic*] to disease process that you don't recalculate what the studies have provided to you, that you accept typically on face value what is presented by doctors and scientists in the field?Answer: I don't know that anybody does that. Well, maybe people do that. I don't know that anybody really should do that. That's why in medical school we learn basic statistics; we learn how to analyze methodology; we understand sound practices.
>
> Having said that, I think sometimes it depends on what the conclusions of the paper -- the conclusions are. So that if people are making drastic recommendations or drawing drastic conclusions, especially if they're the only one saying it, then you're really going to analyze it to make sure that their conclusions are valid and that you agree with them. So sometimes I think it depends on the extent of the conclusions that somebody is drawing.

Cestari Dep. at 76:13-77:10 (objection omitted). Therefore, so long as the author's conclusions are in line with Cestari's preexisting understanding of the topic and the methods "seem right" to him, he does not examine the study critically or consider how it could inform his interpretation of other medical literature at hand. As stated above, this is not a scientific method of any kind, but given

Cestari's approach it is certainly not "reliable at every step" and therefore his opinions must be excluded. *Amorgianos* 303 F.3d at 267.

### 1. Cestari Fails To Reliably Compare Data Supporting Other Substances Associated With PTC To The Data Supporting An Association Between LNG and PTC

Cestari's inconsistent analysis is most glaring in his discussion of other substances that he considers associated with or potential risk factors for the development of PTC, specifically Tetracyclines and Vitamin A. Cestari Dep., at 46:10-47:2, 65:1-6, 67:2-11. Cestari alleges that there are flaws that nullify the results of every single piece of medical literature supporting a relationship between LNG and PTC, Cestari Rpt., 10-23. yet it is his position that Tetracycline and Vitamin A are better documented risk factors for PTC than LNG. Cestari Dep., at 136:19-137:18, 199:7-16. While Cestari does facially compare the literature supporting the Vitamin A and Tetracycline associations with PTC to the literature supporting LNG's association with PTC, he does not do so uniformly or reliably.

For example, Cestari takes substantial issue with *An Estimation of the Risk of Pseudotumor Cerebri among Users of the Levonorgestrel Intrauterine Device* ("Valenzuela"), a peer-reviewed published retroactive analysis of the incidence of PTC among Mirena users relative to non-users. Ex. D, Valenzuela. Cestari argues that age-matching the cases and controls would have lowered the resulting PTC incidence rate among Mirena users and that the authors "underestimated" the Mirena exposure in the control groups.[2] Cestari Rpt., at 17. These errors, he speculates, would have negated the fact that PTC occurred 7.69 times more often in Mirena users than non-users in one group, and 3.9 times more often in Mirena users than non-users in the other group. Cestari

[2] Cestari's "underestimation" claim against Valenzuela misrepresents their methods. Valenzuela's authors did not "estimate" LNG-IUS exposure, they used billing data from the University of Utah system to identify women who had an LNG-IUS inserted within that system.

Rpt., at 17-18. He concludes by introducing allegedly contradictory data from other sources and goes on to make specific assertions that the elevated incidence rates of PTC in Mirena users disappear entirely if his perceived methodological flaws had been performed using his desired approach. Cestari Rpt., at 17-18. Notably, he does not show his math.

By contrast, when reviewing the literature documenting the association between Tetracyclines or Vitamin A and PTC, he did not rigorously examine the methods, discuss confounders, or check the statistical analysis in that literature. He even concedes that there are no studies that demonstrate that Vitamin A exposure cause PTC, which is the standard that he claims is required to establish an LNG-PTC association. Cestari Dep., at 46:10-47:2. Despite these omissions, he still concludes that Vitamin A use is a risk factor associated with PTC. 65:1-6. He did not perform a statistical analysis with respect to Tetracycline and IIH. Cestari Dep. at 75:3-18.

