**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ---------------------------------------------------------- | x | |
| **IN RE:** | : | |
| | : | |
| **MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY LITIGATION (NO. II)** | : | **17-MD-2767 (PAE)**<br>**17-MC-2767 (PAE)** |
| | : | |
| ***This Document Relates to All Actions*** | : | |
| | : | |
| ---------------------------------------------------------- | x | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF DEAN M. CESTARI, M.D.**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 1

I. Dr. Cestari Is Qualified to Render His Opinions ........ 1

II. Dr. Cestari Applied a Reliable Methodology. ........ 5

A. Dr. Cestari Conducted a Reliable Literature Review Using His Clinical Experience, Knowledge, and Training ........ 5

B. Plaintiffs' Various Criticisms Do Not Provide a Basis for Exclusion. ........ 7

1. Plaintiffs' Criticisms About the Epidemiological Evidence Lack Merit. ........ 7

2. Dr. Cestari's Analysis of Oral Contraceptive Data Is Reliable. ........ 12

3. Dr. Cestari Is Not Required to Speculate About Plaintiffs' Mechanism Theories or the Dechallenge/Rechallenge Data. ........ 13

CONCLUSION ........ 14

## TABLE OF AUTHORITIES

### Cases

*Bartlett v. Mut. Pharm. Co., Inc.*,
742 F. Supp. 2d 182 (D.N.H. 2010) ........ 8

*Costantino v. Herzog*,
203 F.3d 164 (2d Cir. 2000) ........ 13

*Daubert v. Merrell Dow Pharms. Inc.*,
509 U.S. 579 (1993) ........ 5

*Deutsch v. Novartis Pharm. Corp.*,
768 F. Supp. 2d 420 (E.D.N.Y. 2011) ........ 7

*Diaz v. Johnson Matthey, Inc.*,
893 F. Supp. 358 (D.N.J. 1995) ........ 4

*Huskey v. Ethicon, Inc.*,
29 F. Supp. 3d 691 (S.D.W. Va. 2014) ........ 7

*In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*,
2013 WL 1558690 (D.N.J. Apr. 10, 2013) (unpublished) ........ 3

*In re Mirena IUD Prods. Liab. Litig.*,
169 F. Supp. 3d 396 (S.D.N.Y. 2016)
*aff'd*, 2017 WL 4785947 (2d Cir. Oct. 24, 2017) (summary order)
*cert. petition filed*, No. 17-1037 (Jan. 22, 2018) ........ 2, 7, 11

*In re Mirena IUD Prods. Liab. Litig.*,
202 F. Supp. 3d 304 (S.D.N.Y. 2016)
*aff'd*, 2017 WL 4785947 (2d Cir. Oct. 24, 2017) (summary order)
*cert. petition filed*, No. 17-1037 (Jan. 22, 2018) ........ 8

*K.E. v. GlaxoSmithKline LLC*,
2017 WL 440242 (D. Conn. Feb. 1, 2017) ........ 3, 4

*Lyman v. Pfizer, Inc.*,
2012 WL 2971550 (D. Vt. July 20, 2012) ........ 3

*Magistrini v. One Hour Martinizing Dry Cleaning*,
180 F. Supp. 2d 584 (D.N.J. 2002)
*aff'd*, 68 F. App'x 356 (3d Cir. 2003) ........ 2

*Mancuso v. Consol. Edison Co. of New York, Inc.*,
967 F. Supp. 1437 (S.D.N.Y. 1997) ........ 4

*McCullock v. H.B. Fuller Co.*,
61 F.3d 1038 (2d Cir. 1995) ........ 2, 4

*Rosen v. Ciba-Geigy Corp.*,
78 F.3d 316 (7th Cir. 1996)........................................................................................ 13

*Scott v. Chipotle Mexican Grill*,
315 F.R.D. 33 (S.D.N.Y. 2016)........................................................................................ 8

**Rules**

FED. R. CIV. P. 26 (a)(2)(D)(ii) ........................................................................................ 14

## PRELIMINARY STATEMENT

Dr. Dean Cestari is a neuro-ophthalmologist and an assistant professor at Harvard Medical School. He is one of approximately ten physicians in the country who are board-certified in both neurology and ophthalmology. He has researched IIH extensively and treats approximately 300 IIH patients a year in his clinical practice. After a comprehensive review of the available scientific evidence, Dr. Cestari concluded that the available evidence does not support a causal relationship between Mirena and IIH. Lacking any basis to exclude a preeminent expert in IIH, Plaintiffs resort to straw-person arguments and lawyer-driven theories that have never been sponsored by their experts. Nothing in their motion warrants excluding Dr. Cestari's testimony under Rule 702 or *Daubert*.

