**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**IN RE:**

**MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY LITIGATION (NO. II)**

**17-MD-2767 (PAE)**
**17-MC-2767 (PAE)**

***This Document Relates to All Actions***

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF VINCENZO SALPIETRO, MD**

## TABLE OF CONTENTS


**PRELIMINARY STATEMENT ........ 1**

**FACTUAL BACKGROUND ........ 1**

I. Levonorgestrel is a Potent Synthetic Steroid Hormone Derived from Testosterone ........ 1

II. A Likely Role for Steroid Hormones in PTC/IH Pathophysiology is Well-Accepted in the Scientific Literature ........ 3

**STANDARD OF REVIEW ........ 4**

**ARGUMENT ........ 6**

I. Dr. Salpietro's Mechanism Opinions are Biologically Plausible and Admissible in the Second Circuit under *Daubert* ........ 7

II. Dr. Salpietro Reliably Applies Scientific Methodology to Connect LNG to IH Through MR Agonism ........ 11

A. Bayer Misrepresents Dr. Salpietro's Foundational Opinions Regarding the Endogenous Hormone Progesterone ........ 12

B. Dr. Salpietro Reliably Concludes that LNG Plausibly Acts as a MR Agonist ........ 13

C. Dr. Salpietro Reliably Synthesizes the Available Evidence to Conclude that LNG Plausibly Increases CSF Production through a MR-Mediated Mechanism ........ 18

**CONCLUSION ........ 20**

**TABLE OF AUTHORITIES**

**Cases**

*Amorgianos v. Amtrak*,
303 F.3d 256 (2d Cir. 2002)........................................................................ 6, 11, 12, 13
*Bartoli v. Novartis Pharm. Corp.*, No. 3:13-0724,
2014 U.S. Dist. LEXIS 52956 (M.D. Pa. Apr. 17, 2014) ......................................................... 7
*Bartoli v. Novartis Pharms. Corp.*, No. 3:13-0724,
2014 U.S. Dist. LEXIS 52956, at *29 (M.D. Pa. Apr. 17, 2014) ........................................... 10
*Beastie Boys v. Monster Energy Co.*,
983 F. Supp. 2d 369 (S.D.N.Y. 2014)........................................................................................ 5
*Campbell* v. Metropolitan Prop. & Cas. Ins. Co.,
239 F.3d 179 (2d Cir. 2001)....................................................................................................... 6
*Danley v. Bayer (In re Mirena IUD Prods. Liab. Litig.)*,
169 F. Supp. 3d 396 (S.D.N.Y. 2016)...................................................................................... 15
*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579, 590 (1993)........................................................................................... 4, 6, 8, 11
*Deutsch v. Novartis Pharms. Corp.*,
768 F. Supp. 2d 420 (E.D.N.Y. Mar. 8, 2011)................................................................ 5, 8, 10
*EEOC v. Mavis Disc. Tire, Inc.*,
129 F. Supp. 3d 90 (S.D.N.Y. 2015)........................................................................................ 16
*FDIC v. Suna Assocs.*,
80 F.3d 681 (2d Cir. 1996)........................................................................................................ 11
*Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, No. 11 Civ. 6188 (DLC),
2012 U.S. Dist. LEXIS 173768, (S.D.N.Y. Dec. 3, 2012) ......................................................... 6
*Golod v. Hoffman La Roche*,
964 F. Supp. 841 (S.D.N.Y. 1997) ............................................................................................ 8
*Hart v. Rick's Cabaret Int'l, Inc.*,
60 F. Supp. 3d 447 (S.D.N.Y. 2014)................................................................................ 6, 11, 12
*Heller v. Shaw Indus., Inc.*,
167 F.3d 146, 155 (3d Cir. 1999)............................................................................................. 11
*In re Ephedra Prods. Liab. Litig.*,
393 F. Supp. 2d 181 (S.D.N.Y. 2005)...................................................................................... 15
*In re Fosamax Products Liability Litig.*,
645 F. Supp. 2d 164 (S.D.N.Y. 2009)...................................................................................... 10
*In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-CV-5810,
2017 WL 6729295 (S.D.N.Y. Dec. 28, 2017) ............................................................................ 8
*In re Neurontin Mktg. Sales Practices and Prods. Liab. Litig.*,
612 F. Supp. 2d 116 (D.Mass. 2009) ....................................................................................... 10
*In re Pfizer Inc. Sec. Litig.*, 2010 U.S. Dist. LEXIS 26927,
2010 WL 1047618 (S.D.N.Y. Mar. 22, 2010) ............................................................................ 7
*In re PPA Prods. Liab. Litig.*,
289 F. Supp. 2d 1230 (W.D. Wash. 2003)................................................................................ 10
*In re Zoloft Prods. Liab. Litig.*,
26 F. Supp. 3d 466 (E.D. Pa. 2014) ......................................................................................... 15

*K.E. v. Glaxosmithkline LLC*, No. 3:14-cv-1294(VAB), 2017 U.S. Dist. LEXIS 13705 (D. Conn. Feb. 1, 2017) .......... 15
*McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233 (11th Cir. 2005) .......... 10, 14
*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995).......... 11
*Park West Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314 (S.D.N.Y. 2009).......... 7
*Port Auth. Police Asian Jade Soc. of N.Y. & N.J. Inc. v. Port Auth. of N.Y. & N.J.*, 681 F. Supp. 2d 456 (S.D.N.Y. 2010).......... 16
*R.F.M.A.S., Inc. v. Mimi So*, 748 F. Supp. 2d 244 (S.D.N.Y. 2010).......... 7, 20
*Trouble v. Wet Seal. Inc.*, 179 F. Supp. 2d 291 (S.D.N.Y. 2001).......... 7
*Zuchowicz v. United States*, 870 F. Supp. 15 (D. Conn. Sep. 15, 1994).......... 5, 8, 11

