# EXHIBIT A2

## Nov. 29, 2017
## Deposition of Juliane Schoendorf, Ph.D.

**In the Matter Of:**

IN RE: MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY

# CONFIDENTIAL

# VIDEOTAPED DEPOSITION OF DR JULIANE SCHOENDORF, VOLUME II

*November 29, 2017*

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------

IN RE:

MIRENA IUS LEVONOROGESTREL-RELATED
PRODUCTS LIABILITY LITIGATION (No. II)

---------------------------------------

17-MD-2767(PAE)

-----------------------

**CONFIDENTIAL**

Videotaped deposition of:

DR JULIANE SCHOENDORF
(Volume II)

taken at:

Hannes Snellman Attorneys Ltd

Eteläesplanadi 20
Helsinki
Finland

on Wednesday, November 29th, 2017

commencing at 9.29am

-----------------------

A P P E A R A N C E S

For the Plaintiff:

MR MAX KENNERLY

KENNERLY LOUTEY LLC
601 Walnut Street, 1150W
Philadelphia, PA 19106
Telephone: 215.261.7070
E-mail: mkennerly@kennerlyloutey.com

MR LAWRENCE JONES

JONES WARD PLC
The Pointe
1205 E. Washington Street
Suite 111
Louisville
Kentucky 40206
Telephone: 502.882.6000
Email: larry@jonesward.com

MR PETER MILLER

JONES WARD PLC
The Pointe
1205 E. Washington Street
Suite 111
Louisville
Kentucky 40206
Telephone: 502.882.6000
Email: larry@jonesward.com

For the Defendant Bayer:

MS SHAYNA S. COOK

GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP
564 West Randolph Street
Suite 400
Chicago, Illinois 60661
Telephone: 312.881.5947
E-mail: scook@goldmanismail.com

MS EMMA C. NEFF

Goldman, Ismail, Tomaselli, Brennan & Baum
564 West Randolph Street
Suite 400
Chicago, Illinois 60661
Telephone: 312.881.5952
E-mail: eneff@goldmanismail.com

MR SHANKAR DURAISWAMY

COVINGTON & BURLING LLP
One City Center, NW
Washington, DC 20001-4956
Telephone: 202.662.5273
E-mail: sduraiswamy@cov.com

Also present:

DR SIMON LIEBICH

Senior Counsel

Bayer Nordic SE

Interpreter:

MS MANUELA WILLE

Court reporter:

MS KAY HENDRICK

Discovery Litigation Services, LLC
Suite 2300
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: 404.847.0999

Videographer:

MR DAVID ROSS ELLIOTT

Discovery Litigation Services, LLC
Suite 2300
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: 404.847.0999

# I N D E X

Contents Page

INTERPRETER sworn 10
DR JULIANE SCHOENDORF 10

Examination by MR KENNERLY 10
Examination by MR JONES 128
Cross-examination by MS COOK 161

L I S T O F E X H I B I T S

The following exhibits were marked:


| Exhibit number | Description | Page |
|---|---|---|
| Exhibit 14 | Bayer document re association between Mirena and IIH | 52 |
| Exhibit 15 | BfArM response | 76 |
| Exhibit 16 | Copy of Jadelle web page "Patient and Drug Safety" | 139 |
| Exhibit 17 | E-mail of 4 May 2017 MIR_CW_00383493 | 140 |
| Exhibit 18 | E-mail of 8 Dec. 2016 from T. Tervomaa MIR_IH_US00010962 | 147 |
| Exhibit 19 | Response from C. Walsh in response to Exhibit 18 | 154 |

| | | |
|---|---|---|
| Exhibit 20 | E-mail from N. Slutsky to Dr Schoendorf and others | 155 |
| Exhibit 21 | Excerpt from FDA website | 167 |
| Exhibit 22 | Excerpt from Periodic Update Report Nov. 2008 | 175 |
| Exhibit 23 | Request from British Health Authority | 178 |
| Exhibit 24 | Response from British Health Authority | 179 |
| Exhibit 25 | Portion of the Periodic Risk Evaluation Report 3 March 2015 | 185 |
| Exhibit 26 | Portion from Guidelines of Good Pharmalogical Practices | 188 |
| Exhibit 27 | Letter to the Editor re Dr Etminan's analysis | 196 |

| | | |
|---|---|---|
| Exhibit 28 | Publication by Valenzuela and others | 203 |
| Exhibit 29 | Print-out from CDC website | 210 |
| Exhibit 30 | Analysis of other hormonal products at Bayer | 225 |
| Exhibit 31 | Clinical Study Report | 231 |
| Exhibit 32 | Letter from New Zealand Medicines and Medical Devices Safety Authority 5 April 2001 | 239 |
| Exhibit 33 | E-mail chain 2/3 May 2006 from P. Korner | 243 |
| Exhibit 34 | E-mail chain 5 April 2006 000382164 | 247 |
| Exhibit 35 | Letter to Editor from Dr Freidman, 18 March 2014 | 279 |

| | | |
|---|---|---|
| Exhibit 36 | Print out from New Zealand Health Authority website | 280 |

Wednesday, 29th November, 2017

THE VIDEOGRAPHER: Good morning. This is a continuation in the video deposition of Dr Juliane Schoendorf being taken on 29th November 2017 at 9.29am, as indicated on the video scene.

Interpreter previously sworn

JULIANE SCHOENDORF
having been duly sworn,
testified as follows:

Examination by MR KENNERLY:

Q. Good morning, Dr Schoendorf. If you could go to Exhibit 2. Exhibit 2, as we discussed yesterday, is one of the letters from Bayer's lawyers talking about the subject of your testimony, correct?

A. Yes.

Q. Now, the second bullet point there refers to the clinical trials that Defendants believe are relevant in assessing whether there is any causal association between the use of Mirena and IIH, do you see that?

A. Yes.

Q. Now, first has Bayer ever assessed if

there is a causal association between Mirena and IIH?

A. Yes, we have done that in repeated signal assessments.

Q. Okay. And that would be the signal assessments that we talked about yesterday?

A. Yes, correct.

Q. Now, in those signal assessments have you ever reviewed clinical trial evidence?

A. Yes, I have.

Q. So which clinical trials does Bayer believe are relevant in assessing whether there is a causal association between Mirena and IIH?

A. Well, generally all safety data deriving from the clinical trials, so all clinical trials are relevant when you want to assess what clinical trial data are available. So in the clinical trials that are done by Bayer the serious adverse events, so any undesirable effects or any undesirable occurrences are reported according to the clinical trial guidelines, and that means as serious adverse events they are also reported into the Pharmacovigilance database. So when we do our retrievals in the Pharmacovigilance database for cases that are reported -- that are reporting

idiopathic intracranial hypertension in Mirena users, or users of other or LNG Ius, that means that we are also searching in the serious adverse events that come from clinical trials.

Q. Okay. So see if I understand this correctly. When Bayer's assessing a causal association between Mirena and IIH Bayer doesn't look at the clinical trials by themselves or pooled, instead it sees the clinical trial cases as essentially other case reports, correct?

MS COOK: Object to form.

A. So the clinical trial cases in the Pharmacovigilance database are identifiable as such so you can also associate them to the trial in which they were reported on, so if there were any confirmed cases of idiopathic intracranial hypertension in the clinical trials you could identify them as a clinical trial case, could also see which trial that is reported from and, of course, you put it into the relation to the overall clinical trial evidence from the clinical trial set Bayer has performed.

MR KENNERLY: Now, speaking generally about medical products, clinical trials are often used to assess the safety of drugs and devices, correct?

A. Correct. That is correct, yes.

Q. And in some circumstances it is possible to either find a causal association or to establish the absence of a causal association based upon the clinical trial alone, correct?

A. That, of course, depends on the clinical trial and the event that you are looking at, but in general yes, for certain incidences that may be the case, yes.

Q. And what are the factors that affect that, if you can use a clinical trial to establish the presence or absence of a causal association?

MS COOK: Object to form.

A. The factors, there are many factors that will affect that so it will depend on the size of the clinical trial or the event itself that you are investigating or your product, so generally speaking.

MR KENNERLY: Now in the context of intracranial hypertension and any drug, whether it is Mirena or otherwise, is it possible to use a clinical trial to prove or disprove a causal association?

A. So a clinical trial that would be specifically looking into the topic of idiopathic intracranial hypertension, because this is such a rare disease, studying it in a clinical trial would

be a very charge clinical trial, which is actually not feasible to study this in a clinical trial.

Q. Has Bayer ever done any form of calculation as to the nature of the clinical trial that would be needed to prove or disprove a causal association between Mirena and intracranial hypertension?

A. Well, not that I am aware of, but knowing the background frequency of idiopathic intracranial hypertension you don't actually have to make statistical calculations to know that the trial would be huge, of a size that would not be feasible.

Q. So because of the rarity of intracranial hypertension that would require a trial with hundreds of thousands, potentially millions of patients, correct?

A. I can't tell you the exact number, but it would be a very high, a very large trial and a high number of patients.

Q. Now, you mentioned that all clinical trial data, including adverse events is going into Bayer's database, first when you are mentioning database before you talked the ARGUS database?

MS COOK: Object.

MR KENNERLY: A-R-G-U-S?

A. So I was saying --

MS COOK: I am sorry, I was going to object to the characterization of the testimony.

A. So when I was referring to what goes into the Pharmacovigilance database, which you state correctly as the ARGUS database, I was talking about the serious adverse event from clinical trials which are -- so any kind of adverse events, so it may be any undesirable occurrences that are reported within the clinical trial and that may or may not have anything to do with a clinical trial itself or with a drug that is studied in the clinical trial, and if they meet certain criteria, the seriousness criteria which are defined in the guidelines, and including factors like hospitalization, for example, or otherwise medically important events that require intervention, these are classified as serious adverse events and they need to be reported expeditely, so that means they need to be captured and reported within certain timelines. And to that aim they are reported into the Pharmacovigilance database where they undergo a case process similar to other single cases that we receive. So it is processed and it's evaluated and it is reported within the timelines to the applicable health authorities. So when I am

saying that -- yes, so these serious adverse events are captured for all clinical trials in the ARGUS database or Pharmacovigilance database.

MR KENNERLY: Now when you said all clinical trials described in this process, do you mean all clinical trials sponsored by Bayer or all clinical trials sponsored and conducted by anybody that involve Mirena?

A. So that would mean all clinical trials sponsored by Bayer. Of course clinical trials if they are sponsored by somebody else, whether we know of these reports would depend on whether they are reporting these reports then to us as a marketing authorization holder, which may sometimes be the case if there is some kind of contract or agreement, and it may also be the case if they study -- if they publish their study results afterwards and then these cases would be identified from the literature and would be captured as published report from study cases, so ...

Q. So talking about clinical trials not sponsored by Bayer, the two ways that an incidence of intracranial hypertension would make it into Bayer's database would be either if the entity conducting that trial reported it to Bayer or if

Bayer spotted it in published literature; is that correct?

A. Yes, that is correct.

Q. How does the published literature, how does an instance of an adverse event in published literature of clinical trial that Bayer didn't sponsor, how does that information make it into Bayer's database?

A. So there is a whole process around the screening of the medical literature at Bayer, so you have to distinguish between the process that's done at local level, that's basically done by the Pharmacovigilance representative of Bayer in every country who screens the local literature for published cases of any adverse events for any drugs that Bayer has on the market in that country. And then we have the global function, which is the Pharmacovigilance literature service who are screening all English language scientific literature for publications that mention case reports of any adverse reactions with any drug of Bayer. So there are certain criteria that they use to identify, so it needs to be clear that this is some Bayer drug that was involved or it cannot excluded that it was a Bayer drug that was involved and that this event

occurred to a identifiable patient in a trial, so you have to create a single case report, you need to be able to identify a single patient in that publication. So they will then enter those cases directly in the ARGUS database and they are then marked as a case deriving from the literature. They will also be reported according to the guidelines.

Q. Are you aware of that ever happening with a case involving intracranial hypertension where an instance of intracranial hypertension was found in a clinical trial not sponsored by Bayer, and Bayer noticed that, went out and got that information and put that into its database?

MS COOK: Objection. Vague as to drug and disease.

A. So just to make sure that I understand your question correctly, so whether we are aware of any clinical trials, and here I am referring to the definition of clinical trial as a clinical trial that is not an observational trial?

MR KENNERLY: Interventional?

A. Yes, so whether I am aware of any clinical trials that are not sponsored by Bayer?

MR KENNERLY: Yes. You previously gave an answer about what happened if Bayer spotted a

clinical trial involving any Levonorgestrel product that wasn't sponsored by Bayer, so Bayer sees that this occurred in a clinical trial that Bayer didn't sponsor, and you described the process of how Bayer would then try and investigate to find information on the patient level and put that into its database, correct?

MS COOK: Objection.

MR KENNERLY: I don't mean to put words in your mouth, but generally is that what you are describing.

A. I don't --

MS COOK: Sorry, I just need to object. We are just presenting her on Mirena, so to the extent that you are asking about products beyond Mirena, that's beyond the scope. Okay, you can answer.

A. So I am sorry, can you just rephrase the question?

MR KENNERLY: Sure.

A. It is very complicated now.

MR KENNERLY: We are talking about how clinical trial adverse events relating to Mirena end up in Bayer's database if they showed up in a clinical trial that Bayer didn't sponsor, good so far?

A. So yes. Yes.

Q. Are you aware of that ever actually happening where Bayer saw intracranial hypertension in a clinical trial involving Mirena and went out, got information and put it into its database?

A. So we have not identified any case of idiopathic intracranial hypertension deriving from a published clinical interventional trial that was not sponsored by Bayer. We have done an extensive search in the literature and in our continuous monitoring of the literature, we screen all publications that have to do with Mirena and in that course, yes, there have been publications on case reports of idiopathic intracranial hypertension in Mirena user, and these cases made it into the database according to the -- so there has been one published case from a local literature and this case has made it into our database. So does that answer your question?

Q. Yes. Can you tell me more about that case that you are just referring to?

A. Yes, that was a single case publication from, I believe it was Portugal, but in the Spanish language, but it was identified in the local literature and there, so according to our standard processes it was then also translated and the case

details were included in the ARGUS database and it was reported as a single case. It refers to a case actually of a woman that was diagnosed with idiopathic intracranial hypertension after having taken a course of tetracycline antibiotic, and I believe seven days, if I remember correctly, after starting the antibiotic she developed symptoms of headache and was then diagnosed with idiopathic intracranial hypertension. They described that they stopped the antibiotic and they did a lumbar puncture where they diagnosed increased intracranial pressure and she was put on medication and she improved, and also her symptoms, her papilledema improved. Then during the follow-up when her symptoms was resolving the authors state that she also mentioned that she had been using Levonorgestrel Ius for, I believe, it was more than two years, if I recall correctly. And as what I would say is a precautionary measure they also decided to remove that Ius and discuss that in the publication for referring to the published case reports from the '90s that were published with Norplant, which we discussed yesterday.

Q. Now, that case, that would constitute a positive challenge with Mirena and intracranial hypertension, wouldn't it?

MS COOK: Object to form.
A. No, it wouldn't because the patient actually, the patient's symptoms resolved while Mirena was still in place. Is it positive dechallenge -- so it is not an unambiguous positive dechallenge case because they did a lumbar puncture and initiated treatment. So you can't say this is a clear positive dechallenge case. They stopped the tetracycline antibiotic so the improvement of the symptoms followed that so, but actually the patient's recovery started before they actually removed the Mirena. So that is not ...
MR KENNERLY: So let me ask you about the lumbar puncture part. Now is it Bayer's view that if a patient received a lumbar puncture and their symptoms of intracranial hypertension improved, that lumbar puncture precludes Bayer from determining that is a positive dechallenge?
MS COOK: Objection to the terminology.
A. So it is certainly information that is important to consider when you are looking into cases, into the cases to assess the clinical course of the disease in relation to whether or not the Mirena was removed. So you have to consider what kind of treatment she received, and you have to

consider that it's just the nature of the disease that in a certain percentage it is self-limiting, or the symptoms -- the episode, the symptoms will improve after the lumbar puncture and in many cases this will be a self-limiting episode so you have to consider that. But it is not the only consideration.

MR KENNERLY: So I want to make sure I understand this. Will Bayer -- so backing up.

We talked a lot yesterday about Pharmacovigilance, reviewing case reports, whether from clinical trials or elsewhere, do you recall that?

A. Yes.

Q. And one of the factors that's reviewed in those individual cases is if there is a positive dechallenge, correct?

A. Yes, that is correct.

Q. Now, will Bayer ever conclude that a case showed a positive dechallenge if the patient received a lumbar puncture?

MS COOK: Objection.

A. Well, so you cannot really make the conclusions always just on this one factor, so you have to look at the complete course of the disease and then you have to see the overall picture of the

cases that you receive.

MR KENNERLY: Sure. And I don't want to say that is the only factor for it, but what I wanted to understand is does Bayer consider a lumbar puncture to preclude the determination that a case involved a positive dechallenge?

A. No, but it's certainly one factor that you have to consider.

Q. So in some of the signal investigations there is reference to language that there is no unambiguous cases of positive dechallenge, do you recall that language?

A. Yes, correct, that refers to the fact that in the majority of cases treatment was initiated. So besides lumbar puncture also acetazolamide treatment or other treatment mentioned, and that does then not represent an unambiguous dechallenge.

Q. So in Bayer's view the fact that a lumbar puncture occurred automatically means that the case cannot be an unambiguous positive dechallenge?

MS COOK: Object to form.

A. No, that is not what I am saying. What I am saying is you have to consider that when you

look at the cases and determine the pattern with regards to the further cause of the disease whether or not the Mirena was removed. So you have to take into account whether the woman got a lumbar puncture, and you have to take into account in a certain percentage of idiopathic intracranial hypertension cases she recovers after a lumbar puncture.

MR KENNERLY: Sure. Just assume that a case involved a woman simultaneously having the Mirena removed and receiving a lumbar puncture, in a case with those two facts would Bayer conclude that the dechallenge is necessarily ambiguous?

MS COOK: Objection. Calls for speculation.

A. So that is a hypothetical case then, so it would certainly not be the only factors that you would look at in that case. You look at the full information in that case.

MR KENNERLY: Miss Cook, you did it again. You already had a "Vague" earlier. You just had "calls for speculation". Object to the form and stop with "object to the form".

MS COOK: This is a totally appropriate objection under the Rules.

MR KENNERLY: It is not. It is object to

form and stop there --

MS COOK: I totally disagree with you and you are not going to sit here and instruct me on your view of the Rules. I know what the Rules are and I am following them. So move on.

MR KENNERLY: For the record, each time you do it, you have had notice before this deposition, you know it from case law, object to the form. Do not give a suggestive answer. Do not say "vague". Do not say "calls for speculation".

MS COOK: There is no suggesting here. Just ask proper questions and you will be fine.

MR KENNERLY: So has Bayer ever concluded that there was positive dechallenge in a case in which the woman received a lumbar puncture?

MS COOK: Object to form.

A. So we have in our analysis of the cases that we have received, we have looked at all cases with regards to whether they improved or recovered or did not recover, and whether they received a lumbar puncture or treatment, and have come to the conclusion that we couldn't really identify an unambiguous case of dechallenge.

MR KENNERLY: Now, what's the term "medically confirmed" mean in the context of

Pharmacovigilance?
MS COOK: Object to form.
A. So the term "medically confirmed", when it refers to a single case, a spontaneous case, means that this is a case that was reported by a healthcare professional, so either a physician or a nurse, or has later been followed up with a reporter has later been confirmed by a healthcare professional, yeah.
MR KENNERLY: Does that mean confirmed by any healthcare professional or confirmed by Bayer?
A. Confirmed by the healthcare. So if you go back to the reporter and ask for the contact details of the person's treating physician, so that you go contact the treating physician and the treating physician confirms the information that was provided by the reporter in the first place.
Q. So when Bayer reviews the reports of intracranial hypertension Bayer doesn't question if the physician diagnosed intracranial hypertension?
A. I don't understand the question, what you mean the question?
Q. What I want to know is from what you describe there it seems that for your purposes in Pharmacovigilance, if a healthcare provider has diagnosed the patient with intracranial hypertension

then you in Pharmacovigilance will from then on assume yes, the patient actually had intracranial hypertension; is that correct?

MS COOK: Object to form.

A. So we are talking now here about the cases of idiopathic intracranial hypertension, so regardless whether it is a physician or a non-healthcare professional, a patient that reports to us, the terms that this event is reported are captured in our database, so it is the term as reported. And this term will then be decoded by the so-called Med DRA terminology M-E-D D-R-A, so that is what is then captured in the case and is the reported event. That has not changed in any way by Bayer, that this is what the case is reported under.

MR KENNERLY: I mean for your purpose instead Pharmacovigilance when you are conducting a signal assessment do you accept those diagnosis or do you do your own judgment based on the available records?

MS COOK: Object to form?

A. So when we see, from Pharmacovigilance purposes when we see, when we evaluate the cases of idiopathic intracranial hypertension we will, of course, also look into the details that are reported

which, since these are spontaneous reports, are very often limited and you don't get all the details, so you also look into what kind of signs and symptoms are reported and what are the results of investigations. If the reported details do not, in our view, support a diagnosis, for example, a patient has had a lumbar puncture that has a normal opening pressure, or the signs and symptoms that are reported are not consistent in general, then that certainly goes into our assessment, but it does not mean that we can change the case. So the case as reported will be as reported by the physician or by the healthcare professional, is captured as such in the database and stays in the database and is included in our -- is reviewed in our analysis.

MR KENNERLY: Sure. And to be clear, I don't mean talking about changing the ARGUS database. I mean in terms of Bayer performing the signal assessments and causality assessments. In that context, as I understand your answer, Bayer does do its own review to see if it agrees with the diagnosis of IIH, correct?

A. To the extent that it is at all possible, because based on spontaneous reports which are very often limited, it is very often not possible

to make a very clear determination. So that is the nature of spontaneous reports that goes for all products and all events, there is limited information and we have to deal with the information that we have. It is, however, important to look at these details because the search that we do in our database actually to look for potential cases of idiopathic intracranial hypertension also includes search terms that are not idiopathic intracranial hypertension itself, but we are also looking for more and specific symptoms like papilledema, which is a sign that can also be caused by either -- by other conditions like, for example, intracranial thrombosis or other conditions. So if we do such a broad search it is, of course, necessary to also look into the other events that have been reported, so if there is a diagnosis of another cause for the papilledema that was reported in that case, then this is not -- that precludes a diagnosis of idiopathic intracranial hypertension and, of course, it wouldn't make sense to include that case into the analysis since it hasn't been reported as idiopathic intracranial hypertension in the first place.

Q. Now, specific to Bayer's review of whether or not the patient had IIH, what criteria

does Bayer use to reassess if the patient actually had IIH, does Bayer use the modified Dandy, the Friedman criteria or something else?

A. I would like to correct that we are not doing a systematic reassessment of all the cases that are coming to us. What we do is when we do our detailed case analysis, that we look into the details that are reported in that case detail and if there are details reported that preclude a diagnosis of idiopathic intracranial hypertension, as I mentioned, for example, a case was reported as papilledema and the patient had an intracranial cerebral venous sinus thrombosis, that is a diagnosis that precludes the diagnosis of idiopathic intracranial hypertension, so in that case we would say this is not a case that should be included in the cumulative review of all cases of idiopathic intracranial hypertension.

Q. So when Bayer reviews the IIH cases Bayer goes through to see if some of those reported IIH cases aren't really IIH?

A. So when we do our review of our spontaneous cases we go through all available case details, and if there's no case details available then we just have to state that as a case with limited information reporting IIH, but we also look

at all the other events that have been reported, and in that case if that is a case that, due to the broad surge criteria that we search, is captured because it reports papilledema and then you have additional diagnosis that precludes a diagnosis of idiopathic intracranial hypertension, that would not be a case that goes into the cumulative analysis of idiopathic intracranial hypertension cases.

Q. So this procession that Bayer is doing, this removes from the analysis some cases that were initially reported with IIH, correct?

MS COOK: Object to form.

A. No, that is not correct. I said this refers to cases that were primarily not reported as IIH but are captured by our broad search criteria. So we want to make sure that we capture every single case that is potentially IIH in our cumulative analysis. This is why we have these broad search criteria that makes it necessary that we then afterwards look at the cases that have been identified by this broad search criteria to see whether there are actually diagnosis that preclude that this case that was not reported as IIH in the first place, is actually a completely different diagnosis. It may, of course, occur in single cases

that a reporter changes the diagnosis with a follow-up. It may occur that there is conflicting information, so it is a matter of a diligent case review to see, to look at all the details and identify these cases, but actually if you look at our signal investigation which describes that process and you see actually that we have almost included all cases that have been identified by our search.

MR KENNERLY: So what are the broad search criteria you just referred to?

A. So the broad search criteria are based on the Med DRA terminology and that includes, I hope I can get it all by heart --

MS COOK: You have the signal assessments in that pile.

MR KENNERLY: You can look at anything there to help you out, or if you need something else let us know.

MS COOK: So all the documents we brought here yesterday are still in here marked as Exhibit 3, right?

MR KENNERLY: They should be. There is the DFA assessment, there is at least the 2017 signal assessment and also the 2015. If there is something else you need it is available somewhere.

A. So this is from the BfArM assessment. You want the page number?

MR KENNERLY: Yes, please?

A. So this is page 40 of 95 of the BfArM response.

MR KENNERLY: 40, 4- 0?

A. Yes, 4-0, 95.

Q. Okay.

A. And that is the chapter that is about the review of the individual case sector reports, and it starts with the description of retrieval and products involved in this review. And this chapter describes how that retrieval was performed. It says here in the first paragraph: A search was performed in Bayer's Pharmacovigilance databases using the following search criteria, Med DRA PT, so that is Med DRA preferred term. The idiopathic intracranial hypertension. Preferred term intracranial pressure increase. Preferred CSF pressure increased, and preferred term papilledema. Med DRA version 20.0.

Q. Okay.

A. And it goes on to say that:

"The terms papilledema and increased intracranial pressure may be reported in cases referring to other underlying disorders that are not

consistent with a diagnosis of IIH using the conservative approach or over inclusive approach, these terms were included in the search and cases were checked manually for additional diagnosis that exclude IIH."

Q. Now, as described by that paragraph the first sentence talks about how papilledema and increased intracranial pressure may be reported in cases with other disorders not consistent with diagnosis of IIH, correct?

A. Yes.

Q. So that's excluding cases, correct?

A. No, sorry, I don't understand the question it does not exclude cases.

Q. Where does it say here that you are looking at cases that weren't deemed intracranial hypertension to properly deem them as intracranial hypertension?

MS COOK: Object to form.

A. I am not sure that I understand the question.

MR KENNERLY: So this shows when you did the ICSR, the review of the individual cases.

A. Yes.

Q. You looked through Bayer's database for

IIH?
A. Yes.
Q. Increased intracranial pressure?
A. Yes.
Q. CSF pressure increased?
A. Yes.
Q. And papilledema, correct?
A. Correct.
Q. All right. And then the next sentence talks about how Bayer reviewed cases involving papilledema intracranial pressure to find underlying disorders not consistent with IIH, correct?
MS COOK: Object to form.
A. So no, so the next paragraph says that some of the search criteria may be referring to other underlying diseases. So if you have a case that reports papilledema that may be caused by a various number of diseases, so what we do is look into the case whether one of these other diseases is reported, like venous sinus thrombosis. If that is the case then this case is not an IIH case and will not be included in the further analysis. But if it is not reported, so if we can not exclude that this is actually a case that refers to IIH, although it is not reported as such, this will be a case that will

be included in the analysis. And that is actually also further explained and displayed on page 44 of 95, where you see here under the headers of "reported terms" --

Q. Now, in this whole assessment --

A. Sorry, I wasn't --

Q. Oh, go ahead?

A. We had -- so where it is listed how many of the cases are, what were the terms that were identified by the retrieval and reported in these cases, so we had 277 cases that reported idiopathic intracranial hypertension as a term, but there were also 31 case that only reported there was an increased intracranial pressure, and the case details did not provide any further information on a different diagnosis so these were included, although they may not, in fact, constitute idiopathic intracranial hypertension. And then there were 11 cases that are reporting papilledema of unclear etiology with no further information. So there we were also not able to exclude that this was IIH, so these are also included.

Q. Okay. Now, has Bayer ever done a review of its blindness in Mirena cases to see if those could be potentially IIH cases?

A. So you mean blindness as a reported term?

Q. Yes?

A. No, we haven't included blindness as a search term in the cases. So overall there are only a limited number of blindness, but blindness is a very unspecific sign that --

Q. Sure. How many -- to the best of your knowledge how many blindness cases are reported with Mirena?

MS COOK: Objection. Outside the scope. You can answer if you know.

A. So I don't recall a number now and I wouldn't want to speculate here.

MR KENNERLY: But this would be doable by Bayer to just take a look at them to see if they could potentially be IIH, correct?

A. Well, if there was information in the case that the patient had IIH or had blindness as a consequence of IIH, that would actually be captured in that case as a separate event, or if there was mention of papilledema or intracranial, increased intracranial pressure that would all be captured in that case as a separate event, so that case would be captured by our retrieval.

MR KENNERLY: Well, it would be captured by your retrieval if it had already been reported as IIH, correct?

MS COOK: Object to form.

A. It would be captured in our retrieval if it would include one of the events that are looked for in our retrieval. So that is idiopathic intracranial hypertension or intracranial pressure increased, or CSF pressure increased or the papilledema.

MR KENNERLY: Okay. Now has Bayer ever looked through the Mirena reports for severe visual impairment to see if those cases could potentially be IIH cases?

A. So again if any of the cases would have reported that the patient has idiopathic intracranial hypertension, or even just the sign of papilledema or intracranial pressure increased, these cases in addition report visual disturbance would be captured by this retrieval.

Q. But the answer to my question whether Bayer had looked at severe visual impairment cases to see if they could be IIH cases is no, correct?

MS COOK: Object to form.

A. So we did not include visual impairment

as a search term into the search for idiopathic intracranial hypertension because visual impairment again is a very general system that can be caused by a multitudes of diseases, and if you don't have any information in the case that would then lead to an extraction of one of our search terms then there is nothing you can say on that case based on that case.

Q. But you don't know if you haven't looked at those blindness or severe visual impairment cases if they might have indications of IIH, correct?

MS COOK: Object to form.

A. So if a visual disturbance case -- if case from, a spontaneous case from a Mirena user reporting visual disturbance has -- reports symptoms that are indicative of idiopathic intracranial hypertension, so signs that are indicative of idiopathic intracranial hypertension such as papilledema or the intracranial pressure was increased, that would be a case where these events are extracted and the case is captured by our retrieval. So that means that cases that report visual disturbance and are potentially idiopathic intracranial hypertension, although they don't report the exact term, idiopathic intracranial hypertension

but, for example, papilledema, they would be captured by our retrieval algorithm. So it would not make sense to look at cases of visual disturbance that do not report any of the other signs because, as I said, visual disturbance is a very common, very broad symptom that may have a broad multitude of underlying diseases, and if there is no additional information in the case, that would be extracted and fall into our retrieval criteria, and this would not be a case where we could make any further determination, except for that there are other underlying diseases that may be reported.

MR KENNERLY: Isn't it true that some studies have shown that 24% of patients with IIH develop blindness or severe visual impairment in one or both eyes?

MS COOK: Object to form.

A. It is true that idiopathic intracranial hypertension if it is chronic may lead to severe visual impairment and blindness. So the rates of blindness differ between the different patient population, so I think you cited one of the highest numbers. There are other serious in outpatient where the percentage is lower, but it is a serious complication of idiopathic intracranial hypertension,

yes.

MR KENNERLY: Sure. And what I am citing is page 10 of the document you grabbed?

A. Yes.

Q. Isn't it also true that in IIH patients somewhere between 84% to over 90% of them have headache, correct?

A. That is correct, yes.

Q. Has Bayer ever looked through headache or migraine case that don't mention intracranial hypertension or increased CSF or increased pressure or papilledema to see if those cases might be intracranial hypertension?

A. So both headache and migraine are very common symptoms and have a number of different reasons, of which idiopathic intracranial hypertension is a very rare cause. And if in a case there would be in a case reporting headache, there would be additional information that is indicative of a diagnosis of idiopathic intracranial hypertension so, for example, papilledema, then that case with headache would be captured by our retrieval. But we have not looked at every single headache case because headache is a very common general system, and if the case does not include additional information that

would be extracted and then be captured by our retrieval, and this case would not be relevant for our analysis.

Q. Now IIH can produce a lot of vision related issues like blurred vision, photophobia, double vision, severe visual impairment and blindness, correct?

MS COOK: Object.

A. Can you repeat the whole question?

MR KENNERLY: Sure. I will tell you I am pulling it from page 10 of that document. IIH can cause a variety of vision related symptoms, including blurred vision, photophobia, double vision, severe visual impairment and blindness, correct?

A. Yes, it can. Yes.

MR KENNERLY: Okay. So if a woman using Mirena had both a headache and vision issues that would be suspicious for potential IIH, correct?

MS COOK: Object to form.

A. So both headache and visual vision issues or visual disturbances are very common symptoms that are associated with a lot of diagnoses. For example, patients with migraine which is a very common condition, have visual disturbances or headache, or if you have an impaired vision that can

actually be the cause of your headache, so this is very common. So these are all possible underlying conditions for these symptoms. So if a woman would be reporting headache and vision disturbances and other signs that would make this a suspicious case for idiopathic intracranial hypertension, for example, she underwent an ophthalmological examination and the ophthalmologist diagnoses papilledema, although that's still not a confirmed diagnosis of IIH that case, since papilledema will be extracted, that case will be captured by our retrieval. So I believe that we have really with our retrieval criteria did a very broad search for any potential idiopathic intracranial hypertension case to the best of our abilities.

Of course, every spontaneous reports are limited by their nature of a spontaneous report. It is a voluntarily reported event and the amount of details is dependent on how much detailed information the reporter provides. The Company has procedures in place to make sure that all relevant information is obtained and follow-up procedures, but as they are voluntary reports in many cases it is not possible to get all the information, but when the information indicates that this is a potential diagnosis of

idiopathic intracranial hypertension, then that will be extracted and that would then be captured by our retrieval.

MR KENNERLY: You just ended there with the information in the cases of potential diagnosis of IIH, Bayer has defined that as where there is a report of IIH, increased intracranial pressure, increased CSF pressure and papilledema, correct?

MS COOK: Object to form.

A. So that is our retrieval criteria that we use to identify potential cases of idiopathic intracranial hypertension. It is the idiopathic intracranial hypertension, intracranial pressure increased, CSF increased and papilledema.

MR KENNERLY: Now, Bayer could go through its database and review every case where a woman reported blindness and some form of vision disturbance to see if those cases may include potential IIH cases, correct?

A. It would be possible but I would question the sense in that exercise, because if you have a case where blindness or visual disturbance or headache is reported and you don't have any further details that indicate this is an idiopathic intracranial hypertension case, given the fact that

idiopathic intracranial hypertension is such a rare condition the likelihood that there are other conditions that cause the symptoms in this patient is very high because they are so much more common; migraine, impaired vision causing headache, tension headaches. There is a million reasons for having these symptoms. So if that case has not otherwise any information that is at least indicative of -- has some indication that this may be a case of idiopathic intracranial hypertension like, for example, the results of an ophthalmological exam that state they have papilledema, then this case is not useful in the assessment of causality.

Q. But you don't know if those cases have more information in them because you have never reviewed them for IIH, correct?

A. Well, I know that based on our Standard Operating Procedures how we process and evaluate single cases and how the case processes and case evaluators are instructed on making sure that they retrieve the relevant events out of a case that has been spontaneously reported. So if a woman, for example, that has been using Mirena reports that she suffered from headache and visual disturbance and also mentions that she has had an ophthalmology

consult and they diagnosed papilledema, that would be a case that would be captured by this retrieval.

Q. Now, if a woman reported blindness, migraines and lumbar puncture that still wouldn't enter into your search for IIH, would it?

MS COOK: Objection to form.

A. So that's now a hypothetical case, so I need to ...

MR KENNERLY: You yourself pointed us to page 40 of this which says your search terms were: IIH, increased intracranial pressure, increased CSF pressure and papilledema, that's it, right?

A. Yes.

Q. So --

A. Sorry.

Q. Page 40, the one you identified?

A. Umm hmm.

Q. And that list does not include migraine, correct?

A. No, that list does not include migraine. Migraine is a different condition.

Q. Yes, it does not include headache?

A. Idiopathic intracranial hypertension.

Q. Your list does not include migraine, blindness or lumbar puncture, does it?

A. So lumbar puncture is not a disease itself, it is a procedure which you may have for any kind of reasons. So that is not captured as a reported event if you have other events that constitute a diagnosis, so then it would be captured as a procedure that was performed.

Q. Correct. But that's not in your search terms, you're not looking for procedure performed lumbar puncture in Mirena users, are you?

MS COOK: Object to form.

A. No, and I don't see the sense in that. If you have a lumbar puncture, if you have mention of a lumbar puncture that says the results showed increased intracranial pressure, that would be indicative of potentially an IIH case. There can be other reasons for that. But that would be indicative and that would be a case that would be captured. If a case just mentions that there was a Mirena user who had a lumbar puncture due to a suspected diagnosis of meningitis, that would be a case of meningitis where it is documented that there is a lumbar puncture, but this is not a case that is relevant for the analysis of idiopathic intracranial hypertension.

MR KENNERLY: Sure.

MS COOK: Can I --

MR KENNERLY: Let me ask one more. Do you want to take a break?

MS COOK: I was just going to ask for a quick bio-break. I don't want to interrupt the flow.

MR KENNERLY: So you just used a hypothetical example there. I will give you a hypothetical. In your databases assume there is a woman using Mirena and the report says that she has headache and vision loss and that a lumbar puncture was performed, now are you saying that you would not want to know any more information because you are certain that could not be intracranial hypertension?

MS COOK: Object to form.

A. No, that is not what I am saying. As I mentioned, in such a case where there is no real diagnosis, and this is a case where she obviously went to hospital and had a diagnostic, so that is a case that would be as per our Standard Operating Procedures would be followed up by the colleagues in the country where it was reported to try to get as much information as possible on the conditions and on the final diagnosis. So ultimately we would do everything that we can in our powers to get the information on what was the reason for the lumbar puncture or what was the diagnosis after the lumbar

puncture. As I said, it is in the nature of spontaneous reports that this information is sometimes not available, and so if a case remains with that limited information there is very little that you can assess based on the case details. And now I would also like a bio-break.

MR KENNERLY: Sure, one more question though. Bayer's policy is not to track down all the details of every single report it receives, is it?

A. Yes, we have standard procedures that define how often you will try to receive follow-up information. It varies on the severity of the condition and as reported, but idiopathic intracranial hypertension is a serious event and is classified as serious, and that undergoes a defined number of follow-up procedures by the persons.

MR KENNERLY: Sure. But that is somewhere defined that way. Under the example that we were discussing of the woman with headache and vision loss, lumbar puncture, under Bayer's procedure Bayer would not automatically go out and try to obtain more information, that would be something that you would have to suggest they do as part of your signal assessment, correct?

MS COOK: Object to form.

A. No, that is not correct, because if the woman was hospitalized and got a lumbar puncture that is also a serious case. That goes for all serious cases, there is a defined number of follow-up attempts that you have to do and there is always, if it is a consumer report, so a non-healthcare professional, there is always the attempt to also contact the treating physician because obviously the treating physician will have the most details on the condition, so that is all written down in our procedures. Can I really have a bio-break now?

MR KENNERLY: Yes. Yes.

THE VIDEOGRAPHER: This is the end of Media 1, Volume 2 in the deposition of Dr Juliane Schoendorf. Going off the record at 10.41am, as indicated on the video screen.

(Short Recess)

THE VIDEOGRAPHER: This is the beginning of Media 2, Volume 2 in the video deposition of Dr Juliane Schoendorf. Going back on the record at 10.55am, as indicated on the video screen. Thank you, counsel.

MR KENNERLY: Dr Schoendorf, we have been talking about this part of Exhibit 3, the BfArM response?

MS COOK: Logistically do you want to pull that out of Exhibit 3 and mark it separately so it is easier to tell what we are talking about.

MR KENNERLY: Yes.

MS COOK: I don't really care but it is your deposition, I just thought that might help.

MR KENNERLY: It will be easier. Can we mark that as Exhibit 14?

(Exhibit 14 marked for identification)

Now, were you involved in drafting this document?

A. Yes, I was one of the authors who compiled it.

Q. Who are the other authors?

A. So there are -- there is several. It is a very large document, so we have my colleague Petra Koelm who worked on the document with me. Part of it were also compiled with the help of our epidemiology experts, so that is Alex Asimwe and Asia Bhatti, and part of our colleagues helped in compiling the information on other Levonorgestrel containing combined hormone contraceptives and other progestins, that would be the Global Safety Leads in our department who are helping on that. And -- yes, so ...

MR KENNERLY: I didn't mean to cut you off. I can see on the title it says it is a response document. Do you also consider this to also be a signal assessment?

A. Yes, that is basically an update of our signal assessment including.

Q. Is this the latest signal assessment that's been done by Bayer involving Mirena and IIH?

A. So, yes, that is the latest document that we have compiled regarding this topic yes.

Q. Okay. As you said it is a big thick document. Does this contain the sub total of what Bayer believes is relevant in determining if there is a causal association between Mirena and IIH?

MS COOK: Object to form.

A. Can you repeat that question?

MR KENNERLY: Does this contain all of the information that Mirena believes is relevant in determining if there is a causal association between Mirena and IIH?

MS COOK: Object to form.

A. So that Bayer believes is relevant?

MR KENNERLY: You are correct. Let me try it one more time so that I say it right. Does this response to BfArM contain all of the information that

Bayer believes is relevant in determining if there is a causal association between Mirena and IIH?

MS COOK: Object to form.

A. So it is a direct response to the request of BfArM, so BfArM had asked specific requests and we are addressing all the requests of BfArM with all relevant data to addressing their questions.

MR KENNERLY: Okay. And you would agree with me that there's hundreds, maybe thousands of pieces of literature, data that is in some way relating to Mirena or intracranial hypertension, so this document doesn't include every single conceivable relevant thing, but it does include what Bayer believes is of use in determining if there is a causal association, correct?

MS COOK: Object to form.

A. It does include every single piece of literature that we were able to identify that is, in our view, relevant to assessing a causal association. It does not include every single piece of literature ever published on IIH, no, but that was not the question of BfArM.

MR KENNERLY: No?

A. It doesn't also include every single

piece ever published on Mirena, but it includes -- so we did for the literature, and that is also -- the literature search is explained also in the relevant chapter. We did a very broad search, so that would be --

MR KENNERLY: Sure. And I don't mean to confuse the question. My point is I don't want to pull something out and show it to you and say it is not in here. I am asking the exact opposite. You feel confident what matters, whether it is scientific data or published literature, has made it into this document?

MS COOK: Object to form.

A. So I am confident that we really in responding to these specific questions BfArM looked at all the relevant data to respond to their questions.

MR KENNERLY: Okay. And sitting here you can't think of any medical literature or scientific data relevant to a potential causal association between Mirena and IIH that is not referenced in here somewhere?

A. So, as I said, to answer the specific questions of BfArM, we did exactly what they asked us. We did a complete review of our spontaneous, of

our reports in our Pharmacovigilance database. We did a search of the medical literature for relevant topics and we can look at the search criteria, and based on all these data we made the assessment that's included in this response.

Q. Okay. If you could turn to page 2. Now, the second paragraph under summary ends with the sentence that says:

"Over diagnosis of IIH is common due to inadequate exclusion of other causes."

Do you see that?

A. Yes.

Q. Now, there is no citation there, is there?

A. Actually this is the executive summary which doesn't have any citations, it is an excerpt of the document.

Q. The summary actually contains three citations in it, but not that point?

A. Right. So it contains the citations where we specifically reference to the publications.

Q. Okay?

A. Yeah. So it contains the citation on Valenzuela et al. It contains the citation from the publication by Etminan et al, because these were two

publications that triggered signal investigations, and it contains the citation of the letter to the Etminan where he actually -- where he in a letter to the editor referring to his previous publication on the FAERS data analysis, F-A-E-R-S data analysis. He says that if you do the calculations stratified by age, by female gender and reproductive age you do not see an increased reporting observation. So these were the relevant publications that triggered signal investigations and that we included here in the executive summary. So the rest, if you want to see the references you need to turn to the main body of the text.

Q. All right. Let me keep you on the executive summary. Now towards the bottom of the paragraph that begins "Publication by Valenzuela", the second sentence there says:

"In the Company's view the publication supports the conclusion that there is no increased risk of development of IIH associated with LNG Ius use for the following reasons."

Then it lists reasons after that. My question is how does Valenzuela support the conclusion there is no increased risk of IIH with Mirena users?

A. So we have discussed the publication of Valenzuela yesterday but I am happy to.

Q. No, my question is very specific. Yesterday you testified about problems with the control group in Valenzuela, that is an issue that would undermine the methodology of the study, correct?

MS COOK: Object to form.

A. That is not correct. So that is not what -- that was not the whole discussion that we had about Valenzuela. So the points that support our conclusion is that on the one hand -- so the first portion of the study, if you want to call it, is that the two study sides looked at their database of idiopathic intracranial hypertension patients and looked at their presenting signs and symptoms, demographics, characteristics and like age or body weight, and then in these patients they determined via telephone interviews and patient chart reviews determined whether these patients reported having used a Mirena in the past. So when comparing those who had used a Mirena in the past and those who hadn't, they couldn't see any difference in terms of their patient characteristics or presenting signs or symptoms or anything. So that is actually -- it

isn't proved but it is supportive of saying that there doesn't seem to be a separate disease entity, and the authors themselves say that the results of their study do not indicated that LNG Ius causes IIH. The part which is related to the risk analysis that they are doing, there yesterday pointed out there is a methodological problem in how they determine the number of users of Mirena or Levonorgestrel Ius in their controls that they use to compare whether there is an increased risk. So first of all though they use a different method than what they use in their cases. So they are not doing chart reviews, they are not doing telephone interviews, but they are using different methodologies in the different sides and Denmark it is actually just an estimate based on any old sales figure. And in the Utah side it is based on the billing codes of their billing database at that side. And that is also by the authors themselves pointed out that is one of their limitations because that may result in an underestimate. And there are further reasons to assume that what they get as a rate of Mirena users in their control samples are underestimates. So since Mirena is a long acting reversible contraceptive that can be used for up to five years,

they did not take into account those women who had Mirena inserted before the study period. They could not take into account any Mirenas that were inserted outside of the billing system of that specific hospital and, of course, there is the question of whether the billing code really represents all of the LNG Ius' that are inserted in that side. When you think about what a billing code means, it means that it is something that is documented also for billing purposes, and it may be that if this is entered by the physician into the system or by the nurse into the system, and especially in cases where there is no reimbursement sought or you may also just omit to include that billing code. So these are all reasons to say that it is possible that this is an underestimate, and that is acknowledged by the authors. So looking at the published data that is available, which is directly available for Denmark, that confirms it was an underestimate for Denmark. And for Utah if you look at the published data on the national level and the available data on a state level, you come to the same conclusion that it must be an underestimate. So if you replace that underestimate by either the published data for Denmark or by a cautious estimate based on the

published data for Utah and you do the risk analysis, you no longer see an increased odds ratio. So that indicates no increased risk. So in that way the study in both parts supports our conclusion that there is no evidence for increased risk.

MR KENNERLY: So you disregarded and redid the data suggesting an increased risk and then wholly accepted data that you believe disproves an increased risk, correct?

MS COOK: Object to form.

A. We did not disregard any data. It is based on our detailed review of the paper and the available information that is published on the background rate of Levonorgestrel Ius use in the populations where this study was performed.

MR KENNERLY: How long have you worked in the sciences?

MS COOK: Object to form.

A. What do you mean by sciences?

MR KENNERLY: Do you think you work in the sciences today or medicine, how would you refer to it?

A. I am working as Global Safety Lead with responsibility for, among other things, for Mirena at Bayer.

Q. That's scientific work, isn't it?
A. Yes.
Q. So how long have you been doing something relating to science?
MS COOK: Object to form.
A. So I still don't understand the question, so you are asking me about my training? So I am a physician by training. I have worked in a hospital, and after my hospital work I've joined the Company which had a different name at the time, and have been working first for Clinical Development and thereafter in Pharmacovigilance, and Pharmacovigilance since 2004, and I have been working on Mirena since 2005.
MR KENNERLY: Now, in all those years of science how many times have you seen an issue where all of the data and all of the literature points one way?
A. That is a very general question, I am not sure that I now understand.
Q. In your review of all the data and all the literature relating to IIH, Is it your view that all of it supports the conclusion that there is no increased risk?
A. Yes, in our review of the data, all of

the data that we have reviewed both in the literature, both in the -- both studies, like the Etminan publication, who later confirms in his letter to the editor that the reporting odds ratio that he presented are influenced by the fact that this is a product that is used by women of fertile age and that the condition is something that occurs in women of fertile age, so that there is actually no increased reporting odds ratio if you look at that. So that is supportive.

The same with the Valenzuela results where the authors themselves say that they conclude that their first study results do not indicate that this is -- that IIH is caused by Levonorgestrel Ius use. And if you then consider that the risk analysis are limited by the methodology, and if you do the risk analysis based on the published data on the Levonorgestrel Ius rate in the respective populations, yes, these are all supportive to our conclusion to say that Levonorgestrel Ius use, or Mirena use is not associated with an increased risk of IIH.

Q. So there is no data or evidence anywhere that even suggests there is an increased risk of IIH with Mirena?

A. I am not sure that I understand what --
MS COOK: Excuse me, I need to object.
A. Sorry.
MS COOK: Objection. Outside the scope. You can answer.
A. So I don't understand what you mean by that. If there hadn't been any data suggesting a potential safety signal why would we have performed the signal investigations that we did? So that's the purpose of a signal investigation. If you see a potential signal then you do a full signal investigation of all the data, and after careful review of all the data that is available you come to a conclusion, and the conclusion repeatedly of our signal investigation and also of the latest signal investigation has been that we feel that the currently available data does not indicate that there is an increased risk of Levonorgestrel Ius use with idiopathic intracranial hypertension.
MR KENNERLY: Okay. If you turn to page 12. Now on page 12 there is a section that begins "Hypothesis increased CSF production leads to IIH." Do you see that?
A. Yes.
Q. All right. And there is a short

summary of these hypotheses. Then the final sentence begins with: "These hypotheses are challenged by." And it gives three reasons there, do you see that?

A. Yes.

Q. And in that whole section there is just one citation, correct?

A. No, it is actually -- it also refers to the paragraph above, so the first -- so the hypothesis that increased CSF production is responsible for IIH is challenged by the fact that there have actually been quite old studies, but studies showing that they measured the CSF production rate in IIH patients and they did not find that this was increased versus controls. So I mean, that speaks against that this is a causative factor. The other reason to say that is that the absorption of the cerebral spinal fluid has many pathways and it is actually only recently also that the other pathways with which CSF production is absorbed have been identified, so that also makes it unlikely that just an overproduction of CSF would result in the clinical picture of the idiopathic intracranial hypertension. And there is also a specific condition which is called choroid plexus papilledema where you have,

C-H-O-R-O-I-D, and that would give rise to something that's called hydrocephalus, which is not idiopathic intracranial hypertension. So these are all arguments to say that this hypothesis that has been discussed by many authors is unlikely to be indeed the hypothesis.

Q. Number 1 there, the study showing significant differences in the CSF production rate between IIH patients and controls has a citation to number 36, which is a 1992 study involving 16 patients?

A. Yes.

Q. To your knowledge you don't know of any other literature about this issue, correct?

A. Not on the top of my head, no.

Q. And none of it made it into this paper, right?

A. So the paper, as I said, was really not to give a -- it is a very detailed discussion on the hypotheses on idiopathic intracranial hypertension that are discussed in the literature. It is very much based on the reviews on the topic also and signal discussions, but the primary purpose is to present to the BfArM the response to their questions, and their questions were really directed to what is

the evidence on, or what data do you have on the topic of Mirena and idiopathic intracranial hypertension. I believe that it would be a subject of a large book to really discuss all the different hypotheses for idiopathic intracranial hypertension. That is not possible in the framework of this response.

Q. So in discussing this very particular issue with the German Regulatory Authority, instead of discussing thoroughly those papers you say somewhere exist, but you did not mention, you referred the German Regulatory Authority to a paper from 25 years ago that is supportive of the argument you want to make?

MS COOK: Object to form.

A. No, that is not what I have stated and that's not what we have done.

MR KENNERLY: Then why didn't you put something more recent here?

MS COOK: I object to the interruption of the witness. I don't think she was finished with the answer but she can answer this one. Are you all right?

A. Yes, I need to -- so with a specific topic of studies measuring the CSF production rate in

individuals with idiopathic intracranial hypertension versus controls, this is actually the only study that we could identify. It is -- but the discussion of the different hypotheses is actually very much in line with recent reviews on the topic of idiopathic intracranial hypertension and the possible hypotheses that were written by experts in the field. And these are also cited there, so we can have a look at the citations and I can point out to you the reviews that have been used to summarize the current understanding in the scientific field on idiopathic intracranial hypertension and the hypotheses on its etiology.

MR KENNERLY: Did you talk with any experts in IIH at any point when preparing this document?

MS COOK: Object to form.

A. No, I read the reviews.

MR KENNERLY: Have you talked to any experts in IIH in conjunction with any of the signal assessments?

MS COOK: Object to form.

A. No, I haven't.

MR KENNERLY: Did you call Deborah Freidman?

A. No, I have not called Dr Freidman.

MR KENNERLY: Did you call any of the

experts in the etiology of IIH?
MS COOK: Object to form.
A. So these discussions based on the etiology are based on the review of the literature and relies on the reviews that were published, for example, by Dr Friedman or other experts in the field of idiopathic intracranial hypertension, and that is what you would do in a signal investigation of this kind.
MR KENNERLY: But Bayer certainly can find an expert in IIH somewhere in the world, right?
MS COOK: Object to form.
A. So, yes, I don't understand the relevance of the question but yes, Bayer, we know of the experts in the field of IIH, but for a signal investigation where you basically have to, according to the guidelines on the signal investigation where you have to look at the available data that you have on your product and the condition, and that is what you analyze and you put it into the relationship of the current status of knowledge of the condition, which is published and available in the medical literature. So that is how you would go about in a signal investigation, and that's how we did our signal investigations.

MR KENNERLY: Okay. If you turn to page 15, maybe even start at the bottom of 14 and seeing the context on it. I am going to ask you about that first bullet point on 15. Now, if you go to 14 there is a section on IIH and reproductive hormones, correct?

A. Yes.

Q. And as we make our way down there is a pathomechanism of IIH in general and then a comment here about how none of these theories provide a convincing and sound explanation for female predominance in IIH, do you see that?

A. Yes, that is correct.

Q. So in these bullet points you are giving reasons why Bayer believes that there is not a hormonal component to the path of physiology of IIH, correct?

MS COOK: Object to form.

A. So in these bullet points we discuss different hypotheses that have been discussed in the literature, and again this is also based on the scientific reviews of experts in the field that have looked into this method and have discussed this. So there have been in the past several hypotheses on how you, to explain the phenomenon that you see

idiopathic intracranial hypertension almost exclusively in women. So there are men who develop it, but it's really the female gender is a risk factor, and the women of fertile age, but none of these hypotheses have really been confirmed. So one is the hypotheses of having tiny clots in the arachnoid Villi, V-I-L-L-I, that help in the drainage of cerebral spinal fluids, and that would be caused by estrogens.

MR KENNERLY: I am going to focus you on the point that I was asking about, that second bullet point?

A. Okay.

Q. About agonistic action of progesterone at the mineralocorticoid receptor, do you see that?

A. Yes.

MS COOK: I just have to object that that wasn't the question, but let's move on.

MR KENNERLY: No, that is where I directed her and then I asked about what she's discussing. I am objecting to the answer because it is killing time.

MS COOK: No, just move on -- I am not objecting to that.

MR KENNERLY: Bullet point 2 has a sentence

there that says:
"Progesterone, however, exerts antimineralocortoicoid affects."
Do you see that?
A. Yes.
MR KENNERLY: Now, why does that matter in rejecting this hypothesis about how IIH is related to hormones?
MS COOK: Object to form.
A. This respects the different hypothesis that have been put forth in the literature to say that this could be a potential mechanism how hormones are involved in the development of IIH. This one refers to the hypothesis that progesterone, so the natural hormone, also binds to the mineralocorticoid receptor and the mineralocorticoid receptor has been found in epithelial cells, and that by the progesterone binding to this that the CSF stimulation would be increased by aldosterone, A-L-D-O-E-S-T-R-O-N-E. So that is the mineralocorticoid that is acting.
Now there is two there is two things that challenge such a hypothesis. One of them is what we discussed previously, that there are many reasons to assume that in fact the increase of cerebral spinal

fluid rate is not the cause, because it has not been shown in studies. There are many other pathways with which it is drained, so all of these reasons speak against that. The second one is that although progesterone binds to a mineralocorticoid receptor, it has an opposite effect than what you would have for other steroids, so actually it would be, to put it bluntly, protective against IIH. So that is not compatible with this hypothesis.

MR KENNERLY: What about Levonorgestrel, does it exert an anti-mineralocorticoid effect?

A. No, to the best of my knowledge, Levonorgestrel doesn't exert any affect on the mineralocorticoid receptor.

Q. Why was just progesterone but not Levonorgestrel mentioned here in the BfArM response?

A. This is the section that talks about hypothesis on reproductive hormones, how they influence idiopathic intracranial hypertension. We can go to the discussion where we discuss the plausibility, the biological plausibility of Levonorgestrel exerting some kind of affect, and where we say that based on all these hypotheses there is no way Levonorgestrel would fit in in a biological hypothesis, so therefore that this is relevant to the

question, so ...

Q. And when you said before Levonorgestrel to the best of your knowledge doesn't affect the mineralocorticoid receptor, what do you base that on?

A. So that is based on published reviews on different progestins and they are binding to different steroid receptors as in in-vitro studies and their activity and that is also -- yeah, that is based on these reviews.

Q. So based on your recall of literature that Levonorgestrel does not bind to the mineralocorticoid receptor?

A. No.

MS COOK: Object to form.

A. So this is not what I said, and that is also not correct. Progestins, all progestins, so all artificial progesterones, they all bind to different steroid receptors, they all bind to different steroid receptors in different intensities and some of them exert also effects on that. So that is a published review. So although I have also a basic training in pharmacology it is not my field of expertise, but actually in these kind of questions I turn to my pharmacokinetics expert who is Birte Hofmann, who has

a much wider knowledge than me. And by talking to Birte Hofmann and looking at the pertinent literature, that is my understanding.

MR KENNERLY: Okay. Are you able to identify any of that literature relating to Levonorgestrel and actions on the neuro-corticoid receptor that you just referred to?

A. You mean in this document?

Q. No, like you said on your own that you were aware of some literature, what are you thinking of? If it is in this document great, but I am asking you what were you thinking of in your answer?

A. I am not sure whether the publications that I am referring to are included in this document. I have to check.

Q. What are you thinking of, what is the best of your recollection?

A. So I am not sure whether this is helpful for you, but I have a literature folder where I have references on, reviews on progestins and progestin effects that are used in hormonal contraceptives or hormone replacement therapies and the different pharmacokinetic and the different pharmacological actions, and that also includes overview on receptive binding that also includes --

which does not mean much, because it my may bind to a receptor but it may exert positive effects or negative effects, or no effects at all. That also includes an overview on the effects of different progestins in the different mineral -- different steroid receptors.

Q. So I can tell you that is the one that's cited there for number 64?

A. Okay.

Q. And I will represent to you, I am just trying to clear up the literature you are talking about, I will represent to you, and you can look at it, that in this it talks about how progesterone has an anti mineralocorticoid effect but Levonorgestrel does not. Now are you thinking of something else that talks about Levonorgestrel having no effect, or are you thinking of this paper? I am just trying to understand what paper you are talking about?

A. So can we have a look at the paper?

Q. Yes. We will mark this as Exhibit 15.

(Exhibit 15 marked for identification)

You will be looking at page 32?

A. Sorry, which page?

MS COOK: 32.

MR KENNERLY: 32. Table 9 shows

progesterone with anti-mineralocorticoid effect, which is what it was cited for in the BfArM response. Then if you notice the same table includes Levonorgestrel but does not say it has an anti-mineralocorticoid effect. I just want to know when you are talking about the affects of Levonorgestrel do you know of other literature, or are you thinking of this?

MS COOK: Object to form.

A. Yes, this is the literature that we cite also in this document and that --

MR KENNERLY: And that's what you are thinking of in your answers?

A. That's what I am thinking of personally in my answers, but also in my talks to my colleague, Birte Hofmann who confirmed this. So she has certainly also a wider knowledge base also on this subject, but this is our representative publication on this topic.

Q. Okay. Can you turn to page 18 of the BfArM response? You can put the study aside. On page 18, this is the section about published case histories, and there is a reference to a 2010 article by Martinez, do you see that?

A. Yes.

Q. Then there is a Company comment underneath it, and I want to ask you about the first two sentences of that where it says:

"This conference abstract contains only limited information but does not provide any details pointing towards a cause/effect relationship. As the patient did not present with increased opening pressure at lumbar puncture and did not have papilledema the basis for the diagnosis IIH is uncertain."

Now in this case the patient's doctors diagnosed her with IIH, correct?

MS COOK: Objection to form.

A. So this is an abstract that was presented at a neuropthamology society, and this abstract talks about a woman that was diagnosed with PTC or atypical PTC, or atypical idiopathic intracranial hypertension, because she actually did not present with papilledema. Papilledema is an unspecific sign but it is a typical sign of IIH, and in some patients -- but some patients may not present with papilledema, so that's why they call it atypical IIH. However, these women didn't have an increased intracranial pressure when they did the lumbar puncture in the blind position when you only do it

and it is actually a criteria that is part of the modified Dandy criteria for a diagnosis of IIH. So that's why we write the diagnosis is actually uncertain. Absence of papilledema itself does not exclude IIH, but she also didn't have increased opening pressure when they did the lumbar puncture. That somehow questions the diagnosis, yes.

MR KENNERLY: So in performing its signal assessments did Bayer question, as you said, or deem uncertain every IIH diagnosis unless the patient had documented elevated CSF pressure from a lumbar puncture?

MS COOK: Object to form.

A. The modified Dandy criteria, or the treatment criteria, if you wish, or whatever, so they are explained here on page 9 of the document. They all include that you have an intracranial, increased intracranial pressure when you do a lumbar puncture. That is one part of the criteria to make the diagnosis of idiopathic intracranial hypertension, plus the exclusion of other causes that cause intracranial hypertension. In our analysis we did -- we included all cases that were reported as idiopathic intracranial hypertension, or also cases that were reported not as idiopathic intracranial

hypertension per se, but were reported as having papilledema, for example, or increased intracranial pressure if there was no other diagnosis in that case. So we did not exclude any cases that were reported as idiopathic intracranial hypertension unless there was another diagnosis that basically excluded that diagnosis.

MR KENNERLY: So you mentioned there, there is a bit on the Friedman criteria, and we talked before about these reviews that you are relying on. So who are the experts in the field? You talked about these reviews and you talked about the people you communicate with, who are the people who wrote these most useful reviews about IIH?

MS COOK: Object to the form.

A. So I can't give you the biography, or I don't know them personally, so I can tell you which reviews we have used in coming to this conclusion. So Dr Freidman is certainly an expert who has published a lot in the field of IIH. So she is a name that we have, that we are frequently citing here.

MR KENNERLY: Anyone else?

A. Well, you see the list of references here starting on page 89 through 95. So it is 114

references, most of which have something to do with IIH.

MR KENNERLY: So these would be the best experts in the world on IIH?

A. I am sorry --

MS COOK: Object to the form.

MR KENNERLY: I just want to know what we are looking at and what you are relying on, because you mentioned a lot about reviews and the literature reviews and things like that, and this is the best stuff out there in your view about IIH, or these articles by these authors?

MS COOK: So object to form. I mean, just from what you want, do you want her to point to the articles and authors, because obviously they are not all IIH? Do you want her to take the time to do that for you?

MR KENNERLY: No, I am just trying to understand if there is something else out there, if this is the right thing or what?

A. So these are the publications that we have identified in our literature search to be relevant on the one hand to the question that was asked by the BfArM on the topic idiopathic intracranial hypertension and Levonorgestrel or

Levonorgestrel Ius, and these are the current and most relevant articles that were identified also on IIH.

Q. Okay. If you could look at page 41, it is about the methodology. I don't mean reference 41, page 41?

A. Oh, sorry.

Q. This is about the methodology of the ICSR review, do you see that?

A. Yes.

Q. Now, did BfArM expect you to use the WHO causality assessment criteria?

MS COOK: Object to form.

A. So in their request, which is here, which is on page 8 of the document, they asked us to include, to perform an analysis that should include all relevant data from clinical studies, literature, publications and spontaneous reports and should discuss biological plausibility, and they want a detailed analysis of individual cases that should also include an assessment of causality using the WHO criteria, which includes what is the medicinal product in the case, what is the reaction types or what was reported, the temporal relationship response to discontinuation or response after

readministration, concurrent conditions and physical examination findings. So these were all topics that we looked at in our cumulative analysis of the overall review.

MR KENNERLY: Okay. So when you actually went through it, when Bayer actually did this review it did not use the WHO causality criteria, correct?

A. That is not correct. So if you look at the WHO causality criteria it mentions what is the product, what is the product, what is the reaction time, what is the temporal relationship response to discontinuation or response after readministration, concurrent conditions, communication and physical examination findings. These are all categories that we have included in our review, and as discussed here on page 41 all these criteria were looked at and presented in a by case tabulation. And all the cases that were identified by our retrieval are actually appended to this document, and that included all the criteria that are part of these WHO criteria. What we did not do here in this case is do that formal assessment which is basically a kind of tick box assessment and say this is based on these and these criteria, and you come up with a certain assessment, because that is for the reasons that are mentioned

here, since this is a very rough and general criteria algorithm that is meant to be applied to all drugs and all events, and in the case of a long acting reversible contraceptive product, which is where you have a constant exposure, these formal criteria you can always say there is a temporal relationship because it occurred when Mirena was used, so that is what challenge this. Nevertheless, we looked at all the criteria that are part of the WHO criteria for causality assessment and presented them in this document and then based on the overall review of this came to our conclusion.

MR KENNERLY: Now, if you had done the tick box, the formal WHO criteria that you were just talking about, the vast majority of these individual cases would have been deemed probable, correct?

MS COOK: Object to form.

A. No, I don't agree with that. So the WHO causality criteria are very -- they are very formal. So basically when you have a temporal relationship which is a given, you more or less come into a category where you have a possible relationship. That is a formal causality algorithm that has been used on a single case basis also in the past for a single case reporting, but that has

actually been replaced by the general guidance to say that case is related or not related. That is then -- that determines the reportability criteria of the single case and in terms of spontaneous cases unless it is explicitly stated that the reporter does not suspect a causal relationship, it is always assumed as related.

MR KENNERLY: Can you go to page 86?

A. Yes.

Q. Now the first full paragraph there is about analyzes of spontaneous reporting databases. It says there that:

"The analyzes performed in external spontaneous reporting databases", the language in the middle that ends with "do not provide a signal for increased risk."

This document is dated October 2017. Is it true that performing a disproportionality analysis in a spontaneous reporting database for Mirena and IIH does not provide a signal for an increased risk?

MS COOK: I am going to object to form.

A. What it says is that the analysis performed in these databases emphasize the importance of confounders when interpreting the data coming from spontaneous reports. So the disproportionality

analysis that -- algorithms when you perform them in these databases show increased RORs which are influenced by the fact that it is a product that is used in a population that is most susceptible to having this condition. So women of fertile age using Mirenas and women of fertile age are most likely to get IIH. That was also acknowledged by Dr Etminan who published this letter to the editor where he said that if you adjust the ROR, if you stratify and look at the relevant stratum of women of fertile age you don't find an increasing reporting odds ratio. So while this was a potential signal that we investigated and looked at, in the end of the result of our signal assessment is that the signal is refuted. So it is a false signal.

MR KENNERLY: Well, I am asking you specifically what this paragraph is about, which is disproportionality analyzes. This is dated October 2017 and, as you said, when you perform a disproportionality analysis, which you said you did monthly, it gives you right now, and has been for several years giving you on increased ROR, correct?

MS COOK: Object to form.

A. No, I wouldn't agree to this characterization about having increased RORs for

years. So what this paragraph says is that the analysis performed in these spontaneous databases, when you do disproportionality analyzes on these, as published by Etminan and as also done by us, you see that this reporting is influenced -- is confounded by the fact that you have women reporting Mirena use, so women are using Mirena and women are the most likely population to develop idiopathic intracranial hypertension, many of them have additional risk factors. In addition, disproportionality analyzes which are done in spontaneous databases are influenced by other factors that influence spontaneous reporting rates, and so based on the signal that we saw, that a lot of the -- starting from the end of 2013, the beginning of 2014, there's an increase in cases submitted to the Company, especially originating from the US. And looking into that further it becomes clear that these are lawsuits that are filed in the product litigation, and these all create spontaneous case reports, as we discussed yesterday. They are handled as spontaneous case reports, and these influence the disproportionality analyzes that you get when you do disproportionality analyzes on that topic in these databases.

That is also discussed here in this

document, that any reporting rates that you calculate, or any disproportionality analysis that you get are in the recent years very much influenced by the fact that this is topic for which there is a product litigation on-going. And with every new group of lawsuits that are filed you get a higher number of spontaneous reports on the database, and that will always influence your reporting rate and your disproportionality analysis. So basically litigation influences the disproportionality analysis in your database and leads to an increased ROR. If you look at these data and do the analysis then, the increased ROR is a signal for the on-going litigation, but it is not a signal for a causal relationship between Mirena and Levonorgestrel Ius.

MR KENNERLY: Now, you didn't provide BfArM with any of the disproportionality analyzes that you have been doing monthly in Imperica, did you?

A. No, and that is also not what you routinely do in a signal investigation. We included here as an appendix the signal investigation that we did in the FAERS database and in the WHO Vigibase. We included also the overall number of cases and the reporting rates which show that there is an increased, an increase in reporting rates which is

also -- which is based on the same cause factor that influences the disproportionality algorithms, namely the on-going product litigation in the US. So this is all in this document. So that addresses the question of spontaneous reports, what are the factors of influencing the spontaneous reports that we get in Mirena users for IIH.

Q. So Bayer did not give BfArM any of the Imperica disproportionality analyzes. Bayer has not included any of the Imperica disproportionality analyzes and signal assessments, but Bayer did tell BfArM just last month that there is no signal and that the signal has been refuted based on analyzes of spontaneous reporting databases; is that correct?

MS COOK: Object to form.

A. No, that is not correct.

MR KENNERLY: What part of that is not correct?

A. Bayer clearly says that -- so first of all taking a step back. Disproportionality analyzes are a method of signal detection. So you do disproportionality analysis in databases to see whether there is disproportionates reporting. So you receive more reports for one event for one product compared to all the other events than all the other

products. When you see such disproportionate reporting that is a potential signal that you investigate. That is what we have done, and we have established that the signal of disproportionality that we see in our whole database and the FAERS database starting from 2014 is based on the fact that there are increasing number of cases are submitted in product litigation, and they are here shown. They are discussed and shown in the response document here, and it also discusses how that influences the reporting rate.

Q. So every single month Imperica will tell you that there is disproportionate reporting of Mirena and IIH, and then every single month you will close that or refute it without doing a signal assessment, correct?

A. So --

MS COOK: Hang on a second --

A. Sorry.

MS COOK: Objection. Cumulative. Go ahead.

A. No, I can't tell you whether that is actually something that comes every single month. I would need to go back into every single month of Imperica runs to see whether that statement is

accurate. But yes, if you receive a high number of cases for a specific event associated with a drug, then you increase the reporting. The reporting rate increases and you may also see an increase, a trend, so that may produce a flag in the disproportionality analysis that you do every month. If you have that investigated and you know -- so if you have that topic under monitoring and you know this disproportionality flag has been caused by the filing of another dozen of lawsuits in the last month, then that does not constitute a -- then this constitutes not a new signal, or not any new safety information. Then that just reflects the fact that there is on-going product litigation which leads to the filing of new cases, and that impacts on the reporting rates and will also impact on a disproportionality algorithm. That is what happens in the context of stimulated reporting. Stimulated reporting is something that is an acknowledged term by all regulatory authorities, and that does then not -- so based on the fact that this has been investigated, the reason for this disproportionality analysis and the reason for the increased reports, as such, has been investigated, so it is not a new signal.

MR KENNERLY: You made a reference there to

under monitoring. As of right now is any sort of signal between Mirena and intracranial hypertension under monitoring?

MS COOK: Object to form.

A. So the topic of idiopathic intracranial hypertension and Mirena is under monitoring by the Company since -- I mean safety is under monitoring when you put your product on the market, but specifically for IIH the Company has been monitoring all new cases that come in for IIH since the first signal investigation that we did back in 2008.

MR KENNERLY: Okay. So does that mean it was never really closed?

THE INTERPRETER: May I intervene. I think the witness did not mean it was under monitored but it was being monitored. And in German we would use the equivalent to "under". So it was just a language mistake, saying it was being monitored but it was not --

A. As being monitored.

THE INTERPRETER: Not under monitoring. It was under monitoring. It was being monitored, correct?

A. That is correct, yes.

MR KENNERLY: Okay. Part of the linguistic

thing. Thank you. So you were talking about going back to the first signal assessment. So in that time has the issue ever been closed or has it always been open?

MS COOK: Object to form.

A. So as we discussed also yesterday, we did a first full signal investigation on IIH in Mirena in 2008, where based on the review of all the data that was available at the time we came to the conclusion that there is no indication for increased risk. This was submitted to the British Health Authority and they agreed with our conclusions that there is no increased risk. So this signal is closed, but the topic since it is a relevant topic remains under monitoring. We have several topics that are under monitoring, although there is no indication under increased risk based on the current data that we have. The topics remain under monitoring as that is part of routine Pharmacovigilance. That is how you do Pharmacovigilance.

MR KENNERLY: So right now the potential relationship between Mirena and IIH is being monitored and is also closed?

MS COOK: Object to form.

A. So the most recent signal investigation that we performed and that was also submitted to BfArM concludes, based on all the available data, there is no indication for an increased risk of Mirena use and IIH. So we closed that signal, but the topic itself remains under monitoring.

MR KENNERLY: What does that mean, how does that change?

A. Excuse me, what was the second?

MR KENNERLY: What changes at Bayer when something is closed or under monitoring, is that just like reading the news as it comes in?

MS COOK: Object to form.

A. That means that we are -- when something is under monitoring that means that we are at periodic intervals looking at all new cases that have come in in that topic. All new cases that come in are being looked at. So we have our so-called on-going monitoring, and I believe we had that -- it is part of our Exhibit here somewhere. So in that --

MR KENNERLY: You mean --

A. On a three monthly basis --

MR KENNERLY: I am going to interrupt you, but are you referring to that quarterly on-going monitoring document?

A. Yes, correct, and for that we always get retrievals from our Pharmacovigilance database of all the cases that are until that time point in the Pharmacovigilance database, and there are several topics that we monitor. So we monitor the overall number of cases and then specific topics where we monitor the reporting frequency, and then there are other topics where we look at all the new cases to see has there been any new relevant cases. Have there been any changes in the cases, and IIH is one of the topics. That is where in that file that we get, every new case of IIH is flagged, and we receive that. In addition as part of our routine monitoring we would see on a weekly basis all cases that are serious and unexpected. So that's also what is an IIH case, if that is reported then it falls under serious and unexpected. So on a weekly basis we always see these cases and we can identify whether there is new cases coming in.

MR KENNERLY: Now we can take a break.

MS COOK: Just for the record, I don't know if you care, it is your deposition, but that was Exhibit 11, if that's helpful?

MR KENNERLY: Yes. Now we will take a break.

THE VIDEOGRAPHER: This is the end of Media 2 in Volume 2 in the deposition of Dr Juliane Schoendorf. Going off-the-record at 12.16p.m. as indicated on the video screen.

(The Lunch Recess)

THE VIDEOGRAPHER: This is the beginning of Media 3, Volume 2 in the video deposition of Dr Juliane Schoendorf. Going back on the record at 12.57pm as indicated on the video screen.

MR KENNERLY: Good afternoon, Dr Schoendorf. Now, in the BfArM response, Exhibit 14, there is various discussions about the pathophysiology and etiology of IIH, correct?

A. Yes, that's correct.

Q. Now prior to the response to BfArM had Bayer ever considered any of this evidence or literature relating to the pathophysiology of IIH in its signal assessments?

A. Yes, they have.

Q. When did that first happen?

A. That basically happened the first time we are faced with the topics. When you review all the literature pertaining to the condition and look at also the hypothesis on the pathomechanism and the etiology of that, as the name indicates, idiopathic

intracranial hypertension is a condition for which the actual cause and the etiology has not been identified.

Q. Now, when it comes to assessing a causal association between a drug and adverse event, one factor is the presence of a biologically plausible action, correct?

A. That is one of the many factors that we consider, yes.

Q. Now, is it essential that a plausible biological -- biologically plausible mechanism be detailed before a causal association can be found?

MS COOK: Object to form.

A. To assess a causal relationship you have to look at many factors, and biological plausibility is one of the factors that you look at. So if there is a biologically plausible mechanism that is an indicator of causality, but it is not the only indicator of causality.

MR KENNERLY: Well, specifically is it necessary to find a causal association?

MS COOK: Object to form.

A. No, it is not the exclusive criteria that you assess causality with, but it is one of the important criteria to consider when you assess

causality.

MR KENNERLY: Now you mentioned a minute ago that there's no -- I don't mean to put words in your mouth, but there's no proven or agreed upon mechanism by which IIH occurs, correct?

MS COOK: Object to form.

A. It is correct IIH is called idiopathic because the actual cause of the condition is not known.

MR KENNERLY: Now, are there biologically plausible mechanisms that have been proposed as the underlying cause of IIH?

MS COOK: I object to outside the scope. Go ahead.

A. So several hypothesis will have been proposed as potential mechanisms, but they have been discussed in the literature and none of them has been established as really the cause of IIH.

MR KENNERLY: Sure, but my question is specific. Does Bayer believe that any of these proposed mechanism are biologically plausible?

MS COOK: Objection. Outside the scope.

A. So, as said, there are several hypothesis have been proposed on how IIH may be caused and what mechanisms may cause IIH, but really

none of them have been established as the underlying cause of the disease, so -- yes.

MR KENNERLY: Just to clarify, I am not asking if it is established. I am asking if Bayer believes that any of these proposed mechanisms are biologically plausible?

MS COOK: Objection. Outside the scope. Object to form.

A. So since none of them have been established and -- since none of them have been established as the mechanism in which IIH is caused, so there is no established biologically plausible mechanism that we can identify by which Mirena would cause some IIH.

MR KENNERLY: So in Bayer's view a mechanism has to be established before it can be biologically plausible?

MS COOK: Objection. Outside the scope.

A. So a biologically plausible mechanism is something that you would consider in your causality assessment, and I assume we are still talking here about the causality assessment with regards to Mirena and IIH. So in order to look at whether there is a biologically plausible mechanism we have looked at the different hypothesis that have

been proposed, most of which don't have anything to do with hormones, many of which don't have anything to do with progestins, and the ones that have been suggested involving progestin are actually not biologically plausible to be applicable to Levonorgestrel Ius. So in summary, looking at the hypotheses that are out there we could not identify a biologically plausible mechanism by which Levonorgestrel Ius use causes IIH.

MR KENNERLY: In Bayer's view is it biologically plausible that hormones play a role in causing IIH?

MS COOK: Objection. Outside the scope. Go ahead.

A. So as discussed in our response document to the BfArM, since it has been established that the female gender and women of reproductive age are risk factors for developing IIH, it is a valid hypothesis to investigate further whether there is influence of sex hormones on the development of IIH. But none of these hypothesis have been really established as the mechanism of IIH at this point.

MR KENNERLY: Now, we talked before about how clinical trials are not really an appropriate mechanism to prove or disprove a causal association

with Mirena and IIH, do you recall that?
MS COOK: Object to form.
A. What we discussed was that given that the event we are talking about, IIH, is such a rare event a clinical trial to investigate potential causal association between Levonorgestrel Ius use and IIH would be of a size that's not feasible to conduct.
MR KENNERLY: And we discussed before the role of disproportionality analyzes, and is it your testimony that disproportionate reporting of an adverse event is not useful in proving or disproving a causal association between Mirena and IIH?
A. So we talked in detail about what a disproportionality analysis is. It is an analysis that you do on spontaneous data and, as also stated in the regulations, it is a tool for hypothesis generation. So you look into big spontaneous databases, a process that's called data mining and run a statistical algorithm over it and you see whether there is disproportionate reporting. That can then raise and flag and you have to look at it and if you say this is something that I want to investigate, so then you have the so-called validated signal and you do your signal investigation on that.

That is what a disproportionality analysis is for, to look for flags in a large data set. These flags are not an expression of causality per se, and that's actually clearly stated in the guidelines. Disproportionality analysis cannot be a proof of causality, but what they do is they help you in the signal -- in the process that is called signal detection, to look for these kind of flags that you want to investigate further. But since the whole disproportionality analysis is based on spontaneously reported data any disproportionality analysis are limited by the same factors, or influenced by the same factors that influence spontaneous adverse event reports. That means it is dependent on the population where you use the drug and it is dependent on the population where this condition is most often observed, and it is also subject to stimulated reporting. That means if you have stimulated reporting, for example, in the framework of litigation you have a higher number of reports that are submitted as spontaneous reports, and that will lead to an increased reporting observation that gives you a disproportionality analysis flag. And that is then -- if that is based on the fact of the stimulated reporting all it tells you is that there

is stimulated reporting.

Q. So what kinds of studies are useful in proving or disproving a causal association between Mirena and IIH?

A. So that's a hypothetical question which you would investigate if you have a confirmed signal that there may be an association and you can think about what studies you want to design to look at that. Certainly the Valenzuela and Others publication is one attempt at looking at that, and they looked at their -- it's a case control study. It is not a classical case control study, so they -- their methodology is somewhat limited by the fact that their cases and controls do not really derive from the same population, but nevertheless a case control study is something where you can -- that can contribute to the question on whether there is a causal association. And as we have discussed previously, the results of Valenzuela and Others support, in our view, the conclusion that there is no increased risk of Levonorgestrel Ius and idiopathic intracranial hypertension.

Q. So other than case control studies what kinds of studies are useful in proving or disproving a causal association between Mirena and IIH?

MS COOK: Object to form.

A. So that falls under the header of epidemiological studies like the case control study. So these are all studies that can be done to investigate if you have the suspicion that there is a causal association between a drug and an event, if the event is relatively rare. It's acknowledged by the regulators that in a clinical development of a product, since its based on clinical studies there will always be a limited number of patients that are included in this programme. So even if it is several thousand of patients, as is the case for Mirena, this is still not a sufficient patient number to investigate the occurrence of rare events. So in that case the information that you can get on these rare events is from -- from these rare events, then you get from your Pharmacovigilance activities, which include the routine Pharmacovigilance activity, so the monitoring of the spontaneous adverse events that you get, and then if based on the data that you get if you have -- if you see a signal and based on the data that you have you feel that there is a need to do a further study, then you can think about different study designs where you ...

Q. You mentioned -- are you done?

A. Just finishing the sentence -- where different designs in which you could study this.

MR KENNERLY: No, you said in response to my prior question that it was -- that I was asking a hypothetical. Is it your testimony that Bayer has never considered what kinds of studies are useful in proving or disproving a causal association between Mirena and IIH?

A. So to have -- to study something, to design a study to investigate an association you would need some degree of reasonable suspicion to say that this is based on the data that we have. The data that we have is insufficient to answer that question, so we will investigate further, but based on the conclusions of our signal investigation that is not the case.

Q. Now, are you aware of any peer reviewed literature that concluded Mirena users were not at an increased risk of IIH?

A. So you mean peer reviewed literature of a study or?

Q. Yes?

A. Yes, the Valenzuela and Others conclude in their publication that the results of their study do not indicate that Levonorgestrel Ius causes PTC or

idiopathic intracranial hypertension. The results of their risk analysis, as I explained earlier, are limited by the study methodology and when we did our reanalysis of these risk analysis based on what we consider more accurate estimates in the control group, we did not find an increased risk.

Q. So my question was if you are aware of any peer reviewed literature that concluded Mirena users were not at an increased risk of IIH, and the answer is no, correct?

MS COOK: Object to form.

A. So what I am saying is that in our view the publication of Valenzuela allows for that conclusion that there is no increased risk of Mirena use and IIH. And apart from the Valenzuela publication and the publication of Etminan and Others that we also discussed, where Etminan in his later letter to the editor concludes that there is no increased reporting odds ratio when you adjust for female age and the fertile age stratum. Also supporting the conclusion there are no other studies published out there that address the question of Levonorgestrel Ius and IIH.

MR KENNERLY: Now your views on what the Valenzuela studies showed were not peer reviewed,

correct?
A. I am not sure that --
Q. Your views, you said before your view of the Valenzuela study?
A. Yes.
Q. Bayer's view of what the Valenzuela studies shows has not been subjected to the peer review, correct?
A. It is correct that this is our conclusions, based on that we put that in the response document to be to BfArM, so it is submitted to the regulatory authorities, submitted to BfArM and it's currently under assessment. We have not heard back from BfArM. The main points with regard to the Valenzuela publication, so the limitations that we discovered when reviewing the paper and looking at the pertinent literature, that is actually something that we plan to address in a letter to the editor of the Journal to point out that when you look at the risk analysis and the assumptions that were made for the controls and then compare it to what is published on the actual usage rates and the respective study populations, that these risk analysis are based on incorrect numbers, and if you replace them with the published numbers of the rates then you end up with

an odds ratio that doesn't indicate an increased risk.

Q. Now, in that letter to the editor are you going to propose the way that the case control study should be designed to prove or disprove an increased risk of IIH among Mirena users?

MS COOK: Object to form.

A. No, that is not the purpose of that letter to the editor. Just it is actually -- so this is currently in draft form and we are writing this out together also with our epidemiologist, and it is just meant to point out and make aware that the assumptions that were done for the control group are not consistent with what is published on the actual usage rates, that if you considered these publications on the actual usage rates to do the risk calculations, then we come to a result which is actually very much in line with the overall conclusions of the authors, who say that in their publication that the study does not suggest that IIH is caused by Levonorgestrel Ius. And the overall conclusions were, as I say, that the result of the study should be really considered very cautiously given the limitations of the study, and that they do not recommended a removal of a Levonorgestrel Ius in

a patient who is diagnosed with IIH, and that also Levonorgestrel Ius, given its superior contraceptive efficacy, should be considered as a good contraceptive option in an IIH patient.

(Technical Interruption)

THE VIDEOGRAPHER: This is the beginning of media 4, Volume 2 in the video deposition of Dr Juliane Schoendorf. Going back on the record at 13.39pm, as indicated on the video screen.

MR KENNERLY: Dr Schoendorf, we have talked about signals a lot, and so I understand, is it Bayer's position that there is no signal for Mirena and IIH?

MS COOK: Object to form.

A. So we performed several signal investigations into the topic, so the most recent one is the one we also submitted to the BfArM, and each of these signal investigations we refuted the signal, that means in our conclusion what we considered as a false signal.

MR KENNERLY: So, for example, sitting here right now it is Bayer's position that there is no signal for Mirena and IIH?

A. So as we have discussed we made several signal investigations which all came to the

conclusion that the signal is refuted.

Q. I have to be pedantic on the point. Right now sitting here Bayer's position is there is no signal because all of the signals have been refuted, correct?

A. Yes, it is correct that -- so a signal is basically -- the definition of a signal is that you have some finding which may come from the literature or that may come from a disproportionality analysis, or that may come from single case reports, and that you investigate further to see whether that signal is actually a true signal for a causation, or whether you can refute the signal based on all the data that you have. And we have done several signal assessments on the topic of Mirena and idiopathic intracranial hypertension and have refuted that signal. The latest one is from this year which was also submitted to the BfArM.

Q. Now, a signal can be refuted or validated under Bayer's protocols for handling this, correct?

A. These are two different things. So validation of a signal means that you -- so when you have -- we can turn to one of the guidelines that we also have here. So validation of the signal means

that you detect something which may be either a single case report or an increased reporting odds ratio, or it may be a finding in the literature. So, for example, let's take the finding from a disproportionality algorithm, that is a statistical number. It is a statistical algorithm. And the first step, if you have that result of that algorithm and its flagging, that there is an increased reporting odds ratio, then you look at it to see whether that is actually constituting something that you want to investigate further. That is then what's called, according to the guidelines, a validated signal, so it is signal validation. What then follows is the actual investigation of that signal. So the assessment, is that a true signal? So to say it in very simple terms, is it a true signal or is it a false signal? In the end if you have done your signal investigation, you have looked at all the pertinent data and then you come to the conclusion either that signal is confirmed or it's refuted, or a false signal.

Q. And there is also the option of under Bayer's policy that the signal needs further assessment?

A. Correct. It can also be that you say

based on all the available data that we have that we can not conclusively answer that question, so there may be need to either further monitor it or to do further assessments.

Q. Now, given Bayer's views about stimulated reporting, is there any scenario under which disproportionate reporting could lead to a confirmed signal for Mirena and IIH?

A. So what you call biased views on stimulated reporting are actually also the views that are shared by the regulators. Stimulated reporting refers to the fact that spontaneous case reports can be affected by stimulated reporting, and the guidance gives several examples how -- what may be considered stimulated reporting. So, for example, cases deriving from public attention around the matter or around the product, or the condition, or cases that are submitted in association with an on-going product litigation. That falls under stimulated reporting. That is something that is an acknowledged phenomenon that can affect spontaneous reporting and in turn can also affect disproportionality algorithms, because disproportionality analysis is what you do in databases of spontaneous reports. So everything that affects spontaneous reports and affects the reporting

and the reporting rates of spontaneous report, will also affect your disproportionality, the results of any disproportionality analysis that you do in this database. So to come back to your question, I don't understand what you mean by saying that the views on stimulated reporting, these are the views that are shared by the regulators and that just means that this is a factor that affects spontaneous reporting rates and disproportionality algorithms.

Q. Now, you said shared by the regulators. Has any regulator anywhere in the world told Bayer to perform disproportionality analysis differently with regards specifically to Mirena and IIH because of lawsuits?

A. No, and that's also not what we have done and that's not what I have said.

Q. So I am asking you about Bayer's views on stimulated reporting specific to Mirena and IIH. You have testified about that at length. Given Bayer's views specifically about Mirena and IIH, and specifically about stimulated reporting with Mirena and IIH because of lawsuits, is there any level of disproportionate reporting of spontaneous adverse events that would prompt Bayer to find a confirmed signal for Mirena and IIH?

MS COOK: Object to form.

A. Again, I think we need to take a step back and look at what a disproportionality, a signal of disproportionate is actually, and that is also according to the available regulatory guidelines. Disproportionality analysis are done in spontaneous databases, spontaneous adverse events databases to look for signals. So it is a signal detection tool, it is a data mining tool. You perform these statistical analysis over the whole database to look whether there is a disproportionate reporting, that means whether there are more reports of a specific event to a specific product compared to the rest of the reports. If that is the case, so if you have an increased reporting odds ratio then that means that you have a positive flag here for an increased reporting authorization, for example. That is then -- that means you have done your signal detection and you have identified a potential safety signal, and that is something that you can look at and then you investigate further whether that is actually a confirmed signal or is not a confirmed signal. The disproportionality analyzes are not something -- so it is something that you use for signal detection but not something that you use for

signal confirmation.

MR KENNERLY: You testified before though, that Bayer has stopped using disproportionate reporting for Mirena and IIH as a signal because of stimulated lawsuits. You have testified before that Bayer does not open signal assessments any more based just on disproportionate reporting, isn't that true since 2015 at least, that Bayer has had disproportionate reporting but has not opened a signal assessment on the basis of disproportionate reporting?

MS COOK: Object to form.

A. So since the signal investigation that we performed based on the fact that we saw an increase in spontaneous cases and also affects the disproportionality analysis that was performed in 2014, we have done two further signal investigations into the topic of idiopathic intracranial hypertension and Mirena based on -- and that the first signal investigation in 2015 also looked at the disproportionality analyzes in the FDA database and the WHO Vigibase, and what that shows you that exactly that, what disproportionality algorithm is based on spontaneous data and is influenced both by the population that experience a condition, and it's

influenced by the population that uses your drug. So if you are confining your analysis in the case of Levonorgestrel Ius and IIH to women of fertile age you don't see an increased reporting odds ratio. On the other hand, what we see is with the onset of stimulated reporting in the US in the context of litigation you see an increase in the spontaneous reports which automatically leads to an increase of disproportionality reporting. So it is what disproportionality analysis is based on, it's based on spontaneous reports. And if you have anything that increases the number of spontaneous reports, either by litigation or other public attention, that means that you get an increased reporting odds ratio, which is simply a reflection of the fact that there is stimulated reporting. And all the regulatory guidelines say that, they say that if you interpret the analysis of your disproportionality analysis you have to take into account all the factors that influence spontaneous adverse events reports, such as stimulated reporting.

MR KENNERLY: Now, given that Bayer believes the Valenzuela study shows no increased risk in IIH among Mirena users, does that mean it is less likely that Bayer will confirm a signal in future

signal assessments?

MS COOK: Object to form.

A. I don't understand the question. To confirm a signal means that you do a signal investigation, and if you look at all the data that you have available, and that includes not only spontaneous adverse event data from spontaneous event databases, but also the literature and what is published in the literature. So if based on all that data you come to the conclusion that a signal is confirmed so that there is a causal association, then that means a confirmed signal. So I don't understand how you put that into relation.

MR KENNERLY: Well, in future signal assessments you are going to look at all the available evidence including Valenzuela, correct?

MS COOK: Object to form.

A. So do you mean in future, so in hypothetical?

MR KENNERLY: Hypothetically in the future?

A. So if there would be a new potential signal arising from any kind of sources that we discussed, and I mean that's the same for all products and all safety topics, so if there is a new information arising on a topic arising from

literature from spontaneous reporting, that means that you do a new signal investigation. That means that you can also call it reopen a signal investigation, but it means that you redo a signal investigation that is also described in the guidelines. And also a topic that has been previously investigated can be reopened if new significant information is received on that topic. And we have done, in the case of idiopathic intracranial hypertension we have done that repeatedly in the past every time that there was really new relevant information coming in that we considered new information, like a new publication, or back in 2014 the increase in cases, we have done a full signal investigation. And every time that we have done the full signal investigation we have refuted the signal, but we continue to monitor the topic of idiopathic intracranial hypertension and Mirena.

Q. Now you were mentioning before about restricting analysis to women of, I think it was, is it 15 to 44 years old?

A. So what I was referring to was the analysis that we did and that also Etminan described in his letter to the editor, where you do a

disproportionality analysis in the FAERS database, but you restrict -- so you don't restrict, but you stratify the cases and look at the cases that were reported by women of fertile age. So we look at all cases that were ever reported in women of fertile age that referred to IIH and referred to Mirena and referred to all other products. So we have a huge database of spontaneous reports, but only women who are actually at risk, at highest risk of developing IIH and are most likely to receive Mirena because it is used as a contraceptive and as treatment for heavy menstrual bleeding. So if you do that analysis then you don't see any increased reporting odds ratio in the time before the US litigations, because that is, of course, another factor that influenced spontaneous reporting. But in the time before the US litigations you don't see an increased reporting odds ratio. So the reporting odds ratio that you observe when you look at the whole database can be explained by the fact that both the condition that you are looking at and the product that you are looking at is something that is used almost exclusively, or is observed almost exclusively in the same population, namely women of fertile age.

Q. Isn't it true that Bayer has multiple

medically confirmed reports of women over the age of 44 who are using Mirena and developed IIH?

A. We would have to look into the data.

Q. You could look at page 51?

A. So on page -- so before we look at single cases I would like to point out that on page 46 of 95 we discussed the age profile of all our cases that we have received and that have some information on age. So the average age of the patients at onset, this is page 46 --

Q. This is also not my question?

A. But it addresses your question because it says here the average age was 29.5 years of age with a range of 18 to 52 years. The age information was available in 267 of 319 cases. So this is actually an age profile that is consistent with what you would expect to see in a typical sample of patients with idiopathic intracranial hypertension. It is -- yeah.

Q. Okay. And on page 51 there is a spontaneous report from 2002, which is more than a decade before the litigation, of a normal weight 46 year old woman who developed intracranial hypertension while using Mirena, correct?

A. So you are referring to the case from

Spain?

Q. Yes?

A. Yes. So this patient was 46 years old and had a body mass index of 22.36. That is correct. I mean, IIH, or idiopathic intracranial hypertension does not occur exclusively in obese women. So you also have idiopathic intracranial hypertension in women who are -- who have a normal body mass index, but what it is, what has been established is that increased or excess weight and weight increase, obesity, are risk factors. So if you look at the totality of the cases then you will see that the majority of cases where the information on weight is available are, in fact, overweight or obese or have reported recent weight gain.

Q. Okay. Well, this woman over 46 has none of those risk factors here. And are you telling me that this case does not provide any reason whatsoever to suspect a potential causal association between Mirena and IIH?

MS COOK: Object to form.

A. So this is a spontaneous case report and it provides the information that you get from a spontaneous case report. It is something that was reported by the Company. It is a medically confirmed

case, so it was reported by a physician. So there are many reasons why this can be reported to the Company. So either the physician wants to highlight that he had the case, or the physician asked the Company whether, what the Company's opinion is on whether there have been other cases reported on this. So this is a spontaneous case report. As it says here, it is very limited details so there is no information on the first start of symptoms, whether the symptoms that the patient experienced were actually already present before the insertion of Mirena. There is no information on whether she received any treatment, so that means that the level of evidence that you can get from this kind of single case is very limited. So what you have to do is look at the totality of the cases to determine whether overall there is a signal for an increased risk. Since there are more than -- there are several million Mirena users since launch of Mirena, and the majority of these women are, some were in the age between adolescence and the menopause. That means that we expect to get a certain number of spontaneous cases that are referred to idiopathic intracranial hypertension, because that is just the population where you have occurrences of idiopathic intracranial

hypertension.

MR KENNERLY: Okay. On page 58 there is a 52 year old normal weight woman in Portugal who in 2004 developed intracranial hypertension while using Mirena, and is it Bayer's position that this is of no use in investigating a potential causal association with Mirena and IIH?

A. 58, you say?

Q. Page 58, the report from Portugal?

A. Right. So sorry, I was looking at the case. What was your question?

Q. So this is a 52 year old woman report from 2004. She is normal weight and it is a medically confirmed case. My question is is this report of no use in assessing whether there is a causal association between Mirena and IIH?

A. I don't understand your question, because it is right here in that table. That is part of our signal investigation that we are submitting to the BfArM, so we are including it in our overall analysis of whether there is a reason for causation.

Q. So yes, the answer is yes, it is of use?

A. All of our cases, we include all the cases into our overall analysis of whether there is

causal association.
Q. Okay.
A. Between --
Q. So this case --
A. -- Levonorgestrel and IIH.
Q. So this case from 2004 involving a 52 year old woman of normal weight, and the other case we just talked about from 2002 involving a 46 year old woman of normal weight, now you testified before that Bayer did its first signal investigation in 2008, so is it true to say that Bayer received these two reports and did nothing?
MS COOK: Object to form.
A. So we had received these reports. We processed the reports, we evaluated the reports and reported these reports to the health authorities as per applicable guidelines. We included these in our routine Pharmacovigilance, which includes signal detection and preparation of aggregate safety reports that are submitted to the health authorities. So I wouldn't disagree with your characterization.
MR KENNERLY: Now based on your monthly reviews on disproportionality, is there disproportionate reporting of IIH in women who use Mirena who are over 44 years old?

MS COOK: Object to form.

A. So again the disproportionality analysis that is part of our signal detection activities that are performed monthly, they are done on the complete database of spontaneous reports, and that includes all cases that have ever been reported for Mirena and all cases that have ever been reported for all our products. And over these full database disproportionality analysis are run that look at product event combinations, so how many events have been reported for a specific product. There is no breakdown by age groups per default in these monthly analysis. If you have an increased reporting odds ratio you will look at the cases that this reporting odds ratio is based on, and then you can do things like age stratification or stratifying by gender, or do simply a single case assessment, as we have done in the past and as we are doing also here, to look into the possible reasons for such an increased reporting odds ratio.

MR KENNERLY: Okay. I am just going to talk on the record, I'm done for the moment. So for record purposes we have finished questioning of Dr Schoendorf as a designee for both of the designee notices. The Plaintiffs are noting here that even as

of now Dr Schoendorf's custodial file has not been closed. We have requested prioritization of it several months ago and yet still have not received all of it. We were sent documents by FTP site late last night and have not had a chance to review them. Dr Schoendorf talked about a spreadsheet used in her signal investigations that we have never received before. We were provided with a copy of it last night and have not had a chance to review it. Dr Schoendorf testified about extensive use of the Imperica database for disproportionality analysis, we have not been provided any of this and we are requesting all of it. So we have been hobbled in our ability to conduct this deposition. We are preserving the objection now. We would hope that we can work out something with defense counsel on it, but we don't want to leave it unsaid.

In terms of scheduling, from prior discussion with defense counsel, and she can tell me if I am wrong, we are going to move to individual questioning of Dr Schoendorf. Upon our conclusion of that defense will do their follow-up of Dr Schoendorf, which can include the designee component of it as well, so there is no waiver by moving to the individual.

MS COOK: We have addressed the discovery issues by e-mail and we will continue to do so, and we can confer processes and orders to provide for all of those issues, so I don't really think we need to get into it here unless you want to. We have never received a request for the Imperica database, it was not one of the databases that we were ordered to produce, but if you want to raise any of these discovery issues after today we will obviously meet and confer about them.

Agree we are stopping the 30(b)(6) portion and moving to the personal deposition. By agreement we are going to stay on the same transcript, just to make things more efficient.

MR JONES: We are staying on the same transcript?

MS COOK: Yes, that's what we talked about before.

MR JONES: So continuing the Exhibit numbers?

MS COOK: Yes, continue exhibit numbers, but realtime is not working any more, if you want to go off the record real quick and get that back up running.

COURT REPORTER: I don't know if we can get

it back up.

MS COOK: Okay. Let's just go then if you're fine with that Larry?

MR JONES: I would love to have it but I realize everybody has flights, so let's roll. I need a mic though.

Examination by MR JONES

Q. Good afternoon, Dr Schoendorf. I am Larry Jones, we met a couple of years ago and I took your deposition, do you remember that?

A. Yes, I do.

Q. I'll try to be fairly quick today, but I want to go over some different things that you have said over the last day or so. Yesterday, and I am reading from page 119 of the rough draft transcript, you say:

"We have, we are very open and transparent about the number of cases that we receive and how that affects our reporting rates globally, and this is based on the numbers that we received from US litigation."

So I want to ask you why is it important for someone in your position to be open and transparent about the cases?

MS COOK: Object to form.

A. So I don't -- no, I don't recall in which context I said these things but, of course, it is when you communicate with the regulators you have to be open and transparent in your communication of the data that you have, and the most recent signal investigation that was submitted to the BfArM we included all the information that they requested and -- does that answer your question?

MR JONES: Kind of. You said it is important to be open and transparent with the regulators. As the Global Safety Lead for Mirena do you feel that it is important to be open and transparent to everyone that you communicate with about safety data?

A. Yes, I agree it is important to be -- to make sure that all the relevant information on safety and efficacy of your product reaches also, for example, the prescribing healthcare provider or the patient.

Q. Is openness and transparency a core corporate value for the Bayer companies?

A. Well, so yes, definitely, I would say that we try to be open and transparent wherever we can. Yes.

Q. And why is it important to be open and transparent with regard to safety data?

MS COOK: Object to form.

A. So in a case of a communicating with prescribing physicians and also patients, it is important to provide all relevant data on the risks and the side effects of the product, on the other hand also of the benefits of the product so that the prescribing physician and the patient are enabled to come to an informed decision on whether in that particular case actually that a product is an appropriate choice.

MR JONES: And I think I heard you say a few minutes ago when you were testifying in your corporate capacity, and feel free to correct me if I am wrong, but I thought I heard you say something along the lines of a physician could always call the company and ask if there were instances of someone who had developed a certain condition such as PTC?

A. So you are saying whether we get calls from physicians asking this?

Q. Yes?

A. Yes, that is also part of Bayer's business that we answer to inquiries from physicians on all kinds of products and all kinds of conditions.

Q. So it is acceptable for a physician to call the Company and ask, for instance, if there are other patients who have developed pseudotumor cerebri while using Mirena?

A. Of course we have -- it is possible for every physician to call the Company to ask on information on the products, yes.

Q. Would you encourage physicians to do that?

A. Would we encourage physicians to ask questions? Yes, of course, if they have questions on our products they are encouraged to contact the Company, I believe. So it is not my area of expertise but there is a whole organization that's looking into medical, providing medical information, and there are -- in every country there are certain numbers that a physician can call. So it is desired that Bayer does that, yes -- that a physician does that.

Q. As the Global Safety Lead for Mirena are you ever involved either directly or indirectly in responding to such physician inquiries?

A. Yes, these kind of physician inquiries, we have procedures for this kind of scenario so, of course, there are a lot of inquiries on the products

that can come from physicians and consumers, and a lot of these are inquiries can, for example, be answered based on the available product information material. So if it refers to a known side effect then the person in the country in the Company that has this available can answer that question directly. If it is a so-called complex safety query, so that's referring to data that is not easily available from the product information or other documentation that is available in the country, then this query is forwarded to the global Pharmacovigilance function. So it is forwarded to the group account of the Global Safety Leads of that product. So if there's a question on Mirena that would come to the Womens Healthcare Group account by the colleague in the country, and they will forward the question and it would fall in our responsibility to compose a response to that question.

Q. Okay. So that was a very long answer. Is the sum of it yes, you are involved in responding to inquiries directly or indirectly from physicians?

MS COOK: Object to form.

A. So the response to that is yes in some instances, and I tried with my very long answer, I apologize for that, but I tried to explain to you

which these instance are, so it is not in every instance that I am involved.

MR JONES: Okay. So if a physician were to inquire with the Company today about whether or not Bayer was aware of other Mirena users who had pseudotumor cerebri while on Mirena, would that be an inquiry that you would be involved in answering?

MS COOK: Object to form.

A. That's a hypothetical question that I can only refer to the procedures that are in place that describe these hypothetical scenarios, if that is a question that is asked by a physician in a country and the country person says, okay, this is a query that is too complex, I can't answer that. So it is forwarded to our group account and that will ultimately reach, for example, me as GSL for Mirena.

Q. Okay. Well, let's take it out of the hypothetical then. Have you been involved directly or indirectly in responding to a physician inquiry about Bayer's knowledge related to whether any Mirena users had developed pseudotumor cerebri while using the product?

A. So you are referring to a specific request, or a specific question from a specific physician.

Q. Have you ever been involved in any -- can you just read the question back?

(read back)

THE VIDEOGRAPHER: This is the end of Media 4, Volume 2 in the video deposition of Dr Juliane Schoendorf. Going off the record at 14.24pm as indicated on the video screen to sort out technical issue.

(Short Recess)

THE VIDEOGRAPHER: This is the beginning of Media 5, Volume 2 in the video deposition of Dr Juliane Schoendorf. Going back on the record at 14.32 pm as indicated on the video screen.

MR JONES: Dr Schoendorf, after that technical rain delay, I don't expect you to remember the question that was on the table, so let me try to summarize it. Do you recall any instances of you ever having been involved in responding to a physician inquiry regarding Bayer's knowledge of Mirena users who have developed pseudotumor cerebri?

A. So we get a lot of inquiries on all kinds of topics every week, so I have to say that it is possible that I have been, but to the best of my memory now I can't recall a specific instance that I can point out.

Q. If a physician were to call you today and inquire about the potential association between Mirena and developing pseudotumor cerebri, what would you tell them?

MS COOK: Object to form.

A. So as mentioned, that would certainly not be the physician calling me directly but it would go via according to our processes and would come to our e-mail account and we would put together an answer that reflects what we know as of today on the topic of idiopathic intracranial hypertension and Mirena, and would, of course, be consistent with our Company position that there is no increased risk of idiopathic intracranial hypertension in Mirena. It would cite, for example, the pertinent literature and also it's usually a part of -- this is also a description of what has been reported in the spontaneous adverse event reporting, how that relates to what we know on the condition and how that is related to what influencing factor you have to consider when interpreting these numbers. But, of course, it depends on how the question is asked, who is asking it, so what exactly is the information that is needed. I can now here only speculate what it would be that we put into the answer that will very

much depend on what the person who wants information really wants to have.

Q. What if the question was: Is there a connection between Mirena and pseudotumor cerebri?

MS COOK: Object to form.

A. So do you mean if the question was is there a causal association between idiopathic intracranial hypertension and Mirena?

MR JONES: Is there a connection, a connection?

MS COOK: Object to form.

A. So I guess in that case the first response would be to could you please specify what it is that you are inquiring for. Connection is a very unspecific term. But assuming that you are inquiring about what is the Company position on the causal association, on a potential causal association between Mirena and idiopathic intracranial hypertension, the answer would be that it is the Company position that there is no causal association between the Mirena and idiopathic intracranial hypertension.

MR JONES: Okay. And would your answer to that also include all of the things that you mentioned before, such as citations to pertinent

literature, the number of cases reported?
MS COOK: Object to form.
A. Again it is a hypothetical scenario that you are putting up, so it depends on who's asking, what exactly the person is asking, what kind of detail is required that will determine the answer that we give.
MR JONES: But isn't it true that you do receive such inquiries about pseudotumor cerebri?
MS COOK: I object to form.
A. So right now I'm not aware of what kind of -- which inquiry you are referring to.
MR JONES: I am not speaking of any particular one. I am saying isn't it true that you personally have been involved in responding to such inquiries?
MS COOK: Objection. Asked and answered.
A. So again I have been involved in responding to requests by health authorities on the question what is the evidence, what is the data and what is the Company position on a potential causal association between Mirena and idiopathic intracranial hypertension. And, as I mentioned, it is possible that since we have received a lot of inquiries on all kinds of medical topics in relation

to our product, it is possible that in the past I have been involved in responding to so-called complex safety query that is forwarded by the country organization to the global organization that related somehow to idiopathic intracranial hypertension and Mirena, but right now I can't really recall a specific instance.

Q. For the purposes of openness and transparency do you believe that it would be necessary and appropriate to inform the inquiring physician about the number of cases of Mirena users who have developed pseudotumor cerebri to that questioning physician?

A. You are referring now to that hypothetical inquiry about a physician asking about idiopathic intracranial hypertension and Mirena?

Q. Yes?

MS COOK: Okay. Then I object to form.

A. So again, the detail of the response will depend on who is asking it and what kind of information is required. Usually an absolute number of cases -- that goes for all inquiries -- an absolute number of spontaneous adverse event reports that has been reported to the Company is of very little information to a physician out there because

there's nothing that he or she can relate that number to. So usually we would then set that number in relation to how many Mirenas have been sold since Mirena has come on the market and what is the estimated post-marketing exposure of Mirena, and probably give a reporting rate on that.

MR JONES: Let's mark this as deposition Exhibit 16.

(Exhibit 16 marked for identification)

Dr Schoendorf, I have handed you a copy of a web page that I have printed out from the Jadelle web page. It says in bold: "Patient and drug safety". Did I describe that correctly?

A. So it says "Jadelle patient and drug safety" here in the header .

Q. Yes. So let's read the first line:

"Humans vary in their biological reactions to medicinal products."

Do you agree with that?

A. That is a very general statement, but I can agree to that, yes.

Q. Okay. "This is why not all adverse reactions, side effects associated with the use of medicinal products can be detected during clinical development, not even about the most comprehensive

clinical trials."
Do you agree with that statement?
A. Yes, we had a discussion on that topic. Yes.
Q. "Capturing as many of these adverse reactions however rare as they may be in absolute terms from worldwide sources is of paramount importance for continued patient and drug safety Pharmacovigilance."
Do you agree with that?
A. Yes, I agree with that statement.
Q. Skipping down to where it says:
"The following World Health Organization statement is emblematic of the shared responsibility".
And then there is a quote:
"To know of something that is harmful to another person who does not know and not telling is unethical."
And it cites ethics and Pharmacovigilance, WHO, do you agree with that statement?
A. Yes, I would agree with that statement.
Q. Let's mark this as deposition Exhibit 17.
(Exhibit 17 marked for identification)

Dr Schoendorf, I have handed you a document with the first page, the Bates number is MIR_CW_00383493. Did I describe that correctly?

A. Yes.

Q. Okay. And this looks like a May 4th, 2006 e-mail. Did I describe that correctly? Do you need some help showing you where the date is?

A. Yes, can I have just a second to look at this e-mail?

Q. Sure.

A. Thank you for giving me the time.

Q. Sure. The sender is Anna Mari Samavalli, S-A-M-A-V-A-L-L-I?

A. That is correct.

Q. I probably didn't pronounce that correctly, did I?

A. That's fairly good.

Q. Do you know Anna Mari?

A. Anna Mari was a former colleague of mine working in Pharmacovigilance also as a Global Safety Lead.

Q. Was she your boss at one time?

A. I think at one time she was my administrative boss for a short time before she left the Company, yes.

Q. Do you know, have you talked with Miss Salmivalli in the last two years or so?

A. No, I haven't.

Q. Okay. Let's go down, do you see that you are a recipient of this e-mail, do you see Juliane Schoendorf?

A. So the recipient is Paul Korner and there is a long list of people that's CCd, including me and our functional boss at the time Jutta Breitfeld.

Q. And CCd means you received a copy of this e-mail, correct?

A. That is correct.

Q. Let's go down to, do you see the paragraph "post-marketing experience"?

A. Yes.

Q. Okay. It reads:

"Benign intracranial hypertension is an unlisted effect of Mirena. Systemic use of Levonorgestrel is not commonly associated to increased incidence of intracranial hypertension. In ARGUS database altogether eight cases of", it is supposed to be benign but it reads bening, I guess, "eight cases of benign intracranial hypertension were found. Please don't distribute the exact numbers

outside the Company."
Did I read that correctly?
A. You read that correctly.
Q. Okay. And why wouldn't -- do you remember this e-mail exchange and this Mirena query from the USA?
A. No, I don't recall it as a specific exchange. So it goes on to say that there are 11 cases of increased intracranial pressure and papilledema, and then I believe on the next page --
Q. Right, I was asking about the "please don't distribute the exact numbers outside the Company"?
A. Yes.
Q. Do you know why Miss Salmivalli would instruct all of these recipients not to distribute the number of cases of benign intracranial hypertension to individuals outside the Company?
A. So to know the exact reasons why she put it in there we would have to ask Miss Salmivalli. But as I mentioned, what I can think of, because that is how we have been communicating also in other instances, is that she means that it is not useful -- as we discussed previously, it is not useful to send out just the number of cases to persons who have no

other knowledge on the product. So they don't know of the post-marketing exposure, or they don't know how many units have been distributed, and since these -- so what you usually would do is put it into relation to your post-marketing exposure and report something like a reporting rate. The other reason that I could think of is that since these are numbers that derive from a Pharmacovigilance database, which is a database that constantly receives new reports for all products, for all events, so by the time that you send your response and put the numbers together, there are new reports coming in. So by the time a response reaches a particular physician the numbers may be outdated already because, as I said, the Pharmacovigilance database is not a closed database, but it is constantly reporting new numbers. So these are the reasons that I can imagine that led her to put the statement in there.

Q. Is there a policy within the Company to not give out the exact number of benign intracranial hypertension cases to individuals who ask?

A. I am not aware of such a policy. As I mentioned, there are good reasons that -- to say that providing an absolute number of cases that are in the database at any given time is not very useful

information for an inquiring physician, for example, because you have to put it into relation of the overall post-marketing exposure, how many women have been inserted with Mirena cumulatively, because this refers to cumulative numbers that have been received over the years that Mirena last been on the market, and you want to put it into relation with the post-marketing exposure. So if the question is related to that, then giving something out like a reporting rate of an event compared to based on the post-marketing exposure is a much more useful information to provide. And on the other hand, as I mentioned, by the time that this response will reach a physician the numbers will likely be outdated.

Q. What if the physician wants to know what the numbers are, will the Company give them to he or she?

MS COOK: Object to form.

A. You mean -- so you mean a hypothetical physician saying that I want numbers? That depends -- I can't answer that really. It will depend on who is the physician asking and so it's ...

MR JONES: Well, according to this e-mail, Miss Salmivalli said don't give out exact numbers to

anyone outside the Company, right?

MS COOK: Object to form.

A. As I've already explained to you I can only guess her reasons for putting that in there, but there are good reasons to say that exact or absolute numbers are of limited information for an outside physician who does not have the knowledge on the overall post-marketing exposure for Mirena, so you have to tut put it into relation, so something like a reporting rate, a cumulative reporting rate is much more helpful information to the physician and, again, the number, the absolute number of cases by the time that you report them may actually be outdated and that is also not helpful.

MR JONES: She didn't say any of that in her e-mail, did she, she said don't distribute the exact numbers outside the Company, right?

MS COOK: Object to form.

A. So, again you are right. We have -- we would have to ask Anna Mari Salmivalli to know exactly what the reasons are. I gave you two which I think are very good and valid reasons to say that rather than providing exact numbers it is more helpful to provide some reporting rates. This is an e-mail that goes to internal people and mostly many

are actually Pharmacovigilance people who have -- who are -- who know what it means to have an absolute number versus a reporting rate, and so I can only assume that the numbers -- that the people that received this e-mail would interpret this statement in the way that I have, that an absolute number is not very helpful to an outside person but what is much more helpful is, for example, a reporting rate, or a statement on the observed reporting rate of spontaneous reports.

MR JONES: Yes or no, that is not what she said, correct?

MS COOK: Object to form.

A. Sorry, what is not what she said?

MR JONES: Everything that you just said. She said: "Do not distribute the exact numbers outside the Company." That's what she said, right?

MS COOK: Object to form.

A. You are correct that this is what is written here and I have given you the potential explanations what this will mean, what she actually means with that, and you would need to ask Anna Mari Salmivalli.

MR JONES: Can we mark that as Exhibit 18?

(Exhibit 18 marked for identification)

You have been handed Exhibit 18 which is marked at the bottom MIR_IH_US00010962. This is an e-mail of December 8th, 2016 from Teija Tervomaa, T-E-R-V-O-M-A-A. Do you know who that is?

A. She is part of the clinical development operations and a study manager, who has been working as a study manager in the clinical development.

Q. It is to Chuck Walsh, who is Chuck Walsh?

A. Chuck Walsh is a colleague who works in the US organization of Bayer and in the Pharmacovigilance organization at Bayer, and I am actually right now what sure what his function is.

Q. And who is Eeva Lukkari-Lax?

A. Eeva Lukkari-Lax is the Clinical Lead for Mirena, so she is the physician, the responsible physician within clinical development.

Q. And how about Antonio Costales, do you know who that is?

A. Yes, I know Tony Costales. He is currently working as, what's the title? Medical, study medical expert for, among other things I know him from working as a study medical expert for Mirena study.

Q. Okay. Let's read the e-mail:

"Dear Chuck, we are currently at the investigator meeting for Mirena extended trial 18649. There is a question from one of the PIs that we would need some help from the safety."

Do you know what a PI is?

MS COOK: I object to foundation to this document. She can answer that question.

A. So PI, I assume, stands for principal investigator.

MR JONES: Then it reads:

"My ophthalmologist asked me about pseudotumor in women using Mirena Ius. She has three patients with such. What information does the Company have on this, would you be able to assist on this question."

Did I read that correctly?

A. Yes --

MS COOK: Object to foundation.

A. Yes.

MR JONES: So now that you are asking, or you were concerned about answering a hypothetical that hadn't happened, so if you were involved in this exchange and the question came from a Mirena trial investigator saying; my ophthalmologist asked me about pseudotumor in women using Mirena Ius, she has

three patients with such, what information does the Company have on this? What information would you provide in response to that question?

MS COOK: Object to form.

A. So I would probably pick up the phone and ask Teija about more details on what the background is of this question before I -- and based on the results of that phone call I would compose an answer on the information. But I mean this is a hypothetical scenario. I have to say that this is the first time that I see this e-mail, so ...

Q. Would you recommended that -- does Mr Walsh report to you? Does Mr Walsh report to you?

A. No, there is no reporting line from Mr Walsh to me, no.

Q. The US Pharmacovigilance doesn't report in any manner to Global Safety Lead for Mirena?

MS COOK: Object to form.

A. So when you say report to me, I assume that you mean is he my (In German)

THE INTERPRETER: Subordinate?

A. Yes. So when you say does he report to me, I assume that you mean is he my subordinate and reports to me in terms of that I am his

administrative boss or I am his functional boss, and to that the question is no, I am neither his administrative nor his functional boss. Do we write e-mails to each other? Do we have contact? Yes, of course we have contact, and he writes also e-mails to me if he has questions.

MR JONES: So if Mr Walsh were to ask you how should I respond to this, would you tell him he should pick up the phone and call and get more details about this?

MS COOK: Object to form and foundation.

A. So again if this -- so this is now a hypothetical scenario. If the question would reach me through either of these persons I would reach out to them to try to get some more information on the question, and then based on that information I would compose the answer that may be as detailed or as concise as the requesting physician wanted.

MR JONES: What more information do you need about the question, what information does the Company have on this?

MS COOK: Object to form and foundation.

A. So are you asking what would I ask on the phone?

MR JONES: What more information do you

need in order to be able to answer that question?

MS COOK: Same objection.

A. Well, so the information that a Company has on idiopathic intracranial hypertension and Levonorgestrel Ius, that includes the information deriving from spontaneous adverse event reports that contains all the information that we know from clinical trials and the information from the literature, that all the information that we have gathered in repeated signal investigations on the topic over the years since, with the first one being 2008 and repeated signal investigations then in 2014, 2015 and the last one which was recently submitted to the German Health Authority. That alone is a document that has many pages, so 95 pages without appendices. So that is all the information that we have on this topic. Certainly this is not a document that serves a purpose of answering such a question so ...

MR JONES: So you wouldn't give that 95 page document or the information contained therein to a physician inquiring about what information does the Company have on this issue?

MS COOK: Object to form.

A. Certainly if I find out about what a

hypothetical physician exactly wants, then that information would be based on the information that is in here but, yeah, that again depends on who is asking the question and what kind of detail is required and etc, etc. Let's mark this as exhibit --

MS COOK: Counsel, your time has expired. I gave you 10 extra minutes because of the Court Reporter and Videographer's technical problems, and it is now 3.10 so we really need to pass the witness.

MR JONES: Well, we had 3.10 and then we got in here and had all these snafus even after that.

MS COOK: You guys hired the Court Reporter and Videographer. We are not going to be held responsible for their tech problems. I will give you two minutes to do this e-mail and we are done.

MR JONES: No. No.

MS COOK: Yes, we are.

MR JONES: No. No, we are not.

MS COOK: We have an agreement.

MR JONES: We will go -- we lost about 10 minutes here --

MS COOK: No, Larry we won't. We did not. We didn't/

MR JONES: Yes. We didn't what?

MS COOK: We didn't lose 10 minutes. Five

minutes.
MR JONES: Take it to the Court.
MR KENNERLY: If you take it to the Court you are going to see what her answers are. Do you want that in front of the judge?
MS COOK: Yes, I absolutely do. I also want your open ended questions in front of the judge. Let's mark it as an exhibit and get out of here.
(Exhibit 19 marked for identification)
This is Exhibit 19. Five minutes.
MR JONES: Just pipe down, please.
MS COOK: Can you please put what he just said on the record.
MR JONES: That's fine. You are very disrespectful to me.
MS COOK: No, do you know what, you are being condescending? The deposition protocol requires you to be courteous to me.
MR JONES: You are not being courteous to me.
MS COOK: Both of you have been behaving inappropriately to me. I think everyone in this room would agree.
MR JONES: I have not even talked to you on the record.

MS COOK: Right now you are. Pipe down.

MR JONES: You are telling me --

MS COOK: Let's move on. You are out of here in five minutes so let's just move on.

MR JONES: I will get through both of these documents. Here, let's mark them at the same time.

(Exhibit 20 marked for identification)

Mark that one as Exhibit 20.

MR JONES: Dr Schoendorf, Exhibit 19 is the response from Chuck Walsh to the question in Exhibit 18. Do you see that?

A. Yes.

MS COOK: Object to foundation.

MR JONES: I have one simple question. And is Exhibit 19 the response out of the information that the Company has on pseudotumor cerebri in women using Mirena Ius?

MS COOK: Objection. Lacks foundation. Object to form.

A. Sorry, so you are asking, this was the response -- so you are asking whether this was the response of Chuck Walsh to that question?

MR JONES: No, my question was is that all of the information that the Company has about pseudotumor in women using Mirena Ius?

MS COOK: Objection. Lacks foundation.

MR JONES: You can have a continuing running objection.

A. What the e-mail says, and that e-mail was written by Chuck Walsh and does not include me, so this is the first time I see this e-mail, is that he says that here is a statement on pseudotumor cerebri, so there is a typo, idiopathic intracranial hypertension IIH from the most recent PBRER, page 719, December 2015. Then in quotation marks it says:

"Available data for Mirena currently do not indicate that Mirena use would be associated with an increased risk for developing IIH. As discussed in the scientific literature reviewed (for this report), confirmed evidence for a causal association of Levonorgestrel Norplant implant use and intracranial hypertension is lacking."

That is the end of the quotation and that ends the e-mail of Chuck Walsh.

MR JONES: So yes or no, is this all the information that the Company has on pseudotumor and women using Mirena Ius?

MS COOK: Object to form and foundation.

A. So this is a statement that Chuck Walsh copied from the most recent PBRER at the time.

I assume that this is the statement that was copied from the most recent signal investigation that was included in the PBRERs and submitted to the regulatory authorities. I don't know why he did that and why he provided that, and I was not involved in the discussion in that. But it seems that he considered that this is an appropriate answer, but I don't know whether there has been any further exchange, or whether there was more detailed -- the paragraph that is stated here is the conclusion of the signal investigation. That presents all the available data at that time.

MR JONES: Let's look at Exhibit 20, this is one that you are involved in. From Noa Slutsky to you, Petra Koelm, Andrea Machlitt, Mirja Leena Kaipomaki, PV TAG, WHC and Roumen Anguelov:

"Dear colleagues, we have been approached with the following query; is there a contraindication, a known risk to insert Mirena to an overweight patient with a history of pseudotumor cerebri and current papilledema."

Did I read that correctly?

A. Yes, you read that correctly.

Q. Okay. And the date of that e-mail is February 20th, 2017, right?

A. Yes, that is correct.
Q. Okay. And you responded to that inquiry, right?
A. That is correct, it comes from me.
Q. Okay. Can you read that into the record?
A. "Dear Noa, as per CCDS neither overweight nor a history of pseudotumor cerebri and current papilledema are contraindications to Mirena insertion. It lies in the responsibility of the treating physician to decide together with the patient whether Mirena is the appropriate contraceptive option in her particular case."
Q. And that's the totality of your answer to that inquiry, correct?
A. That is the answer to the question whether overweight with a history of pseudotumor cerebri and current papilledema is a contraindication to Mirena use, which is not the case.
Q. Okay. So you only answered the specific question that was asked, correct?
A. Correct. The specific question was that, is overweight and history of pseudotumor cerebri a contraindication to Mirena use, and that is not the case. That is based on our CCDS. That is

also the conclusion that the authors of the Valenzuela and Others paper reached in their conclusion. That is correct.

Q. And you didn't respond so that the physician would learn that Jadelle, which is a Levonorgestrel releasing contraceptive is, in fact, contraindicated for someone with pseudotumor cerebri?

MS COOK: Object to form.

MR JONES: Correct?

A. Okay. So firstly Jadelle is not contraindicated to -- so idiopathic intracranial hypertension is not a contraindication to Jadelle use.

MR JONES: Has it been removed from the label?

MS COOK: Object to form.

A. So which label are you referring to, I have to ask here, because it has never been in the Company core label of Jadelle?

MR JONES: We are now out of time.

MS COOK: Counsel, you are out of time and now you are talking about a different product. I will give you another minute.

MR JONES: No. No, let's be cordial to

each other.

MS COOK: I totally agree.

MR JONES: I am fine.

MS COOK: If you want another minute wrap up.

MR JONES: No, I don't want to get into the Jadelle label. It is taking too long anyway. I can wrap up. All I wanted was the extra time for the snafus. Thanks Dr Schoendorf. Sorry, I didn't have an opportunity to talk with you for a couple of hours, but maybe some other time.

MS COOK: I have a number of questions for the witness. I need to go grab my documents, can we take just a quick two minute break for me to do that?

THE VIDEOGRAPHER: This is the end of Media 5, Volume 2 in the video deposition of Dr Juliane Schoendorf. Going off the record at 3.19 pm as indicated on the video screen.

(Short recess)

THE VIDEOGRAPHER: This is the beginning of Media 6, Volume 2 in the video deposition of Dr Juliane Schoendorf. Going back on the record at 15.38pm as indicated on the video screen. Thank you for your patience counsel.

Cross-Examination by MS COOK

MS COOK: And just so there is no confusion down the line I want to note for the record we took a longer break due to some technical difficulties with the Court Reporter's technology, just so there is no confusion about the break. Now I will get started.

Good afternoon Dr Schoendorf?

A. Good afternoon.

Q. Are you a physician?

A. Yes, I am.

Q. And you have a medical degree?

A. Yes, I have.

Q. How long have you been at Bayer?

A. So I started first at Bayer in 2000 in the Clinical Development and then came to Pharmacovigilance in 2004, and I have been working on Mirena since 2005.

Q. What is your current position at Bayer?

A. It is Global Safety Lead in Pharmacovigilance.

Q. What are your responsibilities with respect to Mirena as a Global Safety Lead?

A. So there is a wide range of responsibilities, but generally speaking I am responsible for the monitoring of all relevant safety

data that comes in for Mirena, with responsibility for doing signal detection and signal investigations for Mirena. We are responding to inquiries from health authorities and other external parties regarding safety topics in Mirena, and we are preparing periodic summary reports that look at the safety and the benefits that are -- benefits data that are available for the products and come to an overall benefit, conclusion on the benefit risk profile for the products.

Q. In terms of your review of the benefit risk profile of Mirena, why is it relevant to your job to consider the benefits of Mirena?

A. So when we look at the risks and side effects of a product you have to also put that into relation of the expected benefits of a product to weigh them against each other and to make sure that the benefit risk profile remains positive.

Q. And if you say that the benefit risk profile remains positive what exactly does that mean?

A. That means that the benefits that you get from Mirena, for example, the highly reliable contraception, then also -- or if you use it as a treatment for heavy menstrual bleeding, so the affect

of treatment for heavy menstrual bleeding or the other non contraceptive benefits that you may get, for example, the reduction of period pains or when you use it together with estrogen replacement treatment the effective protection from excessive growth of the lining of the uterus. So all these benefits you consider in that benefit risk profile. So that these benefits that you get from using Mirena outweigh the residual risk and the side effects that you may have from the product.

Q. You were asked some questions about adverse event reports or individual case reports, do you remember those questions?

A. Yes.

Q. Are adverse event reports the same thing as individual case reports?

A. So individual case safety reports or spontaneous adverse event reports are referring to the same thing, so these are reports that come into the Company, or in the case of a regulatory authority directly to the regulatory authority, that come in from a physician or maybe also from a patient that is using your medicine, that either wants to report that something has occurred while he or she was using your drug, or is asking about whether there was something

she is experiencing maybe in relation to the drug.
Q. Specifically you were asked about adverse events that were reported with relation to idiopathic intracranial hypertension or IIH, do you remember those questions?
A. Yes.
Q. And you also were asked about benign intracranial hypertension or pseudotumor cerebri, BIH or PTC, are those sometimes used as synonyms for IIH?
A. Yes, correct, they are used as synonyms.
Q. So if I refer to IIH then we can assume that I am referring to the synonyms as well; is that okay?
A. Yes.
Q. Has Bayer collected adverse event reports for Mirena -- first of all how long has Mirena been available to women in the world?
A. So the first marketing authorization was 1990 in Finland and then successively in other countries, and the first marketing authorization in the US was at the end of 2000, and I think the start of 2001 available in the market in the US.
Q. Since Mirena became available to women

has Bayer collected any reports of IIH that it received in the world?

A. So ever since we started marketing of Mirena we have received all kinds of spontaneous adverse event reports that were reported to us, so on all conditions and all questions that were asked with regards to the conditions so, and that includes also cases of IIH.

Q. What has Bayer done to monitor the topic of IIH with Mirena since the very first time that it received any report?

A. So I have to say I was not involved in that at the time, but the routine Pharmacovigilance activities that apply from the start of the marketing of a product is that you collect all the adverse event reports, you process them, you evaluate them and report them to the authorities. You summarize periodically the safety data in your aggregate summary reports and report that to health authorities. And you do cumulative reviews, as it was called before, the new terminology was introduced that meant signal investigations on certain topics if they arise.

Q. And you raise a good point about things that happened before you became involved with Mirena

in 2004. I just want to make sure it is clear from the record that my questions to you right now are also in your capacity as a corporate witness under 30(b)(6), so both portions of your deposition, is that clear?

A. Understood. That's clear.

Q. Okay. So you were asked about a few different reports of IIH that have been reported to the Company earlier today, do you remember that?

A. Yes.

Q. And why would Bayer, you know, upon receiving any report at all of IIH, why would Bayer just not conclude automatically that there must be a safety problem?

A. So a spontaneous report per se, so which may be triggered simply by a physician contacted the Company and asking whether what he or she sees in a patient right now could be attributable to the drug. So that would trigger spontaneous adverse event report, but that in itself does not provide you evidence that this is caused by the drug. So that the condition that is mentioned in the spontaneous report is caused by the drug, so a spontaneous report itself is not evidence that you have a safety problem.

Q. And specifically with respect to Mirena when you have received individual adverse event reports of IIH with Mirena, why would you not automatically conclude that Mirena must have caused the IIH in that patient?

A. So because when you think about the population that Mirena is used in, which are women of fertile age and the majority because they are using it for contraception or for heavy menstrual bleeding, that this is a population that is at higher risk of developing IIH. So considering that there is a large post-marketing exposure, so that means a large number of women using Mirena over the years, a large post-marketing exposure has accumulated, you would expect that IIH as a condition occurring in women of fertile age is also observed in Mirena users.

Q. I am going to hand you Exhibit 21.

(Exhibit 21 marked for identification)

And ask you if you have seen this document before from the FDA website?

A. Yes. Yes.

Q. And you mentioned what Bayer's view was about why you would not automatically conclude from an adverse event that Mirena caused IIH, do you know if that's consistent with regulatory authorities?

A. Yes, that is also consistent with how regulatory authorities would weigh the evidence arising from a spontaneous adverse event report.

Q. And this document is questions and answers on FDA's adverse event reporting system which you testified earlier is called FAERS, right?

A. That is correct, yes.

Q. And if you turn to page 4 out of 5 there is a list of points, and it says:

"When you view the website output of reported reactions (side effects or adverse drug reactions for a drug product) it is important to consider the following points."

And the second point is:

"Existence of a report does not establish causation."

Do you see that Dr Schoendorf -- page 4 of 5?

A. Yes.

Q. And the FDA's website goes on to say:

"For any given report there is no certainty that a suspected drug caused the reaction, while consumers and healthcare professionals are encouraged to report adverse events, the reaction may have been related to the underlying disease being treated or

caused by some other drug taken concurrently or occurred for other reasons. The information in these reports reflects only the reporter's observations and opinions."

Is that statement from the FDA's website consistent with Bayer's view?

A. Yes, that is consistent in our view.

Q. And if adverse event reports do not establish whether a drug causes a condition why do you in your role as Global Safety Lead spend time reviewing and monitoring them at all?

A. Because the spontaneous adverse event reports provide an important source of information when you do your safety monitoring, and we also are doing this as required by the regulations by looking at the spontaneous adverse event reports and do so called signal detection, which means that we are looking -- is there arising from the pattern that we see in these reports from the number of them that we see of these reports, is there a potential signal, so a flag for something that we need to investigate further.

Q. Does Bayer send all adverse event reports that it receives from Mirena related to IIH to the FDA and other regulatory authorities around

the world?

A. Yes, so when a single case report is reported to the Company then it is processed and evaluated and is reported according to the timelines and the applicable regulations to all health authorities.

Q. And to this day has the FDA ever raised any questions or concerns about any adverse event reports of IIH with Mirena that Bayer has submitted?

A. No.

Q. You were asked questions about signal investigations that you have performed, do you recall those questions?

A. Yes.

Q. And I think you have tried to explain this, but can you try to explain what exactly is a signal from a Pharmacovigilance perspective?

A. Yes, so a signal from a Pharmacovigilance perspective is a term that is used to say that this is something that you potentially want to investigate. That can derive from many sources. That could be a single case report, but that could also be, as we discussed, a signal from disproportionality analysis or so the data mining activity. It could be a new publication. So then

when you have that observation you will have to look at it and see is that something that I want to investigate, and when you make the decision to investigate then it's a so called validated signal. That just means that this needs further investigation, and after that there comes the signal investigation or signal assessment where you look at all available data to come to the conclusion is that a true signal, so is it confirmed or is it a false signal. Then it is refuted.

Q. And just the fact that you decide to do a signal investigation or a signal assessment, does that mean that you believe there is something unsafe about a drug?

A. No, to do a signal investigation you have to have some findings, some safety observation where you say this is something that I need to investigate, and during the investigation and the assessment you will come to the conclusion whether that is a new safety signal or whether it was a false signal and is therefore refuted.

Q. And if you could he look at Exhibit 5, which is the guideline on Good Pharmacovigilance Practices from the European Medicines Agency, and that's the Regulatory Agency for Europe, right?

A. That is correct.

Q. And please, if you could turn about five pages in to the list page that has various definitions?

A. Yes.

Q. And do you see the definition of validated signal?

A. Yes.

Q. And you just discussed validated signal. And is the EMA's definition, which refers to a validated signal as:

"Sufficient evidence demonstrating the existence of a new potentially causal association or a new aspect of a known association, and therefore justifies further analysis of the signal."

Is that consistent with your views that you just expressed?

A. Yes, correct. It means that this is something that justifies to look into, to start a signal investigation.

Q. And the fact that there's a potential causal association that needs to be further analyzed, does that mean that there is reasonable evidence of a causal association at that point?

A. No, that does not mean that.

Q. And if you turn to the next page, at the top do you see that there is a definition for signal assessment which says:

"The process of further evaluating a validated signal taking into account all available evidence to determine whether there are new risks causally associated with the active substance."

Do you see that?

A. Yes.

Q. And so the signal assessment, is that the opportunity for you to actually see whether there is a causal association between the product and the condition?

A. Exactly. So signal assessment or signal investigation, which I have used synonymously, is the process of the determination of a causal relation.

Q. And you testified about the four signal assessments that you have performed with Mirena related to IIH, do you remember those?

A. Yes.

Q. And I believe you testified that at the end of your analyzes in those signal assessments you found that the signal was refuted?

A. That is correct.

Q. And is there a definition for refuted signal in the EMA guidance here?
A. Yes, that is on the same page under the definition for signal assessment where it says:
"Refuted signal is a validated signal which following further assessment has been determined to be 'false', that means a causal association can not be established at that point in time."
Q. And is that what you have concluded as a result of all your signal assessments in the past decade for Mirena and IIH?
A. Yes, that's what we concluded.
Q. When did you conduct your first formal signal assessment of Mirena and IIH?
A. So the first formal signal assessment, although it wasn't called as such at the time, that was before also these guidelines was available, was what we performed on the request of the English Health Authority in 2008.
Q. Before 2008 had you been monitoring reports, any reports of IIH that you received with Mirena?
A. So before 2008 we have been monitoring all our reports in routine Pharmacovigilance.
Q. Had there been any safety signal that

had come up, or a potential safety signal that had come up with Mirena and IIH before 2008?

A. No.

Q. And I will hand you Exhibit 22.

(Exhibit 22 marked for identification)

And ask you if you recognize Exhibit 22 as an excerpt from the Periodic Safety Update Report from November 2008?

A. Yes, that is correct.

Q. And this is an excerpt that contains the initial pages and then the portion on IIH. Can you confirm that?

A. Yes.

Q. What is a Periodic Safety Update Report?

A. So that is what I mentioned earlier, that is a report which you prepare periodically, that means after at defined time intervals and it summarizes all relevant safety data on the product to come to an overall conclusion on the benefit risk profile of the product. So the format has slightly changed over the years, but it remained the same, and it is prepared for submission to the regulatory authorities.

Q. And obviously this is an excerpt, but

does it say at the bottom how many total pages of data are contained here?

A. Yes, so in this particular Periodic Safety Report that covers the data of one year, if I believe, so from September 2007 to September 2008, this report has 3,039 pages.

Q. Did you put together or work with others on your team to put together this PSUR?

A. Yes.

Q. And did you keep it in the ordinary course of business at Bayer?

A. Yes.

Q. If you turn to page 2901, is that the 2008 signal assessment that you performed?

A. Sorry, 290?

Q. At the bottom it says page 2901 of 3039?

A. Yes, 2901. Yes.

Q. And?

A. Yes, that is the signal investigation document.

Q. At the time can you tell from this how many reports of IIH Bayer had received as of March 2008, and I refer you to the post-marketing data section on page 3 of 5 of this signal

assessment?
A. So?
Q. If you look at the bottom of page 3?
A. Yes.
Q. Do you see where I am referring to, 24 cases reporting --
A. Yes, so it is here on that page 3 of 5. It says 24 cases reporting a diagnosis or suspected intracranial hypertension of papilledema of unclear etiology, and these are the cases that were in the database at the time.
Q. And at that point can you tell how many people had been using Mirena, or how many Mirenas had been inserted in patients since it originally went on the market in 1990, if you look at the next page?
A. So at that time point the total cumulative post-marketing experience was close to 33 million women years, and the total number of insertions estimated from the number of units was more than 12.76 million.
Q. Did you calculate the reporting rate of IIH or related events, because papilledema is included here in this signal assessment?
A. Yes, the reporting rate is on the next

paragraph, which is very low at 0.07 cases per 100,000 women years.

Q. Now, you were asked some questions about why you used global data in your signal assessments, do you recall those questions?

A. Yes, I do.

Q. And I believe you testified just now that you performed this signal assessment at the request of the British Health Authority?

A. That is correct.

Q. And I will hand you what's been marked as Exhibit 23.

(Exhibit 23 marked for identification)

Is Exhibit 23 the request from the British Health Authority that led to the signal investigation in 2008?

A. Yes, that is correct.

Q. And the next to last paragraph says:

"Please provide a cumulative review with comments on your global safety data, including any literature for BIH and all other related terms."

Do you see that?

A. Yes.

Q. And is that one reason why you used the global safety data in your signal assessment?

A. Yes, of course.

Q. Did Bayer send the completed signal assessment to the British Health Authority?

A. Yes.

Q. Did the Health Authority respond?

A. Yes, they did. They agreed with our assessment.

Q. I will hand you what has been marked as Exhibit 24.

(Exhibit 24 marked for identification)

And ask you if this is the response that you received from the British Health Authority?

A. Yes, that is the response.

Q. And the second paragraph here, well it says:

"Thank you for submitting a cumulative review of worldwide safety data for Mirena and benign intracranial hypertension, dated 19th March, 2008. Your review of 24 cases found no conclusive temporal patterns and no unambiguous cases of positive dechallenge. A literature review did not find supporting evidence. You conclude that current available data for Mirena do not indicate an associated risk for development of IIH."

Do you see that?

A. Yes.

Q. Now, the 24 cases that you provided in your signal assessment, the MHRA noted that there were no unambiguous cases of positively challenged, do you see that?

A. Yes.

Q. And yesterday you were asked questions about positive dechallenge, do you recall those questions?

A. Yes.

Q. What does it mean that there were no unambiguous cases of positive dechallenge?

A. So that means that there were no cases where IIH developed in a Mirena user, Mirena was removed and the patient recovered without there being any other reason for the recovery than the removal of Mirena. So there were no cases where the patients, for example -- or the cases where patients recovered, they received treatment or had any other factors that would mark this as not a dechallenge case.

Q. And is it important from a Pharmacovigilance Best Practices perspective to look at potential positive dechallenge cases to see whether there is some other factor that could explain why the condition improved after the drug

was also stopped?

A. That is part of Good Pharmacovigilance Practice to assess dechallenge.

Q. And did the MHRA agree with the Company's assessment that the positive dechallenge reports were -- that there were no unambiguous cases of positive dechallenge?

A. Yes, they write that they accept our conclusion.

Q. And the sentence that you pointed to that says:

"We accept your conclusion that there is currently insufficient evidence of an association between Mirena and BIH."

Was that what you understood the British Health Authority to conclude?

A. Yes.

Q. Then they go on to ask the Company to continue to closely monitor all future ADR reports, is that the same as an adverse event report that we discussed earlier?

A. That's the same, yes.

Q. And since 2008 has the Company continually been monitoring every case that it hears about from any means related to IIH and Mirena?

A. Yes.
Q. And has the Company continued to provide that information to regulatory authorities?
A. Yes.
Q. And in addition to sending the PSUR to the -- withdrawn.
In addition to submitting the signal assessment to the British Health Authority did Bayer also send it to the FDA?
A. Yes, as you see in Exhibit 22 there is the cover letter that was sent along with the PSUR that included the signal investigation performed in 2008, and so that cover letter was sent along with the PSUR to the FDA.
Q. And the second paragraph hear says:
"This time period covered by this report is from September 2007 to September 2008 based upon the agency's February 1st, 2008 waiver approval letter allowing for submission of the Periodic Safety Update Report, or PSUR, in lieu of the US Periodic Safety Report."
Do you see that?
A. Yes.
Q. And did Bayer receive permission from the FDA in 2008 to submit each year the global PSUR

instead of the US specific Periodic Safety Report?
A. That is correct.
Q. And is that, is the submission of global data to the FDA common for globally marketed products from global companies like Bayer?
A. That is a very common procedure, not only for Bayer or Mirenas but also for other products and other companies, yes.
Q. And you were shown the guidance, Exhibit 10, from the FDA, if you can just find that briefly?
A. Yes.
Q. And if you turn to page 11, Plaintiffs counsel showed you a sentence that says:
"FDA suggest that sponsors calculate reporting rates by using the total number of spontaneously reported cases in the United States in the numerator and estimates of national patient exposure to products in the denominator."
Do you recall being asked about that.
A. Yes.
Q. Were you asked about the footnote that comes right after that sentence?
A. No, I wasn't.
Q. And can you please read footnote 20

that comes right after that sentence into the record?

A. The footnote reads:

"In addition to US reporting rates sponsors can provide global reporting rates when relevant."

Q. And did you believe that it was relevant to provide the global reporting rate related to Mirena and IIH in the various signal assessments that you submitted to the FDA?

A. Yes.

Q. Why was that?

A. Because, of course, the global data presents the largest data source that we have, and Mirena is a globally marketed product and IIH is a condition that is also observed globally.

Q. And the PSURs and signal assessments that you submitted to the FDA, did you also submit those to regulatory authorities around the world?

A. Yes.

Q. And did you believe that providing US only information would not give a full picture of Mirena and IIH?

A. So I would agree that providing the global data provides the full picture of the topic of Mirena and IIH.

Q. I would like to ask you -- so you mentioned that you continued to monitor for IIH with Mirena after 2008, but when was the next time that there was any potential signal that came up with Mirena and IIH?

A. So the next potential signal that we identified during our on-going monitoring was when we started noticing an increase in the cases that were reporting IIH with Mirena, so as a result we started our signal investigation and that showed that the source of these additional cases were actually cases coming from product litigation in the US.

Q. And I am going to hand you Exhibit 25.

(Exhibit 25 marked for identification)

And ask you if Exhibit 25 is a portion of the Periodic Benefit Risk Evaluation Report submitted to the FDA on March 3rd, 2015?

A. Yes, that is correct.

Q. And did you have any role in creating this document?

A. Yes, I was one of the contributing authors to the document.

Q. Did you create it in the regular course of your business activities at Bayer?

A. Yes.

Q. And this is obviously again just an exert of a longer document, but is it the relevant exert to that contains the 2014 signal assessment that you did related to cases that you received on IIH?

A. Yes.

Q. And if you turn to page 64, section 16.2.1.2, is your signal assessment included in the Periodic Benefit Risk update -- Evaluation Report that you submitted to FDA?

A. Yes.

Q. And in the summary of this assessment, it says:

"Stimulated reporting in the context of US lawsuits artificially increased the reporting rates of IIH during this PBRER/PSUR interval."

Do you see that?

A. Yes.

Q. Now, you were asked questions about the concept of stimulated reporting, do you recall that?

A. Yes.

Q. And is the phenomenon of having artificially increased reporting from lawsuits well known within the Pharmacovigilance and regulatory community?

A. Yes.
Q. And if you turn back to the guidance from the FDA, Exhibit 10, and turn to page 9, the paragraph in the middle towards the bottom where it is talking about data mining, it says: "In addition AERS", A-E-R-S which I think you said is the FDA's reporting base, correct?
A. That is correct.
Q. Or VARES, V-A-R-E-S, do you know that what that is?
A. No, sorry I would need to look that up. Right now I don't recall the abbreviations.
Q. Okay. So AERS is the one that's relevant to Mirena, right?
A. Correct.
Q. So it says:
"AERS or VARES data may be affected by the submission of incomplete or duplicate reports, underreporting or reporting stimulated by publicity or litigation."
Is that what it says?
A. That is correct.
Q. And is that a reference to the stimulated reporting phenomenon that you discussed in your signal assessment?

A. That is referring to stimulated reporting in the context of litigation, yes.

Q. And you were asked about whether the European regulatory guidelines talked about stimulated reporting at all, do you remember being asked about that?

A. Yes, that is correct. The question was on European guidelines and also cases from litigation and the stimulated reporting.

Q. I hand you Exhibit 26.

(Exhibit 26 marked for identification)

Is Exhibit 26 a portion of the European Guidelines on Good Pharmacovigilance Practices?

A. Yes, it is.

Q. And is that part of the same body of guidance for Pharmacovigilance from the European Regulatory Authority that you were shown yesterday?

A. Yes, that is correct.

Q. If you turn to pages 29 of 33, do you see where it discusses spontaneous reports, and the European guidelines says:

"Stimulated reporting can occur in certain situations."

Do you see that?

A. Yes.

Q. And then it goes on to say that:
"Reporting can also be stimulated by invitation from patients or consumer organizations through their members or a class lawsuit."
Do you see that?
A. Yes.
Q. And is this also a reference to the stimulated reporting phenomenon from litigation that you referenced in your signal investigation?
A. That refers to the same phenomenon, yes.
Q. And even though it is well known in the Pharmacovigilance and regulatory authority that lawsuits can lead to an artificial increase in the number of adverse event reports, did you still do another signal investigation when you received these lawsuits claiming IIH --
MR KENNERLY: Object to the form. You can answer.
MS COOK: -- in Mirena patients?
A. Yes, we initiated another signal investigation when we saw that there were increased cases -- an increased number of cases coming from US litigation.
Q. And did you ignore the adverse event

reports of IIH with Mirena, even though they came in the form of lawsuits?

A. No, we didn't.

Q. And in your 2014 analysis can you just describe briefly what you did in that signal investigation?

A. So the signal investigation included a discussion of the condition and also a search of the scientific literature to look for relevant publications on drug associated IIH, and publications on specifically referring to Levonorgestrel and Mirena and IIH. Then in addition to the literature review we looked on our database to look for cases reported in our clinical trials and the clinical development programme for Mirena and in all our post marketing data, so all our spontaneous adverse event reports that referred to IIH or to other events that could be indicative of IIH.

Q. So if you focus on the adverse event reports that you reviewed, if you could turn to page 74 where you discuss the reporting rate. So even as of 2014 when there was stimulated reporting from litigation, how many post-marketing -- post-marketing reports, that is the same as adverse events, right?

A. Yes, so adverse event. Spontaneous adverse events, yes.

Q. And how many had you received for Mirena since the first launch in 1990 as of 2014?

A. So at that time when we did that signal investigation a total of 66 post-marketing reports for Mirena -- from Mirena users were identified.

Q. And did that include lawsuits that had been filed?

A. That includes the lawsuits, yes.

Q. And it includes lawsuits even if people were not actually -- did not even actually really have IIH, right?

A. So the filing of a lawsuit triggers the creation of a spontaneous case report, and what is reported in that lawsuit is included in the case report in the database, so that includes all case reports where the lawsuit filed was for IIH or another relevant event.

Q. So you said you had received 66 reports total, and how many people or how many insertions of Mirena had there been by that point?

A. So by that point the total number of insertions was 32.9 million, and estimating the total post-marketing exposure since launch you come to a

number of 99.4 million women years.

Q. Did you submit the signal investigation to the FDA?

A. Yes, signal investigation was included in the PBRER or PSUR for Mirena that was submitted to the FDA. The first page of this Exhibit is the cover letter that accompanies the submission of the PBRER to the FDA.

Q. And did the FDA raise any questions with Bayer about how you calculated the reporting rate for IIH with Mirena?

A. No.

Q. Has any other regulatory authority raised any questions about how you calculated the reporting rate?

A. No.

Q. Has the FDA ever asked you to only look at US data with IIH and Mirena?

A. No.

Q. You were asked questions about disproportionality analyzes, do you recall those questions?

A. Yes.

Q. And do disproportionality analyzes compare adverse event reports of different products?

A. Yes, that is what they do. They are comparing, spontaneous adverse event databases compare the adverse event reports of different products and different events.

Q. And so the data that's going into these disproportionality analyzes, are those the same adverse event reports that the FDA website said cannot be used to establish causation?

MR KENNERLY: Object to form. You can answer.

A. So these are the spontaneous adverse event reports that the FDA guidance is talking about when they say that these are single -- you can not establish causation based on single case reports. These other -- the basis of the database where you perform your disproportionality analyzes, yes.

MS COOK: And Exhibit 6 is the 2015 signal assessment that you performed, if you can find that one. There you go. Is Exhibit 6 the portion of the Periodic Benefit Risk Evaluation Report that contains your 2015 signal assessment?

A. Yes, that is correct.

Q. And was the entire signal assessment that you did in 2015 included as an appendix to your periodic report and submitted to the FDA?

A. Yes, that is correct.
Q. Did you ever get any questions from the FDA about that?
A. No.
Q. And you were asked about some tables in the appendix?
A. Yes.
Q. That show various analyzes, do you recall those questions?
A. Yes.
Q. Now, which table in this signal assessment do you believe actually compared the appropriate groups in the disproportionality analysis?
A. So if you turn to page 724, and there is on that page table 3 where we performed disproportionality analysis in the FDA database for the Med DRA PT benign intracranial hypertension, which was the term used at the time for idiopathic intracranial hypertension. And that analysis restricts to female cases, so cases reported by women. And then you have a sub group by -- so a grouping by H group, and here when you see in this the second row, not counting the head row, you have the H stratum of women of fertile age. So this is

then the group which is relevant, because this is the group of women that uses Mirena, and is also the group of women that is most likely to have IIH. And in that group of women you don't have an increased reporting odds ratio.

Q. So you are referring to the column that says female age 17 to 45?

A. Yes.

Q. And in that group was there an increased reporting odds ratio?

A. There was no increase of reporting odds ratio.

Q. And I believe you testified that this signal investigation was triggered by a publication by a person called Etminan?

A. That is correct.

Q. Are you aware of a reanalysis that Dr Etminan did after that publication where he also restricted his analysis to women of child bearing age?

A. Yes, I am aware that he published this reanalysis in a letter to the editor following addressing his publication.

Q. I will hand you Exhibit 27 and ask you if you recognize that.

(Exhibit 27 marked for identification)
Is that the letter to the editor that you are referring to?
A. Yes, that is correct, that is the letter to the editor.
Q. And in the first page, the left column, second paragraph, it says: "Neither analyzes" and here he is referring to his initial paper that triggered your investigation, correct?
A. Yes, that is correct.
Q. It says:
"Neither analyzes controlled for reproductive age which has a strong correlation with BIH. Due to this strong correlation and analysis that does not compare the risk of BIH with Mirena to women in the same age group, mainly to effect modification. This means that an unstratified analysis by reproductive age can artificially overestimate the risk of BIH with Mirena."
Is that consistent with why you did that same restriction in your disproportionality analysis and your signal assessment?
A. That is consistent with the reason.
Q. And then in the second column, the bottom paragraph, Dr Etminan writes:

"Based on the age restricted analysis a signal is not detected with Mirena with respect to BIH when child bearing age is accounted for."

Do you see that?

A. Yes.

Q. And what does that mean to you, or how did you interpret that statement?

A. So that means that Dr Etminan when he looks at his age restricted analysis comes to the same conclusions as we came in our signal investigation, that you do not see an increased reporting odds ratio and therefore you don't see a signal with regards to BIH with Mirena.

Q. And did Dr Etminan disclose in a separate letter to the editor that he was a lawyer for the Plaintiffs in IIH lawsuits?

MR KENNERLY: Try it again. You called him a lawyer.

MS COOK: That's funny. Did Dr Etminan disclose in a separate letter to the editor that he was an expert witness for plaintiff lawyers in IIH lawsuits involving Mirena?

MR KENNERLY: Object to the form. You can answer.

A. So actually yes, he mentioned that

after a letter to the editor to his original publication was sent by Dr Freidman, who mentioned that he was an expert witness to the Plaintiff lawyers.

MS COOK: You testified that earlier that disproportionality analyzes are, I think you called it hypothesis generating; is that correct?

A. That is correct.

Q. What does it mean for something to be -- that disproportionality analyzes or hypothesis generating?

A. That means that this a tool for signal detection in data mining, so that you do a statistical algorithm that you run over the database and then you get these statistical flags, and these may be a reason to look into something further. So that means hypothesis generating. So you see a statistical algorithm and say this is something that I want to investigate.

Q. If you turn back to the FDA's guidance for Good Pharmacovigilance Practices, Exhibit 10, and I ask you to turn to page 9, and is this the section on data mining methods, including proportional reporting ratio of which a disproportionality analysis is one?

A. Yes.

Q. And do you see that the FDA's guidance also says that these approaches are inherently exploratory or hypothesis generating?

A. Yes.

Q. And if you look at the previous page of the guidance, in the first paragraph and the data mining section do you see that it says:

"Data mining is not a tool for establishing causal attributions between products and adverse events."?

A. Yes, that's what it says.

Q. And is that consistent with what you testified to today about the inability of disproportionality analyzes to establish causal attributions?

A. Yes, that is consistent.

Q. And you were asked today about whether Bayer has done any disproportionality analyzes of IIH and Mirena since its 2013 signal assessment, do you recall that?

A. Yes.

Q. Has Bayer been doing disproportionality analyzes continually since 2015?

A. Yes, we are doing that every month in

our database.

Q. And have you been reviewing the results of the monthly disproportionality analyzes?

A. Yes, me or my colleague Petra Koelm have been doing these.

Q. And do you look to see whether the results of the disproportionality analyzes are in fact due to lawsuits being filed?

A. Yes, I mean in the case of idiopathic intracranial hypertension we have a very good picture on how many case reports are being filed, since we are seeing them both in our weekly listings that we get from the database, and we see it in our monthly disproportionality algorithms where we can drill down and look into the cases that are actually producing these disproportionality flags, and in addition we are on a quarterly basis monitoring all new cases of IIH that come in.

Q. If you found in your review that lawsuits did not account for the increased reports with Mirena, would you investigate any signal from a disproportionality analysis further?

A. Yes, as for any new safety, new relevant safety information that's identified during our signal detection practices or a review of the

literature we would reopen a signal investigation into the topic.

Q. Were there any signals raised by the disproportionality analyzes that happen monthly with Mirena and IIH before lawsuits started being filed in 2013 and 2014 in the United States?

A. No.

Q. If you turn to Exhibit 8, that is your 2017 signal assessment?

A. Yes.

Q. Did you create the signal assessment as part of your regular business activities at Bayer?

A. Yes.

Q. And did you again review the literature and the post-marketing adverse event reports and other information that you could find relevant to the issue of Mirena and IIH?

A. Yes, we did.

Q. And if you turn to page 343, the summary paragraph, it says that the newly identified publication, and that's referencing the Valenzuela publication, correct?

A. Sorry, I am not on the right page right now.

Q. It is just the second page --

A. Oh, yes.

Q. Let me just ask you this, was the signal assessment triggered by the publication of the Valenzuela article?

A. Yes.

Q. And why did that trigger a signal investigation?

A. Because when we got aware of that publication we decided that this is a potential signal that we need to look into, so we started to do a thorough review of the publication, but also again looked into all other available data from the literature and in our spontaneous adverse event database.

Q. Before the Valenzuela publication had actually been published as a peer reviewed article had it been presented at a conference as an abstract?

A. That is correct.

Q. Two abstracts?

A. Two abstracts, one I believe by Valenzuela as first author and one by Rai as a first author.

Q. It is R-A-I. And when the abstracts became available did you actually review those and

include them in your 2015 signal assessment?

A. Yes, they are part of that 2015 signal assessment that we performed after becoming aware of the publication by Etminan and others.

Q. Okay. So in the summary of the 2017 signal assessment it says:

"The newly identified publication does not provide new evidence for an increased risk of LNG Ius use and development of IIH. The Company agrees with the assessment given by the authors themselves i.e., that their findings do not indicate that use of an LNG Ius can cause PTC, and that the results of the risk analyzes must be interpreted with great caution."

Is that actually consistent with the authors conclusions as stated in the article?

A. Yes, it is.

Q. I will show you Exhibit 28 and ask you if you recognize that as the published Valenzuela article?

(Exhibit 28 marked for identification)

A. Yes, that is the publication by Valenzuela and Others.

Q. And if you turn to page 4, the discussion section, the middle paragraph says:

"Our investigation does not indicate that an LNG Ius can cause PTC, and the number of women with an LNG Ius was too small to determine if an LNG Ius is an independent risk factor for PTC."

Do you see that?

A. Yes.

Q. And is that consistent with your conclusion from the article and your signal investigation?

A. That is consistent, yes.

Q. It goes on to say that:

"Although use of an LNG Ius seems to be associated with an increased risk of PTC, it is possible that this observation occurred because use of an LNG Ius is also associated with other established risk factors that are known to be associated with PTC, e.g. obesity and recent weight gain. The analysis was also limited by the lack of temporal data to confirm that exposure to LNG Ius occurred prior to PTC symptom onset or diagnosis."

Do you see that?

A. Yes.

Q. And is that consistent with some of the limitations of the article that you discussed in your signal investigation?

A. Yes, these were some of the limitations that are also acknowledged by the authors themselves, for example that they have a lack of temporal data to confirm that they actually -- the symptoms of PTC may have occurred before the woman started using Mirena, the study was not possible to take into account the established risk factors that they mention here, for example obesity and recent weight gain.

Q. And turning to the next page where the authors discuss the possible explanations for their studies association, do you see where it says that:

"Another explanation is that LNG does not cause increased intracranial pressure but that PTC is more likely to occur in the same population of women who are more likely to have an LNG Ius recommended to them by their physician. LNG Ius is often, although not exclusively, recommended for women who may have difficulty with other forms of contraception."

Then it goes on to discuss women with obesity and other conditions, do you see that?

A. Yes.

Q. Then finally it says:

"When interpreting the findings presented here it is also important to consider that the risk analysis does not account for potential confounders."

And those potential confounders, including excess weight and weight gain, is that consistent with the limitations that you discussed in your own signal investigation?

A. Yes, these were some of the limitations that were mentioned in our signal investigation.

Q. And then you were asked at length about the analysis that you did about -- withdrawn.

With respect to this discussion about the potential confounding of Mirena being used by women who are already before using Mirena at higher risk of getting IIH, I believe you were asked yesterday about the use of Mirena by those women, correct?

A. Yes.

Q. And you were asked about the fact that the US label for Mirena lists in the section about possible, or about post-marketing adverse events, it lists venous thrombotic events, do you recall being asked about that?

A. Yes.

Q. When was that listing of venous thrombotic events added to the Mirena label in the US?

A. That was actually fairly recent, so only a few years ago.

Q. Was it after the Valenzuela study period concluded in 2014?

A. Yes, that was after that time.

Q. And are you aware of any evidence that the listing of venous thrombotic events has impacted physicians prescribing habits with Mirena in the US?

A. No, it certainly has not changed the recommendations on the medical eligibility criteria. I also am not aware of any other impact that it may have had in prescribing.

Q. And the recommendations that you are referring to that comes from the US Government Center for Disease Control?

A. Yes, that is correct.

Q. And the World Health Organization?

A. That is correct.

Q. Now, are you aware of any studies showing Mirena actually increases the risk of venous thrombotic events?

A. No, on the contrary.

Q. And is it well established that birth control pills, for example, and other contraceptives including estrogen, unlike Mirena, do increase the risk of venous thrombotic events?

A. Yes, that is an established fact. Yes.

Q. Now, you were asked about your own analysis, or the Company's analysis of the Valenzuela data using estimates of how many, what percentage of the population of Utah and Denmark uses Mirena based on published data, do you recall those questions?

A. Yes.

Q. And for the Utah percentage what was the percentage that you used to do your recalculations?

A. So the percentage that we finally used for recalculation was 10% and that is based on the published data that we found on the national average use of contraceptive use, and further supplemented by a publication on contraceptive use deriving from a survey that included data specific to Utah, and on the publication also derived from Utah specific data that showed that the majority of long acting reversible contraceptives that are used in Utah are, in fact, Mirena or Levonorgestrel Ius.

Q. Okay. And when you say Mirena or Levonorgestrel Ius, at the time of this study the Mirena was the only option for Levonorgestrel Ius?

A. Yes, I meant that this is to be seen as a synonym, yes, in this context.

Q. Okay. And since then has the FDA approved a couple of other, several other LNG Ius's in the United States?
A. Yes, correct, among them also a non bio product.
Q. Okay. So Exhibit 13, you can find it, if you want, it is the Boulete publication?
A. Yes.
Q. This is the publication that included a survey showing the use of long acting reversible contraceptives in Utah and other states, correct?
A. That is correct, yes.
Q. And what was the percentage of LARC, L-A-R-C, also known as Long Acting Reversible Contraceptives that this study found to be used in Utah?
A. That was 18.9%.
Q. And that wasn't the number that you used in your estimate, right?
A. No, we took a rather more cautious estimate based on the fact that not all, although the majority, but not all long acting reversible contraceptives users in Utah would be using Mirena.
Q. And I am going to ask you about -- you were asked some questions about the telephone survey

methodology that was used in this article, right?
A. Yes, correct.
Q. And that is from the behavioral risk factors surveillance system?
A. Yes.
Q. Okay. And I am going to hand you Exhibit 29.
(Exhibit 29 marked for identification)
Which is a print-out from the CDC website about this survey that the CDC does, do you see that?
A. Yes.
Q. And are you familiar with this survey, this survey the BRFSS that the CDC uses?
A. Well, yes, since I've found this publication I've made myself familiar with the survey, yes.
Q. And the CDC website says that this survey is the nation's premier system of health related telephone surveys that collects state data about US residents regarding their health related risk behaviors, chronic health conditions and use of preventative services and that it's been around since 1984, do you see that?
A. Yes.
Q. And are you familiar with the survey as

something that Government agencies rely on consistently for health information?

A. Yes.

Q. And is that one of the reasons that you found that it was a reliable source of data?

A. Yes.

Q. And when you recalculated the risk of -- the potential risk of IIH using the published data on use of Mirena in Utah and in Denmark, did you find that there was any difference between Mirena and non-Mirena users in terms of IIH?

A. No, if you take the rates of Mirena use in the -- that are published in the literature for the rate of Mirena use in the control population, then you don't find an increased risk for IIH for Mirena users versus non-Mirena users.

Q. And now this signal assessment on the Valenzuela publication was just completed, correct, a couple of months ago?

A. Yes, that is correct.

Q. And do you intend to submit it to the FDA?

A. Yes, this will be included in the next PBRER that will be compiled during the beginning of next year and it will then be submitted also to the

FDA.
Q. Why haven't you sent that signal assessment immediately to the FDA?
A. Because as per regulatory guidelines a signal assessment that results in a refuted signal, so the conclusion that it is a false signal doesn't need to be submitted immediately, but it will be submitted, included in the next regular PBRER, which we will do and we will submit it in the first quarter of next year.
Q. So just in a couple of months?
A. Yes, so I believe in probably March, some time in March next year.
Q. Okay. Let's turn to Exhibit 14, the BfArM response. Okay. So this document, is this the response to questions that the Company received from the German regulatory authority in July 2017?
A. Yes, that is correct.
Q. And if you turn to page 8 of 95 does it describe the questions that the regulatory authority had for Bayer?
A. Yes, that's included here.
Q. And does it say why BfArM, the German regulatory authority reached out to Bayer with these requests, or what it was that triggered the request?

A. Yes, BfArM mentioned that they considered a signal management process based on the recent publication by Reuben Valenzuela and Others, so it was the same publication that triggered our signal investigation that led BfArM to request these data from us.

Q. And had you already been doing your signal investigation before getting the requests?

A. Yes, we have.

Q. And what did you do, I know it is a very lengthy response, or a lengthy response to BfArM so I don't want every detail, but in general what did Bayer do to respond to these questions from the German authority?

A. So again as for other signal investigations and also addressing specifically the questions by BfArM we looked at all pertinent literature that referred to IIH and Levonorgestrel Ius or Levonorgestrel products in other combinations, either as sole active ingredient or other combinations in combined oral contraceptives. We looked in addition to the literature, we also looked into the spontaneous data that have been received for Mirena again and did an update of a cumulative review for Mirena, but also for other Levonorgestrel

containing products and whether as a single substance or also in combination or with other products, and we again looked at the clinical trial cases that were reported, and taking them into account all these informations we provided a summary conclusion on the topic of ... on the topic.

Q. Did you consult other people in Bayer who are experts in other disciplines?

A. Yes, so we also consulted with our so-called safety management team, which consists of experts on the product from different fields. So that includes experts in epidemiology and also in pharmacokinetics, yes, and these functions were also consulted.

Q. And why did you not call external experts in the field of IIH to help you put together this response document?

A. So the response document itself, so the data that we have on IIH and Levonorgestrel, or other Levonorgestrel substances, is kept at Bayer so we are the ones that can only do the analysis on our cases with regards to the assessment, for example, on what is the current state of the art with regards to the hypothesis around IIH, we relied on the population of scientific literature until the data time point.

Q. And have you yourself been reviewing IIH related literature for the past decade?

A. Yes, so since doing our first formal signal assessment in 2008 I have repeatedly been investigating the topic and reading the relevant literature publications on the topic.

Q. Did you look into Bayer's safety database to see whether there were any clinical trial cases that had been reported with Mirena of IIH as part of this review that you did recently?

A. Yes, we did that also.

Q. And had there been any Mirena patients in the clinical trials who actually had IIH?

A. Yes -- so no, actually we retrieved three clinical trial cases but on close inspection of these cases you see that in two cases, each deriving from two Mirena trials, the diagnosis of idiopathic intracranial hypertension was not confirmed. One of them actually did not report idiopathic intracranial hypertension, but we captured it because of our large, our broad retrieval criteria. And the last case that was identified by our retrieval was actually also a case where a patient with a preexisting idiopathic intracranial hypertension was enrolled in the trial, and then this report was sent

to us because she had a pre-planned hospitalization to undergo surgery, but she never suffered worsening. So to summarize, actually in our clinical trials we did not have any cases of patients developing IIH under any of our Levonorgestrel Ius's.

Q. And the last case that you mentioned, that was a patient who had IIH before ever getting an LNG Ius, which was Skyla in that instance?

A. That is correct. That is a case deriving from a trial with Skyla where the patient had a history, so she had a concomitant condition of IIH at the time that she was enrolled in the trial, and the condition did not worsen when she received her Skyla, but she was hospitalized for a pre-planned surgery.

Q. So even though there were no clinical trial cases of Mirena where there was a confirmed case of IIH, did you discuss those three cases that you analyzed in the BfArM response?

A. Yes, they are in here.

Q. And had they been previously discussed in other signal assessments?

A. Yes, they have.

Q. And did you also review all of the case reports that Bayer had received of IIH at that

point, including ones related to lawsuits?
A. Yes, all of these reports are included and reviewed and discussed in this signal assessment.
Q. And you were asked about two specific cases in one of the tables. Were the full case reports related to the IIH cases with Mirena, were those all attached as an appendix to this response?
A. Yes, all of them were attached as an appendix to the response.
Q. And why did you not just focus on the two cases that the lawyer for the Plaintiffs showed you today when you assessed the safety of Mirena in this BfArM assessment?
MR KENNERLY: Object to the form.
A. Because when you do a signal assessment you want to look at the totality of the data that is available at that time when you do your signal assessment, so you have to look at all cases.
Q. And you were asked a question about the executive summary on page 2 where you referenced over diagnosis of IIH being common, and you didn't have a footnote citing an article there, do you remember being asked about that?
A. Yes, correct, that's because we are very -- we limit the number of footnotes that we have

in the executive summary to only those articles that we actually specifically mention here.

Q. And on page 87 do you see in the top paragraph about halfway down where it says:

"Over diagnosis of IIH is common."

A. That is correct, and there is a reference number 25.

Q. And you cite to an article there, the Fisayo article, is that correct, it is F-I-S-A-Y-O?

A. Yes, that is correct. That article is entitled:

"Over diagnosis of idiopathic intracranial hypertension."

Q. And when you reviewed all of the case reports, all of the post-marketing cases of IIH that you had received with Mirena, including any lawsuits that had been filed, I am trying to find where it is that you discuss the reporting rates?

A. So that would be --

Q. Page 44?

A. Marketing, and it is page 44 and 45, yes.

Q. Okay. So in that review you included and analyzed cases that were part of lawsuits filed, right?

A. That is correct, yes.
Q. But if you exclude cases submitted in the context of litigation, what was the reporting frequency as of October 2017 with Mirena and IIH?
A. So I have to correct you, the data cut-off point of this is October 2017 was when it was submitted, so the data cut-off point of this report is --
Q. May?
A. Is May, yes. So the reporting frequency, excluding the reports from litigations is 0.08 per 100,000 women years.
Q. And even if you include litigation what was the reporting frequency?
A. If you include the cases that come out of the litigation the reporting frequency is 0.22 cases per 100,000 women, so still below one.
Q. And how does that compare to the recorded background rate in women of reproductive age?
A. So the reported incidence of women of IIH, of women of reproductive age of IIH is 2 to 4 cases per 100,000 women years generally, and that increases when you look at women who have excess body weight or are obese.

Q. And what is the rate for that population?

A. That is more than, cited as more than 20 per 100,000.

Q. And as of the May 2017 cut-off point how many Mirenas had been inserted in the world since it launched in 1990?

A. So at that time the number of units that was sold approximately equating to the number of units inserted was 45.5 million, and that resulted in a cumulative post-market experience close to 142 million women years.

Q. And of the 45.5 million Mirena insertions how many cases of IIH had Bayer received by May 2017?

A. There were 315 spontaneous cases potentially referring to a diagnosis of IIH.

Q. Now in this BfArM response did you also look at Bayer's other contraceptives and whether there were reports of IIH with those?

A. Yes, we did.

Q. And did you find any evidence that there is a risk of IIH with any of Bayer's other contraceptives?

A. No, we didn't.

Q. And in page 85, if you turn to that, there is a reference to literature discussing cases of IIH with Norplant, do you recall that?
A. Yes.
Q. And do you remember being asked about the fact that Jadelle or Norplant 2 has a warning for IIH on it?
A. Yes, I recall.
Q. And what's your understanding as to why there is a warning on the Jadelle label related to reports of IIH?
A. So that is for historical reasons since Jadelle is the successor product of Norplant, sometimes referred to as Norplant 2, and the Norplant label -- in the Norplant label a wording was included in the '90s saying that cases of IIH have been reported in Norplant users, based on the fact that there were spontaneous cases reported for Norplant at the time. So when Jadelle as a successor product, when the Jadelle label was put together a lot of the language that is contained, that was contained in the Norplant label was taken over for Jadelle as well.
Q. And the Jadelle label that was originally put into place, was that a label that was put into place -- withdrawn.

You discuss the Norplant case reports and the BfArM response?

A. Yes, I do.

Q. And did the Company conclude that the Norplant case reports provide evidence of an increased risk with Levonorgestrel products?

A. No, so as single case reports they do not provide evidence for a causal association. That is actually also discussed by the first authors of the publication that mention these, that it is not possible to establish a causal association based on these case reports. Nevertheless, at the time I assume I wasn't involved in the discussions at the time, but I assume that based on these published case reports a corresponding language was included in the Norplant label that was later then transferred to the successor product Jadelle.

Q. Do you still have the Valenzuela article in front of you, Exhibit 28?

A. Yes.

Q. If you turn to page 4, the discussion section, the bottom paragraph?

A. Yes.

Q. It says:

"Previous reports on another LNG

contraceptive implant Norplant, suggested in association with PTC as in the present report."
Which refers to this Mirena article, right?
A. Right.
Q. "These previous reports did not imply a causative role for LNG in the pathogenesis of PTC."
Do you see that?
A. Yes.
Q. And is that consistent with your conclusions in the BfArM assessment and signal assessments?
A. That is consistent with our conclusions, yes.
Q. And if there is not evidence of a causative role for LNG why hasn't the Company taken the Jadelle warning out of the label?
A. Well, we have discussed that in the Company. It is just so that a warning that is contained in a product labeling, to remove it you have to go to the health authorities to ask for permission to remove it, and that requires the submission of new relevant data on that product and referring to the warning in question. And since Jadelle is a product where the post-marketing exposure is lower and there are no newly available

data really that we could use for such a submission to request a warning, we decided to go the other way to include an additional sentence in the labeling that states exactly that, that the evidence for this warning is based on isolated case reports coming from spontaneous adverse event reporting only.

Q. Is Jadelle even sold in the United States?

A. No, it is not.

Q. And it is -- I believe that you said we decided to, instead of deciding to request a warning, did you mean instead of deciding to request removal of the warning?

A. Yes, sorry, it is getting very late. So what I meant is we discussed whether we would have a data package that is necessary to request the removal of the existing warning in the Jadelle label, and came to the decision that this is not the case.

Q. Okay. And as part of the BfArM assessment did your team look at all of the other Bayer products, hormonal products to see whether there were IIH warnings anywhere for them?

A. Yes, we looked at all products, all hormonal products containing Levonorgestrel, either as mono or in combination, and we also looked at all

other progestin containing products that are marketed by Bayer, and looked at even on a country level on the country labels of all of these products within the European Union, and we came to the result that actually none of the other products, except for Jadelle, includes any warning on idiopathic intracranial hypertension.

Q. And this is Exhibit 30.

(Exhibit 30 marked for identification)

Is it the analysis that your team put together of all the other hormonal products at Bayer?

A. Yes, that is correct, that is the analysis.

Q. And the only product to have a warning on IIH anywhere is Jadelle?

A. Yes, that is correct.

Q. And why is it that you haven't recommended adding a warning about IIH to the Mirena label?

A. Because based on the currently available data there is no increased risk for IIH when using Mirena, so adding such a warning is not warranted.

Q. And is that the conclusion that you came to in the BfArM assessment?

A. That is also the conclusion that we came to in the BfArM assessment report.

Q. And if you have the Valenzuela in front of you still, if you look at the last page, the very conclusion of the Valenzuela article, do you see where it says:

"We do not recommend the removal of LNG Ius from women with PTC as a benefit of effective contraception for these women likely outweighs the risk. Likewise, if a woman with PTC or at risk for PTC needs contraception an LNG Ius should be considered as an effective form of contraception." Do you see that?

A. Yes.

Q. And is that consistent with the conclusion that you have reached?

A. Yes, that is consistent with our conclusions.

Q. And is that conclusion consistent with your views today?

A. Yes, that is consistent with our views today.

Q. Has the FDA ever recommended any information or labeling to be added to the Mirena label related to IIH?

A. No, they haven't.
Q. And has FDA recently approved a revised label for Mirena?
A. So there have been several label, approved label revisions during the last years and months, yes.
Q. And did that include any discussion or proposed labeling from the FDA about IIH?
A. No, it didn't.
Q. And all of your opinions that you have expressed in the course of your deposition, are those opinions that you came to in the course of your work at Bayer?
A. Yes.
Q. And do you hold them to a reasonable degree of medical certainty?
A. Yes.
Q. I think we have to change the tape.
THE VIDEOGRAPHER: This is the end of Media 6, Volume 2 in the video deposition of Dr Juliane Schoendorf. Going off the record at 17.21 pm, as indicated on the video screen.
(Short Recess).
THE VIDEOGRAPHER: This is the beginning of Media 7, Volume 2 in the video deposition of

Dr Juliane Schoendorf. Going back on the record at 17.27pm, as indicated on the video screen.

Re-examination by MR KENNERLY

Q. Good evening, Dr Schoendorf. First, do you believe that any of the answers that you gave to the questions from Miss Cook were inconsistent with the answers that you gave me in response to my questions?
A. No.
Q. Do you think there is anything contradictory in the answers that you gave Miss Cook as compared to mine?
A. No, I don't think so.
Q. And would you go back and change any of the answers that you gave me?
A. No.
Q. Okay. Now you mentioned the clinical study cases that you reviewed. I know one of them is at page 42 and 43 of BfArM, the 2008 case. Do you know which one I am talking about?
A. Yes.
Q. All right. Now I don't have the transcript in front of me, the realtime, but I believe you said that upon review that case was

not really IIH or something to that effect; is that correct?

MS COOK: Object to form.

A. Sorry, which case are you referring to?

MR KENNERLY: The 2008 report from Sweden, a clinical trial case?

A. Yes, that is correct.

Q. Now, was it Bayer's conclusion that this person did not actually have intracranial hypertension?

A. It is actually the conclusion of the clinical trial investigator that reported the event who said that. So the clinical trial investigator reported that this patient who had been using Mirena, so this is the trial where she had been using the first Mirena for five years and then a second consecutive Mirena, so she had been using Mirena in total for five years and 10 months. Then she was hospitalized because of headaches, and the information was that the neurological examinations were all normal. The investigator first reported that intracranial benign hypertension was diagnosed when we followed up on that, to say that all neurological examinations were normal so what was the diagnosis based on? And the investigator said that

the diagnosis seemed, in fact, to be very unsure, and as a consequence of the lumbar puncture the patient experienced a severe headache. So the diagnosis of an idiopathic intracranial hypertension was never corroborated.

Q. Corroborated?

A. Corroborated. So it was never confirmed by any of the follow-up information that we received in that trial case.

Q. Okay. And you are mentioning follow-up as in when you were doing some form of investigation or assessment you reached out to someone to get more information about the case than was already in your files?

A. Yes, that is correct. So in particular since I was the appointed Global Safety Lead for this trial, I remember personally that -- in the clinical trial, of course, everything that is reported is also under close monitoring and you are in contact with the clinical trial investigators by the other team that conducts the clinical trial. In that case when you receive such a report in a clinical trial and you have open questions on that, you will reach out to your study teams and the people who are in contact with the clinical trial investigator to receive all

necessary information to come to a conclusive assessment on that case.

Q. Okay. And did you actually get and review the patient's medical records relating to IIH?

A. No, we didn't get the patient's medical records so we followed up with the investigator who provided the information as is written here.

Q. Okay. Did you follow-up with any of the patient's doctors?

MS COOK: Object to form.

A. That was the clinical investigator was the treating physician for that patient.

MR KENNERLY: So it says here in that report, let me give you Exhibit 31, which is the clinical study case itself.

(Exhibit 31 marked for identification)

In BfArM and in page 2 at the bottom of that clinical report says that intracranial hypertension was diagnosed. Then the investigator's comment at the bottom of this says:

"The only information that is found in the journal, was that all the examinations were normal ... The diagnosis seems to be very unsure and there are no really explanation more than the examination

of findings were normal."
Did I read that correctly?
A. Yes, sorry, it is a very long text.
Q. Sure, but so --
A. Yes.
Q. -- but in this case --
A. So may I correct you? This is -- this appears to be an excerpt of actually the Pharmacovigilance database of that case.
Q. Got it. But what it describes there is that the patient was diagnosed by their doctors with intracranial hypertension, correct?
A. Well, there was a report of suspected idiopathic intracranial hypertension and that was reported to us and that is when we started to go back to the clinical trial investigator to ask for more information.
Q. Okay. And that patient's in the middle of this Bayer sponsored clinical trial goes to the hospital and is diagnosed with IIH, correct?
A. Well, so what the clinical trial investigator says is based on the information that she got on the journal is that all the examinations were normal. It seems that these examinations were performed because there was a suspicion of idiopathic

intracranial hypertension, but if all the
examinations were normal her conclusion was that this
diagnosis seems to be very unsure.
Q. Okay?
A. And there is no explanations for the
findings, and the patient recovered without removing
the Mirena.
Q. But no one at Bayer either reviewed
this patient's medical records from that hospital or
talked to the patient's doctors at the hospital,
correct?
A. No, that is not correct. As I said,
this is the patient in the clinical trial and the
clinical trial investigator is the treating doctor of
that patient, so ...
Q. Not here they are not. They weren't at
the hospital. The patient went to the hospital for
the diagnosis of IIH, so the clinical director may
be some form of treating doctor but they are not the
one that treated the IIH, correct?
A. It is correct that this is not the
person who performed the neurological examinations.
Q. Okay. So a doctor at a hospital, this
is someone in Bayer's clinical trial, which this is
sponsored by Bayer, correct, this clinical trial?

A. Yes, correct.
Q. And in that investigator's brochure is IIH, correct?
A. Sorry?
MS COOK: Object to form.
MR KENNERLY: The clinical investigator has a little brochure that tells them how to run the study. It includes in there that they are supposed to look for a list of adverse events, and that includes IIH, doesn't it?
MS COOK: Object to form.
A. I am not sure that I agree with that statement. We would have to look -- you are referring to the investigator's brochure.
MR KENNERLY: Yes, I am?
A. That was in place at the time of that trial?
Q. So do you know either way if it was there?
A. I am sorry?
Q. Do you know either way if in that investigator's brochure there was IIH as an adverse reaction?
A. I am unable to confirm or refute that now --

Q. That's fine?

A. -- it was certainly not mentioned as a side effect of Mirena.

Q. Oh, no, I don't mean it that way. I mean as things to look for, but we can move aside from that because what we have here, though, is this person in a Bayer sponsored trial has a Mirena, goes to a hospital, gets diagnosed with IIH --

A. Suspected IIH.

Q. The hospital didn't diagnosed them with suspected IIH, they diagnosed them with IIH, correct? It says it right here; intracranial benign hypertension was diagnosed, correct?

A. Well, that's what it says but the diagnosis was based on neurological examinations which were all normal and that --

Q. Well, that's Bayer's -- Bayer looks at the person again for whatever reason, but there is no documentation here that Bayer ever talked to the people, the doctors at the hospital nor that Bayer ever got those records from it. Bayer just decides the diagnosis seems to be very unsure and then concludes well, then it wasn't IIH. Is that a fair description?

MS COOK: Object to form.

A. No, that is not a fair description. That was actually what we received when inquiring further on the case via the clinical trial investigator. That is the person that we can turn to in the clinical trial to get more information, and that was the information that we could obtain from that clinical trial investigator, who actually said -- or I don't recall whether it was she or he -- said that that's the information that was available. All the neurological examinations were normal and the diagnosis seems to be very unsure, and that there is really no explanation for the examination findings, which were then resolved in the following and the patient continued with Mirena in the trial.

MR KENNERLY: They resolved the patient had a spinal puncture. The question I have for you though, is did you ever ask that investigator to get a copy of those records diagnosing IIH, or did you ever ask that investigator if the investigator or you could talk to the doctors at the hospital for more information?

MS COOK: Object to form.

A. Usually if we have something unclear we usually ask them to provide the information that they have in terms of maybe a hospital discharge letter or

whatever, that is what we do in the clinical trial.
MR KENNERLY: And you felt here you could overrule that hospital's diagnosis of IIH without ever talking to the doctors or reviewing the hospital medical records?
MS COOK: Object to form.
A. Actually that is a misrepresentation. This is what the investigator commented.
MR KENNERLY: So the investigator overruled the hospital without seeing the medical records or talking to their doctors, and then you at Bayer just took what the investigator said as the gospel for your signal assessments then and going on to the present, correct?
MS COOK: Object to form.
A. Sorry, so the investigator says that she looks at the patient journal and all the information that she finds is that all the examinations that are contained in the patient's journal are normal, and it is the conclusion that the diagnosis is very unsure and that is the information that we received for this SAE after following up with the investigator and trying to get all the information that we can. So when the investigator tells us this is the information we have it is, in my

judgment, this diagnosis is to be very unsure, this is what we put in the SAE report. And that was the information that she had at hand and could give me. So I think we followed this up very diligently.

MR KENNERLY: Is this excellent work in Pharmacovigilance?

MS COOK: Object to form.

A. I believe that we at Bayer do excellent work at Pharmacovigilance, yes.

MR KENNERLY: But this right here, deciding based on the investigator's examination of some sort, an investigator looking at their own journal and the investigator saying it's unsure, you could decide without getting any medical records and without even talking to the doctors that their diagnosis of IIH was wrong, correct?

MS COOK: Object to form.

A. You are misrepresenting what I said. I said that we did all that -- all in our possibility to go back to the clinical trial investigator, who is the person that we have to turn to to get follow-up information on a SAE report that he or she reports, and asked her or him to provide any information that she has on that case. So that is what she or he has provided to us by looking at the patient journal and

giving us the information that all the results of the examinations were normal and that their diagnosis seemed to be very unsure. Taking all that aside, this is a case that occurred in a patient that had been on Mirena for more than five years, or five years and 10 months, the symptoms which were, in the assessment of the clinical trial investigator, of an uncertain nature because the diagnosis was unsure, resolved spontaneously and the patient continued with Mirena in the trial. So this was assessed as an event that is unrelated to the study treatment both by the clinical trial investigator and by the Company.

MR KENNERLY: Okay. Now, I present to you Exhibit 32.

(Exhibit 32 marked for identification)

This is an April 5th, 2001 letter from the New Zealand Medicines and Medical Devices Safety Authority to a medical services executive at Schering. Schering is now Bayer, correct?

A. Schering was bought by Bayer, yes.

Q. Have you ever seen this document before?

A. Yes, I believe I have.

Q. Okay?

A. I mean it predates my time at Schering but ...

Q. Sure, you have talked to people, whether doctors, lawyers, etc, you have explored this document, correct?

A. Yes.

Q. All right. Does it have a typo on it?

A. Sorry?

Q. Does it have a typographical error on it?

A. Well, I don't know whether it is a typographical error but it does have a mistake in it, yes.

Q. And what's that?

A. So it talks about the WHO database that holds 85 reports of intracranial hypertension and 45 of papilledema with Mirena, and that is actually a typo because that should read Levonorgestrel.

Q. Okay.

A. It is not referring to reports of Mirena but referring to --

Q. Levonorgestrel products in general?

A. Levonorgestrel products in general, yes.

Q. Now, do you know if that's supposed to

include just Levonorgestrel only products, or Levonorgestrel and combination Levonorgestrel and something else products?

A. I believe that refers to the published, the published single case reports with Norplant that we have discussed earlier.

Q. Okay. So my question is, given that this is New Zealand talking about a 27 year old woman who had a Mirena for seven months and developed IIH, and the fact that New Zealand had identified the WHO database holding 85 reports of IIH and 45 cases of papilledema relating to, as we just discussed, Levonorgestrel, why didn't Bayer consider that a signal worthy of a signal assessment?

A. So I can't speak to the discussions that were held within the Company at that time, but I believe that a reply was submitted to Medsafe, so Medsafe the New Zealand Health Authority, by the Company that also satisfied the New Zealand Health Authority.

Q. Okay?

A. We can look at the reply that was reported and also by the conclusions of the Medsafe Health Authority at the time.

Q. All right. But I am asking about signal assessments. You are talking before no signal assessments were performed until 2008, correct?

A. Well, until 2008 we did, of course, also our routine Pharmacovigilance monitoring. The formal term of signal assessment is actually a term that only appears in the regulatory guidelines at a later stage, but I believe that in this case the colleagues that were responsible at the time provided a response to the New Zealand Health Authority and that response led the New Zealand Health Authority to conclude that there was no increased risk with Mirena.

Q. So whatever term we use for it, if signal association is a later term of art, signal investigation, the first time -- isn't it true that the first time Bayer did a truly thorough analysis of a potential causal association between Mirena and IIH was 2008?

MS COOK: Object to form.

A. Maybe we should look at the response provided to New Zealand at that time. I believe that the colleagues that provided the response looked at the relevant data. It was not a document, a signal

investigation as such, but the response was provided to the New Zealand Health Authority which was satisfied with the response and concluded that there was no safety issue with Mirena with regards to IIH and Mirena.

MR KENNERLY: Okay. This will be Exhibit 33.

(Exhibit 33 marked for identification)

Exhibit 33 is an e-mail chain from May 3rd, 2006 -- well, I should correct that. It is an e-mail chain that begins back in May 2nd, 2006 and ends May 3rd, 2006. First off who is Paul Korner?

MS COOK: Object to foundation.

MR KENNERLY: I will tell you that I am going to ask you about the first page. If you want to read more of it to be familiar with it that's fine. One of the ones I wanted to ask you about was the second e-mail down in this chain, which is Paul Korner writing to Richard Nieman, N-I-E-M-A-N. He says:

"Dear Rich, we are working on this new AE" presumably adverse event "of pseudotumor cerebri."

Now, the last sentence there says:

"I will request all info on the other cases as PTC has been associated with oral contraceptives,

adrenal hormones and steroids."

Do you see that language?

A. I see that, yes.

Q. So at that time of May 3rd, 2006, did Bayer still believe that there was an association between PTC and oral contraceptives, adrenal hormones and steroids?

MS COOK: Object to form and object to foundation.

A. So first of all I have to say that I am not involved in that e-mail correspondence, and this is the first time I see this. And I am also not quite sure, although I have heard the name of Paul Korner I am not sure what his function was at the time. Secondly, I would say that I don't know what he means in this e-mail, Paul Korner. So when you talk about association that can, of course, mean association in terms of has been investigated, there have been cases, or temporal association with use, or it may mean a causal association. That e-mail doesn't say, doesn't make clear whether that refers to the causal association, in particular for oral contraceptives. Case control studies have shown that there is no causal association between the intake of oral contraceptives and PTC or IIH, or PTC as it is

called here or IIH.

MR KENNERLY: So that is part of what I am asking about the time of this. Let me frame it a different way. What's the earliest time that you know of at which Bayer believed there was not an association between oral contraceptives and PTC?

MS COOK: Object to form, also to the extent that this is a corporate rep question outside the scope.

A. So whether I know when -- I don't know the sense.

MR KENNERLY: I will give it by example. So that BfArM response, does it have discussion in there about oral contraceptives not being associated with PTC?

A. Yes, correct, and that is based on the published literature, that is studies from the '90s that showed in case control studies that there is no causal association between --

Q. Sure, and to be clear I am not asking about your current beliefs or what's in that e-mail or the literature before. What I am trying to understand is I know I can find this October 2017 BfArM response in which Bayer has said it has looked at, reviewed if there is an association between PTC

and oral contraceptives and it believes there is not one. What is the earliest dates that you are aware of anything from Bayer that says that? Is this in a 2014 document, a 2008 document? That is why I have this e-mail here because I am looking at a 2006 document in which one Bayer employee writes to another that PTC has been associated with oral contraceptives, so I am asking you if you are aware of anything around earlier at Bayer that suggests otherwise, or when this changed later on at Bayer?

MS COOK: Object to the form and scope.

A. I am not sure that I understand what you mean by this change. So as I explained to you what -- I don't know what Paul, this person Paul Korner, meant with his e-mail. All he is saying is that PTC has been associated with oral contraceptives that in association may mean anything from saying that it has been discussed, it has been reported in temporal association or a causal association. Here he just says PTC has been associated, that means it has been reported. I don't know his function and I don't know how far he was really at the time that he is writing this e-mail, how involved in the matter he was, so I can only guess now here. But all I can say is that in the signal investigations that we have

performed we have also looked into the available data on oral contraceptives and the case control studies that were looking into oral contraceptive use, and IIH showed no increase risk for oral contraceptive use and IIH.

Q. What was your role in the summer of 2006 at Bayer?

A. So in the summer of 2006 I was also working as a Global Safety Lead for Mirena together with other colleagues of mine.

Q. You never dealt with Richard Nieman or Paul Korner?

A. So these are two US colleagues but I don't recall now that I have dealt with them directly, so it has been a long time ago.

Q. Okay. Now we will do Exhibit 34.

(Exhibit 34 marked for identification)

This is another e-mail chain from 2006, one that you are on. And you can look as much as you want for context but I am going to be asking you about the e-mail on the fourth page which has a Bates number at the bottom ending with 382164. So I gave you the whole change for context but that is all I am asking about is the fourth page. So this fourth page is what is described as a standard answer to

questions about intracranial hypertension. This is on an April 5th, 2006 e-mail. It says in the first paragraph, which is background, and you are on this e-mail, correct?

A. Yes, I have been copied into this e-mail, so ...

Q. Okay. So in the first paragraph, which is the background on IIH, it includes a line there that says in women of reproductive age -- I am not quoting it directly -- in women of reproductive age the incidence of IIH is approximately 3.3 per 100,000, do you see that language?

A. Yes.

Q. Do you agree with that number, is that a correct incidence of IIH in women of reproductive age?

MS COOK: Object to form.

A. So as I said, it is cited as 2 to 4 per 100,000 women per year.

MR KENNERLY: Sure. And that is within that.

A. It is.

Q. And I am not holding you to the precision data but this is in that area?

A. Yes.

Q. Okay. So if you go down to the bottom the conclusion, it says:
"The number of gathered women years with Mirena is approximately more than 19m currently. Up-to-date the data concerning spontaneous ADR reports in which increased intracranial pressure or benign intracranial hypertension was reported is small compared to the expected incidents calculated for Mirena users."
Do you see that language?
A. Yes, I can see that language.
Q. Now, is it appropriate to compare an incidence rate to a reporting rate?
MS COOK: Object to form.
A. Well, in terms of when you talk of signal detection, for example, the reporting rate and also the -- the size of the reporting rate can indicate whether there is a safety signal, so ...
MR KENNERLY: Sure?
A. It is, of course, not the same thing as an incidence, as a true incidence of a disease occurring in a certain population, because a reporting rate for spontaneous reports is influenced by the known limitations of spontaneous reports -- spontaneous reports is limited by the known

limitations of spontaneous reports.

Q. So in this paragraph is this a comparison of the reporting rate and the incidence rate?

A. So what she concludes here is to say that the reporting rate that we see from spontaneous adverse event reports is small, and therefore in itself since you would expect a certain number of reports of IIH in a population of fertile aged women who are using Mirena and also are at greatest risk of IIH, you would expect a certain number of spontaneous reports to be received by the Company, so the reporting rate itself is small compared to the background frequency in that population. So it does not give a signal.

Q. I am talking about the comparison of it. Would you agree that reporting rates can by no means be considered incidence rates for either absolute or comparative purposes?

A. Yes, and I don't think that is what she's doing here.

Q. So she has the word "compare" in there as the verb, and she has the expected incidence rate for IIH and then the reporting rate for Mirena, correct?

MS COOK: Object to form.

A. Correct, but what that means is that you look at the expected background rate in a population and then you look at your reporting rate so, which is, of course, not the incidence of the condition that you are looking at because it is derived from spontaneous reports that are characterized by a certain degree of underreporting, but if the reporting rate of that event for your product is really so low that you would say that, even when considering, considering under reporting I still do not see that a signal for that, I have now received more reports, spontaneous reports of that condition which I know is predominantly occurring in the population that is using my product, then this is a reasonable comparison to see whether you see that there is a safety signal that you should investigate.

MR KENNERLY: Okay. And in this e-mail which is dated April 5th, 2006, and you are on, says that the reporting is: "Small compared to the expected incidence calculated for Mirena users."

Now, as of this time in 2006 had Bayer calculated an expected incidence of IIH for Mirena users?

MS COOK: Object to form.

A. So I don't think that this suggests that we calculate it and expected incidence, and I have to say this e-mail was written by my Finnish colleague Anna Marie Salmivalli, so I am certain some of the formulations may not be perfect in terms of not coming from a native speaker, but what she refers to here is the expected background incidence in a population in a typical population of Mirena users, which is women of a fertile age.

MR KENNERLY: So when she writes "expected incidence calculated from Mirena users", you believe that she's referring to women of reproductive age, and up there she says that incidence is estimated to be approximately 3.3 per 100,000, so it would be correct to say that when she says expected incidence rate calculated for Mirena users, she means 3.3 per 100,000, correct?

A. And up to 19.3 per 100,000 that was based on the publications at the time, so newer publications numbers are cited of more than 20 per 100,000 in women who are obese or have excess weight.

Q. That is a pretty big range from 3.3 to 19.3, isn't it?

A. Yes, that is correct.

Q. And you think that's how she meant it,

is that wide of a potential range?

MS COOK: Object to form.

A. I cannot reconstruct from this e-mail what she exactly meant --

MR KENNERLY: No --

A. -- this is the numbers that she is citing in the background, is what I am saying, referring to the population of fertile women, and in addition to the increased risk in women who are obese.

MR KENNERLY: Not necessarily reconstructing her thoughts but what Bayer understood the expected incidence calculated for Mirena users to be at this time in 2006, and I understand that that is a range of 3.3 to 19.3; is that correct?

MS COOK: Object to form and foundation.

A. So I can only refer to what she writes here in the background, that she says that the population, the incidence is 3.3 in the population of women of reproductive age. That is the background incidence is 3.3 per 100,000 and increases in women who are obese. When evaluating the reporting rate derived from spontaneous reports that were received at the time and putting that into relation to the post-marketing, estimated post-marketing exposure

with the product at that time, the reporting rate is very low even when considering considerable underreporting, that you must assume that not every case, not every case of IIH occurring in a Mirena user is reported, but only a small fraction. Even when considering that the reporting rate is very low, given the fact that we are talking about a population of Mirena users that is at increased risk of developing IIH. So it's 3.3 per 100,000 here it says, cited here based on her references, and even higher when you consider obese women.

MR KENNERLY: Okay. Now, this is an exhibit Miss Cook presented to you and I don't remember the number. It is the PSUR submitted in November 25th, 2008?

MS COOK: 22. Do you have it?

A. No, it must be in the big pile.

MR KENNERLY: I am going to ask you about page 2 of 5 -- actually no, it is all messed up because it skips around. So at the bottom would be page 2902 of 3039, which is something like seven or eight pages into it.

A. 2902.

Q. It says at the top "IIH and Levonorgestrel implant, Norplant." Now this page

describes Wysowski, W-Y-S-O-W-S-K-I, and Green study, a couple of other literature relating to Norplant, correct?

A. That is correct.

Q. All right. Do you see the third paragraph from the bottom that begins "despite the conclusions." That paragraph says:

"Despite the conclusions given by the authors", and they are referring up there to Wysowski and Green, "the article has been cited as evidence for the association of Norplant/Levonorgestrel risks with IIH by some, Freidman 2007."

Then it goes on to say: "Others share more critical view of the data, references Frank and Singh." S-I-N-G-H. So at that time in 2008 did Bayer understand Dr Friedman's work to have found upon reviewing Wysowski and Green that there was an association between Norplant/Levonorgestrel use and IIH?

MS COOK: Object to form.

A. So what Wysowski and the other published articles that are referred to here are actually presenting are spontaneous case reports of occurring in Norplant users, and some of these case reports refer to idiopathic intracranial hypertension

in Norplant use, and these single case reports -- spontaneous case reports are as such also limited as all spontaneous case reports by the usual limitations of a spontaneous case report, so they can not be as such taken as an evidence of causation. They looked at the characteristics of these case reports and also saw that these women, apart from the fact that they were women of fertile age, were also at increased risk because most of them who had information on their body weight had increased body weight. So the authors themselves included that it was actually not possible to derive a conclusion on a causal association on Norplant and IIH based on the data that they reviewed. So they reached very cautious conclusions. These publications have been cited in the following by several authors to reference that there has been published associations between Norplant and IIH. Now, again we have discussed the word association a few minutes ago, association can mean is there a vague term that can mean anything from has been discussed in the context with and has been, there have been reports of temporal association, or so the other end of the spectrum of the association would be a causal association. But what is said here is that there is also concluded by

the authors the single case reports do not provide evidence for a causal association, and that is also shared with other authors in the field that published on this.

MR KENNERLY: But not Deborah Freidman, Debra Freidman cited it as evidence for an association of Norplant/Levonorgestrel use with IIH, correct?

MS COOK: Object to form.

A. So actually what Dr Freidman published in her articles was a long list of different drugs where she writes different drugs and different conditions that have been associated with IIH, so these include also conditions that have in later, or in studies have been shown not to be associated, and I am also aware actually of an exchange of letter of the editors where she addresses that and emphasizes that when she talks about drugs or conditions that have been associated with IIH, she means exactly that, association and not a causal evidence.

MR KENNERLY: What is the date of that Dr Freidman letter that you just referenced?

A. I would need to look into the response document because it is referenced here.

Q. Where is it referenced there?

A. So this is Exhibit 14, the BfArM response. If you turn to page 10 on the second paragraph, there Dr Freidman says that the authors meaning Dr Freidman and the other authors of that article:

"The authors point out in their response to a letter to the editor on this publication", that is reference Number 7, so they point out that:

"The associated conditions listed are exactly that, association and we did not mean to imply that they were causal."

That is reference Number 8. That refers to the authors' response by Freidman, Liu and Digie. The author responds in neurology in 2014.

Q. So that says 2014. You talked before about the Etminan article and you mentioned how Etminan had submitted the article and it was sent to Freidman for peer review but she turned it down because she was a paid expert for Bayer, do you remember that?

A. Actually, I did not mention that, but I recall from the letter of Dr Freidman that that is what she mentioned.

Q. Okay. So she had mentioned that, that is part of that correspondence. Now when would that

be that she is turning down reviewing Etminan's article because she is a paid expert for Bayer?

MS COOK: Object to form and foundation.

A. I don't know when. So I can only tell you when the article of Etminan and Others were published.

MR KENNERLY: Is that 2014, 2015?

A. Yes, it is in here. So it is 2015.

MR KENNERLY: All right. And this is -- so it takes a while for articles to be published, so Etminan submitted at some point prior to that, right --

MS COOK: Object to form and object to foundation --

COURT REPORTER: Sorry, I never got that answer.

MS COOK: I said object to form and foundation and she didn't hear what the witness's answer.

MR KENNERLY: I will withdraw it, unless you want to answer it. I just don't want to confuse it. Go ahead and answer. I don't want to obstruct you.

A. So I said that I don't know when Dr Etminan submitted his publication.

MR KENNERLY: Okay. But by 2015 at the latest Dr Freidman turns down performing a peer review of it because she's getting paid by Bayer for legal expert work, correct?

MS COOK: Object to form and foundation.

A. So I only know that Dr Freidman serves as an expert witness for Bayer based on her letter to the editor. That is all I know. I can't comment any further on that.

MR KENNERLY: And that's why I am asking, is you used this Exhibit 22, Bayer are involved at this time, talks about how Freidman has reviewed Wysowski and Green to find evidence of association of Norplant/Levonorgestrel with IIH use, that is what Bayer says to the FDA in this 2008 article. By the time we get to the present you at Bayer are relying on Dr Freidman saying no, she didn't mean there was a causal association there. What I am asking you very specifically is did you think for a moment, did you consider the possibility that Freidman has changed her views because she is now, as you know, a paid expert witness for Bayer?

MS COOK: Object to form and foundation.

A. So what we say here in this article is that the publications of Wysowski and Others on

Norplant reports and IIH have been frequently cited in the following literature that deals with this topic. The article that is cited here by Dr Freidman in 2007, and I am sure -- so this is the article that's entitled "Freidman idiopathic intracranial hypertension", and it is published in 2007. That is a review article. That includes a review of IIH and it includes a list of various drugs and conditions that have been published in association with IIH.

MR KENNERLY: And as of 2008 Bayer interpreted that study as citing this is evidence for an association between Norplant/Levonorgestrel and IIH, that is what it says in the 2008 letter, correct?

MS COOK: Object to form.

A. As I said, association may mean everything from a temporal association or a discussion and association into causal association. So it is correct that by that time Dr Freidman had not published that letter where she actually says what is -- what it is when she refers to associations, that she has clarified later in that letter, namely that it is exactly referring to association, and that is in response to another letter by someone else who points out that a lot of

the conditions and drugs that she lists there lack evidence for a causal association, and that's when she clarifies that when she speaks of association she does not mean causal association.

MR KENNERLY: Now, the last question on this, since you cited Freidman talking about this subsequently, do you think it could change how you view Friedman's conclusions and arguments based on the fact that she's a paid legal expert by Bayer, or is this irrelevant to how you view it scientifically?

MS COOK: Object to form.

A. Sorry, which conclusions of Dr Freidman are you referring to?

MR KENNERLY: On page 10 of BfArM where by this point Dr Freidman has written this letter about how it is not an association that's causal, which is differently from how Bayer interpreted this in 2008 in Exhibit 22. I am just asking you, looking at this in your judgment performing your Pharmacovigilance duties, does the fact that she might be, we don't know, we don't know the exact time she started, that this could have come from her at the time she was already a paid expert legal witness for Bayer, does that have any affect on whether or not you rely on it for Pharmacovigilance and for submitting it to

regulatory authorities?
MS COOK: Object to form and foundation.
A. So I am confused. Do you ask me whether I think that Dr Freidman who was an acknowledged expert in the field of IIH, changes her opinions based upon --
MR KENNERLY: No, I am not asking that, I am just asking you performing your Pharmacovigilance and regulatory duties here, does that change how you view her conclusions, the fact that she may very well have been at that time a paid legal expert witness for Bayer, or does it not change how you use her conclusions?
MS COOK: Object. Form --
MR KENNERLY: Is there reason to be suspicious of them or not?
MS COOK: Objection to form and foundation --
MR KENNERLY: For you, not her?
A. Sorry, what we are talking about is Dr Freidman addressing a letter to the editor, a comment that she has received by someone else, not by Bayer, I believe, but by someone else, pointing out that in her review article she has a long list of conditions and drugs for which no causal association

has been associated, and that's when she points out you are right, this is a long list, and by listing it the associated conditions are exactly that, associations, and we did not mean to imply that they were causal. That is the reply to the letter to the editor by someone else who is writing in to point out that this long list is not a list of conditions or drugs for which a causal evidence exists. That's when she clarifies. I don't see how that would be influenced by anything else that Dr Freidman does and certainly --

Q. So the fact that someone is a paid legal expert witness is not grounds to suspect the opinions, the scientific opinions they are giving, even if they are consistent with the person paying them; is that correct?

MS COOK: Object to form.

A. Well, of course, I guess it is good publication practice to mention that, and when you do a publication and if you are a paid expert witness that you mention that in the disclosure of conflicts of interest. That is what Dr Freidman also did in her letter to the editor.

MR KENNERLY: Okay. Now, this was the MHRA response, April 4th, I think that was one of the

Exhibits you used Miss Cook?

MS COOK: Yes, it was.

MR KENNERLY: Or did I dream that up? This single page thing.

MS COOK: It is Exhibit 24.

MR KENNERLY: Do you have 24 in there? So I want to ask you about the third paragraph there that begins "we accept". It says:

"We accept your conclusion that there is currently insufficient evidence of an association between Mirena and BH. However, we request that all future ADR reports are closely monitored and followed up for future information to allow complete assessment of cases. Please note that follow-up information must be expedited to us."

Do you see that language?

A. Yes.

Q. All right. So MHRA didn't simply agree there's no signal, we can forget about this, correct?

MS COOK: Object to form.

A. So they accepted our conclusions that there is no evidence for an association, but request that we monitor all future ADR reports on IIH, which we did.

MR KENNERLY: So MHRA was still interested in following up on this, correct?

MS COOK: Object to form.

A. So this is what the letter says, that they request us that we continue to monitor all reports of IIH, which Bayer did.

MR KENNERLY: Did MHRA ever tell that you that Bayer was no longer obligated to follow this, including expediting follow-up information to them?

A. So I am not aware of any further communication with MHRA on this matter.

Q. So this would still be true today, this is the last word of MHRA on this issue, is they still expect that all future ADR reports are closely monitored and followed up for information to complete the assessment, and that follow-up information must be expedited to them. That is still true today, isn't it?

MS COOK: Object to form.

A. So, that is still true today and that is what we are still doing today. So reports of idiopathic intracranial hypertension are under on-going monitoring, and as with all reports of IIH and also when follow-up information, significant follow-up information is received for a single case

report, that is reported expeditely which means according to the -- in the timelines and for a single case reporting in the regulations.

MR KENNERLY: Now, if you remember earlier I was asking about that 2008 clinical trial case in Sweden, do you remember that one?

A. Yes.

MR KENNERLY: And that's initially received on April 1st, 2008, so it is about three days before this, and the latest follow-up for it is September 14th, 2015. Was that Swedish clinical trial case reported to MHRA as a diagnosis of IIH, or was it reported as something else?

MS COOK: Object to form and foundation.

A. Sorry, are you referring to the --

MR KENNERLY: Yes, that one?

MS COOK: Exhibit 31.

A. Exhibit 31?

MR KENNERLY: Yes.

A. So I would like to make one comment here. So there's a case which is Exhibit 31 is actually referring to a clinical trial case, so a serious adverse event coming from a clinical trial. That is actually not what MHRA means when they say ADR reports, because ADR reports is referring,

generally referring to drug reaction reports, and that generally refers to spontaneous adverse event reports.

Q. So did Bayer never send anything about this clinical case to MHRA?

A. So I would have to check the reporting register of how this case has been reported. I am certain that this case has been reported to the ethics committees involved in the clinical trials and the regulatory authorities according to the applicable guidelines for such a case, which is an unrelated serious adverse event case deriving from a clinical trial. At the latest the MHRA will have been made aware of that when we submitted the PSUR that included the signal investigation. So on the one hand, of course, these trial cases are included in the listings that are appended to the PSURs, and on the other hand they are also -- this case was discussed in the subsequent signal investigations on IIH, which were included in the PSURs which were submitted to the regulatory authorities.

Q. Okay. So let me take you back to that FDA guidance and page 11 of it.

A. You are referring to Exhibit 10?

Q. Yes, the Good Pharmacovigilance

Practice, page 11, the paragraph after the numbered paragraph, or the number of indented lines. The second sentence there is:

"FDA suggests that sponsors calculate reporting rates by using the total number of spontaneously reported cases in the United States in the numerator and estimates of national patient exposure to product in the denominator."

Now, as we have discussed before Bayer has never done that specific calculation, correct?

MS COOK: Object to form.

A. So you have asked me that before and I said that Bayer has done exactly this calculation based on the global numbers, and as you can see in the footnote that is following this statement here, that this footnote number 20, it says:

"In addition to US reporting rates sponsors can provide global reporting rates when relevant."

And so to assess reporting rates for IIH, which is a condition that occurs all over the world, and for Mirena which is a product that is marketed all over the world, the global reporting rates are considered the relevant reporting rates, and since they are based on a much later data source, provide also more robust information.

MR KENNERLY: Do you understand the word "exactly" in English?
MS COOK: Object to form.
A. Yes.
MR KENNERLY: So the calculation used in the United States is not exactly the same as the calculation using global, correct?
A. Did I use the word "exactly" in my statement just now?
MR KENNERLY: Yes, that's why I asked you.
A. Then I have to apologize and you have to excuse me, it is getting very late.
Q. Understood, and we are almost done?
A. And even after these two days English is still not my native language, so it may be that I use the wrong word. So what I mean is that in the case of IIH with a product that is marketed globally like Mirena, the global reporting rates provide the most, the biggest data set, they are based on the biggest data set and provide the most relevant information to assess this. That's what we have provided to the FDA with all our PSURs, and FDA has never come back to us asking for US specific reporting rates.
Q. Now, in the footnote that you mentioned

before, footnote 20, that starts with "in addition to US reporting rates", correct?

A. That is correct, yes.

Q. So just reading the guidance, it says the time in which you provide global rates is if it is relevant and you provide them in addition to the US rates, correct?

MS COOK: Object to form.

A. So formally yes, that is correct, but as I said, we are providing our global reporting rates and our PSURs have been submitted to the FDA and FDA has accepted as the relevant figure to provide them in the -- for these kind of signal investigations on IIH.

MR KENNERLY: And you said FDA has accepted it, I mean when you are driving your car is it okay to go through a stop light unless a police officer stops you?

MS COOK: Object to form.

A. So do you mean does a stop light mean that you should stop your car?

MR KENNERLY: I mean yeah, quite literally if you drive through a stop light but a police officer is not there to tell you no, did you do still do something wrong?

MS COOK: Object to form.

A. I am not sure what this has to do with anything that we are discussing, but you should not run over a stop light, irrespective of whether there is a policeman standing there or not.

MR KENNERLY: Okay. So the fact that the FDA hasn't complained about one thing or another doesn't establish that Bayer is doing it correctly and appropriately, agree?

MS COOK: Object to form.

A. So if the FDA doesn't come back to us requesting something specifically, that is an indicator that it appears that we didn't do something wrong. So what we are talking about here is the presentation of reporting rates of spontaneous reports, and that means that you put the number of spontaneous reports you had in relation with the post-marketing exposure that you do. Restricting this analysis to one country, even if it is the US which is a big country and is also -- there is also a lot of Mirenas sold in the US, that certainly gives -- doesn't give us additional or more complete information than presenting the global reporting rates, because that takes into account we would disregard all other reports that are reported in all

other countries, and on the other hand also disregard all other Mirenas that were sold elsewhere than in the US. So the presentation of the global reporting rates is an adequate way of presenting your reporting rates in signal investigation, and that's what we have done in the signal investigations that were also submitted to the FDA.

MR KENNERLY: Okay. Almost done.

MS COOK: Yeah, I mean if it is longer than a couple of minutes I think she probably would be --

MR KENNERLY: It is.

MS COOK: Okay.

MR KENNERLY: So the Etminan article -- sorry, the Etminan letter, following up with it that was used as an exhibit. Now this follow-up letter doesn't retract any of the original article, does it?

MS COOK: Object to form.

A. I don't think it uses the word "retract" here. The letter doesn't use the word "retract", it speaks of a revised disproportionality analysis.

MR KENNERLY: Okay. So Etminan has done a supplemental analysis which is provided here, but nothing from the original report is revised or corrected or withdrawn, is it?

MS COOK: Object to form.
A. So the letter to the editor is called "revised disproportionality analysis", so he revised his disproportionality analysis, and he states here in this letter that's based on the age restricted analysis, a signal is not detected with Mirena with respect to IIH when child bearing age is accounted for, so that differs from the conclusions that he has reached on the higher than expected number of reports for Mirena. And he further concludes that although in general disproportionality analysis, they are not restricted by age for many drug safety questions. Restriction to the appropriate age range where age might be strong confounder, or affect modifier might produce a more unbiased estimate of the signal. So that says that he has revised this disproportionality analysis and based on his revision he comes to the conclusion that when you look at this, also taking into account the age, then you no longer see a signal for Mirena and IIH.
MR KENNERLY: With the age restricted analysis.
A. With Mirena and IIH?
Q. Now, but he doesn't say that there is no signal. What he says is when you perform the age

restricted analysis there is no signal, correct?
A. Correct, and that this produces a more unbiased estimate of the signal. So that to translate it into lay language it is not under the influencing factors that otherwise influence these kind of disproportionality algorithms as we have established are the population in which the condition occurs and the population in which the product is used, and other confounding factors.
Q. Now, to use lay language, what you just said there actually begins with the word "might" doesn't it, it might produce a more unbiased estimate of the signal, correct?
A. That is correct, that is what is stated here.
Q. Okay. One last little subject. We can look at the BfArM if you need to, but is it fair to say there is a number of legal cases in there, correct, in the ICSRs?
A. Yes, that is correct.
Q. And A lot of those legal cases are lacking information like patient weight or further course of the patient, right?
A. Yes, that is correct, but that's also a characteristic of spontaneous adverse event, so event

reports in general and some of the reports have limited information.

Q. Have you ever asked anyone whether Bayer general counsel or outside counsel, or anyone for more information about these legal cases as they go on and more information is produced in the case discovery?

MS COOK: I am going to object, and I actually think this is starting to get beyond the bounds when Plaintiffs don't put information in their complaints and they are now questioning the witness, but I will just let her address it.

A. So how this process works, as I understand it, is that when a lawsuit is filed then Bayer receives, and I must say you are the expert on that, so they receive a Plaintiff fact sheet or summons, so they receive initial information and then in the course of this there will be further information submitted which may include patient files that are pages and pages long. All these, as they are submitted to Bayer, they are actually -- so the information that's included in them is then entered into the data base, but since this is a gradual process, or starts with the initial filing, which may have very limited information, so the cases that have

been recently filed may contain very limited information, but as more information is submitted to Bayer that information is entered into the database.

MR KENNERLY: That last sentence is just what I was wondering. So at least ideally the same case reports arising from litigation, the database should contain the full scope of relevant medical knowledge that Bayer knows through the lawsuit, correct?

A. Yes, and if you look at the actual case narratives of some of these reports you will see in the reports where the patient files have been received, these are very, very long narratives. So Bayer does the best in their abilities because they have to report this into the timelines, but they have a dedicated group that tries, or that includes all relevant medical information that is contained in these files into the database.

Q. So this is the last thing and we are done, page 55 has one of one of these legal cases dating back to 2015?

A. Yes, page 55.

Q. Now, I am not going to ask you if you can identify them, if you can recall it personally that would be fabulous, but what I am going to ask

you, though, is based on the information here does it seem like Bayer has not received sufficient information to know even the weight of plaintiff in this case that has been there for at least two years?

MS COOK: Object to form. Foundation. And outside the scope.

A. So this is the summary that -- the extract of the information that is contained in the case that was extracted and put into this table. So the full case report would be in the appendix to this, so this is not all the information available in the database, but according to this summary documentation it appears that actually in the documentation that was provided, and there is a lot of detail in that but there is, however, no report on the BMI of the patient.

MR KENNERLY: Okay. No further questions.

MS COOK: I have just three minutes of follow-up on the new Exhibits.

Cross-examination by MS COOK

Q. Talking about the Freidman issue and you were asked questions about the letter to the editor that she wrote that you cited in BfArM, do

you recall that?
A. Yes.
Q. I am going to mark Exhibit 35.
(Exhibit 35 marked for identification)
And ask if this is the letter to the editor from Dr Freidman that you referenced?
A. Yes, that is correct. That is the letter.
Q. And in this does she write:
"The associated conditions listed are exactly that - associations - and we did not mean to imply that they were causal."?
A. Yes.
Q. And at the bottom does it have the date of that letter?
A. So 2014.
Q. March 18th, 2014 in the Neurology Journal, do you see that?
A. Yes, March 18th.
Q. And the Etminan publication was from June 2015, correct?
A. I would need to check that.
Q. Well, I can point you to the signal investigation that's Exhibit 6 and I can just show you the citation quickly so that you can see the

citation confirms it is from June 2015?
A. Yes, that is correct, it is June 2015.
Q. Is it likely that it went through a peer review for a year and three months, have you ever heard of that happening?
A. No. No.
Q. Is there any evidence whatsoever that Dr Freidman was an expert witness for anyone, Bayer or otherwise, at the time that she sent in the letter to the editor in March 2014?
A. Not that I am aware of.
Q. And she later discloses that potential conflict of interest when she writes other publications, correct?
A. That is correct, yes.
Q. I wanted to ask you about the 2001 letter from New Zealand that you were asked about, do you recall that, Exhibit 22?
A. Yes.
Q. And you mentioned that you would like to look at the response from New Zealand Health Authority?
A. Yes.
Q. And I will mark that as Exhibit 36.
(Exhibit 36 marked for identification)

Which is a print-out from the New Zealand Health Authority website, and you have seen this before, haven't you?

A. Yes.

Q. And this is the minutes of a later meeting in 2001 of the New Zealand Medicines Committee, correct?

A. That is correct, yes.

Q. And if you turn to page 5 of 31 do you see the discussion of Mirena and benign intracranial hypertension?

A. Yes, I see that.

Q. And it refers to a comment from Schering from August 4th, 2000 and May 30th, 2001?

A. Yes.

Q. And it says that:

"Comment was sought from Schering. The Company had one other possible case, however while this patient had had BIH, it appeared to have occurred prior to the use of Mirena, and worsened headache was considered the correct term."

Do you see that?

A. Yes.

Q. Then does it say the committee agreed that there was insufficient information to establish

a causal association between Mirena and BIH and that the matter should not be taken any further at present?
A. That is what it says yes.
Q. And was that your understanding of the resolution of the question that the New Zealand Health Authority raised?
A. That is my understanding, yes.
Q. You were asked about Exhibit 34, the e-mails -- sorry, Exhibits 33 and 34, the e-mails from Paul Korner?
A. Yes.
Q. That is 33 and you have 34?
A. 34, yes.
Q. In 33 the question that Paul Korner asks about the new AE of pseudotumor cerebri adverse event, what is the date on that e-mail?
A. That is 3rd May 2006.
Q. And then if you look at Exhibit 34, it is a lengthy e-mail change, including information provided by your colleague Salmivalli in the drug safety department, correct?
A. Yes, that is correct.
Q. And the final e-mail at the very front from Paul Korner, what is the date on that?

A. So that is 7th July 2006.

Q. So a couple of months later?

A. That is correct, yes.

Q. And what does Paul Korner say in that final e-mail here?

A. He says:

"Thank you very much for your response which provided me with exactly the precise rates to reassure me that there is no safety signal or globally or US related to this topic. Many thanks."

Q. And the topic that he is referring to based on the e-mail chain, is that the same discussion about the one case that he received that was PTC with Mirena, if you look to the back, page 169, that is the same e-mail, correct? The same e-mail as in Exhibit 33 from Tim Glennon regarding the doctor's question about a 26 year old who had Mirena inserted?

A. Correct, that is the same e-mail that starts this e-mail chain, yes. So, yes.

Q. And then finally you were asked about the 2008 clinical trial case and the investigator's belief that the IIH diagnosis was not confirmed, do you recall those questions?

A. Yes.

Q. And even though that diagnosis of IIH was not confirmed did you include an analysis of that clinical trial case and the information about it in every single one of your signal assessments that you provided to the regulatory authorities?

A. Yes, we did.

MS COOK: No further questions.

MR KENNERLY: We are done.

THE VIDEOGRAPHER: This is the end of Media 7, Volume 2 in the video deposition of Dr Juliane Schoendorf and the end of the video deposition of Dr Juliane Schoendorf. Going off the record at 19.00 hours, 7.00 p.m. as indicated on the; video screen.

------ooo------

CERTIFICATE OF COURT REPORTER

I, Kay Hendrick, an accredited real-time reporter subcontracted by Discovery Litigation Services, hereby certify that the testimony of the witness, Juliane Schoendorf, in the foregoing transcript taken on Wednesday, November 29th, 2017 was recorded by me in machine shorthand and was thereafter transcribed by me; and that the foregoing transcript is a true and accurate verbatim record of the said testimony.

I further certify that I am not a relative, employee, counsel or financially involved with any of the parties to the within cause, nor am I an employee or relative of any counsel for the parties, nor am I in any way interested in the outcome of the within cause.

..........................

Signed: ........................

Name: Miss Kay Hendrick

Dated: December 23rd, 2017

DEPOSITION ERRATA SHEET

Assignment No. 38085

Case Caption: IN RE: MIRENA IUS LEVONOROGESTREL-RELATED PRODUCTS LIABILITY

Witness: DR JULIANE SCHOENDORF - November 29, 2017

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of ____________, 20___.

____________________________________

DR JULIANE SCHOENDORF

Sworn to and subscribed before me this _____ day of ________________, 20__.

__________________________

Notary Public

My commission expires________

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:________________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:________________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:________________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:________________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:________________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:________________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:________________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

DR JULIANE SCHOENDORF

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:_______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:_______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:_______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:_______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:_______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:_______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

DR JULIANE SCHOENDORF

**-**

**------ooo------** 284:16

**0**

**0** 34:6

**0.07** 178:1

**0.08** 219:12

**0.22** 219:16

**000382164** 8:21

**1**

**1** 51:14 66:7

**10** 5:4,5,7 42:3 43:11 153:7, 20,25 183:10 187:3 198:21 229:18 239:6 258:2 262:14 268:24

**10%** 208:12

**10.41am** 51:15

**10.55am** 51:21

**100,000** 178:2 219:12,17,23 220:4 248:12, 19 252:14,17, 18,21 253:21 254:9

**11** 37:18 95:23 143:8 183:13 268:23 269:1

**114** 80:25

**119** 128:16

**12** 64:21

**12.16p.m** 96:3

**12.57pm** 96:9

**12.76** 177:21

**128** 5:8

**13** 209:6

**13.39pm** 109:9

**139** 6:14

**14** 6:6 52:8,9 70:2,4 96:12 212:14 258:1

**14.24pm** 134:6

**14.32** 134:13

**140** 6:17

**142** 220:11

**147** 6:21

**14th** 267:11

**15** 6:10 70:2,4 76:20,21 118:22

**15.38pm** 160:23

**154** 6:24

**155** 7:2

**16** 6:12 66:10 139:8,9

**16.2.1.2** 186:8

**161** 5:9

**167** 7:5

**169** 283:15

**17** 6:16 140:24, 25 195:7

**17.21** 227:22

**17.27pm** 228:2

**175** 7:8

**178** 7:10

**179** 7:13

**18** 6:19,24 8:24 77:20,22 120:14 147:24, 25 148:1 155:11

**18.9%** 209:17

**185** 7:17

**18649** 149:2

**188** 7:21

**18th** 279:17,19

**19** 6:23 154:9, 10 155:9,15

**19.00** 284:13

**19.3** 252:18,23 253:15

**196** 7:23

**1984** 210:23

**1990** 164:21 177:15 191:4 220:7

**1992** 66:10

**19m** 249:4

**19th** 179:18

**1st** 182:18 267:9

**2**

**2** 10:14 51:14, 19 56:6 71:25 96:2,7 109:7 134:5,11 160:16,21 217:20 219:22 221:6,14 227:20,25 231:18 248:18 254:19 284:10

**2/3** 8:18

**20** 7:1 155:7,8 157:13 183:25 220:4 252:20 269:16 271:1

**20.0** 34:20

**2000** 161:14 164:23 281:14

**2001** 8:17 164:24 239:17 280:16 281:6, 14

**2002** 120:21 124:8

**2004** 62:13 123:4,13 124:6 161:16 166:1

**2005** 62:14 161:17

**2006** 8:19,21 141:6 243:10, 11,12 244:4 246:5 247:7,8, 18 248:2 251:19,22 253:14 282:18 283:1

**2007** 176:5 182:17 255:12 261:4,6

**2008** 7:8 92:11 93:8 124:11 152:12 174:19, 20,23 175:2,8 176:5,14,24 178:16 179:18 181:23 182:13, 17,18,25 185:3 215:4 228:20 229:5 242:3,5, 20 246:4 254:15 255:15 260:15 261:10, 13 262:17 267:5,9 283:22

**2010** 77:23

**2013** 87:15 199:20 201:6

**2014** 8:25 87:15 90:6 115:17 118:14 152:12 186:3 190:4,22 191:4 201:6 207:2 246:4 258:14, 15 259:7 279:16,17 280:10

**2015** 7:17 33:24 115:8,20 152:13 156:10 185:17 193:17, 21,24 199:24 203:1,2 259:7, 8 260:1 267:11 277:21 279:21 280:1,2

**2016** 6:19 148:3

**2017** 6:16 10:1, 5 33:23 85:17 86:19 157:25 201:9 203:5 212:17 219:4,6 220:5,15 245:23

**203** 8:2

**20th** 157:25

**21** 7:4 167:17, 18

**210** 8:5

**22** 7:7 175:4,5, 6 182:10 254:16 260:11 262:18 280:18

**22.36** 121:4

**225** 8:9

**23** 7:9 178:12, 13,14

**2300** 4:4,12

**231** 8:12

**239** 8:17

**24** 7:12 177:5,8 179:9,10,19 180:2 265:5,6

**24%** 41:14

**243** 8:19

**247** 8:21

**25** 7:15 67:13 185:13,14,15 218:7

**25th** 254:15

**26** 7:19 188:10, 11,12 283:17

**267** 120:15

**27** 7:22 195:24 196:1 241:8

**277** 37:11

**279** 8:25

**28** 8:1 203:18, 21 222:19

**280** 9:4

**29** 8:4 188:19 210:7,8

**29.5** 120:13

**290** 176:15

**2901** 176:13, 16,18

**2902** 254:21,23

**29th** 10:1,5

**2nd** 243:11

### 3

**3** 7:17 33:20 51:24 52:2 96:7 176:25 177:3,7 194:16

**3,039** 176:6

**3.10** 153:9,10

**3.19** 160:17

**3.3** 248:11 252:14,16,22 253:15,19,21 254:9

**30** 8:7 225:8,9

**30(b)(6)** 127:11 166:4

**30309** 4:6,14

**3039** 176:17 254:21

**30th** 281:14

**31** 8:11 37:13 231:15,17 267:17,18,21 281:9

**315** 220:16

**319** 120:15

**32** 8:14 76:22, 24,25 239:15, 16

**32.9** 191:24

**33** 8:18 177:19 188:19 243:7, 8,9 282:10,13, 15 283:16

**34** 8:20 247:16, 17 282:9,10, 13,14,19

**343** 201:19

**35** 8:23 279:3,4

**36** 9:2 66:10 280:24,25

**382164** 247:22

**3rd** 185:17 243:9,12 244:4 282:18

### 4

**4** 6:16 109:7 134:5 168:8,17 203:24 219:22 222:21 248:18

**4-** 34:6

**4-0** 34:7

**40** 34:4,6 47:10,16

**404.847.0999** 4:6,14

**41** 82:4,6 83:16

**42** 228:20

**43** 228:20

**44** 37:2 118:22 120:2 124:25 218:20,21

**45** 195:7 218:21 240:16 241:12

**45.5** 220:10,13

**46** 120:7,10,22 121:3,16 124:8

**4th** 141:5 264:25 281:14

### 5

**5** 8:17,20 134:11 160:16 168:8,18 171:22 176:25 177:7 254:19 281:9

**51** 120:4,20

**52** 6:8 120:14 123:3,12 124:6

**55** 277:20,22

**58** 123:2,8,9

**5th** 239:17 248:2 251:19

### 6

**6** 160:21 193:17,19 227:20 279:24

**64** 76:8 186:7

**66** 191:6,20

### 7

**7** 227:25 258:8 284:10

**7.00** 284:13

**719** 156:10

**724** 194:15

**74** 190:21

**76** 6:10

**7th** 283:1

### 8

**8** 6:19 82:15 201:8 212:19 258:12

**84%** 42:6

**85** 221:1 240:16 241:11

**86** 85:8

**87** 218:3

**89** 80:25

**8th** 148:3

### 9

**9** 76:25 79:16 187:3 198:22

**9.29am** 10:6

**90%** 42:6

**90s** 21:21 221:16 245:17

**95** 34:4,7 37:3 80:25 120:7 152:15,20 212:19

**99.4** 192:1

### A

**A-E-R-S** 187:6

**A-L-D-O-E-S-T-R-O-N-E** 72:20

**A-R-G-U-S** 14:25

**abbreviations** 187:12

**abilities** 44:15 277:14

**ability** 126:14

**able** 18:3 37:21 54:19 75:4 149:14 152:1

**about** 10:16 11:6 12:22 15:6 16:21 18:25 19:15,21 20:19 22:13 23:9 28:5 29:17 34:9 35:7 36:10 51:24 52:3 58:4,11 60:8 62:7 66:14 69:23 70:3,10 71:11,14,20 72:7 73:10,17 76:12,13,16,18 77:6,22 78:2, 16 80:10,12,14 81:9,11 82:5,8 84:15 85:11 86:17,25 93:1 96:12 99:22 100:23 101:4, 14 103:8 104:23 109:11 112:5 113:17, 19,20,21 118:20 124:8 126:6,10 127:10,17 128:19,25 129:15 133:4, 20 135:2 136:16 137:9 138:11,15 139:25 143:11 148:18 149:11, 21,25 150:6 151:10,20 152:22,25 153:20 155:24 159:23 161:6 163:11,25 164:2,7 165:24 166:7 167:6,23 170:8,11 171:14 172:2 173:18 178:4 180:8 181:25 183:20,22 186:19 187:5 188:3,4,6 192:10,14,20 193:12 194:3,5 199:14,18 206:7,8,9,12, 15,16,17,19 208:1 209:24, 25 210:10,20 217:4,19,23 218:4 221:5 225:18 227:8 228:21 230:13 240:15 241:8 242:1 243:15, 17 244:17 245:3,14,21 247:21,24 248:1 250:16 254:7,18 257:18 258:16 260:12 262:6, 15 263:20 265:7,19 267:5,9 268:4 272:7,14 276:5 278:23,24 280:16,17 282:9,16 283:13,17,21 284:3

**above** 65:9

**absence** 13:3, 11 79:4

**absolute** 138:21,23 140:6 144:24 146:5,12 147:2,6 250:19

**absolutely** 154:6

**absorbed** 65:20

**absorption** 65:17

**abstract** 78:4, 14,16 202:18

**abstracts** 202:20,21,24

**accept** 28:18 181:8,12 265:8,9

**acceptable** 131:1

**accepted** 61:8 265:22 271:12, 15

**accompanies** 192:7

**according** 11:20 18:7 20:15,24 69:16 111:12 114:5 135:8 145:24 170:4 267:2 268:10 278:13

**account** 25:4,5 60:1,3 116:19 132:12,15 133:15 135:9 173:5 200:20 205:6,25 214:4 272:24 274:19

**accounted** 197:3 274:7

**accumulated** 167:14

**accurate** 91:1 106:5

**acetazolamide** 24:16

**acknowledged** 60:16 86:7 91:19 104:7 112:20 205:2 263:5

**acting** 59:24 72:21 84:3 208:18 209:10, 14,22

**action** 71:14 97:7

**actions** 75:6,24

**active** 173:7 213:20

**activities** 104:17 125:4 165:14 185:24 201:12

**activity** 74:9 104:18 170:25

**actual** 97:2 98:8 107:22 108:14,16 111:14 277:10

**actually** 14:1, 10 20:2 21:3 22:3,10,11 28:2 30:7 31:1 32:22,24 33:5, 7 36:24 37:1 38:20 44:1 56:15,18 57:3 58:25 59:15 63:8 65:8,12, 19 68:2,4 73:7 74:24 78:18 79:1,3 83:5,6, 18 85:1 90:23 100:4 102:4 107:17 108:9, 18 110:12 111:10 112:10 114:4,22 119:9 120:16 122:11 130:11 146:13 147:1,21 148:13 173:11 185:11 191:12 194:12 197:25 200:15 202:16, 25 203:15 205:4 206:24 207:18 215:13, 14,19,23 216:3 218:2 222:9 225:5 229:9,11 231:3 232:8 236:2,7 237:7 240:17 242:7 254:19 255:23 256:11 257:10, 16 258:21 261:20 267:22, 24 275:11 276:9,21 278:14

**added** 206:22 226:24

**adding** 225:18, 22

**addition** 39:19 87:10 95:13 182:5,7 184:4 187:5 190:12 200:16 213:22 253:9 269:17 271:1,6

**additional** 32:4 35:4 41:7 42:19,25 87:9 185:11 224:3 272:22

**address** 106:22 107:18 276:12

**addressed** 127:1

**addresses** 89:4 120:12 257:17

**addressing** 54:6,7 195:23 213:16 263:21

**adequate** 273:4

**adjust** 86:9 106:19

**administrative** 141:24 151:1,3

**adolescence** 122:21

**ADR** 181:19 249:5 265:12, 24 266:14 267:25

**adrenal** 244:1,6

**adverse** 11:19, 22 12:3 14:21 15:7,8,17 16:1 17:5,15,21 19:22 97:5 101:12 102:13 104:19 113:23 114:7 116:20 117:7 135:18 138:23 139:22 140:5 152:6 163:12,15,18 164:3,17 165:5,15 166:20 167:2, 24 168:3,5,11, 24 169:8,12, 16,23 170:8 181:20 189:15, 25 190:16,19, 24 191:1,2 192:25 193:2, 3,7,11 199:10 201:15 202:13 206:17 224:6 234:9,22 243:22 250:7 267:23 268:2, 12 275:25 282:16

**AE** 243:21 282:16

**AERS** 187:6, 13,17

**affect** 13:9,14 73:13,22 74:3 112:21,22 113:2 162:25 262:24 274:14

**affected** 112:13 187:17

**affects** 72:3 77:6 112:25 113:8 115:15 128:20

**after** 21:4,6 23:4 25:7 49:25 57:22 62:9 64:12 82:25 83:12 127:9 134:14 153:11 171:6 175:18 180:25 183:23 184:1 185:3 195:18 198:1 203:3 207:1,3 237:22 269:1 270:14

**afternoon** 96:10 128:9 161:7,8

**afterwards** 16:17 32:20

**again** 25:19 39:15 40:3 70:21 114:2 125:2 137:3,18 138:19 146:11, 19 151:12 153:3 186:1 197:17 201:14 202:11 213:15, 24 214:3 235:18 256:18

**against** 65:16 73:4,8 162:17

**age** 57:7 58:17 63:6,8 71:4 86:5,6,10 100:17 106:20 116:3 119:4,5, 24 120:1,7,9, 13,14,16 122:20 125:12, 16 167:8,16 194:25 195:7, 20 196:13,16, 18 197:1,3,9 219:20,22 248:9,10,16 252:9,12 253:20 256:8 274:5,7,12,13, 19,21,25

**aged** 250:9

**agencies** 211:1

**Agency** 171:24, 25

**agency's** 182:18

**aggregate** 124:19 165:18

**ago** 67:13 98:3 126:3 128:10 130:14 206:25 211:19 247:15 256:19

**agonistic** 71:14

**agree** 54:9 84:18 86:24 127:11 129:16 139:19,21 140:2,10,11, 21,22 154:23 160:2 181:4 184:23 234:12 248:14 250:17 265:18 272:9

**agreed** 93:12 98:4 179:6 281:24

**agreement** 16:15 127:12 153:19

**agrees** 29:21 203:9

**ahead** 37:7 90:21 98:14 100:14 259:22

**aim** 15:20

**aldosterone** 72:19

**Alex** 52:19

**algorithm** 41:2 84:2,23 91:17 101:20 111:5, 6,7 115:23 198:14,18

**algorithms** 86:1 89:2 112:22 113:9 200:14 275:6

**all** 11:14,15 14:20 16:2,4,6, 9 17:19 20:11 26:18 29:23 30:2,3 31:5,16, 22 32:1 33:4,7, 13,19 36:9 38:23 44:2,21 50:8 51:3,10 53:17,25 54:6, 7 55:16 56:4 57:14 59:10 60:6,14 62:15, 17,21,23,25 63:19 64:12, 13,25 66:3 67:4,22 73:3, 23 74:17,18,19 76:3 79:17,23 81:16 82:17 83:2,14,16,17, 19 84:2,3,8 87:20 89:4,20, 25 91:19 92:10 93:8 94:3,16, 17 95:3,8,14 96:22 102:25

104:4 109:25 110:4,13 111:18 112:1 116:16,19 117:5,9,15,23, 24 119:4,7 120:7 123:24 125:6,7,8 126:4,13 127:3 129:8,17 130:6,25 134:21 136:24 137:25 138:22 139:22 143:16 144:10 152:7, 9,16 153:11 155:23 156:20 157:11 160:8 161:25 163:6 164:18 165:4, 6,15 166:12 169:11,23 170:5 171:8 173:5 174:10, 24 175:19 178:21 181:19 188:5 190:15, 16 191:17 200:17 202:12 209:21,22 213:17 214:4 216:24 217:2, 7,8,18 218:14, 15 224:20,23, 25 225:3,11 227:10 228:23 229:21,23 230:25 231:23 232:23 233:1 235:16 236:10 237:17,18 238:19 239:1,3 240:7 242:1 243:24 244:10 246:15,24 247:23 254:19 255:5 256:3 259:9 260:8 265:11,18,24 266:5,14,23 269:20,22 270:22 272:25 273:2 276:20 277:16 278:12

**allow** 265:13

**allowing** 182:19

**allows** 106:13

**almost** 33:7 71:1 119:22,23 270:13 273:8

**alone** 13:4 152:14

**along** 130:17 182:11,13

**already** 25:20 39:2 122:11 144:14 146:3 206:11 213:7 230:13 262:23

**also** 11:22 12:3,14,18 16:16 18:7 20:25 21:13, 15,19 24:15 28:25 29:3 30:8,10,12,15 31:25 33:24 37:2,13,21,22 42:5 46:25 50:6 51:3,7 52:18 53:3 54:25 55:2,3 59:18 60:9,13 64:15 65:8,19, 21,24 66:22 68:8 70:21 72:15 74:9,17, 21,22 75:24,25 76:3 77:11,15, 17 79:5,24 82:2,21 84:24 86:7 87:4,25 88:19,23 89:1 90:10 91:4,16 93:6,24 94:2 95:15 96:24 101:16 102:17 106:17,20 108:11 109:1, 17 110:18,25 111:22,25 112:10,22 113:2,15 114:4 115:15,20 117:8 118:3,5, 6,24 120:11 121:7 125:18 129:18 130:5, 8,23 135:16 136:24 141:20 143:22 146:14 151:5 154:6 159:1 162:15, 24 163:22 164:7 165:7 166:3 167:16 168:1 169:14 170:23 174:17 181:1 182:9 183:7 184:15, 17 188:8 189:2,7 190:8 195:2,18 199:3 202:11 204:15, 18 205:2,24 207:9 208:17 209:4,14 211:25 213:16, 22,25 214:2,9, 12,13 215:11, 23 216:24 220:18 222:9 224:25 226:1 230:18 241:20, 24 242:6 244:12 245:7 247:1,8 249:17 250:10 256:2, 6,8,25 257:2, 14,16 264:22 266:24 268:18 269:25 272:20 273:1,6 274:18 275:24

**although** 36:24 37:16 40:24 44:9 73:4 74:22 93:16 174:16 204:12 205:16 209:21 244:13 274:10

**altogether** 142:22

**always** 23:23 51:5,7 84:6 85:6 88:8 93:3 95:1,18 104:10 130:17

**am** 14:8 15:2, 25 18:18,22 19:17 24:24,25 26:5 35:20 42:2 43:10 49:14 55:9,14 58:2 61:23 62:8,19 64:1 70:3 71:10,21, 23 75:11,13, 14,18 76:10,17 77:14 81:5,18 85:21 86:16 94:23 99:3,4 106:12 107:2 113:17 125:21 126:20 128:9, 16 130:16 133:2 137:13, 14 144:22 148:12 150:25 151:1,2 160:3 161:10,24 164:14 167:17 177:5 185:13 195:21 201:23 207:9 209:24 210:6 218:17 228:21 234:12, 15,20,24 242:1 243:14 244:10, 12,14 245:2, 20,22 246:5,8, 12 247:20,23 248:9,23 250:16 252:4 253:7 254:18 257:16 260:10, 18 261:4 262:18 263:3, 7,8 266:10 268:7 272:2 276:8 277:23, 25 279:3 280:11

**ambiguous** 25:12

**among** 61:24 108:6 116:24 148:22 209:4

**amount** 44:18

**analysis** 7:23 8:7 26:17 29:15 30:21 31:7 32:7,10, 18 36:22 37:1 43:3 48:22 57:5 59:5 61:1

63:15,17 79:22 82:16,20 83:3 85:18,22 86:1, 20 87:2 88:2,9, 10,12 89:22 91:6,22 101:15 102:1,5,10,11, 23 106:2,4 107:20,23 110:10 112:23 113:3,12 114:6,10 115:16 116:2, 10,18 118:21, 24 119:1,12 123:21,25 125:3,9,13 126:11 170:24 172:15 190:4 194:14,17,20 195:19 196:14, 18,21 197:1,9 198:25 200:22 204:18 205:25 206:8 208:2 214:21 225:10, 13 242:18 272:19 273:21, 23 274:3,4,6, 11,17,22 275:1 284:2

**analyze** 69:20

**analyzed** 172:23 216:19 218:24

**analyzes** 85:11, 13 86:18 87:3, 10,23,24 88:17 89:9,11,13,20 101:10 114:23 115:21 173:23 192:21,24 193:6,16 194:8 196:7,12 198:6,10 199:15,19,24 200:3,7 201:4 203:13

**Andrea** 157:15

**Anguelov** 157:16

**Anna** 141:12, 18,19 146:20 147:22 252:4

**another** 30:17 80:6 91:10 119:15 140:18 159:24 160:4 189:16,21 191:19 205:12 222:25 246:7 247:18 261:24 272:7

**answer** 18:25 19:16 20:18 26:9 29:20 38:12 39:21 55:23 64:5 67:22 71:21 75:12 105:13 106:10 112:2 123:22 129:9 130:24 132:6, 19,24 133:14 135:10,25 136:19,23 137:6 145:22 149:7 150:9 151:17 152:1 157:7 158:14, 16 189:19 193:10 197:24 247:25 259:16, 19,21,22

**answered** 132:3 137:17 158:20

**answering** 133:7 149:21 152:18

**answers** 77:13, 15 154:4 168:5 228:6,8,12,16

**anti** 76:14

**anti-mineralocorticoid** 73:11 77:1,5

**antibiotic** 21:5, 7,10 22:9

**antimineralocorticoid** 72:3

**Antonio** 148:18

**anybody** 16:7

**anyone** 80:23 146:1 276:3,4 280:8

**anything** 15:11 33:16 58:25 100:1,2 116:11 228:11 246:3, 9,17 256:20 264:10 268:4 272:3

**anyway** 160:7

**anywhere** 63:24 113:11 224:22 225:15

**apart** 106:15 256:7

**apologize** 132:25 270:11

**appeared** 281:19

**appears** 232:8 242:8 272:13 278:14

**appended** 83:19 268:17

**appendices** 152:16

**appendix** 88:21 193:24 194:6 217:7,9 278:11

**applicable** 15:25 100:5 124:17 170:5 268:11

**applied** 84:2

**apply** 165:14

**appointed** 230:16

**approach** 35:2

**approached** 157:17

**approaches** 199:3

**appropriate** 25:23 100:24 130:12 138:10 157:7 158:12 194:13 249:12 274:13

**appropriately** 272:9

**approval** 182:18

**approved** 209:2 227:2,5

**approximately** 220:9 248:11 249:4 252:14

**April** 8:17,20 239:17 248:2 251:19 264:25 267:9

**arachnoid** 71:7

**area** 131:13 248:24

**aren't** 31:20

**argument** 67:13

**arguments** 66:4 262:8

**ARGUS** 14:23 15:6 16:2 18:5 21:1 29:17 142:22

**arise** 165:23

**arising** 117:22, 25 168:3 169:18 277:6

**around** 17:9 112:16,17 169:25 184:18 210:22 214:24 246:9 254:20

**art** 214:23 242:16

**article** 77:24 202:4,16 203:16,20 204:8,24 210:1 217:22 218:8, 9,10 222:19 223:3 226:5 255:10 258:5, 16,17 259:2,5 260:15,24 261:3,4,7 263:24 273:13, 16

**articles** 81:12, 15 82:2 218:1 255:22 257:11 259:10

**artificial** 74:18 189:14

**artificially** 186:15,23 196:18

**Asia** 52:19

**aside** 77:21 235:5 239:3

**Asimwe** 52:19

**ask** 22:13 26:12 27:12 49:1,3 70:3 78:2 128:23 130:18 131:2, 6,10 143:20 144:21 146:20 147:22 150:6 151:7,23 159:19 167:19 175:6 179:11 181:18 185:1, 15 195:24 198:22 202:2 203:18 209:24 223:20 232:16 236:17,19,24 243:15,17 254:18 263:3 265:7 277:23, 25 279:5 280:16

**asked** 54:5 55:24 71:20 81:24 82:15 122:4 133:12 135:22 137:17 149:11,24 158:21 163:11 164:2,7 165:6 166:7 170:11 178:3 180:7 183:20,22 186:19 188:3,6 192:17,20 194:5 199:18 206:7,12,15,19 208:1 209:25 217:4,19,23 221:5 238:23 269:12 270:10 276:3 278:24 280:17 282:9 283:21

**asking** 19:15 55:9 62:7 71:11 75:12 86:16 99:4 105:4 113:17 130:21 135:23 137:5 138:15, 20 143:11 145:23 149:20 151:23 153:4 155:20,21 163:25 166:17 242:1 245:3,20 246:8 247:20, 24 260:10,18 262:18 263:7,8 267:5 270:23

**asks** 282:16

**aspect** 172:14

**assess** 11:16 12:24 22:22 50:5 97:14,24, 25 181:3 269:19 270:21

**assessed** 10:25 217:12 239:10

**assessing** 10:21 11:12 12:6 54:20 97:4 123:15

**assessment** 28:18 29:10 33:23,24 34:1 37:5 46:13 50:24 53:4,6,7 56:4 82:12,21 83:22,23,24 84:10 86:14 90:16 93:2 99:21,22 107:13 111:15, 24 115:10 125:17 171:7, 12,19 173:3, 10,14 174:4,6, 14,15 176:14 177:1,24 178:8,25 179:3,7 180:3 181:5 182:8 186:3,8,12 187:25 193:18, 21,23 194:12 196:22 199:20 201:9,11 202:3 203:1,3,6,10 211:17 212:3,5 214:22 215:4 217:3,13,15,18 223:10 224:20 225:25 226:2 230:12 231:2 239:7 241:15 242:7 265:14 266:16

**assessments** 11:4,6,8 29:19 33:14 68:19 79:9 89:11 96:18 110:15 112:4 115:6 117:1,15 173:19,23 174:10 178:5 184:9,16 216:22 223:11 237:13 242:2,3 284:4

**assist** 149:14

**associate** 12:14

**associated** 43:22 57:20 63:21 91:2 139:23 142:20 156:12 173:7 179:24 190:10 204:13,15,17 243:25 245:14 246:7,16,20 257:13,15,19 258:9 264:1,3 279:10

**association** 6:7 10:22 11:1,13 12:7 13:2,3,11, 21 14:6 53:14, 19 54:2,16,20 55:20 97:5,12, 21 100:25 101:6,13 103:3,7,18,25 104:6 105:7,10 112:18 117:11 121:20 123:6, 16 124:1 135:2 136:7,17,20 137:22 156:15 172:13,14,22, 24 173:12 174:7 181:13 205:11 222:8, 11 223:2 242:16,19 244:5,17,18, 19,20,22,24 245:6,19,25 246:17,19 255:11,18 256:13,19,23, 24 257:2,7,20 258:10 260:13, 18 261:9,12, 16,17,18,24 262:2,3,4,16 263:25 265:10, 23 282:1

**associations** 256:17 261:22 264:4 279:11

**assume** 25:8 28:2 49:7 59:22 72:25 99:21 147:4 149:8 150:20, 24 157:1 164:13 222:13, 14 254:3

**assumed** 85:6

**assuming** 136:15

**assumptions** 107:20 108:13

**Atlanta** 4:6,14

**Atlantic** 4:5,13

**attached** 217:7, 8

**attempt** 51:7 103:10

**attempts** 51:5

**attention** 112:16 116:13

**attributable** 166:18

**attributions** 199:10,16

**atypical** 78:17, 22

**August** 281:14

**author** 202:22, 23 258:14

**authorities** 15:25 91:20 107:12 124:16, 20 137:19 157:4 162:4 165:17,20 167:25 168:2 169:25 170:6 175:24 182:3 184:18 223:20 263:1 268:10, 21 284:5

**authority** 7:10, 13 8:16 9:3 67:9,12 93:12 152:14 163:20, 21 174:19 178:9,15 179:3,5,12 181:16 182:8 188:17 189:13 192:13 212:17, 20,24 213:14 239:19 241:19, 21,25 242:11, 12 243:2 280:22 281:2 282:7

**authorization** 16:14 114:17 164:20,22

**authors** 21:15 52:12,14 59:3, 18 60:17 63:12 66:5 81:12,15 108:19 159:1 185:22 203:10, 16 205:2,10 222:9 255:9 256:11,16 257:1,3 258:3, 4,6

**authors'** 258:13

**automatically** 24:20 50:21 116:8 166:13 167:4,23

**available** 11:17 28:19 31:22,23 33:25 50:3 60:18,21 61:13 64:13,17 69:18,22 93:9 94:3 112:1 114:5 117:6,16 120:15 121:14 132:3,6,8,10 156:11 157:12 162:8 164:19, 24,25 171:8 173:5 174:17 179:23 202:12, 25 217:17 223:25 225:21 236:9 247:1 278:12

**average** 120:9, 13 208:13

**aware** 14:8 18:8,17,22 20:2 75:10 105:17 106:7 108:12 133:5 137:11 144:22 195:17,21 202:8 203:3 207:4,9,17 246:2,8 257:16 266:10 268:14 280:11

**B**

**back** 27:12 51:20 89:20 90:24 92:11 93:2 96:8 107:14 109:8 113:4 114:3 118:14 127:23 128:1 134:2,3, 12 160:22 187:2 198:20 228:1,15 232:15 238:20 243:11 268:22 270:23 272:11 277:21 283:14

**background** 14:9 61:14 150:7 219:19 248:3,8 250:14 251:3 252:7 253:7,18,20

**backing** 23:8

**base** 74:4 77:17 187:7 276:23

**based** 13:3 28:19 29:24 33:11 40:7 46:17 50:5 56:4 59:15,16 60:25 61:12 63:17 66:22 69:3,4 70:21 73:23 74:6,10, 11 83:23 84:11 87:13 89:1,13 90:6 91:21 93:8,17 94:3 102:10,24 104:9,20,21 105:12,14 106:4 107:10, 23 110:13 112:1 115:6, 14,19,24 116:10 117:9 124:22 125:15 128:21 132:3 145:10 150:7 151:16 153:2 158:25 182:17 193:14 197:1 208:5,12 209:21 213:2 221:17 222:11, 14 224:5 225:20 229:25 232:22 235:15 238:11 245:16 252:19 254:10 256:13 260:7 262:8 263:6 269:14,24 270:19 274:5, 17 278:1 283:12

**basic** 74:22

**basically** 17:12 53:5 69:16 80:6 83:22 84:20 88:9 96:21 110:7

**basis** 78:9 84:24 94:22 95:14,17 115:10 193:15 200:17

**Bates** 141:2 247:21

**Bayer** 6:6 8:9 10:25 11:11,18 12:7,21 14:3 16:6,10,22,25 17:1,6,10,13, 16,21,23,25 18:11,12,23,25 19:2,3,4,24 20:3,9 22:17 23:8,18 24:4 25:11 26:13 27:10,17,18 28:14 29:18,20 31:1,2,18,19 32:9 36:10 37:23 38:16 39:11,22 42:9 45:6,15 50:20 53:8,13,22 54:1,15 61:25 69:10,14 70:15 79:9 83:6 89:8, 9,11,19 94:10 96:16 98:20 99:4 105:5 113:11,24 115:3,6,8 116:22,25 119:25 124:10, 11 129:22 131:18 133:5 148:11,12 161:13,14,18 164:17 165:1,9 166:11,12 169:23 170:9 176:11,23 179:2 182:8,24 183:5,7 185:24 192:10 199:19, 23 201:12 212:21,24 213:13 214:7, 20 216:25 220:14 224:21

225:2,11 227:13 232:19 233:8,25 235:7,17,19, 20,21 237:11 238:8 239:20, 21 241:13 242:18 244:5 245:5,24 246:3,6,9,10 247:7 251:22 253:12 255:16 258:19 259:2 260:3,7,11,15, 16,22 261:10 262:9,17,23 263:12,23 266:6,8 268:4 269:9,13 272:8 276:4,15,21 277:3,8,14 278:2 280:8

**Bayer's** 10:15 12:6 14:22 16:24 17:8 19:23 22:14 24:19 30:24 34:15 35:25 50:8,20 99:15 100:10 107:6 109:12,22 110:3,20 111:23 112:5 113:17,20 123:5 130:23 133:20 134:19 167:22 169:6 215:7 220:19, 23 229:8 233:24 235:17

**bearing** 195:19 197:3 274:7

**became** 164:25 165:25 202:25

**because** 13:24 14:13 22:2,6 29:24 30:6 32:3 40:2 41:4 42:23 45:21 46:4,15 49:11 51:1,8 56:25 59:20 71:21 73:1 76:1 78:18 81:8,15 83:25 84:7 98:8 110:4 112:22 113:13, 22 115:4 119:10,14 120:12 122:24 123:18 138:25 143:21 144:14 145:2,4 153:7 159:19 167:6,8 169:12 177:23 184:12 195:1 202:8 204:14 212:4 215:20 216:1 217:15, 24 225:20 229:19 232:25 235:6 239:8 240:18 246:5 249:22 251:6 254:20 256:9 257:24 258:19 259:2 260:3,21 267:25 272:24 277:14

**becomes** 87:18

**becoming** 203:3

**before** 14:23 22:11 26:7 60:2 74:2 80:10 97:12 99:16 100:23 101:9 107:3 115:2,5 118:20 119:14,16 120:5,22 122:11 124:9 126:8 127:18 136:25 141:24 150:7 165:21, 25 167:20 174:17,20,23 175:2 201:5 202:15 205:5 206:11 213:8 216:7 239:23 242:2 245:22 258:15 267:9 269:9,12 271:1 281:3

**beginning** 51:18 87:15 96:6 109:6 134:10 160:20 211:24 227:24

**begins** 57:16 64:22 65:2 243:11 255:6 265:8 275:11

**behaving** 154:21

**behavioral** 210:3

**behaviors** 210:21

**being** 10:5 92:16,18,20,22 93:23 94:18 152:11 154:17, 19 168:25 180:15 183:20 188:5 200:8,11 201:5 206:10, 18 217:21,23 221:5 245:14

**belief** 283:23

**beliefs** 245:21

**believe** 10:21 11:12 20:22 21:6,16 44:12 61:8 67:3 94:19 98:20 131:13 138:9 143:10 171:13 173:22 176:5 178:7 184:6,20 194:12 195:13 202:21 206:12 212:12 224:10 228:6,25 238:8 239:24 241:4, 18 242:9,23 244:5 252:11 263:23

**believed** 245:5

**believes** 53:13, 18,22 54:1,15 70:15 99:5 116:23 246:1

**below** 219:17

**benefit** 162:9, 11,18,19 163:7 175:20 185:16 186:9 193:20 226:8

**benefits** 130:8 162:7,13,16,22 163:2,7,8

**benign** 142:18, 23,24 143:17 144:20 164:7 179:17 194:18 229:22 235:12 249:7 281:10

**bening** 142:23

**besides** 24:15

**best** 38:8 44:15 73:12 74:3 75:17 81:3,10 134:23 180:22 277:14

**between** 6:7 10:22 11:1,13 12:7 14:6 17:11 41:21 42:6 53:14,19 54:2 55:21 66:9 88:15 92:2 93:23 97:5 101:6,13 103:3,25 104:6 105:7 121:20 122:21 123:16 124:3 135:2 136:4,7,18,21 137:22 173:12 181:14 199:10 211:10 242:19 244:6,24 245:6,19,25 255:18 256:17 261:12 265:11 282:1

**beyond** 19:15, 16 276:9

**Bfarm** 6:10 34:1,4 51:24 53:25 54:5,7, 23 55:15,24 66:24 73:16 77:2,21 81:24 82:11 88:16 89:8,12 94:3 96:11,15 100:16 107:11, 12,14 109:17

110:18 123:20 129:7 212:15, 23 213:1,5,12, 17 216:19 217:13 220:18 222:2 223:10 224:19 225:25 226:2 228:20 231:18 245:13, 24 258:1 262:14 275:17 278:25

**BH** 265:11

**Bhatti** 52:20

**biased** 112:9

**big** 53:11 101:18 252:22 254:17 272:20

**biggest** 270:19, 20

**BIH** 164:9 178:21 181:14 196:14,15,19 197:3,13 281:19 282:1

**billing** 59:17 60:4,6,8,9,14

**bind** 74:12,18, 19 76:1

**binding** 72:18 74:7 75:25

**binds** 72:15 73:5

**bio** 209:4

**bio-break** 49:4 50:6 51:11

**biography** 80:16

**biological** 73:21,24 82:19 97:11,15 139:17

**biologically** 97:6,11,17 98:10,21 99:6, 12,17,19,24 100:5,8,11

**Birte** 74:25 75:2 77:16

**birth** 207:21

**bit** 80:9

**bleeding** 119:12 162:25 163:1 167:9

**blind** 78:25

**blindness** 37:24 38:1,4,6, 9,19 40:9 41:15,20,21 43:7,14 45:17, 22 47:3,25

**bluntly** 73:8

**blurred** 43:5,13

**BMI** 278:17

**body** 57:12 58:17 121:4,8 188:15 219:24 256:10

**bold** 139:12

**book** 67:4

**boss** 141:22,24 142:9 151:1,3

**both** 41:16 42:14 43:17,20 61:4 63:1,2 115:24 119:20 125:24 154:21 155:5 166:4 200:12 239:11

**bottom** 57:15 70:2 148:2 176:1,16 177:3 187:4 196:25 222:22 231:18, 21 247:22 249:1 254:20 255:6 279:14

**bought** 239:21

**Boulete** 209:7

**bounds** 276:10

**box** 83:22 84:14

**break** 49:2 95:20,25 160:14 161:4,6

**breakdown** 125:12

**Breitfeld** 142:10

**BRFSS** 210:13

**briefly** 183:11 190:5

**British** 7:9,12 93:11 178:9,14 179:3,12 181:15 182:8

**broad** 30:14 32:2,15,18,21 33:9,11 41:5,6 44:13 55:4 215:21

**brochure** 234:2,7,14,22

**brought** 33:19

**bullet** 10:19 70:4,14,19 71:11,25

**business** 130:24 176:11 185:24 201:12

**C**

**C-H-O-R-O-I-D** 66:1

**calculate** 88:2 177:22 183:15 252:2 269:4

**calculated** 192:10,14 249:8 251:21, 23 252:11,16 253:13

**calculation** 14:4 269:10,13 270:5,7

**calculations** 14:11 57:6 108:17

**call** 58:13 68:22,25 78:22 112:9 118:3 130:17 131:2, 6,17 135:1 150:8 151:9 214:15

**called** 65:25 66:2 68:24 98:7 101:19 102:7 111:12 165:21 168:6 169:17 171:4 174:16 195:15 197:17 198:6 245:1 274:2

**calling** 135:7

**calls** 25:13,21 26:10 130:20

**came** 84:12 93:9 109:25 149:23 161:15 185:4 190:1 197:10 224:18 225:4,25 226:2 227:12

**can't** 14:17 22:7 55:19 80:16 90:22 133:14 134:24 138:6 145:22 241:16 260:8

**cannot** 17:24 23:22 24:21 102:5 193:8 253:3

**capacity** 130:15 166:3

**capture** 32:16

**captured** 15:19 16:2,19 28:10, 13 29:13 32:3, 15 38:20,23,25 39:1,5,19 40:21 41:1 42:22 43:1 44:11 45:2 47:2 48:3,5,17 215:20

**Capturing** 140:5

**car** 271:16,21

**care** 52:5 95:22

**careful** 64:12

**case** 12:10,18

13:8 15:22 16:14,16 17:20 18:2,6,9 20:6, 13,16,17,20, 21,25 21:2,20, 23 22:6,8 23:10,19 24:5, 21 25:9,11,15, 17,18 26:8,14, 23 27:4,5 28:13,15 29:11 30:18,21 31:7, 8,11,15,22,23, 24 32:2,6,17, 23 33:3 34:10 36:16,19,20, 21,24,25 37:13,14 38:19,21,24 40:5,7,13,14, 20,21 41:8,9 42:10,17,18, 21,23,25 43:2 44:5,10,11,14 45:16,22,25 46:7,9,12,19, 21 47:2,7 48:15,17,18, 20,22 49:15, 16,18 50:3,5 51:3 77:22 78:11 80:4 82:23 83:17,21 84:3,24,25 85:2,4 87:20, 21 95:12,16 103:11,12,15, 23 104:3,12,15 105:16 108:4 110:10 111:2 112:12 114:14 116:2 118:9 120:25 121:18, 22,24 122:1,4, 7,15 123:11,14 124:4,6,7 125:17 130:4, 11 136:12 158:13,19,25 163:12,16,17, 20 170:2,22 180:20 181:24 191:15,16,17 193:14 200:9, 11 215:22,23 216:6,9,18,24 217:5 218:14 222:1,5,7,12, 14 224:5,18 228:20,25 229:4,6 230:9, 13,21 231:2,16 232:6,9 236:3 238:24 239:4 241:5 242:9 244:23 245:18 247:2 254:4 255:23,24 256:1,2,3,4,6 257:1 266:25 267:3,5,12,21, 22 268:5,7,8, 11,12,18 270:17 276:6 277:6,10 278:4,10,11 281:18 283:13, 22 284:3

**cases** 11:25 12:9,12,16 15:23 16:18,20 17:15 18:4 20:15 22:22 23:4,15 24:1, 11,14 25:1,7 26:17,18 28:6, 23 30:7 31:5, 17,18,20,22 32:8,10,14,20, 25 33:5,8 34:24 35:3,9, 12,14,16,23 36:10 37:9,11, 19,24,25 38:5, 9 39:13,14,15, 18,22,23 40:10,22 41:3 42:12 44:23 45:5,11,18,19 46:14,19 51:4 59:12 60:12 79:23,24 80:4 82:20 83:17 84:16 85:4 87:16 88:23 90:7 91:2,15 92:10 94:16,17 95:3,6,8,9,10, 14,18,19 103:14 112:15, 17 115:15 118:14 119:3,5 120:6,8,15 121:12,13 122:6,16,23 123:24,25 125:6,7,14 128:19,25 137:1 138:11, 22 142:22,24 143:9,17,25 144:21,24 146:12 165:8 177:6,8,10 178:1 179:19, 20 180:2,4,12, 13,17,18,23 181:6 183:17 185:8,11 186:4 188:8 189:23 190:13 194:21 200:15,17 214:3,21 215:9,15,16 216:4,17,18 217:5,6,11,18 218:15,24 219:2,15,17,23 220:14,16 221:2,16,18 228:19 241:12 243:24 244:19 265:14 268:16 269:6 275:18, 21 276:5,25 277:20

**categories** 83:14

**category** 84:22

**causal** 10:22 11:1,13 12:6 13:2,3,11,21 14:5 53:14,19 54:2,16,20 55:20 85:6 88:14 97:5,12, 14,21 100:25 101:6,13 103:3,18,25 104:6 105:7 117:11 121:19 123:6,16 124:1 136:7,16,17,20 137:21 156:15 172:13,22,24 173:12,16 174:7 199:10, 15 222:8,11 242:19 244:20, 22,24 245:19 246:19 256:12, 24 257:2,20 258:11 260:18 261:18 262:2, 4,16 263:25 264:5,8 279:12 282:1

**causality** 29:19 46:13 82:12,21 83:7,9 84:10, 19,23 97:18, 19,24 98:1 99:21,22 102:3,6

**causally** 173:7

**causation** 110:12 123:21 168:16 193:8, 14 256:5

**causative** 65:16 223:6,15

**cause** 25:2 30:17 42:17 43:12 44:1 46:3 73:1 79:21 89:1 97:2 98:8,12, 18,25 99:2,14 203:12 204:2 205:13

**cause/effect** 78:6

**caused** 30:12 36:17 40:3 63:14 71:8 91:9 98:25 99:11 108:21 166:21,23 167:4,24 168:22 169:1

**causes** 56:10 59:4 79:21 100:9 105:25 169:9

**causing** 46:5 100:12

**caution** 203:14

**cautious** 60:25 209:20 256:14

**cautiously** 108:23

**CCD** 142:8,11

**CCDS** 158:7,25

**CDC** 8:4 210:9, 10,13,17

**cells** 72:17

**Center** 4:5,13 207:13

**cerebral** 31:12 65:18 71:8 72:25

**cerebri** 131:4 133:6,21 134:20 135:3 136:4 137:9 138:12 155:16 156:8 157:21 158:8,18,24 159:8 164:8 243:22 282:16

**certain** 13:7 15:13,20 17:22 23:2 25:5 49:12 83:24 122:22 130:19 131:16 165:22 188:22 249:22 250:8,11 251:8 252:4 268:8

**certainly** 22:20 24:7 25:16 29:9 69:10 77:17 80:19 103:9 135:6 152:17,25 207:7 235:2 264:11 272:21

**certainty** 168:21 227:16

**chain** 8:18,20 243:9,11,18 247:18 283:12, 20

**challenge** 21:24 72:23 84:8

**challenged** 65:3,11 180:4

**chance** 126:5,9

**change** 29:11 94:8 227:18 228:15 246:13 247:23 262:7 263:10,12 282:20

**changed** 28:14 175:22 207:7 246:10 260:20

**changes** 33:1 94:10 95:10 263:5

**changing** 29:17

**chapter** 34:9,12 55:4

**characteristic** 275:25

**characteristics** 58:17,24 256:6

**characterization** 15:3 86:25 124:21

**characterized** 251:8

**charge** 14:1

**chart** 58:19 59:12

**check** 75:15 268:6 279:22

**checked** 35:4

**child** 195:19 197:3 274:7

**choice** 130:12

**choroid** 65:25

**chronic** 41:19 210:21

**Chuck** 148:8, 10 149:1 155:10,22 156:5,19,24

**circumstances** 13:1

**citation** 56:13, 23,24 57:2 65:7 66:9 279:25 280:1

**citations** 56:16, 19,20 68:9 136:25

**cite** 77:11 135:15 218:8

**cited** 41:22 68:8 76:8 77:2 220:3 248:18 252:20 254:10 255:10 256:15 257:6 261:1,3 262:6 278:25

**cites** 140:20

**citing** 42:2 80:21 217:22 253:7 261:11

**claiming** 189:17

**clarified** 261:22

**clarifies** 262:3 264:9

**clarify** 99:3

**class** 189:4

**classical** 103:12

**classified** 15:17 50:15

**clear** 17:23 22:8 29:16 30:1 76:11 87:18 166:1,5, 6 244:21 245:20

**clearly** 89:19 102:4

**clinical** 8:11 10:20 11:9,11, 15,17,18,21 12:4,8,9,12,17, 20,21,23 13:4, 6,10,15,20,22, 25 14:1,2,4,20 15:7,10,11,12 16:2,5,6,7,9, 10,21 17:6 18:11,18,19,23 19:1,3,22,24 20:4,8 22:22 23:11 62:11 65:22 82:17 100:24 101:5 104:8,9 139:24 140:1 148:5,7, 15,17 152:8 161:15 190:14 214:3 215:8, 13,15 216:3,16 228:18 229:6, 12,13 230:17, 20,21,22,25 231:12,16,19 232:16,19,21 233:13,14,18, 24,25 234:6 236:3,5,7 237:1 238:20 239:7,12 267:5,11,22,23 268:5,9,13 283:22 284:3

**close** 90:15 177:18 215:15 220:11 230:19

**closed** 92:13 93:3,14,24 94:5,11 126:2 144:15

**closely** 181:19 265:12 266:14

**clots** 71:6

**code** 60:6,8,14

**codes** 59:17

**colleague** 52:16 77:15 132:15 141:19 148:10 200:4 252:4 282:21

**colleagues** 49:19 52:20 157:17 242:10, 24 247:10,13

**collect** 165:15

**collected** 164:17 165:1

**collects** 210:19

**column** 195:6 196:6,24

**combination**

214:2 224:25 241:2

**combinations** 125:10 213:19, 21

**combined** 52:22 213:21

**come** 12:4 26:21 60:22 64:13 83:24 84:21 92:10 94:17 108:17 110:8,9,10 111:19 113:4 117:10 130:10 132:1,14 135:8 139:4 162:8 163:19,21 171:8,19 175:1,2,20 191:25 200:18 219:15 231:1 262:22 270:23 272:11

**comes** 90:23 94:12 97:4 158:4 162:1 171:6 183:23 184:1 197:9 207:12 274:17

**coming** 31:6 80:18 85:24 95:19 118:12 144:12 185:12 189:23 224:5 252:6 267:23

**comment** 70:9 78:1 231:21 260:8 263:22 267:20 281:13, 17

**commented** 237:8

**comments** 178:20

**committee** 281:7,24

**committees** 268:9

**common** 41:5 42:15,24 43:21,24 44:2 46:4 56:9 183:4,6 217:21 218:5

**commonly** 142:20

**communicate** 80:13 129:4,14

**communicating** 130:4 143:22

**communication** 83:13 129:5 266:11

**community** 186:25

**companies** 129:22 183:5,8

**company** 44:20 62:10 78:1 87:16 92:7,9 121:25 122:3,5 130:18 131:2, 6,13 132:5 133:4 135:13 136:16,20 137:21 138:24 141:25 143:1, 13,18 144:19 145:17 146:1, 17 147:17 149:14 150:2 151:21 152:3, 23 155:16,24 156:21 159:20 163:20 166:9, 17 170:3 181:18,23 182:2 203:9 212:16 222:4 223:15,18 239:13 241:17, 20 250:12 281:18

**Company's** 57:18 122:5 181:5 208:2

**comparative** 250:19

**compare** 59:9 107:21 192:25 193:3 196:15 219:18 249:12 250:22

**compared** 89:25 114:13 145:10 194:12 228:13 249:8 250:13 251:20

**comparing** 58:21 193:2

**comparison** 250:3,16 251:16

**compatible** 73:9

**compiled** 52:13,18 53:10 211:24

**compiling** 52:21

**complained** 272:7

**complaints** 276:11

**complete** 23:24 55:25 125:5 265:13 266:16 272:22

**completed** 179:2 211:18

**completely** 32:24

**complex** 132:7 133:14 138:3

**complicated** 19:20

**complication** 41:25

**component** 70:16 126:24

**compose** 132:17 150:8 151:17

**comprehensive** 139:25

**conceivable** 54:14

**concept** 186:20

**concerned** 149:21

**concerning** 249:5

**concerns** 170:8

**concise** 151:18

**conclude** 23:18 25:11 63:12 105:23 166:13 167:4,23 179:22 181:16 222:4 242:13

**concluded** 26:13 105:18 106:8 174:9,12 207:2 243:3 256:25

**concludes** 94:3 106:18 235:23 250:5 274:10

**conclusion** 26:22 57:19,24 58:12 60:22 61:4 62:23 63:20 64:14 80:18 84:12 93:10 103:20 106:14,21 109:19 110:1 111:19 117:10 126:21 157:10 159:1,3 162:9 171:8,19 175:20 181:9, 12 204:8 212:6 214:5 225:24 226:1,5,16,19 229:8,11 233:2 237:20 249:2 256:12 265:9 274:18

**conclusions** 23:23 93:12 105:15 107:10 108:19,22 197:10 203:16 223:10,13 226:18 241:24 255:7,8 256:15 262:8,12 263:10,13 265:22 274:8

**conclusive** 179:19 231:1

**conclusively** 112:2

**concomitant** 216:11

**concurrent** 83:1,13

**concurrently** 169:1

**condescending** 154:17

**condition** 43:24 46:2 47:21 50:13 51:10 63:7 65:24 69:19,21 86:5 96:23 97:1 98:8 102:16 112:17 115:25 119:20 130:19 135:19 166:22 167:15 169:9 173:13 180:25 184:15 190:8 216:11,13 251:6,14 269:20 275:7

**conditions** 30:12,14 44:3 46:3 49:21 83:1,13 130:25 165:6,7 205:20 210:21 257:13, 14,18 258:9 261:8 262:1 263:25 264:3,7 279:10

**conduct** 101:8 126:14 174:13

**conducted** 16:7

**conducting** 16:25 28:17

**conducts** 230:21

**confer** 127:3, 10

**conference** 78:4 202:17

**confident** 55:10,14

**confining** 116:2

**confirm** 116:25 117:4 175:12 204:19 205:4 234:24

**confirmation** 115:1

**confirmed** 12:15 26:25 27:3,8,9,10,11 44:9 71:5 77:16 103:6 111:20 112:8 113:24 114:22 117:11,12 120:1 121:25 123:14 156:15 171:9 215:18 216:17 230:8 283:23 284:2

**confirms** 27:15 60:19 63:3 280:1

**conflict** 280:13

**conflicting** 33:2

**conflicts** 264:21

**confounded** 87:5

**confounder** 274:14

**confounders** 85:24 205:25 206:1

**confounding** 206:10 275:9

**confuse** 55:7 259:21

**confused** 263:3

**confusion** 161:2,6

**conjunction** 68:18

**connection** 136:4,9,10,14

**consecutive** 229:17

**consequence** 38:20 230:2

**conservative** 35:2

**consider** 22:21, 24 23:1,6 24:4, 8,25 53:3 63:15 97:9,25 99:20 106:5 135:21 162:13 163:7 168:13 205:24 241:14 254:11 260:20

**considerable** 254:2

**consideration** 23:6

**considered** 96:16 105:6 108:15,23 109:3,19 112:14 118:13 157:7 213:2 226:12 250:18 269:23 281:21

**considering** 167:11 251:11 254:2,6

**consistent** 29:9 35:1,9 36:12 108:14 120:16 135:12 167:25 168:1 169:6,7 172:16 196:20, 23 199:13,17 203:15 204:7, 10,23 206:2 223:9,12 226:15,17,19, 21 264:15

**consistently** 211:2

**consists** 214:10

**constant** 84:5

**constantly** 144:9,16

**constitute** 21:23 37:17 48:5 91:11

**constitutes** 91:11

**constituting** 111:10

**consult** 47:1 214:7

**consulted** 214:9,14

**consumer** 51:6 189:3

**consumers** 132:1 168:23

**contact** 27:12, 14 51:8 131:12 151:4,5 230:19,24

**contacted** 166:17

**contain** 53:12, 17,25 277:1,7

**contained** 152:21 176:2 221:21 223:19 237:19 277:17 278:9

**containing** 52:22 214:1 224:24 225:1

**contains** 56:18, 20,23,24 57:2 78:4 152:7 175:10 186:3 193:20

**Contents** 5:2

**context** 13:18 26:25 29:20 70:3 91:17 116:6 129:3 186:14 188:2 208:25 219:3 247:20,23 256:21

**continually** 181:24 199:24

**continuation** 10:4

**continue**

118:17 127:2, 21 181:19 266:5

**continued** 140:8 182:2 185:2 236:14 239:9

**continuing** 127:19 156:2

**continuous** 20:10

**contraception** 162:24 167:9 205:18 226:9, 11,12

**contraceptive** 59:25 84:4 109:2,4 119:11 158:13 159:6 163:2 208:14, 15 223:1 247:3,4

**contraceptives** 52:22 75:22 207:22 208:19 209:11,15,23 213:21 220:19, 24 243:25 244:6,23,25 245:6,14 246:1,8,16 247:2

**contract** 16:15

**contradictory** 228:12

**contraindicated** 159:7,12

**contraindication** 157:19 158:18, 24 159:13

**contraindications** 158:9

**contrary** 207:20

**contribute** 103:17

**contributing** 185:21

**control** 58:5 59:23 103:11, 12,16,23 104:3 106:5 108:4,13 207:13,22 211:14 244:23 245:18 247:2

**controlled** 196:12

**controls** 59:9 65:15 66:9 68:2 103:14 107:21

**convincing** 70:11

**Cook** 5:9 12:11 13:12 14:24 15:2 18:14 19:8,13 22:1, 19 23:21 24:23 25:13,19,23 26:2,11,16 27:2 28:4,21 32:12 33:14,19 35:19 36:13 38:11 39:4,24 40:12 41:17 43:8,19 45:9 47:6 48:10,25 49:3,13 50:25 52:1,5 53:15, 21 54:3,17 55:13 58:8 61:10,18 62:5 64:2,4 67:15, 20 68:15,20 69:2,12 70:18 71:17,23 72:9 74:15 76:24 77:9 78:13 79:13 80:15 81:6,13 82:13 84:17 85:21 86:23 89:15 90:18,20 92:4 93:5,25 94:13 95:21 97:13,22 98:6,13,22 99:7,18 100:13 101:2 104:1 106:11 108:7 109:14 114:1 115:12 117:2, 17 121:21 124:13 125:1 127:1,17,21 128:2 129:1 130:3 132:22 133:8 135:5 136:5,11 137:2,10,17 138:18 145:19 146:2,18 147:13,18 149:6,18 150:4,19 151:11,22 152:2,24 153:6,12,17, 19,22,25 154:6,12,16,21 155:1,3,13,18 156:1,23 159:9,17,22 160:2,4,12 161:1,2 189:20 193:17 197:19 198:5 228:7,12 229:3 231:11 234:5,11 235:25 236:22 237:6,15 238:7,17 242:21 243:13 244:8 245:7 246:11 248:17 249:14 251:1, 25 253:2,16 254:13,16 255:20 257:9 259:3,13,17 260:5,23 261:15 262:11 263:2,14,17 264:17 265:1, 2,5,21 266:3, 19 267:14,17 269:11 270:3 271:8,19 272:1,10 273:9,12,17 274:1 276:8 278:6,19,22 284:7

**copied** 156:25 157:1 248:5

**copy** 6:12 126:8 139:10 142:11 236:18

**cordial** 159:25

**core** 129:21 159:20

**corporate** 129:22 130:15 166:3 245:8

**correct** 10:17 11:7 12:10,24, 25 13:4 14:16 17:2,3 19:7 23:16,17 24:13 28:3 29:22 31:4 32:11,13 35:10,12 36:7, 8,12 38:17 39:3,23 40:11 42:7,8 43:7,14, 18 45:8,19 46:16 47:19 48:7 50:24 51:1 53:23 54:16 58:7,9 61:9 65:7 66:14 70:6,13, 17 74:17 78:12 83:7,8 84:16 86:22 89:14, 16,18 90:16 92:23,24 95:1 96:13,14 97:7 98:5,7 106:10 107:1,8,9 110:5,6,21 111:25 117:16 120:24 121:4 130:15 141:14 142:12,13 147:12,19 158:1,4,15,21, 22 159:3,10 164:11 168:7 172:1,18 173:25 175:9 178:10,17 183:2 185:18 187:7,8,15,22 188:7,18 193:22 194:1 195:16 196:4, 9,10 198:7,8 201:22 202:19 206:13 207:14, 16 209:4,11,12 210:2 211:18, 20 212:18 216:9 217:24

218:6,9,10 219:1,5 225:12,16 229:2,7 230:15 232:7,12,20 233:11,12,20, 21,25 234:1,3 235:12,13 237:14 238:16 239:20 240:5 242:4 243:10 245:16 248:4, 15 250:25 251:2 252:15, 17,24 253:15 255:3,4 257:8 260:4 261:14, 19 264:16 265:20 266:2 269:10 270:7 271:2,3,7,9 275:1,2,13,14, 19,20,24 277:9 279:7,21 280:2,14,15 281:7,8,21 282:22,23 283:3,15,19

**corrected** 273:25

**correctly** 12:6 15:6 18:17 21:6,17 139:13 141:3,6,16 143:2,3 149:16 157:22,23 232:2 272:8

**correlation** 196:13,14

**correspondence** 244:11 258:25

**corresponding** 222:15

**corroborated** 230:5,6,7

**Costales** 148:18,20

**could** 10:14 12:17,18 37:25 38:17 39:13,23 41:10 45:15 49:12 56:6 60:2 68:3 72:12 82:4 100:7 105:2 112:7 120:4 130:17 136:13 144:7 166:18 170:22,23,25 171:22 172:2 180:24 190:18, 20 201:16 224:1 236:6,20 237:2 238:3,13 262:7,22

**couldn't** 26:22 58:23

**counsel** 51:22 126:16,19 153:6 159:22 160:24 183:14 276:4

**counting** 194:24

**countries** 164:22 273:1

**country** 17:14, 16 49:20 131:16 132:5, 10,16 133:13 138:3 225:2,3 272:19,20

**couple** 128:10 160:10 209:2 211:19 212:11 255:2 273:10 283:2

**course** 12:19 13:5 16:10 20:12 21:5 22:22 23:24 28:25 30:15,20 32:25 44:16 60:5 119:15 129:3 131:5, 11,25 135:12, 22 151:5 176:11 179:1 184:12 185:23 227:11,12 230:18 242:5 244:17 249:20 251:5 264:18 268:16 275:23 276:18

**Court** 4:1 127:25 153:7, 12 154:2,3 161:5 259:15

**courteous** 154:18,19

**cover** 182:11, 13 192:6

**covered** 182:16

**covers** 176:4

**create** 18:2 87:20 185:23 201:11

**creating** 185:19

**creation** 191:15

**criteria** 15:13 17:22 30:25 31:3 32:3,15, 19,21 33:10,11 34:16 36:15 41:9 44:13 45:10 56:3 79:1,2,14,15, 19 80:9 82:12, 22 83:7,9,16, 20,24 84:1,5,9, 14,19 85:3 97:23,25 207:8 215:21

**critical** 255:14

**Cross-examination** 5:9 161:1 278:22

**CSF** 34:19 36:5 39:9 42:11 45:8,14 47:11 64:22 65:10, 13,20,22 66:8 67:25 72:18 79:11

**cumulative** 31:16 32:7,17 83:3 90:20 145:5 146:10 165:20 177:18 178:19 179:16 213:24 220:11

**cumulatively** 145:4

**current** 68:10 69:21 82:1 93:17 157:21 158:9,18 161:18 179:22 214:23 245:21

**currently** 64:17 107:13 108:10 148:21 149:1 156:11 181:13 225:20 249:4 265:10

**custodial** 126:1

**cut** 53:1

**cut-off** 219:6,7 220:5

## D

**D-R-A** 28:12

**Dandy** 31:2 79:2,14

**data** 11:14,17 14:21 54:7,11 55:11,16,20 56:4 57:5 60:17,20,21,24 61:1,7,8,11 62:17,21,25 63:1,17,23 64:7,12,13,17 67:1 69:18 82:17 85:24 88:12 93:9,18 94:3 101:16,19 102:2,11 104:20,22 105:12,13 110:14 111:19 112:1 114:9 115:24 117:5, 7,10 120:3 129:6,15 130:2,6 132:8 137:20 156:11 157:12 162:1,7 165:18 170:24 171:8 175:19 176:2,4,25 178:4,20,25 179:17,23

183:4 184:12, 13,24 187:5,17 190:16 192:18 193:5 198:13, 23 199:7,9 202:12 204:19 205:3 208:3,5, 13,16,17 210:19 211:5,9 213:6,23 214:19,25 217:16 219:5,7 223:22 224:1, 16 225:21 242:25 247:1 248:24 249:5 255:14 256:13 269:24 270:19, 20 276:23

**database** 11:23,24 12:13 14:22,23 15:5, 6,21 16:3,24 17:8 18:5,13 19:6,23 20:5, 15,18 21:1 28:10 29:13, 14,18 30:6 35:25 45:16 56:1 58:14 59:17 85:19 88:7,11,22 90:5,6 95:2,4 113:4 114:10 115:21 119:1, 8,19 125:5,8 126:11 127:6 142:22 144:8, 9,15,25 177:11 190:13 191:17 193:15 194:17 198:14 200:1, 13 202:14 215:8 232:9 240:15 241:11 277:3,6,18 278:13

**databases** 34:15 49:7 85:11,14,23 86:2 87:2,11, 24 89:14,22 101:19 112:24 114:7 117:8 127:7 193:2

**date** 141:7 157:24 257:21 279:14 282:17, 25

**dated** 85:17 86:18 179:18 251:19

**dates** 246:2

**dating** 277:21

**DAVID** 4:11

**day** 128:15 170:7

**days** 21:6 267:9 270:14

**deal** 30:4

**deals** 261:2

**dealt** 247:11,14

**Dear** 149:1 157:17 158:7 243:21

**Deborah** 68:22 257:5

**Debra** 257:6

**Dec** 6:19

**decade** 120:22 174:11 215:2

**December** 148:3 156:10

**dechallenge** 22:5,6,8,18 23:16,19 24:6, 11,18,22 25:12 26:14,23 179:21 180:8, 12,20,23 181:3,5,7

**decide** 158:11 171:11 238:13

**decided** 21:19 202:9 224:2,11

**decides** 235:21

**deciding** 224:11,12 238:10

**decision** 130:10 171:3 224:18

**decoded** 28:11

**dedicated** 277:16

**deem** 35:17 79:9

**deemed** 35:16 84:16

**default** 125:12

**Defendants** 10:20

**defense** 126:16,19,22

**define** 50:11

**defined** 15:14 45:6 50:15,18 51:4 175:18

**definitely** 129:23

**definition** 18:19 110:7 172:6,10 173:2 174:1,4

**definitions** 172:4

**degree** 105:11 161:11 227:16 251:8

**delay** 134:15

**demographics** 58:17

**demonstrating** 172:12

**Denmark** 59:15 60:18,19,25 208:4 211:9

**denominator** 183:19 269:8

**department** 52:24 282:22

**depend** 13:14 16:12 136:1 138:20 145:23

**dependent** 44:19 102:14, 15

**depends** 13:5 135:22 137:4 145:22 153:3

**deposition** 10:4 26:7 51:14,19 52:6 95:22 96:2,7 109:7 126:14 127:12 128:11 134:5, 11 139:7 140:23 154:17 160:16,21 166:4 227:11, 20,25 284:10, 12

**derive** 103:14 144:8 170:21 256:12

**derived** 208:17 251:7 253:23

**deriving** 11:15 18:6 20:7 112:16 152:6 208:15 215:16 216:10 268:12

**describe** 27:23 133:11 139:13 141:3,6 190:5 212:20

**described** 16:5 19:4 21:9 35:6 118:5,24 247:25

**describes** 33:6 34:13 232:10 255:1

**describing** 19:11

**description** 6:4 34:11 135:17 235:24 236:1

**design** 103:8 105:10

**designed** 108:5

**designee** 125:24 126:23

**designs** 104:24 105:2

**desired** 131:17

**despite** 255:6,8

**detail** 31:8 101:14 137:6 138:19 153:4 213:12 278:16

**detailed** 31:7 44:19 61:12 66:19 82:20 97:12 151:17 157:9

**details** 21:1 27:13 28:25 29:2,5 30:6 31:7,9,23 33:4 37:14 44:19 45:24 50:5,9 51:9 78:5 122:8 150:6 151:10

**detect** 111:1

**detected** 139:24 197:2 274:6

**detection** 89:21 102:8 114:8, 19,25 124:19 125:3 162:2 169:17 198:13 200:25 249:16

**determination** 24:5 30:1 41:10 173:16

**determine** 25:1 59:7 122:16 137:6 173:6 204:3

**determined** 58:18,20 174:6

**determines** 85:3

**determining** 22:17 53:13,19 54:1,15

**develop** 41:15 71:2 87:8

**developed** 21:7 120:2,23 123:4 130:19 131:3 133:21 134:20 138:12 180:14 241:10

**developing** 100:18 119:9 135:3 156:13 167:11 216:4 254:9

**development** 57:20 62:11 72:13 100:20 104:8 139:25 148:5,7,17 161:15 179:24 190:15 203:9

**devices** 8:15 12:24 239:18

**DFA** 33:23

**diagnosed** 21:3,8,11 27:19,25 47:1 78:12,16 109:1 229:22 231:20 232:11,20 235:8,10,11,13

**diagnoses** 43:22 44:8

**diagnosing** 236:18

**diagnosis** 28:18 29:6,22 30:17,19 31:9, 13,14 32:5,22, 25 33:1 35:1,4, 10 37:16 42:20 44:10,25 45:5 48:5,19 49:16, 22,25 56:9 78:9 79:2,3,7, 10,20 80:3,6,7 177:8 204:20 215:17 217:21 218:5,12 220:17 229:25 230:1,3 231:24 233:3,18 235:15,22 236:11 237:3, 21 238:1,15 239:2,8 267:12 283:23 284:1

**diagnostic** 49:17

**didn't** 17:6 19:3,24 53:1 67:18 78:23 79:5 88:16 141:15 146:15 153:23,24,25 159:4 160:9 190:3 217:21 220:25 227:9 231:6 235:10 241:13 259:18 260:17 265:18 272:13

**differ** 41:21

**difference** 58:23 211:10

**differences** 66:8

**different** 32:24 37:16 41:21 42:15 47:21 59:11,14 62:10 67:4 68:4 70:20 72:10 74:7,8,18,19, 20 75:23 76:4, 5 99:25 104:24 105:2 110:22 128:14 159:23 166:8 192:25 193:3,4 214:11 245:4 257:11, 12

**differently** 113:12 262:17

**differs** 274:8

**difficulties** 161:4

**difficulty** 205:18

**Digie** 258:13

**diligent** 33:3

**diligently** 238:4

**direct** 54:4

**directed** 66:25 71:19

**directly** 18:5 60:18 131:21 132:6,21 133:18 135:7 163:21 247:15 248:10

**director** 233:18

**disagree** 26:2 124:21

**discharge** 236:25

**disciplines** 214:8

**disclose** 197:14,20

**discloses** 280:12

**disclosure** 264:21

**discontinuation** 82:25 83:12

**discovered** 107:16

**discovery** 4:4, 12 127:1,9 276:7

**discuss** 21:19 67:4 70:19 73:20 82:19 190:21 205:10, 19 216:18 218:18 222:1

**discussed** 10:14 21:22 58:1 66:5,21 70:20,23 72:24 83:15 87:20,25 90:9 93:6 98:17 100:15 101:3,9 103:18 106:17 109:24 117:23 120:7 143:24 156:13 170:23 172:9 181:21 187:24 204:24 206:3 216:21 217:3 222:9 223:17 224:15 241:6, 13 246:18 256:18,21 268:19 269:9

**discusses** 90:10 188:20

**discussing** 50:19 67:8,10 71:20 221:2 272:3

**discussion** 58:10 66:19 68:3 73:20 126:19 140:3 157:6 190:8 203:25 206:9 222:21 227:7 245:13 261:18 281:10 283:13

**discussions** 66:23 69:3 96:12 222:13 241:16

**disease** 13:25 18:15 22:23 23:1,24 25:2 48:1 59:2 99:2 168:25 207:13 249:21

**diseases** 36:16, 18,19 40:4 41:7,11

**disorders** 34:25 35:9 36:12

**displayed** 37:2

**disproportionality** 85:18,25 86:18,20 87:3, 10,22,23 88:2, 9,10,17 89:2,9, 10,20,22 90:4 91:5,9,16,22 101:10,15 102:1,5,10,11, 23 110:9 111:5 112:22,23 113:2,3,9,12 114:3,6,23 115:16,21,23 116:9,10,18 119:1 124:23 125:2,9 126:11 170:24 192:21, 24 193:6,16 194:13,17 196:21 198:6, 10,25 199:15, 19,23 200:3,7, 14,16,22 201:4 273:20 274:3, 4,11,16 275:6

**disproportionate** 90:1,13 101:11,21 112:7 113:23 114:4,11 115:3,7,9,10 124:24

**disproportionates** 89:23

**disprove** 13:21 14:5 100:25 108:5

**disproves** 61:8

**disproving** 101:12 103:3, 24 105:7

**disregard** 61:11 272:25 273:1

**disregarded** 61:6

**disrespectful** 154:15

**distinguish** 17:11

**distribute** 142:25 143:12, 16 146:16 147:16

**distributed** 144:3

**disturbance** 39:19 40:13, 15,23 41:3,5 45:18,22 46:24

**disturbances** 43:21,24 44:4

**doable** 38:15

**doctor** 233:14, 19,23

**doctor's** 283:17

**doctors** 78:11 231:10 232:11 233:10 235:20 236:20 237:4, 11 238:15 240:4

**document** 6:6 42:3 43:11 52:11,16,17 53:3,9,12 54:13 55:12 56:17 68:14 75:8,11,14 77:11 79:16 82:15 83:19 84:11 85:17 88:1 89:4 90:9 94:25 100:16 107:11 141:1 149:7 152:15, 17,21 167:19 168:4 176:21 185:20,22 186:2 212:15 214:17,18 239:22 240:5 242:25 246:4,6 257:24

**documentation** 132:9 235:19 278:14,15

**documented** 48:21 60:9 79:11

**documents** 33:19 126:4 155:6 160:13

**does** 11:11 17:4,5,7 20:18 24:4,17 27:9 29:10,20 31:1, 2 35:14,15 42:25 47:18, 20,22,24,25 53:12,17,24 54:14,18,21 57:23 64:17 72:6 73:11 74:12 76:1,15 77:4 78:5 79:4 85:5,20 91:11, 20 92:12 94:7 98:20 108:20 115:6 116:24 121:6,18 129:9 131:18 140:18 146:7 149:13 150:1,12,13,23 151:20 152:22 156:5 162:20 166:20 168:15 169:23 171:12 172:23,25 176:1 180:11 196:15 197:6 198:9 203:7 204:1 205:12, 25 210:10 212:19,23 219:18 240:7, 9,12 245:13 250:14 262:4, 20,23 263:9,12 264:10 271:20 273:16 277:14 278:1 279:9,14 281:24 283:4

**doesn't** 12:7 27:18 54:13,25 56:16 59:2 73:13 74:3 108:1 150:17 212:6 234:10 244:21 272:8, 11,22 273:16, 19 274:24 275:12

**doing** 31:5 32:9 59:6,12,13 62:3 88:18 90:15 125:18 162:2 169:15 199:23,25 200:5 213:7 215:3 230:11 250:21 266:21 272:8

**done** 11:3,18 14:3 17:11,12 20:9 37:23 53:8 67:17 84:13 87:4,11 90:3 104:4,25 108:13 110:14 111:17 113:16 114:6,18 115:17 118:9, 10,14,16 125:4,17,22 153:15 165:9 199:19 269:10, 13 270:13 273:6,8,22 277:20 284:8

**double** 43:6,13

**down** 50:8 51:10 70:8 140:12 142:4, 14 154:11 155:1 161:3 200:14 218:4 243:18 249:1 258:18 259:1 260:2

**dozen** 91:10

**Dr** 5:5 7:2,23 8:24 10:4,13 51:14,20,23 68:24 69:6 80:19 86:7 96:2,8,11 109:8,10 125:24 126:1, 6,10,21,23 128:9 134:5, 12,14 139:10 141:1 155:9 160:9,17,22 161:7 168:17 195:18 196:25 197:8,14,19 198:2 227:20 228:1,5 255:16 257:10,22 258:3,4,22 259:24 260:2, 6,17 261:3,19 262:12,15 263:4,21 264:10,22 279:6 280:8 284:11,12

**DRA** 28:12 33:12 34:16, 17,20 194:18

**draft** 108:10 128:16

**drafting** 52:10

**drainage** 71:7

**drained** 73:3

**dream** 265:3

**drill** 200:14

**drive** 271:23

**driving** 271:16

**drug** 6:14 13:19 15:12 17:21,23,25 18:14 91:2 97:5 102:15 104:6 116:1 139:12,14 140:8 163:25 164:1 166:19, 21,23 168:11, 12,22 169:1,9 171:14 180:25 190:10 268:1 274:12 282:21

**drugs** 12:24 17:15 84:2 257:11,12,18 261:8 262:1 263:25 264:8

**due** 32:2 48:19 56:9 161:4 196:14 200:8

**duly** 10:10

**duplicate** 187:18

**during** 21:14 139:24 171:18 185:7 186:16 200:24 211:24 227:5

**duties** 262:20 263:9

**E**

**e-mail** 6:16,19 7:1 8:18,20 127:2 135:9 141:6,9 142:5, 12 143:5 145:24 146:16, 25 147:5 148:3,25 150:11 153:15 156:4,6,19 157:24 243:9, 10,18 244:11, 16,20 245:21 246:5,15,23 247:18,21 248:2,4,6 251:18 252:3 253:3 282:17, 20,24 283:5, 12,15,16,19,20

**e-mails** 151:4,5 282:10

**e.g.** 204:17

**each** 26:6 109:17 151:4 160:1 162:17 182:25 215:16

**earlier** 25:20 106:2 166:9 168:6 175:16 181:21 198:5 241:6 246:9 267:4

**earliest** 245:4 246:2

**easier** 52:3,7

**easily** 132:8

**editor** 7:22 8:23 57:4 63:4 86:8 106:18 107:18 108:3,9 118:25 195:22 196:2,5 197:15,20 198:1 258:7 260:8 263:21 264:6,23 274:2 278:25 279:5 280:10

**editors** 257:17

**Eeva** 148:14,15

**effect** 73:6,11 76:14,16 77:1, 5 132:4 142:19 196:16 229:1 235:3

**effective** 163:5 226:8,12

**effects** 11:19 74:21 75:21 76:2,3,4 130:7 139:23 162:15 163:9 168:11

**efficacy** 109:3 129:18

**efficient** 127:14

**eight** 142:22,24 254:22

**either** 13:2 16:24 27:6 30:12 60:24 111:1,20 112:3 116:13 122:3 131:21 151:14 163:23 213:20 224:24 233:8 234:18,21 250:18

**elevated** 79:11

**eligibility** 207:8

**ELLIOTT** 4:11

**else** 16:11 31:3 33:17,25 76:15 80:23 81:19 241:3 261:25 263:22,23 264:6,10 267:13

**elsewhere** 23:11 273:2

**EMA** 174:2

**EMA's** 172:10

**emblematic** 140:14

**emphasize** 85:23

**emphasizes** 257:17

**employee** 246:6

**enabled** 130:9

**encourage** 131:8,10

**encouraged** 131:12 168:23

**end** 19:22 51:13 86:13 87:15 96:1 107:25 111:17 134:4 156:18 160:15 164:23 173:23 227:19 256:23 284:9, 11

**ended** 45:4 154:7

**ending** 247:22

**ends** 56:7 85:15 156:19 243:11

**English** 17:19 174:18 270:2, 14

**enrolled** 215:25 216:12

**enter** 18:4 47:5

**entered** 60:10 276:22 277:3

**entire** 193:23

**entitled** 218:11 261:5

**entity** 16:24 59:2

**epidemiological** 104:3

**epidemiologist** 108:11

**epidemiology** 52:19 214:12

**episode** 23:3,5

**epithelial** 72:17

**equating** 220:9

**equivalent** 92:17

**error** 240:9,12

**especially** 60:12 87:17

**essential** 97:10

**essentially** 12:10

**establish** 13:3, 10 168:15 169:9 193:8,14 199:15 222:11 272:8 281:25

**established** 90:4 98:18 99:1,4,10,11, 12,16 100:16, 22 121:9 174:8 204:16 205:7 207:21,25 275:7

**establishing** 199:9

**estimate** 59:15 60:25 209:19, 21 274:15 275:3,13

**estimated** 139:5 177:20 252:13 253:25

**estimates** 106:5 183:18 208:3 269:7

**estimating** 191:24

**estrogen** 163:4 207:23

**estrogens** 71:9

**et al** 56:24,25

**etc** 153:5 240:4

**ethics** 140:20 268:9

**etiology** 37:20 68:12 69:1,4 96:13,25 97:2 177:10

**Etminan** 56:25 57:3 63:3 86:7 87:4 106:16,17 118:24 195:15, 18 196:25 197:8,14,19 203:4 258:16, 17 259:5,11,25 273:13,14,22 279:20

**Etminan's** 7:23 259:1

**Europe** 171:25

**European** 171:24 188:4, 8,12,16,21 225:4

**evaluate** 28:23 46:18 165:16

**evaluated** 15:24 124:15 170:4

**evaluating** 173:4 253:22

**Evaluation** 7:16 185:16 186:9 193:20

**evaluators** 46:20

**even** 39:17 63:24 70:2 104:11 125:25 139:25 153:11 154:24 189:12 190:1,21 191:11,12 216:16 219:13 224:7 225:2 238:14 251:11 254:2,5,10 264:15 270:14 272:19 278:3 284:1

**evening** 228:5

**event** 13:6,15 15:7 17:5,25 28:9,14 38:21, 24 44:18 48:4 50:14 89:24 91:2 97:5 101:4,5,12 102:13 104:6,7 114:13 117:7 125:10 135:18 138:23 145:10 152:6 163:12, 15,18 164:17 165:5,16 166:20 167:2, 24 168:3,5 169:8,12,16,23 170:8 181:20 189:15,25 190:16,19 191:1,19 192:25 193:2, 3,7,12 201:15 202:13 224:6 229:12 239:11 243:22 250:7 251:9 267:23 268:2,12 275:25 282:17

**events** 11:19, 22 12:3 14:21 15:8,16,18 16:1 17:15 19:22 30:3,16 32:1 39:6 40:20 46:21 48:4 84:3 89:25 104:14, 16,19 113:24 114:7 116:20 125:10 144:10 164:3 168:24 177:23 190:17, 25 191:2 193:4 199:11 206:17, 18,22 207:5, 19,24 234:9

**ever** 10:25 11:9 14:3 18:8 20:2 23:18 26:13 37:23 39:11 42:9 54:22 55:1 93:3 96:16 119:5 125:6,7 131:21 134:1,18 165:3 170:7 192:17 194:2 216:7 226:23 235:19, 21 236:17,19 237:4 239:22 266:7 276:3 280:5

**every** 17:13 32:16 42:23 44:16 45:16 50:9 54:13,18, 21,25 79:10 88:5 90:12,14, 23,24 91:6 95:12 118:11, 15 131:6,16 133:1 134:22 181:24 199:25 213:12 254:3,4 284:4

**everybody** 128:5

**everyone** 129:14 154:22

**everything** 49:23 112:24 147:15 230:18

261:17

**evidence** 11:9 12:20 61:5 63:23 67:1 96:16 117:16 122:14 137:20 156:15 166:21, 24 168:2 172:12,24 173:6 179:22 181:13 203:8 207:4 220:22 222:5,8 223:14 224:4 255:10 256:5 257:2,6, 20 260:13 261:11 262:2 264:8 265:10, 23 280:7

**exact** 14:17 40:25 55:9 142:25 143:12, 19 144:20 145:25 146:5, 17,23 147:16 262:21

**exactly** 55:24 115:23 135:23 137:5 146:21 153:1 162:20 170:16 173:14 224:4 253:4 257:19 258:10 261:23 264:3 269:13 270:2, 6,8 279:11 283:8

**exam** 46:11

**examination** 5:7,8 10:12 44:8 83:2,14 128:8 231:25 236:12 238:11

**examinations** 229:20,24 231:23 232:23, 24 233:2,22 235:15 236:10 237:19 239:2

**example** 15:15 29:6 30:13 31:11 41:1 42:21 43:23 44:7 46:10,23 49:6 50:18 69:6 80:2 102:19 109:21 111:4 112:15 114:17 129:19 132:2 133:16 135:15 145:1 147:8 162:23 163:3 180:18 205:3,8 207:22 214:22 245:12 249:16

**examples** 112:14

**excellent** 238:5,8

**except** 41:10 225:5

**excerpt** 7:4,7 56:16 175:7, 10,25 232:8

**excess** 121:10 206:2 219:24 252:21

**excessive** 163:5

**exchange** 143:5,8 149:23 157:9 257:16

**exclude** 35:5, 14 36:23 37:21 79:5 80:4 219:2

**excluded** 17:24 80:7

**excluding** 35:12 219:11

**exclusion** 56:10 79:21

**exclusive** 97:23

**exclusively** 71:2 119:22,23 121:6 205:17

**excuse** 64:2 94:9 270:12

**executive** 56:15 57:11,15 217:20 218:1 239:19

**exercise** 45:21

**exert** 73:11,13 74:21 76:2 186:2,3

**exerting** 73:22

**exerts** 72:2

**exhibit** 6:4,6, 10,12,16,19, 23,24 7:1,4,7, 9,12,15,19,22 8:1,4,7,11,14, 18,20,23 9:2 10:14 33:20 51:24 52:2,8,9 76:20,21 94:20 95:23 96:12 127:19,21 139:8,9 140:24,25 147:24,25 148:1 153:5 154:8,9,10 155:7,8,9,11, 15 157:13 167:17,18 171:22 175:4, 5,6 178:12,13, 14 179:9,10 182:10 183:10 185:13,14,15 187:3 188:10, 11,12 192:6 193:17,19 195:24 196:1 198:21 201:8 203:18,21 209:6 210:7,8 212:14 222:19 225:8,9 231:15,17 239:15,16 243:6,8,9 247:16,17 254:13 258:1 260:11 262:18 265:5 267:17, 18,21 268:24 273:15 279:3, 4,24 280:18, 24,25 282:9,19 283:16

**exhibits** 6:2 265:1 278:20 282:10

**exist** 67:11

**existence** 168:15 172:13

**existing** 224:17

**exists** 264:8

**expect** 82:11 120:17 122:22 134:15 167:15 250:8,11 266:14

**expected** 162:16 249:8 250:23 251:3, 21,23 252:2,7, 10,15 253:13 274:9

**expedited** 265:15 266:17

**expeditely** 15:18 267:1

**expediting** 266:9

**experience** 115:25 142:15 177:18 220:11

**experienced** 122:10 230:3

**experiencing** 164:1

**expert** 69:11 74:25 80:19 148:22,23 197:21 198:3 258:19 259:2 260:4,7,22 262:9,23 263:5,12 264:13,20 276:15 280:8

**expertise** 74:23 131:14

**experts** 52:19 68:7,13,18 69:1,6,15 70:22 80:11 81:4 214:8,11, 12,16

**expired** 153:6

**explain** 70:25 132:25 170:15, 16 180:25

**explained** 37:2 55:3 79:16 106:2 119:19 146:3 246:13

**explanation** 70:11 205:12 231:25 236:12

**explanations** 147:21 205:10 233:5

**explicitly** 85:5

**exploratory** 199:4

**explored** 240:4

**exposure** 84:5 139:5 144:2,5 145:3,8,11 146:8 167:12, 14 183:19 191:25 204:19 223:25 253:25 269:8 272:18

**expressed** 172:17 227:11

**expression** 102:3

**extended** 149:2

**extensive** 20:9 126:10

**extent** 19:14 29:23 245:8

**external** 85:13 162:4 214:15

**extra** 153:7 160:8

**extract** 278:9

**extracted** 40:21 41:8 43:1 44:11 45:2 278:10

**extraction** 40:6

**eyes** 41:16

**F**

**F-A-E-R-S** 57:5

**F-I-S-A-Y-O** 218:9

**fabulous** 277:25

**faced** 96:22

**fact** 24:13,19 37:17 45:25 63:5 65:11 72:25 86:3 87:6 88:4 90:6 91:13,21 102:24 103:13 112:12 115:14 116:15 119:20 121:14 159:6 171:11 172:21 200:8 206:15 207:25 208:20 209:21 221:6, 17 230:1 241:10 254:7 256:7 262:9,20 263:10 264:12 272:6 276:16

**factor** 23:23 24:3,7 65:16 71:4 89:1 97:6 113:8 119:15 135:20 180:24 204:4

**factors** 13:9,13 15:15 23:14 25:16 87:10,12 89:5 97:8,15, 16 100:18 102:12,13 116:19 121:11, 17 180:19 204:16 205:7 210:4 275:5,9

**facts** 25:11

**FAERS** 57:5 88:22 90:5 119:1 168:6

**fair** 235:23 236:1 275:17

**fairly** 128:13 141:17 206:24

**fall** 41:8 132:17

**falls** 95:16 104:2 112:19

**false** 86:15 109:20 111:17, 21 171:9,20 212:6

**false'** 174:7

**familiar** 210:12, 15,25 243:16

**far** 19:25 246:22

**FDA** 7:4 115:21 167:20 169:25 170:7 182:9, 14,25 183:4, 10,15 184:9,17 185:17 186:10 187:3 192:3,6, 8,9,17 193:7, 12,25 194:3,17 209:1 211:22 212:1,3 226:23 227:2,8 260:15 268:23 269:4 270:22 271:11, 12,15 272:7,11 273:7

**FDA's** 168:5,20 169:5 187:6 198:20 199:2

**feasible** 14:2, 12 101:7

**February** 157:25 182:18

**feel** 55:10 64:16 104:22 129:13 130:15

**felt** 237:2

**female** 57:7 70:11 71:3 100:17 106:20 194:21 195:7

**fertile** 63:6,8 71:4 86:5,6,10 106:20 116:3 119:4,5,24 167:8,16 194:25 250:9 252:9 253:8 256:8

**few** 130:14 166:7 206:25 256:19

**field** 68:7,11 69:6,15 70:22 74:23 80:11,20 214:16 257:3 263:5

**fields** 214:11

**figure** 59:16 271:12

**file** 95:11 126:1

**filed** 87:19 88:6 191:9,18 200:8,11 201:5 218:17,24 276:14 277:1

**files** 230:14 276:19 277:12, 18

**filing** 91:9,14 191:14 276:24

**final** 49:22 65:1 282:24 283:5

**finally** 205:22 208:11 283:21

**find** 13:2 19:5 36:11 65:14 69:10 86:11 97:21 106:6 113:24 152:25 179:21 183:10 193:18 201:16 209:6 211:10, 15 218:17 220:22 245:23 260:13

**finding** 110:8 111:3,4

**findings** 83:2, 14 171:16 203:11 205:23 232:1 233:6 236:12

**finds** 237:18

**fine** 26:12 128:3 154:14 160:3 235:1 243:17

**finished** 67:21 125:23

**finishing** 105:1

**Finland** 164:21

**Finnish** 252:3

**first** 10:25 14:22 27:16 30:23 32:24 34:14 35:7 58:12 59:10 62:11 63:13 65:9 70:4 78:2 85:10 89:19 92:10 93:2,7 96:20,21 111:7 115:20 122:9 124:10 136:12 139:16 141:2 150:11 152:11 156:6 161:14 164:18,20,22 165:10 174:13, 15 191:4 192:6 196:6 199:7 202:22 212:9 215:3 222:9 228:5 229:16, 21 242:17,18 243:12,15 244:10,12 248:2,7

**firstly** 159:11

**Fisayo** 218:9

**fit** 73:24

**five** 59:25 153:25 154:10 155:4 172:3 229:16,18 239:5

**flag** 91:5,9 101:22 102:23 114:16 169:21

**flagged** 95:12

**flagging** 111:8

**flags** 102:2,8 198:15 200:16

**flights** 128:5

**flow** 49:4

**fluid** 65:18 73:1

**fluids** 71:8

**focus** 71:10 190:19 217:10

**folder** 75:19

**follow** 266:8

**follow-up** 21:14 33:2 44:22 50:11,16 51:4 126:22 230:8, 10 231:9 238:21 265:14 266:9,16,24,25 267:10 273:15 278:20

**followed** 22:10 27:7 49:19 229:23 231:7 238:4 265:12 266:15

**following** 6:2 26:5 34:16 57:21 140:13 157:18 168:13 174:6 195:22 236:13 237:22 256:16 261:2 266:2 269:15 273:14

**follows** 10:11 111:14

**footnote** 183:22,25 184:3 217:22 269:15,16 270:25 271:1

**footnotes** 217:25

**forget** 265:19

**form** 12:11 13:12 14:3 22:1 24:23 25:21,22 26:1, 8,16 27:2 28:4, 21 32:12 35:19 36:13 39:4,24 40:12 41:17 43:19 45:9,17 47:6 48:10 49:13 50:25 53:15,21 54:3, 17 55:13 58:8 61:10,18 62:5 67:15 68:15,20 69:2,12 70:18 72:9 74:15 77:9 78:13 79:13 80:15 81:6,13 82:13 84:17 85:21 86:23 89:15 92:4 93:5,25 94:13 97:13,22 98:6 99:8 101:2 104:1 106:11 108:7, 10 109:14 114:1 115:12 117:2,17 121:21 124:13 125:1 129:1 130:3 132:22 133:8 135:5 136:5,11 137:2,10 138:18 145:19 146:2,18 147:13,18 150:4,19 151:11,22 152:24 155:19 156:23 159:9, 17 189:18 190:2 193:9 197:23 217:14 226:12 229:3 230:11 231:11 233:19 234:5, 11 235:25 236:22 237:6, 15 238:7,17 242:21 244:8 245:7 246:11 248:17 249:14 251:1,25 253:2,16 255:20 257:9 259:3,13,17 260:5,23 261:15 262:11 263:2,14,17 264:17 265:21 266:3,19 267:14 269:11 270:3 271:8,19 272:1,10 273:17 274:1 278:6

**formal** 83:21 84:5,14,20,23 174:13,15 215:3 242:7

**formally** 271:9

**format** 175:21

**former** 141:19

**forms** 205:18

**formulations** 252:5

**forth** 72:11

**forward** 132:16

**forwarded** 132:11,12 133:15 138:3

**found** 18:11 72:17 97:12 142:25 173:24 179:19 200:19 208:13 209:15 210:14 211:5 231:22 255:16

**foundation** 149:6,18 151:11,22 155:13,18 156:1,23 243:13 244:9 253:16 259:3, 14,18 260:5,23 263:2,18 267:14 278:6

**four** 173:18

**fourth** 247:21, 24

**fraction** 254:5

**frame** 245:3

**framework** 67:6 102:19

**Frank** 255:14

**free** 130:15

**Freidman** 8:24 68:23,24 80:19 198:2 255:12 257:5,6,10,22 258:3,4,13,18, 22 260:2,6,12,

17,20 261:3,5, 19 262:6,12,15 263:4,21 264:10,22 278:23 279:6 280:8

**frequency** 14:9 95:7 219:4,11, 14,16 250:14

**frequently** 80:21 261:1

**Friedman** 31:3 69:6 80:9

**Friedman's** 255:16 262:8

**front** 154:5,7 222:19 226:3 228:24 282:24

**FTP** 126:4

**full** 25:17 64:11 85:10 93:7 118:15,16 125:8 184:21, 24 217:5 277:7 278:11

**function** 17:17 132:11 148:13 244:14 246:21

**functional** 142:9 151:1,3

**functions** 214:13

**funny** 197:19

**further** 25:2 36:22 37:2,15, 20 41:10 45:23 59:21 87:18 100:19 102:9 104:23 105:14 110:11 111:11, 23 112:3,4 114:21 115:17 157:8 169:22 171:5 172:15, 22 173:4 174:6 198:16 200:22 208:14 236:3 260:9 266:10 274:10 275:22 276:18 278:18 282:2 284:7

**future** 116:25 117:14,18,20 181:19 265:12, 13,24 266:14

**G**

**GA** 4:6,14

**gain** 121:15 204:18 205:8 206:2

**gathered** 152:10 249:3

**gave** 18:24 146:21 153:7 228:6,8,12,16 247:22

**gender** 57:7 71:3 100:17 125:16

**general** 13:7 29:9 40:3 42:24 62:19 70:9 84:1 85:1 139:20 213:12 240:22,23 274:11 276:1,4

**generally** 11:14 12:22 13:16 19:10 161:24 219:23 268:1,2

**generating** 198:7,11,17 199:4

**generation** 101:18

**German** 67:9, 12 92:16 150:21 152:14 212:17,23 213:14

**get all** 29:2 44:24 237:23

**gets** 235:8

**getting** 206:12 213:8 216:7 224:14 238:14 260:3 270:12

**give** 26:9 49:6 66:1,19 80:16 89:8 137:7 139:6 144:20 145:17,25 152:20 153:14 159:24 184:21 231:15 238:3 245:12 250:15 272:22

**given** 45:25 84:21 101:3 108:24 109:2 112:5 113:19 116:22 144:25 147:20 168:21 203:10 241:7 254:7 255:8

**gives** 65:3 86:21 102:22 112:14 272:22

**giving** 70:15 86:22 141:11 145:9 239:1 264:14

**Glennon** 283:16

**global** 17:17 52:23 61:23 129:12 131:20 132:11,12 138:4 141:20 150:18 161:19, 22 169:10 178:4,20,25 182:25 183:4,5 184:5,7,12,24 230:16 247:9 269:14,18,22 270:7,18 271:5,10 272:23 273:3

**globally** 128:20 183:4 184:14, 15 270:17 283:10

**goes** 15:4 29:10 30:2 31:19 32:7 34:22 51:3 138:22 143:8 146:25 168:20 189:1 204:11 205:19 232:19 235:7 255:13

**going** 14:21 15:2 26:3 49:3 51:15,20 70:3 71:10 85:21 93:1 94:23 96:3,8 108:4 109:8 117:15 125:21 126:20 127:13 134:6, 12 153:13 154:4 160:17, 22 167:17 185:13 193:5 209:24 210:6 227:21 228:1 237:13 243:15 247:20 254:18 276:8 277:23, 25 279:3 284:12

**good** 7:20 10:3,13 19:24 96:10 109:3 128:9 141:17 144:23 146:5, 22 161:7,8 165:24 171:23 181:2 188:13 198:21 200:10 228:5 264:18 268:25

**gospel** 237:12

**got** 18:12 20:5 25:4 51:2 153:11 202:8 232:10,23 235:21 259:15

**Government** 207:12 211:1

**grab** 160:13

**grabbed** 42:3

**gradual** 276:23

**great** 75:11 203:13

**greatest** 250:10

**Green** 255:1, 10,17 260:13

**grounds** 264:13

**group** 58:5 88:6 106:6 108:13 132:12, 15 133:15 194:22,23 195:1,2,3,4,9 196:16 277:16

**grouping** 194:23

**groups** 125:12 194:13

**growth** 163:6

**GSL** 133:16

**guess** 136:12 142:23 146:4 246:24 264:18

**guidance** 85:1 112:13 174:2 183:9 187:2 188:16 193:12 198:20 199:2,7 268:23 271:4

**guideline** 171:23

**guidelines** 7:19 11:21 15:14 18:7 69:17 102:4 110:24 111:12 114:5 116:17 118:6 124:17 174:17 188:4,8,13,21 212:4 242:8 268:11

**guys** 153:12

H

**habits** 207:6

**hadn't** 58:23 64:7 149:22

**halfway** 218:4

**hand** 58:12 81:23 116:5 130:8 145:12 167:17 175:4 178:11 179:8 185:13 188:10 195:24 210:6 238:3 268:16, 18 273:1

**handed** 139:10 141:1 148:1

**handled** 87:21

**handling** 110:20

**Hang** 90:18

**happen** 96:20 201:4

**happened** 18:25 96:21 149:22 165:25

**happening** 18:8 20:3 280:5

**happens** 91:17

**happy** 58:2

**harmful** 140:17

**hasn't** 30:22 223:15 272:7

**haven't** 38:4 40:8 68:21 142:3 212:2 225:17 227:1 281:3

**having** 10:10 21:4 25:9 46:6 58:20 71:6 76:16 80:1 86:5,25 134:18 186:22

**head** 66:15 194:24

**headache** 21:8 42:7,9,14,18, 22,23,24 43:17,20,25 44:1,4 45:23 46:5,24 47:22 49:9 50:19 230:3 281:21

**headaches** 46:6 229:19

**header** 104:2 139:15

**headers** 37:3

**health** 7:10,13 9:3 15:25 93:11 124:16, 20 137:19 140:13 152:14 162:4 165:19 170:5 174:19 178:9,15 179:3,5,12 181:16 182:8 207:15 210:18, 20,21 211:2 223:20 241:19, 20,25 242:11, 12 243:2 280:21 281:2 282:7

**healthcare** 27:5,8,10,11, 24 29:12 129:19 132:15 168:23

**hear** 182:15 259:18

**heard** 107:13 130:13,16 244:13 280:5

**hears** 181:24

**heart** 33:13

**heavy** 119:11 162:25 163:1 167:9

**held** 153:13 241:17

**help** 33:17 52:6,18 71:7 102:6 141:7 149:4 214:16

**helped** 52:20

**helpful** 75:19 95:23 146:11, 14,24 147:7,8

**helping** 52:24

**HENDRICK** 4:3

**here** 18:18 26:3,11 28:5 33:20 34:14 35:15 37:3 38:14 55:9,18, 21 57:10 67:19 70:10 73:16 79:16 80:22,25 82:14 83:15,21 84:1 87:25 88:21 90:8,10 94:20 99:22 109:21 110:3, 25 114:16 120:13 121:17 122:8 123:18 125:18,25 127:5 135:24 139:15 147:20 153:3,11,21 154:8 155:4,6 156:7 157:10 159:19 174:2 176:2 177:7,24 179:14 194:23 196:8 205:7,24 212:22 216:20 218:2 231:8,14 233:16 235:6, 12,19 237:2 238:10 245:1 246:5,19,24 250:5,21 252:7 253:18 254:9, 10 255:22 256:25 257:24 259:8 260:24 261:3 263:9 267:21 269:15 272:14 273:19, 23 274:4 275:15 278:1 283:5

**high** 14:18,19 46:4 91:1

**higher** 88:6 102:20 167:10 206:11 254:11 274:9

**highest** 41:22 119:9

**highlight** 122:3

**highly** 162:23

**hired** 153:12

**historical** 221:12

**histories** 77:23

**history** 157:20 158:8,17,23 216:11

**hmm** 47:17

**hobbled** 126:13

**Hofmann** 74:25 75:2 77:16

**hold** 227:15

**holder** 16:14

**holding** 241:11 248:23

**holds** 240:16

**hope** 33:12 126:15

**hormonal** 8:8 70:16 75:21 224:21,24 225:11

**hormone** 52:22 72:15 75:22

**hormones** 70:5 72:8,12 73:18 100:2,11,20 244:1,7

**hospital** 49:17 60:5 62:9 232:20 233:9,10,17,23 235:8,10,20 236:20,25 237:4,10

**hospital's** 237:3

**hospitalization** 15:15 216:1

**hospitalized** 51:2 216:14 229:19

**hours** 160:11 284:13

**how** 17:4,7 19:4,21 34:13 35:7 36:10 37:8 38:8,9 44:19 46:18,19 50:11 57:23 59:7 61:16,21 62:3,16 69:23,24 70:10,24 72:7,12 73:18 76:13 90:10 93:20 94:7 98:24 100:24 112:14 117:13 125:10 128:19 135:18,19,22 139:3 143:22 144:3 145:3 148:18 151:8 161:13 164:18 168:1 176:1,22 177:12,13 190:23 191:3,21 192:10,14 197:6 200:11 208:3 219:18 220:6,14 234:7 246:22,23 252:25 258:16 260:12 262:7,10,16,17 263:10,13 264:9 268:7 276:13

**however** 30:5 72:2 78:23 140:6 265:11 278:16 281:18

**huge** 14:12 119:7

**Humans** 139:17

**hundreds** 14:15 54:10

**hydrocephalus** 66:2

**hypertension** 12:1,16 13:19,24 14:7,10,14 16:23 18:9,10 20:3,7,14 21:4,9,25 22:16 25:6 27:18,19,25 28:3,6,24 30:8,9,20,23 31:10,14,17 32:6,8 34:18 35:17,18 37:12,18 39:8,17 40:2,17,18,24,25 41:19,25 42:11,13,17,20 44:6,14 45:1,12,13,25 46:1,10 47:23 48:23 49:12 50:14 54:12 58:15 64:19 65:23 66:3,20 67:3,5 68:1,6,12 69:7 71:1 73:19 78:18 79:20,22,24 80:1,5 81:25 87:9 92:2,6 97:1 103:22 106:1 110:16 115:19 118:10,18 120:18,24 121:5,7 122:24 123:1,4 135:11,14 136:8,19,22 137:23 138:5,16 142:18,21,24 143:18 144:21 152:4 156:9,17 159:13 164:4,8 177:9 179:18 194:18,20 200:10 215:18,20,24 218:13 225:7 229:10,22 230:4 231:20 232:12,14 233:1 235:13 240:16 248:1 249:7 255:25 261:6 266:22 281:11

**hypotheses** 65:1,2 66:20 67:5 68:4,6,12 70:20,24 71:5,6 73:23 100:7

**hypothesis** 64:22 65:10 66:4,6 72:7,10,14,23 73:9,18,25 96:24 98:15,24 99:25 100:19,21 101:17 198:7,10,17 199:4 214:24

**hypothetical** 25:15 47:7 49:6,7 103:5 105:5 117:19 133:9,11,18 137:3 138:15 145:20 149:21 150:10 151:13 153:1

**Hypothetically** 117:20

**I**

**I'LL** 128:13

**I'M** 125:22 137:11

**I'VE** 62:9 146:3 210:14,15

**i.e.** 203:10

**ICSR** 35:23 82:9

**ICSRS** 275:19

**ideally** 277:5

**identifiable** 12:13 18:1

**identification** 52:9 76:21 139:9 140:25 147:25 154:9 155:7 167:18 175:5 178:13 179:10 185:14 188:11 196:1 203:21 210:8 225:9 231:17 239:16 243:8 247:17 279:4 280:25

**identified** 16:18 20:6,23 32:21 33:8 37:10 47:16 65:21 81:22 82:2 83:18 97:3 114:19 185:7 191:7 200:24 201:20 203:7 215:22 241:11

**identify** 12:17 17:22 18:3 26:22 33:5

45:11 54:19 68:3 75:5 95:18 99:13 100:7 277:24

**idiopathic** 12:1, 16 13:23 14:9 20:7,13 21:4,8 25:6 28:6,24 30:7,9,19,22 31:10,14,17 32:5,7 34:17 37:11,17 39:7, 16 40:1,16,18, 23,25 41:18,25 42:16,20 44:6, 14 45:1,11,12, 24 46:1,9 47:23 48:23 50:13 58:15 64:19 65:23 66:2,20 67:2,5 68:1,5,11 69:7 71:1 73:19 78:17 79:20, 24,25 80:5 81:24 87:8 92:5 96:25 98:7 103:21 106:1 110:15 115:18 118:9, 18 120:18 121:5,7 122:23,25 135:11,14 136:7,18,21 137:22 138:5, 16 152:4 156:8 159:12 164:4 194:19 200:9 215:17,19,24 218:12 225:6 230:4 232:14, 25 255:25 261:5 266:22

**ignore** 189:25

**IIH** 6:8 10:23 11:2,13 12:7 29:22 30:25 31:2,18,20,25 32:11,15,17,23 35:1,5,10 36:1, 12,21,24 37:21,25 38:17,19,20 39:3,14,23 40:11 41:14 42:5 43:4,11, 18 44:10 45:6, 7,19 46:16 47:5,11 48:15 53:8,14,20 54:2,22 55:21 56:9 57:20,24 59:4 62:22 63:14,22,25 64:23 65:11,14 66:9 68:14,18 69:1,11,15 70:5,9,12,17 72:7,13 73:8 78:9,12,20,23 79:2,5,10 80:14,20 81:2, 4,11,16 82:3 85:19 86:7 89:7 90:14 92:9,10 93:7, 23 94:5 95:10, 12,16 96:13,17 98:5,7,12,18, 24,25 99:11, 14,23 100:9, 12,18,20,22 101:1,4,7,13 103:4,25 105:8,19 106:9,15,23 108:6,20 109:1,4,13,23 112:8 113:13, 18,20,22,25 115:4 116:3,24 119:6,10 120:2 121:5,20 123:7,16 124:5,24 156:9,13 164:4,10,13 165:1,8,10 166:8,12 167:3,5,11,15, 24 169:24 170:9 173:20 174:11,14,21 175:2,11 176:23 177:23 179:24 180:14 181:25 184:8, 14,22,25 185:2,5,9 186:5,16 189:17 190:1, 10,12,17,18 191:13,18 192:11,18 195:3 197:16, 21 199:20 200:18 201:5, 17 203:9 206:12 211:8, 11,15 213:18 214:16,19,24 215:2,10,13 216:4,7,12,18, 25 217:6,21 218:5,15 219:4,22 220:14,17,20, 23 221:3,7,11, 16 224:22 225:15,18,21 226:25 227:8 229:1 231:5 232:20 233:18, 20 234:3,10,22 235:8,9,11,23 236:18 237:3 238:15 241:10, 12 242:20 243:4 244:25 245:1 247:4,5 248:8,11,15 250:9,11,24 251:23 254:4, 9,24 255:12,19 256:13,18 257:7,13,19 260:14 261:1, 7,9,13 263:5 265:24 266:6, 23 267:12 268:20 269:19 270:17 271:14 274:7,20,23 283:23 284:1

**imagine** 144:17

**immediately** 212:3,7

**impact** 91:16 207:9

**impacted** 207:5

**impacts** 91:15

**impaired** 43:25 46:5

**impairment** 39:13,22,25 40:2,10 41:15, 20 43:6,14

**Imperica** 88:18 89:9,10 90:12, 25 126:11 127:6

**implant** 156:16 223:1 254:25

**imply** 223:5 258:11 264:4 279:12

**importance** 85:23 140:8

**important** 15:16 22:21 30:5 97:25 128:23 129:11, 13,16 130:1,6 168:12 169:13 180:21 205:24

**improve** 23:4

**improved** 21:12,13 22:16 26:19 180:25

**improvement** 22:9

**in-vitro** 74:8

**inability** 199:14

**inadequate** 56:10

**inappropriately** 154:22

**incidence** 16:22 142:21 219:21 248:11, 15 249:13,21 250:3,18,23 251:5,21,23 252:2,7,11,13, 15 253:13,19, 21

**incidences** 13:7

**incidents** 249:8

**include** 30:21 39:6,25 42:25 45:18 47:18, 20,22,24

54:13,14,18, 21,25 60:14 79:17 82:16,21 104:18 123:24 126:23 136:24 156:5 191:8 203:1 219:13, 15 224:3 227:7 241:1 257:14 276:19 284:2

**included** 21:1 29:14 31:16 33:7 35:3 36:22 37:1,16, 22 38:4 56:5 57:10 75:14 79:23 83:15,19 88:20,23 89:10 104:11 124:17 129:8 157:3 177:24 182:12 186:8 190:7 191:16 192:4 193:24 208:16 209:9 211:23 212:8,22 217:2 218:23 221:15 222:15 256:11 268:15,16,20 276:22

**includes** 30:8 33:12 55:1 75:24,25 76:4 77:3 82:22 117:6 124:18 125:6 152:5 165:7 191:10, 11,17 214:12 225:6 234:8,10 248:8 261:7,8 277:16

**including** 14:21 15:14 43:12 53:6 117:16 123:20 142:8 178:20 198:23 206:1 207:23 217:1 218:16 266:9 282:20

**inclusive** 35:2

**incomplete** 187:18

**inconsistent** 228:7

**incorrect** 107:24

**increase** 34:19 72:25 87:16 88:25 91:3,4 115:15 116:7,8 118:14 121:10 185:8 189:14 195:11 207:23 247:4

**increased** 21:11 34:19,23 35:8 36:3,5 37:14 38:22 39:9,18 40:20 42:11 45:7,8, 14 47:11 48:14 57:8,19,24 59:10 61:2,3,5, 7,8 62:24 63:8, 21,24 64:18,22 65:10,15 72:19 78:7,23 79:5, 17 80:2 85:16, 20 86:2,22,25 88:11,13,25 91:23 93:10, 13,17 94:4 102:22 103:21 105:19 106:6, 9,14,19 108:1, 6 111:2,8 114:15,16 116:4,14,23 119:13,17 121:10 122:17 125:13,19 135:13 142:21 143:9 156:13 186:15,23 189:22,23 195:4,10 197:11 200:20 203:8 204:13 205:13 211:15 222:6 225:21 242:13 249:6 253:9 254:8 256:8,10

**increases** 91:4 116:12 207:18 219:24 253:21

**increasing** 86:11 90:7

**indeed** 66:5

**indented** 269:2

**independent** 204:4

**index** 121:4,8

**indicate** 45:24 63:13 64:17 105:25 108:1 156:12 179:23 203:11 204:1 249:18

**indicated** 10:6 51:16,21 59:4 96:4,9 109:9 134:7,13 160:18,23 227:22 228:2 284:13

**indicates** 44:25 61:3 96:25

**indication** 46:9 93:10,17 94:4

**indications** 40:10

**indicative** 40:16,17 42:19 46:8 48:15,16 190:18

**indicator** 97:18, 19 272:13

**indirectly** 131:21 132:21 133:19

**individual** 23:15 34:10 35:23 82:20 84:15 126:20, 25 163:12,16, 17 167:2

**individuals** 68:1 143:18 144:21

**influence** 73:19 87:12,22 88:8 100:20 102:13 116:20 275:5

**influenced** 63:5 86:3 87:5,12 88:3 102:12 115:24 116:1 119:15 249:23 264:10

**influences** 88:10 89:2 90:10

**influencing** 89:6 135:20 275:5

**info** 243:24

**inform** 138:10

**information** 17:7 18:13 19:5 20:5 22:20 25:18 27:15 30:3,4 31:25 33:3 37:15,20 38:18 40:5 41:7 42:19,25 44:19,21,24 45:5 46:8,15 49:11,21,24 50:2,4,12,22 52:21 53:18,25 61:13 78:5 91:12 104:15 117:25 118:8, 12,13 120:9,14 121:13,23 122:9,12 129:8,17 131:7,15 132:3,9 135:23 136:1 138:21, 25 145:1,12 146:6,11 149:13 150:1, 2,9 151:15,16, 19,20,25 152:3,5,7,8,9, 16,21,22 153:2 155:15,24 156:21 169:2, 13 182:3 184:21 200:24 201:16 211:2 226:24 229:20 230:8,13 231:1,8,22 232:17,22 236:5,6,9,21, 24 237:18,21,

24,25 238:3, 22,23 239:1 256:9 265:13, 15 266:9,15, 17,24,25 269:25 270:21 272:23 275:22 276:2,5,6,10, 17,19,22,25 277:2,3,17 278:1,3,9,12 281:25 282:20 284:3

**informations** 214:5

**informed** 130:10

**ingredient** 213:20

**inherently** 199:3

**initial** 175:11 196:8 276:17, 24

**initially** 32:11 267:8

**initiated** 22:7 24:15 189:21

**inquire** 133:4 135:2

**inquiries** 130:24 131:22, 23,25 132:2,21 134:21 137:9, 16,25 138:22 162:3

**inquiring** 136:14,15 138:10 145:1 152:22 236:2

**inquiry** 133:7, 19 134:19 137:12 138:15 158:3,15

**insert** 157:19

**inserted** 60:2,3, 7 145:4 177:14 220:6,10 283:18

**insertion** 122:11 158:10

**insertions** 177:20 191:21, 24 220:14

**inspection** 215:15

**instance** 17:5 18:10 131:2 133:1,2 134:24 138:7 216:8

**instances** 130:18 132:24 134:17 143:23

**instead** 12:9 28:17 67:9 183:1 224:11, 12

**instruct** 26:3 143:16

**instructed** 46:20

**insufficient** 105:13 181:13 265:10 281:25

**intake** 244:24

**intend** 211:21

**intensities** 74:20

**interest** 264:22 280:13

**interested** 266:1

**internal** 146:25

**interpret** 116:17 147:5 197:7

**interpreted** 203:13 261:11 262:17

**Interpreter** 5:4 10:8 92:14,21 150:22

**interpreting** 85:24 135:21 205:23

**interrupt** 49:4 94:23

**interruption** 67:20 109:5

**interval** 186:16

**intervals** 94:16 175:18

**intervene** 92:14

**intervention** 15:17

**interventional** 18:21 20:8

**interviews** 58:19 59:13

**into** 11:22 12:19 13:23 14:21 15:5,21 16:23 17:7 18:13 19:6 20:5,15,17 22:21,22 25:4, 5 28:25 29:3, 10 30:15,21 31:7 32:7 36:18 40:1 41:8 47:5 55:11 60:1,3, 11 66:16 69:20 70:23 84:22 87:17 90:24 101:18 109:16 115:18 116:19 117:13 120:3 123:25 125:19 127:5 131:15 135:25 144:4 145:2,7 146:9 158:5 160:6 162:15 163:19 172:19 173:5 184:1 193:5 198:16 200:15 201:2 202:10, 12 205:6 213:23 214:4 215:7 221:24, 25 247:1,3 248:5 253:24 254:22 257:23 261:18 272:24 274:19 275:4 276:23 277:3, 15,18 278:10

**intracranial** 12:1,16 13:19, 24 14:6,10,14 16:23 18:9,10 20:3,7,14 21:4, 9,11,24 22:16 25:6 27:18,19, 25 28:2,6,24 30:8,9,13,19, 22 31:10,12, 14,17 32:6,8 34:17,18,24 35:8,16,17 36:3,11 37:12, 14,18 38:22,23 39:8,16,18 40:2,16,18,19, 24,25 41:18,25 42:10,13,16,20 44:6,14 45:1,7, 12,13,25 46:1, 10 47:11,23 48:14,23 49:12 50:14 54:12 58:15 64:19 65:23 66:3,20 67:2,5 68:1,6, 11 69:7 71:1 73:19 78:18,24 79:17,18,20, 22,24,25 80:2, 5 81:25 87:8 92:2,5 97:1 103:22 106:1 110:16 115:18 118:10,18 120:18,23 121:5,7 122:23,25 123:4 135:11, 14 136:8,18,21 137:23 138:5, 16 142:18,21, 24 143:9,17 144:20 152:4 156:8,16 159:12 164:4,8 177:9 179:18 194:18,20 200:10 205:13 215:18,19,24 218:12 225:7 229:9,22 230:4 231:19 232:12, 14 233:1 235:12 240:16 248:1 249:6,7

255:25 261:5 266:22 281:10

**introduced** 165:21

**investigate** 19:5 90:3 100:19 101:5, 24 102:9 103:6 104:5,14 105:10,14 110:11 111:11 114:21 169:21 170:21 171:3, 4,18 198:19 200:21 251:17

**investigated** 86:13 91:7,21, 24 118:7 244:18

**investigating** 13:16 123:6 215:5

**investigation** 33:6 64:10,12, 15,16 69:8,16, 17,24 88:20,21 92:11 93:7 94:1 101:25 105:15 111:14, 18 115:13,20 117:5 118:2,4, 5,15,16 123:19 124:10 129:7 157:2,11 171:6,7,12,15, 18 172:20 173:15 176:20 178:15 182:12 185:10 189:9, 16,22 190:6,7 191:6 192:2,4 195:14 196:9 197:11 201:1 202:7 204:1,9, 25 206:4,6 213:5,8 230:11 242:17 243:1 268:15 273:5 279:24

**investigations** 24:9 29:5 57:1, 10 64:9 69:25 109:16,18,25 115:17 126:7 152:10,12 162:2 165:22 170:12 213:16 246:25 268:19 271:14 273:6

**investigator** 149:2,9,24 229:12,13,21, 25 230:25 231:7,12 232:16,22 233:14 234:6 236:4,7,17,19 237:8,9,12,16, 23,24 238:12, 13,20 239:7,12

**investigator's** 231:20 234:2, 14,22 238:11 283:22

**investigators** 230:20

**invitation** 189:3

**involve** 16:8

**involved** 17:24, 25 24:6 25:9 34:12 52:10 72:13 131:21 132:20 133:2, 7,18 134:1,18 137:15,18 138:2 149:22 157:5,14 165:12,25 222:13 244:11 246:23 260:11 268:9

**involving** 18:9 19:1 20:4 36:10 53:8 66:10 100:4 124:6,8 197:22

**irrelevant** 262:10

**irrespective** 272:4

**isn't** 41:13 42:5 59:1 62:1 115:7 119:25 137:8,14 242:17 252:23 266:18

**isolated** 224:5

**issue** 58:5 62:16 66:14 67:9 93:3 134:8 152:23 201:17 243:4 266:13 278:23

**issues** 43:5,17, 21 127:2,4,9

**it's** 15:23 23:1 24:7 71:3 103:11 104:7 107:13 111:20 115:25 116:10 135:16 145:23 171:4 210:22 238:13 254:9

**its** 18:13 19:6 20:5 29:21 37:24 45:16 68:12 79:8 96:18 104:9 109:2 111:8 124:10 199:20

**itself** 13:15 15:11 30:10 48:2 79:4 94:6 166:20,24 214:18 231:16 250:8,13

**Ius** 12:2 21:16, 19 57:20 59:4, 8 61:14 63:14, 18,20 64:18 82:1 88:15 100:6,9 101:6 103:21 105:25 106:23 108:21, 25 109:2 116:3 149:12,25 152:5 155:17, 25 156:22 203:8,12 204:2,3,4,12, 15,19 205:15, 16 208:20,22, 23 213:19 216:8 226:7,11

**Ius'** 60:7

**Ius's** 209:2 216:5

**J**

**Jadelle** 6:12 139:11,14 159:5,11,13,20 160:7 221:6, 10,13,19,20, 22,23 222:17 223:16,24 224:7,17 225:6,15

**job** 162:13

**joined** 62:9

**Jones** 5:8 127:15,19 128:4,8,10 129:10 130:13 133:3 134:14 136:9,23 137:8,13 139:7 145:24 146:15 147:11,15,24 149:10,20 151:7,19,25 152:20 153:10, 16,18,20,24 154:2,11,14, 19,24 155:2,5, 9,14,23 156:2, 20 157:13 159:10,15,21, 25 160:3,6

**journal** 107:19 231:23 232:23 237:17,20 238:12,25 279:18

**judge** 154:5,7

**judgment** 28:19 238:1 262:19

**Juliane** 5:5 10:4,9 51:14, 20 96:2,8 109:8 134:5,12 142:6 160:17, 22 227:21 228:1 284:11, 12

**July** 212:17 283:1

**June** 279:21 280:1,2

**just** 18:16 19:13,14,17 20:20 23:1,23 25:8,20 26:12 31:24 33:10 38:16 39:17 45:4 48:18 49:3,5 52:6 59:15 60:13 65:6,21 71:17, 23 73:15 75:7 76:10,17 77:5 81:7,13,18 84:14 89:12 91:13 92:17 94:11 95:21 99:3 105:1 108:9,12 113:7 115:7 122:24 124:8 125:21 127:13 128:2 134:2 141:8 143:25 147:15 154:11,12 155:4 160:14 161:2,5 166:1, 13 171:5,11 172:9,17 178:7 183:10 186:1 190:4 201:25 202:2 211:18 212:11 217:10 223:18 235:21 237:11 241:1, 13 246:20 257:22 259:21 262:18 263:8 270:9 271:4 275:10 276:12 277:4 278:19 279:24

**justifies** 172:15,19

**Jutta** 142:9

**K**

**Kaipomaki** 157:16

**KAY** 4:3

**keep** 57:14 176:10

**KENNERLY** 5:7 10:12 12:22 13:18 14:25 16:4 18:21,24 19:9,19,21 22:13 23:7 24:2 25:8,19, 25 26:6,13,24 27:9 28:16 29:16 33:9,16, 22 34:3,6 35:22 38:15 39:1,11 41:13 42:2 43:10,16 45:4,15 47:9 48:24 49:1,5 50:7,17 51:12, 23 52:4,7 53:1, 17,23 54:9,24 55:6,18 61:6, 16,20 62:15 64:20 67:18 68:13,17,22,25 69:10 70:1 71:10,19,25 72:6 73:10 75:4 76:25 77:12 79:8 80:8,23 81:3,7, 18 83:5 84:13 85:8 86:16 88:16 89:17 91:25 92:12,25 93:22 94:7,10, 21,23 95:20,24 96:10 97:20 98:2,10,19 99:3,15 100:10,23 101:9 105:3 106:24 109:10, 21 115:2 116:22 117:14, 20 123:2 124:22 125:21 154:3 189:18 193:9 197:17, 23 217:14 228:4 229:5 231:14 234:6, 15 236:15 237:2,9 238:5, 10 239:14 243:6,14 245:2,12 248:20 249:19 251:18 252:10 253:5,11 254:12,18 257:5,21 259:7,9,20 260:1,10 261:10 262:5, 14 263:7,15,19 264:24 265:3,6 266:1,7 267:4, 8,16,19 270:1, 5,10 271:15,22 272:6 273:8, 11,13,22 274:21 277:4 278:18 284:8

**kept** 214:20

**killing** 71:21

**kind** 15:8 16:15 22:25 29:3 48:3 69:9 73:22 74:24 83:22 102:8 117:22 122:14 129:10 131:23, 24 137:5,11 138:20 153:4 271:13 275:6

**kinds** 103:2,24 105:6 130:25 134:22 137:25 165:4

**know** 14:11 16:11 26:4,8 27:22 33:18 38:12 40:8 46:14,17 49:11 66:13 69:14 77:5,7 80:17 81:7 91:7,8 95:21 127:25 135:10,19 140:17,18 141:18 142:1 143:15,19 144:1,2 145:16 146:20 147:2 148:4,19,20,22 149:5 152:7 154:16 157:4,8 166:11 167:24 187:9 213:10 228:19,21 234:18,21 240:11,25 244:15 245:5, 10,23 246:14, 21,22 251:14 259:4,24 260:6,8,21 262:21 278:3

**knowing** 14:9

**knowledge** 38:9 66:13 69:21 73:12 74:3 75:1 77:17 133:20 134:19 144:1 146:7 277:8

**known** 98:9 132:4 157:19 172:14 186:24 189:12 204:16 209:14 249:24, 25

**knows** 277:8

**Koelm** 52:17 157:15 200:4

**Korner** 8:19 142:7 243:12, 19 244:14,16 246:15 247:12 282:11,15,25 283:4

**L**

**L-A-R-C** 209:14

**label** 159:16, 18,20 160:7 206:16,22 221:10,15,20, 22,23,24 222:16 223:16 224:17 225:19 226:25 227:3, 4,5

**labeling** 223:19 224:3 226:24 227:8

**labels** 225:3

**lack** 204:18 205:3 262:1

**lacking** 156:17 275:22

**Lacks** 155:18 156:1

**language** 17:19 20:23 24:10,12 85:14 92:17 221:21 222:15 244:2 248:12 249:10,11 265:16 270:15 275:4,10

**LARC** 209:13

**large** 14:18 52:16 67:4 102:2 167:11, 12,13 215:21

**largest** 184:13

**Larry** 128:3,10 153:22

**last** 89:12 91:10 126:5,8 128:15 142:2 145:6 152:13 178:18 215:21 216:6 226:4 227:5 243:23 262:5 266:13 275:16 277:4, 19

**late** 126:4 224:14 270:12

**later** 27:7 63:3 106:17 222:16 242:9,16 246:10 257:14 261:22 269:24 280:12 281:5 283:2

**latest** 53:7,9 64:15 110:17 260:2 267:10 268:13

**launch** 122:19 191:4,25

**launched** 220:7

**law** 26:8

**lawsuit** 189:4 191:14,16,18 276:14 277:8

**lawsuits** 87:18 88:6 91:10 113:14,22 115:5 186:15, 23 189:14,17 190:2 191:8, 10,11 197:16, 22 200:8,20 201:5 217:1 218:16,24

**lawyer** 197:15, 18 217:11

**lawyers** 10:16 197:21 198:4 240:4

**lay** 275:4,10

**lead** 40:5 41:19 61:23 102:22 112:7 129:12 131:20 141:21 148:15 150:18 161:19,22 169:10 189:14 230:16 247:9

**leads** 52:23 64:22 88:11 91:14 116:8 132:13

**learn** 159:5

**least** 33:23 46:8 115:8 277:5 278:4

**leave** 126:17

**led** 144:17 178:15 213:5 242:12

**Leena** 157:15

**left** 141:24 196:6

**legal** 260:4 262:9,23 263:12 264:13 275:18,21 276:5 277:20

**length** 113:19 206:7

**lengthy** 213:11 282:20

**less** 84:21 116:24

**let** 22:13 33:18 49:1 53:23 57:14 134:16 202:2 231:15 245:3 268:22 276:12

**let's** 71:18 111:4 128:2,5 133:17 139:7, 16 140:23 142:4,14 148:25 153:5 154:8 155:3,4, 6 157:13 159:25 212:14

**letter** 7:22 8:14,23 57:2,3 63:3 86:8 106:18 107:18 108:3,9 118:25 182:11,13,18 192:7 195:22 196:2,5 197:15,20 198:1 236:25 239:17 257:16, 22 258:7,22 260:7 261:13, 20,23,25 262:15 263:21 264:5,23 266:4 273:14,15,19 274:2,5 278:24 279:5,8,15 280:10,17

**letters** 10:15

**level** 17:12 19:6 60:21,22 113:22 122:13 225:2

**Levonorgestrel** 19:1 21:16 52:21 59:8 61:14 63:14, 18,20 64:18 73:10,13,16, 22,24 74:2,12 75:6 76:14,16 77:4,7 81:25 82:1 88:15 100:6,9 101:6 103:21 105:25 106:23 108:21, 25 109:2 116:3 124:5 142:20 152:5 156:16 159:6 190:11 208:20,22,23 213:18,19,25 214:19,20 216:5 222:6 224:24 240:18, 22,23 241:1,2, 13 254:25

**lies** 158:10

**lieu** 182:20

**light** 271:17,20, 23 272:4

**like** 15:15 30:11,12 31:4 36:20 43:5 46:10 50:6 58:17 63:2 75:9 81:10 94:12 104:3 118:13 120:6 125:16 141:5 144:6 145:9 146:9 183:5 185:1 254:21 267:20 270:18 275:22 278:2 280:20

**likelihood** 46:2

**likely** 86:6 87:7 116:25 119:10 145:14 195:3 205:14,15 226:9 280:3

**Likewise** 226:10

**limit** 217:25

**limitations** 59:20 107:15 108:24 204:24 205:1 206:3,5 249:24 250:1 256:3

**limited** 29:2,25 30:3 31:25 38:6 44:17 50:4 63:16

78:5 102:12 103:13 104:10 106:3 122:8,15 146:6 204:18 249:25 256:2 276:2,25 277:1

**line** 68:5 108:18 139:16 150:15 161:3 248:8

**lines** 130:17 269:2

**linguistic** 92:25

**lining** 163:6

**list** 47:18,20,24 80:24 142:8 168:9 172:3 234:9 257:11 261:8 263:24 264:2,7

**listed** 37:8 258:9 279:10

**listing** 206:21 207:5 264:2

**listings** 200:12 268:17

**lists** 57:22 206:16,18 262:1

**literally** 271:22

**literature** 16:18 17:1,4,6,10,14, 18,19 18:6 20:10,11,17,24 54:11,19,21 55:2,3,11,19 56:2 62:17,22 63:2 66:14,21 69:4,23 70:21 72:11 74:11 75:3,5,10,19 76:11 77:7,10 81:9,22 82:17 96:17,23 98:17 105:18,20 106:8 107:17 110:9 111:3 117:8,9 118:1 135:15 137:1 152:9 156:14 178:21 179:21 190:9,12 201:1,14 202:13 211:13 213:18,22 214:25 215:2,6 221:2 245:17, 22 255:2 261:2

**litigation** 4:4,12 87:19 88:5,10, 14 89:3 90:8 91:14 102:20 112:19 116:7, 13 120:22 128:22 185:12 187:20 188:2,8 189:8,24 190:23 219:3, 13,16 277:6

**litigations** 119:14,16 219:11

**little** 50:4 138:25 234:7 275:16

**Liu** 258:13

**LLC** 4:4,12

**LNG** 12:2 57:20 59:4 60:7 203:8,12 204:2,3,12,15, 19 205:12,15, 16 209:2 216:8 222:25 223:6, 15 226:7,11

**local** 17:12,14 20:16,23

**Logistically** 52:1

**long** 59:24 61:16 62:3 84:3 132:19,24 142:8 160:7 161:13 164:18 208:18 209:10, 14,22 232:3 247:15 257:11 263:24 264:2,7 276:20 277:13

**longer** 61:2 161:4 186:2 266:8 273:9 274:19

**look** 12:8 23:24 25:1,17 28:25 29:3 30:5,7,15 31:7,25 32:20 33:4,5,16 36:18 38:16 41:3 56:3 60:20 63:9 68:8 69:18 76:12,19 82:4 83:8 86:9 88:12 95:8 96:23 97:15,16 99:23 101:18, 22 102:2,8 103:8 107:19 111:9 114:3,8, 10,20 117:5,15 119:3,4,19 120:3,4,5 121:11 122:15 125:9,14,18 141:8 157:13 162:6,14 171:1,7,22 172:19 177:3, 15 180:22 187:11 190:9, 13 192:17 198:16 199:6 200:6,15 202:10 215:7 217:16,18 219:24 220:19 224:20 226:4 234:9,13 235:5 241:23 242:22 247:19 251:3,4 257:23 274:18 275:17 277:10 280:21 282:19 283:14

**looked** 26:18 35:25 39:6,12, 22 40:9 42:9, 23 55:15 58:14,16 70:23 83:3,16 84:8 86:13 94:18 99:25 103:11 111:18 115:20 190:13 202:12 213:17,22 214:3 224:23, 25 225:2 242:24 245:24 247:1 256:5

**looking** 13:6,23 22:21 30:10 35:16 48:8 60:17 75:2 76:22 81:8 87:17 94:16 100:6 103:10 107:16 119:20, 21 123:10 131:15 169:15, 18 238:12,25 246:5 247:3 251:6 262:18

**looks** 141:5 197:9 235:17 237:17

**lose** 153:25

**loss** 49:9 50:20

**lost** 153:20

**lot** 23:9 43:4, 22 80:20 81:9 87:14 109:11 131:25 132:2 134:21 137:24 221:20 261:25 272:21 275:21 278:15

**love** 128:4

**low** 178:1 251:10 254:2,6

**lower** 41:24 223:25

**Lukkari-lax** 148:14,15

**lumbar** 21:10 22:6,14,15,17 23:4,20 24:4, 15,20 25:4,7, 10 26:15,20 29:7 47:4,25 48:1,9,12,13, 19,21 49:9,24, 25 50:20 51:2 78:8,24 79:6, 11,18 230:2

**Lunch** 96:5

## M

**M-E-D** 28:12

**Machlitt** 157:15

**made** 20:15,17 55:11 56:4 66:16 91:25 107:20 109:24 210:15 268:14

**main** 57:12 107:14

**mainly** 196:16

**majority** 24:14 84:15 121:13 122:20 167:8 208:18 209:22

**make** 14:11 16:23 17:7 18:16 23:7,22 30:1,20 32:16 41:2,10 44:5, 21 67:14 70:8 79:19 108:12 127:14 129:17 162:17 166:1 171:3 244:21 267:20

**makes** 32:19 65:21

**making** 46:20

**management** 213:2 214:10

**manager** 148:6, 7

**manner** 150:18

**manually** 35:4

**many** 13:13 23:4 37:9 38:8, 9 44:23 62:16 65:18 66:5 72:24 73:2 87:9 97:8,15 100:2 122:2 125:10 139:3 140:5 144:3 145:3 146:25 152:15 170:21 176:1,23 177:12,13 190:23 191:3, 21 200:11 208:3 220:6,14 274:12 283:10

**March** 7:17 8:24 176:24 179:18 185:17 212:12,13 279:17,19 280:10

**Mari** 141:12,18, 19 146:20 147:22

**Marie** 252:4

**mark** 52:2,8 76:20 139:7 140:23 147:24 153:5 154:8 155:6,8 180:20 279:3 280:24

**marked** 6:2 18:6 33:20 52:9 76:21 139:9 140:25 147:25 148:2 154:9 155:7 167:18 175:5 178:11,13 179:8,10 185:14 188:11 196:1 203:21 210:8 225:9 231:17 239:16 243:8 247:17 279:4 280:25

**market** 17:16 92:8 139:4 145:6 164:24 177:15

**marketed** 183:4 184:14 225:1 269:21 270:17

**marketing** 16:13 164:20, 22 165:3,14 190:16 218:21

**marks** 156:10

**Martinez** 77:24

**mass** 121:4,8

**material** 132:4

**matter** 33:3 72:6 112:16 246:23 266:11 282:2

**matters** 55:10

**may** 6:16 8:18 13:7 15:8,10 16:14,16 32:25 33:2 34:24 35:8 36:15,17 37:17 41:6,11, 19 45:18 46:9 48:2 59:20 60:10,13 76:1, 2 78:21 91:4,5 92:14 98:24,25 103:7 110:8,9, 10 111:1,3 112:3,14 140:6 141:5 144:14 146:13 151:17 163:2,10 166:16 168:24 187:17 198:16 205:4,17 207:9 219:9,10 220:5,15 232:7 233:18 243:9, 11,12 244:4,20 246:17 252:5 261:16 263:11 270:15 276:19, 24 277:1 281:14 282:18

**maybe** 54:10 70:2 160:11 163:22 164:1 236:25 242:22

**mean** 16:6,9 19:9 26:25 27:9,21 28:16 29:10,17,18 38:1 53:1 55:6 61:19 64:6 65:15 75:8 76:1 81:13 82:5 92:7,12, 15 94:7,21 98:3 105:20 113:5 116:24 117:18,23 121:5 136:6 145:20 147:21 150:9,21,24 162:21 171:13 172:23,25 180:11 197:6 198:9 200:9 224:12 235:4,5 240:1 244:17, 20 246:13,17 256:20 258:10 260:17 261:16 262:4 264:4 270:16 271:16, 20,22 273:9 279:11

**meaning** 258:4

**means** 11:21 12:2 15:19 24:20 27:4 40:22 60:8 94:14,15 102:14,18 109:19 110:23, 25 113:7 114:12,15,18 116:14 117:4, 12 118:1,2,4 122:13,21 142:11 143:23 147:2,22 162:22 167:12 169:17 171:5 172:18 174:7 175:18 180:13 181:25 196:17 197:8 198:12, 17 244:16 246:20 250:18 251:2 252:16 257:19 267:1, 24 272:16

**meant** 84:2 108:12 165:22 208:24 224:15 246:15 252:25 253:4

**measure** 21:18

**measured** 65:13

**measuring** 67:25

**mechanism** 72:12 97:11,17 98:5,21 99:11, 13,16,19,24

100:8,22,25

**mechanisms** 98:11,16,25 99:5

**Med** 28:12 33:12 34:16,20 194:18

**media** 51:14,19 96:2,7 109:7 134:4,11 160:16,21 227:20,25 284:10

**medical** 8:15 12:23 17:10 55:19 56:2 69:22 131:15 137:25 148:21, 22,23 161:11 207:8 227:16 231:4,6 233:9 237:5,10 238:14 239:18, 19 277:7,17

**medically** 15:16 26:25 27:3 120:1 121:25 123:14

**medication** 21:12

**medicinal** 82:22 139:18, 24

**medicine** 61:21 163:23

**Medicines** 8:15 171:24 239:18 281:6

**Medsafe** 241:18,19,24

**meet** 15:13 127:9

**meeting** 149:2 281:6

**members** 189:4

**memory** 134:24

**men** 71:2

**meningitis** 48:20

**menopause** 122:21

**menstrual** 119:12 162:25 163:1 167:9

**mention** 17:20 38:22 42:10 48:12 67:11 205:7 218:2 222:10 258:21 264:19,21

**mentioned** 14:20 21:15 24:16 31:10 49:15 73:16 80:8 81:9 83:25 98:2 104:25 135:6 136:25 137:23 143:21 144:23 145:13 166:22 167:22 175:16 185:2 197:25 198:2 206:6 213:1 216:6 228:18 235:2 258:16,23,24 270:25 280:20

**mentioning** 14:22 118:20 230:10

**mentions** 46:25 48:18 83:9

**messed** 254:19

**met** 128:10

**method** 59:11 70:23 89:21

**methodological** 59:7

**methodologies** 59:14

**methodology** 58:6 63:16 82:5,8 103:13 106:3 210:1

**methods** 198:23

**MHRA** 180:3 181:4 264:24 265:18 266:1, 7,11,13 267:12,24 268:5,13

**mic** 128:6

**middle** 85:15 187:4 203:25 232:18

**might** 40:10 42:12 52:6 262:20 274:14 275:11,12

**migraine** 42:10, 14 43:23 46:5 47:19,21,24

**migraines** 47:4

**million** 46:6 122:19 177:19, 21 191:24 192:1 220:10, 12,13

**millions** 14:15

**mine** 141:20 228:13 247:10

**mineral** 76:5

**mineralocorticoid** 71:15 72:15, 16,21 73:5,14 74:4,13 76:14

**mining** 101:19 114:9 170:24 187:5 198:13, 23 199:8,9

**minute** 98:2 159:24 160:4, 14

**minutes** 130:14 153:7,15,21,25 154:1,10 155:4 256:19 273:10 278:19 281:5

**MIR_CW_00383493** 6:17 141:3

**MIR_IH_US00010962** 6:21 148:2

**Mirena** 6:8 10:22 11:1,13 12:1,7 13:20 14:6 16:8 19:14,15,22 20:4,12,14 21:24 22:4,12, 24 25:3,10 37:24 38:10 39:12 40:14 43:17 46:23 48:9,18 49:8 53:8,14,18,20 54:2,12 55:1, 21 57:25 58:21,22 59:8, 22,24 60:2 61:24 62:14 63:21,25 67:2 84:7 85:19 87:6,7 88:15 89:7 90:14 92:2,6 93:8,23 94:5 99:13,23 101:1,13 103:4,25 104:12 105:8, 18 106:8,14 108:6 109:12, 23 110:15 112:8 113:13, 18,20,21,25 115:4,19 116:24 118:19 119:6,10 120:2,24 121:20 122:12, 19 123:5,7,16 124:25 125:7 129:12 131:4, 20 132:14 133:5,6,16,21 134:20 135:3, 12,14 136:4,8, 18,21 137:22 138:6,11,16 139:4,5 142:19 143:5 145:4,6 146:8 148:16, 23 149:2,12, 23,25 150:18 155:17,25 156:11,12,22 157:19 158:9, 12,19,24 161:17,22 162:1,3,5,12, 13,23 163:8

164:18,19,25 165:4,10,25 167:1,3,4,7,13, 16,24 169:24 170:9 173:19 174:11,14,22 175:2 177:13 179:17,23 180:14,17 181:14,25 184:8,14,22,25 185:3,5,9 187:14 189:20 190:1,12,15 191:4,7,22 192:5,11,18 195:2 196:15, 19 197:2,13,22 199:20 200:21 201:5,17 205:5 206:10,11,13, 16,22 207:6, 18,23 208:5, 20,21,23 209:23 211:9, 11,12,14,16 213:24,25 215:9,12,17 216:17 217:6, 12 218:16 219:4 220:13 223:3 225:18, 22 226:24 227:3 229:14, 16,17 233:7 235:3,7 236:14 239:5,10 240:17,21 241:9 242:14, 19 243:4,5 247:9 249:4,9 250:10,24 251:21,23 252:8,11,16 253:13 254:4,8 265:11 269:21 270:18 274:6, 10,20,23 281:10,20 282:1 283:14, 18

**Mirenas** 60:3 86:6 139:3 177:13 183:7 220:6 272:21 273:2

**Mirja** 157:15

**misrepresentation** 237:7

**misrepresenting** 238:18

**Miss** 25:19 142:2 143:15, 20 145:25 228:7,12 254:13 265:1

**mistake** 92:18 240:12

**modification** 196:17

**modified** 31:2 79:2,14

**modifier** 274:14

**moment** 125:22 260:19

**monitor** 95:5,7 112:3 118:17 165:9 181:19 185:2 265:24 266:5

**monitored** 92:15,16,18, 20,22 93:24 265:12 266:15

**monitoring** 20:10 91:8 92:1,3,6,7,9, 21,22 93:15, 16,19 94:6,11, 15,19,25 95:13 104:19 161:25 169:11,14 174:20,23 181:24 185:7 200:17 230:19 242:6 266:23

**mono** 224:25

**month** 89:12 90:12,14,23,24 91:6,10 199:25

**monthly** 86:21 88:18 94:22 124:22 125:4, 12 200:3,13 201:4

**months** 126:3 211:19 212:11 227:6 229:18 239:6 241:9 280:4 283:2

**more** 20:19 21:17 30:10 46:4,15 49:1, 11 50:7,21 53:24 67:19 84:21 89:24 106:5 114:12 115:6 120:21 122:18 127:14, 22 145:11 146:11,23 147:8 150:6 151:9,15,19,25 157:9 177:21 205:14,15 209:20 220:3 230:12 231:25 232:16 236:5, 20 239:5 243:16 249:4 251:13 252:20 255:13 269:25 272:22 274:15 275:2,12 276:5,6 277:2

**morning** 10:3, 13

**most** 51:9 80:14 81:1 82:2 86:4,6 87:7 94:1 100:1 102:16 109:16 119:10 129:6 139:25 156:9,25 157:2 195:3 256:9 270:19,20

**mostly** 146:25

**mouth** 19:10 98:4

**move** 26:5 71:18,23 126:20 155:3,4 235:5

**moving** 126:25 127:12

**Mr** 4:11 5:7,8 10:12 12:22 13:18 14:25 16:4 18:21,24 19:9,19,21 22:13 23:7 24:2 25:8,19, 25 26:6,13,24 27:9 28:16 29:16 33:9,16, 22 34:3,6 35:22 38:15 39:1,11 41:13 42:2 43:10,16 45:4,15 47:9 48:24 49:1,5 50:7,17 51:12, 23 52:4,7 53:1, 17,23 54:9,24 55:6,18 61:6, 16,20 62:15 64:20 67:18 68:13,17,22,25 69:10 70:1 71:10,19,25 72:6 73:10 75:4 76:25 77:12 79:8 80:8,23 81:3,7, 18 83:5 84:13 85:8 86:16 88:16 89:17 91:25 92:12,25 93:22 94:7,10, 21,23 95:20,24 96:10 97:20 98:2,10,19 99:3,15 100:10,23 101:9 105:3 106:24 109:10, 21 115:2 116:22 117:14, 20 123:2 124:22 125:21 127:15,19 128:4,8 129:10 130:13 133:3 134:14 136:9, 23 137:8,13 139:7 145:24 146:15 147:11, 15,24 149:10, 20 150:13,16 151:7,19,25 152:20 153:10, 16,18,20,24

154:2,3,11,14, 19,24 155:2,5, 9,14,23 156:2, 20 157:13 159:10,15,21, 25 160:3,6 189:18 193:9 197:17,23 217:14 228:4 229:5 231:14 234:6,15 236:15 237:2,9 238:5,10 239:14 243:6, 14 245:2,12 248:20 249:19 251:18 252:10 253:5,11 254:12,18 257:5,21 259:7,9,20 260:1,10 261:10 262:5, 14 263:7,15,19 264:24 265:3,6 266:1,7 267:4, 8,16,19 270:1, 5,10 271:15,22 272:6 273:8, 11,13,22 274:21 277:4 278:18 284:8

**MS** 4:3 5:9 12:11 13:12 14:24 15:2 18:14 19:8,13 22:1,19 23:21 24:23 25:13,23 26:2,11,16 27:2 28:4,21 32:12 33:14,19 35:19 36:13 38:11 39:4,24 40:12 41:17 43:8,19 45:9 47:6 48:10,25 49:3,13 50:25 52:1,5 53:15, 21 54:3,17 55:13 58:8 61:10,18 62:5 64:2,4 67:15, 20 68:15,20 69:2,12 70:18 71:17,23 72:9 74:15 76:24 77:9 78:13 79:13 80:15 81:6,13 82:13 84:17 85:21 86:23 89:15 90:18,20 92:4 93:5,25 94:13 95:21 97:13,22 98:6,13,22 99:7,18 100:13 101:2 104:1 106:11 108:7 109:14 114:1 115:12 117:2, 17 121:21 124:13 125:1 127:1,17,21 128:2 129:1 130:3 132:22 133:8 135:5 136:5,11 137:2,10,17 138:18 145:19 146:2,18 147:13,18 149:6,18 150:4,19 151:11,22 152:2,24 153:6,12,17, 19,22,25 154:6,12,16,21 155:1,3,13,18 156:1,23 159:9,17,22 160:2,4,12 161:1,2 189:20 193:17 197:19 198:5 229:3 231:11 234:5, 11 235:25 236:22 237:6, 15 238:7,17 242:21 243:13 244:8 245:7 246:11 248:17 249:14 251:1, 25 253:2,16 254:16 255:20 257:9 259:3, 13,17 260:5,23 261:15 262:11 263:2,14,17 264:17 265:2, 5,21 266:3,19 267:14,17 269:11 270:3 271:8,19 272:1,10 273:9,12,17 274:1 276:8 278:6,19,22 284:7

**much** 44:19 46:4 49:21 66:22 68:4 75:1 76:1 88:3 108:18 136:1 145:11 146:10 147:8 247:19 269:24 283:7

**multiple** 119:25

**multitude** 41:6

**multitudes** 40:4

**must** 60:22 166:13 167:4 203:13 254:3, 17 265:15 266:17 276:15

**myself** 210:15

**N**

**N-I-E-M-A-N** 243:19

**name** 62:10 80:21 96:25 244:13

**namely** 89:2 119:23 261:23

**narratives** 277:11,13

**nation's** 210:18

**national** 60:21 183:18 208:13 269:7

**native** 252:6 270:15

**natural** 72:15

**nature** 14:4 23:1 30:2 44:17 50:1 239:8

**necessarily** 25:12 253:11

**necessary** 30:15 32:19 97:21 138:10 224:16 231:1

**need** 15:18,19 18:2 19:13 33:17,25 47:8 57:12 64:2 67:24 90:24 104:22 105:11 112:3 114:2 127:4 128:6 141:7 147:22 149:4 151:20 152:1 153:9 160:13 169:21 171:17 187:11 202:10 212:7 257:23 275:17 279:22

**needed** 14:5 135:24

**needs** 17:23 111:23 171:5 172:22 226:11

**negative** 76:3

**neither** 151:2 158:7 196:7,12

**neuro-corticoid** 75:6

**neurological** 229:20,24 233:22 235:15 236:10

**neurology** 258:14 279:17

**neuropthamolog y** 78:15

**never** 46:15 92:13 105:6 126:7 127:5 159:19 216:2 230:4,7 247:11 259:15 268:4 269:10 270:23

**nevertheless** 84:8 103:15 222:12

**new** 8:14 9:2

88:5 91:12,15, 24 92:10 94:16,17 95:8, 9,12,19 117:21,24 118:2,7,12,13 144:9,12,16 165:21 170:25 171:20 172:13, 14 173:6 200:17,23 203:8 223:22 239:18 241:8, 10,19,20 242:11,12,23 243:2,21 278:20 280:17, 21 281:1,6 282:6,16

**newer** 252:19

**newly** 201:20 203:7 223:25

**news** 94:12

**next** 36:9,14 143:10 173:1 177:15,25 178:18 185:3,6 205:9 211:23, 25 212:8,10,13

**Nieman** 243:19 247:11

**night** 126:5,9

**Noa** 157:14 158:7

**non** 163:2 209:4

**non-healthcare** 28:8 51:6

**non-mirena** 211:11,16

**none** 66:16 70:10 71:4 98:17 99:1,9, 10 100:21 121:17 225:5

**nor** 151:3 158:8 235:20

**normal** 29:7 120:22 121:8 123:3,13 124:7,9 229:21,24 231:23 232:1, 24 233:2 235:16 236:10 237:20 239:2

**Norplant** 21:22 156:16 221:3, 6,13,14,15,17, 18,22 222:1,5, 16 223:1 241:5 254:25 255:3, 24 256:1,13,18 261:1

**Norplant/ levonorgestrel** 255:11,18 257:7 260:14 261:12

**note** 161:3 265:14

**noted** 180:3

**nothing** 40:7 124:12 139:1 273:24

**notice** 26:7 77:3

**noticed** 18:12

**notices** 125:25

**noticing** 185:8

**noting** 125:25

**Nov** 7:8

**November** 10:1,5 175:8 254:15

**now** 10:19,25 11:8 12:22 13:18 14:20 16:4 19:20 21:23 22:14 23:18 26:24 28:5 30:24 35:6 37:5,23 38:13 39:11 43:4 45:15 47:3,7 49:10 50:6 51:11 52:10 56:7,13 57:15 62:15,20 64:21 70:4 72:6,22 76:15 78:11 82:11 84:13 85:10 86:21 88:16 92:1 93:22 95:20,24 96:11,15 97:4, 10 98:2,10 100:23 105:17 106:24 108:3 109:22 110:3, 19 112:5 113:10 116:22 118:20 124:9, 22 126:1,15 134:24 135:24 137:11 138:6, 14 148:13 149:20 151:12 153:9 155:1 159:21,23 161:6 166:2,18 178:3,7 180:2 186:19 187:12 194:11 201:24 207:17 208:1 211:17 220:18 228:18,23 229:8 234:25 239:14,20 240:25 243:23 246:24 247:14, 16 249:12 251:12,22 254:12,25 256:18 258:25 260:21 262:5 264:24 267:4 269:9 270:9,25 273:15 274:24 275:10 276:11 277:23

**number** 6:4 14:17,19 34:2 36:18 38:6,13 42:15 50:16 51:4 59:8 66:7, 10 76:8 88:7, 23 90:7 91:1 95:6 102:20 104:10,13 111:6 116:12 122:22 128:19 137:1 138:11, 21,23 139:1,2 141:2 143:17, 25 144:20,24 146:12 147:3,6 160:12 167:12 169:19 177:19, 20 183:16 189:15,23 191:23 192:1 204:2 209:18 217:25 218:7 220:8,9 247:22 248:14 249:3 250:8,11 254:14 258:8, 12 269:2,5,16 272:16 274:9 275:18

**numbered** 269:1

**numbers** 41:23 107:24,25 127:20,21 128:21 131:17 135:21 142:25 143:12 144:7, 11,13,16 145:5,14,17, 21,25 146:6, 17,23 147:4,16 252:20 253:6 269:14

**numerator** 183:18 269:7

**nurse** 27:6 60:11

**O**

**obese** 121:6,14 219:25 252:21 253:10,22 254:11

**obesity** 121:11 204:17 205:8, 20

**object** 12:11 13:12 14:24 15:2 19:13 22:1 24:23 25:21,22,25 26:8,16 27:2 28:4,21 32:12 35:19 36:13 39:4,24 40:12

41:17 43:8,19 45:9 48:10 49:13 50:25 53:15,21 54:3, 17 55:13 58:8 61:10,18 62:5 64:2 67:15,20 68:15,20 69:2, 12 70:18 71:17 72:9 74:15 77:9 79:13 80:15 81:6,13 82:13 84:17 85:21 86:23 89:15 92:4 93:5,25 94:13 97:13,22 98:6, 13 99:8 101:2 104:1 106:11 108:7 109:14 114:1 115:12 117:2,17 121:21 124:13 125:1 129:1 130:3 132:22 133:8 135:5 136:5,11 137:2,10 138:18 145:19 146:2,18 147:13,18 149:6,18 150:4,19 151:11,22 152:24 155:13, 19 156:23 159:9,17 189:18 193:9 197:23 217:14 229:3 231:11 234:5,11 235:25 236:22 237:6,15 238:7,17 242:21 243:13 244:8 245:7 246:11 248:17 249:14 251:1, 25 253:2,16 255:20 257:9 259:3,13,17 260:5,23 261:15 262:11 263:2,14 264:17 265:21 266:3,19 267:14 269:11 270:3 271:8,19 272:1,10 273:17 274:1 276:8 278:6

**objecting** 71:21,24

**objection** 18:14 19:8 22:19 23:21 25:13,24 38:11 47:6 64:4 78:13 90:20 98:22 99:7,18 100:13 126:15 137:17 152:2 155:18 156:1,3 263:17

**obligated** 266:8

**observation** 57:8 102:22 171:1,16 204:14

**observational** 18:20

**observations** 169:3

**observe** 119:18

**observed** 102:17 119:22 147:9 167:16 184:15

**obstruct** 259:22

**obtain** 50:21 236:6

**obtained** 44:22

**obviously** 49:16 51:8 81:15 127:9 175:25 186:1

**occur** 32:25 33:2 121:6 188:22 205:14

**occurred** 18:1 19:3 24:20 84:7 163:24 169:2 204:14, 20 205:5 239:4 281:20

**occurrence** 104:14

**occurrences** 11:20 15:9 122:25

**occurring** 167:15 249:22 251:14 254:4 255:24

**occurs** 63:7 98:5 269:20 275:8

**October** 85:17 86:19 219:4,6 245:23

**odds** 61:2 63:4, 9 86:11 106:19 108:1 111:2,9 114:15 116:4, 14 119:13,17, 18 125:13,15, 20 195:5,10,11 197:12

**off** 51:15 53:1 127:23 134:6 160:17 227:21 243:12 284:12

**off-the-record** 96:3

**officer** 271:17, 24

**often** 12:23 29:2,25 50:11 102:16 205:16

**Oh** 37:7 82:7 202:1 235:4

**okay** 11:5 12:5 19:16 34:8,21 37:23 39:11 43:16 53:11 54:9 55:18 56:6,22 64:20 70:1 71:13 75:4 76:9 77:20 82:4 83:5 92:12,25 120:20 121:16 123:2 124:2 125:21 128:2 132:19 133:3, 13,17 136:23 138:18 139:22 141:5 142:4,17 143:4 148:25 157:24 158:2, 5,20 159:11 164:15 166:7 187:13 203:5 208:21 209:1,6 210:6 212:14, 15 218:23 224:19 228:18 230:10 231:3,9 232:18 233:4, 23 239:14,25 240:19 241:7, 22 243:6 247:16 248:7 249:1 251:18 254:12 258:24 260:1 264:24 268:22 271:16 272:6 273:8, 12,22 275:16 278:18

**old** 59:16 65:12 118:22 120:23 121:3 123:3,12 124:7,9,25 241:8 283:17

**omit** 60:13

**on-going** 88:5, 13 89:3 91:14 94:19,24 112:18 185:7 266:23

**one** 4:5,13 10:15 20:16 23:14,23 24:7 36:19 39:6 40:6 41:15,22 47:16 49:1 50:7 52:12 53:24 58:12 59:19 62:17 65:7 67:22 71:5 72:13,23 73:4 76:7 79:19 81:23 89:24 95:10 97:6,8,16,24 103:10 109:16, 17 110:17,24 127:7 137:14 141:22,23

149:3 152:11, 13 155:8,14 157:14 176:4 178:24 185:21 187:13 193:19 198:25 202:21, 22 211:4 215:18 217:5 219:17 228:19, 21 233:8,20 243:17 246:2,6 247:18 264:25 267:6,16,20 268:16 272:7, 19 275:16 277:20 281:18 283:13 284:4

**ones** 100:3 214:21 217:1 243:17

**only** 23:6 24:3 25:16 37:13 38:5 65:19 68:2 78:4,25 97:19 117:6 119:8 133:10 135:24 146:4 147:3 158:20 169:3 183:7 184:21 192:17 206:25 208:23 214:21 218:1 224:6 225:14 231:22 241:1 242:8 246:24 253:17 254:5 259:4 260:6

**onset** 116:5 120:10 204:20

**open** 93:4 115:6 128:18, 24 129:5,11, 13,24 130:1

154:7 230:23

**opened** 115:9

**opening** 29:7 78:7 79:6

**openness** 129:21 138:8

**Operating** 46:18 49:18

**operations** 148:6

**ophthalmologic al** 44:7 46:11

**ophthalmologist** 44:8 149:11,24

**ophthalmology** 46:25

**opinion** 122:5

**opinions** 169:4 227:10,12 263:6 264:14

**opportunity** 160:10 173:11

**opposite** 55:9 73:6

**option** 109:4 111:22 158:13 208:23

**oral** 213:21 243:25 244:6, 22,25 245:6,14 246:1,7,16 247:2,3,4

**order** 99:23 152:1

**ordered** 127:7

**orders** 127:3

**ordinary** 176:10

**organization** 131:14 138:4 140:13 148:11, 12 207:15

**organizations** 189:3

**original** 198:1 273:16,24

**originally** 177:14 221:24

**originating** 87:17

**other** 8:7 12:2, 10 15:22 24:16 30:12,13,15 32:1 34:25 35:9 36:15,19 41:4,11,23 44:5 46:2 48:4, 16 52:14,21,22 56:10 61:24 65:17,19 66:14 69:6 73:2,7 77:7 79:21 80:3 87:12 89:25 95:8 103:23 106:21 116:5,13 119:7 122:6 124:7 130:7 131:3 132:9 133:5 143:22 144:1,6 145:12 148:22 151:4 160:1,11 162:4,17 163:2 164:21 169:1, 2,25 178:21 180:16,19,24 183:7,8 190:17 192:13 193:15

201:16 202:12 204:15 205:18, 20 207:9,22 209:2,11 213:15,19,20, 25 214:2,7,8, 19 216:22 220:19,23 224:2,20 225:1,5,11 230:20 243:24 247:10 255:2, 21 256:23 257:3 258:4 268:18 272:25 273:1,2 275:9 280:13 281:18

**others** 7:2 8:2 103:9,19 105:23 106:16 159:2 176:8 203:4,23 213:3 255:13 259:5 260:25

**otherwise** 13:20 15:16 46:7 246:10 275:5 280:9

**our** 11:23 20:10,17,24 26:17 28:10 29:6,10,14,15 30:6 31:6,21 32:15,17 33:5, 8 38:25 39:5,7 40:6,21 41:2,9 42:22 43:1,3 44:11,12,15 45:2,10 46:17 49:18,23 51:10 52:18,20,24 53:5 54:20 55:25 56:1

58:11 61:4,12 62:25 63:19 64:14 69:24 70:8 77:18 79:22 81:22 83:3,15,18 84:12 86:14 90:5 93:12 94:18,20 95:2, 13 100:15 103:20 105:15 106:3,12 107:9 108:11 109:19 120:7 123:19, 20,24,25 124:17 125:3,8 126:13,21 128:20 131:12 132:17 133:15 135:8,9,12 138:1 142:9 158:25 169:7 174:24 179:6 181:8 185:7,10 190:13,14,15, 16 197:10 200:1,12,13,25 202:13 204:1 206:6 213:4 214:9,21 215:3,20,21,22 216:3,5 223:12 226:17,21 238:19 242:6 265:22 270:22 271:10,11

**out** 9:2 18:12 20:4 33:17 46:21 50:21 52:2 55:8 59:6, 19 68:9 81:11, 19 100:7 106:22 107:19 108:11,12

120:6 126:16 133:17 134:7, 25 138:25 139:11 143:25 144:20 145:9, 25 151:14 152:25 154:8 155:3,15 159:21,22 168:8 212:24 219:15 223:16 230:12,23 258:6,8 261:25 263:23 264:1,6

**outdated** 144:14 145:15 146:13

**outpatient** 41:23

**output** 168:10

**outside** 38:11 60:4 64:4 98:13,22 99:7, 18 100:13 143:1,12,18 146:1,6,17 147:7,17 245:8 276:4 278:7

**outweigh** 163:9

**outweighs** 226:9

**over** 35:2 42:6 56:9 101:20 114:10 120:1 121:16 124:25 125:8 128:14, 15 145:6 152:11 167:13 175:22 198:14 217:21 218:5, 12 221:22 269:20,22

272:4

**overall** 12:20 23:25 38:5 83:4 84:11 88:23 95:5 108:18,21 122:17 123:20, 25 145:3 146:8 162:9 175:20

**overestimate** 196:19

**overproduction** 65:22

**overrule** 237:3

**overruled** 237:9

**overview** 75:25 76:4

**overweight** 121:14 157:20 158:8,17,23

**own** 28:19 29:21 75:9 206:3 208:1 238:12

**P**

**p.m.** 284:13

**package** 224:16

**page** 5:2 6:4,13 34:2,4 37:2 42:3 43:11 47:10,16 56:6 64:21 70:1 76:22,23 77:20,22 79:16 80:25 82:4,6, 15 83:16 85:8 120:4,5,6,10,

20 123:2,9 128:16 139:11, 12 141:2 143:10 152:21 156:9 168:8,17 172:3 173:1 174:3 176:13, 16,25 177:3,7, 16 183:13 186:7 187:3 190:20 192:6 194:15,16 196:6 198:22 199:6 201:19, 23,25 203:24 205:9 212:19 217:20 218:3, 20,21 221:1 222:21 226:4 228:20 231:18 243:15 247:21, 24 254:19,21, 25 258:2 262:14 265:4 268:23 269:1 277:20,22 281:9 283:14

**pages** 152:15 172:3 175:11 176:1,6 188:19 254:22 276:20

**paid** 258:19 259:2 260:3,21 262:9,23 263:11 264:12, 20

**pains** 163:3

**paper** 61:12 66:16,18 67:12 76:17,18,19 107:16 159:2 196:8

**papers** 67:10

**papilledema** 21:13 30:11,17 31:11 32:4 34:20,23 35:7 36:7,11,17 37:19 38:22 39:10,17 40:19 41:1 42:12,21 44:9,10 45:8, 14 46:12 47:1, 12 65:25 78:9, 19,22 79:4 80:2 143:10 157:21 158:9, 18 177:9,23 240:17 241:12

**paragraph** 34:14 35:6 36:14 56:7 57:16 65:9 85:10 86:17 87:1 142:15 157:10 178:1, 18 179:14 182:15 187:4 196:7,25 199:7 201:20 203:25 218:4 222:22 248:3,7 250:2 255:6,7 258:3 265:7 269:1,2

**paramount** 140:7

**part** 22:14 50:23 51:24 52:17,20 59:5 79:1,19 83:20 84:9 89:17 92:25 93:19 94:20 95:13 123:18 125:3 130:23 135:16

148:5 181:2 188:15 201:12 203:2 215:10 218:24 224:19 245:2 258:25

**particular** 67:8 130:11 137:14 144:13 158:13 176:3 230:15 244:22

**parties** 162:4

**parts** 61:4

**pass** 153:9

**past** 58:21,22 70:24 84:25 118:11 125:18 138:1 174:10 215:2

**path** 70:16

**pathogenesis** 223:6

**pathomechanism** 70:9 96:24

**pathophysiology** 96:13,17

**pathways** 65:18,19 73:2

**patience** 160:24

**patient** 6:13 18:1,3 19:6 22:2,15 23:19 27:25 28:2,8 29:6 30:25 31:1,12 38:19 39:16 41:21 46:3 58:19,24 78:7 79:10 104:13 109:1,4

121:3 122:10 129:20 130:9 139:12,14 140:8 157:20 158:12 163:22 166:18 167:5 180:15 183:18 215:23 216:7, 10 229:14 230:2 231:13 232:11 233:6, 13,15,17 236:14,15 237:17 238:25 239:4,9 269:7 275:22,23 276:19 277:12 278:17 281:19

**patient's** 22:3, 10 78:11 231:4,6,10 232:18 233:9, 10 237:19

**patients** 14:16, 19 41:14 42:5 43:23 58:15, 18,20 65:14 66:9,11 78:21 104:10,12 120:10,18 130:5 131:3 149:13 150:1 177:14 180:17, 18 189:3,20 215:12 216:4

**pattern** 25:1 169:18

**patterns** 179:20

**Paul** 142:7 243:12,18 244:13,16 246:14 247:12

282:11,15,25 283:4

**paying** 264:15

**PBRER** 156:9, 25 192:5,7 211:24 212:8

**PBRER/PSUR** 186:16

**PBRERS** 157:3

**Peachtree** 4:5, 13

**pedantic** 110:2

**peer** 105:17,20 106:8,25 107:7 202:16 258:18 260:2 280:4

**people** 80:12, 13 142:8 146:25 147:1,4 177:13 191:11, 21 214:7 230:24 235:20 240:3

**per** 49:18 80:1 102:3 124:17 125:12 158:7 166:15 178:1 212:4 219:12, 17,23 220:4 248:11,18,19 252:14,16,18, 20 253:21 254:9

**percentage** 23:2 25:6 41:24 208:4,8, 9,11 209:13

**perfect** 252:5

**perform** 82:16

86:1,19 113:12 114:9 193:16 274:25

**performed** 12:21 34:13,14 48:6,8 49:10 61:15 64:8 85:13,23 87:2 94:2 109:15 115:14,16 125:4 170:12 173:19 174:18 176:14 178:8 182:12 193:18 194:16 203:3 232:25 233:22 242:3 247:1

**performing** 29:18 79:8 85:18 260:2 262:19 263:8

**period** 60:2 163:3 182:16 207:2

**periodic** 7:7,15 94:16 162:6 175:7,14 176:3 182:19,20 183:1 185:16 186:9 193:20, 25

**periodically** 165:18 175:17

**permission** 182:24 223:21

**person** 132:5 133:13 136:1 137:5 140:18 147:7 195:15 229:9 233:22 235:7,18 236:4 238:21 246:14

264:15

**person's** 27:13

**personal** 127:12

**personally** 77:14 80:17 137:15 230:17 277:24

**persons** 50:16 143:25 151:14

**perspective** 170:17,19 180:22

**pertaining** 96:23

**pertinent** 75:2 107:17 111:19 135:15 136:25 213:17

**Petra** 52:17 157:15 200:4

**pharmacokinetic** 75:23

**pharmacokinetics** 74:25 214:13

**pharmacological** 75:24

**pharmacology** 74:23

**Pharmacovigilance** 11:23,24 12:13 15:5,21 16:3 17:13,18 23:10 27:1,24 28:1,17,22 34:15 56:1 62:12,13 93:20,21 95:2,

4 104:17,18 124:18 132:11 140:9,20 141:20 144:8, 15 147:1 148:12 150:17 161:16,20 165:13 170:17, 19 171:23 174:24 180:22 181:2 186:24 188:13,16 189:13 198:21 232:9 238:6,9 242:6 262:19, 25 263:9 268:25

**Pharmalogical** 7:20

**phenomenon** 70:25 112:20 186:22 187:24 189:8,10

**phone** 150:5,8 151:9,24

**photophobia** 43:5,13

**physical** 83:1, 13

**physician** 27:6, 13,14,15,19 28:7 29:12 51:8,9 60:11 62:8 122:1,3,4 130:9,17 131:1,6,17,18, 22,23 133:3, 12,19,25 134:19 135:1,7 138:11,13,15, 25 144:13 145:1,14,16,

21,23 146:7,11 148:16,17 151:18 152:22 153:1 158:11 159:5 161:9 163:22 166:16 205:16 231:13

**physicians** 130:5,21,24 131:8,10 132:1,21 207:6

**physiology** 70:16

**PI** 149:5,8

**pick** 150:5 151:9

**picture** 23:25 65:23 184:21, 24 200:10

**piece** 54:18,21 55:1

**pieces** 54:11

**pile** 33:15 254:17

**pills** 207:22

**pipe** 154:11 155:1

**PIS** 149:3

**place** 22:4 27:16 30:23 32:24 44:21 133:10 221:24, 25 234:16

**plaintiff** 197:21 198:3 276:16 278:3

**Plaintiffs** 125:25 183:13 197:16 217:11 276:10

**plan** 107:18

**plausibility** 73:21 82:19 97:16

**plausible** 97:7, 10,11,17 98:11,21 99:6, 12,17,19,24 100:5,8,11

**play** 100:11

**please** 34:3 136:13 142:25 143:11 154:11, 12 172:2 178:19 183:25 265:14

**plexus** 65:25

**plus** 79:21

**pm** 134:13 160:18 227:22

**point** 10:19 55:7 56:19 68:9,14 70:4 71:11,12,25 81:14 95:3 100:22 107:19 108:12 110:2 120:6 134:25 165:24 168:14 172:24 174:8 177:12,17 191:22,23 214:25 217:1 219:6,7 220:5 258:6,8 259:11 262:15 264:6 279:23

**pointed** 47:9 59:6,19 181:10

**pointing** 78:6 263:23

**points** 58:11 62:17 70:14,19 107:14 168:9, 13 261:25 264:1

**police** 271:17, 23

**policeman** 272:5

**policy** 50:8 111:23 144:19, 22

**pooled** 12:8

**population** 41:22 86:4 87:8 102:15,16 103:15 115:25 116:1 119:23 122:24 167:7, 10 205:14 208:4 211:14 214:24 220:2 249:22 250:9, 14 251:4,15 252:8 253:8,19 254:7 275:7,8

**populations** 61:15 63:19 107:23

**portion** 7:15,19 58:13 127:11 175:11 185:15 188:12 193:19

**portions** 166:4

**Portugal** 20:22 123:3,9

**position** 78:25 109:12,22 110:3 123:5 128:24 135:13 136:16,20 137:21 161:18

**positive** 21:24 22:4,5,8,18 23:15,19 24:6, 11,21 26:14 76:2 114:16 162:18,20 179:20 180:8, 12,23 181:5,7

**positively** 180:4

**possibility** 238:19 260:20

**possible** 13:2, 20 29:24,25 44:2,23 45:20 49:21 60:15 67:6 68:6 84:22 125:19 131:5 134:23 137:24 138:1 204:14 205:6, 10 206:17 222:11 256:12 281:18

**post** 190:15

**post-market** 220:11

**post-marketing** 139:5 142:15 144:2,5 145:3, 8,11 146:8 167:12,14 176:24 177:18 190:23,24 191:6,25 201:15 206:17 218:15 223:24 253:25 272:18

**potential** 30:7 43:18 44:14,25 45:5,11,19 55:20 64:8,11 72:12 86:12 90:2 93:22 98:16 101:5 114:19 117:21 121:19 123:6 135:2 136:17 137:21 147:20 169:20 172:21 175:1 180:23 185:4,6 202:9 205:25 206:1, 10 211:8 242:19 253:1 280:12

**potentially** 14:15 32:17 37:25 38:17 39:13 40:23 48:15 170:20 172:13 220:17

**powers** 49:23

**practice** 181:3 264:19 269:1

**practices** 7:21 171:24 180:22 188:13 198:21 200:25

**pre-planned** 216:1,14

**precautionary** 21:18

**precise** 283:8

**precision** 248:24

**preclude** 24:5 31:9 32:22

**precludes** 22:17 30:19 31:13 32:5

**predates** 240:1

**predominance** 70:12

**predominantly** 251:14

**preexisting** 215:24

**preferred** 34:17,18,19,20

**premier** 210:18

**preparation** 124:19

**prepare** 175:17

**prepared** 175:23

**preparing** 68:14 162:6

**prescribing** 129:19 130:5,9 207:6,10

**presence** 13:11 97:6

**present** 66:24 78:7,19,21 122:11 223:2 237:14 239:14 260:16 282:3

**presentation** 272:15 273:3

**presented** 63:5 78:15 83:17 84:10 202:17 205:23 254:13

**presenting** 19:14 58:16,24 255:23 272:23 273:4

**presents** 157:11 184:13

**preserving** 126:15

**pressure** 21:11 29:8 34:18,19, 24 35:8 36:3,5, 11 37:14 38:23 39:8,9,18 40:19 42:11 45:7,8,13 47:11,12 48:14 78:8,24 79:6, 11,18 80:3 143:9 205:13 249:6

**presumably** 243:22

**pretty** 252:22

**preventative** 210:22

**previous** 57:4 199:6 222:25 223:5

**previously** 10:8 18:24 72:24 103:19 118:7 143:24 216:21

**primarily** 32:14

**primary** 66:23

**principal** 149:8

**Print** 9:2

**print-out** 8:4 210:9 281:1

**printed** 139:11

**prior** 96:15 105:4 126:18 204:20 259:11 281:20

**prioritization** 126:2

**probable** 84:16

**probably** 139:6 141:15 150:5 212:12 273:10

**problem** 59:7 166:14,25

**problems** 58:4 153:8,14

**procedure** 48:2,6,8 50:20 183:6

**procedures** 44:20,22 46:18 49:19 50:10,16 51:11 131:24 133:10

**process** 15:22 16:5 17:9,11 19:4 33:6 46:18 101:19 102:7 165:16 173:4,16 213:2 276:13,24

**processed** 15:23 124:15 170:3

**processes** 20:25 46:19 127:3 135:8

**procession** 32:9

**produce** 43:4 91:5 127:8 274:15 275:12

**produced** 276:6

**produces** 275:2

**producing** 200:15

**product** 13:16 19:1 63:6 69:19 82:23 83:10 84:4 86:3 87:19 88:5 89:3,24 90:8 91:14 92:8 104:9 112:17,18 114:13 119:21 125:10,11 129:18 130:7, 8,11 132:3,9, 13 133:22 138:1 144:1 159:23 162:15, 16 163:10 165:15 168:12 173:12 175:19, 21 184:14 185:12 209:5 214:11 221:13, 19 222:17 223:19,22,24 225:14 251:10, 15 254:1 269:8,21 270:17 275:8

**production** 64:22 65:10, 13,20 66:8 67:25

**products** 8:8 12:23 19:15 30:3 34:12 90:1 117:24 119:7 125:8 130:25 131:7, 12,25 139:18, 24 144:10 162:8,10 183:5,7,19 192:25 193:4 199:10 213:19 214:1,2 222:6 224:21,23,24 225:1,3,5,11 240:22,23 241:1,3

**professional** 27:6,8,10 28:8 29:13 51:7

**professionals** 168:23

**profile** 120:7, 16 162:10,12, 18,20 163:7 175:21

**progesterone** 71:14 72:2,14, 18 73:5,15 76:13 77:1

**progesterones** 74:18

**progestin** 75:21 100:4 225:1

**progestins** 52:23 74:7,17 75:20 76:5 100:3

**programme** 104:11 190:15

**prompt** 113:24

**pronounce** 141:15

**proof** 102:5

**proper** 26:12

**properly** 35:17

**proportional** 198:24

**propose** 108:4

**proposed** 98:11,16,21,24 99:5 100:1 227:8

**protection** 163:5

**protective** 73:8

**protocol** 154:17

**protocols** 110:20

**prove** 13:21 14:5 100:25 108:5

**proved** 59:1

**proven** 98:4

**provide** 37:15 70:10 78:5 85:15,20 88:16 121:18 127:3 130:6 145:12 146:24 150:3 166:21 169:13 178:19 182:3 184:5,7 203:8 222:5,8 236:24 238:23 257:1 269:18,24 270:18,20 271:5,6,13

**provided** 27:16 126:8,12 157:5 180:2 214:5 231:8 238:25 242:10,23,24 243:1 270:22 273:23 278:15 282:21 283:8 284:5

**provider** 27:24 129:19

**provides** 44:20 121:23 184:24

**providing** 131:15 144:24 146:23 184:20,23 271:10

**proving** 101:12 103:3,24 105:7

**pseudotumor** 131:3 133:6,21 134:20 135:3 136:4 137:9 138:12 149:12,25 155:16,25 156:7,21 157:20 158:8,17,23 159:7 164:8 243:22 282:16

**PSUR** 176:8 182:5,11,14,20,25 192:5 254:14 268:14

**PSURS** 184:16 268:17,20 270:22 271:11

**PT** 34:16 194:18

**PTC** 78:17 105:25 130:19 164:9 203:12 204:2,4,13,17,20 205:4,13 223:2,6 226:8,10,11 243:25 244:6,25 245:6,15,25 246:7,16,20 283:14

**public** 112:16 116:13

**publication** 8:1 18:4 20:21 21:20 56:25 57:4,16,18 58:1 63:3 77:18 103:10 105:24 106:13,16 107:15 108:20 118:13 170:25 195:14,18,23 198:2 201:21,22 202:3,9,11,15 203:4,7,22 208:15,17 209:7,9 210:15 211:18 213:3,4 222:10 258:7 259:25 264:19,20 279:20

**publications** 17:20 20:11,13 56:21 57:1,9 75:13 81:21 82:18 108:16 190:10 215:6 252:19,20 256:15 260:25 280:14

**publicity** 187:19

**publish** 16:17

**published** 16:19 17:1,4,5,15 20:8,16 21:20,21 54:22 55:1,11 60:17,20,24 61:1,13 63:17 69:5,22 74:6,21 77:22 80:20 86:8 87:4 106:22 107:21,25 108:14 117:9 195:21 202:16 203:19 208:5,13 211:8,13 222:14 241:4,5 245:17 255:22 256:17 257:3,10 259:6,10 261:6,9,20

**pull** 52:1 55:8

**pulling** 43:11

**puncture** 21:10 22:6,14,15,17 23:4,20 24:5,15,20 25:4,7,10 26:15,21 29:7 47:4,25 48:1,9,12,13,19,21 49:9,25 50:1,20 51:2 78:8,25 79:6,12,18 230:2 236:16

**purpose** 28:16 64:10 66:23 108:8 152:18

**purposes** 27:23 28:23 60:10 125:23 138:8 250:19

**put** 12:19 18:13 19:6,9 20:5 21:12 67:18 69:20 72:11 73:7 77:21 92:8 98:3 107:10 117:13 135:9,25 143:20 144:4,11,18 145:2,7 146:9 154:12 162:15 176:7,8 214:16 221:20,24,25 225:10 238:2 272:16 276:10 278:10

**putting** 137:4 146:4 253:24

**PV** 157:16

**Q**

**quarter** 212:9

**quarterly** 94:24 200:17

**query** 132:7,10 133:14 138:3 143:5 157:18

**question** 18:17 19:18 20:18 27:18,20,21 35:14,21 39:21 43:9 45:21 50:7 53:16 54:23 55:7 57:23 58:3 60:5 62:7,19 69:14 71:18 74:1 79:9 81:23 89:5 98:19 103:5,17 105:4,14 106:7,22 112:2

113:4 117:3 120:11,12 123:11,14,17 129:9 132:6, 14,16,18 133:9,12,24 134:2,16 135:22 136:3,6 137:20 145:8 149:3,7,15,23 150:3,7 151:2, 13,16,20 152:1,18 153:4 155:10,14,22, 23 158:16,21, 22 188:7 217:19 223:23 236:16 241:7 245:8 262:5 282:6,15 283:17

**questioning** 125:23 126:21 138:13 276:11

**questions** 26:12 54:8 55:15,17,24 66:24,25 74:24 79:7 131:11 151:6 154:7 160:12 163:11, 13 164:5 165:6 166:2 168:4 170:8,11,13 178:3,5 180:7, 9 186:19 192:9,14,20,22 194:2,9 208:6 209:25 212:16, 20 213:13,17 228:7,9 230:23 248:1 274:12 278:18,24 283:24 284:7

**quick** 49:4 127:23 128:13 160:14

**quickly** 279:25

**quite** 65:12 244:13 271:22

**quotation** 156:10,18

**quote** 140:16

**quoting** 248:10

**R**

**R-A-I** 202:24

**Rai** 202:22

**rain** 134:15

**raise** 101:22 127:8 165:24 192:9

**raised** 170:7 192:14 201:3 282:7

**range** 120:14 161:23 252:22 253:1,15 274:13

**rare** 13:25 42:17 46:1 101:4 104:7, 14,16 140:6

**rarity** 14:13

**rate** 59:22 61:14 63:18 65:14 66:8 67:25 73:1 88:8 90:11 91:3 139:6 144:6 145:10 146:10 147:3, 8,9 177:22,25 184:7 190:21 192:11,15 211:14 219:19 220:1 249:13, 16,17,23 250:3,4,6,13, 23,24 251:3,4, 9 252:16 253:22 254:1,6

**rates** 41:20 87:13 88:1,24, 25 91:15 107:22,25 108:15,16 113:1,9 128:20 146:24 183:16 184:4,5 186:15 211:12 218:18 250:17,18 269:5,17,18, 19,22,23 270:18,24 271:2,5,7,11 272:15,24 273:4,5 283:8

**rather** 146:23 209:20

**ratio** 61:2 63:4, 9 86:11 106:19 108:1 111:3,9 114:15 116:4, 14 119:13,17, 18 125:14,15, 20 195:5,10,12 197:12 198:24

**re** 6:6 7:22

**Re-examination** 228:4

**reach** 133:16 145:14 151:13, 14 230:23

**reached** 159:2 212:24 226:16 230:12 256:14 274:9

**reaches** 129:18 144:13

**reaction** 82:23 83:10 168:22, 24 234:23 268:1

**reactions** 17:21 139:17,23 140:6 168:11, 12

**read** 68:16 134:2,3 139:16 143:2,3 148:25 149:16 157:22, 23 158:5 183:25 232:2 240:18 243:16

**reading** 94:12 128:16 215:5 271:4

**readministration** 83:1,12

**reads** 142:17, 23 149:10 184:3

**real** 49:15 127:23

**realize** 128:5

**really** 23:22 26:22 31:20 44:12 51:11 52:5 55:14 60:6 66:18,25 67:4 71:3,5 92:13 98:18,25 100:21,24 103:14 108:23 118:12 127:4 136:2 138:6 145:22 153:9 191:12 224:1 229:1 231:25 236:12 246:22 251:10

**realtime** 127:22 228:24

**reanalysis** 106:4 195:17, 22

**reason** 49:24 65:17 91:22,23 121:19 123:21 144:6 178:24 180:16 196:23 198:16 235:18 263:15

**reasonable** 105:11 172:23 227:15 251:16

**reasons** 42:16 46:6 48:3,16 57:21,22 59:21 60:14 65:3 70:15 72:24 73:3 83:25 122:2 125:19 143:19 144:17, 23 146:4,5,21, 22 169:2 211:4 221:12

**reassess** 31:1

**reassessment** 31:5

**reassure** 283:9

**recalculated** 211:7

**recalculation** 208:12

**recalculations** 208:10

**recall** 21:17 23:11 24:12 38:13 74:11 101:1 129:2 134:17,24 138:6 143:7 170:13 178:5 180:8 183:20 186:20 187:12 192:21 194:9 199:21 206:18 208:5 221:3,8 236:8 247:14 258:22 277:24 279:1 280:18 283:24

**receive** 15:23 24:1 50:11 89:24 91:1 95:12 119:10 128:19 137:9 182:24 230:22, 25 276:16,17

**received** 22:15, 25 23:20 26:15,18,20 118:8 120:8 122:13 124:11, 14 126:3,7 127:6 128:21 137:24 142:11 145:5 147:5 165:2,4,11 167:2 174:21 176:23 179:12 180:19 186:4 189:16 191:3, 20 212:16 213:23 216:13, 25 218:16 220:14 230:9 236:2 237:22 250:12 251:13 253:23 263:22 266:25 267:8 277:13 278:2 283:13

**receives** 50:9 144:9 169:24 276:15

**receiving** 25:10 166:12

**recent** 67:19 68:5 88:3 94:1 109:16 121:15 129:6 156:9,25 157:2 204:17 205:8 206:24 213:3

**recently** 65:19 152:13 215:10 227:2 277:1

**receptive** 75:25

**receptor** 71:15 72:16 73:5,14 74:4,13 75:7 76:2

**receptors** 74:8, 19,20 76:6

**recess** 51:17 96:5 134:9 160:19 227:23

**recipient** 142:5, 7

**recipients** 143:16

**recognize** 175:6 195:25 203:19

**recollection** 75:17

**recommend** 226:7

**recommendations** 207:8,11

**recommended** 108:25 150:12 205:15,17 225:18 226:23

**reconstruct** 253:3

**reconstructing** 253:12

**record** 26:6 51:15,20 95:21 96:8 109:8 125:22,23 127:23 134:6, 12 154:13,25 158:6 160:17, 22 161:3 166:2 184:2 227:21 228:1 284:13

**recorded** 219:19

**records** 28:20 231:4,7 233:9 235:21 236:18 237:5,10 238:14

**recover** 26:20

**recovered** 26:19 180:15, 18 233:6

**recovers** 25:7

**recovery** 22:11 180:16

**redid** 61:6

**redo** 118:4

**reduction** 163:3

**refer** 61:21 133:10 164:13 176:24 253:17 255:25

**reference** 24:10 56:21 77:23 82:5 91:25 187:23 189:7 218:7 221:2 256:16 258:8, 12

**referenced** 55:21 189:9 217:20 257:22, 24,25 279:6

**references** 57:12 75:20 80:24 81:1 254:10 255:14

**referencing** 201:21

**referred** 33:10 67:12 75:7 119:6,7 122:23 190:17 213:18 221:14 255:22

**referring** 15:4 18:18 20:20 21:20 34:25 36:15 57:4 75:14 94:24 118:23 120:25 132:8 133:23 137:12 138:14 159:18 163:18 164:14 177:5 188:1 190:11 195:6 196:3,8 207:12 220:17 223:23 229:4 234:14 240:20, 21 252:12 253:8 255:9 261:23 262:13 267:15,22,25 268:1,24 283:11

**refers** 10:20 21:2 24:13 27:4 32:14 36:24 65:8 72:14 112:12 132:4 145:5 172:10 189:10 223:3 241:4 244:21 252:6 258:12 261:21 268:2 281:13

**reflection** 116:15

**reflects** 91:13 135:10 169:3

**refute** 90:15 110:13 234:24

**refuted** 86:15 89:13 109:18 110:1,5,16,19 111:20 118:17 171:10,21 173:24 174:1,5 212:5

**regard** 107:14 130:2

**regarding** 53:10 134:19 162:5 210:20 283:16

**regardless** 28:7

**regards** 25:2 26:19 99:23

113:13 165:7 197:13 214:22, 23 243:4

**register** 268:7

**regular** 185:23 201:12 212:8

**regulations** 101:17 169:15 170:5 267:3

**regulator** 113:11

**regulators** 104:8 112:11 113:7,10 129:4,12

**regulatory** 67:9,12 91:20 107:12 114:5 116:16 157:4 163:20,21 167:25 168:2 169:25 171:25 175:23 182:3 184:18 186:24 188:4,17 189:13 192:13 212:4,17,20,24 242:8 263:1,9 268:10,21 284:5

**reimbursement** 60:13

**rejecting** 72:7

**relate** 139:1

**related** 43:5,12 59:5 72:7 85:2, 7 133:20 135:20 138:4 145:9 168:25 169:24 173:20 177:23 178:21 181:25 184:8 186:4 210:19, 20 215:2 217:1,6 221:10 226:25 283:10

**relates** 135:18

**relating** 19:22 54:12 62:4,22 75:5 96:17 231:4 241:12 255:2

**relation** 12:20 22:23 117:13 137:25 139:3 144:5 145:2,7 146:9 162:16 164:1,3 173:17 253:24 272:17

**relationship** 69:20 78:6 82:24 83:11 84:6,21,23 85:6 88:15 93:23 97:14

**relatively** 104:7

**releasing** 159:6

**relevance** 69:14

**relevant** 10:21 11:12,16 43:2 44:21 46:21 48:22 53:13, 18,22 54:1,7, 14,20 55:3,16, 20 56:2 57:9 73:25 81:23 82:2,17 86:10 93:14 95:9 118:12 129:17 130:6 161:25 162:12 175:19 184:5,7 186:2 187:14 190:9 191:19 195:1 200:24 201:16 215:5 223:22 242:25 269:18, 23 270:20 271:6,12 277:7,17

**reliable** 162:23 211:5

**relied** 214:24

**relies** 69:5

**rely** 211:1 262:24

**relying** 80:10 81:8 260:16

**remain** 93:18

**remained** 175:22

**remains** 50:3 93:15 94:6 162:18,20

**remember** 21:6 128:11 134:15 143:5 163:13 164:5 166:9 173:20 188:5 217:23 221:5 230:17 254:14 258:20 267:4,6

**removal** 108:25 180:16 224:13, 17 226:7

**remove** 21:19 223:19,21

**removed** 22:11, 24 25:3,10 159:15 180:15

**removes** 32:10

**removing** 233:6

**reopen** 118:3 201:1

**reopened** 118:7

**rep** 245:8

**repeat** 43:9 53:16

**repeated** 11:3 152:10,12

**repeatedly** 64:14 118:11 215:4

**rephrase** 19:17

**replace** 60:23 107:24

**replaced** 85:1

**replacement** 75:22 163:4

**reply** 241:18,23 264:5

**report** 7:8,16 8:11 16:19 18:2 39:19 40:22,24 41:4 44:17 45:7 49:8 50:9 51:6 111:2 113:1 120:21 121:22, 24 122:7 123:9,12,15 144:5 146:13 150:13,17,20, 23 156:14 163:23 165:11, 17,19 166:12, 15,20,23,24 168:3,15,21,24 170:2,22 175:7,15,17 176:4,6 181:20 182:16,20,21 183:1 185:16 186:9 191:15, 17 193:20,25 215:19,25 219:7 223:2 226:2 229:5 230:22 231:15, 19 232:13 238:2,22 256:4 267:1 273:24 277:15 278:11, 16

**reportability** 85:3

**reported** 11:20, 22,25 12:15,19 15:9,18,19,21, 24 16:25 18:7 21:2 27:5 28:9, 11,13,15,25 29:4,5,8,11,12 30:16,18,22 31:8,9,11,19 32:1,11,14,23 34:24 35:8 36:19,23,25 37:3,10,11,13 38:1,9 39:2,16 41:12 44:18 45:17,23 46:22 47:3 48:4 49:20 50:13 58:20 79:23,25 80:1,5 82:24 95:16 102:11 119:4,5 121:15,25 122:1,2,6 124:16 125:6,

7,11 135:17 137:1 138:24 164:3 165:5 166:8 168:11 170:3,4 183:17 190:14 191:16 194:21 214:4 215:9 219:21 221:17,18 229:12,14,21 230:18 232:15 241:24 246:18, 21 249:7 254:5 267:1,12,13 268:7,8 269:6 272:25

**reporter** 4:1 27:7,12,16 33:1 44:20 85:5 127:25 153:8,12 259:15

**reporter's** 161:5 169:3

**reporting** 11:25 16:13 31:25 37:19 40:15 42:18 44:4 57:8 63:4,9 84:25 85:11, 14,19 86:11 87:5,6,13 88:1, 8,24,25 89:14, 23 90:2,11,13 91:3,15,18 95:7 101:11,21 102:18,19,22, 25 103:1 106:19 111:2,9 112:6,7,10,11, 13,15,19,21,25 113:1,6,8,18, 21,23 114:11, 15,17 115:4,7, 9,11 116:4,6,9, 14,16,21 118:1 119:13,16,17, 18 124:24 125:13,14,20 128:20 135:18 139:6 144:6,16 145:10 146:10, 24 147:3,8,9 150:15 168:5 177:6,8,22,25 183:16 184:4, 5,7 185:9 186:14,15,20, 23 187:7,19,24 188:2,5,9,22 189:2,8 190:21,22 192:10,15 195:5,10,11 197:12 198:24 218:18 219:3, 10,14,16 224:6 249:13,16,17, 23 250:3,6,13, 17,24 251:4,9, 11,20 253:22 254:1,6 267:3 268:6 269:5, 17,18,19,22,23 270:18,24 271:2,10 272:15,23 273:3,4

**reports** 12:10 16:12,13 17:20 20:13 21:21 23:10 27:17 28:8 29:1,24 30:2 32:4 34:10 36:17 39:12 40:15 44:16,23 46:23 50:2 56:1 82:18 85:25 87:20,22 88:7 89:5,6,24 91:23 102:14, 20,21 110:10 112:12,24,25 114:12,14 116:8,11,12,20 119:8 120:1 124:12,14,15, 16,19 125:5 138:23 144:9, 12 147:10 150:25 152:6 162:6 163:12, 15,16,17,18,19 164:18 165:1, 5,16,19 166:8 167:3 169:3,8, 13,16,19,20,24 170:9 174:21, 24 176:23 181:6,19 187:18 188:20 189:15 190:1, 17,20,24 191:6,18,20 192:25 193:3, 7,12,14 200:11,20 201:15 216:25 217:2,6 218:15 219:11 220:20 221:11 222:1, 5,7,12,15,25 223:5 224:5 238:22 240:16, 20 241:5,11 249:6,23,24,25 250:1,7,9,12 251:7,13 253:23 255:23, 25 256:1,2,3,6, 22 257:1 261:1 265:12,24 266:6,14,21,23 267:25 268:1,3 272:16,17,25 274:9 276:1 277:6,11,12

**represent** 24:17 76:10,12

**representative** 17:13 77:18

**represents** 60:6

**reproductive** 57:7 70:5 73:18 100:17 196:13,18 219:19,22 248:9,10,15 252:12 253:20

**request** 7:9 54:5 82:14 127:6 133:24 174:18 178:9, 14 212:25 213:5 224:2, 11,12,16 243:24 265:11, 23 266:5

**requested** 126:2 129:8

**requesting** 126:13 151:18 272:12

**requests** 54:6 137:19 212:25 213:8

**require** 14:14 15:16

**required** 137:6 138:21 153:5 169:15

**requires** 154:18 223:21

**residents** 210:20

**residual** 163:9

**resolution** 282:6

**resolved** 22:3 236:13,15 239:9

**resolving** 21:14

**respect** 161:22 167:1 197:2 206:9 274:7

**respective** 63:18 107:22

**respects** 72:10

**respond** 55:16 151:8 159:4 179:5 213:13

**responded** 158:2

**responding** 55:15 131:22 132:20 133:19 134:18 137:15, 19 138:2 162:3

**responds** 258:14

**response** 6:10, 23,24 7:12 34:5 51:25 53:2,25 54:4 56:5 66:24 67:7 73:16 77:2,21 82:24, 25 83:11,12 90:9 96:11,15 100:15 105:3

107:11 132:18, 23 136:13 138:19 144:11, 13 145:13 150:3 155:10, 15,21,22 179:11,13 212:15,16 213:11 214:17, 18 216:19 217:7,9 220:18 222:2 228:8 242:11,12,22, 24 243:1,3 245:13,24 257:23 258:2, 6,13 261:24 264:25 280:21 283:7

**responsibilities** 161:21,24

**responsibility** 61:24 132:17 140:15 158:10 162:1

**responsible** 65:11 148:16 153:14 161:25 242:10

**rest** 57:11 114:13

**restrict** 119:2

**restricted** 195:19 197:1,9 274:5,12,21 275:1

**restricting** 118:21 272:18

**restriction** 196:21 274:13

**restricts** 194:21

**result** 59:20 65:22 86:13 108:17,22 111:7 174:10 185:9 225:4

**resulted** 220:10

**results** 16:17 29:4 46:11 48:13 59:3 63:11,13 103:19 105:24 106:1 113:2 150:8 200:2,7 203:12 212:5 239:1

**retract** 273:16, 19,20

**retrieval** 34:11, 13 37:10 38:25 39:2,5,7,20 40:22 41:2,9 42:22 43:2 44:12,13 45:3, 10 47:2 83:18 215:21,22

**retrievals** 11:24 95:2

**retrieve** 46:21

**retrieved** 215:14

**Reuben** 213:3

**reversible** 59:24 84:4 208:19 209:10, 14,22

**review** 29:21 30:24 31:16,21 33:4 34:10,12 35:23 37:24 45:16 55:25 61:12 62:21,25 64:13 69:4 74:22 82:9 83:4,6,15 84:11 93:8 96:22 107:8 126:5,9 162:11 178:19 179:17, 19,21 190:13 200:19,25 201:14 202:11, 25 213:24 215:10 216:24 218:23 228:25 231:4 258:18 260:3 261:7 263:24 280:4

**reviewed** 11:9 23:14 29:15 36:10 46:16 63:1 105:17,20 106:8,25 156:14 190:20 202:16 217:3 218:14 228:19 233:8 245:25 256:14 260:12

**reviewing** 23:10 107:16 169:11 200:2 215:1 237:4 255:17 259:1

**reviews** 27:17 31:18 58:19 59:12 66:22 68:5,9,16 69:5 70:22 74:6,10 75:20 80:10, 12,14,18 81:9, 10 124:23 165:20

**revised** 227:2

273:20,24 274:3,16

**revision** 274:17

**revisions** 227:5

**Rich** 243:21

**Richard** 243:19 247:11

**right** 33:21 36:9 47:12 53:24 56:20 57:14 64:25 66:17 67:23 69:11 81:20 86:21 92:1 93:22 109:22 110:3 123:10, 18 137:11 138:6 143:11 146:1,17,19 147:17 148:13 155:1 157:25 158:3 166:2,18 168:6 171:25 183:23 184:1 187:12,14 190:25 191:13 201:23 209:19 210:1 218:25 223:3,4 228:23 235:12 238:10 240:7 242:1 255:5 259:9,12 264:2 265:18 275:23

**rise** 66:1

**risk** 7:16 57:20, 24 59:5,10 61:1,3,5,7,9 62:24 63:15, 16,21,25 64:18 71:3 85:16,20 87:9 93:11,13, 17 94:4 100:18 103:21 105:19 106:2,4,6,9,14 107:20,23 108:2,6,16 116:23 119:9 121:11,17 122:17 135:13 156:13 157:19 162:9,12,18,19 163:7,9 167:10 175:20 179:24 185:16 186:9 193:20 196:15, 19 203:8,13 204:4,13,16 205:7,24 206:11 207:18, 24 210:3,21 211:7,8,15 220:23 222:6 225:21 226:10 242:13 247:4 250:10 253:9 254:8 256:9

**risks** 130:6 162:14 173:6 255:11

**robust** 269:25

**role** 100:11 101:10 169:10 185:19 223:6, 15 247:6

**roll** 128:5

**room** 154:22

**ROR** 86:9,22 88:11,13

**RORS** 86:2,25

**ROSS** 4:11

**rough** 84:1 128:16

**Roumen** 157:16

**routine** 93:19 95:13 104:18 124:18 165:13 174:24 242:6

**routinely** 88:20

**row** 194:24

**Rules** 25:24 26:4

**run** 101:20 125:9 198:14 234:7 272:4

**running** 127:24 156:3

**runs** 90:25

**S**

**S-A-M-A-V-A-L-L-I** 141:13

**S-I-N-G-H** 255:15

**SAE** 237:22 238:2,22

**safety** 6:14 8:16 11:14 12:24 52:23 61:23 64:8 91:12 92:7 114:19 117:24 124:19 129:12, 15,18 130:2 131:20 132:7, 13 138:3 139:13,15 140:8 141:21 149:4 150:18 161:19,22,25 162:5,7 163:17 165:18 166:14, 25 169:10,14 171:16,20 174:25 175:1, 7,14,19 176:4 178:20,25 179:17 182:19, 20 183:1 200:23,24 214:10 215:7 217:12 230:16 239:18 243:4 247:9 249:18 251:17 274:12 282:22 283:9

**said** 16:4 32:13 41:4 50:1 53:11 55:23 66:18 74:2,16 75:9 79:9 86:8, 19,20 98:23 105:3 107:3 113:10,16 128:15 129:3, 10 144:14 145:25 146:16 147:12,14,15, 16,17 154:13 187:6 191:20 193:7 224:10 228:25 229:13, 25 233:12 236:8,9 237:12 238:18,19 245:24 248:18 256:25 259:17, 24 261:16 269:13 271:10, 15 275:11

**sales** 59:16

**Salmivalli** 142:2 143:15, 20 145:25 146:20 147:23 252:4 282:21

**Samavalli** 141:13

**same** 60:22 63:11 77:3 89:1 102:12,13 103:15 117:23 119:23 127:13, 15 152:2 155:6 163:15,19 174:3 175:22 181:20,22 188:15 189:10 190:24 193:6 196:16,21 197:10 205:14 213:4 249:20 270:6 277:5 283:12,15,19

**sample** 120:17

**samples** 59:23

**satisfied** 241:20 243:3

**saw** 20:3 87:14 115:14 189:22 256:7

**saying** 15:1 16:1 24:24,25 49:10,14 59:1 92:18 106:12 113:5 130:20 137:14 145:21 149:24 221:16 238:13 246:15, 17 253:7 260:17

**says** 34:13 36:14 47:10 48:13 49:8 53:2 56:8 57:6, 17 72:1 78:3 85:12,22 87:1 89:19 120:13 122:7 133:13 139:12,14 140:12 156:4, 7,10 168:9 173:3 174:4 176:16 177:8 178:18 179:15 181:11 182:15 183:14 186:13 187:5,16,21 188:21 195:7 196:7,11 199:3,8,12 201:20 203:6, 25 205:11,22 210:17 218:4 222:24 226:6 231:14,19,21 232:22 235:12, 14 237:16 243:20,23 246:3,20 248:2,9 249:2 251:19 252:13, 15 253:18 254:10,24 255:7 258:3,15 260:15 261:13, 20 265:8 266:4 269:16 271:4 274:16,25 281:16 282:4 283:6

**scenario** 112:6 131:24 137:3 150:10 151:13

**scenarios** 133:11

**scene** 10:6

**scheduling** 126:18

**Schering** 239:20,21 240:1 281:14, 17

**Schoendorf** 5:5 7:2 10:5,9,13 51:15,20,23 96:3,8,11 109:8,10 125:24 126:6, 10,21,23 128:9 134:6,12,14 139:10 141:1 142:6 155:9 160:9,17,22 161:7 168:17 227:21 228:1,5 284:11,12

**Schoendorf's** 126:1

**science** 62:4, 16

**sciences** 61:17, 19,21

**scientific** 17:19 55:10,19 62:1 68:11 70:22 156:14 190:9 214:25 264:14

**scientifically** 262:10

**scope** 19:16 38:11 64:4 98:13,22 99:7, 18 100:13 245:9 246:11 277:7 278:7

**screen** 20:11 51:16,21 96:4, 9 109:9 134:7,

13 160:18,23 227:22 228:2 284:14

**screening** 17:10,19

**screens** 17:14

**se** 80:1 102:3 166:15

**search** 20:9 30:6,8,14 32:3, 15,18,21 33:8, 9,11 34:14,16 35:3 36:15 38:5 40:1,6 44:13 47:5,10 48:7 55:3,4 56:2,3 81:22 190:8

**searching** 12:3

**second** 10:19 56:7 57:17 71:11 73:4 90:18 94:9 141:8 168:14 179:14 182:15 194:24 196:7, 24 201:25 229:16 243:18 258:2 269:3

**Secondly** 244:15

**section** 64:21 65:6 70:5 73:17 77:22 176:25 186:7 198:23 199:8 203:25 206:16 222:22

**sector** 34:10

**see** 10:23 12:5, 18 23:25 28:22,23 29:21 31:19 32:21 33:4,7 37:3,24 38:16 39:13,23 42:12 45:18 48:11 53:2 56:11 57:8,11 58:23 61:2 64:10,23 65:4 70:12,25 71:15 72:4 77:24 80:24 82:9 87:4 89:22 90:1,5,25 91:4 95:9,14,18 101:20 104:21 110:11 111:9 116:4,5,7 119:13,17 120:17 121:12 142:4,5,14 150:11 154:4 155:11 156:6 168:17 169:19, 20 171:2 172:6 173:2,8,11 177:5 178:22 179:25 180:5, 23 182:10,22 186:17 188:20, 24 189:5 194:23 197:4, 11,12 198:17 199:2,8 200:6, 13 204:5,21 205:11,20 210:10,23 215:8,16 218:3 223:7 224:21 226:5,13 244:2,3,12 248:12 249:10, 11 250:6 251:12,16 255:5 264:9 265:16 269:14 274:19 277:11 279:18,25 281:10,12,22

**seeing** 70:2 200:12 237:10

**seem** 59:2 278:2

**seemed** 230:1 239:3

**seems** 27:23 157:6 204:12 231:24 232:24 233:3 235:22 236:11

**seen** 62:16 167:19 208:24 239:22 281:2

**sees** 12:9 19:2 166:18

**self-limiting** 23:2,5

**send** 143:24 144:11 169:23 179:2 182:9 268:4

**sender** 141:12

**sending** 182:5

**sense** 30:20 41:3 45:21 48:11 245:11

**sent** 126:4 182:11,13 198:2 212:2 215:25 258:17 280:9

**sentence** 35:7 36:9 56:8 57:17 65:2 71:25 105:1 181:10 183:14, 23 184:1 224:3 243:23 269:3 277:4

**sentences** 78:3

**separate** 38:21, 24 59:2 197:15,20

**separately** 52:2

**September** 176:5 182:17 267:11

**serious** 11:18, 21 12:3 15:7, 17 16:1 41:23, 24 50:14,15 51:3 95:15,17 267:23 268:12

**seriousness** 15:13

**serves** 152:18 260:6

**service** 17:18

**services** 4:4,12 210:22 239:19

**set** 12:21 102:2 139:2 270:19, 20

**seven** 21:6 241:9 254:21

**several** 52:15 70:24 86:22 93:15 95:4 98:15,23 104:11 109:15, 24 110:14 112:14 122:18 126:3 209:2 227:4 256:16

**severe** 39:12, 22 40:9 41:15, 19 43:6,13 230:3

**severity** 50:12

**sex** 100:20

**share** 255:13

**shared** 112:11 113:7,10 140:14 257:3

**she's** 71:20 250:21 252:12 260:3 262:9

**sheet** 276:16

**short** 51:17 64:25 134:9 141:24 160:19 227:23

**should** 31:16 33:22 82:16, 18,20 108:5,23 109:3 151:8,9 226:11 240:18 242:22 243:10 251:17 271:21 272:3 277:7 282:2

**show** 55:8 86:2 88:24 194:8 203:18 279:24

**showed** 19:23 23:19 48:13 106:25 183:14 185:10 208:18 217:11 245:18 247:4

**showing** 65:13

66:7 141:7 207:18 209:10

**shown** 41:14 73:2 90:8,9 183:9 188:17 244:23 257:15

**shows** 35:22 76:25 107:7 115:22 116:23

**side** 59:16,18 60:7 130:7 132:4 139:23 162:14 163:9 168:11 235:3

**sides** 58:14 59:14

**sign** 30:11 38:7 39:17 78:20

**signal** 11:4,5,8 24:9 28:18 29:19 33:6,14, 23 50:23 53:4, 6,7 57:1,9 64:8,9,10,11, 15 66:23 68:18 69:8,15,17,24, 25 79:8 85:15, 20 86:12,14,15 87:14 88:13, 14,20,21 89:11,12,13,21 90:2,4,15 91:12,24 92:2, 11 93:2,7,13 94:1,5 96:18 101:25 102:7 103:6 104:21 105:15 109:12, 15,18,20,23,25 110:1,4,6,7,12, 13,14,17,19, 23,25 111:13, 14,15,16,17, 18,20,21,23 112:8 113:25 114:3,8,18,20, 22,23,25 115:1,4,6,10, 13,17,20 116:25 117:1, 4,10,12,14,22 118:2,3,4,15, 16,17 122:17 123:19 124:10, 18 125:3 126:7 129:6 152:10, 12 157:2,11 162:2 165:22 169:17,20 170:11,17,18, 23 171:4,6,7,9, 10,12,15,20,21 172:7,10,11, 15,20 173:3,5, 10,14,15,18, 23,24 174:2,4, 5,10,14,15,25 175:1 176:14, 20,25 177:24 178:4,8,15,25 179:2 180:3 182:7,12 184:8,16 185:4,6,10 186:3,8 187:25 189:9,16,21 190:5,7 191:5 192:2,4 193:17,21,23 194:11 195:14 196:22 197:2, 10,13 198:12 199:20 200:21, 25 201:1,9,11 202:3,6,10 203:1,2,6 204:8,25 206:4,6 211:17 212:2,5,6 213:2,5,8,15 215:4 216:22 217:3,15,17 223:10 237:13 241:14 242:2, 3,7,16,25 246:25 249:16, 18 250:15 251:12,17 265:19 268:15, 19 271:13 273:5,6 274:6, 15,19,25 275:1,3,13 279:23 283:9 284:4

**signals** 109:11 110:4 114:8 201:3

**significant** 66:8 118:8 266:24

**signs** 29:3,8 40:17 41:4 44:5 58:16,24

**similar** 15:22

**simple** 111:16 155:14

**simply** 116:15 125:17 166:16 265:18

**simultaneously** 25:9

**since** 29:1 30:21 44:10 59:24 62:13,14 84:1 92:7,10 93:14 99:9,10 100:16 102:9 104:9 115:8,13 122:18,19 137:24 139:3 144:3,7 152:11 161:17 164:25 165:3,10 177:14 181:23 191:4,25 199:20,24 200:11 209:1 210:14,23 215:3 220:7 221:12 223:23 230:16 250:8 262:6 269:23 276:23

**Singh** 255:15

**single** 15:22 18:2,3 20:21 21:2 27:4 32:16,25 42:23 46:19 50:9 54:13,18,21,25 84:24,25 85:4 90:12,14,23,24 110:10 111:2 120:6 122:14 125:17 170:2, 22 193:13,14 214:1 222:7 241:5 256:1 257:1 265:4 266:25 267:2 284:4

**sinus** 31:12 36:20

**sit** 26:3

**site** 126:4

**sitting** 55:18 109:21 110:3

**situations** 188:23

**size** 13:14 14:12 101:7 249:17

**Skipping** 140:12

**skips** 254:20

**Skyla** 216:8,10, 14

**slightly** 175:21

**Slutsky** 7:1 157:14

**small** 204:3 249:8 250:7,13 251:20 254:5

**snafus** 153:11 160:9

**so-called** 28:12 94:18 101:24 132:7 138:2 214:10

**society** 78:15

**sold** 139:3 220:9 224:7 272:21 273:2

**sole** 213:20

**some** 13:1 16:15 17:23 24:9 31:19 32:10 36:15 41:13 45:17 46:9 54:11 73:22 74:20 75:10 78:21 99:14 105:11 110:8 120:8 122:20 128:14 132:23 141:7 146:24 149:4 151:15 160:11

161:4 163:11 169:1 171:16 178:3 180:24 194:5 204:23 205:1 206:5 209:25 212:13 230:11 233:19 238:11 252:4 255:12,24 259:11 276:1 277:11

**somebody** 16:11

**somehow** 79:7 138:5

**someone** 128:24 130:18 159:7 230:12 233:24 261:25 263:22,23 264:6,12

**something** 31:3 33:17,24 50:22 55:8 60:9 62:4 63:7 66:1 67:19 76:15 81:1,19 90:23 91:19 94:11,15 99:20 101:23 103:16 105:9 107:17 111:1, 10 112:20 114:20,24,25 119:21 121:24 126:16 130:16 140:17 144:6 145:9 146:9 163:24,25 169:21 170:20 171:2,13,17 172:19 198:9, 16,18 211:1 229:1 236:23 241:3 254:21 267:13 271:25 272:12,13

**sometimes** 16:14 50:3 164:9 221:14

**somewhat** 103:13

**somewhere** 33:25 42:6 50:17 55:22 67:11 69:11 94:20

**sorry** 15:2 19:13,17 35:13 37:6 47:15 64:3 76:23 81:5 82:7 90:19 123:10 147:14 155:20 160:9 176:15 187:11 201:23 224:14 229:4 232:3 234:4,20 237:16 240:8 259:15 262:12 263:20 267:15 273:14 282:10

**sort** 92:1 134:7 238:11

**sought** 60:13 281:17

**sound** 70:11

**source** 169:13 184:13 185:11 211:5 269:24

**sources** 117:22 140:7 170:22

**Spain** 121:1

**Spanish** 20:22

**speak** 73:3 241:16

**speaker** 252:6

**speaking** 12:22 13:17 137:13 161:24

**speaks** 65:16 262:3 273:20

**specific** 30:10, 24 54:5 55:15, 23 58:3 60:4 65:24 67:24 91:2 95:6 98:20 113:18 114:12,13 125:11 133:23, 24 134:24 138:7 143:7 158:21,22 183:1 208:16, 17 217:4 269:10 270:23

**specifically** 13:23 56:21 86:17 92:9 97:20 113:13, 20,21 164:2 167:1 190:11 213:16 218:2 260:19 272:12

**specify** 136:13

**spectrum** 256:23

**speculate** 38:14 135:24

**speculation** 25:14,21 26:10

**spend** 169:10

**spinal** 65:18 71:8 72:25 236:16

**sponsor** 17:7 19:4,24

**sponsored** 16:6,7,10,11, 22 18:11,23 19:2 20:9 232:19 233:25 235:7

**sponsors** 183:15 184:4 269:4,17

**spontaneous** 27:4 29:1,24 30:2 31:22 40:14 44:16,17 50:2 55:25 82:18 85:4,11, 14,19,25 87:2, 11,13,20,21 88:7 89:5,6,14 101:16,18 102:13,21 104:19 112:12, 21,24,25 113:1,8,23 114:6,7 115:15,24 116:7,11,12,20 117:7 118:1 119:8,15 120:21 121:22, 24 122:7,22 125:5 135:18 138:23 147:10 152:6 163:18 165:4 166:15, 19,23,24 168:3 169:12,16 188:20 190:16 191:1,15 193:2,11 202:13 213:23 220:16 221:18 224:6 249:5, 23,24,25 250:1,6,11 251:7,13 253:23 255:23 256:2,3,4 268:2 272:15, 17 275:25

**spontaneously** 46:22 102:10 183:17 239:9 269:6

**spotted** 17:1 18:25

**spreadsheet** 126:6

**stage** 242:9

**standard** 20:24 46:17 49:18 50:10 247:25

**standing** 272:5

**stands** 149:8

**start** 70:2 122:9 164:23 165:14 172:19

**started** 22:11 161:6,14 165:3 185:8,9 201:5 202:10 205:5 232:15 262:21

**starting** 21:7 80:25 87:14 90:6 276:9

**starts** 34:11 271:1 276:24 283:20

**state** 15:5 21:15 31:24 46:11 60:21 210:19 214:23 226:4 244:5 251:12 266:1,12,14,18,20,21 270:15 271:24

**stated** 67:16 85:5 101:16 102:4 157:10 203:16 275:14

**statement** 90:25 139:20 140:2,11,14,21,22 144:18 147:5,9 156:7,24 157:1 169:5 197:7 234:13 269:15 270:9

**states** 183:17 201:6 209:3,11 224:4,8 269:6 270:6 274:4

**statistical** 14:11 101:20 111:5,6 114:10 198:14,15,18

**status** 69:21

**stay** 127:13

**staying** 127:15

**stays** 29:14

**step** 89:20 111:7 114:2

**steroid** 74:8,19 76:6

**steroids** 73:7 244:1,7

**still** 22:4 33:20 44:9 47:4 62:6 99:21 104:13 126:3 189:15 219:17 222:18

**stimulated** 91:18 102:17,18,25 103:1 112:6,10,11,13,15,19 113:6,18,21 115:5 116:6,16,21 186:14,20 187:19,24 188:1,5,9,22 189:2,8 190:22

**stimulation** 72:18

**stop** 25:21 26:1 271:17,20,21,23 272:4

**stopped** 21:10 22:8 115:3 181:1

**stopping** 127:11

**stops** 271:18

**stratification** 125:16

**stratified** 57:6

**stratify** 86:9 119:3

**stratifying** 125:16

**stratum** 86:10 106:20 194:25

**Street** 4:5,13

**strong** 196:13,14 274:14

**studied** 15:12

**studies** 41:14 63:2 65:12,13 67:25 73:2 74:8 82:17 103:2,8,23,24 104:3,4,9 105:6 106:21,25 107:7 205:11 207:17 244:23 245:17,18 247:2 257:15

**study** 8:11 14:2 16:16,17,19 58:6,13,14 59:4 60:2 61:4,15 63:13 66:7,10 68:2 77:21 103:11,12,16 104:3,23,24 105:2,9,10,21,24 106:3 107:4,22 108:5,20,23,24 116:23 148:6,7,22,23,24 205:6 207:1 208:22 209:15 228:19 230:24 231:16 234:8 239:11 255:2 261:11

**studying** 13:25

**stuff** 81:11

**sub** 53:12 194:22

**subject** 10:16 67:3 77:18 102:17 275:16

**subjected** 107:7

**submission** 175:23 182:19 183:3 187:18 192:7 223:22 224:1

**submit** 182:25 184:17 192:2 211:21 212:9

**submitted** 87:16 90:7 93:11 94:2 102:21 107:11,12 109:17 110:18 112:18 124:20 129:7 152:13 157:3 170:9 184:9,17 185:16 186:10 192:5 193:25 211:25 212:7,8 219:2,7 241:18 254:14 258:17 259:11,25 268:14,21 271:11 273:7 276:19,21 277:2

**submitting** 123:19 179:16 182:7 262:25

**subordinate** 150:22,24

**subsequent** 268:19

**subsequently** 262:7

**substance** 173:7 214:1

**substances** 214:20

**successively** 164:21

**successor** 221:13,19 222:17

**such** 12:13 13:24 29:13 30:14 36:25 40:18 46:1 49:15 72:23 90:1 91:23 101:4 116:20 125:19 130:19 131:22 136:25 137:9,15 144:22 149:13 150:1 152:18 174:16 224:1 225:22 230:22 243:1 256:2,5 268:11

**suffered** 46:24 216:2

**sufficient** 104:13 172:12 278:2

**suggest** 50:23 108:20 183:15

**suggested** 100:4 223:1

**suggesting** 26:11 61:7 64:7

**suggestive** 26:9

**suggests** 63:24 246:9 252:1 269:4

**Suite** 4:4,12

**sum** 132:20

**summarize** 68:10 134:17 165:17 216:3

**summarizes** 175:19

**summary** 56:7, 15,18 57:11,15 65:1 100:6 162:6 165:19 186:12 201:20 203:5 214:5 217:20 218:1 278:8,13

**summer** 247:6, 8

**summons** 276:17

**superior** 109:2

**supplemental** 273:23

**supplemented** 208:14

**support** 29:6 57:23 58:11 103:20

**supporting** 106:21 179:22

**supportive** 59:1 63:10,19 67:13

**supports** 57:19 61:4 62:23

**supposed** 142:23 234:8 240:25

**sure** 18:16 19:19 23:7 24:2 25:8 29:16 32:16 35:20 38:8 42:2 43:10 44:21 46:20 48:24 50:7,17 55:6 62:20 64:1 75:13,18 98:19 107:2 129:17 141:10, 12 148:13 162:17 166:1 232:4 234:12 240:3 244:13, 14 245:20 246:12 248:20 249:19 261:4 272:2

**surge** 32:3

**surgery** 216:2, 15

**surveillance** 210:4

**survey** 208:16 209:10,25 210:10,12,13, 16,18,25

**surveys** 210:19

**susceptible** 86:4

**suspect** 85:6 121:19 264:13

**suspected** 48:19 168:22 177:8 232:13 235:9,11

**suspicion** 104:5 105:11 232:25

**suspicious** 43:18 44:5 263:16

**Sweden** 229:5 267:6

**Swedish** 267:11

**sworn** 5:4 10:8, 10

**symptom** 41:6 204:20

**symptoms** 21:7,13,14 22:3,10,16 23:3 29:3,8 30:11 40:15 42:15 43:12,22 44:3 46:3,7 58:16,25 122:9,10 205:4 239:6

**synonym** 208:25

**synonymously** 173:15

**synonyms** 164:9,12,14

**system** 40:3 42:24 60:4,11, 12 168:5 210:4,18

**systematic** 31:5

**Systemic** 142:19

**T**

**T-E-R-V-O-M-A-A** 148:4

**table** 76:25 77:3 123:18 134:16 194:11, 16 278:10

**tables** 194:5 217:5

**tabulation** 83:17

**TAG** 157:16

**take** 25:3,5 38:16 49:2 60:1,3 81:16 95:20,24 111:4 114:2 116:19 133:17 154:2,3 160:14 205:6 211:12 268:22

**taken** 10:5 21:5 169:1 221:22 223:15 256:5 282:2

**takes** 259:10 272:24

**taking** 89:20 160:7 173:5 214:4 239:3 274:18

**talk** 68:13 125:22 160:10 236:20 244:17 249:15

**talked** 11:6 14:23 23:9 68:17 80:9,11, 12 100:23 101:14 109:10 124:8 126:6 127:17 142:1 154:24 188:4 233:10 235:19 240:3 258:15

**talking** 10:16 15:6 16:21 19:21 28:5 29:17 51:24 52:3 75:1 76:11,18 77:6 84:15 93:1 99:22 101:4 159:23 187:5 193:12 228:21 237:4,11 238:15 241:8 242:2 250:16 254:7 262:6 263:20 272:14 278:23

**talks** 35:7 36:10 73:17 76:13,16 77:15 78:16 240:15 257:18 260:12

**tape** 227:18

**team** 176:8 214:10 224:20 225:10 230:20

**teams** 230:24

**tech** 153:14

**technical** 109:5 134:7,15 153:8 161:4

**technology** 161:5

**Teija** 148:3 150:6

**telephone** 4:6, 14 58:19 59:13 209:25 210:19

**tell** 14:17 20:19 43:10 52:3 76:7 80:17 89:11 90:13,22

126:19 135:4 151:8 176:22 177:12 243:14 259:4 266:7 271:24

**telling** 121:18 140:18 155:2

**tells** 102:25 234:7 237:25

**temporal** 82:24 83:11 84:6,20 179:19 204:19 205:3 244:19 246:19 256:22 261:17

**tension** 46:5

**term** 26:24 27:3 28:10,11 34:17,18,20 37:12 38:2,5 40:1,25 91:19 136:15 170:19 194:19 242:7, 15,16 256:20 281:21

**terminology** 22:19 28:12 33:12 165:21

**terms** 28:9 29:18 30:8 34:23 35:3 37:4,9 40:6 47:10 48:8 58:23 85:4 111:16 126:18 140:7 150:25 162:11 178:21 211:11 236:25 244:18 249:15 252:5

**Tervomaa** 6:20 148:3

**testified** 10:11 58:4 113:19 115:2,5 124:9 126:10 168:6 173:18,22 178:7 195:13 198:5 199:14

**testifying** 130:14

**testimony** 10:16 15:3 101:11 105:5

**tetracycline** 21:5 22:9

**text** 57:13 232:3

**than** 21:17 59:11 73:6 75:1 89:25 103:23 120:21 122:18 146:23 177:21 180:16 220:3 230:13 231:25 239:5 249:4 252:20 272:23 273:2,9 274:9

**Thank** 51:21 93:1 141:11 160:23 179:16 283:7

**thanks** 160:9 283:10

**that's** 17:11,12 19:16 23:14 35:12 44:9 47:7,12 48:7 53:8 56:4 62:1 64:9 66:2 67:17 69:24 76:8 77:12,14 78:22 79:3 95:15,23 96:14 101:7,19 102:3 103:5 113:15, 16 117:23 127:17 131:14 132:7 133:9 141:17 142:8 147:17 154:14 158:14 166:6 167:25 171:25 174:12 181:22 187:13 193:5 197:19 199:12 200:24 201:21 212:22 217:24 235:1,14,17 236:9 240:25 243:16 252:25 260:10 261:5 262:2,16 264:1,8 267:8 270:10,21 273:5 274:5 275:24 276:22 279:24

**their** 16:17 22:15 44:17 54:7 55:16 58:14,16,24 59:4,9,11,17, 19,23 63:13 66:24,25 74:9 82:14 103:11, 13,14 105:24 106:2 108:19 126:22 139:17 153:14 159:2 189:4 203:11 205:10,16 210:20 232:11 237:11 238:12, 15 239:2 256:10 258:6 276:10 277:14

**themselves** 12:8 59:3,19 63:12 203:10 205:2 256:11

**theories** 70:10

**therapies** 75:22

**there's** 31:23 54:10 87:15 98:3,4 132:13 139:1 172:21 265:19 267:21

**thereafter** 62:12

**therefore** 73:25 171:21 172:14 197:12 250:7

**therein** 152:21

**these** 15:17 16:1,12,13,17 20:14 29:1 30:5 32:18 33:5 35:3 36:19 37:10, 16,22 39:18 40:20 44:2,3 46:7 55:15 56:4,25 57:8 58:18,20 60:14 63:19 65:1,2 66:3 68:7 69:3 70:10,14,19 71:5 73:3,23 74:10,24 78:23 80:10,12,14 81:3,11,12,21 82:1 83:2,14, 16,20,23 84:5, 15 85:23 86:2 87:2,3,18,19, 22,24 88:12 95:18 98:20 99:5 100:21 102:2,8 104:4, 15,16 106:4 107:23 108:15 109:18 110:22 113:6 114:9 122:20 124:11, 14,16,17 125:8,12 127:8 129:3 131:23 132:2 133:1,11 135:21 140:5 143:16 144:4, 7,16 151:14 153:11 155:5 163:6,8,19 169:2,19,20 174:17 177:10 185:11 189:16 193:5,11,13,15 198:15 199:3 200:5,16 205:1 206:5 212:24 213:5,13 214:4,13 215:16 217:2 222:10,12,14 223:5 225:3 226:9 232:24 247:13 255:24 256:1,6,7,15 257:14 268:16 270:14 271:13 275:5 276:5,20 277:11,13,18, 20

**thick** 53:11

**thing** 54:14 81:20 93:1 163:16,19 249:20 265:4 272:7 277:19

**things** 61:24 72:22 81:10 110:22 125:15 127:14 128:14 129:3 136:24 148:22 165:24 235:5

**think** 41:22 55:19 60:8 61:20 67:21 92:14 103:7 104:23 114:2 118:21 127:4 130:13 141:23 143:21 144:7 146:22 154:22 164:23 167:6 170:15 187:6 198:6 227:18 228:11,14 238:4 250:20 252:1,25 260:19 262:7 263:4 264:25 273:10,18 276:9

**thinking** 75:10, 12,16 76:15,17 77:8,13,14

**third** 255:5 265:7

**thorough** 202:11 242:18

**thoroughly** 67:10

**those** 11:8 18:4 23:15 25:11 28:18 31:19 37:25 39:13 40:9 42:12 45:18 46:14 58:21,22 60:1 62:15 67:10 121:17 127:4 163:13 164:5,9 170:13 173:20, 23 178:5 180:8 184:18 192:21 193:6 194:9 202:25 206:1, 13 208:6 216:18 217:7 218:1 220:20 227:12 235:21 236:18 275:21 283:24

**though** 50:8 59:10 115:2 128:6 189:12 190:1 216:16 235:6 236:17 278:1 284:1

**thought** 52:6 130:16

**thoughts** 253:12

**thousand** 104:12

**thousands** 14:15 54:10

**three** 56:18 65:3 94:22 149:12 150:1 215:15 216:18 267:9 278:19 280:4

**thrombosis** 30:13 31:13 36:20

**thrombotic** 206:18,22 207:5,19,24

**through** 31:19, 22 35:25 39:12 42:9 45:15 80:25 83:6 151:14 155:5 189:4 271:17, 23 277:8 280:3

**tick** 83:22 84:13

**Tim** 283:16

**time** 26:6 53:24 62:10 71:22 81:16 83:11 93:2,9 95:3 96:21 118:11, 15 119:14,16 141:11,22,23, 24 142:9 144:10,12,25 145:13 146:12 150:11 153:6 155:6 156:6,25 157:12 159:21, 22 160:8,11 165:10,13 169:10 174:8, 16 175:18 176:22 177:11, 17 182:16 185:3 191:5 194:19 207:3 208:22 212:13 214:25 216:12 217:17 220:8 221:19 222:12, 14 234:16 240:1 241:17, 25 242:10,17, 18,23 244:4, 12,15 245:3,4 246:22 247:15 251:22 252:19 253:14,24 254:1 255:15 260:12,16 261:19 262:21, 22 263:11 271:5 280:9

**timelines** 15:20,24 170:4 267:2 277:15

**times** 62:16

**tiny** 71:6

**title** 53:2 148:21

**today** 61:21 127:9 128:13 133:4 135:1,10 166:9 199:14, 18 217:12 226:20,22 266:12,18,20, 21

**together** 108:11 135:9 144:11 158:11 163:4 176:7,8 214:16 221:20 225:11 247:9

**told** 113:11

**Tony** 148:20

**too** 133:14 160:7 204:3

**took** 128:10 161:3 209:20 237:12

**tool** 101:17 114:8,9 198:12 199:9

**top** 66:15 173:2 218:3 254:24

**topic** 13:23 53:10 66:22 67:2,25 68:5 77:19 81:24 87:24 88:4 91:8 92:5 93:14 94:6,17 109:16 110:15 115:18 117:25 118:6,8,18 135:11 140:3 152:11,17 165:10 184:24 201:2 214:6 215:5,6 261:3 283:10,11

**topics** 56:3 83:2 93:15,18 95:5,6,8,11 96:22 117:24 134:22 137:25 162:5 165:22

**total** 53:12 176:1 177:17, 19 183:16 191:6,21,23,24 229:18 269:5

**totality** 121:12 122:16 158:14 217:16

**totally** 25:23 26:2 160:2

**towards** 57:15 78:6 187:4

**track** 50:8

**training** 62:7,8 74:22

**transcript** 127:13,16 128:17 228:24

**transferred** 222:16

**translate** 275:4

**translated** 20:25

**transparency** 129:21 138:9

**transparent** 128:18,25 129:5,11,14,24 130:2

**treated** 168:25 233:20

**treating** 27:13, 14,15 51:8,9 158:11 231:13 233:14,19

**treatment** 22:7, 25 24:14,16 26:21 79:15 119:11 122:13 162:25 163:1,5 180:19 239:11

**trend** 91:4

**trial** 11:9,17,21 12:9,12,14,18, 20,21 13:4,6, 10,15,21,22,25 14:1,2,4,11,14, 18,21 15:10, 11,12 16:25 17:6 18:1,11, 19,20 19:1,3, 22,24 20:4,8 101:5 149:2,23 214:3 215:9, 15,25 216:10, 12,17 229:6, 12,13,15 230:9,17,18, 20,21,22,25 232:16,19,21 233:13,14,24, 25 234:17 235:7 236:3,5, 7,14 237:1 238:20 239:7, 10,12 267:5, 12,22,23 268:13,16 283:22 284:3

**trials** 10:20 11:11,15,16,18 12:4,8,17,23 15:7 16:2,5,6, 7,9,10,21 18:18,23 23:11 100:24 140:1 152:8 190:14 215:13,17 216:3 268:9

**tried** 132:24,25 170:15

**tries** 277:16

**trigger** 166:19 202:6

**triggered** 57:1, 9 166:16 195:14 196:9 202:3 212:25 213:4

**triggers** 191:14

**true** 41:13,18 42:5 85:18 110:12 111:15, 16 115:7 119:25 124:11 137:8,14 171:9 242:17 249:21 266:12,18,20

**truly** 242:18

**try** 19:5 49:20 50:11,21 53:23 128:13 129:24 134:16 151:15 170:16 197:17

**trying** 76:11,17 81:18 218:17 237:23 245:22

**turn** 56:6 57:12 64:20 70:1 74:24 77:20 110:24 112:21 168:8 172:2 173:1 176:13 183:13 186:7 187:2,3 188:19 190:20 194:15 198:20,22 201:8,19 203:24 212:14, 19 221:1 222:21 236:4 238:21 258:2 281:9

**turned** 258:18

**turning** 205:9 259:1

**turns** 260:2

**tut** 146:9

**two** 16:22 21:17 25:11 56:25 58:14 72:22 78:3 110:22 115:17 124:12 142:2 146:21 153:15 160:14 202:20, 21 215:16,17 217:4,11 247:13 270:14 278:4

**types** 82:23

**typical** 78:20 120:17 252:8

**typo** 156:8 240:7,18

**typographical** 240:9,12

**U**

**ultimately** 49:22 133:16

**Umm** 47:17

**unable** 234:24

**unambiguous** 22:5 24:11,17, 21 26:23 179:20 180:4, 12 181:6

**unbiased** 274:15 275:3, 12

**uncertain** 78:10 79:4,10 239:8

**unclear** 37:19 177:9 236:23

**under** 25:24 28:15 37:3 50:18,20 56:7 91:8 92:1,3,6, 7,15,17,21,22 93:15,16,17,18 94:6,11,15 95:16 104:2 107:13 110:20 111:22 112:6, 19 166:3 174:3 216:5 230:19 251:11 266:22 275:4

**underestimate** 59:21 60:16, 19,23,24

**underestimates** 59:23

**undergo** 15:22 216:2

**undergoes** 50:15

**underlying** 34:25 36:11,16 41:6,11 44:2 98:12 99:1 168:25

**undermine** 58:6

**underneath** 78:2

**underreporting** 187:19 251:8 254:3

**understand** 12:5 18:16 23:8 24:4 27:20 29:20 35:13,20 62:6, 20 64:1,6 69:13 76:18 81:19 109:11 113:5 117:3,12 123:17 245:23 246:12 253:14 255:16 270:1 276:14

**understanding** 68:10 75:3 221:9 282:5,8

**understood** 166:6 181:15 253:12 270:13

**underwent** 44:7

**undesirable** 11:19,20 15:9

**unethical** 140:19

**unexpected** 95:15,17

**Union** 225:4

**United** 183:17 201:6 209:3 224:7 269:6 270:6

**units** 144:3 177:20 220:8, 10

**unless** 79:10 80:6 85:4 127:5 259:20 271:17

**unlike** 207:23

**unlikely** 65:21 66:5

**unlisted** 142:19

**unrelated** 239:11 268:12

**unsafe** 171:13

**unsaid** 126:17

**unspecific** 38:7 78:20 136:15

**unstratified** 196:17

**unsure** 230:1 231:24 233:3 235:22 236:11 237:21 238:1, 13 239:3,8

**until** 95:3 214:25 242:3,5

**up** 19:23 23:8 27:7 49:19 59:25 76:11 83:24 107:25 127:23 128:1 137:4 150:5 151:9 160:5,8 175:1,2 185:4 187:11 229:23 231:7 237:22 238:4 252:13, 18 254:19 255:9 265:3,13 266:2,15 273:14

**Up-to-date** 249:5

**update** 7:8 53:5 175:7,14 182:19 186:9 213:24

**upon** 13:4 98:4 126:21 166:11 182:17 228:25 255:17 263:6

**us** 16:13 28:9 31:6 33:18 47:9 55:25 82:15 87:4,17 89:3 116:6 119:14,16 128:21 148:11 150:17 164:23, 24 165:5 182:20 183:1 184:4,20 185:12 186:14 189:23 192:18 206:16,23 207:6,12 210:20 213:6 216:1 232:15 237:25 238:25 239:1 247:13 265:15 266:5 269:17 270:23 271:2,7 272:11,19,21, 22 273:3 283:10

**USA** 143:6

**usage** 107:22 108:15,16

**use** 10:22 13:10,20 17:22 31:1,2 45:11 54:15 57:21 59:9,11 61:14 63:14,20,21 64:18 82:11 83:7 87:6 92:16 94:5 100:9 101:6 102:15 106:15 114:24,25 123:6,15,23 124:24 126:10 139:23 142:19 156:12,16 158:19,24 159:14 162:24 163:4 203:9,11 204:12,14 206:13 208:14, 15 209:10 210:21 211:9, 12,14 224:1 242:15 244:19 247:3,5 255:18 256:1 257:7 260:14 263:13 270:8,16 273:19 275:10 281:20

**used** 12:23 49:5 58:21,22 59:25 63:6 68:10 75:21 80:18 84:7,24 86:4 119:11,22 126:6 164:9,11 167:7 170:19 173:15 178:4, 24 193:8 194:19 206:10 208:9,11,19 209:15,19 210:1 260:11 265:1 270:5 273:15 275:9

**useful** 46:12 80:14 101:12 103:2,24 105:6 143:23,24 144:25 145:11

**user** 20:14 40:14 48:18 180:14 254:5

**users** 12:1,2 48:9 57:25 59:8,22 89:7 105:18 106:9 108:6 116:24 122:19 133:5, 21 134:20 138:11 167:16 191:7 209:23 211:11,16 221:17 249:9 251:21,24 252:8,11,16 253:13 254:8 255:24

**uses** 116:1 195:2 208:5 210:13 273:18

**using** 21:16 34:15 35:1 43:16 46:23 49:8 59:13 82:21 86:5 87:7 115:3 120:2,24 123:4 131:4 133:22 149:12,25 155:17,25 156:22 163:8, 23,24 167:8,13 177:13 183:16 205:5 206:11 208:3 209:23 211:8 225:22 229:14,15,17 250:10 251:15 269:5 270:7

**usual** 256:3

**usually** 135:16 138:21 139:2 144:4 236:23, 24

**Utah** 59:16 60:20 61:1 208:4,8,16,17, 19 209:11,16, 23 211:9

**uterus** 163:6

**V**

**V-A-R-E-S** 187:9

**V-I-L-L-I** 71:7

**vague** 18:14 25:20 26:9 256:20

**Valenzuela** 8:2 56:24 57:16,23

58:2,5,11 63:11 103:9,19 105:23 106:13, 15,25 107:4,6, 15 116:23 117:16 159:2 201:21 202:4, 15,22 203:19, 23 207:1 208:3 211:18 213:3 222:18 226:3,5

**valid** 100:18 146:22

**validated** 101:24 110:20 111:12 171:4 172:7,9,11 173:5 174:5

**validation** 110:23,25 111:13

**value** 129:22

**VARES** 187:9, 17

**varies** 50:12

**variety** 43:12

**various** 36:17 96:12 172:3 184:8 194:8 261:8

**vary** 139:17

**vast** 84:15

**venous** 31:12 36:20 206:18, 21 207:5,18,24

**verb** 250:23

**version** 34:20

**versus** 65:15

68:2 147:3 211:16

**very** 14:1,18 19:20 29:1,25 30:1 38:7 40:3 41:5 42:14,17, 24 43:21,23 44:2,13 46:4 50:4 52:16 55:4 58:3 62:19 66:19,21 67:8 68:4 84:1, 19 88:3 108:18,23 111:16 122:8, 15 128:18 132:19,24 135:25 136:14 138:24 139:20 144:25 146:22 147:7 154:14 165:10 178:1 183:6 200:10 213:11 217:25 224:14 226:4 230:1 231:24 232:3 233:3 235:22 236:11 237:21 238:1,4 239:3 254:2,6 256:14 260:18 263:11 270:12 276:25 277:1, 13 282:24 283:7

**via** 58:19 135:8 236:3

**video** 10:4,6 51:16,19,21 96:4,7,9 109:7, 9 134:5,7,11, 13 160:16,18, 21,23 227:20,

22,25 228:2 284:10,11,14

**Videographer** 4:9 10:3 51:13, 18 96:1,6 109:6 134:4,10 153:13 160:15, 20 227:19,24 284:9

**Videographer's** 153:8

**view** 22:14 24:19 26:4 29:6 54:20 57:18 62:22 81:11 99:15 100:10 103:20 106:12 107:3,6 167:22 168:10 169:6,7 255:14 262:8,10 263:10

**views** 106:24 107:3 112:5,9, 10 113:5,6,17, 20 172:16 226:20,21 260:21

**Vigibase** 88:22 115:22

**Villi** 71:7

**vision** 43:4,5,6, 12,13,17,20,25 44:4 45:17 46:5 49:9 50:19

**visual** 39:12, 19,22,25 40:2, 9,13,15,23 41:3,5,15,20 43:6,14,20,21,

24 45:22 46:24

**Volume** 51:14, 19 96:2,7 109:7 134:5,11 160:16,21 227:20,25 284:10

**voluntarily** 44:18

**voluntary** 44:23

**W**

**W-Y-S-O-W-S-K-I** 255:1

**waiver** 126:24 182:18

**Walsh** 6:23 148:8,9,10 150:13,16 151:7 155:10, 22 156:5,19,24

**want** 11:16 23:7 24:2 27:22 32:16 34:2 38:14 49:2,4,11 52:1 55:7 57:11 58:13 67:14 77:5 78:2 81:7, 14,16 82:19 101:23 102:9 103:8 111:11 126:17 127:5, 8,22 128:14,23 145:7,21 154:5,7 160:4, 6 161:3 166:1 170:21 171:2 198:19 209:7 213:12 217:16 243:15 247:20

259:21,22 265:7

**wanted** 24:3 151:18 160:8 243:17 280:16

**wants** 122:3 136:1,2 145:16 153:1 163:23

**warning** 221:6, 10 223:16,18, 23 224:2,5,12, 13,17 225:6, 14,18,22

**warnings** 224:22

**warranted** 225:23

**wasn't** 19:2 37:6 71:18 174:16 183:24 209:18 222:13 235:23

**way** 28:14 50:18 54:11 61:3 62:18 70:8 73:24 108:4 147:6 224:2 234:18, 21 235:4 245:4 273:4

**ways** 16:22

**web** 6:12 139:11,12

**website** 7:5 8:5 9:4 167:20 168:10,20 169:5 193:7 210:9,17 281:2

**Wednesday** 10:1

**week** 134:22

**weekly** 95:14, 17 200:12

**weigh** 162:17 168:2

**weight** 58:18 120:22 121:10, 13,15 123:3,13 124:7,9 204:17 205:8 206:2 219:25 252:21 256:10 275:22 278:3

**well** 11:14 14:8 23:22 38:18 39:1 46:17 80:24 86:16 97:20 117:14 121:16 126:24 129:23 133:17 145:24 152:3 153:10 164:14 179:14 186:23 189:12 207:21 210:14 221:22 223:17 232:13, 21 235:14,17, 23 240:11 242:5 243:10 249:15 263:11 264:18 279:23

**went** 18:12 20:4 49:17 83:6 177:15 233:17 280:3

**weren't** 35:16 233:16

**West** 4:5,13

**what's** 26:24 111:11 148:21 178:11 221:9 240:14 245:4, 21

**whatever** 79:15 235:18 237:1 242:15

**whatsoever** 121:19 280:7

**WHC** 157:16

**where** 15:21 18:10 20:3 21:11 35:15 37:3,8 40:20 41:10,23 45:6, 16,22 48:20 49:15,16,20 56:21 57:3 60:12 61:15 62:16 63:11 65:25 69:16,17 71:19 73:20,23 75:19 78:3 84:4,22 86:8 93:8 95:6,8,11 102:15,16 103:16 104:24 105:1 106:17 118:25 121:13 122:25 140:12 141:7 171:7,17 174:4 177:5 180:14,17,18 187:4 188:20 190:21 191:18 193:15 194:16 195:18 200:14 205:9,11 215:23 216:10, 17 217:20 218:4,17 223:24 226:6 229:15 257:12, 17,25 261:20 262:14 274:13 277:12

**wherever** 129:24

**whether** 10:21 11:12 13:19 16:11,12 18:17,22 22:23 23:10 25:2,4 26:19,20 28:7 30:25 32:22 36:19 39:21 55:10 58:20 59:9 60:6 75:13,18 89:23 90:22,25 95:18 99:24 100:19 101:21 103:17 110:11,13 111:10 114:11, 12,21 122:5,6, 9,12,16 123:15,21,25 130:10,20 133:4,20 155:21 157:8,9 158:12,17 163:25 166:17 169:9 171:19, 20 173:6,11 180:24 188:3 199:18 200:6 214:1 215:8 220:19 224:15, 21 236:8 240:4,11 244:21 245:10 249:18 251:16 262:24 263:4 272:4 276:3

**which** 11:11 12:14,18 14:1 15:5,7,14 16:14 17:17 21:22 26:15 29:1,24 30:11 33:6 42:16 43:23 47:10 48:2 56:16 59:5 60:18 62:10 65:20,24 66:2,10 69:22 73:3 76:1,23 77:2 80:17 81:1 82:14,15, 22 83:22 84:4, 21 86:2,17,20 87:11 88:4,24, 25 89:1 91:14 97:1 98:5 99:11,13 100:1,2,8 103:5 104:17 105:2 108:17 109:25 110:8, 17 111:1 112:7 116:8,15 120:21 124:18 126:23 129:3 133:1 137:12 144:8 146:21 148:1 152:13 158:19 159:5, 18 166:16 167:7 168:6 169:17 171:23 172:10 173:3, 15 174:5 175:17 178:1 187:6 194:11, 19 195:1 196:13 198:24 210:9 212:8 214:10 216:8 223:3 228:21 229:4 231:15 233:24 235:16 236:13 239:6 243:2,18 245:5,24 246:6 247:21 248:3,7 249:6 251:5, 14,19 252:9 254:21 262:12, 16 263:25 264:8 265:24 266:6 267:1,21 268:11,20 269:20,21 271:5 272:20 273:23 275:7,8 276:19,24 281:1 283:8

**while** 22:3 86:12 120:24 123:4 131:4 133:6,21 163:24 168:22 259:10 281:18

**who** 17:14,18 48:18 52:12, 14,17,24 58:22 60:1 63:3 71:2 74:25 77:16 80:11,13,19 82:12,21 83:7, 9,20 84:9,14, 19 86:8 88:22 108:19 109:1 115:22 119:8 120:2,23 121:8 123:3 124:24, 25 130:19 131:3 133:5 134:20 135:22 136:1 138:12, 20 140:18,21 143:25 144:21 145:23 146:7 147:1,2 148:4, 6,8,10,14,19 153:3 198:2 205:15,17

206:11 214:8 215:13 216:7 219:24 229:13, 14 230:24 231:7 233:22 236:7 238:20 240:15 241:9, 11 243:12 250:10 252:21 253:9,22 256:9 261:25 263:4 264:6 283:17

**who's** 137:4

**whole** 17:9 37:5 43:9 58:10 65:6 90:5 102:9 114:10 119:19 131:14 247:23

**wholly** 61:7

**why** 32:18 64:8 67:18 70:15 72:6 73:15 78:22 79:3 122:2 128:23 130:1 139:22 143:4,15,19 157:4,5 162:12 166:11,12 167:3,23 169:9 178:4,24 180:25 184:11 196:20 202:6 212:2,23 214:15 217:10 221:9 223:15 225:17 241:13 246:4 260:10 270:10

**wide** 161:23 253:1

**wider** 75:1

77:17

**will** 13:14 18:4, 7 23:3,5,8,18 26:12 28:1,11, 24 29:11 36:21,25 43:10 44:10,11 45:1 49:6 50:11 51:9 52:7 76:10,12,20,22 88:8 90:12,14 91:16 95:24 98:15 102:21 104:10 105:14 113:1 116:25 121:12 125:14 126:22 127:2,9 132:16 133:15 135:25 137:6 138:20 145:13, 14,17,22 147:21 153:14, 20 155:5 159:24 161:6 171:1,19 175:4 178:11 179:8 195:24 203:18 211:23,24,25 212:7,9 230:23 243:6,14,24 245:12 247:16 259:20 268:13 276:12,18 277:11 280:24

**wish** 79:15

**withdraw** 259:20

**withdrawn** 182:6 206:8 221:25 273:25

**within** 15:9,20, 24 144:19

148:17 186:24 225:3 241:17 248:20

**without** 90:15 152:15 180:15 233:6 237:3,10 238:14

**witness** 67:21 92:15 153:9 160:13 166:3 197:21 198:3 260:7,22 262:23 263:12 264:13,20 276:11 280:8

**witness's** 259:18

**woman** 21:3 25:4,9 26:15 43:16 44:3 45:16 46:22 47:3 49:8 50:19 51:2 78:16 120:23 121:16 123:3, 12 124:7,9 205:5 226:10 241:9

**women** 60:1 63:6,7 71:2,4 78:23 86:5,6, 10 87:6,7 100:17 116:3 118:21 119:4, 5,8,24 120:1 121:6,8 122:20 124:24 145:3 149:12,25 155:16,25 156:22 164:19, 25 167:7,13,15 177:19 178:2

192:1 194:22, 25 195:2,3,4, 19 196:16 204:2 205:14, 17,19 206:10, 13 219:12,17, 19,21,22,23,24 220:12 226:8,9 248:9,10,15,19 249:3 250:9 252:9,12,21 253:8,9,20,21 254:11 256:7,8

**Womens** 132:14

**won't** 153:22

**wondering** 277:5

**word** 250:22 256:19 266:13 270:1,8,16 273:18,19 275:11

**wording** 221:15

**words** 19:9 98:3

**work** 61:20 62:1,9 126:16 176:7 227:13 238:5,9 255:16 260:4

**worked** 52:17 61:16 62:8

**working** 61:23 62:11,13 127:22 141:20 148:6,21,23 161:16 243:21 247:9

**works** 148:10

276:13

**world** 69:11 81:4 113:11 140:13 164:19 165:2 170:1 184:18 207:15 220:6 269:20, 22

**worldwide** 140:7 179:17

**worsen** 216:13

**worsened** 281:20

**worsening** 216:2

**worthy** 241:14

**would** 11:5 13:22,25 14:5, 12,14,18 16:9, 12,18,19,23,24 19:5 21:18,23 25:11,16,17 31:4,15 32:6 38:15,20,23,24 39:1,5,6,15,19 40:5,20 41:1,2, 8,9 42:18,19, 22 43:1,2,18 44:3,5 45:2,20 47:1,2,5 48:5, 14,16,17,20 49:10,18,19,22 50:6,21,22 52:23 54:9 55:4 58:6 61:21 64:8 65:22 66:1 67:3 69:8,23 71:8 72:19 73:6,7,24 81:3 84:16 90:24 92:16 95:14

99:13,20 101:7 103:6 105:11 113:24 117:21 120:3,6,17 126:15 128:4 129:23 131:8, 10 132:14,17 133:6,7 135:4, 6,7,8,9,12,15, 25 136:13,19, 23 138:9 139:2 140:22 143:15, 20 144:4 146:20 147:5, 22 149:3,14 150:2,5,8,12 151:8,13,14, 16,23 153:2 154:23 156:12 159:5 166:11, 12,19 167:3, 14,23 168:2 180:20 184:21, 23 185:1 187:11 200:21 201:1 209:23 218:19 224:15 228:15 234:13 244:15 250:8, 11,17 251:10 252:14 254:20 256:24 257:23 258:25 264:9 266:12 267:20 268:6 272:24 273:10 277:25 278:11 279:22 280:20

**wouldn't** 21:25 22:2 30:20 38:14 47:4 86:24 124:21 143:4 152:20

**wrap** 160:4,8

**write** 79:3 151:3 181:8 279:9

**writes** 151:5 196:25 246:6 252:10 253:17 257:12 280:13

**writing** 108:10 243:19 246:23 264:6

**written** 51:10 68:7 147:20 156:5 231:8 252:3 262:15

**wrong** 126:20 130:16 238:16 270:16 271:25 272:14

**wrote** 80:13 278:25

**Wysowski** 255:1,9,17,21 260:13,25

Y

**yeah** 27:8 56:23 74:9 120:19 153:3 271:22 273:9

**year** 110:17 120:23 123:3, 12 124:7,8 176:4 182:25 211:25 212:10, 13 241:8 248:19 280:4 283:17

**years** 21:17 59:25 62:15 67:13 86:22 87:1 88:3 118:22 120:13, 14 121:3 124:25 128:10 142:2 145:6 152:11 167:13 175:22 177:19 178:2 192:1 206:25 219:12, 23 220:12 227:5 229:16, 18 239:5,6 249:3 278:5

**yesterday** 10:15 11:6 21:22 23:9 33:20 58:2,4 59:6 87:21 93:6 128:15 180:7 188:17 206:12

**yet** 126:3

**you're** 48:8 128:3

**yourself** 47:9 215:1

Z

**Zealand** 8:14 9:3 239:18 241:8,10,19,20 242:11,12,23 243:2 280:17, 21 281:1,6 282:6