**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **IN RE:** | : | |
| | : | |
| **MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY LITIGATION (NO. II)** | : | **17-MD-2767 (PAE)**<br>**17-MC-2767 (PAE)** |
| | : | |
| ***This Document Relates to All Actions*** | : | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF VANESSA DALTON, M.D., M.P.H.**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 1

ARGUMENT ........ 2

I. Dr. Dalton's General Causation Opinion Is Admissible. ........ 2

  A. Dr. Dalton Is Qualified to Opine on General Causation. ........ 2

  B. Dr. Dalton's General Causation Opinion Is Reliable. ........ 5

II. Dr. Dalton's Labeling Opinions Are Admissible. ........ 9

CONCLUSION ........ 10

# TABLE OF AUTHORITIES

**Cases**

*Arista Records LLC v. Lime Group LLC*,
2011 WL 1674796 (S.D.N.Y. May 2, 2011) .................................................................. 5

*Deutsch v. Novartis Pharm. Corp.*,
768 F. Supp. 2d 420 (E.D.N.Y. 2011) ................................................................ 6, 9

*In re Baycol Prods. Liab. Litig.*,
532 F. Supp. 2d 1029 (D. Minn. 2007) ................................................................ 10

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*,
2000 WL 876900 (E.D. Pa. June 20, 2000) ........................................................... 10

*In re Mirena IUD Prods. Liab. Litig.*,
169 F. Supp. 3d 396 (S.D.N.Y. 2016)
*aff'd*, 2017 WL 4785947 (2d Cir. Oct. 24, 2017) (summary order)
*cert. petition filed*, No. 17-1037 (Jan. 22, 2018) ........................................... 4, 5, 8, 10

*In re Seroquel Prods. Liab. Litig.*,
2009 WL 3806436 (M.D. Fla. July 20, 2009) .......................................................... 9

*In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Prods. Liab. Litig.*,
2011 WL 6740363 (S.D. Ill. Dec. 22, 2011) ............................................................ 4

*Lyman v. Pfizer, Inc.*,
2012 WL 2971550 (D. Vt. July 20, 2012) ................................................................ 4

*Scott v. Chipotle Mexican Grill, Inc.*,
315 F.R.D. 33 (S.D.N.Y. 2016) ................................................................................ 6

*Watkins v. Cook, Inc.*,
2015 WL 1395773 (S.D.W. Va. Mar. 25, 2015) ....................................................... 9

*Wise v. C.R. Bard, Inc.*,
2015 WL 521202 (S.D.W. Va. Feb. 7, 2015) ........................................................... 9

## PRELIMINARY STATEMENT

Plaintiffs' challenge to the testimony of Vanessa Dalton, M.D., M.P.H., a tenured Professor at the University of Michigan Medical School, an active OB/GYN clinician, and a credentialed researcher, should be rejected. Dr. Dalton reliably opines that the available evidence is insufficient to conclude that Mirena causes IIH, and further opines that the Mirena label is adequate. Plaintiffs' motion is loaded with rhetoric but light on legal support, weighted down with bare assertions unhinged from reality. While Plaintiffs may disagree with Dr. Dalton's conclusions, she derived her opinions from a scientifically sound methodology.

## BACKGROUND

Vanessa Dalton, M.D., M.P.H., is a tenured Professor in the Gynecology division of the OB/GYN department at the University of Michigan Medical School, where she has remained on the faculty since completing her training in 2001, and the Medical Director of Planned Parenthood of Michigan. Pl. Ex. D, Dalton Rpt. at 1.[1] Dr. Dalton maintains a busy family planning clinical practice where she has gained extensive experience counseling the very patient population at issue in this litigation on the risks and benefits of contraceptive options. *Id*. at 2. She treats approximately 2,000 reproductive-age women per year – more than half of whom are overweight or obese. Pl. Ex. E, Dalton Dep. 62:17–64:4, 209:22–210:3. She places or supervises placement of 5–10 IUDs per month; more than 80% of which are Mirena. Pl. Ex. D, Dalton Rpt. at 2; Pl. Ex. E, Dalton Dep. 105:23–106:10. More pointedly, in her role as the lead of a weekly family clinic that serves women with complicated medical conditions, Dr. Dalton has consulted on contraception in the context of IIH. Pl. Ex. D, Dalton Rpt. at 2. Earning recognition by her peers, Dr. Dalton has served on the Patient Safety Committee of the American

[1] Except where noted otherwise, the exhibits referenced herein are contained in Defendants' compendium of exhibits (Dkt. 167).

