**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**IN RE:**

**MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY LITIGATION (NO. II)**

**17-MD-2767 (PAE)**
**17-MC-2767 (PAE)**

***This Document Relates to All Actions***

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY FREDERICK FRAUNFELDER, MD, MBA**

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT……………………………………………………….…...1**

**STANDARD OF REVIEW ........................................................................................... 2**

**ARGUMENT........................................................................................................... 3**

I. Dr. Fraunfelder's Causality Determination Is Based on the Totality of the Evidence............................................................................................. 4

A. Case Reports Contribute to the Reliability of Dr. Fraunfelder's Causation Determination Based on a Totality of the Evidence ......................................... 6

1. Dr. Fraunfelder Reliably Reviewed *Individual* Case Reports .................... 8

2. Dr. Fraunfelder's Review of Norplant Case Reports Provides Reliable Analogy Data That Adds to the Totality of the Evidence........................... 9

B. Dr. Fraunfelder Reliably Interpreted Epidemiological Evidence ...................... 11

1. The Etminan Disproportionality Analyses............................................... 13

2. The Valenzuela Evidence ...................................................................... 15

C. Dr. Fraunfelder Does Not Intend to Offer Mechanism Opinions to the Jury; Rather, He is Qualified to Consider Mechanism Evidence Within the Totality of the Evidence........................................................................................ 17

**CONCLUSION ....................................................................................................... 19**

# TABLE OF AUTHORITIES

**Cases**

*Advanced Fiber Techs. Tr. v. J&L Fiber Servs., Inc.*, No. 1:07-CV-1191,
2010 U.S. Dist. LEXIS 45938 (N.D.N.Y. May 11, 2010)........................................................ 15
*Amorgianos v. Amtrak*,
303 F.3d 256 (2d Cir. 2002)........................................................................................ 3, 12, 16
*Arista Records LLC v. Usenet.com, Inc.*,
608 F. Supp. 2d 409 (S.D.N.Y. 2009)........................................................................................ 16
*Astra Aktiebolag v. Andrx Pharms., Inc.*,
222 F. Supp. 2d 423 (S.D.N.Y. 2002)........................................................................................ 8
*Bartoli v. Novartis Pharm. Corp.*, No. 3:13-0724, 2014 U.S. Dist. LEXIS 52956 (M.D. Pa. Apr. 17, 2014) ........................................................................................................................ 18
*Beastie Boys v. Monster Energy Co.*,
983 F. Supp. 2d 369 (S.D.N.Y. 2014).................................................................................. 2, 20
*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996)........................................................................................................ 16
*Campbell* v. Metropolitan Prop. & Cas. Ins. Co.,
239 F.3d 179 (2d Cir. 2001)........................................................................................................ 3
*Daubert v. Merrell Dow Pharms.*,
43 F.3d 1311 (9th Cir. 1995) .................................................................................................. 16
*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)........................................................................................................ 2, 11, 20
*Deutsch v. Novartis Pharms. Corp.*,
768 F. Supp. 2d 420 (E.D.N.Y. Mar. 8, 2011)....................................................................... 2, 6
*Drake v. Allergan, Inc.*, No. 2:13-cv-234,
2014 U.S. Dist. LEXIS 151830, at *21 (D. Vt. Oct. 23, 2014)……………………..………...6
*Drake v. Allergan, Inc.*,
111 F. Supp. 3d 562 (D. Vt. 2015)..................................................................................... 4, 6, 19
*Ergotron, Inc. v. Rubbermaid Commer. Prods., LLC*, No. 10-2010 ADM/JJG,
2012 U.S. Dist. LEXIS 121795 (D. Minn. Aug. 28, 2012) .................................................... 15
*G.E. v. Joiner*,
522 U.S. 136 (1997)........................................................................................................................ 4
*Hart v. Rick's Cabaret Int'l, Inc.*,
60 F. Supp. 3d 447 (S.D.N.Y. 2014)...................................................................................... 2, 19
*Hemmings v, Tidyman's Inc.*,
285 F.3d 1174 (9th Cir. 2002) ................................................................................................. 13
*Hilaire v. DeWalt Indus. Tool Co.*,
54 F. Supp. 3d 223 (E.D.N.Y. 2014) ....................................................................................... 17
*In re Ephedra Prods. Liab. Litig.*,
393 F. Supp. 2d 181 (S.D.N.Y. 2005)........................................................................................ 12
*In re Fosamax Products Liability Litig.*,
645 F. Supp. 2d 164 (S.D.N.Y. 2009)................................................................................ 5, 6, 11, 19

