# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY LITIGATION (NO. II),<br><br>This Document Relates to All Actions, | 17-MD-2767 (PAE)<br>17-MC-2767 (PAE) |

~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF
NANCY J. NEWMAN, M.D.

9:07 a.m.
Thursday, the 8th day of February, 2018

Suite 1600 Two Alliance Center
3560 Lenox Road, NE
Atlanta, Georgia

Blanche J. Dugas, CRR, RPR, CCR No. B-2290
~~~~~~~~~~~~~~~~~~~~~~~~~

APPEARANCES OF COUNSEL

On Behalf of the Plaintiffs:

KATHRYN SNAPKA, Esquire
The Snapka Law Firm
Suite 1511
606 North Carancahua
Corpus Christi, Texas 78403
(361) 888-7676
(361) 884-8545 (facsimile)
ksnapka@snapkalaw.com
JENNIFER L. ORENDI, Esquire
Dalimonte Rueb, LLP
Suite 200
1250 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 538-2790
jorendi@drlawllp.com

On Behalf of the Defendants:

SHAYNA S. COOK, Esquire
Goldman, Ismail, Tomaseli, Brennan & Baum, LLP
Suite 400
564 West Randolph Street
Chicago, Illinois 60661
(312) 881-5947
(312) 881-5247 (facsimile)
scook@goldmanismail.com

Also Present:
A.J. Gallo, videographer



INDEX OF EXAMINATION


| EXAMINATION | PAGE |
|---|---|
| EXAMINATION BY MS. SNAPKA | 7 |
| EXAMINATION BY MS. COOK | 236 |
| FURTHER EXAMINATION BY MS. SNAPKA | 243 |


- - -

INDEX TO EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of video deposition of Nancy J. Newman, MD | 7 |
| 2 | Curriculum vitae | 8 |
| 3 | PowerPoint presentation slides titled "Optic Neuropathy Causes," Bates stamped MIR_NNEWMAN_IIH_00000186 through 198 | 9 |
| 4 | Nancy Newman, MD additional materials reviewed | 10 |
| 5 | Invoices concerning consulting on the Mirena litigation from Nancy J. Newman, MD | 15 |
| 6 | Expert report of Nancy J. Newman, MD | 18 |
| 7 | Article titled "Risk factors for poor visual outcome in patients with idiopathic intracranial hypertension" | 39 |
| 8 | Research investigation titled "Effect of Acetazolamide on visual function in patients with idiopathic intracranial hypertension and mild visual loss - The idiopathic intracranial hypertension treatment trial" | 41 |
| 9 | Article titled "Overdiagnosis of idiopathic intracranial hypertension" | 59 |
| 10 | Chapter 5 - Papilledema - Deborah I. Friedman | 76 |
| 11 | Article titled "Doxycycline and intracranial hypertension" | 77 |
| 12 | Review article titled "Medication-induced intracranial hypertension in dermatology" | 78 |
| 13 | Article titled "Idiopathic intracranial hypertension" by Deborah I. Friedman, MD | 83 |
| 14 | Update on idiopathic intracranial hypertension by Beau B. Bruce, Valerie Biousse and Nancy J. Newman | 95 |
| 15 | Neuro-ophthalmology review titled "Update on the pathophysiology and management of idiopathic intracranial hypertension" by Valerie Biousse, Beau B. Bruce and Nancy J. Newman | 101 |
| 16 | NIH-PA author manuscript titled "Risk factors for idiopathic intracranial hypertension in men: A case-control study" | 107 |
| 17 | Copy of the deposition of Nancy J. Newman, MD dated March 10, 2009 in the case of Weilbrenner vs. Teva Pharmaceuticals, USA, Inc. | 110 |
| 18 | Handwritten comparison of Weilbrenner vs. Mirena User | 158 |
| 19 | PowerPoint presentation slides, first page titled "19 yo woman with visual loss" Bates stamped MIR_NNEWMAN_IIH_00000058 through 101 | 159 |
| 20 | Article titled "Atypical idiopathic intracranial hypertension - normal BMI and older patients" | 161 |
| 21 | E-mail exchange with attachments, Bates stamped MIR_IIH_AE_Source12_00000001 through 43 | 163 |
| 22 | Drug insert for Jadelle | 171 |
| 23 | Article titled "Not so benign intracranial hypertension - Condition needs to be diagnosed before patients develop visual symptoms" by Kathleen B. Digre | 214 |
| 24 | Drug insert for Mirena | 224 |


(Original Exhibits 1 through 24 have been attached to the original transcript.)

Page 6

Videotaped Deposition of Nancy J. Newman, M.D.
February 8, 2018
VIDEOGRAPHER: This will be Tape No. 1 to the videotaped deposition of Dr. Nancy Newman taken in the matter of -- in reference to the Mirena levonorgestrel-related products liability litigation No. II. Today's deposition is being held at Thompson Hine on February 8th, 2018. The time is now 9:07 a.m.
My name is Alexander Gallo. I'm the videographer. The court reporter is B.J. Dugas. Counsel, would you please introduce yourselves for the record.
MS. SNAPKA: Kathryn Snapka, Snapka Law Firm, Corpus Christi.
MS. ORENDI: Jennifer Orendi, Dalimonte & Rueb, Washington, D.C.
MS. COOK: Shayna Cook for defendants.
VIDEOGRAPHER: Can the court reporter please swear in the witness.
NANCY J. NEWMAN, M.D.,
having been first duly sworn, was examined and

Page 7

testified as follows:
EXAMINATION
BY MS. SNAPKA:
**Q. Doctor, would you just state your name for the record, please.**
A. Nancy J. Newman.
(Exhibit 1 was marked for identification.)
**Q. (By Ms. Snapka) Dr. Newman, my name is Kathy Snapka. You have before you Exhibit No. 1 which is the notice to your deposition.**
MS. COOK: Do you have a copy for me?
MS. SNAPKA: Yes, I do.
MS. COOK: Thanks.
**Q. (By Ms. Snapka) Did you receive that notice prior to your deposition?**
A. Yes.
**Q. And did you attempt to comply with the documents to be produced?**
A. Yes.
**Q. And did you bring here today a set of documents that you believe are responsive to that notice?**
A. Yes.
**Q. All right. You have the -- your current**

Page 8

**and complete resumé or CV, including a complete list of all publications; is that right?**
A. Yes.
**Q. And that is marked as Exhibit No. 2.**
(Exhibit 2 was marked for identification.)
MS. COOK: And I have a copy of it.
**Q. (By Ms. Snapka) No. 2 is a list of all presentations, talks, speaking engagements, medical grand rounds that you have presented. Is that reflected in your CV?**
A. Yes, ma'am.
**Q. No. 3 is "All slides, handouts and other documents relating to all presentations, talks, speaking engagement and medical grand rounds."**
**Have you complied with No. 3?**
A. That's kind of difficult just because I give lots and lots of talks as you'll see in the CV. So what I did was we have provided some representative slide presentations from I guess two years ago in a prior deposition and I added one which is more of a little bit more updated.
**Q. Can you identify which one that was.**
A. Yes, I can, if you'd show me the group.
**Q. Thank you.**

Page 9

**Of course, it's probably going to be the very last one that I get to here. This one here.**
MS. SNAPKA: All right. Let's go ahead and mark that one as the next Exhibit No. 3.
(Exhibit 3 was marked for identification.)
**Q. (By Ms. Snapka) That's in a file folder called, "Optic neuropathy causes PowerPoint"; is that correct?**
A. Yes.
**Q. Now, the next, No. 4 says, "Slides, handouts and other documents relating to all presentations."**
**Let me back up. On No. 3, this was specific to levonorgestrel-containing contraceptives, Mirena or IUDs. So is that specifically responsive to the --**
A. I have none of that.
**Q. Oh, you have none of that on No. 3?**
A. Correct.
**Q. So what you've identified as your slide presentations, talks, speaking engagements is actually responsive to No. 4; is that correct?**
A. That is correct.

Page 10

Q. No. 5 is "All documents and materials reviewed, considered and relied upon in the course of developing your opinions in the matter that are not listed in the Appendix B."
And you have some additional things that you've provided to us; is that correct?
A. I don't think so. I think it's all in Appendix B.
Q. There was a supplement related to depositions that -- that you've reviewed.
A. Oh, yes.
Q. So that's --
A. The last four years because that would have been updated by two years.
Q. Right.
MS. COOK: So just for the record, the updated list that we've provided was additional materials reviewed after the report.
MS. SNAPKA: Okay.
Let's go ahead and mark that as the next exhibit.
(Exhibit 4 was marked for identification.)
THE WITNESS: Yes, sorry. Of course.

Page 11

The transcripts of the experts.
Q. (By Ms. Snapka) No. 6 is "All communications between the witness and any third party other than counsel for the defendants, including, but not limited to defendants of the retained experts relating in any way to Mirena PTC/IH litigation."
A. There are none.
Q. Do you know who the other retained experts are?
A. I know of potentially one or two. I'm not sure who is still doing that kind of work for them.
Q. Okay. No. 7 is "All communications between the witness and Valenzuela, Rai, Kirk, Sanders, Sundar, Warner, Digre, Crum, Jones, Katz, concerning the publication and estimation of the risk of pseudotumor cerebri among users of the levonorgestrel intrauterine device for the underlying study."
A. There are none.
Q. No. 8, "All communications between the witness and those individuals listed relating in any way to Mirena PTC or IH litigation."
A. There are none.
Q. Any -- No. 9 is "All communications between the witness and the editors of the Journal of Neuro-Ophthalmology regarding the 2017 publication and

Page 12

estimation of the risk of pseudotumor cerebri among users of the levonorgestrel intrauterine device or the underlying study."
A. There are none.
Q. "All communications between you and the editors of the Journal of Therapeutic Advances in Drug Safety regarding the 2015 publication risk of intracranial hypertension with intrauterine levonorgestrel or subsequent letters to the editor by Deborah Friedman or Mahyar Etminan?
A. There are none.
Q. No. 11, "All communications between you and Etminan, Luo, Gustafson regarding the 2015 publication."
A. There are none.
Q. No. 12 is "All communications between you and Etminan concerning the letter to the editor."
A. There are none.
Q. No. 13, "All communications between you and Etminan, Luo or Gustafson concerning the 2015 publication."
Are there any?
A. There are none.
Q. Have you had any communication whatsoever with Dr. Etminan?

Page 13

A. No.
Q. Whether it's oral or written.
A. Correct.
Q. Then we can skip down to No. 18, "All communications between you and Dr. Friedman regarding the 2016 letter to the editor."
Are there any?
A. There are none.
Q. "All communications between you and Dr. Friedman relating in any way to Mirena PTC/IH litigation"?
A. None.
Q. No. 20, "All communications between you and editors of the Journal of Therapeutic Advances in Drug Safety regarding the 2015 publication or subsequent letters to the editor by Dr. Friedman or Dr. Etminan"?
A. None.
Q. 21 is "All work product notes, memos and other documents you've created in connection with Mirena PTC/IH litigation other than draft reports, including any copies of materials reviewed that contained writing, highlighting or marking of any kind"?
A. So I believe you have my billing records?
Q. Yes.

Page 14

A. Okay. So you have everything.
**Q. All right. When you were reviewing the -- the documentation in preparation, do you make any written notes? Do you highlight? Do you tab in any way?**
A. No.
**Q. Do you have any documents or tangible materials related to No. 22?**
A. No.
**Q. Do you have any contract or retention letter with Bayer concerning your involvement in Mirena PTC/IH litigation?**
A. Only the billing invoices and the payment slips.
**Q. There was no original letter agreement or a letter of interest or e-mail or anything like that?**
A. No.
**Q. And 24 is "All time sheets, time records, billing records and documents reflecting the time you spent in connection with your work in the Mirena PTC/IH litigation and the amount invoiced or to be invoiced for that time."**
A. You have that.
**Q. All right.**
MS. SNAPKA: Let me mark this as

Page 15

Exhibit No. 5.
(Exhibit 5 was marked for identification.)
**Q. (By Ms. Snapka) I want to make sure that I'm -- I'm organizing this correctly. Is that a complete set of your billing records related to PTC/IH litigation?**
A. That is correct.
**Q. What appears in the back is a set of handwritten notes. Am I correct to say that you've kept a log of the time that you've spent, and from that log, you develop your invoices?**
A. That is correct.
**Q. Doctor, how many times have you provided sworn testimony, either in deposition or at trial?**
A. So it depends on if you remove out when I'm a treating physician giving a deposition. But if we look only at depositions for medical-legal consulting work in which usually there's medical malpractice but not always, I would say that over 20 years of doing this, we're somewhere south of 50 and north of 30.
**Q. Okay. So we're --**
A. For both depositions and trial court.
**Q. If at any time I ask you a question that -- that is confusing to you or that you don't understand, would you please ask me to repeat it or rephrase it?**

Page 16

A. Yes, ma'am.
**Q. All right. Doctor, have you ever given a deposition related to PTC -- and if -- could we use the term "PTC" just as a --**
A. It's -- it's fine if you want to. It flows off the tongue a lot easier than IIH and that's fine if you want to use that. I'll know what you're talking about as long as we're assuming we're talking about idiopathic intracranial hypertension.
**Q. Well, the problem is -- is --is when you talk about idiopathic, what that means is there's no other cause that has been determined; correct?**
A. That is correct.
**Q. But in -- in there, you have testified in cases where you have opined that there is a cause; correct?**
A. For individual cases that more likely than not there is a cause of elevated intracranial pressure in that patient, yes.
**Q. All right. So my question to you is, how many times have you testified related to PTC caused by some exogenous substance?**
A. Well, again, we're talking terminology, but I believe I have only had one deposition testimony that would fit that.

Page 17

**Q. Okay. Have you been consulted on cases with that question?**
A. That one case, yes. I don't believe there's any other and it certainly never came to deposition.
**Q. You were first retained by Bayer in July of 2014?**
A. Correct.
**Q. It reflects here there was a meeting for 1.25 hours. And who was that meeting with?**
A. I believe it was with Ken Baum but I -- at this point, it's hard for me to remember.
**Q. Was it in person?**
A. If I put "meeting," then I'm sure it was.
**Q. Have you added up the total amount of -- of money that you have charged for your review in this case?**
A. I have not.
**Q. Doctor, looking at your CV -- we were provided a CV with your report. Are there things that have been added to your CV since the time of the report?**
A. So is the CV from the report, the November --

Page 18

Q. Correct.
A. -- 2017?
Q. Not -- not November. It's -- let's see.
MS. SNAPKA: Can we have this marked.
(Exhibit 6 was marked for identification.)
Q. (By Ms. Snapka) January 18, 2018.
A. I think that's the report, but I think the CV provided with the report may have been dated November.
Q. Yes, November 2017, yes.
MS. SNAPKA: So we marked this as Exhibit 5 [sic], sorry. Sorry.
Q. (By Ms. Snapka) So can you tell me what was added.
MS. COOK: You said Exhibit 6?
MS. SNAPKA: Yes.
MS. COOK: Okay. I thought you said 5.
THE WITNESS: So what has been added would -- if I can look at it.
MS. SNAPKA: Just for clarification for Counsel. Exhibit No. 5 was the invoices. Exhibit 6 is the report with the CV attached. And then Exhibit 2 is the CV

Page 19

that she provided to us today.
THE WITNESS: So it would just be two months more of presentations.
Q. (By Ms. Snapka) Articles?
A. Committee -- committee appointments and articles, yes.
Q. In that two-month period of time, have you produced any either presentations, publications or any other published material, journal articles or the like, on pseudotumor -- excuse me -- and IH?
A. Let's look at the last number here is 364 and the published articles -- and in the latest CV, we're up to 366. So it's really only --
Q. Only two?
A. -- two additional articles. And neither of them specifically are on idiopathic intracranial hypertension.
Q. All right.
A. And I can do the same for presentations if you'd like.
Q. Please.
A. So this presentation went up to 493 and this goes up to 497. So no, none of them are specifically about idiopathic intracranial hypertension.

Page 20

Q. Okay. Dr. Newman, you are a neuro-ophthalmologist; correct?
A. I am.
Q. You are not an ophthalmologist; correct?
A. That is correct. I am a neurology-trained neuro-ophthalmologist.
Q. And so you are not familiar with the standard of care for an ophthalmologist; correct?
A. Oh, yes, I am.
Q. Okay. Tell me what in your CV reflects your expertise in the practice, clinical practice of ophthalmology.
A. Basically, a neuro-ophthalmologist is -- does exactly what an ophthalmologist does, except for those of us who are neurology trained, we don't do surgery.
Q. Okay. So as far as examining the eye and understanding what is required when faced with a certain set of circumstances, you believe that you are an expert and are competent to testify to the standard of care of an ophthalmologist?
A. Yes, ma'am, I am.
Q. You practice with -- you have a clinical practice; correct?
A. Yes, ma'am.

Page 21

Q. You also teach and you also do research; correct?
A. Yes, ma'am.
Q. And --
A. And a lot of administration.
Q. A lot of administration.
You also have as colleagues Dr. Beau Bruce; is that correct?
A. No longer. He has moved to the CDC.
Q. He has moved to the CDC. He was your colleague; correct?
A. Yes, ma'am.
Q. All right. When did he move to the CDC?
A. I think it's a full year ago, if not a little more.
Q. He was a PhD epidemiologist; correct?
A. He is a PhD epidemiologist.
Q. And are you an expert in epidemiology?
A. I'm an expert in epidemiology as it relates to neuro-ophthalmologic disorders, yes, ma'am.
Q. Do you hold any degrees in epidemiology?
A. I hold a medical degree but not an advanced degree in epidemiology.
Q. Or do you have any additional specialized training in epidemiology?

A. No additional specialized training in epidemiology other than what is my own knowledge base and what has been self-taught over many years.
**Q. All right. So in other words, you have no additional expertise other than the training that you received to enable you to look at epidemiological studies for your purposes as a neuro-ophthalmologist; correct?**
MS. COOK: Object to form.
THE WITNESS: No additional training.
But I have additional expertise.
**Q. (By Ms. Snapka) How did you acquire that expertise?**
A. Through 28 years of being a neuro-ophthalmologist.
**Q. Are you an expert in sex hormones?**
A. Again, I have expertise in how they relate to neuro-ophthalmologic disorders.
**Q. Can you identify in your CV those documents that you've produced where you have given your expert opinion on sex hormones?**
A. I have never given expert opinion on sex hormones.
**Q. All right. Have you ever been qualified or disqualified to give an opinion on sex hormones?**



A. It has never come up.
**Q. But you are holding yourself out at this point to be an expert in sex hormones?**
A. As they relate to neuro-ophthalmologic disorders, yes, ma'am.
**Q. Are you an expert in pharmacokinetics?**
A. Similar answer. I'm an expert inasmuch as it relates to disorders of neuro-ophthalmology.
**Q. What about pharmacodynamics?**
A. The same.
**Q. What about are you an expert in aromatase?**
A. No.
**Q. Are you an expert in aromatization of androgens into estrogen?**
A. Again, as it relates to neuro-ophthalmologic disorders, I can opine on those with an expertise, yes, ma'am.
**Q. Have you ever written any papers regarding the aromatization of androgens?**
A. No, but it may have been referenced in the paper we did on the study when we looked at clinical effects or clinical manifestations of men with idiopathic intracranial hypertension as relates their testosterone levels.
**Q. Can you identify that paper in your CV, please?**



A. Yes, ma'am. The first author is J. Alex Fraser, and it is 254.
**Q. And that is 254 under --**
A. Publications.
**Q. Under publications.**
**Before you close it, because I'm going to have a question about that. Make sure I can find it. Okay, Fraser, Bruce, Rucker, another Fraser, Atkins and Newman.**
A. And Biousse.
**Q. And Biousse. Risk factors for idiopathic intracranial hypertension in men. And so in that paper, you have published on the aromatization of androgens?**
A. It may have been referenced in there. I would have to look at the paper itself to see if it actually comes up.
**Q. Okay. Dr. Biousse is -- Dr. Biousse still at Emory?**
A. Yes.
**Q. And she is a colleague of yours?**
A. Yes.
**Q. And has she been retained by Bayer?**
A. No.



**Q. Has Dr. Bruce been retained by Bayer?**
A. I believe he was at some -- at one point. I don't know anymore.
**Q. Do you know Dr. Friedman?**
A. Which one?
**Q. Dr. Deborah Friedman?**
A. Yes, ma'am.
**Q. And how do you know Dr. Friedman?**
A. Neuro-ophthalmology is a small community and we've both been in it a long time.
**Q. And do you respect Dr. Friedman?**
A. Yes.
**Q. Do you believe she is a good neuro-ophthalmologist?**
A. Yes.
**Q. Who publishes to the extent that you do in the neuro-ophthalmological community?**
A. On anything?
**Q. Well, yeah, on anything neuro-ophthalmology.**
A. I doubt there are more than a handful of people who have as many publications as I have. I've never actually asked to look at someone's CV. There are probably no more than ten people, I think, who would have this many publications.

Page 26

**Q. Can you give me their names?**
A. Oh, goodness. It would just be guessing.
**Q. Well, I don't want you -- you obviously review --**
A. Sure.
**Q. -- your colleagues' work, do you not?**
A. Yes.
**Q. Okay. Dr. Andy Lee would be one in Houston?**
A. Yeah. I think Andy Lee, Neal Miller, Alfredo Sadun, Valerie Biousse. There probably are a few more, as I say around ten, but I can't just pluck their names out right now.
**Q. Have you ever spoken with any of your neuro-ophthalmology colleagues about retention by Bayer?**
A. No.
Let me amend that because I must -- if I know that Dr. Bruce was involved, I think it's because at one point he said it to me. So I just want to be sure we have that on record.
**Q. Okay. When you are at neuro-ophthalmology meetings, do you visit with colleagues about -- who are also involved in the Bayer litigation?**
A. What do you mean visit with them?

Page 27

**Q. Talk about -- about giving deposition testimony or your review or your work.**
A. Oh, no. Definitely not.
**Q. How much of your work at this point is administration?**
A. It's hard to carve any of this out in reliable pockets because as with many busy people, probably also like yourself, you're doing two or three top things at the same time. But I would say, depending on how one defines administration, whether it's committee work for the university or the medical school, that's what I usually think of as administrative time, as well as running the neuro-ophthalmology unit, I'd say it's probably 15 to 20 percent of my time.
**Q. How many other cases other than -- than the case that we are currently involved in, the Bayer case, have you worked on in the last 12 months, in other words, your retention as an expert witness?**
A. Correct. And you mean any case, just even reviewing records for --
**Q. Anything.**
A. Anything. So I probably have about four or five active cases right now.
**Q. With regard to -- are those for plaintiff?**

Page 28

**Are those for defendants?**
A. Both.
**Q. And how many of each?**
A. So if one looks at the cases I've reviewed, and again, mostly medical malpractice cases, if I -- if you look at the cases I'm asked to review, it's approximately 25 percent plaintiff, 75 percent defense. If you look at those that come to deposition, it's probably more like 20/80, 20 percent plaintiff, 80 percent defense.
**Q. The cases that you currently have, how many of those are for the plaintiff?**
A. So of the four or five active cases, I think two or -- at least two are plaintiff, maybe even three at this time. It just happens to be this year that way.
**Q. All right. So they are -- they are plaintiffs who are alleging medical malpractice against a healthcare provider?**
A. That is correct.
**Q. What is the discipline of the healthcare provider in each of those cases?**
A. Oh, it varies.
**Q. Can you tell me?**
A. Sure. Because most of the time my

Page 29

testimony is requested regarding causation, rather than standard of care, so there are ER physicians, primary care physicians, cardiologists, anesthesiologists. I think there's one with an ophthalmologist.
**Q. Okay. So are you opining about the standard of care of the ophthalmologist or are you providing causation testimony?**
A. I'm providing almost exclusively causation testimony.
**Q. The publications that are listed in your CV -- well, let me -- let me back up.**
**In the presentations section of your CV, have you made any of the presentations with any of the other neuro-ophthalmologists who are retained by Bayer for this case?**
A. Have I -- let me make sure I have your question correct -- correctly. Have I made any presentations with them? Usually, I don't present with another person so I'm not sure I understand your question.
**Q. Okay. On all of the presentations that you've made, the 446 -- how many are there?**
A. It's 497.
**Q. The 497 presentations, how many of those**

Page 30

**were with other people? Were you -- did you have a co-presenter?**
A. So many of them, I'm an invited speaker and there are other invited speakers, but they wouldn't necessarily be presenting on the same topic or having anything interactive with me. The exception is that Dr. Biousse and I will sometimes do courses together, and in that case, we will lecture with each other in a way, but we each have our own specific talks.
**Q. So would I be correct in saying that on all these presentations, you were the sole presenter? In other words, you weren't on a panel discussion; correct?**
A. Well, some of them, I am on a panel and I'll point that out. And sometimes I don't even include panel discussions on -- on this list because it would get too long. But for -- I'm trying to think. Yeah, invited panelist. If you look at No. 496, I'll put in that I was a panelist and there were other people discussing the same topic.
**Q. Who else was on that panel?**
A. Oh, gosh. I'm not sure I can remember. Eric Eggenberger. I can't remember who else. I'm sorry.
**Q. Okay.**

Page 31

A. Karl Golnik.
**Q. Golnik?**
A. Yeah. That's another one.
**Q. Now, when you list publications, when you list yourself as an author, does that mean that you had a hand in writing the publication?**
A. Almost always, yes.
**Q. When it's not the case, what have you done?**
A. So sometimes if there are group publications, I will have provided patients and data and at the very least would have read over the manuscript prior -- to approve it prior to its publication. But I would say 99 percent of the time, I'm writing.
**Q. Okay. And so --**
A. And reviewing.
**Q. -- in other words, if you've listed it here, you're an author; is that right?**
A. Yes, ma'am.
**Q. Okay. You have a section listed as reviews and critiques. What -- explain to me what you mean by listing reviews and critiques.**
A. So it's just very small publications that I don't think rise to the level of being considered peer review where I've been asked to critique an -- and

Page 32

article or -- that's usually what it is and that's why there's so few of them. Mostly, they're for review journals and they just like my opinion on -- on a couple of articles that have come out as an expert opinion.
