# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA

KATELYN WEILBRENNER, A MINOR, )
AND DIANN COURTOY, INDIVIDUALLY )
AND AS NATURAL MOTHER AND NEXT )
FRIEND OF KATELYN WEILBRENNER, )
)
Plaintiffs, )
)
-vs- )CASE NO.: 7:08-CV-23
)
)
TEVA PHARMACEUTICALS, USA., INC.,)
)
Defendant. )

---

DEPOSITION OF NANCY J. NEWMAN, M.D.

March 10, 2009

1365 Clifton Springs Road

Atlanta, Georgia

Reported by:

Sharon A. Gabrielli, RPR

JOB NO. 21584

EXHIBIT
17
Newman 2/8/18

NANCY J. NEWMAN, M.D.

March 10, 2009
9:10 a.m.

Deposition of NANCY J. NEWMAN, M.D., held at Emory Clinic, 1365 Clifton Springs Road, Atlanta, Georgia pursuant to agreement, before Sharon A. Gabrielli, a Registered Professional Reporter in the State of Georgia.

--oOo--

A P P E A R A N C E S

Appearing on behalf of the Plaintiffs:

WILLIAM G. GAINER, ESQUIRE
A. LEROY TOLIVER, ESQUIRE
Toliver & Gainer, LLP
942 Green Street, Suite A
Conyers, Georgia 30012
770-929-3100
gainer@toliverandgainer.com
altoliver@aol.com

Appearing on behalf of the Defendant:

JONATHAN I. PRICE
Goodwin Proctor, LLP
620 Eighth Avenue
New York, NY 10018
212-813-8800
jprice@goodwinprocter.com

--oOo--

NANCY J. NEWMAN, M.D.

INDEX

EXAMINATION


| Witness Name | Page |
|---|---|
| NANCY J. NEWMAN, M.D. | |
| By Mr. Price | 6 |
| By Mr. Gainer | 148 |
| By Mr. Price | 149 |


EXHIBIT


| Exhibit | Description | Page |
|---|---|---|
| Exhibit 1 | Amended Notice of Deposition and Subpoena Duces Tecum to Nancy J. Newman, M.D. | 8 |
| Exhibit 2A | Black Binder entitled "Katelyn Weilbrenner" plus Bay Medical Center Records | 151 |
| Exhibit 2B | Black Binder entitled "Weilbrenner Depositions" | 151 |
| Exhibit 2C | Plaintiff's Disclosures | 151 |
| Exhibit 3 | Collection of documents consisting of correspondence between Mr. Gainer and Dr. Newman | 15 |
| Exhibit 4 | Two-pages of handwritten notes prepared by Dr. Newman entitled "Weilbrenner (Gainer)" | 16 |
| Exhibit 5 | Handwritten notes prepared by Dr. Newman entitled "Weilbrenner (Gainer) Billing" | 17 |
| Exhibit 6 | Medication-Induced Intracranial Hypertension in Dermatology | 17 |

NANCY J. NEWMAN, M.D.

EXHIBITS (CONTINUED)

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 7 | Five-pages of abstracts of articles relating to pseudotumor cerebri and intracranial hypertension | 17 |
| Exhibit 8 | Curriculum Vitae of Nancy J. Newman, M.D. | 17 |
| Exhibit 9 | Report of Nancy J. Newman, M.D. | 55 |
| Exhibit 10 | Profiles of Obesity, Weight Gain, and Quality of Life in Idiopathic Intracranial Hypertension (Pseudotumor Cerebri) | 82 |
| Exhibit 11 | Pseudotumor Cerebri Secondary To Minocycline Intake | 101 |
| Exhibit 12 | Fulminant Idiopathic Intracranial Hypertension | 113 |
| Exhibit 13 | Anemia and Papilledema | 115 |
| Exhibit 14 | Audible Pulsatile Tinnitus in Idiopathic Intracranial Hypertension | 116 |
| Exhibit 15 | Excerpt of article entitled "Papilledema" | 117 |

(The original Exhibits 2A, 2B, 2C, and Exhibit 3 were returned to Nancy J. Newman, M.D., and copies are attached hereto.)

--oOo--

NANCY J. NEWMAN, M.D.

having been first duly sworn, was deposed and testified as follows:

EXAMINATION

BY MR. PRICE:

Q Good morning, Dr. Newman.

A Good morning.

Q I'm Jonathan Price. I represent Teva Pharmaceutical, USA, which is the defendant in this action.

Can you -- well, before we start, I know you've been deposed before, so I'm going to assume that you basically know what's going to happen here today. And I won't go through all that, but just very, very briefly, I want us to be on the same wavelength in terms of the questions that I'm asking. So if you don't understand a question or if I phrase it clumsily or awkwardly or in any other way, in a way that it's not clear to you or you don't understand, please tell me and I'll try to rephrase it or restate the question in a way that you do understand it. Can we agree on that?

A Yes, sir.

Q All right. And if you want to take a break

at any time for any reason, just tell us. We'll stop. But the only thing I ask is that you not do that and not confer with Mr. Gainer and Mr. Toliver while there's a question pending --

A Yes, sir.

Q -- okay?

Can you please state your name for the record.

A Sure. Nancy J. Newman.

MR. GAINER: Before we go further, could we just stipulate we'll use the same as we did for Dr. Chaum; that is, all objections except as to form of the question and responsiveness of the answer will be reserved until the time of trial or first use of the deposition and stipulate that Dr. Newman can appear before any notary to read and sign the depo?

MR. PRICE: Right.

MR. GAINER: Okay.

Q (BY MR. PRICE) We've got the preliminaries out of the way.

And your place and date of birth?

A Glen Cove, New York, Long Island, June 24th,

1956.

Q And your current address?

A 18 Lullwater Estate Road, Atlanta, Georgia, 30307.

Q And what is your current occupation?

A I am a neuro-ophthalmologist.

Q Where are you employed?

A I'm a professor at Emory University.

Q Is that where we are today?

A Yes, sir.

Q The Emory Eye Center, I guess it's called?

A Yes, sir.

Q You are appearing here today pursuant to a notice and subpoena; is that correct?

A Yes, sir.

MR. PRICE: Okay. I would like to mark this as Newman Exhibit 1.

(WHEREUPON, Newman Exhibit 1 was marked for identification.)

Q (BY MR. PRICE) Dr. Newman, have you seen this before?

A Yes, sir.

Q Okay. This is the Notice of Deposition and the subpoena. I'd like very quickly to run through the

items that are listed on the subpoena duces tecum part as far as documents you were supposed to bring with you today or have available to you today. Some of these are repetitive or duplicative, but we'll go over them anyway.

Number 1 is, "All correspondence, notes, test results, experiments, demonstrations, photographs, movies, or any other items gathered, tested, or created in the course of your consideration of this case." Do you have those with you today?

A Yes, in chronological order, all the emails and transmittal letters and anything --

Q Okay.

A -- that I've had.

Q This is -- this is it?

A Those are -- those are all the communications with Mr. Gainer.

Q Okay. We'll leave this here for a second.

"All reports, whether preliminary or final, created or authored by you or anyone acting under your direction in this case, including reports created, whether delivered to plaintiff's counsel or not."

A No reports.

MR. GAINER: Other than the Rule 26

report, which we've already provided --

MR. PRICE: Right.

MR. GAINER: -- to counsel.

THE WITNESS: And also, probably in that first -- I'm not sure where this fits in, so I want to make sure for number 1, I -- when I read records, I make a little chronology in my own little chicken scratch that's no substantive stuff, but it's just so I know the dates. And I made a copy for you.

MR. PRICE: Okay.

THE WITNESS: So there's a front and back page of that.

Q (BY MR. PRICE) "Copies of all items provided to you by Plaintiffs' counsel in this case that were reviewed by you to provide background or information in order for you to reach and prepare opinions to testify in this case."

A Right. So that would be -- yeah, so that would be all of this (indicating).

Q Okay.

A So it includes the medical records, the deposition testimonies, the disclosure of expert witnesses, and one last deposition testimony.

Q Okay. Make a stack, and we'll mark all those, I guess.

"Copies of all items which may be used by you as demonstrations, exhibits, or aids in the course of your testimony at the trial."

A None of those.

MR. GAINER: Yeah. And I'm going to object to that request, as I have in previous depositions, in regards to their being requested for attorney work product.

Q (BY MR. PRICE) Number 5 is, "All books, treatises, articles authored or co-authored by you." I know that's a voluminous set.

A So I made a new copy of my CV. I thought that would be helpful. This is updated January '09.

Q Okay. Then we'll talk about how, if at all, this differs or the ways that it differs from the one we already had.

A Not much.

Q "All books, treatises, articles, publications, or materials that you consulted or utilized in consideration of this case which affected your opinion in the case."

A So, for that, I made a copy of a review

article, recent review article on medication-induced intracranial hypertension. And here are just a couple of abstracts of articles that were not necessarily referenced in that review article, so that --

Q Okay. We'll talk about that in more detail, too.

Number 7 we've got. Number 8, "An itemized list of time charges and expenses for services or opinions rendered."

A There you go.

Q Okay. Number 9 we've got, I think.

A Um-hmm.

Q Number 10, "All documents or other file materials you intend to show the jury in this case," other than what we've got here.

MR. GAINER: Same objection as I had to number 5.

MR. PRICE: Right.

Q (BY MR. PRICE) "Any and all electronic data and printed data obtained by anyone upon which you have relied in forming your opinions in this case."

A You have everything.

Q 12, I guess, is --

A You have everything.

Q -- everything.

"Raw data and results of physical as well as mental testing you performed, or anyone at your direction performed on or concerning Katelyn Weilbrenner."

A I have never met her.

Q Okay. "Raw data and results of physical and mental testing concerning Katelyn Weilbrenner, although not performed by you or at your direction, but which was utilized by you in forming your opinions concerning Katelyn Weilbrenner."

A Medical records.

Q Medical records. And nothing else?

A Nothing else.

Q "All notes of interview and information obtained from Katelyn Weilbrenner and from Ava Diane Courtroy."

A Just the depositions.

Q Number 16 also is the medical records?

A Yes, sir.

Q And number 17, "All school records in your possession concerning Katelyn Weilbrenner."

A I don't think I have any.

MR. PRICE: Maybe we should mark these

things before we go further. Let's make -- Exhibit 2 will be a big exhibit, which will be the case-specific materials that Dr. Newman referred to; those being a binder of medical records relating to Katelyn Weilbrenner, a binder of all the depositions taken in the case, including a rough draft of Dr. Chaum's deposition, which is separate, not included in the binder; another group of medical records, which is also separate from the medical records binder; and three documents which are plaintiffs' disclosure of expert witnesses, plaintiffs' second disclosure of expert witnesses, and plaintiffs' third disclosure of expert witnesses in this case. All that is Exhibit 2.

(WHEREUPON, Newman Exhibit 2 was marked for identification.)

THE WITNESS: Does that mean you're going to take all that with you?

Q (BY MR. PRICE) Well, we're going to get copies made. We'll figure out how to do that.

MR. GAINER: Yes, if we could stipulate

that Dr. Newman could retain those that she's brought with her, and can our court reporter make these copies?

(Whereupon, there was a discussion off the record.)

MR. GAINER: We've stipulated that Defendant's Exhibit number 2, the originals of those brought with Dr. Newman today will remain in her possession; however, we will make a copy of all of Plaintiffs' Exhibit number 2 and provide it to the court reporter.

(WHEREUPON, Newman Exhibit 3 was marked for identification.)

Q (BY MR. PRICE) Exhibit number 3 is a group of documents, which include emails, correspondence between Dr. Newman and Mr. Gainer, a draft of Dr. Newman's expert report, a signed copy of the expert report, and the Notice of Deposition and subpoena. And these are items which Dr. Newman identified as communications between her and Mr. Gainer; is that correct?

A That is correct. Are you going to copy those, too, and send it? I mean, ultimately, I'd just like to have everything back, in case there's a court

appearance.

MR. PRICE: Right, that's fine.

MR. GAINER: Okay. Do you want us to make copies of all the exhibits?

MR. PRICE: I -- that sounds like the easiest way to deal with this.

MR. GAINER: Okay. All right.

(WHEREUPON, Newman Exhibit 4 was marked for identification.)

Q (BY MR. PRICE) Exhibit 4 -- maybe you can clarify this, Dr. Newman, are these -- are these two separate items, or are they --

A They're the -- this is the back page of this (indicating).

Q I see. Exhibit 4 is a two-page set of handwritten notes prepared by Dr. Newman relating to articles that you reviewed; is that --

A No, this is the chronology of the medical records.

Q Okay.

A And that is your copy.

Q This one --

A Or the court reporter's copy.

Q All right. We'll talk about that, it may be

easier for everything to be held together.

Let's make Exhibit 5 the handwritten list of time and expenses incurred by Dr. Newman.

(WHEREUPON, Newman Exhibit 5 and Newman Exhibit 6 were marked for identification.)

Q (BY MR. PRICE) Exhibit 6 is a review article by Deborah Friedman titled "Medication-Induced Intracranial Hypertension in Dermatology."

(WHEREUPON, Newman Exhibit 7 was marked for identification.)

Q (BY MR. PRICE) Exhibit 7 is five pages of abstracts of articles relating to pseudotumor cerebri and intracranial hypertension; is that correct?

A Correct. And minocycline.

Q And minocycline.

(WHEREUPON, Newman Exhibit 8 was marked for identification.)

Q (BY MR. PRICE) And Exhibit 8 is a version of Dr. Newman's curriculum vitae dated January '09.

Dr. Newman, apart from the work you did in connection with preparing your expert report in this case, what, if anything, did you do to prepare for today's deposition?

A I read everything over several days ago, and

I met with Mr. Gainer and Mr. Toliver this morning for about half an hour.

Q Okay. And what did you and Mr. Toliver and Mr. Gainer discuss?

A Not very much, actually. Just about -- I don't even remember what we -- there wasn't much substantive -- we talked about the fact that they bought my book, which I thought was pretty cool, and maybe Dr. Chaum's deposition, just to make sure that I had had a chance to read it. And that's that.

Q And did you read Dr. Chaum's deposition?

A Yes, sir.

Q Apart from the meeting you've just described, did you meet with or talk to anyone else in preparation for the deposition?

A No, sir.

Q Have you spoken to Dr. Chaum?

A No, sir.

Q Do you know Dr. Chaum?

A No, sir.

Q Have you ever spoken with him?

A No, sir.

Q Read any articles that he's reviewed or report -- or I'm sorry. Strike that.

Have you read any articles that he's identified as an author of?

A Not specifically, to my knowledge, but there may have been articles in the past that I wouldn't recognize that he had been an author of that I've read.

Q Independent of having reviewed the expert disclosure in this case, do you have any familiarity with Dr. Chaum's qualifications or expertise?

A Not independent of seeing his CV in the disclosure, no, sir. Although, it's interesting, I think we were at Mt. Sinai near the exact same time, but I don't recall him.

Q Do you know Dr. Spector?

A Yes, sir.

Q You knew Dr. Spector prior to this case?

A Yes, sir.

Q Have you discussed this case with Dr. Spector?

A No, sir.

Q Beyond, then, what we have in front of us today and what we've already identified, did you review any other documents in preparation for this deposition?

A No, sir.

Q Now, we had previously been provided with a

copy of your CV dated or updated 8/08, and this morning you brought with you a copy updated 1/09. Can you point me to or describe quickly what differences there may be between the one we already had and -- this is Exhibit 8, I believe?

