**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**IN RE:**

**MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY LITIGATION (NO. II)**

**17-MD-2767 (PAE)**
**17-MC-2767 (PAE)**

***This Document Relates To All Actions***

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE THE GENERAL CAUSATION EXPERT TESTIMONY OF WILLIAM JUSKO, PH.D.**

# TABLE OF AUTHORITIES

## CASES

*Amorgianos v. AMTRAK*, 137 F. Supp. 2d 147 (E.D.N.Y. 2001), *aff'd* 303 F.3d 256 (2d. Cir., 2002)....................19

*Amorgianos v. Amtrak*, 303 F.3d 256 (2d. Cir., 2002)....................*passim*

*Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.*, 222 F.Supp.2d 423 (S.D.N.Y., 2002)....................11

*Awad v. Merck & Co.*, 99 F. Supp 2d 301 (S.D.N.Y. 1999), *aff'd sub nom. Washburn v. Merck & Co.*, 213 F.3d 627 (2d Cir. 2000)....................14

*Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996)....................19

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)....................*passim*

*GE v. Joiner*, 522 U.S. 136 (1997)....................5, 11

*Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447 (S.D.N.Y. 2014)....................4

*Heller v. Shaw Indus., Inc.*, 167 F.3d 146 (3d Cir. 1999)....................5

*In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164 (S.D.N.Y. 2009)....................10

*In re M/V MSC Flaminia*, No. 12-cv-8892 (KBF), 2017 U.S. Dist. LEXIS 119146 (S.D.N.Y. July 28, 2017)....................4, 10, 15

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004)....................7, 14

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)....................9

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612 (S.D.N.Y. 2016)....................4, 16

*Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202 (2d Cir. 1984)....................19

## RULES

Fed Rules Evid R 702....................4

Fed Rules Evid R 703....................10, 15

**SCIENTIFIC ARTICLES**


Africander D, et al., *Molecular mechanisms of steroid receptor- mediated actions by synthetic progestins used in HRT and contraception*, 76 STEROIDS 636-52 (2011) .......................... 12, 13

Apter, D. et al., Pharmacokinetics of two low-dose levonorgestrel-releasing intrauterine systems and effects on ovulation rate and cervical function: pooled analyses of phase II and III studies. *Fertil. Steril.* 2014;101(6):1656-1662 .................................................................... 3, 18

Botella et al., Lack of estrogenic potential of progesterone- or 19-nor-progesterone-derived progestins as opposed to testosterone or 19-nor-testosterone derivatives on endometrial Ishikawa cells, J. Steroid Biochem. Mol. Biol. 55(1):77-84 (1995) ........................................ 12

Garcia-Becerra et al., Comparative evaluation of androgen and progesterone receptor transcription selectivity indices of 19-nortestosterone-derived progestins, 91 J. Steroid Biochem. Mol. Biol. 21-27 (2004) .............................................................................................................. 12

Jusko WJ, Perspectives on variability in pharmacokinetics of an oral contraceptive product. *Contraception*. 2017; 95(1): 5–9 ......................................................................................... 5, 8

Kancheva R, Hill M, Novak Z, Chrastina J, Kancheva L, and Starka, *Neuroactive steroids in periphery and cerebrospinal fluid*, Neuroscience 191: 22-27, 2011 ....................................... 17

Kempegowda P, et al. 2016 Women with idiopathic intracranial hypertension have a distinct andro-metabolic signature compared to polycystic ovarian syndrome and simple obesity. 18th European Congress of Endocrinology 2016, Munich, Germany. *Endocrine Abstracts* 41 EP728 ......................................................................................................................... 4

Krattenmacher R, Drospirenone: pharmacology and pharmacokinetics of a unique progestogen *Contraception*. 2000; 62:29-38 ......................................................................................... 12

Kuhl H, Pharmacology of estrogens and progestogens: influence of different routes of administration, 8(S1) Climacteric 3-63 (2005) …………………………………………12

Kumar et al., Nestorone: a progestin with a unique pharmacological profile, 65 STEROIDS 629-36 (2000) ............................................................................................................................ 12

Lu NZ, et al., International Union of Pharmacology. LXV. The Pharmacology and Classification of the Nuclear Receptor Superfamily: Glucocorticoid, Mineralocorticoid, Progesterone, and Androgen Receptors, PHARMACOLOGICAL REVIEWS 58(4):782-797 (2006) ............................. 2

Lundeen, et al., Rat uterine complement C3 expression as a model for progesterone receptor modulators: characterization of the new progestin trimegestone, J Steroid Biochem Mol Biol 78 (2001) 137-143 ................................................................................................................ 12

McGeeney BE & Friedman DI, Pseudotumor Cerebri Pathology, *Headache* 2014;54:445-458 ... 3

Moore et al., *Multiple nuclear receptor signaling pathways mediate the actions of synthetic progestins in target cells*, 357 MOLECULAR & CELLULAR ENDOCRINOL. 60-70 (2012)..... 11, 13

Mueck & Sitruk-Ware, Nomegestrol acetate, a novel progestogen for oral contraception, 76 Steroids 531-9 (2011) ........................................................................................................ 12

Muhn P, et al., Drospirenone: a Novel Progestogen with Antimineralocorticoid and Antiandrogenic Activity, ANNALS NEW YORK ACADEMY OF SCIENCES 311-35 (1995) . 12

Philibert et al., The pharmacological profile of a novel norpregnane progestin (trimegestone), 13 Gynecol. Endocrinol. 316-26 (1999) ........................................................................... 12

Salpietro V, Arrigo T, Loddo I, et al. Idiopathic Intracranial Hypertension: a unifying neuroendocrine hypothesis is possible? The Child: A Journal of Pediatrics, 2012;1(2) ............ 3

Schindler et al., Classification and pharmacology of progestins, 46 Maturitas S7-S16 (2003) ... 12

Winneker RC, et al., The preclinical biology of a new potent and selective progestin: trimegestone 68 Steroids 915-20 (2003) (2003)........................................................................... 12

Zhang et al., In vitro characterization of trimegestone: a new potent and selective progestin, 65 Steroids 637-43 (2000) (2000)................................................................................... 12

