# EXHIBIT B

## Feb. 8, 2018 Deposition of William Jusko, Ph.D.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------x

| | |
|---|---|
| IN RE: ) | Case No, |
| MIRENA IUS LEVONORGESTREL- ) | 17-MD-2767 (PAE) |
| RELATED PRODUCTS LIABILITY ) | 17-MC-2767 (PAE) |
| LITIGATION (NO. II) ) | |
| ) | |
| This Document Relates to ) | |
| All Actions ) | |

------------------------------x

VIDEOTAPED DEPOSITION OF WILLIAM J. JUSKO, Ph.D.

WASHINGTON, D.C.

THURSDAY, FEBRUARY 8, 2018

9:12 A.M.

Job No.: 39484

Reported by: Leslie A. Todd

Deposition of WILLIAM J. JUSKO, Ph.D., held at the offices of:

COVINGTON & BURLING, LLP
850 10th Street, Northwest
Washington, D.C.

Pursuant to notice, before Leslie Anne Todd, Court Reporter and Notary Public in and for the District of Columbia, who officiated in administering the oath to the witness.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS:

CHRISTINA T. NATALE, ESQUIRE
JONES WARD PLC
1205 E. Washington Street
Suite 111
Louisville, Kentucky 40206
(502) 682-6000

TREVOR ROCKSTAD, ESQUIRE
DAVIS CRUMP PLC
2601 Fourteenth Street
Gulfport, Mississippi 39501
(228) 863-6000

ON BEHALF OF DEFENDANTS:

MICHELLE MANGRUM, ESQUIRE
SHOOK HARDY & BACON, LLP
1155 F Street NW
Suite 200
Washington, D.C. 20004
(202) 783-8400



APPEARANCES (Continued)

MICHAEL X. IMBROSCIO, ESQUIRE
ALEJANDRO BARRIENTO, ESQUIRE
COVINGTON & BURLING, LLP
850 10th Street, Northwest
Washington, D.C. 20001-4956
(202) 662-5694

ALSO PRESENT:

DANIEL HOLMSTOCK (Videographer)



C O N T E N T S

EXAMINATION OF WILLIAM J. JUSKO, Ph.D. PAGE
By Ms. Natale 11
By Ms. Mangrum 245

E X H I B I T S

(Attached to transcript)

JUSKO DEPOSITION EXHIBITS PAGE
No. 1 Notice of Video Deposition of William Jusko, Ph.D. 11
No. 2 Expert Report of William J. Jusko, Ph.D. 13
No. 3 Article entitled "Role of Sex (Gender) and Chronobiology in PK/PD 16
No. 4 Curriculum Vitae: William J. Jusko 17
No. 5 Dr. William Jusko's Materials Reviewed 17
No. 6 Article entitled "Evaluating the role of testosterone in cerebrospinal fluid secretion 19
No. 7 E-mail string re Mirena Statement on Serum vs. Plasma 29

EXHIBITS CONTINUED
(Attached to transcript)


| JUSKO DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| No. 8 | Article entitled "Perspectives on variability in pharmacokinetics of an oral contraceptive product" | 35 |
| No. 9 | Highlights of Prescribing Information for Mirena | 40 |
| No. 10 | E-mail string re Mirean Q&A | 44 |
| No. 11 | E-mail re Need medical assessment of letter | 48 |
| No. 12 | Plaintiffs' FRCP 26 General Causation Expert Disclosures | 53 |
| No. 13 | Accepted Manuscript entitled "Clarification of contraception drug pharmacokinetics in obesity" | 66 |
| No. 14 | Expert Report of William J. Jusko, Ph.D. | 73 |
| No. 15 | Article entitled "A Reappraisal of Testosterone's Binding in Circulation: Physiological and Clinical Implications" | 78 |




EXHIBITS CONTINUED
(Attached to transcript)


| JUSKO DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| No. 16 | Article entitled "Plasma steroid-binding proteins: Primary gate-keepers of steroid hormone action" | 94 |
| No. 17 | May 26, 2016 deposition of William J. Jusko, Ph.D. | 98 |
| No. 18 | Article entitled "Sex Steroids and the Free Hormone Hypothesis" | 102 |
| No. 19 | Article entitled "Pharmacokinetics of two low-dose levonorgestrel-releasing intrauterine systems and effects on ovulation rate and cervical function: Pooled analyses of phase II and III studies" | 121 |
| No. 20 | E-mail string re Serum LNG & FLI | 127 |
| No. 21 | Article entitled "Multiple nuclear receptor signaling pathways mediate the actions of synthetic progestins in target cells" | 145 |




EXHIBITS CONTINUED
(Attached to transcript)


| JUSKO DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| No. 22 | Article entitled "Molecular mechanisms of steroid receptor-mediated actions by synthetic progestins used in HRT and contraception" | 147 |
| No. 23 | Article entitled "Drospirenone: pharmacology and pharmacokinetics of a unique progestogen" | 149 |
| No. 24 | Article entitled "Classification and pharmacology of progestins" | 151 |
| No. 25 | Article entitled "The preclinical biology of a new potent and selective progestin: Trimegestone" | 153 |
| No. 26 | Article entitled "Drospirenone: A Novel Progestogen with Antimineralocorticoid and Antiandrogenic Activity" | 156 |
| No. 27 | Article entitled "Pharmacology of estrogens and progestogens: influence of different routes of administration" | 158 |




EXHIBITS CONTINUED
(Attached to transcript)


| JUSKO DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| No. 28 | Article entitled "Nomegestrol acetate, a novel progestogen for oral contraception" | 160 |
| No. 29 | Bayer HealthCare Clinical study Report, No. 46796 | 176 |
| No. 30 | Article entitled "Neuroactive Steroids in Periphery and Cerebrospinal Fluid" | 200 |
| No. 31 | Article entitled "Cerobrospinal fluid progesterone in pregnant women" | 207 |
| No. 32 | Article entitled "Progesterone Receptors: Form and Function in Brain" | 210 |
| No. 33 | FDA Approval Letter to Bayer Health Care | 247 |

Page 10

P R O C E E D I N G S

-----------------

THE VIDEOGRAPHER: This is video number 1 in the video-recorded deposition of Dr. William Jusko taken in the matter of In re: Mirena IUS Levonorgestrel-Related Products Liability Litigation (No. II).

This deposition is being held at the law offices of Covington at 850 10th Street, Northwest, in Washington, D.C., on February 8th, 2018. The time on the video screen is 9:12 a.m.

My name is Daniel Holmstock, and I am the videographer. The court reporter is Leslie A. Todd.

Will counsel please introduce themselves and whom they represent.

MS. NATALE: Christina Natale for the plaintiffs.

MR. ROCKSTAD: Trevor Rockstad, also for the plaintiffs.

MS. MANGRUM: Michelle Mangrum for the defendants.

MR. BARRIENTO: Alejandro Barriento for the defendants.

Page 11

MR. IMBROSCIO: Michael Imbroscio for the defendants.

THE VIDEOGRAPHER: Would the court reporter please administer the oath.

WILLIAM J. JUSKO, Ph.D.,
and having been first duly sworn,
was examined and testified as follows:

(Jusko Exhibit No. 1 was marked for identification.)

EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MS. NATALE:

**Q Good morning, Dr. Jusko.**

A Good morning.

**Q My name is Christina Natale. I reintroduced myself just a few minutes ago off the record. I believe we met about a year and a half ago up in Buffalo, and that was also in a Mirena PTC case; is that correct?**

A Yes, it was.

**Q Okay. So you were served with a notice of deposition for today's deposition, and I marked it for the record as Exhibit 1.**

**Have you seen this document before?**

A Yes, I have.

Page 12

**Q Okay. The first thing I wanted to just ask you about, if you see on the first page, there's a caption, and it says In re: Mirena IUS levonorgestrel-Related Products Ligation -- Litigation, No. II.**

**Do you understand that the testimony you're providing today is in this multidistrict litigation that's captioned on the first page of this notice?**

A Yes.

**Q Okay. So I mentioned that we met about a year and a half ago and that was also in a Mirena PTC case, but you understand that today's testimony is in kind of like a separate litigation. Do you understand that?**

A Yes.

**Q Okay. And -- okay. So there are -- there's an Exhibit A that starts on page 4 of this notice and says "Documents to be produced."**

**And just before we started here, counsel for the Bayer defendants provided us with some documents, and we won't go through them right now, but we'll just kind of go through what they're responsive to and mark them for the record. Okay?**

Page 13

A Okay.

**Q So the first, which was your current CV or resume, I understand that there was a CV appended to your report that was disclosed on January 18th, 2018, correct?**

A That's correct.

**Q Okay. And is the CV that's appended to your report, is that your most recent and up-to-date CV?**

A What's the date at the top right corner?

**Q Let's take -- that's a good -- let's -- let's mark the report for the record.**

**And just for ease, it's all kind of one thing, just the way that you produced it, but it's your report and all of the appendices that are attached to it, okay. I'm going to mark that as Exhibit 2.**

(Jusko Exhibit No. 2 was marked for identification.)

BY MS. NATALE:

**Q And this is your report in this MDL dated January 18th, 2018. And your CV is Appendix A, I believe, and it starts on page 26, kind of.**

A Yes.
Q Okay. And that's --
A January 2018, that's my most recent one.
Q Okay. Is there anything that is not included in this CV that you would add as of -- between January 2018 and now?
A No.
Q Okay. Do you have any publications in press or manuscripts that you've submitted that have not been accepted yet?
A We don't have any new submissions since I submit -- prepared this.
Q Okay. Did you have any materials -- looking back at Exhibit 1. I'm sorry. We're just going to go back and forth.
Exhibit 1, which was a notice of deposition, did you have any materials responsive to the requests regarding any presentations, talks, et cetera, that you've given regarding levonorgestrel- containing contraceptives, Mirena or IUDs?
A Yes.
Q Okay. And that's requests 2 and 3 -- kind of requests 2 and 3. We have some responsive



materials here, so let's just go ahead and mark these while we've got them, and then, you know, on one of these breaks we'll take a look through them.
So this we have a PowerPoint titled -- it looks to be a PowerPoint, and it's actually been Bates-stamped for us helpfully, thank you -- titled "Role of Sex," parentheses, "Gender, and Chronobiology in PK/PD."
And is PK an abbreviation for pharmacokinetics?
A Yes, it is.
Q Okay. And PD, is that an abbreviation for pharmacodynamics?
A That's correct.
Q Okay. So I'm going to mark this Exhibit 3, and we have a note -- friendly note from counsel that it is responsive to several requests, including 2, 3, 7 and -- is that 24? Oh, yeah, 24. Okay.
MS. NATALE: So that would include some timesheets, time records, billing records, that's all kind of in this pile.
MS. MANGRUM: Yeah.



MS. NATALE: So it's not just the PowerPoint. There's several -- kind of a stack of responsive material.
MS. MANGRUM: That's right.
MS. NATALE: Okay. So we'll mark that for now. I've got a copy for us.
(Jusko Exhibit No. 3 was marked for identification.)
BY MS. NATALE:
Q And you can put this to the side for now. It's just that we've got it marked for the record. Thank you, Doctor.
And then we have another stack that looks like it has some materials responsive to numbers 2, 3, and 21. So that would be some of the slides and handouts we discussed, and then also some work product, notes, memos and other documents you created in connection with this litigation, including any materials that have writing or highlighting, anything like that, correct?
A That's correct.
Q Okay. So we're going to just mark this for now as Exhibit 4, and we'll come back to this



maybe later.
(Jusko Exhibit No. 4 was marked for identification.)
MS. NATALE: That is for you.
BY MS. NATALE:
Q You can also put that to the side.
Okay. And then we also -- while we are on the subject, request number 5 says: "All documents or materials reviewed, considered and/or relied upon in the course of developing your opinions in this matter that are not listed on your reference list or materials reviewed and relied upon that were produced with your report."
So we do have a document that's been provided to us by counsel today that appears to be responsive to that request. I would just ask, do you know if you reviewed these materials prior to forming your opinions in this litigation or after?
A Prior, of course.
Q Okay. I'm marking Exhibit 5 for the record.
(Jusko Exhibit No. 5 was marked for identification.)
BY MS. NATALE:

Page 18

Q And so these -- these materials --
A Oh, let me correct that.
Q Okay.
A These deposition transcripts, I only read those in the last two days, so --
Q Okay.
A -- that was not so recent.
Q Did you read them in their entirety or were you looking for something specific?
A I was just skimming through them.
Q Okay. Okay. And then we have one last stack of materials, and it looks like that is responsive to request number 21, which was all work product, notes, memos, like you mentioned, containing any highlighting as well, in addition to any that are included in the other kind of stack that we had.
Do you understand that to be what this set of documents is?
I'm going to mark this as Exhibit 6, and it does look to have some highlighting and handwriting and sort materials of that nature, correct?
A Yes.

Page 19

Q Okay.
(Jusko Exhibit No. 6 was marked for identification.)
BY MS. NATALE:
Q So I mentioned earlier that we discussed that you gave some testimony back in 2016 in a Mirena PTC case, and if you go to Appendix C of your report, which is Exhibit 2 -- I'm sorry, Dr. Jusko, you can put the notice away. We're done with that for now.
A Oh.
Q Thank you so much.
A All right. You want me to go to Exhibit 2? Yes, okay.
Q So Appendix C is your disclosure of expert testimonial work updated January 17, 2018.
A Yes.
Q Okay. And so would that be the second case listed on here, Kellington v. Bayer?
A Yes. That was our previous acquaintance.
Q Okay. So I'm sure at the time we must have asked you about things that you did to prepare for your deposition. Have you done

Page 20

anything to prepare specifically for today's deposition since you submitted your report on January 18th, 2018?
A I continued to review the documents and the literature, and I met with the attorneys.
Q Okay. Did you review any materials after you gave your deposition in 2016 prior to disclosing your report on January 18th, 2018?
A In between the first expert report and the second one, I reviewed much more literature and assessed things more extensively.
Q Okay. So let's talk about kind of -- just to try to get a timeline down, you disclosed a report in the spring of 2016 in that Kellington case, and you were deposed on May 26, 2016, correct?
A I don't recall exact dates, but I -- I will trust what you tell me.
Q Okay. I will represent that to you. I'm sure we -- we might talk about it later.
And then there was a -- I'll represent to you that this litigation that you've disclosed your -- your newest report in was kind of created in April 2017 of last year, okay?

Page 21

Do you know when you were contacted by Bayer this, I guess, kind of second time around about this litigation?
A I know it happened. I can't remember the exact date.
Q Okay. Do you think it was in the spring or summer of this past year or in the fall?
A It could be either one.
Q Okay. Do you have any idea when you started reviewing new materials for this litigation?
A Reviewing materials in terms of preparing the second expert report?
Q Yes.
A Okay. In the interval between the two expert reports. I'm not sure exactly what the date was.
Q Okay. Did you do any research before agreeing to testify again for Bayer in this litigation?
A I've continually followed the literature in regard to oral -- oral contraceptive or contraceptive drug products.
Q Okay. And is Mirena an oral

contraceptive?
A No, it's an I -- IUD.
Q Okay. So when you were asked at some point to testify on behalf of Bayer the second time, did you do any specific research to Mirena and pseudotumor cerebri before you agreed to testify again?
MS. MANGRUM: Objection. Form.
You can answer.
THE WITNESS: Okay. With my interest in pharmacokinetics and pharmacodynamics, I continually look at the literature, and I probably assessed if there was anything further published regarding pharmacokinetics of IUDs.
BY MS. NATALE:
Q Okay. At various points today I know that there is going to be a lot of kind of big words and all kinds of stuff, so it might be helpful to, A, our court reporter, but, B, to kind of streamline things if we kind of establish some abbreviations ahead of time, okay?
So you said IUDs, and that would be intrauterine device?
A That's correct.



Q Okay. If I say "LNG," will you understand that I mean levonorgestrel?
A Definitely.
Q Okay. And if I say "sex hormone-binding globulin," would SHBG be -- be an appropriate abbreviation for that?
A Excellent.
Q Okay. And when I say "pseudotumor cerebri," or I might abbreviation PTC, do you understand that to be basically synonymous with what you refer to in your report as idiopathic intracranial hypertension, or IIH?
A Yeah, I would prefer IIH. I'm more used to that term.
Q Okay. I will probably use PTC, but we'll understand that we're talking about the same thing, okay?
A We'll try.
Q Okay. We'll do our best and we'll see if it becomes an issue. Okay.
So let's take a look at your -- your report that was disclosed, that's Exhibit 2, on January 18th, 2018.
On the first page of the report itself,



you list certain bullets -- there are certain bullets here. Would it be accurate to say that these are the opinions that you express in this report?
MS. MANGRUM: Object to form.
THE WITNESS: These are key ones, yes.
BY MS. NATALE:
Q These are the key opinions that you express in your report?
A That's right.
Q Okay. You -- you talk throughout your report about different terminology, and at certain points you describe -- strike that.
Would it be -- would it be accurate to say that within your report you express some criticisms of the opinions that were disclosed by plaintiffs' experts in this litigation?
A Yes.
Q Okay. And your -- would you -- what would you say is your role in this litigation?
A The role of your experts?
Q Of you. Sorry.
A Oh, my role.
Q What would be your role in this



litigation?
A Okay. To provide scientific insights regarding the pharmacokinetics and pharmacodynamics of levonorgestrel in context of any issues raised in this case.
Q Okay. So would it be fair to say that the criticisms that you express in this report of plaintiffs' experts' testimony specifically relates to the pharmacokinetics of levonorgestrel?
MS. MANGRUM: Object to form.
THE WITNESS: Other parties have opinions that don't include the correct or the -- don't include the role of pharmacology in the models or mechanisms that they're proposing. So I'm a pharmacologist, so I have those insights as well.
BY MS. NATALE:
Q Okay. So your report largely focuses on the pharmacokinetics and pharmacology of levonorgestrel. Is that appropriate?
A Largely, yes.
Q Okay. Does -- does pharmacology -- we talked earlier about PK and PD as abbreviations for pharmacokinetics and pharmacodynamics. Would

Page 26

you say that pharmacology kind of encompasses both of those topics?
A Yes, it does.
Q Okay. Is that a fair definition or is there anything else you would include under pharmacology?
A Well, pharmacology has anything to do with the properties of drugs.
Q Okay.
MS. MANGRUM: I'm sorry. It's starting to get in his face now, so I just asked if he could move it and see --
MS. NATALE: Do you want -- let's take a quick break off the record.
THE VIDEOGRAPHER: The time is 9:30 a.m., and we're going off the record.
(Recess.)
THE VIDEOGRAPHER: The time is 9:33 a.m., and we're back on the record.
BY MS. NATALE:
Q Okay. Dr. Jusko, before we breaked I asked you if you -- part of your report involved criticisms of opinions disclosed by plaintiffs' experts in this case, correct?

Page 27

A Yes.
Q Okay. Would it be fair to say that some of your criticisms regard terminology used by plaintiffs' experts in this case?
MS. MANGRUM: Object to form.
THE WITNESS: Yeah, I -- I'm not sure I understand --
BY MS. NATALE:
Q Okay. Sure. So let's --
A -- that part.
Q Let's take a look at -- just let's see if we can just find an example.
Okay. So on page 15 of your report -- and we'll come back to this idea, I just want to give you kind of an idea of what I'm talking about -- you say -- do you see paragraph 24?
A Yes.
Q Okay. You say: "Plaintiffs' experts criticize Mirena for what they characterize as extreme or at least unusual variability in the LNG serum concentrations."
Did I read that correctly?
A Yes.
Q Okay. And is it fair to say that you

Page 28

take issue with the characterization of Mirena's variability as extreme or unusual?
A Yes, I do.
Q Okay. So opinion number 1 -- sorry, bullet number 1 on page 1 of your report says: "Levonorgestrel serum concentrations in women are only moderately variable, including plasma concentrations in women using Mirena."
Did I read that correctly?
A That's correct.
Q Okay. And there is a -- kind of like a footnote on -- next to serum, and it says at the bottom here: "The term 'serum' and 'plasma concentrations' are used interchangeably in this report as they typically yield identical drug concentrations in pharmacokinetics."
Did I read that correctly?
A That's correct.
Q Okay. Is there any reason that you use "serum" and "plasma" interchangeably throughout this report?
A I was being a bit fastidious. Sometimes people make measurements of one, sometimes the other. Sometimes it's just confusing which one

Page 29

they measured, but in the end it seldom makes any difference.
Q Do you think it might be confusing to refer to "serum" and "plasma" within the same sentence or paragraph referring to the same measurements?
A Most people would understand that they mean the same thing.
Q Okay. Is "plasma" a term that is currently broadly used in pharmacology?
A Yes.
Q Okay. Do you know if Bayer studies measure the plasma or the serum of LNG in Mirena users?
MS. MANGRUM: Object to form.
THE WITNESS: I could -- I'd need to look back at the documents. It's not something I would pay that much attention to since it hardly matters.
BY MS. NATALE:
Q Okay. Let's -- let's take a look at -- I'm going to mark for you Exhibit No. 7.
(Jusko Exhibit No. 7 was marked for identification.)

Page 30

BY MS. NATALE:
Q Okay. Do you see this document is -- there's a Bates stamp at the bottom, MIR_AC_00216689. Do you see this in the bottom of this first page here, right at the bottom? Just so we're on the same page.
A Yes. 689, yes.
Q Okay. Do you see the subject of this e-mail chain is "Mirena statement on serum versus plasma"?
A Okay. Yes.
Q Okay. And I saw on -- in your report, at the end there's a list of depositions and exhibits you reviewed, and one of those was Dr. Christian Zurth, correct?
A If that's in the list, yes.
Q Okay. Do you remember reviewing a deposition of Dr. Christian Zurth?
A Zurth, yes, I did.
Q Okay. Do you know what position he has held at any point in time with regards to Mirena?
A Yes, at one time he had involvement with the pharmacokinetics of Mirena.
Q Okay. Do you -- do you have any reason

Page 31

to dispute he was the senior pharmacokinetics expert for women's healthcare?
A I believe that's true.
Q Okay. So -- and this -- he appears to be the first recipient of this e-mail, correct? If you look on the first page, Dr. Jusko.
A Yes.
Q Okay. So if you turn to the second to last page, and the Bates number ends in 6692.
A Yes.
Q Okay. So this appears to be an e-mail from Dr. Zurth to Dr. Costales, correct?
A Yes.
Q Okay. And after that first sentence, he says: "Almost all pharmacokinetic investigations with Mirena were conducted in serum samples. Only in a few old studies, which were mainly conducted after oral or intravenous administration of levonorgestrel, used plasma for concentration measurements."
Did I read that correctly?
A Yes.
Q Okay. Do you have any reason to disagree with that?

Page 32

A No.
Q And then he continues: "In the former label serum and plasma was used in parallel. The intention of Bayer was to use the same wording throughout the document and not to confuse the patient with different expression."
Did I read that correctly?
A Yes.
Q You can put that aside.
Okay. So back to your report, which was Exhibit 2. We were talking about the -- this first bullet point on the first page, right?
A We were, okay.
Q Okay. And you say that: "Levonorgestrel serum concentrations in women are only moderately variable." Correct?
A That's right.
Q Okay. And how would you define "moderate"?
A All right. That's a rather subjective term.
Q Okay.
A Okay. It often depends on the circumstances of the measurements. But I went

Page 33

through an assessment of a great deal of literature on oral contraceptive pharmacokinetics, but also some of the other dosage forms, and I calculated the coefficients of variation from four pharmacokinetic parameters or exposure indices from a large number of studies. Actually every study I could find that was relevant.
And then I also did a literature assessment of what various publications, what various investigators were describing as modestly, moderately, severely variable or terms like that. And my assessment was that there's a certain range of -- well, CV percent values that most people would consider to be moderate.
Q When you say that you went -- did an assessment of a great deal of literature, do you mean specifically for this litigation or at some point in time in your career?
A I continually use -- assess variability whenever I'm looking at pharmacokinetics. There's earlier times professionally where I've considered the idea of variability, particularly in comparing pharmacokinetics versus pharmacodynamics.
In the previous expert report, I started

Page 34

compiling a number of publications that describe levonorgestrel pharmacokinetics after OC dosing. And for the purpose of that first expert report, I had a long list of products from which I determined that it looked like there were terms one could describe -- values that one could describe as moderately variable.

