# EXHIBIT I

## May 26, 2016 Deposition of William Jusko, Ph.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

---

EMILY C. KELLINGTON,

Δ π EXHIBIT 17
Deponent Jusko
Date 3/8/18 Rptr LT
WWW.DEPOBOOK.COM

Plaintiff,

V. Case No.: 5:14-CV-00002-EKD-RSB

BAYER HEALTHCARE
PHARMACEUTICALS, et al.,

Defendants.

______________________________/

Videotaped Deposition of WILLIAM J. JUSKO, Ph.D., held on Thursday, May 26, 2016, taken at the Law Offices of Goldberg Segalla, 665 Main Street, Suite 400, Buffalo, New York, 14614, commencing at 9:20 a.m., before Lindsay Nicole Robel, a Court Reporter and Notary Public in and for the State of New York.

APPEARANCES:

Representing the Plaintiff,
Emily C. Kellington:
JONES WARD, PLC
Marion East Taylor Building
312 South Fourth Street, Sixth Floor
Louisville, Kentucky 40202
Phone: (502) 882-6000
Email: Lauren@jonesward.com
BY: R. LAUREN HORNER, ESQ.
Email: christina@jonesward.com
BY: CHRISTINA NATALE, ESQ.

Representing the Defendants and Witness:
GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP
564 West Randolph Street, Suite 400
Chicago, Illinois 60661
Phone: (312) 681-6000
Email: eneff@goldmanismail.com
BY: EMMA C. NEFF, ESQ.



APPEARANCES: (CONT'D.)

Representing the Defendants and Witness:
SHOOK, HARDY & BACON, LLP
1155 F Street NW, Suite 200
Washington, D.C. 20004
Phone: (202) 783-8400
Email: Mmangrum@shb.com
BY: MICHELLE R. MANGRUM, ESQ.

ALSO PRESENT:
Michael Zotara, Videographer



INDEX


| WITNESS | PAGE |
|---|---|
| WILLIAM JUSKO, Ph.D. | |
| Examination by Ms. Horner | 13-217 |




INDEX OF EXHIBITS


| DESCRIPTION | MARKED |
|---|---|
| Exhibit-1 (Amended Notice of Video Deposition of William J. Jusko, Ph.D.) | 15/16 |
| Exhibit-2 (Mirena Products Liability-Expert Report of William J. Jusko, Ph.D.) | 18 |
| Exhibit-3 (curriculum vitae: William J. Jusko, May 2016) | 41 |
| Exhibit-4 (documents reviewed by Dr. Jusko produced 5/25/2016 at 10:50 a.m.) | 48 |
| Exhibit-5 (Interactions of sex hormone-binding globulin with target cells (Rosner), reference 21) | 76 |

INDEX OF EXHIBITS (CONT'D.)


| DESCRIPTION | MARKED |
|---|---|
| Exhibit-6 (Sex Steroids and the Free Hormone Hypothesis) | 82 |
| Exhibit-7 (Role of Endocytosis in Cellular Uptake of Sex Steroids by Hammes) | 100 |
| Exhibit-8 (University of Cincinnati Medical Center January 22, 2016 report of John E. Maggio, Ph.D.) | 113 |
| Exhibit-9 (Adverse Drug Reactions and Interactions: Mechanisms, Risk Factors, Detection, Management and Prevention) | 117 |




INDEX OF EXHIBITS (CONT'D.)


| DESCRIPTION | MARKED |
|---|---|
| Exhibit-10 (Metformin-Associated Lactic Acidosis (MALA): Case Files of the Einstein Medical Center Medical Toxicology Fellowship by Kopec) | 120 |
| Exhibit-11 (Leiras Clinical Study Report B078) | 137 |
| Exhibit-12 (Norplant system warning label) | 146 |
| Exhibit-13 (Berlex Laboratories, Inc. Clinical Study Report Number A46796) | 166 |
| Exhibit-14 (Schering Clinical Study Report Number A10982) | 184 |




INDEX OF EXHIBITS (CONT'D.)


| DESCRIPTION | MARKED |
|---|---|
| Exhibit-15 (Bayer Healthcare Clinical Study Report Number A46796) | 190 |
| Exhibit-16 (Multiple Nuclear Receptors Signaling Pathways Mediate the Actions of Synthetic Progestinsin Target Cells by Moore) | 209 |
| Exhibit-17 (Mediated actions by synthetic progestins used in HRT and contraception, by Africander) | 211 |
| Exhibit-18 (Drospirenone: Pharmacology and pharmacokinetics of a unique progestogen by Krattenmacher) | 212 |




INDEX OF EXHIBITS (CONT'D.)


| DESCRIPTION | MARKED |
|---|---|
| Exhibit-19 (The preclinical biology of new potent and selective progestin: Trimegestone by Winneker) | 213 |
| Exhibit-20 (Drospirenone: A Novel Progestogen with Antimineralocorticoid and Antiandrogenic Activity by Muhn) | 215 |
| Exhibit-21 (Classification of pharmacology of progestins by Schindler) | 217 |
| Exhibit-22 (Pharmacology of estrogens and progestogens: Influence of different routes of administration by H. Kuhl) | 218 |

INDEX OF EXHIBITS (CONT'D.)

| DESCRIPTION | MARKED |
|---|---|
| Exhibit-23 (Nomegestrol acetate, a novel progestogen for oral contraception by Mueck) | 219 |



INDEX OF REQUESTS

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| BY-MS.HORNER: | | |
| Request-1 (I think in light of that, we're going to renew our request for more of these slides - (page 35) | 47 | 5 |



VIDEOTAPED DEPOSITION OF
WILLIAM J. JUSKO, Ph.D.
MAY 26, 2016

THE VIDEOGRAPHER: Okay. We're now on record. My name is Michael Zotara, a videographer for Golkow Technologies. Today's date is May 26th, 2016, and the time is 9:26 a.m.

This video deposition is being held in Buffalo, New York in the matter of Mirena, Kellington versus Bayer Healthcare Pharmaceuticals Incorporated for the U.S. District Court for the Western District of Virginia.

Today's deponent is William Jusko, Ph.D.

And will the attorneys present please introduce themselves.

MS. HORNER: My name is Lauren Horner. I'm here representing the plaintiffs in this case.

MS. NATALE: Christina Natale for the plaintiffs.

MS. NEFF: Emma Neff for the



defendants and the witness.

MS. MANGRUM: Michelle Mangrum for the defendants and Dr. Jusko.

THE VIDEOGRAPHER: Thank you. Also present is Lindsay Robel, a court reporter with Golkow Technologies.

You may now swear in the witness.

Thereupon,

WILLIAM J. JUSKO, Ph.D.,

404 Kapoor Hall, University at Buffalo, Buffalo, New York, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY-MS.HORNER:

Q. Thank you, Dr. Jusko. My name is Lauren Horner, and I'm representing plaintiffs as we just stated. Have you ever been deposed before?

A. Yes.

Q. Okay. How many times?

A. Oh, probably about four.

Q. Okay. And how long ago?

A. The last time was probably about two years ago.

Page 14

Q. Okay. So the rules of depositions are somewhat familiar to you then; right?
A. Yes.
Q. Okay. But let's just kind of refresh your memory, if you don't mind. Number one, it's important that we don't talk over top of one another. The reason for that is that, of course Ms. Mangrum wants to get her objections in, and it's also easier for the court reporter. Does that make sense?
A. Yes.
Q. Okay. And for that reason, just please wait until my question is finished before you answer. Okay?
A. Certainly.
Q. Okay. And of course, if defense counsel objects, please allow her to have an opportunity to object before answering.
MS. HORNER: Counsel, I'd like to ask that you keep your objections to form, please, today.
BY-MS.HORNER:
Q. If I ask a confusing question,

Page 15

Doctor, please let me know and I'll do my best to explain the question or to rephrase it so that's more understandable. But if you do answer a question that I ask, then I'm going to assume that you understood it. Does that make sense?
A. Yes.
Q. Okay. Please always give a verbal response. If you nod your head or say uh-huh, it makes the record unclear. So a yes or a no is better. Does that make sense as well?
A. Mm-hmm. Yes.
Q. Yes? Okay. All right. And I think it's going to be a fairly long deposition today. I'm hoping it won't be the full seven hours. But if you do need a break, it's certainly not a marathon. So please let us know, and we'll do our best to finish our line of questioning so you can take a break. Okay?
A. All right.
MS. HORNER: All right. First of all, I'm going to mark as Exhibit-1 to your

Page 16

deposition the notice that we sent.
(Whereupon, the following was marked for purposes of identification: Exhibit-1, Amended Notice of Video Deposition of William J. Jusko, Ph.D.)
BY-MS.HORNER:
Q. Okay. Have you seen this document before?
A. Yes, I have.
Q. Okay. And taking a look at Exhibit-A, which I believe starts -- where is Exhibit-A to this? Oh, here it is. It starts on the second page. There's some instructions. And then if we move on to page 4, there's some requests for documents to be produced. Did you look at these?
A. Yes, I looked at this request.
Q. Okay. Did you do anything to search for these documents?
A. I looked in my files, yes.
Q. Okay. And I believe that some documents were produced to us, but we're waiting on copies. So we'll, I guess, wait just a minute to go through that. So let's

Page 17

leave this to the side for now. Okay. How did you prepare for this deposition, Doctor?
A. I met with my two attorneys for discussions.
Q. Okay. And when did you meet with them?
A. Yesterday.
Q. How long did you meet with them for?
A. Most of the day.
Q. Okay. Did you do any preparation prior to yesterday?
A. We also met about two weeks ago as well.
Q. Okay. And how long did you meet then?
A. I think it was about a day and a half.
Q. Okay. So you've spent about two and a half days with the attorneys preparing?
A. Yes.
Q. All right. Did you do anything else to prepare for your deposition?
A. I looked through the files of information that I had.

Q. Okay. Did you discover anything in your files that impacts your opinions today during that review?
A. No.
Q. Okay. And was anybody with you, other than the attorneys, when you met with them --
A. No.
Q. -- yesterday?
A. No.
MS. HORNER: Okay. All right. Now I'm going to mark your report as Exhibit-2 to your deposition.
(Whereupon, the following was marked for purposes of identification: Exhibit-2, Mirena Products Liability-Expert Report of William J. Jusko, Ph.D.)
BY-MS.HORNER:
Q. And what I've just marked and Ms. Mangrum has handed to you, Doctor, this is your report in this case; correct?
A. That is correct.
Q. Okay. And just taking a quick look at the CV, which is attached I think as



exhibit -- or I'm sorry -- appendix B, toward the back. I know that you handed us I think an updated curriculum vitae as well. Or, I'm sorry -- the attorneys did -- that's being produced today at the deposition; is that correct?
A. That's correct.
Q. Okay. And as soon as we get it entered, it will say that it was updated on May 2016; is that correct?
A. Correct.
Q. Okay. Is there anything substantially different between these two curriculum vitaes?
A. No.
Q. Okay. What about any new publications that have been done on levonorgestrel?
A. All of my submitted publications are listed in my CV.
Q. Okay. So there's nothing between February and May that you published about levonorgestrel?
A. That's correct.



Q. Okay. And nothing about Mirena?
A. That's correct.
Q. And nothing about pseudotumor cerebri?
A. That's correct.
Q. Okay. And when I say pseudotumor cerebri, would it make sense if I call it PTC or if I call it IIH, which stands for idiopathic intracranial hypertension, would you agree with me that those are essentially synonyms?
A. Well, my understanding is the preferred term is IIH.
Q. Okay. So if either one of us uses any of those terms, we're still talking about the same condition; right?
A. Okay.
Q. Okay. All right. I want to turn really quickly to page 2 of your report where you state that you worked on the pharmacokinetic and pharmacodynamics for Norplant on behalf of Wyeth. So this would be at the bottom of the page in paragraph eight, last sentence. Do you see that, sir?
A. Number eight, yes.



Q. Okay. What was your involvement exactly in the Norplant project for Wyeth?
A. My work for Wyeth fell under a confidentiality agreement. But, in general, it was advising on any issues they had with the pharmacokinetics.
Q. Okay. So you're not allowed to talk about your work more specifically with respect to Norplant?
A. It's been a very long time, and I no longer have the confidentiality agreement. So I'm not sure of what I'm permitted to do or not.
Q. Okay. Have you notified Wyeth that you're testifying in this case to see if they might release you from that agreement?
A. No.
Q. Okay. Are you able to testify to who you worked with at Wyeth on this project?
A. Yes.
Q. Okay. Who did you work with?
A. I believe the director of the department at the time was a scientist named

Soong Chiang, S-o-o-n-g C-h-i-a-n-g. He's long been retired.
Q. Okay. And he was the director, meaning he oversaw the project? Is that --
A. No, he supervised consideration of the pharmacokinetics.
Q. Okay. And who else did you work with, other than Dr. Chiang, I think you said?
A. There were a number of people who were in his department. I'm not certain who was also involved with Norplant.
Q. Okay. And were you a consultant with them or were you an employee?
A. Consultant.
Q. Okay. When exactly did you work on the Norplant project?
A. Perhaps the late 1980s, 1990s. It's been quite a while.
Q. Okay. So you can't remember -- you can't remember if it was in the '80s or the '90s?
A. No, I cannot remember.
Q. Okay. Do you remember if it was



before Norplant was on the market or after Norplant was on the market?
A. It was before it was approved by the FDA.
Q. Okay. So did any of your work include research on Jadelle, which is also known as Norplant-2?
A. No.
Q. Okay. Did your work involve bench-testing of the Norplant?
A. No.
Q. Okay. Did it involve in vivo testing of the Norplant?
A. Yes.
Q. Okay. And you did this testing in Buffalo, New York; is that right?
MS. MANGRUM: Objection.
A. No. Perhaps I should clarify my previous statement.
BY-MS.HORNER:
Q. Okay.
A. Someone else did all the studies. I only looked at the pharmacokinetic data.
Q. Oh, okay. And when you were looking



at the pharmacokinetic data, what was it you were looking for exactly?
A. Interpretation of the time course of plasma drug concentrations.
Q. Okay. And were your results published anywhere?
MS. MANGRUM: Objection.
A. Probably not. Not with me as a co-author at least.
BY-MS.HORNER:
Q. Okay. Do you still have any of the documentation from the work you did on behalf of Wyeth for the Norplant project?
A. No.
Q. What did you think of the lawsuits alleging side effects from Norplant in the 1990s?
MS. MANGRUM: Objection.
A. I have no recollection of anything about that.
BY-MS.HORNER:
Q. You don't remember that there were thousands of lawsuits filed against Wyeth on behalf of women who were injured by the



Norplant?
MS. MANGRUM: Objection.
A. No.
BY-MS.HORNER:
Q. Did you know that Wyeth settled those suits?
MS. MANGRUM: Objection.
A. I paid no attention to any of that.
BY-MS.HORNER:
Q. Are you aware of the label change that occurred for the Norplant in 1993?
A. No.
Q. So you're not aware that there's a pseudotumor cerebri warning on the Norplant label?
MS. MANGRUM: Objection.
A. If I looked at the label, I could tell you whether it's there or not.
BY-MS.HORNER:
Q. But sitting here today, you have no knowledge that there's a pseudotumor cerebri warning on the Norplant label?
A. I believe there is.
Q. Okay. And how did you learn that

Page 26

there is a warning?
A. By reading the label.
Q. Okay. So when did you last read the Norplant label?
A. Probably two weeks ago.
Q. Okay. When did you first learn that there was a warning added to the Norplant label for pseudotumor cerebri?
A. I don't -- I don't have any recollection of when it was added.
Q. Okay. But you don't remember when you learned of the addition of the warning?
A. Oh, I know it's in the label, but I don't know that it was an addition.
Q. Okay. So your testimony is that you believe there may have always been a warning in the label for pseudotumor cerebri?
MS. MANGRUM: Objection.
A. It's not something I thought about.
BY-MS.HORNER:
Q. Okay. And my question earlier was when did you learn that there was a pseudotumor cerebri warning in the Norplant label?

Page 27

A. Oh, perhaps in the last six months.
Q. Okay.
A. Whenever I first looked at the label.
Q. So you hadn't looked at the Norplant label at all until about six months ago?
A. That's correct.
Q. What other contraceptives have you done research on other than levonorgestrel?
A. I worked with the combination product, levonorgestrel and ethinyl estradiol.
Q. Okay. And any other progestins that you've done research on?
A. What do you mean do research on?
Q. What do you think I mean? Well, how about this: What do you think research means? What does it mean to you?
A. It can run at various levels. There could be experimental work in the laboratory. There could be examination of information in the literature. It could be consulting with people who have -- wish to discuss the topic.
Q. Okay. Let's stick with experimental

Page 28

work. Have you done any experimental work with other progestins than levonorgestrel?
A. No.
Q. Okay. And you have done experimental work, though, with levonorgestrel; right?
A. Correct.
Q. Okay. What about consulting with others; do you consult with others regularly about progestins like LNG or any other progestin?
MS. MANGRUM: Objection.
A. I've interacted with Johnson & Johnson regarding norgestimate.
BY-MS.HORNER:
Q. Okay. Any other progestins?
A. Probably not.
Q. Let's take a look again at page 2 of your report. I believe it's also in paragraph eight here. You list consulting for the National Institutes of Health, the FDA and various pharmaceutical companies, such as Amgen, Genentech, Pfizer, Johnson & Johnson, and Roche, among others.
And of course we also have Wyeth,

Page 29

which you discussed, and is now Pfizer, I think you say right here.
Did I read all of that more or less correctly?
A. Yes.
Q. Okay. So starting with Amgen, what projects have you worked on for Amgen?
A. Again, they were usually experimental drugs where I was under a confidentiality agreement.
Q. Okay.
A. But in general, it was talking about pharmacokinetics and pharmacodynamics of their products.
Q. Okay. Are there any that made it to market that you worked on?
MS. MANGRUM: Object to form.
A. Probably, yes.
BY-MS.HORNER:
Q. Okay. But you can't talk to us today about that, because you're under a confidentiality agreement?
A. It depends on the question --
Q. Okay.

A. -- about the product.
Q. So can you tell me what they were that made it to market?
A. They have a fusion protein called -- I'm trying to remember the name of it. It's a fusion protein used for treatment of rheumatoid arthritis.
Q. Okay.
A. It'll come back to me in a moment.
Q. If you remember it, just let us know.
A. Okay.
Q. Anything else for Amgen?
A. There were many different compounds in development, and it's been a plethora of them.
Q. Okay. So you can't remember any others specifically today?
A. Most of the times they had letters and numbers, and it's impossible to remember those.
Q. Okay. And so just to be clear, I'm only asking about ones that went to market.
A. Oh.



Q. Are there any others that you consulted with Amgen on that made it to market?
A. Probably, but I can't recall now.
Q. Okay. What about for Genentech?
A. Much of the same as my previous answer. Yeah, confidentiality, consulting on compounds, and development.
Q. Okay. So you wouldn't be able to tell us any that you worked on that made it to market because of a confidentiality agreement?
A. One is a monoclonal antibody that's used to treat patients with asthma. I'm trying to remember the name, but I can't.
Q. Any others that you can remember?
A. No.
Q. Okay. What about for Pfizer, which I guess would also include Wyeth, do you -- other than Norplant, do you recall any drugs that made it to market that you could talk about here today that you did some work on?
A. I'm certain there are, but it seems I just can't remember.



