UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:

MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABLITY LITIGATION (NO. II)
*This Document Relates To All Actions*

17-MD-2767 (PAE)
17-MC-2767 (PAE)

**PLAINTIFFS' MOTION TO EXCLUDE EXPERT OPINIONS OF GREGORY VAN STAVERN, M.D. PURSUANT TO *DAUBERT***

# TABLE OF AUTHORITIES

## Cases

*Brooks v. Outboard Marine Corp*, 234 F.3d 89 (2d Cir. 2000) .................................................. 11

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.23d 1311 (9th Cir. 1995) ........................................ 7

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ............................................. passim

*Franklin v. Consolidated Edison Co.*, U.S. App. LEXIS 6518 (2d Cir. 2002)............................ 11

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ........................................................................ 7, 11

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999) ............................................................. 2, 9

*LVL XIII Brands Inc. v. Louis Vuitton Malletier S.A*,, 209 F. Supp. 3d 612 (S.D.N.Y. 2016)... 1, 9

*Zerega Ave. Realty Corp v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206 (2d Cir. 2009)........ 1

## Rules

Rule 702 ......................................................................................................................... passim

**TABLE OF CONTENTS**


I. INTRODUCTION .... 1
II. ARGUMENT .... 1
  A. STANDARD OF REVIEW .... 1
  B. *DAUBERT* FACTORS .... 1
  C. APPLICATION OF *DAUBERT* TO EXCLUDE DR. VAN STAVERN'S OPINIONS .... 2
    1. Dr. Van Stavern has not provided a reliable methodology upon which his opinions are based. .... 2
    2. Dr. Van Stavern's opinions are based upon limited data or data that was available but he chose not to review. .... 3
    3. Dr. Van Stavern's opinions are not based upon a scientific method of weighing as to *all* the evidence. .... 8
    4. Dr. Van Stavern's criticism of research that supports finding that Mirena causes or contributes to cause PTC is flawed, as he uses a qualitative analysis to reach a quantitative conclusion. .... 10
III. CONCLUSION .... 12

## I. INTRODUCTION

Gregory Van Stavern, M.D., (hereinafter "Dr. Van Stavern") is a neuro-ophthalmologist currently employed with Washington University located in St. Louis, Missouri. Dr. Van Stavern has submitted two Expert Reports in litigation involving Mirena and Intracranial Hypertension (IH). (*See* Exhibit A, Expert Report of Dr. Gregory Van Stavern dated 3.26.16; and Exhibit B, Expert Report of Dr. Gregory Van Stavern dated 1.18.18). Dr. Van Stavern has also been deposed twice. (*See* Exhibit C, Deposition Transcript of Dr. Gregory Van Stavern dated 2.13.18; and Exhibit D, Deposition Transcript of Dr. Gregory Van Stavern dated 5.17.16). Dr. Van Stavern is one of five neuro-ophthalmologists submitted as an expert by Defendants Bayer Healthcare Pharmaceuticals, Bayer Pharma AG, and Bayer Oy (collectively, "Bayer") in this litigation. For reasons discussed below, Dr. Van Stavern's reports and testimony should be excluded.

## II. ARGUMENT

### A. STANDARD OF REVIEW

Plaintiffs refer to, and incorporate herein, *Plaintiffs' Omnibus Daubert Brief* filed contemporaneously with the instant Motion to Exclude in its entirety.

### B. *DAUBERT* FACTORS

For the sake of brevity, Plaintiffs cite to *Plaintiffs' Omnibus Daubert Brief* filed contemporaneously with the instant Motion to Exclude for the general *Daubert* standard. However, Plaintiffs relevantly note that this Court has expressly commented on the Second Circuit's instruction to exclude expert testimony if it is "speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith.'" *LVL XIII Brands Inc. v. Louis Vuitton Malletier S.A,*, 209 F. Supp. 3d 612, 636 (S.D.N.Y. 2016) (Engelmayer, J.) (*quoting Zerega Ave. Realty Corp v. Hornbeck Offshore Transp., LLC,* 571 F.3d 206, 214 (2d Cir. 2009)).

