# EXHIBIT C

**In the Matter Of:**

IN RE: MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY

# VIDEOTAPED DEPOSITION OF GREGORY P. VAN STAVERN, M.D.

*February 13, 2018*

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: Case Nos.
MIRENA IUS LEVONORGESTREL- 17-MD-2767(PAE)
RELATED PRODUCTS LIABILITY 17-MC-2767(PAE)
LITIGATION (NO. II)
_________________________________/

VIDEOTAPED DEPOSITION OF GREGORY P. VAN STAVERN, M.D.
ST. LOUIS, MISSOURI
TUESDAY, FEBRUARY 13, 2018

Reported by:
DEBORAH HABIAN, CSR, RMR, CRR, CLR
JOB NO. 39388

FEBRUARY 13, 2018

9:34 A.M. CST

Videotaped deposition of GREGORY P. VAN STAVERN, M.D., taking place at the law offices of HeplerBroom, 211 North Broadway, Suite 2700, St. Louis, Missouri, pursuant to notice, before DEBORAH HABIAN, Missouri Certified Court Reporter, Illinois Certified Shorthand Reporter, Registered Merit Reporter, Certified Realtime Reporter, Certified Livenote Reporter.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS
GORI JULIAN & ASSOCIATES, P.C.
BY: D. TODD MATHEWS, ESQ.
156 North Main Street
Edwardsville, Illinois 62025
-and-
DALIMONTE RUEB, LLP
BY: JENNIFER L. ORENDI, ESQ.
1250 Connecticut Avenue NW, Suite 200
Washington, D.C. 20036

ON BEHALF OF BAYER HEALTHCARE AND THE WITNESS
GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM, LLP
BY: EMMA C. NEFF, ESQ.
SHAYNA S. COOK, ESQ.
564 West Randolph Street, Suite 400
Chicago, Illinois 60661

ALSO PRESENT:
Jeff Hill, Legal Videographer

I N D E X

WITNESS: PAGE
GREGORY P. VAN STAVERN, M.D.
Examination by Mr. Mathews ............... 9
Examination by Ms. Neff .................. 145

REQUESTS AND INSTRUCTIONS OF COUNSEL
By Mr. Mathews .......................... 44
By Ms. Neff ............................ 12
By Ms. Neff ............................ 12
By Ms. Neff ............................ 20
By Ms. Neff ............................ 26
By Ms. Neff ............................ 117

PLAINTIFFS' EXHIBITS TO VAN STAVERN DEPOSITION

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 1 | 3/6/15 Van Stavern invoice to Goldman Ismail, no Bates | 10 |
| Exhibit 2 | Transcript of 5/17/16 video deposition of Gregory Van Stavern, M.D. re Shenika Houston v. Bayer HealthCare Pharmaceuticals, et al., 266 pp | 31 |

(CONTINUING)

PLAINTIFFS' EXHIBITS TO VAN STAVERN DEPOSITION


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 3 | Expert Report of Gregory Van Stavern, M.D. | 47 |
| Exhibit 4 | Notice of Video Deposition of Gregory Van Stavern, M.D. | 63 |
| Exhibit 5 | Defendants' and Dr. Gregory Van Stavern's Responses and Objections to Notice of Video Deposition of Gregory Van Stavern, M.D. | 65 |
| Exhibit 6 | Gregory Van Stavern, M.D. Additional Materials Reviewed | 67 |
| Exhibit 7 | Khin Kilgore, M.D., et al 11/13/17 presentation to Neuro-Opthalmology | 69 |
| Exhibit 8 | WashU Individual (Research) Conflicts of Interest Policy | 83 |

(CONTINUING)

PLAINTIFFS' EXHIBITS TO VAN STAVERN DEPOSITION

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 9 | Jeffrey Peipert, et al article | 86 |
| Exhibit 10 | 2017 AJOG article by Jeffrey F. Peipert, et al | 87 |
| Exhibit 11 | American Journal Obstetrics Gynecology article by | 88 |
| Exhibit 12 | SLU School of Medicine article by Jeffrey F. Peipert, Tessa Madden, et al | 90 |
| Exhibit 13 | Monsanto Laboratory of the Life Sciences WashU grant app | 94 |
| Exhibit 14 | Pseudotumor and Real Tumor PowerPoint presentation by Gregory P. Van Stavern, M.D., WashU School of Medicine | 113 |

(CONTINUING)

PLAINTIFFS' EXHIBITS TO VAN STAVERN DEPOSITION

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 15 | Review & Update of Pseudotumor Cerebri PowerPoint presentation by Kung, McCoy and Van Stavern | 116 |
| Exhibit 16 | Papilledema and Idiopathic Intracranial Hypertension, PowerPoint presentation by Gregory P. Van Stavern, M.D., WashU School of Medicine | 128 |
| Exhibit 17 | Idiopathic Intracranial Hypertension (Pseudotumor Cerebri): What Do We Know? PowerPoint presentation by Gregory P. Van Stavern, M.D., WashU School of Medicine | 135 |
| Exhibit 18 | Idiopathic Intracranial Hypertension: What the Bleep Do We Know? PowerPoint presentation by Gregory P. Van Stavern, M.D., WashU School of Medicine | 137 |

THE VIDEOGRAPHER: The videotaped deposition of Gregory Van Stern [sic], Medical Doctor, taken in the matter of Mirena Levonorgestrel Products Liability Litigation being held at the location of 211 North Broadway on 2/13/2008 at 9:34 a.m.

My name is Jeff Hill. I'm the videographer, and the court reporter is Debbie Habian.

Counsel please introduce yourselves for the record and then the court reporter will swear in the witness.

MR. MATHEWS: Todd Mathews for the plaintiffs.

MS. ORENDI: Jennifer Orendi for the plaintiffs.

MS. NEFF: Emma Neff for Bayer and for the witness.

MS. COOK: Shayna Cook with --

MS. NEFF: And before we move forward, I'd request any counsel attending this deposition by video please identify yourselves for the record in accordance with the deposition protocol.

(No response.)

MS. NEFF: Am I correct that, to your knowledge, nobody is on the line at this time?

MR. MATHEWS: To my knowledge, nobody's on.

MS. NEFF: Great. Thanks.

THE REPORTER: Raise your right hand, please, Doctor.

(Oath administered.)

THE WITNESS: I do.

THE REPORTER: Thank you.

GREGORY VAN STAVERN,

called as a witness herein by the plaintiffs, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MATHEWS:

Q. Doctor, could you please state your name for the record.

A. Gregory Van Stavern.

Q. Okay. And during the course of this deposition, I'll attempt to refer to you as Dr. Van Stavern. Am I saying that correctly?

A. That's correct.

Q. All right. Great. Doctor, you're here

today to testify as an expert for the defendants in this matter; is that correct?
A. That's true.
Q. All right. And in preparation for the deposition today, I've been provided some documents. I'm going to have them identified collectively as Exhibit 1.
(Plaintiffs' Exhibit 1 was marked for ID.)
BY MR. MATHEWS:
Q. You've been handed what's been marked as Exhibit 1. Could you identify that group of documents, please?
A. Yes, I see them. These look like invoices.
Q. Are those invoices you have provided for the defendants in this matter?
A. They are.
Q. All right. And through at least November of -- November 27, 2017, do they adequately reflect the billing that you have made in this matter?
A. Let me just take a quick look. (Reviewing document.)
Yeah, they look accurate.

Q. All right. And I see the first invoice being dated March 6th, 2015. Does that sound about right?
A. That's about right.
Q. Okay. And if we added this correctly, these total up to $107,250. Does that sound about right?
A. I trust your math on that.
Q. Whatever is included in these documents totaled up would be what you billed, correct?
A. Correct.
Q. You haven't had any additional billing that isn't accounted for here except from November 27, 2017 to current?
A. That's correct.
Q. All right. Now, when were you first contacted about being an expert witness in cases related to Mirena and the association with PTC or IIH?
MS. NEFF: Object to form.
Go ahead.
THE WITNESS: It was probably, you know, late 2014.
BY MR. MATHEWS:
Q. All right. And do recall who contacted

you?

A. I believe Emma Neff contacted me originally.

Q. And do you have any idea how Ms. Neff found you as somebody who might be an expert in this field?

A. I actually don't know.

Q. All right. And when were you initially contacted, what was the scope of the work that you were asked to perform?

MS. NEFF: Counsel -- Dr. Van Stavern, I'm going to instruct you not to answer regarding the substance of the communications with counsel.

BY MR. MATHEWS:

Q. When were you initially contacted, was there -- what was your understanding of what you were being asked to do in giving an opinion in this matter?

MS. NEFF: Again, Dr. Van Stavern, I'm going to instruct you not -- not to answer what you have been asked to do in giving an opinion in this matter as it reflects -- as so far as it reflects communications between you and any counsel for Bayer.

MR. MATHEWS: Okay.
BY MR. MATHEWS:
Q. Doctor, when you were first contacted about this matter, what did you do in preparing to provide services to the defendant in this matter?
MS. NEFF: Object to form.
THE WITNESS: Well, I think I was asked -- basically, I was told a little bit about the litigation and I told them I'd think about it, and I was already of the opinion that there was no relationship whatsoever between any hormonal contraceptive and IIH. So I thought about it for a little bit and looked at my time commitments for the next six months because I had an idea that this might take quite a bit of my time, and then it looked like I would be able to do this, and so I contacted her back and said that, you know, I would be able to serve as an expert.
BY MR. MATHEWS:
Q. All right. Prior to being contacted in this matter, had you ever served as an expert witness in any other cases?
A. I have.

Q. All right. And in what cases -- how -- let me ask you this: How many times?

A. You know, probably I do about maybe one a year, maybe twice a year. Sometimes I'll just serve as a regular person who reviews a case for an attorney. Sometimes I'm contacted by an attorney and I'll review a case and just say it's either not my area of expertise or if it's a case that they're defending, I'll say I just don't think it's a defensible case. If it's a plaintiff, I may say I really don't think it's an actionable case.

Q. You said maybe one to two times a year. How many years back does that go?

A. I started doing this probably when I was a few years into practice, so probably beginning around 2004 or 2005.

I usually don't get to asked to do this unless you have built up some degree of expertise.

Q. So since 2004, 2005, up until when you were first contacted about this in 2014, maybe you had between ten and twenty cases that you had looked at to serve as an expert witness in?

A. I think that's reasonable.

Q. Okay. And over the course on average during that time, how much income did you generate from performing as an expert witness or performing services as an expert witness on a yearly basis?

MS. NEFF: Object to form.

THE WITNESS: I'd have to go back and calculate. I don't know off the top of my head.

BY MR. MATHEWS:

Q. Okay. Of those ten to twenty cases roughly, how many times did you actually accept an assignment as being an expert witness for someone?

A. You mean as opposed to just saying this is not a case I can do?

Q. Correct.

A. Probably most of them, like 80 percent of them.

Q. And do you have an idea of that 80 percent, how many times were on behalf of the plaintiff as opposed to the defendant?

A. Yeah, I would say probably 70 percent defendant/30 percent plaintiff.

Q. Okay. And do you recall in those matters how many times you actually had to

testify either in deposition or in court?
A. So probably, you know, only deposed -- I've never testified in court. I've probably been deposed about maybe eight times in the last ten years, not including the deposition that we did two years ago here.
Q. Okay. All right. And, you know, my earlier question was kind of specific on time frame that took us up to when you were first contacted in this matter. Since you were contacted in this matter, other than in this matter, have you performed expert witness services in any other cases?
A. I've reviewed one other case.
Q. All right. And did you take on that case?
A. It was -- I did, but it was just a very brief record review.
Q. Okay. So since you were contacted in this case, other than the one record review, you haven't served as an expert witness in any other cases?
A. Um... no, I haven't.
Q. All right. And is there a reason for that?

MS. NEFF: Object to form.
THE WITNESS: Partly just my -- my practice is busy. We -- my partner, my colleague in neuro-ophthalmology at Washington University left to go to the University of Minneapolis. He decided he wanted somewhere much, much colder than St. Louis. So my practice has gotten much, much busier. We have a daughter. You know, so it's really more a matter of time commitment.
BY MR. MATHEWS:
Q. Understood. All right. So in these underlying -- or in these cases where you served as an expert witness, does the case Colin vs. Pediatric Association back in 2012 sound familiar to you?
A. That is correct.
MS. NEFF: Object to form.
Go ahead.
THE WITNESS: Yeah, I do vaguely remember it.
BY MR. MATHEWS:
Q. Okay. What type of case was that?
A. I'd probably have to see the details. I think it was -- actually, I think it was

someone -- if I remember, it was a surgeon who was being asked to leave the practice because of symptoms of vertigo and dizziness and something along those lines.

Q. Got it. And do you recall were you serving as an expert for the plaintiff or for the defendant in that case?

A. For the defendant, from what I recall.

Q. Okay. And what about Reynolds vs. Galveston Discount Warehouses, what kind of case was that?

MS. NEFF: Object --

BY MR. MATHEWS:

Q. Do you remember that one?

MS. NEFF: Object to form.

THE WITNESS: Yeah, I really don't. I'd have to see the details.

BY MR. MATHEWS:

Q. McWherter vs. St. John's, does that sound familiar, another Michigan case?

MS. NEFF: Object to form.

THE WITNESS: Same thing I vaguely remember it, but again, I would need to see details of it. I think it was about four or five years ago.

BY MR. MATHEWS:

Q. Okay.

A. My memory's good, but it's not that good.

Q. That's all right. And all I'd ask is if you remember, you remember. If you don't, that's fine.

Palmer vs. Chris Daley, does that one sound familiar to you, a North Carolina case?

A. Yeah.

MS. NEFF: Object to form.

THE WITNESS: Yeah, the names are familiar, but I just don't recall the specific details.

BY MR. MATHEWS:

Q. The last one I'll ask you about is Short vs. Cox and I think that's Lester Cox Medical Center down in Springfield. Do you remember that case at all?

MS. NEFF: Object to form.

THE WITNESS: I vaguely remember some of the details but not off -- just not in great detail.

BY MR. MATHEWS:

Q. Okay. Did any of those cases that

you -- that I just referenced have anything to do at all with pseudotumor cerebri or Mirena?

MS. NEFF: Objection to form, compound.

THE WITNESS: Definitely not Mirena. I don't think any of those cases had to do with IIH.

BY MR. MATHEWS:

Q. Have you ever been contacted outside of this case in reference to serving as an expert in a case involving pseudotumor cerebri?

A. I have.

Q. Okay. Do you recall when that would have been?

A. Probably -- there was a case just -- it was just last year, but it was a case that ultimately was not pursued any further.

Q. Okay. And what were the surroundings of that case? What did it involve?

MS. NEFF: Dr. Van Stavern, to the extent that you were not disclosed as an expert -- and I don't know what your confidentiality understanding is in that case, but if there's confidential information that you can't disclose, that's okay, you just need to answer.

THE WITNESS: No. Basically it was

just someone who had been -- not been -- who had had a questionable diagnosis of IIH that was thought not to be appropriately treated, but my ultimate understanding was that the diagnosis had not been secured.

BY MR. MATHEWS:

Q. Okay. Do you recall if there was any claim to Mirena use in that case and a resulting PTC diagnosis or failure to diagnose?

MS. NEFF: Object to form.

THE WITNESS: No, not at all.

BY MR. MATHEWS:

Q. Okay. All right. So the first page of Exhibit 1, your invoices from October of 2014 to March 6th of 2015, it looks like you spent about twelve hours on this matter. Do you recall what you did in those twelve hours?

A. A lot of that was a reading -- a re-review of some of the literature, my review of some of the specific cases, drafting an expert report, things more along those lines.

Q. Okay. So that time did include drafting the expert report?

MS. NEFF: Object to form.

THE WITNESS: I believe it did, but

again, that was again nearly three years ago.
BY MR. MATHEWS:
Q. Outside of this first page of Exhibit 1, are there any other handwritten or electronic documents that indicate the specific work that was performed in those twelve hours?
A. Not that I'm aware of.
Q. Okay. Do you do your own billing for cases you serve as an expert witness in?
A. I do.
Q. Okay. So when you went to create the invoice in March of 2015 and billed twelve hours, how did you know that it was twelve hours? In other words, how did you keep track of the amount of hours up until the point where you billed?
A. Well, since I don't want to detract from my busy practice, I usually do this on the weekends or at night. So I usually keep track of how much time I'm devoting to a specific case, so...
Q. Okay. And how do you keep track of that?
A. Basically I usually go to my office, I look at the time and then do whatever I'm going

to do and then look at when I finish and then keep track of that time.

Q. Okay. And when you keep track of that time, you write it down somewhere?

MS. NEFF: Object to form.

THE WITNESS: Not specifically, no. It's not like I keep a spreadsheet.

BY MR. MATHEWS:

Q. Okay. I know some people have referenced keeping like a scrap piece of paper. Do you keep a scrap piece of paper until you bill and then you know you're done with that one and move on?

A. No. It's more very informal.

Q. Okay. Is it something you just keep in your mind, you keep track of?

A. More or less.

Q. Okay. So this twelve hours was re-reviewing some articles. Do you recall which articles they would have been?

A. Again, not off the top of my head. A lot of them were the -- I will say a lot of these were the original case control study published in the late '80s, early 1990s. I was already familiar with that literature, but I

wanted to take another look at it because it'd been a few years since I'd looked at those studies.

Q. Okay. All right. And it appears that you're billing $750 an hour; is that correct?

A. Yes. That is the Wash U recommended rate. So our institution has a -- they provide guidelines for physicians doing expert witness work, and that's their recommended rate for record review.

Q. Okay. And I know I should be familiar with their rates being that I practice law here in St. Louis, but I'm -- is there a different rate for reviewing records as opposed to testifying or is it all just a recommended straight across the board $750 rate?

MS. NEFF: Object to form.

THE WITNESS: So their recommendation is usually 750 an hour for record review and then 1,500 an hour for deposition, and then 3,000 an hour for live testimony. Again, nobody's obligated to follow that, but that's just their guidelines.

BY MR. MATHEWS:

Q. And are those the guidelines you use in

your practice?

MS. NEFF: Object to form.

THE WITNESS: Generally, for the most part.

BY MR. MATHEWS:

Q. Okay. All right. And do you know, is $750 an hour more or less than you make in your practice of treating patients on a daily basis?

MS. NEFF: Object to form.

THE WITNESS: You know, I've never really calculated my hourly rate. So I really don't know for sure. I mean, because a lot of time I spend answering phone calls, calling patients, answering e-mails. I devote a lot of time to patient care. So I've never really broken it down into an hourly rate.

BY MR. MATHEWS:

Q. Okay. All right. And you said that you believe this twelve hours includes drafting a report. I assume that that's something you do as you described at your home on your home computer; is that correct?

A. That's correct.

MS. NEFF: Object to form.

Go ahead.

BY MR. MATHEWS:
Q. All right. Do you recall -- you drafted the report. Would this have included the final expert report you gave back in 2015?
MS. NEFF: Object to form.
THE WITNESS: Yes.
BY MR. MATHEWS:
Q. Okay. Do you recall were there any drafts of that report prior to the final report?
A. I really don't remember.
Q. Okay. What did you do in preparing that report?
A. Well, really I just looked through the literature I was already familiar with, I looked through the literature I'd written myself and published articles and reviews for IIH in the past and essentially just formalized an opinion that I already held in a more structured way.
Q. Did anyone other than yourself participate in the creation of that report?
A. Not at all.
Q. Okay. After you had created your report, did anyone review that report and provide suggestion to you on changes?
MS. NEFF: Again, Dr. Van Stavern, I'm

going to instruct you not to answer with respect to communications with counsel. If anyone else reviewed your report and provided input, you may answer with regard to them.

THE WITNESS: Can you repeat the question?

BY MR. MATHEWS:

Q. Sure. Other than counsel for Bayer or your own private counsel, did anyone else provide any input on suggested -- suggested revisions to your report?

A. Not at all.

Q. All right. Then if I've kept them in order. The page 2 of Exhibit 1 is an invoice from February 16, 2016. Do you see that?

A. I do.

Q. All right. And so that encompasses from 10/15 to 2/16, if I'm reading that correctly; is that right?

A. That's correct.

Q. All right. Did you not have any billing from 3/6/15 to 10/15?

A. Presumably not. That may have been a time where there was not a whole lot going on with the case.

Q. All right. And it appears that you spent 20 hours during 10/15 to 2/16; is that right?
A. That's correct.
Q. All right. Do you recall what you did for those 20 hours?
A. Again, off the top of my head, I think some of that was reviewing some of the specific cases that I was asked to review and in the context of reviewing those cases, then just phone calls, you know, occasionally meetings with some of the attorneys. So it encompassed mostly that. Again, I don't remember the specific breakdown of time.
Q. All right. And you said that it was a review of some of the specific cases you were asked to review. Were you provided cases or specific document to review?
A. Yes. I was given case histories and medical records to review.
Q. All right. Were you given any sort of studies that you didn't already have in your possession to review?
MS. NEFF: Object to form.
THE WITNESS: There may have been a few

studies regarding -- from obstetrics and gynecology journals, but as far as which specific ones, I don't remember.

BY MR. MATHEWS:

Q. All right. Were you given any additional material to review other than what I've already described?

MS. NEFF: Object to form.

THE WITNESS: So I was given the Bayer signal analysis which I reviewed.

BY MR. MATHEWS:

Q. And what did you find to be significant about the Bayer signal analysis?

A. That --

MS. NEFF: Object to form.

Go ahead.

THE WITNESS: That basically -- and I think I covered this in my report, that the number of cases reported was much lower than you would expect, if there was a causal relationship between Mirena and IIH and keeping with what I had already believed.

BY MR. MATHEWS:

Q. All right. Were you given any of the underlying data that supported the Bayer signal

analysis?
A. You mean the specific cases?
Q. Yes.
A. I believe I was, but again, it's been a while since I've looked at all that.
Q. Would that have been information that you would have reviewed in that 20 hours of review?
A. It should --
MS. NEFF: Object to form.
THE WITNESS: It should have been.
BY MR. MATHEWS:
Q. Is there any document or list that you created to show what materials you received from outside sources?
A. No, there isn't.
MS. NEFF: Counsel, I will just point out that there is a "materials reviewed" list contained in Dr. Van Stavern's report.
MR. MATHEWS: Sure.
BY MR. MATHEWS:
Q. During this 20 hours, did you create any additional reports?
A. I -- that may have been the time when I created the specific reports for those cases.

Q. And when we're referring to those specific cases, we're talking about what ultimately resulted in a deposition that you gave, correct?
A. That's correct.
Q. All right. And I believe that deposition was May 17th, 2016. Does that sound about right?
A. That's about right.
Q. All right. So the time encapsulated in your 2/16/2016 billing would not have included your time for the deposition, correct?
A. No. That was separate.
MR. MATHEWS: Let's go ahead and do this. Let's mark this as Exhibit 2.
And this is the depo transcript. (Tendering document to counsel).
(Plaintiffs' Exhibit 2 was marked for ID.)
BY MR. MATHEWS:
Q. And since we talked about the deposition, let's just -- I'll get this out of the way and then we'll go back to Exhibit 1.
So I've handed you -- handed you what's been marked as Exhibit 2 in this matter and I'll

tell you it's 266 pages.
Does this appear to be the deposition transcript from the deposition you gave May -- May 17th, 2016?
A. It does. And obviously I'm not going to read the whole thing, but it looks like it.
Q. In preparation for today's deposition, did you review your previous deposition?
A. I actually didn't.
Q. Okay. I know that if you look at the -- page 265, the next-to-last page -- do you see that?
A. I do.
Q. All right. And that's generally what we call a redaction page or that's where corrections can be made. I don't see any changes.
Did you at any time review your deposition and suggest changes to it or clarifications that needed to be made?
MS. NEFF: Object to form.
THE WITNESS: No. I had reviewed it after I had already given it a couple weeks later, and I didn't see any corrections that needed to be made.

BY MR. MATHEWS:
Q. All right. As we sit here today, if I were to go back and ask you the same questions that you were asked in this deposition, would your opinions or answers change in any way, to the best of your knowledge?
MS. NEFF: Object to form.
THE WITNESS: I really don't think so.
BY MR. MATHEWS:
Q. Okay. That'll save us a lot of time.
A. Um-hum.
Q. All right. You can set that aside.
A. Sure. (Witness complying.)
Q. All right. Going back to Exhibit No. 1, let's see, we go through to the next page and there's another 20 hours for the next period of 2/16 through 4/16.
That 20 hours, do you recall what you did during that time?
A. Some of that was probably more material review. Some of it was meeting with the attorneys, but again, I don't have a specific breakdown.
Q. Okay. Do you recall when you were first contacted about this case, was it by

telephone?
A. From the best I can remember, it was by e-mail.
Q. Okay.
A. I hate -- you know, I hate talking on the phone. So if it was up to me, I'd do everything by e-mail.
Q. Fair enough. Then after your e-mail communication, did you at any time meet with lawyers for Bayer before you drafted your report?
A. We did meet at least once or twice.
Q. Okay. Do you recall how long you met before you drafted your report?
A. Really brief meetings, maybe 30, 40 minutes.
Q. And were those here in St. Louis or where were those meetings?
A. They were in St. Louis.
Q. All right. And then after you drafted your report but before you did deposition preparation, okay --
A. (Nodding.)
Q. -- if I can define it that way --
A. (Nodding.)

Q. -- did you have any other meetings with Bayer counsel during that time?

A. Again, not that I can recall.

Q. Okay. And so this takes us through 4/2016, and then you gave your deposition in May of 2016.

Does this 20 hours account for depo preparation?

A. That should have included preparation as well.

Q. Okay. This did?

A. Right.

MS. NEFF: Object to form.

Go ahead.

THE WITNESS: (Nodding.)

BY MR. MATHEWS:

Q. So how many times did you meet to prepare for that first deposition that you gave?

A. You know, it's been a couple of years. Um... maybe two or three times.

Q. Okay. And I'm sure that you were asked that in your previous deposition. So I won't ask you to go back and recall how many hours and all of that.

The meetings for preparing for your

deposition, were those all done here in St. Louis?
A. They were.
Q. Okay. Then we have a bill for May of 2016 and there's 27 hours.
Does that account for the time giving the deposition?
A. That does include the deposition.
Q. Okay. And I know you said that there was suggested or recommended billing rates at Wash U. I see that you have just the flat $750 an hour billing rate here.
Did you not charge the recommended rate of Wash U for your deposition?
A. I felt because I knew there might be -- I was going to commit a lot of time over the next few years, it was easier just to do a straight 750 an hour fee.
Q. Okay. All right. Other than depo prep, does that 27 hours account for anything additional --
MS. NEFF: Object --
BY MR. MATHEWS:
Q. -- on the May 19, 2016 bill?
MS. NEFF: Object to form.

THE WITNESS: Again, just wanted to at least look at my -- you know, review the materials, review the literature again, review my report just basically preparing for the deposition.
BY MR. MATHEWS:
Q. All right. Then we have May 2016 to June 2016, and we have twelve hours.
Is there a way to determine -- it seems like you have overlapping billing here. Can you explain that to me? You have billing for both -- May on both.
MS. NEFF: Object to the form.
THE WITNESS: Yeah, I really don't remember specifically.
BY MR. MATHEWS:
Q. Okay. Do you know what these twelve hours were for May and June of 2016?
A. I'd really have to go back to the time and look at what I was doing at that point. I'm sure it was more discussions with the attorney, reviewing more materials, maybe reviewing some of the cases, probably reviewing my deposition.
Q. Okay. When you say you'd have to go back and look at the time, what would you go

back and look at? Is there something physical you would look at?

A. I'd probably have to go back in time to where I was at that point.

Q. Understood. Okay. All right.

A. Which, to the best of my knowledge, we're not able to do at this point.

Q. If you figure it out, let me know.

A. I will let you know. I've been waiting for that my whole life.

Q. And you may have the same answer for September 2016 through November 2016. You had 20 hours billed at that time. This would have been after your deposition.

Do you recall what those 20 hours were spent doing?

A. Not off the top of my head.

Q. Okay. All right. Then at some point did you understand that the stature of the litigation had changed to being something called "multidistrict litigation"?

MS. NEFF: Object to form.

THE WITNESS: I did. Again, I'm not a lawyer. So I don't understand the nuances of how cases are prepared, the designation of

cases, but I did understand sort of the way it was being tried had changed significantly.

BY MR. MATHEWS:

Q. All right. And at the time you were made aware of that, were you given any additional materials to review?

A. Um... there may have been more articles specifically from OB/GYN journals, maybe a couple of articles I might not have had a chance to see otherwise.

Q. Okay. Did you, at any time prior to understanding that the litigation had changed into a multidistrict litigation, speak with any of your peers or any of the other "experts" in the field to discuss their thoughts and theories on PTC related to Mirena use?

MS. NEFF: Object to form.

THE WITNESS: Well, I think we need to back up a second. I mean, it's something we discuss, IIH, at conferences all the time. I go to conferences every year. We're a relatively small community. I think in the United States, there are maybe 100, 120 full-time academic neuro-ophthalmologists. So we know each other. So this topic about IIH, what causes IIH, is

there any relationship between IIH and certain other risk factors gets discussed all the time.
So the topic of hormonal contraceptives and IIH would come up periodically at conferences and at meetings and so on, but in terms of did I discuss this litigation with anyone else in the community, no.
BY MR. MATHEWS:
Q. At any time prior to February of 2017, did you discuss the fact that you were serving as an expert witness in Mirena litigation? Did you ever discuss that with any of your peers or any other experts in the field?
A. No. Not in detail, no.
Q. Okay. When you said "not in detail," had you told or had you spoken with other people in your field concerning that you were serving as an expert in a Mirena-related litigation?
A. Not that I can remember.
Q. Because when you said "in detail," it made me think that maybe --
A. No. I was trying to remember if I had actually discussed it with anyone and I really hadn't.
Again, you know, we talk about topics

like this all the time. So we may have talked about -- I may have talked to someone else about IIH and contraceptives in another context, but as far as this litigation, I can't recall specifically doing that.

Q. All right. And then from December 2016 until July '17, it looks like you spent 29 hours, additional hours if I can do math? Probably not.

A. That looks about right.

Q. About 29 hours?

A. That's fine.

Q. Do you recall what you did during that time, those 29 hours?

A. I think there more materials to review. There may have been one or two more cases to review, depositions to review and review of some of the expert depositions. So it was more reviewing some of that material, meeting with attorneys, that type of thing, going back to my original report, reviewing that.

