# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

SHENIKA J. HOUSTON, )
)
Plaintiff, )
) Civil Action No.
) 2:14-cv-00035
vs. )
)
BAYER HEALTHCARE )
PHARMACEUTICALS, INC., )
et al., )
)
Defendants. )

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

SHAMEKA M. BRIDGES AND )
PETERSON BRIDGES, )
)
Plaintiffs, )
) Civil Action No.
) 2:14-CV-00036-WMA
vs. )
)
BAYER HEALTHCARE )
PHARMACEUTICALS, INC., )
BAYER PHARMA AG, and )
BAYER OY, )
)
Defendants. )

VIDEOTAPED
DEPOSITION OF GREGORY VAN STAVERN, M.D.
TAKEN ON BEHALF OF THE PLAINTIFFS
May 17, 2016

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

KATHLEEN CHEEK and BILLY CHEEK, )
)
Plaintiffs, )
) Civil Action No.
) 2:15-CV-00020
vs. )
)
BAYER HEALTHCARE PHARMACEUTICALS, INC., et al. )
)
)
Defendants. )

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

SARAH D. HOOVER, )
)
)
Plaintiff, )
) Civil Action No.
) 3:14-CV-05090-SRB
vs. )
)
BAYER HEALTHCARE PHARMACEUTICALS, INC., et al. )
)
)
Defendants. )



UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA

EMILY C. KELLINGTON, )
)
)
Plaintiff, )
) Civil Action No.
) 5:14-CV-00002-MFU
vs. )
)
BAYER HEALTHCARE PHARMACEUTICALS INC. )
)
)
)
Defendant. )

VIDEOTAPED DEPOSITION OF GREGORY VAN STAVERN, M.D., produced, sworn, and examined on May 17, 2016, between the hours of 8:58 o'clock in the forenoon and 4:00 o'clock in the afternoon of that day, at the law offices of HeplerBroom, 211 North Broadway, Suite 2700, St. Louis, Missouri, before CATHERINE E. BOYD, a Certified Court Reporter, #0233, within and for the State of Missouri, a Registered Professional Reporter, and a Certified Shorthand Reporter in the state of Illinois.



A P P E A R A N C E S:

For the Plaintiffs:
Jones Ward PLC
312 S. Fourth Street, 6th Floor
Louisville, Kentucky 40202
By: Lawrence L. Jones, II, Esquire
Justin Brown, Esquire
502-882-6000
Larry@jonesward.com
justin@jonesward.com

For the Defendant:
Goldman Ismail Tomaselli Brennan & Baum, LLP
429 Santa Monica Boulevard,
Suite 710
Santa Monica, California 90401
By: Kenneth Baum, J.D., M.D., Esquire
310-576-6900
Kbaum@goldmainsmail.com

Videographer:
Golkow Technologies
By: Jesse Bader,CLVS
Court Reporter:
Golkow Technologies
By: Catherine E. Boyd, CCR, RPR, IL-CSR



INDEX OF QUESTIONERS


| QUESTIONS BY: | PAGE NO. |
|---|---|
| DIRECT EXAMINATION BY MR. JONES | 7 |
| CROSS-EXAMINATION QUESTIONS BY MR. BAUM | 243 |
| REDIRECT EXAMINATION QUESTIONS BY MR. JONES | 255 |

INDEX OF EXHIBITS

VAN STAVERN EXHIBITS


| NO. | DESCRIPTION | PAGE MKD. |
|---|---|---|
| 1 | GROUP, NOTICE, POWERPOINT PRESENTATIONS | 8 |
| 2 | DESCRIPTION | 38 |
| 3 | ATYPICAL IDIOPATHIC INTRACRANIAL HYPERTENSION ARTICLE BY BRUCE, ET AL. | 183 |
| 4 | PSEUDOTUMOR CEREBRI BRIEF REVIEW OF CLINICAL SYNDROME AND IMAGING FINDINGS | 189 |
| 5 | DOXYCYCLINE AND INTRACRANIAL HYPERTENSION, (FRIEDMAN ET AL.) | 200 |
| 6 | MEDICATION-INDUCED INTRACRANIAL | 202 |




E X H I B I T S C O N T ' D.


| | | |
|---|---|---|
| 7 | IDIOPATHIC INTRACRANIAL HYPERTENSION BY DEBORAH FRIEDMAN, M.D. | 204 |
| 8 | REVIEW (FRIEDMAN, ET AL) EVOLVING EVIDENCE IN ADULT IDIOPATHIC INTRACRANIAL HYPERTENSION: PATHOPHYSIOLOGY AND MANAGEMENT | 218 |
| 9 | NANOS PATIENT BROCHURE PSEUDOTUMOR CEREBRI | 225 |
| 10 | CAN WE PREDICT THE PROGNOSIS/OUTCOME OF IIH PATIENTS | 228 |
| 11 | ACOG PRACTICE BULLETIN | 247 |




VIDEOGRAPHER: We are now on the record. My name is Jesse Bader, and I am the videographer for Golkow Technology. Today's date is May 17th, 2016, and the time is 8:58 a.m. This video deposition is being held in St. Louis, Missouri, in the matter of Emily Kellington views Bayer Healthcare Pharmaceuticals, Incorporated. The deponent is Dr. Gregory Van Stavern.

Will counsel please identify themselves.

MR. JONES: Larry Jones for plaintiff.

MR. BROWN: Justin Brown for the plaintiff.

MR. BAUM: Ken Baum for the defense. I would just say, I think it was noticed in the Houston case initially, not the Kellington case, but it has been cross-noticed in the Kellington, Cheek, and two other cases.

MR. JONES: I was thinking it was noticed in the Kellington case, and then all of the cross notices. I don't think it matters.

We will make sure you have -- Ken will make sure you have all of the cross notices.

VIDEOGRAPHER: All right. The court reporter is Catherine Boyd, and will now swear in the witness.

GREGORY VAN STAVERN, M.D.,

of lawful age, produced, sworn, and examined on behalf



of the Plaintiffs, deposes and says:

DIRECT EXAMINATION

BY MR. JONES:

Q. Good morning. Sir, can you please state your full name for the record?

A. Gregory Van Stavern.

Q. And are you a Medical Doctor?

A. I am.

Q. Okay. I'll call you Dr. Van Stavern out of respect.

A. Sure.

Q. Okay. And, Dr. Van Stavern, where do you live?

A. I live in St. Louis.

Q. And what kind of doctor are you?

A. So I'm a neuro-ophthalmologist.

Q. And did you receive a copy of the deposition notice that came along with a list of documents requests?

A. I believe I did. I can't recall off the top of my head. I'm sure I did.

Q. Did you gather some documents before this deposition in response to that request?

A. I believe I have a number of documents that I've reviewed.

Page 10

Q. Okay. But did you gather any that you brought here with you today?
A. What I brought with me is the narrative report, and my case report on the Houston case.
Q. Okay. And you also brought along with you, I've been given, it looks like, some invoices, a couple of articles, some PowerPoint presentations; is that correct?
A. That's correct.
Q. And did you -- What did you do to go through and respond to the Request for Production of Documents before your deposition?
A. Mostly went through my files and gathered those.
{Marked for identification Van Stavern Exhibit 1, Group, Notice, PowerPoint Presentations, 05/17/16.}
Q. (By Mr. Jones) Okay. I'm going to slide over to you what I'm going to collectively mark as Plaintiff's Exhibit 1. Are those the documents that you brought with you to produce in response to the Deposition Notice and Request for Production of Documents?
A. That's correct.
Q. How much time did you spend going through

Page 11

your files looking for what you've ultimately produced?
A. Oh, I don't know. Several hours. I can't really put a number on it.
Q. Let's look at the invoices first.
A. Sure.
Q. On the top, it says March 6, 2015, right?
A. That's correct.
Q. Okay. And it's from -- It looks like you're sending this to an Emma Neff at Goldman Ismail Tomaselli Brennan & Baum; is that correct?
A. Yes.
Q. Who's Emma Neff?
A. She's the attorney who initially contacted me about this case.
Q. About the Mirena pseudotumor cerebri cases?
A. That's correct.
Q. That contact occurred -- when did that contact first occur?
A. So I believe the first time I was contacted by Emma was in the fall of 2014.
Q. And when did you begin your consulting in this litigation?
A. Probably within the next month or two.
Q. I see on here it says: "This invoice concerns consulting on the Mirena litigation during

Page 12

10/31/14 to 03/06/15; is that correct?
A. That's correct.
Q. And it looks like you spent about -- It looks like you spent exactly 12 hours consulting on this matter between October 31st of '14, and March 6, 2015; is that correct?
A. That's correct.
Q. And what did you do in those 12 hours of consulting?
A. Mostly familiarizing myself with previous literature that I had reviewed, some of the stuff I had written about; IIH, just some of the particulars about the case. So, really, just familiarizing myself with the details of the case.
Q. And did you agree -- When did you form your opinions that Mirena is not associated with pseudotumor cerebri? Would that have been back in 2014?
A. Well, I've actually long held the opinion that hormonal contraceptives, in general, are not causally related to idiopathic intracranial hypertension. I've been teaching that to residents, and medical students, and community physicians for years. So long before that date.
Q. Okay. So when Ms. Neff contacted you in the fall of 2014, did you say, "I agree with your position

Page 13

and will serve as an expert in this case"?
A. Well, I mean, although I agreed with the position, I had to look at my schedule and decide if I wanted to undertake it because it would be -- it would be a fairly heavy commitment.
Q. And when you say a fairly heavy commitment, what do you mean?
A. I mean, just devoting myself to putting the time into reviewing the files, and doing things like this, the deposition.
Q. And it looks like -- I'll get to the other invoices in a second, but it looks like total, through the end of April, 2016, you spent 52 hours since the fall of 2014; is that correct?
A. That's correct.
Q. And you consider that to be a significant commitment?
A. I would consider that a significant commitment.
Q. And so, when did you agree that -- or when did you inform Ms. Neff that you agreed with the position that Bayer is taking in this litigation, and that you would serve as an expert witness?
A. I would probably say the date I have listed here, October 31st. I don't remember exactly, but it

was about a month or two after she had initially contacted me.
Q. And it looks like your consulting fee is $750 per hour; is that right?
A. That's correct.
Q. Now, in your day job as a doctor, do you make more or less than $750 an hour?
A. You know, I've never really calculated my hourly wage, so I couldn't tell you that for sure.
Q. How did you come up with -- What did you do to decide to bill $750 per hour in this case?
A. The institution at which I work, Washington University, has a set fee, so it gives us a sort of schedule of fees that are suggested or recommended, so I typically use that fee schedule.
Q. And does the fee go to the University, or does that go to you?
A. It goes to me.
Q. Did -- Was Ms. Neff the first person to contact you about this litigation, or did someone else contact you before Ms. Neff?
A. She was the first person.
Q. Okay. And do you know if at the time whether Nancy Newman had been retained to serve as an expert in this litigation?


A. At that time, I did not know that.
Q. Do you know if she was -- had been retained at that time?
A. At that time, I did not know that.
Q. Today, do you know when she was retained as an expert witness?
A. I don't know when she was retained.
Q. Okay. What about Bo Bruce?
A. Same thing. At that point, I did not know, and I still don't know at what point he was retained.
Q. You're friends with Dr. Newman and Dr. Bruce, right?
A. Well, I mean, I trained with Nancy Newman, so I certainly know her well. I know Bo Bruce well. We've collaborated on studies together. We are certainly friendly.
Q. Yeah. You all go to conferences together?
A. We do.
Q. You know their spouses' names or their kids' names, right?
A. I actually don't know Bo's kid's name, but I know Nancy's kid's name.
Q. Was Nancy your mentor?
A. She was.
Q. And Nancy did not contact you before Ms.


Neff contacted you?
A. She did not.
Q. How did -- Do you know how Ms. Neff found her way to you?
A. I actually don't know that.
Q. You didn't ask?
A. I didn't ask.
Q. Okay. Going to the next page -- So this next invoice is dated February 16th, 2016, and it says: "This invoice concerns consulting on the Mirena litigation from 10, 2015, to 2, 2016." Is that correct?
A. That's correct.
Q. And you spent 20 hours during that period consulting on the Mirena litigation?
A. That's correct.
Q. And you did that at $750 an hour?
A. That's correct.
Q. And what did you do during that 20 hours between October of 2015 and February of 2016?
A. Well, it was a combination of reviewing the literature, some discussions and meetings with Emma. So a combination of those things.
Q. What percentage of that time would you attribute to reviewing literature?


A. The bulk of it, but I don't have an exact percentage to give you.
Q. And going from the first invoice to the second invoice, it looks like there was about a seven-month period between --
It looks like there was about a seven-month period where you did not do any consulting on the Mirena litigation, correct?
A. That's right.
MR. JONES: Can we go off the record for just a second?
VIDEOGRAPHER: The time is 9:09. We are going off the record.
{Short break taken from 9:09-9:10 a.m.}
VIDEOGRAPHER: The time is 9:10, and we are back on the record.
Q. (By Mr. Jones) Sorry about that Dr. Van Stavern. I had a minor emergency that came up that I had to deal with. I think I asked -- I got distracted on your answer. Did you agree that there was about a seven-month period where you didn't do any consulting on the Mirena litigation?
A. That's correct.
Q. Okay. And the next invoice is dated 04/25/2016. This invoice concerns consulting on the

Page 18

Mirena litigation from 2, 2016 to 4, 2016; is that correct?
A. That's correct.
Q. And it says that you spent, again, exactly 20 hours on the matter?
A. That's right.
Q. Do you bill in hourly increments, or quarter hours, or tenths of an hour?
A. Usually, just hourly.
Q. Do you keep detailed records of what you did during, for instance, the 20 hours on this invoice?
A. No, I don't keep detailed records.
Q. Your clients just trust that you come up with the right number?
A. I try to be fair. You know, I try to estimate how much time I've spent on a specific case.
Q. Now, was it during this period that you wrote your expert report?
A. That's correct.
Q. Before February of 2016, you hadn't begun writing your expert report, correct?
A. I hadn't started writing it.
Q. Okay. And you are here today to give both a general causation opinion and a specific causation opinion for a particular case, right?

Page 19

A. That's right.
Q. Okay. And so the 20 -- Let me ask you this: When did you agree to give a specific causation opinion in -- Who are you here giving an opinion on here today? Is that Houston?
A. Houston.
Q. Houston. When did you agree to give a specific opinion on the Houston case?
A. Honestly, I don't remember when I was sent the case files. It would probably have been sometime before February, 2016.
Q. And why do you say -- Why do you say it probably would have been before that?
A. Because I would have spent a little more time reviewing it before I wrote an opinion, but I don't recall specifically when I received those materials.
Q. Do you know how much time you spent reviewing Ms. Houston's medical records?
A. I can't really give you a specific breakdown.
Q. Approximately?
A. Probably about 3 or 4 hours.
Q. And how much time would you say you spent writing Ms. Houston's specific causation report?

Page 20

A. Another few hours.
Q. Three hours?
A. Hmmm. Yeah. Somewhere around there.
Q. And how many hours would you say you spent writing the general causation report?
A. That's more than that. And, again, I can't give you a specific number.
Q. Okay. Well, do you have an approximate?
A. You know. Because it really involved writing the report, going back to my sources to make sure I was trying to be as accurate as possible, and that everything lined up with my opinion. So probably at least eight hours.
Q. Do you know -- You have your report in front of you, don't you?
A. I do.
Q. Do you know what date you signed that report?
A. It should be on here. Actually, I don't recall specifically which date I signed.
Q. Do you know what month it would have been in?
A. Probably, March.
Q. And does this invoice take us through the end of April?

Page 21

A. Yeah. Yes, it does. Actually, I think it was the middle of April.
Q. Okay. And so how much time have you spent on this case between the middle of April, and where we are, the middle of May today?
A. I would estimate probably between 20 and 25 hours.
Q. And that will be billed at $750 an hour, as well --
A. Yes. The same rate.
Q. -- correct? So that would be somewhere between 15,000 and -- $15,000 and $20,000?
A. Somewhere around there. I might have lost my ability to do simple mathematics.
Q. Yeah, me too. That's why I went to law school. So with that, it looks like we've got $5,000 billed; $30,000, $39,000, plus, approximately, another $15,000 to $20,000. So you're somewhere around $55,000 through today, right?
A. I think that's fair.
Q. And then you're getting -- Are you charging $750 a hour to be here today?
A. That's correct. Well, actually, I was including -- when you stated that, I was actually including today.

Page 22

Q. Okay.
A. Just based on the estimate of what I heard how long this would take.
Q. How long did you hear it might take?
A. Eight hours.
Q. Okay. What did you do to prepare for your deposition?
A. So what I did is, again, reviewed my general report. I reviewed the case report. I reviewed the literature I thought was most relevant to the case, including some of the things I've written myself, some of the lectures I've given, some of the original literature regarding the association with hormonal contraceptives and IIH.
Q. Did you meet with counsel?
A. I did meet with counsel.
Q. When did you meet with counsel?
A. We met yesterday, and Sunday, and a couple of weeks ago.
Q. Okay. How many hours did you spend yesterday with counsel?
A. Probably, about three hours.
Q. And how many hours did you spend on Sunday with counsel?
A. About seven hours.

Page 23

Q. And you said a couple weeks ago, as well?
A. That's correct.
Q. How many hours?
A. About four hours.
Q. So that's about 14 hours to prepare for the deposition, right?
A. That's correct.
Q. And you spent about eight hours writing your report?
A. That's right.
Q. So you spent six more hours preparing for the deposition than you did writing the report?
A. Somewhere around there, yeah.
Q. Tell me what else is in that stack, that collective Exhibit 1?
A. So it looks like it's the ACOG statement about contraceptives in overweight and obese women.
Q. And why are you producing that just this morning?
A. Well, the -- There are general guidelines about which contraceptives we preferentially prescribe to overweight and obese women. And Mirena has been suggested as a preferred alternative for overweight and obese women.
Q. Nonhormonal contraceptives have also been

Page 24

recommended as a preferred contraceptive for overweight and obese women, correct?
A. Yes, both of them have.
Q. And so I understand that. That -- That statement was in your report. But why are you producing this this morning, what's the importance of it?
A. Well, I think the importance is, if you're preferentially prescribing a medication to women who are likely to develop a certain condition that could bias any sort of interpretation of studies showing an increased incidence.
Q. Yeah, that's not answering my question. Why are you -- That's in your report. Why -- I'm trying to figure out why you selected this to give to me this morning; was this cited in your report?
A. I believe it was. I cite the ACOG report in my -- in my opinion.
Q. You're not an OB/GYN, are you?
A. I'm not OB/GYN, but just because I'm a physician, I, at least, have some familiarity with contraceptives, although I don't prescribe them.
Q. Are you a member of the American College of Obstetrics and Gynecology?
A. I am not.

Page 25

Q. Do you regularly receive ACOG bulletins?
A. I don't.
Q. Okay. Are you an expert in obesity?
A. Well, again, I see a lot of people who have complications with obesity. So as part of my training and my clinical experience, I have more knowledge about the complications of obesity than certainly a lay person.
Q. But you certainly wouldn't go to a conference and stand up and call yourself an obesity expert, would you?
A. Well, I mean, if the issue was obesity related to IIH, or stroke, then, yeah, I would consider myself at least an expert in that arena.
Q. You would go to a conference, and you would stand up and say, "I'm an expert in obesity"?
A. Well, I wouldn't say that.
MR. BAUM: Objection.
Q. (By Mr. Jones) Okay.
A. The complications of obesity, yes. Not necessarily obesity.
Q. What about obesity causes PTC?
A. Well, I think that's where you have to stand back a second and say cause. So if you're saying IIH, or idiopathic intracranial hypertension, the reason a

Page 26

lot of us prefer the term IIH is because we don't know a specific cause. We do know that there are specific risk factors that are associated with it, and obesity is one of the primary risk factors.
Q. Obesity is not a cause, though, is it?
A. Well, I think when you're talking about risk factors, you're talking about something that causes a higher incidence, a higher likelihood that that person will develop that outcome or that condition. Some risk factors have better evidence or more solid evidence of a causal relationship. And so for IIH, obesity has a higher level of evidence for a causal relationship.
Q. Does obesity cause PTC?
MR. BAUM: I'm going to object -- I know it's hard, but you need to pause just so I can object when I have an objection. Objection, form.
A. And so, again, I'm going to step back a second. I think it's really -- It's a little just overly simplistic to say X causes Y because there may be multiple factors. I think obesity is one of the risk factors that has enough evidence to support a causal relationship with IIH.
Q. Okay. And I'm going to ask my question again: Does obesity cause PTC?
A. And I'm going to --

Page 27

MR. BAUM: Objection, asked and answered.
A. And, again, I'm going to answer the same way. It is a risk factor that has a high enough level of evidence to support a causal relationship.
Q. Okay. You can explain your answer, but yes or no, does obesity cause PTC?
MR. BAUM: Objection, form.
A. I don't think that's something I can answer yes or no. It's the way I think I'm thinking about something, X causing Y. There are a number of factors involved, and obesity is a risk factor that has a high level of evidence to support a causal relationship.
Q. There is no known cause of pseudotumor cerebri, is there?
A. At this point, we don't have a specific cause.
Q. What else do you have in your stack of Exhibit 1 over there?
A. I think the next thing is --
Q. Would you mind keeping it in order.
A. Sure.
Q. We're going to give it to the court reporter.
A. Sure. I'll turn just it over this way, to make it easier for me to keep it straight.

Page 28

The next is an UpToDate report about contraceptive counseling for obese women.
Q. Okay. Is that something that you cited in your report?
A. I don't believe I cited that in my report.
Q. Okay. Where did you come up with this document?
A. It's on UpToDate, which is an accessible on-line source for medical information.
Q. Did you get on UpToDate and get this yourself?
A. It was provided to me by the attorney.
Q. Okay. Flip it over. What's the next document?
A. So this is a talk I gave several years ago about IIH.
Q. Okay. Where did you give that talk?
A. I think this was the one I gave in Chesterfield to community ophthalmologists.
Q. Chesterfield, Missouri?
A. Missouri.
Q. Was that at St. Luke's?
A. Yeah, it was at St. Luke's.
Q. Okay. This was one of your -- was it called a grand round, or something like that?

Page 29

A. It was a grand round presentation.
Q. What is grand round presentation?
A. So a grand rounds presentation, at most hospitals, each department has sort of a grand rounds where they invite a speaker to talk about a specific topic, just to either educate the physicians, or update them on sort of current management or current thoughts about a disease.
Q. Okay. How many people were at that presentation?
A. Probably about 20, 25.
Q. Okay. Do you have privileges over at St. Luke's?
A. No, I don't.
Q. Okay. You can flip that one over. And what's this next one?
A. So this was another talk, a very similar talk I gave. I think this was one -- I actually don't recall --
Q. That was at Wash U., wasn't it?
A. Yes, this one --
Q. At grand round?
A. Yeah. It was given at grand rounds.
Q. Okay. So you gave this to your colleagues?
A. That's correct.

Page 30

Q. Okay. How many people were at that presentation?
A. Oh, if this was the neurology grand rounds one, which I think it was, probably about 50 or 60.
Q. Okay. You can flip that one over.
And then what's the next one?
A. So this is a -- I was invited to be a visiting professor at Michigan State University in 2012. And so I was asked to give one talk, which I gave. And then they had this thing where they ask each of the visiting speakers to talk about the biggest myths in Neuro-Ophthalmology. And I chose the myth that there is an evidence for causal association with hormonal contraceptive and IIH.
Q. I can see from here that at the bottom of that it says "OC;" that's "oral contraceptives," right?
A. That's correct.
Q. So was this about oral contraceptives or was it about hormonal contraceptives?
MR. BAUM: Objection, vague.
A. It was about overall contraceptive use.
Q. (By Mr. Jones) Is there anything in there that relates to the levonorgestrel IUD?
A. There is nothing specifically in the slides. But, I mean, it's not like I just showed the slide and

Page 31

press the advance button. I try to supplement it with other material.
Q. Is there any reference to levonorgestrel at all in that presentation?
A. In the slide, itself, no.
Q. When did you give that presentation?
A. That was 2012.
Q. Okay. That was before you were hired by Bayer at $750 an hour, right?
A. That's correct.
Q. Okay. You can flip that one over.
What's the next one?
A. This is a talk I gave just about a month ago to the Neurosurgery Department.
Q. Okay. So that's after you've been hired by Bayer to opine about the relationship between levonorgestrel and PTC, correct?
A. That's correct.
Q. Okay. Is there reference to levonorgestrel in that presentation?
A. No. But, listen, these are neurosurgeons. This is mostly talking about which patients would benefit from surgical intervention, like shunting.
Q. Okay. You can flip that over.
What else did you do to prepare for your

Page 32

deposition?
A. I think pretty much everything that I have covered.
Q. Did you go back and re-review all of the articles that are listed in your report?
A. I reviewed all of the articles. Some of them, I was already familiar with, so I didn't have to spend as much time with them. Some of them didn't seem relevant, so I may have read the abstract, and didn't really spend much time with those either.
Q. When is the last time you talked to Dr. Nancy Newman?
A. Probably -- Probably at the NANOS meeting in February.
Q. Okay. And did you talk about your work in this case?
A. We did not.
Q. Not at all? It didn't come up?
A. It did not come up at all.
Q. What about Dr. Bruce, when is the last time you talked to him?
A. Same meeting.
Q. And did you talk to him about your work in this case?
A. That did not come up at all.

Page 33

Q. So you all are all working on the same case, and you didn't talk about it at all?
MR. BAUM: Objection. Asked and answered.
A. No, we didn't.
Q. (By Mr. Jones) Let's -- Have you seen a copy of Dr. Bruce's report?
A. I've not seen a copy of his report.
Q. Have you seen a copy of Dr. Newman's report?
A. No.
Q. Have you seen a copy of Dr. Lee's report?
A. No.
Q. Do you know Dr. Lee?
A. I know Dr. Lee.
Q. Have you ever collaborated with Dr. Lee?
A. Multiple times. We're actually co-editors of a section in the Journal of Neuro-Ophthalmology.
Q. Did you recommend to Ms. Neff that she talk to Dr. Newman?
A. Absolutely not.
Q. Did you recommend to Ms. Neff that she talk to Dr. Bruce?
A. No.
Q. It was just a coincidence that you guys all got hired in the same litigation?
MR. BAUM: Objection.

A. I think it's more than a coincidence. We're acknowledged experts in this condition, and Neuro-Ophthalmology is a fairly small club.
Q. There are a lot of acknowledged experts in this particular condition, aren't there?
MR. BAUM: Objection.
A. Well, I don't -- I think you would have to define a lot. It is a relatively small community of people. We see these patients, teach about this condition, and do research on this condition.
Q. (By Mr. Jones) There is more than three, right?
A. There are more than three.
Q. Let's go over to your C.V.
A. Actually, I don't have that with me.
Q. Oh, you don't. We might be able to provide you with a copy of it.
A. Thank you.
Q. You have it. Okay. So you went to medical school where?
A. At Penn State.
Q. All right. And then you did a residency over at North Carolina -- University of North Carolina Hospitals, Chapel Hill, one in Ophthalmology, and one in Neurology, correct?



A. I didn't complete the residency in Ophthalmology. I did two years of Ophthalmology and then decided to switch, and then completed a Neurology residency.
Q. So you didn't complete the Ophthalmology residency?
A. I didn't.
Q. But you're a Neuro-Ophthalmologist?
A. That's correct.
Q. You don't have to complete the Ophthalmology residency to be a Neuro-Ophthalmologist?
A. You can go either one of two routes. You can either do a Neurology residency, and then a Fellowship, or an Ophthalmology residency, and a Fellowship. Or do something like I did, which I wouldn't recommend, which is part of one and then a full other.
Q. So it's the Neuro-Ophthalmology Fellowship that you did at Emory from 1999 to 2000, that's what allows you to represent that you're a Neuro-Ophthalmologist?
A. I think that's fair. Just like most subspecialties, and, at least, Ophthalmology, there is no accreditation for sub-specialization. So anyone can call themselves a Neuro-Ophthalmologist, but I think



those of us that have done fellowships in well recognized programs, most of us sort of identify ourselves as Neuro-Ophthalmologists.
MR. BAUM: Objection to form.
Q. (By Mr. Jones) And did you study under Nancy Newman at Emory?
A. I did.
Q. What about Bo Bruce, did you study under him, or was he a contemporary, or --
A. Oh, he came a few years later. So I didn't know him when I was doing my Fellowship.
Q. Okay. So you weren't at Emory at the same time as Dr. Bruce?
A. That's correct.
Q. So you didn't train him, or anything, right?
A. No, I didn't.
Q. All right. Do you know what Dr. Newman purports to offer opinions about in this particular case?
A. Well, I know she has fairly the same opinion that I do, that hormonal contraceptives have no causal relationship with IIH.
Q. Are there any differences in the opinion that you're offering and Dr. Newman is offering?
MR. BAUM: Objection.



A. Well, I haven't seen her report. But just knowing from, you know, the presentations that have been done at NANOS, and just informal discussions in the years past, that I suspect that we have the same opinion.
Q. (By Mr. Jones) You're licensed as a Medical Doctor in Missouri?
A. I am.
Q. Okay. Any other states?
A. Not at this time.
Q. Let's go over to -- Can you flip to where it talks about editorial responsibilities.
A. Sure. Yeah. Here we are.
Q. What is a peer reviewer of these different journals you list?
A. So, periodically, when someone submits an article to be published, the editor of that journal will decide who is going to review the article, and sort of vet it for scientific merit, accuracy, methodology, and so on. This means that I've been sent articles to review for these journals.
Q. How many articles have you reviewed as a peer reviewer?
A. Oh, hundreds. Again, I definitely don't recall specifically.

Page 38

Q. How many peer reviewers are there for each of these articles?
A. Oh, so generally when an editor gets a manuscript, typically they send it to at least two, and sometimes three.
Q. But my question is: For instance, you list that you're a peer reviewer for Ophthalmology?
A. That's correct.
Q. Is that an on-line journal, or is that a print publication?
A. Oh, that's the premier journal in Ophthalmology. So it's print and on-line.
Q. And how many -- How many other physicians enjoy status as a peer reviewer for Ophthalmology?
A. Oh, many. Because it covers all subspecialties of Ophthalmology, so there are a lot of reviewers.
Q. Right.
{Marked for identification Plaintiffs Exhibit 2, Opthalmopathy Journal Editorial Board - 10/1/2007 - 9/30/2008, 05/17/16.}
Q. (By Mr. Jones) I'll mark this as Plaintiff's Exhibit 2. I've handed you the Ophthalmology Editorial Board for 2008.
MR. BAUM: Larry, do you have a copy for me?

Page 39

MR. JONES: I'm sorry. Yes.
Q. (By Mr. Jones) And the scientific reviewers from October 1st, 2007, to September 30, 2008; is that correct?
A. That's right.
Q. Okay. And I counted these up, and there appear to be over a thousand scientific reviewers; is that correct?
A. That's correct.
Q. Okay. You're maybe one of, maybe, a thousand people that review for the Ophthalmology Journal?
A. Right. But I guess the caveat is that they typically send these manuscripts out to people who have at least some expertise in the area that the manuscript covers.
Q. Can you flip to the F's.
A. Okay.
Q. Do you see Frederick W. Fraunfelder on there?
A. I do.
Q. Okay. So Dr. Fraunfelder, who is one of our experts in this case, he's a scientific reviewer for the Ophthalmology Journal as well?
A. Correct.

Page 40

Q. Have you heard of Dr. Fraunfelder?
A. Yes, I've heard of him.
Q. I mean, he -- Do you agree that Dr. Fraunfelder is the expert in ocular -- or drug-induced ocular side effects?
MR. BAUM: Objection.
A. I don't know if he's "the expert." That's his area of expertise.
Q. (By Mr. Jones) Do you consider him an expert in that area?
MR. BAUM: Objection.
A. I would consider him an expert in that particular area.
Q. (By Mr. Jones) Have you ever -- You're familiar that he writes a book about drug-induced side effects, correct?
A. I'm familiar with that.
Q. Have you ever reviewed his book before?
A. I have not reviewed his book.
Q. Back to those ACOG Bulletins. You don't have to look at them. We're not done. Just temporarily.
A. Sure.
Q. Have you ever looked at the -- at those particular ACOG bulletins before you were retained as

Page 41

an expert in this litigation?
A. No, I hadn't.
Q. Okay. Let's go over to page 3 of your C.V. Can you tell me how many pages your C.V. is?
A. I don't know. I have to look. Looks like -- Looks like about 12 pages.
Q. Can you see how many pages your report is in this case?
A. About 12 pages.
Q. About the same, right?
A. Right.
MR. BAUM: Objection.
Q. (By Mr. Jones) Let's talk about the "major invited professorships and lectureships." You have, it looks like 53 different items listed here; is that correct?
A. That's what it looks like.
Q. Okay. And how many of these relate specifically to pseudotumor cerebri?
A. I'd have to count them up.
Q. Okay. Can you do that?
A. About two so far, the ones I think we already discussed.
Q. That would be number 23 and number 26?
A. That's correct.

Q. Those are the grand rounds?
A. That's correct.
Q. That's correct. I don't know if I included the one that I just gave to the Neurosurgery Department. I don't know if that's here or not.
A. Yeah. Those are all the ones I see.
Q. So two of the 53 major invited professorships and lectureships relate to pseudotumor cerebri, correct?
A. Correct.
Q. And those two are actually the same speech, correct?
MR. BAUM: Objection.
A. Well, I altered it a little bit. And I try to update my talks every time I give one.
Q. (By Mr. Jones) But you at least agree with me that the two that you gave are titled the same thing; idiopathic intracranial hypertension, What Do We Know?
A. There are, more or less, similar.
Q. They're exactly similar; the titles, right?
A. The contents is not exactly the same, the title is similar.
Q. Is the title similar, or is it the same?
A. It's --


MR. BAUM: Objection. Asked and answered misrepresents the documents.
Q. (By Mr. Jones) You can answer.
A. Yes, it's similar.
Q. Show me how it's not the same?
A. Well, I think one of them says -- I mean --
Q. Yeah -- No, I'm looking at your list here.
MR. BAUM: Doctor, you can pull out whatever you want to answer his questions.
A. Okay. So idiopathic intracranial hypertension, What the Bleep do we Know? And I believe the one was basically What Do We Know? So they're not exactly the same.
Q. (By Mr. Jones) Read item 23 and item 26 at pages 3 and 4 of your C.V., and tell me are those titles exactly the same or are they similar?
MR. BAUM: Do you have a copy for me?
MR. JONES: No.
A. I agree they're the same.
Q. (By Mr. Jones) Okay. That wasn't so hard, was it?
MR. BAUM: Objection. Improper. Move to strike.
Q. (By Mr. Jones) All right. Let's go to page 5 of your C.V. where it says "Research Support."


Do you see that?
A. Correct.
Q. And then in parentheses. It has "(role, title, duration, and amount.)" What's that mean?
A. Oh, basically, for research support. It's mostly for grants that you've attained that provides salary support, what your role is in that grant, and in that study, you know, how much you received, and how long it lasted, and so on.
Q. What I'm trying to figure out is how that relates to what you've listed down there as your research support. Where would I find what your role was in these particular research endeavors?
A. Well, for that study, I was a site PI. I don't know why it's not listed there, but that's my role in that study.
Q. When you say "that study," you're talking about the Multicenter Double-Blind Randomized Placebo-Controlled Study of Weight?
A. Right. The IIH treatment trial, right.
Q. Well, because there are different studies down here, right?
A. That's correct.
Q. Just trying to keep the record clear.
A. Right. So that's the IIH treatment trial.


Q. Okay. And what did you say your role was?
A. I was a site principal investigator.
Q. And what is a site principal investigator?
A. That's a person who is the main person at that site trying to recruit patients to follow patients while they're in the study to make sure that everything is done properly. They receive all the appropriate testing to direct and coordinate the research coordinator, when they're trying to recruit and follow patients.
Q. And is site principal investigator, is that also the title?
A. That's the title, as well.
Q. And where -- Let's talk about duration. How long did your role in that endeavor last?
A. It lasted about two years.
Q. And, amount, is how much you would have been paid for your role in that endeavor?
A. That's correct.
Q. And how much were you paid?
A. I was not paid at all.
Q. All right.
A. This was not a study where there was salary support.
Q. And how -- What site did you oversee?

A. Washington University.
Q. And how many patients were recruited into that study?
A. We recruited six subjects.
Q. 6, s-i-x?
A. Six.
Q. And how many of them were followed for two years?
A. Well, two of the patients dropped out. One because of issues with travel, and just the time commitment. The other one became pregnant. And we continued to follow them clinically, but they had to drop out of the study.
Q. Okay. So the results -- Your site contributed four patients to the results of that study?
MR. BAUM: Objection. Mischaracterizes.
A. No. I mean, the initial six patients were included, and their statistical methods do include some of the data from those six, taking into effect the fact that they dropped out.
Q. (By Mr. Jones) How long were the two that were in the study -- at what point did they drop out during the two year period?
A. I really don't remember.
Q. Do you know how many centers were included



in this entire study?
A. We had about -- about 40. I don't remember the exact number, but it was a number of centers across the United States.
Q. And you had one of those 40 centers, right?
A. That's correct.
Q. And about how many patients were in the other approximately 39 centers?
A. Oh, we had 161 subjects across those centers. So, in general, it was just a study where it was difficult to recruit subjects. So, actually, six subjects was one of the highest reciting centers, believe it or not.
Q. Why was it so difficult to recruit subjects?
A. I think the biggest issue was probably the travel and the time commitment. They had to show up for frequent visits. The visits were long. They required a lot of testing. And I think that dissuaded some subjects from wanting to participate. The other issue was that, as it turned out, many people were doing too well. So they didn't have enough visual loss to qualify for the study.
Q. Of the six that you ultimately got at your site, how many patients did you try to recruit that ultimately didn't want to participate or weren't



otherwise qualified?
A. I would say our recruitment rate -- we, probably, for every one patient we recruited, we had about 5 or 6 that we tried to recruit, but, for one reason or another, failed screening, wasn't able to participate or didn't want to participate.
Q. Were the study participants paid or compensated in any way?
A. Well, as part of the study, they did get the structured weight loss plans. They got a weight loss coach, and replacement plan. They got things like parking validation, and so on.
Q. Mileage, meals, anything like that?
A. For certain subjects, they did. Again, I don't remember the specifics of who got what. But everyone certainly got the structured weight loss plan, and certainly they got the study drug. They received the Acetazolamide as part of the study.
Q. But they didn't get any sort of compensation on top of that, like, here's a thousand dollars, or $50 a visit, or anything like that?
A. No.
Q. What about gift cards? Did they receive gift cards as appreciation for their participation in the study?



A. I think some of them got gift cards. Some of them got some gifts that were sent by NORDIC; mugs, and things like that.
Q. And this particular study didn't involve trying to figure out whether or not there was an association between contraceptives and pseudotumor cerebri, correct?
A. No. In fact, we required everyone to be on some sort of -- some type of contraception.
Q. You required everyone to be on some type of contraception?
A. Absolutely. Because they were going to be placed on a medication which potentially had teratogenic effects. So it was important that people were on some sort of effective contraceptive method since we were going to be placing at least half of them on the study drug.
Q. Was this study -- Did you exclude women who were not of child-bearing age?
A. Well, basically, everyone had to meet criteria for IIH. So the majority of women were of child-bearing age, but I think there were one or two men. I think there were a few people that were outside the typical age range.
Q. And you didn't require men to be on

contraception, right?
A. Obviously not.
Q. Okay. And this was -- This was a treatment trial, correct?
A. That's correct.
Q. It wasn't about diagnosing what caused a particular patient's pseudotumor cerebri, correct?
A. Well, the primary outcome was visual field loss at six months. But because this was an opportunity to look at a large group of patients with securely diagnosed IIH in a standardized fashion, there were a couple of other secondary outcomes, one of which was looking at the role of Vitamin A in IIH. So blood and spinal fluid was sent and analyzed for changes in Vitamin A, Vitamin A metabolism, genetic markers for Vitamin A, as, essentially, almost a substudy.
Q. What -- Was there a substudy of whether or not the women in this particular study were on contraceptives at the time of their diagnosis with pseudotumor cerebri?
A. As far as I know, that was not part of the study.
Q. Are you relying on the study as a basis for any of your opinions?
A. No, not -- Certainly not the primary basis,



although I will say, again, as an organization when we designed the study, we were allowing women in with hormonal contraceptives. Again, because the general consensus is there is no causal relationship between hormonal contraceptives and IIH.
Q. That's your opinion?
A. That is my opinion.
Q. Where did the funding come from for the study.
A. The National Eye Institute.
Q. And where does -- This was part of the NORDIC treatment trial; is that correct?
A. That's correct.
Q. And do you do any other work with NORDIC?
A. Yes, I'm part of NORDIC. So we're now about to start recruiting for another treatment trial, that's at least sponsored by NORDIC.
Q. And where does NORDIC get its funding for its studies?
A. NORDIC doesn't actually get funding specifically. NORDIC is really an consortium of Neuro-Ophthalmologists who are interested in gathering together our resources to investigate rare and uncommon diseases. So we talk about them, help design studies, partner sometimes with industry, and get funding either



from the National Eye Institute or industry. This upcoming treatment trial is an industry-sponsored study.
Q. When you say industry-sponsored study, what does that mean?
A. Usually, a pharmaceutical company.
Q. Okay. Have you ever received any research funding from a pharmaceutical company?
A. I personally have not.
Q. Have you ever sought research funding from a pharmaceutical company?
A. I haven't.
Q. Does your -- What department are you in over at Wash U.?
A. I technically have a dual appointment, but my main appointment is in Ophthalmology.
Q. Are you aware of any research funding that has benefited your department at Washington University?
MR. BAUM: Objection. Form.
A. I'm not sure what you mean by that.
Q. (By Mr. Jones) I'm sorry. Poor question. Are you aware of -- Are you aware of any funding from a pharmaceutical company that has benefited any research done by your department at Wash U.?
MR. BAUM: Objection. Form.



A. You mean, me, personally? I mean, my colleagues certainly had grants and support from the National Eye Institute and some of them have industry-sponsored treatment trials where the studies are covered by whatever the grant source is. I'm not sure if that's what you're asking or not.
Q. (By Mr. Jones) Has Bayer donated any money to research funding at Wash U.?
A. I actually have no idea.
Q. Now, under -- in both letters, under the Multicenter Double-blind, it says St. Luke's NEI Fund, and then it has some numbers. What does that mean? Does that relate to the treatment trial we've just been talking about?
A. Yes. Because it was the funding ultimately came from the National Eye Institute, but it was sort of funneled through and coordinated by St. Luke's Hospital in New York.
Q. In New York?
A. Oh, actually, it was Rochester. One of the two. I don't remember.
Q. So this is a different St. Luke's than the one we talked about where you gave the talk?
A. Totally different.
Q. Okay. Then still in research support, the

second one, Perspective Evaluation of Visual Pathway Functional Connectivity in Patients With Clinically Isolated Syndrome. That's not pseudotumor cerebri related, correct?
A. That's right.
Q. And the next one, Ocular Biomarkers in Early and Pre-symptomatic Alzheimer's Disease. That's not pseudotumor cerebri related, correct?
A. Correct.
Q. You treat patients that have been diagnosed with pseudotumor cerebri, correct?
A. Correct.
Q. Have any of them asked you, or any of your colleagues whether Mirena is associated with pseudotumor cerebri?
A. No patient has specifically asked me.
Q. Have they asked any of your colleagues, that you're aware of?
A. Not that I'm aware of.
Q. Have you talked with your colleagues about whether they've seen cases of pseudotumor cerebri patients that were on Mirena at the time of their diagnosis?
A. Not Mirena, specifically.
Q. Have you -- How many pseudotumor cerebri


patients have you treated?
A. Oh, well, I think, on average, I see about 10 to 15 IIH patients per week, some of them in follow-ups, and some of them new patients. So you can certainly multiply that over the course of a whole year, and multiply that over the course of about 16 years, acknowledging that I'm a lot busier in the, say, last 5 to 10 years, than I was in my first five years of practice.
Q. Uh-huh.
A. So a large number of IIH patients.
Q. Have you gone back through the treatment files of your patients to investigate whether or not any of them were using the Mirena IUS at the time of their development of symptoms of pseudotumor cerebri?
A. No offense, but it's kind of a bad way to investigate a causal relationship; to start looking back and making these connections. If that was the case, I would really want to try to do some more sort of formal study looking at that.
Q. So the answer is no, you haven't done that?
A. I haven't. I see no reason to do that.
Q. Let's go over to your peer-reviewed manuscripts. What is a peer-reviewed manuscript?
A. Generally, there are two types -- There are


multiple types of manuscripts. There is essentially original research, either a controlled trial, a case report, case series, clinical observation, or some sort of study where you're sending it to a journal that's going to be sent out to be reviewed by your peers, and vetted for, again, for scientific merit, accuracy, methodology, and so on.
Q. You do have some case reports in here, right?
A. I have a few case reports in here, right.
Q. You have a letter to the editor in here, right?
A. That's correct.
Q. And so judging by what you've put it under, that's a peer-reviewed manuscript, as well, right?
A. They go through the same process.
Q. And I count up, it looks like you have 48 peer-reviewed manuscripts?
A. I'll take your word for it. That's probably right.
Q. Help me understand how many of these are pseudotumor cerebri specific.
A. So, let's see, we have -- Let's go back. We have one, two --
Q. As you find them, will you call out the


title.
A. So, sure. So, I'm just -- Let's go back and make sure I haven't missed any. We do have one that's in press that's not on here that's about IIH. It's about neuro-imaging and IIH. That should be showing up later this year.
I think the first one, or the most recent is Salvay, et.al., one. We looked at Papilledema Grade and DWI, MRI, and IIH.
Q. Okay. So that's one.
A. And the next one is Padhye, et.al., where we looked at the association with visual parameters and neuro-imaging in IIH.
Q. Okay.
A. And the other one is the Viets, et al., we looked at hyperintense optic nerve heads on DWI in IIH patients.
Q. In IIH patients, or -- I see papilledema there.
A. In this particular study, all the subjects we included had IIH.
Q. Okay.
A. And then the next one is the Bruce, et. al.
Q. Okay.
A. And the next one after that is the other

Page 58

Bruce, et al.
Q. Okay.
A. Let's see. The other one -- The next one is Randhawa, et.al.
Q. What's the name of it?
A. So it's the Relationship to BMI and Intraocular Pressure with the Severity of Disease in IIH.
Q. I'm going to catch up with you here. Got it.
A. The next one is Borsody, et.al., The Relationship of Ouabain-like Compounds in IIH.
Q. Okay.
A. The next one is the Galvin, et al., Demographics Patterns in Clinical Presentation in Southeastern Michigan.
Q. Okay.
A. And I think that's it.
Q. So of 48 peer-reviewed manuscripts, we counted eight that relate to pseudotumor cerebri, right?
A. Correct.
MR. BAUM: You're excluding the other one?
MR. JONES: I'm sorry?
MR. BAUM: That's excluding the one that he

Page 59

told you about that's coming out?
MR. JONES: It's not listed on here, so.
Q. (By Mr. Jones) Okay. So how many of the eight examined a relationship between contraception and pseudotumor cerebri?
A. None of them, specifically.
Q. How many of them, generally?
A. None of them addressed that issue.
Q. Okay. How many of the eight address a relationship between PTC and hormones?
A. None of them address that particular issue.
Q. Okay. And idiopathic intracranial hypertension in Men, the fifth one, that didn't have anything to do with women PTC patients, right?
A. Well, it was -- Basically, we collaborated with several centers to develop a series of with IIH and then looked at them to discern patterns. That is where we gathered those men with IIH. So that was sort of abstracted from a larger group of IIH patients.
Q. But the specific study, the specific article, didn't deal with women who had developed PTC, correct?
A. That's correct.
Q. And the fourth one, Atypical idiopathic intracranial hypertension, Normal BMI, in Older

Page 60

Patients. That's the title of that one, right?
A. That's right.
Q. And that one didn't specifically address PTC in overweight or obese women of child-bearing age, correct?
A. Well, again, the only caveat, the only way that they gathered that data, and analyzed it, it was looking at a larger series of subjects with IIH that were more typical.
Q. But it didn't include any specific analysis of overweight or obese women of child-bearing age, correct?
A. That's correct.
Q. That wasn't the focus of the article?
A. That wasn't the focus.
Q. Okay. The sixth one, The Relationship of Body Mass Index and Intraocular Pressure With Severity of Disease and idiopathic intracranial hypertension. Do you see that one?
A. I see it.
Q. That was a letter to the editor, right?
A. That's right.
Q. That was two pages?
A. That's correct.
Q. And that was -- You were -- You wrote to the

Page 61

editor about your retrospective study of 55 IIH patients, correct?
A. That's right.
Q. And in that letter, or in that study, you talked about that those with identified secondary cause of raised intracranial pressure were excluded, correct?
A. That's correct.
Q. Retrospective, that means you're looking backward, right?
A. That's right.
Q. And you're looking at the files of these 55 patients going backwards, right?
A. That's correct.
Q. And that's something that you said that you hadn't done with your own patients to determine whether or not any of them had been using Mirena at the time that they were -- began experiencing symptoms of pseudotumor cerebri, correct?
A. Again, I mean, you do that, those types of studies when there is a question that's worthy of study.
Q. And many of these peer reviewed manuscripts that you cite here are 2 and 3 page written pieces, correct?
A. Most of them are. And some are longer.

Q. Have you done any epidemiological studies, yourself, regarding the potential relationship between pseudotumor cerebri and levonorgestrel?
A. I've not done any such studies, myself.
Q. Have you done any sort of laboratory testing to determine whether or not there is an association between pseudotumor cerebri and levonorgestrel?
A. No, I haven't.
Q. What is an invited publication? I'm on page 9 of your C.V.
A. Those are when somebody solicits you to write a chapter or review article.
Q. Or, what, a review article?
A. A review article.
Q. What is a review article?
A. Basically, just writing that article, reviewing specifics fees, updating it. Just educating the audience about where things stand with that condition.
Q. Okay. And I've counted that you have 26 on your list, does that seem correct?
A. That's correct.
Q. Okay. And of these 26, how many are pseudotumor cerebri specific?
A. Let's see, I have one, the Mears, et.al.


Q. The which one?
A. Mears.
Q. Okay.
A. The one I wrote for the Encyclopedia of Neurologic Sciences is a very brief section on IIH and papilledema. And then the Randhawa, et.al.
Q. Okay.
A. Again, they touch on it on the Rafols, et. al., it's a Comprehensive Board Review in Neurology.
And then the article I wrote for Seminars in Neurology in 2007 also discusses IIH and papilledema.
Q. Which one is that?
A. It's the Van Stavern, Optic Disc Edema Seminars in Neurology, 2007.
Q. Okay. So 5 of the 26 related to pseudotumor cerebri in some way, right?
A. That's correct.
Q. Okay. And 2 of them -- 2 of the 26 relate specifically to pseudotumor cerebri?
MR. BAUM: Objection. Form.
Q. (By Mr. Jones) Correct?
A. That's correct. Although, the others really do, I mean, discuss it.
Q. Right. But the other three. So two relate specifically to PTC, and three relate generally to PTC,


correct?
A. That's fair.
Q. Okay. And the Mears, Van Stavern piece, idiopathic intracranial hypertension Update and Review, do you see that one?
A. I do.
Q. And that was written for the expert -- What is that journal?
A. Oh, it's a -- It's -- To be fair, it's a mid-tier journal. It's just basically expert reviews in Ophthalmology.
Q. And to be honest, do you know what an impact factor is?
A. It's probably low.
Q. Would it surprise you that the impact factor is 0.00?
A. Well, I mean, you have to -- It wouldn't surprise me. As I said, it's not a very well known journal.
Q. Would it surprise you that the on-line version of this article has only been reviewed 29 times?
MR. BAUM: Objection. Foundation.
A. I don't know if that surprises me or doesn't surprise me.


Q. (By Mr. Jones) What's the current opinion in Ophthalmology Journal?
A. I consider that a higher level journal. Again, just talking about the current thought or a current matter about a particular condition.
Q. Do you know what the impact factor is for that journal?
A. Probably higher than expert reviews, but I don't know specifically.
Q. What is an impact factor?
A. That really is just how frequently articles from that journal are cited in other publications. There is a particular formula they use that I don't recall, the generated impact factor. But, in general, the higher the impact factor, the higher profile of the journal.
MR. JONES: We've been going an hour and ten minutes, and traditionally we've tried to break for the witness every hour, so let's take a break. But I also want to let you know, anytime you need a break, for, you know, we're getting older; the bathroom sometimes calls our names.
THE DEPONENT: Sure.
MR. JONES: You can go anytime, just let me know.

THE DEPONENT: That's fine.
MR. JONES: We're going to go off the record for a break.
VIDEOGRAPHER: The time is 10:11. We're going off the record.
{Short break taken 10:11 - 10:24 a.m.}
VIDEOGRAPHER: The time is 10:24, and we are back on the record.
Q. (By Mr. Jones) Dr. Van Stavern, welcome back. Other than Ms. Houston, do you know the names of any of the other women who are involved in pseudotumor cerebri litigation?
A. Well, I did read a case for Copley. My understanding is she withdrew in the case.
Q. Any other -- Do you know any of my clients' names, other than Ms. Copley and Ms. Houston?
A. I was sent records on a Sadie Miller to review, but I haven't reviewed them yet.
Q. Okay. Other than those three, do you know the names of any of my other clients?
A. I don't.
Q. Do you know a Latoya Thompson? Do you recognize that same as a patients of yours?
A. That name is familiar.
Q. Do you know that she has a lawsuit against



Bayer involving the Mirena and pseudotumor cerebri?
A. I have been told that one my patients did, but I wasn't given any more information beyond that. But I guess, now I know.
Q. Did you disclose to Ms. Thompson when you started treating her that you were an expert for Bayer Pharmaceuticals in the pseudotumor cerebri litigation?
MR. BAUM: Objection, form.
A. I wouldn't see any reason to do that.
Q. (By Mr. Jones) You don't think that you're being paid $750 an hour to give an opinion on behalf of Bayer that pseudotumor cerebri is not related to levonorgestrel presents a conflict of interest?
MR. BAUM: Objection. Asked and answered.
A. Not when it's an opinion that I've held for years and years before that time.
Q. (By Mr. Jones) And your opinion that you say that you've held for years and years before that time, was that levonorgestrel specific?
A. It was hormonal contraceptives, in general.
Q. But, specifically, oral contraceptives, right?
MR. BAUM: Objection.
A. Basically, any hormonal contraceptive. For the reasons, again, we can discuss this in more detail:



They are preferentially prescribed to the women who are at highest risk for getting this condition.
Q. You agree that there are experts in your field that disagree with you about whether or not there is an association between pseudotumor cerebri and levonorgestrel, correct?
MR. BAUM: Objection.
A. I suspect there is some. But I think if you look at the entire community, the consensus is that there is no association. Again, that's why we did not exclude women from the IHTT who were using contraceptives.
Q. (By Mr. Jones) When you say the consensus of the community, point me to some sort of scientific research that supports that there is no causal association between levonorgestrel and pseudotumor cerebri?
A. Well, I think it depends upon on how you're turning its question on its head. What we usually try to do is see if there is a causal relationship. And there are numerous case control studies, and series looking at that question, and have not found a difference in contraceptive use among IIH women and women that don't have IIH.
Q. Point me to a single case control study that



has evaluated the potential association between levonorgestrel and pseudotumor cerebri?
MR. BAUM: Objection to the form.
A. There is no -- There is no control study for that particular agent, but, again, there are a number of studies looking at hormonal contraceptives.
Q. (By Mr. Jones) What hormones? What hormonal contraceptives?
A. Well, if you go back -- It's interesting. If you go back in literature for IIH, there has long been a thought that, you know, hormones could play a role. Simply because it affects women of child-bearing age. So it makes sense to, at least, investigate that question. Although, when you look at it, it looks like in the earliest literature where there were reported cases, it was mostly with estrogen-containing components. Or estrogen is just higher in obese women. So, you know, there are -- There are no specific studies looking at that particular contraceptive because I think, to me, and to a lot of us, that question has been settled.
Q. Settled. Tell me how it's settled?
A. I think if you look at the evidence, there is no evidence supporting a causal relationship between any hormonal contraceptive and IIH.

Q. Except for the Rai study?
MR. BAUM: Objection. Mischaracterizes.
A. I think the Rai study has a number of serious limitations.
Q. (By Mr. Jones) Are you an epidemiologist?
A. I certainly have more epidemiologic knowledge, and specialized knowledge in epidemiology than a lay person, and certainly than a lot of other physicians who not involved in academic medicine.
Q. Okay. So do you think that physicians that are involved in academic medicine are qualified to opine about epidemiologic studies?
A. Well, look at it this way. I think if you're participating in studies, if you're participating in the design of epidemiologic studies, and simply if you're just looking at the literature, critically, what you have to do to be an effective physician, especially in an academic process -- academic practice, you have to have a basic knowledge of epidemiology, even if you don't have a degree in it.
Q. All right. I agree with you.
MR. BAUM: Objection. Move to strike counsel's comments and testimony.
MR. JONES: Move to strike objection to something other than form.



MR. BAUM: If you want to make an agreement that your side is going to limit to "objection, form" instead of the 172 speaking objections during the Etminan deposition, I'm happy to make that agreement, Larry.
MR. JONES: I'd be glad to do it. That's what the rules require.
MR. BAUM: But not in your firm's practice.
MR. JONES: I don't do speaking objections.
MR. BAUM: You're not the only person from your firm.
MR. JONES: You were at the Etminan depositions. Did you do speaking objections?
MR. BAUM: Since I took it, no.
MR. JONES: On cross, you didn't?
MR. BAUM: "Objection to form."
MR. JONES: Should we put you under oath?
Q. (By Mr. Jones) Okay. Moving on. You agree that there is something that is recognized -- strike that. You agree that the concept of medication-induced intracranial hypertension is a recognized and generalized concept in the medical community, correct?
A. I think I would probably prefer to use the term "medication associated," rather than induce. Induce implies as a direct cause.



Q. Okay. So you agree that medication associated intracranial hypertension is a well recognized concept in the medical community?
A. I agree with that, but I think we also have to agree on a definition. Association doesn't necessarily mean causation. It means it occurs in someone who's using a specific medication.
Q. And you're not a lawyer, right?
A. I am definitely not a lawyer.
Q. Do you have something against lawyers?
A. No, not at all.
Q. Do you understand the difference between legal causation and scientific causation?
A. I understand legal causation, to a degree, certainly not to the degree that a lawyer would understand it.
Q. What's your understanding of legal causation?
A. That something is more likely than not to occur.
Q. And that would be 50.1 percent, or above, correct?
A. Correct.
Q. And your report is not based upon concepts of legal causation, is it?



MR. BAUM: Objection. Form.
A. Well, I think it's really based on causation, in general. Do we have enough evidence to support a causal relationship again between X and Y, which is in this case Mirena and IIH, and the answer is no.
Q. That's your opinion?
A. That's my opinion.
Q. Let's go over to Appendix B of your C.V. This is your dep disclosure of prior testimony.
A. Sure.
MR. BAUM: His report, or of his C.V.?
MR. JONES: Appendix B of his report, I suppose.
A. My report. Oh, I don't think I have that.
Q. (By Mr. Jones) It's part of the C.V. that I gave you.
A. Oh, okay. Let me just flip to it. Here we go. Sorry about that.
Q. What was Cullen v MI Pediatric Association; what was that case about?
A. So he was a pediatric surgeon who had developed some dizziness and eye movement abnormalities, and was being -- Again, it's been about four years -- was basically suing the pediatric

associates because he needed extra time for work, and needed time off, and more time to complete his duties.
Q. So this was a doctor suing his own medical practice?
A. Yes.
Q. And who did you serve as an expert for in that case?
A. Cullen.
Q. And do you remember how much you were paid for your consulting in the Cullen case?
A. That would have been when I was at Wash U. It would have been $750 an hour. Probably I only spent about 5 or 6 hours on that case, so -- so whatever six times 750 is.
Q. And moving to the next one, what is Runnels versus Galveston Discount Warehouses?
A. From my recollection, the person who was suing this Galveston Discount Warehouse was injured, and was claiming a loss of vision and other visual symptoms.
Q. Okay. And did you serve as an expert for Galveston Discount Warehouse?
A. I did.
Q. McWherter versus St. John's Providence Hospital.



A. Yeah, that was -- Oh, what was that one? That was actually interesting. It was somebody who was thought to have pseudotumor cerebri or IIH, but didn't. And the claim was that he was misdiagnosed.
Q. Okay. And did you serve as an expert for the hospital in that case?
A. The hospital.
Q. And Palmer versus Chris Daley?
A. That was somebody -- Did you need the details?
Q. Uh-huh.
A. Yeah. So I think this was someone who underwent hip surgery, and developed vision loss as a result of the hip surgery.
Q. And which party did you serve as an expert for?
A. The physician in that case.
Q. And that would be Daley?
A. That's correct.
Q. And Short v. Cox?
A. So this was one where I was actually a treating physician. So I actually treated the patient, and she was suing the doctor -- or the hospital.
Q. And were you paid as an expert in that case?
A. I was.



Q. And --
A. There was an issue with, basically, her GPN, and that they had not given her enough nutrition, so she developed this condition call Wernicke's due to B1 deficiency.
Q. Which party did you testify for in that case?
A. For the patient.
Q. Okay. Moving over to Appendix C, this is titled at the top, "Materials reviewed in conjunction with materials cited in the report." Did I read that correctly?
A. You did.
Q. So is it your testimony that you reviewed all of these materials before or during the writing of your report for this case?
A. Again, I did. Again, with the caveat I mentioned earlier: I didn't read every article in depth. Some of them I was familiar with before just because of being in practice for so many years. Some of them I looked at quickly because it didn't seem relevant to the case. But I did lay my eyes on all of them.
Q. Okay. How many of these did you review thoroughly?



A. I can't give you an exact number.
Q. Well, I count 363 pieces of medical literature. Approximately how many of the 363 pieces of medical literature did you review thoroughly?
A. I'd probably say, just to get a general idea --
MR. BAUM: Objection, form.
A. I would say thoroughly reviewing it, and re-reviewing, probably about 20 percent.
Q. (By Mr. Jones) And how did you -- Did you get these pieces of literature on-line, or did you go to medical school library? Where did you get them?
A. The majority of them I got on-line.
Q. Okay.
A. Or throughout our med -- through our med school library. I don't know that anyone actually physically goes to the library any more.
Q. Were any of the 363 pieces of medical literature provided to you by counsel?
A. The ACOG statement that I mentioned in the UpToDate article that I mentioned, I think that was it. That's all that I can recall off the top of my head.
Q. When you -- When you -- Tell me the process by which you engaged in selecting the materials that you would review for purposes of preparing your report

in this case?
A. So, basically, I was trying to answer the question at least why I held the opinion that Mirena is not causally associated with IIH. So it's basically, you're looking through the articles that I have written, and other articles that I have looked at the past looking at IIH, in general.
Looking at what's been written about with contraceptives, hormonal contraceptives, in general, and IIH.
And, also, just investigating more about Mirena, specifically.
MR. BAUM: Just note before you -- Going forward, you may want to go a slower on some of the --
A. I'm sorry.
Q. (By Mr. Jones) So when you sat down at a computer to search for medical literature, what search terms did you use?
A. Well, basically IIH, levonorgestrel, Mirena, specifically.
Q. Anything else?
A. Yeah. I mean, if you want to try to be as broad as possible, you can use other terms, like papilledema, acknowledging that you're getting a lot of articles that have nothing to do with IIH.


Q. Yeah. I'm not asking what you would search. I'm asking what you did search?
A. Those are the main ones I used.
Q. What kind of software program or interface do you use to search for medical literature?
A. PubMed.
Q. And do you have a specific PubMed account that's tied to you?
A. Our University does.
Q. Do you have log-in information?
A. I do.
Q. Are your past searches recorded in the PubMed interface?
A. I have no idea. I don't think so.
Q. How many hours did it take you to find these 363 pieces of medical literature?
A. A number of hours. I don't remember specifically. That's what I tried to include in the hours that I spent on this case.
Q. All right. Approximately, how many hours?
A. Oh, again, at least probably 8 to 10, or more, just because you have to sift through a lot of articles that were not necessarily relevant to the question at hand.
Q. How many -- Approximately how many articles


did you sift through to come up with 363 pieces of medical literature?
A. I can't give you a specific number.
Q. Did you print each of these articles out?
A. I did not.
Q. And it looks like you also reviewed about seven Bayer internal company documents; is that correct?
A. That's correct.
Q. And what were those documents that you reviewed?
A. So I reviewed the signal analysis that Bayer performed. I'm just going through here. Which ones specifically are you referring to?
Q. I'm asking what these documents were that you reviewed?
A. I'd have to look in my report. So Bayer had performed a signal analysis. They also had done their own analysis of the Etminan article. They also had done a couple analyses of that article. I think that's the most I can recall from Bayer, specifically.
Q. Did you review any e-mails between Bayer employees?
A. I did not review any e-mails.
Q. Did you review any adverse event reports


involving individuals who reported pseudotumor cerebri in connection with Mirena use?
A. If you mean the specific cases, no, I didn't review those.
Q. Have you ever conducted a signal analyses, yourself?
A. I have not.
Q. So other than the signal analysis -- analyses, and the analyses of the Etminan piece, can you remember anything else that was contained in the internal Bayer company documents that you reviewed for purposes of preparing this report?
A. Not that I can recall.
Q. Then it looks like you've listed 44 product labels here; is that correct?
A. That's correct.
Q. And did you review each of these labels from cover-to-cover?
A. No, not in depth.
Q. And then there is a deposition of a Julie Ann Schoendorf listed here. Did you review that deposition from cover-to-cover?
A. I did not. I mostly skimmed through it.
Q. Who provided the company documents to you? Would that have been counsel?

A. That's correct.
Q. You didn't have access to the database of documents that Bayer has produced in this case, correct?
A. Not the internal documents, no.
Q. And did counsel provide you with the labels that you looked at in this case?
A. They provided a few of them.
Q. Did you go out and find any of them on your own?
A. Some of them are available on-line.
Q. Did you go out and find them on your own?
A. I found a few of them. I can't remember which ones, specifically.
Q. Okay. So you skimmed Dr. Schoendorf's deposition. Did you review any other depositions?
A. I reviewed Dr. Etminan's deposition. Dr. Fraunfelder's deposition. Dr. Tang's deposition.
A couple of others with Dr. Maggio. I didn't read that all the way through. I mostly tried to pick out the things that were relevant. The Pfaff deposition.
Q. And did you review those from cover-to-cover?
A. Those, I did.
Q. You did. How much time did you spend on



those depositions?
A. Several hours.
Q. Several hours for each deposition, or several hours in total?
A. Probably at least an hour, or hour and a half, for each one. Again, some of them, you know, there was -- I spent a little more time, some a little less, so I can't give you an exact number.
Q. And then it looks like you -- the other depositions that you reviewed, you reviewed those after you prepared your report, didn't you?
A. Hmmm, I believe it was after. I prepared my report -- Yes, actually it was. Sorry. I was trying to get my timeline straight in my head.
Q. And then it looks like you reviewed reports of Dr. Etminan, Dr. Fraunfelder, Dr. Maggio, Dr. Ross, and Dr. Tang; is that correct?
A. That's correct. Although, I didn't spend a lot of time on the Ross deposition.
Q. Okay. Why didn't you spend a lot of time on the Ross depo -- report or deposition? You said deposition.
A. Deposition.
Q. I was talking about the reports. You read all of those reports, right?



A. I'm sorry?
Q. You answered deposition when I had asked you about the reports.
A. I'm sorry.
Q. That's okay. Did you review all of those reports cover-to-cover?
A. The reports?
Q. Uh-huh.
A. I'm mostly referring to the depositions.
Q. Okay. I'm asking about the reports.
A. I did not then.
Q. Did you review the reports at all?
A. The reports? No, I didn't.
Q. Okay. You're not a pharmacologist, are you?
MR. BAUM: Objection.
A. Again, we're going to go back to the idea that I have more specialized knowledge of pharmacology than a lay person, just part and parcel of being a physician and being in practice.
Q. How many pharmacology classes did you take in medical school?
A. So we took a year's worth of pharmacology.
Q. A year's worth or a semester's worth?
A. Two semesters worth.
Q. Six credit hours?



A. Okay. It's medical school. We really don't count medical hours. So it's basically fall and spring.
Q. How many hours a week in class taking pharmacology classes?
A. Oh, you know, you're taking me back to 1992. Probably at least four hours a week, five hours a week.
Q. Okay. And what were those -- what was the first part of the year course called, was it Introduction to Pharmacology?
MR. BAUM: Objection. Form.
A. I think we have to go back to the semester schedule at Penn State College of Medicine in 1990. I don't remember specifically.
Q. You don't have a pharmacology degree, right?
A. No, I don't.
Q. Would you go to a pharmacology conference and stand up and claim to be an expert in pharmacology?
MR. BAUM: Objection, form.
A. No, I wouldn't.
Q. (By Mr. Jones) Have you -- In your day-to-day practice, do you conduct pharmacokinetics, or pharmacology-type tests on blood or other fluids?
MR. BAUM: Objection. Form.
A. Well, again, to some degree, if I'm treating

Page 86

a patient with a medication, it's incumbent upon me to know about the pharmacology in terms of risks. But if they need blood monitoring, I do treat patients that require periodic blood monitoring. Again, so to that degree, yes, I do that.
Q. (By Mr. Jones) Do you do any of the tests yourself?
MR. BAUM: Objection, form.
A. No, not myself.
Q. (By Mr. Jones) You send them out to someone else, right?
A. That's correct.
Q. Okay. Let's look at your report proper.
A. Sure.
MR. BAUM: Justin, the report, do you have a copy for counsel?
MR. BROWN: No.
MR. BAUM: We ought to break. And maybe you guys can get a copy.
MR. JONES: You don't have a copy of your own expert's report?
MR. BAUM: You don't have a copy of an Exhibit that you are using with the witness for --
MR. JONES: I'm not using it as an Exhibit. I haven't marked it. But he has a copy of his report.

Page 87

Why don't you give him -- Let's see. Here, you can have this one, Ken.
MR. BAUM: Thank you, sir.
Q. (By Mr. Jones) Okay. Let's see here. We've already covered that you pursued residency training in Ophthalmology and Neurology, and then completed a fellowship in Neuro-Ophthalmology at Emory University, right?
A. That's correct.
Q. But it was the Ophthalmology residency that you didn't complete?
A. That's right.
Q. Okay. Then you say, I practice -- "I practiced as the sole neuro-ophthalmologist at Wayne State University in Detroit for nine years in an area with a very high incidence of IIH." Is that right? Did I read that correctly?
A. That's correct.
Q. What is your basis for saying that that area had a very high incidence of IIH?
A. That was -- Unfortunately, Michigan is one of the states that has a high incidence of obesity, and that goes along with high instances of IIH. So I saw a lot of patients with IIH over that time frame.
Q. Right. But how do you -- How did you

Page 88

quantify that -- that Wayne State University in Detroit as having a high incidence of IIH, versus other areas?
A. Simply by the fact that I had a huge volume of IIH patients who were obese.
Q. This doesn't say anything about "obese." We're talking about very high incidence of IIH. How did you make that determination? What's your basis for it? Is there any sort of scientific literature that says that the incidence of IIH at Wayne State University is very high compared to anywhere else?
A. Oh, there is plenty of evidence that the higher the incident of obesity, the higher the incidence of IIH, so I think it's reasonable to make the statement that there is a high incidence of IIH in an area that has a high incidence of obesity.
Q. Okay. But you don't have any studies or reports or any other data that would support your suggestion in your report that that particular area had a very high incidence of IIH, as compared to other areas?
MR. BAUM: Objection, form.
A. Other than what I just said.
Q. (By Mr. Jones) And you mentioned that -- You say the state of Michigan has a very high incidence of obesity?

Page 89

A. That's correct. Well -- Well, let me qualify that. It does. But particularly the city of Detroit and the Detroit Metro area.
Q. And tell me, point me to the science that says that the city of Detroit has a higher incidence of obesity than anywhere else?
MR. BAUM: Objection, form.
A. Well, there are incidence rates of obesity in the United States where you can look at the map, and see areas where there are higher concentration of obese patients. I can't give you a specific article on that right at this second.
Q. What is the incidence of obesity in the City of Detroit?
A. I know it's high. I don't know specifically how high, but it's high.
Q. How do you know it's high?
A. Again, I looked at that data before, just not in the recent few weeks, so I can't give you a number off the top of my head. Simply by virtue of practicing and living in Detroit for nine years, I can tell you it's high.
Q. You didn't look at that data before writing this report, correct?
MR. BAUM: Objection, form.

A. That's correct.
Q. (By Mr. Jones) You didn't cite to any sort of data for that in your report, right?
A. It seemed so obvious that I didn't feel it was necessary.
Q. How does the City of St. Louis compare in terms of the incidence of obesity?
A. Like most major urban cities in the United States, it also has a high incidence.
Q. And what about how does the city of St. Louis compare to the City of Detroit in terms of the incidence of PTC?
A. I don't know, specifically. I suspect it's similar, but I don't know for sure. I do see almost the same volume of IIH patients that I see in St. Louis that I did in Detroit.
Q. Do you agree that different areas -- different geographic areas of the country may have different incidences of obesity?
A. That's true.
Q. Okay. And do you agree that different geographic areas of the country have different incidences of PTC?
A. I'd agree with that, as well.
Q. Okay. "Overview of IIH. You say idiopathic



intracranial hypertension, IIH, also called pseudotumor cerebri, is a disorder of intracranial pressure of unknown cause." Did I read that correctly?
A. You did.
Q. And so you agree that you personally don't know the cause of the elevated intracranial pressure in pseudotumor cerebri patients?
A. No one does at this point.
Q. Tell me how you define cause?
A. So, again, I think there are a couple of ways I think about cause, and I think a lot of it comes down to a lot of the classical causal criteria. So you would like there to be scientific plausibility for, say, you know, condition or exposure X causing something, condition Y.
You also would like there to be a decent dose response curves -- curve. The more you are exposed to this agent or drug, the more likely you are to develop to your outcome.
You would like some evidence there is exposure to this agent or toxin or drug without any other confounders that cause this outcome.
You also would like to see evidence of de-challenge, where you withdraw the substance or drug or exposure, and the condition goes away.



And, ideally, also, evidence of re-challenge; where you expose the person to the agent, drug, whatever, and have the exact same condition recur.
So those are some of the things that I think about when I am trying to ascertain cause.
Q. Okay. And scientific plausibility, is that the same as biological plausibility?
A. It's about the same. It's essentially the same.
Q. And you named, let's see, 1, 2, 3, 4, 5 items; is that correct?
A. That's correct.
Q. And determining whether something is the cause, using your definition, do all five have to be satisfied, or is there a combination of the five that need to be satisfied before it meets your definition of cause?
MR. BAUM: Objection, form.
A. Well, I think in the real world, it's very hard to satisfy all of those criteria. So we do the best we can. We like to see a pattern. So we would like to see several of those fulfilled before we have a high level of confidence there is a common cause. And, again, it's not always all or none.
Q. (By Mr. Jones) For example, exposure to the



agents without any sort of confounding factors, that can be pretty difficult to find someone to test them, correct?
MR. BAUM: Objection, form.
A. Right. So in that setting, you definitely would like some of this other criteria fulfilled.
Q. (By Mr. Jones) And de-challenge, let's talk about that for a second. That means that you remove the suspected offending substance, and the symptoms resolve? Is that your definition of de-challenge?
A. I would consider it that, yes.
Q. Okay. And would you agree that in this particular case in trying to examine de-challenge evidence, between de-challenge evidence related to the potential association between levonorgestrel, or Mirena, and PTC, is complicated by the fact that the diagnostic tools can sometimes relieve symptoms in such patients?
MR. BAUM: Objection, form.
A. It's complicated in the sense that just about everyone will receive a lumbar puncture. In a small subset of patients, that can relieve the symptoms temporarily. And in a very small subset, it can relieve the symptoms permanently.
Q. (By Mr. Jones) Okay. In what --

Page 94

Approximately, what percentage of patients will a lumbar puncture relieve symptoms temporarily versus long-term?
A. So temporarily, probably the majority of patients will get temporary relief within about 24 to 36 hours. It's about the length of time it takes for the spinal fluid to recirculate and reaccumulate. Again, my own personal experience is probably less than five percent of people will get permanent relief, or, essentially, a cure with one spinal tap. So although it does happen, it doesn't happen commonly.
Q. Right. And the majority, I think I understood you to say, that they may receive initial relief, but their body continues to produce and circulate cerebral spinal fluid, so their intracranial pressure will reemerge; is that correct?
MR. BAUM: Objection, form.
A. Right. Although, I wouldn't say it continues to overproduce spinal fluid because we don't understand --
Q. We don't know that's what the problem is?
A. That's correct.
Q. But the -- The pressure, generally, comes back?
A. Right. If we did a spinal tap on you, your

Page 95

pressure would be low for 24 for 36 hours, and then it would come back to its baseline level. Again, and that depends. If you do a spinal tap, sometimes you can get a dura leak. So you can have a spinal leak, so the pressure would be low for up to a week or two because they have a spinal leak.
Q. Okay. And what is -- A lumbar puncture and spinal tap are the same thing, right?
A. They're identical.
Q. Okay. And so describe for me what a spinal tap is?
A. So, basically, you're introducing a needle in-between the vertebra, the bones, in that form that surround the spine. And you're accessing what is called the subarachnoid space, which is a space surrounding -- that is containing the spinal fluid that surrounds the spine. You're measuring the pressure, and then usually, and what we're hoping, is that everybody that has a spinal tap for any condition will withdraw the fluid and send it off to the lab to look for evidence of inflammation, and infection, and so on.
And with a spinal tap, especially when we are talking about pressure -- I don't want to digress -- but it's really important that the technical aspects of the procedure are correct. Because the pressure can be

Page 96

inaccurately measured. I used to do all of my own spinal taps when I was in Detroit. I stopped doing that in 2005 or 2006. So improper positioning, breath-holding, and so on, can all artificially elevate the opening pressure.
Q. And it can also -- You're right. It can also artificially lower the pressure, as well, can't it?
A. Yes. Although, that seems to be less common. Simply because to lower the pressure, the most common reason I see that when it's artificially low is when the patient has had a botched LP, where they access the subarachnoid space, and then lose the space, and there is a spinal leak in-between. So that seems to happen less frequently.
Q. And you say you don't do your own spinal taps any more?
A. I stopped, simply because the time was not worth the reimbursement.
Q. Oh, from an insurance standpoint?
A. Yes.
Q. Who does -- When you have a patient that needs a spinal tap now, who does the spinal tap?
A. We usually have our interventional radiologist do it.

Page 97

Q. Okay. Who is a doctor, a medical doctor?
A. Yes. It's a radiologist.
Q. Other than these, I'll call them the five prongs -- Other than those five prongs, is there anything else that you consider important in determining whether something is causing something else?
A. Yeah. If I didn't mention it, certainly, a temporal relationship. You, obviously, want somebody exposed to the agent in a reasonable time frame. So, certainly, if they develop the condition, and then they were exposed to the agent at some later date, obviously would not support a causal relationship.
Q. Well, okay. So we have six now. Let's talk temporal relationship for a second. Do you agree that smoking cigarettes causes lung cancer?
MR. BAUM: Objection.
A. Again, I think we're going to have to redefine the term "cause" again. That's an over -- again, it's a little overly simplistic to say it's causes it, as if it's the only determinant. It certainly is a major risk factor. I think there is certainly enough evidence to support a causal relationship between tobacco exposure and the development of lung cancer. But, clearly, people can

get lung cancer without tobacco expose and vice versa. So that's why I'm just being cautious about the term cause.

Q. Well, give me an example of something that fits your definition of cause, that satisfies your prongs here that you've talked about?

A. Well, I think certainly tobacco would satisfy a lot of these prongs. I mean, we know the basic information about physiology, about why tobacco can injure cells, and promote cancer, and tumor genesis. Certainly, there is temporal relationship.

There's, if you stop smoking, the risk of lung cancer decreases. If you start smoking again, it increases. So it satisfies a lot of those criteria.

Q. You said there is a temporal relationship with smoking and lung cancer; how so?

A. Well, only in the sense that if you have a higher exposure for a longer period of time, you're more likely to develop lung cancer.

Q. Can you tell me or can anyone tell me how long after my exposure to smoking cigarettes it will be before I end up with lung cancer?

MR. BAUM: Objection, form.

A. I don't think anyone can give any specific person a number on that.



Q. (By Mr. Jones) Okay. Let's talk about re-challenge. That means that you take the substance -- the suspected offending substance away, and the symptoms get better. And then you reintroduce the offending substance, and things get worse again; is that correct? Is that what a re-challenge is?

A. Yes.

Q. Okay. And in cases involving a serious condition like pseudotumor cerebri that could lead to permanent visual loss, do you believe it to be ethical to try to reintroduce Mirena for purposes of trying to gather re-challenge evidence?

MR. BAUM: Objection, form.

A. If I can expand on that a little bit. Anytime you are talking about a medication that causes an adverse effect, whether it's Pseudotumor, or what, your decision about whether to start that medicine or reintroduce that medicine is -- is -- involves a number of different factors, including how serious the condition is, how important it is that the patient receive that specific medication, and the individual patient's desires.

So it's not as simple as saying you would never reintroduce that medication. So, I mean, we certainly reintroduce medication all the time in people that have



had side effects with them because it's really important that they be on that medication. I wouldn't necessarily agree with the premise of that question.

Q. But would you agree with the fact that a woman who is using a contraceptive intrauterine system, like Mirena, has other contraceptive options, other than the Mirena?

MR. BAUM: Objection, form.

A. Well, there are other options. Although it seems that Mirena is a better option for obese women. And, again, it's -- I'm not sure I would want to make someone switch their contraceptive system -- or contraceptive symptom because of the development of a condition that I don't think is causally related to that contraception.

Q. Do you know what ParaGard is?

A. I've heard of ParaGard. I didn't know the specific details. It's a similar medication to Mirena.

Q. It's a non-hormonal IUD, correct?

A. Yes. Okay. I'm thinking of the wrong one. Sorry about that.

Q. Okay. Have you heard of it now that I've -- Does that refresh your recollection?

A. Now I recall.

Q. Okay. So are you aware of how many reports



there have been made of pseudotumor cerebri in association with the nonhormonal ParaGard IUD?

MR. BAUM: Objection, form.

A. I suspect there aren't any.

Q. (By Mr. Jones) Why do you suspect that?

A. I think because I've read that. I might have heard that.

Q. You mentioned association and causal association, right?

A. Right.

Q. Okay. What I'm trying to understand is, are those different concepts for you, or is causal association and association the same thing?

A. I think I said causal relationship. I know it's a lot of semantics. But they --

Q. Well, let me write that one down.

A. Okay.

Q. Causal relationship. Okay. Have you ever used the term causal association?

A. I probably have, but I'm really trying to sort of keep the term "association" and "cause" separate because that's the why I try to keep it separate in my practice and my research.

Q. Okay. Tell me what causal relationship means to you?

Page 102

A. So, again, it's probably easier to start with what association means to me. It means that these two things happen in the same person. Let's say there is a condition X and exposure Y, and both happen in the same person. So they're clearly associated. They're associated temporally, or whatever, but they occur in the same person.
A causal relationship means that that exposure has enough evidence to support cause. And, again, you can -- that evidence can be statistical. It can be biological. But there is a high enough level of evidence to support cause. Because in many cases the association can be coincidental.
Q. Okay. The exposure has enough evidence to support cause. That's causal relationship, right?
A. That's correct.
Q. So how is that different than cause?
A. Well, I'm using cause --
MR. BAUM: Objection, form.
A. Well, again, cause seems, at least to me, to imply that's the only sole determinant of that outcome.
Q. (By Mr. Jones) So causal relationship is something less than cause, in the way you use it?
MR. BAUM: Objection. Form.
A. I think it's just we're using the term

Page 103

differently. I mean --
Q. (By Mr. Jones) I'm just trying to figure out what you're saying in your report, how you use the term?
A. Again, when I'm using the term "causal relationship," I'm talking about a risk factor, or some sort of a -- some sort of exposure, risk factor, that has a high enough level of evidence to support a causal relationship. That that plays a causal role in the development of that condition.
Q. And is that the same or different than the six factors you've laid out over here?
A. Those six factors are what helps me or helps us determine whether or not that particular risk factor has a causal role in the development of that condition.
Q. And you do or you do not use causal association?
MR. BAUM: Objection. Asked and answered.
A. I generally try not to use that term because it can be confusing. Can I say I've never used it? No. But I try to avoid that.
Q. (By Mr. Jones) Okay. So the second sentence of your overview of IIH: "This condition primarily occurs in obese and overweight women of child-bearing age." Did I read that correctly?

Page 104

A. That's correct.
Q. So, obese -- Obesity, and overweight, and child-bearing age is associated with PTC?
A. I think those are risk factors that have a high enough level of evidence to support that causal relationship I mentioned.
Q. Okay. So you think that obesity, overweight, and women of child-bearing age equals causal relationship? Did I understand that correctly?
MR. BAUM: Objection, form.
A. Well, yeah. Obviously, it's not just me that thinks that. That's what pretty much all the literature support.
Q. (By Mr. Jones) We're just talking about you today.
A. Well, yes, that's what I think.
Q. Okay. And you agree that obesity doesn't cause PTC, right?
MR. BAUM: Objection, form.
A. And I think we're going to have to go back to my original explanation that obesity is a risk factor that has a high enough level of evidence to support a causal relationship in that condition.
Q. So a risk factor is something different than causal relationship?

Page 105

A. Yes. Risk factor, at least in the technical term, means correlation that it's associated with. Again, getting back being to associated. Saying something is a risk factor does not necessarily mean it has a causal relationship with that outcome.
Q. So obesity is a risk factor for PTC?
A. But it's a risk factor that has a high enough level of evidence to support a causal relationship.
Q. Okay. Let me -- I'll put a question mark on it. Obesity is a risk factor for PTC, correct?
MR. BAUM: Objection, form.
A. It is, but not all risk factors are created equal.
Q. (By Mr. Jones) And not all obese people develop PTC, correct?
A. That's correct.
Q. In fact, not all women of child-bearing age that are obese develop PTC, correct?
A. That's correct. That's why we call it idiopathic.
Q. And, in fact, a very, very, very small percentage of obese women of child-bearing age develop PTC, correct?
MR. BAUM: Objection, form.

A. That's correct.
Q. (By Mr. Jones) And the same can be said about overweight women of child-bearing age?
MR. BAUM: Objection, form.
Q. (By Mr. Jones) Correct?
A. That's correct.
Q. And the same can be said about women of child-bearing age who have recent weight gain; is a very small percentage of them ultimately develop PTC, correct?
MR. BAUM: Objection, form.
A. Yes. But certainly higher than people who don't have weight gain, who are not obese, and who are not women of child-bearing age.
Q. (By Mr. Jones) Do you agree that certain medications can be risk factors for the development of PTC?
A. I think certain medications -- again, I know we're going to go into the terminology again, and I apologize -- are associated with IIH. Again, some of them have a higher level of evidence that might support a causal relationship.
Q. Which medications have higher levels of evidence that would support a causal relationship?
A. So I think the tetracyclines, for one. And



I think the -- The evidence to back that up is when you look at the people who have what's called tetracycline-associated PTC, or IIH, those patients tend to be, or have a higher proportion of higher body habitus, or atypical than the typical IIH patients.
Do I think that it's proven that, you know, tetracycline causes pseudotumor? No. I just think tetracycline derivatives have a higher level evidence partly because there is a higher proportion of atypical patients suggesting there might be something unique about the tetracycline.
Q. Any other medications?
A. So I think the Vitamin A derivatives are the same way. Again, we actually have pretty good evidence that there is a biological mechanism that it may interact with the arachnoid granulations that drain spinal fluid. The original reports were from the polar explorers, who ate a lot of bear liver and ingested a lot of Vitamin A. An induced-A syndrome like IIH, you can create an animal model of IIH with excess of vitamin A. So I think there is enough evidence there to support a causal relationship.
Q. Any other medications?
A. Probably, corticosteroid withdrawal. And partly the reason for that is -- Again, I apologize for



another digression. But with pediatric or, at least, prepubertal IIH, that seems to be a different condition. For the male to female gender ratio, it's about one-to-one. Obesity is less common. And at least in my practice, in speaking with some of my colleagues, we tend to see this steroid withdrawal more commonly in that group. Again, some that might support more of a causal relationship.
Q. Okay. Any other medication?
A. Those are the main ones I think about. A lot of other medications are cited. You know, Lithium is cited. Certainly things like Norplant are cited. Oral contraceptives are cited. If you look in a textbook, you are going to see long lists, a list as long as my arm of medications that are associated with IIH. But when I'm giving lectures, I always try to explain to the audience that those are really based on, in many cases, anticdotes, case reports, and so on. I just think it's important not to withdraw medicine based on insufficient evidence.
Q. Have you done any scientific research with regard to the scientific plausibility of the medications that you just listed, being able to cause PTC?
MR. BAUM: Objection, form.



A. I personally have not.
Q. (By Mr. Jones) And have you done any scientific research on dose response levels in relation to whether any of those medications are -- could be a cause of pseudotumor cerebri?
A. I have not.
Q. And --
MR. BAUM: Objection, form.
Q. (By Mr. Jones) And have you personally done any scientific research to discover cases of de-challenge, as it relates to those medications you listed and whether or not they cause pseudotumor cerebri?
MR. BAUM: Objection, vague.
A. In my own clinical experience, I've seen a number of patients where I've essentially de-challenged them, but I haven't published any research on that.
Q. (By Mr. Jones) How many Mirena patients have you de-challenged in your personal clinical practice?
MR. BAUM: Objection, form.
A. Because my opinion is that there is not sufficient evidence for a causal relationship with Mirena, I haven't de-challenged anyone.
THE DEPONENT: Just off the record, are we

Page 110

getting close to a break?
MR. JONES: Yes, we are. We can.
THE DEPONENT: My bladder is speaking to me.
MR. JONES: Got you. Let's go off for a break.
VIDEOGRAPHER: The time is 11:20, and we are going off the record.
{Off the record discussion from 11:20-11:31 a.m.}
VIDEOGRAPHER: The time is 11:31 and back on the record.
MR. BAUM: I have now remembered the complete list of cases in which this deposition was cross noticed other than the Houston case, and those are the Kellington, Cheek, Hoover, and Bridges cases. I appreciate the opportunity to put that on the record.
MR. JONES: Sure, no problem.
Q. (By Mr. Jones) Okay. Dr. Van Stavern, if you had a patient that came to you for treatment of PTC, and that person was on tetracyclines, would you advise that patient to discontinue the use of the tetracycline?
MR. BAUM: Objection, form.
A. Now, the answer is it depends. I have had patients on tetracycline. I have had a few patients on growth hormones, and those medications where there may

Page 111

be an association, but we're not sure. If they had no visual loss, and minimal symptoms, and it was really important for them to be on the medication, I have kept them on the medication and followed them very carefully.
Q. Are there -- What are tetracyclines used to treat?
A. Actually, the most common scenario that we see when there is the question about whether it's associated with IIH is acne. But it can be used to treat infections and certain other conditions.
Q. Do you agree that tetracyclines are likely preferentially prescribed to women of child-bearing age?
MR. BAUM: Objection, form.
A. That I don't know. They may be.
Q. (By Mr. Jones) What are Vitamin A derivatives? What are they used to treat?
A. Well, these days, as long as you're not eating Polar Bear liver, which most people aren't, it's usually in the form of Accutane, which is also used to treat acne.
Q. Okay. And corticosteroids, what are they used to treat?
A. They're used to treat a wide variety of

Page 112

inflammatory diseases.
Q. And you mentioned -- Specifically, you talked about the pediatric cases with regard to corticosteroid withdrawal. What kinds of conditions would corticosteroids be used to treat pediatric patients?
A. Well, the ones that come to mind are patients with juvenile rheumatoid arthritis. That's one. There are a couple of other auto immune diseases. One goes by the term Nomid, N-o-m-i-d, which is inflammatory disease that can be treated with prednisone. Childhood lupus is another one.
Q. And withdrawal means they've been taken off the corticosteroids?
A. That's correct.
Q. What is a fluoroquinolone?
A. Oh, that's an antibiotic.
Q. Okay. And do you consider fluoroquinolones to be associated with the development of pseudotumor cerebri?
A. I don't.
Q. Were you aware that pseudotumor cerebri is listed in the labeling for fluoroquinolone?
MR. BAUM: Objection, form.
A. I wasn't aware of that.

Page 113

Q. (By Mr. Jones) So you don't know how many cases FDA saw fluoroquinolone-related pseudotumor cerebri that caused the FDA to require a warning in the fluoroquinolone label?
MR. BAUM: Objection, form.
A. No. But, again, I guess that's gets into the limitations of the FDA data. These things can be reported by anyone. And there is not necessarily any verification that they actually had the condition. But I wasn't aware of that.
Q. (By Mr. Jones) That first paragraph of your overview of IIH, you cite one article, Fisayo, F-i-s-a-y-o, et.al., 2016?
A. That's correct.
Q. Is that your citation for the entire paragraph or just for that sentence?
A. Just that sentence. Although, I mean, mainly, that sentence.
Q. And what is your support for the remainder of that paragraph?
A. Just that when we're trying to diagnose someone with IH, we have to make sure that we fulfill the criteria for diagnosis, and we look for other causes that can cause Intracranial Hypertension.
Q. And that sentence citing of Fisayo -- am I

Page 114

pronouncing that correctly?
A. I think so. I actually haven't met Fisayo.
Q. Okay. The fact that other conditions can mimic IIH, and that misdiagnose is relatively common, is it important when trying to ascertain causal medications -- I'm sorry -- trying to ascertain causal relationships between this condition and other disorders, or agents, such as medications, since alternate causes of Intracranial Hypertension must be adequately excluded. So are you saying in that sentence that certain medications can be alternate causes of Intracranial Hypertension?
MR. BAUM: Objection, form.
A. I think what I was saying before, there are certain medicines that are associated with IH, and have a higher level of evidence that they may have a causal role. You just have to judge each individual case on its own merits.
Q. (By Mr. Jones) Okay. But you don't say: Since alternate causal relationships of Intracranial Hypertension must be adequately excluded, correct?
MR. BAUM: Objection, form.
A. By that, I am mostly referring to things like venus sinus thrombosis, meningitis, tumor, that sort of thing.

Page 115

Q. (By Mr. Jones) But what proceeds that is says, "such as medications," right?
A. That's true.
MR. BAUM: Objection, form.
Q. (By Mr. Jones) Let's go to the next paragraph. What is your scientific basis for this next paragraph? I don't see any sort of citations listed.
MR. BAUM: Objection, form.
A. Well, basically, just my knowledge about IIH, the literature I published about imaging and IIH. Just everything that we learned about this condition over the past 30 years or so. So it's more, kind of a generic statement about where things stand with IIH.
Q. (By Mr. Jones) Based upon your experience?
A. Right. And my research.
Q. Okay. The sentence, I guess, it's the second full sentence: "The current criteria are thought to significantly lower the likelihood of patients with IIH 'mimickers' being falsely diagnosed with the condition."
A. I'm sorry. Where are you?
Q. Page 2.
A. Oh page 2.
Q. Second full sentence.
A. Okay. Okay.

Page 116

Q. Do you see the "mimickers" statement?
A. Right.
Q. Tell me what you mean by that sentence?
A. So, for example, if, you know, somebody shows up and they have headache and papilledema, and they have transient visual obscurations, and they get, say, a head CT, and it's normal, and they get a spinal tap, and it shows high pressure, normal spinal fluid; they could have been diagnosed with IIH, when in reality they may have had a venous sinus thrombosis. It wouldn't have been detected with a CT scan.
Q. Okay. Are you, in any of the files of my clients that you've reviewed, do you believe any of them to have been falsely diagnosed with PTC?
A. No, I don't.
Q. And the false diagnosis, do you consider that to be a problem?
A. I definite --
MR. BAUM: Objection, form.
A. I definitely consider false diagnosis to be a problem.
Q. (By Mr. Jones) Okay. And you've relied in your report on, when I say the Durcan's study, you know the Durcan's study, right?
A. Correct.

Page 117

Q. And other epidemiological studies trying to calculate the incidence rate of PTC in obese women and overweight women. You know what I'm talking about, right?
A. I'd agree with that.
Q. Okay. And wouldn't you agree that misdiagnosis could have, in fact, impacted the results of the Durcan's study and the other epidemiological studies that you rely upon?
A. I think it could, but I think that cuts both ways. You could have misdiagnosis in each group. So I don't think that really points one direction or the other. That's the best evidence we have.
Q. Misdiagnosis in either group, which groups are you speaking?
A. So if you're looking at -- so if you're saying, you know, you had a group of people with IIH and a group without, and you're looking at contraceptive use in each group, I mean, you could say either group could contain people who are misdiagnosed or underdiagnosed.
Q. Durcan didn't look at contraceptive use, right?
MR. BAUM: Objection. Form.
A. They were listing contraceptive use.

Q. (By Mr. Jones) They were listing it, what do you mean?
A. Let me go to where I cite Durcan. I just want to make sure we're all on the same page here. So in Durcan, it looked like they found no significant difference in oral contraceptive use in the IIH group in the general female population. So it is something that they looked at.
Q. Okay. We'll come back to that. Wouldn't the misdiagnosis, the overdiagnosis of PTC actually inflate the number of PTC patients in the general population in the Durcan study?
MR. BAUM: Objection, form.
A. It's possible.
Q. (By Mr. Jones) What causes venous sinus thrombosis?
A. Well, there are a number of risk factors. People can have hereditary conditions that increase the chance of developing a blood clot. It does seem to be more prevalent in obese women. So obesity can be a risk factor for that condition. Dehydration is another risk factor. So there are a number of different things that can contribute to that. Some cases, there is no specific cause found.
Q. Are oral contraceptives related in any way



to venous sinus thrombosis?
A. Yes. The estrogen-containing ones definitely are.
Q. And can increased intracranial hypertension cause venous sinus thrombosis?
A. Can increased intracranial pressure cause venus sinus thrombosis? Thrombosis, hmm -- you mean, as a direct effect? It's hard to see how that could happen. It would be the result of venous sinus thrombosis. But directly causing it? I suppose if you had high enough pressure, you could compress the posterior cerebral arteries. But I'm not familiar with the compression of the vein, itself, causing a thrombosis.
Q. So is it also the case that venous sinus thrombosis precedes PTC?
MR. BAUM: Object to the form.
A. No. I think the vast majority of P -- I mean, to have IIH, it means, by definition, if you're filling the criteria, that you shouldn't have venous sinus thrombosis. Because if you have venous sinus thrombosis, it's clearly not IIH.
Q. Yeah. But I'm talking about pseudotumor cerebri.
MR. BAUM: Object to form.



A. I'm using the term synonymously. If you're talking about a pseudotumor cerebri-like syndrome, which encompasses a variety of causes of intracranial hypertension, then venous sinus thrombosis can produce a pseudotumor cerebri-like syndrome.
Q. (By Mr. Jones) The next paragraph: "Potential causes in mechanisms for IIH." Again, there are no citations to any journal articles. So can you tell me what your bases is for this paragraph?
A. Again, I've been doing this for a long time. Just reviewing the literature, giving talks about it, publishing research in it. So it's more just an introductory statement about what we know about this condition.
Q. Other than my client, Ms. Thompson, you haven't seen any of my other patients -- or any of my other clients, have you?
MR. BAUM: Objection, form.
A. Certainly none that I know about.
Q. (By Mr. Jones) Okay. You've never treated any of them, other than Ms. Thompson?
A. As far as I know.
Q. You say: "The specific pathogenesis of IIH is unknown." Did I read that correctly?
A. That's correct.



Q. And what is pathogenesis?
A. Essentially, how; this specific mechanism by which this develops.
Q. And you don't know that?
A. I don't.
MR. BAUM: Objection.
Q. (By Mr. Jones) And no one does, that you're aware of?
A. At this point, the specific cause is unknown, is, I guess, why we call it idiopathic.
Q. You go on to talk about: "There are a number of risk factors that have been identified that are associated with IIH." Correct?
A. That's correct.
Q. Okay. And you cite the things you've talked about: Female gender, child-bearing age, excess weight, and recent weight gain, right?
A. That's correct.
Q. Do you know why PTC has a predilection for women of child-bearing age?
A. No, I don't.
Q. And it doesn't have that same sort of predilection for pre-pubescent females, does it?
A. That's correct.
Q. Do you believe that the predilection for

Page 122

women of child-bearing age is related in any way to hormones?

A. Well, I think that gets back to what we were discussing earlier. It certainly makes sense to think that hormones can contribute, to some degree, to this condition. That's why that stimulated all the interest in looking at things like contraceptives, and so on. But, to date, there is no specific hormone that's been causally associated. In fact, people have looked at things like leptin and ghrelin, which are hormones that are secreted by the adipose tissue that seem to regulate satiety, or how full we feel. And initial results suggested there were differences in IIH patients versus control. When you control for weight, it turns out there is no real difference. So it's been looked at, but no specific hormone has been implicated as a cause.

VIDEOGRAPHER: We have two minutes left on the tape.

Q. (By Mr. Jones) Okay. You say: "That it may be that IIH represents a converging of events to a final common pathway resulting in elevated intracranial pressure." What do you mean by that?

A. It means that you have a variety -- It's sort of like -- you have sort of a like a child doing,

Page 123

sort of playing with blocks. And you have enough blocks on top of another that it finally tips over. So you have the right genetic profile, obesity, weight gain, female gender, and reproductive age. And they all line up to cause this condition. But what specific factors we're talking about, aside from the risk factors I mentioned, we don't know.

Q. Okay. And you agree that specific anatomic and genetic factors may render certain individuals more susceptible to developing the condition, correct?

A. That's possible.

Q. That's what you say in here, correct?

A. I say there may also be. We just don't know what they are yet.

MR. BAUM: Should we change the tape?

MR. JONES: Yeah. We should.

VIDEOGRAPHER: Time is 11:49. We are going off the record.

{Short break taken.}

VIDEOGRAPHER: The time is 11:50. We are back on the record.

Q. (By Mr. Jones) Dr. Van Stavern, going to the next paragraph that starts with "papilledema," do you see that?

A. I see it.

Page 124

Q. I don't see any sort of citations to medical literature in this paragraph. So can you point me to what your scientific support is for this particular paragraph?

MR. BAUM: Objection, form.

A. I can probably point you to the whole article, review article that I wrote on papilledema in seminars in Neurology. But, again, it just speaks to the fact that I've published on this, spoken on it. I'm familiar with the subject.

Q. (By Mr. Jones) What basis do you have for saying that, "Put differently, papilledema is not specific to, synonymous with, or diagnostic of IIH, and the term is often misused, even by neurologists, to refer to any condition where there is swelling of the optic disc."

A. So, basically, I -- certainly, from my own clinical experience, I often get patients referred with papilledema, and it turns out either the disc is not truly swollen. It's just an unusually shaped optic disc. They have another condition entirely, like ischemic optic neuropathy, or they have optic neuritis, or some other condition. It's just an overuse of the term. Where papilledema means optic disc swelling. And it can lead to confusion. And, again, looking,

Page 125

once more, at that Fisayo article, it can lead to misdiagnosis.

Q. Do you ever call any of these neurologists and tell them that they've misused the term?

A. That doesn't seem very polite. What I usually do is dictate a letter telling them my medical opinion, and discuss what the condition is with the patient. And, certainly, when I give lectures, that is one of the things I try to emphasis, particularly to the neurologists, but also to the community of the ophthalmologists and optometrists who also fall into that trap.

Q. Okay. Let's go to next paragraph. In this, you cite the Yeung article. Y-e-u-n-g. Is that article in support of this entire paragraph, or just the sentence in which the citation is contained?

A. Primarily, that sentence.

Q. Okay. What is your support for the first sentence that: "It's highly likely that metabolic consequences of excess weight underlie its pathogenesis"?

A. Well, it goes back to that whole idea of scientific plausibility. You know, why do people who get this condition most commonly are obese? So it has to have, probably, some relationship to the obesity.

Page 126

And we know that adipose tissue is essentially almost like an endocrine organ. It secretes hormones, and so on. But it's more just a general statement that whatever the underlying cause is, it probably has some relationship to obesity and the downstream effects of obesity.
Q. All right. So this is a theory, correct?
A. It's a more generic statement.
Q. Has this theory been proven?
MR. BAUM: Objection.
A. No. It hasn't been proven. That's why I said it's highly likely, but not proven.
Q. (By Mr. Jones) And thin women also developed PTC, correct?
A. They do.
Q. Okay. And so what is the highly likely pathogenesis for thin women?
A. Well, again, even some of those, it depends on what you mean by thin. So some women are normal body habitus, but have had recent weight gain, and it seems like recent weight gain is a risk factor for developing IIH as well. So if you're talking about a thin woman who has no weight gain at all, if she develops IIH, which can happen, although it's rare, we don't know what the cause is. You're trying to just

Page 127

do -- come up with the best explanation possible for why these risk factors converge for this condition.
Q. And then when you're treating patients, isn't it true that you rely on evidence that doesn't absolutely prove an association between a substance and a condition in treating patients?
MR. BAUM: Objection, form.
A. I guess I'm not sure I understand what you're asking.
Q. (By Mr. Jones) Well, you don't wait until something is a hundred percent proven before advising patients not to continue the use of a medication that has been associated in the literature with the development of a serious condition, do you?
MR. BAUM: Objection, form.
A. Well, nothing in medicine is a hundred percent, no.
Q. (By Mr. Jones) Still in that paragraph, you say: In addition to adipose -- "In addition, adipose tissue also leads to increases in estrogen by its effect on --" and you have me with that word --
A. Aromatase.
Q. "-- aromatase; by contrast, obese women have lower progesterone levels, on average, than normal weight women." What's -- What's the important of that

Page 128

sentence?
MR. BAUM: Objection, form.
A. Well, since the -- this case, or this litigation relates to a progesterone-secreting device, that seems relevant.
Q. (By Mr. Jones) How is it relevant?
A. Well, again, like we were discussing earlier, if obesity is related in a causal way to IIH, and it's related in some way to hormone levels, it would be more likely related to estrogen, since estrogen is higher in obese women, and lower in -- and progesterone is lower in obese women.
Q. Is progesterone, has it proven to be lower in obese women who developed PTC?
A. Not that I know of.
Q. And the obese women that are using Mirena, they would, in fact, have higher levels of the synthetic progesterone, correct?
A. That's correct.
Q. And you say: "As such, if female sex hormones play any role in IIH at all, estrogen is the likely culprit." Did I read that correctly?
A. You did.
Q. Okay. And you don't have any scientific evidence that estrogen is the culprit in the

Page 129

development of PTC, do you?
A. No, that's why I said, "if they play a role," because we don't know.
Q. And, in fact, you go on in the next sentence: Nevertheless, there is no reliable evidence that estrogen-containing contraceptives cause IIH." Correct?
A. That's correct.
Q. And we're dealing in this case with a synthetic progestin, correct?
A. That's correct.
Q. Have there been any studies that you can point me to that have studied the relationship between progestins and the development of PTC?
A. Not specifically addressing that question.
Q. Can you point me to any scientific evidence anywhere that disproves an association between levonorgestrel and PTC?
MR. BAUM: Objection, form.
A. Unfortunately, that's not the way science works. It's almost impossible to prove a negative. So the idea is building a chain of logic or causal connection to prove a causal relationship. We don't try to disprove relationships.
Q. (By Mr. Jones) Have there been any studies

Page 130

that you're aware of that have examined the relationship between levonorgestrel and PTC?
MR. BAUM: Objection to the form.
A. No specific studies.
Q. (By Mr. Jones) The Rai study didn't look at that?
MR. BAUM: Objection.
A. Well, I'm sorry. Yeah. That was a case control study. That was one study that did examine the relationship.
Q. (By Mr. Jones) Okay. Are you aware of any studies by Bayer Pharmaceuticals to ascertain whether or not there is a relationship between levonorgestrel and PTC?
MR. BAUM: Objection, form.
A. I'm not aware of any.
Q. (By Mr. Jones) Have you asked Bayer whether they've done any such studies?
MR. BAUM: Objection, form.
A. I wouldn't say I need to do that.
Q. (By Mr. Jones) You wouldn't see a need to ask them if they've done any studies in giving an opinion that levonorgestrel is not related to the development of PTC?
MR. BAUM: Objection, form.

Page 131

A. Well, going back to what I said and is contained in the report, looking at the body of evidence, there is really not enough evidence to support a causal relationship that would make such a study justifiable.
Q. (By Mr. Jones) What about the sales of billions of dollars of contraceptives that has been alleged to be associated with the development of PTC?
MR. BAUM: Objection, form.
A. Well, I think you're used the term alleged and associated in way that, again, suggests there is no causal relationship based on the evidence that we have to date.
Q. (By Mr. Jones) You keep saying on the evidence we have to date. Can you point me to any evidence that says there is no causal association between levonorgestrel and PTC?
MR. BAUM: Objection. Asked and answered.
A. I think we can extrapolate what we know about hormonal contraceptives in general. The fact that if any of these hormones are going to be associated with IIH, it's more likely to be estrogen-containing ones, than progestin-containing ones.
Q. You said you have no proof that it's related

Page 132

to estrogen-containing contraceptives, right?
A. There are no studies looking at that. It's just looking at, again, the propensity for women who develop this condition to be obese.
Q. And you have no evidence that estrogen is related to the development of PTC, correct?
MR. BAUM: Objection, form.
A. That's correct.
Q. (By Mr. Jones) Continuing, again, in that paragraph, you say: "BMI is a better surrogate marker of whole body adipose tissue than weight, but is still imperfect as weight exists on a continuum and categories of overweight versus obese are relatively arbitrary. For example, while a patient with a BMI of 29.8 is technically considered overweight, and a patient with a BMI of 30.1 is considered obese, their risk of clinical complications from excess weight is similar." Did I read that correctly?
A. You did.
Q. Okay. So if we go with your theory, how far down the BMI do we go before the difference is -- where the risk is considered clinically different?
MR. BAUM: Objection, form.
A. Are you speaking of the risk for IIH?
Q. (By Mr. Jones) Yes.

Page 133

A. Most of the time we're doing studies, including the Bruce study that I contributed to, we are using a BMI of less than 25 or greater than 25. But to that point, if someone has a BMI of 24.9, they're technically considered normal body habitus. But all they have to do is have a large meal, and they transition into overweight. So that's the point of saying, it's a continuum. It's not a clear linear delineation.
Q. And there is no evidence that says that the risk of developing PTC, if you're a 26 BMI versus a 27 BMI is any different, right?
MR. BAUM: Objection, form.
A. Well, the higher the BMI, it seems like the higher the risk of IIH.
Q. (By Mr. Jones) The lower the BMI, the lower the risk of IIH, right?
A. I think that's a fair statement.
Q. Okay. Let's go to next paragraph. You talk about obstructive sleep apnea. Do you have any scientific support for this paragraph? There are no citations here.
MR. BAUM: Objection, form.
A. So this study Bruce, et al., that we did, that I contributed to, did show a higher incidence of,

at least self-reported obstructive sleep apnea in men who had IIH. And it's been another one of those things that's at least been reported; some patients with IIH have obstructive sleep apnea. The problem or the biggest confounder there is obesity is a risk factor for obstructive sleep apnea and IIH. So that's a big confounder.
Q. Was this self-reported obstructive sleep apnea?
A. In our study?
Q. Yes.
A. Yes, it was.
Q. I mean, you didn't review any medical records to confirm that diagnosis?
A. Not -- No, we didn't.
Q. Going to the next paragraph: "Vitamin A toxicity." I see that you cite Warner, at al, 2007, in the middle of the paragraph. Is that your support for the entire paragraph?
MR. BAUM: Objection, form.
A. Well, only the one related to that specific sentence, at least the study that sentence is referring to.
Q. (By Mr. Jones) And I was mistaken, I see another citation here; Grzybowski.



G-r-z-y-b-o-w-s-k-i.
A. That's correct.
Q. In the -- And you say, that second to last sentence: "The mechanisms by which vitamin A and its synthetic derivatives lead to reversible ICP elevation are unknown." Is that correct?
A. That is correct.
Q. Okay. But vitamin A and vitamin A derivatives are associated with the development of PTC, correct?
MR. BAUM: Objection, form.
A. They're associated with the development of intracranial hypertension.
Q. (By Mr. Jones) Okay. Even though the mechanism by which vitamin A and its synthetic derivatives may elevate that intracranial pressure are unknown?
A. That's correct.
Q. You say: "Vitamin A could lead to Intracranial Hypertension via enhanced transcription of genes involved in CFS secretion or absorption, or could cause structural changes in the arachnoid granulations, which help modulate spinal fluid resorption." Did I read that correctly?
A. That's correct.



Q. I notice you say "could" in both of those. Has that theory been proven?
A. No. There are some animal models of vitamin A-induced PTC or IIH, where it seems like there are changes in the arachnoid granulations, but that's not a consistent theme.
Q. Okay. So that theory hasn't been proven?
A. That's correct.
Q. The next paragraph: "There has been a recent surge of interest in disorders of CFS dynamics and how they might relate to the development of IIH." You say "Broadly speaking, this could involve several mechanisms." And then you go on to list three. Did I read that?
A. Yes.
Q. Is that correct?
A. That's correct.
Q. And what is your scientific support for this paragraph?
A. Again, same as before. Just basic knowledge of anatomy, and physiology about CFS generation, CFS absorption, drainage through the venous sinuses, and so on.
Q. Okay. And these three potential mechanism that you cite, they haven't been proven?



A. They haven't.
Q. The next paragraph: "Traverse venous sinus narrowing occurs in a significant number of patients with IIH." I don't see a citation in that paragraph. So what is your scientific support for your opinions in that paragraph?
A. There have been a number of studies published looking at this. I didn't cite them. You know, Bruce, et. al., published an article recently, looking at how frequently this occurs. It seems to occur frequently in IIH patients.
Q. Okay. Any others that you can think of, other than Bruce, et al?
MR. BAUM: Objection, form.
A. Not off the top of my head. I mean, I can point you probably to a lot of different reviews. Some of the reviews I've written might have even mentioned that.
Q. And what's it mean when you say "traverse venous sinus narrowing occurs in a significant number of patients with IIH"?
A. So if you're looking at an MR venogram, which is a special MRI technique to look at the venous sinuses. So the transverse sinuses are branches off the superior sagittal sinus. So if you look at IIH

Page 138

patients, a significant number of them will have narrowing or almost collapse of the traverse sinus.
Q. And when that traverse sinus collapse -- collapses, could it cause a thrombosis?
MR. BAUM: Objection, form.
A. Theoretically, it could cause thrombosis, but, again, if that causes a thrombosis, that would be evident on the imaging.
Q. (By Mr. Jones) You say: "It's not known whether the traverse venous sinus narrowing represents a primary or secondary cause in the pathogenesis of IIH?
A. That's correct.
Q. Tell me what you mean by that?
A. So there are two main theories about how this occurs. One theory is that people can have narrowing of the traverse sinus, and that reduces drainage, increases central venous pressure because you have narrowing, and you have decreased drainage through the venous sinuses. That can increase your central venous pressure and cause intracranial hypertension. So there is one theory that the primary cause, for whatever reason, you have this.
The other theory is that when you have intracranial hypertension, that causes enough pressure

Page 139

that it collapses the transverse sinus. And that actually has some evidence to support it. Probably the study that John King did in 2001, which was the craziest study. We would never get it approved in the United States. It was done in Australia, where they basically did a venogram, a catheter venogram. Put in a catheter in the groin, and shot dye through the traverse sinus on it. Saw the stenosis. And while they were doing the venogram, they had somebody else do what's called a cisternal tap. Where they did a spinal tap through the neck, and lowered the pressure. And they saw that that pressure gradient disappeared. So that was evidence that this may be a secondary phenomenon; that if you lower the pressure, the traverse sinus stenosis disappears.
Q. So the collapsed -- The collapsed or narrowed venous sinus pops back to the way it was?
A. So when they inject dye through it, you can measure gradient, you can measure pressure. So you can measure the pressure right at the beginning of that stenosis and right after the stenosis. And there was a difference in pressure. So when you lower the intracranial pressure, that pressure difference disappears.
Q. Okay. But what happens to the -- to the --

Page 140

Is it the vein?
A. Yes. So the vein -- So this was an imaging study. So subsequent imaging studies have shown conflicting results. So sometimes that stenosis gets better after the LP, and the pressure is lowered, and some cases it stays. So that's why we're still not settled whether it's primary or secondary.
Q. Okay. Your next sentence, you say: "There are several theories to explain its role in the disease, however, there is no agreement on a single unifying process." Is that correct?
A. I would agree with that.
Q. All right. The next paragraph comes under the heading "management." Again, there is no citations. Is that based upon your clinical experience?
A. Right.
MR. BAUM: Objection, form.
A. Certainly the reviews I publish, and so on.
Q. (By Mr. Jones) The next paragraph at the beginning of page 4, it looks like you cite the de Simone, et. al., 2005, article in that paragraph. Is that the citation that provides your scientific basis for the entire paragraph, or just that sentence?
A. Let me just read the sentence.

Page 141

MR. BAUM: Objection. Form.
A. Oh, that, plus my clinical experience, having seen it happen in a number of patients over the last 15 years.
Q. (By Mr. Jones) You begin that paragraph with a discussion about asymptomatic patients. What does asymptomatic patients mean?
A. So the typical symptoms we expect with this condition are headache, transient visual obscuration, double-vision, much less commonly, pulsatile tinnitus, or whooshing in the ears. So as we actually showed in a study we did, the Galvin, et.al., study back in 2004, about 18 percent of people can have -- be asymptomatic. So they may not have any symptoms, or they may be minimally symptomatic, where they have a headache once a week, and it's not as big a deal. So it's uncommon, but not rare for somebody to present with asymptomatic IIH.
Q. Okay. But they still have increased pressure, they're just not experiencing symptoms, or at least, not severe symptoms?
MR. BAUM: Objection, form.
A. That's true.
Q. (By Mr. Jones) And you say that's about 18 percent of the people with the condition?

A. In our study, 18 percent of them presented asymptomatically. Essentially, they went to the eye doctor just for a routine eye exam. And eye doctor noted their nerves were swollen. They were sent to us, and we diagnosed them.
Q. And your next sentence says: "While some patients have a chronic course with substantial loss of vision, many, if not most patients, have a self-limited course with spontaneous resolution occurring within 12 to 24 months, and do well with conservative management." Did I read that correctly?
A. You did.
Q. When you say "many, if not most," what percentage are you speaking of there?
A. We know that about 10 percent of, patients or less, have permanent severe visual loss. So the majority of patients do well. We know from the IIH treatment trial that people with mild visual loss do fairly well with conservative treatment. By conservative, I mean essentially medication and weight loss.
Q. What does self-limited course mean?
A. Meaning that left to its own devices, the intracranial pressure normalizes within a year or two.
Q. And you say spontaneous resolution. So when



you speak of spontaneous resolution, are you talking about resolution without any sort of treatment?
A. Yes. So, basically, someone who presents asymptomatic, and they get their spinal tap to diagnose a disease. And, again, they don't have much in the way of symptoms. They have no field loss. We follow them for a couple of years, and everything gets better. Sometimes they lose weight, which is a concomitant treatment, but many of these patients may not lose any weight, and the symptom resolves on its own.
Q. Just goes away?
A. That is correct.
Q. And what percentages have spontaneous resolution without any sort of treatment, other than what you just talked about?
A. I can't give you a specific number. I don't think any of us have really studied that question. I think a significant number do, but we don't know.
Q. So "significant" meaning more than 50 percent, less than 50 percent?
A. In my own exper --
MR. BAUM: Objection, form.
A. In my own experience, I suspect probably more than 50 percent.
Q. (By Mr. Jones) And can you point me to any



studies that would support that many, if not most, patients have spontaneous resolution occurring between 12 to 24 months?
A. As I just said, nobody has ever done a study specifically trying to answer that question.
Q. Do you agree that patients who have had spontaneous resolution of their symptoms within 12 to 24 months can experience relapses at a later time?
A. Yes, they can.
Q. Do you agree that pseudotumor cerebri can be chronic in some patients that require a lifetime of treatment?
MR. BAUM: Objection, form.
A. In my -- In my own experience, that seems to be uncommon, where they need long-term treatment, but it can definitely occur.
Q. (By Mr. Jones) What do you think it is that causes this significant number of patients who have spontaneous resolution; what do you think it is that occurs that results in a spontaneous resolution?
A. Without knowing the specific cause of why the pressure was high in the first place, I think it's really hard to speculate on why it normalizes, particularly in absence of concomitant treatment, like weight lost, and so on.



Q. And in your experience, you would agree that not all women who lose weight experience a resolution, a complete resolution of symptoms, correct?
A. Right. That's not invariable.
Q. Down at the bottom of that paragraph you say: "In some cases, a single diagnostic LP can lead to lasting resolution." You cite de Simone. Did I read that correctly?
A. You did.
Q. Isn't it true that that de Simone study only involved a single patient?
A. That's right. That was one patient.
Q. Are there any other studies that you're aware of that show that a single diagnostic LP can lead to a lasting resolution of PTC?
A. No studies, other than my own experience, and discussing it with other colleagues who have definitely seen the same scenario play out.
Q. How many patients have you had where a single diagnostic LP led to a lasting resolution of that patient's symptoms?
A. In 15 years, probably less than a dozen.
Q. You say: "Less than 10 percent of patients have severe permanent visual field loss." Are you speaking of blindness in that sentence?

A. By visual field loss, we're talking about sort of mean deviation on visual field, but you can also say, certainly, legal blindness, as well, or significant vision loss.
Q. Where do you get your 10 percent figure for that sentence?
A. Again, if you go to some of the reviews I've written, some of the studies have been done by Mike Wall, and others, that's a number that's commonly cited in the epidemiologic studies.
Q. Have you ever seen a number as high as 25 percent cited?
MR. BAUM: Objection, form.
A. Not off the top of my head. And, again, I think it depends on how you're quantifying severe visual loss.
Q. (By Mr. Jones) You would agree that visual loss is a serious potential complication of PTC, correct?
A. I'd agree.
Q. Do you agree that it's important for someone who is experiencing symptoms of PTC to timely seek medical treatment?
MR. BAUM: Objection, form.
A. I'd agree with that.



Q. (By Mr. Jones) Do you agree that the longer one goes without medical treatment for PTC, the more likely it is that they will experience severe visual loss, correct?
MR. BAUM: Objection, form.
A. I wouldn't necessarily agree with that. You know, patients can have elevated cranial pressure from IIH for months and years without experiencing any vision loss. I think it's important to seek attention because you want to get diagnosed, and you also want to rule out other conditions that can potentially be even more serious that can cause high intracranial pressure.
Q. There was some discussion in your report about headaches and migraines. Isn't it true that the kinds of headaches that one experiences in relation to their PTC are different in pattern and severity than just a normal run-of-the-mill headache?
MR. BAUM: Objection, form.
A. So I actually completely disagree with that. So the classic -- sort of a classic intracranial hypertension headache is a headache that is more pressure like. It is typically worse when they're supine and worse upon wakening. But I can tell you from my own experience from things that Friedman has published and Mike Wall has published, there are



significant overlap in headaches types, or headache pheno types in IIH patients. The majority of IIH patients have coexisting primary headache syndrome. In fact, in one study, I think Wall was one of the authors -- I can't recall specifically -- they went into a waiting room, and queried patients both who had IIH and didn't have IIH about all the different symptoms. And the incidence of headache was almost equivalent in both. So I think relying on the specific type of headache in terms of diagnosis or treatment is a recipe for failure.
Q. Who is Deb Friedman?
A. She's a neuro-ophthalmologist who has done a lot of research and clinical work in IIH.
Q. She's one of the most prominent people in the field, isn't she?
A. I'd agree with that.
Q. Do you know Deb Friedman?
A. I know her very well.
Q. When is the last time you talked to her?
A. Hmmm. We're on a committee together, so we had a conference call about two weeks ago.
Q. Okay. Have you ever talked to her about your work in this case?
A. We had a very brief conversation at the



NANOS meeting in February where we are the poster. And she just mentioned that she was involved in this case. And I said I was involved in this case. And that was the extent of it.
Q. Did -- So you know that she is being paid by Bayer to serve as an expert consultant in relation to the allegations that pseudotumor cerebri and Mirena are associated, you know that, right?
MR. BAUM: Objection, form.
A. I do know that.
Q. (By Mr. Jones) Did you write this report yourself?
A. I did.
Q. Did your wife review a copy of this?
A. No. She's a stroke neurologist. Although she's been to as many -- We actually met at NANOS. She's been to as many NANOS meetings as I have. So she probably could. But she did not.
Q. Did you consult with Deb Friedman on this report?
A. Not at all.
Q. Did anyone offer you any sort of revisions or criticisms to this report?
MR. BAUM: I'll just instruct you that under the Federal rule, the substance of any communications

you've had with counsel are not discoverable, but you can go ahead and answer.
A. Yes. So I sent it. I wrote it. I sent it to counsel, and they looked at it. They mainly just suggested areas where I could expand my discussion. And that's the extent of it.
Q. (By Mr. Jones) What is -- What is NANOS? You talked about NANOS.
A. So NANOS is the North American Neuro-Ophthalmologist Society. So it's a group of neuro-ophthalmologists, who essentially just share information, collaborate. We meet every year at the annual NANOS meeting, where there are didactic lectures, symposiums. There are poster sessions, platform sessions. So it's an opportunity for all of us to all gather, sort of share our research, educate each other, expose residents and medical students to the community.
Q. How many -- Approximately how many neuro-ophthalmologists attend the NANOS meeting?
A. So a lot of people attend. This year I think we had over a thousand people, but many of those were -- some of them are basic science researchers. Many of them are medical students and residents. So usually there is about, you know, 400 active



neuro-ophthalmologists in the United States. And of those, maybe 80 to 100 do what I do, which is full time, academic neuro-ophthalmology. A lot of other people mix it with a general ophthalmology or general neurology, and do neuro-ophthalmology as sort of a side business.
Q. When you say full time academic ophthalmology, neuro-ophthalmology, what do you mean by that? Because you treat patients, right?
A. That's correct.
Q. But you do it in a University setting; is that what you mean when you say full time academic?
A. So by full time, I mean I only do neuro-ophthalmology. I don't general neurology or general ophthalmology or surgery. By academic, I mean I'm involved in the teaching of residents and medical students, participating in research, that sort of thing.
Q. What percentage of neuro-ophthalmologists are also involved in teaching of residents?
A. I think of us, probably 100 of the 400 are full time academic. Of that other 300, probably half of them are involved in a University setting in one way or another. So I think the majority of us are involved in teaching residents or medical students, some to a



high degree, some to a lesser degree.
Q. Okay. Do you know any of the authors of the Rai abstract that you've reviewed?
A. I know Kathleen Digre.
Q. Do you know Dr. Katz?
A. I know him, although not quite as well.
Q. And Digre, is that how you pronounce the last name?
A. That's right.
Q. She's one of the prominent researchers in the field, isn't she?
A. She definitely is.
Q. She's very well respected, correct?
A. She is.
Q. What about Dr. Katz?
A. He's similar. He's very well respected. It's been around for a while. He's published a lot.
Q. Were doctor -- Do you know any of the other authors of that piece?
A. No, not very well. Actually, I don't think I know any of them at all.
Q. Or was --
A. Actually, I have to look if Judith Warner was on that. They have a big group on that. If she was on that, I know her well.



Q. And is she pretty respected as well?
A. She is.
Q. Was Dr. Digre -- See, I've been calling her "digray."
MR. BAUM: It's like the temperature degree.
A. It's okay. She's very easy going. I don't think she'd mind.
Q. (By Mr. Jones) Yeah. Was Dr. Digre, or Dr. Katz, or Dr. Warner at the most recent NANOS conference that you went to?
A. They were.
Q. And did you talk to them about their study?
A. I didn't.
Q. Not at all?
A. Not at all.
Q. Did you mention to them that -- well, which ones of them -- Were they all there?
A. Kathleen was there. Brad Katz was there. Actually, Judith was there. I don't know if any of the other authors were there at this most recent NANOS meeting.
Q. Did you ask them any questions about their study?
A. I didn't.
Q. Did you tell them that you were serving as

an expert witness in this litigation?
A. I didn't.
Q. Did you ask them anything about whether or not there is a publication of their study plan?
A. I didn't ask them.
Q. It didn't come up at all?
A. It did not.
Q. Did they mention that they were working on a study; on this study?
A. Not --
MR. BAUM: Objection, form.
A. -- to me.
Q. (By Mr. Jones) Are you aware of them mentioning it to anyone else?
A. Not that I'm aware of.
Q. Do you know or have you heard whether or not they were planning to publish an article or a report of their findings in any journal?
A. Well, normally, when Kathleen, or one of that group publishes an abstract at NANOS, they're pretty good about turning it around to a publication in the next 6 to 12 months. So I would expect it to come out at some point.
Q. Are you aware -- Have you heard one way or another whether they've submitted it for publication?



A. I haven't heard.
Q. Do you have any knowledge of whether or not they've submitted it for publication?
A. I have no idea.
Q. You didn't ask Dr. Digre, or Dr. Katz, or Dr. Warner for any further details about the methodologies they used for their study?
MR. BAUM: Objection. Asked and answered.
A. The idea of doing an abstract analysis -- and I've done a lot of abstracts at NANOS, is it's more like an audition. You show your abstract, and you get comments from the people who see the poster, post comments that might anticipate, criticisms from reviewers. And then you kind of sort of finalize it for a publication. So in some sense, it's almost a larval form of the final publication. So for any abstract that comes out, if I have questions about it, and I don't have the opportunity to talk to the authors right away, I usually wait for the publication to come out because in some cases it will address whatever questions I had.
Q. And these particular authors, they then took their results to ARVO as well, correct?
A. That's what I heard. I wasn't there.
Q. And did you -- What is ARVO?



A. It's the Association for Research and Vision in Ophthalmology. It's another meeting, mostly for Ophthalmology, where people get together and share basic science and clinical research with each other.
Q. Are you a member of ARVO?
A. I'm actually not. Partly for simple logistics reasons. ARVO usually occurs about two to three weeks after the American Academy of Neurology. And I often have multiple commitments at the AN meeting. And there are just a lot of meetings to go to in a short period of time. So you kind of have to pick and choose which meetings you're going to attend. So ARVO sort of gets put on the back burner.
Q. Do you subscribe to the ARVO journal?
MR. BAUM: Objection to form.
A. I have access to it, and I usually get a table of contents sent to my e-mail, just like, you know, Ophthalmology and Neurology, and so on.
Q. Do you remember seeing the -- we'll call it the Rai or Digre study, do you remember seeing that published in the ARVO journal?
MR. BAUM: Objection, form.
A. I don't recall seeing it.
Q. (By Mr. Jones) Are you aware of anyone who has written any letters to the editor of ARVO regarding



the results of the Digre, Rai study?
MR. BAUM: Objection --
A. I'm not aware of that.
MR. BAUM: -- form.
Q. (By Mr. Jones) Have you ever written a letter to the editor, to any journal criticizing any scientific literature that you read in a specific journal?
A. No, I never have.
Q. Have you ever telephoned or e-mailed or otherwise communicated with any authors of a piece in a medical journal that you may have disagreed with?
A. Not necessarily disagreed with. There are articles that come out that are published by my colleagues where I have some questions about their methodology, or how they selected the patients. And when I run into them at meetings, I may ask them about it, but never in a formal way.
Q. And you didn't ask any of the authors of the Digre/Rai study about their methodology, correct?
MR. BAUM: Objection. Asked and answered.
A. As I said, these are usually articles that have come out in peer reviewed publications where a question comes up, and I'll contact them. Usually not because of an abstract.

Page 158

Q. (By Mr. Jones) Are you aware of whether or not Deb Friedman has talked to any of the authors of the authors of the Rai/Digre study about their results?
A. I'm not aware if she's spoken to any of them about it.
Q. Are you aware of whether she's corresponded with them about it?
A. My understanding is that she reached out to them. But beyond that, I don't know what the extent of the communication was.
Q. When did she reach out to them? Do you know?
A. I actually don't know.
Q. Do you know -- strike that.
Now, when you go to these NANOS meetings, do you attend other programs, other than the ones that you're giving a lecture at?
A. Yeah. I usually attend just about everything -- Well, it depends. Sometimes I'll skip some of the platform sessions.
Q. Do you remember presenting at a Snow Bird session of NANOS?
A. It's been at Snow Bird three times in the last 15 years, so I was at all of them.
Q. Have you presented at all of them?

Page 159

A. I don't recall. I presented at a couple of them.
Q. Okay. When is the last time you presented at Snow Bird?
A. So I think it was Snow Bird in 2010 or 2011, and I usually have a poster, or some sort of presentation at most NANOS.
Q. At one of these Snow birds that you presented at, was a session about Daubert, and serving as an expert witness for defendants. Did you attend that seminar?
A. That one I did not attend. That was not a mandatory symposium. That was a voluntary one.
Q. Have there ever been any seminars that you're aware of at NANOS that involved serving as an expert witness for a plaintiff in a litigation?
A. I don't recall off the top of my head. It's actually not a bad idea, but I don't think there has been one.
MR. BAUM: Move to strike.
MR. JONES: I've got 12:38, and I could use a lunch break.
MR. BAUM: Whatever your pleasure.
THE DEPONENT: Yeah. That's fine with me.
MR. BAUM: Sure.

Page 160

VIDEOGRAPHER: The time is 12:38. We're going off the record.
{Lunch break taken from 12:38 -- 1:23 p.m.}
VIDEOGRAPHER: The time is 1:23, and we are back on the record.
Q. (By Mr. Jones) Dr. Van Stavern, welcome back from lunch. Going back to your C.V., why did you not finish the Ophthalmology residency?
A. Well, mainly because I really hated being in the operating room. And primary duty of an ophthalmologist is to do surgery. And so I looked into other options, and it seemed like it would a good opportunity to switch to Neurology. And I was able to stay at the same institution and not have to interview or do anything along those lines.
Q. Were you asked to leave the Ophthalmology program?
A. I was not.
Q. Do you receive grades in the Ophthalmology residency program?
A. You receive evaluations.
Q. Okay. And how were your evaluations?
A. For the most part, they were fairly good.
Q. And for the other part, how were they?
A. Well, since I was really unhappy in the

Page 161

residency, they probably weren't quite as good.
Q. Were you -- That was in North Carolina, right?
A. That's correct.
Q. And were you licensed as a medical doctor in North Carolina?
A. I ultimately was, but when you're a resident, you work under a training license. So I became licensed in North Carolina, like right before I left.
Q. And why haven't you kept your North Carolina license up?
A. Probably because I don't intend to move back there and practice.
Q. And were you licensed as a medical doctor in Georgia?
A. I was.
Q. Okay. And were you licensed as an ENT in Georgia?
A. ENT? No, not at all.
Q. Okay. So if the Georgia Medical Board website says that, it's just a mistake?
A. That must be a mistake.
Q. Have you ever been sued before?
A. No, I haven't.

Q. All right. Let's go back to -- I'm on your report. I think we left off on page 4, right?
A. Right.
Q. Okay. You say: "Surgical options for treatment include optic nerve sheath fenestration and CFS conversion (shunting)." I take it from our talk just now, you don't perform surgeries; is that correct?
A. That's correct.
Q. Who do you -- Who do you refer your surgical candidates to?
A. So for optic nerve sheath fenestration, that's usually one of our occular plastic surgeons. And for shunting, that's one of our neurosurgeons.
Q. Okay. And what is an optic nerve sheath fenestration?
A. That's where you -- basically, the optic nerve is surrounded, like the rest of the brain, by meninges, or dura, or lining surrounding it. So the idea is the spinal fluid, itself, is collected between the optic nerve and the lining. So the surgeon goes in and makes a little opening in the lining of the optic nerve or a window to allow the fluid to come out.
Q. Does it come out of the eye?
A. No. It basically goes into the eye socket, itself.



Q. And do you have any idea how much one of those optic nerve sheath fenestration surgeries costs?
A. I really don't know. I would expect probably somewhere around several thousand dollars, including the facility fee and everything else.
Q. Okay. What did shunting? What is the CFS diversion shunting?
A. So there are two types of shunts. The one type that is much less commonly performed these days is called a lumboperitoneal shunt. That's where a drain is placed in the spinal canal to drain fluid into the belly.
And the other one is called a ventricular-peritoneal shunt of a VT shunt, where a catheter tube is placed in the spaces in the brain, and that's connected to the belly, to permanently drain spinal fluid.
Q. Okay. And is there a tube that the cerebral spinal fluid flows through?
A. That's correct.
Q. And is that tube completely in someone's body or is it outside?
A. It's inside the body.
Q. Okay. And that goes down and drains cerebral spinal fluid into the --



A. Peritoneum, sort of the area around the abdomen.
Q. Okay. And where is the LP placed, is it back in the lumbar region?
A. Back in the lumbar region.
Q. And how does one that has an LP or VP shunt, how do they release the pressure of the cerebral spinal fluid?
A. Well, I mean, you're basically draining the spinal fluid, so that's lowering the pressure.
Q. Right. Is there a device that they push a button on and it drains?
A. So some of them come with a valve that can be reprogrammed, and some of them can be reprogrammed externally these days. So it depends if somebody got their VP shunt done 10 or 15 years ago, they probably don't have a programmable valve.
Q. Do you have any idea how much these shunts cost?
A. I really don't.
Q. Do you know anything about -- Let me ask the question differently. Have you read in the literature about the failure rates of the shunt devices?
A. Yes. They're very high.
Q. So if a shunt fails, more than likely a



patient is going to have another shunt --
A. That's usually --
Q. -- installed?
MR. BAUM: Objection to the form.
A. That's usually the case.
Q. (By Mr. Jones) Okay. And that surgical options paragraph, is there any scientific literature that you can cite me to to support your conclusions in that paragraph?
A. Well, again, I'm going back to my experience and the reviews I've read. At least in terms of what options are out there.
Q. Okay. Epidemiology. You say: "As discussed above, IIH is primarily a disease of obese/overweight reproductive-age women, though men and thin women do sometimes develop IIH." Did I read that correctly?
A. That's correct.
Q. And what is a thin woman? How can you define a thin woman?
A. I think most of us would use a BMI less than 25.
Q. And so do you consider someone that's obese or overweight to be the opposite of thin; fat?
MR. BAUM: Objection, form.

Page 166

A. We try not to use that term clinically.
Q. (By Mr. Jones) Is thin a clinical term?
A. Well, it's just more of a general term, meaning somebody of normal body habitus.
Q. Who is this Friesner that you cite in this paragraph?
A. Yes. So that was in a study trying to estimate how much cases of IIH had occurred in the United States in the period of interest.
Q. And do you know Friesner?
A. I don't know that person personally.
Q. Where is that person out of, do you know?
A. I don't know off the top of my head.
Q. Okay. So you're relying on the Durcan study and the Friesner study for your epidemiological conclusions -- I take that back. Let me restate.
The Durcan, the Friesner, and the Asensio-Sanchez piece for the your epidemiologic conclusions in your report?
MR. BAUM: Objection, form.
A. That's correct.
Q. (By Mr. Jones) You haven't done any sort of epidemiological studies yourself, right?
A. Well, we did review the -- at least the characteristics of the patients that had IIH in Detroit

Page 167

over a period of time. That wasn't specifically looking at incidence, but it was looking at a specific group of patients.
Q. Okay. Have you ever done any epidemiological studies that tried to determine the incidence rate of PTC per 100,000 women?
A. I haven't personally done them.
Q. And the Durcan -- Durcan study, that was -- was that Iowa and Louisiana?
A. Yes. That was the one.
Q. And we agreed earlier, didn't we, that the incidence of PTC in one geographic region can be different than the incidence in another geographic region, correct?
A. Correct. And I think that's borne out by other studies done in other countries.
Q. Have there been any other U.S. epidemiological studies similar to the Durcan study?
A. Not that I'm aware of.
Q. And you agree, don't you, that the incident of --
MR. BAUM: Objection, form.
MR. JONES: Sure.
Q. -- that the incidence of PTC can vary based upon the race or nationality of individuals?

Page 168

A. Well, I think if you look -- I don't think we know that for sure. I think it tracks along with obesity.
Q. Isn't there some -- Isn't there a bit of a dispute about the -- whether obesity is a recognized risk factor of PCT and women in Japan?
MR. BAUM: Objection, form.
A. Well, there probably is some dispute. I'm not familiar with the incidence rates of IIH in Japan.
Q. (By Mr. Jones) Do you know what percentage of women of child-bearing age in the United States use the Mirena product?
A. I'm not familiar. I have no idea what the proportion of patients of that age group use it.
Q. Do you know what percentage of overweight or obese women in the United States use the Mirena product?
A. I don't know. I do know that it is preferentially prescribed to obese women, so I suspect that it's a relatively higher number.
Q. And tell me everything that supports your statement that Mirena is preferentially prescribed to overweight and obese women?
A. So I think you have the ACOG statement. You have the CDC guidelines. Those are, at least

Page 169

recommendations to prescribing gynecologists to prescribe Mirena to overweight and obese women.
Q. But the documents you just cited don't say specifically to prescribe Mirena to the exclusion of anything else, do they?
MR. BAUM: Objection, form.
A. No, they don't, but I think it's a reasonable assumption that people do try to follow guidelines.
Q. (By Mr. Jones) But what you've cited also says, in the same paragraph, as the LNG IUS, it preferentially recommends non-hormonal IUD's like the ParaGard, doesn't it?
A. It seems to recommend either or both.
Q. So if that's your basis, wouldn't you agree that ParaGard is also preferentially prescribed to overweight or obese women?
MR. BAUM: Objection, form.
A. It's possible.
Q. (By Mr. Jones) And you're not aware of any cases of pseudotumor cerebri that have been reported in connection with ParaGard, are you?
A. I'm not aware of any.
Q. Do you know the percentage of overweight or over obese users -- strike that.

Page 170

Q. What percentage of Mirena users are overweight or obese?
A. I don't have access to that information.
Q. You can ask Bayer for that information, couldn't you?
MR. BAUM: Objection. Form.
A. I probably could.
Q. (By Mr. Jones) But you didn't ask?
A. I didn't ask.
Q. Wouldn't that be the best evidence of whether or not Mirena is being preferentially prescribed to overweight and obese women?
MR. BAUM: Objection, form.
A. It all depends on how accurate those records are, and if it takes into account people that are prescribed other medications as well. I mean, we would only know how many women were prescribed Mirena. We wouldn't know how many women were prescribed other medications not made by Bayer.
Q. (By Mr. Jones) I'm asking do you know the percentage of Mirena users that are overweight or obese?
A. That I don't know. No. I get what you're saying. No, I don't know that.
Q. Let's go down to the: "Pediatric IIH is

Page 171

uncommon and may represent a distinct disorder with a different clinical and demographic profile from adult IIH." Did I read that correctly?
A. You did.
Q. Okay. And are you certain that pediatric IIH represents a distinct disorder with a different clinical and demographic profile from adult IIH, or is that just something that's still to be proven?
A. Well, I think when you look at pre-pubertal IIH, there are different characteristics. Those patients can have a more normal body habitus. There is less incidence of obesity; the male to female ratio is almost one to one. So it's behaving very differently than what we see in the post-pubertal - pre-menopausal IIH. Has it been proven? No. But it seems to be behaving very differently than we'd expect.
Q. And you say that below that: "The primary risk factors for developing IIH are female gender, age 15 to 45, (Post-pubertal to pre-menopausal), and excess weight/recent weight gain." Is that correct?
A. That's correct.
Q. So this condition, PTC, seems to affect women more prominently who are in that period during which reproductive hormones are active in their bodies, correct?

Page 172

A. That's true.
Q. Have you read any evidence about PTC being associated with menstrual problems?
A. There are some literature suggesting people with dysmenorrhea maybe have a higher likelihood of developing IIH in the context of the other risk factors.
MR. BAUM: Sorry. Go ahead.
A. That's not commonly stated as one of the primary risk factors again because it doesn't have that high level of that evidence supporting a causal relationship.
Q. Are you aware --
MR. BAUM: Objection, form.
Q. (By Mr. Jones) Are you aware of whether or not dysmenorrhea has been reported by Mirena users?
MR. BAUM: Objection. Form.
A. I'm sure it's been reported. I'm not sure how frequently it's been reported.
Q. Have you read any of the clinical studies, the clinical preapproval studies for Mirena?
A. Only briefly.
Q. Are you aware of the fact that Mirena has known to disrupt a user's normal bleeding patterns?
MR. BAUM: Objection, form.

Page 173

A. Yes, I do understand that.
Q. (By Mr. Jones) Going down to: "From a practical standpoint, this means that any attempt to identify a causal variable medication hormonal status, other associated medical conditions must account for possible confounding due to the known primary risk factors." Did I read that correctly?
A. You did.
Q. Okay. And you say, "A large well designed, prospective study might be able to minimize confounding and isolate and evaluate risk factors; however, given the rarity of IIH, (which occurs at an incidence of less than 1 per 1,000 even among high-risk groups), such a study would likely be unfeasible given the number of subjects needed and the time required to complete it." Did I read that correctly?
A. You did.
Q. And is that your opinion?
A. It is my opinion. I mean, could you design a study designed to answer that question, or could you have a clinical trial for IIH designed to answer another primary outcome, and include that as a secondary outcome? It's possible. You just need to give that incidence a large number of subjects to power the study, and I think it would be difficult to justify

Page 174

funding for that study given the evidence available.
Q. And given that the perspective -- large perspective, well designed study is not feasible, you would agree that that a retrospective study is useful in furthering our understanding of relationships between PTC and other potential risk factors?
MR. BAUM: Objection, form.
A. I think the caveat here is every retrospective study -- and I've done my share -- is subject to significant limitations. The degree to which you can draw causal conclusions from a retrospective study is extremely limited.
Q. (By Mr. Jones) The retrospective studies that you did, did you include any caveat that it would be difficult to draw any sort of conclusions from your work when you published it?
MR. BAUM: Objection, form.
A. I think every study I've done that is retrospective has an acknowledgment towards the end that one of the limitations of this study is retrospective. It doesn't mean it's not worthwhile, it just means it has limitations.
Q. (By Mr. Jones) Right. In fact, you can't create -- There is no perfect study, is there?
A. There is no such animal.

Page 175

Q. Do you agree that Mirena can cause hormonal adverse affects?
MR. BAUM: Objection. Form.
A. Again, can it cause -- can it be associated with hormonal changes? Sure. I'm sure it can.
Q. (By Mr. Jones) How does Mirena work?
A. Well, again, my understanding is that it has a release of levonorgestrel, which is a progestin that slowly decreases over time.
Q. Has it been known to cause any hormonal systemic adverse affects?
MR. BAUM: Objection, form.
A. Have they been reported to occur in association with Mirena? I'm sure they have. To my knowledge, I'm not sure that a causal relationship has been proven.
Q. Are there any hormonal adverse effects listed in the Mirena warning label?
MR. BAUM: Objection.
A. I think there are a number of them. But just like with most warning labels, there are limitations about the accuracy, and whether a specific diagnosis was verified.
Q. (By Mr. Jones) Would you agree that there are lots of things included in pharmaceutical warning

Page 176

labels that have not been proven with certainty to be caused by that pharmaceutical product?
MR. BAUM: Objection, form.
A. Sure. I think that's the issue with warning labels, in general.
Q. (By Mr. Jones) This CDC document that you referred to that you say recommends Mirena, and other forms of progestin-only contraception, have you ever reviewed that before this litigation?
A. No, I hadn't.
Q. Did you go out and find that yourself, or was that provided by Bayer's counsel?
A. That was provided by counsel.
Q. Going to page 6. You talk about "correlation does not equal causation." Do you see that?
A. I do.
Q. And then you, later on, say, "Association is not the same thing as causation." Correct?
A. Correct.
Q. So is "correlation" different than "association," or are you using those terms synonymously?
A. I'm using them the same way.
Q. And then in the paragraph below, you say:

Page 177

"There are a number of medications that have been associated with the development of IIH." Is that correct?
A. That's correct.
Q. And isn't it true that -- Isn't it true that -- well, strike that.
You say: "In most cases, the evidence is insufficient to establish that there is a causal relationship between exposure to the medication and the development of IIH." Is that correct?
A. That's correct.
Q. Okay. And just so I understand, what evidence of -- or what evidence is sufficient to establish a causal relationship?
A. Well, I think --
MR. BAUM: Objection to the form. Go ahead.
A. In the layout before that, there is certain criteria you like to see fulfilled before you can develop more certainty about a causal relationship, including the things we talked about: The scientific plausibility, dose response curve, temporal relationship, and so on.
Q. And we were talking earlier about this, and I said something about medication-induced intracranial hypertension. Do you remember that?

A. I do.
Q. And you said that you wouldn't say medication-induced, you would say medication-associated?
MR. BAUM: Objection.
Q. (By Mr. Jones) Is that correct?
MR. BAUM: Objection. Mischaracterizes.
A. Well, I mean, I probably used those terms before. What I'm trying to convey with that term is that the medicines are associated with IIH.
{Marked for identification Plaintiffs Exhibit 3, Atypical idiopathic intracranial hypertension article by Bruce, et al., 05/17/16.}
Q. (By Mr. Jones) Let's mark this as Deposition Exhibit 3. Can you describe the document that's been handed to you?
A. So it's an article entitled Atypical idiopathic intracranial hypertension.
Q. And you are the third listed author on this?
A. That's correct.
Q. And I see Dr. Bruce and Dr. Newman are also listed; is that correct?
A. That's true.
Q. Okay. They're also experts in this case,



right?
MR. BAUM: Objection, form.
A. They are.
Q. (By Mr. Jones) Let's -- The methods in this: "A retrospective cohort study of 400 consecutive adult patients with IIH with known BMI from three centers was undertaken." Is that correct?
A. That's correct.
Q. Okay. So you all started off with looking at 407 files; is that correct?
A. That's right.
Q. Okay. And then it looks like, you identified 18 IIH patients with normal BMI, and 19 age 50 years or over, at the time of diagnosis, who were compared with the remainder of the cohorts. Is that correct?
A. That's true.
Q. So you looked specifically at these 37 patients, right?
A. That's right.
Q. And compared them against the other, I guess, 370?
A. That's correct.
Q. Okay. And you say medication-induced, not medication associated. "Medication-induced IIH was



more frequent in patients with IIH with normal BMI's." Is that correct?
A. That's true.
Q. Okay. So, in this case, in this article that was published, you used the term medication-induced, correct?
MR. BAUM: Objection, form.
A. Although, I think if you go back earlier when we're talking about medications, and the methods, I think we're talking about medications that are possibly contributing, not necessarily that are causally related. So even though we kind of use the shorthand in the table about contributing medications, I think earlier we do mention that it is possibly contributing.
Q. Okay. My question is: You used the term medication-induced in the result section of this article; is that right?
A. That is true.
Q. Can you go to: At the bottom it says page 1829.
A. Uh-huh.
Q. Up at the top, the second column, you write: "Among people with normal BMI (table one) medication-induced IIH was more frequent (28% versus



7%)." That's 28 percent versus 7 percent, correct?
A. That's correct.
Q. "And the implicated medications in the patients with normal BMI were vitamin A preparations. (2 patients) depo progestins (2 patients) and recent steroid discontinuation (1 patient)." Is that correct?
A. That's true.
Q. So of the five normal BMI patients that you examined, 40 percent of them were taking a progestin at the time, correct?
MR. BAUM: Objection, form.
A. Well, again, I had a caveat that 40 percent means two people. And that was clearly a different type of progestin than Mirena. That was a depo form. The depo for had been associated with weight gain, which is one of the reasons we included that as a possible contributing medication in the study.
Q. What's the differences between the depo progestin and the progesterone?
MR. BAUM: Objection, form.
A. One is basically a depo form. And the other is an IUD form. And they do have different side effect profiles. And the depo form does seem to be more associated with weight gain.
Q. Is it more associated with PTC?

Page 182

A. Well, if you can call two patients in our study associated.
Q. You chose the size of the study, right?
A. Uh-huh. Again, I think we're using the term associated in the way I originally defined it, meaning that we're not saying there is a causal relationship.
Q. Down at the bottom of 1829 you say: "Given the high proportion of medication-related IIH among our patients with normal weight, we attempted to identify new medication associations with IIH through a case-controlled study between our atypical patients with IIH, and other patients with IIH, but we did not find any such association. However, by only using other patients with IIH, rather than normal persons as controls, our power to find such associations would have been reduced, because other patients with IIH, despite their more typical features may also have had unknown medication or other risk factor that contributed to their development of IIH." Did I read that correctly?
A. You did.
Q. Okay. So the study wasn't powered sufficiently to find any sort of new medical association -- new medication associations with IIH, correct?

Page 183

MR. BAUM: Objection, form.
A. Right. That was not the purpose of the study.
Q. (By Mr. Jones) That means you did not have enough people to do that?
MR. BAUM: Objection, form.
A. No, not only not enough people. You would also have to -- I mean, when you're designing a study, you have to set up a priori outcomes. You have to say ahead of time what you're going to be looking at. So you really want to design the study differently, if that's one of the main questions you're trying to answer.
But since we had a large group of people with IIH, it seemed like it was reasonable to see if we saw anything in there that was interesting.
{Marked for identification Plaintiffs Exhibit 4, Pseudotumor Cerebri Brief Review of Clinical Syndrome and Imaging Findings, 05/17/16.}
Q. (By Mr. Jones) I'll mark this as Plaintiff's Exhibit 4. This is review article entitled Pseudotumor Cerebri Brief Review of Clinical Syndrome and Imaging Findings published June 16, 2011." Did I describe that correctly?

Page 184

A. You did.
Q. Was this cited in the list of materials reviewed in preparation for this report?
A. I don't believe it was.
Q. Down in the second paragraph, it talks about the confusion of the terminology, "The benign intracranial hypertension, idiopathic intracranial hypertension, pseudotumor cerebri." Do you see that?
A. I do.
Q. And do you agree that there is a little bit of confusion or dispute about the terminology to be used?
MR. BAUM: Objection, form.
A. Yeah. I think a lot of people use these term in different ways to mean different things.
Q. (By Mr. Jones) And it says: "Certain authors propose to use the use of PTC as a catchment for both categories; purely IIH, and that due to secondary causes of intracranial hypertension, such as venous stenosis," correct?
MR. BAUM: Objection, form.
A. That's what it says, but I completely disagree with that statement.
Q. (By Mr. Jones) Oh, you disagree with that?
A. Yes

Page 185

Q. Tell me why?
A. Well, again, we already mentioned that venous stenosis is a common finding in IIH. And I wouldn't consider it a secondary cause. I wouldn't consider it a cause at all at this point. That has not been established.
Q. You don't consider venous stenosis to be part of the pseudotumor cerebri catch-all diagnosis?
MR. BAUM: Objection, form.
A. It is an imaging finding that we see. It's like saying that papilledema is a cause of pseudotumor. It's just a finding we see in that condition.
Q. (By Mr. Jones) Okay. It says: "There is another argument that proposes a classification of isolated intracranial hypertension as being either idiopathic or secondary." Do you disagree with that? There has been some talk in the field about we should either call it idiopathic or secondary?
A. Yeah. But, again, to me that doesn't seem like that's a big area of disagreement. If you have brain tumor, you have secondary intracranial hypertension.
Q. Okay. Fair enough. Let's go over to the second page, table one, it says: "Confounding conditions that may present similar to IIH." And it's

Page 186

using idiopathic intracranial hypertension. Do you see down in the middle, where it says: "Levonorgestrel implant system"?
MR. BAUM: Can I have the same objection on a document he hasn't seen before?
A. I do see that.
MR. BAUM: Should I do -- renew the objection each time?
MR. JONES: Well, you can have a standing objection.
Q. (By Mr. Jones) Have you ever heard of the American Society of Neuroradiology?
A. Yeah. I do. I have heard of them.
Q. Is it a well respected organization?
A. I'm pretty sure it is. I assume it is.
Q. Is the American Journal of Neuroradiology a recognized authority in the scientific field?
A. It's recognized for neuro-imaging, not necessarily for clinical medicine. It's really well recognized for specific issues regarding neuro-imaging.
Q. So for folks that do neuro-imaging, this is a well recognized journal, right?
A. It is.
Q. It's not some fly-by-night internet publication?

Page 187

MR. BAUM: Objection, form.
A. No, it's not.
Q. (By Mr. Jones) So table one, it says "levonorgestrel implant system." I take it that you disagree that a levonorgestrel implant syndrome is a confounding condition that may present similar to IIH?
MR. BAUM: Objection, form.
A. Well, I think going back to what I think we talked about earlier. When you look at a lot of textbooks, you're going to see lists as long as this or longer, with all the things that have been associated with the development of IIH. But in many cases there is just not enough evidence to support a causal relationship. So they're just listed there, in some cases just to let people know that you'll see this come up. But, hopefully, with the caveat that these are usually based on case series, anecdotal reports, and you shouldn't make treatment decisions without looking at the whole picture and the whole body of evidence. So it is the long way of saying, that, yes, you will see these list of things that are associated with IIH, but the authors, in good faith, should acknowledge that none of these are proven to cause the condition.
Q. What in the whole body of evidence gives you, as a physician, comfort the levonorgestrel

Page 188

implant system is not associated with the development of PTC?
MR. BAUM: Objection, form.
A. I think we have the same issue with contraceptive use in general. It's going to be preferentially prescribed to people who are at highest risk for this condition, including people of reproduction age. That makes it -- I mean, if you're looking to try to separate out the signal from the noise, there is just a lot of noise there. And, again, looking at the data regarding the Norplant system, there is not evidence that it's causally related to IIH.
Q. Is it evidence that it's not causally related to IIH?
MR. BAUM: Objection, form.
A. I guess we're going to have to keep disagreeing about how we do science; we don't try to disapprove things, and don't try to prove a negative.
Q. (By Mr. Jones) Do you look at the evidence out there -- I mean, you agree there are numerous articles that say that levonorgestrel is associated with PTC, correct?
MR. BAUM: Objection, form.
A. Again, if we're using the term that IIH

Page 189

occurred in the patient who is using levonorgestrel; absolutely, there are reports out there about the temporal relationship.
Q. (By Mr. Jones) There are numerous articles out there, just like this one that we're dealing with, that lists levonorgestrel as being associated with PTC, correct?
MR. BAUM: Objection, form.
A. Well, two points with that. Again, you're using the term associated, and I'm using the term associated meaning that there is no proven causal relationship. I would also not go to a Neuroradiology Journal for definitive information about pseudotumor cerebri syndrome, at least the clinical characteristics. The imaging characteristics, absolutely.
Q. Who would you go to; would you go to Deb Friedman?
A. I would probably go to, at least an ophthalmology journal, a neurology journal, or our journal, the Journal of Neuro-Ophthalmology.
Q. What about Deb Friedman, would you believe it if Deb Friedman said that PTC was associated with levonorgestrel?
MR. BAUM: Objection, form.

Page 190

A. Well, I don't believe things just based on the authority of the person saying them. If they publish data, or did a nice review, and cited evidence, then, yes, I would believe them. I wouldn't believe something just because this person said it.
Q. (By Mr. Jones) All right. Isn't that what you do everyday when you read articles? You don't go back and reproduce the results, do you?
MR. BAUM: Objection, form.
A. Well, I mean, you read an article. I mean, one of the things we learn when we're training as physicians, and then you cultivate during your medical practice, is how to critically analyze the literature. Some of it includes looking at the methodology, looking at the results, looking if they line-up with other evidence that's been published on this particular subject. So, I mean, I'm hoping that I and my other -- my colleagues are not just reading something and blindly accepting it.
Q. (By Mr. Jones) What evidence has been published that says that levonorgestrel is not related to PTC?
MR. BAUM: Objection. Asked and answered countless times. You can answer again.
A. Again, there is no evidence that there is a

Page 191

causal relationship between those two things.
Q. (By Mr. Jones) That's not answering my question. What evidence can you point me to that says that there is not an association between PTC and levonorgestrel?
MR. BAUM: Move to strike colloquy. Objection. You can answer again.
A. We can do this all day, but I'm going to keep giving you the same answer.
Q. (By Mr. Jones) Give it to me. Give it to the jury, too.
A. Yeah. So, basically, in science there is almost no way to prove a negative. So our job is to try to prove causal connections between events and outcomes. And there is no evidence that exposure to this medication causes IIH.
MR. BAUM: Another objection to the colloquy.
MR. JONES: That's not a proper objection.
MR. BAUM: It is, actually. Under Federal rules if I don't state that I move to strike your colloquy, then I have waived it.
MR. JONES: Show me in the rules where it says "colloquy."
MR. BAUM: Shows me where it doesn't, if

Page 192

we're into disapproving.
MR. JONES: It's in the rule. The only proper objection is on form. Look at the rules.
MR. BAUM: I am allowed to object to colloquy.
MR. JONES: No.
MR. BAUM: Yes, I am.
Q. (By Mr. Jones) There is evidence that levonorgestrel is an associated with PTC, isn't there?
MR. BAUM: Objection, form.
A. I think I just answered. There is definitely case reports of people who are on that medication that developed IIH. Whether there is evidence that there is a causal relationship, there isn't.
Q. Isn't it true that the Rai Digre study says that it is -- that there is a significant association between the use of the levonorgestrel releasing IUD and pseudotumor cerebri?
MR. BAUM: Objection, form. You don't have to testify from memory.
A. If they found a higher incidence of IIH in Mirena users than nonusers in control subjects in that study, but there are a lot of issues with that study, which I'm happy to discuss.

Page 193

Q. They said it was significantly associated, didn't they?
MR. BAUM: Objection. It's not a memory test. You can show him the document.
MR. JONES: I don't have the document with me right now.
Q. (By Mr. Jones) Did you read it? Have you read it?
A. I have read the abstract.
Q. Okay. And it said "significantly associated," didn't it?
MR. BAUM: Same objection. Improper.
A. Well, I can go to where I talked about it in my report, if you don't mind.
Q. (By Mr. Jones) Sure. Go for it.
A. They found an increased risk of IIH with exposure to Mirena. So, yeah, so if that's what you're saying, I agree that that's what that abstract said.
Q. You don't remember it saying "significantly associated"?
MR. BAUM: Objection, form.
A. I do remember them saying that it has not been established that Mirena is a cause of IIH.
Q. (By Mr. Jones) I'm glad you remember that. Do you remember them saying that it was "significantly

associated"?
MR. BAUM: Objection, form.
A. You'd have to show me the abstract to see it.
Q. (By Mr. Jones) Did you review the abstract before your deposition in preparation for your testimony here today?
A. A few weeks ago.
MR. JONES: Mark this as Deposition Exhibit 5.
{Marked for identification Plaintiffs Exhibit 5, Doxycycline and intracranial hypertension, (Friedman et al.), 05/17/16.}
{Off the record discussion.}
MR. JONES: Run out and get me a copy of that. Give me that Exhibit sticker off there, please.
MR. BAUM: Do you want to see if I have an electronic copy, and I can follow along?
MR. JONES: This one is not in his review list.
MR. BAUM: Can I take a look and see if I have a copy of it on my computer and save you the effort?
MR. JONES: Oh, sure.
MR. BAUM: I'm sorry.



MR. JONES: Let's take just about a 5 or 10-minute break.
VIDEOGRAPHER: The time is 2:13, and we're going off the record.
{Short break taken 2:13 - 2:24 p.m.}
VIDEOGRAPHER: The time is 2:24, and we're back on record.
Q. (By Mr. Jones) Dr. Van Stavern, sorry about that mixup. I'm handing you what has been marked Deposition Exhibit 5. The article is Doxycycline and intracranial hypertension. And first author is D.I. Friedman. Down at the bottom, it looks like the copyright is 2004 by AAN Enterprises, Inc. Have you seen this before?
A. Oh, I've seen it, but I haven't read it in a long time.
Q. And it was on your reviewed list; is that fair to say?
A. It is. But it's an article I was familiar with. I just haven't read thoroughly for a while.
Q. Okay. And the first paragraph says "Intracranial hypertension pseudotumor cerebri (PTC) is associated with many exogenous agents, including vitamin A, isotretinoin --
A. -- tretinoin.



Q. " -- and other synthetic retinoic acid compounds, corticosteroid withdrawal, nalidixic acid, levonorgestrel, and tetracyclines." Did I read that correctly?
A. You did.
Q. And do you disagree with Dr. Friedman's sentence there?
MR. BAUM: Objection, form.
A. As long as we're agreeing to use the term "associated" the way I've used it in the past.
Q. (By Mr. Jones) So you'll agree that levonorgestrel is associated with intracranial hypertension pseudotumor cerebri?
MR. BAUM: Objection, form.
A. As long as we acknowledge that does not imply a causal relationship.
Q. (By Mr. Jones) I'm handing what I'm going to mark as Deposition Exhibit No. 6.
{Marked for identification Plaintiffs Exhibit 6, Medication-Induced intracranial hypertension in Dermatology, 05/17/16.}
Q. (By Mr. Jones) This is an article entitled Medication-Induced intracranial hypertension in Dermatology, published in the American Journal of Clinical Dermatology February 2005. Did I read that



correctly?
A. You did.
Q. And have you seen this article before?
A. I have seen it.
Q. Okay. I'm going to tell you that this is not in your reviewed list of articles that you reviewed in preparing your report; is that fair to say?
A. It is. But I've seen this article.
Q. Is there a reason why you didn't include this article in your report?
MR. BAUM: Objection, form.
A. I felt that the other articles included -- just covered whatever was said in here.
Q. (By Mr. Jones) This is by Dr. Deborah Friedman, correct?
A. Correct.
Q. And this is the same Dr. Friedman that we -- Deb Friedman we discussed earlier?
A. That's correct.
Q. The one who's a consulting expert for Bayer?
MR. BAUM: Objection, form.
A. That's true.
Q. (By Mr. Jones) Go to the page where it says "Definition and Etiologies." It's the third full page.
A. Got it.

Q. Okay. And down in the bottom paragraph, she says: "For the purposes of this article, the term 'IIH' is reserved for patients with the idiopathic form. 'PTC' and 'intracranial hypertension' are more inclusive terms, and will be used for the discussion of medication-induced intracranial hypertension." Did I read that correctly?
A. You did.
Q. Okay. And then in table 2, she says "medications associated with intracranial hypertension," and she lists "levonorgestrel implants." Did I read that correctly?
A. You did.
Q. Okay. And do you agree that levonorgestrel implants are associated with intracranial hypertension?
MR. BAUM: Objection, form.
A. With the same caveat as before.
Q. (By Mr. Jones) I'll mark this next one Deposition Exhibit 7, and hand it to you.
{Marked for identification Plaintiffs Exhibit 7, idiopathic intracranial hypertension by Deborah Friedman, M.D., 05/17/16.}
Q. (By Mr. Jones) This is an article by Deborah I. Friedman called idiopathic intracranial



hypertension. It looks like it is in the Current Pain and Headache Reports, 2007. Did I read that correctly?
A. You did.
Q. And in symptoms and signs of IIH, Dr. Friedman says, "Headache is the most common presenting symptom of IIH experienced by more than 90 percent of patients." Do you agree with that?
A. I do.
Q. And then she goes on to say: "IIH may be a cause of new daily persistent headache, and should be suspected in patients with recent onset of progressively worsening disabling headaches." Do you agree with that?
A. I agree with that.
Q. Then she says: "The headache is most frequently described as retro-ocular, frontal, and pressure-like, but it varies considerably." Do you agree with that?
A. I do.
Q. Then she says: "There may be migrainous features with throbbing, photophobia, phonophobia, and nausea." Do you agree with that?
A. I do.
Q. She says: "The pain may be worse upon awakening and is frequently described as the worse



headache of one's life." Do you agree with that?
A. That one, I'm a little surprised she put that in there. I wouldn't say that it is frequently described as the worse headache of one's life, but everything else you read I agree with.
Q. Then she says: "Transient visual obscurations occur in approximately 75 percent of patients." Do you agree with that?
A. I do.
Q. She says: "They may be uniocular or binocular, consisting of partial or complete visual loss that is often provoked by a change in posture." Do you agree with that?
A. I do.
Q. She says: "The visual obscurations usually last less than 60 seconds, and reflect papilledema." Do you agree with that?
A. I do.
Q. She says: "Approximately 50 percent of IIH patients have pulsatile tinnitus that is often not volunteered and must be specifically queried." Do you agree with that?
A. I do.
Q. She says: "Binocular, diplopia, blurred vision and subjective visual field loss may be



present." Do agree with that?
A. I do.
Q. She says: "Less common symptoms include ataxia, vertigo, disturbed hearing, torticollis, and facial palsy." Do you agree with that?
A. I do.
Q. She says: "Neck, back, and radicular pain is sometimes prominent." Do you agree with that?
A. I agree.
Q. She says "Fever, meningismus --
A. -- gismus.
Q. -- gismus -- "-- meningismus and altered sensorium, or focal neurologic deficits suggest another diagnosis." Do you agree with that?
A. I do.
Q. She says: "The hallmark of IIH is papilledema, which is usually bilateral, but may be asymmetric or unilateral." Do you agree with that?
A. I do.
Q. "The timing of papilledema in relation to the patient's symptoms is uncertain." Do you agree with that?
A. I do.
Q. Then she says: "Papilledema may be present early in the course. Some experts maintain that it

develops before the patient becomes symptomatic." Do you agree with that?
A. I do.
Q. Over to "Medical Treatment."
A. Okay.
Q. She says: "The evidence supporting weight loss as an effective treatment is largely retrospective and suggests that losing approximately six percent of body weight is associated with an improvement of in papilledema grade." Do you agree that the evidence supporting weight loss is largely retrospective?
MR. BAUM: Objection, form.
A. Certainly was at the time that this paper was written, but that was before the results of IIH treatment trial were released or actually before the study was even conducted.
Q. Okay. And that trial found improvement -- What did that trial find?
MR. BAUM: Objection, form.
A. So, just briefly, it was a study really designed to answer the question of whether the medication we commonly used to treat this condition, acetazolamide actually works. So it was a group of people. Everyone in the study was given a structured weight loss plan. Half of them got the study drug,



which is acetazolamide, and half of them got placebo. So both groups improved. The people who got the weight loss and the acetazolamide improved better than the people who got weight loss alone, but it did tell us that weight loss alone can be an effective treatment.
Q. And then she says: "The effect of weight loss on headache and the other associated symptoms of IIH has not been studied, nor has any particular dietary protocol." Do you agree with that?
MR. BAUM: Objection, form.
A. I do.
Q. (By Mr. Jones) And she says: "Because many women with IIH have systemic fluid retention, a low-salt diet that avoids excessive fluid intake may be helpful." Do you agree with that?
A. I think that's a reasonable thing. I don't know if that has the same level of evidence. But I think a low-salt diet is reasonable, and I often recommend to my patients.
Q. Okay. Acetazolamide. She talks about common side effects with acetazolamide.
A. I'm sorry. Where are you at here?
Q. The next paragraph down.
A. Okay.
Q. Well, first, she says: "All medications



used to treat IIH are considered off label." What does that mean?
A. It means that it's not FDA indication for that medication.
Q. It hasn't been proven as safe and effective for that treatment, correct?
A. True. But as I'm sure you know, a lot of the medications we use are off label.
Q. Going down, she talks about: "Common side effects of acetazolamide include paresthesias, drowsiness, and altered taste sensation, (especially for carbonated beverages)." Do you agree with that?
A. I do.
Q. And low serum bicarbonate levels are expected, and do not generally require treatment. Do you agree with that?
A. I do.
Q. "Severe adverse reactions include allergies, Stevens-Johnson syndrome, aplastic anemia, and renal stones." Do you agree with that?
MR. BAUM: Objection, form.
A. I do.
Q. (By Mr. Jones) What is Stevens-Johnson's syndrome?



A. That's a severe syndrome where you essentially have -- if you can think of the worse case of sunburn in your life, it effects your entire body, and that can be life-threatening. It's the equivalent of getting high grade burns over your entire body.
Q. Going over to the next page, the paragraph that begins with "Headaches." I want to go to the last sentence. It says, she writes: "Patients with IIH commonly continue to experience headaches after their intracranial pressure is successfully treated." Do you agree with that?
A. I do.
Q. Going over to the surgical treatment section, do you see where she talks at the top of the second column: "Various types of shunts are used to treat IIH."
A. Yes.
Q. Okay. And she says in the middle of that paragraph: "A retrospective review of 27 IIH patients treated with lumboperitoneal shunts with a mean follow-up of six years showed that 56 percent of patients required revision." Do you agree with that?
MR. BAUM: Objection, form.
A. I don't know. Do you mean do I agree that she wrote that, or do I agree with that statistic?

Q. (By Mr. Jones) Do you agree with that statistic, based upon your experience?
A. Yes. I would agree with that, especially for the LP shunts, which really are not used any more.
Q. Okay. And it says: "And the average revision rate was 2.4 per patient, with a median time to first revision of 11 months." Does that seem consistent with your experience as well?
A. It does. I think that's the Eggenberger study. Yeah, it is. So I've seen that study. I agree with that.
Q. Going down, she talks about: "A review of a 30 year experience with shunting for IIH at Johns Hopkins School of Medicine studied 115 shunt procedures (79 lumboperitoneal, and 36 ventriculoperitoneal or ventriculoatrial) in 42 patients. 45 percent of patients had one procedure, 24 percent underwent two, 19 percent underwent three to five procedures, and 12 percent had six or more procedures." Does that seem like a fair statement, based upon your experience?
A. It does. And I actually discussed this study when I was giving my talks to the neurosurgeons a few weeks ago.
Q. Yeah. And then consistent, I think, with what you said a second ago, "lumboperitoneal shunts


were more likely to require revisions 86 percent, than ventricular shunts, 44 percent."
MR. BAUM: Objection, form.
A. Agreed.
Q. (By Mr. Jones) Then below that: Secondary causes of intracranial hypertension. Do you see that?
A. I do.
Q. And she says: "The diagnosis of IIH requires the exclusion of a secondary cause." Do you agree with that?
A. I do agree with that.
Q. And it says, she writes: "Many secondary causes have been reported in literature, but the only case controlled study of IIH identified only obesity and recent weight gain as risk factors." Do you agree with that?
A. I'd agree with that.
Q. Okay. And then skipping down, a sentence: "Among the many exogenous agents associated with intracranial hypertension, the best evidence exists for tetracyclines, vitamin A, and retinoids, corticosteroid withdrawal, human growth hormone, nalidixic acid, leuprorelin acetate --" Can you help me with that one?
A. Leuprorelin acetate.
Q. -- chlordecone pesticide, and levonorgestrel


contraceptive system." Did I read that correctly?
A. You did.
Q. Do you agree with her that the best evidence exists for those substances --
MR. BAUM: Objection, form.
Q. (By Mr. Jones) -- being associated with the development of intracranial hypertension?
MR. BAUM: Objection.
A. Well, I think, again, we're coming back to sort of the terminology being associated with it. You mean, the best evidence, meaning there are lots of case reports, or there are case reports of people who developed IIH while they're being exposed to the medications? Yes.
But if we're talking about best evidence in terms of a causal relationship, that's where I would disagree.
Q. Do you agree with me she titles this section "Secondary causes of intracranial hypertension"?
MR. BAUM: Objection, form.
A. She titled it that way. I would agree with that.
Q. (By Mr. Jones) She next writes: "After discontinuing the agent, the intracranial pressure does not always revert to normal right away, and other


therapeutic measures may be needed in the interim." Do you agree with that?
MR. BAUM: Objection, form.
A. I agree.
Q. (By Mr. Jones) And then the bottom, the last sentence, she says: "There is no confirmed association of IIH with oral contraceptive usage or during pregnancy." Do you agree with that?
A. I would agree with that.
Q. Okay. She's talking about something different than levonorgestrel that she discusses above, correct?
MR. BAUM: Objection, form.
A. That's right.
Q. (By Mr. Jones) Go over to her conclusions.
A. Okay.
Q. She writes: "The incidence of IIH in the United States is increasing, requiring a high level of suspicion by medical practitioners. The evaluation of patients with a new onset of headaches, particularly if they are obese women, or using medications known to be associated with intracranial hypertension should include an ophthalmologic examination." Do you agree with that.
A. I would agree with that statement.

Page 210

Q. And you didn't review this particular article in preparation for preparing your report, correct?
MR. BAUM: Objection, form.
A. Right.
MR. BAUM: You have a supplemental list, right?
MR. JONES: I got a supplemental list with some depositions.
MR. BAUM: And in the attached Exhibits?
MR. JONES: I don't know about that.
MR. BAUM: The record will speak for itself.
Q. (By Mr. Jones) Well, you certainly didn't review this article before you wrote your report, right?
MR. BAUM: Objection, form.
A. No. It's just a standard of the article. And primarily -- The audience is primarily headache specialists.
Q. But Dr. Friedman is a prominent expert in the field of pseudotumor cerebri intracranial hypertension, correct?
A. She is.
Q. Did you cite anywhere in your report that other authors had noted that there was an association

Page 211

between levonorgestrel and pseudotumor cerebri?
MR. BAUM: Objection, form.
A. I believe what I'm talking about, levonorgestrel and Norplant -- I believe I mentioned something about that. Yes. So it's under the contraceptive implant section, second paragraph, about several additional case series and case reports that presented patients who developed IIH while using Norplant. So if that's what you're asking, I did actually mentioned that.
Q. You cited several -- or you reviewed several of Dr. Friedman's articles before you wrote your report, correct?
A. That's correct.
Q. Okay. But you did not cite that report or Dr. Friedman's conclusions that the best evidence exists for, among others, levonorgestrel in relation to intracranial hypertension, right?
MR. BAUM: Objection, form.
A. Again, when I'm reading that sentence, I'm reading "associated with" not "causally related to."
Q. (By Mr. Jones) Do you consider yourself an advocate in this case for Bayer?
MR. BAUM: Object to the form.
A. Absolutely not.

Page 212

Q. (By Mr. Jones) Did you cite anything in your report that contradicted your opinion that there is no causal association between Mirena and pseudotumor cerebri.
MR. BAUM: Objection, form.
A. I sure hope not. But, no, as far as I know, I didn't.
{Marked for identification Plaintiffs Exhibit 8, Review (Friedman, et al) Evolving Evidence in Adult idiopathic intracranial hypertension: Pathophysiology and management, 05/17/16.}
Q. (By Mr. Jones) We're marking that as Deposition Exhibit No. 8. This is an article Evolving evidence in adult idiopathic intracranial hypertension: Pathophysiology and management. Deborah Friedman is listed as the fifth author. It appears as though it was published in the Journal of Neurology, Neurosurgery and Psychiatry; is that right?
A. That's correct.
Q. Have you heard of that journal before?
A. I have. But it's kind of interesting, I didn't realize this says Open Access, which usually is a JNNP -- I guess JNNP. I didn't realize that's an Open Access Journal. Sure. Yeah, I've heard of JNNP.

Page 213

Q. And it says down here in the left-hand column, "received November 1st, 2015, revised January 18th, 2016, and accepted January 19, 2016," right?
A. I see that.
Q. Okay. The second sentence, the authors, including Dr. Friedman, write: "IIH causes significant morbidity, including permanent visual loss in up to 25 percent of cases with reports of 1 to 2 percent new cases being registered blind per year." Do you agree with that?
A. Well, again, the number I've usually cited and the sources I'm more familiar with suggest 10 percent. So I need to see where she's citing the 25 percent.
MR. BAUM: Can I have a standing objection on the documents he's never seen before?
Q. (By Mr. Jones) Have you ever seen this document before?
A. This one, I don't believe I have ever seen. This just came out, I think.
Q. Well, did you do your search for documents in this case before or after January 19th of 2016?
A. It was around that time. But, again, this was a review article. So if I came across it, I

Page 214

probably wouldn't have included it because it's, more or less, a generic review.
Q. The authors, including Dr. Friedman, write: "IIH is an expensive condition for society and the individuals. In the USA, in total, economic costs are estimated at greater than U.S. $444 million per annum, and 57 percent of patients report significant lost earnings, with 31 percent changing occupation." Have you ever seen those statistics before?
MR. BAUM: I'm just -- Because it hasn't been granted, I'm going to object, again, to the use of the document that he hasn't seen before.
MR. JONES: Oh, you can have a standing objection.
MR. BAUM: Then I won't -- I won't --
A. I've heard those statistics discussed in general ways, and I would agree with them.
Q. (By Mr. Jones) Going over to the paragraph "Role of obesity." It's the third full page.
A. I'm sorry. Which page?
Q. Third full page?
A. Okay.
Q. First sentence: "Obesity is a consistent risk factor for the development of IIH." You would agree with that, right?

Page 215

A. I would.
Q. Okay. Down in the second paragraph: "Despite the association between IIH and an obese phenotype, the pathological mechanism tying the two together are unclear, and IIH is a rare disorder, while obesity is common." Do you agree with that?
A. I do.
Q. "Suggestions that -- Suggestions that centrally distributed adiposity transmits pressure, thereby generating raised ICP are questionable, as few of these patients have elevated ICP." Do you agree with that?
A. I do. There was a theory prevalent for a while, mostly by this surgeon Harvey Sugerman, that people with central lobe obesity had increased abdominal pressure, which caused increased central venous -- increased thoracic pressure and increased central venous pressure. But, again, the objection to that: So he was a bariatric surgeon, so his theory was everybody should get bariatric surgery performed by him, of course. But the idea is, if that's the case, we should be seeing an epidemic of IIH, since there are so many obese people.
Q. Okay. Going over to the clinical features: "Visual loss is the major morbidity in IIH." Do you

Page 216

agree with that?
A. I do.
Q. "Historic hospital-based series reported bilateral blindness in up to 10 percent." Do you agree with that?
A. I would.
Q. Is that the same 10 percent that you were referring to in terms of permanent visual loss?
A. It is.
Q. Okay. So that relates to bilateral blindness in up to 10 percent?
A. That's right.
Q. The authors write: "The majority of patients with papilledema suffer some form of visual loss as measured by formal perimetry." Do you agree with that?
A. I agree with that, although, it depends on what you mean by visual loss. At least in the IHTT people were allowed to enter with mild visual loss, but that mild visual loss is usually not symptomatic.
Q. Can you go over to table 2.
A. Sure.
Q. "Conditions that may cause intracranial hypertension." Do you see that?
A. I do.

Page 217

Q. And under "pharmacological agents," do you see levonorgestrel listed anywhere in there?
A. I just see hormonal agents. I would assume that includes all hormonal agents. But, no, I don't see, specifically, levonorgestrel.
Q. Okay. I was reading that to be -- and correct me if I'm wrong -- "Hormonal agents:" And then it says "corticosteroid withdrawal, growth hormone, thyroxine replacement in children." Am I misreading? I took that to mean that hormonal agents they were referring to were those three. Are those all hormonal agents?
A. I wouldn't consider corticosteroids hormonal agents. I guess, I'm reading that as hormonal agents as sort of a broad category for sex hormones.
Q. Okay. Okay. Can you go to page 9.
A. Okay.
Q. Do you see where it says "competing interests"?
A. I see that.
Q. And it says "none declared"?
A. I see that.
Q. Okay. And that's -- Is that where an author is suppose to put any conflicts of interest that they may have?

A. For this generally, I assume that's where they would put their conflictive interests.

Q. And if Dr. Friedman was a paid expert consultant on pseudotumor cerebri cases as of January 19th of 2016, do you believe she should have noted that in the competing interest section of this article?

MR. BAUM: Object to form.

A. Well, first, I suggest that you discuss that with Dr. Friedman, specifically. But to me this doesn't look like an article that is specifically dealing with causal relationship between Mirena, specifically, and IIH. So that I don't know.

And she is acknowledging, at least, that hormonal agents, at least, have, and associated with IIH.

{Marked for identification Plaintiffs Exhibit 9, NANOS Patient Brochure pseudotumor cerebri, 05/17/16.}

Q. (By Mr. Jones) 9 is a NANOS patient brochure pseudotumor cerebri, copyright 2015; is that correct?

A. Yes.

Q. And NANOS is the Neuro-Ophthalmology Society of North American; is that correct?

A. That's true.



Q. And you're a member of NANOS?

A. I am.

Q. And have you ever looked on the NANOS website at this patient brochure?

A. Yes. Actually, we hand it out to patients.

Q. Okay. Good. Let's go down to the physiology section. And it says: "As it does seem to occur more often in young women who are overweight, there is the possibility of a hormonal influence." Do you agree with that?

A. I think if we're going back to the idea that there is possible -- there is a hormonal influence, including all the things that we talked about, sex hormones, leptin and ghrelin, and so on, I would agree with that as a possibility.

Q. And going over to the treatment section. It discusses Diamox, which is the same as acetazolamide; is that correct?

A. That's right.

Q. And it says: "It can cause side effects, including tingling of fingers and toes, loss of appetite, and intolerance for carbonated beverages." Do you agree with that?

A. I do.

Q. "It may alter taste and causes frequent



urination and fatigue." Do you agree with that?

A. I do.

Q. "Much more rarely, it may increase -- it may predispose the patient to kidney stones or even cause bone marrow blood problems." Do you agree with that.

A. I do. But fortunately, that's pretty rare.

Q. And the next paragraph down, it talks about "Pressure may also be lowered by draining off CFS. This may be accomplished with a spinal tap, but continuing production will replace the lost volume within hours." Do you agree with that?

A. I do.

Q. Going over to the last page: The frequently asked questions under: "When will this go away?" It says: "It was thought in the past that pseudotumor was a self-limited disease that resolved over 1 to 2 years. While it is possible for pressures to vary over time, prolonged problems with CFC outflow may result in long-term increased pressure." Do you agree with that?

A. I do. What I would disagree with -- and I am not really disagreeing. But this is not a scientific document. This is using very generic, lay terms for patient information. So it's not really been vetted or subjected to the same scientific rigor.

Q. And you hand it out to your patients, right?



A. Right. It's just a general overview for people who have no idea what this condition is.

Q. Was that Exhibit 9, Doctor?

A. Yes.

{Marked for identification Plaintiffs Exhibit 10, Can We Predict the Prognosis/Outcome of IIH Patients, 05/17/16.}

Q. (By Mr. Jones) I'm going to mark this as Deposition Exhibit 10. This is a document: Can We Predict the Prognosis Outcome of IIH Patients by Valerie -- can you help me with the last name?

A. Biousse.

Q. -- Biousse, Emory University, Atlanta, Georgia. You know Dr. Biousse, right?

A. I know her well.

Q. Yeah. And do you think she's competent and qualified to talk about IIH?

A. She is.

Q. Let's look at some of the things she has to say.

A. Okay. So this is 2013, correct?

Q. Yes. It is an Annual Meeting Syllabus, do you see?

A. Yes.

Q. She says that in the first paragraph in the introduction: "Because the number of patients irreversibly lose vision or have a chronic disease with reduced quality of life, the term 'benign intracranial hypertension' is not used any more." Do you agree with that?
A. I do. Let me just -- You probably told me. Where are you on the page?
Q. Oh. The introduction.
A. Oh, okay.
Q. I was in the last sentence.
A. I got you.
Q. Okay. The next paragraph she talks about: "In most patients IIH has a self-limited course and symptoms, and signs resolve with the diagnostic lumbar puncture, weight loss and medical treatment. In others, chronic symptoms, (mostly headaches) result in altered quality of life." Do you agree with that?
A. I agree with that.
Q. "Indeed, many IIH patients suffer from persistent headaches, even after normalization of the intracranial pressure." Do you agree with that?
A. Again, with the caveat that in many of those occasions, that has more to do with migraine than intracranial hypertension.



Q. Does the development of IIH result in a development of some sort of migraine syndrome as well?
A. So that's actually an interesting question. I don't think we know that for sure. We do see people who have a history of migraine, and then have IIH, have it resolve, and have persistent migraine headache. We do see occasional patient -- and I've seen them -- where they have IIH, and then they develop migraine headaches thereafter. But whether the change in intracranial pressure, and something about the meninges, and the trigeminal afferents are affected, and that sort of triggers migraine, we really don't know.
Q. Okay. She goes on to write: "Patients with IIH also experience depression, anxiety, and reduced quality of life, which are found more often than would be expected based on the patient's persistent headaches and co-morbid obesity." Do you agree with that?
MR. BAUM: Objection to form.
A. I do.
Q. (By Mr. Jones) Next page, first paragraph, last sentence: "Although visual loss is usually relatively mild in presentation, it may progress insidiously. Indeed up to 25 percent of IIH patients develop secondary optic atrophy and associated



permanent visual loss." Do you agree with that?
MR. BAUM: Objection, form.
A. I agree with that.
Q. "Blindness occurs in at least one eye in 8 to 10 percent of the patients." Do you agree with that?
A. I do.
Q. Next sentence: "Although IIH is self-limited in many patients, it can also be a chronic disease, with delayed worsening and recurrence." Do you agree with that?
A. I do.
Q. "The long-term relapse rate (over 10 years) was only 15 percent in a recent study, whereas two earlier studies had a relapse rate of 38.4 percent over 6.2 years, and 28 percent over two years." Are those numbers consistent with your experience?
A. It is.
MR. BAUM: Objection, form.
A. And I think, unfortunately, some of it has to do with the increased rate of obesity, and losing weight, and then regaining weight.
Q. Do all women who had PTC that resolved, who ultimately gained weight develop a -- Let me strike that.



Do all women who have had a resolution of their PTC symptoms experience a relapse upon subsequent weight gain?
A. Not all. But if you look at, again, the other way around, the patients who have IIH and had it resolved, and have it recur, the majority of them have had recent weight gain.
Q. Okay. Let's go over to medications. She says that: "While various medications have been proposed to cause or, more likely, to precipitate IIH, (such as tetracyclines and its derivatives, cyclosporine, lithium, nalidixic acid, nitrofurantoin, oral contraceptives, levonorgestrel, Danazol, and tamoxifen), there are compelling test-retest data only in a few individual patients (such as in patients treated with tetracyclines, particularly minocycline)." Do you agree with that?
A. I do.
MR. BAUM: Objection, form.
Q. (By Mr. Jones) Do you agree that levonorgestrel can precipitate the development of IIH in someone who may be predisposed to develop it?
MR. BAUM: Objection, form.
A. Well, I don't know what precipitate means. If you mean cause it, then, no, I don't agree the

Page 226

evidence supports that. And I think her statement actually is it's been proposed to cause. So I think it is one of those things, it's an open question.
Q. (By Mr. Jones) Well, using your blocks analogy from earlier, if you put the levonorgestrel on the top, and -- can that precipitate or cause the blocks to all fall down in a particular patient?
MR. BAUM: Objection, form.
A. Again, I don't believe there is enough evidence to say that that's the case.
THE DEPONENT: Should I be doing a better job of keeping these in order?
MR. BAUM: Just don't walk out with any of them.
THE DEPONENT: Okay. I'm not really holding up my end of bargain here.
MR. BAUM: That's okay.
Q. (By Mr. Jones) Have you ever done any sort of investigation to try to determine the number of women who use the Norplant levonorgestrel product who ultimately developed PTC?
MR. BAUM: Objection, form.
A. I've never done such a study.
Q. (By Mr. Jones) Have you ever tried to determine the number of Mirena users who have developed

Page 227

PTC?
MR. BAUM: Objection, form.
A. No, I haven't.
Q. (By Mr. Jones) Have you ever attempted to determine the number of Skyla levonorgestrel users who ultimately developed PTC?
MR. BAUM: Objection, form.
A. I haven't.
Q. (By Mr. Jones) Can PTC be diagnosed without a lumbar puncture?
A. I don't think you really wouldn't meet the criteria. So I think you need those to say somebody definitely has IIH and needs a lumbar puncture.
Q. Can you definitely say someone has a papilledema without a lumbar puncture?
A. Technically, no. There are characteristics of papilledema that might differentiate it from other causes of disc swelling. It's usually bilateral. The central vision is preserved. But beside that, there is no way to say, just looking at the optic disc, and saying, that's papilledema.
Q. Because sometimes it's pseudopapilledema, right?
A. Correct. I mean, there should be - You can, by fundus exam, you should be able to differentiate

Page 228

pseudopapilledema -- pseudoedema from true edema. Whether it's papilledema or not, you really have to look at the whole picture, and then, obviously, do a lumbar puncture.
Q. Right. Because you need to know what the pressure is, right?
A. To a degree. I mean, you're really trying to see if the pressure is high. But you're also trying to establish whether or not there is a meningeal process, whether there is inflammation in the spinal fluid.
Q. Do you know how many de-challenge cases there have been of related to Mirena and pseudotumor cerebri?
A. I'm not aware of any clean de-challenge cases.
Q. Are you aware of any unclean de-challenge cases?
A. I'm not aware of a good de-challenged case.
Q. And that's because they were complicated by the lumbar puncture?
MR. BAUM: Objection, form.
A. A lumbar puncture and/or concomitant medication, and/or weight lost.
Q. (By Mr. Jones) Do you know how many

Page 229

re-challenge cases there are with Mirena and pseudotumor cerebri?
MR. BAUM: Objection, form.
A. I'm not aware of any.
Q. (By Mr. Jones) Down at the bottom of page 6 of your report, it says: "The strongest evidence would be a prospectively collected series of subjects, none of whom carry the two highest risks of IIH, (female gender and excess weight/or weight gain), all demonstrating the development of intracranial hypertension after exposure to medication, resolution of ICH after withdrawal of the medication, and then redevelopment of ICH after re-challenge with the same drug." Then you go onto write, "Obviously, such a study is not ethically or practically feasible." Do you agree with that?
A. I would agree with that.
Q. Down in the third full paragraph, you say, "I do not recommend that my patients with IIH discontinue their hormonal contraception, (including Mirena), nor is it standard practice among my colleagues in neuro-ophthalmology to do so, as there is no established causal relationship." Did I read that correctly?
A. You did.

Q. Which of your colleagues did you consult with to determine whether or not they followed your practice?
A. Oh, it isn't what was a formal discussion. It's something that just comes up at meetings, when we talk about causes of IIH in our practice patterns. So it's not something formal discussion, where somebody who was serving said, Do you discontinue? It's just something that most of us routinely do, or in this case, don't do.
Q. Can you name me one specific person that you had this discussion with, in which you learned that their standard practice was to not discontinue the hormonal contraception in IIH patients?
A. I can't name a specific person.
Q. You say: "A survey of the existing literature supports this contention." Tell me exactly what literature supports your contention?
A. So I think referring to some of the original studies, and looking at, at least, oral contraceptives and hormonal contraceptives in IIH, the Durcan study. Another one which was by Giuseffe. These are all in here. Another one by Rhonda Krishnon. Another one by Ireland. They really all found no difference in hormonal contraceptive use among IIH patients, and



patients who didn't have IIH.
Q. They related to oral contraceptive usage, correct?
A. Right.
Q. And you understand that Mirena is not an oral contraceptive, correct?
A. Correct, but it is a hormonal contraceptive.
Q. Do you do a birth control history with your clients or with your patients that you see these days?
A. I do. But primarily because I want to know if they're using some effective form of contraceptive, if we're going to end up putting them on Diomox.
VIDEOGRAPHER: We have two minutes left on the card.
Q. (By Mr. Jones) Do you know how many of your patients are Mirena users, or were Mirena users at the time of their diagnosis?
MR. BAUM: Objection. Asked and answered.
A. I don't know the number.
Q. (By Mr. Jones) Down at the bottom of the last sentence you say: "Notably, it is quite likely that some of the older reports of purported IIH and users of estrogen-containing OC's were actually due to thrombotic events missed by less sensitive imaging studies used at the time." Did I read that correctly?



A. You did.
Q. And you're just speculating there?
MR. BAUM: Objection, form.
A. Well, there certainly, actually -- Valerie Biousse published a series of people who were misdiagnosed as IIH, who ended up having traverse sinus thrombosis due to inadequate imaging. But I think it's a reasonable assumption, when you look in the older literature, particularly in pre-MRI era, that probably some of those patients had venous sinus thrombosis, but the exact number would be speculation.
Q. (By Mr. Jones) All right. Give me the citation for the literature that supports, quite likely some of the older reports of purported IIH were actually due to thrombotic events missed by less sensitive imaging studies?
A. It would probably be Valerie Biousse's study looking at transverse sinus thrombosis misdiagnosed as IIH.
Q. Where did she publish that?
A. I'd have to look it up. It was a while ago.
Q. Okay. Was it over five years ago?
A. It was over five years ago.
Q. Ten years ago?
A. It might have been when she was doing her



stroke neurology work in France.
Q. You didn't cite that in your report, did you?
A. I didn't.
MR. JONES: Do we need to go off the record?
THE DEPONENT: Yes, I need to use the bathroom. It's perfect timing.
VIDEOGRAPHER: The time is 3:12. We're going off record.
{Short break taken 3:12 - 3:24 p.m.}
VIDEOGRAPHER: The time is 3:24 and we are back on the record.
Q. (By Mr. Jones) Dr. Van Stavern, can you go down the bottom of page 8 of your report?
A. Yes.
Q. Okay. The last sentence it says, "It is estimated that the rate of IIH reported with Mirena users is less than 0.1/100,000." And then -- well, I better finish out the sentence. "which is well below the expected rate of IIH among women of reproductive age, and more than two orders of magnitude below the expected rate in obese women in this age group." You cite a document, KCOPLEY_JSEU_24 to 45; is that correct?
A. Yes.

Q. And is that an e-mail that you reviewed, an internal Bayer company e-mail?
MR. BAUM: Objection, form.
A. It was the Bayer signal analysis, part of the Bayer signal analysis.
Q. (By Mr. Jones) Okay. Fair enough. And you didn't -- You didn't do this calculation yourself. You're just reporting what was in that document, right?
A. I did not do the calculation myself.
Q. Let's go to the last -- or the page 11. Let's try to short change this. You disagree with Dr. Fraunfelder, as you listed in your report here, right?
A. That's true.
Q. And you disagree with Dr. Tang to the extent of what's listed here in your report, correct?
A. That's correct.
Q. And you disagree with Dr. Maggio to the extent listed here in your report, correct?
A. That's correct.
Q. And we talked about Dr. Fraunfelder earlier. Do you know Dr. Tang?
A. I do know Dr. Tang, although not very well.
Q. Have you ever met her before?
A. I have.
Q. Okay. And you would agree she is an expert



in the field of pseudotumor cerebri and intracranial hypertension, correct?
MR. BAUM: Object to form.
A. I would agree.
Q. (By Mr. Jones) And it's not listed in this report, but you did a separate report involving one of my clients, Ms. Houston, correct?
A. That's correct.
Q. And we're not going to go through it. You disagree to the extent listed in your report about Ms. Houston, correct?
A. Well, actually, looking at Dr. Tang's deposition, it looks like she ultimately agreed that Mirena was not related to IH in that case.
Q. So are your opinions related to Ms. Houston contained in your report with that caveat?
A. They are.
MR. JONES: I have no further questions. I'm going to let you get out of here and go pick up your daughter.
MR. BAUM: Thanks. I'm ready to go. Hopefully, it won't take me very long. I don't care about switching seats to make this faster. The one thing I'll say to you, Doc, is your inclination is going to be to turn and look at me.



A. Sure.
MR. BAUM: But there is that camera on you. You're probably better off looking that way. Let's see. All right to just go.
MR. JONES: Oh, yeah.

CROSS-EXAMINATION

QUESTIONS BY MR. BAUM:
Q. Doctor, you remember you were asked some questions about the major lectureships and pre -- or professorships on your C.V. which pertain to IIH?
A. That's true, I do recall that.
Q. And you were specifically pointed to number 23 and number 26 on that list. Do you recall that?
A. Yes.
Q. You brought with you today four different presentations that addressed IIH, correct?
A. I did.
Q. In fact, in one of the ones you brought today correlates with entry number 15 on that C.V. list, the 2012 visiting professorship at Michigan State, correct?
A. That's correct.
Q. And you also brought with you today a fourth one that was the recent neurosurgery presentation, correct?



A. That's correct.
Q. You had been asked -- There was a discussion between you and counsel between having reviewed various depositions or reports from plaintiff experts this morning. Do you recall that exchange?
A. I do.
Q. And there was this sort of -- it sounded like a miscommunication; you were being asked about reports, and you kept answering depositions, and you guys were working through that misunderstanding. Correct?
A. That's true.
Q. As to the reports, you understand that those are the reports that are filed, like your report in front of you, in advance of a deposition like today's proceeding?
A. Yes. And I apologize because I completely blanked on that, on that question.
Q. Did you review the report of Dr. Etminan, for example, in this litigation?
A. I did.
Q. And did you review the report of doctors Fraunfelder and Tang in this litigation?
A. I did.
Q. You were asked some questions about a

Page 238

patients of yours. I wrote down the name, I think it was Latoya Thompson, do you recall that?
A. I do.
Q. And you were asked if you had told Ms. Thompson whether -- or that you were serving as an expert in this litigation, do you recall that?
A. I do.
Q. To the best of your recollection, did Ms. Thompson ever say anything to you about bringing a lawsuit over her use of Mirena?
A. She did not mention that at all.
Q. Do you recall Ms. Thompson ever asking you if you thought her condition was related in any way to her use of Mirena?
A. The best I can recall, it never came up.
Q. Under those circumstances, was there any reason why you would have felt obligated to spontaneously tell Ms. Thompson about your role in this litigation?
A. I wouldn't see any reason to.
Q. Based on the questions that you received today from Ms. Thompson's lawyer, does it appear that Miss Thompson is already aware of your role as an expert in this litigation?
MR. JONES: Objection.

Page 239

A. I would say it seems likely.
Q. (By Mr. Baum) You were asked whether you had ever seen any letters to the editor about the Rai poster from ARVO 2015, do you recall that?
A. I do.
Q. Have you ever seen anybody submit a letter to the editor about a poster that was presented at ARVO?
A. No, they usually only refer to published manuscripts.
Q. I'm going to hand you what I'm going to mark -- Larry, do you have the stickers next to you?
MR. JONES: I'm sure I do.
MR. BAUM: All right if I do consecutive numbers?
MR. JONES: Sure.
{Marked for identification Plaintiffs Exhibit 11, ACOG Practice Bulletin, 05/17/16.}
Q. (By Mr. Baum) Do you recall being asked some questions about ACOG bulletin today?
A. I do.
Q. Was that ACOG bulletin provided to you when you were being asked those questions?
A. It was not.

Page 240

Q. And you were asked whether the ACOG statement on the use of the contraceptives in obese women also said that a nonhormonal IUD ParaGard was just as preferred as an option for obese women as a levonorgestrel IUD, do you recall that?
A. I do.
Q. Could you turn to page 1462 of Exhibit 11.
A. Okay. I'm there.
Q. Is this the, by the way, the ACOG statement that you were -- practice bulletin that you were referring to earlier?
MR. JONES: Object to form.
A. Yes.
Q. (By Mr. Baum) If you look -- Do you see on the bottom of the left column there is a section which hormonal contraceptives are appropriate for obese women? Do you see that?
A. I do.
Q. And there are two full paragraphs in that section, correct?
A. Yes.
Q. And in the first paragraph there is no recommendation about a particular form of contraceptive to use in obese women, right?
A. Correct.

Page 241

Q. In the second paragraph, at one point about halfway down, it says "Accordingly, consideration should be given to progestin-only and intrauterine methods when counselling obese women regarding contraceptive choices." Correct?
A. Correct.
Q. The ParaGard IUD that was discussed with you, is that both progestin-only and intrauterine, to your knowledge?
A. Ah, no.
Q. And then the last sentence of this section, does it read: "Because obese women experience an elevated risk for dysfunctional uterine bleeding and endometrial neoplasia, use of the levonorgestrel intrauterine system may represent a particularly sound choice for obese women."
A. I agree it says that.
Q. Does it say anything in that sentence that a nonhormonal IUD would represent a particularly sound choice for obese women?
A. No, it doesn't.
Q. You can put that Exhibit aside.
You were asked some questions about Exhibit 3, which is a publication by Dr. Bruce and yourself. Can you pull that out quickly.

Page 242

A. Yes.
Q. You were asked about a phrase "medication induced." Do you recall that?
A. I do.
Q. And do you recall saying, you know, somewhere else in this paper, we made clear that we were talking about these medications were only possibly associated with IIH?
A. That's correct.
Q. If you turn to page 1829 and you go to the discussion section and the first paragraph, do you see a sentence about half a way down that paragraph that says: "We found that four percent of our patients with IIH were of normal weight, and of these, over a quarter were exposed to a medication that might be associated with IIH."
A. I do.
Q. Is that the language that you were referring to?
A. That was it.
Q. And is that -- The medications that are being referred to there are the very same ones that counsel for plaintiffs asked you about earlier today?
A. They are.
Q. Okay. You were shown Exhibit 4, which was

Page 243

an article by a Degnan and Levy. Can you pull that out quickly.
A. Sure. I'm sorry. It's somewhere in here probably at the beginning. Here it is.
Q. And you were asked some questions about table 1 in that document that was labeled "Confounding conditions that may" represent -- or may "present as similar to IIH." Do you recall that?
A. I do.
Q. And it was specifically pointed out to you, the footnote at the bottom, that this list was adapted from several sources, including Wall. Do you see that?
A. Yes.
Q. Who's Wall? Do you know who Wall is?
A. Mike Wall is a neuro-ophthalmologist at the University of Iowa.
Q. First, let me ask you: Any of the authors that are listed down there as the adapted from, are you aware of any of them ever having stated that levonorgestrel has been proven to cause IIH?
A. Yes.
Q. Wall. That cite, Wall 22 specifically, can you confirm for me, at the end of this article, is that Mike Wall's 2010 publication called idiopathic intracranial hypertension.

Page 244

A. Double-check. I'm pretty sure it is. Yes, it is.
Q. And that's the Neurology Clinics 2010 location; is that right?
A. That's correct.
Q. You actually in one of the PowerPoints that you brought here today, you specifically reproduced the table that appears in Mike Wall's publication from 2010, right?
A. I did.
Q. In the table that Mike Wall used in his publication, did you anywhere say that, as it represents in Degnan, that the levonorgestrel implant is a confounding condition that may present similar to IIH?
A. No.
Q. In fact, what did Dr. Wall say as regards to any form of any hormonal contraceptive, and the state of evidence between it and IIH?
A. That, basically, they're unproven, and unlikely; that the association is unproven and unlikely, at least in terms of a causal relationship.
Q. Okay. And then the last few questions, sir: Do you remember being asked if you have ever done, yourself, conducted any sort of analysis of a number of

Page 245

women that had used Norplant, who subsequently -- or who developed IIH while using Norplant?
A. Yes.
Q. And you said that you hadn't, correct?
A. That's correct.
Q. Have you conducted your own study, your own analysis of how many women have developed IIH while using Mirena?
A. I haven't performed my own study, no.
Q. Did you review any documents that identified the number of reports of women developing IIH while using Mirena?
MR. JONES: Objection, form.
A. Yes. I had reviewed the Bayer signal analysis, but I hadn't conducted my own personal study.
Q. (By Mr. Baum) And then lastly, sir, you do remember being asked if you cited anything in your report that contradicts your opinions?
A. I do.
Q. Do you think there is any reliable scientific evidence that contradicts your opinion that a causal relationship between Mirena and IIH has not been established?
A. No. I mean, I certainly cited the Rai study and the Etminan study. But as I discussed in any

Page 246

report, there are significant limitations, and you can't really draw causal conclusions from them.
Q. So did you cite the relevant evidence in your report regardless of which side --. Strike that.
Did you -- You mentioned the Rai study. You were asked questions about that throughout today by Plaintiffs' counsel, correct?
A. Correct.
Q. Did you acknowledge the existence of the Rai study in your report?
A. I --
Q. Did you, in fact, report the results of the Rai study in your report?
A. I did.
Q. Same with the study by Dr. Etminan?
A. I did.
Q. To your knowledge, did you omit any study that looked at Mirena and IIH from your report?
A. I included everything that was available.
Q. To your knowledge, did you omit any studies of LNG and IIH in your report?
A. I didn't.
Q. Do you think you played it straight when setting forth the evidence in your report?
MR. JONES: Objection, form.

Page 247

A. I did.
MR. BAUM: No further questions.
REDIRECT EXAMINATION
QUESTIONS BY MR. JONES:
Q. I have a few. Can I see that article that that you were discussing?
MR. BAUM: The Wall article?
MR. JONES: No. The one that referred to Wall.
MR. BAUM: The Degnan?
Q. (By Mr. Jones) All right. Yeah. Exhibit 4. Degman. Can you go to table 1, which is where Mr. Baum had you talking about, it referred to Michael Wall, Dr. Wall. Right?
A. Right.
Q. Can you read -- It actually refers to several authors there, doesn't it?
A. It does.
Q. And can you read them into the record.
A. So there is Friedman and Jacobson. And there is another one Szitkar, S-z-i-t-k-a-r. And then Wall and Alperin.
Q. I'm sorry. And we talked about Deborah Friedman has written that there is -- the best evidence for an association exists, for among other things,

Page 248

levonorgestrel and PTC, correct?
A. Right. But she didn't say that there is proven causal relationship.
Q. Right. And I understand that you're splitting the hairs on that.
MR. BAUM: Objection.
Q. (By Mr. Jones) Would it be reasonable to conclude that that author, when he refers to Friedman down there, that's where he or she is getting the levonorgestrel to include in that table?
A. They don't cite where they're getting the medication and the exposures. They're just listing all the authors, and listing all the exposure. So it's not clear where they're drawing what from.
Q. Right. Let's talk about these four presentations that you presented. Idiopathic intracranial hypertension, Pseudotumor Cerebri, What Do We Know? This is the one -- Which presentation is this? Which one does it correspond to on your list in your C.V.?
A. I'm not sure which one that is. That's probably one from 2009, and one for 2011.
Q. Okay. Are there any dates or other indications on these presentations?
A. No. And I usually put dates on them, but

Page 249

for some reason I didn't with those. So it looks like the -- the one from 2010 -- Yeah. I'm not sure which is which. But they're actually very similar in some ways.
Q. But you think they were sometime in 2011?
A. Yeah. They were within about a year of each other.
Q. And on the one that I referenced, idiopathic intracranial hypertension, Pseudotumor Cerebri, What Do We Know? You have down there, "Financial disclosure: I have no relevant financials disclosures relevant to this presentation." Do you see that?
A. Yes.
Q. And why would you put that on the first page?
A. Oh, that's actually an institutional requirement that we include our financial disclosures.
Q. And do you do that on all of your presentations?
A. I try to do it on all of them. I didn't do it -- I have it on the one for neurosurgery, but I don't think I gave counsel the updated version. The version I gave the neurosurgeons actually had a disclosure.
Q. Okay. The one, Pseudotumor and Real Tumor,

Page 250

do you see that?
A. Yes. That's the one I'm referring to.
Q. And on the third full page, you have -- when did you give this presentation, do you know?
A. About a month ago.
Q. Okay. And did you list a financial disclosure or a conflict of interest in this presentation, letting your audience know that you were a paid litigation consultant in litigation involving Bayer and pseudotumor cerebri?
A. I didn't because I didn't discuss hormonal contraceptives at all in that discussion.
Q. There were some discussion about this ACOG Bulletin Number 73. You actually cited two ACOG bulletins in your report.
A. Correct.
Q. Okay. And the other one relates to long-acting reversible contraceptives, correct?
A. Correct.
Q. And ParaGard is also a long-acting reversible contraceptive, correct?
A. That's true.
Q. Okay. Did you know that the bulletin that Mr. Baum went over with you, did you know that ACOG actually withdrew that bulletin in December of 2015?

Page 251

A. I have actually heard that, although my understanding is that it's unclear why they withdrew.
Q. Did you know before you included it in your report, that the bulletin had been withdrawn?
A. I didn't. But since it was withdrawn in 2015, in all the relative cases, and literature, particularly regarding Mirena included, were before 2015, I wouldn't think it's relevant.
Q. Do you normally cite materials that have been withdrawn by their sponsoring organizations?
MR. BAUM: Objection, form.
A. I think the point of citing that was that it makes it reasonable to assume that Mirena was preferentially prescribed to obese women. And since all the cases were encompassed by that time frame, below 2015, I still think it's relevant to cite.
Q. (By Mr. Jones) Show me in here where it says that Mirena was preferentially prescribed to obese women?
A. Again, I didn't say preferentially prescribed. I said it's reasonable to assume that because of the recommendations.
Q. And show me in here where it says that Mirena is recommended -- I'm using your language -- for obese women.

Page 252

A. I think it's preferred for obese -- it has several advantages for obese women.
Q. It doesn't even say preferred in this bulletin, does it?
A. It probably doesn't.
Q. It says: "It may represent a particularly sound choice for obese women." Right?
A. Right.
Q. And that sentence: "Accordingly, consideration should be given to progestin only and intrauterine methods when counseling obese women regarding contraceptive choices." That doesn't say progestin-only intrauterine methods, does it?
A. No, it doesn't.
Q. Okay. And there are intrauterine methods that are not progestin based?
A. Correct.
Q. Such as ParaGard, correct?
A. Yes.
Q. Which is also a long-acting reversible contraceptive, correct?
A. Yes.
Q. Let's look on page 1462. The sentence where it says that "The LNG IUS may represent a particularly sound choice for obese women." It has a footnote, cite

Page 253

34. Okay. Can you turn with me back to footnote 34.
A. I'm going to have to find it. I just had it in my hand. Here is we go. What is this, where is it?
Q. The citation on page 1462.
A. Uh-huh. Okay.
Q. Number -- It cites the footnote 34.
A. Footnote 34. Okay. Right. Now.
Q. Right. Now turn to footnote 34 for me.
A. Okay.
Q. What's the citation note for that?
A. It looks like a Journal called Contraception.
Q. Who are the authors of it?
A. Grimes and Shields.
Q. And do you know who David Grimes is?
A. No, I don't.
Q. Did you know that David Grimes is a paid consultant for -- Did you know that David Grimes is paid by Bayer to act as a consultant regarding Mirena?
MR. BAUM: Objection, form.
A. I didn't know that.
Q. (By Mr. Jones) If that's the case, do you think that the Dr. Grimes should be disclosing his financial conflict of interest in making such recommendations?

MR. BAUM: Objection, form.
A. I actually have no opinion on that.
MR. JONES: I have no additional questions.
MR. BAUM: None for me, sir. All right.
VIDEOGRAPHER: This is the end of the deposition. The time is 3:49, and we are off the record.



GREGORY VAN STAVERN, M.D.
DEPOSITION CORRECTION SHEET
N RE: SHENIKA A. HOUSTON, SHAMEKA M. BRIDGES, et al, KATHLEEN CHEEK, et al., SARAH D. HOOVER, and EMILY C. KELLINGTON, vs. BAYER HEALTHCARE PHARMACEUTICALS, INC., ET AL,

Upon reading the deposition and before subscribing thereto the deponent indicated the following changes should be made:

Page Line Should read:
REASON ASSIGNED FOR CHANGE:
Page Line Should read:
REASON ASSIGNED FOR CHANGE:
Page Line Should read:
REASON ASSIGNED FOR CHANGE:
Page Line Should read:
REASON ASSIGNED FOR CHANGE:
Page Line Should read:

REASON ASSIGNED FOR CHANGE:

Page Line Should read:

REASON ASSIGNED FOR CHANGE:
Page Line Should read:

________________________
GREGORY VAN STAVERN, M.D.



STATE OF MISSOURI )
) SS
COUNTY OF ST. LOUIS )

I, Catherine E. Boyd, a Certified Court Reporter, within and for the State of Missouri, #0233, Registered Professional Reporter, and Certified Shorthand Reporter within and for the State of Illinois, do hereby certify that pursuant to notice between counsel, there came before me at the offices of HeplerBroom, 211 North Broadway, Suite 2700, St. Louis, Missouri,

GREGORY VAN STAVERN, M.D.

a witness of lawful age, who was by me first duly sworn to testify to the whole truth touching and concerning the matters in controversy therein; that the witness was examined, and said examination was reduced to shorthand by me on that day, between the aforesaid, and later transcribed into computer-assisted transcription under my supervision, that it is a true record of the testimony given by the witness, and now is herewith returned.

I further certify that I am neither attorney, nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken; and further, that I am not a relative or employee of any attorney, or employed by the parties hereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand on May 27, 2016.

________________________________
Catherine E. Boyd, CCR # 233, RPR
Certified Court Reporter within and for the State of Missouri.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: Case Nos.
MIRENA IUS LEVONORGESTREL- 17-MD-2767(PAE)
RELATED PRODUCTS LIABILITY 17-MC-2767(PAE)
LITIGATION (NO. II)
______________________________/

VIDEOTAPED DEPOSITION OF GREGORY P. VAN STAVERN, M.D.
ST. LOUIS, MISSOURI
TUESDAY, FEBRUARY 13, 2018

Reported by:
DEBORAH HABIAN, CSR, RMR, CRR, CLR
JOB NO. 39388

FEBRUARY 13, 2018
9:34 A.M. CST

Videotaped deposition of GREGORY P. VAN STAVERN, M.D., taking place at the law offices of HeplerBroom, 211 North Broadway, Suite 2700, St. Louis, Missouri, pursuant to notice, before DEBORAH HABIAN, Missouri Certified Court Reporter, Illinois Certified Shorthand Reporter, Registered Merit Reporter, Certified Realtime Reporter, Certified Livenote Reporter.



A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS
GORI JULIAN & ASSOCIATES, P.C.
BY: D. TODD MATHEWS, ESQ.
156 North Main Street
Edwardsville, Illinois 62025
-and-
DALIMONTE RUEB, LLP
BY: JENNIFER L. ORENDI, ESQ.
1250 Connecticut Avenue NW, Suite 200
Washington, D.C. 20036

ON BEHALF OF BAYER HEALTHCARE AND THE WITNESS
GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM, LLP
BY: EMMA C. NEFF, ESQ.
SHAYNA S. COOK, ESQ.
564 West Randolph Street, Suite 400
Chicago, Illinois 60661

ALSO PRESENT:
Jeff Hill, Legal Videographer



I N D E X


WITNESS: PAGE

GREGORY P. VAN STAVERN, M.D.
Examination by Mr. Mathews ............... 9
Examination by Ms. Neff .................. 145

REQUESTS AND INSTRUCTIONS OF COUNSEL
By Mr. Mathews .......................... 44
By Ms. Neff ............................. 12
By Ms. Neff ............................. 12
By Ms. Neff ............................. 20
By Ms. Neff ............................. 26
By Ms. Neff ............................. 117

PLAINTIFFS' EXHIBITS TO VAN STAVERN DEPOSITION

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | 3/6/15 Van Stavern invoice to Goldman Ismail, no Bates | 10 |
| Exhibit 2 | Transcript of 5/17/16 video deposition of Gregory Van Stavern, M.D. re Shenika Houston v. Bayer HealthCare Pharmaceuticals, et al., 266 pp | 31 |





(CONTINUING)

PLAINTIFFS' EXHIBITS TO VAN STAVERN DEPOSITION

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 3 | Expert Report of Gregory Van Stavern, M.D. | 47 |
| Exhibit 4 | Notice of Video Deposition of Gregory Van Stavern, M.D. | 63 |
| Exhibit 5 | Defendants' and Dr. Gregory Van Stavern's Responses and Objections to Notice of Video Deposition of Gregory Van Stavern, M.D. | 65 |
| Exhibit 6 | Gregory Van Stavern, M.D. Additional Materials Reviewed | 67 |
| Exhibit 7 | Khin Kilgore, M.D., et al 11/13/17 presentation to Neuro-Opthalmology | 69 |
| Exhibit 8 | WashU Individual (Research) Conflicts of Interest Policy | 83 |

(CONTINUING)

PLAINTIFFS' EXHIBITS TO VAN STAVERN DEPOSITION

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 9 | Jeffrey Peipert, et al article | 86 |
| Exhibit 10 | 2017 AJOG article by Jeffrey F. Peipert, et al | 87 |
| Exhibit 11 | American Journal Obstetrics Gynecology article by | 88 |
| Exhibit 12 | SLU School of Medicine article by Jeffrey F. Peipert, Tessa Madden, et al | 90 |
| Exhibit 13 | Monsanto Laboratory of the Life Sciences WashU grant app | 94 |
| Exhibit 14 | Pseudotumor and Real Tumor PowerPoint presentation by Gregory P. Van Stavern, M.D., WashU School of Medicine | 113 |



(CONTINUING)

PLAINTIFFS' EXHIBITS TO VAN STAVERN DEPOSITION

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 15 | Review & Update of Pseudotumor Cerebri PowerPoint presentation by Kung, McCoy and Van Stavern | 116 |
| Exhibit 16 | Papilledema and Idiopathic Intracranial Hypertension, PowerPoint presentation by Gregory P. Van Stavern, M.D., WashU School of Medicine | 128 |
| Exhibit 17 | Idiopathic Intracranial Hypertension (Pseudotumor Cerebri): What Do We Know? PowerPoint presentation by Gregory P. Van Stavern, M.D., WashU School of Medicine | 135 |
| Exhibit 18 | Idiopathic Intracranial Hypertension: What the Bleep Do We Know? PowerPoint presentation by Gregory P. Van Stavern, M.D., WashU School of Medicine | 137 |



THE VIDEOGRAPHER: The videotaped deposition of Gregory Van Stern [sic], Medical Doctor, taken in the matter of Mirena Levonorgestrel Products Liability Litigation being held at the location of 211 North Broadway on 2/13/2008 at 9:34 a.m.

My name is Jeff Hill. I'm the videographer, and the court reporter is Debbie Habian.

Counsel please introduce yourselves for the record and then the court reporter will swear in the witness.

MR. MATHEWS: Todd Mathews for the plaintiffs.

MS. ORENDI: Jennifer Orendi for the plaintiffs.

MS. NEFF: Emma Neff for Bayer and for the witness.

MS. COOK: Shayna Cook with --

MS. NEFF: And before we move forward, I'd request any counsel attending this deposition by video please identify yourselves for the record in accordance with the deposition protocol.

(No response.)



MS. NEFF: Am I correct that, to your knowledge, nobody is on the line at this time?

MR. MATHEWS: To my knowledge, nobody's on.

MS. NEFF: Great. Thanks.

THE REPORTER: Raise your right hand, please, Doctor.

(Oath administered.)

THE WITNESS: I do.

THE REPORTER: Thank you.

GREGORY VAN STAVERN,

called as a witness herein by the plaintiffs, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MATHEWS:

**Q. Doctor, could you please state your name for the record.**

A. Gregory Van Stavern.

**Q. Okay. And during the course of this deposition, I'll attempt to refer to you as Dr. Van Stavern. Am I saying that correctly?**

A. That's correct.

**Q. All right. Great. Doctor, you're here**

Page 10

**today to testify as an expert for the defendants in this matter; is that correct?**
A. That's true.
**Q. All right. And in preparation for the deposition today, I've been provided some documents. I'm going to have them identified collectively as Exhibit 1.**
(Plaintiffs' Exhibit 1 was marked for ID.)
BY MR. MATHEWS:
**Q. You've been handed what's been marked as Exhibit 1. Could you identify that group of documents, please?**
A. Yes, I see them. These look like invoices.
**Q. Are those invoices you have provided for the defendants in this matter?**
A. They are.
**Q. All right. And through at least November of -- November 27, 2017, do they adequately reflect the billing that you have made in this matter?**
A. Let me just take a quick look. (Reviewing document.)
Yeah, they look accurate.

Page 11

**Q. All right. And I see the first invoice being dated March 6th, 2015. Does that sound about right?**
A. That's about right.
**Q. Okay. And if we added this correctly, these total up to $107,250. Does that sound about right?**
A. I trust your math on that.
**Q. Whatever is included in these documents totaled up would be what you billed, correct?**
A. Correct.
**Q. You haven't had any additional billing that isn't accounted for here except from November 27, 2017 to current?**
A. That's correct.
**Q. All right. Now, when were you first contacted about being an expert witness in cases related to Mirena and the association with PTC or IIH?**
MS. NEFF: Object to form.
Go ahead.
THE WITNESS: It was probably, you know, late 2014.
BY MR. MATHEWS:
**Q. All right. And do recall who contacted**

Page 12

**you?**
A. I believe Emma Neff contacted me originally.
**Q. And do you have any idea how Ms. Neff found you as somebody who might be an expert in this field?**
A. I actually don't know.
**Q. All right. And when were you initially contacted, what was the scope of the work that you were asked to perform?**
MS. NEFF: Counsel -- Dr. Van Stavern, I'm going to instruct you not to answer regarding the substance of the communications with counsel.
BY MR. MATHEWS:
**Q. When were you initially contacted, was there -- what was your understanding of what you were being asked to do in giving an opinion in this matter?**
MS. NEFF: Again, Dr. Van Stavern, I'm going to instruct you not -- not to answer what you have been asked to do in giving an opinion in this matter as it reflects -- as so far as it reflects communications between you and any counsel for Bayer.

Page 13

MR. MATHEWS: Okay.
BY MR. MATHEWS:
**Q. Doctor, when you were first contacted about this matter, what did you do in preparing to provide services to the defendant in this matter?**
MS. NEFF: Object to form.
THE WITNESS: Well, I think I was asked -- basically, I was told a little bit about the litigation and I told them I'd think about it, and I was already of the opinion that there was no relationship whatsoever between any hormonal contraceptive and IIH. So I thought about it for a little bit and looked at my time commitments for the next six months because I had an idea that this might take quite a bit of my time, and then it looked like I would be able to do this, and so I contacted her back and said that, you know, I would be able to serve as an expert.
BY MR. MATHEWS:
**Q. All right. Prior to being contacted in this matter, had you ever served as an expert witness in any other cases?**
A. I have.

Page 14

**Q. All right. And in what cases -- how -- let me ask you this: How many times?**

A. You know, probably I do about maybe one a year, maybe twice a year. Sometimes I'll just serve as a regular person who reviews a case for an attorney. Sometimes I'm contacted by an attorney and I'll review a case and just say it's either not my area of expertise or if it's a case that they're defending, I'll say I just don't think it's a defensible case. If it's a plaintiff, I may say I really don't think it's an actionable case.

**Q. You said maybe one to two times a year. How many years back does that go?**

A. I started doing this probably when I was a few years into practice, so probably beginning around 2004 or 2005.

I usually don't get to asked to do this unless you have built up some degree of expertise.

**Q. So since 2004, 2005, up until when you were first contacted about this in 2014, maybe you had between ten and twenty cases that you had looked at to serve as an expert witness in?**

A. I think that's reasonable.

Page 15

**Q. Okay. And over the course on average during that time, how much income did you generate from performing as an expert witness or performing services as an expert witness on a yearly basis?**

MS. NEFF: Object to form.

THE WITNESS: I'd have to go back and calculate. I don't know off the top of my head.

BY MR. MATHEWS:

**Q. Okay. Of those ten to twenty cases roughly, how many times did you actually accept an assignment as being an expert witness for someone?**

A. You mean as opposed to just saying this is not a case I can do?

**Q. Correct.**

A. Probably most of them, like 80 percent of them.

**Q. And do you have an idea of that 80 percent, how many times were on behalf of the plaintiff as opposed to the defendant?**

A. Yeah, I would say probably 70 percent defendant/30 percent plaintiff.

**Q. Okay. And do you recall in those matters how many times you actually had to testify either in deposition or in court?**

Page 16

A. So probably, you know, only deposed -- I've never testified in court. I've probably been deposed about maybe eight times in the last ten years, not including the deposition that we did two years ago here.

**Q. Okay. All right. And, you know, my earlier question was kind of specific on time frame that took us up to when you were first contacted in this matter. Since you were contacted in this matter, other than in this matter, have you performed expert witness services in any other cases?**

A. I've reviewed one other case.

**Q. All right. And did you take on that case?**

A. It was -- I did, but it was just a very brief record review.

**Q. Okay. So since you were contacted in this case, other than the one record review, you haven't served as an expert witness in any other cases?**

A. Um... no, I haven't.

**Q. All right. And is there a reason for that?**

Page 17

MS. NEFF: Object to form.

THE WITNESS: Partly just my -- my practice is busy. We -- my partner, my colleague in neuro-ophthalmology at Washington University left to go to the University of Minneapolis. He decided he wanted somewhere much, much colder than St. Louis. So my practice has gotten much, much busier. We have a daughter. You know, so it's really more a matter of time commitment.

BY MR. MATHEWS:

**Q. Understood. All right. So in these underlying -- or in these cases where you served as an expert witness, does the case Colin vs. Pediatric Association back in 2012 sound familiar to you?**

A. That is correct.

MS. NEFF: Object to form.

Go ahead.

THE WITNESS: Yeah, I do vaguely remember it.

BY MR. MATHEWS:

**Q. Okay. What type of case was that?**

A. I'd probably have to see the details. I think it was -- actually, I think it was

Page 18

someone -- if I remember, it was a surgeon who was being asked to leave the practice because of symptoms of vertigo and dizziness and something along those lines.

**Q. Got it. And do you recall were you serving as an expert for the plaintiff or for the defendant in that case?**

A. For the defendant, from what I recall.

**Q. Okay. And what about Reynolds vs. Galveston Discount Warehouses, what kind of case was that?**

MS. NEFF: Object --

BY MR. MATHEWS:

**Q. Do you remember that one?**

MS. NEFF: Object to form.

THE WITNESS: Yeah, I really don't. I'd have to see the details.

BY MR. MATHEWS:

**Q. McWherter vs. St. John's, does that sound familiar, another Michigan case?**

MS. NEFF: Object to form.

THE WITNESS: Same thing I vaguely remember it, but again, I would need to see details of it. I think it was about four or five years ago.

Page 19

BY MR. MATHEWS:

**Q. Okay.**

A. My memory's good, but it's not that good.

**Q. That's all right. And all I'd ask is if you remember, you remember. If you don't, that's fine.**

**Palmer vs. Chris Daley, does that one sound familiar to you, a North Carolina case?**

A. Yeah.

MS. NEFF: Object to form.

THE WITNESS: Yeah, the names are familiar, but I just don't recall the specific details.

BY MR. MATHEWS:

**Q. The last one I'll ask you about is Short vs. Cox and I think that's Lester Cox Medical Center down in Springfield. Do you remember that case at all?**

MS. NEFF: Object to form.

THE WITNESS: I vaguely remember some of the details but not off -- just not in great detail.

BY MR. MATHEWS:

**Q. Okay. Did any of those cases that you -- that I just referenced have anything to do at all with pseudotumor cerebri or Mirena?**

Page 20

MS. NEFF: Objection to form, compound.

THE WITNESS: Definitely not Mirena. I don't think any of those cases had to do with IIH.

BY MR. MATHEWS:

**Q. Have you ever been contacted outside of this case in reference to serving as an expert in a case involving pseudotumor cerebri?**

A. I have.

**Q. Okay. Do you recall when that would have been?**

A. Probably -- there was a case just -- it was just last year, but it was a case that ultimately was not pursued any further.

**Q. Okay. And what were the surroundings of that case? What did it involve?**

MS. NEFF: Dr. Van Stavern, to the extent that you were not disclosed as an expert -- and I don't know what your confidentiality understanding is in that case, but if there's confidential information that you can't disclose, that's okay, you just need to answer.

THE WITNESS: No. Basically it was

Page 21

just someone who had been -- not been -- who had had a questionable diagnosis of IIH that was thought not to be appropriately treated, but my ultimate understanding was that the diagnosis had not been secured.

BY MR. MATHEWS:

**Q. Okay. Do you recall if there was any claim to Mirena use in that case and a resulting PTC diagnosis or failure to diagnose?**

MS. NEFF: Object to form.

THE WITNESS: No, not at all.

BY MR. MATHEWS:

**Q. Okay. All right. So the first page of Exhibit 1, your invoices from October of 2014 to March 6th of 2015, it looks like you spent about twelve hours on this matter. Do you recall what you did in those twelve hours?**

A. A lot of that was a reading -- a re-review of some of the literature, my review of some of the specific cases, drafting an expert report, things more along those lines.

**Q. Okay. So that time did include drafting the expert report?**

MS. NEFF: Object to form.

THE WITNESS: I believe it did, but

Page 22

again, that was again nearly three years ago.
BY MR. MATHEWS:
**Q. Outside of this first page of Exhibit 1, are there any other handwritten or electronic documents that indicate the specific work that was performed in those twelve hours?**
A. Not that I'm aware of.
**Q. Okay. Do you do your own billing for cases you serve as an expert witness in?**
A. I do.
**Q. Okay. So when you went to create the invoice in March of 2015 and billed twelve hours, how did you know that it was twelve hours? In other words, how did you keep track of the amount of hours up until the point where you billed?**
A. Well, since I don't want to detract from my busy practice, I usually do this on the weekends or at night. So I usually keep track of how much time I'm devoting to a specific case, so...
**Q. Okay. And how do you keep track of that?**
A. Basically I usually go to my office, I look at the time and then do whatever I'm going

Page 23

to do and then look at when I finish and then keep track of that time.
**Q. Okay. And when you keep track of that time, you write it down somewhere?**
MS. NEFF: Object to form.
THE WITNESS: Not specifically, no. It's not like I keep a spreadsheet.
BY MR. MATHEWS:
**Q. Okay. I know some people have referenced keeping like a scrap piece of paper. Do you keep a scrap piece of paper until you bill and then you know you're done with that one and move on?**
A. No. It's more very informal.
**Q. Okay. Is it something you just keep in your mind, you keep track of?**
A. More or less.
**Q. Okay. So this twelve hours was re-reviewing some articles. Do you recall which articles they would have been?**
A. Again, not off the top of my head. A lot of them were the -- I will say a lot of these were the original case control study published in the late '80s, early 1990s. I was already familiar with that literature, but I

Page 24

wanted to take another look at it because it'd been a few years since I'd looked at those studies.
**Q. Okay. All right. And it appears that you're billing $750 an hour; is that correct?**
A. Yes. That is the Wash U recommended rate. So our institution has a -- they provide guidelines for physicians doing expert witness work, and that's their recommended rate for record review.
**Q. Okay. And I know I should be familiar with their rates being that I practice law here in St. Louis, but I'm -- is there a different rate for reviewing records as opposed to testifying or is it all just a recommended straight across the board $750 rate?**
MS. NEFF: Object to form.
THE WITNESS: So their recommendation is usually 750 an hour for record review and then 1,500 an hour for deposition, and then 3,000 an hour for live testimony. Again, nobody's obligated to follow that, but that's just their guidelines.
BY MR. MATHEWS:
**Q. And are those the guidelines you use in**

Page 25

**your practice?**
MS. NEFF: Object to form.
THE WITNESS: Generally, for the most part.
BY MR. MATHEWS:
**Q. Okay. All right. And do you know, is $750 an hour more or less than you make in your practice of treating patients on a daily basis?**
MS. NEFF: Object to form.
THE WITNESS: You know, I've never really calculated my hourly rate. So I really don't know for sure. I mean, because a lot of time I spend answering phone calls, calling patients, answering e-mails. I devote a lot of time to patient care. So I've never really broken it down into an hourly rate.
BY MR. MATHEWS:
**Q. Okay. All right. And you said that you believe this twelve hours includes drafting a report. I assume that that's something you do as you described at your home on your home computer; is that correct?**
A. That's correct.
MS. NEFF: Object to form.
Go ahead.

Page 26

BY MR. MATHEWS:
Q. All right. Do you recall -- you drafted the report. Would this have included the final expert report you gave back in 2015?
MS. NEFF: Object to form.
THE WITNESS: Yes.
BY MR. MATHEWS:
Q. Okay. Do you recall were there any drafts of that report prior to the final report?
A. I really don't remember.
Q. Okay. What did you do in preparing that report?
A. Well, really I just looked through the literature I was already familiar with, I looked through the literature I'd written myself and published articles and reviews for IIH in the past and essentially just formalized an opinion that I already held in a more structured way.
Q. Did anyone other than yourself participate in the creation of that report?
A. Not at all.
Q. Okay. After you had created your report, did anyone review that report and provide suggestion to you on changes?
MS. NEFF: Again, Dr. Van Stavern, I'm

Page 27

going to instruct you not to answer with respect to communications with counsel. If anyone else reviewed your report and provided input, you may answer with regard to them.
THE WITNESS: Can you repeat the question?
BY MR. MATHEWS:
Q. Sure. Other than counsel for Bayer or your own private counsel, did anyone else provide any input on suggested -- suggested revisions to your report?
A. Not at all.
Q. All right. Then if I've kept them in order. The page 2 of Exhibit 1 is an invoice from February 16, 2016. Do you see that?
A. I do.
Q. All right. And so that encompasses from 10/15 to 2/16, if I'm reading that correctly; is that right?
A. That's correct.
Q. All right. Did you not have any billing from 3/6/15 to 10/15?
A. Presumably not. That may have been a time where there was not a whole lot going on with the case.

Page 28

Q. All right. And it appears that you spent 20 hours during 10/15 to 2/16; is that right?
A. That's correct.
Q. All right. Do you recall what you did for those 20 hours?
A. Again, off the top of my head, I think some of that was reviewing some of the specific cases that I was asked to review and in the context of reviewing those cases, then just phone calls, you know, occasionally meetings with some of the attorneys. So it encompassed mostly that. Again, I don't remember the specific breakdown of time.
Q. All right. And you said that it was a review of some of the specific cases you were asked to review. Were you provided cases or specific document to review?
A. Yes. I was given case histories and medical records to review.
Q. All right. Were you given any sort of studies that you didn't already have in your possession to review?
MS. NEFF: Object to form.
THE WITNESS: There may have been a few

Page 29

studies regarding -- from obstetrics and gynecology journals, but as far as which specific ones, I don't remember.
BY MR. MATHEWS:
Q. All right. Were you given any additional material to review other than what I've already described?
MS. NEFF: Object to form.
THE WITNESS: So I was given the Bayer signal analysis which I reviewed.
BY MR. MATHEWS:
Q. And what did you find to be significant about the Bayer signal analysis?
A. That --
MS. NEFF: Object to form.
Go ahead.
THE WITNESS: That basically -- and I think I covered this in my report, that the number of cases reported was much lower than you would expect, if there was a causal relationship between Mirena and IIH and keeping with what I had already believed.
BY MR. MATHEWS:
Q. All right. Were you given any of the underlying data that supported the Bayer signal

Page 30

**analysis?**
A. You mean the specific cases?
**Q. Yes.**
A. I believe I was, but again, it's been a while since I've looked at all that.
**Q. Would that have been information that you would have reviewed in that 20 hours of review?**
A. It should --
MS. NEFF: Object to form.
THE WITNESS: It should have been.
BY MR. MATHEWS:
**Q. Is there any document or list that you created to show what materials you received from outside sources?**
A. No, there isn't.
MS. NEFF: Counsel, I will just point out that there is a "materials reviewed" list contained in Dr. Van Stavern's report.
MR. MATHEWS: Sure.
BY MR. MATHEWS:
**Q. During this 20 hours, did you create any additional reports?**
A. I -- that may have been the time when I created the specific reports for those cases.

Page 31

**Q. And when we're referring to those specific cases, we're talking about what ultimately resulted in a deposition that you gave, correct?**
A. That's correct.
**Q. All right. And I believe that deposition was May 17th, 2016. Does that sound about right?**
A. That's about right.
**Q. All right. So the time encapsulated in your 2/16/2016 billing would not have included your time for the deposition, correct?**
A. No. That was separate.
MR. MATHEWS: Let's go ahead and do this. Let's mark this as Exhibit 2.
And this is the depo transcript.
(Tendering document to counsel).
(Plaintiffs' Exhibit 2 was marked for ID.)
BY MR. MATHEWS:
**Q. And since we talked about the deposition, let's just -- I'll get this out of the way and then we'll go back to Exhibit 1.**
**So I've handed you -- handed you what's been marked as Exhibit 2 in this matter and I'll**

Page 32

**tell you it's 266 pages.**
**Does this appear to be the deposition transcript from the deposition you gave May -- May 17th, 2016?**
A. It does. And obviously I'm not going to read the whole thing, but it looks like it.
**Q. In preparation for today's deposition, did you review your previous deposition?**
A. I actually didn't.
**Q. Okay. I know that if you look at the -- page 265, the next-to-last page -- do you see that?**
A. I do.
**Q. All right. And that's generally what we call a redaction page or that's where corrections can be made. I don't see any changes.**
**Did you at any time review your deposition and suggest changes to it or clarifications that needed to be made?**
MS. NEFF: Object to form.
THE WITNESS: No. I had reviewed it after I had already given it a couple weeks later, and I didn't see any corrections that needed to be made.

Page 33

BY MR. MATHEWS:
**Q. All right. As we sit here today, if I were to go back and ask you the same questions that you were asked in this deposition, would your opinions or answers change in any way, to the best of your knowledge?**
MS. NEFF: Object to form.
THE WITNESS: I really don't think so.
BY MR. MATHEWS:
**Q. Okay. That'll save us a lot of time.**
A. Um-hum.
**Q. All right. You can set that aside.**
A. Sure. (Witness complying.)
**Q. All right. Going back to Exhibit No. 1, let's see, we go through to the next page and there's another 20 hours for the next period of 2/16 through 4/16.**
**That 20 hours, do you recall what you did during that time?**
A. Some of that was probably more material review. Some of it was meeting with the attorneys, but again, I don't have a specific breakdown.
**Q. Okay. Do you recall when you were first contacted about this case, was it by**

**telephone?**
A. From the best I can remember, it was by e-mail.
**Q. Okay.**
A. I hate -- you know, I hate talking on the phone. So if it was up to me, I'd do everything by e-mail.
**Q. Fair enough. Then after your e-mail communication, did you at any time meet with lawyers for Bayer before you drafted your report?**
A. We did meet at least once or twice.
**Q. Okay. Do you recall how long you met before you drafted your report?**
A. Really brief meetings, maybe 30, 40 minutes.
**Q. And were those here in St. Louis or where were those meetings?**
A. They were in St. Louis.
**Q. All right. And then after you drafted your report but before you did deposition preparation, okay --**
A. (Nodding.)
**Q. -- if I can define it that way --**
A. (Nodding.)



**Q. -- did you have any other meetings with Bayer counsel during that time?**
A. Again, not that I can recall.
**Q. Okay. And so this takes us through 4/2016, and then you gave your deposition in May of 2016.**
**Does this 20 hours account for depo preparation?**
A. That should have included preparation as well.
**Q. Okay. This did?**
A. Right.
MS. NEFF: Object to form.
Go ahead.
THE WITNESS: (Nodding.)
BY MR. MATHEWS:
**Q. So how many times did you meet to prepare for that first deposition that you gave?**
A. You know, it's been a couple of years. Um... maybe two or three times.
**Q. Okay. And I'm sure that you were asked that in your previous deposition. So I won't ask you to go back and recall how many hours and all of that.**
**The meetings for preparing for your**



**deposition, were those all done here in St. Louis?**
A. They were.
**Q. Okay. Then we have a bill for May of 2016 and there's 27 hours.**
**Does that account for the time giving the deposition?**
A. That does include the deposition.
**Q. Okay. And I know you said that there was suggested or recommended billing rates at Wash U. I see that you have just the flat $750 an hour billing rate here.**
**Did you not charge the recommended rate of Wash U for your deposition?**
A. I felt because I knew there might be -- I was going to commit a lot of time over the next few years, it was easier just to do a straight 750 an hour fee.
**Q. Okay. All right. Other than depo prep, does that 27 hours account for anything additional --**
MS. NEFF: Object --
BY MR. MATHEWS:
**Q. -- on the May 19, 2016 bill?**
MS. NEFF: Object to form.



THE WITNESS: Again, just wanted to at least look at my -- you know, review the materials, review the literature again, review my report just basically preparing for the deposition.
BY MR. MATHEWS:
**Q. All right. Then we have May 2016 to June 2016, and we have twelve hours.**
**Is there a way to determine -- it seems like you have overlapping billing here. Can you explain that to me? You have billing for both -- May on both.**
MS. NEFF: Object to the form.
THE WITNESS: Yeah, I really don't remember specifically.
BY MR. MATHEWS:
**Q. Okay. Do you know what these twelve hours were for May and June of 2016?**
A. I'd really have to go back to the time and look at what I was doing at that point. I'm sure it was more discussions with the attorney, reviewing more materials, maybe reviewing some of the cases, probably reviewing my deposition.
**Q. Okay. When you say you'd have to go back and look at the time, what would you go**

**back and look at? Is there something physical you would look at?**

A. I'd probably have to go back in time to where I was at that point.

**Q. Understood. Okay. All right.**

A. Which, to the best of my knowledge, we're not able to do at this point.

**Q. If you figure it out, let me know.**

A. I will let you know. I've been waiting for that my whole life.

**Q. And you may have the same answer for September 2016 through November 2016. You had 20 hours billed at that time. This would have been after your deposition.**

**Do you recall what those 20 hours were spent doing?**

A. Not off the top of my head.

**Q. Okay. All right. Then at some point did you understand that the stature of the litigation had changed to being something called "multidistrict litigation"?**

MS. NEFF: Object to form.

THE WITNESS: I did. Again, I'm not a lawyer. So I don't understand the nuances of how cases are prepared, the designation of



cases, but I did understand sort of the way it was being tried had changed significantly.

BY MR. MATHEWS:

**Q. All right. And at the time you were made aware of that, were you given any additional materials to review?**

A. Um... there may have been more articles specifically from OB/GYN journals, maybe a couple of articles I might not have had a chance to see otherwise.

**Q. Okay. Did you, at any time prior to understanding that the litigation had changed into a multidistrict litigation, speak with any of your peers or any of the other "experts" in the field to discuss their thoughts and theories on PTC related to Mirena use?**

MS. NEFF: Object to form.

THE WITNESS: Well, I think we need to back up a second. I mean, it's something we discuss, IIH, at conferences all the time. I go to conferences every year. We're a relatively small community. I think in the United States, there are maybe 100, 120 full-time academic neuro-ophthalmologists. So we know each other. So this topic about IIH, what causes IIH, is



there any relationship between IIH and certain other risk factors gets discussed all the time.

So the topic of hormonal contraceptives and IIH would come up periodically at conferences and at meetings and so on, but in terms of did I discuss this litigation with anyone else in the community, no.

BY MR. MATHEWS:

**Q. At any time prior to February of 2017, did you discuss the fact that you were serving as an expert witness in Mirena litigation? Did you ever discuss that with any of your peers or any other experts in the field?**

A. No. Not in detail, no.

**Q. Okay. When you said "not in detail," had you told or had you spoken with other people in your field concerning that you were serving as an expert in a Mirena-related litigation?**

A. Not that I can remember.

**Q. Because when you said "in detail," it made me think that maybe --**

A. No. I was trying to remember if I had actually discussed it with anyone and I really hadn't.

Again, you know, we talk about topics



like this all the time. So we may have talked about -- I may have talked to someone else about IIH and contraceptives in another context, but as far as this litigation, I can't recall specifically doing that.

**Q. All right. And then from December 2016 until July '17, it looks like you spent 29 hours, additional hours if I can do math? Probably not.**

A. That looks about right.

**Q. About 29 hours?**

A. That's fine.

**Q. Do you recall what you did during that time, those 29 hours?**

A. I think there more materials to review. There may have been one or two more cases to review, depositions to review and review of some of the expert depositions. So it was more reviewing some of that material, meeting with attorneys, that type of thing, going back to my original report, reviewing that.

**Q. Were you asked at any time to produce a new report in this matter?**

A. Just a couple of months ago.

**Q. Okay. And so that wouldn't be**

**reflected in your billing through the end of July 2017, correct?**

A. No not at that point.

**Q. And then we have a bill, the final bill which I know you're happy of so I can stop asking you billing questions. November 27th, 2017, which encompasses August through November of '17, three hours of time --**

A. (Nodding.)

**Q. -- do you recall what you did in those three hours?**

A. That was I think just reviewing a couple more papers and a couple more materials.

**Q. All right. During that time were these articles and papers provided to you by someone else or was that through your independent research?**

A. That was my own. They were all ones I was already aware of.

**Q. Do you recall which articles those were?**

A. That was probably the Valenzuela article.

**Q. We'll get -- we'll get to that in just a bit. Again, none of this time included**



**drafting a new report; is that correct?**

A. Not at that point. I mean, that -- I'm sure it had to include it at some point. I don't remember which specific bill included the report.

**Q. Okay. Well, let me ask that question then. You were asked to do another report maybe a couple months ago. We only have billing through November of 2017.**

**Clearly you're here today, so there will be additional billing that you've incurred since November of 2017; is that correct?**

A. Correct.

MS. NEFF: Object to form.

BY MR. MATHEWS:

**Q. Do you have any idea, as we sit here today, how much time that would be?**

A. Not off the top of my head. Some of it depends on how long we're here today.

**Q. Sure. Would the time to create the new report be included in that time from November until now?**

A. I believe there was probably an invoice that isn't included here, that I think included the time I spent drafting the report.



**Q. Okay. Do you have any idea how much that invoice was for?**

A. That -- that I would have to -- that I do keep records of. I have records of all my invoices and I don't have that right now.

MR. MATHEWS: And we'd just ask on the record we get a copy of that invoice if one's out there.

MS. NEFF: If anything exists other than what's been provided to you today, we will certainly provide it.

BY MR. MATHEWS:

**Q. And again, I think you've already answer this had question, but just so I know your billing practice hasn't changed, you're still billing at a flat $750 an hour regardless of whether it's reviewing documents or giving testimony in a deposition; is that correct?**

A. That's correct.

**Q. All right. And you don't know how much -- excluding today's deposition, you don't know what the outstanding amount of invoices are that aren't provided to us today?**

MS. NEFF: Object to form.

THE WITNESS: Not off the top of my



head.

BY MR. MATHEWS:

**Q. And do you have some sort of estimate as to how long it took you to create the new report?**

A. Since it wasn't a completely new report, it was simply adding some material that wasn't there before, probably only about four or five hours.

**Q. Have we discussed now -- excluding the time from November 2017 to current, have we discussed all of the time and billing that you have made in this matter?**

A. Yeah. Not including the time we're spending here today, yes.

**Q. Understood. Do you have an understanding of how much -- well, strike that.**

**All of the meetings that you've had with defense counsel in preparation, were those all done here in St. Louis?**

A. They were all done here.

**Q. Okay. We've discussed a little bit briefly about things you did to prepare for your last deposition.**

**What did you do to prepare for this**

Page 46

**deposition today?**
A. Mostly just reviewing my original report again, refamiliarize myself with some of the literature I'd already reviewed for the report, some meetings with the attorneys.
**Q. Okay. And how many hours did you spend meeting with the attorneys specifically to prepare for this deposition?**
A. Probably about ten.
**Q. And when were those meetings?**
A. I don't have the dates. I'd have to look back through my calendar.
**Q. Okay. Were they in the last two weeks?**
A. Probably in the last month.
**Q. And how many meetings did you have?**
A. Probably three or four.
**Q. Okay.**
A. Again, this is unfortunately a really busy time for me, so my time is really constrained. We have our annual ophthalmology meeting coming up, and I had to submit an ROM grant the day after the Super Bowl. So it was just very difficult to fit everything in. So the timing could have been better.
**Q. Understood.**

Page 47

A. Although I'm from Philadelphia. So I've been waiting my whole life to see the Eagles win a Super Bowl. So that made it worth it.
**Q. So at least you had that and hopefully you got to see some of it.**
A. I did have that.
MR. MATHEWS: Let's get that marked as Exhibit 3.
(Plaintiffs' Exhibit 3 was marked for ID.)
BY MR. MATHEWS:
**Q. I've handed you what's been marked as Exhibit 3. Can you identify that for us, please?**
A. Yes. It's my expert report.
**Q. And that expert report includes a couple of appendices.**
**One is your CV; is that correct?**
A. That's correct.
**Q. And the other is a list of articles and documents you relied upon in forming your opinion?**
MS. NEFF: Object to form.
THE WITNESS: It's not all of the

Page 48

documents. I mean, I formed my opinion before I received all these documents, but yes, it includes those.
BY MR. MATHEWS:
**Q. All right. And let me turn you to Appendix A, and that's a copy of your CV. To the best of your knowledge, is this accurate and up-to-date?**
A. Let me just look through here. (Reviewing document).
Yeah, there's about two articles since then that have been published that aren't on here, but probably not critical.
**Q. Are those articles that you relied upon in forming your opinion?**
A. No, not at all.
**Q. Okay. And just so the record's complete, there's also an Appendix C that includes your prior testimony; is that correct?**
A. Ah, that's correct.
**Q. All right. And other than Houston and Thompson, we discussed those other three cases previously, correct?**
A. Right.
**Q. All right. And I don't want to spend a**

Page 49

**whole lot of time here on your CV because I know you covered it in your previous depo.**
**You are still a professor over at Wash U; is that correct?**
A. That's correct.
**Q. And specifically you're in the Department of Ophthalmology and Visual Sciences; is that correct?**
A. Correct. I also have a dual appointment in the neurology department, but my main -- primary appointment is in ophthalmology.
**Q. All right. Your other appointment in neurology, is that also under the title of professor?**
A. It is.
**Q. All right. Give me an idea of what your responsibilities are as a professor at Wash U in the Ophthalmology and Visual Sciences Department.**
A. So I think as an academic neuro-ophthalmologist, there's -- usually we think of this in terms of three prongs. There's clinical care, so taking care of patients which I do just about every day, and I have busy clinics every day of the week. There's also

Page 50

education. So I work with Wash U medical students, sometimes outside medical students. I have ophthalmology residents. That's my responsibility to teach.

So they're with me in clinic most days, so I teach them there. I also give didactic lectures to both ophthalmology and neurology residents. Every year my colleague at St. Louis University and I put together a four or five-hour neuro-ophthalmology review, which is next Monday, just to educate the residents before they're in cervic examination.

I teach medical students as well both in my clinic or formal didactic lectures. I also have neurology residents from our institution rotate with me. So that's all sort of encompassed in the purview of sort of teaching and education.

Then there's also clinical research. So a lot of my activities are devoted to clinical research, basically doing projects or studies to answer -- answer questions that are sort of clinically-based.

**Q. Okay. So in these three phases of your practice, how much time is devoted to the**

Page 51

**clinical care aspect of it just on average?**

A. Probably about 60 or 70 percent. I mean, there's clearly overlap, because if I'm in clinic with a resident and medical student, I'm teaching and I'm also seeing patients.

**Q. Certainly. About how many patients do you see a week on average?**

A. So probably -- let me just kind of run the numbers quickly. Probably about 60 or 70 a week.

**Q. And do you have certain days that you see patients and then certain days that you do more of the education side or... Explain to me kind of how -- how your workweek is made up.**

A. So we usually divide it in terms of half days. So I see basically six or seven half days per week as just -- six or seven half days per week is devoted to direct patient care when I'm seeing patients in clinic.

**Q. All right. And then the other 40 to -- 30 to 40 percent of your time, how is it divided up between clinical research and education?**

A. Probably about 50/50.

**Q. Okay. And your clinical research, give me an idea of how you go about deciding which**

Page 52

**projects you're going to get involved in for clinical research.**

A. Well, I think if you're interested in clinical research, you're really going to focus on areas where there's a large degree of uncertainty, where there's really unresolved questions. Some people are more focused on basic science; some people are more focused on clinical research. I'm more focused on clinical research because I'm not a basic scientist.

But I'm usually interested in areas where there are unresolved -- unresolved questions that pertain directly to patient care, some areas of uncertainty. Some of it also depends upon the resources that are available to you at the institutions. So our institution is a mecca for neuro-imaging.

So since I've relocated to Washington University in 2009, I've become very interested in neuroimaging and visual pathways, both in terms of IIH and I've published a number of articles about neuroimaging with IIH, also in optic neurology. In fact, our grant is about --

THE REPORTER: Excuse me. I have to stop. Can you move your microphone up? Because

Page 53

all I'm hearing is --

THE WITNESS: Oh, I'm sorry.

THE REPORTER: It's not you. It's not -- I'm sorry. Do we want to go off the record?

MR. MATHEWS: Yes.

THE REPORTER: Okay. I'm sorry.

THE VIDEOGRAPHER: Going off the record at 10:18 a.m.

(Recess taken from 10:18 a.m. to 10:20 a.m.)

THE VIDEOGRAPHER: On the record at 10:20 a.m.

THE WITNESS: Okay. I'll try to speak slower.

So basically -- so in IIH and also imaging of the optic nerve and optic neuritis and multiple sclerosis, what I was about to say was that the grant we just submitted was using a very novel type of imaging. It looks at what we call connectivity between different regions of the brain in patients with optic neuritis.

And I've also -- you know, I've collaborated with a number of different people at Washington University, and one of my

Page 54

interests is looking at ocular biomarkers in the eye for people with pre-clinical Alzheimer's disease because we have a huge Alzheimer's disease research center at Wash U.

So we're looking to see if we can detect early signs of Alzheimer's disease using imaging in the eye. So it's sort of -- and again, those are important areas. It's really interesting to me, and I think they have public health health implications and there's a lot of sort of uncertainty about, you know, what we do in patients with early Alzheimer's disease and how we diagnose and treat people with optic neuritis and multiple sclerosis and, you know, better ways of understanding and managing IIH.

BY MR. MATHEWS:

**Q. Now, this area is certainly very fond of and very proud of Wash U. Wash U is one of the leading research institutes certainly in the Midwest, if not the entire country. Would you agree with that?**

A. Definitely. I'm biased of course.

**Q. And Wash U depends upon grants not only from the federal government but also from private industry, correct?**

Page 55

MS. NEFF: Object to form and foundation.

THE WITNESS: Yeah, I don't know the specific details of where their endowments come from, but I'm sure it's a combination of government, private donors, and industry.

BY MR. MATHEWS:

**Q. Part of your job in clinical research is you have to submit grants, correct?**

MS. NEFF: Object, form.

THE WITNESS: Yes and no. To be honest there are people who do clinical research and do essentially what's considered unfunded clinical research, research with residents, medical students and so on, and that's really what I was doing up until about two or three years ago.

So last year was the first time I submitted an actual NIH grant and actually, that was one of the reasons I relocated to Washington University, so I could sort of expand the scope of my research portfolio, because the institution I was at before, although it was a good -- good institution, it just didn't have the same type of resources and opportunity for collaboration that I found at Washington

Page 56

University. So most of the research I had been doing was either unfunded or just basically funded through departmental funds, small projects to do with residents and medical students.

And I have had the opportunity, I had a pilot grant from the National MS Society. So I have had the opportunity to get more funding for the research. But in terms of how -- am I one of those people that rely primarily on grant-funded research? I am not one of those people.

BY MR. MATHEWS:

**Q. Sure. And so you do have some understanding of how grants get funded and how research gets funded, though, correct?**

MS. NEFF: Object to form.

THE WITNESS: Yes.

BY MR. MATHEWS:

**Q. All right. And one of those ways which you've already described is through federal government grants such as NIH, correct?**

A. Correct.

**Q. And that's one that you've applied for?**

A. Correct.

Page 57

**Q. Was that fund granted?**

A. Well, last year it was rejected. So we resubmitted it this year. So I guess we're keeping our fingers crossed.

**Q. Okay. And in your process of submitting grants, have you come to understand that some grants are funded through private industry?**

MS. NEFF: Object to form.

THE WITNESS: Oh, sure. Yeah. Sure. There's lots of private -- private -- private donors and private industry sponsors who will fund a grant.

BY MR. MATHEWS:

**Q. Okay. And you -- do you -- do you have an understanding that Wash U receives funding from private industry?**

MS. NEFF: Object to form and foundation.

THE WITNESS: Of course, yeah. I think every institution does.

BY MR. MATHEWS:

**Q. All right. And when we talk about private industry, some of those examples would be pharmaceutical companies, correct?**

Page 58

MS. NEFF: Object to form and foundation.
THE WITNESS: True.
BY MR. MATHEWS:
**Q. All right. Have you yourself -- and I think I already know the answer to this question.**
**Have you yourself ever received any funding that was made by Bayer Pharmaceutical?**
A. No, I haven't.
**Q. Okay. In any of the clinical research studies that you have done, whether you were the lead researcher on them or simply one of the researchers on them, have any of them, to your knowledge, been funded by Bayer?**
A. None at all.
**Q. All right. And how long have you been a -- hang on. It's on here. Never mind.**
**In 2017 you were promoted to professor, correct?**
A. Right.
**Q. Help me understand the difference between associate professor and professor, not including any pay details.**
A. Um-hum. So it's a very archaic

Page 59

hierarchical process where you usually start off as a junior instructor or an assistant professor, which is kind of the lowest rank entry level, and then each institution has their own criteria for whether or not you're suitable for promotion. A lot of that has to do with your education and teaching portfolio, a lot of it has to do with your research, how much you published, you know, what journals you published in, if you have published in higher tier journals, lower tier journals. Some of it is clinical care.
Some people -- again, not to get into too much details, some people are on what are called tenured tracks, where essentially -- where they're on essentially research tracks where they are much more dependent upon getting grant funding and publishing in high tier journals to get promoted.
I'm in a clinician scientist track, where it's helpful for me to be able to publish and it's really helpful for me to get grants, but it's not solely dependent on that. Some of it does include things like productivity in clinic. It includes teaching, you know, my

Page 60

evaluation from medical students and residents. So it is less dependent on research than someone who's on a pure research track.
**Q. What is the benefit between being on a tenured track as opposed to a clinician track?**
A. Well, some of it depends -- if somebody is an M.D./Ph.D. and their focus is really on basic science research, then they may spend only like a half day a week or a half a day every other week in clinic. So they're not going to be as valuable from a clinical productivity standpoint.
**Q. Okay. After professor, is there another level?**
A. Probably the highest level is getting an endowed share. It's like being a partner in a law firm. That's where your salary is essentially covered by private donor fund, where they cover your salary and you're not as dependent on seeing tons of patients in clinic and generating clinical revenue.
**Q. And I don't know. That's why I'm asking. Is that kind of your ultimate goal, your end game is to have an endowed chair or what's your plan?**

Page 61

MS. NEFF: Object to form.
THE WITNESS: I wouldn't say it's an end game. It would be nice to have. I mean, there's no guarantee, and a lot of that depends if there is a donor who's willing to donate money for our neuro-ophthalmology chair.
BY MR. MATHEWS:
**Q. Got it. Is there some sort of a review board that makes the determination if you're going to move up to the professor level?**
A. Yes. There's a promotions committee. So basically you're -- the chairman of your department decides if your credentials are good enough to submit to the promotions committee, and then it gets submitted to the promotions committee and they -- it's like Survivor and they, like, vote you off the island or they keep you on the island.
So once it goes through the promotions committee, they decide that you can either be promoted or you have to stay an associate professor, for example, for a few more years and try to bolster your resume.
**Q. Okay. Do you know from 2009, when you got to Washington University, until you -- until**

Page 62

**last summer, when you became a professor, how many times had you made it to -- through the -- through the Survivor round to decide if you were going to be a professor or not?**

MS. NEFF: Object to form.

THE WITNESS: Oh, I mean, it only came up last year. We had talked about it for the last two years, and the last year the chairman and I talked and he decided it was a good time to put me up for promotion.

BY MR. MATHEWS:

**Q. All right. And who is your department chair?**

A. His name's Todd Margolis. He took over the department, I believe in 2014 or 2015.

**Q. All right. I saw -- one question I had, you're licensed in Missouri but no longer in Michigan. You know, in the legal profession, once we get licensed somewhere, we never ever, ever, ever, ever turn loose of it for any reason.**

**Is there a reason you're not still licensed in Michigan?**

MS. NEFF: Object to form.

THE WITNESS: I don't think -- my wife

Page 63

was not a big fan of Detroit. So I don't think we'd ever live in Michigan again, and it wouldn't be that hard to reactivate my license if we ever moved back.

BY MR. MATHEWS:

**Q. Fair enough. All right. Let me hand you what's going to be marked as Exhibit 4.**

(Plaintiffs' Exhibit 4 was marked for ID.)

BY MR. MATHEWS:

**Q. You've been handed what's been marked as Exhibit 4. Can you identify that document, please?**

A. It just says "Notice of Video Deposition of Gregory Van Stavern, M.D."

**Q. Prior to me handing that to you just now, have you seen this document before?**

A. I have.

**Q. Okay. And specifically on page 4, "Documents to be produced," prior to today's deposition, did you have a chance to look through this list of documents to be produced?**

A. I had.

**Q. All right. And subject to any objections by the defense counsel, did you**

Page 64

**provide all of the documents you had in your possession that relate to these 24 items?**

MS. NEFF: And, Counsel, I will just note for the record we have served our responses and objections to this notice.

MR. MATHEWS: Right.

THE WITNESS: But yes.

BY MR. MATHEWS:

**Q. Okay. And those documents include some slide decks that I've got and your billing statements. Does that sound right?**

A. That's correct.

**Q. And we'll get to these, but it appears that there's five slide decks. Does that sound right?**

A. That's correct.

**Q. And let me direct you to number 2 on Exhibit A, which is page 2 of that document, and under the word "communication," that means "Every manner or means of disclosure or exchange of information regardless of means utilized whether oral, written electronic or by document or otherwise and whether face-to-face in a meeting by telephone, mail, telex, discussion, release, personal delivery or otherwise."**

Page 65

**Does that seem like -- do you take that to understand any communication that you've had regardless of what form or media other than with your attorneys?**

MS. NEFF: So I will -- I will object to the form of the question and note that we have served objections to plaintiffs' notice including the definition just described.

Go ahead and answer.

THE WITNESS: Yes, I agree that seems inclusive.

BY MR. MATHEWS:

**Q. All right.**

MS. NEFF: Counsel, we've been going for nearly an hour now. Whenever you get to a good stopping spot. Do you have --

MR. MATHEWS: I've got one document and probably one question and then we can take a break.

MS. NEFF: Great.

MR. MATHEWS: Is that okay?

MS. NEFF: Yes.

MR. MATHEWS: All right. Mark this 5.

(Plaintiffs' Exhibit 5 was marked for ID.)

Page 66

BY MR. MATHEWS:
**Q. Doctor, I've handed you what's been marked as Exhibit 5. Can you identify that document for me, please?**
A. It looks like just defendants' and my responses and objections to the notice of the video deposition.
**Q. All right. And this is the objections that were just referenced by the defense lawyer. Did you yourself have any hand in preparing these objections?**
A. None at all.
**Q. All right. Prior to today, had you seen this document?**
A. I don't remember seeing this at all.
MR. MATHEWS: All right. That's all I got -- we can go off the record.
MS. NEFF: Okay.
THE VIDEOGRAPHER: Off the record at 10:33 a.m.
(Recess taken from 10:33 a.m. to 10:42 a.m.)
THE VIDEOGRAPHER: On the record at 10:42 a.m.

Page 67

BY MR. MATHEWS:
**Q. All right. Doctor, welcome back from the break. During the break I was handed another additional document that we'll mark as 6.**
(Plaintiffs' Exhibit 6 was marked for ID.)
BY MR. MATHEWS:
**Q. And can you identify that document?**
A. It's the additional materials reviewed, just more materials I had reviewed.
**Q. And the first one is a Kilgore poster session presentation, correct?**
A. That's correct.
**Q. All right. And did you happen to bring a copy of that with you today?**
A. I actually didn't have it with me.
**Q. All right. Can you describe what it was that you reviewed?**
A. So basically it was a presentation at the American Academy of Ophthalmology by some of my colleagues where they had done a case-controlled study looking at the incidence of IIH in -- they looked at basically a group of patients with IIH and a group of matched

Page 68

controls to see if there was an increased frequency of oral contraceptive or hormonal contraceptive used in the IIH with comparative controls and they did not find an increased incidence.
**Q. All right. And were you actually at that presentation in November of 2017?**
A. I was.
**Q. Okay. And how long of a presentation was it?**
A. They're usually about twelve minutes. So it's basically eight minutes for presentation and then about three to four minutes for questions.
**Q. And the -- what you reviewed prior to today's deposition, was that an abstract or was it the full poster session?**
A. It was just an abstract.
**Q. And isn't -- is it your opinion that an abstract is something that can be relied upon in forming one's opinion?**
MS. NEFF: Object to form.
THE WITNESS: Well, it certainly isn't where I came to the opinion that there's no relationship. It's just another piece of

Page 69

information that supports that.
BY MR. MATHEWS:
**Q. Okay. As you reviewed the archive, were you provided with or did you have access to any of the underlying specific data associated with that poster session presentation?**
MS. NEFF: Object to form.
THE WITNESS: No. I don't have access to the database.
BY MR. MATHEWS:
**Q. And were you made aware of the details of how any of that research was conducted?**
A. Well, in the presentation in the abstract, they talk about methodology. So it was done as a -- basically it looked like a fairly well designed case control study.
MR. MATHEWS: Okay. Go ahead and mark this as 7.
(Plaintiffs' Exhibit 7 was marked for ID.)
BY MR. MATHEWS:
**Q. You've been handed what's been marked as Exhibit 7.**
**Does that appear to be an accurate abstract of the poster session that you're**

Page 70

referring to?
A. Yes.
Q. All right. And is this -- does this appear to be exactly what you reviewed?
A. It is.
Q. All right. Did you review any additional material in relation to this Kilgore study that we haven't discussed today?
A. No.
Q. All right. All right. Also on Exhibit 6 it lists one, two, three, four, five, six... seven deposition transcripts that you've reviewed; is that correct?
A. That's correct.
Q. All right. Did you -- have you had an opportunity to review Dr. Newman or Dr. Dinkin's deposition transcripts?
A. No, I haven't.
Q. All right. Are you aware that their depositions have been taken?
A. My under- -- yes, I am aware of that.
Q. All right. Is there a reason why you have not reviewed their deposition transcripts?
A. I just wouldn't find it relevant.
Q. Okay.

Page 71

A. I mean, again, my opinions are not dependent upon other people in the community. I mean, my opinions are based on the evidence available.
Q. Certainly. You know Dr. Newman, correct?
A. I do. I trained with her.
Q. All right. And tell me about your training with Dr. Newman.
A. So I spent a year doing a Fellowship in neuro-ophthalmology at Emory University from 1999 to 2000.
Q. And as a fellow under Dr. Newman, what was your -- what were your duties as it relates to Dr. Newman's practice?
A. Well, mostly just to see patients with her, present patients to her, teach the residents and medical students who were rotating through the service and then participate in research projects with her.
Q. And did you participate in research projects with her?
A. I did.
Q. Did you participate in any research projects with her concerning PTC?

Page 72

A. Not at the -- not during that year. We've since collaborated on other projects, but during that year my big project was on head injury and neuro-ophthalmic deficits.
Q. And you said you've collaborated with Dr. Newman since that time.
Have those collaborative efforts been specifically related to PTC?
A. They have.
Q. All right. And describe those research projects to me.
A. Well, we -- we basically pooled the database of patients that I had seen. At that point I was in Detroit with IIH patients seen at Emory and then I think IIH patients at an institution in Mississippi and essentially used that database to explore questions about incidence, prognosis, and characteristics of IIH.
Q. Okay. You were contacted in this litigation back in 2014; is that correct?
A. That's correct.
Q. All right. At that time did you go back and look at your patient population for say the previous five years who had a PTC diagnosis

Page 73

to see if any of them had a use of Mirena during that time?
A. Well, no, I didn't because again, you know, I think -- I don't think a reasonable person could look at the entire body of evidence and come to any conclusion other than the association with hormonal contraceptives and IIH is simply coincidental. So at that point, I mean, there's enough evidence to convince me that there's no relationship. So I didn't see the need to do that.
Q. Okay. But when you were doing research with Dr. Newman, you went back in your records and looked at the pooled database of patients to do that particular research; is that correct?
MS. NEFF: Object to form.
THE WITNESS: But it wasn't specific to any -- any -- it wasn't specific to Mirena. It was just looking at the entire database.
BY MR. MATHEWS:
Q. All right. Well, if, "if" you went back and looked at your patient population and saw that a certain number of folks with PTC also were on Mirena, wouldn't that be of importance to you at least as a term of your research to

Page 74

**determine what patients had particular birth control as opposed to which patients had a different birth control?**
MS. NEFF: Object to form, incomplete hypothetical.
THE WITNESS: Well, let me answer it this way: If I went back and saw some of my patients with IIH that were on Mirena, I would be completely unsurprised and unphased at all by that. Since Mirena is preferentially prescribed to obese women, I would not be surprised at all that some of my patients were on Mirena, just like many of my patients with IIH are on hormonal contraceptives of some type because the vast majority of patients with IIH are of limited reproductive age. So it makes sense that they'd be on a hormonal contraceptive.
It's also not -- as I'm sure you know, it's not as easy as going back and looking at my database and saying, oh, some of these people are on Mirena. To really answer the question scientifically, you'd need to do a case-controlled study, and trust me, those are not easy to do. You have to appropriately select the cases and appropriately match the

Page 75

controls. And, I mean, sometimes it seems easy in theory, but in practice, it's exceedingly difficult, especially with a condition where we don't understand or don't know the underlying cause.
BY MR. MATHEWS:
**Q. Do you have an opinion on whether levonorgestrel causes an increase in weight gain in women?**
MS. NEFF: Object to form.
THE WITNESS: I believe in some forms, that it can result in weight gain.
BY MR. MATHEWS:
**Q. Okay. And what is that opinion based on?**
A. Basically articles I had reviewed and my basic understanding of the pharmacology.
**Q. And you are not a pharmacologist, correct?**
A. Well, do I have a Ph.D. in pharmacology? No. But, I mean, I'm a physician. I'm a practicing physician. So I have to have a more than basic understanding of pharmacology, particularly the effects of certain pharmacologic agents on the brain and

Page 76

the visual pathway.
**Q. And how did you gain that knowledge that's more than just, you know, the average man on the street?**
A. Well, I mean, you know, just my training, medical school, residency, fellowship and 18 years in practice, you know, I attend conferences multiple times per year, you know, I see patients and I see patients who have new problems and they're on medications who are -- that are new or experimental.
For example, we -- you may know this if you're in St. Louis. We have a huge cancer center, and so a lot of patients with cancer are on experimental agents, and they may have vision problems and it's important for me to understand the pharmacology of some of these agents and how they might impact the visual system.
**Q. You had mentioned your education in medical school.**
**What -- what classes or courses did you take involving pharmacology?**
A. Probably similar to most people who do medical school, they are curricula-included in a one-year pharmacology course.

Page 77

**Q. Have you taken any other pharmacology courses outside of that?**
A. Not a specific pharmacology course.
**Q. Okay. And since we're on this topic and it's, I'm sure, going to garner the same question -- responses, what is an epidemiologist?**
A. Well, it's somebody who studies patterns and incidences and frequency of diseases to look for patterns to see if there's specific risk factors for diseases or patterns of behavior that are associated in a causal way with the disease.
**Q. All right. First, you would agree with me that an epidemiologist is a subspecialty in the medical field?**
MS. NEFF: Object to form.
THE WITNESS: Yeah. I mean, you can have a Ph.D. in public health and a doctorate in epidemiology. Most people do it through biostatistics, and they may have their doctorate in biostatistics.
BY MR. MATHEWS:
**Q. Okay. And you're not an epidemiologist as would be defined as a subspecialty in**

**medicine; is that correct?**
MS. NEFF: Object to form.
THE WITNESS: Well, as you might have anticipated, again, I have to know about epidemiology. I've done epidemiologic studies, I've participated in case control studies. So I have to have a basic understanding of epidemiology and not just to understand the diseases I see and the patients I see in clinic but also to perform clinical research.
BY MR. MATHEWS:
**Q. You would agree with me that someone who has their doctorate in biostatus- -- as a biostatistician I think is how you described it -- would have a better understanding of epidemiology than your basic understanding of epidemiology; is that correct?**
MS. NEFF: Object to form and foundation.
THE WITNESS: Well, I think they might have better understanding of things like methodology and biostatistics, but in terms of how it pertains to clinical care of patients, then I don't think those things are easily translatable.



BY MR. MATHEWS:
**Q. Okay. All right. All right. We talked about Dr. Newman.**
**Other than this research of your pooled databases, have you done any other research with Dr. Newman over the years?**
A. Um... what have we done together? I mean, I've written -- honestly, believe it or not, I think that's about it.
**Q. Okay. When was last time you spoke with Dr. Newman?**
A. Oh, a couple of weeks ago.
**Q. Was that at a conference or was that just over the phone?**
A. It was by e-mail.
**Q. By e-mail?**
A. (Nodding.) Yeah, to me e-mail --
**Q. Right. Because you prefer --**
A. Right.
**Q. -- to do everything by e-mail?**
A. I do everything by e-mail.
**Q. Understood.**
**Over the course -- well, let's say since 2014, how many times do you think you've corresponded with Dr. Newman?**



A. Oh, probably only a couple times a year.
**Q. And then how many times do you think you've actually seen Dr. Newman?**
A. Usually we see each other at NANOS, neuro-ophthalmology meeting. We see each other at the Academy of Ophthalmology meeting and the Academy of Neurology meeting -- meetings, so at least three times year.
**Q. And during those times, have you had any discussion about the connection of Mirena to PTC?**
A. Not at all.
**Q. Okay. During those three years or three times a year for the last -- I guess going on four years now, have you been at any conferences where the presentation has been made of the connection or lack of connection between Mirena and PTC?**
A. Well, at the NANOS meeting in 2015, there was the poster that later became the Valenzuela paper.
**Q. Since that time have you discussed the Valenzuela paper with Dr. Newman?**
A. I have not.



**Q. Have you had an opportunity to review Dr. Newman's report in this matter?**
A. I have not.
**Q. Okay. And is there a reason that you haven't reviewed that report?**
A. Again, I just don't feel that it would be relevant in forming my opinion.
**Q. Okay. Do you know Dr. Dinkin?**
A. I do.
**Q. All right. Same questions for Dr. Dinkin -- let me just do it this way: Dr. Dinkin, Dr. Cestari, Dr. Rizzo, do you know all of them?**
A. I do. Some better than others.
**Q. Since you were retained in this matter in 2014, have you discussed the connection of Mirena and PTC with any of them?**
A. I haven't.
**Q. All right. Have you seen any of their expert reports in this matter?**
A. I haven't.
**Q. Do you understand that they've all been retained as experts in this case?**
A. I do now.
**Q. Okay. Is your knowledge of that**

because I just said it?
A. No.
MS. NEFF: Object to form.
THE WITNESS: I've heard some of the names mentioned just briefly.
BY MR. MATHEWS:
Q. Okay. And again, I don't want to know what your -- what the lawyers from Bayer have told you, okay?
A. Um-hum.
Q. Other than the experts that I just mentioned, have you discussed the connection of Mirena and PTC with any other individuals in your field in the last -- since 2014?
MS. NEFF: Object to form.
THE WITNESS: Yeah, I think briefly at a NANOS meeting, I ran into Deb Friedman, who's another neuro-ophthalmologist, and I think it was in relation to the Valenzuela poster. And she mentioned that she had some issues with the poster, and that was pretty much the extent of it.
BY MR. MATHEWS:
Q. All right. Let me -- we'll get back to the experts in a bit. Let me...



How much time did you spend reviewing the depositions that are listed on Exhibit 6?
A. Oh, quite bit of time. I mean, at least six to eight hours. I don't remember off the top of my head.
Q. And that's additional time that you have not billed for yet, correct?
A. Not at this point.
Q. Okay. All right.
(Plaintiffs' Exhibit 8 was marked for ID.)
BY MR. MATHEWS:
Q. I've handed you what's been marked as Exhibit No. 8. Do you see that?
A. I do.
Q. All right. And this is the individual research conflicts of interest policy for Washington University. Does that look right?
A. It does.
Q. Are you familiar with this policy?
A. I am. I am.
Q. Okay. And if we look over on page 3 of 8, Subsection 6, sub (a)(2), sub 2, it reads: "A covered individual shall complete or update a financial disclosure statement that discloses



all personal, financial interests and those of their family regardless of value that appear to be related to the covered individual's institutional responsibilities."
Did I read that correctly?
A. You did.
Q. All right. In this case have you disclosed the $107,250 you've received from Bayer as testifying as an expert?
A. No, I haven't.
Q. All right. And you started this back in 2014; is that correct?
A. That's correct.
Q. Um-hum. And it requires you to report certainly at least annually, according to 6(b) on page 4, financial interests that you receive that could be in relation to your research; is that correct?
MS. NEFF: Object to the form.
THE WITNESS: My understanding of that and after discussing it with some institutional officials at Washington University, it has more to do with grants, private donations, and entrepreneurial enterprises.



BY MR. MATHEWS:
Q. Okay. So it's your understanding that you're not required to disclose monies received from Bayer in performing expert witness work in this matter?
MS. NEFF: Object to form.
THE WITNESS: That's the understanding, I understand that I got from discussing it with some of the officials.
BY MR. MATHEWS:
Q. Okay. All right. And you do understand that Bayer is a contributor -- contributor to certain grants at Washington University, correct?
MS. NEFF: Object to form and foundation.
THE WITNESS: I didn't know that, but I wouldn't be surprised that they were. Wash U has a lot of grants.
BY MR. MATHEWS:
Q. Do you know a Dr. Jeff Peipert at Wash U?
A. Actually, I don't know him.
Q. P-E-I-P-E-R-T. He's in the OB -- OB/GYN department.

Page 86

A. Never met him.
MR. MATHEWS: All right. So let's just go ahead and mark this.
(Plaintiffs' Exhibit 9 was marked for ID.)
BY MR. MATHEWS:
**Q. And I've handed you Exhibit 9, which is an article published in 2017 where Dr. Peipert is one of the participants in that research. It indicates that the title is "Long-acting reversible contraception -- contraception use among residents in obstetrics/gynecology training programs" and it lists Dr. Peipert as the department of OB/GYN at Wash U. do you see that?**
A. I do.
**Q. All right. And then I'm going to direct you over to page 6 of 7, the next-to-last page under "Footnotes," and it says: "Dr. Peipert receives research funding support from Bayer HealthCare Pharmaceuticals, Teva Pharmaceuticals and Merck." Do you see that?**
A. I do.
**Q. Prior to me discussing just this one article with you, were you aware that Bayer**

Page 87

**finances certain research programs at Wash U?**
MS. NEFF: Object form.
THE WITNESS: I wasn't aware of that, but again, I'm not entirely surprised.
(Plaintiffs' Exhibit 10 was marked for ID.)
MS. NEFF: So, Counsel, just before we get into the next document, it looks like this is a -- a print copy from online and there are some text boxes that are covering some of the text, for example, on page 2. So we would just -- to the extent that the official exhibit is that same format, we would object to it.
MR. MATHEWS: This is the best copy I have.
BY MR. MATHEWS:
**Q. So I've handed you what's been marked Exhibit 10. Again, this is another article by Dr. -- where Dr. Peipert is involved. It's a 2017 article. "Prolonged use..." is how this article starts. Do you see that?**
A. I do.
MS. NEFF: Object to form.
BY MR. MATHEWS:
**Q. All right. And then on page 7 of 8**

Page 88

**also, the next-to-last one, it gives a very similar disclosure. Dr. Peipert receives research funding from Bayer, Teva, and Merck. Do you see that?**
A. I do.
**Q. All right.**
A. I should mention that, I mean, every study or every paper is simply going to have to stand or fall on its own merit. You know, industry-funded studies, maybe we look at that with a little more skeptical eye, but ultimately it's going to have to stand or fall on its own merits.
**Q. Certainly.**
(Plaintiffs' Exhibit 11 was marked for ID.)
BY MR. MATHEWS:
**Q. I've handed you what's been marked as Plaintiffs' Exhibit 11 and this is another article involving Dr. Peipert, this one published in 2015, and also Tessa Madden is one of the researchers on this. Do you see that?**
A. I do.
MS. NEFF: Object to form.

Page 89

BY MR. MATHEWS:
**Q. All right. And this is "Long-term utilization and continuation of intrauterine devices." Do you see that?**
A. I do.
**Q. All right. And over on page 6 of 7, again, the next one, we see Dr. Peipert's disclosure again, receives research support from Teva, Bayer HealthCare Pharmaceuticals and Merck Company and serves on the advisory board for Teva. Then it gives Dr. Madden's disclosure, that she serves on a scientific advisory board for Bayer HealthCare Pharmaceuticals and a data safety monitoring board for Phase IV safety studies of Bayer contraceptive products.**
**Do you see that?**
A. I do.
**Q. Did I read that correctly?**
A. You did.
**Q. All right. So Dr. Peipert and Dr. Madden both have a connection to Bayer Pharmaceuticals. Is that your understanding from the documents I've shown you?**
MS. NEFF: Object to form.
THE WITNESS: I'm not sure they have a

connection. It sounds like their research has been funded in part by Bayer.
BY MR. MATHEWS:
**Q. All right. And the last portion I read about Dr. Madden, she actually serves on a scientific advisory board for Bayer HealthCare, specifically as to Bayer contraceptive products, correct?**
MS. NEFF: Object to form.
THE WITNESS: Correct.
MR. MATHEWS: All right. And that one.
(Plaintiffs' Exhibit 12 was marked for ID.)
BY MR. MATHEWS:
**Q. And this is Exhibit No. 12. This is a 2016 article again with Dr. Madden and Dr. Peipert, "Association of Baseline Bleeding Pattern on Amenorrhea" -- and I always pronounce that wrong -- "With the Levonorgestrel Intrauterine System Use."**
**This particular article is directly dealing with levonorgestrel intrauterine system use, correct?**
MS. NEFF: Object to form.
THE WITNESS: Correct.



BY MR. MATHEWS:
**Q. And this is, again, Dr. Madden and Dr. Peipert involved, correct?**
A. Let me just -- (reviewing document.)
Yes.
**Q. And again, we see on page 6 of 7, which is the third to last of this article -- of this document, the same disclosures, correct?**
A. Well, it sounds like they're very --
MS. NEFF: Object to form.
THE WITNESS: -- they're very good about acknowledging their disclosures.
BY MR. MATHEWS:
**Q. Okay. Right. And I've got more articles that I could go on and on about. Your desire, I think you told us earlier, is to do more and more research, to do more and more and perhaps one day even get a -- a -- I don't remember what you called it -- an endowed chair. That's done by doing research, correct?**
MS. NEFF: Object to form, mischaracterizes.
THE WITNESS: Actually, not at all. It has nothing do with that. It actually has to do with a donor who's very interested in pursuing



endowed promotion or education or research. So it is completely dependent on who donates money. Those things happen only intermittently and they're very unpredictable. So I wouldn't even call that a goal. It would just be nice if it happened.
BY MR. MATHEWS:
**Q. You would agree with me, would you not, that giving an opinion contrary to one of the donors at Wash U would significantly hurt your chances of getting someone to sponsor or to pay for a neuro-ophthalmology chair at Wash U?**
MS. NEFF: Object to the form of the question.
THE WITNESS: I'm not sure I even understand that question.
BY MR. MATHEWS:
**Q. Sure.**
A. I think you may be misunderstanding the role of a chair, but go ahead.
**Q. Okay. The way you get this -- this position is by a donor being willing to put up money for research for a particular area you're interested in or a particular area you serve in; is that correct?**



MS. NEFF: Object to form.
THE WITNESS: Not usually. It's usually a private donor, a family or a foundation --
BY MR. MATHEWS:
**Q. Okay.**
A. -- that may have an interest in a particular disease.
**Q. Okay. So they put up the money and you get this chair, if you will. You would agree with me that giving an opinion contrary to one of the other donors at the University would affect your ability to have someone sponsor that chair or pay money for that chair for your research?**
MS. NEFF: Object to form and foundation.
THE WITNESS: Yeah, I'm not sure -- so basically, for example, the Schnuck family sponsors a chair for one of our researchers for neurofibromatosis. So I'm not sure how someone could give an opinion against a family or against a disease. So chairs are not usually sponsored by pharmaceutical companies. They're usually sponsored by families or private

foundations or donors.
BY MR. MATHEWS:
**Q. Would you agree with me that Monsanto, for instance, has donated a significant amount of money to Wash U over the years?**
MS. NEFF: Object to form and foundation.
THE WITNESS: I have no -- I have no idea, but I'll take your word for it.
BY MR. MATHEWS:
**Q. Are you aware of the current merger between Bayer and Monsanto?**
MS. NEFF: Object to the form and foundation.
THE WITNESS: I was only most vaguely aware of that.
(Plaintiffs' Exhibit 13 was marked for ID.)
BY MR. MATHEWS:
**Q. I've handed you what is a printout that's from online. It's page -- it's got a listing at the top, Monsanto Laboratory of Life Sciences, Washington University in St. Louis, page 1 of 5. At the bottom it has a print date of 2/12/2018, and it contains five pages.**



**Does that look -- have I accurately described the document?**
MS. NEFF: Counsel, just before we go further, there are rectangular boxes at various intervals throughout this document. Is it your representation that it printed this way online or were those added by counsel?
MR. MATHEWS: No. It -- this is how it printed. This is the exact way it printed.
MS. NEFF: It printed with these boxes?
MR. MATHEWS: It did.
MS. NEFF: Okay. Go ahead.
THE WITNESS: Yeah, I see.
BY MR. MATHEWS:
**Q. All right. And I'm going to refer you to page 4, the last paragraph, and it says: "Monsanto is an agricultural company with headquarters located in St. Louis. Monsanto Corporation has for many years been a major supporter of research in the sciences at Washington University through such measures as the Washington University Monsanto Biomedical Research Agreement which has brought more than a hundred million dollars of research funding to the University." Did I read that right?**



A. You did.
**Q. Would you agree with me that giving an opinion contrary to Bayer, which is in the process of merging with Monsanto, may cause an issue for you at the University if you were to give an opinion contrary to Bayer?**
MS. NEFF: Object to the form.
THE WITNESS: I completely disagree with that. I think my -- I mean, I think Washington University has -- my wife actually has the best phrase for it. She says it's "the unconscious expectation of excellence." So we're expected to maintain scientific integrity and our opinions should be based on scientific evidence and scientific fact, not about who we might offend and who we might tick off.
BY MR. MATHEWS:
**Q. Okay. Okay. All right. Let's turn back to, um... let's talk a little bit about your opinion in this case real quick.**
THE WITNESS: Can you still hear me okay?
THE REPORTER: I can. Thank you.
BY MR. MATHEWS:
**Q. And I'm sorry. What exhibit number is**



**your opinion?**
A. Oh, actually I had -- let me see.
MS. NEFF: 3.
MR. MATHEWS: 3. All right.
BY MR. MATHEWS:
**Q. Do you have Exhibit 3?**
A. I have my own copy.
**Q. Okay. That's fine. As long as you have --**
A. I'm sure they're the same.
**Q. Exhibit 3, your opinion is actually 17 pages long; is that correct?**
A. It is.
**Q. All right. And it's dated January 18, 2018, when you get back there on page 17?**
A. Um-hum, correct.
**Q. Does that sound right? All right.**
**Does this appear to encompass your entire opinion?**
MS. NEFF: Object to form.
THE WITNESS: Just make sure this is -- yes, this is a current copy, so it does.
BY MR. MATHEWS:
**Q. And you had previously given an opinion in this case, and since that time would you**

**agree that the major significant issue that's changed is the Valenzuela article?**

MS. NEFF: Object to the form.

THE WITNESS: I wouldn't say it's changed. It's just another piece of evidence that I've incorporated into this version of the report.

BY MR. MATHEWS:

**Q. Fair enough. Okay. Are there any other studies that have come out since you last testified that in your opinion are significant to the issue of whether Mirena cause PTC?**

A. I'm trying to remember if Dr. Etminan had published a letter to the editor essentially sort of retracting or revising his original paper. I don't remember off the top of my head if that came out after my deposition or before, but if it did come after, that's the only other thing I can think of.

**Q. Is your opinion -- is your opinion based on the Etminan article and/or a letter to the editor?**

MS. NEFF: Object to the form.

THE WITNESS: No. My opinion is really based on, again, an entire body of scientific



evidence about the relationship between hormonal contraceptives and IIH. It's just another piece of information that I basically incorporate into this report.

BY MR. MATHEWS:

**Q. And what was the significance that you put on the Etminan letter?**

A. I mean, it's fairly minor as, you know, I think I went into in the report, I mean, how a lot of flaws at least the original report as far as how he did his disproportionality analysis, but I think one of the interesting things was the second part of that analysis where he looked at the rates of IIH in Mirena versus two other contraceptives found that they were exactly the same. And since we have really good, well-designed case-controlled studies showing that there's no relationship between hormonal contraceptives and IIH, I think that's helpful. It shows us that there's really no difference between Mirena and these other contraceptives. So that's part of the report I thought could be useful, and as he mentioned in his sworn affidavit -- affidavit and the subsequent letter to the editor, he really did not do a correct



disproportionality analysis and that if you correct for that, there's really no increased reporting rate for Mirena.

**Q. All right. And then as to Valenzuela, tell me what significance you attributed to the Valenzuela study.**

MS. NEFF: Object to form.

THE WITNESS: Well, I would say it's only significant in that it's one of the only two papers that specifically look at the relationship between Mirena and IIH, but again, as I mention in the report, it's unfortunately severely methodologically flawed. That doesn't mean it's worthless. It just means you have to be very cautious about any conclusions you draw from a poorly designed case control study.

BY MR. MATHEWS:

**Q. All right. So you're critical of the way in which that study was conducted?**

A. I am.

**Q. All right. And once you reviewed the study, you went through it, you thought about it. Did you take any steps to send a letter to the editor, to contact Valenzuela and say, hey, here's a problem? Did you do any of those**



**things?**

MS. NEFF: Object to form.

THE WITNESS: No, I didn't. I didn't for a couple reasons. The first is that, I mean, I am an expert in the litigation. So there could be a perceived conflict of interest.

The second is that, again, when you look at the paper, the conclusions they draw which is one that their evidence does not show that Mirena causes IIH; and two, and this is most important to me since I take care a lot of -- a lot of these women is that they're not recommending that people remove the Mirena.

So their conclusions are essentially the conclusions I would draw anyway based on, again, this large body of evidence. So since that was their conclusion, I didn't think it was critical that somebody sent a letter to the editor. If someone chooses to do that, I think that would be reasonable, but I didn't think I should be the person to do that.

BY MR. MATHEWS:

**Q. You certainly have the ability to send a letter to the editor if you choose to do that, correct?**

A. I do.
**Q. Have you done that in the past?**
A. Have I ever? Um... honestly, I have just never done that.
**Q. Have you ever read a study and said you know what, it just doesn't make sense to me, let me call up the author and ask them some questions? Have you ever done that?**
MS. NEFF: Object to form.
THE WITNESS: I haven't done that.
BY MR. MATHEWS:
**Q. Have you ever been at a conference and run into an author that you disagreed with and said, I'm going to talk to them about their research and why I disagree with it?**
MS. NEFF: Object to form.
THE WITNESS: I have done that in a polite way. These, again, are all people I know. I mean, everybody would agree that there's no study that's perfect, and there's also no study that's so worthless that you couldn't at least get some information from it, and there's a big middle ground there.
BY MR. MATHEWS:
**Q. Have you -- do you know Valenzuela?**



A. I actually don't know him or her.
**Q. Do you know Valenzuela when you would see her?**
A. I don't think I could pick her out of a lineup.
**Q. Have you been at any conferences where Valenzuela has spoken since 2014?**
MS. NEFF: Object to form.
THE WITNESS: I have been at a lot of conferences, and it's possible she spoke there and I wasn't there for the talk.
BY MR. MATHEWS:
**Q. It was a bad question. I should have said that you were in attendance for.**
A. I wasn't.
**Q. All right. Other than the two studies we've discussed, is there any other significant study that's come out since you gave your deposition in 2015?**
MS. NEFF: Object to form.
THE WITNESS: No. The one abstract that we talked about at the Academy of Ophthalmology, but again, that just essentially is in line with a lot of other well-designed case-controlled studies that reach the same



conclusion.
BY MR. MATHEWS:
**Q. You mentioned something earlier that gave me pause to go back to something else. You'd mentioned submitting a grant for some research you're wanting to do. In the submission of that grant, did you disclose the expert work you're doing in this case?**
A. No, because it had absolutely no relationship to either IIH or Mirena.
**Q. Have you submitted any grants since 2014 that did relate to PTC or Mirena?**
A. No, I haven't.
**Q. Have you been asked to conduct any research or studies since 2014 concerning the connection between Mirena and PTC?**
MS. NEFF: Object to form.
THE WITNESS: I have not.
BY MR. MATHEWS:
**Q. Let's talk a little bit about some wordsmithing as it would be or whatever you want to refer to it as. You refer to this commonly as idiopathic intracranial hypertension, correct?**
A. I do.



**Q. And "idiopathic" basically meaning no known cause?**
A. Correct.
**Q. I'm saying that correctly?**
A. Um-hum, yes.
**Q. And for you to describe something as idiopathic, it's your opinion that there is no known cause, correct?**
MS. NEFF: Object to form.
THE WITNESS: Well, I think it's not just my opinion. It's the opinion of the entire neuro-ophthalmology community. That is the preferred term.
Now, I will say conventionally, I think a lot of us use the term IIH and pseudotumor cerebri synonymously. I do it in part for two reasons. One is a very practical reason. Up until recently, I used a voice recognition software program for my dictations and it could not recognize IIH, it just could not. It always got it wrong. So a lot of times for practical reasons I would use the term "pseudotumor cerebri."
The other reason is a lot of physicians in the community just are familiar with the term

Page 106

pseudotumor cerebri just because it has a historical -- it's historically been used to describe this condition. So when I say the patient had idiopathic intrauterine hypertension, they're just not as familiar with it. So sometimes they end up using that term.
BY MR. MATHEWS:
**Q. So based on studies and reports that we've seen, we know that some people in the medical field believe that Mirena causes to or contributes to PTC; is that fair?**
MS. NEFF: Object.
Object to form.
THE WITNESS: Yeah, I don't know of any neuro-ophthalmologist who truly believes that.
BY MR. MATHEWS:
**Q. Medical professionals, though. There are studies that connect Mirena and PTC --**
MS. NEFF: Object --
BY MR. MATHEWS:
**Q. -- in the medical community?**
MS. NEFF: Object to form.
THE WITNESS: Well, actually it's interesting. I gave a talk several years before I was involved in this litigation about some of

Page 107

the biggest sort of myths or misperceptions in -- in neuro-ophthalmology. One of them is that hormonal contraceptives cause IIH or have a relationship to IIH. So yeah, I do think there are physicians in the community who think erroneously that there's some kind of connection between not just Mirena but other contraceptive and IIH.
BY MR. MATHEWS:
**Q. So for someone in the medical community that believes that there is a connection between Mirena and PTC, they would not use the term "idiopathic" because they would have a belief of the known cause; is that fair to say?**
MS. NEFF: Object to the form and foundation, incomplete hypothetical.
THE WITNESS: Yeah, honestly, I couldn't really read someone's mind. I don't know why they would do whatever they do or say whatever they say.
BY MR. MATHEWS:
**Q. Okay. If someone has a heart attack, okay, and they're morbidly obese, you could say that their morbid obesity caused or contributed to cause their heart attack.**

Page 108

MS. NEFF: Objection.
BY MR. MATHEWS:
**Q. Is that basic medicine?**
MS. NEFF: Object to form.
THE WITNESS: Yes and no. "Cause" is a really specific term in medicine. I think a lot of times the way we understand diseases, I mean, we lack complete understanding of a lot of diseases. So we usually talk about things like risk factors. In other words, is there something that will dramatically increase the likelihood of this disease occurring in a certain person, is the -- does the absence of this particular risk factor dramatically lower the chance of that person developing this disease and does treating this condition or treating this factor reduce the risk.
So I think for certain diseases and particularly IIH, we know that obesity is probably the most important risk factor for developing IIH. I don't know that we know enough about IIH to say it causes IIH. I think we can only talk about things like risk factors for certain diseases, particularly diseases that we don't completely understand.

Page 109

I know that's a long way of answering your question, but it's just overly simple, I think to me and I think to a lot of physicians, to say oh, X causes Y.
BY MR. MATHEWS:
**Q. Back to my hypothetical about the heart attack, you wouldn't refer to a heart attack as an idiopathic heart attack?**
MS. NEFF: Object to the form.
BY MR. MATHEWS:
**Q. Right?**
MS. NEFF: Same objection.
THE WITNESS: Well, I think we'd probably call it -- tissue-wise it's a myocardial infarction, and we'd look for some underlying condition that caused it.
BY MR. MATHEWS:
**Q. Okay. So you wouldn't refer to it as an idiopathic myocardial infarction?**
MS. NEFF: Object to the form.
BY MR. MATHEWS:
**Q. You never heard that term in medicine, correct?**
MS. NEFF: Same.
THE WITNESS: I haven't.

Page 110

BY MR. MATHEWS:
**Q. Because you wouldn't be able to -- somebody is going to say X caused Y for a myocardial infarction?**
MS. NEFF: Object to form.
THE WITNESS: Well, I think the underlying tissue injury is lack of blood flow to the myocardium, but then there's a lot of risk factors to developing that. Does obesity cause a heart attack? I don't know if it causes it. It certainly is a risk for it. Does atherosclerosis cause a heart attack? It's related to it. I don't know that it caused it in the strictest sense. What caused the heart attack is lack of blood flow to the heart tissue.
BY MR. MATHEWS:
**Q. So would it be fair to say that your opinion is this condition, pseudotumor cerebri, intracranial hypertension, whatever you want to label it as, you have a -- you believe is idiopathic because there hasn't been a study or test that in your mind has shown the cause of PTC or intracranial hypertension?**
MS. NEFF: Object to the form of the

Page 111

question.
THE WITNESS: Well, just to clarify, when you say "intracranial hypertension," there's a lot of causes of intracranial hypertension like brain tumor, hemorrhage and so on, but idiopathic intracranial hypertension, we have high pressure in the head, but in this condition we don't know what the underlying cause is.
BY MR. MATHEWS:
**Q. Let me ask you this: If you had a 20-year-old, no other factors, no obesity, no -- no other factors that came into your office that had intracranial hypertension and was on Mirena, would you counsel them to have the Mirena removed or not?**
A. Well, first off, if I see a -- say a 20-year-old and they're atypical, meaning they're not, you know, of female reproductive age, they're not obese, I'm going to look really hard for another underlying cause of intracranial hypertension before I go down the path of saying it's some drug that we know with pretty good evidence that doesn't cause intracranial hypertension.

Page 112

**Q. But if you don't find any of those other factors and Mirena's -- she has Mirena in her, are you going to tell her to have the Mirena removed or not?**
MS. NEFF: Object to form.
THE WITNESS: Well, let's say in this hypothetical that this is a patient who we've done the testing we'd normally do and I'd probably go a little bit further than I normally would in terms of looking for an underlying cause. If we ended up calling her IIH or pseudotumor cerebri syndrome, then I would treat her like I would treat any patient with IIH and not recommend that Mirena be removed.
BY MR. MATHEWS:
**Q. So you would do a lumbar puncture?**
A. If she had evidence of intracranial hypertension, her MRI was otherwise unremarkable or showed evidence of IIH, then yes, we'd do a lumbar puncture.
**Q. And if her condition didn't resolve, you still wouldn't tell her to have the Mirena removed?**
MS. NEFF: Object to form.
THE WITNESS: If I'm diagnosing her

Page 113

with IIH -- and again, I'd have to be pretty confident that it's IIH since you're describing a hypothetical patient that doesn't otherwise fit the typical demographic. What I normally do with IIH patients, treatment of IIH is driven by two things, symptoms attributed directly to intracranial hypertension and also visual field loss.
So if she had significant visual field loss, then I would treat her like I treat any patient with IIH, aggressive medical treatment and then have a very low threshold for doing something like a shunt or an optic nerve sheathe fenestration. If she had very mild visual loss or no vision loss, then I might recommend weight loss and Diamox.
BY MR. MATHEWS:
**Q. Let me go through these remaining documents that you provided prior to today's depo.**
(Plaintiffs' Exhibit 14 was marked for ID.)
BY MR. MATHEWS:
**Q. All right. I've handed you what's called "Pseudotumor and Real Tumor"; is that**

**right?**
A. That's correct.
**Q. And that's Exhibit 14; is that correct?**
A. Yes, it is.
**Q. Tell me what this is.**
A. So this was a Grand Rounds talk I gave to the neurosurgery department. I think it was a year or two ago.
**Q. Okay. And when you say "Grand Rounds," tell me what that is?**
A. So basically every Wednesday morning, the neurosurgery department has Grand Rounds where they have speakers talk about topics of interest to both the attending and the residents.
**Q. All right. And this document that's -- doesn't have page numbers ends with something that says "Key points" on the back; is that right?**
A. That's true.
**Q. All right. How did you go about preparing this document?**
A. How? I mean, I basically went to my computer and created a PowerPoint presentation.
**Q. Is this a document that has evolved**



**over time or was this document one that you created just for the Grand Round?**
A. I basically scavenged previous presentations. I have -- you know, in 18 years I've given a lot of talks on a lot of subjects and I've given -- when I'm asked to give a talk on a subject, there's a chance I've talked about it in the past or talked about a related topic. So I'll just sort of look at the slides and I'll sort of update them and reformat them for the particular audience to which I'm speaking.
**Q. All right. And in this particular case, has this document in its form as presented here today been used other than for the Grand Round?**
MS. NEFF: Object to form.
THE WITNESS: Yeah, not this particular document.
BY MR. MATHEWS:
**Q. All right. And you said this is maybe two years old?**
A. Yeah.
MS. NEFF: Object to form, mischaracterizes.
THE WITNESS: I don't remember off the



top of my head when I gave this talk. It should be in my CV. I list all my lectures.
BY MR. MATHEWS:
**Q. All right.**
(Plaintiffs' Exhibit 15 was marked for ID.)
BY MR. MATHEWS:
**Q. And you've been handed Exhibit 15 and that's a review and update of pseudotumor cerebri, correct?**
A. That's correct.
**Q. And in this document -- tell me how this document -- what it's in relation to.**
MS. NEFF: Object to form.
THE WITNESS: So this was given as Grand Rounds to the ophthalmology department by my fellow at the time, Dr. Kung.
BY MR. MATHEWS:
**Q. Okay. And did you participate in the creation of this document?**
A. Yeah, I provided some slides to Nathan. He made up a lot of these slides on his own. I reviewed it with him before he gave the presentation. Dr. McCoy is a neurosurgery resident who also contributed to the lecture.



**Q. And how old is this document?**
A. This was just I think a year ago. No. Actually, this may be two years ago. I apologize. I just can't remember off the --
**Q. That's okay. Certainly since 2014?**
A. Definitely since then.
**Q. All right. And in this document, again, there aren't any page numbers and it's just a blank page at the end, but it does end with something called "summary." So -- but about halfway through, on something called "Diagnosis: Step 2 of 5" is the heading of the page?**
A. Okay. I mean, I'm pretty familiar with this. So I can probably find it.
**Q. Okay.**
A. Lots of pictures.
MS. NEFF: Counsel, while Dr. Van Stavern is looking for that, I would just like to note these are Dr. Van Stavern's proprietary slides. So they are not specifically stamped as confidential, but we intend to have them be confidential to this.
MR. MATHEWS: I assume we'd put "confidential" on all exhibits today and then we

can go through the de-designation process if and when it gets to that.
MS. NEFF: Thank you.
MR. MATHEWS: See, I'm easy.
BY MR. MATHEWS:
**Q. I see here Step 2 "Diagnosis," about halfway down it says "hormones" and it specifically lists levonorgestrel, correct?**
A. Correct.
**Q. And it says "Ask about these known causes and disorders," right?**
MS. NEFF: Object to form, mischaracterizes.
THE WITNESS: Well, I think it's just asking about disorders and causes.
BY MR. MATHEWS:
**Q. Okay. But it specifically mentions levonorgestrel, correct?**
A. That's correct.
**Q. Which is Mirena?**
MS. NEFF: Object to form.
THE WITNESS: Yeah, Mirena is one form of LNG.
BY MR. MATHEWS:
**Q. Norplant would be another?**



MS. NEFF: Object to form.
THE WITNESS: That's correct.
BY MR. MATHEWS:
**Q. What are some others examples?**
A. We list a number of the drugs that in the literature have been associated with IIH including tetracycline-related derivatives, Vitamin A, retinoids, Lithium. There's a lot in the literature about these medications that have been anecdotally associated with IIH.
**Q. Okay. So this is to diagnose IIH, right?**
MS. NEFF: Object to form.
THE WITNESS: I think the idea behind this table, it's important to remember we don't just show the slide and move on to the next slide. We usually supplement it with some commentary. I think the idea behind this is that patients may come in or referring providers may send patients in with the idea that these drugs or medications have been associated with IIH, and it's incumbent upon the physician to really look carefully at the literature and also at the particular drug to see how strong a relationship there is.



BY MR. MATHEWS:
**Q. So you'd want to know if the patient were on levonorgestrel?**
MS. NEFF: Object to form.
THE WITNESS: I think you want to know is there any evidence supporting a causal relationship.
BY MR. MATHEWS:
**Q. Okay. And this was sometime after 2014 and you are discussing at least in the diagnosis levonorgestrel, which Mirena would be one example of. But on the front page, the authors report no relevant financial disclosures, right?**
A. Yes.
MS. NEFF: Object to form.
BY MR. MATHEWS:
**Q. Is there a reason you didn't disclose that you were serving as an expert for Bayer specifically related to Mirena and PTC in this presentation?**
A. Well, again, I don't remember specifically. I will say that Dr. Kung actually made a lot of these slides and this is his slide. So I may have just -- it just may have not occurred to me and he was the one doing the



presentation and not me.
**Q. Okay.**
A. I can't -- I don't know that I can give you a better answer than that, but I think it was mostly because a lot of these were his slides and he was the one giving the talk.
**Q. You would agree that if your name is going on something like this that's a presentation and it's specifically referring to levonorgestrel, that you should disclose that you're serving as an expert for Bayer in relation to Mirena and PTC?**
MS. NEFF: Object to form.
THE WITNESS: If I gave this talk myself, today I probably would do it differently.
BY MR. MATHEWS:
**Q. All right. And I'm going to keep you going through here maybe another 20 pages back, "Treatment Red Flags," if you could find that one.**
A. Sure. (Reviewing document.)
Is it after all the pictures?
**Q. Ah...**
A. It's probably after "Diagnosis."

**Q. Yeah, it's not quite to the pictures. It doesn't look like. Well, there's several pictures in there.**
A. If you could just show it to me.
**Q. Yeah. Sure (indicating to document).**
A. Um-hum.
**Q. See that "Treatment red flags"?**
A. Um-hum.
**Q. And what does treatment red flags mean?**
A. It means that -- actually, let me see that again.
**Q. Oh, I'm sorry.**
(Tendering document to witness.)
A. Because this is a little out of context.
(Reviewing document.)
Yeah, I think "Treatment red flags," I think the context is that this is when you might think about surgical intervention.
**Q. Okay. And so "worsening visual fields despite treatment." So if somebody's been treated but their vision is getting worse?**
A. (Nodding.)
**Q. Worsening papilledema despite treatment, overall health deteriorating,**



**noncompliant with treatment, right?**
A. Correct.
**Q. In any of those would the fact that somebody has Mirena be one of those treatment red flags?**
MS. NEFF: Object to form.
THE WITNESS: Treatment? I'm not -- I think a lot of this is basically if somebody is progressing despite treatment. So I'm not sure how Mirena would factor into that.
BY MR. MATHEWS:
**Q. So you go in, you treat somebody, their eyesight's getting worse, you go in and treat them, their papilledema is getting worse, their health is deteriorating, then you're going to decide a surgical intervention is necessary?**
MS. NEFF: Object to form.
BY MR. MATHEWS:
**Q. Correct?**
MS. NEFF: Compound.
THE WITNESS: Usually if somebody -- I mean, the cont- -- the indications for surgery in most IIH patients is basically progression of vision loss despite maximum medical treatment, relevant indications, and I have actually ended



up doing this in a couple of patients, there are some patients who just unfortunately are not compliant. They won't show up for follow-up exams, they won't show up for -- they won't take their medications.
There are also some patients who have what we call superimposed functional visual loss. They have psychogenic visual loss, meaning we can't rely upon their vision or their visual fields. So we don't have a good idea of what their vision actually is, and they seem to have persistent papilledema despite pretty aggressive medical treatment. So those are patients where you probably would have a low threshold for considering having a fenestration or a shunt procedure.
BY MR. MATHEWS:
**Q. With somebody in this condition, where the conservative treatment hasn't helped, it's actually getting worse, with all the research and data that's out there, knowing that somebody had Mirena in them, why wouldn't you simply suggest that they have the Mirena removed rather than taking the drastic step of putting a shunt in?**



MS. NEFF: Object to form.
THE WITNESS: So, I mean, my first responsibility is taking care of my patients. I see a lot of women in my practice, I see lot of IIH, I think I see ten to fifteen IIH patients a week. So my first goal is protecting their vision and taking care of them. So that means trying to use the best available medical evidence at my disposal.
So for someone like that in the hypothetical circumstances you're describing, since, again, based on my review of the large body of literature there is no credible evidence that any hormonal contraceptive, including Mirena, is causally related to IIH, it doesn't make any sense to discontinue it and in fact, discontinuing a medication, especially when it's not based on good evidence can do more harm than good.
A lot -- I mean, I see lot of patients who are sent to me where there's this potential medication toxicity and stopping the medicine isn't always the best thing to do because they may need to be on that medication. Some women really do well on Mirena, and so if there is no

Page 126

evidence that the Mirena has anything to do with the IIH, it just doesn't -- it doesn't seem like good medical practice to me to discontinue it.
BY MR. MATHEWS:
**Q. Do you have an idea of what is involved in the removal of Mirena the procedure?**
MS. NEFF: Object to form.
THE WITNESS: I'm not a gynecologist. So I've never removed or inserted Mirena.
BY MR. MATHEWS:
**Q. Do you have just a general understanding -- I mean, you know a lot about pharmacology and epidemiology.**
**Do you have a general understanding of what's involved in the removal of Mirena?**
MS. NEFF: Object to form.
THE WITNESS: I think it's a pretty straightforward procedure.
BY MR. MATHEWS:
**Q. Okay. Is it a time-consuming procedure, to the best of your knowledge?**
A. To the best of my knowledge, I don't think it is.
**Q. Okay. When someone is in this condition of having worsening visual fields,**

Page 127

**worsening papilledema, overall health is deteriorating after they've had treatment, what's the time frame for somebody like that? In other words, their visual field is getting worse. If some treatment isn't taken in the next 24 hours, is that significant or is it two weeks or is it -- I mean, what's the time frame there?**
MS. NEFF: Object to the form.
THE WITNESS: Yeah, so it really depends upon their -- their examination. If somebody presents to us -- and most of the patients we've ended up sending for shunt or fenestration has been people who present with pretty significant visual loss even before they're diagnosed.
So if they present with profound visual loss, then those are patients that we're going to admit and get diagnosed quickly and probably have a very low threshold for doing a shunt or fenestration within the next couple of days. Somebody who has just progressive visual loss that's been over the course of a few months and they don't seem to be responding to treatment, then probably within the next few weeks or so.

Page 128

A lot of it depends upon their visual field.
BY MR. MATHEWS:
**Q. All right.**
(Plaintiffs' Exhibit 16 was marked for ID.)
BY MR. MATHEWS:
**Q. And I've handed you what's been marked as Plaintiffs' Exhibit 16. Can you identify that document?**
A. It's a looks like a lecture I gave, "Papilledema and Idiopathic Intracranial Hypertension."
THE REPORTER: Can you please repeat the title again?
THE WITNESS: "Papilledema and Idiopathic Intracranial Hypertension."
THE REPORTER: Thank you.
BY MR. MATHEWS:
**Q. Do you have a time frame for when this would have been generated?**
A. You know, it looks like it was right after we visited Australia. So that was probably in 2011. I can only tell by the kangaroo pictures on the back. So I'm pretty sure it was in 2011 because we went to Australia

Page 129

in 2010.
**Q. Okay. And what was this document created for?**
A. I think this was -- I think this was a talk I gave at a local hospital to community ophthalmologists.
**Q. "Local hospital" meaning local to St. Louis?**
A. Yes.
**Q. Not to Australia?**
A. Yes, yes. No, not to Australia. That would have been awesome but...
**Q. And did you create this document?**
A. I did.
**Q. And, you know, in it I -- and it's about halfway back. You discuss Norplant.**
**Do you have an understanding about the connection of Norplant to PTC?**
MS. NEFF: Object to form.
THE WITNESS: Again, when you review the data from Norplant, and again, I go into this in the expert review, it's really interesting because you look at that association and you just essentially see what you would expect if the association was just simply

Page 130

occurring by chance or coincidental. So my opinion is that Norplant has no causal relationship to IIH.
(Reviewing document.) Sorry. I'm still trying to find where you are in this slide.
BY MR. MATHEWS:
**Q. No. You're fine. It's about halfway back and it's "exogenous substances associated with PTC."**
A. Oh, I see that. Um-hum, I got it.
**Q. So as we look through there, we see you refer to a variety of things. To some of them you have question marks out to the side. Do you see that?**
A. I do.
**Q. What's the purpose of that?**
MS. NEFF: Object to form.
THE WITNESS: Well, I think in this slide, I'm simply letting the practitioners know that there are these associations out there and I think in it's important to understand that we're using "association" in two ways. There's the looser term of "association" meaning these two things seem to happen at the same time and

Page 131

the same person which could be coincidental, and then there's "association" in the more strict epidemiologic sense in that these things occur in the same person in a much higher frequency than expected by chance.
So I think what I was getting at -- and this is seven years ago now. I think the things that were in bold print and with an asterisk are the medications that seem to have maybe a higher level of evidence of maybe a truer epidemiologic relationship, but again, I always supplement these slides with commentary and as I say in the text, I mean, a lot of these associations are simply based on anecdotal reports and could simply occur by chance.
BY MR. MATHEWS:
**Q. Okay. So Norplant isn't bold, but it's not got a question mark next to it either --**
A. Right.
**Q. -- right?**
**So is that an indication of the jury's not still out on that one? I mean, is that why you've not put a question mark next to it?**
A. Well...
MS. NEFF: Object to form.

Page 132

THE WITNESS: Yeah, I think what I've said when I've given these lectures are none of these-- none of these are proven to have a causal relationship to IIH, but I think people should be aware of them because patients go online, and as we talked about earlier, referring doctors are sometimes under the impression that these medications can cause IIH.
And again, you have to judge how important is it that somebody be using these medications. You know, so I don't consider any of these medications to be proven to cause IIH. I think the ones I put in bold print have a little bit stronger evidence, and by that I usually mean that these have been reported in patients who are otherwise atypical, right? So they're atypical body habitus in men, you know, patients who might not otherwise be typical for IIH.
As far as why I put a question mark in some and why I didn't in others, I honestly don't remember.
BY MR. MATHEWS:
**Q. Are any of these lectures or presentations that you've give or specifically**

Page 133

**the ones that you've provided material on today, are they recorded?**
A. Not usually. Actually, the ones that in ophthalmology are now being recorded, but I don't think -- that Grand Round that Nathan gave I don't think was recorded.
**Q. Okay. To the best of your knowledge, any of these that -- you've talked about the one Nathan gave. The others, have they been recorded, to your knowledge?**
A. Not that I can remember. I don't think so. I don't think the Neurosurgery Grand Rounds was recorded.
**Q. Okay. Is it fair to say that your hope is one day you won't have to call it an idiopathic intracranial hypertension anymore? You'll know in your mind what the cause is?**
MS. NEFF: Object to form.
THE WITNESS: No, I think that's fair. I mean, we all would love to be able to understand this condition better. That was actually one of the -- partly the rationale for the idiopathic intracranial hypertension treatment trial. The main goal was to assess the efficacy of these -- this treatment of

acetazolamide. But there were other -- we were hoping we'd get a better understanding of the condition itself, including, you know, maybe there were -- we were looking at certain vitamin A levels and vitamin A genes in this study to see if the association that's in the literature panned out, and interestingly, as it turned out, it really has not panned out.

So that's another example where you look in the literature and there's always these reports of vitamin A levels and retinal binding protein and retinoids being associated with IIH, but when you look specifically in a well-controlled rigorously designed study, it turns out the vitamin A just did not pan out.

BY MR. MATHEWS:

**Q. It's true that other diseases have once upon a time been described as idiopathic that are no longer described as idiopathic because a known cause now exists; is that true?**

MS. NEFF: Object to form.

THE WITNESS: That's true.

BY MR. MATHEWS:

**Q. All right.**

MS. NEFF: Counsel, we've been going



for a little over hour. So if you want to --

MR. MATHEWS: This is a good time to break.

MS. NEFF: Great. Off the record.

THE VIDEOGRAPHER: Off the record at 11:50 a.m.

(Recess taken from 11:50 a.m. to 12:05 p.m.)

THE VIDEOGRAPHER: Back on the record at 12:05 p.m.

(Plaintiffs' Exhibit 17 was marked for ID.)

BY MR. MATHEWS:

**Q. Doctor, I've handed you what's been marked as Exhibit 17. Can you identify that slide deck for me, please?**

A. It looks like a lecture I gave titled "Idiopathic Intracranial Hypertension or Pseudotumor Cerebri, What Do We Know?"

**Q. Okay. And when would this slide deck have been created?**

A. Based on the kangaroos on the back, it was probably within the year after we went to Australia. I think this was for the Neurology Department Grand Rounds.



**Q. Okay. So 2011, 2012?**

A. Yeah. Yeah, probably 2011.

**Q. All right. Other than for the Grand Rounds, have you used this slide deck for any additional presentations since that time?**

A. I haven't.

**Q. Okay. And let's see... I am going to flip you over to way in the back. It's again this same chart --**

A. Same table.

**Q. -- that we saw earlier.**

A. Right.

**Q. I could hand it to you if you want.** That might be easier. (Tendering document to witness.)

A. Yeah, I mean, that's pretty much the same slide.

**Q. Again, does that appear to be the same slide we spoke about earlier?**

A. Yeah. I think I just recycled the slide.

**Q. And again, it has certain drugs in bold font, certain ones with an asterisk, certain ones a question mark, certain ones with nothing, correct?**



A. Correct.

**Q. All right. And the reason for those markings, is it the same in this slide as it was in the previous slide?**

A. Pretty much everything I said about the last slide (Nodding).

**Q. All right. And you think you probably just copied this slide over from the other presentation or vice versa?**

A. Yes.

**Q. All right. So if I ask you the same questions, I'll get the same answers?**

A. Basically, yes.

(Plaintiffs' Exhibit 18 was marked for ID.)

BY MR. MATHEWS:

**Q. You've been handed what's been marked as Exhibit 18. Can you identify that document?**

A. This is another lecture I did called "Idiopathic Intracranial Hypertension, What the Bleep Do We Know?"

**Q. Okay. And do you know what time frame this would have been created in?**

A. I think this was also to the Neurology Department, but I think also in 2009.

Page 138

**Q. Okay. And we've got a sunset on the back of this one. Where is that at?**
A. That one, I'm not sure where that was. That might have been Hawaii.
**Q. All right. But we think this was 2009, correct?**
A. Correct.
**Q. All right. And again, I'm back to this similar slide, but this one seems a little bit different. I'll show it to you so you don't have to find it.**
A. Um-hum.
**Q. This one is the -- a list of medications or vitamin A or what have you, but it doesn't seem to have the bold and the asterisks on it.**
**Is there something different being corresponded through this slide than the previous slides?**
MS. NEFF: Object to the form of the question.
THE WITNESS: I think it just has to do with the style. I might have liked the bold print with the other slide and this one, I wanted to make it more basic. So I don't think

Page 139

there was anything more than that.
BY MR. MATHEWS:
**Q. All right. Now, let's see, your report was Exhibit 3; is that correct?**
A. I believe.
**Q. And do you have it there?**
A. I have my report.
**Q. You've got your own copy again?**
A. Yes.
**Q. And on page 16 of your report, the next-to-last page of the actual report, you have a summary there, right?**
A. Yes.
**Q. And your summary is: "In summary, the available evidence does not support a causal relationship between Mirena and IIH. Such a relationship is not accepted in the medical community, and I do not believe that Mirena has been shown to cause IIH. None of the five causal factors identified above: Scientific plausibility, dose responses, disease occurring in the absence of potential confounders, clear pattern of recover -- recovery shortly after dechallenge, and in the absence of therapeutic intervention and rechallenge are met with**

Page 140

**respect to Mirena."**
**Did I read that right?**
A. You did.
**Q. And that is your -- that's a fair summary of your opinion?**
MS. NEFF: Object to form.
THE WITNESS: It is.
BY MR. MATHEWS:
**Q. Now, in respect to this statement, "Available scientific data do not support an increased incidence via IIH among Mirena users, especially when one considers that the** population using Mirena (women in their child bearing age) is already a high risk population for IIH. Further, confounding occurs if the highest risk factors for IIH, obesity and recent weight gain, are also considered."
Is that consistent with your opinion?
MS. NEFF: I'm sorry. Counsel, where are you reading from?
MR. MATHEWS: Well, that's a statement from Dr. Newman's report.
MS. NEFF: Okay. I'm going to object to the form and foundation.
THE WITNESS: Could I actually see it

Page 141

just to...
BY MR. MATHEWS:
**Q. Sure. And feel -- well, let me -- let me give you -- this is my copy, but it's on page 15, which I think is the last page and you're welcome to read the whole thing.**
A. No. I'm not going to read the whole thing. I won't be able to do that.
**Q. Well, that's why I was just reading the part that I thought was important.**
A. (Reviewing document.)
No, I think it's a different way of saying it, but I think I do agree with that.
**Q. Essentially the same opinion, would you agree?**
A. I would agree with that.
MS. NEFF: Object to form.
BY MR. MATHEWS:
**Q. I'm going to hand you Dr. Cestari's report. And this is --**
MS. NEFF: Counsel, do you have a copy for me as well?
MR. MATHEWS: I'm sorry. I do. And I'll give you Newman's too. Sorry about that.
(Tendering documents to counsel.)

BY MR. MATHEWS:
**Q. Page 22 is where you'll find --**
THE REPORTER: Do you want a sticker on that, Counsel?
MR. MATHEWS: We didn't mark it as exhibit.
THE REPORTER: Okay. All right.
MR. MATHEWS: So I don't think you need to.
BY MR. MATHEWS:
**Q. Did you read through Dr. Cestari's opinion there in the "Conclusion" section of page 22 of his report?**
A. I'm just looking through it now.
**Q. Okay.**
A. (Reviewing document.)
Okay. I basically read it.
**Q. All right. And is his opinion essentially the same opinion that you have?**
MS. NEFF: Object to form.
THE WITNESS: Well, I think again there's only a certain amount of evidence out there. So I think we've all looked at the evidence and essentially come to the same conclusion.



BY MR. MATHEWS:
**Q. All right. So after looking at Dr. Newman's conclusions, Dr. Cestari's conclusions, I just want to understand I -- your response to me is the same research is out there, same studies, you all seem to have looked at the same studies and come to similar or the same conclusions --**
MS. NEFF: Objection.
BY MR. MATHEWS:
**Q. -- based on what you've seen?**
MS. NEFF: Object to the form of the question.
THE WITNESS: I think, again, we've all looked at the available medical evidence and judged it by the best quality available, and based on the best evidence available, I think we've all come to the conclusion that there's no evidence of a causal relationship.
BY MR. MATHEWS:
**Q. All right. This is Dr. Rizzo's report. And the conclusions are on page 22 of that report. If you could take a look at those.**
A. (Reviewing document.)
Again, I think there's just only so



many ways of saying essentially that Mirena does not cause IIH based on the best available evidence.
**Q. Just so many ways of saying the same thing; is that fair to say?**
MS. NEFF: Object to the form.
THE WITNESS: Or reaching the same conclusion.
BY MR. MATHEWS:
**Q. All right. And this is Dr. Dinkin's report. Page 14 is the conclusions there, if you could read through them.**
A. Yes, I've read them.
**Q. And after reading Dr. Dinkin's report or the conclusions of the report, he has reached the same or similar opinion that you have in this case; is that fair to say?**
MS. NEFF: Object to form and foundation.
THE WITNESS: Well, I think -- I haven't read his report but -- I don't know what he's reviewed, but I'm assuming he's reviewed the same available medical evidence that I have and has come to the same conclusion.
MR. MATHEWS: All right. I have no



further questions.
MS. NEFF: Let's go off the record for a moment.
THE VIDEOGRAPHER: Off the record at 12:15 p.m.
(Recess taken from 12:15 p.m. to 12:17 p.m.)
THE VIDEOGRAPHER: On the record at 12:17 p.m.

EXAMINATION

BY MS. NEFF:
**Q. Good afternoon, Dr. Van Stavern. Do you recall you were asked previously about your expertise in epidemiology?**
A. I do.
**Q. Can you describe your experience and expertise in epidemiology that you were relying on in this case?**
A. Well, again, I have designed case-controlled studies, I have been involved in a number of multicentered clinical trials as a leading investigator. As a member of Nordic, N-O-R-D-I-C, I was at least partly involved in the implementation and design of the idiopathic

intracranial hypertension trial, and I simply just have to note that epidemiology simply being in a medical center where we see really rare diseases and I have to understand something about patterns of disease and risk factors simply to treat patients.

**Q. You were asked: Do you have an opinion on whether levonorgestrel causes an increase in weight gain in women? Do you recall that question?**

A. I do.

**Q. You replied: "I believe in some forms it can." What did you mean by that?**

A. I think I was thinking of Depo-Provera. So I was kind of in general thinking of progestins overall rather than Mirena specifically.

**Q. Are you aware of any evidence that Mirena causes weight gain?**

A. No, I'm not.

**Q. Are you aware of any evidence that Mirena does not cause weight gain?**

A. No. I think there have been several studies looking at that, showing it actually does not.



**Q. Are those studies that you referenced showing Mirena does not cause weight gain included in the materials you reviewed for this litigation?**

A. They are.

MS. NEFF: Thank you. I have no further questions.

MR. MATHEWS: No questions.

THE VIDEOGRAPHER: Off the record at 12:19 p.m.

(Deposition concluded at 12:19 p.m. CST.)



REPORTER CERTIFICATE

I, Deborah Habian, a Certified Shorthand Reporter within and for the State of Illinois, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition was reported stenographically by me, was thereafter reduced to printed transcript by me, and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That the reading and signing by the witness of the deposition transcript was agreed upon as stated herein;

That I am not a relative or employee of attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand this 20th day of February, 2018.

Deborah Habian

DEBORAH HABIAN, CSR, RMR, CRR, CLR
MO CCR NO. 1409
IL CSR NO. 084-02432



DEPOSITION ERRATA SHEET

Assignment No. 39388

Case Caption: IN RE: MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY

Witness: GREGORY P. VAN STAVERN, M.D. - FEBRUARY 13, 2018

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of

___________, 20___.

___________________________________

GREGORY P. VAN STAVERN, M.D.

Sworn to and subscribed before me this _____ day

of ________________, 20__.

__________________________

Notary Public

My commission expires________

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------
IN RE:

MIRENA IUS LEVONOROGESTREL-RELATED
PRODUCTS LIABILITY LITIGATION (No. II)

---------------------------------------

17-MD-2767(PAE)

-----------------------

**CONFIDENTIAL**

Videotaped deposition of:

DR JULIANE SCHOENDORF
(Volume II)

taken at:

Hannes Snellman Attorneys Ltd

Eteläesplanadi 20
Helsinki
Finland

on Wednesday, November 29th, 2017

commencing at 9.29am

------------------------

* * * * *

A. No, that is not a fair description. That was actually what we received when inquiring further on the case via the clinical trial investigator. That is the person that we can turn to in the clinical trial to get more information, and that was the information that we could obtain from that clinical trial investigator, who actually said -- or I don't recall whether it was she or he -- said that that's the information that was available. All the neurological examinations were normal and the diagnosis seems to be very unsure, and that there is really no explanation for the examination findings, which were then resolved in the following and the patient continued with Mirena in the trial.

MR KENNERLY: They resolved the patient had a spinal puncture. The question I have for you though, is did you ever ask that investigator to get a copy of those records diagnosing IIH, or did you ever ask that investigator if the investigator or you could talk to the doctors at the hospital for more information?

MS COOK: Object to form.

A. Usually if we have something unclear we usually ask them to provide the information that they have in terms of maybe a hospital discharge letter or

whatever, that is what we do in the clinical trial.
MR KENNERLY: And you felt here you could overrule that hospital's diagnosis of IIH without ever talking to the doctors or reviewing the hospital medical records?
MS COOK: Object to form.
A. Actually that is a misrepresentation. This is what the investigator commented.
MR KENNERLY: So the investigator overruled the hospital without seeing the medical records or talking to their doctors, and then you at Bayer just took what the investigator said as the gospel for your signal assessments then and going on to the present, correct?
MS COOK: Object to form.
A. Sorry, so the investigator says that she looks at the patient journal and all the information that she finds is that all the examinations that are contained in the patient's journal are normal, and it is the conclusion that the diagnosis is very unsure and that is the information that we received for this SAE after following up with the investigator and trying to get all the information that we can. So when the investigator tells us this is the information we have it is, in my

judgment, this diagnosis is to be very unsure, this is what we put in the SAE report. And that was the information that she had at hand and could give me. So I think we followed this up very diligently.

MR KENNERLY: Is this excellent work in Pharmacovigilance?

MS COOK: Object to form.

A. I believe that we at Bayer do excellent work at Pharmacovigilance, yes.

MR KENNERLY: But this right here, deciding based on the investigator's examination of some sort, an investigator looking at their own journal and the investigator saying it's unsure, you could decide without getting any medical records and without even talking to the doctors that their diagnosis of IIH was wrong, correct?

MS COOK: Object to form.

A. You are misrepresenting what I said. I said that we did all that -- all in our possibility to go back to the clinical trial investigator, who is the person that we have to turn to to get follow-up information on a SAE report that he or she reports, and asked her or him to provide any information that she has on that case. So that is what she or he has provided to us by looking at the patient journal and

giving us the information that all the results of the examinations were normal and that their diagnosis seemed to be very unsure. Taking all that aside, this is a case that occurred in a patient that had been on Mirena for more than five years, or five years and 10 months, the symptoms which were, in the assessment of the clinical trial investigator, of an uncertain nature because the diagnosis was unsure, resolved spontaneously and the patient continued with Mirena in the trial. So this was assessed as an event that is unrelated to the study treatment both by the clinical trial investigator and by the Company.

MR KENNERLY: Okay. Now, I present to you Exhibit 32.

(Exhibit 32 marked for identification)

This is an April 5th, 2001 letter from the New Zealand Medicines and Medical Devices Safety Authority to a medical services executive at Schering. Schering is now Bayer, correct?

A. Schering was bought by Bayer, yes.

Q. Have you ever seen this document before?

A. Yes, I believe I have.

Q. Okay?