UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: MIRENA IUS )
LEVONORGESTREL-RELATED ) 17-MD-2767 (PAE)
PRODUCTS LIABILITY ) 17-MC-2767 (PAE)
LITIGATION (NO.II) )
_______________________________)
THIS DOCUMENT Relates )
TO ALL ACTIONS. )

\- - -

FRIDAY, JANUARY 19, 2018

\- - -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Videotaped deposition of Laura Plunkett, Ph.D., DABT, held at the offices of Pulaski Law Firm, 2925 Richmond Avenue, Suite 1725, Houston, Texas, commencing at 9:03 a.m., on the above date, before Carrie A. Campbell, Registered Diplomate Reporter, Certified Realtime Reporter, California, Texas and Illinois Certified Shorthand Reporter, Missouri and Kansas Certified Court Reporter.

\- - -

GOLKOW LITIGATION SERVICES
877.370.DEPS
deps@golkow.com

I think I mention, play -- the Plan B pill even specifically here.

But certainly the majority of the work that I've done -- when you read this report, hopefully you'll understand -- that to me, the closest comparison product would be the subdermal implants based on the way that the drug is released over time, long term in the body versus a daily oral dose with one single bolus.

QUESTIONS BY MS. COOK:

Q. Well, let me ask you this: You don't provide an opinion in your report about whether or not combined oral contraceptives increase the risk of IIH, correct?

MS. NATALE: Objection. Form.

THE WITNESS: I don't have that specific statement, that is true.

QUESTIONS BY MS. COOK:

Q. And you also don't provide an opinion that -- about whether a levonorgestrel-only containing contraceptive pill increases the risk of IIH, correct?

MS. NATALE: Same objection.

or the Plan B pill that contains levonorgestrel.

Have you formed an opinion about whether you think that causes PTC, IIH?

MS. NATALE: Objection. Form.

THE WITNESS: Are you asking for an independent opinion about just that product?

QUESTIONS BY MS. COOK:

Q. Yes.

A. No, I have not.

Q. Okay. And then with respect to Norplant, you said that -- I believe you said that your focus here was looking at the cause and effect relationship between Mirena and PTC, correct?

A. One of the focuses. I lay it out for you in my report. I first consider the pharmacokinetics of delivering of the dose, and then I also, within the general causation context, look to the relationship between LNG exposure and PTC, yes.

Q. And then with respect to Norplant, are you intending to provide an opinion that Norplant causes IIH?

MS. NATALE: Objection. Form.

THE WITNESS: So I rely on literature that has described the relationship between Norplant and IIH, or PTC or IIH or essentially the condition that I call pseudotumor cerebri, but I have not formed a complete causation opinion just on that.

For example, I haven't looked at the -- all of the literature and the adverse event reporting or any files, discovery, clinical trials specific to Plan B, which is what I would do if I was going to do what I did here for Mirena where I focused on more than just, for example, the epidemiological literature.

QUESTIONS BY MS. COOK:

Q. You just said Plan B.

Did you mean Norplant there?

A. Oh, I'm sorry, yes, Norplant, yes.

Q. Okay. That answer you just gave, that's about Norplant, right?

A. Right. It's the same idea.
In other words, I have looked at the labeling and some of the FDA documents on Norplant mainly as it relates to pharmacokinetics and chemical analogy for Mirena. And then there certainly is a literature body on Norplant and PTC which describes that the -- it has indeed been listed as a drug known to be associated with PTC.
Many of the review papers list it under a table like we just saw in this document, Exhibit 3, on page --
Q. Yeah, the table on Exhibit 3, by the way, doesn't include Norplant or levonorgestrel, correct?
MS. NATALE: Objection. Form.
THE WITNESS: Yes, it has levonorgestrel here under Endocrine.
If you're looking at the table --
QUESTIONS BY MS. COOK:
Q. Panel 2?
A. Yes, panel 2.
Q. So just so I understand, you

You do not offer any opinion about how biologically increased androgen would cause an increased intracranial pressure due to elevated cerebrospinal fluid levels, correct?

MS. NATALE: Objection. Form.

THE WITNESS: So what you're asking me is if I laid out more details? No. Again, it's my understanding that there is a mechanism expert that will be describing this in the litigation.

