**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**IN RE:**

**MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY LITIGATION (NO. II)**

**17-MD-2767 (PAE)**
**17-MC-2767 (PAE)**

***This Document Relates to All Actions***

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF JAMES WHEELER, M.D., M.P.H., J.D.

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT ........................................................................................ 1**
**FACTUAL BACKGROUND ........................................................................................ 1**

I. Levonorgestrel is the Only Active Ingredient of Mirena, from Which Mirena Derives Both its Contraceptive Efficacy and Adverse Side Effects ........................................................ 1
II. Defining Intracranial Hypertension and the Likely Role of Sex Hormones ........................ 2

**STANDARD OF REVIEW**
**ARGUMENT ........................................................................................................ 4**

I. Dr. Wheeler's Opinions Satisfy the *Daubert* Criteria ........................................................ 4
II. Dr. Wheeler Reliably Analyzed the Available Data to Reach a Causality Opinion ............ 5

A. The Etminan Article is But One Piece of the Evidence in Supporting a Causal Association Between Mirena and PTC/IH ................................................................... 5
B. The Valenzuela Study Is a Reliable Basis for the Opinion that Mirena is Causally Associated with PTC/IH .............................................................................................. 6
C. Dr. Wheeler's Biologically Plausible Mechanism Opinions Are Admissible ............. 9
D. Mirena Adverse Event Reports And Norplant Case Reports Are Part of the Weight of the Evidence Upon Which Dr. Wheeler May Rely .................................................... 10

III. Dr. Wheeler Properly Applies Reliable Methodology to Reach His Conclusions ............ 12

**CONCLUSION ........................................................................................................ 15**

**CERTIFICATE OF SERVICE…………………………………………………………...16**

## TABLE OF AUTHORITIES

### Cases

*Amorgianos v. AMTRAK*,
137 F. Supp. 2d 147, 168 (E.D.N.Y. 2001),
*aff'd* 303 F.3d 256 (2d Cir. 2002) .......... 12
*Amorgianos v. Amtrak*,
303 F.3d 256 (2d Cir. 2002).......... 5, 7, 15
*Arista Records LLC v. Usenet.com, Inc.*,
608 F. Supp. 2d 409 (S.D.N.Y. 2009).......... 7
*Bartoli v. Novartis Pharm. Corp.*, No. 3:13-0724,
2014 U.S. Dist. LEXIS 52956 (M.D. Pa. Apr. 17, 2014) .......... 10
*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996).......... 7
*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579, 590 (1993).......... 3
*Deutsch v. Novartis Pharms. Corp.*,
768 F. Supp. 2d 420, 453 (E.D.N.Y. Mar. 8, 2011).......... 4, 10
*Drake v. Allergan, Inc.*, No. 2:13-cv-234,
2014 U.S. Dist. LEXIS 151830 (D. Vt. Oct. 23, 2014) .......... 11
*Drake v. Allergan, Inc.*,
111 F. Supp. 3d. 562, 567 (D. Vt. 2015).......... 15
*In re Accutane Prods. Liab.*,
2009 WL 2496444 (M.D. Fla. Aug. 11, 2009),
*aff'd*, 378 F. App'x 929 (11th Cir. 2010)) .......... 8
*In re Fosamax Prods. Liab. Litig.*,
645 F. Supp. 2d 164 (S.D.N.Y. 2009).......... 9, 11, 15
*In re M/V MSC Flaminia*, No. 12-cv-8892 (KBF),
2017 U.S. Dist. LEXIS 119146 (S.D.N.Y. July 28, 2017) .......... 6, 7
*In Re Neurontin Mktg.*,
612 F. Supp. 2d 116 (D. Mass. 2009) .......... 14
*In re PPA Prods. Liab. Litig.*,
289 F. Supp. 2d 1230 (W.D. Wash. 2003).......... 11, 12
*In re Rezulin Prods. Liab. Litig.*,
369 F. Supp 2d 398, 425 (S.D.N.Y. 2005).......... 11
*In re Viagra Prods. Liab. Litig.*,
572 F. Supp. 2d 1071 (D. Minn 2009).......... 14
*In re Zoloft*,
858 F.3d 787 (3d Cir. 2017).......... 12
*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999).......... 4
*Raskin v. The Wyatt Co.*,
125 F.3d 55 (2d Cir. 1997).......... 7
*Rider v. Sandoz Pharm. Corp.*,
295 F.3d 1194 (11th Cir. 2002) .......... 11

