# EXHIBIT 1

## Jan. 18, 2018 Expert Report of William Jusko, Ph.D.

THE CENTER FOR WOMEN'S HEALTHCARE

JAMES M WHEELER.MD.MPH.JD

In Re: Mirena® IUS Levonorgestrel-Related Products Liability Litigation (No. II)

Expert Report by Dr. James M. Wheeler, MD, MPH, JD

## A. Introduction

Women worldwide have a variety of safe and effective contraceptive methods available to them;[1] long-acting reversible contraceptive ("LARC") methods including intrauterine devices ("IUDs") are some of the most effective.[2] Hormonal and non-hormonal IUDs are the most common reversible method of contraception worldwide, used by more than 90 million women.[3]

In the United States, IUD use gradually increased through the 1960's and 1970's. By 1995, the National Survey of Family Growth reported that about 1% of female contraceptive-users used an IUD.[4] Thereafter, the use of IUDs increased from 1.3% of contraceptive-users in 2001 to 5.5% in 2006-2008.[5] By 2009, IUD use was up to 8.5%, and by 2012 up to 11.6% of contraceptive

[1] Wu W-J & Edelman A: Contraceptive method initiation: Using the Centers for Disease Control and Prevention Selected Practice guidelines. Obstet Gynecol Clin N Am 2015 Dec;42(4):659-667, p 659.
[2] Kavanaugh ML, Jerman J, Finer LB: Changes in use of long-acting reversible contraceptive methods among U.S. women, 2009-2012. Obstet Gynecol 2015 Nov;126(5):917-927, p 917.
[3] American College of Obstetricians and Gynecologists ("ACOG"), Practice Bulletin #59, Intrauterine Device, Jan 2005, pp 1-10, p 2. IUDs are also sometimes called Intrauterine Systems ("IUS"); these terms are considered synonymous in common clinical usage, and will be treated as synonyms within this Report as well.
[4] Ibid., p 1.
[5] ACOG Practice Bulletin No. 121, July 2011: Long-acting reversible contraception: Implants and intrauterine devices, Obstet Gynecol 118(1):1.

users.[6] Despite the safety and efficacy of IUDs demonstrated by prospective trials, and the growing popularity of IUD use in the U.S., by 1988 all but one IUD had been withdrawn from the U.S. market by their manufacturers due to economic considerations, including product liability concerns as to risks of IUD-pelvic infection.[7]

Currently in the U.S., there are two categories of IUDs approved by the Food and Drug Administration ("FDA"), and available in the U.S. market. One is the copper T380A, known by its manufacturer's trademark name of Paragard®. Paragard® is FDA-approved for use for 10 years;[8] it is copper-containing, and is thus non-hormonal. The other currently available FDA-approved IUDs contain the progestin levonorgestrel ("LNG"). These devices include Bayer's Mirena®, with a labeled release rate of 20 mcg/day for up to five years; Bayer's Skyla®, with a labeled release rate of 12 mcg/day for up to three years; Allergan's Liletta®, with a labeled release rate of 19.5 mcg/day for up to three years; and most recently, Bayer's Kyleena®, with a labeled release rate of 16 mcg/day for up to five years. The first FDA-approved LNG-containing IUD within this hormone-containing group, Mirena®, is the subject of this litigation.

The LNG-IUD, in its provision of cost-effective reversible contraceptive with prompt return of fertility after its removal, generally offers the associated benefit of less menstrual bleeding.[9] However, regarding the side effects of the progestin, LNG, within Mirena®, the ACOG Practice Bulletin #59 on IUDs states: "This small amount of steroid (i.e., LNG) confers *minimal*

---

[6] ACOG Practice Bulletin #186, Long-acting reversible contraception: Implants and intrauterine devices. November 2017, p 1. *See also*, Kavanaugh ML et al. (2015), p 920.
[7] ACOG Practice Bulletin #59, p 1.
[8] Ibid., p 2.
[9] Ibid.

*systemic side effects,* although some women may experience hormonal-related effects…"[10] (Emphasis added). These benefits are not unique to the LNG-IUD.

As discussed below, it is my expert opinion that these systemic side effects of the LNG released by Mirena® include Intracranial Hypertension ("IH") and Pseudotumor Cerebri ("PTC"). Stated another away, Mirena® is capable of causing or contributing to IH and PTC. IH and PTC have potential serious consequence to the women diagnosed with these problems, such as the risk of permanent vision changes including blindness. I base the opinions in this report on my education, training, and experience, I have reached these opinions using appropriate methodologies for my fields of expertise, and I hold these opinions to a reasonable degree of medical certainty.

## B. Expert's Qualifications

My qualifications to write this Expert Report are represented with my curriculum vitae ("CV"), which is attached to this Expert Report and intended to be incorporated within. The following summarizes some of the most salient information from my CV that is relevant to my expert opinions:

### 1. Clinical Practice – Obstetrics & Gynecology and Reproductive Endocrinology

In 1978, I graduated from Harvard College *magna cum laude* with the double major of Biology and Psychology/Social Relations. During college, I did laboratory research in the neuroendocrinology of reproduction resulting in peer-reviewed publication, presentation at the National Institutes of Health ("NIH"), and foreshadowing my related work in humans regarding the medication, depo-leuprolide. I attended medical school at Baylor College of Medicine in

[10] Ibid., p 2. The systemic side effects of the LNG are described as "minimal", but *not* "absent", "nonexistent", or "insignificant" – especially when faced by an individual woman experiencing a serious neuro-ophthalmologic side effect - even at low prevalence.

Houston from 1978 to late 1981, during which I concentrated in reproductive medicine, and published peer-reviewed research in prestigious medical journals pertaining to female reproduction. Between medical school and residency, I completed an NIH-supported research fellowship at Baylor in medical endocrinology, specifically, andrology – the study of testosterone and other androgens within male reproduction. Residency in Obstetrics and Gynecology ("Ob/Gyn") at Baylor followed from 1982 to 1986; I was the most-published Ob/Gyn resident, awarded one of Baylor's best resident teachers by the medical honor society, and chosen as administrative chief resident my senior year. Part of my residency involved working at Planned Parenthood, learning contraceptive practice including the proper use of IUDs. Additionally, I "moonlighted" at Planned Parenthood and several private contraceptive clinics, gaining further contraceptive experience including all aspects of IUD use. Later, moonlighting as an emergency room physician, I also gained experience regarding IUD-associated complications, complementing my experience on initial counseling and initiating contraceptives in my other residency and moonlighting experiences.

From 1986 to 1988, I completed a post-residency subspecialty fellowship in Reproductive Endocrinology and Infertility at Yale University School of Medicine. Part of the fellowship training was in contraceptive services, including supervising Yale Ob/Gyn residents in evaluating and providing their clinic patients IUDs, and managing any related complications.

In 1988, I returned to Baylor as Ob/Gyn faculty, with partial responsibility for supervising the Ob/Gyn residents in the provision of contraception within their clinics, and managing complications at their hospitals. This work contributed to my being awarded two faculty teaching awards my first year back at Baylor. I practiced in this academic setting until 1994, and then moved to private practice where I continue to work currently. During my academic practice years

at Yale and Baylor from 1986 to 1994, then my private practice from 1994 to the present, I have provided contraceptive counseling and care to thousands of women, and have offered IUD contraception as one choice to many of them. I have personally placed, or supervised placing, IUDs in women throughout these various experiences, including the LNG-releasing Mirena®, which is the subject of the present litigation.

### 2. Methodology: Clinical Epidemiology, Biostatistics, and Evidence-based Medicine

Having conducted research in both laboratory and clinical settings by the time I completed my medical training, I enjoyed the immediate impact on practice, resulting from the presentation and publication of clinical research, and dedicated myself to furthering the quality of clinical research within my own field of practice. As an Ob/Gyn resident, I recognized that some clinical research findings were potentially affected by factors related to both cause and purported effect, but not directly causing the effect; these factors are known as "confounding variables". I came to recognize that within the field of reproductive medicine, there were various issues within the research that I would later come to identify as "bias", including selection bias, ascertainment bias, performance bias and many, many others. These experiences led me to be the first surgical specialist accepted into Yale's Robert Wood Johnson Clinical Scholars Program, the nation's preeminent program teaching clinical epidemiology. Clinical epidemiology is distinguished from "classical epidemiology" because it is, first, practiced by clinicians actually treating patients, and secondly, although interested in cause-effect relationships causing disease, it is from a distinctly clinical approach rather than the statistical mining of huge cross-sectional data sets available from government and insurance entities. The practice of Clinical Epidemiology is the firm foundation by which "Evidence-based Medicine" has proliferated in the U.S. and worldwide, and I was part of clinical epidemiology's introduction to Ob/Gyn in the 1980's.

Complementing my training in clinical epidemiology within the Clinical Scholars Program, I concurrently earned a M.P.H. from the Yale University School of Public Health, majoring in Biostatistics with a minor in Maternal/Child Health. Many of my publications following my training focus upon the methodology by which Ob/Gyn clinical research should be conducted, reducing biases and controlling for confounders, all in order to understand the cause-effect relationships important to clinical practice.

**3. Social Policy - Student, Medical Practitioner, Occasional Medical Leader**

Much of the Clinical Scholars Program, especially since it was supported by the Robert Wood Johnson Foundation, was dedicated to the evaluation and generation of social policy, and inspiring such policy towards improving health care in society at large. Within my M.P.H. program, while my major area of concentration was in Biostatistics, my minor was in Maternal and Child Health Policy; for this degree, I was awarded graduation honors of *'with Distinction'*. During my training, I served as a regional and national officer of the younger Ob/Gyns within ACOG; as national chairman of this group in 1987-1988, I focused on social policy issues of pregnancy during residency, stress among resident physicians affecting medical care, and domestic violence. My interest in contributing to social policy extended into serving as a medicolegal consultant reviewing litigation, for plaintiffs and defendants, in civil and criminal venues, beginning in 1989. My interest and study of social policy extended into my earning a J.D. from 2001 to 2005 at the University of Houston Law Center, concentrating in health law, and earning a Legal Nurse Consulting diploma in 2016.

It is via the totality of my education, training, research, experience, and knowledge across these several fields of study by which I present myself as sufficiently Expert to serve as a reviewer in this case, and present this Expert Report of my opinions and their basis.

