# EXHIBIT 4

## Jan. 30, 2018 Deposition of James Wheeler

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

______________________________

IN RE:
MIRENA IUS
LEVONORGESTREL-RELATED
PRODUCTS LIABILITY 17-MD-2767(PAE)
LITIGATION (NO.II) 17-MC-2767(PAE)

This Document Relates to
All Actions

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Tuesday, January 30, 2018

ORAL DEPOSITION OF JAMES WHEELER, M.D., held at the offices of the Pulaski Law Firm, 2925 Richmond Avenue, Houston, Texas, commencing at 9:10 a.m., on the above date, before Rene White Moarefi, Texas Certified Shorthand Reporter, Certified Realtime Reporter, Certified LiveNote Reporter, Louisiana Certified Court Reporter, and Notary Public in and for the State of Texas.

__ __ __

GOLKOW LITIGATION SERVICES
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

APPEARANCES

FOR THE PLAINTIFFS:
LESLIE LaMACCHIA, ESQ.
PULSKI LAW FIRM
2925 Richmond Avenue, Suite 1725
Houston, Texas 77098
Tel: 713.664.4555
llamacchia@pulaskilawfirm.com

KATHRYN SNAPKA, ESQ.
THE SNAPKA LAW FIRM
606 N. Carancahua, Suite 1511
Corpus Christi, Texas 78403
Tel: 361.888.7676 Fax: 361.884.8545
ksnapka@snapkalaw.com
MARTIN D. CRUMP, ESQ.
ANDERSON R. BROWN, ESQ.
DAVIS & CRUMP, P.C.
2601 Fourteenth Street
Gulfport, Mississippi 39501
Tel: 228.863.6000 Fax: 228.864.0907
martincrump@daviscrump.com

FOR THE DEFENDANTS:
TAREK ISMAIL, ESQ.
ALLYSON MILLER JULIEN, ESQ.
GOLDMAN, ISMAIL, TOMASELLI, BRENNAN & BAUM, LLP
564 West Randolph Street, Suite 400
Chicago, Illinois 60661
Tel: 312.681.6000 Fax: 312.881.5190
tismail@goldmanismail.com

Also Present:
MR. DOUG OVERSTREET - VIDEOGRAPHER



INDEX

PAGE

APPEARANCES................................ 2
JAMES WHEELER, M.D.
EXAMINATION
BY MR. ISMAIL.......................... 6
BY MS. LAMACCHIA....................... 300
FURTHER EXAMINATION
BY MR. ISMAIL.......................... 328

CERTIFICATE................................ 335
INSTRUCTIONS TO WITNESS.................... 336
ERRATA..................................... 337
ACKNOWLEDGMENT OF DEPONENT................. 338
LAWYER'S NOTES............................. 339

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Videotaped Deposition of James Wheeler; no Bates, 6 pages | 12 |
| Exhibit 2 | Invoice; no Bates, 6 pages | 24 |
| Exhibit 3 | Curriculum Vitae; no Bates, 31 pages | 31 |
| Exhibit 4 | Disclosure of Prior Expert Testimony; no Bates, 5 pages | 45 |
| Exhibit 5 | Expert Report by Dr. James M. Wheeler, MD, MPH, JD; no Bates, 48 pages | 53 |
| Exhibit 6 | List of References Cited in the Report; no Bates, 3 pages | 63 |
| Exhibit 7 | Reliance List of Additional Published Resources; no Bates, 10 pages | 63 |
| Exhibit 8 | Additional Documents Reviewed; no Bates, 2 pages | 64 |
| Exhibit 9 | Paper titled "Contraceptive Failures in Overweight and Obese Combined Hormonal Contraceptive Users"; no Bates, 15 pages | 91 |
| Exhibit 10 | CDC report titled U.S. Medical Eligibility Criteria for Contraceptive Use, 2010; no Bates, 88 pages | 106 |
| Exhibit 11 | Article titled "An integrated mechanism of pediatric pseudotumor cerebri syndrome: evidence of bioenergetic and hormonal regulation of cerebrospinal fluid dynamics"; no Bates, 8 pages | 133 |
| Exhibit 12 | Article titled "Risk of Intracranial Hypertension with Intrauterine Levonorgestrel"; no Bates, 4 pages | 173 |
| Exhibit 13 | Article titled "Revised Disproportionality Analysis of Mirena and Benign Intracranial Hypertension"; no Bates, 2 pages | 181 |
| Exhibit 14 | Affidavit of Dr. Mahyar Etminan; no Bates, 3 pages | 183 |
| Exhibit 15 | ARVO 2015 Annual Meeting Abstracts; no Bates, 1 page | 187 |
| Exhibit 16 | Article titled "An Estimation of the Risk of Pseudotumor Cerebri among User of the Levonorgestrel Intrauterine Device"; no Bates, 8 pages | 189 |
| Exhibit 17 | Article titled "Management of a Perforated Levonorgestrel-medicated Intrauterine Device-a Pharmacokinetic study: Case Report"; no Bates, 3 pages | 253 |
| Exhibit 18 | Kempegowda publication titled "Women with idiopathic intracranial hypertension have a distinct andro-metabolic signature compared to polycystic ovary syndrome and simple obesity"; no Bates, 1 page | 283 |
| Exhibit 19 | Handwritten notes; no Bates, 6 pages | 294 |
| Exhibit 20 | Materials reviewed by witness; no Bates, 1096 pages | 294 |
| Exhibit 21 | Agreed Order; no Bates, 10 pages | 297 |
| Exhibit 22 | Letter dated 4-5-2001 from Kathlyn Ronaldson to Raewyn McNee; no Bates, 36 pages | 319 |

THE VIDEOGRAPHER: Okay. We're now on the record. My name is Doug Overstreet. I'm the videographer for Golkow Technologies. Today is January 30th, 2018. The time is 9:10 a.m.

This video deposition is being held at Houston, Texas, in the matter of Mirena Products Liability Litigation for the US District Court, Southern District of New York. The deponent is Mr. James Wheeler. The court reporter is Rene Moarefi. She will now swear in the witness.

JAMES WHEELER, M.D.,
having been duly sworn, testified as follows:

EXAMINATION

BY MR. ISMAIL:
Q. Morning, Doctor.
A. Good morning, sir.
Q. When were you first approached to serve as a expert on behalf of the plaintiffs in the Mirena litigation?
A. I believe this past summer about July of '17.
Q. Who was it that approached you?
A. Attorney Leslie LaMacchia.
Q. Did you -- had you ever worked with Ms. LaMacchia before she contacted you in the summer of 2017?
A. Yes, we met and worked together when she was at



another law firm some years ago.
Q. Tell me about the context of your prior work with Ms. LaMacchia.
A. It was involving litigation. And I don't recall exactly what the subject of that litigation was. I'm sorry.
Q. Had she retained you as an expert in that litigation?
A. I was invited as a consultant. I would not consider myself having been retained in that litigation.
Q. Were you paid?
A. I was paid for the time for a presentation to the staff, yes.
Q. Do you recall what the subject matter was of the presentation you gave to the staff?
A. I do not.
Q. Other than that one presentation you gave on behalf of Ms. LaMacchia to the staff, had you done any other work with her before the Mirena litigation?
A. I don't believe so. I don't recall.
Q. Have you done any work on behalf of any of the other plaintiff counsel in the Mirena litigation?
A. Of the ones I know of, no.
Q. Did you sign a retainer agreement with plaintiffs' counsel for your work in the Mirena



litigation?
A. I did not.
Q. When did you first begin to do work on behalf of the plaintiffs in the Mirena litigation?
A. I believe it was the summer. I believe about July of '17.
Q. What did you understand to be the scope of the engagement?
A. I was -- it was explained to me that I was being asked as a clinician, an obstetrician, gynecologist, and reproductive endocrinologist, to look at a body of materials, medical literature, documents from Bayer, signal investigations from Bayer, and I was to review these things, do my own research, and come up with opinions as to whether there could be a causal relationship between Mirena and intracranial hypertension.
Q. Prior to being contacted by plaintiffs' counsel in the summer of 2017, had you ever previously considered the relationship between any contraceptive product and intracranial hypertension?
A. In my clinical practice, yes.
Q. And tell me about the context of that.
A. Is I've had the occasion of a few patients who were using Mirena specifically and developed unusual symptoms of a central nervous system sort. And it



occurred to me that these were CNS-based symptoms. In another setting, I might think they were due to intracranial hypertension.

I did not do lumbar punctures on these patients. I did not do CNS imaging, but simply because of the temporal association, the patients and I decided to remove the Mirena IUD.
Q. What were the symptoms of a central nervous system sort that you just referred to in your prior answer?
A. Among the few patients -- there were, you know, four or five patients -- they included headache, photophobia, a strange sensation in their head I remember one of my patients describing; a couple had nausea. They were not profoundly severe symptoms, but they were new to them. These patients -- I do not recall any of them having migraine, epilepsy, or other preexisting neurologic problems.
Q. So as you've described with these patients that you had on Mirena, you did not do a diagnostic workup to confirm the presence or absence of intracranial hypertension; is that true?
A. That is true, because their symptoms were sufficient. They wanted to know -- they themselves asked the question could there be an association with the

Page 10

Mirena. And because such a workup would not have altered what we did, namely, removing the Mirena, we did not go any farther.
Q. In the context of your patients on Mirena that you've just described --
A. Yes.
Q. -- did you do any research into the -- whether there's any evidence linking Mirena to central nervous system symptoms?
A. No. I must describe that my thought was, gosh, this sounds like pseudotumor cerebri, because I had learned about that in my training. But I did not take it any further.
Q. So am I correct, sir, that prior to being retained by plaintiffs' counsel in this litigation, you had never researched the issue of whether pseudotumor cerebri is associated in any way with Mirena use?
A. That --
MS. LAMACCHIA: Objection, form.
A. That would be correct.
Q. (BY MR. ISMAIL) What did you do to prepare for the deposition today?
A. I did a series of things at different times over the last couple of weeks. I read documents that were given to me. I reviewed my expert report. I reviewed the

Page 11

literature I cited as well as the literature that's in my reliance list. I had a meeting yesterday with plaintiffs' counsel to review those materials and to discuss today's proceedings.
Q. Which of the plaintiffs' counsel were in attendance at the meeting yesterday?
A. Ms. LaMacchia, Kathy Snapka.
Q. Snapka.
A. Snapka, Martin, and Anderson. These -- these four attorneys.
Q. When you say in preparation for your deposition you reviewed documents that were provided to you, are these all documents that you listed as either cited or reliance materials in your expert report?
A. That is my understanding, yes.
Q. Nothing new in preparation for your deposition, to the best of your knowledge?
A. Correct. Nothing new other than those listed on my -- the list is complete.
Q. Can you explain your answer? I don't understand what you said.
A. Yes. Newness is relative. When did I get them. But as I understand it, everything is on those two lists for you.
Q. Okay. Go ahead and mark --

Page 12

(Exhibit 1 marked.)
Q. (BY MR. ISMAIL) Doctor, we've provided you what's been marked as Exhibit 1 to your deposition. It's a copy of the notice for today's proceedings. Have you seen this before?
A. I believe I have, yes.
Q. And if you turn to the -- if you'll notice, they're double-sided copies. So if you turn to the fourth page, you'll see a -- an Exhibit A to this notice wherein we asked you to bring certain documents with you today.
A. Yes.
Q. Have you had a chance to review this list?
A. Yes.
Q. Have you searched for the documents called for by the notice?
A. Yes.
Q. Have you brought documents with you today?
A. Ms. LaMacchia has --
Q. Okay.
A. -- all my documents.
Q. Do you have an understanding of what materials are going to be tendered to me today?
A. Yes. And I will observe as it happens.
Q. Okay. Well, I don't think we need it narrated, but to the best of your knowledge, what is it that you've

Page 13

brought with you today?
A. We brought the medical literature that I personally reviewed in preparation of today, and a new CV on myself, and then some other materials there.
Q. Okay. Is -- is it your understanding that the medical literature that is -- that you've brought today material that are either cited or listed in your reliance list?
A. That is my understanding, and I -- I checked that. I can't swear there may not be a miss, but I did try to make it complete.
Q. Okay. And then you said you had an updated CV; is that correct?
A. Yes.
Q. And then did you bring an -- any invoices that you've tendered for your work in these cases?
A. Yes.
Q. Okay.
A. All of them.
Q. All of them.
If you -- let's just briefly walk through some of the topics here, if you don't mind.
A. Okay.
Q. Item No. 2 asks for lectures, presentation, talks, speaking engagements, or medical grand rounds that

Page 14

you have presented.
First of all, have you ever -- do you have any materials that fall within the purview of that request?
A. Oh, just within my CV. My CV lists invited lectures.
Q. Do you have any of the materials that you used in any of the lectures that you have given over the years?
A. No.
Q. Do you still have them in your possession?
A. I don't think so. I may have an occasional slide, but not a slide presentation.
Q. Request 3 requests for any slides, handouts, or other documents relating to any lectures or presentations, grand rounds, that sort of thing, that you have prepared regarding long-acting, reversible contraceptives, including Mirena.
Do you have anything that falls within that category?
A. I do not.
Q. Have you ever given a lecture presentation or talk that covers the topic of Mirena?
A. I do not believe I have.
Q. Item 4 is where we ask specifically for an article that was listed on your CV entitled Artfully

Page 15

Dodging Daubert: Avoiding Dismissal As a Medical Expert.
Your prior CV noted this was in press. Did you bring a copy of that article?
A. I did not. I withdrew that blog item so it did not end up being on subsequent CVs.
Q. Was it ever published?
A. To my understanding, no, although I can't swear to that because of the nature of a blog. But coming from The Expert Institute, they said they never released it.
Q. Did you tender a -- a blog to The Expert Institute for publication on their site?
A. I tendered a double-spaced, two-and-a-half-page document, which I remembered including the topics of the blog, but I did not do an electronic transfer; I did not send a blog, per se.
Q. Do you have in your possession somewhere on your computer or otherwise a copy of what you referenced on your CV, this article about Artfully Dodging Daubert?
A. Because we did not publish it, it's gone. I do not have it.
Q. You deleted it?
A. Yes.
Q. When did you delete it?
A. When my medical/legal adviser suggested I not submit it. So that would have been sometime in the fall

Page 16

of '17.
Q. Who is your medical/legal adviser?
A. Her name is Rosalea Hamilton. She works out of Dallas. She's written a book on medical/legal consulting.
And I erred in not having her review the blog script before submitting it. She advised me not to submit it because the cleverly coined title would end up in opposing counsel asking me questions about it.
Q. And here we are today.
A. She was prophetic.
Q. Ms. Hamilton, is she a lawyer?
A. She is not. She has a business background. She has consulted with medical/legal experts and other experts for at least 30 years.
Q. So when you say -- you describe Ms. Hamilton as your medical/legal adviser. What does that mean?
A. She -- the book she wrote is on experts marketing their services, so she does not teach me legal things, she does not teach me medical things, she advises me as to how to promote my consulting services.
Q. So you've used Ms. Hamilton over the years to advise you on how better to market your services as an expert witness; is that fair?
A. How to better serve the people who could use me in this sort of consulting, yes.

Page 17

Q. Well, not to better serve them, because she's neither a medical professional nor a lawyer, right?
MS. LAMACCHIA: Objection, form.
A. Not better in the sense of qualitative improvement, but in terms of demographic spread, access. Marketing, I think, might be the best word.
Q. (BY MR. ISMAIL) Is Ms. Hamilton associated with a organization? Does she have a business name? Or is it . . .
A. Her business name is Expert Communications. She has a blog. She has a monthly newsletter. And she is affiliated with some expert registries. The one I'm most aware of is SEAK, S-E-A-K, out of Massachusetts.
Q. Has Ms. Hamilton assisted you in getting expert engagements over the years?
A. Directly, no. Indirectly, frankly, not that I'm aware of.
Q. Do you pay Ms. Hamilton?
A. I do.
Q. So Ms. Hamilton advised you not to publish your article on Artfully Dodging Daubert, correct?
MS. LAMACCHIA: Objection, form, asked and answered.
A. That was my catchy title. I do remember the headings of what I submitted. She's very conservative

Page 18

with her advice. She advised me not to publish it, and if you hire a consultant, you might want to follow their advice. So out of respect for her, I withdrew it.
Q. (BY MR. ISMAIL) Did Ms. Hamilton advise you to delete all of your copies of the article entitled Artfully Dodging Daubert?
A. She did.
Q. And you did that in the fall of 2017?
A. As best as I can recall. I believe it was due in June, and then I -- and I should have asked her first, but then it was a couple of weeks later.
Q. So during the time that you were doing work on behalf of plaintiffs' counsel in the Mirena litigation, you erased all copies of your article entitled Artfully Dodging Daubert, true?
MS. LAMACCHIA: Objection, form.
A. Those two things would seem to temporally overlap, but I would attest that they were unrelated.
Q. (BY MR. ISMAIL) Item No. -- by the way, other than The Expert Institute blog site and Ms. Hamilton, had you -- have you ever -- did you forward a copy of your Artfully Dodging Daubert article to anyone else?
A. Just The Expert Institute and just Ms. Hamilton I think you asked?
Q. Correct.

Page 19

A. Nobody else.
Q. Item No. 5 asks for any materials that you reviewed, considered, or relied upon in the course of developing opinions in this case that are not listed in your expert report materials list.
A. No other materials to submit.
Q. Have you ever communicated with any author of any publication that you list in your materials reviewed list?
A. Not that I know of.
Q. Have you ever communicated with any other expert witness you understand to have been retained by the plaintiffs in this litigation?
A. With this litigation, not any Mirena litigation.
Q. You'll have to explain that proviso.
A. I don't mean to be vague. Excuse me. There was one expert I read some time ago. He and I had worked together during our work with the American College of Obstetricians and Gynecologists. We have never communicated about Mirena. We've never communicated about litigation, but we worked closely together for a year.
Q. And who is that individual?
A. Dr. Michael Policar.
Q. And what was the context of your work with Dr. Policar?
A. We were both national officers in the American

Page 20

College of Obstetricians and Gynecologists, which I will now abbreviate as ACOG for now on.
Q. And I think you told us, but just to confirm, your work with Dr. Policar had -- did not touch upon the issue of Mirena; is that true?
A. Not that I can recall, although this goes back a couple of decades. I don't recall contraceptive issues were part of our work together. I am able to attest that I knew he was active in family planning matters back then.
Q. You indicate -- do you recall how it was you got a copy of Dr. Policar's report?
A. It was given to me.
Q. By plaintiffs' counsel?
A. Yes.
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) Did you ask for it?
A. Did I ask for it. I don't recall.
Q. Do you recall which party to the litigation retained Dr. Policar?
A. Which party retained?
Q. Yes.
A. I believe he was a defense expert, so that would be Bayer, I believe.
Q. Was there anything in Dr. Policar's expert report with which you recall disagreeing?

Page 21

MS. LAMACCHIA: Objection, form.
A. It's been a while since I've read it. I just don't recall.
Q. (BY MR. ISMAIL) Any other communication you had with any other witness who has been retained to serve as an expert in the litigation?
A. No.
Q. Have you --
A. Michael is the only person that I've had contact with ever.
Q. Do you have respect for Dr. Policar?
A. Yes.
Q. Are you familiar with his reputation in the medical community?
A. Yes.
Q. Dr. Policar enjoys a highly favorable reputation in the medical community, true?
MS. LAMACCHIA: Objection, form.
A. The circles that I'm aware with. I -- I can't claim to know all of them. But the circles that I am aware of him, yes.
Q. (BY MR. ISMAIL) You would consider Dr. Policar a -- a good clinician?
MS. LAMACCHIA: Objection, form.
A. I have not seen him work. I don't know any of

his patients. Would I consider him a good clinician with the amount of information and knowledge I have? I'd have to answer I have no reason not to.

Q. (BY MR. ISMAIL) You would recognize Dr. Policar as a thought leader in the OB/GYN community; is that fair?

A. I have some familiarity with the phrase "thought leader." I have not seen him referred to as a thought leader. I would not argue if he were to claim to be a thought leader.

Q. Okay. Have you reviewed any other expert reports that have been submitted in the Mirena litigation?

A. Yes.

Q. Whose?

A. Regarding this aspect of the litigation, Dr. Darney, Dr. Fraunfelder, Dr. Johanson, Dr. Salpietro, Dr. Barnhart, Dr. Hewitt, Dr. Dalton, along with Dr. Policar's expert reports of some time ago. I read others, but I would not be able to recall their names. I do not recall their names.

Q. Did you review Dr. Moye's report?

A. I did not.

Q. Did you review Dr. Plunkett's report?

A. I did not.

Q. Do you know either Dr. Moye or Dr. Plunkett?

A. I do not.



Q. Okay. Did you review any of -- drafts or final copies of any expert report prepared by plaintiffs' experts prior to the submission of your expert report?

A. Other than mine?

Q. Correct.

A. No.

Q. No. 8 asks for any work products, memos, calculations, tables, graphs, et cetera, that you created in connection with the Mirena litigation.

Do you have any such material?

A. And the additional phrase "contains writing highlighting or marking"?

Q. Yeah.

A. My personal set of literature was largely highlighted reflecting the volume I read, and I asked for that to be presented to you.

Q. Great. Anything else other than that?

A. No.

Q. Do you have any communication with plaintiffs' counsel upon which you are relying for any of your opinions in this case?

MS. LAMACCHIA: Objection, form.

A. Communications that I'm relying on. We have shared research findings. We have shared research papers. I don't know if that counts as a communication. In terms



of a memo, a letter, an opinion, a statement, that's what I would think of as a communication. I would say no.

Q. (BY MR. ISMAIL) Okay. If we have the invoices, we can take a look at those, and the CV, I guess.

(Exhibit 2 marked.)

Q. (BY MR. ISMAIL) I hand you what we've marked as Exhibit 2 to your deposition, sir. This is a copy of the invoices I received today. Does Exhibit 2 contain all the invoices that you have tendered in the Mirena litigation?

A. Yes, as of today.

Q. As of today.

And let me just scroll through to the end. So the -- the last time recorded in an invoice here is December 21st, 2017; is that correct?

A. Yes, sir.

Q. And so you've not tendered a invoice since December 21st, 2017?

A. Correct. One is pending with the end of January.

Q. Pending -- have you -- you have not tendered it to plaintiffs' counsel?

A. True.

Q. Do you recall how much time currently is recorded on your pending invoice?

A. For the month of January, up until this morning, about 17 hours.



Q. So does -- if you look at the first page of Exhibit 2, does this reflect that you first began doing substantive work in this litigation on or about June 29, 2017?

A. Yes.

MS. LAMACCHIA: Objection, form.

A. Excuse me. Yes.

Q. (BY MR. ISMAIL) Okay. So it looks like -- so if we add up the amount of money you've made as of the time that you submitted your expert report -- so $35,000, give or take, is the amount of money that you earned for the expert report you submitted in December?

A. I have it added up to 40,200.

Q. Okay. I will give you the benefit of that.

And then you said you had about 17 hours in January?

A. Yes.

Q. And your hourly rate that you're charging for this litigation is?

A. $400 an hour. So that would be 6,800.

Q. Okay. So when we're done today, you'll be a little over $50,000, all in, in the Mirena litigation. Is that about right?

MS. LAMACCHIA: Objection, form.

A. 50 thousand plus or minus 3, I would say.

Q. (BY MR. ISMAIL) Great. Okay. You can put that aside for now.
Oh, by the way, do the payments that you receive for your work in the Mirena litigation go to you personally?
A. No.
Q. Where do they go?
A. Into my professional association.
Q. Is that professional association the same association that your medical practice is operated out of?
A. Yes.
Q. And then do you draw income from your professional association?
A. Yes. I don't call it a draw. I call it my professional association pays me as well as other expenses.
Q. Okay. So the money you earn in the Mirena litigation passes through your professional association to you?
A. Pass through sometimes implies one to one. The money is deposited into the professional association, and it goes to pay various expenses including part of my salary.
Q. All right. And what's your salary?
A. My salary from my PA annually is $6,400.



Q. You obviously earn a lot more than $6,400, correct?
A. Fortunately, yes.
Q. Okay. And why is your salary capped at $6,400?
A. Because that is my understanding with my personal disability company.
Q. So you have long-term disability insurance?
A. I do, two policies.
Q. And your long-term disability insurance caps how much money you can earn in your professional capacity?
A. In my professional association capacity, yes, it does, at 6,400 a year.
Q. And so for all the other thousands of dollars you earn working professionally above $6,400, where does that go?
A. To various expenses, staff salaries, rent, equipment expenses, CLE, CME, staplers, all those sorts of things.
Q. Okay. But you're not representing that -- withdrawn.
There's clearly a profit above your salary of 6,400 and any expenses associated with your professional association, correct?
MS. LAMACCHIA: Objection, form.
A. There's very little profit. There's expenditure



for a variety of expenses. But at the end of the year, the professional association has a modest profit.
Q. (BY MR. ISMAIL) Okay. Is there any other owner of your professional association other than you?
A. No. In Texas, doctors have to own medical practices.
Q. Do you have any family members who draw a salary from your professional association?
A. Yes, I do.
Q. Who?
A. My wife, who is my nurse, Janet; and legal assistant.
Q. Okay. So does your wife draw a salary in excess of $6,400?
MS. LAMACCHIA: Objection, form.
A. May I answer?
Q. (BY MR. ISMAIL) Yes.
A. Yes.
Q. And does she draw on -- does she get paid by the hour?
MS. LAMACCHIA: Objection, form.
A. She gets paid a salary and a year-end bonus.
Q. (BY MR. ISMAIL) So money you work as an expert witness in the Mirena litigation in part flows to your wife, correct?



MS. LAMACCHIA: Objection, form.
A. Correct.
Q. (BY MR. ISMAIL) And so by paying your wife through your professional association -- withdrawn.
So your household income from the Mirena litigation exceeds $6,400 a year, correct?
MS. LAMACCHIA: Objection, form.
A. That's correct.
Q. (BY MR. ISMAIL) So you're able to draw long-term disability insurance and still earn more than $6,400 in part by having money go to your wife, right?
MS. LAMACCHIA: Objection, form.
A. If you were to look at my family income, yes. And please understand this is reviewed by Unam annually and has been for 11 years. It satisfies our contractual agreement.
Q. (BY MR. ISMAIL) Okay. What professional activities are you unable to participate in because of your long-term disability?
A. As per my two Unam contracts, material activities to my specialty, which includes delivering of babies and performance of surgery.
Q. So your -- how long have you been unable to engage in obstetric care and do surgeries?
A. Not quite obstetric care. I do see pregnant

people. I am not able to deliver them.
Q. Fair enough. Let me rephrase.
How long have you been unable to deliver babies and perform surgeries?
A. Since July of '06, so 11-1/2 years.
Q. How many employees do you have in your professional association?
A. Not including myself, two.
Q. And so one is your wife?
A. Correct.
Q. And --
MS. LAMACCHIA: Objection, form, asked and answered.
Q. (BY MR. ISMAIL) -- who is the other?
A. Marlene, our office manager and general assistant.
Q. Okay. So the only salaries paid out of your professional association are you, your wife, and Marlene, right?
A. Correct. We do have some PRN workers. We do have that sort of thing, of course, consultants.
Q. What are PRN workers?
A. As needed. Pro re nata. Excuse me.
Q. And those are folks you pay hourly, I assume?
A. Yes, my IT man, things of that sort.



Q. Got it.
(Exhibit 3 marked.)
Q. (BY MR. ISMAIL) All right. I've marked Exhibit 3 to your deposition. It's a copy of the CV that was provided today. And I understand this is an updated CV since it's dated January 26, 2018; is that correct?
A. Correct.
Q. Are there any changes to your CV relative to the CV served with your expert report other than the deletion of the Artfully Dodging Daubert article?
A. I have corrected a couple of typos. I don't remember having to make any other additions or changes. So that would be a no.
Q. Okay. So when you tendered your expert report -- withdrawn.
So is Exhibit 3 a accurate and up-to-date copy of your curriculum vitae?
A. As best to my ability, yes.
Q. Okay. You have no articles that you have drafted or are in -- in print that have been added to Exhibit 3 compared to the CV served previously?
A. If we look on page 11, Articles 50 through 53 are dated July 2017 and thereafter. Those may be added, because this CV I updated from my October '17 CV. And I think it was my July '17 CV that I first submitted for



this litigation.
Q. All right.
A. So to paraphrase, those four entries would be the only material updates from July of '17.
Q. So just eyeballing your prior CV and comparing it to the one given today, it looks like you have a -- a publication entitled A Known Tool in Clinical Science, a New Tool in Litigation, Clinical Epidemiologist Expert Testimony and Drug Device Litigation. That's a document that you prepared?
A. Yes.
Q. And that was published in the DRI newsletter?
A. Yes.
Q. And then you have a article entitled Varying Concepts of Causation, Philosophy, Science, Medicine, and the Law. And that was published also in the DRI newsletter.
A. As I understand it, one of their newsletters. The "Medical Liability and Health Law" newsletter.
Q. And then the only other change was the deletion of the Artfully Dodging Daubert article; is that correct?
MS. LAMACCHIA: Objection, form, asked and answered.
A. Yes.
Q. (BY MR. ISMAIL) Why didn't you tender your



October CV with your expert report served in December?
A. I don't know.
Q. Your CV lists your medical employment history as being a reproductive endocrinologist, obstetrician gynecologist in private practice; is that correct?
A. Yes.
Q. And your practice is entitled The Center For Women's Healthcare?
A. Yes, that's the name of the PA.
Q. You list academic positions in the next section of your CV, and you list one current academic position, and that's at Brighton College, correct?
A. Yes.
Q. And that is an online -- online certification --
A. Online school.
Q. You can call it that. So let me rephrase.
Brighton College is an online school that offers paraprofessional certificates, correct?
A. Yes, some degrees, paraprofessional certificates, continuing education of various sorts.
Q. And you conduct online courses for the Brighton College paralegal certificate, correct?
A. For that one in particular, yes.
Q. Any other courses for which you provide any services at Brighton College other than the paralegal

certificate?
A. Yes, and they're listed here. Those are the various courses and the various certificates and diplomas I teach.
Q. So what certificate does the legal research associate's degree go to?
A. There is actually a legal research associate's degree.
Q. Okay. It's not a JD program, right?
A. Oh, no.
Q. What's the DOC program?
A. That is a program for physicians and medical students to teach them medical/legal concepts.
Q. And then -- so the only -- withdrawn.
Is there any other certificate from Brighton College that you provide services to other than the paralegal certificate? I understand you teach courses, but classes that go to the certification from Brighton College.
A. Certification as a paralegal, certification as a legal nurse consultant.
Q. Those are the two?
A. Yes, in terms of certifications.
Q. Okay. You don't teach medicine, correct?
A. Correct, except in the context of those programs.


Q. The paralegal certificate programs?
A. And the DOC program. Medicine comes up. There's examples involving medicine. I'm teaching medical professionals, but I don't teach medical courses.
Q. And you call yourself a professor of medicine at Brighton College, right?
MS. LAMACCHIA: Objection, form.
A. I call myself that because that's what they call me.
Q. (BY MR. ISMAIL) But you're not actually a professor of medicine, per se, correct?
A. My title there is just as you see it here.
Q. I understand. But if we were actually to look at the -- you understand the professional medicine usually refers to physicians teaching young doctors or medical students at an academic medical school, correct?
MS. LAMACCHIA: Objection, form.
A. I understand that to be the most prevalent --
Q. (BY MR. ISMAIL) Sure.
A. -- definition or example.
Q. But that's not what you do at Brighton, right?
MS. LAMACCHIA: Objection, form.
A. I teach medical students and doctors, but not medical courses.
Q. (BY MR. ISMAIL) Right.


A. I think it's important to look at the context. There's a comma after that medicine word.
Q. You left academic medicine in 1996, correct?
A. Roughly, yes, if not '95.
Q. Well, I'm just going off your CV here.
A. I left in '95, but there was a year where I was a clinical professor, meaning practicing with an affiliation.
Q. And you have been in private practice since leaving academic medicine in '95, '96, correct?
A. Correct.
Q. Are you -- have you been a solo practitioner during this entire time?
A. No.
Q. You've had physician partners?
A. Yes, partners and associates.
Q. When is the -- so you're currently a solo practitioner, correct?
A. Yes, sir.
Q. How long has that been true?
A. For about six years if not seven now.
Q. How big was your practice at its largest?
A. Six physicians.
Q. And was that six years ago, or did it whittle down over time?


MS. LAMACCHIA: Objection, form.
A. That would have been more like 13 or 14 years ago, and there was less of a whittling down and more of a strategic change down to two partners and then one.
Q. (BY MR. ISMAIL) How many patients would you estimate you have in your practice?
A. Current active patients that perhaps have seen me in the last two years?
Q. Let's go with that definition.
A. A few thousand.
Q. Has that been -- withdrawn.
How would you describe your current practice in terms of the types of patients you treat, the types of services you offer?
A. The types of patients I treat first. I have an OB/GYN and reproductive endocrinology practice. The types of patients within each of those areas do overlap a bit in terms of contraception, fertility advice, infertility treatment. About 25 percent of my practice is early pregnancy. The remaining is gynecology.
The kinds of things I have my practice -- the most prevalent would include polycystic ovary syndrome, menopause, contraception, endometriosis, fibroids, infertility, and then the pregnant people it's providing first trimester pregnancy care.

Page 38

Q. Do you see patients in the clinic every day?
A. I do not. I see them Tuesday through Friday.
Q. And about how many patient visits do you have a day?
A. About 12.
Q. Over the last 11 years, has your practice changed in any material way?
MS. LAMACCHIA: Objection, form.
A. The last 11 --
Q. (BY MR. ISMAIL) So I'm --
A. -- years.
Q. -- going back to when you went on disability.
A. Right. I have always worked about 32 hours a week seeing patients. I can't recall if I used to see some patients on Mondays. I'd say not materially different.
Q. And I was going more to the mix of patients and services you provide.
A. Very, very similar; very, very similar.
Q. So you -- you have not performed surgeries in the last 11 years, correct?
A. Not hospital-based surgeries. We do some office-based procedures that some people would call surgeries.
Q. Have you ever acted as a consultant or a speaker

Page 39

for a pharmaceutical company?
A. Yes.
Q. Which companies?
A. They would be included in my CV to some degree. Off the top of my head, I have lectured for Ortho, Johnson & Johnson, Searle. Instrument companies would you like to know?
Q. Sure.
A. Karl Storz. It's been a while. That's what I can recall at this point.
Q. When is the last time you worked on behalf of any pharmaceutical or device company?
A. It would be at least 12 years.
Q. Have you ever -- withdrawn.
Did any of your prior work on behalf of drug or device companies have anything to do with IUDs?
A. Not that I can recall.
Q. Have you ever conducted any research yourself on Mirena?
A. I have not --
Q. Have you ever --
A. -- other than my literature research for this case.
Q. Have you done any research on IUDs generally?
A. I --

Page 40

MS. LAMACCHIA: Objection, form, vague.
A. And if I may offer, I think you mean clinical research.
Q. (BY MR. ISMAIL) Either basic science research, clinical research, epidemiology research. You can define it -- I mean it in the broadest sense.
A. The only research I have done on Mirena and IUDs in general would be in the context of supporting my role in this litigation.
Q. Have you done any research, again, defined broadly, on levonorgestrel other than your work as a retained expert in this litigation?
MS. LAMACCHIA: Objection, form.
A. Not that I can recall.
Q. (BY MR. ISMAIL) Have you done any work on intracranial hypertension or PTC in any context other than as a retained witness in this litigation?
A. No.
Q. Have you ever done any research on any neuro-ophthalmology topic other than your work as a retained witness in this litigation?
A. No.
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) Have you any -- done any research whatsoever on any topic relevant to this case

Page 41

other than as a retained witness?
MS. LAMACCHIA: Objection, form.
A. I have done research of a related area on neuroendocrinology in vertebrates. I have published on a sodium-potassium ATPase pump, but specifically on Mirena or IUDs, I have not done basic or clinical research.
Q. (BY MR. ISMAIL) Have you -- so you've -- withdrawn.
You've never published on the topic of Mirena, correct?
A. Correct.
Q. You've never published on IUDs generally, correct?
A. Correct.
Q. You've never published on levonorgestrel, correct?
A. Except perhaps -- I don't think so. I think I published on other -- on other progestins perhaps mentioning levonorgestrel, but I would not consider that on levonorgestrel.
Q. You've never published on the topic of intracranial hypertension or PTC, correct?
A. Correct.
Q. You've never published on any neuro-ophthalmology topic, correct?

