**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**IN RE:**

**MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY LITIGATION (NO. II)**

**17-MD-2767 (PAE)**
**17-MC-2767 (PAE)**

***This Document Relates to All Actions***

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE THE GENERAL CAUSATION EXPERT TESTIMONY OF TODD LEE, PHARM.D., PH.D.**

## PRELIMINARY STATEMENT

Bayer's opposition to Plaintiffs' motion fails to respond substantively to Plaintiffs' arguments and, where it does, it does so incompatibly with its own arguments against Plaintiffs' expert witnesses. Bayer's opposition is devoid of case law, resting instead on accusations as to the "tone" of Plaintiffs' brief. Plaintiffs' "tone" was appropriate: for example, Dr. Lee intends to provide a Bradford Hill analysis in which, in his own words, he "[has] not reviewed the mechanistic literature to evaluate the plausibility criterion," see Plt. Mem., ECF 176, p. 3 of 10, but which he nonetheless feels confident about because of his conclusions — drawn without any experience with contraceptives and without a medical degree — about small, inconclusive studies involving completely different medications. Dr. Lee's methodology was unreliable and Bayer's lawyer-created backfill, with calculations he performed and studies he never review, does not save it.

### I. Bayer Provides No Case Law In Defense Of Dr. Lee's Methodology Or Opinions

Presumably, Bayer's claim that Plaintiffs "misapprehend[] the role of a defense expert," rests on its counsel's pronouncement that "fundamentally our experts are rebuttal experts." 03/09/18 CMC Trans. at 58:24-25. Yet, Bayer offers *no* case law to support what precisely Dr. Lee's proper role is, and Bayer fails to demonstrate Dr. Lee carried out that purported role.

Although "[w]hen offering expert testimony, the defendant has 'no burden to produce models or methods of their own,'" a rebuttal expert must, "[a]t a minimum, [...] meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony."[1] Ignoring this standard entirely, Bayer urges

[1] *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (quoting *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007)); (citing *inter alia*, *Cospelich v. Hurst Boiler & Welding Co., Inc.*, 08CV46-LG-JMR, 2009 U.S. Dist. LEXIS 131718, at *2 (S.D. Miss. July 7, 2009) (excluding testimony where the rebuttal expert failed to employ a reliable methodology).

that Dr. Lee can offer any opinion he likes so long as it is critical of Plaintiffs' experts. First, as a matter of law, Bayer's argument is simply incorrect: even an expert disclosed solely in rebuttal must also proffer *relevant and reliable* testimony. Second, as a matter of fact, Dr. Lee goes far beyond pointing out flaws in the opinions of Plaintiffs' experts, and he purports to offer a variety of *affirmative* opinions such as his complete rejection of Valenzuela, his "reanalysis" of Valenzuela, his claim "Bayer's collection of adverse event reports do not indicate a potential signal," and his opinion that for "oral contraceptives ... there is no evidence of an increased risk of IIH" and his attempt to apply that opinion to Mirena specifically. See Report of Dr. Lee, "Summary and Conclusion," p. 54 (ECF 176-1, page ID 9819). Bayer must demonstrate these conclusions arose from a reliable methodology.

## II. Dr. Lee Does Not Offer Methodologically-Sound Rebuttal Opinions

### A. Dr. Lee's Haphazard "Rebuttal" Application Of Bradford Hill Does Not Constitute Proper Methodology

Despite his apparent belief that Bradford Hill should not even be applied in this case, Dr. Lee engaged in his own cherry-picked, distilled version of the analysis. Initially, Dr. Lee's criticism of the use of Bradford Hill by Plaintiffs' experts is flawed from the outset because Bayer's own expert, Dr. Langer, conceded the elements to perform Bradford Hill are far more liberal than Dr. Lee claims,[2] and because *Bayer's own data* provides evidence of disproportionate adverse event reporting, data which Bayer inexplicably withheld from their own experts.[3]

Next, Dr. Lee undeniably misapplied three of the criteria.[4] Dr. Lee admits in his report that

