# EXHIBIT 2

Case MDL No. 2767 Document 1-1 Filed 12/29/16 Page 1 of 15

**BEFORE THE UNITED STATES**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| In re: MIRENA®<br>LEVONORGESTREL-INDUCED<br>INTRACRANIAL HYPERTENSION<br>PRODUCTS LIABILITY LITIGATION | MDL No. ________________ |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407**

Plaintiffs Shakara Carter, Miranda Gledhill, Octavia Holmes, Nancy Hopkins, Latonya Hoskin, Andrea Johnson, Tiara Mitchell, Maryssa Reese, Jessica Stanley, Kayla Talley ("Movants') respectfully submit this Brief in Support of their Motion to transfer certain cases currently filed against Bayer Healthcare Pharmaceuticals, Inc., Bayer Pharma AG and Bayer Oy (collectively "Bayer"), pursuant to 28 U.S.C. § 1407(c)(ii) and Rule 6.2(a) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation ("JPML"). Movants respectfully move for transfer of their individual cases, and all tag along cases included on the Schedule of Actions attached to their Motion for Transfer, to the United States District Court for the Southern District of Mississippi, Southern Division, for coordinated and/or consolidated pre-trial proceedings before the Honorable Louis Guirola, Jr., Chief Judge.[1]

[1] Movants seek consolidation separate and apart from *In Re: Mirena IUD Products Liability Litigation*, MDL No. 2434, which is currently pending in the Southern District of New York, pending the resolution of an appeal to the United States Court of Appeals for the 2nd Circuit. MDL No. 2434 involves only cases alleging injury caused by the migration of the actual Mirena IUD *device*; whereas, these cases are related to the *drug* released from the device. MDL 2434 does not include cases alleging IH caused by the levonorgestrel released from the Mirena® LNG-IUS. As such, the cases at issue in this petition are not appropriate for inclusion in MDL 2434.

Specifically, Movants seek transfer of cases in which the individual plaintiffs allege that levonorgestrel, a potent synthetic hormone, contained in the Mirena® levonorgestrel-releasing intrauterine system ("LNG-IUS"), caused them to develop conditions which manifested as increased intracranial pressure ("ICP") or intracranial hypertension ("IH"). The symptoms caused by the increased intracranial pressure can be grouped into a few different broad categories: i) headaches and migraines; ii) transient visual obscurations, iii) visual loss; iv) diplopia; v) pulsatile tinnitus; and vi) other various symptoms. In many cases, the medical literature identifies such conditions by various names, such as Intracranial Hypertension ("IH"), Pseudotumor Cerebri ("IH"), Benign Intracranial Hypertension ("BIH"), Secondary Intracranial Hypertension ("SIH"), Medication-Induced Intracranial Hypertension ("MIH"), or Idiopathic Intracranial Hypertension ("IIH"). As of today's date, based upon counsel's research, there are 116 substantially similar cases pending against Bayer in seventeen different jurisdictions. Movants anticipate that many more will be filed in the future.

Factors such as the need for judicial economy, consistency in rulings, and the commonality present among Movants' claims all merit consolidation and favor the transfer of these actions. The Southern District of Mississippi offers a convenient venue for Movants' claims to be consolidated as the *Talley* action involving the Mirena® LNG-IUS is already pending in that District and that Court is well prepared and able to handle a large number of transferred cases.

## I. BACKGROUND RE: LITIGATION STATUS AND SCOPE

### A. Mirena® IUS and Intracranial Hypertension

Mirena® LNG-IUS is an intrauterine contraceptive device, designed and marketed by Bayer Healthcare Pharmaceuticals, Inc., which was first approved by the Food and Drug Administration ("FDA") in 2000. Mirena® IUS releases levonorgestrel ("LNG"), a potent

Case MDL No. 2767 Document 1-1 Filed 12/29/16 Page 3 of 15

synthetic progestogen, directly into the uterus for birth control.

IH is a condition that develops in the skull when a person's cerebrospinal fluid level becomes elevated, causing increased intracranial pressure. Fluid builds up in the skull and is not released and absorbed at the proper rate. IH is frequently diagnosed after a lumbar puncture, or spinal tap, is performed which allows a physician to evaluate the level of cerebrospinal fluid in the skull.

