# EXHIBIT 11

# In the Matter Of:

IN RE: MIRENA IUS LEVONORGESTREL-RELATED PRODUCTS LIABILITY

---

## CONFIDENTIAL

## VIDEOTAPED DEPOSITION OF DR JULIANE SCHOENDORF, VOLUME II

*November 29, 2017*

---

DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------
IN RE:

MIRENA IUS LEVONOROGESTREL-RELATED
PRODUCTS LIABILITY LITIGATION (No. II)

--------------------------------------

17-MD-2767(PAE)

-----------------------

**CONFIDENTIAL**

Videotaped deposition of:

DR JULIANE SCHOENDORF
(Volume II)

taken at:

Hannes Snellman Attorneys Ltd

Eteläesplanadi 20
Helsinki
Finland

on Wednesday, November 29th, 2017

commencing at 9.29am

-----------------------

actually been replaced by the general guidance to say that case is related or not related. That is then -- that determines the reportability criteria of the single case and in terms of spontaneous cases unless it is explicitly stated that the reporter does not suspect a causal relationship, it is always assumed as related.

MR KENNERLY: Can you go to page 86?

A. Yes.

Q. Now the first full paragraph there is about analyzes of spontaneous reporting databases. It says there that:

"The analyzes performed in external spontaneous reporting databases", the language in the middle that ends with "do not provide a signal for increased risk."

This document is dated October 2017. Is it true that performing a disproportionality analysis in a spontaneous reporting database for Mirena and IIH does not provide a signal for an increased risk?

MS COOK: I am going to object to form.

A. What it says is that the analysis performed in these databases emphasize the importance of confounders when interpreting the data coming from spontaneous reports. So the disproportionality

causality.
MR KENNERLY: Now you mentioned a minute ago that there's no -- I don't mean to put words in your mouth, but there's no proven or agreed upon mechanism by which IIH occurs, correct?
MS COOK: Object to form.
A. It is correct IIH is called idiopathic because the actual cause of the condition is not known.
MR KENNERLY: Now, are there biologically plausible mechanisms that have been proposed as the underlying cause of IIH?
MS COOK: I object to outside the scope. Go ahead.
A. So several hypothesis will have been proposed as potential mechanisms, but they have been discussed in the literature and none of them has been established as really the cause of IIH.
MR KENNERLY: Sure, but my question is specific. Does Bayer believe that any of these proposed mechanism are biologically plausible?
MS COOK: Objection. Outside the scope.
A. So, as said, there are several hypothesis have been proposed on how IIH may be caused and what mechanisms may cause IIH, but really

none of them have been established as the underlying cause of the disease, so -- yes.

MR KENNERLY: Just to clarify, I am not asking if it is established. I am asking if Bayer believes that any of these proposed mechanisms are biologically plausible?

MS COOK: Objection. Outside the scope. Object to form.

A. So since none of them have been established and -- since none of them have been established as the mechanism in which IIH is caused, so there is no established biologically plausible mechanism that we can identify by which Mirena would cause some IIH.

MR KENNERLY: So in Bayer's view a mechanism has to be established before it can be biologically plausible?

MS COOK: Objection. Outside the scope.

A. So a biologically plausible mechanism is something that you would consider in your causality assessment, and I assume we are still talking here about the causality assessment with regards to Mirena and IIH. So in order to look at whether there is a biologically plausible mechanism we have looked at the different hypothesis that have

been proposed, most of which don't have anything to do with hormones, many of which don't have anything to do with progestins, and the ones that have been suggested involving progestin are actually not biologically plausible to be applicable to Levonorgestrel Ius. So in summary, looking at the hypotheses that are out there we could not identify a biologically plausible mechanism by which Levonorgestrel Ius use causes IIH.

MR KENNERLY: In Bayer's view is it biologically plausible that hormones play a role in causing IIH?

MS COOK: Objection. Outside the scope. Go ahead.

A. So as discussed in our response document to the BfArM, since it has been established that the female gender and women of reproductive age are risk factors for developing IIH, it is a valid hypothesis to investigate further whether there is influence of sex hormones on the development of IIH. But none of these hypothesis have been really established as the mechanism of IIH at this point.

MR KENNERLY: Now, we talked before about how clinical trials are not really an appropriate mechanism to prove or disprove a causal association

Q. And in page 85, if you turn to that, there is a reference to literature discussing cases of IIH with Norplant, do you recall that?
A. Yes.
Q. And do you remember being asked about the fact that Jadelle or Norplant 2 has a warning for IIH on it?
A. Yes, I recall.
Q. And what's your understanding as to why there is a warning on the Jadelle label related to reports of IIH?
A. So that is for historical reasons since Jadelle is the successor product of Norplant, sometimes referred to as Norplant 2, and the Norplant label -- in the Norplant label a wording was included in the '90s saying that cases of IIH have been reported in Norplant users, based on the fact that there were spontaneous cases reported for Norplant at the time. So when Jadelle as a successor product, when the Jadelle label was put together a lot of the language that is contained, that was contained in the Norplant label was taken over for Jadelle as well.
Q. And the Jadelle label that was originally put into place, was that a label that was put into place -- withdrawn.