> Question: […] Can you think of any other exogenous substance that had a study done regarding association to a disease process in which you discounted the study because you recalculated the odds ratio yourself?
>
> [Objections and Re-reading of the Question]
>
> Answer: So I looked at the Daniels study and how they calculated their numbers for tetracyclines because this is very relevant to my practice. And I look at the methodologies that they used. And in my head just kind of -- again, same type of thing, you kind of ballpark it. So I'd say that in that study, I tried to confirm the data as best I can. But I can't -- I don't know that there's another study on an exogenous agent, the way you're asking the question, that would have that data available to me to actually recheck.

Cestari Dep., at 230:24-231:20.[3] Cestari's position on medical literature is clear: If data on a subject is new or if he has not heard of it, he will "dig deeper" and analyze the methods, check the math, and perhaps investigate alternative exposure rates as he did in his recalculation of the

[3] Again, it is worth noting that reading medical literature, reviewing methodology and "rough numbers" in one's head, and "ballparking" one's math to reach scientific conclusions that are by definition quantitative is not a sufficiently reliable principle or method to satisfy Rule 702.

incidence rates in Valenzuela. Cestari Dep. at 235:9-236:1; Cestari Rpt. at 17-18. If the conclusions match what he expects them to be, he does not. Cestari Dep. 76:13-77:10.

Since Cestari's report and testimony do not contain a statistical analysis of the support for Tetracycline- and Vitamin A-induced PTC, it follows that Cestari's faith in those associations stems from something other than the medical literature. When asked about this in his deposition, Cestari refers to his own experience with Tetracycline- and Vitamin A- induced PTC as well as the consensus of the medical community. Cestari Dep. at 46:10-20, 112:17-24. This demonstrates that he applied different analyses to the evidence of PTC with LNG than he did to the evidence of PTC with Tetracyclines and Vitamin A. To evaluate whether LNG can cause PTC, he picked apart the methods and explanations of every piece of literature supporting that conclusion and attempted to explain how their conclusions were, in his opinion, void. But he holds the evidence of Tetracycline- and Vitamin A-induced PTC to a much lower standard based on his own experience and his understanding of what the rest of the medical community believes. This inextricably embeds into Cestari's review method an inconsistent and unreliable predisposition for or against certain pieces of medical literature from the outset of his analysis. This failure to use a uniform method to compare the data underlying what he holds to be true to the bases for Plaintiffs' experts' opinions means his literature review is by design one-sided and unreliable in its analysis of the facts. For that reason, his opinions and testimony should be excluded.

### 2. Cestari Misrepresents The Relevance and Significance Of Studies Of PTC In Oral Contraceptive Users

Likewise, Cestari differentially reviews the literature supposedly *disproving* a causal association of any substance to PTC and the literature supporting the association of LNG and PTC. Throughout his testimony, Cestari repeatedly compares the relationship between PTC and LNG to the relationship between PTC and oral contraceptives ("OC") as a class. Cestari Rpt. at 15, 22.

These analogies to the LNG-PTC relationship are baseless for numerous reasons. First, the studies that he cites to do not name the progestins that were contained in the OC studied. It is impossible to know from review of those documents whether any of those patients used an OC that contained LNG. Even if Cestari were correct in his assertion that OC do not cause PTC, these studies are therefore irrelevant to the question of whether Mirena can cause PTC. Moreover, even those OC may contain LNG are combination products, meaning that they also contain an estrogen component. As admitted by numerous Bayer employees, designees, and experts in this matter, estrogen is a complicating factor in LNG pharmacology for many reasons, making Cestari's analysis an inappropriate apples-to-oranges comparison. Cestari does not critically examine this fact in his analysis, making his use of these studies unreliable.

Moreover, Dr. Cestari notes "the importance of controlling for established risk factors – age, gender, weight gain, and BMI," Cestari Rpt. at 11, without even noting, much less addressing with a reliable methodology, that none of his cited studies involving OC controlled at all for weight gain or BMI. Notably, Dr. Cestari later criticizes Valenzuela for comparing BMI across the cases and controls, rather than doing a patient-by-patient control for weight gain or BMI, Cestari Rpt. at 15, despite his earlier, unquestioning reliance on five studies that did absolutely nothing to control for these issues.