## ARGUMENT

### I. Dr. Cestari Is Qualified to Render His Opinions.

Dr. Cestari is undoubtedly qualified to offer opinions about IIH and general causation. Dr. Cestari is a neuro-ophthalmologist (the specialty that diagnoses and treats IIH) and an assistant professor of ophthalmology at Harvard Medical School. Pl. Ex. C, Cestari CV at 1. He completed residencies in both neurology and ophthalmology (Cornell/New York Presbyterian Hospital), as well as a fellowship in neuro-ophthalmology (Harvard Medical School). Pl. Ex. A, Cestari Rpt. at 1. He is one of approximately ten physicians in the United States who is board-certified by both the American Board of Ophthalmology and the American Board of Psychiatry & Neurology. *Id.* Dr. Cestari has researched IIH extensively, and served as one of the co-investigators of a NIH-sponsored, multicenter randomized controlled study regarding IIH. *Id.*; Pl. Ex. B, Cestari Dep. 207:4-25. He also maintains an active clinical practice, where he treats approximately 300 patients with IIH per year, and "often tackles the issue of medical causation because of its crucial importance in treatment and medical management decisions." *Magistrini*

*v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 611 (D.N.J. 2002), *aff'd,* 68 F. App'x 356 (3d Cir. 2003); Pl. Ex. A, Cestari Rpt. at 1; Pl. Ex. B, Cestari Dep. 196:2-197:1 (explaining that he often sees complicated cases where "patients [] fly in for second, third, fourth opinions" and assessing causation is crucial because "If I'm wrong, my patient can go blind"). Dr. Cestari's extensive experience renders him qualified to offer opinions in this case. *See McCullock v. H.B. Fuller Co*., 61 F.3d 1038, 1043 (2d Cir. 1995) (expert physician, who was an experienced medical doctor practicing in the specialty of ear, nose and throat, was qualified to testify about "a throat ailment and its causes").

Plaintiffs' quibbles with Dr. Cestari's qualifications outside the area of neuro-ophthalmology lack any basis. ***First,*** Dr. Cestari is qualified to opine on epidemiological studies, as he routinely relies on epidemiological studies as part of patient care, has personally participated in several epidemiological studies (the results of which have been published in the peer-reviewed literature), and has experience evaluating the design of epidemiological studies.[1] Pl. Ex. C, Cestari CV; Pl. Ex. B, Cestari Dep. 77:17-79:16 ("I'm certainly an expert in epidemiology as it applies to the studies that are related to neuroophthalmology and taking care of my patients."); *id.* at 210:14-211:12 (explaining his critical evaluation of study design for an epidemiological study in which he was asked to participate). These qualifications far exceed the "liberally construed" qualifications requirements in the Second Circuit, and Plaintiffs provide no legal support to the contrary. *See, e.g., In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 412, 426 (S.D.N.Y. 2016), *aff'd*, 2017 WL 4785947 (2d Cir. Oct. 24, 2017) (summary order), *cert. petition filed*, No. 17-1037 (Jan. 22, 2018) ("medical doctors do not need to be

[1] The fact that Dr. Cestari does not design "clinical trials" (*i.e.*, "controlled studies") does not render him unqualified to opine on the methodology and results of epidemiological studies like Valenzuela and Etminan. Pl. Ex. B, Cestari Dep. 143:1-9.

epidemiologists in order to testify regarding epidemiological studies."); *K.E. v. GlaxoSmithKline LLC*, No. 3:14-CV-1294(VAB), 2017 WL 440242, at *8 (D. Conn. Feb. 1, 2017) (rejecting qualifications challenge where medical doctor had experience designing observational studies and had also published observational studies in the peer-reviewed literature); *Lyman v. Pfizer, Inc.*, No. 2:09-cv-262, 2012 WL 2971550, at *3 (D. Vt. July 20, 2012) ("A medical doctor does not have to be an epidemiologist in order to testify about epidemiological studies."); *In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, Nos. 11-5304, 08-08, 2013 WL 1558690, at *2 (D.N.J. Apr. 10, 2013) (unpublished) ("Dr. Cornell does not have to possess a particular subspecialty — epidemiology — to testify as an expert.").[2]