**Rules**

Federal Rule of Evidence 702.......... 4, 6

**Scientific Literature**

Andrews LE, Liu GT, Ko MW. Idiopathic Intracranial Hypertension and Obesity. *Horm Res Paediatr* 2014;81:217-225.......... 9, 19
Bruce BB, Biousse V & Newman NJ. Update on Idiopathic Intracranial Hypertension. *Am J Ophthalmol* 2011;152:163–169 .......... 3
Chen J & Wall M. Epidemiology and Risk Factors for Idiopathic Intracranial Hypertension. *Int Ophthal Clin* 2014;54(1):1-11 .......... 3
Foley J. Benign forms of intracranial hypertension; toxic and otitic hydrocephalus. *Brain* 1955;78:1-41.......... 3
Fraser JA et al., Risk factors for idiopathic intracranial hypertension in men: a case-control study, *J Neurol Sci*. 2010; 290(1-2):86-95.......... 3
Lu NZ, et al., International Union of Pharmacology. LXV. The Pharmacology and Classification of the Nuclear Receptor Superfamily: Glucocorticoid, Mineralocorticoid, Progesterone, and Androgen Receptors, PHARMACOLOGICAL REVIEWS 58(4):782-797 (2006).......... 2, 4
Markey KA, Mollan SP, Jensen RH, Sinclair AJ. Understanding idiopathic intracranial hypertension: mechanisms, Management, and future directions. *Lancet Neurology* 2016;15:78-91 .......... 3
McGeeney BE & Friedman DI, Pseudotumor Cerebri Pathology, *Headache* 2014;54:445-458.......... *passim*
Oldstone MB: Disturbance of pituitary-adrenal interrelationships in benign intracranial hypertension (pseudotumor cerebri). *The Journal of Clinical Endocrinology and Metabolism* 1966, 26(12):1366-1369 .......... 19
Quinkler M & Diedrich S. Difference of In Vivo and In Vitro Antimineralocorticoid Potency of Progesterone, *Endocrine Res*, 28:4, 465-70.......... 13
Rossier et al., "Epithelial Sodium Transport and Its Control by Aldosterone: The Story of Our Internal Environment Revisited." *Physiological Reviews* 2015 95:1, 297-340.......... 19

Salpietro V, et al. Pediatric idiopathic intracranial hypertension and the underlying endocrine-metabolic dysfunction: a pilot study. *J Pediatr Endocrinol Metab*. 2014;27(1-2):107–115.... 19

Salpietro V, Polizzi A, Berte LF, et al. Idiopathic Intracranial Hypertension: a unifying neuroendocrine hypothesis through the adrenal-brain axis. *Neuroendocrinol Lett*., 2012;33(6):569-73 ........ 3

Sheldon CA, Kwon YJ, Liu GT, McCormack SE. An integrated mechanism of pediatric pseudotumor cerebri syndrome: evidence of bioenergetic and hormonal regulation of cerebrospinal fluid dynamics. *Pediatr. Res*. 2015; 77: 282-299........ 4, 10, 19

Souque A, et al. The Mineralocorticoid Activity of Progesterone Derivatives Depends on the Nature of the $C_{18}$ Susbtituent. *Endocrinology* 1995;163(12):5651-5........ 13

Thurtell MJ, Bruce BB, Newman NJ, Biousse V. An Update on Idiopathic Intracranial Hypertension. *Rev Neurol Dis* 2010;7(0):e56-e68........ 3

Weber KT. Aldosteronism Revisited: Perspectives on Less Well-Recognized Actions of Aldosterone. *J Lab Clin Med* 2003;142(2):71-82........ 19

## PRELIMINARY STATEMENT

Bayer's motion to exclude Dr. Salpietro suffers from a fundamental misunderstanding of Dr. Salpietro's opinions, the numerous scientific sources upon which he relies, and Second Circuit *Daubert* jurisprudence. Attempting to pin Dr. Salpietro's opinions to its own "leap" framework, Bayer makes numerous leaps masquerading as well-established science and law. Bayer creates its own convoluted structure for Dr. Salpietro's opinions, taking for granted its own incorrect interpretations of the proffered evidence, and in the end necessarily falls back on disagreement with Dr. Salpietro's conclusions. Dr. Salpietro's expected testimony consists solely of reliably applying his repeatedly peer-reviewed mechanism to levonorgestrel and reaching a conclusion of biologic plausibility. Bayer's mere disagreement with Dr. Salpietro's conclusions is not a proper ground for exclusion. Rather, Bayer may test Dr. Salpietro's opinions at trial through vigorous cross-examination and presentation of contrary evidence.

## FACTUAL BACKGROUND

### I. Levonorgestrel is a Potent Synthetic Steroid Hormone Derived from Testosterone

Levonorgestrel ("LNG") is a potent synthetic progestin[1] derived from testosterone and is the only active ingredient in Mirena. Ex. A1, Hofmann 30(b)(6) Dep. at 163:7-9; *see also* Ex. B1, Dfts' Objs and Resps to Plfs' 2nd Set RFA, Nos. 1, 2. Mirena is an intrauterine device ("IUD") manufactured and marketed by Defendants, intended to release approximately 20 micrograms of LNG per day for up to five years. Ex. C, 2017 Mirena Label. After LNG is released from Mirena into the uterine cavity, it goes to the endometrium (the lining of the uterus) and is then absorbed through the highly-vascularized lining into the systemic circulation, *i.e.*, the blood. Ex. A1, Hofmann Dep. at 56:11-21; 57:3-6; 57:8-12.

[1] Progestin is one of many names for a class of synthetic steroid hormones such as LNG.

Steroid hormones and their corresponding receptors are classified as families. Androgens and estrogens, for example, have the highest binding affinity to the Androgen Receptor (AR) and Estrogen Receptor (ER), respectively. The other steroid hormone receptors are the Progesterone Receptor (PR), Glucocorticoid Receptor (GR), and Mineralocorticoid Receptor (MR). Every steroid hormone binds with varying affinity – or none at all – to the various receptors. Once a steroid hormone is bound to a receptor, it may either induce activity (agonism), or inhibit activity (antagonism). Ex. D1, Lu 2006; *see also* Ex. D2, Sitruk-Ware 2006, at p. 169 ("The effects of progestins are related to interactions not only with the [PR] but also with other steroid hormone receptors. Some progestins interact with the [AR], the estrogen receptor [ER], the glucocorticoid receptor [GR] or the mineralocorticoid receptor [MR].") Once in the blood, steroid hormones such as LNG can produce various biological activities by binding at these receptors and subsequently causing DNA transcription or transrepression. Ex. D2, Sitruk-Ware 2006, at p. 169 (binding at these receptors "may either induce transactivation of a steroid receptor or prevent activation.") "All progestins bind to the PR and have the expected effect on the uterine endometrium, but each progestin has a distinctive profile of activity in other target tissues, a profile not necessarily shared by other members of the same class." *Id. See also* Ex. A1, Hofmann Dep. at 58:6-25 (Q. So levonorgestrel has its own set of receptors that it may bind to and cause activity -- A. That's correct."); *see also* Ex. E, MIR_PIEU-R_00377654 Bayer's Expert report on the toxico-pharmacological documentation to the Mirena NDA, at _661 ("LNG is not a pure progesterone agonist. It has a low, but substantial affinity to the androgen receptor and the mineralocorticoid receptor, and to some transport proteins.") Therefore, both the mechanism of contraception and the adverse effects of LNG are directly attributable to its specific hormone-receptor interactions.