College of Obstetricians and Gynecologists (ACOG) and contributed to the organization's opinion on long-acting reversible contraception (including IUDs like Mirena). *Id*. at 2. She has also published peer-reviewed literature on IUDs, including Mirena, and amassed over a decade of epidemiological training and experience. *Id*. at 1–2. She earned a Master's in Public Health, with a research focus, and completed a post-graduate research training program in health services funded by the National Institutes of Health. *Id*. at 1. She currently serves as both the Associate Director of Resident Research and the Associate Chair of Research at the University of Michigan Medical School. *Id*. at CV pg. 2. She has designed, executed, analyzed, and interpreted observational studies and spends about 50% of her time on epidemiological work. *Id*. at 1; Pl. Ex. E, Dalton Dep. 24:8–17. In fact, she is currently the principal investigator on a grant that observes patterns of contraceptive use, including IUDs. Pl. Ex. D, Dalton Rpt. at 1. Against this credentialed background and backed by ample objective support, Dr. Dalton offers general causation and labeling opinions in this litigation.[2]

## ARGUMENT

### I. Dr. Dalton's General Causation Opinion Is Admissible.

#### A. Dr. Dalton Is Qualified to Opine on General Causation.

Dr. Dalton is well-qualified by her clinical experience, training, and education to offer a general causation opinion in this litigation from both a clinical and an epidemiological perspective. She devotes a large percentage of her gynecologic clinical practice to counseling overweight and obese women of reproductive age on the risks and benefits of available contraceptive options – the very patient population at a higher risk of IIH – and is experienced in prescribing and inserting Mirena. Pl. Ex. D, Dalton Rpt. at 2; Pl. Ex. E, Dalton Dep. 62:17–64:4,

[2] Plaintiffs' "Factual Background" section contains many factual allegations without citation and untethered to the record. *See, e.g.*, Pl. Br. at 1-2. Because these bald claims are irrelevant to the *Daubert* inquiry, Bayer will not take the Court's time to address them in this opposition brief.

105:23–106:10, 209:22–210:3.[3] Furthermore, even Plaintiffs recognize that Dr. Dalton has clinical experience consulting on contraceptive options for women with IIH, which makes her perspective particularly relevant to this litigation. Pl. Br. at 8. Dr. Dalton leads a family planning clinic consulting on contraceptive options for women with complex medical conditions, and despite the rarity of this disease, she has personally encountered patients with IIH in her clinical practice. Pl. Ex. D, Dalton Rpt. at 1; Pl. Ex. E, Dalton Dep. 217:18–25.

The fact that Dr. Dalton does not personally treat these patients for their IIH symptoms does not mean she cannot offer a helpful perspective to the jury. Pl. Br. at 8. As a clinician, she is called upon to assess the perceived risks and benefits of available contraceptive options based on each patient's circumstances. Pl. Ex. E, Dalton Dep. 164:1–165:20, 166:15–17. This evaluation goes beyond the product's label and involves regularly reviewing relevant medical literature and determining whether reliable data show that a contraceptive option causes or is associated with an adverse event. Pl. Ex. D, Dalton Rpt. at 32 ("My practice as a physician is devoted to counseling women about their options for family planning and contraceptive care. That includes an ongoing evaluation of the available evidence regarding the risks and benefits of the methods I prescribe."). And this assessment includes patients at heightened risk for and with IIH.