*In re Human Tissue Prods. Liab. Litig.*,
582 F. Supp. 2d 644 (D.N.J. 2008) .......... 12
*In re M/V MSC Flaminia*,
2017 U.S. Dist. LEXIS 119146 (S.D.N.Y. 2017) .......... 3, 16
*In re PPA Prods. Liab. Litig.*,
289 F. Supp. 2d 1230 (W.D. Wash. 2003) .......... 6, 9
*In re Rezulin Prods. Liab. Litig.*,
369 F. Supp 2d 398, 425 (S.D.N.Y. 2005) .......... 6, 11
*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
858 F.3d 787 (3d Cir. 2017) .......... 12
*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) .......... 3
*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27, 40 (2011) .......... 11
*McCullock v. H.B. Fuller Co.*,
61 F.3d 1038 (2d Cir. 1995) .......... 12
*Milward v. Acuity Specialty Prods. Group*,
639 F.3d 11 (1st Cir. 2011) .......... 4, 18, 19
*Park West Radiology v. CareCore Nat'l LLC*,
675 F. Supp. 2d 314 (S.D.N.Y. 2009) .......... 9
*R.F.M.A.S., Inc. v. Mimi So*,
748 F. Supp. 2d 244 (S.D.N.Y. 2010) .......... 9
*Raskin v. The Wyatt Co.*,
125 F.3d 55 (2d Cir. 1997) .......... 16
*Rider v. Sandoz Pharm. Corp.*,
295 F.3d 1194 (11th Cir. 2002) .......... 6
*Rosenfeld v. Oceania Cruises. Inc.*,
654 F.3d 1190 (11th Cir. 2011) .......... 13
*Silivanch v. Celebrity Cruises, Inc.*,
171 F. Supp. 2d 241 (S.D.N.Y. 2001) .......... 6
*Tucker v. SmithKline Beecham Corp.*,
701 F. Supp. 2d. 1040 (S.D. Ind. 2010) .......... 11
*Tyler v. Bethlehem Steel Corp.*,
958 F.2d 1176 (2d Cir. 1992) .......... 16
*Washington v. Kellwood Co.*,
105 F. Supp. 3d 293 (S.D.N.Y. 2015) .......... 16
*Wendell v. GlaxoSmithKline LLC*,
858 F.3d 1227 (9th Cir. 2017) .......... 3, 11
*Yaccarino v. Motor Coach Indus., Inc.*, No. 03-CV-4527,
2006 U.S. Dist. LEXIS 97208 (E.D.N.Y. 2006) .......... 17
*Zuchowicz v. United States*,
140 F.3d 381 (2d Cir. 1998) .......... 12

**Other Authorities**

Mary Sue Henifin, Howard M. Kipen & Susan R. Poulter, Reference Guide on Medical Testimony, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 439, 444 (Fed. Jud. Ctr., 2d ed. 2000) ........ 6

**Rules**

Federal Rule of Evidence 702........ 2, 20

## PRELIMINARY STATEMENT

Bayer's Memorandum of Law in Support of Defendants' Motion to Exclude the Expert Testimony of Dr. Fraunfelder mischaracterizes Dr. Fraunfelder's opinions, the evidence upon which he relies, and Second Circuit *Daubert* jurisprudence. Bayer offers in support of its arguments cherry-picked quotations from Dr. Fraunfelder's two separate depositions, and conveniently decontextualized *Daubert* case law, while ignoring entirely Dr. Fraunfelder's well-accepted methodology of consideration and weighing of the totality of the evidence. Dr. Fraunfelder is uniquely qualified in the assessment of spontaneous case reports and drug-induced ocular side effects, and his well-grounded opinions are both relevant and reliable. Bayer's Motion to Exclude Dr. Fraunfelder (Dkts 151, 152) must be denied.

## FACTUAL BACKGROUND

PTC is a serious condition caused by excess build-up of cerebrospinal fluid around the brain, resulting in increased intracranial pressure. If untreated, or if not timely treated, PTC can lead to permanent loss of vision. A cardinal sign of PTC in many patients is papilledema, an ophthalmologic condition involving swelling of the optic nerves. Thus, one of the first steps in a PTC diagnosis is typically a fundoscopic examination performed by an ophthalmologist. Intracranial pressure and papilledema have several potential causes, but PTC is diagnosed when imaging reveals no physical findings such as thrombosis or intracranial mass. When a drug is suspected, the condition may be termed "Secondary" or "Medication-Induced" Intracranial Hypertension. Evidence supporting the role levonorgestrel (LNG) in causing or contributing to PTC is long-standing and wide-ranging, including: 1) evidence since the early 1990s that PTC is associated with LNG-releasing implants; 2) case reports and adverse event reports of Mirena and PTC; and 3) epidemiologic findings of a statistically significant increased risk of PTC with Mirena.

Dr. Fraunfelder was previously designated as an expert by Plaintiffs in several cases that pre-dated the formation of MDL 2767. In his prior report and testimony, he discussed the body of evidence that supports his opinions that, more likely than not, Mirena can cause or substantially contribute to causing PTC. Since the above-captioned matter was formed in April 2017, the totality of the evidence supporting a causal association between Mirena and PTC has been augmented by, among other things: 1) the publication of an epidemiological study in a peer-reviewed journal identifying a statistically significant increased risk of developing PTC/IH with Mirena; 2) corporate discovery of Bayer's employees and corporate designees; and 3) the ever-increasing number of reports of women that have used Mirena and developed PTC.

## STANDARD OF REVIEW

Under *Daubert*, "an expert need not base his opinion on the best possible evidence, but upon 'good grounds, based on what is known.'" *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 453 (E.D.N.Y. Mar. 8, 2011) (quoting 509 U.S., at 590). "[Federal Rule of Evidence 702] codifies a liberal admissibility standard and '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.*, at *426 (quoting 509 U.S. at 596). *See also Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 369, 377 (S.D.N.Y. 2014) (Engelmayer, J). "Federal Rule of Evidence 702 grants an expert witness testimonial latitude unavailable to other witnesses, provided that (1) 'the testimony is based on sufficient facts or data,' (2) 'the testimony is the product of reliable principles and methods,' and (3) 'the expert has reliably applied the principles and methods to the facts of the case.'" *Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 464-65 (S.D.N.Y. 2014) (Engelmayer, J) (quoting *Daubert*, 509 U.S., at 579, 597). "In

fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e.*, whether it 'has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Amorgianos v. Amtrak*, 303 F.3d 256, 265-66 (2d Cir. 2002) (quoting *Campbell v. Metropolitan Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (internal citations omitted).