**Q. Is that the way reviews and critiques work? Somebody asks to --**
A. Yes.
**Q. -- to have it reviewed or critiqued?**
A. Yes. These in particular, yes.
**Q. What if you, as a neuro-ophthalmologist, read something that you don't think rises to the level of -- of reliance? What do you do?**
A. Then I would write a letter to the editor --
**Q. Okay.**
A. -- of that journal.
**Q. And have you written letters to the editor of the journal?**
A. Yes, ma'am.
**Q. And where are those contained?**
A. So mostly since they are published and in a sense peer reviewed, they would be in my publications.
Let me just look to make sure. Yeah. If they are published -- sometimes I put them in other

Page 33

publications. Yeah, you'll see here, letter to the editor, letter to the editor. So I -- I tend to put them in other publications.
**Q. Can you identify on your CV any letters to the editor that you've written relating to the issue of PTC?**
A. So I'm looking. Yes. No. 36 was our response to a letter to the editor. So it's a letter to the editor about a letter to the editor on the clinical course of idiopathic intracranial hypertension with transverse sinus stenosis.
**Q. You said that's No. 36?**
A. No. 36.
And No. 37 was also an author response. So a letter to the editor about a letter to the editor and that was in regard to our article, "Does the presence of transverse sinus stenosis influence the clinical presentation and outcome of idiopathic intracranial hypertension?"
And then we have a letter to the editor, No. 42, which was on asymmetric papilledema in idiopathic intracranial hypertension, and again, it was a response to someone's letter about our article.
And No. 43, overdiagnosis of idiopathic intracranial hypertension, again, a letter to the

editor as a response to a letter to the editor about our article.

And I believe that's it. Yes, that's it.

**Q. You have no other letter -- letters to the editor regarding some article or publication that you have read that you took issue with, other than those that you've identified; correct?**

MS. COOK: Object to form.

THE WITNESS: So, again, I'd have to look through every one of these 367 publications to make sure that I didn't miss a letter to the editor, but I believe that would be it, what I have mentioned.

**Q. (By Ms. Snapka) When you publish, tell me what is required from an ethical standpoint regarding disclosing any potential conflicts of interest.**

A. So there's both ethical and what the journal requires. Usually, the journal requires enough to totally compensate for the ethical questions. So are you asking me do I -- so I absolutely comply with what the journal requires as far as disclosures.

**Q. And tell me what the journals require as far as disclosures.**

A. Depends on the journal.



**Q. Okay. So there are different journal requirements?**

A. That is correct. And there are also different requirements depending on when we're talking about. So the requirements 20 years ago are very different than the requirements now even for the same journal.

**Q. When did they change?**

A. Oh --

MS. COOK: Object to form.

THE WITNESS: Each one has changed, evolved over time. It would be impossible to answer for every journal.

**Q. (By Ms. Snapka) Are there overarching ethical considerations for when you disclose a conflict of interest?**

A. Yes.

**Q. When? Tell me -- tell me about that.**

A. Well, that's a very global question.

**Q. I want to understand what the ethics are that come into play when you disclose a conflict of interest.**

A. Right. So I would disclose a conflict of interest if the subject matter of what I am writing about in the journal article could be -- could in any



way it be perceived that I might have a conflict of interest in that regard.

**Q. In other words, the work that you're being paid for by someone is touched upon in that journal article or publication?**

A. Well, even more than that. I -- I would think it goes beyond whether you're paid for it or not. If you have any kind of affiliation, then it should be disclosed if the subject matter of the work that is in question could in any way be perceived as being influenced by that relationship, yes, ma'am.

**Q. Okay. In that circumstance, then, your ethics require you to disclose your affiliation?**

A. Yes.

**Q. Or any potential conflict of interest?**

A. Yes. As I mentioned, both my ethics and the requirements. And the requirements are usually even beyond that because they will often ask you to disclose any relationships that you have even if it's not in relation to that subject matter.

**Q. You've published extensively. Under what circumstances have you been paid for any of your publications?**

A. Never.

**Q. So you receive no compensation from books,**



**book chapters?**

A. Well, that's not what you asked. You asked am I paid for a publication. I would never be paid for a publication. I have written books in which I receive royalties.

**Q. Okay. Are there any other circumstances in which there has been remuneration for your publication?**

A. For something written?

**Q. Yes.**

A. No.

**Q. What about for speaking?**

A. No. Honorarium. In other words, when I am a visiting professor, we get a small honorarium -- honorarium for speaking.

**Q. When you travel to make presentations, is your way paid?**

A. Yes, ma'am.

**Q. All right. All your -- your travel, your expenses, your lodging?**

A. It depends. When I speak at meetings, it comes out of my own pocket, but if I'm an invited professor, yes, I -- my -- my way is reimbursed, coach, of course, and I am off- -- offered an honorarium on most occasions.

**Q. Can you give me the range of the honorarium?**
A. Never more than $1,000. Typically, more like 500.
**Q. You indicated that everything in here you were an author of; correct?**
A. Yes, ma'am.
**Q. If you'll look, find the publication "Risk factors for poor visual outcome in patients with idiopathic intracranial hypertension" in your publications.**
MS. COOK: Do you know the year?
MS. SNAPKA: Looks like 2015.
**Q. (By Ms. Snapka) I think it's 2015. Do you have that?**
A. Who is the first author?
**Q. Wall.**
A. I have the IH treatment trial if that -- oh, there it is. Yep.
**Q. Which -- what number is that on your CV?**
A. 331.
**Q. 331?**
A. Right. So this is --
**Q. Excuse me just a second. I'll ask you a question in a second.**



MS. SNAPKA: If we can have that marked.
(Exhibit 7 was marked for identification.)
**Q. (By Ms. Snapka) That is now marked as Exhibit No. 7; correct?**
A. Yes. Thank you.
**Q. And that is listed on your CV under No. 331; is that correct?**
A. That's correct.
**Q. All right. On the Exhibit No. 7 itself, your name does not appear as an author, does it?**
A. I -- that's correct. I am -- well, it doesn't appear as the writing committee. Remember I mentioned that there are going to be a few cases in here which are multicenter trials in which as a principal investigator, I provided patients and at the very least would have looked at the manuscript before it was submitted in its final form, but I would not have actually been one of the ones writing the paper.
**Q. Did you list yourself as a principal investigator or as an author on your CV?**
A. Oh, I'm not listed as an author on my CV. I am the -- you see what's bolded, "NORDIC idiopathic intracranial hypertension study group" so I'm a member of the study group.



**Q. All right. So you're not claiming to be an author of this?**
A. Again, I am not an author in the sense of someone actually writing the paper, but it -- if you search on PubMed under my name, this article will come up because I'm listed in the authors at the end.
**Q. At the end under "author contributions," is that where your name appears?**
A. Well, they will -- they will refer you here to the full author list.
**Q. Right. Under "author contributions"?**
A. Let's see.
**Q. If you'll look at page --**
A. No. That's for the writing com- -- the writing committee contributions.
**Q. Is it entitled, "author contributions"?**
A. What you say is author contributions that's what -- that's where they specifically say who did what of the writing committee. But if you see, it's for the NORDIC idiopathic intracranial hypertension study group.
**Q. Right. Well, you said, "I'm not an author in the sense of someone actually writing the paper, but if you search on PubMed, this article will come up because I'm listed in the authors at the end."**



A. Well, if you look at the bottom of the first page.
**Q. Uh-huh (affirmative).**
A. It says, "NORDIC idiopathic intracranial hypertension study group co-investigators are listed on the neurology website at neurology.org." So I misspoke when I said it was at the end. It's actually at the beginning.
**Q. So --**
MS. SNAPKA: I'm sorry?
MS. COOK: Do you have a copy of Exhibit 8 for me?
MS. SNAPKA: I have a -- yes, I do.
MS. COOK: Thanks.
(Exhibit 8 was marked for identification.)
**Q. (By Ms. Snapka) Going back to No. 7, when you said it's at the beginning, where is it at the beginning?**
A. It's at the bottom of the first page. About two lines up from the bottom, it says, "NORDIC idiopathic intracranial hypertension study group co-investigators are listed on the neurology website at neurology.org."

**Q. Okay. So your name is not listed at the beginning. Just a reference as an investigator is listed there; is that correct?**
A. That is correct.
**Q. All right. If you'll look at Exhibit No. 8.**
A. Yes.
**Q. It is also listed on your CV; correct?**
A. Correct.
**Q. Is that the same circumstance you're --**
A. That is correct.
**Q. All right. You're not --**
A. Although that one, you actually have me listed in -- on the end, Page 1650.
**Q. And are you under "collaborators and cites"?**
A. That is correct.
**Q. Okay. How many collaborators and cites are listed here?**
A. There are hundreds.
**Q. Okay. When the term "levonorgestrel" is used, are you familiar with the molecular makeup of levonorgestrel?**
A. In -- in basic terms, yes.
**Q. How is the levonorgestrel in Norplant**



**different than the levonorgestrel in Mirena?**
A. I wouldn't know for sure. I know that the delivery is different.
**Q. And I'm not asking about the delivery.**
A. Right.
**Q. I'm asking about the levonorgestrel.**
A. I don't know if it's different. I think it's the same.
**Q. Would that be the same true -- same would be true for Jadelle?**
A. I don't know offhand, but I believe so.
**Q. So the levonorgestrel is the same in levonorgestrel-containing subdermal implants as intrauterine implants; correct?**
A. That is correct.
**Q. In your clinical practice -- excuse me -- how many days a week do you see patients?**
A. Two and a half.
**Q. How many patients do you see a week?**
A. Varies. At least 35.
**Q. 35 patients a week?**
A. Yes.
**Q. Are these from Georgia?**
A. They're from everywhere but a lot from Georgia.



**Q. When you say "everywhere," do you mean all over the United States?**
A. I mean sometimes even the world.
**Q. All right. So you see international patients as well?**
A. Yes, I do.
**Q. All right. What percentage of your practice is international patients?**
A. Probably two to three percent.
**Q. Do people come to see you upon referral from another physician usually?**
A. Usually, yes.
**Q. Are they usually referred from ophthalmologists or primary care physicians or...**
A. It's a mix. Ophthalmologists, neurologists, neurosurgeons, ENT, primary care.
**Q. I understand you have a database of patients that you've seen; is that correct?**
A. We do a diagnostic coding of every patient we see, and we can mine that coding repository for a group of patients with a certain diagnosis.
**Q. When you see a patient who presents with elevated intracranial pressure, what is the coding that you use?**
A. It depends on what the cause of the



elevated intracranial pressure is.
**Q. If there is not a meningitis, if there is not a neoplasm, what do you use?**
A. Again, it depends on what the cause of the elevated intracranial pressure is. So if it's idiopathic intracranial hypertension, then we code them with diagnostic code. I believe the number is 157.
**Q. What if you determine it -- do you have a code for PTC?**
A. The code for idiopathic intracranial hypertension is 157.
**Q. My question is, do you have a separate code for PTC?**
A. No.
**Q. Do you have a separate code if you've determined, for example -- or do you ever make a determination that intracranial hypertension is caused by a tetracycline?**
A. So those would probably be coded under 157, and they might be coded under the code for papilledema. I do not believe we have any other general code to use for those cases. We would have a code for venous sinus thrombosis or brain tumor as you mentioned before or hydrocephalus.

**Q. Those would be coded separately; correct?**
A. Yes.
**Q. So that in your database, if you wanted to pull up all of the cases of elevated intracranial hypertension from any of the potentially associated precipitators, they would fall under your code for IIH, which is 157; correct?**
A. That is correct.
**Q. When you take a history, what -- you take a detailed history, do you not?**
A. Yes, I do.
**Q. Do you ask about -- tell me what you ask about with regard -- when you have a patient who comes in with elevated pressure.**
A. You mean elevated intracranial pressure?
**Q. Yes.**
A. Well, I wouldn't necessarily know that to begin with. So bottom line is I take the same detailed history on everyone. And so I'm going to ask about the history of the present illness. I'm going to ask about their past medical history and surgical history. I'm going to ask about their family history. I'm going to ask about their social history as regards smoking, drinking. I'm going to ask about their medications. I'm going to ask about their allergies



and then I'm going to do an extensive physical examination.
**Q. Do you ask about birth control?**
A. Yes, I do.
**Q. Do you ask about birth control in general?**
A. Yes.
**Q. And do you ask about specifically what type of birth control they're using?**
A. That would come as part of the question about birth control.
**Q. So you would then record what type of birth control is being utilized; correct?**
A. That is correct. Of course, in women.
**Q. Yes, of course.**
A. Right.
**Q. Are you aware of any application for levonorgestrel in men?**
A. I'm not.
**Q. Are you aware of application for levonorgestrel in postmenopausal women?**
A. I am not.
**Q. And are you aware of any application of levonorgestrel in prepubertal children of either gender?**
A. I'm not aware of that.



**Q. How many cases that are coded under 157 are currently in your database?**
A. So the last time we actually did a study to look at some aspect of IIH, we were over a thousand. I think we're probably near 1500 or so, but that would just be an estimate.
**Q. When was the last time that you looked at the database for what you've coded under 157?**
A. So my fellow is currently looking at that database specifically combined with any cause of papilledema. But -- but specifically looking at the IIH database and those with papilledema to look at the characteristics of their swelling and that's why I'm saying I think we must be up near 1500, but I don't know the exact number.
**Q. In your previous response, you said, "The last time we actually did a study to look at some aspect of IIH, we were over a thousand." When was that?**
A. Well, that was the published studies we did with Beau Bruce. I think it's -- most of them came out around the early 2000 teens where we were looking at risk factors for visual outcome.
**Q. When you were looking for that population, did you note how many of the individuals with IIH had**



**a Mirena implanted?**
A. No.
**Q. Since the time that you have been retained in July of 2014, have you looked at your database to see how many individuals were implanted with a Mirena?**
A. No.
**Q. Why not?**
A. It never really has come up. It just hasn't come up.
**Q. When you were retained as an expert for Bayer, isn't the question -- what were you told the question was?**
A. I'm not sure --
MS. COOK: I object to communications between --
MS. SNAPKA: I'll rephrase the question. Thank you.
**Q. (By Ms. Snapka) What -- what was your understanding of what your job was when you were retained by Bayer in this litigation?**
A. I'm not sure what my job was. I would -- I was asked to review the evidence on a possible association between Mirena and by relationship, by analogy, any LNG-containing compound and idiopathic intracranial hypertension.

**Q. So the question did come up about Mirena usage and -- and idiopathic intracranial hypertension; correct?**
A. Yes, in the published literature, yes.
**Q. All right. So you have at your disposal over a thousand, maybe 1500 cases that you have coded as 157 that would also contain within them whether or not they utilized Mirena; correct?**
A. Probably.
**Q. Okay. And so when you say the question didn't come up, isn't that the question that you were attempting to answer or you were simply asked to review the published literature?**
A. I was asked to review the body of evidence.
**Q. Well, when you say the body of evidence, you have a body of evidence that you have access to; correct?**
A. Again, no one asked me to perform a study, if that's what you're asking.
**Q. It's not -- not really what I'm asking. You're a researcher; correct?**
A. Correct.
**Q. And you're being retained by Bayer. They wanted you to look at the body of evidence to determine a relationship between**



**levonorgestrel-containing products and idiopathic -- idiopathic intracranial hypertension; correct?**
A. Correct.
**Q. And so as a researcher for this task, you confined yourself to published literature?**
MS. COOK: Object to the form.
THE WITNESS: I confine myself to the body of published literature, yes, as well as other materials that were available regarding the topic. But I was -- I would have to do research. It's not like it just would be an answer like that. I would have to do research in order to look at the question you're asking in my database.
**Q. (By Ms. Snapka) Right. But that information is there; correct?**
A. Not necessarily.
**Q. Okay. Do you -- if you've taken a complete medical history that indicates what type of birth control is used, then the information would be contained within your database; correct?**
A. I would hope so, but it's not always the case that patients tell you what they're on, especially when it's not a pill that they take every day; correct? I mean, that's...



**Q. I don't know.**
A. I didn't mean to ask you that.
**Q. Well, I mean, it's important to you to know whatever exogenous substances they're -- they're exposed to; correct?**
A. I would think so but -- and I agree with you. But I think lay people don't necessarily understand that agents they get either over the counter on one hand or that are administered in a way different than a pill, they're not always aware that that should be volunteered as a medication.
**Q. You don't know one way or the other because you haven't looked in your database to determine how many actually volunteered that they are utilizing a Mirena as birth control; correct?**
A. That is correct. And, of course, the database goes back to 1989 so we would have to probably limit it for the question that you're asking.
**Q. Of course. Well, you could also look at it back to 1989 for any levonorgestrel-containing birth control, including Norplant; correct?**
A. It's a theoretical possibility, but, again, most of what I would be told is if they even told me that they were on the pill would be the pill and I really wouldn't have any way of knowing what compound



that pill was made of.
**Q. As a researcher and as a clinician, is it important to you to obtain a complete medical history?**
A. Yes.
**Q. So when you're -- when you see patients, you actually visualize and talk to the patients; right?**
A. Yes, ma'am.
**Q. In other words, you never just put your name on a chart and let your fellow do all the work and you don't see them; right?**
A. I see every patient.
**Q. Okay. So when you are talking to the patients, you want to know what it is that they are on; correct?**
A. Again, ideally, it would be a detailed medication history and there are many different aspects of the office who obtain that history. So sometimes it's the patient themselves fills out a form which then gets entered into the system and we review it. And sometimes it's specifically asking them, and in some cases, it's the resident asking them or a technician asking them or a fellow asking them and sometimes it's me asking them.
**Q. But you review whatever is written down,**

Page 54

**don't you?**
A. Yes, ma'am.
**Q. Have you done a search of your thousand to 1500 cases coded as 157 as to how many of those patients had a ParaGard inserted?**
A. No.
**Q. Do you know what a ParaGard is?**
A. Yeah, the copper IUD.
**Q. All right. So you have no research reflecting how many patients who have a ParaGard have been diagnosed under your code 157?**
A. I do not know.
MS. SNAPKA: Let's take a break.
VIDEOGRAPHER: Going off the record at 10:19.
(A recess was taken.)
VIDEOGRAPHER: Back on the record at 10:30.
**Q. (By Ms. Snapka) Dr. Newman, we had talked earlier about what your obligations are with -- regarding to disclosing that you are a retained expert paid by Bayer to testify in the PTC/IH litigation. Do you recall that questioning?**
A. I recall, yes.
**Q. Have you recently published regarding**

Page 55

**overdiagnosis of intracranial hypertension?**
A. It's not so recent, but yes, a few years ago.
**Q. Do you know when that was?**
A. I'd have to look in my CV.
**Q. Please do.**
A. Yes. No. 338 was published in 2016.
**Q. That was after you had been retained by Bayer; correct?**
A. The publication of it, yes. I can't be sure of the timing of the actual accumulation of data and writing it because, of course, publication lag is usually at least six months.
**Q. You were retained by Bayer in July of 2014; correct?**
A. That is correct.
**Q. All right. So it was after you were retained by Bayer; correct?**
A. That it was published, yes.
**Q. And the accumulation of data and the writing you said would have been like six months?**
A. I'm saying that the publication itself would have taken at least six months. I can't tell you on this particular article how long it took.
**Q. And so it would have been ethically**

Page 56

**appropriate for you to disclose that you had been a retained expert by Bayer to testify in the PTC/IH litigation?**
A. Well, actually, I don't think the topic of that specifically required me to disclose that. I disclosed whatever the journal neurology required that I disclose.
**Q. And with regard to your disclosures, if you believe that you have an ethical obligation to disclose, but the journal may not require it, you would still follow your ethical guidelines, wouldn't you?**
A. Yes, ma'am.
**Q. And this had to do with diagnosis of PTC and IH; correct?**
A. It had to do with overdiagnosis of the particular entity of IIH, yes.
**Q. And you did not disclose on that paper that you were a paid expert by Bayer in the PTC litigation; correct?**
A. I'd have to look to make sure, but I doubt I would have because the topic has nothing to do with this litigation.
**Q. Well, if there are fewer people being diagnosed with idiopathic intracranial hypertension,**

Page 57

**then that lowers the total number of diagnosed cases; correct?**
A. If that were true, yes, but what the article says is that there are more people diagnosed with idiopathic intracranial hypertension who actually have it.
**Q. There are more people than actually have it? Did I understand that correct?**
A. That is correct.
**Q. All right.**
A. It's an overdiagnosis.
**Q. All right. PTC is diagnosed by modified Dandy criteria properly; correct?**
A. That is correct.
**Q. Are you saying that when a diagnosis is given, that -- and they follow the modified Dandy criteria, that is not really PTC or IH?**
A. If you read the article, you'd see that most of the overdiagnosis had to do with the fact that, A, they did not follow the modified Dandy criteria; and, B, they misinterpreted normal-appearing optic nerves as papilledema.
**Q. Bilateral papilledema can be indicative of conditions with high morbidity and mortality; correct?**
A. Yes.

Page 58

**Q. As a physician, it's the responsibility of the clinician to make sure that anything that has a high rate of morbidity or mortality is excluded; correct?**
A. Yes.
MS. COOK: Object to form.
**Q. (By Ms. Snapka) When a clinician sees bilateral papilledema, is it incumbent upon them to follow the diagnosis through to determine that there is no condition which would have high morbidity or potential mortality?**
MS. COOK: Object to form.
THE WITNESS: Yes.
**Q. (By Ms. Snapka) And is your point that they don't know what they're looking at or they're assuming something is papilledema when it is, in fact, not papilledema?**
MS. COOK: Object to the form.
THE WITNESS: For most of those cases, yes.
**Q. (By Ms. Snapka) All right. And in those cases, you use the term in the article "thinking bias." What did you mean by that?**
A. So if you look at the article -- can we look at it? I'll show you. There is a

Page 59

well-respected --
**Q. Let's have it marked just so we'll know what we're talking about.**
A. Sure.
MS. SNAPKA: Would that be number --
THE WITNESS: 9.
(Exhibit 9 was marked for identification.)
THE WITNESS: So when one looks at the topic of overdiagnosis or misdiagnosis, there is a standard table of understanding diagnostic error and what kind of errors are made and that is your Table 1 in this paper on Page 3, which is called the DEER taxonomy which is the diagnostic error evaluation. And so it breaks down what the type of error is due to. Is it due to someone not seeing what they should see? Is it due to someone having already in their head a diagnosis they think it should be, et cetera.
And so what we did was we used this DEER classification, which is used in all papers that discuss diagnostic error, and we tried to classify the misdiagnosed

Page 60

patients and misdiagnosed physicians or optometrists into what kind of error, what category of error they make. And so I believe that's what you're referring to.
**Q. (By Ms. Snapka) Well, my question was "thinking bias." What is "thinking bias"?**
A. So thinking bias, if you look under the taxonomy, let's look and see here. So most of these --
(Cell phone rings.)
MS. SNAPKA: I am so sorry.
THE WITNESS: That's okay.
**Q. (By Ms. Snapka) Please continue.**
A. So most of the diagnostic errors were actually under physical examination and what went wrong was failure or delay in eliciting critical examination finding or an inaccurate/misinterpreted physical examination finding.
And then there are a few scattered other ones and then too much consideration weight given to the diagnosis or too little weight given to the diagnosis. But the majority, if you see up here in Table 1 are under No. 3, and that has to do with -- if you look at the abstract, the most common errors were inaccurate ophthalmoscopic examination in headache

Page 61

patients and thinking biases, reinforcing the need for rapid access to specialists.
So thinking bias is, in this case and according to the DEER, would be somebody comes in with headache or someone is obese and the immediate assumption when they look in the back of the eyes is that that's papilledema when in reality it's not.
**Q. Have you written that you should have a high index of suspicion with papilledema for workup for IIH?**
A. When you see papilledema, you should have a high suspicion for IIH, yes.
**Q. And why is that?**
A. Because most cases of papilledema, which is disc edema due to raised intracranial pressure, is going to be idiopathic. So you should have a high suspicion for IIH. There are cases in which you will find a brain tumor or venous sinus thrombosis or a meningeal process and that's what you have to rule out.
**Q. So you agree that the differential diagnosis when you see papilledema should include all of those things?**
A. Of course.
MS. COOK: Object to form.

**Q. (By Ms. Snapka) Let me -- let me ask it a different way.**

**When you look at the fundus and you see bilateral papilledema, what would your differential diagnosis include?**

A. So first of all, if the patient does not have a diagnosis, when I see swelling of both optic nerves, the first thing in the differential is, is that swelling in both optic nerves due to raised intracranial pressure and, therefore, I can call it papilledema, or is it due to some other cause of bilateral optic nerve head swelling, such as inflammatory processes like optic neuritis or ischemic processes like anterior ischemic optic neuropathy and other categories or hereditary optic neuropathies like Leber hereditary optic neuropathy.

Even before that step, which is papilledema causing disc edema versus other causes in disc edema, would be to make sure it's truly disc edema. I teach my residents it's called the Missouri clause because the license plate in Missouri says, "Show me state"; right? So the first step I make them do is show me it really is papilledema. Let's make sure it's not a congenitally anomalous optic nerve head that looks kind of poochy but isn't really swelling. So we go



through that exercise first and that's what I do every time I see a patient.

Then we differentiate is it -- once we're sure it's true disc edema or disc swelling, we determine whether it's papilledema, disc edema due to raised intracranial pressure. If we believe it's papilledema due to raised intracranial pressure, in addition to looking for all the things that can cause raised intracranial pressure, we have to confirm that there is, indeed, raised intracranial pressure because sometimes we get it wrong and we're back in that second pile either of nonraised intracranial pressure causes of true swelling or our first pile which is, shucks, it wasn't even real swelling to begin with.