A Yes. Sure. Probably the easiest would be to -- you can help me -- it would be to turn to page maybe 31 or 32 in that one.

Q Okay. The book chapters, is that --

A So the articles would end -- here they end on 33. There they end on 33 -- no, 30 --

Q The most recent article on this one is Abruzzo?

A What's the number?

Q 223.

A 223, okay. So -- that's now 217, we must have moved it up. Do you have one that's Calvetti, O.?

Q "Management of isolated optic neuritis in France" "Prise en charge des nevrites optiques" --

THE COURT REPORTER: I'm sorry?

THE WITNESS: It's in French. You don't want to know.

Yes, okay, so yes, that one I have as 220. You have it as which?

NANCY J. NEWMAN, M.D.

Q (BY MR. PRICE) 218.
A Okay. So there probably were a couple added there. Do you have 221 -- do you have "Newman, N.J., Perioperative Vision Loss?"
Q Yes.
A Do you have Jung?
Q Yes.
A Do you have Atkins?
Q Yes.
A Mayorov? M-A-Y-O-R-O-V.
Q No.
A Okay. So there are -- one, two, three, four, five, six -- seven additional articles in the six months.
Q Okay.
A Five months. Not bad. And do any of them have the word "intracranial hypertension" in them? Let me -- let me look to make sure.
Yes, there's one, which is called "A patient with headache and increased intracranial pressure and the review of neurologic diseases." And I am completely blocking on what that was about.
Q Was that a case report?
A It's a case report as a teaching case, one of

those educational articles, and I certainly can tell you it had nothing to do with drug-induced intracranial hypertension. I just can't remember --

Q Are you the principal author of that or --

A No, I'm one of the sandwich authors. I'm in the middle there. I can't remember.

Q Okay.

A Sorry. But I know it has nothing to do with drug-induced idiopathic intracranial hypertension. All the others have nothing.

And so there also would have been some additions to the -- if you look on page 19 and 20, those would -- up on the top, you'll see 19 and 20. Those are -- or 21, those are presentations.

Q Right.

A And so I'm up to 362, and what's that?

Q 358.

A So, again, there wouldn't have been anything on this topic, but it's just more presentations; otherwise, it's the same. Probably on another committee or two.

Q So you are still the Leo Delle Jolley professor of ophthalmology here?

A Yes, I'm the Jolley professor of

ophthalmology.

Q And what does that entail in terms of your responsibilities?

A That particularly is just a named chair, which helps support my salary since I don't generate a whole lot of income.

Q Then let's talk more generally about what you do. Do you spend a portion of your time in clinical practice or seeing patients?

A Yes, sir. So to make it simple for you, let me just outline, any given week might be different, because about every four to six weeks I am either at a meeting where I'm presenting or I'm a visiting professor somewhere, so things change.

But if I'm here, my routine we can would be about 50 percent patient care, during which I do a lot of teaching, because we always have ophthalmology, neurology, neurosurgery residents rotate with us, and at least two or three fellows in neuro-ophthalmology who are training.

So we all see patients together, so we're doing clinical care, but I'm also teaching at that time.

Additionally, I have other teaching

responsibilities, which involve giving lectures to medical students, to residents in various departments. I have administrative responsibilities as the director of the neuro-ophthalmology section here. And then I do a lot of research, research in the broad sense of the word, meaning anything from clinical trials, clinical research, to chart reviews, to writing articles and writing books.

Q Okay. Can you break down roughly the percentage of your time spent doing research versus other things?

A Again, most of that is done on evenings and weekends, and so it's really hard to say that, so if we said 50 percent clinical care, I would say a good -- depending on how you define research, a good 30 percent of my time would be doing some form of academic productivity, and then the other 20 percent would be administration and more formal teaching.

Q Is some of your teaching in the classroom as opposed to clinical practice?

A Again, most of my teaching would be one-on-one clinical practice training for residents and fellows, but I do give formal lectures. It's not so much a classroom, but I give formal lectures on the

basic curriculum of neuro-ophthalmology to ophthalmology residents, neurology residents, neurosurgery residents, first and second-year Emory medical students. And then when I travel I'm often doing CME-type courses for practitioners, as well as residents.

Q When I came in this morning, they sent me to the third floor to what appeared to be a clinic, a walk-in clinic, or I guess people have appointments there. Do you see patients in that clinic?

A Yes, sir. That was my office, which is in the clinical unit. It's a lot easier to find than this room, so that's why.

Q Okay. And just quickly to confirm some of these things, you have a board certification in neurology; is that correct?

A Yes, sir.

Q Do you have also have a board certification in ophthalmology?

A No, sir.

Q Can you tell me what -- how neuro-ophthalmology is different from neurology on the one hand and ophthalmology on the other hand.

A Yes, sir. Neuro-ophthalmology is a

subspecialty of both neurology and ophthalmology. I often describe it as diagnosing brain disease using the eye examination. So you need the skills of the ophthalmologist as far as the clinical examination of the eye and the optic nerve, and you need the skills of the neurologist as regards thinking about where the lesion would be and where the problem is and how it happens, the mechanisms of it, because it's typically the -- the brain aspect of ophthalmology.

Q You did your residency in neurology; is that correct?

A Yes, sir.

Q You did not do a residency in ophthalmology?

A That is correct. I am not a surgeon.

Q But then you were a fellow in neuro-ophthalmology?

A Yes, sir. You can become a neuro-ophthalmologist either from the neurology side or the ophthalmology side. Those who come from the ophthalmology side tend to retain some of the surgical procedures that might be related to neuro-ophthalmology, such as surgery in the -- in the orbit, the eye socket, that kind of thing.

Q Is there a subspecialty in pediatric

neuro-ophthalmology?

A There are a handful of folks who are neuro-ophthalmologists who have an interest in pediatric neuro-ophthalmology. Many of them have done both fellowships in neuro-ophthalmology and pediatric ophthalmology, although I know of at least one who is a neurologist, so he did not do a pediatric ophthalmology fellowship. In order to do that, you need to be a surgeon.

Q Is there a difference in the kind of cases that a pediatric neuro-ophthalmologist would see versus a general neuro-ophthalmologist?

A Again, there are so few pediatric neuro-ophthalmologists that that's a hard distinction. They typically, if there -- if they can, will only see pediatric neuro-ophthalmology cases. The problem is that there aren't that many of them, so I don't know any of them who don't also see adults. The ophthalmology-trained ones see adults with strabismus; for example, their eyes are crossed or out, and they do surgery on them to straighten them.

Most neuro-ophthalmologists include pediatrics in their specialty, because once you get so subspecialized, then it's across the board as far as

ages. So, for example, about 25 percent of my practice could be classified as pediatric; in other words, depending on how you define it, under the age of 18 or up to puberty.

Q Are there particular diseases or conditions that you will see in pediatric patients that you don't see in older patients?

A Certainly.

Q Such as?

A Depending on the age you're talking about. So in the newborn, we're talking more about developmental things. In -- as you get a little older, some of the same disease categories would apply, such as neoplasm or inflammation, but the actual neoplasms or inflammations will also differ depending on the age of the patient.

Q We're actually fellow alumni.

A Which one?

Q Princeton.

A Princeton?

Q Yeah.

A Cool. What year?

Q '75. So we overlap, but --

A Oh, cool. You were in Barbara Binswanger's

class.

Q I was in Barbara Binswanger's class.

A She's a good friend. That's cool.

Were you in a club? I'm sorry, I shouldn't --

Q We'll do that off the record.

A Yeah, okay. Later.

Q I guess you took kind of a little bit of an unusual route to medicine through art or --

A Well, I got to Princeton from a big public high school on Long Island, where if you had half a brain, you did math and science because those were the only advanced classes. And there were almost 900 kids in my graduating class in high school. And so I got to Princeton and saw that there was all this other stuff out there that I had no idea existed.

So I did all my pre-med requirements first. I knew I was going into medicine, but then I majored in art history so that I could do literature and sociology and anthropology and all sorts of history fun stuff.

And then I won a Marshall Scholarship, so that allowed me -- from the British government -- to study whatever I wanted for two years at any British university. And so I did more art history and deferred

medical school. I was already accepted.

Q So it was not really a change of course; it was a detour?

A No, sir. No, it was a slight hiatus, a lovely hiatus; but to be honest with you, it really was delightful because I really didn't like England very much and I didn't like doing the kind of research you do in a specialty like art history, where you're all by yourself and you're alone and you're with the books. And it made me really want to be back and going to medical school and becoming a physician.

So, in a way, it had the opposite effect that they hope the Marshall Scholarship has, which is to give you an appreciation for England and have you expand your interest. It made me very glad that I had made the right choice to begin with and was very happy to be back.

See, I wouldn't have gotten anywhere near as excited if you told me you had been to Harvard.

Q I'd like to talk just very quickly about some of your involvement with pharmaceuticals. Have you ever been employed by a pharmaceutical company as a --

A It depends on how you define employed.

Q Right. And --

A I've been a consultant for several different pharmaceutical companies over the years. And I did actually -- was -- run a trial, was the study chairman of a study for Allergan, in which we looked at a topical agent as a neuroprotective agent in one of the diseases that I'm an expert on.

Q Okay. You have a number of grants listed, also, that appear to be pharmaceutical related. You were principal investigator of a controlled high-risk Avonex multiple sclerosis study; is that correct?

A Yes, sir.

Q That was after Avonex was already on the market; is that correct?

A Yes, sir.

Q And what was the purpose of that study?

A So it had already been shown to be effective in the treatment of relapsing remitting multiple sclerosis. And so what this study looked at were patients who had yet to be defined as clinically definite multiple sclerosis but who had had a clinically isolated first event of presumed demyelination. That typically can be the first event of multiple sclerosis.

And we took those patients, which included

patients with what's called optic neuritis, which is inflammation of the optic nerve. And if their brain MRI had two or more lesions, silent lesions in the brain itself, which made them in the high -- put them in the high-risk category for the subsequent development of multiple sclerosis, we randomized them to either placebo or Avonex to see if that would delay the clinical diagnosis of multiple sclerosis. And indeed, it did. And the study was stopped -- the effect was seen at 18 months, and the study was stopped at two years.

And subsequently other drugs of that -- of that kind, including Copaxone, which is made by Teva --

Q Right.

A -- have been shown to be effective; although Copaxone, the work has been presented at the Academy of Neurology but has yet to be published.

Q Did this work lead to a revision of the indications for Avonex?

A Yes.

Q So they added an indication for --

A For clinically isolated syndromes, yes, sir.

Q Other than your role in the study, did you participate in any way in the regulatory filings or --

or the regulatory proceedings relating to that revision of the indication?

A No, sir.

Q You were co-investigator in a study relating to neuroprotective or potential neuroprotective effect of Ropinirole in early Parkinson's disease?

A Yeah. So, again, a number of those studies are more revenue-generating enterprises for our neuro-ophthalmology unit. Basically, we act as the ophthalmologists for studies that are ongoing, usually in neurology or medicine, where there's been concern that there may be an occular side effect of the drug.

So as part of their study, they need someone to be doing the ophthalmologic examination before and during the study on the study subjects to make sure that those effects are documented.

Q Okay. And you distinguish that from a role where you were actually involved in the analysis of underlying data or the publication of --

A Yes, sir.

Q -- an article?

A Yes, sir. Mostly we're a technician in -- in those situations, and I know nothing about those drugs other than potentially their occular side effects.

Q How about the study of safety and efficacy of Brimonidine-Purite?

A Right. So that's the trial that I actually designed with Allergan. I am known for my work in a rare disease called Leber's, hereditary optic neuropathy, in which healthy young men will typically lose vision in one eye from an optic neuropathy, followed within weeks or months of the other eye. And it's a disease related to disorders of mitochondrial DNA, and it provides an incredibly unique substrate for testing drugs because there is not another disease in the body where you know that something is definitely going to happen and yet you've got two separate mini organs that you have the potential of treating in a window before one -- after one has gone, but before the other has.

Plus, the eyes are so accessible to intervention because you can put drops in which diffuse in and you can also stick a needle in the eye and deliver drug. So even though it's a rare disease, the drug companies absolutely love it because it has that algorithm that you can, within ten patients, know whether you have an effective treatment, either given systemically or into an eye, because if you keep the

second eye from happening, you've done it; you don't need controls because the person acts as their own internal control.

So I was approached by Allergan because they have a drug which, in animal studies and pathophysiologically, not only should be a good neuroprotective agent and these are neural cells that are having trouble in Leber's, but its mechanism is actually potentially via mitochondrial DNA and even via Complex I, which is where the mutations are for Leber's. And so it was the absolute ideal drug to consider using in this. And the idea being if it had shown efficacy, then they could use it in glaucoma or and in other more -- more frequent diseases. Unfortunately, it was a completely negative trial, but it still is -- was a very important study.

Q So this has not resulted in an approved drug product?

A No, it resulted in a couple of publications, but it did not result in approved drug indication.

Q Is the drug still under consideration, or was it basically ruled out at this point?

A Well, that drug had already been approved for the treatment of glaucoma because of its pressure

lowering effects. What they were hoping to get from this study was to show that it actually had neuroprotective effects as well, because glaucoma is also an optic neuropathy with involvement of the retinal ganglion cells.

Q Next is as a co-investigator in a safety study of Pramipexole versus Ropinirole. Is that similar to the --

A That's similar to the Ropinirole study, yes, sir.

Q And a co-investigator on a double blind, placebo-controlled, dose escalation, parallel group study of E2007 for Eisai Medical Research.

A It's the same.

Q Co-investigator, idiopathic intracranial hypertension in African-Americans. You have a journal article relating to that, do you not?

A Yes, sir.

Q Did that journal article emerge from this study?

A Right. So I've been here 20 years and I've kept a database, and we probably have the largest experience in the world in neuro-opthalmic diseases for which we have a database. And every once in a while,

depending on how good my fellow is and what they're hungry for, we mine the database.

And so if you'll look at the CV, you'll see several articles, for example, on homonymous hemianopia, because we mined our database of almost a thousand cases of homonymous hemianopia; and I think we came out with something like eight articles on it, depending on various features.

So, similarly, we have mined the database of our idiopathic intracranial hypertension experience with two other centers as well, the University of Mississippi and, I think, Wayne State in Detroit, where previous fellows of mine have migrated, and combined them and I think our database is over 700 patients.

And so we've looked at various aspects of idiopathic intracranial hypertension, so-called pseudotumor cerebri, in particular at sort of the difference -- differences one might find; so first in race, so we've looked at African-Americans versus non-African-Americans; in gender, we've looked at men versus women.

We recently mined it for a -- a abstract which hopefully will become a paper; we call it "The Old and The Restless," which are basically the older

patients, because this is usually a younger patient's disease, and the skinny patients, to see what's different about them and what are the risk factors in those patients compared to the typical IIH patient.

So that's where all that is coming from. And in particular, a very, very fine young fellow, fellow in both senses, named Dr. Beau Bruce, who is now a junior faculty with us, has made that his project. And he's been in charge of the mine, and so he's been doing all these articles.

Q Okay. Before we go on, do you prefer the term "idiopathic intracranial hypertension" versus "pseudotumor cerebri" or --

A Well, a couple things. The purists would use idiopathic intracranial hypertension, or IIH; neither of which are very easy to say, they don't flow off the tongue, but only in those settings where it's truly idiopathic, where we don't know the cause; whereas, you would use the term "pseudotumor cerebri" for a syndrome of raised intracranial pressure that has normal imaging, no venous sinus thrombosis and no structural abnormality like a brain tumor as the cause of raised intracranial pressure.