## TABLE OF CONTENTS

**INTRODUCTION** ..... **1**

**FACTUAL BACKGROUND** ..... **1**

I. Pharmacological Properties of Levonorgestrel ..... 1

II. Biological Mechanism(s) of Intracranial Hypertension ..... 3

**LEGAL STANDARD** ..... **4**

**ARGUMENT** ..... **5**

I. Dr. Jusko's opinions on the variability of LNG levels among and between Mirena users are entirely subjective and do not constitute admissible scientific knowledge ..... 7

II. Dr. Jusko's opinions on Plaintiffs' proffered mechanism(s) of disease are uninformed and unhelpful to the trier of fact ..... 9

A. Dr. Jusko's opinions on LNG's binding to the mineralocorticoid receptor (MR) and potential for biological activity are contrary to the scientific literature and and are the product of admittedly flawed methodology. ..... 11

B. Dr. Jusko's opinions on LNG's binding to the androgen receptor (AR) and potential for biological activity are uninformed and contrary to well-accepted scientific principles ..... 14

C. Dr. Jusko's opinions regarding concentrations of LNG in the brain and CSF are faulty conclusions based in false premises. ..... 16

III. Dr. Jusko is categorically unqualified to opine on the adequacy of Mirena's label ..... 19

**CONCLUSION** ..... **20**

## INTRODUCTION

Dr. Jusko attempts to rebut Plaintiffs' experts in three main areas: 1) pharmacokinetics and variability of levonorgestrel (LNG) in Mirena users; 2) mechanism of disease of pseudotumor cerebri/intracranial hypertension (PTC/IH); and 3) the adequacy of the Mirena label. Ex. A, Jusko Rpt. Yet, Dr. Jusko's opinions are admittedly subjective, largely beyond his expertise, and contrary to well-accepted scientific principles. In addition to the common methodological shortcomings that Dr. Jusko shares with Defendants' other expert witnesses, including a complete lack of clear methodology, differential application of methodology to sources not in his favor, and opining in matters far beyond his expertise, (*see* Plaintiffs' Omnibus Motion to Exclude Defendants' General Causation Expert Witnesses, hereinafter "Plfs' Omnibus Mot."), Dr. Jusko's opinions are flawed for multiple reasons that render them uniquely unreliable and necessitate their exclusion, or alternatively, significant limitation.

## FACTUAL BACKGROUND

### I. Pharmacological Properties of Levonorgestrel

The field of pharmacology encompasses both pharmacokinetics and pharmacodynamics.[1] Ex. B, Jusko 2018 Dep. at 25:22-26:3. Thus, the pharmacologic properties of levonorgestrel (LNG) include its absorption, distribution, metabolism, and excretion, as well as its biological effects and mechanism of action. LNG is a potent synthetic progestin[2] derived from testosterone and is the only active ingredient in Mirena. Ex. C, Hofmann Dep. at 163:7-163:9; *see also* Ex. D, Dfts' Objs and Resps to Plfs' Second Set RFAs, Nos. 1, 2.

[1] Defendants designated Dr. Birte Hofmann as a corporate representative pursuant to Rule 30(b)(6) in response to Plaintiffs' Pharmacokinetics 30(b)(6) Notice. As Dr. Hofmann explained, pharmacokinetics includes "what the body does to the drug, so once it gets into the body, it is absorbed, distributed, metabolized, and excreted." Ex. C, Hofmann Dep. at 31:23-32:3. Pharmacodynamics "defines what the drug does in the body, in terms of where does it go and bind to which – what is the biological action." *Id.* at 46:18-46:20.

[2] Progestin is one of many names for a class of synthetic steroid hormones such as LNG.

Mirena is an intrauterine device ("IUD") manufactured and marketed by Defendants, intended to release approximately 20 micrograms of LNG per day for up to five years. Ex. E, 2017 Mirena Label. After LNG is released from Mirena into the uterine cavity, it goes to the endometrium (the lining of the uterus) and is then absorbed through the highly-vascularized lining into the systemic circulation, *i.e.*, the blood. Ex. C, Hofmann Dep. at 56:11-56:21; 57:3-57:6; 57:8-57:12. Serum (*i.e.*, systemic; blood) levels of LNG vary greatly both inter- and intra-individually, regardless of the dose or method of administration. Ex. E, 2017 Mirena Label.

Once in the blood, most of the LNG is bound to the proteins albumin and sex hormone binding globulin (SHBG). *Id*. The fraction of LNG that is bound to SHBG and albumin is thereby "occupied" and incapable of binding to receptors; hormonal activity is therefore limited to the degree of binding.[3] Therefore, the free (*i.e.*, unbound) fraction of LNG is highly relevant to predicting its capacity for systemic biological activity. Unbound steroid hormones, including LNG, "largely act through the nuclear receptor 'super-family' mechanisms where drug-receptor binding is followed by alteration of DNA-mediated transcription of various genes leading to further biochemical and physiological effects.[4] Binding of drugs to diverse receptors in cell or

---

[3] This concept is widely known as the "Free Hormone Hypothesis." Dr. Hofmann testified as 30(b)(6) designee that the Free Hormone Hypothesis "seems to explain a great deal about what happens with sex steroids." *see* Ex. C, Hofmann Dep. at 74:24-75:2. Dr. Hofmann also agreed more than one dozen times that only the "free" or "unbound" concentration of LNG is capable of biological activity. *See id*. at 177:21-178:2; 195:24-196:24; 197:22-198:9; 202:15-202:17; 229:22-230:7; 241:13-18; 243:16-243:25; 251:15-19; 270:6-270:16; 271:20-272:6; 274:4-274:14; 280:2-280:11; 289:11-289:16; 406:21-407:1; 407:11-407:18; 410:3-410:13; 412:19-412:22.