And then after the expert report and first deposition, I thought the information that I gathered was quite valuable, and the whole literature should -- the field should see it, so I extended my assessments and published an article on them -- on the subject matter.

**Q Okay. So one quick clarifying question. You talked about OC dosing, and in your report here in this first bullet you say "moderately -- only moderately variable, including plasma concentrations in women using Mirena," correct?**

A Yes.

**Q So have you done a separate assessment regarding just the variability of Mirena?**

A The documents I've looked at have statistics in there where I -- I also made that assessment.

Page 35

**Q You also made an assessment of the variability with Mirena specifically.**

A I -- I -- okay. There are reports where the variability for Mirena is expressed, and it's in my expert report.

**Q Okay. So you mentioned that you extended your assessments and published an article on the matter, and I believe that is reference number 2 in your report, and it's "Perspectives on variability in pharmacokinetics of an oral contraceptive product." Is that correct?**

A Yes.

**Q And that was just published in 2017, correct?**

A Yes.

**Q Okay. I marked that as Exhibit 8 for the record.**

(Jusko Exhibit No. 8 was marked for identification.)

BY MS. NATALE:

**Q If you could turn with me to page 4 of this article that you -- you are the author of this article, correct?**

A Yes.

Page 36

**Q Okay. On page 4, the first sentence you write: "There appears to be no consensus in PK as to what constitutes low, moderate or large intersubject variability."**

**Did I read that correctly?**

A Yes.

**Q Do you agree with that statement that you wrote?**

A Well, it was pertaining to what was existent in the literature before I did my analysis.

**Q Okay. So do you believe that before you did your analysis, there was no consensus in PK as to what constitutes low, moderate or large intersubject variability?**

A I could not find any publications that went to the extent of trying to be definitive on that issue.

**Q Okay. So -- okay. If you go down two more paragraphs, do you see "the consideration"?**

A Yeah.

**Q Okay. You write: "The consideration of low, moderate or high variability is both subjective and context related."**

Page 37

**Did I read that correctly?**

A That's correct.

**Q Do you agree with that statement that you wrote?**

A Yes, I do.

**Q Okay. And so when you say "definitively," you mean your subjective and context-related definition, correct, of moderate?**

MS. MANGRUM: Object to form.

THE WITNESS: My assessments were examining pharmacokinetics in what are typically young healthy women so that there are no known strong alternative factors causing variability. So if one looks at young healthy subjects, you know, that was the context of the data I was assessing. But if one added in all sorts of diseases and such, other things could be different.

BY MS. NATALE:

**Q Okay. So I think you were just addressing the context-related point. Is your use of the word "moderate" subjective --**

MS. MANGRUM: Object --

BY MS. NATALE:

Q -- as you state here in your publication?
A My use pertains to studies in young -- studies in healthy volunteers.
Q Okay. We'll talk a bit more about that issue later, but you may for now put this to the side.
Did you review any Bayer internal documents to see how the company describes the inter- or intra- -- sorry, I'm going to restart that.
Did you review any Bayer internal documents to see how the company describes the inter- or intraindividual variability with Mirena?
A I've seen company documents where the variability metrics are presented. I don't remember how they described them.
Q Okay. Let's really quickly, if you turn in your report to -- there are some additional materials that you reviewed and relied upon that were in addition to the materials referenced in your report, correct?
I wish I could give you a page number. There just isn't one. It's after Appendix A --



oh, it's Appendix B. Perfect.
A Okay.
Q Okay. So after the depositions that we mentioned briefly, there's a category called "Product Labels," correct?
If you turn two more pages, I think, there's depositions and exhibits, and then a category called "Product Labels."
A Okay.
Q Are you at Product Labels? I don't think we're on the same page. One more. There you go.
A Oh, Product Labels, yes. Okay.
Q So there's a number of Mirena labels listed here, correct?
A Yes.
Q Okay. And they are dated 2000, 2008, 2009, 2013, and 2014; is that accurate?
A Yes.
Q Okay. When you formed your opinions in this case, was it important to rely upon the most accurate and up-to-date information available?
A In general, yes.
Q Okay. Do you know if the most recent



Mirena label was approved by the FDA in 2014?
A I don't know the dates of FDA approvals of the labels.
Q Okay. Do you have any reason to dispute that the label for Mirena was updated in October 2015?
A I have no idea.
Q Okay. Do you have any reason to dispute that the Mirena label was updated in December 2016?
A I don't know.
Q Okay. Do you have any reason to dispute that the Mirena label was updated in May 2017?
A I have no idea.
Q Okay. Would it be of -- of relevance to you to review the most recent Mirena label before you provided opinions in this case?
MS. MANGRUM: Object to form.
THE WITNESS: Probably, yes.
MS. NATALE: Okay. I'm going to mark for the record Exhibit 9.
(Jusko Exhibit No. 9 was marked for identification.)
BY MS. NATALE:



Q And this one is actually paper-clipped together, so we'll try to be really careful when we flip through pages that we don't lose track of the order. If it's easier for you, on our next break what we can do with the report is staple the kind of appendices as separate parts so that we can flip through easier and find what we're looking for.
But I marked as Exhibit 9, and does this appear to be a label for Mirena?
A (Peruses document.) Okay, yeah.
Q Does it appear to be a label for Mirena?
A Yes, it is.
Q Okay. And do you see about halfway down that front page on the right-hand side, right before the line break, do you see "Revised 5/2017"?
A Yes.
Q Okay. Does this Mirena label appear to be updated as of May 2017?
A Okay.
Q Have you ever seen this document before?
MS. MANGRUM: Object to form.
THE WITNESS: I -- I'm not sure because

it -- it looks so similar to the previous labels.
BY MS. NATALE:
Q Sure. But it's not listed in Appendix B of your report, correct?
A Apparently not.
Q Okay. If you turn with me to -- I know there's no page numbers, but Section 12 is Clinical Pharmacology.
A Yes.
Q And we'll probably come back to this a few times, but you do express some opinions in your report about the Clinical Pharmacology section of the Mirena label, correct?
A Yes.
Q And so as of May 2017 when this label was revised, do you see at the bottom paragraph of this page says "Metabolism"? Do you see that?
A That's right.
Q Okay. And about four lines up from the bottom, there's a sentence that starts at the very end of the line: "Metabolic clearance rates may differ among individuals by severalfold, and this may account in part for wide individual variations in LNG concentrations seen in individuals using



LNG- containing contraceptive products."
Did I read that correctly?
A You read it correctly, but that's not a sentence I agree with.
Q You don't agree with what Bayer has provided in the FDA-approved labeling for Mirena?
A The label is a joint effort of the company and the FDA, so it's -- so this is written here, but my more careful assessment of the literature for Mirena, I wouldn't agree with this.
Q Okay. You don't agree that the individual variation in LNG concentration seen in individuals using LNG-containing contraceptive products is wide?
A No.
Q Okay. You can put that aside for now.
I'm going to mark -- strike that.
You do reference in your materials-reviewed list some documents with Bates numbers like what we've talked about today. Does that make sense, those numbers at the bottom starting with MIR?
A Okay.
Q So you did review some Bayer internal



documents, correct?
A Yes, I did.
Q Okay. But I believe you testified, and I'm definitely paraphrasing here, that you are not aware of or don't recall seeing Bayer internal documents describing the variability of LNG. Is that accurate?
A I've seen analysis of the plasma concentrations of levonorgestrel in Mirena and other products, and expressions of variability in reports.
Q Sure. But you didn't see -- you don't recall seeing any internal documents describing or characterizing the variability of -- of LNG with Mirena, correct?
A I would expect they would have cited, Okay, this is the coefficient of variation --
Q Okay.
A -- and that's how they would describe the variability.
Q Okay. I'm going to mark for you Exhibit 10.
(Jusko Exhibit No. 10 was marked for identification.)



BY MS. NATALE:
Q And you see this document is Bates-stamped at the bottom MIR_ELEU_00717168 on the first page?
A Yes.
Q Okay. And this e-mail is titled -- the subject is "Mirena Q&A," and there appears to be an attachment "LNG Serum Levels Q&A 1st Version," correct?
A That's right.
Q Okay. So if you turn to the third page of this document, that appears to be an attachment titled "Mirena LNG Serum Concentrations," question mark, "Q&A," correct?
A Okay.
Q Is that correct?
A Yes.
Q Okay. I'm sorry. I'll try to be more precise in my -- in my questions.
Do you see there's these bullet points on the first page of this attachment about four up from the bottom?
Do you see the document says: "It is already well known that there are marked

Page 46

individual differences in the LNG plasma levels during Mirena use"? Did I read that correctly?
A Yeah, but they're referencing some very old studies, 1990, 1984.
Q Sure.
A There's much better, more recent information.
Q So if you flip to Appendix A -- appendix -- let's see. Not -- it's not an appendix, but the references in your report.
A My references?
Q Yeah, back to your report, which is Exhibit 2.
A Okay.
Q Go back to your references before you get to any of the appendices, you have 20 -- 20 pages of report and then references.
A Yeah.
Q Okay. If you would flip to number 28.
Does that appear to be the very old Nilsson study that's referenced in the Bayer document we were just looking at, Exhibit 10?
A Well, the first author is Nilsson and it's 1984, but I'm not sure it's the very same

Page 47

article.
Q Sure. If you turn to on Exhibit 10, the page ending in 717172. Do you see references?
A All right.
Q Okay.
A Okay.
Q Do you see, 1984, Nilsson, et al., "Ovarian function in amenorrheic and menstruating users of a levonorgestrel-releasing intrauterine device"?
A That's correct.
Q Does that appear to correspond to reference 28 in your report?
A Yes.
Q Okay. You can put that aside for now.
A But as you're addressing the issue of variability, I created Table 1 where I examined all possible information that I could find that relates to variability of levonorgestrel after administration of Mirena, and that's a far more extensive, more recent compilation of the information available.
Q Sure. At the time that this document was -- Exhibit 10 was created in 2007 by Bayer

Page 48

employees, did they describe the interindividual differences in LNG plasma levels during Mirena use as marked?
MS. MANGRUM: Object to form.
THE WITNESS: Well, that --
BY MS. NATALE:
Q Is that what they --
A This perspective is outdated, because my assessment has many more recent articles.
Q Do you think that it was accurate at the time that this document was written?
MS. MANGRUM: Object to form.
THE WITNESS: I would have to see whether there was other studies at the time. Knowledge science evolves with time. You know, perhaps that was their interpretation.
BY MS. NATALE:
Q Okay. You can put that aside for now.
I'm going to mark Exhibit 11 for the record.
(Jusko Exhibit No. 11 was marked for identification.)
BY MS. NATALE:
Q And then this one is Bates-stamped

Page 49

MIR_CH_00073426. Do you see that at the bottom of the first page?
A Yes.
Q Okay. And the attachment to this e-mail says "Systemic absorption of levonorgestrel in Mirena." Did I read that correctly?
A Yes.
Q Okay. If you turn to the attachment, which starts at the page ending in 429. Do you see we have an attachment titled "Systematic absorption of levonorgestrel in Mirena"?
A Okay.
Q Okay.
A 429, yep.
Q About halfway through the first paragraph, there's a sentence that ends "ERT," and then do you see the next sentence states: "Although interindividual variation in plasma LNG concentrations is wide" -- did I read that correctly?
A (Peruses document.)
Q Are you with me in that first paragraph, Dr. Jusko?
A Uh --

Page 50

Q About four lines down, do you see there's a sentence that ends "in women receiving ERT." ERT is at the very beginning of the -- about the fifth line down.
A Are we on the same page?
Q I think so.
A 429?
Q We've got a table at the bottom.
A Oh, okay.
Q Okay?
A All right.
Q Do you see -- right here, you see "ERT" at the -- on the fifth line down.
A Oh, all right. Okay. Yes, I see it.
Q So the sentence I read you starts: "Although interindividual variation in plasma LNG concentrations is wide" -- did I read that part of the sentence correctly?
MS. MANGRUM: Objection.
THE WITNESS: Well, again, that was somebody's perspective at some point in time. My assessment is very comprehensive. It's much more appropriate.
BY MS. NATALE:

Page 51

Q Okay. Your -- your assessment of the variability of LNG concentrations with Mirena are more comprehensive and appropriate than those performed by Bayer employees at various points in time?
MS. MANGRUM: Object to form.
THE WITNESS: Well, science evolves with time. As more data is gathered, one gets a better assessment of -- of the nature of anything happening.
BY MS. NATALE:
Q Okay. You can put that aside.
You -- let's take a look back at Exhibit 2, which is your report in this litigation.
And --
MS. MANGRUM: Let me -- can I just ask you a brief question?
MS. NATALE: You want to do so on the record?
MS. MANGRUM: Yes.
MS. NATALE: Okay.
MS. MANGRUM: Exhibit 11 --
MS. NATALE: Those are as produced.

Page 52

MS. MANGRUM: Okay.
MS. NATALE: So if there's a blank page, it's a dividing page between the e-mail and the attachment, and it was just the entire document was produced for continuity and --
MS. MANGRUM: Okay.
MS. NATALE: -- that's how it was produced.
BY MS. NATALE:
Q Okay. So if you turn in your report, which is Exhibit 2, it's all the way back to the front, which is the actual report itself, you state on page 14 -- let me know when you're there.
A Okay.
Q Okay. So paragraph 22 begins: "It has been suggested that total serum LNG concentrations for Mirena may," quote, "spike," unquote.
Did I read that so far correctly?
A Yes.
Q Who suggested that total serum LNG concentrations for Mirena may spike?
A That contention was some -- in some of the documents that I read in preparation for the first expert report that I filed.

Page 53

Q The first report that you filed.
A Yes.
Q So that statement comes from your first report?
MS. MANGRUM: Object to form.
THE WITNESS: It comes from the documents I reviewed for the first report.
BY MS. NATALE:
Q Okay. So let's -- let's take a quick look at -- again, if we turn to the back of your report, in Appendix C, which is the additional materials reviewed and relied upon.
Do you see a listing that you -- that you title -- back under Product Labels where we were before, do you see "Plaintiffs' Expert Reports"?
A Okay.
Q Okay. Do you see there are several -- what you list under Plaintiffs' Expert Reports, there are several items listed, correct?
A Yes.
Q Okay. I'm going to mark Exhibit 12 for the record.
(Jusko Exhibit No. 12 was marked

for identification.)
BY MS. NATALE:
Q Do you see that this appears to be a document filed in the case that we're here discussing today, MD 7 -- 2767? It has the same caption at the top as your report. Do you see that?
A Yes, it does.
Q Okay.
A Yes.
Q And does this document appear to be the plaintiffs in this litigation, their disclosure of general causation expert witnesses?
A That's what it's titled.
Q Okay. So if you keep that out and look back to the page we were at in your report where you say "Plaintiffs' Expert Report."
A Okay.
Q Okay. Do you see -- let's just take this one. Let's start on the last page of your -- in your -- your report, if you flip one more page, do you see Amended Report of Frederick Fraunfelder in your report?
A I lost --



Q Okay. We're back in Appendix B.
A B. Okay.
Q Under "Plaintiffs' Expert Reports," and then flip to the next page, it looks to carry over one line to the next page, under Product Labels and then Plaintiffs' Expert Reports.
A Okay. Well --
Q We'll take a break after this and get everything stapled for you. I think it's a good time to do so, but let's just finish this up.
A All right.
Q Okay. So do you see if you turn it over, carry on to the next page, you see Amended Report of Frederick Fraunfelder?
A All right. Fraunfelder, okay.
Q Yes? Okay. Does that name appear on Exhibit 12? Plaintiffs expert disclosures in this litigation.
Do you see a Dr. Rick or Dr. Frederick Fraunfelder?
A Yeah, one says Rick, the other one says Frederick --
Q I'll represent -- I'm sorry to cut you off. I'll represent to you that's the same



person, okay?
A Okay.
Q Okay. So that appears to line up with the last report listed on your list, correct?
A All right. Yes.
Q Yes? Okay. Okay. So then let's flip back to the -- your report and Appendix B, and let's just go in reverse order. So the next name up is Dr. Conrad Johanson, correct?
Looking at Appendix B of your report.
A Oh, B. Okay.
Q Okay. Flip back one page, do you see at the bottom of that page Dr. Conrad Johanson?
A Yes.
Q Okay. Does that name appear in Exhibit 12?
A Exhibit 12. Yes.
Q Okay. So that appears to line up with materials that you reviewed for this litigation, right?
A Yes.
Q Okay. And then the next up is report of Vincenzo Salpietro, correct?
On your Appendix B. I'm sorry, we're



going to just keep going back and forth. Appendix B, one line up.
A Oh, yes.
Q Do you see list Report of Vincenzo Salpietro?
A That's correct.
Q Okay. And do you see that name in Exhibit 12?
A Yes.
Q Okay. And then the next line up in Appendix B is Dr. Philip Darney. Do you see that?
A Darney.
Q Is that in Exhibit 12?
A Yes.
Q Okay. So that appears to line up with materials reviewed in this litigation, correct?
A Yes.
Q Okay. And then do you see back to Appendix B, the next line up is Laura Plunkett?
A Okay.
Q Do you see that name on Exhibit 12?
A Yes.
Q Okay. And so that appears to be a material that was disclosed in this litigation,

Page 58

MDL 2767, correct?
A Yes.
Q Okay. And then the next line up in Appendix B is Dr. James Wheeler. Do you see that?
A Yes.
Q And does that name appear in Exhibit 12?
A You're doing well.
Q Okay. So that appears to be a document that was disclosed in this MDL 2767, correct?
A Yes.
Q Okay. The next line up in Appendix B is Lemuel Moye. Do you see that? On Appendix B, your materials list.
A B, Lemuel Moye.
Q Do you see that name in Exhibit 12?
A That's correct.
Q Okay. So that also appears to be a plaintiffs' expert disclosed in MDL 2767, correct?
A Yes.
Q Okay. So the next line up in your Appendix B is the report of John E. Maggio. Do you see that?
A Yes.
Q Do you see Dr. John Maggio in

Page 59

plaintiffs' expert disclosures, Exhibit 12?
A It's not listed, but I don't know if it's relevant to point out that in Dr. Salpietro's -- I think in his deposition, he referred to the report from Dr. Maggio.
Q Sure. Do you -- do you know if Dr. Maggio passed away last year?
A That's what I heard.
Q Okay. So he -- his opinions were not disclosed in this litigation; is that correct?
A I'm not sure of the status of his previous report.
Q Okay. Have you seen any reports that were disclosed by the names that you see in Exhibit 12 that use the term "spike"?
A I wouldn't -- I can't remember.
Q Okay. Do you have any reason to dispute that none of plaintiffs' experts who disclosed reports in MDL 2767 used the term "spike" in their reports?
MS. MANGRUM: Objection.
THE WITNESS: I know there's -- it's possible to do computer word searches and --
BY MS. NATALE:

Page 60

Q Sure.
A -- you know, but -- you know, I can't say whether or not they did.
Q Okay. And the reason that I ask is that you in your report back at page 14, you appear to take specific issue with the term "spike."
And let me direct you to the second -- so we're back in your report at page 14.
A Yes.
Q Okay. And you say after -- well, paragraph 22, the second paragraph with -- among that paragraph 22 says: "The term," quote, "spike," unquote, "is vague," and then you continue, right? Is that correct?
A That's correct.
Q Okay. So you --
A But --
Q Sorry.
A I remember during my previous deposition that this issue was raised, and, you know, we dealt with it at some length looking at some specific data, so that's where it also appeared.
Q Sure. So would it be important in criticizing the opinions disclosed by plaintiffs'

Page 61

experts in this litigation to ensure that the criticisms you raise actually refer to the plaintiffs' opinions disclosed in this litigation?
MS. MANGRUM: Objection.
THE WITNESS: Well, my report talks about variability. My report has a more comprehensive scientific assessment of all sorts of aspects of pharmacokinetics, pharmacology of levonorgestrel in different dosage forms. So besides some relevance to some previous issues, this is also something that is of value to discuss in general in pharmacokinetics.
BY MS. NATALE:
Q And here on page 14, you take issue with terminology that you say is suggested by plaintiffs and their experts, correct? And specifically the term "spike," right?
A Well, right now I'm not referring -- in paragraph 22, I'm not saying -- referring to any of your expert witnesses. I'm just providing general pharmacokinetic information.
Q Sure. And so I asked you before we looked at Exhibit 12, if you -- you stated at the beginning of the paragraph: "It has been

**suggested," and I asked you who suggested that, correct?**
MS. MANGRUM: Objection.
THE WITNESS: You have to read back -- I don't recall.
BY MS. NATALE:
**Q Okay, sure. Let's -- let's see if we can pull that up.**
**I said: "Let's take a look back at Exhibit 2, which is your report in this litigation. You state on page 14," so paragraph 22 --**
A Okay.
**Q -- 'It has been suggested that total serum LNG concentrations for Mirena may,' quote, 'spike,' unquote. Did I read that so far correctly?"**
**You said: "Yes."**
**I said: "Who suggested that total serum concentrations for Mirena may spike?"**
**And you said: "That contention was in some -- some other -- some of the documents that I read in preparation for the first expert report that I filed."**



**Correct? Is that correct?**
A Yes.
**Q Okay. So do you believe that that term "spike" was suggested by some -- someone in this litigation or in a document that you reviewed?**
MS. MANGRUM: Objection.
THE WITNESS: Well, as I've stated, I had seen that used previously from your previous expert report -- expert Dr. Maggio. I saw that Dr. Salpietro seemed to endorse Dr. Maggio's report. So it seemed to me to remain relevant.
BY MS. NATALE:
**Q Okay. Do you think that it would be relevant to your opinions in -- disclosed in this litigation to only -- strike that.**
**Do you think that it's appropriate to raise criticisms of opinions that you attribute to plaintiffs' experts in this litigation that are not in fact disclosed by plaintiffs in this litigation?**
MS. MANGRUM: Objection.
THE WITNESS: Well, I guess I'm not clear on the nuances of what is relevant from our previous activities versus what is relevant here.