Q. Okay. And again, you're -- you have a confidentiality agreement. So that would cover anything that's in development that wasn't marketed? That's my understanding.
A. That's correct.
Q. Okay. What about for Johnson & Johnson, does anything ring a bell?
MS. MANGRUM: Object to form.
A. Again, it was norgestimate. I remember some work with some -- with new antibiotics they were developing. Again, it's been quite a few years.
BY-MS.HORNER:
Q. Okay. And what about Roche?
MS. MANGRUM: Objection.
A. All much the same.
BY-MS.HORNER:
Q. You can't remember specifically any drugs that made it to market?
MS. MANGRUM: Objection.
A. I'd have to go online, look at the list of drugs and it would probably prompt my memory, but it seems to --
BY-MS.HORNER:



Q. Okay.
A. Those have seemed to escape me today.
Q. So how long ago did you do this work for these companies?
A. It's been quite a long time since I worked with many of these, but my last interaction with Roche was probably about three years ago.
Q. Okay. And what about Johnson & Johnson?
A. It could be 12 years ago at least.
Q. Okay. And then what about Pfizer?
A. Also at least ten years ago.
Q. Okay. And that would include Wyeth as well?
A. Even longer for Wyeth.
Q. Okay. And what about Genentech?
A. Two or three years ago, I interacted with them.
Q. And finally, what about Amgen?
A. Again, that's been quite a long time. Perhaps six years ago.
Q. Okay. Okay. Let's turn to appendix

C of your report, which lists prior testimony in the past four years. Did you find it?
A. Yes.
Q. Okay. Good. So you list here three cases in which you gave testimony either at trial or in deposition as an expert; correct?
A. Yes.
Q. And all three of these cases are patent cases; right?
A. Correct.
Q. Okay. And which party were you testifying on behalf of in each of these cases?
A. For number one here, it was Amneal, plus about six other small companies.
Q. Okay. What about number two?
A. Teva.
Q. And number three?
A. Probably Apotex.
Q. I sense some hesitation. Is it hard to remember?
A. After a while, these companies all sound alike.



Q. Okay. So because these are all involving patent claims, these are not personal injury cases; correct?
A. Correct.
Q. All right. And what drugs were involved in these patent cases?
A. With Shire, it was lisdexamfetamine.
Q. Okay. What about for Teva?
A. Bupropion.
Q. And for Apotex?
A. It's not been that long, but I don't remember what drug there.
Q. Okay. Have you given sworn testimony of any kind other than in these cases in the last four years?
A. I've created an expert report for another case.
Q. Okay. But you haven't testified at, say, an arbitration hearing under oath?
A. No.
Q. Okay. And you say you've prepared expert reports. So you've consulted for litigants other than these in the last four years; right?



A. Yes.
Q. Okay. How many of those were plaintiffs?
A. Plaintiffs --
MS. MANGRUM: Object to form.
BY-MS.HORNER:
Q. Actually, strike that.
How many of those were personal injury cases?
MS. MANGRUM: Objection.
(Whereupon, reporter clarification.)
A. None.
BY-MS.HORNER:
Q. We broke our rule about talking over top of each other, didn't we? I do it too sometimes, so -- obviously. How long have you been consulting in legal cases?
A. The first time was in the early 1990s.
Q. Okay. So you've been doing this work for approximately 26 years or so?
A. Yes.
Q. Have you consulted in a legal case that primarily involved personal injuries,



other than this case?
A. Yes.
Q. Okay. How many such cases have you consulted in?
A. I believe two.
Q. Other than this case?
A. Correct.
Q. And what did those cases involve?
A. The previous case, I think I'm allowed to reveal it, was dealing with Ortho Evra.
Q. Okay. And there was another case that primarily involved personal injury other than Ortho Evra and this Mirena case. What was that?
MS. MANGRUM: I'm going to object just to the extent you're seeking information about cases in which he may have consulted but was not disclosed as an expert. I'm not sure what your question is asking. But to the extent you're asking about consulting arrangements that he had that he was not disclosed as an expert, gave no testimony, I just make an objection to that.

BY-MS.HORNER:
Q. Okay. What case was that in?
A. The one besides Ortho Evra?
Q. Mm-hmm.
A. Okay. I don't remember the drug, but it was a nonsteroidal anti-inflammatory drug.
Q. Okay. In the NSAID case -- NSAID is a common abbreviation for that; correct?
A. Correct.
Q. In that case, did you testify on behalf of the defendant or the plaintiffs?
MS. MANGRUM: Objection.
A. Defendant.
BY-MS.HORNER:
Q. And what about in the Ortho Evra case?
A. Also the defendant.
Q. And let me just clarify. I think I might have said testify. But you consulted in both of those cases for the defendant; is that correct?
A. Correct.
Q. Okay. So all of your work involving



personal injury cases has been on behalf of defendants; is that a fair assessment?
A. That's probably correct.
Q. How much of your income is derived from legal consulting work?
A. 10 to 20 percent.
Q. How much would that be per year?
A. It's quite variable.
Q. How much of your time is devoted to legal consulting -- well, I'll just ask it that way. Strike that.
How much of your time is devoted to legal consulting?
A. Again, it's variable. Some years, none; other years, perhaps 20 percent.
Q. What about this year?
A. No more than 20 percent.
Q. How much of your time is devoted to teaching?
A. 20 percent.
Q. And what about administrative-type work?
A. 10 percent.
Q. And what about research?



A. The rest of my time, typically 60 to 80 percent.
Q. Okay. So 20 percent, 20 percent, 10 percent; all right, so maybe 50 percent on research then?
A. Probably more than that.
Q. More than that. Okay.
A. I work many extra hours, so I have to count that.
Q. All right. So I think your hourly rate was disclosed in your report as six hundred dollars an hour; is that correct?
A. Yes.
Q. Okay. And what is your fee schedule for testimony versus writing reports?
A. It's a standard hourly rate.
MS. HORNER: Okay. How far are we in? Are we about an hour?
THE VIDEOGRAPHER: 36.
(Whereupon, sotto voce discussion off the record.)
MS. HORNER: All right. Dr. Jusko, we did get copies of the materials that have been produced today. And I'd like to now



enter these as an exhibit, number 3.
(Whereupon, the following was marked for purposes of identification: Exhibit-3, curriculum vitae: William J. Jusko, May 2016.)
MS. HORNER: Ms. Mangrum, I just want to point out on your copy we made a note on one of these, so I wanted to make sure that it didn't go to the witness.
MS. MANGRUM: Okay. May I hand this to him?
MS. HORNER: Sure. Yeah.
BY-MS.HORNER:
Q. And so let's just really quickly go through these and through the document request that was sent to you. So let's take a look again at Exhibit Number-1, and looking at, I believe it was page 4, where those requests are.
So we talked a bit earlier about your resume or curriculum vitae. And so in this Exhibit Number-3, the first document is your updated curriculum vitae; is that correct?

Page 42

A. Yes.
Q. Okay. And if we look at the next one, all lists of presentations, talks, speaking engagements and medical grand rounds that the witness has presented. That is the second document that we have in Exhibit-3; correct?
A. Correct.
Q. Okay. And --
MS. MANGRUM: Correct, subject to limitation in our response, which limited it to one year.
MS. HORNER: Okay. That was going to be my -- okay.
BY-MS.HORNER:
Q. Do you have any lists of earlier talks that you've given?
A. I don't keep a continuing list.
Q. Okay. All right. And for number three we asked for all slides, handouts and other documents relating to all presentations, talks, speaking engagements and medical grand rounds that the witness has prepared or presented regarding levonorgestrel-containing

Page 43

contraceptives, Mirena or IUDs.
And so the third document that we have is responsive to this request; correct?
A. Correct.
Q. Okay. And this presentation is dated January 29th of this year. Am I reading that right?
A. Correct.
Q. Do you have any older presentations or slides that are in your possession relating to LNG, contraceptives, Mirena or IUDs?
A. No.
Q. You do not. Okay. Did you search for any older ones?
A. I looked in my teaching files, and this is the only one that relates to contraceptives.
Q. Okay. Do you know if you ever had any older ones?
A. Perhaps several decades ago I may have talked about drug interactions with contraceptives, but I incorporated that information into these slides.

Page 44

Q. Okay. And why were these slides created in January?
A. I was teaching a course to our Doctor of Pharmacy students.
Q. So there's a course about contraceptives that you're currently teaching or just finished teaching?
A. No. The course is about pharmacokinetics in general.
Q. So do you usually teach about the role of sex (gender) and chronobiology and pharmacokinetics and pharmacodynamics when you teach that class?
A. All of these topics are of special interest to me.
Q. Okay. So I guess my question is: Why is there suddenly a presentation in 2016 that would relate to levonorgestrel-containing contraceptives, but there aren't earlier ones?
MS. MANGRUM: Object to form.
A. Each year I update my lecture slides.
BY-MS.HORNER:

Page 45

Q. Okay. So this is the most up-to-date version then?
A. Yes.
Q. And you don't keep older versions; is that right?
A. No reason to.
Q. Okay. All right. So looking at number four: Slides, handouts, other documents relating to presentations, talks, speaking engagements, grand rounds on idiopathic intracranial hypertension/pseudotumor cerebri, do you have anything like that?
A. No.
Q. And what about with respect to pharmacology and pharmacokinetics?
A. That's the entire area of my expertise.
Q. So you do have some documents that are responsive to this; right?
A. Not relating to contraceptives.
Q. Okay. So this isn't limited to contraceptives; it's on pharmacology and pharmacokinetics. So there are more documents that you would have that are

responsive to this then?
A. I don't understand your question.
MS. MANGRUM: I'll just interpose my objection as stated in our response, which is this entails 50 years of Dr. Jusko's work. And should you desire to give us a more narrowly-tailored request, we'd certainly consider that, but we haven't seen that. And this otherwise is overly burdensome for the reasons I just stated.
BY-MS.HORNER:
Q. Okay. How many different slide sets do you have that relate to pharmacology and pharmacokinetics?
A. Perhaps 50.
Q. 50. How are they kept?
A. In files in my computer.
Q. Are they in one folder?
A. No.
Q. Okay. How long does it take you to find a file in your computer?
A. Sometimes very quick; sometimes less, not so quick.
Q. Okay. So you have about 50, and



some of them you can find pretty quickly?
A. Yes.
MS. HORNER: Okay. I think in light of that, we're going to renew our request for more of these slides.
BY-MS.HORNER:
Q. Okay. So number six: All documents or materials reviewed, considered, and/or relied upon in the course of developing the witness's opinions in this matter that are not listed in the reliance list produced March 2016. Do you see that?
A. Yes.
Q. Now, first of all, I guess we should note that there is a reliance list that's attached to your report, which we have marked as Exhibit-2; right?
A. Correct.
MS. HORNER: Okay. And I received a couple of emails noting that there are additional documents that you looked at in the meantime and are relying upon, and we'll enter those as Exhibit-4.
(Whereupon, the following was marked



for purposes of identification: Exhibit-4, documents reviewed by Dr. Jusko produced 5/25/2016 at 10:50 a.m.)
(Whereupon, sotto voce discussion.)
MS. MANGRUM: Oh, one's for me. Sorry.
MS. HORNER: Sorry about that.
BY-MS.HORNER:
Q. Okay. And so looking at the body of the email, the first page is dated May 25th, and it says full study report for A46796. Did I read that correctly?
A. It sounds right.
Q. And it gives a Bates number; right? Do you remember what this study was concerning?
A. It included the pharmacokinetics of levonorgestrel and study of three different products.
Q. Okay. And turning to the next page, in the body of the email, we have company document, MIR_KCOPLEY_00002752 through same Bates beginning, but the last four digits of the Bates are 2810. Did I read that



correctly?
A. It appears so.
Q. Okay. Do you recall what this document is?
A. In this case, I'd have to look at it.
Q. Okay.
A. But the numbers escape me.
Q. Okay. And we received this on the 23rd.
So do you remember looking at an additional document fairly recently that this might relate to?
A. I have company file documents and did a lot of crazy numbers.
Q. Okay.
A. I don't remember which is which.
Q. All right. Fair enough. And then also some deposition transcripts and their exhibits underneath; right?
A. Yes.
Q. Okay. In reviewing any of these, did they change your opinions?
A. No.

Q. Okay. Let's look at Exhibit Number-1 again and turn the page over to page 5. Looking at number seven: All communications between the witness and any third party, other than counsel for the defendants, including, but not limited to, defendant's other retained experts relating in any way to the Mirena litigation. Did I read that correctly?
A. It sounds correct.
Q. Do you have any such communications?
A. No.
Q. Have you spoken in any way to anybody regarding the Mirena litigation, other than defense counsel or other experts?
A. Only defense counsel.
Q. Okay. So you've not spoken to any of the other retained experts either?
A. No.
Q. Number eight: All communications between the witness and Ruju Rai. This is the authors of Rai abstract; correct?
A. Yes.
Q. Okay. Have you ever spoken with any



of them?
A. No.
Q. Even regarding things not related to this litigation?
A. I've not spoken to them.
Q. Okay. So you don't know Dr. Digre or Dr. Katz, for example?
A. No, I don't.
Q. Okay. Number nine -- strike that.
Doctor, have you ever looked at the Valenzuela abstract? Is that --
A. I'm sorry. Which abstract?
Q. I'm not sure it's on your reliance list. So if not, that's fine. But are you familiar with the Valenzuela abstract?
A. The -- I'm sorry. What was the word? What's the name of the abstract?
Q. Okay. Let's just look at request number nine.
A. Number nine. Okay.
Q. The fourth name listed there, there's Ruja Rai, Brian Kirk, Jessica Sanders, then Reuben Valenzuela.
A. Oh, okay.



Q. Have you read an abstract by him that has him listed as the first-named author?
A. I don't believe so.
Q. Okay. So you wouldn't have talked to anybody about this article here that's mentioned, "Exploratory Study of the Relationship Between Levonorgestrel-Releasing Intrauterine System and Idiopathic Intracranial Hypertension"?
A. There was one abstract that I've seen, but I'm not sure which is number eight or which is number nine.
Q. Okay. That's -- again, I don't think it was on your reliance list. I just wanted to make sure. So looking at number ten: All communications between, again, these same authors. And as you've stated, you've not spoken with anyone other than defense counsel regarding this case; correct?
A. Correct.
Q. Okay. Have you ever spoken to Dr. Deborah Friedman?
A. No.



Q. Do you know who Dr. Friedman is?
A. I know she has publications, but I don't know who she really is.
Q. And you've never spoken with any of the plaintiff's health care providers, to your knowledge?
A. No.
Q. For number 16: All work product, notes, memos, and other documents the witness has created in connection with the Mirena litigation, other than draft reports, including any copies of materials reviewed that contain writing, highlighting, or marking of any kind. So we were given today a packet of materials that seem to be responsive to this request. I'd just like to ask you a few questions about them. Looking at the first page, which seems to be a chart, could you explain what this chart relates to?
A. Okay. Would you hold up the one you're talking about?
Q. This one right here (indicating).
A. Okay.

Q. It's a -- looks like some kind of graph that's plotting different levels of drug and, presumably, blood serum compared to BMI. So what is this chart or this graph?
A. Okay. It's a graph of the average levonorgestrel concentrations in 13 subjects in relation to their body mass index, BMI.
Q. Okay. Where did you get the data underlying this graph?
A. From one of the company reports.
Q. Do you remember which report?
A. I believe it's this full study report that we previously mentioned as -- in the beginning of Exhibit-4, but I would need to see the exhibit to be positive.
Q. Sure. Sure. All right. And did you create this yourself?
A. Yes.
Q. Turning to the second page, there are some handwritten notes on what looks to be subjects in a study with their age, weight, height and BMI. And then on the next page, there is some more handwritten notes with the concentration -- the average



concentration I assume of drug, BMI, and also another chart or a graph. What was the purpose of these notes?
A. The numbers are data that I extracted from the company report to make the calculations of BMI.
Q. So this data is the basis of your graph that's on page 1?
A. Yes.
Q. And what is the graph at the bottom of the third page you have here?
A. I made a sketch of how I would like to have a nicer graph look like.
Q. Okay. Why are some of the dots black?
A. Those are subjects referred to in Dr. Maggio's, either his report or deposition.
Q. All right. And turning to the next page, which would be page 4, this is a page from clinical study report number A46796; right?
A. That's correct.
Q. And it's got some data here,



including area under the curve for levonorgestrel with Mirena, maximum concentration of levonorgestrel and T last and T max. I'm not sure what those mean exactly. Did I read that correctly?
A. Yes.
Q. Okay. What did you use this data for?
A. I used the AUC values and the T last to calculate the C average.
Q. Okay. And so the C average, I believe, was on the earlier pages here. Yeah, so the page prior; right?
A. Correct.
Q. So those are the results of your calculations; correct?
A. That's correct.
Q. Moving on to the next, I guess, four pages, we have here a document that says clinical pharmacology review and Liletta is circled in red. Do you see that?
A. That's right.
Q. What was this document used for?
A. I used it to extract the



levonorgestrel concentrations during use of Mirena.
Q. Okay. And where did you get this document?
A. Probably by Internet search of the FDA website.
Q. All right. Let's move on to the next several pages with an article entitled "Pharmacokinetics of low-dose levonorgestrel-releasing intrauterine systems and effects on ovulation rate and cervical function: Pooled analyses of phase II and III studies." Do you see that document?
A. Yes.
Q. Okay. What were you looking at this article for?
A. It contained plasma concentrations of levonorgestrel during use of Mirena.
Q. Okay. So you were trying to get plasma concentrations from the literature; is that fair?
MS. MANGRUM: Objection.
A. Yes.
BY-MS.HORNER:

Q. And moving on to the next article, it says "quantitative levonorgestrel plasma level measurements in patients with regular and prolonged use of the levonorgestrel-releasing intrauterine system." Did I read that correctly?
A. Yes.
Q. And this is an article by Dr. Seeber; correct?
A. Correct.
Q. So -- okay. And you've got some highlighting here in the document. What was this document used for?
A. To create the table in my report showing levonorgestrel concentrations during use of Mirena.
Q. Okay. And looking at your report just really quickly, what table would that be exactly? I might be able to point you to it. This would be on page number 9?
A. That's correct.
Q. So looking again at Exhibit Number-3, let's just move on to the next document. This is, "Tissue concentrations of



levonorgestrel in women using a levonorgestrel-releasing IUD," an article by Dr. Nilsson; correct?
A. Correct.
Q. Okay. And what was this article used for?
A. It is a reference that I use to describe levonorgestrel concentrations in serum and tissues.
Q. Okay. And then looking again at Exhibit Number-3 at the next article, we have "Pharmacokinetics of a combined oral contraceptive in obese and normal-weight women." This is an article by Dr. Westhoff. Did I read all of that correctly?
A. Yes.
Q. And what was this used for?
A. To describe levonorgestrel concentrations during use of an oral contraceptive.
Q. Okay. These are levonorgestrel concentrations. Were they combined oral contraceptive; right?
A. Yes.