An expert's testimony must be based both on a reliable foundation that is also relevant to the subject matter of the litigation. *Id.* at 635. "The Court's task 'is to make certain that an expert, whether basing testimony upon professional studies of personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* at 635-636 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

### C. APPLICATION OF *DAUBERT* TO EXCLUDE DR. VAN STAVERN'S OPINIONS

There are multiple reasons that Dr. Van Stavern's testimony does not meet the requirements under *Daubert* and as such, he should not be allowed to testify as an expert in this litigation. First, Dr. Van Stavern fails to provide reliable methodology for his opinions. Second, his opinions are largely based on limited data, or data that was available to him, but he chose not to review. Third, Dr. Van Stavern cannot cite to a scientific method used to review all of the evidence for his opinions. Fourth, Dr. Van Stavern is critical of Plaintiffs' experts' opinions that Mirena use causes, or contributes to cause, Pseudotumor Cerebri (hereinafter "PTC") but he uses flawed analysis in rejecting their conclusions. Each of these reasons independently shows that Dr. Van Stavern's opinions do not rise to the level required under *Daubert* and when reviewed collectively, dictate that this Court must exclude his reports and testimony.

#### 1. Dr. Van Stavern has not provided a reliable methodology upon which his opinions are based.

Dr. Van Stavern repeatedly states his primary opinion, namely, "there is no reliable evidence that a causal relationship exists between Mirena and IIH." (Ex. A at pg. 11; Ex. B at pg. 16). Dr. Van Stavern did not conduct his own studies to support his opinion. Indeed, he admits that he is not an epidemiologist and has not conducted any research studies with regard to PTC. (Ex. C at pg. 77:24-78:25; Ex. D at pg. 108: 21-109:1). Further, he testified that he has not been

asked to conduct any research or studies concerning the connection between Mirena and PTC. (Ex. C at pg. 104: 14-18). Instead, Dr. Van Stavern merely states that his opinions are based "on the evidence available," without sufficiently defining the available evidence upon which he relies. (Ex. C at pg.143: 2-19). Dr. Van Stavern has conducted zero epidemiological studies and has completed no laboratory testing regarding the potential relationship between PTC and levonorgestrel, the hormonal component of the Mirena device. (Ex. D at pg. 62:5-8). Most importantly, Dr. Van Stavern has agreed that there is no control study that supports his opinion that there is zero causal association between levonorgestrel and PTC. (Ex. D at pg. 68: 25-69:6).

This lack of methodology used by Dr. Van Stavern is precisely what *Daubert* cautions against. The requisite elements of Rule 702 serve as a gate-keeping function wherein the Court must decide "(1) whether the theory or methodology underlying the testimony is reliable and (2) whether the expert's theory or methodology is relevant in that it 'fits' the facts of the case." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590-591 (1993). Dr. Van Stavern's lack of methodology renders his opinions unreliable and as such, should be ruled inadmissible under Rule 702 and *Daubert*.

**2. Dr. Van Stavern's opinions are based upon limited data or data that was available but he chose not to review.**

Dr. Van Stavern states in his report that "the myriad metabolic dysregulations in obesity could predispose to IIH though presently there is inadequate evidence for specific causative pathways." (Ex. B at pg. 2). However, this statement is made without citation to scientific evidence in support. Expert opinions that are not based on data or evidence are clearly unreliable and as such must be barred.

Further, in his most recent deposition on February 22, 2018, Dr. Van Stavern discussed different items that he reviewed prior to his deposition in support of his position that Mirena does

not cause or contribute to cause PTC. One such item warrants further investigation as an example of how Dr. Van Stavern's opinions are not reliable or relevant. Dr. Van Stavern testified that one of the materials he reviewed was a presentation made at an American Academy of Ophthalmology training that he attended in November 2017. That presentation involved a case-controlled study looking at the incidence of idiopathic intracranial hypertension (hereinafter "IIH"). Dr. Van Stavern did not bring the materials with him to the deposition and admitted he did not have access to the database containing the underlying scientific data associated with that presentation. (Ex. C at pgs. 67:12-69:16). Further, the following exchange took place regarding his review of the data used for this study:

> **Question**: And were you made aware of the details of how any of that research was conducted?
>
> **Answer**: Well in the presentation in the abstract they talk about methodology so it was done as a …basically it looked like a fairly well designed case control study.

(Ex. C at pg. 69: 11-16).

Thus, Dr. Van Stavern's opinions are admittedly based, in part, on abstracts discussed at a training and are cited without further review of the data and methodology upon which they are based. In referencing his opinions, he testified that "I mean, again, my opinions are not dependent on other people in the community. I mean, my opinions are based on the evidence available." (Ex. C at pg. 71:1-4). Dr. Van Stavern should not be allowed to testify as an expert as these "materials" upon which his opinions are based were not adequately reviewed by him in forming his opinions.