Q. Were you asked at any time to produce a new report in this matter?

A. Just a couple of months ago.

Q. Okay. And so that wouldn't be

reflected in your billing through the end of July 2017, correct?
A. No not at that point.
Q. And then we have a bill, the final bill which I know you're happy of so I can stop asking you billing questions. November 27th, 2017, which encompasses August through November of '17, three hours of time --
A. (Nodding.)
Q. -- do you recall what you did in those three hours?
A. That was I think just reviewing a couple more papers and a couple more materials.
Q. All right. During that time were these articles and papers provided to you by someone else or was that through your independent research?
A. That was my own. They were all ones I was already aware of.
Q. Do you recall which articles those were?
A. That was probably the Valenzuela article.
Q. We'll get -- we'll get to that in just a bit. Again, none of this time included

drafting a new report; is that correct?
A. Not at that point. I mean, that -- I'm sure it had to include it at some point. I don't remember which specific bill included the report.
Q. Okay. Well, let me ask that question then. You were asked to do another report maybe a couple months ago. We only have billing through November of 2017.
Clearly you're here today, so there will be additional billing that you've incurred since November of 2017; is that correct?
A. Correct.
MS. NEFF: Object to form.
BY MR. MATHEWS:
Q. Do you have any idea, as we sit here today, how much time that would be?
A. Not off the top of my head. Some of it depends on how long we're here today.
Q. Sure. Would the time to create the new report be included in that time from November until now?
A. I believe there was probably an invoice that isn't included here, that I think included the time I spent drafting the report.

Q. Okay. Do you have any idea how much that invoice was for?

A. That -- that I would have to -- that I do keep records of. I have records of all my invoices and I don't have that right now.

MR. MATHEWS: And we'd just ask on the record we get a copy of that invoice if one's out there.

MS. NEFF: If anything exists other than what's been provided to you today, we will certainly provide it.

BY MR. MATHEWS:

Q. And again, I think you've already answer this had question, but just so I know your billing practice hasn't changed, you're still billing at a flat $750 an hour regardless of whether it's reviewing documents or giving testimony in a deposition; is that correct?

A. That's correct.

Q. All right. And you don't know how much -- excluding today's deposition, you don't know what the outstanding amount of invoices are that aren't provided to us today?

MS. NEFF: Object to form.

THE WITNESS: Not off the top of my

head.
BY MR. MATHEWS:
Q. And do you have some sort of estimate as to how long it took you to create the new report?
A. Since it wasn't a completely new report, it was simply adding some material that wasn't there before, probably only about four or five hours.
Q. Have we discussed now -- excluding the time from November 2017 to current, have we discussed all of the time and billing that you have made in this matter?
A. Yeah. Not including the time we're spending here today, yes.
Q. Understood. Do you have an understanding of how much -- well, strike that.
All of the meetings that you've had with defense counsel in preparation, were those all done here in St. Louis?
A. They were all done here.
Q. Okay. We've discussed a little bit briefly about things you did to prepare for your last deposition.
What did you do to prepare for this

deposition today?
A. Mostly just reviewing my original report again, refamiliarize myself with some of the literature I'd already reviewed for the report, some meetings with the attorneys.
Q. Okay. And how many hours did you spend meeting with the attorneys specifically to prepare for this deposition?
A. Probably about ten.
Q. And when were those meetings?
A. I don't have the dates. I'd have to look back through my calendar.
Q. Okay. Were they in the last two weeks?
A. Probably in the last month.
Q. And how many meetings did you have?
A. Probably three or four.
Q. Okay.
A. Again, this is unfortunately a really busy time for me, so my time is really constrained. We have our annual ophthalmology meeting coming up, and I had to submit an ROM grant the day after the Super Bowl. So it was just very difficult to fit everything in. So the timing could have been better.
Q. Understood.

A. Although I'm from Philadelphia. So I've been waiting my whole life to see the Eagles win a Super Bowl. So that made it worth it.

Q. So at least you had that and hopefully you got to see some of it.

A. I did have that.

MR. MATHEWS: Let's get that marked as Exhibit 3.

(Plaintiffs' Exhibit 3 was marked for ID.)

BY MR. MATHEWS:

Q. I've handed you what's been marked as Exhibit 3. Can you identify that for us, please?

A. Yes. It's my expert report.

Q. And that expert report includes a couple of appendices.

One is your CV; is that correct?

A. That's correct.

Q. And the other is a list of articles and documents you relied upon in forming your opinion?

MS. NEFF: Object to form.

THE WITNESS: It's not all of the

documents. I mean, I formed my opinion before I received all these documents, but yes, it includes those.

BY MR. MATHEWS:

Q. All right. And let me turn you to Appendix A, and that's a copy of your CV. To the best of your knowledge, is this accurate and up-to-date?

A. Let me just look through here. (Reviewing document).

Yeah, there's about two articles since then that have been published that aren't on here, but probably not critical.

Q. Are those articles that you relied upon in forming your opinion?

A. No, not at all.

Q. Okay. And just so the record's complete, there's also an Appendix C that includes your prior testimony; is that correct?

A. Ah, that's correct.

Q. All right. And other than Houston and Thompson, we discussed those other three cases previously, correct?

A. Right.

Q. All right. And I don't want to spend a

whole lot of time here on your CV because I know you covered it in your previous depo.
You are still a professor over at Wash U; is that correct?
A. That's correct.
Q. And specifically you're in the Department of Ophthalmology and Visual Sciences; is that correct?
A. Correct. I also have a dual appointment in the neurology department, but my main -- primary appointment is in ophthalmology.
Q. All right. Your other appointment in neurology, is that also under the title of professor?
A. It is.
Q. All right. Give me an idea of what your responsibilities are as a professor at Wash U in the Ophthalmology and Visual Sciences Department.
A. So I think as an academic neuro-ophthalmologist, there's -- usually we think of this in terms of three prongs. There's clinical care, so taking care of patients which I do just about every day, and I have busy clinics every day of the week. There's also

education. So I work with Wash U medical students, sometimes outside medical students. I have ophthalmology residents. That's my responsibility to teach.

So they're with me in clinic most days, so I teach them there. I also give didactic lectures to both ophthalmology and neurology residents. Every year my colleague at St. Louis University and I put together a four or five-hour neuro-ophthalmology review, which is next Monday, just to educate the residents before they're in cervic examination.

I teach medical students as well both in my clinic or formal didactic lectures. I also have neurology residents from our institution rotate with me. So that's all sort of encompassed in the purview of sort of teaching and education.

Then there's also clinical research. So a lot of my activities are devoted to clinical research, basically doing projects or studies to answer -- answer questions that are sort of clinically-based.

Q. Okay. So in these three phases of your practice, how much time is devoted to the

clinical care aspect of it just on average?
A. Probably about 60 or 70 percent. I mean, there's clearly overlap, because if I'm in clinic with a resident and medical student, I'm teaching and I'm also seeing patients.
Q. Certainly. About how many patients do you see a week on average?
A. So probably -- let me just kind of run the numbers quickly. Probably about 60 or 70 a week.
Q. And do you have certain days that you see patients and then certain days that you do more of the education side or... Explain to me kind of how -- how your workweek is made up.
A. So we usually divide it in terms of half days. So I see basically six or seven half days per week as just -- six or seven half days per week is devoted to direct patient care when I'm seeing patients in clinic.
Q. All right. And then the other 40 to -- 30 to 40 percent of your time, how is it divided up between clinical research and education?
A. Probably about 50/50.
Q. Okay. And your clinical research, give me an idea of how you go about deciding which

projects you're going to get involved in for clinical research.

A. Well, I think if you're interested in clinical research, you're really going to focus on areas where there's a large degree of uncertainty, where there's really unresolved questions. Some people are more focused on basic science; some people are more focused on clinical research. I'm more focused on clinical research because I'm not a basic scientist.

But I'm usually interested in areas where there are unresolved -- unresolved questions that pertain directly to patient care, some areas of uncertainty. Some of it also depends upon the resources that are available to you at the institutions. So our institution is a mecca for neuro-imaging.

So since I've relocated to Washington University in 2009, I've become very interested in neuroimaging and visual pathways, both in terms of IIH and I've published a number of articles about neuroimaging with IIH, also in optic neurology. In fact, our grant is about --

THE REPORTER: Excuse me. I have to stop. Can you move your microphone up? Because

all I'm hearing is --

THE WITNESS: Oh, I'm sorry.

THE REPORTER: It's not you. It's not -- I'm sorry. Do we want to go off the record?

MR. MATHEWS: Yes.

THE REPORTER: Okay. I'm sorry.

THE VIDEOGRAPHER: Going off the record at 10:18 a.m.

(Recess taken from 10:18 a.m. to 10:20 a.m.)

THE VIDEOGRAPHER: On the record at 10:20 a.m.

THE WITNESS: Okay. I'll try to speak slower.

So basically -- so in IIH and also imaging of the optic nerve and optic neuritis and multiple sclerosis, what I was about to say was that the grant we just submitted was using a very novel type of imaging. It looks at what we call connectivity between different regions of the brain in patients with optic neuritis.

And I've also -- you know, I've collaborated with a number of different people at Washington University, and one of my

interests is looking at ocular biomarkers in the eye for people with pre-clinical Alzheimer's disease because we have a huge Alzheimer's disease research center at Wash U.

So we're looking to see if we can detect early signs of Alzheimer's disease using imaging in the eye. So it's sort of -- and again, those are important areas. It's really interesting to me, and I think they have public health health implications and there's a lot of sort of uncertainty about, you know, what we do in patients with early Alzheimer's disease and how we diagnose and treat people with optic neuritis and multiple sclerosis and, you know, better ways of understanding and managing IIH.

BY MR. MATHEWS:

Q. Now, this area is certainly very fond of and very proud of Wash U. Wash U is one of the leading research institutes certainly in the Midwest, if not the entire country. Would you agree with that?

A. Definitely. I'm biased of course.

Q. And Wash U depends upon grants not only from the federal government but also from private industry, correct?

MS. NEFF: Object to form and foundation.

THE WITNESS: Yeah, I don't know the specific details of where their endowments come from, but I'm sure it's a combination of government, private donors, and industry.

BY MR. MATHEWS:

Q. Part of your job in clinical research is you have to submit grants, correct?

MS. NEFF: Object, form.

THE WITNESS: Yes and no. To be honest there are people who do clinical research and do essentially what's considered unfunded clinical research, research with residents, medical students and so on, and that's really what I was doing up until about two or three years ago.

So last year was the first time I submitted an actual NIH grant and actually, that was one of the reasons I relocated to Washington University, so I could sort of expand the scope of my research portfolio, because the institution I was at before, although it was a good -- good institution, it just didn't have the same type of resources and opportunity for collaboration that I found at Washington

University. So most of the research I had been doing was either unfunded or just basically funded through departmental funds, small projects to do with residents and medical students.

And I have had the opportunity, I had a pilot grant from the National MS Society. So I have had the opportunity to get more funding for the research. But in terms of how -- am I one of those people that rely primarily on grant-funded research? I am not one of those people.

BY MR. MATHEWS:

Q. Sure. And so you do have some understanding of how grants get funded and how research gets funded, though, correct?

MS. NEFF: Object to form.

THE WITNESS: Yes.

BY MR. MATHEWS:

Q. All right. And one of those ways which you've already described is through federal government grants such as NIH, correct?

A. Correct.

Q. And that's one that you've applied for?

A. Correct.

Q. Was that fund granted?
A. Well, last year it was rejected. So we resubmitted it this year. So I guess we're keeping our fingers crossed.
Q. Okay. And in your process of submitting grants, have you come to understand that some grants are funded through private industry?
MS. NEFF: Object to form.
THE WITNESS: Oh, sure. Yeah. Sure. There's lots of private -- private -- private donors and private industry sponsors who will fund a grant.
BY MR. MATHEWS:
Q. Okay. And you -- do you -- do you have an understanding that Wash U receives funding from private industry?
MS. NEFF: Object to form and foundation.
THE WITNESS: Of course, yeah. I think every institution does.
BY MR. MATHEWS:
Q. All right. And when we talk about private industry, some of those examples would be pharmaceutical companies, correct?

MS. NEFF: Object to form and foundation.

THE WITNESS: True.

BY MR. MATHEWS:

Q. All right. Have you yourself -- and I think I already know the answer to this question.

Have you yourself ever received any funding that was made by Bayer Pharmaceutical?

A. No, I haven't.

Q. Okay. In any of the clinical research studies that you have done, whether you were the lead researcher on them or simply one of the researchers on them, have any of them, to your knowledge, been funded by Bayer?

A. None at all.

Q. All right. And how long have you been a -- hang on. It's on here. Never mind.

In 2017 you were promoted to professor, correct?

A. Right.

Q. Help me understand the difference between associate professor and professor, not including any pay details.

A. Um-hum. So it's a very archaic

hierarchical process where you usually start off as a junior instructor or an assistant professor, which is kind of the lowest rank entry level, and then each institution has their own criteria for whether or not you're suitable for promotion. A lot of that has to do with your education and teaching portfolio, a lot of it has to do with your research, how much you published, you know, what journals you published in, if you have published in higher tier journals, lower tier journals. Some of it is clinical care.

Some people -- again, not to get into too much details, some people are on what are called tenured tracks, where essentially -- where they're on essentially research tracks where they are much more dependent upon getting grant funding and publishing in high tier journals to get promoted.

I'm in a clinician scientist track, where it's helpful for me to be able to publish and it's really helpful for me to get grants, but it's not solely dependent on that. Some of it does include things like productivity in clinic. It includes teaching, you know, my

evaluation from medical students and residents. So it is less dependent on research than someone who's on a pure research track.

Q. What is the benefit between being on a tenured track as opposed to a clinician track?

A. Well, some of it depends -- if somebody is an M.D./Ph.D. and their focus is really on basic science research, then they may spend only like a half day a week or a half a day every other week in clinic. So they're not going to be as valuable from a clinical productivity standpoint.

Q. Okay. After professor, is there another level?

A. Probably the highest level is getting an endowed share. It's like being a partner in a law firm. That's where your salary is essentially covered by private donor fund, where they cover your salary and you're not as dependent on seeing tons of patients in clinic and generating clinical revenue.

Q. And I don't know. That's why I'm asking. Is that kind of your ultimate goal, your end game is to have an endowed chair or what's your plan?

MS. NEFF: Object to form.
THE WITNESS: I wouldn't say it's an end game. It would be nice to have. I mean, there's no guarantee, and a lot of that depends if there is a donor who's willing to donate money for our neuro-ophthalmology chair.
BY MR. MATHEWS:
Q. Got it. Is there some sort of a review board that makes the determination if you're going to move up to the professor level?
A. Yes. There's a promotions committee. So basically you're -- the chairman of your department decides if your credentials are good enough to submit to the promotions committee, and then it gets submitted to the promotions committee and they -- it's like Survivor and they, like, vote you off the island or they keep you on the island.
So once it goes through the promotions committee, they decide that you can either be promoted or you have to stay an associate professor, for example, for a few more years and try to bolster your resume.
Q. Okay. Do you know from 2009, when you got to Washington University, until you -- until

last summer, when you became a professor, how many times had you made it to -- through the -- through the Survivor round to decide if you were going to be a professor or not?

MS. NEFF: Object to form.

THE WITNESS: Oh, I mean, it only came up last year. We had talked about it for the last two years, and the last year the chairman and I talked and he decided it was a good time to put me up for promotion.

BY MR. MATHEWS:

Q. All right. And who is your department chair?

A. His name's Todd Margolis. He took over the department, I believe in 2014 or 2015.

Q. All right. I saw -- one question I had, you're licensed in Missouri but no longer in Michigan. You know, in the legal profession, once we get licensed somewhere, we never ever, ever, ever, ever turn loose of it for any reason.

Is there a reason you're not still licensed in Michigan?

MS. NEFF: Object to form.

THE WITNESS: I don't think -- my wife

was not a big fan of Detroit. So I don't think we'd ever live in Michigan again, and it wouldn't be that hard to reactivate my license if we ever moved back.

BY MR. MATHEWS:

Q. Fair enough. All right. Let me hand you what's going to be marked as Exhibit 4.

(Plaintiffs' Exhibit 4 was marked for ID.)

BY MR. MATHEWS:

Q. You've been handed what's been marked as Exhibit 4. Can you identify that document, please?

A. It just says "Notice of Video Deposition of Gregory Van Stavern, M.D."

Q. Prior to me handing that to you just now, have you seen this document before?

A. I have.

Q. Okay. And specifically on page 4, "Documents to be produced," prior to today's deposition, did you have a chance to look through this list of documents to be produced?

A. I had.

Q. All right. And subject to any objections by the defense counsel, did you

provide all of the documents you had in your possession that relate to these 24 items?

MS. NEFF: And, Counsel, I will just note for the record we have served our responses and objections to this notice.

MR. MATHEWS: Right.

THE WITNESS: But yes.

BY MR. MATHEWS:

Q. Okay. And those documents include some slide decks that I've got and your billing statements. Does that sound right?

A. That's correct.

Q. And we'll get to these, but it appears that there's five slide decks. Does that sound right?

A. That's correct.

Q. And let me direct you to number 2 on Exhibit A, which is page 2 of that document, and under the word "communication," that means "Every manner or means of disclosure or exchange of information regardless of means utilized whether oral, written electronic or by document or otherwise and whether face-to-face in a meeting by telephone, mail, telex, discussion, release, personal delivery or otherwise."

Does that seem like -- do you take that to understand any communication that you've had regardless of what form or media other than with your attorneys?

MS. NEFF: So I will -- I will object to the form of the question and note that we have served objections to plaintiffs' notice including the definition just described.

Go ahead and answer.

THE WITNESS: Yes, I agree that seems inclusive.

BY MR. MATHEWS:

Q. All right.

MS. NEFF: Counsel, we've been going for nearly an hour now. Whenever you get to a good stopping spot. Do you have --

MR. MATHEWS: I've got one document and probably one question and then we can take a break.

MS. NEFF: Great.

MR. MATHEWS: Is that okay?

MS. NEFF: Yes.

MR. MATHEWS: All right. Mark this 5.

(Plaintiffs' Exhibit 5 was marked for ID.)

BY MR. MATHEWS:

Q. Doctor, I've handed you what's been marked as Exhibit 5. Can you identify that document for me, please?

A. It looks like just defendants' and my responses and objections to the notice of the video deposition.

Q. All right. And this is the objections that were just referenced by the defense lawyer. Did you yourself have any hand in preparing these objections?

A. None at all.

Q. All right. Prior to today, had you seen this document?

A. I don't remember seeing this at all.

MR. MATHEWS: All right. That's all I got -- we can go off the record.

MS. NEFF: Okay.

THE VIDEOGRAPHER: Off the record at 10:33 a.m.

(Recess taken from 10:33 a.m. to 10:42 a.m.)

THE VIDEOGRAPHER: On the record at 10:42 a.m.

BY MR. MATHEWS:
Q. All right. Doctor, welcome back from the break. During the break I was handed another additional document that we'll mark as 6.
(Plaintiffs' Exhibit 6 was marked for ID.)
BY MR. MATHEWS:
Q. And can you identify that document?
A. It's the additional materials reviewed, just more materials I had reviewed.
Q. And the first one is a Kilgore poster session presentation, correct?
A. That's correct.
Q. All right. And did you happen to bring a copy of that with you today?
A. I actually didn't have it with me.
Q. All right. Can you describe what it was that you reviewed?
A. So basically it was a presentation at the American Academy of Ophthalmology by some of my colleagues where they had done a case-controlled study looking at the incidence of IIH in -- they looked at basically a group of patients with IIH and a group of matched

controls to see if there was an increased frequency of oral contraceptive or hormonal contraceptive used in the IIH with comparative controls and they did not find an increased incidence.

Q. All right. And were you actually at that presentation in November of 2017?

A. I was.

Q. Okay. And how long of a presentation was it?

A. They're usually about twelve minutes. So it's basically eight minutes for presentation and then about three to four minutes for questions.

Q. And the -- what you reviewed prior to today's deposition, was that an abstract or was it the full poster session?

A. It was just an abstract.

Q. And isn't -- is it your opinion that an abstract is something that can be relied upon in forming one's opinion?

MS. NEFF: Object to form.

THE WITNESS: Well, it certainly isn't where I came to the opinion that there's no relationship. It's just another piece of

information that supports that.
BY MR. MATHEWS:
Q. Okay. As you reviewed the archive, were you provided with or did you have access to any of the underlying specific data associated with that poster session presentation?
MS. NEFF: Object to form.
THE WITNESS: No. I don't have access to the database.
BY MR. MATHEWS:
Q. And were you made aware of the details of how any of that research was conducted?
A. Well, in the presentation in the abstract, they talk about methodology. So it was done as a -- basically it looked like a fairly well designed case control study.
MR. MATHEWS: Okay. Go ahead and mark this as 7.
(Plaintiffs' Exhibit 7 was marked for ID.)
BY MR. MATHEWS:
Q. You've been handed what's been marked as Exhibit 7.
Does that appear to be an accurate abstract of the poster session that you're

referring to?
A. Yes.
Q. All right. And is this -- does this appear to be exactly what you reviewed?
A. It is.
Q. All right. Did you review any additional material in relation to this Kilgore study that we haven't discussed today?
A. No.
Q. All right. All right. Also on Exhibit 6 it lists one, two, three, four, five, six... seven deposition transcripts that you've reviewed; is that correct?
A. That's correct.
Q. All right. Did you -- have you had an opportunity to review Dr. Newman or Dr. Dinkin's deposition transcripts?
A. No, I haven't.
Q. All right. Are you aware that their depositions have been taken?
A. My under- -- yes, I am aware of that.
Q. All right. Is there a reason why you have not reviewed their deposition transcripts?
A. I just wouldn't find it relevant.
Q. Okay.

A. I mean, again, my opinions are not dependent upon other people in the community. I mean, my opinions are based on the evidence available.

Q. Certainly. You know Dr. Newman, correct?

A. I do. I trained with her.

Q. All right. And tell me about your training with Dr. Newman.

A. So I spent a year doing a Fellowship in neuro-ophthalmology at Emory University from 1999 to 2000.

Q. And as a fellow under Dr. Newman, what was your -- what were your duties as it relates to Dr. Newman's practice?

A. Well, mostly just to see patients with her, present patients to her, teach the residents and medical students who were rotating through the service and then participate in research projects with her.

Q. And did you participate in research projects with her?

A. I did.

Q. Did you participate in any research projects with her concerning PTC?

A. Not at the -- not during that year. We've since collaborated on other projects, but during that year my big project was on head injury and neuro-ophthalmic deficits.
Q. And you said you've collaborated with Dr. Newman since that time.
Have those collaborative efforts been specifically related to PTC?
A. They have.
Q. All right. And describe those research projects to me.
A. Well, we -- we basically pooled the database of patients that I had seen. At that point I was in Detroit with IIH patients seen at Emory and then I think IIH patients at an institution in Mississippi and essentially used that database to explore questions about incidence, prognosis, and characteristics of IIH.
Q. Okay. You were contacted in this litigation back in 2014; is that correct?
A. That's correct.
Q. All right. At that time did you go back and look at your patient population for say the previous five years who had a PTC diagnosis

to see if any of them had a use of Mirena during that time?

A. Well, no, I didn't because again, you know, I think -- I don't think a reasonable person could look at the entire body of evidence and come to any conclusion other than the association with hormonal contraceptives and IIH is simply coincidental. So at that point, I mean, there's enough evidence to convince me that there's no relationship. So I didn't see the need to do that.

Q. Okay. But when you were doing research with Dr. Newman, you went back in your records and looked at the pooled database of patients to do that particular research; is that correct?

MS. NEFF: Object to form.

THE WITNESS: But it wasn't specific to any -- any -- it wasn't specific to Mirena. It was just looking at the entire database.

BY MR. MATHEWS:

Q. All right. Well, if, "if" you went back and looked at your patient population and saw that a certain number of folks with PTC also were on Mirena, wouldn't that be of importance to you at least as a term of your research to

determine what patients had particular birth control as opposed to which patients had a different birth control?

MS. NEFF: Object to form, incomplete hypothetical.

THE WITNESS: Well, let me answer it this way: If I went back and saw some of my patients with IIH that were on Mirena, I would be completely unsurprised and unphased at all by that. Since Mirena is preferentially prescribed to obese women, I would not be surprised at all that some of my patients were on Mirena, just like many of my patients with IIH are on hormonal contraceptives of some type because the vast majority of patients with IIH are of limited reproductive age. So it makes sense that they'd be on a hormonal contraceptive.

It's also not -- as I'm sure you know, it's not as easy as going back and looking at my database and saying, oh, some of these people are on Mirena. To really answer the question scientifically, you'd need to do a case-controlled study, and trust me, those are not easy to do. You have to appropriately select the cases and appropriately match the

controls. And, I mean, sometimes it seems easy in theory, but in practice, it's exceedingly difficult, especially with a condition where we don't understand or don't know the underlying cause.
BY MR. MATHEWS:
Q. Do you have an opinion on whether levonorgestrel causes an increase in weight gain in women?
MS. NEFF: Object to form.
THE WITNESS: I believe in some forms, that it can result in weight gain.
BY MR. MATHEWS:
Q. Okay. And what is that opinion based on?
A. Basically articles I had reviewed and my basic understanding of the pharmacology.
Q. And you are not a pharmacologist, correct?
A. Well, do I have a Ph.D. in pharmacology? No. But, I mean, I'm a physician. I'm a practicing physician. So I have to have a more than basic understanding of pharmacology, particularly the effects of certain pharmacologic agents on the brain and

the visual pathway.
Q. And how did you gain that knowledge that's more than just, you know, the average man on the street?
A. Well, I mean, you know, just my training, medical school, residency, fellowship and 18 years in practice, you know, I attend conferences multiple times per year, you know, I see patients and I see patients who have new problems and they're on medications who are -- that are new or experimental.
For example, we -- you may know this if you're in St. Louis. We have a huge cancer center, and so a lot of patients with cancer are on experimental agents, and they may have vision problems and it's important for me to understand the pharmacology of some of these agents and how they might impact the visual system.
Q. You had mentioned your education in medical school.
What -- what classes or courses did you take involving pharmacology?
A. Probably similar to most people who do medical school, they are curricula-included in a one-year pharmacology course.

Q. Have you taken any other pharmacology courses outside of that?

A. Not a specific pharmacology course.

Q. Okay. And since we're on this topic and it's, I'm sure, going to garner the same question -- responses, what is an epidemiologist?

A. Well, it's somebody who studies patterns and incidences and frequency of diseases to look for patterns to see if there's specific risk factors for diseases or patterns of behavior that are associated in a causal way with the disease.

Q. All right. First, you would agree with me that an epidemiologist is a subspecialty in the medical field?

MS. NEFF: Object to form.

THE WITNESS: Yeah. I mean, you can have a Ph.D. in public health and a doctorate in epidemiology. Most people do it through biostatistics, and they may have their doctorate in biostatistics.

BY MR. MATHEWS:

Q. Okay. And you're not an epidemiologist as would be defined as a subspecialty in

medicine; is that correct?
MS. NEFF: Object to form.
THE WITNESS: Well, as you might have anticipated, again, I have to know about epidemiology. I've done epidemiologic studies, I've participated in case control studies. So I have to have a basic understanding of epidemiology and not just to understand the diseases I see and the patients I see in clinic but also to perform clinical research.
BY MR. MATHEWS:
Q. You would agree with me that someone who has their doctorate in biostatus- -- as a biostatistician I think is how you described it -- would have a better understanding of epidemiology than your basic understanding of epidemiology; is that correct?
MS. NEFF: Object to form and foundation.
THE WITNESS: Well, I think they might have better understanding of things like methodology and biostatistics, but in terms of how it pertains to clinical care of patients, then I don't think those things are easily translatable.

BY MR. MATHEWS:
Q. Okay. All right. All right. We talked about Dr. Newman.
Other than this research of your pooled databases, have you done any other research with Dr. Newman over the years?
A. Um... what have we done together? I mean, I've written -- honestly, believe it or not, I think that's about it.
Q. Okay. When was last time you spoke with Dr. Newman?
A. Oh, a couple of weeks ago.
Q. Was that at a conference or was that just over the phone?
A. It was by e-mail.
Q. By e-mail?
A. (Nodding.) Yeah, to me e-mail --
Q. Right. Because you prefer --
A. Right.
Q. -- to do everything by e-mail?
A. I do everything by e-mail.
Q. Understood.
Over the course -- well, let's say since 2014, how many times do you think you've corresponded with Dr. Newman?

A. Oh, probably only a couple times a year.

Q. And then how many times do you think you've actually seen Dr. Newman?

A. Usually we see each other at NANOS, neuro-ophthalmology meeting. We see each other at the Academy of Ophthalmology meeting and the Academy of Neurology meeting -- meetings, so at least three times year.

Q. And during those times, have you had any discussion about the connection of Mirena to PTC?

A. Not at all.

Q. Okay. During those three years or three times a year for the last -- I guess going on four years now, have you been at any conferences where the presentation has been made of the connection or lack of connection between Mirena and PTC?

A. Well, at the NANOS meeting in 2015, there was the poster that later became the Valenzuela paper.

Q. Since that time have you discussed the Valenzuela paper with Dr. Newman?

A. I have not.

Q. Have you had an opportunity to review Dr. Newman's report in this matter?
A. I have not.
Q. Okay. And is there a reason that you haven't reviewed that report?
A. Again, I just don't feel that it would be relevant in forming my opinion.
Q. Okay. Do you know Dr. Dinkin?
A. I do.
Q. All right. Same questions for Dr. Dinkin -- let me just do it this way: Dr. Dinkin, Dr. Cestari, Dr. Rizzo, do you know all of them?
A. I do. Some better than others.
Q. Since you were retained in this matter in 2014, have you discussed the connection of Mirena and PTC with any of them?
A. I haven't.
Q. All right. Have you seen any of their expert reports in this matter?
A. I haven't.
Q. Do you understand that they've all been retained as experts in this case?
A. I do now.
Q. Okay. Is your knowledge of that

because I just said it?

A. No.

MS. NEFF: Object to form.

THE WITNESS: I've heard some of the names mentioned just briefly.

BY MR. MATHEWS:

Q. Okay. And again, I don't want to know what your -- what the lawyers from Bayer have told you, okay?

A. Um-hum.

Q. Other than the experts that I just mentioned, have you discussed the connection of Mirena and PTC with any other individuals in your field in the last -- since 2014?