QUESTIONS BY MS. COOK:

Q. Can you point to the levels of androgen that were recorded in any Mirena user who reported having IIH?

MS. NATALE: Objection.

THE WITNESS: No, unfortunately that data is not reported that I can recall.

QUESTIONS BY MS. COOK:

Q. Have you conducted any testing to support your opinions?

MS. NATALE: Objection. Form.

THE WITNESS: What do you mean

by "testing"? In an animal or a
human?
QUESTIONS BY MS. COOK:
Q. Yes.
A. No, I've not administered Mirena to an animal or a human or, even more generally, levonorgestrel -- levonorgestrel. LNG. That's -- otherwise it's a mouthful.
Q. Have you published any of the opinions in your report or put them through peer review?
A. As they relate only to Mirena, no, but certainly there's things in my report that talk about basic principles that are in some of my publications. So basic principles of pharm and tox, I certainly talk about that in some of my papers.
Q. The opinions about LNG, Mirena and IIH, that hasn't been subjected to peer review or published, correct?
A. No, I have not published those opinions.
Q. And have you presented or shared your opinions about LNG and Mirena and IIH or PTC with anyone other than the lawyers

that range, yes.

But again, this is a different product because it's -- as you just indicated, I believe, this is a combination product, so there's -- this is, again, an apples to oranges comparison now because now you've got the effect of estrogen and progestins on levels of binding protein, so it's a little bit more complex.

This calculation -- well, not calculation. This paper introduces additional complexities, which is again why I've tried to focus on the single products, the single hormone products, when you're making a comparison, such as the Norplant product.

Q. Did you look to see what the free levonorgestrel level is in any combined oral contraceptive?

MS. NATALE: Objection. Form.

THE WITNESS: Did I try to determine a specific number? No.

I mean, it ought to be -- if it was -- if you're talking about just the progestin component of it and what

MS. NATALE: Objection. Form.

THE WITNESS: If what you're asking me is whether or not some of the characteristics or factors that have been described as confounding are the same within the population that are also exposed to Mirena, that is true, because Mirena is used here by women.

QUESTIONS BY MS. COOK:

Q. So would you agree that you would expect at least some women using Mirena to have PTC just by coincidence?

MS. NATALE: Objection. Form.

THE WITNESS: It's possible. That's why you need to do -- that's why you need in these studies to look at, as the investigators describe, characteristics. So, yes, you need to look at that as well.

QUESTIONS BY MS. COOK:

Q. And when you say "characteristics" you mean...

A. You need to define your population. So if you're -- Mirena users are

testified as an expert in pharmacology for them.

Q. You can put that aside. Thank you.

At various times today you have answered questions by discussing the weight of the evidence.

What does that mean?

A. So to me the weight of the evidence is a methodology or a tool that scientists use in order to evaluate scientific information, and it can be done in a variety of context. I use weight of the evidence in my regulatory work. When I'm putting together a dossier on a compound to describe information for a -- for regulators such as the FDA, I put together parts of a safety assessment, for example.

I use it in litigation as well when I'm doing causation analysis, for example. It's essentially gathering all the information you can that are relevant to a question you're trying to answer.

So in a case like this where, for example, I was doing -- I was answering

two basic questions: One was related to what do we know about the pharmacokinetics of levonorgestrel, LNG; and also specifically Mirena as well.

So I gathered, you know, all of the information I could find publicly available as well as what was referred to in the labeling or referred to within the FDA submission. And I looked at what that information said based on weighing that information across the quality of the data. You evaluate different studies based on whether or not they're peer-reviewed or not, whether or not the information is -- has statistical analysis attached to it, things like that.

The other context in the question I was asked to address is use of weight of the evidence in doing a causation analysis. So in my report I describe that I use the Bradford Hill criteria. Essentially that's a set of -- to me a set of questions that organize information that you then analyze using weight of the evidence.

So essentially it's all of the

relative information I could find that related to the question of does it make sense that Mirena and LNG can cause pseudotumor cerebri, PTC, in humans that have been exposed to it through a drug product. And so that's how I use the weight of the evidence methodology.