*Silivanch v. Celebrity Cruises, Inc.*,
171 F. Supp. 2d 241 (S.D.N.Y. 2001)........................................................................ 11
*Tyler v. Bethlehem Steel Corp*.,
958 F.2d 1176 (2d Cir. 1992)........................................................................................ 7
*Washington v. Kellwood Co.*,
105 F. Supp. 3d 293 (S.D.N.Y. 2015)) ........................................................................ 7

**Rules**

Federal Rule of Evidence 702........................................................................................ 3, 4

**Articles**

Ainat Klein, Naftali Stern, Etty Osher, Efrat Kliper & Anat Kesler (2013) Hyperandrogenism is Associated with Earlier Age of Onset of Idiopathic Intracranial Hypertension in Women, Current Eye Research, 38:9, 972-976 ........................................................................ 3
Chen J & Wall M. Epidemiology and Risk Factors for Idiopathic Intracranial Hypertension. *Int Ophthal Clin* 2014;54(1):1-1 ........................................................................................ 2
Fraser JA et al., Risk factors for idiopathic intracranial hypertension in men: a case-control study, J Neurol Sci. 2010; 290(1-2):86-95........................................................................ 3
Hornby C, Mollan SP, Mitchell J, et al. (2017) What Do Transgender Patients Teach Us About Idiopathic lntracranial Hypertension? *Neuro-Ophthalmology*, 41:6, 326-329 .......................... 3
Kempegowda P, et al. Women with idiopathic intracranial hypertension have a distinct andro-metabolic signature compared to polycystic ovarian syndrome and simple obesity. 18th European Congress of Endocrinology 2016. Endocrine Abstracts 41 EP728 ........................... 3
Thurtell MJ, Bruce BB, Newman NJ, Biousse V. An Update on Idiopathic Intracranial Hypertension. *Rev Neurol Dis.* 2010;7(0):e56-e68................................................................. 3
Valenzuela, R.M., et al. An Estimation of the Risk Pseudotumor Cerebri among Users of the Levonorgestrel Intrauterine Device, *Neuro-Ophthalmology*, March 2017................................ 8
Westgate CSJ, Botfield H, O'Reilly M, Hodson D, Sinclair A: Evaluating the role of testosterone in cerebrospinal fluid secretion. Endocrine Abstracts 2017, 50:P325...................................... 3

**Books**

Federal Judicial Center, Reference Manual on Scientific Evidence (3d Ed. 2011).................... 6, 9
Green, M., et al. Reference Guide on Epidemiology, Federal Judicial Center, Reference Manual on Scientific Evidence (2d Ed. 2000) ........................................................................ 7
Henifin, M., et al. Reference Guide on Medical Testimony, Federal Judicial Center, Reference Manual on Scientific Evidence (2d Ed. 2000) ........................................................... 10

## PRELIMINARY STATEMENT

Bayer's motion to exclude the expert testimony of Dr. Wheeler misinterprets Dr. Wheeler's opinions, the numerous reliable sources upon which he relies, and Second Circuit *Daubert* jurisprudence. Dr. Wheeler relies on an overwhelming body of scientific literature, epidemiologic data, and documents produced by Bayer in fact discovery to reach his ultimate conclusion: "Applying accepted standards of causality to the weight of evidence […] it is my expert opinion that Mirena LNG-IUS does indeed cause, or is a substantial factor in causing IH." (*See* Ex. 1, Wheeler Rpt. 47). Dr. Wheeler has considered *all* evidence regarding an association between Mirena and pseudotumor cerebri/intracranial hypertension ("PTC/IH") and *all* evidence happens to support his conclusion. Bayer ignores Dr. Wheeler's actual opinions, and cites instead to decontextualized deposition soundbites, wherein counsel for Bayer asked Dr. Wheeler to identify any evidence that "concludes" Mirena causes intracranial hypertension. (*See* Dfts. Br. at 1-2). Yet, Bayer cannot point to a single piece of evidence concluding either 1) that there is *no* association between the potent synthetic hormone levonorgestrel (LNG) in Mirena and PTC/IH; or 2) that levonorgestrel *does not* cause PTC/IH. Because Dr. Wheeler bases his opinion on reliable scientific principles and the weight of the evidence, the present motion must be denied.

## FACTUAL BACKGROUND

### I. Levonorgestrel is the Only Active Ingredient of Mirena, from Which Mirena Derives Both its Contraceptive Efficacy and Adverse Side Effects

Levonorgestrel (LNG) is a synthetic progestin derived from testosterone. The Mirena IUD consists of a T-shaped plastic frame with a reservoir that releases LNG daily for an extended period of time. Although the mechanism of contraceptive efficacy is believed to be mostly local within the uterus, the common adverse effects of LNG that are included on the Mirena label are directly

attributable to Mirena having a systemic effect in the body,[1] as acknowledged by even Bayer's own paid experts and corporate designees. Clearly, as opined by Dr. Wheeler, and as Bayer well knows, that the systemic circulation of LNG "causes a multitude of hormonal side effects, many of which are androgenic since LNG is an androgenic progestin." (Ex. 1, Wheeler Rpt. at 37).