**C. Clinical and Research Perspectives on Mirena®**

The Mirena® levonorgestrel-releasing intrauterine system ("LNG-IUS") was approved by FDA on December 6, 2000 and has been marketed in the U.S. since 2001. Researching MEDLINE via the search engine PubMed for the search term "Mirena" produces over 5500 citations; searching for "Mirena" and "complications" produces over 400 citations. A broad swath of published studies was reviewed for this Expert Report, and representative literature regarding the most relevant aspects to this litigation are presented and cited herein according to topic.

**1. Informed Consent for Contraceptive Choice – Benefits Must Be Balanced Against Risks**

The ACOG Practice Bulletin #186 "Intrauterine Device", introduces the topic of intrauterine contraception to its readership, i.e. all U.S. Ob/Gyns, with the introductory sentence that IUDs are among the most effective reversible contraceptive methods in the U.S.[11] The introductory section to ACOG's earlier 2005 Practice Bulletin on IUDs concludes: "To achieve more widespread use of IUDs among women who are appropriate candidates, clinicians should understand the risks, benefits, indications, and contraindications to IUD use."[12] And, under the IUD Practice Bulletin #59's section "IUD Candidate Selection", ACOG advises:

> "Women considering an IUD should be counseled about its advantages *and side effects* as well as other family planning methods. They should *understand when to return* for follow-up evaluation…"[13] (Emphasis added.).

There are advantages of IUD use for many women. However, it is clear that women, and the practitioners who provide healthcare for women, need to understand the side effects of IUD

---

[11] ACOG Practice Bulletin #186, 2017, p 1.

[12] ACOG Practice Bulletin #59, 2005, p 1. These Bulletins are written as clinical practice guidelines for all Ob/Gyns across the U.S., with a variety of goals beginning with education, but including advocating various social policies deemed worthwhile from ACOG's point of view. The social policy aspect within this ACOG Practice Bulletin of advocating for "more widespread use of IUDs" – even to the point of advocating IUDs "should be advocated for *all* women" is evident from ACOG's choice of words.

[13] Ibid., p 2.

use and the importance of return follow-up in detecting and managing those side effects. IUD placement must be preceded by complete and balanced discussion of IUD benefits, including potential non-contraceptive benefits, versus significant risks of IUD use -- including those that have serious clinical impact even if relatively infrequent. Moreover, when a patient has a pre-existing condition that already puts them at risk for a particular complication, it is essential that the doctor and the patient be aware if the IUD has the potential to increase that risk.

A woman has multiple choices when considering contraception, many of which do not need the active participation, or prescription, by a healthcare provider such as an Ob/Gyn.[14] It is the especially procedural nature of IUD-insertion and monitoring that requires detailed discussion between the woman and healthcare provider, including a balanced discussion of risks versus benefits, and effective information transfer before the woman grants consent for IUD placement. IUD placement is a procedure performed by a trained, licensed healthcare provider, and thus requires procedural informed consent in addition to the overall contraceptive counseling required by all contraceptive choices. IUD use is a reproductive choice by a woman, advised and guided by her healthcare provider.

**2. Practice Guidelines for Contraceptive Choice, Including IUDs**

Initiation of a contraceptive method requires a provider and woman to jointly weigh the risks and benefits of the potential contraceptive choice, including an IUD.[15] Various professional societies and governmental entities have issued clinical practice guidelines regarding reproductive and contraceptive choice, including ACOG, as discussed above. In addition to ACOG, the United

---

[14] These methods include natural family planning, withdrawal, male condom, female condom, and over-the-counter oral contraceptive options, e.g. "Plan B" post-coital contraception.

[15] Wu & Edelman (2015), p 660.

States' Centers for Disease Control ("CDC"), adopting the Medical Eligibility Criteria for Contraceptive Use by the World Health Organization ("WHO"), issued U.S. Medical Eligibility Criteria for Contraceptive Use in 2010 and updated it in 2016.[16] The CDC's recommendations are: "meant to serve as a source of clinical guidance, healthcare providers should ***always*** *consider the individual clinical circumstances of* ***each person*** seeking family planning services."[17] (Emphasis added.) Furthermore, the CDC emphasizes: "Voluntary informed choice of contraceptive methods is an essential guiding principle of contraceptive counseling."[18]

Within this CDC document, the classification of diseases associated with use of either copper-containing or LNG-containing IUDs do not list any purely ophthalmologic disorders (e.g. glaucoma), nor neuro-ophthalmologic disorders (e.g. cortical blindness), but do list neurologic conditions of History of Stroke, Epilepsy, Depressive Disorders, and Migraine.[19] According to the CDC, and the WHO, for either Initiation or Continuation of an IUD, the copper-containing IUD is rated more favorably than the LNG-containing IUD in patients with History of Stroke, and Migraine; these two types of IUDs are rated equally favorable for Epilepsy and Depressive Disorders.[20] Currently, there are no guidelines within this CDC document for women with Pseudotumor Cerebri ("PTC") or Intracranial Hypertension ("ICH"), the neuro-ophthalmologic disorders at issue in this case.

---

[16] CDC, U.S. Medical Eligibility Criteria for Contraceptive Use, 2016, Morbidity and Mortality Weekly Report ("MMWR"), July 29, 2016, Vol. 65, pp 1-88.
[17] Ibid., p 1.
[18] Ibid., p 4.
[19] Ibid., p 54, p 55.
[20] Ibid., p 55. For History of Stroke and Migraine ('Initiation' or 'Continuation'), LNG-IUD is given a "2", indicating "A condition for which the advantages of using the method generally outweigh the theoretical or proven risks", and the copper-containing IUD is given a classification of "1", indicating "A condition for which there is no restriction for the use of the contraceptive method."

**3. Specific Consent Requirements for Hormone-containing IUDs**

The principles discussed above regarding counseling and consent pertain to contraceptive counseling in general, but specifically to both types of IUDs available in the U.S. – the copper-containing Paragard® and the LNG-releasing IUDs including Mirena®. For example, a woman would need to be informed that the anticipated longevity of Mirena® is five years, and Paragard® is ten years, after placement in the uterus. In this context the healthcare provider would also discuss with each woman IUD continuation rates, per year, with each of the IUDs available over this anticipated longevity its contraceptive efficacy. However, potential IUD-using women should be informed that IUD use is often discontinued during the lifespan of an IUD; both types of IUDs are continued for four years in about 63% of women, and five years in about 53% of women choosing either IUD.[21] Whereas some properties between copper-containing IUDs and LNG-containing IUDs are similar, the hormone within LNG-containing IUDs confers some properties that should be included within the informed consent necessary for proper reproductive and counseling choice.

There are multiple aspects of counseling specific to the LNG within the Mirena® that must be part of that counseling and resulting informed consent. The LNG within Mirena® is a potent synthetic progestin, available for decades within Norplant, Jadelle, combined oral contraceptives (mostly in combination with an estrogen component), and emergency contraceptives, derived by removal of the carbon element from position 19 of the testosterone molecule. It is therefore not surprising that LNG, as a "19-nor" steroid, has marked androgenic activity similar to its parent

[21] Diedrich JT, Madden T, Zhao Q, Peipert J: Long-term utilization and continuation of intrauterine devices. Am J Obstet Gynecol 2015 Dec; 213(6):822e1-822e6. P e1. Continuation rates were minimally longer for the 10-year copper-containing IUD, but not to a statistically significant degree, compared to 5-year LNG-containing IUDs.

hormone, testosterone.[22] The androgenic effect of LNG is caused by direct effects on end-organs like the uterine lining and skin, but also by the degree to which LNG binds, and otherwise affects, Sex-Hormone Binding Globulin ("SHBG").[23] Typical androgenic side effects of progestins includes acne, hirsutism, and weight gain, among others.[24] Newer progestins, such as norgestimate, have been designed specifically to decrease the undesirable hyper-androgenic properties of older progestins, especially LNG.[25]

The uterine vasculature is the mechanism by which endometrial LNG is absorbed, because endometrial levels of LNG from an IUD are several hundred times that which can be achieved via oral LNG, whereas LNG levels in the muscle of the uterus (i.e., the myometrium) are about the same between daily oral LNG and intrauterine LNG delivery systems.[26] Despite the generally low average systemic levels of LNG reported in the Mirena® label:

> "in the first few months of use, women may notice side effects related to the androgenic activity of LNG (e.g. acne nausea, headache, breast tenderness, depression) which are usually mild, transient, and decrease over time."[27]

These documented side effects are clear evidence that significant amounts of LNG are systemically available after delivery from LNG-containing IUDs. Furthermore, these significant amounts of systemically absorbed LNG would be expected to cause androgenic side effects.

The systemic side effects described above are well-documented in the medical literature and well-known to clinicians caring for women using LNG-containing IUDs. Thus, it is not

---

[22] Darney PD: The androgenicity of progestins. Amer J Med 1995 (supply 1A); 98:1A-104S-1A-110S, p 104S.
[23] Ibid., p 105S. In general, the greater a progestin increases SHBG, the less androgen effects result from its use. LNG is inherently very similar to testosterone, and increases SHBG modestly versus other progestins. LNG can decrease SHBG levels, so LNG is considered a relatively androgenic progestin.
[24] Linn ES: Clinical significance of the androgenicity of progestins in hormonal therapy in women. Clinical Therapeutics 1990. 12;3, pp 447-455, p 451.
[25] Phillips A: The selectivity of a new progestin. Acta Obstet Gynecol Scand Suppl 1990. 152:21-24, p 21.
[26] Ibid., citing Lahteenmaki P, Rauramo I, Backman T: The LNG IUS in contraception. Steroids 2000. 65(10-11):693-697.
[27] Ibid., p 780, citing multiple prior studies.

surprising that serious androgenic side effects of low prevalence would simply require greater time and numbers to make themselves known within the medical literature pertaining to LNG-containing IUDs.