Page 42

A. Correct.
Q. And have you published on any topic relevant to anything in this case?
MS. LAMACCHIA: Objection, form.
A. As I mentioned, I have published on neuroendocrinology before, neuroendocrine control of reproduction, and a sodium-potassium ATPase pump mechanism. Those are within this litigation things I've published on.
Q. (BY MR. ISMAIL) You don't mention any of those -- any of that work in your expert report, correct?
A. It is part of my appended CV, but I do not mention it in the body of the report.
Q. You have not published a peer-reviewed article in the last 15 years, correct?
A. Correct.
Q. You've never presented at a medical conference on Mirena or IUDs generally, correct?
A. Correct.
Q. You've never presented at a medical conference about levonorgestrel, correct?
A. Not that I can recall, correct.
Q. You've never presented at a medical conference on intracranial hypertension or PTC, correct?
A. I believe not.

Page 43

Q. So I'm correct?
A. You are correct.
Q. You've never presented at a medical conference about any neuro-ophthalmology topic, correct?
A. Correct.
Q. You've never presented at a medical conference about any topic relevant to this case, correct?
A. Not correct. I have lectured on contraception. I've lectured on some of the more global aspects of this case. Contraception, study design issues, basic clinical research issues, things that would be related that way.
Q. Your presentations on contraception did not involve IUDs, correct?
A. I --
MS. LAMACCHIA: Objection, form.
A. -- would anticipate they did to a minimal degree. I would think I would have commented some, but not focused upon.
Q. (BY MR. ISMAIL) So you would have listed IUDs as one of the available forms of contraception, but not dove into the risks and benefits of that particular option; is that fair?
MS. LAMACCHIA: Objection, form.
A. I can't attest to that. I do not recall ever giving a talk just on IUDs. Most of my talks involved

Page 44

oral contraception, which I recall I would compare to some degree with other methods, and that would include a risk and benefit discussion. But I would not claim focus.
Q. (BY MR. ISMAIL) When was the last time you gave a presentation at a medical conference on contraception?
A. We'd have to flip back through my CV. May I?
Q. Sure.
A. Okay. It has been since over a dozen years.
And I'm going to answer the question contraception for contraception, not as a component of menopausal hormone replacement.
Q. Yes.
A. Okay. I think this is responsive. It would be Talk No. 61 in October of 1990.
Q. Okay. Is that the most recent presentation you've located on your CV that touches -- that covers the topic of contraception?
A. Yes.
Q. That was well before Mirena was even on the market, correct?
A. That is correct.
Q. So to the best of your knowledge, you've not presented at a medical conference on the topic of contraception for about 17 years?
A. Yes. It's no longer --

Page 45

Q. 27 years.
A. 27, yes.
Q. Have you had any communication with anyone from Bayer about intracranial hypertension or PTC?
A. No verbal communication, no personal communication.
Q. Any written communication you've had with anyone from Bayer about IIH or PTC?
A. No personal to me.
Q. So you're -- if I understand your answer, you're excluding your review of internal company documents or the label or that kind of thing?
A. Yes.
Q. All right. Is there any personal communication, written or oral, you've had with Bayer that you are relying upon in any way for your opinions in this case?
A. No.
Q. I'm going to mark as Exhibit 4 to your deposition a document that was appended to your expert report.
(Exhibit 4 marked.)
Q. (BY MR. ISMAIL) That is your list of prior testimony in the last four years. Doctor, is there any additional testimony you have provided since the most recent deposition noted in December of 2017?
A. I don't believe so.

Page 46

Q. Would I be correct in assuming that there are many more cases that you -- legal cases that you worked on other than those in Exhibit 4 that just didn't get to the point of you providing expert testimony?
MS. LAMACCHIA: Objection, form.
A. There's many more cases in which I did not provide deposition or trial testimony which is on this list.
Q. (BY MR. ISMAIL) What is -- what percentage of your professional time is spent on legal matters?
A. Depends on the week, month, season. Depends on the day sometimes.
Q. Can you give me your -- how about on an annual basis?
A. On an annual basis -- and you asked for a percentage of professional time?
Q. Correct.
A. Sometimes on an annual basis over the last five years, all professional time, between 15 and 20 percent.
Q. What is the percentage of your professional association's income that derives from your work as a -- on legal matters?
A. Same time period, last five years, all activities, between 2-3/7s.
Q. Okay. The -- would you agree, sir, that the

Page 47

majority of your expert work involves medical malpractice cases?
A. Yes.
Q. Can you give me a breakdown plaintiff-defendant in your med mal work?
A. Yes. Having done it for 29 years, the first few years, I was largely defense based on the order of 80 to 90 percent. Over the next three decades, that reversed itself to my peak year doing perhaps 85 percent plaintiff. Now in the last couple of years, it's 75 percent plaintiff, 25 percent defense.
Q. Have you ever been an expert witness in any case involving IUDs?
A. Yes.
Q. Any case involving Mirena?
A. Yes.
Q. What do you recall about your expert work in a case involving Mirena?
A. It regarded intrauterine perforation and damages thereof. It was not a products case; it was a medical negligence case.
Q. And were you on behalf of the plaintiff or defendant in that case?
A. Plaintiff. I believe there were two.
Q. Do you recall who the plaintiffs' counsel was?

Page 48

A. I do not.
Q. Other than your two cases involving uterine perforation with Mirena, any other case in which you were an expert involving an IUD?
A. Not that I can recall.
Q. Have you ever worked as an expert in any case involving intracranial hypertension or PTC before this one?
A. No.
Q. Have you ever been retained in a product liability case before this one?
A. Yes.
Q. What case litigation was that?
A. Involving pelvic mesh.
Q. How many cases were you retained in pelvic mesh?
A. Eight plus or minus two.
Q. On behalf of the plaintiff?
A. Yes.
Q. Do you recall which pelvic mesh product?
A. Ethicon's.
Q. The SUI or prolapse mesh?
A. Both.
Q. Did you ever testify in court?
A. Yes.
Q. Which case?

Page 49

A. Langston.
Q. Other than your work in the pelvic mesh litigation, have you ever worked in a product liability matter other than this one?
A. I don't believe so.
Q. Did you testify in the pelvic mesh litigation on the adequacy of the instructions for use with the pelvic mesh?
A. I don't believe so.
Q. So would I be correct that this litigation is the first time in your 29 years of being an expert that you've commented on the adequacy of a prescription drug or medical device label?
MS. LAMACCHIA: Objection, form.
A. No.
Q. (BY MR. ISMAIL) What other case --
A. I was involved in -- I was on the defense, I believe, for Searle pharmaceuticals when the concept was -- a drug was being used off-label, and I had to comment about that.
Q. Was -- was Searle being sued?
A. Yes.
Q. And you were retained by Searle?
A. Yes.
Q. Which drug?

A. It was a prostaglandin. Norethisterone. Forgive me if I'm blanking.
Q. That's fine.
A. It was a drug that was first used to prevent acid-related ulcers in the stomach. It's used for induction of labor all across the country off-label.
Q. So other than that matter for Searle involving off-label use, you've never previously opined on the adequacy of a prescription drug label, correct?
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) Before this one?
A. In another -- at least one case, maybe a couple of cases, involving methotrexate use for pregnancy of unclear location I reviewed and testified about label.
Q. Is that a med mal or product liability case?
A. Med mal.
Q. Okay. But my -- if I restrict my question to product liability litigation, I would be correct?
A. That it would just be the Searle --
Q. Searle --
A. -- induction of labor case.
Q. Okay. Have you ever been a party to a litigation yourself as either plaintiff or defendant?
A. Yes, I have.
Q. How many occasions?



A. Six. I imagine you're excluding family law matters?
Q. Yes, I don't want to know about family law matters.
A. I understand.
Q. Have you ever been sued for malpractice?
A. Yes, I have.
Q. How many times?
A. Six times.
Q. Have any of those gone to trial?
A. No.
Q. Have any of those been settled?
A. Yes.
Q. How many?
A. Most of them were during my time at Baylor, and, as I recall, three or four were settled.
Q. Do you have any pending litigation to which you are a party?
A. Not that I'm aware of.
Q. So the only times you've been a party to litigation were the six malpractice cases and --
A. Yes.
Q. -- family -- and family law matters?
A. There was -- recalling, there were five during my academic period. There was one in private practice my



covering my partner in 2006. That's the last litigation.
Q. You have a law degree, correct?
A. I do.
Q. You keep your law license active?
A. By the definition of the Texas Bar, yes.
Q. Have you ever practiced law?
A. No.
Q. And why is it that you keep your bar license active?
A. I think it's a good idea. I have learned from all the CLE I've done. I -- I don't have a better answer than that.
Q. Do you have a different hourly rate that you charge for testifying?
MS. LAMACCHIA: Objection, form.
A. Versus?
Q. (BY MR. ISMAIL) Versus preparing your report, reviewing documents.
A. Oh, I see. No, my hourly rate is the same as I say for all activities.
Q. Okay.
MR. ISMAIL: We've been going a little over an hour. Do y'all want a break or keep going?
MS. LAMACCHIA: It's up to the witness.
THE WITNESS: Witness is comfortable.



(Discussion off the record.)
(Exhibit 5 marked.)
Q. (BY MR. ISMAIL) Doctor, I'm going to hand you what we've marked as Exhibit 5 to your deposition.
A. My report.
Q. Exhibit 5 is a copy of the expert report without appendices that was tendered to the defense in this litigation.
Now, you understand, Doctor, from your extensive experience as an expert that an expert report is the purpose of which is to disclose all the opinions that you intend to offer at trial. You understand that, right?
A. Yes, as of the date I signed it.
Q. Does Exhibit 5, your expert report dated December 27, two thousand -- sorry -- December 21st, 2017, contain all the opinions that you intend to offer in this litigation?
MS. LAMACCHIA: Objection, form.
A. I intend to make a good effort at answering any questions put to me. I've done a fair amount of work since I wrote this report. The material nature of my opinions has not changed. The strength of some of my opinions has changed. So does this -- does this represent all my opinions? "All" is a tough word. I would have to say potentially not.

Page 54

Q. (BY MR. ISMAIL) Okay. Are there any opinions related to this case that you intend to offer that are not contained in your expert report dated December 21st, 2017?
MS. LAMACCHIA: Objection, form.
A. Depends on the questions asked.
Q. (BY MR. ISMAIL) Can you tell me if you are presently aware of any opinions that you're going to offer in this litigation other than those contained in your expert report dated December 21st, 2017?
MS. LAMACCHIA: Objection, form.
A. I can foresee some questions that would be asked of me.
Q. (BY MR. ISMAIL) That's not what I'm asking, sir.
A. Okay.
Q. And I don't -- I'm not trying to make this more complicated. I'm not asking you whether if somebody asks you a question off topic whether you're willing to answer it that's not the spirit of my question.
A. I understand that.
Q. Okay. My question is whether there are any opinions that you are going to offer in this litigation of which you're presently aware that are not contained in your report dated December 21st, 2017.
MS. LAMACCHIA: Objection, form.
A. I would have to say I can anticipate questions

Page 55

that would ask me that I have additional information that is not contained in this report.
Q. (BY MR. ISMAIL) How is it that you can anticipate questions that have not yet been asked of you but will be in the future?
MS. LAMACCHIA: Objection, form, mischaracterizes prior testimony.
A. Simply because it's at the heart of the matter. Simply because, as you said, I have some experience doing this work. Because you're a very good questioner, I think you're going to ask me some things like pharmacokinetics of levonorgestrel, which I've had a chance to study more since I wrote this. Does that -- does that help answer it?
Q. (BY MR. ISMAIL) Not really.
Have you prepared any supplements to your expert report wherein you disclosed opinions you intend to offer in this litigation?
A. Nothing further than this report.
Q. You've not prepared any rebuttal expert report to the opinions offered by the defense experts, correct?
A. Correct.
Q. If you turn to page 13 of your report, sir, you write PTC -- and for the purposes of your testimony, we understand that to mean pseudotumor cerebri, correct?

Page 56

A. Yes.
Q. You write "PTC and IH," which you've defined as intracranial hypertension, correct?
A. Yes.
Q. "PTC and IH are related neuro-ophthalmologic conditions, so care must be taken with their definition within any discourse such as this." Then you say, "PTC is defined as a syndrome encompassing the constellation of symptoms caused by elevated intracranial pressure of unclear cause with normal brain" -- can you pronounce that next term.
A. "Parenchyma."
Q. -- "and cerebral spinal fluid constituents."
Did I read that correctly?
A. You did.
Q. You say that PTC and IH must be care -- care must be taken in their definition, and then you define PTC, correct?
MS. LAMACCHIA: Objection, form.
A. I defined PTC, yes.
Q. (BY MR. ISMAIL) All right. But then you don't define IH, correct?
MS. LAMACCHIA: Objection, form.
A. Not within this paragraph, that's correct.
Q. (BY MR. ISMAIL) Okay. And so for the purposes

Page 57

of your opinions in this case, your -- what is your definition of intracranial hypertension?
A. My definition of intracranial hypertension will be symptoms and signs sometimes proven by laboratory testing and imaging of elevated pressure in the head.
Q. Now --
A. If I could continue.
Q. Please.
A. IH is a more global term than PTC. It's meant to allow us to converse and discuss without being hindered by the many, many definitions that have been forwarded over the last 100 years of PTC and various forms of intracranial hypertension. My use of IH is meant to be a more global approximation of all that.
Q. So intracranial hypertension is associated with conditions other than PTC, correct?
A. Oh, yes. I don't know if we would capitalize that. For example, is the sentence, intracalvarium masses cause intracranial hypertension? That can be true.
Q. So -- and that's where I was going to go next. So medical professionals distinguish intracranial hypertension that are caused by, for example, a tumor from what has been defined in the medical literature as PTC, correct?
A. Correct, very specifically those are distinct.

Page 58

Q. So when you are using the term "IH" or "intracranial hypertension," are you including within that all conditions that cause intracranial hypertension?
A. No.
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) So when you use intracranial hypertension, you're using that to be synonymous with what's been defined as PTC in the medical literature?
A. Not exactly synonymous, but including and representative of, because my study of the literature tells me that there's been an evolution of these various definitions. And I had to come up with a term with which we could communicate throughout this case.
Q. Okay. So you're aware the literature describe -- has used terminology such as benign intracranial hypertension?
A. I am. And the controversy around the use of the word "benign" I would cite Corbett on that. I would basically trace the etymology of the word back to Dandy in 1937, then to Foley in the 50s, then to Corbett and his co-authors in 1989.
There's -- there's quite a range of opinions, plus our literature has at least ten different renditions of the modified Dandy criteria. So that's why I used this more global term "IH" capitalized to be

Page 59

distinguished from intracerebral thrombosis can cause intracranial hypertension.
Q. Is there any -- when you use the term "intracranial hypertension," does that define a condition that meets the modified Dandy criteria for diagnosis?
A. I'd have to ask you which modified Dandy criteria, but I can answer your question in general, yes.
Q. What conditions do you include under the umbrella term "intracranial hypertension" other than those that are defined in the medical literature as PTC?
A. It would include some authors using the phrase "benign intracranial hypertension." IH, as well as some of other terms, are diagnoses of exclusion. It might be more useful to say what my use of the term IH excludes.
Q. Okay.
A. It excludes going back all the way to Dandy tumors, but more modern renditions are very specific about excluding thromboses that are identifiable now that were not identifiable back in the '30s. So I would -- forgive me. I would say any anatomic, physical, identifiable, imageable cause of elevated intracranial pressure would be excluded in my use of the word "IH."
Q. Do you have in mind a diagnostic criteria for the condition that you have described as intracranial hypertension?

Page 60

A. Not to nitpick, but conditions perhaps of various names. I would use some rendition of the modified Dandy criteria, symptoms and signs of elevated intracranial hypertension, most common symptom headache, but sometimes no symptoms, too. Signs, the most common would be papilledema. Diagnostic imaging would have to exclude mass lesions, evidence of thromboses like a dural sinus thrombosis. Cerebrospinal fluid, if assessed, normal or very close to normal. No meningitis. No obvious infection. That would be my rendition.
Q. Would you require a lumbar puncture to assess pressure?
A. No.
Q. No.
So your definition of intracranial hypertension does not require demonstrated increase in opening pressure, for example?
MS. LAMACCHIA: Objection, form.
A. Although that is a standard part of traditional Dandy criteria, even the amount of hypertension can vary. And because of the data I've reviewed and the nature and myasthenic nature of this diagnosis, at this point for this litigation, I do not require a lumbar puncture.
Q. (BY MR. ISMAIL) Can you point me to any article in the peer-reviewed medical literature that concurs with

Page 61

the opinion that a lumbar puncture is not required to diagnose intracranial hypertension?
A. I would -- I've not searched that. I would anticipate there would not be in the neurology literature on that. This is -- this is a construct to aid my communication in this litigation.
Q. So you would agree that the consensus in the medical literature is to require a lumbar puncture assessing an elevated opening pressure before a diagnosis of, say, PTC or IIH or benign intracranial hypertension can be made?
A. Correct. Your statement is correct with what I've read.
Q. But your definition in this case would not require that diagnostic step, true?
A. For my --
MS. LAMACCHIA: Objection, form.
A. -- role in this litigation, we have struggled to come up with a term of communication that encompasses these various things. I would not require it.
Q. (BY MR. ISMAIL) So when you say Mirena is associated with intracranial hypertension, you're making that statement using the definition of intracranial hypertension that you've provided today, true?
A. Yes.

Page 62

MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) You know that the literature frequently uses the phrase "idiopathic intracranial hypertension" to describe at least a subset of conditions that you are opining about in this litigation, correct?
A. Correct.
Q. And you disagree with the terminology "idiopathic intracranial hypertension," correct?
A. Not necessarily. We would have to talk about which subset of patients does the word "idiopathic" apply to and which does it not.
Q. Is idiopathic intracranial hypertension part of the constellation of conditions that you describe as intracranial hypertension?
A. Potentially, yes, if no other associated condition or medication was within that patient's history.
Q. And pseudotumor cerebri, as that term is used in the medical literature, that would be -- fall within the umbrella term of IH that you use in this case?
A. It would.
Q. But you would allow other conditions that do not meet the definition of PTC to fall under IH, correct?
MS. LAMACCHIA: Objection, form.
A. In the way I'm using it within this litigation with the data I have before me, yes.

Page 63

Q. (BY MR. ISMAIL) Now, you're not an expert in ophthalmology, correct?
A. Correct.
Q. You're not an expert in neuro-ophthalmology, correct?
A. Correct.
Q. You're not an expert in intracranial hypertension, correct?
A. Correct. And since we're defining terms, I do not present myself as an expert in those things despite a smattering of knowledge.
(Exhibit 6 marked.)
Q. (BY MR. ISMAIL) I'm handing you what we've marked as Exhibit 6 to your deposition. And I'll just give you this as well, Exhibit 7, to your deposition.
(Exhibit 7 marked.)
A. Thank you.
Q. (BY MR. ISMAIL) Exhibit 6 and 7 are -- Exhibit 6 is entitled List of References Cited in the Report. And Exhibit 7 is list -- Reliance List of Additional Published Resources.
Do you recognize these exhibits as such?
A. I do.
Q. Do Exhibits 6 and 7 contain all the materials you're relying upon to support your opinions in this case?

Page 64

MS. LAMACCHIA: Objection, form.
A. No, there is an additional list for you of items that I'm relying upon. These are the vast majority of the literature items.
MR. ISMAIL: And do we have that list available?
MS. LAMACCHIA: We do. And it was responsive to Request No. 5 in the notice of deposition.
MR. ISMAIL: Okay. Before we get there . . .
Q. (BY MR. ISMAIL) Do Exhibits 6 and 7 contain all the materials you relied upon as of the service of your expert report on December 20 -- withdrawn.
Exhibits 6 and 7 contain all the materials you relied upon for your expert report dated December 21st, 2017?
A. Yes.
Q. And since December 21st, 2017, you have reviewed additional materials upon which you're relying? Do I understand that correctly?
A. Relying today, yes.
Q. Okay. Do you have that list?
MS. LAMACCHIA: Uh-huh.
A. We do.
(Exhibit 8 marked.)

Page 65

Q. (BY MR. ISMAIL) Marking Exhibit 8. It's a document provided today entitled Additional Documents Reviewed. Am I correct, Doctor, that everything listed on Exhibit 8 you've reviewed since December 27 -- December 21st, 2017?
A. Yes.
Q. There are the seven expert reports you referenced previously?
A. Yes.
Q. And then you have literature and then there's some Bates numbers there?
A. Yes.
Q. Are those actual literature, or are those company documents?
A. They appear to be company documents.
Q. Then you have --
A. And then -- I'm sorry. If we would include the last one there, Mirena label as a company document.
Q. And then on page 2, there are two additional publications that you are citing in Exhibit 8, correct?
A. Correct, that are not represented within our other two lists.
Q. Can you give me a description of what these company documents are, if you know?
A. I would have to look at them and show them to

Page 66

you.
Q. All right. So between Exhibits 6, 7, and 8, do they contain a listing of all materials you're relying upon for your opinions in this case?
A. Yes.
Q. You've not reviewed any deposition testimony, correct?
A. Correct.
Q. Including any testimony of any expert witness in this litigation?
A. No deposition testimony. I -- I've read expert reports.
Q. And have you read -- actually read the -- each of the documents that is listed in Exhibits 6, 7, and 8?
A. Yes. And I'm sure we would all understand there are different levels of reading from perusal to cursory to in-depth review to intense study.
Q. Okay. So you have at least glanced at all the documents on Exhibit 6, 7, and 8, right?
MS. LAMACCHIA: Objection, form.
A. I will say glanced to perused. I've -- I've read the words.
Q. (BY MR. ISMAIL) Of every page of every document?
A. Of every page of every document.
Q. Okay. Who selected the internal Bayer documents

Page 67

for your review?
MS. LAMACCHIA: Objection, form.
A. Counsel. I have no access otherwise.
Q. (BY MR. ISMAIL) Okay. So the internal company documents you're relying upon on this case were selected for your review by plaintiffs' counsel, true?
A. True thus far.
Q. In your expert report, if I -- please correct me if I'm wrong, but I noticed four internal Bayer documents that you cited in the body of your report. Does that sound about right?
A. About right, yes, uh-huh.
Q. Two --
A. I just saw four as I looked, two on page 20 and one on page 25 and Mirena prescribing information on page 24.
Q. Okay. So let's -- let's be specific. Two of the internal Bayer documents you reference in the body of your report deal with acne and hair growth, right?
A. Is there a particular page number we're looking at?
Q. Page 20.
A. Androgenic side effects. In the body, I don't specifically cite which androgenic side effects.
Q. Down in the footnote, I believe you do.

Page 68

A. Hair loss and acne, correct.
Q. Okay. And then I guess you reference as well this communication with the New Zealand health authority, correct?
A. Medsafe, yes.
Q. And then you reference a -- a spreadsheet of adverse event reports that you reviewed, 115 adverse event report cases?
A. Yes.
Q. And then there's a reference to the rate of ovarian cysts from a specific clinical trial. Do you recall referencing that?
A. What page are we looking at now, please?
Q. Well, I don't have the page number. But do you recall citing that reference in your expert report?
A. It sounds very familiar, but I need to see the cite --
Q. Okay. Well, let --
A. -- to testify.
Q. Let me ask it this way.
A. Okay.
Q. The only internal Bayer documents that even mention intracranial hypertension under any definition is the communication from the New Zealand health authority and the spreadsheet of the adverse event reports you

Page 69

reviewed in this case, true?
A. I --
MS. LAMACCHIA: Objection, form.
A. I would not be able to conclude that. I don't -- I don't have that breadth of memory.
Q. (BY MR. ISMAIL) Do you recall citing any other internal Bayer document that even mentions intracranial hypertension other than the New Zealand health care communication and the spreadsheet of 115 adverse event reports?
A. You're asking citing and do I remember. Well, I don't remember. I certainly don't remember citing any other documents.
Q. Okay. As we go through your report today if you see another internal document that reference -- references intracranial hypertension other than the two I mentioned, you'll point it out to me?
A. Okay.
Q. With respect to this communication with the New Zealand health authority, what was your purpose in making that reference on page 20?
A. It was to provide a bookend for when this association and possible causal relationship first appeared in Bayer documents.
Q. So you reviewed a selection of Bayer documents

Page 70

provided by plaintiffs' counsel to form an opinion as to when you think folks at Bayer were aware of an association between Mirena and IIH?
MS. LAMACCHIA: Objection, form.
A. Potentially aware, and the beginning date based on the documents I had, realizing there could be even earlier documents that I did not have access to.
Q. (BY MR. ISMAIL) Do you know how this inquiry from the New Zealand health authority was resolved?
A. I do not recall if I read that or not.
Q. Are you relying on this communication from the New Zealand health authority in any way as supporting your opinion on causation?
MS. LAMACCHIA: Objection, form.
A. To some degree, yes.
Q. (BY MR. ISMAIL) Does it matter how the New Zealand health authority resolved this inquiry as to the probity of that dialogue on the issue of causation?
MS. LAMACCHIA: Form.
A. I don't know the word "probity."
Q. (BY MR. ISMAIL) Then I'll rephrase. Is it relevant to you in any way to understand how the New Zealand health authority resolved the issue of this inquiry to which you cited in your expert report?
A. Taking in the context the date and the other

Page 71

cases subsequent, I would certainly want to know, and if I do know, I don't recall, but I would say it would not affect my overall conclusion very much.
Q. How --
A. It's a -- it's a single case 17 years ago.
Q. How -- you -- you indicated you are relying at least in part on this -- the fact of the inquiry from the New Zealand health authority in your opinion about causation. Tell me --
A. True.
Q. -- in what way you are relying upon that communication for a causation opinion.
A. My causation opinion is there is a causal relationship between Mirena and IH. Part of that causation opinion would be when could this first have appeared. When could reasonably prudent people raise this as a possible causal relationship. That's what the New Zealand inquiry means to me.
Now, does it mean it should have been immediately concluded? No. But it's a bookend of a series of information.
Q. So do I understand correctly, Doctor, you're not relying on the fact of the New Zealand communication to support the -- the opinion that there is a causal relationship between Mirena and IIH?

Page 72

A. No, I am still using it as -- as one of the building blocks of that conclusion.
Q. Okay. You've told me that you're relying upon it to help set the time frame when this conclusion could have been reached --
A. But the causal relationship as well.
Q. Okay. In what way is the fact of the inquiry relevant to whether or not there is a causal relationship at all?
A. One has to first postulate whether there could be a causal relationship. One person has to make one inquiry to start the snowball rolling.
Q. So --
A. And to me the New Zealand report is the first nidus of that snowball.
Q. All right. And you've told me you don't know one way or another how that inquiry with New Zealand was resolved?
A. I'm less interested in the resolution at that very long time ago than I am with the subsequent data to it, data, literature, reports, opinions. To me, this is the starting point.
Q. Your expert report does not contain any opinion on the overall risk/benefit profile of Mirena, true?
MS. LAMACCHIA: Objection, form.

Page 73

A. I include no formal risk/benefit analysis, as I would call it, although I do mention Mirena in various groups and various uses, but no formal risk/benefit analysis.
Q. (BY MR. ISMAIL) Your opinion -- your expert report does not contain any opinion on any potential adverse event from Mirena other than intracranial hypertension, correct?
MS. LAMACCHIA: Objection, form.
A. I haven't asked so far. But could I ask you to repeat your question?
Q. (BY MR. ISMAIL) Sure. Your expert report does not contain any opinion regarding any potential adverse event for Mirena other than intracranial hypertension, correct?
A. And I believe --
THE REPORTER: I didn't hear your objection.
MS. LAMACCHIA: Same objection.
A. And I believe you're asking for a specific risk --
Q. (BY MR. ISMAIL) Yes.
A. -- because on page 8, I am talking about the need for a complete discussion of benefits versus risks of IUD use, which would include Mirena.
Q. Yes, I'm looking for a specific adverse event.

A. For example, perforation.
Q. For example.
MS. LAMACCHIA: Counsel, is that a question?
MR. ISMAIL: He was asking for clarification and I provided it.
A. Because my focus was on IH, although I've read a lot about perforation, I don't believe I addressed perforation or anything other than androgenic side effects. But my focus was on androgenic side effects including our concept of IH.
Q. (BY MR. ISMAIL) Your expert report does not contain any opinion regarding Bayer's compliance with FDA regulations, correct?
A. That is correct.
Q. You have -- your expert report does not contain any opinions on the adequacy of Bayer's drug development efforts for Mirena, correct?
MS. LAMACCHIA: Objection, form.
A. Drug development, that's correct.
Q. (BY MR. ISMAIL) Your expert report does not contain any opinions regarding Bayer's pharmacovigilance regarding Mirena, true?
A. The vigilance portion, that's correct, I don't talk about that.
MR. ISMAIL: All right. I'm going to switch


topics here, maybe now is a good time for a break.
MS. LAMACCHIA: It's a good time for a break.
THE WITNESS: Thank you.
THE VIDEOGRAPHER: Off the record, 10:48, the end of Tape 1.
(Short recess.)
THE VIDEOGRAPHER: Okay. On the record, 11:03, beginning of Media 2.
A. Counsel.
Q. (BY MR. ISMAIL) Yes, sir.
A. I have a correction to something I said earlier.
Q. Please.
A. I experienced the tip of the tongue phenomenon with that Searle product, the product Cytotec.
Q. Great.
A. Thank you.
Q. Doctor, you agree that contraceptive choice is important, correct?
A. Yes.
Q. Unplanned pregnancy is a serious public health issue?
A. Yes.
Q. Unplanned pregnancy can present certain risks to both the mother and the baby?


A. Sure, yes.
Q. And there are socioeconomic consequences to unplanned pregnancy, correct?
MS. LAMACCHIA: Objection, form.
A. Yes.
Q. (BY MR. ISMAIL) What contraceptive products do you generally prescribe?
A. I'm going to define "prescribe" as the broader sense of recommend if it's not requiring a prescription.
Q. And let me rephrase.
A. Okay.
Q. When I say "prescribe," I do mean prescription, contraceptives --
A. Okay.
Q. -- products that are only available through a physician's prescription.
A. Then we would skip the introductory part of my usual informed concept and we would go to all things prescription beginning with diaphragm requires a prescription. Then we would move to hormonal contraception.
And I offer oral, rarely transdermal, rarely injectable. Then in terms of LARC, I use intrauterine contraception. That requires a prescription. And I'm not going to mention sterilization, because that's not my


definition of a prescription.
Q. So can you give me a breakdown of those patients who are receiving prescription contraceptives how your patients -- if you just give me a rough breakdown proportion of each type of contraception you just described.
A. Because of my practice being dominated with reproductive endocrinology patients, many of whom need ovarian suppression of control or one degree or another, the vast majority of my population uses oral contraception on the order of 95 plus or minus 2 percent.
Q. In that proportion that you just described, has that been true for, say, the last ten years of your prior private practice?
A. I would think so.
Q. Even going back longer than that?
A. With that plus or minus couple of percentage points, I would say yes.
Q. Now --
A. And I would say that would be typical of my kind of practice.
Q. You would agree that all prescription forms of contraception have risks and benefits associated, right?
MS. LAMACCHIA: Objection, form.
A. To some degree or another, yes, each one has

Page 78

their own ratio.
Q. (BY MR. ISMAIL) And some -- all forms of prescription contraceptives carry potentially serious risks, right?
MS. LAMACCHIA: Objection, form.
A. I know you want precise answers. I -- I think the -- the most serious risk of a diaphragm is not using it?
Q. (BY MR. ISMAIL) Okay. So if we exclude diaphragm --
A. Perhaps we should.
Q. -- then using either implantable, intrauterine, or oral contraceptives all carry potentially serious side effects?
A. And let's add transdermal.
Q. Transdermal. All carry --
A. All those.
Q. -- potentially serious complications, correct?
A. Yes.
Q. Now, contraceptives are not equally efficacious, correct?
MS. LAMACCHIA: Objection, form.
A. They're not equally efficacious as published as theoretical optimal use and real world practical use.
Q. (BY MR. ISMAIL) Would you agree, Doctor, that

Page 79

IUDs are the most effective form of reversible contraceptive?
A. In general, across all populations, all demographics, in general, yes.
Q. You indicated that the vast majority of your prescription experience with contraceptives are in oral contraceptives, correct?
A. Yes.
Q. Does that include combined oral contraceptives?
A. It includes mostly combined oral contraceptives.
Q. Do you currently prescribe oral contraceptives that contain levonorgestrel?
A. Yes, I do.
Q. If I abbreviate levonorgestrel to LNG for the purposes of today, will you understand what I'm referring to?
A. Yes.
Q. How long have you been prescribing LNG-containing oral contraceptives?
A. Probably since 1982.
Q. Now, there are potentially serious risks with oral contraceptives of any type, right?
A. Yes.
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) Are there particular women who

Page 80

are at increased risk of side effects from oral contraceptives?
A. Yes.
Q. Can you tell me what those categories are?
A. I can certainly recall some of them.
Q. Uh-huh.
A. They would be people who had a bad side effect to a contraceptive before. They would be women who are of what's called advanced maternal age or advanced contraceptive age somewhat arbitrarily chosen as age 35.
There are people who are at risk for thromboembolic phenomenon, people who have had a blood clot before or possess a thrombophilia at which they're at risk for thrombosis again. There are -- there is some concern about hypertensive women less than there was some years ago. There's some concern about diabetic women, although less concern than there was years ago.
Overlapping with those comorbidities are issues with weight. Obesity is rarely a favorable experience for any medical scenario, and this includes contraceptive prescription.
Q. So some of the conditions that you describe as potential side effects from oral contraception include thromboembolism, correct?
A. Correct.

Page 81

Q. And that's a potentially fatal consequence of oral contraceptives, correct?
MS. LAMACCHIA: Objection, form.
A. Whatever contributes to the thromboembolism, it is a potentially fatal situation.
Q. And you would consider obesity as a risk factor for increasing the risk of various side effects from oral contraceptives, correct?
MS. LAMACCHIA: Objection, form.
A. It would depend on the degree of obesity. It would depend on the degree of the -- any mitigation was concomitant with the oral contraception, but I can testify that in general the literature reflects some increase, although this is not consensual, it's not consensus across the literature, obesity does represent additional challenge.
Q. (BY MR. ISMAIL) Which LNG-containing oral contraceptives do you prescribe?
A. I prescribe the 20-microgram ethinyl estradiol containing pill known at one time as Nordette and then sister drug Mircette. A medium dose in the 30- to 35-microgram range, Lo/Ovral or more commonly now Low-Ogestrel. And then occasionally I prescribe 50-microgram EE pills, Ovral and Ogestrel. I occasionally, not often, will prescribe phasic

Page 82

levonorgestrel-containing pills like Triphasil or Tri-Levlen.
Q. And of the various products you just described, do you have an approximate breakdown of your prescribing practices as to how much of each type?
A. We're going to -- we're going to lump the LNG pills all together compared to the other progestins?
Q. Correct. So of the --
A. Uh-huh.
Q. -- LNG-containing oral contraceptives, how does it break down?
A. I would say to answer the question this way, that it is probably a fourth of my practice takes LNG oral contraceptives.
Q. And of the oral contraceptives containing LNG, which do you prescribe the most?
A. Probably it would be a slightly skewed Bell-shaped curve with Low-Ogestrel at the peak.
Q. Is that the 20-milligram or the 30 to --
A. That's the 30 --
Q. -- 35? Okay.
A. 30 to 35 range.
Q. And this estimate you gave about a quarter of your practice being levonorgestrel-containing oral contraceptives, has that been true over the last ten years

Page 83

or so?
A. Yes.
Q. Going back to the '90s, was it more common to have LNG-containing oral contraceptives?
A. Yes.
Q. You indicated that you place IUDs as well?
A. I do.
Q. Do you currently place Mirena?
A. If you would define "currently" for me, please.
Q. When's the last time you placed a Mirena?
A. Over six months ago.
Q. You have women who you are following in your practice who have a Mirena, correct?
A. Correct.
Q. Over the last six months, how many IUDs have you placed?
A. A couple of ParaGards.
Q. So --
A. Two.
Q. Two over the past six months?
A. Yes.
Q. In the previous six months, how many IUDs did you place?
A. I would estimate three to five. I don't know for sure.