---

[2] Deposition of Dr. Langer, 172:6-174:1. *See also* Plaintiffs' Omnibus Brief, ECF 174, p. 9.
[3] *See* § D, *infra* (Empirica database).
[4] Specificity, Biological Plausibility, and Coherence, as described in Plaintiffs' Brief in Supp. of Mot. to Exclude Dr. Lee, ECF 176, p. 2.

he did not even assess the data or literature relied upon by Plaintiffs' experts:[5]

> While I have not reviewed the mechanistic literature to evaluate the plausibility criterion, plausibility is effectively refuted by the absence of any association between oral contraceptive use (with their significantly higher LNG doses and blood serum concentrations) and IIH.[6]

As Bayer acknowledges, Dr. Lee made *no* attempt to analyze the plausibility of LNG or Mirena causing PTC; instead, he "focused on studies examining the rates of oral contraceptive use among women with IIH."[7] Dr. Lee's analysis is undeniably insufficient to survive *Daubert*, and even Dr. Lee's proxy analysis is unilluminating and irrelevant. Oral contraceptives (OC) are an inappropriate comparator for several reasons, including: 1) the OC studies accounted for *all* formulations, not just those with LNG; 2) even the OC studied that do contain LNG also contain an estrogen component; and 3) the OC studies were too small to find statistical significance, and nonetheless most of the studies found an increased use of OCs among IH patients.[8]

### B. Bayer Has Not Established Dr. Lee Used A Reliable Methodology To Reject Valenzuela Entirely Because Of Potential Preferential Prescribing

Continuing its theme that "Plaintiffs fundamentally misstate the role of a defense expert," Bayer argues that Dr. Lee need "not quantify the precise impact or degree of preferential prescribing." Defendants' Opposition, ECF 211, p. 6, 7. Again, while Bayer need not produce models or methods of their own to rebut Plaintiffs' experts, Dr. Lee must support *his own claim* that "one simply cannot point to the Valenzuela study as evidence that the use of LNG-IUS is associated with IIH, much less evidence of a causal relationship."[9] Dr. Lee is offering an

[5] *See also* Plaintiffs' Brief in Supp. of Mot. to Exclude Dr. Lee, ECF 176, pp. 7-8.
[6] Report of Dr. Lee, ECF 176-1, p. 45.
[7] Dfts Opposition, ECF 211, p. 4
[8] See, e.g., Plaintiffs' Omnibus Brief, ECF 174, p. 14; Plaintiffs' Omnibus Response, ECF 213, p. 22; and, Plaintiffs' Response regarding Dr. Moyé, ECF 215, p. 9.
[9] Report of Dr. Lee, p. 43, ECF 176-1.

extraordinary opinion — the complete and total rejection of a peer-reviewed study that has never been criticized in the literature — and his only basis is a speculation that, because preferential prescribing exists to some extent, he can completely ignore Valenzuela's statistically significant findings.

Dr. Lee's complete rejection would be bad enough in its own right, but it is made even worse by the specifics of the study. Valenzuela provided the weights of Mirena users with intracranial hypertension (BMI 35, standard deviation 9) and non-Mirena users with intracranial hypertension (BMI 35, standard deviation 7), and provided an exceedingly high p-value for the difference, 0.92, indicating just how similar the populations were. For Dr. Lee to reject Valenzuela on the basis of preferential prescribing, he must use a reliable method to explain how, embedded within those virtually identical ($p = 0.92$) populations, obese Mirena users with a 22/100,000 risk of IH have somehow irredeemably confounded the results by being compared to non-obese non-Mirena users with a 6.8/100,000 risk of IH. Such is inherently a quantitative analysis, and one that Dr. Lee could do, but either he refused to do so or he was told by Bayer not to do so — presumably because, under any scenario, the effect of preferential prescribing would make *not* invalidate Valenzuela's findings, particularly not within the confines of the highly similar populations of Mirena users (BMI 35, SD 9) and non-Mirena users (BMI 35, SD 7). Without *any* quantitative data that directly addresses the issue, and without any attempt to quantify the alleged effect, Dr. Lee's opinion is entirely speculative and lacks good grounds.