Symptoms of IH include severe headache, nausea, ringing in the ears, blurred or dimmed vision, double vision, and neck, shoulder or back pain. This condition can also cause swelling of the optic nerves, leading to temporary or permanent blindness. There is currently no treatment to reverse permanent injury to the optic nerves caused by increased intracranial pressure. As such, treatment of IH primarily focuses on preventing further vision loss. Although IH is considered reversible in some patients, it may take years before normal pressure is maintained. Unfortunately, it also may be irreversible in some cases.

In June 2015, a group of prominent researchers reported that their epidemiological study demonstrated that "[e]xposure to an LNG-IUS was significantly associated with the development of IIH … ." *See* Rai, et al., The Relationship between the Levonorgestrel-Releasing Intrauterine System and Idiopathic Intracranial Hypertension, Invest. Ophthalmol. Vis. Sci. 2015; 56(7):2228. These researchers reported that their study found an Odds Ratio of 7.7, meaning that a woman exposed to a LNG-releasing IUS is 7.7 times more likely to develop IH than a woman not exposed to this type of IUS. *Id.*

While the association between IH and LNG has been the subject of recent scientific research, it has been well known within the pharmaceutical industry, including to Bayer, for many years. In 1991, a levonorgestrel-releasing implant called Norplant® became available in the United

Case MDL No. 2767 Document 1-1 Filed 12/29/16 Page 4 of 15

States, after its manufacturer obtained FDA approval on December 10, 1990. Norplant® was manufactured by Leiras Oy (now Bayer Oy) but sold in the United States by Wyeth Pharmaceuticals; however, Leiras Oy (now Bayer Oy) sold Norplant to the rest of the world.

In February 1993, Wyeth submitted a supplemental new drug application to the FDA for the Norplant® System, requesting the addition of "idiopathic intracranial hypertension" and other modifications to the PRECAUTIONS section of Norplant® System's physician labeling. The supplemental NDA also requested other modifications to the physician labeling and the patient package insert. Wyeth requested expedited review of its supplemental NDA and on March 26, 1993, the FDA approved the supplemental NDA, including its proposed addition of warnings regarding IH to the Norplant® System. The new labeling addition included under the PRECAUTIONS section stated:

> "Idiopathic intracranial hypertension (pseudotumor cerebri, benign intracranial hypertension) is a disorder of unknown etiology which is seen most commonly in obese females of reproductive age. There have been reports of idiopathic intracranial hypertension in NORPLANT SYSTEM users. A cardinal sign of idiopathic intracranial hypertension is papilledema; early symptoms may include headache (associated with a change in frequency, pattern, severity, or persistence; of particular importance are those headaches that are unremitting in nature) and visual disturbances. Patients with these symptoms should be screened for papilledema and, if present, the patient should be referred to a neurologist for further diagnosis and care. **NORPLANT SYSTEM should be removed from patients experiencing this disorder."**

(emphasis added). By 2001, Norplant®'s label included an entry under the "Warnings" section for "Idiopathic Intracranial Hypertension" that stated:

> Idiopathic intracranial hypertension (pseudotumor cerebri, benign intracranial hypertension) is a disorder of unknown etiology which is seen most commonly in obese females of reproductive age. There have been reports of idiopathic intracranial hypertension in NORPLANT (levonorgestrel implants (unavailable in us)) SYSTEM users. A cardinal sign of idiopathic intracranial hypertension is papilledema; early symptoms may include headache (associated with a change in frequency, pattern, severity, or persistence; of particular importance are those headaches that are unremitting in nature) and visual disturbances. Patients with

Case MDL No. 2767 Document 1-1 Filed 12/29/16 Page 5 of 15

> these symptoms, particularly obese patients or those with recent weight gain, should be screened for papilledema and, if present, the patient should be referred to a neurologist for further diagnosis and care. NORPLANT (levonorgestrel implants (unavailable in us)) SYSTEM should be removed from patients experiencing this disorder."

In light of the pharmaceutical industry's experience with the Norplant® System, as well as Bayer's specific involvement as the manufacturer of the Norplant® System, Bayer knew or should have known of the association between levonorgestrel and IH at the time it put Mirena on the market. However, the product label for the Mirena® LNG-IUS has never contained any warning relating to the risk of IH. To this day, Bayer does not warn patients or physicians of the association between the Mirena® LNG-IUS and IH, despite the fact that another of its levonorgestrel-releasing contraceptive implants, Jadelle®, contains such a warning. Further, Bayer has never publicly provided any information to patients or physicians regarding the potential need to remove the Mirena® LNG-IUS in light of an IH diagnosis. Instead, Bayer has always represented the Mirena® LNG-IUS as a low or no hormone contraceptive with few or no systemic effects, and as a low hormone option compared to other hormonal contraceptives.