You discuss the Norplant case reports and the BfArM response?

A. Yes, I do.

Q. And did the Company conclude that the Norplant case reports provide evidence of an increased risk with Levonorgestrel products?

A. No, so as single case reports they do not provide evidence for a causal association. That is actually also discussed by the first authors of the publication that mention these, that it is not possible to establish a causal association based on these case reports. Nevertheless, at the time I assume I wasn't involved in the discussions at the time, but I assume that based on these published case reports a corresponding language was included in the Norplant label that was later then transferred to the successor product Jadelle.

Q. Do you still have the Valenzuela article in front of you, Exhibit 28?

A. Yes.

Q. If you turn to page 4, the discussion section, the bottom paragraph?

A. Yes.

Q. It says:

"Previous reports on another LNG

contraceptive implant Norplant, suggested in association with PTC as in the present report."

Which refers to this Mirena article, right?

A. Right.

Q. "These previous reports did not imply a causative role for LNG in the pathogenesis of PTC."

Do you see that?

A. Yes.

Q. And is that consistent with your conclusions in the BfArM assessment and signal assessments?

A. That is consistent with our conclusions, yes.

Q. And if there is not evidence of a causative role for LNG why hasn't the Company taken the Jadelle warning out of the label?

A. Well, we have discussed that in the Company. It is just so that a warning that is contained in a product labeling, to remove it you have to go to the health authorities to ask for permission to remove it, and that requires the submission of new relevant data on that product and referring to the warning in question. And since Jadelle is a product where the post-marketing exposure is lower and there are no newly available

data really that we could use for such a submission to request a warning, we decided to go the other way to include an additional sentence in the labeling that states exactly that, that the evidence for this warning is based on isolated case reports coming from spontaneous adverse event reporting only.

Q. Is Jadelle even sold in the United States?

A. No, it is not.

Q. And it is -- I believe that you said we decided to, instead of deciding to request a warning, did you mean instead of deciding to request removal of the warning?

A. Yes, sorry, it is getting very late. So what I meant is we discussed whether we would have a data package that is necessary to request the removal of the existing warning in the Jadelle label, and came to the decision that this is not the case.

Q. Okay. And as part of the BfArM assessment did your team look at all of the other Bayer products, hormonal products to see whether there were IIH warnings anywhere for them?

A. Yes, we looked at all products, all hormonal products containing Levonorgestrel, either as mono or in combination, and we also looked at all

other progestin containing products that are marketed by Bayer, and looked at even on a country level on the country labels of all of these products within the European Union, and we came to the result that actually none of the other products, except for Jadelle, includes any warning on idiopathic intracranial hypertension.

Q. And this is Exhibit 30.

(Exhibit 30 marked for identification)

Is it the analysis that your team put together of all the other hormonal products at Bayer?

A. Yes, that is correct, that is the analysis.

Q. And the only product to have a warning on IIH anywhere is Jadelle?

A. Yes, that is correct.

Q. And why is it that you haven't recommended adding a warning about IIH to the Mirena label?

A. Because based on the currently available data there is no increased risk for IIH when using Mirena, so adding such a warning is not warranted.

Q. And is that the conclusion that you came to in the BfArM assessment?

A. That is also the conclusion that we came to in the BfArM assessment report.

Q. And if you have the Valenzuela in front of you still, if you look at the last page, the very conclusion of the Valenzuela article, do you see where it says:

"We do not recommend the removal of LNG Ius from women with PTC as a benefit of effective contraception for these women likely outweighs the risk. Likewise, if a woman with PTC or at risk for PTC needs contraception an LNG Ius should be considered as an effective form of contraception."
Do you see that?

A. Yes.

Q. And is that consistent with the conclusion that you have reached?

A. Yes, that is consistent with our conclusions.

Q. And is that conclusion consistent with your views today?

A. Yes, that is consistent with our views today.

Q. Has the FDA ever recommended any information or labeling to be added to the Mirena label related to IIH?

CERTIFICATE OF COURT REPORTER

I, Kay Hendrick, an accredited real-time reporter subcontracted by Discovery Litigation Services, hereby certify that the testimony of the witness, Juliane Schoendorf, in the foregoing transcript taken on Wednesday, November 29th, 2017 was recorded by me in machine shorthand and was thereafter transcribed by me; and that the foregoing transcript is a true and accurate verbatim record of the said testimony.

I further certify that I am not a relative, employee, counsel or financially involved with any of the parties to the within cause, nor am I an employee or relative of any counsel for the parties, nor am I in any way interested in the outcome of the within cause.

Signed: ........................
Name: Miss Kay Hendrick
Dated: December 23rd, 2017