Regardless, the "consistently confirmed" evidence Cestari cites regarding OC and IH, Cestari Rpt. at 11, is neither "consistent" nor "confirmatory:" all of the reports Cestari mentions are small case-control studies sin which an IH patient was matched to one or two controls solely on the basis of age and sex. None of these studies were sufficiently statistically powered to detect an association for PTC, which is why the p-values for Digre 1984 and Durcan 1988 were reported, respectively, "NS" as in "not significant," and "P > 0.4" Indeed, four of those studies actually

found an *increased* use of oral contraceptives among patients with IH.[4] Pieced together, these results betray a complete lack of coherent methodology, and form nowhere near a sufficient basis for Cestari to reach his conclusions about OC and IH, much less to reject the entire body of evidence of a causal relationship between Mirena and IH. Cestari's testimony regarding the studies on the incidence of PTC in OC users should be excluded, and to the extent that he relied on these studies in reaching his opinions regarding Mirena, those opinions should likewise be excluded.

**3. Cestari Fails To Support Or Quantify Alleged Demographic Differences Between Mirena Users And Users Of Other Substances Associated With PTC**

Throughout Cestari's report and deposition he frequently alleges that the demographics (age, sex, and BMI) of the patients that he believes have PTC caused by exogenous substances are 'atypical,' but that the patients in the studies and reports associating LNG with PTC are not 'atypical.' Cestari Rpt. at 14-15, 21-23; Cestari Dep. at 46:10-48:16, 55:2-58:7, 62:25-64:24, 70:2-22, 110:11-111:3, 153:14-154:17, 167:5-168:3, 194:8-22, 234:1-235:8. Essentially, Cestari argues that if LNG caused PTC, the patients would not resemble the "typical" PTC patient, an obese female of reproductive age. He therefore interprets the alleged absence or lack of "atypical" patients as evidence against an LNG-PTC association. Cestari Rpt. at 14-15; Cestari Dep. 234:1-235:8. While this argument is facially engaging, it is entirely lacking in support or quantitative analysis and his conclusion is therefore erroneous.

Regarding his conclusion that patients with Mirena-induced PTC should be "atypical," Cestari testified that: "the patient population should look different," and cited to medical literature regarding Tetracycline-induced PTC. Cestari Dep. at 47:3-19. Yet, when pressed on the issue,

[4] For Digre 1984, 6/11 cases compared to 5/11 controls; for Durcan 1988, 17% of patients compared to 15.6% of the population; Radhakrishnan 1993 found an elevated odds ratio for OC of 1.39 (95% CI 0.63-3.04); and Ireland 1990 found an elevated odds ratio as well for OC of 1.80 (0.42-7.64). For the only remaining study, Giuseffi 1991, 20% of IH patients used OC compared to 15% of controls, for an odds ratio of 0.6 (95% CI, 0.2-1.8).

Cestari conceded that an obese woman of childbearing years could still develop Tetracycline-induced PTC, again making clear that his analysis is inherently biased *against* a finding that LNG is capable of causing PTC. Cestari Dep. at 50:5-9.

Moreover, Cestari fails to provide *any* statistical analysis within his report to support *either* of his necessary premises: 1) that Mirena users are for any reason *more likely* to be at a higher background risk for development of PTC; and 2) that Mirena users who develop PTC *are* in fact at a higher background risk for development of PTC. Rather, Cestari hastily accepts these qualitative premises as fact before blindly applying them to his apparently quantitative analysis. Yet, again, Cestari never performed *any* statistical analyses to explain *how*, or *how much*, the application of what he views as the "correct" data would impact the results of Valenzuela, or anything else for that matter. Thus, Cestari's conclusions regarding the demographics of Mirena users with or without PTC are logically flawed and lack even a scintilla of actual support and should be excluded.