***Second,*** Dr. Cestari need not be "an endocrinologist or [a] pharmacologist" or an "Obstetrician or Gynecologist" to render his opinions in this case. Pl. Br. at 16. As a preeminent expert on IIH, he has spent a great deal of his professional life studying IIH, including the mechanisms and medications that might cause it. He is therefore qualified to discuss Plaintiffs' mechanism theories and the medications that have been linked to IIH in the literature. *See* Pl. Ex. B, Cestari Dep. 150:1-11 ("as a neurologist and ophthalmologist, I have to know about the pharmacokinetics of many medications" and "I am [an expert] in terms of the medications that are related to the field I practice in."); *id.* at 148:17-149:4 ("I believe I am an expert in sex hormones as they pertain to pseudotumor cerebri or IIH"); Pl. Ex. A, Cestari Rpt. at 20 (noting that he has "devoted a large part of [his] professional [life] to understanding . . . this disease").

---

[2] Dr. Cestari is also qualified to testify about what Plaintiffs call the "epidemiological significance" of case reports. Pl. Br. at 15. Physicians routinely review case reports, and Dr. Cestari has published multiple case reports of his own. *See* Pl. Ex. C, Cestari CV. It does not take any particular specialty to conclude that case reports do not establish causation, and Plaintiffs' own experts and the FDA agree on this point. *See* Def. Omnibus Br. at 18-19 & n.13; Ex. A, FDA, *Questions and Answers on FDA's Adverse Event Reporting System* (attached hereto), at 4.

Dr. Cestari is not required to specialize in every possible area that may be relevant to his opinions, and his education and experience render him more than qualified under Rule 702. *See McCullock*, 61 F.3d at 1043 (holding that appellant's "suggestion that [medical doctor] had to be a specialist in environmental medicine to provide expert testimony in this case is an unwarranted expansion of the gatekeeper role announced in *Daubert*."); *GlaxoSmithKline*, 2017 WL 440242, at *9 (medical doctor and expert in pediatric cardiology "is qualified to testify about hypothetical ways that Paxil might affect embryonic serotonin levels and cause heart defects" because he is "accustomed to reading and reviewing scientific studies and evaluating arguments about the heart's biological functions").

Plaintiffs' reliance on *Mancuso v. Consol. Edison Co. of New York, Inc.* is misplaced. 967 F. Supp. 1437 (S.D.N.Y. 1997). In *Mancuso*, the expert's report was so deficient that it was initially rejected by the magistrate judge, apparently for failing to cite adequate "'data and other information.'" *Id*. at 1443. The expert also lacked "formal training regarding PCBs," had "almost no prior experience diagnosing the effects of PCB exposure," and relied on his own informal "self-education." *Id.* at 1443-45. Similarly, Plaintiffs cite *Diaz v. Johnson Matthey, Inc.*, but that case involved an expert who diagnosed the condition at issue for the first time in the context of litigation (when he evaluated the plaintiff). 893 F. Supp. 358, 372-73 (D.N.J. 1995). Here, the facts are plainly distinguishable: Dr. Cestari has provided a thorough and detailed report, he has extensive training regarding IIH, he has participated in epidemiological research regarding IIH, he regularly diagnoses and treats IIH, and he has devoted a large part of his career to understanding the causes of IIH.

***Finally,*** Plaintiffs claim that Dr. Cestari should be precluded from making certain so-called "clinical claims" about Mirena because he does not prescribe Mirena or other birth

control. Pl. Br. at 17. However, Dr. Cestari does not purport to offer testimony based on clinical experience with Mirena. Rather, all of the statements that Plaintiffs challenge are based on Dr. Cestari's review of epidemiological data and treatment guidelines, which he is qualified to interpret and rely on. *Compare* Pl. Br. at 17 *with* Pl. Ex. A, Cestari Rpt. at 14 (citing eight sources, including clinical recommendations and epidemiological studies, in support of his opinion that "[a]ccording to evidence-based guidelines, Mirena is a preferred contraceptive for obese women"); *id.* at 18 (citing four epidemiological studies in support of his statement that "multiple published, controlled studies [found] that Mirena use is not associated with significant weight gain"); *id.* at 21; Pl. Ex. C, Cestari CV (relying on Apter 2014 to support his opinion that "LNG levels . . . are highest in the first few months after insertion and decline steadily thereafter"); Ex. B, Apter 2014 at Figure 1 (attached hereto); Pl. Ex. B, Cestari Dep. 126:13-18 (testifying that "I believe the studies show that most women have it in place for at least three years"). The mere fact that Dr. Cestari does not prescribe Mirena does not render him unqualified to discuss published materials concerning Mirena. *See Daubert v. Merrell Dow Pharms. Inc.,* 509 U.S. 579, 592 (1993) ("Unlike an ordinary witness . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.").