## II. A Likely Role for Steroid Hormones in PTC/IH Pathophysiology is Well-Accepted in the Scientific Literature

Although no *definitive* mechanism for PTC/IH has been established, *no one* – including Bayer or its agents – denies that sex hormones are intrinsically connected to its pathophysiology. *See, e.g.*, Ex. A2, Schoendorf 30(b)(6) Dep. Vol. II (Nov. 29, 2017) at 100:16-20 (Q. In Bayer's view is it biologically plausible that hormones play a role in causing IIH? A. So as discussed in our response document to the BfArM, since it has been established that the female gender and women of reproductive age are risk factors for developing IIH, it is a valid hypothesis to investigate further whether there is influence of sex hormones on the development of IIH") (objection omitted). Descriptions of this "likely" connection abound in the scientific literature, frequently authored by Bayer's own paid experts. *See, e.g.*, Ex. D3, Chen & Wall 2014, at p. 5;[2] Ex. D4, Thurtell 2010, at p. 6;[3] Ex. D5, Fraser 2010; at p. 88.[4] *See also* Ex. D6, Markey 2016, at p. 79; Ex. D7, McGeeney & Friedman 2014, at p. 445;[5] Ex. D8, Bruce 2011,[6] at p. 165.

As early as 1955, scientists have suggested that "an underlying endocrine imbalance with presumably a disturbance of electrolytes is in some way connected with the alteration of intracranial pressure." Ex. F1, Salpietro 2012 at p. 569 (citing Ex. D9, Foley 1955). In 2012, a group of research scientists, led by Dr. Salpietro, sought to explain several seemingly distinct risk factors for IH under a unifying theory of neuroendocrinology. *Id.* Dr. Salpietro's group identified a connection between, among others: obesity, primary and secondary aldosteronism,

[2] "Because female sex and obesity are the main risk factors for IIH, endocrine and hormonal changes likely play a role in the disease through an undetermined pathway."

[3] "The likely role of sex hormones in its pathogenesis is highlighted by the predilection for post-pubertal pre-menopausal women, as well as the absence of a gender preference before puberty." Frequent co-author Newman is a disclosed Bayer expert in this matter and Bruce, a consulting expert for Bayer, has submitted materials in support of Bayer's filings in this matter. *See* Affidavit of Beau B. Bruce, M.D., Ph.D., at Dkt 53-14.

[4] "The likely role of sex hormones in the pathogenesis of IIH is highlighted by the clear predilection of IIH for postpubertal, premenopausal women and the absence of a gender preference before puberty." Bayer experts Bruce and Newman are also co-authors of this piece.

[5] Dr. Friedman is a consulting expert for Bayer in this matter, as she disclosed in a 2016 Letter to the Editor of *Therapeutic Advances in Drug Safety*.

[6] Co-authors, Bruce and Newman.

recombinant growth hormone therapy, *hormonal contraceptives*, vitamin A intoxication or deficiency, corticosteroid therapy or acute withdrawal, and endocrine disorders such as Cushing's syndrome and Addison's disease. *Id.*

Cerebrospinal fluid (CSF) is mainly produced at the epithelial cells of the choroid plexus in the brain. Ex. D7, McGeeney & Friedman 2014, at p. 446. The choroid plexus epithelial cells are abundant in MR, which are essential to maintaining salt and water balance. *Id.* at p. 570; *see also* Ex. D1, Lu 2006, at p. 784 ("Thus, aldosterone is a critical regulator of serum sodium and other electrolytes and of cardiovascular tone"); *see also* Ex. D7, McGeeney & Friedman 2014, at p. 449 ("Enhanced Na+ passage into the CSF results in increased CSF production.") Thus, Salpietro et al. proposed that agonism at the MR of the choroid plexus "create an osmotic gradient to drive CSF secretion," and thereby increase intracranial pressure. *Id.*, at p. 571; *see also* Ex. F2, Salpietro Rpt. at p. 17. Each of the toxicities and endocrine disorders discussed by Salpietro et al. are compatible with a mechanism of MR agonism.

Well-respected IH scholars, including some of Bayer's own paid experts, have long given credence to this mechanism. *See e.g.*, Ex. D7, McGeeney & Friedman 2014, at pp. 449-50 ("Abnormalities in aldosterone homeostasis would potentially explain both the female sex predilection and relationship to obesity found in patients with IIH, has potential therapeutic implications, and warrants further exploration"); *see also* Ex. D10, Sheldon 2015, at p. 285 ("it is generally accepted that aldosterone is present within the CSF in concentrations that correlate with plasma levels, and bind high-affinity aldosterone, mineral-corticoid receptor-binding sites within the choroid plexus and other central nuclei.")

## STANDARD OF REVIEW

Federal Rule of Evidence 702 requires that expert testimony be "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993). To be reliable, "[t]he

subject of an expert's testimony must be 'scientific . . . knowledge.'" *Id.* at 589-90. Yet, as the United States Supreme Court stressed in *Daubert*: "Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science … 'Indeed, scientists do not assert that they know what is immutably 'true' – they are committed to searching for new, temporary, theories to explain, as best they can, phenomena.'" *Zuchowicz v. United States*, 870 F. Supp. 15, 20, (D. Conn. Sep. 15, 1994) (quoting *Daubert*, 509 U.S., at 590). Thus, "[s]cience is not an encyclopedic body of knowledge about the universe. Instead, it represents a *process* for proposing and refining theoretical explanations about the world that are subject to further testing and refinement" 509 U.S., at 590 (quoting Brief for American Association for the Advancement of Science et al. as *Amici Curiae* 7-8) (emphasis in original).