Dr. Dalton is also well-qualified to opine on the clinical relevance of epidemiological studies and to rely upon these studies to reach her general causation opinion. Plaintiffs seek to exclude Dr. Dalton because she is not a "licensed epidemiologist." Pl. Br. at 6. Setting aside the fact that there is no special licensure for this field, there is no support for Plaintiffs' untenable

[3] Plaintiffs characterize the preferential prescribing of Mirena to obese women as an "unproven assertion[]," Pl. Br. at 2, but even their own expert Dr. Wheeler confirms it as fact. Ex. 14, Wheeler Dep. 90:16-18 ("hormonal IUDs are preferentially prescribed to obese women").

position that Dr. Dalton must bear the formal title "epidemiologist" or possess a Ph.D. in epidemiology. *See Lyman v. Pfizer, Inc.*, No. 2:09-cv-262, 2012 WL 2971550, at *3 (D. Vt. July 20, 2012) ("A medical doctor does not have to be an epidemiologist in order to testify about epidemiological studies."); *In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Prods. Liab. Litig.*, No. 3:09-md-02100-DRH-PMF, 2011 WL 6740363, at *6 (S.D. Ill. Dec. 22, 2011) ("[S]imply because Dr. Devoy is not an epidemiologist does not mean he cannot testify to the epidemiological studies that he has reviewed. Dr. Devoy regularly reviews epidemiological studies in the course of his employment and this experience allows him to testify about the studies he has reviewed in this case." (citations omitted)). Indeed, Judge Seibel rejected this very argument against Dr. Dalton (and other OB/GYNs) in the *Mirena I* MDL, explaining that "[t]his level of expertise [ ] is not required under *Daubert*" because "medical doctors do not need to be epidemiologists in order to testify regarding epidemiological studies." *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 426 (S.D.N.Y. 2016), *aff'd*, 2017 WL 4785947 (2d Cir. Oct. 24, 2017) (summary order), *cert. petition filed*, No. 17-1037 (Jan. 22, 2018).

Plaintiffs' effort to typecast Dr. Dalton as simply an OB/GYN with no pertinent experience beyond the examination room is without merit. Dr. Dalton's academic training and decades of clinical experience more than prepare her to opine on epidemiological data and identify flaws in the data upon which Plaintiffs rely. She earned a Master's in Public Health, and completed post-graduate training funded by the National Institutes of Health. Pl. Ex. D, Rpt. at 1; Pl. Ex. E, Dalton Dep. 23:9–24:4. As Dr. Dalton explained in her deposition, she currently spends over half of her work responsibilities on epidemiology. *Id*. at 24:8–17 ("probably more than half of the time I spend in my job, it is doing work in epidemiology."). She serves as both the Associate Director of Resident Research and the Associate Chair of Research at the

University of Michigan Medical School, and has personally designed and interpreted observational studies. Pl. Ex. D, Dalton Rpt. at 1, CV pg. 2. Dr. Dalton is well-equipped to opine on the clinical import of epidemiological studies. *In re Mirena*, 169 F. Supp. 3d at 426 ("Bayer's clinical experts' medical qualifications in the field of OB/GYN, their familiarity with IUDs, and their experience evaluating (and in some cases conducting) epidemiological studies as part of their clinical work and research suffice under *Daubert* and qualify them to opine on epidemiological studies").

Dr. Dalton is thus fully qualified to offer the opinions in her report, and Plaintiffs' criticisms cannot support the exclusion of her testimony. *See Arista Records LLC v. Lime Group LLC*, No. 06-CV-5936 (KMW), 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011) ("'Quibble[s] with an expert's academic training' go to the 'testimony's weight ... not its admissibility,' and are an appropriate subject for cross-examination." (citation omitted)).

**B. Dr. Dalton's General Causation Opinion Is Reliable.**

Dr. Dalton's general causation opinion is backed by a reliable and sound methodology. Unlike Plaintiffs' experts, who did not even consider contrary evidence and ignored the conclusions drawn by the authors of the data they do cite, Dr. Dalton weighed all data relied upon by Plaintiffs' experts (and more) against her clinical experience, knowledge, and training, and then systematically explained throughout her report why the data do not support a causal association between Mirena and IIH.[4] This thorough, measured approach provides a reliable methodology upon which to rest her opinions. *See In re Mirena*, 169 F. Supp. 3d at 418–19

[4] Plaintiffs' assertion that Dr. Dalton "reviewed a list of literature cultivated by Bayer and regurgitated the opinions of Bayer's other paid experts" cannot be aligned with Dr. Dalton's deposition testimony. First, Dr. Dalton repeatedly testified that she has not even reviewed any other defense experts' reports in this litigation. *See* Pl. Ex. E, Dalton Dep. 20:10-12, 41:3-6. Second, Dr. Dalton conducted her own literature research before agreeing to serve as an expert in this litigation, and while she was provided with some materials by defense counsel, she also conducted her own research in connection with her opinions. *Id.* at 34:19-35:23.