"The *Daubert* factors do *not* constitute a definitive checklist or test, and the gatekeeping inquiry must be tied to the particular facts. Those factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (internal citations omitted) (emphasis added). The Second Circuit has clarified that the court's inquiry "is fluid and will necessarily vary from case to case." *Amorgianos*, 303 F.3d at 266 (internal citations omitted); *see also In re M/V MSC Flaminia*, 2017 U.S. Dist. LEXIS 119146, at *171-72 (S.D.N.Y. 2017). Indeed, the Ninth Circuit recently agreed, and reversed a lower court exclusion of expert testimony where the court "overemphasized" two *Daubert* factors. *Wendell v. GlaxoSmithKline LLC,* 858 F.3d 1227, 1232, (9th Cir. 2017) (the lower court "overemphasized the facts that (1) the experts did not develop their opinions based on independent research and (2) the experts did not cite epidemiological studies. We hold that all together, these mistakes warrant reversal.")

**ARGUMENT**

Bayer has atomized the reliable evidentiary support that Dr. Fraunfelder considered in reaching his opinions based on the totality of the evidence. Furthermore, Bayer ignores the standards set forth by *Daubert* and its progeny regarding each piece of evidence relied upon by

Dr. Fraunfelder, as well as his application of a totality of the evidence methodology. Careful review of Dr. Fraunfelder's report evidences this reliable, well-accepted approach, based on properly considered, admissible forms of evidence. Dr. Fraunfelder's opinions are both relevant and the product of reliable methodology, and his testimony is therefore admissible.

## I. Dr. Fraunfelder's Causality Determination Is Based on the Totality of the Evidence

"No serious argument can be made that the weight of the evidence approach is inherently unreliable. Rather, admissibility must turn on the particular facts of the case. Here, the question is whether [the expert], in reaching his opinion, applied the methodology with 'the same level of intellectual rigor' that he uses in his scientific practice." *Milward v. Acuity Specialty Prods. Group*, 639 F.3d 11, 18-19 (1st Cir. 2011) (quoting *Kumho*, 526 U.S. at 152); *see also G.E. v. Joiner,* 522 U.S. 136, 153-55 (1997) (Stevens J, concurring in part and dissenting in part) ("[T]he Court of Appeals expressly decided that a 'weight of the evidence' methodology was scientifically acceptable. To this extent, the Court of Appeals' opinion is persuasive. It is not intrinsically 'unscientific' for experienced professionals to arrive at a conclusion by weighing all available scientific evidence-this is not the sort of 'junk science' with which Daubert was concerned… In any event, it bears emphasis that the Court has not held that it would have been an abuse of discretion to admit the expert testimony.") Moreover, as the First Circuit held, it is an error to "treat[] the separate evidentiary components" of the weight of the evidence "atomistically, as though [the] ultimate opinion [i]s independently supported by each." *Id.* at 23.

Accordingly, courts within the Second Circuit have "found that case reports, prevalence studies, adverse event reports, animal studies, and a hypothesis about a potential mechanism through which the drug supposedly caused the alleged injury [are] sufficiently reliable to permit

an expert to testify." *Drake v. Allergan, Inc.*, 111 F. Supp. 3d 562, 567 (D. Vt. 2015) (citing *In re Fosamax Products Liability Litig*., 645 F. Supp. 2d 164 (S.D.N.Y. 2009). Notably, an expert need not rely upon *all* of these sources for his methodology to be admissible. *Id.* Indeed, a drug injury MDL court in this District has admitted expert testimony based on the expert's clinical experience, case reports, and a proposed mechanism that was biologically plausible. *Fosamax*, 645 F. Supp. 2d at 175, 179.

Bayer perverts Dr. Fraunfelder's express methodology, claiming that he applies the WHO-UMC individual case causality system to reach his causation opinion here. That is simply incorrect:

> Q. You were asked some questions about your methodology and use of the WHO-UMC system for standardized case causality assessment; is that correct?
> A. Yes.
> Q. Is that your methodology that you applied in reaching your conclusions?
> A. It's not the only methodology I used.
> Q. What other methodology did you use?
> A. Well, I looked at individual case reports. I looked at spontaneous reports. I looked at the available literature. I looked at the epidemiological papers. I looked at the plausible biological mechanism for sex hormones causing pseudotumor cerebri.
> Q. And is that all contained within these opinions 1 through 8 of your report on Pages 1 to 2?
> A. Yes.

Ex. A, Fraunfelder Dep. at 598:8-599:7. *See also id.* at 28:22-33:14 (*Defense* counsel walking Dr. Fraunfelder through these lines of evidence ("you helpfully summarize it on the first page")); 36:21-37:1 ("THE WITNESS: In my opinion, the body of literature that I cite, taken as a whole, make it more likely than not that Mirena causes IIH"); 630:16-631:8 ("[b]ut not just because of their paper, but because of the body of evidence"). *See also* Ex. B, Fraunfelder Rpt. at pp. 1-2 ("[b]ased on a systematic analysis of the above sources of information and my education experience and training in drug safety monitoring and drug-induced ocular side effects…")

Clearly, Dr. Fraunfelder did not utilize the WHO-UMC system to analyze *all* of the data; rather, he used it to examine the individual case reports – as Bayer even acknowledges, its intended use – and synthesized that data along with other forms of reliable data described below to reach a conclusion based on *the totality of the evidence.* Ex. A, Fraunfelder Dep. at 599:8-24.