So you have to prove it's high pressure before you can actually call it papilledema.

**Q. All right. And the first step in that is the observation of the discs; correct?**

A. That is correct. But just observation of the discs doesn't tell you it's papilledema.

**Q. But it tells you what you should do next; correct?**

A. It tells you you need to evaluate to make sure it's true disc edema and then you need to use your clinical acumen first and your diagnostic skills



to -- to see if it is papilledema versus these other causes of disc edema and then you need to run various tests to confirm that there's raised intracranial pressure and investigate for the causes of raised intracranial pressure.

**Q. And you want to rule out a neoplasm in the brain?**

A. You certainly want to look for a mass lesion which can be neoplastic, cancer, or non-neoplastic such as a big hemorrhage or an abscess due to an infection or even a stroke. So things that can cause mass effect would be the first one, yes.

**Q. Once that is ruled out, if there's no abnormality noted there, then you would move on to lumbar puncture; correct?**

A. Well, first, you also want to make sure there's no hydrocephalus, which is a blockage of spinal fluid, because you wouldn't want to do a lumbar puncture in that setting, either.

So those are the two things you want to rule out before you would do a lumbar puncture.

And on the same imaging, that you're ruling out a mass lesion and hydrocephalus, you would hopefully have good enough imaging you might get a look at the coverings of the brain to see if they are



abnormally thickened or enhancing, which would suggest a meningeal process, and also a look at the venous sinuses, the venous drainage from the brain because that's where the spinal fluid is resorbed. So if you have a problem with venous drainage, it's going to keep the fluid from entering the venous system nicely and will, therefore, back up the pressure. And those things you can see on imaging as well.

**Q. Venous sinus stenosis can occur even in people without raised intracranial pressure; correct?**

A. Stenosis?

**Q. Stenosis.**

A. Yes.

**Q. And it doesn't raise the intracranial pressure in those individuals; correct?**

A. Again, for individual cases, you are correct. Often, it's due to giant arachnoid granulations doing it.

No one, to my knowledge, has done a population study on normal people who have had lumbar punctures demonstrating that their intracranial pressure is not raised when they have venous sinus stenosis.

**Q. You yourself have written about incidental findings of venous sinus stenosis in individuals**

**without a diagnosis of intracranial hypertension; correct?**

A. That is correct. But to argue against my own comments -- and I'm sure I hedged them when I wrote them -- we didn't necessarily do a lumbar puncture in these normal people incidentally found to have that finding to see if maybe they did have raised intracranial pressure, but in some way, it was compensated.

So, yes, I do believe it can occur. It occurs way more frequently in people who do have elevated intracranial pressure.

**Q. I understand. I just wanted to make sure that we were clear that -- that you have written about the people who have not been diagnosed with intracranial hypertension and have as an incidental finding.**

A. Right. But they have not been lumbar -- they have not had a lumbar puncture or their spinal fluid pressure measured.

**Q. So you don't know one way or the other?**

A. We don't know. We assume since they don't have symptoms of it and they don't have papilledema, but we can't know that without doing a lumbar puncture.



**Q. I understand. I simply read that you had written that and I was trying to clarify it.**

A. Yes, ma'am.

**Q. As an expert in intracranial hypertension, you have opined about a percentage that have significant vision loss; correct?**

A. Yes, ma'am.

**Q. And what is that percentage?**

A. So it depends on which referral base you use. Overall, it's been suggested about 10 percent and that's what I included in my report. If you look at all the reports, if you look at reports from tertiary centers that have a -- probably a referral bias for the worst cases, it can be as high as 25 or 30 percent.

**Q. The question that I wanted to ask was what percentage have any visual loss, including visual field loss?**

MS. COOK: Object to form.

THE WITNESS: Yeah. I -- there are conflicting reports in the literature on that. I don't know of anyone who has done a meta-analysis to specifically look on any kind of visual field defect. It would be un- -- it depends on how you define it and



what degree because it would be unusual for anyone with papilledema not to at least have enlargement of the blind spots on their Humphrey visual field.

So if you're going to call that a visual field defect, then I imagine the prevalence is very high, almost not -- I would say 90 percent or so. But it really depends on how you're defining visual field defects.

**Q. (By Ms. Snapka) I'm talking about any visual field defects that are permanent as a result of intracranial hypertension.**

A. Okay. Again, the number of 10 percent is sort of what has been laid out there that if you really try to look population-based and do meta-analysis and avoid the referral bias. In my experience, we're talking probably 25 percent at least.

**Q. Can you discuss what effects there are of the psychosocial effects of the diagnosis of intracranial hypertension?**

MS. COOK: Object to form.

THE WITNESS: Psychosocial. So there have been recent articles in the literature



on cognitive effects and on quality of life. And I imagine that would fit under psychosocial. And it has been suggested that beyond just the visual deficits and beyond just the headache, that patients with IIH have a worse quality of life than other patients with headache or with visual disturbances.

**Q. (By Ms. Snapka) In what respect?**

A. Well, that's just been -- so there are -- there are standardized survey tools that are used in clinical trials -- and the IIH TT did this as well -- that look at just regular quality-of-life measures, at neurologic quality-of-life measures and at vision-related quality-of-life measures. And patients do not do as well who have IIH, in particular, the IIH TT, which was the big multicenter randomized controlled trial of acetazolamide in the treatment of IIH found that there actually was a benefit of acetazolamide in those measures of quality of life, in addition to the measures of visual field defects, amongst those patients who had acetazolamide versus those with placebo.

So above and beyond the fact that it helped with the visual field, it also helped with quality of

life.
**Q. Let's talk about acetazolamide.**
A. Sure.
**Q. What side effects are there from acetazolamide?**
A. They're pretty miserable. I can say, personally, I've taken it for altitude at a much smaller dose than my poor patients who take it for IIH, and you get tingling in your balls of your feet and in your hands. You have to pee a lot. Some people find it makes them fatigued. And the main problem that I had with it was that it makes -- even at the smallest dose, it makes any carbonated beverage taste horrible. So it -- it can be bothersome.
Many of the side effects are relieved over time with use.
**Q. How much time?**
A. It depends on the individual.
**Q. Can you give me a range?**
A. I think usually people -- some people are fine with it right away but people -- we often tell them to hang in there for like three to six months and, hopefully, it'll be better.
**Q. In your IIH patients, do you find that once triggered, PTC remits or is it permanent?**



A. What do you mean "triggered"?
MS. COOK: Object to the form.
**Q. (By Ms. Snapka) Once it's diagnosed, once it begins in a patient.**
A. Okay. So once it begins in a patient, then tell me your question again.
**Q. What is the course of PTC?**
A. So IIH has a very, very unpredictable course, and the only good predictive features are the way you present to begin with. So if you are incidentally just found on an optometric examination to found to have bilateral swelling of your optic nerves and you didn't really have a headache and your visual fields are totally normal, you are more likely to pursue a benign course of your disorder than if you show up in the ER after two weeks of the worst headaches of your life and you were fine two weeks before that and you have vision of only a small tunnel in the middle, you don't do well.
Our group has also been able to propose in case-control studies various markers for who does worse to help the person who is making the initial diagnosis. And those include remarkably male gender. Now, men only get it about nine percent of the time, but male gender, they have a worse prognosis. We're



not sure where why. It has nothing -- it's weight-matched and everything. We think it's because they don't suffer headaches as much so they don't come to attention until later in the course and so they weren't treated early.
African-American race has a very poor prognostic sign and these patients need to be more carefully monitored and often more aggressively treated. We looked in to see if that was an access of care problem or a socioeconomic problem and it was not. There's something about the African-American optic nerve which is more susceptible to the high pressure which is interesting -- I know I'm getting off topic -- but it's interesting because African-Americans do worse with glaucoma, which is an optic nerve disorder due to high pressure in the eye. So this was not, I guess in a way, I guess unexpected.
We have found that body weight, BMI, we know that BMI is a huge risk factor for IIH. What we looked at is what about if it's really big BMI and we found out that the higher BMI, the worse prognosis.
So these are some of the features that now allow us, perhaps, to change or adapt the way we follow certain patients or treat certain patients based on the risk factors for visual loss.



**Q. In general terms, diagnosis of intracranial hypertension is a serious diagnosis?**
A. Yes.
**Q. And can be a serious and vision-threatening problem?**
A. Yes.
**Q. We talked briefly about Dr. Friedman before. You're aware, are you not, in her book chapter on papilledema, she lists --**
MS. SNAPKA: I apologize. I can hand this to you.
MS. COOK: Can I just take a look at it?
MS. SNAPKA: Yeah, certainly. Happy to copy at a break if you'd like.
MS. COOK: Do you know which book it's from?
MS. SNAPKA: I apologize. I do not.
THE WITNESS: I can tell you. It's my book.
**Q. (By Ms. Snapka) I'm sorry. What did you say?**
A. Nothing.
**Q. Did you say it's mine?**
A. No. Let me look at it.

Page 74

**Q. Do you know what book it's from?**
A. Yes.
**Q. Which book is it?**
A. This is from the Walsh and Hoyt Clinical Neuro-Ophthalmology, Edition 6.
**Q. And you're an editor of that book; correct?**
A. Yeah.
**Q. So when you said it's mine, that's what you meant?**
A. Oh, is that what you were asking? Yes, it's my book.
**Q. Okay. So in your book, she has written in Chapter 5 under, "Papilledema, Table 5.5, exogenous substances whose exposure or ingestion has been associated with pseudotumor cerebri."**
**Do you see that?**
A. Yes.
**Q. And does it list levonorgestrel?**
A. Yes, it does.
**Q. And when was that published?**
A. 2015, maybe. Not sure.
**Q. Okay. Further on --**
A. Oh, no, no. It couldn't be. We haven't worked on that book in ages. I apologize. Let me look it up.

Page 75

**Q. That's okay.**
A. Just out of curiosity. 6th Edition, 2005.
**Q. 2005?**
A. Yeah. I'm getting old.
**Q. On Page 274, it also expounds beyond the table "Other substances associated with the development of PTC includes supplemental growth hormone, levonorgestrel implants (Norplant) and others."**
A. Indeed, that's what she wrote in probably 2004 for a 2005 book. Yes.
**Q. And you were the editor of that book?**
A. I was the editor, not the author of that chapter. Yes.
**Q. I understand.**
**As an editor, what are your responsibilities for accuracy?**
A. Mostly just to make sure that we have authors who are going to write about their topic.
**Q. And you choose authors that are recognized experts in their field?**
A. Yes, we do.
**Q. I can --**
MS. SNAPKA: Counsel, I can tag this and we can get a copy at a break if you'd

Page 76

like.
MS. COOK: It's up to you. It's your deposition.
MS. SNAPKA: I mean, what I'm asking is, do you want a copy?
MS. COOK: Oh, are you marking it as an exhibit?
MS. SNAPKA: I will.
MS. COOK: I'll just look at it briefly.
MS. SNAPKA: Certainly.
MS. COOK: Are you finished with it?
MS. SNAPKA: I'm done. I was getting ready to move on to something else.
MS. COOK: Go ahead.
MS. SNAPKA: What exhibit did you mark that as?
MS. COOK: 10.
MS. SNAPKA: 10.
MS. COOK: Sorry. I grabbed your stickers.
(Exhibit 10 was marked for identification.)
MS. SNAPKA: Let's go ahead and mark this. I'll get a copy. We marked this as

Page 77

No. 11.
(Exhibit 11 was marked for identification.)
**Q. (By Ms. Snapka) Dr. Newman, what we have marked as Exhibit No. 11 is also by Dr. Friedman and others; correct?**
A. That is correct.
**Q. Is there a protocol by which authors are listed first or middle or last? Can you explain that to me, please.**
A. Sure. So usually, the first author is the person who wrote the paper and presumably was most involved in the study if there was a study. And pre -- and by convention, the last author is usually a senior author which means someone who runs the lab in which the study was run.
In cases -- in situations like this which are case reports, it probably would be more likely that they're in the order of how many cases they contributed to the discussion, to the paper.
**Q. But the first author, would it be correct to call that person the lead author?**
A. You can use that term, yeah.
**Q. So in this -- in Exhibit No. 11, Dr. Friedman is the lead author; correct?**

A. That is correct.
**Q. And it begins by saying, "Intracranial hypertension (pseudotumor cerebri {PTC}) is associated with many exogenous agents, including vitamin A, also tretinoin and other synthetic retinoid acid compounds, corticosteroid withdrawal, nalidixic acid, levonorgestrel and tetracycline."**
**Did I read that correctly?**
A. You read that correctly.
MS. COOK: Counsel, I'm going to object just for the record to the highlighting on this.
MS. SNAPKA: Okay.
MS. COOK: I don't know if it's on -- oh, yeah, it's on the official exhibit. It doesn't matter. Just keep going. It's just for the record.
MS. SNAPKA: Okay.
**Q. (By Ms. Snapka) And the date of Exhibit No. 11 was 2004; is that correct?**
A. Right. So it was published in 2004. So the study itself was probably written and pulled together in 2003 or earlier, yes, ma'am.
(Exhibit 12 was marked for identification.)



**Q. (By Ms. Snapka) Let me hand you Exhibit No. 12. This is a review article. Is this a peer-reviewed article, by the way?**
A. I wouldn't know for sure. Let me look at what -- it's the American Journal of Clinical Dermatology. I'm not sure. Some review articles are peer reviewed and some are not. They're just invited.
**Q. So you don't know one way or the other?**
A. I don't know one way or the other.
**Q. The date on this says -- publication date 2005 -- I'm sorry. It's published, the American Journal of Clinical Dermatology, 2006; correct? It was copyright 2005.**
A. I don't know whether that's a six or a five up in the right-hand corner.
**Q. Okay.**
A. I think it's probably 2005 because they wouldn't copyright it a different year than they published it, which again means it was probably written in 2004 or earlier.
**Q. If you'll look at page --**
A. I think it's 2005. I can see it probably a little better on the bottom there. But in -- I may need reading glasses, too.
MS. COOK: Just for the record, the



same objection about highlighting.
MS. SNAPKA: Okay.
**Q. (By Ms. Snapka) And this is Dr. Friedman herself; correct? There's no other authors listed?**
A. That's correct.
**Q. Or contributors?**
A. That's correct.
**Q. When you write a paper, when you publish a paper, you want to give the most accurate medical information possible, correct?**
A. I try to do that.
**Q. You believe Dr. Friedman tries to do that as well?**
A. I can't --
MS. COOK: Object to form.
THE WITNESS: I can't speak for anyone other than myself.
**Q. (By Ms. Snapka) But you when you publish, you certainly want to give the most accurate information; correct?**
A. I try to, up to the date of what I have available to me, yes, ma'am.
**Q. Under No. 6, "Hormone therapy," there is -- the second sentence says, "There are a few reports of PTC occurring with oral contraceptive use, but the**



**association has never been borne out in case-control studies of PTC."**
**Do you see that?**
A. Yes.
**Q. The next sentence says, "Given the large number of women using oral contraceptives, a direct relationship is unlikely. It is possible that hormone-related weight gain or fluid retention may be contributory in the reported patients. Alternatively, there may be an underlying central venous thrombosis that is associated with oral contraceptive use."**
A. "Cerebral venous thrombosis."
**Q. I'm sorry, did I say "central"?**
A. Yes.
**Q. I need my glasses.**
**The next sentence says, "In contrast to oral contraceptives, there is a well-established relationship between PTC and levonorgestrel-releasing implants."**
**Did I read that correctly?**
A. You read it correctly.
**Q. And that is Dr. Friedman's opinion or her -- well, it's what she wrote in 2005; correct?**
A. It is what she wrote here, yes.
**Q. It says, "Headache is a common adverse**

effect of levonorgestrel"; is that right?
A. That's what she wrote, yes.
Q. Do you disagree with that?
A. I disagree that -- well, I'll take that back. I don't agree or disagree with it.
Q. You have no opinion?
A. It has been reported in patients with levonorgestrel, yes.
Q. So you have no opinion one way or the other?
A. I wouldn't necessarily have called it "common," but then I guess it depends on what the definition of "common" is so it's what she's writing.
Q. She goes on to say, "Patients developing headache or visual disturbances while using it" -- and there, "it" refers to levonorgestrel-containing -- releasing implants; correct?
A. I believe that's what she's referring to, yes.
Q. Okay. It says, "Patients developing headaches or visual disturbances while using it should be evaluated for fundoscopic evidence of PTC."
Do you agree with that?
A. I agree that any patients developing headache or visual disturbances should have a



fundoscopic examination looking for PTC.
(Exhibit 13 was marked for identification.)
Q. (By Ms. Snapka) Let me hand you Exhibit 13.
But before I get to that, let me go back to 12 for a second.
A. Sure.
Q. Dr. Friedman in -- in this paper specifically discusses in contrast to oral contraceptives, there's a well-established relationship between PTC and levonorgestrel-releasing implants.
Is that part of the body of evidence that you reviewed?
A. The references that she references is, indeed, part of the body of evidence that I have reviewed. They are case reports.
What's interesting to me is the sentence before you highlighted, which is "The association has never been borne out in case-control studies of PTC," and certainly, what she references for the next highlighted part are not case-control studies.
Q. What she's referring to in that sentence, which I did read to you, before the highlighted part



was there are a few reports of PTC occurring with oral contraceptive use, but the association has never been borne out in case-control studies.
A. That is correct.
Q. She's referring to oral contraceptives; correct?
A. That is correct. And that's why she says it's not been borne -- even though there were these case reports, it turns out it's not true because case-control studies have never borne it out. And what she references for the implants are only case-control -- are only case reports and not case-control studies.
Q. In Exhibit No. 13, another article that is written by Dr. Friedman, it looks like it was published in current pain and headache reports; correct?
A. Correct, in 2007.
Q. The very first paragraph says, "Idiopathic intracranial hypertension is a secondary headache disorder characterized by headaches and visual symptoms. It is most frequent" -- "It most frequently occurs in obese women of childbearing age. However, many secondary causes exist and it may affect children, men and slim individuals. Prompt



recognition, evaluation and treatment are needed to prevent permanent visual loss."
Do you agree with that?
A. The whole thing?
Q. Yes.
A. No, I don't agree with the whole thing.
Q. Tell me what you don't agree with.
A. I don't agree with that there are many secondary causes that exist.
Q. Okay. If you look at the last page above the paragraph starting "Special circumstances," in the paragraph entitled, "Secondary causes of intracranial hypertension" -- well, if we begin that on the previous page, it says, "The diagnosis of IIH requires the exclusion of a secondary cause."
Do you agree with that?
A. Yes.
Q. Why? Why does it require the exclusion of a secondary cause?
A. Because you want to make sure you have not missed a brain tumor, venous sinus thrombosis, meningitis.
Q. Would you also agree that if it's caused by an exogenous substance, then you need to remove the exogenous exposure?

A. If it is being caused by an exogenous substance that you are certain is the cause, then absolutely you should remove it.
**Q. When you say "certain," what if you suspect that it's a cause?**
A. If you suspect that it is a cause and you have reason for that suspicion, then you should remove it.
**Q. On the next page, beginning -- the sentence beginning with "Among the many exogenous agents associated with intracranial hypertension, the best evidence exists for tetracyclines, vitamin A and retinoids, corticosteroid withdrawal, human growth hormone, nalidixic acid, leuprorelin acetate, chlordecone pesticide and levonorgestrel contraceptive system."**
**Did I read that correctly?**
A. You read it correctly.
**Q. So Dr. Friedman believes that among the exogenous substances, levonorgestrel is included within those for which she says the best evidence exists?**
MS. COOK: Object to form.
THE WITNESS: She writes that amongst those associated, yes.



**Q. (By Ms. Snapka) The answer to my question is "yes"?**
MS. COOK: Object to form.
THE WITNESS: Amongst those associated, yes.
**Q. (By Ms. Snapka) Does she list levonorgestrel contraceptive systems?**
A. Yes. System.
**Q. System?**
A. Without an S, yes.
**Q. Have you ever discussed with Dr. Friedman levonorgestrel and intracranial hypertension?**
A. No. You -- you asked me that in my deposition notice, I believe.
**Q. The deposition notice required the production of documents. If I -- if I asked you a conversation, that was probably a little bit early -- just for the record, let me ask you.**
A. Sure.
**Q. Have you ever called up Dr. Friedman and said, Deborah, let's visit about levonorgestrel and what you've published in the past, even in my book? Have you ever done that?**
A. No.
**Q. Or any words to that effect?**



A. No.
**Q. Why not?**
A. It just hasn't come up.
**Q. All right. So you recognize that there are other neuro-ophthalmologists who believe that levonorgestrel-containing implants are associated with intracranial hypertension?**
MS. COOK: Object to form.
THE WITNESS: So in the early 2000s, so we're talking more than ten years ago, Deb Friedman wrote that there is an association and used the compound. So in that point, it would have been what she calls it, levonorgestrel system, I assume we can make the correct assumption that what she's talking about is Norplant.
**Q. (By Ms. Snapka) Why would you assume that?**
A. Because of the timing of her publications.
**Q. When was Mirena put on the market?**
A. Probably the early 2000s, but what she -- what she references are all Norplant references. Every time she makes a reference to when she says the levonorgestrel system, she makes references only to Norplant.
**Q. Mirena was on the market in the early**



**2000s; correct?**
A. I believe that's when -- yes.
**Q. Are there other neuro-ophthalmologists who believe that levonorgestrel-containing implants are associated with intracranial hypertension?**
MS. COOK: Object to form.
THE WITNESS: I don't know what lots of -- what every neuro-ophthalmologist thinks, but within the general neuro-ophthalmology community, there is certainly no consensus that LNG causes or is -- or causes IIH.
**Q. (By Ms. Snapka) Well, there's no consensus, but you recognize that there are some neuro-ophthalmologists who believe that it is a contributing cause and some who don't?**
MS. COOK: Object to form.
THE WITNESS: No. Actually, I -- I don't know that and I don't even know what Dr. Friedman herself thinks now. We have much more experience and I cannot -- I don't know personally of any neuro-ophthalmologist who believes there's a -- a causal relationship between LNG-containing products and IIH to the

point where I suppose if there was one, they would be an expert in this litigation for the plaintiff's side. I -- I have not come across any neuro-ophthalmologist who believes -- who professes that in any way that I've seen.

**Q. (By Ms. Snapka) Well, you don't know if Dr. Friedman still holds what her published work states?**

A. Again, her published work was more than ten years ago and was in relation to the Norplant system, and whether she still even believes that, I don't know. She's never come out and said -- said that it actually causes it. She says there's an association. She says what she says. But you'd have to ask her if now, in retrospect, whether she believes even that.

MS. SNAPKA: Objection, nonresponsive.

**Q. (By Ms. Snapka) My question is you don't know today if Dr. Friedman still holds what her published work states, do you?**

A. I do not.

MS. COOK: Object to the form.

**Q. (By Ms. Snapka) Have you reviewed any of Dr. Friedman's articles where she has come out and**



**said, I now disavow of any relationship or association between levonorgestrel-containing implants and intracranial hypertension?**

A. I've not seen that, but I also haven't seen any recent publications in which she has.

**Q. So the answer to my question is no, you have not seen anything where she's come out and said that there's no association?**

A. The answer is no, I have not.

I do know that she was very involved in the construction of the idiopathic intracranial hypertension treatment trial, and they did not use any LNG-containing product as an exclusion criteria. Whereas, they did use minocyclines as an exclusion criteria for the trial, which, to me, implies that she no longer thinks that, but you'd have to ask her.

**Q. You don't know one way or the other, do you?**

A. For sure, no. But I think that's pretty compelling evidence given how the trial was constructed.

**Q. The trial was to determine the efficacy of Diamox; correct?**

A. Of acetazolamide, yes.

**Q. Can you tell me what pharmaceutical**



**companies you've consulted with in your years as a physician.**

A. I may miss some from the early dates, and if so, if you have further information, please correct me and I will correct my statement.

But most of the pharmaceutical companies that I've had anything to do with has had to do with my research and it's mostly regarding Leber hereditary optic neuropathy and other mitochondrial disorders. So we had a clinical trial on the treatment of early onset Leber hereditary optic neuropathy treated with brimonidine and I believe the company that helped me put that trial together was whoever makes that, which it's either -- it's Allergan, I think, whoever is the one that's in California. I think it's Allergan.

And then more recently, the research I do with Leber hereditary optic neuropathy, I consult for a company called Santhera, which is in Switzerland, and Gensight, which is in France. And they are companies looking at gene therapy for this disorder and I help them put together -- design their clinical trials.

**Q. Can you describe for me the path of physiological mechanism of tetracyclines in causing intracranial hypertension.**



A. We don't know for sure.

**Q. Can you describe for me the physiological basis for steroid withdrawal causing intracranial hypertension.**

A. We're not even sure that that relationship exists, but no, nobody really knows what that mechanism could possibly be, either.

**Q. Can you describe for me the pathophysiological mechanism of why retinoids cause intracranial hypertension?**

MS. COOK: Object to the form.

THE WITNESS: Again, we're not even sure it does cause it. It's been postulated that it does and the mechanism has been suggested that it has something to do with gumming up the arachnoid villi in the meninges to some extent so that passive reabsorption can't cross. There's some studies in rats that have looked at that. But, again, a true elucidation of the mechanism is not, to date, available.

**Q. (By Ms. Snapka) What about nalidixic acid?**

A. I have no idea because I'm not even convinced that there's an association.

**Q. What about leuprorelin?**

A. The same with that.
**Q. What about chlordecone?**
A. Same with that.
**Q. Are there any of the exogenous agents that you're able to describe a pharmacological mechanism for intracranial hypertension?**
A. Again, many have been postulated and some have been tried to be modeled in animals, but the answer is we do not know the exact mechanisms.