In general, because pseudotumor cerebri or

PTC come off the lips a lot easier than IIH or idiopathic intracranial hypertension, some people use them interchangeably. So it depends on what you prefer. In this database, it was IIH.

Although, it's interesting, in "The Old and Restless" abstract, within this database there were, among the skinny patients, a number of cases where there were presumed medicine-related cases. So, for the purists, those probably should not have been incorporated in the group called IIH.

Q Because it's not idiopathic?

A Because it's not idiopathic.

Q There's actually one more listing here, 2007-2008, co-investigator, idiopathic intracranial hypertension with no specific sub-subject identified. Do you know what that was?

A Oh, again, that's probably -- we got a small grant from the department to mine the database.

Q Okay. And so the same mining has resulted in several presentations; is that correct?

A Yes, sir.

Q One on African-Americans, one on IIH, not just a women's disease?

A Yes, sir.

NANCY J. NEWMAN, M.D.

Q Although it's more common in women; is that correct?

A Yes, sir.

Q For -- 9 to 1 or so?

A Approximately, yes, sir.

Q I'm not going to go through the articles at this time in detail, although we will look at some later on. I do have to ask you, though, because, I mean, you have some great titles, and what do sunglasses tell us about --

A Oh, that's a good one. That's a -- you want to read the title so they know the in-joke? But that's a -- the landmark article.

Q "The 'sunglasses sign' predicts" -- and there are a number of them, but one of them is "'Sunglasses sign' predicts nonorganic visual loss in neuro-ophthalmologic practice"?

A Yes. You see, if I give this -- if I tell you this information, I'm going to have to kill you because this is neat stuff.

It comes, again, from 20 years of experience. Unfortunately, I would say about 10 percent of my practice, if not more, has to do with people who are either feigning, consciously feigning or unconsciously

exhibiting nonorganic signs of neuro-ophthalmic interest. So they're either pretending or hysterically having vision loss.

And it has been my experience with these people that they wear sunglasses even inside the examination room. And we looked at that prospectively as a sign, when someone walks in the room, whether you can predict that they're going to have nonorganic visual complaints or not.

And it was highly predictive because most of the time people would wear sunglasses for organic issues that you could immediately see the problem because they've got inflammation in their eye. So if they don't have inflammation in their eye and they're wearing sunglasses, there's a good chance that they are nonorganic or what we call functional patients.

This is important because when you go to examine these patients, you need to have a suspicion of that first so that you know the kind of testing you want to do, because you can prove normal vision in most of these patients.

And what's interesting is we actually asked them why they were wearing their sunglasses, and some were because they -- they said that they had

photophobia, that bright lights bother them; which, of course, when you think about it, if your vision isn't working, you want all the light you can.

But my favorite is because there is a cultural understanding that that's what blind people do, like Stevie Wonder and Ray Charles; and, of course, they wore sunglasses so people wouldn't see their eyes moving inappropriately or they weren't really looking at them and that people found that very disconcerting.

I even had one young man come in not only wearing sunglasses but moving his head like Stevie Wonder. So it's an interesting cultural thing, they say because blind people wear sunglasses.

Q That's interesting.

A So now when you go to fake, you know not to put sunglasses on.

Q There are also a lot of book chapters and books, I just wanted to note. You're currently one of the editors of Walsh and Hoyt's Clinical Neuro-Ophthalmology; is that correct?

A Yes, sir, both the fifth edition and the sixth edition.

Q Do you have specific responsibilities or responsibilities for specific parts of the textbook or

as a general editor?

A Well, for the fifth edition, Neil Miller and I edited the whole thing, both of us doing everything. And he and I each wrote six of the chapters ourselves, which was extensive, because most of these chapters are 300 pages.

For the sixth edition, we took on two junior co-editors, and Neil and I still oversaw the whole three volumes. We each only wrote, I think, three chapters at that point and -- but each of the editors was specifically the -- the next level above the author they were specifically assigned.

And I can't remember, because I would imagine that's your next question, for the papilledema chapter, I believe my colleague Dr. Biousse was the overseer of that chapter, but Neil and I pretty much read everything. It doesn't mean we necessarily agree with everything that was written, but we tried to keep it from having any egregious statements, egregiously wrong statements.

Q I'd like to turn, then, to some of your prior testimony. Exhibit B to your expert report that we were provided with was a list of cases in which you've appeared, either as a -- either for deposition or in

court appearance as an expert witness. Are you familiar with that list?

A I hadn't recalled that we had attached it, so I had actually printed you your own --

Q Okay.

A -- which is updated January 14th. I'm not sure --

Q This is through December 11th.

A So I think there's one more.

Q Okay. Is that at the end?

A No, in the beginning, the very first.

Q The beginning. As I reviewed this list, most of the testimony involved the ischemic optic neuropathy cases?

A Yes, sir.

Q And then some of the hemianopia cases?

A I think there's just one hemianopia, maybe.

Q Just one?

A Maybe.

Q The first question I had is, did any of these cases involve vision loss allegedly attributable to a drug exposure?

A Yes. So the only one I believe would fit that category would be second page, down toward the

bottom, Brannen versus USA --

Q Right.

A -- which is the issue of amiodarone optic neuropathy versus anterior ischemic optic neuropathy.

Would you like me to expound a little on that?

Q No. I'll just ask -- in connection with your work in that case, did you have occasion to review the product labeling or full prescribing information for amiodarone?

A Yes, sir.

Q And did that labeling include a warning about the risk of optic neuropathy?

A It's in a list of multiple -- they call it optic neuritis, which really is not the appropriate term. It should have been optic neuropathy, and it is listed in the rare side effects of amiodarone.

Q Did you offer an opinion in that case that -- strike that.

Was the manufacturer of amiodarone a party to that case?

A No, sir.

Q Did you offer an opinion in that case that the labeling of amiodarone should have had a more

extensive warning regarding optic neuropathy?

A No, sir.

Q Okay. Is that the only case, then, on this list that involved a drug exposure?

A Yes, sir.

Q Are all of these cases medical malpractice cases?

A No, sir.

Q Which ones are not?

A If I may run down the list.

Okay. So Falkner versus Dependable Waste.

Q And what was the issue in that case?

A This was a woman complain -- contending that her tunnel vision is a result of a motor vehicle accident.

Q And what was your -- the substance of your testimony there?

A She wore sunglasses.

Q Okay.

A I never examined her. No, she was functional vision loss, nonorganic.

Let me see. I guess second page, Conley versus Dry would not classify as medical malpractice. It actually was a legal malpractice case where the

plaintiff attorney was being sued by the previous plaintiff that he had not put on the appropriate defense, so it's linked to medical malpractice.

Q The underlying action was a medical malpractice?

A That resulted in a legal malpractice, yes, sir.

Q And your opinion in that case was that the --

A The plaintiff attorney was right to have dropped the case.

Let's see. Last page, Caffey Versus Javers, J-A-V-E-R-S, that was not medical malpractice. That was supposedly that the plaintiff -- that the plaintiff's Leber's hereditary optic neuropathy -- no, sorry, that the -- that Leber's hereditary optic neuropathy had been precipitated by a motor vehicle accident, and the motor vehicle -- the people being sued were the owner of the cow that got in the way of the car.

Q Okay. And what was your opinion in that case?

A My opinion was that the accident did not precipitate the Leber's hereditary optic neuropathy

and, therefore, the owner of the cow was not responsible for the patient's blindness.

Q Okay. The list indicates that you testified for plaintiff in that case, though.

A Right. So the -- the person in the car -- I can't remember the specifics. It was a plaintiff case. I think that the person in the car was being sued by the passenger in the car for having run into the cow, and that person who was the driver was the passenger's mother, was suing their mother and the cow owner --

Q A colorful case.

A -- for the Leber's. Yes.

And then Lowe versus Connelly was also not a medical malpractice. That was a horrible case where a motorcyclist was struck and ultimately killed, but was alive for a while, and I gave testimony on whether he was actually suffering during that time period.

And -- ah, there's one we missed on drugs, sorry about that, that's also not a medical malpractice. That was where a Leber's hereditary optic neuropathy patient contended that while he was taking an antihistamine made by Pfizer, that that precipitated his Leber's hereditary optic neuropathy.

Q And you testified on Pfizer's behalf in that

case?

A That is correct.

Q And your opinion was that the drug could not have precipitated the Leber's?

A Correct. There was not a temporal relationship to it; and also, there's -- it's a harmless antihistamine that has nothing to do with mitochondrial vision loss.

Q Most of the cases on this list indicate deposition, a few also have parentheses, "in court."

Should I understand if it just says deposition, you only gave a deposition in the case; if it says deposition and also says court, you gave both deposition testimony and courtroom testimony.

A Yes, sir. And there is one, maybe two where it's just court. I think there's one case where -- in Minnesota, they don't do deposition before court. So it was just court.

Q Okay. And in all of the cases on this list, you were testifying as an expert, not as a treating physician; is that correct?

A That is correct. I do not keep a list of treating physician testimony.

Q Do you testify also as a treating physician?

A Unfortunately, when I have to.

Q Have there ever been any occasions when your testimony was offered as an expert witness and the court declined to admit your testimony for any reason?

A No, sir.

Q You've never been offered to testify and had a court conclude that you were not qualified to give the opinion you were offering?

A I've never had that happen, yes, sir.

Q Have you ever been the subject of a -- strike that.

Are you familiar with the term "Daubert motion"?

A Yes, sir.

Q What does that mean to you?

A Well, I'm sure I won't say it in medicalese.

MR. GAINER: I'll object to form, but you can answer as best you can.

THE WITNESS: As far as I understand it, it means that there's not enough scientific basis for the opinion to be given and it's just struck out of hand.

Q (BY MR. PRICE) To your knowledge, has --

A Was that right?

Q Close enough?
A Close enough, okay.
Q To your knowledge, has your testimony or proposed testimony ever been the subject of a Daubert motion to exclude?
A As far as I know, no, sir.
Q Or an equivalent state court motion?
A As far as I know, no, sir.
Q We identified another case, Shirley Crisp versus David Bush. Do you recall that case?
A No, sir. Was I a treating physician, perhaps?
Q Perhaps. You testified -- our information is that you testified for a defendant in 2006 relating to continuation of amiodarone following coronary bypass. Does that ring any bells?
A It may have been a treating physician testimony. I'm pretty good about keeping track of everything I do as a medical expert. But I don't -- I don't recall that case.
Q Defense attorney Richard Schiller.
A Sorry. Was it here in Atlanta? That would give a clue maybe.
Q Kentucky.

A Wow. That's strange. And there's a -- an actual deposition?

Q This says trial testimony.

A Not a chance. A court in Kentucky, I would remember, I think.

MR. PRICE: You want to take a five-minute break?

MR. GAINER: Sure.

(Whereupon, there was a brief recess.)

Q (BY MR. PRICE) Back on the record.

Just a few more follow-up questions on the -- on your history as an expert witness.

Roughly how much time, percentage-wise, would you say you spend testifying?

A Certainly less than -- oh, testifying, 1 percent, less than 1 percent.

Q Well, when I say "testify," I mean all the work associated with being an expert witness.

A Sure. So medical legal expert review, probably less than 5 percent of my time, more like 2 percent, it's always on weekends and evenings after my child goes to sleep or is off somewhere else.

Q And can you estimate what percentage is on the plaintiff side versus the defense side?

A I would say it's about 75 to 80 percent defense and about 25 to 20 percent plaintiff.

Q Okay. And as we've seen, it looks like the vast majority of your testimony is in medical malpractice cases, is that fair?

A That would be fair, yes, sir.

Q Have you ever offered an opinion in the area of epidemiology?

A Specifically, no.

Q You may have offered opinions as to causation that were based on epidemiological studies, is that your --

A That's correct.

Q -- hesitation?

A Yeah, that was my hesitation, because I am not an expert in epidemiology, but I would use epidemiological studies to help determine frequency, for example, of a disease and, as you point out, to look at the issue of causation.

MR. GAINER: I'm going to object to responsiveness just as to the word "expert," which is a determination by the trial court.

Q (BY MR. PRICE) Do you have any legal

training?

A No, sir.

Q Do you have any training in FDA regulatory matters?

A No, sir.

Q And you don't propose to offer any opinion in this case as to FDA regulatory issues?

A That is correct, sir.

Q How did you come to be an expert in this case?

A I believe -- if I may look at the correspondence.

Q Sure.

A So this would imply, from the email in Exhibit 3, the first page, that I had been called by Mr. Gainer and that we spoke on the telephone, because the first documentation I have is an email from him dated December 10th, 2008, in which he says, "Thank you for speaking with me today. I can hand deliver a copy of the records and retainer to you tomorrow."

Q And did he do that?

A I believe so, because I gave him my home address, and it was presumably couriered to my house.

Q Okay. I'd like to mark as Exhibit 9 the

document that was produced to us as your report in this case dated December 16, 2008.

A Yes, sir.

(WHEREUPON, Newman Exhibit 9 was marked for identification.)

Q (BY MR. PRICE) Is this, in fact, your expert report in this case?

A Yes, sir.

Q Did you draft this document?

A No, Mr. Gainer drafted the document. I believe in Exhibit 3, there is a draft that I made corrections on, which deal solely with the spelling of the word "ophthalmology" and an addition of a word, "the".

Q Okay. This is the part -- the page of Exhibit 3 which is titled "Report of Nancy J. Newman, M.D.", but which is unsigned and undated and has some handwritten marks on it. And those are your handwritten marks; is that correct?

A Yes, sir.

Q Do you agree with the substance of this report?

A Yes, sir.

Q The report states that you've reviewed

medical records pertaining to Katelyn Weilbrenner, including those from Colquitt Medical Center, Dr. Terrance Croyle, Dr. Robert Hawes, Dr. Robert Mirate, and Dr. Robert Spector; is that correct?

A That is correct. This was prior to reading any of the depositions.

Q And those records are all in the binder that -- the medical records binder that's part of Exhibit 2?

A Yes, sir.

Q Do you know Dr. Croyle?

A No, sir.

Q Do you know Dr. Hawes?

A No, sir.

Q Have you ever spoken to either of them?

A I -- you know, Dr. Croyle may have referred patients to me in the past, and so I can't 100 percent say to you that he didn't call me once to tell me he's sending me a patient, but I don't recall any interaction with him. And the same with -- is it Dr. Mirate or Mirate (pronunciation)?

Q I think it's Mirate.

A I don't know how it's pronounced, but I believe I have seen patients who either have seen him

or he has referred to me in the past, but I don't recall specifically talking to him.

Q And specifically, you have not discussed Katelyn Weilbrenner with Doctors Croyle, Hawes, or Mirate?

A That's correct, I have not.

Q And Dr. Spector, you testified before that you knew Dr. Spector --

A Yes, sir.

Q -- prior to this case.

A Yes, sir, it's a small community, neuro-ophthalmology.

Q Is Dr. Spector a neuro-ophthalmologist here in Atlanta?

A Yes, sir.

Q Where is his practice?

A He's in private practice up by Northside.

Q Does he have privileges here at Emory?

A No, sir.

Q Do you know where he does have privileges?

A Probably St. Joseph's, Northside, and the hospitals that are on the north end of town.