[4] Steroid hormones are classified by groups, as are their corresponding receptors. Androgens and estrogens, for example, have the highest affinity to the Androgen Receptor (AR) and Estrogen Receptor (ER), respectively. The other steroid hormone receptors are the Progesterone Receptor (PR), Glucocorticoid Receptor (GR), and Mineralocorticoid Receptor (MR). Every steroid hormone has varying relative binding affinity (RBA) – or none at all – to the various receptors. Once a steroid hormone is bound to a receptor, it may either induce activity (agonism), or inhibit activity (antagonism). Ex. F1, Lu NZ, et al., International Union of Pharmacology. LXV. The Pharmacology and Classification of the Nuclear Receptor Superfamily: Glucocorticoid, Mineralocorticoid, Progesterone, and Androgen Receptors, PHARMACOLOGICAL REVIEWS 58(4):782-797 (2006). For example, mineralocorticoids including aldosterone induce water and sodium production and reabsorption by agonism at the MR. *Id.* The RBA of LNG to the MR, therefore, is represented as a percentage of the capacity of a true mineralocorticoid such as aldosterone. Androgens including testosterone are responsible for male development and can cause adverse effects such as hirsutism, acne, and amenorrhea in women. *Id.* The RBA of LNG to the AR is thus represented as a percentage of the capacity of a true androgen such as dihydrotestosterone (DHT).

tissue preparations is a common screening method to assess the potential for further activity of the compounds." Ex. A, Jusko Rpt. at p. 9. This process is well-characterized in the literature.

The presence and biological effects of LNG have been noted in organs and tissues throughout the body, including the brain. For example, 6.8% of women in Mirena clinical trials have reported acne, and 16.3% have reported headache/migraine. Ex. E, 2017 Mirena Label. Numerous studies have also demonstrated that LNG can inhibit ovulation, as stated in the FDA-approved Mirena® label and admitted by Defendants. *Id. See also* Ex. D, Dfts' Objs and Resps to Plfs' Second Set RFAs, No. 14. It does so by "suppress[ing] the hypothalamic-pituitary-ovarian [axis]," which is located "in the brain." Ex. B, Jusko 2018 Dep. at 203:22-205:2; *see also* Ex. F2, Apter, D. *et al.*, Pharmacokinetics of two low-dose levonorgestrel-releasing intrauterine systems and effects on ovulation rate and cervical function: pooled analyses of phase II and III studies. *Fertil. Steril.* 2014;101(6):1656-1662. Thus, both the contraceptive efficacy and adverse effects of LNG are attributable to these hormone-receptor interactions.

## II. Biological Mechanism(s) of Intracranial Hypertension

Intracranial hypertension (IH) generally refers to the condition of elevated cerebrospinal fluid (CSF) pressure. When no clear pathology is identified, the condition is often termed Pseudotumor Cerebri (PTC). Ex. F3, McGeeney BE & Friedman DI, Pseudotumor Cerebri Pathology, *Headache* 2014;54:445-458. CSF is mainly produced at the epithelial cells of the choroid plexus (CP) in the brain. Although no mechanism for PTC/IH has been conclusively established, fluid dynamic changes in the CSF are clearly involved. *Id.* Nearly all of the published literature in this regard directly implicates steroid hormones. Specifically, the literature supports a mechanistic role for mineralocorticoid agonists in the choroid plexus and altered levels of circulating androgens. Ex. F4, Salpietro V, Arrigo T, Loddo I, et al. Idiopathic Intracranial Hypertension: a unifying neuroendocrine hypothesis is possible? The Child: A Journal of

Pediatrics, 2012;1(2); *see also* Ex. F5, Kempegowda P, et al. 2016 Women with idiopathic intracranial hypertension have a distinct andro-metabolic signature compared to polycystic ovarian syndrome and simple obesity. 18th European Congress of Endocrinology 2016, Munich, Germany. *Endocrine Abstracts* 41 EP728.

## **LEGAL STANDARD**

Under Federal Rule of Evidence 702, a witness must be qualified to offer opinion evidence by "scientific, technical, or other specialized knowledge" that will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed Rules Evid R 702. Although the standard for qualification is a liberal one, if "there is a mismatch between the area of expertise and the proffered opinions, there is a possibility of cloaked unreliability. An individual with expertise in one field may not offer opinions in another: the expertise and area of proffered opinions should be closely related." *In re M/V MSC Flaminia*, No. 12-cv-8892 (KBF), 2017 U.S. Dist. LEXIS 119146, at *170 (S.D.N.Y. July 28, 2017) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993)).

In addition to qualification, "[t]he subject of an expert's testimony must be 'scientific . . . knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 589-90. Thus, the district court is charged with a "gatekeeping" function under Rule 702: "it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d. Cir., 2002) (citing *inter alia*, 509 U.S. at 597); *see also Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 464-65 (S.D.N.Y. 2014). The district court must ensure "that the proffered testimony is 'more than subjective belief or unsupported speculation.'" *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 643 (S.D.N.Y. 2016) (quoting *Daubert*, 509

U.S. at 590). Plaintiffs adopt and incorporate in full Plfs' Omnibus Mot., § II, for a full discussion of reliability factors considered in the Second Circuit under *Daubert*.

Although the district court is directed under *Daubert* to focus on the principles and methodology employed by the expert without regard to the court's belief as to the correctness of the conclusions the expert has reached, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *GE v. Joiner*, 522 U.S. 136, 146 (1997). When an expert's opinion does not reliably follow from the data or studies known to the expert, and the methodology used, "*Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 265-66 (citing *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999)).

**ARGUMENT**

Where convenient, Dr. Jusko's opinions are at odds with the scientific literature, at odds with his own publications, at odds with the agents and/or employees of the companies that have retained him, at odds with the corporate representatives designated by the companies that have retained him, and at odds with the FDA-approved labeling with which he elsewhere purports to agree emphatically. Where Dr. Jusko's opinions are manifestly without basis, and in areas of expertise where he is categorically not qualified to opine, Dr. Jusko falls back on common sense, his ability to read, and documents that he admittedly did not even consider in forming his opinions. These are unquestionably not the qualifications of an expert witness.

Regarding steroid hormone variability, Dr. Jusko's opinions are, as he admits in his own peer-reviewed publication, "subjective and context related." *See* Ex. B, Jusko 2018 Dep. at 36:22-37:5; *see also* Ex. G, Jusko WJ, Perspectives on variability in pharmacokinetics of an oral contraceptive product. *Contraception*. 2017; 95(1): 5–9. Yet, he asserts his own subjective and

context related definition and characterization of variability throughout his expert report as well-established tenets of pharmacology.