But my statements are basically what I believe scientifically true.
MS. NATALE: Okay. Let's take a break. Off the record.
THE VIDEOGRAPHER: Okay. The time is 10:15 a.m., and we're going off the record.
(Recess.)
THE VIDEOGRAPHER: The time is 10:33 a.m. We're back on the record.
BY MS. NATALE:
**Q Welcome back, Dr. Jusko.**
**While we were on a break, I saw that you were able to staple the different parts of your report together so they're a little bit easier to navigate, right?**
A Very good. Yes.
**Q And I'll let you know that we can put aside almost everything from earlier. We're going to move on to another topic right now, okay?**
A Go to it.
**Q Okay. If you turn on Exhibit 2, which is your report, if you turn to page 6.**
**Okay. At the bottom, the last paragraph starts paragraph 18, correct? Are you with me?**



A Okay.
**Q Okay. You -- you start by stating: "The binding of LNG to SHBG and the changes that occur in various circumstances complicates the interpretation of LNG concentrations in serum."**
**Did I read that correctly?**
A Yes.
**Q Okay. You -- one of the references that pops up quite a bit in your -- throughout your report is reference number 3, which is your -- another 2017 publication by you titled "Clarification of contraceptive drug pharmacokinetics in obesity," correct?**
A Yes.
**Q Okay. And you cite that piece multiple times throughout your report, correct?**
MS. MANGRUM: Object to form.
THE WITNESS: I think so.
BY MS. NATALE:
**Q Is it fair to say that you rely on information that you published in that article throughout your report?**
A Parts of it, yes.
**Q Okay. I'm going to mark Exhibit 13.**

(Jusko Exhibit No. 13 was marked
for identification.)
BY MS. NATALE:
Q And this is -- does this appear to be reference number 3 in your report?
A This -- can I comment?
Q Yes.
A This is the manuscript version. It's actually been published.
Q Okay.
A Okay.
Q When was it actually published?
A I think January 2017.
Q If you turn to page 7 of this Exhibit 13. You're the author of this document, correct?
A You're referring to the --
Q The article, yes.
A -- the article. Yes, I am.
Q Okay. If you'd turn to page 6 -- 7, I'm sorry, of the manuscript. Do you see under -- there's a heading "Role of Protein Binding"?
A Yes.
Q Okay. And you say: "The binding of LNG



to SHBG and the changes that occur in various circumstances complicates the interpretation of progestogen and EE concentrations in plasma."
Did I read that correctly?
A Yes.
Q Okay. And that's pretty similar to the language on page 6 of your report, except you say serum instead of plasma in your port -- report, correct?
A Correct.
Q Okay. And in the -- in the article you say progestin and EE concentrations, and in your report you just say LNG, correct?
A Yes.
Q And so in your manuscript, which is Exhibit 13, continuing on, you say: "As with several other hormones and fat soluble vitamins, there is binding to specific circulating globulin proteins in plasma."
Did I read that correctly?
A Yes.
Q Okay. And does that also appear to be the next sentence in your -- in your expert report?



A That's correct.
Q Okay. And then back to the manuscript, you say: "This provides an added central plasma pool of the drug or hormone and serves to alter access to various tissues."
Did I read that correctly?
A Yes.
Q And is that also the next sentence in your expert report?
A Yes.
Q Okay. Back to the manuscript. You say: "The," quote, "Free Hormone Hypothesis," end quote, "argues that binding of sex steroids to strongly binding proteins such as SHBG reduces the availability of free drug to diffuse into many body tissues."
Did I read that correctly?
A Yes.
Q And does that appear to be the next statement also in your report on page 6?
A Yes, it does.
Q Okay. And then in your manuscript which is Exhibit 13, you say: "Thus, SHBG binding of LNG and EE may have a -- may have a protective



role for some tissues."
Did I read that correctly in the manuscript?
A Yes.
Q Okay. And so in your manuscript you're discussing LNG and EE, and in your report you say LNG and other sex steroids, correct?
A Yes.
Q Okay. And in your manuscript you say "may have a protective role for some tissues," correct?
A Yes.
Q And in your report you say "has a protective role for many tissues."
A Yes.
Q Okay. Is there a reason why in your publication you say "may have," and in your report you say that the SHBG binding has a protective role?
A It's a -- just a slight difference in terminology. But in my publication, I went on to describe some additional public -- published information that forms an additional hypothesis for the role of SHBG.

Page 70

Q Okay. And so you do not continue in your 2017 report by describing that additional hypothesis, correct?
A That's right.
MS. MANGRUM: Object to form.
BY MS. NATALE:
Q Sorry. That's right?
A That's correct.
Q Okay. And first, I guess a side question, what do you mean by "protective role for many tissues"?
A Well, when drug -- when drugs are bound to proteins in plasma, if the drug is bound to the protein, then it -- less is available to the tissues.
Q Okay. And that -- that's what you mean by "protective," less is available to the tissues?
A That's right.
Q Why is that protective?
A If -- if there's lower concentrations in tissues, then there's lesser chance of the drug doing something outside of the target tissue.
Q Okay. And is ethinyl estradiol -- that's EE, right?

Page 71

A Yes.
Q Okay. And so is it your understanding that EE increases sex hormone-binding globulin, SHBG?
A Yes, it does.
Q Okay. And so that would have what you describe as a protective role, correct?
MS. MANGRUM: Objection.
THE WITNESS: It's part of what it does in the body, yes.
BY MS. NATALE:
Q Okay. And so when LNG is administered in combination with EE, that EE may have, as you state, a protective role, meaning that less is available to the tissues and there's a lesser chance of the drug doing something outside of the target tissue?
MS. MANGRUM: Object to form.
THE WITNESS: Yes. The EE is primarily present in the oral contraceptives, and of course they exhibit far higher total concentrations, far higher free concentrations, than we're talking about with Mirena.
BY MS. NATALE:

Page 72

Q Sure. And I'm just trying to understand, you -- you said that EE -- strike that.
That binding to SHBG has a protective role in that there's a lesser chance of the drug doing something outside of the target tissue because less is available, correct?
A That's correct.
Q Okay. So you mentioned that you -- your article, your manuscript, Exhibit 13, goes on to explain a hypothesis that is not in your 2017 report, correct?
A Yes.
Q Let's really quickly -- I'm going to mark for the record your report from 2016 from the Kellington case, okay? And I'm sure you're familiar with that document.
A Okay, yes.
Q Are you? Okay. You authored it, correct?
A I did.
(Jusko Exhibit No. 13 was marked for identification.)
BY MS. NATALE:

Page 73

Q Okay. So this one -- if I could steal that stapler from you for a minute, I can staple this for us. Because it's paper-clipped. I did my best, it's a little bit loose, but it's paper clipped just in case.
(Jusko Exhibit No. 14 was marked for identification.)
MS. NATALE: Michelle, this is Exhibit 14 and it's the 2016 report.
MS. MANGRUM: Thank you.
BY MS. NATALE:
Q Okay. And does this -- I actually believe that this version of your report is undated. I could be wrong. Let's take a quick look.
Do you see it's signed on page 18 but there's no date?
A I'm sorry?
Q I'm sorry. Do you see on page 18 it's signed but there's no date?
A Oh, 18. Sorry.
Q That's okay.
A Okay.
Q To the best of your knowledge, is this

**the report that you disclosed in the Kellington case in 2016?**
A Yes.
**Q It appears to be?**
A It appears to be.
**Q Okay. If you turn to page 5 of Exhibit 14, which is your 2016 report, do you see paragraph 18?**
A Yes.
**Q Okay. And most of the way down -- about half -- a little more than halfway down that paragraph, you state: "More recent research has indicated that," and it continues, correct?**
A That's correct.
**Q Is that the hypothesis you were talking about?**
A Yeah --
MS. MANGRUM: Object to form.
THE WITNESS: -- it's essentially the same information.
BY MS. NATALE:
**Q Okay. Why did you not include that information in your 2018 report?**
A Okay. Well, the free hormone hypothesis



itself is an hypothesis, but it seems to explain a great deal about what happens with sex steroids. The role of megalin, the role of SHBG for uptake of sex steroids and to target tissues is also a hypothesis but a much weaker hypothesis, and applies pretty much -- may be relevant for steroids getting into their target tissues because the target tissues may have these additional mechanisms.
So these mechanisms don't appear to apply outside the target tissues. These mechanisms have only been explored in cell -- or perhaps animal systems and need more substantiation.
So I think it's entirely possible that this is a viable mechanism. But also in reading the literature further, I have another reference in here about testosterone. Those investigators did a very thorough assessment of all sorts of factors pertaining to testosterone binding and tissue uptake. They discuss these same hypotheses. They came to the conclusion that the free hormone hypothesis remains most relevant for testosterone as well.



**Q Okay.**
A So I decided it was a little too complicated bringing all these issues up again.
**Q Okay. Fair enough. If you'll bear with me, I might bring some of them up again, but we'll do our best to keep it uncomplicated.**
**You mentioned a more recent -- you said that you -- in reading the literature further, you have another reference in here about testosterone.**
**And if we turn -- you can put Exhibit 14 aside, sorry about that, for now.**
**And then Exhibit 2, which is your 2018 report, if you flip now to -- we started at the bottom of page 6, right?**
A Yeah.
**Q Talking about the free hormone hypothesis.**
A Yeah.
**Q Which you just explained, right?**
A Yes.
**Q Okay. Now if you turn to page 7 -- one sec. And actually, I'm going to turn you to page 8.**
**Okay. So you talk about -- it looks**



**like this is a carryover from the previous page talking about the Free Androgen Index, but you state in the last sentence of this -- last two sentences of this carryover paragraph: "A recent review, reference 47, has described the FAI as," quote, "overly simplistic, an inaccurate measure of free testosterone concentrations," unquote, "and," quote, "most experts do not favor its use," end quote.**
**Did I read that correctly?**
MS. MANGRUM: Object to form.
THE WITNESS: Yes, that reference 47 is what I was talking about, the testosterone review and the testosterone -- the authors' consideration of the megalin and such for target tissue update.
BY MS. NATALE:
**Q Okay. And that is -- you said that's the reference you were talking about, correct?**
A Yes, it is.
**Q Okay. So if we turn to Appendix B -- no, not Appendix B. The references list in your expert report, let's -- that's -- reference number 47 is Goldman, et al., "A reappraisal of testosterone's binding and circulation." Is that**

Page 78

**correct?**

A That's correct.

**Q Okay. I'm going to mark that article as Exhibit 15.**

(Jusko Exhibit No. 15 was marked for identification.)

BY MS. NATALE:

**Q So you did mention, I believe, that the authors conclude that the free hormone hypothesis is still the most -- let me -- let me find what you said here.**

**You said: "They came to the conclusion that the free hormone hypothesis remains most relevant for testosterone as well." Correct?**

A Yes.

**Q So is it your conclusion after reading this article that the free hormone hypothesis is still the most relevant model for both testosterone and levonorgestrel?**

A It seems to best explain the role of protein binding for both.

**Q Okay. In your report, do you -- do you have any criticize -- criticisms of the free hormone hypothesis?**

Page 79

A Am I criticizing it, are you asking?

**Q Sure, yeah.**

A Oh. Well, it's a hypothesis, and any hypothesis -- and actually anything in biology there can be exceptions, and a major exceptions to its role is the fact that we now understand there are a great number of transporters for drugs that move drugs from one side of a membrane to another. So if there is a transporter involved, the behave- -- the distribution pharmacokinetics could be more complex.

**Q Okay. So I marked Exhibit 15, and this one is paper-clipped because it's a pretty large article, including all the references, et cetera. But does this appear to be the Goldman article that you cited in your -- as reference 47 in your report?**

A Yes.

**Q Okay. You mentioned that -- strike that.**

**Is it your -- is it your view that the hypothesis raised by Goldman may be applicable to levonorgestrel?**

MS. MANGRUM: Object to form.

Page 80

BY MS. NATALE:

**Q Is that why you cited it in your report?**

A Well, I cited it because there was this analogous index, the FAI, Free Androgen Index, that these authors examined many different ways of dealing with protein binding, and in that specific instance they did not endorse the FAI.

**Q Okay. So let's talk about the many different ways that they examined of dealing with protein binding in Dr. Goldman's article.**

**So on the first page of this article by Goldman, et al., they discuss under -- do you see "Essential Points"?**

A Okay.

**Q Okay. And it says -- it talks about circulating testosterones binding to cognate binding proteins.**

**Are those the transport proteins you were talking about?**

MS. MANGRUM: Objection.

THE WITNESS: Yes.

BY MS. NATALE:

**Q Binding proteins are -- is that another kind of word for transport proteins?**

Page 81

A Yes.

**Q You can -- I'm trying to understand. So if you don't feel like --**

A Okay.

**Q I would like to understand if there is a difference or could you explain that?**

A All right. Generally, when drugs bind to proteins, they can bind what's called nonspecifically. It's typically what albumin is doing -- doing. But there are some proteins, the globulins, that have much stronger affinity, and they have very specific affinity for particular ligands. Those would be what would be considered the transport proteins.

**Q Okay. So under Essential Points, the first bullet talks about cognate binding proteins for circulating testosterone, correct?**

A Yes.

**Q And it lists sex hormone-binding globulin, or SHBG; is that correct?**

A Yes.

**Q And does levonorgestrel bind to SHBG?**

A Yes, it does.

**Q And does it do so specifically?**

Page 82

A Yes.
Q Okay. And does it do so with high affinity?
A It does.
Q Okay. And then it lists human serum albumin, HSA, correct?
A Yes.
Q Okay. Does levonorgestrel bind to albumin?
A That's correct.
Q Okay. And does it do so specifically?
A I would call it nonspecific.
Q And what does that mean?
A It -- typically the proteins, like albumin, can bind a wide variety of compounds without there being particular structural characteristics of the drug that causes the affinity. It's more related simply to the partition coefficient, the lipid solubility of the drug. When there is a higher partition coefficient typically it's more of the nonspecific binding to albumin. It -- it gets more complicated too, but...
Q Okay. We can probably cut it there.

Page 83

Okay. So next on -- under that bullet, the author lists cortisol-binding globulin.
Is CBG an abbreviation for cortisol-binding globulin?
A Yes.
Q Okay. Does levonorgestrel bind to CBG?
A I don't think it does.
Q Okay. And do you express anywhere in your report that LNG binds to CBG?
A I don't claim it does.
Q And that -- sorry, please continue. I didn't mean to cut you off.
A It's considered binding primarily to SHBG and albumin.
Q Okay. So I guess that kind of takes -- takes us one step beyond.
My next question was this article by Goldman mentions orosomucoid.
A Yes.
Q Does LNG bind to orosomucoid?
A Probably not.
Q Okay. So one of Dr. Goldman's -- I think one of the analysis that they do of the applicability or appropriateness of the FAI, as

Page 84

you explained, is they talk about the fact that testosterone binds to all of those binding proteins, correct?
A Yes.
MS. MANGRUM: Object to form.
BY MS. NATALE:
Q And under this Essential Points, they say: "These binding proteins," meaning SHBG, HSA, CBG and orosomucoid, "play an important role in regulating the transport, tissue delivery, bioactivity and metabolism of testosterone."
Is that -- did I read that correctly?
A That's what they say.
Q Okay. And so at least in terms of CBG or orosomucoid, those points are not relevant to levonorgestrel; is that correct?
A They actually don't -- even though testosterone does bind a little bit to CBG and orosomucoid, typically calculations dealing with binding of testosterone only consider the SHBG and albumin binding.
Q Okay. Is it correct, though, that -- strike that.
On page 3 of the Goldman article, I

Page 85

think this is what you may be just said, under paragraph 2, the biology of binding proteins -- do you see where I am?
A Under Section 2, yes.
Q Yeah, section 2. Sorry.
And then about three lines up from the bottom, it says: "Current computations of free and bioavailable testosterone only account for the potential impact of alterations in HSA and SHBG, ignoring CBG and orosomucoid and other potentially interacting proteins and steroid hormones."
Did I read that correctly?
A Yes, that's basically what I just said previously.
Q Okay. Okay, cool.
And so is one of their kind of criticisms of those current models that they don't account for binding to those other proteins?
MS. MANGRUM: Object to form.
THE WITNESS: It's not a criticism. It's the fact that by using calculations with just these two proteins, SHBG and HSA, they get a pretty accurate determination of the free drug.
BY MS. NATALE:

Q Okay. On page 2 of this article, so flipping back one, the bullet at the top of this page under Essential Points says: "The ensemble allosteric model of testosterones binding to SHBG developed from recent studies using modern biophysical techniques suggests that testosterone binding to SHBG is a complex, multistep process that involves inter-binding site allostery."
Did I read that pretty correctly?
A Pretty good.
Q Okay. What is allostery? Allostery?
A Allosteric effects are where there are secondary parts of the binding protein that affects the binding of the ligand to the primary site.
Q Okay. And so the primary site, is that what is generally thought to be an active binding site?
MS. MANGRUM: Object to form.
THE WITNESS: It would be the specific binding site, yes.
BY MS. NATALE:
Q Specific binding site. So is this -- are the authors stating here that perhaps



testosterone can bind to SHBG at sites other than that primary or specific site?
MS. MANGRUM: Object to form.
THE WITNESS: They basically have a -- a hypothesis or evidence for multiple steps in the binding, but the end result is an equilibrium condition. But in the course of binding, there's interactions between the drug and the large protein that have come to be characterized with what they call modern biophysical techniques where they can visualize what's happening at the molecular level in the context of the binding process.
BY MS. NATALE:
Q In your review of the literature, did you come across any articles that state that levonorgestrel's binding to SHBG might be allosteric?
A There is literature to indicate that LNG binding is very similar to testosterone binding to SHBG, but I don't think people have gotten into the biophysical aspects for LNG.
Q Okay. So you've not seen an article stating that LNG binds to SHBG allosterically.



You've not seen that precise claim in the literature. Is that accurate?
A I haven't seen it, but it's not important because we see the end results of the binding, and it's very similar.
Q Okay. Back to page 2 of Goldman, under "Introduction," about -- there's a second full paragraph that starts with "Total testosterone."
A Total, yes.
Q Okay. It says: "Total testosterone refers to the sum of the concentrations of protein-bound and unbound testosterone in circulation."
Did I read that correctly?
A Yes.
Q Okay. And would it be fair to say that total levonorgestrel would refer to the sum of concentrations of protein-bound and unbound levonorgestrel in the circulation?
A Yes.
Q Okay. And so then the authors say: "The fraction of circulating testosterone, which is unbound to any plasma protein, is referred to as the free testosterone fraction."



Did I read that correctly?
A That's correct.
Q And would it be fair to say the fraction of circulating levonorgestrel, which is unbound to any plasma protein, is referred to as the free levonorgestrel fraction?
A Correct.
Q Okay. The authors say: "The term 'bioavailable testosterone' refers to the fraction of circulating testosterone that is not bound to SHBG and largely represents the sum of the free testosterone plus the HSA-bound testosterone."
Did I read that correctly?
A Yes.
Q Okay. Now, is it your understanding that bioavailable levonorgestrel would include both the circulating test- -- the circulating levonorgestrel that's not bound to SHBG and also reflecting the HSA-bound levonorgestrel?
A That's what they call it, yes.
Q That -- when they describe testosterone, correct?
A That's what they call for bioavailable fraction for testosterone.

Page 90

Q Okay. Do you believe that the bioavailable fraction of levonorgestrel includes levonorgestrel that is bound to albumin?

A For testosterone, we talk about the free hormone hypothesis. This is in addition to the free hormone hypothesis where they are claiming that a drug bound to albumin is also available to tissues.

So an extended hypothesis, it's -- sort of additional conjecture, it's something people have looked into. But the bottom line is when examining testosterone, they still use the free testosterone. They don't use the so-called bioavailable testosterone.

Q Okay. Okay. So your reference to this article was in regards to -- at least in the -- the -- the point that we were referring to in your article is in reference to the so-called Free Androgen Index, correct?

A Yes.

Q Okay. And so if we turn to page 9 of the Goldman article, which is Exhibit 15, do you see at the bottom the heading, "What is the biologically active fraction of circulating

Page 91

testosterone? - The historical evolution of the free hormone hypothesis"?

A Yes.

Q And under this subheading of the article, and the next -- over the next several pages, do these authors discuss certain models of estimating free testosterone, including the Free Androgen Index?

A I don't see where you're talking about the Free Androgen Index.

Q Okay.

A Okay.

Q Is the Free Androgen Index a model developed by -- do you know who developed that model?

A They probably cite it, but I don't remember.

Q Okay. If you turn to page 16 of Goldman.

Do you see 8.1, "Calculated free testosterone based on linear models"?

A Yes.

Q Okay. Does it -- it states: "The algorithms published by Vermeulen, Sodergard and

Page 92

Mazer are all based on the linear model of testosterone's binding to SHBG."

Did I read that correctly?

A That's correct.

Q Okay. And so the Free Androgen Index is based on a linear model of testosterone binding to SHBG, correct?

A I'm sorry, say that again.

Q Sure. The Free Androgen Index, is that based on the linear model of testosterone's binding to SHBG?

A It's just a simple ratio. I don't know that one would say it's based on anything.

Q Okay. All right. So back to page 10 of Exhibit 15.

A Ten or --

Q Page 10 -- sorry, Exhibit 15, page 10.

A Yeah, I'm on page 10. Okay.

Q Okay. The second full paragraph starts: In the 1980s and 1990s, the free hormone hypothesis was challenged by various studies. Pardridge, Manni and others postulated that HSA-bound testosterone being loosely bound could disassociate in the capillaries and to the cell

Page 93

and thus become bioavailable."

Did I read that correctly?

A Yes.

Q Okay. Do you believe that HSA-bound levonorgestrel can disassociate in the tissue capillaries, enter the cell and thus become bioavailable?

A It depends on the diffusion circumstances. If there are initial concentrations where the drug or the hormone is only bound to the proteins, and there's nothing in the tissues, then if blood-flow through the particular tissue is slow enough, the kinetics of disassociation could allow some of the bound -- HSA-bound drug or testosterone to come off and diffuse into the tissues. But that would be an initial uptake paradigm.

If one is at equilibrium, like under multiple dosing circumstances, constant dosing circumstances, then the equilibrium conditions would apply, and whatever is bound to albumin would stay in albumin. Whatever is in the tissue and bound would stay there. Things are at equilibrium.

Page 94

Q Okay.
A So it's complex.
Q Okay. I'm just going to quickly mark Exhibit 16 and ask you -- well.
(Jusko Exhibit No. 16 was marked for identification.)
BY MS. NATALE:
Q You can -- we're not done with Goldman, so if you want to keep that out.
A Glad to.
Q Here is Exhibit 16.
And are you familiar with the piece -- this piece by Dr. Hammond, "Plasma steroid-binding proteins: Primary gatekeepers of steroid hormone action"?
A Mm-hmm.
Q You're familiar with this piece?
A I've seen it in the past, yes.
Q If you just flip to the second page of the article, under "Free steroids are active steroids."
A Yes.
Q Okay. The second sentence begins: "Steroids that are loosely and nonspecifically

Page 95

bound to albumin have also been proposed to be accessible to tissues...," and cites Pardridge 1988, correct?
A Okay.
Q Isn't that correct so far?
A Yes. Yes.
Q Okay. And they continue: "... but steroids still have to disassociate from albumin before they diffuse into cells and exert their activities."
Did I read that correctly?
A Yes.
Q Do you agree with that statement?
A Yes.
Q Okay. And then it continues: "Numerous reports of the facilitated uptake of SHBG-bound steroids have also surfaced," with several citations, "but have never been substantiated in physiologically relevant context."
Did I read that correctly?
A That's correct.
Q Do you agree with that statement?
A Yeah, that's pretty much what Goldman was saying also, and it's -- it's difficult to

Page 96

make these determinations to prove -- prove these concepts.
Q Sure. So you mentioned that Goldman was saying that as well, and if we go back to page 10 of Goldman.
The next paragraph begins where we were: "A second set of studies reported that SHBG-bound testosterone may be internalized into the cell through an endocyte -- endocytitic -- endocytic process mediated by a membrane protein megalin."
Did I read that correctly?
A Yes.
Q And that's the process that was in your 2016 report but not your 2018 report, correct?
A That's correct.
Q Okay. And you mentioned that that is also what you referred to as a hypothesis, correct?
A Yes.
Q Okay. And I think you said it's a -- still a possible hypo- -- hypothesis, correct?
A Well, hypothesis is always a possibility.
Q Sure. Would you describe it as likely

Page 97

or unlikely?
MS. MANGRUM: Object to form.
THE WITNESS: From the viewpoint that, you know, transfer of protein sex hormone-binding proteins would seem to exist for more reasons than just binding the drug that -- it would seem reasonable that this could occur, but it's something that remains to be studied more --
BY MS. NATALE:
Q It seems --
A -- appropriately.
Q Sorry. It seems reasonable?
A In these discussions about testosterone, and when -- with testosterone being the sex hormone being studied, they have some context that's relevant to testosterone in the systems that they are studying.
But as they state in here somewhere, "because of the lack of follow-up studies," et cetera, "the putative role of megalin and the transport of sex hormones has remained elusive." So it's difficult to assess in -- and again in humans.
In the bottom -- other sentence at the

bottom: "Additional reports about binding protein membrane receptors and many potential target tissues -- sort of also is what I was talking about, and these two things together offer a potential for further assessment of the role of target tissue uptake of compounds.