Q. Which is different from Mirena that only uses levonorgestrel; correct?
MS. MANGRUM: Objection.
A. Correct.
BY-MS.HORNER:
Q. So the next article we have is, "Adiposity and sex hormones across the menstrual cycle: The BioCycle Study," by Dr. Yeung. Did I read that correctly?
A. That's correct.
Q. And what was this article used for?
A. It was one of my references that describe sex hormone concentrations in women who were obese.
Q. Okay. And I believe that's the last in your packet of notes; is that correct?
A. I trust what you have is correct.
Q. Okay. So you don't have any other handwritten notes that would be responsive to our request in number 16?
A. No.
Q. Okay. And finally -- well, let's just move on down. You don't have any pictures, photographs, drawings or diagrams



relating to any of the plaintiffs in this litigation; do you?
A. No.
Q. Do you have any demonstratives or exhibits that you're planning to use at trial?
A. No.
Q. Do you have any consultant contracts or retention letters for this litigation?
A. I'm not sure we have a letter in that regard.
Q. Okay. So you didn't sign a contract with Bayer for your work in this case?
A. Definitely not with Bayer.
Q. Okay. What about with the attorneys?
A. I don't think we have a letter.
Q. Okay. And so finally, number 20, we received some documents that are responsive to our request; it looks like four pages of bills. So the first page would be March 26th, second page May -- I'm sorry. March 26th, 2015, second page May 6th, 2015; third page January 15th of 2016; and fourth page

March 18th of 2016. Is that accurate, sir?
A. I think you said them correctly.
Q. Okay. And it looks like so far you've done a total of 83 hours of work on this case; is that correct?
A. 36, 36, 36 -- 81, is that what you said?
Q. Is it 81? So much for my math skills.
MS. MANGRUM: That's why we're here.
BY-MS.HORNER:
Q. Okay. So, so far you've been paid a total of -- again, I'm going to get into some math territory, not good -- it looks like $48,600?
A. If you did your math correct, I won't disagree.
Q. Okay. I'm sure Ms. Mangrum will correct me if I'm wrong.
MS. MANGRUM: Ms. Mangrum doesn't do math so well herself.
BY-MS.HORNER:
Q. All right. So have you spent any additional time since billing these hours on



this case?
A. Yes.
Q. And have you been paid in advance for your time today?
A. No.
Q. Okay. So Bayer still owes you some money; right?
A. Yes.
Q. Okay.
A. Well, the attorneys owe me some money, someone.
Q. The attorneys owe you some money?
A. Someone pays me.
Q. Okay. So do you know how many additional hours you've spent since your last bill?
A. Vaguely 40, but I can't be certain.
Q. Okay. So not including your time today, you'll be sending a bill for an additional $24,000 approximately?
A. Perhaps somewhere between 15 and 24. I'm not clear.
MS. HORNER: All right. Okay. I think we're at a good breaking point, if you



want to take a break.
MS. MANGRUM: Would you like to take a break?
THE WITNESS: That'd be fine.
MS. HORNER: Okay. Let's do that. I need to get these in order.
THE VIDEOGRAPHER: We're going off record at 10:33 a.m.
(Whereupon, recess taken from 10:33 a.m. until 10:44 a.m.)
THE VIDEOGRAPHER: Okay. We're back on record at 10:44 a.m.
BY-MS.HORNER:
Q. Welcome back, Dr. Jusko. In your report, you talk pretty extensively about levonorgestrel products, which, just to clarify, if I didn't before, sometimes I refer to as LNG products. Does that make sense?
A. LNG is the common abbreviation.
Q. Okay. LNG products that are used in combination with ethinyl estradiol, which I may be mispronouncing; is that right?
A. Yeah, we usually say ethinyl



estradiol.
Q. Estradiol, okay. And I may abbreviate that when I'm talking to you as EE. Does that make sense as well?
A. That's good.
Q. Okay. Now, levonorgestrel is bound to transport proteins; right?
MS. MANGRUM: Objection.
A. Yes.
BY-MS.HORNER:
Q. Okay. And those transport proteins are albumin and sex hormone-binding globulin; correct?
A. Correct.
Q. And to save us all some effort today, I'll abbreviate sex hormone-binding globulin as SHBG. Does that make sense?
A. Very good.
Q. Okay. So, Doctor, when sex hormone-binding globulin increases, what does that do to the level of levonorgestrel and serum?
A. Are you talking about the free or the total concentration?

Q. The total concentration.
A. It increases also.
Q. Okay. And why does that occur?
A. Because of the binding to SHBG.
Q. Okay. So if I'm paraphrasing correctly -- and please do correct me if I'm wrong -- that means that if there's more transport protein of SHBG, that more of the levonorgestrel will be bound to it and therefore total levels will be higher?
A. Your phrasing is not quite correct.
Q. Okay. Please correct me.
A. Okay. When you say more will be bound, the concentration bound per molecule of SHBG will not change.
Q. The concentration bound per molecule of SHBG will not change. Does that mean --
MS. HORNER: Here, do we have a blank piece of paper?
BY-MS.HORNER:
Q. So are you -- when you say -- when you make that statement, are you assuming that we have a finite amount of levonorgestrel? Is that the underlying



assumption?
A. There's always a finite amount.
Q. Sure. Okay. But you would agree that, generally speaking, if there's enough levonorgestrel to bind to additional sex hormone-binding globulin, that total levels generally would increase as sex hormone-binding globulin increases?
A. The connection between the first part of your statement and the second part of your statement doesn't really work right.
Q. Okay. Why doesn't it work right?
A. Well, state it again and I'll tell you.
Q. Can you read back what I said?
A. It's such a long sentence, I lost track.
MS. MANGRUM: The court reporter is going to read it back for you.
THE WITNESS: That's good.
(Whereupon, record read back by reporter.)
THE WITNESS: Okay. Stating that -- that part about there's enough levonorgestrel



just doesn't quantitate correctly with me.
BY-MS.HORNER:
Q. Okay. So why doesn't it?
A. Levonorgestrel is there for whatever concentration it is after giving whatever product is there. So saying there's enough or not enough doesn't really function well in pharmacokinetics.
Q. Isn't it true that if you were to give the same dose of levonorgestrel to the same woman and in one scenario you give her ethinyl estradiol, and in the other scenario you do not, that the same woman would have higher total levels of levonorgestrel with the ethinyl estradiol than she would if she only used the levonorgestrel?
A. Now you're adding in an extra complication from what we were talking about before.
Q. Okay. So what's the extra complication?
A. Ethinyl estradiol.
Q. That's what we were talking -- oh, okay. All right.



A. You hadn't mentioned ethinyl estradiol previously.
Q. That's true, I hadn't. Fair enough.
So and the reason ethinyl estradiol is important is because it causes the body to have more sex hormone-binding globulin; correct?
MS. MANGRUM: Object to form.
A. No.
BY-MS.HORNER:
Q. It does not?
A. Well, I didn't say it does not.
Q. So does it or doesn't it?
MS. MANGRUM: Your question was the reason it's important and then you gave the rest. So that's, I believe, where the confusion is.
A. That's exactly so.
BY-MS.HORNER:
Q. Well -- okay. So does ethinyl estradiol cause sex hormone-binding globulin to increase in somebody who takes ethinyl estradiol?
A. Yes.

Q. Okay. And in that scenario, if you also take levonorgestrel, your total serum levels of levonorgestrel will be higher than if you didn't take the ethinyl estradiol?
A. Correct.
Q. Okay. Is levonorgestrel -- strike that.
What other types of progestin bind to sex hormone-binding globulin?
A. I believe some do and some don't. And I primarily appreciate that it's ethinyl -- it's levonorgestrel.
Q. Okay. And do you know what other types of hormones that are androgynous typically bind to sex hormone-binding globulin?
A. Very likely the sex hormones.
Q. Do you know which ones?
A. Progestin and estradiol.
Q. Okay. So you believe that progesterone binds to sex hormone-binding globulin?
A. I'm not positive.
Q. What about testosterone, do you know



if it binds to sex hormone-binding globulin?
A. Yes, it does.
Q. Okay. Do you know why levonorgestrel binds to sex hormone-binding globulin?
A. Yes.
Q. Why does it?
A. Because it likes to. I'm sorry. The body has these globulins that are considered transport proteins and they aid in the functioning of the ligands that they bind to.
Q. All right. Does levonorgestrel's affinity for sex hormone-binding globulin relate in any way to its androgenicity?
MS. MANGRUM: Object to form.
A. There's some discussion about that, but intrinsically not.
BY-MS.HORNER:
Q. Isn't it true that levonorgestrel is derived from 19-Nortestosterone?
A. It could be. I would have to look that up.
Q. But sitting here today, you're not



certain?
A. It sounds familiar, but I'm not certain.
Q. In your report, you -- I'll have to find you the page, so you can look at it -- you cite a series of authors on page 7 for the proposition that when LNG is bound to sex hormone-binding globulin, that it is still hormonally active. And I believe this is paragraph -- second full paragraph on page 7. Is that a fair --
MS. MANGRUM: Object to form. Excuse me, Lauren. Sorry.
MS. HORNER: Go ahead.
MS. MANGRUM: I just made an objection to form. I didn't know you were not finished.
BY-MS.HORNER:
Q. I was just going to say: Is that a fair characterization of this paragraph?
A. I'm sorry. Which paragraph again?
Q. It's the second paragraph on page 7.
A. Does it start with "plaintiffs" or "as reviewed by"?



Q. "As reviewed by," the second full paragraph.
A. Full paragraph.
Q. And in the last sentence, you say: "Further, the recent studies -- and here you're indicating you're citing to your citations 20 to 23 -- "describing the more advanced views of the role of sex hormone-binding globulin and allowing access of sex hormones to target tissues are only beginning to be appreciated."
Did I read that right?
A. Correct.
Q. Are you saying here that levonorgestrel that's bound to sex hormone-binding globulin is hormonally active?
A. It could be.
Q. It could be. Okay. Would you say that that is a plausible contention?
MS. MANGRUM: Object to form.
A. These references are highly credible.
BY-MS.HORNER:
Q. Okay. So would you agree that your contentions here are plausible?

Page 74

A. Yes.
Q. Okay. And how is this mechanism of -- that's described in these articles, how is it supposed to work?
MS. MANGRUM: Object to form.
A. How do these mechanisms work?
BY-MS.HORNER:
Q. You cite to -- we can turn to the references -- numbers 20 to 23 for the idea that bound LNG is still hormonally active. By what mechanism would that work? And you cite to these references, so I assume you're relying on their findings.
A. Okay. If you look at the title of reference 20 -- although, I would need the article to give you more details -- but the title sort of says it all, that it mediates the activity of the sex hormone by its interaction at the plasma membrane.
Q. So getting a little deeper into that, what does that mean, "by the interaction of the plasma membrane"? Is there a receptor at the plasma membrane for sex hormone-binding globulin?

Page 75

A. There's a mechanism by which the steroid bound to the SHBG can do as it says here, trigger signal transduction. It's a common phenomenon in pharmacology.
Q. Okay. But it's a fairly new idea, right, that sex hormone-binding globulin can have these effects; correct?
MS. MANGRUM: Object to form.
A. Well, the publication was in 1999. It depends on your definition of new.
BY-MS.HORNER:
Q. Okay. And my understanding of the role that sex hormone-binding globulin plays in this proposed mechanism is that a bound hormone may still activate a receptor for sex hormone-binding globulin because it's bound to the sex hormone-binding globulin. Is that a correct assessment?
A. That's fairly good.
Q. Okay. Good. Glad to hear it. Isn't it true that Dr. Rosner only speculates that this may be one possibility, among many, as to how the mechanism could work?
MS. MANGRUM: Object to form.

Page 76

A. I would have to look back into the article to see if he used those words.
(Whereupon, the following was marked for purposes of identification: Exhibit-5 Interactions of sex hormone-binding globulin with target cells by Rosner.)
BY-MS.HORNER:
Q. Okay. Let's actually pull that out. So I've got here -- I'm marking as Exhibit-5 to your deposition. So this would be the article that you're citing as number 20 in your references list; correct? No, I'm sorry. Number 21.
A. Yeah, you now have 21. This is 21.
Q. Okay. And if we turn to page, I think 83, and look at section five, conclusions and open questions, in the second to last paragraph, it says -- and I'll quote it -- "SHBG exists intracellularly. Does it get there by local synthesis? By uptake via the receptor for sex hormone-binding globulin? By both? Does plasma sex hormone-binding globulin assist to serve in transporting steroids into the cell? Or is it plasma sex

Page 77

hormone-binding globulin that is internalized and is simply on its way to the metabolic trash bin? Does the use of locally synthesized sex hormone-binding globulin differ from that of plasma borne sex hormone-binding globulin? Might it serve, for instance, to sequester steroids within the cell, thus preventing their access to nuclear steroid receptors, and in turn, hindering steroid effects? Alternatively does locally synthesized and secreted sex hormone-binding globulin play an autocrine/paracrine role vis-à-vis the receptor for sex hormone-binding globulin? Certainly both of these scenarios are possible." Did I read that correctly?
A. Correct.
Q. Okay. Wouldn't all of those questions suggest that really nobody knows exactly how this mechanism is working?
MS. MANGRUM: Object to form.
A. I noticed you didn't support the speculative word that you used before, but what he's doing is providing a rational scientific discussion about the observations

that he's made.
BY-MS.HORNER:
Q. Okay. And if we turn to page 80 of this article, looking at, it looks like it's a really long paragraph, the first one, and the last sentence of that starting with "a mechanism for how it," do you see that?
A. Page 80? Oh, I'm on 82.
Q. Yes. Okay. And it says, "a mechanism for how it got there," meaning, I believe the --
(Whereupon, sotto voce discussion off record.)
BY-MS.HORNER:
Q. Okay. He says a mechanism for how it got there, and by that means -- he means the sex hormone-binding globulin in the cell. "A mechanism for how it got there was provided by the observations leading to the conclusion that megalin was the sex hormone-binding globulin receptor." This is from Hammes 2005, which you've also cited in your report; correct?
MS. MANGRUM: I object to form.



A. Again, I'm not clear where you're reading again. Page 80, but what part?
BY-MS.HORNER:
Q. Oh, I'm sorry. Page 80. And you see the paragraph that begins in the lower left-hand corner?
A. Oh, there it is. Okay.
Q. Okay. It starts with "a mechanism for how it."
A. Okay.
Q. Okay. So I'm just going to read this first part until we get to this Hammes citation right here. So, "a mechanism for how it got there was provided by the observations leading to the conclusion that megalin was the sex hormone-binding globulin receptor," and citing Hammes 2005 for that. Did I read that correctly?
A. Okay. Yes.
Q. Okay. And you also cite Hammes 2005; is that right?
A. It's -- yes.
Q. Number 22 in your report. After the semicolon it says, "this conclusion has been



questioned, Rosner in 2006, Willnow and Nykjaer, 2006." Did I read that correctly?
A. Okay.
Q. And you do not cite those two, I don't believe?
MS. MANGRUM: Object to form.
BY-MS.HORNER:
Q. You don't cite those two articles, Rosner 2006 and Willnow 2006?
A. No, I couldn't cite everything possible.
Q. Okay. And then the paragraph continues, "and (to our knowledge), no further data have appeared to either substantiate or refute the original observations." Did I read that right?
A. You're reading it correctly.
Q. Okay. Isn't it true that adult mice do not have serum sex hormone-binding globulin?
MS. MANGRUM: Object to form.
BY-MS.HORNER:
Q. I'm sorry. Plasma sex hormone-binding globulin?



A. I'm not sure about that.
Q. Okay. So you wouldn't know one way or the other if the results regarding megalin and mice that were found by Hammes in 2005 actually would translate into humans who do have sex hormone-binding globulin?
MS. MANGRUM: I object to form.
A. He's criticizing a specific set of data from an article in the literature, but the whole entire article deals with much more information than that one study.
BY-MS.HORNER:
Q. Okay. But you haven't cited to any of the criticisms in your report; have you?
MS. MANGRUM: Object to form.
A. My statements were of a general nature.
BY-MS.HORNER:
Q. Okay. Is it fair to say that this mechanism is subject of debate in the scientific community?
MS. MANGRUM: Object to form.
A. It's a mechanism with considerable credibility based on the reputations of the

authors of these studies.
MS. HORNER: All right. I'm going to enter Exhibit Number-6 to your deposition.
(Whereupon, the following was marked for purposes of identification: Exhibit-6, Sex Steroids and the Free Hormone Hypothesis.)
BY-MS.HORNER:
Q. And I believe this is a report -- okay, a reply to the 2006 article you -- okay. This is a reply to the Hammes article from 2005 that you cite as reference number 22 in your report. Have you ever seen this document before, Doctor?
A. I probably have.
Q. Okay. I'd like to point you in particular to the second page, the last -- appears to be the last sentence of this reply. It starts with thus. Do you see that?
A. Okay.
Q. It says, "Thus, the conclusion by Hammes, et al. that there is a megalin-mediated endocytic pathway for the



uptake of androgens and estrogens bound to their sex hormone-binding globulin proteins does not seem to be sufficiently supported by the evidence presented." Did I read that right?
A. That's what he's stating.
Q. Okay. And this is Dr. Rosner that wrote this reply; correct?
A. Yes. Again, he's addressing certain experimental data, not necessarily the entire conceptual area.
Q. Okay. So, but he is saying that there's -- the evidence presented by Hammes does not sufficiently support the contention that androgens and estrogens bound to SHBG would be taken up by this megalin-mediated pathway?
MS. MANGRUM: Object to form.
A. Well, the title of the Hammes article, it says "role of endocytosis," and that's an extremely common phenomenon for all sorts of proteins getting into cells.
BY-MS.HORNER:
Q. Okay. So it's a general principle



that he's trying to get at?
A. That who's trying to get at?
Q. I'm sorry. That Dr. Hammes is trying to get at.
MS. MANGRUM: Object to form.
A. He's speaking to the issue of endocytosis, yes.
BY-MS.HORNER:
Q. Okay. Do you know if any studies have been done on human tissues to see if sex hormone-binding hormone has these effects?
MS. MANGRUM: Object to form.
A. Many of these kinds of studies are not possible to carry out in human tissues.
BY-MS.HORNER:
Q. Okay. So we don't know if the same types of activities would occur in human tissues then?
MS. MANGRUM: Object to form.
A. Typically studies in animal systems are indicative of similar physiology in humans, but not always.
BY-MS.HORNER:
Q. Right. Because mice do not have



serum sex hormone-binding globulin; correct?
A. But many species do.
Q. But not mice?
A. I'm not sure about mice, but --
Q. Or rats? Okay. So this hypothesis that you're relying on for the proposition that levonorgestrel that's bound to sex hormone-binding globulin, that it's still hormonally active, is that -- that's fair to say that you're supporting that idea; correct?
MS. MANGRUM: Object to form.
A. I'm basically posing these articles as indicative of the fact that there's great complexity in understanding the role of sex hormone-binding globulin with the number of possibilities.
BY-MS.HORNER:
Q. Okay. So is it fair to say then that you don't know if levonorgestrel, when it is bound, is still hormonally active?
MS. MANGRUM: Object to form.
A. Well, it can be answered with -- I can't understand to your question with a

simple yes-or-no answer.
BY-MS.HORNER:
Q. Then don't. Go ahead. How would you respond to that contention?
A. Okay. Any compounds bound to proteins can be released from the proteins, and on release, they become active.
Q. Okay. So that would be the -- I think you call it the free-something hypothesis in your report. Is that right?
MS. MANGRUM: Object to form.
A. That's partly related to the free hormone hypothesis.
BY-MS.HORNER:
Q. Free hormone hypothesis. Okay. So you're not denying that the free, meaning unbound to whatever the carrier protein is, fraction of a hormone is the active part of what is in blood serum; is that right?
MS. MANGRUM: Object to form.
A. The free drug in the serum is part of what's active.
BY-MS.HORNER:
Q. So the part that is bound to sex



hormone-binding globulin in the case of levonorgestrel, which we would say is not free, are you contending that it is hormonally active or that it's not?
A. I'm saying it could be, yes.
Q. It could be, but you don't know for sure?
A. No. The scientific evidence indicates that it likely is.
Q. That it likely is. But you're basing that on mice studies; correct?
MS. MANGRUM: Object to form.
A. No. These articles have a variety of experimental approaches.
BY-MS.HORNER:
Q. Okay. But the model used to actually obtain the experimental data is in mice; right?
A. Some of the data came from mice, but there's a variety of other experimental evidence.
Q. Okay. But nevertheless, this is a hypothesis that hasn't been fully proven; correct?