Another example of the unreliability of Dr. Van Stavern's opinions is his citation to the Durcan study in his 2016 report (s*ee* Ex. A at pg. 5) and his 2016 deposition as one of the items which he relied upon in formulating his opinions. Dr. Van Stavern cites to this study to state that "it looked like they found no significant difference in oral contraceptive use in the IIH group to

the general population." (Ex. D at pg. 116:4-9). Problematically, when asked if misdiagnosis or overdiagnosis of PTC could inflate the number of PTC patients in the general population in the Durcan study, he admitted, "[i]t's possible." (Ex. D at pgs. 116:22-118:4).

Thus, Dr. Van Stavern's opinions are unreliable as they are based on limited and flawed data. This unreliability is further demonstrated in his review of Bayer's clinical trials involving Plaintiffs diagnosed with IIH. His report states as follows: "In the first case, it is unclear from the documentation whether she ever received a lumbar puncture; she did not ever meet the criteria for IIH (MIR_PIEU_157045 to -048)" (Ex. C at pg. 9). However, Bayer's designee admitted in her deposition that the investigator assigned to this clinical trial never obtained the medical records of this patient, nor were the doctors who made the PTC diagnosis contacted. (*See* Ex. E Dr. J. Schoendorf Deposition, Volume II, pg. 236:16-238:14).

Dr. Van Stavern was specifically asked in his deposition in May 2016 about six different studies pertaining to PTC or IIH and the relationship with certain medication, including levonorgestrel. Dr. Van Stavern had to concede that some of these research sources do, in fact, associate hormonal agents with PTC. An example of such a concession is found in his deposition from May 2016 wherein the 2013 paper from Dr. Biousse asks, "Can we predict prognosis outcome for IIH patients?" Dr. Van Stavern admitted that Dr. Biousse is competent and qualified to discuss IIH. Dr. Biousse mentioned levonorgestrel as a medication proposed to cause, or more likely precipitate, IIH. Dr. Van Stavern's testimonial commentary on this research, which was ignored and not included as a basis for his opinion, is as follows: "Well, I don't know what precipitate means. If you mean cause it, then, no, I don't agree the evidence supports that. And I think her statement actually is it's been proposed to cause. So I think it is one of those things, it's an open

question." (Ex. D at pgs. 221:9-226:3). Accordingly, Dr. Van Stavern's opinions are "cherry-picked" in that he expressly disregards research in opposition to his stated opinions.

Further, Dr. Van Stavern is a neuro-ophthalmologist but spends a great deal of time discussing literature in different fields of medicine and relying on such as part of his expert opinion, even though these areas are outside the area of his expertise. For example, in his May 2016 deposition, Dr. Van Stavern cites his reliance on the American College of Obstetricians and Gynecologists (ACOG) to support his testimony that Mirena is preferentially prescribed to overweight and obese women, in the following deposition excerpt:

> "**Question**: Do you know what percentage of overweight or obese women in the United States use the Mirena product?
>
> **Answer**: I don't know. I do know that it is preferentially prescribed to obese women, so I suspect it's a relatively higher number.
>
> **Question**: And tell me everything that supports your statement that Mirena is preferentially prescribed to overweight and obese women?
>
> **Answer**: So I think you have the ACOG statement. You have CDC guidelines. Those are, at least recommendations to prescribing gynecologists to prescribe Mirena to overweight and obese women.
> **Question**: But the documents you just cited don't say specifically to prescribe Mirena to the exclusion of anything else, do they?
>
> **Answer**: No, they don't, but I think it's a reasonable assumption that people do try to follow guidelines."

(Ex. D at pg. 23:14-24 and pgs. 168:18-170:24).

Further examples of Dr. Van Stavern venturing outside of his area of expertise include his acknowledgment that he is neither a pharmacologist nor an epidemiologist. (Ex. C at pgs. 75: 18-78:25). Dr. Van Stavern also testified that if he had a patient using Mirena who has been diagnosed with IIH and who has not responded to conservative treatment, he would still not consider removal of the Mirena, opting instead for a shunt to relieve the pressure. (Ex. C at pgs. 124:18-126:23).

Curiously, Dr. Van Stavern did not cite his own work in the Epidemiology section of his report (both Ex. A and Ex. B at pg. 4). However, Dr. Van Stavern co-authored an article with two other doctors titled, "Atypical Idiopathic Intracranial Hypertension," in which the increased rate of medication-induced IIH in people of normal BMI was statistically significant. The complete disregard of his own work is yet another example of why Dr. Van Stavern's opinions require exclusion.