MS. NEFF: Object to form.

THE WITNESS: Yeah, I think briefly at a NANOS meeting, I ran into Deb Friedman, who's another neuro-ophthalmologist, and I think it was in relation to the Valenzuela poster. And she mentioned that she had some issues with the poster, and that was pretty much the extent of it.

BY MR. MATHEWS:

Q. All right. Let me -- we'll get back to the experts in a bit. Let me...

How much time did you spend reviewing the depositions that are listed on Exhibit 6?

A. Oh, quite bit of time. I mean, at least six to eight hours. I don't remember off the top of my head.

Q. And that's additional time that you have not billed for yet, correct?

A. Not at this point.

Q. Okay. All right.

(Plaintiffs' Exhibit 8 was marked for ID.)

BY MR. MATHEWS:

Q. I've handed you what's been marked as Exhibit No. 8. Do you see that?

A. I do.

Q. All right. And this is the individual research conflicts of interest policy for Washington University. Does that look right?

A. It does.

Q. Are you familiar with this policy?

A. I am. I am.

Q. Okay. And if we look over on page 3 of 8, Subsection 6, sub (a)(2), sub 2, it reads: "A covered individual shall complete or update a financial disclosure statement that discloses

all personal, financial interests and those of their family regardless of value that appear to be related to the covered individual's institutional responsibilities."

Did I read that correctly?

A. You did.

Q. All right. In this case have you disclosed the $107,250 you've received from Bayer as testifying as an expert?

A. No, I haven't.

Q. All right. And you started this back in 2014; is that correct?

A. That's correct.

Q. Um-hum. And it requires you to report certainly at least annually, according to 6(b) on page 4, financial interests that you receive that could be in relation to your research; is that correct?

MS. NEFF: Object to the form.

THE WITNESS: My understanding of that and after discussing it with some institutional officials at Washington University, it has more to do with grants, private donations, and entrepreneurial enterprises.

BY MR. MATHEWS:
Q. Okay. So it's your understanding that you're not required to disclose monies received from Bayer in performing expert witness work in this matter?
MS. NEFF: Object to form.
THE WITNESS: That's the understanding, I understand that I got from discussing it with some of the officials.
BY MR. MATHEWS:
Q. Okay. All right. And you do understand that Bayer is a contributor -- contributor to certain grants at Washington University, correct?
MS. NEFF: Object to form and foundation.
THE WITNESS: I didn't know that, but I wouldn't be surprised that they were. Wash U has a lot of grants.
BY MR. MATHEWS:
Q. Do you know a Dr. Jeff Peipert at Wash U?
A. Actually, I don't know him.
Q. P-E-I-P-E-R-T. He's in the OB -- OB/GYN department.

A. Never met him.

MR. MATHEWS: All right. So let's just go ahead and mark this.

(Plaintiffs' Exhibit 9 was marked for ID.)

BY MR. MATHEWS:

Q. And I've handed you Exhibit 9, which is an article published in 2017 where Dr. Peipert is one of the participants in that research. It indicates that the title is "Long-acting reversible contraception -- contraception use among residents in obstetrics/gynecology training programs" and it lists Dr. Peipert as the department of OB/GYN at Wash U. do you see that?

A. I do.

Q. All right. And then I'm going to direct you over to page 6 of 7, the next-to-last page under "Footnotes," and it says: "Dr. Peipert receives research funding support from Bayer HealthCare Pharmaceuticals, Teva Pharmaceuticals and Merck." Do you see that?

A. I do.

Q. Prior to me discussing just this one article with you, were you aware that Bayer

finances certain research programs at Wash U?

MS. NEFF: Object form.

THE WITNESS: I wasn't aware of that, but again, I'm not entirely surprised.

(Plaintiffs' Exhibit 10 was marked for ID.)

MS. NEFF: So, Counsel, just before we get into the next document, it looks like this is a -- a print copy from online and there are some text boxes that are covering some of the text, for example, on page 2. So we would just -- to the extent that the official exhibit is that same format, we would object to it.

MR. MATHEWS: This is the best copy I have.

BY MR. MATHEWS:

Q. So I've handed you what's been marked Exhibit 10. Again, this is another article by Dr. -- where Dr. Peipert is involved. It's a 2017 article. "Prolonged use..." is how this article starts. Do you see that?

A. I do.

MS. NEFF: Object to form.

BY MR. MATHEWS:

Q. All right. And then on page 7 of 8

also, the next-to-last one, it gives a very similar disclosure. Dr. Peipert receives research funding from Bayer, Teva, and Merck. Do you see that?

A. I do.

Q. All right.

A. I should mention that, I mean, every study or every paper is simply going to have to stand or fall on its own merit. You know, industry-funded studies, maybe we look at that with a little more skeptical eye, but ultimately it's going to have to stand or fall on its own merits.

Q. Certainly.

(Plaintiffs' Exhibit 11 was marked for ID.)

BY MR. MATHEWS:

Q. I've handed you what's been marked as Plaintiffs' Exhibit 11 and this is another article involving Dr. Peipert, this one published in 2015, and also Tessa Madden is one of the researchers on this. Do you see that?

A. I do.

MS. NEFF: Object to form.

BY MR. MATHEWS:
Q. All right. And this is "Long-term utilization and continuation of intrauterine devices." Do you see that?
A. I do.
Q. All right. And over on page 6 of 7, again, the next one, we see Dr. Peipert's disclosure again, receives research support from Teva, Bayer HealthCare Pharmaceuticals and Merck Company and serves on the advisory board for Teva. Then it gives Dr. Madden's disclosure, that she serves on a scientific advisory board for Bayer HealthCare Pharmaceuticals and a data safety monitoring board for Phase IV safety studies of Bayer contraceptive products.
Do you see that?
A. I do.
Q. Did I read that correctly?
A. You did.
Q. All right. So Dr. Peipert and Dr. Madden both have a connection to Bayer Pharmaceuticals. Is that your understanding from the documents I've shown you?
MS. NEFF: Object to form.
THE WITNESS: I'm not sure they have a

connection. It sounds like their research has been funded in part by Bayer.
BY MR. MATHEWS:
Q. All right. And the last portion I read about Dr. Madden, she actually serves on a scientific advisory board for Bayer HealthCare, specifically as to Bayer contraceptive products, correct?
MS. NEFF: Object to form.
THE WITNESS: Correct.
MR. MATHEWS: All right. And that one.
(Plaintiffs' Exhibit 12 was marked for ID.)
BY MR. MATHEWS:
Q. And this is Exhibit No. 12. This is a 2016 article again with Dr. Madden and Dr. Peipert, "Association of Baseline Bleeding Pattern on Amenorrhea" -- and I always pronounce that wrong -- "With the Levonorgestrel Intrauterine System Use."
This particular article is directly dealing with levonorgestrel intrauterine system use, correct?
MS. NEFF: Object to form.
THE WITNESS: Correct.

BY MR. MATHEWS:
Q. And this is, again, Dr. Madden and Dr. Peipert involved, correct?
A. Let me just -- (reviewing document.)
Yes.
Q. And again, we see on page 6 of 7, which is the third to last of this article -- of this document, the same disclosures, correct?
A. Well, it sounds like they're very --
MS. NEFF: Object to form.
THE WITNESS: -- they're very good about acknowledging their disclosures.
BY MR. MATHEWS:
Q. Okay. Right. And I've got more articles that I could go on and on about. Your desire, I think you told us earlier, is to do more and more research, to do more and more and perhaps one day even get a -- a -- I don't remember what you called it -- an endowed chair. That's done by doing research, correct?
MS. NEFF: Object to form, mischaracterizes.
THE WITNESS: Actually, not at all. It has nothing do with that. It actually has to do with a donor who's very interested in pursuing

endowed promotion or education or research. So it is completely dependent on who donates money. Those things happen only intermittently and they're very unpredictable. So I wouldn't even call that a goal. It would just be nice if it happened.
BY MR. MATHEWS:
Q. You would agree with me, would you not, that giving an opinion contrary to one of the donors at Wash U would significantly hurt your chances of getting someone to sponsor or to pay for a neuro-ophthalmology chair at Wash U?
MS. NEFF: Object to the form of the question.
THE WITNESS: I'm not sure I even understand that question.
BY MR. MATHEWS:
Q. Sure.
A. I think you may be misunderstanding the role of a chair, but go ahead.
Q. Okay. The way you get this -- this position is by a donor being willing to put up money for research for a particular area you're interested in or a particular area you serve in; is that correct?

MS. NEFF: Object to form.

THE WITNESS: Not usually. It's usually a private donor, a family or a foundation --

BY MR. MATHEWS:

Q. Okay.

A. -- that may have an interest in a particular disease.

Q. Okay. So they put up the money and you get this chair, if you will. You would agree with me that giving an opinion contrary to one of the other donors at the University would affect your ability to have someone sponsor that chair or pay money for that chair for your research?

MS. NEFF: Object to form and foundation.

THE WITNESS: Yeah, I'm not sure -- so basically, for example, the Schnuck family sponsors a chair for one of our researchers for neurofibromatosis. So I'm not sure how someone could give an opinion against a family or against a disease. So chairs are not usually sponsored by pharmaceutical companies. They're usually sponsored by families or private

foundations or donors.
BY MR. MATHEWS:
Q. Would you agree with me that Monsanto, for instance, has donated a significant amount of money to Wash U over the years?
MS. NEFF: Object to form and foundation.
THE WITNESS: I have no -- I have no idea, but I'll take your word for it.
BY MR. MATHEWS:
Q. Are you aware of the current merger between Bayer and Monsanto?
MS. NEFF: Object to the form and foundation.
THE WITNESS: I was only most vaguely aware of that.
(Plaintiffs' Exhibit 13 was marked for ID.)
BY MR. MATHEWS:
Q. I've handed you what is a printout that's from online. It's page -- it's got a listing at the top, Monsanto Laboratory of Life Sciences, Washington University in St. Louis, page 1 of 5. At the bottom it has a print date of 2/12/2018, and it contains five pages.

Does that look -- have I accurately described the document?

MS. NEFF: Counsel, just before we go further, there are rectangular boxes at various intervals throughout this document. Is it your representation that it printed this way online or were those added by counsel?

MR. MATHEWS: No. It -- this is how it printed. This is the exact way it printed.

MS. NEFF: It printed with these boxes?

MR. MATHEWS: It did.

MS. NEFF: Okay. Go ahead.

THE WITNESS: Yeah, I see.

BY MR. MATHEWS:

Q. All right. And I'm going to refer you to page 4, the last paragraph, and it says: "Monsanto is an agricultural company with headquarters located in St. Louis. Monsanto Corporation has for many years been a major supporter of research in the sciences at Washington University through such measures as the Washington University Monsanto Biomedical Research Agreement which has brought more than a hundred million dollars of research funding to the University." Did I read that right?

A. You did.
Q. Would you agree with me that giving an opinion contrary to Bayer, which is in the process of merging with Monsanto, may cause an issue for you at the University if you were to give an opinion contrary to Bayer?
MS. NEFF: Object to the form.
THE WITNESS: I completely disagree with that. I think my -- I mean, I think Washington University has -- my wife actually has the best phrase for it. She says it's "the unconscious expectation of excellence." So we're expected to maintain scientific integrity and our opinions should be based on scientific evidence and scientific fact, not about who we might offend and who we might tick off.
BY MR. MATHEWS:
Q. Okay. Okay. All right. Let's turn back to, um... let's talk a little bit about your opinion in this case real quick.
THE WITNESS: Can you still hear me okay?
THE REPORTER: I can. Thank you.
BY MR. MATHEWS:
Q. And I'm sorry. What exhibit number is

your opinion?
A. Oh, actually I had -- let me see.
MS. NEFF: 3.
MR. MATHEWS: 3. All right.
BY MR. MATHEWS:
Q. Do you have Exhibit 3?
A. I have my own copy.
Q. Okay. That's fine. As long as you have --
A. I'm sure they're the same.
Q. Exhibit 3, your opinion is actually 17 pages long; is that correct?
A. It is.
Q. All right. And it's dated January 18, 2018, when you get back there on page 17?
A. Um-hum, correct.
Q. Does that sound right? All right.
Does this appear to encompass your entire opinion?
MS. NEFF: Object to form.
THE WITNESS: Just make sure this is -- yes, this is a current copy, so it does.
BY MR. MATHEWS:
Q. And you had previously given an opinion in this case, and since that time would you

agree that the major significant issue that's changed is the Valenzuela article?

MS. NEFF: Object to the form.

THE WITNESS: I wouldn't say it's changed. It's just another piece of evidence that I've incorporated into this version of the report.

BY MR. MATHEWS:

Q. Fair enough. Okay. Are there any other studies that have come out since you last testified that in your opinion are significant to the issue of whether Mirena cause PTC?

A. I'm trying to remember if Dr. Etminan had published a letter to the editor essentially sort of retracting or revising his original paper. I don't remember off the top of my head if that came out after my deposition or before, but if it did come after, that's the only other thing I can think of.

Q. Is your opinion -- is your opinion based on the Etminan article and/or a letter to the editor?

MS. NEFF: Object to the form.

THE WITNESS: No. My opinion is really based on, again, an entire body of scientific

evidence about the relationship between hormonal contraceptives and IIH. It's just another piece of information that I basically incorporate into this report.

BY MR. MATHEWS:

Q. And what was the significance that you put on the Etminan letter?

A. I mean, it's fairly minor as, you know, I think I went into in the report, I mean, how a lot of flaws at least the original report as far as how he did his disproportionality analysis, but I think one of the interesting things was the second part of that analysis where he looked at the rates of IIH in Mirena versus two other contraceptives found that they were exactly the same. And since we have really good, well-designed case-controlled studies showing that there's no relationship between hormonal contraceptives and IIH, I think that's helpful. It shows us that there's really no difference between Mirena and these other contraceptives. So that's part of the report I thought could be useful, and as he mentioned in his sworn affidavit -- affidavit and the subsequent letter to the editor, he really did not do a correct

disproportionality analysis and that if you correct for that, there's really no increased reporting rate for Mirena.

Q. All right. And then as to Valenzuela, tell me what significance you attributed to the Valenzuela study.

MS. NEFF: Object to form.

THE WITNESS: Well, I would say it's only significant in that it's one of the only two papers that specifically look at the relationship between Mirena and IIH, but again, as I mention in the report, it's unfortunately severely methodologically flawed. That doesn't mean it's worthless. It just means you have to be very cautious about any conclusions you draw from a poorly designed case control study.

BY MR. MATHEWS:

Q. All right. So you're critical of the way in which that study was conducted?

A. I am.

Q. All right. And once you reviewed the study, you went through it, you thought about it. Did you take any steps to send a letter to the editor, to contact Valenzuela and say, hey, here's a problem? Did you do any of those

things?

MS. NEFF: Object to form.

THE WITNESS: No, I didn't. I didn't for a couple reasons. The first is that, I mean, I am an expert in the litigation. So there could be a perceived conflict of interest.

The second is that, again, when you look at the paper, the conclusions they draw which is one that their evidence does not show that Mirena causes IIH; and two, and this is most important to me since I take care a lot of -- a lot of these women is that they're not recommending that people remove the Mirena.

So their conclusions are essentially the conclusions I would draw anyway based on, again, this large body of evidence. So since that was their conclusion, I didn't think it was critical that somebody sent a letter to the editor. If someone chooses to do that, I think that would be reasonable, but I didn't think I should be the person to do that.

BY MR. MATHEWS:

Q. You certainly have the ability to send a letter to the editor if you choose to do that, correct?

A. I do.
Q. Have you done that in the past?
A. Have I ever? Um... honestly, I have just never done that.
Q. Have you ever read a study and said you know what, it just doesn't make sense to me, let me call up the author and ask them some questions? Have you ever done that?
MS. NEFF: Object to form.
THE WITNESS: I haven't done that.
BY MR. MATHEWS:
Q. Have you ever been at a conference and run into an author that you disagreed with and said, I'm going to talk to them about their research and why I disagree with it?
MS. NEFF: Object to form.
THE WITNESS: I have done that in a polite way. These, again, are all people I know. I mean, everybody would agree that there's no study that's perfect, and there's also no study that's so worthless that you couldn't at least get some information from it, and there's a big middle ground there.
BY MR. MATHEWS:
Q. Have you -- do you know Valenzuela?

A. I actually don't know him or her.
Q. Do you know Valenzuela when you would see her?
A. I don't think I could pick her out of a lineup.
Q. Have you been at any conferences where Valenzuela has spoken since 2014?
MS. NEFF: Object to form.
THE WITNESS: I have been at a lot of conferences, and it's possible she spoke there and I wasn't there for the talk.
BY MR. MATHEWS:
Q. It was a bad question. I should have said that you were in attendance for.
A. I wasn't.
Q. All right. Other than the two studies we've discussed, is there any other significant study that's come out since you gave your deposition in 2015?
MS. NEFF: Object to form.
THE WITNESS: No. The one abstract that we talked about at the Academy of Ophthalmology, but again, that just essentially is in line with a lot of other well-designed case-controlled studies that reach the same

conclusion.
BY MR. MATHEWS:
Q. You mentioned something earlier that gave me pause to go back to something else. You'd mentioned submitting a grant for some research you're wanting to do. In the submission of that grant, did you disclose the expert work you're doing in this case?
A. No, because it had absolutely no relationship to either IIH or Mirena.
Q. Have you submitted any grants since 2014 that did relate to PTC or Mirena?
A. No, I haven't.
Q. Have you been asked to conduct any research or studies since 2014 concerning the connection between Mirena and PTC?
MS. NEFF: Object to form.
THE WITNESS: I have not.
BY MR. MATHEWS:
Q. Let's talk a little bit about some wordsmithing as it would be or whatever you want to refer to it as. You refer to this commonly as idiopathic intracranial hypertension, correct?
A. I do.

Q. And "idiopathic" basically meaning no known cause?
A. Correct.
Q. I'm saying that correctly?
A. Um-hum, yes.
Q. And for you to describe something as idiopathic, it's your opinion that there is no known cause, correct?
MS. NEFF: Object to form.
THE WITNESS: Well, I think it's not just my opinion. It's the opinion of the entire neuro-ophthalmology community. That is the preferred term.
Now, I will say conventionally, I think a lot of us use the term IIH and pseudotumor cerebri synonymously. I do it in part for two reasons. One is a very practical reason. Up until recently, I used a voice recognition software program for my dictations and it could not recognize IIH, it just could not. It always got it wrong. So a lot of times for practical reasons I would use the term "pseudotumor cerebri."
The other reason is a lot of physicians in the community just are familiar with the term

pseudotumor cerebri just because it has a historical -- it's historically been used to describe this condition. So when I say the patient had idiopathic intrauterine hypertension, they're just not as familiar with it. So sometimes they end up using that term.
BY MR. MATHEWS:
Q. So based on studies and reports that we've seen, we know that some people in the medical field believe that Mirena causes to or contributes to PTC; is that fair?
MS. NEFF: Object.
Object to form.
THE WITNESS: Yeah, I don't know of any neuro-ophthalmologist who truly believes that.
BY MR. MATHEWS:
Q. Medical professionals, though. There are studies that connect Mirena and PTC --
MS. NEFF: Object --
BY MR. MATHEWS:
Q. -- in the medical community?
MS. NEFF: Object to form.
THE WITNESS: Well, actually it's interesting. I gave a talk several years before I was involved in this litigation about some of

the biggest sort of myths or misperceptions in -- in neuro-ophthalmology. One of them is that hormonal contraceptives cause IIH or have a relationship to IIH. So yeah, I do think there are physicians in the community who think erroneously that there's some kind of connection between not just Mirena but other contraceptive and IIH.

BY MR. MATHEWS:

Q. So for someone in the medical community that believes that there is a connection between Mirena and PTC, they would not use the term "idiopathic" because they would have a belief of the known cause; is that fair to say?

MS. NEFF: Object to the form and foundation, incomplete hypothetical.

THE WITNESS: Yeah, honestly, I couldn't really read someone's mind. I don't know why they would do whatever they do or say whatever they say.

BY MR. MATHEWS:

Q. Okay. If someone has a heart attack, okay, and they're morbidly obese, you could say that their morbid obesity caused or contributed to cause their heart attack.

MS. NEFF: Objection.

BY MR. MATHEWS:

Q. Is that basic medicine?

MS. NEFF: Object to form.

THE WITNESS: Yes and no. "Cause" is a really specific term in medicine. I think a lot of times the way we understand diseases, I mean, we lack complete understanding of a lot of diseases. So we usually talk about things like risk factors. In other words, is there something that will dramatically increase the likelihood of this disease occurring in a certain person, is the -- does the absence of this particular risk factor dramatically lower the chance of that person developing this disease and does treating this condition or treating this factor reduce the risk.

So I think for certain diseases and particularly IIH, we know that obesity is probably the most important risk factor for developing IIH. I don't know that we know enough about IIH to say it causes IIH. I think we can only talk about things like risk factors for certain diseases, particularly diseases that we don't completely understand.

I know that's a long way of answering your question, but it's just overly simple, I think to me and I think to a lot of physicians, to say oh, X causes Y.

BY MR. MATHEWS:

Q. Back to my hypothetical about the heart attack, you wouldn't refer to a heart attack as an idiopathic heart attack?

MS. NEFF: Object to the form.

BY MR. MATHEWS:

Q. Right?

MS. NEFF: Same objection.

THE WITNESS: Well, I think we'd probably call it -- tissue-wise it's a myocardial infarction, and we'd look for some underlying condition that caused it.

BY MR. MATHEWS:

Q. Okay. So you wouldn't refer to it as an idiopathic myocardial infarction?

MS. NEFF: Object to the form.

BY MR. MATHEWS:

Q. You never heard that term in medicine, correct?

MS. NEFF: Same.

THE WITNESS: I haven't.

BY MR. MATHEWS:
Q. Because you wouldn't be able to -- somebody is going to say X caused Y for a myocardial infarction?
MS. NEFF: Object to form.
THE WITNESS: Well, I think the underlying tissue injury is lack of blood flow to the myocardium, but then there's a lot of risk factors to developing that. Does obesity cause a heart attack? I don't know if it causes it. It certainly is a risk for it. Does atherosclerosis cause a heart attack? It's related to it. I don't know that it caused it in the strictest sense. What caused the heart attack is lack of blood flow to the heart tissue.
BY MR. MATHEWS:
Q. So would it be fair to say that your opinion is this condition, pseudotumor cerebri, intracranial hypertension, whatever you want to label it as, you have a -- you believe is idiopathic because there hasn't been a study or test that in your mind has shown the cause of PTC or intracranial hypertension?
MS. NEFF: Object to the form of the

question.

THE WITNESS: Well, just to clarify, when you say "intracranial hypertension," there's a lot of causes of intracranial hypertension like brain tumor, hemorrhage and so on, but idiopathic intracranial hypertension, we have high pressure in the head, but in this condition we don't know what the underlying cause is.

BY MR. MATHEWS:

Q. Let me ask you this: If you had a 20-year-old, no other factors, no obesity, no -- no other factors that came into your office that had intracranial hypertension and was on Mirena, would you counsel them to have the Mirena removed or not?

A. Well, first off, if I see a -- say a 20-year-old and they're atypical, meaning they're not, you know, of female reproductive age, they're not obese, I'm going to look really hard for another underlying cause of intracranial hypertension before I go down the path of saying it's some drug that we know with pretty good evidence that doesn't cause intracranial hypertension.

Q. But if you don't find any of those other factors and Mirena's -- she has Mirena in her, are you going to tell her to have the Mirena removed or not?

MS. NEFF: Object to form.

THE WITNESS: Well, let's say in this hypothetical that this is a patient who we've done the testing we'd normally do and I'd probably go a little bit further than I normally would in terms of looking for an underlying cause. If we ended up calling her IIH or pseudotumor cerebri syndrome, then I would treat her like I would treat any patient with IIH and not recommend that Mirena be removed.

BY MR. MATHEWS:

Q. So you would do a lumbar puncture?

A. If she had evidence of intracranial hypertension, her MRI was otherwise unremarkable or showed evidence of IIH, then yes, we'd do a lumbar puncture.

Q. And if her condition didn't resolve, you still wouldn't tell her to have the Mirena removed?

MS. NEFF: Object to form.

THE WITNESS: If I'm diagnosing her

with IIH -- and again, I'd have to be pretty confident that it's IIH since you're describing a hypothetical patient that doesn't otherwise fit the typical demographic. What I normally do with IIH patients, treatment of IIH is driven by two things, symptoms attributed directly to intracranial hypertension and also visual field loss.

So if she had significant visual field loss, then I would treat her like I treat any patient with IIH, aggressive medical treatment and then have a very low threshold for doing something like a shunt or an optic nerve sheathe fenestration. If she had very mild visual loss or no vision loss, then I might recommend weight loss and Diamox.

BY MR. MATHEWS:

Q. Let me go through these remaining documents that you provided prior to today's depo.

(Plaintiffs' Exhibit 14 was marked for ID.)

BY MR. MATHEWS:

Q. All right. I've handed you what's called "Pseudotumor and Real Tumor"; is that

right?
A. That's correct.
Q. And that's Exhibit 14; is that correct?
A. Yes, it is.
Q. Tell me what this is.
A. So this was a Grand Rounds talk I gave to the neurosurgery department. I think it was a year or two ago.
Q. Okay. And when you say "Grand Rounds," tell me what that is?
A. So basically every Wednesday morning, the neurosurgery department has Grand Rounds where they have speakers talk about topics of interest to both the attending and the residents.
Q. All right. And this document that's -- doesn't have page numbers ends with something that says "Key points" on the back; is that right?
A. That's true.
Q. All right. How did you go about preparing this document?
A. How? I mean, I basically went to my computer and created a PowerPoint presentation.
Q. Is this a document that has evolved

over time or was this document one that you created just for the Grand Round?

A. I basically scavenged previous presentations. I have -- you know, in 18 years I've given a lot of talks on a lot of subjects and I've given -- when I'm asked to give a talk on a subject, there's a chance I've talked about it in the past or talked about a related topic. So I'll just sort of look at the slides and I'll sort of update them and reformat them for the particular audience to which I'm speaking.

Q. All right. And in this particular case, has this document in its form as presented here today been used other than for the Grand Round?

MS. NEFF: Object to form.

THE WITNESS: Yeah, not this particular document.

BY MR. MATHEWS:

Q. All right. And you said this is maybe two years old?

A. Yeah.

MS. NEFF: Object to form, mischaracterizes.

THE WITNESS: I don't remember off the

top of my head when I gave this talk. It should be in my CV. I list all my lectures.

BY MR. MATHEWS:

Q. All right.

(Plaintiffs' Exhibit 15 was marked for ID.)

BY MR. MATHEWS:

Q. And you've been handed Exhibit 15 and that's a review and update of pseudotumor cerebri, correct?

A. That's correct.

Q. And in this document -- tell me how this document -- what it's in relation to.

MS. NEFF: Object to form.

THE WITNESS: So this was given as Grand Rounds to the ophthalmology department by my fellow at the time, Dr. Kung.

BY MR. MATHEWS:

Q. Okay. And did you participate in the creation of this document?

A. Yeah, I provided some slides to Nathan. He made up a lot of these slides on his own. I reviewed it with him before he gave the presentation. Dr. McCoy is a neurosurgery resident who also contributed to the lecture.

Q. And how old is this document?

A. This was just I think a year ago. No. Actually, this may be two years ago. I apologize. I just can't remember off the --

Q. That's okay. Certainly since 2014?

A. Definitely since then.

Q. All right. And in this document, again, there aren't any page numbers and it's just a blank page at the end, but it does end with something called "summary." So -- but about halfway through, on something called "Diagnosis: Step 2 of 5" is the heading of the page?

A. Okay. I mean, I'm pretty familiar with this. So I can probably find it.

Q. Okay.

A. Lots of pictures.

MS. NEFF: Counsel, while Dr. Van Stavern is looking for that, I would just like to note these are Dr. Van Stavern's proprietary slides. So they are not specifically stamped as confidential, but we intend to have them be confidential to this.

MR. MATHEWS: I assume we'd put "confidential" on all exhibits today and then we

can go through the de-designation process if and when it gets to that.
MS. NEFF: Thank you.
MR. MATHEWS: See, I'm easy.
BY MR. MATHEWS:
Q. I see here Step 2 "Diagnosis," about halfway down it says "hormones" and it specifically lists levonorgestrel, correct?
A. Correct.
Q. And it says "Ask about these known causes and disorders," right?
MS. NEFF: Object to form, mischaracterizes.
THE WITNESS: Well, I think it's just asking about disorders and causes.
BY MR. MATHEWS:
Q. Okay. But it specifically mentions levonorgestrel, correct?
A. That's correct.
Q. Which is Mirena?
MS. NEFF: Object to form.
THE WITNESS: Yeah, Mirena is one form of LNG.
BY MR. MATHEWS:
Q. Norplant would be another?

MS. NEFF: Object to form.
THE WITNESS: That's correct.
BY MR. MATHEWS:
Q. What are some others examples?
A. We list a number of the drugs that in the literature have been associated with IIH including tetracycline-related derivatives, Vitamin A, retinoids, Lithium. There's a lot in the literature about these medications that have been anecdotally associated with IIH.
Q. Okay. So this is to diagnose IIH, right?
MS. NEFF: Object to form.
THE WITNESS: I think the idea behind this table, it's important to remember we don't just show the slide and move on to the next slide. We usually supplement it with some commentary. I think the idea behind this is that patients may come in or referring providers may send patients in with the idea that these drugs or medications have been associated with IIH, and it's incumbent upon the physician to really look carefully at the literature and also at the particular drug to see how strong a relationship there is.

BY MR. MATHEWS:
Q. So you'd want to know if the patient were on levonorgestrel?
MS. NEFF: Object to form.
THE WITNESS: I think you want to know is there any evidence supporting a causal relationship.
BY MR. MATHEWS:
Q. Okay. And this was sometime after 2014 and you are discussing at least in the diagnosis levonorgestrel, which Mirena would be one example of. But on the front page, the authors report no relevant financial disclosures, right?
A. Yes.
MS. NEFF: Object to form.
BY MR. MATHEWS:
Q. Is there a reason you didn't disclose that you were serving as an expert for Bayer specifically related to Mirena and PTC in this presentation?
A. Well, again, I don't remember specifically. I will say that Dr. Kung actually made a lot of these slides and this is his slide. So I may have just -- it just may have not occurred to me and he was the one doing the

presentation and not me.
Q. Okay.
A. I can't -- I don't know that I can give you a better answer than that, but I think it was mostly because a lot of these were his slides and he was the one giving the talk.
Q. You would agree that if your name is going on something like this that's a presentation and it's specifically referring to levonorgestrel, that you should disclose that you're serving as an expert for Bayer in relation to Mirena and PTC?
MS. NEFF: Object to form.
THE WITNESS: If I gave this talk myself, today I probably would do it differently.
BY MR. MATHEWS:
Q. All right. And I'm going to keep you going through here maybe another 20 pages back, "Treatment Red Flags," if you could find that one.
A. Sure. (Reviewing document.)
Is it after all the pictures?
Q. Ah...
A. It's probably after "Diagnosis."