Again, I think that's a standard method that scientists use.

Q. Okay. If you turn to -- also part of Exhibit 1 is your report in this case, and on page 4 you have a subsection 3 titled Methodology, correct?

A. Yes.

Q. Okay. Under paragraph 10 you talk about a tool -- method known as human health risk assessment.

What does that mean?

A. So risk assessment is a tool that I use also as part of my evaluations and most questions I'm asked. In other words, it is looking at whether or not there is a risk or a safety concern raised by exposure.

So in this case when you're putting together, for example, information on

a label for a product, you will look at the risks and benefits, and assessing risk is part of what you do. What does the experience tell you?

Also, when I do a weight of the evidence assessment sometimes in causation, part of that implies applying principles of risk assessment even though I'm not doing a risk assessment necessarily as part of that methodology.

The principles of risk assessment include dose response evaluation, which is part of weight of the evidence as I do in causation. It involves exposure assessment. So when we talk about temporality under Bradford Hill, that's exposure assessment as well.

So I list it there as another method that I use as a pharmacologist in different projects I work on.

Q. And then paragraph 11 you describe the weight of the evidence assessment that you were talking about just a bit ago. You state, "In the current case I examined the Mirena product labeling."

Is that correct? Do you examine that?

A. Yes, that's correct.

Q. "Internal company documents related to the pharmacokinetics of Mirena"?

A. Yes, and also the pharmacology and toxicology as well.

Q. Okay. "Scientific literature related to the benefits and risks of levonorgestrel products"?

A. That's correct.

Q. Okay. And then "as well as FDA regulations that govern the development and marketing of human prescription drug products."

Is that correct as well?

A. That's correct.

Q. You state at the end of paragraph 10, "Risk assessment is a standard tool used by pharmacologists and toxicologists when they are trying to understand the benefits and risks associated with a drug"; is that correct?

A. That's correct.

MS. COOK: Object to form.

QUESTIONS BY MS. NATALE:

Q. Did I read that correctly?

A. You read that correctly, yes.

Q. Is it correct that is a standard tool used in the field?

A. Yes, it is.

MS. COOK: Object to form.

THE WITNESS: I'm sorry, I'll be a little slower.

Yes, it is.

QUESTIONS BY MS. NATALE:

Q. Okay. And how would you define it as a standard tool?

A. It is a standard tool means that it's something that you apply. So there's specific types of risk assessments that are done by -- in the drug arena, just like there's specific types of risk assessment done in the pesticide arena.

But regardless of which arena you're in, the risk assessment uses some of the same methods, which I talked about, what are you exposed to; how much are you exposed to; looking at what -- what the risk profile or the hazard profile for the compound is as

you go through your assessment. So those are all standard things.

The difference in the drug world is when you do a risk assessment you are -- you are also making -- if you're doing an approval decision, you're making a assessment of how -- whether or not the risks outweigh the benefits. So that's a very specific use of risk assessment within the drug approval arena.

But when I'm doing a safety assessment for a product such as Mirena, I'm using still those same basic principles of dose response and exposure, for example, to look at what does the information say.

Q. Is that a commonly accepted methodology in pharmacology and toxicology?

A. Yes. And there's, again, just -- just as there's -- I cite in paragraph 12 -- sorry, paragraph 11, to -- sorry, it's paragraph 12 -- to some of the regulatory bodies that apply weight of the evidence, and the same thing would go with risk assessment. You can find descriptions of the general process of risk assessment

within different regulatory bodies as well.

Q. Okay. You can put that aside. Thank you.

Earlier I believe you were asked some questions about whether there's any literature that has ever identified levonorgestrel or progestins as a secondary cause of PTC.

Do you recall that?

A. Generally, yes.

Q. Okay. And I believe it was in the context of a chart in Exhibit 3 from Ball that said medication reportedly associated with intracranial hypertension.

Does that ring a bell?

A. Yes. We did describe this, yes.

Q. Okay.

A. Yeah, and we were looking at this panel over here, panel 2.

(Plunkett Exhibit 38 marked for identification.)

QUESTIONS BY MS. NATALE:

Q. Dr. Plunkett, I'm going to mark Exhibit 38 for the record, and this is a 2017