## II. Defining Intracranial Hypertension and the Likely Role of Sex Hormones

This litigation incorporates multiple terms for the alleged injuries in this case: (1) pseudotumor cerebri ("PTC"), (2) intracranial hypertension ("IH"), (3) benign intracranial hypertension and (4) idiopathic intracranial hypertension ("IIH"). Dr. Wheeler testifies that after studying all the literature "there's been an evolution of these various definitions" and ultimately Dr. Wheeler determined that the term intracranial hypertension is simply a term which "could be communicated throughout the case." (Ex. 4, Wheeler Dep. 58: 10-13.) It is preposterous for Bayer to suggest that Dr. Wheeler "created his own definition of this term for purposes of litigation." (Dfts. Br. 1, n.1).

Although no *definitive* mechanism for PTC/IH has been established, *no one* – including Bayer or its agents – denies that sex hormones are intrinsically connected to its pathophysiology. *See, e.g.*, Ex. 5, Schoendorf 30(b)(6) Dep. Vol. II (Nov. 29, 2017) at 100:16-20 (Q. In Bayer's view is it biologically plausible that hormones play a role in causing IIH? A. […] it is a valid hypothesis to investigate further whether there is influence of sex hormones on the development of IIH") (objection omitted). Descriptions of this "likely" connection abound in the scientific literature, often authored by Bayer's own paid experts. *See, e.g.*, Ex. 6, Chen & Wall[2] at 5 ("Because female sex and obesity are the main risk factors for IIH, endocrine and hormonal

---

[1] For example, acne (> 5% reported in clinical trials) is evidence of androgenic activity. *See* Ex. 2, 2015 Mirena Label, at 15. *See also* Ex. 3, Lukkari-Lax Dep. 55:7-12; 55:15-56:5; 168:22-25.

[2] Chen J & Wall M. Epidemiology and Risk Factors for Idiopathic Intracranial Hypertension. *Int Ophthal Clin* 2014;54(1):1-1

changes likely play a role in the disease through an undetermined pathway"); Ex. 7, Thurtell[3] at 6 ("The likely role of sex hormones in its pathogenesis is highlighted by the predilection for post-pubertal pre-menopausal women, as well as the absence of a gender preference before puberty"); Ex. 8, Fraser[4] at 88 ("The likely role of sex hormones in the pathogenesis of IIH is highlighted by the clear predilection of IIH for postpubertal, premenopausal women and the absence of a gender preference before puberty.")

Over the last several years, several publications have provided additional support for a mechanistic role specifically regarding circulating androgens. *See, e.g.*, Ex. 9, Klein 2013[5] ("Increased levels of circulating androgens are associated with earlier age of onset of IIH in women"); Ex. 10, Kempegowda 2016[6] ("IIH is characterized by increased testosterone but not androstenedione"); Ex. 11, Westgate 2017[7] ("testosterone may have a pathogenic role in IIH through modulation of CSF formation"); Ex. 12, Hornby 2017 ("This interesting case presents the possibility of androgens having a pathogenic role in IIH.")[8]

## STANDARD OF REVIEW

Federal Rule of Evidence 702 requires that expert testimony be "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993). Under *Daubert*, "an expert need not base his opinion on the best possible evidence, but upon 'good grounds, based on

---

[3] Thurtell MJ, Bruce BB, Newman NJ, Biousse V. An Update on Idiopathic Intracranial Hypertension. *Rev Neurol Dis*. 2010;7(0):e56-e68. Frequent co-author Newman is a disclosed Bayer expert in this matter and Bruce, a consulting expert for Bayer, has submitted materials in support of Bayer's filings in this matter. *See* Dkt 53-14.

[4] Fraser JA et al., Risk factors for idiopathic intracranial hypertension in men: a case-control study, *J Neurol Sci*. 2010; 290(1-2):86-95. Bayer experts Bruce and Newman are also co-authors of this piece.

[5] Ainat Klein, Naftali Stern, Etty Osher, Efrat Kliper & Anat Kesler (2013) Hyperandrogenism is Associated with Earlier Age of Onset of Idiopathic Intracranial Hypertension in Women, Current Eye Research, 38:9, 972-976

[6] Kempegowda P, et al. Women with idiopathic intracranial hypertension have a distinct andro-metabolic signature compared to polycystic ovarian syndrome and simple obesity. 18th European Congress of Endocrinology 2016. Endocrine Abstracts 41 EP728.