### 4. Specific Consent Requirements for Hormone-Containing IUDs in Obese Women

Ob/Gyns are taught that obese women may be particularly good candidates for hormone-containing IUDs for a variety of reasons:

- Oral contraceptives are less effective in obese women;[28]
- Oral contraceptives may impart greater risk of some complications, including thrombosis, in obese women at already increased risk for such events.
- Obese women are at greater risk for endometrial hyperplasia, which can be reversed with the progestin within a hormone-containing IUD; and
- Pregnancy is more high-risk in the pregnant woman, so the most effective reversible contraceptive – namely, an IUD – is especially indicated.[29]

However, a 2013 article reporting on a large contraceptive study including over 7400 participants utilizing all hormonal methods including oral, subdermal, vaginal, and intrauterine delivery, failed to demonstrate different three-year failure rates among overweight, obese and morbidly obese women for any of the studied methods.[30] These authors conclude "there is no evidence to support a change in contraceptive counseling for females based on BMI alone".[31] All women,

---

[28] *For explanation as to how obese women may exhibit differences in oral contraceptive pharmacokinetics and thus contraceptive efficacy, see:* Edelman AB, Carlson NE, Cherala G, Munar MY, Stouffer RL, Cameron JL, Stanczyk FZ, Jensen JT: Impact of obesity on oral contraceptive pharmacokinetics and hypothalamic-pituitary-ovarian activity. Contraception 2009 Aug;80(2):119-127, p 119.
[29] McNicholas C, Zhao Q, Secura G, Allsworth JE, Madden T, Peipert JF: Contraceptive failure in overweight and obese combined hormonal contraceptive users. Obstet Gynecol 2013 Mar;121(3):585-592, p 585.
[30] Ibid., p 589.
[31] Ibid.

regardless of weight, must have a balanced discussion of risks versus benefits – including those less common risks that nonetheless confer significant potential danger – when considering a contraceptive choice with their health provider.

**D. Pseudotumor Cerebri ("PTC") and Intracranial Hypertension ("IH") – Biologically Plausible Androgenic Side Effects of Intrauterine LNG**

PTC and IH are related neuro-ophthalmologic conditions, so care must be taken with their definition within any discourse such as this. PTC is defined as a "syndrome encompassing the constellation of symptoms caused by elevated intracranial pressure of unclear cause with normal brain parenchyma and cerebrospinal fluid constituents."[32] Peer-reviewed articles and abstracts have proposed an integrated mechanism involving sex hormones in which changing cerebrospinal fluid ("CSF") dynamics cause pediatric PTC, a mechanism supported by several lines of evidence:[33]

- Earlier age of onset of IH has been noted with elevated androgen in adult females;[34]
- These CSF hormone changes are not found in peripheral plasma, suggesting a hormonal activity within the CSF itself, and these CSF hormonal changes plausibly effect an elevation of CSF pressure – the very definition of IH and a key element of PTC;[35]

---

[32] Sheldon CA, Paley GL, Xiao R, Kesler A, Eyal O, Ko MW, Boisvert CH, Avery RA, Salpietro V, Phillips PH, Heidary G, McCormack SE, Liu GT: Pediatric idiopathic intracranial hypertension. Ophthalmology 2016; 1-8, p 1. Pediatric IH shares some, but not all, features of adult IH; like adults, female gender and obesity seem to be associated with older children developing IH, as well as pubertal hormonal changes. Ibid. at 2-7. The definition of the syndrome is not dependent upon age or gender; however, the required cerebrospinal fluid measurement and first-line treatment options may differ in the pediatric population. Ibid.

[33] Sheldon CA, Kwon YJ, Liu GT, McCormack SE: An integrated mechanism of pediatric PTC syndrome: evidence of bioenergetic and hormonal regulation of cerebrospinal fluid dynamics. Pediatric Research 2015. 77(2):282-289.

[34] Ibid, p 286,citing Klein A, Stern N, Osher E, Kliper E, Kesler A: Hyperandrogenism is associated with earlier age of onset of idiopathic IH in women. Current Eye Research 2013; 38(9):972-976, p 972. These authors raised the possible confounder of tetracycline, used for androgen-associated acne, which is also found to be associated with IH (p 975). Sheldon et al. also discuss tetracycline as a possible confounder between androgens and IH...

[35] Sheldon CA (2015) et al., p 286; see also Toscano V et al. (1991) p 85.

- Increased androgens in women with polycystic ovaries are associated with PTC;[36] and
- Authors have proposed a direct pathogenic role for testosterone in the secretion of CSF.[37]

This string of collaborative evidence, from multiple groups of investigators, strongly supports a neurohormonal mechanism to explain PTC and IH to be deemed biologically plausible. Thus, it is biologically plausible that intrauterine LNG, a sex hormone that is systemically present in Mirena users, causes, or is a substantial factor contributing to causing and/or worsening of PTC/IH. Although not a fundamental criterion, biologic plausibility is an important consideration that strongly supports causation. For this Report evaluating the medical literature suggesting a causal association between intrauterine LNG and PTC/IH, PTC and IH will be grouped together into the term "Intracranial Hypertension", or "IH."

**E. Publications Proposing Intrauterine LNG ("LNG-IUS") Is Causally Linked to IH**

This report is focused upon whether intrauterine LNG delivered via intrauterine device could cause IH. When discussing pharmacologic effects, the proper focus is on the LNG compound rather than the delivery mechanism. Stated simply, whether LNG is delivered via oral, intramuscular, intrauterine or any other mode of delivery, the active ingredient is still LNG. Although delivery mechanism may affect the concentration of LNG in a patient's bloodstream, it is still the effects of LNG which are the subject of this report. Having reviewed the medical

---

[36] Kempegowda P, O'Reilly M, Hornby C, Botfield H, Taylor A, Hughes B, Tomlinson J, Arlt W, Sinclair A: Women with IH have a distinct andro-metabolic signature compared to polycystic ovary syndrome and simple obesity. Poster presentation online. ECE2016, Munich, Germany. This group from the Institute of Metabolism have presented several posters on this topic, including recently: O'Reilly *et al.*, Androgen excess is highly prevalent in women with idiopathic intracranial hypertension and is biochemically distinct from polycystic ovary syndromes. *Endocrine Abstracts* (2017) **50** P320.

[37] Westgate C, Botfield H, O'Reilly M, Hodson D & Sinclair A. Evaluating the role of testosterone n cerebrospinal fluid secretion. *Endocrine Abstracts* (2017) **50** P325.

literature associating LNG in varying delivery mechanisms, my focus is on LNG delivered via an intrauterine device, or system, i.e. "LNG-IUS."

Once the biologic plausibility of LNG-IUD causing IH is rationally raised from review of any and all delivery mechanisms of LNG causing IH, it would be reasonable and prudent to search the medical literature to see if investigators have proposed such a cause-effect relationship, as I have done. Remembering the very low prevalence of IH, one would expect to find case reports from clinicians, some review publications, and some epidemiologic work derived from very large data sets – but not large experiments including randomized clinical trials or prospective cohort studies – simply due to the practical impossibility of recruiting large numbers of patients and ethical considerations of designing a study with IH as the endpoint.

On November 12, 1992, FDA sent a letter to Wyeth containing a request for several labeling revisions. *See* Corresp. to S. Sobel (FDA) from J. Morrison (Wyeth) (Feb. 23, 1993) (discussing the initiation of the labeling changes). On November 16, 1992, Wyeth responded by sending a "proposed 'Dear Doctor' letter and labeling text describing reports of idiopathic intracranial hypertension (pseudotumor cerebri)" to FDA. *Id.* On February 23, 1993, Wyeth requested "an expedited review of this supplemental application providing text concerning idiopathic intracranial hypertension (pseudotumor cerebri) for both physician and patient package inserts." *Id.* The label change was approved on March 26, 1993. *See* Corresp. to J. Morrison (Wyeth) from S. Sobel (FDA) (Mar. 26, 1993). The medical literature relevant to exploring a causal relationship between LNG and IH is just over 20 years old. In a 1995 letter to the Editor of the New England Journal of Medicine, ophthalmologists reported two patients "in

whom (optic) disc edema occurred four to five months after subcutaneous implantation of LNG"[38] in a 16-year-old and a 19-year-old, respectively. Both young women had markedly elevated CSF opening pressures on lumbar puncture, diagnostic of IH. Alder et al. (1995) comment that "LNG may have contributed to the onset of IH, or it may have had nothing to do with it", calling for further research.[39] In response to the Alder et al. letter, Wyeth-Ayerst Laboratories replied, commenting on their database of IH patients using their LNG implant, Norplant®. The Bayer Signal Investigations reviewed as part of this report represent Bayer's interest in investigating the possible association of LNG with IH in their products containing the hormone; regardless of whether Bayer looked at the signal evaluations of Mirena, Norplant or Jadelle, they were looking at the same hormone's effects, namely LNG, delivered via differing mechanisms. Wyeth-Ayerst reported that many Norplant® users with IH were obese, "a known risk factor" for IH. Further, in 24 of 44 reports in which follow-up information was available, removing the Norplant® implant did not resolve the IH, which, Wyeth-Ayerst argues "further confound[s] the issue of a causal relation." Notably, Wyeth-Ayerst did *not* say whether, according to the other 20 reports, removing the Norplant® implant resolved the IH. If removing the Norplant® implant resolved the IH in 20 of the 44 reports, which is implied by Wyeth-Ayerst's letter, those cases would be examples of a positive dechallenge, which is further evidence suggestive of a causal association.

Also in 1995, a poster was presented by R.A. Tang et al. at an ophthalmologists' meeting in which the authors prospectively examined 100 Norplant® users, and "confirmed the presence of IH in patients with Norplant® which resolved in some patients upon removal of the device."[40]

---

[38] Alder JB, Fraunfelder FT, Edwards R: LNG implants and IH. N Engl J Med 1995. 332(25):1720-1721, p 1720. Note this was subcutaneous LNG, not intrauterine LNG.
[39] Ibid., p 1721.
[40] Tang RA, Pardo G, Woon CC, Hamlin N, O'Neal T, Schiffman SJ: PTC associated with the Norplant contraceptive device. Poster Presentation, Neuro-ophthalmology session, Investigative Ophthalmology & Visual

Another paper published in the Ob/Gyn literature in 1995 cited data from the FDA's MedWatch Spontaneous Reporting System including 39 Norplant® patients presenting with IH, concluding more "studies are needed" to evaluate whether LNG can cause IH.[41] A 1998 paper on a lower dose LNG implant system, Jadelle®, reported, "serious adverse events such as …idiopathic IH have been reported during LNG implant therapy…"[42] but concluded "causality is unclear" because the "population incidence is difficult to calculate." In line with these published concerns linking LNG implants to IH, the manufacturers nevertheless added precautions to prescribing clinicians regarding LNG's possible causative link to IH in the Prescribing Information brochures for both Norplant®[43] and Jadelle®, both also manufactured by Bayer or its predecessors.[44]

Ophthalmologists and neurologists are the medical specialists most likely to diagnose IH due to the procedures required for accurate diagnosis, including lumbar puncture. However, for specialists other than neurologists or ophthalmologists that prescribe or encounter medications associated with IH, their specialty's literature may reflect a possible causative link between LNG and IH; one such specialty is Dermatology. In a Dermatologic review article published in 2005, Dr. Deborah Friedman noted "a strong association of IH with tetracycline usage"[45] – which would be a concern to dermatologists, who often prescribe tetracyclines for acne, an androgen-associated skin disease. Dr. Friedman, in her "Table II. Medications associated with IH," includes LNG

Science, Mar 15, 1995, 36(4), S677, poster no. 3100-87. A PubMed search failed to demonstrate a corresponding published paper derived from this abstract.