Page 84

Q. Okay. So was there a time that you were placing IUDs more frequently in your patients than you did this past year?
A. The -- in short, no. It would just depend on the patients I was working with that year and who was coming in the door and what informed consent looked like. There hasn't been a shift in my attitude regarding IUDs until six months ago.
Q. All right. So let's say in 2016, what was your estimate of how many IUDs you placed?
A. In the year 2016, probably six to eight to ten, eight plus or minus two.
Q. Be fair to say that over the last 10, 12 years, on average, you would place fewer than ten IUDs a year?
MS. LAMACCHIA: Objection, form.
A. I would say ten plus or minus a couple. I would say over the last ten years, not more than 100.
Q. (BY MR. ISMAIL) I take it prior to six months ago, you were placing Mirenas, right?
A. Yes.
Q. Of the ten plus or minus a couple every year, how many were Mirena versus other IUDs?
A. The majority.
Q. Were Mirenas?
A. Yes, sir.

Page 85

Q. And of the balance, would those be ParaGards or others, hormonal IUDs?
A. They would be ParaGard. I did use Progestasert some years ago, but not very many.
Q. So since year 2000, what's your estimate of how many Mirenas you've placed?
A. At 17 years, I guess about 110 plus or minus ten.
Q. Did you begin placing Mirenas as soon as that product was available in or around 2000?
A. Well, about 2002, yes.
Q. Have you ever placed a Skyla?
A. I have not.
Q. Liletta?
A. I have not.
Q. Kyleena?
A. I have not.
Q. So you estimate you've maybe placed 40 or 50 ParaGards?
A. Yes, over that same time period.
Q. Was it your work in this litigation beginning about six months ago that led to your change in preference for Mirena as an IUD?
A. Yes.
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) What risks do you associate with

the ParaGard?
A. I associate risk of perforation at its insertion. Once it's successfully placed, in my informed consent process with the patient, I would say there is some literature reporting that copper-containing IUDs are associated with more excess bleeding and more uterine pain.
And if this was of particular relevance, we would go into the literature a bit. I'm sorry. I'd like to continue. I do mention -- not by name, but I mention Wilson's hepatolenticular disease, although that's profoundly rare.
I do mention the length of time it's kept, and I do talk about continued rates with everybody, too.
Q. Are there noncontraceptive benefits to a Mirena?
A. Yes.
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) Such as?
A. Without question, the most widely known as well as useful is reduced uterine bleeding.
Q. Have you counseled women about the benefit of reduced uterine bleeding with a Mirena?
A. Yes, I have counseled. And part of that counseling is whether amenorrhea, if it were to result, is a good thing for them. I do let them know that amenorrhea


is, interestingly enough, one of the reasons people stop using Mirena.
MS. LAMACCHIA: Counsel, can we go off the record for one second?
MR. ISMAIL: Sure.
THE VIDEOGRAPHER: Off the record at 11:19 a.m.
(Short recess.)
THE VIDEOGRAPHER: We're on the record at 11:20.
A. Please.
Q. (BY MR. ISMAIL) Yeah. In your experience, Doctor, is the Mirena effective in -- is it an effective form of contraception?
MS. LAMACCHIA: Objection, form.
A. With occasional exception, but in general, yes.
Q. (BY MR. ISMAIL) And in your experience where reduced uterine bleeding is a desired effect of the product, is it effective in that context as well?
A. In most situations, yes, it is.
Q. You've described for me two instances in which you had patients exhibit neurological symptoms that led you to remove the IUD in the case of Mirena?
A. I'm sorry. Did you say two or few?
Q. Two.


A. It's a few.
Q. Okay. How many is a few?
A. I believe on the order of four.
Q. All right. So you have four patients for whom you recall removing the Mirena because of neurological symptoms?
A. Neurologic or potentially neurologic symptom. And what I mean there, not to be vague, is nausea. Okay.
Q. So you're including nausea in that context as well?
A. Yes, because in retrospect now, I recognize the nausea they had, although it did not make much sense to me then, could have been a symptom of IH.
Q. Did you have any patients on Mirena that developed papilledema?
A. I don't know. None proven.
Q. And I think you told us none of your Mirena patients were worked up to diagnose intracranial hypertension, correct?
A. Not adequately, correct. Not adequately to make that diagnosis, correct.
Q. Generally, in your experience, is the Mirena well tolerated?
MS. LAMACCHIA: Objection, form.
A. You'd have to let me know what you mean by


"well." Now, I could -- I could comment further.
Q. (BY MR. ISMAIL) Let me rephrase. Relative to other forms of prescription contraceptives, including ParaGard, oral contraceptives, subdermal contraceptives, is the Mirena well tolerated?
A. Let me answer each of those. ParaGard, it's tolerated, it seems, very much similarly. To oral contraceptives, there are discontinuations of age. And for very different reasons a direct comparison is difficult. But I do believe that there's a discontinued rate of Mirena over time greater than oral contraception for lack of tolerance.
For transdermal, transdermal is actually tolerated very well over time. It's usually discontinued to conceive or because of my concerns with potential complications.
Q. On page 12 of your report.
A. Yes.
Q. You write, "OB/GYNs are taught that obese women may be particularly good candidates for hormonal-containing IUDs for a variety of reasons," which you then list, correct?
A. Correct.
Q. Taught by whom?
A. Our teachers in general, more specifically our

Page 90

professors, our fellow residents who are senior to us. Some of these teachings are informal classroom settings. Much of it is in the clinic when we learn to actually care for patients.
Q. So you would agree that it's the general view in the OB/GYN community that hormonal IUDs are particularly -- withdrawn.
You would agree that it's the general view in the OB/GYN community that obese women are particularly good candidates for hormonal IUDs?
MS. LAMACCHIA: Objection, form.
A. As best, I can assess the general feeling from medical literature, although it's not unidirectional, ACOG documents, my own experience, conferences, I would say in general that's true.
Q. (BY MR. ISMAIL) So you would agree that hormonal IUDs are preferentially prescribed to obese women?
A. For a variety of reasons in this country, yes.
Q. You write in the next full paragraph below what we just read, "However, a 2013 article reporting on a large contraceptive study including over 7400 participants utilizing all hormonal methods, including oral, subdermal, vaginal, and intrauterine delivery, failed to demonstrate different three-year failure rates among overweight, obese, and morbidly obese women for any of the study

Page 91

methods."
Did I read that correctly?
A. Yes, sir.
Q. Now, your citation for that is an author by McNichols?
A. McNicholas.
Q. Yes. Thank you.
A. Would I be able to see my copy?
(Exhibit 9 marked.)
Q. (BY MR. ISMAIL) Is Exhibit 9 a copy of the McNicholas paper?
A. It is.
Q. Now, if you look in the method section in the abstract.
A. Yes. Of the abstract, yes.
Q. The forms of contraception examined in this study were the oral contraceptive pill, transdermal patch, and the contraceptive vaginal ring, correct?
A. Yes.
Q. Not the intrauterine form of contraception, correct?
A. Correct.
Q. So is that a mistake in your report?
MS. LAMACCHIA: Objection, form.
A. It is in terms of I should delete "all" and

Page 92

should delete "intrauterine delivery."
Q. (BY MR. ISMAIL) So the McNicholas study does not comment at all on contraceptive efficacy in obese women using an IUD, correct?
A. That's correct. Hormone containing or not. I apologize for that error.
Q. And in any event, what this study looked at was just the -- the efficacy of specific forms of contraception and whether there's a difference in efficacy in -- stratified by BMI, correct?
A. Efficacy as defined by failure rate, that's right.
Q. So this paper doesn't -- well, this paper doesn't address some of the other reasons why obese women are particularly good candidates for IUDs, correct?
A. Well --
MS. LAMACCHIA: Form.
A. -- it does not look at bleeding, happenstances among obese versus not obese. It does not look at oral versus intrauterine risk. Now, the citation of this paper was simply for the effect of obesity on oral contraception risk.
Q. (BY MR. ISMAIL) Not risk, efficacy, right?
A. Sorry. Efficacy.
Q. So --

Page 93

A. I sometimes will include unintended pregnancy as a risk and I shouldn't. It should be efficacy.
Q. So the -- the rationale of -- that you described as generally being the view in the medical community that obese women are particularly good candidates for IUDs is not contradicted in any way by the McNicholas paper, correct?
A. I think that's true.
Q. And the McNicholas paper does not in any way contradict the consensus view that -- withdrawn.
All right. We'll leave it at that.
A. Okay. May I comment on -- I need to correct my previous testimony. I have used hormonal vaginal ring as well, not very many, on the order of the patch I've used. So I just need to adjust my contraceptive use testimony.
Q. Over the last six months, sir, do you even offer hormonal IUDs as a contraceptive option to your patients?
A. Not over the last six months, no.
Q. Prior to six months ago, was there a particular patient population that you believe was well suited for Mirena?
A. Yes.
Q. What's that?
A. In order of prevalence, it would be, No. 1, there's the concept of bridging contraception to

Page 94

menopause. So this would be perimenopausal people, perhaps in their 40s, who are not interested in sterilization. Category No. 2, I did feel that progressively worse obesity did represent a particular advantage of intrauterine hormonal contraception. So that would be a second group. No. 3, although having read about the importance of parity or not, I more often will discuss intrauterine contraception in people who have had a baby before.
Q. On page -- on page 1 of your report, you describe that "Hormonal and nonhormonal IUDs are the most common reversible method of contraception worldwide used by more than 90 million women."
Did I read that correctly?
A. You did.
Q. Do you have an approximate breakdown between hormonal and nonhormonal IUDs of that 90 million?
A. I do not off the top of my head.
Q. All the hormonal IUDs use LNG, correct?
A. Yes, currently.
Q. Currently.
A. Yes, currently, yes.
Q. Now, you understand, Doctor, that several thousand patients have been studied in clinical trials using a Mirena?

Page 95

A. Yes --
MS. LAMACCHIA: Objection, form.
A. -- that is my understanding.
Q. (BY MR. ISMAIL) And some of those studies are prospective and some have been retrospective, correct?
A. Yes.
Q. On page 6 of your report, you were able to confirm over 5,500 citations to Mirena in the medical literature. Actually, that appears on page 7 of your report. Sorry.
A. With a PubMed search, yes.
Q. And that makes Mirena the most widely studied hormonal IUD ever?
A. I've --
MS. LAMACCHIA: Objection, form.
A. I've not studied that fact, but I could believe that if stipulated.
Q. (BY MR. ISMAIL) Your task in this case was to canvass the world's medical literature to determine whether or not there is a causal relationship between Mirena and intracranial hypertension, correct?
MS. LAMACCHIA: Objection, form.
A. My mission was to review the medical literature as to that possibility and then compared with the cases that I was made aware of.

Page 96

Q. (BY MR. ISMAIL) Can you identify a single medical article in which the authors conclude that Mirena causes intracranial hypertension?
A. I cannot.
Q. Can you identify a single abstract in which the authors conclude that Mirena causes intracranial hypertension?
A. Focusing on the verb "conclude," no, I cannot.
Q. Can you identify a single poster presentation in which the authors conclude that Mirena causes intracranial hypertension?
A. Focusing on the word "conclude," no, I cannot.
Q. Can you identify a single presentation at a scientific conference in which the speaker suggested that Mirena causes intracranial hypertension?
A. A presentation?
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) At a scientific conference.
A. Verbal presentation?
Q. Yes, sir.
A. I reviewed a slide presentation by Corbett -- based on what I know about the printed literature and the printed poster literature, in reasonable probability, those slides exist where such a causal relationship is suggested, proposed, or raised. I would have to look at

Page 97

my Corbett slides. Can I look through that stack?
MS. LAMACCHIA: Sure.
A. It would be from the first volume --
MS. LAMACCHIA: This is -- your binders are -- oh, everything here.
A. Can I use my binders?
MS. LAMACCHIA: You can look at your binders.
Q. (BY MR. ISMAIL) Whatever you need to look at to answer the question, sir.
A. Thank you.
This is a lecture by James Corbett from the University of Mississippi, and it is entitled Medication Associated Intracranial Hypertension. And in his seventh slide -- seventh slide, he includes levonorgestrel in Norplant as a hormone associated with intracranial.
Now, I cannot tell you he used the word "suggest." I don't mean to be nonresponsive, but we can look at the slide he presented.
Q. Sure. So do you know Dr. Corbin?
A. Corbett I think it is.
Q. Corbett. Sorry.
A. I do not. I've read several of his works, though.
Q. And where did you get a copy of this slide

Page 98

presentation?
A. Because I have no access to slide presentations other than counsel, this item I'm able to attest came from counsel in this litigation.
Q. So this document's not Bates numbered in any way. You can confirm on the -- your copy there.
A. No, it is not.
Q. And do you know how counsel obtained a copy of the slide presentation?
MS. LAMACCHIA: Objection, form.
A. I do not know.
Q. (BY MR. ISMAIL) Do you know when this presentation was given?
A. I quickly looked for a date and did not see one.
Q. You understand there's a difference between association and causation, correct?
A. Oh, very much so, yes.
Q. The title of the -- the title slide says, "Medication Associated Intracranial Hypertension," correct?
A. Yes, associated, right.
Q. And the word "cause" or "causation" does not appear anywhere in the slide presentation, correct?
A. I didn't check all the slides. It's certainly not on that slide.

Page 99

Q. And all this slide has that you referred me to it's entitled "Corticosteroids and Other Hormones," and it's got a bullet listing of various medical products or categories, including levonorgestrel, correct?
A. And specifically Norplant. It does not say Mirena.
Q. Right. So going back to my question. Even including the Corbett slide deck, can you identify a single presentation at a scientific conference in which the speaker suggested that Mirena causes intracranial hypertension?
A. No.
Q. And you understand when I'm using the term "intracranial hypertension," I'm using it as you've defined that term in your opinions in this case?
A. I believe we agreed to that, so, yes.
Q. Can you identify a single -- I'll give this back to you, sir.
A. Thank you.
Q. Can you identify a single medical organization in the world that has concluded that Mirena causes intracranial hypertension?
A. No, I cannot.
Q. Can you identify a single public health regulatory body anywhere in the world that has concluded

Page 100

that Mirena causes intracranial hypertension?
A. No.
Q. Is it your position, sir, that it is generally accepted in the medical community that Mirena causes intracranial hypertension?
MS. LAMACCHIA: Objection, form.
A. No, it is not my position at this time.
Q. (BY MR. ISMAIL) You agree that it is not generally accepted in the medical community that Mirena causes intracranial hypertension, true?
MS. LAMACCHIA: Objection, form.
A. I believe that's true.
Q. (BY MR. ISMAIL) Are you aware of anyone other than paid experts for the plaintiffs who has concluded that Mirena causes intracranial hypertension?
MS. LAMACCHIA: Objection, form.
A. Focusing on the verb "concluded" to be distinguished from raises the possibility, questions, investigates, no, I do not.
Q. (BY MR. ISMAIL) You have found in your review of the published medical literature several articles in which the authors conclude the opposite; namely, that a causal relationship between Mirena and IH has not been established, true?
MS. LAMACCHIA: Objection, form.

Page 101

A. Has not been established definitively. I think that's consensus throughout the literature.
Q. (BY MR. ISMAIL) Make sure I understand your testimony. Is it your view that the consensus view in the medical literature is that a causal relationship between Mirena and intracranial hypertension has not been established?
A. Has not been established --
MS. LAMACCHIA: Objection, form.
A. -- definitively has not been proven, true.
Q. (BY MR. ISMAIL) Now, using your definition of intracranial hypertension, do you believe there are known causes of that condition?
A. Using my definition, yes.
Q. So you -- I'm excluding --
A. Masses --
Q. Correct.
A. -- meningitis, thrombosis.
Q. So what conditions do you believe cause intracranial hypertension?
A. I believe there can be medications, most typically published in the literature retinoids, the tetracycline line of medications, some hormones ranging from growth hormone to levonorgestrel. I do feel levonorgestrel has a place on that list.

Page 102

I would have to reference one of my IH review articles to further embellish that list. I would look at either binder or one of the articles by Friedman to answer that more fully.
Q. Okay. So just so you have my question in mind, I wasn't asking about products or -- or conditions that have been associated with IH.
A. Uh-huh.
Q. I'm asking for -- and it may be the same answer, but just so I'm clear, the Dr. Wheeler list of products or conditions that cause intracranial hypertension. And you've told me --
A. Medication associated.
Q. And you said tetracycline products, growth hormone, other hormones, including levonorgestrel, all of which you think cause IH, right?
A. Cause or are significant contributing factors, yes.
Q. And can you tell me which article you're now reviewing?
A. I mentioned binder. I'm looking at binder.
Q. Uh-huh.
A. And one of my favorite reviews that I've reviewed in this litigation, because it goes to the history of nomenclature like I tried to with you. It has a nice

Page 103

modified Dandy criteria. And it -- just to reference you, on page 540, it has clinical associations with IH as I define it and -- and it includes some things that I'm sure we're going to talk about: Female gender; obesity to be distinguished from weight gain; sleep apnea; hypothyroidism; Addison's disease; uremia, which means kidney failure; lupus; and then gets into the medications.
Q. And what table is that from?
A. Table --
Q. Go ahead.
A. Table 2, page 540, Binder 2004.
Q. Do you believe all the conditions and medications listed in Table 2 of that binder publication cause intracranial hypertension?
A. We've not talked about the various definitions of cause. Cause is the word I'm tripping up on. Cause or a significant contributing factor. The specific use of Table 2 to me is that it lists these factors such that the word "idiopathic" would not apply.
Q. So idiopathic means no identifiable cause, right?
A. To me, it means no identifying cause or contributing factor. And we haven't even talked about what population and what risk factors they have. Idiopathic to me means not a clue suggesting any other factor.

Page 104

Q. So the -- the conditions and products listed in Table 2 of that article, if a patient has such a condition or has used such a product, do you think that takes it out of the idiopathic form of intracranial hypertension?
A. In my eyes for the discussion that we're having today, yes. Now, in the realm of the neurology literature, not necessarily, thus the problem with nomenclature.
Q. So female gender is listed in Table 2, right?
A. Yes.
Q. So if a woman develops intracranial hypertension, you believe that's no longer idiopathic?
MS. LAMACCHIA: Objection, form.
A. Potentially not.
Q. (BY MR. ISMAIL) Does --
A. It would depend on what kind of female. And I'm sure we're going to talk about female versus male and adiposity patterns and -- and this sort of thing.
Q. So I'm having trouble reconciling your testimony. If Table 2 lists conditions that if are present you think take it out of intracranial -- idiopathic IH, wouldn't it be the case that a woman presenting with intracranial hypertension is no longer idiopathic?
MS. LAMACCHIA: Objection, form.
A. It would not fit -- it would not fit my exclusion

Page 105

from idiopathic. If a woman had no other identical -- identifiable factor, I would not fault an author including her as idiopathic.
Q. (BY MR. ISMAIL) How about an obese woman?
A. That, I would say is closer to the line of truly being an exclusion. However, it would partly depend on degree of obesity as to how sure I was.
Q. Okay. So if we had, say, a BMI over 35 --
A. Okay.
Q. -- would that be -- in a woman with a BMI over 35 presented with intracranial hypertension, in your view, sir, is that idiopathic or not?
MS. LAMACCHIA: Objection, form.
A. It is not in that I would prescribe weight loss for her, and there would be a very good chance that would be successful therapy.
Q. (BY MR. ISMAIL) So in your view of the woman over -- with a BMI over 35 who developed intracranial hypertension, it is not idiopathic because the obesity is an identifiable cause of that condition?
A. The obesity is a plausible generally accepted pathogenic mechanism, yes.
Q. How does obesity cause intracranial hypertension?
MS. LAMACCHIA: Objection, form.
A. I have read a variety of things about this. It

Page 106

has to do with the inflammatory nature of some obesity patterns. A hip/thigh obesity pattern, more found in women, is thought to be more contributing to the various factors that affect CSF mechanics. Much of which I've learned about the role of obesity is in the other expert reports, so we may want to look at their much more erudite statements than mine.
But within some of the reports, there's elegant explanations as to how obesity could affect CSF mechanics and cause or significantly contribute to IH.
Q. (BY MR. ISMAIL) Is it beyond your expertise, Doctor, to comment on how obesity causes intracranial hypertension?
A. It's beyond my expertise in terms of the pathophysiology and mechanisms, yes.
Q. It's within your expertise to comment that obesity is a cause of intracranial hypertension?
MS. LAMACCHIA: Objection, form.
A. It's within my expertise as a clinician to report that obesity would certainly be one of the factors I would look for in assessing an individual patient's risk of IH. That, I can attest to.
(Exhibit 10 marked.)
A. It's definitely a clinical parameter that I have access to and I'm familiar with.

Page 107

Q. (BY MR. ISMAIL) Right. So female gender is associated with an increased risk of IH, correct?
A. I do believe --
MS. LAMACCHIA: Objection, form.
A. -- that's fairly consensual in the literature.
Q. (BY MR. ISMAIL) And obesity increases a patient's risk of developing IH, correct?
A. That seems --
MS. LAMACCHIA: Objection, form.
A. -- to be consensus. To be distinguished from weight gain, which appears to be another independent risk factor.
Q. (BY MR. ISMAIL) That's where I was going next. So recent weight gain is an independent risk factor for --
A. IH.
Q. -- intracranial hypertension?
A. Yes.
Q. Age is a risk factor for developing intracranial hypertension; namely, it is women of reproductive age, which are higher risk of IH, correct?
MS. LAMACCHIA: Objection, form.
A. A more complicated answer will be required there, because we would have to separate adult from pediatric IH where the gender differences are quite different in those populations. But with the way you phrase your question, I

Page 108

can say it is generally a reproductive-age woman prevalence.
Q. (BY MR. ISMAIL) And you would agree that the women who are -- withdrawn.
So the -- of -- of the adult IH population, the demographic that is at greatest risk of developing intracranial hypertension is a women of reproductive age who is either obese and/or had recent weight gain --
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) -- correct?
A. Did you say the most at risk?
Q. Right.
A. I'm sorry. If you could say that again, please.
Q. The demographic group most at risk for IH -- for adult IH are women of reproductive age who are either obese and/or had recent weight gain?
MS. LAMACCHIA: Same objection.
A. On those -- if we look at demographic factors of age and gender and weight, that would be the group.
Q. (BY MR. ISMAIL) And, of course, women of reproductive age is the indicated population for Mirena, correct?
A. It is, with the small exception of using Mirena for bleeding post reproduction or in women who are sterilized.

Page 109

And at this point, as in my report, I want to point out the difference in the epidemiologic definition of reproductive age women, 15 to 44. The Mirena demographic does not quite achieve synonymousness with that.
Q. Right. You say --
A. Okay.
Q. -- 20 to 40, right?
A. I would say the Mirena demographic extends from the 20s to the 50s.
Q. All right.
A. Okay.
Q. We'll get to that.
A. All right.
Q. On page 9 of your report, you reference a document from the CDC?
A. Yes. This is it.
Q. Okay. And that was my next question. So Exhibit 10 is that copy of that CDC document, right?
A. Yes.
Q. First of all, if you turn to page 5 of the document, sir.
A. Yes.
Q. There is a table on efficacy rates?
A. Yes.

Page 110

Q. And they talk about typical versus perfect use, right?
A. And this was something we were talking about earlier, yes.
Q. And that distinction and -- and endpoint recognizes that some form of contraceptive -- contraceptives in the real world are used imperfectly?
A. Humans are humans.
Q. Correct.
A. That's right.
Q. So forget to take an oral -- forget to take a pill, failed to use a condom, that kind of thing, right?
A. All sorts of things, yes.
Q. And the difference between perfect use and typical use in a Mirena, there isn't one because there's no user error, so to speak, with a Mirena, right?
MS. LAMACCHIA: Objection, form.
A. Correct. And I noticed this when I read this article, the only little asterisk I would put there would be unknown expulsion.
Q. (BY MR. ISMAIL) And that's a fairly rare complication?
A. It is.
Q. And you see here that using this document that you cited, I assume you thought this Exhibit 10 is a

Page 111

reliable document?
A. Oh, I do.
Q. The efficacy of a Mirena is 99.8 percent, right?
A. Their defined efficacy, yes.
Q. Now, you cite this document as listing a classification of diseases associated with copper-containing or LNG-containing IUDs. Do you see that characterization?
A. Yes.
Q. And in fairness, Doctor, that's actually not what this document does, right? If you want to reference the IUD section, it begins on page 52 of Exhibit 10.
A. In the 50s, yes. But I reference page 54.
Q. I understand. But let me ask my question this way: This entire document is to catalog eligibility criteria for various forms of contraception, right?
A. That's the title.
Q. It is not even purportedly a listing of conditions associated as a potential side effect of any of the contraceptives listed in this document, true?
MS. LAMACCHIA: Objection, form.
A. That is true. My choice of words could be much better there.
Q. (BY MR. ISMAIL) And that's sort of obvious from the listing of conditions. You will see things like STDs

Page 112

and valvular disorders, none of which are conditions associated with an IUD, correct?
A. We should use valvular disorders, not STDs.
Q. Okay. Fine.
A. But, yes, yes.
Q. So it would be erroneous to list the CDC document as cataloguing conditions associated with the use of a Mirena, correct?
A. Yes, that's a miswriting on my part.
Q. And, instead, the classification of eligibility criteria go from 1 to 4 with a 1 being no restrictions on use, correct?
A. Correct.
Q. So if you go to the --
A. And that's -- and that's what my paragraph should have said as characterizing this better.
Q. Right. This document actually does not provide any evidence whatsoever on the issue of what side effects are causally associated with any IUD, true?
A. This is not about association or causation at all, that's right.
Q. Okay. Now, if you go to page 27 of your report --
A. Yes.
Q. -- you have a section describing the methodology

Page 113

used -- actually, it begins -- the section begins on page 26.
A. Yes, I remember.
Q. A section on the methodologies you use to arrive at your opinions in this case, correct?
A. Yes.
Q. The first methodology you list is a differential diagnosis.
A. That's an example I give of a clinical tool as I say, yes.
Q. Okay. A differential diagnosis is the process by which a clinician can -- considers that potential diseases that could be responsible for a given clinical presentation and then systematically eliminates potential causes through further testing.
Is that a fair description of a differential diagnosis?
A. It is, although in this case I like my writing better. But that's -- that's fair what you said.
Q. Okay. It is a process that necessarily examines the causes of a single patient's clinical symptoms, true?
A. In its usual -- that's a very interesting point. That's its usual clinical use, yes.
Q. There is no differential diagnosis process by which a clinician establishes whether a particular drug

exposure can cause a particular outcome?
A. I can't agree with that, because I could see where you take a look at a exposure to medication and you would list the possible outcomes of that. That is certainly a mechanism akin to differential diagnosis. Am I understanding the question?
Q. Let me ask -- let me ask it this way: In a clinical process of differential diagnosis, the conditions considered presuppose the identification of the potential causes as being established causes of the patient's clinical presentation, true?
A. Yes. I guess if we -- if we said "differential diagnosis can only occur to an individual human," but the process of listing an exposure and listing its possible outcomes, we might choose to call that deductive reasoning, but that is differential diagnosis.
Q. There's no differential diagnosis process to establish that a drug causes a particular side effect?
MS. LAMACCHIA: Is that a question?
MR. ISMAIL: Yeah.
THE WITNESS: It is -- it's a question.
Q. (BY MR. ISMAIL) That construct doesn't even make sense in the context of establishing causation, does it, Doctor?
MS. LAMACCHIA: Objection, form.



A. Not in the strictest sense.
Q. (BY MR. ISMAIL) Okay.
A. Because -- because differential diagnosis at the bedside usually involves an individual patient. But the process underlying differential diagnosis is a process of logic and deductive reasoning that would apply to that scenario.
Q. So you're --
A. So -- I'm sorry. Let me finish, please.
Q. Please.
A. Is -- is I would not object to you standing up and giving a talk and saying now I'm going to give in quotes a differential diagnosis of the various things that could cause -- that could come from this drug exposure. That would be an analogy.
Q. Can you identify any publication in the peer-reviewed literature that purports to follow a process of differential diagnosis to determine the potential side effects of the prescription medicine?
A. I -- I have never read that, so I'm not able to point to that.
Q. So when you say you employ the methodology of differential diagnosis, you acknowledge that you're using that term differently than how it's typically used in clinical medicine?



MS. LAMACCHIA: Objection, form.
A. I put it in quotes here. I tried to describe the process. I -- I mean it as a explanation and analogy. It does make sense to me, and I do try to explain the logic and deduction behind it.
Q. (BY MR. ISMAIL) Do you have my question in mind, sir?
A. I thought I did. Maybe we should try it again.
Q. When you employ -- when you say you employed a methodology of differential diagnosis, you acknowledge that you're using that term differently than how it is typically used in clinical medicine?
A. Typically used in the general situation, yes.
Q. And so when you say "the methodology of differential diagnosis," that's more akin to saying you followed a process of deductive reasoning?
A. I think --
MS. LAMACCHIA: Objection, form.
A. I think that's a fair interpretation.
Q. (BY MR. ISMAIL) All right. You then -- you say in your section on differential diagnosis -- well, let's go on to the second --
A. Methodology.
Q. -- methodology you list, and you say that of a risk/benefit analysis --



A. Yes.
Q. -- right?
A. Yes.
Q. Now, you agree all prescription medicines have risks, right?
MS. LAMACCHIA: Objection, form.
A. Generally, yes.
Q. (BY MR. ISMAIL) And on an individual patient basis, doctors perform a risk/benefit analysis for any recommended medical treatment, right?
A. They do. They should. We could argue the verb there perhaps. But there's some process of risk/benefit analysis for each prescription.
Q. And so that's one type of a risk/benefit methodology, counseling a particular patient on his or her medical options --
A. Yes.
Q. -- correct?
Another type of a risk/benefit calculation is that employed by the FDA in its review and decision to approve prescription medicines. You're aware of that, right?
A. Much more --
MS. LAMACCHIA: Objection, form.
A. -- detailed.

Page 118

Q. (BY MR. ISMAIL) And obviously FDA-approved Mirena for use, correct?
A. Yes.
Q. And thereby concluded that the benefits of Mirena outweigh its potential risks?
A. In general.
Q. So those are two different uses of the risk/benefit methodology that you and I just discussed, correct?
A. Yes.
Q. Now, the risk/benefit methodology cannot be used to determine whether a medicine causes an adverse event in the first place, true?
A. I think that's true.
Q. So when you say one other approach of -- or methodology you use in your report and you list the risk/benefit analysis, you agree that methodology was not employed by you in arriving at your opinion on causation, correct?
MS. LAMACCHIA: Objection, form.
A. I think that's true.
Q. (BY MR. ISMAIL) You then have a section on methodologies used by clinical epidemiologists and biostatisticians. Do you see that on page 28?
A. Used as a, but, yes.

Page 119

Q. What did I say? Well --
A. By -- it's a matter of labeling.
Q. Fair enough.
But then your report delves into philosophy, right?
A. Introductory philosophy as an introduction, yes.
Q. So that's this section on page 29?
A. Yes.
Q. What is the purpose of you including this discussion of philosophy in your expert report?
A. I am so glad you asked. Because the whole purpose is to introduce the science of causality. Some philosophers -- and even just by our discussions today, causality is not always a black and white discussion. It's not always crystal clear as Bradford Hill used the word. It is not to this day a conceptually -- a consensually determined concept.
So it's meant to introduce how causation was first raised by philosophers, then moved to natural scientists. And we have different concepts of causation in science, medicine, and law.
Q. Is this discussion of philosophical approach to causation relevant to any of the opinions you offer in this case?
MS. LAMACCHIA: Objection, form.

Page 120

A. Yes.
Q. (BY MR. ISMAIL) So this discussion of Immanuel Kant and David Hume are concepts that you relied upon for arriving at your opinions on causation?
A. To some degree, yes. It's -- I'm sorry. But it's my -- it's my attempt -- I mean, you've -- you've done a good job pointing out some of my writing imperfections, but it's my attempt to introduce a very important concept that causation is not always crystal clear. It rarely is, in fact.
Q. Can you -- can you agree, Doctor, that it is outside the mainstream and the peer-reviewed medical literature to discuss a philosopher's view on causation when considering whether a medication causes a particular adverse event?
MS. LAMACCHIA: Objection, form.
A. I can certainly agree with that, although my context is not medical literature. I'm not writing a journal piece here.
Q. (BY MR. ISMAIL) Right. But anyway . . .
A. But the answer to your question is, no, I haven't seen that.
Q. You then have a section on natural scientists' discussion of causation, right?
A. Emily Cox, yes.

Page 121

Q. Did you rely on this discussion involving the natural scientists' view of causation in arriving at your opinions in this case?
A. As a background mechanism, yes, to my understanding of the development of the definition of causation, yes.
Q. And you would agree that these concepts by natural scientists such as Jacob Henle and Robert Koch are not generally included in the peer-reviewed medical literature when analyzing whether a medicine can cause a side effect --
MS. LAMACCHIA: Form.
Q. (BY MR. ISMAIL) -- correct?
A. We're -- we're comparing an apple and an orange. My writing here is not a medical literature. Medical literature is extremely limited in pagination. It is not typically used. So your question is correct.
Q. If you'd turn to page 32, that's -- sorry. Just for context. You then go in to discuss the Bradford Hill criteria on assessing causation, correct?
A. Yes.
Q. Have you ever published in any context on the Bradford Hill criteria before?
A. I believe I mentioned it, described it, in my articles on causation for the DRI journal.

Q. And that's --
A. In any medical journals, no.
Q. Okay. On page 32, you say at the -- at the carryover paragraph at the top.
A. Uh-huh.
Q. You say, "Whereas belief that a causal relationship alone is not sufficient to warrant action, uncertainty about whether there's a causal relationship or even an association is not sufficient to suggest action should not be taken."
Did I read that correctly?
A. Yes. That's from Bradford Hill.
Q. And what is the application of that concept to your opinions in this case?
A. That the absence of an absolutely provable causal relationship does not excuse us from our responsibility of trying to define and understand the causal relationship between Mirena and IH.
Q. So the -- the quoted passage is uncertainty about whether there's a causal relationship or even an association is not sufficient to suggest action should not be taken? What action do you believe is being referred to there?
A. When he issued these words, he was cautioning his audience about inactivity. He was specific -- and this is



very relevant to our discussion today. He was cautioning his audience to not simply throw up their hands and say if something is absolutely not proven, we don't have to act on it.
He was imploring his audience to take action on the best information they had, and I think that's immediately applicable today.
Q. I'm trying to figure out what the act is. The act in what way?
A. Well, he was addressing smoking and lung cancer, and the act would be to do something about education and science about smoking.
Q. Do you believe, sir, using the words you have in your report, that there's uncertainty about whether there's a causal relationship or even an association between Mirena and intracranial hypertension?
A. I do, because it is not absolutely proven.
Q. Now, you -- at various points in time -- withdrawn.
You apply the Bradford Hill criteria to the relationship between intracranial hypertension and Mirena, correct?
A. Yes, as reflected in the medical literature.
Q. And of the various nine criteria of Bradford Hill, you at -- you rely on sort of a common set of lines



of evidence to support your view that criteria had been met?
A. Fair enough.
Q. And so to understand what your supporting bases are for your causation opinion in this case, tell me if I understand it correctly. You state that intracranial hypertension is an androgen-mediated condition and Mirena has causes -- androgen-related side effects?
A. That's part of it, yes.
Q. And if I refer to that as the androgen theory as a shorthand, you'll know what I'm referring to?
A. Yes. We would -- we would include in the androgen theory that -- and I don't think you'll have a problem with this -- that levonorgestrel is absorbed into the systemic circulation.
Q. That's part of the androgen?
A. That's -- that's the -- the -- part of the androgen theory.
Q. Right. So you rely on that theory, right?
A. Yes.
Q. And then you rely on the experience with Norplant and Jadelle?
A. In part, yes.
Q. And then you rely on three different sources of epidemiological data, the Etminan publication --



A. Valenzuela.
Q. -- Valenzuela and the 115 adverse event reports?
A. Yes.
Q. Any other epidemiological data upon which you're relying?
A. Not directly.
Q. Other than the androgen theory, Norplant and Jadelle experience, and the three data sets of epidemiological data, is there any other evidence that you're relying upon for your opinion on causation? Have I missed anything?
A. Well, the short answer is yes. What we're missing is since I wrote this report, I have much more study into plausible mechanisms as to how androgens can affect CSF mechanics.
Q. All right. Well, let's put -- let me ask the question this way.
A. Maybe -- I'm -- I'm sorry, but that could just be -- that just could be the mechanism of the androgen theory.
Q. So let me -- let me rephrase my question --
A. Okay.
Q. -- slightly.
A. Okay.
Q. When you issued your expert report and signed it

Page 126

on December 21st, 2017, the bases for your causation opinion were the androgen theory, the Norplant and Jadelle experience, and the three specific data sets of epidemiological data we've referenced, correct?
A. As specific to Mirena, yes.
Q. And subsequently through your review of other experts, expert reports, you've been exposed to other mechanistic theories --
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) -- correct?
A. Mechanistic theories and research. I dare say science.
Q. And nowhere in your expert report do you comment on the plausibility of any other theory of causation other than the androgen theory, true?
A. True.
Q. Now, on page 11 of your report, you -- you note that there are certain androgenic side effects that have been associated with Mirena, correct?
A. Yes.
Q. And those include acne and hair growth, correct?
A. Yes.
Q. You quote the Mirena label there in the middle paragraph. Do you see where I am in your report?
A. Yes.