### C. Bayer Has Not Demonstrated Dr. Lee Used A Reliable Method To "Reanalyze" Valenzuela, And Bayer's Citation To A New Poster That Dr. Lee Never Reviewed Is Improper And Unhelpful To Them

Similarly, Bayer fails to understand Dr. Lee must reliably support the claim that

"Valenzuela's reported results are not reliable." Defendants' Opposition, ECF 211, p. 7. Bayer bears the burden of demonstrating Dr. Lee reached this conclusion with a reliable methodology. Rather than explain how Dr. Lee does so, because he does not, Bayer offers two strawman arguments in defense of Dr. Lee's opinions.

First, Bayer points to a new, non-peer-reviewed abstract that Dr. Lee did not rely on in forming his opinions, was not cited in his materials, and was not mentioned at his deposition.[10] Bayer's desperate effort, a telling sign of their lack of confidence in Dr. Lee, runs straight into a case cited by Bayer's on Omnibus Brief, *Hollander*, in which the Tenth Circuit affirmed a trial court refusing to use epidemiological studies that the party's own expert did not rely on.[11]

Moreover, it is ludicrous to suggest, as Bayer does, that this abstract is somehow more reliable than the Valenzuela results, and Bayer's argument betrays every criticism that Bayer, and Dr. Lee, level at Valenzuela. First, the DeLott poster reports a p-value of 0.45.[12] As one of Bayer's other paid epidemiologists, Dr. Langer, explained, this p-value demonstrates that the study's results are "slightly less likely to be the result of chance than a coin flip."[13] Moreover, the limited methodology described by the poster makes no sense at all, not least because:

- The study included "Women 18-45 years old using a hormonal IUD *or non-hormonal form of contraception (copper IUD or sterilization procedure)*," thereby *not* comparing hormonal IUD users to women in general or even women using contraceptives, but rather to an arbitrary group of women with Copper IUDs and sterilization.
- The exclusion criteria, "Presence of other contraceptive device (V45.59)," would knock out users of other levonorgestrel-only products, such as Bayer's Jadelle.
- The authors excluded "Failed IUD insertion or mechanical complication code" *but did not* look for subsequent implants or insertions, thereby arbitrarily excluding some

[10] Defendants' Opposition, ECF 211, p. 7, n.4 (citing Ex. A thereto, DeLott 2018).
[11] *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1215 (10th Cir. 2002)( "The district court accurately observed that the Hollanders' own experts did not rely on these studies.").
[12] *See* Defendants' Exhibit A, ECF 211-1.
[13] Deposition of Dr. Langer 149:15-150:8. There, Dr. Langer was discussing the results of the Kilgore poster regarding oral contraceptives, reporting a slightly *lower* p-value of 0.415.

unknown number of women who, in fact, had a hormonal IUD.

Again, Dr. Lee did not even review this source, because it did not even exist at the time he formed or disclosed his opinions. Regardless, it does not *reliably* or *replicably* support his opinions.

Second, Bayer unsuccessfully attempts to resuscitate the opinions that Dr. Lee actually provided. Plaintiffs do not "insinuat[e]" that Dr. Lee did not include the Jones publication "on his list of materials reviewed."[14] Rather, although Dr. Lee cites the source in his lawyer-created "Materials List," he never actually explains if or how he relied upon it, nevermind how he used it to arrive at his Mirena use estimates. Whereas Dr. Lee consistently cites to the literature throughout his report, he never actually cites the Jones 2012 article anywhere, and citation to it is conspicuously absent on page 37 of Dr. Lee's report, where Bayer directs the Court. Indeed, that is the same page Plaintiffs quoted (ECF 176, p. 6) to reveal Dr. Lee's undeniably erroneous calculation in which he blithely multiplied the Boulet results and the Sanders results, a "method" that inexplicably skips steps 2, 3, and 4 of the "reanalysis" offered by Bayer's Omnibus Response. Furthermore, Dr. Langer's and Dr. Barnhart's explanation how they — admittedly, incorrectly — considered the Jones article in their estimates is irrelevant to if or how Dr. Lee did so.