**B. Mirena® Levonorgestrel-Related IH Litigation**

To date, 116 lawsuits have been filed against Bayer alleging that the levonorgestrel, a potent synthetic hormone, released from the Mirena® LNG-IUS caused them to develop IH. *See* Schedule of Actions. Each of these actions assert virtually identical claims against the same defendants, the Bayer entities, for the same injury, the development of IH, caused by the same product, Mirena®. These 116 claims are pending in seventeen (17) different federal jurisdictions. *Id.*

C. **<u>Many More Claims Anticipated</u>**

While the number of filed cases is substantial, the filed cases represent only a small sample of the cases that are expected to be filed against Bayer by women alleging that Mirena® LNG-IUS caused them to develop IH. This product has been used by more than 15 million women worldwide. Given the 7.7 odds ratio presented by Rai, et al., it likely that a significant number of these women have developed IH, so it is expected that several hundred similar claims exist. In fact, the undersigned law firm expects to file over one hundred lawsuits on behalf of individuals injured by Mirena® LNG-IUS and is currently aware of several hundred more unfiled cases.

## II. ARGUMENT

Title 28, Section 1407 of the United States Code provides: "When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a). The presence of common factual questions necessitates transfer under § 1407 in order to prevent duplication of discovery and eliminate the possibility of inconsistent pretrial rulings. *In re Eastern Airlines, Inc. Flight Attendant Weight Program Litig.*, 391 F. Supp. 763, 764 (J.P.M.L. 1975). Transfer under § 1407, however, does not require complete identity or even majority of common factual or legal issues as a prerequisite to transfer. *In re Rembrandt Techs., L.P.*, 493 F. Supp. 2d 1367, 1369 (J.P.M.L. 2007); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 173 F. Supp. 2d 1377, 1379 (J.P.M.L. 2001).

A. **<u>Movants' Claims Involve Common Questions of Law and Fact against the Same Defendants.</u>**

Movants all assert that they suffered injuries and damages as a result of levonorgestrel, a potent synthetic hormone, released from the Mirena® LNG-IUS, a pharmaceutical product designed, manufactured, advertised, and distributed by Bayer. All of Movants' lawsuits name the

Case MDL No. 2767 Document 1-1 Filed 12/29/16 Page 7 of 15

same Bayer entities as defendants. Questions common to all suits arise from the underlying facts and course of conduct alleged in each complaint. Specifically, Bayer's actions relating to the design, manufacture, sale, testing, marketing, advertising, promotion, and/or distribution of Mirena® form the basis of each lawsuit. Such common questions include:

1) Whether Bayer failed to warn and/or adequately warned innocent consumers and physicians about the known association between levonorgestrel and IH;

2) Whether Bayer intentionally, deliberately, knowingly, carelessly, recklessly, or negligently misrepresented, omitted, concealed, or suppressed material and important information regarding the true and known risks of levonorgestrel usage, including IH, from physicians and Plaintiffs;

3) Whether Bayer's conduct in marketing, advertising, and/or promoting the Mirena® LNG-IUS was negligent;

4) Whether Bayer's conduct was negligent and/or intentional in failing to properly, fully, and/or thoroughly study and test the Mirena® LNG-IUS;

5) Whether Bayer's misconduct constitutes a breach of any warranty or warranties recognized by law;

6) Whether Bayer's misconduct constitutes a violation of any applicable consumer protection and/or fair trade practices laws;

7) Whether Movants are entitled to recover damages from Bayer, including compensatory damages and/or punitive or exemplary damages; and

8) If damages are available to Movants, the method or methods by which such relief should be determined.

All of the Movants allege that their IH injuries were caused by levonorgestrel released from the Mirena® LNG-IUS through the exact same mechanism of action. As such, there are common questions of science that will be presented in each of these cases and which will likely be supported by the same expert witnesses, both for the Movants and Bayer.

Transfer is therefore appropriate and necessary given the significant number of common questions of law and fact present in this litigation. This necessity is particularly clear in these cases because all actions relate to the same defendants, the same injury, and

Case MDL No. 2767 Document 1-1 Filed 12/29/16 Page 8 of 15

the same pharmaceutical product.