**4. Cestari's Opinions Regarding Mechanism of PTC Are Based In *Ipse Dixit* Rather Than Scientific Support**

Cestari's report does not attempt to address Plaintiffs' experts' actual opinions regarding the mechanisms by which LNG, or anything else, may cause PTC. Cestari Rpt. at 9, 20-21. While he does admits that "[i]n some case reports and animal studies, androgen dysregulation has been proposed as a potential underlying pathomechanism to explain IIH[,]" he disregards these studies because they have not been "identified as the specific change that drives IIH risk[.]" Cestari Rpt. at 20. Once again Cestari attempts to hold Plaintiffs' theories to an unreasonable standard far afield of what is required for admissibility. *See generally Astra Aktiebolag*, 222 F.Supp.2d 423.

As noted *supra*, and in Plaintiffs' Omnibus Motion, Dr. Cestari raises a variety of hypothetical objections to Valenzuela 2017, but makes no effort to evaluate how those objections would have changed the actual results. Necessarily, Dr. Cestari must use his own *ipse dixit* rejection of Valenzuela to justify why he performed only a cursory examination of the mechanism described by Plaintiffs' experts. Thus, he concludes: "[m]ost importantly, the plaintiffs' experts have no reliable clinical data that supports their various mechanism theories." Cestari, p. 21. If there is a "method" present in Cestari's analysis, it is simply rejecting clinical data and then using his own rejection of *clinical* data as a basis for not evaluating the *mechanism* data. It is only through this sort of unscientific circular reasoning that Dr. Cestari can reach absurd, counterfactual conclusions seemingly written for the sole purpose of supporting Defendants' *Daubert* brief such as: "there is absolutely no credible evidence of a causal relationship in the medical literature." Cestari Rpt. at 22. His opinions on Plaintiffs' mechanism opinions completely lack any discernable methodology or support, are entirely unscientific, and must be excluded.

**5. Cestari's Testimony With Regards To Dechallenge and Rechallenge Is Unreliable As Applied To The Facts Of The Case**

Cestari discusses the presence or lack of dechallenge and rechallenge in case reports and studies as an important factor in his analysis of case reports, and in his ultimate opinions in this case. Cestari Rpt. at 13-14, 21-22. Cestari Dep. at 47:3-48:4, 136:19-137:3, 151:14-154:17. Cestari defines dechallenge as when withdrawal of a drug triggers a resolution of a condition, and rechallenge as when reintroduction of a drug causes a recurrence of a condition. Cestari Rpt. at 13. He describes these relationships as indicia that there is a causal association between the drug and the condition, but also inverts this analysis to argue that a lack of resolution with withdrawal or a resolution without withdrawal indicates there is no causal association between the drug and the

condition. Cestari Rpt. at 13-14, 22. The issue with Cestari's analysis is that the same factors in LNG-PTC dechallenge cases that lead him to consider those cases invalid as evidence of a causal relationship are factors that are present in virtually all cases of PTC and treatment thereof, *i.e.*, the interplay of multiple risk factors, the chronic and recurring nature of PTC, and the therapeutic effect of treatment. Yet, Cestari again takes these alleged flaws in the data for granted as they apply to substances that are not Mirena. For example, he never addresses whether these factors confound an association between PTC and Tetracyclines or Vitamin A, despite his insistence that these other associations are more well-founded.