## II. Dr. Cestari Applied a Reliable Methodology.

### A. Dr. Cestari Conducted a Reliable Literature Review Using His Clinical Experience, Knowledge, and Training.

Dr. Cestari conducted a thorough review of the available medical literature and scientific evidence using his clinical experience, knowledge, and training. He considered all of the materials that the Plaintiffs' experts reviewed, and more. Ex. C, Cestari Reliance List (attached hereto). Specifically, he systematically reviewed literature and other materials relating to: the

diagnostic criteria for IIH, the epidemiology of IIH, the clinical features of IIH, the treatment of IIH, the pathophysiology of IIH, and the etiology of IIH. Pl. Ex. A, Cestari Rpt. at 2-22. When evaluating this evidence, he used the same neutral approach that he would use in his professional work as a clinician-scientist. *See* Pl. Ex. B, Cestari Dep. 22:24-23:11 ("I want to always have an open mind. I want to see what the available data shows and analyze each individual study and look at the merits of each individual study.").

Based on his review of the available scientific evidence, Dr. Cestari concluded that "I do not believe there is a causal relationship between the use of Mirena and the development of IIH." Pl. Ex. A, Cestari Rpt. at 22. This conclusion is consistent with the Valenzuela authors' conclusion based on the results of their study. Ex. 64, Valenzuela 2017, at 192 (Abstract) ("Our investigation . . . does not suggest an LNG-IUS can cause PTC."); *see also id.* at 196 ("As in the present report, these previous reports [about Norplant] did not imply a causative role for LNG in the pathogenesis of PTC."). Dr. Cestari's evaluation of the evidence is also consistent with the published, peer-reviewed literature and the generally accepted view in the medical community. Pl. Ex. A, Cestari Rpt. at 20 ("Apart from the plaintiffs' experts, nobody I am aware of, including many neuro-ophthalmologists who have devoted a large part of our professional lives to understanding and treating this disease (myself included) assert that we have isolated its cause on a molecular level."); *see also* Def. Omnibus Br. at 10 & n.6 (all of the plaintiff experts agree that there is no general acceptance that Mirena causes IIH); *id.* at 22 & n.17 (plaintiff experts agree with the Norplant case report authors' own conclusions that the case reports do not establish causation); *id.* at 22-23 (every epidemiological study looking for an association between oral contraceptives and IIH has found no association).

Courts routinely hold that literature reviews are a reliable methodology under *Daubert.* *See In re Mirena*, 169 F. Supp. 3d at 421 (admitting expert testimony based on "decades of experiences as a doctor and a review of scientific literature"); *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 480 (E.D.N.Y. 2011) (admitting expert testimony where the witnesses "primarily based their [] opinions on their review of the relevant medical literature and their own personal experiences as prescribing physicians"); *Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 691, 735 (S.D.W. Va. 2014) (holding that expert employed a reliable methodology where he "offers an opinion about the lack of evidence of clinically significant degradation based on his clinical experience and his review of the scientific literature").

**B. Plaintiffs' Various Criticisms Do Not Provide a Basis for Exclusion.**

**1. Plaintiffs' Criticisms About the Epidemiological Evidence Lack Merit.**

Dr. Cestari provides a detailed analysis of the available epidemiological evidence concerning Mirena and IIH. Pl. Ex. A, Cestari Rpt. at 14-18 (one-page analysis on Etminan and nearly two pages on Valenzuela). Plaintiffs avoid addressing the substance of Dr. Cestari's analysis, and instead argue that Dr. Cestari: (a) fails to provide quantitative opinions regarding "*how*, or *how much*, the application of what he views as the 'correct' data would impact the results of Valenzuela;" and (b) uses a different standard when evaluating the evidence concerning vitamin A and tetracycline antibiotics. *See* Pl. Br. at 6-8, 11 (emphasis in original). Both of these claims are baseless.