An expert's inference or assertion must, then, "be derived by the scientific method in order to qualify as 'scientific knowledge.'" *Id.* Under *Daubert*, "an expert need not base his opinion on the best possible evidence, but upon 'good grounds, based on what is known.'" *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 453 (E.D.N.Y. Mar. 8, 2011) (quoting 509 U.S., at 590). "Rule 702 codifies a liberal admissibility standard and '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.*, at *426 (quoting 509 U.S. at 596). *See also Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 369, 377 (S.D.N.Y. 2014) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.")

"Trial courts serve as 'gatekeepers,' responsible for 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 464-65 (S.D.N.Y. 2014) (quoting 509 U.S., at 579, 597). ""Federal Rule of Evidence 702 grants an expert witness testimonial latitude unavailable to other witnesses, provided that (1) 'the testimony is based on sufficient facts or data,' (2) 'the testimony is the product of reliable principles and methods,' and (3) 'the expert has reliably applied the principles and methods to the facts of the case.'" *Id.* (quoting *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co*., No. 11 Civ. 6188 (DLC), 2012 U.S. Dist. LEXIS 173768, at *6 (S.D.N.Y. Dec. 3, 2012) (quoting Fed. R. Evid. 702).

"In fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it 'has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Amorgianos v. Amtrak*, 303 F.3d 256, 265-66 (2d Cir. 2002) (quoting *Campbell* v. Metropolitan Prop. & Cas. Ins. Co., 239 F.3d 179, 184 (2d Cir. 2001). "Next, the district court must determine 'whether the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered.' In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Id.* (internal citations omitted).

## ARGUMENT

Dr. Salpietro grounds his analysis in valid scientific principles and evidence. ***First***, Dr. Salpietro's mechanism of agonism at the mineralocorticoid receptor (MR) is a well-supported pathophysiological explanation for IH. ***Second,*** Dr. Salpietro reliably applies this mechanism to

levonorgestrel (LNG), a steroid hormone with a demonstrated wide capacity for biological activity, to conclude, more likely than not, "that the LNG released by the Mirena® IUD causes or substantially contributes to causing PTCS through this MR-Na+/K+ channels mechanism." Ex. F2, Salpietro Rpt. at p. 30. Simply put, well-reasoned conclusions drawn from valid scientific premises are not "leaps."

Bayer does its best to confuse its rejection of Dr. Salpietro's *conclusions* with some potentially excludable unscientific *process*. Yet, there is nothing unscientific about drawing conclusions from available scientific evidence, and the court's analysis must focus "not on the substance of the exper's conclusions, but on whether those conclusions were generated by a reliable methodology." *Trouble v. Wet Seal. Inc*., 179 F. Supp. 2d 291, 301 (S.D.N.Y. 2001). To the extent that a party, such as Bayer, "questions the weight of the evidence upon which the other party's expert relied or the conclusions generated from the expert's assessment of that evidence, it may present those challenges through cross-examination of the expert." *R.F.M.A.S., Inc. v. Mimi So*, 748 F. Supp. 2d 244, 252 (S.D.N.Y. 2010) (citing *Park West Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314, 326 (S.D.N.Y. 2009)).

## I. Dr. Salpietro's Mechanism Opinions are Biologically Plausible and Admissible in the Second Circuit under *Daubert*

"Where a 'hypothesis has been deemed plausible and credible in the relevant medical literature' and where it is within an expert's 'field of expertise based on training, experience, and history of publication,' it is reasonable to admit that hypothesis." *Bartoli v. Novartis Pharm. Corp.*, No. 3:13-0724, 2014 U.S. Dist. LEXIS 52956, at *23 (M.D. Pa. Apr. 17, 2014) (quoting *In re Pfizer Inc. Sec. Litig.*, 2010 U.S. Dist. LEXIS 26927, 2010 WL 1047618, at *6 (S.D.N.Y. Mar. 22, 2010)); *see also In re Pfizer*, at *19-20 (finding that the expert's opinion, "while about a mechanism not proven conclusively or uniformly accepted, is far from baseless speculation and

concerns a theory that has been subject to, and approved for publication by, peer review"); *accord Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 439-40 (E.D.N.Y. 2011).

Astoundingly, Bayer claims that Dr. Salpietro's agreement that his mechanism "is not *proven*" is "a dispositive threshold matter." Dkt 156 at p. 5 (quoting Salpietro Dep. at 350:15–22) (emphasis added). Yet, Bayer's purported threshold is notably absent from *any* precedent, no less the case law that it actually cites in support of its outrageous contention. *See id.* at p. 6 ("Such unproven theories fall short of Daubert's requirements. *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-CV-5810, 2017 WL 6729295, at *7 (S.D.N.Y. Dec. 28, 2017) ("Theoretical possibility . . . does not qualify as 'scientific' or 'technical knowledge' within the meaning of Rule 702.") (citations omitted)"). Rather, as the Supreme Court held in *Daubert*, "it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science … 'Indeed, scientists do not assert that they know what is immutably 'true' – they are committed to searching for new, temporary, theories to explain, as best they can, phenomena.'" 509 U.S., at 590; *accord Zuchowicz*, 870 F. Supp. at 20. Dr. Salpietro's mechanism goes far beyond "theoretical possibility," and a "conclusive hypothesis" – a made-up phrase used by Bayer in its response to the German Health Authority – is an oxymoron without basis in either science or the law. Dfts. Ex. 71, MIR_IIH_EU00606946 at _960 ("In summary, no conclusive hypothesis exists for a theoretical pathomechanism by which reproductive hormones would cause the development of IIH.")

Failing to muster up *any* support for its claim that a mechanism must be *proven*, Bayer argues that a "biologically plausible" mechanism must be accepted by the scientific community in order to "constitute 'scientific knowledge' within the meaning of *Daubert*.'" Dkt 156 at p. 6 (quoting *Golod v. Hoffman La Roche*, 964 F. Supp. 841, 860 (S.D.N.Y. 1997)). However,

Bayer's interpretation of general acceptance under *Golod* is tantamount to resurrection of *Frye*: "That austere standard, absent from, and incompatible with, the Federal Rules of Evidence, should not be applied in federal trials." *Daubert*, 509 U.S. at 589. Rather, in *Golod*, the Court rejected a "biologically plausible" mechanism where, *in addition to* a lack of evidence that the expert's theory had "achieved any acceptance (or rejection) in the medical community," the expert had "provided no direct scientific evidence to support the[] novel aspects of his theory," and the hypothesis had "not been previously advanced in the scientific literature or otherwise been subjected to peer review, such as through a grant application process." 964 F. Supp. at 860. Remarkably, the Court *still* noted that the expert's testimony might be admissible if "further scientific support for the hypothesis is adduced prior to trial." *Id*. at 861.