("[G]iven that Defendants' experts are attempting to prove a negative . . . pointing to the absence of convincing studies or the weaknesses of studies on which Plaintiffs rely, and evaluating them in light of their clinical experience, training and research, is in these circumstances a logical and valid approach."); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) ("When offering expert testimony, the defendant has no burden to produce models or methods of their own; they need only attack those of the plaintiffs' experts." (internal quotation marks omitted)); *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 480 (E.D.N.Y. 2011) (admitting expert testimony where the witnesses "primarily based their [ ] opinions on their review of the relevant medical literature and their own personal experiences as prescribing physicians").

One glance through Dr. Dalton's report demonstrates that Plaintiffs' assertion that Dr. Dalton "baldly claims that there is no causal relationship of [I]IH" is spurious, and that Dr. Dalton's opinion is far from "baseless." Pl. Br. at 5, 9. There can be no credible dispute that Dr. Dalton's opinion is backed by a thorough review of peer-reviewed literature. Indeed, Dr. Dalton methodically addresses every piece of epidemiological evidence Plaintiffs' experts identified as evidence of causation. Unlike Plaintiffs' designated experts, she directly confronted allegedly contrary data and proceeded to explain why they do not support an association between Mirena and IIH. *See* Pl. Ex. D, Dalton Rpt. at 18–25. At her deposition and in her report, she systematically walked through the errors in Dr. Etminan's paper, which were also recognized by the author himself and Plaintiffs' own experts. *Id.* at 19; Pl. Ex. E, Dalton Dep. at 255:24–258:1 (listing methodological flaws in Etminan 2015). And Dr. Dalton certainly did not "deliberately ignore[] the importance and conclusions of the Valenzuela study," as Plaintiffs claim. Pl. Br. at 13. Dr. Dalton spends over ***6 pages*** of her report assessing the pervasive methodological failures

in the study, including the flaws that led the Valenzuela authors to conclude that their "investigation does not indicate that LNG-IUS can cause PTC, and the number of women with LNG-IUS was too small to determine if an LNG-IUS is an independent risk factor for PTC" – a conclusion fully aligned with her opinions. *See* Pl. Ex. D, Dalton Rpt. at 19–25; Ex. 14, Wheeler Dep. 193:14–194:7, 194:21–197:12, 194:11–20. Dr. Dalton even conducted her own reanalysis that showed that correcting even one of the flaws in the Valenzuela data renders the results not statistically significant.[5] *See* Pl. Ex. D, Dalton Rpt. at 22. Plaintiffs try to trivialize Dr. Dalton's exposure estimates as unbacked "assumptions," Pl. Br. at 6, but as explained in her report and recognized by Plaintiffs' own experts, Valenzuela significantly underestimated Mirena use in the control groups. Ex. 14, Wheeler Dep. 194:21–197:12, 198:19–199:6; Pl. Ex. D, Dalton Rpt. at 19–25. Dr. Dalton's analysis was both conservative and based on peer-reviewed medical literature, including state-specific survey data collected by the Centers for Disease Control. *Id*. at 19–24.

Dr. Dalton also assessed whether any evidence of an association exists between any hormonal contraception and IIH, relying on published literature. She discusses the Norplant case reports and explains the absence of controlled studies finding an increased risk of IIH in Norplant users. *See id*. at 18–19; Pl. Ex. E, Dalton Dep. 203:24–204:13 ("I have looked and I have reviewed and I have tried to find the -- anything I could find about the evidence of the association between IIH and Norplant. And I have not found evidence that it has a causal relationship."). Dr. Dalton also considered combined oral contraceptive (COC) data because this