### A. Case Reports Contribute to the Reliability of Dr. Fraunfelder's Causation Determination Based on a Totality of the Evidence

"Even if case reports on their own are not reliable evidence of causation, they do contribute to the reliability of a causation determination." *Deutsch*, 768 F. Supp. 2d at 476. Thus, "[w]hile Plaintiffs concede that courts have held that causation opinions should not be based *solely* on adverse event reports, […] adverse event reports are nevertheless relevant when combined with other evidence, particularly epidemiological evidence." *Drake v. Allergan, Inc.*, No. 2:13-cv-234, 2014 U.S. Dist. LEXIS 151830, at *21 (D. Vt. Oct. 23, 2014) (emphasis in original); *see also In re Rezulin Prods. Liab. Litig.*, 369 F. Supp 2d 398 (S.D.N.Y. 2005) (quoting *Reference Manual on Medical Testimony*, at 475 ("[c]asual attribution based on case studies must be regarded with caution. However, such studies may be carefully considered in light of other information available, including toxicological data."))

Case reports are "plainly relevant to an expert's opinion as to whether a given risk factor is generally associated with an injury." *Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241, *264 (S.D.N.Y. 2001). Moreover, as a drug injury MDL in this District held, "a large number of case reports adds greater weight to the reliability of an opinion on causation." *In re Fosamax*, 645 F. Supp. 2d at 184 (citing *In re PPA Prods. Liab. Litig*., 289 F. Supp. 2d 1230, 1242 (W.D. Wash. 2003) (finding "significant the sheer volume of case reports, case series and spontaneous reports associating PPA with hemorrhagic stroke to women"); *Rider v. Sandoz Pharm. Corp.*, 295 F.3d

1194, 1202 (11th Cir. 2002) ("stating in dicta that reliable evidence on causality includes, *inter alia*, 'a very large number of case reports.'")) Dr. Fraunfelder reviewed and accounted for a large number of case reports from numerous sources including those found in published medical literature, in Bayer's clinical studies, and in databases of adverse event reports, such as those maintained by FDA and WHO. Ex. B, Fraunfelder Rpt. at pp. 8-11 and 17-26.

Without question, Dr. Fraunfelder is qualified to render a reliable opinion regarding a body of case reports and the details of the individual reports. As Bayer notes, Dr. Fraunfelder described his expertise his 2016 deposition as: "the world's expert on spontaneous reports on pharmacovigilance in ophthalmology." Dkt 152 at p. 2 (quoting Dkt 167-80, 4/12/16 Fraunfelder Dep. 34:3-5, 107:17-19). Far from puffery, Dr. Fraunfelder explained that he is the only ophthalmologist consultant for the WHO-UMC, which collects global data on drug adverse effects, and the Director of the National Registry of Drug-Induced Ocular Side Effects, an organization that collects and disseminates case reports from the FDA and WHO. Ex. C, 4/12/16 Fraunfelder Dep. 19:17-22:4; 57:3-8. Furthermore, as a longtime co-author of the multi-edition textbook "Drug Induced Ocular Side Effects," Dr. Fraunfelder regularly adjudicates case reports utilizing the WHO-UMC causality assessment system and publishes these assessments for the medical community. Ex. D, Fraunfelder et al., DRUG INDUCED OCULAR SIDE EFFECTS 7th ed., (2015) (excerpt). Drawing from his extensive knowledge and experience in this regard, Dr. Fraunfelder considered both the body of reports and the details of individual case reports here among the totality of the evidence, with "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. Thus, Dr. Fraunfelder's opinions regarding case reports are a reliable piece of his totality of the evidence methodology.

**1. Dr. Fraunfelder Reliably Reviewed *Individual* Case Reports**

Attempting to undermine Dr. Fraunfelder's methodology, which it severely misconstrues, Bayer itself buttresses the reliability of Dr. Fraunfelder's examination of individual case reports. Bayer claims that "the WHO-UMC criteria for standardized case causality assessment […] were developed to assess only individual case reports..." Dkt. 152 at p. 6. Thus, utilizing the WHO-UMC criteria, which he regularly does as a clinician, as Director of the National Registry of Drug-Induced Ocular Side Effects, and as consultant to the WHO, Dr. Fraunfelder examined *individual* case reports to show evidence of a "probable/likely" causal association, which buttresses (but does not alone prove) his opinions about a causal association. Dr. Fraunfelder reviewed individual case report data *aggregated by Bayer* to assess information about temporality and dechallenge, two well-accepted aspects of assessing a causal relationship between a drug and an adverse event. Ex. B, Fraunfelder Rpt. at pp. 17-25; *see also* Ex. A, Fraunfelder Dep. at 374:17-412:17.

"Pursuant to Rule 703, an expert may rely on any facts or data 'of a type reasonably relied upon by experts in the particular field,' including facts, data, and opinions that are otherwise inadmissible." *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 491 (S.D.N.Y. 2002); *accord In re Diet Drugs*, 890 F. Supp. 2d 552, 561 (E.D. Pa. 2012) ("many courts have recognized that medical professionals often base their opinions on data other than statistical evidence from controlled clinical trials or epidemiological studies.") Dr. Fraunfelder, and other experts in spontaneous case report analysis frequently, and reasonably, rely upon such reports to inform causality decisions in practice. Moreover, as described in Plaintiffs' Memorandum of Law in Opposition to Defendants' Omnibus Motion, filed contemporaneously, the WHO-UMC system is

undeniably generally accepted and is used routinely in peer-reviewed publications, by regulatory agencies, and by pharmaceutical companies. *See also* Ex. B, Fraunfelder Rpt. at p. 24.