**Q. For any of the exogenous agents?**
A. For any of the exogenous agents that you just asked about.
**Q. Or -- or any exogenous agents?**
A. As far as I know, no.
**Q. One of the studies that you referenced when we were talking about quality of life, those were done by telephone interviews; correct?**
A. Usually, they're done by actual surveys and then potentially the follow-up by telephone interviews. There's a mix.
**Q. I -- I thought that the one that you referred to was done by telephone survey.**
A. Which one that I referred to? In the IIH TT?
**Q. The one that talked about quality of life**



**in intracranial hypertension patients.**
A. Well, the IIH TT had people filling out surveys. They may have followed up with telephone conversations.
**Q. In the obesity studies in the '80s, were those done by telephone interview?**
A. Which obesity studies --
**Q. The --**
A. -- in the '80s?
**Q. I can get that for you at a break.**
(Exhibit 14 was marked for identification.)
**Q. (By Ms. Snapka) Let me hand you Exhibit No. 14. This is an article who lists first Dr. Bruce, then your colleague, Dr. Biousse, and you; correct?**
A. That is correct.
**Q. It says, "Update on idiopathic intracranial hypertension"; correct?**
A. Correct.
**Q. Going back to one of the questions that we -- I asked about before. In -- you would certainly call this your article; right?**
A. I am one of the authors.
**Q. It says under "Quality of life, reductions in depression are common among idiopathic intracranial**



**hypertension patients"; correct?**
A. That is what we were talking about before, yes.
**Q. What -- what is the year of this article?**
A. So -- published in 2011. So it would have been produced in about 2010.
**Q. On Page 165 when you're talking about pathophysiology, about midway down, it says, "Indeed a role for sex hormones in the pathogenesis of idiopathic intracranial hypertension is suspected given the disorder's preferential occurrence among postpubertal premenopausal women and the absence of a gender preference before puberty"; correct?**
A. Where are you reading? I'm sorry. Mine is not highlighted so --
**Q. And -- and let me -- let me back up just a second.**
A. Sure.
**Q. On the first page --**
A. Yes.
**Q. -- where it says -- just so that we know what we're talking about. The sentence that begins "Additionally," do you see that?**
A. Yes.
**Q. Okay. "Additionally, patients in whom a**



**syndrome develops of raised intracranial hypertension secondary to certain medications or who are found to have central venous sinus stenosis, not thrombosis, still are classified conventionally as having idiopathic intracranial hypertension."**
**Did I read that correctly?**
A. Yes, you did.
**Q. So even when you are using intracranial hypertension secondary to a medication, your terminology is idiopathic intracranial hypertension in this article; correct?**
A. That is the classic convention, yes.
**Q. All right. Now, let's go to 165 in the portion that begins "Indeed."**
A. Great. Thank you.
**Q. "Indeed, a role for sex hormones in the pathogenesis of idiopathic intracranial hypertension is suspected given the disorder's preferential occurrence among postpubertal, post -- premenopausal women and the absence of gender preference before puberty."**
**Did I read that correctly?**
A. You read that correctly.
**Q. And if you'd turn the page to 166 at the top beginning with the sentence "Various." It says,**

"Various medications have been proposed to cause or precipitate idiopathic intracranial hypertension (such as tetracycline and its derivatives, cyclosporine, lithium, nalidixic acid, nitrofurantoin, oral contraceptives, levonorgestrel, danazol and tamoxifen), although there are compelling data only in a few cases."
Did I read that correctly?
A. No.
Q. I did not read that correctly?
A. Correct.
Q. Did I mispronounce some -- a word?
A. No. You said, "Although there are." You said --
Q. "Although there is."
A. But you're correct. It probably should have been "are."
Q. Okay.
A. I apologize that I -- your grammar is correct and ours is not.
Q. Okay. With regard to the substance of what I read to you --
A. You read it correctly, yes.
Q. Your -- so your work describes the medications that have been proposed to cause or



precipitate idiopathic intracranial hypertension; correct?
A. This list, those that have been proposed, yes.
Q. And levonorgestrel is contained within that list?
A. It is listed as those that have been proposed, yes.
Q. Regardless of whether it is subdermal or intrauterine; correct?
A. Again, it is listed as those that have been proposed.
Q. The next sentence says, "It is appropriate to discontinue potentially associated medications, particularly those in which an association is very likely such as tetracyclines"; correct?
A. That is what it says.
Q. Okay. Then you go on to state, "However, it is likely that others, such as oral contraceptives, have been implicated only by their association with the young women most at risk for idiopathic intracranial hypertension."
Did I read that correctly?
A. Yes.
Q. So you are not -- you're clear here that



the oral contraceptives are associated by the people who are at risk; correct?
MS. COOK: Object to form.
THE WITNESS: What you just said is not right.
Q. (By Ms. Snapka) I apologize for the misstatement of the question.
What you are saying is oral contraceptives have been implicated only by their association with the young women most at risk for idiopathic intracranial hypertension?
A. That is what I'm saying, yes.
Can you read that question back again because the "only" implies that they've been implicated only because of this association. It's not that only the oral contraceptives have been implicated.
Q. No. I --
A. Does that make sense?
Q. No. I understand what you're saying. In other words, when you talk about the hormones, you're saying that if oral contraceptives have been implicated in the past, it is by their association by young women of childbearing age?
A. That's what that sentence meant, yes.



Q. That's -- and that's what I intended. I apologize if the question was unclear.
A. And it's reflecting case-control studies which bear out that it's just associated because of that matching.
Q. Do you agree that there are persons who are susceptible to development of intracranial hypertension?
A. I think it is a -- a construct that we believe in medicine that the more risk factors you have for a disorder, the more susceptible you are to get it and I think that's what that statement means. So that if you're a woman in your childbearing age who are obese or overweight or had recent weight gain, you are more susceptible to that happening, yes.
(Exhibit 15 was marked for identification.)
Q. (By Ms. Snapka) No. 15 -- I apologize. No. 15. Again, this is -- this is your paper; correct?
A. Correct.
Q. What is the date of publication?
A. 2012 so it would have been put together in 2011.
Q. Do you know when Norplant left the market?

Page 102

A. I would be guessing at the date. So no, I do not.

**Q. Actually, after Norplant leaves the market and the last Norplant is removed, then Norplant really isn't in the mix anymore, is it?**

MS. COOK: Object to form.

THE WITNESS: In the mix for what? I'm sorry.

**Q. (By Ms. Snapka) For people being exposed to Norplant.**

A. That would be correct.

**Q. By the way, going back, this is a -- No. 14 was a peer-review publication, was it not?**

A. It's an invited review. It's a -- what they call a perspective for the American Journal of Ophthalmology. But I do believe it was sent out to reviewers.

**Q. Do you know what neuro-ophthalmologists would be in a position to review or who reviewed Exhibit 14?**

A. Oh, I wouldn't know who the reviewers are. That's kept entirely confidential.

**Q. In this exhibit, just to note on --**

A. You're talking about 15 now?

**Q. Yeah. I am sorry. I'm talking about 15**

Page 103

**now. If you look at Page 489 under Box 2, simply 1 and 2 reaffirm what we had talked about earlier regarding stenosis of one or both transverse cerebral venous sinuses. It says, "Although common in idiopathic intracranial hypertension, these radiological findings are not specific to IIH and are also found in patients with other causes of raised intracranial pressure. Additionally, patients with normal ICP are occasionally incidentally found to have one or all of the above radiological findings."**

**So did I read that correctly?**

A. You read it correctly.

**Q. So when you make a statement "patients with normal ICP," those are patients for whom their intracranial pressure has been measured, correct, or you wouldn't make the statement?**

A. Oh, I wouldn't really be willing to bet my money on that. I -- I -- we probably should have put patients with presumed normal ICP. I -- I don't know is the answer whether we've actually seen a patient with these findings where the lumbar puncture has revealed a normal pressure, plus the problem there is it may not have been normal before and these findings may be persistent without ongoing raised pressure. So it becomes difficult.

Page 104

**Q. But what you published was patients with normal ICP are occasionally incidentally found to have one or all of the above radiological findings. In other words, anybody reading this is going to assume that these patients had normal ICP findings because that's what you said; correct?**

A. You mean normal ICP?

**Q. Normal ICP.**

MS. COOK: Object to form.

THE WITNESS: I don't know what other -- how -- what people would assume. It's incidentally and it's occasionally. So I can't even tell you the number here.

**Q. (By Ms. Snapka) And that -- that really wasn't my question. I guess --**

A. I'm sorry.

**Q. Let me rephrase the question.**

A. Sure.

**Q. What you wrote was "normal ICP."**

A. Correct.

**Q. Normal ICP, the only way to know if the pressure is normal is to do a lumbar puncture; correct?**

A. That's fair.

**Q. And when you say "a few," IIH itself is a**

Page 105

**rare disease, is it not?**

A. It, again, sort of depends on your definition of that. We've been calling it rare for 20, 30 years and the problem is it's getting more and more common and a lot less rare as the obesity epidemic is hitting the heights it is. So I -- I would -- I would just -- I use the word "rare." You use the word "rare." It doesn't have a real quantification to it. I think it's becoming less and less rare.

**Q. In the paragraph beginning "Although."**

A. Yes.

**Q. "Although various medications have been** proposed to cause or more likely precipitate IIH (such as tetracycline and its derivatives, cyclosporine, lithium, nalidixic acid, nitrofurantoin, oral contraceptives, levonorgestrel, danazol and tamoxifen), there are compelling test/retest data in few individual patients such as in patients treated with tetracyclines, particularly minocycline."

Did I read that correctly?

A. Yes.

**Q. On the next page, if I can point out to you.**

A. Sure.

Page 106

Q. Beginning "Multiple coexisting mechanisms are likely necessary to produce the syndrome of isolated intracranial hypertension. It seems that some patients in particular, such as obese patients, especially young women, and those with anomalous distal transverse sinuses resulting in bilateral transverse sinus stenosis, are predisposed to developing raised intracranial pressure which might be triggered by specific events or situations such as weight gain, endocrine changes, hypercoagulable states, specific medications and OSA."
Did I read that correctly?
A. Yes.
Q. And we discussed the -- that there are certain individuals who are predisposed to development of idiopathic intracranial hypertension; correct?
A. Yes. We spoke about that.
MS. SNAPKA: Let's go ahead and take a break.
VIDEOGRAPHER: Going off the record at 11:44.
(A recess was taken.)
VIDEOGRAPHER: Back on the record at 12:01.
Q. (By Ms. Snapka) Doctor, earlier in your

Page 107

test- -- in your testimony, you recall me asking you about aromatization of androgens?
A. Yes, ma'am.
Q. And you said that you believed that it was an article dealing with risk factors for idiopathic intracranial hypertension in men in case-control study. Is that -- is Exhibit 16 the reference to which you referred?
(Exhibit 16 was marked for identification.)
THE WITNESS: So this is the reference to which I referred and I believe -- and we can call up the testimony if you wish. I believe I said that there may have been topics in this which referenced articles that may have dealt with that. That's what I said.
Q. (By Ms. Snapka) Okay. So does this article itself discuss aromatization of androgens?
A. No. That was not its intent.
Q. Okay. One of the things that I wanted to -- and again, this is -- this is your -- one of -- you're one of the authors on this paper. This is your work.
A. Yes, ma'am.

Page 108

Q. On the second page under "Introduction, the likely role of sex hormones in the pathogenesis of IIH."
Do you see that?
A. Yes.
Q. All right. In this work, you stated, "The likely role of sex hormones in the pathogenesis of IIH is highlighted by the clear predilection of IIH for postpubertal, premenopausal women and the absence of a gender preference before puberty"; correct?
A. That is correct, yes.
Q. "Although female adulthood is characterized by high levels of estrogen and low levels of testosterone, women taking exogenous estrogen such as oral contraceptives and women who have high estrogen levels due to pregnancy seem not to be at higher risk for the development of IIH."
Did I read that correctly?
A. Yes.
Q. If, instead, low testosterone is implicated in IIH, it is possible that men with IIH may have lower testosterone levels than men in general population" -- "in the general population making them more similarly hormonally" -- "similar hormonally to the young women usually affected by IIH."

Page 109

Did I read that correctly?
A. Yes, you did.
Q. So the fact that women who take exogenous estrogen and who are pregnant and are producing very large amounts of estrogen don't seem to have the same higher risk for the development of IIH.
That's what your paper says; right?
MS. COOK: Object to the form.
THE WITNESS: No, that's not what it said. It said they don't have an -- a higher risk for development of IIH. Yes.
Q. (By Ms. Snapka) And that -- I apologize if I didn't ask it clearly. That was my question. They don't have a higher risk?
A. They do not have a higher risk of IIH.
Q. So that this -- there may be multifactorial components of sex hormones in the development of IIH, not simply more estrogen means a higher risk?
A. Yes. There are many theories in that regard.
Q. So it's not as simple to say, well, if you have more estrogen, then you have more IIH; correct?
A. That is correct. Nothing is simple.
MS. COOK: Did you say theories or series?

THE WITNESS: Theories.
MS. COOK: Okay. I -- the real-time, I was just making sure.
Q. (By Ms. Snapka) Do you recall the deposition that you gave in the Caitlin Wall Brenner case?
A. I have -- I didn't recall it when it was brought up in my deposition in 2014, but subsequent to that, since I was made aware of it, I barely recall it. So mostly I know it now because it was brought up in 2014. But I don't think I recalled it then and, honestly, I can't recall any of it now.
(Exhibit 17 was marked for identification.)
Q. (By Ms. Snapka) We've marked the -- a copy of the deposition testimony as Exhibit No. 17. Do you see that in front of you?
A. Yes, ma'am.
Q. In your deposition, your sworn testimony was taken in that case; correct?
A. Yes.
Q. And you were under oath as you are today, correct?
A. Yes.
Q. In that deposition, you indicated that --



A. You want to tell me which page?
Q. Yes. Page 53.
A. Thank you.
Q. There was a discussion beginning at Line 8. Have you ever offered an opinion in the area of epidemiology, where you said specifically, no. The question was: You may have offered opinions as to causation that were based on epidemiological studies, is that -- and you said: That's correct.
Your hesitation. And then your answer was: Yeah, that was my hesitation because I am not an expert in epidemiology, but I would use epidemiological studies to help determine frequency, for example, of a disease, and as you point out, to look at the issue of causation.
Is that what you're doing here today?
A. I -- yes. I am doing exactly what that says and I figure -- feel that that makes me an expert in the epidemiologic aspects of neuro-ophthalmologic disorders, yes.
Q. In that -- on Line 17, you said, "I'm not an expert in epidemiology."
Did you say that?
A. That's what I said right there.
Q. All right.



A. But I -- I had a caveat to it in the next paragraph which you did read.
Q. And because you're using epidem- -- in other words, for you to be able to appreciate a study, you have to have an epidemiological understanding of what they're saying; correct?
A. Absolutely.
Q. And you do not have any training in FDA regulatory matters?
A. I do not have any training in that, that is correct.
Q. You're not an FDA expert; correct?
A. Again, I have expertise in things that relate to the FDA and how they relate to neuro-ophthalmology. So, for example, I've actually been an expert on FDA panels and I've presented to the FDA regarding neuro-ophthalmic disorders and trials, clinical trials.
Q. Do you intend to offer any opinions in this case as to FDA regulatory issues?
A. Again, as they relate specifically to neuro-ophthalmic clinical practice, I might.
Q. Are they reflected in your report?
A. Yes.
Q. And we'll identify those when -- when they



come up?
A. Yes, ma'am.
Q. How many cases of intracranial hypertension have you, personally, to this date seen and treated?
A. Me, personally, more than 800. And this would be a guess, but I've been doing this for 28 years, and I probably have about two or three new per week. I don't see patients every week, but somewhere around there I would say, probably. 500.
Q. Have you ever -- going back to the previous question. Have you ever published in FDA regulation?
A. No, I have not published in FDA regulation.
Q. And -- and I apologize if I asked you this before. You've never published on the subject of epidemiology; is that correct?
A. No, that's not correct because I have published epidemiologic studies.
Q. And I apologize. That was not my question.
Have you ever published on the subject of epidemiology itself?
MS. COOK: Object to the form.
THE WITNESS: You mean like teaching article on epidemiology?
Q. (By Ms. Snapka) Sure.
A. No.

**Q. Okay. You use for teaching documents produced by other professors or epidemiologists to teach epidemiology to your students; correct?**
MS. COOK: Object to form.
THE WITNESS: Well, again, I'm not sure I sort of understand. Epidemiology is the study of populations and risks and odds ratios and I use that every day in my clinical care when I'm trying to decide a management for a patient. So -- and I teach that to my students so that's why I'm having trouble absolutely asking your question -- answering your question. I'm not trying to avoid it. I just -- I am not -- I am not a professor of epidemiology if that's what you're asking me.
**Q. (By Ms. Snapka) And there are such disciplines; correct?**
A. There are such people who are professors, yes.
**Q. And you're not one of them?**
A. I am not one of them, no.
**Q. Do you consider yourself to be an expert in toxicology?**



A. Again, as it applies to neuro-ophthalmic disorders, I have an expertise in toxicology.
**Q. In -- when you gave your sworn testimony in the Wall Brenner case, Page 63, at the bottom, you were asked that question and your sworn testimony at that time was, "Not an expert, no, sir" --**
MS. COOK: Object to form.
MS. SNAPKA: I'm going to continue reading --
MS. COOK: Oh, sorry.
MS. SNAPKA: -- if you'll give me a chance to finish it.
MS. COOK: I didn't mean to interrupt you.
**Q. (By Ms. Snapka) "Not an expert, no, sir. I -- just to add, you know, I do know some of the basic underpinnings of how one goes about deciding whether something is toxic to something, but I am not an expert, nor -- and -- so I do not hold myself out as that."**
**Did I read that correctly?**
A. You did read it.
**Q. Is that your sworn testimony?**
A. That was my sworn testimony in 2009 in a medical-legal situation, yes.



**Q. This is a medical-legal situation, isn't it?**
A. Yes, it is.
**Q. When we determine something from -- in a medical-legal context, we use reasonable medical probability. Do you understand that medical-legal term?**
A. Yes.
**Q. And what do you understand that term to mean?**
A. I understand that term to be more likely than not so more than 50 percent.
**Q. And that is obviously a different standard than what is utilized for -- in medicine; correct?**
A. Correct.
**Q. So when you're testifying here today, we talk about more likely than not.**
A. Correct, which is why I feel very comfortable saying that I'm an expert in these fields because you are asking whether I feel I can make distinctions of more likely than not with my expertise and I believe I can.
**Q. The only reason why I'm asking, Doctor, is you said that you didn't hold yourself out to be an expert in toxicology, but you knew some of the basic**



**underpinnings. Is that still your testimony today or have you --**
A. No.
**Q. -- acquired expertise?**
A. Well, certainly, since 2009, I have acquired quite a bit of expertise, especially in epidemiology and these other fields. But more than that, I think that back in 2009 when I was asked this, it may not be clear from my demeanor here, but I'm a fairly self-effacing person and I probably cut myself a little short in here and I was not thinking about what the legal definition is where you're talking about more likely than not.
**Q. And I'm simply trying to review what your sworn testimony was in a medical-legal context.**
A. I understand.
**Q. Have you had any formal training in toxicology beyond the normal medical school curriculum?**
A. No.
**Q. Given that you are prepared to talk about epidemiology, if something happens very, very infrequently, an epidemiological study is not going to be helpful to you at all.**
**Would you agree with that?**

Page 118

A. I wouldn't agree with the "at all." I think the more infrequent an occurrence, the more difficult it is to use epidemiologic principles to prove an association or a cause.
**Q. If you look at Page 86, beginning on Line 16. Your sworn testimony in that -- on that day was "So, for example, if something happens very, very infrequently, an epidemiologic study is not going to be very helpful to you at all."**
**Did I read that correctly?**
A. You read it correctly.
**Q. Was that your testimony?**
A. It was.
**Q. You go on to say, "That doesn't mean that the event wasn't caused by that because you can have what are called idiosyncratic reactions so that one particular person has a response to a drug, for example, that another person doesn't."**
**Is that what an idiosyncratic reaction is?**
A. Correct.
**Q. "And so epidemiologic studies for that are not helpful."**
**Was that your testimony?**
A. That was my testimony.
MS. COOK: And I'm just going to object to the fact that there are six more paragraphs to that answer so objection for the record.

Page 119

**Q. (By Ms. Snapka) The previous paragraphs discuss various levels of epidemiological causation, don't they?**
A. Yes.
**Q. In -- in very general terms.**
A. I'd have to read them.
**Q. Please do so.**
A. That is correct. And for the record, the problem is what do you call epidemiologic studies. And since this time, just nomenclature-wise, case-control studies, for example, are epidemiologic studies and what I was referring to here were big studies where you look for in large numbers of controlled population incident events.
**Q. A case report is where you simply report the characteristics of a single patient; correct?**
A. Correct.
**Q. In a very rare disorder, a case report would be one -- a single case report; correct?**
A. Correct.
**Q. And then the next level of evidence would be what's called a case series; correct?**

Page 120

A. Correct.
**Q. And it sort of depends on how rare or how non-rare a disorder is how many you would consider a series or not; correct?**
A. Correct.
**Q. So a very rare disorder, we often say that a series is three cases because you've seen it case after case after case, but a series can be a large number or a small number; correct?**
A. Correct.
**Q. It just depends on how rare the disorder you're talking about is; right?**
A. That is correct.
**Q. Then you go on in that discussion to talk about case-control study; right?**
A. Correct.
MS. COOK: What page are you on?
MS. SNAPKA: Page 85, Line 12. I'm going over what you had referenced was omitted.
MS. COOK: Okay. Thanks.
**Q. (By Ms. Snapka) And you discuss case-control study, in particular, retrospective case-control study, which in a sense is just sort of a retrospective where you take all the people you have with a disorder and then you compare it to other people who don't have the disorder; correct?**

Page 121

A. Correct.
**Q. And you talk about a prospective case-control study and then a randomized control and then -- and then we talk about what I had started with which was if something is very -- happens very, very infrequently, an epidemiologic study is not going to be very helpful to you at all?**
A. Right. And then the paragraph in between. So the only caveat I would say where I don't agree with what I said back in 2009 is that the reality is that all these kinds of studies in a way are epidemiologic studies and I was using that term only to relate to the -- the large population studies where you look for the incidents in a population.
**Q. Well, it becomes difficult to do an epidemiologic study on something that happens very, very infrequently; correct?**
A. Well, it's not difficult to do the study. It's difficult to do a study that's going to show a positive answer.
**Q. Which is why it's very important to consider case reports and things of that nature; correct?**

MS. COOK: Object to form.
THE WITNESS: Again, that's the lowest level of evidence and it can give you an idea, but below the incidence studies, you can do case-control studies and case-control studies are done for rare diseases. So either retrospective or prospective case-control studies can be done even when you're talking about a rare event.
MS. SNAPKA: Off the -- off the record briefly.
VIDEOGRAPHER: Off the record at 12:21.
(A recess was taken.)
VIDEOGRAPHER: Back on the record at 12:26.
**Q. (By Ms. Snapka) Dr. Newman, we took a break for a technical issue. Going back to my question. Intracranial hypertension is very uncommon; correct?**
A. Idiopathic intracranial hypertension or intracranial hypertension?
**Q. Let's say PTC.**
A. Or IIH. For example, intracranial



hypertension is quite common in neurosurgical patients. So that's why I'm trying -- I'm just trying to -- anyway, it is -- IIH is written as a rare disease, but it really depends on how you define rare, and especially with the obesity epidemic, it is increasing almost exponentially. I mean, it is very, very much increasing.
**Q. You write in your -- in the papers that we've reviewed -- and I can go over those, but you write about the fact that there may be susceptible persons.**
A. As we talked about before, there are very well-established, very strong risk factors for the disease including obesity, overweight and recent weight gain as well as being female and in your childbearing ages that certainly make a patient far more susceptible to the disorder than people who do not have those characteristics.
**Q. And in any given particular patient, they may have an idiosyncratic reaction to an exogenous substance; correct?**
MS. COOK: Object to form.
THE WITNESS: So -- so any person can have an idiosyncratic reaction to any exogenous substance.



**Q. (By Ms. Snapka) What do you mean when you say confounding factors?**
A. So confounding factors are factors that are highly associated with a particular aspect of person or a disease that if you do not take into consideration will confound your analysis of association or causation.
**Q. Confounding factors can mask causation, can they not?**
A. They can.
**Q. The confounding factor may be a factor that's assumed to be the cause of the problem, and so the real cause in a given patient may not be noticed because of that confounding factor; correct?**
A. Correct.
**Q. When you look at a case report, you assume that whoever is writing the case report or whoever saw the patient knows what those other factors are because if they're confounding factors, it's because it's known that they are involved in that disease in some way and would have a compelling reason why they are presented the case report inasmuch as either the confounding factor isn't that or that the confounding factor ends up being removed and the case still happens. Correct?**



A. You better point me to the page because that's a really long sentence.
**Q. I'm reading what you've testified to.**
A. I know.
**Q. Page --**
A. Sometimes I don't know when to shut up when I'm answering a question, so please help me know what page I'm on.
**Q. Page 91.**
A. Thank you.
**Q. The question that was asked to you was: So with an individual case report, you ordinarily can't discount the possibility that a confounding factor may have played a role in the event that's described.**
**You answered: No, you can't. You assume that whoever is writing the case report or whoever saw the patient knows what those other factors are because if they're confounding factors, it's because it's known that they are involved in that disease in some way and would have a compelling reason why they are presented -- presented that case report inasmuch that either that confounding factor isn't that or that the confounding factor ends up being removed and the case still happens or the factor that is being proposed as causative is removed. The confounding factor stays**

there and the patient doesn't have the disease anymore.