Q In your opinion, is Dr. Spector a capable neuro-ophthalmologist?

A Yes, sir.

Q Have you worked together with him on -- consulted with him together on individual cases?

A Not very often. There are occasions where someone will want a second opinion and we will refer to each other. It's rare.

We did co-author a long, long time ago a book chapter on neuro-ophthalmology, when I first moved down here. Dr. Spector had been at Emory until 1986 or '87, and he left to go into private practice.

When I came down, that made two neuro-ophthalmologists in town. And you can imagine there might have been actually some competition, but we have a superb relationship. He's a delightful guy and it's never been a problem. We have --

Q It's not like lawyers; they say lawyers need two in town.

A No, we have -- now we have maybe three, but -- or four; but it's a big town, and so there's -- there's lots of room.

Q Do you recall the subject matter of the book chapter that you co-authored with him?

A Yeah, it was a general chapter for a medical textbook on vision loss and neuro-ophthalmology topics.

Q Okay. As best you can recall, did it discuss PTC or IIH in any way?

A I'm sure it did, because that's a very common disease in neuro-ophthalmology, but I doubt it got into a lot of specifics because it's just an overview chapter. I can find it here. And let's see if the title helps us. It will be in the book chapter list way at the beginning.

Yeah, it's the very first one, actually, number 1. It's "Visual loss diplopia, nystagmus, ptosis and pupillary abnormalities." So pretty much all of neuro-ophthalmology. And within the visual loss, I'm sure we talked about papilledema and pseudotumor.

Q In the third paragraph, your report goes on to say, "Over the course of my medical training and clinical experience, I've seen, treated, and evaluated adult and pediatric patients with intracranial hypertension, also referred to as pseudotumor cerebri, PTC, for over 20 years."

Can you estimate for me how many patients you've seen in the last 20 years with IIH or PTC?

A Well, actually, I can come pretty close because of that database. I think the vast majority of

the cases of the over 700 came from us; I'd say at least over -- at least 550. And I've had a colleague for the past four or five years, so I would say, personally, maybe 400 patients.

Q Does that -- that doesn't include patients you might have seen at Mass General?

A That's true, it doesn't include patients I would have seen during my fellowship, which would have been at least another 30 or 40 during that year that I had some contact with that who had raised intracranial pressure.

Plus, it doesn't include what I see down at Grady. I go down to Grady Hospital, which is a big inner city hospital, one day a week and I -- I consult down there, and so I'm sure I've seen a whole bunch more down there, too, so...

Q Can you estimate the number of cases in that group or subset where the patient had a history of exogenous drug use with a drug that has been associated with PTC?

A Again, it's going to be hard to come up with the numbers. Beau Bruce could probably tell you exactly, but I would say that probably out of the 400 or so that I have seen, less than 20, more than 10,

somewhere in that vicinity, would be -- there would have been an issue regarding an exogenous drug.

Q And within that group, how many involve minocycline?

A Right, so I would say probably about five. I was trying to think about that. Obviously, I imagined you would ask, and I would say at least five, but it's hard to get at that information.

Q What about other tetracyclines?

A And that's where I have concerns, because I can't remember 100 percent that it was specifically minocycline; although usually, it's -- somebody was taking something for acne, and so I would imagine that it would be more likely to be minocycline than one of the other tetracyclines, but I can't tell you for sure.

Q And then the next sentence is, "From my review of Ms. Weilbrenner's medical records and based upon my knowledge, training, and experience, it is my opinion that the precipitating cause of her PTC optic nerve damage and permanent loss of vision was Minocycline." Is that your opinion?

A Yes, sir.

Q And that's the opinion you're offering in this case?

NANCY J. NEWMAN, M.D.

A Yes, sir.

Q Okay. We'll talk about that in more detail later.

You provided us with a breakdown of your expenses, and I would just ask at this point that -- whether the numbers in this next paragraph in terms of your rates are accurate --

A That is correct.

Q -- and that -- and those are the rates that are reflected in the breakdown that you gave us?

A Yes, sir.

Q Last, the report says, "The report is not exhaustive of all the opinions I hold in this matter." And we may come to this in more detail later. But can you at this point tell me in a summary fashion what other opinions you may offer in this case?

MR. GAINER: I'm going to object to form, but you may answer.

THE WITNESS: I have no other substantive opinions than what's there to date. I imagine this was put in by Mr. Gainer in order to make sure that if something else comes along, that I am still allowed to offer another opinion if I have

more information or I'm asked other questions.
Q (BY MR. PRICE) Okay. That's fair enough. The only thing we would ask at this time, I guess, is that if you do formulate further opinions that you propose to offer in this case, that you communicate those to Mr. Gainer so that they can be disclosed --
A Yes, sir.
Q -- to defendant.
We talked about epidemiology, but do you consider yourself to be an expert in statistics?
A No, sir.
MR. GAINER: I'm going to object to form, but you may answer.
THE WITNESS: No, sir.
Q (BY MR. PRICE) Do you consider yourself to be an expert in toxicology?
MR. GAINER: Object to form, but you may answer.
THE WITNESS: Not an expert, no, sir. I -- just to add, you know, I do know some of the basic underpinnings of how one goes about deciding whether something is toxic to something, but I am not an expert, so I do

not hold myself out as that.

MR. GAINER: I'm going to object to responsiveness, again, at least insofar as it goes to "expert," inasmuch as that's a determination for the trial judge.

Q (BY MR. PRICE) You certainly are not board certified in toxicology; is that correct?

A That is correct, sir.

Q Have you had formal training in toxicology beyond the normal medical school curriculum?

A Not formal training, although I -- I do read on it. And as you probably know from my CV, I've -- I've written a few things that involve that topic.

Q Okay. Other than the practice of medicine, are you involved in any other businesses?

A No, sir.

Q Your time is full as it is?

A Yes, sir. Yes, sir.

Q Do you own any interest in any other businesses or business entities?

A No, sir.

Q Can you tell me which hospitals you have privileges at?

A Yes, sir. At Emory University Hospital, at

Grady Hospital, I don't believe I have privileges at the VA hospital anymore because I wasn't going there, so it didn't seem pertinent, and at Egleston's -- so Children's Healthcare of Atlanta at Egleston Hospital.

Q And that's admitting and consulting privileges?

A That is correct.

Q At all of those hospitals?

A Yes, sir.

Q Have you ever had your privileges suspended or revoked at any hospital?

A No, sir.

Q Have you ever applied for privileges at any hospital and been denied?

A No, sir.

Q You are licensed to practice medicine here in Georgia; is that correct?

A Yes, sir.

Q Are you still licensed in Massachusetts?

A I just let it lapse.

Q Are there any other states in which you're licensed?

A No, sir.

Q Are you required to take continuing medical

education?

A I believe for licensure in Georgia, you have to show proof or have available proof of continuing medical education, yes, sir.

Q And how do you satisfy that requirement?

A I go to a lot of meetings, most of the time I'm on the program, but that's never been an issue.

Q When we looked at your CV, we identified a number of presentations that related to intracranial -- idiopathic intracranial hypertension.

Other than the ones we talked about, have any of the continuing medical education courses or seminars you've participated in, either as a teacher or a student, related to PTC or IIH?

Too broad a question or --

A Yeah, I mean, I do an awful lot of teaching. And a lot of what I do is case-based education, and so there will always be an idiopathic intracranial hypertension case in the teaching that I do. So in general, I'm always talking about the management -- detection, management, and treatment of raised intracranial pressure.

To cut to the chase, I don't believe that I have attended a specific seminar or myself given any

lectures on exogenous substances and pseudotumor cerebri; however, I think just a few years ago, for example, the North American Neuro-Ophthalmology Society, which is the big society of all neuro-ophthalmologists, has an annual meeting. And I believe in the past five years, one of the symposia of the annual meeting was on raised intracranial pressure. So there was an entire symposium on it, and I don't have specific recall, but I am sure that all manner of topics, including pathophysiology, were discussed. I was not a speaker.

Q You were in attendance?

A Yes, sir.

Q When you say it was an entire symposium --

A So it would have been a half day.

Q Okay. A series of talks presented?

A Lectures by experts and not so expert and -- yes, sir.

Q I assume you -- from your testimony that you can't say more specifically off the top of your head exactly when and where that was, but can you -- is that information that you can find for us?

A That would be pretty difficult.

Q Okay. When we were talking about your

teaching responsibilities, you mentioned that -- that a portion of your teaching is to first and second year medical students; is that correct?

A Yes, sir.

Q Is PTC or IIH -- you're right, it doesn't flow off the tongue -- a subject that you typically cover in teaching first and second-year medical students?

A I am much more basic than that with the first and second year medical students. I teach them basic disease categories and mechanisms of disease as it relates to specifically the optic nerve, for example, using that as a way for them to think about diseases in general.

And so I do teach them swelling of the optic nerve, papilledema, which is specifically swelling of the optic nerve due to raised intracranial pressure.

And as an example, I believe I show them one patient with idiopathic intracranial hypertension. I probably also show them some -- a case with hydrocephalus as a cause of it, but we don't get into the disease itself too much or the specifics of it.

Q So you wouldn't talk to them about risk factors associated with the disease?

A That is correct, I would not, except for obesity. I would mention -- you know, in the case that I present, I'm going to make it the most typical case I can, and so I will have it be a female in her childbearing ages who is obese.

Q You are a member of the North American Neuro-Ophthalmological --

A Society.

Q -- Society?

A Yes, sir.

Q What are their criteria for becoming a member of that society?

A You can be a member, depending on your membership category, just by having an interest. You can be a -- a full active member if you have had -- I believe it's a fellowship in neuro-ophthalmology or been trained in neurology or ophthalmology and have an interest in it.

You then become a fellow of the society if you've gone to a certain number of meetings, if you're -- shown that you have a -- a particular interest and practice that would make you sort of a higher tier in that. And so I'm a fellow, but so are lots of other people.

Q Is there a separate board certification in neuro-ophthalmology?

A No, sir.

Q Okay. The American Academy of Neurology, another association you're a member of; is that correct?

A Oh, yes, sir.

Q Is that the board certifying entity?

A No, the board certifying entity is the American Board of Psychiatry and Neurology.

Q Okay. Are you a member of that?

A You're not a member of that. That's the degree grant -- the certification granting body.

Q Do you attend meetings of the American Academy of Neurology?

A Yes, sir, the American Academy of Neurology, American Academy of Ophthalmology, American Neurological Association, North American Neuro-Ophthalmology Society; sometimes ARVO, which is the Association of Research in Vision and Ophthalmology. What else? There are more.

Q Okay. You mentioned the symposium at a prior annual meeting of the North American Neuro-Ophthalmology Society relating to intracranial

hypertension.

Have you been in attendance at any meetings or seminars of one of these other organizations, the American Academy of Neurology, Southeast Neuro-Ophthalmology Society, some of the others that you listed, which had a similar program?

A No, because those would not be to the level of detail as the -- we can call it NANOS, N-A-N-O-S, the North American Neuro-Opthalmology Society. NANOS meetings are for neuro-ophthalmologists, so they get into details of more complex and important neuro-opthalmic problems specifically; whereas, these other meetings, it's mostly we go to either teach general neurologists or general ophthalmologists, or we go to present our work at platforms or poster sessions.

Q Okay. We also talked earlier about the -- the part of your work that involves clinical practice or actually seeing patients. When you see a patient, is it -- do you typically take a medical history of the patient when you see them?

A Yes, sir.

Q The first time?

A Yes, sir. Every time.

Q Every -- okay. So the subsequent visits, it

would be changes in history from the last time you saw them?

A Yes, sir.

Q Is it important to you that the patient's medical history be accurate and complete?

A Of course, sir.

Q You rely on that to a significant extent in formulating your treatment plans, diagnosis, et cetera?

A Yes, sir, that and whatever medical records I might have.

Q When you take a medical history, does that include history of medication use?

A Yes, sir.

Q When you take a medical history from a patient, do you rely on the patient's account or the patient's memory, or do you look to outside sources?

A It depends on the situation. If I have medical records available, I will certainly use them. And it's one of the skills that I try to teach my trainees, is you -- you have the medical records in advance, you review them in advance, you put them in chronological order; and then when you sit there with the patient, you ask them to tell you what happened in chronological order, and you match what they say with

the objective data to make sure that everybody is on the same page.

And sometimes the medical records are wrong, and sometimes the patient doesn't recall correctly, and the -- the cumulative history that you get is far more robust than if you only, like a medical student, say, "I'm just going to listen to what the patient says."

Q Do you find that patients usually have a pretty accurate recollection?

A It depends.

Q On?

A The level of intelligence of the patient, the level of engagement they have had in their own medical problems. There are many different things. I use family members, if they're there, that's helpful, too.

Q Do you prescribe medication to patients?

A Not very often. It is said that neuro-ophthalmologists don't cure disease, we admire it. We tend to be diagnosticians. There are a few patients we actually manage, and pseudotumor patients would be in that group. But in general, we tend to make the diagnosis and get them to the appropriate physician for ongoing care.

Q Recognizing that limitation, is there a group

of medications that you -- that tend to be the ones you prescribe?

A Yes, sir. Probably the only medications I end up prescribing would be aspirin when I've had someone with a vascular problem; acetazolamide, Diamox for patients with raised intracranial pressure; and Prednisone, steroids, either oral Prednisone or, if they're in the hospital, IV Solu-Medrol, IV methylprednisolone for things like giant cell arteritis, optic neuritis.

And those three are probably the main three. You'd have to -- I'd have to think really hard about any others that I actually write a prescription for.

Q Can I assume that you're, then, pretty familiar with the prescribing information or labeling for acetazolamide and Prednisone?

A Yes, sir, because, of course, aspirin is over the counter. But I'm pretty familiar with that, too.

Q When you prescribe one of these drugs, and we'll leave aspirin out since it's over the counter, do you refer to the prescribing information before prescribing to refresh your recollection about what's in it?

A Not -- not every time for those two drugs.

Certainly, were I to prescribe something else, given the rarity of my doing so, I always go to the PDR, but for those two, I don't usually do that right before prescribing.

We do, on a routine basis, have like a journal club kind of meeting every few years amongst the fellows and my colleagues who practice neuro-ophthalmology here to -- to look at acetazolamide, for example, to make sure we're doing the right things, like getting blood counts before, checking for sulfa allergies, all those kinds of things. So that would be another time when we refresh ourselves on the labeling information.

For Prednisone, I'm not sure I've ever actually looked at the labeling information, because the side effects of that medication are so important in what we do that we're very aware of it.

Q And when you say the side effects are so important, in what way?

A Because for a number of our patients, in particular, those who would be -- who have giant cell arteritis or who have steroid responsive inflammatory optic neuropathies, they are on it for a chronic period of time. And steroids are a very good medicine, but

they have horrible long-term side effects that need to be watched for very carefully.

Q If there was a change to the warning information or prescribing information on one of these drugs, other than the periodic meetings that you've described to -- to review them, how would that come to your attention?

A Well, both the American Academy of Neurology for sure and maybe even the American Academy of Ophthalmology do send out bulletins when there are changes or -- or alerts regarding new study findings that they think are of importance to their membership, so I might receive something like that.

I know I get in the mail changes in prescribing information regarding a whole slew of different drugs that I don't use, so I know some people are getting those.