Regarding mechanism of disease, Dr. Jusko has no demonstrable understanding of Plaintiffs' experts' opinions, but rather grounds his opinions in his understanding that the term idiopathic means that there is no cause. Although Dr. Jusko describes expertise in causation as a collaborative effort, of which he limits his own qualifications to issues specifically related to pharmacology, he nevertheless persists in offering his unsupported causation opinions. Ex. B, Jusko 2018 Dep. at 229:1-231:17. Furthermore, despite testifying under oath nearly two years ago that the sources he relied upon for critical underpinnings of his opinions do not in fact stand for the proposition for which he cited them, Dr. Jusko continues to cite these sources as supportive of his opinions here. Indeed, Dr. Jusko countered that one would need to trace every reference to its origin and understand the methodology used in each study in order to reach a proper conclusion. He did not do so. *Id.*at 145:2-164:24.

Regarding the Mirena label, Dr. Jusko's opinions are untimely and beyond the scope of the Court's orders regarding the current phase of the litigation. Regardless, he lacks basic qualifications to opine on the Mirena label or labeling regulations aside from his knowledge "that there are FDA guidances on what should be in labels," and his ability to "read those guidances as well as anyone." *Id.* at 241:21-241:24. Moreover, Dr. Jusko admittedly formed his limited labeling opinions without even reviewing the most recent labeling variation (approved by the FDA in 2017), or the most recent FDA guidance on clinical pharmacology labeling (publicly available since 2016), despite his testimony that it was generally "important to rely upon the most accurate and up-to-date information available," and that it would be of relevance to review the most recent Mirena label before providing opinions in this case. *Id.*at 39:14-40:19; 243:17-245:18.

Altogether, Dr. Jusko's expert report is a disjointed amalgamation of his opinions from a prior case regarding experts and opinions that are no longer disclosed by any Plaintiff in this litigation, passages from his own peer-reviewed publications selectively pasted and edited where inconvenient to the opinions he expresses here, commentary without meaningful synthesis, and adoption of his own subjective definitions and standards as authoritative without disclosure of their origin. Dr. Jusko does not deny that Plaintiffs' experts have "provided extensive reviews with abundant literature citations" in support of their opinions; rather, his criticisms lie with their adverse conclusions, their utilization of terminology differing from his own, and their application of the valid scientific process of synthesizing known data. Ultimately, Dr. Jusko's opinions are unhelpful to the trier of fact because they are formed from flawed methodology or flawed application of appropriate methodology, and because they are well beyond his self-limited expertise. These opinions should be excluded, or alternatively, significantly limited.

## I. Dr. Jusko's opinions on the variability of LNG levels among and between Mirena users are entirely subjective and do not constitute admissible scientific knowledge

Under Rule 702 and *Daubert*, "the requirement of 'knowledge' guards against the admission of subjective or speculative opinions." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004). Dr. Jusko's opinions on the variability of LNG levels in Mirena users are admittedly subjective, and as such do not constitute scientific knowledge.

At the outset of his report, Dr. Jusko contends that: "Levonorgestrel serum concentrations in women are moderately variable, including plasma concentrations in women using Mirena."[5] Ex. A, Jusko Rpt. at 1. Although Dr. Jusko himself used this word to describe the level of variability of LNG concentrations in his report, asked to define "moderate," Dr. Jusko offered: "That's a

[5] Dr. Jusko uses the terms "plasma" and "serum" interchangeably throughout his report, as he explains in a footnote. *See* Ex. B, Jusko Rpt. at p. 1, n.1. Both refer to the blood, or systemic, levels.

rather subjective term." Ex. B, Jusko 2018 Dep. at 32:14-32:21. Further elaboration by Dr. Jusko on this point revealed multiple layers of subjectivity, and a noted lack of consensus in the scientific community. At his deposition, Dr. Jusko explained that after disclosing his opinions in earlier Mirena PTC/IH cases, he "thought the information that [he] gathered was quite valuable and [ . . . ] the field should see it, so [he] extended [his] assessments and published an article on them -- on the subject matter." *Id.* at 33:24-34:13. That information was published as Jusko WJ, Perspectives on variability in pharmacokinetics of an oral contraceptive product, *Contraception* 2017; 95(1):5-9. Ex. B, Jusko 2018 Dep. at 35:6-35:12; *see also* Ex. G, Jusko 2017. Therein, Dr. Jusko states: "There appears to be no consensus in PK as to what constitutes low, moderate or large intersubject variability." *Id*. at 36:1-36:6. Asked if he agreed with that statement as he wrote it, Dr. Jusko explained that "it was pertaining to what was existent in the literature before [he] did [his] analysis," before which, he "could not find any publications that went to the extent of trying to be definitive on that issue." *Id*. at 36:7-36:11; 36:16-18. Thereafter, Dr. Jusko has apparently adopted his own definition as definitive and applies it throughout his report as such.

The inappropriate application of the term "moderate" throughout Dr. Jusko's report is further underscored by another line in his own publication: "The consideration of low, moderate or high variability is both subjective and context related." *Id.* at 36:22-37:5. Notably, Dr. Jusko's context did not include Mirena users, as his article exclusively describes pharmacokinetic variability in oral contraceptive users. Faced with Defendants' internal documents specifically referring to the variability with Mirena as "marked" and "wide", Dr. Jusko claimed that his assessment is "very comprehensive. It's much more appropriate." *Id.* at 50:21-50:23. Dr. Jusko even went so far in defending the use of his own preferred term as to reject the term "wide" in the FDA-approved Mirena label, a document he describes elsewhere in his report as "an accurate

reflection of pharmacokinetic and pharmacodynamic information for LNG and Mirena." *Id.* at 42:15-43:9; *see also* Ex. A, Jusko Rpt. at 19.

Furthermore, Dr. Jusko explained at his deposition that the context of the data that he was assessing was "typically young healthy women so that there are no known strong alternative factors causing variability." *Id*. at 37:10-37:16. Yet, many of Dr. Jusko's opinions regarding LNG pharmacokinetics and variability specifically pertain to obese women, and differences in these parameters due to the condition of obesity. As Dr. Jusko acknowledges in his report: "Obesity is a complicating factor in the PK/PD[6] of drugs and hormones." Ex. A, Jusko Rpt. at p. 4. Dr. Jusko's utilization of the term "modest" to define LNG serum levels and variability in Mirena users throughout his report is, by his own definition, subjective and lacking necessary context. As such, his opinions do not constitute admissible expert testimony and should therefore be excluded.