**Q Okay. I'm going to mark for you Exhibit 17, and this is the transcript of your deposition from May 2016.**

(Jusko Exhibit No. 17 was marked for identification.)

BY MS. NATALE:

**Q And if you will turn for me to page 72 of the transcript.**

**Do you appear to be discussing, at least starting at page 72, the literature by Dr. Hammes and his colleagues regarding the role of endocytosis in steroid hormone uptake?**

A Mm-hmm. Yes.

**Q Okay. And so that discussion continues for several pages of the transcript. And then -- and then on page 88 -- are you on page 88 now? Sorry.**

A Oh.



**Q Sorry, page -- page 86 actually. Let me know when you're there.**

A I'm there now.

**Q Okay. There's a question just at the bottom of that page: "So the part that is bound to sex hormone-binding globulin in the case of levonorgestrel, which we would say is not free, are you contending that it's hormonally active or that it's not?"**

**"A. I'm saying it could be, yes.**

**"Q. It could be, but you don't know for sure?"**

**"A. No. The scientific evidence indicates that it likely is."**

**Did I read that correctly?**

A Yes.

**Q Okay. Did you testify in May 2016 that the scientific evidence indicates that levonorgestrel bound to SHBG is likely biologically active?**

MS. MANGRUM: Object to form.

THE WITNESS: Okay. At that time, based on my assessment of the literature and in consideration of parallelisms with other transport



protein-binding phenomena, there is an appreciable amount of evidence to indicate that binding to these target proteins could facilitate uptake into target organs. I believe that it's strongly possible. It's just something very difficult to prove in an invivo system.

BY MS. NATALE:

**Q Would you say that it's plausible?**

MS. MANGRUM: Object to form.

THE WITNESS: I'm not sure I would use that term. I would basically prefer to say that this is what the evidence says, something is possible.

BY MS. NATALE:

**Q Okay. On page 88 of the transcript, you say: "It's an idea that has concert -- considerable support in the pharmacology literature."**

**Did I read that correct?**

A Yes. In fact, some of the other publications -- well, the other articles we were referring to, people like Pardridge, there have been many studies done with drugs, other entities, to show that under initial diffusion conditions,



the drug can come off the protein fast enough so it can enter the -- the tissue.

**Q So you said you believe that it's strongly possible, correct?**

MS. MANGRUM: Object to form.

BY MS. NATALE:

**Q Just now -- I'm sorry, I'm reading from the transcript of today.**

A Oh.

**Q You said: "At that time, based on my assessment of the literature and in consideration of parallel -- parallelisms with other transport protein-binding phenomena, there is an appreciable amount of evidence to indicate that binding to these target proteins could facilitate uptake into target organs. I believe that it's strongly possible. It's just something very difficult to prove in an invivo system."**

**Is that your testimony today?**

A Okay. As I just indicated, there's many studies, a great deal of additional information on this whole subject area. So I -- based on a broad array of information, yes, I believe it's possible.

Page 102

Q Okay. And I'm going to mark Exhibit 18, and this is Exhibit 6 to your 2016 deposition.
(Jusko Exhibit No. 18 was marked for identification.)
BY MS. NATALE:
Q So does this look familiar to you? Have you seen this document before?
A (Peruses document.) Yep. Yes.
Q Okay. And in the very beginning of this letter to the editor, do you see that author -- Dr. Rosner begins -- back on the front page. Sorry, Dr. Jusko.
A Sorry.
Q "In their research article published in the September 9th, 2005 issue of Cell, Hammes, et al., 2005, investigated the role of megalin," parentheses, "an endocyte -- endocytic receptor in a variety of tissues," end parentheses, "and SHBG," parentheses, "sex hormone-binding globulin," end parentheses, "on the cellar -- cellular uptake of sex steroid hormones in mice."
Does that appear to be discussing Dr. Hammes' hypothesis that we've been talking about regarding megalin?

Page 103

A Yes.
Q Okay. So if you -- there's a -- the second paragraph in that column starts with "Hammes, et al." Do you see that?
A Yes.
Q Okay. So the second sentence, Dr. Rosner states: "Mice lacking megalin are severely deficient in vitamin D, and this deficiency has been reported to be associated with impaired gonadal development and function. Thus, it is possible that it is a deficiency in vitamin D and not a lack of megalin that causes the reproductive abnormalities observed by Hammes, et al."
Did I read that correctly?
A Yes.
Q Okay. And is that one of Dr. Rosner's criticisms of the megalin model?
MS. MANGRUM: Object to form.
THE WITNESS: Yes.
BY MS. NATALE:
Q Okay. And then he continues: "Furthermore, the adult mouse liver does not synthesize SHBG and there is no SHBG in adult mouse plasma. Thus, findings related to the

Page 104

importance of SHBG in the uptake of steroids and in steroid hormone action in this mouse model are unlikely to yield biologically relevant results."
Did I read that correctly?
A That's correct.
Q Is that another criticism that Dr. Rosner raises of the megalin model?
A That's correct.
Q Okay. And do you agree that because of the lack of synthesis of SHBG in adult mouse plasma, findings related to the importance of SHBG in the uptake of steroids and in steroid hormone action in this mouse model are unlikely to yield biologically relevant results?
A Well, that's his opinion in criticizing the other article. I haven't gone back into detail to examine, you know, all the experimental intricacies of the studies.
Q Okay. If -- if adult mice lack synthesis of SHBG in their plasma, is that model likely to yield biologically relevant results?
MS. NATALE: Object to form.
THE WITNESS: It gets more complex from the viewpoint of whether mice have the same

Page 105

properties of their target tissues, whether everything is happening in terms of binding in megalin in mice is relevant to other species. One always takes animal data with a certain perspective.
BY MS. NATALE:
Q Okay. And so Dr. Rosner continues: "In addition, whereas the BN16 cell line expresses megalin, it does not express receptors for androgens and estrogens, calling into question the physiological relevance of studies on the uptake of steroid hormones in these cells."
Did I read that correctly?
A Yeah, I guess -- I guess that's just what I was saying.
Q Okay. So is that another criticism that Dr. Rosner raises of the megalin model?
A Yes.
Q Okay. And then in the next paragraph, Dr. Rosner begins: "There are several other concerns regarding this study. The authors analyzed the specificity of the megalin-SHBG interaction both before and after denaturation of megalin."

Page 106

Did I read that correctly?
A Okay.
Q And he continues: "Although SHBG does not bind to denatured megalin, the binding of megalin to denatured SHBG was not investigated. It is feasible that megalin, which is known to bind to a large variety of protein and nonprotein ligands may be able to bind biologically inactive SHBG, resulting in a misinterpretation of these experiments."
Did I read that correctly?
A That's what he said.
Q Is that another criticism that Dr. Rosner raises of the megalin model?
A That's correct.
Q Okay. In the next paragraph, Dr. Rosner -- if we skip the first sentence, Dr. Rosner states: "They did not chemically characterize the molecules that had been -- that had incorporated the H-label - it could have been incorporated into any number of metabolites of testosterone. In the absence of kinetic data, it is not clear whether events confounded the interpretation of the results, such as rapid

Page 107

uptake of testosterone with its subsequent release into the medium."
Did I read that correctly?
A Yeah, he is confounding two -- two criticisms into sort of like one.
Q Okay. So would you say that's two more criticisms that Dr. Rosner raises of the megalin model?
A Yes.
Q Okay. If we go further down the page -- let's see. We're going to skip two more sentences, and do you see "furthermore"?
A Okay.
Q Okay. "Furthermore, the H-compounds were not identified. If the suggestion by Hammes, et al. - that sex surrogate hormones bound to SHBG are taken up by the cells with the help of megalin - were correct, then one would expect more than 11 percent uptake of the bound steroid."
Did I read that correctly?
A Yes.
Q Okay. Is that another criticism that Dr. Rosner raises of this megalin model?
A Yes.

Page 108

Q Okay. And moving into the next column, skipping down maybe about ten lines, he says: "This could have been tested by examining the percentage uptake ... nevertheless, it is unlikely that the discrepancy between the uptake of SHBG and the uptake of 3H-testosterone can be attributed to a decreased percentage uptake of 125 SHBG because there is little change in 3H-testosterone uptake as the SHBG concentration is increased from 10 to 500 or as the ratio of SHBG to testosterone is increased from 1:10 to 5:1."
So that appears to be just a continuation of his previous criticism, correct?
MS. MANGRUM: Object to form.
THE WITNESS: Okay.
BY MS. NATALE:
Q Is that correct?
A Yes.
Q Okay. And at the end of that paragraph, Dr. Rosner says: "These observations are difficult to reconcile with the model that posits uptake of bound testosterone."
Did I read that correctly?

Page 109

A Yes.
Q Okay. Next, Dr. Rosner says that: "Hammes, et al., also investigated uptake of the testosterone metabolite 3H-DHT," correct?
A Yes.
Q Okay. And he says: "They show about 1 percent uptake by the cells, but again do not supply kinetic and chemical data."
Did I read that correctly?
A Yes.
Q Is that another criticism that Dr. Rosner raises about the megalin model?
A Not exactly, but he's describing something.
Q Okay. That they don't supply kinetic and chemical data to support their claims?
A He's just describing the circumstances of another -- of another study.
Q Okay.
A Of this study.
Q And so at the bottom of this page, he continues: "Thus, most of the testosterone must have entered the cell to be metabolized and then must have been secreted back into the medium.

Page 110

**Hence, the finding by Hammes, et al., that only about 1 percent of the 3H-label in their experiments is associated with the cells is difficult to interpret."**

**Do you see moving on to the next page? Did I read that correctly?**

A Okay. Yes.

**Q So that would be the continuation of what you said was -- I believe you said a description of circumstances, and here Dr. Rosner continues with a criticism of that circumstance, correct?**

A Yes.

**Q Okay. So then the last paragraph of this whole commentary by Dr. Rosner states: "Thus, the conclusion by Hammes, et al., that there is a megalin-mediated endocytic pathway for the uptake of androgens and estrogens bound to their SHBG proteins does not seem to be sufficiently supported by the evidence presented."**

**Did I read that correctly?**

A Yes, but you've skipped over something a little bit earlier.

**Q Okay.**

Page 111

A They're talking about DHT in the previous paragraph. "The most reasonable interpretation is that the free DHT is the active species, and that SHBG itself has a modest effect through mechanisms not explained by these experiments."

So they're saying that something is happening with the presence of SHBG as one component of these experiments.

**Q Okay. So Dr. Rosner mentions -- I think I counted as we went through eight criticisms of Dr. Hammes' model, correct?**

MS. MANGRUM: Object to form.

THE WITNESS: Yes, Rosner is providing some additional perspectives on this model, on the data of that particular study.

BY MS. NATALE:

**Q And he concludes that the conclusion that there is a megalin-mediated endocytic pathway for the uptake of SHBG-bound proteins -- bound hormone does not seem to be sufficiently supported by the evidence presented, correct?**

A That's what he is saying.

**Q Okay. And so despite these criticisms**

Page 112

**by Dr. Rosner, do you still believe that the megalin-mediated pathway is strongly possible?**

MS. MANGRUM: Object to form.

THE WITNESS: You're reciting everything that Rosner says. It's followed by a response from the authors. Do you have the other pages for the response?

BY MS. NATALE:

**Q I don't have that with me because this is the exhibit -- this is the full exhibit --**

A Okay, fine.

**Q -- that was entered.**

A Because usually the authors will have some contention of what someone is saying.

But -- but in any case, this is one study. Others have looked at it as well. It's one aspect. Yes, it has some criticisms. And any animal cell type of system provides a limited perspective, but it's a starting point --

**Q Okay.**

A -- in further addressing a particular question.

Beyond the megalin hypothesis, there's a lot of other literature pointing to release of

Page 113

drugs from binding proteins as part of their tissue uptake process, and it's -- it needs consideration of whether one is looking at initial uptake conditions versus equilibrium conditions.

I think many of the conditions in this paper that he's criticizing are equilibrium conditions as opposed to initial uptake conditions.

**Q So you said it has some criticisms, and any animal cell type of system provides a limited perspective, but it's a starting point, correct?**

A That's correct.

**Q Do you believe that while there may be limitations to any study, it doesn't necessarily invalidate its results?**

MS. MANGRUM: Object to form.

THE WITNESS: Typically scientific experts in the field would make consideration of any individual study in context of all of the relevant literature that pertains to the subject matter as well.

BY MS. NATALE:

**Q Sure. So considering all of the issues that Dr. Rosner raises, you still believe that**

Page 114

this model is strongly possible.
MS. MANGRUM: Object to form.
BY MS. NATALE:
Q Is that correct?
A Megalin has been implicated for assisting the uptake of other ligands as well. So there's a lot more information about megalin than just from this one particular study.
Q Sure. And so you still believe that the megalin-mediated uptake of SHBG-bound sex hormones is strongly possible; is that correct?
MS. MANGRUM: Object to form.
THE WITNESS: It's a hypothesis that expands upon the free hormone hypothesis in terms of potential role in target tissue uptake. But it's a hypothesis.
BY MS. NATALE:
Q Okay. Back to Dr. Goldman, which is Exhibit -- is it 15? Exhibit 15.
And you mentioned at the end of that last paragraph on page 10, you -- you mention the sentence at the end: "Additional reports of the identification of androgen-binding protein/SHBG membrane receptors and many potential target

Page 115

tissues, including the epididymus, testes, prostate, skeletal muscle, and the liver of rats led to speculation that these proteins may have a much broader function in modulating sex steroid action."
Did I read that correctly?
A Yes.
Q Okay. And at least according to Dr. Goldman, that's speculation, correct?
A That's correct.
Q Okay. And just for -- women using Mirena do not have an epididymus or testes or prostate, correct?
I know it's kind of a ridiculous question, but I --
A You're serious. Okay.
Q Yeah. Yeah, it's a serious question.
A That's correct.
Q That's correct. Okay.
A Well, there's a lot of stuff about transgender people, but --
Q Fair enough.
A Okay.
Q Okay. And then on page 12, do you see

Page 116

there's a second full paragraph that starts "The extrapolation of rodent studies"?
A Yes.
Q Okay. The last sentence of that paragraph says: "In spite of markedly elevated total testosterone levels, the free testosterone concentrations and reproductive function in these mice are normal, providing further support for the free hormone hypothesis."
Did I read that correctly?
A Yes. As I've stated, the free hormone hypothesis is -- best explains most of the data, but there's complexities that people need to look into.
Q Okay. And then the next paragraph, the last sentence states -- is talking about Nagase Analbuminemia Rats, NAR, right? Next paragraph.
A Okay. Yes.
Q Which are a mutant strain of rats characterized by a total lack of serum albumin, correct?
A Yes.
Q Okay. The last sentence states: "They found that the circulating free testosterone

Page 117

concentrations in NAR were not different from rats with normal albumin concentrations, supporting the free hormone hypothesis."
Did I read that correctly?
A That's correct.
Q Okay. And that's consistent with your opinion that the free hormone hypothesis best explains most of the data?
A That's correct.
Q Okay. So if we turn back to page 16, we turned there for a minute earlier but we moved away from it. Under that heading 8.1, "Calculated free testosterone based on linear models."
A Yes.
Q Okay. So is it -- is it fair to say that Dr. Goldman raises some criticisms of these algorithms based on the linear model of testosterone's binding of SHBG?
A I don't know that they're criticizing.
Q So she talks about they all use Scatchard analysis to linearize data, but under several experimental conditions, the underlying assumptions are not met. Correct?
A They're describing the limitations of --

Page 118

of that, but technically the -- if Scatchard analysis is used, it's actually not -- it's -- it's a nonlinear model.

**Q Okay. So she mentions the algorithms published by Vermeulen, Sodergard and Mazer, correct?**

A Yes.

**Q And are you -- then do you have any understanding what Dr. Vermeulen's model is?**

A Yes.

**Q Do you believe that it's a reliable model to calculate free testosterone?**

A It fairly well allows one to calculate, estimate the -- the fraction free or the free concentration given the drug, the -- you know, testosterone concentration, SHBG concentration, and albumin concentration.

**Q Do you believe that the algorithm -- are you familiar with the algorithm published by Dr. Sodergard?**

A It's very similar.

**Q Okay. And so you believe that that's also a reliable method to estimate free testosterone?**

Page 119

MS. MANGRUM: Object to form.

THE WITNESS: It works very well.

BY MS. NATALE:

**Q Okay. The last paragraph of that section begins -- you see "These algorithms"?**

A Yes.

**Q Okay. About halfway down -- sorry, several lines -- one, two, three, four -- the fifth line down, she states: "All three equations, especially Vermeulen's equation, have been widely used in the literature and in commercial laboratories."**

**Did I read that correctly?**

A That's right.

**Q Okay. She continues: "The calculated free testosterone values derived using these equations correlate with free testosterone concentrations measured by equilibrium dialysis in some studies but display substantial systematic differences from the values derived using the equilibrium dialysis method and from each other."**

**Did I read that correctly?**

A That's correct.

**Q Do you understand that statement to be**

Page 120

**correct?**

A That's correct.

**Q Okay. What does it mean for the calculated values to display substantial systematic differences from the values derived using equilibrium dialysis method?**

MS. MANGRUM: Object to form.

THE WITNESS: Equilibrium dialysis is a direct experimental technique that usually gives you reliable indication of the free concentration or the fraction -- free fraction unbound.

But when they describe substantial systematic differences, you need to go a couple more lines, they defined differences above 20 percent to be unacceptable. If something is 20 -- or actually 25 percent in many circumstances, that's pretty good.

BY MS. NATALE:

**Q Okay. You -- you can put Dr. Goldman away for now.**

**You also -- you cite several times in your report an article by Dr. Apter, et al.**

**Does that sound familiar to you?**

A Yes.

Page 121

**Q Okay. In reference 43 is to Apter, et al., "Pharmacokinetics of two low-dose levonorgestrel-releasing intrauterine systems and effects on ovulation rate and cervical function: pooled analyses of phase II and III studies." Correct?**

A That's correct.

**Q Okay. And do you know if those authors estimated free hormone values, free levonorgestrel values?**

A I believe so, but I need to look back to double-check that.

**Q Sure. Let's mark that Exhibit 19.**

(Jusko Exhibit No. 19 was marked for identification.)

(A discussion was held off the record.)

BY MS. NATALE:

**Q Here's Exhibit 19. Does that appear to be the Apter source that you cite throughout your report?**

A Yes.

**Q Okay. If you turn to page 1658 at the bottom. Are you there?**

A 1658, yes.
**Q Okay. So right before -- do you see about halfway down the left-hand side column, there's a heading "Determination of drug concentration based on noncompartmental analysis of pooled subject data"?**
A Yes.
**Q Okay. So the last two sentences actually just above that, the authors describe a model by which they estimated individual total and unbound LNG serum concentrations for the two low-dose LNG IUDs, correct?**
A Yes.
**Q Okay. And the last two sentences state: "The inclusion of SHBG was required to describe the PK of LNG because the elimination of LNG depends on SHBG. Unbound LNG serum concentrations for LNG IUS 13.5 micrograms and LNG IUS 19.5 micrograms were calculated using SHBG and total LNG serum concentrations."**
**Did I read that correctly?**
A Yes.
**Q Okay. Does their model appear to include a measurement of albumin?**



A They're not stating it. It does, but I -- I certainly expect that they did.
**Q They're not stating it?**
A They're not stating it.
**Q So there's nothing in this article to indicate that they did; is that correct?**
MS. MANGRUM: Object to form. Unless you read the whole article.
MS. NATALE: Sure.
THE WITNESS: (Peruses document.) I can't see where there are -- I can't find where they described it in here, but I'm fairly certain I've seen the bases of these calculations, and they did use albumin.
BY MS. NATALE:
**Q Okay. It's -- it's nowhere in this article, though, that you can see?**
A I can't find it right now, but --
**Q Okay.**
A -- like I said...
**Q Okay.**
A Just to clarify, I'm pretty certain I've seen -- they use the Vermeulen method, and the Vermeulen method works quite well for



levonorgestrel. Levonorgestrel, as we pointed out earlier, is less complicated than testosterone because testosterone has this additional binding to CPG and orosomucoid. I've employed these calculations myself and they work really, really well for levonorgestrel.
**Q Okay. You said that you believe that they used the formula, Vermeulen, but do you see that in this article that they did so?**
A I couldn't find it --
**Q Okay.**
A -- but like I said, I've seen -- I thought I've seen it somewhere.
**Q Okay. And then you also said you've employed those calculations yourself and they work really, really well for levonorgestrel, correct?**
A Yes.
**Q Did you do any such calculations in this litigation?**
A No.
**Q You did not do any calculations using the Vermeulen method in this litigation, correct?**
A Part of my own research involves assessing pharmacokinetics of levonorgestrel and



doing pharmacokinetic calculations. So my student has used this method in application to other data that we have for other studies, and it works really well.
**Q At any point in your expert report disclosed on January 18th, 2018, do you mention any such calculations of free levonorgestrel?**
MS. MANGRUM: Object to form.
BY MS. NATALE:
**Q That you've performed.**
A I don't know if I've stated it explicitly.
**Q Okay. Do you include any estimations that you have calculated in your report of free levonorgestrel levels? With Mirena.**
A I'm not presenting any in my expert report.
**Q Okay. So going back to your report, which is Exhibit 2 -- you can put Apter away. You can -- sorry.**
A Apter? Okay.
**Q Yeah. Going back to your report, which was Exhibit 2. You talk -- at the bottom of page 7 --**

Page 126

A In my report?
Q Yep, in your report.
A Okay.
Q You say -- in the last sentence, carrying over at the end of page 7, you say: "Some old studies report a parameter the authors refer to as the free levonorgel -- free levonorgestrel index," parentheses, "FLI." Is that correct?
A Yes.
Q And then you describe what the algorithm is, correct? I don't know if I would call it an algorithm, the formula.
A Yes.
Q Okay. And it says: "This reflects the ratio of LNG divided by SHBG times 100 as an index of biologically available LNG."
Did I read that correctly?
A Correct.
Q Okay. Is that an accurate description of what the FLI is purported to be?
A That's correct.
Q Okay. And are you aware if Bayer has ever utilized the FLI in studies involving Mirena?