MS. MANGRUM: Object to form.
A. Which hypothesis are you talking about?
BY-MS.HORNER:
Q. The idea that bound hormones may be active.
A. It's an idea that has considerable support in the pharmacology literature.
Q. Okay. But you're only citing to Dr. Rosner. And Dr. Rosner criticizes Dr. Hammes. And then you're also citing to Dr. Willnow, who is Hammes' co-author?
(Whereupon, reporter clarification.)
A. Not in reference 23.
BY-MS.HORNER:
Q. So you don't know if Dr. Willnow was a co-author on reference number 22?
A. Well, the article -- you probably have the article, so we could look at the list of authors.
Q. I don't have it right now. I think we'll get it printed, though, and we can show that to you.
All right. Okay. Let's move on



just a little bit. You spent some time talking about the pharmacokinetics of levonorgestrel and obesity. From your report -- and if I'm missing anything, please let me know -- my takeaways were that obesity affects pharmacokinetics of levonorgestrel by creating higher serum estrogen, lower progesterone, decreased luteinizing hormone and altered rhythmic patterns of estrogen, progesterone and luteinizing hormone during the menstrual cycle. Is that correct?
A. So what paragraph are you in?
Q. I'll have to dig it back up. Okay. So this would be on page 4. It's the paragraph before paragraph 15. This one isn't numbered, but it's in the first sentence. What other ways are you saying that obesity affects the pharmacokinetics of levonorgestrel?
A. Obesity produces a change in sex hormone-binding globulin, is one.
Q. Okay.
A. But in general, obesity produces a variety of metabolic changes and probably is

increasing the rate of metabolism of the drug.
Q. You think it increases metabolism?
A. Yes.
Q. All right. Would you say that there's anything additional you would add?
MS. MANGRUM: Object to form.
A. That's very broad.
BY-MS.HORNER:
Q. I'm sorry. With respect to how obesity can affect the pharmacokinetics of levonorgestrel, would you add anything else?
A. Perhaps, yes.
Q. Okay. What else would you add?
A. Obesity creates a constellation of physiological changes and maybe different things could be happening in obesity.
Q. Okay. Okay. How would the constellation of physiological changes relate to the pharmacokinetics of levonorgestrel?
A. Okay. People who are obese, their livers get bigger and that can change handling of drugs. People who are obese typically have somewhat greater renal function



than thin people, which would also affect the pharmacokinetics of drugs. The extra fat tissue could play a role.
Q. All right. Anything else?
A. There are just so many things that happen during obesity, that it could be a long list, but I've given you major ones.
Q. Those are the major ones that you would rely on for your opinions?
A. Depends on the question being posed.
Q. Okay. So my question is: What ways can obesity affect the pharmacokinetics of levonorgestrel? And I kind of need a firm answer on that, because if I don't know what your opinion is, then I won't know what to expect when you testify. So what are all of the different ways? So we've talked about, like you had in your report, higher serum estrogen, lower progesterone, decreased luteinizing hormone, altered rhythmic patterns of estrogen, progesterone and luteinizing hormone during the menstrual cycle. You talked about changes in sex hormone-binding globulin, a variety of metabolic changes,



increases in metabolism, a constellation of physiological changes, including a bigger liver, greater renal function and fat tissue, and that might somehow affect. Is there anything else that you would add?
A. Okay. If a drug was given orally, there could be a change in drug absorption. If a drug was given by some other route of administration, the extra fat tissue could play a role in absorption of the drug.
Besides those sex hormones that were mentioned, there could be other hormonal changes in general. I believe there's a change in cortisol, possibly thyroid hormones. So we have many hormones that control body functions. Those could be different. Some people who are obese would have, let's say, psychological reasons that could then affect handling of drugs by the body.
Q. Anything else?
A. I've given you quite a list, but I imagine there could be some more, but I just can't think of them currently.
Q. Okay. Do you have any reason to



think you might think of them later?
A. It's always possible.
Q. Okay. Well, if you do think of any more, please let us know as soon as possible. So I've got the full list, as I know it, higher --
(Whereupon, reporter clarification.)
BY-MS.HORNER:
Q. Strike that.
All right. The list that I have of ways that obesity can affect the pharmacokinetics of levonorgestrel, according to you, Dr. Jusko, are that it causes higher serum estrogen, lower progesterone, decreased luteinizing hormone, altered rhythmic patterns of estrogen, progesterone and luteinizing hormone during the menstrual cycle, changes in sex hormone-binding globulin, a variety of metabolic changes, increased metabolism, a constellation of physiological changes, including a bigger liver, greater renal function, fat tissue which somehow affects absorption, I think; with respect to oral dosing, changes in drug absorption; with

Page 94

respect to other routes of dosing, extra fat tissue and changes in absorption. There are other hormonal changes that could occur, some of which may be thyroid hormone changes. Some women who are obese might also have psychological reasons for handling drugs differently. Is that right?

MS. MANGRUM: Object to form.

A. You've well-captured the list that I gave. I just thought of one more.

BY-MS.HORNER:

Q. Okay. What's the next one?

A. Most people think obesity is caused by too much food or too little exercise, but there's a long list of genetic reasons for people being obese, and there could be comorbidity with those genetic factors as well.

Q. Okay. So a link between an obesity gene and the handling of levonorgestrel in the body?

A. Handling of any drug in the body.

Q. Okay. Anything else you can think of?

Page 95

A. Sounds like a nice list to me, but --

Q. Okay. And when you say -- I've just got to get some clarification on some of these. When you say changes in sex hormone-binding globulin, what kind of changes do you mean specifically?

A. There's a modest decrease in SHBG concentrations in obese women.

Q. All right. And with respect to a variety of metabolic changes, what do you mean there?

A. That's sort of broad. That -- well, one particular element is that obesity is sometimes called metabolic syndrome. Metabolic syndrome is a predecessor to diabetes. There's all sorts of changes in pharmacokinetics in diabetes. So obesity could be coupled to diabetes, and together they could change pharmacokinetics.

Q. Okay. Any other metabolic changes that you meant by a variety of metabolic changes?

A. There may be others. I can't think

Page 96

of them now.

Q. Okay. So the liver gets bigger. Does that mean that more drug is cleared or less drug is cleared?

A. Both can happen.

Q. Both can happen. So we don't know which way that one kind of falls?

A. Each drug must be studied individually.

Q. And by that, you mean in order to know what the effects on obese women might be with levonorgestrel, the drug has to be studied in obese women; right?

MS. MANGRUM: Object to form.

A. Correct.

BY-MS.HORNER:

Q. You said that fat tissue could have an affect somehow, and later you said that with non-oral routes of administration it could have something to do with absorption. Are there any other ways that fat tissue could affect the pharmacokinetics of levonorgestrel?

A. Fat tissue contains many genes and

Page 97

many drug-metabolizing enzymes and many hormone-metabolizing enzymes, so that tissue is metabolically active.

Q. Okay. So when you say it could be affecting the pharmacokinetics of levonorgestrel, do we know how it could be affecting the pharmacokinetics?

MS. MANGRUM: Object to form.

A. It produces lower plasma concentrations.

BY-MS.HORNER:

Q. But do you know what the mechanism might be for how fat tissue itself would produce lower concentrations?

A. We see lower plasma concentrations of levonorgestrel in obese women, but it could be due to the liver or to the fat tissue metabolizing the drug.

Q. Okay. So we're not sure which one it is?

A. Correct.

Q. It could be both?

A. Yes.

Q. But there's no clear scientific

evidence to point us in one direction or the other?
MS. MANGRUM: Object to form.
A. We know for lots of drugs that it's because the liver metabolizes differently in obese women. So based on that precedence, we expect it to be happening in the liver, but the fat tissue is also a possibility.
BY-MS.HORNER:
Q. When you say there are other hormonal changes, including changes in thyroid hormones, is there anything specific that you would point to as far as hormonal changes?
A. I haven't looked at all of the biochemical changes in obesity, so I can't say that there couldn't be a few to many more.
Q. Okay. And with respect to thyroid hormone changes, what would those changes be?
A. The thyroid is considered the gas pedal of the body. People with low thyroid concentrations metabolize drugs slower. People with high thyroid concentrations metabolize drugs faster.



Q. Okay. So obese women generally have lower thyroid hormone concentrations or higher?
A. I'm not clear on if they even do. I just brought it up as a possibility. I wouldn't be surprised that it's different, but I'm not sure.
Q. Okay. And when you said some who are obese might have psychological reasons for handling drugs differently, what did you mean by that exactly?
A. I'm kind of bringing up maybe they don't take drugs -- maybe they take drugs differently, maybe they're less reliable, maybe they're more reliable, but it's probably not a pharmacokinetic reason. It's more a compliance issue.
Q. Okay. So you're talking about compliance. Oh, it looks like we need to take a quick break, so he can change the tape.
MS. HORNER: Yeah, I think he finished his -- did you finish your answer, sir?



THE WITNESS: Yes.
THE VIDEOGRAPHER: Now we're going off record at 11:32 a.m.
(Whereupon, recess taken.)
(Whereupon, the following was marked for purposes of identification: Exhibit-7, Role of Endocytosis in Cellular Uptake of Sex Steroids by Hammes.)
THE VIDEOGRAPHER: Okay. Now continuing the testimony of William Jusko. This is disc number two, and we're back on record at 11:41 a.m.
BY-MS.HORNER:
Q. Okay. Dr. Jusko, welcome back. First of all, I promised you this Hammes article so you could see that Dr. Willnow was a co-author of it. So I'll give that to you.
MS. MANGRUM: I'll object to form.
BY-MS.HORNER:
Q. Okay. So is what I've handed you marked as Exhibit Number-7, the reference that you cite in your report for Dr. Willnow at number 23.



A. I'm sorry. Are you waiting for me?
Q. Yeah, I just wanted to verify that that is citation number 23 to your report, the article by Dr. Willnow -- I'm sorry. The article by Dr. Hammes. Excuse me.
A. Yes, it is.
Q. Okay. And as you can see, Dr. Willnow is a co-author. He's the last named co-author on this article; correct?
A. Yes.
Q. Okay. Now, my understanding is you did some Googling over the break. So I'd like to ask you what you discovered?
A. Okay. You asked me about thyroid hormones during -- in obese people. I found indication that obesity is often accompanied by hypothyroidism, poor thyroid function.
Q. Okay. So in that scenario, drug metabolism would be slower than normal; right?
A. Hypothyroidism itself causes slower drug metabolism.
Q. Okay. And hypothyroidism is caused by or is a cause of obesity?

MS. MANGRUM: Object to form.
A. I don't -- don't know that one can say cause. I would just say associated.
BY-MS.HORNER:
Q. Associated. So we don't know which one causes the other or if they even have a causal relationship then?
A. I would guess not.
Q. Okay. All right. I think when we left, we were talking about psychological reasons why women who are obese may have different metabolism of drugs. And you indicated that the reason for differences may be compliance issues among obese women; is that correct?
MS. MANGRUM: Object to form.
A. My statement there is rather unclear. You know, basically compliance is not pharmacokinetics or drug metabolism, but it was just an associated factor.
BY-MS.HORNER:
Q. Okay. And if -- would it be fair to paraphrase that as obese women are less likely to take their medications as directed?



A. It's more complex than that.
Q. Okay. So what's the basis of your contention then?
MS. MANGRUM: Object to form. Go ahead.
A. I guess --
MS. MANGRUM: You can answer.
A. Okay. I probably would be better to state that obesity, because of all the associated changes, obese women may be taking other drugs and have different kinds of drug interactions. Just the whole scenario for obesity is different than normal.
BY-MS.HORNER:
Q. Okay. And so with respect to compliance issues, what's the basis of your opinion?
A. I'm not sure I know of compliance issues in obesity for sure. I probably should not have said that.
Q. Do most obese women develop pseudotumor cerebri?
MS. MANGRUM: Objection.
A. Do most?



BY-MS.HORNER:
Q. Yes, that's my question.
A. My understanding is that there's a small incidence of it in anyone.
Q. And do most levonorgestrel users develop pseudotumor cerebri?
A. Probably not.
Q. Okay. So we're not talking about the typical patient in this litigation; are we?
MS. MANGRUM: Object to form.
A. I'm sorry. What again?
BY-MS.HORNER:
Q. Well, given that pseudotumor cerebri is rare among obese women and rare among users of levonorgestrel, isn't it true that the patients in this litigation are not typical patients?
MS. MANGRUM: Objection.
A. I'm not an epidemiologist and I don't know all the exact statistics, but my understanding is that it -- IIH occurs at a far incidence in obese women in compared to non-obese women.



BY-MS.HORNER:
Q. Sure. But do you know what the incidence -- or the prevalence of obesity is in the United States today among women of childbearing age?
A. Yes.
Q. What is it?
A. About 30 percent.
Q. Okay. So pseudotumor cerebri doesn't occur in 30 percent of women, though; right?
A. Correct.
Q. And according to the Rai abstract, there's an increased incidence of pseudotumor cerebri with levonorgestrel IUDs; correct?
MS. MANGRUM: Objection.
A. What abstract?
BY-MS.HORNER:
Q. The -- I call it the Rai abstract. It's the abstract showing a 7.7 times increased risk of pseudotumor cerebri with use of an LNG IUS. Are you familiar with that abstract?
MS. MANGRUM: Objection. Form.
A. I don't think I cited it.

BY-MS.HORNER:
Q. I believe it is in your reliance list.
A. Oh, I think it was someone else's. Okay.
Q. Okay. Are you familiar with that statistic generally?
A. No.
Q. No, you've never heard that statistic before?
A. I'd like to see the abstract, see what you're talking about.
Q. All right. But even assuming that's true -- or let's leave that aside -- pseudotumor cerebri would be rare even among users of levonorgestrel; right?
MS. MANGRUM: Objection.
A. It's a certain incidence of women and a certain many women take levonorgestrel, especially oral contraceptive users.
BY-MS.HORNER:
Q. So I guess what I'm trying to get at here is whether or not you would agree with me that women who develop pseudotumor



cerebri while using levonorgestrel, even if they're obese, are outliers. Would you agree with that?
MS. MANGRUM: Object to form.
A. Would you -- how would you define outliers?
BY-MS.HORNER:
Q. Well, how would you define it? You're a pharmacologist. You probably have a better definition than me anyway.
A. Someone -- someone or something beyond the normal -- well beyond the normal range of observations.
Q. Okay. And that would actually fit this condition because we don't even expect to see cases of pseudotumor cerebri in, say, clinical trials; right?
MS. MANGRUM: Object to form.
A. I'm not an epidemiologist. You're asking questions that I don't feel I have expertise to answer.
BY-MS.HORNER:
Q. All right. Fair enough. You do know that there are thin women who develop



pseudotumor cerebri; right?
A. I don't know that.
MS. MANGRUM: Object to form.
BY-MS.HORNER:
Q. You didn't know that? In fact --
MS. MANGRUM: He didn't say I didn't know that. He said I don't know that.
MS. HORNER: Okay. Well --
MS. MANGRUM: Meaning, what you were referring to, just for the record. So, sorry. Go ahead with your next question.
BY-MS.HORNER:
Q. Okay. Well, then let's clarify. Did or did you not know that there are thin women who develop pseudotumor cerebri?
A. I know there's a certain incidence in all women, but it must be some of them are thin.
Q. Okay. And several of the women in this litigation actually had normal BMI when they developed pseudotumor cerebri while on Mirena. Did you know that?
MS. MANGRUM: Objection.
A. I don't know anything about the



women in this case.
BY-MS.HORNER:
Q. Okay. Doctor, if we could turn to page 14 of your report. You say in paragraph number -- oh, I'm sorry. It's paragraph 14, not page 14. I apologize. So we have to dig and find it.
MS. MANGRUM: That's on page 4.
MS. HORNER: Page 4. Thank you.
THE WITNESS: Four.
BY-MS.HORNER:
Q. Okay. So here you say, it can be noted -- I'm sorry. It's actually in the third paragraph underneath number 14. I apologize. The last sentence says, "It can be noted that some, but not all epidemiological studies, have indicated that increased weight may be associated with increased risk of oral contraceptive failure." Did I read that correctly?
A. Correct.
Q. Okay. And you actually cite three different studies here; they're going to be the Holt 2005 study, the Brunner 2006 study,

Page 110

and the McNicholas 2013 studies to support your statement. And these are references nine through -- nine through eleven. Is that right?

A. I cited references nine, ten, and eleven.

Q. Okay. And those are the Holt, Brunner and McNicholas studies; right?

A. Yes.

Q. The newest of those three, the McNicholas study concluded that overweight and obese females do not appear to be at increased risk for contraceptive failure when using the contraceptive pill, patch or vaginal ring. Does that ring a bell?

MS. MANGRUM: I object to form.

A. I'd like to see the article.

BY-MS.HORNER:

Q. I don't have it here, so --

A. Okay.

Q. But do you remember that being the finding of the --

A. It sounds familiar.

Q. Okay. Were you aware, Doctor, that

Page 111

the McNicholas study also had the highest number of enrolled patients?

MS. MANGRUM: Object to form.

A. No, I don't know that detail.

BY-MS.HORNER:

Q. Okay. In fact, the McNicholas study had 7,486 patients in the study compared to 248 in the Holt study and 205 in the Brunner study. Did you know that?

MS. MANGRUM: I object to form. If you're going to ask him those specifics, I'd appreciate you handing him the article or getting it printed. Unless you have memorized the numbers, you can answer, Doctor.

A. I don't know those numbers.

BY-MS.HORNER:

Q. Okay. So, in other words, the largest study also found that there was no difference?

MS. MANGRUM: Object to form.

BY-MS.HORNER:

Q. Are larger studies generally more reliable than smaller studies?

Page 112

MS. MANGRUM: Object to form.

A. One would have to be careful to assess the methodology, the clinical approach, and part of this is epidemiology where one might -- I don't have the expertise there.

BY-MS.HORNER:

Q. Okay. So -- but you cited all three studies. So you consider them to be authoritative; right?

A. I -- yes.

Q. Okay. On page 1 of your report, Doctor, one of your statements is -- let me find where it is. Okay. If we're looking at the third from the bottom bullet point, the second sentence, it starts by saying, "Any comparison of LNG exposures between products should look at average values, not extreme values." Did I read that correctly?

A. That's correct.

Q. Okay. And at about page 15 of your report, and just generally, you criticize Dr. Maggio for discussing ranges of values and emphasizing higher values of plasma LNG concentration. Is that a fair paraphrasing

Page 113

of what you have at page 15?

A. Yes.

MS. HORNER: And I've got Dr. Maggio's report here. So we can just go ahead and mark that, I guess. We'll mark this as Exhibit Number-8.

(Whereupon, the following was marked for purposes of identification: Exhibit-8, University of Cincinnati Medical Center January 22, 2016 report of John E. Maggio, Ph.D.)

BY-MS.HORNER:

Q. And you've read this before; right?

A. Yes.

Q. Okay. If we turn to page 30 to 31 of his report, he lists here some figures stating that -- it talks about subjects in the study A46796. Okay. I think actually the page citation is really 29 to 30, not 30 to 31. Yes, so he starts with, "consider study A46796." Do you see that in the bottom paragraph on 29?

A. Yes.

Q. Okay. And according to Dr. Maggio,

Page 114

this study showed that 17 -- 16.7 percent of Mirena subjects in the study had higher plasma LNG concentrations than the corresponding average concentrations in Norplant users. Is that a fair summary of Dr. Maggio's contentions here?
MS. MANGRUM: Object to form.
A. That appears to be what he's stating.
BY-MS.HORNER:
Q. Okay. And you suggest on page number 15 of your report that comparing the highest 16.7 percent of Mirena subjects with the higher 2.7 percent of Norplant subjects, would be actually more fair than what Dr. Maggio has done here; is that also fair?
A. Correct.
Q. Okay. You take issue with the idea of putting a pseudotumor cerebri warning on the Mirena label. Is that also your position?
MS. MANGRUM: Objection.
A. Am I stating that in my report?
BY-MS.HORNER:

Page 115

Q. Well, I believe you have a whole section on labeling considerations. So is it not your position that the Mirena label does not need to be changed to include a pseudotumor cerebri warning?
MS. MANGRUM: Object to form.
A. I was concerned how you were quoting me. So that's what my point is here.
BY-MS.HORNER:
Q. Oh, okay. Well, I guess maybe instead of quoting you, let me just ask you if you agree that the Mirena label should be changed to include a pseudotumor cerebri warning?
MS. MANGRUM: Object.
A. I'm not a labelling expert, although I know a lot about the labeling section for pharmacokinetics and drug metabolism. The considerations that go into those warnings are the purview of the company and the FDA.
BY-MS.HORNER:
Q. Okay. You are contending, though, that based on average serum levels, that Mirena does have a low and steady

Page 116

administration of levonorgestrel for women; correct?
A. Yes.