"[T]he trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.23d 1311, 1319 (9th Cir. 1995). Moreover, an expert's opinion is inadmissible if it "is connected to existing data only by the *ipse dixit* of the expert," for a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Each of the instances cited above provide a basis for this Court to exclude Dr. Van Stavern as an expert. His opinions do not meet the standards of *Daubert* and specifically rely upon information and data with which he is not familiar, does not specialize in, and has not conducted independent research. Dr. Van Stavern has taken the conclusions of others, many outside his field, and simply cited to them as the basis for his opinions without taking the required further step in demonstrating that these opinions are, indeed, reliable to this Court. Instead, he relies upon limited data and conveniently disregards other data that would support Plaintiffs' experts' opinion that use of Mirena can cause or contribute to cause PTC. Dr. Van Stavern has failed to fill the gap between recitation of these studies and his formulation of opinions stating Mirena use does not cause PTC and as such, his opinions should be barred as evidence.

**3. Dr. Van Stavern's opinions are not based upon a scientific method of weighing as to *all* the evidence.**

Dr. Van Stavern's broad review of the studies cited, without a clear and consistent scientific method, cannot support his opinions under *Daubert*. An example of this is found in Dr. Van Stavern's report dated March 26, 2016, wherein he states as follows: "Excessive weight gain and weight gain are independently associated with IIH in a dose response manner, with weight gain being a significant risk factor independent of baseline BMI (Daniels et al. 2007)." (Ex. A at pg. 5). The flaw in Dr. Van Stavern's analysis that renders his broad opinions unreliable is that the Daniels study itself has flaws, to which Dr. Van Stavern makes no mention. The Daniels study consisted of 34 PTC patients, compared to 41 patients with other neuro-ophthalmologic disorders. The small sample size of this study, as well as the information gathered about weight and weight gain, both pose problems as to the study's credibility. Further, the questionnaire used in this study included certain medications but excluded levonorgestrel implants, which is a curious choice given that levonorgestrel implants are identified among "medications associated with intracranial hypertension" in one of the papers cited in the Daniels 2007 study. (*Id.*).

Another example of Dr. Van Stavern's opinions lacking a scientific methodology is his description of patients that he saw while practicing in the Detroit, Michigan area. Dr. Van Stavern made the blanket statement that: "I practiced as the sole neuro-ophthalmologist at Wayne State University in Detroit for nine years in an area with a very high incidence of IIH." (Ex. D at pg. 87: 13:16). When asked by Plaintiffs' counsel his basis for saying that area had a high incidence of IIH, the following exchange took place:

> **Answe**r: That was…Unfortunately, Michigan is one of the states that has a high incidence of obesity, and that goes along with high instances of IIH. So I saw a lot of patients with IIH over that time frame.

**Question**: Right. But how do you…How did you quantify that…that Wayne State University in Detroit as having a high incidence of IIH, versus other areas?

**Answer**: Simply by the fact that I had a huge volume of IIH patients who were obese.

**Question**: This doesn't say anything about 'obese.' We're talking about very high incidence of IIH. How did you make that determination? What's your basis for it? Is there any sort of scientific literature that says that the incidence of IIH at Wayne State University is very high compared to anywhere else?

**Answer**: Oh, there is plenty of evidence that the higher the incident of obesity, the higher the incidence of IIH, so I think it's reasonable to make the statement that there is a high incidence of IIH in an area that has a high incidence of obesity.

**Question**: Okay. But you don't have any studies or reports or any other data that would support your suggestion in your report that that particular area had a very high incidence of IIH, as compared to other areas?

**Answer**: Other than what I just said.
…
**Question**: You didn't look at that data before writing this report, correct?

**Answer**: That's correct.

**Question:** You didn't cite to any sort of data for that in your report, right?

**Answer**: It seemed so obvious that I didn't feel it was necessary.

(*Id.* at pgs. 87: 21-90:5).

These detailed examples demonstrate that Dr. Van Stavern's opinions are not based upon a scientific method or even any basic data retrieval. This lack of review necessarily renders his opinions unreliable under *Daubert*. This Court has instructed that its task "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs the same level of intellectual rigor that characterizes the practice of an expert in a relevant field." *LVL XIII Brands Inc. v. Louis Vuitton Malletier S.A,*, 209 F.Supp.3d 612, 636 (S.D.N.Y. 2016)(Engelmayer, J.) (*quoting Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Nothing about Dr. Van Stavern's reliance upon studies of which he has not fully reviewed the

methodology or data rises to the level of "intellectual rigor that characterizes the practice of an expert" as required by this Court. Therefore, his opinions fail to meet the requirements under *Daubert* and should be excluded.