Q. Yeah, it's not quite to the pictures. It doesn't look like. Well, there's several pictures in there.
A. If you could just show it to me.
Q. Yeah. Sure (indicating to document).
A. Um-hum.
Q. See that "Treatment red flags"?
A. Um-hum.
Q. And what does treatment red flags mean?
A. It means that -- actually, let me see that again.
Q. Oh, I'm sorry.
(Tendering document to witness.)
A. Because this is a little out of context.
(Reviewing document.)
Yeah, I think "Treatment red flags," I think the context is that this is when you might think about surgical intervention.
Q. Okay. And so "worsening visual fields despite treatment." So if somebody's been treated but their vision is getting worse?
A. (Nodding.)
Q. Worsening papilledema despite treatment, overall health deteriorating,

noncompliant with treatment, right?
A. Correct.
Q. In any of those would the fact that somebody has Mirena be one of those treatment red flags?
MS. NEFF: Object to form.
THE WITNESS: Treatment? I'm not -- I think a lot of this is basically if somebody is progressing despite treatment. So I'm not sure how Mirena would factor into that.
BY MR. MATHEWS:
Q. So you go in, you treat somebody, their eyesight's getting worse, you go in and treat them, their papilledema is getting worse, their health is deteriorating, then you're going to decide a surgical intervention is necessary?
MS. NEFF: Object to form.
BY MR. MATHEWS:
Q. Correct?
MS. NEFF: Compound.
THE WITNESS: Usually if somebody -- I mean, the cont- -- the indications for surgery in most IIH patients is basically progression of vision loss despite maximum medical treatment, relevant indications, and I have actually ended

up doing this in a couple of patients, there are some patients who just unfortunately are not compliant. They won't show up for follow-up exams, they won't show up for -- they won't take their medications.

There are also some patients who have what we call superimposed functional visual loss. They have psychogenic visual loss, meaning we can't rely upon their vision or their visual fields. So we don't have a good idea of what their vision actually is, and they seem to have persistent papilledema despite pretty aggressive medical treatment. So those are patients where you probably would have a low threshold for considering having a fenestration or a shunt procedure.

BY MR. MATHEWS:

Q. With somebody in this condition, where the conservative treatment hasn't helped, it's actually getting worse, with all the research and data that's out there, knowing that somebody had Mirena in them, why wouldn't you simply suggest that they have the Mirena removed rather than taking the drastic step of putting a shunt in?

MS. NEFF: Object to form.

THE WITNESS: So, I mean, my first responsibility is taking care of my patients. I see a lot of women in my practice, I see lot of IIH, I think I see ten to fifteen IIH patients a week. So my first goal is protecting their vision and taking care of them. So that means trying to use the best available medical evidence at my disposal.

So for someone like that in the hypothetical circumstances you're describing, since, again, based on my review of the large body of literature there is no credible evidence that any hormonal contraceptive, including Mirena, is causally related to IIH, it doesn't make any sense to discontinue it and in fact, discontinuing a medication, especially when it's not based on good evidence can do more harm than good.

A lot -- I mean, I see lot of patients who are sent to me where there's this potential medication toxicity and stopping the medicine isn't always the best thing to do because they may need to be on that medication. Some women really do well on Mirena, and so if there is no

evidence that the Mirena has anything to do with the IIH, it just doesn't -- it doesn't seem like good medical practice to me to discontinue it.
BY MR. MATHEWS:
Q. Do you have an idea of what is involved in the removal of Mirena the procedure?
MS. NEFF: Object to form.
THE WITNESS: I'm not a gynecologist. So I've never removed or inserted Mirena.
BY MR. MATHEWS:
Q. Do you have just a general understanding -- I mean, you know a lot about pharmacology and epidemiology.
Do you have a general understanding of what's involved in the removal of Mirena?
MS. NEFF: Object to form.
THE WITNESS: I think it's a pretty straightforward procedure.
BY MR. MATHEWS:
Q. Okay. Is it a time-consuming procedure, to the best of your knowledge?
A. To the best of my knowledge, I don't think it is.
Q. Okay. When someone is in this condition of having worsening visual fields,

worsening papilledema, overall health is deteriorating after they've had treatment, what's the time frame for somebody like that? In other words, their visual field is getting worse. If some treatment isn't taken in the next 24 hours, is that significant or is it two weeks or is it -- I mean, what's the time frame there?

MS. NEFF: Object to the form.

THE WITNESS: Yeah, so it really depends upon their -- their examination. If somebody presents to us -- and most of the patients we've ended up sending for shunt or fenestration has been people who present with pretty significant visual loss even before they're diagnosed.

So if they present with profound visual loss, then those are patients that we're going to admit and get diagnosed quickly and probably have a very low threshold for doing a shunt or fenestration within the next couple of days. Somebody who has just progressive visual loss that's been over the course of a few months and they don't seem to be responding to treatment, then probably within the next few weeks or so.

A lot of it depends upon their visual field.
BY MR. MATHEWS:
Q. All right.
(Plaintiffs' Exhibit 16 was marked for ID.)
BY MR. MATHEWS:
Q. And I've handed you what's been marked as Plaintiffs' Exhibit 16. Can you identify that document?
A. It's a looks like a lecture I gave, "Papilledema and Idiopathic Intracranial Hypertension."
THE REPORTER: Can you please repeat the title again?
THE WITNESS: "Papilledema and Idiopathic Intracranial Hypertension."
THE REPORTER: Thank you.
BY MR. MATHEWS:
Q. Do you have a time frame for when this would have been generated?
A. You know, it looks like it was right after we visited Australia. So that was probably in 2011. I can only tell by the kangaroo pictures on the back. So I'm pretty sure it was in 2011 because we went to Australia

in 2010.
Q. Okay. And what was this document created for?
A. I think this was -- I think this was a talk I gave at a local hospital to community ophthalmologists.
Q. "Local hospital" meaning local to St. Louis?
A. Yes.
Q. Not to Australia?
A. Yes, yes. No, not to Australia. That would have been awesome but...
Q. And did you create this document?
A. I did.
Q. And, you know, in it I -- and it's about halfway back. You discuss Norplant.
Do you have an understanding about the connection of Norplant to PTC?
MS. NEFF: Object to form.
THE WITNESS: Again, when you review the data from Norplant, and again, I go into this in the expert review, it's really interesting because you look at that association and you just essentially see what you would expect if the association was just simply

occurring by chance or coincidental. So my opinion is that Norplant has no causal relationship to IIH.
(Reviewing document.) Sorry. I'm still trying to find where you are in this slide.
BY MR. MATHEWS:
Q. No. You're fine. It's about halfway back and it's "exogenous substances associated with PTC."
A. Oh, I see that. Um-hum, I got it.
Q. So as we look through there, we see you refer to a variety of things. To some of them you have question marks out to the side. Do you see that?
A. I do.
Q. What's the purpose of that?
MS. NEFF: Object to form.
THE WITNESS: Well, I think in this slide, I'm simply letting the practitioners know that there are these associations out there and I think in it's important to understand that we're using "association" in two ways. There's the looser term of "association" meaning these two things seem to happen at the same time and

the same person which could be coincidental, and then there's "association" in the more strict epidemiologic sense in that these things occur in the same person in a much higher frequency than expected by chance.

So I think what I was getting at -- and this is seven years ago now. I think the things that were in bold print and with an asterisk are the medications that seem to have maybe a higher level of evidence of maybe a truer epidemiologic relationship, but again, I always supplement these slides with commentary and as I say in the text, I mean, a lot of these associations are simply based on anecdotal reports and could simply occur by chance.

BY MR. MATHEWS:

Q. Okay. So Norplant isn't bold, but it's not got a question mark next to it either --

A. Right.

Q. -- right?

So is that an indication of the jury's not still out on that one? I mean, is that why you've not put a question mark next to it?

A. Well...

MS. NEFF: Object to form.

THE WITNESS: Yeah, I think what I've said when I've given these lectures are none of these-- none of these are proven to have a causal relationship to IIH, but I think people should be aware of them because patients go online, and as we talked about earlier, referring doctors are sometimes under the impression that these medications can cause IIH.

And again, you have to judge how important is it that somebody be using these medications. You know, so I don't consider any of these medications to be proven to cause IIH. I think the ones I put in bold print have a little bit stronger evidence, and by that I usually mean that these have been reported in patients who are otherwise atypical, right? So they're atypical body habitus in men, you know, patients who might not otherwise be typical for IIH.

As far as why I put a question mark in some and why I didn't in others, I honestly don't remember.

BY MR. MATHEWS:

Q. Are any of these lectures or presentations that you've give or specifically

the ones that you've provided material on today, are they recorded?

A. Not usually. Actually, the ones that in ophthalmology are now being recorded, but I don't think -- that Grand Round that Nathan gave I don't think was recorded.

Q. Okay. To the best of your knowledge, any of these that -- you've talked about the one Nathan gave. The others, have they been recorded, to your knowledge?

A. Not that I can remember. I don't think so. I don't think the Neurosurgery Grand Rounds was recorded.

Q. Okay. Is it fair to say that your hope is one day you won't have to call it an idiopathic intracranial hypertension anymore? You'll know in your mind what the cause is?

MS. NEFF: Object to form.

THE WITNESS: No, I think that's fair. I mean, we all would love to be able to understand this condition better. That was actually one of the -- partly the rationale for the idiopathic intracranial hypertension treatment trial. The main goal was to assess the efficacy of these -- this treatment of

acetazolamide. But there were other -- we were hoping we'd get a better understanding of the condition itself, including, you know, maybe there were -- we were looking at certain vitamin A levels and vitamin A genes in this study to see if the association that's in the literature panned out, and interestingly, as it turned out, it really has not panned out.

So that's another example where you look in the literature and there's always these reports of vitamin A levels and retinal binding protein and retinoids being associated with IIH, but when you look specifically in a well-controlled rigorously designed study, it turns out the vitamin A just did not pan out.

BY MR. MATHEWS:

Q. It's true that other diseases have once upon a time been described as idiopathic that are no longer described as idiopathic because a known cause now exists; is that true?

MS. NEFF: Object to form.

THE WITNESS: That's true.

BY MR. MATHEWS:

Q. All right.

MS. NEFF: Counsel, we've been going

for a little over hour. So if you want to --
MR. MATHEWS: This is a good time to break.
MS. NEFF: Great. Off the record.
THE VIDEOGRAPHER: Off the record at 11:50 a.m.
(Recess taken from 11:50 a.m. to 12:05 p.m.)
THE VIDEOGRAPHER: Back on the record at 12:05 p.m.
(Plaintiffs' Exhibit 17 was marked for ID.)
BY MR. MATHEWS:
Q. Doctor, I've handed you what's been marked as Exhibit 17. Can you identify that slide deck for me, please?
A. It looks like a lecture I gave titled "Idiopathic Intracranial Hypertension or Pseudotumor Cerebri, What Do We Know?"
Q. Okay. And when would this slide deck have been created?
A. Based on the kangaroos on the back, it was probably within the year after we went to Australia. I think this was for the Neurology Department Grand Rounds.

Q. Okay. So 2011, 2012?
A. Yeah. Yeah, probably 2011.
Q. All right. Other than for the Grand Rounds, have you used this slide deck for any additional presentations since that time?
A. I haven't.
Q. Okay. And let's see... I am going to flip you over to way in the back. It's again this same chart --
A. Same table.
Q. -- that we saw earlier.
A. Right.
Q. I could hand it to you if you want. That might be easier. (Tendering document to witness.)
A. Yeah, I mean, that's pretty much the same slide.
Q. Again, does that appear to be the same slide we spoke about earlier?
A. Yeah. I think I just recycled the slide.
Q. And again, it has certain drugs in bold font, certain ones with an asterisk, certain ones a question mark, certain ones with nothing, correct?

A. Correct.
Q. All right. And the reason for those markings, is it the same in this slide as it was in the previous slide?
A. Pretty much everything I said about the last slide (Nodding).
Q. All right. And you think you probably just copied this slide over from the other presentation or vice versa?
A. Yes.
Q. All right. So if I ask you the same questions, I'll get the same answers?
A. Basically, yes.
(Plaintiffs' Exhibit 18 was marked for ID.)
BY MR. MATHEWS:
Q. You've been handed what's been marked as Exhibit 18. Can you identify that document?
A. This is another lecture I did called "Idiopathic Intracranial Hypertension, What the Bleep Do We Know?"
Q. Okay. And do you know what time frame this would have been created in?
A. I think this was also to the Neurology Department, but I think also in 2009.

Q. Okay. And we've got a sunset on the back of this one. Where is that at?
A. That one, I'm not sure where that was. That might have been Hawaii.
Q. All right. But we think this was 2009, correct?
A. Correct.
Q. All right. And again, I'm back to this similar slide, but this one seems a little bit different. I'll show it to you so you don't have to find it.
A. Um-hum.
Q. This one is the -- a list of medications or vitamin A or what have you, but it doesn't seem to have the bold and the asterisks on it.
Is there something different being corresponded through this slide than the previous slides?
MS. NEFF: Object to the form of the question.
THE WITNESS: I think it just has to do with the style. I might have liked the bold print with the other slide and this one, I wanted to make it more basic. So I don't think

there was anything more than that.
BY MR. MATHEWS:
Q. All right. Now, let's see, your report was Exhibit 3; is that correct?
A. I believe.
Q. And do you have it there?
A. I have my report.
Q. You've got your own copy again?
A. Yes.
Q. And on page 16 of your report, the next-to-last page of the actual report, you have a summary there, right?
A. Yes.
Q. And your summary is: "In summary, the available evidence does not support a causal relationship between Mirena and IIH. Such a relationship is not accepted in the medical community, and I do not believe that Mirena has been shown to cause IIH. None of the five causal factors identified above: Scientific plausibility, dose responses, disease occurring in the absence of potential confounders, clear pattern of recover -- recovery shortly after dechallenge, and in the absence of therapeutic intervention and rechallenge are met with

respect to Mirena."
Did I read that right?
A. You did.
Q. And that is your -- that's a fair summary of your opinion?
MS. NEFF: Object to form.
THE WITNESS: It is.
BY MR. MATHEWS:
Q. Now, in respect to this statement, "Available scientific data do not support an increased incidence via IIH among Mirena users, especially when one considers that the population using Mirena (women in their child bearing age) is already a high risk population for IIH. Further, confounding occurs if the highest risk factors for IIH, obesity and recent weight gain, are also considered."
Is that consistent with your opinion?
MS. NEFF: I'm sorry. Counsel, where are you reading from?
MR. MATHEWS: Well, that's a statement from Dr. Newman's report.
MS. NEFF: Okay. I'm going to object to the form and foundation.
THE WITNESS: Could I actually see it

just to...
BY MR. MATHEWS:
Q. Sure. And feel -- well, let me -- let me give you -- this is my copy, but it's on page 15, which I think is the last page and you're welcome to read the whole thing.
A. No. I'm not going to read the whole thing. I won't be able to do that.
Q. Well, that's why I was just reading the part that I thought was important.
A. (Reviewing document.)
No, I think it's a different way of saying it, but I think I do agree with that.
Q. Essentially the same opinion, would you agree?
A. I would agree with that.
MS. NEFF: Object to form.
BY MR. MATHEWS:
Q. I'm going to hand you Dr. Cestari's report. And this is --
MS. NEFF: Counsel, do you have a copy for me as well?
MR. MATHEWS: I'm sorry. I do. And I'll give you Newman's too. Sorry about that.
(Tendering documents to counsel.)

BY MR. MATHEWS:
Q. Page 22 is where you'll find --
THE REPORTER: Do you want a sticker on that, Counsel?
MR. MATHEWS: We didn't mark it as exhibit.
THE REPORTER: Okay. All right.
MR. MATHEWS: So I don't think you need to.
BY MR. MATHEWS:
Q. Did you read through Dr. Cestari's opinion there in the "Conclusion" section of page 22 of his report?
A. I'm just looking through it now.
Q. Okay.
A. (Reviewing document.)
Okay. I basically read it.
Q. All right. And is his opinion essentially the same opinion that you have?
MS. NEFF: Object to form.
THE WITNESS: Well, I think again there's only a certain amount of evidence out there. So I think we've all looked at the evidence and essentially come to the same conclusion.

BY MR. MATHEWS:
Q. All right. So after looking at Dr. Newman's conclusions, Dr. Cestari's conclusions, I just want to understand I -- your response to me is the same research is out there, same studies, you all seem to have looked at the same studies and come to similar or the same conclusions --
MS. NEFF: Objection.
BY MR. MATHEWS:
Q. -- based on what you've seen?
MS. NEFF: Object to the form of the question.
THE WITNESS: I think, again, we've all looked at the available medical evidence and judged it by the best quality available, and based on the best evidence available, I think we've all come to the conclusion that there's no evidence of a causal relationship.
BY MR. MATHEWS:
Q. All right. This is Dr. Rizzo's report. And the conclusions are on page 22 of that report. If you could take a look at those.
A. (Reviewing document.)
Again, I think there's just only so

many ways of saying essentially that Mirena does not cause IIH based on the best available evidence.

Q. Just so many ways of saying the same thing; is that fair to say?

MS. NEFF: Object to the form.

THE WITNESS: Or reaching the same conclusion.

BY MR. MATHEWS:

Q. All right. And this is Dr. Dinkin's report. Page 14 is the conclusions there, if you could read through them.

A. Yes, I've read them.

Q. And after reading Dr. Dinkin's report or the conclusions of the report, he has reached the same or similar opinion that you have in this case; is that fair to say?

MS. NEFF: Object to form and foundation.

THE WITNESS: Well, I think -- I haven't read his report but -- I don't know what he's reviewed, but I'm assuming he's reviewed the same available medical evidence that I have and has come to the same conclusion.

MR. MATHEWS: All right. I have no

further questions.
MS. NEFF: Let's go off the record for a moment.
THE VIDEOGRAPHER: Off the record at 12:15 p.m.
(Recess taken from 12:15 p.m. to 12:17 p.m.)
THE VIDEOGRAPHER: On the record at 12:17 p.m.

EXAMINATION
BY MS. NEFF:
Q. Good afternoon, Dr. Van Stavern. Do you recall you were asked previously about your expertise in epidemiology?
A. I do.
Q. Can you describe your experience and expertise in epidemiology that you were relying on in this case?
A. Well, again, I have designed case-controlled studies, I have been involved in a number of multicentered clinical trials as a leading investigator. As a member of Nordic, N-O-R-D-I-C, I was at least partly involved in the implementation and design of the idiopathic

intracranial hypertension trial, and I simply just have to note that epidemiology simply being in a medical center where we see really rare diseases and I have to understand something about patterns of disease and risk factors simply to treat patients.

Q. You were asked: Do you have an opinion on whether levonorgestrel causes an increase in weight gain in women? Do you recall that question?

A. I do.

Q. You replied: "I believe in some forms it can." What did you mean by that?

A. I think I was thinking of Depo-Provera. So I was kind of in general thinking of progestins overall rather than Mirena specifically.

Q. Are you aware of any evidence that Mirena causes weight gain?

A. No, I'm not.

Q. Are you aware of any evidence that Mirena does not cause weight gain?

A. No. I think there have been several studies looking at that, showing it actually does not.

Q. Are those studies that you referenced showing Mirena does not cause weight gain included in the materials you reviewed for this litigation?

A. They are.

MS. NEFF: Thank you. I have no further questions.

MR. MATHEWS: No questions.

THE VIDEOGRAPHER: Off the record at 12:19 p.m.

(Deposition concluded at 12:19 p.m. CST.)

REPORTER CERTIFICATE

I, Deborah Habian, a Certified Shorthand Reporter within and for the State of Illinois, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition was reported stenographically by me, was thereafter reduced to printed transcript by me, and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That the reading and signing by the witness of the deposition transcript was agreed upon as stated herein;

That I am not a relative or employee of attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand this 20th day of February, 2018.

DEBORAH HABIAN, CSR, RMR, CRR, CLR
MO CCR NO. 1409
IL CSR NO. 084-02432

DEPOSITION ERRATA SHEET

Assignment No. 39388

Case Caption: IN RE: MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY

Witness: GREGORY P. VAN STAVERN, M.D. - FEBRUARY 13, 2018

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of

____________, 20___.

___________________________________

GREGORY P. VAN STAVERN, M.D.

Sworn to and subscribed before me this _____ day of ________________, 20__.

__________________________

Notary Public

My commission expires________

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_______________

______________________________________________________

Reason for change:___________________________________

Page No._____Line No._____Change to:_______________

______________________________________________________

Reason for change:___________________________________

Page No._____Line No._____Change to:_______________

______________________________________________________

Reason for change:___________________________________

Page No._____Line No._____Change to:_______________

______________________________________________________

Reason for change:___________________________________

Page No._____Line No._____Change to:_______________

______________________________________________________

Reason for change:___________________________________

Page No._____Line No._____Change to:_______________

______________________________________________________

Reason for change:___________________________________

Page No._____Line No._____Change to:_______________

______________________________________________________

Reason for change:___________________________________

SIGNATURE:__________________________DATE:____________

GREGORY P. VAN STAVERN, M.D.

DEPOSITION ERRATA SHEET

Page No.______Line No.______Change to:________________

_________________________________________________________

Reason for change:____________________________________

Page No.______Line No.______Change to:________________

_________________________________________________________

Reason for change:____________________________________

Page No.______Line No.______Change to:________________

_________________________________________________________

Reason for change:____________________________________

Page No.______Line No.______Change to:________________

_________________________________________________________

Reason for change:____________________________________

Page No.______Line No.______Change to:________________

_________________________________________________________

Reason for change:____________________________________

Page No.______Line No.______Change to:________________

_________________________________________________________

Reason for change:____________________________________

Page No.______Line No.______Change to:________________

_________________________________________________________

Reason for change:____________________________________

SIGNATURE:__________________________DATE:_____________

GREGORY P. VAN STAVERN, M.D.

**Exhibits**

**39388 Stavern. Gregory Exhibit 1** 4:17 10:7,8, 12 21:14 22:4 27:14 31:23 33:14,15

**39388 Stavern. Gregory Exhibit 2** 4:20 31:15, 18,25

**39388 Stavern. Gregory Exhibit 3** 5:4 47:9,10, 14 97:6,11 139:4

**39388 Stavern. Gregory Exhibit 4** 5:7 63:7,8,12

**39388 Stavern. Gregory Exhibit 5** 5:10 65:24 66:3

**39388 Stavern. Gregory Exhibit 6** 5:16 67:6 70:11 83:2

**39388 Stavern. Gregory Exhibit 7** 5:19 69:19,23

**39388 Stavern. Gregory Exhibit 8** 5:23 83:10,14

**39388 Stavern. Gregory Exhibit 9** 6:4 86:4,7

**39388 Stavern. Gregory Exhibit 10** 6:6 87:5,18

**39388 Stavern. Gregory Exhibit 11** 6:9 88:15,19

**39388 Stavern. Gregory Exhibit 12** 6:12 90:12, 15

**39388 Stavern. Gregory Exhibit 13** 6:16 94:17

**39388 Stavern. Gregory Exhibit 14** 6:19 113:21 114:3

**39388 Stavern. Gregory Exhibit 15** 7:4 116:5,8

**39388 Stavern. Gregory Exhibit 16** 7:8 128:4,8

**39388 Stavern. Gregory Exhibit 17** 7:14 135:11, 15

**39388 Stavern. Gregory Exhibit 18** 7:21 137:14, 18

**$**

**$107,250** 11:6 84:8

**$750** 24:5,16 25:7 36:11 44:16

**(**

**(a)(2)** 83:23

**1**

**1** 10:7,8,12 21:14 22:4 27:14 31:23 33:15 94:24

**1,500** 24:20

**10** 87:5,18

**10/15** 27:18,22 28:2

**100** 39:23

**10:18** 53:9

**10:18 a.m** 53:10

**10:20** 53:11,13

**10:33** 66:20

**10:33 a.m** 66:21

**10:42** 66:22,24

**11** 88:15,19

**11:50** 135:6,7

**12** 90:12,15

**120** 39:23

**12:05** 135:8,10

**12:15** 145:5,6

**12:17** 145:7,9

**12:19** 147:10, 11

**13** 94:17

**14** 113:21 114:3 144:11

**15** 116:5,8 141:5

**16** 27:15 128:4, 8 139:10

**17** 41:7 42:8 97:11,15 135:11,15

**17th** 31:7 32:4

**18** 76:7 97:14 115:4 137:14, 18

**19** 36:24

**1990s** 23:24

**1999** 71:12

**2**

**2** 27:14 31:15, 18,25 64:17,18 83:23 87:11 117:12 118:6

**2/12/2018** 94:25

**2/13/2008** 8:6

**2/16** 27:18 28:2 33:17

**2/16/2016** 31:11

**20** 28:2,6 30:7, 22 33:16,18 35:7 38:13,15 121:19

**20-year-old** 111:12,18

**2000** 71:12

**2004** 14:17,21

**2005** 14:17,21

**2009** 52:19 61:24 137:25 138:5

**2010** 129:1

**2011** 128:23,25 136:1,2

**2012** 17:15 136:1

**2014** 11:23 14:22 21:14 62:15 72:21 79:24 81:16 82:14 84:12 103:7 104:12, 15 117:5 120:9

**2015** 11:2 21:15 22:12 26:4 62:15 80:20 88:21 103:19

**2016** 27:15 31:7 32:4 35:6 36:5,24 37:7,8, 18 38:12 41:6 90:16

**2017** 10:20 11:14 40:9 42:2,7 43:9,12 45:11 58:19 68:7 86:8 87:20

**2018** 97:15

**211** 8:5

**22** 142:2,13 143:22

**24** 64:2 127:6

**265** 32:11

**266** 32:1

**27** 10:20 11:14 36:5,20

**27th** 42:6

**29** 41:8,11,14

**3**

**3** 47:9,10,14 83:22 97:3,4,6, 11 139:4

**3,000** 24:21

**3/6/15** 27:22

**30** 34:15 51:21

**4**

**4** 63:7,8,12,19 84:16 95:16

**4/16** 33:17

**4/2016** 35:5

**40** 34:16 51:20, 21

**5**

**5** 65:23,24 66:3 94:24 117:12

**50/50** 51:23

**6**

**6** 67:5,6 70:11 83:2,23 86:18 89:6 91:6

**6(b)** 84:15

**60** 51:2,9

**6th** 11:2 21:15

**7**

**7** 69:18,19,23 86:18 87:25 89:6 91:6

**70** 15:22 51:2,9

**750** 24:19 36:18

**8**

**8** 83:10,14,23 87:25

**80** 15:17,20

**80s** 23:24

**9**

**9** 86:4,7

**9:34** 8:6

**A**

**a.m.** 8:6 53:9, 11,13 66:20, 22,24 135:6,7

**ability** 93:13 101:23

**able** 13:17,19 38:7 59:21 110:2 133:20 141:8

**about** 11:3,4,7, 17 13:4,10,11, 14 14:3,22 16:4 18:9,24 19:16 21:15 29:13 31:2,8,9, 21 33:25 39:25 40:25 41:2,10, 11 45:8,23 46:9 48:11 49:24 51:2,6,9, 23,25 52:22,23 53:18 54:11 55:16 57:23 62:7 68:11,13 69:14 71:8 72:17 78:4 79:3,9 80:11 90:5 91:12,15 96:15,19 99:1 100:15,22 102:14 103:22 104:20 106:25 108:9,22,23 109:6 114:13, 21 115:7,8 117:11 118:6, 10,15 119:9 122:19 126:12 129:16,17 130:8 132:6 133:8 136:19 137:5 141:24 145:14 146:5

**above** 139:20

**absence** 108:13 139:22, 24

**absolutely** 104:9

**abstract** 68:16, 18,20 69:14,25 103:21

**academic** 39:23 49:20

**Academy** 67:21 80:7,8 103:22

**accept** 15:11

**accepted** 139:17

**access** 69:4,8

**accordance** 8:23

**according** 84:15

**account** 35:7 36:6,20

**accounted** 11:13

**accurate** 10:25 48:7 69:24

**accurately** 95:1

**acetazolamide** 134:1

**acknowledging** 91:12

**across** 24:16

**actionable** 14:12

**activities** 50:20

**actual** 55:18 139:11

**actually** 12:7 15:11,25 17:25 32:9 40:23 55:18 67:17 68:6 80:4 85:23 90:5 91:23,24 96:10 97:2,11 103:1 106:23 117:3 120:22 122:10 123:25 124:11, 20 133:3,22 140:25 146:24

**added** 11:5 95:7

**adding** 45:7

**additional** 11:12 29:6 30:23 36:21 39:6 41:8 43:11 67:4,10 70:7 83:6 136:5

**adequately** 10:21

**administered** 9:8

**admit** 127:19

**advisory** 89:10, 12 90:6

**affect** 93:13

**affidavit** 99:24

**after** 26:22 32:23 34:8,20 38:14 46:22 60:13 84:21 98:17,18 120:9 121:23,25 127:2 128:22 135:23 139:23 143:2 144:14

**afternoon** 145:13

**again** 12:20 18:23 22:1 23:21 24:21 26:25 28:7,13 30:4 33:22 35:3 37:1,3 38:23 40:25 42:25 44:13 46:3,18 54:8 59:13 63:2 71:1 73:3 78:4 81:6 82:7 87:4, 18 89:7,8 90:16 91:2,6 98:25 100:11 101:7,16 102:18 103:23 113:1 117:8 120:21 122:11 125:12 128:14