[7] Westgate CSJ, Botfield H, O'Reilly M, Hodson D, Sinclair A: Evaluating the role of testosterone in cerebrospinal fluid secretion. Endocrine Abstracts 2017, 50:P325..

[8] Hornby C, Mollan SP, Mitchell J, et al. (2017) What Do Transgender Patients Teach Us About Idiopathic lntracranial Hypertension? *Neuro-Ophthalmology*, 41:6, 326-329.

what is known.'" *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 453 (E.D.N.Y. Mar. 8, 2011) (quoting 509 U.S., at 590). "Rule 702 codifies a liberal admissibility standard and '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.*, at *426 (quoting 509 U.S. at 596); *see also Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 369, 377 (S.D.N.Y. 2014).

"Trial courts serve as 'gatekeepers,' responsible for 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 464-65 (S.D.N.Y. 2014) (quoting 509 U.S., at 579, 597). ""Federal Rule of Evidence 702 grants an expert witness testimonial latitude unavailable to other witnesses, provided that (1) 'the testimony is based on sufficient facts or data,' (2) 'the testimony is the product of reliable principles and methods,' and (3) 'the expert has reliably applied the principles and methods to the facts of the case.'" *Id.* (quoting *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, No. 11 Civ. 6188 (DLC), 2012 U.S. Dist. LEXIS 173768, at *6 (S.D.N.Y. Dec. 3, 2012) (quoting Fed. R. Evid. 702).

## ARGUMENT

### I. Dr. Wheeler's Opinions Satisfy the *Daubert* Criteria

A district court "determining the admissibility of the expert's testimony *may* consider one or more of the specific *Daubert* factors. The emphasis on the word 'may' reflects *Daubert*'s description of the Rule 702 inquiry as 'a flexible one.' The *Daubert* factors do *not* constitute a definitive checklist or test, and the gatekeeping inquiry must be tied to the particular facts." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (internal citations omitted) (emphasis added). The four factors "*may or may not* be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* (emphasis added).

Thus, the Second Circuit has instructed that the court's inquiry "is fluid and will necessarily vary from case to case." *Amorgianos v. Amtrak*, 303 F.3d 256, 266 (2d Cir. 2002) (internal citations omitted). "In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.*

## II. Dr. Wheeler Reliably Analyzed the Available Data to Reach a Causality Opinion

Plaintiffs address in detail the multiple lines of evidence relied upon by Plaintiffs' experts, including Dr. Wheeler, in Plaintiffs' Memorandum of Law in Opposition to Defendants' Omnibus Motion ("Plaintiffs' Omnibus Opp."). Here, Plaintiffs specifically address Dr. Wheeler's reliance upon that evidence, and the conclusions he draws therefrom.

### A. The Etminan Article is But One Piece of the Evidence in Supporting a Causal Association Between Mirena and PTC/IH

For the sake of brevity, Plaintiffs direct the Court to Plaintiffs' Omnibus Opp., contemporaneously filed, for a full discussion of the Etminan analyses. Here, Plaintiffs address Bayer's claims as they specifically relate to Dr. Wheeler's methodology.

As Bayer's brief inadvertently admits, Dr. Wheeler carefully considered the Etminan study, its potential to provide useful information, and its many limitations, as a reliable expert should do. Dr. Wheeler concluded the Etminan study was a "net zero," which, as explained in Plaintiffs' Omnibus Opp., is the same conclusion reached by the literature that evaluated it, specifically Dr. Deborah Friedman's 2016 Letter to the Editor. *See* Plaintiffs' Omnibus Response Brief, § I(A)(1). Indeed, in 2015, prior to the formulation of this MDL, Bayer reached ***the exact same conclusion as Dr. Wheeler***, concluding: "none of the conclusions are supported by the results from their cohort study, given the study's limitations as pointed out above." (Dkt 167-70, p. 17 of 36). The "cohort study" to which Bayer is referring is the exact same "cohort analysis," the IMS LifeLink study,

that Bayer now claims in its motion is so indisputable that Dr. Wheeler is obliged to accept its results -- while, of course, deeming the other half of the study unreliable, as Bayer demands without a hint of irony -- and then draw conclusions from the cohort study that the study itself never drew.