[41] Wysowski DK, Green L: Serious adverse events in Norplant users reported to the Food and Drug Administration's MedWatch Spontaneous Reporting System. Obstet Gynecol 1995. 85(4):538-542.

[42] Coukell AJ, Balfour JA: LNG subdermal implants. A review of contraceptive efficacy and acceptability. Drugs 1998. Jun;55(60:861-887. Abstract

[43] Norplant® System, LNG implants, Prescribing Information, p 216 and p 220.

[44] Jadelle® LNG implants for subdermal use, p 33.

[45] Freidman, DI: Medication-induced IH in dermatology. Am J Clin Dermatol 2006. 6(1);29-37, p 29.

implants.[46] Dr. Friedman comments that there are a few reports of IH with oral contraceptives, but clinical research failed to demonstrate cause and effect. However, she explained that in contrast, "there is a well-established relationship between IH and LNG-releasing implants," and that a patient with headache or visual disturbance while using a LNG implant "should be evaluated for fundoscopic evidence of IH."[47] In a separate paper, Dr. Freidman comments further, "Among the many exogenous agens associated with ICH, the best evidence exists for tetracycline, vitamin A retinoids, … and levonorgestrel contraceptive systems."[48]

Twenty years after the initial expressed concern of LNG causing IH in the ophthalmology literature, a flurry of publications looked at that possible cause-and-effect relationship. A 2015 abstract reported on a retrospective series of 59 patients with IH, finding "LNG-IUS exposure …is disproportionately more common among IH patients," but "a causative role for LNG-IUS has not yet been established."[49] These authors also presented this data at another meeting earlier in 2015.[50] In a scientific article published in 2017, these authors combined their 59 IH patients with 64 IH patients from Rigshospitalet in Glostrup, Denmark; 8 patients in each group had a LNG-IUS in place. The authors concluded that their research "suggests that women with an LNG-IUS may have an increased risk of development."[51]

---

[46] Ibid., p 30.
[47] Ibid., p 35.
[48] Friedman DI: Idiopathic intracranial hypertension, Current Pain and Headache Reports 2007, 11:62-68, p 67.
[49] Rai R, Kirk B, Sanders J, Valenzuela R, Sundar S, Warner J, Digre KB, Ambati B, Crum AV, Katz BJ: The relationship between the LNG-releasing IUS and idiopathic IH." Association for Research in Vision and Ophthalmology, 2015, Poster No B0081.
[50] Valenzuela RM, Rai R, Kirk BH, Sundar S, Sanders JN, Warner JEA, Digre KB, Crum AV, Katz BJ: Exploratory study of the relationship between the LNG-releasing IUS and idiopathic IH. Poster 102, North American Neuro-Ophthalmology Society, 41st Annual Meeting, Feb 21-26, 2015. This study appears to have occurred first in time.
[51] Valenzuela RM, Rai R, Kirk BH, Sanders JN, Sundar S, Hamann S, Warner JES, Digre KB, Crum AV, Jones KP, Katz BJ: An estimation of the risk of PTC among users of the LNG IUD. Neuro-Ophthalmology 2017, DOI:10.1080/01658107.2017.1304425.

Another group in 2015 used the FDA's Adverse Events Reporting System ("FAERS") to conduct a retrospective cohort study of two OCs and Mirena® on IH diagnosis.[52] As a response to the editor by Dr. Deborah Friedman noted, the authors used imperfect proxy diagnoses for "IH," such as 'cerebral edema,' and controlled only for the potential confounder of obesity, but not age.[53] Author Dr. Etminan replied to criticisms of his 2015 article, by stating "it is biologically plausible for a woman on Mirena™ to experience IH only after a few months of use," and generally attempting to rebut the criticisms stated.[54] Then, in 2017, Dr. Etminan wrote that his prior analyses had not controlled for reproductive age, which has a known strong correlation with IH. Dr. Etminan then performed a revised analysis, purporting to restrict the population by age; he concluded that his restricted analysis failed to suggest an association of IH with Mirena®.[55]

**F. Materials reviewed and relied upon in forming my expert opinions**

When initially contacted to conduct my review, I requested whatever materials were available that could be useful to my review and analysis, including cases within the Defendants' 2015 signal evaluation. On a continuing basis, I have requested all additional materials that I deemed to be relevant to forming my opinions. I reserve the right to review any additional documents that could affect my opinions expressed herein, and if those opinion changes are material, I would reserve the right to amend my opinions with an addendum to this Expert Report.

**1. Medical literature**

Much of the literature I reviewed in this case is cited above. These represent, but do not comprise, the totality of the medical literature I reviewed in coming to my conclusions. I performed

---

[52] Etminan M, Luo H, Gustafson: Risk of IH with intrauterine LNG. Ther Adv Drug Saf 2015. 6(3):110-113, p 110.
[53] Friedman D: Risk of IH with intrauterine LNG. Letter to the Editor. Ther Adv Drug Saf 2016. 7(1):23-24.
[54] Etminan M: Risk of IH with intrauterine LNG: reply. Ther Adv Drug Saf 2016. 7(1):25-26, p 25.
[55] Etminan M: Revised disproportionality analysis of Mirena and benign IH. Ther Adv Drug Saf 2017. 8(9):299-300, p 299.

my own literature search on MEDLINE via the PubMed search engine. I attest that I have made a reasonably thorough review of the published medical literature most relevant to the issue of whether Mirena® has a causative link with IH. I further attest that these are the same methods that I would use in my clinical and research practices.

**2. Communications Among Employees at Mirena's Manufacturer, Bayer Pharmaceuticals.**

I have reviewed thousands of pages of internal company documents and emails among employees at Bayer involving questions as to IH. To a reasonable and prudent healthcare provider, proof of Bayer's knowledge of this potential causal association is clear simply from the Product Information for Norplant® and Jadelle® – two drugs containing the same drug, and manufactured and sold by the same company – the breadth and depth of these corporate emails stand for the fact that Bayer leadership andscientific staff were demonstrably well aware of the possible serious risk of IH with Mirena®. More broadly, I reviewed emails inquiring as to androgenic side effects of Mirena®,[56] and specifically those relating to concern for IH which date back to the first signal evaluation requested by the New Zealand health authority MedSafe on 04/05/2001.[57] Further supporting these emails are presentations, summaries, and other types of communications; yet no specific action was taken by Bayer regarding Mirena®.

**3. Signal evaluation (individual case list): 2001-2015**

I have been provided an Excel spreadsheet produced by the Defendants, and a PDF printout of this spreadsheet, comprising individual case information for patients included in the Defendants'

[56] For example, in an email dated 10/29/2003, a company employee explained that "hair loss is considered as an androgenic side effect of the levonorgestrel released from Mirena." MIR_PIEU_00497630. Likewise, a company employee explained in an email dated 02/10/2004 that "acne is an adverse effect of Mirena classified as common (>1/100, <1/10). The adverse effect is due to the systemic effect of levonorgestrel released from Mirena." MIR_AC_00365998.

[57] MIR_KJEU_00000923.

2015 signal investigation. As detailed below, I have evaluated these cases as a dataset to further investigate the causal association between Mirena® and IH.

**a. Dataset Inclusion Criteria**

Each patient is included in this dataset because they had a Mirena® placed, were diagnosed with IH at a time ranging from a few weeks to eleven years after the first IUD was placed, and someone (clinician, lawyer, nurse, medical student, relative, or consumer themselves) reported this diagnosis and its possible association with Mirena® to the manufacturer or a health authority. By definition, the accrual of this group of patients is by outcome, and thus retrospective. Each reporter had to know to whom to report this case, e.g. the FDA's FAERS or MedWatch systems. However, in addition to recognizing that this data represents an impressively large collection of 115 women with IH through 2015 – much larger than most published papers on the subject - some of the data is worthy of specific comment. One caveat that is always applicable to adverse event reports is the low rate of reporting, meaning that only a fraction of real-world complications that patients experience end up in adverse event databases.[58]

**b. Possible confounders between LNG-IUS and IH**

**i. Age at IUS insertion**

One basic datum recorded for most patients in this dataset is their age at diagnosis of IH. Age is one of the most important potential confounders in the proposed Mirena/IH causative link as exemplified by the series of publications between Dr. Etminan and Dr. Friedman cited above. However, analysis of a group of women's ages can be a challenge to classical epidemiologists as they have to deal with the data as it is available; it is a classic epidemiologic definition that

---

[58] A conservative estimate for the degree of underreporting is 90% (i.e. only 10% of events are reported, ref. e.g. Hazel L et al: Under-Reporting of Adverse Drug Reactions: A Systematic Review, Drug Safety 2006)."

"reproductive-aged women" are between 15 and 44 years of age – and that is how epidemiologists must analyze this dataset, because they do not have the personalized information within a patient's medical chart. But, what if the distribution of patients within a group of "reproductive-aged women" is not evenly spread out over the 15 to 44 year range? A reasonable and prudent clinician would certainly provide different counseling to a teenager contemplating contraceptive options, versus a woman on the verge of menopause – even though they're both defined as "reproductive-aged women."