Page 127

Q. It's -- it reads, "In the first few months of use, women may notice side effects related to the androgenic activity of LNG, acne, nausea, headache, breast tenderness, depression, which are usually mild, transient, and decrease over time."
Did I read that correctly?
A. Yes.
Q. Do you disagree in any way with that characterization?
A. Standing as its own clause, no, I do not. I would simply point out that individual women will vary with when their symptoms present and individual women will vary whether these are transient or not.
And, finally, I understand the purpose behind writing this clause. This does not have to be -- this could not be interpreted as being absolutely comprehensive as to all androgenic effects. In other words, I would not hold this sentence up as proving IH is not androgenic in cause.
Q. So on its terms --
A. As used.
Q. As used. You agree that as a general proposition, the language from the label you quoted on page 11 is accurate?
A. Yes --

Page 128

MS. LAMACCHIA: Objection, form.
A. -- I do.
Q. (BY MR. ISMAIL) Now, as to the androgen theory, there are various components to that proposition, correct?
A. We could call them elements to the --
Q. We could.
A. -- to the theory.
Q. The -- the first element to the androgen theory is that intracranial hypertension itself is an androgen-mediated condition?
A. I wouldn't call it the first element. I would back it up to LNG is androgenic. I hope we could agree on that. The IUD, the Mirena, does allow systemic levels. That's been well proven in the literature.
No. 3 would be LNG binds androgen receptors as well as others throughout the body, including the brain. And then we come to the intracranial interbrain mechanisms by which androgen binding could affect CSF production.
Q. Well, let's focus on that --
A. Fourth.
Q. Okay. Keep going.
A. Okay. Keep going?
Q. Sure.
A. Okay. So -- so, once again, my knowledge of this

Page 129

has been greatly bolstered by the other experts. But when I wrote this, I believed androgen binds the brain, can affect CSF production, and that is the mechanism which causes IH.
IH can have a long latency phase where symptoms could be delayed in diagnosis for a while or some acute symptoms could be very apparent quickly, like my patients. Okay? And then I do believe IH is not always severe; it can be mild, moderate, severe. And I would not be surprised if prospective research showed that IH could actually potentially regress, especially in milder forms or with weight loss.
Then the treatment of IH could happen with or without the specific treatment for IH. In my patient population, that's called spironolactone. That's a diuretic. Whereas neurologists use Diamox.
Q. So I think you sort of expanded the scope of the question that I intended to ask.
A. Of the androgen theory.
Q. Okay.
A. So we now have the full span of it.
Q. Okay. Yeah. You would agree that you're -- you don't hold yourself out as an expert in the mechanistic theories of how hormones may affect intracranial hypertension?

A. I am not an expert, but I am an enthusiastic student of it.
Q. And your opinions in this case are -- just taking you at your word -- focusing on the biologic plausibility of a particular mechanistic theory on Mirena and IIH, correct?
A. Taking me exactly as my word, I am a clinician with some background that allows me to review all this material so I know what to tell my patient on Tuesday. That's my word.
Q. I don't think your report says it quite that way, but I guess we'll agree to disagree.
Now, as to the question of whether IIH is an androgen-mediated condition. That's a necessary element to the androgen theory, correct?
A. It is not that simple. It is not just androgen. Now, this is not something I thought about when I wrote this report, but I've read about the effects of other hormones and other potential mechanisms. Androgenicity of LNG appears to be one of the fundamental building blocks of IIH.
Q. I'm trying to ask the -- a different --
A. Okay. Let me --
Q. -- a different context.
A. Let me listen better.



Q. A necessary element but not sufficient element of the androgen theory that you describe in your expert report is that IIH can be an androgen-mediated condition?
A. True.
MS. LAMACCHIA: Objection, form.
A. Excuse me. True.
Q. (BY MR. ISMAIL) You agree it has not been scientifically proven that IIH can be an androgen-mediated condition, true?
A. When I wrote the report or now? Which am I testifying to?
Q. Why don't you start with when you wrote the report.
A. When I wrote the report, I would say no, it has not been proven. But with the admittedly persuasive writing style of some of our experts, I did not know how much work had been done. It seems to be probably proven to me --
Q. So --
A. -- that -- that androgens cause or significantly contribute to IH.
Q. The reports you're relying upon for these mechanistic theories are Drs. Salpietro and Johanson?
A. Yes.
Q. Anyone else?



A. No.
Q. Do you know what Dr. Salpietro testified to in his deposition as to whether the theories he describes in his report are a hypothesis or proven?
MS. LAMACCHIA: Objection, form.
A. If he is -- short answer, no. Longer answer is it would depend on the definition of proven he was given. I mean, to a scientist, proven means absolute. We've got to be careful with our words.
Q. (BY MR. ISMAIL) The -- can you identify any peer-reviewed publication in which it has been concluded that the androgen theory adopted in your expert report has been established?
A. To an absolute level, no, I cannot.
Q. To any level, can you identify any peer-reviewed publication that describes the androgen theory used in your expert report as being established?
A. I -- I have not studied that. I have not looked for that. I cannot do that.
Q. Can you identify any medical association in the world that has indicated that the androgen theory used in your expert report has been established in any context?
A. No, I can't. That -- that tends to be a much later in the scientific process --
Q. Can --



A. -- thing.
Q. Can you identify any presentation at a scientific conference in which the speaker or author articulated that the androgen theory in your expert report has been established?
A. No.
Q. Now, the various -- on page 12 of your expert report, you describe the various lines of proof that you're relying upon to conclude that IIH can be an androgen-mediated process, right? I'm sorry. Did I say 12 --
A. Not page 12.
Q. 13.
A. I believe that's later, yeah.
Q. Page 13, right?
A. Yes, uh-huh.
Q. The first paper -- the first point you say here is that "Earlier age of onset of IH has been noted with elevated androgen in adult females."
Did I read that correctly?
A. Yes.
Q. And the citation you rely upon for that is a paper by Sheldon?
A. Yes.
(Exhibit 11 marked.)

Page 134

Q. (BY MR. ISMAIL) Doctor, is Exhibit 11 a copy of the Sheldon paper that you rely upon for your opinions in this case?
A. It is one of the Sheldon articles, yes.
Q. Now, this -- did you find this to be a reliable paper?
A. Well, a reliable paper, yes.
Q. And the terminology of this paper, it uses the phrase "pseudotumor cerebri syndrome"?
A. It does.
Q. And that would be part of the intracranial hypertension definition that you have used for your opinions in this case, correct?
A. Correct.
Q. You see in the abstract where these -- and, by the way, this publication's from 2015, correct?
A. February 2015, yes.
Q. A relatively recent publication, right?
A. Two and half years, yes, two years.
Q. Do you see in the abstract of this paper that you agree is reliable the authors write, "The mechanisms underlying PTCS is unknown."
Do you see that?
A. Yes, I do.
Q. Do you agree or disagree with the authors'

Page 135

statement that the mechanisms underlying pseudotumor cerebri syndrome is unknown?
A. We have to look at such a quote in the context of how they're using it. They go from symptoms and outcomes of 10 percent risk of visual loss to the sentence you quote to then talk about association. That sentence is used in its strictest sense to introduce softer relationships of association.
Q. So do you agree or disagree the mechanism of PTC is unknown?
A. I would insert the adverb "absolutely" or "for sure" or "proven," but I would agree with their statement.
Q. Okay. Would you agree with their statement as written or only as modified by you?
A. I -- I would -- they're the experts. I would accept their sentence as written.
Q. On page 284 of their publication --
A. Yes.
Q. -- there is a Figure 1.
A. Yes.
Q. That describes a proposed metabolic and hormonal mechanisms underlying pediatric PTCS.
A. Demonstrating some of the potential mechanisms, yes.
Q. Now --

Page 136

A. Reflecting that it's not known.
Q. Do you believe that these -- that this -- the potential mechanisms articulated in the Sheldon -- in the Sheldon paper are consistent with the androgen theory that you use in your report?
A. Even though the word "androgen" does not appear on this figure, the answer is yes, because androgens are aromatized to estrogen, and androgen has association with obesity and insulin levels.
Q. Do you see where the authors in the description of Figure 1, which is this mechanistic theory, write in the second sentence of note, "much of this remains to be tested"?
A. I -- I think that's a very true statement.
Q. So you would agree that the mechanism proposed in the Sheldon paper is just a hypothesis --
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) -- that it's not been established?
A. I would call it more a work in progress. It's not just a schematic drawing on a white board. It's -- it's a hypothesis based on work already done moving forward.
Q. Now --
A. Very complicated stuff here.

Page 137

Q. Now, the -- you cite this paper as saying, "Earlier age of onset has been noted with elevated androgen in adult females," right?
A. Yes.
Q. This paper was actually more specific than just saying "androgen levels," right?
A. I'd have to look at that --
Q. Page 286, left column.
A. -- spot.
Q. This is the particular page you cite.
A. Yes, uh-huh.
Q. Left column under -- towards the bottom in the first -- and at the last full paragraph.
A. The -- the sentence I'm reading says, "Increased androgens, namely, basal testosterone and androstenedione, have been linked with a younger age at presentation of PTCS in an adult female population."
Q. So there's -- there's no listing by the Sheldon authors of levonorgestrel, correct?
A. There's no listing -- I'm not -- they mention levonorgestrel just above that. What -- what do you mean by "listing"? I'm sorry.
Q. Let me rephrase.
A. Okay.
Q. The particular citation you make to the Sheldon

paper is that "Earlier age of onset of IH has been noted with elevated androgen in adult females," right?
A. Yes.
Q. And the particular reference that you cite Sheldon for -- proposition that you cite Sheldon for is specific to basal testosterone and androstenedione --
A. A-dione you could call it.
Q. Very good. So I'll rephrase.
The particular androgens that Sheldon cites for the proposition that you write in your report are testosterone and A-dione, correct?
A. That's what I cite, but he does mention levonorgestrel above it.
Q. But not in the context of linking younger age with a presentation of IIH?
A. Correct.
MS. LAMACCHIA: Objection, form.
A. But linking exogenous LNG with PTC, yes. You see that.
Q. (BY MR. ISMAIL) Yeah, I -- I --
A. Okay.
Q. -- see exactly where the reference is to levonorgestrel.
A. But for my written point about younger age, we've got the sentence, and the proof is it's linked to the


Klein article, his Reference 63.
Q. And that is testosterone and A-dione?
A. And A-dione.
Q. Not levonorgestrel?
A. Not LNG, which is not a natural hormone.
Q. Now, you then say, "CSF hormone changes are not found in peripheral plasma, suggesting hormonal activity within the CSF itself."
Do you see that in --
A. I do.
Q. -- your expert report?
None of that is specific to LNG, correct?
A. Correct. Those are native hormones.
Q. Then you cite, "Increased androgens in polycystic ovaries are associated with PTC"?
A. Yes.
Q. And that, again, is not specific to LNG, correct?
A. That is correct.
Q. And then you note as one of the bases you're relying upon is that "Authors have proposed a pathogenic role for testosterone in the secretion of CSF," right?
A. Yes.
Q. And that's specifically not LNG, right?
A. But we are now saying that we don't think LNG is androgenic?


Q. Can you answer my question?
A. I did, I thought.
Q. No, you answered -- you gave me a question.
A. Okay. Let's try again.
Q. Where you write, "Authors have proposed a direct pathogenic role for testosterone in the secretion of CSF" --
A. Right.
Q. -- that is specific to testosterone, not LNG, true?
A. That is correct.
Q. Thank you.
Now, you write -- all the things that we just discussed --
A. Uh-huh.
Q. -- referencing a theory that IIH has some androgen side effect component to it or hormonal component to it is not specific to LNG, true?
A. That's correct, because androgens work through receptors.
Q. So where you write in the next paragraph, "This string of collaborative evidence from multiple groups of investigators strongly supports a neurohormonal mechanism to explain PTC and IH to be deemed biologically plausible," correct?


A. Yes.
Q. And then you write, "Thus, it is biologically plausible that LNG is a substantial factor in causing PTCS," correct?
A. Yes.
Q. Focusing on your transition from the general discussion of hormones to LNG in particular, okay?
A. Okay.
Q. Even if there is a neurohormonal mechanism to explain PTC and IH, that does not necessarily mean that levonorgestrel is part of that biologically plausible theory, true?
A. Not true.
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) Why not?
A. At -- at my level of understanding, androgens are androgens. The affinity of levonorgestrel for androgen receptors is -- is strong. It's much more androgen than progesterone. So anything that testosterone does, LNG can do at least as potently, potentially more.
Q. What support do you have for the proposition that "anything testosterone does, LNG can do at least as potently, potentially more"?
A. Dr. Darney would not like my wording. I am referring entirely to the androgenicity of progestin.

There is ample data. Darney has it in his article I reviewed for this report that they're able to measure hormonal affinity to receptors. They vary in their affinity to estrogen -- progestins vary in their affinity to estrogen, progesterone, and testosterone receptors. LNG works at the receptor level as a super testosterone.

Q. And what's your support for that?

A. Darney.

Q. Anything else?

A. Everything Darney cites in that -- in -- in the -- there's a body of literature, the androgenicity of -- of progestins. It's huge.

Q. LNG is -- fundamentally is a progestin, correct?

A. It is absolutely a progestin.

Q. And --

A. But it's not progesterone.

Q. Is it -- in your view is that LNG is a -- what did you call it -- a super testosterone?

A. Let's call it what it is. It's a 19-nor derivative. It is a very androgenic progestin, and everyone knows this.

Q. So, in your view, once it is established that -- withdrawn.

In your view, once there is evidence that IIH has a neurohormonal mechanism, that automatically



implicates LNG?

A. No. If IH as a mechanism that involves testosterone, that LNG would be highly suspect of following the same pathway.

Q. Can you identify any peer-reviewed medical literature discussing the androgen theory of IIH using -- measuring LNG?

A. No.

Q. Can you --

A. Not yet.

Q. Can you identify any peer-reviewed literature discussing the androgen theory of IIH having any experimental data on LNG at all?

A. No, too early. Hasn't been done.

Q. And so the -- the -- the link between the androgen theory and IIH as including LNG is based on the proposition that LNG effects will follow -- will be akin to testosterone effects?

A. Yes, with the understanding of the androgenicity of LNG --

Q. And --

A. -- which is well-established.

Q. But testosterone itself has not been established to be part of the mechanism of developing IIH. That's still just a hypothesis, right?



A. It's a -- with what I wrote here, and authors who know more than me, it's a -- it's a work in progress. It's a hypothesis being developed.

Q. Why --

A. It appears to be at least a contributing significant factor.

Q. If testosterone is a significant contributing factor, why is it that young, obese women are more associated with IH?

MS. LAMACCHIA: Objection, form.

A. As compared to men?

Q. (BY MR. ISMAIL) Yes.

A. This question has been looked at in the literature. It has to do with the distribution of the fat. It has to do with the ratio of the testosterone to estrogen at least, probably not progesterone. It's not a simple direct effect where more androgen causes more IH. It's much more complicated than that. It involves insulin resistance.

Fat on women is not the same as fat on men. It's interesting that if you look at populations of IH in men, the fat pattern resembles that more of women. I have read that. So it's not simply testosterone begets IH. You must ask that question to the people smarter than me in this litigation, because this has been looked at.



Q. Okay. Well, I don't get to ask them, I get to ask you.

A. Well, you'll get to ask them, too.

Q. If you don't know, just tell me you don't know. Well, let me ask it this way.

Is it --

A. Okay.

Q. Is it beyond your expertise, Doctor, to comment on why it is if testosterone is a substantial contributing factor to IH that the highest risk demographic group is young, obese women?

MS. LAMACCHIA: Objection, form.

A. No, it's not beyond my expertise, because young, obese women, which is a huge part of the practice that I serve, have their own endocrinology, their own risk factors, their own issues. The difference between obese females and those who don't get IH can be a myriad of factors.

Q. (BY MR. ISMAIL) Has that been established, sir?

A. Sure.

Q. What publication establishes that?

A. Well, we've -- we've talked about -- I think we agree that female genders are risk for IH. I think we agree obesity is a risk for IH. I think we agree with that.

Page 146

Q. Yes.
A. But there are other risk factors for IH, too. We've talked about drug exposures.
Q. My question was: Why if testosterone is -- is a contributing factor to IH, you rarely see men with the condition, but the demographic group with the highest prevalence is young, obese women. That dichotomy I'm asking you to explain. And has that been explained specifically?
A. It's -- it's been written about. It's been talked about. And I can't tell you it's been proven. It has to do with the fat distribution and the nature of the fat itself.
Q. And what article discusses that?
A. Darney's.
Q. Darney's --
A. Darney's.
Q. -- writ large?
A. Darney's opinion.
Q. His expert report?
A. His expert report. And I cannot recall. I have read it elsewhere as well.
Q. So putting aside these expert reports of other plaintiff experts, can you identify anything else in the medical community that describes this phenomenon that you

Page 147

say that IH is a testosterone effect and LNG is a super testosterone?
MS. LAMACCHIA: Objection, form.
A. One moment, please. No, I thought I remembered a cite and I -- it's not here. I cannot recall. Sorry.
Q. (BY MR. ISMAIL) None of the articles or research that you cite in support of your androgen theory involve any progestin, do they, Doctor?
A. No.
Q. Am I correct?
A. I'm sorry. Say it again.
Q. I was afraid we had a double negative here. That's why I'm clarifying.
A. Fair enough.
Q. Let me ask it this way.
A. Okay.
Q. Do any of the articles you cite in support of your androgen theory involve any progestin?
A. No.
MS. LAMACCHIA: You're saying progestin or progesterone?
Q. (BY MR. ISMAIL) Progesterone or progestin.
A. No and no.
Q. Thank you.
A. I heard progestin.

Page 148

Q. But it doesn't involve any progestin or any progesterone, correct?
A. Correct.
Q. Does -- in -- in the androgen theory that you've used in your expert report, does it matter whether the LNG is free or bound?
A. Yes, because bound LNG is much more active metabolically.
I'm sorry. Could I have another moment?
Okay. Please. Thank you.
Q. When you say "bound LNG is much more metabolically active," first of all, what do you understand LNG to be bound to?
A. SHBG, for the most part, sex hormone-binding globulin.
I might have misspoken there. LNG is highly bound to SHBG. It is unbound LNG, which is thought as traverse cell membranes and is the more active, if I misspoke.
Q. Do you know whether the proportion of LNG released by Mirena, which proportion is bound and which is unbound?
A. It's highly bound. All LNG in those circulation is highly bound on the order of 98 percent.
Q. So is it your view, Doctor, that it is the bound

Page 149

proportion of LNG that is related to IIH?
A. No.
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) It's the unbound?
A. Yes.
Q. And so --
A. In all probability. I don't know, but that's sort of standard neuroendocrine teaching.
Q. So your -- you told me that the vast, vast majority, up to 98 percent, of LNG released by Mirena is un -- is bound, correct?
A. That's -- that's my understanding.
Q. And so is it the 2 percent or less of unbound Mirena that you think is implicated here -- I'm sorry -- of LNG that is implicated here?
MS. LAMACCHIA: Objection, form.
A. That is my level of understanding, yes.
Q. (BY MR. ISMAIL) So your androgen theory that you describe in your expert report requires systemic circulation of LNG, correct?
A. It would. It would.
Q. LNG released in the uterine cavity does not -- is not causally related to IIH, correct?
MS. LAMACCHIA: Objection, form.
A. No, it would be, because, clearly, LNG is

released into the uterus. The estimates I read that 10 to 20 percent can get into the systemic circulation, thereby get access to the brain.

Q. (BY MR. ISMAIL) Right.

A. Now, if you're asking me LNG that specifically binds to uterine testosterone receptors, that LNG would be used up. That wouldn't make it to the brain.

Q. So I asked a poor question, but I think we got to the same end point.

A. Okay.

Q. Let me make sure I understand. It is only the LN -- for a Mirena that is placed intrauterine, it is only the LNG released into the -- systemically that you believe is associated with IH, correct?

MS. LAMACCHIA: Objection, form.

A. That seems to be all that would be plausible.

Q. (BY MR. ISMAIL) And it would only be that proportion of systemic IIH -- withdrawn.

And it would only be that proportion of systemic LNG that is released from a Mirena that could be related to IH?

A. In all probability, yes.

Q. And you told me that you think 10 to 20 percent of released Mirena -- withdrawn.

You think -- you've told me that 10 to



20 percent of the released LNG from a Mirena are available to the systemic circulation?

A. In general. Individual susceptibility may vary.

Q. Do you know whether testosterone levels have been measured in Mirena users?

MS. LAMACCHIA: Testosterone?

MR. ISMAIL: Yeah.

A. I would think so, but I don't know the literature cite.

Q. (BY MR. ISMAIL) Do you know whether testosterone levels are increased in Mirena users?

A. I do know that the ovaries can be suppressed with Mirena. I know that 45 percent of first-year cycles are ovulatory and second year 73 percent ovulatory, meaning 55 percent and 37 percent are anovulatory. And in levonorgestrel-induced anovulation, native testosterone levels would be decreased.

I would predict the literature would say Mirena lowers testosterone levels based on that. But I don't know a literature cite for your specific question.

Q. Do you agree, Doctor, that the amount of systemic LNG available from Mirena is highest immediately after placement?

MS. LAMACCHIA: Objection, form.

A. Not necessarily.



Q. (BY MR. ISMAIL) Do you --

A. It's my -- I'm sorry. It's my understanding that LNG climbs and peaks and then to a variable degree declines, and that even in the package insert for Mirena, it talks about a wider individual variation of LNG levels in year two than year one. So there's a -- there is a great deal of variation. It's not always immediately upon insertion.

Q. So what is your understanding of the time course over which systemic LNG levels climb before they come down?

A. My understanding is they start off at zero. The Mirena goes in. The Mirena has to be releasing its LNG. LNG climbs. I actually don't know the number of months it takes to peak. I don't know that. It doesn't decline -- the release rate of LNG declines over time. The systemic blood level drops a little bit in the second year, but there's wide individual variation.

Q. So would you agree, Doctor, that for any particular group of Mirena patients, the lower the systemic LNG, the lower the IIH risk?

A. No.

MS. LAMACCHIA: Objection, form.

Q. (BY MR. ISMAIL) Why not?

A. Risk factors. Everyone I read in this talks



about susceptible women, vulnerable women, risk factors, such an important concept --

Q. So --

A. -- to get out.

Q. Let me rephrase.

A. Okay.

Q. All else being equal in terms of other risk factors for IH, the lower the systemic LNG, the lower the risk?

MS. LAMACCHIA: Form.

A. I think the answer to that is yes, as exemplified by the IH preponderance of Mirena versus Skyla. I think that's true.

Q. (BY MR. ISMAIL) Have you investigated whether there are any cases of IH reported with Skyla?

A. I'm aware of four.

Q. And where did you find four?

A. Was that the German data? Was that -- was that BfArM? By all the studying I've done, I'm aware of four Skyla cases, and I'm aware of pushing 200 Mirena cases.

Q. Do you know --

A. So I would -- I'm sorry. I would not be surprised if there was a dose response curve.

Q. Do you know --

MS. LAMACCHIA: Counsel, I'm sorry. We've

Page 154

been going about an hour and 50 minutes right now. Do you think this is -- are you at a point where you could -- we could take a lunch break? It's 12:52.

MR. ISMAIL: Yeah. Actually, I didn't know that lunch was here. Let me just finish up --

MS. LAMACCHIA: It's been here for 25 minutes, so --

MR. ISMAIL: I wasn't aware of that.

THE WITNESS: Although I'm comfortable at a natural breaking point.

MR. ISMAIL: Let's do a couple more questions, then we'll stop.

MS. LAMACCHIA: Sure.

Q. (BY MR. ISMAIL) Do you know whether there's a relationship between systemic LNG and BMI in Mirena users?

A. Systemic LNG and BMI. I don't know that.

Q. Your opinion is that it doesn't matter how the LNG is delivered, whether it's orally, intrauterine, or intramuscular, correct? I think you used that exact phrase somewhere in your report.

A. If I used that exact phrase, it's to explain that LNG is LNG is LNG. It turns out that delivery does matter, because LNG in the arm surrounded by adipose is going to be much less vascularized, much less absorbed than in the uterus.

Page 155

Q. Do you believe that levonorgestrel-containing oral contraceptives cause IIH -- cause IH?

MS. LAMACCHIA: Objection, form.

A. I think rarely they can, but there has not been a huge reporting of IH with LNG OCs.

Q. (BY MR. ISMAIL) Are -- is the systemic level of LNG higher with combined oral contraceptives than they are for Mirena?

A. I would think so.

Q. All right. Let's take a lunch break.

THE VIDEOGRAPHER: Okay. We're off the record at 12:54, end of Media 2.

(Lunch recess.)

THE VIDEOGRAPHER: We are on the record at 1:45, beginning of Tape 3.

Q. (BY MR. ISMAIL) Doctor, this morning at various times you referenced review of the expert report by Dr. Darney. Do you recall that?

A. I do.

Q. To the extent Dr. Darney cites published literature that is not listed in your materials reviewed list, did you go look to the secondary sources cited by Dr. Darney?

A. I did not. And to give you a perspective, I have spent maybe a total of 50 minutes with his report, maybe

Page 156

an hour.

Q. And is that a similar estimate for the amount of time you spent reviewing Dr. Salpietro and Johanson's report?

A. Roughly. I haven't had the reports for a very long time. I have not studied them. Remember, we were talking about the different levels of reading.

Q. Yes.

A. I have heavily perused them --

Q. Okay.

A. -- at best.

Q. And so when did you receive those reports?

A. January 9th. And I received the other reports, Barnhart and company, on the 22nd.

Q. All right. So in total, you've spent less than three hours reviewing the other plaintiff expert reports that you were providing; is that fair?

A. Yes.

Q. Now, right before the lunch break, I asked you whether you agreed that the systemic levels of LNG from combined oral contraceptives are higher than the systemic level of LNG from Mirena, and I think you agreed?

A. I believe you asked me if I would expect them to be. That literature has to exist. I don't know it off the top of my head. I would fully expect it to be.

Page 157

Q. Would that mean, Doctor, that you would expect that the risk of IH from combined oral contraceptives is greater than that with Mirena?

A. Not necessarily.

Q. Why not?

A. There's -- the association between LNG, wherever it's placed, and IH is not as simple as a dose response. There may be a play with periodicity. It's quite clear that intrauterine LNG, for example, achieves a steady state that gradually declines over it several years, but it's quite steady. Whereas with an oral contraceptive, you're going to have a daily peak and valley. So much of drug actions has to do with area under the curve. So how high a blood level go -- goes may not be as important as the total area under a curve of drug exposure.

Q. You --

A. I don't claim to be an expert in pharmacokinetics. And, again, I know this data has to exist. I don't know it off the top of my head.

Q. So as part of your work in this case, you've not examined the levels of systemic LNG that occurs in women taking combined oral contraceptives; is that true?

A. That is true.

Q. And so you have no way to relate for us what the level of systemic LNG from combined oral contraceptives,

Page 158

how that -- those levels are achieved over the dosing cycle of a birth control pill?
A. I am not able to do that.
Q. You haven't analyzed the risk of IH from oral contraceptives at all in your report, have you?
A. I have not analyzed them in my report. I, of course, have come across some comments on it in my literature search involving Mirena.
Q. This -- so you don't know what the average level of LNG -- systemic LNG is from combined oral contraceptives, true?
A. True.
Q. And you don't know how that relates to the steady state of systemic LNG from a Mirena, true?
A. I don't know how those two relate, because I don't know one of the factors you're asking, that's correct.
Q. And -- you're aware that combined oral contraceptives have been used by really tens of millions of women since their introduction, yes?
A. Yes.
Q. And you can't identify any peer-reviewed publication that has found an increased risk of intracranial hypertension in women using combined oral contraceptives, true?

Page 159

A. I have not looked for such literature, and I cannot point to any at this time.
Q. Are you aware, sir, that the combined oral contraceptives and the relationship to intracranial hypertension, in fact, has been studied?
A. I have not looked, so I -- I don't know. I would think it would be within some reviews, perhaps reviews on IH rather than oral contraceptives.
Q. So moving away from reviews, I'm actually asking about epidemiological research.
A. I don't know. I've not looked.
Q. Would the fact that combined oral contraceptives containing levonorgestrel have been shown not to increase the risk of IH, would that be inconsistent in some way with the theory that levonorgestrel is -- plays a causative role in IH?
MS. LAMACCHIA: Objection, form.
A. Not necessarily, because the vast majority of LNG-containing pills have estrogen. Very early on, we talked about this is more complex than level of testosterone or level of LNG. The real secret may be the ratio of testosterone to estrogen.
Q. (BY MR. ISMAIL) That's complete speculation by you, that which you just testified to, right?
A. Hypothetical, theorizing, speculative, any of

Page 160

those things.
Q. Would you at least agree, whereas maybe it doesn't disprove the androgen theory in your view, it would at least be inconsistent with the androgen theory if combined oral contraceptives have not been shown to increase risk of IH?
A. Again, I have to say not necessarily.
Q. Well, I know it's not necessarily the case. My question is whether if you are presented with a set of data that combined oral contraceptives have been shown not to increase the risk of IH, that would at least be some piece of evidence that you would put on the scale of pointing away from the androgen theory in your report?
A. No, not necessarily.
Q. And that's because --
A. I would have to study it more.
Q. Okay. You don't know one way or the other is what you're saying?
A. No, it -- it deserves a place on the scale, but I would not know which side of the scale to put it on without further study.
Q. So you're completely unable to comment one way or another how the epidemiological research on combined oral contraceptives in IH impacts the causation opinion you're offering in this case; is that fair?

Page 161

MS. LAMACCHIA: Form.
A. I have not looked -- I think that's fair.
Q. (BY MR. ISMAIL) Okay. You're -- you've also commented in your report and relied upon the experience with Jadelle and Norplant. Do you recall doing that?
A. I remember commenting on them or citing the experience, yes.
Q. And these -- and Jadelle and Norplant, both of which are products that are implanted and not placed intrauterine?
A. Correct.
Q. Do you acknowledge, sir, that Jadelle and Norplant produce far higher systemic levels of LNG than does Mirena?
A. I have not studied that.
Q. So you have no information on the differences in systemic availability of LNG between Mirena on the one hand and Jadelle and Norplant users on the other?
A. Correct.
Q. Not something you considered?
A. Something I considered, but not something I studied in my role in this litigation.
Q. You certainly agree with the proposition that for any medicine, there can be a dosing threshold that must be reached before certain side effects develop?

MS. LAMACCHIA: Objection, form.
A. Could you ask that again, please?
Q. (BY MR. ISMAIL) For any medication, there --
A. Any medication.
Q. -- there can be a dosing threshold that must be reached before certain side effects develop?
A. I --
MS. LAMACCHIA: Same objection.
A. I don't know that.
Q. (BY MR. ISMAIL) I take it you -- withdrawn.
Your report doesn't offer any opinions in any way on what the level of systemic LNG that must be present for there to be -- for the androgen theory to be biologically plausible, true?
A. True.
Q. Now, correct me if I'm wrong, but other than citation to the Jadelle label, am I correct that you don't cite to any other article or secondary source dealing with Jadelle at all from your expert report?
A. I think the seven articles relate to Jadelle.
Q. Which articles?
A. Let me double-check, please.
Q. Can you say the name again so we can follow?
A. Sivin, S-i-v-i-n. It will take me just a second.
I have that right. S-i-v-i-n.



Q. Okay. Am I correct that -- can I see the paper?
A. Yes. That's one.
Q. The Sivin publication that you've just handed me is not cited actually in your report, is it, sir?
A. No.
Q. Am I correct?
A. You're correct.
Q. And was there another publication by Sivin that you had in your -- in your binder there?
A. Yes, but, again, not cited in my report --
Q. Okay.
A. -- just something I've read.
Q. So Sivin publications dealing with Norplant specifically?
A. Jadelle is in there, too, I believe.
Q. Okay.
A. Let me make sure they're in the binder list.
They are.
Q. Were they in the supplemental list that was provided today, or were they in the materials reviewed in the initial report?
A. They are in the reliance list of additional published resources.
Q. Got it. Did you do any investigation as part of your work in this case to understand how it is that there



was information about IH in the Jadelle label, where that originated from or how it was placed there?
A. No.
Q. You didn't -- did you review any of the correspondence about reg -- about the regulatory interaction with FDA regarding the Jadelle label?
A. No, not that I -- not that I can recall anyway.
Q. So would I be correct, sir, that as you sit here today, you are unaware factually of the progeny of the information in the Jadelle level about IH?
A. Correct.
Q. Now, with respect to Norplant, you cite a series of -- you cite a couple of articles of individual case reports with Norplant; is that correct?
A. Yes. You see these in various articles, the Sunku article, Wysowski, others.
Q. The case reports that you cited involving Norplant and IH do not establish a causal relationship between Norplant and IH, true?
A. They raise a causal relationship. They do not prove a causal relationship.
Q. And, in fact, there is no epidemiology study above case reports that establish a causal relationship between Norplant and IH, correct?
A. Case report to case series. I think the Wysowski



article would be more than a case report, if I recall.
Q. They involve spontaneous adverse event reports sent to -- received by FDA?
A. The FDA.
Q. And that was just a collection of case reports, correct?
A. Which is typically called a case series. But your -- your point is taken. It's a -- it's a modest epidemiologic paper.
Q. There's no Level 1 or Level 2 evidence establishing a causal relationship between Norplant and IH, correct?
A. Correct, that is true.
MS. LAMACCHIA: Objection, form.
A. Assuming we mean the same thing, Level 1 would be RCT, Level 2 would be case control studies or prospective cohort studies.
Q. (BY MR. ISMAIL) Correct.
A. Okay.
Q. And the case series or case reports that you cite to involving Norplant and IH do not control for the other -- for -- for risk factors we know that are associated with intracranial hypertension?
A. Risk factors or are they confounding factors, that's right.

Page 166

Q. And so you can't look at any of the papers you've cited regarding Norplant and conclude that that product causes IH, correct?
A. You cannot.
Q. Are you aware, sir, of any peer-reviewed publication stating that Norplant does cause IH?
A. If it exists, I have not read it. I'm not able to point to that.
Q. Can you identify any scientific or medical organization that has concluded that Norplant causes IH?
A. I cannot. I've not looked for that.
Q. Are there any data available whatsoever to show higher rates of intracranial hypertension in Norplant patients compared to non-Norplant patients?
A. Meaning controlled studies, not that I'm aware of. I've never read it.
Q. On page 16 of your report, you make reference to some correspondence involving Wyeth.
A. I see it.
Q. And -- and specifically in 44 reports of IH in Norplant users, that's the data set being commented upon, correct?
A. Yes.
Q. You reference that 24 of which when the Norplant was removed, the symptoms of IH did not improve. Do you

Page 167

see that?
A. I did cite that, yes.
Q. Would the fact that 24 of these 44 patients, even upon removal of the Norplant the symptoms of IH did not resolve, point away from a causal relationship involving Norplant and IH?
A. Not necessarily.
Q. Okay.
A. It would go on the scale, but it would have to be investigated further.
Q. Which side of the scale would it go on?
A. I would put it right on the fulcrum until I knew how long had they had it in, how severe the symptoms were. We don't know it's a immediate cause and then reverse cause with dechallenge. We don't know that.
Q. How would the 24 cases of a failed dechallenge involving Norplant go on the side of the scale establishing causation?
MS. LAMACCHIA: Objection, form.
A. If they were thin patients, if the IH was particularly severe, does permanent vision loss reverse, for example, no. There -- there could be multiple clinical scenarios where it would not go on the disapproving side.
Q. (BY MR. ISMAIL) That's not what I asked. So if

Page 168

I understand the options of which side of the scale --
A. Okay.
Q. -- these 24 cases of a failed dechallenge either could point away from causation or be irrelevant to the question of causation. They can't help prove causation, true?
A. I think they can cause -- help prove causation.
Q. A failed dechallenge. So removal of the Norplant resulting in no improvement in symptoms will help prove causation with Norplant?
A. Because it doesn't negate that it happened with the implant placed.
Q. So it would be neutral to the question of causation?
A. Not necessarily.
Q. So you think it's proof of causation that there's a failed dechallenge?
A. I'm not able to conclude that if -- if we're talking about just the challenge itself, but I -- I feel that's a folly. I think you have to look at the -- the whole patient's clinical situation.
Q. I'm just relying on what you cite in your report, sir.
A. Understood.
Q. So it's not my folly.