Finally, Bayer's epidemiologists did not "converge[] upon fairly similar estimates of Mirena use in the controls." Rather, they assumed the exact same number, provided to them by Bayer, without even bothering to perform the calculation themselves, much less explain in their report their supposed "methodology." Bayer argues that "[c]onsistent results from multiple experts are reassuring, just as when multiple studies find similar results," but the only experts that have reached this exact same assumption are those paid by Bayer in this action, not one was capable

[14] Defendants' Opposition, ECF 211, p. 7

of replicating the numbers, and, as explained in Plaintiffs' Omnibus Reply, the calculation itself was little more than a bad faith means for evading the data about women at risk for unintended pregnancy provided on the face of Boulet 2016.

**D. The Use Of Adverse Event Reporting Rates By Bayer's Experts Is Doubly Unreliable: Bayer Admits This Data Should Not Be Used To Assess Causation, And Bayer's Withholding Of Empirica From Its Experts Is Fatal To Their Opinions On This Subject And On General Causation**

Bayer's Omnibus Response admits, as the Plaintiffs' Omnibus argued, that adverse event reporting rates and disproportionality analyses are "not a tool for establishing causal attributions between products and adverse events." ECF 201, p. 13 (quoting FDA Guidance). That is correct, which again raises the question: why did all of Bayer's experts rely on adverse event reporting rates to justify their conclusions about causation?[15] Bayer's brief dances around this issue, arguing simultaneously that Bayer's experts are, and are not, relying on adverse event reporting rates for their opinions about causation. Like all of the opinions offered by Bayer's experts, it appears their analysis of adverse event reports was simply cut-and-pasted from Bayer's BfArM Response[16] without any regard as to whether it was properly part of a causation assessment. Plaintiffs' position is clear and consistent: these unreliable analyses should be precluded, and any opinions that depend upon them should be closely scrutinized to see if they survive *Daubert*.

Nonetheless, Bayer suggests these opinions are admissible, so, in the alternative — that is, if this Court finds Bayer's use of adverse event reporting rates is not inherently unreliable — Plaintiffs raise a second, independent basis for excluding these opinions: Bayer withheld from its experts its own analyses of the adverse event reporting rates. Bayer bizarrely attempts to blame

---

[15] See Plaintiffs' Omnibus, ECF 174, p. 22, fn 33 (citing instances of Bayer's experiences relying on adverse event reporting rates for opinions about causation).
[16] See ECF 167-71, page ID 8523-25 (identical analysis by Bayer).

*Plaintiffs* for the withholding, accusing Plaintiffs of "refus[ing] to provide the experts with the necessary data to evaluate how Empirica calculated its disproportionality analyses." See Bayer's Omnibus Response, ECF 201, p. 14. First, this argument concedes Plaintiffs' point: Bayer's experts brought adverse event reporting rates into their opinions but those experts did not review critical relevant evidence — Bayer's own disproportionality analyses in their Empirica database — and thus their opinions about adverse event reporting rates are admittedly unreliable. Second, of course, Plaintiffs have no obligation to fill the holes in the methods used by Bayer's experts, and Bayer itself should have provided this material to its experts before their reports and could have provided it during their direct examination of their own experts. Third, the history of this issue reveals the willingness of Bayer's experts to simply rubber-stamp whatever argument Bayer gives them, which further reveals the unreliability of their methods.

As explained in Plaintiffs' Omnibus, Bayer violated this Court's discovery and ESI orders and secretly withheld Empirica from the Plaintiffs, and the database only came to light when Bayer's pharmacovigilance designee was forced to make the choice between admitting a regulatory violation and a key aspect of liability (by acknowledging the lack of any disproportionality analysis) or revealing the existence of Empirica. ECF 174, p. 23. She chose the latter, Plaintiffs demanded it be produced, and Bayer's counsel claimed that the entirety of the database (as it pertained to IH and related conditions) had been produced.