**B. <u>Coordination Serves the Best Economic and Equitable Interests of the Parties, Counsel, and Judiciary.</u>**

Coordination of these actions serves the best interests of the parties, parties' counsel, and the judiciary by conserving economic resources and equitably preventing inconsistent rulings. Unless Movants' claims are centralized and coordinated, the parties and courts will be forced to spend a great deal of time, effort, and money litigating common issues of both fact and law. Furthermore, the parties may be prejudiced by various courts entering contradictory rulings on discovery and evidentiary issues common to all claims. Such disparate rulings will lead to more litigation and, ultimately, to incongruous results and bad precedent. In contrast, coordination avoids the pitfalls of piecemeal litigation by resolving disputes related to common issues in one singular ruling. *In re StarLink Corn Products Liability Lit.,* 152 F.Supp.2d 1378, 1380 (J.P.M.L. 2001).

Coordinated pretrial proceedings conserve the time, effort, and financial resources of the judiciary and the parties, while simultaneously eliminating the possibility of inconsistent rulings from sister courts in parallel proceedings that might impair the equitable and orderly administration of justice. *See, e.g., In re Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig.*, 883 F. Supp. 2d 1355, 1356 (J.P.M.L. 2012) ("Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings; and conserve the resources of the parties, their counsel and the judiciary"); *In re DePuy Orthopaedics, Inc.*, 753 F. Supp. 2d 1378, 1379 (J.P.M.L. 2010) ("Centralization under Section 1407 will eliminate duplicate discovery, prevent inconsistent trial rulings on discovery and other issues, and conserve the resources of the parties, their counsel and the judiciary").

Motions, including case dispositive motions and evidentiary motions seeking to exclude

Case MDL No. 2767 Document 1-1 Filed 12/29/16 Page 9 of 15

expert testimony under Federal Rule of Evidence 702, have already been filed in nearly identical Mirena® IH cases. In fact, the United States District Court for the Western District of Missouri, Western Division, has already ruled on both plaintiffs' and Bayer's Rule 702/*Daubert* motions in three Mirena® IH cases. *Hoover v. Bayer Healthcare Pharmaceuticals Inc., et al.*, Case No. 3:14-cv-05090-SRB, Dkt. No. 126 (W.D. Mo., Dec. 20, 2016); *Miller v. Bayer Healthcare Pharmaceuticals Inc. et al.*, Case No. 4:14-cv-00652-SRB, Dkt. No. 121 (W.D. Mo., Dec. 20, 2016); *Sellers v. Bayer Healthcare Pharmaceuticals Inc., et al.*, Case No. 4:14-cv-00954-SRB, Dkt. No. 114 (W.D. Mo., Dec. 20, 2016). If these cases are not consolidated, similar motions will be presented to more than sixteen different courts. This will permit a dangerous opportunity for disparate rulings, creating unnecessary work for the federal appellate judiciary and substantial uncertainty for the parties. In addition to the possibility for disparate rulings, an absence of coordination will require multiple courts, all of which have busy case dockets, to spend time considering motions regarding the same issues. The Mirena® IH cases involve complex questions related to medical causation and corporate liability. As such, motions in these cases require consideration of many thousands of pages of legal briefing, exhibits, deposition transcripts, and scientific literature. In light of 28 U.S.C. § 1407, the inefficient and inequitable framework of multiple courts considering and ruling on motions regarding the same discovery, evidentiary, and case-dispositive issues can be, and therefore should be, prevented through transfer and coordination.

Moreover, in litigation bearing both common and unique issues of fact, it is important that the actions be allowed to go forward before a single judge who can establish a pretrial program under which pretrial proceedings with respect to any non-common issues proceed concurrently with pretrial proceedings on common issues. *In re Smith Patent Litig.*, 407 F. Supp. 1403, 1404

Case MDL No. 2767 Document 1-1 Filed 12/29/16 Page 10 of 15

(J.P.M.L. 1976). *See also In re Nexium (Esomeprazole) Prods. Liab. Litig.*, 908 F. Supp. 2d 1362, 1363 (J.P.M.L. 2012) (stating that "[t]he transferee court can employ any number of pretrial techniques – such as establishing separate discovery and/or motion tracks" to manage individual questions of fact). In addition, if the actions are not centralized in one location, counsel for both parties will be forced to litigate actions in several different courts concurrently, and scheduling conflicts will likely result and potentially cause delay for multiple courts. Finally, it is essential to ensure that all parties have access to the same essential documents and discovery without concerns over duplication of costs and effort or inconsistencies in document production.