Given Cestari's characterization of childbearing age, obesity, female sex, and certain substances as risk factors of PTC as opposed to causes of PTC, there is no methodology by which Cestari can argue that removal of any one risk factor could place the blame on or absolve any risk factor in determining what caused a particular individual's PTC. Cestari Dep. at 72. For example, throughout his testimony Cestari implies that obesity is the predominant cause of PTC. However, in a study in which Cestari was a co-investigator, weight loss without other treatment among PTC patients did not cause improvement in headache disability or visual acuity. Ex. E, *Effect of Acetazolamide on Visual Function in Patients With Idiopathic Intracranial Hypertension and Mild Visual Loss*, at 1647 ("2014 Wall"). Yet, Cestari does not apply the same, apparently common sense, analysis to his own work in the field as it applies to treatment of PTC.

Another problem with Cestari's dechallenge analysis in the context of this case is the fact that PTC is a chronic condition, and even if symptoms resolve completely for a time, a substantial percentage of patients have a recurrence in the condition later in life. Cestari Dep. 68:18-69:7. Given that PTC patients have this predisposition, a recurrence in symptoms is quite possibly meaningless with respect to the cause of the initial onset, but under Cestari's interpretation, it

would falsely indicate a 'negative dechallenge' and discount the role of any risk factors, exogenous or otherwise, in the initial PTC onset.

Cestari explains in both his report and deposition that most treatments of PTC involve removing CSF from the skull or decreasing CSF production to relieve intracranial pressure. Cestari Rpt. at 7-8, Cestari Dep. at 89:15-90:8, 154:18-157:2. Indeed, the diagnostic procedure itself, a lumbar puncture, can temporarily treat patients' symptoms because it removes CSF from the skull, decreasing intracranial pressure. Cestari Rpt. at 7. Without any support, Cestari claims that "rarely, this diagnostic procedure can provide long lasting therapeutic benefits such that a patient does not need additional medical or surgical treatments." Cestari Rpt. at 7. Under Cestari's dechallenge analysis, the very procedure that he believes is necessary for proper diagnosis automatically confounds dechallenge, and forecloses the possibility of determining what caused the patient's condition. Cestari Rpt. at 22; Cestari Dep. at 199:19-200:18.

Thus, Cestari's discussion of dechallenge is a paradox masquerading as an analysis. In the same paragraph of his report Cestari argues that patients who left the Mirena in place and had symptoms resolve after lumbar puncture are evidence that Mirena was not the cause of their PTC without even considering whether those individuals were simply, temporarily treated. Cestari Rpt. at 22. Cestari's use of the dechallenge analysis is utterly meaningless and unreliable as applied to the facts of the case. Therefore, Cestari's opinions on dechallenge and rechallenge should be excluded. To the extent that Cestari relied on his conclusions about dechallenge and rechallenge in reaching his overall opinions, those opinions should likewise be excluded.

### C. Cestari's Testimony Should Be Limited To His Expertise

Cestari discloses a wide array of opinions and conclusions spanning numerous fields of medicine. While he may be a qualified expert neuro-ophthalmologist, the opinions he seeks to provide extend far beyond neuroophthalmology. To the extent that his report and testimony make conclusions outside of the field of neuro-ophthalmology and on topics he is not qualified to opine on, those conclusions must be excluded. *Mancuso*, 967 F.Supp. at 1437. *LVL XIII Brands, Inc.*, 2016 U.S. Dist. LEXIS 124109 at *36. Likewise, to the extent that he relied on those conclusions in reaching his overall opinions, those opinions should also be excluded.

#### 1. Cestari Lacks Expertise To Evaluate The Epidemiological Significance Of Case Reports And Studies

Cestari should not be allowed to testify about the epidemiological significance of case reports and studies. He is not an epidemiologist by profession or by training. Cestari Rpt. at 1; Cestari Dep. at 77:11-13. He has not taught courses on epidemiology or published papers or book chapters on epidemiology. Cestari Dep. at 77:14-78:16. Cestari has taken no courses on epidemiology or biostatistics since he graduated from medical school in 1998. *Id*, at 78:17-79:5; Nonetheless, the opinions in his report and deposition almost exclusively rely upon his conclusions about whether or not the available case reports and studies are sufficient epidemiologic evidence that a causal relationship exists. Because he lacks any relevant qualifications, Cestari should not be allowed to testify about whether the case reports and studies examining the association of LNG and PTC amount to evidence of a causal relationship.