First, Plaintiffs suggest that Dr. Cestari should have "show[n] his math" or performed a "statistical analysis" to quantify his opinions regarding Valenzuela. Pl. Br. at 6-7, 11. However, Dr. Cestari ***does*** quantify the degree to which the errors in Valenzuela affected the odds ratios. He expressly opines that the errors regarding exposure rates would have inflated the odds ratios by "3-4 fold" in the Denmark study-arm and "up to 7-fold" in the Utah study-arm. *See* Pl. Ex. A,

Cestari Rpt. at 17-18. And, when asked about this opinion at his deposition, he walked counsel through his reasoning using simple algebra and an example of how a 5-fold under-estimation of exposure in the control group would result in a 5-fold over-estimation of the resulting odds ratio. Pl. Br. Ex. B, Cestari Dep. 226:4-228:3. Thus, Dr. Cestari has in fact explained "*how* or *how much*" the errors in Valenzuela would impact the results, and no further "statistical analysis" is necessary. *Cf.* Pl. Br. at 11. As a rebuttal expert, Dr. Cestari is not required to "produce models or methods of [his] own;" it is enough that he "attack[s] those of the plaintiffs' experts." *See Scott v. Chipotle Mexican Grill*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (internal quotation marks omitted). It is Plaintiffs' burden to demonstrate that Valenzuela is reliable evidence of general causation, not Defendants' burden to prove exactly how unreliable it is. *See In re Mirena IUD Prods. Liab. Litig.*, 202 F. Supp. 3d 304, 310 (S.D.N.Y. 2016), *aff'd*, 2017 WL 4785947 (2d Cir. Oct. 24, 2017) (summary order), *cert. petition filed*, No. 17-1037 (Jan. 22, 2018) ("Generally, in products liability cases, 'to establish causation, [plaintiffs] must offer admissible expert testimony regarding both general causation . . . and specific causation.'" (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268 (2d Cir. 2002)). Notably, Plaintiffs nowhere suggest that Dr. Cestari's estimates regarding the degree of inflation were incorrect. Their criticisms, whatever they may be, do not provide a ground for exclusion under *Daubert*. *See Bartlett v. Mut. Pharm. Co., Inc.*, 742 F. Supp. 2d 182, 196 (D.N.H. 2010) ("whatever shortcomings existed in [the expert's] calculations went to the weight, not the admissibility, of the testimony." (internal quotation marks omitted)).[3]

---

[3] Plaintiffs assert that Dr. Cestari "misrepresents" Valenzuela because he refers to their "underestimation" of LNG-IUS exposure. Pl. Br. at 6 n.2. However, this phrasing is verbatim from the authors themselves. *See* Ex. 64, Valenzuela 2017, at 196 ("we may have ***underestimated*** the number of women with an LNG-IUS." (emphasis added)).

Second, Plaintiffs claim that Dr. Cestari's literature review was asymmetric and unreliable because he "did not rigorously examine the methods" of the literature on vitamin A and tetracycline antibiotics. Pl. Br. at 7. However, Dr. Cestari applied the same careful approach to all of the literature he reviewed:

> Q. Is it fair to say that you accepted the science at face value when it came to the association of tetracycline and IIH?
>
> A. I want to be clear. I think any prudent clinician approaches everything with a sense of skepticism and the sense of show me the data, prove it to me, let me kind of go through it, make sure that I agree with the hypothesis, I agree with the methodology, I agree with the statistical analysis, I agree with the results, and then I agree with the conclusions. Right? So going through the literature, I applied that methodology but I did not perform a statistical analysis, if that's what you're asking me.

Pl. Ex. B, Cestari Dep. 75:3-18; *see also id.* at 22:24-23:11. Further, experts are permitted to rely on their training and experience, and there is nothing unreasonable about Dr. Cestari scrutinizing studies more carefully when they do not comport with his training and experience. *Cf.* Pl. Br. at 7-8; *see* Pl. Ex. B, Cestari Dep. 235:9-236:8 ("You have to understand it. In your mind, you have to kind of go through it and say does this make sense, does it seem right. If it doesn't, then you dig deeper."); *id.* ("And you take that into account [] what are the conclusions of the authors. Are the authors saying something that's going to change? Is it a paradigm shift in terms of how you apply this data to your patients?").