Finally, Bayer clings to its own semantical interpretation of Dr. Salpietro's literal utterances[7] to suggest that some aspect of Dr. Salpietro's work is *disputed* or hotly contested. Dfts. Br. at p. 6 (citing Salpietro Dep. at 237:22–24) ("Salpietro acknowledges his general model is "controversial.") Yet, not even Bayer's paid experts has published any criticisms or disagreement with Dr. Salpietro's mechanism, and many of the sources that Bayer's experts cite lend further support thereof. *See, e.g.*, Ex. D11, Andrews 2014 (cited by six of twelve Bayer experts) ("Thus, derangements of the corticosteroid axis through exogenous or endogenous mechanisms may lead to the development of IIH via this mechanism"); Ex. D7, McGeeney & Friedman 2014, at pp. 449-50 (cited by Bayer experts Newman and Van Stavern) ("Abnormalities in aldosterone homeostasis would potentially explain both the female sex predilection and relationship to obesity found in patients with IIH, has potential therapeutic implications, and warrants further exploration").

---

[7] Notably, Dr. Salpietro testified in English with a "back-up" translator although his native language is Italian. Moreover, Dr. Salpietro is a scientist and physician, and has never testified before in *any* language.

Regardless, the fact "'[t]hat the mechanism remains unknown does not mean that the one proposed by the [plaintiffs' experts] is not widely accepted as plausible.'" *Deutsch*, 768 F. Supp. 2d 420, 438 (quoting *In re Fosamax Products Liability Litig.*, 645 F. Supp. 2d 164, 183 (S.D.N.Y. 2009)) (collecting cases): *In re Neurontin Mktg. Sales Practices and Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 149 (D.Mass. 2009) (finding that biologic plausibility supported opinion on causation despite the fact that there was 'robust debate in the scientific community' on the proposed mechanism); *In re PPA Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1247 (W.D. Wash. 2003) ("The fact that the mechanism remains unclear does not call the reliability of the opinion into question.") *See also Bartoli*, 2014 U.S. Dist. LEXIS 52956, at *29 (expert allowed to testify as to mechanism where: "[he] is not offering his opinion as *the* mechanism, but rather indicating that it is a plausible one given his understanding of the relevant medical literature.") (emphasis added). Dr. Salpietro describes the probability as "more likely than not" to connote exactly that: a weighing of the evidence.

Bayer's citation to *McClain v. Metabolife Int'l, Inc.*, to suggest that "more likely than not" has "little value in the *Daubert* context," intentionally decontextualizes its source. Dfts. Br. at pp. 6-7 (citing 401 F.3d 1233, 1244 (11th Cir. 2005)). There, the court rejected opinions based on no more than "the broad principles of pharmacology," as invoked by the expert, and held that an "expert's assurances that he has utilized generally accepted *scientific methodology* are insufficient" to satisfy *Daubert*. 401 F.3d at 1244 (emphasis added). Contrastingly, each step of Dr. Salpietro's mechanism is firmly grounded in well-accepted scientific knowledge. *See e.g.*, Ex. D10, Sheldon 2015, at p. 285;[8] Ex. D7, McGeeney & Friedman 2014, at p. 446, 449.[9]

---

[8] "It is generally accepted that aldosterone is present within the CSF in concentrations that correlate with plasma levels, and bind high-affinity aldosterone, mineral-corticoid receptor-binding sites within the choroid plexus and other central nuclei."

## II. Dr. Salpietro Reliably Applies Scientific Methodology to Connect LNG to IH Through MR Agonism

Under *Daubert*, "'scientific' implies a grounding in the methods and procedures of science,' while ''knowledge' connotes more than subjective belief or unsupported speculation.'" *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043-44 (2d Cir. 1995) (quoting 509 U.S. at 590). Applying this standard, the Second Circuit has affirmed the admission of expert testimony "despite the fact that the expert 'could not point to a single piece of medical literature' that specifically supported [his] opinion." *Amorgianos*, 303 F.3d at 266-67 (quoting *McCullock*, 61 F.3d at 1043). "Where an expert otherwise reliably utilizes scientific methods to reach a conclusion," *id.* at 266, "[d]isputes as to the strength of his credentials, faults in his use of differential etiology as a methodology, or lack of textual authority go to the weight, not the admissibility" of his testimony. *McCullock*, 61 F.3d at 1044; *see also Zuchowicz*, 140 F.3d at 387. "A contrary requirement 'would effectively resurrect a *Frye*-like bright-line standard, not by requiring that a methodology be 'generally accepted,' but by excluding expert testimony not backed by published (and presumably peer-reviewed) studies.'" *Amorgianos*, 303 F.3d at 267 (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)). "Such a bright-line requirement would be at odds with the liberal admissibility standards of the federal rules and the express teachings of Daubert." *Id. See also Hart*, 60 F. Supp. 3d at 465; *FDIC v. Suna Assocs.*, 80 F.3d 681, 687 (2d Cir. 1996) (finding that district court did not abuse discretion by admitting expert testimony based on a hybrid of two widely used methods). Simply put, Dr. Salpietro's opinions rest on "good grounds," and his analysis is "reliable at every step." *Id.*

[9] "The production of CSF involves energy dependent Na+/K+-ATPase situated on the luminal membrane of the CP epithelium transporting Na+ from the epithelial cytoplasm into the CSF space;" "Aldosterone is a mineralocorticoid with well-known actions on the kidneys, but it is also active on epithelial cells of the choroid plexus."

### A. Bayer Misrepresents Dr. Salpietro's Foundational Opinions Regarding the Endogenous Hormone Progesterone

As this Court has held, "[i]mportant here, a minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Hart*, 60 F. Supp. 3d at 465 (Engelmayer, J.) (quoting *Amorgianos*, 303 F.3d at 267). "'The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions.' 'This limitation on when evidence should be excluded accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.'" *Id*. (internal citations omitted). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267. "The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Id.* (internal citations omitted).