[5] Plaintiffs' indecipherable tangent on statistical significance does not impact the reliability of Dr. Dalton's testimony. Pl. Br. at 13. As an initial matter, Dr. Dalton's opinion does not depend on the statistical significance of Valenzuela: the authors themselves reiterate that no causal relationship exists. In any event, none of the cases Plaintiffs cite have anything to do with a defense expert attacking the methodological flaws in Plaintiffs' purported causation evidence. In fact, the *Matrixx Initiatives* case Plaintiffs cite has nothing to do with Rule 702.

form of birth control releases higher systemic levels of LNG than Mirena; as detailed in her report, no studies have found even an association between COCs and IIH (a fact which Plaintiffs' experts do not dispute). Pl. Ex. D, Dalton Rpt. at 19, 32; Def. Omnibus Br. at 22–23.[6] Plaintiffs call this opinion "incredibly misleading," but provide neither support nor any explanation of how this is a *Daubert* argument. Pl. Br. at 9.

Unable to credibly challenge the reliability of Dr. Dalton's methodology, Plaintiffs resort to a series of lawyer-inspired attacks not sponsored by any of their experts. For instance, Plaintiffs' brief lists supposed "methodological limitations" in the Durcan and Radhakrishnan articles relating to COCs, but they do not articulate how their repetition of the factual details of these studies undermines the results. Pl. Br. at 12. Likewise, Plaintiffs' brief argues that the COC studies "made no attempt to control for confounding factors" and did not involve LNG, but again these criticisms are unsponsored by Plaintiffs' experts, probably because the criticisms are factually wrong. *Id.* at 3. Unlike Valenzuela, many of the COC studies explicitly controlled for age and weight,[7] and Dr. Dalton explained her basis for concluding that LNG was involved.[8]

At bottom, Plaintiffs' attacks on Dr. Dalton's opinions do not go to the reliability of her methodology, and mere disagreement with her conclusions does not provide a basis for exclusion

---

[6] Ex. 4, Fraunfelder Dep. 16:7-14; Ex. 2, Darney Dep. 43:2-14.

[7] *See, e.g.*, Ex. 33, Giuseffi 1991 at 240 ("A stepwise logistic regression analysis was performed to reduce the chance of invalid associations that may have resulted from the large number of univariate tests performed on the data. For differences of **weight** and of **recent weight gain** between patients and controls we used a 2-tailed independent *t* test."); Ex. 51, Radhakrishnan 1993 at 22 ("We assessed the predictive power of the following variables, utilizing a multiple logistic regression model . . . : **age at diagnosis**, duration of disease, **body weight** . . .") Ex. A, Kilgore 2017 ("With multivariate analysis including **BMI**, the OR was 0.67 (95% CI, 0.26-1.76; P-value = 0.415)") (attached hereto) (emphases added).

[8] As Dr. Dalton explained in her report, backed by published literature, the predominant progestins used in COCs during the relevant time period were norethindrone and norgestrel/levonorgestrel (the same active drug). Pl. Ex. D, Dalton Rpt. at 29.

under *Daubert*. *See In re Mirena*, 169 F. Supp. 3d at 425 ("[I]f Plaintiffs disagree with Dr. Javitt's conclusions, they can take it up on cross-examination. Their criticisms do not undermine her reliability, but rather go to the weight that should be given to her testimony.").