Relegated to a footnote in Bayer's brief, Bayer criticizes Dr. Fraunfelder's reliance on, *inter alia*, published case reports (Martinez and Ros Forteza), and reports from Bayer's own clinical trials. Dkt 152 at pp. 10-11 n.5. Yet, Bayer's criticisms are superficial and focus on its own interpretation of the factual data, rather than the methodology of *considering* these reports as part of the totality of the evidence. Indeed, many of the above sources of evidence, including the reports from Bayer's adverse event database, were considered and cited in Bayer's response to the German regulatory authority, as Dr. Fraunfelder noted in his report. Ex. B, Fraunfelder Rpt. at p. 23; *see also* Plfs' Br. in Opp of Dfts' Omnibus Mot ("Plaintiffs' Omnibus Opp.), filed contemporaneously. To the extent that a party, such as Bayer, "questions the weight of the evidence upon which the other party's expert relied or the conclusions generated from the expert's assessment of that evidence, it may present those challenges through cross-examination of the expert." *R.F.M.A.S., Inc. v. Mimi So*, 748 F. Supp. 2d 244, 252 (S.D.N.Y. 2010) (citing *Park West Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314, 326 (S.D.N.Y. 2009)).

**2. Dr. Fraunfelder's Review of Norplant Case Reports Provides Reliable Analogy Data That Adds to the Totality of the Evidence**

The Norplant case reports reviewed by Dr. Fraunfelder also provide a reliable piece of the body of evidence upon which experts can rely. *See In re PPA.*, 289 F. Supp. 2d 1230 (permitting expert causation opinions regarding phenylpropanolamine and stroke by analogy to a body of evidence regarding similar chemicals within the class of sympathomimetic drugs). Contrary to Bayer's assertion that Dr. Fraunfelder "attempt[ed] to cherry-pick Norplant case reports to support his opinion while ignoring data from all other LNG products," Dr. Fraunfelder considered relevant,

analogous data. Dkt 152 at p. 10 n.4. Bayer's parenthetical argument is disingenuous at best, and easily disposed of based on the testimony of its own expert pharmacologist.

Norplant and the LNG-IUDs including Mirena are the only levonorgestrel-*only* long-acting reversible contraceptives (LARC) that have ever been marketed or sold in the United States. Contrastingly, every LNG-containing oral contraceptive marketed in the United States contains an estrogen component, commonly in the form of ethinyl estradiol (EE). Ex. E, U.S. Department of Health and Human Services, FDA Drug Database search results: levonorgestrel. Critically, as Bayer's expert pharmacologist Dr. Jusko explained, "when LNG is administered in combination with EE, that EE may have […] a protective role, meaning that less is available to the tissues and there's a lesser chance of the drug doing something outside of the target tissue." Ex. F, Jusko Dep. at 68:22-72:19. Moreover, although Bayer cherry-picks and decontextualizes both Dr. Fraunfelder's testimony and its original source, Dr. Fraunfelder noted that: "Specifically, the literature has focused on the well-established relationship of LNG to PTC, in contrast to largely disproven associations to oral contraceptives and pregnancy." Ex. B, Fraunfelder Rpt. at p. 27 (citing Friedman DI, Medication-Induced Intracranial Hypertension in Dermatology, *Am. J. Clin. Dermatol.*, 2005, 6: 30-37, Ex. G hereto ("In contrast to oral contraceptives, there is a well established relationship between PTC and levonorgestrel-releasing implants."))

Additionally, Bayer points to Dr. Fraunfelder's use of the word "possible" in his textbook to characterize the association between Norplant and PTC. This argument holds no weight for several reasons. First, Bayer's claim regarding Dr. Fraunfelder's alleged "silence outside of the courtroom" regarding Mirena specifically is striking, given Bayer's treatment of the Etminan analyses, described *infra* and in Plaintiffs' Omnibus Opp. filed contemporaneously. No one can

fault Dr. Fraunfelder, or any expert, for not publishing his opinions with this litigation pending. Second, Dr. Fraunfelder testified that "[i]t's a scientific consensus in my circles that regard it as probable," and that he and his coauthors plan to update the characterization to "probable" in the 8th edition of the book. Ex. A, Fraunfelder Dep. at; 532:17-534:15; 517:23-520:24 ("I'm going to rewrite it and put it under probable"); *see also* Ex. B, Fraunfelder Rpt. at p. 24 (discussing "developments in the epidemiological and medical literature, the number of cases reported in the clinical trial setting, the reported cases of dechallenge with both Norplant and Mirena®, and the likely role for sex hormones in PTC pathophysiology.") "No one should be too surprised by the prospect that a scientist's views may evolve as more data become available and the question receives more study." *Tucker v. SmithKline Beecham Corp.*, 701 F. Supp. 2d. 1040, 1062 (S.D. Ind. 2010). Rather than "[s]tretching beyond his pre-litigation view about Norplant," Dr. Fraunfelder has reviewed the body of evidence as it has evolved over the last several years, and his views have likewise evolved.