Did I read that correctly?
A. You read that correctly.
MS. COOK: Just object. That's not the full answer.
Q. (By Ms. Snapka) Did I read the entirety of the answer?
A. Except for the last sentence.
Q. Oh, I'm sorry. So there -- you would hope that whoever is doing the case report would be explaining those issues.
Okay. Now that's the full answer. I apologize. That's the full answer; correct?
A. Correct.
Q. All right. Whoever presents the case report knows there are confounding factors. Is that what you're trying to say?
A. That you would hope whoever is reporting the case would know about those confounding factors. That's what I'm trying to say.
Q. And that's why we hopefully have peer review even for case reports; right?
A. Correct.
Q. Your opinion is a case-control --



case-control study is more widely accepted as demonstration of causation. Your answer was: Absolutely and is based though on more epidemiologic principles. And so again, not very helpful if we're talking about rare or idiosyncratic events. Yes, sir. Correct?
A. That's what I wrote -- that's what I said, yes.
Q. In the Weilbrenner case, the question was whether minocycline was a precipitating agent in Ms. Weilbrenner's PTC; correct?
A. Correct.
Q. In minocycline, the time of exposure to minocycline and development of PTC has been anywhere from within eight weeks to more than a year; correct?
A. Well, the reports suggesting an association between them have ranged. The most compelling ones in my mind are those that have it within two months or so. Sometime within a week, a few weeks, but usually within a couple of months.
Q. The reports have indicated anywhere from a couple of months to more than a year; correct?
A. There are reports that propose causation in which there is an exposure to the agent for up to that amount of time, but the majority of the reports that



are compelling in their challenge-rechallenge have usage that is within two months of onset of the drug use.
Q. And you explained in your sworn testimony in the Weilbrenner case --
A. What page are we on now?
Q. Page 98.
A. Thank you.
Q. Going over to Page 99.
Simply that there are people who become symptomatic even more than a career year out, and that's what you're saying; right?
A. Right. But the beginning of that sentence is at least from the case series, it's usually within eight weeks. So at least I'm consistent in what I'm saying.
Q. With regard to dose response for an exogenous drug, it is a potential principle that can help support toxicity causation; is that right?
A. Yes.
Q. It's your testimony, though, that it does not have to be -- necessarily be there, but it's one of the list of things like challenge-rechallenge that is potentially helpful?
A. That's what I said, yes.



Q. And then further: Of course, again, with idiosyncratic reactions, it doesn't necessarily hold. Was that your sworn testimony?
A. That's what I said. And the rest of that is: But if the mechanism of the toxicity is presumably a drug-affecting tissue, then the concept that the more drug, the more damage to tissue is certainly a reasonable one to keep in your list of questions regarding toxicity.
Q. That's correct. Is it your testimony now that the pathophysiology of minocycline causes damage to tissue?
A. Again, we don't know the exact pathophysiology of tetracycline.
Q. So you don't know one way or the other?
A. We do not know.
Q. At that time, you were not familiar with the term Bradford Hill criteria?
A. That's what I said.
Q. Have you heard that term since then?
A. Yes, ma'am.
Q. Are you considering yourself an expert in Bradford Hill?
A. I probably know as much about it as anyone at this point, yes. I have an expertise in Bradford

Page 130

Hill mostly from the reports from your experts, and then I went out and did a lot of looking around myself and my own investigation and so I feel very comfortable with those criteria.

**Q. Okay. So that was sometime within the last two months you became an expert in Bradford Hill?**

A. Yes, ma'am.

**Q. On Page 102, Line 19, you indicate that you don't believe that menstrual irregularity has necessarily been shown to be associated, and you're talking about with PTC; correct?**

A. I'd have to know specifically that I was talking about IIH, but I assume I was and, yes, that's what I wrote. That's what I said. Excuse me.

**Q. Is that still your opinion?**

A. Yes.

**Q. In discussing the Weilbrenner case on Page 105, and I'm referring you to Line 23 because I want to ask you about things that have been smoldering before. When you were talking -- when you're using the term "smoldering," the things have been smoldering, is what you're referring to the precipitating factors that may predispose a particular patient to PTC?**

MS. COOK: Object to form.

Page 131

THE WITNESS: So I wouldn't -- I think your term "precipitating factors" is bothering me here. Can you tell me what you're referring to?

**Q. (By Ms. Snapka) You used the term "precipitating factors" in published data. Precipitate, may precipitate PTC. And my question is: When you use the term -- what did you mean when you said things have been smol -- how long things have been smoldering before?**

A. So in this particular deposition on this page, I assume we're talking here about -- I was talking about the fulminant in IIH, the malignant form of IIH, and I was asked whether this particular patient, whether I would have characterized her as the malignant variety.

And I indicated that when we presented the 16 patients or so that we did in the paper that's being referenced here, I said one of the problems was defining was the onset of the disease truly only two weeks before or had it been -- subclinical is -- probably would have been a better word than smoldering, which is that it had existed and was causing maybe only minor symptoms and then it became more manifest, or was it really not there at all and

Page 132

then at two weeks before they presented, it started.

**Q. All right. So when you said smoldering, what you meant was present so clinically or without symptoms?**

A. Or just minor symptoms enough that, you know, someone may have felt not so great, but it wasn't enough to bring them to attention or for them to think that anything was necessarily wrong.

**Q. You go on to state, "And it just may be that it tips over what becomes symptomatic to the patient."**

**Are you referring there to an exogenous substance?**

A. In this case, I was, yes.

**Q. So by the term "tipping over," it was that there was a subclinical or minimally symptomatic condition, and the exogenous substance, when you say tipping over means makes it become symptomatic or diagnosable?**

A. So I'm not -- I'm not arguing with that possibility, but I actually think the conversation here on Pages 105 and 106 is maybe more that somebody may have not really acknowledged their headaches or they didn't have much of in the way of headaches but the disease was causing peripheral vision loss, and

Page 133

then when the vision loss gets just within where they can see the problem or their headaches start up is when they noticed it.

But I don't argue with you about the idea of having a precipitant or a trigger, but I think this conversation is actually about something else.

**Q. And that's fine. And that's -- that really is my question. There can be a precipitant or a trigger in susceptible patients?**

A. Well, again, that is a theory and it is the theory that I used in this deposition for this one particular patient. No one -- unfortunately because we don't know the mechanism of this disorder, we don't know if you have to have a trigger or whether you have to have pressure high for a long enough period of time before someone gets symptom -- we just don't know.

**Q. Right. And so when you said, "I'm not arguing with that possibility," that is a possibility, isn't it?**

A. Where did I say that?

**Q. Well, in your -- you just testified --**

A. Oh, yeah. I thought you were reading from here.

**Q. No, I'm not.**

A. Yeah.

Q. You said -- you said, "I'm not arguing" --
A. I'm not arguing with that possibility. It's a hypothesis that has been suggested that probably I think in here, I've even suggested we don't know for sure, but that's what we -- what has been suggested.
Q. All right. And in this -- in this case, that is not only what you suggested, you said it was more likely than not that that's what occurred; correct?
A. In this particular case, yes.
Q. All right. So it can happen that a person can be particularly susceptible and an exogenous substance be introduced which makes the pseudotumor cerebri symptomatic and diagnosable; correct?
A. It is possible.
Q. You discuss lumbar punctures -- and just for your reference, on Page 107.
A. Thank you.
Q. And I want to talk about your opinion regarding lumbar punctures. You agree that lumbar punctures can be both therapeutic in addition to being diagnostic; correct?
A. Absolutely.
Q. You -- you however believe that repeated



lumbar punctures are punitive?
A. At least -- yes. I feel that that would be an inappropriate way of controlling this disease because they are not very pleasant for the patient.
Q. They also carry significant risk, do they not?
A. Not all that much, but they -- they do -- every procedure has some risk. The reason you would not do serial lumbar punctures as a treatment for IIH, which in the old days was done, my very first patient as a medical student clinically was someone who was coming in for their one-month lumbar puncture and they were up to, like, No. 45.
I think that the main reason we don't do that anymore is that it is an unreasonably, un-nice thing to do to a patient. And we have shunting procedures, and my feeling is if they absolutely require serial lumbar punctures, then they should have a shunt placed.
Q. You had said at that time if the medical therapy and two lumbar punctures don't begin the process of improving, then I would immediately go to an intervention such as a surgical shunt or an optic nerve sheath fenestration; correct?
A. Correct.



Q. You don't yourself perform lumbar punctures, do you?
A. I do.
Q. You do perform. How frequently do you perform lumbar punctures?
A. Currently, no longer.
Q. Okay. When did you stop doing lumbar punctures?
A. Probably about ten, 15 years ago.
Q. Why did you stop?
A. Because it blocked my day and I wasn't being given a room for it anymore in my office area, and it became easier to have it go specifically to someone who could do it as an assigned procedure at an assigned time.
Additionally, more and more, especially with many of these obese patients, it's a lot easier to do it under radiographic guidance in a radiology suite where they could see the needle go between the bones and they're not doing it blind.
Q. Do you place surgical shunts?
A. No.
Q. Do you perform optic nerve sheath fenestrations?
A. No.



Q. Who do you refer to for those procedures?
A. So for the shunting procedures, to neurosurgery, and to -- and for the optic nerve sheath fenestration, to the oculoplastics physicians.
Q. In Kate Weilbrenner's case, she had an initial lumbar puncture and was prescribed acetazolamide; is that correct?
A. I believe so, but I would have to be --
Q. Look at Page 108.
A. Thank you. Yes.
Q. And also her minocycline was stopped and discontinued; correct?
A. Yes. And she also had a second lumbar puncture.
Q. Correct. With regard to lumbar punctures, it's your opinion that the CSF reproduces within -- I think you said an hour and a half?
A. That is correct.
Q. And because of the hole in the dura, it can continue to drain for maybe up to two weeks?
A. That is correct.
Q. At that time, you had stated there's a fair amount of cynicism about whether acetazolamide does anything at all in this disease. Do you recall that?
A. Yes, I wrote that.

Page 138

**Q. And specifically --**
A. I said that.
**Q. You said that. I'm specifically referring to Page 110, Line 7. With regard to that testimony --**
A. Yes.
**Q. -- have you changed your opinion?**
A. Yes, I have.
**Q. You describe the randomized control trial in early pseudotumor, and that is the NORDIC trial; is that correct?**
A. That is correct.
**Q. You're now of the opinion that acetazolamide is an effective treatment?**
A. At least for the population we chose to treat, you know, it's -- you have to make analogies to things that we were -- that were exclusionary. So, for example, the IIH TT only looked at IIH patients who had mild to moderate visual field loss. And so we assume -- and I think rightly so -- that by analogy that we can say that the positive results in that subgroup of IIH patients can be applied to IIH patients with less severe and with more severe visual field defects.
**Q. At the time of your testimony, you talked about the side effects making the patient so miserable**

Page 139

**that they don't want to eat and they don't want to drink sugared beverages because everything tastes bad; is that right?**
A. This is true. I think it's carbonated beverages actually.
**Q. You actually said sugared beverages.**
A. Right. But that's the whole point is anything with carbonation is going to taste horrible. And so a lot of these people, part of their obesity is that they are drinking a lot of carbonated beverages that contain sugar, and so therefore if they stop drinking it because of what the carbonation tastes like, then they're getting less sugar and it may help them lose weight.
**Q. What did you mean by the testimony "they don't want to eat"?**
A. Because sometimes they get nauseated with it.
**Q. What did you mean by the testimony "everything tastes bad"?**
A. I probably misspoke. It's every carbonated beverage tastes bad.
**Q. Should a patient who has been diagnosed with PTC be monitored -- have their optic nerves monitored?**

Page 140

A. So every patient with IIH should have regular ophthalmologic, especially neuro-ophthalmologic follow-up which involves looking at the front of their optic nerves and at their visual function. So looking at both structure and function.
If papilledema has resolved, they are no longer at risk for any visual -- any further visual dysfunction and therefore you can get to the point if their IIH has resolved or they've been shunted and there's no papilledema they do not need to be followed regularly.
**Q. With regard to the followed regularly, up until that point, how frequently should they be followed?**
A. Depends entire -- each individual patient is different. It depends entirely how they presented and what the scope of their disease is. It's very important clinically and that's why this is a primary care disease for neuro-ophthalmologists. Because you determine on each patient whether you need to see them at one week, whether you need to see them in three weeks or whether they can go for three months. And it will change based on the course and what happens to the patient.
**Q. Is that the range?**

Page 141

A. Oh, no. I know --
MS. COOK: Object to form.
THE WITNESS: I currently have some IIH patients that I only see on a yearly basis.
**Q. (By Ms. Snapka) Okay. But as far as regular -- certain -- would you agree with this that if you've ever been diagnosed with IIH, then you must have a neuro-ophthalmological examination every year?**
A. Some form of ophthalmologic examination every year, yes, ma'am.
**Q. Can the ophthalmological examination be performed by a regular ophthalmologist?**
A. If there is no papilledema at all and the visual function has been entirely normal through the whole course, I will on occasion discharge my patients to a general ophthalmologist because they might be better taking care of their need for glasses and everything else, which I will not specifically do for these patients.
**Q. In the Weilbrenner case, she had been obese for at least three years prior to her diagnosis; correct?**
A. Again, it would be -- memory -- if you could tell me the page. I'm not questioning that.

**Q. I'm actually summarizing it.**
A. Okay. That's fine.
**Q. Let me find it for you so that you --**
A. That's fine. I have no reason to doubt that you've misread that, so I'm fine.
**Q. So she was -- so she was obese three years before; correct?**
A. Correct.
Can you tell me how old she was?
**Q. Fifteen.**
A. Thank you. So she was obese starting at age 12? Was that what --
**Q. I do not know.**
A. But she was 15 at the time of vision loss?
**Q. That's correct. That's correct.**
A. Okay. So --
**Q. So she had a Mirena, so she was of childbearing years, presumably had been --**
A. Who had a Mirena?
MS. COOK: Wait. Wait. Wait.
MS. SNAPKA: I'm sorry. Let me back up.
THE WITNESS: Sorry.
**Q. (By Ms. Snapka) She was 15, so she was presumably menstruating?**



A. Yeah, I would assume so. Very often that kind of obesity occurs in the setting of puberty, so my feeling would be probably she was post -- post-menstruation.
**Q. I apologize. My M --**
A. Was your minocycline.
**Q. Was -- yes.**
A. Okay. I got it.
**Q. And menstruating actually.**
A. Okay.
**Q. So she is -- she was obese for three years prior; correct?**
MS. COOK: Whoa.
MS. SNAPKA: I'll be happy to find that reference for you if you'd like.
MS. COOK: Yeah, I mean, I'm just going to object because I think that she -- she said she didn't know without looking.
MS. SNAPKA: I'm -- okay.
**Q. (By Ms. Snapka) Let's look at Page 128, Line 14.**
A. Sure.
Yeah, she had been obese for three years before.
MS. SNAPKA: Did you find that,



Counsel?
MS. COOK: Yeah. Thanks.
**Q. (By Ms. Snapka) All right. So she had been obese for three years prior; correct?**
A. Correct.
**Q. She was still obese?**
A. Correct.
**Q. After -- after the removal of the minocycline?**
A. Correct.
**Q. She had two lumbar punctures, the effect of which would have worn off; correct?**
A. By when?
**Q. Two weeks after the last lumbar puncture.**
A. Okay.
**Q. Do you agree that the effect would have worn off two weeks after the last lumbar puncture?**
A. It should have, although there -- just to go on the record, there are cases in which after two lumbar punctures and nothing else, IIH goes away, and it is felt to be secondary to just getting that pressure below the hydraulic threshold which would have to get built up really, really high again to pop it over into the IIH realm.
So it has been -- it has been demonstrated



that without weight loss, without any other medication that two lumbar punctures can cure the disease.
**Q. Okay. In -- in the circumstance that you just described, the CSF builds up and then if a precipitating cause is reintroduced, then -- in a susceptible person, then it could reemerge; correct?**
MS. COOK: Object to the form.
THE WITNESS: Perhaps, yes.
**Q. (By Ms. Snapka) So Katelyn Weilbrenner was a susceptible individual for development of IIH; correct?**
A. I would agree with that.
**Q. She had had six weeks of Diamox, 250 milligrams BID, which is, in your opinion, a low dose; correct?**
A. That's a very low dose, yes.
**Q. If we go back to Page 111, you were discussing your opinion in that case. "If you ask me to a degree of medical probability like over 50 percent given that she's still obese and that the pseudotumor has not come back and she has someone watching to make sure there is no swelling of her optic nerves, the lumbar puncture would be -- no longer be at play, the Diamox would no longer be at play. The only thing at play is that she had stopped**

the minocycline."
Is that your testimony?
A. That's what I said.
Q. Do you know if Ms. Weilbrenner was advised to lose weight?
A. I don't know whether she was actually my patient or not. If she had been my patient, I could tell you unequivocally that I advised her to lose weight.
Q. Okay. Does everyone that you advise to lose weight lose the weight you want them to lose?
A. Not everyone, no.
Q. Do you put them on a specific diet?
A. I suggest that they actually consult a nutritionist via their primary care provider.
Q. Do you follow up to find out if they've lost weight?
A. When I see them in follow-up, I weigh them.
Q. And what percentage of them have been successful in losing the weight you want them to lose?
A. I've never actually tried to quantify it. As everyone around this table probably knows, it's hard to lose weight. But most of my patients do lose some weight. Whether it's enough or not is a -- another question.



Q. So you would agree as an expert it's hard to lose weight; right?
A. It is hard to lose weight.
Q. We talked about susceptible individuals. And generally, susceptible individuals for development of IIH as you've described are women in childbearing years, women who are obese?
A. Who have had recent weight gain or who are overweight.
Q. So had recent weight gain or are overweight?
A. All of those are risk factors.
Q. Well, they make you susceptible, do they not?
A. It -- it depends on how you're using the word "susceptible." If what it means is that you are at higher risk of developing the disorder, then the answer is yes.
Q. Is that what you meant when you used the term "susceptible"?
A. Yes.
Q. When you talk about susceptibility --
A. What page are you on?
Q. I'm on Page 125.
A. Thank you.



Q. "You indicated things can happen in combination. Things can be precipitated in the susceptible individual. And I think that's a very well-proven and very often the scenario in a lot of situations especially when we're talking about exogenous drugs."
Was that your testimony?
A. That's what I said, yes.
Q. In the Weilbrenner case, you testified that it was the minocycline --
A. Which page, I'm sorry?
Q. I'm just asking in general.
A. Oh, okay.
Q. You testified that it was the minocycline that was the precipitating event.
A. Correct. I believe that is what I testified.
Q. The -- in other words, the exogenous drug that she was exposed to precipitated her IIH; correct?
A. That is what I testified to, yes.
Q. I think you said it was -- if you want to look at 128, Line 23, "It was tipped over by the use of minocycline"?
A. That is what it says.
Q. There are reports of individuals who are



not obese who develop IIH; correct?
A. Yes.
Q. And have you done studies indicating whether or not the -- in non-obese individuals medications or exogenous substances are -- are involved or they're exposed to exogenous substances?
A. So we have a study that we did that looked at so-called atypical IIH patients, and they would be the -- the skinny ones, the men, the older ones. And indeed the rate of exogenous substance that are believed to be associated with IIH were higher than in the rate of our general, more typical IIH population.
Q. In an obese or morbidly obese patient who has two lumbar punctures, a course of treatment of a fairly low dose of Diamox, who had a Mirena at the time of diagnosis that was removed and who no longer has IIH, in other words, the -- why don't we do this.
Ms. Weilbrenner was obese; correct?
A. Correct.
Q. She had two lumbar punctures; correct?
A. Correct.
Q. She remained obese.
A. Correct.
Q. And she was treated with Diamox and the Diamox was stopped; correct?

Page 150

A. Correct.
**Q. And then she had resolution of her PTC; correct?**
A. Correct.
**Q. And also had stopped the minocycline. Minocycline discontinued; correct?**
A. Correct.
**Q. And in that case --**
A. Correct.
**Q. -- your sworn testimony was that the minocycline more likely than not precipitated her idiopathic intracranial hypertension; correct?**
A. Correct.
**Q. Now, if you have a Mirena user who is obese --**
A. Correct.
**Q. -- who has two lumbar punctures --**
A. You're making a hypothetical here; correct?
**Q. Correct.**
A. Okay. That's fine.
**Q. Who has a six-weeks course of Diamox just like Ms. Weilbrenner did; correct?**
A. Correct.
**Q. Who remains obese; okay? Same thing.**
A. Correct.

Page 151

**Q. And who has had their PTC resolved; okay? And they had the Mirena removed; okay?**
A. Okay.
**Q. Now, in that circumstance, would your testimony be that the Mirena was the precipitating event for the IIH?**
MS. COOK: Object to the incomplete hypothetical.
THE WITNESS: So two reasons why I can't answer that question with an affirmative; okay? Why I can't answer that as yes or more likely than not.
One is the literature and the body of evidence for minocycline and IIH is such that in a way that Mirena does not have and as a matter of fact Mirena is the exact opposite of, which is if you do case-control studies which have been done twice now, one, Miller, et al., and the other was Daniels, where you look at the demographics and the characteristics in general of patients who have had presumed minocycline-induced elevated intracranial pressure, the demographic profile is different. You have many thin people. You

Page 152

have some men. It's -- not many men are on minocycline because it's usually for women with acne. But you have a difference in demographic profile.
Additionally, with the minocyclines, you have several cases of challenge-rechallenge where when you gave the agent back, they got it again. We have no such data for Mirena and, as a matter of fact -- so we have not a single rechallenge case and, as a matter of fact, we have several studies showing that the demographics and the clinical presentation of IIH in Mirena users in a population in Utah, in a population in Denmark, in my own personal clinical practice, is no different than your typical run-of-the-mill IIH. So that's the body of evidence difference.
The second reason why I can't say more likely than not is because I don't know when that Mirena was placed. I know when Ms. Weilbrenner had her minocycline and the onset of her symptoms. I do not know when that Mirena is placed, and if it was as in a couple of the case s we've seen

Page 153

in this litigation, if it's someone who had a Mirena for five years and was more than a year or ten months or so into her second one and it happens, that's hard for me to explain how it could tip it over. So I would need to know also the temporal relationship.
But the main reason is that the body of evidence does not suggest that there is any need for tipping because most IIH patients, there is nothing else that tipped them over. So that's why I feel even though this is a while ago, this testimony in 2009, would I still come down on the 51 percent more likely than not with this -- with the Weilbrenner case? I may, but I would not be able to say the same thing for the -- the hypothetical that you have raised.
**Q. (By Ms. Snapka) I want to discuss your response to that. If you assume a Mirena is placed and then the patient begins to have headaches and then is evaluated within a six-month time period, does that help you if you make that assumption?**
A. Again, that is one of the things to be

Page 154

considering, but given the body of evidence that we have now, I would not be able to say more likely than not if that person is the exact demographic of everyone else of my IIH patients, and all the literature that I've reviewed and all the -- the case reports that I reviewed again when this litigation started, I've had boxes of medical records of either four or five individual cases. There is nothing about them that specifically makes me think this is different than just run-of-the-mill IIH.

**Q. When we began your deposition, you talked about demographics. When we began your deposition, I asked you if men were exposed to levonorgestrel. Do you recall that?**

A. Yes. And I didn't know.

**Q. All right. Dr. Newman, if men are never exposed to levonorgestrel, you cannot have the same demographic, can you?**

A. Well, you --

MS. COOK: Object to form.

THE WITNESS: That's an interesting question. You can have pretty close to the same demographic. It's 90 percent -- actually 91 percent women and nine percent men.

Page 155

**Q. (By Ms. Snapka) So as far as a woman of childbearing years who has -- who has a Mirena in place, you don't have that same demographic to even be able to control; correct?**

MS. COOK: Object to the form.

THE WITNESS: I'm not sure I understand what you're saying. The demographic is overwhelmingly the same demographic as who would be taking -- using a Mirena.

**Q. (By Ms. Snapka) Right. But going back to this hypothetical, in Weilbrenner, you found causation; correct?**

A. I said 51 -- that it is more likely than not in this deposition that in that particular case, that the minocycline precipitated her IIH.

**Q. And just to be clear, in the hypothetical Mirena user, even -- even within -- excuse me -- six months, you are unable to say, yes, 51 percent because of the demographics; correct?**

MS. COOK: Object to the form.

THE WITNESS: It's partly the demographics. What I said was the entire body of evidence, the entire body of literature, which involves demographics, it

Page 156

involves challenge-rechallenge, that you just can't say more likely than not in the Mirena situation.

**Q. (By Ms. Snapka) And my point about the demographics is -- and if I misunderstood you, I apologize. But because minocycline was given to men --**

A. But that's not very common.

**Q. -- and they developed IIH --**

A. Yeah -- no, that's -- that's not -- all the cases of -- that I'm aware of with IIH and minocycline were in women, but quite a number of them were -- it's thin women. There may be a man or two in there, but that's not the issue. The issue is the lack of obesity.

**Q. Is the lack of obesity?**

A. Yeah, mostly. That's the main confounding feature.

**Q. If you find women who are not obese who have a Mirena inserted and then develop PTC, how would that affect your opinion?**

A. That would --

MS. COOK: Object to the form.

THE WITNESS: That would be a compelling case report, and we'd -- I'd

Page 157

have to know all the other details regarding any other risk factors and the temporal relationship and whether there was a recheck -- de-challenge and rechallenge. But, again, it's a case report, and it would have to be well-documented. And again, this is a hypothetical because I do not know of any good data beyond single case reports that in any way make that relationship.

You know, for the minocycline, the tetracyclines, there's even two epidemiologic studies which have shown that there is an actual higher rate of IIH in min -- or tetracycline/minocycline users. So -- the Daniels. So it's not only the demographics, it's epidemiologic work, it's rechallenge. It's just -- hit a higher level of support and of evidence.