Q Where does --

A Which I assume it comes from the American Academy of Neurology, would be my guess. But otherwise, I'm pretty current on the literature. So I review at least ten journals a month in the fields of neurology, neurosurgery, and ophthalmology, and neuroradiology. And so I think if anything is out

there I'd catch it.

You have to admit, the only two drugs I prescribe are pretty longstanding players in -- in the field. And so it would be really unusual for something new to be popping up on them.

Q You testified that on the very rare occasion where you prescribe something else, you would invariably go to the PDR to --

A Yes, sir.

Q Are there other resources that you would invariably look at?

A Yeah, no, I'm sure there are other resources out there. I'm a techno-peasant; I'm really technologically a dinosaur, so I go to the book, and we at least keep the book up to date. I also will ask my more technologically savvy colleagues and residents and fellows to look things up, and I imagine they have -- I think in their Palm Pilots they've got something they can actually look at right away and they get information, and I have no idea what that program is.

Sometimes I might go to PubMed just to see if actually a peer reviewed article has been issued on the topic. That I can do. But that's about as far as I get.

NANCY J. NEWMAN, M.D.

Q Have you ever received a "dear doctor" or "dear healthcare professional" letter from a pharmaceutical company?

A Again, I think some of the ones that I get probably via the Academy of Neurology list serve, maybe some of those, it's usually for psychiatric medicines or things like that, but -- so I guess the answer is yes, but it's not had any relevance to me.

Q And so you don't recall any of them specifically?

MR. GAINER: Object to the form, but you can answer.

THE WITNESS: I don't recall, no, sir.

Q (BY MR. PRICE) Do you recall whether any of those letters have come from a generic pharmaceutical company?

A No idea. Some of them, the return address certainly is a pharmaceutical company, but I wouldn't know generic from name brand.

Q You understand what I mean when I refer to a generic pharmaceutical company?

A I assume you mean that they didn't develop the drug, but they are market -- I don't know, actually.

Q Do you have an understanding as to the difference between a brand name drug and a generic drug?

MR. GAINER: Object to form, but you may answer.

THE WITNESS: Right, I assume that a brand name drug is from the company that developed it and then patented it. I'm probably using the wrong phrase, "patent", but they have the rights to that drug. And then other companies can make it in a generic form.

Q (BY MR. PRICE) When you prescribe Diamox or Prednisone or Solu-Medrol, do you prescribe them to be dispensed as written, or do you prescribe them generically?

A So, I try hard to use acetazolamide because I know it's cheaper for my patients, but I believe that only Diamox comes in sequels; I may be wrong, but I've been told by patients that for the longer lasting, they need the drug name. So I never say dispense as written; I just leave it up to the patient and their pharmacist to decide what -- what they want to do with that.

I am not sure Prednisone has a -- I've always thought of it as just as a generic drug. I'm not sure anybody has rights to it. I know Solu-Medrol is the brand name of IV methylprednisolone. I rarely do intravenous; that would be in the hospital, so I haven't come up with that issue. So usually I just write Prednisone. I don't -- I didn't -- I don't know if that's a brand name or a generic.

Q Okay. Before you prescribe acetazolamide or Prednisone to a patient, do you discuss the potential risks associated with that drug -- with those drugs with the patient?

A Yes, sir, of course, I do.

(Whereupon, there was a brief recess.)

Q (BY MR. PRICE) Back on the record.

Dr. Newman, are you familiar with the drug Minocin?

A I believe it is a minocycline drug.

Q If I represent to you that Minocin is the brand name, minocycline the generic name, you wouldn't disagree with that?

A I would not disagree, no, sir.

Q Okay. What is minocycline?

A As far as I know, it's an antibiotic within

the tetracycline family that is often used and prescribed for acne.

Q Okay. Have you ever prescribed minocycline?

A No, sir.

Q Prior to being retained as an expert in this case, had you ever reviewed the minocycline label or prescribing information?

A I probably did when I had those cases we've talked about before, perhaps five cases, in which I was concerned about its relationship to the development of intracranial hypertension.

Q As best you can recall, have you ever discussed minocycline with anybody from the FDA?

A No, sir.

Q Any other state or federal regulatory person?

A As far as I know, no, sir.

Q All right. Just for convenience, instead of repeating different names each time, I'm just going to talk about PTC from now on when we talk about pseudotumor cerebri. If a context arises in which IIH is more appropriate or more correct, I'll count on you to tell me.

A Sounds fair.

Q Okay.

MR. PRICE: I would like to mark this as Exhibit 10.

(WHEREUPON, Newman Exhibit 10 was marked for identification.)

Q (BY MR. PRICE) Dr. Newman, I've marked as Exhibit 10 an article from the American Journal of Ophthalmology, the lead author Anthony Daniels. And this is from the April 2007 issue of Volume 143. You are listed as a secondary author on this article, are you not?

A That is correct.

Q Along as with Valerie Biousse?

A Biousse (pronunciation).

Q Who is a fellow of yours?

A No, she's my colleague.

Q Okay. What was your role in the research or preparation of this article?

A Correct, so our role, Dr. Biousse and my role was to provide patients for this multi-centered study and read over the article and make sure we were comfortable with it for publication.

Q And were you comfortable with it?

A Yes, sir.

Q What was the purpose of this study?

A The purpose was to look more specifically at body mass index, which -- as a marker of obesity and patterns of weight gain as they relate to the prevalence of idiopathic intracranial hypertension and to also look at a vision specific quality of life measure in those patients.

Q And if you could summarize, what were the conclusions that the study draws?

A So both higher levels of weight gain as well as absolute values of BMI are associated with greater risk of idiopathic intracranial hypertension. And even nonobese patients, if they had recently had a substantial weight gain, were at greater risk for IIH.

And then the other finding was that, indeed, the vision specific overall quality of life measure was affected to a greater extent in IIH patients versus other neuro-ophthalmologic disorder patients.

Q In the first paragraph, a couple sentences down, it says, "Although numerous conditions, medications, and lifestyle factors have been implicated as potential risk factors for IIH, the strongest evidence for association exists for obesity and weight gain." Do you agree with that statement?

A I do agree with that statement.

NANCY J. NEWMAN, M.D.

Q And it goes on to say, "Incidence in case-control studies have documented IIH to be associated with female gender obesity and weight gain"; is that correct?

A Yes, sir.

Q And you agree with that?

A I agree that incidence in case-control studies have documented that, yes.

Q What is a case-control study?

A A case-control study is where you take a patient with a disorder and you match them usually, if you're -- if you're doing the study well, with at least two patients matched for some -- the basic demographic variables that are not being questioned in the study. And then you look at the relative frequency of these other features that you have hypothesized might be related to this disorder.

Q And what is a case report?

A A case report is where you simply report the characteristics of a single patient.

Q Can you characterize for me the differences between a case report and a case-control study vis-a-vis their usefulness in establishing causation of a condition?

A Sure. So there are various levels of evidence. The first level of evidence would start with a single case report. The next level of evidence would be what would be called a case series; and it sort of depends on how rare or how nonrare a disorder is, how many you would consider a series or not. So a very rare disorder, we often say that a series is three cases because you've seen it case after case after case, so -- but a series can be a large number or a small number.

And then the next level of evidence would be a case-control study, and in particular, a retrospective case-control study, which in a sense, this is sort of retrospective, where you -- you take all the people you have with a disorder and then you compare it to other people who don't have the disorder.

A prospective case-control study is where you -- each time a new patient comes in with that disorder, you match them immediately with at least two cases -- sorry, at least two controls.

And then the next level of evidence, of course, depending on whether we're talking about an intervention or not, would be a randomized controlled study in which people are blinded, both the patients

and the examiners, to the questions that you're asking, and you would randomly assign them to different groups and see prospectively what your results are. So those are the levels of evidence.

In addition for causation, as you mentioned earlier, there are epidemiologic studies which try to assess the incidence or frequency of a disorder in a population by itself, then a population with one or more associated factors that you've hypothesized to see if the incidence is greater in that group.

And these are all -- all these levels of evidence can be used to determine causation; some are stronger than others, and some are more readily used in -- in certain disorders than others.

So, for example, if something happens very, very infrequently, an epidemiologic study is not going to be helpful to you at all. That doesn't mean that the event wasn't caused by that, because you can have what are called idiosyncratic reactions so that one particular person has a response to a drug, for example, that another person doesn't. And so epidemiologic studies for that are not helpful.

In those, challenge/rechallenge studies or animal studies would be helpful. The

challenge/rechallenge meaning that you actually -- either because the patient was told to take it again or they decide to take the medication again, and they have the same event happen.

I think I answered your question.

Q I think so.

Would you agree the case reports are used to formulate hypotheses, which are then tested by some of the other types of studies you've described?

MR. GAINER: Object to form, but you may answer.

THE WITNESS: They can be. I think -- the role of the case report basically, as I see it, is two -- two different things: Either you're teaching somebody something that you already know, but by illustrating it in a certain way, you're driving home a very important teaching point; or you are providing a new association that you have hypothesized because it is only in one case. You review the literature that came before it to -- perhaps there are other cases to support it. And you -- you use it to at least get the idea out there that this is a

possibility.

If we're going to get more specific about exogenous agents, if, within that case report, there's challenge/rechallenge data that's remarkably robust compared to anything, even a series or a case-control study, obviously, for that particular patient. And so all it tells you is that that possibility exists.

Q (BY MR. PRICE) In the two uses you identified, in the first of those uses, you're talking about a situation where, at least in your mind, causation has already been established?

A That is correct.

Q So where causation has not yet been established, the usefulness of the case report, as I understand your testimony, is, in fact, the formulation of a hypothesis based on evidence in that report, what you've seen in the medical literature --

A Correct.

Q -- and that can then be tested?

A Yes, sir. Although, every once in a while -- and, I mean, I don't mean to be picky, but the truth is that sometimes the case report allows you to go back

and find things that people -- because they just reported a whole bunch of people and they didn't make the connection before; and so sometimes you can even make the connection because you now believe -- you know, you've come up with that case report and you can go back and find situations where that probably was the case before.

Q Right. Would you agree that a single case report or even a case series cannot, in and of itself, establish causation?

MR. GAINER: I'm going to object to form, but you may answer.

THE WITNESS: Unless, of course, there is some challenge/rechallenge data. I guess it depends on what you mean by "proof." There's a difference with scientific proof versus, you know, I guess we get into your jargon, probability, and so that's -- I -- I'd have to have you define the word "proof" to me before I could say yes or no to that question.

Q (BY MR. PRICE) Well, I think at least for our purposes today, when I talk about proof, I'm thinking more in terms of scientific proof than -- than

what would necessarily stand up in a court room. And when I say that, I'm not saying necessarily that one is stronger than the other. I mean --

A I understand. I think that when something happens very rarely and on an idiosyncratic basis, it's -- you can't use the same types of studies to give scientific proof that you would in other situations. Similarly, if something is multifactorial, you have to take into account the other factors that are involved.

Q Do you have an understanding of what a confounding factor is?

A Yes, sir.

Q What is that?

A So, basically, that would be a coexistent factor that may actually be the cause, that would -- if you didn't know that, you would assume that -- that something -- that the factor you think is there is the cause because it's in company with this confounding factor.

Confounding factors also, though, can mask causation, because they -- it may be a factor that's assumed to be the cause of the problem, and so the real cause in a given patient may not be noticed because of that confounding factor.

Q Would you agree that the reason that a case report, absent the kind of challenge/rechallenge circumstances you described, typically cannot establish causation is that the case report does not control for or account for potential confounding factors?

MR. GAINER: I'll object to form, but you may answer.

THE WITNESS: That may be the case in any given case report, yes, sir.

Q (BY MR. PRICE) So with an individual case report, you ordinarily can't discount the possibility that a confounding factor may have played a role in the event that's described?

A No, you can't. You assume that whoever is writing the case report or whoever saw the patient knows what those other factors are, because if they're confounding factors, it's because it's known that they are involved in that disease in some way and would have a compelling reason why they presented that case report inasmuch that either that confounding factor isn't that or that the confounding factor ends up being removed and the case -- and the case still happens, or the factor that is being proposed as causative is removed, the confounding factor stays there, and the patient

doesn't have the disease anymore.

So there are -- you would hope that whoever is doing the case report would be explaining those issues.

Q You would hope, but the author of a case report may not recognize a confounding factor --

A That's fair, certainly that's fair.

Q -- or may not appreciate its role in the event being reported?

A Yes, sir, but that's why we hopefully have peer review, even for case reports.

Q Would you agree that the advantage of a case-control study over a case report is that the case-control study attempts to control for or account for confounding factors?

A Yes, sir. And --

Q And that is why a case-control study is more widely accepted as a demonstration of -- of causation?

A Absolutely, and it is based, though, on more epidemiologic principles, as you know. And so, again, not very helpful if we're talking about rare or idiosyncratic events, yes, sir.

Q Okay. Do you consider the -- the role of minocycline in causing IIH or PTC to be a rare or

idiosyncratic event?

A Yes, I do.

Q In this article that we were discussing, the Daniels article, the risk factor -- strike that.

Did the study or the methodology of the study include having patients in controls fill out a risk factor questionnaire?

A Yes.

Q And this risk factor questionnaire included, among the questions that were asked, questions relating to recent use of tetracycline class antibiotics; is that correct?

A Yes, sir.

Q As well as other things?

A Yes.

Q Pregnancy history, menstrual irregularity -- excuse me, irregularities?

A Yes, sir.

Q Corticosteroid use?

A Yes, sir.

Q And presumably, then, an attempt was made to control in this study for those other factors; is that correct?

A Which other factors, I'm sorry?

Q The -- the use of tetracycline class antibiotics, pregnancy history, menstrual irregularities, corticosteroid use.

A I'm not sure they controlled for that; in other words, they didn't have to find another -- I don't think they found -- had to find controls who specifically didn't use that.

Q Okay.

A They just asked these questions.

Q Do you know what use --

A And the controls were matched -- let's see how the controls were matched. Controls were identified among lists of patients seen within four weeks. Yeah, they were just patients who had been evaluated by the same neuro-ophthalmologist within the past four weeks and were required not to have IIH.

Q Okay.

A And they were matched based on just gender and age. So it's not like they matched for whether they were on corticosteroids or tetracyclines.

Q Do you know what, if any, use was -- the answers to these questions were put?

A My guess is that if there had been enough of them, they would have run it as a variable between

cases in controls, but I don't think there were enough cases to make that a -- we're only talking about 34 cases, so I don't think they used that.

Q Okay. The study concluded that higher BMIs were associated with a greater risk of IIH; is that correct?

A That's correct.

Q With a P-value of .003?

A I'm not right there, so if you're at the right --

Q If you look at the results at the very beginning of the --

A You mean in the abstract?

Q Yes.

A Great. If you say so, that's perfect. Yes, .003.

Q Is that, as you understand it, a pretty high degree of statistical correlation?

A Yes, sir.

Q And the study also found a high degree of statistical correlation with higher percentages of weight gain during the year before symptom onset; is that correct?

A Yes, sir.

Q A P-value of .004?

A Yes, sir.

Q Do you know if the study analysis included a review of significant weight gain over longer periods of time than a year?

A I'm sorry, tell me again.

Q Do you know if the -- if, in analyzing the data, the investigators looked at weight gain over periods of time longer than a year before symptom onset?

A I don't know that off the top of my head, but I could look and find out. I'm not sure where that is. But I'm sure it's written somewhere. I think they've purposely made it a year, but I'd have to read the article over more carefully.