## II. Dr. Jusko's opinions on Plaintiffs' proffered mechanism(s) of disease are uninformed and unhelpful to the trier of fact.

As part of its gatekeeping task, "the district court must 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Where an expert's opinions do not meet this level of rigor, they must be excluded. Dr. Jusko's opinions on the biological processes by which Mirena may cause PTC/IH are beyond his expertise, admittedly flawed in foundation, and ultimately unhelpful to the trier of fact.

To the extent that Dr. Jusko does not believe that *any* drug can cause PTC/IH simply because of "the fact that it's considered idiopathic, there's no known cause," Ex. B. Jusko 2018

[6] PK/PD is a common abbreviation for Pharmacokinetics and Pharmacodynamics. *See* Ex. B, Jusko 2018 Dep. at 25:22-26:3.

Dep. at 227:20-227:21, this is "mere personal opinion going beyond his expertise and, as such, would not be helpful to the jury." *See In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 197-98 (S.D.N.Y. 2009). To the extent that Dr. Jusko does feel qualified to address the mechanism opinions proffered by Plaintiffs' experts, it is solely by virtue of his review of their reports and "a number of" references therein – sources that he never cites or analyzes within his own report. Ex. B, Jusko 2018 Dep. at 226:18-227:12. Certainly, Dr. Jusko limits his own expertise in disease mechanism to "insights regarding drugs involved, their pharmacology." *Id.* at 228:12-228:20; *see also id.* at 194:13-194:20 ("Q. So do you intend to give any opinions in this litigation about pathophysiology of PTC or IIH? [ . . . . ] A. No. [ . . . ]") Rather than form an independent opinion using his own expertise, Dr. Jusko "instead restates the findings of others in a field in which he does not himself possess expertise." *See In re M/V MSC Flaminia*, 2017 U.S. Dist. LEXIS 119146, at *231. These are not proper bases of an expert opinion under Rule 703. *See id.*

Ultimately, Dr. Jusko concludes that Plaintiffs' mechanism opinions are "entirely speculative and unsupported by any direct scientific evidence." Yet, it is a well-accepted scientific process to attribute biological responses to the receptor binding profile of steroid hormones or other drug molecules, and then develop models to account for these responses. Indeed, Dr. Jusko explains in his report that he frequently applies this methodology in his own practice: "In particular, we routinely measure their receptor binding, assess subsequent genomic, proteomic, biochemical, physiologic, and pharmacologic responses to these drugs, and develop mechanistic mathematical models to account for these processes." Ex. A, Jusko Rpt. at p. 2. His refusal to engage in this scientific process here is entirely unscientific.

Furthermore, Dr. Jusko lacks even a basic understanding of any mechanism involving either steroid hormone family (*i.e.*, mineralocorticoids or androgens), or the causation of PTC/IH

generally. Overall, Dr. Jusko's criticisms of Plaintiffs' Experts' mechanism opinions are based in false premises and a brief, litigation-driven review of materials well beyond his expertise and boil down to mere disagreement with their conclusions. Thus, Dr. Jusko's opinions on biological mechanism suffer numerous, additive blows, which together render his mechanism opinions wholly unreliable and unhelpful to the trier of fact.

**A. Dr. Jusko's opinions on LNG's binding to the mineralocorticoid receptor (MR) and potential for biological activity are contrary to the scientific literature and are the product of admittedly flawed methodology.**

"Even if an expert's methodologies satisfy the Daubert standard for admissibility, the court must still determine whether that evidence actually supports the expert's conclusions. The court must reject expert testimony where 'there is simply too great an analytical gap between the data and the opinion proffered.'" *Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.*, 222 F.Supp.2d 423 (S.D.N.Y., 2002) (quoting *Joiner*, 522 U.S. at 146). Although Dr. Jusko purports to review the pertinent scientific literature before reaching his conclusions on the potential mineralocorticoid activity of LNG, he has admittedly never done so. Yet, after reviewing these very citations at two separate depositions, Dr. Jusko is still adamant that these sources refute a role for LNG in a MR-mediated model of PTC/IH causation. Accordingly, Dr. Jusko's claim that "those [studies] that do show activity show antimineralocorticoid activity" is unsupported, and is willfully ignorant at best. Ex. A, Jusko Rpt. at p. 10.

Dr. Jusko relies on two citations for the proposition that LNG displays antimineralocorticoid activity. The first, by Moore *et al.*, is the only article that has ever listed LNG as an antimineralocorticoid. Ex. H1, Moore *et al.*, *Multiple nuclear receptor signaling pathways mediate the actions of synthetic progestins in target cells*, 357 MOLECULAR & CELLULAR ENDOCRINOL. 60-70 (2012). In their review article, Moore and colleagues offer a string of citations

to other scientific articles for the relative binding affinity (RBA) and activity of LNG; notably, none of these sources list LNG as an antimineralocorticoid.[7]

Among the citations by Moore and colleagues appears Dr. Jusko's second citation, to Africander et al. Ex. H9, Africander et al., *Molecular mechanisms of steroid receptor- mediated actions by synthetic progestins used in HRT and contraception*, 76 STEROIDS 636-52 (2011). Yet, Dr. Africander and colleagues found that literature regarding LNG's biological activity at the MR is "not consistent," citing to another string of studies.[8] *See id.* at p. 639. Review of these underlying references also fails to demonstrate a single source identifying any antimineralocorticoid activity of LNG. Faced with each of the relevant sources at his May 2016 deposition (*i.e.*, those that actually discuss both LNG and MR activity, as detailed in nn.1-2, *supra*), Dr. Jusko was forced to admit that they do not in fact support his contention: "Q. [N]one of these sources say that there is antimineralocorticoid activity; right? A. True." Ex. I, Jusko 2016 Dep. at 222:10-222:13.