Page 127

A I know they've referred to it in some of the documents that I've seen. I'm not sure what you mean by use of it.
Q Do you know if they've ever utilized the FLI to calculate free levonorgestrel levels?
A I know there's been description of it, but I don't recall that context, use of it.
Q Okay. I'm marking Exhibit 20.
(Jusko Exhibit No. 20 was marked for identification.)
BY MS. NATALE:
Q And this one is Bates-stamped MIR_PIEU_00244634. Do you see that at the bottom of the first page?
A Yes.
Q Okay. And the subject is Re: Serum LNG & FLI. Correct?
A I'm sorry, say it again.
Q The subject appears to be regarding serum LNG and FLI, correct?
A That's correct.
Q Okay. And if you turn to the e-mail -- the chain starts on the third page, which ends in 636 at the bottom.

Page 128

A Okay.
Q Okay. So one more over. There you go.
A Okay.
Q So the first e-mail is from Dr. Pirjo Inki to Dr. Zurth, correct?
A Yes.
Q Okay. And the second kind of -- or third, I guess, indented section, she says: "Now, I've done some calculations based on the available publications and clinical study reports regarding the FLI of Mirena."
Did I read that correctly?
A Yes.
Q Okay. Does it appear that Dr. Inki did some calculations regarding the FLI of Mirena?
A Correct.
Q And if you flip back to the very first page of this.
A All right.
Q Do you see there is an e-mail from Dr. Rolf Schuermann?
A Yes.
Q Okay. And he states in the second paragraph: "Regarding tissue concentrations, the paper Christian is working on is intended for internal use and potentially regulatory activities. Your paper is very nicely summarizing the data. I assume that all data are taken from published figures. The FLI concept appears quite sound, so I do not see a reason why not using it."

Page 129

Did I read that correctly?
A That's what's said, yes.
Q Okay. And so at that point in time, at least Dr. Schuermann and Dr. Zurth and Dr. Inki, who are involved in this chain, appear to find some utility in the measurement -- the calculation of the FLI.
MS. MANGRUM: Object to form.
THE WITNESS: Okay. So he's talking about the FLI --
BY MS. NATALE:
Q Mm-hmm.
A -- and proposing to use it.
Q And he says that it appears quite sound, correct?
A That's what he's saying.
Q And that he doesn't see a reason why not to use it, correct?

A Well, this -- Dr. Schuermann is head of corporate clinical development. I'm not sure what responsibilities --

**Q Okay.**

A -- that has, whether he has, you know, pharmacologic credentials.

**Q Okay. So if we turn to the attachment, which is "Serum levonorgestrel concentrations of Mirena users."**

**Do you see the -- the second paragraph on the first page says: "The free levonorgestrel index, FLI, can be used as an indicator of the unbound and biologically active fraction of LNG, which represents systematic exposure and takes into account the SHBG induction of different estrogen regimens. FLI is calculated as follows."**

**And that appears to be the formula that you included in your report, correct?**

A Well, he is quoting the literature there, yes.

**Q Okay. And so if you flip through the rest of this document, it does appear to include some calculations of FLI with Mirena, correct?**

A They're talking about the possibility of



using it. It never did appear in the Mirena label.

**Q Sure.**

A And Dr. Zurth was copied on this. I recall seeing another document where Dr. Zurth responded and said that using a calculated free concentration, I think he referenced the Vermeulen method would be preferable.

**Q Okay. So if you turn through the attachment to this document, does it appear that those calculations were performed using FLI?**

MS. MANGRUM: Object to form.

THE WITNESS: Well --

BY MS. NATALE:

**Q There appear to be some FLI calculations in this document, correct?**

**If you flip over to the next page.**

A Yes, there are.

**Q Okay. You can put that aside for now.**

A Well, you know, look at the last page here. This is really highly relevant.

**Q Sure.**

A They calculate the FLI on oral therapy.

**Q Mm-hmm.**



A Okay. We know -- I have indications in my report that women taking larger doses of levonorgestrel, women taking oral contraceptives, women taking Mirena, almost everybody has about the same fraction free. It's typically between 1 and 2 percent. So the FLI in all these Mirena users is a very low number. The percent free is going to be between 1 and 2 percent here. The percent free for OC users is going to be between 1 and 2 percent. So this is a clear indication that the FLI is worthless.

**Q I -- I'm a bit confused as to your conclusion. You're describing that the percent is quite low with Mirena, correct? Of free -- of free hormones.**

A Okay. This is a ratio that they're claiming reflects percent free or that approximates free drug.

**Q Mm-hmm.**

A We know the free drug -- percent free values in Mirena users is between 1 and 2 percent.

**Q Mm-hmm.**

A It's between 1 and 2 percent women taking levonorgestrel, the oral doses. It's



between 1 and 2 percent for women taking oral therapy, OCs. So one wants an index like this to represent -- to show a value between 1 and 2 percent. But it doesn't indicate that for OC users. It's tenfold off. It's -- it's a perverted value.

**Q You believe that the FLI with oral therapy -- strike that.**

**You believe that the percent of free hormone with oral therapy is also between 1 and 2 percent?**

A Yes, I do.

**Q Okay. And it's between 1 and 2 percent of a higher total concentration, correct?**

A That's correct.

**Q And so this is a ratio, not -- so it would make sense that the ratio for a higher dosage would be higher than the ratio for a lower dosage, correct?**

A That's the problem with it.

**Q Okay. Let's --**

A Okay. So this ratio is molar concentration of levonorgestrel to molar concentration of sex hormone-binding globulin.

Page 134

But the claim is that it relates to the fraction of free drug. The fraction of free drug is the same in anyone taking any contraceptive -- you know, levonorgestrel-containing product.

I've got lots of data in my report saying the percent free is between 1 and 2 percent. So one would -- if the FLI was reasonable, it would provide a number that is very close to that for Mirena. But it cannot, because the FLI does not take into account the concentration of levonorgestrel, which is of course far higher in OC users, and it does not factor in the albumin concentration.

So it -- that's the same reason Goldman criticizes it. It's just a lousy index for free drug.

**Q And oral contraceptives also contain ethinyl estradiol, correct?**

A And it raises SHBG concentrations, and that's part of the point of wanting to assess the free drug concentration. You want to know what it is in spite of any perturbations of the system.

**Q Okay. You mentioned -- you mentioned that you believed you saw at some point in time**

Page 135

**that Dr. Zurth appeared to have -- strike that.**

**You mentioned that you recall seeing another document where Dr. Zurth responded and said that using a calculated free concentration, you think he referenced the Vermeulen method would be preferable, correct?**

A Yes.

**Q Okay.**

MS. NATALE: Let's -- is it a good time to break for lunch?

MR. IMBROSCIO: Yeah, lunch is right out there, so...

MS. NATALE: Okay. Let's do that. Let's go off the record.

THE VIDEOGRAPHER: Okay. The time is 12:01 p.m. Going off the record. Completing video 1.

(Whereupon, the lunch recess was taken from 12:01 p.m. to 1:07 p.m.)

THE VIDEOGRAPHER: The time is 1:07 p.m. on February 8, 2018, and we are on the record with video 2.

BY MS. NATALE:

**Q Welcome back, Dr. Jusko.**

Page 136

A Thank you.

**Q Did you enjoy your lunch?**

A It was excellent.

**Q It was pretty good. I think we can -- we're reenergized and ready to go.**

**Earlier we marked for the record Exhibit 3, which was documents that you brought with you today responsive to various requests from the notice of deposition. Correct?**

A Yes.

**Q Okay. And on the break we pulled out from Exhibit 3 the invoices which were responsive to request number 24 on the notice of deposition. Okay?**

A I don't remember the number, but, yes, it was.

**Q Fair enough. Okay.**

**So are these all of the invoices that you have submitted in association with your work in both the Kellington case and in this MDL 2767?**

A (Peruses document.) They appear to be. There's one duplicate in here.

**Q Yes, I did notice that. So we'll -- we'll just go through kind of in basic order.**

Page 137

**There appear to be -- if we exclude the duplicate, there appear to be two invoices in 2015, right? One dated in March and one dated in May of 2015, correct?**

A Oh, the May one is duplicate also.

**Q Okay.**

A But they didn't pay me twice.

**Q Okay. No, I didn't assume so.**

**So we have -- from 2015, it appears we have -- the Bates stamp conveniently ends in 73, and that is the March 26th, 2015 invoice, and then there's two invoices that are just a duplicate of May 6, 2015, correct?**

A That's correct.

**Q Okay. And between those two invoices, you billed for eight hours in 2015, correct? Or is that six?**

A It was three and three.

**Q Three and three, so six hours in 2015. Is that correct?**

A That's correct.

**Q Okay. And then in 2016, there is an invoice January 15th, 2016; March 18th, 2016; May 27th, 2016, and there's a duplicate of that**

one, right?
A Yes.
Q Okay. So there's three invoices properly from 2016. And those total, it's 30 hours and 45 hours and another 40 hours, so leading up to and actually beyond your -- the date of your deposition in 2016, you billed for 115 hours in 2016. Is that correct?
A Yes.
Q Okay. And then in 2017, there are -- we discussed when you were contacted in this separate MDL 2767, and I know that you weren't super sure when you began work. And this March 4th is the first invoice from 2017, but that would appear to predate the creation of MDL 2767, correct? And I'll represent to you that was in April 2017.
MS. MANGRUM: Object to form.
THE WITNESS: The creation of MDL -- what number? I don't know what that means.
BY MS. NATALE:
Q Sure. Sure. So the case caption that is on your report, the front of --
A Oh.
Q You disclose your report in this case,



which is -- it's Exhibit 2. Do you have it in front of you?
A I have Exhibit 2 here.
Q Okay. And then --
A I don't see such a number, yeah.
Q Okay. Okay. So on the -- the exhibit -- what was the -- Exhibit 12 was -- we talked about the general expert disclosures of the plaintiffs in this broader litigation that we've been talking about, correct?
A All right.
Q Okay. And we looked at the case caption, and it said 17-MD-2767, and I believe in your report that was disclosed in this litigation. There actually was a cover page that included that same caption, but I will represent to you that the report you've disclosed is in a case captioned 17-MD-2767. Okay?
A I will have to trust your representation.
Q Okay. So as of March 4th, 2017, that case didn't exist yet. So it looks like maybe, and I don't -- I don't want to speculate, but if -- do you recall that maybe this was -- this



March 4th invoice was in preparation for maybe a trial that didn't end up happening or some other capacity?
MS. MANGRUM: Object to form.
THE WITNESS: I can't quite recall what -- what I was doing during that time frame and why --
BY MS. NATALE:
Q Okay.
A Except it related to Mirena.
Q Okay. Have you ever given testimony in a Mirena litigation that did not involve PTC?
A This -- these two --
Q Yeah.
A These cases are the only ones I've been involved in.
Q Perfect. And the only reason I ask is because the invoices say "on the Mirena litigation," so I was just trying to see if we could narrow it down to Mirena and PTC, and it sounds like we can, correct?
A I prefer to call it Mirena IIC -- IIH.
Q Okay. So then there is another invoice in July 14th, 2017, and then there's another,



which looks like the biggest chunk of it, on January 18th, 2018. So we've got 8 hours, 4 hours and 61 hours, correct?
A Yes.
Q Which totals to 73 hours in 2017.
A I --
Q Is that correct?
A Eight and four is 12. 73 hours, right.
Q Okay. So in total, you've spent approximately 194 hours between -- from 2015 to present at least up to January 18th, 2017, you've invoiced for; is that accurate?
A Those are the hours I billed for. I probably spent a lot more time than that.
Q Okay. I'm sure Ms. Mangrum and company thank you for that.
And so I just quickly -- Trevor here totaled up these invoices for me, and it looks like you billed for through January 18th, 2018, $116,000 -- $116,400.
Does that sound accurate?
A My estimate is the total is somewhere around 190.
Q Oh, okay.

Page 142

A For all the years.
Q Okay. You -- you believe that you've billed approximately $190,000 in this --
A I think that was my estimate.
Q Okay. Now, I know that it's -- and I don't mean to mischaracterize. I know it's a little bit -- you can't quite recall when you were working on the Kellington matter and when you were working in kind of this mass tort action. Is that fair?
A That's correct.
Q Okay. So we'll just kind of lump it all together, and say in the total formation of your opinions in this matter, that's the time that you've spent so far reflected in these invoices, correct?
A Those -- those are the hours that I billed for, yes.
Q Fair enough. I didn't mean to insinuate otherwise.
Okay. So in -- in that time -- strike that.
We looked at earlier Exhibit 17, which was your deposition from May 26, 2016, correct?

Page 143

And that's Exhibit 17.
A Oh, okay.
Q Now, after that deposition, you likely reviewed the deposition transcript for errata, correct? Do you recall doing that?
A I'm usually asked to double-check everything, yes.
Q So at any point since then and up to today, have you ever read through your deposition transcript for content?
A In the last several days, I -- I read it again.
Q You did review that again?
A Yes.
Q Okay. All right. You can put aside the invoices.
Okay. If we turn to Exhibit 2, which is your 2018 report. You've already got it. And we go to page 10 of your report.
A Sorry, what page?
Q Ten of your report.
A Ten.
Q Okay. Do you see in the second paragraph down, you say: "Some reviews have

Page 144

provided comparisons of relative binding affinities, RBA, of various progestins for the five steroid receptor binding systems and discussed possible clinical relevance."
Did I read that correctly?
A Yeah, I cited several reviews, but I need to make a correction. 53 only considered two receptor systems.
Q Good to know. So what are the -- what are the five steroid receptor systems?
A Progestins, androgens, mineralocorticoids, glucocorticoids -- and one more -- estrogens.
Q Okay. When you say "progestins," do you mean progesterone?
A Yeah, progesterone as the -- and its cognate receptor.
Q Okay. And so then back to your report, you say: "Although Sitruk-Ware reported weak LNG binding at the MR in human steroid receptors in vitro, many studies show no LNG-induced activity at the MR, and those that do show activity show antimineralocorticoid activity."
Did I read that correctly?

Page 145

A Yes.
Q Okay. And after you say "those that do show activity show antimineralocorticoid activity," you cite to references 50 and 54; is that correct?
A That's correct.
Q Let's turn to your reference list and see what those sources are.
So reference number 50 is to a 2012 piece part by Dr. Moore, correct?
A Yes.
Q Okay. And then reference 54 is a 2011 piece reference by Dr. Africander; is that correct?
A That's correct.
Q So let's start with Dr. Moore's article. I'm going to mark it Exhibit 21.
(Jusko Exhibit No. 21 was marked for identification.)
BY MS. NATALE:
Q Okay. And does this appear to be reference number 50 from your report by Dr. Moore?
A Yes.
Q Okay. And if you turn to page 64, it

appears to be where you're -- I believe what you're citing here. It's like a really tiny -- it's a sideways chart and there is a really baby little 64 on the side.
A 63, 64, okay.
Q Okay. So if you go down on Table 1, it says: "Reported RBA and activity of various progestins with nuclear receptors other than PR."
Is that what this table appears to be?
A That's what it says.
Q Okay. And if you go down to levonorgestrel, under MR, you see the reported binding affinities of 17 and 75, and then it says antimineralocorticoid; is that correct?
A That's correct.
Q Okay. And the references cited for that are Africander, which is citation 54 from your report, correct?
A Yes.
Q Okay. And then the Botella article does not -- does not discuss mineralocorticoid activity; is that correct?
A I can't remember what's in Botella.
Q Okay. And then Garcia-Becerra, which



also does not discuss mineralocorticoid activity, correct?
MS. MANGRUM: Object to form.
THE WITNESS: Again, I don't remember what's in there.
BY MS. NATALE:
Q Okay. And then Kuhl 2005, which we will discuss in a bit. And then Kumar 2000, which does not discuss mineralocorticoid activity LNG.
MS. MANGRUM: Object to form.
BY MS. NATALE:
Q And then Mueck and Sitruk-Ware, which we'll discuss in a minute. And then Philibert and Schindler, right? Those are the references cited by Dr. Moore?
A That's correct.
Q Okay. So let's start with Dr. Africander. And you also independently in your report as reference 54 cite Dr. Africander's case as -- as evidence of antimineralocorticoid effect, correct?
A Yes.
Q Okay. So I'm going to mark Exhibit 22.
(Jusko Exhibit No. 22 was marked



for identification.)
BY MS. NATALE:
Q And this is -- does this appear to be the Africander paper cited at 54 in your report?
A (Peruses document.) Okay.
Q This is the Africander piece?
A Yes.
Q Okay. If you could turn with me to page 639. I know, they're so small. There's a Table 2 right at the top of the --
A That's correct.
Q -- page.
A Yes.
Q Okay. And so under LNG, if you follow it over to antimineralocorticoid, the key shows that the literature is not consistent; is that correct?
A Yes, for antimineralocorticoid, he's got plus/minus, and he defines it as literature not consistent.
Q Okay. So this article itself does not say that LNG is an antimineralocorticoid, correct?
MS. MANGRUM: Object to form.
THE WITNESS: Well, it's indicating



that -- the -- one would have to go back to what he's citing, but he's indicating that some would show anti-MR, some would not.
BY MS. NATALE:
Q Okay. So let's go back through what Dr. Africander is citing, and start with Krattenmacher, which we will -- do you see it says "Data obtained from"?
A Yes.
Q Okay. So I'm going to mark Exhibit 23, which is the Krattenmacher piece.
(Jusko Exhibit No. 23 was marked for identification.)
BY MS. NATALE:
Q Okay. And if you would turn for me -- does this appear to be the -- sorry, let's trace that in the references. Dr. Africander shows Krattenmacher as reference 153. And that citation is to Krattenmacher, "Drospirenone: pharmacology and pharmacokinetics of a unique progestogen."
Does this Exhibit 23 appear to be that reference?
A Okay, yes.
Q And if you'll turn to page 31, do you

Page 150

see a Table 2 at the bottom?
A (Peruses document.)
Q Do you see Table 2?
A That's right.
Q And in this review for levonorgestrel, under Antimineralocorticoid, is listed as no effect, correct?
A (Peruses document.)
Q Is that what the table shows?
A Yes, it does.
Q Okay. And then if we go back to Dr. Africander, which was number 22 -- you can put -- whenever you're ready you can put Krattenmacher aside.
So back to Dr. Africander, which was Exhibit 22, on page 639.
A Okay.
Q The next citation is to Schindler, et al., and that's citation number 11, correct?
A That's correct.
Q Okay. And citation number 11 is Schindler, et al., "Classification and pharmacology of progestins," 2003, correct?
A All right. Schindler, 11. Correct.

Page 151

Q Okay. So I'm going to mark that as Exhibit 24.
(Jusko Exhibit No. 24 was marked for identification.)
BY MS. NATALE:
Q Okay. And does this appear to be the article by Schindler cited by Dr. Africander?
A (Peruses document.)
Q Does this appear to be that piece?
A Okay, where are we at? Sorry.
Q That's okay. Is this the article --
A Oh.
Q -- that Dr. Africander cited at reference 11?
A Yes.
Q Okay. So if you turn to page S11, do you see Table 2?
A Yes.
Q And for levonorgestrel under Antimineralocorticoid, we see no effect, correct?
A (Peruses document.)
Q Is that correct?
A I'm looking.
Q Okay. Sorry about that.

Page 152

A Oh, there it is. (Peruses document.)
Q Are you on Table 2?
A Yes.
Q Oh, sorry.
A I'm just double-checking some references.
Q No, you're fine. I just wasn't sure if we were on the same page.
A Yep.
Q Take your time.
A (Peruses document.)
Q And I -- I apologize. I promise I'm not trying to -- I'm -- it's unclear if you were just saying, "Yep," that we're on the same page or if the answer was, yes, it shows no effect.
A What was your last question?
Q Okay. Does this doc -- this piece by Dr. Schindler shows that -- under Antimineralocorticoid, it shows no effect, correct?
A Correct.
Q Correct?
A Yes.
Q Okay. And then back to Dr. Africander's

Page 153

article, which was Exhibit 22. The next citation was to Kuhl and that -- oh, sorry, Winneker, and that's citation 54, correct? In the Africander piece?
A Going back to Africander. Okay.
Q Yes, back to Africander on page 639.
A Okay.
Q So we've gone through Krattenmacher, which showed no effect, right?
A Yes.
Q And Dr. Schindler, which showed no effect, correct?
A Yes.
Q Okay. So the next citation is Winneker, and that's reference 55. And if we go to her reference list, we see number 55 is Winneker, "The preclinical biology of a new potent and selective progestin: trimegestone," and that's from 2003.
I'm going to mark for you Exhibit 25.
(Jusko Exhibit No. 25 was marked for identification.)
BY MS. NATALE:
Q Does this appear to be that article by Dr. Winneker?

Page 154

A (Peruses document.) Okay.
Q Okay. Does that appear to be the reference?
A Yes.
Q Okay. And if you will turn to page 917. Do you see Table 3?
A Yes.
Q Okay. And I -- I can't really tell, I don't know if you can, there's no key to this chart, right?
A Well, it's got the plus/minuses again.
Q Right, right. But then for -- so for LNG, for example, under Antimineralocorticoid, do you see plus/minus?
A That's correct.
Q Okay. So that might mean it's inconclusive, right?
MS. MANGRUM: Object to form.
THE WITNESS: More likely, it's saying that some studies show activity and some do not.
BY MS. NATALE:
Q Okay. But it does not say that there's antimineralocorticoid activity, correct?
MS. MANGRUM: Object to form.

Page 155

THE WITNESS: Well, the plus means this -- someone is showing some activity.
BY MS. NATALE:
Q Okay.
A If it had no activity, it would be simply minus.
Q Okay. And it's citing to -- for this chart the citations are 8 through 10 and 13, right?
A Yes.
Q Okay. So citation number 9 is Philibert, which -- well, let's take a look at the Philibert piece. I'm going to mark that as Exhibit 26.
(Jusko Exhibit No. 26 was marked for identification.)
BY MS. NATALE:
Q Just bear with me one sec, Dr. Jusko. Okay. Sorry about that. Okay. Exhibit -- sorry. I'm going to withdraw that.
(Jusko Exhibit No. 26 was withdrawn.)
BY MS. NATALE:
Q The next citation -- citation 13 is to Muhn, "Drospirenone: a novel progestogen with

Page 156

antimineralocorticoid and antiandrogenic activity." Correct?
A I lost track.
Q Okay. So back to Exhibit 25, which is Winneker.
A Winneker, all right.
Q Okay. Number 13 is to Muhn, "Drospirenone: a novel progestogen with antimineralocorticoid and antiandrogenic activity," 1995, correct?
A That's right.
Q Okay. So we're going to mark Exhibit 26, and that's the Muhn case.
(Jusko Exhibit No. 26 was remarked for identification.)
BY MS. NATALE:
Q And if you would turn for me to page 330.
A (Peruses document.)
Q Do you see Table 8?
A (Peruses document.)
Q Are you with me on page 330?
A I'm getting there.
Q You're fine.