BY-MS.HORNER:
Q. Okay. Liver enzyme CYP2D6 is a drug-metabolizing enzyme; is that right?
A. Yes.
Q. Okay. And it metabolizes neurosteroids and hydroxytryptamines, like serotonin; is that right?
A. I'm not sure about the first, but I think the second is correct.
Q. Okay. Are you aware that about 7 percent of Caucasians and 1 percent of Asians have a gene that makes them poor CYP2D6 metabolizers?
A. I'm not sure of those exact percentages, but in general, yes.
MS. HORNER: Let me show you something. All right. I'm going to mark this as Exhibit Number-9 to your deposition.
(Whereupon, the following was marked for purposes of identification: Exhibit-9,

Page 117

Adverse Drug Reactions and Interactions: Mechanisms, Risk Factors, Detection, Management and Prevention.)
BY-MS.HORNER:
Q. Doctor, I just handed you Exhibit Number-9 which is a book chapter entitled, "Adverse Drug Reactions and Interactions: Mechanisms, risk factors, detection, management and prevention," authored by -- excuse me -- P.A. Routledge. And looking at the bottom, it comes from Stephens' Detection of New Adverse Drug Reactions, Fifth Edition. Did I read that correctly?
A. Yes.
Q. Okay. I'd like, if you would, for you to turn to page 98 of this chapter. And here it says CYP2D6, which is the liver enzyme that we were discussing; correct?
A. Correct.
Q. If you look at the third sentence, which starts with, "this phenotype occurs," do you see that?
A. Okay.
Q. "This phenotype occurs in about 7

percent of Caucasians and up to 20 percent of Ethiopians, but has a lower prevalence in other racial types, for example, 1 percent in Oriental populations." Did I read that correctly?
A. Yes.
Q. Okay. So we do know that, somewhat rarely or uncommonly, there are people who are poor CYP2D6 metabolizers; right?
A. Correct.
Q. Okay. So people who were poor metabolizes for that enzyme, they would have higher levels of drugs that are metabolized by that enzyme; correct?
A. Given similar doses, yes.
Q. Okay. And with some drugs, the levels could be many times higher; is that right?
MS. MANGRUM: Object to form.
A. With the drugs metabolized principally by that metabolic pathway, yes.
BY-MS.HORNER:
Q. Okay. Have you ever heard of a drug called phenformin?



A. Yes.
Q. Okay. And are you aware that the drug was actually withdrawn because some poor CYP2D6 metabolizers had drug levels of more than 100 times the level an average person may have?
MS. MANGRUM: Objection.
A. I vaguely recall the withdrawal, but not those specifics.
MS. HORNER: Okay. Let me see if I can find the article. Okay. So I only have two copies of this, unfortunately.
(Whereupon, sotto voce discussion off the record.)
BY-MS.HORNER:
Q. All right. Okay. Are you -- are you aware that the risk with phenformin was development of lactic acidosis among the poor metabolizers?
MS. MANGRUM: Objection.
A. No. I'm not very familiar with that drug.
(Whereupon, the following was marked for purposes of identification: Exhibit-10,



Metformin-Associated Lactic Acidosis (MALA): Case Files of the Einstein Medical Center Medical Toxicology Fellowship by Kopec.)
MS. HORNER: Okay. All right. I'm going to hand you this exhibit, just so that you have something to go on. This is going to be Exhibit Number-10 to your deposition. And unfortunately, I've only got two copies. So I can show you what parts I'm going to point out, if you'd like.
MS. MANGRUM: I can sort of look over his shoulder.
MS. HORNER: Would that work? Okay. I really apologize.
MS. MANGRUM: I don't want to be in the film. So if you'll tell me.
BY-MS.HORNER:
Q. Okay. I just want to point out in the very -- actually, the second to last page, page 65. And just for the record, actually, this is an article entitled "Metformin-associated lactic acidosis (MALA): Case files of the Einstein Medical Center Medical Toxicology Fellowship." First author



is Kopec. And I read that correctly; didn't I, Doctor?
A. Yes.
Q. Okay. And if we turn to page 65 of this exhibit, I'd just like to point you to the last -- I'm sorry -- the second to last paragraph of the article that starts with "phenformin was the first biguanide." I may be pronouncing that incorrectly. Do you see that?
A. Yes.
Q. Okay. If we go down to the third sentence starting with in 1997, it says, "In 1977, phenformin was withdrawn from the market due to an elevated risk of lactic acidosis and associated mortality. Prior to withdrawal, the reported incidence of lactic acidosis was 40 to 64 cases per 100,000 person-years, a 10 to 20 percent higher incidence than metformin." Did I read that right?
A. Yes.
Q. Okay. So this drug was withdrawn then; you'd agree?

MS. MANGRUM: Object to form.
BY-MS.HORNER:
Q. Based on this article?
A. That's what it says here.
Q. Okay. So based on this information, I mean, isn't it fair to say that people who are at a higher risk of developing adverse events, like lactic acidosis secondary to using phenformin, that those people deserve a warning that something like this can happen to them?
MS. MANGRUM: Objection.
A. The warnings have to be decided by the FDA and the companies together. So it requires a consideration of the relevant body of information.
BY-MS.HORNER:
Q. Okay. But would you agree with me that consideration of uncommon events is actually very important when discussing adverse effects that can happen with drug use?
MS. MANGRUM: Objection.
A. Again, that gets into combination of



epidemiology and legalities regarding labeling that I'm not comfortable discussing.
BY-MS.HORNER:
Q. Okay. You agree that when looking at pharmacology, we're concerned with drug response curves; is that fair?
A. What was the last words? The drug response what?
Q. Drug response curves.
A. Curves.
MS. MANGRUM: Objection.

BY-MS.HORNER:
Q. Or drug response levels. I mean, isn't it important to know what the possible amount of exposure could be, because you tend to see more adverse effects with higher drug levels?
MS. MANGRUM: Objection.
A. In general, that's true, but needs to be assessed on a drug-by-drug basis.
BY-MS.HORNER:
Q. Okay. And in the case of pseudotumor cerebri -- and you know, I don't



know that it's your opinion that it does cause it, but assuming that it does -- we don't know what that level would be for causing it?
MS. MANGRUM: I'll object. Objection.
A. My understanding of IIH is that it's considered idiopathic. So there's no known cause.
BY-MS.HORNER:
Q. Well, are you aware that there's also a similar disease called secondary intracranial hypertension?
MS. MANGRUM: Objection.
A. Not really.
BY-MS.HORNER:
Q. You've never heard of that term before?
A. Not second, no -- well, I may have seen it, but it's not familiar to me.
Q. Are you aware that there are drugs which are considered to cause pseudotumor cerebri?
MS. MANGRUM: Objection.



A. Again, I thought it's considered idiopathic. So there's no known cause.
BY-MS.HORNER:
Q. Okay. So you weren't aware that vitamin A intoxication has been shown to cause pseudotumor cerebri?
MS. MANGRUM: Objection.
A. Again, my recollection is that, you know, there's no known cause.
BY-MS.HORNER:
Q. Even vitamin A intoxication?
A. I haven't -- well, again, I'm not a clinician. I'm not an epidemiologist. It's not my area of expertise, but I don't -- so I can't answer.
Q. Okay. And you weren't aware that tetracyclines are considered to be a secondary -- I'm sorry. Scratch that -- or strike that. You weren't aware that tetracyclines have a causal association with pseudotumor cerebri?
MS. MANGRUM: Objection.
A. It's kind of repetitive, but I believe there's no known cause.

Page 126

BY-MS.HORNER:
Q. Okay. So in your understanding, no drug causes pseudotumor cerebri?
MS. MANGRUM: Objection.
A. It's not known why it happens. So there's no cause known.
BY-MS.HORNER:
Q. Okay. Getting back kind of to one of my other points. You did agree with me that, generally, higher drug concentrations are a concern, because it's more likely that there will be adverse effects?
MS. MANGRUM: Objection.
BY-MS.HORNER:
Q. Is that a fair summary of what you said earlier?
A. It's a general expectation that needs to be evaluated on a drug-by-drug basis.
Q. Okay. And you'd agree with me, wouldn't you, that there can be people who, for whatever reason, develop high levels of drug that may be in a minority, but nevertheless, may take a drug; right?
MS. MANGRUM: Objection.

Page 127

A. It's -- that's kind of vague. Could you say it again? I'm sorry.
BY-MS.HORNER:
Q. Okay. When a drug is on the market, it's available to everyone; right?
MS. MANGRUM: Objection.
BY-MS.HORNER:
Q. With a prescription, say, or over-the-counter; right?
A. Yes.
Q. Okay. And some portion of those people may be, say, slow metabolizers; correct?
A. No.
Q. They may not be?
A. Depends on the metabolic pathway.
Q. Okay. So, for example, with phenformin, we know that that there is a liver enzyme deficiency that can occur, which would cause about 7 percent of Caucasians and 1 percent of Asians to develop high levels of phenformin; correct?
MS. MANGRUM: Objection.
A. I wasn't clear that phenformin has

Page 128

this genetic group for metabolic deficiency. So it's not a drug I'm really careful with -- look at this literature more carefully.
BY-MS.HORNER:
Q. Okay. Just thinking about hypothetically then, if we're looking at, say, a drug like phenformin --
MS. MANGRUM: Okay. Wait just a minute, because I think he's reading the article that you were asking about.
BY-MS.HORNER:
Q. Oh, I'm sorry. Go ahead.
A. Okay. So rereading this, it says phenformin is metabolized by 2D6. So, okay. It is. It may be connected to what you were -- to slower metabolism in some people.
Q. Okay. Isn't it true that we need to be concerned about people who say it may be a minority, but who will have high drug concentrations, say, for example, like the poor CYP2D6 metabolizers users using phenformin?
MS. MANGRUM: Objection.
A. Establishing the metabolic pathways of

Page 129

drug metabolism is something that is commonly done for most drugs.
BY-MS.HORNER:
Q. Right. But don't we need to be looking at, say, the higher standard deviations of drug exposure and be concerned about those patients because they're more likely to suffer adverse effects?
MS. MANGRUM: Objection.
A. Again, that's kind of vague. It's repeating that with some drugs high concentrations may produce more side effects.
BY-MS.HORNER:
Q. Do you agree that it's important to warn people like poor CYP2D6 metabolizers that drugs that are metabolized on that pathway, such as phenformin, could have severe adverse effects for them?
MS. MANGRUM: Objection.
A. If that's been studied, if it's been established, then that would be true.
BY-MS.HORNER:
Q. And would that be true even though the effects are very rare and unlikely to

Page 130

happen in the average patient?
MS. MANGRUM: Objection.
A. Again, it's an epidemiological question about what is rare and what's associated with the drug.
BY-MS.HORNER:
Q. Okay. But assuming that it is rare and unlikely to happen in the average patient, we still would want to warn about the possibility of lactic acidosis and death with phenformin; right?
MS. MANGRUM: Objection.
A. That's an old drug with all that's happened in the past in history now. So there's no sense in me speculating about phenformin.
BY-MS.HORNER:
Q. Okay. But I'm just talking generally. It's not really speculating. I'm just asking if you agree with the principle that when you have a severe adverse effect that may be rare, we should still warn about it?
MS. MANGRUM: Objection.

Page 131

A. Well, it's largely a matter of the validity of the information and the joint consideration of a company and the FDA on what's appropriate to be warned about.
BY-MS.HORNER:
Q. Okay. Well, let's assume that -- that we have certain proof that this drug causes the condition, but rarely. And this is just hypothetical. And the FDA has said yes, if you, you know, a label has been proposed and the FDA says it's okay, would you agree that that's the right thing to do, to warn about that rare but serious adverse effect?
MS. MANGRUM: Objection.
A. If that had been the FDA's decision, I would respect that.
BY-MS.HORNER:
Q. Okay. But you don't know whether it would be the right thing to do or not?
MS. MANGRUM: Objection.
A. Every drug, every situation, there's -- all drugs have a certain risk of something happening and drug therapy is a

Page 132

risk versus benefit situation.
BY-MS.HORNER:
Q. Right. And we don't know who the, for example, the poor CYP2D6 metabolizers are; do we?
A. Sure, we do.
Q. We do know who they are?
A. Yes.
Q. So if I were to have a child, say, how would I know that that child is a poor metabolizer?
A. There's a simple genetic test that's available.
Q. Is that test commonly done?
A. It's commonly done for drugs used to treat patients with psychiatric disorders.
Q. Okay. So, say I wanted to use phenformin, would I be tested for that before being prescribed the drug?
MS. MANGRUM: Objection.
A. The drug is not available, so no prescription would take place.
BY-MS.HORNER:
Q. Okay. Well, let's say hypothetically

Page 133

if it were available. You've been -- you've been doing pharmacology for 50 years you say in your report; right? This drug was taken off the market in 1977. So you got your Ph.D. in 1970. For seven years of your career, it was on the market; right?
MS. MANGRUM: Objection.
A. Sounds right.
BY-MS.HORNER:
Q. Okay. So do you know if the poor CYP2D6 metabolizers were tested for this gene before they were prescribed phenformin?
MS. MANGRUM: Objection.
A. To my knowledge, that kind of testing was not available at this time.
BY-MS.HORNER:
Q. So they were not tested for it; correct?
A. But they could be now.
Q. Okay, but they weren't then. And for example, if there were a gene for pseudotumor cerebri, we wouldn't know what it is today; right?
MS. MANGRUM: Objection.

A. What's this?
BY-MS.HORNER:
Q. I'm just -- it's a hypothetical. Hypothetically, if there were a gene that made you predisposed to pseudotumor cerebri, there wouldn't be any way to test for that today; right, because we don't know what it is, correct?
MS. MANGRUM: Objection.
A. Well, you're saying if there was a gene. If there is a gene, then it's known and it could be tested for. If there was a gene, though.
BY-MS.HORNER:
Q. Okay. But we don't know of one; right?
MS. MANGRUM: Objection.
A. Not to my knowledge.
BY-MS.HORNER:
Q. Okay. So what I'm trying to get at is: People will be prescribed drugs for which they may be at a higher risk of adverse events, but they don't know that they're at a higher risk; right?



MS. MANGRUM: Objection.
A. Let me put it more appropriate -- appropriately. Well, not appropriately. If you experience depression or psychotic problems and needed a drug for treatment of those conditions, you could have a genetic test to help determine the right drug and the right dose.
BY-MS.HORNER:
Q. Okay.
A. No implications meant there.
Q. Okay. So you have absolutely no opinions about whether or not it's appropriate to warn for pseudotumor cerebri with respect to Mirena?
MS. MANGRUM: Objection.
A. I think we've gone through that. It's a question for the epidemiologist and the regulators.
BY-MS.HORNER:
Q. Okay. So you have no opinion on it whatsoever?
MS. MANGRUM: Objection.
A. Well, my belief is since there's no



known cause, there's no reason to warn with Mirena.
BY-MS.HORNER:
Q. And that is based on the assumption that it's idiopathic; right?
A. Right.
Q. And based on your belief -- or well, your understanding that there's no such thing as secondary intracranial hypertension?
MS. MANGRUM: Objection.
A. I'm not clear on all of the intricacies for this disease condition. So, you know, I'm not a clinician. There's terms that may be used that I'm not comfortable with.
MS. HORNER: Okay. How much time do we have? Is it getting close to noon? Because it's a good time to stop.
THE VIDEOGRAPHER: We're at 45 minutes on this disc.
MS. HORNER: Let's just go ahead then.
(Whereupon, the following was marked for purposes of identification: Exhibit-11,



Leiras Clinical Study Report B078.)
BY-MS.HORNER:
Q. Doctor, I'm going to hand you an exhibit I will mark Number-11. And what this is, is clinical study report B078. Excuse me. Have you ever seen this before?
A. Oh, I've seen a lot of reports labeled Leiras. I'd have to look in more detail.
Q. Okay. Just let me know when you're finished.
A. I may or may not have seen it because there's so many reports, but I don't think I used the information from here.
Q. Okay. And that's fine. What I'd like for you to look at it is this is actually a packet of documents. I have the report as the first stapled group of pages and then three appendixes to the report, which are attached. Yeah, three appendixes. So first I'd like you to take a look at appendix E and turn to page 79 of that.
Now, Doctor, again, just to remind you, you really criticized Dr. Maggio for

pulling out outlier levonorgestrel serum concentrations from one of the studies that he looked at. Remember that?

MS. MANGRUM: Objection.

A. Yes.

BY-MS.HORNER:

Q. Okay. And I wanted to show you, looking at page 79 of this appendix, we have a table here that's E.2.3 entitled Serum LNG -- actually, that's the name of the section. And then underneath it says Table E.2.3.1, descriptive statistics for randomized subgroups of serum levonorgestrel at 3, 6, 12, 24, 36 and 48 -- I'm sorry -- 48 and 60 months. Did I read that right?

A. I'm not really sure where you are. You're in appendix E?

Q. I'm in appendix E. I'm looking at page numbers at the top right-hand corner.

A. Oh, at the top?

Q. Yeah. I'm sorry.

A. Oh. I was looking at the bottom.

Q. This document actually comes from the new drug application, and the numbers at the



bottom are for pagination from that.

A. Okay.

Q. The Bates number, if it helps you, ends in 86692. Can you find it?

A. I think I'm with you.

Q. All right. Page 79 and it ends in 86692. So again, the title of this --

A. Oh, yes.

Q. Okay. And then the title of this table is Distributive Statistics for Randomized Subgroups of Serum Levonorgestrel at 3, 6, 12, 24 and 36, 48 and 60 months. Excuse me. Did I get that more or less correct?

A. Okay.

Q. Okay. So I'd really like to point you to here in the far right-hand column, we have Q3, which is the third quartile for serum levonorgestrel concentrations in this study. Does that look right to you?

MS. MANGRUM: Objection.

A. Q3, second from the right? Okay.

BY-MS.HORNER:



Q. Yes. And then we also have max, meaning maximum serum concentrations, and picograms per milliliter all the way to the right. Do you see that column as well?

A. Okay.

Q. Okay. So there are two values I really want to draw your attention to in particular. Number one, if you look at month 24 and look at what's called present LNG IUS formulation, go all the way over to max. And we see that, for that time point, somebody had a maximum serum concentration of 853 picograms per milliliter. Is that right?

MS. MANGRUM: Objection.

A. Yes, but I'm trying to figure out what it means original and present here because it's under the same heading.

BY-MS.HORNER:

Q. Yeah. So if you turn to the report, what this -- I mean, you can look to the title of it, if you like. It says five-year clinical performance of the new formulation of levonorgestrel



intrauterine system and serum levonorgestrel concentration with the new formulation compared to that with the original one.

So does that help explain at all what these two formulations are?

A. So you're saying the new one is Mirena?

Q. I will represent to you that this is one of the pivotal clinical trials that was submitted for approval of the Mirena to the FDA.

A. Okay. But some of their studies had more than one formulation, and it gets kind of confusing which one has really become the marketed one.

Q. Yeah, actually, this isn't either. They didn't submit data on that when they got approval. So this is actually comparing formulation B and formulation C. What's been marketed is formulation D.

MS. MANGRUM: Objection.

A. So it's not Mirena.

BY-MS.HORNER:

Q. Okay. This is the basis of approval

Page 142

for the drug, though.
MS. MANGRUM: Objection.
BY-MS.HORNER:
Q. So that's not relevant to you?
MS. MANGRUM: Objection.
A. Well, I thought we were talking about Mirena. So, you know, companies develop exploratory products that may not be the same product as they put on the market.
BY-MS.HORNER:
Q. Okay. So your opinion here today is that the data that the FDA relied on to approve the Mirena is not relevant to the Mirena actually?
MS. MANGRUM: Objection.
A. I don't know that the FDA relied on this. I'm not -- they have a clinical pharmacology report summarizing what they relied on. So we need to look at that.
BY-MS.HORNER:
Q. Okay. So if I were correct and this is what the FDA relied upon, would you have still any reason to disregard these results with respect to their impact on

Page 143

Mirena?
MS. MANGRUM: Objection.
A. Again, it's not Mirena. They didn't market this formulation for a reason, so -- and I can't speculate what they're thinking at the time.
BY-MS.HORNER:
Q. Okay. What if you knew that the supplier for the two being changed and that's why the formulations were different, would that impact your opinions in any way?
MS. MANGRUM: Objection.
A. No. The actual product being used is the one that needs to be considered.
BY-MS.HORNER:
Q. Okay. Well, let's assume that this is Mirena. These serum levels of 853 is pretty high; correct?
MS. MANGRUM: Objection.
A. No, not at all.
BY-MS.HORNER:
Q. You don't think that's high?
A. No.
Q. Isn't it true that that's within the

Page 144

range of what you might expect to see with Norplant, for example?
MS. MANGRUM: Objection.
A. Ideally one would want to compare the study and the same subjects, which is of course difficult to do, and the likely higher concentrations of Norplant will probably be much higher than this.
BY-MS.HORNER:
Q. Okay. Let's take a look at the Norplant label.
MS. MANGRUM: Can we take a restroom break before you do that?
MS. HORNER: Sure. You know what, how far are we in now?
THE VIDEOGRAPHER: 56.
MS. HORNER: 56. Okay.
THE VIDEOGRAPHER: Just on this tape.
MS. HORNER: Why don't we just -- is it about lunchtime?
MS. NATALE: It's 12:30.
MS. HORNER: Okay. Let's just stop for lunch. Want to do about an hour?