**4. Dr. Van Stavern's criticism of research that supports finding that Mirena causes or contributes to cause PTC is flawed, as he uses a qualitative analysis to reach a quantitative conclusion.**

Dr. Van Stavern critically discusses both the 2015 Etminan publication as well as the 2017 Velenzuela study in his expert reports. (*See generally* Ex. A and Ex. B). Regarding the 2015 Etminan publication, Dr. Van Stavern's comment in his 2018 report is as follows: "While the authors report a "higher than expected" reporting odds ratio in Mirena users in FAERS (ROR 1.78 and 1.5 for 'intracranial hypertension' and papilledema, respectively), the limitations of their study make it impossible to draw that conclusion." (Ex. B at pg. 10). In his review of the Valenzuela study, Dr. Van Stavern opines that "there are at least two other significant methodologic flaws that render the odds ratios reports by Valenzuela et al. unreliable." (*Id.* at pg. 11). In both of these statements, Dr. Van Stavern is making vague *qualitative* objections but does not attempt to make a *quantitative* objection based on the actual numbers and calculations. Such objections and criticisms are not reliable as Dr. Van Stavern made no calculations or quantitative analysis in his review of these studies, which are in turn based on quantitative numbers and data.

Moreover, Dr. Van Stavern dismisses the Plaintiffs' experts' citations to Bayer's adverse event reports that support a causal connection between Mirena and IIH. (*Id.* at pg. 15). In this criticism, Dr. Van Stavern fails to point out that Bayer, who hired him for his expertise, did not provide him (or any of the other purported experts) the data from the Bayer Empirica database. This information cannot be discounted when it was never provided by Bayer to Dr. Van Stavern

for his review. As such, any opinions from Dr. Van Stavern regarding these findings should be barred as unreliable.

In addition, Dr. Van Stavern takes issue with the Plaintiffs' experts' findings about the "temporality" criteria in determining that Mirena causes IIH. (*Id.*). Dr. Van Stavern's criticism includes the statement that "since Mirena LNG levels are highest shortly after insertion and decline steadily thereafter (a point most of the plaintiffs' experts do not appear to contest), this does not support their conclusion that Mirena causes IIH." (*Id.*). In fact, Bayer's own label affixed to the Mirena product says the LNG serum levels are "stable" in the first few weeks and actually shows LNG serum levels going *up* after 12 months and being even higher after 24 months.[1] Again, Dr. Van Stavern's opinions with regard to Plaintiffs' experts fails to look quantitatively at the data provided by the very company that has hired him. That failure renders his opinions unreliable and inadmissible.

When reviewing expert opinions for compliance with Rule 702, the factors include: "consideration of the foundation for the opinion, its subjectivity, any failure to test, the expert's consideration of alternative causes and a comparison of the methodology to the expert's regular professional work." *Franklin v. Consolidated Edison Co.*, U.S. App. LEXIS 6518, at *5 (2d Cir. 2002); *Brooks v. Outboard Marine Corp*, 234 F.3d 89, 92 (2d Cir. 2000). Further, even if an expert's methodologies are determined to satisfy the *Daubert* standard for admissibility, the court must still decide whether that evidence actually supports the expert's conclusions. *Joiner*, 522 U.S. at 146.

[1] The label says, "A stable serum concentration, without peaks and troughs, of LNG of 150-200 pg/mL occurs after the first few weeks following insertion of Mirena. LNG concentrations after long-term use of 12, 24 and 60 months were 180±66 pg/mL, 192±140 pg/mL, and 159± 59 pg/mL, respectively."

Dr. Van Stavern's lack of a quantitative review renders his opinions inadmissible. He admits to a lack of review and knowledge of the data for many of the studies he cites. He did not personally conduct any tests or studies in support of his opinions, and he utilized data and research that is far afield from his regular professional work as a neuro-ophthalmologist. Dr. Van Stavern's opinions must be excluded because they do not rise to the standards required under *Daubert*. This Court must exercise its gate-keeping function under *Daubert* and find that Dr. Van Stavern's opinions are unreliable for the reasons listed above and exclude him as Bayer's expert.

## III. CONCLUSION

For reasons discussed above, Plaintiffs respectfully request this Court exclude Dr. Van Stavern as an expert for Bayer in any capacity as his opinions are unreliable and do not meet the requirements of Rule 702 and *Daubert*.

Dated: March 2, 2018

Respectfully submitted,

*/s/ Lawrence L. Jones II*
Lawrence L. Jones II
Jones Ward PLC
*Co-Lead Counsel for Plaintiffs*

Martin D. Crump
Davis & Crump PC
*Co-Lead Counsel for Plaintiffs*

Maxwell S. Kennerly
Kennerly Loutey, LLC
*Liaison Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was filed via the ECF/CM system with the Clerk of the Court, which will have sent notice to all attorneys of record in this matter on March 2, 2018.

/s/ *Lawrence L. Jones II*
Lawrence L. Jones