129:20,21 131:11 132:9 136:8,18,22 138:8 139:8 142:21 143:14, 25 145:20

**against** 93:22, 23

**age** 74:16 111:20 140:14

**agents** 75:25 76:15,17

**aggressive** 113:11 124:13

**ago** 16:6 18:25 22:1 41:24 43:8 55:16 79:12 114:8 117:2,3 131:7

**agree** 54:21 65:10 77:14 78:12 92:8 93:10 94:3 96:2 98:1 102:19 121:7 141:13,15,16

**Agreement** 95:23

**agricultural** 95:17

**Ah** 48:20 121:24

**ahead** 11:21 17:19 25:25 29:16 31:14 35:14 65:9 69:17 86:3 92:20 95:12

**all** 9:25 10:4,19 11:1,16,25 12:8 13:22 14:1 16:7,15, 24 17:12 19:5, 19 20:2 21:11, 13 24:4,15 25:6,18 26:2, 21 27:12,13, 17,21 28:1,5, 15,21 29:5,24 30:5 31:6,10 32:14 33:2,12, 14 34:20 35:24 36:1,19 37:7 38:5,18 39:4, 20 40:2 41:1,6 42:14,18 44:4, 20 45:12,18, 20,21 47:25 48:2,5,16,21, 25 49:12,16 50:16 51:20 53:1 56:20 57:23 58:5,16, 17 62:12,16 63:6,24 64:1 65:13,23 66:8, 12,13,15,16 67:2,15,18 68:6 70:3,6,10, 15,19,22 71:8 72:10,23 73:21 74:9,11 77:14 79:2 80:13 81:10,13,19,22 82:24 83:9,16 84:1,7,11 85:11 86:2,17 87:25 88:6 89:2,6,20 90:4, 11 91:23 95:15 96:18 97:4,14, 17 100:4,18,21 102:18 103:16 113:24 114:16, 21 115:12,20 116:2,4 117:7, 25 121:18,23 124:20 128:3 133:20 134:24 136:3 137:2,7, 11 138:5,8 139:3 142:7, 18,23 143:2,6, 14,18,21 144:10,25

**along** 18:4 21:21

**already** 13:11 23:25 26:14,18 28:22 29:7,22 32:23 42:19 44:13 46:4 56:21 58:6 140:14

**also** 48:18 49:9,13,25 50:6,15,19 51:5 52:14,22 53:16,23 54:24 70:10 73:23 74:18 78:10 88:1,21 102:21 113:7 116:25 119:23 124:6 137:24,25 140:17

**although** 47:1 55:22

**always** 90:18 105:20 125:23 131:11 134:10

**Alzheimer's** 54:2,3,6,12

**am** 9:1,23 56:9, 11 70:21 83:21 100:20 101:5 136:7

**Amenorrhea** 90:18

**American** 67:21

**among** 86:12 140:11

**amount** 22:15 44:22 94:4 142:22

**analysis** 29:10, 13 30:1 99:11, 13 100:1

**and/or** 98:21

**anecdotal** 131:14

**anecdotally** 119:10

**annual** 46:20

**annually** 84:15

**another** 18:20 24:1 33:16 41:3 43:7 60:14 67:4 68:25 82:18 87:18 88:19 98:5 99:2 111:21 118:25 121:19 134:9 137:19

**answer** 12:12, 21 20:24 27:1, 4 38:11 44:14 50:22 58:6 65:9 74:6,21 121:4

**answering** 25:13,14 109:1

**answers** 33:5 137:12

**anticipated** 78:4

**anymore** 133:16

**anyone** 26:19, 23 27:2,9 40:7, 23

**anything** 20:1 36:20 44:9 126:1 139:1

**anyway** 101:15

**apologize** 117:4

**appear** 32:2 69:24 70:4 84:2 97:18 136:18

**appears** 24:4 28:1 64:13

**appendices** 47:18

**Appendix** 48:6, 18

**applied** 56:24

**appointment** 49:10,11,12

**appropriately** 21:3 74:24,25

**archaic** 58:25

**archive** 69:3

**area** 14:8 54:17 92:23,24

**areas** 52:5,11, 14 54:8

**aren't** 44:23 48:12 117:8

**around** 14:17

**article** 42:23 86:8,25 87:18, 20,21 88:20 90:16,21 91:7 98:2,21

**articles** 23:19, 20 26:16 39:7, 9 42:15,20 47:21 48:11,14 52:22 75:16 91:15

**aside** 33:12

**ask** 14:2 19:5, 16 33:3 35:23 43:6 44:6 102:7 111:11 118:10 137:11

**asked** 12:10, 18,22 13:9 14:18 18:2 28:9,17 33:4 35:21 41:22 43:7 104:14 115:6 145:14 146:7

**asking** 42:6 60:23 118:15

**aspect** 51:1

**assess** 133:24

**assignment** 15:12

**assistant** 59:2

**associate** 58:23 61:21

**associated** 69:5 77:12 119:6, 10,21 130:9 134:12

**association** 11:18 17:15 73:7 90:17 129:23,25 130:23,24 131:2 134:6

**associations** 130:21 131:13

**assume** 25:20 117:24

**assuming** 144:22

**asterisk** 131:8 136:23

**asterisks** 138:16

**atherosclerosis** 110:12

**attack** 107:22, 25 109:7,8 110:10,12,15

**attempt** 9:22

**attend** 76:7

**attendance** 103:14

**attending** 8:21 114:14

**attorney** 14:6,7 37:21

**attorneys** 28:12 33:22 41:20 46:5,7 65:4

**attributed** 100:5 113:6

**atypical** 111:18 132:16,17

**audience** 115:11

**August** 42:7

**Australia** 128:22,25 129:10,11 135:24

**author** 102:7, 13

**authors** 120:12

**available** 52:15 71:4 125:8 139:15 140:10 143:15,16,17 144:2,23

**average** 15:1 51:1,7 76:3

**aware** 22:7 39:5 42:19 69:11 70:19,21 86:25 87:3 94:11,16 132:5 146:18,21

**awesome** 129:12

**B**

**back** 13:18 14:14 15:7 17:15 26:4 31:23 33:3,14 35:23 37:19,25 38:1,3 39:19 41:20 46:12 63:4 67:2 72:21,24 73:13,22 74:7, 19 82:24 84:11 96:19 97:15 104:4 109:6 114:18 121:19 128:24 129:16 130:9 135:9,22 136:8 138:2,8

**bad** 103:13

**based** 71:3 75:14 96:14 98:21,25 101:15 106:8 125:12,18 131:14 135:22 143:11,17 144:2

**Baseline** 90:17

**basic** 52:8,10 60:8 75:17,23 78:7,16 108:3 138:25

**basically** 13:9 20:25 22:24 29:17 37:4 50:21 51:16 53:16 56:2 61:12 67:20,24 68:12 69:15 72:12 75:16 93:19 99:3 105:1 114:11, 23 115:3 123:8,23 137:13 142:17

**basis** 15:5 25:8

**Bayer** 8:17 12:25 27:8 29:9,13,25 34:10 35:2 58:9,15 82:8 84:9 85:4,12 86:21,25 88:3 89:9,13,15,21 90:2,6,7 94:12 96:3,6 120:18 121:11

**bearing** 140:14

**became** 62:1 80:21

**because** 13:15 18:2 24:1 25:12 36:15 40:20 49:1 51:3 52:10,25 54:3 55:21 73:3 74:14 79:18 82:1 104:9 106:1 107:13 110:2, 22 121:5 122:14 125:23 128:25 129:23 132:5 134:19

**become** 52:19

**before** 8:20 34:10,14,21 45:8 48:1 50:12 55:22 63:17 87:7 95:3 98:17 106:24 111:22 116:23 127:15

**beginning** 14:17

**behalf** 15:20

**behavior** 77:12

**behind** 119:14, 18

**being** 8:5 11:2, 17 12:18 13:22 15:12 18:2 24:12 38:20 39:2 60:4,16 92:22 133:4 134:12 138:17 146:2

**belief** 107:13

**believe** 12:2 21:25 25:19 30:4 31:6 43:23 62:15 75:11 79:8 106:10 110:21 139:5,18 146:12

**believed** 29:22

**believes** 106:15 107:11

**benefit** 60:4

**best** 33:6 34:2 38:6 48:7 87:14 96:11 125:8,23 126:21,22 133:7 143:16, 17 144:2

**better** 46:24 54:15 78:15,21 81:14 121:4 133:21 134:2

**between** 12:24 13:12 14:23 29:21 40:1 51:22 53:21 58:23 60:4 80:18 94:12 99:1,18,21 100:11 104:16 107:7,11 139:16

**biased** 54:22

**big** 63:1 72:3 102:23

**biggest** 107:1

**bill** 23:12 36:4, 24 42:4 43:4

**billed** 11:10 22:12,16 38:13 83:7

**billing** 10:21 11:12 22:8 24:5 27:22 31:11 36:10,12 37:10,11 42:1, 6 43:8,11 44:15,16 45:12 64:10

**binding** 134:11

**biomarkers** 54:1

**Biomedical** 95:22

**biostatistician** 78:14

**biostatistics** 77:21,22 78:22

**biostatus-** 78:13

**birth** 74:1,3

**bit** 13:9,14,16 42:25 45:22 82:25 83:3 96:19 104:20 112:9 132:14 138:9

**blank** 117:9

**Bleeding** 90:17

**Bleep** 137:21

**blood** 110:7,15

**board** 24:16 61:9 89:10,12, 14 90:6

**body** 73:5 98:25 101:16 125:13 132:17

**bold** 131:8,17 132:13 136:22 138:15,23

**bolster** 61:23

**both** 37:12 50:7,13 52:20 89:21 114:14

**bottom** 94:24

**Bowl** 46:22 47:3

**boxes** 87:10 95:4,10

**brain** 53:22 75:25 111:5

**break** 65:19 67:3 135:3

**breakdown** 28:14 33:23

**brief** 16:18 34:15

**briefly** 45:23 82:5,16

**bring** 67:15

**Broadway** 8:5

**broken** 25:16

**brought** 95:23

**built** 14:19

**busier** 17:8

**busy** 17:3 22:18 46:19 49:24

**C**

**calculate** 15:8

**calculated** 25:11

**calendar** 46:12

**call** 32:15 53:21 92:5 102:7 109:14 124:7 133:15

**called** 9:13 38:20 59:15 91:19 113:25 117:10,11 137:19

**calling** 25:13 112:11

**calls** 25:13 28:11

**came** 62:6 68:24 98:17 111:13

**can't** 20:23 41:4 117:4 121:3 124:9

**cancer** 76:13, 14

**care** 25:15 49:23 51:1,18 52:13 59:12 78:23 101:11 125:3,7

**carefully** 119:23

**Carolina** 19:9

**case** 14:5,7,9, 10,12 15:15 16:14,16,20 17:14,23 18:7, 10,20 19:9,19 20:9,10,14,15, 18,22 21:8 22:21 23:23 27:25 28:19 33:25 69:16 78:6 81:23 84:7 96:20 97:25 100:16 104:8 115:13 144:17 145:19

**case-controlled** 67:23 74:23 99:17 103:25 145:21

**cases** 11:17 13:24 14:1,23 15:10 16:13,22 17:13 19:25 20:5 21:20 22:9 28:9,10, 16,17 29:19 30:2,25 31:2 37:23 38:25 39:1 41:16 48:22 74:25

**causal** 29:20 77:12 120:6 130:2 132:4 139:15,20 143:19

**causally** 125:15

**cause** 75:5 96:4 98:12 105:2,8 107:3, 14,25 108:5 110:10,12,23 111:9,21,24 112:11 132:8, 12 133:17 134:20 139:19 144:2 146:22 147:2

**caused** 107:24 109:16 110:3,

13,14

**causes** 39:25 75:8 101:10 106:10 108:22 109:4 110:10 111:4 118:11, 15 146:8,19

**cautious** 100:15

**center** 19:18 54:4 76:14 146:3

**cerebri** 20:2,10 105:16,23 106:1 110:19 112:12 116:10 135:19

**certain** 40:1 51:11,12 73:23 75:25 85:13 87:1 108:13, 18,24 134:4 136:22,23,24 142:22

**certainly** 44:11 51:6 54:17,19 68:23 71:5 84:15 88:14 101:23 110:11 117:5

**cervic** 50:12

**Cestari** 81:12

**Cestari's** 141:19 142:11 143:3

**chair** 60:24 61:6 62:13 91:19 92:12,20 93:10,14,20

**chairman** 61:12 62:8

**chairs** 93:23

**chance** 39:9 63:21 108:15 115:7 130:1 131:5,15

**chances** 92:11

**change** 33:5

**changed** 38:20 39:2,12 44:15 98:2,5

**changes** 26:24 32:17,19

**characteristics** 72:18

**charge** 36:13

**chart** 136:9

**child** 140:13

**choose** 101:24

**chooses** 101:19

**Chris** 19:8

**circumstances** 125:11

**claim** 21:8

**clarifications** 32:20

**clarify** 111:2

**classes** 76:21

**clear** 139:22

**clearly** 43:10 51:3

**clinic** 50:5,14 51:4,19 59:25 60:10,20 78:9

**clinical** 49:23 50:19,21 51:1, 22,24 52:2,4,9 55:8,12,13 58:11 59:12 60:11,21 78:10,23 145:22

**clinically-based** 50:23

**clinician** 59:20 60:5

**clinics** 49:25

**coincidental** 73:8 130:1 131:1

**colder** 17:7

**Colin** 17:14

**collaborated** 53:24 72:2,5

**collaboration** 55:25

**collaborative** 72:7

**colleague** 17:4 50:8

**colleagues** 67:22

**collectively** 10:7

**combination** 55:5

**come** 40:4 55:4 57:6 73:6 98:10,18 103:18 119:19 142:24 143:7, 18 144:24

**coming** 46:21

**commentary** 119:18 131:12

**commit** 36:16

**commitment** 17:10

**commitments** 13:15

**committee** 61:11,14,16,20

**commonly** 104:22

**communication** 34:9 64:19 65:2

**communications** 12:13,24 27:2

**community** 39:22 40:7 71:2 105:12,25 106:21 107:5, 10 129:5 139:18

**companies** 57:25 93:24

**company** 89:10 95:17

**comparative** 68:3

**complete** 48:18 83:24 108:8

**completely** 45:6 74:9 92:2 96:8 108:25

**compliant** 124:3

**complying** 33:13

**compound** 20:3 123:20

**computer** 25:22 114:24

**concerning** 40:17 71:25 104:15

**concluded** 147:11

**conclusion** 73:6 101:17 104:1 142:12, 25 143:18 144:8,24

**conclusions** 100:15 101:8, 14,15 143:3,4, 8,22 144:11,15

**condition** 75:3 106:3 108:16 109:16 110:19 111:8 112:21 124:18 126:25 133:21 134:3

**conduct** 104:14

**conducted** 69:12 100:19

**conference** 79:13 102:12

**conferences** 39:20,21 40:5 76:8 80:17 103:6,10

**confident** 113:2

**confidential** 20:23 117:22, 23,25

**confidentiality** 20:21 16:10,11,19 20:8 33:25 72:20

**conflict** 101:6

**conflicts** 83:17

**confounders** 139:22

**confounding** 140:15

**connect** 106:18

**connection** 80:11,18 81:16 82:12 89:21 90:1 104:16 107:6,11 129:18

**connectivity** 53:21

**conservative** 124:19

**consider** 132:11

**considered** 55:13 140:17

**considering** 124:15

**considers** 140:12

**consistent** 140:18

**constrained** 46:20

**cont-** 123:22

**contact** 100:24

**contacted** 11:17,25 12:2,9,16 13:3,18,22 14:6,22

**contained** 30:19

**contains** 94:25

**context** 28:10 41:3 122:15,18

**continuation** 89:3

**contraception** 86:11

**contraceptive** 13:13 68:2,3 74:17 89:15 90:7 107:7 125:14

**contraceptives** 40:3 41:3 73:7 74:14 99:2,15,19,21 107:3

**contrary** 92:9 93:11 96:3,6

**contributed** 107:24 116:25

**contributes** 106:11

**contributor** 85:12,13

**control** 23:23 69:16 74:2,3 78:6 100:16

**controls** 68:1,4 75:1

**conventionally** 105:14

**convince** 73:9

**Cook** 8:19

**copied** 137:8

**copy** 44:7 48:6 67:16 87:9,14 97:7,22 139:8 141:4,21

**Corporation** 95:19

**correct** 9:1,24 10:2 11:10,11,15 15:16 17:17 24:5 25:22,23 27:20 28:4 31:4,5,12 42:2 43:1,12,13 44:18,19 47:19,20 48:19,20,23 49:4,5,8,9 54:25 55:9 56:16,22,23,25 57:25 58:20 64:12,16 67:13,14 70:13,14 71:6 72:21,22 73:15 75:19 78:1,17 83:7 84:12,13,18 85:14 90:8,10,23,25 91:3,8,20 92:25 97:12,16 99:25 100:2 101:25 104:24 105:3,8 109:23 114:2,3 116:10,11 118:8,9,18,19 119:2 123:2,19 136:25 137:1 138:6,7 139:4

**corrections** 32:16,24

**correctly** 9:23 11:5 27:19 84:5 89:18 105:4

**corresponded** 79:25 138:18

**could** 9:18 10:12 46:24 55:20 73:5 84:17 91:15 93:22 99:22 101:6 103:4 105:19,20 107:23 121:20 122:4 131:1,14 136:13 140:25 143:23 144:12

**couldn't** 102:22 107:18

**counsel** 8:10,21 12:11,14,25 27:2,8,9 30:17 31:17 35:2 45:19 63:25 64:3 65:14 87:7 95:3,7 111:15 117:18 134:25 140:19 141:21,25 142:4

**country** 54:20

**couple** 32:23 35:19 39:9 41:24 42:13 43:8 47:18 79:12 80:1 101:4 124:1 127:21

**course** 9:21 15:1 54:22 57:20 76:25 77:3 79:23 127:23

**courses** 76:21 77:2

**court** 8:8,11 16:1,3

**cover** 60:19

**covered** 29:18 49:2 60:18 83:24 84:3

**covering** 87:10

**Cox** 19:17

**create** 22:11 30:22 43:20 45:4 129:13

**created** 26:22 30:14,25 114:24 115:2 129:3 135:21 137:23

**creation** 26:20 116:20

**credentials** 61:13

**credible** 125:13

**criteria** 59:5

**critical** 48:13 100:18 101:18

**crossed** 57:4

**CST** 147:11

**current** 11:14 45:11 94:11 97:22

**curricula-included** 76:24

**CV** 47:19 48:6 49:1 116:2

## D

**daily** 25:8

**Daley** 19:8

**data** 29:25 69:5 89:13 124:21 129:21 140:10

**database** 69:9 72:13,17 73:14,19 74:20

**databases** 79:5

**date** 94:24

**dated** 11:2 97:14

**dates** 46:11

**daughter** 17:9

**day** 46:22 49:24,25 60:9 91:18 133:15

**days** 50:5 51:11,12,16,17 127:21

**de-designation** 118:1

**dealing** 90:22

**Deb** 82:17

**Debbie** 8:8

**December** 41:6

**dechallenge** 139:24

**decide** 61:20 62:3 123:16

**decided** 17:6 62:9

**decides** 61:13

**deciding** 51:25

**deck** 135:16,20 136:4

**decks** 64:10,14

**defendant** 13:5 15:21 18:7,8

**defendant/30** 15:23

**defendants** 10:1,17

**defendants'** 66:5

**defending** 14:9

**defense** 45:19 63:25 66:9

**defensible** 14:10

**deficits** 72:4

**define** 34:24

**defined** 77:25

**Definitely** 20:4 54:22 117:6

**definition** 65:8

**degree** 14:19 52:5

**delivery** 64:25

**demographic** 113:4

**department** 49:7,10,19 61:13 62:12,15 85:25 86:14 114:7,12 116:16 135:25 137:25

**departmental** 56:3

**dependent** 59:17,23 60:2, 20 71:2 92:2

**depends** 43:19 52:15 54:23 60:6 61:4 127:11 128:1

**depo** 31:16 35:7 36:19 49:2 113:20

**Depo-provera** 146:14

**deposed** 16:2,4

**deposition** 8:2, 22,23 9:22 10:5 16:1,5 24:20 31:3,7, 12,22 32:2,3,7, 8,19 33:4 34:21 35:6,18, 22 36:1,7,8,14 37:5,23 38:14 44:18,21 45:24 46:1,8 63:15, 21 66:7 68:16 70:12,17,23 98:17 103:19 147:11

**depositions** 41:17,18 70:20 83:2

**derivatives** 119:7

**describe** 67:18 72:10 105:6 106:3 145:17

**described** 25:21 29:7 56:21 65:8 78:14 95:2 134:18,19

**describing** 113:2 125:11

**design** 145:25

**designation** 38:25

**designed** 69:16 100:16 134:14 145:20

**desire** 91:16

**despite** 122:21, 24 123:9,24 124:12

**detail** 19:23 40:14,15,20

**details** 17:24 18:17,24 19:14,22 55:4 58:24 59:14 69:11

**detect** 54:6

**deteriorating** 122:25 123:15 127:2

**determination** 61:9

**determine** 37:9 74:1

**detract** 22:17

**Detroit** 63:1 72:14

**developing** 108:15,21 110:9

**devices** 89:4

**devote** 25:14

**devoted** 50:20, 25 51:18

**devoting** 22:20

**diagnose** 21:9 54:13 119:11

**diagnosed** 127:16,19

**diagnosing** 112:25

**diagnosis** 21:2, 4,9 72:25 117:12 118:6 120:10 121:25

**Diamox** 113:16

**dictations** 105:19

**didactic** 50:6, 14

**didn't** 28:22 32:9,24 55:23 67:17 73:3,10 85:17 101:3, 17,20 112:21 120:17 132:21 142:5

**difference** 58:22 99:20

**different** 24:13 53:21,24 74:3 138:10,17 141:12

**differently** 121:16

**difficult** 46:23 75:3

**Dinkin** 81:8,11, 12

**Dinkin's** 70:17

144:10,14

**direct** 51:18 64:17 86:18

**directly** 52:13 90:21 113:6

**disagree** 96:8 102:15

**disagreed** 102:13

**disclose** 20:24 85:3 104:7 120:17 121:10

**disclosed** 20:20 84:8

**discloses** 83:25

**disclosure** 64:20 83:25 88:2 89:8,11

**disclosures** 91:8,12 120:13

**discontinue** 125:16 126:3

**discontinuing** 125:17

**Discount** 18:10

**discuss** 39:15, 20 40:6,10,12 129:16

**discussed** 40:2,23 45:10, 12,22 48:22 70:8 80:23 81:16 82:12 103:17

**discussing** 84:21 85:8 86:24 120:10

**discussion** 64:24 80:11

**discussions** 37:21

**disease** 54:3,4, 6,12 77:13 93:8,23 108:12,16 139:21 146:5

**diseases** 77:10, 11 78:9 108:7, 9,18,24 134:17 146:4

**disorders** 118:11,15

**disposal** 125:9

**disproportionality** 99:11 100:1

**divide** 51:15

**divided** 51:21

**dizziness** 18:3

**Doctor** 8:3 9:7, 18,25 13:3 66:2 67:2 135:14

**doctorate** 77:19,21 78:13

**doctors** 132:7

**document** 10:24 28:18 30:13 31:17 48:10 63:12,17 64:18,22 65:17 66:4,14 67:4,9 87:8 91:4,8 95:2,5 114:16, 22,25 115:1, 13,18 116:12, 13,20 117:1,7 121:22 122:5, 13,16 128:9 129:2,13 130:4 136:14 137:18 141:11 142:16 143:24

**documents** 10:6,13 11:9 22:5 44:17 47:22 48:1,2 63:20,22 64:1, 9 89:23 113:19 141:25

**does** 11:2,6 14:14 17:14 18:19 19:8 31:7 32:2,5 35:7 36:6,8,20 57:21 59:24 64:11,14 65:1 69:24 70:3 83:18,19 95:1 97:17,18,22 101:9 108:13, 16 110:9,11 117:9 122:9 136:18 139:15 144:1 146:22, 25 147:2

**doesn't** 100:13 102:6 111:24 113:3 114:17 122:2 125:15 126:2 138:15

**doing** 14:15 24:8 37:20 38:16 41:5 50:21 55:16 56:2 71:10 73:12 91:20 104:8 113:12 120:25 124:1 127:20

**dollars** 95:24

**donate** 61:5

**donated** 94:4

**donates** 92:2

**donations** 84:23

**done** 23:12 36:1 45:20,21 58:12 67:22 69:15 78:5 79:5,7 91:20 102:2,4,8,10, 17 112:8

**donor** 60:18 61:5 91:25 92:22 93:3

**donors** 55:6 57:12 92:10 93:12 94:1

**dose** 139:21

**down** 19:18 23:4 25:16 111:22 118:7

**Dr** 9:23 12:11, 20 20:19 26:25 30:19 70:16,17 71:5,9,13,15 72:6 73:13 79:3,6,11,25 80:4,24 81:2,8, 11,12 85:21 86:8,13,20 87:19 88:2,20 89:7,11,20,21 90:5,16,17 91:2,3 98:13 116:17,24 117:18,20 120:22 140:22 141:19 142:11 143:3,21 144:10,14 145:13

**drafted** 26:3 34:10,14,20

**drafting** 21:20, 23 25:19 43:1, 25

**drafts** 26:9

**dramatically** 108:11,14

**drastic** 124:24

**draw** 100:15 101:8,15

**driven** 113:5

**drug** 111:23 119:24

**drugs** 119:5,21 136:22

**dual** 49:9

**duly** 9:14

**during** 9:21 15:2 28:2 30:22 33:19 35:2 41:13 42:14 67:3 72:1,3 73:1 80:10,14

**duties** 71:14

E

**e-mail** 34:3,7,8 79:15,16,17, 20,21

**e-mails** 25:14

**each** 39:24 59:4 80:5,6

**Eagles** 47:3

**earlier** 16:8 91:16 104:3 132:6 136:11, 19

**early** 23:24 54:6,12

**easier** 36:17 136:14

**easily** 78:24

**easy** 74:19,24 75:1 118:4

**editor** 98:14,22 99:25 100:24 101:19,24

**educate** 50:11

**education** 50:1, 18 51:13,22 59:7 76:19 92:1

**effects** 75:24

**efficacy** 133:25

**efforts** 72:7

**eight** 16:4 68:12 83:4

**either** 14:8 16:1 56:2 61:20 104:10 131:18

**electronic** 22:5 64:22

**else** 27:2,9 40:7 41:2 42:16 104:4

**Emma** 8:17 12:2

**Emory** 71:11 72:15

**encapsulated** 31:10

**encompass** 97:18

**encompassed** 28:12 50:17

**encompasses** 27:17 42:7

**end** 42:1 60:24 61:3 106:6 117:9

**ended** 112:11 123:25 127:13

**endowed** 60:16,24 91:19 92:1

**endowments** 55:4

**ends** 114:17

**enough** 34:8 61:14 63:6 73:9 98:9 108:22

**enterprises** 84:24

**entire** 54:20 73:5,19 97:19 98:25 105:11

**entirely** 87:4

**entrepreneurial** 84:24

**entry** 59:4

**epidemiologic** 78:5 131:3,10

**epidemiologist** 77:7,15,24

**epidemiology** 77:20 78:5,8, 16,17 126:13 145:15,18 146:2

**erroneously** 107:6

**especially** 75:3 125:17 140:12

**essentially** 26:17 55:13 59:15,16 60:18 72:16 98:14 101:14 103:23 129:24 141:14 142:19,24 144:1

**estimate** 45:3

**Etminan** 98:13, 21 99:7

**evaluation** 60:1

**even** 91:18 92:4,15 127:15

**ever** 13:23 20:8 40:12 58:8 62:19,20 63:2, 4 102:3,5,8,12

**every** 39:21 49:24,25 50:8 57:21 60:9 64:20 88:7,8 114:11

**everybody** 102:19

**everything** 34:7 46:23 79:20,21 137:5

**evidence** 71:3 73:5,9 96:15 98:5 99:1 101:9,16 111:24 112:17, 19 120:6 125:9,13,18 126:1 131:10 132:14 139:15 142:22,24 143:15,17,19 144:3,23 146:18,21

**evolved** 114:25

**exact** 95:9

**exactly** 70:4 99:15

**examination** 9:16 50:12 127:11 145:11

**examined** 9:14

**example** 61:22 76:12 87:11 93:19 120:12 134:9

**examples** 57:24 119:4

**exams** 124:4

**exceedingly** 75:2

**excellence** 96:12

**except** 11:13

**exchange** 64:20

**excluding** 44:21 45:10

**Excuse** 52:24

**exhibit** 10:7,8, 12 21:14 22:4 27:14 31:15, 18,23,25 33:14 47:9,10,14 63:7,8,12 64:18 65:24 66:3 67:6 69:19,23 70:11 83:2,10,14 86:4,7 87:5,12, 18 88:15,19 90:12,15 94:17 96:25 97:6,11 113:21 114:3 116:5,8 128:4, 8 135:11,15 137:14,18 139:4 142:6