Bayer has not shown even the predicate for their argument -- that the Etminan study is "negative data that weighs against his predetermined causation theory" -- much less shown, as required by the very cases they cite, that Dr. Wheeler "[did] not acknowledge or account for that evidence." To the contrary, Dr. Wheeler acknowledged and accounted for the Etminan study and reached the same conclusions reached by the literature and by Bayer itself. Precluding Dr. Wheeler's testimony on this basis would not only violate precedent, in which preclusion is not warranted merely for "flaws in [an expert's] factual premises, unless the information or assumptions that the expert relied on were so unrealistic and contradictory as to suggest bad faith," *In re M/V MSC Flaminia*, No. 12-cv-8892 (KBF), 2017 U.S. Dist. LEXIS 119146, at *280-81 (S.D.N.Y. July 28, 2017), but would violate common sense. A plaintiff's expert plainly cannot be precluded for reaching the same conclusions reached by the literature and by the defendant itself. Dr. Wheeler's analysis of the Etminan study is a reliable consideration among his weight of the evidence methodology.

**B. The Valenzuela Study Is a Reliable Basis for the Opinion that Mirena is Causally Associated with PTC/IH**

For the sake of brevity, Plaintiffs direct the Court to Plaintiffs' Omnibus Opp., contemporaneously filed, for a full discussion of the Valenzuela analyses. Notably, however, as Plaintiffs' explain in Plaintiffs' Omnibus Opp., because Valenzuela so strongly supports an inference of causation, Bayer attempts to marginalize its results through a parade of alleged errors

and speculative assumptions. Thus, Bayer's argument that Dr. Wheeler's *reliance* upon Valenzuela is unreliable is necessarily premised on the Court's rejection of Valenzuela itself.

As a threshold matter, Bayer cites *no* precedent for its claim that a court may reject an entire peer-reviewed study as unreliable because of alleged limitations. Indeed, "[e]ven if movants are correct that there are flaws in [an expert's] factual premises, 'unless the information or assumptions that the expert relied on were so unrealistic and contradictory as to suggest bad faith, inaccuracies in the underlying assumptions or facts do not generally render an expert's testimony inadmissible. Less egregious suggestions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.'" *In re M/V MSC Flaminia*, 2017 U.S. Dist. LEXIS 119146, at *280-81 (quoting *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 306 (S.D.N.Y. 2015)). Courts within this District have frequently "decline[d] movants' invitation to predetermine the[] facts as a basis to preclude an expert," finding that "[t]he appropriate means to test any alleged weaknesses in [an expert's] data, calculations, or factual premises is therefore cross-examination, not preclusion." *Id.* (citing *Amorgianos*, 303 F.3d at 267 ("Only serious flaws in reasoning or methodology will warrant exclusion")); *see also Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 423 (S.D.N.Y. 2009) ("'contentions that assumptions are unfounded go to the weight, not the admissibility of the testimony'") (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir. 1992); *see also*, *Raskin v. The Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("disputes as to the validity of underlying data [ ] go to the weight of the evidence," not the admissibility of the proffered expert testimony) (internal citations and quotations omitted).

Finally, Dr. Wheeler does not "draw overreaching conclusions," as Bayer suggests. Dfts. Br. at p. 8 (quoting *In re Accutane Prods. Liab.*, 2009 WL 2496444, at *2 (M.D. Fla. Aug. 11,

2009), *aff'd*, 378 F. App'x 929 (11th Cir. 2010)). Rather, Dr. Wheeler directly addresses the authors' finding that "their research "suggests that women with an LNG-IUS may have an increased risk of development." (Ex. 1, Wheeler Rpt. 18).[9] Furthermore, the authors note:

> There are two possible explanations for the association demonstrated in our study. One explanation is that LNG does cause increased intracranial pressure, either through one of the mechanisms discussed above or through another, as yet unknown mechanism. Another explanation is that LNG does not cause increased intracranial pressure, but that PTC is more likely to occur in the same population of women who are more likely to have an LNG-IUS recommended to them by their physician.

(Ex. 13, Valenzuela 2017). Thus, Dr. Wheeler acknowledged that there is a question of an association between Mirena and IH, (Ex. 4, Wheeler Dep. 200: 17-18), and considered it as evidence "suggest[ing] that women with a Mirena could have - - may have an increased risk in developing IIH." (Ex 5, Wheeler Dep. 190:19-20). The Valenzuela study is a reliable piece of the weight of the evidence from which Dr. Wheeler forms his opinion that Mirena is causally associated with PTC/IH.

In sum, Bayer's criticisms of Dr. Wheeler's Valenzuela opinions are wholly unfounded. Rule 702 and *Daubert* permit experts to rely upon statistical data that is not perfect—it need only be reliable and trustworthy. "Indeed, 'in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.'" *Rosenfeld v. Oceania Cruises. Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (*quoting Hemmings v, Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)). Dr. Wheeler's opinions regarding Valenzuela are reliable, and any alleged limitations to the study itself go to the weight, rather than the admissibility of the evidence.