Among the cases contained within this dataset, only one was documented to be over 50 years old, and only two cases were documented to be under 20 years of age (both 19 years old), comprising just 2% of the sample. Fourteen percent were between 41 and 50 years. The vast majority remaining (83%) were 20 to 40 years old – a much less heterogenous age than some commenters on epidemiologic research would believe. A group of women aged 15-44 years defined as "reproductive-aged" is so variable in actual clinical practice that to analyze it as if the ages are symmetrically distributed, or otherwise homogenous in their goals, aversion to risk, aversion to failure or any other aspect of choosing a contraceptive, is folly to a clinician. Any reasonable practicing Ob/Gyn would likely agree that at least three-fourths of the IUDs he/she places are in women between 20 and 40. This is not to say that age does not matter as a possible confounder to the LNG-IUS and IH causative link, but it is probably much less profound a confounder in clinical practice than supposed by some non-clinical epidemiologic experts – especially within a dataset defined as this one is by outcome of IH, and with a Mirena® in place.

**ii. Obesity**

The two confounding variables discussed most in the medical literature that could obscure the causative link between Mirena® and IH are age, discussed in the preceding section, and

obesity, discussed here. Obesity within clinical research is most often defined by Body Mass Index ("BMI"). BMI of 25 to 30 $kg/m^2$ is called "Overweight," > 30 to 40 is "Obese," and $\geq$ 40 is, to various degrees, "Class 3 obesity" or "Extreme Obesity."[59] A typical Ob/Gyn clinician would explain that many of the patients who receive Mirena® have higher BMIs, for a variety of reasons. In this reviewed dataset, BMI was available for only a fourth of the included patients: 19% were normal weight, 33% were Overweight, 33% were Obese, and 15% were Extremely Obese. This distribution approaches a normal, or Gaussian, distribution with mode and mean at 30 $kg/m^2$.

**iii. Latency to Diagnosis**

Among the body of medical literature reviewed, authors have discussed 'when' IH 'should' present after a Mirena® is placed. As reviewed above, other androgenic symptoms and signs (e.g. acne, nausea, weight gain) can occur within days of IUS placement, or after some months or years; one would certainly expect that same degree of variability with the diagnosis of IH after LNG-IUS placement. In fact, due to IH often having an asymptomatic phase, and a difficult-to-diagnose phase, a reviewer would expect even wider variability of time latency to diagnosis than other symptoms or signs of androgenicity. Of the over 70 cases in which latency time is known between Mirena® insertion and diagnosis of IH, 45% had a time latency to diagnosis of 6 months or less. Eighty percent were diagnosed within two years, and 97% within 4 years. Two likely statistical outliers were diagnosed 10 (Case 200915880GPV) and 11 years (Case 2011-110099) post (initial)-IUS placement;[60] one patient had had a prior Mirena® and two had had two prior Mirena® systems[61] – and none of the earlier systems were associated with IH. It is worthwhile to note that

[59] Center for Disease Control and Prevention ("CDC"), Defining adult overweight and obesity, content source Division of Nutrition, Physical Activity, and Obesity; website last updated 6/16/16, p 1.

[60] See MIR_KCOPLEY_JSEU_00000022.

[61] Ibid.

each newly implanted device will begin with a higher release rate and resultant higher average blood levels of LNG.[62] While it is unclear why the first exposure did not result in IH, it is important to consider that the diagnosis is at a time of increased exposure. With the understanding of intrauterine-to-systemic absorption of LNG, as discussed above, this distribution of time latency to diagnosis is not contrary to a causative link between LNG-IUS and IH.

### c. Special Patient Groups' Impact on Proposed LNG-IUS' Causation of IH

Sometimes a single case report can lend insight into a cause-effect relationship in clinical medicine. This dataset offers several such interesting, but very small, patient subsets that nonetheless may contribute to understanding the proposed causation of Mirena® to IH.

#### i. LNG-IUS Embedded in Uterine Wall

A couple of the identified women diagnosed with IH after their Mirena® placement were found to have suffered an IUD perforation in which the system was within the wall of the uterus instead of the cavity.[63] It is reported that an LNG-IUS perforating the uterine wall, or likely if embedded in the uterine myometrial wall, can infuse an inordinate amount of LNG into the general vascular system,[64] and cause an inordinate degree of systemic hormonal side effects. Within this data set, these two women's experiences would contribute to the proposed causative link of LNG-IUS and IH; conversely, but as expected, this dataset lacks any case with an imbedded IUD but without IH, since those diagnoses were required for inclusion.

---

[62] Mirena Prescribing Information. Whippany, NJ: Bayer HealthCare Pharmaceuticals Inc.; September 2015, at pg. 18.

[63] Case numbers 2014-170342, 2013-139813.

[64] Haimov-Kochman R, Amsalem H, Adoni A, Lavy Y, Spitz IM: Management of a perforated LNG-medicated IUD – a pharmacokinetic study: case report. Hum Reprod 2003. Jun;18(6):1231-1233. Abstract.

### ii. Patients "Dechallenged" of Their LNG-IUS

One might expect that if LNG-IUS caused IH, then withdrawal of the IUD would cause these symptoms to cease at some variable length of time in many individuals. I found 11 such patients' reports with documented removal of the device,[65] with 9 cases described as "recovered" from their symptoms and signs of IH, and 2 of "unknown" outcome; none were "not recovering" or "worse" – although a rare case manifesting such a result would not damn the proposed causative link between LNG-IUS and IH. The "Dechallenged" group's findings certainly support the proposed causative link, particularly for any of those individual cases.

### iii. Symptomatic Patients "Dechallenged", Then "Rechallenged"

In epidemiologic tribute to Koch's classic postulates of causation (described in detail later herein), if an IH-causing LNG-IUS was removed, and symptoms resolved, then reinserting a new new Mirena® would be expected to cause the symptoms/signs of IH to recur. Although this postulate could be discounted in many ways (what if the first IUS had been embedded, and the second, well-placed in the cavity??), it is a moot suggestion as I was unable to discover any dechallenged, then rechallenged, patients within this dataset. In clinical medicine, if an LNG-IUS was removed because it was thought to be causing IH, no reasonable clinician would reinsert another LNG-IUS especially following successful dechallenge.

### iv. Prior Personal History of IH

All clinicians who had even a wisp of suspicion Mirena® could cause, exacerbate, or in any way be associated with IH would spend ample informed counseling discussing alternatives with a woman with a prior history of IH. In the dataset, one such woman was given a Mirena®,

---

[65] See MIR_KCOPLEY_JSEU_00000022

and her IH recurred.[66] Only one interesting patient, possibly representing causation, possibly mere coincidence – but certainly any clinician would want to be very careful placing a Mirena® in a woman with prior history of IH, or for that matter, other neurologic conditions including migraine.[67]

#### v. Prior Use of non-LNG Progestin without IH

The body of literature investigating the causal mechanism of IH has increasingly focused on the androgen profile of those afflicted. As described above, LNG is a highly androgenic progestin, and its association with IH is in line with this plausible mechanism. Other progestins are closer in their selectivity profile to natural progesterone than testosterone, such as medroxyprogesterone acetate ("MPA").

### G. Methodology Used within this Report

My expert opinions are given from three perspectives: first, as a clinician who has counseled patients and placed IUDs for three decades; second, as a clinical epidemiologist and biostatistician objectively interested in the developing science associating LNG-IUS with IH which has potentially serious consequences, including potential blindness, to the woman who actually experiences it; and third, from the social policy point of view as a care provider to women and intermittent thought leader in guiding women's healthcare across various sized populations, ranging from the nation's women to my own private practice. Not unexpectedly, each of my three perspectives has its own methodologies associated with it. These methodologies are the tools by which I reviewed the materials outlined above, and derived the conclusions and opinions with which I later conclude this Expert Report.

---

[66] Case no. 200942600GPV. *See also* 2013-065190.
[67] As per CDC guidelines for the U.S., and WHO worldwide guidelines; see FN 17 above.

### 1. Methodologies Used as a Clinician and Ob/Gyn

Clinicians use a variety of methodologies that are assimilated, applied, shuffled, and then expressed as "clinical opinions". These methodologies are sufficiently subjective that no computer has been able to be programmed to practice medicine, *per se.* A computer can store vast amounts of data, but lacks the subjective balancing and judgment inherent within a doctor's mind – especially tuned in a physician someone might term "standard" or "reasonable" - or even a "good" – physician caring for his/her patients.

One methodologic tool used by clinicians is that of "differential diagnosis." Differential diagnosis begins with the listing of all possible causes for a symptom or sign, and as evidence accrues, one or more of those possibilities is placed probabilistically lower on the list. Ultimately, the single best possibility of diagnosis, or at least the best of a shorter list, is derived at the top of the list of possible causes. My differential diagnosis in this Expert Report will be of appropriate breadth and depth to incorporate any and all reasonably likely causes of a particular symptom or sign. This Report centers upon causes of IH; the word "idiopathic" has been applied to both of these clinical entities. However, "idiopathic" does not mean "unknown," and certainly does not mean "unknown forever despite advances of medical understanding." "Idiopathic" should be reserved for entities that have truly *no* reasonable explanation at all with the facts presenting. It should be used flexibly, and the clinical understanding of causation in a patient should evolve during evaluation. If a cause is found, then "idiopathic" should not be used.

Another clinical methodology is that of "risk:benefit analysis," suggesting that a ratio can be constructed between "risks" and "benefits" of a particular medical maneuver or drug exposure. *All* medical maneuvers have *some* risks associated with them, and these risks must be balanced with its benefits *for any given individual patient*. At the center of this litigation is the placement of the drug-eluting device Mirena®. There are well-documented risks of uterine perforation and

expulsion associated with insertion of the Mirena® device. There are also well-documented risks associated with the exposure to the levonorgestrel released from the device, including androgenic side effects such as acne and ovarian cysts. A clinically important risk, even one of low prevalence, is one that could seriously and deleteriously affect a patient's life; IH is certainly one such entity, resulting in an estimated 10-20% risk of blindness or other permanent visual disturbance. To properly counsel patients as to the risks versus benefits of any medical maneuver or drug exposure, truly informed consent between patient and healthcare provider must consist of a weighing of 1) the estimated overall incidence of the risk, and 2) the severity of the risk, against the benefits of the maneuver or drug exposure. Ultimately, after all risks and benefits have been conveyed, the final decision regarding which contraceptive is used lies exclusively with the patient.