Page 169

A. Then it's mine. But -- but my point being that I don't expect things to be so crystal clear that you would give the implant and then remove it and everything would go back to baseline. All these things that I have read not everyone returns to baseline with the dechallenge.
Q. You -- you write in your report that you infer that the other 20 reports of IH in Norplant users had a -- had some improvement of symptoms following the Norplant removal, correct?
A. Inferred is a reasonable word.
Q. Right. It's not stated as such in the letter.
A. It's not stated as such in the letter.
Q. And you would agree that it at least involves some level of speculation by you as to what happened with those other 20 patients, true?
A. Correct.
Q. Now, I think implicit in our discussion we had just now was that you agree there is a hierarchy of reliability of epidemiological evidence?
A. I do agree with that.
Q. And we've already referenced one construct for that, the -- the Level 1, 2, 3, and so on as a way of articulating that hierarchy?
A. Popularized by Sackett, right.
Q. And just so that we're on -- make sure you and I

are on the same page, meta-analyses of randomized clinical trials are at the top of that hierarchy, correct? Again, assuming they're well done?
A. Thank you. You -- you took the words for me.
With meta-analysis, garbage in, garbage out. So if your meta-analyses truly make a criteria for a properly done meta-analysis, not just a systemic review, then I would agree with you, meta-analysis of Level 1 studies is a Level 1 study.
Q. And then you would also include randomized clinical trials in the category of the highest reliability of clinical research?
A. In general, but there's also ways to do RCTs well and not well, but in general, yes.
Q. And I presuppose in my questions here that it's a competently done study, okay?
A. (Moving head up and down.)
Q. And then going down the hierarchal pyramid, you would get to cohort studies, correct?
A. Specifically prospective cohort studies would be next.
Q. Prospective cohort studies. And then what would be below prospective cohort studies?
A. Well, paired with prospective cohort would be a special kind of retrospective study called case control



studies or as my former boss, Dr. Horowitz, called it, trohoc, cohort spelled backwards. That would be Category 2. Category 3 would be retrospective cohort studies, things of that sort.
Q. And then category --
(Discussion off the record.)
Q. (BY MR. ISMAIL) Below retrospective cohort studies would be case reports?
A. Case reports, case series.
Q. And you agree that the general view in the scientific community is that case reports are not enough to establish causation, true?
A. They're enough --
MS. LAMACCHIA: Objection, form.
A. -- to raise the suspicion, to raise and stimulate further research, but rarely are they sufficient to cause -- to prove causation.
Q. (BY MR. ISMAIL) And that's particularly true when the side effect being examined has a background rate, it makes it very difficult to establish causation from case reports, true?
A. Yes. And also very low prevalent outcome case reports are difficult to interpret.
Q. And then below case reports would be animal or in vitro studies?



A. I consider them a whole different category. I -- I, frankly, have never seen them included in our pyramid.
Q. So that would be outside the pyramid of clinical research?
A. That would be an apple to a banana.
Q. And animal and in vitro studies are not enough to establish causation, true?
A. No, they're enough to help develop a hypothesis into lead future research in -- in humans.
Q. You agree that there are no meta-analyses of any sort that establish even an association between Mirena and IH, correct?
A. Correct.
Q. There are no randomized clinical trials establishing a association between Mirena and IH, correct?
A. Correct.
Q. There are no prospective cohort studies that establish a relationship between Mirena and IH, correct?
A. Correct.
Q. Your report on page 18 in the first -- in that full paragraph there, you write, "20 years after the initial express concern of LNG causing IH in the ophthalmology literature, a flurry of publications looked at that possible cause and effect." And then you go on to cite essentially two papers, the Etminan and Valenzuela



studies; is that correct?
A. Yes.
Q. Is that the -- is that the flurry to which you were referring?
A. It's a Houston flurry.
Q. Fair enough. But that's the flurry, right?
A. Yes.
Q. Okay.
A. And it --
Q. Two snowflakes is a flurry in Houston?
A. Not this year.
It's the Valenzuela group, Rai, in the Valenzuela, and the Etminan series of papers, the three papers that are --
Q. And I just --
A. -- so key here.
Q. And I just want to make sure I had the universe correctly. The flurry is the Etminan series and the Valenzuela-Rai series, right?
A. Yes.
(Exhibit 12 marked.)
Q. (BY MR. ISMAIL) Is Exhibit 12 to your deposition the initial publication that Etminan and colleagues that you rely on -- or that you cite in your expert report?
A. I recognize it.

Page 174

Q. Now, on the bottom of the very last sentence of page 1, this paper reads, "Currently, no epidemiological study has examined the possible association between the risk of ICH with IUL."
And IUL is defined as intrauterine levonorgestrel?
A. LNG, that's right.
Q. So understanding the acronym used in the paper, do you agree with that sentence?
A. I do.
Q. So prior to the publication by Etminan, there was no epidemiological evidence whatsoever establishing even an association between Mirena and intracranial hypertension, true?
A. True.
Q. Are you relying on the Etminan analyses for your opinion on causation in this case?
MS. LAMACCHIA: Objection, form.
A. Not relying on it, but it's contributing to my suspicion of a causal relationship. It contributes, it's not pivotal.
Q. (BY MR. ISMAIL) So I in fairness didn't ask you whether it was pivotal or dispositive. I just want to understand whether your -- you think the Etminan studies support your opinions or you disavow them.

Page 175

A. I do not disavow them, because they're real. They're in the literature. It's a very interesting tete-a-tete between Etminan and Dr. Friedman, worthy of study in medical journalism classes, but I do not disavow them. I still think they're a brick in the wall. Perhaps not as big a brick as Dr. Etminan first wanted, but it is a -- it is a point of information.
Q. And using the construct that we've discussed today, do you think the Etminan studies fall on the side of supporting an opinion of causation in this case on the scale?
A. The Etminan data presentation arguable was that a retraction or not has so obscured the meaning of these papers to me. I am not able to conclude it's strongly supportive or not supportive of -- of a -- of a causal relationship. It is an important observation. It deserves to be acknowledged, but it has been obscured to me by the editorial goings on. I just don't -- I don't know how to finely interpret it.
Q. Well, on page 19 at the start at the top, you described this Etminan paper, Exhibit 12, as "Using the FDA adverse event reporting system to conduct a retrospective cohort studies of two oral contraceptives in Mirena on IH diagnosis."
Did I read that correctly?

Page 176

A. Yes.
Q. That is an incorrect description of the Etminan study, correct? Am I -- am I right?
A. Well, let's see. I see FAERS data in his paper. I see retrospective cohort study. What am I missing?
Q. Okay. So if you look at the methods in the abstract.
A. Yes, that's where I'm looking.
Q. All right. So do you understand there are two different components to the Etminan paper?
A. Yes.
Q. The first was an examination of the FAERS database to do what is known as a disproportionality analysis of adverse events reported with Mirena?
A. And then "we also conducted" --
Q. And so --
A. -- leads into the second part.
Q. So it -- and then a second analysis was using an entirely different database to compare Mirena to two different combined oral contraceptives, correct?
A. The likely --
MS. LAMACCHIA: Objection, form.
A. -- database, yes.
Q. (BY MR. ISMAIL) So the Etminan paper was not using the FAERS database to conduct a retrospective cohort

Page 177

study of two oral contraceptives and Mirena?
A. I stand corrected.
Q. Now, do you understand the difference between the two analyses that Dr. Etminan purported to have done?
A. Do I understand the differences? Only as best I could discern by reading it.
Q. Do you know what a disproportionality -- disproportionality assessment is?
A. I have read about it to where one looks at the proportion of an outcome among one particular exposure as compared to the other exposures included in the -- in the database. So one would look to see for a particular birth control pill if there was more IH for one pill compared to all the other drugs in the database. That's my basic understanding.
Q. Okay. With all due respect, that's not what a disproportionality analysis purports to do. So let me try it this way. I take it you've never done a disproportionality analysis of spontaneous adverse event data?
A. I have not.
Q. You've never been trained on how to do it?
A. Correct.
Q. Have you ever been trained how to critically analyze a disproportionality analysis --

disproportionality analysis done by others?
A. I have not.
Q. Do you -- if you go to the cohort study on the IMS LifeLink database.
A. In the methods section?
Q. Well, I want to discuss that part of Dr. Etminan's paper.
A. Okay.
Q. So that's different than the FAERS analysis.
A. The FAERS analysis. Two separate analyses, yes.
Q. And you've never worked with the IMS database before, right?
A. I have not, not trained in it, have never done it.
Q. Now, the results of the cohort study comparing Mirena to these two different combined oral contraceptives demonstrated no increased risk of intracranial hypertension with Mirena compared to the COC controls, true?
A. True.
Q. So Dr. Etminan's paper, at least the cohort portion of this analysis, would not establish an increased risk of IH with Mirena, true?
A. True.
Q. Now, as to the FAERS analysis, do you know what



data comprise the FAERS database?
A. What data comprises the FAERS database. I understand it is a reporting system where people report adverse events to the FDA. That's the raw data.
Q. Do you under -- so you understand that fundamentally the FAERS database is -- is the FDA's database?
A. Yes. And there's a great risk of selection bias. There's a risk of underreporting.
Q. Overreporting?
A. Overreporting.
There's -- there's problems with such databases.
Q. Have you reviewed what the FDA itself says about the limitations of the FAERS data?
A. I have not.
Q. Did you incorporate in your methodology employed in this case the FDA's articulated limitations of the FAERS data?
A. I did not.
Q. Do you accept it as the consensus view in the scientific literature that FAERS data cannot be relied upon to determine general causation?
A. I would expect that to be the opinion, and I would certainly accept that as well.



Q. You agree that there are substantial limitations in a researcher's ability to use the FAERS data to make comparisons between medicines, correct?
A. Yes.
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) And you would have to view any data from analysis of the FAERS data with extreme caution?
A. Yes. And request more rigorous future research.
Q. You cannot calculate incidence or prevalence rates of a adverse event by using the FAERS data, correct?
A. That's correct.
Q. The FAERS data does not control for confounders, right?
A. Correct.
Q. And that weakens the reliability of that data?
A. The ability --
MS. LAMACCHIA: Objection, form.
A. -- to interpret it, that's all correct.
Q. (BY MR. ISMAIL) Now, in its first iteration, the Etminan analysis of the FAERS data purported to demonstrate an elevated odds ratio with Mirena reports of the adverse events being researched here, correct?
A. Yes.
Q. And you understand that Dr. Etminan revised his conclusions in subsequent documents, right?



A. I do.
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) And there was the letter by Dr. Friedman and the response thereto by Dr. Etminan, right?
A. Yes.
Q. And then Dr. Etminan actually published a revised analysis, right?
A. Yes.
(Exhibit 13 marked.)
Q. (BY MR. ISMAIL) This is Exhibit 13 to your deposition. You've reviewed this, have you not?
A. I have.
Q. And you understand that this is a further comment by Dr. Etminan on the very same data set that he purported to analyze in 2015?
A. Yes, post Dr. Friedman's review.
Q. And the -- the -- the factors that necessitated Dr. Etminan publishing Exhibit 13 were certain methodological flaws that were pointed out to him about his initial analysis, correct?
A. Yes. Not controlling for age in particular.
Q. So what Dr. Etminan admits to in Exhibit 13 is that his initial analysis failed to control for reproductive age, and that was a significant confounding

Page 182

variable in his analysis, right?
A. Yes.
Q. And what he says is that by failing to do so, he -- that analysis could artificially overestimate the risk of IH with Mirena, correct?
A. Yes.
Q. And then he says in -- further on in that paper -- I'm on the right column of page 1.
A. Yes.
Q. You would agree that an age-restricted analysis of the FAERS data would be the proper analysis to do?
A. Yes.
Q. And --
A. You know, all other things being possible, yes.
Q. And what he says is, "Based on the age-restricted analysis, a signal is not detected with Mirena with respect to BIH when childbearing age is accounted for."
Did I read that correctly?
A. You did. And that was his conclusion.
Q. So the conclusion of Dr. Etminan is that in both his cohort study and a more rigorous methodological approach to the FAERS data failed to establish an increased risk of IH with Mirena, true?
A. True.
MS. LAMACCHIA: Objection, form.

Page 183

Q. (BY MR. ISMAIL) Are you aware that Dr. Etminan further commented on the reliability of his analysis in an affidavit?
A. I am not -- I do not know that sitting here.
(Exhibit 14 marked.)
A. I did read the little note on his being involved in litigation in the article.
Q. (BY MR. ISMAIL) Did you see that Dr. Etminan failed to disclose in his initial publication that he was a retained witness for the plaintiffs in the litigation?
A. I noticed it was not there.
Q. Exhibit 14 --
A. There's no conflicts of interest reported.
Q. Exhibit 14, sir, is an affidavit from Dr. Etminan. I take it you weren't -- were not provided this document by plaintiffs' counsel as part of your review?
A. Correct.
Q. Do you -- if you -- feel free to look at as much of this as you want, but Dr. Etminan actually further describes some of the mistakes he made in his initial attempt at analyzing the FAERS data.
In addition to failing to limit his analysis by reproductive age, he failed to limit his analysis to unique reports and then was subject to double counting

Page 184

cases against Mirena?
A. That would falsely inflate his estimates.
Q. And that would be a false -- falsely inflated estimate bias against Mirena, true?
MS. LAMACCHIA: Objection, form.
A. Yes.
Q. (BY MR. ISMAIL) And at the bottom of page 1 in Paragraph 7 -- first in Paragraph 6, he says, "A proper analysis would be limited to women of reproductive age."
I think you agreed with that already?
A. I did. And that's what he did in his 17 article.
Q. And then he says, "The proper analysis should use unique cases, not unique reports" so that he avoids the double counting problem. That -- you would agree with that?
A. Yes, everyone would.
Q. He then says in Paragraph 8 -- and just so you follow the acronym, the DPA is disproportionality analysis?
A. His analysis, yes.
Q. "Rerunning DPA analyses of the FAERS data using the software and properly limiting it to unique cases and women of reproductive age results in no elevated ROR from Mirena suggesting that intracranial hypertension and Mirena use are likely not related."

Page 185

Did I read that correctly?
A. You did.
Q. You did not consider these statements from Dr. Etminan when arriving at your opinions in this case, right?
A. I did not have this affidavit, so I would not have included this in my opinion.
Q. Can you now, sitting here today, Doctor, agree that Dr. Etminan's analyses do not provide any evidence supporting a causal relationship between Mirena and IH?
MS. LAMACCHIA: Objection, form.
A. Other than the concept, other than the hypothesis, I would have to conclude that Etminan's work is a net zero. It does not significantly contribute to our understanding of a causal relationship.
Q. (BY MR. ISMAIL) So Dr. Etminan did two analyses, both of which conclude no increased risk with Mirena, right?
A. Yes.
Q. And you cannot look to that data as at least being some evidence pointing away from a causal relationship?
A. It could certainly be interpreted that way. I -- as I said with my initial answer to this, I am sufficiently obscured, confused, not able to interpret all

Page 186

this. And I've read what other experts have read about -- have written about this series, and -- and I'm -- I don't feel able to assess it.
Q. Do you see that --
A. That's why I have to conclude it's a zero.
Q. Do you see that Dr. Etminan writes in Paragraph 16 that when he does the analysis correctly, the odds ratio is actually below 1?
A. So he's proposing a protective effect.
Q. Well, I think he says it's not statistically significant, right?
A. It's not -- yeah, that's what that means.
Q. So the -- numerically, it would suggest a lower risk with Mirena users, but at worse, it would be no effect one way or another by Mirena and IH?
A. Well, because the confidence interval includes 1.0.
Q. So you would agree with my statement?
A. I would agree with your statement. And, again, I -- I stick with my statement with what he wrote, what Dr. Friedman wrote, what Dr. Etminan wrote combined with this affidavit, and what I've read about other experts, reading this it's very hard for me to interpret it further.
Q. Okay. So you would agree it's not evidence of an

Page 187

increased risk? And when I say "it," I mean any analysis done by Dr. Etminan.
A. Any of these analyses by Dr. Etminan does not push the balance towards proving causation.
Q. And if one accepts at face value the analyses done and corrected by Dr. Etminan, that would point away from causation, correct?
MS. LAMACCHIA: Objection, form.
A. It would -- I'm using my words carefully. It would not point towards causation. It's a different conclusion to say it further disproves causation. I don't think it's powerful enough to prove much of anything.
(Exhibit 15 marked.)
Q. (BY MR. ISMAIL) Exhibit 15, is this the poster presentation from Rai and colleagues that you cite in your report, sir?
A. Yes, I recognize it.
Q. This poster presentation by definition has not been peer-reviewed, correct?
A. Poster presentations are usually reviewed by peers at a meeting before they get accepted. I don't know the specifics for this, though.
Q. Can you tell from this poster presentation what data set was used for the Rai analysis?
A. It's my understanding under the methods section,

Page 188

it was a series of patients with the diagnosis of PTC discerned from ICD-9 coding data.
Q. Right. But the underlying data set is what?
A. I'm not -- I'm not seeing -- the underlying data set is -- you mean to ask is it billing information? Is that -- is that how I -- is that -- because whenever anyone talks about ICD-9, that's a billing tool.
Q. Let's move on. Under the conclusions of the authors themselves of this poster write, "A causative role for LNG-IUS has not yet been established"?
A. Correct.
Q. Do you agree with the authors that a causative role in the LNG-IUS has not yet been established?
A. Yes. And they're -- and they're reflecting this billing data set work of theirs.
Q. So I think you agreed with me that with the statement in the initial Etminan paper, that as of the publication of that paper, there were no epidemiological data showing even an association with Mirena and IH, right?
A. Uh-huh. Yes.
Q. And so since we have established that the Etminan analysis also doesn't establish an association between Mirena and IH, would I be correct that the Rai poster is the first epidemiological sort analysis that purports to

Page 189

establish an association between Mirena and IH?
MS. LAMACCHIA: Objection, form.
A. No. It suggests raise the question of is what I -- is the verb I would use. It -- it does not prove an association.
Q. (BY MR. ISMAIL) Fair enough.
A. It does not establish an association. It raises the question.
Q. Okay. So you would agree the Rai poster doesn't establish even an association between Mirena and IH, right?
A. Yes.
Q. And then these same authors prepared a paper --
A. An article.
Q. -- and published it?
A. Right.
Q. And the lead author there was Valenzuela?
A. Valenzuela now.
Q. But it's the same --
A. Group.
Q. The same group?
A. Yes.
(Exhibit 16 marked.)
A. Thank you.
Q. (BY MR. ISMAIL) Yep. Is Exhibit 16, sir, a copy

Page 190

of the Valenzuela paper that you cite in your report?
A. Yes.
Q. Now, are you relying upon the Valenzuela paper for your opinions in this case?
MS. LAMACCHIA: Objection, form.
A. Relying to some degree, more citing than relying.
Q. (BY MR. ISMAIL) Okay. Do you believe the Valenzuela paper establishes an association between Mirena and IH?
A. I think this paper raises the question that there's an increased risk of developing IH with Mirena, yes.
Q. Okay. The Valenzuela paper raises the question of an increased risk of IH with Mirena, but does not establish an association, true?
A. Correct.
MS. LAMACCHIA: Objection, form.
A. I -- I like the word the authors use here, "suggest." It suggests that women with a Mirena could have -- may have an increased risk of developing IH.
Q. (BY MR. ISMAIL) Did you critically examine the Valenzuela publication to understand the methodology employed by the authors?
A. Not to great extent.
Q. Don't you agree it would be the appropriate thing

Page 191

to do if you're going to rely on a study to critically examine the study to make sure you're comfortable that it followed good scientific principals?
MS. LAMACCHIA: Objection, form.
A. With my role as a clinician, I read it, I tried to understand it to the best of my ability. I would not overly rely on it, but I would cite it because of its subject matter and say this is yet one more suggestion in the literature that this association exists.
Q. (BY MR. ISMAIL) You -- you had -- in your report, sir, you describe yourself as a clinical epidemiologist, right?
A. I am trained as a clinical epidemiologist.
Q. So isn't it appropriate in clinical epidemiology to critically examine the scientific rigor of any study that you are analyzing on the issue of causation?
A. It can be, but that level of analysis varies. In this litigation, I am presented as a clinician with clinical epidemiology understanding and training.
I did not do in-depth clinical epidemiological analysis. My handling of the Etminan and Valenzuela information is handled in a paragraph. That's not an in-depth analysis.
Q. In fairness, though, sir, you cite the Valenzuela studies in -- as establishing or helping to establish

Page 192

several of the Bradford Hill criteria, right?
A. Yes, it is -- it is one brick in the Bradford Hill wall.
Q. So you understand that two different databases were analyzed in the Valenzuela paper, right?
A. Yes, the Utah and the Danish one.
Q. Now, you cited and you quoted specifically from the Rai poster in your expert report that causation had not been established. And you told me you agreed with that articulation by the authors, right?
A. Yes.
Q. Now, on page 195, in the discussion section in the second paragraph --
A. Yes.
Q. -- second sentence, the authors write, "Our investigation does not indicate that LNG-IUS can cause PTC, and the number of women with LNG-IUS was too small to determine if an LNG-IUS is an independent risk factor for PTC."
A. I think that's a perfect description of their work.
Q. So you agree with that, right?
A. I do.
Q. They write in the -- further down in that section in the next paragraph, second sentence, "As in the present

Page 193

report, these previous reports do not -- did not imply a causative role for LNG in the pathogenesis of PTC."
Do you agree with that sentence?
A. Yes.
Q. The authors report several limitations that would suggest caution should be exercised from interpreting their results, right?
A. I'm getting to that section. Limitations of our study include.
Q. There was no data to confirm that the diagnosis of IH actually followed the exposure to LNG, right?
A. There was temporal disconnect there. They were not able to show that.
Q. And so -- and the authors and researchers were not able to control for other confounding medications that you think have a causative role with IH such as tetracycline products, right?
A. Which could affect these results.
Q. There was no attempt by the authors in the Valenzuela publication to control for confounders, right?
A. Correct.
Q. This is --
A. Another criticism.
Q. And so the Valenzuela analyses don't consider other factors that may influence the risks such as

obesity, right?
A. Could affect the exposure and the outcome at the same time, that's right.
Q. And so you cannot determine from the Valenzuela data what an adjusted odds ratio would look like, correct?
A. No, I can't. That -- that is not supported by this data.
Q. The vast majority of the women on Mirena who developed IH in the Valenzuela study were obese, right?
A. They were obese, yes.
Q. The Valenzuela analyses have never been replicated, true?
MS. LAMACCHIA: Objection, form.
A. I'm not aware it's been attempted. I've never seen a replication. I -- I don't know if it's been attempted. I've never seen a follow-up publication like this.
Q. (BY MR. ISMAIL) It's never been replicated before or since the publication of Valenzuela?
A. Not that I've seen.
Q. In the Utah study, the non-IIH control group included women who had a Mirena inserted at the University of Utah during a five-year period, right?
A. '08 to -- to '13, yes.
Q. And the authors themselves recognize it was not



possible to capture women who had a Mirena placed outside the university health system, right?
A. That would be true.
Q. And that means they would have missed in the control group Mirenas placed in doctors' offices, Planned Parenthood community health clinics, right?
A. So their denominator would be much smaller.
Q. And that would -- the consequence of having an artificially low denominator of Mirena in the control group would be to --
A. Increase the numerator in the case group.
Q. Would be to artificially increase the relative risk of IH with Mirena, correct?
A. That's correct.
Q. That's a serious flaw in the paper, right?
MS. LAMACCHIA: Objection, form.
A. Potential serious. It's a -- it's a severe limitation.
Q. (BY MR. ISMAIL) And it's not really hypothetical, Doctor. You would agree that it's -- that an IUD like Mirena are commonly placed --
A. Uh-huh.
Q. -- in physician offices or a Planned Parenthood and not through a university health hospital?
A. That's correct. Even -- even this excellent



university setting.
Q. And you would recognize that Mirena's a product that is used -- that is placed and left in situ on average what, almost three years, right?
MS. LAMACCHIA: Objection, form.
A. On average, three years would be fair. Maybe -- maybe a share -- shade less than that, but three-ish years.
Q. (BY MR. ISMAIL) And by restricting the analysis to Mirenas placed at the university hospital from '08 to 2013, the researchers missed Mirenas placed even at the hospital prior to 2008 but were in situ during the study period?
A. Yes.
Q. That's another flaw of the paper, right?
A. That's -- that's another --
MS. LAMACCHIA: Objection, form.
A. -- flaw that would affect their calculated odds ratio.
Q. (BY MR. ISMAIL) And so do you know whether there -- data exists that more accurately describe the percentage of women in Utah who use Mirena as their form of contraception?
A. I have not looked for such a statistic.
Q. Did you see -- so you have no way to comment



whether the percentage of Mirena users -- withdrawn.
You have no ability to comment whether the Mirena exposure used in the control group in the Utah part of the study is at all consistent with what other research shows is the prevalence of Mirena use generally in Utah?
A. No, but that would be a very good comparison point --
Q. You think --
A. -- for the authors to do.
Q. You think that would be a worthwhile step to take to improve the methodological rigor of this analysis?
A. And the interpretation of it.
Q. Now, in the Denmark part of the study --
(Discussion off the record.)
Q. (BY MR. ISMAIL) -- the authors attempted to calculate the percentage of Danish women of childbearing age using a Mirena at any given time, right?
A. Yes.
Q. But to do so, they used only a single year's worth of Mirena sales data, correct?
A. I'm looking for that.
Q. If you look under -- on page 194 in the right column, which is describing the Danish part of the study, they say, "During the study period, we identified 154,877 women that fell within the age group" --

Page 198

A. Ah.
Q. -- "of 18 to 55."
A. I see the comment on 2014 --
Q. And --
A. -- the year the -- the IUDs were sold.
Q. And so they used one year's worth of sales data to calculate the control group, right?
A. It appears so.
Q. And that is --
A. A sliver of a biopsy.
Q. Well, let me -- let me ask the question. If you were to better calculate the control group of Mirena users in this Danish system, you would want to use more than a single year's worth of sales data, right?
MS. LAMACCHIA: Objection, form.
A. You would, especially because if one year of that information should be available, multiple years should be available.
Q. (BY MR. ISMAIL) And using just the single year's worth of Mirena sales in Denmark would severely underestimate the Mirena exposure in the control group, right? Because as you agreed, the product is left --
A. For more than one year.
Q. -- in place --
A. That would. That would be the effect.

Page 199

Q. And so the results from the Danish part of the study would also artificially overestimate the relative risk of IH in Mirena users, true?
MS. LAMACCHIA: Objection, form.
A. That would be the expected statistical result, yes.
Q. (BY MR. ISMAIL) The authors of this paper conclude on the very last page, "We do not recommend the removal of LNG-IUS from women with PTC as the benefit of effective contraception for these women likely outweighs the risk."
Did I read that correctly?
A. You did.
Q. Do you agree with the authors' conclusion?
MS. LAMACCHIA: Objection, form.
A. I think it depends on the individual woman, the severity of her symptoms, what alternatives to contraception. I can't -- I can't accept such a blanket conclusion as that.
Q. (BY MR. ISMAIL) Fair enough.
So if I understood correctly, Doctor, you have relied on three published epidemiological analyses in your report, the Etminan FAERS analysis, the Etminan cohort study comparing to COCs, and the Rai-Valenzuela analysis, correct?

Page 200

A. Cited them more than relied on them in my opinions.
Q. And we agreed the Etminan studies at best provide no evidence of causation?
A. Correct.
Q. And you agreed, just based on our brief review this afternoon, the Valenzuela analyses suffer from severe methodological limitations that would have to be considered when interpreting the results?
A. Fair.
Q. And the -- so as you sit here today, you would agree there is no epidemiological evidence establishing even an association between Mirena and IH, true?
A. Based --
MS. LAMACCHIA: Objection, form.
A. Based on these papers and what we've reviewed, there's no demonstration of an association. The question is raised, but there is no association demonstrated.
Q. (BY MR. ISMAIL) And there is no epidemiological data even raising the question from a evidence-based perspective that the incidence of IH with obese Mirena users is elevated compared to obese women in the background population, true?
A. True.
MR. ISMAIL: We can take that break.

Page 201

THE VIDEOGRAPHER: We're off the record, 2:47.
(Short recess.)
THE VIDEOGRAPHER: On the record at 3:10.
Q. (BY MR. ISMAIL) Doctor, I want to turn now to the 115 adverse event reports you discuss extensively in your report, okay?
A. Okay.
Q. All right. I didn't think that was going to be controversial, but okay.
A. Well, discuss extensively. I don't know if I discussed them extensively. I'm sorry.
Q. Fair enough.
A. Okay.
Q. You don't claim to be an expert in pharmacovigilance, right?
A. Correct.
Q. You never worked for FDA or even consulted on their behalf, correct?
A. I've been there. I have -- I have consulted with them on a couple of devices, but I've never been retained as a expert to review a drug or vigilance or anything.
Q. You've never worked in a pharmacovigilance role in any capacity for any company or regulatory association, correct?

A. I have not.
Q. Never published on pharmacovigilance?
A. No.
Q. You've never published on the use of adverse event report analysis, correct?
A. Correct.
Q. And I think you told me you have not even read the FDA guidance on the limitations of adverse event data; is that true?
A. That is true.
Q. And you do rely on spontaneous adverse event reports for your opinions in this case, correct?
A. To some degree, yes.
Q. Have you ever used spontaneous adverse event reports in any context before this case?
A. No.
Q. Did you access the primary data yourself from the FDA database?
A. No.
Q. In relying on the adverse event reports for your opinions in this case, did you consider the limitations on the reliability of said reports?
A. I did. Because of the reporting nature, just the very nature of the data, you -- you do wonder just how accurate this data is, how precise it's recorded, et



cetera.
Q. You -- you write -- if you -- you wouldn't mind, sir, turning to page 28 of your report in the section under methodologies used as a clinical epidemiologist and biostatistician.
A. Yes.
Q. Do you consider yourself a biostatistician?
A. I'm trained in biostatistics. I don't practice biostatistics. I guess I would be a journeyman biostatistician statistician.
Q. You write -- in the middle part of the paragraph, there's a sentence that begins "although"?
A. Yes.
Q. "Although there is some application of statistics necessary to understanding some of the medical literature pertaining to this litigation, the real question is the integration of the impact of the 115 cases of IH with Mirena in situ to a proposed cause and effect relationship between LNG-IUS and IH."
Did I read that correctly?
A. Right.
Q. What did you mean by those 115 cases constitute the real question on this issue?
A. Because it's not a statistical question. Those 115 cases don't require a lot of statistical analysis.



You simply read their story, you look at the data, and you say, wow, there could be something here.
My -- my statement is in parallel to what Bradford Hill said, that he didn't agree with people getting carried away with statistical analyses. I'm actually echoing that here.
Q. You -- you rely on the 115 cases for evidence satisfying several of the Bradford Hill criteria, right?
A. Yes.
Q. So these 115 cases are important to the process you use to arrive at your opinions in this case, true?
A. True.
Q. Now, you were provided an Excel file of the 115 adverse event reports, right?
A. Yes.
Q. And you're aware that these are spontaneous adverse event reports?
A. They were not elicited; they were spontaneous.
Q. And you understand that some of them were retrieved by the company from the FDA database?
A. I'm not sure I knew that.
Q. You understand that in all cases, the company reported any adverse event it received to the FDA?
A. I do understand that.
Q. Now, adverse event reports, the likes of which



you analyzed in this case, are reported without regard to causality, correct?
A. That's correct.
Q. Meaning --
A. It's the outcome.
Q. Meaning the reporter of any adverse event need not even suspect that the drug caused the adverse event to make a report, true?
A. That's my understanding.
Q. And I think you yourself reference that any adverse event report can be made by literally anyone?
A. In fact, that's represented in this data set that was nurses, medical students, lawyers making these adverse reports.
Q. Patients, family members?
A. The list goes on.
Q. And you would agree that there is varying amount of information that is provided in an adverse event report?
A. Very true.
Q. And regardless of how diligent the company's drug safety department is in following up on adverse event reports, it's oftentimes unable to get any meaningful information regarding the patient, comorbidities, that kind of thing?

MS. LAMACCHIA: Objection, form.
A. It is certainly not a clinical trial sort of setting. The data is spotty. The follow-up is poor. Lots of holes in the data set.
Q. (BY MR. ISMAIL) And because of the various characteristics of adverse event data that you and I just discussed, you would agree that any analysis of spontaneous adverse event reports must be done with caution?
A. Done with caution interpreted accordingly.
Q. And --
A. It has to be seen as exploratory.
Q. Right. So adverse event report data cannot be used to establish causation, true?
A. Not to prove it, not to absolutely prove it, not to establish it, that's correct.
Q. And the proper use of adverse event report data is as a hypothesis generating for guiding future study?
A. Yes, and to generate better answers to a interesting question.
Q. Now, these 115 cases in particular, do you have an understanding of -- of how that data compilation came to be?
A. Well, I -- I understand it's registry data. I understand it comes from many different countries,



different sources. We've talked about different people reporting it. I don't know -- if you're asking do I know was this data abstracted from another data set, that I don't know.
Q. I'll clarify my question here in a minute, but I just want to follow up with your answer. You said it's registry data. That has a specific meaning in epidemiology?
A. It does. It's not formal registry data. It is perhaps I should say registered data. It's call-in data. It's spontaneous reported data.
Q. Let -- let me ask my question this way: Do you --
A. Okay.
Q. -- do you -- do you understand the 115 cases that you analyzed the spreadsheet of were part of a 2015 signal assessment done by Bayer on the issue of Mirena and IH?
A. I do have some understanding of that. I -- I have been told that in that I noticed that the data -- if I recall correctly, the data ends at 2015 for that reason.
Q. Nowhere in your expert report do you discuss the signal assessment done by Bayer itself, true?
A. True.
Q. And in your materials list, any of the materials list, any of the three that we've marked at your



deposition, the 2015 signal assessment isn't even listed?
A. True.
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) Do I infer correctly from the absence of that signal assessment that you did not review and rely upon it for your opinions in this case?
A. True.
Q. So you have no opinions on the analysis or conclusions reached by Bayer in the 2015 signal assessment, true?
A. True.
Q. Do you -- are you aware that the signal assessment was updated by Bayer after 2015?
A. I am not.
Q. And your materials reviewed list does not contain reference to subsequent signal assessments done by the company. Would I infer correctly that you did not review any signal assessments done by Bayer after 2015 either?
A. Correct.
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) So you have no opinions on the analysis or conclusions of any signal assessment done by Bayer on Mirena and IH, true?
MS. LAMACCHIA: Objection, form.
A. Correct.



Q. (BY MR. ISMAIL) Do you know whether there is updated data that exists on spontaneous adverse event reports after 2015?
A. I am not aware of it. I would expect there to be.
Q. Did you inquire of counsel to get the most up-to-date data set for you to analyze for your opinions in this case?
A. I don't remember specifically asking that. I -- I do not -- I do not know if I ever asked for that.
Q. Would you agree, sir, that if one is going to be analyzing adverse event reports as part of a inquiry into causation, it would be appropriate to use a more complete data set than you used in this case?
MS. LAMACCHIA: Objection, form.
A. In my role as a physician, the 115 cases raised sufficient question in my mind as to an association. I think up-to-date data would be a good idea. I think more data would be a good idea. But in my role as a physician in this litigation, I -- I really can't assess -- I don't -- I don't think I did an analysis of these cases as much as read them.
Q. (BY MR. ISMAIL) Well, I mean, you read them and then spent several pages of your expert report commenting on your observation of these data, right?