Contrary to Bayer's claims that Plaintiffs used "only part of the Empirica report" and that Plaintiffs failed to address "Empirica's comparison group," ECF 201, p. 14, the data provided to Plaintiffs *has no comparison group*. The exhibit Bayer attaches to its Omnibus Response, ECF 202-5, reveals no comparison group at all — as is typical of disproportionality analyses. The FDA's

own White Paper on this subject says not a word about "comparison groups" for disproportionality analyses.[17] Rather, as the FDA explains for the primary measure used by Bayer, the Proportional Reporting Ratio (PRR), "PRR is the degree of disproportionate reporting of an adverse event for a product of interest compared to this same event for all other products in the database. **Thus, the entire database is used as a background 'expected.'**" Peer-reviewed articles by Bayer's own employees say the same for all disproportionality analyses: "The foundation of the majority of statistical signal detection methods is a 2 x 2 contingency table that relates the observed count for an adverse event of interest and a drug of interest **with all other events and drugs in the database that together constitute a background** from which an expected count is derived: the principal difference being the method by which the expected value is calculated."[18] The "comparison group" for a disproportionality analysis is always the same: the drug-event combination in question is compared against the rest of the drug adverse event database.

Dr. Langer was the first of Bayer's epidemiologists to be deposed. Dr. Langer's report said, and he testified, that the adverse event reporting rate supported his opinions on causation, and so, as recounted by Plaintiffs' Omnibus, ECF 174, p. 24, Plaintiffs asked him for his opinions about a PRR greater than 40 and a Chi$^2$ greater than 3,000, numbers that are *lower* than the numbers reflected by Empirica. Dr. Langer agreed those figures "certainly" support causation and "would be consistent with a causal association." ECF 174, p. 24. Dr. Langer said not one word about needing to know a "comparison group" to interpret disproportionality data like PRR and Chi$^2$. When it came time to depose Dr. Barnhart and Dr. Lee, however, both suddenly had a new

[17] "Data Mining at FDA -- White Paper." Emphasis added. Attached hereto as Ex. 1.
[18] Candore, et al., Comparison of statistical signal detection methods within and across spontaneous reporting databases, Drug Saf. 2015 Jun;38(6):577-87. Emphasis added. Attached hereto as Ex. 2.

argument that had never appeared in their reports: they could not interpret any disproportionality analyses without knowing some "comparison group," which they defined in vague terms that included age, sex, and potentially a host of other criteria. Dr. Barnhart and Dr. Lee of course knew by that point where counsel was going (thanks to Dr. Langer being deposed first), and knew that it would be impossible to question them further about this issue because Bayer's own Empirica database does not use any "comparison group."

Bayer's "comparison group" argument is a transparent sham concocted after Dr. Langer's deposition, and the willingness of Dr. Barnhart and Dr. Lee to go along with it speaks volumes about their reliability and honesty. The FDA does not use "comparison groups." Bayer's employees have published articles that do not use "comparison groups." Bayer itself did not use "comparison groups" in its own disproportionality analyses. Dr. Langer did not mention "comparison groups." To date, Bayer has not cited any scientific or regulatory authority for the "comparison group" argument that Dr. Barnhart and Dr. Lee willingly used to evade this issue, and whatever arguable authority Bayer may dredge up before the *Daubert* hearing certainly cannot overcome the authority of the FDA *and Bayer itself*.

Bayer's experts made their causation opinions dependent upon adverse event reporting rates and Bayer withheld critical data about the same; their experts' methodologies were rendered unreliable by their own hand.

Dated: March 26, 2018

Respectfully submitted,

*/s/ Lawrence L. Jones II*

Lawrence L. Jones II
Jones Ward PLC
*Co-Lead Counsel for Plaintiffs*

Martin D. Crump
Davis & Crump PC
*Co-Lead Counsel for Plaintiffs*

Maxwell S. Kennerly
Kennerly Loutey, LLC
*Liaison Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed via the ECF/CM system with the Clerk of the Court, which will have sent notice to all attorneys of record in this matter on March 26, 2018.

/s/ *Lawrence L. Jones II*
Lawrence L. Jones