As this Panel is well aware, coordination will prevent costly and inefficient duplication of discovery efforts, which will benefit both plaintiffs and defendants. In the absence of Section 1407 coordination, it will be necessary for Bayer's employees and witnesses to be deposed multiple times. In fact, each plaintiff who files a lawsuit will have the opportunity to depose the employees responsible for designing, marketing, labeling, and manufacturing Mirena®. Further, Bayer will be forced to respond to hundreds of different sets of discovery requests. If the cases are consolidated, the parties can work together to prevent duplication of discovery, which will prevent waste of time and resources by all parties and the judiciary. All parties will benefit from the more efficient discovery process that will attend coordination of these cases.

Service of process in these cases further exemplifies the need for transfer. Specifically, all plaintiffs currently must serve Bayer Pharma AG, a German corporation, and Bayer Oy, a Finnish corporation, using methods authorized by The Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Convention"). Under The Hague Convention, each plaintiff must have her complaint translated into German before service of process can be attempted. *See* Hague Convention, Art. 5. The document must

Case MDL No. 2767 Document 1-1 Filed 12/29/16 Page 11 of 15

then be served on the respective country's central authority, which will either accept or reject service.

Service pursuant to The Hague Convention is a burdensome and expensive undertaking. Further, it is not uncommon for the plaintiffs' attempts to serve Bayer Pharma AG to be rejected by the German Central Authority, causing additional expense and delay in the proceedings. Further, without formal Section 1407 consolidation, the parties cannot agree to streamlined procedures for service of process. *See, e.g., Davis v. Jobs & Adverts Online, GmbH,* 94 F. Supp. 2d 719, 721 n.7 (E.D.Va. 2000). However, where cases are coordinated pursuant to §1407, the parties can agree to streamlined service of process procedures that conserve time, money and resources that are better spent prosecuting, defending, and managing the cases. *See, e.g.*, *In re: Yasmin and Yaz (Drosperenone) Marketing, Sales Practices and Relevant Products Liability Litigation*, 3:09-md-02100, Dkt. No. 3171 (S.D.Ill., December 20, 2013).

Therefore, Section 1407 coordination is necessary to avoid disparate rulings from district courts across the country, unnecessary and duplicative work for the judiciary, and inefficient litigation of these cases.

**C. <u>The Southern District of Mississippi is the Proper Transferee Forum.</u>**

The Movants request that these cases be transferred to the Southern District of Mississippi, Southern Division. The criteria used by the Judicial Panel on Multidistrict Litigation in determining the most appropriate transferee forum under 28 U.S.C. § 1407 include the convenience of the parties and witnesses; the relative degree of progress achieved in pending actions; the location of parties, witnesses, and documents; the likelihood that a given district's location would enhance the prospects for cooperation among the federal and state courts; and, when no clear choice emerges from these factors, the preference of the majority of the parties. *In*

Case MDL No. 2767 Document 1-1 Filed 12/29/16 Page 12 of 15

*re Factor VIII or IX Concentrate Blood Prods. Liab. Litig.*, 853 F. Supp. 454, 455 (J.P.M.L. 1993); *In re New Mexico Natural Gas Antitrust Litig.*, 482 F. Supp. 333, 337 (J.P.M.L. 1979). For example, in the phenylpropanolamine (PPA) MDL, the Panel selected a transferee court based in part on the fact that it was "a major metropolitan court that (i) is not currently overtaxed with other multidistrict dockets, and (ii) possesses the necessary resources to be able to devote the substantial time and effort to pretrial matters that this complex docket is likely to require." *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 173 F. Supp. 2d 1377, 1379-80 (J.P.M.L. 2001).

The Southern District of Mississippi has an efficient civil docket and is not currently overtaxed. Further, it is a location that will be convenient for all parties involved.

Therefore, under the Section 1407 criteria, the Southern District of Mississippi is the best location for coordination of these actions.

**1. The Southern District of Mississippi is Efficient and Has the Resources Necessary to Commit to Managing this Litigation.**

The Southern District of Mississippi has an efficient civil docket. The median time from filing to trial was 23.6 months in 2015 and 22.6 months in 2014.[2] Additionally, the Southern District, Southern Division, does not currently have an MDL pending before it, so it is not overly taxed with the administrative and judicial responsibilities that accompany an MDL. Finally, as of June 30, 2016, the Southern District of Mississippi only had 1,449 cases pending in its four courthouses.[3] Therefore, the Southern District of Mississippi, Southern Division, has the ability and resources to efficiently manage the Mirena® Levonorgestrel-Related Intracranial Hypertension Product Liability cases.