#### 2. Cestari Lacks Expertise To Evaluate Study Design

Likewise, Cestari should not be allowed to testify about the strengths or weaknesses of studies or opine about how those strengths and weaknesses would affect the outcome of those studies. Cestari does so, improperly, in several ways: 1) offers multiple opinions on how the

Valenzuela study was flawed, 2) speculates that if it were not flawed the results would have changed, and 3) concludes that the results would have changed to reduce the odds ratios below a statistically significant increased risk. Cestari Rpt. at 16-18; Cestari Dep. at 221:13-231:20. Cestari is not qualified to offer any of those opinions, which is clear from his complete failure to even *attempt* a statistical adjustment to support his necessarily quantitative conclusion. When asked about whether controlled studies to determine possible drug-related mechanisms were feasible, Cestari advised that he would have to ask someone who designed clinical trials to answer that question. Cestari Dep. at 143:1-9. Thus, Cestari is admittedly unqualified to answer basic questions about study design and its implications outside of his prepared report, calling into question how these opinions were even formed. Cestari's opinions on study design, study methodology, and the effects of alleged flaws in methodology on study results should all be excluded because he completely lacks qualifications to offer these opinions. To the extent that he relied on his conclusions about study design in reaching his overall opinions, those opinions should likewise be excluded.

### 3. Cestari Lacks Expertise In Endocrinology, Pharmacology, Or Any Other Field Relevant To Disease Mechanism

Cestari should not be allowed to testify about the viability of the endocrinological or hormonal mechanisms of causation advanced by Plaintiffs' experts. Cestari is not an endocrinologist or pharmacologist, and his expertise in general neuro-ophthalmology, *i.e.*, the diagnosis and treatment of the condition, in no way qualifies him to testify about the mechanism of disease. Prior to his deposition in this matter, Cestari had never testified or written any book chapters about sex hormones. Cestari Dep. at 149:9-25. Asked if he had any specialized training in sex hormones, Cestari qualified his own expertise, stating that he is "a board-certified neurologist, ophthalmologist. [He] [is] aware of the literature that's related to sex hormones as

they are relevant to neuro-ophthalmic disease." Cestari Dep. at 148:23-149:4. Mere awareness of literature does not make Cestari an expert in the field of medicine discussed in that literature. Clearly, Cestari has not "employ[ed] the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co*., 526 U.S. at 152. Cestari's opinions on the viability of the endocrinological and/or hormonal mechanisms of causation advanced by Plaintiffs' experts should be excluded because he lacks any qualifications in any relevant field. To the extent that he relied on his conclusions about those mechanisms in reaching his overall opinions, those opinions should likewise be excluded.

**4. Cestari Is Unqualified To Make Clinical Claims About Mirena**

Cestari makes several statements throughout his report and deposition with regards to Mirena. For example, Cestari claims that: 1) most women have Mirena in place for at least three years; 2) Mirena is preferentially prescribed to overweight women;3) Mirena users do not gain weight; and 4) the LNG blood concentration is highest in the first few months after insertion and declines steadily thereafter. Cestari Dep. at 124:23, 126:13-18; Cestari Rpt. at 14, 18, 21. Cestari is not qualified to make these statements as he is not an Obstetrician or Gynecologist, has never prescribed Mirena or any other birth control, and has only reviewed the Mirena packet insert information in the context of this lawsuit. Cestari Dep. at 113:14-17, 150:25-151:5. Cestari has no clinical experience with the product or its users from which to draw his first three conclusions, and his claims about weight gain and blood concentrations are contradicted by the Mirena Prescribing Information itself. Weight gain is listed as an adverse reaction in the Prescribing Information, and according to the Pharmacokinetics section LNG blood concentrations do not peak and begin to decline until two years after insertion. Ex. F, 2017 Mirena Label at 16, 19. Cestari lacks any relevant experience or qualifications to support these opinions, and as such they should be

excluded. To the extent that he relied on these conclusions in reaching his overall opinions, those opinions should likewise be excluded.