Contrary to Plaintiffs' claim, Dr. Cestari did not apply a "much lower standard" to the evidence concerning vitamin A and tetracyclines. *Cf.* Pl. Br. at 8. Rather, he explained in detail why he concluded that the available evidence shows a stronger association between vitamin A and tetracyclines and IIH. For example, while IIH almost exclusively affects obese women of childbearing age (Def. Omnibus Br. at 2), many patients who use tetracyclines or vitamin A and develop IIH are ***non-obese*** and/or ***male.*** *See* Pl. Ex. B, Cestari Dep. 47:3-48:16 ("Miller, et al.,

and Daniels, et al., had basically shown that if you look at the population that develops increased intracranial pressure after they take tetracyclines, they're different. They can be men or women. Their body weights don't make a difference. Recent weight gain is not a factor. On average, they have higher opening pressures. It's a different population."); *id.* (noting "a difference in the patient characteristics" for "vitamin A-induced increased intracranial pressure"); *id.* at 136:19-137:3 (similar; noting "a body of literature that demonstrates atypical patients who get [IIH]" while using vitamin A). Notably, Dr. Cestari relies on Daniels 2007 (Ex. 22), which not only provides epidemiological support for an association between tetracyclines and IIH, but also controlled for weight (unlike the Valenzuela study). *See* Pl. Ex. B, Cestari Dep. 47:3-48:16. In contrast, there is "absolutely no difference" in the characteristics of patients who develop IIH while using Mirena and the typical IIH patient. *See id*. ("the Valenzuela article . . . showed [] that there was absolutely no difference in the patient characteristics in the patients who developed IIH and who had a Mirena and who did not have a Mirena."); *id.* at 267:7-268:7 (not aware of any evidence that Mirena use affects both obese women and thin women indiscriminately). While Plaintiffs offer various musings about why Dr. Cestari's analysis was unreliable, they offer no expert to sponsor their argument that it is unreliable for a clinician to consider the characteristics of the patient populations who develop IIH when considering possible causes. Pl. Br. at 10-11.[4]

[4] Nor do they explain why Dr. Cestari was required to perform a "statistical analysis" regarding whether Mirena users have a higher background risk of IIH. Pl. Br. at 11. Dr. Cestari's report provides published epidemiological data to support his opinion that Mirena is a preferred contraceptive for obese women, who have a higher risk of IIH. *See* Pl. Ex. A, Cestari Rpt. at 14 (noting that "Mirena is a preferred contraceptive for obese women" and citing eight supporting sources, including published epidemiological data); *id.* at 3-4 (explaining that the incidence of IIH is higher in overweight and obese women, with citations to epidemiological data). Dr. Cestari also cited literature expressing this opinion. *See* Ex. 27, Etminan 2015, at 111 ("For example, clinicians may be more likely to prescribe [intra-uterine levonorgestrel] to women with

Aside from patient characteristics, Dr. Cestari also addresses other differences in the data available for tetracyclines and vitamin A as compared to Mirena that support a potential causal link between those substances and IIH but not between LNG and IIH:

- ***Dechallenge/rechallenge data.*** There are "clean" and "clear" dechallenge and rechallenge cases for tetracyclines and vitamin A, but no such data for Mirena. Pl. Ex. B, Cestari Dep. 47:3-48:16 (tetracyclines); *id.* at 136:19-137:3 (vitamin A); *id.* at 267:1-6 (no published rechallenge cases for Mirena); Pl. Ex. A, Cestari Rpt. at 21-22 (no unconfounded dechallenge cases for Mirena).

- ***Temporal data.*** There is compelling temporal data showing that signs and symptoms of IIH start soon after tetracyclines are taken. In contrast, for women who have developed IIH while using Mirena, on average, the symptoms developed nearly two years after insertion. Pl. Ex. B, Cestari Dep. 47:3-48:16 (tetracyclines); *id.* at 136:19-137:3 (vitamin A); Pl. Ex. A, Cestari Rpt. at 21 (Mirena).

- ***Resolution of symptoms after discontinuation.*** There is evidence that symptoms typically resolve after discontinuation of minocycline (a type of tetracycline), but the evidence does not show a similar pattern of resolution after discontinuation of Mirena. Pl. Ex. B, Cestari Dep. 268:18-269:7 (for Mirena, "it's about 50 percent get better, 50 percent don't.").