Attempting to pin Dr. Salpietro's opinions to its perplexing leap framework, Bayer misinterprets his opinions at every step. ***First***, Bayer claims that Dr. Salpietro's opinions *require* that Progesterone act as an MR-agonist. Dkt. 156 at p. 8, and n.3. This claim is found nowhere in Dr. Salpietro's report. Regardless, support for Dr. Salpietro's conclusion is found in the medical literature. Dr. Salpietro begins by describing the binding affinity of Progesterone at the MR: "Progesterone is known to have MR binding affinity similar to Aldosterone. Several authors found that progesterone binds the human MR with higher affinity than natural ligands such as aldosterone and cortisol." Ex. F2, Salpietro Rpt. at p. 9 (citing Souque A et al., Endocrinology. 136:5651-8, 1995; Quinkler M et al., Endocr Res. 28:465-70, 2002).

Yet, Bayer takes issue with the second half of Dr. Salpietro's reliance upon these studies, *i.e.*, the conclusion that P is an MR-agonist, arguing that the studies undermine his view. Dkt 156 at p. 8 n.3. However, as Dr. Salpietro explained at his deposition, the authors "showed that the metabolites of progesterone had different activity on the mineralocorticoid receptor. Some of them had larger agonistic activity than some others." Ex. F3, Salpietro Dep. at 54:2-6; *see also* Dkt 167-61 (Souque 1995), at p. 5656 ("In contrast, the mineralocorticoid properties of the 18-substituted P derivatives depend on the nature of the substituent, because 18VP and 18EP, like P behave as antagonists, whereas the presence of the enone function confers agonist properties"); Dkt 167-50 (Quinkler 2002), at p. 467 ("We showed that P has a low agonist MC-activity with approx. 25% of the maximum aldosterone-induced response at $10^{-}$6 mol/L"); *see also* Ex. D7, McGeeney & Friedman 2014, at p. 452 ("Progesterone has mineralocorticoid effects which can enhance CSF production.") Far from "pluck[ing] out a stray sentence," Dr. Salpietro's opinion is very much consistent with the scientific literature upon which he relies. Thus, a "rigorous examination of the facts" on which Dr. Salpietro relies, "the method by which [he] draws an opinion from those facts, and how [he] applies the facts and methods to the case at hand" demonstrates "good grounds" for his conclusions. *Amorgianos*, 303 F.3d at 267.

**B. Dr. Salpietro Reliably Concludes that LNG Plausibly Acts as a MR Agonist**

Taking for granted its interpretation that Dr. Salpietro's opinions *require* Progesterone to act as an MR-agonist, Bayer makes its ***second*** leap, claiming: "Even if he could reliably demonstrate that progesterone acts as an MR agonist, Dr. Salpietro has no reliable evidence that LNG, a synthetic progestin, acts as such an agonist." Dkt 156 at p. 8 (citing Salpietro Dep. at 252:22–253:10). Yet, as Bayer notes, Dr. Salpietro acknowledged that "small changes in the chemical structures may change completely the outcome of that drug." *Id.* (citing Dkt 167-12, Salpietro Dep. at 246:6–9. For this reason, Dr. Salpietro distinctly analyzed the evidence

regarding LNG specifically, to come to a conclusion regarding LNG. Thus, Dr. Salpietro's analysis does not require "analogy" to progesterone, or that "differences in chemical structure" between LNG and progesterone make no difference," as Bayer's citation to *McClain* implies. *Id.* (citing 401 F.3d at 1246).

Moreover, Bayer undermines its own first premise by arguing that synthetic progestins do not always act at the receptors analogously to Progesterone. Dkt 156 at p. 8. Specifically, even if Progesterone is an MR-antagonist as Bayer argues, Bayer admits that LNG is capable of acting differently. Dr. Salpietro does not rely upon "guilt by association," nor does he claim that every progestin may cause PTC/IH. Rather, he reliably synthesizes the available scientific evidence regarding LNG, specifically, and concludes that LNG more likely than not acts as a MR-agonist.

**1. Dr. Salpietro Provides Reliable Evidence that Levonorgestrel Binds Substantially at the MR**

LNG is a potent synthetic progestin, with its own unique pharmacological profile and set of receptors at which it may bind and cause biological activity. Ex. A1, Hofmann Dep. at 58:6-25. Although the desired activity of any progestin is at the progesterone receptor (PR), "LNG is not a pure progesterone agonist. It has a low, but substantial affinity to the androgen receptor and the mineralocorticoid receptor, and to some transport proteins." Ex. E, MIR_PIEU-R_00377654, at _661. Dr. Salpietro provides ample support for this foundational fact in his Report. Ex. F2, Salpietro Rpt. at p. 7 (citing Pollow K. Contraception 40:325-41, 1989; Sitruk-Ware, Hum. Reprod. Update 12: 169-178, 2006; Stanczyk et al., Endocrine Rev. 34: 171-208, 2013; Africander D et al. Steroids. 76:636-52, 2011). Moreover, Bayer even ***admits*** this point: "Subject to the objections and clarifications below, the Bayer Defendants admit that levonorgestrel has been shown to bind to the mineralocorticoid receptor in *in vitro* studies of certain animal and/or human tissue models." Ex. B2, Dfts' Rsps to Plfs' RFA, No. 20.

Dr. Salpietro cites to both *in vitro* and *in vivo* binding studies of LNG in support of his opinion. Furthermore, limitations to *in vitro* methodology relied upon do not constitute "methodologic *flaws* which render [an] opinion on plausible biological mechanism of injury inadmissible," and "these limitations can be effectively addressed on cross-examination." *In re Zoloft Prods. Liab. Litig.*, 26 F. Supp. 3d 466, 471 (E.D. Pa. 2014) (emphasis in original); *accord K.E. v. Glaxosmithkline LLC*, No. 3:14-cv-1294(VAB), 2017 U.S. Dist. LEXIS 13705, at *34-35 (D. Conn. Feb. 1, 2017) (finding animal studies admissible when the "gap between what these sources reasonably imply and more definitive scientific proof of causality is not too great," and when "the inferences are of a kind that physicians and scientists reasonably make from good but inconclusive science") (quoting *In re Ephedra Prods. Liab. Litig.*, 393 F. Supp. 2d 181, 197 (S.D.N.Y. 2005)); *see also Danley v. Bayer (In re Mirena IUD Prods. Liab. Litig.)*, 169 F. Supp. 3d 396, 432 n.23 (S.D.N.Y. 2016) ("the expert's 'extrapolation from studies to support [his or her] conclusions, as well as [his or her] use of *in vitro* versus *in vivo* studies [goes] to the weight and not the admissibility of expert testimony'") (citing *In re Ephedra*, 393 F. Supp. at 189).