## II. Dr. Dalton's Labeling Opinions Are Admissible.

Dr. Dalton's clinical labeling opinions satisfy Rule 702. Plaintiffs' motion consists of a string of allegations unbacked by a single relevant legal citation. Their argument that Dr. Dalton's labeling opinion should be excluded because she is not a pharmacologist and has not worked for the FDA or a pharmaceutical company misses the mark. *See* Pl. Br. at 4–5. Dr. Dalton, as a prescribing physician, is the *precise* audience to whom the label is directed and by whom the label (including the pharmacological data) must be clinically interpreted. Dr. Dalton opines about what is "clinically useful" from her personal perspective as a frequent prescriber of contraception to overweight or obese women of reproductive age and as a physician who spends half of her time on epidemiology. Pl. Ex. E, Dalton Dep. 24:8–17, 62:17–64:4, 209:22–210:3, 336:2–9, 384:8–24; Pl. Ex. D, Dalton Rpt. at 2, 26. Indeed, courts have consistently concluded that prescribing physicians' opinions on the clinical adequacy of prescription labeling are admissible. *See, e.g.*, *Watkins v. Cook, Inc.*, No. 2:13-cv-20370, 2015 WL 1395773, at *10 (S.D.W. Va. Mar. 25, 2015) (finding physician qualified to opine on the adequacy of labeling so long as his opinion is "based on his knowledge of and clinical experience with the risks of SIS products [] and not on FDA requirements or regulations"); *Wise v. C.R. Bard, Inc.*, No. 2:12-cv-01378, 2015 WL 521202, at *5 (S.D.W. Va. Feb. 7, 2015) (deeming physician qualified to evaluate "warnings based on his knowledge of and clinical experience with the risks of pelvic mesh products"); *Deutsch*, 768 F. Supp. 2d at 440 (permitting experts to "opine as to the adequacy of the labels from the perspective of oncologists and prescribing physicians"); *In re Seroquel Prods. Liab. Litig.*, No. 6:06-md-1769-Orl-22-DAB, 2009 WL 3806436, at *8 (M.D.

Fla. July 20, 2009) (allowing medical doctor experts to "express opinions regarding the accuracy and adequacy of the Seroquel label"); *In re Baycol Prods. Liab. Litig.*, 532 F. Supp. 2d 1029, 1064 (D. Minn. 2007) ("Dr. Boult is qualified to render an opinion regarding the completeness or accuracy of the Baycol label based on his knowledge of the risks of Baycol and his own clinical experience."); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, No. MDL-1203, 2000 WL 876900, at *11 (E.D. Pa. June 20, 2000) ("Drs. Rubin and Avorn are qualified to render an opinion as to the labels' completeness, accuracy, and—it follows from that—the extent to which any inaccuracies or omissions could either deprive a reader or mislead a reader of what the risks and benefits of the diet drugs in issue are or were at the time the labeling was published."). Moreover, Judge Seibel deemed Dr. Dalton's opinions on the clinical adequacy of Mirena's label admissible in the *Mirena I* MDL because she and the other challenged defense experts possessed "experience in inserting IUDs, including Mirena, and [] familiarity with its label, how it is understood, and how it is discussed with patients." *In re Mirena*, 169 F. Supp. 3d at 423. Plaintiffs have failed to muster a single case concluding otherwise. Their motion does not present a valid basis for exclusion and should be denied.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny in its entirety Plaintiffs' motion to exclude the testimony of Dr. Vanessa Dalton.

DATED: March 15, 2018

Respectfully submitted,

*_/s/ Shayna S. Cook_*
Shayna S. Cook
Goldman Ismail Tomaselli Brennan & Baum LLP
564 W. Randolph St., Suite 400
Chicago, IL 60661
Telephone: (312) 881-5947
Facsimile: (312) 881-5247
scook@goldmanismail.com

Paul W. Schmidt
Michael X. Imbroscio
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-5272
Facsimile: (202) 778-5272
pschmidt@cov.com
mimbroscio@cov.com

E. James Shepherd
Shook, Hardy & Bacon LLP
600 Travis Street, Suite 3400
Houston, TX 77072
Telephone: (713) 546-5610
Facsimile: (713) 227-8008
eshepherd@shb.com

*Attorneys for Defendants Bayer HealthCare Pharmaceuticals Inc., Bayer Pharma AG, and Bayer Oy*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of March, 2018, a copy of the foregoing has been served on the interested parties in this action via electronic mail to:

Martin D. Crump
Davis & Crump PC
2601 Fourteenth Street
Gulfport, Mississippi 39501
martincrump@daviscrump.com
*Co-Lead Counsel for Plaintiffs*

Lawrence L. Jones II
Jones Ward PLC
The Pointe
1205 East Washington Street, Suite 111
Louisville, Kentucky 40206
larry@jonesward.com
*Co-Lead Counsel for Plaintiffs*

Maxwell S. Kennerly
Kennerly Loutey, LLC
PO Box 30049
Elkins Park, Pennsylvania 19027
msk@thlawyer.com
*Liaison Counsel for Plaintiffs*

*/s/ Shayna S. Cook*
Shayna S. Cook