### B. Dr. Fraunfelder Reliably Interpreted Epidemiological Evidence

*Daubert* does not require that an expert base his or her opinion on the best possible evidence, regardless of availability, but upon 'good grounds, based on what is known.' 509 U.S. at 590*; see also Fosamax*, 645 F. Supp. 2d at 178. Further, an opinion on medical causation need not be based on evidence from controlled epidemiological studies. *See, e.g., In re Rezulin*, 309 F.Supp.2d at 563, n.146 ("plaintiffs are correct that neither rule 702 nor *Daubert* requires experts to rely on epidemiological data"); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 40 (2011) ("[a] lack of statistically significant data does not mean that medical experts have no reliable basis for inferring a causal link between a drug and adverse events"); *Wendell*, 858 F. 3d at 1235-1236

("[t]he district court also wrongfully required that the experts' opinions rely on animal or epidemiological studies. Neither are necessary for an expert's testimony to be found reliable and admissible"); *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 793 (3d Cir. 2017) ("A causal connection may exist despite the lack of [statistically] significant findings, due to issues such as random misclassification or insufficient power").

Erroneously, Bayer asserts that because Dr. Fraunfelder cannot cite to published literature that includes a "more likely than not" conclusion in support of causation, he cannot reach a reliable opinion regarding causation. Dkt 152 at p. 4, 11-12. "Courts, however, should not exclude an opinion merely because there is an absence of literature on the precise issue as long as other factors demonstrate the reliability of the expert's opinion." *In re Human Tissue Prods. Liab. Litig.*, 582 F. Supp. 2d 644, 656 (D.N.J. 2008). Indeed, the Second Circuit has frequently rejected the argument that *Daubert* requires exclusion of a causation opinion unless it is based on published studies. *See In re Ephedra Prods. Liab. Litig.*, 393 F. Supp. 2d 181, 184 (S.D.N.Y. 2005) (citing *Zuchowicz v. United States*, 140 F.3d 381, 386-87 (2d Cir. 1998); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043-44 (2d Cir. 1995)); *see also Amorgianos*, 303 F.3d at 266-67 ("[t]his is not to suggest that an expert must back his or her opinion with published studies that unequivocally support his or her conclusions.")

Disregarding Dr. Fraunfelder's description of his totality of the evidence approach, *including* statistically significant epidemiological data, from which he reached a causality opinion, Bayer's counsel pressed Dr. Fraunfelder to cite to a publication using his *exact* causality language: "Have you seen any scientific publication that comes to the conclusion in your opinion that Mirena causes IIH, the same opinion that you expressed to me a few minutes ago?" Ex. A, Fraunfelder

Dep. at 36:14-18; *see also id.* at 37:3-9 ("I'm asking a little bit of a different question, which is have you seen a specific article or publication or study where the authors conclude -- reached the same conclusion that you have reached, that Mirena can cause -- is capable of causing IIH?"); 37:21-24 ("I just want to know, is there an article that you can point me to where that causation conclusion is reached in the article?"); *id*. at 39:17-21. Such a requirement is contrary to *Daubert* case law, both within the Second Circuit and beyond.

Despite alleged flaws that Bayer levels at the Valenzuela study, and Dr. Fraunfelder's *agreement* that the Etminan analyses are of limited utility, Dr. Fraunfelder reliably considered the epidemiologic data as among the totality of the evidence. "Indeed, 'in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.'" *Rosenfeld v. Oceania Cruises. Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (*quoting Hemmings v, Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)).

**1. The Etminan Disproportionality Analyses**

For the sake of brevity, Plaintiffs direct the Court to Plaintiffs' Omnibus Opp., contemporaneously filed, for a full discussion of the Etminan analyses. Here, Plaintiffs address Bayer's claims as they specifically relate to Dr. Fraunfelder's methodology. Primarily, Bayer distorts Dr. Fraunfelder's opinions regarding the Etminan analyses, claiming that Dr. Fraunfelder "relied on" this body of work to support his opinions, and asserting that he "rejected or ignored" unfavorable evidence therein. *Id.*

***First***, Bayer claims that "Dr. Fraunfelder arbitrarily decided to assign [Etminan 2015] less value, advocating that it still has "some validity" -- without explaining how a major cornerstone of his support could be repudiated with no overall impact on his opinions." Dkt 152 at p. 3. Bayer's

analysis is incorrect on numerous levels. Initially, the Etminan 2015 study is not a "major cornerstone" of Dr. Fraunfelder's support. As he described in his report, Dr. Fraunfelder reviewed *all four* relevant pieces of *published literature*, and concluded that, "[r]egrettably, Dr. Etminan's "Letter to the Editor", and ultimately his series of analyses, is of little utility in assessing the relationship between the LNG-IUS and PTC." Ex. B, Fraunfelder Rpt. at p. 14; *id.* at 15 ("Dr. Etminan's contributions to the epidemiological literature are of questionable value in assessing whether Mirena can cause PTC.") More importantly, however, Dr. Fraunfelder's weighing of the Etminan analyses was far from arbitrary. Dr. Fraunfelder described in his report numerous methodological errors in Dr. Etminan's analyses, including those propounded by Bayer's consulting expert, Dr. Friedman in her letter to the editor. *Id.* at pp. 12-14.

***Next,*** Bayer argues that "Dr. Fraunfelder admitted he did not know the full story about the Etminan study because he had not been given Dr. Etminan's sworn affidavit -- which he admitted he would want to see and which further refutes his already specious reliance on Etminan's analysis." Dkt 152 at p. 3. Plaintiffs' direct the Court to Plaintiffs' Omnibus Opp. for a discussion of the "Etminan Affidavit," but note here that Dr. Fraunfelder reviewed *all four* relevant pieces of *published literature* regarding Dr. Etminan's analysis.