**Q. (By Ms. Snapka) You said the Daniels is the epidemiological study that you're relying on?**

A. It's a -- it's a case-control study, yes.

MS. COOK: Can we break for lunch when you have a stopping point, please?

MS. SNAPKA: Give me one moment ,

please.
**Q. (By Ms. Snapka) What is the other study other than Daniels?**
A. So I think its first author is Miller. It's from the Utah group. But I think they -- that, I may be mistaken. That may actually be a more looking at the demographics regarding case-control rather than incidence levels.
MS. SNAPKA: I'd like to have this marked and attached.
(Exhibit 18 was marked for identification.)
MS. COOK: Can I take a look at it?
MS. SNAPKA: At this time we can break for lunch.
MS. COOK: Okay.
VIDEOGRAPHER: Going off the record at 1:21.
(A lunch recess was taken at 1:21 p.m. and the deposition reconvened at 2:09 p.m.)
VIDEOGRAPHER: Back on the record at 2:09.
**Q. (By Ms. Snapka) Doctor, after our lunch break, we looked through some of the slides and if**



**you'll recall, I had spoken with you about visual field loss or visual acuity loss.**
A. Yes, ma'am.
**Q. You recall that?**
A. I think -- I think you only mentioned visual field loss, yes.
**Q. All right. In one of your PowerPoints -- and I will mark this one as the next exhibit. Exhibit No. 19, this Exhibit No. 19 is a PowerPoint that you produced to us; correct?**
(Exhibit 19 was marked for identification.)
THE WITNESS: Correct.
**Q. (By Ms. Snapka) Do you know when it was done?**
A. No, except we know for sure it had to be before 2014 because it was provided in the first deposition.
**Q. Okay.**
A. And just looking at the slides, I get a feeling it's one of my old ones just because I don't use that template anymore. So the earliest it could possibly be would be 1989, and the latest, I would say just by nature of it, would be about 2014, but I think we're more toward the '90s or early 2000s.



**Q. Is there anything in the slide which is marked as 87 on Exhibit No. 19 that is inaccurate or is that still -- does it still apply today?**
A. I think this is -- this is the Corbett study from Iowa, which is about 1986, '87. And so they're a tertiary care facility in the University of Iowa that specializes in idiopathic intracranial hypertension, so this data is from that study.
**Q. My question was: Is there anything in the slide that is inaccurate or does it still apply today?**
A. It still applies to their study, but it probably overestimates the visual field or visual acuity loss as 92 percent. And remember we talked about just even having enlarged blind spots would count in some people's -- any visual field loss or visual acuity loss. And so -- and it says severe visual impairment, 25 percent. And that I think that was the number I gave you for my experience. And again, it all depends on what referral bias you have to your institution.
**Q. I'm sorry, the 25 percent is the number you gave me, correct, for severe visual impairment?**
A. Yes. In my -- I said between 20 and 25 percent of my patients have severe visual impairment, but, again, it's because of a referral



bias. But these particular numbers are from the Jim Corbett et al. study, which I believe is either '87, '88, sometime around the late '80s.
(Exhibit 20 was marked for identification.)
**Q. (By Ms. Snapka) Prior to the break, we were talking about atypical idiopathic intracranial hypertension; correct?**
A. Yes.
**Q. And is Exhibit No. 20 the study that you were referring to?**
A. Yes.
**Q. That's your study; correct?**
A. Yes.
**Q. And --**
A. It's a study which included at that point in the database patients from Emory, University of Mississippi and Detroit.
**Q. All right. And that was a 2010 study; correct?**
A. 2010 publishing. So probably 2009 or so, putting it together.
**Q. In your discussion, you said "We found that four percent of our patients with IIH were of normal weight and of these over a quarter were exposed to a**

Page 162

medication that might be associated with IIH."
A. That's what it says, yes.
Q. Yes. Did your paper discuss this as a "high proportion of medication-related IIH among our patients with normal weight"?
A. Yes, we felt that that was a higher percentage.
Q. In your study, the medications considered possibly contributing included vitamin A preparation, minocycline, cyclosporine, doxycycline, tetracycline, depot progestins and recent discontinuation of steroids; is that correct?
A. That is what we did.
Q. So progestins were included in there as well?
A. They were included as possibly contributing, yes.
Q. I want to go back to a question that I had asked earlier related to -- I may have to withdraw the question because the exhibit that I want to use is not readable.
MS. ORENDI: I can read it from here.
MS. SNAPKA: Let me attempt it. If not, I'll try to get a better copy . Let me mark this.

Page 163

(Exhibit 21 was marked for identification.)
Q. (By Ms. Snapka) Exhibit No. 21 is --
MS. COOK: Can I have --
MS. SNAPKA: I'm sorry.
Q. (By Ms. Snapka) -- something called a source file produced to us by Bayer in this litigation. Specifically denominated as Source 12. And your left hand under your pinky is where it's talking about Source 12.
A. Okay.
Q. I want to relate this back to testimony that you gave. And if we go to Page 41 of that.
A. Where is it labeled?
MS. ORENDI: In the bottom.
Q. (By Ms. Snapka) In the bottom right.
A. Okay. Got it. Sorry.
Q. And I want to refer you back to your testimony earlier, and I'll be glad to show you and an expanded --
A. Sure. Yeah, I can't --
Q. -- copy of it.
A. I'm afraid I can't read it.
Q. Right. You were saying that you didn't know of any neuro-ophthalmologists who believe that

Page 164

levonorgestrel was a cause of idiopathic intracranial hypertension. Do you recall that testimony?
A. That I'm not aware of any neuro-ophthalmologists who have said that, yes.
Q. Okay. And what I wanted to show you, this particular document, this was provided to us by Bayer as part of a source file. And if you look at the next page, which is Page 42, and in the bottom part, I'm going to read to you the statement that is made and then I'll ask you a question about it. I understand --
A. Okay.
Q. -- it's -- and I'll --
A. That's okay.
Q. I'll even be --
A. I'll listen.
Q. Okay. "Mirena intrauterine device contains levonorgestrel which causes idiopathic intracranial hypertension, pseudotumor cerebri, but this is not listed on company's website or accompanying drug documentation. Patient had severe headaches and vision loss that would be permanent if untreated. Now she requires treatment for pseudotumor cerebri to preserve vision and hopefully reverse vision loss. She started the IUD in September 2009 and began having

Page 165

symptoms in February 2010 initially attributed to migraine, but idiopathic intracranial hypertension diagnosed after visual loss began in August of 2010."
Assuming that I have read that correctly, we don't know what kind of a physician, but would you agree that there is at least one physician who believes that levonorgestrel causes idiopathic intracranial hypertension?
MS. COOK: Object to form.
THE WITNESS: I don't know who wrote this. I don't even know if this is a physician. Maybe it's an optometrist, maybe -- I have no idea.
Q. (By Ms. Snapka) And we don't either. This is -- this is an incomplete report that was provided to us by Bayer. We would like to have the rest of it to see who it is. It sort of directly affects the testimony --
A. Doesn't tell us anything about obesity or weight gain or -- you know, it's a completely incomplete --
Q. Right.
A. But -- and again, and I have no idea who -- who wrote that either.
Q. Right. And particularly if this was in a

**patient that you have called a typical idiopathic intracranial hypertension, that would be very significant to you, wouldn't it?**
MS. COOK: Object to form.
THE WITNESS: Again, I am on the record as saying that it would be of interest and would deserve attention, but a case report is a case report and an adverse event report is even less informative than a case report because we're just missing so much information.
**Q. (By Ms. Snapka) Right. And as a researcher, certainly anything that contributes to a susceptible patient's developing idiopathic intracranial hypertension is something that you would want to further define; correct?**
A. I would most certainly love to know what makes people who get IIH get IIH.
**Q. As we discussed earlier, you haven't looked at your own database to determine the recording of whether or not the patients used a levonorgestrel-containing intrauterine device; correct?**
A. That is correct.
**Q. Or anything that introduces levonorgestrel**



**into the body?**
A. That is correct.
**Q. How many patients have you personally seen in your clinic that have intracranial hypertension -- idiopathic intracranial hypertension and who have had a Mirena implanted?**
A. So I'm not sure I would have a good number for that, but I know of at least two or three.
**Q. And when was that?**
A. All within the last four years.
**Q. Did you not have Mirena patients who were diagnosed with idiopathic intracranial hypertension prior to that time and Mirena?**
A. I might have, but it wasn't something that was consciousness for me to even think about. For example, either it was not written or until I even knew about this litigation in 2014, I was not aware of any concern about Mirena in particular.
**Q. Did you not understand that Mirena was a levonorgestrel implant?**
A. So Mirena is an intrauterine deliverer of LNG.
**Q. Right. All right. And my question is: Prior to 2014, did you know what a Mirena was?**
A. No, I did not actually.



**Q. So you didn't know -- what is your familiarity with IUDs?**
A. So only before 2014, I had -- I knew that there were IUDs that were copper and that there were IUDs that had a form of hormonal contraception delivered locally. I didn't know the name Mirena. I didn't know what was out there or how many were used or anything. So when I was contacted in 2014 about this litigation -- and you can see in my time records I went and spent a good deal of time researching the topic, getting myself up to speed, looking at all the literature in that regard before agreeing to participate in this litigation.
**Q. Did it then make you want to take a history from your patients who came in to find out if they had an LNG eluding IUD?**
A. Right. So I also -- as we mentioned earlier, I was sent several cases to review in this litigation. And so I did start systemically asking my IIH patients what form of contraception they used, and in particular, specifically whether they had a Mirena. Mostly out of intellectual curiosity since, as you point out, I see so many patients with IIH, I wanted to know.
**Q. Prior to 2014, you were aware of the**



**association of LNG and IIH; correct?**
A. Prior to 2014, I was aware of the case reports regarding the Norplant implant.
**Q. And as we discussed, the LNG in Norplant is the LNG in the Mirena?**
A. That is correct.
**Q. So you were aware of the association of LNG and IIH; correct?**
MS. COOK: Object to form.
THE WITNESS: I was aware of the case reports which had proposed an association, and I was aware of the low level of evidence of that association, of the literature that suggested that association, and I was aware of the conclusions of the authors of that literature in which they themselves conclude that there is no definite association and it may be completely coincidental.
**Q. (By Ms. Snapka) Well, you're aware that Dr. Friedman wrote in the book that you edited that is used as both a textbook and a practice guide that there is an association with LNG and IIH; correct?**
A. She listed it --
MS. COOK: Object to form.

THE WITNESS: -- as a proposed association, yes.

**Q. (By Ms. Snapka) All right. And that's all she said about it. It was an association; correct?**

A. She said it was a -- she said it was -- had been associated in the literature.

**Q. Okay. And so you were aware of that prior to 2014?**

A. Yes, because I even knew the literature to which -- to which she's referring which, again, were case reports and not conclusive of a definite association.

**Q. Did -- when you found out about the litigation and you became intellectually curious, did you yourself observe whether or not the patients that came to you for IIH had the copper-only device, ParaGard?**

A. I actually do not think -- again, I think I may have had one person tell me that they had a copper IUD, which actually now that I think about it, if I'm saying there were three that I had that said they were in Mirena and one the copper IUD, that's about the percentage at least that I'm aware of IUD use is about one quarter, 25 percent copper and 75 percent hormonal.



**Q. In your -- in your practice, did -- you said you see international patients?**

A. Very rarely. Mostly for that disease I told you two or three percent, that disease I told you about, Leber hereditary optic neuropathy, they will come in from everywhere to see me.

**Q. When you treat someone for IIH, is it important to know what they -- what medications they're on or what exogenous substances they may be exposed to?**

A. Yes.

(Exhibit 22 was marked for identification.)

**Q. (By Ms. Snapka) Exhibit No. 22 is the Jadelle label. Have you ever treated someone for IIH that -- excuse me -- had Jadelle implanted?**

A. Not to my knowledge.

**Q. Would it be important to follow the manufacturer's guidelines as found in the label and directives related to Jadelle and IIH?**

MS. COOK: Object to form.

THE WITNESS: Is it important to follow directives? If I were a prescriber, yes, it would be.

**Q. (By Ms. Snapka) What if you're a -- what**



**if you're someone treating IIH?**

A. What --

MS. COOK: Object to form.

THE WITNESS: What are you asking?

**Q. (By Ms. Snapka) Is it important to follow the label?**

A. Well, again --

MS. COOK: Object to form.

THE WITNESS: -- I -- I don't prescribe Jadelle and I don't remove Jadelle. So it wouldn't be me following a label for Jadelle.

**Q. (By Ms. Snapka) Well, you diagnose idiopathic intracranial hypertension, do you not?**

A. Yes, ma'am.

**Q. Okay. If you look at the Jadelle label -- and you've reviewed this label before; correct?**

A. I have seen it, yes.

**Q. All right. And if you look on the upper right where it talks about idiopathic intracranial hypertension, it says, "Consider this diagnosis if persistent headache or visual disturbance occurs and remove Jadelle if diagnosed."**

A. That's what it says.

**Q. And if you had a patient who came in who**



**said, "I'm using Jadelle for contraception," and you diagnose that patient with idiopathic intracranial hypertension, would you recommend that they have the Jadelle removed?**

MS. COOK: Object to the form.

THE WITNESS: Based on the evidence in the literature regarding the substance in Jadelle, my answer would be I would not recommend it, but I would discuss with the patient what the strength of the literature is, what the history of the label coming down from the Norplant label and what the basis is of that, and then I would have them have a discussion with their gynecologist regarding what they want to do.

**Q. (By Ms. Snapka) If you'll look at Page 18, under 5.9.**

A. Yes.

**Q. It says, "Idiopathic intracranial hypertension has been reported on rare occasions in users of levonorgestrel implants. Consider this diagnosis if persistent headache and/or visual disturbances occur in a woman with Jadelle, particularly if the patient is obese or has recently**

Page 174

gained weight. Remove Jadelle if idiopathic intracranial hypertension is diagnosed."
A. That's what it says.
Q. Would you tell the patient in whom you've diagnosed idiopathic intracranial hypertension that the label says remove Jadelle?
A. I would -- I would tell them that the label says that, yes.
Q. Would you tell them the label is wrong?
A. I would tell them that the -- the body of evidence does not suggest that is necessary, and I would tell them that the label is something that appears to have been inherited based on a literature from another product, and that that literature does not, in my mind, show a definite relationship between IIH and LNG implants.
I would also -- which I have done since 2014 -- make it very clear that they are aware that I am a party in this litigation and that these are my opinions and that they will also see on the Internet other opinions and that they should either, if they're capable of looking into it directly themselves, they can, or they should talk about it further with their gynecologist and with me if they want to.
I do think that the -- well, that's enough.

Page 175

Q. Dr. Newman, you're actually not a party to this litigation. You're a paid expert in the litigation; correct?
A. Fine. Did I use the wrong phrase? I'm sorry.
Q. Well, party means plaintiff or defendant --
A. I apologize. I didn't realize that was the term.
Q. Sure. You're a paid expert; correct?
A. I am an expert in this litigation, yes.
Q. And anytime that you're published on an issue related to causes, you should explain that you're a paid expert in the IIH/PTC litigation for Bayer; correct?
MS. COOK: Object to form.
THE WITNESS: If the publication is directly the subject matter of pertaining to or related to this litigation, then I agree with you.
Q. (By Ms. Snapka) So if it's discussing the pathophysiology, then you should disclose; correct?
MS. COOK: Object to form.
THE WITNESS: No, absolutely not. There's multiple theories regarding pathophysiology and it has nothing to do

Page 176

with this litigation.
Q. (By Ms. Snapka) Or causes of IIH?
A. Again, this --
MS. COOK: Object to form.
THE WITNESS: That's fine. I mean, I -- any article that since 2014, which means the delay of the publication, I have made it clear that I am a medical-legal expert.
Q. (By Ms. Snapka) Well, you're not just a medical-legal expert. You're a medical-legal expert hired by Bayer to opine on the causation of LNG to IIH; correct?
A. Correct.
Q. And that's really -- if you're going to fully disclose, that's what you should say?
A. And that's fine, but I have not written anything -- anything since 2014 on the -- the subject matter of -- that relates to this litigation.
Q. Just so that we can be clear, when you say the subject matter that relates to this litigation, define that, please.
A. The relationship between LNG and the development of IIH.
Q. Is it your opinion that for a causal

Page 177

association to be made that statistical significance in a study is required?
A. It would be preferable to have such data. There are occasions where you can draw a causal inference when you've had lower level of evidence, such as challenge-rechallenge in individual cases and case-control data which suggests a different demographic.
Q. You have referred a couple of times to challenge-rechallenge. What about just de-challenge?
A. Not if nothing else has been done as far as treatment is concerned.
Q. Well, if you've been diagnosed with idiopathic intracranial hypertension, then you've had a lumbar puncture; correct?
A. Correct.
Q. And probably been put on Diamox?
A. Most likely, yes.
Q. All right. And so when you say not if nothing else has been done as far as treatment is concerned, if you have a de-challenge, in other words, a removal, after diagnosis and it goes away, does that come to your level of --
A. No. Because as you point out, those people will almost always, if not always, be treated with a

lumbar puncture, Diamox, and likely weight loss.
**Q. Well, you're assuming that it's successful weight loss?**
A. Correct. We would want to know.
**Q. Lumbar puncture and weight loss.**
A. Diamox.
**Q. I mean Diamox.**
**To make sure that I'm clear on the double negative, you don't accept de-challenge after lumbar puncture and Diamox; is that correct?**
MS. COOK: Object to form.
THE WITNESS: Correct, just in -- just by itself, correct.
**Q. (By Ms. Snapka) All right. Well, isn't -- you have to have the lumbar puncture to have the diagnosis; right?**
A. And that's what makes this so complicated.
**Q. As a physician, don't you want to err on the side of safety?**
MS. COOK: Object to form.
THE WITNESS: That's a very global question, so I'll answer with a global answer. Yes, of course I want to err on the side of safety.
**Q. (By Ms. Snapka) So when you're -- when**



**you're trying to make a decision about whether some exogenous substance is -- in a susceptible individual is the cause of their development of IIH, isn't the safer course to recommend not putting it back in or removal of the LNG?**
A. Well, that would be making a decision based on no evidence to suggest that there's a relationship. And, you know, I'm not the one prescribing contraception, so you'll have to ask a GYN what it means if you remove a very effective and potentially the best choice of contraception for a woman because you think there might be some association. I don't think that's being very fair to the patient.
**Q. If you have -- if you're a physician who is relying upon published literature that you yourself have listed with LNG association, do you believe that they are not acting reasonably if they recommend removal after diagnosis of IIH?**
MS. COOK: Object to form.
THE WITNESS: I cannot say what's reasonable for another doctor. I will not call them unreasonable. However, I don't think there's published literature out there that in any way even shows a possible association. I mean, that's as far as I



would take it is a possible association. And the authors of that literature say exactly the same thing.
**Q. (By Ms. Snapka) The -- in the Jadelle label, you said that it was -- you made some reference to the Norplant label.**
A. Yes.
**Q. Where did you get that information?**
A. So again, from what I understand, the label on Jadelle was his historically brought down because it's the -- because it's LNG from the Norplant label. I know nothing about the background or history that allowed that to happen or made that happen, but that is my understanding.
**Q. Where did you get that understanding?**
A. I'm not even sure. I'm not sure.
**Q. Can you find me one piece of documentary evidence that you've reviewed that says that?**
A. Well, I think the label is -- it's because it's identical on the two. If you look at the Norplant label, the -- the wording is identical, so I'm just assuming that that's what happened.
**Q. But you don't know for sure, do you?**
A. I don't know for sure, no.
**Q. It could be that it was put in the Norplant**



**label for a reason and retained in Jadelle for a reason.**
MS. COOK: Object.
THE WITNESS: I --
MS. COOK: Object to form.
THE WITNESS: I don't believe that is the case.
**Q. (By Ms. Snapka) But you don't know that it's not the case.**
A. Well, I don't --
MS. COOK: Object to form.
THE WITNESS: I don't think that my communications -- I mean, I have other communications that I'm not sure I'm allowed to express. Is that the --
**Q. (By Ms. Snapka) And what I guess I'm -- I'm saying, Dr. Newman, is other than what -- what you may have heard from someone, you rely on no documentary evidence to tell you where the Jadelle label came from; correct?**
MS. COOK: Object to form.
THE WITNESS: Again -- that is correct.
**Q. (By Ms. Snapka) Do you have a -- I think we have a copy of your report --**

A. Right.
**Q. -- that's been marked?**
A. I brought one with me.
**Q. I think we marked it as Exhibit No. 6. In your report, you discuss your qualifications, then you talk about Walsh and Hoyt's Clinical Neuro-Ophthalmology Fifth and Sixth Editions. Is that the most recent edition of Walsh and Hoyt?**
A. Yes, it is.
**Q. You said you've been involved with the management of more than 1,000 patients with raised intracranial pressure, most of them diagnosed with idiopathic intracranial hypertension. Is that where you got the number that you gave us previously, which I was trying to find? Is that 800?**
A. Well, what I said was that I've -- our database probably has close to 1,500, but that I personally have seen probably -- I don't remember -- 500.
**Q. Okay. So when you say, "I've been involved with the management of more than a thousand patients with raised intracranial pressure, most of them diagnosed with IIH," is that the 500 you're referring to?**
A. This is a -- it's hard to estimate. This



is the database number and so involved with the management, I -- it's probably not the best phrasing.
**Q. How do you know there's a thousand patients in the database?**
A. Because when we have mined it for our studies, that's the numbers we've been having.
**Q. As far as the database, is that something that you have a fellow do or do you personally do it or both?**
A. All of us enter data, and then -- I mean, the data comes from all of us seeing patients.
**Q. Okay. And if you wanted to go into your database and look at it, would it be simply -- is there a search field for which you would put in Code 157?**
A. Yes.
**Q. And then -- and then that references that data?**
A. It references the case.
**Q. The case itself?**
A. And then you have to make sure that the coding was correct, you have to look at the medical information, and then you have to add it to that database of IIH. So in other words, to look at these clinical characteristics.



**Q. Well, if you're the one doing the coding, wouldn't you hope that it's correct?**
A. I would hope so, but we have four or five physicians who are contributing and we have fellows who stay for a year who will be doing some of the coding, so we have to make sure it's clean data.
**Q. You mentioned that -- that in addition to the Emory database, there are other -- you can pull from other databases as well?**
A. No. So what I mentioned was that the early studies looking at the prognostic features were a combination of our data and then the data from previous fellows of mine, one who is in Detroit and had started his own practice there at the university, and one at University of Mississippi.
**Q. So you contacted your fellows and they all have their own databases as well?**
A. Correct.
**Q. And is this limited to Emory researchers? In other words, is this a public access database?**
A. Oh, no, it's totally limited to -- to Emory with HIPAA compliance and deidentification.
**Q. You have published headache journals; correct?**
A. Rarely.



**Q. But you have published in headache journals?**
A. I think so. I'd have to specifically look.
**Q. Well, you state that "The headaches that occur from increased intracranial pressure are often indistinguishable from those resulting from other causes includes migraines and chronic tension headaches." That's at the top of Page 4.**
A. Correct.
**Q. You're familiar with the Mirena label and its -- its discussion of headaches?**
A. I know that headaches have been reported as a -- as a side effect at least in the -- on the label.
**Q. Okay. And is there a mechanism that you have identified by which LNG causes headaches?**
A. I don't know of any such mechanism. These reports -- I'm not sure that people have actually looked to see if it's more common than age and gender match population. So I think they just have to report a symptom when people in the -- in the trials report these symptoms, and if it's above a certain percent, they have to put it in the label. That's my understanding of how that works.
**Q. You state in your report, "No well-controlled epidemiologic studies have**

demonstrated any agent, including antibiotics or contraceptive therapies to be independently related to the diagnosis of IIH in this study population."
A. And where are you?
Q. On No. 2 on Page 5.
A. Yes.
Q. In your previous testimony, you had indicated that simply because there are confounders doesn't mean that the exogenous agent is not the cause. Do you recall that?
A. I would have to be shown it, but I'm not arguing with that statement.
Q. Okay. So without me showing you, you're willing to accept that?
A. That I -- that you can have -- just because there are confounders doesn't mean it's not causative, that's true, but it makes it difficult to prove.
Q. Right. So the proof is difficult, but it doesn't mean that the exogenous agent was not the cause?
MS. COOK: Object to form.
THE WITNESS: It just -- it doesn't mean it's not, correct. It's not -- you can't prove a negative.
Q. (By Ms. Snapka) You also talk about that



de-challenge is confounded by concurrent treatment interventions. That's in No. 3 on Page 5.
A. Correct.
Q. It would be irresponsible of a physician to remove a Mirena without treating IIH; correct?
MS. COOK: Object to the form.
THE WITNESS: Are you -- what -- what part of that are you asking me is irresponsible?
Q. (By Ms. Snapka) If the -- if the patient had IIH --
A. Yes.
Q. -- and removed the Mirena, it would be irresponsible of the physician not to treat?
A. I absolutely agree.
Q. So that when you talk about it's confounded by the treatment, not treating is not an option for a responsible physician; correct?
MS. COOK: Object to form.
THE WITNESS: Correct, unless there's absolutely no vision loss. Although you'd still -- you'd still absolutely have to do the lumbar puncture as a diagnostic test. So, yes, I agree with you.
Q. (By Ms. Snapka) Do you understand that --



strike that.
In cases of IIH where minocycline is discontinued or tetracycline is discontinued, is there always resolution of the IIH?
A. There should be.
Q. Is it?
A. Yes.
Q. So you're not aware of any cases where IIH is triggered by a tetracycline, the tetracycline is removed, and the patient has symptoms resolved without long-term treatment with either a shunt or Diamox?