Q Are you familiar with any other studies that review the level of risk associated with weight gain over periods longer than a year?

A Not off the top of my head. There may be.

Q Okay.

A And by the way, just because you asked it before, so on page 638, it did reveal that the use of tetracycline antibiotics within six months before IIH symptom onset was more common among patients versus

control.

So, actually, this is a case-control study even with a rare occurrence that did show a greater percentage. And this -- even was using logistic regression, it was an independent variable. How about that?

Q And that was with a P-value of .02?

A Correct.

Q Which is still statistically significant, less so than .002?

A Yes, but a whole lot more scientifically than even challenge/rechallenge data, so that's actually impressive. I hadn't even remembered that was in here.

Q The study also concluded that higher levels of BMI were associated with progressively greater risk; is that correct?

A Yes, sir.

Q In fact, the study analogizes that relationship to a dose response effect; is that correct?

A Yes, sir.

Q What is a dose response effect?

A The higher the dose, the worse the problem; and so in this case, the higher the BMI, the worse

likelihood. And we actually showed in -- I can't remember which paper of our data mining, that there may actually be association with the higher the intracranial pressure itself, the worse the probability of vision loss.

Q Would you agree that in -- with respect to the dose response effect, a strong dose response effect is an important consideration in establishing that a -- that exposure to a drug causes a particular effect?

MR. GAINER: Object to form.

THE WITNESS: It depends if it's an idiosyncratic response or not. I'm not sure anyone has -- at least in the articles that I shared with you and that I've looked at, I'm not sure anyone has specifically looked at the dosage necessary for tetracycline precipitated raised intracranial pressure.

So I'm not sure -- given idiosyncratic events, there usually isn't a dose response effect. I know that people have looked to see how long you need to be on the medication, and that's -- at least from the case series, it's usually within eight weeks, although there are people who become

symptomatic even more than a year out.

Q (BY MR. PRICE) As a general matter, and for the moment, not talking specifically about minocycline and PTC, as a general criterion in support of causation of an effect or a side effect of a drug, dose response is an important consideration, is it not?

A It is one of the potential principles used to help support toxicity causation. It does not have to necessarily be there, but it's one of the list of things like challenge/rechallenge that is potentially helpful. Of course, again with idiosyncratic reactions, it doesn't necessarily hold. But if the mechanism of the toxicity is presumably a drug affecting tissue, then the concept that the more drug, the more damage to tissue is certainly a reasonable one to keep in your list of questions regarding toxicity.

Q Are you familiar with the term "Bradford Hill criteria"?

A No, sir.

Q Turning again specifically to the issue of what this study found with respect to tetracycline class antibiotics. On page 639, at the bottom of the second column, the discussion says, "Because our findings support an association of tetracycline with

IIH, we agree with previous authors that tetracycline class antibiotics should be avoided in patients with known IIH. However, because the degree of association in our study was not highly significant, P equals .02, in the context of examining multiple potential risk factors, we believe that larger case-control studies, with ascertainment of pharmacy records in addition to self-report, are needed."

A Sounds very reasonable.

Q Do you know if any such studies have been conducted?

A I do not believe so. I know that this group, which is basically at the University of Pennsylvania, is continuing to look at this question, but I don't know if they're doing that.

Q The American Journal of Ophthalmology is a peer review journal?

A Yes, sir. And I will point out it's remarkable to me, actually, in a study of only 34 patients, that they should have come up with any statistical significance on that at all. I'm -- you're talking about 6 out of 34 patients reported tetracycline class drug use. To me, that seems rather high.

MR. PRICE: Mark this as Exhibit 11.

(WHEREUPON, Newman Exhibit 11 was marked for identification.)

(Whereupon, there was an outside interruption.)

MR. GAINER: She needs to take a break for a moment to make a call, I think.

THE WITNESS: Yeah, I need to -- okay. Yeah, I'm going to need about five minutes to try to arrange some stuff.

MR. PRICE: Okay.

THE WITNESS: Thank you.

(Whereupon, there was a brief recess.)

Q (BY MR. PRICE) I think we're up to 11. We've marked as Exhibit 11 an article by Earl Ang as the lead author titled "Pseudotumor Cerebri Secondary To Minocycline Intake."

Doctor, have you seen this article before?

A I don't believe so. I'm just looking to make sure it wasn't one of the abstracts that I printed, but I don't think so. There it is. It is the article that goes with one of the abstracts in the pile that I gave you.

Q Okay. So you would have reviewed it before, or at least the abstract?

A I would have reviewed the abstract.

Q And this is from the -- this article is published in the Journal of American Board of Family Medicine, May, June 2002.

A Yes, sir.

Q Are you familiar with that journal?

A No, sir.

Q You don't know whether it's peer reviewed or not?

A Oh, I assume it is.

Q Okay. On page 231, at the bottom of the first column, Dr. Ang states that "Epidemiologic studies have confirmed an association between female sex reproductive age group, menstrual irregularity, obesity, and recent weight gain." He unfortunately doesn't footnote that statement, but would you agree with its content?

A No. I don't believe that menstrual irregularity has necessarily been shown to be associated. If you look at age matched and gender matched populations, there is some information regarding some suggestion regarding polycystic ovary disease or ovarian syndrome which can cause menstrual irregularity and IIH. So that may be where that's

coming from. I'd like to see the reference, but the others are certainly reasonable.

Q And menstrual irregularity can also be a comorbidity of obesity; is that correct?

A You know, I don't know that for a fact. My sort of gut-instinct-medical thing says it certainly may be, but I just don't know the literature on that.

Q At the bottom of the next column, he says, "The only serious complication of idiopathic intracranial hypertension is vision loss, which can be sudden or gradual and can occur at any time during the course of the disease. Appropriate treatment can prevent vision loss, however, risk factors for vision loss include duration of related symptoms before diagnosis, systemic hypertension, anemia, older age, and higher degrees of myopia."

Do you agree that appropriate treatment can prevent vision loss?

A If you are there early enough, sometimes. We have reported a malignant form of idiopathic intracranial hypertension where it's just such a florid, rampant, rapidly progressive disorder that no matter what you do, it's still a very severe outcome.

But in most cases, if you are monitoring the

patient correctly and if you have been involved in the patient's care early enough -- in other words, they've come to attention before there already is severe vision loss -- you usually can prevent further visual loss and sometimes even revert some of the original vision loss.

I don't agree with all of those associations. I think that these are very, very small study -- and again, they don't even reference what -- what their source is. But hypertension, for example, it only was in one study where they looked at men with IIH, and they seemed to be more often hypertensive, but I don't think that's panned out. And certainly, in our reports, it has never come out as an independent variable.

Q What about anemia?

A Yeah, anemia, it may actually be an entirely different disease. And again, we have a paper on idiopathic intracranial -- idiopathic intracranial hypertension -- with little (indicating) -- and anemia. And there may be all sorts of pathophysiologic issues underlying that, which may include actually ischemic to the optic nerve head and not necessarily the high pressure being the thing that causes the vision loss. So it has a whole other aspect to it that I don't think

you can just lump in there.

If you look at the long laundry lists that have been thrown in for this disease, they're usually done before modern neuroimaging. And so a number of disorders up at the top of the column, for example, these endocrine stuff, the renal failure, the Lupus, they may actually relate to venous sinus thrombosis as a cause of raised intracranial prior and not relate to the syndrome.

We've been talking about a pseudotumor, in which there isn't a recognizable, underlying structural abnormality, such as clot in the venous sinuses, so a lot of this literature is tough.

Q Did you form an opinion as to whether Katelyn Weilbrenner's condition was of the malignant variety, as you've described now?

A I -- you know, by the definition of what we used in our article, she would have come close regarding the -- the rapid presentation, but it's tough because -- and one of the criticisms of our paper, and very rightfully so, is that you don't know how long things may have been smoldering before and it just may be that it tips over what becomes symptomatic to the patient.

So, for example, a number of my patients have horrible visual loss when they present to me, partly because they never really had headaches. And that's why they come -- ended with me, because if they had headaches to signal it early in their course, before there's any visual problem, they can be given the appropriate treatment and it can be stopped.

I probably would not have included her in the paper, mostly because in the paper we were trying to show that this can happen even without exogenous triggers, even without venous sinus thrombosis, even without other precipitating causes of the disorder.

Q And she had headaches --

A Probably two weeks.

Q For about two weeks?

A Yeah.

Q Is that --

A That's what the medical records suggest, yes.

Q Right. Do you consider that length of time to be a rapid onset between initial symptoms and visual loss?

A It's short --

MR. GAINER: Object to form, but you may answer.

THE WITNESS: Yeah, it's fairly short, at least in the overall look at IIH patients. Not that surprising for me because I see the bad cases and the unusual cases.

Q (BY MR. PRICE) On the top of page 232, Dr. Ang talks about lumbar puncture being therapeutic in addition to being diagnostic. Would you agree with that?

A That is correct.

Q And that repeated lumbar punctures may be necessary if the initial one does not relieve the pressure?

A That I don't agree with.

Q Okay. Why?

A I think it's punitive. I think that usually, at most, you would do two lumbar punctures and, of course, medical therapy. And if the medical therapy and two lumbar punctures don't begin the process of it improving, then I would go immediately to an intervention such as a surgical shunt or an optic nerve sheath fenestration.

Q And the medical intervention is the administration of acetazolamide?

A That is correct. And in the malignant form,

we even suggested, you know, one very brief course of IV steroids, even.

Q In Katelyn Weilbrenner's case, she had an initial lumbar puncture and was prescribed acetazolamide; is that correct?

A Correct, and the minocycline was stopped.

Q And the minocycline was stopped.

A Right.

Q And then she had a second lumbar puncture?

A Yeah. I'm not sure I would have necessarily done that on her. She already, after the first lumbar puncture, I think, had improvement, if not relief, in her headache. And I probably would have done the acetazolamide, I would have stopped the minocycline, would have done the one lumbar puncture, and then I would have watched her very carefully. And, indeed, if you look at it, what are we talking, one week -- or 12 days later was the second lumbar puncture.

Q Right.

A The opening pressure wasn't really even still elevated. 23.5 is borderline. I wouldn't even call that an elevated pressure. So I'm not --

Q So within the 12 days with the medical treatment, withdrawal of minocycline?

A They're stopping the minocycline, right.
Q And the initial --
A And the one lumbar puncture --
Q -- lumbar puncture, it had come down.
A Right.
Q Is there any way to actually determine the -- numerically, in a quantifiable way, the intracranial pressure without doing the lumbar puncture?
A No.
Q As you sit here today, can you determine which of the three treatment modalities, being the initial lumbar puncture, the withdrawal of the minocycline, and the administration of acetazolamide, played a role in bringing her intracranial pressure down?
MR. GAINER: Object to form, but you may answer.
THE WITNESS: Right. So with 100 percent assurety, no, I cannot. But a lumbar puncture, basically, the fluid you remove is recreated within an hour and a half. The whole reason it works therapeutically is it makes a hole in the dura. Pathologic studies have shown that that hole may last with some

drainage up to a couple weeks at most.

So we know that certainly after the first lumbar puncture or let's say even the second lumbar puncture, two weeks after that, any effect from those should be gone.

And the acetazolamide, there's a fair bit of cynicism about whether it does anything at all in this disease, and that's why there's about to be a randomized control trial in early pseudotumor to see if it has any benefit at all besides making the patient so miserable from the side effects that they don't want to eat and they don't want to drink sugared beverages because everything tastes bad.

So -- and she was also put on a pretty small dose of Diamox for her size, 250 BID. Usually I'm at 500 BID or 500 QID in patients of her size. So it's possible, but that was then taken away. It was discontinued. I believe, by the time she had seen Dr. Spector, I do not believe she was on Diamox anymore. So it probably was discontinued somewhere in the -- in June

would be my guess.

So if you ask me to a degree of medical probability, like over 50 percent, given that she's still obese, and that the pseudotumor has not come back, and she has someone watching to make sure there is no swelling of her optic nerves, the lumbar puncture would no longer be at play, the Diamox would no longer be at play, the only thing at play is that she had stopped the minocycline.

Q (BY MR. PRICE) When you say no longer in play, though, her initial -- her pressure on the initial lumbar puncture was, what, over 55, I believe?

A Correct.

Q Which is very elevated?

A Yes, sir.

Q And as you testified, 12 days later, at the second lumbar puncture, it was down below a threshold level?

A Right, which still may reflect the hole made by the first lumbar puncture.

Q Right. And she was still on Diamox or acetazolamide in that period?

A Yes, sir.

NANCY J. NEWMAN, M.D.

Q So between the -- and the reduction in pressure that occurred between the first lumbar puncture and the second lumbar puncture, both of those factors may still have been at play?

A Absolutely, and may even have been the primary ones during that particular period of time.

Q And she was not rechallenged with minocycline, was she?

A No, sir.

Q You wouldn't do that?

A I wouldn't do it, no, sir.

Q Or you'd be testifying in a different case.

A Yeah, exactly, there would have been a very different answer to your sets of questions.

Q Finally, at the top of page 232, Dr. Ang says, in referring to intracranial hypertension, "It's most often seen in reproductive-age women who are obese, who have recently gained weight, and who have irregular menses."

I take it you would agree with the first part of that; I think, in fact, you testified that -- that the most common factors are reproductive-age women who are obese, but you don't necessarily agree that irregular menses play a role?

A That is correct.

Q I don't have too many questions about this article, but just so we have something to reference what we've been talking about, I would like to mark as Exhibit 12 this article, which is from Neurology in 2007, the lead author is Thambisetty.

A Um-hmm.

Q And you're secondary author. And the title is "Fulminant Idiopathic Intracranial Hypertension."

Is this the article you were referring to before relating to what you called malignant --

A Yes, sir.

Q -- situations?

A Yes, sir.

(WHEREUPON, Newman Exhibit 12 was marked for identification.)

Q (BY MR. PRICE) This article was a case series --

A Yes, sir.

Q -- of 16 patients?

A Yes, sir.

Q One comment on page 231 is that "The pathophysiology of IIH remains unknown, and it is unclear why these patients had such an acute evolution

of a characteristically subacute to chronic disorder." Is that still the case, that the pathophysiology remains unknown?

A Yes, sir.

Q And you go on -- the article goes on to say, "Although several investigators have mentioned seeing patients with acute IIH, similar reports are exceedingly rare in the literature." And you agree with that?

A Yes, sir.

Q Is there any way to tell or have you identified any factors that suggest who may be at risk for this kind of acute and fulminant condition?

MR. GAINER: Object to form, but you may answer.

THE WITNESS: I think we refer potentially to anemia in here. Also, in our subsequent studies of African-Americans with IIH and men with IIH, who both have worse visual prognosis, we tried to go back here and see -- I think -- I'm not sure we mentioned in this article how many of these patients, for example, were African-American. We do tell how many were men and women. And

I think it's -- there's only two men in here, so that probably can't be the answer in this. But I believe we went back and quite a number of these patients were African-American. But that doesn't really help us know any more about it.

Q (BY MR. PRICE) And the fact that anemia plays a role, the anemia, as you testified before, might be a different situation altogether?

A Right, may have a different -- add something extra to the pathophysiology.

(WHEREUPON, Newman Exhibit 13 was marked for identification.)

Q (BY MR. PRICE) Again, just so we're talking about the same thing, Exhibit 13 is an article from the American Journal of Ophthalmology from April 2003. Valerie Biousse is the lead author, you were again a secondary author.