Although Dr. Jusko specifically revised this section of his report for disclosure on January 18, 2018, his citations to Moore and Africander remain. *See* Ex. A, Jusko Rpt. at p. 10 (citing to references 50, 54). Despite having reviewed his prior deposition transcript prior to his deposition on February 8, 2018, *see* Ex. B, Jusko 2018 Dep. at 142:23-143:14, Dr. Jusko was *still* unaware that these sources do not support his opinion. *See id.*at 163:8-167:17. Rather than deny this critical flaw in his analysis, Dr. Jusko countered that one would need to review all of the original studies

---

[7] Aside from citation to Africander, discussed in further detail *infra*, Moore and colleagues cite to Botella et al. (1995) (MR not discussed), attached hereto as Ex. H2; Garcia-Becerra et al. (2004) (MR not discussed), attached hereto as Ex. H3; Kuhl (2005) (LNG **not** an antimineralocorticoid), attached hereto as Ex. H4; Kumar et al. (2000) (MR not discussed), attached hereto as Ex. H5; Mueck and Sitruk-Ware (2011) (LNG **not** an antimineralocorticoid), attached hereto as Ex. H6; Phillibert et al. (1999) (MR not discussed for LNG), attached hereto as Ex. H7; and Schindler et al. (2003) (LNG **not** an antimineralocorticoid), attached hereto as Ex. H8.

[8] Aside from citation to Schindler, Kuhl, and Mueck and Sitruk-Ware (*see* n.7, *supra*), Africander and colleagues cite to Krattenmacher (2000) (LNG **not** an antimineralocorticoid), attached hereto as Ex. H10; Winneker (2003) (literature not consistent), attached hereto as Ex. H11. Aside from Philibert (*see* n.1, *supra*), Winneker and colleagues cite to Zhang et al. (2000) (LNG not discussed), attached hereto as Ex. H12; Lundeen et al. (2001) (MR not discussed), attached hereto as Ex. H13; and Muhn (1995) (LNG **not** an antimineralocorticoid), attached hereto as Ex. H14.

to examine their methodology before reaching an appropriate conclusion – an analysis that he admittedly failed to perform over the last two years. *Id.* at 164:14-164:24. Astoundingly, Dr. Jusko maintained this position even after Plaintiffs' counsel reread him the testimony from his 2016 deposition. *Id.* at 166:19-167:17 ("I -- I didn't trace them back, but let me reiterate the statement from Africander, that some of these animal systems do exhibit some antimineralocorticoid activity in rat models.") Unfortunately, for Dr. Jusko's analysis, his failure to critically review the sources he cited cannot be rescued by the content of the sources themselves. Rather, as described *supra*, thorough review of these articles only serves to underscore Dr. Jusko's misplaced reliance. The conclusion that LNG is an antimineralocorticoid "does not reliably follow from the data or studies known to the expert, and the methodology used," and its exclusion is thereby compelled. *Amorgianos*, 303 F.3d at 265-66.

Finally, despite Dr. Jusko's characterization of potential biological effects produced pursuant to these binding properties as "speculation," the very sources Dr. Jusko cites for his opinions endorse this methodology. Ex. H1, Moore *et al.* (abstract); *see also* Ex. H9, Africander *et al.* (abstract). Yet, Dr. Jusko apparently lacks the expertise to determine *which* biological effects would evidence agonistic activity at the MR. *See* Ex. B, Jusko 2018 Dep. at 174:13-175:21 ("Agonism? Well, that would be water retention, but bloating is -- could be more of an exaggerated feature of it that needs to be considered by someone [ . . . ] with more expertise than me.") Moreover, Dr. Jusko rejected even clinical evidence of these effects as merely "coincident with taking the drug" (*e.g.*, bloating, edema, and weight gain), despite acknowledging that he is "not an expert" in clinical trials, but he has "a certain amount of limited common sense." *Id.* at 179:13-179:16. Thus, Dr. Jusko's opinions on the biological activity of LNG at the MR lack a reliable

scientific basis and are admittedly beyond his expertise. As such, they are unhelpful to the trier of fact, and demand exclusion.

**B. A. Dr. Jusko's opinions on LNG's binding to the androgen receptor (AR) and potential for biological activity are unsupported and beyond his expertise.**

In determining whether proffered expert testimony is "good science," "a significant consideration is whether research was conducted independently or for the sole purpose of litigation." *Awad v. Merck & Co.*, 99 F. Supp 2d 301, 303-304 (S.D.N.Y. 1999), *aff'd sub nom. Washburn v. Merck & Co.*, 213 F.3d 627 (2d Cir. 2000); *see also In re Rezulin*, 369 F. Supp. 2d at 420. Despite offering the opinion that a role for androgenic activity in PTC/IH causation is "entirely speculative," Dr. Jusko had never even considered this possibility until three weeks prior to the disclosure of his opinions, and admittedly lacks the relevant expertise.

Notably, when Dr. Jusko was asked to provide an opinion in the above-captioned matter, he did not do *any* research regarding PTC/IH before agreeing to reaffirm his earlier opinion that Mirena does not cause PTC/IH. Ex. B, Jusko 2018 Dep. at 21:9-22:14. Moreover, Dr. Jusko had never even considered an AR-mediated mechanism until Plaintiffs' expert reports were disclosed on December 28, 2018, a mere three weeks prior to the disclosure of his own report. *Id.* at 191:12-192:18. Yet, the majority of the scientific evidence *directly* linking circulating androgens to PTC/IH appeared in the literature *after* Dr. Jusko disclosed his first report. It is inconceivable that a pharmacologist with Dr. Jusko's background in steroid hormones would not even consider the complete pharmacological profile of a drug before determining that the same precluded a plausible biological mechanism. This approach betrays a decidedly unscientific, litigation-driven analysis that cannot pass *Daubert* muster.

Misleadingly, Dr. Jusko alleges that there is no *direct* scientific evidence in support of an androgen-mediated model. To the contrary, Plaintiffs' experts build upon numerous lines of direct

scientific evidence to reach their conclusions; rather, Dr. Jusko takes issue with their synthesis, a process that he was apparently unable to follow. *Id.* at 195:24-196:3. Indeed, Dr. Jusko readily admits in his report that "Plaintiffs have provided extensive reviews with abundant literature citations" in, what he describes as "an attempt to support their conjecture." *Id.* at 195:12-196:9. Dr. Jusko's assessment is plainly nonsensical; a well-supported opinion cannot be conjecture.