Page 157

A I'm getting there.
Q I just can't tell from here. I don't mean to rush you or -- I'm just trying -- I can't tell when you're there. There's a lot of documents out now.
A Yes, some of these studies either I haven't seen, looked at closely or haven't seen in a long time, but in all of these cases, one needs to look carefully at what doses they used, what kind of screening system they used to reflect the conclusions that they reached.
Q Sure. Well, we'll definitely get there. So under --
A You're on table -- oh, I'm on Table 5 -- 8.
Q So Table 8 on page 330.
A Okay.
Q And under Antimineralocorticoid Activity, for levonorgestrel it shows no effect, correct?
A Yes.
Q That's correct?
A That's correct.
Q Okay. And then -- okay. So we're going

Page 158

to put that one aside.
Okay. And let's go back to Exhibit 22, which was Africander.
So we went through Krattenmacher, Schindler and Winneker, and none of those showed antimineralocorticoid activity, correct?
MS. MANGRUM: Object to form.
THE WITNESS: They were -- some were reporting no activity and some were reporting plus/minus.
BY MS. NATALE:
Q And the one that was plus/minus, we went through that citation and that also showed no activity.
MS. MANGRUM: Object to form.
BY MS. NATALE:
Q Okay. So the next source is Kuhl, which is reference 128, correct, in Africander?
A Kuhl, 128, yes.
Q Okay. And that is "Pharmacology of estrogens and progestogens: influence of different routes of administration," 2005; is that correct?
A 2005, Kuhl, yes.
(Jusko Exhibit No. 27 was marked

Page 159

for identification.)
Q Okay. So this I've marked Exhibit 27. Does this appear to be the Kuhl citation?
A (Peruses document.)
BY MS. NATALE:
Q I'm sorry, was that a -- did you say "yes"?
A What --
Q Is this the reference?
A Oh, this is Kuhl, yes.
Q Okay. If you turn with me to page 32. And there's a Table 9, and just let me know when you get there. I don't mean to rush you.
A (Peruses document.) Okay, I'm on -- on Table 9.
Q Okay. And for levonorgestrel under Antimineralocorticoid, did Dr. Kuhl report that there -- it is not effective?
A That's right.
Q Okay. You can put that one aside.
Okay. And then whenever you are ready, we'll go back to Exhibit 22, which is Africander.
A (Peruses document.) Okay.
Q Okay. So back to Exhibit 22, which was

Page 160

Africander. And the next citation is to Mueck and Sitruk-Ware, reference 56, correct?
A Yes.
Q Okay. And reference 56 is "Nomegestrol acetate, a novel progestogen for oral contraception," 2011, correct?
A That's right.
Q Okay. And I'm going to mark Exhibit 28 for the record.
(Jusko Exhibit No. 28 was marked for identification.)
BY MS. NATALE:
Q Does this appear to be the citation to Mueck and Sitruk-Ware?
A Yes.
Q Okay. And if you'd go to page 533.
A I'm sorry, what page?
Q Five three three.
A All right.
Q Okay. And then Table 3, do the authors appear to show that at the -- as an antimineralocorticoid, levonorgestrel is not effective?
MS. MANGRUM: Object to form.

Page 161

THE WITNESS: That's what's reported, but in this case, the reference is back to Kuhl, the previous article we were talking about, so it's not any new information.
BY MS. NATALE:
Q Okay. Sure. But that's a separate source that Dr. Africander listed in her references, right?
A That's one of those references -- their references, yes.
Q Okay. So we've gone through -- we looked at Exhibits 21 through 28, and that was the Moore article that you cite and the Africander article you cite, and then all of the sources cited by Dr. Africander, correct?
A Yes.
Q And none of those sources state that LNG is an antimineralocorticoid, correct?
MS. MANGRUM: Object to form.
THE WITNESS: A couple of them had some plus in terms of activity.
BY MS. NATALE:
Q They had plus/minus. None of them actually had plus, correct?

Page 162

A That's correct.
Q Okay. And you may have noticed while we were going through these exhibits that they had a prior exhibit sticker on them. Do you see that in the photocopy of the exhibits that we just looked at, 21 through 28?
A What was your question again?
Q Sure. Did you notice on the exhibits that we just looked at, 21 through 28, that there are -- there's a photocopied exhibit sticker on there?
A I didn't notice.
Q Okay. So if we look at them now, do you see -- if we take them back in order, Exhibit 21 which was Moore shows Exhibit 16, 5/26/16 at the bottom. We're on exhibit --
A Oh, all right. Yes.
Q Do you see that?
A Yes.
Q Okay. So those -- that date May 26, 2016, was the date of your deposition in the Kellington matter, correct?
A Yes.
Q Okay. So let's take a look back at

Page 163

Exhibit 17, which was your deposition transcript.
And I'm going to take you to page 208 of the transcript.
Sorry, exhibit --
A Oh.
Q That's okay, I know there's a lot.
Exhibit 17 is your transcript from May 2016?
A All right. I just wanted to point out regarding Africander that on page 646, they have the statement about mineralocorticoid receptor.
Q Mm-hmm.
A They're talking about progestins binding to the MR.
Q Mm-hmm.
A They say: "In contrast, LNG and GS bind to the MR with relatively high affinity, Table 1, and do exhibit some anti-MR activity in rat models, Table 2."
So you had me go through these very quickly, although I think we looked at them once before, but these people have a lot of expertise in this area and their interpretation of a great many of these same references was -- is that some

Page 164

show anti-MR activity.
Q Sure. And in the chart where Dr. Africander talks about whether or not it's an antimineralocorticoid, she said it's not consistent, and we did walk through all of the sources and none of those show antimineralocorticoid activity, correct?
MS. MANGRUM: Object to form.
THE WITNESS: We were looking at the summary tables, and then there were additional references. It gets kind of complicated.
BY MS. NATALE:
Q Sure.
A One needs to go back to all of these original ones to be fair and examine whether they were using appropriate doses. But certainly this summary from Africander is indicating that some are showing activity, some not.
Q Have you done so?
A Not in great detail.
Q You've not gone back through the references and traced them to see what models they were using, correct?
A I have not.

Page 165

Q And you cite the source as Moore and Africander are the two citations that you list in your report for antimineralocorticoid activity of LNG, correct?
MS. MANGRUM: Object to form.
THE WITNESS: That's correct.
BY MS. NATALE:
Q Okay. So let's go to Exhibit 17, which was your deposition from 2016.
A Okay.
Q Okay. And if you --
A Deposition? Deposition?
Q Yeah, Exhibit 17.
A Okay.
Q And if you start at page 209, and going through page 222, and please take a look, if you would care to, just let me know when you're done.
Does that appear to -- do you appear to have been shown Exhibit 16 through 23 to your 2016 deposition?
A (Peruses document.) Okay. So there's some déjà vu.
Q Yeah, I know, right? So you were shown back in 2016 the exhibits we just looked at, and

Page 166

they had those stickers: In 2016, Exhibit 16 was the Moore article; in 2016, Exhibit 17 was the Africander article; in 2016, Exhibit 18 was Krattenmacher; in 2016, Exhibit 19 was Winneker; Exhibit 20 was Muhn; Exhibit 21 was Schindler; Exhibit 22 was Kuhl; and Exhibit 23 was Mueck and Sitruk-Ware, correct?
A That's sounds right.
Q Okay. And then on page 222 of your deposition, you were -- after being shown those exhibits, you were asked: "Okay. But none of these sources say that there is antimineralocorticoid activity, right?"
And your answer was: "True."
Did I read that correctly?
A That's what I stated there, but as I indicated here, I thought I saw a couple where it said plus/minus, which means it's ambiguous.
Q Okay. But none of them actually state that there is antimineralocorticoid activity.
MS. MANGRUM: Object to form.
BY MS. NATALE:
Q And that's what you testified under oath in 2016, correct?

Page 167

MS. MANGRUM: Object to form.
THE WITNESS: That was my interpretation at the time.
BY MS. NATALE:
Q Okay. But you still cite now in 2018 Dr. Africander and Dr. Moore for the contention that LNG is an antimineralocorticoid.
A Again, with these and tracing back, there is some indication that they thought there's some activity.
Q But you didn't trace them back, right?
MS. MANGRUM: Object to form.
THE WITNESS: I -- I didn't trace them back, but let me reiterate the statement from Africander, that some of these animal systems do exhibit some antimineralocorticoid activity in rat models.
BY MS. NATALE:
Q Do you know if that's ever been extrapolated in human studies or in vitro studies?
MS. MANGRUM: Object to form.
THE WITNESS: I'm not aware of -- I -- I imagine the clinical studies, especially those of Mirena, measure a great number of things. It --

Page 168

they could have been looking for signals of such activity, but I can't recall if they are.
BY MS. NATALE:
Q Okay. And when you say "clinical studies," what exactly would you be looking at in clinical studies regarding antimineralocorticoid activity or mineralocorticoid activity generally?
A Well, if it had activity like aldosterone, there would be changes in sodium excretion, changes in body water, perhaps some other effects related to that.
Q Okay.
A And if they had anti-MR activity, there would be the converse of that.
Q Okay. And looking at Exhibit 17, which is your deposition transcript, I think you might have mentioned that. Let's take a look and see what -- Exhibit 17, your transcript.
A (Peruses document.)
Q I'm sorry, Dr. Jusko, were you looking for something in your report or --
A I --
Q It's okay. I just want to make sure we're talking about the same thing.

Page 169

A All right. Go ahead.
Q Exhibit 17 is the depo transcript, right?
A Oh, which one are you talking about?
Q The one we were just looking at.
A Oh, all right.
Q Okay. So you explain on pages 222 to 223 that ultimately in order to -- and I'm sorry, I'll wait for you to get there. I don't mean to rush you.
A 223?
Q Mm-hmm.
A Okay.
Q You explain that more than just binding has to happen, and more than just agonism or antagonism has to happen, correct?
A That's right.
Q Okay. And you ultimately say you would want to look at downstream effects that ultimately lead to whatever may happen in terms of salt and water flux.
Is that what you were just talking about?
A That's correct.

Page 170

Q Okay. And so then on page 225, you were asked -- I think you said exactly what you just said -- that on page 225, you said: "Well, backing up a bit, women taking oral contraceptives don't actually exhibit the array of kind of effects that people taking aldosterone does -- did, so it's probably not been necessary to explore that."
Do you see that?
A Yes.
Q Okay. And you were asked if weight gain and bloating have been reported with women who take levonorgestrel, right?
A That's right.
Q Okay. And then at least with regards to bloating, you said: "I'm not sure." Right?
A My answer -- prior to that, I says -- I said: "I think both weight gain and weight loss has been reported, but I'm not positive."
Q Okay.
A But in my current report there's citation of additional articles that the predominant evidence is that there's not extra weight gain with Mirena.

Page 171

Q Sure. So then -- and then you were asked: "What about bloating?"
And you said: "I'm not sure." Right?
A Right.
Q And then on the next page, you were -- page 226, you were asked: "So you can't rule out that effects similar to what aldosterone would have have been reported or observed in users of Norplant and Mirena?"
And you said: "I'm not sure it's my place to speculate on that."
Correct?
A I said that.
Q Okay. So between May 2016 and as you sit here today, have you looked at clinical trials of Mirena to determine whether these sorts of events are reported by users of Mirena?
A I've not done any additional inspection of any clinical trials related to those effects, except for the citations I have here about weight gain or lack of weight gain with Mirena.
Q Okay. So you can put all of that aside for now, and go back to Exhibit 2, which is your report.

Page 172

And in Appendix B, which I know you have them separated out now. Please take your time. I know it's that time of year.
A (Peruses document.) All right.
Q So Appendix B --
A B.
Q -- which is your materials reviewed and relied upon, in addition to materials referenced in your report.
A Okay.
Q Okay. And if you go almost -- it's actually the last two pages of Appendix C says "Other Material." Appendix B, sorry. Yes.
Do you see "Other Material"?
A Okay.
Q Okay. And these appear to be -- there's a few items at the beginning, "Mirena MDL No. 2767 Master Complaint." Do you see that?
A Yes.
Q Does that MDL number ring a bell now?
A That number doesn't, no.
Q It doesn't mean anything to you. Okay.
A No.
Q Fair enough.

Page 173

And then the second one says "Mirena Clinical Pharmacology and Review," right?
A Well, I -- it's listed -- I must have looked at all of this material --
Q Sure.
A -- but it's a wealth of material --
Q Sure.
A -- and quite a while ago.
Q Fair enough.
So really my question is, many of these references are clinical study reports, correct?
A That's what they're -- that's what they're stated as.
Q Okay. And that includes Clinical Study Report No. A46796 with appendices, Bates range MIRBSR-R00138205, and then some. Do you see that?
A That's right.
Q Okay. So at some point you've reviewed that document, correct?
A When I reviewed these clinical documents, I was typically looking at pharmacokinetic issues --
Q Sure.
A -- and sometimes additional issues.

Page 174

Q Well, you -- you discussed in your report, and we -- I think we just talked about this, but let's quickly turn in your report to page 10.
You state -- I'm sorry. Take your time and let me know when you're there.
A (Peruses document.)
Q Page 10 of the actual report itself. I'm sorry.
A What's that?
Q Your report at page 10.
A All right. Okay.
Q In that first paragraph about halfway down, you state: "However, while receptor affinity can provide a theoretical" -- I lost my place -- "pharmacokinetic basis for a differing adverse effect profile, the relationship between receptor affinity and the adverse effect profile is entirely speculative unless it correlates with clinical findings."
Did I read that correctly?
A Yes.
Q Okay. And you wrote that, correct?
A Yes.

Page 175

Q Okay. And then you explained just a bit ago here what some -- aldosterone is a mineralocorticoid agonist, correct?
A That's right.
Q So you explained that some of the types of bloating or weight gain that you would see with aldosterone would be indication of mineralocorticoid agonism, correct?
MS. MANGRUM: Object to form.
THE WITNESS: I don't know if I used the word "bloating."
BY MS. NATALE:
Q Okay. What would you describe as a clinical finding that correlates with mineralocorticoid agonism?
A Agonism? Well, that would be water retention, but bloating is -- could be more of an exaggerated feature of it that needs to be considered by someone --
Q Okay.
A -- with more expertise than me.
Q Okay. Well, let's take a look at -- we were just talking about your materials list and the Bates range for Clinical Study Report A46796,

Page 176

correct?
A (Peruses document.) Okay.
Q Was that -- do you remember that, we talked about that briefly?
A We -- yes, we just discussed it, yes.
Q Okay. I'm going to mark for you Exhibit 29, and I will tell you that I have excerpted some pages from that document, just to save us from 2,000 to 4,000 pages of -- 1300 pages of this study report, okay?
A Okay.
(Jusko Exhibit No. 29 was marked for identification.)
BY MS. NATALE:
Q Okay. So this is Exhibit 29, and this -- the first Bates stamp on that first page correspond to the first page of the range you cite in your references list. Do you see at the bottom 138205?
A Yes.
Q Okay. And then the title of this says "Clinical Study Report A46796," correct?
A Okay.
Q Okay. So if you will flip to the second

Page 177

page, do you see a heading "Adverse Drug Reactions, Expected Adverse Drug Reactions"?
A Yes.
Q Okay. And then there's a text Table 4 titled "Expected Adverse Drug Reactions for Mirena." Did I read that correctly?
A Yes.
Q Okay. Under Common Undesirable Effects, do you see "Endocrine disorders, edema"?
A My understanding of these kinds of reports are -- it's something that happened while subjects were taking the drug. It's basically coincident with taking the drug. It doesn't mean that there's a cause-effect relationship.
Q Sure. Do you -- what -- what do you think "expected adverse drug reactions for Mirena" means?
A Well, that's their way of titling the table. But when it comes from these case report summaries, again it's something they found coincident with taking the drug.
Q Okay. And you stated in your report that you -- strike that.
You testified -- strike that.

Page 178

**Okay. And then the next line is "Metabolism and nutrition disorders," and do you see weight gain as a common -- as a common undesirable effect?**

A Yeah, they list that here, but there's ample other references in the literature that women taking Mirena, you know, more comprehensive studies do not show weight gain.

**Q Okay.**

A So that kind of indicates a sort of mistrust of this type of information. It may be real; it may not.

**Q Okay. Then at the bottom of the page, do you see progestin -- a title "Progestin-Related Side Effects"?**

A Oh, down there. Yes.

**Q Yeah. Okay. And if you turn to the next page, do you see bloating listed on there?**

A Yes.

**Q Okay. And edema?**

A Yes.

**Q Okay. And weight gain?**

A Yes.

**Q Okay.**

Page 179

A But it's got the same relevance. It's coincident while taking Mirena, but more careful assessments, such as the references I cite here, do not show that these effects are higher in Mirena users compared to appropriate controls. Many times these clinical trials don't necessary -- don't have appropriate controls. So it's reporting what the women say, not necessarily appropriate independent assessment.

**Q Do you consider yourself an expert in clinical trial -- clinical trials?**

A I'm sorry?

**Q Do you consider yourself an expert in clinical trials?**

A I'm not an expert, but I have a certain amount of limited common sense.

**Q Sure. Just a bit ago here, you testified that whether water retention or bloating is a feature of mineralocorticoid agonism needs to be considered by someone with more expertise than you, correct?**

A That's right.

**Q Okay. So you don't -- you don't believe that you have expertise in clinical findings correlating to pharmacological profiles, correct?**

Page 180

MS. MANGRUM: Object to form.

THE WITNESS: I know quite a bit about pharmacology, and I study pharmacokinetics, which is the effect of drugs on the body, so I have a perspective on appreciating what drugs can do in humans. But in terms of these clinical trial summaries and such, they have to be taken with, quote, a grain of salt.

MS. NATALE: Okay. All right. Let's take a break. Off the record.

THE VIDEOGRAPHER: All right. The time is 2:08 p.m. We're going off the record.

(Recess.)

THE VIDEOGRAPHER: The time is 2:30 p.m., and we're back on the record.

BY MS. NATALE:

**Q Welcome back, Dr. Jusko.**

**If you would look for me at Exhibit 2, which is your 2018 report, to page 4.**

**Okay. Do you see paragraph 14?**

A Yes.

**Q Okay. You begin: "Obesity is a complicating factor in the PK/PD of drugs and hormones."**

Page 181

**Did I read that correctly?**

A Yes.

**Q Okay. So the next sentence you state: "The increase in body weight, besides adding the mass of excess adipose tissue, produces variable changes in renal, hepatic, endocrine and other organ functions."**

**Did I read that correctly?**

A Yes.

**Q Okay. First, do you know if levonorgestrel has a first pass metabolism in the liver?**

A It does not.

**Q It does not. Okay. So that wouldn't be a potentially complicating factor for levonorgestrel, correct?**

MS. MANGRUM: Object to form.

THE WITNESS: That's correct.

BY MS. NATALE:

**Q Okay. So then the next -- the next sentence you state: "For example, we found that obesity produced a large decrease in the rate of metabolism, clearance of the corticosteroid**

Page 182

methylprednisolone."
Did I read that correctly?
A Yes.
Q Okay. And so if we go to just quickly look to Exhibit 13, which was your 2017 manuscript.
A Okay.
Q Okay. I just wanted to see if this is what you were talking about. On page 2 -- that's, yeah, the article, sorry.
A Okay.
Q The first full paragraph, you state, second sentence: "For example, we found that obesity produces a large decrease in the rate of CYP3A4-mediated metabolism, decreased clearance of the corticosteroid methylprednisolone."
Did I read that correctly?
A Yes.
Q Okay. And so is it that -- so obesity -- does obesity decrease CYP3A4?
A Sometimes.
Q Okay. What is CYP3A4?
A Okay. There's multiple enzymes in the liver and other tissues that metabolize various

Page 183

drugs. This is one of them. It accounts for the majority -- well, maybe about half of drug metabolism pathways in humans. It's a very common one. It's basically a pharmacogenetic designation of an enzyme that exists.
Q Okay. So an obesity-related decrease in CYP3A4 might in some cases decrease the clearance rate of -- of a compound; is that accurate?
A It does sometimes, but obesity is very complex, and that for some drugs there's increased metabolism, some drugs no change, some drugs a decrease in metabolism.
Q Okay. In CYP3A metabolism or in metabolism generally?
A In general.
Q Okay. Let's take a look at Exhibit 9, which is the Mirena label from 2017 that we looked at earlier, and back to the Clinical Pharmacology section, Section 12.
A I'm there.
Q Okay. The -- the last sentence on that page --
A Which page?
Q I know, there's no page numbers.

Page 184

A There's no page numbers, so --
Q So there's a diagram of --
A All right, I found it.
Q Perfect. Okay.
So the last sentence on that page says: "In vitro studies have demonstrated that oxidative metabolism of LNG is catalyzed by CYP enzymes, especially CYP3A4."
Did I read that correctly?
A Yes.
Q Okay. So might that be a complicating factor of the PK and PD of Mirena in obesity?
MS. MANGRUM: Object to form.
THE WITNESS: Well, there's been many studies with Mirena and obesity, so we -- we know what happens. There's a modest change in metabolism.
BY MS. NATALE:
Q There have been many studies on Mirena and obesity?
A There's been several.
Q Okay. Looking specifically at obesity or studies that included obese women?
A Studies have measured levonorgestrel

Page 185

concentrations in normal and obese women using Mirena.
Q Okay. Then if you could turn for me to Exhibit 17, which was your deposition transcript from 2016. See if we can -- on page 101 of Exhibit 17.
A What page?
Q The -- the deposition transcript.
A Oh, deposition. Yeah, okay.
Q Yes, you can put those -- everything else away for now.
On page 101.
A Yeah.
Q Okay. So just to try to refresh your recollection, on a break from your last deposition -- strike that.
On page 98 of the deposition --
A Yep.
Q Okay. So you -- you were asked at line 18: "Okay. And with respect to thyroid hormone changes, what would those changes be?
"A. The thyroid is considered the gas pedal of the body. People with low thyroid concentrations metabolize drugs slower; people

Page 186

with high thyroid concentrations metabolize drugs faster.

"Q. Okay. So obese women generally have lower thyroid hormone concentrations or higher?

"A. I'm not clear on if they even do. I just brought it up as a possibility. I wouldn't be surprised that it's different, but I'm not sure."

Did I read that correctly?

A Yes.

Q Okay. And then if you look to page 101 --

A Right.

Q -- it looks like on a break from the deposition, you did some Googling. Do you -- are you remembering at all?

A Yes. I always try to be helpful.

Q You were very helpful. So on page 101, you were asked at line 11: "Okay. Now, my understanding is you did some Googling over the break, so I would like to ask what you discovered."

"A. Okay. You asked me about thyroid

Page 187

hormones during -- in obese people. I found indication that obesity is often accompanied by hypothyroidism, poor thyroid function.

"Q. Okay. So in that scenario drug metabolism would be slower than normal, right?

"A. Hypothyroidism itself causes slower drug metabolism."

Did I read that correctly?

A Yes.

Q Okay. So might obesity-related hypothyroidism being a complicating factor in the PK and PD of levonorgestrel?

A Well, we see that obese women have lower LNG concen- -- concentrations no matter how LNG is given, including with Mirena. So it looks like obese women metabolize the drug somewhat faster than people of normal weight.

Q Sure. But obese women with hypothyroidism, might that be a complicating factor?

MS. MANGRUM: Object to form.

THE WITNESS: Well, hypothyroidism does the opposite of what we're seeing happening in obesity. So even though obese women might have a

Page 188

tendency for hypothyroidism, if hypothyroidism was the cause of altered metabolism and obesity, there would be slower metabolism in obese women and higher LNG concentrations, and the whole thing is opposite.

BY MS. NATALE:

Q Earlier you talked about -- we looked at -- and you don't have to pull it out right now, but we looked at exhibit -- we looked at Exhibit 8, which was your perspectives on variability piece, right?

A Okay.

Q And you said: "My assessments were examining pharmacokinetics in what are typically young healthy women, so that there are no known strong alternative factors causing variability. So if one looks at young healthy subjects, you know, that was the context of the data I was assessing, but if one added in all sorts of diseases and such, other things could be different."

Is that correct, that was your testimony?

A Yes.

Page 189

Q Okay. So have you investigated serum levels of levonorgestrel in obese women with hypothyroidism?