Page 145

MS. MANGRUM: Yeah, whatever you've normally been doing.
MS. NEFF: We've been doing 45 minutes to an hour.
MS. HORNER: I'd like an hour, honestly. I don't like rushing through lunch, but it's up to you guys because I know you have planes.
MS. NATALE: We can plan on maybe an hour. And then if everyone is back before then, just get started
MS. MANGRUM: Yeah. We'll be back.
MS. HORNER: Okay. Well, in that case, let's just make it 45 if you're going to be back no matter what.
MS. MANGRUM: Okay. That's good.
THE VIDEOGRAPHER: Okay. We're going off record at 12:38 p.m.
(Whereupon, luncheon recess was taken from 12:38 p.m. until 1:52 p.m.)
(Whereupon, the following was marked for purposes of identification: Exhibit-12 Norplant system warning label.)
THE VIDEOGRAPHER: Okay. We're back

Page 146

on record at 1:52 p.m.
BY-MS.HORNER:
Q. I hope you had a good lunch, Dr. Jesko. When we were talking before, we were going over this clinical study report, 3078. And I think we were looking at one of the appendixes to it, appendix E. And we were looking at some of the maximum serum concentrations that were identified in the study. So when we left off, I think we were going to take a look at the Norplant label.
MS. HORNER: And I've got a copy here for you (indicating).
BY-MS.HORNER:
Q. And so the top page is the original. And as you can see, it's really hard to read because it's very small print. So I blew up the print in the following pages.
MS. MANGRUM: Is this Exhibit-12?
MS. HORNER: I'm sorry, yes. Exhibit-12.
BY-MS.HORNER:

Page 147

Q. So, Doctor, I'd like for you to look, I guess, technically on page 4 of this exhibit. And it starts saying -- let me know when you get there. Page 4. So it's going to be --
A. There's no page numbers.
Q. I know. I'm sorry. I should have added them. Okay. So we have the top page that's the original, flip past that, and then we have kind of the first page of the blown-up version.
A. Okay.
Q. Now just flip that over one more. And then on the back is where I want you to look. So it would be, yes, right there. And so if we're looking at this first paragraph, it starts by saying levonorgestrel concentrations among women. Is that where you are?
A. Okay.
Q. Okay. So I just want to kind of skip that really quick and go to the second sentence that says, "levonorgestrel concentrations reach a maximum or near max

Page 148

within 24 hours after placement with mean values of sixteen hundred plus or minus eleven hundred picograms per milliliter. They decline rapidly over the first month, partially due to circulating proteins, sex hormone-binding globulin" -- here it's abbreviated SHBG -- "that binds levonorgestrel, and which is depressed by the presence of levonorgestrel.
At three months, mean levels decline to values of around 400 picograms per milliliter, while concentrations normalize to a 60 kilogram body weight of 327 plus or minus standard deviation picograms per milliliter at 12 months, with further decline by 1.4 picograms per milliliter per month to reach 258 plus or minus 95 standard deviation picograms per milliliter at 60 months." Did I read that correctly?
A. Yes.
Q. So when we compare this to what we see in Exhibit Number-11, we were looking at -- in particular at 24 months, at least one subject who had a maximum serum concentration

Page 149

of 853 picograms per milliliter. Do you remember that?
A. Yes.
Q. Okay. And so here we do have some information on what averages are for women on the Norplant at, first of all, early in the first month, within 24 hours, I guess. So that would be the sixteen hundred figure; right?
A. Yes.
Q. Okay. And then at three months, it's four hundred picograms per milliliter; right?
MS. MANGRUM: Objection.
A. Okay.
BY-MS.HORNER:
Q. And at 12 months, we have 327 on average; right?
MS. MANGRUM: Objection.
A. Yes.
BY-MS.HORNER:
Q. And then we have 258 picograms per milliliter at 60 months; right?
A. Correct.

Page 150

Q. So this is actually going to fall somewhere between that 327 and the 258 figures that we have for Norplant. So here we see that at 24 months, there's somebody on Mirena who's having more than double the serum levels of LNG compared to the average woman who takes the Norplant.
MS. MANGRUM: Objection.
BY-MS.HORNER:
Q. Is that a correct assessment?
A. That's not the proper way to make the comparison.
Q. How would you compare it?
A. I would compare this non-Mirena value with the higher values that would be experienced in the Norplant users, because you're looking at sort of a high value.
Q. Okay.
A. Excuse me.
Q. Isn't it important to note, though, that here we have given for us a median that's 153 at 24 months for the total between original and present version used in this study, but somebody is experiencing a

Page 151

serum level that's many, many times that? Isn't that important?
MS. MANGRUM: Objection.
A. Not really.
BY-MS.HORNER:
Q. Why isn't it important?
A. Many reasons. First of all, these concentrations are not really very high compared to the kinds of exposures after use of oral contraceptives. These are miniscule compared to those exposures. And that range of values would need to be compared to the likely high values of Norplant from an entirely different study.
And presuming these -- okay. These are standard deviations. So as I prepared in my expert report, if you do two standard deviations, you'll have the upper limit of a 95 percent confidence limits. So if we take which number? Let's say -- all right. Well, a 327, so two standard deviations is let's say 120, 240; 240 plus 327; 240 plus 327 is nearly six hundred. So there's going to be about two and a half percent of the

Page 152

population that are going to have values above six hundred. So if we knew what those values were, that would be somewhat of a better comparison, but it's still different studies, a product with different mechanisms of action and far less exposures from other routes of administration, oral contraceptives.
And then finally, you should take note that in this report on page 32, they describe the subject with high LNG. And at the time she had 853, March 1992, it stated no complaints recorded. So there's no problem.
Q. Okay. With respect to saying this is many times less than the exposure observed with oral contraceptives, would you be referring to, for example, on page 14 of your report -- and I believe that's Exhibit-2 -- you say here in the first paragraph, looks like the second full sentence that starts with while: "While LNG subsequently defuses from the endometrium into plasma and then to other tissues, the plasma concentrations produced by Mirena (130 to 340

Page 153

picograms per milliliter) are far lower than with typical -- I'm sorry -- "are far lower than found with typical OCs." Did I read that correctly?
A. Yes.
Q. Okay. And then you go on to say, for example, Westhoff, et al., which is citation number 17, observed average LNG maximum concentration values of about 7,000 picograms per milliliter and minimum concentration values of about twenty-five hundred picograms per milliliter in women taking an OC --
And by OC, we mean oral contraceptive; right?
A. Yes.
Q. -- taking an OC daily containing 150 milligrams of levonorgestrel and 30 micrograms of ethinyl estradiol very similar to the profiles depicted in figure one." Did I read that correctly?
A. Yes.
Q. Okay. So the value that you're using to compare to this figure for Mirena

is the 7,000 picograms per milliliter, which is C max, when using a combine oral contraceptive according to Westhoff; is that correct?
A. Yes.
Q. Okay. Now, we talked a little bit earlier about how the use of ethinyl estradiol induces sex hormone-binding globulin. Remember that?
A. Yes.
Q. Okay. And we also talked a little bit about the theory that you have from Hammes and from -- I forget his name. I'm sorry -- Willnow, that the bound portion of that hormone is actually chemically active -- or strike that.
We talked earlier about the research you're relying on from Hammes and from Willnow that shows that LNG bound to sex hormone-binding globulin is still hormonally active. Do you remember that?
MS. MANGRUM: Objection.
A. Yeah. I'm relying on much more than that one citation, of course.



BY-MS.HORNER:
Q. Okay. But you make that contention?
A. Yes.
Q. Okay. And we discussed how that's actually subject to debate. Do you remember any of that discussion?
MS. MANGRUM: Objection.
A. I don't consider it subject to debate. I consider that there was a discussion of the various elements of the science involved.
BY-MS.HORNER:
Q. Okay. Doctor, what is the free levonorgestrel index?
A. What is it?
Q. (Nods head)
A. It's a ratio of the free levonorgestrel and sex hormone-binding globulin concentrations.
Q. Okay. And why do some studies look at the free levonorgestrel index?
MS. MANGRUM: Objection.
A. These are typically older studies that paid more attention to free drug without



full consideration of the more modern understanding of the pharmacology.
BY-MS.HORNER:
Q. All right. And the reason for that is, according to you, the older understanding is that only the free part of the drug, meaning the unbound portion, is hormonally active; correct?
MS. MANGRUM: Objection.
A. Yes.
BY-MS.HORNER:
Q. Okay. So here we have at maximum 7,000 picograms per milliliter, but it's being -- I'm sorry. The dosing in Westhoff is being used with ethinyl estradiol; correct?
MS. MANGRUM: Objection.
A. It's given in combination, yes.
BY-MS.HORNER:
Q. So isn't it true that the total serum level will look higher because of the induction of the sex hormone-binding globulin?
MS. MANGRUM: Objection.
A. Yes.



BY-MS.HORNER:
Q. Okay. And isn't it true that because of the way oral dosing works that there will be peaks that are much higher on a daily basis compared to what you would see with the Norplant or Mirena, as far as serum levels are concerned; is that right?
A. Excuse me. Yes, there's the C max, C min phenomenon that occurs.
Q. Okay. Have you compared the area under the curve between Mirena and Norplant?
A. I just did it for Mirena. It's easy to do for Norplant. I don't think I did the calculation.
Q. Have you compared the area under the curve for Mirena and Norplant and the mini pill?
MS. MANGRUM: Objection.
A. What do you consider to be the mini pill?

BY-MS.HORNER:
Q. The mini pill would be a progesterone only pill. And here I'm

referring specifically to a pill that uses levonorgestrel.
A. At what dose?
Q. Let's say, I think 30 milligrams is used in the literature. Say 30 milligrams.
A. Okay.
Q. Have you ever done a comparison like that?
A. I visually looked at things, but not with specific calculations.
Q. Okay. So is it your understanding that there are significant differences between the area under the curve for Mirena and Norplant and the mini pill?
MS. MANGRUM: Objection.
A. I would expect so.
BY-MS.HORNER:
Q. You would?
A. Yes.
Q. But you haven't done those calculations?
A. I could do it easily, but give me a little bit of time.
Q. Okay. And what would you expect to



have the highest area under the curve?
A. The 30 microgram oral dose.
Q. And what would be the second?
A. Norplant.
Q. And the third would be Mirena?
A. Yes, on average.
Q. And you think the differences would be significant?
MS. MANGRUM: Objection.
A. Oh, definitely.
BY-MS.HORNER:
Q. Okay. So, and by significant -- what would be significant to you?
A. Are you talking about statistically or clinically?
Q. How about both.
A. Many things are easily statistically significant, but clinical significance is hard to judge. I'm sorry.
Q. And so clinical significance means, does it make a difference in the individual patients that are taking the drug; is that fair?
A. Yes.



Q. All right. I'd like to take a look at appendix G3, which I think is next in the packet with Exhibit-11. And we'll turn to -- I'm looking again at the top part of the page. So this will be page 371.
A. Which exhibit?
Q. I'm sorry. It's in Exhibit-11, but there were several documents that were together with it. They're actually all part of the same study. So there was the report, appendix E.
A. Yup.
Q. There's an appendix G.3, and an appendix G.5. Do you see those?
A. G3. Okay.
Q. So if we look at G.3 and we turn to page 371 -- and again, I'm looking in the top corner -- but the Bates number for the page ends in 87737. And it's actually page 371 in the NDA as well, so that's easy, if that helps.
Q. Okay. So here, if you look under LNG serum concentration at 24 months, which is I guess the second column in this chart,



we see that there's subject number seven who has a serum concentration of 853 at 24 months. Do you see that?
A. Yes.
Q. Okay. And if we look to the left, it looks like she's had kind of high levels compared to the others for some time. So her first level measured at three months is 482. At six months she was measured at 597. Am I reading that correctly?
MS. MANGRUM: Object to form.
A. All right. I see 597.
BY-MS.HORNER:
Q. And then after 24 months, if we look at 36 months, her levels drop pretty significantly to 145; is that correct?
A. Okay.
Q. Okay. So I guess my question is: Does this pattern bear out the claim that Mirena causes LNG serum levels that are low and steady?
MS. MANGRUM: Objection.
A. They're certainly low. Steady depends on one's definition of that.

BY-MS.HORNER:
Q. Okay. And I'd like to point out that this listing starts with the number one. And if we just go through and look, the subjects are numbered consecutively, so that when we get to the last page of this, page 374, we see that there were 100 patients or 100 subjects. Do you see that?
A. Okay.
Q. So is it fair to say that in this study, one percent of the subjects had levels that were at least twice as high as what was seen in the average Norplant patient?
MS. MANGRUM: Objection.
A. One might want to say that, but it's not the proper way of making a comparison.
BY-MS.HORNER:
Q. Okay. Let's look at the next appendix. And that's going to be appendix G5. Actually, I'd like you to turn to your report instead first. I apologize.
We'll just look at page 3, figure one. I just want to look at that really quickly. So here you're explaining what



maximum concentration, minimum concentration and area under the curve and half-life are in this figure. Is that fair?
A. That's correct.
Q. Okay. And we talked a little bit about area under the curve before. Remember that? It was just a minute ago.
A. Yes.
Q. Would it be fair to say that area under the curve allows us to compare overall drug exposure regardless of the method of administration?
A. It's best used to make a comparison when the method of administration is the same.
Q. Okay. But it's a measure of overall drug exposure; is that correct?
A. Yes.
Q. And therefore, if you have dosing orally, which results in a daily peak down to washout versus a subdermal or intrauterine or transdermal form, which is intended to have a more steady administration rate, that you can then compare what the drug exposure



is between the oral dosing and the other types of administration a little more in an apples-to-apples fashion. Is that a fair way of putting it?
MS. MANGRUM: Objection.
A. Yes.
BY-MS.HORNER:
Q. Okay. Looking back at number -- I'm sorry -- appendix number 5 that we just pulled out, I'd like you to look at subject number seven again. So it's going to be on the second page of this. And the actual page number is 411 out of 412, looking in the top corner. And I know it's really small print. And I apologize. Nothing I can do about it, unfortunately.
So here subject number seven has her values entered at 3 months, 6 months, not at 12 months, at 24 months, and at 36 months. Are you able to see that or is it too small?
A. I can barely make it out.
Q. Okay. And if we go all the way to the right-hand side, the furthest column, are



you able to see there that this is the column listing area under the curve for each subject?
A. Yes.
Q. Okay. Are you able to follow the line along to see that no area under the curve was calculated for subject number seven?
A. Yes, I can see that.
Q. Okay. Doctor, wouldn't that skew the results to exclude the subject who had the highest serum levels?
MS. MANGRUM: Objection.
A. I don't understand your question.
BY-MS.HORNER:
Q. So if AUC data was calculated for each patient and that was averaged, but the person who had the highest serum levels for LNG was excluded from the AUC calculation, wouldn't that skew AUC downwards compared to what was actually observed?
A. You mean if one was calculating the average value?
Q. Sure.

Page 166

A. Yeah, when one leaves out one number, it creates a different mean.

(Whereupon, the following was marked for purposes of identification: Exhibit-13, Berlex Laboratories, Inc. Clinical Study Report Number A46796.)

BY-MS.HORNER:

Q. Okay. I'm going to give you another exhibit, which we're going to mark Number-13. Lucky 13. Here you go. And this is another clinical study report with the number A04411. The title is, "An Open-Label Non-Randomized Trial With a Levonorgestrel-Releasing Intrauterine System in Young Women to Evaluate the Short-Term Dosage Form Performance Characteristics -- Final Report." Did I read that correctly?

A. Yes.

Q. Okay. Have you ever seen this before?

A. Perhaps when we look at the data, I will remember it more clearly.

Q. Okay. Well, let's look at page 32, text table seven. And thank goodness this

Page 167

one is, I think, paginated in an easier format. The last Bates number on it is 103505.

A. Page 32. Okay.

Q. Yup. First off, I want to note, this study has four different segments that are indicated in this table; is that right?

A. It states, yeah, four segments.

Q. Okay. And are you recalling anything about this study at this point or --

A. No, I can't recall what the four segments were.

Q. Okay. Well, if we look at the table, we can see that Segment 1 had their serum levels measured from months one to three; right?

A. Oh, yeah.

Q. And then for Segment 2, it's from one to six. Segment 3 was from one to nine months, and then Segment 4 was from one month to 12 months; is that fair, looking at the table?

A. Yes.

Page 168

Q. Okay. So looking at Segment Number 4, I want to draw your attention to someone who experienced a high serum concentration again in the C max field. So this is going to be the one that says 734 under month four. Do you see that? It's in the very bottom row of data.

A. Okay. Yes.

Q. And so we know that somebody here has been experiencing a pretty high level compared to what we see in the other segments?

MS. MANGRUM: Objection.

BY-MS.HORNER:

Q. Is that fair?

A. Yes, that number is higher.

Q. Okay. In fact, it's more than double what any of the other two are showing for their maximum concentrations; isn't it?

MS. MANGRUM: Objection.

A. It's higher. But again, these numbers are very low compared to oral doses.

BY-MS.HORNER:

Q. Okay. And for each of these

Page 169

segments, we have a number of subjects that were in it. So we can figure out how many subjects were actually in the study; can't we?

A. I'm not sure if there's repetition of the same subjects from one segment to the next, but we could see what the numbers are total.

Q. Okay. Well, if we look earlier, I'm sure we can see that in the methods.

A. Yeah, looks to be different subjects.

Q. You believe it's different subjects? If you look at page 18 of the report --

A. Okay.

Q. -- there's a Section 9.4.3 that says method of assigning patients to treatment groups. And here it says -- are you there?

A. I'm on page 18.

Q. Okay. And do you see Section 9.4.3?

A. 9.4, okay.

Q. And it says method of assigning patients to treatment groups; correct?

A. Okay.

Q. So the paragraph says, "There was

Page 170

only one product used in this study, however, there were four treatment segments based on the usage time of the product. The first 15 subjects enrolled were assigned to Segment 1, the second group of 15 subjects were assigned to Segment 2. The third group of 15 subjects were assigned to Segment 3 and the fourth group of 15 subjects were assigned to Segment 4. Subjects in Segment 1 had systems removed 3 months after insertion. Subjects in Segments 2, 3, and 4 had the systems removed 6, 9, and 12 months respectively after insertion. As noted previously, the 16th subject enrolled subject 1016, Segment 2, was discontinued at 3 months due to withdrawal of consent. The subject's data were included in the analysis of Segment 1 since she completed three months of treatment." Did I read that correctly?
A. Yes.
Q. Okay. So we do know then that these are the same women in each segment. And actually, this is giving us a better idea of how many subjects there are total in

Page 171

the study because we know that there were four segments of 15 subjects; right?
MS. MANGRUM: Objection.
A. You started off saying something about the same women, and I'm not sure that was correct.
BY-MS.HORNER:
Q. Okay. Well --
A. Each group appears to be a different group of women.
Q. Okay. Because the numbers are different?
A. From the description here.
Q. What about it exactly makes you think that they're different women?
A. The phrasing; the first 15 subjects, the fourth group of 15 subjects. But we should look more carefully for any listing of the subject demographics. They appear to be different subjects because the later tables show different subject numbers for different groups.
Q. All right. So you don't think it's possible that some of the subjects simply did

Page 172

not have their serum levels measured at certain time points?
MS. MANGRUM: Objection.
A. No, I'm not saying anything about that.
BY-MS.HORNER:
Q. Okay. Well, all right. Regardless, the way that the methods section is written on page 18 suggests that there were 61 patients in the study?
A. Sounds right.
Q. Okay. That's all I was trying to get. All right. So -- all right. And I want to point out that also in Segment 2 -- I'm sorry. Segment 3 on page 32, looking again at the maximum serum levels that we see here, between months two and three somebody had a spike in the amount of hormone of at least about 250 picograms per milliliter; right? Because we're seeing 385 as the maximum for month two, and then in the same group we're seeing 648 in the next month as the maximum. Am I reading that correctly?