**exhibits** 117:25

**exists** 44:9 134:20

**exogenous** 130:9

**expand** 55:20

**expect** 29:20 129:25

**expectation** 96:12

**expected** 96:13 131:5

**experience** 145:17

**experimental** 76:11,15

**expert** 10:1 11:17 12:5 13:20,23 14:24 15:3,4,12 16:12,21 17:14 18:6 20:9,20 21:21,23 22:9 24:8 26:4

40:11,18 41:18 47:16,17 81:20 84:9 85:4 101:5 104:8 120:18 121:11 129:22

**expertise** 14:8, 20 145:15,18

**experts** 39:14 40:13 81:23 82:11,25

**explain** 37:11 51:13

**explore** 72:17

**extent** 20:20 82:21 87:12

**eye** 54:2,7 88:11

**eyesight's** 123:13

**F**

**face-to-face** 64:23

**fact** 40:10 52:23 96:15 123:3 125:16

**factor** 108:14, 17,20 123:10

**factors** 40:2 77:11 108:10, 23 110:9 111:12,13 112:2 139:20 140:16 146:5

**failure** 21:9

**fair** 34:8 63:6 98:9 106:11 107:14 110:18 133:14,19 140:4 144:5,17

**fairly** 69:16 99:8

**fall** 88:9,12

**familiar** 17:16 18:20 19:9,13 23:25 24:11 26:14 83:20 105:25 106:5 117:14

**families** 93:25

**family** 84:2 93:3,19,22

**fan** 63:1

**far** 12:23 29:2 41:4 99:10 132:20

**February** 27:15 40:9

**federal** 54:24 56:21

**fee** 36:18

**feel** 81:6 141:3

**fellow** 71:13 116:17

**fellowship** 71:10 76:6

**felt** 36:15

**female** 111:19

**fenestration** 113:14 124:15 127:14,21

**few** 14:16 24:2 28:25 36:17 61:22 127:23, 25

**field** 12:6 39:15 40:13,17 77:16 82:14 106:10 113:7,9 127:4 128:1

**fields** 122:20 124:10 126:25

**fifteen** 125:5

**figure** 38:8

**final** 26:4,9 42:4

**finances** 87:1

**financial** 83:25 84:1,16 120:13

**find** 29:12 68:4 70:24 112:1 117:15 121:20 130:5 138:11 142:2

**fine** 19:7 41:12 97:8 130:8

**fingers** 57:4

**finish** 23:1

**firm** 60:17

**first** 9:14 11:1, 16 13:3 14:22 16:9 21:13 22:3 33:25 35:18 55:17 67:12 77:14 101:4 111:17 125:2,6

**fit** 46:23 113:4

**five** 18:25 45:9 64:14 70:11 72:25 94:25 139:19

**five-hour** 50:10

**flags** 121:20 122:7,9,17 123:5

**flat** 36:11 44:16

**flawed** 100:13

**flaws** 99:10

**flip** 136:8

**flow** 110:7,15

**focus** 52:4 60:7

**focused** 52:7,8, 9

**folks** 73:23

**follow** 24:22

**follow-up** 124:3

**follows** 9:15

**fond** 54:17

**font** 136:23

**Footnotes** 86:19

**form** 11:20 13:7 15:6 17:1, 18 18:15,21 19:11,20 20:3 21:10,24 23:5 24:17 25:2,9, 24 26:5 28:24 29:8,15 30:10 32:21 33:7 35:13 36:25 37:13 38:22 39:17 43:14 44:24 47:24 55:1,10 56:17 57:9,18 58:1 61:1 62:5,24 65:3,6 68:22 69:7 73:16 74:4 75:10 77:17 78:2,18 82:3,15 84:19 85:6,15 87:2, 23 88:24 89:24 90:9,24 91:10, 21 92:13 93:1, 16 94:6,13 96:7 97:20 98:3,23 100:7 101:2 102:9,16 103:8,20 104:17 105:9 106:13,22 107:15 108:4 109:9,20 110:5,25 112:5,24 115:13,16,23 116:14 118:12, 21,22 119:1,13 120:4,15 121:13 123:6, 17 125:1 126:7,16 127:9 129:19 130:18 131:25 133:18 134:21 138:20 140:6,24 141:17 142:20 143:12 144:6, 18

**formal** 50:14

**formalized** 26:17

**format** 87:13

**formed** 48:1

**forming** 47:22 48:15 68:21 81:7

**forms** 75:11 146:12

**forward** 8:20
**found** 12:5 55:25 99:15
**foundation** 55:2 57:19 58:2 78:19 85:16 93:4,17 94:7, 14 107:16 140:24 144:19
**foundations** 94:1
**four** 18:24 45:8 46:16 50:9 68:13 70:11 80:16
**frame** 16:9 127:3,7 128:19 137:22
**frequency** 68:2 77:9 131:4
**Friedman** 82:17
**front** 120:12
**full** 68:17
**full-time** 39:23
**functional** 124:7
**fund** 57:1,13 60:18
**funded** 56:3,15, 16 57:7 58:15 90:2
**funding** 56:8 57:16 58:9 59:18 86:20 88:3 95:24
**funds** 56:3
**further** 20:16 95:4 112:9 140:15 145:1 147:7

**G**

**gain** 75:8,12 76:2 140:17 146:9,19,22 147:2
**Galveston** 18:10
**game** 60:24 61:3
**garner** 77:5
**gave** 26:4 31:4 32:3 35:5,18 103:18 104:4 106:24 114:6 116:1,23 121:14 128:10 129:5 133:5,9 135:17
**general** 126:11, 14 146:15
**generally** 25:3 32:14
**generate** 15:3
**generated** 128:20
**generating** 60:21
**genes** 134:5
**gets** 40:2 56:16 61:15 118:2
**getting** 59:17 60:15 92:11 122:22 123:13, 14 124:20 127:4 131:6
**give** 49:16 50:6 51:24 93:22 96:6 115:6 121:3 132:25 141:4,24
**given** 28:19,21 29:5,9,24 32:23 39:5 97:24 115:5,6 116:15 132:2
**gives** 88:1 89:11
**giving** 12:18,22 36:6 44:17 92:9 93:11 96:2 121:6
**goal** 60:23 92:5 125:6 133:24
**goes** 61:19
**going** 10:6 12:12,21 22:25 27:1,24 32:5 33:14 36:16 41:20 52:1,4 53:8 60:10 61:10 62:4 63:7 65:14 74:19 77:5 80:15 86:17 88:8,12 95:15 102:14 110:3 111:20 112:3 121:8,18,19 123:15 127:18 134:25 136:7 140:23 141:7, 19
**good** 19:3,4 55:23 61:13 62:9 65:16 91:11 99:16 111:24 124:10 125:18,19 126:3 135:2 145:13
**got** 18:5 47:6 61:8,25 64:10 65:17 66:17 85:8 91:14 94:21 105:21 130:11 131:18 138:1 139:8
**gotten** 17:8
**government** 54:24 55:6 56:22
**Grand** 114:6,9, 12 115:2,14 116:16 133:5, 12 135:25 136:3
**grant** 46:22 52:23 53:19 55:18 56:7 57:13 59:18 104:5,7
**grant-funded** 56:11
**granted** 57:1
**grants** 54:23 55:9 56:15,22 57:6,7 59:22 84:23 85:13,19 104:11
**great** 9:5,25 19:22 65:20 135:4
**Gregory** 8:2 9:12,20 63:15
**ground** 102:23
**group** 10:12 67:24,25
**guarantee** 61:4
**guess** 57:3 80:15
**guidelines** 24:8,23,25
**gynecologist** 126:8
**gynecology** 29:2

**H**

**Habian** 8:9
**habitus** 132:17
**hadn't** 40:24
**half** 51:16,17 60:9
**halfway** 117:11 118:7 129:16 130:8
**hand** 9:6 63:6 66:10 136:13 141:19
**handed** 10:11 31:24 47:13 63:11 66:2 67:3 69:22 83:13 86:7 87:17 88:18 94:20 113:24 116:8 128:7 135:14 137:17
**handing** 63:16
**handwritten** 22:4
**hang** 58:18
**happen** 67:15

92:3 130:25

**happened** 92:6

**happy** 42:5

**hard** 63:3 111:21

**harm** 125:18

**hasn't** 44:15 110:22 124:19

**hate** 34:5

**haven't** 11:12 16:21,23 58:10 70:8,18 81:5, 18,21 84:10 102:10 104:13 109:25 136:6 144:21

**having** 9:14 124:15 126:25

**Hawaii** 138:4

**he's** 85:24 144:22

**head** 15:8 23:21 28:7 38:17 43:18 45:1 72:3 83:5 98:16 111:7 116:1

**heading** 117:12

**headquarters** 95:18

**health** 54:10 77:19 122:25 123:15 127:1

**Healthcare** 86:21 89:9,13 90:6

**hear** 96:21

**heard** 82:4 109:22

**hearing** 53:1

**heart** 107:22, 25 109:6,7,8 110:10,12,14, 15

**held** 8:5 26:18

**Help** 58:22

**helped** 124:19

**helpful** 59:21, 22 99:19

**hemorrhage** 111:5

**here** 9:25 11:13 16:6 24:12 33:2 34:17 36:1,12 37:10 43:10,16,19,24 45:15,20,21 48:9,13 49:1 58:18 115:14 118:6 121:19

**here's** 100:25

**herein** 9:13

**hey** 100:24

**hierarchical** 59:1

**high** 59:18 111:7 140:14

**higher** 59:10 131:4,9

**highest** 60:15 140:16

**Hill** 8:7

**historical** 106:2

**historically** 106:2

**histories** 28:19

**home** 25:21

**honest** 55:11

**honestly** 79:8 102:3 107:17 132:21

**hope** 133:14

**hopefully** 47:5

**hoping** 134:2

**hormonal** 13:13 40:3 68:2 73:7 74:14,17 99:1, 18 107:3 125:14

**hormones** 118:7

**hospital** 129:5, 7

**hour** 24:5,19, 20,21 25:7 36:12,18 44:16 65:15 135:1

**hourly** 25:11, 16

**hours** 21:16,17 22:6,13,14,15 23:18 25:19 28:2,6 30:7,22 33:16,18 35:7, 23 36:5,20 37:8,18 38:13, 15 41:8,11,14 42:8,11 45:9 46:6 83:4 127:6

**Houston** 48:21

**how** 12:4 14:1, 2,14 15:2,11, 20,25 22:13, 14,20,22 34:13 35:17,23 38:25 43:17,19 44:1, 20 45:4,17 46:6,15 50:25 51:6,14,21,25 54:13 56:9,15 58:17 59:8 62:1 68:9 69:12 76:2,17 78:14,23 79:24 80:3 83:1 87:20 93:21 95:8 99:9,11 114:21,23 116:12 117:1 119:24 123:10 132:9

**huge** 54:3 76:13

**hundred** 95:24

**hurt** 92:10

**hypertension** 104:23 106:5 110:20,24 111:3,5,6,14, 22,25 112:18 113:7 128:12, 16 133:16,23 135:18 137:20 146:1

**hypothetical** 74:5 107:16 109:6 112:7 113:3 125:11

**I**

**I'D** 8:21 13:10 15:7 17:24 18:17 19:5 24:2 26:15 34:6 37:19 38:3 46:4,11 112:8 113:1

**I'LL** 9:22 14:4, 7,9 19:16 31:22,25 53:14 94:9 115:9 137:12 138:10 141:24

**I'M** 8:7 10:6 12:12,20 14:6 22:7,20,25 24:13 26:25 27:18 32:5 35:21 37:20 38:23 43:2 47:1 51:3,4,5, 19 52:9,10,11 53:1,2,4,7 54:22 55:5 59:20 60:22 74:18 75:21,22 77:5 86:17 87:4 89:25 92:15 93:18,21 95:15 96:25 97:10 98:13 102:14 105:4 111:20 112:25 115:6,11 117:14 118:4 121:18 122:12 123:7,9 126:8 128:24 130:4, 20 138:3,8 140:19,23 141:7,19,23 142:14 144:22 146:20

**I'VE** 10:5 16:3,

14 25:10,15 27:13 29:7 30:5 31:24 38:9 47:2,13 52:18,19,21 53:23 64:10 65:17 66:2 78:5,6 79:8 82:4 83:13 86:7 87:17 88:18 89:23 91:14 94:20 98:6 113:24 115:5,6,7 126:9 128:7 132:1,2 135:14 144:13

**ID** 10:9 31:19 47:11 63:9 65:25 67:7 69:20 83:11 86:5 87:6 88:16 90:13 94:18 113:22 116:6 128:5 135:12 137:15

**idea** 12:4 13:16 15:19 43:16 44:1 49:16 51:25 94:9 119:14,18,20 124:10 126:5

**identified** 10:6 139:20

**identify** 8:22 10:12 47:14 63:12 66:3 67:9 128:8 135:15 137:18

**idiopathic** 104:23 105:1,7 106:4 107:13 109:8,19 110:22 111:6 128:11,16 133:16,23 134:18,19 135:18 137:20 145:25

**IIH** 11:19 13:13 20:6 21:2 26:16 29:21 39:20,25 40:1,4 41:3 52:21,22 53:16 54:15 67:24,25 68:3 72:14,15,19 73:7 74:8,13,15 99:2,14,19 100:11 101:10 104:10 105:15,20 107:3,4,8 108:19,21,22 112:11,13,19 113:1,2,5,11 119:6,10,11,22 123:23 125:5,15 126:2 130:3 132:4,8,12,19 134:12 139:16,19 140:11,15,16 144:2

**imaging** 53:17,20 54:7

**impact** 76:18

**implementation** 145:25

**implications** 54:10

**importance** 73:24

**important** 54:8 76:16 101:11 108:20 119:15 130:22 132:10 141:10

**impression** 132:8

**incidence** 67:23 68:5 72:18 140:11

**incidences** 77:9

**include** 21:22 36:8 43:3 59:24 64:9

**included** 11:9 26:3 31:11 35:9 42:25 43:4,21,24 147:3

**includes** 25:19 47:17 48:3,19 59:25

**including** 16:5 45:14 58:24 65:8 119:7 125:14 134:3

**inclusive** 65:11

**income** 15:2

**incomplete** 74:4 107:16

**incorporate** 99:3

**incorporated** 98:6

**increase** 75:8 108:11 146:8

**increased** 68:1,4 100:2 140:11

**incumbent** 119:22

**incurred** 43:11

**independent** 42:16

**indicate** 22:5

**indicates** 86:10

**indicating** 122:5

**indication** 131:21

**indications** 123:22,25

**individual** 83:16,24

**individual's** 84:3

**individuals** 82:13

**industry** 54:25 55:6 57:8,12,17,24

**industry-funded** 88:10

**infarction** 109:15,19 110:4

**informal** 23:14

**information** 20:23 30:6 64:21 69:1 99:3 102:22

**initially** 12:8,16

**injury** 72:4 110:7

**input** 27:3,10

**inserted** 126:9

**instance** 94:4

**institutes** 54:19

**institution** 24:7 50:16 52:16 55:22,23 57:21 59:4 72:16

**institutional** 84:4,21

**institutions** 52:16

**instruct** 12:12,21 27:1

**instructor** 59:2

**integrity** 96:13

**intend** 117:22

**interest** 83:17 93:7 101:6 114:14

**interested** 52:3,11,19 91:25 92:24

**interesting** 54:9 99:12 106:24 129:23

**interestingly** 134:7

**interests** 54:1 84:1,16

**intermittently** 92:3

**intervals** 95:5

**intervention** 122:19 123:16 139:25

**into** 14:16 25:16 39:13 59:13 82:17 87:8 98:6 99:3,9 102:13

111:13 123:10 129:21

**intracranial** 104:23 110:20, 24 111:3,4,6, 14,22,25 112:17 113:7 128:11,16 133:16,23 135:18 137:20 146:1

**intrauterine** 89:3 90:20,22 106:4

**introduce** 8:10

**investigator** 145:23

**invoice** 11:1 22:12 27:14 43:23 44:2,7

**invoices** 10:15, 16 21:14 44:5, 22

**involve** 20:18

**involved** 52:1 87:19 91:3 106:25 126:5, 15 145:21,24

**involving** 20:10 76:22 88:20

**island** 61:17,18

**isn't** 11:13 30:16 43:24 68:19,23 125:23 127:5 131:17

**issue** 96:5 98:1,12

**issues** 82:20

**it'd** 24:1

**it's** 14:8,10,11 17:9 19:3 23:7, 14 30:4 32:1 35:19 39:19 44:17 47:16,25 53:3 54:7,8 55:5 58:18,25 59:21,22,23 60:16 61:2,16 67:10 68:12,25 74:18,19 75:2 76:16 77:5,8 85:2 87:19 88:12 93:2 94:21 96:11 97:14 98:4,5 99:2,8 100:8,9, 12,14 103:10 105:7,10,11 106:2,23 109:2,14 110:12 111:23 113:2 116:13 117:8 118:14 119:15,22 121:9,25 122:1 124:19 125:17 126:17 128:10 129:15,22 130:8,9,22 131:17 134:17 136:8 141:4,12

**items** 64:2

**its** 88:9,12 115:13

**itself** 134:3

**IV** 89:14

**J**

**January** 97:14

**Jeff** 8:7 85:21

**Jennifer** 8:15

**job** 55:8

**John's** 18:19

**journals** 29:2 39:8 59:9,11, 19

**judge** 132:9

**judged** 143:16

**July** 41:7 42:2

**June** 37:8,18

**junior** 59:2

**jury's** 131:21

**just** 10:23 14:4, 7,9 15:14 16:17 17:2 19:13,22 20:1, 14,15,24 21:1 23:15 24:15,23 26:13,17 28:10 30:17 31:22 36:11,17 37:1, 4 41:24 42:12, 24 44:6,14 46:2,23 48:9, 17 49:24 50:11 51:1,8,17 53:19 55:23 56:2 63:14,16 64:3 65:8 66:5, 9 67:11 68:18, 25 70:24 71:16 73:19 74:12 76:3,5 78:8 79:14 81:6,11 82:1,5,11 86:2, 24 87:7,12 91:4 92:5 95:3 97:21 98:5 99:2 100:14 102:4,6 103:23 105:11,20,25 106:1,5 107:7 109:2 111:2 115:2,9 117:2, 4,9,19 118:14 119:16 120:24 122:4 124:2 126:2,11 127:22 129:24, 25 134:15 136:20 137:8 138:22 141:1,9 142:14 143:4, 25 144:4 146:2

**K**

**kangaroo** 128:24

**kangaroos** 135:22

**keep** 22:14,19, 22 23:2,3,7,11, 15,16 44:4 61:17 121:18

**keeping** 23:10 29:21 57:4

**kept** 27:13

**Key** 114:18

**Kilgore** 67:12 70:7

**kind** 16:8 18:10 51:8,14 59:3 60:23 107:6 146:15

**knew** 36:15

**know** 11:23 12:7 13:19 14:3 15:8 16:2, 7 17:9 20:21 22:13 23:9,12 24:11 25:6,10, 12 28:11 32:10 34:5 35:19 36:9 37:2,17 38:8,9 39:24 40:25 42:5 44:14,20,22 49:1 53:23 54:11,14 55:3 58:6 59:9,25 60:22 61:24 62:18 71:5 73:4 74:18 75:4 76:3,5,7, 8,12 78:4 81:8, 12 82:7 85:17, 21,23 88:9 99:8 102:6,19, 25 103:1,2 106:9,14 107:19 108:19, 21 109:1 110:10,13 111:8,19,23 115:4 120:2,5 121:3 126:12 128:21 129:15 130:20 132:11, 17 133:17 134:3 135:19 137:21,22 144:21

**knowing** 124:21

**knowledge** 9:2, 3 33:6 38:6 48:7 58:15 76:2 81:25 126:21,22 133:7,10

**known** 105:2,8 107:14 118:10

134:20

**Kung** 116:17 120:22

**L**

**label** 110:21

**Laboratory** 94:22

**lack** 80:18 108:8 110:7,15

**large** 52:5 101:16 125:12

**last** 16:4 19:16 20:15 45:24 46:13,14 55:17 57:2 62:1,7,8 79:10 80:15 82:14 90:4 91:7 95:16 98:10 137:6 141:5

**late** 11:23 23:24

**later** 32:24 80:21

**law** 24:12 60:17

**lawyer** 38:24 66:9

**lawyers** 34:10 82:8

**lead** 58:13

**leading** 54:19 145:23

**least** 10:19 34:12 37:2 47:5 73:25 80:9 83:4 84:15 99:10 102:22 120:10 145:24

**leave** 18:2

**lecture** 116:25 128:10 135:17 137:19

**lectures** 50:7, 14 116:2 132:2,24

**left** 17:5

**legal** 62:18

**less** 23:17 25:7 60:2

**Lester** 19:17

**let** 10:23 14:2 38:8,9 43:6 48:5,9 51:8 63:6 64:17 74:6 81:11 82:24,25 91:4 97:2 102:6 111:11 113:18 122:10 141:3

**let's** 31:14,15, 22 33:15 47:8 79:23 86:2 96:18,19 104:20 112:6 136:7 139:3 145:2

**letter** 98:14,21 99:7,24 100:23 101:18,24

**letting** 130:20

**level** 59:4 60:14,15 61:10 131:10

**levels** 134:5,11

**levonorgestrel** 8:4 75:8 90:19, 22 118:8,18 120:3,11 121:10 146:8

**Liability** 8:4

**license** 63:3

**licensed** 62:17, 19,23

**life** 38:10 47:2 94:22

**like** 10:14 13:17 15:17 21:15 23:7,10 32:6 37:10 41:1,7 59:24 60:9,16 61:16, 17 65:1 66:5 69:15 74:13 78:21 87:8 90:1 91:9 108:9,23 111:5 112:13 113:10, 13 117:19 121:8 122:2 125:10 126:2 127:3 128:10, 21 135:17

**liked** 138:23

**likelihood** 108:12

**limited** 74:16

**line** 9:2 103:24

**lines** 18:4 21:21

**lineup** 103:5

**list** 30:13,18 47:21 63:22 116:2 119:5 138:13

**listed** 83:2

**listing** 94:22

**lists** 70:11 86:13 118:8

**literature** 21:19 23:25 26:14,15 37:3 46:4 119:6,9,23 125:13 134:7, 10

**Lithium** 119:8

**litigation** 8:4 13:10 38:20,21 39:12,13 40:6, 11,18 41:4 72:21 101:5 106:25 147:4

**little** 13:9,14 45:22 88:11 96:19 104:20 112:9 122:14 132:14 135:1 138:9

**live** 24:21 63:2

**LNG** 118:23

**local** 129:5,7

**located** 95:18

**location** 8:5

**long** 34:13 43:19 45:4 58:17 68:9 97:8,12 109:1

**Long-acting** 86:10

**Long-term** 89:2

**longer** 62:17 134:19

**look** 10:14,23, 25 22:25 23:1 24:1 32:10 37:2,20,25 38:1,2 46:12 48:9 63:21 72:24 73:5 77:10 83:18,22 88:10 95:1 100:10 101:8 109:15 111:20 115:9 119:23 122:2 129:23 130:12 134:10, 13 143:23

**looked** 13:14, 17 14:24 24:2 26:13,14 30:5 67:24 69:15 73:14,22 99:13 142:23 143:6, 15

**looking** 54:1,5 67:23 73:19 74:19 112:10 117:19 134:4 142:14 143:2 146:24

**looks** 21:15 32:6 41:7,10 53:20 66:5 87:8 128:10,21 135:17

**loose** 62:20

**looser** 130:24

**loss** 113:8,10, 14,15,16 123:24 124:8 127:15,18,22

**lot** 21:18 23:22 25:12,14 27:24 33:10 36:16

49:1 50:20 54:10 59:6,7 61:4 76:14 85:19 99:10 101:11,12 103:9,24 105:15,21,24 108:6,8 109:3 110:8 111:4 115:5 116:22 119:8 120:23 121:5 123:8 125:4,20 126:12 128:1 131:13

**lots** 57:11 117:17

**Louis** 17:7 24:13 34:17,19 36:2 45:20 50:8 76:13 94:23 95:18 129:8

**love** 133:20

**low** 113:12 124:14 127:20

**lower** 29:19 59:11 108:14

**lowest** 59:3

**lumbar** 112:16, 20

**M**

**M.D.** 63:15

**M.d./ph.d.** 60:7

**Madden** 88:21 89:21 90:5,16 91:2

**Madden's** 89:11

**made** 10:22 32:16,20,25 39:5 40:21 45:13 47:3 51:14 58:9 62:2 69:11 80:17 116:22 120:23

**mail** 64:24

**main** 49:11 133:24

**maintain** 96:13

**major** 95:19 98:1

**majority** 74:15

**make** 25:7 97:21 102:6 125:16 138:25

**makes** 61:9 74:16

**man** 76:3

**managing** 54:15

**manner** 64:20

**many** 14:2,14 15:11,20,25 35:17,23 46:6, 15 51:6 62:2 74:13 79:24 80:3 95:19 144:1,4

**March** 11:2 21:15 22:12

**Margolis** 62:14

**mark** 31:15 65:23 67:4 69:17 86:3 131:18,23 132:20 136:24 142:5

**marked** 10:9,11 31:19,25 47:8, 11,13 63:7,9, 11 65:25 66:3 67:7 69:20,22 83:11,13 86:5 87:6,17 88:16, 18 90:13 94:18 113:22 116:6 128:5,7 135:12,15 137:15,17

**markings** 137:3

**marks** 130:14

**match** 74:25

**matched** 67:25

**material** 29:6 33:20 41:19 45:7 70:7 133:1

**materials** 30:14,18 37:3, 22 39:6 41:15 42:13 67:10,11 147:3

**math** 11:8 41:8

**Mathews** 8:13 9:3,17 10:10 11:24 12:15 13:1,2,21 15:9 17:11,22 18:13,18 19:1, 15,24 20:7 21:6,12 22:2 23:8 24:24 25:5,17 26:1,7 27:7 29:4,11, 23 30:12,20,21 31:14,20 33:1, 9 35:16 36:23 37:6,16 39:3 40:8 43:15 44:6,12 45:2 47:8,12 48:4 53:6 54:16 55:7 56:13,19 57:14,22 58:4 61:7 62:11 63:5,10 64:6,8 65:12,17,21,23 66:1,16 67:1,8 69:2,10,17,21 73:20 75:6,13 77:23 78:11 79:1 82:6,23 83:12 85:1,10, 20 86:2,6 87:14,16,24 88:17 89:1 90:3,11,14 91:1,13 92:7, 17 93:5 94:2, 10,19 95:8,11, 14 96:17,24 97:4,5,23 98:8 99:5 100:17 101:22 102:11, 24 103:12 104:2,19 106:7,16,20 107:9,21 108:2 109:5,10,17,21 110:1,17 111:10 112:15 113:17,23 115:19 116:3, 7,18 117:24 118:4,5,16,24 119:3 120:1,8, 16 121:17 123:11,18 124:17 126:4, 10,19 128:2,6, 18 130:7 131:16 132:23 134:16,23 135:2,13 137:16 139:2 140:8,21 141:2,18,23 142:1,5,8,10 143:1,10,20 144:9,25 147:8

**matter** 8:3 10:2,17,22 12:19,23 13:4, 6,23 16:10,11, 12 17:10 21:16 31:25 41:23 45:13 81:2,15, 20 85:5

**matters** 15:25

**maximum** 123:24

**may** 14:11 27:3,23 28:25 30:24 31:7 32:3,4 35:6 36:4,24 37:7, 12,18 38:11 39:7 41:1,2,16 60:8 76:12,15 77:21 92:19 93:7 96:4 117:3 119:19, 20 120:24 125:24

**maybe** 14:3,4, 13,22 16:4 34:15 35:20 37:22 39:8,23 40:21 43:7 88:10 115:20 121:19 131:9, 10 134:3

**Mccoy** 116:24

**Mcwherter** 18:19

**mean** 15:14 25:12 30:2 39:19 43:2 48:1 51:3 61:3 62:6 71:1,3 73:9 75:1,21 76:5 77:18 79:8 83:3 88:7 96:9 99:8,9 100:14 101:5 102:19 108:7 114:23 117:14 122:9 123:22 125:2,20 126:12 127:7 131:13,22 132:15 133:20 136:16 146:13

**meaning** 105:1 111:18 124:9 129:7 130:24

**means** 64:19, 20,21 100:14 122:10 125:7

**measures** 95:21

**mecca** 52:17

**media** 65:3

**medical** 8:2 19:18 28:20 50:1,2,13 51:4 55:14 56:4 60:1 71:18 76:6,20,24 77:16 106:10, 17,21 107:10 113:11 123:24 124:13 125:8 126:3 139:17 143:15 144:23 146:3

**medication** 125:17,22,24

**medications** 76:10 119:9,21 124:5 131:9 132:8,11,12 138:14

**medicine** 78:1 108:3,6 109:22 125:22

**meet** 34:9,12 35:17

**meeting** 33:21 41:19 46:7,21 64:24 80:6,7,8, 20 82:17

**meetings** 28:11 34:15,18 35:1, 25 40:5 45:18 46:5,10,15 80:8

**member** 145:23

**memory's** 19:3

**men** 132:17

**mention** 88:7 100:12

**mentioned** 76:19 82:5,12, 20 99:23 104:3,5

**mentions** 118:17

**Merck** 86:22 88:3 89:9

**merger** 94:11

**merging** 96:4

**merit** 88:9

**merits** 88:13

**met** 34:13 86:1 139:25

**methodologically** 100:13

**methodology** 69:14 78:22

**Michigan** 18:20 62:18,23 63:2

**microphone** 52:25

**middle** 102:23

**Midwest** 54:20

**might** 12:5 13:16 36:15 39:9 76:18 78:3,20 96:16 113:15 122:18 132:18 136:14 138:4,23

**mild** 113:14

**million** 95:24

**mind** 23:16 58:18 107:18 110:23 133:17

**Minneapolis** 17:6

**minor** 99:8

**minutes** 34:16 68:11,12,13

**Mirena** 8:3 11:18 20:2,4 21:8 29:21 39:16 40:11 73:1,18,24 74:8,10,12,21 80:11,19 81:17 82:13 98:12 99:14,21 100:3,11 101:10,13 104:10,12,16 106:10,18 107:7,12 111:14,15 112:2,4,14,22 118:20,22 120:11,19 121:12 123:4, 10 124:22,23 125:15,25 126:1,6,9,15 139:16,18 140:1,11,13 144:1 146:16, 19,22 147:2

**Mirena's** 112:2

**Mirena-related** 40:18

**mischaracterizes** 91:22 115:24 118:13

**misperceptions** 107:1

**Mississippi** 72:16

**Missouri** 62:17

**misunderstanding** 92:19

**moment** 145:3

**Monday** 50:11

**money** 61:6 92:2,23 93:9, 14 94:5

**monies** 85:3

**monitoring** 89:14

**Monsanto** 94:3, 12,22 95:17, 18,22 96:4

**month** 46:14

**months** 13:15 41:24 43:8 127:23

**morbid** 107:24

**morbidly** 107:23

**more** 17:9 21:21 23:14,17 25:7 26:18 33:20 37:21,22 39:7 41:15,16, 18 42:13 51:13 52:7,8,9 56:8 59:17 61:22 67:11 75:23 76:3 84:22 88:11 91:14,17 95:23 125:18 131:2 138:25 139:1