---

[9] Quoting Ex. 13, Valenzuela, R.M., et al. An Estimation of the Risk Pseudotumor Cerebri among Users of the Levonorgestrel Intrauterine Device, *Neuro-Ophthalmology*, March 2017.

**C. Dr. Wheeler's Biologically Plausible Mechanism Opinions Are Admissible**

Contrary to Bayer's assertions, a mechanism need not be definitively established to be admissible under *Daubert*. "Biologic plausibility is a judgment about whether an agent plausibly could cause a disease, based on existing knowledge about human biology and disease pathology. *In re Fosamax Prods. Liab. Litig*., 645 F. Supp. 2d 164, 181 (S.D.N.Y. 2009) (citing Michael D. Green et al., Reference Guide on Epidemiology at 388 *in* Federal Judicial Center, Reference Manual on Scientific Evidence (2d Ed. 2000)).

"Experts need not conduct studies of their own in order to opine on a topic; a review of other studies and scientific literature can be enough to qualify experts to testify and to make that proposed testimony reliable." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042-43 (2d Cir. 1995). Indeed, the fact "that the mechanism remains unknown does not mean that the one proposed by the [plaintiffs' experts] is not widely accepted as plausible.'" *Fosamax*, 645 F. Supp. 2d at 183 (citing *In re Neurontin Mktg. Sales Practices and Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 149 (D.Mass. 2009) (finding that biologic plausibility supported opinion on causation despite the fact that there was 'robust debate in the scientific community' on the proposed mechanism); *In re PPA Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1247 (W.D. Wash. 2003) ("The fact that the mechanism remains unclear does not call the reliability of the opinion into question."). *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 438, 2011 U.S. Dist. LEXIS 22755, *47-48 (citing *Fosamax*, 645 F. Supp. 2d at 198).

Dr. Wheeler does not intend to testify regarding the *precise* mechanism of action by which Mirena may cause or substantially contribute to causing PTC, nor is he required to do so in order to opine that there is a *biologically plausibile* mechanism*:* "The fact that the mechanism remains unclear does not call the reliability of the opinion into question." *In re PPA Prods. Liab. Litig.*, 289 F. Supp. 2d at 1247; *see also Bartoli v. Novartis Pharm. Corp.*, No. 3:13-0724, 2014 U.S.

Dist. LEXIS 52956, at *29 (M.D. Pa. Apr. 17, 2014) (expert allowed to testify as to mechanism where: "[he] is not offering his opinion as *the* mechanism, but rather indicating that it is a plausible one given his understanding of the relevant medical literature.") (emphasis added).

In forming his mechanism opinion, Dr. Wheeler performed his own literature searches and "performed a thorough review of the published medical literature most relevant to the issue of whether Mirena has a causative link with IH." (Ex. 1, Wheeler Rpt. 20). Contrary to Bayer's claims that Dr. Wheeler's androgen theory is "untested, unpublished" and unreliable, Dr. Wheeler has a clear understanding of all of the relevant literature in this case and used such to form his mechanism opinion that there is "clear documentation of androgenic side effects upon insertion of Mirena" and "there is a hormonal mechanism in some cases of IH." (Ex. 1, Wheeler Rpt. 33-34). Furthermore, Dr. Wheeler draws upon his knowledge and training in gonadotropins, hypogonadism, and general reproductive endocrinology in forming his opinions. (*Id.* 3-4) ("medical endocrinology, specifically, andrology – the study of testosterone and other androgens") *See also* Ex. 14, Wheeler CV. These are sufficient bases under Rule 702 and Rule 703 for Dr. Wheeler to opine as to biological plausibility as one part of his weight of the evidence analysis.

**D. Mirena Adverse Event Reports And Norplant Case Reports Are Part of the Weight of the Evidence Upon Which Dr. Wheeler May Rely**

"Even if case reports on their own are not reliable evidence of causation, they do contribute to the reliability of a causation determination." *Deutsch*, 768 F. Supp. 2d at 476. Thus, "[w]hile Plaintiffs concede that courts have held that causation opinions should not be based *solely* on adverse event reports, […] adverse event reports are nevertheless relevant when combined with other evidence, particularly epidemiological evidence." *Drake v. Allergan, Inc.*, No. 2:13-cv-234, 2014 U.S. Dist. LEXIS 151830, at *21 (D. Vt. Oct. 23, 2014); *see also In re Rezulin Prods. Liab. Litig.*, 369 F. Supp 2d 398 (S.D.N.Y. 2005) (quoting *Reference Manual on Medical Testimony*, at

475 ("[c]asual attribution based on case studies must be regarded with caution. However, such studies may be carefully considered in light of other information available, including toxicological data."))[10]

Case reports are "plainly relevant to an expert's opinion as to whether a given risk factor is generally associated with an injury." *Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241, *264 (S.D.N.Y. 2001). Moreover, as a drug injury MDL in this District held, "a large number of case reports adds greater weight to the reliability of an opinion on causation." *In re Fosamax*, 645 F. Supp. 2d at 184 (citing *In re PPA Prods. Liab. Litig*., 289 F. Supp. 2d 1230, 1242 (W.D. Wash. 2003) (finding "significant the sheer volume of case reports, case series and spontaneous reports associating PPA with hemorrhagic stroke to women"); *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) ("stating in dicta that reliable evidence on causality includes, *inter alia*, 'a very large number of case reports.'"))