**2. Methodologies Used as a Clinical Epidemiologist and Biostatistician**

I have reviewed the materials provided to me not only as a practicing physician but also as a clinical epidemiologist and biostatistician. I have reviewed the medical literature relevant to this case for its methodologic rigor and its clinical impact. This case is focused on exposure to Mirena® and the outcome claimed to result from that exposure, namely IH. Although this outcome is relatively uncommon epidemiologically, it can have very serious consequences including blindness, for the individuals who suffer from it. Although there is some application of statistics necessary to understanding some of the medical literature pertaining to this litigation, the real question is the integration of the impact of the 115 cases collected of IH with Mirena® *in situ* to a proposed cause and effect relationship between LNG-IUS and IH. The central core of inquiry in this Report is evaluating the existence of a causal relationship between Mirena® and IH. Fortunately, within the realm of epidemiology, there is guidance as to how to evaluate proposed causal relationships – namely, concepts of causality.

**a. Concepts of Causality Are Rooted in Philosophy, Not the Natural Sciences**

Does "A" cause "B" – a simple but fundamental question of causality – is a question first broached by philosophers, not natural scientists, in the 1700's. "The concept of causality is that of a necessary connection between events," in contrast to "free will" whereby events are deliberately made to happen. Science insists that "one event must always follow another in accordance with a universal rule."[68] Philosophical giants debated the role of free will versus that of a universal rule; David Hume felt "causal necessity is an illusion," that one event always follows another is something we believe because we simply witnessed it, but an actual causal relationship is "impossible to prove, empirically or logically."[69] Immanuel Kant countered Hume with "causality of reason" derived from our senses and our mind – a theory dismissed by natural scientists as "not just unscientific but embarrassingly mysterious."[70] Hume and Kant did agree, however, that causality could not be truly proven, stymying a purely philosophical answer to the questions, "what do we mean by causation?"[71]

**b. Natural Scientists "Enunciate the Concepts of Causation"**[72]

In the 1800's, improved understanding of infectious diseases inspired Jakob Henle to publish his concepts of causation, which were further developed and popularized by Henle's pupil, Robert Koch.[73] Naturally enough for the time, with intensive study of infectious diseases, the simple Henle-Koch postulates of causation were most applicable to infectious diseases:

---

[68] Greenstreet S: Kant vs. Hume on the necessary connection, Philosophy Now, 2005, pp 1-5, p 1.
[69] Ibid., p 5, citing, David Hume, *Treatise of Human Nature*, 1739.
[70] Ibid., p 1, citing Immanuel Kant, *Critique of Pure Reason*, 1781.
[71] Rothman KJ, Greenland S: Causation and causal inference in epidemiology. Am J Public Health 2005. 95:s144-s150, p 144.
[72] Evans AS: Causation and disease: The Henle-Koch Postulates Revisited. Yale J Biol & Med 1976. 49:175-195, p 175.
[73] Ibid. Henle published in 1840, Koch in 1884 and 1890

1. The causative agent occurs in every case of the disease in question.
2. The agent occurs in no other disease as a nonpathogenic organism.
3. After the agent is isolated and grown in culture, it can induce the disease anew if administered to an unaffected host.[74]

The Henle-Koch postulates kicked off the field of infectious disease epidemiology. Later, its concepts were then applied to chronic disease epidemiology – specifically, in the study of cigarette smoking purportedly causing lung cancer. The 1964 Surgeon General's Advisory Group on Smoking and Health "set up a series of attributes that related evidence of association between a suspected cause (smoking) and a disease (lung cancer) as summarized (in Table form entitled 'Elements of Causation in Chronic Disease'):

1. The consistency of the association.
2. The strength of the association.
3. The specificity of the association.
4. The temporal relationship of the association.
5. The coherence of the association."[75]

A year after the "Elements of Causation in Chronic Disease" were published, arose perhaps "one of the most cited papers in health research"[76] – the proceedings from Sir Austin Bradford Hill's Presidential Address to the Section of Occupational Medicine of the Royal Society of

---

[74] Ibid., modified from Table 1, Henle-Koch Postulates, p 177.
[75] Ibid., p 191, citing Table 12 from Surgeon General, Advisory Committee of the USPHS, "Smoking and Health," PHS Pub. No. 1103, Supt. Of Doc., Washington, C.C., 1964.
[76] Phillips CV, Goodman KJ: The missed lessons of Sir Austin Bradford Hill. Epidemiologic Perspectives & Innovations 2004, 1:3, pp 1-5, p 1.

Medicine.[77] Hill proposed "nine considerations" as to "how to intuitively assess causation"[78] which are often reduced to a checklist called "Bradford-Hill's criteria of causation" to be "considered in attempting to distinguish causal from non-causal associations":[79]

1. Strength: The stronger the association, the more likely the relationship is causal.
2. Consistency: Replicated results in different settings demonstrates the same association.
3. Specificity: A proposed cause produces a specific effect.
4. Temporality: The proposed cause always precedes the outcome event.
5. Biologic gradient: There is a dose-response between cause and subsequent effect.
6. Biologic plausibility: A theoretical basis between cause and effect must be posited
7. Coherence: The proposed cause-effect relationship is compatible with existing knowledge and theory.
8. Experimental evidence: The effect from the cause can be altered within an experiment.
9. Analogy: A similar cause exerts similar effect.

Authors warn that Hill's eloquence of exposition of association vs. causation is partially lost when reduced to a checklist format.[80] Hill himself "explicitly stated cause-effect decisions cannot be based on a set of rules."[81] Hill also warned of "overemphasis on statistical significance testing" and "the mistake of drawing conclusions from inadequate samples."[82] Hill understood that since "our object is to take action,"[83] "a best decision can be based on whatever information

---

[77] Ibid., citing, Hill AB: The environment and disease: association or causation? Proc R Soc Med 1965. 58:295-300.
[78] Ibid, p 2.
[79] Rothman & Greenland (2005), p s148-s149.
[80] Phillips and Goodman (2004), pp 1-2.
[81] Ibid., Abstract.
[82] Ibid., p 2. Quoting from Hill's speech, "the glitter of the *t* table diverts attention from the inadequacies of the fare", p 299.
[83] Ibid., citing Hill p 300.

we have now."[84] Whereas belief that a causal relationship alone is not sufficient to warrant action, "uncertainty about whether there is a causal relationship (or even an association) is not sufficient to suggest action should *not* be taken."[85] These authors, Phillips and Goodman, who explain Hill's speech and paper so comprehensibly, conclude that this statement - 'Uncertainty of a causal relationship is *not sufficient to suggest action should* ***not*** *be taken'* - "may be the most important unlearned lesson (from Hill) in health decision making."[86] (Emphasis added).

## H. Opinions Resulting from Applying Methodologies to Materials Reviewed

Methodologies used as a clinician, and as a clinical epidemiologist and biostatistician, were reviewed in the preceding section, "Section G". Materials reviewed in deriving my opinions were outlined in the section preceding Section G, "Section F". Here, in Section H, I will apply the methodologies described to the materials reviewed to present my opinions as an expert reviewer, citing back to the sections in which the foundation of my opinions lies. Each opinion is stated to a reasonable degree of scientific and medical probability based on my experience, education, training, and the totality of the information reviewed.

### 1. Intrauterine Levonorgestrel ("LNG") Enters the Systemic Circulation in Mirena® Users.

Likely similar to most Ob/Gyn practitioners in the U.S., I was trained that IUDs exert their function locally, within the uterine cavity, with little-to-no systemic effects. However, LNG-

---

[84] Ibid., p 3.
[85] Ibid., p 4.
[86] Ibid. Interestingly, Phillips and Goodman (p 2) query "why Hill's list seems more popular than others"; citing, and recognizing, as does this reviewer, that there are other 'causal criteria' published in clinical medicine and epidemiology. For a particularly erudite and modern resolution of the problem of "no single, clearly articulated definition for the discipline (of causation, an essential concept in epidemiology)", see Parascandola M, Weed DL: Causation in epidemiology. J Epidemiol Community Health 2001. 55:905-912. These authors "searched the MEDLINE database for definitions of causation in the epidemiological literature" and retrieved 148 records, classifying causation definitions as "Production," "Necessary causes," "Sufficient-component causes," "Probabilistic cause," and "Counterfactual causes.".

containing IUDs have been definitively shown to produce measurable LNG levels systemically, and to produce androgenic and other systemic hormonal side effects. The specific evidence for this includes:

- Clear documentation of side effects occurs upon insertion of Mirena®.[87]
- LNG has been actually measured systemically after intrauterine placement of Mirena®.[88]

I conclude, to a reasonable degree of medical and scientific probability, that LNG indeed enters the systemic circulation of women using Mirena®.

**2. LNG is a 19-nor-Testosterone-derived Progestin, with Androgenic Side Effects.**

LNG is indisputably a more androgenic progestin than most others available. Thus, more androgenic side effects are observed with its use than with other, less androgenic, progestins. The specific evidence for this includes:

- Clear documentation of androgenic side effects upon insertion of Mirena®.[89]
- Clinical experience demonstrates these androgenic side effects resolve within a few weeks after removing Mirena®.

I conclude, based on applying reasonable medical probability to the information reviewed, that LNG is a 19-nor-testosterone derived progestin with known androgenic side effects.

---

[87] See Introduction, Section C.3.
[88] See Section C.3.
[89] See Section C.3. re: acne, nausea, breast tenderness, headache as androgenic side effects.

### 3. There is Substantial Scientific Evidence of an Underlying Hormonal Mechanism of IH.

The specific evidence that IH have an underlying hormonal mechanism of causation, especially mediated by androgens includes:

- Pubertal hormone changes are associated with IH in children.[90]
- These changes in hormone levels are not seen peripherally, suggesting a central neuroendocrine site of androgens causing IH.[91]
- Polycystic ovary syndrome is associated with elevated androgens, and IH.[92]
- Elevated androgens in adults are associated with earlier age of onset of IH.[93]
- Authors have proposed a direct pathogenic role for testosterone in the secretion of CSF.[94]

I conclude, to a reasonable degree of medical and scientific probability, that there is an underlying hormonal mechanism of some cases of IH.