Page 210

A. Right. But I don't think I would call that an analysis. I don't think any of the epidemiologists designated in this case would call that an analysis. Descriptive statistics at best, you know, a review, an assessment of is there potentially something here.
Q. So you reviewed the -- withdrawn.
Did you review the actual MedWatch forms or adverse event files for any of the cases, the 115 cases?
A. No, I -- IU had the spreadsheet, I ran through the spreadsheet, did some simple calculations as to ages and . . .
Q. Okay. So on page 21 of your report, in the data set inclusion criteria --
A. Yes.
Q. -- you write, "Each patient is included in this data set because they had a Mirena placed, were diagnosed with IH at any time ranging from a few weeks to 11 years after the first IUD was placed, and someone" --
A. The reporting person.
Q. -- "reported this diagnosis and its possible association"?
A. That is my understanding.
Q. Where did you get the understanding that each of the 115 cases are reports of intracranial hypertension?
A. That's -- that IH is our kind of epidemiologic

Page 211

broad net IH where people could have papilledema, not have a lumbar puncture. The presumptive diagnosis was IH, but it was not clinched like it would be clinically.
Q. How do you know the presumptive diagnosis is IH?
A. That was my understanding of each of those cases.
Q. So a report of papilledema with no other reported symptoms would qualify as intracranial hypertension in your rubric?
A. Not clinically, but in a epidemiologic initial review, yes. Now, I -- I have read Dr. Friedman's opinion of that. I have read the criticism of that. But in my role here as a clinician looking at this data set at the 10,000-foot level, I thought that appropriate.
Q. So your methodological approach to the review of the 115,000 -- 115 cases you described as a 10,000-foot review. Can you explain what that means?
A. From an altitude of 10,000 feet as compared to on the surface interviewing each one, completing a data set, having very complete data. It's -- it's a review. It's an initial look.
Q. So you did not do a rigorous analysis of the 115 adverse event reports cited in your report, true?
MS. LAMACCHIA: Objection, form.
A. Certainly not rigorous, not even a degree or two or three less strict than rigorous. I did a review.

Page 212

Q. (BY MR. ISMAIL) So you recognize that some number of the 115 adverse event reports would not even meet your definition of intracranial hypertension, capital I capital H?
MS. LAMACCHIA: Objection, form.
A. That would not surprise me if that's true. I certainly know some of them did not have lumbar punctures. The papilledema issue that you raised.
Q. (BY MR. ISMAIL) So where you -- so you use the abbreviation IH specifically in your report to equate to the condition that you've described for us today under oath, right?
A. Yes.
Q. But --
A. But it's important to distinguish my use of IH as an epidemiologic reviewer as compared to PTC or IH as a clinician. Those are not the two -- not the same definitions.
Q. Can you explain that answer, please?
A. I'll try. Let me first answer as a physician, because I understand that's how I'm designated to be today. As a physician, I'm familiar with the Dandy criteria for PTC, the various modifications and updates over the years. I would say those Dandy criteria have to be satisfied in a clinical scenario to diagnose that

Page 213

condition.
Now, in my role as a epidemiologic reviewer who happens to also be a physician, I am using IH to include those strictly defined PTC people, but also people who may not have had a lumbar puncture, who had other signs that were pretty clearly elevated intracranial hypertension.
And the reason I do this is -- has to do with one of the things we were talking about just before is I don't want to exclude too many of the subjects less we miss the lessons they could teach us.
Q. The -- a -- a report of papilledema and nothing else does not meet the clinical definition of intracranial hypertension, true?
A. True, very true, and spoken about in the literature.
Q. Do you -- does a -- a report of papilledema meet the Wheeler epidemiologic review of intracranial hypertension?
MS. LAMACCHIA: Objection, form.
A. Potentially, yes.
Q. (BY MR. ISMAIL) What else would you need?
A. I'd want to know was there dechallenge -- any rechallenge information. I'd like to know if there were any other associated symptoms, did they have a Mirena,

those sorts of things.
Q. Why would the use of a Mirena or dechallenge inform what medical condition the patient had?
A. It -- it only suggests a possible linkage.
Q. Isn't that -- when I'm -- I'm trying to identify the case selection process for your review. When you are determining what cases to include in a data set for your review, you decide what adverse event is of interest, correct?
A. Well, I -- I first decided what exposure was of interest. That was Mirena placement.
Q. Okay.
A. And then I looked for signs of IH. That's epidemiologic review IH.
Q. So if a patient had a Mirena and reported papilledema, that's enough for you to include in your umbrella term intracranial hypertension?
A. At my epidemiologic review level, yes, not as a clinician.
Q. Okay. So you have a disconnect between what you would do clinically in diagnosing a patient and what you would do as an epidemiologist in analyzing the data?
A. Not analyzing, 10,000-foot review.
Q. Okay. So --
A. I do not claim to have analyzed this huge data



set in-depth.
Q. So --
A. I didn't -- I didn't think that was my role in this case --
Q. And I'm --
A. -- in fact.
Q. I'm not here to disabuse you of what you think your role is. So let me just understand the bases for your opinions.
So I -- I think you agreed that you accept as possible that these 115 cases do not meet -- some of them may not meet your clinical criteria for intracranial hypertension, true?
A. I'm crystal clear on that.
Q. And you don't know how many of the 115 cases would fail your clinical criteria for IH, true?
A. IH, PTC, correct.
Q. Did you do -- did you use -- withdrawn.
Did you determine that these 115 cases meet whatever qualifies as your epidemiological definition of IH?
A. By -- by reading each case? I saw enough for each case to qualify for a epidemiologic review conclusion that they probably had IH.
Q. You didn't identify these 115 cases out of the



broader data set of adverse event reports, correct?
A. Correct.
Q. And those -- that selection was done before these cases ever got to you, right?
A. Yes, that's right.
Q. Do you know who made that selection?
A. I do not.
Q. Do you know what criteria was used to identify the 115 cases that you at a 10,000-foot level looked at in this case?
A. I do not know strictly. I presume people with much more experience than I with these kind of data sets.
Q. Do you know what number of the 115 cases actually were reported with either IIH -- intentionally using that term.
A. I'm with you.
Q. -- benign intracranial hypertension or PTC?
A. From all the data I reviewed, very few.
Q. Now, you understand that these -- the -- the allegation of either PTC or intracranial hypertension is -- has not been confirmed clinically by any health care provider?
A. I do.
MS. LAMACCHIA: Objection, form.
A. It's report data. It did not result in them



being referred to a clinician or --
Q. (BY MR. ISMAIL) Right. So --
A. It's unconfirmed.
Q. So none of the 115 cases you're aware of have been medically confirmed diagnoses of IH, true?
A. Not within this data set, that's correct.
Q. Do you know that some portion of the 115 cases are actually comprised of lawsuits filed in the litigation which you've been designated as an expert?
MS. LAMACCHIA: Objection, form.
A. I did not know that fact. I did see some notations of lawsuit case, lawyer referred, things like that.
Q. (BY MR. ISMAIL) Do you know what portion of the 115 cases you looked at as part of your opinions in these case originated as lawsuits filed by plaintiffs' counsel?
MS. LAMACCHIA: Objection, form.
A. I would not know that number. I would estimate the percentage that had any designation as to any involvement with lawyers to be about 15 to 20 percent.
Q. (BY MR. ISMAIL) That sort of a back of the envelope estimate you've made, or did you actually do that calculation?
A. Back of the envelope. Not even with an envelope, just -- just an observation.

Page 218

Q. Okay.
A. But I did notice.
Q. Would it surprise you that the number exceeds 15 to 20 percent?
A. No.
Q. Would it surprise you that the number of cases that actually report IIH or benign intracranial hypertension or PTC, the proportion that were lawsuit originated is much greater than 15 to 20 percent?
MS. LAMACCHIA: Objection, form.
A. I simply have this recollection of going through the data.
Q. (BY MR. ISMAIL) Do you know -- do you agree, sir, that, including lawsuits, initiated adverse events changes the intensity of reporting?
MS. LAMACCHIA: Objection, form.
A. I have read something of that. I think it's even a -- a named bias. You know, it's a form of reporting bias, but that doesn't surprise me.
Q. (BY MR. ISMAIL) Right. So when one looks at -- as you indicated, the spontaneous adverse event system, it's a -- it's a voluntary reporting system?
A. Yes.
Q. With both under- and overreporting?
A. Right. And no restrictions on who can report.

Page 219

Q. Right. So what -- there are various biases that may influence the intensity of these voluntary reports?
A. Yes, things in the news, lawsuits.
Q. So there may be -- if you were just to analyze one product's adverse event reports of a event at interest compared to another, they may actually have identical risk profiles, but there might be some stimulated reporting of one product relative to another?
A. Stimulated over or even under.
Q. And so including lawsuit-generated adverse event reports would be one of the stimulated reportings that would confound any analysis of adverse event data.
A. Yes --
Q. You would agree to that?
A. -- it would.
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) Now, these 115 cases were reported over a period of 15 years, right?
A. That's my understanding, from '01 to '15.
Q. Do you have any understanding, sir, of what the total Mirena exposure was for these -- from which these 115 cases were derived?
A. Would have to be in the hundreds of thousands.
Q. Actually, it would be in the millions. Would that make sense to you?

Page 220

A. That's tens of hundreds of thousands, so, yes.
Q. And you understand these 115 cases were not limited just to the United States, right?
A. No, I noticed the country of origin was widely variable.
Q. So you have no understanding of what the exposure data is for the 115 cases identified for your review, correct?
A. I don't know the denominator better than what I told you. I knew it was a very large number of Mirenas placed.
Q. And so the denominator would be this qualitatively the worldwide exposure of Mirena from 2000 to 2015?
A. Roughly, yes.
Q. And quantitatively, you don't know what that number is?
A. No, I do not know that exact number.
Q. So because of -- well, you don't even have an estimate of that number, right?
A. Well, I said hundreds of thousands.
Q. And --
A. I just know it's a very big number. We're -- we're dealing with a unusual, uncommon outcome.
Q. So because of that, you do not know what the

Page 221

reporting rate of the 115 IH cases you analyzed in this case, true?
A. The reporting rate. I would not.
Q. Is -- to know a reporting rate, you would need to know the exposure data and the denominator from which you calculate a reporting rate?
A. Right. You need a numerator and denominator for a rate.
Q. So you can't tell us whether there is an elevated reporting rate of intracranial hypertension with Mirena users compared to any other group of patients, true?
A. True.
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) There is a background rate of intracranial hypertension, right?
A. Yes.
Q. Meaning there are patients who develop intracranial hypertension who have never been exposed to LNG?
A. Correct.
Q. In fact, you would acknowledge that most patients who develop intracranial hypertension have not been exposed to LNG?
MS. LAMACCHIA: Objection, form.
A. I -- I think that would be true.

Page 222

Q. (BY MR. ISMAIL) And just to take the other side of that same coin, the vast majority of women exposed to Mirena do not develop intracranial hypertension?
A. That's certainly true.
Q. Do you know what the background rate is of intracranial hypertension?
A. I've read the statistic. I've read -- it's on the order of cluster migraine headaches. It's on the order of 1 per 10,000, I think. It's a very small number.
Q. Do you have a particular reference in mind for that statistic?
A. I would go back to the binder and Friedman review articles in my literature.
Q. You've --
A. But please consider that a very rough estimate. I -- I grant you it is very uncommon. But in neurology, it's as common as cluster headaches.
Q. And you and I agreed earlier that gender and age and obesity and/or recent weight gain --
A. And weight gain.
Q. -- are all risk factors for the development of intracranial hypertension?
A. In fact, I've -- I've said this a couple of times. They are risk factors, possible confounding factors. We don't have the relationships completely

Page 223

understood.
Q. Do you know what the background rate of intracranial hypertension is in women?
A. No, I've not seen that number specifically.
Q. Do you know what the background rate is of intracranial hypertension in reproductive-age women?
A. No.
Q. Do you know what the background rate of intracranial hypertension is in reproductive-age women --
A. Who are heavy.
Q. -- with obesity or recent weight gain?
A. No. If -- if I've read those numbers, I don't have them memorized.
Q. Okay. So you cannot opine that the reporting rate of intracranial hypertension with Mirena users exceeds the background rate of intracranial hypertension in reproductive age women, true?
MS. LAMACCHIA: Form.
A. True.
Q. (BY MR. ISMAIL) Now, because you cannot conclude -- withdrawn.
Have you seen any analyses in your review of materials in this case wherein people did look at the reporting rates of intracranial hypertension on Mirena users and compare it to background rates?

Page 224

A. No.
Q. Would that be --
A. I don't think so.
Q. Would that be of interest to you?
A. Yes.
Q. Why?
A. Well, that would be one more brick in the wall. That would be one more bit of datum that we would look at to try to see how it fits in the total story.
Q. So --
A. But, yes, that would be of interest.
Q. So if the reporting rate of intracranial hypertension in Mirena users does not exceed the background rate of intracranial hypertension in reproductive-age women, that piece of data would point away from a causal association?
A. That's correct.
Q. You write -- so insofar, Doctor, as you have no information about the reporting rate of these 115 cases, how does your analysis of those cases fit in your overall bases upon which you're relying for your opinions?
A. They are bits of information, piece of data that raise my concern that Mirena's associated with IH. It stimulates me to want to read better data. It stimulates me to want better education from Bayer so I can pass it on

Page 225

to my patients. It raises clinical concerns in my mind.
Q. So the -- the mere fact of -- you agreed with me that the population of women -- excuse me. Withdrawn.
You agree that the population of people who are prescribed Mirena fall within the demographic group most at risk for the condition?
A. Yes.
Q. And so it would not be surprising to see intracranial hypertension develop in reproductive-age women whether or not they're taking a -- or using a Mirena, right?
A. I under --
MS. LAMACCHIA: Objection, form.
A. I understand that. But we're dealing with an outcome of such potential seriousness. If there is even a suggestion that I could do something clinically to help protect my patients, I want to take that into consideration.
Q. (BY MR. ISMAIL) So --
A. I can recognize that there's no such thing as perfect research or perfect FDA data, but if there's a real risk there, I want to know that clinically.
Q. So I appreciate your comments on -- on patient counseling, and I promise I'll get there. But I'm actually at a earlier step in -- at least in your report.

Page 226

A. Yeah, I'm sorry, I -- I can't help but think as a doctor --
Q. Fair enough.
A. -- every -- every answer I give.
Q. So it would not surprise you to find 115 left-handed, reproductive-age women who have intracranial hypertension?
MS. LAMACCHIA: Objection, form.
A. I don't think -- let me think for just a second. Would not surprise me to see -- I -- I don't get the relevance. I --
Q. (BY MR. ISMAIL) Right.
A. You know, 17 percent of people are left-handed. Would I be surprised to see 115 left-handed people? Would be an amazing coincidence.
Q. Really? You don't think you could find 115 women in this country who are left-handed who have developed intracranial hypertension?
MS. LAMACCHIA: Objection, form.
A. Well, IH is common enough. The population of the country, 17 percent are left-handed. And I think you could. I think you could.
Q. (BY MR. ISMAIL) Right. And --
A. I don't think it would be easy, but I think you could.

Page 227

Q. And -- and the mere fact that you can find some group of women who share some other characteristic who develop intracranial hypertension doesn't mean that characteristic caused the disease, right?
A. You're right. But let's work through your analogies for a second. Left-handed people tend to be more ambidextrous. The wiring of their brain is different. There could be something to that theory. What I'm saying is we can't be dismissive.
Q. But you would agree that the -- the -- the identification of 115 reproductive-age women who have developed intracranial hypertension, regardless what their other common exposure is, does not establish that that exposure caused the condition?
A. Does not --
MS. LAMACCHIA: Objection, form.
A. -- establish cause. Raises the possibility, mandates further research, mandates education of our patients.
Q. (BY MR. ISMAIL) So the only -- so these 115 cases that you reviewed in this -- as part of your expert work in this case simply raise the possibility that there is a relationship between Mirena and IH, right?
A. Yes.
Q. So you've indicated to me that the use of these

Page 228

adverse event data would be to prompt you or another reviewer to look for better data?
A. Yes.
Q. And you and I -- I think you agreed with me earlier today that the only data sets that you looked at in this case were Etminan, Valenzuela, and these 115 case reports, right?
MS. LAMACCHIA: Objection, form.
A. That's all that I know of. If there's more, I'd love to see them.
Q. (BY MR. ISMAIL) So none of the data that you looked at as part of your work in this case establishes an association between Mirena and IH --
MS. LAMACCHIA: Form.
Q. (BY MR. ISMAIL) -- true?
A. It establishes a possible association. It does not establish or prove absolutely cause.
Q. These 115 cases, you cannot say -- withdrawn.
You cannot say these 115 cases are even an association between Mirena and intracranial hypertension unless you've determined that that condition is occurring more frequently to Mirena users than nonusers?
A. That's not true. The -- the simple observation that there's 115 people with this unusual neurologic syndrome and they all have Mirena makes me want to

Page 229

investigate that question more.
Q. That's not what I asked.
A. It makes me question whether there's a cause-effect relationship.
Q. Still not what I asked.
A. It makes it very important to me to know if there's a relationship.
Q. I -- I --
A. But it does not allow me to conclude there's cause. I -- I recognize the limitations of the data. But when I read that number of cases, it was alarming to me.
Q. So you think 115 cases of intracranial hypertension out of millions of reproductive-age women is an alarming statistic?
MS. LAMACCHIA: Objection, form.
A. With my approach as a clinician looking for serious disease and wanting to prevent it in my patients, I want to know more about that relationship.
Q. (BY MR. ISMAIL) Can you identify -- can you identify any peer-reviewed publication that uses temporal association of an adverse event with a prescription medicine as establishing an association?
A. No, because we know that temporal association does not prove causation. I mean, I was fortunate enough to learn that in medical school and law school. I mean,

we -- we know that.
Q. So --
A. We know that.
Q. -- the -- these 115 cases are identified solely on the basis of temporal association with Mirena, right?
MS. LAMACCHIA: Objection, form.
A. Thus -- thus far at that level of knowledge of their cases, yes.
Q. (BY MR. ISMAIL) And that's the level you reached about these 115 cases, correct?
A. That's all I have.
Q. So the temporal association of Mirena with these 115 cases does not establish an association, true?
MS. LAMACCHIA: Objection, form.
A. Does not establish cause. It raises a possible association.
Q. (BY MR. ISMAIL) You recognize that temporal association does not prove causation?
A. I accept that.
Q. On page 21 you write under "Possible confounders" --
A. Yes.
Q. -- "Age is one of the most important potential confounders." Did I read that correctly?
A. Yes, and I think others share that view.



Q. And you believe it's a potential confounder because what we've talked about repeatedly today, it's the 20 to 40 range that's the greatest demographic risk?
A. Well, yes, and -- and, you know, the definition of confounder needs to be mentioned sometime today. That's a factor that's related to exposure and related to outcome, but is -- but is not related in between them.
Q. So then you say reproductive-age women typically is defined by an epidemiologist as being between ages 15 and 44, right?
A. That's a -- that's a school -- epidemiology school definition.
Q. And then --
A. Of course, you would always want to read if the authors were identifying another stratum.
Q. And then you comment that in these 115 cases, the distribution of those cases does not spread equally in that age range, right?
A. Right.
Q. That doesn't -- the -- you certainly recognized that the vast majority of the 115 cases you looked at occurred in women of reproductive age?
A. Yes.
Q. And so whether or not the distribution was flat or a Bell curve or something else within that age range



doesn't control for the confounder of age when looking at these 115 cases, true?
A. True.
Q. And you go on to say obesity is another important confounding variable, as we've discussed, right?
A. Yes.
Q. You said on the carryover on to page 23, "A typical Ob/Gyn clinician would explain that many of the patients who receive Mirena have higher BMIs, for a variety of reasons," closed quote.
Did I read that correctly?
A. Yes, and we've -- we've addressed that earlier today.
Q. So you would expect that compared to other forms of long-acting -- withdrawn.
You would expect compared to other forms of prescription contraceptives, obese women are preferentially prescribed Mirena?
A. Yes, you would see Mirena over -- overrepresented in that group.
Q. Better stated.
And then you comment that "BMI was available for only a fourth of the included patients." And that was based on your --
A. Review at 10,000 feet.



Q. Okay. Did you include in your subset adverse events in which the term "obesity" was reported but without a BMI?
A. No. What my sentence here means is BMI was reported, because I had to -- I had to categorize it.
Q. Did you include in your subset here instances in which recent weight gain was reported?
A. No.
Q. So you --
A. Just BMI.
Q. You acknowledge that the 115 cases, there's a -- there's more data from that data set on the proportion of obese patients or recent weight gain than just in 25 percent of the cases?
A. I do. And why did I not -- why did I not abstract that data is because of the limitations of the data collection I recognize.
Q. And --
A. I think such data could be overanalyzed.
Q. Regardless of which -- how you arrived at your subset --
A. Uh-huh.
Q. -- 81 percent of the patients you included in your subset were either overweight or obese?
A. Yes.

Page 234

Q. And some additional percentage had recent weight gain, but not considered here?
A. Correct.
Q. And so in these 115 cases that you looked at, you recognize that the vast majority of those cases were reported in patients at the highest -- the demographic group of patients at the highest risk of IH whether or not they've been exposed to a Mirena?
A. Females, reproductive age, some degree of obesity, I think that's a fair statement.
Q. You then have a section on "Latency to Diagnosis"?
A. Yes.
Q. Do you agree, sir, that once the LNG -- withdrawn.
I want to turn to your -- to the mechanistic theory that you said is biologically plausible, which at times we called the androgen theory.
In the context of your androgen theory when the systemic levonorgestrel has been removed, the risk of IIH should go down?
A. If everything ordered what people call first order kinetics of elimination, if elimination really happened, if the LNG comes off the testosterone receptor, the thing is we -- we don't know that. That -- that may

Page 235

not be true. That may be a false assumption, just as one would expect dechallenging every Mirena patient with IIH that would cure it, and it doesn't.
Q. So let me go back to my question.
A. Okay.
Q. Do you know of any reliable data that would support the notion that systemic LNG levels remain detectible in women after the Mirena has been removed?
A. Systemic levels, not CSF levels. Systemic levels, no.
Q. Do you --
A. I would expect systemic levels would go down.
Q. Do you know of any -- well, I didn't ask whether you suspected that was true. I asked if you had any reliable data that you're aware of.
A. No.
Q. And then you drew a distinction between systemic and CSF levels, so let me catch that part of your answer.
A. Right.
Q. Are you aware of any reliable data that shows that CSF levels of LNG remain after a Mirena has been removed?
A. Recognizing the difficulty in doing such research, no, I do not.
Q. Is there any peer-reviewed medical literature

Page 236

that you can point me to to suggest that after LNG exposure is removed, that Mirena continues to have androgenic side effects?
A. Can I -- say that -- would you repeat your question?
Q. Yes, sir. Can you point me to any peer-reviewed medical literature to suggest that after the LNG exposure has been removed, Mirena continues to have androgenic side effects?
A. I would point to people suspected of having Mirena-associated IH, the Mirena is removed and the IH doesn't disappear. I know that IH does not always resolve with Mirena removal.
Q. One explanation of that is that Mirena's not --
A. Causative.
Q. -- causative with the IH, right?
A. That would be one --
MS. LAMACCHIA: Objection, form.
A. -- of the differential diagnosis of reasons, that's right.
But to answer your question, I'm not able to point to a literature that says that.
Q. (BY MR. ISMAIL) And I want to rephrase my question to mean any androgenic effect of Mirena.
Are you aware of any peer-reviewed

Page 237

publication that has suggested that any androgenic effect of Mirena continues after the product has been removed?
A. Literature, no. Clinical experience, I would anticipate it would take a while to clear acne and hair growth, just to be fully disclosing. So technically, however long it took those symptoms to resolve. I've not read an article about that.
Q. Now, you write on page 24 of your report -- actually, it's a carryover sentence if you want to see where it begins on the bottom of 23.
A. Thank you.
Q. "It is worthwhile to note that each newly implanted device will begin with a higher release rate and resultant higher average blood levels of LNG."
Did I read that correctly?
A. Yes.
Q. Do you believe that to be a true statement?
A. Each newly implanted device, higher release rate. Yes, with what I've read in the package insert, the release rate is higher initially and declines over time. The -- the part -- the resultant higher average blood levels would be on average with individual variation.
Q. Okay. So on -- on a -- on a average sort of population-wide basis, your expectation is the blood levels of LNG would be higher in the period after a new

Page 238

placement of Mirena and then go down to some steady state over time?
A. Yes, some steady state characterized by pretty wide variable spread.
Q. And you have not --
A. And it stays steady for some years.
Q. And you don't have any opinions in your report as to the time course of when that initially higher blood levels of LNG drops to that steady state?
A. No, I -- I cite the package insert. It didn't tell me when peak levels occur. It tells me the average level first year, second year, third year.
Q. You -- your analysis of the latency of diagnosis in these 115 cases, I guess in 70 of which you found some evidence to -- some data from which you could calculate latency, right?
A. Yeah, which means there were 45 with no information on that.
Q. And then you picked these cut points of six months, two years, and four years to analyze the data, right?
A. Review the data. I -- I can't claim analysis here.
Q. Fine. I don't --
A. Okay.

Page 239

Q. I don't mean to overstate your --
A. Proficiency.
Q. Fair enough. So let me rephrase.
A. All right.
Q. In your discussion of these 70 cases, you chose as points of demarcation six months, two years, and four years, right?
A. Yes.
Q. Is there any -- withdrawn.
How did you go about deciding that those would be the time points at which you would censor the data?
A. An epidemiologic tool is to look for clumping of data. You know, many different things, pharmacokinetics, epidemiology, clinically, you want to know the halfway point. So it just so happened that it was close to half, we're at six months. That's how I picked that point.
And then 80 percent is another important number in reproductive medicine. 80 percent of women will be pregnant within a year of trying. So that's why that percentage stuck in my -- in my mind.
Q. What does that have anything to do with the case that we're talking about today?
A. I'm -- I'm looking for natural clumpings. I'm looking for -- I'm looking for what the data can tell me.

Page 240

I'm looking for natural clumping.
Q. Okay. So you -- you chose six months, two years, and four years --
A. Right.
Q. -- not because that relates to any theory of causation, but rather --
A. No.
Q. -- because that's where the clumping occurs?
A. That's where the data occurred. And the four-year choice was to capture most of the data, and then we had those two strange statistical outliers.
Q. So there's nothing about 80 percent of IH cases reported within two years that is -- that you found in -- withdrawn.
There's nothing in the peer-reviewed literature that would ascribe any particular meaning to the percentage of IH cases reported within the first two years after exposure?
A. Not that I've come across.
Q. And the same answer for six months and four years?
A. Six months, many people would say you would expect to see IH within six months, but even that's not known. No, it's just that's where the data clumped.
Q. All right. So --

Page 241

A. The roughly half -- half point was six months.
Q. So the -- the 45 percent of the 70 cases with a latency to diagnosis of six months or less in and of itself does not help establish causation in this case, true?
A. If temporal association does not prove causation, parsing that temporal association does not prove causation.
Q. So this -- this entire discussion of six months, two years, and four years in your report on page 23 are more interesting observations of the data rather than supportive of your opinions in this case?
MS. LAMACCHIA: Objection, form.
A. The -- the way they're supportive of my opinions, if I was asked a priori would you expect all of the IH to occur within the first few months after Mirena placement, up above that I explain, no, I don't because IH is difficult to diagnose. There's going to be an asymptomatic phase.
So this time course observed is not incompatible with a causative relationship between Mirena and IH. The real exception to what I just said is those two at 10 and 11 years. They could certainly represent background cases. They could represent something from some other cause. I'm not able to claim that for all of

Page 242

them.
Q. (BY MR. ISMAIL) In your answer you said the distribution of latency at six months, two years, and four years is not incompatible with causation, correct?
A. Correct.
Q. But nor is it supportive of causation?
A. Because it's temporal association, that's right.
Q. So the answer's yes?
A. The answer's yes.
Q. Is there any discussion in the peer-reviewed literature that you can point us to that would support the notion that a patient exposed to Mirena can develop IH a year or more after the Mirena was placed?
A. That would be such a hard study to do. I've not read that in the peer-reviewed literature.
Q. And if I change my question to make it six months or even one month, you couldn't point us to any discussion in the peer-reviewed literature that would support a causal role of Mirena with IH with any degree of latency after placement, true?
A. That's correct. But, again, the reason I included this paragraph in my paper was to remind us of this potentially long asymptomatic phase and the difficulty to diagnose.
I didn't want opposing experts to claim that

Page 243

IH would have to happen within just weeks of Mirena placement.
Q. And in fairness, Doctor, that's your -- your criticism of such an opinion would be a hypothesis by you that it's still possible that Mirena can cause IH some weeks or months after placement?
A. But with these -- it's with hypothesis generation that we're going to design the follow-up studies to answer these things. But it's -- it's hypothesis generation.
Q. So it wouldn't matter to you if the distribution of latency between Mirena placement and IH, instead of being 45 percent in the first six months, was 25 percent. Would that change your views in this case?
MS. LAMACCHIA: Objection, form.
A. I'd want to know what the rest of the data looked like. For example, if you showed me data with a spike at three months and a spike at six months and a spike at nine months, I would say, That's very odd. It's hard for me to see how that exposure would cause that outcome.
So what you're just describing to me could simply mean a different size of the slope of the line. So if -- if it -- if you're describing from a 45 percent to 25 and the slope is otherwise consistent, I would say sure, that's still possible.
Q. (BY MR. ISMAIL) Would it be -- would it weaken

Page 244

the hypothesis of a causal role between Mirena and IH if the time to -- the latency time to diagnosis was longer than you believed it to be in your expert report?
MS. LAMACCHIA: Objection, form.
A. If it was -- you know, I mentioned the 10 and the 11 years. A fair question sort of thing would be just keep pushing that back to nine, eight, seven.
The way I would answer that is in my view, for what that's worth, the longer in years, the less likely the -- the -- it could be cause and effect. Not impossible, but less likely.
Q. (BY MR. ISMAIL) And -- and I appreciate that, and I'm not really asking on a patient-by-patient basis, but let me just follow up on your answer.
You would say the longer -- the longer the gap between placement and diagnosis, the less likely Mirena would be causally associated with that particular patient's symptoms?
A. With that particular patient's symptoms.
Q. So --
A. Unless -- see every -- every case has to be individualized. What if she had recent weight gain? You know, if she had recent weight gain with the Mirena on board, develops IH, the Mirena contributed.
Q. Well, wouldn't the epidemiology tell you the

Page 245

weight gain is what caused the IH?
A. I can't --
MS. LAMACCHIA: Objection, form.
A. -- rely just on temporal association. It would be both factors probably.
Q. (BY MR. ISMAIL) So let me ask on a population-wide basis.
A. Sure.
Q. If the average time of -- between placement and diagnosis is longer than you believed it to be in your expert report in these 115 cases or any other --
A. 70.
Q. -- comparable --
A. 70.
Q. -- 70 cases --
A. Right.
Q. -- that would point away from a causal connection between Mirena and IH?
MS. LAMACCHIA: Objection, form.
A. On a population basis, that's hard to say because it has to do with access to care, access to diagnosis of IH, which is not made by every kind of doctor. I'm much more comfortable commenting on that as a physician for an individual patient.
Q. (BY MR. ISMAIL) Okay. So --

Page 246

A. Population, it's too speculative.
Q. So I guess at the end of the day we'll revert to the conclusion that nothing -- nothing can be determined from the -- your reporting of the latency in these 70 cases?
A. Nothing can be determined in a definitive way. It's a way to raise the question. It's a way to consider a piece of data that would weaken the causative theory, and it does not.
Q. The data that would weaken a causative theory being?
A. Being if I saw a spike at three months, a spike at six months, a spike at nine months. There's different patterns this little bit of data could have that would have made me question whether there was cause and effect. This pattern that I describe here, to me, does not exclude a cause and effect relationship.
Q. So the spiking of data -- withdrawn.
The spiking of cases around the latency time at various time points would point away from causation; do I understand?
A. With a steady state exposure like Mirena levels.
Q. Now, do you know what the half-life is of levonorgestrel from Mirena?
A. Oh, I read that once and I cannot recall it. So

Page 247

the answer is no, not at this time. I do not recall. I know one of the LNG scientists would know that on the top of their head.
Q. Is there any support in the peer-reviewed literature to suggest that if a patient had a Mirena removed and thereafter developed IH, that the Mirena could have been causally associated with that condition?
A. That is very interesting, and I have not read that, but I will be interested in reading that in years to come. That is very interesting. But, no, I'm not -- I've not read that.
Q. You write on --
MR. ISMAIL: How you doing?
THE REPORTER: Good.
MR. ISMAIL: Okay.
Q. (BY MR. ISMAIL) You okay, sir?
A. Oh, yes. Thank you. You okay?
Q. I'm doing great.
A. Okay.
Q. You write -- you write -- I'm on page 24 of your report.
A. Okay. Thank you.
Q. Under "Special Patient Groups."
A. Yes.
Q. You write, "Sometimes a single case report can

Page 248

lend insight into a cause-effect relationship in clinical medicine."
A. That may be the best-worded thing I've written. It doesn't prove causation. It can add insight.
Q. A single case report can be hypothesis-generating?
A. Yes, raise interest, raise questions, kind of like what we were talking about before with case reports.
Q. So you then describe a couple of -- a few --
A. A few.
Q. -- of these single case reports or a couple of case reports --
A. Couple, uh-huh.
Q. I think she's going to ask you to stop interrupting my question, sir, if you don't mind.
The first category you have is an embedment of an IUD, right?
A. Right.
Q. And that's a known potential risk of all IUDs, correct?
A. Yes.
Q. Do you know what the incidence rate of embedment is with a -- with a Mirena in particular, IUDs generally?
A. No, it's very low. It would be lower than perforations. It would be very low, less than 1 percent

Page 249

by far.
Q. You -- you said you identified 2 out of 115 cases in which a Mirena was embedded in the uterine wall, right?
A. Yes, uh-huh.
Q. And you would expect that out of the millions of women who had used a Mirena, there are potentially thousands of cases of IUD embedment?
A. Thousands.
MS. LAMACCHIA: Objection, form.
A. If it's -- if it's a one out of a thousand embedment rate, every million there'd be a hundred -- a thousand.
Q. (BY MR. ISMAIL) A thousand.
A. So you would expect potentially thousands of embedments.
Q. And so the -- you're not aware of any case report in the medical literature of IIA -- withdrawn.
You're not aware of any report in the medical literature of IH in a Mirena user who had a embedment, correct?
A. No. The -- the most relevant literature I cite here.
Q. And as far as you know, there are thousands of women who have had a Mirena embedment who have never developed IH?

Page 250

A. Or didn't present or -- or just aren't known.
Q. All that is a possibility and you don't know the answer?
A. I don't know the answer.
Q. Did you -- out of these two cases -- withdrawn.
These two cases that you identified here, there's nothing in those two cases that would lead any scientist or clinician to conclude there's a causal relationship between Mirena and IH, right?
A. Wrong. What -- this would raise the question is if it's embedded, the LNG would be exposed to the systemic circulation. It's an interesting dose response.
Q. Do you think there's a dose relationship between LNG and the risk of IH?
A. At this point I don't have -- I don't have a clue at all as to that. I think it may end up being risk factors. I think it may end up being an individual person's susceptibility to it.
Q. Is it --
A. I don't think it's going to be as simple as just dose response.
Q. Isn't dose response one of the Bradford Hill criteria?
A. It's -- it is.
Q. And so you would say you don't know whether there

Page 251

is a dose response between LNG exposure and IH -- and IH, correct?
A. LNG -- I think we were talking about systemic levels.
Q. No. Let me rephrase.
Do you think there's a dose relationship between LNG and IH?
A. I think as represented with these embedded cases, potentially, yes.
Q. You told me when I asked that exact same question 60 seconds ago "I don't have a clue."
A. Well, I don't have a good clue.
Q. Okay. There's not a reliable basis from which you could opine that there's a dose relationship between LNG and IH, true?
A. Beautifully stated and true. There's not enough data.
Q. And your -- your question of dose response that you raise in your report were these two cases of embedment, right?
A. Yes.
Q. Now --
A. Because there is no other data to reflect on that.
Q. Do you know whether the LNG reservoir in these

Page 252

two cases were in the peritoneal cavity or the uterine cavity?
A. Uterine -- reservoirs. I don't know that.
Q. So do you know --
A. The part of the IUD with the drug in it.
Q. Right. So the arm of the Mirena might be embedded in the uterine wall, but the LNG is continuing to be released in the uterus, right?
A. Yes, but by the nature of your question, I don't think we can assume that the -- the LNG-containing portion would have to be in the myometrium. There would be a hole there. There would be a -- I don't know.
Q. Okay. So in these two cases that you identified of embedment, you don't know whether the LNG was being released in the uterus or outside the uterus, correct?
A. I don't.
Q. And --
A. Well, I know it was in the uterus. I don't know if it was in the uterine cavity.
Q. Let me rephrase. These two cases of embedment that you cite in your report, you don't know whether the LNG from the embedded Mirena was being released in the uterus -- uterine cavity?
A. Correct.
Q. And so you don't know whether the LNG in these

Page 253

two embedded cases was being released in the -- outside the uterine cavity, correct?
A. Although that would mean a perforation, not an embedment.
Q. I agree.
A. They were embedded; they weren't perforated.
Q. So that would lead you to conclude that there was not LNG released outside of the uterine cavity, correct?
A. It would lead me to conclude there -- conclude there was not LNG outside the uterus, but it could be outside the uterine cavity in the wall of the uterus.
Q. You report -- you say, "It's reported that an LNG-IUS perforating the uterine wall, or likely if embedded in the uterine myometrial wall, can infuse an inordinate amount of LNG into the general vascular system," correct?
A. Correct.
Q. Now, the citation you have there is to the Haimov publication, right?
A. Yes.
Q. Now, that's a case report, right?
A. That's a single case report.
Q. We'll mark that as Exhibit 17.
(Exhibit 17 marked.)
A. Thank you.