[2] http://www.uscourts.gov/statistics-reports/analysis-reports/statistical-tables-federal-judiciary.
[3] *Id.*

Case MDL No. 2767 Document 1-1 Filed 12/29/16 Page 13 of 15

### 2. The Southern District of Mississippi Best Serves the Convenience of Parties and Witnesses.

"[T]ransfers shall be made by the judicial panel on the multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a).

Convenience of parties and witnesses includes consideration of the accessibility to the transferee jurisdiction to counsel from multiple jurisdictions. *E.g., In re High Pressure Laminate Antitrust Litig.,* 2000 US Dist. LEXIS 14849; *In re Polyester Staple Antitrust Litig.*, 259 F. Supp 2d. at 1376; *See also* Gregory Hansel, *Extreme Litigation: An Interview with Judge Wm. Terrell Hodges, Chairman of the Judicial Panel on Multidistrict Litigation*, 19 Me. B.J. 16, 19 (2004) ("[W]e take into account…the accessibility of the court, particularly air travel in selecting a transferee district.").

The Southern Division of the Southern District of Mississippi is located within five miles of Gulfport-Biloxi International Airport, which provides many convenient flight options. This airport is served by three major airlines, including American Airlines, Delta, and United Airlines. The number of flight options into and out of Gulfport-Biloxi International Airport and its proximity to the courthouse will increase convenience for the parties and attorneys involved in these cases. The hour long taxi rides to and from the airport for routine status conferences, which are usually to be expected in MDLs located in larger metropolitan areas, will not be required if these cases are transferred to the Southern District of Mississippi, Southern Division.

In addition to its ease of accessibility, this Court is located on the Mississippi Gulf Coast, a region with a heavily developed tourism industry, providing convenient and affordable lodging and dining options for the parties, witnesses, and attorneys who will travel to the District for

frequent Court proceedings. There are hundreds of hotels and restaurants on the Mississippi Gulf Coast, all of which are much more affordable than comparable facilities in larger cities. This will allow the parties and their attorneys to substantially reduce travel expenses, while still having sufficient lodging and dining options.

Transferring these actions to the Southern District of Mississippi, Southern Division, for coordinated and/or consolidated proceedings will be convenient for all witnesses, parties, and counsel who are involved these actions.

## III. CONCLUSION

Movants respectfully move this Panel, pursuant to 28 U.S.C. § 1407 and Rule 6.2 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation, for an order transferring all related Mirena® Levonorgestrel-Related Intracranial Hypertension Product Liability cases to the Southern District of Mississippi, Southern Division, for coordinated and/or consolidated proceedings before the Honorable Louis Guirola, Jr., Chief Judge.

Dated: December 29, 2016.

Respectfully submitted,

/s/ Trevor B. Rockstad
Trevor B. Rockstad
Davis & Crump, P.C.
2601 14th Street
Gulfport, Mississippi 39501
T: (228) 863-6000
F: (228) 864-0907
trevor.rockstad@daviscrump.com
*Counsel for Movants-Plaintiffs*

**COUNSEL FOR PLAINTIFFS IN THE FOLLOWING ACTIONS:**

*Kayla Talley v Bayer Pharmaceuticals Inc., et al.*, Case No., 1:16-cv-447 (S.D. Miss.)
*Octavia Holmes v. Bayer Pharmaceuticals Inc., et al.,* Case No. 4:16-cv-00203 (N.D. Miss.)
*Latonya Hoskin v. Bayer Pharmaceuticals Inc., et al.*, Case No. 3:16-cv-00231 (N.D. Miss.)
*Shakara Carter v. Bayer Pharmaceuticals Inc., et al.*, Case No. 2:16-cv-07331 (D.N.J.)

*Miranda Gledhill v. Bayer Pharmaceuticals Inc., et al.*, Case No. 2:16-cv-07332 (D.N.J.)
*Nancy Hopkins v. Bayer Pharmaceuticals Inc., et al.*, Case No. 2:16-cv-07333 (D.N.J.)
*Andrea Johnson v. Bayer Pharmaceuticals Inc., et al.*, Case No. 2:16-cv-04449 (D.N.J.)
*Maryssa Reese v. Bayer Pharmaceuticals Inc., et al.,* Case No. 2:16-cv-08670 (D.N.J.)
*Jessica Stanley v. Bayer Pharmaceuticals Inc., et al.,* Case No. 2:16-cv-08899 (D.N.J.)
*Tiara Mitchell v. Bayer Pharmaceuticals Inc., et al.*, Case No. 3:16-cv-00816 (M.D. La.)