**D. Cestari's Opinions About Oral Contraceptives Are Also Confusing And Misleading, And Should Be Excluded Under Rule 403**

In addition to qualification and indicia of reliability, "[t]hroughout, a judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules." *Daubert*, 509 U.S. at 595. As the Supreme Court explained: "'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'" *Id.* (internal citation omitted). *See also Arista Records LLC v. Lime Grp. LLC*, No. 06 CV 5936 (KMW), 2011 U.S. Dist. LEXIS 47416, at *15 (S.D.N.Y. Apr. 29, 2011) (quoting *Nimely v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005)) ("The Rule 403 inquiry is particularly important in the context of expert testimony, 'given the unique weight such evidence may have in a jury's deliberations.'") Specifically, the district court has authority to exclude expert testimony under Rule 403, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 566 (S.D.N.Y. 2007); *see also THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230 (S.D.N.Y. 2010).

Cestari opines about the significance of studies allegedly showing no association between use of OC and PTC, as discussed in §B2 *supra*. These opinions have immense potential to confuse the issues and mislead the jury. As discussed in §B2*supra*, OC contain different hormones or progestins than Mirena, are typically combined with an estrogen, and have a different route of administration. Whether or not OC cause PTC has no probative value to the facts at issue in this case, but has dramatic potential to mislead the jury because it suggests that hormones, progestins,

or birth control generally have been proven to not cause PTC. Furthermore, for the reasons set forth in §B2 *supra*, the conclusion that OC have been proven to not cause PTC is erroneous. The OC studies and Cestari's opinions as to those studies are of minimal, if any, probative value that is substantially outweighed by danger of confusing the issues and misleading the jury. As such they should be excluded, along with Cestari's overall opinions to the extent they rely on these studies.

### E. Although Cestari Is Essentially A Rebuttal Expert, His Opinions Do Not Directly Address Plaintiffs' Experts' Opinions, And Are Therefore Unhelpful To The Trier Of Fact

In order for Cestari's opinions on Plaintiffs' experts' opinions to be admitted they must have probative value and help the trier of fact to understand the evidence or to determine a fact in issue. Rule 702. Cestari failed to analyze or even seriously address any of Plaintiffs' experts' opinions. While Cestari discusses the data underlying their opinions generally in his attempt to discredit the data itself, and disagrees with the experts' conclusions, he never once examines or discusses with any depth the specific methods or analyses advanced by any one of Plaintiffs' experts. Not one of the Plaintiffs' experts' names appear in the body of his report. Because Cestari has not confronted the methods or explanations for Plaintiffs' experts' opinions, Cestari's opinions specifically regarding their testimony are not probative of any actual fact in issue. Therefore, these conclusions should be excluded and Cestari should be prevented from testifying as to the opinions proffered by Plaintiffs' experts in this matter.

## IV. CONCLUSION

For the reasons stated above, Plaintiffs ask the Honorable Court to Grant Plaintiffs' Motion to Exclude the Opinions and Testimony of Dean M. Cestari, M.D.

Dated: March 2, 2018

Respectfully submitted,

*<u>/s/ Lawrence L. Jones II</u>*

Lawrence L. Jones II
Jones Ward PLC
*Co-Lead Counsel for Plaintiffs*

Martin D. Crump
Davis & Crump PC
*Co-Lead Counsel for Plaintiffs*

Maxwell S. Kennerly
Kennerly Loutey, LLC
*Liaison Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was filed via the ECF/CM system with the Clerk of the Court, which will have sent notice to all attorneys of record in this matter on March 2, 2018.

/s/ *Lawrence L. Jones II*

Lawrence L. Jones