Based on the foregoing differences, Dr. Cestari opined that the available scientific evidence is simply stronger and "more convincing" with respect to vitamin A and tetracyclines. *See* Pl. Ex. B, Cestari Dep. 47:3-48:16, 136:19-137:3, 193:20-194:7. Dr. Cestari's views are consistent with the medical community, and Plaintiffs' experts do not opine otherwise. While Plaintiffs may disagree with Dr. Cestari's conclusions about the evidence, such criticisms "are best addressed on cross-examination." *In re Mirena*, 169 F. Supp. 3d at 421 ("Although Plaintiffs and their experts may take issue with Dr. Goldberg's conclusions, these criticisms go to the weight, not the admissibility, of his testimony and are best addressed on cross-examination.").

---

higher BMI"); *see also* Ex. 64, Valenzuela 2017, at Tables 1-2 (mean BMI of Mirena users with IIH was 35 in Utah and 36 in Denmark [BMI $\geq$30 is classified as obese]).

**2. Dr. Cestari's Analysis of Oral Contraceptive Data Is Reliable.**

Dr. Cestari's analysis of the data on oral contraceptives is reliable. As Dr. Cestari explains in his report, several studies "failed to find an association between oral contraceptives and IIH" — even though case reports initially suggested a possible relationship. Pl. Ex. A, Cestari Rpt. at 11; *see also* Pl. Ex. B, Cestari Dep. 21:6-23:11. This shows the "dangers of relying on case reports and case series as evidence of causation" and the "importance of controlling for established risk factors." Pl. Ex. A, Cestari Rpt. at 11. Further, the lack of an association between oral contraceptives and IIH supports Dr. Cestari's overall views concerning the relationship between LNG and IIH. Pl. Ex. B, Cestari Dep. 21:6-23:11. Plaintiffs claim that Dr. Cestari failed to "critically examine" the nature of the oral contraceptives that were studied in the literature he relies on; however, this is belied by his testimony. Pl. Br. at 9; Pl. Ex. B, Cestari Dep. 22:24-23:11 (testifying that under his approach the "details of each study are always important" including "what the drug is that they're looking at"); Pl. Ex. C, Cestari Reliance List (relying on literature, including Gerstman 1991, showing that LNG/norgestrel (the same active drug) were predominant progestins used in combined oral contraceptives in the 1980s and early 1990s, when the oral contraceptive studies were conducted). Moreover, Plaintiffs' other criticisms of Dr. Cestari's opinions regarding oral contraceptives are scientifically inaccurate and, in several instances, are expressly disavowed by Plaintiffs' own experts. *See* Def. Opp. to Pl. Omnibus Br. at 16-20, 25.[5]

[5] Plaintiffs also suggest that Dr. Cestari's opinions about oral contraceptives should be excluded under Rule 403. Pl. Br. at 18-19. This argument, of course, has no relation to a Rule 702 analysis and is premature at this stage. But even on the merits, evidence about oral contraceptives has enormous probative value because it tends to refute a dose-response relationship and is also necessary to understanding the risk-benefit profile of Mirena. *See* Def. Omnibus Br. at 22-23; Ex. 2, Darney Dep. 66:10-12, 69:5-11 (Mirena is more effective than oral contraceptives and avoids the risk of deep-vein thrombosis associated with oral contraceptives). Further, if the jury can understand evidence about Norplant (a subdermal implant with a different

**3. Dr. Cestari Is Not Required to Speculate About Plaintiffs' Mechanism Theories or the Dechallenge/Rechallenge Data.**

Plaintiffs criticize Dr. Cestari for failing to engage in speculation about biological mechanism and dechallenge/rechallenge data. *See* Pl. Br. at 11-14. With respect to biological mechanism, Dr. Cestari's report reflects that he considered Plaintiffs' mechanism theories and concluded that the available scientific evidence does not support the specific mechanism theories proposed by the plaintiff experts. Pl. Ex. A, Cestari Rpt. at 21 (Plaintiffs' androgen theory "cannot explain why IIH rarely [a]ffects men."); *id.* at 21 n.1 ("Plaintiffs' experts overstate the evidence in support of their theories"); *id.* at 20 ("the very sources cited by the plaintiffs' experts indicate that increasing estrogen levels, not androgen levels, are somehow related to IIH."); *id.* at 11 (noting evidence that "low levels of testosterone might be the important hormonal link in women with IIH" and evidence that "rising levels of estrogen" could be a "precipitating factor"). Plaintiffs' own expert agreed that research on IIH is still in the "prehistoric" stage. Ex. 12, Salpietro Dep. 409:5-410:17. Dr. Cestari is not required to engage in speculation or guesswork to fill in the gaps in the available scientific evidence. *See Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) ("the courtroom is not the place for scientific guesswork").