**2. Dr. Salpietro Reliably Concludes that Levonorgestrel Plausibly Acts as an Agonist at the MR Based on the Scientific Literature**

Thus, Dr. Salpietro begins with the well-accepted scientific premise that "it is plausible that synthetic progestins exert therapeutic actions as well as side-effects via some of these receptors." *See, e.g.*, Dkt 176-15 (Africander 2011), at p. 636 (abstract); *see also* Jusko Rpt. at p. 9 ("Binding of drugs to diverse receptors in cell or tissue preparations is a common screening method to assess the potential for further activity of the compounds.") As Dr. Salpietro notes preliminarily, there is *no* scientific evidence that LNG acts as an *anti*-mineralocorticoid: "Several authors agree that LNG is not an antagonist at MRs." Ex. F2, Salpietro Rpt. at p. 10 (citing Kuhl H. Climateric. 8:3–63, 2005; Mueck & Sitruk-Ware. Steroids. 76:531-9, 2011; Elger W.

Steroids. 68:891-905, 2003). Indeed, further support for Dr. Salpietro's conclusion is found by discerningly tracing back the sources cited by Bayer's expert on this issue. Ex. F3, Salpietro Dep. at 55:19-56:24; *see also* Plfs' Br. in Supp of Mot. to Excl. Jusko (Dkt. 135) at pp. 11-14 (§ II.A). In addition to a lack of scientific data to the contrary, Dr. Salpietro analyzed clinical effects consistent with MR-agonism, as described *infra.*

Whereas Bayer's expert Dr. Jusko draws the conclusion that LNG is an MR-antagonist despite a demonstrable lack of a *single* source directly supporting *his* proposition, Dr. Salpietro reliably concludes from the available evidence that LNG plausibly acts as an agonist at the MR. That Dr. Salpietro's conclusion diverges from Bayer's is not a proper ground for exclusion; rather, the jury may hear both and decide which opinion to credit.[10] *EEOC v. Mavis Disc. Tire, Inc.*, 129 F. Supp. 3d 90, 115 (S.D.N.Y. 2015) (citing *Port Auth. Police Asian Jade Soc. of N.Y. & N.J. Inc. v. Port Auth. of N.Y. & N.J.*, 681 F. Supp. 2d 456, 466-67 (S.D.N.Y. 2010) ("It is the jury's role to decide between competing conclusions based on the data and analysis.")

**3. Dr. Salpietro Reliably Interprets Bayer's Clinical Data to Determine that Mirena Users Experience Clinical Symptoms of MR-Agonism**

Beginning with the premise that LNG does not demonstrably display *anti*-mineralocorticoid activity, Dr. Salpietro reliably synthesized published case reports and clinical and non-clinical data produced by Bayer to consider whether Mirena users clinically exhibit effects consistent with agonism at the MR. For example, Dr. Salpietro noted that: "clinical reports of patients who experienced typical mineralocorticoid activation symptoms (e.g., increase in body weight or blood pressure) following a LNG-IUD implant have been reported in the medical literature." Salpietro Rpt. at p. 10 (citing Rosenthal & Oparil. Comprehensive hypertension. 70: 865–882, 2007; Vos et al. Neth J Med. 70:431, 2012) (footnote omitted).

[10] Subject to this Court's finding that Dr. Jusko's opinions on this issue are admissible. *See* Plfs' Br. in Supp. of Mot. to Excl. Jusko (Dkt. 135) at pp. 11-14 (§ II.A).

Furthermore, Dr. Salpietro explained that "[s]trong support for MR agonist activity also comes from Bayer's clinical studies and postmarketing reports, which demonstrate LNG causing MR agonism-related side effects," including those reported as "[e]xpected adverse drug reactions of Mirena" in Clinical Study Report (CSR) A46796. *Id*. at pp. 10-11.

Remarkably, despite challenging Dr. Salpietro's reliance upon case reports to support his conclusion that Mirena can cause mineralocorticoid effects such as bloating or edema, weight gain, or increased blood pressure, Dkt. 156 at pp. 10-12, Bayer has failed to designate a single fact witness, corporate representative, or expert witness capable of explaining how *any* clinical findings with Mirena correspond in any way to its pharmacological profile. For example, Pharmacokinetics 30(b)(6) designee Birte Hofmann could not explain the biological process by which LNG causes *any* clinically observed side effect, including those listed in CSR A46796 as "Expected Adverse Drug Reactions for Mirena." Ex. A1, Hofmann 30(b)(6) Dep. at 157:23-167:10. More specifically, Dr. Hofmann could not identify the mechanism by which the LNG released by Mirena could cause either edema or weight gain. *Id.* at 161:25-162:12; 164:21-165:6 (*e.g.*: "But I have no idea what the mechanism is.") *See also* Ex. A3, Zurth Dep. at 80:24-90:9 (testifying that biological effects produced by LNG are beyond pharmacokinetics expertise, and unable to determine who, if anyone, at Bayer has the requisite expertise to explain the mechanistic processes). Indeed, Defendants argued against fact discovery on these very topics on purported relevancy grounds.[11]

Bayer even objected to Requests for Admission on these precise issues, including both *whether* Mirena causes these side effects, and *how*. *See* Ex. B2, Dfts' Rsps to Plfs' RFA, Nos. 18-21; Ex. B1, Dfts' Rsps to Plfs' 2nd Set RFA, Nos. 9, 17-23. Moreover, although Bayer's

---

[11] Ex. G, October 24, 2017 CMC Transcript (Dkt. 110) at 30:9-21. Notably, as Dr. Hofmann testified, while the *contraceptive efficacy* of Mirena is thought to be mostly a *local* effect, "the levels of levonorgestrel in the systemic circulation are what would cause any potential adverse effects." Ex. A1, Hofmann 30(b)(6) Dep. at 200:4-202:17.

expert pharmacologist, Dr. Jusko, holds himself out as an expert on "any studies that concern how drugs work on any process in the body," he was unable to testify as to even the most basic facets of these processes relating to LNG. Ex. H, Jusko 2018 Dep. at 196:14-198:14 (discussing clinical findings indicative of biological activity at the MR). Bayer's refusal to engage in the appropriate scientific method of assessing scientific data and clinical findings to determine potential biological consequences does not render Dr. Salpietro's methodology unreliable or his conclusions incorrect.