***Finally***, and most egregiously, Bayer claims that Dr. Etminan "did not repudiate his companion epidemiological study comparing Mirena to two oral contraceptives and finding that there were no differences in intracranial hypertension rates between these products," and that Dr. Fraunfelder "fails to consider this portion of the study, but still relies on the repudiated disproportionality analysis." Dkt 152 at p. 8. This argument cannot be taken. Astoundingly, Bayer partakes in the exact cherry-picking of Dr. Etminan's analyses of which it accuses Dr. Fraunfelder;

unsurprisingly, Bayer claims that Dr. Etminan's equally flawed second analysis is somehow reliable because it reaches Bayer's desired conclusion. Yet, unlike Bayer and its experts, Dr. Fraunfelder did *not* accept the "helpful" pieces of Dr. Etminan's analyses as reliable and conveniently disregard the rest. Rather, he concluded that the Etminan analyses as a whole are of limited value, and do not add to the totality of the evidence. To the extent that Bayer points to cherry-picked deposition soundbites to suggest otherwise, perceived "[i]nconsistencies in expert testimony do not warrant exclusion under Rule 702; rather, they are appropriate topics for cross-examination." *Ergotron, Inc. v. Rubbermaid Commer. Prods., LLC,* No. 10-2010 ADM/JJG, 2012 U.S. Dist. LEXIS 121795, at *38-39 (D. Minn. Aug. 28, 2012) (citing *Advanced Fiber Techs. Tr. v. J&L Fiber Servs., Inc.*, No. 1:07-CV-1191, 2010 U.S. Dist. LEXIS 45938 (N.D.N.Y. May 11, 2010) (denying *Daubert* motion premised on inconsistencies between expert's report and later deposition testimony)).

### 2. The Valenzuela Evidence

For the sake of brevity, Plaintiffs direct the Court to Plaintiffs' Omnibus Opp., contemporaneously filed, for a full discussion of the Valenzuela analyses. Notably, however, as Plaintiffs' explain in Plaintiffs' Omnibus Opp., because Valenzuela so strongly supports an inference of causation, Bayer attempts to marginalize its results through a parade of alleged errors and speculative assumptions. Thus, Bayer's argument that Dr. Fraunfelder's *reliance* upon Valenzuela is unreliable is necessarily premised on the Court's rejection of Valenzuela itself.

As a threshold matter, Bayer cites *no* precedent for its claim that a court may reject an entire peer-reviewed study as unreliable because of alleged limitations. Indeed, "[e]ven if movants are correct that there are flaws in [an expert's] factual premises, 'unless the information or

assumptions that the expert relied on were so unrealistic and contradictory as to suggest bad faith, inaccuracies in the underlying assumptions or facts do not generally render an expert's testimony inadmissible. Less egregious suggestions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.'" *In re M/V MSC Flaminia*, 2017 U.S. Dist. LEXIS 119146, at *280-81 (quoting *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 306 (S.D.N.Y. 2015)). Courts within this District have frequently "decline[d] movants' invitation to predetermine the[] facts as a basis to preclude an expert," finding that "[t]he appropriate means to test any alleged weaknesses in [an expert's] data, calculations, or factual premises is therefore cross-examination, not preclusion." *Id.* (citing *Amorgianos*, 303 F.3d at 267 ("Only serious flaws in reasoning or methodology will warrant exclusion")); *see also Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 423 (S.D.N.Y. 2009) ("'contentions that assumptions are unfounded go to the weight, not the admissibility of the testimony'") (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir. 1992); *see also, Raskin v. The Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("disputes as to the validity of underlying data [ ] go to the weight of the evidence," not the admissibility of the proffered expert testimony) (internal citations and quotations omitted).

Finally, Dr. Fraunfelder does not "dr[a]w 'different conclusions than the scientists who performed the original work," as Bayer suggests. *Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1317 n.4 (9th Cir. 1995). Rather, as Dr. Fraunfelder notes in his report: "[t]he authors explain that there are two possible explanations for their results: 1) that LNG causes increased intracranial pressure through an already-postulated or yet unknown mechanism; or 2) that PTC is more likely to occur in the same population of women who are more likely to ha e an LNG-IUS." Ex. B,

Fraunfelder Rpt. at p. 12. Thus, Dr. Fraunfelder reliably considered the Valenzuela results, "[a]long with the case reports and spontaneous reports with both Mirena and Norplant, the medical literature […], and a plausible biological mechanism," as a piece of the totality of the evidence.

### C. Dr. Fraunfelder Does Not Intend to Offer Mechanism Opinions to the Jury; Rather, He is Qualified to Consider Mechanism Evidence Within the Totality of the Evidence

Courts within the Second Circuit have "liberally construed expert qualification requirements." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. 00-CV-1898, 2008 WL 1971538, at *5 (S.D.N.Y. 2008) (internal quotation marks omitted). Experts need not conduct studies of their own in order to opine on a topic; a review of other studies and scientific literature can be enough to qualify experts to testify and to make that proposed testimony reliable. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042-43 (2d Cir. 1995) (rejecting argument that because expert had "no experience performing or interpreting air quality studies" he was not qualified to testify). "An expert need not be precluded 'from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute.'" *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 236 (E.D.N.Y. 2014) (quoting *Yaccarino v. Motor Coach Indus., Inc.*, No. 03-CV-4527, 2006 U.S. Dist. LEXIS 97208, at *9 (E.D.N.Y. 2006)).