A. No, I'm agreeing that that's often the case that you take away the minocycline and then they -- they -- the IIH resolves.
Q. My question wasn't clear. Are you aware of tetracycline-induced IIH cases where the tetracycline is removed and the patient nonetheless continues with requiring Diamox or a shunt?
A. I would be very suspect of that case as being due to the tetracycline.
Q. Are you aware of any cases where tetracycline has been removed and the patient has required ongoing Diamox or had shunt placement?
A. Not in my practice, and if that's in a case report, then I don't believe that that's a valid case.



Q. There is no accepted pathophysiologic mechanism by which any of the exogenous substances cause elevated ICP; correct?
A. Correct.
Q. What I'd like for you to do, Doctor --
MS. SNAPKA: Briefly, how long have we been going?
VIDEOGRAPHER: Four hours and 20 minutes.
MS. SNAPKA: Sorry, just this last after lunch.
VIDEOGRAPHER: About an hour and 45 minutes.
MS. COOK: No, since lunch, we've been going about 45 minutes.
MS. SNAPKA: 45, thank you.
THE WITNESS: Yeah, 50.
Q. (By Ms. Snapka) Dr. Newman, we talked a little bit about differential diagnosis, but I want to explore that in some more depth. If you would, I'd like for you to write down if you see a patient and you're doing a differential diagnosis on a patient that you suspect may have idiopathic intracranial hypertension, what causes are in your differential?
A. We don't know the causes of IIH.

Page 190

**Q. Well, you want to find out what may be precipitating the IIH in order to relieve the cause. For example, if it's head injury --**
A. Head injury doesn't cause IIH.
**Q. Doesn't cause IIH. What about hematological disorders like anemia?**
A. Doesn't cause IIH.
**Q. Okay. Is it something you consider when you're looking at an IIH patient?**
A. It's a risk factor which may increase the severity of the visual dysfunction.
**Q. Okay. So if -- do you consider a differential diagnosis when you see a patient that you think may have IIH?**
A. Well, as we talked about before, I first make sure that there's true papilledema and it's not just someone who has chronic headaches and has funny-looking optic nerves. I then go through the clinical assessment to make sure that it's disc edema due to raised intracranial pressure, and part of that assessment includes of lumbar puncture to document an elevated pressure as well as imaging to make sure that the nerves aren't enhancing and then clinical information to make sure it's not an optic neuritis or ischemic optic neuropathy.

Page 191

Once I believe I have bilateral disc edema that's true disc edema and I think from the symptoms and signs that it's due to raised intracranial pressure, I do imaging to rule out a mass lesion, a meningeal process, hydrocephalus and venous sinus thrombosis, and I do a lumbar puncture to document an elevated intracranial pressure and normal cerebrospinal fluid contents, i.e., not an inflammation or an infection. Once I have that done, then I know I have idiopathic intracranial hypertension.
**Q. Are hematological disorders like anemia a risk factor for IIH?**
A. So anemia is likely a risk factor for poor visual function in IIH and it may be a risk factor for a syndrome that looks like IIH but might have something to do with venous sinus thrombosis. The problem is that the anemia literature predated our ability to noninvasively image the veins in the venous sinuses. So it's a tough literature to get through.
**Q. So there hasn't been any literature on anemia since we've had venous radiologic examinations?**
A. In MRVs -- in other words, to be able to look at the venous side, we ourselves have shown that it's a possible relationship. We have a -- we had a paper on anemia and elevated intracranial pressure. The problem is we -- we don't know what the mechanism is to make sure that it truly is IIH, but there has been a -- an association with anemia and there -- we certainly have shown that there is a relationship with a poor prognostic factor.

Page 192

**Q. Do you ever consider potential causes of IIH PTC?**
MS. COOK: Object to form.
THE WITNESS: I'm not sure what you're asking besides the risk factors, the obesity, the recent weight gain, those -- those things or is that -- or...
**Q. (By Ms. Snapka) Perhaps I'm not -- I'm not asking my question clearly.**
A. I'm sorry.
**Q. You've described on a couple of occasions the process that you go through in examining a patient to make sure that they have true intracranial hyperter -- papilledema and intracranial hypertension and -- as you've described. But do you ever go through as you're looking at the patient what could possibly be precipitating it?**
A. Sure. So are you asking do I get a hemoglobin to check for the hematocrit?

Page 193

**Q. Yes.**
A. Yes.
**Q. Okay. And perhaps I'm not asking the question in the way that communicates it well. But what I want to find out is when you're looking for potential causes, what are you looking for?**
A. Well, as you know, in the vast majority there's not going to be anything. But I think what you're trying to ask me here is do I ask if they're on minocycline or not, and the answer is yes. Is that the line we're going here? I'm sorry, I just didn't understand what you were asking.
**Q. I'm trying to look at the various things that you think about when you're looking at a patient as far as potential causes.**
A. Sure. So if I've -- I've ruled out -- so the problem is when I'm talking to the patient, it's usually before I get all these tests. So it's not in a -- a way like that. So the historical questions when I suspect that someone might have elevated intracranial pressure, those historical questions are going to investigate all those things that I'm actually going to try to rule out and come up with a diagnosis of IIH.
So I'm going to ask them do they have focal

Page 194

neurologic signs that would suggest a mass lesion. I'm going to ask them if they're postpartum or have had a family history of clotting disorders or personal -- a personal history of clotting disorders which may push me to the venous sinus thrombosis concern.

I'm going to ask them if they've had fever, neck stiffness, anything that might go with a meningeal process. So that's all part of the history and, yes, I'm going to ask them if they've been recently put on a tetracycline derivative, and as part and parcel of my medications, I will probably end up getting a contraceptive history and as I told you, since 2014, I have asked them if they have a Mirena.

**Q. Do you also ask about lithium?**

A. That would be a drug that people -- if someone's on lithium, it's in their med list, you know. That's not like Mirena where they may not think it's a drug. So do I specifically ask lithium? No, I don't.

**Q. What about synthetic growth hormone?**

A. None -- that's a pediatric treatment. None of my patients who would be in this category would I have to ask that. And if they were on it, that would be something they would be telling me -- it would be

Page 195

in their med list.

**Q. Are you aware that spas prescribe growth hormone?**

A. Spas?

**Q. Yes, spas. Medical spas prescribe growth hormone to adults?**

MS. COOK: Object to form.

THE WITNESS: I'm sorry, S-P-A-S?

**Q. (By Ms. Snapka) Yes.**

A. I'm sorry. I thought it was an abbreviation for something I didn't know. Okay. No, I actually didn't know that, but I would assume that would be on a medication list.

**Q. Vitamin A derivatives, do you ask about that?**

A. I do.

**Q. And you said now you also ask about Mirena?**

A. I do.

**Q. Do you ask about any other levonorgestrel contraceptive system?**

A. I ask about contraceptives. But I go beyond the med list, and...

**Q. For which of these has a causal association been established?**

A. That's a tough word, established. I think

Page 196

more likely than not the tetracyclines and possibly the retinoids, the vitamin A are the only ones that have had enough evidence in the literature to -- to suggest true causation.

**Q. And if the other ones don't, then why are they in this list?**

A. They're in this list because it has been suggested. And I told you why the Mirena is on my list now. It's because of this litigation.

MS. SNAPKA: Let's go off the record for a second, please.

VIDEOGRAPHER: Going off the record at 3:09.

(A recess was taken.)

VIDEOGRAPHER: Back on the record at 3:13.

**Q. (By Ms. Snapka) In your report, you discuss Etminan; correct?**

A. What page?

**Q. It started on 8.**

A. Okay.

**Q. Did you rely on the second part of the Etminan -- the second Etminan paper?**

MS. COOK: Object to form.

THE WITNESS: I'm not sure what

Page 197

you're asking me, I'm sorry.

**Q. (By Ms. Snapka) Before I get to that, you talk about stimulated reporting from litigation --**

A. Yes.

**Q. -- is that right?**

**What is stimulated reporting from litigation?**

A. That is where there's an increase in reporting rate of an association because of ongoing litigation with advertisement, et cetera.

**Q. When did this litigation begin?**

A. I believe sometime around -- I don't know exactly when the litigation began.

**Q. Well, then how do you know that the reporting was stimulated by litigation?**

A. Because it has increased certainly in the last three years over -- we have a signal assessment from 2015 and then between 2015 and the end of 20 -- or the middle of 2017, the cases have doubled.

**Q. And what do you attribute that to?**

A. I think a great deal of it -- we know that 60 percent of the cases are in the setting of litigation.

**Q. How do you know that?**

A. Because it's on the reports of the cases.

If you look at the -- the post-marketing data from -- I guess it was 2017, that's the recent one, 60 percent were submitted in the context of U.S. litigation.

**Q. Up until 2014, do you know how many cases were submitted or reported?**

A. All I know is the 2015 signal assessment had 115 possible cases with 69 of them medically confirmed.

**Q. Okay. And -- but you don't know when -- when litigation began?**

MS. COOK: Object to form.

THE WITNESS: Well, I know it must have begun as early as July of 2014 because then I was -- that's when I was contacted, but I don't know when it all started.

**Q. (By Ms. Snapka) Did you rely in any way on Etminan 2015 to support your opinion?**

A. So I think that every piece of information is helpful. The re-evaluation of the first part of his study with a disproportionality analysis in its way actually is helpful because it showed that there was no association when you age match it, and not to mention if you -- and age and gender match it, and not to mention if you body weight match it.

And then the second portion, which was the



analysis of the claims data, even if the search terms which he used were incorrect, he used the same incorrect search terms for users of two forms of contraception and Mirena and there was no difference in the frequency of intracranial hypertension, which to me is a piece of information, again, another negative piece, which shows no difference.

So I think in a way, both pieces help inform by their negative associations.

**Q. All right. So you rely on both of them for the purpose of supporting your opinion that there's no association?**

MS. COOK: Object to form.

THE WITNESS: The -- the redone version of the first part in an appropriate manner, correct.

**Q. (By Ms. Snapka) Okay. Did you read Dr. Friedman's letter criticizing Dr. Etminan's report?**

MS. COOK: Object to form.

THE WITNESS: Yes. The first version, yes.

**Q. (By Ms. Snapka) There's only -- there's only one letter; correct?**

A. Right. It's the first version of his report.



**Q. Correct. But --**

A. Yes.

**Q. -- it's the second version in particular that you're relying on to support your opinion?**

A. Well, I think it is the reality of the situation, and so I -- that's helpful to know.

**Q. On the Valenzuela report, you indicate that they report unadjusted odds ratio based on those comparisons of 7.70 and 3.91 in Utah and Denmark respectively. However, methodologic limitations included a severalfold underestimation of Mirena exposure in both Utah and Denmark controls in a failure to control for BMI, recent weight gain or age between IIH patients and those without IIH render those reported associations meaningless.**

**Did you do any sort of calculation or odds ratio recalculation?**

A. Yes, I did.

**Q. Where are they in your report?**

A. Not in the report, but just for my own edification.

**Q. So what did you -- what odds ratios did you come up with?**

A. I came up with no association even being incredibly generous because there's no way we can know



what the BMI data are. So just looking at the usage rates reported recently in Utah and Denmark, and accounting just for that and being very, very generous because the rates which I could have used would have been as high as 18 percent, but using something like ten percent for Utah and nine percent for Denmark, it makes it not associated whatsoever, which does not, as I mentioned, account for BMI, it doesn't account for the fact that the Utah data, we don't know who got potentially Mirenas outside of the Utah system like with Planned Parenthood. We don't know who had a Mirena in place already -- remember it's five years they last -- who was not therefore caught by a code that counts for insertion of Mirena.

And in the Denmark data, they used a one-year insertion rate for a five-year product. So both of them absolutely misrepresent and totally under-represent the Mirena usage which many papers have shown in those populations.

**Q. Did you use the Boulet numbers for the prevalence of Mirena uses in Utah ages 15 to 44?**

A. So if you want to show me the paper, we can look at it.

**Q. I just need to know where you got the numbers.**

Page 202

A. I don't know specifically which of these. There are several that gave me numbers, but I'm happy to look at the article.
**Q. And so you -- as far your calculation, if you did a calculation, why didn't you include it?**
A. Why didn't I include it?
**Q. Yes.**
A. Because there was really -- I mean, it's self-evident and I didn't really need to put in a calculation in here by just saying that I thought it was -- that I know it was completely underestimated.
**Q. On Page 10, in the second paragraph beginning review of Mirena post-marketing data up until September 28th, 2015 and you're discussing the signal assessment, reveals 115 possible cases, 69 medically confirmed representing a rate of case reports of levonorgestrel-containing IUD users Mirena and Jaydess/Skyla diagnosed with IIH extremely low at .09 cases per 100,000 woman years. Are you relying on the rate of case reports to assess causation?**
A. No.
**Q. That really provides no value for assessing causation; correct?**
A. It provides as little value as using case reports to suggest association and causation.

Page 203

**Q. Are you aware of any literature that supports using adverse event reporting rate to assess causation?**
A. No, and it shouldn't be used that way. Unfortunately, the plaintiff experts are using it that way.
**Q. We've talked earlier in your deposition about the value of case reports --**
A. Correct.
**Q. -- when you were working for the plaintiff in the -- in the Catherine Pallman case; correct?**
A. Weilbrenner.
**Q. Weilbrenner; is that correct?**
A. In -- what I was referring to in there was not establishing causation as regards to tetracycline and IIH. That had already been done by the body of literature. What I was doing in that deposition was saying why I believe to a reasonable degree of medical certainty more likely than not, 50 -- more than 50 percent that in her specific case, I felt it was most likely involved in her IIH. I was not establishing overall causation between minocycline and IIH in general.
**Q. I apologize, that was not my question. We talked about the value of case reports in that case;**

Page 204

**correct?**
A. Correct.
**Q. Did you review Dr. Salpietro's report in this case?**
A. His report, yes.
**Q. You said that -- and of course you didn't have the depositions at the time, so this has to be from the report; correct?**
A. From -- so my report only includes my reactions and comments as regards to their reports. I have subsequently reviewed the depositions.
**Q. You indicate that Dr. Salpietro says progestins effect on CSF production is excitatory. What does that mean to you?**
A. That means it's an agonist, which means it increases CSF production.
**Q. Okay. Can you find that in Dr. Salpietro's report?**
A. It may take a while.
So the only statement I'm coming across here is in the section that begins on Page 30 through 33 that progesterone can alter CSF dynamics, which is what I may have interpreted meaning that increases the production of CSF.
**Q. That's not exactly what --**

Page 205

A. That's not exactly what this says. It's also possible that I may have confused him with someone else who said that progestins are excitatory, but I'd have to look at all the reports to know that. Let me just finish this one to make sure.
MS. COOK: So what was it that your question was, because it didn't come through clearly? I forgot what you had asked originally.
MS. SNAPKA: What she says is that -- her report says that Salpietro says progesterone's effect on CSF production is excitatory, and I said where was that, and we've now determined that it's not in there.
THE WITNESS: Yeah, I think I either was referring to the fact that he says it affects cerebrospinal fluid dynamics without necessarily saying what those dynamics were either up or down, although the implication is that it -- because he talks about fluctuations, that it in some way affects that. But -- or that I may have mistakenly attributed what someone else said to him, and I will check that,

but not now because it would require checking every report.

**Q. (By Ms. Snapka) All right. Going back to your report on Page 9, and I think this is probably in the -- in your discussion of Dr. Etminan, you said Mirena is preferentially prescribed for obese women, and you cite Peipert 2011; is that correct?**

A. Correct.

**Q. And is Peipert a reliable source about the contraceptive choices of women in the United States?**

A. I would have to look at it, but if I cited it, I felt it was reliable.

**Q. Okay. Or a reliable source about contraceptive choices that can be generalized to women in Utah?**

A. Well, it's -- I believe that's the one that's the United States.

**Q. Okay. All right.**

A. And this isn't about Utah anyway.

**Q. Oh, that's true. You're -- that is correct.**

**But it is a reliable source about the contraceptive choices of women in the United States?**

A. I'd have to look at the article. I don't want to speak off the top of my head. If I -- if I



put it here, then I used it as a citation, but I need to see the article to know whether it was the United States or whether it was the world or -- you know, I can't accept the whole sentence without specifically seeing the article.

**Q. All I'm really trying to find out is because you cited it, you found it to be a reliable source; correct?**

A. Yes.

**Q. We talked about your paper where you had -- where you discussed and you may have referred to Digre, I don't know, but it talked about removing things that may precipitate IIH. Do you recall that?**

A. I don't know which paper you're talking about.

**Q. All right. That is going to be Exhibit No. 14. In that paper particularly, you said it is appropriate to --**

A. What page?

**Q. I'm sorry, it's 166. You said, "It is appropriate to discontinue potentially associated medications, particularly those in which association is very likely such as tetracyclines."**

**When you talk about the potential associated medications in 2011, levonorgestrel was**



**part of that list; correct?**

MS. COOK: Object to form.

THE WITNESS: It's in the list above of various medications have been proposed --

**Q. (By Ms. Snapka) Right.**

A. -- to cause or precipitate, yes.

**Q. And then you say, "It is appropriate to discontinue potentially associated medications." And then you talk about the tetracyclines; correct?**

A. It's appropriate to -- to discontinue the tetracyclines. It's not written very well.

**Q. Well, what you said is, "It's appropriate to discontinue potentially associated medications."**

MS. COOK: Object to form.

**Q. (By Ms. Snapka) And then you -- and then you go on to say "particularly those." So all potentially associated medications?**

A. Right. It should -- right.

**Q. Can I -- let me finish my question.**

A. Sorry.

**Q. What you state, "It is appropriate to discontinue potentially associated medications, particularly those in which an association is very likely, such as tetracycline."**



**So at the time you wrote this, it included levonorgestrel; correct?**

A. So --

**Q. Am I correct?**

A. No.

**Q. Does it say levonorgestrel three lines up?**

A. It is included in the whole list of proposed to cause medications. And the sentence is not very artfully written, but it is meant to say -- because you look at the next sentence, it is meant to say, sure, you can discontinue those that are like the tetracyclines, which are particularly likely to have an association. Whereas the next sentence says, "However, others such as oral contraceptives, have been clearly shown not to be associated and therefore there would be no reason."

So if you look also in the list that you think I'm saying they should be discontinued, oral contraceptives are up in that list too. So obviously that's not what I meant to say.

**Q. Well, you cited the Digre article, did you not?**

A. The -- which one, for the tetracycline?

**Q. For --**

A. Yeah, for the tetracyclines.

**Q. Well --**
A. The Reference No. 11 is about tetracyclines.
**Q. Does the Digre article consider other medications other than tetracycline?**
A. We'll have to -- to show it, but the -- the reference came after tetracycline.
**Q. What I'd like to do is show you the list and we can --**
MS. SNAPKA: Or we can take a break now and attach it. But that's what I would like to do, is show the witness.
MS. COOK: What list?
MS. SNAPKA: The Digre list of drugs.
MS. COOK: In the reference?
MS. SNAPKA: Yes.
MS. COOK: I think we should probably have the article for her to look it at.
MS. SNAPKA: Okay. Let me e-mail it and then I can go back to that later.
**Q. (By Ms. Snapka) Since you mentioned tetracyclines -- and we've already discussed I'm simply using it as a -- as a way of referencing the line of questioning. Were you aware -- you were not aware of any pathophysiologic mechanism by which**



**tetracyclines cause PTC; correct?**
A. That has been shown to be -- that has been proven, no. I know that there are many hypotheses, but, no, there's not been any proven mechanism.
**Q. Accepted pathological mechanism?**
A. There's no accepted pathologic mechanism, to my knowledge.
**Q. I know it's your position that the association between PTC and tetracyclines is very likely.**
A. It is likely. It is more likely than not.
**Q. Are you aware of any well-controlled epidemiological studies on that association?**
A. Again, the only study is the Daniels study, which is a case-control study, and there is also the Miller, which is a -- it's not a full-length article yet. So that's -- that's a similar case-control study. And then there are the individual challenge-rechallenge cases, and then there are the differences in demographics.
**Q. When you say the challenge-rechallenge cases, those are case reports?**
A. That is correct.
**Q. So are you aware of any epidemiological studies or case-control studies that show a**



**statistically significant increase in the risk of PTC in patients who use tetracyclines?**
A. Not when phrased that way, no.
**Q. Okay. What's wrong with my phrasing?**
A. You're using a different denominator.
**Q. Okay. Do you rely on Kesler, the 2004 study?**
A. Can you show me which one we're talking about?
**Q. I will in just a moment. Is it -- is it -- is it fair to say that a researcher can appropriately conclude there's a likely association between a drug and an adverse event even if there's no accepted pathophysiologic mechanism?**
MS. COOK: Object to form.
THE WITNESS: As long as there are -- the body of evidence as a whole is highly suggestive of that association, yes.
**Q. (By Ms. Snapka) Okay. And is it fair to say that a researcher can appropriately conclude there's a likely association between a drug and an adverse event if there's no epidemiological study showing a statistically significant increase in the risk?**
A. Again , if there is a body of knowledge



that is strong enough to support it anyway.
**Q. Is there an accepted pathophysiologic mechanism by which obesity can cause PTC?**
A. Not one that is accepted, although the relationship between the two is of course widely accepted.
**Q. Is there an accepted pathophysiologic mechanism by which weight gain can cause PTC?**
A. No.
MS. SNAPKA: We can go off the record.
VIDEOGRAPHER: Off the record at 3:56.
(A recess was taken.)
VIDEOGRAPHER: Back on the record at 4:09.
**Q. (By Ms. Snapka) Before we broke, we were looking at your Exhibit No. 14 where you cite -- am I saying Digre? Do you know Kathleen Digre?**
A. That's fine.
**Q. Is that the way you pronounce it?**
A. Sure.
**Q. Do you know her?**
A. Yeah.
**Q. And in --**

MS. SNAPKA: If we can have this marked, please.
(Exhibit 23 was marked for identification.)
**Q. (By Ms. Snapka) This is Exhibit --**
MS. COOK: Do you have a copy of that?
MS. SNAPKA: I'm sorry.
MS. COOK: That's all right.
**Q. (By Ms. Snapka) It's entitled "Not so benign intracranial hypertension," and it discusses -- by the way, is she a neuro-ophthalmologist?**
A. Yes, she is.
**Q. Appended to her article, if you see that?**
A. Yes.
**Q. It says, "Drugs associated with increased intracranial pressure," and under hormones, it lists Norplant; correct?**
A. Yes.
**Q. And Norplant is levonorgestrel?**
A. That is the active ingredient, yes.
**Q. So going back to your paper where it says, "It is appropriate to discontinue potentially associated medications, particularly those in which an association is very likely such as tetracyclines."**



**But Digre's paper herself appends with drugs associated with increased intracranial pressure; correct?**
A. That is correct.
**Q. Including levonorgestrel?**
A. That have been -- have been suggested to be associated, yes. I just want to look at this a little bit closer if you wouldn't mind.
Right. So the entire article outside of the table is only about the tetracyclines.
**Q. Well, and then it is appended with -- and I believe that you stated it incorrectly. You said they have been suggested to be associated, yes. What it actually says --**
A. Is drugs associated.
**Q. -- is drugs associated with increased --**
A. Right.
**Q. -- intracranial pressure; correct?**
A. Correct. But the article -- which is why it's referenced, the entire article is about the cyclines.
**Q. But the entire article also includes the appended portion, doesn't it?**
A. That is correct, but the entire discussion is about the tetracyclines, which is why that specific



reference was put there next to tetracycline.
**Q. Prior to -- prior to 2014 when you were hired, if a patient came in with a Norplant, they had the Norplant implanted within six months or so, had complaints of headache, and you determined that they had IIH, would you have suggested removing the Norplant?**
A. Is that a hypothetical?
MS. COOK: Object to form.
**Q. (By Ms. Snapka) Did it happen?**
A. I don't recall any event of that nature.
**Q. Then assume it's a hypothetical.**
A. Okay. Would I have back then, based on the evidence that I have, I probably would have had a discussion with them and had them discuss it further with their GYN.
**Q. When you say discuss it, you, mean discuss removal with their GYN?**
A. No. I would have had a discussion about the weight of the evidence, and it would have had a lot to do whether they were the typical demographic for IIH or not, et cetera.
**Q. When you talk about the typical demographic for IIH, the -- we talked earlier about patients who are susceptible, who could be susceptible to an**



**exogenous substance; correct?**
A. Correct.
**Q. Wouldn't be typical -- as you're describing it, typical demographic of an obese female in childbearing years, wouldn't that be a demographic that could be susceptible to an exogenous substance?**
A. It could be.
**Q. So when you say you want to know about, you know, consider whether or not they're -- they fit the typical demographic, are you discounting that -- that being an overweight female of childbearing years could predispose someone, and that levonorgestrel could be the tipping point?**
A. I'm not ruling out that possibility. I'm just saying it's a possibility and the weight of the evidence has not shown that there's an increased risk, and I'm just concluding the same way the authors who wrote the only two little articles there are on it, on a letter to the editor that their -- that we don't know. So I would have had the discussion with the patient, and then it was the decision that she would have had to make with her GYN.
**Q. Let me -- you mention letters to the editor. You were talking about your criticism s of Rai and Valenzuela, correct, in your report?**

Page 218

A. Oh, yeah, nothing to do with the letter to the editor.
**Q. Right. Let's go back to your criticisms of Rai and Valenzuela.**
A. Certainly.
**Q. And you found --**
A. You mean the Valenzuela article.
**Q. The Valenzuela article.**
A. Right.
**Q. You found it to be highly improperly done; is that correct?**
A. Yes.
**Q. Did you write a letter to the editor and explain why you thought it was such a bad article?**
A. No.
**Q. Did you pick up the phone and call Valenzuela and say, I don't know what you're talking about, why didn't you do this or that?**
A. No.
**Q. Why not?**
A. Mostly because of this litigation. I felt it was not appropriate for me to be the one because there would be the suggestion of a conflict of interest.