A Senior author.

Q Senior author, that's why you come last?

A Right.

Q Okay, as opposed to the sandwich?

A Right.

Q I get it. Entitled, "Anemia and

Papilledema." And this is the article you were referring to that explored the association of anemia with papilledema and whether or not this was the same condition as PTC?

A Correct.

(WHEREUPON, Newman Exhibit 14 was marked for identification.)

Q (BY MR. PRICE) Just quickly, Exhibit 14 is an article from Neurology from April 1998 entitled "Audible Pulsatile Tinnitus in Idiopathic Intracranial Hypertension." This is a --

A It's a good one.

Q -- case report?

A Yeah, it's a good one. We thought of entitling that spousal insomnia from IIH. The partner in the bed could actually here the pulsing noises.

Q Dr. Lessell, is that how it's --

A Simmons Lessell, yes.

Q He was one of your teachers; is that --

A He was my mentor at Massachusetts Eye and Ear Infirmary.

Q That's why he gets to come last, and you're in the middle this time?

A Right. And I think my -- is my fellow first,

Valerie was my fellow at the time.

Q Valerie Biousse is the first author, yes.

I mentioned this only to draw your attention to one issue with Patient 1, which is that the article notes that her medical history was notable for hypertension and 140-pound weight gain in the --

A Wow.

Q -- previous two years. So this is one instance -- and again, it's a case report, we don't know exactly what it means in this regard, but one instance where the patient had a weight gain over -- a substantial weight gain over more than the one-year period reported in that earlier article?

A Absolutely.

MR. PRICE: Exhibit 15.

(WHEREUPON, Newman Exhibit 15 was marked for identification.)

THE WITNESS: Did you buy it, too?

MR. PRICE: I didn't, but can I get a discount?

THE WITNESS: Yeah.

Q (BY MR. PRICE) Exhibit 15 is an excerpt from Walsh and Hoyt's Clinical Neuro-Ophthalmology, 6th edition, 2005. This is the -- one of the volumes that

you were an editor for?

A Yes, sir.

Q And this is a section on papilledema, pages 273 and -- 272 and 273. On page 272, there's a statement that "IIH is a diagnosis of exclusion that occurs primarily in young obese women." Do you agree with that?

A That's correct. Especially if you're using the idiopathic intracranial hypertension, yes, sir.

Q And it goes on to -- and -- well, it says the PT -- maybe you can help me. In the next sentence, it talks about the PTC syndrome. Was there an intention to distinguish between IIH in the first sentence and PTC in the second?

A Absolutely. That's the whole point. So idiopathic intracranial hypertension is a diagnosis of exclusion that occurs primarily in young obese women and occasionally obese men with no evidence of an underlying disease.

Once you have an underlying association that you believe is truly associated, then you really shouldn't be calling it idiopathic intracranial hypertension. You should be calling it pseudotumor cerebri or pseudotumor cerebri syndrome, which I think

is appropriate. And so it says PTC syndrome may be associated with a number of different conditions.

Q Okay. So if you've identified exposure to an exogenous drug like minocycline, technically, that would take you out of the idiopathic characterization and into PTC?

A That is correct. Or you could just call it elevated intracranial pressure. The reason it's probably better to call it PTC or pseudotumor is because then the management, aside from getting rid of the exogenous substance, still is the same; you still have to try to treat symptoms and try to preserve visual function. And so the same management principles should apply for all of the secondary causes of raised intracranial pressure.

Q On page 273, under the heading "Endocrinologic and Metabolic Conditions," the statement is made that "Obesity is the most common finding in patients with PTC." You would agree with that?

A Yes.

Q "One case-control study" found obesity and recent weight gain in significantly more -- "found obesity and recent weight gain significantly more

prevalent in PTC patients compared to control patients." Is that your study that we looked at earlier?

A No. That hadn't been published yet, so that must be one of the ones they reference, which is not as good a study as a prospective look. But, yes, so it had already been suggested.

Q "Many of these patients also have irregular menses, likely a comorbidity of obesity rather than an effect of increased ICP"?

A Well, there you go. See, I'm learning something by reading my own book. So there is a reference there that would suggest that irregular menses occur more often in obese patients.

Q This statement distinguishes between irregular menses as a comorbidity of obesity rather than an effect of increased ICP.

A It doesn't even bring up the issue of --

Q It doesn't make a statement as to whether?

A -- irregular menses --

THE COURT REPORTER: I'm sorry.

THE WITNESS: I'm sorry.

MR. PRICE: Sorry.

THE COURT REPORTER: "It doesn't even

bring up the issue"?

Q (BY MR. PRICE) Well, let me ask the question, then.

A Sure, sorry.

Q This statement does not make a claim as to irregular menses versus obesity being a cause or the risk factor associated with PTC?

MR. GAINER: Object to form, but you may answer.

Q (BY MR. PRICE) Is that correct?

A Correct.

Q Do you know if Katelyn --

A Which, if I may add, which to me implies that that's not even being brought up as a possibility. And I think it's a misinterpretation when you see some of these other things say that irregular menses, in and of themselves, are associated or a cause of raised intracranial pressure or pseudotumor.

I think this is the main question: Is it a result of the raised intracranial pressure itself, or is it a result of the obesity? I don't think anybody thinks of it as a causative factor of raised intracranial pressure.

Q Do you know if Katelyn Weilbrenner reported

irregular menses?

A Yeah, I know, I know she did.

Q And that condition or situation preceded her -- long preceded her development of PTC; is that correct?

A As far as we know, yes. But certainly didn't long precede her development of obesity.

Q Right. But at least in her case, we know that the ICP didn't cause the irregular menses?

A I think that's a fair assessment, yes.

Q Do you know if anybody has done any research specifically attempting to determine whether irregular menses in PTC cases is a comorbidity of obesity versus an independent risk factor?

A I -- I don't know if anyone has specifically looked at that. As I mentioned earlier, I think probably the issue has come up in settings of poly -- polycystic ovarian syndrome, POS, where very often these patients have menstrual irregularities, and so the -- and some people believe that poly ovarian -- polycystic ovarian syndrome may have a relationship with elevated intracranial pressure. So I -- I imagine that that has been discussed, but no studies have specifically, to my knowledge, looked at irregular

menses as a cause of elevated intracranial pressure.

Q Apart from the possible association with polycystic ovary disease, to your knowledge, has anyone speculated on a physiological pathway between -- that would cause irregular menses to result in elevated intracranial pressure?

MR. GAINER: Object to form, but you can answer.

THE WITNESS: Not that I'm aware of. I know that there are certain theories, hormonal theories, which people have proposed to cause raised intracranial pressure, maybe using the fat cells as little hormonal organs themselves, that could also -- those hormonal changes could also affect a person's menses, but not directly that I'm aware of.

Q (BY MR. PRICE) So you would speculate that the association, if there is one, is that irregular menses is another manifestation of some other underlying condition that may also be causing PTC?

A That's fair.

MR. GAINER: Object to form.

THE WITNESS: That's fair, either the obesity or poly ovarian --

Q (BY MR. PRICE) Or something else?
A -- or polycystic ovarian syndrome or something else, yes, sir.
Q And if there is something else, a third or fourth condition, no one has speculated about what that might be?
A They may have. - I can't say off the top of my head that no one has speculated something, but I am not aware of literature that has moved in a direction far enough that it would be considered likely.
Q Nothing in the literature that you reviewed in preparation for preparing your report or testifying here today supports that?
A Correct.
Q Going on, in the next column, a statement is made that "Even when a patient is taking a drug that is known or suspected to cause PTC, one should not necessarily assume that the drug is the sole cause of the condition. For example, patients may have idiopathic PTC or a real tumor that is brought to medical attention or worsens when a particular medication is used." Would you agree with that statement?
A I do. In two ways. Number one, I'm --

I'm -- I make really sure that the "or real tumor" is in there because I don't want people to assume that they can get away without scanning these people and missing something horrible. But I also agree that things can happen in combination, things can be precipitated in the susceptible individual, and I think that that's a very well proven and very often the scenario in a lot of situations, especially when we're talking about exogenous drugs.

Q Now, Katelyn Weilbrenner was obese, was she not?

A Yes, sir.

Q Would you characterize --

A And she still is, from what I understand.

Q Would you characterize her as morbidly obese?

A I'm not sure what the exact definition of morbidly obese is, but she is certainly obese, not just overweight, and I think -- I can't remember her BMI. I'm not sure it was actually written here, but I know that she at the time was weighing about 230 pounds.

Q And she was 5-6, was she not?

A Correct.

Q If I represented to you that that calculates to a BMI just slightly in excess of 37, would you have

any reason to disagree with that?

A That to me would be obese, and I just don't know what the definition of morbidly obese is.

Q If we look back quickly at the Daniels article -- I'm not sure which exhibit it is.

A And that's exhibit -- is that 10? Exhibit 10.

Q Okay. If you look on page 637, in the bottom of the second column, Obese Class 1 is identified as a BMI of 30 to 35, and a BMI of greater than 35, which is the highest breakdown shown here, as Obese Class 2, 3.

A Okay, does that equate with --

Q Does that help you --

A Does that equate with morbidly -- I mean, I don't know whether morbidly obese is a standard term or not, that's all.

Q Okay. And when we were looking at this article, we agreed, I think, that it reported that higher -- increasing levels of BMI were associated with progressively greater risk of IIH; is that correct?

A That is correct.

Q Ms. Weilbrenner was also past the age of puberty --

A Yes, sir.

Q -- or in the --

A Yes, sir.

Q And a female, of course?

A Yes, sir.

Q So she had all those risk factors; is that correct?

A Yes, sir. She was a female in the childbearing age who was obese, absolutely.

Q And notwithstanding that she was only 15 at the time of this original event, that she was still, as far as you were concerned, of childbearing age?

A Yes, sir.

Q And in addition to those risk factors, as we know, she was exposed to minocycline?

A That is correct.

Q I believe you -- your opinion, as expressed in your report, is that -- let me just look at it specifically -- minocycline was the precipitating cause of her PTC.

A Yes, sir.

Q What's the basis for your conclusion that minocycline was the precipitating cause as opposed to one of the other risk factors that she had?

A Right. So that's the real crux of the

matter, isn't it, because patients with her profile can spontaneously have elevated intracranial pressure and be called idiopathic intracranial hypertension patients. Typically, those patients do not have as fulminant, of course, as she did, but I've even written about 16 patients who do.

Typically, they are not cured by a -- two lumbar punctures and a two-month, six-week course of Diamox, 250 milligrams BID, unless they lose weight or have had some other, like a surgical intervention.

The thing that pushes me over that 50 percent probability edge in her case is the temporal relationship, the fact that she had been obese for three years before and has continued to be obese, probably weighs even more now. And yet she had this single event that went away in the setting we have just talked about, which included two lumbar punctures, six weeks of Diamox at 250 BID, and discontinuation of the minocycline.

So, to me, we have a susceptible person, absolutely agree with you on all counts, who I believe was tipped over by the use of minocycline. We have enough reports of minocycline doing this to patients who are not obese, who are not female, and even a

couple in whom they've had challenge/rechallenge and it came back.

So I think idiosyncratically and rarely, I think everyone will agree that some patients have had minocycline-induced pseudotumor cerebri, elevated intracranial pressure.

And I think in this case, this was enough to tip her over. And she has not had a recurrence, which is very unusual in this setting, if I do not --

Q Unusual that she's not had a recurrence?

A A recurrence, if this were just due to her female gender, her age, and her obesity. And that's the nut; that's it. I mean, we can go around in lots and lots more circles, but that's what the whole thing is based on. And that's why I was very careful to use the words "precipitating." Because I absolutely agree with you, that she was a susceptible individual to this.

Q Okay. Can you entirely exclude the possibility that this condition was caused in Katelyn Weilbrenner by her obesity, but that it was brought to medical attention or worsened as a result of the exposure to minocycline?

MR. GAINER: Object to form, but you may

answer.

THE WITNESS: There are two questions in there, I think. So brought to medical attention by it, no. What brought her to medical attention was her severe symptomatology of raised intracranial pressure.

The second question was -- can you read it back, because it was a specific wording?

(Whereupon, the record was read by the court reporter as follows:

"QUESTION: Can you entirely exclude the possibility that this condition was caused in Katelyn Weilbrenner by her obesity, but that it was brought to medical attention or worsened as a result of the exposure to minocycline?")

THE WITNESS: Okay. So can I exclude that it was worsened, and I guess I'm not sure what you're saying was worsened. Is it possible that she had a smoldering underlying pseudotumor, idiopathic intracranial hypertension with elevated intracranial pressure and the minocycline made that

pressure go up just a little bit more, enough to express the symptomatology? I think it unlikely, given that we have normal eye examinations, with no evidence of disc edema, and this would have been about eight or nine months before, while she had been obese for about two years at that point.

So I think that that's unlikely. But in a way, I'm almost agreeing with your supposition, which is that I do think that the minocycline tipped it over in her, but I don't think it was there already. I think it's what made it happen in a susceptible person.

Q (BY MR. PRICE) Okay. Well, my intention in asking the question that way or using those words was to make reference to the language in Walsh and Hoyt, and so --

A Sure.

Q -- perhaps I was inartful in doing that. Walsh and Hoyt says that, as we -- as we said, even when a patient is taking a drug that is known or suspected to cause PTC, in this case minocycline, one should not necessarily assume that the drug is the sole

cause of the condition.

So the question, then, I guess more simply is, can we exclude the possibility that minocycline was not the sole cause of the condition?

MR. GAINER: Object to form.

THE WITNESS: Yes. I mean, I -- no, the way you asked it, can we exclude, no; sorry, no, we cannot exclude. And that's exactly what I've been saying. I've never said in this case that I believe minocycline was the sole cause of her condition. I've never said that.

I have cases where I believe minocycline was the sole cause of the condition because I can't find anything else; although in my heart of hearts, do I think that that particular patient has something that made them susceptible that I just don't know and we don't know is related, yeah, I think that's very possible.

In her case, I'm admitting up front, I do not believe it is the sole -- it was the sole cause, but I do think it was the precipitating cause.

Q (BY MR. PRICE) Okay. That's fair.

As you say, that is sort of the crux of the issue, but just for the purposes of completeness, I would like to run through some --

A Of course.

Q -- additional areas of inquiry.

We talked about dose response before, and I think you testified that -- that a dose response relationship between minocycline and PTC has not been ascertained.

MR. GAINER: Object to form, but you may answer.

Q (BY MR. PRICE) Is that accurate?

A I believe that we don't have the depth of knowledge of that to be able to answer that question, yes, sir.

Q Do we know whether a single exposure to minocycline is enough to cause the condition?

MR. GAINER: Object to form.

THE WITNESS: Yeah, again, I'd have to look at every single case reported in the literature, which I have not. I don't know whether a single dose has done it. That would surprise me, but I don't know.

Q (BY MR. PRICE) So if there were case reports of a single dose associated with -- a single dose of minocycline associated with PTC, that would be some evidence; but, on the other hand, one would have to look further as to whether there were other factors in that case?

A Of course. As in all cases, yes, sir.

Q Do you believe that there's a minimum period of time for ingestion of minocycline to cause PTC?

MR. GAINER: Object to form.

THE WITNESS: Again, the majority of cases have been -- the symptoms have occurred within eight weeks of taking the medication. There are some cases where the patient was on it for more than a year. But the majority are within eight weeks. I don't know what the minimum time would be necessary.