More precisely, Dr. Jusko takes issue with the conclusions drawn from valid scientific premises, though he is unqualified to do so and fails to do so with any precision or informed perspective. Dr. Jusko's rejection of Dr. Johanson's model rests on 1) a lack of LNG measurements in the brain or CSF (discussed *infra*), and 2) a lack of scientific *certainty* that PTC/IH is physiologically caused by a hormone-mediated increase in production of CSF. Regarding the second point, Dr. Jusko sticks his head in the sand, oversimplifying Dr. Johanson's model, and refusing to consider the many lines of valid scientific evidence offered in support. Indeed, Dr. Jusko provides neither citation to, nor analysis of, *any* of the sources synthesized by Dr. Johanson; rather, he appears to have simply reviewed Dr. Johanson's report and "a number of" the references cited therein. *Id.* at 226:18-227:12. Whereas Dr. Jusko admits that Dr. Johanson "is a world renowned expert in cerebrospinal fluid production and fluid transport dynamics," *id.* at 196:5-196:9, Dr. Jusko most decidedly is not. He "instead restates the findings of others in a field in which he does not himself possess expertise," which cannot support an expert opinion under Rule 703. *See In re M/V MSC Flaminia*, 2017 U.S. Dist. LEXIS 119146, at *231. Simply put, Dr. Jusko "lacks the requisite expertise to rebut experts outside his field." *Id.* at *232.

Finally, Dr. Jusko oversimplifies Plaintiffs' opinions regarding an androgen-mediated mechanism, suggesting that: 1) "testosterone is doing something to increase production of CSF by the choroid plexus, and in turn, that may lead to IIH"; and 2) "because LNG binds to the androgen

receptors to a modest degree, then maybe LNG could do this too." Ex. B, Jusko 2018 Dep., at 193:8-12; 194:1-5. While CSF production and fluid transport dynamics are understandably beyond Dr. Jusko's knowledge, experience, training, and skill, his apparent lack of understanding of LNG's most basic pharmacological properties is astounding. Dr. Jusko was unable to quantify either in his report or at his deposition the degree to which LNG binds to the AR, and his attempt to qualify its capacity as "modest", or "to some degree" amounts to unsupported speculation even if it were not verifiably incorrect.[9] *Id.* at 193:10-193:11; 197:3-197:8. "To the extent that his opinions are based on that unsupported assumption, they are not relevant." *LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 643. Although Dr. Jusko holds himself out as an expert on "any studies that concern how drugs work on any process in the body," Ex. B, Jusko 2018 Dep. at 194:17-194:20, he is demonstrably unaware of even the most basic facets of these processes as they relate to LNG. *Id.* at 196:14-198:14; 167:19-175:21. Given these significant limitations, Dr. Jusko's opinions regarding LNG's binding affinity or capacity for biological activity at the AR lack both expertise and a reliable scientific basis and should therefore be excluded.

### C. Dr. Jusko's opinions regarding concentrations of LNG in the brain and CSF are faulty conclusions based in false premises.

Lastly, even assuming *arguendo* that steroid hormone activity at the CSF were a "proven" mechanism, Dr. Jusko takes issue with its application to Mirena. He claims: "Even if this were a proven mechanism by which IIH occurs, which it is not, this is unlikely to occur with Mirena, firstly because endogenous concentrations of progesterone, testosterone, and many other hormones have been shown to be extremely low in CSF, much less than unbound hormone in plasma (59)."

---

[9] Again, Dr. Jusko ignores inconvenient data within the sources that he relies upon. For example, he cites Dr. Africander and colleagues for LNG's alleged "antimineralocorticoid" activity, but fails to note that the authors found that LNG displays "effective" androgenic biological activity, *See* Ex. G8, Africander *et al*., at p. 639, Table 1, and note that older progestins including LNG "bind to the AR with high relative affinity, and are agonists, but not antagonists, for the AR," *id*. at 645.

Ex. A, Jusko Rpt. at p. 11. Again, Dr. Jusko conveniently cherry-picks his chosen reference for the passages helpful to his analysis but completely ignores the evidence within that same source that is contrary to his conclusions.

Although "endogenous concentrations" of hormones have been shown to be relatively low in CSF, endogenous concentrations are only those *produced* in the CSF. Ex. J, Kancheva R, Hill M, Novak Z, Chrastina J, Kancheva L, and Starka, *Neuroactive steroids in periphery and cerebrospinal fluid*, Neuroscience 191: 22-27, 2011. However, LNG is not an endogenous hormone, meaning that it cannot be produced by local synthesis in any organ including the brain. Ex. B, Jusko 2018 Dep. at 199:13-199:15. Rather, it must be introduced to the body by a drug delivery system such as Mirena. In other words, any LNG in the CSF *must* be of peripheral origin, meaning coming from the circulation. *Id.* at 203:3-203:5. And, as Kancheva *et al*. note, "[a]ccording to the information available, part of the neurosteroids may be synthesized *de novo* in the CNS, but substantial part of the steroid metabolites may be also synthesized in the CNS from the steroid precursors or directly transported through BBB[10] from the periphery." Ex. J, Kancheva *et al*., at p. 26. Critically, these authors conclude, "brain steroids of peripheral origin may reflect various physiological situations or even pathologies." *Id.* at pp. 26-7. Thus, it is the very purpose of this article to describe how even low levels of steroids transported to the CSF from the periphery may penetrate the blood-brain barrier (BBB), and excite biological processes therein.

Faced with evidence in his very own cherry-picked reference that circulating steroids indeed make their way to the brain, Dr. Jusko pivoted back to his original false premise: evidence of steroids *generally* producing biological activity in the central nervous system (CNS) cannot be applied to LNG because it has never been studied in this way. *Id.*at 201:2-201:4; 203:6-203:21.

[10] Blood-brain barrier refers to the mechanism of the capillaries to filter certain substances before the blood is carried to the tissue of the brain and spinal cord.