A Well, I haven't done direct studies myself with Mirena. A great number of obese -- a suitable number of obese women have been included in the Mirena trials. I don't know how many were hypothyroid, but if they were, these factors are sort of opposing each other.

Q Sure, absolutely. And I think -- I hope that's what I'm trying to ask you. There might be factors that play in either direction, correct?

A Yes.

MS. MANGRUM: Object to form.

BY MS. NATALE:

Q And so I guess that's -- I'm just trying to understand when you say in your report that obesity is a complicating factor in drug pharmacokinetics and pharmacodynamics, there might be factors that go in either direction, correct?

A There are, but Mirena has been studied very extensively in obese women, so there is much more clarity there.

Q Okay. So you -- I believe it was your

testimony you've not studied the PK of LNG with Mirena specifically, correct?
A Not in my own lab.
Q Okay. And you've also only studied the PK of LNG in healthy young individuals, correct?
A Yes.
Q Okay. You may put everything else aside other --
A But, again, I've looked at extensive literature --
Q Sure.
A -- on this subject. A favorite subject of mine.
Q Okay. The pharmacokinetics of levonorgestrel?
A Pharmacokinetics of oral contraceptives. The pharmacokinetics in obesity. The issue of variability in pharmacokinetics.
Q Okay.
A That's all part of my fun.
Q Okay.
Okay. You can put all the rest of that aside.
Okay. So back to your report,



Exhibit 2. You state on the -- the final bullet point says: "Suggestion that LNG causes idiopathic intracranial hypertension, IIH, via activity at the mineralocorticoid and/or androgen receptors is entirely speculative and unsupported by any direct scientific evidence."
Did I read that correctly?
A Yes.
Q Okay. So we talked a little bit about mineralocorticoid activity earlier, right?
A Yes.
Q So this "and/or androgen receptors," let's -- let's take a quick look at Exhibit 14, which was your 2016 expert report.
Okay. Do you see the final bullet on page 1 of your 2016 report states --
A Yes.
Q Okay, sorry. And it states: "Suggestion that LNG causes idiopathic intracranial hypertension, IIH, via activity at the mineralocorticoid receptor is entirely speculated -- speculative and unsupported by the evidence."
Did I read that correctly?



A Yes.
Q Okay. So we looked at -- and you don't have to pull it out again, but Exhibit 12 earlier, which was the plaintiffs' expert disclosures in this case, and it was dated December 28th, 2017, correct?
A Whatever.
Q We can take a look if you want to see it. I can represent to you that the plaintiffs disclosed their expert reports on December 28th, 2017, okay?
A I certainly trust you.
Q Okay. That's good.
So at any point in time prior to that date, had you ever investigated a potential role of androgen activity in the causation of PTC or IIH?
A No. No, I have not.
Q Okay. And so -- okay.
So is it your understanding that some of plaintiffs' experts have described in their reports what you refer to as activity at the androgen -- mineralocorticoid and/or androgen receptors as a mechanism of IIH or PTC?



A Yes. Your expert Johanson is advocating that as a possibility.
Q Okay. And do you believe that Dr. Johanson's report relies -- strike that.
Do you believe that Dr. Johanson advocates for a mechanism of IIH via direct activity at the androgen receptors?
A No, my reading of what he said is that he believes excessive testosterone has some role to play, and because LNG binds to the androgen receptors to a modest degree, then maybe LNG could do this too.
Q Okay. Okay. So it's your understanding that Dr. Johanson's report advocates that excessive testosterone and LNG binding to androgen receptors to a modest degree -- strike that.
Okay. So your reading of Dr. Johanson's -- I just want to break it down because I was a little bit confused by your answer. I want to make sure I understand.
Your reading of Dr. Johanson's report is that excessive testosterone has a role to play in IIH pathology or causation, correct?
MS. MANGRUM: Object to form.

THE WITNESS: Well, his theory, supported by very limited cell and animal data, is that testosterone is doing something to increase production of CSF by the choroid plexus, and in turn, that may lead to IIH.
BY MS. NATALE:
**Q Okay. And you are not a pathologist, correct?**
A That's correct.
**Q Right. And you're not a neuroscientist, correct?**
A That's correct.
**Q So do you intend to give any opinions in this litigation about pathophysiology of PTC or IIH?**
MS. MANGRUM: Object to form.
THE WITNESS: No. My expertise relates to the pharmacology, and if there's any studies that concern how drugs work on any process in the body, I feel qualified to assess.
BY MS. NATALE:
**Q Okay. And on -- you just stated that Dr. Johanson's theory is supported by very limited cell and animal data, correct?**



A Yes.
**Q Okay. If we turn to page 11 of your report, Exhibit 2.**
**I'm sorry, you can put the 2016 one away for a minute.**
**On page 11.**
A Do I have the right one?
**Q I think so.**
A Okay.
**Q Yeah. Page 11.**
A Yep.
**Q Okay. First full paragraph you state: "Plaintiffs have provided extensive reviews with abundant literature citations in an attempt to support their conjecture that LNG for Mirena could possibly produce IIH."**
**Did I read that correctly?**
A Yes.
**Q Okay. Would you say that you would agree that Dr. Johanson provided extensive review with abundant literature citations to support his opinions, correct?**
MS. MANGRUM: Object to form.
THE WITNESS: It's -- it's like he



wanted to confuse the issue by reciting every possible literature article that he could come up with.
BY MS. NATALE:
**Q Sure. Do you understand that Dr. Johanson is a world renowned expert in cerebrospinal fluid production and fluid transport dynamics?**
A I'll admit to that.
**Q Okay. All right. Thank you for that.**
**So --**
A But he doesn't do much pharmacology.
**Q Sure. Fair enough.**
**Did you -- okay. I believe you said as a second part of basically -- so here's what I was trying to get at. I thought you explained that he said there might be a role for testosterone, and then because LNG binds to a modest degree, I think you said, to the -- I want to find exactly what you said, so I didn't mean to confuse anything.**
**You said, Because LNG binds to the androgen receptors to a modest degree, then maybe LNG could do this too.**
**Did I read that correctly?**



A Well, that's -- that's the thesis being posed why one can connect LNG and testosterone.
**Q Okay. Do you believe that levonorgestrel binds to the androgen receptors to a modest degree?**
MS. MANGRUM: Object to form.
THE WITNESS: It does to some degree. I would have to look back at the numbers.
BY MS. NATALE:
**Q Sure. Do you have any idea what the relative binding affinity of levonorgestrel is to the androgen receptors relative to, say, DHT?**
MS. MANGRUM: Object to form.
THE WITNESS: I could look at one of those summary tables, but I --
BY MS. NATALE:
**Q Sure.**
A -- I've seen so many numbers.
**Q Fair enough. And I don't intend to -- I don't mean to confuse the issue.**
**Do you have any reason to dispute Dr. Darney's -- you read a report by Dr. Darney in this litigation, correct?**
A Yes.

Page 198

Q Okay. And do you have any reason to dispute Dr. Darney's citation to literature stating that levonorgestrel is the most highly androgenic of all the synthetic progestins?
MS. MANGRUM: Object to form.
THE WITNESS: I don't recall him saying that. It's been a while since I read his --
BY MS. NATALE:
Q Okay. Do you have any reason to dispute that levonorgestrel is the most androgenic of all the synthetic progestins?
MS. MANGRUM: Object to form.
THE WITNESS: I'm not sure that's true, but I don't recall.
BY MS. NATALE:
Q Okay. Do you have any -- okay. All right. Let's see.
So then another part of -- strike that.
There were some materials in your -- strike that.
Let's go to page -- in your Exhibit 2, in your report, let's go to page 11.
Okay. In that same full paragraph we were looking at, you state -- it's the third

Page 199

sentence now, "Even if this were." Do you see where we are?
A Yeah.
Q Okay. "Even if this were a proven mechanism by which IIH occurs, which it is not, this is unlikely to occur with Mirena firstly because endogenous concentrations of progesterone, testosterone, and many other hormones have been shown to be extremely low in CSF, much less than unbound hormone in plasma."
Did I read that correctly?
A You read it correctly.
Q Okay. Is levonorgestrel an endogenous hormone?
A No.
Q It's not. Okay. And so let's -- you cite for that reference number 59, correct?
A Yes.
Q Okay. And that is -- if we look at your reference list -- I'm going to say this wrong, Kancheva, "Neuroactive steroids in periphery and cerebrospinal fluid."
Do you remember -- do you recall that reference?

Page 200

A Yes.
Q Okay. So let's mark Exhibit 30 for the record.
(Jusko Exhibit 30 was marked for identification.)
BY MS. NATALE:
Q Okay. Does this appear to be your cite -- the article that you cite at 59 by Kancheva?
A Yes.
Q Okay. I'm positive I'm saying that wrong, but I don't know how else to say it.
A Sounds good to me.
Q Okay. All right. So if we could just take a look on page 26 at "Conclusive Remarks."
Okay. So the authors state: "The concentrations of the CSF steroids are pronouncedly lower in comparison with the circulating ones."
And I believe that's the point that you were making, correct?
A They made lots of measurements to show that.
Q Okay. And that's what you are basically

Page 201

citing in your report, right?
A Yes. One of your experts claimed that because these steroids are found in CSF, LNG must be there too.
Q Okay.
A So -- but these concentrations are really, really low.
Q Okay. So then the next sentence says: "Alternatively, brain steroid levels in general exceed the circulating steroid levels because of an accumulation and/or local synthesis."
Did I read that correctly?
A Where do you see that?
Q It's the very next sentence in Conclusive Remarks.
A Okay.
Q Okay. So let's -- let's start again.
"The concentrations of the CSF steroids are pronouncedly lower in comparison with the circulating ones."
A All right.
Q "Alternatively, brain steroid levels in general exceed the circulating steroid levels because of an accumulation and/or local

synthesis."
Did I read that correctly?
A Yes.
Q Okay. Do you have any reason to disagree with that?
A No, I agree completely.
Q Okay. And then it says: "It is not possible to distinguish between these sources by simple steroid measures in humans. However, the steroid concentrations in the brain may be influenced by circulating hormones as suggested by experimental studies in rodents."
Did I read that correctly?
A Yes.
Q Do you have any reason to disagree with that?
A It sounds reasonable.
Q Okay. And then on the last sentence before it turns to the next page, it says: "Brain synthesis may provide minimal level of neurosteroids, which are indispensable for the CNS functions. Thus, brain steroids of peripheral origin may reflect various physiological situations or even pathologies."



Did I read that correctly?
A Yes.
Q Okay. And "peripheral origin" would mean the circulation, correct?
A Yes.
Q Okay. So these authors state that the level of steroids that are actually synthesized in the brain are quite low, that there is evidence of physiological activity of peripheral steroids in the CNS; is that correct?
A That's what they are saying here, but my point was that one of your experts said that because a couple of these steroids could get from serum into CSF, their deduction -- the person's deduction was that, well, it must happen to LNG as well.
But LNG has never been studied this way, and this article is saying that if there's any parallelism between these steroids and LNG, LNG would have to be there at extremely low concentration.
Q Okay. How does -- do you have any understanding of how levonorgestrel suppresses -- may suppress ovulation?



A In -- well, in general, yes.
Q Okay. How does it do so?
A Let me think.
I should know this, but I'm kind of blocking on it.
Q Okay. If you could -- what exhibit is it?
Exhibit 19, let's just take a quick look. I think I might be able to refresh your memory, but I could be wrong. I'm trying to refresh mine too.
A Okay.
MS. MANGRUM: What number was that?
MS. NATALE: No. 19.
MS. MANGRUM: Okay. And after?
MS. NATALE: Yeah. Okay.
BY MS. NATALE:
Q And we're going to turn to page 1661.
Okay. In the right-hand column, do you see the third full paragraph starts "Ovulation rates"?
A Okay.
Q Okay. And they state: "Ovulation rates observed in these pooled analyses" -- sorry --



"suggest that the LNG doses of all three devices do not generally reach high enough systemic levels to suppress the hypothalamic-pituitary-ovarian access."
Did I read that correctly?
A Yes.
Q Okay. Did that refresh your memory about how levonorgestrel suppresses ovulation?
A Well, it's going in that direction.
Q Okay. And what is the hypothalamic-pituitary-ovarian access?
A Okay. There -- there are peptides released from the hypothalamus that stimulate production of hormones in other organs. Those hormones in circulating do additional things. Basically, a feedback mechanism as well.
I didn't do well at explaining that. I'm sorry.
Q I was -- I thought that was pretty good.
Where is the hypothalamus?
A It's in the brain.
Q Okay. So levonorgestrel does reach the brain, correct?
A This is saying that LNG and the devices

Page 206

do not reach high enough to suppress the HPA. So they're talking about -- you know, they're implying the mechanism, such as oral contraceptives, were --

**Q Okay.**

A -- at higher concentrations. But, yes, the higher concentrations, they would certainly reach part -- part of the brain.

**Q Let's take a quick look back at Exhibit 9, which is the 2017 Mirena label.**

**And we're back on page -- the page with Section 12, Clinical Pharmacology.**

A Okay.

**Q Okay. And you've got a tab now. You're getting wise here.**

**Okay. Under 12.2, Pharmacodynamics," the second paragraph states: "Ovulation is inhibited in some women using Mirena. In a one-year study approximately 45 percent of menstrual cycles were ovulatory."**

**Did I read that correctly?**

A That's right.

**Q Okay. So in a one-year study, approximately 55 percent of menstrual cycles were**

Page 207

**anovulatory, correct?**

A Okay.

**Q And so in those women, sufficient LNG reached the brain to cause anovulation, correct?**

MS. MANGRUM: Object to form.

THE WITNESS: Well, something was happening where women were ovulating, but one also has to remember there's a device in the uterus, maybe there's other things going on. I can't be --

BY MS. NATALE:

**Q Okay.**

A -- certain on this.

**Q Okay. You can put that aside for now, both of those. All three of those, I guess. Yeah.**

**And then -- okay. Let's take a look at -- I'm going to mark Exhibit 31.**

(Jusko Exhibit No. 31 was marked for identification.)

BY MS. NATALE:

**Q So I'm marking Exhibit 31 for you. I will ask quickly if you have seen this before, and if you have not, I will absolutely give you some**

Page 208

**time to look it over.**

**And this is a 1995 publication by Hirabayashi titled "Cerebrospinal fluid progesterone in pregnant women."**

**Have you ever seen this before?**

A No.

**Q Okay. Why don't you take a minute to give this a review. I will tell you that I would -- if I -- if I were you, I might look at the summary, and then I will be talking a little bit about the discussion section, okay?**

**And just let me know when you are ready.**

A (Peruses document.) Go ahead. I wish they had measured the plasma concentration.

**Q Sure. Okay. So on page 11 of your report, which was Exhibit 2, we talked about something that you said which was that: "The concentrations of endogenous hormones in the CSF have been shown to be extremely low, much less than unbound hormone in plasma." Correct?**

A Yes.

**Q Okay. So in that sentence are you talking about total hormone in the CSF versus unbound hormone in plasma?**

Page 209

A That's what the -- the other reference was assessing.

**Q Okay. So do you -- do you believe that that's an appropriate comparison, total hormone in the CSF versus unbound hormone in the plasma?**

A Okay. The other article measured total in serum or plasma, free in serum and plasma, and whatever was in CSF, but CSF has very, very little protein. So it's essentially a free drug.

**Q In all of the hormone that's in the CSF.**

A There's very, very little protein that --

**Q Sure.**

A -- under normal circumstances.

**Q Okay. So we talked earlier about the free hormone hypothesis, correct?**

A Yes.

**Q Okay. And it's the unbound hormone that is capable of potential biological activity, correct, according to the free hormone hypothesis?**

A Yes.

**Q Which you believe is at present the most appropriate model that we have for LNG, correct?**

A It's generally what explains most

Page 210

things, perhaps not all.
Q Okay. So if LNG is in the CSF, then most of it would be biologically active, correct?
MS. MANGRUM: Object to form.
BY MS. NATALE:
Q Or capable -- I will strike that.
If there is LNG in the CSF, then most of it would be capable of biological activity, correct?
MS. MANGRUM: Object to form.
THE WITNESS: For whatever receptors or targets that the CSF is bathing, then it would be capable of initially binding to those targets.
BY MS. NATALE:
Q Okay. And you actually answered my question for me, so we -- we can put this Exhibit 31 aside.
Okay. Let me just take one minute to look over something else, and we might be getting close to an end here.
Let's look at one more article, and I'm going to -- that I'm going to mark as Exhibit 32.
(Jusko Exhibit No. 32 was marked for identification.)

Page 211

BY MS. NATALE:
Q Okay. And this one is also paper-clipped, not stapled, but it is paginated, so hopefully we can keep track of where we're at.
This one is a 2008 article by Brinton and others titled "Progesterone receptors: form and function in the brain."
Are you familiar with this article at all?
A I may have seen it in the past, but I'm not --
Q Okay. And you do know Dr. Stanczyk, correct?
A Yes, I do.
Q Okay. Do you know Dr. Brinton?
A No.
Q Have you ever discussed this litigation with Dr. Stanczyk?
A No.
Q Okay. And you don't know Dr. Brinton, so I would assume that you've not discussed this litigation with her, correct?
A Correct.
Q Okay. Have you discussed this

Page 212

litigation with anyone in the Department of Pharmacology at UCLA?
A UCLA is where Stanczyk is located?
Q Yeah.
A Okay. What are you asking me, what I've discussed?
Q Sure. Have you discussed this -- any aspect of this litigation, Mirena and PTC, with anyone in the pharmacology department at UCLA?
A No.
Q Okay. Have you discussed any aspect of this litigation with any of the other experts disclosed by the defendants in this case?
A No.
Q Okay. Have you discussed this litigation with anyone at all aside from counsel for the defendants?
A Very briefly. Before I came to this meeting, I visited my daughter and son-in-law, and I told her why I was here.
Q Fair enough.
A But I didn't discuss the case.
Q Fair enough. Not -- nothing substantive.

Page 213

A Right.
Q Okay. So the first thing I wanted to just discuss with you is on the first page in the abstract, about halfway through the paragraph there's a sentence starting in the middle of this -- of the line, "Remarkably." Do you see where I am now?
A Okay.
Q "Remarkably, PRs are broadly expressed throughout the brain and can be detected in every neural cell type."
Did I read that correctly?
A Okay.
Q Okay. Do you know if -- strike that.
And then it states: "The distribution of PRs beyond hypothalamic borders suggests a much broader role of progesterone in relating neural function."
Did I read that correctly?
A I'm sorry. Say that one again.
Q Sure. The next sentence says: "The distribution of PRs beyond hypothalamic borders suggests a much broader role of progesterone in relating neural function."

Did I read that correctly?
A That's correct.
Q Okay. So I think earlier you were stating that -- let me take a look and pull your testimony here.
Okay. I think I'm at the part of your testimony that I wanted to ask you about, but it's a little bit unclear in the record. It says -- I asked you -- sorry, strike that.
You stated: "That's the thesis being posed," which you were talking about pathophysiology of IIH via increased free testosterone levels, and you said, "which one can connect LNG" -- I think that your testimony -- and it's not reading really correctly here, I think you stated that you believe Dr. Johanson advocates that because there are other steroid hormones in the CSF, that levonorgestrel must be there too, correct?
MS. MANGRUM: Object to form.
THE WITNESS: I'm sorry. I've been fascinated by this article, and I --
BY MS. NATALE:
Q Sure. Do you want to take some time to



read through it?
A Yeah. Can we have until --
Q Yeah, let's do that.
A -- 7 o'clock?
Q Yeah, I know, it's really interesting, right?
A Yeah.
Q Okay. Well, I will --
A Go ahead and ask a question.
Q I will challenge you, I really hope that after -- after this you really do read the whole article because it is --
A It is.
Q -- very fascinating, really interesting stuff.
But if you would turn with me to page 14, there's a -- the last full paragraph on that page, let me know when you're there.
A Okay.
Q Okay. So about halfway down the paragraph, the authors state: "Considering that the" -- so did you read through the methods at all?
A I just got through part of it.



Q Okay. Okay, cool. So I'm going to read a sentence, and the reason that I ask that is that the first part of it may not make sense out of context, so just let me know if you want to read anything else.
But they say: "Considering that the injected concentration of AP alpha induced -- of AP alpha is diluted into the cerebrospinal fluid, and the volume of the cerebral fluid in a 300-gram rat is 580 microliter -- microliters, the final concentration of AP alpha would be more than 50. Thus, inhibition of neurogenesis at micromolar concentrations of AP alpha in this study is consistent with our dose response data, which demonstrates inhibition of neural progenitor cells proliferation at micromolar concentrations and promotion of neurogenesis at nanomolar concentrations."
Did I read that correctly?
MS. MANGRUM: Object to form.
THE WITNESS: Yeah, but it's hard for me to know why you're picking this out, but it -- why is it relevant?
BY MS. NATALE:



Q Sure.
A It's just a sentence in the paper.
Q Sure. So these authors found dose response for a metabolite of the neurosteroid progesterone at nanomolar and micromolar concentrations. Is that accurate?
MS. MANGRUM: Object to form.
THE WITNESS: Okay. AP -- okay. AP alpha is a neurosteroid P4 metabolite.
BY MS. NATALE:
Q Mm-hmm.
A And P4 is what?
Q P4 -- if you look at the beginning will show this. So you have P4 on the front page -- page 2 of the article says "Progesterone," parentheses, "P4." On page 2 of the article, top sentence under Introduction.
A Oh, okay.
Q You see "Progesterone, P4."
A Oh, "Progesterone, P4." Yes, okay.
Q Okay?
A Yes.
Q So micromolar and nanomolar concentrations of this -- this metabolite of

**progesterone showed dose response for neural activity, correct?**
MS. MANGRUM: Object to form.
THE WITNESS: That's what they're reading.
BY MS. NATALE:
**Q Okay.**
A But could I cut you short slightly?
**Q Absolute -- sure, absolutely.**
A If you go back to page 5, the reason I was fascinated by this page. Third paragraph down, it says: "Although mPR progesterone receptor binds P4" -- talking about in the brain -- "with high selectivity and affinity, it does not bind many of the synthetic progestins, including," dot, dot, dot, "norgestrel."
**Q Okay. Do you know --**
A So --
**Q Sorry.**
A -- a lot of this is not relevant to norgestrel.
**Q Sure. Do you know -- well, first of all, do they mention levonorgestrel?**
A Norgestrel is sometimes -- that's



sometimes a shorthand, but norgestrel itself is the enantiomer --
**Q Mm-hmm.**
A -- and includes levo as well as the other enantiomeric form.
**Q And levo is the biologically active isomer, correct?**
A Yes, but would have been included in these kinds of studies.
**Q Okay. And do you know if levonorgestrel binds to progesterone receptors at 220 percent, the relative binding affinity of progesterone?**
A Well, those are screening studies in different circumstances. This is particular to the brain, which this article is about.
**Q Okay. And then if we turn to -- that's all I have for you in that one.**
**Okay. So in your -- let's go back to Exhibit 2, which is your report. So we were talking about the final bullet point on your first page, which says: "Suggestion that LNG causes IIH via activity at the mineralocorticoid and/or androgen receptors is entirely speculative and unsupported by direct scientific evidence."**



**Correct?**
A That's it.
**Q That's what it says. Okay.**
**And you -- on your reference list, you -- let's take a quick look.**
**So I didn't see any of these sources in your reference list, but in Appendix B, which was your additional materials reviewed, do you recall reviewing -- strike that.**
**Do you recall reviewing any of the sources cited by Dr. Johanson in his review of the androgen mechanism we'll call it?**
A Yes.
**Q Okay. Are any of them cited here in your report?**
A Let me think.
MS. MANGRUM: They are cited, because it says "Deposition and cited articles."
MS. NATALE: Okay. So is that to say that you believe that -- I -- I will refrain from asking you to testify, so I apologize, but I will also ask that you not testify into the record or coach the witness.
MS. MANGRUM: No, I wasn't coaching him.