Page 173

MS. MANGRUM: Objection.
A. I wouldn't describe this as a spike.
BY-MS.HORNER:
Q. Okay. Why wouldn't you describe that as a spike?
A. The range of values is rather modest.
Q. All right. Well, let's turn to page 66. And actually, I'm going to ask you: What to you would be a spike?
A. An extreme rise in plasma concentrations over a very short time interval.
Q. What would be an extreme rise to you?
(Whereupon, reporter clarification.)
A. It would depend on the dosage form, the type of product.
BY-MS.HORNER:
Q. So an increase of 250 picograms per milliliter isn't -- wouldn't count as a spike, though?
A. No.
Q. If we look at table nine, which is

on page 66, you see here some tables for individual subjects and their serum levels. And looking at subject 1039, about halfway down, we see that she's the one who had the serum level of 648.5 picograms per milliliter of LNG in month three. Do you see that there?
MS. MANGRUM: Objection.
A. Yes.
BY-MS.HORNER:
Q. Okay. And actually, we see that her level the month prior was 248.6. Do you see that as well?
A. Yes, I do.
Q. Okay. So her levels have more than doubled in a month and we're not looking at her first month. We're looking at two and three months after her insertion; right?
A. Correct.
Q. So would you still say that this is not a spike?
A. Definitely.
Q. Okay. Let's look at the next page, 67. And look at subject 1059. So it's the



second from the bottom. And we see here that this subject's serum levels started at 900. Well, to be precise, it's 902.7 picograms per milliliter of levonorgestrel; correct?
A. Yes.
Q. And the next month she's got 864.3 picograms per milliliter; correct?
A. Correct.
Q. The following month she has 663.4 picograms per milliliter; correct?
A. Correct.
Q. And in month four, she's experiencing a 734.9 level of levonorgestrel in picograms per milliliter; correct?
A. Correct.
Q. Okay. Did you notice, Doctor, that neither of these patients completed the study?
MS. MANGRUM: Objection.
BY-MS.HORNER:
Q. For example, there are no more values after the fourth month for subject 1059. And then looking at the previous



page, there are no values following the third month for subject 1039.
MS. MANGRUM: Objection.
BY-MS.HORNER:
Q. Is that correct?
A. Okay. Yes.
Q. So if subjects are dropping out who have the highest serum concentrations, wouldn't that skew the results of the average serum concentrations calculated in the study?
MS. MANGRUM: Objection.
A. Well, in those tables, there are means and other statistics listed for each month. So the data are included there.
BY-MS.HORNER:
Q. Okay. But these women would not be included in, for example, the fifth month on?
MS. MANGRUM: Objection.
A. Yes, they were not included.
BY-MS.HORNER:
Q. So for the fifth month on, we don't know how these women might have exhibited serum levels of LNG, because it wasn't measured; correct?



MS. MANGRUM: Objection.
A. Clearly not.
BY-MS.HORNER:
Q. If we look at text table six on page 31 of the same study. So this is actually going to be the page before the table we initially looked at. Let me know when you're ready.
A. Page what?
Q. 31.
A. 31.
Q. And -- I'm sorry. Just let me know when you're ready.
A. Okay. I'm ready.
Q. And if you recall, we were discussing subject 1039 and 1059. Do you remember that?
A. Yes.
Q. Okay. So here this table is titled Residual LNG for Subjects Who Prematurely Discontinued. Did I read that correctly?
A. That's right.
Q. So looking at the amount of loss in milligrams for subject 1039, it looks like

she lost 0.44 milligrams of LNG from her Mirena during the study period. Am I reading that correctly?
A. I'm sorry. Repeat that, the numbers again.
Q. It was really -- I apologize for that. So if we look at the listing for subject 1039, we see that she was exposed to Mirena for 92 days; correct?
A. 1059?
Q. I'm sorry. 39.
A. Oh, 39. 92. Okay.
Q. Yes. And here they're listing residual milligrams. So that's the amount of drug left in the Mirena?
A. That's right.
Q. And next we have a column that says percentage of initial content. So for her, it's showing 99.14 percent; is that right?
A. That's right.
Q. And she lost 0.44 milligrams of drug from her Mirena during the 92 days that she used it. Is that also correct?
A. I'm sorry. Repeat that again.



Q. Well, after the percentage of initial content, the next column says loss and milligrams.
A. Milligrams, right.
Q. And so for subject 1039, she lost 0.44 milligrams of LNG from her Mirena during the time period that she used it.
A. Okay. Yes.
Q. So then we have the percentage of the loss, which is kind of the inverse of percentage of initial contact, I guess, and she has 0.86 percent. Is that correct?
A. Yes.
Q. Okay. So let's look now at the very bottom row that has information on subject 1059. Do you see that row?
A. Correct.
Q. So she was exposed for 114 days, and her residual content of LNG that was left in her Mirena was 49.16 milligrams. Am I reading that correctly?
A. Okay.
Q. Her percentage of initial content was 95.85 and she lost 2.13 milligrams of LNG



during the 114 days that she used Mirena; is that right?
A. Yes.
Q. So in other words, she -- her Mirena lost 4.15 percent of the drug that it contained during the time it was inserted in subject 1059?
A. Yes.
Q. What does it mean to you that both of these women had very high -- well, strike that.
What does it mean to you that both of these women had serum levels of 600 and 800 picograms per milliliter, but the elution of the drug was so different between them?
MS. MANGRUM: Objection.
A. Well, those are individual cases that when, you know, part of the study was to make a comparison for many different subjects and there's a certain amount of variability for the percent loss.
BY-MS.HORNER:
Q. Okay. So we know that there's variability between Mirenas as to how much



drug will be eluted in a given time period; right?
A. Yes.
Q. And we also know that women who have varying amounts of drug elution during a similar time period may still have very similar and higher levels of levonorgestrel in their serum; correct?
MS. MANGRUM: Objection.
A. Okay. Once again on that.
MS. HORNER: Can you read it back?
(Whereupon, record read back by reporter.)
THE WITNESS: Okay. Once more. I'm sorry.
(Whereupon, record read back by reporter.)
THE WITNESS: You're making a comparison with fragmentary data. I thought I've seen other data where they compile overall release rates and serum concentrations of levonorgestrel looking at the group as a whole. So picking out a couple of individuals seems to be unfair.

BY-MS.HORNER:
Q. Well, but isn't it true that in the real world these two patients out of 60 represent thousands, maybe even millions of women?
MS. MANGRUM: Objection.
A. Not necessarily, no.
BY-MS.HORNER:
Q. Do you know how many Mirenas have been sold worldwide?
A. I don't know.
Q. Would you disagree with me if the number was in the millions?
A. I have no basis to agree or disagree.
Q. Okay. So based on this study and the study we just looked at, serum levels of six hundred or more occurred in between one and maybe about two percent of the subjects; right?
A. Yes.
Q. And if we extrapolate those rates to the number of Mirenas sold worldwide, then we're talking about potentially thousands,



hundreds of thousands, even maybe millions of women; right?
MS. MANGRUM: Objection.
A. Well, it's all kind of a specious argument because we don't know what these concentrations actually mean for any individual. I think I've seen something in here saying that someone had an adverse report where her concentrations were below a hundred and another person had an adverse event, adverse report and the concentrations were something higher. So just taking individuals is a limited piece of the picture. We look at the totality of the data.
BY-MS.HORNER:
Q. Right. So and that goes to the issue of drug response rate; right? That certain effects may occur at a lower amount of drug and it's -- the reason that we get concerned about high doses is that it's simply more likely that adverse events will happen at higher doses; is that fair?
MS. MANGRUM: Objection.



A. And in comparison of these concentrations where the exposures from women taking oral contraceptives, these values are relatively trivial.
MS. HORNER: Okay. All right. Let's look at another one. This will be Exhibit Number-14 to your deposition, and mercifully shorter because I've omitted some pages.
(Whereupon, the following was marked for purposes of identification: Exhibit-14, Schering Clinical Study Report Number A10982.)
BY-MS.HORNER:
Q. Okay. Doctor, so what I've just marked as Exhibit Number-14 is Clinical Study Report Number A10982 that is entitled a "multi-center open label nonrandomized study of SHG00650A (levonorgestrel intrauterine system) and parous women seeking contraception to avoid -- to evaluate its efficacy, safety and pharmacokinetic profile when inserted for 12 months, MM1." Did I read that correctly?
A. Yes.
Q. And this one is dated March 17th,



2005. Now, as you can see, this document originally is four hundred pages. So I've excerpted it, because it was getting to be a little much. But do you recall reading this study or this report?
A. I probably have, yes.
Q. Okay.
A. By the way, is this Mirena again --
Q. This is. This is.
A. -- or one of the experimental ones?
Q. Okay. So if we turn to page 80, which is really just the second page of the document.
A. Yup.
Q. And look at footnote two, we see that there was a subset of subjects called the FAS subjects. So the footnote says the ten subjects evaluated in the FAS 4PK included the following subjects. Did I read that correctly?
A. Yes.
Q. And then it lists the numbers of the subjects; right?
A. Yes.

Q. Okay. And if we look at page 81, we see in the first paragraph that another set of subjects is described. So it says: As shown in Section 11.1, 462 subjects were included in the PPS. Of these, a total of 20 subjects for whom serum LNG concentration and the pre-insertion sample was above LLOQ; meaning, 30 -- 30 picograms per milliliter were excluded from the PPS-PK. Did I read that correctly?
A. Yes.
Q. This resulted in the PPS-PK of 442 subjects. Did I read that right?
A. Yes.
Q. Okay. So in this study we know that there were 442 subjects in one segment, so to speak, of the study, and then there were another ten subjects that were evaluated separately. Is that correct?
A. That's correct.
Q. Okay. Unfortunately, we have never received appendices with the individual serum level data for the 442, but we do have C max values and those are on page 394. So



we'll just be flipping to that page really quickly. Are you at page 394?
A. Okay.
Q. Okay. And we'll just look at the bottom row. Well, actually, let's read the title of the table. So this table is entitled Table 79, serum LNG concentration by time point during 12 month insertion of LNG IUS (PPS-PK) MM1. Did I read that right?
A. Yes.
Q. Okay. So here we see that in the bottom row we have maximum serum concentrations listed. And at one month, somebody experienced a concentration of 1085.5 picograms per milliliter. Did I read that right?
A. Yes.
Q. Somebody else -- or maybe the same person, we don't know -- experienced a maximum concentration at six months of 1055.2 picograms per milliliter of LNG; is that correct?
A. Yes.
Q. And then in the twelfth month,



somebody -- could be the same person again, but we don't know -- experienced a maximum serum LNG concentration of 829.6 picograms per milliliter; is that right?
A. Yes.
Q. Okay. Now, turning to page 495, which is just the next page.
A. 395?
Q. I'm sorry. 395. I wrote it wrong on my notes. Thank you.
Here we have the individual data on the subjects in the FAS group; correct?
A. That's what it's labeled.
Q. Okay. And it looks like this group also included analysis for a shorter time period, so from one hour to 14 days; correct?
A. Yes.
Q. Okay. And I just want to point out that some of these seem to be experiencing what I would call a spike. And maybe you'll disagree with me. I suspect you will. But let's take a look at subject 65 -- 652412, I think. Yes. And looking at this subject,



under six months, her serum levels were 284.9 picograms per milliliter; correct?
MS. MANGRUM: Objection to everything before the question started. But you can answer that question, Doctor.
A. Okay. It's the number ending with 412?
BY-MS.HORNER:
Q. Yes, ending in 412.
A. Referring to six months?
Q. And referring to six months.
A. Okay.
Q. Her serum levels are 284.9 picograms per milliliter; correct?
A. Okay. Yes.
Q. And then the next month -- or I'm sorry. Strike that.
Then in the 12-month period, her levels go up to 430.2 picograms per milliliter; right?
A. Yes.
Q. Okay. And so it's clear here that she's not experiencing a slow decrease in her serum levels; is she?

MS. MANGRUM: Objection.
BY-MS.HORNER:
Q. She's experiencing an increase; correct?
MS. MANGRUM: Objection.
A. Well, that value of 12 months is similar to 7 days, 14 days, not much different from one month. The six-month value seems to be on the lower side.
MS. HORNER: Okay. I think we need to change the tapes, so we'll stop really quickly.
THE VIDEOGRAPHER: Okay. We're going off record at 2:51 p.m.
(Whereupon, recess taken from 2:51 p.m. until 3:02 p.m.)
(Whereupon, the following was marked for purposes of identification: Exhibit-15 Bayer Healthcare Clinical Study Report Number A46796.)
THE VIDEOGRAPHER: Okay. Now continuing the testimony of Dr. William Jusko. This is disc number three, and we're back on record at 3:02 p.m.



BY-MS.HORNER:
Q. Okay, Dr. Jusko, I'm going to hand you now what I've marked as Exhibit Number-16. And it's pretty big.
MS. MANGRUM: Do we have a 15?
MS. HORNER: Oh, did we? I'm sorry. You're right. That is Exhibit Number-15. I skipped a number. Thank you for catching that.
BY-MS.HORNER:
Q. Okay. So Exhibit Number-15, this document is clinical study report number A46796; correct?
A. Yes, it is.
Q. And the title is, "multi-center, open, randomized, dose finding phase II study to investigate for a maximum of three years ultra-low dose levonorgestrel contraceptive intrauterine systems (LCS) releasing in vitro 12 micrograms per 24 hours and 16 micrograms per 24 hours of levonorgestrel compared to Mirena in nulliparous and parous women in need of contraception." Did I read that correctly?



A. Yes.
Q. And this was published December 7th of 2009; correct?
MS. MANGRUM: Objection.
BY-MS.HORNER:
Q. Or at least the date on it is December --
A. It's dated, yes.
Q. Okay. All right. Doctor, let's turn to page 21 of the report. And I'll just note here actually that I've got the report stapled together, and then included with the exhibit is also Section 15.6 separately stapled and then appendix 16.2.10, which are all included as part of this exhibit.
But looking at the report, page 21. Okay. Actually, this is just continuing Section 6.1, study design. So turning back to page 20, we see that it says, "In addition to the above variables studied in the whole population, addition variables were studied in three subsets. All subsets were studied in selective centers in Finland



only." Did I read that correctly?
A. Oh, down there? Okay. Yes.
Q. Okay. And so turning to the next page where I originally pointed you, "It says the subsets were the following: Subset one, ovarian and cervical function studied in 60 subjects, 20 per treatment arm." Did I read that right?
A. Yes.
Q. And then just skipping down to subset three, it says, "Pharmacokinetics studied in 37 subjects, 12 per treatment arm." Did I read that right?
A. Correct.
Q. Okay. And in the following paragraph, it describes subset one. And I guess the third sentence that starts serum LNG and SHBG, do you see that in about the middle of the paragraph?
A. Where? What did you just state?
Q. I didn't finish it. I just wanted to point you to it. So the paragraph that has bolded in subset one, if you go down --
A. Okay.

Q. -- one, two, three lines, there's a sentence that starts with serum LNG.
A. Okay.
Q. And so that sentence says: Serum LNG and SHBG were determined at these examinations." Did I read that right?
A. Yes.
Q. So that would relate to the subset one, which had 20 women per treatment arm; correct?
A. Yes.
Q. Okay. Skipping on down again to the paragraph that starts in subset three, that paragraph reads, "In subset three, the pharmacokinetics of LNG were evaluated. Serum LNG and SHBG were determined at baseline and at day one, three, and seven and two weeks after start of treatment. Thereafter, they were determined at every visit." Did I read that right?
A. Yes.
Q. So we know in this study that there are different treatment arms. And are you familiar with this study at all?



A. Yes, I am.
Q. Okay. So do you know what the treatment arms were in this study?
A. Yes.
Q. Okay. So here, correct me if I'm wrong, we have a device called the LCS16; correct?
A. Yes.
Q. And that's being used in one of the treatment arms. Then we have a 12 microgram LCS12 device that's being studied; correct?
A. Correct.
Q. And is it your understanding that that device is the Skyla?
MS. MANGRUM: Objection.
A. I'm not sure.
BY-MS.HORNER:
Q. Okay. And then the third device that's being studied in the third treatment arm would be the Mirena; correct?
A. Correct.
Q. Okay. So we know from page 21 that subsets one and three will both have serum level data for us; right?



A. Yes.
Q. Okay. I also want to point out that this study also measured sex hormone-binding globulin. Why is that important, Doctor?
MS. MANGRUM: Objection.
A. It binds levonorgestrel.
BY-MS.HORNER:
Q. Okay. And if the proportion of LNG that's bound serum -- I'm sorry. Strike that.
If the proportion of LNG that's bound to sex hormone-binding globulin is hormonally active to the same degree that free levonorgestrel would be, what would the purpose be in measuring sex hormone-binding globulin?
A. It's usually measured because it influences the pharmacokinetics.
Q. Okay. And by that, do you mean the amount of total LNG seen in the serum?
A. When the total LNG is measured, it usually is in proportion to the SHBG concentrations.



Q. Okay. And one of the things that can inflate the amount of SHBG that is present in serum would be ethinyl estradiol; right?
A. Yes.
Q. All right. Let's look at page 90. And let me know when you get there. Are you ready?
A. Yes.
Q. So here we have section nine, which says pharmacokinetic results. This allows us to see -- actually, you know what, so you're familiar with the times that LNG was sampled both between these two subsets, though; right?
A. Yes.
Q. Okay. So would you agree with me they're not entirely identical?
A. What's not identical?
Q. Well, for example, in subgroup three, in the first sentence here under section nine, pharmacokinetic results, LNG and SHBG were measured at baseline at day one, three, seven and 14, and then at every treatment

thereafter -- every visit thereafter. Is that correct?
A. Yes.
Q. Okay. And so in subgroup one, in the next paragraph, it says serum LNG and SHBG were analyzed at one, three, five, seven, nine and eleven days during the first year and then at day 1 and day 12 during the second and third year of insertion?
A. Correct.
Q. Okay. So we don't have completely identical sampling going on as far as time goes. But both of these groups are being sampled throughout the study period; correct?
A. Yes.
Q. Okay. And looking at pages 92 to 93, these are figures that show the geometric mean concentrations of LNG and serum after insertion of LCS12, LCS16 and Mirena in linear scale. That's for text figure two on page 921 right?
A. Yes.
Q. And then the following page, text figure three, is showing the same measures



but for the first six months?
A. Correct.
Q. Okay. What is the purpose in using a geometric mean?
A. It better expresses the central tendency of the data when the dispersion is log-normal.
Q. When the dispersion is log-normal?
A. Yes.
Q. What does that mean?
A. When the distribution of values is log-normal.
Q. Okay. What does it mean when something is log-normal?
A. A normal distribution, if you look at the array of values, produces a bell-shape curve. A log-normal distribution will have values that are skewed a little more to the left or right.
Q. All right. Would you agree with me that the way these graphs appear is fairly smooth?
MS. MANGRUM: Objection.
A. Yes.