**morning** 114:11

**most** 15:17 25:3 50:5 56:1 76:23 77:20 94:15 101:11 108:20 123:23 127:12

**mostly** 28:13 46:2 71:16 121:5

**move** 8:20 23:13 52:25 61:10 119:16

**moved** 63:4

**MR** 8:13 9:3,17 10:10 11:24 12:15 13:1,2, 21 15:9 17:11, 22 18:13,18 19:1,15,24 20:7 21:6,12 22:2 23:8 24:24 25:5,17 26:1,7 27:7 29:4,11,23 30:12,20,21 31:14,20 33:1, 9 35:16 36:23 37:6,16 39:3 40:8 43:15 44:6,12 45:2 47:8,12 48:4 53:6 54:16 55:7 56:13,19 57:14,22 58:4 61:7 62:11 63:5,10 64:6,8 65:12,17,21,23 66:1,16 67:1,8 69:2,10,17,21 73:20 75:6,13 77:23 78:11 79:1 82:6,23 83:12 85:1,10, 20 86:2,6 87:14,16,24 88:17 89:1 90:3,11,14 91:1,13 92:7, 17 93:5 94:2, 10,19 95:8,11, 14 96:17,24 97:4,5,23 98:8 99:5 100:17 101:22 102:11, 24 103:12 104:2,19 106:7,16,20 107:9,21 108:2 109:5,10,17,21 110:1,17 111:10 112:15 113:17,23 115:19 116:3, 7,18 117:24 118:4,5,16,24 119:3 120:1,8, 16 121:17 123:11,18 124:17 126:4, 10,19 128:2,6, 18 130:7 131:16 132:23 134:16,23 135:2,13 137:16 139:2 140:8,21 141:2,18,23 142:1,5,8,10 143:1,10,20 144:9,25 147:8

**MRI** 112:18

**Ms** 8:15,17,19, 20 9:1,5 11:20 12:4,11,20 13:7 15:6 17:1, 18 18:12,15,21 19:11,20 20:3, 19 21:10,24 23:5 24:17 25:2,9,24 26:5, 25 28:24 29:8, 15 30:10,17 32:21 33:7 35:13 36:22,25 37:13 38:22 39:17 43:14 44:9,24 47:24 55:1,10 56:7, 17 57:9,18 58:1 61:1 62:5, 24 64:3 65:5, 14,20,22 66:18 68:22 69:7 73:16 74:4 75:10 77:17 78:2,18 82:3, 15 84:19 85:6, 15 87:2,7,23 88:24 89:24 90:9,24 91:10, 21 92:13 93:1, 16 94:6,13 95:3,10,12 96:7 97:3,20 98:3,23 100:7 101:2 102:9,16 103:8,20 104:17 105:9 106:12,19,22 107:15 108:1,4 109:9,12,20,24 110:5,25 112:5,24 115:16,23 116:14 117:18 118:3,12,21 119:1,13 120:4,15 121:13 123:6, 17,20 125:1 126:7,16 127:9 129:19 130:18 131:25 133:18 134:21,25 135:4 138:20 140:6,19,23 141:17,21 142:20 143:9, 12 144:6,18 145:2,12 147:6

**much** 15:2 17:7,8 22:20 29:19 43:17 44:1,21 45:17 50:25 59:8,14, 17 82:21 83:1 131:4 136:16 137:5

**multicentered** 145:22

**multidistrict** 38:21 39:13

**multiple** 53:18 54:14 76:8

**myocardial** 109:15,19 110:4

**myocardium** 110:8

**myself** 26:15 46:3 121:15

**myths** 107:1

**N**

**N-O-R-D-I-C** 145:24

**name** 8:7 9:19 121:7

**name's** 62:14

**names** 19:12 82:5

**NANOS** 80:5,20 82:17

**Nathan** 116:21 133:5,9

**National** 56:7

**nearly** 22:1 65:15

**necessary** 123:16

**need** 18:23 20:24 39:18 73:11 74:22 125:24 142:8

**needed** 32:20, 25

**Neff** 8:17,20 9:1,5 11:20 12:2,4,11,20 13:7 15:6 17:1, 18 18:12,15,21 19:11,20 20:3, 19 21:10,24 23:5 24:17 25:2,9,24 26:5, 25 28:24 29:8, 15 30:10,17 32:21 33:7 35:13 36:22,25 37:13 38:22 39:17 43:14 44:9,24 47:24 55:1,10 56:17 57:9,18 58:1 61:1 62:5,24 64:3 65:5,14, 20,22 66:18 68:22 69:7 73:16 74:4 75:10 77:17 78:2,18 82:3, 15 84:19 85:6, 15 87:2,7,23 88:24 89:24 90:9,24 91:10, 21 92:13 93:1, 16 94:6,13 95:3,10,12 96:7 97:3,20 98:3,23 100:7 101:2 102:9,16 103:8,20 104:17 105:9 106:12,19,22

107:15 108:1,4 109:9,12,20,24 110:5,25 112:5,24 115:16,23 116:14 117:18 118:3,12,21 119:1,13 120:4,15 121:13 123:6, 17,20 125:1 126:7,16 127:9 129:19 130:18 131:25 133:18 134:21,25 135:4 138:20 140:6,19,23 141:17,21 142:20 143:9, 12 144:6,18 145:2,12 147:6

**nerve** 53:17 113:13

**neuritis** 53:17, 22 54:14

**neuro-imaging** 52:17

**neuro-ophthalmic** 72:4

**neuro-ophthalmologist** 49:21 82:18 106:15

**neuro-ophthalmologists** 39:24

**neuro-ophthalmology** 17:4 50:10 61:6 71:11 80:6 92:12 105:12 107:2

**neurofibromatosis** 93:21

**neuroimaging** 52:20,22

**neurology** 49:10,13 50:7, 15 52:23 80:8 135:24 137:24

**neurosurgery** 114:7,12 116:24 133:12

**never** 16:3 25:10,15 58:18 62:19 86:1 102:4 109:22 126:9

**new** 41:23 43:1,20 45:4,6 76:9,11

**Newman** 70:16 71:5,9,13 72:6 73:13 79:3,6, 11,25 80:4,24

**Newman's** 71:15 81:2 140:22 141:24 143:3

**next** 13:15 33:15,16 36:17 50:11 87:8 89:7 119:16 127:6,21,25 131:18,23

**next-to-last** 32:11 86:18 88:1 139:11

**nice** 61:3 92:5

**night** 22:19

**NIH** 55:18 56:22

**nobody** 9:2

**nobody's** 9:3 24:22

**Nodding** 34:23, 25 35:15 42:9 79:17 122:23 137:6

**noncompliant** 123:1

**none** 42:25 58:16 66:12 132:2,3 139:19

**Nordic** 145:23

**normally** 112:8, 9 113:4

**Norplant** 118:25 129:16, 18,21 130:2 131:17

**North** 8:5 19:9

**note** 64:4 65:6 117:20 146:2

**nothing** 91:24 136:24

**notice** 63:14 64:5 65:7 66:6

**novel** 53:20

**November** 10:20 11:14 38:12 42:6,7 43:9,12,21 45:11 68:7

**now** 11:16 43:22 44:5 45:10 54:17 63:17 65:15 80:16 81:24 105:14 131:7 133:4 134:20 139:3 140:9 142:14

**nuances** 38:24

**number** 29:19 52:21 53:24 64:17 73:23 96:25 119:5 145:22

**numbers** 51:9 114:17 117:8

**O**

**oath** 9:8

**OB** 85:24

**OB/GYN** 39:8 85:25 86:14

**obese** 74:11 107:23 111:20

**obesity** 107:24 108:19 110:9 111:12 140:16

**object** 11:20 13:7 15:6 17:1, 18 18:12,15,21 19:11,20 21:10,24 23:5 24:17 25:2,9, 24 26:5 28:24 29:8,15 30:10 32:21 33:7 35:13 36:22,25 37:13 38:22 39:17 43:14 44:24 47:24 55:1,10 56:17 57:9,18 58:1 61:1 62:5,24 65:5 68:22 69:7 73:16 74:4 75:10 77:17 78:2,18 82:3,15 84:19 85:6,15 87:2, 13,23 88:24 89:24 90:9,24 91:10,21 92:13 93:1,16 94:6, 13 96:7 97:20 98:3,23 100:7 101:2 102:9,16 103:8,20 104:17 105:9 106:12,13,19, 22 107:15 108:4 109:9,20 110:5,25 112:5,24 115:16,23 116:14 118:12, 21 119:1,13 120:4,15 121:13 123:6, 17 125:1 126:7,16 127:9 129:19 130:18 131:25 133:18 134:21 138:20 140:6,23 141:17 142:20 143:12 144:6, 18

**objection** 20:3 108:1 109:12 143:9

**objections** 63:25 64:5 65:7 66:6,8,11

**obligated** 24:22

**obstetrics** 29:1

**obstetrics/ gynecology** 86:12

**obviously** 32:5

**occasionally** 28:11

**occur** 131:3,15

**occurred** 120:25

**occurring** 108:12 130:1 139:21

**occurs** 140:15

**October** 21:14

**ocular** 54:1

**off** 15:8 19:22 23:21 28:7 38:17 43:18 44:25 53:4,8 59:1 61:17 66:17,19 83:4 96:16 98:16 111:17 115:25 117:4 135:4,5 145:2,4 147:9

**offend** 96:16

**office** 22:24 111:13

**official** 87:12

**officials** 84:22 85:9

**oh** 53:2 57:10 62:6 74:20 79:12 80:1 83:3 97:2 109:4 122:12 130:11

**okay** 9:21 11:5 13:1 15:1,10, 24 16:7,19 17:23 18:9 19:2,25 20:12, 17,24 21:7,13, 22 22:8,11,22 23:3,9,15,18 24:4,11 25:6, 18 26:8,11,22 32:10 33:10,24 34:4,13,22 35:4,11,21 36:4,9,19 37:17,24 38:5, 18 39:11 40:15 41:25 43:6 44:1 45:22 46:6,13,17 48:17 50:24 51:24 53:7,14 57:5,15 58:11 60:13 61:24 63:19 64:9 65:21 66:18 68:9 69:3,17 70:25 72:20 73:12 75:14 77:4,24 79:2, 10 80:14 81:4, 8,25 82:7,9 83:9,22 85:2, 11 91:14 92:21 93:6,9 95:12 96:18,22 97:8 98:9 107:22,23 109:18 114:9 116:19 117:5, 14,16 118:17 119:11 120:9 121:2 122:20 126:20,24 129:2 131:17 133:7,14 135:20 136:1,7 137:22 138:1 140:23 142:7, 15,17

**old** 115:21 117:1

**once** 34:12 61:19 62:19 100:21 134:17

**one** 14:3,13 16:14,20 18:14 19:8,16 23:12 41:16 47:19 53:25 54:18 55:19 56:9,11, 20,24 58:13 62:16 65:17,18 67:12 70:11 86:9,24 88:1, 20,21 89:7 90:11 91:18 92:9 93:11,20 99:12 100:9 101:9 103:21 105:17 107:2 115:1 118:22 120:11,25 121:6,21 123:4 131:22 133:8, 15,22 138:2,3, 9,13,24 140:12

**one's** 44:7 68:21

**one-year** 76:25

**ones** 29:3 42:18 132:13 133:1,3 136:23,24

**online** 87:9 94:21 95:6 132:6

**only** 16:2 43:8 45:8 54:23 60:8 62:6 80:1 92:3 94:15 98:18 100:9 108:23 128:23 142:22 143:25

**ophthalmologist s** 129:6

**ophthalmology** 46:20 49:7,11, 18 50:3,7 67:21 80:7 103:23 116:16 133:4

**opinion** 12:18, 22 13:11 26:17 47:23 48:1,15 68:19,21,24 75:7,14 81:7 92:9 93:11,22 96:3,6,20 97:1, 11,19,24 98:11,20,24 105:7,11 110:19 130:2 140:5,18 141:14 142:12, 18,19 144:16 146:7

**opinions** 33:5 71:1,3 96:14

**opportunity** 55:24 56:6,8 70:16 81:1

**opposed** 15:14, 21 24:14 60:5 74:2

**optic** 52:23 53:17,22 54:13 113:13

**oral** 64:22 68:2

**order** 27:14

**Orendi** 8:15

**original** 23:23 41:21 46:2 98:15 99:10

**originally** 12:3

**other** 13:24 16:11,13,14, 20,21 22:4,14 26:19 27:8 29:6 35:1 36:19 39:14,24 40:2,13,16 44:9 47:21 48:21,22 49:12 51:20 60:10 65:3 71:2 72:2 73:6 77:1 79:4, 5 80:5,6 82:11, 13 93:12 98:10,18 99:14,21 103:16,17,24 105:24 107:7 108:10 111:12, 13 112:2 115:14 127:4 134:1,17 136:3 137:8 138:24

**others** 81:14 119:4 132:21 133:9

**otherwise** 39:10 64:23,25 112:18 113:3 132:16,18

**our** 24:7 46:20 50:15 52:16,23 57:4 61:6 64:4 93:20 96:14

**out** 30:18

31:22 38:8 44:8 98:10,17 103:4,18 122:14 124:21 130:14,21 131:22 134:7, 8,15 142:22 143:5

**outside** 20:8 22:3 30:15 50:2 77:2

**outstanding** 44:22

**over** 15:1 36:16 49:3 62:14 79:6,14,23 83:22 86:18 89:6 94:5 115:1 127:23 135:1 136:8 137:8

**overall** 122:25 127:1 146:16

**overlap** 51:3

**overlapping** 37:10

**overly** 109:2

**own** 22:8 27:9 42:18 59:5 88:9,12 97:7 116:22 139:8

**P**

**P-E-I-P-E-R-T** 85:24

**p.m.** 135:8,10 145:5,6,7,9 147:10,11

**page** 21:13 22:3 27:14 32:11,15 33:15 63:19 64:18 83:22 84:16 86:18,19 87:11,25 89:6 91:6 94:21,24 95:16 97:15 114:17 117:8, 9,13 120:12 139:10,11 141:5 142:2,13 143:22 144:11

**pages** 32:1 94:25 97:12 121:19

**Palmer** 19:8

**pan** 134:15

**panned** 134:7,8

**paper** 23:10,11 80:22,24 88:8 98:16 101:8

**papers** 42:13, 15 100:10

**papilledema** 122:24 123:14 124:12 127:1 128:11,15

**paragraph** 95:16

**part** 25:4 55:8 90:2 99:13,22 105:16 141:10

**participants** 86:9

**participate** 26:20 71:19, 21,24 116:19

**participated** 78:6

**particular** 73:15 74:1 90:21 92:23,24 93:8 108:14 115:11, 12,17 119:24

**particularly** 75:24 108:19, 24

**partly** 17:2 133:22 145:24

**partner** 17:3 60:16

**past** 26:17 102:2 115:8

**path** 111:23

**pathway** 76:1

**pathways** 52:20

**patient** 25:15 51:18 52:13 72:24 73:22 106:4 112:7,13 113:3,11 120:2

**patients** 25:8, 14 49:23 51:5, 6,12,19 53:22 54:12 60:20 67:25 71:16,17 72:13,14,15 73:14 74:1,2,8, 12,13,15 76:9, 14 78:9,23 113:5 119:19, 20 123:23 124:1,2,6,14 125:3,5,20 127:13,18 132:5,16,18 146:6

**pattern** 90:18 139:23

**patterns** 77:9, 10,11 146:5

**pause** 104:4

**pay** 58:24 92:11 93:14

**Pediatric** 17:15

**peers** 39:14 40:12

**Peipert** 85:21 86:8,13,20 87:19 88:2,20 89:20 90:17 91:3

**Peipert's** 89:7

**people** 23:9 40:16 52:7,8 53:24 54:2,13 55:12 56:10,12 59:13,14 71:2 74:20 76:23 77:20 101:13 102:18 106:9 127:14 132:4

**per** 51:17,18 76:8

**perceived** 101:6

**percent** 15:17, 20,22,23 51:2, 21

**perfect** 102:20

**perform** 12:10 78:10

**performed** 16:12 22:6

**performing** 15:3,4 85:4

**perhaps** 91:18

**period** 33:16

**periodically** 40:4

**persistent** 124:12

**person** 14:5 73:5 101:21 108:13,15 131:1,4

**personal** 64:25 84:1

**pertain** 52:13

**pertains** 78:23

**Ph.d.** 75:20 77:19

**pharmaceutical** 57:25 58:9 93:24

**Pharmaceuticals** 86:21,22 89:9,13,22

**pharmacologic** 75:25

**pharmacologist** 75:18

**pharmacology** 75:17,21,24 76:17,22,25 77:1,3 126:13

**Phase** 89:14

**phases** 50:24

**Philadelphia** 47:1

**phone** 25:13 28:11 34:6

79:14
**phrase** 96:11
**physical** 38:1
**physician** 75:22 119:22
**physicians** 24:8 105:24 107:5 109:3
**pick** 103:4
**pictures** 117:17 121:23 122:1,3 128:24
**piece** 23:10,11 68:25 98:5 99:2
**pilot** 56:7
**plaintiff** 14:11 15:21,23 18:6
**plaintiffs** 8:14, 16 9:13
**plaintiffs'** 10:8 31:18 47:10 63:8 65:7,24 67:6 69:19 83:10 86:4 87:5 88:15,19 90:12 94:17 113:21 116:5 128:4,8 135:11 137:14
**plan** 60:25
**plausibility** 139:21
**please** 8:10,22 9:7,18 10:13 47:15 63:13 66:4 128:13 135:16
**point** 22:15 30:17 37:20 38:4,7,18 42:3 43:2,3 72:14 73:8 83:8
**points** 114:18
**policy** 83:17,20
**polite** 102:18
**pooled** 72:12 73:14 79:4
**poorly** 100:16
**population** 72:24 73:22 140:13,14
**portfolio** 55:21 59:7
**portion** 90:4
**position** 92:22
**possession** 28:23 64:2
**possible** 103:10
**poster** 67:12 68:17 69:6,25 80:21 82:19,21
**potential** 125:21 139:22
**Powerpoint** 114:24
**practical** 105:17,21
**practice** 14:16 17:3,8 18:2 22:18 24:12 25:1,8 44:15 50:25 71:15 75:2 76:7 125:4 126:3
**practicing** 75:22
**practitioners** 130:20
**pre-clinical** 54:2
**prefer** 79:18
**preferentially** 74:10
**preferred** 105:13
**prep** 36:20
**preparation** 10:4 32:7 34:22 35:8,9 45:19
**prepare** 35:18 45:23,25 46:8
**prepared** 38:25
**preparing** 13:4 26:11 35:25 37:4 66:10 114:22
**prescribed** 74:10
**present** 71:17 127:14,17
**presentation** 67:13,20 68:7, 9,12 69:6,13 80:17 114:24 116:24 120:20 121:1,9 137:9
**presentations** 115:4 132:25 136:5
**presented** 115:13
**presents** 127:12
**pressure** 111:7
**Presumably** 27:23
**pretty** 82:21 111:24 113:1 117:14 124:12 126:17 127:15 128:24 136:16 137:5
**previous** 32:8 35:22 49:2 72:25 115:3 137:4 138:19
**previously** 48:23 97:24 145:14
**primarily** 56:10
**primary** 49:11
**print** 87:9 94:24 131:8 132:13 138:24
**printed** 95:6,9, 10
**printout** 94:20
**prior** 13:22 26:9 39:11 40:9 48:19 63:16,20 66:13 68:15 86:24 113:19
**private** 27:9 54:25 55:6 57:7,11,12,17, 24 60:18 84:23 93:3,25
**probably** 11:22 14:3,15,16 15:17,22 16:2, 3 17:24 20:14 33:20 37:23 38:3 41:9 42:22 43:23 45:8 46:9,14, 16 48:13 51:2, 8,9,23 60:15 65:18 76:23 80:1 108:20 109:14 112:9 117:15 121:15, 25 124:14 127:19,25 128:23 135:23 136:2 137:7
**problem** 100:25
**problems** 76:10,16
**procedure** 124:16 126:6, 18,21
**process** 57:5 59:1 96:4 118:1
**produce** 41:22
**produced** 63:20,22
**productivity** 59:24 60:11
**products** 8:4 89:15 90:7
**profession** 62:18
**professionals** 106:17
**professor** 49:3, 14,17 58:19,23 59:3 60:13 61:10,22 62:1,

4

**profound** 127:17

**progestins** 146:16

**prognosis** 72:18

**program** 105:19

**programs** 86:13 87:1

**progressing** 123:9

**progression** 123:23

**progressive** 127:22

**project** 72:3

**projects** 50:21 52:1 56:4 71:20,22,25 72:2,11

**Prolonged** 87:20

**promoted** 58:19 59:19 61:21

**promotion** 59:6 62:10 92:1

**promotions** 61:11,14,15,19

**prongs** 49:22

**pronounce** 90:18

**proprietary** 117:20

**protecting** 125:6

**protein** 134:12

**protocol** 8:24

**proud** 54:18

**proven** 132:3, 12

**provide** 13:5 24:7 26:24 27:10 44:11 64:1

**provided** 10:5, 16 27:3 28:17 42:15 44:10,23 69:4 113:19 116:21 133:1

**providers** 119:19

**pseudotumor** 20:2,10 105:15,22 106:1 110:19 112:12 113:25 116:9 135:19

**psychogenic** 124:8

**PTC** 11:18 21:9 39:16 71:25 72:8,25 73:23 80:12,19 81:17 82:13 98:12 104:12,16 106:11,18 107:12 110:24 120:19 121:12 129:18 130:10

**public** 54:9 77:19

**publish** 59:21

**published** 23:24 26:16 48:12 52:21 59:9,10 86:8 88:21 98:14

**publishing** 59:18

**puncture** 112:16,20

**pure** 60:3

**purpose** 130:17

**pursued** 20:16

**pursuing** 91:25

**purview** 50:17

**put** 50:9 62:10 92:22 93:9 99:7 117:24 131:23 132:13, 20

**putting** 124:24

**Q**

**quality** 143:16

**question** 16:8 27:6 43:6 44:14 58:7 62:16 65:6,18 74:21 77:6 92:14,16 103:13 109:2 111:1 130:14 131:18,23 132:20 136:24 138:21 143:13 146:10

**questionable** 21:2

**questions** 33:3 42:6 50:22 52:7,13 68:14 72:17 81:10 102:8 137:12 145:1 147:7,8

**quick** 10:23 96:20

**quickly** 51:9 127:19

**quite** 13:16 83:3 122:1

**R**

**Raise** 9:6

**ran** 82:17

**rank** 59:3

**rare** 146:3

**rate** 24:7,9,14, 16 25:11,16 36:12,13 100:3

**rates** 24:12 36:10 99:14

**rather** 124:23 146:16

**rationale** 133:22

**re-review** 21:19

**re-reviewing** 23:19

**reach** 103:25

**reached** 144:15

**reaching** 144:7

**reactivate** 63:3

**read** 32:6 84:5 89:18 90:4 95:25 102:5 107:18 140:2 141:6,7 142:11,17 144:12,13,21

**reading** 21:18 27:18 140:20 141:9 144:14

**reads** 83:23

**real** 96:20 113:25

**really** 14:11 17:9 18:16 25:11,15 26:10,13 33:8 34:15 37:14,19 40:23 46:18,19 52:4,6 54:8 55:15 59:22 60:7 74:21 98:24 99:16, 20,25 100:2 107:18 108:6 111:20 119:23 125:25 127:10 129:22 134:8 146:3

**reason** 16:24 62:21,22 70:22 81:4 105:17,24 120:17 137:2

**reasonable** 14:25 73:4 101:20

**reasons** 55:19 101:4 105:17, 22

**recall** 11:25 15:24 18:5,8 19:13 20:12 21:7,16 23:19 26:2,8 28:5

33:18,24 34:13 35:3,23 38:15 41:4,13 42:10, 20 145:14 146:9

**receive** 84:16

**received** 30:14 48:2 58:8 84:8 85:3

**receives** 57:16 86:20 88:2 89:8

**recent** 140:16

**recently** 105:18

**recess** 53:10 66:21 135:7 145:6

**rechallenge** 139:25

**recognition** 105:18

**recognize** 105:20

**recommend** 112:14 113:15

**recommendation** 24:18

**recommended** 24:6,9,15 36:10,13

**recommending** 101:13

**record** 8:11,23 9:19 16:18,20 24:10,19 44:7 53:5,8,12 64:4 66:17,19,23 135:4,5,9 145:2,4,8 147:9

**record's** 48:17

**recorded** 133:2,4,6,10, 13

**records** 24:14 28:20 44:4 73:13

**recover** 139:23

**recovery** 139:23

**rectangular** 95:4

**recycled** 136:20

**red** 121:20 122:7,9,17 123:5

**redaction** 32:15

**reduce** 108:17

**refamiliarize** 46:3

**refer** 9:22 95:15 104:22 109:7,18 130:13

**reference** 20:9

**referenced** 20:1 23:10 66:9 147:1

**referring** 31:1 70:1 119:19 121:9 132:7

**reflect** 10:21

**reflected** 42:1

**reflects** 12:23, 24

**reformat** 115:10

**regard** 27:4

**regarding** 12:13 29:1

**regardless** 44:16 64:21 65:3 84:2

**regions** 53:21

**regular** 14:5

**rejected** 57:2

**relate** 64:2 104:12

**related** 11:18 39:16 72:8 84:3 110:13 115:8 120:19 125:15

**relates** 71:14

**relation** 70:7 82:19 84:17 116:13 121:12

**relationship** 13:12 29:20 40:1 68:25 73:10 99:1,18 100:11 104:10 107:4 119:25 120:7 130:3 131:11 132:4 139:16,17 143:19

**relatively** 39:21

**release** 64:25

**relevant** 70:24 81:7 120:13 123:25

**relied** 47:22 48:14 68:20

**relocated** 52:18 55:19

**rely** 56:10 124:9

**relying** 145:18

**remaining** 113:18

**remember** 17:21 18:1,14, 23 19:6,19,21 26:10 28:13 29:3 34:2 37:15 40:19,22 43:4 66:15 83:4 91:19 98:13,16 115:25 117:4 119:15 120:21 132:22 133:11

**removal** 126:6, 15

**remove** 101:13

**removed** 111:16 112:4, 14,23 124:23 126:9

**repeat** 27:5 128:13

**replied** 146:12

**report** 21:21,23 25:20 26:3,4,9, 12,20,23 27:3, 11 29:18 30:19 34:11,14,21 37:4 41:21,23 43:1,5,7,21,25 45:5,7 46:3,5 47:16,17 81:2, 5 84:14 98:7 99:4,9,10,22 100:12 120:13 139:3,7,10,11 140:22 141:20 142:13 143:21, 23 144:11,14, 15,21

**reported** 29:19 132:15

**reporter** 8:8,11 9:6,10 52:24 53:3,7 96:23 128:13,17 142:3,7

**reporting** 100:3

**reports** 30:23, 25 81:20 106:8 131:14 134:11

**representation** 95:6

**reproductive** 74:16 111:19

**request** 8:21

**required** 85:3

**requires** 84:14

**research** 42:17 50:19,21 51:22,24 52:2, 4,9,10 54:4,19 55:8,12,14,21 56:1,9,11,16 58:11 59:8,16 60:2,3,8 69:12 71:20,21,24 72:10 73:12, 15,25 78:10 79:4,5 83:17

84:17 86:9,20 87:1 88:3 89:8 90:1 91:17,20 92:1,23 93:15 95:20,23,24 102:15 104:6, 15 124:20 143:5

**researcher** 58:13

**researchers** 58:14 88:22 93:20

**residency** 76:6

**resident** 51:4 116:25

**residents** 50:3, 8,11,15 55:14 56:4 60:1 71:18 86:12 114:15

**resolve** 112:21

**resources** 52:15 55:24

**respect** 27:1 140:1,9

**responding** 127:24

**response** 8:25 143:5

**responses** 64:4 66:6 77:6 139:21

**responsibilities** 49:17 84:4

**responsibility** 50:4 125:3

**resubmitted** 57:3

**result** 75:12

**resulted** 31:3

**resulting** 21:8

**resume** 61:23

**retained** 81:15, 23

**retinal** 134:11

**retinoids** 119:8 134:12

**retracting** 98:15

**revenue** 60:21

**reversible** 86:11

**review** 14:7 16:18,20 21:19 24:10,19 26:23 28:9,16,17,18, 20,23 29:6 30:8 32:8,18 33:21 37:2,3 39:6 41:15,17 50:10 61:8 70:6,16 81:1 116:9 125:12 129:20,22

**reviewed** 16:14 27:3 29:10 30:7,18 32:22 46:4 67:10,11, 19 68:15 69:3 70:4,13,23 75:16 81:5 100:21 116:23 144:22 147:3

**reviewing** 10:24 24:14 28:8,10 37:22, 23 41:19,21 42:12 44:17 46:2 48:10 83:1 91:4 121:22 122:16 130:4 141:11 142:16 143:24

**reviews** 14:5 26:16

**revising** 98:15

**revisions** 27:11

**Reynolds** 18:9

**right** 9:6,25 10:4,19 11:1,3, 4,7,16,25 12:8 13:22 14:1 16:7,15,24 17:12 19:5 21:13 24:4 25:6,18 26:2 27:13,17,19,21 28:1,3,5,15,21 29:5,24 31:6,8, 9,10 32:14 33:2,12,14 34:20 35:12 36:19 37:7 38:5,18 39:4 41:6,10 42:14 44:5,20 48:5, 21,24,25 49:12,16 51:20 56:20 57:23 58:5,17,21 62:12,16 63:6, 24 64:6,11,15 65:13,23 66:8, 13,16 67:2,15, 18 68:6 70:3,6, 10,15,19,22 71:8 72:10,23 73:21 77:14 79:2,18,19 81:10,19 82:24 83:9,16,18 84:7,11 85:11 86:2,17 87:25 88:6 89:2,6,20 90:4,11 91:14 95:15,25 96:18 97:4,14,17 100:4,18,21 103:16 109:11 113:24 114:1, 16,19,21 115:12,20 116:4 117:7 118:11 119:12 120:13 121:18 123:1 128:3,21 131:19,20 132:16 134:24 136:3,12 137:2,7,11 138:5,8 139:3, 12 140:2 142:7,18 143:2,21 144:10,25

**rigorously** 134:14

**risk** 40:2 77:11 108:10,14,17, 20,23 110:9,11 140:14,16 146:5

**Rizzo** 81:12

**Rizzo's** 143:21

**role** 92:20

**ROM** 46:21

**rotate** 50:16

**rotating** 71:18

**roughly** 15:11

**round** 62:3 115:2,15 133:5

**Rounds** 114:6, 9,12 116:16 133:12 135:25 136:4

**run** 51:8 102:13

**S**

**safety** 89:14

**said** 13:18 14:13 25:18 28:15 36:9 40:15,20 72:5 82:1 102:5,14 103:14 115:20 132:2 137:5

**salary** 60:17,19

**same** 18:22 33:3 38:11 55:24 77:5 81:10 87:13 91:8 97:10 99:16 103:25 109:12,24 130:25 131:1,4 136:9,10,17,18 137:3,11,12 141:14 142:19, 24 143:5,6,7,8 144:4,7,16,23, 24