Dr. Wheeler reviewed 115 adverse events reports produced by Bayer in this litigation, from Bayer's own adverse event database. Each of these 115 patients "had a Mirena placed, were diagnosed with IH at a time ranging from a few weeks to eleven years after the first IUD was placed and some clinician reported this diagnosis and its possible association with Mirena to the manufacturer [Bayer] or a health authority." (Ex. 1, Wheeler Rpt. 21). Dr. Wheeler clearly points to the 115 adverse event reports to *illustrate* a valid premise – that there is an association between PTC/IH and Mirena. Furthermore, Dr. Wheeler reviewed the individual case reports to assess Bradford Hill factors, discussed in detail *infra*, such as "experimental evidence," "temporality," and "biologic gradient." (Ex. 1, Wheeler Rpt. 20-26, 35-39). Thus, Dr. Wheeler opines that spontaneous reports and case reports form part of the "weight of evidence" that he considered in

[10] Ex. 15, Mary Sue Henifin, Howard M. Kipen & Susan R. Poulter, Reference Guide on Medical Testimony, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 439, 444 (Fed. Jud. Ctr., 2d ed. 2000).

reaching his opinion that Mirena more likely than not causes or is a substantial factor in causing PTC/IH. The Norplant case reports reviewed by Dr. Wheeler also provide a reliable piece of the body of evidence upon which experts may rely. *See In re PPA.*, 289 F. Supp. 2d 1230 (permitting expert causation opinions regarding phenylpropanolamine and stroke by analogy to a body of evidence regarding similar chemicals within the class of sympathomimetic drugs).

## III. Dr. Wheeler Properly Applies Reliable Methodology to Reach His Conclusions

Bradford Hill and weight of the evidence are generally accepted and reliable methods by which an expert may reach a causation opinion. See, e.g., *In re Zoloft*, 858 F.3d 787, 797 (3d Cir. 2017) (assuming the Bradford Hill and weight of the evidence methods "are generally reliable" and noting that the "use of standard techniques bolster the inference of reliability.")

Bradford Hill criteria refers to a set of factors that epidemiologists generally consider when determining "whether a statistical association is indeed causal." *See Amorgianos v. AMTRAK*, 137 F. Supp. 2d 147 (E.D.N.Y. 2001), *aff'd* 303 F.3d 256 (2d Cir. 2002). Sir Bradford Hill absolutely did not state that his criteria is only to be applied if a "clear cut case of association" has been established, as asserted by Defendants (Dfts Br. 16). Rather, Sir Bradford Hill explicitly states the exact opposite: "We must not be too ready to dismiss a cause-and-effect hypothesis merely the grounds that the observed association appears to be slight" and "the association we observe may be one new to science or medicine and we must not dismiss it too light-heartedly as just too odd."[11] Bradford Hill does not stand for the proposition that hard-and-fast rules of evidence must be obeyed before accepting cause and effect. (Ex. 17, Bradford Hill at 299). In fact, Bradford Hill states that "none of my nine viewpoints can bring indisputable evidence for or against the cause-and effect hypothesis and on can be required as *sine qua non.*" *Id*. Rather, Dr. Wheeler considered

[11] Ex. 16, Sir Bradford Hill, *The Environment and Disease: Association or Causation*, 58 Proceedings of the Royal Society of Medicine 295 (1965).

the types of evidence and data regularly considered by scientists and physicians in coming to causality conclusions, including those propounded by Sir Bradford Hill.

As its final and least convincing attack on Dr. Wheeler's methodology, Bayer wrongly asserts that Dr. Wheeler "drew grossly overreaching conclusions" and "cobbled together a causation opinion forcing pieces of evidence showing no association into the Bradford Hill framework." (Dfts. Br. 19). Dr. Wheeler applies a reliable scientific method to the evidence in this litigation. Yet, Bayer conveniently ignores the *entire* body of scientific literature cited by Dr. Wheeler establishing his opinions and methodologies, when even its own paid experts have lent support to its application elsewhere. Bayer's implication that Dr. Wheeler "first developed an opinion for this litigation and then worked backwards therefrom" is disingenuous and has no basis in reality. (Dfts. Br. 19). As a clinician and clinical epidemiologist, Dr. Wheeler had the opportunity to study the scientific literature, study the published epidemiologic studies, study the LNG-containing products' labels, and study the Bayer adverse event reports, which he applied throughout his Bradford Hill and weight of the evidence analysis to reach his causation opinion. (Ex. 4, Wheeler Dep. 269: 17-22).