### 4. Application of the Bradford-Hill Criteria Establishes a Causal Relationship between Mirena® and Intracranial Hypertension

As a clinical epidemiologist and biostatistician, there is sufficient evidence within the clinical experience and medical literature pertaining to Mirena® to conclude with reasonably high medical probability that this LNG-IUS is indeed causally related to IH. As reviewed above, there is no one universally-accepted "causation checklist."[95] However, the most widely accepted, and understandable, criteria set for causation may be that of Bradford-Hill.[96] Applying the totality of

---

[90] See Section D.
[91] See Section D.
[92] See Section D.
[93] See Section D.
[94] See Section D.
[95] See Section H.2.a, H.2.b.
[96] See FNs 75 and 78 above.

information discerned and presented within this report to the causation criteria of Bradford-Hill, I find the following:

1. Strength of Association.

Within the dataset collected by Bayer in 2015, there are 115 cases of IH in women with a Mirena® in situ.[97] This is a sizable series of IH patients, especially with any knowledge as to their contraceptive practices. Despite the potential for selection bias and accrual bias operating due to the manner in which these cases were collected, this is nonetheless a significant number of cases collected. And there is medical literature[98] reporting on possible association of IH with intrauterine use of LNG, showing a significantly elevated odds ratio for Mirena users. I conclude that Strength of Association is sufficiently demonstrated to satisfy this element of a causal relationship between LNG-IUS and IH.

2. Consistency of association.

Within the dataset, there are consistent associations of IH with Mirena® across a fairly wide range of variables, including country of origin, reporting person, BMI of patients, age of patients, and latency time until diagnosis. There is a sufficient degree of heterogeneity within the dataset to demonstrate the Consistency of Association. Further the association of IH and LNG was sufficiently consistent with other LNG-containing devices to be included in the Product Information brochure of LNG implants Norplant® and Jadelle®. Additionally, the Rai/Valenzuela group found a statistically significant increased risk of IH in a large case-control observational study of two different groups (i.e. the Utah cohort, and the Rigohospitalet cohort). I conclude that

[97] If additional data from Bayer becomes available, I reserve the right to review the data and supplement my opinions.

[98] See Rai R et al. (2015) cited in FN 51; see also, Valenzuela RM et al. (2015), (2017) cited in FNs 52 and 53, above.

this criterion is particularly well-established. I conclude that the Consistency of Association is sufficiently demonstrated to satisfy this element of a proposed causal relationship between LNG-IUS and IH.

3. Specificity of proposed cause and effect relationship.

Cases were collected from Bayer Signal Evaluations of IH and Mirena® use. Medical literature was reviewed suggesting association of IUS-LNG and IH.[99] Other delivery mechanisms of the same hormone, LNG, include the risk of IH in their Product information.[100] Again, the Product Information regarding IH risk with Norplant® and Jadelle® adds to the finding of sufficient specificity to strengthen a causal relation between LNG-IUS and IH. I conclude that the Specificity of Proposed Cause-and-Effect Relationship is sufficiently demonstrated to satisfy this element of a causal relationship between LNG-IUS and IH.

4. Temporality.

The diagnosis of IH in the vast majority of these cases followed Mirena® placement. One patient was found to have a prior diagnosis of IH, and then had IH diagnosed again after Mirena® placement. As previously mentioned, 80 percent of cases collected by the Defendants in 2015 occurred within 2 years of Mirena® placement, and 97% within 4 years. Analysis of Temporality favors a causal relationship. I conclude the Temporality element is satisfied to acknowledge a causal relationship between LNG-IUS and IH.

5. Biologic gradient.

Within the database of cases produced in the Bayer Signal Evaluations, one case is included from a clinical trial involving the lower dose LNG-IUS, Skyla®. It is unclear if Bayer included all

---

[99] See FNs 51-53 above, citing Rai, Valenzuela, et al.
[100] For example, Norplant and Jadelle.

reported cases involving Skyla® and this was the only one, though it is equally unclear why only this one case would be included otherwise. However, if it is the only known case, or one of only a few cases, of IH associated with the lower-LNG-dose Skyla® IUS, compared to this review of the collected 110+ cases of higher-LNG-dose Mirena®, a dose-response between LNG and IH may be proposed, satisfying the criterion of biologic gradient.

Additionally, it is known that women with an imbedded Mirena® have higher systemic levels of LNG, and at least two patients that are included in this dataset had documented embedded Mirena® IUS and were diagnosed with IH. This also lends support to a biologic gradient. This is also in line with documented evidence of rates of other known androgenic side effects reported with the different dose LNG-IUS products, namely ovarian cysts and acne. For example, in a head-to-head comparative pharmacokinetic study of the three Bayer manufactured products (Mirena®; Kyleena® aka LCS16; and Skyla® aka LCS12), the reporting rate of ovarian cysts decreased expectedly with each decreasing dose.[101] Because IH is a relatively uncommon disease, the apparent lack of cases with Skyla® is likely an effect of biologic gradient. I conclude there is sufficient information that Biologic Gradient is demonstrated in the proposed causal relationship between LNG-IUS and IH.

6. Biologic plausibility.

Sufficient LNG from LNG-IUS enters the systemic circulation to cause a multitude of hormonal side effects, many of which are androgenic since LNG is an androgenic progestin. The medical literature described above contains sufficient evidence that IH is more likely than not caused by sex hormones including androgens. These factual bases offer strong Biologic

---

[101] MIR_IIH_EU00369901, at p. 17. Ovarian cysts were reported by 25.2% of Mirena® subjects, 9.8% of Kyleena® subjects, and 8.8% of Skyla® subjects.

Plausibility that LNG from Mirena® could cause IH as an androgenic side effect. Analysis of Biologic Plausibility definitely favors a causal relationship. I conclude that Biologic Plausibility is established in demonstrating a causal relationship between LNG-IUS and IH.

7. Coherence.

Based on the medical literature analysis, and the known IH warning with other LNG-containing devices, the proposed causal relationship is compatible with existing knowledge and theories. Mirena® as a cause, or substantial causative factor for IH is sufficiently Coherent. I conclude Coherence is satisfied in proposing a causal relationship between LNG-IUS and IH.

8. Experimental evidence.

In epidemiology, "experiment" usually means a randomized clinical trial. Many researchers would consider a randomized placebo-controlled trial involving contraceptive choices not practical, and potentially not ethical due to the differential likely effects on pregnancy rates and complications within a placebo-controlled group, of a comparison otherwise-treated group. Thus, experimental evidence often refers to "challenge-dechallenge-rechallenge" evidence, as explained earlier in this report. The "dechallenge" data noted above may also inform this criterion, although, as previously mentioned, the sample to which this applies is relatively small. I conclude there is sufficient evidence of an Experimental type, within clinical experience, to support the proposed causal relationship between LNG-IUS and IH.

9. Analogy.

IH is associated with other hyperandrogenic syndromes including Polycystic Ovary Syndrome. This clinical observation satisfies Analogy to a reasonable degree. I conclude Analogy is sufficient to support a causal relationship between LNG-IUS and IH.

Analogy can be evaluated by seeing if other aspects of a device, e.g. other IUDs, have the degree of reported IH as the LNG-IUS does. This look at the converse of the LNG-IUD and IH association would including studying reports of IH with the copper-containing IUD, Paragard®. It is noteworthy that the U.S. FDA' Adverse Event Reporting System ("FAERS") contains ***no*** associated cases of IH.

Overall, application of the Bradford-Hill causality criteria to the knowledge and theory of the association of Mirena® and IH supports a causal relationship to a reasonable degree of medical certainty, based on applying reasonable medical probability to the totality of information reviewed.

### 5. Systemic LNG from Mirena® Causes or Substantially Contributes to Causing IH.

The causal relationship between LNG-IUS and IH derives from the medical literature reviewed.[102] Additional evidence that Mirena® causes or substantially contributes to IH is derived from the collection of 115 cases of women with IH who have a Mirena® in place,[103] including:

- The onset of symptoms of IH in most patients is within two years after Mirena® placement.[104]
- The majority of women with IH and a Mirena® in place, when "dechallenged" with its removal, the IH will resolve.[105]

I conclude, to a reasonable degree of scientific and medical probability, that systemic LNG from Mirena® more likely than not causes, or substantially contributes to causing or worsening, IH.

---

[102] See Rai et al, and Valenzuela et al., cited in FNs 51-53 above.
[103] See, Section F.3.a. – Dataset Inclusion Criteria of PTC/ICH and Mirena® in place.
[104] See, Section F.3.b.3 – Latency of Mirena insertion to IH diagnosis.
[105] See, Section F.3.c.2.

**6. Mirena® is a contraceptive choice, within the context of a woman's reproductive choice and its placement requires informed consent.**

IUDs are being promoted to consumers, and their healthcare providers, from multiple sources including professional societies, government agencies, and IUD manufacturers.[106] A reasonable and prudent Ob/Gyn should be aware that LNG is a synthetic hormone capable of causing many diverse hormone-related side effects. A reasonable woman choosing a hormone-containing IUD would want to know of their prospective IUD's specific, hormone-related side effects. These hormonal aspects of LNG-IUS must be part of the informed consent for Mirena® which includes presentation of potential benefits, alongside potential side effects.[107] A reasonable woman would expect to be informed of potential neuro-ophthalmologic syndromes, especially those with a significant risk of blindness or permanent vision disturbance. Because IH is a biologically plausible hormonal side effect of Mirena®, a reasonable woman and their prescribing physicians would want to be informed of this serious risk in the context of its frequency in the general population, in obese women of childbearing age, and specifically in Mirena® users.[108] Any reasonable woman, and particularly a reasonable woman at an enhanced risk of a serious side effect such as IH, would want to know if IH was a risk of consenting to Mirena®, and would factor this risk into their informed consent decision. A reasonable and prudent healthcare provider would inform patients choosing Mirena® what symptoms to watch for, and to adjust accordingly their follow-up with their healthcare provider.

I conclude, based on reasonable medical probability applied to the information reviewed, that Mirena® is a contraceptive choice made between a woman and her healthcare provider, lies within the context of women's reproductive choice, and its placement requires adequate informed

---

[106] See, Sections Introduction, C.1., C.2.
[107] See, Section C.3.
[108] See, Section D.

consent including balanced discussion of risks versus benefits of LNG-IUS for the individual woman.