Confidential - Subject to Protective Order



Q. (BY MR. ISMAIL) In the Haimov case report, the IUD was found to have perforated the uterus and ended up in the peritoneal cavity, correct?
A. It says right here in their abstract, "intraperitoneal dislocated" is the wording they're using.
Q. And so the measurements of plasma concentrations of LNG in this particular case report, this Haimov article, comes from a woman with a perforated Mirena, correct?
A. An intraperineal LNG, not intramyometrial LNG --
Q. One --
A. -- that is correct.
Q. One cannot conclude that a Mirena embedded in the uterine wall would release -- would have elevated LNG plasma concentrations on the order of magnitude reported in Haimov, true?
A. True.
Q. The two cases that you cite in your expert report, there's no evidence that the Mirena ended up in the peritoneal cavity, correct?
A. No, and no -- no supporting data that the LNG was peritoneal.
Q. So when you write "LNG perforating the uterine wall" and then you write "or likely if embedded in the uterine myometrial wall, can infuse an inordinate amount



of LNG" --
A. So that clause should be excluded --
Q. Right. So --
A. -- from "or" to "wall."
Q. So really, it should read "It has been reported in a single case report" --
A. Right.
Q. -- "of an LNG-IUS perforating the uterine wall can infuse an inordinate amount of LNG into the general vascular system"?
A. From the peritoneal capacity. That is what it should say.
Q. So these two cases of Mirena embedment you cite in your expert report do not provide any data whatsoever on a dose response, true?
A. There's nothing that I can cite in the literature.
Q. And you have no idea what the release of LNG was into the plasma from the two cases of embedment?
A. I do not.
Q. And if you look at the actual reported values in Table II --
A. Yes.
Q. -- even in the case of the fully perforated Mirena, the plasma concentrations of LNG are in line with



that reported from combined oral contraceptives, correct?
A. Microgynon is -- yes.
Q. Do you consider combined oral contraceptives to have an inordinate amount of LNG?
A. No.
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) So the same level of LNG from a perforated Mirena is an inordinate amount compared to the same level from an oral contraceptive?
A. Depends on what the comparison point is. I meant to a properly placed IUD.
Q. Ah. So -- by the way, Doctor, do you tell your patients taking combined oral contraceptives they're at risk of IH?
A. Neurologic things, but not IH in particular. We cover neurologic complications, though.
Q. Do you warn patients of --
A. Headache, yeah.
Q. Let me rephrase. Do you warn your patients for whom you describe combined oral contraceptives that they're at risk of ocular disorders such as papilledema, double vision?
A. We cover neuro changes. We cover vision changes. We don't list them -- I don't know how many of my patients would understand papilledema as a word.



Q. Sure. But --
A. So changes in vision, call us. Headaches that you've never had before, call us. We cover that because we're also commonly giving oral contraceptives to people over 35.
Q. On page 25 of your report --
A. Uh-huh.
Q. -- you say 11 of the 115 cases Mirena was removed and had some sort of recovery.
A. I found 11 who had their device removed and 9 had some kind of recovery and 2 were unknown.
Q. Do you know whether any of these 11 patients were receiving treatment for their IH?
A. Some cases did mention Diamox treatment. I do not know these nine. As I wrote this, I did not know, and today I do not know.
Q. And you recognize, Doctor, that there are interventions that have been shown to be effective in ameliorating IH?
A. Yes, Diamox, acetazolamide, the leading one and then there's nonpharmacologic things like weight loss.
Q. So the -- the fact that patients had a Mirena removed -- withdrawn.
It would be important when considering these cases of dechallenge to know whether there was a medical

intervention that would alternatively explain their improved symptoms?
A. Oh, ideally medical intervention on all these people would be advantageous. We just don't have it.
Q. That's not -- that's not what I asked.
A. I'm sorry.
Q. When considering the significance of these cases of dechallenge, it would be important to know whether the women had any medical intervention that would alternatively explain their improved symptoms?
A. Sure.
Q. And you don't know?
A. I don't know.
Q. There are actually far more than 11 documented cases of Mirena removal out of these 115. Was there some other filter that you used to arrive at these 11?
A. Not that I can report. I mean, these are the 11 I found. You'll notice that's the phrasing I used. I found 11.
Q. Okay. And if -- rather out of the total population of -- of the 115 cases where Mirena was removed, the recovery rate was more on the order of 25 percent?
A. Okay. So maybe 28 patients had their IUDs removed.



Q. No, more than that.
A. Okay.
Q. What I'm trying to understand is you found it at least important enough to comment that you found 11 cases of removal, 9 of which had improvement and 2 you don't know?
A. Right.
Q. If that ratio was different than what you reported, would that impact your opinions in this case?
MS. LAMACCHIA: Objection, form.
A. Recognizing the limitations of the data and having to be reasonable in any conclusions from it, unless it was zero or one, that might be important.
I -- I don't put too much stock in the precision of estimation here. I would not -- I would not expect clinically a 90 percent response rate. So I guess my answer to the question is no. I don't want to put too much value in any one such datum.
Q. (BY MR. ISMAIL) Okay. So if the -- the actual percentage of documented recovery after Mirena removal was 25 percent instead of 90 percent, that wouldn't change any of your opinions in this case?
A. I would make --
MS. LAMACCHIA: Objection, form.
A. -- note of it. I don't think it would change



opinions.
Q. (BY MR. ISMAIL) And as you recognize, there are many cases in the 115 where the Mirena was removed in which -- or maybe you don't recognize.
Do you know that there are many cases of -- in -- out of the 115-case data set where the Mirena was removed and there was no amelioration of symptoms?
A. I'm aware of some. I -- I don't have a number on that --
Q. And that --
A. -- sitting here.
Q. And that would be a failed dechallenge, right?
A. That would be a -- reasonably stated, a negative dechallenge, failed dechallenge.
Q. And a failed dechallenge would fall on the spectrum of being unsupportive of a causal association?
A. Once again, it depends. If -- it does not support a causal relationship if one knew that all the effects went away with withdrawal -- withdrawal of the Mirena.
Q. Do you have any basis to opine that a significantly higher percentage had improvement or resolution of symptoms when the Mirena was removed compared to when the Mirena was not removed?
A. I'm sorry, complicated question.



Q. Sure.
A. Can I try it again?
Q. Comparing the group of patients with reported symptoms who had the Mirena removed to those patients who did not have the Mirena removed, do you have any basis to tell me whether the recovery rate in those two groups differ from one another?
A. I'm not.
Q. You note on page 25 there's no evidence of a successful dechallenge rechallenge, correct?
A. Not that I -- as I said, I wasn't able to discover any. If there are any, I'd love to know it.
Q. And you've never found such a dechallenge rechallenge case in the -- published in the literature, correct?
A. I have not.
Q. You have not?
A. I have not seen one clinically.
Q. That was my next question.
A. Oh, thank you.
Q. Your next group is "Prior Personal History of IH"?
A. Yes, one patient.
Q. That this observation has nothing to do with an analysis of association or causation?

Page 262

A. No.
Q. Correct?
A. No.
Q. Am I correct?
A. Interesting -- you're correct. Interesting anecdote along with my word "flurry."
Q. And then your last special group is "Prior Use of a non-LNG Progestin without IH." And you would further agree that this observation has nothing to do with an analysis of association or causation, correct?
A. Correct, just -- just a comment.
Q. Okay.
MR. ISMAIL: Now's a good time for a break.
THE WITNESS: Oh, okay.
THE VIDEOGRAPHER: Off the record at 4:30.
(Short recess.)
THE VIDEOGRAPHER: Okay. We're on the record at 4:55.
Q. (BY MR. ISMAIL) Doctor, I want to turn your attention to page 35 of your report, please. And here's the section that you walked through the Bradford Hill criteria. At least it begins there, right?
A. Yes, there's a introduction on the page before, and then we go into it on the next page.
Q. Do you recognize, sir, that the Bradford Hill

Page 263

criteria is to be applied only if an association has been established in the first instance?
MS. LAMACCHIA: Objection, form.
A. I have read that suggestion by other experts and I'm not sure that's what Sir Bradford Hill said or meant, because it was all about trying to establish causation. I'm not sure I can agree that it was only to be applied once a causal relationship was well-known.
Q. (BY MR. ISMAIL) That's not what I said. Bradford Hill himself said his criteria is to be applied only if a clear-cut case of association has been established. That was his words, right?
A. When he gave it, yes, that -- that is what he said.
Q. And so do you believe that the Bradford Hill criteria to establish causation can be applied even if an association has not been established?
A. I think the Bradford Hill criteria are sufficiently robust that I would say and he would say that if there's a clear suggestion of an association, it can be applied. He -- he seemed to have some wiggle room on things much more than the people who have generated checklists after him would propose.
Q. So is that a yes?
A. It's a yes. Yes, that's a yes.

Page 264

Q. Okay.
A. I -- I do think it's okay and -- you know, allow me one more moment. We need to keep all that in mind to the weight of the analysis. We need to -- but I think it's appropriate.
Q. The first criteria is "Strength of Association," correct?
A. Yes.
Q. And what you cite in support of concluding that this criteria has been met is the Valenzuela publication?
A. Yes.
Q. And the 115 adverse event reports we just saw?
A. Yes.
Q. Now, you've already -- I think you agreed with me previously that the Valenzuela study suffered from several methodological limitations, correct?
A. Indeed.
Q. And the authors themselves conclude that no conclusions about causation can be gleaned from their paper?
A. No definitive conclusions. Nonetheless, their hypothesis was generated. They presented their data. They published -- it's in play.
Q. And the 115 cases that we just went through are not a statistical association at all; it's just a temporal

Page 265

association, correct?
A. Correct. My interpretation here, "Strength of Association," does not require the adjective great strength of association. There is association and it has some tenability.
Q. And you've agreed that there's no replication of the Valenzuela analysis that exists anywhere in the medical literature, correct?
A. Not that I've seen. Not that I know of.
Q. And the 115 adverse event reports is not a replication of the Valenzuela hypothesis, correct?
A. It is not.
Q. And the Valenzuela report stands alone as the only published piece of epidemiology that you are pointing to as relevant to the case of the strength of association, correct?
A. Correct.
Q. And you don't know whether -- if that -- if the methodological flaws of Valenzuela are corrected, whether any purported association dissipates?
A. Correct.
Q. The next criteria is "Consistency of association." Here you claim that the consistency of association is established from within the 115 cases that we just looked at, right?

Page 266

A. Yes.
Q. And then you also again cite to Valenzuela and then I guess the package insert of Jadelle and Norplant --
A. Norplant.
Q. -- right?
A. Yes.
Q. Now, the package inserts themselves, you recognize the regulatory standard for warning may be very different than the scientific standard for association or causation?
A. I do. There's many reasons why things can be manifested in a warning.
Q. And so the product insert for Norplant and Jadelle do not speak to the consistency of an association between those products and IH, correct?
A. Consistency.
MS. LAMACCHIA: Objection, form.
A. In and of themselves, I don't think they do other than they both have the same drug and similar warnings. That -- that would be consistency.
Q. (BY MR. ISMAIL) The -- but the -- the package inserts themselves do not speak to any evidential basis of an association, correct?
A. Correct.
Q. And there's many other LNG-containing products

Page 267

out there that you don't comment on, right?
A. Referring to the oral contraceptives, I imagine.
Q. So, for example, you have no comment in your expert report on whether the suggestion of a causal relationship between Mirena and IH is consistent with LNG-containing oral contraceptives, correct?
A. Correct.
Q. You have no comment on whether there's an association with Skyla and IH in your report, correct?
A. Correct.
Q. There's no comment in your report about an association between Liletta and IH in your report?
A. Correct.
Q. And there's no comment about whether there is an association with Kyleena and IH in your report, correct?
A. Correct.
Q. All of which are LNG-containing products?
A. Available today, correct.
Q. And so there's nothing in your expert report establishing a consistency of increased risk of IH across the collection of LNG-containing contraceptives, true?
A. True.
Q. And within the 115 cases, your examples of consistency were to say it's -- it's -- there are cases across a wide variety of country of origin?

Page 268

A. Yes.
Q. Why does that have anything to do with the Bradford Hill criteria?
A. It has to do with consistency in terms of different populations, different reporting systems, different -- many different factors leading up to reporting such a possible association.
Q. You did not rigorously analyze the 115 cases to comment on the consistency of IH reported by country of origin, right?
A. No, I did not analyze that. I didn't send out a questionnaire or assess that.
Q. Not even that. There's no work product by you from which you identify how many cases come from different geographic regions and how that relates to the exposure of Mirena in those populations, correct?
A. No, I didn't have denominators trying to figure out relative -- no.
Q. Okay.
A. I simply noted the number -- the widespread number of countries.
Q. So for you, your approach to assessing consistency of association, it was enough to say, oh, there's a variety of countries represented in these 115 cases, there's different BMIs, there's different types of

Page 269

reporters. That to you is the type of information that satisfied consistency?
A. For this analysis, yes, I feel it's consistent enough.
Q. Without any sort of rigorous analysis of that data --
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) -- correct?
A. My approach here is as a clinician. I'm not here as a rigorous analyst.
Q. Well, I mean, I -- you've said that several times, sir, but then you purport to apply an epidemiological construct to your opinions in this case. So you say you're a clinician, but then you apply the Bradford Hill criteria which comes from the scientific field of epidemiology, right?
A. But we clinicians are allowed to read it.
Q. I didn't say you weren't allowed to read it, but --
A. We're allowed to think about it.
Q. That may be true, too.
A. We're allowed to apply it.
Q. So you're a clinician applying epidemiological concepts?
A. Bradford Hill's concepts were not so obscure or

Page 270

difficult to understand that it's over a clinician's head, even one as modest as myself. I think it's appropriate.
Q. You don't comment here that there -- there are data that establish the absence of risk with Mirena and IH, correct?
A. I do not consider that.
Q. Well, that would point away from consistency of association, would it not?
A. It would.
Q. And so the Etminan data set is an example of that, right?
MS. LAMACCHIA: Objection, form.
A. You'll remember my conclusion on the Etminan data was that it's a zero influence to me. I just can't interpret it. I could not agree with you that it disproved an association.
Q. (BY MR. ISMAIL) And I don't think I said it disproved an association. I think I said there is an absence of consistency of association when you include the Etminan -- both of Etminan's analyses in this equation, true?
MS. LAMACCHIA: Objection, form.
A. I don't understand that question.
Q. (BY MR. ISMAIL) If you actually looked at -- there's only been two published epidemiological analyses

Page 271

of IH and Mirena, right?
A. Yes.
Q. One of them Valenzuela, one of them Etminan?
A. Yes.
Q. They are not consistent conclusions?
A. They are. They are.
Q. Etminan published no increased risk compared to oral contraceptives, and when he corrected his flawed analysis, he saw no increased reporting odds ratio, true?
A. Yes.
MS. LAMACCHIA: Objection, form.
A. That was his conclusion.
Q. (BY MR. ISMAIL) Is that consistent with the conclusion reached by Valenzuela?
A. It doesn't have to be the same. It doesn't have to be equal to be consistent. One set of conclusions, one set of data, one set of investigators could find an effect and another could find no effect.
Q. So if --
A. The Etminan -- my opinion of the Etminan story is that it is so conflicted and so complex, it's a zero for me.
Q. I -- and so you've stated, and I appreciate that, but my question's different. Let me ask it hypothetically.

Page 272

If you have two epidemiological studies, one finding an effect and one finding no effect, would you consider that to be a consistency of association?
MS. LAMACCHIA: Objection, form.
A. Between those two studies, no. But here's a construct we could all understand is a confidence interval, the same elements in that confidence interval, some could indicate an association, some could not, and yet they're consistent because they're in the same confidence interval.
Q. (BY MR. ISMAIL) So do you believe Etminan is consistent with Valenzuela?
A. I am saying in the universe of research results, they could be consistent. At this point, I'm not able to conclude they are.
Q. Okay. So if you -- if you considered the published epidemiology about Mirena and IH, you cannot conclude that there's a consistency of association in that published research, true?
A. Between those two groups I cannot.
Q. Those are the only two.
A. Well, between those two groups I cannot.
Q. And you throw in the 115 adverse event cases with all the limitations we described, it still doesn't show a consistency of association across the three different

Page 273

analyses, true?
MS. LAMACCHIA: Objection, form.
A. Across those three there's -- they're not equally consistent with each other.
Q. (BY MR. ISMAIL) Now, the third criteria is specificity. What does specificity mean in the Bradford Hill construct?
A. That a specific cause has a specific effect would be a simple interpretation.
Q. Intracranial hypertension is in no way specific to Mirena users, right?
A. I would say that's true.
Q. Intracranial hypertension is no way -- no way specific to LNG, true?
A. True.
Q. IH by whatever definition predates the introduction of LNG-containing products by decades?
A. Many decades.
Q. The only support you cite for the criteria of specificity is the product labeling of Norplant and Jadelle?
A. LNG-containing products. That's correct.
Q. And you ignore all the other LNG-containing products in your analysis, correct?
A. I did not --

Page 274

MS. LAMACCHIA: Objection, form.
A. -- cite them. I did not study them for this.
Q. (BY MR. ISMAIL) So when you say "specificity," would you like to revise your conclusion on this criteria in light of our discussion?
MS. LAMACCHIA: Objection, form.
A. No.
Q. (BY MR. ISMAIL) So you think specificity is established in the Bradford Hill criteria on the basis of the package insert of Norplant and Jadelle alone?
A. I also cite the Valenzuela data, and that happens to be just all the information available to me with nonoral levonorgestrel.
I did not look strongly at oral levonorgestrel because I think that's such a different arena than what we're talking about.
Q. You didn't look critically at the relationship between Norplant and Jadelle on the one hand and IH on the other, did you, sir?
A. No, I just went with the product warning. I did not study that topic in great detail other than the Sivin articles that I showed you.
Q. How does the Venezuela study establish specificity?
MS. LAMACCHIA: Venezuela, is that a new

Page 275

one?
A. Valenzuela.
Q. (BY MR. ISMAIL) Valenzuela.
A. Yeah, I --
MS. LAMACCHIA: Okay. Just making sure.
Q. (BY MR. ISMAIL) Sorry.
A. I understood.
Q. Thank you.
A. And --
MS. LAMACCHIA: Was that for me, the eye roll? I'm sorry.
MR. ISMAIL: I'm sorry?
MS. LAMACCHIA: Was the eye roll for me?
Q. (BY MR. ISMAIL) Doctor, how does the Valenzuela paper establish specificity?
A. Because those authors, who I'm sure had their own hypothesis generation, their reasons to generate their hypothesis, raise the suspicion and have some concern that Mirena has some specific contribution to IH.
Q. And --
A. The -- the -- my third criteria on here is not profoundly specific cause and effect relationship. It's specificity meaning some specificity. I think we're -- I mean, you're welcome to interpret it how you wish. I don't think Bradford Hill required microscopic precision,

Page 276

profound attachment to these criteria. He -- he himself warned against such a checklist approach.
Q. No. 4, "Temporality." The only support you identify for this criteria to be met is the 115 adverse event reports, correct?
A. Yes.
Q. And I think you and I discussed at some detail the censoring of the data at six months, two years, or four years does not inform the causation inquiry, true?
A. It does not form a causation?
Q. Inform.
A. I'm sorry. You'll have to ask me again.
Q. I'll rephrase.
A. Thank you.
Q. You agreed earlier that regardless of the percentage of cases reported within two years or four years, that does not establish a positive temporal association with the product, true?
A. It does not establish it. It does not prove it. It can raise it. It can suggest it.
Q. But on the --
A. No --
Q. Please. I didn't mean to interrupt.
A. Oh. Once again, I don't think temporality has to be ironclad before doing such an analysis.

Page 277

Q. It was enough for you that out of the 115 cases that you looked at on a spreadsheet, 80 percent were reported within two years of placement and 97 percent within four years, true?
A. I think it was some indication of temporality.
Q. "Biological gradient" is the fifth one, which sometimes is referred to as a dose response, correct?
A. Yes, and I -- that's -- we talked about that under the word "dose response" earlier.
Q. Right, in which you told me that -- when I asked you if there was a dose response and you said, quote, I don't have a clue, that was your sworn testimony, right?
MS. LAMACCHIA: Objection, form.
A. A bit flippant on my part, and I should apologize.
Q. (BY MR. ISMAIL) No need to apologize, but it accurately describes the basis of your information on this issue, right?
MS. LAMACCHIA: Objection, form.
A. I don't have dose response information.
Q. (BY MR. ISMAIL) So you would agree that you cannot conclude that the biological gradient criteria has been met in the case of Mirena and IH, true?
A. We've talked about the embedded issue and how I confused intraperitoneal with embedded in the wall.

Page 278

I cite here issues of ovarian cysts which could reflect the potency of the LNG within these different products. The Skyla, that in my total exposure to this information being associated with four cases by every means I could know of such association, whereas Mirena is associated with these 115, that is some evidence of a gradient.
Q. You understand that there's not presently litigation involving the Skyla, but there is on the Mirena, right?
A. I am.
Q. And you've agreed that the fact of litigation changes the intensity of voluntary reporting of adverse events, correct?
A. We've talked about that, yes.
Q. And so you could not establish a biological gradient from the absolute number of adverse events reported on Skyla versus Mirena, true?
A. True. But I wasn't done with my answer just a moment ago.
Q. My apologies.
A. It's okay. I need just a second to breathe sometimes.
And I talked about two data points and I have a third data point that I haven't had a chance to

Page 279

focus on enough today, and that is the data point of my awareness of the IUD that has no LNG.
So ParaGard, despite all my work in this case, I've never seen a single reported case of IH from ParaGard. So zero LNG, zero IH, low dose LNG four cases with all the biases we talked about, the highest LNG I have the most cases. Not a perfect construct, but it does show dose gradient.
Q. In your discussion of biological gradient in your expert report, do you discuss the issue of ParaGard?
A. I don't. But as we talked about earlier, there's been more work done since December by me.
Q. In your -- if you turn to page 46 of your expert report.
A. Yes.
Q. Sort of the summary section.
A. Yes.
Q. The -- towards the bottom you see "Biologic Gradient"?
A. Yes.
Q. You conclude -- "I conclude this causality" -- "I conclude this causality criterion is, quote, marginally satisfied from the available data."
Do you believe that description of the biological gradient criteria accurately reflects your

Page 280

opinion in this case?
A. When I wrote this, yes. As I sit here now, I would perhaps choose the adverb "modestly" rather than "marginally," but I may be excused of splitting hairs with that. The biologic gradient evidence is not strong. It's not great. It's marginal or modest.
Q. And nowhere in your analysis of the biological gradient issue do you discuss other sources of LNG that result in even higher levels of systemic or plasma concentrations of LNG, true?
A. No, my -- my gradient is based on the -- what the device delivers at the uterus.
Q. Under 6 you have a reference to biologic plausibility, which I believe is meant to capture in full the androgen theory described elsewhere in your report, correct?
A. Yes.
Q. You have a section next on "Coherence." What do you understand this criteria to be aiming for?
A. Is -- coherence means that in the background of knowledge, in the background of science that the cause -- that the proposed causal relationship is coherent with that understanding.
To try to specify this to the proposed causal relationship of Mirena to IH, it would be are other

Page 281

hormones known to cause IH, other medications, other syndromes relating to the androgen theory, other syndromes that are hyperandrogenic. Coherence, I think, is pretty strong.
Q. There are no hormones that are known to cause IH, true?
MS. LAMACCHIA: Objection, form.
A. No hormones known to cause. Well, there's a great deal of consensus that Danazol can cause IH. Growth hormone can cause IH. I see these listed repeatedly in the articles I've read.
Is that proof of causation? Perhaps not. Does it show consensus of opinion, which is really what more -- what coherence is more about. Coherence reminds me of Frye and Daubert analyses where things fit in with general science.
Q. (BY MR. ISMAIL) There's no consensus of opinion that Mirena causes IH, true?
A. True.
Q. The next criteria is "Experimental evidence"?
A. Yes.
Q. Do I understand your discussion here that a randomized clinical trial is not practical to examine the relationship between Mirena and IH?
A. It's prohibitively expensive to propose such a

Page 282

RCT because of the low prevalence of IH.
Q. In your summary -- and back on page 46 -- because of the difficulty you say exists for experimentally examining this issue, you write, "This causality criterion is simply impossible or unethical to demand a study of association of LNG to IH."
So you conclude that by saying it's impossible to establish this criteria, you would agree that this criteria has not been established?
A. I -- I'd have to say that's the best opinion.
Q. Okay. So even though elsewhere in your report, including on page 38 where you purport to say the experimental evidence criteria from Bradford Hill has been established, really your opinion is it is impossible to establish that criteria?
A. I think what we're seeing in those additional eight pages is a reflection of the strength of any experimental data. It's just not strong. I think the best opinion is there is no experimental data to support the causal relationship.
Q. Very good. And then you have the last section is by analogy is the last criteria, correct?
A. Yes, uh-huh.
Q. And the one analogy you draw is to polycystic ovary syndrome?

Page 283

A. Yes.
Q. And you actually discuss that concept on page 14. You don't have a citation to the literature in your Bradford Hill section, but tell me if I'm cross-referencing correctly.
On page 14 do you discuss this concept with Footnote 36?
A. 36 is what I see, yes.
Q. Okay. That's the Kempegowda publication?
A. Yes.
Q. How did I do on the pronunciation?
A. Pretty good. Kempegowda.
Q. Gowda?
A. Yeah.
(Exhibit 18 marked.)
A. Thank you.
Q. (BY MR. ISMAIL) Yes, sir.
MR. ISMAIL: Here you go.
MS. LAMACCHIA: Thank you.
Q. (BY MR. ISMAIL) Is Exhibit 18, sir, a copy of the Kempegowda -- Kempegowda --
A. I think that's fine. Or Kempegowda.
Q. -- poster that you're relying upon in this case?
A. Yes. In this particular citation, yes.
Q. And so what these -- and really the Kempegowda

Page 284

poster is the only support you make for this proposition, right?
A. It is. It's the only cite.
Q. What these researchers comment in the background section, let's start there, that the presence -- sorry -- the prevalence of PCOS, which is polycystic ovary syndrome, in IH -- IIH patients is 39 to 57 percent, which is higher than the background population --
A. Yes.
Q. -- correct?
A. By a matter of four times.
Q. By the way, these -- did you find this poster reliable?
A. Well, remembering it's a poster, I did find it very nicely done. And poster presentations go under some peer review typically. Although I've never been to this meeting, I think it is fairly reliable, yes.
Q. And this was from 2017, right?
A. I believe it's very recent. Let me see the --
Q. Oh, sorry, '16 I think it's from.
A. I don't quite catch the date. There it is. ECE2016, May of 2016 in Munich.
Q. And then the authors comment about the -- this observation they make about the prevalence of PCOS in IIH patients. And they say, "Both conditions share a similar

Page 285

phenotype of young, obese women."
A. That's them identifying confounders potentially.
Q. Right. So there's no statement by these authors to suggest that the prevalence of PCOS in IIH patients is disproportionate given both conditions share the same demographic phenotype, correct?
A. No, they make no statement like that.
Q. So there's no statistical association established by Exhibit 18, correct?
A. Correct.
Q. And then they go on to do some pretty cool experimental analyses here, and what they establish is there's actually a different androgen signature in the cohort of patients who have IH compared to the cohort of patients who have PCOS and no IH?
A. Beautifully stated. Signature's very nice.
Q. And so what you have is a different androgen signature in the IH group compared to the PCOS group?
A. Yes.
Q. And so what they're saying is it is not necessarily the same androgenic process that may be associated with both PCOS and IH, true?
A. That's correct, because not all PCOS people get IH. There's got to be something different between these two groups.

Page 286

Q. And the fact that there are different signatures in the PCOS group compared to the IH group would suggest that there's not an association between those two conditions?
A. Not necessarily.
Q. It's not -- it doesn't prove it, but it suggests there may be a lack of an association between those conditions?
A. That's not what it tells me. It tells me there may be other factors. There may be susceptibilities. There may be different factors involved.
Q. Well, certainly you wouldn't look at the Kempegowda poster and be able to cite their actual data as evidence of an association between PCOS and IH, true?
A. We have their statement on the prevalence. That's actually suggestive of an association. And the fact that there was a characteristic androgen signature suggests to me that the androgen theory behind IH has relevance.
Q. That's not what I asked.
You cited this paper for evidence of an association between PCOS and IH, true?
A. Yes.
Q. And it is only that purported association that you cite as establishing the analogy criteria, true?

Page 287

A. Yes.
Q. The actual data generated by Kempegowda, the experiment that they run and report on, does not establish an association between IH and PCOS, true?
A. Other than their statement about the prevalence of IH was higher in PCOS than the general population. That's a background.
Q. Let me separate those two things.
A. Okay.
Q. The actual data generated and commented upon by Kempegowda does not establish -- their experiment does not establish an association between PCOS and IH, true?
A. It does not, that's correct.
Q. The only comment here is on the fact that both PCOS and IH happen more commonly in young, obese women?
A. That and that the prevalence of PCOS is higher in IH patients.
Q. But you have no way from Kempegowda to know whether that prevalence of PCOS in IH patients is at all unexpected given the common phenotype of young, obese women?
A. That is correct.
Q. Your last section, sir, has -- in your report talks about patient counseling, which you've referred to at times today.

Page 288

A. Starting about page 40?
Q. Thereabouts, yeah.
A. Okay. Yes.
Q. Now, you've never participated in the drafting of a prescription drug label, right?
A. I don't think so.
Q. What I said is correct?
A. Correct. Forgive me.
Q. You do not hold yourself out as a regulatory expert, correct?
A. I do not.
Q. You don't cite anywhere in your report the regulatory standards for a warning, a precaution, or anything to do with prescription drug labeling, true?
A. True.
Q. Do you know whether the FDA investigated -- withdrawn.
Do you know anything about interactions with the FDA regarding IH?
MS. LAMACCHIA: Objection, form.
A. No.
Q. (BY MR. ISMAIL) Do you have any information on what -- what data or analyses were provided to FDA about Mirena and IH?
A. At the approval process? I do not.

Page 289

Q. Or in the postmarketing period.
A. Or postmarketing surveillance, no, I do not.
Q. Have you seen any indication, sir, that the FDA had any concern about the adequacy of the Mirena label with respect to IH?
A. No.
Q. By all accounts, intracranial hypertension is an exceedingly rare event whether or not it is associated with Mirena, true?
MS. LAMACCHIA: Objection, form.
A. I would characterize it as uncommon. My reading in the neurology literature says it's as common as cluster headaches, which is a topic that comes up in my practice every couple of weeks. I would just say we have to say uncommon.
Q. (BY MR. ISMAIL) Nowhere in your report do you opine as to what you think the incidence rate of IH is with Mirena users, true?
A. True.
Q. So there's nothing in your report from which there could be a warning quantifying the risk of IH with a Mirena?
A. No, no quantifying.
Q. There's nothing in your report from which you would be able to identify any special populations at risk

of IH in Mirena?
MS. LAMACCHIA: Objection, form.
A. Women, reproductive age women, obese reproductive age women. Those would be the populations in particular.
Q. (BY MR. ISMAIL) What data supports the proposition that obese reproductive age women are at an increased risk of IH from the Mirena?
A. Increased risk for IH in general, I think we've agreed on that. And there's sufficient evidence in my opinion that because this population is at risk for getting a Mirena, they are the patient population we should direct our education most to.
Q. Going back to my question, what data supports the proposition that obese reproductive age women are at an increased risk of IH from Mirena?
A. I do not have a denominator to adequately define that relative risk.
Q. You don't opine anywhere in your expert report as to when in time in the timeline here sufficient evidence existed to warrant inclusion in the Mirena package insert, true?
A. True.
Q. Now, you mentioned the organization ACOG before?
A. Yes.
Q. ACOG is the largest professional association that



is addressed towards women's health?
A. That's my understanding.
Q. And --
A. Certainly the biggest for OB/GYNs in the United States.
Q. And ACOG from time to time publishes practice bulletins for the benefit of its health care members?
A. Yes.
Q. And you know that some of the leading researchers and clinicians in the area of women's health are members of ACOG?
A. Yes.
Q. And you know that the purpose behind these practice bulletins is to improve the providing of health care to women in America?
A. Yes, as well as to serve the OB/GYN membership of ACOG.
Q. And you recognize that these practice bulletins from ACOG are prepared in sort of a consensus document to reflect sort of best practices in the areas of interest?
A. Yes. When I wrote my technical bulletin, I had 21 reviewers.
Q. And so you would recognize that there is a rigorous process that goes into the preparation of ACOG practice bulletins, correct?



A. Yes.
Q. Now, ACOG has addressed the issue of IUDs in various practice bulletins, correct?
A. Yes, and at this point let me remind us all there's practice bulletins, technical bulletins, committee bulletins. I think you're speaking of ACOG documents in general.
Q. Sure. But --
A. Right.
Q. And you would agree that generally ACOG practice bulletins or technical bulletins or committee bulletins are designed to capture the consensus view about the topics of interest?
A. Yes. And the first two are the most reviewed. Sometimes things come out of the committees much faster.
Q. And ACOG has commented upon the use of long-acting reversible contraception, right?
A. Yes, most recently as last year.
Q. And you I think even in your report characterized ACOG's consensus view as encouraging wider use of hormonal IUDs including Mirena, true?
A. Yes.
Q. Nowhere in any of the consensus documents prepared by ACOG do you see any articulation of a concern that Mirena is associated with IH, true?



A. True.
Q. And there's nothing in ACOG to suggest that patients should be counseled about a potential risk of IH, correct?
A. Correct. So far that's correct.
Q. And that would be consistent with what you understand to be the consensus in the medical community, true?
A. True, the medical literature, medical community, ACOG.
Q. And that consensus view in the medical community was reaffirmed by ACOG as recently as this past calendar year, true?
A. Yes.
MS. LAMACCHIA: Objection, form.
Q. (BY MR. ISMAIL) And, again, ACOG encourages even wider use of IUDs like Mirena, correct?
A. Yes.
Q. With no articulated concern right up to this day, as far as you know, that Mirena is associated with IH, true?
A. True.
Q. And again, you understand that to be consistent with the consensus medical view, correct?
A. Yes.