Similarly, Dr. Cestari's analysis of dechallenge and rechallenge data is reliable. As Dr. Cestari explains in his report, there are no cases of unconfounded dechallenge, *i.e.*, cases where it was possible to conclude that "discontinuing the Mirena, and not medically treating the disease, [] led to improvement." Pl. Ex. A, Cestari Rpt. at 22; *see also* Pl. Ex. B, Cestari Dep. 267:1-6 (no published cases of rechallenge with Mirena). Additionally, Dr. Cestari reviewed data

---

route of administration, a higher dosage of LNG, higher average blood levels of LNG, and a different regulatory history than Mirena), then it is also capable of understanding oral contraceptives, and the presence of estrogen in oral contraceptives should not send them spiraling into confusion. Any minimal danger of confusion is "more than outweighed by the highly probative value of the [evidence]." *Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000).

showing that patients exhibit similar recovery rates regardless of whether Mirena is kept in place or removed. Pl. Ex. A, Cestari Rpt. at 22 ("whether Mirena is removed or not appears to have no bearing on whether or not a patient's IIH resolves, as approximately equal numbers of women reportedly resolve (or improve) or do not, whether the device is removed or left in place."). Plaintiffs' main response is that Dr. Cestari's analysis is unreliable because confounding factors "are present in virtually all cases of PTC and treatment thereof." Pl. Br. at 13. However, the presence of confounders is a limitation of the available scientific evidence on Mirena and IIH, not a proper attack on Dr. Cestari's methodology. As Dr. Cestari explains in his report, it is not scientifically sound to simply make assumptions about possible dechallenge cases (and it was unreliable for the plaintiff experts to do so). Pl. Ex. A, Cestari Rpt. at 21. Here again, Dr. Cestari is not required to speculate beyond the existing scientific evidence.[6]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny in its entirety Plaintiffs' motion to exclude the testimony of Dean M. Cestari, M.D.

[6] Plaintiffs' claim that Dr. Cestari is not a proper rebuttal expert lacks merit. Dr. Cestari's opinions address the "same subject matter" identified by Plaintiffs, and also respond to the specific arguments raised by the plaintiff experts. FED. R. CIV. P. 26 (a)(2)(D)(ii); *see* Pl. Ex. A, Cestari Rpt. at 20-22 (section entitled "Plaintiffs' Experts"); *cf.* Pl. Br. at 1 ("In his report and deposition, Cestari takes issue with the methodologies and analyses of several publications relied upon by Plaintiffs' experts.").

DATED: March 15, 2018

Respectfully submitted,

*/s/ Shayna S. Cook*

Shayna S. Cook
Goldman Ismail Tomaselli Brennan & Baum LLP
564 W. Randolph St., Suite 400
Chicago, IL 60661
Telephone: (312) 881-5947
Facsimile: (312) 881-5247
scook@goldmanismail.com

Paul W. Schmidt
Michael X. Imbroscio
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-5272
Facsimile: (202) 778-5272
pschmidt@cov.com
mimbroscio@cov.com

E. James Shepherd
Shook, Hardy & Bacon LLP
600 Travis Street, Suite 3400
Houston, TX 77072
Telephone: (713) 546-5610
Facsimile: (713) 227-8008
eshepherd@shb.com

*Attorneys for Defendants Bayer HealthCare Pharmaceuticals Inc., Bayer Pharma AG, and Bayer Oy*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of March, 2018, a copy of the foregoing has been served on the interested parties in this action via electronic mail to:

Martin D. Crump
Davis & Crump PC
2601 Fourteenth Street
Gulfport, Mississippi 39501
martincrump@daviscrump.com
*Co-Lead Counsel for Plaintiffs*

Lawrence L. Jones II
Jones Ward PLC
The Pointe
1205 East Washington Street, Suite 111
Louisville, Kentucky 40206
larry@jonesward.com
*Co-Lead Counsel for Plaintiffs*

Maxwell S. Kennerly
Kennerly Loutey, LLC
PO Box 30049
Elkins Park, Pennsylvania 19027
msk@thlawyer.com
*Liaison Counsel for Plaintiffs*

*/s/ Shayna S. Cook*
Shayna S. Cook