Thus, Dr. Salpietro reliably synthesized the available evidence, and concluded biologic plausibility from pharmacological data and clinical findings both in Bayer's clinical trials and the scientific literature. Ex. F3, Salpietro Dep. at 54:14-55:9 ("So basically there is the in vitro data, there is the animal data and there is the clinical data. The combination of this data suggests to me that is more likely than not that the effect is agonistic on the mineralocorticoid receptor.") This methodology is reliable and admissible in the Second Circuit.

### C. Dr. Salpietro Reliably Synthesizes the Available Evidence to Conclude that LNG Plausibly Increases CSF Production through a MR-Mediated Mechanism

Finally, Dr. Salpietro provides reliable evidence that steroid hormones such as LNG may cause increased cerebrospinal fluid (CSF) pressure by dysregulating the volume of the CSF. Bayer convolutes and decontextualizes both the language of Dr. Salpietro's own report and the testimony from another Plaintiffs' expert to suggest otherwise.

***First***, Bayer claims that Dr. Salpietro, in discussing "how MR agonism in the choroid plexus increases intracranial pressure" is unable "to decide whether his model requires increased fluid production or decreased outflow." Dkt 156 at p. 13. To the contrary, Dr. Salpietro's report explains his mechanism — 1) MR agonism stimulates $Na^+/K^+$-ATPase pumps, 2) leading to movement of sodium into the choroid plexus, 3) creating an osmotic gradient that 4) increases

pressure and drives CSF secretion — at length with citations to numerous peer-reviewed publications, including his own. Ex. F2, Salpietro Rpt. at pp. 16-18 (citing, *e.g.*, Salpietro 2014, Ex. F4 hereto). Further, Dr. Salpietro clearly elucidates the mechanistic process:

> According to this model, the MR agonistic activity of aldosterone on the epithelial cells of the choroid plexus, more likely than not, act similarly to the classical mechanisms involved in the epithelial cells of the kidney, thus leading to an enhancement of the number and activity of the sodium channels $Na^+/K^+$ ATPase in the apical membranes with consequent increase of some CSF electrolytes (especially $Na^+$) and, by result, increased CSF (osmotic) pressure and fluid gradient.

*Id*. at p. 18 (citing Weber 2003, Ex. D12 hereto; Salpietro 2012, Ex. F1 hereto; Andrews 2014, Ex. D11 hereto; Sheldon 2015, Ex. D10 hereto).

Dr. Salpietro does not, as Bayer claims, "side-step the issue," nor does he provide a "circular statement," nor does his mechanism "make little sense." As Dr. Salpietro notes, the electrolyte-osmotic model of IH has been studied for decades. Ex. F2, Salpietro Rpt. at pp. 17-18 (citing Foley 1955, Ex. D9 hereto; Oldstone 1966, Ex. D13 hereto). Moreover, this model is consistent with the same well-studied and generally-accepted model of how sodium channels function throughout the body, in organs other than the brain. There is nothing speculative or unreliable about this model; as one review noted, the "epithelial sodium transport and its control by aldosterone" were required "for the evolution of life on Earth," and, in humans, "sodium balance ensures a constant amount of sodium in the body, which is crucial for the maintenance of the [extracellular fluid] volume, and thus blood pressure." Ex. D14, Rossier 2015. Thus, Dr. Salpietro's mechanism makes sense intrinsically, just as a physician recommending a low salt diet to a patient with arterial hypertension.

***Second***, Bayer claims "Dr. Salpietro's report cites no literature finding that LNG increases fluid production," but that is simply untrue. Dkt 156 at p. 13. As described in detail,

*supra*, Dr. Salpietro's report explains at length multiple lines of evidence that LNG increases fluid production. For example, Dr. Salpietro considered evidence that: animal studies of LNG produced weight gain; Bayer itself considered "edema" and "weight gain" among the "common" "expected adverse drug reactions for Mirena;" Bayer's clinical trials revealed a multitude of Mirena patients with edema, bloating, and weight gain, all of which Dr. Salpietro explains "are strong evidence of mineralocorticoid agonism;" peer-reviewed literature showed that clinical trial subjects using Mirena were nearly eight times more likely to discontinue for hormonal reasons; and, in one trial conducted by Bayer nearly 10% of women discontinued for hormonal reasons. Ex. F2, Salpietro Rpt. at pp. 10-12. To the extent Bayer disagrees with Dr. Salpietro's conclusions drawn from this wealth of data, synthesized using his training as a medical doctor and his extensive experience specifically regarding intracranial hypertension and mineralocorticoid activation, that disagreement goes to the weight of his testimony, not its reliability. *R.F.M.A.S., Inc.*, 748 F. Supp. 2d at 252.

## CONCLUSION

Bayer's offers as support for its motion (Dkt 155, 156) no more than ultimate disagreement with Dr. Salpietro's conclusions, supported only by Bayer's own superfluous use of the verbs "posits," "speculates," and "hypothesizes" throughout, and its convoluted "leap" framework that fails to demonstrate unreliability at each step. Dr. Salpietro's opinions are the reliable product of "good science," and therefore must be admitted under Rule 702 and *Daubert*.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court DENY Bayer's Motion to Exclude the Expert Testimony of Vincenzo Salpietro, M.D.

Dated: March 15, 2018

Respectfully submitted,

*/s/ Lawrence L. Jones II*
Lawrence L. Jones II
Jones Ward PLC
*Co-Lead Counsel for Plaintiffs*

Martin D. Crump
Davis & Crump PC
*Co-Lead Counsel for Plaintiffs*

Maxwell S. Kennerly
Kennerly Loutey, LLC
*Liaison Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2018, I served all counsel of record with the foregoing via this Court's CM/ECF System, which will provide notice of filing to all counsel of record.

/s/ *Lawrence L. Jones II*
Lawrence L. Jones II