Rather, Dr. Fraunfelder rightly admitted that he is "not being put forward as an expert on the mechanism of it." Ex. A, Fraunfelder Dep. 384:7-8; 571:13-16 ("That's not something that I'm going to be an expert on.") Dr. Fraunfelder does not intend to testify regarding the *precise* mechanism of action by which Mirena may cause or substantially contribute to causing PTC, nor is he required to do so in order to opine that there is *biologic plausibility*. "The fact that the mechanism remains unclear does not call the reliability of the opinion into question." *In re PPA*,.

289 F. Supp. 2d at 1247; *see also Bartoli v. Novartis Pharm. Corp.*, No. 3:13-0724, 2014 U.S. Dist. LEXIS 52956, at *29 (M.D. Pa. Apr. 17, 2014) (expert allowed to testify as to mechanism where: "[he] is not offering his opinion as *the* mechanism, but rather indicating that it is a plausible one given his understanding of the relevant medical literature.") (emphasis added).

Defendants have misconstrued Dr. Fraunfelder's reliance on "mechanism" evidence, claiming that "Dr. Fraunfelder's report unambiguously states that an essential aspect of his causation opinion is his view that the literature establishes a mechanism for how Mirena causes IIH." Dkt. 152 at p. 5 (citing Fraunfelder Report at 27 ("Conclusion" describing bases for his opinion to include "scientific literature describing a likely biological mechanism")). Again, Bayer's citation fails to prove up its overreaching claim. Bayer's argument suffers numerous flaws, not least because it atomizes the lines of evidence relied upon by Dr. Fraunfelder, "as though his ultimate opinion was independently supported by each." *Milward*, 639 F.3d at 23.

Rather, Dr. Fraunfelder properly considered and acknowledged that the relevant medical literature supports "a plausible underlying biological mechanism for steroid hormones including LNG." Ex. B, Fraunfelder Rpt. at p. 1; *see also id.* at p. 6 ("The greatly increased risk of this rare disease among obese women of child bearing age suggests an underlying mechanism related to sex hormones. PTC has also been studied in men with testosterone deficiency and reported in transgender individuals undergoing testosterone therapy. Thus, even atypical cases are supportive of an underlying mechanism related to sex hormones"); *id*. at p. 7 ("This role is strengthened by the therapeutic use of spironolactone (a powerful anti-mineralocortioid and anti-androgen) in pediatric cases of PTC with aldosteronism. […] The lack of reports of PTC with the non-hormonal IUD Paragard is also strongly indicative of a causal mechanism related to sex hormones. This lack

of reports of PTC with Paragard is hardly surprising, as Bayer's Global Safety Leader explained, because Paragard contains no hormone and is therefore incapable of causing systemic hormonal effects.") Thus, Dr. Fraunfelder reliably opines that it is biologically plausible that Mirena causes or substantially contributes to causing PTC.

Bayer's argument that Dr. Fraunfelder's entire methodology should be impeached because his opinion relies on the "pillar" of "his mechanism tenant" is severely misguided and finds no basis in Dr. Fraunfelder's report or deposition testimony. Dkt 152 at p. 6. Rather, Dr. Fraunfelder's accounting for the existence of a biologically plausible mechanism is but one consideration in the totality of the evidence from which he reached his opinions.

## CONCLUSION

Dr. Fraunfelder has reliably applied a "totality of the evidence" methodology in reaching his opinions in this case. Among the admissible sources of causality evidence relied upon by Dr. Fraunfelder, "no body of evidence was itself treated as justifying an inference of causation. Rather, each body of evidence was treated as grounds for the subsidiary conclusion that it would, if combined with the other evidence, support a causal inference." *Milward*, 639 F.3d at 23. Courts within the Second Circuit have found these types of evidence, including "case reports, prevalence studies, adverse event reports, animal studies, and a hypothesis about a potential mechanism through which the drug supposedly caused the alleged injury […] sufficiently reliable to permit an expert to testify." *Drake*, 111 F. Supp. 3d at 567 (citing *Fosamax*, 645 F. Supp. 2d 164).

An expert's analysis need not be perfect to be received in evidence – it need only rest on a reliable foundation that is relevant to the task at hand. *Hart,* 60 F. Supp. at 467. Dr. Fraunfelder has reliably applied an accepted methodology in reviewing the evidence in this case. To the extent

that Bayer draws different conclusions therefrom, Bayer may utilize the traditional and appropriate means to attack Dr. Fraunfelder's opinions, namely: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of." *Beastie Boys*, 983 F. Supp. 2d at 377 (citing *Daubert*, 509 U.S. at 596). Dr. Fraunfelder's expert opinions are relevant and reliable, and therefore admissible under Rule 702 and *Daubert*.

WHEREFORE, Plaintiffs respectfully request that this honorable Court deny Bayer's Motion to Exclude the Expert Testimony of Dr. Frederick Fraunfelder, MD, MBA.

Dated: March 15, 2018

Respectfully submitted,

*/s/ Lawrence L. Jones II*
Lawrence L. Jones II
Jones Ward PLC
Co-Lead Counsel for Plaintiffs

Martin D. Crump
Davis & Crump PC
Co-Lead Counsel for Plaintiffs

Maxwell S. Kennerly
Kennerly Loutey, LLC
Liaison Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2018, I served all counsel of record with the foregoing via this Court's CM/ECF System, which will provide notice of filing to all counsel of record.

*/s/ Lawrence L. Jones II*
Lawrence L. Jones II