**Q. Well, it didn't stop Dr. Friedman, did it?**

Page 219

MS. COOK: Object to form.
THE WITNESS: Again, that's a different article, and I don't know the circumstances, but you mean when she responded to Etminan's.
**Q. (By Ms. Snapka) Correct.**
A. Right. That was her choice and she did disclose her relationship.
**Q. All right. And you have not, though, chosen to in any public way criticize Valenzuela; is that right?**
A. That is correct.
**Q. Does that mean that your criticisms -- if you properly disclose, does that mean that your criticisms are less valid?**
A. I don't think so personally, but I am trying to avoid any sense of possible conflict of interest or bias, and I did not think it was appropriate.
**Q. And no other neuro-ophthalmologist has done so, have they?**
A. Well, and that's the catch-22; right? So first of all, I don't know what letters have been written to the editor. Certainly no letters have been published. So maybe someone has written something, I

Page 220

just don't know yet. It usually takes a good six months because then they get it back to the authors who then have to write a response. So that's No. 1.
No. 2, the irony and sort of the catch-22 in all of this is that I think the people who have been most involved in really looking critically at this literature are looking critically at this literature because of this litigation, and unfortunately, that would make us be perceived as potentially biased.
**Q. Do you know how many neuro-ophthalmologists Bayer has retained in this litigation?**
A. No, I don't actually.
**Q. Well, when you say everybody who would be looking critically at it has been retained in the litigation --**
A. I didn't say that. I said everybody who would be looking critically at this topic is likely someone involved in this litigation. I don't -- I don't -- which side Bayer or your side or whatever, but I think the underlying reality is that you look very closely at the literature when you are specifically studying the case. That's why.
**Q. Has Dr. Biousse been retained by Bayer?**
A. No.

Page 221

**Q. Have you spoken with Dr. Biousse about the articles that you have published with her regarding LNG --**
A. No.
**Q. -- and it's --**
MS. COOK: Object -- sorry.
**Q. (By Ms. Snapka) -- and its association with IIH?**
MS. COOK: Object to the form.
THE WITNESS: No.
**Q. (By Ms. Snapka) Have you had any discussion with her at all regarding LNG and IIH since 2014?**
A. I probably have.
**Q. And what are the nature of those discussions?**
A. Just that -- what I am telling my patients, that -- that I probably have said something to her about I've been asking my patients systemically and I have been having discussions with them.
**Q. And did she say anything back to you?**
A. No, just this is very interesting. I mean, that's really where we are.
**Q. Is she doing the same thing?**
A. I can't speak for her.

MS. COOK: Object to form.
THE WITNESS: I don't know.
Q. (By Ms. Snapka) I mean, the only --
A. I don't know.
Q. The only way you would know is if she happened to tell you, I think that's a good idea; I think I'll do that too?
A. I wouldn't be surprised if she were, but I don't know for sure.
Q. Since you talked about case reports being extremely unreliable -- I'm sorry.
Since you've talked about adverse event reporting being unreliable, whenever you talk about adverse event reporting in your report, that likewise should not be given any weight?
MS. COOK: Object to form.
THE WITNESS: So -- so I'm not sure I used the term unreliable. It certainly is the lowest level of our evidence because it lacks nearly all the details necessary to come to some kind of conclusion about the case. But, yes, of course, I'm going to look at every piece of evidence that we have supportive and non-supportive, and you just have to look at it critically to know



the level of evidence.
Q. (By Ms. Snapka) The reason why I'm asking is in a couple of places in your report, you talk about adverse event reporting being particularly low. And so that's why I wanted to clarify that you weren't by any stretch saying that that was supportive of your conclusion.
A. Well, it's as supportive of my conclusion as it is supportive of any of the plaintiff experts' conclusions.
Q. You also, in a couple of situations in your report, talk about confounding by treatment, and you include lumbar puncture, Diamox and weight loss. Are you assuming then that that is weight loss that is undertaken by the patient that is of sufficient amount to reduce the -- the 5 to 10 percent that is necessary?
A. Correct.
Q. All right. And do you -- what do you base that on, that the people --
A. Base what on?
Q. That the people who have received treatment have done all three of those things?
A. Oh, I can't say for sure they have, but it's -- it's certainly possible that they have and



it's very probable, nearly 100 percent probable that they had the LP and been put on Diamox.
Q. As far as the weight loss --
A. We hope; right?
Q. You really don't know, do you?
A. We don't know. We do -- it's a scary thing, this diagnosis and at least at the beginning people do try.
Q. Well, just as -- do you have a number or percent of your patients that successfully lose ten percent of their body weight?
A. I've not specifically looked at that.
Q. And certainly the young lady that you testified in who was diagnosed with IIH, the Weilbrenner case, she didn't lose weight and gained some?
A. She did not, that is correct.
MS. COOK: Object to form.
(Exhibit 24 was marked for identification.)
Q. (By Ms. Snapka) Exhibit No. 24 is the Mirena label, and you've reviewed that as well; correct?
A. Yes.
Q. On Table 1 in the adverse reactions, we



discussed briefly before about headache?
A. What page?
Q. I'm sorry. I don't know the page, but it is Table 1.
A. Table 1. I have it.
Q. We talked briefly about adverse reactions, and you said that if they're over some threshold, and it looks like it's greater than or equal to five percent reported in clinical trials; is that correct?
A. That is correct.
Q. Now, it says headache or migraine in 16.3 percent were reported. Did I read that correctly?
A. That is correct.
Q. Are you aware of whether or not those headaches are related in any way to intracranial pressure?
A. No, there's no way of knowing from this. There's also no way of knowing that if you took a controlled population of the same age, whether they too would have a 16.3 percent report of headache/migraine.
Q. What did you -- with regard to -- I think you said you -- in the last two months have become an expert in Bradford Hill?

A. I believe so, yes, I have.
**Q. What did you look at because I didn't see anything on your reliance list that you looked at to make yourself an expert on Bradford Hill?**
A. Well, first of all, I looked at the actual article which lays out by Sir Bradford Hill the Bradford Hill criteria.
**Q. Where did you find that?**
A. Oh, goodness. I have a copy. You -- in the -- the disclosure of -- of --
**Q. Is it on your reliance list?**
A. Yes, it is.
**Q. Did you look at anything else other than the article by Sir Bradford Hill?**
A. Well, I think that's the source, and then I looked at the experts who used it in their reports.
**Q. So you relied on our experts?**
A. Well, there's nothing to rely on more than the original source. I didn't rely on your experts. I looked at how they used it in their reports.
**Q. In your reliance list, does it reflect anything that you reviewed that now makes you an expert in pharmacokinetics of levonorgestrel?**
MS. COOK: Object to form.
THE WITNESS: Again, as regards the



whole topic of pharmacokinetics as it relates to IIH and neuro-ophthalmology, I believe that I have an expertise in that regard.
**Q. (By Ms. Snapka) So you did not review anything separately or in preparation for your testimony here today?**
A. Other than what's on the list.
**Q. Where did you gain your understanding of the pharmacology of LNG?**
A. Again, through research, looking at the articles, and also reading the depositions of the Bayer experts and reading the reports and depositions of your experts and looking at the primary sources that are referenced in those reports.
**Q. You have an article here by J.W. Chan, "Idiopathic intracranial hypertension associated with depot medroxyprogesterone." Do you recall that?**
A. If it's on the list. I would have to see the article.
**Q. What is depot medroxyprogesterone?**
A. That's Depo-Provera. That's the shot you get for -- every several months to avoid pregnancy.
**Q. And did Dr. Chan find an association with --**



A. I'd have to -- I'd have to see the article.
**Q. To make sure that I understand prior to 2014, would it be correct to say that IUD usage in women was not something that was something that you considered on a regular basis?**
MS. COOK: Object to the form.
**Q. (By Ms. Snapka) In association with IIH?**
A. So that's a compound sentence, but that -- that is fair.
**Q. I want to make sure that it's not compound. I want to -- prior to 2014 -- 2014, you were hired by Bayer as an expert; correct?**
A. That is correct.
**Q. All right. Prior to 2014, IUD usage in women was not something you considered on a regular basis; correct?**
A. That's fair.
**Q. Did you ever consider it prior to 2014?**
A. Oh, I'm sure I had, but I can't begin to tell you under what setting. But I'm sure it would have come up at some point in my career.
**Q. When you did your calculations on the odds ratios for Valenzuela, did you do those in your head or did you write them down somewhere?**
A. I think I did them in my head. I might



have made one of those boxes and sketched it, but I never kept it, if that's what you're asking.
**Q. And the reason why I'm asking is I don't know what your calculations were. So I'm unable to --**
A. I understand.
**Q. It was either in your head or on something you threw away.**
A. Correct.
**Q. And you didn't put it in your paper.**
A. In my report, no.
**Q. And why didn't you put it in your report?**
A. Because I didn't go into that kind of detail because it seems so self -- so self-evident. And because many of the criticisms I have could not even be included in a numerical fashion just because they -- the BMI, who knows what that would have changed.
**Q. All right. Can you create that for us today, recreate it since we don't have it?**
A. We'd need all the source articles with -- that I reference here with -- with the -- with the tables, all the source articles for the -- the rate of Mirena, the rate of Mirena use in the various places. I mean, we can do it if you want to pull the articles.
**Q. Which articles would you need?**

Page 230

A. I'd need all the ones that I referenced in here.
**Q. Name them.**
A. Okay. Let's go to that. Okay. I'd need the Cibula, the Boulet, the Sanders and the Lindh.
MS. SNAPKA: Let's go off the record briefly.
VIDEOGRAPHER: Going off of the record at 4:35.
(A recess was taken.)
VIDEOGRAPHER: Back on the record. 4:38.
**Q. (By Ms. Snapka) Doctor, you indicated that you would need the Cibula, Boulet, Sanders and Lindh to recreate the calculations that you performed that led to your calculation of the odds ratio that is not in your report; correct?**
A. That is correct. It also would be much better to be able to go online and use the little EPI box where you fill in the numbers and it comes out with percentages.
**Q. Okay. And in the interest of time and in the interest of the snowstorm that's coming in, I would like to ask that you supplement your report with the calculations that you have testified that you**

Page 231

**performed in -- for the odds ratio, the recalculated odds ratio that you refer to; okay?**
A. I can do that.
**Q. All right. Do you intend to supplement your report in any other way?**
A. If there's more information that comes, I know I'm -- I'm reading the depositions of the plaintiff experts. If there are things in there that I think change my opinion or that I'd like to respond to, I don't know what the protocol is, whether I would do something in my report or whether I would just be able to testify to those things were there to be a court appearance.
**Q. Do you intend to mine your database for the IIH and Mirena or Jadelle or ParaGard usage?**
A. No.
**Q. Why not?**
A. There are two basic reasons for that. The first is that the quality of the numerator will be very poor. Until recently, there was no attempt to systematically ask the question, and I'm afraid that it wouldn't give us valid data. And if you also look -- remember that the database goes back so far, there wasn't even Mirena on the market.
The second reason is that I am not -- this

Page 232

is really not where my research is going right now. But the main issue is that I don't think there's enough reason to be doing this. I'm not seeing any big prevalence of use among my IIH patients. They look exactly like my IIH patients, and the quality of my work is not any better than the Utah and Denmark group when they specifically looked at their IIH patients using Mirena versus those not using Mirena and found absolutely no difference between those two cohorts.
If we really wanted to get at this, we would have to be doing a prospective look in which we age match, BMI match, and systematically ask about contraceptive use.
**Q. First of all, the quality of the information in the database is unknown until you look at it; correct?**
A. Well, not really. Because again, no one has specifically asked about Mirena usage until -- and I don't know what my other doctors are doing. I just know what I've been doing. And so I think that the quality would be very poor.
**Q. Okay. The second thing about your database is you talk about that it goes back so far. You can control the search, can't you? In other words, you**

Page 233

**can cut it off in time?**
A. Yes, we could.
**Q. So that's not a valid reason not to do it is because it goes back so far; right?**
A. But it certainly makes the data -- the numbers of people smaller; right?
**Q. Yes. I mean, if you --**
A. It limits -- it limits the number of cases of IIH.
**Q. That's correct. But if you start in whenever Mirena became available --**
A. Right.
**Q. -- and go forward, then that would be a smaller number than the total number; correct?**
A. This is true. I just don't think it would be adding good information to what we already have.
**Q. And so for that reason, you're not curious enough to even look; is that right?**
MS. COOK: Object to the form.
THE WITNESS: Well, it's not -- it's not like we have a button I can press which will bring up the word Mirena and IIH and just cross-reference. It would mean looking at hundreds of charts to see if the word Mirena was even in the medication

list. It would require probably months of someone doing that full time.
**Q. (By Ms. Snapka) Well, you talked about the question, there actually are non-litigation questions being asked regarding Mirena usage and IIH; correct?**
MS. COOK: Object to form.
THE WITNESS: I'm not sure what you mean by the question, I'm sorry.
**Q. (By Ms. Snapka) Well, you've reviewed the BfArM report, haven't you?**
A. Yes.
**Q. And who's B -- do you know what BfArM is?**
A. Yeah, the -- the Bayer report. Is that what you're talking about?
**Q. Yes. The Bayer, yes, the report to the German regulatory agency; correct?**
A. Yeah. Yes.
**Q. All right. And so this question is a question that is being considered in the medical and regulatory community; right?**
MS. COOK: Object to form.
THE WITNESS: Well, from what I understand, that response was required because of this litigation.
**Q. (By Ms. Snapka) Is that -- that's your**



**impression?**
A. Well, because of the stimulation of cases and, therefore, this has been brought up.
**Q. When you talk about stimulation, do you mean the stimulation of more reports or the stimulation of more cases that actually occurred?**
A. Stimulation of reports.
**Q. When is the last time that you published anything related to potential causes of IIH by exogenous factors?**
A. Probably the atypical IIH paper.
**Q. And what year was that?**
A. I think we have it here. Here it is. It was published in 2010.
**Q. You indicated in previous testimony that it was not common for men to be prescribed minocycline. Where do you get that idea?**
A. I think it's because these days -- and I may -- I may be wrong about this, but I was under the impression that minocycline is used most often for acne treatment, and I was under the impression that it would have been more in women. That's an interesting question whether it's used in men. I don't know.
**Q. Because men get acne too; right?**
A. I guess they do. It never even occurred to



me.
**Q. Is it your recollection that BfArM was prompted by the Valenzuela publication?**
A. I'm not sure what it was prompted by. I thought it was prompted by the number of cases reported. I didn't -- I don't know whether it was prompted by the Valenzuela.
**Q. So you just don't know one way or the other?**
A. I don't know.
MS. SNAPKA: Doctor, that's all the questions I have at that time. I would appreciate it if you would forward the supplement to your report that we've requested at your earliest convenience and forward it to counsel so that they can provide it to us.
THE WITNESS: Thank you.
EXAMINATION
BY MS. COOK:
**Q. I have a few questions, Dr. Newman. Let's start with you were asked some questions about your prior deposition testimony, about whether you were an expert in toxicology. Do you remember being asked about those questions?**



A. Yes.
**Q. Have you reviewed information related to toxicology for purposes of your opinions that you're providing here?**
A. Yes.
**Q. What is your expertise that you have related to your opinions in this litigation that fall under the area of toxicology, if you understand that question?**
A. So I think so. I feel that I am well-versed in the toxicology aspects of IIH and exogenous substances.
**Q. And when you say you feel you're well-versed in the toxicology aspects of IIH and exogenous substances, does that include any questions related to levonorgestrel?**
A. Correct.
**Q. With respect to the database that you have been asked about that Emory keeps, would it be appropriate to calculate an incidence rate of IIH in Mirena users using any of the data that you have?**
A. No.
**Q. Why not?**
A. Mostly because it's not prospectively collected in a consistent manner in which every

Page 238

patient with IIH is asked whether they are using Mirena or not in real time. Secondly, as often happens with referral institutions like my own, there's going to be referral bias, and it would be impossible to -- to sort things out.

**Q. Switching topics again to the questions that you were asked about why you did not systemically ask about or consider the question of IUDs and IIH before 2014. Do you recall those questions?**

A. Yes.

**Q. So why was it that you did not consider IUDs and IIH before 2014?**

A. Because in my experience as a neuro-ophthalmologist, this was not something in any way discussed or thought of as an issue, and it -- when you think about it in just terms of basic biology, the delivery system is intrauterine, and we have experience with far larger doses and serum levels with the OCPs that have included LNG and the implants that have included LNG.

**Q. Are you aware of any literature published, whether a letter to the editor or a case report or any of the literature -- well, withdrawn.**

**Prior to 2014, was there any discussion in the neuro-ophthalmology community that you were part**

Page 239

**of about LNG IUDs and IIH?**

A. No.

**Q. Was there any consensus in the medical community that you're a part of before 2014 that there was any connection between LNG IUDs and IIH?**

A. No.

**Q. Is there any consensus today?**

A. No.

**Q. You were asked questions about the Valenzuela publication and the calculations. Do you recall being asked those questions and asked to supplement your report?**

A. Yes.

**Q. Do you include in your report your interpretations and I guess opinions about the Valenzuela publication?**

A. I do.

**Q. And are you relying on -- well, let me ask you this: Do the opinions about -- your opinions about Valenzuela in 2017, do they stand on their own based on what you've written in your report regardless of any calculations that you did?**

A. Yes.

**Q. Can you find Exhibit 16 in front of you, the Fraser publication.**

Page 240

**Looks like this (indicating).**

A. Yes. Got it.

**Q. In the Fraser publication, you were asked on Page 2 about a statement regarding the likely role of sex hormones in the pathogenesis of IIH that was highlighted by clear predilection of IIH for postpubertal or premenopausal women. What sex hormones is that referring to?**

A. Likely estrogens the way it's described. But the three sex hormones would be estr -- estrogen, progesterone and testosterone.

**Q. The next sentence discusses how female adulthood is characterized by high levels of estrogen and low levels of testosterone, and that women taking exogenous estrogens such as oral contraceptives and women who have high estrogen levels due to pregnancy seem not to be at a higher risk for the development of IIH.**

**The studies that show that women taking exogenous estrogens are not at a higher risk for the development of IIH, do those studies also include women who -- who have higher levels of progesterone or progestins?**

A. Yes, these are a combination oral contraceptive agents.

Page 241

**Q. And the women who have high estrogen levels due to pregnancy, do you know how pregnancy impacts their progesterone levels?**

A. They have very high -- pregnancy is a high progesterone state.

**Q. Is there any reliable evidence that there's a higher risk of IIH in women who are pregnant?**

A. No. The evidence suggests there's not.

**Q. With respect to the statement that evidence has not shown an increased risk of IIH in women taking exogenous estrogens, does that evidence rule out any role for endogenous or naturally occurring estrogens in the development of IIH?**

A. It doesn't rule it out, but the fact that pregnancy also doesn't have an increased risk of IIH would suggest that it's not so simple.

**Q. When -- when -- are you aware of discussions within the neuro-ophthalmology community about the role of sex hormones in the development of IIH?**

A. It comes up all the time. You know, it seems like it should be so easy. What makes obese women in their childbearing ages different from everybody else? And so of course people head toward the -- the sex hormone issue. But if it were

Page 242

clear-cut, we would have figured this out a long time ago.
**Q. The discussions that you're aware of in your medical community, are those focused mainly on a potential role of estrogen or a potential role of progestins or progesterone?**
A. Usually it's focused on estrogens, and it's usually focused on the mechanistic side of poor outflow of the spinal fluid rather than increased production of the spinal fluid.
**Q. The Fraser article that we're looking at, what was your central finding in that study?**
A. So the central finding was we looked to see what the clinical pattern was among men with IIH, and they have a clinical pattern of low testosterone levels.
**Q. Can you find Exhibit 20, please. The Bruce article.**
A. Have it.
**Q. If you can turn to the second page where you were asked about the medications that you considered possibly contributing to IIH that you looked at in this study. Do you recall those questions?**
A. Yes.

Page 243

**Q. On that list is something called depot, D-E-P-O-T, progestins. You see that?**
A. Yes.
**Q. What is that?**
A. That is an injection for contraception.
**Q. Is that a levonorgestrel contraception?**
A. It is not.
**Q. Did you include levonorgestrel in this study as a medication considered possibly contributing to IIH?**
A. No.
MS. COOK: No further questions.
MS. SNAPKA: Only because I was rushing.
FURTHER EXAMINATION
BY MS. SNAPKA:
**Q. Which publications do you believe most strongly support your opinion regarding no causation?**
MS. COOK: Object to the form. Object to the scope.
THE WITNESS: I'd have to pick the whole body of the knowledge. I can't pick any one thing out. But it -- the biggest support frankly comes from the articles that initially purported that there was an

Page 244

association because one was completely withdrawn as regards to their first association, their claim of association, Etminan. And then the other one has serious flaws that when one compensates for those flaws, we come out without an association as well.
**Q. (By Ms. Snapka) And you recall the questions that counsel just asked regarding Valenzuela and I had asked you about the calculations that you did --**
A. Yes.
**Q. -- on the -- and the odds ratio.**
**And you were testifying now as an epidemiological expert as you testified earlier; correct?**
A. Regarding this issue, yes.
**Q. Right. And so the odds ratio that you calculated support your opinion regarding Valenzuela; correct?**
A. Correct.
**Q. And so the only way that we would be able to know how you arrived at that is to see those calculations that led you to the odds ratio; correct?**
A. Partly, but there's so much more that is

Page 245

wrong and not been included that can't be included numerically because I don't know the obesity issues and the preferential prescribing of Mirena for patients who are obese. And I don't know how many patients got their IUDs outside of the Utah system, and I don't know how many people got their IUDs two years before the time period and in the Utah, and I don't know how many people were having IUDs in place in Denmark for the -- anywhere up to five years that were not -- or four plus -- four plus one or four years that were missed in the Denmark study that you -- you can get as numerical as you want. The only thing you can actually calculate are the -- the -- the contribution that comes just from one of the flaws, which was to not look at what the baseline usage of Mirena is in Denmark and in Utah.
So even if we do those calculations, they're not even taking into context any of these other issues that I just brought up. So it's fine, but it's -- it's even worse than that. I'm happy to give you the calculations, but it isn't what this whole thing stands on. It's much worse than that.
**Q. No, I understand. The fact is that you did the work to help support your opinion in part and --**
A. Mostly out of curiosity because I had this

data regarding usage in Denmark and in Utah, and so I thought it would be interesting to see what it comes out to.

**Q. Also, you were talking about the consensus of opinion, and I had showed you earlier what we refer to as Source File 12, and I know that that -- it's the one that was really hard to read --**

A. Yes.

**Q. -- and I read it to you, and we didn't know what kind of a doctor it was and that is all that we were provided.**

MS. SNAPKA: I would, for the record, request a complete -- the complete Source File 12 to the extent that it includes everything in that report.

MS. COOK: I mean, you can send us a discovery request, but discovery closed long ago so I'm not going to discuss it anymore today. I'd just like to wrap up.

MS. SNAPKA: That's all the questions I have at this time, Doctor. Thank you very much.

MS. COOK: Thanks.

THE WITNESS: You-all travel safely and quickly.



VIDEOGRAPHER: Going off the record 5:00 p.m.

(Deposition concluded at 5:00 p.m.)



DISCLOSURE

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia which states: "Each court reporter shall tender a disclosure form at the time of the taking of the deposition stating the arrangements made for the reporting services of the certified court reporter, by the certified court reporter, the court reporter's employer or the referral source for the deposition, with any party to the litigation, counsel to the parties, or other entity. Such form shall be attached to the deposition transcript," I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a representative of Discovery Litigation Services, LLC. Discovery Litigation Services, LLC was contacted to provide court reporting services for the deposition. Discovery Litigation Services, LLC will not be taking this deposition under any contract that is prohibited by O.C.G.A. 9-11-28(c).

Discovery Litigation Services, LLC has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.

Discovery Litigation Services, LLC will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

Blanche J. Dugas
CCR No. B-2290



STATE OF GEORGIA:
COUNTY OF FULTON:

I hereby certify that the foregoing transcript was reported, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages represent a true, complete, and correct transcript of the evidence given upon said hearing, and I further certify that I am not of kin or counsel to the parties in the case; am not in the employ of counsel for any of said parties; nor am I in any way interested in the result of said case.

BLANCHE J. DUGAS, CCR-B-2290

Page 250

CAPTION

The Deposition of NANCY J. NEWMAN, M.D., taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the Deponent will read and sign the transcript of said deposition.

Page 251

CERTIFICATE

STATE OF GEORGIA
COUNTY OF FULTON

Before me, this day, personally appeared, NANCY J. NEWMAN, M.D., who, being duly sworn, states that the foregoing transcript of her deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

________________________
NANCY J. NEWMAN, M.D.

SUBSCRIBED and SWORN to before me this ______day of_______________, 20___ in the jurisdiction aforesaid.

____________________ ______________________
My Commission Expires Notary Public

*If no changes need to be made on the following two pages, place a check here ____, and return only this signed page.*

Page 252

DEPOSITION ERRATA SHEET

Our Assignment No. 39392
Case Caption: In Re: Mirena IUS
Levonorgestrel-Related Products
Liability Litigation (No. II)

Witness: NANCY J. NEWMAN, M.D. - 02/11/2018

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and The same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of
____________, 20___.

__________________________________
NANCY J. NEWMAN, M.D.

Page 253

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________

SIGNATURE:_______________________DATE:___________
NANCY J. NEWMAN, M.D.