Q (BY MR. PRICE) In this case, Katelyn Weilbrenner, she began taking minocycline in January of '06; is that correct?

A Yes, sir. So initially -- and this took awhile to sort out, but to the best of the knowledge of all the parties involved, I believe she started it January 16th, 2006, and took it for the 30 days of

those 30 pills, so that would have put us February 15 or so, right. And then she refilled the prescription for 30 pills, but it -- it seems most likely -- and she had a few leftover, so it seems most likely she took it for about 28 days working backwards from about mid April to May 11, so that there was about a one-month gap when she wasn't taking it.

Now, it's not clear whether maybe, during her menses at that time, she took a few pills or what. There's clearly not absolute recollection, but we know for sure that she was on it fairly consistently up until the diagnosis was made on May 11th.

Q So, in fact, the initial exposure to minocycline was well more than eight weeks before she became symptomatic?

A That's correct.

Q And the second course of minocycline, or what appears to be the second course of minocycline was closer in proximity?

A Correct. It would have been about four weeks before. And we don't have an examination in between those two courses. I mean, what would have been interesting would have been to look at her -- her ocular fundi on February 15, for example, at a time

when she wasn't symptomatic.

And it goes to the question before, whether I would have included her in my fulminant cases, because it very well may be that she had smoldering disc edema without symptoms of headache and diplopia and the other things that she developed back during the first course of the drug. We just don't know.

Q If we assume that -- for the purposes of argument that she had not had any incipient disc edema or a smoldering case, as you say, after the first course, but that the -- her later course of minocycline precipitated the event. In your opinion, would it be unusual to have a period of exposure to the drug not causing the problem and then a subsequent exposure of the drug causing the problem?

MR. GAINER: Object to form, but you may answer.

THE WITNESS: Yeah, sort of the opposite of challenge/rechallenge, it's challenge/unchallenge. I -- you know, I don't think we have enough cases to know that. I mean, we've got a time period from January -- mid January to mid May, she's on it, she's off it, she's on it, it happens.

I don't think either of us, for sake of argument, can make it -- make that month and a half or six weeks that she was off it into something when we don't know what the exam was like.

And I don't think, actually, the case reports give enough information to really get a feel for were all these patients taking it every day at a certain dose before the symptoms began or were some of them on it and off it. I think it would have to be looked at very carefully.

Q (BY MR. PRICE) In terms of the natural history of the condition, in your view, is it common for PTC to be silent for a period of time before headaches or other symptoms begin?

A Actually, in my practice, yes. And that's -- that's -- but that reflects quaternary care, fourth level care, because these people --

Q Meaning more serious cases?

A Meaning more serious, because what happens is that because they don't have the -- the run of the mill symptoms of raised intracranial pressure to have signaled someone to look at their eyes, they go

unrecognized for a long time until their vision is what brings them to attention.

It's not the exact picture we have here, but certainly we have lots of patients like that. So how do I equate that to the general population of pseudotumor patients? It's less common, but it's, you know, the old double negative, it's not uncommon.

Q Okay. Are there -- besides the headaches, are -- and actual visual loss, are there other common initial presenting symptoms?

A Right, so about a third of patients will have double vision, which I believe she did, so she had a sixth nerve palsy. And before that, if you ask, you may get a more frequent reporting of certain symptoms that most people don't necessarily volunteer.

And that includes what we call transient visual obscurations, which are blackout -- very brief, seconds-long blackouts of vision in one eye or the other, usually with changes in posture, like going from tying your shoe to going up.

And about 80 percent of patients, if you ask, will have that whooshing noise in their ears that most think is just normal. They don't really think about it, but if you specifically ask them, they'll say, "Oh,

yeah, I was wondering what that was." And it's because it's not usually as bothersome as the person I wrote the paper -- the couples we wrote the paper about, but if you listen quietly, they can actually hear their heart beat in their ears.

So no one really asked her. I don't even know if anybody asked her when she showed up. I don't think so.

Q Is that whooshing in the ear, as you've described it, always a symptom of elevated intracranial pressure, or are there other things that can cause the symptoms?

A Oh, there are other things that can cause that, but it's a very common finding in patients with elevated intracranial pressure, it's just usually not something they usually volunteer. You have to ask about it.

Q Based on your review of Katelyn Weilbrenner's medical records, do you have an impression as to the current status of her vision?

A Yes, sir.

Q Which is what?

A So, the latest note I have that's an ophthalmology note is dated May 22nd, 2008. It's from

Dr. Croyle. She's 20/25 in her right eye, 20/70 minus 1 in her left eye. She has bilateral optic atrophy. And Humphrey visual fields show mostly inferonasal defects in the right eye and inferonasal greater than superonasal defects in her left eye.

Q Can you describe in laymen's terms what the inferonasal defects mean?

A So, basically, from midline toward her nose, she doesn't see as well. And in the right eye, it's mostly toward the nose and down. And in the left eye, it's pretty much the whole nasal area with a little involvement centrally, which is why her visual acuity, the ability to see the eye chart, is low, is down as well.

Q Can you tell me what that pattern of vision means in terms of the optic nerve damage that she suffered?

A Certainly. So, first of all, the -- the whiteness of her optic nerves tells you that she's lost a lot of optic nerve fibers. And the optic nerve were actually quite lucky, we have a lot of redundancy. So she still has visual function despite some very nasty looking optic nerves.

If we look at the Humphrey visual field, her

latest Humphrey visual field that I have here -- I think it's this one. Let's see. Just looking at June 19, '07, visual field just because it's the one that I could find most quickly, because they're all about the same --

Q And this is dated --

A June 19th, 2007.

Q Okay. And this is part of the medical records in Exhibit 2?

A Yes, sir. And so you see here that she's got a dense inferonasal defect in her right eye, plus what we would call an inferior arcuate defect, so it extends from the normal physiologic blind spot all the way in an arc inferiorly. So she's basically missing her vision completely inferiorly and a little bit superiorly on the nasal part towards the nose. This is the right eye.

Q Okay. Before you go on --

A Yeah.

Q -- just for the record, you're referring to the image in the upper right portion of the page, and the darkened or blackened part of that image is what you were pointing to or identifying as enabling you to determine that that's where the visual defect is?

A That's correct. And so that was the right eye.

And in the left eye -- so nasal is now this way (indicating), toward the nose here -- she's lost even more superiorly, although it's a little less dense inferiorly toward her blind spot.

So for all functional purposes, she can see in the upper outer quadrants of each of her eyes.

Q Okay. And again, with the left eye, you're referring to the image in the upper right side of the page?

A Yes, which is called the gray scale. Because it's in shades of gray.

Q And the other graphs showed the same information in different graphic format?

A Right. Correct, either numerically or in boxes.

Q Okay. You have not examined Katelyn Weilbrenner yourself; is that correct?

A That is correct.

Q Do you have an opinion as to whether her vision loss is permanent?

A Yes, I do have an opinion, and yes, I do believe it is permanent.

Q And that's because once nerve fibers in the optic nerve have died, they don't recover; is that correct?

A That is correct.

Q Are you aware of any experimental procedures or studies, the intent of which is to revive or resuscitate vision in a case like Katelyn Weilbrenner's?

MR. GAINER: Object to form, but you may answer.

THE WITNESS: So there are obviously many studies ongoing to see if we can get the optic nerve to regenerate, so those are rather basic science studies. The level we're at with that in animal models is taking a rat presumably from no light to shadows at most or light perception at most. So that would not relate to her level of -- of need.

There are studies looking to see if one can increase either awareness or true plasticity of the higher cortical functions that subserve vision, so the brain areas that subserve vision, to enhance someone's functional ability who has an afferent

problem, in other words, either retinal or optic nerve.

And there's some evidence that there are some training programs that may help people functionally, although the exact mechanisms of that action are highly controversial and debated.

Specifically in her case, since she has such good visual acuity retained in one eye, in her right eye, it probably -- her brain wouldn't listen necessarily to any attempt to enhance the central vision in her left eye.

The question would be would some of these programs potentially increase her functional ability as regards her peripheral visual field. And, again, that is very controversial. If she were my patient, I probably would not have her spend money out of pocket on attempting that.

On the other hand, if it were available and she was willing to put the time and effort in, because it's talking about an hour a day on a computer, six days out of seven, for six months, just to see if it might help,

then I -- I would give her my blessing, but I don't think we're talking about anything that is of remarkable gains.

Q (BY MR. PRICE) Okay. Is there a particular medical center where that study that you last described is being done?

A Well, we did a study on patients with anterior ischemic optic neuropathy using a computerized program called Vision Restoration Therapy, which is the kind of thing I'm talking about, and the patients did feel functionally improved. They had no documentable change in their visual field, however.

Q Absent a recurrence of PTC, would you have an expectation that Ms. Weilbrenner's optic nerve damage will worsen?

A No, although there unfortunately are reports, we know that you have a certain amount of attrition normally, as we age, of our optic nerve fibers. And there have been reports of people becoming functionally different over time even though we know that the cause of their optic neuropathy is no longer there, such as people with traumatic optic neuropathy or compressive optic neuropathy in which the tumor has been removed, who many, many years later will have less function as

documented by visual field or by functional measures.

And the only explanation we have for that is the physiologic finding that we know happens, process that we know happens, which is the normal attrition of optic nerve fibers with age. And you could argue that that's fine in you or me, but in someone who starts at a lower number, it may become manifest as they get older.

In general, we say, unless there is another superimposed problem or a recurrence of the problem, she should be stable, and you could even argue could functionally get better at adapting over time, because to some extent, that always happens, too, although usually, again, that's something that happens within six months to a year.

Q So the disease process itself is over in --

A Yes, sir.

Q Are you aware that Katelyn Weilbrenner has a driver's license?

A I was made aware of that in her deposition.

Q Okay. Would you -- if you were her treating physician, would you advise her to be driving?

A Whether I advise or not is not the issue. She's illegal to drive in the state of Georgia.

Q Okay. Is it your intention to bring that to anybody's attention?

A I guess it has been by being said at this deposition, and it was one of the things that truly concerns me. I do not, by law, have to report. It's not like if you know a patient of yours has a seizure or something like that, there's no law that says that.

One could also argue that if she passed the driver's test, then that's the State of Georgia's issue. But if you look at the letter of the law in the state of Georgia, it requires 140 degrees of contiguous visual field with both eyes open, and I do not believe those visual fields show 140 degrees of contiguous visual field.

Q Beyond what you've seen in the deposition transcripts, various deposition transcripts, do you have any knowledge or information as to Katelyn Weilbrenner's actual functionality, you know, how she --

A No, only from the depositions -- --

Q -- has adapted?

A -- it absolutely seems that she appears to be doing well, progressing in school. She has to read slower than she had prior to this. That's just in the

depositions. But outside of the depositions, I know nothing more.

Q And do you intend to offer any opinions as to her occupational or -- or -- and I use that in a -- I guess a technical sense of occupational therapy, sense of what she will be able to do with her life?

A No, sir, I will be offering no opinions in that regard.

Q Okay. Have we now discussed, in one form or another, all the opinions that you intend to at this time, or at least as you know as you sit here, intend to offer in this case?

MR. GAINER: Object to form, but you may answer.

THE WITNESS: I believe so, yes, sir.

MR. PRICE: Okay. I think I'm done. Thank you, Dr. Newman.

MR. GAINER: Okay.

(Whereupon, there was a discussion off the record.)

MR. GAINER: I'll ask one question.

EXAMINATION

BY MR. GAINER:

Q Doctor, while you were not asked specifically this, I think that Mr. Price was getting at aspects of

your testimony concerning the degree of visual loss that she has, in particular, field of vision and that sort of thing.

Let me simply ask you, do you have an opinion as to whether or not Ms. Weilbrenner is legally blind, as would be provided under AMA guidelines?

A Yes, by visual field criteria, she would be considered legally blind.

MR. GAINER: Okay, that's all I have.

FURTHER EXAMINATION

BY MR. PRICE:

Q How do you define legally blind?

A So, again, I -- it's not my definition, but the American Medical Association guidelines would say 20/200 or worse in the best eye, or visual field loss encroaching within the 20 degrees of central visual fixation. That's --

Q And so it's the second one of those criteria that you are applying --

A Yes, sir.

Q -- when you say that you think she's legally blind?

A Yes, sir.

Q Do you know what the legal implications are

NANCY J. NEWMAN, M.D.

of being legally blind?

A No, sir.

Q Beyond the -- the medical definition that you've cited, do you know what any -- strike that.

What is the significance, to you, as a physician, of the fact that she meets that criterion for being legally blind?

MR. GAINER: Object to form, but you may answer.

THE WITNESS: Nothing. I mean, I'll be very honest with you. To me, it's much more an issue of her functionality. I've seen people with far better visual fields than hers completely crippled by it. They don't function.

I've seen people with worse visual function than her insisting that they can do lots of things, and maybe they can.

So to me -- I was asked a specific question by definition of how I understand the definition of legal blindness. To me, it's more an issue of functionality.

And the same goes with driving. The law in Georgia would make her illegal to drive.

I have no idea whether she's functionally quite capable or not of driving.

MR. PRICE: Okay, thank you.

MR. GAINER: Okay.

(Whereupon, there was a discussion off the record.)

MR. PRICE: We're going back on the record just to sort of subdivide Exhibit 2 into 2A, 2B, 2C, so she can figure out exactly what it is.

2A will be the binder of medical records which just says, "Katelyn Weilbrenner," on the outside, plus the clipped documents from Bay Medical Center, which we'll stick in the pocket.

2B we'll make the binder of depositions, including the clipped document, which is the Dr. Chaum rough draft.

And then 2C we'll make the three clipped groupings of documents, which are the plaintiffs' disclosures of expert witnesses' versions -- or rounds 1, 2, and 3.

(WHEREUPON, Newman Exhibit 2 was subdivided and remarked as Newman Exhibit 2A, Newman Exhibit 2B, and Newman Exhibit 2C were marked for identification.)

NANCY J. NEWMAN, M.D.

(Deposition concluded at 1:29 p.m.)

C E R T I F I C A T E

STATE OF GEORGIA:

COUNTY OF FULTON:

I, SHARON A. GABRIELLI, HEREBY CERTIFY that the foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness.

I FURTHER CERTIFY that I am not kin or counsel to the parties in the case; am not in the regular employ of counsel for any of said parties; nor am I in any way financially interested in the result of said case.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of March, 2009.

----------------------------------------

SHARON A. GABRIELLI, RPR

CCR-B-2002

NANCY J. NEWMAN, M.D.

E R R A T A S H E E T

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e) any changes in form or substance which you desire to make to your deposition testimony shall be entered upon the deposition with a statement of the reasons given for making them.

To assist you in making any such corrections, please use the form below. If supplemental or additional pages are necessary, please furnish same and attach them to this errata sheet.

- - -

Page_____ Line______should read:_________________
Reason for change:_______________________________

Page_____ Line______should read:_________________
Reason for change:_______________________________

Page_____ Line______should read:_________________
Reason for change:_______________________________

Page_____ Line______should read:_________________
Reason for change:_______________________________

Page_____ Line______should read:_________________
Reason for change:_______________________________

Page_____ Line______should read:_________________
Reason for change:_______________________________

_______________________
Signature of Deponent

Sworn to and Subscribed before me

_____________________, Notary Public.

This________day of _______________, ____.