Yet, effects of LNG on processes in the brain *have* been studied, as described in several of the sources referenced throughout Dr. Jusko's report but conveniently ignored on this point. For example, numerous studies have demonstrated that LNG may inhibit ovulation, as stated in the FDA-approved Mirena® label and admitted by Defendants. Using one of his cited sources, Plaintiffs' counsel refreshed Dr. Jusko's recollection of this process, explaining that LNG released from an IUD may "suppress the hypothalamic-pituitary-ovarian [axis]," which is located "in the brain." *See generally* Ex. B, Jusko 2018 Dep. at 203:22-205:21; *see also* Ex. F2, Apter, *et al*.

However, Dr. Jusko *still* refused to accept this well-established process, suggesting that the authors were "implying the mechanism, such as oral contraceptives, were [ . . . ] at higher concentrations. But, yes, the higher concentrations, they would certainly reach part -- part of the brain." *Id*. at 206:22-206:8. Thus, Dr. Jusko conceded a biological mechanism by which LNG suppresses ovulation through activity in the brain; he simply does not believe that sufficient LNG from Mirena, specifically, reaches the brain to do so. Even faced with *direct* evidence of this physiological response, Dr. Jusko refused to concede that sufficient LNG released from Mirena reaches the brain to produce this result. *Id*. at 206:9-207:2; 207:3-207:13. Clearly, Dr. Jusko believes quite pedantically that because Mirena is located in the uterus, it is incapable of producing even well-established effects in the brain. This opinion is patently false, misleading, and unhelpful to the trier of fact, and therefore compels exclusion.

Finally, Dr. Jusko claims that even if there is LNG in the CSF, it must be in "extremely low" concentrations, "much less than unbound hormone in plasma." *See* Ex. A, Jusko Rpt. at p. 11. Yet, as Dr. Jusko explained at his deposition, he reached this conclusion by adopting a simple ratio of total hormone in the serum, to "whatever was in CSF." *See* Ex. B, Jusko 2018 Dep. at 208:15-209:9. This analysis is misleading because, as Dr. Jusko explained, "CSF has very, very

little protein. So it's essentially a free drug." *Id.* at 209:8-209:9. According to the free hormone hypothesis, which Dr. Jusko accepts as the most likely explanation of the role of protein binding for both LNG and testosterone, only free drug is capable of biological activity. *Id.*at 74:24-75:2; 75:22-75:24; 78:8-78:21; 116:4-116:14; 116:23-117:9; 209:15-210:1. Therefore, as Dr. Jusko admits, because drug in the CSF is essentially free, it is essentially *all* capable of producing biological activity. *Id.*at 210:2-210:13.

An expert's opinion should be excluded "if it is based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison.'" *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984)). Dr. Jusko's contention that low serum concentrations of LNG should correspond to a lack of biological response in the CSF is a flawed comparison and is the result of his oversimplification of subject matter in which he lacks expertise, and application of contradictory assumptions thereto. As such, these opinions are not the product of reliable methodology, and should be excluded.

**III. Dr. Jusko is categorically unqualified to opine on the adequacy of Mirena's label**

Opinions not offered by "an expert [qualified] by knowledge, skill, experience, training, or education [ . . . ] will not assist the jury." *Amorgianos v. AMTRAK*, 137 F. Supp. 2d 147, 189 (E.D.N.Y. 2001), *aff'd* 303 F.3d 256 (2d. Cir., 2002) (quoting Fed Rules Evid. R 702). Dr. Jusko's opinions about the Mirena label are untimely and beyond the scope of the Court's orders regarding the current phase of this litigation. In any event, he lacks even basic qualifications to opine on the Mirena label or labeling contents generally aside from his knowledge "that there are FDA guidances on what should be in labels," and his ability to "read those guidances as well as anyone." Ex. B, Jusko 2018 Dep. at 240:8-241:24; 232:24-235:2, 235:11-236:23.

More egregiously, Dr. Jusko admittedly formed his limited labeling opinions on the basis of the 2014 Mirena label which has since been updated numerous times in the last four years, despite his testimony that it was generally "important to rely upon the most accurate and up-to-date information available," and that it would be of relevance to review the most recent Mirena label before providing opinions in this case. *Id.* at 39:14-40:19; 243:17-245:18 ("My commentary is rather generic, so it probably doesn't matter.") Yet, Dr. Jusko did not see fit to update these opinions or their bases since he wrote his first report in 2016; actually, they were outdated even then. *See id.*at 242:2-243:16. On direct examination, Counsel for Defendants showed Dr. Jusko the 2014 and 2017 Mirena labels side-by-side for the very first time, attempting to indicate congruity in the Clinical Pharmacology sections of the two documents. *Id.* at 246:14-247:14; 247:24-248:22. This *ex post facto*, lawyer-driven testimony cannot rescue Dr. Jusko's opinions from the sheer ignorance under which they were formed.

Dr. Jusko is no more qualified to opine on the adequacy of the Mirena label than a lay person, and his opinions in this regard are a string of unreliable, undiscerning musings. As such, they are unquestionably unhelpful to the trier of fact, and demand exclusion under *Daubert*.

## **CONCLUSION**

Overall, Dr. Jusko's opinions lack expertise, support, and insight. Even where Dr. Jusko applies reliable methodology, he does so unreliably, and draws improper conclusions that do not logically follow from the available data. For these reasons, and those stated in Plfs' Omnibus Mot., Dr. Jusko's opinions are unreliable and unhelpful to the trier of fact, and should be excluded or alternatively, significantly limited, under Federal Rule of Evidence 702.

WHEREFORE, Plaintiffs respectfully request that this honorable Court enter an Order excluding or alternatively, significantly limiting, Dr. Jusko's general causation expert testimony.

Dated: March 2, 2018

Respectfully submitted,

*/s/ Lawrence L. Jones II*
Lawrence L. Jones II
Jones Ward PLC
*Co-Lead Counsel for Plaintiffs*

Martin D. Crump
Davis & Crump PC
*Co-Lead Counsel for Plaintiffs*

Maxwell S. Kennerly
Kennerly Loutey, LLC
*Liaison Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed via the ECF/CM system with the Clerk of the Court, which will have sent notice to all attorneys of record in this matter on March 2, 2018.

/s/ *Lawrence L. Jones II*
Lawrence L. Jones