I just don't want him --
MS. NATALE: I understand.
MS. MANGRUM: -- tricked when it's expressly in there.
MS. NATALE: And don't think that it was supposed to be tricked, and it's not expressly in there, so we can agree to disagree, and the record will stand as it is. I don't mean to get into any -- we'll move on from that.
BY MS. NATALE:
**Q Did you review the actual -- every single actual citation that is appended to either Dr. Johanson's report or his deposition testimony?**
A I looked through his expert report and I picked out some references to look at.
**Q Okay.**
A I know I looked at -- reference 60 came from him. And there's another one I'm not sure I cited, but --
**Q In your actual reference list?**
A Yeah.
**Q Okay. Got it.**
**So just, for example, you were talking earlier about how you believe the basic gist of**

Page 222

**Dr. Johanson's opinions are that increased testosterone -- free testosterone might be a causal mechanism of PTC or IIH, correct?**
MS. MANGRUM: Object to form.
THE WITNESS: I'm sorry, once more.
BY MS. NATALE:
**Q Sure. I believe you were testifying earlier that basically you believed Dr. Johanson advocates that increased free testosterone might have a causal role in PTC or IIH, correct?**
MS. MANGRUM: Object to form.
THE WITNESS: He's -- his tenet is that he thinks testosterone can increase production of CSF by the choroid plexus, and because testosterone can do it, maybe LNG could do it.
BY MS. NATALE:
**Q Okay. Did you review the sources that Dr. Johanson cited for the proposition that -- let's leave LNG out for a minute, okay?**
A Okay.
**Q Did you review the sources that Dr. Johanson cited for the proposition that increased free testosterone may be associated with IIH or PTC?**

Page 223

MS. MANGRUM: Object to form.
THE WITNESS: I -- he -- I looked at his references that pertained to activity of test- -- possible activity of testosterone and CSF dynamics, and then the connection to IIC, I -- I may or may not have looked at some of those.
BY MS. NATALE:
**Q Okay. So you may have looked at the references pertaining to testosterone's role in CSF dynamics. You don't know if you reviewed the sources discussing the actual connection between testosterone levels and IIH.**
MS. MANGRUM: Object to form.
THE WITNESS: I know I've seen some of them. In particular, there was a couple of case studies in transgender patients, for example.
BY MS. NATALE:
**Q Okay. And so that's one line of evidence that is cited in Dr. Johanson's report, correct?**
A He considers that evidence. Those are just --
**Q Sure.**
A -- a couple of case reports.

Page 224

**Q Sure. But that's not -- do you know if -- for example -- strike that.**
**Do you know, for example, if Dr. Johanson cited literature or abstracts, or what have you, that directly examined a potential role for free circulating androgens in CSF production or IH?**
A I've seen it expressed as a -- as a hypothesis without any substantiation towards LNG.
**Q Okay. So do you intend to -- so give any opinions or testimony in this litigation regarding the pathophysiologic mechanism of IH?**
MS. MANGRUM: Object to form.
THE WITNESS: I cannot opine as an expert on IIH, but I can opine on what I've seen for factors that are associated with IIH and the fact that many of these factors don't come together to provide any kind of explanation of why IIH develops.
BY MS. NATALE:
**Q Okay. So you cannot opine as an expert on IIH, correct, which is what you just said?**
MS. MANGRUM: Object to form.
THE WITNESS: I can opine on some of the

Page 225

pharmacology of the drugs associated with IIH.
BY MS. NATALE:
**Q Okay. And you are not an expert in mechanism of IIH, correct?**
MS. MANGRUM: Object to form.
THE WITNESS: I don't think anyone is.
BY MS. NATALE:
**Q Okay. That's interesting.**
**Okay. And I'm just -- I'm curious, you -- in your -- your 2016 report, you stated -- we looked at Exhibit 14, and the final bullet on the first page of that Exhibit 14, you had stated that: "Suggestion of an IIH mechanism via mineralocorticoid receptor activity was entirely speculative and unsupported by the evidence." Is that correct?**
MS. MANGRUM: So could we have -- we're looking -- he's looking for the exhibit. He doesn't have --
MS. NATALE: Oh, I thought he -- okay.
MS. MANGRUM: -- it in front of him. No, he's --
THE WITNESS: I used to have it.
MS. NATALE: That's okay.

Page 226

THE WITNESS: Someone stole it.
MS. NATALE: All right.
MS. MANGRUM: Okay. To refer --
BY MS. NATALE:
**Q Okay. So front page, last bullet.**
A Okay.
**Q You stated that --**
A Yep.
**Q -- "IIH causation via activity at the mineralocorticoid receptor is -- was entirely speculative and unsupported by the evidence."**
**Did I read that correctly?**
A That's right.
**Q Okay. And now in 2018, in your report, which is Exhibit 2, that last bullet, you've added in this "and/or androgen receptors," right?**
A Yes.
**Q Okay. But do you -- do you believe that in your report you -- you comprehensively reviewed evidence of a potential role for circulating testosterone or androgens in IH pathophysiology?**
MS. MANGRUM: Object to form.
THE WITNESS: I've reviewed Dr. Johanson's report and his deposition. I think

Page 227

he qualifies it as a possibility. I've looked at a number of his references. I'll be able to comment on pharmacologic aspects that pertain to CSF fluid turnover and implications towards anything else happening by virtue of that.
BY MS. NATALE:
**Q You'll be able to comment on it by virtue of having read his report?**
A And the reference --
MS. MANGRUM: Object to form.
THE WITNESS: And the references that he cites.
BY MS. NATALE:
**Q Okay. Do you feel qualified to testify as an expert on those issues simply due to your review of Dr. Johanson's report and the references he cites?**
MS. MANGRUM: Object to form.
THE WITNESS: I have references. I cite some myself on -- on IIH, the fact that it's considered idiopathic, there's no known cause, and I've looked at references, some of the original literature on some of the drugs or hormones that have been associated with it.

Page 228

BY MS. NATALE:
**Q Okay. So is it your understanding that you are qualified to testify as an expert in the pathophysiology of IH because it's called idiopathic, so there is no known cause?**
MS. MANGRUM: Object to form.
THE WITNESS: Again, I can comment on what I know about the pharmacology of the various drugs associated with it and the fact that nothing ties together to explain it.
BY MS. NATALE:
**Q Sure. So, again -- and maybe we're just not connecting here. My actual question is, are you qualified to testify as an expert in the causation of IH?**
MS. MANGRUM: Object to form.
THE WITNESS: Again, I -- I have insights regarding drugs involved, their pharmacology. Some of it has implications in the pathophysiology, but I'm not an IIH expert itself.
MS. NATALE: Okay. I am going to move to strike as nonresponsive, and ask you the question again.
BY MS. NATALE:

Page 229

**Q Are you qualified to testify as an expert in the causation of IIH or PTC?**
MS. MANGRUM: Object to form.
THE WITNESS: Can I ask you what the qualifications of an expert are?
BY MS. NATALE:
**Q Do you -- do you consider yourself qualified as an expert to testify in the causation of PTC?**
MS. MANGRUM: Object to form.
BY MS. NATALE:
**Q Aside from the fact that you believe it's idiopathic, so there is no known cause.**
MS. MANGRUM: Object to form.
THE WITNESS: An expert on the causation of IIH would actually be a constellation of experts from various fields.
BY MS. NATALE:
**Q Okay.**
A And when it pertains to pharmacology, I have that component.
**Q Okay.**
A Someone else might be an ophthalmologist, someone else might be a

Page 230

neuroscientist, someone else would be something else. So...

**Q Sure. That -- so that's fair enough.**

**Do you -- would you limit your expertise in this litigation to pharmacological aspects of Mirena or -- and/or PTC?**

MS. MANGRUM: Object to form.

THE WITNESS: My expertise would extend to any of the reports or comments of the other experts as they overlap into pharmacology.

BY MS. NATALE:

**Q Okay. So your expertise is limited to reports or comments of other experts as far as they relate to pharmacology.**

A Well, the experts and -- and the general literature in the area where they may have cited part of it, but certainly probably not all of it.

**Q Okay. And, again, I just -- there's no answer to the question on the record. So is your expertise in this litigation limited to pharmacological aspects of -- you name it, any broad concepts that you want to discuss here, your expertise is limited to the pharmacological aspects; is that correct?**

Page 231

MS. MANGRUM: Object to form.

THE WITNESS: Again, as they pertain in diverse ways in this case, some implications regarding what happens in patients, animal models, other expert reports, the general literature.

BY MS. NATALE:

**Q You said "some implications regarding what happens in patients." What does that mean?**

A Well, if someone had done a study with drug X, and said they're -- this drug X causes IIH, I would be able to comment on the relevant PK/PD exposures, what is known about the drug in association with the observations. So that I might ask questions like, is there a dose response curve? Are these exposures high, low, unusual? Is there some other feature that needs to be factored in?

MS. NATALE: Okay. I only have one -- I think one last line of questioning, so it's up to you all if you want to take a break off the record, and we can reconvene --

MS. MANGRUM: How long do you think it will be?

MS. NATALE: Maybe like 15, 20 -- I mean

Page 232

I can't promise, but --

MS. MANGRUM: We don't need a break then if it's less than --

MS. NATALE: Well --

MS. MANGRUM: Well, how do you feel?

THE WITNESS: I'm good.

MS. NATALE: Why don't -- let's take a quick break so we can regroup and make sure we get through what we need in the next segment.

MS. MANGRUM: Okay.

MS. NATALE: Okay. Thanks. Off the record.

THE VIDEOGRAPHER: The time is 3:34 p.m. We're going off the record.

(Recess.)

THE VIDEOGRAPHER: The time is 3:51 p.m., February 8, 2018, and we are on the record with video 3.

BY MS. NATALE:

**Q All right, Dr. Jusko, let's turn back to Exhibit 2, which is your report in this litigation. And you can actually get rid of everything else, if you are so inclined to do so.**

**On page 19 of your report, there is a**

Page 233

**heading "Labeling Considerations." Let me know when you get there.**

A Okay.

**Q Do you intend to provide opinions in this litigation regarding the adequacy of Mirena's label?**

A The accuracy of its label?

**Q Adequacy.**

A Adequacy. I'm commenting on it here. I certainly could.

**Q You're commenting on it here. Do you -- do you provide any opinions regarding Mirena's label?**

A I've looked at it. I make a statement here I've looked at labels of many drug products, and as I state here, it provides a certain amount of basic and necessary pharmacokinetic information in regard to the pharmacology section. That's the main part that I'm qualified about.

**Q Okay. Have you ever -- strike that.**

**Okay. So you said the main part that you are qualified about is the pharmacology section; is that accurate?**

A Primarily that, but as we talked about

adverse drug reactions, I have some insights there --
Q Okay. Do you --
A -- like I pointed out earlier.
Q Do you intend to opine about any part of the Mirena label that is not related to pharmacology or pharmacodynamics?
MS. MANGRUM: Object to form.
You can answer.
THE WITNESS: I'm -- I can qualify on the delivery device, the amount released, you know, those aspects.
BY MS. NATALE:
Q Sure. And --
A I have here.
Q Sure. Okay. So, again, those will be -- so earlier we talked about pharmacology, you say encompasses both pharmacokinetics and pharmacodynamics, correct?
A Yes.
Q So do you intend to provide any opinions outside of the pharmacology of LNG, including both pharmacokinetics and pharmacodynamics?
A And if you consider delivery and such as



part of that. Going beyond that, I don't think so.
Q Okay. And I think this was in -- I know you reviewed Dr. Hoffman's testimony, correct?
A Yes.
Q Okay. And I think that she stated that pharmacokinetics encompasses delivery, absorption, distribution -- sorry.
Let's -- let's take a quick look -- what would you say is included in the pharmacokinetics of levonorgestrel? Do you, for instance -- do you feel that delivery is included in pharmacokinetics?
A Yeah. Yes, I do.
Q Okay. That's a much simpler way to get there. So thank you.
Okay. And so, like you said, if you consider delivery and such, but beyond that you don't -- you don't think so. You don't intend to provide any opinions outside of the pharmacology of LNG, including pharmacokinetics and pharmacodynamics extended to delivery.
MS. MANGRUM: Object to form.
THE WITNESS: And possible adverse



effects.
BY MS. NATALE:
Q Okay. And earlier we talked about some clinical findings that might correlate to pharmacodynamic properties, and you stated that that was beyond your expertise, correct?
A I'm not sure what --
MS. MANGRUM: Object to form.
THE WITNESS: -- you're talking about.
BY MS. NATALE:
Q Sure. We were talking about what might be clinical findings that correspond to mineralocorticoid activity, correct?
A Okay.
Q And do you -- do you feel qualified as an expert to opine about the clinical findings that correlate to various PK parameters?
MS. MANGRUM: Object to form.
THE WITNESS: Well, I think I alluded to the fact that a mineralocorticoid property means retention of water. You then segued into edema and bloating. It seems like you basically enhanced what I was saying.
BY MS. NATALE:



Q Okay, okay. And then you talk about adverse effects. Earlier we looked at a clinical study report of -- from Mirena A46796, and we looked at a section titled "Expected Adverse Drug Reactions of Mirena," correct?
A Yes.
Q And you -- do you feel that you have expertise in the assessment of whether -- strike that. Strike that.
Okay. So back to your -- your report at page 19, paragraph 32. Do you see that?
A Yes.
Q Okay. And I'm a little bit confused by the numbering here actually, because it goes from 28 to 32 to 29. Is that maybe just a typo? I never realized that before. I just want to make sure we're on the same page. 27 --
A Oh, we missed numbers.
Q No worries. Probably just got moved from somewhere else.
Okay. So do you see it's not actually paragraph 32, but the -- the paragraph that is labeled 32.
A Right.

Page 238

Q Is that fair?
A Yes.
Q Okay. So you state: "To the extent that the plaintiffs in this litigation claim the Mirena label should have expressed levonorgestrel concentration in moles rather than grams" -- do you see that so far?
A Yes.
Q Okay. Is it your understanding that any of the experts disclosed in this litigation state that the Mirena label should have expressed levonorgestrel concentration in moles rather than grams? Or is it possible that that just came from your previous report?
MS. MANGRUM: Object to form.
THE WITNESS: I know that was an issue that came up previously. I can't remember if anyone --
BY MS. NATALE:
Q Sure.
A -- now is -- more recently is talking about it.
Q Okay. Does Dr. Plunkett talk about that in her report?

Page 239

A I don't remember.
Q Okay. Does Dr. Darney talk about that in his report?
A I don't remember if any of them talk about it.
Q Okay.
A I just don't remember either way.
Q And so when you say "to the extent that," does that mean that if plaintiffs' experts don't opine in those areas that those opinions are irrelevant?
MS. MANGRUM: Object to form.
THE WITNESS: Well, the plaintiffs -- I know there's a lengthy document with lots of complaints, and I don't remember all the items in there. So I don't know if that was in there as well. So other than the experts, there's your commentary.
BY MS. NATALE:
Q Okay. So let's -- that's a great qualification. I'm just trying to understand what -- what these are referring to. So is it possible that you're referring to the plaintiffs' master complaint that I think you've cited on your

Page 240

references list, and not any expert report or --
A It's possible. There's so many details there that --
Q Okay.
A -- it's --
Q Okay. You're not really sure what it's referring to, but to the extent that those claims are raised, you intend to opine otherwise; is that correct?
A I'm -- I -- I will if --
Q Okay. If it comes up.
A If -- I will if you wish.
Q Okay. Okay. And then paragraph 29, which comes after paragraph 32, you state: "To the extent that plaintiffs claim that the Mirena labeling should provide data regarding SHBG, free LNG and the FLA -- FLI observed with Mirena," and you continue, correct?
A That's correct.
Q Okay. So to the extent that none of -- none of plaintiffs' experts provide those opinions or what have you, you don't intend to opine on those issues; is that correct?
MS. MANGRUM: Object to form.

Page 241

THE WITNESS: Again, I don't recall what there is in your list of complaints or in the expert reports on -- on these issues, but it's come up, so I --
BY MS. NATALE:
Q Sure.
A -- have it and talk about it.
Q Okay. Have you ever drafted a drug label?
A No.
Q Have you ever reviewed a drug label for a regulatory authority?
A No.
Q Okay. Do you consider yourself an expert in labeling regulations?
A Not in the regulations, no.
Q Okay. Do you consider yourself an expert in the standard required for a change in an FDA-approved drug label?
MS. MANGRUM: Object to form.
THE WITNESS: Probably not, but I know -- I know there are FDA guidances on what should be in labels, so I can read those guidances as well as anyone.

BY MS. NATALE:
Q Okay. In the last sentence you state: "The product label must be approved by the FDA."
Do you -- do you see that?
A Yes.
Q Do you understand that to be true?
A That's what I said.
Q Okay. And then the specific information is provided in a standard format, and then there's a citation to 78, right?
A Yes.
Q Okay. And if we look at your reference list, number 78 is a Food and Drug Administration guidance from August 2014; is that correct?
A Yes.
Q Okay. And you said -- you testified just a minute ago you know there are FDA guidances on what should be in labels, so you can read those guidances as well as anyone, correct?
A Yes.
Q Are you aware if the August 20 -- August 2014 version of that document is the most recent iteration thereof?
MS. MANGRUM: Object to form.



THE WITNESS: I'm not sure about that particular one, but there's an extremely recent one that pertains to oral contraceptives and may encompass other delivery ways.
BY MS. NATALE:
Q Okay. So that specific guidance from August 2014 was cited in your 2000 -- let's take a quick look at Exhibit 14, which was your prior report, and I would just like you to see if that reference was cited in your earlier report.
A Yeah, I have the same reference.
Q Okay. Do you know if as of May 2000 -- May or April of 2016, when you disclosed your first report, if that was the most recent version of that document, guidance document?
A I'm not sure either way.
Q Okay. Earlier we talked a little bit about the Mirena label and how you reference in your reference list several Mirena labels from 2013, 2014, correct?
A (The witness nods.)
Q Is that correct?
A Yes.
Q Okay. And you had not reviewed any



Mirena labels after 2014, correct?
MS. MANGRUM: Object to form.
THE WITNESS: You showed me the label, and I looked at the Clinical Pharmacology section, and I can't recognize any differences from the earlier ones.
BY MS. NATALE:
Q You've never reviewed it before today, so you do not provide any opinions in your report as of January 18th, 2018, regarding the most recent Mirena label, correct?
MS. MANGRUM: Object to form.
THE WITNESS: Okay. In my discussions the last three days, I have looked at the Mirena label. It could have been the 2017 one.
BY MS. NATALE:
Q Okay. So as far as any opinions that are contained in here, that was -- you wrote this report prior to the last several days, right?
A Yes.
Q Okay. So at least to the extent that anything in the Mirena label is different than it was in 2014, your -- your report does not contain any opinions about the Mirena label; is that



correct?
MS. MANGRUM: Object to form.
THE WITNESS: My commentary is rather generic, so it probably doesn't matter.
BY MS. NATALE:
Q So context doesn't matter to the opinions that you provide in this report?
MS. MANGRUM: Object to form.
THE WITNESS: Well, I -- my brief review of the current label indicates it's pretty much the same information that I looked at before in the sections that I'm familiar with.
BY MS. NATALE:
Q Okay. And to the extent that anything in the FDA guidance documents has changed since August 2014, you've not considered that in forming your opinions, correct?
A That's correct.
MS. NATALE: Okay. I have no further questions. I will pass the witness.
EXAMINATION BY COUNSEL FOR DEFENDANTS
BY MS. MANGRUM:
Q Okay. I just have a few, Doctor. Leave the same materials in front of you, if you will.

MS. MANGRUM: They want me to be on the microphone.

MS. NATALE: Just want to hear you nice and clear.

BY MS. MANGRUM:

**Q Do you recall just now, Dr. Jusko, and earlier in the deposition Ms. Natale asking you questions about the FDA-approved product labeling for Mirena that you've reviewed in this case?**

A Yes.

MS. NATALE: Object to form.

BY MS. MANGRUM:

**Q And if you look at Exhibit 2, and more specifically, Appendix B to Exhibit 2, I'll ask you to turn to that page in exhibit -- Appendix B to Exhibit 2, which lists the materials you reviewed and relied on in this case. And more specifically, after the literature you will see a page that says "Products Labels," correct?**

A Yes.

**Q And I believe the most recent -- well, tell me, what is the most recent Mirena products label listed in this portion of Appendix B to Exhibit 2?**



MS. NATALE: Object to form, asked and answered.

THE WITNESS: It says "2014 Mirena label."

BY MS. MANGRUM:

**Q Okay. I'm going to hand you now what was previously marked as Exhibit 9. And if you will look in the right-hand column, about halfway down before the page break, you'll see a date. And what is that date?**

A "Revised 5/2017."

**Q Okay. Then I'll hand you an exhibit that I would like to mark as Exhibit 33.**

(Jusko Exhibit No. 33 was marked for identification.)

MS. NATALE: I think I've already written a few for you.

I believe I know what it is you are going to give him, but do you have a copy for me?

MS. MANGRUM: Oh, yeah. I'm sorry.

MS. NATALE: My ESP is kicking in.

BY MS. MANGRUM:

**Q So, Doctor, I'm going to hand you what I've marked as Exhibit 33, and ask you to turn to the Highlights of Prescribing Information in that exhibit. It's the second page. And tell me, if you will, what date is on that highlights page, again on the right-hand side just above the page break.**



A "Recent major changes, 05/2014."

**Q And then if you will, Doctor, turn to Section 12 in Exhibit 33.**

**Okay. And now take a moment, please, to compare Exhibit 33 with Exhibit 9, both -- the Clinical Pharmacology section of both documents, and specifically, Doctor, looking for any differences in the Clinical Pharmacology sections of those two exhibits.**

A Well, that Section 12 is word-for-word identical.

**Q And when you say "word-for-word identical," you're referring to what two documents that you've just compared?**

A I was comparing the 2014 document and the 2017 version.

MS. MANGRUM: Okay. Thank you. I have no further questions.



MS. NATALE: That's it.

THE VIDEOGRAPHER: Okay. The time is 4:10 p.m., February 8th, 2018. Going off the record, completing the videotaped deposition.

(Whereupon, the deposition of WILLIAM JUSKO, Ph.D. was concluded at 4:10 p.m.)

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, Leslie Anne Todd, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing of the transcript was not waived; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 11th day of February 2018.

My commission expires November 14, 2018.

Leslie A. Todd

_________________________

LESLIE ANNE TODD

NOTARY PUBLIC IN AND FOR

THE DISTRICT OF COLUMBIA



DEPOSITION ERRATA SHEET

Assignment No. 39484

Case Caption: IN RE: MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY

Witness: WILLIAM J. JUSKO, Ph.D. - FEBRUARY 8, 2018

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of ___________, 20___.

_________________________________

FEBRUARY 8, 2018

Sworn to and subscribed before me this _____ day of _______________, 20__.

_________________________

Notary Public

My commission expires_______



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

WILLIAM J. JUSKO, Ph.D.



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

WILLIAM J. JUSKO, Ph.D.