BY-MS.HORNER:
Q. Okay. Let's take a look at Section 15.6.1, which is actually stapled separately. So if you take off the binder clip, you should be able to get it out pretty easy. There you go. And this will be Table 229 for this report. The title is, "LNG/SHBG-original scale-descriptive statistics, including geometric means by treatment, time point-FAS." Did I read that right?
A. Yes.
Q. Okay. So if we look at the number of subjects in this, it looks like there are, for Mirena, between 10 and 13 subjects who had serum levels measured for this arm of the study. Is that right?
A. No.
Q. Okay. Did I misspeak? I'm sorry?
A. 12 to 13.
Q. 12 to 13. Did I say 15?
A. You said 10.
Q. I said 10? Okay.
A. 10 had baseline measurements.
Q. Yes. Okay. And if we look at the



maximums, it appears that these values seem to be generally lower than the other ones that we saw in the earlier three studies. Is that right?
MS. MANGRUM: Objection.
A. Well, the previous study we looked at, were in Japanese women, who tended to have somewhat higher concentrations, probably because of their expected smaller body sizes.
BY-MS.HORNER:
Q. Okay. But would you agree with me that these are generally lower than the other two?
MS. MANGRUM: Objection.
A. I would need to look back. They look about the same.
BY-MS.HORNER:
Q. Okay. All right. Let's take a look at the next appendix. It should be the last document in the packet for this exhibit. So this is appendix 16.2.10. And it says here that this is pharmacokinetic data. What I'd like to do is have you look at page 15. And here we see we have individual serum

level data for Mirena users in subset three. Am I reading that right?
A. Yes.
Q. Okay. So turning to page 16, which is just continuing this chart, I'd like to point out subject 120810.
A. Okay.
Q. So she has an increase in her serum levels from approximately 314 -- I'm sorry. Not approximately. Exactly 314 picograms per milliliter in month 12 it looks like, and six months later she has an increase by almost a hundred picograms per milliliter up to 410 picograms per milliliter. I'm reading that right; correct?
A. Yes.
Q. Okay. So you again would not agree with me that this is what you would call a spike?
A. Definitely not.
Q. Okay. Let me rephrase that. You would not call this a spike; correct?
A. Okay.
Q. Okay. That was a terrible question,



the first one I did.
MS. MANGRUM: So he didn't answer the second one; did he?
BY-MS.HORNER:
Q. You don't think this is a spike; is it?
A. I don't think it's a spike.
Q. Okay. Would you say that she had steady levels of serum LNG?
A. I would call it fairly steady.
Q. Okay. Let's look at page 20, subject 120909. So she seems to have fairly higher, more in the range of what would be expected on average among Norplant users; correct?
MS. MANGRUM: Objection.
A. Again, there's a range of possibility for Norplant. There's a range for Mirena.
BY-MS.HORNER:
Q. But certainly she's experiencing serum LNG that would be seen on average according to the Norplant label in Norplant users?
MS. MANGRUM: Objection.
A. At what time?



BY-MS.HORNER:
Q. Well, let's see. It's got month 30 here, month 24. So that's about two years out. And then I think we had the Norplant label; this was Exhibit-12. At 12 months, serum levels were 327 plus or minus 119, declining to 258 plus or minus 95 at 60 months. So 327 versus about 270 there and then 302 in month 30.
MS. MANGRUM: Objection.
BY-MS.HORNER:
Q. So that would be fairly comparable to what you see in Norplant; correct?
A. One would have to be a little more careful and specific about how to make the comparison. In this case, there's an explanation for these values.
Q. Okay. What's your explanation?
A. Can we look at the graph that I prepared that we looked at early?
Q. Sure. This is in the documents that were provided pursuant to your notice of deposition?
A. Yes.



Q. Okay. So I'm looking at it right now. You should have it as Exhibit Number-3.
A. Somewhere. There it is. Found it. So you're talking about subject --
Q. 1209 --
A. -- 909?
Q. Yeah.
A. And if you notice in the table, I have subject labeled 909.
Q. Okay.
A. That would be the 120 is part of all of these. So I went through and calculated, as I explained earlier, the C average values is the general expression of total exposure and the BMI from the weight and height values. And the three black dots on here, two are practically superimposed, are -- one of them is the subject we're just talking about, the 909 subject. And the explanation for why some of these subjects had somewhat higher concentrations, though they're not terribly high, is the fact they have smaller body weights, body sizes. So

those three subjects are these three dots.

And then coupled with that, most of the subjects in this study happened to be either overweight or obese. And we know that obesity causes lower concentrations of levonorgestrel, and that tends to be the subjects over here. So the subjects from this study, the valleys that we see, have a total explanation (indicating).

Q. Okay. I do want to point out, though, that we've looked now at four different studies which each showed a proportion of women who are experiencing serum level concentrations in excess of what is expressed by the standard deviation, for example. Would you agree with that?

MS. MANGRUM: Objection.

A. In none of those studies were we able to go back and relate those values to the body size. I expect the Japanese study to be explainable this way, and I would bet almost anything that the overall behavior is going to be just like this for all of the subjects ever studied (indicating).



BY-MS.HORNER:

Q. Okay. And you still disagree with me that it's inappropriate to compare women who are a minority among Mirena users but who are exhibiting serum levels that are similar to what you would see on average among Norplant users?

MS. MANGRUM: Objection.

A. Again, my expert report argues scientifically that's not the proper way to make a comparison.

BY-MS.HORNER:

Q. Okay. But we would be more concerned for women who have those higher levels, wouldn't we, regarding adverse effects?

A. Once again, these concentrations are rather trivial compared to the concentrations experienced after oral dosing, so -- and we don't know the relationship of any of these concentrations to either efficacy or toxicity.

Q. Okay. I'd like you to take a look at your report on page 8, please. Okay. So --



A. What page again?

Q. Page 8.

A. 8.

Q. So here we're talking about relative -- in the bottom paragraph -- relative binding affinities for levonorgestrel; right?

A. That's how it starts.

Q. Okay. And relative binding affinities are simply the degree to which a certain steroid binds to certain receptors?

A. Yes.

Q. Okay. And you would agree with me that in order for a steroid to activate a receptor, that it must be an agonist; correct?

A. Yes.

Q. Okay. And an antagonist would have maybe a blocking effect on the receptor; would that be fair, too?

A. Perfectly stated.

Q. Okay. So what I'd like to do is take a look at some of the citations that you've got here for the proposition that LNG is an antimineralocorticoid. And by that, I



mean that it blocks mineralocorticoid activity. Is that a fair statement?

MS. MANGRUM: Objection.

A. No, that's not.

BY-MS.HORNER:

Q. Okay. So what is your contention then?

A. That there may be binding, but we don't know the relevance of that binding. And some of the articles state that there is questionable or no binding.

Q. Okay. That there's no binding?

A. Yeah.

MS. HORNER: All right. Well, let's take a look at some of them.

(Whereupon, the following was marked for purposes of identification: Exhibit-16, Multiple Nuclear Receptors Signaling Pathways Mediate the Actions of Synthetic Progestins in Target Cells by Moore.)

BY-MS.HORNER:

Q. Okay. You cite Moore -- I want to mark this as Exhibit-16 for real this time -- for the idea that there's no activity.

Okay. So if we look at page -- all right. If we look at page 64 of this article that I've marked as Exhibit-16, which is the Moore article entitled, "Multiple Nuclear Receptors Signaling Pathways Mediate the Actions of Synthetic Progestins in Target Cells," is this the source of your citation for your report?
A. Yeah, this is one that I cited.
Q. Okay. And here it says that for the mineralocorticoid receptor, which is abbreviated MR, for levonorgestrel, there is either a 17 percent binding affinity or a 75 binding affinity for the mineralocorticoid receptor. Am I reading that correctly?
MS. MANGRUM: Objection.
A. Are you in table one or where?
BY-MS.HORNER:
Q. I am in table one.
A. Okay. Okay. Yes, for MR, it states 17 and then 75.
Q. Okay. And underneath that, it says antimineralocorticoid. Am I reading that right?



A. Yes.
Q. Did you happen to check the citations that are listed?
A. The further citations?
Q. The citations that are listed under the column references for this data.
A. There's one, two, three, four, five, six, seven. There's seven references there.
MS. HORNER: Okay. Let's go ahead and go through them.
(Whereupon, the following was marked for purposes of identification: Exhibit-17, Mediated actions by synthetic progestins used in HRT and contraception, by Africander.)
BY-MS.HORNER:
Q. So the first one is the Africander article, which you cite as being one that you find authoritative; correct?
MS. MANGRUM: Objection.
A. It's a respected publication.
BY-MS.HORNER:
Q. Okay. And if we turn to page 639 -- it's underneath the stapled exhibit -- we see the table that Dr. Africander uses for



the biological activity of synthetic progestins on different receptors; is that right?
A. That's right.
Q. Okay. And so Dr. Africander says that the literature is not consistent with respect to antimineralocorticoid activity for levonorgestrel; is that right?
A. I believe so, yes.
Q. And have you ever looked at his source citations here?
A. No, I haven't.
MS. HORNER: Let's do that really quick.
(Whereupon, the following was marked for purposes of identification: Exhibit-18, Drospirenone: pharmacology and pharmacokinetics of a unique progestogen by Krattenmacher.)
BY-MS.HORNER:
Q. Okay. So first let's look at an article by Krattenmacher, which I'll mark as Exhibit-18 to your deposition. There you go, Doctor. And let me know when you're ready.



Are you ready?
A. We're on 18, yes.
Q. Okay. And go ahead and turn to page 31. All right. So if we look at page 31, we see another similar chart; right?
A. In table two, yes.
Q. In table two. And here it's saying that for levonorgestrel there is no antimineralocoid activity; correct?
A. That's right.
(Whereupon, the following was marked for purposes of identification: Exhibit-19, The preclinical biology of new potent and selective progestin: trimegestone by Winneker.)
BY-MS.HORNER:
Q. And looking at another citation from Dr. Winneker, which I'm going to mark as Exhibit-19, this is also cited by Dr. Africander; correct?
A. I have to wait until I see it.
Q. Okay. And the Africander chart is page 639 again, if you want to look at it.

A. Okay.
Q. Are you ready?
A. Yes.
Q. Okay. So you would agree with me this Winneker article is what Dr. Africander is citing?
A. I didn't double check, but I trust you this time.
Q. Okay. So let's just look at the Winneker article on page 917. Should just be the next page over. And we see here on table three, again, we have the same sort of chart. LNG is plus slash minus AMR, meaning antimineralocorticoid receptor; correct?
A. That's correct.
Q. Okay. And it says data adapted from 8 to 10, 13. So those citations are given in the back. And we'll look at some, you know, a lot of them. But in particular I want to point you to the Muhn article, that is cited as number 13. Do you see that?
A. Okay.
MS. HORNER: And just hand that to you as Exhibit Number-20.



(Whereupon, the following was marked for purposes of identification: Exhibit-20, Drospirenone: A Novel Progestogen with Antimineralocorticoid and Antiandrogenic Activity by Muhn.)
BY-MS.HORNER:
Q. So this article is called, "Drospirenone: A Novel Progestogen with Antimineralocorticoid and Antiandrogenic Activity." Do you see on the first page, whose lab this is?
A. Well, there's several co-authors, but laboratories from Schering.
Q. Okay. And are you aware that Schering is the predecessor company to Bayer with respect to the Mirena?
MS. MANGRUM: Objection.
A. No.
BY-MS.HORNER:
Q. Okay. So if I were to say Schering is now Bayer, would you have any reason to disagree with me?
MS. MANGRUM: Objection.
A. It could be.



BY-MS.HORNER:
Q. Okay. So let's just go ahead and look at page 330 of this article. Here again we see that levonorgestrel is listed as having no antimineralocorticoid activity. Do you see that?
A. Okay. In table eight?
Q. Yes.
A. Levonorgestrel has a dash, meaning no activity, negligible activity or no activity.
Q. Okay. All right. For antimineralocorticoid; correct? So that would mean that agonistic activity has not been ruled out?
MS. MANGRUM: Objection.
A. Oh, we'd have to go back through all of these and see what they evaluated, so whether they were looking at both sides of the question.
MS. HORNER: All right. And let's look again at that Africander article and just see some of the other things that Dr. Africander cited. So we also have an article by Schindler that he's citing.



(Whereupon, the following was marked for purposes of identification: Exhibit-21, Classification of pharmacology of progestins by Schindler.)
BY-MS.HORNER:
Q. All right. So what I'm handing you now is the Schindler article that's cited in Africander. And if you would now turn to -- and this is marked Exhibit-21. If you would turn to page S11. And looking again at the chart, table two, it shows biological activities of natural progesterones and synthetic progestins. For levonorgestrel, we have no antimineralocorticoid activity, not effective. Is that correct?
A. That's correct.
Q. Okay. And on page S15, we have listed in table six a 75 percent affinity to the mineralocorticoid receptor; correct?
A. That's correct.
MS. HORNER: And looking again at Africander. I think there's only one more article that he cites and it's the Kuhl article, which I believe you also cite in

your report. And this is from reference 28. So this would be the article from 2005, I believe. Yes.

(Whereupon, the following was marked for purposes of identification: Exhibit-22, Pharmacology of estrogens and progestogens: Influence of different routes of administration by H. Kuhl.)

BY-MS.HORNER:

Q. So I'm marking this as Exhibit Number-22 to your deposition, and it's entitled, "Pharmacology of estrogens and progestogens: Influence of different routes of administration," by H. Kuhl, K-U-H-L. And here, if you would, I'd like you to turn to page 32 for the charts there. Do you know Dr. Kuhl?

A. No, I don't.

Q. Do you know Dr. Fatherby?

A. No, I don't. Not personally, no.

Q. Okay. Are you familiar with their work generally?

A. Yes.

Q. And here again under table nine, we



have the agonism or antagonism for progestogens with respect to certain receptors. Is that correct?

A. Yes.

Q. Okay. And here again we see that there's no antimineralocorticoid activity for levonorgestrel?

A. Correct.

Q. We also see that it's listing the binding affinity at table 10 as 75 for mineralocorticoid?

A. It's probably the same data as the other study.

(Whereupon, the following was marked for purposes of identification: Exhibit-23, Nomegestrol acetate, a novel progestogen for oral contraception by Mueck.)

BY-MS.HORNER:

Q. And I think there's just one more citation Dr. Africander uses, and that's the Mueck article. So I'm handing that to you now and I'm marking it as Exhibit-23. Do you know Dr. Sitruk-Ware?

A. No.



Q. Are you aware that she's a consultant for Bayer?

MS. MANGRUM: Objection.

A. I'm sorry. What?

BY-MS.HORNER:

Q. Were you aware that she's a consultant for Bayer?

A. She works for Bayer?

Q. She's a consultant for Bayer.

A. Consultant, no, I don't. I don't know that.

Q. Okay. And I'd just like you to turn quickly to page 533 of this article, which is "Nomegestrol acetate, a novel progestogen for oral contraception" by Dr. Mueck, M-u-e-c-k. I probably butchered the pronunciation of that.

Okay. So looking at tables two and three again, we're seeing the information on binding affinity being at 75 percent for levonorgestrel as the mineralocorticoid receptor. And we're also seeing in table three that there's no antimineralocorticoid activity for levonorgestrel; is that correct?



A. Correct.

Q. All right. So, actually, everything that Dr. Africander is relying on shows that there's no antimineralocorticoid activity; right?

MS. MANGRUM: Objection.

A. Qualified by the types of systems that they were carrying out these measurements in.

BY-MS.HORNER:

Q. Okay.

A. Doesn't mean there's no --

Q. Okay. So if he's citing these articles for the proposition that the literature is not consistent, actually it is consistent in these citations; isn't it?

MS. MANGRUM: Objection.

A. The main thrust of my statements and arguments were that this is not a viable theory for a mechanism of action of levonorgestrel.

BY-MS.HORNER:

Q. Okay. And that's based on there being what exactly?

A. Any of these measurements are indicating, if anything, weak binding to the receptors. And it's not clear what further effects ensue from this. And the mechanism of action of all the steroids require more than interaction with a receptor. So one needs the cascade of additional measurements and ultimately clinical effects to make these kinds of judgments.
Q. Okay. But none of these sources say that there is antimineralocorticoid activity; right?
A. True.
Q. And if LNG is binding to the mineralocorticoid receptor and it does not have antimineralocorticoid activity, then wouldn't that mean that it has agonistic activity?
A. Not at all.
Q. Okay. So why is that?
A. Besides binding to the receptor, a number of things have to happen. One needs to have a sufficient concentration. Just because there's binding doesn't mean the



concentration is enough to do anything. And when you do have a sufficient concentration, there has to be activation of the receptor, nuclear binding of the drug receptor complex, changes in signaling mechanisms, change in gene expression, downstream effects that ultimately lead to whatever may happen in terms of salt and water flux.
Q. Okay. And as far as we know, nobody has looked at that question; right?
MS. MANGRUM: Objection.
A. I don't think so with levonorgestrel.

BY-MS.HORNER:
Q. Okay. So what we have to go on is the fact that there's not antimineralocorticoid activity and the fact that levonorgestrel does bind to the mineralocorticoid receptor; right?
MS. MANGRUM: Objection.
A. Again, binding to the receptor is just a small part of the story.
BY-MS.HORNER:
Q. Okay. Would you say that it's



possible that in binding to the receptor the hormone can activate the receptor as an agonist and create similar downstream effects as aldosterone would?
MS. MANGRUM: Objection.
A. That's something that could be investigated scientifically, but I don't know.
BY-MS.HORNER:
Q. So it is possible then?
MS. MANGRUM: Objection. Calls for speculation.
A. Again, it would be something so easy to explore that I would think the answer is already in the literature. Although, I don't know it.
BY-MS.HORNER:
Q. Okay. If the answer were in the literature, don't you think you would have found it?
A. I would expect that these review articles that I cited would have had more specifics in that regard.
Q. Okay. Whose job do you think it is to determine whether or not levonorgestrel



has effects similar to aldosterone?
MS. MANGRUM: Objection.
A. Well, backing up a bit, women taking oral contraceptives don't actually exhibit the array of kind of effects that people taking aldosterone does -- did. So it's probably not been necessary to explore it.
BY-MS.HORNER:
Q. Okay. Isn't it true that weight gain and bloating have been reported with women who take levonorgestrel?
MS. MANGRUM: Objection.
A. I think both weight gain and weight loss has been reported, but I'm not positive.
BY-MS.HORNER:
Q. What about bloating?
A. I'm not sure.
Q. You don't know if bloating has been reported or not among, say, Mirena users?
MS. MANGRUM: Objection.
A. Well, Mirena users, I don't know.
BY-MS.HORNER:
Q. What about with respect to Norplant users?

A. I don't know.
Q. So you can't rule out that effects similar to what aldosterone would have have been reported or observed in users of Norplant and Mirena?
MS. MANGRUM: Objection.
A. I'm not sure it's in my place to speculate on that.
BY-MS.HORNER:
Q. But you can't rule it out?
MS. MANGRUM: Objection.
A. I don't know why I should rule it out or rule it in.
MS. HORNER: Okay. No further questions.
MS. MANGRUM: Okay. It'll take me a minute to get my stuff together.
THE VIDEOGRAPHER: Do you want to go off?
MS. MANGRUM: Yes, please.
THE VIDEOGRAPHER: Okay. We're going off record at 3:53 p.m.
(Whereupon, recess taken from 3:53 p.m. until 4:11 p.m.)



THE VIDEOGRAPHER: Okay. We're back on record at 4:11 p.m.
MS. MANGRUM: Okay. I have no questions of the witness.
MS. HORNER: I think that concludes our deposition then.
THE VIDEOGRAPHER: This concludes the testimony of Dr. William Jusko, and we're off record at 4:11 p.m. Thank you.
(Whereupon, the videotaped deposition of WILLIAM J. JUSKO, Ph.D. concluded at 4:11 p.m.)



CERTIFICATE

STATE OF NEW YORK
COUNTY OF ERIE

I, Lindsay Nicole Robel, Notary Public, in and for the County of Erie, State of New York, do hereby certify:

That the witness whose testimony appears hereinbefore was, before the commencement of their testimony, duly sworn to testify the truth, the whole truth and nothing but the truth; that said testimony was taken pursuant to notice at the time and place as herein set forth; that said testimony was taken down by me and thereafter transcribed into typewriting, and I hereby certify the foregoing testimony is a full, true and correct transcription of my shorthand notes so taken.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my seal this 7th day of June, 2016.

Lindsay Nicole Robel
Court Reporter
Notary Public
No.: 01TR6249119