**save** 33:10

**saw** 62:16 73:23 74:7 136:11

**saying** 9:23 15:14 74:20

105:4 111:23 141:13 144:1,4

**says** 63:14 86:19 95:16 96:11 114:18 118:7,10

**scavenged** 115:3

**Schnuck** 93:19

**school** 76:6,20, 24

**science** 52:8 60:8

**sciences** 49:7, 18 94:23 95:20

**scientific** 89:12 90:6 96:13,14, 15 98:25 139:20 140:10

**scientifically** 74:22

**scientist** 52:10 59:20

**sclerosis** 53:18 54:14

**scope** 12:9 55:20

**scrap** 23:10,11

**second** 39:19 99:13 101:7

**section** 142:12

**secured** 21:5

**see** 10:14 11:1 17:24 18:17,23 27:15 32:12, 16,24 33:15 36:11 39:10 47:2,6 51:7,12, 16 54:5 68:1 71:16 73:1,10 76:9 77:10 78:9 80:5,6 83:14 86:14,22 87:21 88:4,22 89:4,7,16 91:6 95:13 97:2 103:3 111:17 118:4,6 119:24 122:7,10 125:4,5,20 129:24 130:11, 12,15 134:6 136:7 139:3 140:25 146:3

**seeing** 51:5,19 60:20 66:15

**seem** 65:1 124:11 126:2 127:24 130:25 131:9 138:15 143:6

**seems** 37:9 65:10 75:1 138:9

**seen** 63:17 66:14 72:13,14 80:4 81:19 106:9 143:11

**select** 74:25

**send** 100:23 101:23 119:20

**sending** 127:13

**sense** 74:16 102:6 110:14 125:16 131:3

**sent** 101:18 125:21

**separate** 31:13

**September** 38:12

**serve** 13:19 14:5,24 22:9 92:24

**served** 13:23 16:21 17:13 64:4 65:7

**serves** 89:10, 12 90:5

**service** 71:19

**services** 13:5 15:4 16:13

**serving** 18:6 20:9 40:10,17 120:18 121:11

**session** 67:13 68:17 69:6,25

**set** 33:12

**seven** 51:16,17 70:12 131:7

**several** 106:24 122:2 146:23

**severely** 100:13

**shall** 83:24

**share** 60:16

**Shayna** 8:19

**sheathe** 113:13

**Short** 19:17

**shortly** 139:23

**should** 24:11 30:9,11 35:9 88:7 96:14 101:21 103:13 116:1 121:10 132:5

**show** 30:14 101:9 119:16 122:4 124:3,4 138:10

**showed** 112:19

**showing** 99:17 146:24 147:2

**shown** 89:23 110:23 139:19

**shows** 99:20

**shunt** 113:13 124:16,24 127:13,20

**sic** 8:2

**side** 51:13 130:14

**signal** 29:10, 13,25

**significance** 99:6 100:5

**significant** 29:12 94:4 98:1,11 100:9 103:17 113:9 127:6,15

**significantly** 39:2 92:10

**signs** 54:6

**similar** 76:23 88:2 138:9 143:7 144:16

**simple** 109:2

**simply** 45:7 58:13 73:8 88:8 124:22 129:25 130:20 131:14,15 146:1,2,6

**since** 14:21 16:10,19 22:17 24:2 30:5 31:21 43:12 45:6 48:11 52:18 72:2,6 74:10 77:4 79:24 80:23 81:15 82:14 97:25 98:10 99:16 101:11, 16 103:7,18 104:11,15 113:2 117:5,6 125:12 136:5

**sit** 33:2 43:16

**six** 13:15 51:16,17 70:12 83:4

**skeptical** 88:11

**slide** 64:10,14 119:16,17 120:24 130:6, 20 135:16,20 136:4,17,19,21 137:3,4,6,8 138:9,18,24

**slides** 115:9 116:21,22 117:21 120:23 121:6 131:12 138:19

**slower** 53:15

**small** 39:22 56:3

**Society** 56:7

**software** 105:19

**solely** 59:23

**some** 10:5 14:19 19:21 21:19,20 23:9, 19 28:8,12,16 33:20,21 37:22 38:18 41:17,19 43:3,18 45:3,7 46:3,5 47:6 52:7,8,14 56:14 57:7,24 59:11,13,14,23 60:6 61:8 64:9 67:21 74:7,12, 14,20 75:11 76:17 81:14 82:4,20 84:21 85:9 87:10 102:7,22 104:5,20 106:9,25 107:6 109:15 111:23 116:21 119:4, 17 124:2,6 125:24 127:5 130:13 132:21 146:12

**somebody** 12:5 60:6 77:8 101:18 110:3 123:4,8,12,21 124:18,21 127:3,12,22 132:10

**somebody's** 122:21

**someone** 15:13 18:1 21:1 41:2 42:15 60:2 78:12 92:11 93:13,21 101:19 107:10, 22 125:10 126:24

**someone's** 107:18

**something** 18:3 23:15 25:20 38:1,20 39:19 68:20 104:3,4 105:6 108:11 113:13 114:17 117:10,11 121:8 138:17 146:4

**sometime** 120:9

**sometimes** 14:4,6 50:2 75:1 106:6 132:7

**somewhere** 17:6 23:4 62:19

**sorry** 53:2,4,7 96:25 122:12 130:4 140:19 141:23,24

**sort** 28:21 39:1 45:3 50:16,17, 23 54:7,11 55:20 61:8 98:15 107:1 115:9,10

**sound** 11:2,6 17:15 18:20 19:9 31:7 64:11,14 97:17

**sounds** 90:1 91:9

**sources** 30:15

**speak** 39:13 53:14

**speakers** 114:13

**speaking** 115:11

**specific** 16:8 19:13 21:20 22:5,20 28:8, 14,16,18 29:3 30:2,25 31:2 33:22 43:4 55:4 69:5 73:17,18 77:3, 11 108:6

**specifically** 23:6 37:15 39:8 41:5 46:7 49:6 63:19 72:8 90:7 100:10 117:21 118:8,17 120:19,22 121:9 132:25 134:13 146:17

**spend** 25:13 46:6 48:25 60:8 83:1

**spending** 45:15

**spent** 21:15 28:2 38:16 41:7 43:25 71:10

**spoke** 79:10 103:10 136:19

**spoken** 40:16 103:7

**sponsor** 92:11 93:13

**sponsored** 93:24,25

**sponsors** 57:12 93:20

**spot** 65:16

**spreadsheet** 23:7

**Springfield** 19:18

**St** 17:7 18:19 24:13 34:17,19 36:2 45:20 50:8 76:13 94:23 95:18 129:8

**stamped** 117:21

**stand** 88:9,12

**standpoint** 60:12

**start** 59:1

**started** 14:15 84:11

**starts** 87:21

**state** 9:18

**statement** 83:25 140:9,21

**statements** 64:11

**States** 39:22

**stature** 38:19

**Stavern** 9:12, 20,23 12:11,20 20:19 26:25 63:15 117:19 145:13

**Stavern's** 30:19 117:20

**stay** 61:21

**step** 117:12 118:6 124:24

**steps** 100:23

**Stern** 8:2

**sticker** 142:3

**still** 44:16 49:3 62:22 96:21 112:22 130:5 131:22

**stop** 42:5 52:25

**stopping** 65:16 125:22

**straight** 24:16 36:18

**straightforward** 126:18

**street** 76:4

**strict** 131:2

**strictest** 110:14

**strike** 45:17

**strong** 119:24

**stronger** 132:14

**structured** 26:18

**student** 51:4

**students** 50:2, 13 55:15 56:5 60:1 71:18

**studies** 24:3 28:22 29:1 50:22 58:12 77:8 78:5,6 88:10 89:15 98:10 99:17

103:16,25 104:15 106:8, 18 143:6,7 145:21 146:24 147:1

**study** 23:23 67:23 69:16 70:8 74:23 88:8 100:6,16, 19,22 102:5, 20,21 103:18 110:22 134:6, 14

**style** 138:23

**sub** 83:23

**subject** 63:24 115:7

**subjects** 115:5

**submission** 104:7

**submit** 46:21 55:9 61:14

**submitted** 53:19 55:18 61:15 104:11

**submitting** 57:6 104:5

**Subsection** 83:23

**subsequent** 99:24

**subspecialty** 77:15,25

**substance** 12:13

**substances** 130:9

**such** 56:22 95:21 139:16

**suggest** 32:19 124:23

**suggested** 27:10 36:10

**suggestion** 26:24

**suitable** 59:5

**summary** 117:10 139:12, 14 140:5

**summer** 62:1

**sunset** 138:1

**Super** 46:22 47:3

**superimposed** 124:7

**supplement** 119:17 131:11

**support** 86:20 89:8 139:15 140:10

**supported** 29:25

**supporter** 95:20

**supporting** 120:6

**supports** 69:1

**sure** 25:12 27:8 30:20 33:13 35:21 37:21 43:3,20 55:5 56:14 57:10 74:18 77:5 89:25 92:15,18 93:18,21 97:10,21 121:22 122:5 123:9 128:25 138:3 141:3

**surgeon** 18:1

**surgery** 123:22

**surgical** 122:19 123:16

**surprised** 74:11 85:18 87:4

**surroundings** 20:17

**Survivor** 61:16 62:3

**swear** 8:12

**sworn** 9:14 99:23

**symptoms** 18:3 113:6

**syndrome** 112:12

**synonymously** 105:16

**system** 76:18 90:20,22

**T**

**table** 119:15 136:10

**take** 10:23 13:16 16:15 24:1 65:1,18 76:22 94:9 100:23 101:11 124:4 143:23

**taken** 8:3 53:10 66:21 70:20 77:1 127:5 135:7 145:6

**takes** 35:4

**taking** 49:23 124:24 125:3,7

**talk** 40:25 57:23 69:14 96:19 102:14 103:11 104:20 106:24 108:9, 23 114:6,13 115:6 116:1 121:6,14 129:5

**talked** 31:21 41:1,2 62:7,9 79:3 103:22 115:7,8 132:6 133:8

**talking** 31:2 34:5

**talks** 115:5

**teach** 50:4,6,13 71:17

**teaching** 50:18 51:5 59:7,25

**telephone** 34:1 64:24

**telex** 64:24

**tell** 32:1 71:8 100:5 112:3,22 114:5,10 116:12 128:23

**ten** 14:23 15:10 16:5 46:9 125:5

**tendering** 31:17 122:13 136:14 141:25

**tenured** 59:15 60:5

**term** 73:25 105:13,15,22, 25 106:6 107:12 108:6 109:22 130:24

**terms** 40:6 49:22 51:15 52:21 56:9 78:22 112:10

**Tessa** 88:21

**test** 110:23

**testified** 9:15 16:3 98:11

**testify** 10:1 16:1

**testifying** 24:15 84:9

**testimony** 24:21 44:18 48:19

**testing** 112:8

**tetracycline-related** 119:7

**Teva** 86:21 88:3 89:9,11

**text** 87:10,11 131:13

**than** 16:11,20 17:7 25:7 26:19 27:8 29:6,19 36:19 44:10 48:21 60:2 65:3 73:6 75:23 76:3 78:16 79:4 81:14 82:11 95:23 103:16 112:9 115:14

121:4 124:24 125:18 131:5 136:3 138:18 139:1 146:16

**Thank** 9:10 96:23 118:3 128:17 147:6

**Thanks** 9:5

**That'll** 33:10

**that's** 9:24 10:3 11:4,15 14:25 19:5,7,17 20:24 24:9,22 25:20,23 27:20 28:4 31:5,9 32:14,15 41:12 44:19 47:20 48:6,20 49:5 50:3,16 55:15 56:24 60:17,22 64:12,16 66:16 67:14 70:14 72:22 76:3 79:9 83:6 84:13 85:7 91:20 94:21 97:8 98:1,18 99:19,22 102:20,21 103:18 109:1 114:2,3,16,20 116:9,11 117:5 118:19 119:2 121:8 124:21 127:23 133:19 134:6,9,22 136:16 140:4, 21 141:9

**their** 24:9,12, 18,23 39:15 55:4 59:4 60:7 70:19,23 77:21 78:13 81:19 84:2 90:1 91:12 101:9, 14,17 102:14 107:24,25 122:22 123:12, 14 124:5,9,11 125:6 127:4,11 128:1 140:13

**theories** 39:15

**theory** 75:2

**therapeutic** 139:24

**there's** 20:22 33:16 36:5 48:11,18 49:21,22,25 50:19 51:3 52:5,6 54:10 57:11 61:4,11 64:14 68:24 73:9,10 77:10 99:18,20 100:2 102:20,23 107:6 110:8 111:4 115:7 119:8 122:2 125:21 130:23 131:2 134:10 142:22 143:18, 25

**these** 10:14 11:6,9 17:12, 13 23:23 37:17 42:14 48:2 50:24 64:2,13 66:11 74:20 76:17 95:10 99:21 101:12 102:18 113:18 116:22 117:20 118:10 119:9, 20 120:23 121:5 130:21, 24 131:3,12,13 132:2,3,8,10, 12,15,24 133:8,25 134:10

**these--** 132:3

**they'd** 74:17

**they're** 14:9 50:5,12 59:16 60:10 68:11 76:10 91:9,11 92:4 93:24 97:10 101:12 106:5 107:23 111:18,19,20 127:16 132:17

**they've** 81:22 127:2

**thing** 18:22 32:6 41:20 98:19 125:23 141:6,8 144:5

**things** 21:21 45:23 59:24 78:21,24 92:3 99:12 101:1 108:9,23 113:6 130:13,25 131:3,7

**think** 13:8,10 14:10,11,25 17:25 18:24 19:17 20:5 28:7 29:18 33:8 39:18,22 40:21 41:15 42:12 43:24 44:13 49:20,22 52:3 54:9 57:20 58:6 62:25 63:1 72:15 73:4 78:14,20,24 79:9,24 80:3 82:16,18 91:16 92:19 96:9 98:19 99:9,12, 19 101:17,19, 20 103:4 105:10,14 107:4,5 108:6, 18,22 109:3,13 110:6 114:7 117:2 118:14 119:14,18 120:5 121:4 122:17,18,19 123:8 125:5 126:17,23 129:4 130:19, 22 131:6,7 132:1,4,13 133:5,6,11,12, 19 135:24 136:20 137:7, 24,25 138:5, 22,25 141:5, 12,13 142:8, 21,23 143:14, 17,25 144:20 146:14,23

**thinking** 146:14,15

**third** 91:7

**Thompson** 48:22

**those** 10:16 15:10,24 18:4 19:25 20:5 21:17,21 22:6 24:2,25 28:6, 10 30:25 31:1 34:17,18 36:1 38:15 41:14 42:10,20 45:19 46:10 48:3,14, 22 54:8 56:10, 11,20 57:24 64:9 72:7,10 74:23 78:24 80:10,14 84:1 92:3 95:7 100:25 112:1 123:3,4 124:13 127:18 137:2 143:23 147:1

**though** 56:16 106:17

**thought** 13:13 21:3 99:22 100:22 141:10

**thoughts** 39:15

**three** 22:1 35:20 42:8,11 46:16 48:22 49:22 50:24 55:16 68:13 70:11 80:9,14, 15

**threshold** 113:12 124:15 127:20

**through** 10:19 26:13,15 33:15,17 35:5 38:12 42:1,7, 16 43:9 46:12 48:9 56:3,21 57:7 61:19 62:2,3 63:22 71:19 77:20 95:21 100:22 113:18 117:11 118:1 121:19 130:12 138:18

142:11,14 144:12

**throughout** 95:5

**tick** 96:16

**tier** 59:10,11, 18

**time** 9:2 13:14, 17 15:2 16:8 17:10 21:22 22:20,25 23:2, 4 25:13,15 27:24 28:14 30:24 31:10,12 32:18 33:10,19 34:9 35:2 36:6, 16 37:19,25 38:3,13 39:4, 11,20 40:2,9 41:1,14,22 42:8,14,25 43:17,20,21,25 45:11,12,14 46:19 49:1 50:25 51:21 55:17 62:9 72:6,23 73:2 79:10 80:23 83:1,3,6 97:25 115:1 116:17 127:3,7 128:19 130:25 134:18 135:2 136:5 137:22

**time-consuming** 126:20

**times** 14:2,13 15:11,20,25 16:4 35:17,20 62:2 76:8 79:24 80:1,3,9, 10,15 105:21 108:7

**timing** 46:24

**tissue** 110:7,16

**tissue-wise** 109:14

**title** 49:13 86:10 128:14

**titled** 135:17

**today** 10:1,5 33:2 43:10,17, 19 44:10,23 45:15 46:1 66:13 67:16 70:8 115:14 117:25 121:15 133:1

**today's** 32:7 44:21 63:20 68:16 113:19

**Todd** 8:13 62:14

**together** 50:9 79:7

**told** 13:9,10 40:16 82:9 91:16

**tons** 60:20

**too** 59:14 141:24

**took** 16:9 45:4 62:14

**top** 15:8 23:21 28:7 38:17 43:18 44:25 83:5 94:22 98:16 116:1

**topic** 39:25 40:3 77:4 115:8

**topics** 40:25 114:13

**total** 11:6

**totaled** 11:10

**toxicity** 125:22

**track** 22:14,19, 22 23:2,3,16 59:20 60:3,5

**tracks** 59:15,16

**trained** 71:7

**training** 71:9 76:6 86:13

**transcript** 31:16 32:3

**transcripts** 70:12,17,23

**translatable** 78:25

**treat** 54:13 112:12,13 113:10 123:12, 13 146:6

**treated** 21:3 122:22

**treating** 25:8 108:16,17

**treatment** 113:5,11 121:20 122:7, 9,17,21,25 123:1,4,7,9,24 124:13,19 127:2,5,24 133:24,25

**trial** 133:24 146:1

**trials** 145:22

**tried** 39:2

**true** 10:3 58:3 114:20 134:17, 20,22

**truer** 131:10

**truly** 106:15

**trust** 11:8 74:23

**try** 53:14 61:23

**trying** 40:22 98:13 125:8 130:5

**tumor** 111:5 113:25

**turn** 48:5 62:20 96:18

**turned** 134:8

**turns** 134:15

**twelve** 21:16, 17 22:6,12,13 23:18 25:19 37:8,17 68:11

**twenty** 14:23 15:10

**twice** 14:4 34:12

**two** 14:13 16:6 35:20 41:16 46:13 48:11 55:16 62:8 70:11 99:14 100:10 101:10 103:16 105:16 113:6 114:8 115:21 117:3 127:6 130:23, 25

**type** 17:23 41:20 53:20 55:24 74:14

**typical** 113:4 132:18

**U**

**ultimate** 21:4 60:23

**ultimately** 20:16 31:3 88:11

**um** 16:23 35:20 39:7 79:7 96:19 102:3

**Um-hum** 33:11 58:25 82:10 84:14 97:16 105:5 122:6,8 130:11 138:12

**uncertainty** 52:6,14 54:11

**unconscious** 96:12

**under** 49:13 64:19 71:13 86:19 132:7

**under-** 70:21

**underlying** 17:13 29:25 69:5 75:4 109:16 110:7 111:8,21 112:10

**understand** 38:19,24 39:1 57:6 58:22 65:2 75:4 76:16 78:8

81:22 85:8,12 92:16 108:7,25 130:22 133:21 143:4 146:4

**understanding** 12:17 20:22 21:4 39:12 45:17 54:15 56:15 57:16 75:17,23 78:7, 15,16,21 84:20 85:2,7 89:22 108:8 126:12, 14 129:17 134:2

**Understood** 17:12 38:5 45:16 46:25 79:22

**unfortunately** 46:18 100:12 124:2

**unfunded** 55:13 56:2

**United** 39:22

**University** 17:5 50:9 52:19 53:25 55:20 56:1 61:25 71:11 83:18 84:22 85:14 93:12 94:23 95:21,22,25 96:5,10

**unless** 14:19

**unphased** 74:9

**unpredictable** 92:4

**unremarkable** 112:18

**unresolved** 52:6,12

**unsurprised** 74:9

**until** 14:21 22:15 23:11 41:7 43:22 55:16 61:25 105:18

**up** 11:6,10 14:19,21 16:9 22:15 34:6 39:19 40:4 46:21 51:14,22 52:25 55:16 61:10 62:7,10 92:22 93:9 102:7 105:17 106:6 112:11 116:22 124:1, 3,4 127:13

**up-to-date** 48:8

**update** 83:24 115:10 116:9

**upon** 47:22 48:14 52:15 54:23 59:17 68:20 71:2 119:22 124:9 127:11 128:1 134:18

**us** 16:9 33:10 35:4 44:23 47:14 91:16 99:20 105:15 127:12

**use** 21:8 24:25 39:16 73:1 86:11 87:20 90:20,23 105:15,22

107:12 125:8

**used** 68:3 72:16 105:18 106:2 115:14 136:4

**useful** 99:23

**users** 140:11

**using** 53:19 54:6 106:6 130:23 132:10 140:13

**usually** 14:18 22:18,19,24 24:19 49:21 51:15 52:11 59:1 68:11 80:5 93:2,3,23, 25 108:9 119:17 123:21 132:15 133:3

**utilization** 89:3

**utilized** 64:21

**V**

**vaguely** 17:20 18:22 19:21 94:15

**Valenzuela** 42:22 80:22,24 82:19 98:2 100:4,6,24 102:25 103:2,7

**valuable** 60:11

**value** 84:2

**Van** 8:2 9:12, 20,23 12:11,20 20:19 26:25 30:19 63:15 117:18,20

145:13

**variety** 130:13

**various** 95:4

**vast** 74:15

**versa** 137:9

**version** 98:6

**versus** 99:14

**vertigo** 18:3

**very** 16:17 23:14 46:23 52:19 53:20 54:17,18 58:25 88:1 91:9,11, 25 92:4 100:15 105:17 113:12, 14 127:20

**via** 140:11

**vice** 137:9

**video** 8:22 63:14 66:7

**videographer** 8:1,8 53:8,12 66:19,23 135:5,9 145:4, 8 147:9

**videotaped** 8:1

**vision** 76:15 113:15 122:22 123:24 124:9, 11 125:7

**visited** 128:22

**visual** 49:7,18 52:20 76:1,18 113:7,9,14 122:20 124:7, 8,10 126:25 127:4,15,17,22 128:1

**vitamin** 119:8 134:5,11,15 138:14

**voice** 105:18

**vote** 61:17

**vs** 17:14 18:9, 19 19:8,17

**W**

**waiting** 38:9 47:2

**want** 22:17 48:25 53:4 82:7 104:21 110:20 120:2,5 135:1 136:13 142:3 143:4

**wanted** 17:6 24:1 37:1 138:25

**wanting** 104:6

**Warehouses** 18:10

**Wash** 24:6 36:11,14 49:4, 18 50:1 54:4, 18,23 57:16 85:18,22 86:14 87:1 92:10,12 94:5

**Washington** 17:4 52:18 53:25 55:19,25 61:25 83:18 84:22 85:13 94:23 95:21,22 96:10

**wasn't** 45:6,8 73:17,18 87:3

103:11,15

**way** 26:18 31:23 33:5 34:24 37:9 39:1 74:7 77:12 81:11 92:21 95:6,9 100:19 102:18 108:7 109:1 136:8 141:12

**ways** 54:15 56:20 130:23 144:1,4

**we'd** 44:6 63:2 109:13,15 112:8,19 117:24 134:2

**we'll** 31:23 42:24 64:13 67:4 82:24

**we're** 31:1,2 38:7 39:21 43:19 45:14 54:5 57:3 77:4 96:13 127:18 130:23

**we've** 45:22 65:14 72:2 103:17 106:9 112:7 127:13 134:25 138:1 142:23 143:14, 18

**Wednesday** 114:11

**week** 49:25 51:7,10,17,18 60:9,10 125:6

**weekends** 22:19

**weeks** 32:23 46:13 79:12 127:7,25

**weight** 75:8,12 113:15 140:17 146:9,19,22 147:2

**welcome** 67:2 141:6

**well** 13:8 22:17 26:13 35:10 39:18 43:6 45:17 50:13 52:3 57:2 60:6 68:23 69:13,16 71:16 72:12 73:3,21 74:6 75:20 76:5 77:8 78:3,20 79:23 80:20 91:9 100:8 105:10 106:23 109:13 110:6 111:2,17 112:6 118:14 120:21 122:2 125:25 130:19 131:24 140:21 141:3, 9,22 142:21 144:20 145:20

**well-controlled** 134:14

**well-designed** 99:17 103:24

**went** 22:11 73:13,21 74:7 99:9 100:22 114:23 128:25 135:23

**what's** 10:11 31:24 44:10 47:13 55:13 60:25 63:7,11 66:2 69:22 83:13 87:17 88:18 113:24 126:15 127:3,7 128:7 130:17 135:14 137:17

**whatever** 11:9 22:25 104:21 107:19,20 110:20

**whatsoever** 13:12

**Whenever** 65:15

**where** 17:13 22:15 27:24 32:15 34:18 38:4 52:5,6,12 55:4 59:1,15, 16,17,21 60:17,18 67:22 68:24 75:3 80:17 86:8 87:19 99:13 103:6 114:13 124:14,18 125:21 130:5 134:9 138:2,3 140:19 142:2 146:3

**whether** 44:17 58:12 59:5 64:22,23 75:7 98:12 146:8

**which** 23:19 29:2,10 38:6 42:5,7,20 43:4 49:23 50:10 51:25 56:20 59:3 64:18 74:2 86:7 91:6 95:23 96:3 100:19 101:9 115:11 118:20 120:11 131:1 141:5

**while** 30:5 117:18

**who** 11:25 12:5 14:5 18:1 21:1 55:12 57:12 62:12 71:18 72:25 76:9,10, 23 77:8 78:13 92:2 96:15,16 106:15 107:5 112:7 116:25 124:2,6 125:21 127:14,22 132:16,18

**who's** 60:3 61:5 82:17 91:25

**whole** 27:24 32:6 38:10 47:2 49:1 141:6,7

**why** 60:22 70:22 102:15 107:19 124:22 131:22 132:20, 21 141:9

**wife** 62:25 96:10

**will** 8:11 23:22 30:17 38:9 43:11 44:10 57:12 64:3 65:5 93:10 105:14 108:11 120:22

**willing** 61:5 92:22

**win** 47:3

**within** 127:21, 25 135:23

**witness** 8:12, 18 9:9,13 11:17,22 13:8, 24 14:24 15:3, 4,7,12 16:12, 21 17:2,14,20 18:16,22 19:12,21 20:4, 25 21:11,25 22:9 23:6 24:8, 18 25:3,10 26:6 27:5 28:25 29:9,17 30:11 32:22 33:8,13 35:15 37:1,14 38:23 39:18 40:11 44:25 47:25 53:2,14 55:3, 11 56:18 57:10,20 58:3 61:2 62:6,25 64:7 65:10 68:23 69:8 73:17 74:6 75:11 77:18 78:3,20 82:4, 16 84:20 85:4, 7,17 87:3 89:25 90:10,25 91:11,23 92:15 93:2,18 94:8, 15 95:13 96:8, 21 97:21 98:4, 24 100:8 101:3 102:10,17 103:9,21 104:18 105:10 106:14,23

107:17 108:5 109:13,25 110:6 111:2 112:6,25 115:17,25 116:15 118:14, 22 119:2,14 120:5 121:14 122:13 123:7, 21 125:2 126:8,17 127:10 128:15 129:20 130:19 132:1 133:19 134:22 136:15 138:22 140:7, 25 142:21 143:14 144:7, 20

**women** 74:11 75:9 101:12 125:4,24 140:13 146:9

**won't** 35:22 124:3,4 133:15 141:8

**word** 64:19 94:9

**words** 22:14 108:10 127:4

**wordsmithing** 104:21

**work** 12:9 22:6 24:9 50:1 85:4 104:8

**workweek** 51:14

**worse** 122:22 123:13,14 124:20 127:5

**worsening** 122:20,24 126:25 127:1

**worth** 47:3

**worthless** 100:14 102:21

**would** 11:10 13:17,19 15:22 18:23 20:12 23:20 26:3 29:20 30:6,7 31:11 33:4 37:25 38:2,13 40:4 43:17,20 44:3 54:20 57:24 61:3 74:8,11 77:14, 25 78:12,15 81:6 87:11,13 92:5,8,10 93:10,12 94:3 96:2 97:25 100:8 101:15, 20 102:19 103:2 104:21 105:22 107:12, 13,19 110:18 111:15 112:10, 12,13,16 113:10 117:19 118:25 120:11 121:7,15 123:3,10 124:14 128:20 129:12,24 133:20 135:20 137:23 141:14, 16

**wouldn't** 41:25 61:2 63:3 70:24 73:24 85:18 92:4 98:4 109:7,18 110:2 112:22 124:22

**write** 23:4

**written** 26:15 64:22 79:8

**wrong** 90:19 105:21

**Y**

**yeah** 10:25 15:22 17:20 18:16 19:10,12 37:14 45:14 48:11 55:3 57:10,20 77:18 79:17 82:16 93:18 95:13 106:14 107:4, 17 115:17,22 116:21 118:22 122:1,5,17 127:10 132:1 136:2,16,20

**year** 14:4,13 20:15 39:21 50:8 55:17 57:2,3 62:7,8 71:10 72:1,3 76:8 80:2,9,15 114:8 117:2 135:23

**yearly** 15:5

**years** 14:14,16 16:5,6 18:25 22:1 24:2 35:19 36:17 55:16 61:22 62:8 72:25 76:7 79:6 80:14,16 94:5 95:19 106:24 115:4,21 117:3 131:7

**yet** 83:7

**you'd** 37:24 74:22 104:5 120:2

**you'll** 133:17 142:2

**you're** 9:25 23:12 24:5 42:5 43:10 44:15 49:6 52:1,3,4 59:5 60:19 61:9,12 62:17,22 69:25 76:13 77:24 85:3 92:23 100:18 104:6,8 113:2 121:11 123:15 125:11 130:8 141:6

**you've** 10:11 43:11 44:13 45:18 56:21,24 63:11 65:2 69:22 70:12 72:5 79:24 80:4 84:8 116:8 131:23 132:25 133:1,8 137:17 139:8 143:11

**yourself** 26:19 58:5,8 66:10

**yourselves** 8:10,22