Dr. Wheeler's conclusions regarding the "strength of an association" between Mirena and IH was based on his studying of Valenzuela and the 115 adverse event reports. Moreover, under Bradford Hill, the Etminan and the Valenzuela conclusions do not need to be the same to satisfy the "consistency" factor. "It doesn't have to be equal to be consistent. One set of conclusions, one set of dates, one set of investigators could find an effect and another could find no effect." (Ex. 4, Wheeler Dep. 271: 15-19). This is akin to Bradford Hill stating he would "put a great deal of weight upon similar results reached in quite different ways". (Ex. 17, Bradford Hill at 297). Another attack Bayer makes is against Dr. Wheeler is his application of the "biologic gradient"

criteria. Dr. Wheeler does admit that "the biologic gradient evidence is not strong" however, each factor is viewed as a guideline, and it is acknowledged that each factor need not be fulfilled in order for a researcher to proclaim causation. *Id*. at 299, *See also In Re Neurontin Mktg.*, 612 F. Supp. 2d 116, 133 (D. Mass. 2009) (citing to the criteria as "guidelines" and noting that the "drawing of causal inferences is informed by scientific expertise" as opposed to a strict scientific methodology). Bayer also criticizes the "specificity" analysis done by Dr. Wheeler stating that he "turned a blind eye to all contrary data". (Dfts. Br. 17). Dr. Wheeler studied evidence regarding both Norplant and Jadelle (the only other LNG- containing LARCs) and Valenzuela (including cohorts in two different populations, both finding statistically significant results) to conclude that this element of a causal relationship between LNG-IUS and IH is satisfied.

Regardless, in the context of a general causation challenge, failure to satisfy the Bradford Hill criteria does not doom admission under *Daubert*. *See, e.g.*, *In re Viagra Prods. Liab. Litig.*, 572 F. Supp. 2d 1071, 1081 (D. Minn 2009). ("The Court agrees that the Bradford Hill criteria are helpful for determining reliability but rejects Pfizer's suggestion that any failure to satisfy those criteria provides independent grounds for granting its *Daubert* Motion."). As Dr. Wheeler testified, his conclusion is based upon the evidentiary body as a whole, including all the things that medical professionals, clinicians and research scientists review in their daily practices to reach such conclusions (i.e., literature reviews, case studies, spontaneous adverse event reports and even drug product labeling).

Furthermore, courts in the Second Circuit have explicitly noted that "an expert is not required to back her opinion with published studies that unequivocally support her position." *Drake v. Allergan, Inc.*, 111 F. Supp. 3d. 562 (D. Vt. 2015) (citing *Amorgianos*, 303 F.3d 256). The Court denied Allergan's motion to strike an expert's testimony that was based on

the "weight of circumstances," noting that, another court had found that "case reports, prevalence studies, adverse event reports, animal studies, and a hypothesis about a potential mechanism through which the drug supposedly caused the alleged injury were sufficiently reliable to permit an expert to testify." *Id*. (citing *In re: Fosamax*, 645 F. Supp. 2d 164). Dr. Wheeler's opinions are well-grounded in the evidence, including case reports, prevalence studies, adverse event reports, and a plausible biological mechanism. Dr. Wheeler applies well-supported facts and data to reach his scientific conclusions. Bayer's mere disagreement with this – or any aspect of – Dr. Wheeler's methodologies do not render his opinions inadmissible under *Daubert*, and Bayer's motion must be denied.

**CONCLUSION**

Wherefore, Plaintiffs respectfully request that this honorable Court deny Bayer's Motion to Exclude the Expert Testimony of James Wheeler, M.D., MPH., J.D.

Dated: March 15, 2018

Respectfully submitted,

*/s/ Lawrence L. Jones II*
Lawrence L. Jones II
Jones Ward PLC
*Co-Lead Counsel for Plaintiffs*

Martin D. Crump
Davis & Crump PC
*Co-Lead Counsel for Plaintiffs*

Maxwell S. Kennerly
Kennerly Loutey, LLC
*Liaison Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2018, I served all counsel of record with the foregoing via this Court's CM/ECF System, which will provide notice of filing to all counsel of record.

/s/ *Lawrence L. Jones II*
Lawrence L. Jones II