**7. A reasonable and prudent healthcare provider counseling women contemplating a LNG-IUS needs to be informed about Mirena®'s side effect risks in order to communicate those risks to their patients.**

This opinion is inherent to the standard of care provided to any patient by a reasonable and prudent healthcare provider. A reasonable woman would want to be informed as to what serious risks could occur from her chosen contraceptive method. And, in order to communicate these serious potential risks to their patients, a reasonable and prudent healthcare provider *must* be informed as to the nature and frequency of serious risks that could occur from their recommended treatments. The reasonable and prudent women's health provider would be expected to rely significantly, if not completely, on the manufacturer's product information, including its Product Information brochure.

I conclude, to a reasonable degree of scientific and medical probability, that reasonable and prudent women's health providers need to be properly informed in order to properly counsel their patient regarding a LNG-IUS, and that provider would rely upon the LNG-IUS' manufacturer heavily, if not completely, to provide accurate product information for that purpose.

**8. A reasonable and prudent healthcare provider would expect a manufacturer of a LNG-IUS to educate them about all of the known risks of their product, and the suspected serious risks about which the manufacturer is aware.**

The Product Information brochure of the LNG-containing implant devices Norplant® and Jadelle®[109] both contain printed warnings of these devices' being associated with reports of IH.

[109] Again, these devices are manufactured and distributed by the same companies, and all release the same single active ingredient.

A reasonable and prudent healthcare provider would expect a similar warning in any LNG-containing implantable device.

I conclude, to a reasonable degree of scientific and medical probability, that a reasonable and prudent women's health provider would not only rely on manufacturer's product information, but would *expect and foresee* such information from the manufacturer.

**9. No reasonable healthcare provider would choose *not* to be informed of a potentially serious neuro-ophthalmologic disease that may result from their treatment of their patients, even at a low prevalence rate.**

Patients treated with IUDs are often not seen by their healthcare provider in clinical follow-up as often as other patients, e.g. oral contraceptive patients, the latter needing more frequent refills of their prescription than IUD-users. A reasonable and prudent healthcare provider would want to be educated as to what early symptoms and signs for which to observe their patients with the IUS device, in some cases even arranging more frequent follow-up than they might recommend. A reasonable and prudent healthcare provider would expect to be informed and educated about a known serious risk of an IUD, if its active ingredient contained within another related contraceptive device had a printed warning.

The Product Information brochure of the LNG-containing implant devices Norplant® and Jadelle®[110] both contained printed warnings of these devices' being associated with reports of IH. A reasonable and prudent healthcare provider would expect a similar warning in any LNG-containing implantable device.

[110] Again, these devices are manufactured and distributed by the same companies, and all release the same single active ingredient.

I conclude, to a reasonable degree of scientific and medical probability, that no reasonable and prudent healthcare providers would choose to not be informed about a serious neuro-ophthalmic disease from a contemplated contraceptive choice, even at a low prevalence.

**10. A reasonable and prudent healthcare provider would expect any manufacturer of a device who receives dozens to hundreds of reports of a serious health risk to alert providers of this risk.**

Starting in 2001, Bayer received dozens of reports about their LNG-IUS being associated with IH.[111] Internal memos, emails, and presentations by Bayer executives and scientific personnel demonstrate clear corporate knowledge of these cases of IH associated with Mirena®.[112] Amazingly, no change in the published Printed Information followed. No "Dear Doctor" letters resulted. No actions resulted despite dozens of women suffering with IH potentially related to Mirena®. All this is made even more astounding by the fact that Mirena® was manufactured and sold by the same companies that produced and sold the Norplant® and Jadelle® devices, which both contained this warning in their Product Information brochures.

I conclude, to a reasonable degree of scientific and medical probability, that a reasonable and prudent healthcare provider would expect any manufacturer of a medical device who receives dozens to hundreds of reports of a serious health risk to alert providers of this risk.

## SUMMARY OF EXPERT OPINIONS

Intrauterine devices ("IUDs") are among the most common reversible method of contraception worldwide, and specifically in the U.S. Influential agencies worldwide, like the World Health Organization, and in the U.S., including the Centers for Disease Control, Planned Parenthood, and the American College of Obstetricians and Gynecologists, actively promote IUDs

---

[111] See, Sections F.2, F.3.a.

[112] See, Section F.2. There are dozens and dozens of communications reflecting corporate knowledge of this serious health risk potentially associated with their LNG-IUS device.

as first-line contraceptives for virtually all women. In the U.S., two IUD categories are available: the copper-containing Paragard®, and the levonorgestrel ("LNG")-containing IUDs Mirena®, Skyla®, Kyleena®, and Liletta®. LNG is a potent synthetic progestin derived from testosterone; it has much more testosterone-like, or so-called 'androgenic'side effects than other progestins. Contraceptives that contain LNG are well-established to impart androgenic side effects including acne, nausea, breast tenderness, and weight gain; this includes LNG delivered via combined oral contraceptive pills, LNG-only contraceptive pills, Norplant® and Jadelle® subcutaneous implants – and the LNG-containing Mirena® intrauterine system ("IUS") manufactured by Bayer Pharmaceuticals.

Pseudotumor cerebri ("PTC") and Intracranial Hypertension ("IH") are uncommon related neuro-ophthalmologic conditions associated with increased brain pressure, and a variety of symptoms and signs including headache, vision changes, weight gain – and most unfortunately – permanent blindness and other vision compromise in a significant minority of PTC/IH patients. In this report, I address these two entities as "Intracranial Hypertension", or "IH". Significant medical literature exists demonstrating IH to have a hormonal basis in both teenagers and adults; risk factors for IH in women includes clinical syndromes associated with elevated androgens, including polycystic ovary syndrome, and obesity. The association between the androgenic progestin LNG and IH is sufficiently established that the manufacturer of LNG-containing subcutaneous implants (Norplant® and Jadelle®) has inserted a warning to healthcare providers and consumers in their Product Information brochures that these devices may be associated with IH. This very same manufacturer produces the Mirena® LNG-IUS. Paradoxically, there is no such warning about IH in the Mirena® Product Information, despite it, too, containing only LNG, and despite the ever-rising number of reports of IH with Mirena® specifically. A reasonable and

prudent healthcare provider, and reasonable consumers, would want to be aware of a highly plausible potential risk of a serious neuro-ophthalmological disorder that could cause permanent blindness.

There is substantial medical literature reporting on the causal relationship of Mirena® LNG-IUS with IH. Furthermore, through company Signal Evaluations of individual case reports, the class of patients within the dataset described throughout this Report is comprised of 115 women with IH while using a Mirena® from 2001 to 2015. The majority of the patients are 20-40 years of age, overweight, and had their IH diagnosed within two years of insertion of their Mirena®. Further, in the 10% of patients with IH who then had their Mirena® removed as documented, 90% recovered from their IH within days or weeks. There is sufficient clinical data to conclude that, to a reasonable medical probability, the LNG-IUS Mirena® directly causes, or is a substantial factor in, causing IH in women.

Clinical epidemiologic analysis of the proposed causal association between Mirena® and IH, demonstrates these factors suggesting a truly causal relationship:

- Strength of Association between Mirena® and IH demonstrated by the 115 collected cases and the cited medical literature.
- Consistency of Association between Mirena® and IH demonstrated among the cases possessing a wide range of variables, and that LNG in contraceptive implants is known to be associated with IH, as represented within their Product Information.
- Specificity of the proposed cause and effect relationship is demonstrated by publications regarding LNG-containing devices, including their Product Information brochures, describing the risk of IH.

- Temporality is demonstrated as Mirena® was inserted before IH was diagnosed in all but one of the 115 cases, in which case the IH worsened.
- Biologic plausibility is provided because LNG from Mirena® can be measured within the peripheral venous circulation, LNG is androgenic, and the systemic side effects of LNG are androgenic. Because IH is more likely than not a hormonal (and, likely, androgenic) syndrome, it is biologically plausible that systemic LNG causes or substantially contributes to IH.
- Analogy of the causal association is provided by other hyperandrogenic syndromes, such as polycystic ovary syndrome, highly associated with IH.
- Coherence of the causal association is provided by the published warnings found in other LNG-containing contraceptive devices, and among the modest-sized relevant literature.

Two of Hill's criteria for causality are less strong than the other seven outlined above. Data satisfying these criteria are arguably present in the data and literature reviewed, but are not as strong as the seven outlined above. These two criteria, of which the first I would term as marginally satisfied, and the second which is impossible to satisfy for practical reasons, are:

- Biologic Gradient, or dose-response relationship, is not well-demonstrated as there is not yet similar IH data available with a LNG-IUS with a different LNG dose than Mirena®. However, it is known that women with an embedded or perforated LNG-IUS have higher systemic LNG levels than those with a proper intrauterine location. The signal evaluation included two women with embedded Mirena®, each with IH. I conclude this causality criterion is marginally satisfied from the available data.
- Experimental Evidence in the form of a randomized clinical trial studying IH in women with Mirena®, compared to placebo treatment, or control treatment such as birth control

pills is practically impossible due to the huge patient numbers that would be required due to the low prevalence of IH, and unethical because some women in the trial would be required to accept absence, or reduced efficacy, of the contraceptive option assigned. The "desired" endpoint of serious, potentially permanent disease, is also ethically questionable. This causality criterion is simply impossible, or unethical, to demand of the study of the association of LNG-IUS to IH.

Applying accepted standards of causality to the totality of evidence within this review, it is my expert opinion that Mirena® LNG-IUS does indeed cause, or is a substantial factor in causing, IH.

A reasonable woman would want to know, in exercising their reproductive choice in selecting a contraceptive, that a particular option carries the risk of a neuro-ophthalmologic syndrome such as IH that could cause permanent blindness – even with a low prevalence rate. A reasonable and prudent healthcare provider would want to know that Mirena® may cause, or be a substantial factor in causing, IH – even at a low prevalence rate. Reasonable physicians would also want to know about early warning signs of IH after Mirena® is chosen after counseling, and to arrange appropriately more careful follow-up with their at-risk patients to detect potentially serious IH early in its development, including women with polycystic ovaries, or obesity, or any personal/family history of prior IH.

Thank you for inviting my review of this information, and the generation of this Expert Report. As further information becomes available through the pendency of this case, I would appreciate the opportunity to review it, and if appropriate, issue an addendum to this Report appending my opinions.

Respectfully submitted,

Dr. James M. Wheeler, MD, MPH, JD
The Center for Women's HealthCare
4100 Milam Street, Houston, TX 77006

December 21, 2017