Page 294

Q. I'm going to go ahead and mark as Exhibit 19 to your deposition . . .
(Exhibit 19 marked.)
Q. (BY MR. ISMAIL) And just ask you to confirm it. Why don't you tell me what it is. What's Exhibit 19?
A. When I made my first pass through the literature, I made some handwritten notes.
Q. Okay.
A. And then I went back and underlined for the first few pages titles and dates. And the little numbers in the margins on some of these are references to the page where I thought things might be useful in my report.
Q. Got it.
A. This is a very early -- although better than my average handwriting, very early product. I don't have this dated, but this almost for sure was in June or July.
Q. Fair enough.
MR. ISMAIL: And, Leslie, if you don't mind, can we make that stack Exhibit 20, the other material you brought?
(Exhibit 20 marked.)
Q. (BY MR. ISMAIL) I'm going to stick an exhibit sticker on here.
A. That's a big exhibit.
Q. Exhibit 20, as you understand it, Doctor, to

Page 295

include copies of the material you reviewed with any underlining or highlighting by you, correct?
A. Yes, and I checked as best I could that it matched up with Exhibit 7, which is a list of those.
MR. ISMAIL: And there's nothing else y'all brought today, right, that we don't have?
MS. LAMACCHIA: No.
MR. ISMAIL: Okay.
Q. (BY MR. ISMAIL) Doctor, I just had a couple other questions about your CV that I skipped over previously.
A. Okay.
Q. You -- if you don't mind pulling that out.
A. It's Exhibit 3.
Q. Exhibit 3. Now, you indicate that your Texas medical license at one time became restricted; is that right?
A. Yes.
Q. And that's reflected on your CV, right?
A. It is.
Q. And there was a consent decree that was agreed to by you with the Texas licensing board?
A. Yes, which is the restriction.
Q. And that includes certain findings of fact that supported your suspension?

Page 296

A. Restriction.
Q. Sorry, restriction.
A. There's a difference in Texas.
Q. There is, and I didn't mean to say it that way, so let me rephrase.
The consent decree you entered into with the licensing board in Texas includes findings of fact that supported the restriction of your license, correct?
A. Yes.
Q. And there was an incident involving you having a relationship with one of your patients, correct?
A. It was a former --
MS. LAMACCHIA: Objection, form.
A. It was a former patient, and there was about six incidents.
Q. (BY MR. ISMAIL) There was a overlapping period of your relationship and your physician/patient -- withdrawn.
There was an overlapping period of your personal relationship with the patient and your physician relationship with the patient?
A. No.
MS. LAMACCHIA: Objection, form.
A. The physician/patient relationship ended in June or July, as I recalled. The finding of fact was based on

Page 297

my -- my name was still on her prescription.
Q. (BY MR. ISMAIL) What are we up to, 19?
A. 21.
Q. That's what I meant.
(Exhibit 21 marked.)
Q. (BY MR. ISMAIL) Is Exhibit 21 a copy of the agreed order you entered into with the Texas Board of Medical Examiners?
A. Yes, it is, and that's my signature.
Q. And you consented to the findings of fact that underlie this order?
A. I signed the document.
Q. And page 2, Paragraph 11, there's a description wherein you state that you "attempted to transfer the patient's care to another physician and thereby terminate the overlapping professional and intimate relationship, but was unable to completely terminate the overlapping relationships until early 1994." Did I read that correctly?
A. You did.
Q. Was that a true statement as you signed and attested to in this document?
MS. LAMACCHIA: Objection, form.
A. Only as manifested by her birth control pill prescription.

Page 298

Q. (BY MR. ISMAIL) Your CV also says you had your privileges at Methodist Hospital in Houston -- well, you were suspended by Methodist Hospital in Houston, correct?
A. It was a attempted suspension. It turns out I was not suspended. I withdrew.
Q. You were put on a practice improvement plan at Methodist Hospital, correct?
A. Correct.
Q. And there was a number of concerns cited in your practice improvement plan, correct?
A. Yes.
Q. And then there was an incident whereby the hospital believed you violated the terms of your practice improvement plan?
MS. LAMACCHIA: Objection, form.
A. Two doctors of the hospital.
Q. (BY MR. ISMAIL) And then there was some dispute between you and the hospital about whether you were suspended and then quit or quit before you were suspended. Is that a fair description?
A. No, sir. It was very, very clear. I got a phone call, threatened suspension. I quit my privileges that day.
Q. Okay. So you were notified about an impending suspension from -- of your privileges at Methodist

Page 299

Hospital and then you elected to quit before that suspension was brought down?
A. On advice of my lawyer, yes.
Q. And your CV description of that entire incident was a lawsuit resulting in a settlement between you and the hospital, correct?
A. Yes.
Q. There's no reference to being on a practice improvement plan in your CV; is that right?
A. Correct.
Q. Are you still president of the candy company that resulted in the goodies today?
A. Yes, but I'm no longer CEO.
Q. That's your wife?
A. No.
Q. Oh.
A. I resigned that position.
Q. When did you resign that position?
A. When we decided to shrink the company.
Q. And how much time do you spend professionally on the activities of Candy Bouquets?
A. Less than --
MS. LAMACCHIA: Objection, form.
A. Less than 2 percent annually.
Q. (BY MR. ISMAIL) Okay. Doctor, thank you for

Page 300

your time.
A. Thank you.
MR. ISMAIL: Pass the witness.
MS. LAMACCHIA: Want to take a short break.
THE VIDEOGRAPHER: Off the record, 5:46.
(Short recess.)
THE VIDEOGRAPHER: We're on the record at 6:06.

EXAMINATION

BY MS. LAMACCHIA:
Q. All right. Dr. Wheeler, let's turn your attention to what was marked as Exhibit 3 to your deposition.
A. I have it.
Q. This is a copy of your updated CV dated January 26th of 2018, but something that wasn't done earlier today was to talk about your educational history.
So can you take us through your -- your undergraduate degrees up through medical school, residency, and any kind of fellowships that -- that you did?
A. Yes, I can. That material is found on page 2 of the CV. I went to college at Harvard College and was a double major in biology and psychology, social relations, in which I graduated magna cum laude.

Page 301

I then went to Baylor here in Houston, graduated in 1981, and then next did a postdoctoral NIH-funded research fellowship in medical endocrinology focused upon andrology, the study of androgens.
I did my OB/GYN residency here at Baylor from '82 to '86 and was chief resident my senior year.
From 1986 to 1988, I went to Yale University where I did three concurrent programs. I was a subspecialty Fellow in reproductive endocrinology. I was a Robert Wood Johnson Clinical Scholar, which included topics of clinical epidemiology and social policy, and I earned an MPH at the School of Public Health, which I had a major in biostats and a minor in maternal and child health.
That's my medical education. I have other kinds of education, the most relevant of which is my JD, which I earned in '05.
Q. Okay. And where did you earn that from?
A. Here at University of Houston Law Center.
Q. Okay.
A. No honors was given there.
Q. When you were studying andrology, what -- what years was that?
A. That was '81 to '82. Now, that's in response to your use of the word "andrology." I've studied androgens

Page 302

since my college days through to the present.
Q. At Harvard while you were majoring in biology?
A. Yes, my -- my senior thesis was partly related to androgens in vertebrates, pituitary hypothalamic actions of sex steroids including testosterone and estrogen. I did original neurophysiologic research as a college student.
Q. So have you been a licensed physician -- practicing physician since 1978?
A. No, that's when I finished college. I've been a licensed physician practicing with patients independently since about '84.
Q. I'm doing my math. So you've been --
A. It's a lot of years.
Q. -- practicing for 33 years. Is that fair to say?
A. Yes.
Q. Okay. And further down in your employment history, your first hospital employment -- appointment was where?
A. My first hospital appointment outside of my residency would have been at Yale-New Haven Hospital in Connecticut.
Q. And how did you get down to Houston?
A. I was recruited.
Q. By Methodist Hospital?

Page 303

A. Yes, and Baylor College of Medicine. So I moved back in '88.
Q. And you've been specializing in reproductive endocrinology and obstetrics and gynecology for 33 years. Is that fair to say?
A. Just to point out the vocabulary, my specialty is OB/GYN. My subspeciality is repro endo. I finished all my training in '88. So coming on 30 years, both of those.
Q. Are you a board certified physician?
A. I am.
Q. And in what specialty?
A. Obstetrics and gynecology.
Q. And when did you become board certified?
A. I think 1989. I should -- yes, December 1989.
Q. Okay. And you've remained board certified every year since 1989?
A. Yes. Last recertified end of last year.
Q. Also looking at your CV, you've been involved with ACOG, correct?
A. Yes.
Q. Okay. In what capacity have you been involved with ACOG?
A. I started out as a local officer and then became a district -- you can think of it as a regional officer and was ultimately elected national chairman of the young

Page 304

OB/GYNs of ACOG called Junior Fellows. My chairman year was '87 to '88.
Q. What -- tell the jury what significance does that mean if you've been elected as a chair of the American College of Obstetricians and Gynecologists?
A. Well, it's chair of just one of the divisions.
Q. Okay.
A. I wasn't chair of the whole college.
Well, on one level it means that you're elected from the board of regional officers.
On the other level it means that you're chosen as a young doctor to help review policy, review editorial pieces, write some things. It's actually a three-year term. I got to visit OB/GYNs all across the country.
My presidential issues would be of interest, remembering that they go back 30 years. I presented that pregnant OB/GYN residents were high risk, which at that time was not accepted. I did original research on resident work hours being excessive 30 years ago. And my third item was to bring domestic violence to the forefront of people's awareness going so far as I gave a lecture to Congressional staffers on Capitol Hill. So each of my three presidential issues were relevant then and perhaps even today.

Page 305

Q. Would it be fair to say that being elected chair in the capacity that you were is an honor?
A. I guess. I mean, it's a very big responsibility. It's not -- it's not an honor you just hang on your wall or --
Q. I understand that. But it's an honor in the sense of -- of being recognized by -- by your peers?
A. Your peers, your leaders, your teachers, you know, basically everyone you've known for four years.
Q. Your CV also points out that you have been appointed to several medical advisory panels.
A. Yes.
Q. Explain to -- explain to the jury what that means. What is a medical advisory panel?
A. Well, medical meaning doctors. Advisory, you give advice and you serve different functions. Panel means you're usually not by yourself, although the one at the top, I am by myself. I am advising the Little Rock Zoo as to how to start a gorilla breeding program, so I'm the only human doctor doing that.
My next one, the regional advisory board for ProAssurance is a group of us that get together and review dozens of brewing med-mal case and construct defenses for these cases on behalf of ProAssurance. So each one is a little bit different.

Page 306

Q. On page 11, earlier today defense counsel had asked you about any recent publications, and there were two, No. 52 and 53, that you did for the DRI. Do you see that?
A. I do.
Q. Okay. What does DRI stand for?
A. I don't know.
Q. Okay.
A. D I think is for defense.
Q. Okay.
A. I don't know what R and I is for.
Q. Okay. But it says, "DRI - The Voice of the Defense Bar." Do you see that?
A. That's their -- that's their moniker. That's their name.
Q. Okay. So since you've been hired as a -- an expert for the plaintiffs in this litigation, you have published literature for the defense bar; is that correct?
A. Yes, and for anyone else who wants to read it including plaintiffs bar.
Q. You were also asked questions about a blog called Artfully Dodging Daubert. Do you recall that?
A. Yes.
Q. Okay. And that didn't go to press, to your recollection, right?

Page 307

A. To my knowledge.
Q. Okay.
A. I don't know if it was released at all. I can't -- I can't attest on the behalf of The Expert Institute whether it was blogged out a day, a week, or at all.
Q. Okay. What --
A. I just don't know.
Q. What does Artfully Dodging Daubert mean?
A. It was a literary device, in fact, two. One was a reference to Dickens, of course, and one was alliteration, and it was meant to be a catchy title to get the eye of the potential reader.
The substance of the article, as I recall, was more mundane. It was about advising expert witnesses. I still remember the subheadings. Know What You Know; subheading 2, Know What You Don't Know; No. 3, Provide Medical Literature For What You Know and What You Don't Know. So it was very forthright, positive. The title I could see could be just a bit too sassy.
Q. I understand.
A. Yeah, that's just what Rosalea said.
Q. I understand. Okay. I might skip around and I apologize for that, but --
A. No worries.

Page 308

Q. -- earlier you were asked some questions about your current practice and whether or not you currently offer hormonal IUDs as contraceptions -- contraception options for your patients. Do you recall that?
A. I do.
Q. Okay. And you have not done so in the last six months; is that right?
A. Correct.
Q. Okay. Is that because of the litigation you're currently involved in?
A. Well, it's not because of the litigation. It's because of how much I've learned in the process of the litigation that has raised legitimate concerns in my mind as to the role of Mirena.
As I -- as I testified, I have not put in anything but a Mirena ever since Progestasert was withdrawn. So until I am given more reassuring data, I am not going to be offering Mirena.
Q. If a patient does come into your practice currently and wishes to discuss contraception options, walk us through that conversation with a patient.
A. We'd have to realize that this has to be individually tailored to the woman. I don't want everyone in the room to laugh, but I actually start with abstinence, especially with my teenagers. I actually do.

Page 309

And I have very few takers on abstinence over 30 years.
So we then go through the different means of contraception. We spend time on barriers, just a moment, and we especially tout the advantage of STD diminution, if not prevention, with some barriers.
We then move to hormonal contraception, primarily of the oral type. As I've testified, I have concerns about transdermal. I will mention that. I've not prescribed it for years, though.
As you might guess, since 95 percent plus of my population ends up using oral contraceptives, we spend the most time on that. I give a introduction to estrogen dose and we actually spend a fair amount of time talking about progestin choice.
In terms of intrauterine contraception, we do talk about that. And my ratio of Mirena to ParaGard over the last few years has been about 2 to 1, two-thirds or so being Mirena, and that has worked well in some people, although I've also had to discontinue IUDs in a fair amount of people over the years .
And I do at least talk about sterilization, although my experience is when people are interested in sterilization, they sort of bring that up first. I am able to promote about one vasectomy every two years, and I'm not kidding.

Page 310

Q. The -- the IUDs that you have had to remove over the years, do you recall the reasons for those?
A. Most often it's localized discomfort. Sometimes there's been coital discomfort. We've tried to take care of that in a few different ways. We've mentioned the four or five patients I had with unusual CNS sort of symptoms for which I removed a Mirena.
Q. CNS, to clarify, central nervous system.
A. Central nervous system.
Q. Thank you.
A. Thank you.
Sometimes people simply ask for it to come out. My clinical experience reflects pretty much what we've talked about today of discontinuation rates, you know. By -- by the third year, we said half, but it's like 60 percent of people are continuing their IUD and 40 percent have had it removed.
Q. You had said you last implanted -- correct me if I'm wrong -- a Mirena six months ago. Do you recall that?
A. June.
Q. Okay. If a patient was to walk into your office after three months -- if this patient, for example, was to come back into your office complaining of headaches and you pull it, would you consider that a differential diagnosis?

Page 311

A. Well, I think you're -- you're asking would there be an underlying differential diagnosis in that interaction.
Q. Right.
A. The answer's yes. And I've heard doctors say differential diagnosis is a formal thing we only do in our residency. But in truth, it's something we do at the bedside very quickly repeatedly, hopefully every patient we see.
So I talk to the patient with headaches. I go through a differential diagnosis in my mind, aided by what she tells me in history, perhaps aided by physical exam, such as checking her fundi with an ophthalmoscope, which I do do sometimes, but I don't dilate their eyes. And then we talk about options based on that differential diagnosis.
Q. I'm going to go through some of these exhibits.
A. Okay.
Q. So let's start with No. 4 really quickly. This is your prior expert testimony.
A. Yes.
Q. You said earlier that now it's 75 percent plaintiffs, 25 percent defendants, right?
A. That's all elements of review. You can see that my testimony is heavily leaning towards plaintiff, but any

Page 312

form of review is 75 percent.
Q. But you have done review and you have testified on behalf of both bars, correct?
A. Yes, and I'm happy to.
Q. Okay. Exhibit 6 and 7 were copies of your references cited in the report and then the reliance list.
A. Yes.
Q. Okay. And then Exhibit 8 was the additional documents reviewed.
A. Yes.
Q. Okay. But you did not review everything listed on Exhibit 8 until after you produced your December 21st, 2017 expert report, correct?
A. Correct.
Q. Okay.
A. I don't know if we should change the title then.
Q. The title of Exhibit 8 is "Additional Documents Reviewed."
A. Yeah, after 12-22.
Q. Sure. Do you recall some questioning regarding Jadelle and Norplant today?
A. Yes.
Q. Okay. And do you recall that you in your -- both your reliance and your reference list and cited in your report of the Sivin article?

Page 313

A. Yes.
Q. Okay. And would you agree with me that both Jadelle and Norplant are both LNG-containing?
A. Yes, they are both LNG-containing.
Q. Okay. And is Jadelle made by Bayer?
A. I believe it is.
Q. Is Norplant made by Bayer?
A. Yes.
Q. Does the Jadelle label have an intracranial hypertension warning?
A. Yes.
Q. And does the Norplant label have an intracranial hypertension warning?
A. Yes.
Q. If you would turn to Exhibit 16.
A. Okay.
Q. This is a copy of the Valenzuela article?
A. Yes, from 2017.
Q. Sure. And if you look at page 195 --
A. Yes.
Q. -- the second column under --
A. (Coughing.)
THE REPORTER: I'm sorry.
MS. LAMACCHIA: Sorry.
THE WITNESS: Excuse me.

THE REPORTER: Start over, please.
MS. LAMACCHIA: Sure.
Q. (BY MS. LAMACCHIA) The Discussion section, this is the second column on page 195, the third paragraph down.
A. Yes.
Q. Okay. It states, the first sentence, "Previous reports on another LNG contraceptive implant, Norplant, suggested an association with PTC." Do you see that?
A. Yes.
Q. Okay. And then there are three citations at 6, 10, and 11. Do you see that?
A. I do.
Q. Okay. The references -- I apologize. And if you look at the back page of the Valenzuela article, No. 6 is the Alder article, 10 is Wysowski article, and 11 is Sivin. Do you see that?
A. Yes.
Q. Okay. And did you reasonably rely on Valenzuela, Alder and Wysowski, and Sivin in giving your opinions regarding Norplant?
MR. ISMAIL: Objection, form.
A. Yes, I did.
Q. (BY MS. LAMACCHIA) And did you rely -- reasonably rely on Valenzuela -- Valenzuela, Alder, Sivin,



and Wysowski in giving your opinions in the totality of the evidence regarding Mirena and the association or causation or significant contribution to intracranial hypertension?
MR. ISMAIL: Objection to form.
A. Yes. And I should answer that compound question all three ways. They relied on my assessment of the relationship, which I concluded was reasonably probable causation in nature and a significant contributing cause of Mirena to IH.
Q. (BY MS. LAMACCHIA) And ultimately would you agree with me that in the Valenzuela article, that there were two groups in a large case control study that found there was a statistically significant increased risk of intracranial hypertension --
MR. ISMAIL: Objection to form.
Q. (BY MS. LAMACCHIA) -- with LNG-IUS?
A. Yes. As we talked about, there was the Utah group and then the Danish group.
Q. And defense counsel pointed out earlier that there were some flaws with the Valenzuela article. Do you recall that?
A. Yes, I do. It's very hard to write a perfect study.
Q. Sure. Would it be irresponsible as a physician



in looking at this type of article to -- to -- strike that. Withdraw that.
Would it be irresponsible as a physician to disregard the Valenzuela article?
MR. ISMAIL: Objection to form.
A. It would not be logical. It would certainly not be responsible in your performance as a physician. So I guess I can expect -- I can accept irresponsible not to work the Valenzuela paper into one's conclusions.
Q. (BY MS. LAMACCHIA) It would have been irresponsible as a clinician in giving an opinion in this type of litigation to disregard the Valenzuela article, correct?
MR. ISMAIL: Objection, form.
A. Because it's one of the sources of information on the relationship of LNG to IH, I do think so. I do think it would not be responsible.
Q. (BY MS. LAMACCHIA) Do you know if Bayer has done any prospective cohort studies between Mirena and intracranial hypertension?
A. I like to think I would have heard of it, but I do not know if they've started any studies.
Q. Do you know if Bayer has done any clinical trials regarding Mirena and intracranial hypertension?
A. Same answer. I would have liked to have heard



about it, and I haven't, so I'm not aware that they have, no.
Q. Do you know if Bayer has done any kind of meta-analysis with -- with Mirena and intracranial hypertension?
A. That can I -- that I can assure you they have not because that would require a number of already performed randomized clinical trials, so that would be a for sure no.
Q. You opined earlier that LNG causes -- Mirena causes or is a substantial contributing factor for intracranial hypertension.
For this opinion, do you contemplate that intracranial hypertension in this context includes a demonstrated elevation in ocular pressure --
MR. ISMAIL: Objection --
Q. (BY MS. LAMACCHIA) -- opening ocular -- opening pressure?
MR. ISMAIL: Objection, form.
A. I feel it requires some demonstration of increased intracranial pressure. The signs of this are many and in the context of a epidemiologic review could include symptoms, headache, nausea, photophobia; signs, papilledema, elevated opening pressure, normal CSF like we've talked about; and then finally confirmation by an

ophthalmologist, neurologist, or the sort.
In an epidemiologic review such as mine, the criteria for including in the diagnosis of IH is not as strict as in the clinical practice. In my clinical practice as a physician, I would not give the diagnosis of PTC without increased CSF pressure on lumbar puncture.
Q. (BY MS. LAMACCHIA) And epidemiology's not clinical medicine, right?
A. It is not.
Q. So do you believe that LNG causes or is a substantial contributing factor for intracranial hypertension?
MR. ISMAIL: Objection, form.
A. Based on the totality of everything I've read and everything I've studied and have thought and reviewed, my answer is yes, I do.
Q. (BY MS. LAMACCHIA) There was a substantial amount of time today spent going through your methodologies and everything you've reviewed in forming your opinions.
For the 115 cases that were part of the signal assessment done by Bayer, what do these 115 cases signify to you as a clinician?
A. They signify to me an important number. They do not serve just as a numerator. Those are 115 individual



mothers, daughters, and wives who may be facing a very serious medical condition.
It was a greater population that I expected to review when I began this work with you back in June. I found it was a sufficient mass effect to really raise the question and to increase my interpretation of the medical probability that Mirena indeed causes IH.
It is a start. It is not conclusive, but nonetheless very important to this reviewer.
Q. And speaking of start, you had -- you cited in your report an April 5th, 2001, a Medsafe New Zealand letter. Do you recall that?
A. I believe that's the 2001 reference.
Q. Right.
A. Yes.
Q. So we can go ahead and mark this as Exhibit 22.
(Exhibit 22 marked.)
Q. (BY MS. LAMACCHIA) Would you agree with me that Exhibit 22 is one of the first concerns for intracranial hypertension because it was a signal evaluation that was requested by the New Zealand health authority, Medsafe?
MR. ISMAIL: Objection, form.
A. That's my understanding of it, yes.
Q. (BY MS. LAMACCHIA) Okay. And it states in the second paragraph, "The WHO database holds 85 reports of



intracranial hypertension and 45 of papilledema with Mirena." Do you see that?
A. I do.
Q. Okay. It also says, "Two cases have been reported in the literature of intracranial hypertension with Norplant, which is an implanted subdermal device, also releasing LNG." Do you see that?
A. I do. Referencing Alder and Sunku, who we've talked about today.
Q. And the MARC was wondering where -- whether or not there was a causal association between Mirena and benign intracranial hypertension, right?
A. Yes.
Q. Okay. So is this one of the pieces of literature marked as Exhibit 22 that you took into consideration and weighed in the totality of the evidence in forming your opinion --
MR. ISMAIL: Objection, form.
Q. (BY MS. LAMACCHIA) -- that there's a causal connection between Mirena and intracranial hypertension?
A. Yes, it was. And in terms of a timeline, as we spoke about earlier, it was the earliest bookend I have of when this association was first raised.
Q. As a clinician, what does this -- this inquiry regarding a causal association between Mirena and



intracranial hypertension mean to you?
A. This raises to me a very serious concern because I recognized immediately that although it's a very uncommon event, the seriousness of the outcome is -- is quite bad with my reading of a 10 to 25 percent permanent vision loss.
This is enough of a concern to kick off some investigation, some attempts to elucidate this -- this possible causal relationship. This is the way very good research and very good answers are begun.
Q. And you took this into consideration -- withdrawn.
We had just talked about Valenzuela. What does Valenzuela mean to you as a clinician in the context of this Mirena litigation?
MR. ISMAIL: Objection to form.
A. Reading the article, the authors present their research hypothesis, their materials, results and conclusions, which includes their review of strengths and limitations of a study.
Research is never without limitations. It always has to be interpreted that way. But as a clinician, I see this as a block in the wall building a case that Mirena indeed causes or is a significant contributing factor to IH.

It's a block that has to be built upon. It is not by itself definitive, but it is nonetheless important.

Q. (BY MS. LAMACCHIA) So it's just a piece in the puzzle. Would you agree?

A. I -- I would. I -- I think it's a very important piece because it is clinical. I think there are strengths as well as weaknesses of the study. Perhaps most importantly is it was done is a strength.

Q. You were asked about Etminan earlier. You were given Exhibits 12 through 14. You were asked some questions. Do you recall that?

A. I do.

Q. Okay. And you understand that Exhibit 14 is not a published article, right?

A. I -- I do. It's a signed and notarized affidavit.

Q. And had you ever seen this exhibit -- exhibit before today?

A. No.

Q. Okay. You understand from Exhibit 13 that Dr. Etminan had revised his disproportionality analysis, right?

A. Yes.

Q. Okay.



A. After the review of the 2015 article by Dr. Friedman.

Q. Right. And -- and do you recall when this revised manuscript or revised analysis by Dr. -- or excuse me -- by Etminan was done?

A. Yes, typically journals print their dates. There's two -- two dates they print, when the manuscript was received, and in this case January 18, 2017, and then after suggested revisions, when was it accepted, April 12th, 2017.

Q. Okay. And the affidavit you were shown as Exhibit 14, can you tell the jury what the date is on there that it was sworn to by Etminan?

A. I believe it's the 17th of December 2016.

Q. So it appears as though the disproportionality analysis of Exhibit 13 was done after the sworn affidavit by Etminan, right?

MR. ISMAIL: Objection to form.

A. Recognizing it can take time to -- to write a paper, but the dates certainly follow that way.

Q. (BY MS. LAMACCHIA) Okay. And you were asked earlier about whether or not you were relying on any of the Etminan analysis, right?

A. Yes.

Q. Okay. And was the Etminan analysis and



reanalysis part of your totality of the evidence of your opinion?

A. It is because the research was started. It was important enough to receive significant critique then and a slightly unusual move -- the opinion of the authors were revised.

It is a piece of the totality of the evidence I've reviewed, although as I've testified, it is a sum zero of proving or disproving a causative relationship between Mirena and IH for me.

I simply don't think I would ever understand all the truths behind this line of research.

Q. I understand. But even as a clinician, what does the Etminan analysis and reanalysis mean to you?

A. What it means to me as a clinician is someone raised a important association. It raised a perhaps overreaction from a reviewer, which then resulted in a somewhat surprising revision of work.

This all suggests to me a very unusual situation. The differential diagnosis includes good, honest research, but also the possibility of politics and other less noble pursuits than pure science.

I would conclude I would never know the absolute truth in such a situation and I would therefore never rely solely on this line of articles.



Q. You were asked some questions about your Bradford Hill analysis.

My question to you is: Do you need to absolutely fulfill with 100 percent certainty every single one of the Bradford Hill criteria in order to render an opinion in -- in -- in this matter?

A. My answer would be no based on my reading of Bradford Hill himself, commentators on Bradford Hill. Some of the papers we've reviewed regarding the application of Bradford Hill causation are in that stack of literature. I feel it's a very useful construct, outline, method to look at the totality of evidence.

I think Bradford Hill himself would encourage a degree of flexibility and openness with the technique because he spoke strongly against using it as a strict checklist.

Most importantly, he didn't want people to get bogged down in statistics and to have confusion lead to inactivity. He felt you would look at your best evidence, your best conclusion on that evidence, and act.

And, therefore, it contributed to my analysis of all this information. It helped me understand -- at least me understand the probable causation of Mirena causing IH.

Q. And so in constructing your outline method to

Page 326

look at the totality of the evidence, you looked at the androgen theory, Norplant, Jadelle, the labels, your experience in using those products, Etminan, Valenzuela articles, the 115 case reports, in addition to 238 either publications, scientific literature, abstracts that are cited in both your reference and your reliance list and your additional documents reviewed in forming your opinion today, right?

MR. ISMAIL: Objection to form.

A. Those are the materials that went into the opinion of my written report. And then since then, I have read very well-written, brilliant expert reports that in size dwarfed mine, and my opinions have only been strengthened as of today when I wrote that report.

Q. (BY MS. LAMACCHIA) And you also have the ability to supplement your opinion as more information becomes available to you, right?

A. Because of my relative inexperience in this kind of litigation, I'm not exactly sure about that. I -- it's my understanding, as I testified, that I can be asked for that if necessary. I don't know who determines the necessity part. I feel today was very productive in explaining my opinions, so I -- I don't want too many hours.

Q. Sure. Are the opinions that you give based on

Page 327

your experience, your training, your knowledge, and all of the medical literature, internal company documents, data sets that you have had the opportunity to review today indicating that more likely than not that Mirena is a substantial contributing factor in causing intracranial hypertension?

MR. ISMAIL: Objection to form.

A. I do think so, and I do think it is a cause or a significant contributing factor of IH to a reasonable medical probability.

Q. (BY MS. LAMACCHIA) One small formal matter. Defense counsel alleged that you had not referenced the 115 case reports in your report. Do you recall that?

MR. ISMAIL: I did?

A. I don't remember that.

MR. ISMAIL: I didn't.

A. Yeah, we talked about it a lot.

Q. (BY MS. LAMACCHIA) Okay.

A. I don't -- I've been paying very careful attention, and I don't remember him saying that specifically.

Q. I -- then I'm apologizing, then, for -- for not hearing it correctly. But --

A. No, no.

Q. -- if we needed to add a footnote into your

Page 328

report, I just wanted to make sure that that would be okay.

A. No apology is necessary as long as we don't use the word "flurry." I've learned some writing tips today.

Q. Are you aware that as of October 2017 that Bayer had responded to questions from BfArM?

MR. ISMAIL: Objection to form.

A. Yes.

Q. (BY MS. LAMACCHIA) Okay. Do you have any recollection what Bayer's response in October of 2017 was with regards to reports of intracranial hypertension being associated with Mirena?

A. I'd prefer to review the document. I don't remember the specific news on Mirena. What sticks out in my memory is the four cases with Skyla.

Q. So you're aware that there were four reported cases of intracranial hypertension with Skyla?

A. Yes. I've not focused very much on Skyla in this litigation, so that correspondence stuck in my memory.

Q. All right, Dr. Wheeler, I don't have any further questions for you at this time.

A. Thank you.

FURTHER EXAMINATION

BY MR. ISMAIL:

Q. Just a couple quick follow-ups.

Page 329

A. Sure, please.

Q. Counsel asked you about clinical diagnostic criteria for PTC. You've never diagnosed a patient with PTC, correct?

A. I have included it on a differential diagnosis several times. I have performed lumbar punctures before. I cannot recall in the time I was doing that work, my ER moonlighting and my residency, where I've actually clinched that diagnosis. I have certainly thought about it and have included it on differential diagnoses.

Q. And that experience you're relating is going back to your early days of a physician?

A. It's close to the time of my board interactions. It's -- it's 30 years old.

Q. Okay. So in the last 30 years, you've not included PTC, your benign intracranial hypertension in a differential diagnosis for one of your own patients, correct?

A. No, I have included it in my concerns in differential diagnosis, but that would be worked on by a -- by a neurologist. What I have not done until very recently is linked that at all to Mirena.

Q. So just to put a final -- just put a final bow on this discussion, you've never diagnosed a patient with PTC yourself, correct?

Page 330

A. Referring now to my private practice?
Q. Even back to your ER days, you told me that you never confirmed the diagnosis.
A. I can't recall. I -- I wouldn't be surprised if I had because it's not all that rare in a very busy residency, but I'll -- I'll testify I cannot recall. In my private practice, no.
Q. And if a patient presented today with a constellation of symptoms that you suspected or had concerns might be PTC, you would refer that patient out to a specialist for further diagnostic workup?
A. I would do that in a very speedy way.
Q. Are you board certified in reproductive endocrinology?
A. I am not.
Q. Okay. I think I guess I misunderstood one of your answers to Ms. LaMacchia a moment ago.
Your board certification is for?
A. Obstetrics and gynecology.
Q. Now, you were asked questions about the Medscape experience involving New Zealand health care authority?
A. The 2001 article -- letter -- 2001 letter.
Q. Right. That -- it -- the inquiry from the New Zealand health care authority does not qualify as medical literature, correct?

Page 331

MS. LAMACCHIA: Objection, form.
A. I liked your phrase before of peer-reviewed medical literature.
Q. (BY MR. ISMAIL) It certainly is not that.
A. It's certainly not that. It is a form of medical literature.
Q. Because it's a communication between the health care authority and individuals at Schering?
A. Yes, it's -- it's medical in nature.
Q. Okay.
A. Yeah.
Q. Now, you -- you have no -- you have zero understanding of the regulatory framework for the health care authority in New Zealand, correct?
A. A fair presumption and very accurate.
Q. So you don't know how often inquiries such as Exhibit 22 are made and what's their significance, if any, in the context of New Zealand's regulation of prescription medicines?
A. Correct.
Q. Counsel asked you what -- if you relied on the fact of this communication in your analysis, and your answer was whatever it was.
But am I correct that at no time did you consider the actual assessment by the New Zealand health

Page 332

care authorities on the inquiry that was raised by Exhibit 22?
A. No, I did not.
Q. Are you aware that the New Zealand health care authorities, after raising this inquiry in Exhibit 22, concluded that there's insufficient information to establish a causal association between Mirena and BIH and that the matter should not be taken any further at present?
MS. LAMACCHIA: Objection, form.
A. And to me, I have no trouble believing that. The most important part of that sentence is the "at present." This was very, very early.
Q. (BY MR. ISMAIL) Right. So whatever the significance of the inquiry, we know that the conclusion reached by the health care authority in New Zealand was that the matter should not be -- should not be pursued further?
A. And I can understand that.
Q. You were asked a question a moment ago by counsel regarding BfArM. Do you recall that?
A. Yes.
Q. And do you understand BfArM to be an abbreviation of the German health care authority?
A. I believe it's German, yes.

Page 333

Q. And similar to my question a moment ago about New Zealand, you have zero background or understanding regarding BfArM's regulation of prescription medications?
A. Correct.
Q. And so you have no ability to comment on what may trigger an inquiry or questions from BfArM in the regulatory context in which that correspondence arises?
MS. LAMACCHIA: Objection, form.
A. That would be correct.
Q. (BY MR. ISMAIL) Nowhere in your expert report do you cite either the BfArM inquiry or the response thereto by Bayer, true?
A. True.
Q. And I don't see anywhere on your materials reviewed list, any of the three that we've marked, even a reference to the BfArM inquiry or the responses thereto by Bayer. Is that accurate?
A. I -- I -- I believe you.
Q. So --
A. I would imagine that's accurate.
Q. Okay. So you did not review the BfArM inquiry or Bayer's response to the questions posed by BfArM as part of your work in this litigation, true?
A. Before I wrote the report.
Q. Well, it certainly wasn't written -- it certainly

wasn't reviewed by you before you wrote the report, right?
A. Right.
Q. And even with an opportunity to provide a supplemental list of materials that you reviewed, the BfArM report or the responses from Bayer still don't appear?
A. Didn't make it.
Q. Okay. That's all I've got.
A. Thank you. The bow is tied.
MR. ISMAIL: Thanks for your time, Doctor. Appreciate it.
THE WITNESS: Thank you all.
MR. ISMAIL: We're good. Do you guys want to read and sign?
MS. SNAPKA: Yes.
THE VIDEOGRAPHER: Okay. We're off the record at 7:02, end of deposition, end of Tape 4.
(Proceedings adjourned at 7:03 p.m.)



CERTIFICATE

I, RENE WHITE MOAREFI, Certified Shorthand Reporter and Notary Public in and for the State of Texas, hereby certify to the following:

That the witness, JAMES WHEELER, M.D., was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That pursuant to FRCP No. 30(e)(2) that the signature of the deponent was requested by the deponent or a party before the completion of the deposition and that the signature is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 2nd day of February, 2018.

______________________________
RENE WHITE MOAREFI, CRR, RPR
Texas Certified Shorthand Reporter
NCRA Certified Realtime Reporter
Notary Public in and for the
State of Texas
My commission expires: 10-28-18



INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.



ERRATA

PAGE LINE CHANGE REASON

ACKNOWLEDGMENT OF DEPONENT

I, JAMES WHEELER, M.D., do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted on the attached errata page.

________________________________________

JAMES WHEELER, M.D. DATE



LAWYER'S NOTES

PAGE LINE

____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________